UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INRE:                                                    Chapter 9

City of Detroit, Michigan,                               No. 13-53846

      Debtor.                                          Hon. Steven W. Rhodes

OBJECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE
DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE
LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT
POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S
BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS
UNDER 11 U.S.C. SECTION 109{c)

     The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police

Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants

Association (the "DPLSA") and the Detroit Police Command Officers Association

(the "DPCOA") (collectively, the ''Detroit Public Safety Unions"), through their

counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state their Objection to

Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C.

Section 109(c) as follows:

INTRODUCTION

    1.    The City of Detroit (the "City") cannot establish that it is eligible to

be a chapter 9 debtor under Section 109(c) of the Bankruptcy Code. First, the City

cannot demonstrate that its petition was "specifically authorized by State law ...

or by a governmental officer ... empowered by State law to authorize such entity

to be a debtor ..." as required by Section 109(c)(2) because one of the City's

express purposes in seeking authorization to file the petition is to attempt to use

these chapter 9 bankruptcy proceedings to illegally impair the constitutionally

protected pension rights of the Detroit Public Safety Union employees,[1] other City

employees and City retirees, in direct violation of the Michigan Constitution, Art.

IX, Sec. 24 and Public Act 436, MCL 141.1541, *et seq.* Second, the City's failure

(and, indeed, in many instances, its refusal) to negotiate in good faith with the

Detroit Public Safety Unions prior to filing the petition as required by Section

109(c)(5)(B) should render the City ineligible to be a Debtor in these proceedings.

Third, in light of the City's refusal to negotiate with the Detroit Public Safety

--------------------------------

[1] The Public Safety Unions, as set forth more fully herein, strenuously disagree that any of the Emergency Manager, the City or the Governor can use the protections afforded by Chapter 9 of the Bankruptcy Code as limited by the 10th Amendment of the United States Constitution to enlarge their state and federal constitutionally limited authority in direct violation of that authority. Nevertheless, the Emergency Manager, supported by the Governor, has repeatedly and publicly articulated an intention to do so, and, given that the filing of the Petition was temporally related to efforts by City retirees and the Retirement Systems to obtain state court orders that would unequivocally declare that the Governor and the Emergency Manager lacked the constitutional authority to impair those pension rights in any venue. See State Comt Complaints, Filed July 8, 2013 and July 17, 2013, Exhibit 6.1 to Motion of Debtor, Pursuant to Section 105(a) ofthe Bankruptcy Code For Entry of An Order Extending the Chapter 9 Stay [Docket No. 56, pp. 26-62].

Unions and the minimal time the City allotted for such negotiations to occur, the City should not now be pe1mitted to claim that such negotiations were impractical under Section 109(c)(5)(C). Finally, given the haste with which this chapter 9 filing occurred, the absence of any evidence of specific, give-and-take negotiations in any of the declarations and documentary evidence submitted in support of the City's petition, and given the Governor, the City and the Emergency Manager's express purpose in attempting to use these chapter 9 proceedings to illegally impair the constitutionally protected, accrued pension rights of the Detroit Public Safety Unions' active members, retirees (as well as thoe of other City employees and retirees), the City has failed to meet its burden under Section 109(c) of the Bankruptcy Code, its petition was not filed in good faith, as required by Section 921(c) of the Bankruptcy Code and, therefore, must be dismissed.

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper before this Court under 28 U.S.C. §1409(a).

3. The Detroit Public Safety Unions, whose collective members provide police and fire protection to the City on a daily basis under extremely difficult conditions, acknowledge that the City faces serious and severe financial challenges that must be addressed, and the Detroit Public Safety Unions have been and are prepared to work with the City to tackle those challenges. However, for the

reasons set forth herein, the Detroit Public Safety Unions believe that the filing of the Petition was defectively authorized and premature.

4.  As a result of the severe economic challenges facing the City, the members of the Detroit Public Safety Unions must do more with fewer active members and less resources under increasingly difficult conditions. At the same time, the active members of each of the Detroit Public Safety Unions have seen their wages and benefits, including their future pension benefits, unilaterally reduced by the City, even as they attempted to negotiate with the City.

5.  Contrary to certain statements made by the City in the papers filed with this Comt and other statements made to the public by the Emergency Manager and the Governor, the Emergency Manager has not negotiated in good faith with the Detroit Public Safety Unions. In the weeks leading up to the City's chapter 9 :filing, there were no negotiations. Rather, the City and the Emergency Manager held two publicly tlumpeted "informational meetings" with the Detroit Public Safety Unions. Both occmTed within a week of the filing of the Chapter 9 petition. As set forth more fully herein, the timing of these meetings, and the content of the meetings, was insufficient to satisfy the requirements of 11 U.S.C. §109(c)(5)(B).

6.  Fmthermore, prior to the filing of the petition, as set forth more fully herein, the City and the Emergency Manager have consistently refused to negotiate

4

with the Detroit Public Safety Unions over terms and conditions of employment under both the former Emergency Manager Law, PA 4, MCL 141.1501, *et seq,* (which was overwhelmingly repealed by Michigan voters in 2012) and since the Emergency Manager's appointment under Public Act 436, MCL 141.1541, *et seq.*

7.     Contrary to the City's claimed efforts to negotiate in good faith, at least with regard to the Detroit Public Safety Unions, the City has consistently sought to block the Detroit Public Safety Unions' efforts to negotiate terms and conditions of employment.   The City has yet to provide the Detroit Public Safety Unions with a concrete restructuring proposal.

8.     At the direction of the Emergency Manager, the City instead successfully convinced the Michigan Employment Relations Commission to dismiss petitions filed by some of the Detroit Public Safety Unions seeking arbitration under Public Act 312, MCL 423.231, *et seq* ("Act 312"i, on the basis that the City has no duty to bargain with the Detroit Public Safety Unions. Subsequent to the successful dismissals, the City indicated its intent to unilaterally impose less favorable terms and conditions of employment on the Union members,

---

² Act 312 is based on"... the public policy of this state ...," which recognizes,"... . that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternative, expeditious, effective and binding procedure for the resolution of disputes." Act 312 provides the remedy for police and firefighter bargaining units if the municipality refuses to negotiate or negotiations are otherwise unsuccessful.

including reduced pay, increased health care premiums, deductibles and co-pays and reduced future pension benefits, and, in the case of some of the Detroit Public Safety Unions, in fact imposed such terms.

9.    The Emergency Manager, prior to filing the chapter 9 Petition, stated his intention to use chapter 9 to significantly impair the vested pension rights and benefits of City employees and retirees.[3]  These pre-petition statements provide the basis for establishing both the lack of proper legal authorization for the Petition and the Emergency Manager's intent to avoid the required pre-petition good faith negotiation process.

10.   Because the City cannot satisfy the requirements of 11 U.S.C. §109(c), it therefore does not qualify to be a debtor under chapter 9.

<u>FACTUAL BACKGROUND</u>

11.   The background narrative of the City's financial problems does not need to be repeated in this objection.  All parties understand that the City is in a woeful financial condition.  Nonetheless, that financial condition does not relieve the City of the need to satisfy the requirements of 11 U.S.C. §109(c).

12.    In the Declaration of Kevyn D. On in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the

---

[3] See, for example, the Proposal for Creditors, Doc. 11-1, page 76 -78, "Labor Costs and Terms and Conditions", "Salaries and Wages", "Operational Efficiencies/Work Rules"; page 109 "Claims for Unfunded Pension Liabilities."

Bankruptcy Code [Doc. No. 11] (the ''Orr Declaration''), and in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Doc. No. 14] (the "Memorandum"), the City asserts that it has satisfied the requirements of §109(c)(5)(B) and (C). The Detroit Public Safety Unions contest this assertion. Specifically, the Detroit Public Safety Unions believe that the City cannot satisfy the requirements of §109(c)(2) or (5), as set forth in more detail below.

13. On March 14, 2013, the Governor appointed Kevyn Orr as Detroit's Emergency Financial Manager pursuant to 1990 PA 72, MCL 141.1201, *et seq,* Orr assumed that role on March 24, 2013 (Orr Declaration, 78). On March 28, 2013, PA 436, MCL 141.1541, *et seq.* became effective and Orr became the Emergency Manager under PA 436.

14. Since the Emergency Manager's appointment, the City has steadfastly declined to negotiate with the Detroit Public Safety Unions, claiming it has no obligation to do so under PA 436. See, generally, Exhibit A, Declaration of Mark Diaz (the ''Diaz Declaration'') and Exhibits 1 and 2 thereto; Exhibit B, Declaration of Daniel McNamara (the "McNamara Declaration") and Exhibits 1 and 2 thereto; Exhibit C, Declaration of Mark Young (the "Young Declaration") and Exhibit D, Declaration of Mary Ellen Gurewitz, Esq. (the "Gurewitz Declaration").

15. However, on June 14, 2013, the Emergency Manager held a meeting at the Westin Hotel at Detroit Metropolitan Airport with the City's creditors, including the Detroit Public Safety Unions. That meeting was an en masse event at which the City presented ce1tain general information about its restructuring intentions; questions were answered, but no negotiations took place. See "City of Detroit Proposal for Creditors" dated June 14, 2013 (the "June 14 Creditor Proposal'') to all creditors in attendance [See Doc. No. 11-1] (On Declaration 80). The June 14 Creditor Proposal was a general overview of the financial condition of the City, the condition of city services and issues regarding payment of personnel, including the members of the Detroit Public Safety Unions. It also had broad proposals for creditor treatment including proposals that would significantly impair the accrued financial benefits of the Detroit Public Safety Union members and retirees. See Restructuring Proposal, [Docket 11-1, p. 60] (attached as Exhibit to On Declaration).

16. On June 20, 2013, the Emergency Manager held a second meeting with various unions and their representatives, including the Detroit Public Safety Unions, at which the City informed the Detroit Public Safety Unions of its intent to propose steep cuts to their pension and health care benefits.

17. A third meeting took place with each of the Detroit Public Safety Unions during the week of July 12, 2013 regarding these proposed cuts. Again the

8

City made it clear that it was not negotiating with the Detroit Public Safety Unions although they were welcome to propose their own restructuring plan. The City also indicated that it would be unwilling to negotiate any terms of such a restructuring plan unless agreement was first reached on actuarial assumptions—one of the central and most hotly disputed issues in these Chapter 9 proceedings. See Exhibit 2 to Exhibit B, McNamara Declaration.

18.     Nevertheless, in response, on July 12, 2013, the Detroit Public Safety Unions jointly wrote to the City's counsel, asking for a more concrete restructuring proposal to which they could respond.     See Exhibit 1 to Exhibit B, McNamara Declaration.

19.     On July 16, 2013, the Emergency Manager sought the Governor's authorization to file these Chapter 9 proceedings.     Orr Declaration, Exhibit J [Docket 11-10].

20.     On July 17, 2013, the Detroit Public Safety Unions received a letter from the Emergency Manager's counsel, which indicated that the Emergency Manager wanted to first reach agreement on actuarial assumptions and which provided no substantive proposals. See Exhibit B, 8 and Exhibit 2 to Exhibit B.

21.     The following day, July 18, 2013, the City filed its Chapter 9 Petition.

22.     As set forth more fully herein, with regard to the Detroit Public Safety Unions, the content of the discussions at the June 14[1]h meeting and the follow up

9

meetings were very general, and the City continued to indicate, through the Emergency Manager, that the meetings should not be construed as negotiations. See Exhibits A, B and C. The specifics of the City's dealings with each of the Detroit Public Safety Unions during the time period leading up to and immediately following the Chapter 9 filing are set forth below. Those dealings and the declarations that support them make it clear that the City did not meet its pre-filing obligation of good faith negotiations with the Detroit Public Safety Unions, or, upon information and belief, other unions or the Retirement Systems about a plan of adjustment.[4]

## THE DPOA

23.    The DPOA consists of nearly 2000 active Detroit police officers. The DPOA's experience is addressed first because, while the DPOA has also experienced the City's refusal to negotiate, it is the only one of the Detroit Public Safety Unions who managed to obtain an Act 312 arbitration award which sets forth the terms and conditions of an employment contract with the City. Specifica11y, on March 25,2013, only days before the effective date ofPA 436, the Act 312 memorializing the terms and conditions of employment between the City

---

[4] The March 26, 2012 Report of the Financial Review Team [Doc. No. 11-4] references the participation between the Review Team and officers of the DPOA, DPCOA, DPLSA and DFFA. The Public Safety Unions were clearly known to the City prior to June 14, 2013.

and the DPOA was issued (the "Award").[5]  A copy of the award is attached  to Exhibit A, Diaz Declaration as Exhibit 1.

24.  Significantly, the Award recognized the record number of issues presented for arbitration were the direct result of the City's refusal to negotiate and its insistence on imposing on the DPOA a series of demoralizing and not necessarily cost-saving City Employment Tetms ("CETs'') under the now-repealed Public Act 4, fmmer MCL 141.1501, *et seq.*  Exhibit **1** to Exhibit A, Award at p. 28. Among the Award's specific findings were:

> . . . The number of issues are as a result of the fact the City imposing in July 2012 without fmther negotiation the City Employment Terms which in many details had 1ittle rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to ''gut'' the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312
> proceedings.  Such an approach brought fmth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere,  and had the effect of overlooking the welfare of the public, *i.e.,* the need for an efficient, effective Detroit Police Department.  This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan.  It is for this reason that the Chai1man, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will

---

[5]  A portion of the Award (a 5% wage increase awarded to DPOA members, effective January **1,** 2014) has been challenged by the City and is the subject of pending but stayed litigation.  See Diaz Declaration,  [5.

> reject in total the City Employment Terms as those terms were not negotiated tetms and were terms implemented under Public Act 4, which act was rejected by the people of the State of Michigan.

25.    The Award further found that, " ... if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced." Exhibit 1 to Exhibit A, Award at p. 29.

26.    The Award further provided for a 5o/o pay raise, effective January 1, 2014 for DPOA members and for the reopening of the Act 312 proceedings to address health care issues after June 30, 2013.    However, the City, through the Emergency anager, filed a complaint for judicial review of the 5% pay raise, which remains pending but stayed by these proceedings.    Exhibit A, Diaz Declaration, ,-r5.  Relying on Public Act 436, the City has declined to reopen the Act 312 proceedings to address health care issues, and instead seeks to unilaterally impose new health care terms on the DPOA.  Exhibit A, Diaz Declaration, ,-r ,-r 8-10.

## THEDFFA

27.    The DFFA consists of all active Detroit fire fighters of all ranks.  It has just under 800 current members.  Relying on PA 436 and claiming it had neither a duty to negotiate or to arbitrate under Public Act 312, the City successfully blocked the DFFA's efforts, as well as the efforts of the DPLSA and

the DPCOA to pursue Act 312 arbitration. See Exhibit B, McNamara Declaration, In a 2-1 decision, the Michigan Employment Relations Commission ruled that, as a result of the Emergency Manager's appointment, it lacked the authority to conduct Act 312 hearings. See Exhibit C, Young Declaration, pp. 2-3.

28.     While, during communications at this time, the City declined to disclose what conditions it intended to impose and made clear its unwillingness to negotiate, the DFFA continued to attempt to engage the City in meaningful discussions regarding its restructuring. See Exhibit 1(7/12/13 Letter) to Exhibit A. By letter dated July 25, 2013, the City infmmed the DFFA that, effective August 16, 2013, its members wages would be cut by 10% across the board, and at a meeting on August 2, 2013 which the City emphatically indicated was not a negotiation, the City presented the terms of new health care plans it intends to impose, which will increase the out of pocket health care costs to be borne by DFFA members by as much as $3000 a year for families.     See McNamara Declaration, ₃[7, 12- 13.

<div align="center">THEDPLSA</div>

29.     Like the DFFA, the DPLSA was blocked in its efforts to engage the City in Act 312 arbitration proceedings.  On June 25, 2013, the City notified the DPLSA of the termination of its collective bargaining agreement effective July 6, 2013 and that it was not requesting bargaining at that time.  After informing the

<div align="center">13</div>

DPLSA that it had no duty to bargain, the Emergency Manager notified the DPLSA that changes to its wages, benefits and working conditions would be forthcoming after August 1, 2013. Exhibit C, Young Declaration, p. 3.

30.     Shortly after the chapter 9 petition was filed, the City's Labor Relations Director informed the DPLSA that the City was prepared to impose terms on its members. In July 31, 2013 conespondence and without any prior negotiation, the City identified 17 terms it intended to implement. Exhibit C, Young Declaration, p. 3.

31.     In response to an August 1, 2013 request from the DPLSA, the City has delayed imposing the 17 terms as of the date of this Objection. Exhibit C, Young Declaration, p. 4.

### THEDPCOA

32.     The DPCOA has been blocked from negotiating with the City and has been subjected to unilaterally imposed City Employment Terms (the "CET") since July of 2012. Its last contract expired in 2009. The CET were a unilaterally imposed set of working conditions, including a 10% wage cut for all DPCOA members. Exhibit D, Gurewitz Declaration, ,l4-5.

33.     As with the DFFA and the DPLSA, the City successfully blocked the DPCOA's efforts to proceed to Act 312 arbitration. Following the suspension of PA 4, the DPCOA filed for Act 312 arbitration, an arbitrator was appointed,

14

hearing dates were scheduled for March of 2013, and there were several days of productive negotiations prior to the appointment of the Emergency Manager. However, all negotiations terminated with the Emergency Manager's appointment. Exhibit D, Gurewitz Declaration, ¶6.

34. The Emergency Manager has consistently taken the position that there is no duty to bargain and has refused to bargain or negotiate with the DPCOA. Exhibit D, Gurewitz Declaration, 8.

## ALLEGED IMPRACTICALITY

35. The City also asserts that negotiations were "impracticable" [Memorandum at p. 40]. The Detroit Public Safety Unions assert that there were, and remain, even absent the creation of a Retirees' Committee, sufficient creditor participants with whom the Emergency Manager could have had meaningful negotiations. The City self-imposed an extremely limited time frame for negotiations during which it elected not to negotiate with the Detroit Public Safety Unions. It should not now be permitted to claim those negotiations were impractical.

36. As set forth in the accompanying brief, based upon these facts and applicable bankruptcy, state and federal law, the City cannot meet its burden of showing it is eligible to be a Debtor under Section 109(c).

## RELIEF REQUESTED

WHEREFORE, the Detroit Public Safety Unions respectfully request that the City of Detroit's chapter 9 petition be dismissed.

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By:  */s/ Barbara A. Patek* Earle
I. Erman  (P24296) Craig
E. Zucker  (P39907)
Barbara A. Patek (P34666)
Counsel for the Detroit Public Safety
Unions
400 Galleria Officentre, Suite 444
Southfield, MI  48034
Telephone: (248) 827-4100
Facsimile: (248) 827-4106
E-mail:  bpatek@ermanteicher.com

DATED:   August 19, 2013

F:\OTHERINS\Detroit, City of\Detroit objection  8 19 13 (2).docx

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INRE:                                              Chapter 9

City of Detroit, Michigan,                         No. 13-53846

      Debtor.                                    Hon. Steven W. Rhodes
_____./

BRIEF IN SUPPORT OF OBJECTION OF THE DETROIT FIRE
FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS
ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS
ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS
ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND
STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

# TABLE OF CONTENTS

Index of Authorities ................................................................................................iii

Statement of Facts ...................................................................................................1

Argun1ent....................................................................................................................2

    A. Burden of Proof for Eligibility.................................................................2

    B. Failure to Comply with the Requirements of 11 U.S.C. §109(c)(5) ........3

    C. **11** U.S.C.§921(c) Must Be Looked At In Conjunction With the
Requirements Of§109(c) ...................................................................................... 18
Relief Requested ..................................................................................................... 18

# INDEX OF AUTHORITIES

Cases

*Ashton* v. *Cameron County Water Improvement District Number One,* 236 U.S. 513 (1936) ....................................................................................................3

*Bond* v. *United States,* 131 S. Ct. 2355 (2011) .................................................. 3, 4

*In re City ofStockton, California,* 2013 WL 2629129 (Bankr. E.D. Cal. 2013)....2

*In re City of Vallejo,* 408 B.R. 280 (BAP 9th Cir. 2009).................................... 18

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R. 973 (Bankr. D.Colo. 1992) .............................................................. 7, 16

*In re County of Orange,* 183 B.R. 594 (Bankr. C.D. Cal. 1995) .......................2, 18

*In re Ellicot School Building Authority,* 150 B.R. 261(Bankr. D. Colo. 1992)...........................................................14, 15

*In re New York City Off-Track Betting Corp.,* 427 B.R. 256 (Bankr. S.D.N.Y. 2010).......................................................................................................6, 7, 16

*In re Sullivan County Regional Refuse Disposal District,* 25 B.R. 60 (Bankr. D. N.H. 1994).......................................................................................... 15

*In re Sullivan County Regional Refuse Disposal District,* 165 B.R. 60 (Bankr. D.N.H. 1994)............................................................................7, 17

*In re Valley Health System,* 383 B.R. 156 (Bankr. C.D. Cal. 2008)......2, 17, 18

*In re Villages at Castle Rock Metropolitan District No. 4,* 145 B.R. 76 (Bankr. D. Colo. 1990)......................................................................................17

*United States v. Bekins,* 304 U.S. 27 (1938)........................................4

**Statutes**

28 U.S.C. § 959(b) ............................................................................................5

11 U.S.C. § 943(b)(4).........................................................................................5

11 U.S.C. § 92l(c)........................................................................................5, 18

11 U.S.C. § 109(c)……………………………………………………………….*passim*

Michigan Public Act 436, MCL 141.1541, *et seq* .............................................3

**Other**

Black's Law Dictionary, (9th ed. 2009)..............................................................13

United States Constitution, Art. 1, Sec. 8, Clause 4 ...........................................3

United States Constitution, Am. X…………………………………3, 4, 6, 7

Michigan Constitution, Art. IX, Sec. 24 .........................................................3, 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INRE:                                              Chapter 9

City of Detroit, Michigan,                         No. 13-53846

                 Debtor.                           Hon. Steven W. Rhodes

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

### BRIEF IN SUPPORT OF OBJECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police Officers Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants Association (the ''DPLSA'') and the Detroit Police Command Officers Association (the "DPCOA") (collectively, the "Detroit Public Safety Unions"), through their counsel, Erman, Teicher, Miller, Zucker & Freedman, P.C., state for their Brief in Support of Objection to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c) as follows:

### STATEMENT OF FACTS

The Detroit Public Safety Unions rely on the facts as set forth in their Objec6on.

**ARGUM.ENT**

**A. Burden of Proof for .Eligibility.**

11 U.S.C. §109(c) provides:

An entity may be a debtor under chapter 9 of this title if and only if such entity ---
    **(1)** is a municipality;
    (2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;
    (3) is insolvent;
    (4) desires to effect a plan to adjust such debts; and
    (5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
        (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;
        (C) is unable to negotiate with creditors because such negotiation is impracticable; or
        (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

The City, as the proponent of the chapter 9 petition, bears the burden of proof to show that it is satisfies the elements of 11 U.S.C. §109(c) and is therefore eligible to file a chapter 9 petition. *In re City of Stockton, California,* 2013 WL 2629129 at *19 (Bankr. E.D.Cal. 2013); *In re County of Orange,* 183 B.R. 594, 599 (Bankr. C.D. Cal. 1995), *In re Valley Health System,* 383 B.R 156, 161 (Bankr. C.D.Cal. 2008). This Objection focuses on the requirements of §109(c)(2) and (5) and the good faith requirement of Section 921(c).

2

B.     The City cannot meet the requirements of §109(c)(2) because Section 109(c)(2) must be read in light of the 10th Amendment of the United States Constitution and principles of federalism. To the extent 109(c)(2) can be read to allow impairment of the Detroit Public Safety Union members and retirees' accrued financial benefits under the PFRS in violation of the Emergency Manager and the Governor's oaths of office, the Michigan Constitution, Art. IX, Sec. 24 and PA 436\ Section 109(c)(2) would violate the Detroit Public Safety Union members' and retirees' rights under the l0th Amendment of the United States Constitution, to be free from federal intrusion on matters related to the State's administration of its fiscal affairs.

While the United States Constitution, Art. 1, Sec. 8, Clause 4, authorizes Congress to enact "uniform Laws on the subject of Bankruptcies throughout the United States," the Supreme Court has held that such authority is subject to the limits of the $10^{lll}$ Amendment. *Ashton v. Cameron County Water Improvement District Number One,* 236 U.S. 513 (1936).    *Ashton* has never been overruled. Fmthermore, both the express language of the 10th Amendment[2] and recent Supreme Court case law recognize that the $10^{l}$h Amendment protects not only states' sovereignty but also the individual liberties of citizens.  *See, e.g. Bond v. United States,* 131 S. Ct. 2355 (2011), recognizing that principles of federalism give individuals the right to challenge unconstitutional intrusions into state

---

[1] MCL 141.1541, *et seq.*

[2] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people."* U.S. Const., Am. X (emphasis added).

3

sovereign authority even when the state does not object (or as here "consents") to those intrusions.[3]

One of the stated goals of the June 14 Creditor Proposal, and a position repeatedly and publicly articulated by the Emergency Manager and the Governor, is that chapter 9 will allow the Emergency Manager to dispense with his sworn constitutional obligation to preserve the accrued financial benefits of City employees and retirees, including Detroit Public Safety Union members and retirees, under the City Retirement Systems. Such a reading of chapter 9 is not consistent with the 10th Amendment, which not only protects state sovereignty, but also protects the rights of individuals to be free from federal interference with their vested, state constitutional rights. *See Bond, supra.*

Based upon the City's articulated goal of using the chapter 9 plan it intends to propose to impair the accrued financial benefits to which the DetToit Public Safety Union members and retirees (as well as other City employees and retirees) are entitled, the City cannot put forth a confi1mable plan of adjustment. A plan which contains such provisions would be in violation of the Michigan Constitution and the restrictions placed on the Emergency Manager by PA 436 and his oath of office, and, as such would not be confirmable. If the goal of the chapter 9 is to file

---

[3] To the extent *United States v. Bekins,* 304 U.S. 27 (1938) can be read to allow a State or municipality to use Chapter 9 to breach an express state constitutional obligation to its citizens in violation of individual rights protected by the1Oth Amendment, *Bekins* is no longer good law.

4

a plan which will not be able to be confirmed, the plan, and the proposal of such a plan, is a meaningless event. As such, the proposal of a non-confirmable plan should not be sufficient to satisfy the requirements of 11 U.S.C. §921(c).

> Article IX, Section 24 of the Michigan Constitution states:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

> 28 U.S.C. §959(b) states:

> **(b)** Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

11 U.S.C. §943(b)(4) addresses confirmation of a chapter 9 plan. The section, written in the affirmative, states that "the court shall confirm the plan if— (4) the debtor is **not** prohibited by law from taking any action necessary to cany out the pian" (emphasis added).

The June 14 Creditor Proposal is based on modifying Michigan constitutionally protected rights. The City has been clear that it is wedded to the June 14 Creditor Proposal. However, the Creditor Proposal violates the Michigan

5

constitution in that it seeks a unilateral modification of the Detroit Public Safety

Union members and retirees' pension rights and employment benefits. As such, it

cannot be confirmed. While there is no requirement that the pre-petition plan

proposed by a possible chapter 9 debtor be the plan that is ultimately confirmed *(In*

*reNew York City Off-Track Betting Corp.,* 427 at 274),  it is clear that the June 14

Creditor Proposal is the general template that the City seeks to use as its chapter 9

plan.  It is illogical for the City to be able to obtain an Order for Relief when its

proposed course of action, in fact, the very core of what it is seeking to

accomplish, is the improper impairment of constitutional rights.

> Bankruptcy courts should review chapter 9 petitions with a jaded eye.
> Principles of dual sovereignty, deeply embedded in the fabric of this
> nation and commemorated in the Tenth Amendment of the United
> States Constitution, severely curtail the power of bankruptcy courts to
> compel municipalities to act once a petition is approved. 6 COLLIER
> ON BANKRUPTCY 900.01 [2][c] (observing bankruptcy courts'
> limited power over municipalities due to the Tenth Amendment). *See*
> *also New York v. United States,* 505 U.S. 144, 155-66, 112 S.Ct.
> 2408, 120 L.Ed.2d 120 (1992) (reviewing development of Tenth
> Amendment jurisprudence, recognizing dual sovereignty and
> observing that 'the  Constitution has never been understood to confer
> upon Congress the ability to require the States to govern according to
> Congress' instructions'). This fundamental constitutional principle
> halts bankruptcy courts from regulating or otherwise controlling
> expenditures or activities of municipalities. 5 WILLIAM J.
> NORTON, JR. & WILLIAM L. NORTON III, NORTON
> BANKRUPTCY LAW AND PRACTICE § 90:4 (3d ed. 2009)
> ('Without the consent of the municipality,
> the court may not interfere with any of the political or governmental
> powers of the debtor, any property or revenues of the debtor, or the
> debtor's use or enjoyment of any income-producing property.');
> H.R.REP. NO. 95-595, at 263 (1977), *reprinted in* 1978

6

U.S.C.C.A.N. 5963, 6221 ('[T]he powers of the court are subject to a strict limitation-that no order or decree may in any way interfere with the political or governmental powers of the petitioner, the property or revenue of the petitioner, or any income-producing powers.'). Congress deemed this principle so important it explicitly recognized the limits of bankruptcy courts' powers in section 904.

In light of these concerns, bankruptcy courts scrutinize petitions for relief under chapter 9. *See In re Sullivan County Reg'l Refuse Disposal Dist.,* 165 B.R. 60, 82 (Bankr.D.N.H.l994) (observing that the jurisdiction of bankruptcy courts 'should not be exercised lightly in chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment'); *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr.D.Colo.1992) (noting that constitutional issues in chapter 9 cases caused Congress 'to limit accessibility to the bankruptcy court by municipalities.') (quoting H.R.REP. NO. 94-938, at 10 (1976)) (internal quotation marks omitted).

*In reNew York City Off-Track Betting, 427 B.R. at 264-265 (footnotes omitted).*

The concern about the limitations of chapter 9 by the Tenth Amendment was

also expressed in *In re Sullivan County Regional Refuse Disposal District,* 165

B.R. at 82-83:

The bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases, in light of the interplay between Congress' bankruptcy power and the limitations on federal power under the Tenth Amendment. Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task.

Although the law is rarely painted in strokes of black and white, there are occasionally cases and situations in which there is a need and justification for a 'bright line' rule on a particular legal question. This is such a situation. Municipalities that wish to come into bankruptcy under Chapter 9 in my judgment must, at a minimum,

7

demonstrate that before filing they either used their assessment or taxing powers to a reasonable extent, or in their pre-petition negotiations have committed to the use of those powers as part of a comprehensive and appropriate work out of their financial problems. If they have undertaken that endeavor in good faith, and nevertheless have failed to reach an accommodation with their creditors, they then may be entitled to Chapter 9 relief if they are otherwise qualified.

C. Failure to comply with the requirements of 11 U.S.C.§109(c)(5).

As stated above, 11 U.S.C. §109(c)(5) contains four (4) requirements as part of the qualifications for an entity to be a debtor under chapter 9. Because the City concedes that it has not satisfied §109(c)(5)(A), [Memorandum, page 40, fn. 12], and there is no suggestion that Section 109(c)(5)(D) applies, only Sections 105(c)(5)(B) and (C) are relevant here, and the Detroit Public Safety Unions assert that the City has not satisfied the remaining requirements of those sections.

Specifically, §109(c)(5)(B) requires the City to show that it:

... has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

The Emergency Manager submitted the June 14 Creditor Proposal to creditors just five weeks before obtaining authorization to file. However, well prior to that time, and almost a year prior to the date of the Emergency Manager's appointment on March 14, 2013, the City Financial Review Team issued its initial Report, dated March 26, 2012, advising that the City "is in a condition of severe

8

financial stress". [See Doc. No. 11-4.] This report was supplemented on February 19,2013. [See doc. No.1 1-7.].

The June 14 Creditor Proposal presented general proposals (identified by the Emergency Manager as the "Executive Summary" [Orr Declaration 81]) for dealing with creditors, including the Detroit Public Safety Unions' constituents. It did not provide any substantive information as to how these proposals would be put in place, the timing of any employment and/or benefit modifications, or otherwise give more than a general statement of proposed treatment. In the context of the significant issues facing the Detroit Public Safety Unions' constituents, this was "bare bones" at best. Nonetheless, the Detroit Public Safety Unions were interested in engaging in a dialogue with the Emergency Manager and his team, in an effort to work on the difficult financial issues facing the City. However, there was limited, or no, opportunity to do so, nor was there any meaningful outreach by the Emergency Manager to the representatives of the Detroit Public Safety Unions to negotiate a mutually agreeable settlement. In his Declaration, the Emergency Manager states:

> 84. The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata*

9

distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amm1ization of the principal of such notes in the event that, e.g., future City revenues exceeded certain thresholds, certain assets were monetized and/or ce11ain grants were received. See June 14 Creditor Proposa1, atpp. 101-109.

85. Having provided the facts and strategies contained in the presentation to its creditor body *en masse,* the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case. At these meetings, fur1her data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occun·ed. Impm1antly, following the June 14 presentation, the City: (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

91. On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92. Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors

10

answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room . . . that the City has established as a repository for infonnation that creditors may find relevant in their evaluation of the City's proposals.

93. Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' prefened approach to address the required changes that are expected to be severely dislocating for retirees.

94. Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger. Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions. Others took a more constructive approach. On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95. On July 10, 2013, the City and certain of its advisors held separate meetings with: (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to: (a) provide additional information on the City's pension restructuring proposal; and (b) discuss a process for reaching a consensual agreement on (i) pension underfunding issues and (ii) the treatment of any related claims. At each meeting, the parties generally discussed: (a) the

11

actuarial assumptions underlying the Pension Systems' claims related to underfunding (and that will be used for funding purposes going forward); (b) the City's prospective ability to make contributions to the Pension Systems; and (c) adjustments to pension benefit design necessary to reduce liabilities, and consequent underfunding, to a level that will allow the City to fund the Pension Systems going forward.

96. On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for: (a) select non-uniform unions and retiree associations and the GRS; and (b) certain uniformed unions and retiree associations and the PFRS to discuss retiree health issues. At each of these meetings, the City's advisors reviewed the proposals for the modification of retiree health benefits that previously had been presented and discussed at the prior meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design tenns was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

97. Meetings with Funded Debt and Pension Representatives. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "Bond Insurer"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented to the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

[Emphasis added][footnotes omitted]

It is clear from the Emergency Manager,s Statement that the June 14, 2013 meeting and the follow up meetings were not for the purposes of negotiation of a settlement, but for the sole purposes of providing information on the changes that the City sought to unilaterally put in place and the treatment of the City's debt. This read of the Orr Declaration is corroborated by the experience of the Detroit Public Safety Unions, as documented by the Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A, B, C and D. This is not negotiation as contemplated by the Bankruptcy Code, nor in any other context.

According to Black's Law Dictionary, ($9^t_h$ ed. 2009),

> Negotiation means
> **1.** A consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter.
> **2.** (*usu. pl.)* Dealings conducted between two or more parties for the purpose of reaching an understanding.

According to the Memorandum,

> ...the City convened the June 14 Meeting . . .for the purpose of engaging its creditors with respect to a consensual restructuring of the City's various classes of debt within the framework of the June 14 Creditor Proposal. At the June 14 Meeting, the Emergency Manager openly invited the City's creditors to contact the City and its advisors to begin negotiations. [Memorandum, page 54-55]

This statement, in conjunction with the Emergency Manager's Declaration, supports that the June 14 Creditor Proposal was the only proposal discussed.

13

Despite the invitation to contact the City, the June 14 Creditor Proposal was essentially presented as a "take it or leave it" proposal. The manner of presentation and the subsequent meetings only invited inquiry, and did not invite any deliberation or discussion. There was nothing to suggest that there was any kind of a "consensual bargaining process". Thus, the June 14th meeting and the subsequent meetings do not qualify as "negotiations". See Diaz, McNamara, Young and Gurewitz Declarations, Exhibits A-D.

Further, the City did not engage with all of the required creditors including, specifically, the Detroit Public Safety Unions. The City repeatedly stressed that meetings were not negotiations and that it had no duty to bargain or negotiated. In particular, as the Diaz, McNamara, Young and Gurewitz Declarations make clear (and consistent with the On Declaration), there was no negotiation, whether actual or purported, prior to July 18, 2013, when the City filed its chapter 9 Petition.

11 U.S.C. §109(c)(5)(B) requires that the entity "has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter." Meetings at which the debtor explains its proposed plan of restructuring do not constitute negotiations, especially when a proposal is not open to discussion. There are no good faith negotiations when creditors are presented a plan as a "take it or leave it" proposal. *In re Ellicot*

*School Building Authority,* 150 B.R. 261, 266 (Bankr. D. Colo. 1992), (even

though the court held that the School Building Authority was not qualified to be a

chapter 9 debtor, the judge still analyzed the requirements of 11 U.S.C.

§109(c)(5)(B) and stated that a "take it or leave it" approach is not a good faith

negotiation). Moreover, there is no good faith negotiation if a party "chooses to

ignore clear, unambiguous contractual rights of the other party" *(In re Sullivan*

*County Regional Refuse Disposal District,* 25 B.R. 60, 78 (Bankr. D. N.H. 1994).

It is required that negotiations with creditors, sufficient to satisfy 11 U.S.C.

§109(c)(5)(B), provide creditors sufficient time to evaluate a proposed plan.

> In general, the Bankruptcy Code, as remedial legislation, should
> be broadly construed in order to provide the intended relief. However,
> municipal bankruptcies involve significant problems which are not
> encountered in the private sector. Important constitutional issues arise
> when a municipality enters the bankruptcy arena. Recognizing these
> problems, Congress consciously sought "to limit accessibility to the
> bankruptcy court" by municipalities. H.R. Conference Repmt, 94-
> 938, p. 10, U.S.Code Cong. & Admin.News 1976, p. 539. One way to
> do so was to require the municipal entity, before rushing to this Court,
> to first seek to negotiate in good faith concerning the treatment the
> creditors may be expected to receive under a plan to be filed under
> section 941 of the Code.

> The conditioned entry to this Court which is afforded by section
> 109(c) recognizes that the negotiating posture of the parties changes
> once the bankruptcy petition is filed. It is one thing to negotiate when
> the debtor is being confronted with the pressures of defaults on public
> debt and the requirement of certifying ever-increasing mill levies in
> order to provide for the payment of such debt. It is another when the
> entity is being protected by the stay of section 362 of the Code and the
> bondholders are being faced with an indeterminate period of
> nonpayment of their bonds. The 'creditor protection' provided by

15

section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor before their rights are further impaired by the provisions of section 362 of the Code.

*In re Cottonwood Water and Sanitation District, Douglas County, Colorado,* 138 B.R.    973,979  (Bankr. D.Colo. 1992).

In addition to the lack of meaningful discussion, the short time period between the June 14 Creditor Proposal and the July 18, 2013 filing date of the chapter 9 petition did not leave any time for any serious or meaningful negotiations.   The combination of all of these factors demonstrates that the City did not fulfill the requirement of 11 U.S.C. §109(c)(5)(B).

Neither can the City rely on 11 U.S.C. §109(c)(5)(C) to excuse its failure to negotiate in good faith. That section provides: "[the entity] is unable to negotiate with creditors because such negotiation is impracticable."

A determination of "impracticability" must be made on a case-by case basis, and requires a "fact sensitive inquiry". *In re New York City Off-Track Betting Corporation,* 427 B.R. 256, 277 (Bankr. S.D.N.Y. 2010).  In the present matter, the Detroit Public Safety Unions assert that the limited amount of time between the June 14 Creditor Proposal and the filing date of July 18, left little time for the City to engage the necessary constituents. The number of constituents is not, in and of itself, and should not be, an impediment to negotiations.  It is impossible for the Emergency Manager to say that with additional time outside of the bankruptcy

16

process, he could not engage the necessary creditors to formulate a workable plan. The difficulty in the negotiation process is the result of an artificial time constraint, not necessarily the result of the number of creditors. The Court should not find that negotiations were "impracticable", because the City created the impediment to continued negotiations based on the mtificial time constraint created by the filing on July 18th. (See *Sullivan,* 165 B.R. at 82 ("the decision [to file chapter 9] appears to be a late hour litigation tactic to hold off Wheelabrator's threatened shut-out and an attempt to position the Districts to force some compromises.")) It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate or there was such a limited time for negotiations. *(In re Villages at Castle Rock Metropolitan District No. 4,* 145 B.R. 76, 85 (Bankr. D. Colo. 1990), six months of conceptual discussions with largest bondholder was sufficient to satisfy §109(c)(5)(C).)

The Memorandum justifies terminating negotiations based on projections of year end cash shortages and the possible end of term of the Emergency Manager. However, there still is cash for operations, and the Emergency Manager's appointment would not terminate, absent extension, until mid-September, 2014. The Emergency Manager has not claimed that the City's assets would be at risk if some reasonable time were spent negotiating with the City's creditors. *In re Valley*

*Health System,383* B.R. 156, 163 (Banrk. C.D.Cal. 2008). The requirement of 11

U.S.C. §109(c)(5)(C) has not been satisfied.

**D.   11 U.S.C. §921(c) must be looked at in conjunction with the requirements of §109(c).**

> 11 U.S.C. §921(c) states:

> After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

While this section is written in the permissive ("may dismiss"), courts have held

that this section requires dismissal if the chapter 9 petition was not filed in good

faith or the debtor does not meet the requirements of chapter 9. *In re Valley Health*

*System,* 383 B.R. at 160, *In re County of Orange,* 183 B.R. at 599, *In re City of*

*Vallejo,* 408 B.R. 280, 289 (BAP 9ʰ Cir. 2009).

<div align="center">

**RELIEF REQUESTED**

</div>

WHEREFORE, based on the facts of this matter and the arguments set forth

herein, the Detroit Public Safety Unions request that the chapter 9 Petition be

dismissed.

18

Respectfully submitted,

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By:    */s/ Barbara A. Patek* Earle
       I. Erman  (P24296) Craig
       E. Zucker  (P39907)
       Barbara A. Patek (P34666)
       Counse1 for the Detroit Public Safety
       Unions
       400 Galleria Officentre, Suite 444
       Southfield, MI  48034
       Telephone: (248) 827-4100
       Facsimile:  (248) 827-4106
       E-mail:  bpatek@ermanteicher.com

DATED:  August 19, 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      Case No. 13-53846

      Debtor.
_____/

## CERTIICATE OF SERVICE

The undersigned certifies that on August 19, 2013, the Objection of the Detroit Fire Fighters Association, The Detroit Police Officers Association, The Detroit Police Lieutenants & Sergeants Association and The Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications Under 11 U.S.C. Section 109(c), Brief in Support and Certificate of Service were electronically filed with the Clerk of the Court for the United States Banluuptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

                              */s/ Barbara A. Patek*
                              BARBARA A. PATEK (P34666)
                              Erman, Teicher, Miller,
                              Zucker & Freedman, P.C.
                              400 Galleria Officentrc, Ste. 444
                              Southfield, MI 48034
                              Telephone: 248-827-4100
                              Facsimile: 248-827-4106
                              Email: bpatek(@crmanteicher.com

Dated: August 19,2013

F:\OTHERINS\Detroil, City ot\cerl of service- obj rc pctition.docx

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INRE:                                              Chapter 9

City of Detroit, Michigan,                         Case No. 13-53846

              Debtor.                              Hon. Steven W. Rhodes

_____/

DECLARATION OF MARK DIAZ
IN SUPPORT OF OJBECTION OF THE DETROIT FIRE FIGHTERS
ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION,
THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION
AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION
TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

I, Mark Diaz, declare as follows:

1.     I have been a Detroit Police Officer for nearly twenty years and have

been the President of the Detroit Police Officers Association ("DPOA") since

January 1, 2013. In that capacity, I have been involved in the DPOA's efforts to

negotiate and to arbitrate its labor matters with the City of Detroit. I make this

declaration based on my personal knowledge, and if called upon to do so, I could

and would testify to the facts set forth herein.

2.     This declaration is submitted in support of the Objection of the Detroit

Fire Fighters Association, the Detroit Police Officers Association, the Detroit

Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

3.      Among the matters in which I have been involved as President of the DPOA is an Act 312 Arbitration Award issued in an arbitration completed before Chairman George Roumell in January of 2013 and which resulted in a decision dated March 25, 2013 (the "Award").   A copy of the Award is attached hereto as Exhibit 1.   An interim award addressing DPOA health care was also issued on December 31, 2013 (the "Interim Award").   A copy of the Interim Award is attached hereto as Exhibit 2.

4.      Act 312, MCL 423.231 *et seq* is a Michigan statute that provides for the compulsory arbitration of labor disputes involving police and firefighter collective bargaining units. Its purpose is to assure the speedy resolution of such disputes.

5.      The Award that resulted from the DPOA's most recent Act 312 hearing is the subject of a pending complaint filed by the City on April 15, 2013 seeking judicial review of the Award (Case No. D12 D-0354). The DPOA filed its answer to the City's complaint on July 11, 2013, and the matter has been stayed by these bankruptcy proceedings.

6.     There were more than 140 issues before the arbitrator in the proceedings that resulted in the Award. The Award provides for the DPOA to receive a 5% wage increase, effective January 1, 2014, and it is that increase that is the subject of the City's complaint.

7.     The reason that there were so many issues before the arbitration panel was that the City had refused to negotiate with the DPOA under former Public Act 4, instead choosing to unilaterally impose terms and conditions of employment on the DPOA, which the Award rejected and found were both demoralizing to DPOA members and not necessarily productive of cost savings.

8.     The Award established contractual terms of employment which govern the relationship between the DPOA and the City. It also provided for the Act 312 proceedings to be reopened as of June 30, 2013 to address health care benefits for DPOA members. To the best of my knowledge, information and belief, at no time after June 30, 2013 through the date of the bankruptcy petition (July 18, 2013) did the City engage in any negotiations with the DPOA with regard to the health care reopener issue.

9.     Rather than reopening the award, it is my understanding that, as of August 2, 2013, the City announced its intention to impose new health care plans on the DPOA and other Public Safety Unions which significantly increase the members' out of pocket medical costs. At an August 2, 2013 meeting with representatives

from Jones Day, we were presented with an outline of the new health care plans the City intends to impose on the DPOA effective January 1, 2014. Among other imposed changes, that proposal will increase the out-of-pocket costs for health care for DPOA members with insured dependents by $3000 per year.

10. I was also involved in informational meetings with representatives from Jones Day in June and July of this year, at which very general outlines of the City's restructuring proposal were discussed. In the course of these meetings, up through and including the August 2, 2013 meeting, we have, at times, asked if the discussions we had were negotiations. The City, through its representatives, has been very clear with us in asserting that these were not negotiations but that they looked forward to input and suggestions from us. These sessions were mainly presentations with minimal explanations of the data, nothing more.

Dated: August 19, 2013

MARK DIAZ,
PRESIDENT, DPOA

# EXHIBIT A-1 (Part 1)

STATE Of MICHIGAN DEPARTMENT Of LABOR &
ECONOMIC GROWTH M!Cl TIGAN EMPLOYMENT
RELATIONS COMMISSION
ACT 312. PUBLIC ACTS OF 1969 AS AMENDID

*In the Matter of*

CITY OF DETROIT

-and-                                              MERC Case No. 012 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

_____

### PANEL'S FINDINGS, OPINION AND ORDERS

George T. Roumcll, Jr., Chairman
Craig Schwartz, Esq., Employer (City) Designee
Theodore Iorio, Esq., Union (DPOA) Designee

APPEARANCES:

FOR THE CITY OF DETROIT:              FOR DETROIT POLICE OFFICERS
                                      ASSOCIATION:

Malcolm D. Brown, Allorney            Donato Iorio, Attorney

### Prologue

This Act 312 proceeding between the Detroit Police Officers Association (DPOA), who

represents approximately 2,000 Police Officers in the City of Detroit, and the City of Detroit

(City), began with the filing of an Act 312 Petition by the DPOA on June 22, 2012. After legal

and political issues concerning P.A. 4 and the duty to bargain were resolved, the Chairman was

appointed as the Arbitrator in this matter on August 23, 2012. After numerous meetings with the

Chairman, Last Best Offers were exchanged by the pm1ics on October 3, 2012. Opening

statements were made by the parties on November 5. 2012 and hearings were held on 'ovcmber

16, 19 and 29,2012, December 12, 13, 18,2012 and on January 8, 11 and 12,2013.

l'ollowing the City's presentation on financial ability, the DPOA presented John Bibish, along with comments of its attorney. Donato Iorio. conceming the City's financial ability at the January 12,2013 hearing. In order to expedite the proceedings. the Chairman. with the consent of the Panel Members, in lieu of scheduling a subsequent hearing date, stated that the City should file a written response to the DPOA·s January 12.2013 financial ability presentation, which the City did on February 1, 2013, and amplified its response in its post-hearing brief.

The Chairman, pursuant to the request of the DPOJ\, made an Interim Award on most aspects of the health care issues and the parties filed briefs on the remaining issues on January 25, 2013. A decision on the remaining health care issues is still pending before the Chainnan. After the Chairman makes a ruling on the remaining health care issues, the parties arc to submit their final health care contract language to the Chairman and a meeting or telephone conference will be held regarding the contract language.

Post-hearing briefs were filed by the parties on all non-health care issues with the last brief being filed February 15, 2013.

Between the issues presented by the City and the DPOA, there are 146 issues in dispute. The issues will be listed when discussed by the Panel rather than separately at this point.

This is the Findings, Opinion and Award pursuant to Act 312 of Public Acts of 1969, as amended, based on the Petition filed by the Detroit Police Officers Association. Subsequent to the June 30, 2012 expiration of the Master Agreement between the City of Detroit and the Detroit Police Officers Association, on July 18, 2012 the City instituted the City Employment Terms (CET) with the Detroit Police Officers Association essentially stripping the previous terms of the expired Master Agreement, which represented 40 years of negotiations.

In doing so, even though apparently the City was acting pursuant to Public Act 4 of

2

Public Acts of 20 II and the Consent Agreement with the State, no attempt was made after .March

2012 to negotiate even though the City had previously negotiated a Tentati ve Agreement with the

DPOA dated February 9, 2012 which had the goal of saving approximately $6 million annually.

The CET, for example, paid attention unneces arily to such minor details as tripping funeral

leaves to two days whereas universally, throughout Southeast .Michigan, police contracts

provided for three days which is reasonable when a Police Officer under the stress of daily

dealing with crime loses a spouse or a child. And, in the big picture, attacking funeral leave is

not where the savings are. But, in the Tentative Agreement of February 2012, the DPOA was

willing voluntarily to address a suspension of a wage differential worth $332,000 per year as one

example and an overtime issue worth $598,000 per year.

      At the same time, the CET in the view ofthis Chairman, ignored a very fundamental cost

issue.

      Even in this Act 312 arbitration the DPOA, to some extent, recognized the City's

financial crisis by a Last Best Offer for essentially the first four and one-half months of a 10%

wage cut and then continuing of a previous no wage increase fi-om 2008 levels, as the DPOA

members have not received a wage increase since 2008.

      The CET has been devastating on crime fighting in Detroit. The CET with its 10% wage

cut from a previous no wage increase since 2008 brought about by any other name a demoralized

Police force. The morale of the Detroit Police Ot1icers by any standard is at an all-time low. As

Gertrude Stein wrote in *Sacred Emily,* "A rose is a rose is a rose". The record reveals that ticket

writing is at an all-time low. Anests are at an all-time low. The Department is completely

demoralized. This has all occurred since the CET. And this is taking place in a major American

urban area where reputedly the homicide rate per capita is among lhe highest in the country,

<div align="center">3</div>

where Police response times are lacking.

The reduced arrest and ticket writing has had a cascading effect on crime prevention as established by the enlightened successor to 0.W. Wilson, namely, Chief Bracton of New York City and Los Angeles fame who pioneered the concept that more ticket writing and mundane misdemeanor enforcement creates an atmosphere of law abiding citizcns. But Police morale in Detroit is at an all-time low impacting effecting law enforcement. And as this Chairman observes, the CET missed a major economic point while emasculating contract language without at least negotiating.

ln addition, 146 issues have now been presented to the Act 312 Panel as there has now been a struggle between the City and. the DPOA with the DPOA attempting to regain some of the provisions of the previous Master Agreement, with the City concerned about cost savings. The existence of 146 issues presented to the Act 312 Panel was most unusual, some 43 years after the enactment of Act 312 when arguably, even in Detroit's financial crisis, the critical issues, if there had been negotiations and this would apply to both sides, could have been narrowed down.

The Chairman recognizes that the financial crisis of Detroit will require reorganization, even within the Detroit Police Department, as has been the case in other major city police departments.

ll is also true that the general employees have taken some big hits with furlough days. The Chairman *is* aware of this. But, during the bearings, a number of which were conducted in the offices of tbe DPOA, on the wall there were pictures of approximately 42 Officers since 1974 who were kiUed in the line of duty, t.wo of \vhich have been killed in the last three years. This does not include those who have been injured while on duty. Thus, being a Police Officer in Detroit, a large urban area with a substantial homicide rate and citizen concern about this rate and

4

crime in general. demands personal sacriiice.

In addition to the City's financial ability, an essential issue with the Detroit Police Department is that in the marketplace the Detroit Police Officers, with the CET wages, are paid below the marketplace. The DPOI\. attempts to use higher paid suburban depat1menls and of course the higher paid Michigan Stale Police to compare. But. even if one compares Flint and perhaps Saginaw, financially distressed cities with Flint having an Emergency hnancial Manager, the Detroit Police are underpaid.

Try as hard as the OPOA has done through its counsel to shift the financial ability focus, the City is running out of cash. The City is in financial crisis. There is no question about it.

On the other hand, the City needs Police Officers to survive and grow.

An effective Detroit Police force is essential to Southeast Michigan. Southeast Michigan is critical to the growth of the great State of Michigan. A Detroit Police force consisting of demoralized Officers not paid the marketplace will have trouble, as is evident today, serving effectively. It is just that simple. But the realities of the financial situation must be faced.

Throughout the hearings, the DPOA in particular, and at some times the Chairman, asked questions about the efforts being made by the City concerning efforts in collecting taxes that were made in the past and even curreutly. Yet, as Jan Lazar pointed out, the past is the past. The question that might be asked is what is going to be done currently and in the future? But, again, currently, the City is in financial crisis. The Chairman and Panel majority will prepare Findings, Opinions and Orders on this basis while recognizing that a demoralized Detroit Police Department, being paid substantially under the marketplace of even financially distressed cities in the area, does not serve the interests of the public as these are Detroit Police Officers that are necessary, even at the risk of their own lives, to protect the public interest of Detroit.

5

The aim of the Chairman, joined by one member or the other of the Panel lo form a majority, is to frame Orders that will withstand challen.ge, help the City, Department and the OfTicers gel back on track, deal with the current financial crisis, and set the foundation for more fruitful (for both the City and the Officers) negotiations in the near future.

lt should also be noted that the Chairman, joined by the DPOA Delegate, crafts the Orders based on the proposition that the Master Agreement that expired on June 30, 2012 except as otherwise modified by the Orders herein is effective the elate of these Findings, Opinion and Orders; and that the CET no longer applies.

### The History

The brief submitted by the cw-rent labor counsel of the City, though the Chairman and certainly the Union Designee do not agree with some of the editorial or advocacy statements therein, essentially gives the basic facts as leading to this Act 312 proceedings and are wotth quoting in total and are as follows:

| | |
|---|---|
| September 18, 2009 | The City institutes a 10% pay reduction in the form of budget required furlough days for all employees, except uniform employees. These are implemented for non-union employees immediately. For union-represented employees, the furlough days are implemented when the union labor contracts expired if a mid-term modification could not be negotiated. ATU had an 8% pay reduction effective October I , 2010 because furlough days ""ould not work operationally for DDOT bus drivers. The City is seeking the additional 2% and is now in Fact-Finding required by Section 13(c) of the Federal Transit Act. See Exhibit 695 at xix. |
| 2010 | City of Detroit borrows $250M through issuance of Fiscal Stabilization Bonds. City grants second lien on State revenue sharing to secure the bonds. Ex. 451 at 8. |

6

| | |
|---|---|
| March 2011 | Passage of P.A. 4 |
| December 2, 2011 | State Treasurer Andy Dillon requests that Governor Snyder undertake a preliminary review of the financial condition of the City of Detroit pursuant to P.A. 4. See Ex. 404. |
| Mid-December 2011 | City begins negotiations with its labor unions for concessions to avoid upcoming cash crisis and possible appointment of an Emergency Manager under P.A 4. |
| December 21, 2011 | State Treasurer Andy Dillon issues a preliminary review of the City's financial condition, finding probable financial stress exists in the City of Detroit and recommends the appointment of a Financial Review Team by Governor Snyder pursuant to P.A. 4. See Ex. 405. |
| December 27, 2011 | Governor Snyder appoints a Financial Review Team. Ex. 406 at 7. |
| January 2012 | Furlough days are converted to an actual 10% wage reduction for non-union employees. Ex. 695 at xix. |
| January 2012 | Financial Review Team begins reviewing City financial condition. Ex. 406 at 1, 7. |
| February 2012 | City concludes discussions with DPOA, DPCOA, DPLSA, DFTA and other unions for concessions which arc placed in separate documents for each union titled "Tentative Agreement". The Tentative Agreements are subject to and require approval by State Treasurer Andy Dillon. See Tentative Agreement between DPOA and City, Ex. 771 at page 1 (introductory paragraph). The Tentative Agreements would extend the labor contracts until June 30, 2015. |
| March 2012 | City of Detroit enters into a financing transaction (referred to as the Refunding Transaction) through the Michigan Fiscal Authority under which it will borrow $137M. This transaction will take several months (Summer, 2012) to actually close. See disc |

7

containing Refunding Transaction documents provided on February 6, 2013.

As part of the transaction, the City grants to bondholders a third lien on its State revenue sharing.

Part of the transaction documents provide that no loan proceeds can be advanced to the City of Detroit without the approval of the State.

Since the City is in desperate need of cash, the City, with State approval, enters into a short term bridge loan arrangement with Bank of America under which the City borrows $80M which is placed in an escrow account to be released only upon State approval. This loan will be repaid when the Refunding Transaction closes. See disc containing Refunding Transaction documents.

| | |
|---|---|
| March 26, 2012 | Report from Detroit Financial Review Team to Governor Snyder finding that Detroit is in a condition of severe financial distress as provided under P.A. 4 and that a consent agreement pursuant to P.A. 4 needs to be entered into between the City and the State. Sec Ex. 406 at 11-12. |
| Late March 2012 | State declines to approve Tentative Agreements entered into between the City and its various unions, including DPOA, because, according Brom Stibitz, Senior Policy Advisory to State Treasurer Andy Dillon, there was insufficient concessions to meet the needs of the City of Detroit and because the City's severe financial condition requires flexibility and the State refused to be bound by labor contracts that would not expire until June 30,20\5. Vol. 9, pp. 172-173. |
| April 4, 2012 | City of Detroit and State of Michigan enter into Financial Stability Agreement. Ex, 407.

The Financial Stability Agreement ("FSA") provides for the establishment of the Financial Advisory Board ("FAB") which is to plan, implement and complete financial restructuring |

8

with the City of Detroit. Ex. 407 at 5.

The FSA provides for a Chief Financial Officer and a Project Management Director. Ex. 407 at 16, 18.

Annex D of the FSA sets forth requirements for labor contracts which includes:

> Uniformity
> Outsourcing
> Consolidation of operations
> Changes to support financial restructuring
> Maintaining the favorable concessions from the tentative agreements (note the testimony of Brom Stibitz at Vol. 9 at 257 that the concessions in the Tentative Agreements were insufficient).

Pursuant to P.A. 4, upon execution of the Financial Stability Agreement the duty to bargain under PERA is suspended. However, existing labor contracts continue in force until their expiration. The FAB has no power under the FSA and P.A. 4 to terminate existing labor contracts.

| | |
|---|---|
| April 2012 | State approves the transfer of $30M of bridge loan proceeds from the Bank of America to the City so that the City can meet payroll, debt and other obligations. Ex.451 at 19. |
| May 25, 2012 | Jack Martin hired as Chief Financial Officer. Vol. 9, pp. 257-258. |
| June 2012 | State approves transfer of an additional $20M from the Bank of America bridge loan proceeds so that Detroit can meet payroll, debt service and other obligations. Ex. 451 at 19. |
| June 22, 2012 | DPOA files Petition for Act 312 arbitration. Petition is stayed pursuant to P.A. 4 and the suspension of the duty to bargain under P.A. 4. |
| June 30, 2012 | DPOA labor contract and most other City labor contracts expire, except for DPLSA, DFFA, and |

9

|  | the Emergency Service Operators ("ESO") in the Fire Department (expiration dates June 30, 2013). Note: DDOT and its labor contracts with the ATU and other unions are subject to Federal Transit Act Section \3(c) requirements, The Water and Sewerage Department and its labor contracts arc subject to federal court control although payroll, benefits, and other related matters are administered by the City of Detroit. |
|---|---|
| June 30. 2012 | City ends FY2012 with $1.9M in cash. See CAFR and see Ex. 451 at 19. |
|  | City is in violation of Act 51 by using $38.1M from the Street Fund for General Fund purposes. The City is required to repay this money to the Street Fund. Vol. 10, pp. 5-6, 15 and CAFR at 80. |
| July 9, 2012 | Kriss Andrews hired as Program Management Director. Vol. 9, p. \05. |
| July 17,2012 | City implements City Employment Terms ("CET") for DPOA and separate CETs for each union that had a labor contract that expired on or before June 30, 2012. See CET applicable to DPOA, Ex. 401. |
|  | Furlough days for non-uniform union-represented employees are converted to an actual 10% wage reduction. See Ex, 695 at xx. |
| July 27,2012 | PFRS enters a judgment against City in Wayne County Circuit Court in the amount of $47M for past due pension plan contributions. Judgment payable with interest in 12 monthly installments. Ex. 455. |
| August 3, 2012 | Michigan Supreme Cou11 approves placement of ballot petition seeking repeal of P.A. 4 on the ballot for the November 6, 2012 election. |
| August 9, 2012 | Board of State Canvassers enters ballot proposal on ballot. |
|  | Entry of ballot proposal for November 6, 2012 election suspends P.A.4. However, actions |

taken under P.A. 4 remain valid.

| | |
|---|---|
| August 2012 | City Refunding Transaction through State Fiscal Authority closes. |
| | $80M of bridge loan proceeds is repaid to Bank of America. |
| | At this time, City has actually received $50M of loan proceeds leaving $87M of loan proceeds available but subject to approval of State of Michigan before disbursement to the City of Detroit. |
| August 15, 2012 | MERC formally begins processing DPOA Act 312 Petition. |
| August 23, 2012 | George Roumell appointed as Act 312 Arbitrator. |
| October 3, 2012 | Parties exchange Last Best Offers. |
| November 6, 2012 | Voters repeal P.A. 4. |
| | PA 72 is revived. |
| | All actions taken under or pursuant to P.A. 4 prior to its suspension on or about August 9, 2012 remain valid. |
| December, 2012 | State approves transfer of an additional $10M of loan proceeds to the City of Detroit for payroll and other purposes. Ex. 451 at 20 and at fn. 1. |
| December 2012 | Governor appoints a Financial Review Team under P.A. 72n. Ex. 464, Attachment B. |
| December 2012 | City begins negotiations with non-uniform unions for additional 10% pay reduction in the form of furlough days. See Ex. 750. |
| December 21, 2012 | Interim Award on health care made by Arbitrator Roumell. A number of issues remained which were briefed on January 25, 2013. Once a ruling is made on the remaining issues, the parties will submit final healthcare contract language to the Arbitrator and oral |

11

|                    | presentations will be made by telephone or in person regarding the contract language. |
|--------------------|---------------------------------------------------------------------------------------|
| December 27, 2012  | Passage of Act 436 (new EFM law) effective March 28, 2013.                             |
| February 5, 2013   | City Council passes Resolution and Mayor l3ing issues Executive Order for an addit ional 10% pay reduction in the form of furlough days for non-u nion employees to be effective February II , 2013. Exs. 757 and 758. |
|                    | Bargaining continues with non-uniform union-represented employees for the furlough days. |
| February 8, 2013   | City seeks approval for an additional $20M of loan proceeds from the Refundi ng Transact ion. |
|                    | If approved this wi ll leave approx imately $57M of loan proceeds. The State has indicated it will hold in reserve at least $57M of the loan proceeds in the event the State needs funds to assist an Emergency Financial Manager or for other purposes. |
| February II , 2013 | Furlough days equivalent to a 10% pay reduction begin for non-union employees. |

The DPOA through its attorneys filed lawsuits seek ing, based upon the provisions of J\ct 312, to maintain the *status quo,* namely, the terms of the Master Agreement while the Act 312 was pending, but thus far the Comts have refused to maintai n the *status quo* and the CET is currently in effect.

### The Criteria

Act 312 of Public Acts of 1969, as amended, in Section 9 thereof sets forth the criteria to be followed by an arbitration panel. Act 116 of Public Acts of 2011 amended Section 9, which Section 9 as arnended by Act 116 providing as follows:

> Sec. 9. ( I) If the parties have no collective bargaining agreement or the parties have an agreement and have begun negotiations or

12

discussions looking to a new agreement or amendment of the existing agreement and wage rates or other conditions of employment under the proposed new or amended agreement are in dispute, the arbitration panel shall base its findings, opinions, and order upon the following factors:

(a) The financial ability of the unit of government to pay. All of the following shall apply to the arbitration panel's determination of the ability of the unit of government to pay:

(i) The financial impact on the community of any award made by the arbitration panel.

(ii) The interests and welfare of the public.

(iii) All liabilities, whether or not they appear on the balance sheet of the unit of government.

(iv) Any law of this state or any directive issued under the local government and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection.

(b) The lawful authority of the employer.

(c) Stipulations of the parties.

(d) Comparison of the wages, hours, and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours, and conditions of employment of other employees performing similar services and with other employees generally in both of the following:

(i) Public employment in comparable communities.

(ii) Private employment in comparable communities.

(c) Comparison of the wages, hours, and conditions of employment of other employees of the unit of government outside of the bargaining unit in question.

(f) The average consumer prices for goods and services, commonly known as the cost of living.

(g) The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays, and other excused time, insurance and pensions, medical and

13

hospitalization benefits, the continuity and stability of employment, and all other benefits received.

(h) Changes in any of the foregoing circumstances while the arbitration proceedings are pending.

(i) Other factors that are normally or traditionally taken into consideration in the determination of wages, hours, and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration, or otherwise between the parties, in the public service, or in private employment.

(2) The arbitration panel shall give the financial ability of the unit of government to pay the most significance, if the determination is supported by competent, material, and substantial evidence.

Though the Act 116 amendment does require the Panel to give financial ability the most significance, the Legislature recognized that the Panel could consider other factors. The amendment also included the 9(1)(e) comparison with other employees of the unit of government outside of the bargaining unit in question. Obviously, the City wishes the Panel to consider the fact that other employees of the City, including union employees, have taken wage cuts in the 10-20% category.

There is the a(ii) interest and welfare of the public. In this case, this is an important consideration, namely, the fact that public safety is involved; that Detroit Police OCticers are not writing tickets and arrests are not being 1nade, which affects safety issues and therefore the interest and welfare of the public. Then there is 9(1)(h)(i), other factors. There is the so-called demoralized criteria and what this Chairman has many times referred to as the art of the possible criteria, namely, what is needed to avoid a demoralized Police force in a high crime area and what is the art of the possible? In this case, as pointed out, the approach of the CET and the failure to attempt to negotiate after March 2012 demoralized the Department, affecting the delivery of Police service. Then there is the art of the possible. What is possible to resolve this

14

dispute short of further disruption in the Department? These factors, when combined with the ability to pay, which is dominant in this situation, must be considered by the Panel in considering the proposals.

It must be recognized that the internal comparisons cannot be overlooked. The unionized general employees as well as union employees have taken a pay reduction by way of furlough days due to the financial emergency in Detroit. Another 24/7 operation in the City, the ATU, namely, the bus drivers, have taken an 8% reduction and are in fact finding for a remaining 2% reduction. These f lcts cannot be overlooked by the Panel in balancing the economic proposals. On the other hand, as already pointed out by the Chairman, Police work is inherently dangerous, suggesting that some recognition must be placed on this factor and the comparison of the marketplace for well trained Police Officers capable of dealing with crime prevention and intervention by reviewing the marketplace for Police Officers in Southeast Michigan by making comparisons with Police employment in comparable financially distressed communities while considering lhe financial emergency in Detroit and the financial sacrifices of other Detroit employees.

As already alluded to, the DPOA counsel attempts as a good advocate to have the Panel look to such communities as Birminghc:m1, Livonia, Grosse Pointe, Sterling Heights, all communities with substantial fund balances, rather high pay, as well as the Michigan State Police whose top pay is in the $67,000 range. The City of Detroit, under financial stress, cannot afford those ranges because of financial problems. But, as the Chairman addresses wages, *it* is very difficult to suggest that the job of a Detroit Police Officer is not as difficult as a State Trooper or Police in the surrounding communities if not more so because of the nature of criminal activity in Detroit, only emphasizing that Detroit Officers are underpaid. Yet, there are two distressed

15

communities nearby \Vhosc wages, as will be pointed out, are above what the CET is suggesting

that Detroit Ofliccrs should be paid, namely. Flint and Saginaw, which make the point.

Then the issue becomes on!; of priorities and the question of the interest and welfare of tbe

public in Detroit that has one of the highest homicide rates per capita in the country. The

Chairman. when turning to the issues. recognizing that the financial ability is "the most

significant"_ also considered other criteria including the marketplace ami the welfare of the public

and the nature ofPolit:c employment including, as compared to other Detroit City employees as

representative in the Southeast. the significant number of Detroit Police Officers who have been

killed on duty as compared to Michigan State Troopcrs and other municipal police departments

in Michigan.

Yet, the Panel must recognize that the civilian employees of the City of Detroit during

Detroit's financial emergency have taken up to a 20% pay cut which, in evaluating the situation

\.Vith the Police, the Panel cam10t overlook.

Section 8 of Act 312 provides:

> 423.238  ldcn titication  of economic issues in dispu te; submission
> and adopt ion of settlement offers; findings, opinion, and or·ctcr.
>
> Sec. 8. The arbitration panel shall identify the economic issues
> in dispute and direct each of the parties to submit to the arbitration panel
> and to each other its last offer of settlement on each economic issue
> before the beginning of the hearing. The determination of the arbitration
> panel as to the issues in dispute and as to which of these issues are
> economic is conclusive. The arbitration panel, within 30 days after the
> conclusion ofthe hearing, or within up to 60 additional days at the
> discretion of the chair, shall make written lindings of fact and
> rromulgate a wrinen opinion and order. As to each economic issue, the
> arbitration panel shall adopt the last offer of settlement which, in the
> opinion of the arbitration panel, more nearly complies with the
> applicable faclors prescribed in section 9. The findings, opinions and
> order as to all other issues shall be based upon the applicable factors
> prescribed in section 9.

16

Pursuant to this provision, certain of the issues presented by the parties have been determined to be economic issues requiring the Panel to adopt the Last Best Offer of one party or the other. Other issues have been determined not to be economic and as to those the Panel may formulate an order based upon the applicable factors prescribed in Section 9. 1\.s to each issue that follows, there will be a majority vote.

## City's Financial Ahility

Detroit's poor financial health can be attributed to a nwnber of factors. With hindsight, a careful observer could point to a number or things that the City's leadership should have been done differently. Today, however, the fact remains that the City is dangerously low on cash. Unfortunately, this situation is unlikely to change in the near term. While many drastic reform measures have been implemented, true reform does not happen overnight.

Over the past several decades, Detroit suffered from declining population and high unemployment. For these reasons, Lax revenue has substantially declined. Since 1990, the City's population has declined by approximately 30%. In addition. unemployment has increased by roughly 200%. When the associated loss of income tax revenue is combined with recent decreases in state revenue sharing, it is not surprising that the City has experienced debilitating cash flow problems. Between property taxes, municipal income taxes, and wagering taxes, only wagering taxes have remained somewhat steady over the past six years. Since 2008, propetty tax revenue has decreased approximately 12% due to declining taxable property valuations and increasing charge-backs due to delinquency rates. Income tax revenues have declined due to lower taxable income of both residents and non-residents. While wagering tax revenues have remained steady, they are projected to decrease beginning in 2013 due to a loss of market share caused by a new casino in Toledo.

17

Declining population has also affected state revenue sharing. Since 2008, revenue sharing has decreased by approximately 30%. Between 2011 and 2012, revenue sharing declined from $239 million to $173 million. This startling decrease is primarily due to the population decline illustrated by the 2010 census. If Detroit continues to lose population, this amount \'-'ill decline even further.

While Mayor Bing and his team can be applauded for efFectuating large cost cutting measures, revenue has continued to decline faster than expenses. Because the City has issued debt to cover the significant shortt lls between revenue and expenditures, debt service costs have increased substantially. for example, debt service and POC expenditures are expected to increase from $126 million in 2008 to $151 million in 2013. Additionally, due to the growing number of retiree and legacy costs, the benefit and pension costs per active employee have jumped from $18,000 in 2000 to $28,000 in 2012. While reductions to the active workforce have occurred, the number of retirees and their associated costs are rising. These costs do not decline when headcount of active employees is reduced.

The City's cumulative unrestricted deficit indicates that the City is insolvent. Over the past five years, the City has run an average annual operating deficit of nearly $100 million. These large financial shortfalls have been addressed with long term debt issuances and drastic cost-cutting actions. Despite the receipt of loan proceeds from the issuance of new debt, cash balances have declined since 2008 due to large operating deficits. Even with the current cost saving measures, the city will have an estimated $110 million sho1ifall at the end of FY201 3. Remaining proceeds from the August 2012 issuance of the "Refunding Bonds," together with remaining short term borrowings, are curren tly held in escrow and can only be used with State approval. The state has mandated that the city reduce cash outflow by between $30 million and

18

$45 million. In addition, the State may release ::;ome of the escrow funds; however, it is unlikely that the State will release more than $20 million by the end of FY2013. Even if tbe City fully reduces cash outt1ow by the stipulated amount and the State releases a portion of tbe escrow account, the city is still left with a $50 million to $60 million cash shortfall at the end of FY2013. Quite simply, the city could be out of cash.

In the past, the city has issued debt to cover such shortfalls, but due to recent debt downgTades, this is no longer possible. The City's credit ratings have been deteriorating rapidly and are at all-time lows. Cnrrently, Detroit's credit ratings are below investment grade (junk statu::;) and are lower than any other major US city. Since the begitming of 2012, Moody's has downgraded the City's credit rating from B2 to Caa1. Similarly, Fitch has downgraded the City's rating from B to CCC. According to Moody's November 2012 report, "[t]hese downgrades reflect the City's ongoing precariously narrow cash position and a weakened State oversight framework following the repeal of Public Act 4…. The negative outlook … is based on the rising possibility that the city could file for bankruptcy or default on an obligation over the next 12 to 24 months, the general uncertainty of the State oversight as challenges to Public Act 72 persist following the repeal of Public Act 4, and the City''s ongoing inability to implement reforms necessary to regain financial stability." furthermore, the City has nearly reached its legal debt limit. It is currently leveraged to 93% of its general obligation borrowing capacity. This illustrates that the City is no longer able to cover cash shortfalls with debt.

According to the McKenzie Group, there exists a $183 million income tax opportunity for the City. According to another, more conservative estimate created by DPOA witness John Bibish, approximately $54 million of income taxes are left on the table every year. Thus, the DPOA questions the City's performance of collecting income taxes over the years. In fact, the

19

income tax staff positions were reduced from 49 in 2009 to 32 currentl y. Of all the departments from which employees can be cut, the DPOA asks why make cuts from the group that collects the revenue?

Then, too, as the McKenzie Group and Bibish estimates are just that, a realistic income tax figure is not known.

According to Cheryl Johnson, the current computer system used in the Department of finance has not been updated since 1998. However, the city has worked with Compuware to build an application that will allow the City to identify non-filer residents (those city residents who file with the IRS but failed to file with the City). The DPOA has indicated that uncollected income taxes could bolster the city's cash. To this effect, letters arc currently being sent to resident non-filers. While the City has started the process to collect income taxes fi-om resident non-filers, the success of such an initiative is uncertain.

According ing to Janet Lazar, an expert in city income taxes, collecting from non-filers will probably not be overly successful. This prediction is based on her observations of other Michigan cities, such as Highland Park. According to Lazar, the City's population is aging. Many of the City's residents receive pension benefits, Social Security, and other governmental assistance that are not taxable by the city. ln addition, due to the low income status of many of the city's residents, the cost of collection could often exceed the amount owed. furthermore, the collection of unpaid income taxes takes time, often in excess of one year. Unfo1iunately, the City is running out of cash and does not have the luxury of time.

According to Mr. Bibish, it does not need to take over a year to improve tax collections. To improve collections, the City should create work groups that are responsible for collection. For example, light duty police officers could be assigned to work with collection investigators.

20

However, this suggestion is unlikely to work. The employees in the Income Tax Division belong to one of three unions in the treasury Department, the AFSCME, the Association of Professional and Technical Employees, or the Detroit Income Tax Investigators Association. Each union bas a labor contract. The use of non-unit personal to perform bargaining unit work could be problematic.

The City should also devise a way to more effectively collect income tax from non-residents. According to Cheryl Johnson, letters are not being sent to non-resident non-filers because the city does not have data on non-resident non-filers. However, even if the City increased its efforts in this regard, there was testimony questioning the results because the tax rate of a non-resident is lower than that of a resident.

In order to increase income tax collections, Lazar has suggested that local income taxes be collected along with State income tax. This bas worked in other states. It has worked in Michigan, too. When a pilot program was attempted in Albion, compliance increased significantly. In Albion. revenue increased 18% in the first year. An 18% income tax revenue increase in Detroit could be substantial. Despite its success in Albion, other cities refused to patticipate due to territorial disputes. The local tax divisions incorrectly claimed that the slate would keep the revenue. They improperly compared the initiative to state reven ue sharing. Just as state revenue sharing was cut, they claimed that the state would also keep the local tax revenue. However, this is a weak argument. By Jaw, the local revenue must be given to the locality. Unfortunately, the argument was enough to scare many mayors.

While the City's financial information may appear to indicate that cash is available to pay police oflicers, certain restrictions often disallow such funds to be used for such purposes. for example, Mr. Bibish claims that there is approximately $68.1 million avai lable in the Capital

21

Improvement Project Fund. This amount represents the Revised Free Balance from outstanding project balances. However, all the monies listed under Capital Projects funds are special project funds raised fi'om voter approved bond issues. The money can only be used for the specific purpose set forth in the bond issue. The City cannot transfer capital project funding to pay debt service for anything other than the project for which the debt was incurred. Therefore, the suggestion that the old capital projects should be closed out and the unused bond funds transferred to pay debt service for other projects is not possible.

Mr. Bibish has also suggested that too much has been budgeted for the 2013 Claims Fund. The official red-book budget for 2013 included a $100 million provision for the Claims Fund. In 2010 and 2011 respectively, only $70 million and $68 million were needed for claims. This indicates that there is approximately $31 million budgeted in excess over the amount needed in 2010 and 2011. If the administration originally thought $80 million was enough (the 2013 Executive Legal Budget only listed $80 million), why was the amount increased to $100 million? It may appear that $100 million may be excessive.

Nevertheless, had the State not released $10 million from escrow in December 2012, the city would have run out of cash. In addition, the only reason the City did not run out of cash in mid-2012 was because the City borrowed more money. Now, the City has borrowed all it can. Its credit rating has decreased to such a low level that additional borrowing is no longer possible.

In his brief, counsel for the DPOA questioned the priorities in the 2012-2013 budget. The Chairman will not go there, so to speak, for those are financial decisions. The City is obligated to provide fire fighting services, emergency medical services, street and sidewalk maintenance, recreation services, garbage pickup, waste disposal, legal defense and the list goes on. Hopefully, those who make the City's financial decisions will recognize the obvious–that

22

public safety is a major concern to the citizens of Detroit; that the issue is whether the Detroit

Police Officers are being compensated comparable with other distressed cities, given the hazards

of serving in a municipality such as Detroit and the responsibilities in controlling mounting crime

concerns in the community.

A State Financial Review Team consisting of financial experts following a review of the

City's finances concluded that the City's finances were in a crisis situation and so reported to the

Governor in the following letter dated February 19, 2013:

| | |
|---|---|
| DATE: | February 19,2013[1] |
| TO: | Governor Snyder |
| FROM: | Detroit Financial Review Team:<br>Andy Dillon<br>Darrell Burks<br>Ronald E. Goldsberry<br>Frederick Headen<br>Thomas H. McTavish<br>Kenneth Whipple |
| SUBJECT: | Report of the Detro it Financial Review Team |

The Detroit Financial Review Team met on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, and February Isl, 14th, and JS'h 2013, to review information relevant to the financial condition of the City of Detro it. Based upon those reviews, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency ex ists with in the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Accompanying this report is supplemental documentation in support of our concl usion.

Our conclusion is based primarily upon the following considerations:

1. Cash Cr isis. The City con tinues to exper ience a significant deplet ion of its cash. Projections have estimated a cumulative cash deficit in excess of $100.0 million by J une 30,2013, absent implementation of finaricial countermeasures. Whi le the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those

23

reforms arc too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

2.    General Fund Deficits. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012: The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3.    Long-Term Liabilities. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund ceriain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4.    Bureaucratic Structure. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilrnembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc:    Dave Bing, Mayor
       Detroit City Councilmembers
       James Bolger, Speaker of the House of Representatives

Randy Richarclville, Senate Majori ty Leader

Purswmt to Section 14(3) of Public Act 72 of 1990. the Local Government Fisc(l|Responsibil ity Act, a Rc,-ic\\'Tcnm is required to report its llndings td the Governor withitl 60 lla)s of its appointment. unless the Governor specifies an earlier date or grants a <me-time 30- day ex tension. This Review Team WHS appointed on December 18. 2012, and in <tccordancc with statutory convention. 60 days thercnllcr w<s February 16, 2013. a Saturduy.

1lowcvcr.Section 6 or the Rcvi5cd Statutes of 1846. which <•pplics to s!ntutcs and administrative rules. provides that "[i]n computing a period of days, the tirst day is cxciudc<l and the las!day is induded. If the last day ofany period or a fixed o- final day is a SMurday. Sundu y or legal holiday. the period or day is cxtt:ndcd to Include the nc:xt d<ty which is not a Saturday, Sunday oJ- lcg.:tl lolld day." Therefore. this Review Team report is due on February l 9, 2013.

Though counsel for the DPOA questioned the concl usions of the report, the Chairman and the City Dele gate, based upon the record made before the Panel, includ ing comments of the rating agencies and the financial information furnished , is in agreement with the Review Team's conclusions in that Detroit is in a financial crisis, having limited ability to pay.

There are ways to raise revenue from both residents who can afford to pay as well as non-residents. Here are the ideas because, without interfer ing with the political process, this Chairman believes that a Chairman in this situation must take some responsibili ties and make some reven ue raising suggest ions:

1. Instead oflaying off or furloughing people in the Finance Section, the City should add to the Finance Secti on to aiel in collecti ng taxes and in particulm income taxes so that it can have agents that can go into the field and monitor the non-residents and part icularly the following types of individuals:

    A. All the lawyers advertising on the billboa rds on the freeways of Detroit because many of them, if not all, are earn ing income in Detroit, even though having offices out of Detroit. Whether they are trial lavvyers or probate lawyers i n the Circuit and Federal Courts, 36'h District Courts or Probate Courts, they earn portions of their fees in Detroit;

    B. There are lawyers that advertise that they are Social Security specialists who have ofiices outside of Detroit but earn their income in Detroit at the Social Security Administrative Tribu nals;

    C. There are labor lawyers who appear before the National Labor Relat ions Boa rd in the McNamara Building and before MERC at Cadillac Place;

25

D.　There are lawyers that appear before State agencies in the Cadillac Place Building;

E.　There are doctors who have ontces in Macomb County and in Grosse Pointe who are operating at St. John's Hospital whose operating rooms, on information and belief, are in Detroit, thereby earning substantial income in Detroit. There are doctors who operate at Sinai, Ford and the DMC.

F.　There are lawyers from New York, Philadelphia and Washington, D.C. that try cases in the Federal Court in Detroit. There are bankruptcy lawyers that come to Detroit. There are visiting athletic learns in three major sports who come to Detroit and earn income in Detroit. There are ente11aincrs that come to Detroit and earn income in Detroit. One does not collect by just vvriting letters. One needs agents "out there''.

2.　The City should contact Louisville, Kentucky and ask how Louisville collects income tax from non-residents who come to Louisvi lle. It so happens that at a regional meeting of the National Academy of Arbitrators, two arbit1·ators, including Richard Block, told this Chairman of their experience of going to Louisville, Kentucky and aJbitrating for a non-municipality and being contacted by the city and asked to pay city income tax for their e±Iorts in the city of Louisville. One of them was arbitrating for General Elect ric. One told that he was "hit" for $33.00. The question is, how does Louisville get the information? This Chairman was hit by Big Rapids. Michigan for a clay he spent in Big Rapids arbitrating.

Detroit, with the cooperation of the State, can prevail on the State legislature to enact two statutes requiring all businesses outside of the city limits, as well as within the city limits, to withhold City of Detroit income tax and also a non-discrimination act so that the employer will not discriminate against hiring City of Detroit residents because some employers might avoid hiring a Detroit resident to avoid the withholding requirement.

Another idea is to pass at least for a limited time (three or four years, if not longer) a sports ticket tax for hockey, baseball and football of $1.00 to $2.00. This would bring in upwards to $10 million annually. The events do receive Police protection at their athletic events. Detroit is in a financial crisis. People go to the Lions, Tigers and the Red Wings games. Particularly at the Tigers and Lions games, there is substantial Police presence. This modest

26

amount will not keep people away. And Detroit is in a cri is. This will help pay for needed Police services. Any resistance should be overcome. These are dire !inancial Limes. The Officers must be brought up to the marketplace.

Fmthennore, the general employees cannot be expected to continue to sacrifice as they have been.

Jan Lazar is correct. The Sta te should be collecting the City of Detroit income tax at least as to residents and to non-residents who are already identified as consistent filers. And vvhen other non-residents are identified in a comprehensive investigation, the State should add them to the State collecting efforts. The Chairman recognizes that this may not be done until 2014, but it should be part of the long range effort.

Many of the above suggestions may not be able to be implemented immediately to address the current cash crisis. In this regard, the Chairman, concerned with restori ng the Detroit Police Ofticers to a reasonable competitive pay rate and some long established benefits necessary to keep the Detroit Police Officers compet itive and benefits used to control absences, the orders will provide for civilianization permitting the Department to employ Police Officers in jobs that require MCOLES certification and that other jobs now performed by Police Officers can be performed by civilians. This will permit the Department to serve citizens with fewer sworn Officers at the same level of Police services as now with Officers being paid at the market rate. Furthermore, if necessary, as was the case in Fli nt, some Officers may be laid off or the force can be reduced as a result of attrition due to retirements. With civilianizat ion, this could impact the number of Officers available for street duty. Yet, there would be, if need be, less current costs to the City while restoring some benefits and paying Officers at least a competitive wage with the distressed cities.

27

In addition, in addressing the Issues, the Chairman has voted with the City Delegate to control some overtime costs. This approach gives significance to the financial ability in Detroit's situation while recognizing other Section 9 criteria, both in the short run and in the long run.

## The Issues

### Preliminary Comment

To repeat a refrain, the parties have submitted 146 issues for the Panel to decide. The number of issues are as a result of the fact the City imposing in July 2012 without further negotiation the City Employment Terms which in many details had little rhyme or reason in addressing the City's financial crisis as applied to public safety and by any definition was an attempt to "gut" the Master Agreement between the City of Detroit and the Detroit Police Officers Association, a product of 40 years of negotiations and Act 312 proceedings. Such an approach brought forth approximately 37 issues proffered by the DPOA attempting to seek economic improvements in a financially distressed city, creating an unrealistic labor relations atmosphere, and had the effect of overlooking the welfare of the public, *i.e.,* the need for an efficient, effective Detroit Police Department. This goal can best be established by the comparables, namely, the marketplace for Police Officers even among the more distressed communities and a recognition even by the Legislature that the Legislature has given special recognition to police unions of the duty to bargain in the current labor climate in Michigan. It is for this reason that the Chairman, concurred in by the Union Delegate, will address the issues based upon the expired Master Agreement and will reject in total the City Employment Terms as those terms were not negotiated terms and were terms implemented under Public Act 4, which

act was rejected by the people of the State of Michigan.

28

Furthermore, if there had been negotiations as in the case of the Tentative Agreement, presumably even if on an around-the-clock basis, a number of the issues would have been reduced. Even so, both the counsel for the City and the DPOA are to be complimented for the fact that they were able to complete the hearings in record time despite the number of issues and to present their briefs in an extraordinarily accelerated time. Those who read this Opinion, if there ever is a Hall of Fame for Lawyers, should make these two counsel the first candidates because both have put in extraordinary efforts as had the two Panel Members. Nevertheless, in a 2013 Act 312, the Chairman will repeat there should not have been 146 issues nor should there have been a CET without an opportunity to bargain for, as the Chairman, as pointed out, it has bred a demoralized Police force.

Counsel mutually numbered the Issues. The Panel will follow the parties' numbering of the Issues, but the Issues will not be discussed in numerical order. In some cases, the Issues will be discussed in interest groups for convenience.

The reference on each Issue to *"status quo"* is a reference to the language in the Master Agreement that expired on June 30, 2012. In addition, the references to the current contract are to the Master Agreement that exx>ired on June 30, 2012.

<u>Issue No. 97</u> -     *Article 48- Contract Duration*

It is appropriate to begin the discussion of the Issues with the length of the contract. Issue No. 97 addresses duration. The City maintains that this is an economic issue. The DPOA maintains that this is a non-economic issue. As a non-economic issue, the Panel can :formulate a provision without accepting the Last Best Offer of either party. The Chairman, joined by the DPOA Delegate, accepts thDPOA's position that duration is a non-economic issue.

The City proposes that the Agreement run from July 1, 2012 to .Tune 30, 2013. The

29

DPOA proposes that the Agreement run from July 1, 2012 to June 30,2014. ·rhe Chairman appreciates that the parties have spent a great deal of time, effort and money in presenting this case.

Yet, by any standard, the City is in a dire financial crisis. The City is in need of a serious reorganization. This is a given. The Department is in the need of reorganization as patt of the City's reorganization. On the other hand, by any definition, the CET as applied to the Police brought about a demoralized Police Department that affected the productivity of the Police and the public welfare, causing this Panel to have to deal unnecessarily with 146 issues, starting with resurrecting a Collective Bargaining Agreement that was a product of 40 years or more of negotiations and interest arbitration. It ⊳ould seem, therefore, to the Chairman that to bring stability to the situation that there be a two year contract beginning on July 1, 2012 with an automatic re-opener on health care insurance and pension issues, with the automatic re-opener taking place on June 30, 2013 which is not too far away. This way, all of the other issues are established, including wages, longevity, transfer rights, seniority rights and the other issues that came before the Panel, including sick leave accumulation.

1-lealth care and pensions are major issues that the parties will be obliged without the pressure of so many issues to review beginning June 30, 2013. The re-opener is automatic as to these two issues, though it is recognized that the health care insurance, because of the enrollment, continues until January 2014. Nevertheless, health care will be re-opened for discussion beyond the open enrollment ending January 2014. To repeat, the re-opener on June 30,2013 for all pension issues and health issues will be re-opened automatically on June 30, 2013.

The Chairman has been joined by the DPOA Delegate in voting for a two year contract except that the DPOA Delegate dissents from a re-opener. The City Delegate dissents from a

two year contract but would agree that if there is a two year contract he will vote for a re-opener as to pensions and health care.

| | |
|---|---|
| **Issue No. 1 - Economic** - | *Union Security - 2% Dues Collection Charge* |
| **Issue No. 5 - Economic** - | *Article 4- Basis of Representation, Pay.for Full-Time Union Officers* |
| **Issue No. 8- Non-Economic** - | *Article 4.O- Basis of Representation, Pay for Grievance Committee* |

The Chairman, for discussion purposes, has grouped Issue Nos. 1, 5 and 8 together as the underlying principle applies. The City proposes to add a Section L to Article 3 whereby the DPOA would reimburse the City "an amount equal to 2% for all Union dues and service fees amounts remitted to the Union" which the DPOA opposes, as there is no such provision in the Master Agreement nor has there ever been such a provision in the parties' numerous past agreements.

As to Issue No. 5, presently the City pays the wages for the full-time release of the President, Vice President, Sergeant at Arms and Financial Secretary of the DPOA. Similarly, as to Issue No. 8, the City has been paying the salary and benefits for three Grievance Committee Members to be off two working days per week. The City proposes that the DPOA reimburse the City for the salary and benefits of the full-time DPOA Officers and the two working days off that the three Grievance Committee Members are off. The DPOA proposes the *status quo.*

The rationale of the City is that the 2% dues collection fee has been imposed on all City unions and that granting this provision would achieve uniformity consistent with the requirements of the Financial Stability Agreement.

In regard to reimbursement for Union Officers and the Grievance Committee Members, the City notes that it bas ceased paying the wages and benefits of union of{icers for every union in the City that has expired labor contracts; that the cost per year for three Grievance Committee

31

Members is $296,000 per year; that the cost tor four full-time Union Officers and three Grievance Committee Members is $691,096; that the cost to the City for all full-time Union representatives City-wide is $2,797,747; and that when the cost for part-time as well as full-time Union representatives City-wide is added. the grand total is $3,125.806.

The Chairman recognizes that this is a considerable amount of savings that cannot be overlooked in a finan.;ially distressed City of Detroit and the DPOA's $691,096 cannot be overlooked. However, there is a failure to recognize the unique circumstances of Police representation. Because of the nature of Police work, including physical contact with certain members of the public, Police Officers are sometimes charged with abuse of force requiring Police representation, including representation of Union Officers as well as legal counsel. This involves *Garrity* hearings where Officers arc represented by both counsel and Union Officers as well as discipline hearings. There are other discip line proceedings in a quasi-military organization, putting an undue burden on the DPOJ\ which is not as common in a civilian union.

Furthermore, though the ranks of the DPOA have been reduced, the representation needs continue. In addition, there is no shovving that the 2% charge would save any appreciable sum of money for the City. There is no showing that the City has charged for deducting for char itable contributions. There is no showing that the City's payroll system is not already keyed to providing such deductions without additional appreciable costs. This has been a method of dealing between the parties for many years. Though the DPOA has approximately 2,000 individuals either paying dues or a service fee, with the cost of representation because of the nature of Police work and discipline issues in a quasi-military organization, its dues structure will have difficulty supporting the representation that the DPOA must provide.

Having said the above, however, in applying the att of the possible and recognizing the

32

City's financial situation, the Chairman will agree with the City on Issue No. 8 and provide that if the DPO/\ wishes to have Grievance Committee Members receive two working days off per week, on any days off those days shall be at the expense of the DPOA, namely, their salaries and benefits for those days off shall be paid by the DPOJ\. This will amount to a savings of $296,000 per annum by the City and can be afforded by the DPOA. This represents a compromise, recognizes the City's financial situation, and it is up to the DPOA to adjust, if it so desires, its method of delivering services to its members. The DPOA must recognize that it is somewhat being treated diffcrcnlly than other unions in the City. But this is because of the nature of the members it represents and the cost associated with doing so, as explained by the Chairman.

As to Issue No. 5, the Chairman believes that the Order is unique to the Detroit Police Officers Association for the reason discussed in Lhis portion of the Opinion. For this reason, the Chairman cautions that the Order as to Issue No. 5 or the Opinion that has been written by the Chairman as to Issue No. 5 should not be taken as a precedent as to the other uniform groups as their numbers and their situations are different and may or may not support the claim for full-time Union Officers as was made by the DPOA based on the numbers of Officers represented by the DPOA that were made to this Panel and the type of representation that was required to be made on a day to day basis.

The Union Delegate concurs with the Chairman as to Issue Nos. 1 and 5, but dissents as to Issue No.8. The City Delegate dissents as to issue Nos. 1 and 5, but concurs with the Chairman as to Issue No. 8.

<u>Issue No. 27</u> -Economic- *Article 12.A - Modify Funeral Leave*

Issue 27 pertains to the funeral leave provisions of Article 12. This is an economic issue. The City proposes that the number of leave days for funeral of immediate family members be

33

reduced from three (3) to two (2). Additiona lly, the City proposes that leave days for funerals of immediate family members exceeding t\V0 (2) days only be extended to ·'a total of five (5) days to be charged against current sick leave…'' Conversely. the OPO/\ proposes that the *status quo* be maintained, which would provide three (3) days of leave for the funerals of immediate fami ly members. The language affording three (3) days of funeral leave has been in the contract between the City and the DPOA for a number of years. The City has put forth no t;Onvincing justification for a reduction in leave days for the funerals of immediate family members. Although legitimate. the cost savings associated with the City's proposal do not justifY a reduction in leave days for funerals of immediate family members in light of added stress to

officers. Indeed, reducing the historical funeral leave that the officers have had would add to the stress of an already highly stressful job at times of personal crisis. Furthermore, com parables to other cities indicate that the City"s proposal, frankly, is below any of the listed police jurisd ictions. Accordingly, considering the lack of significant, consistent cost savings and the comparables presented. the Chairman denies the City's requested changes to Article 12. The DPOA Delegate joins the Chairman in adopting the *status quo*. The City Delegate dissents.

| | | |
|---|---|---|
| Issue No. 79- Economic- | *Article 37- Bonus Vacation Days- Eliminate* | |
| Issue No. 40- Economic- | *Article 14.D.-I- 0\'ertime-Bonus Vacation Days- Did Not Work Roster* | |
| Issue No. 47- Econom ic- | *Article 22.11 -Furlough Selection-Delete-AIIach Bonus Vacation Days to Furlough Days* | |
| Issue No. 49 - Economic- | *Article 25 -Emergency/Excused Leave Days-Relation to Sick and Bonus Vacation Days* | |
| Issue No. 58– Econom ic - | *Article 3J.E.6- lfolidays-Bonus Vacation Days* | |
| Issue No. 59 - Economic- | *Article 3l.F2- 1/olidays-Bonus Vacation Days* | |
| Issue No. 135- Economic - Union Proposal - | | *Article 22-Furlough Selection and Cancellation-Sell Furlough Time-Continue 10Alfach Leave Days and Bonus Vacation Days to Furlough* |
| Issue No. 142 - Economic- 'Union Proposal - | | *Article 37-Bank and Pay Bonus Vacation Days* |

34

Issue No. 116- Economic- Union Proposa 1 -    *II,.icle 37- Bonus Vac:alion-Bonus Vac:ation Days Nor Used to Excused Time or Comp Bank*

The above issues deal with bonus vacation days which are set forth in Article 37 of the

Master Agreement \\ hich in its entirety reads:

### 37. BONUS VACATION DAYS

Bonus vacation days are granted for unused current sick time. OfTicers who have accumuiR tecl a minimum of fil ty (50) sick days including both current and seniority days and have a minimum of six (6) years of service on .ful y lst of each year wi ll be credited with one-half (l/2) of' the unused current sick time from the previous fiscal year up to six (6) days. An officer may request to take his bonus vacation days in any sequence (except when artached to a furlough as stated below) by submilting a request in writing to his commanding officer. This request will be reviewed for the availability of personnel by his commanding officer. Seniority will be a prime consideration when several officers request the same period of time off.

An officer shall be allowed to usc up to three (3) bonus vacation days in conjunction with a furlough. The request to utilize bonus vacation days in this manner must be included in lhe leave day request. Bonus vacation days, "vhen connected to a furlough, shall not be canceled unless the accompanying furlough is canceled. This article does not affect or limit the right of the Department to determine the number of employees assigned to work. Consequently. there will be no increase in the total number of employees who are absent and the effect of granting an employee's request could be that the seniority leave day request of another employee (even if more senior) will be denied.

The Department must insure that bonus vacation days arc expended proportionately throughout the year and arc not carried until the last month5 of the fiscal year; therefore, on April 1... the commanding ol'ficcr shall assign the remaining bon us vacation days at his discretion. Any request to utilize unused bonus n1cation days in conjunction with a furlough scheduled during the months of April. May or June must be submitted to the commanding officer by April l.. or those bonus vacation days will be assigned.

Bonus vacation time shall be deducted from the member's bonus vacation bank before com pensatory lime shall be taken.

As the first sentence of A1ticle 37 clearly indicates. bonus vacation days arc linked to

"unused current sick lime'·. In other vvords, bonus vacation days are granted as an incentive to

35

encourage an Officer's attendance.

The Department continues to be concerned with Officers who have absentee issues. This is the reason that the parlies have negotiated an attendance program set forth in Article 36, namely, the D.P.D. 350 program. Absenteeism causes the Department ovettime costs in that the Department on occasion finds it necessary to bacldi ll for absen t Officers on an overtime basis. Thus. when the City proposes in Issue No. 79 to eliminate bonus vacation days and suggests that it would save $1.2 million per year in the Police Department alone, the proposal ignores the cost of absenteeism.

The DPOA objects to eliminating Article 37, the bonus vacation days, and proposes that the *slalus quo* be maintained. This is an economic issue requiring the Panel to elect one of the parties' proposals. Tn the view of the Chairman, for the reasons already suggested. namely, absences add to the cost of the Department's operations, any savings resulting from the elimination of the Bonus Vacation Days program would be outweighed by the cost ofbackfilling because of absenteeism. Ftuihcrmore, the Bonus Vacation Day program has been a part of the Collective Bargaining Agreement between the DPOA and the City for a number of years. Considering the City has show no convincing reason justifying the elimination of the Bonus Vacation Days program, the Chairman decides to maintain the *slatus quo*. The DPOA Delegate joins the Chairman. The City Delegate dissents.

As to Issue No. 40, since a majority of the Panel is not eliminating bonus vacation days, bonus vacation days will be part of the Did Not Work Roster. Therefore, the City's Issue No. 40 will no longer be necessary and will be rejected \with the DPOA Delegate voting with the Chairman on this rejection as the proposal would remove bonus vacation days from the Did Not Work Roster. The City Delegate dissen ts.

36

As to Issue 47, the City's Last Best Offer proposes the elimination of language contained in Article 22.A regarding Bonus Vacation Days granted in connection with fbrlough days. The DPOA objects to the elimination of this language and supports maintaining the *status quo*. This is an economic issue with the Panel obliged to select one or the other Last Best Offer. Since a majority of the Panel, in addressing Issue No. 79, opted not to eliminate bonus days, it follows that as to Issue No. 47 that the Chairman, joined by the DPOA Delegate, will opt to maintain the *status quo* as to Article 22.A since bonus vacation days shall remain in the Master Agreement. The City Delegate dissents.

Issue 49 makes reference to Article 25, "Emergency/Excused Leave Days". The last sentence of that Article in the first paragraph reads: "All excused days will be deducted from the member's accumula ted sick bank and will consequently affect the accumulation of bonus vacation days." The City proposes to remove the phrase "and will consequently affect the accumulation of bonus vacation days". The DPOA proposes the *status quo*. The City's proposal was on the assumption that bonus vacation days will be eliminated. Since a majority of the Panel rejected the proposal to eliminate bonus vacation days, a majority of the Panel, namely, the Chairman and the DPOA Delegate, will vote to reject the elimination of the bonus vacation language from Article 25. The City Delegate dissents.

Issue No. 58 add resses Article 31.£.6 and the preparation and maintenance of holiday rosters and the eliminat ion of the phrase "and up to three (3) bonus vacation days" as proposed by the City. The DPOA proposes the *status quo*. Since a majority, namely, the Chairman and the DPOA Delegate, have voted to maintain the bonus vacation days, the same majority rejects the elimination of the preparation and maintenance of holiday rosters, the language "and up to three (3) bonus vacation days", and will vote to maintain the *status quo* and keep the reference to

37

the three bonus vacation days in Article 31.E.6.d. The City Delegate dissents.

Issue No. 59 is similar to issue No. 58 in that Article 3l.F.2 addresses Special Rules Affecting Rotation. The City proposes to delete from Article 3l.F.2 the following language:

> F.    Special Rules Affecting Rotation.
>
> * * *
>
> 2.    Employees on Furlough. For purposes of this Article, a furlough period includes the customary five (5) attached leave days c ud up to tin ee (3) bonos vaeGttiou days. The furlough includes the holiday even if it should fall on the first day of the regularly sched uled furlough.
> * * *

The language that the City proposed to delete is the strikeout language. The DPOA proposes the *status quo* and to keep the deleted language. Since the deletion assumes the elimination of the bonus vacation days and a majority of the Panel has opted to maintain the bonus vacation days, a majority of the Panel, namely, the Chai rman <md the DPOA Delegate, will vole to deny the request to delete the above language wi th the City Delega te dissenting.

As to Issue Nos. 135, 142 and 116, which are DPOA proposals, the DPOA has made the following proposals:

<div align="center">

DPOA PROPOSAL
NO. 116
Article 37- Bonus Vacation Days

ARTICLE 37 (NON-ECONOMIC)

</div>

Paragraph 3 of the current collective bargaining agreement shall be amended by addition the following proposed new language:

"Effective Ju ly I, 2012 any bonus vacation days not used by June 30 of each yea r, shall be automatically credited with an equivalent amount of "excused time" which will be placed in the officers compensator y bank"

<div align="center">

38

</div>

Ol>OA PROPOSAL
NO. 135
Article 22 ,G- Furlough Selection and Cancellation

## ARTICLE 22 {NON-ECONOMIC)

Paragraph G-Shall be amended as follows: '·Effective with the first furlough draw after August 28, 2011, members may elect to sell up to one (1) week of rurlough time (5 consecutive days) per furlough period. This shall not diminish the election to attach five leave days and up to three (3) 13onus Vacation Days in connection with the furlough. An election to sell furlough time shall be at the time of the furlough draw. Payment shall be made within thirty (30) days arter the furlough draw.

DPOA PROPOSAL
NO. 142
Article 37 -Bonus Vaca tion Days

## ARTICLE, 37- BONUS VACATION DAYS

Al1icle 37, "Bonus Vacation Days." shall be modified upon issuance of this Award to provide that bonus vacation days that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking.

In regard to these proposals, the City"s Advocate at pages 87 and 88 of his post-hearing brief writes:

3.  Union Issue No. 135- Righi To Attach Bonus Vacation Days
    To Fu rlough Days Even If Furlough Days Are Sold

The City agreed to allow Officers to sell one week of furlough time. With this agreement Officers gave up their right to schedule time off using furlough time and agreed to be at work. It is inconsistent to allow that an Orficer to then schedule leave days and bonus vacation days for the same time period.

Further, to allow the Officer to schedule up to eight consecutive days off even though he has sold his furlough time is unfair to others who want furlough time and maybe prevented from taking it because the employee continues to schedule leave time and bonus vacation time during that period. It is hard enough to schedule fu rlough time when an Officer has sold furlough days to take available vacation time for Bonus Vacation Days and leave days.

39

4. The DPOA Wants The Right To Bank And Sell Any Bonus Vacation Days Not Utilized Within The Fiscal Year

This request should be denied for the following reasons:

Bonus Vacation Days were agreed upon because they had to be used and could not be paid out costing the City much needed cash. This is the premise upon which Bonus Vacation Days were agreed upon and placed in the Labor Contract. To now allow them to be paid out would violate the principle underlying this contract provision.

If police officers are allowed to bank and sell unused Bonus Vacation Days it will be costly to the City. It will cost the City $985,000 to payoff Bonus Vacation Days if all eligible officers bank and sell them. See Ex. 663.

In the Ability To Pay portion of this Brief the City made it clear it has no cash. To allow Police Officers to convert Bonus Vacation Days into paid days negatively affects the City's cash, cash which the City docs not have.

5. Conversion of Bonus Vacation Time To Excuse Days To Be Placed In Officer's Compensatory Time Bank

The DPOA wants to convert any unused bonus vacation days to excuse time to placed in Officers' compensatory time bank. The City opposes this request for the following reasons.

J\tthc present time bonus vacation days must be used or lost. It was negotiated as time off to be utilized during the fiscal year so that the problems of carryover >vould not exist. Further, they were negotiated such that they would be used and not cash out as compensatory time at retirement.

Allowing the conversion of bonus vacation days to compensatory time would allow the officer to have these days paid out as compensatory time bank at retirement. The City is trying to decrease the retirement leave bank payments it must make not increase them.

Sec cost implications set forth in the prior section. Ex. 663.

These proposals will add approximately $1 million annually in cost. Based upon the City's fiscal condition, this is not the contract to add costs. The only reason the Chairman opted with tbe DPOA Delegate to maintain the bonus vacation days is because the bonus vacation days

40

was an incentive to encourage good attendance and, for this reason, had the potential of not only being cost neutral but cost effective, *i.e.,* discouraging absences and, therefore, controlling overtime. Thus. the Chairman, with the concurrence of the City Delegate, will vote to reject Union Issue Nos. 135, 142 and 116. The DPOA Delegate dissents.

Issue 50 - **Economic** - *Article 27 - Police Reserves*

Issue 50 addresses Article 27 of the Collective Bargaining Agreement dealing with police reserves. The DPO/\ proposes to maintain the current language of Article 27 and keep the status quo. Conversely, the City, in its Last Best Offer, proposes the follo·wing modified language:

> The City may deploy Police Reserve Officers lo assist on-du ty police officers or to ass ist the Department by performing tasks that do not requ ire MCOLES certification. These tasks sha ll be limited to traffic duty, crowd contro l, riding with a Police Officer if the Police Officer consents, school patrol, handling and assisting in handling abandoned vehicle, helpi ng \.vith specia l events and centra l events, issu ing parking tickets, and taking police reports.

Since at least 1998, the current Article 27 language has been in the contract. The question of police reserves is always a difficult one for the Police unions and municipalities to negotiate to their mutual satisfaction. ln Detroit, under the current contract language, which either was negotiated or awarded in a 312 arbitration, the parties have developed certain practices as to the use of police reserves. In the absence of any current negotiations on the issue, the City wishes to impose an ernployment term that the City may hire and deploy police reserve officers in a manner deemed appropriate by the Chief of Police. There is no evidence that the parties were negotiating to an impasse on this subject. Nor were they making any concrete proposals prior to this 312 arbitration proceeding to modify the existing practices. Based upon the lack of bargaining history, which suggests no need lo change the current practice, the Chairman, joined by the DPOA Delegate, decides to adopt the *status quo*. Article 27 will contin ue to read:

41

ARTICLE 27

> In continuing its policy on police reserves, the City will in no event use
> police reserves to perform the essential core duties of bargaining unit
> members or to circumvent the holiday overtime and/or any other
> provisions of this agreement. Should a dispute over the deployment of
> reserves arise, the burden of proceeding and the burden of proof in any
> grievance/arbitration matter shall be on the Employer to establish by
> probative, objective evidence, that its use of reserves did not circumvent
> any provision of the collective bargaining agreement, and, but for the
> deployment of reserves, bargaining unit members would not have been
> used to participate in the particular event, duty, function, activity, etc.

> Reserves cannot be assigned to ride with employees unless the employee
> consents. Reserves shall not ride with employees assigned to one person
> cars except in such situations that arise under Article 6.E.4.f. of this
> Agreement.

The City Delegate dissents.

<u>Issue No. 70</u> - Economic- *Article 33 - Pension Provisions - City Right to Modify DB Plans*

In Issue 70, the City proposes the addition of new language to J\.Iticle 33. The language

of the City's proposed Article 33.X reads as follows:

> The City reserves the right to modify, amend, and/or eliminate any and
> all aspects of its pension/retirement plan(s), unless prohibited by law.

The DPOA objects to the insertion of the City"s proposed Atticle 33.X. This is an

economic issue. The City's proposed Article 33.X is too open ended. When parties enter into a

contract, they agree to be bound by the agreed upon terms. The proposed Atticle 33.X could

serve to deny the DPOA of the agreed upon terms contained in the contract. Once orders are

issued, they should be final and binding. J\.ccordingly, the Chairman, joined by the DPOA

Delegate, declines to adopt Article 33.X. The City Delegate dissents.

<u>Issue No. 85</u>- Non-Economic- *Article 40.F- Miscellaneous-Service Weapon*

The City wishes to amend Article 40, Miscellaneous, Section F, as follows, represented

by the strikeouts, suggesting that a weapon costs in excess of $600 and can be recycled:

42

> f-:C.   Service Weapon.   All employees shall be provided at no charge
> with their department-issued service weapon upon full service
> retirement, p!Ovided, lio we ve1, tl1ctt 110 e111ployeewho-retires
> befo1e July 1, 1995 slmll be e11tit+ed-to-receive tliei1 Depa1t111cllt
> issued Glock se111i auto11wtic \'eapon-un+ess-thc-emptoyee-has
> bee!1 qu<tlified witlt the Glock se111i dUtOlllcltic weapon-for-one
> )'MI <ls of the d<!te of•eti1e1nent.
>
> Effective July I, 1989, this pl ovision siJ<dl <lpply  to emp+oyees
> who take" 40 & 8--vested pension:
>
> The Department may refuse to give employees their weapon for
> good cause shown.

This has been designated as a non-economic issue by the parties.

't he City is correct that the proviso should be eliminated because there are no Officers

now employed who would be subject to the proviso. Except for eliminating the proviso, there is

no reason to change the language. It has been in the parties' Master Agreement for some time,

including the provision for employees who can retire at 40 and 8. For this reason, the Chairman,

joined by the DPOA Delegate, will vote to maintain the current language minus the proviso. The

City Delegate dissents. The language will now read:

> F.   Service Weapon.   All employees shall be provided at no charge
> with their department-issued service weapon upon full service
> retiremeut.
>
> Effective July I, 1989, this provision shall apply to employees
> who take a 40 & 8 vested pension.
>
> The Department may refuse to give employees their weapon for
> good cause shown.

Issue No. 88- Economic -   *Article 40.1 - lvfiscellaneous-Correction of Overpayments and
Underpayments*

Issue No. 88 addresses Article 40.I of the Master Agreement which is entitled "Correction

of Overpayments and Underpayments." The City wishes to delete the current language and

replace it with the following language:

43

> When by payroll error an employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment pursuant to applicable law. The City reserves the right to seek immediate recovery through appropriate legal proceedings.

Here, again, the Chairman is faced with no current history of bargaining. But the Chairman is faced with a contract provision that has survived at least two 312 arbitration proceedings, if not before. The whole idea of PERA is to bargain. When this Chairman remanded these proceedings back to bargaining, as permitted by Act 312, he was hoping that he would not be faced with provisions such as this to be decided as this is a provision that should have been resolved by the parties. As it is, this provision has obviously been resolved by the parties long ago, since it has been, there is no reason, in the view of this Chairman, to modifY the contract language. Therefore, the Chairman, with the DPOA Delegate concurring, will reject the City's position and continue the language of Article 40.1 in the Master Agreement. The City Delegate dissents.

 Issue No. 91 -Economic -   *Article 4l.A- Wages-Additional Classification Payments*

As to Issue No. 91, which references Article 4l.B of the Master Agreement, the City proposes the following language with the addition of"unless modified" and the strikeout "Beginning July 1, 200::!:8 through June 30, 2009":

> Unless modified, salaries for the following classifications will be maintained at the clollnr differentials indicated for the term of this Agreement begitming July 1, 200::!8 tlu ough Julie 30, 2009.

> I.   Communications Officer- Police Officer (Class Code 33-12-11)

> | | |
> |---|---|
> | Start | $450 over starting salary of Police Officer |
> | After one year | $450 over starting salary of one-year Police Officer |
> | After two years | $450 over starting salary of two-year Police Officer |
> | After three years | $450 over starting salary of three- year Police |

44

Officer
      After four years    $450 over starting salary of four-year Police
                              Officer
      /\Iter five years    $450 over starting salary of five-year Police
                              Oniccr

   2.     Band Dia·ecto r - Police Office•- (Class Code 33-12-14)
          $821 over maximum of salary of Police Officer

   3.     Assistant Supervisor of Motor Vehicles - Police Officer
          (Class Code 33-12-15)
          $862 over maximum salary of Police Officer

   4.     Police Data Processing Programme r– Police Officer (Class
          Code 33-12-26)
          Minimum: $589 over maximum salary of Police Officer
          Maximum: $!,738 over maximum salary of a Police Officer

   5.     Rad io Main tena nce Officer- Police Officer (Class Code 33-
          12-12)
          $862 over maximum salary or a Police Officer

   6.     Radio Systems and Planning Officer - Police Officer (Class
          Code 33-12-13)
          $1,567 over maximum salary of a Police Officer

   7.     Senior Police Data Processing Programmer- Police Officer
          (Class Code 33- 12-36)
          Police Lieutenant salary

        The DPOA agrees with this language which is in the Master Agreement except the DPOA

does not agree with Lhe addition of"unless modified" and the DPOA referenced *status quo*

without mentioning str iking the "beginning July 1, 2008" language. The Chairman, along with

Lhe DPOA Delegate would agree with striking the "unless modified" language because once an

agreement is consummated it is the parties' agreement. If the parties want to modify it, that is up

to the parties. As a housekeeping matter, the "beginning" language should be struck and the

DPOA Delegate agrees that the language "b<::ginning July 1, 2008 tlu·ough J une 30, 2009" shou ld

be struck because it is redundant and obsolete. On this assumption, in striking the words "unless

modified", the Chairman and the DPOA Delegate adopts the DPOA 's *status quo* language. The

                                     45

# EXHIBIT A-1 (Part 2)

City Delegate dissents as he would include the "unless modified" language.

Issue No. 106- Economic- *Article 33- Sick Leave-Restricted Duty Assignments in Discretion o.(City: Restricted Limited to One Year*

Issue No. 106 is a proposal by the City to limit limited duty for Officers who are not injured on duty or have illnesses not connected to injuries on duty, as contrasted to injuries obtained while on duty to serving in a limited duty capacity for one year. This Chairman is familiar with such a provision whereby the Department would be distinguishing as to limited duty between Officers injured on duty and non-injured on duty Officers as this Chairman was called upon by the Chicago Police Department and the Fraternal Order of Police Chicago Lodge No. 7 to issue an opinion dated February 18, 2013 on the same subject against a background of numerous opinions issueJ by arbitrators in Chicago on the subject.

The Opinion gives the history of the matter in Chicago. Here, in Detroit, the record reveals that there are upwards to 60 non-IOD limited duty Officers serving in a Department of 2,000 Officers. In contrast, in Chicago, in a Department of 10,000 Officers, there are approximately 220 such Officers. This does make the point. Time lines do encourage Officers to get well and get back to full duty. This is particularly important in economically difficult times when the services of all Officers are needed on full duty.

There are provisions for disability retirements. This proposal only applies to non-IOD Officers. It does not apply to injury on duty Officers. The DPOA proposed the *status quo,* namely, no limitation, and the City proposed the one year limitation. As the Chairman understands the City's offer, the one year limitation would begin effective the date of the Order. Furthermore, the Panel must choose one or the other offer. Recognizing that the City needs full-time duty Officers and there are provisions for disability retirement and it seems that one year is a

46

reasonable time to recover from a disability, the Chairman, along with the City Delegate, will accept the one year limitation. The DPO/\ Delegate dissented, maintaining that there should be no limitation. Thus, the Order of the majority would be a one year limitation for non-100 injuries or illnesses. There is no limitation for IOD injuries or illnesses.

<u>Jssuc No. 45</u> -Economic-    *Article 20 - Eliminate Educational Reimbursement*

The City has proposed that the educational stipend set forth in Article 20 under the conditions set forth therein, namely, that Officers can receive a maximum of $850 per fiscal year applied toward tuition in seeking a graduate degree from an accredited university, a maximum of $700 per fiscal year seeking an undergraduate degree, and $600 per fiscal year to be applied toward payment for participating in an employment development program be eliminated. The DPOA proposes to keep the *status quo.*

This provision has been in the parties' contract since 2000. It is similar to the provision that has been in union contracts throughout the City. The City in the cun·ent financial crisis in imposed contracts has eliminated the tuition reimbursement program throughout the City. In the Tentative Agreement the DPOA agreed to suspend the educational reimbursement until July 1, 2015.

In the overall scheme of economic benefits, this benefit has not been a major factor between the parties. In fiscal year 20 ll-2012, there were 43 requests of an average amount of $621 for a total of $26,716. In fiscal year 2009-2010, there were 97 requests of an average of $591 for a total of $57,365. This is an economic issue. The Panel is obliged to select one or the other Last Best Offer. It is a minuscule amount. Nevertheless, it is a saving and the DPOA at one time, in view of the current history of usage, was willing to suspend the payment for three years. The Chairman is aware of the circumstances of the Tentative Agreement which was

47

eventually rejected by the State. Nevertheless, this was the Tentative Agreement and gives some indication of what the parties would bargain on this issue, all other things being equal.

If this was the Last Best Offer of the DPOA, the Chairman would embrace it. But it was not.

Under the circumstances and with little usage and given the City history city-wide, the Chairman will join with the City Delegate and eliminate Article 20. The DPOA Delegate dissents.

Issue No. 81 –Non-Economic -     *Article 40.A- Miscellaneous-Maintenance <?(Conditions-Eliminate*

The City proposes to eliminate At1icle 40.A, the Maintenance of Conditions clause, which reads:

> Wages, hours and conditions of employment legally in effect at the execution of this Agreement shall. except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

The DPOA proposes the *status quo.*

Under normal circumstances, to the Chairman, this would be a "no brainer" and the Chairman would opt to maintain such a clause. But, because of the City's financial crisis, there will be changes in the pat1ies' Master Agreement as a result of this Act 312. In fact, as a result of the Tentative Agreement of february 2012, there were major changes. Thus, the Maintenance of Conditions clause under such conditions is not appropriate. Hopefully, this clause can return in the future. However, under cmTent conditions, the Chairman reluctantly must vote to at least temporarily eliminate the clause and save it for future negotiations. The City Delegate joins with the Chairman in so voting. The DPOA Delegate dissents.

48

<u>Issue No. 84</u>- Economic- *Article 40.£- Misce/laneous-r.:xecution of Agreement Without Prejudice to Any Grievances, etc.*

A1ticle 40.E in the Master Agreement reads:

> The execution of this collective bargai ning agreement shall be without prejudice to any pending grievances, arbitration or other litigation except where the subject malter in dispute may be resolved herein.

The City proposes to eliminate this provision. The DPOA proposes the *status quo.*

This provision has been in the parties' Master Agreement for a number of years. To the Chairman, it is an end run to avoid pending disputes which the parties have chosen to resolve other than through negotiations or Act 312. If the parties had wished to resolve the grievances in negotiations or Act 312, they should have done so.

Having chosen not to do so, then the parties, as they have in the past, should rely on other procedures. It is for these reasons that the Chairman, joined by the DPOA Delegate, votes to keep the present language. The City Delegate dissents.

<u>Issu e No. 83</u> - Econom ic - *Article 40- Miscellaneous-Savings Clause*

Article 40.D of the Master Agreement reads:

> Savings Chlusc. If any article or section of this Agreement or any supplement thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any article or section should be restrained by such tribunal, the remainder of this Agreement and supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such article or section.

The City proposes to remove the clause "the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually" and replace it with the clause "the City shall in its discretion determine". The DPOA proposes the *status quo.*

The Chairman, along with the DPOA Delegate, agrees to keep the *status quo.* This is a

49

mutual contract. If a provision of the Agreement is held invalid, then the palties should mutually agree on a replacement. It is just that simple. The City Delegate dissents.

| | |
|---|---|
| Issue No. 140 - Economic- Union Proposal - | *Article __ - Award of 20% of Savings from Reduction in Certain Benefits* |
| Issue No. 114- Econom ic - Union Proposal - | *Article 18-Leave Days-Pay 1 lhxfor All Time on Restricted Weekends* |
| Issu e No. 136 - Economic - Union Proposal - | *New Rank a_( Corporal to be Established; Any Officer With 15 Years of Service Automatically Promoted to Corporal; 2% Increase* |
| Issue No. 119 - Econom ic - Union Proposal - | *$500 Per Year For Cell Phone Use* |
| Issue No. 125- Econom ic- Union Proposal - | *$1,000 Bonus for All Officers* |
| Issue No. 134 -Economic- Union Proposal - | *Field Training Officers 5% Increase in Wages* |
| Issue No. 121 -Economic- Union Proposal | *Bank or Sell Furlough Time* |

The Chairman has grouped Issue Nos. 140 (Union Proposal), which is different than City Issue No. 140; Union Issue No. 114; Union Issue No. 136; Union Issue No. 119; Union Issue No. 125; Union Issue No. 134 and Union Issue No. I21 as a group. The reason that the Chairman has done so is that these proposals represent economic enhancement over the expired Master Agreement. The Chairman has already discussed the City's abili ty to pay. As this Opinion and Award is being written, a State Financial Review Team on February 19, 2013 issued a report confirming the Chairman's conclusion, along with the financial private agencies' conclusions, that the City of Detroit is in a financial crisis, to say the least. Thus, when the Chairman reviews Union Issue No. 140 and Issue Nos. 114, l 36, 119, 126, 134 and 121, these arc all issues that seek economic improvements of one sort or another that would be proffered in a situation where there was some semblance of an ability to pay.

The Chairman appreciates that as to Union Issue No. 140, an award of 20% of savings from reduction in certain benefits had its genesis in the Tentative Agreement of February 2012 and was no doubt the result of the give and take of bargaining. But that Agreement was rejected

50

by the State. The savings were necessary in order to arrive at an agreement in a critical financial situation. Seeking a Corporal rank is an attempt to get a pay raise where general employees are taking a pay reduction and the City is virtually, if not, insolvent. The Chairman acknowledges that this is an attempt to mirror what occurred with the Wayne County Deputies. But it is not in the cards at this time in Detroit because of the financial crisis which is the proposal represented by Issue No. 132 to provide a 2% increase for Officers with 15 years of service to be automatically promoted to Corporal.

Issue No. 119 provides for $500 per year for cell phone use. Again, this is a cost that the City cannot at this time afford.

Issue No. 125 represents a $1,000 bonus for all Officers—another cost that the City does not have the financial ability to provide.

As to a 5% increase for Field Training Officers, there are some departments that do provide a stipend for Field Training Officers such as, for example, Chicago. But, again, this Chairman with these financial difficult times in Detroit, with the amendments to Act 312 brought about by Act 116 emphasizing financial ability, if there was ever a case where financial improvements, absent compelling circumstances, can be made, this is the case. The proposals listed above, including one and one-half time pay for restricted weekends, fall in this category. This does not mean, in the Chairman's view, that there might be a situation where the marketplace might compel an economic improvement. But the cost associated with these proposals would impede the ability to maintain a competitive wage in these difficult financial times. For instance, the $500 per year cell phone payment and the $1,000 per year bonus just for the Police Officers is estimated to be $3 million. This is no small change.

If 50% of the Officers sold one week of furlough time, this would cost the Department

approximately $900,000.

There would be an additional cost for the time and one-half on the restricted leave day. In addition, this provision had been rejected by three Act 312 Arbitrators, including this Chairman. this Chairman in the mid 1990's in *Case No. D92 C-0554,* noted that the issues concerning restricted days should be resolved through the grievance procedure.

Second, in his August 2003 Act 312 Award, Arbitrator William E. Long rejected an identical proposal for three reasons:

> First, Arbitrator Long stated the language in the DPOA's LBO stating that if the Department restricts leave days for any command district, precinct or pmt thereof, no matter how small, that this counts toward one of the six restricted days for the entire Department was unreasonable. Sec Ex. 674, second exhibit, at 84. The Panel also noted that "there is concern with the fiscal impact of the provision in the last sentence, which in the view of the Panel majority, unnecessarily restricts management in managing its personnel needs and adds unnecessary costs." *!d.* at Ex. 674, second exhibit, at 87.
>
> Second, Arbitrator Long credited the City's analysis of the cost of this provision should they need to exceed the number of restricted days at between $154,000 and $218,000 each day. This is obviously an astronomical cost that the City cmmot afford if it is required to restrict leave days for ⟨my kind of an emergency. See Ex. 674, second exhibit, at 86.
>
> Third, Arbitrator Long noted that there was no record evidence to support how a six day limit on the City's ability to restrict weekend days would be enough or appropriate. Ex. 674, second exhibit, at 86·87.

Arbitrator Richard Block rejected the proposal in his March 2007 Act 312 *I*\ward. See Ex. 674, first exhibit. Arbitrator Block found that the provision would be too costly, that the City needed flexibility concerning restricted days in the event of an emergency and that there was no need shown.

Like the Long and Block Awards, this provision continues to be too costly and there has been no need shown for a change, particularly in a financially distressed city.

It is for these reasons in the economic climate in Detroit that the Chairman must vote

52

along ·with the City Delegate to deny the DPOA's request as to Union Issue No. 140 and to deny theDPOA'srequestasto1ssueNos. 114, 136, 119, 125, 134and 121. TbeDPOADelegate dissents.

Issue No. 124 -Economic- Union Proposal -     *Economic Promotion to Sergeant Based on Seniority Only*

The DPOA as to issue No. 124 has proposed to add a provision that promotion to and through the rank of Sergeant shall be based on length of service therein and as defined length of service. The rationale for this proposal is that promotions in the Detroit fire  Department are by seniority only rather than examination as in the Police Department. The DPOA has not pointed to any comparable police department in Southeast Michigan or anywhere in the State of Michigan where Police Officers are not promoted by examination.

Furthermore, the matter of promotion in the Detroit Police Department has been in existence since the time the parties have been negotiating. There is no basis to change.

For this reason, the Chairman, along with the City Delegate will vote to deny this request. The DPOA Delegate dissents.

Issue  No. 115 -Economic- Union Proposal-     *Article- Legal Representation-Increase Amount to $300,000for Legal Fees*

Article 28 is entitled "Legal Representation and Identification". Paragraph 5 of Artjcle 28 provides:

> Effective July 2004 and each fiscal year thereafter, the City shall either defend or reimburse the DPOA and/or member for all legal expenses and fees incurred by the DPOA or member if the member is criminally charged and/or prosecuted for conduct that arises out of/or involved with the good faith performance of the official duties of the employee and the member is either exonerated or the criminal charges are dismissed. The City's obligation to defend or reimburse shall be capped at an amount of one hundred thousand dollars ($100,000) each fiscal year. The DPOA shall upon request provide documentation supporting a

53

claim for reimbursement.

The DPOA proposes that the amount be increased to $300,000. The City proposes the *status quo.* This is a cost item. As in this round of contract 312, the City opposes any increase in cost and is seeking reductions. This proposal would be costly.

In his brief, the City's Advocate notes, "With no demonstration that the $100,000 allotted per year has either been exceeded was ever close to being exceeded, there is no justification for a change in this provision." Furthermore, the City can elect to defend with its own counsel and, indeed, $100,000 can buy substantial services. Without a proven need for an increased amount, this Chairman, along with the City Delegate, will deny this request. The DPOA Delegate dissents.

Issue No. 117 - Economic - Union Proposal -    *Article 40-Misce/laneous - City shall*
*provide DPOA members with all greater*
*benefits provided to others*

The Union proposes a new Section L to Article 40 to read:

> The City shall propose DPOA bargaining unit members with all greater economic benefits awarded and/or provided to DPCOA, DPLSA and/or DFFA.

There is presently no such provision in the Master Agreement. This is sometimes known in labor parlance as a "favorite nation" clause.

The argument being made by the City is there should be no such provision. There has not been such a provision in the past. The City proposes that the *status quo* remain.

The Panel has put together a contract based upon the unique circumstances of Police work in Detroit and more specifically the work of the Detroit Police Officers - not the Command, not the Supervisors, not the Commanders, and not the Detroit Fire Department. Each of these units have different factors and in a reorganized and reconstituted City government may

54

be expected in each case to be reconstituted in order to respond to the economic realities of what will become a new Detroit. In the meantime, this Panel must address the needs and limitations involved with the Detroit Police Officers Association. This Panel is addressing the City's financial ability in co1 unction with the public welfare of having Police protection. The marketplace for Police Officers, which is different than the marketplace, for example, of the DPLSA or the DPCOA and the art of the possible as to Detroit Police Officers when comparing with similarly situated police officers doing police work.

It is for these reasons that the Chairman, along with the City Delegate, will deny the requested addition of Section L to Article 40. The DPOA Delegate dissents.

Issue No. 52- Economic - *Article 30- Modify Shift D(flerential*

Article 30 of the Master Agreement provides for shift differential, namely, if the tour of duty begins between 11:00 a.m. and 6:59p.m., the rate of shift premium is 50¢ per hour. If the tour of duty begins between 7:00p.m. and 3:59a.m., the rate of shift premium is 60¢ per hour.

The City proposes to reduce the shift premium for the 11:00 a.m. to 6:59p.m. period to 25¢ per hour and from 7:00p.m. to 3:59a.m. to 50¢ per hour, maintaining that this is an attempt to obtain uniformity with all bargaining units throughout the City; that this has been obtained with all the non-uniform units. The DPOA seeks to maintain the *status quo.*

There is no question that this reduction would result in a savings. But it fails to recognize that Police work does not lend itself to uniformity as might be suggested by the fiscal agreement. Here is why.

In his travels among police departments over the years, particularly in large municipalities, the Chairman has been led to believe that there are two major periods in a 24-hour period of high Police activities, namely, between 4:00-8:00 p.m. and at the time that bars

55

close which the Chairman is led to believe in Michigan is 2:00 a.m. And it is also recognized that criminal activity bas a tendency to occur during hours of darkness. This is not always true, of course, but there is the tendency.

In addition, as a Police force grows older and is on permanent shifts as compared to rotating shifts, older Officers tend to use seniority to obtain positions on the day shift. The value of shift premiums, which usually are not available when there are rotating shifts, is to encourage some senior Officers to take the night shifts. Thus, there is a reason for shift differentials in Police work that docs not apply to general employees in both the public and the private sectors.

In other words, the work of Police Officers on the afternoon and midnight shifts, by the nature of criminal activity, can be more demanding and the Department may wish to encourage a more experienced, older Officer to seek employment on the night shifl by a reasonable shift differential that is not necessary to make available to employees in other types of work. Though there may be a cost savings in halting the afternoon shift differential and in docking the night shift differential by 10¢, the nature of Police work and the need for experienced Officers in times of heavy Police activity, coupled with the fact that these shift differentials have been negotiated over a long period of time, even in a fiscal crisis, causes this Chairman to vote with the DPOA Delegate to maintain the current shift differential, namely, the *status quo.* The City Delegate dissents.

| | |
|---|---|
| Issue No. 108- Economic- Union Proposal - | *Article 33-Pension Benejits-2.2% Multiplier* |
| Issue No. 109 - Economic - Union Proposal - | *Article 33.D.H-Pension-/nc/ude Banked Vacation and* Sick *Time in Pension Calculation* |
| Issue No. 110 - Economic - Union Proposal - | *Article 33-Pension-Best 3 of 5 Years* |
| Issue No. 111 –Economic - Union Proposal - | *Article 33-Pension-1.5% Escalator and Same for DROP Plan* |

The Chairman has grouped together Union Proposals represented by Issue Nos. 108, 109,

110 and 111. The DPOA and the City of Detroit entered into a Stipulated Act 312 Award in September 2011 concerning a pension multiplier and the loss of an escalator. What the DPOA proposes to introduce in Issue No. 111 is an escalator of 1.5%, to increase the multiplier from 2.1% to 2.2% (Issue No. 108), and by changing the years to be utilized in the final average compensation (Issue No. 110) from the last 60 months prior to retirement to the best three of the last five years, and to include banked vacation and sick time in average final compensation (Issue No. 109), which the City argues is contrary to the Stipulated Act 312 Award in September 2011 and is designed to alter that Award. The City introduced a report dated January 8, 2013 from actuary Joseph Esuchanko as Exhibit 741 that set forth the cost of these proposals as follows:

> Increase multiplier from 2.1% to 2.2%: $8.5M
>
> Include longevity again, plus all banked vacation and sick leave time in AFC: $103M
>
> Change the definition of Average Final Compensation from last 60 months to highest three years of the last of five years: $8.6M
>
> Reinstitution of longevity, inclusion of banked vacation and sick time and change in years of Average Final Compensation if all were granted: $19.5M
>
> Add 1.5% per annum pension escalator: $40.4M
>
> Cost to increase multiplier, change Average Final Compensation to highest three of five years, include vacation and sick banks and add 1.5% annum pension escalator: $73.2M. See Report, Ex. 741 at 11.

After setting forth this cost analysis, the City's Advocate at page 70 of his brief concludes:

> In view of the stipulated Act 312 Award in September 2011 and the City's current financial condition, awarding the DPOA any of its proposed pension proposals is totally and completely unwarranted. Furthermore, considering that the City has already borrowed $1.58 (the POCs) to fund the pension, any more liability is simply unwarranted.

The Chairman agrees that with the City's financial situation and the fact that only a year

57

previously the DPOA stipulated to the changes referenced in the Stipulated Act 312 Award of September 2011, this is not the time to make the changes sought . For this reason, the Chairman, concurred in by the City Delegate, will vote to reject the DPOA's proposals as to Issue Nos. 108, 109, 110 and 111. The DPOA Delegate dissents.

Issue Nos. 95 and 96 - Economic–  *Article 46-Pension Board to Provide Information to City;*
*City Right to Change Board*
Issue No. 120 - Economic– Union Proposal -    *Article 46-Pension Board-Add Two DPOA*
*Representatives*

The parties have two competing issues as to the Pension Board. The DPOA proposes to have the right to add two Trustees elected to the Police and Fire Pension Board. Presently, the Pension Board's composition has a 50/50 representation as a result of an Act 312 decision by Arbitrator William Long and then confirmed by Arbitrator Ken Frankland as a result of the September 2011 Stipulated Award. Although there was testimony by DPOA President Diaz suggesting that the Commander representative favored management, with the Long and Frankland Awards favoring the current composition and the method in the contract for breaking ties, there is no persuasive reason to overrule previous arbitrators on this issue.

For this reason, the Chairman, along with the City Delegate, will vote for the *status quo.* The DPOA Delegate dissents.

As to Issue No. 95, this issue is the opposite of Issue No. 121 and is an attempt to change the composition of the Board proposed by the City by eliminating the deadlock mechanism implemented by Arbitrator Long in *Case No. D01 D-0568* and to provide in Paragraph L language "The City reserves the right to change the composition structure and decision making procedures of the Pension Board". The Chairman, joined by the DPOA Delegate, will vote for the *status quo.* The City Delegate dissents.

58

As to Issue No. 96, except with the elimination of the reference to the CET and replacing

it with the word "order", which is housekeeping language, the Chairman, joined by the City

Delegate, will adopt Issue No. 96 which provides as follows:

> M.    Within fifteen (15) days of the effective date of this CET, the
> Pension Board shall provide to the Mayor and City Council all
> pension plan documents, including but not limited to: Plan
> Documents, Plan Amendments, Favorable Determination
> Letters (Pension Only), Summary Plan Descriptions, All
> Summaries of Material Modification, Model Enrollment Forms,
> Insurance Contracts, All Funding/Actuarial Reports, All
> Explanations provided to Participants/Employees such as
> "Benefits at a Glance" and/or other summaries. The Pension
> Board shall provide to the Mayor and City Council all future
> amendments to any such documents within five (5) days of the
> amendment.

This seems to be a reasonable provision as, since the City is supplying funds for financing the

pension obligations, the City is entitled to the pension documents as set forth in the above

provision and Paragraph M should be incorporated into Article 96 of the Master Agreement.

Issue No. 123 - Economic - Union Proposal -    *Article 40-Miscellaneous-Canine*

Article 40.K of the Master Agreement provides:

> K.    Canine.  With respect to any assignment made to Canine (K-9)
> on or after July 1, 2007, the City may, at its discretion, direct the
> member on said assignment to return all departmental dogs
> under the age of five and all departmental equipment to the
> department at such time as that member is no longer assigned to
> Canine.

The DPOA proposes to replace Section K as follows:

> Paragraph K- Deleted to reflect the fact that DPOA bargaining unit
> members retiring from and/or leaving the canine unit will be permitted
> to keep their canine.

There is no evidence that there was bargaining over this provision. The City proposes to

keep the *status quo,* making the return of equipment optional at the discretion of the Department

for dogs under the age of five. This provision was in the Master Agreement as a result of negotiations. There is a cost, although minor, in the scheme of things. But, with the lack of negotiations, even on the remand, the Chairman will not vote to modify the Master Agreement. This is a matter that should be negotiated between the parties. For this reason, the Chairman will vote with the City Delegate to maintain the *status quo*. The DPOA Delegate dissents.

Issue No. 28 -Economic-   *Article 13.A and B- Off-Duty Court Appearance-2x Straight Time*
Issue No. 29- Economic–   *Article 13.D- Off-Duty Court Appearance First 60 Ilours as Camp*
                          *Time*
Issue No. 30- Economic -  *Article 13.G- Off-Duty Court Appearance - Holiday Court*
                          *Appearance 1 x*

 The City proposes to modify four Sections of Article 13 addressing off-duty court appearances. The City as to Article 13.A proposes to change the minimum time for off-duty court appearances from three hours at time and one-half to two hours at straight time (Issue No. 28) and to delete the sentence, "Off-duty court appearances for a period of less than 45 minutes which abut a prescheduled shift may be treated as either overtime or cotui time at the option of the Department".

 As pati of Issue No. 28, the City proposes to amend Article 13.B so that the second paragraph shall read, "If the actual amount of time spent in court is less than two hours, the member shall be credited with two hours worked at straight time'' and to amend the third paragraph of A1iicle 13.B to read, "If the court appearance is for two hours or more, the member shall be carried working for the actual amount of time worked".

 Issue No. 29 addresses Article 13.D and provides, as proposed by the City, "Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not cash payment. After the sixty hours of off-duty court time are worked in the fiscal year, the member

shall have the option of being paid in cash or being credited with compensatory time. Furthermore, such off-duty court time shall be paid in cash rather than granting compensatory time when necessary to comply with F.L.S.A. requirements". In the Master Agreement, the member has the option to be credited with compensatory time or being paid in cash, subject to FLSA requirements.

Issue No. 30 is a proposal that "a member who is required to appear in court on a holiday will receive credit either for an off-duty court appearance at the two hours straight time minimum or holiday premium pay (I x) for the actual time spent on the court appearance whichever is greater". The Master Agreement had provided in Section 13.G, "...at three hour minimum or holiday premium pay (2x) for the actual time spent on the court appearance, whichever is greater".

The DPOA proposes the *status quo,* namely, the language in the Master Agreement.

The City notes, as in Exhibit 646, overtime costs for the Department for 2011-2012 were $24 million; that changing court time for two hours straight time from three hours at time and one-half would save the Department $1.5 million annually; that requiring the first 60 hours of court time as banked as compensatory time would save the Department $700,000 per year.

The fact is that in the Tentative Agreement of February 2012, the DPOA, as an attempt to assist the City to save money, did agree to these proposals as to off-duty court appearances, namely, "Article 13 'Off-Duty Court Appearances' of the collective bargaining agreement shall be modified through August 13, 2015 to provide as follows ...". As the Chairman interprets the Agreement, the DPOA was willing to agree to these modifications for a period of three years on the condition that the savings represented by the modifications, along with other savings, would first sunset and, in the Tentative Agreement, would provide that the DPOA members would

61

receive 20% of the savings represented by the Tentative Agreement. Then, too, there was to be no reduction in salary and longevity. Nevertheless, the State rejected the Tentative Agreement because allegedly there was not sufficient economic savings.

The matter has come before an Act 312 Panel. This Panel will recommend a two year contract under certain conditions. The Panel will provide for certain additional savings that were not in the Tentative Agreement, including certain provisions for structural changes that will aid in reorganizing the Department to be economically more efficient and yet provide the Officers with a pathway for a more competitive wage.

As the Chairman sees the proposal of the City, it is in three parts, namely, the comt appearance being two times straight time, the first 60 hours as comp time, and holiday court appearance as time and one-half. The City noted at page 59 of its advocate's brief that "The City requests these changes for the following reasons". The fourth reason that the City gives is:

> The DPOA agreed to this provision as part of the Tentative Agreement.
> See Ex. 771, p. I. Although the Tentative Agreement was rejected by
> the State of Michigan because it did not provide sufficient overall
> savings and because the Labor Contract would be extended to June 30,
> 2015, there is support for this concept from the DPOA.

As to Issue No. 29, the bank of compensatory time would save the Depmiment $700,000 per year and for this reason this Chairman, along with the City Delegate, will opt for this proposal with the DPOA Delegate dissenting. However, as to changing Article 13.A and B as proposed and Article 13.G as to holiday court appearances as proposed, the Chairman, along with the DPOA Delegate, will opt for the *status quo*. Though the changes would represent a savings in overtime, depriving the Officers of a long time benefit is not the way to obtain the savings. What needs to be done is to encourage the Officers to write tickets. If the Department wishes to control overtime as to coutt appearances and holiday court appearances, then the Department

62

should consider adopting the technique that is prevalent in other Michigan municipal police departments, namely, to have a supervisor negotiate with the citizens who arc ticketed and only have the court Officers come to court in the event there are contested tickets. This works well, particularly in suburban departments and controls ove1time. There was no showi ng that the Department has utilized this technique to control overtime justifying eliminating a long-standing contractual benefit.

Based upon this analysis, a majority of the Panel will continue the *status quo* as to Article 38.A and Band A1ticle 13.G with the City Delegate dissenting. As to Issue No. 29, the Chairman, concurred in by the City Delegate, will agree to adopt the City's proposal as to off-duty court appearances for 60 hours at comp time. The DPOA Delegate dissents.

| | |
|---|---|
| <u>Issue Nos. 71 and 72</u> - Economic - | *Article 35.A.2- Sick Leave-Freeze Sick Leave Banks; Limit Future Accrual of Sick Leave; Elimination ofSeniority Sick Leave* |
| <u>Issue No. 73</u> - Econ omic- | *Article 35.B- Sick Leave-Use ofSick Time for Family and Relatives Discretionary* |
| <u>Issu e No. 74</u> - Non-Economic - | *Article 35.F- Sick Leave-Call in Sick Daily Until Doctor Note* |
| <u>Issue No. 75</u>- Economic- | *Eliminate Pay-Out of Sick Leave Accrued A.fler July 17, 2012* |
| <u>Issue No. 76</u> - | *Interest Payments* |
| <u>Issue No. 77</u> - | *Drop Plan Participants-Receipt of Payouts* |
| <u>Issue No. 78-</u> | *Reservation ofRight to Cap Accumulation of Sick Leave and Compensatory Time* |

The City has proposed the above four listed Issues. Issue Nos. 71, 72, 73, 76, 77 and 78 are proposed amendments to Article 35 addressing sick leave. Issue No. 75 addresses an overall elimination of payout of sick leave accrued after July 17, 2012. All of the Issues are deemed economic except Issue No. 74, which is deemed non-economic.

There are two types of sick leave in the Master Agreement. The current sick leave provides that an Officer earns one sick day per month which is placed in a sick leave bank,

63