namely, the current sick leave bank. In addition, after one year, an Officer is credited with five seniority sick days in his or her sick bank. Both banks, current and seniority sick time bank, can accumulate without limitation.

Issue No. 71 is a City proposal that the current sick leave bank be frozen as of July 17, 2012 and that further accumulation of current sick leave banks will be capped at 300 hours.

Issue No. 72 eliminates seniority sick days and freezes existing seniority sick banks.

Though the City maintains, based on Exhibit 659, that the value of seniority sick banks in the Police Department is approximately $2 million every year and that this is an ongoing liability, the fact is that seniority sick banks have been pati of the parties' Master Agreement for a number of years. This provision is in the parties' contract as a guarantee against catastrophic injury or illnesses. With no evidence of negotiations to limit the effect of this provision, the Chairman, joined by the DPOA Delegate, will vote to maintain the *status quo,* namely, the present provision in the Master Agreement as to seniority sick bank and the unlimited accumulation of seniority sick leave with the City Delegate dissenting.

As to Issue No. 71, the Chairman recognized that the payout of sick time at retirement is a cost. The DPOA proposes as to Issue No. 71 that the *status quo* be maintained, noting that the unlimited accumulation of current sick time has been in the pruiies' Master Agreement for some time. The Chairman appreciates that this creates a substantial economic obligation on the part of the City. Yet, the Department is concerned about absenteeism and its effect on the Department's 24/7 operation and the need to have Police on the streets; that absenteeism interferes with the Depruiment's operation. If Officers in effect have no incentive not to use sick days despite the possibility of discipline, the incentive to accumulate sick days as insurance against catastrophic illnesses or the award in accumulation could very well impact on the efforts of the Department to

64

avoid absenteeism and the ovetiime caused by absences.

There are creative ways that the Chairman has seen in other departments to address the so-called legacy costs created by the payouts at retirement or leaving the Department of accumulated sick time. But the proposal of capping, particularly at the low number of 300 hours, would not .fit in to the concept of the art of the possible and would not, in the opinion of the Chairman, shared by lJJe DPOA Delegate, have been reached at the bargaining table.

For this reason, as to Issue No. 71, the Chairman, joined by the DPOA Delegate, will opt to remain the *status quo* and reject the City's proposal. The City Delegate dissents.

As to Issue No. 75, the City proposes that a member shall receive full pay for 100% of the unused accumulated sick bank accumulated as of the date of July 17, 2012. Payment shall be made after permanent retirement/separation within 90 days if the amount is less than $10,000 and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on September $1^{51}$ and August $1^{51}$ with no interest due.

The DPOA proposes the *status quo* as to Article 35.M which gives the Officer the option to take a payment of the accumulated sick time or choose to receive the three year average of 25% of the unused accrued sick leave bank in one (1) ... and have the sum included in the final average compensation used to compute the member's service pension of the retirement allowance.... The lump sum payment the member will receive will be the remaining value of the unused accrued sick leave as provided ... above.

The Panel must choose one or the other option. Issue No. 75 assumes a cap on sick leave and, as explained on Issue No. 73, a majority of the Panel has rejected the cap on sick leave because such a cap could well encourage absenteeism which the Department wishes to avoid. For this reason, the Chairman, along with the DPOA Delegate, votes to maintain the *status quo*

65

as to issue No. 75 and maintain Article 35.M.  The City Delegate dissents.

As to Issue No. 76, the City in the event, which was the case, that a majority of the Panel rejected the City's Issue No. 75, nevertheless proposed that payments made on sick leave accumulations, if the amount is less than $10,000, be paid within 90 days after permanent retirement/separation and if in excess of $10,000 the amount shall be paid in semi-annual installments for a period of three years on February P¹ and August Pᵗ with no interest due.  The Chairman interprets this to mean that if the payments are not made when due, then interest would be paid.  On this basis, the Chairman will vote with the City Delegate to accept this proposal as to issue No. 76.  The DPOA Delegate dissents.  This ruling is subject to the ruling on Issue No. 77.

As to Issue No. 77, the City proposes that DROP Plan participants may only receive payout of sick time when they permanently retire, not when they enter the DROP Plan.  Under the expired Master Agreement, DROP Plan participants receive sick leave payout when they enter the DROP Plan and continue to work as Police Officers.  This proposal could save money to the City.  However, it has an unintentional consequence.  For this reason, the City would ask to amend the proposal to permit Drop Plan participants at the time they enter the Drop Plan to exercise the option, if desired, set forth in Atiicle 3S.M.2 and defer after collecting the three year average of 25% of the unused accrued sick leave bank available at the time of entering the Drop Plan would be received at the time the participant permanently retires.  The City agrees to amend the proposal accordingly with the concurrence of the DPO/\.  Though the DPOA objects to the proposal, the Chairman and the City Delegate concur in the proposal with this amendment, namely, that the Drop Plan participant may exercise the 35.M.2 option at the time of entering the Drop Plan with the understanding that the remaining value of the unused accrued sick leave bank

66

shall not be paid to the Drop Plan participant until the Drop Plan participant permanently retires.

As to Issue No. 78, the City proposes, "The City reserves the right for purposes of retirement payout to cap the number of hours a member may accumulate in their sick leave and compensatory time banks or to the extent allowed by law, cap the amount of payouts from such banks upon retirement." The DPOA objects to such language.

The Chairman has been asked in these proceedings to rule on provisions, including proposals as to caps on payouts. The Chairman, with one or the other Delegate, has made rulings. Once making these rulings, this becomes part of the contract. If the rulings do not modify the Master Agreement, the language or the practices developed under the Master Agreement remain. What Issue No. 78 does is to ignore negotiations, ignore the provisions of the contract that have been crafted between the parties over the years, and these Act 312 proceedings which were carefully developed by the parties through testimony and extensive briefs. There is no place in these proceedings or in the Master Agreement for such language. It fails to recognize that there are two parties to the Agreement. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal on Issue No. 78. The City Delegate dissents.

In Issue No. 73, the City seeks to amend A1ticle 35.B by amending the last sentence of the first paragraph entitled "Sick Time Credit" as follows:

> The granting of sick time for attendance upon these relatives is at the discretion of the City and not limited to any given numbe1 of days per fiscal *year*. However, no more than three (3) days will be granted in one instance.

The City is adding the language "at the discretion of the City" and striking out "and not limited to any given number of days per fiscal year".

The City's Advocate correctly recognizes in his brief the possible impact of the Family and Medical Leave Act on this language, as does the Chairman. Furthermore, the current language has been in Master Agreement for some time. The DPOA objects to this language change.

For these reasons, the Chairman, joined by the DPOA Delegate, will opt for the *status quo* as proposed by the DPOA. The City Delegate dissents.

Issue No. 74 is non-economic. The issue deals with Article 35.E which is entitled "Reporting Illness or Disability". The City proposes one change, namely, notification on a daily basis. The City tells the story of an Officer who when asked to notify the Officer's Command, actually sought a protective order. The Chairman finds this incredible. Though the Chairman appreciates that the DPOA objects, the Chairman finds that this proposal is reasonable to a point. The language should be further refined to clarify that if an Officer is hospitalized that the Officer does not have to call in daily or if the Officer is recuperating from a hospital stay at home that the Officer, if producing a medical statement that indicates when the Officer may return, that this would not require the Officer to call in daily.

In other words, the language should be refined so that it is clear when the daily requirement is to be met.

The Chairman, along with the City Delegate, will approve of the concept once the City clarifies exactly when the daily requirement is to be met. In other words, if an Officer is out, presumably the daily requirement will be met until the Officer produces a doctor's statement indicating the times of illness and return date or when the Command knows that the Officer is recuperating under a direction of a doctor and has documentation to that effect or is in the hospital. The language should be refined. If there is a dispute between the parties as to the

68

reiinement, then it should be returned to the Panel for refinement. Otherwise, the concept is sound.

Therefore, the Chairman will join with the City Delegate, recognizing that the DPOA objects to this change but, in the interest of completing this contract immediately, will adopt this language subject to the comments of the Chairman here. If there is a dispute in any given case as to any discipline over the failure to call in because it fell into one of the categories discussed by this Chairman, that dispute should be attached either to an expedited arbitration at the next expedited arbitration date if the discipline is meted out or to a regular arbitration with these comments so that the umpire will understand the intent behind the change approved by a majority of this Panel. The DPOA Delegate dissents.

Issue No. 80 - Economic - *Jury Duty*

The City proposes to replace Article 35, «Jury Duty" with entirely new language. The new language proposes that "An employee shall be allowed to attend jury duty without pay. An employee may elect to use paid leave for any day he/she serves on jury duty. Jury duty time shall not be counted as time worked for the purposes of computing overtime." This is Section A of the new Article 35. There is also Sections B and C. In Section B there is a provision that provides, "that the Department shall have the discretion in seeking to have the employee excused when his services are essential".

The DPOA proposes to maintain the *status quo* which provides that jury time is paid time and that the jury fees are to be returned to the City.

The City's rationale for the change as set forth in its counsel's brief is, "One of the goals of the Annex D of the Financial Stability Agreement was that there be uniformity in contract provisions." The brief goes on to point out that, except with unexpired labor contracts, the City's

69

expired contracts now have the proposed language.

The Chairman appreciates the desire for uniformity. But there are two reasons why the Chairman will vote with the DPOA Delegate to maintain the *status quo*. First, there is only so much that can be accomplished in an Act 312 and one negotiations. The provisions for jury duty would not be the main focus of negotiations between the parties because there is no showing that it represents a financial savings. Second, the provision as to seeking to have the employee excused is always the Department prerogative. The Department could issue a Special Order without any contract provision asking that all Officers notify the Department as to pending jury duty notification and then exercise the right to seek to have the Officer excused.

Finally, in many cases, an Officer will no doubt be excused as compared to the general employee population. It is doubtful that a Police Officer would be permitted to sit on a jury involving a criminal matter. It is doubtful that a Police Officer would be permitted to sit on a jury involving litigation against another Police Officer or the City. Thus, there was no persuasive reason in the grand scheme of things, particularly when there were no negotiations, to change this provision. For these reasons, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo*. The City Delegate dissents.

| | |
|---|---|
| **Issue No. 26 - Economic** - | *Article 10.C. - Seniority-Assign to Avoid OT* |
| **Issue No. 31 - Economic-** | *Article 14.A - Overtime-Dept. Has Right To Limit OT by Reassigning, etc.* |
| **Issue No. 36- Economic-** | *Article 14.D - Overtime-Assign OT Without Regard to Preschedu/e OT* |
| **Issue No. 43 - Economic** - | *Article 14.E.9.F- Overtime-Assign From Straight time .F'rom Any Entity* |
| | |
| **Issue No. 32 - Economic** - | *Article 14.B.1 -Overtime-Eliminate Daily Overtime* |
| **Issue No. 34 - Economic-** | *Article 14.C- Overtime-Work 80 Hours for OT* |
| **Issue No. 33 - Economic** - | *Article 14.B.4 - Overtime-Not Include Sick Time For OT* |
| **Issue No. 35 - Economic** - | *Article 14.C - Overtime-Calculation* |

Issue Nos.37 and 38- Economic- *Article 14.D.2- Overtime-Notice of OT*
Issue No.39- Economic- *Article 14.D.3 - Overtime-Union Verify OT Lists*
Issue No.42 - Economic - *Article 14.D.9- Overtime-Not Call More than JO For OT*
Issue No.129 - Economic- Union Proposal- *Article 14 - Overtime-Eligible to Work*
*Overtime on a Furlough Day*

Overtime is an important issue to both the OPOA and the City. For a financially strapped City in fiscal year 2011-2012, the overtime cost for the Police Department was $24.9 million. In fiscal year 2010-2011, it was $24.3 million. Not all of this was attributable to the Police Officers. Some was attributable to the Lieutenants and Sergeants as well as the Command. Yet, this is a substantial cost. On the other hand, Police Officers do rely on overtime.

Issue No. 33 is a proposal to amend Article 14.B.4 as follows: "Time off due to furlough, liquidation of compensatory time, and other paid absences (not including sick leave) shall be considered as time worked when applying overtime rules."

The Chairman begins with the discussion that in the Tentative Agreement of February 201 I the DPOA did agree to a modification besides court time as to overtime costs for, in Paragraph 6 of the Tentative Agreement, the following was provided:

> Overtime. Article 14, "Overtime," shall be modified to provide that unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours. Sick time shall not be considered as time worked in meeting the 80 hour work requirement, but time off due to furlough, liquidation of compensatory time, and other paid absences shall continue to be considered as time worked.

The DPOA rejected the City's proposal despite the Tentative Agreement. There is a logical reason for accepting the City's proposal. It discourages the casual taking of sick time on a daily basis for an Officer can still be called in to work overtime without any penalty for taking off sick. The taking of casual sick time will be discouraged, thereby aiding in the control of sick

time.

Based upon this analysis and the fact that the DPOA was agreeable to this provision at one time, the Chairman, along with the City Delegate, will agree with the City's proposal as to Issue No. 33. The DPOA Delegate dissents.

As to Issue No. 34, the City proposes that overtime shall be calculated on the following basis: " ... unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours·'. In the City's brief, it is stated that the purpose of this provision is "elimination of sick leave as time worked for purposes of calculating the 80 work hour requirement before overtime begins. Time orf for furlough, compensatory time and other leave time (except sick time) will be considered time worked". The provision provides elimination of daily overtime (i.e., overtime after eight hours in a day) and payment of overtime only after 80 hours worked in a pay period.

The Chairman, along with the City Delegate, will vote to include this clause with the DPOA Delegate dissenting.with the clear understanding that the clause should have language consistent with the post-hearing brief that "time off for furlough, compensatory time and other leave time (except sick lime) will still be considered time worked". This is the intent of the language and it should be in the contract. This is not an amendment. This is the intent and it is consistent with Issue No. 33. The whole idea of the language is to eliminate time and one-half for time after eight hours.

As to Issue No. 26, the City proposes to add to AI1icle lO.C.4, "The Department may transfer, assign members to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime or for other staffing or manpower purposes." The DPOA objects.

72

This came from the CET.

As to Issue No. 31, the City proposes to add in Article 14.A, "The Department retains the right to limit overtime in determining the deployment, assignment of personnel and resources, including transferring/reassigning employees to different entities on a day to day or week to week basis to limit, avoid or eliminate overtime."

There are difficulties with these two proposals, causing the DPOA to object to these additions. Until very recently, the Department had a Tactical Unit – one on the east side and one on the west side – where the Officers in that Unit were familiar with the entire City and could fill in where there was a need in any District or Precinct. The Chairman appreciates that that Unit has been disbanded. Based upon the proposed Issue Nos. 26 and 31, the proposals ignore seniority and could be causing seniority Officers being transferred while junior Officers are not being transferred. In the case of Issue No. 26, there appears to be an end run around seniority provisions as the last phrase, "or for any other staffing or manpower purposes", does not seem to have anything to do with overtime provisions. Then there is the safety problem in that an Officer could be transferred to an area where the Officer is unfamiliar. An Officer could be transferred to a so-called delta zone and be unaware that the Officer is in a delta zone. The Chairman understands a delta zone is a zone known as being an area where there is a tendency of hostility toward Police Officers. Officers who work such an area are familiar with such dangerous parts, whereas Officers unfamiliar with the area, coming from other areas in the City, would not be.

It is all these factors that cause this Chairman to join with the DPOA Delegate in rejecting the proposals of the City in adding in the contract proposals represented by Issue Nos. 26 and 31. The City Delegate dissents.

As to Issue No. 39, the City proposes to add to Article 14.E.3.a.c which reads, "The

73

Union shall verify and notify the City of any discrepancies in the ovelltime roster and indemnify the City if its failure to notify the City results in a grievance for overtime". The DPOA objects to this provision. In the absence of negotiations over this provision, the Chairman will opt not to honor this request. This is a matter for the bargaining table, not Act 312, particulaTly when there were so many other issues presented. The DPOA Delegate agrees with the Chairman. The City Delegate dissents.

Issue Nos. 36, 37 and 38 address changes as to the procedures in addressing prescheduled overtime. Presently, the Department is operating in patrol on a 12 hour schedule.

Issue No. 42 addresses a limitation on the number of calls that are to be made before on-duty personnel are offered the opportunity to accept overtime and does provide by mandatory overtime by inverse seniority when the daily on-duty roster in the event a sufficient number do not accept the overtime assignment. With 12 hour shifts there is a problem with such a provision if the junior Officer or any Officer on duty has already worked 12 homs, namely, a problem with fatigue.

A majority of the Panel will address the 12 hour schedule on patrol elsewhere. It seems that even if, based upon the majority opinion, the Department and Patrol goes back to eight hours, there is no showing of a need for the changes proposed by the City as to Issue Nos. 36, 37, 38 and 42; that without negotiation there is no indication that the parties would have reached some accommodation. Thus, the Panel has not been given any guidance of what would have occurred at the bargaining table. Since the present language on these subjects has been in the contract for some time, the Chairman, along with the DPOA Delegate, will opt to make no changes to the Master Agreement as to Issue Nos. 36, 37, 38 and 42. The City Delegate dissents as to Issue Nos. 36, 37, 38 and 42.

74

As to Issue No. 43, the City proposes to add an Article 14.E.9.fwhich would read, "The Department reserves the right to assign Officers on straight time from any entity in the City to avoid utilization of any overtime." The DPOA objects. The Chairman appreciates the sentiment behind the City's Last Best Offer as to Issue No. 43. There is, however, a limit to the quest to control overtime. There are the seniority provisions in the contract. There are the bid rights to certain entities which are to be followed. There is the limitation on assigning out rights. This language, to the Chairman, seems too broad and ignores other provisions of the contract that the parties over the years have negotiated. There are provisions sustained by this Chairman, with the concurrence of the City Delegate, in this Opinion that will assist the City in controlling overtime costs and yet protect basic contract rights that have been negotiated over the years between the City and the DPOA. This language as written would not pass muster at the bargaining table. This is another situation where the Chairman is limited to the parties' Last Best Offers. Without protective language giving recognition to other provisions in the contract, this Chairman cannot adopt this language.

It is based upon this analysis that the Chairman is joined by the DPOA Delegate in rejecting the City's proposal as to Issue No. 43. The City Delegate dissents.

Issue No. 129 seeks to amend Article 14.0.5, Overtime, by adding furloughs to the times that employees "are entitled to participate in pre-scheduled overtime opportunities". Reviewing Article 14.5, the symmetry of the provision and its meaning would suggest that furloughs should be included if in fact there is pre-scheduled overtime. Therefore, the Chairman, along with the DPOA Delegate, will vote to add furlough to Article 14.5 as proposed by the DPOA. The City Delegate dissents.

Finally, as to Issue No. 35, Overtime Calculation, because longevity will be restored the

second year of the contract by a majority vote, the calculation in Article 14.C shall remain as in the Master Agreement with the Chairman voting with the DPOA Delegate to maintain the Article l4.C overtime calculation without changes. The City Delegate dissents.

Arbitration:

| | |
|---|---|
| Issue No. 14- Non-Economic- | *Article 8.A- Arbitration-2 Umpires, Not4* |
| Issue No.128 - Economic - Union Proposal - | *Article 4 - Basis of Rep - Special Conferences Held Within 5 Days)* |
| Issue No. 130- Non-Economic- Union Proposal- | *Article 14-Overtime-Preschedu/ed O.T Grievance Heard by Arbitrator Within 30 Days* |
| Issue No. 131 -Non-Economic- Union Proposal– | *Article 17-Arbitration on Performance Review Within 30 Days* |
| Issue No. 132- Non-Economic- Union Pr·oposal- | *Article 36- Regularity in Sick Leave Benefits -Arbitration on Allendance Issues Within 30 Days* |
| Union Proposal No. 146- Economic- | *Article 7- Non-Economic: Payment of Umpire for cancellation days by party cancelling hearing)* |
| Issue No. 16- Non-Economic- | *Article 8.F- Arbitration-Back Wages* |

There are seven issues dealing with arbitration or related to dispute resolution in the parties' Master Agreement. The Chairman has grouped these issues together for the purposes of convenience.

The Master Agreement provides for four Umpires. Currently, the patties are operating with three Umpires with one vacancy. This is Issue No. 14. The City proposes to reduce the number of four Umpires to two. The City's rationale is threefold. First, the number of Officers assigned to the Labor Rela6ons Law Unit has decreased since 2008 hom a high of six Officers in the unit plus an Inspector to three Officers in the unit plus an Inspector, although recently a fourth Officer has been added to the unit.

In addition, the Law Department in most cases has not been furnishing counsel as it has in the past, adding further strain to the Labor Relations Law Unit. Though this Chairman, who also

76

serves as an Umpire for the parties, is aware of the situation, and also the argument that the

pa11ies have been able, nevertheless, to dispose of a number of cases under these circumstances

as the pa11ics have embarked on an ambitious mediation process, the Chairman is not persuaded

that at this juncture there is a need to reduce the number of Umpires. This may be an issue in the

future or by negotiations between the parties. But, this is not a matter that at this time should be

addressed in Act 312. For this reason, the Chairman, joined by the DPOA Delegate, will opt to

vote to decline the City's proposal to reduce the number of Umpi res. The City Delegate dissents.

Jssue No. 128 addresses Article 4, Section 2, the provision for Special Conferences, which

provides that "arrangements for such special conferences shall be made five (5) calendar days in

advance whenever possible." The DPOA proposes to amend Section 2 to read, "Arrangements for

such special conferences shall be made and take place within five (5) calendar days of the request".

The argument was made that there have been delays in scheduling Special Conferences. The

response of the Department was that it takes time to gather information

needed to be presented for Special Conferences and whether the Chief or other high ranking

Officers are needed to be present. Particularly in this time of reorganization in the City and

within the Department itse11:there will be substantial time demands on the Chief and other high

ranking Department Officers that could very well make it not possible to meet the five day

deadline and the fact that the present "wherever possible" language has been in the contract for

some time, causing the Chairman, along with the City Delegate, to vote to decline to adopt the

DPOA proposal and adopt the City's proposal to keep the *status quo.*

Issue No. 130 is a proposal by the DPOA to add a sentence to Section D.10 concerning

overtime grievances to reflect "the grievance shall be heard by an arbitrator within thi1ty (30)

days from the date of the submission of the grievance as an extra day on an expedited basis."

Issue No. 131 is a proposal by the DPOA amending Article 17.D to read, "The Personnel Bureau shall convene the Performance Evaluation Board to hear the matter within forty-five (45) days of the date of the written request to appeal. If the appeal is not heard within forty-five (45) days, the Performance Evaluation shall be increased to its prior rating." The City points out that there may be reasons that the Evaluation Board may not be able to be convened within 45 days and that the result could well be that an underperforming Officer could, by a technicality, not have his or her true rating recorded.

Issue No. 132 is a proposal to add an extra arbitration date under Article 36.H addressing disputes concerning the Attendance Control procedures. The City objects to these proposals. The DPOA argues that such disputes need expedited resolution. The City argues that with its limited staff which also have other duties it will not be able to keep such deadlines.

The Chairman, in reviewing these proposals, would vote to deny same. The current expediting process has been resolving a number of the attendance issues promptly. In fact, there is time on the regular one-day process per month to resolve additional cases. The parties need more time to develop the current procedures. If they are not working, then the patties can sit down and refine the process. Until this is done, within the parties' respective current resources, there is no reason to memorialize any changes. This may be necessary in the future, but not until there has been further experience both in the Performance Evaluation Board and in the expedited process. It is for this reason that the Chairman, along with the City Delegate, votes to reject the DPOA's proposals as to Issue Nos. 130, 131 and 132. The DPOA Delegate dissents.

In this arbitration section, the Chairman appreciates that he has voted in most cases to reject the DPOA's proposals along with one City proposal. But these proposals, including the City proposal, should have been addressed at the bargaining table. They are proposals that in a

78

true impasse situation would have not reached impasse. The Chairman's approach was to address the larger issues that these circumstances have brought to the Panel and to recognize that the issues brought forth that the Chairman has dubbed the "arbitration issues" need time to be worked out between the parties based upon fm1her experience. This explains the Chairman's approach.

As to Issue No. 16, the City proposes an overhaul of Article 8. **f** regarding arbitration of back wages claims ofDPOA members. Specifically, the City Proposes that /\J1icle 8.F read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation for *temporw y employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, We(fare, Family Independence Agency, City-Funded Long-Term Disability Insurance. Sickness and Accident Insurance or Automobile Accidenf Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein; and* when an employee is suspended pending disposition of charges against him, there shall be no offset of interim earnings provided he is exonerated and restored to duty. In consideration for the above, the Union agrees to process cases of officers under suspension in a prompt manner.

The City's proposed changes to Article 8.F would significantly alter a contractual provision that has been included in the agreement between the City and DPOA for many years. Conversely, the DPOA argues for maintaining the *status quo*. Under the current circumstances, there is no reason for a change to the current language of Article 8.F. As an economic issue, the Chairman adopts the proposal of the DPOA. The DPOA Delegate joins the Chairman. The City Delegate dissents. Therefore, Article 8.F will continue to read:

ARTICLE 8.F

All claims for back wages shall be limited to the amount ofwagcs that the employee otherwise would have earned less any compensation for

79

personal services he may have received from any source during the
period in question excluding documented overtime and Department
authorized income earned outside his regularly scheduled work period.

When an employee is suspended pending disposition of charges against
him, there shall be no offset of interim earnings provided he is
exonerated and restored to duty. In consideration for the above, the
Union agrees to process cases of officers under suspension in a prompt
manner.

Issue No. 146 -     *Article 7 - Non-Economic: Payment of Umpire for cancellation days by
                    party cancelling hearing*

The DPOA proposes to place in the contract a provision that the party who cancels an

arbitration hearing shall be responsible for paying the Umpire's cancellation fee.

This is one of the items that should never be in an Act 312. This is an item that should

have been negotiated if the parties had been negotiating. Furthermore, this Chairman, who has

had the privilege of serving as an Umpire with the parties for some time, never realized that the

Umpires were charging cancellation fees because this Chairman was under the impression that

under the contract with the parties the Umpires were not to charge cancellation fees. This came

as a revelation to this Chairman. Because this Chairman believes this matter should be at the

bargaining table and not at Act 312, and because this is a matter that should be resolved by the

parties at the time the issue arises, noting that at the last cancellation with this Umpire, due to

unexpected illness of one of the attorneys, this Umpire never thought of charging a cancellation

fee and this Umpire did not. For these reasons, joined by the City Delegate, this Chairman

rejects this proposal. The DPOA Delegate dissents.

Union Representation:

Issue No. 2 - Non-Economic-     *Article 4.A - Basis of Representation-One Steward/One
                                Alternate*
Issue No. 4 - Non-Economic-     *Article 4.D - Basis of Representation-Seniority of Chief
                                S1eward and Steward*

Article 4.A of the Master Agreement provides that "Employees shall be represented by one (1) steward for each shift" in each represented district. Maintaining that this provision has not been followed in all cases, the City has proposed to add the following sentence to Article 4.A. "Any current practice inconsistent with this representation provision shall be discontinued". The DPOA opposes the addition of this sentence and seeks the *status quo.* This is a matter for the parties to negotiate in the view of this Chairman and not a matter that should be brought to Act 312 with so many other issues. For this reason, the Chairman will vote with the DPOA Delegate and maintain the *status quo.* The City Delegate dissents.

As to Issue No.4, the City proposes the following changes as tmdcrlined, namely, to amend Article 4.0 as follows:

> D. <u>Except as otherwise nrovidcd,</u> only one (I) chief steward and one (I) steward from each shift shall enjoy top seniority · insofar as remaining with their <u>district. precinct,</u> section, unit, or platoon during their term of office, and they shall not be transferred out of or reassigned from their district, section, unit or platoon, except for justifiable cause or reduction in force, or when a <u>district. precinct. section. unit or platoon is discontinued or</u> otherwise inactivated or consolidated.

The City has agreed to remove the pluase "except as otherwise provided". Thus, the Panel is considering this proposal with the "except as" phrase removed. The DPOA apparently objects to the proposal. But there is, in the view of the Chairman, no reason to object because, frankly, the language is cleanup language. This is a simply adjustment and one that the DPOA should have agreed to long ago. For this reason, the Chairman, joined by the City Delegate, will accept the proposed language as amended with the "except as otherwise provided" removed as proposed by the City. The DPOA Delegate dissents.

<u>Transfer and Assignments:</u>

| Issue No. 21 -Non-Economic - | *Article 10.C.J.a- Seniority-Assignments and Transfers-No* |
| | *Tran fer if Discipline or Attendance Issues* |
| Issue No. 24 - Non-Economic - | *Article 10.C.2.a-Seniority-Assignments and Transfers-No* |
| | *Transfer if Discipline or Attendance Issues* |
| Issue No. 22 - Economic- | *Article 10.C.I.A -Seniority -Assignments and Transfers-* |
| | *Additional Entities txempt* |
| Issue No. 23- Non-Economic- | *Article 10.C.1.c-Seniority-Assignments and Transfers* |
| | *Additional Entities Exempt* |
| Iss ue No. 104 - Economic - City Proposal - | *Article 10C I.d. -Seniority-Transfer From* |
| | *Assigned Duty After 5 years* |
| Issue No. 126- Economic- Union Proposal- | *Article 10- Seniority - 50 Day Duration on* |
| | *Temporary Assignments* |
| Issue No. 21 -Non-Economic- | *Art. 10.C.I.a, Seniority-Assignments and Tram:fers-No* |
| | *Tram:fer if Discipline or Attendance Issues* |

In Issue 21, the City's Last Best Offer proposes an overhaul to Article IO.C.l.a, which deals with assignments and transfers based upon seniority. Under the current agreement, "[a]ll assignments and transfers except those excluded herein, shall be based upon seniority provided the employee is qualified." Essentially, the City proposes that assignments and transfers be based upon a number of factors, including seniority, attendance, and the employee's disciplinary record. With respect to attendance, the City proposes that "the employee cannot have been on initial counseling regarding attendance or on the attendance control program-D.P.D. 350 program-within six (6) months." Regarding the employee's disciplinary record, the City proposes that the employee's record, the preceding six (6) months, shall be considered. The DPOA asserts that the *status quo* should be maintained. T!Jis is a non-economic issue.

Accordingly, the Chairman, joined by the DPOA Delegate, declines to adopt the City's Last Best Offer with the City Delegate dissenting. The current language of Article lO.C.l has been a part of the agreement between the City and the DPOA for some time and the City has put forth no cogent reason, in the view of the Chairman, for changing the current provision. Indeed, the City has D.P.D. 350 for controlling attendance and Bonus Vacation Days for incentivizing

82

attendance. In addition, attendance misconduct can be addressed through disciplinary procedures. It would seem that the parties would not have chosen to modify the current techniques for absence control and disciplinary procedures contained in the Collective Bargaining Agreement if faced with a strike. Therefore, Article 10.C.1 a will continue to read:

ARTICLE 10.C.I.a

All assignments and transfers except those excluded herein, shall be based on seniority provided the employee is qualified.

1.    Transfers;

   a.    The present practice of individual officers filing requests (Police Manuel Vol. IV, Chapter I, Sec. 4) for transfers between various districts, and entities shall be continued. The requests shall be valid for a period until October 1st each year. Continuation requests may be submitted on or after August 15th. Whenever openings occur in districts, or entities, the most senior employee on the list shall be transferred provided the employee is qualified. Any time there are common seniority dates on the transfer list, the transfer shall be given to the member who was first recorded as approved by the Personnel Section. In the event members with common seniority dates also have a common recording date, the selection shall be by blind draw. An association representative shall be present at the tie-breaking procedure. The following entities shall be excluded from this procedure...

**Issue No. 24 - Non-Economic -**    *Article 10.C.2.a- Seniority-Assignments and Transfers-Additional Entities Exempt*

Regarding Issue 24, the City proposes the addition of substantive language to Article 10.C.2.a. Specifically, the City's Last Best Offer proposes the following addition:

An assignment list shall be maintained. Placement on the assignment list shall be based on the following factors: seniority, attendance, (the employee can not have been on initial counseling regarding attendance or on the attendance control program- D.P.D. 350 program–within six (6) months) and the employee's disciplinary record, excluding written reprimands, over the preceding six (6) months (such discipline shall be utilized only after all administrative remedies have been exhausted).

83

> Employees who have been placed on the assignment list shall be
> removed from the assignment list if the member receives an initial
> counseling regarding attendance, is placed on the attendance control
> program, or receives written disciplinary action, excluding written
> reprimands (such discipline shall be utilized only after all administrative
> remedies have been exhausted).

This is a non-economic issue, with the DPOA asserting that the *status quo* of Article 24.C.2.a should remain. The provisions of Article 24.C.2.a have been included in the contractual arrangement between the City and the DPOA for some time and there has been no showing of problem with the current provisions. Furthermore, the City has other effective methods of controlling and rewarding attendance, including Bonus Vacation Days. Additionally, the City may exact discipline upon those who maintain poor attendance records. Accordingly, with respect to Article 10.C.2.a, the Chairman decides that the *status quo* should be maintained. The Chairman, joined by the DPOA Delegate, adopts the *status quo*. The City Delegate dissents. Article 10.C.2.a will continue to read:

> A request for assignments within a district, or entity once an employee is
> assigned there, can be made by submitting DPD Form #31 (referred to as
> a Blue Slip) to the Commanding Officer. The request shall be valid for a
> period until October 1st each year. An employee may have only one
> assignment request on file at any time; the most recent request will
> replace earlier requests. Whenever openings occur within districts, or
> entities, the most senior employee on the list shall be assigned provided
> the employee is qualified. Any time there are common seniority dates
> on a job assignment list the job assignment shall be given to the member
> whose request was first received by supervision…

As to Issue No. 104, the City proposes to add the following provision to Article 10.C.l.d, Transfers: "Notwithstanding anything set forth in this Article, the Department may transfer any member from any non-patrol entity to a patrol entity after the completion of five (5) years in the non-patrol entity." The DPOA objects and proposes the *status quo,* namely, objects to any such provision in the contract. The Chairman understands the Department's desirability to have such

84

a provision. But, presumably, with the reorganization of the Department, a number of entities will be eliminated. First, there is no need for such a provision and second, if there are some non-patrol entities, Officers who have seniority will have the opportunity to bid into those positions and their seniority rights should be honored. It is for these reasons that the Chairman, along with the DPOA Delegate, will vote not to include such language in this contract round. The City Delegate dissents.

Issue No. 126 is the Union proposal to amend Article 1O.C.2.c to modify the parties' longstanding provision that temporary assignments will not exceed 84 days to 60 days. The City opposes such a change. The Chairman, along with the City Delegate, will vote to maintain the *status quo* which is the City's Last Best Offer, with the DPOA Delegate dissenting. The reason for this is that the 84 day provision has been in the contract for some time. There is no persuasive reason to change. This is the way the parties have operated for some time. In this era of reorganization in the Department, this is not the time for such a change.

In regard to Issue No. 22, Article 1O.C.l.a addresses transfers and particularly exempts from seniority transfers 29 entities in the Department. The City proposes to add to this exemption list the following additional entities: Bomb Squad, City Council , Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Technical Support, Tactical Operations and Task Force Administration. The DPOA objects to adding these additional entities. This is a one-third increase. The DPOA argues that there is "no demonstrated need" for the change.

As the Chairman views the situation, in reviewing the arguments and Exhibit 639, there is an argument as to the Bomb Squad because of the expense of six weeks of.military bomb disposal training in Alabama and one year of probation training with the Unit plus the six written

85

examinations and six practical examination application testing. There is a need to choose an applicant with the aptitude for this type of work. It is also understandable that in terms of Technical Support that there may be special aptitudes in this day and age of computers and advanced technology that may not necessarily involve the most senior Officers.

But, beyond these two entities, when compared to the type of entities that the parties over the years have excluded, the Chairman believes that the Department has not made its case for the other eight proposed entities. The City Delegate would concur as to the Bomb Squad and the Technical Support, but would dissent as to the exclusion of the City Council, Fatal Squad, Field Training, Gang Enforcement, Firearms Training, Homicide, Tactical Operations and Task Force Administration. The OPOA Delegate would dissent as to the Bomb Squad and the Technical Support inclusion, but would concur with the Chairman as to the exclusion of City Council, Fatal Squad, Field Training, Gang Enforcement, firearms Training, Homicide, Tactical Operations and Task Force Administration.

Issue No. 86 -Economic-    *Article 40.G- Miscellaneous-Deferred comp Selected by City and Direct Deposit*

The City has proposed to amend Article 40.0 "Miscellaneous" as follows, represented by the strikeouts, with the DPOA objecting, proposing the *status quo,* namely, objecting to the strikeouts:

> 6O. Deferred Compensation and Direct Deposit. Members of the bargaining unit may participate in the deferred compensation and direct deposit programs offered by the City. The Associatiou shall be wtit led to al1ange for the establishment of a deferred compensation program *by* a company of its choosing, hieh shall be iucluded ill the defe11ed cor npeusation pr ogranrs offered by *the* City.

The City notes that it pays for the administrative costs of the deferred compensation

86

program. Therefore, its counsel writes, "Accordingly, the City wants tllis provision changed such that the City will select the deferred compensation company and program. The City operates a number a number ofbcnc!it plans and there are cost savings to the City in combining the various benefit plans available to employees. ... If the City is going to pare the cost, it should choose the carrier to limit that cost".

The difficulty with this argument is there has been no negotiation between the parties; that the present language has been in the conu·act for some time. It is possible that the DPOA selected carrier could match the City's cost or even below the City's cost. In other words, the blanket statement, without a history of negotiations and the possibility that the DPOA could meet or even with its chosen carrier be able to save the City money in this area, suggests that this provision has not been well thought out by the City. For this reason, the Chairman will vote with the DPOA Delegate and reject the City's proposal and maintain the *status quo.* The City Delegate dissents. There just was not a history of negotiations addressing the potential cost savings either way.

Iss ue No. 87- Econ o mic-   *Article 40.H- Miscellaneous-Payment of Banked Time*

The City proposes to amend Article 40.H as follows:

> Lump Sum for Ba nked Time. Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. DROP plan participants shall only receive payout for banked time when they permanently retire. not when they enter the DROP plan.
>
> Payment shall be lllade po•suant to the City's schedule fo• that specific pay111ent.  Payment shall be paid within 90 days if the amount is Jess than Ten Thousand ($10.000.00) Dollars, and if in excess ofTen Thousand ($10.000.00) Dollars. the amount shall be made in semi-annual installments over a three-year period with the installments due on February l and August l with no interest due.

87

The underscoring represents the City's proposed additional language. The strikeouts represent the deletions. The DPOA proposes the *status quo*.

The Chairman reviewed the language as proposed as two proposals-one addressing DROP Plan participants; the second dealing with the payout. The proposed amendment of the City, objected to by the DPOA, proposes that the DROP Plan participants receive the payout for bank time other than sick time when they permanently retire. To the Chairman, this is a reasonable proposition for it prevents the participant from being in a higher tax bracket and it preserves cash funds for the City during a time when the City is in financial crisis. For this reason, the Chairman, joined by the City Delegate, will vote to adopt this amendment. The DPOA Delegate dissents.

As to the provision for a payout, the Chairman interprets the no interest language which in Issue No. 144 the DPOA in effect proposed, except the Chairman interprets the City's proposal to include that if the installments are not made when due then interest would be paid. On this basis, the Chairman would accept the City's payout proposal with the City Delegate agreeing and the DPOA Delegate dissenting.

Issue No. 144- Economic- Union Proposal -      *Article 33 - Separation Payments*

The DPOA has proposed the following new language to Article 33:

> X.      All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that effective January I, 20l 3, for future separation payments to members who were already eligible to retire as of the effective date of the Award, a member will have the option of receiving (a) lump sum payment ninety (90) days after separation, or (b) semiannual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ER!P established as part of the Award.

With the exception of the last sentence, this option shall not be available to members in

88

the ERIP established as patt of this Award which, as will be explained elsewhere, there will be

no ERIP. The Chairman does not believe this language is appropriate, as this is contrary to other

issues that the Panel has ruled upon and, therefore, the Chairman, joined by the City Delegate,

will opt to deny the proposal. The DPOA Delegate dissents.

Issue No. 145- Non-Economic- Union Pᵣoposal - *Article 33 -Payment of Accumulated*

This is another proposal by the DPOA which reads:

> ARTICLE 33- PAYMENT OF ACCUMULATED BANKED
> TIME UPON ELECTION TO PARTICIPATE
> IN THE D.R.O.P.
>
> Upon issuance of this Award, the provisions of Article l33,
> "Pension Provisions," pertaining to 'DROP' payments shall be modified
> in accordance with the Memorandum of Understanding attached hereto
> as Exhibit 8.

The City objects. There is a Memorandum signed by the patties dated February 9, 2011.

It is reasonable and it dovetails with the other Orders in regard to payouts and the limits of when

payouts are made for those pruticipating under the DROP Plru1 as issues under the Orders herein.

By agreeing to this proposal, the Chairman would be acting in contradiction to other proposals

that the Chairman has agreed to and for this reason rejects the DPOA proposal as to Issue No.

145, joined by the City Delegate. The DPOA Delegate dissents.

Issue No. 143- Economic - Union Proposal - *Article 33 - Early Retirement*

The DPOA has proposed in Article 33, "Early Retirement", which reads:

> ARTICLE 33 - EARLY RETIREMENT
>
> New language[W
>
> W.    1\n Early Retirement Incentive Program ("ER!P") will be offered
> to a limited number of officers in the Department and the pa11icipation
> will be based on seniority upon the issuance of this Award. The total
> maximum number of early retirements will be ISO, to be allocated to
> members of the DPOA (76%), the DPLSA (23%) and the DPCOA (I%).

89

Employees will be eligible to pa1ticipate in ERIP if they (a) arc lhree (3) years or less away from completing either 20 or 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service. All banked time will be relinquished in exchange for retirement service credit.

The City will offer members with between 17 and 20 years of service the ability to early retire as follows, as well as between 22 and 25 years: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory). and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year ear lier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begi ns with sick time.

DROP participants with 22 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERTP in accordance with the above.

Any language not expressly modified remains current language (i.e. CBA .*status quo)*.

The City opposes adding this provision.

This language was in the Tentative Agreement signed on February 9, 2012 which at that time the City had agreed to it. In his post-hearing brief at page 71, the City's counsel writes in part:

The Tentative Agreement contained an early retirement plan under which l00 DPOA members would be able to retire three years early by forfeiting ce11ain accrued banks or by purchasing time. This proposal was agreed to because the City believed it was in a position to allow 100 DPOA Officers to retire early and leave the force. The underlying concept was that these Officers would not need to be replaced and there would be substantial savings.

90

# EXHIBIT A-1 (Part 3)

This is no longer the case. Since January/February 2012, the Department has had more than 100 DPOA members retire. See Ex. 742, January 31, 2012 headcount showing 2,091 DPOA members, and Ex. 743 November 30, 2012 headcount showing 2,001 DPOPA. Since November 30, 2012 there has also been an additional 20 retirements....

Furthermore, during the hearing, counsel for the DPOA suggested there would be more

retirements. It is problematical whether any of these retirees will be replaced in the economic

environment in Detroit. Thus, there is no room to encourage any Officers to retire. For this

reason, the Chairman, joined by the City Delegate, as the City opposes the early retirement plan

at this point, rejects the early retirement proposal. The DPOA Delegate dissents.

| | | |
|---|---|---|
| Issue No. 53- Economic- | *Article 31.A- Holidays- Eliminate Holidays-Election Day and 8ᵗ⁻ and 9ⁱⁱ Holidays* | |
| Issue No. 54- Economic- | *Article 3J.B- Holidays- txcuse Day and Holiday* | |
| Issue No.55 - Econom ic - | *Article 31.C.1 - Holidays- 1 ⤫ on Holidays  if Scheduled and Not Appear to Holiday Pay* | |
| Issue No.141- Economic- | Union Proposal -        *Article 31- Holiday Pay* | |
| Issue No. 56- Economic- | *Article 3J.C.2- Holidays-Holiday Rosters Employer Discretion* | |

The above five issues all deal with holidays.

Alticle 31.A of the Master Agreement provides for a schedule of holidays. The City's

Last Best Offer with strikeouts is as follows:

A.      Schedule of Holidays

Each employee shall be entitled to the following holidays in accordance with this schedule.

| | |
|---|---|
| Independence Day | July 4th |
| Labor Day | First Monday in September |
| Veteran's Day | November II th |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | December 25ᵗʰ |
| New Year's Day | January 1st |
| Memorial Day | Last Monday in May |

In <tdditio11, each ernployee shall be e11titled to a l1oliday 011 one Clectiou Day in e,tch year 01  au eighth holiday if 1m clectiorr is 110t scheduled. (Notification will be rnadc by Special Order.) A ninth holiday shall be

91

> granted to crnployees '\l10 h:t\ie bee11 ernployed ninety (90) days or l11ore
> and-who *me* entitled to 1egular holidays u11der existing vldinn11ces. Tlris
> holiday shall be take11 at ıııɪʏ tilne dur ill̥g the fiscal *year* which is
> mtrtttа+ty-acceptable to tllc cn1ployec dnd the Depart111ent. To insure tlrat
> the nintlr holid,tys are e.ᴄpended proportionately tluougbout the *year* and
> rtot carried unti**l** tl1e last nrortths of tl re fiscal year. orr May 11:ɾ,-tfle
> con11nandiug *officer* shall assign tire le111airling llilltlt holidays at Iris
> discretion. Ninth holidays whieh *.rre* llvt used pli01 to the end of the
> fiscal yea will be lost.

Thus, the City proposes to eliminate the so-called 8ʰ and 9ʰ holiday. The DPOA

proposes lo maintain the *status quo.* In support of its position, the City Advocate in his post-

hearing brief writes:

### Elimination of Election Day and Eighth and Ninth Holidays

> While there are three holidays involved, in reality the City seeks
> to eliminate only two holidays per year. In years in which there is an
> election for which Officers have the day off they day otf they have an
> eighth and ninth holiday. These holidays should be eliminated for two
> reasons:

>> First, pursuant to the Financial Stability Agreement and
>> Annex D it will conform the DPOA contact and the
>> labor contracts of all other City employees whose
>> contract has expired. As noted above, uniformity and
>> thus ease of administration are one of the goals set forth
>> in the Financial Stability Agreement.

>> City will receive cost savings in the amount of
>> approximately $390,000 per holiday, and with DY:TA
>> parity and approximately the City wi **ll** save $500,000
>> per holiday and $1M for both holidays. Ex. 654.
>> approximately $500,000 per holiday or $1M for both
>> holidays.

The Chairman acknowledges that the City makes a point. The problem, however, is that

though the City is in serious financial stress the Chairman must consider the nature of Police

work and the marketplace. No one can doubt the stress of Police who are working the street and

the need, when available, for holiday time off. Furthermore, even when compared with

distressed cities such as Flint and Saginaw, the holiday made available by the so-called 8ˡʰ and 9ˡˡ

92

holiday in Detroit, which has been available for numerous years, is competitive. There is a difference between the Police and general employees and the need to have the time off, if available, to relieve the stress of Police work. And, as indicated, the number of holidays is competitive even with the distressed cities such as Flint and Saginaw. It is for these reasons that the Chairman concludes, along with the DPOA Delegate, that the deletion of the 8'h and 9'h holidays, particularly in the absence of negotiations, is not the area for savings and therefore would opt with the DPOA Delegate to maintain the *status quo*. The City Delegate dissents.

However, for the period from July 1, 2012 through June 30, 2013, there shall not be an 8'h or 9'h holiday. The 8'h and 9'h holiday will commence the second year of the contract, July 1, 2013. On this point, the DPOA Delegate would dissent as he would opt to have an 8'h and 9'h holiday begin in the first year of the contract. The City Delegate, though objecting to the 8''' and 9''' holiday, would nevertheless join with the Chairman in agreeing that in any event there would not be an 8'h and 9'h holiday in the first year of the contract.

Issue No. 54 addresses a proposed change by the City in Article 31.8.3 as follows:

> 3.    Should the holiday fall on Sunday and the Monday leave day begins the next 28 day work cycle, the leave day will be the Friday prior to the holiday or a day mutually agreed upon between the employee and the Department. Should that Friday ahe.tcly be used in coru uetiolth ml:iele 32 [Excuse Time] thea tlte lc<ve day ʋill be TliUJsday oʋ a day lllutually agreed ttpon-:

The DPOA proposes the *status quo*. The City's reason for the change is set forth in the following statement in its counsel's post-hearing brief:

> Under the Labor Contract, if a holiday falls on a weekend and friday is an excuse day for the Officer, then the Officer has Thursday off. This someti mes creates scheduling issues for the Department. The Department wants to eliminate the requirement that if Friday is an excuse day that the Officer has Thursday off and wants to replace it with a day to be mutually agreed upon. In this way, the Officer receives his

93

day off and the Department can better schedule for the holiday week.

> Therefore, the City requests that its Last Best Offer, Issue No. 54, be granted.

This statement, as the Chairman views it, is a perfect example of the failure to bargain.

If the parties had bargained rather than take this issue to Act 312, the parties would have been able to resolve the matter. The matter should have been resolved on the remand. It was not. Yet, the parties have had language on the issue in the Master Agreement for some time. This is a signal to the Chairman that the language should not be changed. If the language is to be changed, it is to be changed at the bargaining table. This is not an issue for Act 312. For this reason, the Chairman, joined by the DPOI\ Delegate, will vote for the *status quo* on this issue. The City Delegate dissents.

Issue No. 55 seeks to change the rate of pay for those Officers required to work from double time to time and one-half the regular rate of pay for all hours actually worked in addition to their regular day's pay of eight hours and a provision that employees who are scheduled to work on any holiday, but fail to report to work.shall not be eligible for holiday pay.

Issue No. 56 is a proposal concerning flexibility in assigning employees to various holiday rosters at the discretion of the Department by eliminating the following language in 3l.C.2 under "example": ''In those cases where an employee works four (4) or more hours into a holiday as a result of overtime, he is not entitled to holiday premium rate for that shift; the overtime hours shall be compensated at the regular time and one-half rate''.

Issue No. 141 is a Union proposal that Officers be able to take part of their holiday pay in compensatory time. As to the DPOA's proposal, the City favors the *status quo.* Holiday pay from double time to time and one-half, though the City has suggested that there is no City

94

comparable to Detroit, the City did offer the comparables of St. Louis, Pittsburgh, Cleveland, Philadelphia, Baltimore and Chicago in terms of holiday pay. Only one (Pittsburgh) paid more than Detroit at 2.5 times. One (Philadelphia) paid straight time. Three (Cleveland, Baltimore and Chicago) paid time and one-half. St. Louis paid straight time plus four hours comp time. Yet, it seems with the long bargaining history of double time plus eight hours it is difficult, despite the fiscal crisis, to reduce this benefit. For this reason, the Chairman will vote with the DPOA Delegate and continue the double time for holiday work with the City Delegate dissenting as to Issue No. 55.

On Issue No. 55, there was a second Issue concerning employees who are scheduled to work on any holiday and fail to repmt. The Chairman believes this is a fair provision and wouJd vote with the City Delegate and agree that such employees who fail to report will lose their holiday pay. The DPOA Delegate dissents.

As to Issue No. 56, the holiday roster issue, this seems reasonable to the Chairman and the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

As to the DPOA's proposal on Issue No. 141, if the City wants to pay cash, the Chairman will go along with the City and vote with the City Delegate to reject the DPOA's proposal. The DPOA Delegate dissents.

**Issue No. 139- Economic- City Proposal-** *Elim;nate 2% Promotional Increase*

The annual cost of the 2% increase on Officers who pass the promotional test and are on a promotional list waiting promotion is approximately $270,000 per year. During the time period July 1, 2012 to October 12, 2012, a period of three and one-half months, the 2% promotional increase cost to the city was $73,000. The 2% promotional increase has cost as much as

95

$340,000 annually to the City. *See* Exhibit 691. To the City, in financial crisis, this is no small amount.

Recognizing that the DPOA itself agreed to suspend the educational reimbursement, albeit on a sunset basis until July 1, 2015, the Chairman will agree to the elimination of the 2% promotional increase, recognizing that the parties at the end of this two year agreement can again revisit the issue. The City Delegate will join with the Chairman in adopting the City's proposal. The DPOA Delegate dissents.

<u>Issue No. 127</u>- Economic- Union Proposal-       *Article 11 - No Requirement to Pe1jorm*

The DPOA has proposed amending Article 11, Section B, as follows:

> Employees shall not be assigned duties normally performed by a person
> of higher rank, except in emergency situations, and shall receive the
> wages of the first year sergeant for all time/hours worked.

As the parties know, this matter is in arbitrating, awaiting an opinion. That opinion will be forthcoming when this Act 312 assignment is completed. That opinion will answer the issue raised. For this reason, the Chairman, joined by the City Delegate, will reject this proposal. The DPOA Delegate dissents.

<u>Issue No. 133</u>- Economic- Union Proposal -       *Field Training Officers*

The DPOA had proposed that once an Officer is certified FTO, namely, Field Training Officer, the Officer shall receive a 5% adjusted gross wage annually. The Chairman appreciates that in other large city departments there is a precedent for such a proposal. However, the City is in a financial crisis. This is not the time, unfortunately, for such an economic improvement. The Chairman notes that, though there are arguments for such a benefit, the parties over the years, when the City was perhaps able to afford such a benefit, have not negotiated or obtained such a benefit in previous Act 312.

96

Thus, considering the financial circumstances and the previous bargaining history, the Chairman, joined by the City Delegate, will vote not to include a stipend at this time for a Field Training Officer. The DPOA Delegate dissents.

Issue No. 133 - Union Proposal- Economic-    *Article 40- Miscellaneous- Include Sick Time in Lump Sum Payments*

The DPOA has proposed to amend Article 40.H as follows:

> H.    Lump Sum for Banked Time. Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than including sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability.

The City objects.

The Chairman, along with the City Delegate, agrees with the City that Article 40.H should not be amended as proposed by the DPOA. As the City points out in the transcript at Vol. 6, pg. 93, some payments involve several hundred thousand dollars and there are concerns as to sick leave that sometimes it takes anywhere from 30 days to six months to reconcile sick leave banks. This explains that the parties over the years have negotiated the language "other than sick time". It is for this reason that the Chairman was not persuaded to adopt the proposed amendment and opted with the City Delegate to continue the present Article 40.H language. The DPOA Delegate dissents.

Issue No. 48- Economic - *Article 22-Furlough Selection City Can Change*
Issue No. 51 -Economic-  *Article 29-Eliminate Longevity*
Issue No. 89 A and B - Economic - *Article 4l.A  - Wages-10% Reduction*
Issue No. 90- Economic - *Article 41.A- Wages-City Right to Institute Furlough Days*

As to Issue No. 48, the City proposes to add a subparagraph I to Article 22, "Furlough

97

Selection and Cancellation", which reads: "The City reserves the right to make changes to any aspect of furloughs, including but not limited to, the number of furlough days and selection process". The Master Agreement has been negotiated between the parties, including Act 312 proceedings. This is an Act 312 proceeding where proposals have been made, testimony has been taken and arguments have been made, including arguments concerning furloughs. Once Orders have been issued and agreements have been made, this is the pat1ies' contract. What the City is proposing is inconsistent with a binding contract to be honored by both parties. For this reason, the Chairman, joined by the DPOA Delegate, will reject the City's proposal. The City Delegate dissents.

Issue No. 89 A and B deals with wages. Issue No. 51 deals with longevity. Issue No. 90 addresses furloughs. These issues represent the core money issues with the exception of issue No. 90, which is basically a layoff issue, between the pm1ies in this Act 312 proceedings.

As to Issue No. 89 A and B, the Last Best Offer of the City is as follows:

(CORRECTED - UPDATED)
ISSUE NO. 89 A and B -ECONOMIC

CBA Article 4l.A- Wages
CET Article 38.A - Wages
CET Provision and City Last Best Offer on Issue 89 A

**WAGE DECREASE:**  All classifications and positions shall receive a 10% wage reduction effective 7-17-12.

July 17, 2012 - June 30, 2013

| CLASS CODE | TITLE | Min | Max |
|---|---|---|---|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 I" Step | $29,352 | $33,065 |

98

| 33-10-14 | Police Officer- Promotion List | $47,914 | $47,914 |
|----------|-------------------------------|---------|---------|
| 33-12-11 | Communications Officer- Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer- Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer- Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer- Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |
| 33-12-26 | Police Data Processing Programmer- Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing Programmer - Governed by wage rate for a Police Lieutenant contained in the Lts. And Sgts. Labor Contract | $74,028 | $76,220 |

IF THE ARBITRATOR AWARDS THE UNION A 2-YEAR DURATION FOR THE LABOR CONTRACT, THE CITY'S LAST BEST OFFER FOR THE TIME PERIOD JULY 1, 2013 TO JUNE 30, 2014 (ISSUE 89b) IS:

July 1, 2013 - June 30, 2014

| CLASS CODE | TITLE | Min | Max |
|------------|-------|-----|-----|
| 33-10-11 | Police Officer | $36,274 | $47,914 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $29,352 | $47,914 |
| 33-10-13 | Police Officer 2-20-95 1" Step | $29,352 | $33,065 |
| 33-10-14 | Police Officer- Promotion List | $47,914 | $47,914 |
| 33-12-11 | Communications Officer - Police Officer | $36,724 | $48,364 |
| 33-12-12 | Radio Maintenance Officer- Police Officer | $48,776 | $48,776 |
| 33-12-13 | Radio Systems & Planning Officer- Police Officer | $49,481 | $49,481 |
| 33-12-14 | Communications Officer- Police Officer - Promotion List | $48,364 | $48,364 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles - Police Officer | $48,776 | $48,776 |

99

| 33-12-26 | Police Data Processing Program mer-<br>Police Officer | $48,503 | $49,652 |
| 33-12-36 | Senior Police Data Processing<br>Programmer - Governed by wage rate for a<br>Police Lieutenant contained in the Lts.<br>And Sgts. Labor Contract | $74,028 | $76,220 |

As to Issue No. 51 , the City proposes to eliminate Article 29, "Longevity".  As to issue

No. 90, the City proposes to add to A11icle 4l.A  the following language:

> BUDGET REQUIRED FURLOUGHS:  The City reserves the right to
> reinstitute future furloughs as a means of cost containment.

The DPOA's  proposal as to Issue No. 89 (wages) as well as Issue No. 51 (longevity) and

Issue No. 90 concerning budget furloughs is as follows:

DPOA PROPOSAL
NO. 89
Article  41 -Wages/Longevity

Article 4J.A  of the current Collective Bargaining Agreement
shall  be applied/enforced as follows:

### 41. WAGES

Employees hired prior to February 20, 1995, in this title shall proceed
from minimum to maximum on the basis of five equal steps.

Employees  hired on or after February  20, 1995 in this title shall receive
wage increases and step  increments in accordance with Exhibit II. B.
Effective July  I, 2000, employees in this title shall proceed  from
minimum  to maximum on the basis of five equal steps.

Employees who have already completed the Police Academy prior to
July 1, 2000, but have not yet reached  the I" pay step shall have $1,000
of the I" pay step applied to their annual salary, effective July I, 2000.
Employees  who complete the Police Academy on or after July  I, 2000,
will have $1,000 of the 1st pay step applied  to their-annual salary  upon
completion of the Police Academy.  This increase will be considered an
early entitlement to part of the first annual step increase.

Employees  in the classification of Police Officer  shalt receive  the
following wage  adjustment effective January 1, 2013 for the duration of
this agreement.

Compensation Schedule

100

Janua 1, 2013

| Class Code | Title | Min. | Max. |
|---|---|---|---|
| 33-10-11 | Police Officer | $40,304 | $53,237 |
| 33-10-12 | Police Officer (hired after 2/20/95) | $32,613 | $53,237 |
| 33-12-11 | Communications Officer- Police Officer | $40,754 | $53,687 |
| 33-12-12 | Radio Maintenance Officer- Police Officer | $54,099 | $54,099 |
| 33-12-13 | Radio Systems & Planning Officer- Police Officer | $54,804 | $54,804 |
| 33-12-15 | Assistant Supervisor of Motor Vehicles- Police Officer | $54,099 | $54,099 |
| 33-12-26 | Police Data Processing Programmer- Police Officer | $53,826 | $54,975 |
| 33-12-36 | Senior Police Data Processing Programmer- Police Lieutenant | $71,870 | $74,000 |

Essentially, effective January I, 2013, the DPOA proposed restoring the 10% wage cut in all classifications and proposing a two year agreement from July 1, 2012. The DPOA rejects the budget required furloughs and restores the longevity payments that were eliminated by the CET. The DPOA is seeking payment of longevity pay pursuant to Paragraph 29 of the Master Agreement according to the schedule thereof and according to the terms thereof.

According to Exhibit 2 of the Master Agreement Schedule, Officers who are employed after February 20, 1995 are hired in under the City's proposal at $29,352. There are five steps beginning after one year until reaching top pay which under the City's proposal would be $47,914 on an annual base wage. Under the DPOA proposal, the top pay after five years would be the rate that existed on July 1, 2008, namely, $53,237 annualized as there had been no pay raise at the base rate since July 1, 2008.

101

Succinctly put, in advocating for a one year contract, the City was proposing to maintain a 10% pay cut. In advocating for a two year contract, if the Panel was so disposed, the City was advocating for a 10% pay cut for two years. Initially, the DPOA was advocating a three year contract and advocating that it maintain the same level of pay, no pay cut, for three years. The Chairman urged the DPOA to back off to a two year contract, recognizing the situation that the parties were facing which the DPOA accepted in making an offer of a two year contract. Then the Chairman uJged, based upon his belief that he would not find the financial situation in Detroit as critical as it turned out to be, that the DPOA offer to accept the 10% pay cut for the first six months and then a restoration of the 10% for the last 18 months. The DPOA accepted this suggestion from the Chairman and made this its offer, namely, to accept the 10% pay cut that had prevailed until January 1, 2013 and then a restoration of the 10% beginning January 1, 2013.

In an attempt to convince the Chairman of their respective positions, the parties offered competing comparables with the City suggesting internal comparables and suggesting that there were no external comparables. The DPOA ignored the internal comparables, suggested certain national Police comparables, and referenced 15 Southeastern Michigan Police comparables as well as Saginaw and Flint. The City suggested that there were no external Police comparables comparable to Detroit. Though the City's internal comparables do reference general employees who have taken pay cuts that were imposed, none of the internal comparables have the same working conditions as Detroit Police Officers who, as pointed out in the prologue, are faced with the same hazards of employment that have unfo11unately in some cases resulted in the death of some Officers. In other words, the Police marketplace is what is being paid by other nearby communities for police services.

Nevertheless, the general employees in Detroit in recent years have taken pay cuts so that

102

in 2013 their pay cuts have averaged a 20% pay cut for both unionized and non-union employees – both supervisors/executives and general employees whereas, up to July 2012, the uniform employees have not taken a pay cut. The financial situation in Detroit is at an emergency stage. Regardless of the Police marketplace, this fact cannot be overlooked by the Chairman, regardless of the equities and the Police marketplace. Yet, the marketplace for Police work is there to behold.

The Midwest national comparables ranging from $55,000 to $80,000 annually are not particularly helpful because the taxing authority of the other national Midw·est cities varies and are not comparable with Detroit. Nor arc the economic conditions in the other national Midwest cities comparable with Detroit.

Likewise, the 15 suburban cities in Southeast Michigan used by the DPOA are not comparable with Detroit. Detroit is not, for example, Livonia, Birmingham, Troy, the Grosse Pointes (Public Safety Departments) or Royal Oak-cities that are financially well off and are not in financial distress. Nor can the Michigan State Police be considered a comparable because Michigan is not in financial distress as Detroit finds itself. Nevertheless, the comparables were used to point out that, for instance, Michigan in base wages on an annual basis at a five year level, exclusive of longevity, pays a State Trooper $59,988. The top pay for a Michigan State Trooper at 10 years is $64,143.36 and after 20 years, $65,730.24. The suburban districts are paying anywhere between $55,000 and $60,000 annually.

One of the criteria under Section 9 of Act 312, besides financial ability, is external comparables. A proper comparable in this situation would be, as pointed out at the beginning of this Opinion in the open letter to Emergency Manager Orr, Flint, Michigan, 60 miles away from Detroit, which is under an Emergency Financial Manager, and Saginaw, Michigan,

103

approximately 85 miles away from Detroit, which is also a financially distressed city, having a deficit in excess of $3 million. Yet, in each of those cities, the police officers are paid more than Detroit's current $47,914 based on an annual base wage at 2,080 straight time hours for a five year Officer, the top pay in Detroit.

Below is a chart comparing the base wage and total compensation between Detroit at the current $47,916 top rate, Flint and Saginaw, noting that Flint is also under an Emergency Financial Manager under Act 72:

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $47,916 | $51,828 |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

As the above chart indicates, in terms of base salary Flint, under an Emergency Financial Manager, is approximately at the five year level $4,000 more than Detroit Officers. As the Officer has more years on the job, the spread, even with Flint, is more. When total compensation is compared, even at five years, the spread between Detroit and Flint is dramatic, namely, $9,000, and almost $12,000 between Saginaw and Detroit.

104

These facts are devastating. These are not comparisons with the high paid State Police nor with Livonia, Birmingham, the Grosse Pointes (Public Safety Departments). The Chairman has chosen to compare primarily with another nearby community that is under an Emergency Financial Manager, namely, Flint. And look what the facts reveal. Compared with the marketplace, Detroit Police Officers, faced with the Police working conditions of a large urban area, are by any definition underpaid even in a distressed community faced with a financial emergency.

To put it another way, there can be no doubt that the job of a Detroit Police Officer is certainly as difficult as any in Southeast Michigan or, for that maHer, the State Police because of the nature of Police work in a large urban American city. Furthermore, the Chairman is informed that the Flint figure was imposed by the Emergency Financial Manager, further emphasizing that the Detroit Police Officers, in comparison with a nearby distressed Michigan city, namely, Flint, Michigan's third largest city, are vastly underpaid.

As to Issue No. 51 , longevity, the City proposes to eliminate longevity, arguing that the City has eliminated longevity with its other unions by virtue of the City Employment Terms as well as its non-union personnel. Yet, in order to reach some semblance in the marketplace, the DPOA argues that it needs longevity and proposes that longevity pay be restored.

The external comparable of Flint and Saginaw clearly establishes that the Detroit Police Officers at $47,4l 6 at the five year rate are grossly underpaid, even in a city that is under an Emergency Financial Manager where there is a serious question of the ability to pay.

Even though the Chairman made the suggestion of what he believes should be the Union's Last Best Offer because it was evident that Detroit Police Officers were clearly underpaid in the comparable workplace in comparable police work, the Chairman, applying the

105

312 criteria and the emphasis required to be put on financial ability, hit a roadblock of Detroit's financial crisis, causing the Chairman to reconsider his initial reaction because of his obligation to follow the statute and the criteria set forth therein as there is a question of ability to pay, though the Chairman will point out that a careh1l analysis suggests that the Orders that will follow will indicate that if Detroit wishes to have a viable Police force in the interest of the citizens' public welfare, there is a way to have some semblance of the ability to pay. In this regard, what a majority of the Panel has done is for the first year continue no pay raises, even though Flint during the same year is making a base wage of $4,000 more. There was recognized that those Officers who are 12 hour shifts, and that is not all of the Detroit Police Officers, are being paid if they work a full year on 12 hour shifts an extra 104 hours at 84 hours every two weeks. But this does not apply to all Detroit Police Officers. The Panel majority, the Chairman and the DPOA Delegate, although the DPOA Delegate is reluctant, believing that the Panel should have awarded a pay restoration in the first year of the contract or at least by July 1, 2013, would award a 5% restoration effective January I, 2014. This gives the Emergency Manager and Mayor nine months to reorganize the Department, if he so chooses, in conjunction with the City and the Department. This will bring the five year Officer up to $50,311.80, based upon a 2,080 hour year, still below Flint. However, if the Department continues 12 hour shifts 84 hours in a two week cycle and makes the 84 hour cycle available, Officers will be able to earn additional monies, at least those on patrol, as they have in the past year.

The reason for not restoring the longevity is there is the claimed ability to pay proposition and the fact that longevity was eliminated with the Lieutenants and Sergeants in an Act 312 proceeding, has been eliminated throughout the City, although imposed, and is not available in Flint. What the majority of the Panel has done is illustrated by the following chart:

106

| Five (5) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $50,311.80 | $54,225 app. |
| Flint | $51,336 | $60,888 |
| Saginaw | $53,700 | $63,396 |

| Ten (10) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $50,311.80 | $54,225 app. |
| Flint | $51,336 | $62,028 |
| Saginaw | $53,700 | $66,048 |

| Fifteen (15) Year Officer | Annual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $50,311.80 | $54,225 app. |
| Flint | $52,176 | $64,272 |
| Saginaw | $53,700 | $67,344 |

| Twenty (20) Year Officer | Atmual Base | Annual Total Compensation |
|---|---|---|
| Detroit | $50,311.80 | $54,225 app. |
| Flint | $53,148 | $66,000 |
| Saginaw | $53,700 | $68,628 |

The Emergency Manager, the Mayor and the Treasurer of the State of Michigan should consider, with the blessings of the Governor, moving the date of the 5% restoration to July 1, 2013 when considering the above comparisons.

In regard to the longevity, again recognize what the longevity payments were in the Master Agreement that expired on June 30, 2012 that had been in the Master Agreement for some time. After five years, an Officer received 1% of base wage; after 11 years, 2% of base wage; after 16 years, 3% of base wage; and after 21 years, 4% of base wage. Using these figures, if the Emergency Manager and the Mayor should consider, recognizing that longevity is being eliminated in Detroit, to bake in as part of the base wage the previous longevity into the Police Officer's base wage. If this is done, look at the figures in comparison with Flint and Saginaw:

| Five (5) Year Officer | Annual Base |
|---|---|
| Detroit | $50,814.92 |
| Flint | $51,336 |
| Saginaw | $53,700 |

107

| Eleven (11) Year Officer | Annual Base |
|---|---|
| Detroit | $51,318.04 |
| Flint | $51,336 |
| Saginaw | $53,700 |

| Sixteen (16) Year Officer | Annual Base |
|---|---|
| Detroit | $51,821.15 |
| Flint | $52,176 |
| Saginaw | $53,700 |

| Twenty-One (21) Year Officer | Annual Base |
|---|---|
| Detroit | $52,324.27 |
| Flint | $53,148 |
| Saginaw | $53,700 |

If the longevity is baked in, it should be done by the Emergency Manager and Mayor. The Panel has not done this although the DPOA Delegate would do it as he believes longevity should have been included in the Order. It should be noted that the City Delegate dissents on any pay increases or any consideration of longevity. The City Delegate agrees with the Chairman that the Chairman has no authority to include longevity. The DPOA Delegate would have included longevity in any event.

Now, where is this money coming from, given the City's ability to pay? First, the Emergency Manager has nine months to reorganize the Department to bring efficiencies to the Department, including controlling overtime. And, in this regard:

(1) there are provisions to work out, including 12 hour shifts and perhaps an an·angement of a dual eight hour/12 hour program which can eliminate, according to the Department, substantial overtime;

(2) in regard to going to court on tickets and ordinance violations, the Detroit Police Depat1ment, in conjunction with the 36'h District Court, can adopt the techniques used in the suburban courts and departments where a supervisor can conduct pre-trials and arrange for pleas

108

from citizens to avoid having Officers appear in court, thereby saving overtime. This is a well-known technique in suburban departments and apparently has not been used in Detroit and can save overtime;

(3) working with the Chief Judge of the 36'ʰ District Court, address the question of Judges who do not appear timely in court which contributes to the overtime that Officers spend in court;

(4) move a number of Officers who are not doing police work out of their positions and into field work. The importance of this is that when these proceedings began there were over 2,000 Police Officers. The latest count is there are under 2,000 Officers either as a result of resignations or retirements. It is anticipated that there will be more retirements before the proposed raises take effect. In the opinion of the Chairman, it is unnecessary to replace the retiring Officers as probably the same or even more police service can be performed for the citizens of Detroit with less Officers if Police Officers are put out on the street.

One example suffices. In Central District, when one walks into that District, there is an Officer assigned to the screening device. Right behind that Officer there are two or three civilian employees at a security desk. If one turns right and walks down the hall, there are three counters where fully uniformed Officers are serving the public for some type of licenses. Every time the Chairman has gone by there, there have been rarely one or two citizens being served. Exactly why there are three full service Officers behind those counters when that work could be done by civilians or whether one Officer rather than three Officers could be doing the work. In other words, a careful survey throughout the Department might reveal a substantial number of Police Officers who could be doing police work rather than civilian work or their jobs could be combined. The significance of this is, rather than replacing Officers who are resigning or

109

retiring, Officers could be performing work out in the field with no increased cost. It is estimated that assuming the overhead cost of a $51,000 or $53,000 Officer is one-third, these Officers no! replaced represents an $80,000 reduction in the budget. If 100 Officers are not replaced, but instead 100 Officers are moved out of counters or out of Precincts where they are not doing police work, this provides the financing to give these Police Officers a wage comparable with Flint and Saginaw. The Emergency Manager and the City government has nine months to accomplish this consistent with the City's ability to pay.

Detroit is in a serious financial crisis. There is a need to have more Police Officers on the street. But the Orders here limit the number of non-IOD limited duty Officers. The Orders provide for civilianization. The Chairman has illustrated the one example where there are Officers who seemingly are wearing full uniforms and are not doing police work, answering calls of citizens and who could replace retiring Officers without adding to the force and still serve the citizens and not strain the City's finances. It may be that, with retirements and resignations and utilizing available person power that could be put out on the street without hiring any other personnel, the Department could operate with between 1,800 to 1,900 Officers and provide the same current service and even increased service to the citizens of Detroit and pay the comparable wages ordered by the majority of the Panel and be cost neutral, in other words without adding costs to the Department. This comment goes hand in hand with the recognition in the Orders of attempts at the need to save overtime costs. The Panel has clearly recognized the City's dire financial crisis.

There is the Section 9(h) criteria that fact finding and arbitrators consider, namely, the art of the possible. The Chairman appreciates that the civilian employees have taken pay cuts. This is unfortunate. But, police work is different. It is dangerous. It has resulted in Police Officers

110

losing their lives. And, as one can see, all the majority of this Panel has done is made a comparison with another city, Flint, that has an Emergency Financial Manager, and the comparison has been with wages that were imposed by that Emergency Financial Manager. Any court that might be called upon to review this Opinion should recognize that the rnt of the possible means that a strike should be avoided. That is the purpose of Act 312. And it would seem that it is possible by applying careful management techniques to get Police Officers out on the street; that it means a smaller Depa1iment in terms of numbers, a more effective Depattment that can do it with less money with Officers who are paid at least a reasonable rate with a comparable community, then this should be done.

Incidentally, this is what is happening in other communities, even to the effect, based upon this Chairman's experience in Chicago, that even Command Officers are now out on the street as a matter of course. Thus, the Chairman realizes there are a number of things that could be done in the Department based on his own observations that can be tightened up consistent with protecting the integrity of the contract and the integrity of the Department, consistent with the City's limited ability to pay.

If the observations of the Chairman are followed, the Order may even be cost neutral. If the Emergency Manager with the Mayor bake in the longevity payments, it is suggested that it still could be in the $5 million to $6 million range as the longevity payments would not have been due until December 2013. And, then, as pointed, it still would be cost neutral. In other words, the ruling of the major ity of the Panel, although the DPOA Delegate reluctantly signed the Order only to get a majority ruling, gives the Emergency Manager the opportunity to accelerate the restoration of 5% as early as July 2013. And, even then, the Chairman is of the view that it could be cost neutral if the resignations and retirements are not replaced. But, certainly, the

111

baking in of the longevity payments at a minimum should be voluntarily done by the Emergency Manager and the Mayor because these are, in the view of the Chairman, cost neutral.

The DPOA Delegate very reluctantly concurs with the Chairman, but if the DPOA Delegate had his druthers would have restored the complete amount of the cut on January 1, 2013. The City Delegate dissents. The City Delegate agrees with the Chairman that longevity should not be restored. The DPOA Delegate voted to restore longevity.

Concerning Issue No. 90, the City proposes to add to Article 4l.A the following provision: "Budget Required Furloughs. The City reserves the right to reinstitute future furloughs as a means of cost containment." The DPOA objects to such a provision. Hopefully, such a provision will not during the life of this Agreement be instituted. But the financial crisis in Detroit is such that this is a possibility. Furthermore, this is consistent with management rights. For this reason, the Chairman, joined by the City Delegate, will vote to include such a provision. The DPOA Delegate dissents.

Issue No. 103 - Economic - City Proposal -          *12-Hour Shifts*
Issue No. 122 - Non-Economic - Union Proposal - 10-Hour *Shifts*

Issue No. 103 is a City issue which the City has dubbed as an economic proposal dealing with 12 hour shifts. The DPOA has proposed Issue No. 122 dealing with work schedules which the DPOA has dubbed as non-economic. Both offers deal with work schedules. The dilemma that the parties have presented is that if an economic issue, then the Panel must select one or the other Offer. If a non-economic issue, the Panel can fashion an award. The two Issues involve work schedules. Work schedules represent a condition of employment which is not necessarily an economic issue. Therefore, the Chairman concludes that since the two Issues are schedules that both Issue No. 103 (12 Hour Shifts) and the proposed 4/10 work schedule is also a work

112

schedule; that the two issue::; are non-economic. The *DPOJ\* Delegate agrees with the Chairman. The City Delegate dissents. This means that the Panel can fashion its own Orders as to scheduling.

As to the 4/10 work schedule, this was a proposal in the Tentative Agreement if 10 hours shifts are utilized as a development of a pilot program. Commander Benson testified that he did a study on a 10 hour shift model and concluded that it would increase the cost to the Department in instituting such a schedule. Commander Benson explained that two 10-hour shifts would cover 20 hours per day which he believed would mean the need to have more equipment and Officers to cover the additional four hours per day which the Department does not have the equipment or the personnel available to accommodate the additional needed squad cars. The Chairman was persuaded by this testimony and for this reason will join with the City Delegate in rejecting Issue No. 122, as mandating a 10 hour shift. On this point, the City Delegate joins with the Chairman in agreeing that this is a management right. The DPOA Delegate believes, again, that the Panel should have issued an Order mandating a 10 hour shift. However, the Department retains the management right to determine whether the Department wishes to initiate a 10 hour shift. The DPOA Delegate dissents.

As to the 12-hour shifts, the Department maintains that the 12-hour shifts project a savings annually in overtime of approximately $3 million per year; that in the Second Precinct, comparing January 2012 before 12-hour shifts with November 2012, there was an increase of Officers on the street from 52% to 76%; that in the Eighth Precinct there was an increase from 75% to 86%. Inspector Rivers testified that there were examples of Officers working on the eight hour shift basis on double shifts. She gave an example in Exhibit 710 in the period between June 27, 2011 through August 7, 2011 in the Southwestern District there were 63 double

113

shifts, meaning Officers worked 63 double shifts or 16 straight hours. The proposed schedule in one scenario provides for a five day week, followed by a two day week, with one three day weekend.

The Chairman appreciates that there are consistent runs in Detroit; that the schedule does provide all Officers with every other weekend off. It does provide a savings in overtime and allegedly provides for more cars on the street.

On the other hand, there has been a ground squall from Officers indicating that there is a fatigue factor that Officers, because of the consistent runs in a large urban area, are having difficulty adjusting to 12 hour days. Yet, other Officers welcome the 12 hour shift. Under such circumstances, this is a matter that should have been developed with more care on the part of the Department with input from Union representatives, recognizing that the Department does have the management right to institute a 12 hour shift. The Chairman, joined by the City Delegate with the Union Delegate dissenting, recognizes the Department's management right to institute a 12 hour shift. However, the Order will also provide, with the City Delegate dissenting, with the Chairman and the DPOA Delegate concurring, that there be established a committee consisting of one member of the Department and one Officer of the DPOA to meet within one week of this Order to explore the possibility of providing an opportunity to operate 12 hour shifts with volunteers and allowing other Officers to work eight hour shifts and to report their findings to the Chief within two weeks of this Order. If the Chief accepts the recommendations of the committee and in doing so implements a volunteer 12 hour program, this ends the matter. If the Chief does not accept a voluntary program by May I, 2013, then within one month of May 1, 2013 the matter may be submitted to the Chairman of this Panel as the senior Umpire under the Umpire System, to determine whether the Chief has been arbitrary in exercising his management

114

discretion in determining not to accept a voluntary program, with the standard being to cmtail

overtime and to have more patrol cars on the street.

The City Delegate agrees with the Chairman that the decision to have 12 hour shifts is a

management right, but disagrees with the committee approach as spelled out in the Order. The

DPOA Delegate dissents on the issue of 12 hour shifts, maintaining that it is a condition of

employment to be negotiated, but would concur with the Chairman as to the committee approach

and the oppOitunity to grieve in the event that the Chief does not accept the committee

reconm1endation or implements, in any event, a volunteer program in establishing 12 hour shifts.

One final point which is a point made by the Chairman. The Chairman, in writing this

portion of the Opinion as to 12 hour shifts, does so on the proposition that the schedule that will

be adopted will be an 84 hour schedule on a two week cycle as this has been the schedule that th<:

Department has used since implementing the 12 hour schedule. The Department's testimony on

this point has been that a 10 hour day is not as effective as a 12 hour day in having cars on the

road and in eliminating overtime.

<u>Issue No. 102</u> - Non-Economic- City Proposal - *Emergency Manager*

The City proposes the following language as to an Emergency Manager:

> An Emergency Manager appointed under the Local Financial Statutory
> and Choice Act may reject, modify or terminate this collective
> bargaining agreement as provided within the Local Financial Stability
> and Choice Act 436 P.A. 2012.
>
> Inclusion of the foregoing language does not constitute an agreement by
> the DPOA to the substantive or procedural content of the language. In
> addition, inclusion of the language does not constitute a waiver of the
> DPOA's right to raise Constitutional and/or other legal challenges
> (including contractual or administrative challenges) to: (1) the validity of
> the Local Financial Stability and Choice 436 P.A. 2012; (2) appointment
> of an Emergency Manager; or (3) any action of an Emergency Manager
> which acts to reject, modify or terminate the collective bargaining
> agreement.

115

The difficulty with this proposal is the failure to recognize that it is not a mandatory subject of bargaining. Act 312 is designed to resolve disputes between public employers and police and fire unions when the parties have reached impasse over mandatory subjects of bargaining. An Act 312 Panel's jurisdiction is limited to resolving mandatory subjects of bargaining.

Section 15(7) of the Public Employment Relations Act provides:

> (7) Each collective bargaining agreement entered into between a public employer and public employees under this act after March 16, 2011 shall include a provision that allows an emergency manager appointed under the local government and school district fiscal accountability act, 20 II PA 4, MCL 141.1501 to 141.153 I, to reject, modify, or terminate the collective bargaining agreement as provided in the local governmen t and school district fiscal accountability act, 2011 PA 4, MCL 141.1501 to 141.1531. Provisions required by this subsection are prohibited subjects of bargaining under this act.

Subsequent to the rejection of Public Act 4, the Legislature enacted Act 436 of Public Acts of 2012. Pursuant to Section 30 of Act 436 and Act 212 30(1) as well as 30(2), it seems that the references to Act 4 of Public Acts of 2011 contained in 15(7) of PERA would also apply to Act 436 of 2012. The point is "provisions required by this subjection are prohibited subjects of bargaining under this Act". This means, in the view of this Chairman, that placing the proposed provision is not a mandatory subject of bargaining, but is required by PERA; that the refusal by the DPOA to agree to such a provision in their contract may well be an unfair labor practice. But that would be a matter before the Michigan Employment Relations Commission and is not a matter to be resolved by this Act 312 Panel, whose jurisdiction is to address mandatory subjects of bargaining. For this reason, the Chairman declines to join either party in issuing an Order including the City's offer on this subject for lack of jurisdiction. Having received no majority, the proposal fails for lack of a majority vote, with the City Delegate

116

dissenting as the City Delegate would vote to include the City's Last Best Offer. The DPOi\.

Delegate takes the position that it would not be an unfair labor practice to resist including such

language in the contract.

Issue No. 60- Economic- *Article 33.1- Pension Provisions-Longevity Delete fi·om AFC*

In Issue No. 60, the City proposes to delete longevity from the average final

compensation of the pension plan. Though a majority of the Panel has not included longevity in

this contract, longevity has been in previous contracts and it is hoped that the City and the

Emergency Manager may in their wisdom reinstate longevity and for this reason the Chairman,

joined by the DPOA Delegate, will reject the City's Issue No. 60 which the DPOA obviously

objects to. The City Delegate dissents.

Issue No. 66 - Economic – *Article 33- Pension Provisions-Right to Create/Amend/Eliminate DC Plan*
Issue No. 67- Economic – *Article 31.U.10- Pension Provisions-City May Create Loan Program from DC Plan*

The City proposes in issue No. 67 to modify Article 3l.U as follows:

U.     Defined Contribution Plan.

\* \* \*

10.     Participant Loan Program. There shall be a <u>The City may create</u>
a participant loan program which will conform with the
requirements of Section 72(p) of the Internal Revenue Code and
shall be limited to "hardship" circumstances, as defined by the
Plan Administrator and will only be available if no other loans
from the Plan are outstanding.   A participant who satisfies
applicable rules and procedures as established by the
Administrator may borrow from the participant's accounts an
amount which does not exceed the lesser of fifty (50%) percent
of the participant's vested accumulated balance or Fifty
Thousand and 00/100 ($50,000.00) Dollars.   Loans must be for a
minimum of One Thousand and 00/100 ($1,000.00) Dollars.
Repayment shall be done through payroll deduction.   However,
any outstanding balance shall be due upon termination of
employment.

117

* * *

Thus, the City proposes to amend Section U.10 by making the Participant Loan Program permissive rather than mandatory, and not only to new hires but to all Officers without negotiating with the DPOA.

Article 31 - Pension Provisions

U.  Defined Contribution Plan for Current and New Hires - The City reserves the right to design, establish, manage, amend, and implement a Defined Contribution Plan and related duty disability retirement provisions for current employees and new hires, which may include a Defined Contribution Retirement Health Care Plan.

This Plan shall be effective for all bargaining unit members hired into the Department on or after June 30, 2012 and when employee contributions may be made on a pre-tax basis.

Bargaining unit members hired into the Department at or after that time, other than as provided herein in regard to duty-disability beneficiaries, will not accrue benefits under the old plan. Rather, those bargaining unit members hired into the Department on or after the effective date shall accrue benefits exclusively under this Section.

* * *

10.  See Issue 67.

* * *

The issue of the type of pension plan is usually an issue of negotiation between the parties. Likewise, the parties did agree that the loan program would be mandatory. There has been no showing after the parties previously agreed that it would be mandatory; that there is any persuasive reason that now the program should be permissive. For both of these reasons, the Chairman, joined by the DPOA Delegate, will vote to deny the request of the City to adopt the proposal represented by Issue No. 66 and 67 which the DPOA objects. The City Delegate dissents.

118

Issue No.68 - Economic - *Article 33.V 1 - Pension Provisions-City Right to Amend Disability Retirement*

In Article 33.V.1, the City proposed the following amendment represented by the underscoring:

> V.  Duty Disability Retirement Provisions
>
> 1.  Subject <u>to the City's reserved authority to amend and modify the following and</u> subject to c, below, applicable to all bargaining unit members who file application for disability retirement benefits, the definition of "total disability" and "total incapacity" for the duty disability retirement provisions is as follows:
>
> \* \* \*

There was no showing of a need for this provision. The duty disability retirement provisions have been in the contract for some. They are a result of negotiations or an Act 312 between the parties. Subsections a, b and c under Section V.1 were carefully drafted. If there arc changes, the changes should be mutually negotiated between the parties or mutually contested in an Act 312. For these reasons, the Chairman, concurred in by the DPOA Delegate, will vote to deny the issue No. 68 proposal by the City. The City Delegate dissents.

Issue No. 69- *Article 33 -New Pension provision. Eliminate vision and dental care*

The City proposes to add to Article 33 a new section on pensions reading:

> Upon the effective date of this Agreement, all vision and dental pensions shall no longer be provided for any future retirees after January I, 2013.

The DPOA opposes.

The rationale that the City presents is that this is a cost item to the City as the City is required to fund this benefit; that its consultants suggest that this benefit is not prevalent in other pension plans. The DPOA questions this fact. Though the Chairman appreciates that the City is

119

in financial difficulty, there arc disputes between the parties as to the financial condition of the pension plan plus the need to make reforms. The problem that the Chairman sees is that with no history of bargaining and an attempt to resolve such issues as this, given the City's financial plight, more needs to be done at the bargaining table before submitting the issue to the Panel. It is for this reason that the Chairman, joined by the DPOA Delegate, will at this time reject this proposal. Though the DPOA Delegate did not agree with the Chairman's position on a re-opener as to pensions, and therefore expressed concern as to the re-opener, in order to obtain a majority vote at this time, agrees to vote to reject the City's proposal on Issue No. 69. The City Delegate dissents, believing that the issue should be addressed at this time.

Issue No. 62 - Economic -    *Article 33.R.l -Pension  Provisions-Full Time to Stay in DROP*
Issue No. 63 - Economic -    *Article 33.R.2-  Pension  Provisions-DROP Limited to 5 Years*

Issue Nos. 62 and 63 are proposals by the City as to the DROP Plan. These are proposals to amend the DROP Plan which the DPOA opposes. Issue No. 62 is a proposal by the City to amend Article 33.R.l to add the following language:

> Members entering the DROP Plan after the effective date of this Agreement must remain in a full duty status for the duration of their participation in the DROP Plan. If a member is not able to return to full duty status within six months, their participation in the DROP Plan shall terminate and he/she shall revert to a regular pension.

The proposal also proposes to delete the reference to the 2.25 escalator in Section R.S and in R.9. Likewise, in R.2, the proposal proposes to incorporate the City's proposal as to Issue No. 63, the five year limitation on participation in the DROP Plan.

The Chairman would agree with the elimination of the reference to the 2.25% escalator because this is a housekeeping matter related to the stipulation in the 20 II Act 312 arbitration before Chairman Frankland. Thus, this would take care of subsections 5 and 9. As to subsection

120

2, this will be discussed in the discussion on lssue No. 63.

The Chairman appreciates the proposal put forth by the City. But the difficulty is that the language is drafted as an internal inconsistency and it does not distinguish between IOD and non-IOD injuries or address the overall issue of limited duty. For this reason, the Chairman, concutTed with by the DPOA Delegate, will deny the City's proposal except as to Sections R.5 and 9. The City Delegate dissents as to Sections R.l and 2, but will concur with the Chairman as to Sections R.5 and 9, and as to Sections R.5 and 9, the DPOA Delegate dissents.

As to issue No. 63, the City seeks to limit the participation in the DROP Plan to five years. When the DROP Plan was adopted by the parties, there was no limitation. There would have to be a futther record developed to establish a cost factor that would strain the already fragile financial condition of the City to convince this Chairman that this provision is needed. At this point, the Chairman is not convinced. For this reason, the Chairman will join with the DPOA Delegate and deny this proposal but, as the Chairman did with Issue No. 63, he again repeats that as to Sections R.5 and 9, he will agree with the City Delegate that the reference to the 2.25 multiplier will be deleted. On this point, the DPOA Delegate dissents. On the point of denying the limitation, the City Delegate dissents, but does agree with the Chairman as to Sections R.S and 9 in deleting the 2.25 references to the multiplier.

Issue No. 61- Economic-    *Article 35.K- Pension Provisions-Delete Reference to 2.25% Escalator-No Escalator for Future*
Issue No. 64 - Economic -  *Article 33.R.5- Pension Provisions-Delete Reference to 2.25% Escalator*
Issue No. 65- Economic-    *Article 3J.R.8- Pension Provisions-Delete Reference to 2.25% Escalator*

Issue Nos. 61, 64 and 65 are what the City proposes are cleanup provisions representing the stipulated award of 2011 concerning eliminating the 2.25% escalator for service credits

earned after September 1, 2011.  As to Article 33.K, the City proposes as follows:

> K.    On or after July 1,1992, and the first of July each year
> thereafter, the pension portion of any retirement allowance or
> death benefit of a member or beneficiary of a member as
> defined in Article IV, Section I (d) of the plan provisions, and
> Article 31. K of this Agreement (to include those members who
> opl lo retire under the new plan provisions) shall be increased at
> the rate of 2.25% per annum computed on the basis of the
> amount of the pension received at the time of retirement by all
> new plan members who are currently retired or who retire on or
> after July I, 1992.
>
> Fot pet solls teti• il lg 0ll or c fte• Joly I, 2001, ul ldet the llew plat•
> ptovisious, tire 2.25% per al llJUlll escalation nn•ount shall be re
> eor nputed enclt fiseal yeat 0ll the basis of llle an1oont of pension
> received in the previous fisc,tl yea• (i.e., the 2.25% pet armurn
> escalatio11 amount shedl be co111pounded).
>
> The pension portion of any retirement allowance or death
> benefit of a member, or beneficiary of a member as defined in
> Article lY, Section I (d) of the plan provisions, and Article 31
> (K) of this Agreement (to include those members who opt to
> retire under the new plan provisions) earned on or after
> September 1, 20 II, shall not be increased whatsoever, per
> annum or otherwise. The pension portion of any retirement
> allowance or death benefit of a member, or beneficiary of a
> member as defined herein, accrued prior to September I, 20 II,
> shall still be increased as provided herein. Hence pension
> benefits earned based on service rendered on or after September
> I, 20 II will no longer receive the 2.25% per annum escalation
> amount. The 2.25% per annum escalation amount shall
> continue to apply to pension benefits earned based on service
> rendered before September I, 2011 .
>
> Pension benefits based on service rendered after the effective
> date of this Agreement shall continue to not be subject to any
> escalation amounts.

The City proposes to delete one full paragraph as struck out and add a sentence as

underscored, plus a reference to Article 3l.K of this Agreement.

As to Issue No. 64, the City proposed to amend At1icle 33.R.5 as represented by the

following underscoring and strikeout:

R.      DROP Plan:

      1.      See Issue No. 62.

      2.      See Issue No. 63.

            * * *

      5.      The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator <u>applicable to the</u> credited service years of 2.25% times that p01 tion of any 1etil ement allowance em ned pli01 to SeptellJbei I, 2011.

            * * *

      8.      See Issue 65.

            • * *

Likewise, as to Issue No. 65, the City proposes to amend Article 3l.R.8 with the following strikeouts and underscoring:

      R.      DROP Plan:

      I.      See Issue 62.

      2.      See Issue 63.

            * * *

      5.      See Issue 64.

            * * *

      8.      When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member 's retirement allowance shall <u>include all annual escalator amounts</u> H5% subject to Article 31(K) that would have been added while the member was participating in the DROP plan.

            * — *

The history behind this language goes back to correspondence between the then counsel of the City, Kenneth Wilson, and the current counsel of the DPOA, Donato Iorio, when in a letter dated July 14,2011 Mr. Wilson wrote Mr. Iorio as follows:

      I am writing to confirm that the City of Detroit and the Detroit

123

Police Officers Association (DPOA) have negotiated the agreement summarized below subject to ratification. This agreement would resolve changes to the collective bargaining agreement that would otherwise have been determined by a majority of a panel pursuant to Public Act 312 of 1969, as amended. Subject to ratification, this agreement is as follows:

* * *

iv. Elimination of Escalator. Pension benefits earned based on service rendered after Septembe•· 1, 2011 would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator. (Identical to LSA award other than the effective date.)

This language then became part of a Stipulated 312 Award before Chairman Kenneth P.

Frankland signed on September 22, 2011 in MERC Case No. 009 F-0731 wherein the Stipulated

Award provided:

iv. Elimination of Escalato r. Pension benefits earned based on service rendered after· September l, 2011 would no longer receive a 2.25% per annum escalation. Pension benefits earned pursuant to service rendered prior to that date would still be subject to the escalator.

Based upon this history, the Chairman concludes that the language proposed by the City in Issue

Nos. 61, 64 and 65 reflects this stipulation. It is clarifying language. And, by placing this hist01y

in this Opinion, confirming the histoty, all will understand the meaning of the language. For this

reason, the Chairman, voting with the City Delegate, accepts the City's proposal as to Issue Nos.

61 , 64 and 65. The DPOA objected, arguing for the *status quo.* Based on the history, the

Chairman cast his vote as indicated with the City Delegate. The DPOA Delegate dissents.

| | |
|---|---|
| Issue No. 9 -Non-Economic- | *Article 6.A - Management Rights-Add Law and FSA Article* |
| Issu e No.10- Non-Economic- | *6.D, E and F- New Management Rights Provision Article* |
| Issue No. 11 - Economic- | *6.G - Management Rights-Delete Confusing Section G* |
| | *about CBA Supplementing Charter* |
| Issu e No. 12- Economic - | *Article 6- Management Rights-Reserve all Rights* |

124

These Issues proposed by the City address management rights and are amendments to Article 6 of the Master Agreement. All of the amendments proposed are opposed by the DPOA, who propose that the *status quo* remain.

The amendments essentially mirror the City Employment Terms. The fact of the matter is the management rights and responsibilities provisions in the Master Agreement have been negotiated over a long period of time and, in the opinion of the Chairman, gives the Department broad rights only subject to any negotiated "provisions of this Agreement".

The management rights in the Master Agreement are two pages long. They have been tested in the umpire system and the Department has fared quite well among the umpires. All the proposals do is represent a stylistic change. There is no need to reinvent the wheel. The present management rights language gives the Department broad rights which the Department has in the past and will continue to exercise. For these reasons, the Chairman, joined by the DPOA Delegate, declines to adopt the City's proposals as to Issue Nos. 9, 10, 11 and 12 and votes to continue the *status quo*. The City Delegate dissents.

Issue No. 17 - Non-Economic -     *Article 9- Discipline-Department Can Implement Disciplinary Policies, etc.*

The City has proposed to amend the introduction to Article 9, "Discipline", as follows:

> All alleged charges and specifications against employees will indicate the specific violation of Departmental rules and regulations including the date, time and location of such alleged violations and a statement in simple concise language of the facts constituting the allegations. The Department reserves the right to implement and/or modify disciplinary policies, rules and penalties, including but not limited to policies relating to use of alcohol and marijuana and other controlled substances with at least thirty (30) days prior notice to the Union.

This, again, is a non-economic issue. Under its management rights, it would seem that the Department has the right to amend policies. But this is asking to confirm this right in the

125

contract. Likewise, the DPOA has the right to challenge the reasonableness of the rule. Therefore, the Chairman would add the language to the Union's right to challenge the reasonableness of the rule in the grievance procedure. With this added provision, the Chairman would adopt the City's Last Best Offer. The City Delegate reluctantly would agree. The DPOA Delegate dissents with amending the provision.

Uniforms

The parties had proposals on uniforms but, during these proceedings, there was a representation that the parties were reaching an agreement on the issue of uniforms. Based upon this representation, the Panel will not issue an award on uniforms. If the Chairman is mistaken, then the Chairman shall be so advised within five days of the issuance of this Opinion and Award and the Panel will meet to address the issue of uniforms.

<u>Issue No.94</u>- City Issue- *Eliminate Adoption by Reference*

Issue No. 94 is a proposal by the City to delete Article 45 of the Master Agreement which is entitled "Adoption by Reference or Relevant Charter Provisions, Ordinances and Resolutions" and reads:

> Except *as* other wise pwvided in this Agreement, the p,uties further agree that all provisions of the City Ch<11ter, Ordimmees a nd Resolutions of the City Couueil relating to the working conditions and comperrsatiou ofeurployccs are incor porated herein by refereucc and rnade a part hereof to tire sarue extent as if they 1vete specifically set fortlr. These clrartel provisious, 01diuauces and resolntious iuclude, bnt arc uot uecessar ily lilllited to, the follow illg subject uratter.
>
> A.  Hours of work and method ofeonrpcns.rtiou
> B.  Ovetiitne payrnents
> C.  Prel1liul11 paymeuts
> D.  Uuiforors and eqnipment
> E.  Vacations (futlough and leave d< ys)
> F.  llolid<tys
> G.  Non duty connected illness or dis,tbility  (sick le< ve)
> H.  Duty conuected illness or disability

126

I.   RetitCtiiCiit System (peusion)
J.   bougevity pay

The Chairman agrees that there is no reason to reference the Charter Provisions,

Ordinances and Resolutions; that the contract involved here should stand by itself.  For this

reason, the Chairman, joined by the City Delegate, will agree to the elimination with the DPOA

Delegate dissenting as the DPOA objects to the elimination of Article 45.

Issue No. 93 - Economic -   *Article 43 - Civilianization*

The City proposes to amend Article 43, "Civilianization", as follows:

The Department shall have the right to use civilians in any
function/classification not requiring MCOLES certification, including in
any of the functions/classifications listed below. Any police officer in a
function/classification that is civilianized shall be reassigned. as-it
decms appt opt iate so loug as it does ll0t reduce *the* fot*cc* ot etode the
utelltbwship of the bat gaining unit as a tesult oftlte use ofcivil!iaus in
the following connnalds alld distt ict assiglllltCIItS including oftlte
folio wiug s/classificatious.

Commands
.L.  Fleet Management
2.   Equipment Property Control Section
1.   Communication Systems Section
4.   Communications Operations
5.   Uniform Store
6.   Auto Pound
7.   Records/Identification Section
8.   Print Shop
9.   Graphic Arts
10. Crime Analysis
11. Technology Liaison Office
12. Technical Support
13.  Any administrative function or classification

District Assignments
.L.  Vehicle Maintenance Officer
2.  Property Officer
3. Any administrative function or classification

To the exteut ei•i lians ate employed to replace swo1lr offieets it shall be
done 0ll the basis of either adding civilia1l staff, or by atttitiou when au
offieet voluntat ily leaves the positions lte/she eu1l ently holds.

127

> Should *the* Oepartrneut decide to utilize officers in any of the abo"e
> mentioned positious, those positious shall be made a vailable for officers
> to subrrrit DPD 568 Iuter Office Mcrnorarrdums for the ttausfcr requests
> fOr the eommaucls. Unless a position is c bolislred, the Department must
> fill all vaca1leies as soo11 as practicable if11ot **it1r** civiliau thau with
> sworll officers.

> Effective September I, 20 **II**, the Department may, at its discret ion,
> reassign bargaining unit members from the 36" District Court in order
> that they may be replaced with civilian staff or civilian securi ty
> personnel.

> The provisions of Article 10 sha ll not apply to this provision.

The strikeouts in the text represent deletions. There is also an added addition, namely, "The

provisions of At1icle 10 shall not apply to this provision". There is also some additional language

in the text concerning MCOLES certification. The City has also added under "Commands" three

additional entities, namely, Communications Operations, Technical Suppot1 and "Any

administrative function or classification". Under "District Assignments", the City has added

''Any administrative function or classification".

     The DPOA proposes the *status quo.*

     Although the City maintains there are 90 Officers affected, some of the City's count

includes present entities that can be civilianized, including Fleet Management, which the City

claims involves 14 Officers. The present Article 43 already provides for civilianization of Fleet

Management. The largest group in the City's proposal is Communications Operations involving

approximately 42 Officers.

     The City does make a point. In their presentations, the parties did refer to the contract

between the City of Chicago and the Fraternal Order of Police Chicago Lodge No. 7 which

represents the Chicago Police Officers. Section 23.12 of that contract recognizes civilianization

of the functions that the city is seeking to civilianize and the amendment proposed to Article 43.

128

The City is seeking with less cetiified Officers in the Department to put more Officers on the street performing Police work. The City is seeking what other major departments arc doing as evidenced by the Chicago contract. This civilianization process will take some time. Based upon the record, the City, even with its present language, has not always been able to civilianize. Yet, the City should have the opportunity to do so as part of the reorganization of the Department and the well being of the citizens served by the Department.

For these reasons, the Chairman, with the concurrence of the City Delegate, will vote to accept the proposal of the City to amend Article 43. The DPOA Delegate dissents.

| | |
|---|---|
| Issue No. 99 -City Proposal- Economic- | *Article 33- Pension-Lump Sum-Actuarial Reduction* |
| Issue No. 100 - City Proposal - Economic- | *Article 33 - Pension-Gaines and Losses on Annuity Accounts* |

These are two issues dealing with pensions. As to Issue No. 99, the City proposes an amendment to Article 33 that reads: "Bargaining unit members may not receive a lump sum cashout of all or part of their accrued financial benefits from the Police and Fire Retirement System without actuarial reduction of benefits fully equivalent to and otherwise of equal value to such payment." As to Issue No. 100, the City proposes to add the following language:

> Bargaining unit members having participant accounts with the Police and Fire Retirement System which may be distributed to participant's beneficiaries in one or more installments rather than as an annuity, sometimes referred to as annuity accounts, shall have such accounts ratably adjusted, not less frequently than once per year, based on actual returns, positive or negative, experienced by the Trust during the fiscal year preceding the crediting date. Final distribution of the account balance due a participant or beneficiary shall be delayed until the final adjustment has been made.

The DPOA objects to these proposals.

The provisions for employee pension contributions and annuity funds have been in the

129

parties' Master Agreement since January 1, 1987. There was no evidence that there was any

negotiation on these proposals by the City. Given the length of time that the concept at issue has

been in the contract and the lack of negotiation between the parties, the Chairman will vote to

maintain the *status quo.* This is the type of proposal, given its longevity, whereby there should

be a history of negotiation. Therefore, the Chairman, along with the DPOA Delegate, will vote

to maintain the *status quo* as to Issue Nos. 99 and 100. The City Delegate dissents.

Issue No. 107- Economic- Union Proposal -     *Article 34- Regularity in Use of Sick Leave-*
                                                       *Discipline*

Issue No. 107 addresses regularity in the use of sick leave benefits and proposes to amend

Article 34.A as follows:

> A.    General:
>
> The Detroi t Police Department is responsible for providing efficient law
> enforcement services. Maximum attendance is required from all
> members if this responsibi lity is to be fulfilled.
>
> The Depal 1:ment shall provide a guideline (copy attached) for
> determining excessive/improper use of sick usage. It is. therefore.
> necessary to identify and correct members who have developed a pattern
> or regularity in the use of their sick leave benefits.
>
> CITY LAST BEST OFFER
>
> A.    General:
>
> The Detroi t Police Department is responsible for providing efficient law
> enforcement services. Maximum attendance is required from all
> members if this responsibility is to be fulfilled.
>
> The Department shall provide a guideline {copy attached} for
> determining excessive/improper use of sick usage. It is. therefore.
> necessary to identify and correct members who have developed a pattern
> or regularity in the use of their sick leave benefits.

Attached to the Offer is an extensive Guideline. The actual proposal refers to Article 34.

However, the proposal would best fit into A1ticle 36 which is the Article in the Master

130

Agreement referring to regularity in the use of sick leave benefits.

The DPOA opposes the addition of this language and, therefore, opts for the *status quo*. The Chairman, concurred in by the DPOA Delegate, believes that this is a non-economic issue and that the Panel, therefore, is not bound by one Offer or the other of the parties.

There was little bargaining on this issue, even though the Chairman is aware that the question of the use of sick leave benefits has generated grievances between the parties. Therefore, the Chairman believes that the matter requires more discussion and negotiations between the parties than was discussed in these proceedings. For this reason, the Chairman, joined by the DPOA Delegate, will opt for a Letter of Understanding to be attached to the contract whereby the parties are to form a regularity in the use of sick leave benefits committee with two members from the Police administration and two members from the DPOA selected by the President. The committee shall meet within one month of the issuance of these Orders. The committee shall attempt to reach agreement on the guidelines for detennining excessive and improper sick leave usage. If the committee is not able to reach agreement by October $1^s$ ·the matter shall be referred to the Panel of existing Umpires who shall render a final and binding opinion by January 15, 2014. The referenced referral should be done no later than October 15, 2013. A majority opinion of the Panel shall be binding on the parties. This shall be in reference to the amendment to Article 36.A. Otherwise, all the provisions of Article 36.A as well as the remaining provisions of Article 36.A shall remain in place.

The DPOA Delegate will join with the Chairman in accepting the Chairman's proposal. The City Delegate would have agreed with the City's proposal as to the amendment to Section A, but would agree with the Chairman and the DPOA Delegate that all the other provisions of Atticle 36.B through H and the portions of Atticle 36.A that were not proposed to be amendment

131

would stay.

Issue No. 82 - *Article 40.C - Miscellaneous- Extent of Agreement*

The City proposes to eliminate Article 40.C, "Miscellaneous", which both parties agree is non-economic, and reads:

> Extent of Agreement. The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the City and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and agrees that the other shall not be obliged to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject matter may not have been within the knowledge or contemplation of either or both parties at the time that they negotiated or signed this Agreement, unless otherwise provided for herein.

The DPOA objects, noting that this language has been in the parties' contract for a number of years. The Chairman sees no reason why this language should not be in the parties' contract. With the number of issues involved in this Act 312, certainly the parties have the opportunity to present the issues they wish put forward. Therefore, it would seem that Article 40.C is an appropriate provision. For this reason, the Chairman, joined with the DPOA Delegate, will vote to retain Article 40.C as it was in the expired Master Agreement expiring on June 30, 2012, with the City Delegate objecting.

Retroactivity

The provisions of the Orders are prospective if involving economic matters from the date of the Opinion and Orders, with the City Delegate agreeing with the Chairman on this point and the DPOA Delegate dissenting.

132

<u>Issue No. 57</u>- Economic-  *Article 31.E.5 - Holidays*

The City has proposed to amend Article 31.E.5, "Holidays", as follows:

E.      Preparation and Maintenance of Holiday Rosters.

* * *

5.     District Rostel·s. <u>At the discretio n of the Employer,</u> all dist rict personnel shall be included on one of the following rosters with the exception as noted in 31.E.5.e.:

a.     **Platoon One.** All employees who start work between 12:00 a.m. and 3:59a.m.

b.     **Platoon Two.** All employees who start work between 4:00a.m. and 10:59a.m. (includ ing staff personnel).

c.     **Platoon Three.** All employees who start work between II :00 a.m. and 4:00 p.m.

d.     **Platoon Four.** An employees who start work between 4:01 p.m. and 11:59 p.m.

e.     The exception to the above is personnel assigned to Central Events Speeidl Opet at ions (fotntetly Special Events Section) of tlte Fitst Ptccinct. Only Fitst Ptccinct Specictl Operations sltallrnai ntain tlteir ow n rosters.

NOTE: These start times shall not include roll call time, nor desk personnel who start earlier than normal hours.

ln other words, the City proposes to add the words "At the discretion of the Employer" and add to E.S.e "Central Events" and to delete the remaining language as indicated. The DPOA objects to the changes.

The Chairman believes that this language, namely, the change to "Central Events" represents the current organization in the Department. The Chairman also believes that the reference to the addition of "At the discretion of the Employer" is a reasonable addition, consistent with management rights. for this reason, the Chairman, along with the City Delegate, will vote to accept the City's proposal. The DPOA Delegate dissents.

133

<u>Issue No. 112</u> - Economic- *Article 33- Pension Provisions*

The Union has proposed to add the following Paragraph P to Article 33:

> Paragraph P – New 13  "Effective July I, 2009, all members that elect <u>DROP. with the immediate payout option shall be paid for all bank time.</u> including sick time. within thirty (30) days. Should any member not <u>receive their lump sum payments within thirty (30) days. they shall</u> <u>receive Michigan judgment interest."</u>

The City opposed this proposal and has made Last Best Offers set forth in Issue Nos. 75, 87 and 145.

The Chairman, joined by the City Delegate, rejects the Union's proposal for the reasons discussed under Issue Nos. 75, 87 and 145. The DPOA Delegate dissents.

Issue No. 102 - Economic- City Issue      *Heallh Care Coverage For All Spouses of Employees Hil·ed on or after January 1, 2003*

The City is proposing that there be no health care coverage for all spouses of employees hired on or after January 1, 2003. The DPOA opposes such a provision. This would affect Officers who have been on the force for 10 years. It would obviously affect the City's ability to recruit qualified candidates because retiree health care for one's spouse is a plus for recruitment. It is doubtful that in negotiations the City would prevail in this n:quest without a major concession on the part of the City. For this reason, the Chairman, joined by the DPOA Delegate, will vote to deny this request. The City Delegate dissents.

Issue No. 113 -Economic      *DPOA Shall Have The Authority to Name an Alternate Health Care Provider*

The DPOA proposes to add to Article 21 a new Section II, namely, "The DPOA shall have the authority to name an alternate health care provider consistent with the terms enwnerated in Article 21." The DPOA has not been able to prevail in such a provision in the past. Furthermore, in the view of the Chairman, it is the responsibility of the City to present insurance

134

plans and proposals.  If the DPOA has an insurance carrier that it wishes to propose to the City, it may at the bargaining table.  FU11hcrmore, as the City points out, it is the City that administers various health plans in many bargaining units.  For this reason, the Chairman, joined by the City Delegate, chooses not to adopt the DPOA's proposal as to a new Section Has proposed.  The DPOA Delegate dissents.

Issu e No. 137 - Non-Economic - DPOA Proposal

The DPOA has proposed to add a new Section R to Article 21 requesting that the City provide the DPOA certain information from Blue Cross Blue Shield each May 1$_s$.  This provision has not been in the parties' contract for some time, if ever.  In the view of the Chairman, there is no reason to have such a provision in the contract.  This is a matter for discussion between the parties during their day-to-day relationship.  Therefore, the Chairman, joined by the City Delegate, will vote to deny this request.  The DPOA Delegate dissents.

Issu e No. 92 A and B - Economic - City Issue     *Permanent Shift Program*

Article 42 of the Master Agreement provides for the permanent shift program.  In 42.A, the City proposes to add the following sentences: "The City reserves the right to modify, amend, terminate or suspend the permanent shift program in its sole discretion.  In the event that the City exercises this right, the City may give prior notice to the Union."  As the parties well know, this Chairman in a previous Act 312 at the request of the parties initiated the permanent shift program.  The program has been successful and there is no reason to abandon the program.  It was a joint initiated program and if it is abandoned, in the view of the Chairman, its elimination should be jointly negotiated as was its creation.  For this reason, the Chairman, along with the DPOA Delegate, will vote to deny the addition of the proposed language.  The City Delegate dissents.

135

I\s to Issue 928, which is a proposal to eliminate the Joint Labor Management Pennanent Shift Committee set forth in Sections O and E. this language is now obsolete as it was necessary when the permanent shift progrmn was in its inf tncy and as a result the City has proposed to eliminate this language, which apparently the DPOA objl:cts to the elimination. There is no reason after permanent shifts have been in place in excess of 10 years to have such language. Therefore, voting with the City, the Chairman agrees to eliminate Sections D and E of the current language. The DPOA Delegate dissents.

## ORDERS

The Orders and the votes of the Delegates arc as set forth in the body of the Opinion. The views expressed in the Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman. But the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the Issue involved. For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE T. ROUMELL, JR., Chairman

136

March 2013

CRAIG S. SCHWARTZ, City Delegate, concurring
and dissenting where indicated

137

M!!Ch 𝒵 2013

\\Ldc.\t..-C

THEODORE M. IORIO, DPOA Delegntc : ···· —
concurnng and dissenting where indicated

138

# EXHIBIT A-2

STATE OF MICHIGAN DEPARTMENT OF LABOR &
ECONOMIC GROWTH MICHIGAN EMPLOYMENT
RELATIONS COMMISSION ACT 312, PUBLIC ACTS OF
1969 AS AMENDED

*In the Matter of*

CITY OF DETROIT

-and-                                                     MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

_____

### CHAIRMAN'S PARTIAL AWARD ON HEALTH INSURANCE

George T. Roumell, Jr., Chairman
Craig Schwartz, Esq., Employer Designee
Theodore Iorio, Esq., Union Designee

APPEARANCES:

FOR THE CITY OF DETROIT:              FOR DETROIT POLICE OFFICERS
                                                           ASSOCIATION:

Malcolm D. Brown, Attorney            Donato Iorio, Attorney

### OPINION AND FINDINGS

The hearings involving this Act 312 have occurred after numerous pre-conference and

pre-trial conferences with the Chairman on November 5, 16, 19, 29, 30, December 12 and 18,

2012. On December 18, 2012, there was a hearing on the issue of health care. Because there

was an ongoing open enrollment on health care that affected the choices that members of the

Detroit Police Officers Association could make which was scheduled to end on December 27,

2012, it was imperative that this Chairman issue an Opinion and Award dealing with the issue of

health care, dealing with health insurance as it affected current employees in order to give said

Officers the opportunity to make informed choices.

With the concurrence of the parties and the members of the Panel, the Chairman, with the splendid work of the reporter to issue a transcript of the hearing within 12 hours of the hearing, issues an Interim Award on most aspects of the health care issue so that the members of the Detroit Police Officers Association can make their choices.

The genesis of the dispute stems from the fact that at one point the City entered into a tentative agreement with the DPOA on February 9, 2012 addressing the health care plans offered to Officers, namely, a PPO Plan, HAP, Blue Care Network Plans and the THC Plan, whereby the City's maximum contribution for any health plan was to be 80% of the Option I Plan offered by BCBSMl/CVS Caremark and the employee was to contribute 20% of the premium. This tentative agreement was not ratified by the City. Following a Consent Agreement between the State and the City, there were City Employment Terms imposed by the City of Detroit on the Detroit Police Officers Association. This Act 312 was instituted.

The DPOA presented Last Best Offers essentially as to COPS Trust mirroring the tentative agreement of February 9, 2012. The City presented a Last Best Offer modifying the benchmark to the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The City's Last Best Offer also provided, "Participants in COPS Trust must pay 20% of the BCBSM Community Blue PPO Modified Option III Plan offered by BCBSM/CVS Caremark plus any additional premium cost, if any, between COPS Trust and Community Blue PPO BCBSM/CVS Caremark". The City's Last Best Offer also provided that the COPS Trust could keep its plan design. The difficulty with the City's proposal was for Officers seeking COPS Trust and there were 400 Officers using COPS Trust is that those Officers would be paying substantially more toward premiums than the 80/20.

What then occmred is, as the record reveals, for a period of about three to four bow-s the

2

parties engaged in off-record negotiations where the parties did modify their positions, but then the negotiations broke down over one issue to be discussed by the Chairman, namely, the issue of working spouse coverage. As the Chairman views it, the working spouse coverage is not economic as it is a language part of the plan which permitted the Chairman to make a choice. Futihermore, the Chairman views the parties' positions as modifying their offers as permitted by the Commission's proposed rules for Last Best Offers.

What now follows is the Award of the Panel on health care, health insurance for current employees, joined by the City Delegate. The Chairman does state that the Union Delegate was active in the negotiations but will dissent because of the issue of the spouse. The representative of COPS Trust, Daniel Gorczyca, testified that COPS Trust on Januaty I, 2013 through December 31,2013 will guarantee the following health care insu rance rates:

|  | Monthly Premium Amounts |
|---|---|
| One Person | $  485.25 |
| Two Persons | $1,016.65 |
| Family | $1,151.53 |

Based upon these rates, the Award shall be that the City shall pay 80% of the premium and the employee shalJ pay 20% based upon this calculation of the above premiums, the City shall pay no more than the following amounts:

|  | City Pays These Amounts Monthly |
|---|---|
| One Person | $388.20 |
| Two Persons | $813.32 |
| Family | $921.22 |

The employees' contribution shall be monthly as follows:

|  |  |
|---|---|
| One Person | $  97.05 |
| Two Persons | $203.33 |
| Family | $230.31 |

The City's obligation to pay 80% shall not be any higher than 80% of the highest

3

premium that it pays for any plan and the City's benchmark shall be as proposed the BCBSM Community Blues PPO Modified Option III Plan offered by BCBSM/CVS Caremark. The Chairman notes that the City pays a premium higher than COPS Trust for HAP.

The Hospitalization Plan Design Changes attached to the tentative agreement of February 9, 2012 and reattached to this Award as Exhibit A shall apply to all plans including COPS Plan and that the parties are to draft appropriate language to be included in the contract. The COPS Plan as designed as well as the design of the other plans attached as Exhibit B to the tentative agreement shall apply except as modified by this Award.

This Award also intends that Paragraph H of Article 20 of the 2004-2011 Agreement be removed as the parties did indicate to the Chairman that a committee is no longer needed. It is the intention of the Award that language be drafted by the parties to comply with this Award.

There were other changes proposed by the City that this Award does not address which will have to be addressed at the January 8. 2013 hearing so that the language changes are clear to the Chairman, namely, proposals as to 20.E and F. Furthermore, this Award does address proposal 20.F as the Award addressed this issue. The language as to Article 2l.A is reserved for fmther discussion. Likewise, the issue of dental and optical care for retirees is reserved and not covered by this Award for further discussion, nan1ely, the proposed Atticle 21.CC language.

The issues represented by the proposed Article 21.Y, BB and DD are rejected.

The issues represented by the proposed language in Paragraphs O and Z are reserved.

The reservation of issues means that this Award has not addressed those issues or that language and will do so after further discussion with the parties in January 2013.

The final issue was raised by the DPOA and that is spousal coverage, particularly under the COPS Trust. The issue involves the working spouse who works for an employer other than

4

the City who has health care insurance coverage. The City's position is that if the other employer furnishes the working spouse's health care insurance, then the City should not be obligated to furnish health care coverage for that spouse. The City, with the other carriers and Blue Cross Plans, furnished the DPOA members and other City employees except groups in which there are still existing collective bargaining agreements have this provision. It does have a cost saving feature. This patticular provision became an area of contention between the parties. As it is, the City has provided that COPS Trust can have its own plan design with modifications. It only seems fair in the area just discussed that all plans have the same features, namely, as long as a spouse has health care coverage by another employer, then the City should not provide spousal coverage, since this will be a universal feature, should be a feature in the COPS Trust provision and for this reason the Chairman will accept tills as his position on this issue based on the representation that it is in all other plans offered by the City to the Officers and for that matter to a large number of City employees.

As to the open enrollment, the open enrollment will be extended until January 15, 2013 so that Officers will have the opportunity to make choices. Member Theodore Torio dissents from this Interim Award. Member Craig Schwartz concurs.

## AWARD

The Award incorporates as the Award the statements made above and does not include the reservations stated above.

GEORGE T. ROUMELL, JR., Chairman

December 19, 2012

5

EXlfiBIT A

OUTLINE OF MEDICAL, DENT/\LAND VISION PLANS

A.  **Mandatory Usc of Generic Drugs.** Generic drugs required unless pre-determined that brand name drug is medically required or a generic equivalent is not available. If brand drug requested but not medically required or generic is available, employee, retiree, or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and brand name drug, even if dispense as written (DAW) is written on the prescription. Appeal procedure for any dispute is available under applicable healthcare plan.

B.  **Limitation on Prescription Drugs.** City will not pay for fertility or impotence prescription drugs under the City's prescription drug programs. This provision does not apply to prescription birth control pills.

C.  **Medica re Advantage.** Enrollment options for retirees and covered dependents that are Medicare-eligible shall be limited to the Medicare advantage plans offered by the City. In the event such Medicare Advantage plans are no longer offered or not cost effective, enrollment in alternate plans will be permitted as determined by the City.

D.  **New Hire.** Eligibility qualifier for hospitalization-medical coverage is the first of the month after new hire completes 91st day of employment.

E.  **New Hire.** Optical coverage eligibility qualifier changed from 60 days to 6 months.

F.  **Sponsored Dependent** coverage eliminated in its entirety.

G.  **Remarriage.** If a retiree marries or remanies after retirement, new spouse and his/her dependents arc not eligible for coverage under the City's healthcare plans.

H.  **Dependen t Health Care Coverage.** The child of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent health care coverage under this Agreement.

I.  **Req uiremen t to Obtain Medicare A & B.** Consistent with current practice, all retirees and covered dependents are required to enroll into Medicare Parts A & B. Failure to enroll or maintain Medicare Parts A & B, City hospitalization-medical coverage will be terminated.

# OUTLINE OF MEDICAL, D)<:NTAL AND VISJON P:LANS

| PP.Q Planl· HAPIBCN. Elan{s) TI1C [!lnn | Jn•Network | Outof-Nel work •• |
|---|---|---|
| .:;:)>aii,icip:ull Premium Conisibution | 2b% for all ohms | 20% for all |
| Elans | | |
| Piari-Ded_uctible | $250/$500 | $500/$lOOQ |
| Co-insurance % | 20% | 40% |
| co-jnsurancc. maximum (OOMax) | S1,000/$2,000 | $2,.0001$x11000 |
| Gffic:f: vjslt | $15 | Subject to deductibk |
| | | md coinsurance |
| ::.:urgent tare co-pay | SJ.S | Subject to deductible |
| | | and coinsuram:c |
| Emergcnc:t rooni | $75 | $75 |
| HosJ)iul ct>·Eay | $0 | $0 |
| | | |
| R.x Dl"lle Plan | | |
| Co-pay (retail. mail h for 90 day suppl'J) | $5/$15/$30 | |
| Mnndatory mnil | — MU 3<t days | |
| Mandatory generic | Required | |
| Traditionaleneric – step therapy | Required | |
| fuclusioo oflifestyle drugs: | Required | |
| | | |
| .COP.S Trust | | |
| Deductible | $175/$350 | |
| | | |
| Co-insurance m imum (OOP.Mu) | :$825/$1650 | |
| coinsurance % | 10% | |
| | | |
| Office visit/Ur_sent C;uc cO-pay | $10 | |
| Emergency Room co-pay | $15 | |
| HospiL'll co-pay | $0 | |
| | | |
| COPS"Fnut Rx DruPl::m | | |
| co··pay (retail, mail h for 90 day supply) | $S/l>15 | |
| Mandatory mail | N/A | |
| | | |
| | | |
| | | |
| | | |
| Othr Ctianl!es | | |
| articfP.ants contribute 20% for dental and vision | | |
| cb:.u:ra'ge | | |
| PartiCipants may choose any dental benefit currently in force with the Citv of Ddroit irn:ludinP. COPS Trust. | | |
| Particip:Ints may che any vision benefit cum:ntly in force 'with the Cit)' of Detroit _including COPS TrusL | | |
| t0-:0P Optical eliminated | | |

Page 5 of 12

0001\1931\0001\1320199

EXIII BIT G

13-53846-tjt   Doc 8811-2   Filed 12/16/14   Entered 12/16/14 15:35:31   Page 86 of 115

STATE OF MICHIGAN DEPARTMENT *OF* LABOR &
ECONOMIC GROWTH MICHIGAN EMPLOYMENT
RELATIONS COMMISSION ACT 312, PUBLIC ACTS OF
1969 AS AMENDED

*In the Matter of*

CITY OF DETROIT

-and-                                    MERC Case No. D12 D-0354

DETROIT POLICE OFFICERS
ASSOCIATION

---

### PANEL'S SUPPLEMENTAL AWARD ON HEALTH INSURANCE

George T. Roumell, Jr., Chairman
Craig Schwartz, Esq., Employer Designee
Theodore Iorio, Esq., Union Designee

APPEARANCES:

FOR THE CITY OF DETROIT:              FOR DETROIT POLICE OFFICERS
                                       ASSOCIATION:

Malcolm D. Brown, Attorney             Donato Iorio, Attorney

#### OPINION, FINDINGS AND ORDERS

On December 21, 2012, a majority of the Panel in the above matter issued a Partial Award

On Health Insurance. The Panel reserved Issue No. 46, Section O, Issue No. 46, Section Z, issue

No. 46, Section AA, Issue No. 46, Section CC, and Issue No. 46, Section D. There were three

other issues – Issue Nos. 101, 113 and 137 – which were also not addressed in the Interim

Award. As to Issue Nos. 101, 113 and 137, the Chairman has elected for convenience purposes

to address those Issues in the main Opinion rather than this Supplemental Award-Order.

Issue No. 46, Section O– Non-Economic- City Proposal

As to Issue No. 46, Section O, the City has proposed to amend Article 21, Section O of

the 2009-2012 labor contract by adding the following underscored phrase:

> The City shall be entitled to implement a self-insured prescription drug program to replace other prescription drug providers, provided such change does not cause a material change in health care benefits. Any dispute over whether such change does not cause a material change in health care benefits shall be subject to the grievance procedures, after the grievant has first exhausted the vendor appeal process. (Change underlined).

The DPOA proposes no change.

In the view of the City, "It is only fair that before any change in a self-insured prescription program is submitted to arbitration, that the individual employee seek a change for a particular drug exhaust the vendor appeal procedure". The Chairman agrees with this observation and for this reason, along with the City Delegate, will vote for this change. The DPOA Delegate objects.

Issue No. 46, Section Æ economic - City Proposal        *City's Premium Contribution*

This issue is laid out in the brief of the City as follows:

> This issue concerns a provision that in no event shall the City's contribution exceed 80%. As noted, the Arbitrator should continue to reserve this issue for decision until he meets with the parties to determine the final contract language. However, some explanation is necessary in this regard which will highlight the issues.

> COPS Trust is offering greater benefits than the benchmark plan which is Option III BCBSM PPO CVS Caremark. Further, the Arbitrator ruled that some of the benefit changes the City sought in order to limit costs would not apply to COPS Trust. As the Arbitrator noted on the record, "Let's make it very simple. There is no doubt that COPS Trust is a richer plan." (Vol. 7, 12/18l12 at 18).

> In regard to cost contributions, the City has proposed that it pay no more than 80% of the premium cost for any plan and the employee would pay 20%, except for COPS Trust which has more generous benefits. The City proposed for COPS Trust that the employees selecting COPS Trust would pay 20% the difference between COPS Trust and Option III BCBSM/PPO CVS Caremark. The DPOA then asserted that this was unfair because one of the City's Plans, HAP, had a higher premium than COPS Trust even though HAP offered the Option

2

JJI benefit package which was a lesser plan design that COPS Trust. The DPOA, through David Gorcyca, then added that COPS Trust would maintain its current premium costs until December 3I, 2013.

If after December 31 , 2013 COPS Trust raises its premium (as the City believes it must because of its enhanced benefits) and becomes the highest cost (premium) plan, the City will then be paying more for COPS Trust with its enhanced benefits than the benchmark plan. In this event, the City will be subsidizing COPS Trust by paying more for COPS Trust with its more generous benefits than the benchmark plan. For example, if all other plans have the same basic plan design, which they do, and if the highest cost plan other than COPS Trust is $900 per month for a family plan and COPS Trust with its better benefits is $930 per month for a family plan, the City will pay more than it should for COPS Trust per month (i.e. 80% of the $930 is obviously more than 80% of $900).

If COPS Trust wants to offer better benefits than the benchmark plan, the Arbitrator ruled they could do so, but not at the City's expense. The employee voluntarily choosing COPS Trust must pay the difference, i.e. 20% of $930 plus $30 (the difference between COPS Trust $930 and the highest premium cost of the benchmark plans $900).

FUithermore, in order to continue to qualify for Economic Vitality Incentive Funds (EVIP Funds), formerly known as state revenue sharing, the City must comply with the requirements of the Act (sec e.g., 2012 P.A. 107 §402(3)) by having new hires pay a minimum of 20% of healthcare costs. If the City is paying more than 80% of the COPS Trust Plan premium costs, then employees are paying less than 20% and the City is not compliant with the law for purposes of EVIP Funds. The City has received approximately $1OOM in EVIP funds (or statutory revenue sharing) every year since 2009. (See new Ex. 462 attached hereto; see also Ex. 450; p. B- 31). Loss of a portion of revenue sharing could be devastating to the City.

At this point, all the City is asking is that the Arbitrator reserve decision on this provision until the cost sharing formula in relation to COPS Trust is determined with the final contract language.

This explains the problem. It is the intention of the Chairman, joined by the City Delegate, that in the event that COPS Trust has a premium higher than the highest premium cost of the benchmark plan than those in COPS Trust will pay 20% of the COPS Trust premium plus the ctifference between the COPS Trust premium and the highest premium cost of the benchmark plan if this becomes an issue at any point during the life of the contract. Tt is fmther the intent of

3

the majority, namely, the Chairman and the City Delegate, that if there is a dispute about tht! language that is drafted, the dispute will be decided by the Chairman of this Panel serving in his capacity as Senior Umpire between the pa1tics under the parties' Umpire System. The Order here clearly sets forth the intent of a majority of the Panel. The DPOA Delegate dissents.

Issue No. 46 -Section AA- *Non-Duty Retirees Eligibility for Hospitalization, Medical and Prescription Drug Insurance Coverage, Article 21, Section A, Coverage*

The City notes that Article 21, Section A, of the 2009-2012 contract provides insurance coverage for "duty disability retirees and their legal dependents''. What has developed is a past practice for non-duty disabili ty retirees to have insurance benefits if said individuals meet the minimum vesting requirements, which for DPOA members is five years, and said individuals qualify for a non-duty disability pension. In some cases, the individual could retire at a young age with six years of seniority and suffer a permanent non-duty related disability costing the City substantial funds. The City seeks contract language changing this practice. The DPOA objects to the change. The Panel must choose one or the other Offer as this is an economic issue.

The difficulty with the City's proposal is there are 20 individuals who are now receiving this benefit. If the proposal was prospective, the Chairman would be more inclined to adopt the City's proposal. But, without this provision, there is an element of unfairness to the individuals who now rely on the practice. It is for this reason at this point in time that the Chairman, along with the DPOA Delegate, will vote to deny the City's request. The City Delegate dissents.

Issue No. 46, Section CC - Section D

The City proposes that future retirees, those retiring after January 1, 2003, will not have dental or optical insurance. This is based on the Millman Repoti suggesting that dental insurance and optical insurance for retirees are generous benefits; that on an annual basis, retirees' dental

4

insurance costs the City among all employees $8,341,000 and retiree vision insurance costs the City $1,362,000. However, this cost is not limited to Police Officers.

The Chairman appreciates that the City is in dire financial crisis, causing the need for financial restructuring. But, during the hearings and the Panel discussions, it was insisted that the Police and Firemen Pension Plan was 96% funded as compared to other pension plans. Furthermore, the issue of pensions will be re-opened on July 1, 2013. At that point, the whole issue of pensions as well as health care will be re-opened and can be revisited when there are not I 46 issues on the table and the matter can be more carefully scrutinized. It is for this reason that the Chairman, along with the DPOA Delegate, will vote to deny this request. The City Delegate dissents.

## ORDERS

The Orders and the votes of the Delegates are set forth in the body of this Opinion. The views expressed in this Opinion are the views of the Chairman and those voting with the Chairman do not necessarily represent the views of the Delegate voting with the Chairman. But, the vote of the Delegate with the Chairman was necessary to obtain a majority vote on the issue involved. For convenience, these Orders have been signed by the Delegates on separate pages, but have the same effect as if signed on the same pages with the Chairman.

March 25, 2013

GEORGE P. ROUMELL, JR., Chairman

5

MarchZho13                          CRAIG S c t y Delegate, concurring
                                     and dissenting where indicated

6

March 2, 2013

GI-4-. ''''

-mEODORE M. lORIO, DAPDc-lc-ga-h-:,-
concurring and dissenting witac: indicated

7

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


INRE:                                                          Chapter 9

City of Detroit, Michigan,                                     Case No. 13-53846

             Debtor.                                           Hon. Steven W. Rhodes
– – – – – – – – – – – – – – – – – – – – – – – – – – – /

DECLARATION OF DANIEL F. McNAMARA
IN SUPPORT OF OJBECTION OF THE DETROIT FIRE FIGHTERS
ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION,
THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION
AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION
TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF
QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)


I, Daniel F. McNamara, declare as follows:

1.      I am President of the Detroit Fire Fighters Association, Local 344,

IAFF, AFL-CIO (DFFA).    I make this declaration based on my personal

knowledge, and if called upon to do so, I could and would testify to the facts set

forth herein.

2.      The DFFA consists of all active Detroit fire fighters of all ranks.  It

has just under 800 current active members.   My responsibilities, as quoted from

our Constitution and By-Laws (Article X Section 3), are as follows: "It shall be the

duty of the President to preside at all meetings of the Local and at meetings of the

Executive Board and Board of Directors. He shall be the executive head of the Local. He shall be a member ex-officio of aJl committees. He shall appoint such committees as may be provided for in this Constitution and By-Laws and such special committees as may be authorized by the Local. He shall enforce strict observance of the Constitution and By-Laws of the International as this document relates to the Local and the Constitution and By-Laws of the Local. He shall have general supervision of the activities of the other officers and chairmen of committees." I would also consider the President to be in charge of all negotiations and other activities to which the Local may be obligated by Federal, State, and Local laws, as well as ordjnances, charters, and contracts.

3.     This declaration is submitted in support of the Objection of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

4.     The DFFA received a letter from Lamont Satchel dated June 25, 2013. This letter was in regard to "Termination of 2009-2013 Collective Bargaining Agreement." It stated, "Pursuant to its Duration provisions, the City hereby gives notice that the 2009-2013 Collective Bargaining Agreement between the City and

the Detroit Fire Fighters Association will not be extended beyond 11:59 PM, June 30, 2013."

5.     Days later, on June 28,2013, the DFFA received another letter from Lamont Satchel regarding "Terms and Conditions of employment following the expiration of the 09-13 Collective Bargaining Agreement (CBA)." It carried an addendum of"Economic Changes to be implemented effective July 1, 2013."

The June 28 letter also stated that, "The City is available to meet with the OFFA Executive Board to answer any questions about the items in the Addendum. Please advise as to your availability during the week of July 8, 2013. The City will also provide a timetable to meet with OFFA Executive Board to review the other terms and conditions to be implemented after expiration of the current CBA."

6.     I responded on July 1, 2013 to the City's June 28 letter. I responded, "The DFFA Executive Board is available to meet with you about the items in the 'addendum' at any time next week. However, since we have another meeting on Wednesday, July 10, 2013 in CAYMC at 3:30p.m. I suggest that we schedule our meeting for that day."

7.     The City and the DFFA did meet over the clarification of the addendum but have never had a meeting or been notified about any other changes to be implemented after the expiration date of the CBA. We did receive a letter dated July 26, 2013 informing the DFFA that the 10% wage cut for our members

who had not received one yet would be implemented in the August 16, 2013 paycheck.

8.     On July 12, 2013, the DFFA and the other Detroit Public Safety Unions sent a letter to Jones Day about the City's failure to provide specific proposals for pension restructuring at our July 10 meeting with the City. (Exhibit 1). On July 17, the City responded to our July 12 letter. (Exhibit 2). In its response, the City failed to provide any substantive proposals in its letter. Instead, the letter merely reiterated the City's promise to negotiate.

9.     The following day, July 18, 2013, the City filed its bankruptcy petition.

10.     In addition, in early 2013, prior to the March 28, 2013 effective date of Public Act 436, the DFFA attempted to get eligibility for Act 312. We worked with a Michigan Employment Relations Commission (MERC) mediator to commence mediation in order to put forth a timely application. We were not successful because of a lack of any real bargaining with the City as well as a subsequent MERC decision.

11.     It was during this time that, at a meeting between the DFFA and City representatives, Mr. John Willems, labor negotiator for the City, responded to our questions as to what we will see in our City Employment Terms by saying, "You know what we want. You can figure it out for yourselves." The City's

unwillingness to even disclose the terms intended to impose made it clear that the City had no intention of negotiating fiJrther with the DFFA.

12.    At an August 2, 2013 meeting with representatives from Jones Day, *we* were presented with an outline of the new health care plans the City intends to impose on the DFFA effective January i., 2014. Among other imposed changes, that proposal will increase the out-of-pocket costs for health care for DFFA members with insured dependents by $3000 per year.

13.    At our meetings with representatives from Jones Day, we have, at times, asked **if** the discussions we had were negotiations. They were very clear with us in asserting that these were not ne gotiations but that they looked forward to input and suggestio_ns from us. These :essions were mainly presentations with minimal explanations of the data, nothing more.

Dated: August 19, 2013

*Daniel J. McNamara*

Daniel F. McNamara

Exhibit 1



# DETROIT FIRE FIGHTERS ASSOCIATION

I.A.F.F. Local 344 • Orgonlud May 1933

243 West Congress, Suite 644 • Detroit, MI 48226-3217

(313) 962-754.6 • (313) 962-7899 fox • www.dffa344.org



Donie F.McNamara
*Presuw&J*

JeffMy M.Pe
*Vu•Prcsidem*

Teru;a S.Sanderfer
*Secr tory*

Robert A.Shinske
*1hmsurer*

Dircetom
E. Carrington
C. Mauczuk
J. Berlin
n. JonClJ
D. Mc:Lnurln
J. Plietb
.H. FOAtcr
D.SlllaU

Daniel Delegato
*Pr ident Emerirtu*

Jul y 12, 2013

Evan Miller
Jones Day
51 Louisiana Avenue. N.W.
Washington, DC 20001-2113
emiller@jonesday.com

David G. Heiman
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114-1190
dghelman@jonesday.com

RE: City of Detroit Pension Restructuring

Gentlemen:

This letter is a follow-up to the July 10 3:30 p.m. meeting set by the City to discuss "pension restructuring proposals."

During that meeting, you discussed, in general terms, the City's interest in reaching agreements on funding liability to the PFRS Pension Fund, actuarial assumptions and amortization schedules.

You also stated that you wished to discuss pension restructuring proposals. You then were asked, by OPOA President Mark Oiaz, for specific City pension benefit restructuring proposals. You declined to give any specific proposals. Instead, while acknowledging that the City does not necessarily have the best or only ideas on how to "restructure" pension benefits, you invited us to submit proposals.

We are reviewing and will provide the City with specific proposals.

But, it would be productive if the City could provide us with its specific proposals on pension benefit restructuring as soon as possible. We have had two meetings with the City where pension benefits were addressed and still have only the City's general observation that pension benefits must be reduced.

We look forward to the next opportunity to meet. We hope that, sufficiently prior to our next meeting, the City will have provided us with specific proposals on pension benefit restructuring so that our meetings can be genuinely good faith negotiations on the City's debt.

Sincerely,

DANIEL F. McNAMARA, President
DETROIT FIRE FIGHTERS ASSOCIATION

STEVE DOLUNT, President
DETROIT POLICE COMMAND
OFFICERS ASSOCIATION

MARK YOUNG, President
DETROIT POLICE LIEUTENANTS
& SERGEANTS ASSOCIATION

MARK DIAZ, President
DETROIT POLICE OFFICERS
ASSOCIATION

AlGiiated _____

International Al.$0ciation of }'ire } 'igbtus
AFirCIO

Ifichigau StAte
AF(.CTO

MetrofOiilall Detroit
AFL-CIO

Exhibit 2

# JONES DAY

51 LOUISIANA AVENUE. N.W • WASHINGTON. O.C. 20001.2113

TELEPHONE . 1.202.679.3939 • FACSIMILE. + 1.202.626.1700

DIRECT NUMBER: (202) O79-364O

[MILLEA&JON S0AV. COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
  &amp; Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:    City of Detroit Pension Restructuring

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it makes sense to first try to reach common ground with key unions and association leaders on actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle contributions and attendant benefit changes. Nonetheless, we are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues: (1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age *55* early retirees and not begin at age *55;* and (2) if there were to be a hard freeze at PFRS, active employees who do not have sufficient service at the freeze date to obtain a vested pension be given an opportunity to earn such service and not lose their entire pensions. The City's advisors are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS . DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IIWINE • JEDDAH • LONDON • 1.05 ANGELES • MADRID
ME   CO CITY  MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH . RIYADH . SAN DIEGO
SAN FRANCISCO • SAO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY ○ TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

'Ibank you for your letter and please keep the lines of communication open.

Sincerely,

cc:    David G. Heiman, Esq.

WAI-313S350vl

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INRE:                                                    Chapter 9

City of Detroit, Michigan,                               Case No. 13-53846

            Debtor.                                      Hon. Steven W. Rhodes
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -        /

### DECLARATION OF MARK YOUNG, PRESIDENT OF THE DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION IN SUPPORT OF OJBECTIONS OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS UNDER 11 U.S.C. SECTION 109(c)

I, Mark Young, President of the Detroit Police Lieutenants and Sergeants Association, declare as follows:

1.      I am the current President of the Detroit Police Lieutenants and Sergeants Association, the exclusive bargaining representative for the purpose of collective bargaining with respect to wages, hours and other terms and conditions of employment for employees of the City of Detroit Police Depa1tment in the following classifications: Police Investigator, Police Sergeant, Police Sergeant-Promotional List, Senior Communications Officer-Police Sergeant, Senior Radio Maintenance Officer-Police Sergeant, Police Sergeant-Chemist, Police Lieutenant, Assistant Supervisor of Operations-Police Lieutenant, Supervisor of Radio Systems and Planning-Police Lieutenant, Supervisor of Operations-Police Lieutenant, Supervisor of Radio Maintenance-Police Lieutenant, Supervisor of Firearms Identification and Explosives-Police Lieutenant.

I make this declaration based on my personal knowledge, and if called upon to do so, I could and would testify to the facts set forth herein.

2.      I am responsible for the day to day administration of the Union including but not necessarily limited to contract administration, collective bargaining, negotiations, and the processing of grievances.

3.     This Declaration is submitted in support of the Objections of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

4.     This Declaration covers the period of the Detroit Police Lieutenants and Sergeants Association Act 312 proceedings, MERC Case No. D13 A-0005, up to and through the dismissal of those proceeding by the Michigan Employment Relations Commission, as well as the significant dates and events related to the bankmptcy filing by the City.

The Act 312 Proceedings

The DPLSA filed its Petition for Act 312 arbitration on February 4, 2013. Its existing collective bargaining agreement had a termination date of June 30, 2013. In accordance with Sec. 13 of Act 312, "...existing wages, hours and other conditions of employment shall not be changed by either party without the consent of the other but a party may so consent without prejudice to his rights or position under the Act." Arbitrator Francis L. Hill was appointed as the neutral arbitrator on February 19, 2013. A pre-healing conference was held on February 26, 2012. Subsequently, hearing dates were scheduled for May 15, *16,* and 21, and June 11 and 13, 2013.

On or about April 12, 2013, after the appointment of the Emergency Manager in March 2013, the City of Detroit filed an Emergency Motion for an Award of Dismissal of the Act 312 Proceeding due to the lack of arbitral jurisdiction. The City claimed that it was not obligated to engage in bargaining under the Public Employment Relations Act ("PERA"), MCL 423.201 et seq., by operation of Sec. 27 (3) of Public Act 436, MCL 141.1541, et seq., the Local Financial Stability and Choice Act. Sec. 27(3) states:

A local government placed in receivership under this act is not subject to Sec. 15(1) of 1947 PA 336, MCL 423.215 for a period of five years from the date the local government was placed in receivership or until the time the receivership is terminated, whichever comes first.

According to the City, the suspension of the duty to bargain under Act 436 extends to all bargaining-related proceedings under PERA and Act 312.

In its decision dated June 14, 2013, the Michigan Employment Relations Commission granted the City's motion to dismiss the Act 312 arbitration proceeding pending between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association. The Commission declared that the City's duty to bargain was statutorily suspended by operation of Sec. 27(3) of PA436.

It must be emphasized that the DPLSA does not concede that the dismissal of the Act 312 case inexorably resulted in the termination of its collective bargaining agreement after June 30, 2013. While the duty to bargain may have been suspended, the existing agreement survives

subject to Sec. 12 (1) U) and (k) of the LFSCA. Under Sec. 12 the EM may reject, modify or terminate one or more terms of a collective bargaining agreement, but only where agreement with the bargaining representative is unlikely, the modification is reasonable and necessary to address the broad financial problem, and any modification is temporary (not to exceed five years). Sec. 12(1) does permit the EM to act as the sole agent of the local government in collective bargaining with employees or representatives and approve any contract or agreement. In the opinion of the DPLSA, Sec. 12 does impose constraints on the right of the EM to reject, modify or terminate one or more terms of the collective bargaining agreement. Acting outside of those constraints could subject the EM to legal action. At various times since the dismissal of the Act 312 proceeding, the City has declared that it has no obligation to bargain with the DPLSA

### The Time Period Following the MERC Decision

Following the dismissal of the DPLSA Act 312 case, the City did not move to impose City Employment Terms ("CETs") on DPLSA members. Emergency Manager Kevyn Orr released a Financial and Operating Plan for the City o Detroit on May 12, 2013. On or about May 20, 2013, the Jones Day law firm notified the DPLSA that it would be evaluating the existing pension and medical plans to determine whether modifications are necessary. Pension restructuring and health plan "discussions" were scheduled in June and July 2013. While representatives of City unions were invited to these "discussions" and told that their input would be welcomed, the discussions amounted to presentations as to what the City planned to implement in these areas. The City indicated that the discussions were not to be construed as "negotiations."

On several occasions during the period preceding the filing of the City's bankruptcy petition, DPLSA representatives met with the EM to engage in dialogue about solutions to problems affecting members of the DPLSA. These meetings were constructive although prefaced by the caveat that the meetings should not be characterized as negotiations.

On June 25, 2013, the City notified the DPLSA of the termination of the cba effective July 6, 2013 and that it was not requesting bargaining at this time. After expressly stating that there was no duty to bargain, the EM on June 28, 2013 further notified the DPLSA that changes to wages, benefits and working conditions would be necessary but that any changes would be postponed until after August 1, 2013 ostensibly to provide the new Chief of Police time to evaluate the needs of the Department and also have time to provide input into the restructuring process.

On July 18,2013, the City filed its petition for bankruptcy. Not long thereafter, the Labor Relations Director Lamont Satchel on July 31, 2013 sent correspondence to the DPLSA that the City was prepared to impose City Employment Terms on DPLSA members. No effective date was indicated in the correspondence. In a separate addendum to the letter, the City identified 17 terms that it intended to implement. No negotiations preceded the letter from the Labor Relations Director.

The DPLSA responded in wntmg in a letter dated August 1, 2013. It expressed disagreement with the proposed CETs and requested a delay in their imposition until it could engage in further discussions with the City. The DPLSA also requested immediate open enrollment for the City of Detroit Deferred Compensation Plans to help offset the proposed 10% pay reduction. It further requested the opportunity for DPLSA members to utilize a "hardship provision" under the deferred comp plan to permit withdrawals.

The DPLSA understands that the EM has given favorable consideration to the August 1 response of the DPLSA. The DPLSA has engaged the EM in discussions over the proposed CETs. As of today's date, August 15, 2013, none of the CETs have yet been imposed on members.

Dated: August 16, 2013

Mark Young, President,
Detroit Police Lieutenant & Sergeant's Association

# EXHIBITD

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INRE:                                              Chapter 9

City of Detroit, Michigan,                         Case No. 13-53846

        Debtor.                                    Hon. Steven W. Rhodes

DECLARATION OF MARY ELLEN GUREWITZ IN SUPPORT OF
OJBECTION OF THE DETROIT FIRE FIGHTERS ASSOCIATION, THE
DETROIT POLICE OFFICERS ASSOCIATION, THE DETROIT POLICE
LIEUTENANTS & SERGEANTS ASSOCIATION AND THE DETROIT
POLICE COMMAND OFFICERS ASSOCIATION TO DEBTOR'S
BANKRUPTCY PETITION AND STATEMENT OF QUALIFICATIONS
UNDER 11 U.S.C. SECTION 109(c)

I, Mary Ellen Gurewitz, declare as follows:

1.   I am the attorney for the Detroit Police Command Officers Association (the "DPCOA"). The DPCOA is composed of the Inspectors and Commanders in the Detroit Police Department. My firm, Sachs, Waldman P.C. has been representing the DPCOA since 1995. I have been the responsible attorney for this client for at least the past ten years. I have handled, among other things, their unfair labor practice litigation, Act 312 proceedings, and collective bargaining negotiations.

2.   I make this declaration based on my personal knowledge, and if called upon to do so, I could and would testify to the facts set forth herein.

3.     This declaration is submitted in support of the Objection of the Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association and the Detroit Police Command Officers Association to Debtor's Bankruptcy Petition and Statement of Qualifications under 11 U.S.C. Section 109(c).

4.     The Emergency Manager has refused to bargain in good faith with the DPCOA. The collective bargaining agreement between the City and the DPCOA expired on June 30, 2009. The terms of this agreement were determined by an Act 312 arbitration award which issued in January, 2010, but which was retroactive, and which had expired before it was resolved. Thereafter, the City failed and refused to bargain about the terms of a successor agreement.

5.     In or about July, 2012, the City presented the DPCOA with a document titled City Employment Terms (CET). This was not a collective bargaining agreement. To the contrary, it was simply a unilaterally imposed set of working conditions, which included, *inter alia,* a 10% wage cut

6.     Following the suspension of PA 4 the DPCOA filed a petition for Act 312 arbitration. An arbitrator was appointed, issues identified, and hearing dates were scheduled for March, 2013. Prior to the scheduled hearing, the parties conducted several days of productive negotiations. However, all negotiations were terminated upon the appointment of the Emergency Manager.

2

7.    In April, 2013, the City filed motions with the Michigan Employment Relations Commission to dismiss the Act 312 proceedings which were then pending with the DPCOA, the Detroit Police Lieutenants and Sergeants Association, and the Police Officers Association of Michigan, which represents the Detroit EMS employees. The City took the position that under PA 436 it had no obligation to bargain. MERC granted the motions to dismiss.

8.    Since the appointment of the Emergency Manager the City has consistently taken the position that it has no obligation to bargain and it has accordingly refused to bargain.

Dated: August **1**,  2013

Mary Ellen Gurewitz

F:\OTiiERINS\Detroit,City ot\declaration in support of objection to eligibility DPCOA.docx

3