**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------x
                                                        :
In re                                                   :        Chapter 9
                                                        :
CITY OF DETROIT, MICHIGAN,                              :        Case No. 13-53846
                                                        :
                              Debtor.                   :        Hon. Steven W. Rhodes
                                                        :
                                                        :
                                                        :
-------------------------------------------------------x

**CONSOLIDATED REPLY TO CERTAIN**
**OBJECTIONS TO CONFIRMATION OF FOURTH AMENDED**
**PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**

I. THE SETTLEMENTS INCORPORATED INTO THE PLAN SHOULD BE APPROVED PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a) .........5

    A.    Standard for Approving Settlements and Compromises......................5

    B.    The UTGO Settlement ........................................................9

    C.    The OPEB Settlement ......................................................13

    D.    The DIA Settlement..........................................................16

II. THE PLAN DOES NOT "DISCRIMINATE UNFAIRLY" AMONG THE CITY'S CREDITORS (11 U.S.C. § 1129(b)(1))..................................23

    A.    The Landscape of Unfair Discrimination...........................................24

        1.    The Fairness Inquiry is Committed to the Court's Informed Discretion ...................................................24

        2.    Special Chapter 9 Considerations ...........................................25

        3.    The Aztec Test and the Markell Test......................................27

    B.    Measuring the Extent of Discrimination ...........................................29

        1.    Funds Received from Third Parties are Outside the Plan and Do Not Constitute Unfair Discrimination.........................30

        2.    Recoveries by Pension Claimants are Further Reduced When Considering Both Pension Claims and Separately Classified OPEB Claims .........................................................33

        3.    The Discrimination is Reduced Upon the Application of a More Appropriate Calculation of Pension Claims................34

    C.    The Plan Satisfies the Four-Factor *Aztec* Test ....................................36

        1.    The City Has Reasonable Grounds to Treat Pensioners Differently from Other Unsecured Claimants .........................36

        2.    It Would Be Practically Impossible to Confirm a Workable Plan Without Discriminating Among Unsecured Creditors....................................................................46

        3.    The City Proposed Its Differential Treatment in Good Faith..................................................................................48

        4.    The Plan Treats Other Unsecured Creditors as Well as Possible Under the Circumstances............................................49

D. The Markell Rebuttable Presumption Does Not Arise in This Case ...........................................................................................51

    1. The Markell Test is Unduly Restrictive and Should Not Be Utilized in this Case...........................................................52

    2. The Plan's Treatment of Unsecured Claims Does Not Give Rise to the Markell Presumption of Unfair Discrimination.........................................................................54

E. The Plan Does Not Discriminate Unfairly Among Secured Creditors ...............................................................................60

III. THE PLAN IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF CREDITORS (11 U.S.C. §§ 943(b)(7), 1129(b)) ............62

A. In Chapter 9, the Best Interests of Creditors and Fair and Equitable Tests Overlap Significantly ...............................................62

B. The Goal of Chapter 9 Is Not the Unconditional Maximization of Creditor Recoveries ...............................................................65

    1. The City Cannot be Compelled to Sell Assets.........................69

    2. The Objecting Parties' Authority is Inapposite........................74

    3. Any Attempt to Raise Taxes Would be Counterproductive and Inevitably Futile .................................79

C. Dismissal of the City's Chapter 9 Case Would be Detrimental to All Creditors ................................................................................82

    1. The Effect of Dismissal of the Chapter 9 Case Would Be a Race to the Courthouse .........................................................84

    2. The Race to the Courthouse Would Give Rise to Judgment Levies of Equal Priority .........................................85

    3. Tax Bills Will Skyrocket in Amount and Complexity and Will Not Be Paid...................................................................91

    4. The Absence of Any Reinvestment Plan Will Further Deplete the Tax Base ................................................................92

D. The Plan's Treatment of LTGO Bond Claims Does Not Violate the Absolute Priority Rule.................................................................93

E. The Plan is Fair and Equitable with Respect to Secured Creditors .............................................................................100

|   |   | 1. | The Plan Satisfies Section 1129(b)(2)(A)(i) of the Bankruptcy Code | 101 |
|---|---|---|---|---|
|   |   | 2. | The Absolute Priority Rule Does Not Apply to Secured Claims | 116 |
| IV. | THE PLAN IS FEASIBLE (11 U.S.C. § 943(b)(7)) | | | 119 |
|   | A. | The Plan will Enable the City to Provide Adequate Municipal Services | | 121 |
|   |   | 1. | The City Has Established Restructuring Initiatives to Improve Operational Efficiency | 121 |
|   |   | 2. | The City Will Invest Nearly $1.4 Billion in Reinvestment Initiatives | 123 |
|   |   | 3. | The City Seeks to Increase Tax Revenues Through Strategic Tax Reforms | 126 |
|   |   | 4. | Feasibility Objections Regarding the City's Ability to Provide Adequate Municipal Services are Unfounded | 127 |
|   |   | 5. | The Plan Provides Adequate Post-Effective Date Governance | 129 |
|   | B. | The City Will Be Able to Make the Payments Required Under the Plan | | 133 |
| V. | THE CITY IS NOT PROHIBITED BY LAW FROM TAKING ANY ACTION NECESSARY TO CARRY OUT THE PLAN (11 U.S.C. § 943(b)(4)) | | | 139 |
|   | A. | The DWSD Pension Funding is Lawful | | 139 |
|   |   | 1. | The DWSD Pension Funding | 140 |
|   |   | 2. | Applicable Law (a) Requires DWSD to Make Contributions to GRS and (b) Permits DWSD to Charge Fees Proportionate to the Costs of Providing Services | 142 |
|   |   | 3. | Under the Ordinances and the Indentures, Bondholders Do Not Have Liens on Revenues Transferred to the Operation and Maintenance Funds | 143 |
|   |   | 4. | DWSD's GRS Contributions Are Properly Paid from the Operation and Maintenance Funds | 146 |
|   |   | 5. | The DWSD Pension Funding is Consistent with Historical Practice and Comports with Applicable Law | 151 |

    B.    The Plan's Allocation of Proceeds from a Potential Qualifying DWSD Transaction Does Not Violate Section 943(b)(4)...............157

    C.    The Plan Provisions Enjoining Modification of Pension Benefits for Ten Years Are Lawful and Proper ..............................159

    D.    The Plan-Mandated PFRS and GRS Pension Discount Rates Are Appropriate................................................................162

    E.    The UTGO Settlement Does Not Violate Michigan Law...............164

    F.    The DIA Settlement Will Not Constitute a Fraudulent Transfer.....166

VI.    ALL REGULATORY AND ELECTORAL APPROVAL NECESSARY UNDER APPLICABLE LAW TO CARRY OUT THE PLAN HAS BEEN OR WILL BE OBTAINED (11 U.S.C. §§ 943(b)(6), 1129(a)(6)) ...............................................................167

    A.    The Board of Water Commissioners Will Continue to Have Rate-Making Authority ....................................................168

    B.    The City Does Not Have to Satisfy Section 943(b)(6) With Respect to Hypothetical Qualifying DWSD Transactions...............169

    C.    The DWSD Pension Funding and DWSD CVR Do Not Constitute a Tax Requiring Electoral Approval..............................169

VII.    THE ASF RECOUPMENT IS LAWFUL AND PROPER........................170

    A.    Use of GRS Traditional Pension Plan Assets to Subsidize ASF Returns was Improper ....................................................172

    B.    Recoupment is the Proper Remedy .................................................174

    C.    Recoupment is Equitable.................................................................176

VIII.  THE PLAN WAS PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW (11 U.S.C. § 1129(a)(3))...........179

IX.    THE PLAN SATISFIES SECTION 1123(a)(4) OF THE BANKRUPTCY CODE ........................................................................186

X.    THE PLAN'S RELEASE, INJUNCTION AND EXCULPATION PROVISIONS ARE APPROPRIATE UNDER PREVAILING LAW .....189

    A.    The Consensual Release Provisions are Appropriate ......................189

    B.    The Exculpation Provisions are Appropriate ..................................190

    C.    The Nonconsensual Release Provisions are Appropriate ...............191

        1.    The Dow Corning Chapter 11 Standard .................................191

2.     Third Party Releases in Chapter 9 ...........................................193

3.     Unusual Circumstances Exist to Approve the Plan's Nonconsensual Third Party Release Provisions ....................197

XI.   THE PLAN'S TREATMENT OF CLAIMS AGAINST THE 36TH DISTRICT COURT IS APPROPRIATE UNDER PREVAILING LAW ...........................................................................................................200

XII.  ASSUMPTION OF CONTRACTS.............................................................204

XIII. A WAIVER OF THE 14-DAY STAY IS APPROPRIATE UNDER BANKRUPTCY RULE 3020(e) .................................................................206

# TABLE OF AUTHORITIES

**CASES**

Ad Hoc Comm. of Pers. Injury Claimants v. Dana Corp. (In re Dana Corp.),
412 B.R. 53 (S.D.N.Y. 2008) ..........................................................................188

Aetna Cas. & Sur. Co. v. Clerk (In re Chateaugay Corp.), 89 F.3d 942
(2d Cir. 1996)........................................................................................ 37-38, 45

Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd.
(In re Monarch Beach Venture, Ltd.), 166 B.R. 428 (C.D. Cal. 1993)............118

Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.),
519 F.3d 640 (7th Cir. 2008) ..........................................................................190

Anchor Resolution Corp. v. State St. Bank & Trust Co.
(In re Anchor Resolution Corp.), 221 B.R. 330 (Bankr. D. Del. 1998) ...........112

Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton),
478 B.R. 8 (Bankr. E.D. Cal. 2012)........................................................95, 97, 98

Bank of Montreal v. Official Comm. of Unsecured Creditors
(In re Am. HomePatient, Inc), 420 F.3d 559 (6th Cir. 2005)...................104, 105

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.),
482 B.R. 404 (Bankr. N.D. Ala. 2012) ............................................... 102-03, 157

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.),
503 B.R. 849 (Bankr. N.D. Ala. 2013) ...................................................... 148-51

Bard v. Sicherman (In re Bard), 49 F. App'x 528 (6th Cir. 2002)...................6, 7, 12

Bd. of Trs. v. City of Detroit, 714 N.W.2d 658 (Mich. Ct. App. 2006)...............155

Bd. of Trs. v. City of Detroit, No. 259592, 2006 WL 2061403
(Mich. Ct. App. July 25, 2006) ........................................................................172

Bolt v. City of Lansing, 587 N.W.2d 264 (Mich. 1998)................. 142, 152-53, 170

Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc),
622 F.2d 872 (5th Cir. 1980) .......................................................... 24, 39, 43-44

Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106 (1939) ............................ 5-6

Chosnek v. Rolley, 688 N.E.2d 202 (Ind. Ct. App. 1997).................................178

City of Pleasant Ridge v. Royal Oak Twp., 44 N.W.2d 333 (Mich. 1950)............87

Class Five Nev. Claimants v. Dow Corning Corp.
(In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002) ................. 191-95, 199

CoreStates Bank, N.A. v. United Chem. Techs., Inc., 202 B.R. 33
(E.D. Pa. 1996)......................................................................................117

Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange),
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ..................................... 63, 85, 95, 97-98

Creekstone Apartments Assocs., L.P. v. Resolution Trust Corp.
(In re Creekstone Apartments Assocs., L.P.), 168 B.R. 639
(Bankr. M.D. Tenn. 1994) ....................................................... 38-39, 56

Engman v. Boyd, No. 1:09-CV-151, 2009 WL 1974460
(W.D. Mich. July 6, 2009) .....................................................................6

Fano v. Newport Heights Irr. Dist., 114 F.2d 563 (9th Cir. 1940) .............. 66, 73-78

First Nat'l Bank v. Barnum Wire & Iron Works, 25 N.W. 202 (Mich. 1885).......174

Fishell v. Soltow (In re Fishell), 47 F.3d 1168 (6th Cir. 1995).................................8

Gafford v. Gen. Elec. Co., 997 F.2d 150 (6th Cir. 1993) ......................................120

Grand Traverse Cnty. v. State, 538 N.W.2d 1 (Mich. 1995)................................203

Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.,
530 U.S. 238 (2000)..............................................................................175

Hindelang v. Mid-State Aftermarket Body Parts Inc. (In re MQVP, Inc.),
477 F. App'x 310 (6th Cir. 2012)...........................................................7

HSBC Bank USA, Nat'l Ass'n v. Calpine Corp., No. 07-CV-3088,
2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) ................................... 109-11, 113

Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Ass'n
(In re Imperial Coronado Partners, Ltd.), 96 B.R. 997
(B.A.P. 9th Cir. 1989)..........................................................................112

In re 11,111, Inc., 117 B.R. 471 (Bankr. D. Minn. 1990) ......................................44

In re Abaunza, 452 B.R. 866 (Bankr. S.D. Fla. 2011)...........................................31

In re Addison Cmty. Hosp. Auth., 175 B.R. 646 (Bankr. E.D. Mich. 1994) ..........67

In re Aleris Int'l, Inc., No. 09-10478, 2010 Bankr. LEXIS 2997
   (Bankr. D. Del. May 3, 2010) .................................................................................7

In re Am. HomePatient, Inc., 298 B.R. 152 (Bankr. M.D. Tenn. 2003) .................28

In re Am. Trailer & Storage, Inc., 419 B.R. 412 (Bankr. W.D. Mo. 2009) ...... 61-62

In re Arden Props., Inc., 248 B.R. 164 (Bankr. D. Ariz. 2000)....................... 117-18

In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989) .........23-24, 27-29, 36, 51

In re Babcock & Wilcox Co., No. 00-10992, 2004 WL 4945985
   (Bankr. E.D. La. Nov. 9, 2004) ............................................................................46

In re Barnwell Cnty. Hosp., 459 B.R. 903 (Bankr. D.S.C. 2011) ..........................67

In re Barnwell Cnty. Hosp., 471 B.R. 849 (Bankr. D.S.C. 2012) ........... 4-5, 26, 207

In re Baugh, 73 B.R. 414 (Bankr. E.D. Ark. 1987) ................................................49

In re Buttonwood Partners, Ltd., 111 B.R. 57 (Bankr. S.D.N.Y. 1990).................62

In re Calpine Corp., 365 B.R. 392 (Bankr. S.D.N.Y. 2007)........................... 110-11

In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,
   177 B.R. 684 (Bankr. D. Colo. 1995)........................................................132, 159

In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,
   187 B.R. 683 (Bankr. D. Colo. 1995)...................................................... 108-09

In re City of Detroit, 504 B.R. 97 (Bankr. E.D. Mich. 2013)........68, 81, 89, 95, 114

In re City of Vallejo, 403 B.R. 72 (Bankr. E.D. Cal. 2009) ........................95, 97, 98

In re Coastal Equities, Inc., 33 B.R. 898 (Bankr. S.D. Cal. 1983) ........................108

In re Condustrial, Inc., No. 09-04425, 2011 WL 3290389
   (Bankr. D.S.C. Aug. 1, 2011) ...............................................................................193

In re Connector 2000 Ass'n, 447 B.R. 752
    (Bankr. D.S.C. 2011) ......................................................... 120, 194-95, 199, 207

In re Cooper, No. 08-20473, 2009 WL 1110648
    (Bankr. N.D. Tex. Apr. 24, 2009)........................................................................25

In re Corcoran Hosp. Dist., 233 B.R. 449
    (Bankr. E.D. Cal. 1999) ...................................26, 40-41, 64, 80-81, 99, 121, 138

In re Corcoran Irr. Dist., 27 F. Supp. 322 (S.D. Cal. 1939).............................77, 80

In re Coventry Commons Assocs., 149 B.R. 109 (Bankr. E.D. Mich. 1992) .......100

In re Crawford, 324 F.3d 539 (7th Cir. 2003).................................................25, 54

In re Crosscreek Apartments, Ltd., 213 B.R. 521 (Bankr. E.D. Tenn. 1997) .........24

In re Cypresswood Land Partners, I, 409 B.R. 396 (Bankr. S.D. Tex. 2009) .......117

In re Deming Hospitality, LLC, No. 11-12-13377, 2013 WL 1397458
    (Bankr. D.N.M. Apr. 5, 2013) .......................................................................52, 56

In re Dow Corning Corp., 192 B.R. 415 (Bankr. E.D. Mich. 1996) ........................8

In re Dow Corning Corp., 244 B.R. 673 (Bankr. E.D. Mich. 1999) ....... 180, 183-84

In re Dow Corning Corp., 244 B.R. 696 (Bankr. E.D. Mich. 1999) ...........29, 52, 59

In re Dow Corning Corp., 244 B.R. 705 (Bankr. E.D. Mich. 1999) .......... 29, 54-55

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000) .................................181

In re Dow Corning Corp., 255 B.R. 455 (E.D. Mich. 2000) ............. 27-28, 182, 190

In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493
    (Bankr. S.D.N.Y. 1991) .........................................................................................8

In re E. Me. Elec. Coop., Inc., 125 B.R. 329 (Bankr. D. Me. 1991) ................. 98-99

In re Fodale, No. 10-69502, 2013 WL 663729
    (Bankr. E.D. Mich. Feb. 21, 2013) .......................................................................8

In re Friedman's, Inc., 356 B.R. 758 (Bankr. S.D. Ga. 2005)......................... 192-93

In re Global Indus. Techs., Inc., No. 02-21626, 2013 WL 587366
(Bankr. W.D. Pa. Feb. 13, 2013) ....................................................................193

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007) ......................191

In re Graphic Commc'ns, Inc., 200 B.R. 143
(Bankr. E.D. Mich. 1996) .................................................... 28, 36, 39, 46, 48-49

In re Gregory Boat Co., 144 B.R. 361 (Bankr. E.D. Mich. 1992).................. 179-80

In re Griswold Bldg., LLC, 420 B.R. 666 (Bankr. E.D. Mich. 2009) ............. 104-05

In re Hibbard Brown & Co., 217 B.R. 41 (Bankr. S.D.N.Y. 1998) .........................8

In re Jartran, Inc., 44 B.R. 331 (Bankr. N.D. Ill. 1984)..........................................42

In re Kliegl Bros. Universal Electric Stage Lighting Co., 149 B.R. 306
(Bankr. E.D.N.Y. 1992)...............................................................................38, 56

In re Lee Way Holding Co., 120 B.R. 881 (Bankr. S.D. Ohio 1990).......................8

In re Manville Forest Prods. Corp., 43 B.R. 293 (Bankr. S.D.N.Y. 1984) ...........109

In re McCommas LFG Processing Partners, LP,
Nos. 07-32222 and 07-32219, 2007 WL 4234139
(Bankr. N.D. Tex. Nov. 29, 2007) .............................................................. 206-07

In re MCorp Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993)..........................................31

In re Meridian Funds Grp. Secs. & ERISA Litig., 917 F. Supp. 2d 231
(S.D.N.Y. 2013)...............................................................................................173

In re Miami Ctr. Assocs., Ltd., 144 B.R. 937 (Bankr. S.D. Fla. 1992) ................118

In re Mount Carbon Metro. Dist., 242 B.R. 18
(Bankr. D. Colo. 1999) ........................62-63, 66-67, 86, 119-20, 135-38, 180-82

In re Orawsky, 387 B.R. 128 (Bankr. E.D. Pa. 2008) ............................................31

In re Outdoor Sports Headquarters, Inc., 161 B.R. 414
(Bankr. S.D. Ohio 1993)..................................................................................112

In re Parke Imperial Canton, Ltd., No. 93-61004, 1994 WL 842777
(Bankr. N.D. Ohio Nov. 14, 1994) ............................................................. 30-31

In re Pierce Cnty. Hous. Auth., 414 B.R. 702
  (Bankr. W.D. Wash. 2009) ...................................................................... 62, 77-79

In re Richmond Unified Sch. Dist., 133 B.R. 221
  (Bankr. N.D. Cal. 1991) ....................................................................26, 70

In re Riddle, 444 B.R. 681 (Bankr. N.D. Ga. 2011) .................................................61

In re Ridgewood Apartments of DeKalb Cnty., Ltd., 174 B.R. 712
  (Bankr. S.D. Ohio 1994) ....................................................................110

In re Rivers End Apartments, Ltd., 167 B.R. 470 (Bankr. S.D. Ohio 1994)...........44

In re Rosedale Park Baptist Church, No. 09-75364, 2010 WL 4813563
  (Bankr. E.D. Mich. Apr. 23, 2010) ....................................................................207

In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970
  (Bankr. N. Neb. 1989) ........................................................... 63, 87-88, 138, 159

In re Sea Trail Corp., No. 11-07370, 2012 WL 5247175
  (Bankr. E.D.N.C. Oct. 23, 2012) .........................................................47

In re Simmons, 288 B.R. 737 (Bankr. N.D. Tex. 2003) .........................................24

In re Stella, No. 05-05422, 2006 WL 2433443
  (Bankr. D. Idaho June 28, 2006).........................................................25

In re Tammarine, 405 B.R. 465 (Bankr. N.D. Ohio 2009)....................................120

In re Trenton Ridge Investors, LLC, 461 B.R. 440
  (Bankr. S.D. Ohio 2011)................................................... 102, 107-08, 117, 118

In re Tribune Co., 472 B.R. 223 (Bankr. D. Del. 2012) ....................................50, 56

In re Union Fin. Servs. Grp., Inc., 303 B.R. 390 (Bankr. E.D. Mo. 2003).............28

In re UNR Indus., Inc., 143 B.R. 506 (Bankr. N.D. Ill. 1992) .............................187

In re Wabash Valley Power Ass'n, Inc., No. 85-2238, 1991 WL 11004220
  (Bankr. S.D. Ind. Aug. 7, 1991).........................................................108

In re Waterford Hotel, Inc., 497 B.R. 255 (Bankr. E.D. Mich. 2013)...........181, 184

In re W. Real Estate Fund, Inc., 75 B.R. 580 (Bankr. W.D. Okla. 1987) ......... 41-42

In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928
  (Bankr. S.D.N.Y. Oct. 31, 2003) ........................................................30

Kelley v. Everglades Drainage Dist., 319 U.S. 415 (1943)....................................74

Kosa v. Treasurer, 292 N.W.2d 452 (Mich. 1980) ................................................174

LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159
  (7th Cir. 1987)........................................................................................8

Lorber v. Vista Irr. Dist., 127 F.2d 628 (9th Cir. 1942) ....................................64, 70

Lyndon Prop. Ins. Co. v. Katz, 196 F. App'x 383 (6th Cir. 2006) ...........................6

Metro Emps. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah),
  836 F.2d 1030 (6th Cir. 1988) .................................................... 181-82

New Magma Irr. & Drainage Dist. v. Bd. of Supervisors (In re New Magma
  Irr. & Drainage Dist.), 193 B.R. 528 (Bankr. D. Ariz. 1994)............................67

Newhouse v. Corcoran Irr. Dist., 114 F.2d 690 (9th Cir. 1940)........................70, 77

Official Comm. of Unsecured Creditors v. Dow Corning Corp.
  (In re Dow Corning Corp.), 456 F.3d 668 (6th Cir. 2006) ........................ 113-14

Official Comm. of Unsecured Creditors v. James Talcott, Inc.
  (In re Int'l Distrib. Ctrs., Inc.), 103 B.R. 420 (S.D.N.Y. 1989) ............................9

Official Comm. of Unsecured Creditors v. Qwest Commc'ns Corp.
  (In re A.P. Liquidating Co.), 283 B.R. 456 (Bankr. E.D. Mich. 2002)...... 132-33

Olympia Equip. Leasing Co. v. W. Union Tel. Co., 786 F.2d 794
  (7th Cir. 1986)................................................................................. 88-89

Otis v. Otis, 45 N.E. 737 (Mass. 1897)................................................................175

Owen v. Owen, 500 U.S. 305 (1991).......................................................................96

Papas v. Buchwald Capital Advisors, LLC
  (In re Greektown Holdings, LLC), 728 F.3d 567 (6th Cir. 2013).........................7

Parker v. Klochko Equip. Rental Co., 590 F.2d 649 (6th Cir. 1979) .....................73

Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n (In re Premier Entm't Biloxi LLC), 445 B.R. 582 (Bankr. S.D. Miss. 2010)................................ 112-13

Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.), 429 B.R. 692 (Bankr. C.D. Cal. 2010)..................120

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) .............................................................5

Rankin v. Dault (In re Rankin), 396 B.R. 203 (E.D. Mich. 2008) ............................6

Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791 (S.D.N.Y. 1995) .....................................................................7

Reynolds v. Comm'r, 861 F.2d 469 (6th Cir. 1988) ...............................................6

Richardson v. Schafer (In re Schafer), 689 F.3d 601 (6th Cir. 2012) ............... 95-96

Sanitary & Improvement Dist. 65 v. First Nat'l Bank of Aurora (In re Sanitary & Improvement Dist. 65), 73 B.R. 205 (Bankr. D. Neb. 1986) ................................................................................ 97-99

Shapiro v. VPA, P.C. (In re Valley X-Ray Co.), 360 B.R. 254 (E.D. Mich. 2007) ....................................................................................52

Shelby Twp. Police & Fire Ret. Bd. v. Charter Twp. of Shelby, 475 N.W.2d 249, 252 (Mich. 1991)..................................................................154

Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs), 339 F.3d 782 (9th Cir. 2003)............... 69-70

Stark v. Moran (In re Moran), 385 B.R. 799 (B.A.P. 6th Cir. 2008) ........................6

Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323 (9th Cir. 1994)...............37

Tenn-Fla Partners v. First Union Nat'l Bank of Fla., 229 B.R. 720 (W.D. Tenn. 1999)..............................................................................185

Till v. SCS Credit Corp., 541 U.S. 465 (2004)....................................................105

Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII), 129 B.R. 440 (M.D.N.C. 1991) ......................................................................31

United States v. Bekins, 304 U.S. 27 (1938) ......................................................71

United States v. Energy Res. Co., 495 U.S. 545 (1990) .........................................108

Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham
    Lambert Grp., Inc.), 134 B.R. 499 (Bankr. S.D.N.Y. 1991) .................................8

Wayne Cnty. Emps. Ret. Sys. v. Wayne Cnty., 836 N.W.2d 279
    (Mich. Ct. App. 2013)................................................................................. 172-73

## UNREPORTED ORDERS

Agreed Order Confirming Amended Plan, In re Natchez Reg'l Med. Ctr.,
    No. 09-00477 (Bankr. S.D. Miss. Dec. 17, 2009) (Docket No. 582)..............197

Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9
    Plan of Adjustment for Jefferson Cnty., Ala., In re Jefferson Cnty.,
    No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (Docket No. 2248)......196, 207

Order Confirming Plan, In re S. Brunswick Water & Sewer Auth.,
    No. 04-09053 (Bankr. E.D.N.C. Oct. 25, 2006) (Docket No. 419)............ 196-97

## FEDERAL CONSTITUTION, STATUTES, RULES & LEGISLATIVE HISTORY

U.S. Const. art. I, § 10.........................................................................................84

U.S. Const. amend. X...........................................................................................71

11 U.S.C. § 365 ............................................................................................ 204-05

11 U.S.C. § 506 ............................................................................................ 111-13

11 U.S.C. § 507 .............................................................................................. 95-96

11 U.S.C. § 901 .................................................................................6, 63, 179, 194

11 U.S.C. § 904 ............................................................................................... 70-71

11 U.S.C. § 928 .................................................................................150-51, 156-57

11 U.S.C. § 943 ...............................................................................................passim

11 U.S.C. § 944 ............................................................................................. 132-33

11 U.S.C. § 1123 .............................................................................................passim

11 U.S.C. § 1129 .................................................................................*passim*

11 U.S.C. § 1325 ..................................................................................181

Fed. R. Bankr. P. 3020 ...................................................................206-07

Fed. R. Bankr. P. 9019 .................................................................5-9, 22

H.R. Rep. 94-686 (1975), <u>reprinted in</u> 1976 U.S.C.C.A.N. 539 ............71

H.R. Rep. 95-595 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963 ...........71

## STATE CONSTITUTION, STATUTES & PROPOSED LEGISLATION

Mich. Const. art. I, § 10 ......................................................................84

Mich. Const. art. IX, § 24 ......................................... 40, 59, 89-90, 154

Michigan Public Act 34 of 2001, M.C.L. §§ 141.2101 *et seq.*................86

Michigan Public Act 94 of 1933, M.C.L.§§ 141.101 *et seq.* (as amended) ..........144

Michigan Public Act 189 of 1979, M.C.L. §§ 141.161 *et seq.*..............164

Michigan Public Act 236 of 1961, M.C.L. §§ 600.101 *et seq.* (as amended) .......203

Michigan Public Act 314 of 1965, M.C.L. §§ 38.1132 *et seq.* (as amended) .......172

Michigan Public Act 336 of 1947, M.C.L. §§ 423.201 *et seq.* (as amended) .......159

Michigan Public Act 436 of 2012, M.C.L. §§ 141.1541 *et seq.*
(as amended) ..................................................................................18, 90

M.C.L. § 38.1133 ........................................................................ 172-73

M.C.L. § 38.1140m......................................................154, 155, 162, 163

M.C.L. § 123.141 ...............................................................................140

M.C.L. § 141.164 ...............................................................................165

M.C.L. § 141.1543 .............................................................................161

M.C.L. § 141.1567 ......................................................................161, 162

M.C.L. § 141.2509 ...........................................................................164

M.C.L. § 141.2705 ...........................................................................165

M.C.L. § 423.210 .............................................................................160

M.C.L. § 423.215 ........................................................................ 160-62

M.C.L. § 566.35 ...............................................................................166

M.C.L. § 600.6021 .............................................................................73

M.C.L. § 600.8103 ...........................................................................203

M.C.L. § 600.8104 ...........................................................................203

Michigan House Bill No. 5566, <u>available at</u> http://www.legislature.mi.gov/
    documents/2013-2014/billengrossed/House/pdf/2014-HEBH-5566.pdf .........131

Michigan House Bill No. 5567, <u>available at</u> http://www.legislature.mi.gov/
    documents/2013-2014/billengrossed/House/pdf/2014-HEBH-5567.pdf .........131

## LOCAL LAWS & EMERGENCY MANAGER ORDERS

Detroit City Charter § 7-1203 ....................................................142, 152

Detroit City Code § 47-2-18 ..............................................................143

Detroit City Council Ordinance 18-01....................................................144

Detroit City Council Ordinance 30-02....................................................144

Detroit Emergency Manager Order No. 6 ............................................122

Detroit Emergency Manager Order No. 14 ..........................................122

Detroit Emergency Manager Order No. 18 ..........................................122

## OTHER AUTHORITIES & SOURCES

3 <u>Collier on Bankruptcy</u> ¶ 365.07
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ..............................205

6 <u>Collier on Bankruptcy</u> ¶ 900.01
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ...............................26

6 <u>Collier on Bankruptcy</u> ¶ 943.03
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) .....................180, 194

7 <u>Collier on Bankruptcy</u> ¶ 1123.01
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) .............................187

8 <u>Collier on Bankruptcy</u> ¶ 1322.05
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) ...............................36

2012 Annual Report of the General Retirement System of the City of Detroit ......89

2012 Annual Report of the Police & Fire Retirement System of the City of
    Detroit ................................................................................................... 89-90

2012 City of Detroit Comprehensive Annual Financial Statement.......................114

2014 City of Detroit Active Employee Benefits, <u>available at</u>
    http://www.detroitmi.gov/Portals/0/docs/EM/Reports/Active%20Employ
    ee%20Health%20Care%20Plan.pdf ...................................................................122

2014 City of Detroit Retiree Health Care Plan, <u>available at</u>
    http://www.detroitmi.gov/Portals/0/docs/EM/Reports/Retiree%20Health
    %20Care%20Plan.pdf.........................................................................................122

Belle Isle, City of Detroit, http://www.detroitmi.gov/DepartmentsandAgencies/
    Recreation Department/BelleIsle.aspx (last visited May 26, 2014) .................123

Citizens Research Council of Michigan, <u>Detroit City Government Revenues</u>,
    Report No. 382 (Apr. 2013).................................................................................81

DIA Statements Regarding the City of Detroit Bankruptcy,
    http://www.dia.org/news/1511/DIA-Statements-Regarding-the-City-of-
    Detroit-Bankruptcy.aspx (last visited May 26, 2014) ........................................20

Egan, Paul & Matt Helms, <u>Michigan Loan Board Approves 30-Year Deal to
    Lease Belle Isle to State</u>, Detroit Free Press (Nov. 12, 2013),
    http://www.freep.com/article/20131112/NEWS01/311120055/Michigan-
    board-to-consider-Belle-Isle-lease-proposals ...................................................123

FY 2015 Sewage Disposal System Capital Improvement Program, <u>available at</u> http://www.dwsd.org/downloads_n/ about_dwsd/cip/sewer_fy_2015_cip_ bowc_approved_2013-12-18.pdf...................................................................129

FY 2015 Water Supply System Capital Improvement Program, <u>available at</u> http://www.dwsd.org/downloads_n/about_dwsd/cip/water_fy_2015_cip_ bowc_approved_2013-12-18.pdf...................................................................129

Laitner, Bill, <u>Agency Report on Poor People Sparks Feud with Oakland County,</u> Detroit Free Press (May 19, 2014), http://www.freep.com /article/20140519/NEWS05/305190019/oakland-county-poverty-Brookings-Institution ........................................................................................116

May 15, 2014 Interest Rate Update, Pension Benefiy Guaranty Corp. (May 15, 2014), www.PBGC.gov/prac/interest/monthly.html ..........................35

Memorandum from David Whitaker, Director, Legislative Policy Division Staff to Detroit City Council (Mar. 26, 2014), <u>available at</u> http://www.detroitmi.gov/ Portals/0/docs/legislative/LegislativePolicy/2014/Joe%20Louis%20Arena% 20Lease%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.pdf..........................................................................123

Memorandum from David Whitaker, Director, Legislative Policy Division Staff to Detroit City Council (Dec. 18, 2013), <u>available at</u> https://www.detroitmi.gov/ Portals/0/docs/legislative/LegislativePolicy /2013/Energy%20Delivery% 20Services%20Agreement%20-%20DTE.pdf .................................................122

Mich. Att'y Gen. Op. 7272 (June 13, 2013)......................................................18, 20

Official Statement for the $500,675,000 City of Detroit Water Supply System Revenue & Refunding Senior Lien Bonds – Series 2011(A), Series 2011(B) & Series 2011(C) ....................................................................146

Official Statement for Series 2003-A, 2003-B and 2003-C Water System Bonds .......................................................................................................155

Official Statement for Series 2005-A and 2005-B Sewage System Bonds...........155

Remarketing Circular for the Remarketing of Series 2001(C-1) and Series 2003(B) Sewage Disposal System Bonds .......................................................147

Restatement (Third) of Restitution and Unjust Enrichment § 50 .........................177

Restatement (Third) of Restitution and Unjust Enrichment § 65 .........................177

Restatement (Third) of Restitution and Unjust Enrichment § 67 ..........................178

Restatement (Third) of Trusts § 72 ........................................................................174

Restatement (Third) of Trusts § 77 ........................................................................173

Restatement (Third) of Trusts § 78 ........................................................................172

Restatement (Third) of Trusts § 79 ........................................................................174

Restatement (Third) of Trusts § 104 ...........................................................175, 177

Restatement (Third) of Trusts § 107 ......................................................................176

United States Census Bureau, State & County QuickFacts,
http://quickfacts.census.gov/qfd/states/26/2622000.html (last visited
May 24, 2014) ........................................................................................................81

The City of Detroit (the "City") hereby files this consolidated reply (the "Reply") in support of confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "Plan").[1]

## PRELIMINARY STATEMENT

1. The City's Plan — the product of months of negotiation, hard-won compromise and unprecedented levels of funding from non-debtor parties invested in the long-term success of the City and its residents — charts the course for the City to conclude the largest and most complex chapter 9 case in history. The Plan is the direct result of the commitment to negotiated, consensual resolutions of disputes adopted by the City, its creditors, this Court and the Court-appointed mediators since the outset of this case. It incorporates multiple settlements with major creditor constituencies holding an overwhelming majority of the City's unsecured debt (while leaving a significant percentage of its secured debt unimpaired). It enjoys the support of the Retiree Committee, the Retirement Systems, primary retiree associations, holders of the City's UTGO debt, and many of the City's employee unions (including its largest, AFSCME), thus eliminating the potential for a great deal of extensive and protracted litigation. Perhaps most

---

[1]    The City filed the Plan and its related disclosure statement (Docket No. 4391) (the "Disclosure Statement") on May 5, 2014. Except as expressly provided herein, capitalized terms not otherwise defined in this Reply have the meanings given to them in the Plan and, if not defined therein, the Disclosure Statement.

importantly, it enables the City to adjust its crushing debt burden while still providing for desperately needed and long-delayed reinvestment in the City to enable it to provide nearly 700,000 residents with basic municipal services.

2.     The objections to the Plan generally strike at the heart of the City's settlements — the "grand bargain" that provides for the donation of hundreds of millions of dollars to the City's most vulnerable creditors while preserving a core cultural asset for its residents and the surrounding communities — and, thus, at the process and progress that have characterized this chapter 9 case.  The objecting parties claim that the City unfairly discriminates in favor of its pensioners at the expense of its financial creditors.  They claim that it is unfair and inequitable for the City to resist the dismantling of the art collection housed at the DIA and that the value of the art collection could be distributed to them.  They claim that a Plan that allegedly fails to maximize returns for the City's funded debt is necessarily proposed in bad faith and in violation of Michigan law.

3.     All of these claims fail, and the Plan should be confirmed. As set forth below, the Plan:  (a) provides an augmented recovery for pensioners while respecting the Bankruptcy Code's prohibition against grossly disparate recoveries between creditor classes; (b) offers creditors meaningful recoveries — despite the City's dire financial and operational circumstances and its legal and practical inability to raise taxes — that are superior to the results of the disorderly

free-for-all that would inevitably follow dismissal of the Chapter 9 Case; (c) respects the enforceable rights and priorities of its various creditors under the Bankruptcy Code, Michigan law and the documents, statutes and ordinances establishing the City's obligations; (d) lays the foundation for a feasible reinvestment and restructuring plan — based upon reasonable financial projections and meaningful post-Confirmation oversight — that allows the City to finally arrest its decades-long financial spiral and provide its residents with adequate municipal services; (e) incorporates settlements that are fair and equitable; and (f) demonstrates the City's manifest good faith in attempting to balance the competing considerations of providing creditor recoveries while preserving the City. As such, the Plan satisfies the requirements of section 943(b) of the Bankruptcy Code, and the Objections should be overruled.

4. The City received hundreds of objections and responses to the Plan (and previously-filed versions thereof) (those that were timely filed and procedurally proper are hereafter collectively referred to as the "Objections"). The Objections are identified by objecting party or parties (each, an "Objecting Party") and docket number on Exhibit A attached hereto (the "Objection

Summary").[2]  The Objection Summary summarizes the arguments raised in the

applicable Objections and the City's response or responses thereto.[3]

## **RESERVATION OF RIGHTS AND BURDEN OF PROOF**

5.      The City reserves any and all rights to (a) respond to any

additional or supplemental objections to the Plan and (b) supplement this Reply,

as a result of, or in connection with, (i) its pretrial brief, (ii) its combined response

to supplemental objections, (iii) the Confirmation Hearing, (iv) information

learned through discovery, (v) the results of plan voting and (vi) any new

information relevant to Confirmation or any Objection that otherwise may come

to light.

6.      The City is required to prove, by a preponderance of the

evidence, that it has satisfied the confirmation requirements set forth in

section 943(b) of the Bankruptcy Code.  In re Barnwell Cnty. Hosp.,

---

[2]      References herein to individual Objections use the capitalized names given
to them in the Objection Summary.

[3]      Hundreds of the Objections (identified collectively in row 49 of the
Objection Summary) are letters or other filings that either (a) raise
non-specific concerns regarding, or object generally to, the Plan;
(b) generally request that the Court not allow any modifications to retirement
benefits pursuant to the Plan; or (c) request other relief unrelated to the
confirmability of the Plan.  Although the City acknowledges many of the
concerns raised in these Objections, they are not (a) asserted with enough
specificity to permit the City to respond or (b) relevant to the confirmability
of the Plan.  Accordingly, the City requests that the Court overrule these
Objections.

-4-

13-53846-swr   Doc 3654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 24 of 256
13-53846-tjt   Doc 8034   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 24 of 256

471 B.R. 849, 855-56 (Bankr. D.S.C. 2012) ("Debtor has met its burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence, which is the applicable evidentiary standard.").

## REPLY TO OBJECTIONS

**I.    THE SETTLEMENTS INCORPORATED INTO THE PLAN
SHOULD BE APPROVED PURSUANT TO SECTION 1123(b)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a)**

7.    As noted above, the City seeks approval of the several global compromises and settlements that are incorporated into the Plan.  Each of the Plan settlements is the product of lengthy (and often difficult) negotiation and mediation sessions between the City and several of its creditor representatives. The results justify the effort expended, as the Plan settlements resolve myriad complex controversies among the City and various creditors or creditor groups on a consensual basis.  As set forth below, each of the Plan settlements (a) represents a fair, equitable and reasonable settlement of complex and extensively mediated issues; (b) furthers the policies and purposes of chapter 9; and (c) is in the best interests of the City, its creditors and all other parties in interest.

### A.    Standard for Approving Settlements and Compromises

8.    Settlements and compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. Los Angeles

-5-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 25 of 256
13-53846-swr   Doc 8034   Filed 05/26/14   Entered 05/26/14 12:14:49   Page 25 of 256

Lumber Prods. Co., 308 U.S. 106, 130 (1939)).  As part of the restructuring process, the Court "may approve a compromise or settlement" under Bankruptcy Rule 9019(a).  Fed. R. Bankr. P. 9019(a).  Similarly, section 1123(b)(3) of the Bankruptcy Code states that a plan may "provide for … the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. §1123(b)(3); 11 U.S.C. § 901(a) (making section 1123(b) applicable in chapter 9 cases).

9.      A decision to approve or reject a proposed compromise or settlement falls within the court's sound discretion.  Engman v. Boyd, No. 09-CV-151, 2009 WL 1974460, at *2 (W.D. Mich. July 6, 2009) ("The bankruptcy court has wide discretion to approve or disapprove settlement agreements…."").  Bankruptcy Rule 9019 empowers a bankruptcy court, in its discretion, to approve settlements that are "fair and equitable."  See Reynolds v. Comm'r, 861 F.2d 469, 473 (6th Cir. 1988) (employing the "fair and equitable" standard).[4]

---

[4]    See also Lyndon Prop. Ins. Co. v. Katz, 196 F. App'x 383, 387 (6th Cir. 2006) (same); Bard v. Sicherman (In re Bard), 49 F. App'x 528, 530 (6th Cir. 2002) (same); Stark v. Moran (In re Moran), 385 B.R. 799, 2008 WL 1766874, at *4 (B.A.P. 6th Cir. 2008) (same), appeal dismissed for lack of standing, 408 B.R. 698 (B.A.P. 6th Cir. 2009); Rankin v. Dault (In re Rankin), 396 B.R. 203, 209 (E.D. Mich. 2008) (same), aff'd on other grounds sub nom. Rankin v. Brian Lavan & Assocs., P.C. (In re Rankin), 438 F. App'x 420 (6th Cir. 2011).

10.     Courts have consistently recognized that plan settlements under section 1123(b)(3) of the Bankruptcy Code should be evaluated under the same "fair and equitable" standard applicable to Bankruptcy Rule 9019 settlements. E.g., Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), aff'd, 68 F.3d 26 (2d Cir. 1995); In re Aleris Int'l, Inc., No. 09-10478, 2010 Bankr. LEXIS 2997, at *60 (Bankr. D. Del. May 3, 2010).

11.     In evaluating whether a proposed agreement is fair and equitable, courts in the Sixth Circuit generally consider four factors:  (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the interest of the creditors and a proper deference to their reasonable views. See Bard, 49 F. App'x at 530.[5]

---

[5]     See also Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC), 728 F.3d 567, 575 n.6 (6th Cir. 2013) (reciting Bard factors); Hindelang v. Mid-State Aftermarket Body Parts Inc. (In re MQVP, Inc.), 477 F. App'x 310, 313 (6th Cir. 2012) (applying Bard factors).

12.    In applying these factors, "[a] bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement." Fishell v. Soltow (In re Fishell), 47 F.3d 1168, 1995 WL 66622, at *3 (6th Cir. 1995) (quoting LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159, 163 (7th Cir. 1987)).

13.    Rather, to approve a compromise, the Court need only reach the conclusion that the City's proposed settlement generates a result that is above the lowest point in the range of reasonableness. See, e.g., In re Fodale, No. 10-69502, 2013 WL 663729, at *9 (Bankr. E.D. Mich. Feb. 21, 2013); In re Dow Corning Corp., 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (quoting In re Drexel Burnham Lambert Grp., Inc., 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991)).  The Court may "approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial." Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

14.    Moreover, when considering a proposed settlement, a court should exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); In re Lee Way Holding Co., 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990) ("It is well established that compromises are favored in bankruptcy.").

-8-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 28 of 256
13-53846-swr   Doc 8054   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 28 of 256

In fact, courts generally accord great deference to the recommendations of an estate representative when considering negotiated agreements.  See, e.g., Official Comm. of Unsecured Creditors v. James Talcott, Inc. (In re Int'l Distrib. Ctrs., Inc.), 103 B.R. 420, 423 (S.D.N.Y. 1989).

15.    Various Objecting Parties assert that the settlements contained in the Plan fail to meet the necessary requirements for approval under section 1123(b)(3) of the Bankruptcy Code or Bankruptcy Rule 9019.  These assertions are without merit.  For the reasons detailed below, the UTGO Settlement, the OPEB Settlement and the DIA Settlement each are "fair and equitable" and satisfy all relevant standards for approval.[6]

**B.    The UTGO Settlement**

16.    The UTGO Settlement consensually resolves — either entirely or in part — two pending adversary proceedings (together, the "UTGO Adversary Proceedings") regarding the priority and payment rights associated with approximately $388 million of claims arising from the City's issuance of certain

---

[6]    Previously, on April 15, 2014, the Court issued an order pursuant to Bankruptcy Rule 9019 approving the COP Swap Settlement between the City and the COP Swap Counterparties.  Order (I) Approving Settlement and Plan Support Agreement with UBS AG and Merrill Lynch Capital Services, Inc. Pursuant to Bankruptcy Rule 9019 and (II) Granting Related Relief (Docket No. 4094).

Unlimited Tax General Obligation Bonds.[7]  It also provides the City with

approximately $45 million that, pursuant to Section IV.D of the Plan, the City will

distribute to the pension funds, including the Income Stabilization Funds, over the

course of a 14-year period.  Absent the UTGO Settlement, this economic benefit

may not be available to the City or its creditors, even if it prevailed in the UTGO

Adversary Proceedings.

17.    A term sheet setting forth the principal terms of the UTGO

Settlement is attached as Exhibit I.A.285 to the Plan.  In summary, the UTGO

Settlement provides for (a) the allowance of the Unlimited Tax General

Obligation Bond Claims in the amount of $388 million[8] and (b) the reinstatement

and subsequent exchange of $287.5 million of the Unlimited Tax General

Obligation Bonds for new bonds issued by the Michigan Finance Authority on a

*pro rata* basis.  The new bonds will be secured by the payment rights associated

---

[7]    See First Am. Compl. for Declaratory J., Nat'l Pub. Fin. Guar. Corp. v. City
       of Detroit (In re City of Detroit), Adv. Proc. No. 13-05309 (Bankr. E.D.
       Mich. Dec. 23, 2013) (Docket No. 41) ("NPFG Complaint"), at 6; Am.
       Compl. of Ambac Assurance Corp. for Declaratory J., Ambac Assurance
       Corp. v. City of Detroit (In re City of Detroit), Adv. Proc. No. 13-05310
       (Bankr. E.D. Mich. Dec. 23, 2013) (Docket No. 57) ("Ambac Complaint"),
       at 6-8.

[8]    National Public Finance Guarantee Corporation, Assured Guaranty
       Municipal Corporation and Ambac Assurance Corporation (together,
       the "Settling Bond Insurers") collectively issued eleven insurance policies
       that guaranteed the City's payment obligations for all but $35 million of the
       Unlimited Tax General Obligation Bonds.

-10-

13-53846-swr  Doc 8045  Filed 05/26/14  Entered 05/26/14 22:10:45  Page 30 of 256
13-53846-swr  Doc 8045  Filed 05/26/14  Entered 05/26/14 22:10:45  Page 30 of 256

with an unlimited tax general obligation levy to the extent permitted by applicable law and a fourth lien on certain distributable state aid.  The UTGO Settlement also mandates that the Plan assign the payment rights associated with the remaining outstanding Unlimited Tax General Obligation Bonds (the "Stub UTGOs") to the City or its designee, and that the insurance policies providing payment coverage to the holders of the Unlimited Tax General Obligation Bonds remain in place to ensure payment of debt service as originally provided for under the Unlimited Tax General Obligation Bonds.

18.    The UTGO Settlement is fair and equitable for two basic reasons.  First, there existed potentially significant litigation risk with respect to the UTGO Adversary Proceedings.  The Settling Bond Insurers alleged, among other things, that certain portions of the City's *ad valorem* millage could lawfully be collected and used only for Unlimited Tax General Obligation Bond debt service and that the Settling Bond Insurers held a statutory lien on such millage.[9] The Settling Bond Insurers further asserted that such lien was upon "special revenue" protected under the Bankruptcy Code.  The Settling Bond Insurers argued that these alleged protections (a) gave them the status of secured creditors

---

[9]    See NPFG Complaint at 14-20 (arguing that a portion of the City's tax authority existed only for payment of the Unlimited Tax General Obligation Bonds); Ambac Complaint at 15-21 (same).  See NPFG Complaint at 32 (asserting that the Unlimited Tax General Obligation Bond obligations were secured by a statutory lien); Ambac Complaint at 33-34 (same).

and (b) required the repayment in full of the Unlimited Tax General Obligation Bonds from the *ad valorem* taxes.[10]

19.     The City vigorously contested each of these assertions and maintained that the claims arising from the Unlimited Tax General Obligation Bonds were general unsecured claims.[11]  Although the City believes it possesses the better and more well-reasoned arguments, it cannot be assured of prevailing on what ultimately are complicated (and in some aspects untested) issues involving both Michigan law and federal bankruptcy law.  The resolution of this uncertainty on terms acceptable to the City and the Settling Bond Insurers demonstrates the fair and equitable nature of the UTGO Settlement under the <u>Bard</u> factors.

20.     Second (and perhaps as important as avoiding a potentially unfavorable result in the UTGO Adversary Proceedings), the UTGO Settlement allows the City to receive the payment rights associated with the Stub UTGOs. This is an economic benefit the City otherwise may not have received.  In this regard, the UTGO Settlement is favorable to the City and should be approved.

---

[10]     <u>See</u> <u>generally</u> Ambac Complaint; NPFG Complaint.

[11]     <u>See</u> <u>generally</u> Mem. in Supp. of Def.'s Mot. To Dismiss, <u>Ambac Assurance Corp v. City of Detroit (In re City of Detroit)</u>, Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Jan. 17, 2014) (Docket No. 83-3).

-12-

13-53846-swr   Doc 8634   Filed 05/27/14   Entered 05/27/14 22:10:49   Page 32 of 256
13-53846-swr   Doc 8634   Filed 05/27/14   Entered 05/27/14 22:10:49   Page 32 of 256

C.    **The OPEB Settlement**

21.    The City and the Retiree Committee have reached a settlement regarding the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims.  As discussed below, the OPEB Settlement is fair and equitable and well within the range of reasonableness necessary for court approval.

22.    Prior to entering into the OPEB Settlement, the present value of OPEB Claims was the subject of a dispute between the City and the Retiree Committee.  Using employee data as of July 30, 2012 and retiree data as of February 1, 2013 provided by the City and the Retirement Systems' actuary, Gabriel Roeder Smith & Company ("Gabriel Roeder"), the City's actuary, Milliman, Inc., estimated the aggregate amount of OPEB Claims at approximately $3.771 billion. In contrast, the Retiree Committee's actuaries estimated the aggregate amount of OPEB Claims at approximately $5 billion.

23.    The cause of this $1.23 billion discrepancy between the estimated aggregate OPEB Claim amounts asserted by the City and the Retiree Committee emanated largely from certain actuarial assumptions and discount rates employed by each party.  In reducing the aggregate amount of OPEB Claims to its present value, the City employed a discount rate obtained with reference to the "Pension Discount Curve" published by Citigroup, as of July 1, 2012.  This

approach yielded a discount rate of approximately 4%. In contrast, the Retiree Committee discounted the aggregate amount of OPEB Claims to present value using substantially lower interest rates based on United States Treasury zero coupon bonds, or so-called "STRIPS," for periods of up to 30 years (and discounted periods in excess of 30 years by the 30-year rate).

24. In addition, the City and the Retiree Committee disputed the proper characterization of payments made by the City on account of OPEB Benefits since the Petition Date. By the end of calendar year 2014, the City estimates that it will have paid approximately $163 million in postpetition OPEB payments to or on behalf of (a) Holders of OPEB Claims on account of OPEB Benefits and (b) newly retired employees of the City and their dependents (including surviving spouses) on account of postpetition health, vision, dental and life benefits provided pursuant to the Retiree Health Plan.

25. The City asserted that such postpetition OPEB payments constitute a partial satisfaction of the OPEB Claims and should reduce, on a dollar-for-dollar basis, the amount of New B Notes distributed on account of allowed OPEB Claims. In contrast, the Retiree Committee asserted that the postpetition OPEB payments should be ignored for the purpose of calculating Class 12 claimants' aggregate recovery. Alternatively, the Retiree Committee

took the position that the postpetition OPEB payments should merely reduce the aggregate amount of the OPEB Claims as a threshold matter.

26.     On or about April 25, 2014, the City and the Retiree Committee agreed to settle their differences on the OPEB Claim issues (and all other issues affecting pensions in this chapter 9 case).  The OPEB Settlement resulted in (a) an Allowed Class 12 Claim of $4.303 billion, which compromises the parties' respective positions set forth above, and (b) an improvement in the interest rate payable on the New B Notes to be distributed to Classes 7, 9, 12, 13 and 14.

27.     The City believes that the OPEB Settlement is fair and equitable and, therefore, satisfies the above-referenced standards for approval of a settlement agreement.  The OPEB Settlement represents a hard-fought resolution of issues regarding the appropriate liquidation of the estimated aggregate allowed amount of the OPEB Claims and the treatment of the postpetition OPEB payments.  Absent the OPEB Settlement, the City anticipates that it would be forced to undergo protracted and expensive litigation to liquidate the OPEB Claims with unpredictable results given that the litigation would depend in part on differing actuarial expert opinions.  Such litigation likely would involve (a) extensive discovery regarding competing experts from the City, the Retiree Committee and the Retirement Systems, among others, and (b) potential contests

over numerous other components of the OPEB Claims (e.g., disputes over retiree census data, actuarial reconciliation of such data and determinations of future medical inflation, mortality, and the impact of the Affordable Care Act on medical benefits pricing, in addition to the adjudication of the proper discount rate and treatment of postpetition OPEB payments).

28.     The City believes that the OPEB Settlement serves the best interests of the City and its creditors, including City retirees, by averting this litigation and bringing the City's chapter 9 case closer to conclusion by resolving one of the largest (if not the largest) claim issues in the case.  Moreover, the agreed-upon Allowed Claim falls between the parties' respective litigation positions and represents a reasonable compromise of the factual and legal arguments under the circumstances.

### D.     The DIA Settlement

29.     A cornerstone of the Plan is the DIA Settlement.  The DIA Settlement offers an unprecedented opportunity for the City to obtain significant value from third parties on account of its interests in the DIA Assets, while also ensuring that the DIA Assets will remain in Detroit for the continuing benefit of Southeastern Michigan residents and the City's cultural heritage.

30.     Under the DIA Settlement, the City will place the art collection housed at the DIA into a formal trust.  In exchange for receiving certainty that the

City will not attempt to sell the DIA Assets and that such assets will remain available for the enjoyment and benefit of the City and its residents in the future, certain philanthropic foundations (collectively, the "Foundations") and DIA Corp. have agreed to contribute approximately $466 million to reduce the Retirement Systems' current levels of underfunding. In addition, the State has agreed to contribute the net present value of $350 million to reduce the Retirement Systems' current levels of underfunding, which contribution is conditioned upon, among other things, the contributions from the DIA Funding Parties.

31. The principal terms on which the Foundations and DIA Corp. have agreed to provide their respective funding are set forth in the term sheet attached to the Plan as Exhibit I.A.91. The Foundations will contribute no less than $366 million over the next 20 years, and DIA Corp. will raise and contribute $100 million over the same period. The funding commitments of the Foundations and DIA Corp. are both subject to a net present value reduction if the parties contribute funds sooner than contemplated under the term sheet.

32. The contributions of the Foundations and DIA Corp. are subject to the satisfaction of conditions precedent, including the following: (a) execution of definitive settlement documents by the City and each Foundation; (b) entry of the Confirmation Order approving the Plan and incorporating the DIA Settlement therein; (c) occurrence of the Effective Date; (d) approval of the DIA

Settlement by the Michigan Attorney General as consistent with Michigan law and Michigan Attorney General Opinion No. 7272; (e) approval of the DIA Settlement by each of the relevant City and State persons or entities specified in PA 436; and (f) the closing of the transaction occurring no later than December 31, 2014.

33.     In addition, the City and the State have agreed to the principal terms of a separate contribution agreement (the "State Contribution Agreement") that will govern the State's contribution of an additional $194.8 million (i.e., the present value of $350 million) to reduce the Retirement Systems' current levels of underfunding.[12]  Under the State Contribution Agreement, the State will make its contribution in a lump sum payment that will occur upon the later of (a) the satisfaction of certain conditions precedent under the State Contribution Agreement and (b) 60 days after the occurrence of the Effective Date.  The State's contribution also is subject to conditions precedent, including:  (a) the entry of the Confirmation Order; (b) the passage of legislation prior to Confirmation authorizing the State's contribution; and (c) satisfaction of the terms and conditions of the State Contribution Agreement as set forth in section 4 thereof and repeated in Section IV.E.3 of the Plan.

---

[12]     The form of the State Contribution Agreement is attached to the Plan as Exhibit I.A.268.

34.     The DIA Settlement is "fair and equitable," as it accurately

reflects — and effectively resolves — the uncertainty surrounding the City's exact

interests in the DIA Assets.  This uncertainty about the City's rights to the DIA

Assets likely would result in litigation if the City attempted to sell DIA Assets to

satisfy creditor claims.  A helpful analysis is to consider a complete and unlimited

ownership interest in property such as the DIA Assets as a "bundle of sticks."

A party holding the complete bundle of sticks that comprised all of the potential

interests in particular property could sell or transfer such property freely and

without limitation.  In contrast, a party holding only a limited amount of the sticks

that comprised all of the interests in particular property would possess only the

ability to sell the sticks it held.

35.     Applying the above illustration to the instant case, there exists

a substantial dispute surrounding the exact "sticks" the City possesses with respect

to the DIA Assets.  For instance, in many cases, the donor agreements governing

the original transfer of art from a private collection to the DIA sought to place

restrictions on the ability of subsequent transferors to sell the art.  Stated

otherwise, the original donors attempted to retain the "sticks" that would be

necessary for the City to sell the art.  Similarly, there is great dispute as to

whether, regardless of specific limitations in donor agreements, the City holds the

DIA Assets in a "charitable trust" or in a "public trust" such that the assets are not

-19-

13-53846-swr   Doc 8654   Filed 05/76/14   Entered 05/76/14 22:10:59   Page 39 of 256
13-53846-swr   Doc 8054   Filed 05/76/14   Entered 05/76/14 22:10:59   Page 39 of 256

subject to sale for the benefit of creditors.  The Michigan Attorney General issued

an opinion reaching a conclusion that the City holds the DIA Assets in a

"charitable trust."[13]  Under either theory, the City also would not possess the

necessary "sticks" to sell or otherwise monetize the DIA Assets in the manner

described by various creditors in their Plan objections.[14]

   36. In addition, resolving the City's precise ownership interests in

the approximately 65,000 works of art housed at the DIA through litigation would

be complicated, time-consuming and expensive.  The various donor agreements

and related documents governing the City's interests in these works of art date

back to 1885.  Given the length of time since the City acquired its interests in

many of the works of art, establishing a factual record in connection with any

litigation would be problematic (if not impossible), further illustrating why the

outcome of any such litigation is uncertain.  In addition, the length of time parties

---

[13] The Michigan Attorney General, in an opinion dated June 13, 2013 (Opinion No. 7272), asserted that "[t]he art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece of the collection may thus be sold, conveyed, or transferred to satisfy the City's debts or obligations."  Mich. Att'y Gen. Op. 7272 (2013).

[14] A position paper commissioned by the DIA in 2013 also argued that the DIA Assets is subject to the public trust doctrine.  See, e.g., DIA Statements Regarding the City of Detroit Bankruptcy, http://www.dia.org/news/1511/ DIA-Statements-Regarding-the-City-of-Detroit-Bankruptcy.aspx (last visited May 26, 2014) ("[T]he DIA's art collection is not subject to sale because it is protected by a public trust and, as recognized by the attorney general, a charitable trust that dates back to 1885.").

would need to locate and review the relevant materials and conduct related discovery would be extensive.  DIA Corp. has stated that the records relating to the DIA Assets include "over a million pages of hard-copy documents, many of which are originals that can be more than a half century old."[15]  A discovery process of this magnitude would cause the City to expend significant resources and incur substantial costs, without any assurance as to the outcome.  Moreover, even if it were concluded that the DIA Assets could be sold for the benefit of creditors, the value that could be obtained from any sale(s) is unknown.

        37.     Given the legal uncertainty described above, the calls of a small group of creditors for the City to abandon the DIA Settlement and its corresponding benefits are unfounded and contrary to the best interests of the City and its various constituents.  The DIA Settlement is an essential component of the Plan and is necessary for the City to exit chapter 9 in a timely fashion. The consideration the City will receive in connection with the DIA Settlement falls well within the range of reasonableness necessary for the Court to determine the DIA Settlement is "fair and equitable."  The value of the funds to be contributed by the DIA Funding Parties is more than any reasonable estimate of

---

[15]     See Objection by the Detroit Institute of Arts to the Relief Requested in the Revised Proposed Order Filed in Connection with the Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts, at 3-4 (Docket No. 4675).

the minimum amount that would be achieved if the City attempted to sell the DIA Assets,[16] and the DIA Settlement ensures that the DIA Assets remain in Detroit for the benefit of area residents and the City's cultural heritage. While selling the DIA Assets to satisfy creditors claims — if such a sale were permissible in the first instance — *might* result in proceeds in excess of those contributed by the DIA Funding Parties, the City would have to part with a significant portion of the most prestigious works in the DIA collection to achieve that result. Although difficult (if not impossible) to quantify, there is *significant* value in maintaining the DIA Assets in the City. The DIA Settlement gives the City access to $466 million to reduce the Retirement Systems' underfunding *and* provides the unquantifiable value of preserving these significant cultural treasures for the benefit of not only Detroit, but for all of Southeastern Michigan.

38. Moreover, neither the Christie's appraisal nor the other valuation evidence the City expects will be submitted to the Court establishes the low end of the range of reasonableness for purposes of Bankruptcy Rule 9019. Recognizing that the views of the Michigan Attorney General and the DIA — who believe that the DIA Assets cannot be sold to satisfy creditor claims — might prevail, the low end of the range of reasonableness is necessarily something closer

---

[16]    See Disclosure Statement at 97, 156-57 (Christie's estimated the aggregate fair market value of the Appraised Art to be between $454 million and $867 million).

to zero, with the DIA Assets remaining in the City and continuing to contribute to life in the City. When properly accounting for the risk of litigation and difficulty of collection, it is clear that the DIA Settlement is well within the range of reasonableness.

## II. THE PLAN DOES NOT "DISCRIMINATE UNFAIRLY" AMONG THE CITY'S CREDITORS (11 U.S.C. § 1129(b)(1))

39. Should any Impaired Class vote to reject the Plan, the Court nevertheless can confirm the Plan provided that it "does not discriminate unfairly … with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Notwithstanding the fact that the deadline for voting on the Plan has not yet passed and it is not yet known whether the "cramdown" provisions of section 1129(b) of the Bankruptcy Code will apply to the Plan, several Objecting Parties have argued that the plan "unfairly discriminates" among unsecured creditors and cannot be confirmed.[17] Although the argument is premature, the City nevertheless responds to it here.

40. As set forth below, the Objecting Parties argue that whether discrimination among creditor classes is "fair" should be measured by one of two tests — the four-factor Aztec test or the "Markell" rebuttable presumption test.

---

[17] See FGIC Objection, at ¶¶ 19-27; COPs Objection, at ¶¶ 13-23; Ambac Objection, at 44-53; Syncora Objection, at ¶¶ 28-60; Macomb County Objection, at ¶¶ 40-42; Court Officers Objection, at 17-18.

Upon the application of either test, the Plan does not discriminate unfairly with respect to any Impaired Class that may vote to reject the Plan.

## A.    The Landscape of Unfair Discrimination

41.    By its terms, section 1129(b)(1) "prohibits only *unfair* discrimination, not all discrimination." In re Aztec Co., 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (emphasis added).   Indeed, it is "necessarily inherent in the term 'unfair discrimination' ... that there may be 'fair' discrimination in the treatment of classes of creditors." In re Simmons, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)).[18]

### 1.    *The Fairness Inquiry is Committed to the Court's Informed Discretion*

42.    By making "fair[ness]" the touchstone of the legal standard, Congress eschewed any rigid mechanical test and instead made clear that courts should apply a flexible standard that takes all relevant circumstances into account. Broadly stated, "[a] bankruptcy court can permit discrimination when the facts of the case justify it." Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980).  The precise justification may vary from case to case; "there is great discretion left to the bankruptcy court to

---

[18]    See also, e.g., In re Crosscreek Apartments, Ltd., 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997) ("[D]iscrimination in the treatment of classes is permissible so long as it is not 'unfair.'").

determine whether the discrimination is fair." <u>In re Cooper</u>, No. 08-20473, 2009 WL 1110648, at *5 (Bankr. N.D. Tex. Apr. 24, 2009).  As the Seventh Circuit explained in the context of chapter 13's discrimination provision, the proper course is for "the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law." <u>In re Crawford</u>, 324 F.3d 539, 542 (7th Cir. 2003).  The fairness inquiry is properly "committed to [the court's] informed discretion and should be decided, case by case, based upon competent evidence and cogent argument as to what is fair and reasonable" in light of the purposes of the relevant law.  <u>In re Stella</u>, No. 05-05422, 2006 WL 2433443, at *4 (Bankr. D. Idaho June 28, 2006).

### 2.    *Special Chapter 9 Considerations*

43.    In light of the foregoing, whether the difference in treatment between holders of Pension Claims in Classes 10 and 11 and holders of other unsecured claims in Classes 7, 9, 12, 13 and 14 is fair and reasonable requires a threshold consideration of the purposes of chapter 9 and the City's unique status as a municipality.  Chapter 9 is designed to assist distressed municipalities in providing vital government services to the general public.  To that end, chapter 9 "provid[es] the debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties

of the type to which a Chapter 11 debtor is subject." In re Richmond Unified Sch. Dist., 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991).

44.     Because of its unique role, chapter 9 provides greater flexibility to the debtor than any other chapter of the Bankruptcy Code.  Id. at 225 ("[U]nlike the other Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather, to meet the special needs of a municipal debtor."); 6 Collier on Bankruptcy ¶ 900.01[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (quoting same).  Accordingly, courts assessing plans of adjustment in chapter 9 have emphasized the unique need to consider the general social welfare when addressing issues of plan confirmation.  See, e.g., Barnwell Cnty. Hosp., 471 B.R. at 869 ("[O]f particular importance to the Court is that the [p]lan preserves the availability of healthcare services to citizens and patients in the [c]ounty"); In re Corcoran Hosp. Dist., 233 B.R. 449, 454 (Bankr. E.D. Cal. 1999) (describing the area's economic woes and noting that "[t]he hospital is very important to the community of Corcoran" and that it was "an essential element to the survival of Corcoran as a community").

45.     The unique concerns of chapter 9 are especially pronounced here, where the City is not just any municipal debtor, but a major American city providing critical services for one of the largest urban populations in the country. No debtor seeking to confirm a plan has ever borne the same level of

responsibility for the social welfare of so many individuals (including thousands of retirees and employees), the majority of whom have little capacity to absorb the financial hardships that are an unavoidable consequence of the City's need to adjust billions of dollars of unsecured debt. The challenge presented by the City's restructuring is literally unprecedented in American bankruptcy law, and the City's (and its retirees') circumstances do not fit neatly into prior case law. Standards articulated in dissimilar contexts should not be applied mechanically here, but should be adapted as necessary to fit both the unique purposes of chapter 9 and the unique circumstances of the City's financial crisis. When properly examined through the prism of chapter 9, that case law supports the conclusion that Plan's discriminatory treatment of different types of unsecured claims is fair.

### 3. *The* **Aztec** *Test and the Markell Test*

46. As noted above, the Objecting Parties argue that whether discrimination among creditor classes is "fair" generally is measured by one of two standards — the four-factor <u>Aztec</u> standard or the "Markell" rebuttable presumption standard.

47. The <u>Aztec</u> standard is born out of the traditional view that "a plan will not unfairly discriminate if there is a rational or legitimate basis for discrimination and [if] the discrimination [is] ... necessary for the reorganization." <u>In re Dow Corning Corp.</u>, 255 B.R. 455, 537-38 (E.D. Mich. 2000) (alteration in

original; internal quotation marks omitted), aff'd in relevant part sub nom. Class

Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),

280 F.3d 648 (6th Cir. 2002). The Aztec test considers:

> (a)    whether the discrimination is supported by a reasonable basis;
>
> (b)    whether the debtor can confirm and consummate a plan without the discrimination;
>
> (c)    whether the discrimination is proposed in good faith; and
>
> (d)    the treatment of the classes discriminated against.

Aztec, 107 B.R. at 590; In re Graphic Commc'ns, Inc., 200 B.R. 143, 148 (Bankr.

E.D. Mich. 1996) (applying four-factor Aztec test).[19]

48.    Other courts have adopted a materiality standard championed

by Professor Bruce A. Markell, often referred to as the "Markell test." See Bruce

A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am.

Bankr. L.J. 227 (1998). According to that test:

> [A] rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of

---

[19]    See also, e.g., In re Union Fin. Servs. Grp., Inc., 303 B.R. 390, 421 (Bankr. E.D. Mo. 2003) (applying four-factor Aztec test); In re Am. HomePatient, Inc., 298 B.R. 152, 168 (Bankr. M.D. Tenn. 2003), aff'd sub nom. Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. HomePatient, Inc.), 420 F.3d 559 (6th Cir. 2005) (same).

> percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

In re Dow Corning Corp., 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999) (finding no unfair discrimination where, under the debtors' proposed joint plan of reorganization, claims of the objecting class would be channeled through a "litigation facility" and all claims not resolved via such facility would be paid in full), aff'd in relevant part, 255 B.R. 445 (E.D. Mich. 2000), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).

49.    If the presumption arises, a debtor can rebut the presumption by showing either that "outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999).

### B.    Measuring the Extent of Discrimination

50.    Central to both the Aztec test and the Markell test is a consideration of the extent of the discrimination. Thus, the first step in this Court's analysis should be to determine the appropriate means by which to measure the extent of the Plan's discriminatory treatment.

## 1. Funds Received from Third Parties are Outside the Plan and Do Not Constitute Unfair Discrimination

51. In the City's case, recoveries for holders of Pension Claims in Classes 10 and 11 are substantially augmented by distributions from third parties, i.e., the DIA Funding Parties and the State. Because these distributions are not made with City funds and are not made on account of claims against the City, they are "outside the Plan" and, therefore, properly excluded from the Court's unfair discrimination analysis.

52. Where the source of a particular class's enhanced recovery is a party other than the debtor, courts consistently find that the resulting differential in recoveries between classes is not "unfair discrimination." As explained by the bankruptcy court in In re Worldcom, Inc.:

> Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes **is not a treatment of these Claims under the plan and does not constitute unfair discrimination**…. **The greater value received by the members of [Class 6B] is not the result of the Debtors' distribution of estate property to such creditors.**

Worldcom, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added).[20]

---

[20] See also, e.g., In re Parke Imperial Canton, Ltd., No. 93-61004, 1994 WL 842777, at *11 (Bankr. N.D. Ohio Nov. 14, 1994) (finding no unfair discrimination and confirming plan pursuant to which debtor's principal secured creditor guaranteed a certain level of recovery to only one

-30-

13-53846-swr   Doc 8045   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 50 of 256
13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 50 of 256

53.     In the chapter 13 context, when a debtor voluntarily contributes "funding ... derived entirely from income that [the debtor] is not legally obligated to commit to the [p]lan" to pay a particular unsecured creditor more than will be paid to other unsecured creditors, the resulting discrimination is not "unfair." In re Orawsky, 387 B.R. 128, 155 (Bankr. E.D. Pa. 2008).[21]  Thus, under certain circumstances in chapter 13, a debtor's distribution of *its own funds* in a manner that results in discriminatory treatment among classes is not "unfair." Discrimination that results from distributions of funds that *are not the debtor's*, as is the case here, must necessarily be even less "unfair."

―――――――――――――――
(continued…)

of two classes of unsecured creditors, the funds for which guarantee would come from the secured creditor's proceeds of the sale of the debtor's principal asset); In re MCorp Fin., Inc., 160 B.R. 941, 960 (S.D. Tex. 1993) (finding no unfair discrimination where, in order to facilitate a settlement, senior bondholders agreed to "share" a portion of their recoveries under the plan to enhance the recovery of a settling junior class); Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII), 129 B.R. 440, 445 (M.D.N.C. 1991) (where all unsecured creditors would receive a 3.5% recovery from the debtor's estate under the plan, but certain unsecured creditors would receive additional monies from the debtor's general partner and partner guarantor resulting in a 100% recovery for those creditors, the plan did not unfairly discriminate because nonbankruptcy law, not the plan, was "the source of [the objecting creditor's] disadvantage"), rev'd on other grounds, 961 F.2d 496 (4th Cir. 1992).

[21]     See also In re Abaunza, 452 B.R. 866, 875-75 (Bankr. S.D. Fla. 2011) (plan did not discriminate unfairly where the debtor chose to use funds that it was not legally required to commit to the plan to pay student loan debt, resulting in student loan debt being paid in full while other unsecured creditors received a dividend of less than 1%).

54.     In the City's case, in connection with the DIA Settlement, the
DIA Funding Parties have earmarked $466 million for distribution to holders of
Pension Claims in Classes 10 and 11.  The DIA Funding Parties receive nothing in
exchange for their contributions, and the DIA Assets remain in the City for the
benefit of the residents of the City and surrounding communities.  The State has
likewise agreed to pay $194.8 million (i.e., the present value of $350 million) for
the benefit of holders of Pension Claims in Classes 10 and 11 in exchange for a
release, as described in the State Contribution Agreement.  *These distributions are
not from the City and do not make use of City funds.*  Although the Plan
incorporates the terms of the DIA Settlement and the State Contribution
Agreement, the augmented recovery that holders of Pension Claims will receive
on account of distributions from the DIA Funding Parties and the State are not a
treatment of those claims under the Plan.  Therefore, the effect of such funding on
the aggregate recoveries of Class 10 and Class 11 claimants should be ignored for
purposes of any unfair discrimination analysis.

55.     In addition, distributions from the State under the State
Contribution Agreement are in consideration of a release of claims against the
State and the State Related Entities by the holders of Pension Claims.  Holders of
Pension Claims are, therefore, relinquishing certain rights in exchange for
enhanced recoveries.  Because neither such distributions nor the rights

relinquished in exchange therefor relate to or affect the City's property, this exchange is not a treatment of claims under the Plan and is properly excluded from the Court's unfair discrimination analysis.

56.     Excluding, as the Court should, the distributions that holders of Pension Claims will receive from the DIA Funding Parties and the State, the estimated percentage recoveries for Classes 10 and 11 are 39% and 48%, respectively.  <u>See</u> Disclosure Statement at § II.B.  Although these recoveries are better than recoveries for other unsecured creditors, the disparity is not as great as might first appear.

### 2.     *Recoveries by Pension Claimants are Further Reduced When Considering Both Pension Claims and Separately Classified OPEB Claims*

57.     In arguing that the Plan unfairly discriminates against non-pension unsecured classes, the Objecting Parties focus on individuals' isolated recoveries on account of Pension Claims.  However, the Objecting Parties fail to consider the Plan's overall treatment of the *holders* of such claims.  The Plan separately classifies otherwise closely-related obligations owed to the City's pensioners:  PFRS Pension Claims (Class 10), GRS Pension Claims (Class 11) and OPEB Claims (Class 12).  Approximately 69% and 56% of holders of claims in Classes 10 and 11, respectively, also hold OPEB Claims.  Under the Plan, holders of OPEB Claims are expected to receive an approximately 10%-13%

recovery on such claims. Thus, the overall percentage recovery for retirees — the majority of which hold both a Pension Claim and an OPEB Claim — is reduced by approximately 15%-24% when considering the treatment of all components of a pension claimant's claims rather than the treatment of the individual Pension Claims and OPEB Claims separately. <u>See</u> Disclosure Statement, Ex. K at 4 (estimating the percentage recovery for Pension Claims and OPEB Claims together to be approximately 24%). In this regard, the Plan's preferential treatment of holders of Pension Claims is less preferential than a narrow focus upon a subset of claims held by such claimants might suggest.

### 3. *The Discrimination is Reduced Upon the Application of a More Appropriate Calculation of Pension Claims*

58. Several Objecting Parties argue that the discrimination between unsecured creditor classes in the Plan is understated because the amount of the Pension Claims is inflated.[22] These parties argue that the aggregate amount of the Pension Claims would be less if calculated "properly" (as defined differently by different Objecting Parties or not at all), such that recoveries on Pension Claims would be commensurately higher. These arguments fail. If anything, the Plan *understates* the amount of the Pension Claims. If the

---

[22] <u>See</u> Syncora Objection, at ¶¶ 36-43; COPs Objection, at ¶ 18; Ambac Objection, at 47 n.16; Macomb County Objection, at ¶ 40 n.9.

potentially higher pension values were used, the resulting percentage recoveries

on Pension Claims would be reduced.

59.     The aggregate amount of the Pension Claims was calculated

utilizing, among other assumptions, a 6.75% discount rate to value the City's

pension liabilities and a 6.75% investment return rate for future growth of its

pension assets.  See Disclosure Statement at 13.  However, to truly determine how

the market would value these liabilities, one would look to a commercial

insurance company that would annuitize the liabilities, which would likely utilize

a discount rate between 3-4%.[23]  If the City were to value its pension liabilities

using a more economically realistic discount rate than 6.75%:  (a) the aggregate

amount of the Pension Claims — i.e., the difference between the value of the

pension liabilities and the Retirement System assets to support them — would

dramatically increase; (b) the percentage recoveries on those claims would

dramatically decrease; and (c) the differential between those recoveries and

recoveries on non-pension unsecured claims would narrow appreciably.  The fact

that the adoption of a 6.75% discount rate for pension liabilities exaggerates the

---

[23]     Similarly, in the private sector, the Pension Benefit Guaranty Corporation
values the pension liabilities of a bankrupt debtor when taking over a
pension plan by reference to commercial annuity rates.  See May 15, 2014
Interest Rate Update, Pension Benefit Guaranty Corp. (May 15, 2014),
www.PBGC.gov/prac/interest/monthly.html (interest rates to value annuity
benefits in single employer and multiemployer plans for the month of
June 2014 between 3.47% and 3.64%).

disparity between unsecured creditor recoveries should be factored into any unfair discrimination analysis. The impact of this calculation will be introduced into evidence at the Confirmation Hearing.

### C. The Plan Satisfies the Four-Factor *Aztec* Test

60. As set forth above, the Aztec test considers: (a) whether the discrimination is supported by a reasonable basis; (b) whether the debtor can confirm and consummate a plan without the discrimination; (c) whether the discrimination is proposed in good faith; and (d) the treatment of the classes discriminated against. Aztec, 107 B.R. at 590; Graphic Commc'ns, 200 B.R. at 148. This four-factor test provides a comprehensive framework for evaluating all of the considerations that may bear on the question of unfair discrimination under section 1129(b)(1) of the Bankruptcy Code. Taking into account all of the relevant factors and other considerations unique to chapter 9, the Plan does not unfairly discriminate in favor of Class 10 and Class 11 claimants.

### 1. *The City Has Reasonable Grounds to Treat Pensioners Differently from Other Unsecured Claimants*

61. The Plan's treatment of Pension Claims is supported by a reasonable basis such that the first Aztec factor is satisfied. A "common [] theme" found in cases employing some variation of the Aztec test is "that the debtor's personal preference for a classification is not sufficient; the justification must be based on reason and fairness." 8 Collier on Bankruptcy ¶ 1322.05[2]. In other

words, while disparate treatment cannot be defended on the basis of mere

favoritism or animus, it can be justified by reference to principles that are

"reasonable" and "nondiscriminatory," in the sense that they can be applied in a

consistent and evenhanded manner.  Steelcase Inc. v. Johnston (In re Johnston),

21 F.3d 323, 328 (9th Cir. 1994).  Several such principles support the Plan's

treatment of Pension Claims.

### (a)    Union and Employee Relations

62.    The Plan's treatment of Pension Claims minimizes the adverse

impact of the pension benefit reductions on the City's current employees, whose

ongoing motivation and cooperation (as well as that of the unions that represent

the employees) is vital to the City's recovery and to the health, welfare and safety

of its residents.  Especially instructive on this point is the Second Circuit's opinion

in Aetna Cas. & Surety Co. v. Clerk (In re Chateaugay Corp.), 89 F.3d 942 (2d

Cir. 1996).  In that case, the debtor proposed a plan that paid workers'

compensation claims in full, while providing a recovery of roughly 40 percent for

derivative insurance company claims of the same priority (resulting in a 60%

differential in recoveries).  In justifying the differential treatment, the court

explained:

> To show that there is a legitimate reason for treating the
> claims of unpaid workers differently than those of
> sureties, [debtor] LTV proffered the affidavit of its Vice
> President of Industrial Relations of the LTV Steel

Company, Inc., who related the history of the company's workers' compensation obligations and explained why these payments are crucial to its future success. LTV's officer explained how such benefits are considered by its employees to be an entitlement under state law and how these benefits often are the employees' only form of wage replacement. Were the debtor unable to satisfy workers' compensation obligations, he added, the unions representing LTV's employees would react so negatively as to jeopardize peaceful labor relations and thereby cast into doubt LTV's ability to secure sales contracts from customers.

Id. at 949.

63. In another case, a bankruptcy court upheld a 60 percent preferential recovery for a union's unsecured claim because the union threatened to strike, and the "[d]ebtor's ability to continue to operate a union shop [was] absolutely critical to its ability to function successfully in its industry." In re Kliegl Bros. Universal Elec. Stage Lighting Co., 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (confirming a plan that provided a 75% recovery on a union's general unsecured claim and a 15% recovery on other general unsecured claims over the objections of the debtor and the disadvantaged class).

64. The same principle has been applied to trade creditors. For example, in Creekstone Apartments Assocs., L.P. v. Resolution Trust Corp. (In re Creekstone Apartments Assocs., L.P.), 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994), the court upheld a preferential recovery of 90 percent for trade creditors because their "services and products were essential to the successful

-38-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 12:10:45   Page 58 of 256
13-53846-swr   Doc 8054   Filed 05/26/14   Entered 05/26/14 12:10:45   Page 58 of 256

operation" of the reorganized debtor.[24]  See also Graphic Commc'ns, 200 B.R. at 148 ("A plan may reasonably discriminate if the 'proposed discrimination protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully.'") (quoting Creekstone, 168 B.R. at 644).

65.     Here, by providing a relatively enhanced recovery to holders of Pension Claims, the City is helping to ensure the success of some of its most vital relationships going forward.  Active employees of the City also have claims for vested pension benefits that are classified in Classes 10 and 11 and treated under the Plan.  Going forward, the pension benefits of active City employees will accrue under new, less generous hybrid pension plans, as set forth in the Plan. See Plan at §§ II.B.3.q.ii.E, II.B.3.r.ii.F.  City employees are no doubt concerned about any further reduction of their benefits.  Moreover, current employees are understandably concerned about the extent of impairment of benefits for retired City employees, as active employees will become retirees at some point. Impairment of Pension Claims beyond that which is proposed by the Plan would have a greater negative impact on the performance and morale of current City employees.

---

[24]     See also LeBlanc, 622 F.2d at 879 (plan that provided a 40 percent recovery for trade creditors and no recovery for unsecured claims held by insiders was not discriminatory, in part because the plan proponents "may well have needed to maintain good relations with trade creditors upon whom they would have to rely to furnish additional goods and services to the hotel").

66. The lifeblood of any city is its employees and its residents. If the City is to recover from its decades-long downward spiral and to function properly, it must have a workforce that is incentivized and motivated to provide the services that the City needs to function and attract residential and commercial growth. Moreover, the approximately 26%-35% differential in unsecured claim recoveries under the Plan is similar to, or substantially less than, the recovery differentials approved as "fair" in the cases cited above.

### (b) Settlement of Litigation

67. The Plan's treatment of Pension Claims is the result of settlements between the City and the Retiree Committee, the Retirement Systems and certain unions and retiree associations, including the potential settlement of a significant portion of ongoing, costly litigation regarding the Court's authority to impair pensions in light of Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause"). Because settlements are fundamental to the bankruptcy process, creditors who have settled with a debtor and agreed to accept a plan or make other valuable concessions may receive more favorable treatment than non-settling creditors without running afoul of section 1129(b)(1)'s prohibition on unfair discrimination.

68. In the chapter 9 case of Corcoran Hospital District, 233 B.R. 449, for example, the court approved the separate classification and

preferential treatment (in the form of a faster rate of repayment) of the unsecured

claim of a particular creditor, consistent with a settlement agreement with the

debtor.  The settlement agreement resolved ongoing litigation between the parties

and enabled the debtor to propose a plan of adjustment under which it could both

"devot[e] its resources to maintaining its hospital operations and [make] the

payments under the [p]lan."  Id. at 456.  The Corcoran court explained that "[i]f

the debtor were forced to expend resources in continued litigation with [the

settling creditor]…, it most likely would not have been able to propose a feasible,

confirmable [p]lan."  Accordingly, "[g]iven the magnitude of [the creditor's]

compromise in the [s]ettlement [a]greement, the court [wa]s unable to say that the

disparate treatment of [the creditor] from the other unsecured creditors

constitute[d] unfair discrimination."  Id. at 457.

   69. Likewise, in In re Western Real Estate Fund, Inc., 75 B.R. 580

(Bankr. W.D. Okla. 1987), secured creditors objected to the debtors' plan of

reorganization because "those creditors who ha[d] settled with the debtors ...

obtain[ed] more favorable treatment than those creditors who ha[d] not settled."

Id. at 585.  The court rejected this argument, stating:  "[T]hat those creditors

which have reached an accommodation with the debtors ... are to receive differing

treatment from that of the remaining creditors[] does not constitute impermissible

discrimination."  Id. at 586.  The court explained that denying confirmation of the

plan "would discourage and remove any incentive for negotiation and resolution of differences prior to confirmation." Id. Because the court believed that settlements or "work outs" are "fundamental to effective reorganization and rehabilitation," it overruled the objections and held that the plan was not unfairly discriminatory. Id.[25]

70. In the City's case, there is a risk that an appellate tribunal will decide that the Michigan Constitution prevents the impairment of vested pension benefits, even in chapter 9.[26] In exchange for the assurance that no such finding will inhibit its ability to adjust its debts in this case and to save those resources that otherwise would be used to litigate that issue, the City has agreed to the settlements reflected in the Plan with its settling retirees and active employees. The settlements relating to Pension Claims also have the effect of substantially reducing the amount of litigation regarding confirmation of the Plan, where the settling parties have agreed to support the Plan. In evaluating this issue, the Court

---

[25]    Cf. In re Jartran, Inc., 44 B.R. 331, 381-83 (Bankr. N.D. Ill. 1984) (finding that discrimination, which resulted from distributions to be made by a third party to certain creditors classes in connection with the "settlement of substantial disputes" that would otherwise impact the debtor's "prospects for effective reorganization," was not unfair; noting that there was "nothing in the record that would indicate that, but for the settlement agreements, [the third party] would designate these moneys as additional contribution to the reorganized [d]ebtor").

[26]    Any such finding likely would be subject to further appeal, thus increasing costs incurred by the City and further delaying the City's ability to adjust its debts and begin its recovery.

should recognize the significant role that settlements play in bankruptcy. Settlements are fundamental to the bankruptcy process and, indeed, have allowed the City to propose what it believes is a confirmable plan for the adjustment of its debts. Moreover, these settlements are the direct result of this Court's mediation process, which was ordered precisely to foster settlements of this type between the City and the various groups representing its pension and OPEB creditors. That the Plan's treatment of Pension Claims is the result of settlements with major creditor constituencies *supports* the conclusion that any resulting discrimination is reasonable and should be approved.

### (c)    Creditor Expectations

71.    The Plan's treatment of Pension Claims is further reasonable based on the fact that individual holders of Pension Claims:  (a) often depend on their pension income to provide basic living needs and expenses; (b) were not provided any choice with respect to whether and how much to invest in their pensions; and (c) had no control over how pension assets were invested and their pension programs operated.  Indeed, courts have permitted the favorable treatment of creditors whose claims against the debtor arose from circumstances where the creditors had no "real opportunity to protect themselves."  LeBlanc, 622 F.2d at 879 (affirming more favorable treatment of trade creditors than insiders, in part because "[t]he trade creditors advanced goods and services to the debtor in the

ordinary course of business, frequently without any knowledge of the debtor's financially perilous condition and without any real opportunity to protect themselves," while "the insiders made loans to the debtor when they were in a position to know of the debtor's financial condition and the risks involved with those loans").[27]

72.     In the City's case, the creditors receiving preferential treatment are individual City employees (active and retired) who chose to work as public servants based on the promise that they would sacrifice higher wages for receipt of guaranteed pensions upon retirement, as a form of deferred compensation. These individuals were not given any "real opportunity to protect themselves" with respect to whether and how much to invest in their pensions or how their pension assets would be managed.  LeBlanc, 622 F.2d at 879.  By contrast, the disadvantaged creditors are, for the most part, financial institutions with the sophistication and experience necessary to appreciate the risks they were taking

_____

[27]     See also In re Rivers End Apartments, Ltd., 167 B.R. 470, 488 (Bankr. S.D. Ohio 1994) (upholding differential treatment in part because "[t]rade creditors generally hold claims that arise from short-term debt and, as such, anticipate payment on a short-term basis," while "[a] lender with a deficiency claim usually holds long term debt and has no reasonable anticipation of quick payment"); In re 11,111, Inc., 117 B.R. 471, 478 (Bankr. D. Minn. 1990) (finding that discriminatory treatment among unsecured creditor classes was not unfair where the disadvantaged creditors (insiders) "knew they were putting their money at risk when they loaned money to the debtor"); Markell, A New Perspective, 72 Am. Bankr. L.J. at 248-49 (noting that the parties' risk expectations should factor into the unfair discrimination analysis).

when they invested in or loaned money to the City.  The financial creditors had

both the opportunity to conduct due diligence and a choice with respect to whether

and how much to invest in the City.  Pensioners simply were not in the same

"position to know of the debtor's financial condition and the risks involved" when

they became creditors of the City, nor did they make knowing investment choices.

Id.  Thus, because creditors can be charged with the level of risk they knowingly

assumed, the average City pensioner may be treated more favorably than the

average bondholder without such discrepancy being deemed "unfair."

### (d) Personal Hardship

73.     The reasonable basis underlying the Plan's treatment of

Pension Claims is further demonstrated by the personal hardship that pensioners

will endure should the Plan further impair their pension benefits.  Unlike

institutional bondholders and their insurers, pensioners rely on payments from the

City for their most basic day-to-day needs.  Just as the Second Circuit recognized

with workers' compensation in Chateaugay, it is significant here that pension

benefits are, for many of the City's retirees, their "only form of wage

replacement."  89 F.3d at 949.  In light of that consideration, the marginal harm

that will result from each dollar of pension cuts is far greater than the harm that

will result from each dollar of cuts imposed on bondholders.

74.     Thus, for all these reasons, there is a reasonable basis for the

Plan's preferred treatment of Pension Claims, and the first <u>Aztec</u> factor is satisfied.

**2.     *It Would Be Practically Impossible
         to Confirm a Workable Plan Without
         Discriminating Among Unsecured Creditors***

75.     Under the second <u>Aztec</u> factor — whether the debtor can

confirm and consummate a plan without the discrimination — courts consider

"whether the debtor could carry out a plan that does not so discriminate." <u>Graphic

Commc'ns</u>, 200 B.R. at 148.  Because it is theoretically possible for a debtor to

craft a plan that does not discriminate at all,[28] courts apply this second <u>Aztec</u>

factor by gauging the *practical* necessity of a plan's differential treatment, not its

theoretical necessity.  For example, one court has reformulated this factor to

consider "the degree to which the debtor can confirm a plan without such

discrimination."  <u>In re Babcock & Wilcox Co.</u>, No. 00-10992, 2004 WL 4945985,

at *11 (Bankr. E.D. La. Nov. 9, 2004) (citing <u>Aztec</u>, 107 B.R. at 590), <u>vacated

pursuant to subsequent settlement agreement</u>, No. 05-232, 2005 WL 4982364

(E.D. La. Dec. 28, 2005).

76.     This formulation acknowledges that, although it might be

theoretically possible to confirm a plan without discriminating among creditors, a

---

[28]     <u>See</u> Markell, <u>A New Perspective</u>, 72 Am. Bankr. L.J. at 254 ("Any
         nonindividual Chapter 11 case theoretically is capable of confirmation
         through plans which do not discriminate.").

court need not insist on that approach if it would create unreasonable difficulties

for the debtor. Courts have recognized that "simply because the reorganization

may be possible without the proposed discrimination does not necessarily render

the [p]lan unfairly discriminatory." In re Sea Trail Corp., No. 11-07370,

2012 WL 5247175, at *10 (Bankr. E.D.N.C. Oct. 23, 2012). "If a plan proponent

can produce evidence demonstrating that different treatment between similarly

situated, albeit unalike, creditors results in more equitable treatment for those

creditors ... a plan should not automatically become unfairly discriminatory

because a reorganization without the discrimination may theoretically be

possible." Id.

77.     Here, the City's preferential treatment of Pension Claims

reflects the serious difficulties inherent in confirming and implementing a plan

without such a preference. The City's recovery will turn in large part on its ability

to marshal the support of its residents in general and its retirees, employees and

their labor unions in particular. As the Court is aware, the City's treatment of

pension claims in bankruptcy has been a flash point of disagreement between the

City and these constituencies. Also as the Court is aware, this is an unprecedented

case with an unprecedented level of opposition to every restructuring proposal that

the City initially made; it would be a practical impossibility to confirm a plan

without settling with some major groups. Settling with holders of Pension

Claims, in particular, is logical and reasonable for all of the reasons discussed above.

78.     By providing holders of Pension Claims with a greater recovery that is still consistent with the terms and spirit of the Bankruptcy Code, the City (a) has garnered support for the Plan from several major creditor constituencies and (b) will ease some of these tensions and take a significant step toward its recovery.  It is, thus, evident that the City could not "carry out a plan that does not so discriminate" and that the second <u>Aztec</u> factor is, therefore, satisfied.

### 3.     *<u>The City Proposed Its Differential Treatment in Good Faith</u>*

79.     The City likewise satisfies the third <u>Aztec</u> factor because the discrimination is proposed in good faith.  To assess good faith for purposes of section 1129(b)(1) of the Bankruptcy Code, courts ask whether the decision to treat some claims better than others stems from animus rather than from legitimate, objective differences between the claimants.[29]  <u>Graphic Communications</u> is instructive on this point.  There, the debtor and the disfavored creditor (Midwest Communications) had a "falling out" as potential joint venturers.  200 B.R. at 145.  After that, the debtor converted Midwest's telephone

---

[29]     The cases cited by Syncora on the issue of "good faith" are inapposite and should be disregarded, as they involved "good faith" in the context of eligibility and the best interests of creditors test.  <u>See</u> Syncora Objection, at ¶ 58.

number and appropriated its business, and the debtor's principal spent 15 years trying to avoid repayment of a loan from Midwest that he may have fraudulently induced in the first place. See id. at 149. In the court's view, the disparate treatment of Midwest's claims — a 10% recovery, as compared to 100% for other unsecured trade creditors — reflected "personal animosity" and "antipathy" and was, therefore, impermissible. Id.; see also, e.g., In re Baugh, 73 B.R. 414, 417 (Bankr. E.D. Ark. 1987) (differential treatment prohibited where it was based on the debtor's "obvious antipathy" to the creditor in question).

80.     Here, the City's proposal was not motivated by ill will against its non-pensioner unsecured creditors. Quite the opposite. The Plan's treatment of Pension Claims is a result of (a) recognition of the objective criteria discussed above (e.g., employee and retiree relations; the settlement of litigation; the creditors' varying expectations; and personal hardship); and (b) mediation that included extensive, intensive, good faith, arms' length bargaining. Thus, the City's preferential treatment of Pension Claims was not motivated by antipathy toward other unsecured creditors. As a result, it is proposed in good faith, and the third Aztec factor is satisfied.

### 4.     The Plan Treats Other Unsecured Creditors as Well as Possible Under the Circumstances

81.     The fourth Aztec factor considers the treatment of the classes asserting that discrimination in a plan is unfair. In connection with this inquiry,

courts examine the magnitude of the difference in recoveries and the extent to which the objecting creditor recovers at all.  With regard to the former, courts generally reject "grossly disparate" recoveries while routinely accepting non-material differences without further scrutiny.  See In re Tribune Co., 472 B.R. 223, 243 (Bankr. D. Del. 2012) (considering "grossly disparate" treatment to be a differential of "50% or more" and cataloging cases in which courts upheld differences of 0.53% and 4% but rejected differences of 50%, 80% and 100%).

82.     Here, estimated recoveries for Classes 10 and 11 are 39% and 48%, respectively, when properly excluding the distributions to be made outside of the Plan, as discussed above at paragraphs 51-56.  As noted above, these recoveries may be overstated, where the Pension Claims may be understated due to the use of a 6.75% discount rate to value the liabilities and when factoring in the combined effect of the overlapping OPEB (Class 12) recovery.  Estimated recoveries for Classes 7, 12, 13 and 14 are between 10% and 13%.[30]  Estimated recoveries for Class 9 (Disputed COP Claims) are between 0% and 10%.

---

[30]     If all of the COP Claims are allowed, it is estimated that Classes 7, 9, 12, 13 and 14 all will receive approximately 10% recoveries.  If all of the COP Claims are disallowed, as the City believes they will and should be, Class 9 will receive no recovery and Classes 7, 12, 13 and 14 may receive as much as a 13% recovery.

83.     The difference between the recoveries on the Pension Claims and the recoveries on the claims in Classes 7, 12, 13 and 14 — between 26% and 35% (or approximately 11% when considering that recoveries for Classes 10, 11 and 12 as a whole are approximately 24%) — falls within the bounds of reasonableness and is not "grossly disparate."  There is a large gap between what is *clearly* "grossly disparate" (generally, greater than a 50% differential) and what is *clearly* immaterial (generally, less than a 4% differential).  For the myriad reasons discussed at length above, the City submits that, (a) under the circumstances, a differential of between 26% and 35% is (i) reasonable and (ii) not grossly disparate, particularly in light of the differences between the relevant claims identified above, and (b) the difference can and should be approved under the <u>Aztec</u> test.  With respect to the ultimate recovery for holders of unsecured claims in Classes 7, 9, 12, 13 and 14, the City has provided these creditors with a sufficient recovery to defeat their claim of discrimination given the circumstances.  Accordingly, the Plan's treatment of Pension Claims is fair and reasonable, clearly satisfies the <u>Aztec</u> test and should be approved.

**D.     <u>The Markell Rebuttable Presumption Does Not Arise in This Case</u>**

84.     Several Objecting Parties effectively assume that the Markell presumption arises in connection with the Plan's treatment of unsecured creditors

13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 12:10:59   Page 71 of 256

classes and then argue that, because the City cannot rebut the presumption, the

Plan unfairly discriminates and cannot be confirmed.[31]  This argument fails.

### 1. The Markell Test is Unduly Restrictive and Should Not Be Utilized in this Case

85.    The United States Court of Appeals for the Sixth Circuit has

not adopted any particular test for determining whether discrimination is unfair

under section 1129(b)(1) of the Bankruptcy Code, and this Court is not bound by

the decisions of other bankruptcy courts within this district.[32]  Thus, it is of no

consequence here that the bankruptcy court in Dow Corning applied the Markell

test in determining whether the chapter 11 plan at issue there unfairly

discriminated.  See Dow Corning, 244 B.R. at 702-05.  Moreover, the Markell test

has been criticized — even in the chapter 11 context where it originated — as

being unduly restrictive and potentially prohibiting differential treatment that is

fair.  E.g., In re Deming Hospitality, LLC, No. 11-12-13377, 2013 WL 1397458,

at *6 (Bankr. D.N.M. Apr. 5, 2013) (stating that "Judge Markell's 'rebuttable

presumption' test … seems restrictive, and could exclude treatment that is fair").

---

[31]    See FGIC Objection, at ¶¶ 19-27; COPs Objection, at ¶¶ 13-23; Ambac Objection, at 45-52; Syncora Objection, at ¶¶ 29-53; Macomb County Objection, at ¶¶ 40-42.

[32]    See, e.g., Shapiro v. VPA, P.C. (In re Valley X-Ray Co.), 360 B.R. 254, 260 (E.D. Mich. 2007) ("There appears to be no binding precedent on this Court, as the only decision within the Sixth Circuit I have found addressing this issue is from the Bankruptcy Court in our District.").

86.     Whatever value the Markell test may have in the typical commercial context of chapter 11, it is ill-suited for chapter 9 because it is too narrow to accommodate all of the concerns relevant in a municipal insolvency. See ¶¶ 43-45, *supra*.  Indeed, there appear to be no published chapter 9 opinions in which a court adopted the Markell test.  Unlike a chapter 11 plan, a chapter 9 plan must address the general social welfare and the provision of essential services to residents.  Evaluation of a chapter 9 plan also must recognize that a municipality, unlike a commercial debtor, cannot simply liquidate and cease to exist — it must restructure in a manner that permits it to protect the health, safety and welfare of its residents.

87.     As discussed above, preferential treatment of Pension Claims is necessary and appropriate to motivate the City's employees and their unions to aid in the City's revitalization.  Without workforce support, the City will be unable to provide essential services, protect the welfare of its residents, and succeed as a City by retaining existing and attracting new residents and businesses. Preferential treatment of Pension Claims also is in recognition of the personal hardship that will befall pensioners, many of whom are also residents of the City, if their Pension Claims are further impaired under the Plan.  This hardship — if severe enough — can also strain City resources by causing City social service costs to rise.

88.     Considerations such as these are highly relevant to the question of whether it is "fair" to treat the claims of pensioners differently from those of other unsecured creditors.  The Markell test, however, leaves no room for such considerations.  As such, this Court's unfair discrimination analysis should not — and need not — rise and fall with Markell.  Rather, the Court should heed the Seventh Circuit's advice and "seek a result that is reasonable in light of the purposes of the relevant law," which in this case is chapter 9.[33]

**2.      *The Plan's Treatment of Unsecured Claims Does Not Give Rise to the Markell Presumption of Unfair Discrimination***

89.     Even if the Court were to apply the Markell test, the Plan's treatment of unsecured claims does not give rise to the "rebuttable presumption" of unfair discrimination.  As such, the City need not rebut any such presumption here.  Under the Markell test, as set forth above:

> [A] rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of

---

[33]     Crawford, 324 F.3d at 542 (unable "to think of a good test" for unfair discrimination itself, the Seventh Circuit concluded "that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law").

materially greater risk to the dissenting class in connection with its proposed distribution.

Dow Corning, 244 B.R. at 710.

### (a) The Differential in Percentage Recovery Is Not Material

90.    Here, the differential between the percentage recovery on Pension Claims and the percentage recovery on other unsecured claims (26%-35%, or less when considering (a) the pensioners' severe loss of healthcare benefits reflected in their Class 12 recovery and (b) that the Pension Claims may be overstated due to the calculation of their value using a 6.75% discount rate for liabilities) is not material and the presumption of unfair discrimination does not, therefore, arise.  This point was made by Professor Markell himself, who gave the following example of when the differential between percentage recoveries for two classes having the same priority is "material" under his test:

> If, for example, a plan gave an assenting class of trade creditors consideration, measured in terms of present value, equal to *ninety percent* of their claims, while giving a dissenting class of bank deficiency claims consideration worth only *five percent*, unfairness would presumptively exist.

Markell, A New Perspective, 72 Am. Bankr. L.J. at 249 (emphasis added).

Professor Markell, thus, chose to use a differential of *85%* to demonstrate what should be considered "material" for purposes of determining whether unfairness presumptively exists.

91.     Even if Professor Markell's example does not definitively

answer the question of what is "material," case law seems to revolve around the

50% differential mark.  That is, where the difference in recovery is 50% or more,

courts tend to find the treatment to be "grossly disparate," such that it becomes

increasingly difficult for the plan proponent to demonstrate that the discrimination

is "fair."[34]  Notwithstanding the foregoing, differentials in excess of 50% *have*

been approved as *not* constituting unfair discrimination.  See, e.g., Creekstone,

168 B.R. at 644-45 (plan that provided a 10% recovery on a deficiency claim and

a 100% recovery to trade creditors (a 90% differential) did not unfairly

discriminate); Kliegl Bros., 149 B.R. at 309 (plan that provided a 75% recovery

on the union's general unsecured claim and a 15% recovery on other general

unsecured claims (a 60% differential) did not unfairly discriminate).

92.     Applying these principles, it is clear that the differential

treatment afforded to non-pension unsecured claims under the Plan is not

materially worse than the treatment of Pension Claims.  Therefore, the Markell

presumption does not arise.  This is especially true in light of the City's various

---

[34]     See Deming Hospitality, 2013 WL 1397458, at *5 (stating that "[r]egardless
of the standard used to determine unfair discrimination, courts agree that if
the treatment of substantially similar claims is 'grossly disparate,' it is very
difficult for the plan proponent to show 'fair' discrimination" and cataloguing
cases in which courts rejected differences in excess of 50%); see also
Tribune Co., 472 B.R. at 243 (considering "grossly disparate" treatment to
be a differential of "50% or more").

-56-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 76 of 256

legitimate and reasonable justifications for the disparate treatment, discussed in detail above, which the Court should consider in this evaluation.

### (b) All Unsecured Classes Face Equal Risk with Respect to Distributions

93.     The Plan also does not allocate materially greater risk to the non-pension unsecured creditor classes with respect to distributions.  As a result, no presumption of unfair discrimination arises under the "materially greater risk" prong of the Markell test.

94.     Proposed distributions to *all* unsecured creditor classes at issue carry with them a certain a degree of risk.  As explained above, distributions to holders of Pension Claims from the DIA Funding Parties and the State are properly excluded from the unfair discrimination analysis.[35]  The ***City's*** proposed distributions on account of Pension Claims — i.e., the distributions that should be considered for these purposes — are to be made from the City's future revenues over a long period of time (decades).  See Disclosure Statement at 19, 22 (explaining that beginning on and after July 1, 2023, the City will make the necessary contributions to GRS and PFRS from its future tax revenues and/or available cash).  Precisely the same is true for the City's proposed distributions to creditors entitled to receive New B Notes (i.e., holders of non-pension unsecured

---

[35]     In any event, the funds from the DIA Settlement will come in over a 20-year period.  See Plan at §§ II.B.3.q.ii.A, II.B.3.r.ii.A.

claims), as conceded by at least one Objecting Party.[36] Moreover, to the extent that the funding from the DIA Funding Parties is not received, the Plan does not require the City to contribute the amounts promised by these parties.[37]

95.     Thus, the Plan does not allocate materially greater risk to the non-pension unsecured creditor classes in connection with its proposed distributions, and any Objections to the contrary[38] should be overruled.

96.     As set forth above, the Plan's treatment of unsecured claims (a) does not result in a materially lower percentage recovery for non-pension unsecured claims and (b) does not allocate materially greater risk in connection with distributions on non-pension unsecured claims. Thus, the Plan's treatment of unsecured claims does not give rise to a presumption of unfair discrimination, and the City need not rebut any such presumption here.

97.     Even if a presumption of unfair discrimination did arise, the City is able to rebut the presumption. As noted above, a debtor can rebut the presumption by showing *either* (a) that "outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, *or* [(b)] that the alleged preferred class had infused new value into the

---

[36]     See COPs Objection, at ¶ 22.

[37]     See Disclosure Statement, at 19, 22 ("If the Outside Funding is not paid as promised, the Plan does not require the City to make up these amounts.").

[38]     See COPs Objection, at ¶¶ 16-19, FGIC Objection, at ¶ 23; Syncora Objection, at ¶¶ 35-45.

reorganization which offset its gain." In re Dow Corning Corp., 244 B.R. at 702.

"In either case — disparity of recovery or disparity of risk — the plan proponent

can rebut the presumption of unfairness by proving that the difference in treatment

is attributable to differences in the prepetition status of the creditors."  Markell,

A New Perspective, 72 Am. Bankr. L.J. at 250.

98.     Here, the difference in treatment is attributable to differences

in the prepetition protections afforded to the holders of Pension Claims.  Before

the commencement of this case, the liabilities underlying the Pension Claims were

protected by the Pensions Clause.  Outside of bankruptcy, those with

constitutionally protected claims conceivably could receive more than those

without such protections.  These differences sufficiently rebut any presumption of

unfair discrimination that might arise in this case.

*  *  *  *  *

99.     In sum, Congress instructed bankruptcy courts to ensure that a

chapter 9 debtor's cramdown plan does not "discriminate unfairly" against an

impaired class of nonconsenting claims.  11 U.S.C. § 1129(b)(1).  Applying any

plausible approach to that broad, equitable standard, the answer here is clear:  the

City's Plan does not discriminate unfairly.  Under the Plan, the City seeks to foster

stable ongoing relationships with its vital constituencies, many of whom will

actually have to implement the City's revitalization plan; settles ongoing and

-59-

13-53846-swr   Doc 8045   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 79 of 256
13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 12:11:49   Page 79 of 256

prospective litigation; recognizes the varying prepetition expectations of, and

opportunities afforded to, its various unsecured creditor constituencies; recognizes

the extreme personal hardships faced by many individual pensioners; and

proposes a comprehensive resolution that is likely to be enforceable and

sustainable after the City exits bankruptcy. The result is non-material

discrimination that is fair and reasonable in light of the purposes of the relevant

law and should be approved.

### E. The Plan Does Not Discriminate Unfairly Among Secured Creditors

100. Two Objecting Parties argue that the Plan unfairly

discriminates against Impaired classes of DWSD Bond Claims (Class 1A).

See NPFG Objection, at ¶¶ 51-58; Assured Objection, at ¶¶ 105-114. These

parties argue that: (a) there will be dissenting classes of Impaired DWSD Bond

Claims; and (b) classes of the same priority (namely, Unimpaired classes of

DWSD Bond Claims and Classes 2A-2F) will receive a materially greater

recovery, resulting in unfair discrimination against non-consenting holders of

Impaired DWSD Bond Claims. These arguments must be rejected.

101. Under the Plan, all secured claims (except for COP Swap

Claims, which have consented to different treatment) are receiving a recovery of

100% of the principal amount of their claim. The only possible difference

between the treatment of Impaired DWSD Bond Claims and Unimpaired DWSD

-60-

13-53846-swr    Doc 8065    Filed 05/76/14    Entered 05/76/14 22:10:59    Page 80 of 256
13-53846-swr    Doc 8034    Filed 05/26/14    Entered 05/26/14 22:10:59    Page 80 of 256

Bond Claims in terms of *recovery* (which is the focus of the unfair discrimination analysis) results from the proposed new market interest rate for the Impaired bonds. Unimpaired classes have their bonds Reinstated, while Impaired classes receive either (a) new bonds with a lower interest rate, with call protection, or (b) new bonds with the same interest rate as before, without call protection. See Plan at § II.B.3.a.ii.B. Any difference in recovery resulting from the different interest rates and call provisions is minimal, and, if discriminatory at all, certainly does not rise to the level of unfair discrimination.

102. The argument that the Plan's treatment of Classes 2A-2F results in unfair discrimination against non-consenting holders of Impaired DWSD Bond Claims also fails. Holders of DWSD Bond Claims are not similarly situated to holders of claims in Classes 2A-2F in the sense required for purposes of section 1129(b)(1) of the Bankruptcy Code because their claims are secured by different collateral, and their rights are established by different statutes and contractual arrangements.[39] In any event, as previously stated, all claims in

---

[39] See In re Riddle, 444 B.R. 681, 686 (Bank. N.D. Ga. 2011) ("Th[e prohibition on unfair discrimination] has little, if any, significance in the context of a secured claim. Because each secured creditor has collateral, repayment terms, and other rights that are unique to it, proper classification in a [] plan requires a separate class for each secured claim. The propriety of the treatment of a secured claim is not generally determined by reference to the treatment of other secured claims. Nothing requires that a plan provide treatment for every secured claim with the same maturity date, rate of interest, payment schedule, or any other term."); In re Am. Trailer & Storage,

Classes 1A and 2A through 2F are receiving a 100% recovery on their claims, such that any unfair discrimination argument fails.

## III.     THE PLAN IS FAIR AND EQUITABLE AND IN THE BEST INTERESTS OF CREDITORS (11 U.S.C. §§ 943(b)(7), 1129(b))

### A.     In Chapter 9, the Best Interests of Creditors and Fair and Equitable Tests Overlap Significantly

103.     Section 943(b) of the Bankruptcy Code requires a bankruptcy court to confirm a chapter 9 plan if, among other things, "the plan is in the best interests of creditors …."  11 U.S.C. § 943(b)(7).  In the context of a chapter 9 case, the best interests of creditors test "has been described as a 'floor, requiring a reasonable effort at payment of creditors by the municipal debtor.'"  In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quoting In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999)).

104.     The best interests of creditors test "simply requires the Court to make a determination of whether or not the plan as proposed is better than the

_____

(continued…)

Inc., 419 B.R. 412, 443 (Bankr. W.D. Mo. 2009) (stating in the context of the court's unfair discrimination analysis that "[u]nlike unsecured claims, each and every secured claim may be treated differently.  The Court in In re Buttonwood Partners stated:  'Unlike unsecured claims, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if secured by the same collateral. This fact leads to the permissibility of individualized treatment based on the particularities of each secured claim.'") (quoting In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)).

alternatives." <u>In re Sanitary & Improvement Dist., No. 7</u>, 98 B.R. 970, 974

(Bankr. D. Neb. 1989). "This is often easy to establish. Since creditors cannot

propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and

cannot force sale of municipal assets under state law, their only alternative to a

debtor's plan is dismissal." <u>Mount Carbon</u>, 242 B.R. at 34. Consequently, courts

apply the best interests of creditors test "to require a reasonable effort by the

municipal debtor that is a better alternative to the creditors than dismissal of the

case." <u>Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange)</u>,

191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 <u>Collier on Bankruptcy</u>

¶ 943.03[7] (15th ed.)).

105. In a cramdown scenario, section 1129(b)(1) of the Bankruptcy

Code requires a bankruptcy court to confirm a chapter 9 plan if the plan is, among

other things, fair and equitable with respect to each dissenting class.[40]

Section 1129(b)(2)(B) of the Bankruptcy Code — the codification of the so-called

"absolute priority rule" — provides that, for a plan to be fair and equitable,

unsecured creditors may receive less than the value of their claims as of the

effective date of a plan only if no class of junior claims or interests receives any

distribution on account of the claims therein. 11 U.S.C. § 1129(b)(2)(B).

---

[40]   <u>See</u> 11 U.S.C. § 1129(b)(1) (providing that, where not all impaired classes have accepted the plan, "the court, on request of the proponent of the plan, shall confirm the plan … if the plan … is fair and equitable …"); <u>see</u> <u>also</u> 11 U.S.C. § 901(a) (making section 1129(b)(1) applicable in chapter 9).

106.    Application of the absolute priority rule to unsecured creditors of a municipal debtor generally is not possible because, in chapter 9, there can be no junior class of equity interests — the class most commonly prevented from receiving or retaining property by the application of the absolute priority rule. See Corcoran Hosp. Dist., 233 B.R. at 458 (holding that the proposed chapter 9 plan did not implicate the absolute priority rule because there were no holders of equity interests in the debtor hospital).  Some Bankruptcy Act-era decisions, therefore, suggested that the requirement that a plan be fair and equitable as to unsecured creditors of a municipal debtor is satisfied where creditors receive "all that they can reasonably expect in the circumstances."  See, e.g., Lorber v. Vista Irr. Dist., 127 F.2d 628, 639 (9th Cir. 1942) (collecting cases).

107.    Several Objecting Parties acknowledge either expressly or tacitly that the chapter 9 tests of whether (a) the debtor has made a reasonable effort in its plan to provide creditors with a better alternative than they would possess if the case were dismissed (i.e., the best interests of creditors test) and (b) whether the plan provides creditors with all they can reasonably expect under the circumstances (i.e., the fair and equitable test) converge and largely involve the same inquiry.[41]  Solely for the purpose of avoiding repetitious argument,

---

[41]     See, e.g., Syncora Objection, at n.9 (noting that elements of the best interests of creditors test is substantially subsumed within the fair and equitable test); Ambac Objection, at n.21 (noting that the Objecting Party addresses the best

therefore, the City — like many of the Objecting Parties — will address these concepts together where appropriate.

**B.      The Goal of Chapter 9 Is Not the
         <u>Unconditional Maximization of Creditor Recoveries</u>**

108.    At the heart of many of the Objecting Parties' arguments that the Plan fails to satisfy the best interests of creditors or fair and equitable tests lies the notion that the City is required to maximize creditor recoveries (and at almost any price).[42]  These Objecting Parties argue that the City must increase tax revenues and monetize "non-core" assets to the maximum extent possible to satisfy the claims of creditors.[43]  The Objecting Parties overstate the holdings of several cases and ignore key principles of municipal bankruptcy law.

---

(continued…)

> interests of creditors and fair and equitable tests interchangeably); COPs Objection, at ¶¶ 24-37 (combining the Objecting Party's best interests of creditors and fair and equitable arguments); NPFGC Objection, at ¶ 59 (recognizing that the fair and equitable test is similar to the best interests of creditors test); FGIC Objection, at ¶ 29 (cross-referencing the Objecting Party's best interests of creditors argument in its fair and equitable argument).

[42]    <u>See</u>, <u>e.g.</u>, FGIC Objection, at ¶ 8 (arguing that "a chapter 9 plan must maximize the value of the municipality's assets to enhance creditor recoveries"); Ambac Objection, at 56 (arguing that the City must provide unsecured creditors with the "greatest return possible under the circumstances"); Syncora Objection, at ¶ 62 (arguing that the Plan is not fair and equitable because it does not provide for the maximization of creditor recoveries).

[43]    <u>See</u>, <u>e.g.</u>, Ambac Objection, at 56-62 (arguing that the City must increase taxation and tax collection and monetize assets that are not "necessary for the provision of public services"); Syncora Objection, at ¶¶ 61-72 (arguing

-65-

13-53846-swr   Doc 8054   Filed 10/26/14   Entered 10/26/14 22:10:59   Page 85 of 256
13-53846-tjt   Doc 8054   Filed 10/26/14   Entered 10/26/14 22:10:59   Page 85 of 256

109.     It is appropriate for the Court to consider the City's ability to satisfy the claims of its creditors in determining whether the Plan is fair and equitable and satisfies the best interests of creditors test.  A plan has failed these tests, for example, where a municipal irrigation district conducted a lavish renovation and expansion of its key assets and then sought to exploit the bankruptcy process to impose the cost of this unnecessary work on bondholders, without offering any evidence that taxpayers cannot shoulder some or all of the burden.  See Fano v. Newport Heights Irr. Dist., 114 F.2d 563, 566 (9th Cir. 1940) (discussed below).

110.     Although it is clear that provision for creditor recoveries in chapter 9 must be more than a mere afterthought, it must equally be accepted that an overarching goal of chapter 9 — and the City's chapter 9 case in particular — is to relieve City residents from the effects of declining services and spiraling taxation caused by the City's crippling debt.  To hold otherwise would be to place creditor recoveries over the health, safety and welfare of the City's residents, which would be antithetical to the purposes of chapter 9.  See Mount Carbon, 242 B.R. at 41 (holding that a chapter 9 plan was not proposed in good faith and

_____

(continued…)

that the Plan is not fair and equitable because it fails to provide for the maximum monetization of "non-core" assets and operational cost reductions); FGIC Objection, at ¶¶ 10-16 (arguing that the City must maximize the value of the DIA Assets and City-owned real estate).

-66-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 86 of 256
13-53846-swr   Doc 8034   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 86 of 256

was not feasible because it provided for the satisfaction of debt over the provision of governmental services; stating that the legislative purpose underlying chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services").[44]

111.    Unlike the debtors in many of the reported chapter 9 cases, the City is no minor special purpose district with limited governmental obligations. The City is a major metropolis, responsible for the health and safety of all of the people, businesses and property within its jurisdictional limits, including its almost 700,000 residents.  <u>See</u> Detroit City Charter (the "<u>City Charter</u>"), Preamble and Declaration of Rights.  The City Charter requires the City to provide — and affords residents the right to receive — myriad municipal services, including: "decent housing; job opportunities; reliable, convenient and comfortable transportation; recreational facilities and activities; cultural enrichment, including libraries and art and historical museums; clean air and waterways, safe drinking water and a sanitary, environmentally sound [C]ity."  <u>Id.</u>  The City also bears responsibility for the safety of thousands of visitors to the City, including

---

[44]     <u>See also</u> <u>In re Barnwell Cnty. Hosp.</u>, 459 B.R. 903, 907 (Bankr. D.S.C. 2011) ("The purpose of chapter 9 is to allow municipalities the opportunity to remain in existence through debt adjustment and obtain temporary relief from creditors."); <u>In re Addison Cmty. Hosp. Auth.</u>, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) (same); <u>New Magma Irr. & Drainage Dist. v. Bd. of Supervisors (In re New Magma Irr. & Drainage Dist.)</u>, 193 B.R. 528, 532 (Bankr. D. Ariz. 1994) (stating that the ultimate purpose of chapter 9 is to beneficially affect the debtor's "citizens").

numerous employees of the City and local businesses who happen to live in surrounding communities.

112. That the City is unable to provide these services is a matter of record with this Court. This Court already has determined, for example, that, as of the Petition Date, the City was, and would remain, "service delivery insolvent" in addition to being unable to pay its debts as they come due. In re City of Detroit, 504 B.R. 97, 189 (Bankr. E.D. Mich. 2013).

> Most powerfully, however, the testimony of Chief Craig established that the City was in a state of "service delivery insolvency" as of July 18, 2013, and will continue to be for the foreseeable future. He testified that the conditions in the local precincts were "deplorable." "If I just might summarize it in a very short way, that everything is broken, deplorable conditions, crime is extremely high, morale is low, the absence of leadership." He described the City as "extremely violent," based on the high rate of violent crime and the low rate of "clearance" of violent crimes. He stated that the officers' low morale is due, at least in part, to "the fact that they had lost ten percent pay; that they were forced into a 12-hour work schedule," and because there was an inadequate number of patrolling officers, and their facilities, equipment and vehicles were in various states of disrepair and obsolescence.

Id. at 169 (citations omitted).

113. The deplorable conditions in the City and the substantial reinvestment necessary to set the City on a path toward a brighter future for its residents dominates any analysis of whether the Plan (a) makes a reasonable effort

-68-

13-53846-swr   Doc 8654   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 88 of 256
13-53846-swr   Doc 8054   Filed 05/26/14   Entered 05/26/14 22:10:59   Page 88 of 256

at payment of creditors' claims and (b) provides creditors with what they reasonably should expect in the circumstances. City residents are not stockholders whose equity interests can be stripped in a corporate restructuring. Rather, their ongoing participation in the structure of the City — as job creators, employees, taxpayers or in other roles — is crucial to the future recovery of the City and the long term interests of all of the City's stakeholders.

114. In this context, the relevant legal authority does not require the City to subject Detroiters to even higher taxes, further cuts in services or the liquidation of City assets. Moreover, in the City's case, any such requirement would place undue emphasis on maximizing creditor recoveries over the remedial function of chapter 9 and would undermine a primary function of municipal bankruptcy relief — i.e., the adjustment of debts to ensure viability of the City.

### 1. *The City Cannot be Compelled to Sell Assets*

115. It is well accepted that a chapter 9 debtor cannot be compelled to liquidate assets. See Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs), 339 F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for conversion of the case to another chapter or for an

involuntary liquidation of any of the debtor's assets.") (quoting Richmond Sch. Dist., 133 B.R. at 225).[45]

116.    No Objecting Party cites to *any* case law holding that a chapter 9 debtor can be compelled to sell any or all of its assets for any purpose, including to satisfy the fair and equitable or best interests of creditors tests. In pursuit of their argument that the City must maximize the value of its assets for the benefit of its creditors, however, the Objecting Parties argue, without support, that the City is required to sell certain "non-core" assets to satisfy creditors' claims.[46]

117.    The absence of authority in support of the Objecting Parties' position is to be expected.  Section 904 of the Bankruptcy Code prohibits the Court from interfering with, among other things, the property and revenues of the City or its use and enjoyment of income-producing property.[47]  By expressly limiting the authority of the bankruptcy court to interfere with a municipality's

---

[45]    See also Newhouse v. Corcoran Irr. Dist., 114 F.2d 690, 691 (9th Cir. 1940) (stating that the debtor's property "cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor"); Lorber, 143 F.2d at 637 (same).

[46]    See, e.g., Ambac Objection, at 56-62; COPs Objection, at ¶¶ 37-44; Syncora Objection, at ¶¶ 61-72.

[47]    See 11 U.S.C. § 904 (providing that "[n]otwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not … interfere with … any of the property or revenues of the debtor; or … the debtor's use or enjoyment of any income-producing property").

assets, section 904 of the Bankruptcy Code protects the constitutionality of

chapter 9 under the Tenth Amendment.

> The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted. The taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation. No involuntary proceedings are allowable, and no control or jurisdiction over that property and those revenues of the petitioning agency necessary for essential governmental purposes is conferred by the bill ….

H.R. Rep. No. 95-595, at 264 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6222;

see also United States v. Bekins, 304 U.S. 27, 51 (1938) (expressing approval of

the foregoing statements of the Committee on of the Judiciary of the House of

Representatives in upholding the constitutionality of Chapter X of the Bankruptcy

Act under the Tenth Amendment to the United States Constitution).

118.   Moreover, since Bekins, Congress further narrowed the power

of bankruptcy courts to interfere with a municipal debtor's assets by, in 1975,

removing from their discretion the determination of whether or not the assets are

"necessary for essential governmental services." See H.R. Rep. No. 94-686, at 18

(1975), reprinted in 1976 U.S.C.C.A.N. 539, 556.  The Objecting Parties may not

achieve through the plan confirmation process that which is expressly prohibited

on constitutional grounds under section 904 of the Bankruptcy Code.

### (a)    The Touted Core/Non-Core Distinction is Illusory

119.   None of the Objecting Parties cite to any authority in support of the distinction they attempt to draw between:  (a) "non-core" assets, which — the Objecting Parties contend — the City must sell to enhance recoveries for its creditors and satisfy the fair and equitable and best interests of creditors tests; and (b) "core" assets, which, presumably, even the Objecting Parties concede cannot be liquidated for the benefit of creditors under any circumstances.  The City is aware of no such authority.  In fact, this distinction appears to have been created by the Objecting Parties in an effort to extend their maximization of recovery arguments to the liquidation of municipal assets while retaining a gloss of reasonableness.

120.   Even if such a distinction existed in the case law (which it does not), the property that the Objecting Parties demand that the City liquidates, including for example the DIA Assets, City-owned land and the DWSD, must be considered core to the services provided by the City.  <u>See</u> City Charter, Preamble and Declaration of Rights (listing among the fundamental rights of City residents: decent housing, recreational facilities and activities; the provision of libraries and art and historical museums; clean air and waterways; safe drinking water; and a sanitary, environmentally sound City).  As such, even under the Objecting Parties' groundless argument that the fair and equitable and best interests of creditors tests

13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 92 of 256

may require the liquidation of non-core assets, the City cannot be forced to monetize the assets identified by the Objecting Parties as a condition of confirmation of the Plan.[48]

121.    Moreover, <u>Fano</u> clearly is factually distinguishable.  In <u>Fano</u>, the debtor first incurred its bond liabilities and then, subsequently, completed the unnecessary and extravagant renovations that rendered it insolvent.  <u>Fano</u>, 114 F.2d at 565.  Here, the City's acquisition of the vast majority of the DIA Assets occurred long before it incurred its massive debt load, and, unlike <u>Fano</u>, no Objecting Party even attempts the argument that the City's acquisition of the DIA Assets caused the City's insolvency.

---

[48]    <u>See</u> M.C.L. § 600.6021(1) ("No execution may issue upon a judgment against [any city].").  Moreover, nothing in the relevant Bond Documents suggests that the parties intended or believed that these assets would be available for the satisfaction of related claims.  There is no evidence, for example, that the value of, or scope of the City's interest in, any of the assets that the Objecting Parties seek to compel the City to sell was the subject of due diligence prior to the applicable issuances.  Moreover, these interests were not reflected in the applicable offering circulars or on the City's books or balance sheet.  Nor is there any evidence that these assets were in any way exempted from the well-established prohibition upon private liens being granted upon public property.  <u>See</u>, <u>e.g.</u>, <u>Parker v. Klochko Equip. Rental Co.</u>, 590 F.2d 649, 653 (6th Cir. 1979) (interpreting Michigan law and noting that "it was, and is, well-understood and established that it is contrary to public policy to allow private liens on public property") (quotation marks omitted).

## 2.     *The Objecting Parties' Authority is Inapposite*

122.    None of the authority relied upon by the Objecting Parties in support of their argument that the City has an unconditional obligation to maximize recoveries for creditors stands for that proposition.  The Objecting Parties commonly cite to the legislative history of the Bankruptcy Code and, in particular, its approval of two Depression-era cases, Kelley v. Everglades Drainage District, 319 U.S. 415 (1943), and Fano, 114 F.2d 563.[49]

123.    Kelley and Fano both stand for the proposition, which the City acknowledges, that it is appropriate for the Court to consider the City's ability to levy additional taxes in considering whether the Plan should be confirmed. See Kelley, 319 U.S. at 420 (stating that, where creditor recoveries are to be sourced from tax revenues, the court should evaluate considered estimates of future tax revenues to determine the fairness of the plan); Fano, 114 F.2d at 566 (holding that the recoveries provided for under the debtor's plan were not equitable, fair or in the best interests of creditors because no evidence was provided that the debtor could not raise taxes to meet its obligations to its creditors).

---

[49]     See, e.g., Assured Objection, at ¶ 57 (citing 124 Cong. Rec. 11,100 (Sept. 28, 1978); 124 Cong. Rec. 17,417 (Oct 6, 1978)); COPs Objection, at ¶ 28 (same); FGIC Objection, at ¶ 8 (citing S. Rep. No. 95-989, at 113 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5899, and Fano).

-74-

124.   The Objecting Parties argue, however, that <u>Fano</u> supports their argument that the City has an unconditional obligation to maximize creditor recoveries.  This is <u>not</u> the case.  In fact, to the extent <u>Fano</u> is relevant to the City's circumstances, it supports the City's position that the Plan is fair and equitable and in the best interests of creditors.

125.   In <u>Fano</u>, an irrigation district was faced with necessary maintenance to its irrigation system at an estimated cost of $15,000.  <u>Id.</u> at 564. Instead of merely completing the required repairs, however, the debtor undertook an extravagant and unnecessary reconstruction and expansion of the entire irrigation system, including the construction of a new office building and other facilities.  <u>Id.</u> at 565.  The total cost of the project was $50,000, and the debtor paid for the improvements essentially on a cash basis through the diversion of tax revenues.  <u>Id.</u>  As of its petition date, the debtor had delinquent taxes receivable of only 5 percent.  <u>Id.</u>

126.   Following these events, the debtor filed a petition for relief under the Bankruptcy Act seeking approval of a plan for the composition of indebtedness that contemplated a reduction in principal of the debtor's bond obligations by $50,000.  <u>Fano</u>, 114 F.2d at 564.  The district court approved the debtor's plan over a bondholder's objection, and the bondholder appealed and

argued that the plan should not be confirmed because the debtor was not insolvent. Id.

127. The United States Court of Appeals for the Ninth Circuit reversed. Id. at 566. The Ninth Circuit agreed that the debtor arguably was insolvent as of the petition date in the sense that it was unable to pay its debts as they came due (according to the court's calculations, the debtor had a deficit of approximately $15,000 in its ability to make interest payments on its bonded debt as of the petition date). Id. at 565. The court concluded, however, that this deficit was the direct result of the unnecessary reconstruction work conducted by the debtor immediately prior to the petition date. Id. The court, therefore, held that the debtor was not insolvent as of the petition date because, on that date, it possessed: (a) valuable and unencumbered assets worth many times its total indebtedness, "all in most excellent physical and almost new condition"; and (b) the power to increase taxes sufficiently to pay the claims of bondholders. Fano, 114 F.2d at 565. Absent a showing that this taxing power was inadequate to pay the claims of creditors, the court was unable to find that the debtor's plan was fair, equitable or in the best interests of creditors. Id. at 566.

128. Pointedly, the court in Fano did not purport to require the debtor to liquidate any of its recently renovated assets, and nothing in the decision suggests that the City can be compelled to do so. In this regard, the Ninth

Circuit's decision in Fano must be read in conjunction with Newhouse,

114 F.2d 690, issued by the same court on the same day.  In Newhouse, the court

affirmed the holding below that a municipal debtor's plan was fair and equitable

and, with respect to the liquidation of assets, clarified that such assets were not

available to satisfy the claims of creditors.

> Throughout appellants' briefs the principle of ordinary or private bankruptcy that the assets of the bankrupt, including his property, must be effectively applied to the debts, is sought to be applied to the situation before us. The bankruptcy of a public entity, however, is very different from that of a private person or concern. The operative assets of an irrigation district and the value of the land of the District, of course, have their evidentiary value as to the amount of money the District can reasonably raise to meet its indebtedness. These elements of value are too affected by the incumbrances upon the land, which in this case appear to be very considerable. But such assets and such property within the District cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor.

Id. at 690-91.  In addition, the court affirmed the lower court's reasoning that the

debtor should not be compelled to levy additional taxes to satisfy the claims of

creditors, even if no statutory limit on taxation had been reached, where to do so

would impose a crushing burden on taxpayers.  See In re Corcoran Irr. Dist.,

27 F. Supp. 322, 326-27 (S.D. Cal. 1939), aff'd, Newhouse, 114 F.2d 690.

129.   Certain Objecting Parties also cite to Pierce in support of their

argument that the City has an unconditional obligation to maximize recoveries for

creditors and, therefore, to sell its assets as necessary.  See Syncora Objection,

at ¶ 70; Ambac Objection, at 54.  In Pierce, a non-profit housing authority filed a

chapter 9 petition for relief in the face of numerous litigation claims.  Pierce,

414 B.R. at 708.  The debtor was governed by a board of six individuals appointed

by the executive of the county served by the debtor.  Id. at 706.  The debtor's

chapter 9 plan proposed that the debtor would retain its properties and continue to

operate in the ordinary course.  Id. at 708.  The plan created a distribution account

for the distribution of recoveries to unsecured creditors into which account would

be deposited recoveries on insurance claims that were assigned to a

post-confirmation committee, among other things.  Id. at 709.  The plan further

contemplated, however, that, solely with respect to potential claims against the

county's insurer, an examiner would be appointed to evaluate the claims before

they were assigned to the committee.  Id.  In addition, the debtor intentionally

excluded claims against its former counsel from those claims that would be

assigned to the committee.  Pierce, 414 B.R. at 716.

130.   Citing Fano, the court presented the issue as whether "it is in

the best interest of creditors and in good faith to confirm a plan that precludes the

Post-Confirmation Committee from investigating and possibly pursuing all

potential sources of recovery already in existence."  Id. at 719.  The court found

that, because the debtor failed to state a valid reason why the committee should be

prevented from evaluating the subject claims, the debtor should not be permitted to eliminate them through confirmation of the plan.  Id. at 719 ("this decision [whether or not to pursue the claims] is a valuable right that the Debtor should not eliminate under the terms of its Amended Plan").  Accordingly, the court denied confirmation of the debtor's plan without prejudice.  Id. at 721.

131.   Pierce is inapposite to the question before the Court.  The issue in Pierce concerned several claims that the debtor attempted to eliminate by blocking their assignment to the post-confirmation committee under the plan. Here, the City seeks to retain its assets to pursue its governmental purpose for the benefit of the residents of the City.  Pierce cannot reasonably be construed to support the proposition that a chapter 9 debtor must *liquidate assets* for the benefit of enhancing creditor recoveries.

### 3.  *Any Attempt to Raise Taxes Would be Counterproductive and Inevitably Futile*

132.   The stark reality is that any attempt by the City to raise taxes — which are already the highest when compared with all other Michigan cities — would be counterproductive in that it would further burden already over-burdened residents and would hamper the City's ability to attract and retain residents and businesses.  These concerns would become more than hypothetical if the City's chapter 9 case were dismissed because, as the Objecting Parties acknowledge, in that event, creditors may seek to enforce judgment levies against the City, which

-79-

13-53846-swr   Doc 8053   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 99 of 256
13-53846-tjt   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:21:45   Page 99 of 256

would require the levying of additional taxes without regard to the City's debt

limits.  See, e.g., Ambac Objection, at 21; Syncora Objection, at ¶ 25.

133.   In considering whether a municipal debtor's plan of adjustment

is fair and equitable and in the best interests of creditors, it is appropriate for the

bankruptcy court to consider whether the tax base can absorb the additional levy.

> The other suggested source of revenue was the increase
> of water tolls, payable in advance of supply, to cover the
> amounts due under the bond issue.  Here, too, we must
> avoid replacing reality by fancy.  It may be true that the
> directors could have increased the tolls in sufficient
> amount to cover the additional money.  But there is a
> limit beyond which the taxing power of a taxing agency
> cannot go, even in the absence of legal limitations.  And
> that is the ability of the taxpayer or toll payer to pay.
> And so, when we find delinquencies amounting to 46.93
> per cent in a taxable year, when we find that even now
> 9.1 per cent of the area of the district has been deeded to
> the district for delinquent taxes, we must be guided by
> the determination of its officers, as explained by the
> secretary of the district at the trial, that, in their opinion,
> the taxable limit had been reached.  Whenever such a
> situation exists in a public taxing body, it has reached tax
> saturation.

Corcoran Irr. Dist., 27 F. Supp. at 326-27.  Where the bankruptcy court concludes

that the levying of additional taxes is futile, the debtor's technical power to levy

additional taxes becomes irrelevant.  See Corcoran Hosp. Dist., 233 B.R. at 459

(rejecting the argument that a chapter 9 debtor "should be obligated to raise taxes

or at least attempt to raise taxes to pay the unsecured creditors in full;" holding that

the debtor's plan was fair and equitable because any attempt to levy additional taxes would be futile).

134.   Here, just as in <u>Corcoran Hospital District</u>, any attempt to raise taxes — even if the City had the power to do so (<u>e.g.</u>, pursuant to a judgment levy in a dismissal scenario) — would be futile.  As of the Petition Date, the tax burden of Detroit residents was one of the highest in Michigan.[50]  At the same time, the average annual income for residents of the City is barely more than half that of the State of Michigan as a whole, and more than double the percentage of Detroiters live below the poverty line than statewide.[51]

135.   Elevated tax rates and falling incomes already have resulted in substantial and increasing rates of tax delinquency — 17% for property taxes alone.[52]  Consequently, the City's tax revenues from virtually all sources have been in a steady state of decline.  <u>See</u> <u>Detroit</u>, 504 B.R. at 118 (finding that, among other things (a) municipal income tax revenues have declined by 30% since 2002 and 15% since 2008, (b) property tax revenues have declined by 10%

---

[50]   Citizens Research Council of Michigan, Detroit City Government Revenues, Report No. 382 (Apr. 2013) ("<u>CRC Report</u>"), at vi.  As of the Petition Date, more than one third of this tax burden was devoted to debt service.  <u>Detroit</u>, 504 B.R. at 189.  The City estimated that this percentage would rise to almost two thirds within five years.  <u>Id.</u>

[51]   United States Census Bureau, State & County QuickFacts, http://quickfacts.census.gov/qfd/states/26/2622000.html (last visited May 24, 2014).

[52]   CRC Report, at 17.

since 2012 and (c) utility users' tax revenues have declined by 28% since 2003).

The City also has been battling a deteriorating property tax base. Real property in

the City has lost approximately 77% of its value in the last fifty years, and the

abundance of vacant, foreclosed and abandoned properties in the City renders

raising property taxes a fool's errand.

136. The combination of high tax and delinquency rates, low

incomes, declining revenues and decreasing property values demonstrates that any

attempt to levy additional taxes — even if an option for the City — would be

futile. Even before the Petition Date, the City already was trapped in a cycle of

ever-increasing taxes, decreasing revenues and escalating delinquencies. Faced

with yet more taxes to pay to satisfy the claims creditors of the City, many

residents and businesses either will be unable or will simply refuse to pay. It is

also important to note that when choosing where to locate, current and prospective

residents and businesses consider relative tax burdens. A city like Detroit, which

has been losing residents and businesses for years, simply cannot afford to make

this situation worse.

## C.   Dismissal of the City's Chapter 9
##        Case Would be Detrimental to All Creditors

137. Several Objecting Parties holding unsecured claims argue that

the City fails to provide a better alternative than dismissal because, in the absence

of the City's chapter 9 case, the applicable Objecting Party could compel the City

to satisfy its specific debt in full.  <u>See</u>, <u>e.g.</u>, COPs Objection, at ¶¶ 74-76 (arguing that, outside of chapter 9, the holders of COP Claims would obtain a judgment requiring the City to pay COP Claims from existing funds, the monetization of assets or the levying of additional taxes);[53] Ambac Objection, at 17-23 (arguing that Holders of Limited Tax General Obligation Bond Claims would obtain an order of mandamus directing the City to satisfy such claims as a first priority from *ad valorem* tax levies outside of chapter 9).

138.    These arguments fixate on the alleged rights of the Objecting Parties under non-bankruptcy law and generally ignore or discount the practical effect of the simultaneous assertion of similar rights by many or all other creditors.  The Objecting Parties cite authority for the proposition that this element of the best interests of creditors test should be applied at the level of individual creditors.  <u>See</u>, <u>e.g.</u>, Syncora Objection, at ¶ 15.  This proposition, however, may not be extended to permit an analysis of the effect of dismissal on the rights of each such creditor in a vacuum.  As a practical reality, outside of chapter 9, these rights are worth no more than the limited or non-existent ability of the applicable creditors to recover on them.

---

[53]    Of course, the City has taken the position that the COP Claims are invalid as a threshold matter.  To the extent the City's efforts to invalidate the COP Claims are successful, holders of COP Claims would receive precisely the same amount outside of bankruptcy as within bankruptcy, <u>i.e.</u>, nothing.

1. ***The Effect of Dismissal of the
Chapter 9 Case Would Be a Race to the Courthouse***

139.    The Objecting Parties are not alone in claiming that they

possess an absolute, unassailable right to be paid in full outside of chapter 9.

In fact, throughout the course of this chapter 9 case, representatives of numerous

creditors of the City have taken the position that they would possess such a right

under applicable non-bankruptcy law.[54]  In the event that this chapter 9 case were

dismissed, other unsecured creditors likely would seek court orders compelling

the City to pay their claims relying on the generally applicable non-bankruptcy

law principal that municipal debtors are obligated to pay their debts and the

Contracts Clause of the Michigan Constitution, Mich. Const. art. I, § 10, or the

United States Constitution, U.S. Const. art. I, § 10, or other theories.

---

[54]    See, e.g., Objection of the Official Committee of Retirees to Eligibility of
the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the
Bankruptcy Code (Docket No. 805), at ¶¶ 24-30 (argument by the Retiree
Committee, in the context of its objection to the City's eligibility to be a
debtor in chapter 9 that pensioners possess an absolute right to be paid in full
under applicable Michigan law); ASFCME Objection to Motion to Extend
the Automatic Stay (Docket No. 84), at ¶¶ 70-72 (arguing that the vested
pension rights of active and retired employees are absolute and cannot be
impaired outside of chapter 9); Local 3308 and Local 917 of the American
Federation of State, County and Municipal Employees' Brief in Support of
Their Objection to Motion of Debtor for Entry of an Order Extending the
Chapter 9 Stay to the 36th District Court and Certain Related Parties
(Docket No. 1126), at § IV (recognizing that, outside of chapter 9, the City
may be forced to satisfy the liabilities of the 36th District Court in full).

140.    As several Objecting Parties acknowledge, the result of dismissal of the chapter 9 case, therefore, would be a race to the courthouse among the City's creditors as they seek to enforce their claims under various legal theories.[55]  As discussed below, there would be no winners of this race.

### 2.    *The Race to the Courthouse Would Give Rise to Judgment Levies of Equal Priority*

141.    The Objecting Parties paint fanciful pictures of the result of their exercise of their state law rights, along with those of all other creditors. At bottom, however, the result of this process would be the issuance of judgment levies ostensibly requiring raising of taxes sufficient to satisfy all or almost all of the City's insurmountable obligations.  Obtaining these levies would be little more than an academic exercise, however, because the crippling tax bills that would ensue would each be of equal priority and, as discussed at paragraphs 132-36 above, cannot possibly be satisfied by the City's tax base.

---

[55]    See Assured Objection, at ¶ 65 (claiming that, as secured parties, holders of DWSD Bond Claims would not become embroiled in the race to the courthouse precipitated by any dismissal of the City's chapter 9 case); Syncora Objection, at ¶ 27 (acknowledging that the effect of dismissal may be a race to the courthouse by the City's creditors); see also Cnty. of Orange, 191 B.R. at 1020 ("In the chapter 9 context, the alternative is dismissal of the case, permitting every creditor to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds.") (quoting 4 Collier on Bankruptcy ¶ 943.03[7] (15th ed.)).

In fact, the race to the courthouse had begun before the Petition Date. See, e.g., the cases discussed in note 59, *infra*.

### (a)     LTGO Bond Claims Will Recover More
####          Under the Plan Than Outside of Bankruptcy

142.    In its Objection, Ambac Assurance Corporation ("Ambac")
asserts that Holders of Claims in Class 7 — arising from Limited Tax General
Obligation Bonds issued by the City (the "LTGO Bond Claims") — "would fare
far better outside of bankruptcy were the case to be dismissed."  Ambac
Objection, at 15.  That conclusion is unfounded.  In fact, the LTGO Bond Claims
would *not* receive a greater recovery outside of bankruptcy than they would under
the Plan.  Ambac itself admits that "recoveries for most unsecured creditors
outside of bankruptcy are often limited, making it relatively easy for a debtor to
establish that a plan provides a better alternative than dismissal."  Ambac
Objection, at 19 (citing Mount Carbon, 242 B.R. at 34).  Ambac asserts, however,
that the LTGO Bond Claims are "special" and are entitled to more favorable
treatment than other unsecured claims — both inside and outside of chapter 9 —
primarily because Michigan Public Act 34 of 2001, the Revised Municipal
Finance Act, M.C.L. §§ 141.2101 *et seq.* (the "RMFA"), provides that Limited
Tax General Obligation Bonds are to be paid as "a first budget obligation."[56]  Id. at
9-10, 19.

---

[56]     The Ambac Objection repeatedly invokes the phrase "first budget
obligation" as though it is manifest from the phrase itself that LTGO Bond
Claims are entitled to priority of payment relative to other unsecured debt by
virtue of being so characterized.  Ambac cites no law to this effect because

143. Even assuming, *arguendo*, that State law affords the LTGO Bond Claims certain protections unavailable to other unsecured claims against the City outside of bankruptcy, the facts of this case contradict Ambac's conclusory assertion that "[t]here can be no question but that outside of bankruptcy … LTGO bondholders would recover far more than they are getting under the Plan, even under the very worst of circumstances." Id. at 19. As their name implies, Limited Tax General Obligation Bonds are *general* obligations of the City, payable from the City's General Fund. There is no segregated account for the benefit of Limited Tax General Obligation Bonds. No lien secures the City's Limited Tax General Obligation Bond debt. See Sanitary & Improvement Dist., No. 7, 98 B.R. at 973 ("Outside of bankruptcy, bondholders may have certain rights concerning the use

_____

(continued…)

no such law exists. The phrase is left undefined by statute, and the City (like Ambac) has not located any case decided under Michigan law that illuminates its meaning. If anything, relevant Michigan case law suggests that other municipal obligations — e.g., obligations related to public safety and, the City would argue, pension obligations — are of equal, if not greater, priority, than defaulted financial obligations. See City of Pleasant Ridge v. Royal Oak Twp., 44 N.W.2d 333, 339 (Mich. 1950) (holding that a municipality is only obliged to satisfy defaulted financial obligations "in view of its resources in the nature of annual tax receipts and the strict necessities of each municipality in carrying on its government."). Indeed, the fact that the state statute refers to "*a* first budget obligation" necessarily implies that there are, or can be, *other* first budget obligations. Accordingly, the characterization of LTGO debt as a "first budget obligation" is not evidence of any priority to be accorded such debt under Michigan law (to say nothing of the distribution scheme of chapter 9).

of the taxing power of the state … or the municipal enterprise, *but bondholders have no 'lien' on any assets of a municipality.*") (emphasis added).  As set forth in detail in the City's pleadings filed in the pending adversary proceeding before this Court regarding the Limited Tax General Obligation Bonds (Adv. Proc. No. 13-05310) (the "Ambac Adversary Proceeding"),[57] unlike the DWSD Bonds and bonds secured by distributable State revenues — which bonds are secured by clearly and expressly-granted liens — the LTGO Bonds are not secured by any lien granted by the City or arising pursuant to applicable law.  Ambac's argument that the LTGO Bonds are secured by implication is unpersuasive.

144.    Moreover, even if, outside of bankruptcy, Holders of LTGO Bond Claims were able to obtain a monetary judgment against the City on grounds that State law prioritizes the LTGO Bond Claims ahead of other unsecured claims against the City, such judgment would do nothing to change the unsecured status of the LTGO Bond Claims.  See, e.g., Olympia Equip. Leasing Co. v. W. Union Tel. Co., 786 F.2d 794, 800 (7th Cir. 1986) ("A judgment creditor holds a general, unsecured debt.  It is different from other unsecured debt

---

[57]    See Mem. in Supp. of Def.'s Mot. to Dismiss, Ambac Assurance Corp. v. City of Detroit (In re City of Detroit), Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Jan. 17, 2014) (Docket No. 83-3) (the "Memorandum Supporting Motion to Dismiss"); Reply to Ambac Corp.'s Opposition to Def.'s Mot. to Dismiss, Ambac Assurance Corp. v. City of Detroit (In re City of Detroit), Adv. Proc. No. 13-05310 (Bankr. E.D. Mich. Feb. 17, 2014) (Docket No. 93).  The City incorporates by reference the entirety of these pleadings and each of the arguments set forth therein.

only to the extent the judgment creditor also has a right to immediate execution.")
(Easterbrook, J., concurring).  Even with a judgment in hand, outside of
bankruptcy, Holders of LTGO Bond Claims would compete with the City's vast
body of secured creditors — and a multitude of other unsecured claims, some of
which will also assert priority under State law — for a share of the limited
resources of an insolvent City.  See Detroit, 504 B.R. at 168 (finding that the City
was insolvent).  Thus, in all likelihood, the LTGO Bond Claims would receive
*less* favorable treatment outside of bankruptcy, as the City simply does not have
sufficient resources to meet its unsecured obligations absent an adjustment of
debts.  Under these circumstances, many of the City's unsecured creditors would
receive little or nothing outside of bankruptcy.

> **(b)** **The City's Pension Obligations**
> **Alone Could Eradicate Any Meaningful**
> **Recoveries for Other Creditors Outside of Chapter 9**

145.   Using the figures employed by the Retirement Systems (which
the City believes are substantially understated), as of June 30, 2012, the City had
unfunded actuarially accrued pension liabilities in the total amount of nearly
$1 billion.[58]  The Pensions Clause provides in part that "The accrued financial

---

[58]   See 2012 Annual Report of the General Retirement System of the City of
Detroit, Actuarial & Statistical Section, at 23 (stating unfunded actuarially
accrued pension liabilities of $837,683,375 as of June 30, 2012); 2012
Annual Report of the Police & Fire Retirement System of the City of Detroit,
Actuarial & Statistical Section, at 20 (stating unfunded actuarially accrued

benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."  Mich. Const. art. IX, § 24.  Relying on the Pensions Clause, prior to the Petition Date, the Retirement Systems and various retiree representatives attempted to obtain injunctions and declaratory judgments against the City seeking to protect pension entitlements by preventing the City from obtaining chapter 9 relief.[59]  Considering that retiree representatives already have acted to protect their allegedly paramount, constitutionally protected interest in pension benefits prior to the Petition Date, it is rational to assume that they would not hesitate to protect their interests against the competing claims of other

_____

(continued…)

pension liabilities of $147,216,398 as of June 30, 2012).  Using what the City believes are more reliable assumptions, that underfunding could be substantially higher.

[59]  See Pls.' Am. Mot. for Prelim. Injunction, Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Cir. Ct. July 8, 2013) (seeking to enjoin the Governor from authorizing the Emergency Manager to file a petition under chapter 9 of the Bankruptcy Code and other declaratory relief); Verified Compl. for Decl. J. and Injunctive Relief, Webster v. State, No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013) (seeking a similar injunction and a declaration that PA 436 is unconstitutional in violation of the Pensions Clause); Compl. for Decl. Relief, General Ret. Sys. v. Orr, No. 13-768-CZ (Ingham Cnty. Cir. Ct. July 17, 2013) (seeking:  (a) a declaration that PA 436 does not permit the Governor to authorize and the Emergency Manager to order a chapter 9 filing that would impair the City's pension obligations; or (b) in the alternative, a declaration that PA 436 is unconstitutional; and (c) an injunction prohibiting the Emergency Manager from acting on any authorization from the Governor to file to file a petition under chapter 9).

creditors, if the City's chapter 9 case were dismissed. In that scenario, retiree representatives may once again seek injunctive relief to protect pension rights by, for example, compelling the City to divert revenues to fully fund the pension plans and maintain such funding, or enjoining the City from distributing revenues to other creditors until any underfunding is satisfied. If obtained, the effects of any such injunction likely would dwarf many of the City's other liabilities and potentially choke off all access to tax revenues for other creditors.

### 3. *Tax Bills Will Skyrocket in Amount and Complexity and Will Not Be Paid*

146. As a result of the anticipated widespread issuance of judgment levies to enforce rights outside of bankruptcy, if this case were dismissed, City officials would be compelled to levy taxes sufficient to satisfy the City's massive debt burden. Just as any attempt to raise additional taxes in connection with confirmation of the City's Plan would be a futile gesture, so too would any attempt to increase the tax burden outside of chapter 9. For all of the same reasons previously discussed,[60] any effort to impose all of these obligations on taxpayers will achieve nothing more than (a) increased delinquencies and an acceleration of the exodus from the City that, in part, gave rise to the City's financial crisis in the first place; and (b) a further deterioration of City services and public health and welfare.

---

[60]    <u>See</u> ¶¶ 132-36, *supra*.

147.   In reality, most or all of the hoped-for additional revenue will not be realized.  Moreover, it is far from clear how the City would distribute any amounts received among the City's myriad creditors, many of whom claim a special entitlement to priority payment under state law.  Much of any such revenues likely would be consumed in litigation over the proper application of any amounts received among the claimants.

148.   Moreover, the purported status of LTGO Bond Claims as "first budget items" under the RMFA is irrelevant in the context of judgment levies, the proceeds of which can only be allocated to the claim that gives rise to the levy. Thus, the City lacks the authority to divert proceeds of judgment levies to other creditors, including the Holders of LTGO Bond Claims.

**4.**    ***The Absence of Any Reinvestment
Plan Will Further Deplete the Tax Base***

149.   Of course, the hypothetical dismissal of the City's chapter 9 case would not merely provoke a free-for-all of creditors seeking to enforce their state law rights against the City; it would have other devastating effects on the City.  The demise of the City's Plan would deprive City residents of the benefit of the City's reinvestment initiatives, for which funds are available only in conjunction with the restructuring transactions and cash infusions contemplated by the Plan.  Rather than investing in the City's revitalization, the City would be forced to make further cuts to essential services in an effort to satisfy pending

judgments.  The resulting decline in services below even today's inadequate levels and the extinguishing of hope of any future improvement can only accelerate the exodus of both residents and businesses from the City, thereby further depleting the tax base and land values and compounding the inability of creditors to realize on their state law rights.

### D.    The Plan's Treatment of LTGO Bond Claims Does Not Violate the Absolute Priority Rule

150.    Ambac argues that the Limited Tax General Obligation Bonds are "structurally senior to other unsecured debt of the City" under State law, in a attempt to show that, pursuant to the absolute priority rule, the LTGO Bond Claims should be paid in full before any other unsecured Claims receive anything under the Plan.  See, e.g., Ambac Objection, at 15.  In its Objection, Ambac repeats the argument it made in the Ambac Adversary Proceeding that State law priorities applicable to Limited Tax General Obligation Bonds are not preempted by, and apply in this case notwithstanding, the distribution scheme set forth in the Bankruptcy Code.  See id. at 24-33.  As the City has set forth in detail in its pleadings filed in the Ambac Adversary Proceeding, Ambac's central contention — that the claims of unsecured creditors in chapter 9 must be prioritized according to the Bankruptcy Code's distribution scheme *and* further sub-categorized into tiers based upon state-law "priorities" — misapprehends the

relationship between state and federal law for purposes of claim prioritization in chapter 9.

151. This Court is familiar with the parties' positions on this issue, and the City will not restate its entire argument here. To briefly summarize, however, the LTGO Bond Claims are unsecured claims based upon contractual obligations of the City (see Memorandum Supporting Motion to Dismiss, at 22-33). Courts are in agreement that: (a) contracts can be impaired in chapter 9 notwithstanding any state statute to the contrary; and (b) the Bankruptcy Code preempts state laws that, if applied in bankruptcy, would reorder the distribution scheme set forth in the Bankruptcy Code. This Court spoke directly to this issue in the Eligibility Opinion, with respect to the analogous question of whether state-law constitutional protections of contractual pension rights could reorder the Bankruptcy Code's distribution scheme, as follows:

> Stated another way, *state law cannot reorder the distributional priorities of the bankruptcy code*. If the state consents to a municipal bankruptcy, it consents to the application of chapter 9 of the bankruptcy code. This point was driven home in the Stockton case:
>
> A state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to "cherry pick," the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed.
>
> While a state may control prerequisites for consenting to permit one of its municipalities (which is an arm of the

> state cloaked in the state's sovereignty) to file a chapter 9
> case, it cannot revise chapter 9.

Detroit, 504 B.R. at 161(emphasis added) (internal citations omitted) (quoting

Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8,

16-17 (Bankr. E.D. Cal. 2012)).[61]

      152.   Ambac further argues that state statutes dictating the priority of

payment of claims are not preempted because section 507 of the Bankruptcy Code

(except for subsection (a)(2), dealing with the priority of claims), is not

incorporated into chapter 9, meaning that "[t]here is absolutely no conflict"

between such state-law priorities and the Bankruptcy Code's distribution scheme.

See Ambac Objection, at 31-32.  For this proposition, Ambac cites Richardson v.

Schafer (In re Schafer), 689 F.3d 601 (6th Cir. 2012), cert. denied, 133 S. Ct. 1244

(2013), in which the Sixth Circuit held that a statute providing for certain state-

---

[61]    See also Cnty. of Orange, 191 B.R.at 1017 ("When a state law conflicts with federal bankruptcy law, the state law is preempted.  Therefore, to the extent that § 27100.1 creates a special class of creditors … in conflict with the priority scheme in the Code, it is preempted by federal law.") (internal citation omitted); In re City of Vallejo, 403 B.R. 72, 77 (Bankr. E.D. Cal. 2009) ("[I]ncorporat[ing] state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws.") (quoting 6 Collier on Bankruptcy ¶ 903.01), aff'd sub nom. Int'l Bhd. of Elec. Workers v. City of Vallejo (In re City of Vallejo), 432 B.R. 262 (E.D. Cal. 2010).

specific bankruptcy exemptions was not preempted by the Bankruptcy Code's exemption provisions.[62]

153.   The non-applicability of most of section 507 in chapter 9 does not mean that the Bankruptcy Code establishes no distribution scheme for claims in chapter 9, or that Congress has left such prioritization to the states.  Moreover, there plainly *is* a conflict between state statutes that prioritize the payment of certain types of unsecured claims and chapter 9's distribution scheme. The importation of state-law priorities into chapter 9 would (a) alter chapter 9's straightforward distribution scheme that primarily distinguishes between secured and unsecured debt, (b) lead to the judicial creation of numerous *de facto* "priority" unsecured classes and (c) subordinate creditors in unsecured classes that cannot point to a state statute favoring their claims.  If Congress had intended this result, it could have expressly provided in the Bankruptcy Code that the chapter 9 distribution scheme shall be determined with reference to state law.  It did not.

---

[62]   Ambac's reliance upon <u>Schafer</u> in this context is unavailing because state laws establishing bankruptcy exemptions — which were the subject of <u>Schafer</u> — do not conflict with the broad purposes of the Bankruptcy Code or disrupt its distribution scheme.  See <u>Schafer</u>, 689 F.3d at 616 ("Indeed, on an as-applied basis, the Michigan [exemptions] statute actually *furthers*, rather than frustrates, national bankruptcy policy.") (emphasis in original). For this reason, the United States Supreme Court has held that "[s]tates are afforded a wide berth in the exemptions arena." <u>Id.</u> at 608 (citing <u>Owen v. Owen</u>, 500 U.S. 305, 306, 308 (1991)).  For the reasons stated in paragraph 151 above (including accompanying note), the same cannot be said of state laws that would modify the Bankruptcy Code's distributional priority scheme.

154.    Ignoring the holdings of the <u>Detroit</u>, <u>Stockton</u>, <u>County of Orange</u> and <u>Vallejo</u> courts, Ambac instead cites certain inapposite cases for the proposition that "[b]ankruptcy courts hold that where a state statute provides structural seniority to a particular group of unsecured creditors, the claims of those creditors must be classified separately and treated as senior."  Ambac Objection, at 27.  In particular, Ambac relies upon <u>Sanitary & Improvement District 65 v. First National Bank of Aurora (In re Sanitary & Improvement District 65)</u>, 73 B.R. 205 (Bankr. D. Neb. 1986), <u>aff'd</u>, 79 B.R. 877 (D. Neb. 1987), <u>aff'd</u>, 873 F.2d 209 (8th Cir. 1989).  In that case, the chapter 9 debtor special improvement district initiated an adversary proceeding to determine whether, in light of a state statute that prioritized the payment of bonds over the payment of warrants, its plan of adjustment could permissibly classify bondholders separately from warrantholders and provide more favorable treatment to the class of bondholders even though both such classes would consist of unsecured claims. <u>Id.</u> at 206.  The issue in <u>District 65</u> was whether such classification was permissible under section 1122 of the Bankruptcy Code.  <u>Id.</u> at 208.  The court found that the relevant state statute provided sufficient justification for the debtor's proposed classification, holding that the debtor "*may* classify the claims of bondholders different from and superior to the claims of warrantholders." <u>Id.</u> at 206 (emphasis added).

155.    Ambac's gloss on <u>District 65</u> — which addressed neither the best interests of creditors test nor the "fair and equitable" standard — is misleading.  First, as noted above, the question in that case was whether the debtor's classification of different types of unsecured claims in separate classes was *permissible* — not whether separate classification according to state law priorities was *required* in all instances.  Moreover, the broader question of whether a plan's classification/distribution scheme "must" take into account all relevant state law priorities simply was not before the court.  To the extent that any language in <u>District 65</u> may be read to infer such a requirement, it is dicta.  Finally, it should be noted that <u>District 65</u> was decided several years before courts in the major chapter 9 cases of <u>County of Orange</u>, <u>Vallejo</u>, <u>Stockton</u> and <u>Detroit</u> clearly articulated the rule — now generally accepted, as discussed above — that to the extent that state law priorities would reorder the priority scheme of the Bankruptcy Code, such state law priorities are preempted.

156.    Ambac also relies upon the chapter 11 case of <u>In re Eastern Maine Electric Cooperative, Inc.</u>, 125 B.R. 329 (Bankr. D. Me. 1991), in which the court denied approval of the debtor's proposed disclosure statement because the plan described therein was unconfirmable.  In <u>Eastern Maine Electric</u>, the debtor's proposed plan of reorganization treated certain patronage capital accounts of the debtor cooperative as general unsecured claims.  <u>Id.</u> at 336.  The court held

that such treatment was impermissible because, under state law and in light of other evidence, patronage capital was an "interest," similar to equity in a private corporation, rather than a "claim," meaning that patronage capital claims had a lower priority than general unsecured claims.  Id. at 339.  As with its interpretation of District 65, Ambac's reliance on this case for the proposition that "where a state statute provides structural seniority to a particular group of unsecured creditors, the claims of those creditors must be classified separately and treated as senior," misses the mark.  The issue in Eastern Maine Electric was not whether state law required one class of unsecured claims to be treated more favorably than another class of unsecured claims (which is the relevant issue in this case).  Rather, Eastern Maine Electric dealt with the question of whether one purported class of claims consisted of "claims" at all, as that term is defined in the Bankruptcy Code.  As explained by the court in Corcoran Hospital District, the distinction between "claims" and equitable interests for purposes of the absolute priority rule simply has no relevance in the chapter 9 context because municipalities have no equity holders.  Corcoran Hosp. Dist., 233 B.R. at 458-59.  Thus, Ambac's reliance upon Eastern Maine Electric is misplaced.  In short, the authority cited by Ambac does not establish that the LTGO Bond Claims are entitled to special treatment in chapter 9, either pursuant to the "fair and equitable" standard or otherwise.

## E.    The Plan is Fair and Equitable with Respect to Secured Creditors

157. Section 1129(b)(2) of the Bankruptcy Code provides that "[f]or the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes" certain enumerated, disjunctive requirements. 11 U.S.C. § 1129(b)(2). "With respect to a class of secured claims," a plan satisfies the statutory "fair and equitable" requirement if such plan provides as follows:

> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]

11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II). Section 1129(b)(2)(A)(i) of the Bankruptcy Code thus provides that a secured creditor is "entitled to retain its lien and to receive property with a present value equal to the allowed amount of its claim." In re Coventry Commons Assocs., 149 B.R. 109, 115 (Bankr. E.D. Mich. 1992). Alternatively, a plan can satisfy the statutory "fair and equitable" requirement by

providing secured creditors with the "indubitable equivalent" of their claims.

11 U.S.C. § 1129(b)(2)(A)(iii).[63]

### 1. *The Plan Satisfies Section 1129(b)(2)(A)(i) of the Bankruptcy Code*

158. The Plan satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code, and therefore is "fair and equitable" with respect to the City's secured creditors, because it provides that secured creditors will: (a) retain their liens in the collateral securing their claims; and (b) receive the present value, as of the Effective Date, of such claims.

### (a) The Bankruptcy Code Expressly Permits the Impairment of Secured Claims

159. Although secured creditors must retain their liens and receive the present value of their claims under the Plan pursuant to section 1129(b)(2)(A)(i) of the Bankruptcy Code, the Plan need not avoid impairing secured claims altogether to satisfy the "fair and equitable" requirement. Rather, the Bankruptcy Code expressly permits the impairment of secured claims. Section 1123(b) of the Bankruptcy Code provides as follows:

---

[63] Section 1129(b)(2)(A)(ii) provides a third alternative, whereby a plan can provide for the sale of the relevant collateral, free and clear of liens, with such liens attaching to the proceeds of such sale. <u>See</u> 11 U.S.C. § 1129(b)(2)(A)(ii). This subsection is inapplicable in the context of the City's plan.

Subject to subsection (a) of this section, a plan may —

(1) impair or leave unimpaired any class of claims, secured or unsecured, or of interests … [and]

(5) *modify the rights of holders of secured claims*, other than a claim secured only by a security interest in real property that is the debtor's principal place of residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

11 U.S.C. § 1123(b)(1), (5) (emphasis added). As discussed in greater detail below, courts routinely approve cramdown plans that alter the contractual rights of secured creditors. See, e.g., In re Trenton Ridge Investors, LLC, 461 B.R. 440, 501-02 (Bankr. S.D. Ohio 2011) (holding that the chapter 11 debtor's plan of reorganization could eliminate a due-on-sale clause in the mortgage notes executed by the debtor and the debtor's principal secured creditor and still satisfy the "fair and equitable" requirement of section 1129(b)(2)(A)(i) of the Bankruptcy Code).

160.    Contrary to the arguments of certain Objecting Parties,[64] the ability to impair secured claims extends to claims secured by liens on "special revenues" (as defined in section 902(2) of the Bankruptcy Code), such as those held by the DWSD bondholders. See, e.g., Bank of N.Y. Mellon v. Jefferson

---

[64]    See, e.g., DWSD Bond Trustee Objection, at ¶¶ 13-30 (stating that the DWSD bondholders' "interests cannot be impaired and are, in fact, expressly protected by chapter 9 of the Bankruptcy Code" (¶ 13) and that "§§ 903, 922(d), 927, 928, 943 and 1111(b) … all work together to specifically protect the interests of the Holders against impairment of any type and at all times" (¶ 30)).

Cnty. (In re Jefferson Cnty.), 482 B.R. 404, 434 n.17, 435 n.18 (Bankr. N.D. Ala. 2012) (explaining that, although the goal of certain 1988 amendments to chapter 9 of the Bankruptcy Code was "to retain as much as possible the pre-bankruptcy status of pledged special revenue financing transactions involving municipalities," those sections of the Bankruptcy Code not changed by the 1988 amendments (e.g., section 1129(b)(1)-(b)(2)(B) regarding nonconsensual impairment) remain available to "modify the contractual relations between parties to municipal special revenue financing agreements" or to "otherwise alter aspects of pledged special revenue transactions involving municipalities"). Any Objections to the contrary should be overruled.

      **(b)     The Interest Rates Applicable to DWSD**
                **Bond Claims Will Provide DWSD Bondholders**
                **the Present Value of Their Allowed Secured Claims**

      161.   Several Objecting Parties — including Assured Guaranty Municipal Corporation ("Assured"), Berkshire Hathaway Assurance Corporation ("Berkshire Hathaway"), National Public Finance Guarantee Corporation ("NPFG") and the DWSD Bond Trustee — argue that the Plan fails to provide them with "deferred cash payments totaling at least the allowed amount of [their] claim[s]," as required by section 1129(b)(2)(A)(i) of the Bankruptcy Code, because the rates of interest set forth in the Interest Rate Reset Chart are insufficient to provide Class 1A Claims with the full value, over time, of the

principal of their claims. These Objections are misplaced and premature; testimony to be presented by the City during the Confirmation Hearing will show that the proposed interest rates, in fact, will provide holders of DWSD Bond Claims with the full allowed amount of their claims.

162. As this Court has observed, "[s]ection 1129(b) of the Bankruptcy Code provides no guidance for calculating the cramdown interest rate required to be paid to confirm a plan of reorganization over a dissenting class of secured claims or unsecured claims." In re Griswold Bldg., LLC, 420 B.R. 666, 692 (Bankr. E.D. Mich. 2009). In Bank of Montreal v. Official Committee of Unsecured Creditors (In re American HomePatient, Inc.), 420 F.3d 559 (6th Cir. 2005), the Sixth Circuit described the general approach bankruptcy courts must follow in determining whether a proposed cramdown interest rate is appropriate. First, a bankruptcy court must "ask what rate an efficient market would produce. This means that the market rate should be applied … where there exists an efficient market." Id. at 568 (internal citation omitted).

163. The term "efficient market" is not defined in the Bankruptcy Code or in relevant bankruptcy case law. In jurisdictions that apply the "efficient market" approach, such as the Sixth Circuit, courts have determined whether an efficient market exists on a case-by-case basis. See, e.g., Griswold, 420 B.R. at 693 (relying upon expert testimony in finding that "there is no credit market for

-104-

13-53846-swr   Doc 8654   Filed 12/17/14   Entered 12/17/14 22:10:59   Page 124 of 256
13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 18:11:45   Page 124 of 256

commercial real estate loans secured by office buildings located in the central

business district of downtown Detroit that the Court can turn to for guidance").[65]

164.    Testimony offered by the City during the Confirmation

Hearing will demonstrate that (a) an efficient market will exist for the New

DWSD Bonds offered in exchange for the Objecting Parties' Class 1A Claims and

(b) the rates set forth in the Interest Rate Reset Chart (i) represent the interest rates

that would be produced by this efficient market for the New DWSD Bonds and

(ii) will provide holders of New DWSD Bonds with the present value of the

allowed amount of their Secured Claims as of the Effective Date.  The yield curve

used in calculating the rates set forth in the Interest Rate Reset Chart (a) is based

upon the *pro forma* credit profile of a post-Confirmation DWSD, (b) reflects the

expected market for improved DWSD credit going forward and (c) provides

DWSD Bond Claims with a par recovery based upon existing maturities.[66]

---

[65]    Where no "efficient market" exists, the Sixth Circuit instructs that bankruptcy
courts should apply the "formula approach" — sometimes called the
"prime-plus" analysis — set forth in Till v. SCS Credit Corp., 541 U.S. 465
(2004).  See Am. HomePatient, 420 F.3d at 568.  Because an efficient market
will exist with respect to the New DWSD Bonds, Till is inapplicable to the
Chapter 9 Case.

[66]    In its Objection, NPFG argues, among other things, that the interest rates
proposed in the Interest Rate Reset Chart are inappropriate because the City's
existing DWSD Bond debt recently has been downgraded by certain credit
rating agencies.  See NPFG Objection, at ¶¶ 69-72.  Citations to the ratings of
the existing DWSD Bonds are inapposite, however, because it is the pro forma
credit profile of the post-Confirmation DWSD that informs the analysis of
whether the interest rates proposed in the Plan are appropriate.

165.     Thus, the rates set forth in the Interest Rate Reset Chart reflect realistic expectations and will provide DWSD bondholders with the present value of their allowed secured claims, and, thus, satisfy section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code.

### (c)     The Modification of Call Protection Is a Permissible Impairment of DWSD Bond Claims

166.     Certain of the Objecting Parties — including Berkshire Hathaway, NPFG and Assured — argue that the Plan is not "fair and equitable" because the "call protection" terms of certain existing DWSD Bonds are not replicated in the terms of the replacement bonds to be distributed pursuant to the Plan.  See Berkshire Hathaway Objection, at ¶¶ 37-39; NPFG Objection, at ¶¶ 73-82; Assured Objection, at ¶¶ 88-95.  These Objections assert that existing contractual call protection provisions have monetary value, and that the modification of such provisions gives rise to secured claims.  The argument is unfounded.

167.     Notably, the default treatment under the Plan does not eliminate call protection with respect to the DWSD Bonds.  Rather, the Plan provides for up to five years of call protection, which is market relative to the interest rate schedule proposed.  See Plan at § II.B.3.a.ii, Ex. I.A.186.  In fact, with respect to existing DWSD Bonds that mature in fewer than five years, the

call protection modifications imposed by the default Plan treatment will have no effect on the applicable bondholders.

168. The reasonable modification of contractual terms in documents associated with secured claims is precisely the type of impairment of secured claims that section 1123(b)(5) of the Bankruptcy Code expressly permits. See 11 U.S.C. § 1123(b)(5) ("Subject to subsection (a) of this section, a plan may … modify the rights of holders of secured claims ...."). In Trenton Ridge, the debtor's plan of reorganization proposed that the debtor's principal secured creditor, PNC Bank, National Association ("PNC") would (a) retain the liens securing its claims and (b) receive distributions at least equal to the present value of its collateral, but eliminated a due-on-sale clause contained in the notes giving rise to PNC's claims. Trenton Ridge, 461 B.R. at 500-01. PNC argued that the elimination of the due-on-sale clause rendered the plan unfair and inequitable. Id. The court disagreed, holding as follows:

> To the contrary, a Chapter 11 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence[,]" 11 U.S.C. § 1123(b)(5), and may also include "any … appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). "These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."

Id. at 501 (quoting United States v. Energy Res. Co., 495 U.S. 545, 549 (1990)).

169.   The Objecting Parties do not cite a single case that holds that section 1129(b)(2)(A)(i) of the Bankruptcy Code forbids the modification of contractual terms in documents underlying secured claims, and they conspicuously ignore Trenton Ridge.  Moreover, Trenton Ridge is not an outlier; several other courts have rejected similar challenges to plan provisions that modified the contractual terms of instruments underlying secured claims.[67]

---

[67]   See, e.g., In re Wabash Valley Power Ass'n, Inc., No. 85-2238, 1991 WL 11004220, at *57 (Bankr. S.D. Ind. Aug. 7, 1991) (rejecting a secured creditor's assertion that the debtor's plan of reorganization violated section 1129(b)(2)(A)(i) of the Bankruptcy Code by altering the terms of the secured creditor's mortgage and note; holding that "… Wabash may modify the terms of the REA Mortgage and note as long as REA (a) retains its lien and (b) is to receive the present value of its secured claim. *This is all that a secured creditor is entitled to under the Code*.") (emphasis added), aff'd, 72 F.3d 1305 (7th Cir. 1995), abrogation on other grounds recognized by In re Castleton Plaza, LP, 707 F.3d 821 (7th Cir. 2013); In re Coastal Equities, Inc., 33 B.R. 898, 905-06 (Bankr. S.D. Cal. 1983) (rejecting a secured creditor's argument that the proposed chapter 11 plan, which "impair[ed] the enforceability" of certain due-on-sale clauses in the secured creditor's trust deeds, failed to satisfy section 1129(b)(2)(A)(i) of the Bankruptcy Code; stating that "[t]his court finds that a due-on-sale clause is not something so sacrosanct that it is immune from modification in a bankruptcy setting;" and holding that notwithstanding such impairment, secured creditors "will be retaining their liens and will be paid an amount calculated to yield the present value of their claims. *This treatment affords each claimant the full value of its interest as required*.") (emphasis added); see also In re City of Colo. Springs Spring Creek Gen. Improvement Dist., 187 B.R. 683, 685, 691 (Bankr. D. Colo. 1995) (confirming a chapter 9 debtor's plan of adjustment that, with respect to the bonds held by certain creditors asserting secured status, and a trust agreement related to such bonds, (a) "eliminate[d] all call premiums," (b) "remove[d] the prohibition

170.   Moreover, by acting to effectively accelerate all of the City's obligations as of the Petition Date, the City's bankruptcy filing rendered the call protections in the DWSD Bonds moot and of no further effect.  "[T]he filing of a bankruptcy petition renders all of a petitioner's outstanding debts mature and payable."  HSBC Bank USA, Nat'l Ass'n v. Calpine Corp., No. 07-CV-3088, 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010).

> It is a basic tenet of the Bankruptcy Code that "[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor." This tenet follows logically from the expansive Code definition of "claim", which allows any claim to be asserted against the debtor, regardless of whether such claim is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed [or] undisputed…[,]" 11 U.S.C. [§] 101(4)(A), and from the Code's provision in Section 502 that a claim will be allowed in bankruptcy regardless of its contingent or unmatured status.

In re Manville Forest Prods. Corp., 43 B.R. 293, 297 (Bankr. S.D.N.Y. 1984) (internal citations omitted), aff'd in relevant part sub nom. Official Comm. of Unsecured Creditors v. Manville Forest Prods. Corp. (In re Manville Forest Prods.

---

(continued…)

of early redemption" for certain series of such bonds and (c) modified contractual provisions of the trust agreement such that certain "obligations of both the District and Trustee" under the trust agreement were "modifie[d] and extinguishe[d];" holding that such impairment was consistent with "the constitutional authority of bankruptcy courts to impair contractual obligations" and "the technical provisions of the Code").

Corp.), 60 B.R. 403 (S.D.N.Y. 1986); see also In re Ridgewood Apartments of

DeKalb Cnty., Ltd., 174 B.R. 712, 720 (Bankr. S.D. Ohio 1994) ("Even without

specific contractual language, a bankruptcy filing acts as an acceleration of all a

debtor's obligations.").

171.　Because the City's obligations arising from the DWSD Bonds

effectively were accelerated upon the commencement of this chapter 9 case, any

"no-call" provisions related to the DWSD Bonds are unenforceable.  In Calpine,

certain lenders that had issued prepetition loans to the debtors objected to the

debtors' motion for authority to obtain postpetition financing, arguing, among

other things, that the notes underlying their loans contained enforceable "no-call"

provisions prohibiting the debtors' proposed refinancing of the loans.

See In re Calpine Corp., 365 B.R. 392, 396-98 (Bankr. S.D.N.Y. 2007), aff'd,

Calpine, 2010 WL 3835200.  The Calpine bankruptcy court held that the debtors'

obligations to the lenders were accelerated upon the debtors' bankruptcy filing,

and further stated that "[g]enerally, no-call provisions that purport to prohibit

optional repayment of debt are unenforceable in chapter 11 cases" because "[t]he

essence of bankruptcy reorganization is to restructure debt … and adjust

debtor-creditor relationships."  Id. at 397 (citation and quotation marks omitted).

According to the court "[i]t would violate the purpose behind the Bankruptcy

Code to deny a debtor the ability to reorganize because a creditor has

contractually forbidden it." Id.  On appeal, the district court affirmed and held

that "[b]ecause Debtor's bankruptcy filing rendered the no-call provision in the

notes unenforceable and liability cannot be incurred pursuant to an unenforceable

contractual provision, Debtor did not incur any liability for repaying the notes."

Calpine, 2010 WL 3835200, at *4.  Id.

172.    As in Calpine, the City's obligations to its creditors —

including holders of DWSD Bond Claims — accelerated by virtue of the City's

bankruptcy filing.  Thus, any contractual call protections contained in documents

underlying the DWSD Bonds are unenforceable.

173.    NPFG's argument that the modification of call protection gives

rise to a secured claim pursuant to section 506(b) of the Bankruptcy Code also

must be rejected.  See NPFG Objection, at ¶¶ 73-82.

174.    Section 506(b) of the Bankruptcy Code provides that:

> To the extent that an allowed secured claim is secured by
> property the value of which, after any recovery under
> subsection (c) of this section, is greater than the amount
> of such claim, there shall be allowed to the holder of such
> claim, interest on such claim, and any reasonable fees,
> costs, or charges provided for under the agreement or
> State statute under which such claim arose.

11 U.S.C. § 506(b).

175.    The authority that NPFG cites in support of its argument that it

is entitled to a secured claim under section 506(b) arising from the modification of

call protections is inapposite. NPFG cites exclusively to cases holding that an oversecured creditor may be entitled to a secured claim for prepayment premiums as a "fee, cost or charge" under section 506(b) of the Bankruptcy Code where the underlying documents expressly provide for such a premium.[68]

176. Critically, NPFG cites no authority holding that an oversecured creditor was entitled to a secured claim under section 506(b) for the loss of call protection where, as here, no premium was payable under the applicable loan documents, and the City is aware of none. To the contrary, in <u>Premier Entertainment</u>, one of the cases upon which NPFG relies, the court explained that such a claim is not allowable as a "fee, cost or charge" under section 506(b) of the Bankruptcy Code, stating:

---

[68]  See <u>Imperial Coronado Partners, Ltd. v. Home Fed. Sav. & Loan Ass'n (In re Imperial Coronado Partners, Ltd.)</u>, 96 B.R. 997, 1000-01 (B.A.P. 9th Cir. 1989) (holding that prepayment premium under loan documents following the debtor's prepetition voluntary prepayment of the loan gave rise to a secured claim under section 506(b); remanding for further consideration of the reasonableness of the contractual premium); <u>Premier Entm't Biloxi LLC v. U.S. Bank Nat'l Ass'n (In re Premier Entm't Biloxi LLC)</u>, 445 B.R. 582, 633-34 (Bankr. S.D. Miss. 2010) (holding that oversecured lenders were not entitled to a secured claim for prepayment premium because the conditions triggering the contractual premium were not satisfied); <u>Anchor Resolution Corp. v. State St. Bank & Trust Co. of Conn. (In re Anchor Resolution Corp.)</u>, 221 B.R. 330, 341 (Bankr. D. Del. 1998) (holding that a claim for a contractual prepayment penalty was reasonable and therefore entitled to secured status under section 506(b) of the Bankruptcy Code); <u>In re Outdoor Sports Headquarters, Inc.</u>, 161 B.R. 414, 424-26 (Bankr. S.D. Ohio 1993) (holding that a contractual prepayment premium was reasonable and therefore an oversecured creditor was entitled to allowance of the full amount of the premium under section 506(b) of the Bankruptcy Code).

> [T]here are two requirements for including a charge as part of an allowed secured claim under § 506(b). First, the charge at issue must satisfy the provisions of § 502(b)(1), that is, it must be included in a contract provision that is enforceable under applicable state law …. Second, the charge must be "reasonable," as determined by federal law.

Premier Entm't, 445 B.R. at 618.[69]  As one Objecting Party admits, the DWSD Bond Documents do not provide for the payment of a premium on prepayment or acceleration.  See Assured Objection, at ¶ 91 ("Because Assured's Call Protection is structured as an absolute prohibition on prepayment of covered Existing DWSD Bonds during the applicable no-call periods, no monetary remedy for breach is specified.").  Holders of DWSD Bond Claims, therefore, are not entitled to the payment of any "fee, cost or charge" under section 506(b) of the Bankruptcy Code.  Consequently, NPFG's section 506(b) argument is unavailing.[70]

---

[69]  See also Calpine, 2010 WL 3835200, at *6 (holding that an oversecured creditor was not entitled to a secured claim under section 506(b) of the Bankruptcy Code because (a) although the loan documents provided for a prepayment premium, payment following the bankruptcy acceleration of the loan was not a prepayment; and (b) the loan documents did not provide for a premium due on acceleration).

[70]  NPFG further contends that the modification of call protection provisions pursuant to the Plan gives rise to secured claims because the Water Supply System and the Sewage Disposal System that are operated, managed and accounted for by the City as separate enterprise funds through DWSD are solvent.  See NPFG Objection, at ¶¶ 81-82.  NPFG cites, among other cases, Official Committee of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668 (6th Cir. 2006), for the principle that "in solvent debtor cases," in analyzing the "fair and equitable" requirement, "courts have generally confined themselves to determining and enforcing

### (d) The Plan Does Not "Strip" the Liens of DWSD Bondholders

177. NPFG, Assured and the DWSD Bond Trustee also argue that the Plan is not "fair and equitable" because its provisions regarding DWSD funding of its allocable share of underfunded GRS pension liabilities "strip" the liens securing the DWSD Bond Claims. For the reasons set forth in paragraphs 240-42 and incorporated herein by reference, the DWSD Pension Funding (as defined below) does not strip the liens of holders of DWSD Bond Claims because the DWSD Pension Funding contemplated in the Plan is properly paid as an expense of operating and administering DWSD's water and sewerage systems from separate "operation and maintenance funds," and *not* from the portion of DWSD revenues that constitutes DWSD bondholders' collateral. Thus,

---

(continued…)

whatever pre-petition rights a given creditor has against the debtor." Id. at 679 (emphasis added). NPFG argues that because the DWSD systems are solvent, DWSD Bond Claims cannot be impaired in bankruptcy under Dow Corning. This argument fails for the simple reasons that (a) the City is the issuer of the DWSD debt — not the DWSD or the systems that it operates — and (b) this Court has determined that the City is insolvent. See Detroit, 504 B.R. at 168. In addition, the DWSD, as a City department, is *part of* the City. The systems operated by DWSD, as enterprise funds, are set apart from other City funds only for accounting purposes. See 2012 City of Detroit Comprehensive Annual Financial Statement, at 16-17 (A "fund is a fiscal and accounting entity with a self-balancing set of accounts that the City uses to keep track of specific sources of funding and spending for a particular purpose."). That the DWSD debt is collateralized by a lien on revenues accounted for in the DWSD funds, which collateral should be sufficient to pay the DWSD bonds in full, does not prevent the application of section 1129(b) to the interest rates.

contrary to the assertions of certain Objecting Parties, the DWSD Pension

Funding does not offend section 1129(b)(2)(A)(i)(I) of the Bankruptcy Code

because DWSD bondholders will retain their liens under the Plan.

178.    The DWSD Pension Funding is also in the best interests of

creditors, including the objecting DWSD bondholders.  Even though the Plan

provides for DWSD to fund its allocable share of underfunded GRS liabilities

over nine years instead of over a longer period, because the Plan impairs pensions,

DWSD's *overall* pension funding obligation will *decrease* significantly if the Plan

is confirmed.  Moreover, the DWSD bondholders — and the counties of Macomb,

Oakland and Wayne, which are DWSD ratepayers — actually will benefit if the

Plan is confirmed because the Plan provides for the elimination of approximately

90% of the City's OPEB liabilities and 100% of its liabilities related to the COPs,

which impairment would significantly reduce DWSD's allocable share of such

liabilities and improve DWSD's overall financial position going forward.

The City anticipates, and intends to present evidence during the Confirmation

Hearing, that, though 2023, the DWSD will realize a total cost *savings* of over

$500 million if the Plan is confirmed — as compared with the status quo —

consisting of savings resulting from the restructuring of the City's legacy liabilities

and the reset of interest rates contemplated in the Plan.[71]  For these reasons, the

Objecting Parties' assumptions that the DWSD will have to increase its rates

beyond normally-budgeted rate increases post-Confirmation are unfounded.

## 2. *The Absolute Priority Rule Does Not Apply to Secured Claims*

179.   The DWSD Bond Trustee and the Ad Hoc Committee of

DWSD Bondholders (the "Ad Hoc Committee") argue that the Plan is not "fair

and equitable" because the absolute priority rule forbids the impairment of secured

DWSD Bond Claims if any junior Class of claims is to receive any distribution

whatsoever under the Plan.  See DWSD Bond Trustee Objection, at ¶¶ 82-83;

Ad Hoc Committee Objection, at ¶¶ 12-16.  These Objecting Parties

misapprehend the scope of the absolute priority rule.  Simply put, the absolute

priority rule does not apply to secured claims.

180.   As noted above, section 1129(b)(2)(B) of the Bankruptcy Code

codifies the absolute priority rule and states that the rule applies to "a class of

*unsecured* claims."  See 11 U.S.C. § 1129(b)(2)(B) (emphasis added).

No analogous provision appears in section 1129(b)(2)(A) of the Bankruptcy Code,

---

[71]   The City anticipates that such anticipated cost savings would enable the
DWSD to make necessary capital improvements while keeping rates
affordable for a ratepayer base that is facing unprecedented economic
challenges.  See generally Bill Laitner, Agency Report on Poor People
Sparks Feud with Oakland County, Detroit Free Press (May 19, 2014),
http://www.freep.com /article/20140519/NEWS05/305190019/oakland-
county-poverty-Brookings-Institution.

which is the portion of the codified "fair and equitable" standard applicable "to a class of *secured* claims." <u>See</u> 11 U.S.C. § 1129(b)(2)(A) (emphasis added). Had Congress intended to make the absolute priority rule applicable to secured claims, it easily could have done so by either adding the language codifying that rule — which appears in section 1129(b)(2)(B) — to section 1129(b)(2)(A) of the Bankruptcy Code or eliminating the phrase that makes section 1129(b)(2)(B) of the Bankruptcy Code applicable solely to unsecured claims.

181. Most courts agree that the statute means precisely what it says, <u>i.e.</u>, that the absolute priority rule applies only to unsecured creditors.[72] In light of

---

[72] <u>See</u>, <u>e.g.</u>, <u>Trenton Ridge</u>, 461 B.R. at 502 (rejecting the minority view and holding that "the absolute priority rule simply does not apply with respect to a fully secured creditor such as PNC"); <u>CoreStates Bank, N.A. v. United Chem. Techs., Inc.</u>, 202 B.R. 33, 54-55 (E.D. Pa. 1996) (affirming the bankruptcy court's ruling that "the absolute priority rule does not apply to a secured creditor like CoreStates;" further stating that "[t]he provisions articulated in § 1129(b)(2)(B) apply only to unsecured claims …. This Court feels that if Congress wanted the payout of secured claims to satisfy the absolute priority rule for purposes of determining whether a plan is fair and equitable, it would have specifically included that requirement in § 1129(b)(2)(A) as it did in § 1129(b)(2)(B);" reviewing relevant legislative history and concluding that "[b]oth the statute and its legislative history reveal intentional Congressional inaction with respect to inserting the absolute priority requirement in the portion of § 1129(b)(2)(A) dealing with secured claims"); <u>In re Cypresswood Land Partners, I</u>, 409 B.R. 396, 437 (Bankr. S.D. Tex. 2009) ("IFA does not have standing to object on the grounds that the Amended Plan violates the absolute priority rule contained in § 1129(b)(2)(B)(ii) because IFA is the holder of a *secured* claim. The absolute priority rule only applies to a class of *unsecured* claims, not to a class of secured claims or equity interest holders.") (emphasis in original); <u>In re Arden Props., Inc.</u>, 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) ("First,

the broad judicial consensus that the unambiguous plain meaning of

section 1129(b)(2) of the Bankruptcy Code controls, the Objecting Parties'

argument that the absolute priority rule applies to secured DWSD Bond Claims is

unpersuasive.

* * * * *

182.   In sum, the City may validly prioritize the provision of

essential governmental services to its residents and cannot, therefore, be

compelled to sell its assets to satisfy the claims of creditors.  The Plan makes a

reasonable effort under the circumstances at paying claims in light of the fact that

the City cannot raise additional tax revenue and any effort to do so would be futile

---

(continued…)

as noted above, the absolute priority rule applies only to unsecured classes,
not to secured claims, the requirements for which are separately set forth in
§ 1129(b)(2)(A) ….").

Although a few courts have held that "the absolute priority rule is violated if
the secured creditor is made to wait for full payment over time while old
equity holders receive new equity under the plan," Trenton Ridge, 461 B.R.
at 503 (citing Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd.
(In re Monarch Beach Venture, Ltd.), 166 B.R. 428, 435 (C.D. Cal. 1993)
and In re Miami Center Associates, Ltd., 144 B.R. 937, 941-42 (Bankr. S.D.
Fla. 1992)), these decisions have been criticized.  See, e.g., id. ("But if
Congress wanted to address the risk inherent in receiving payments over
time under the rubric of the fair and equitable standard in the manner
suggested by the Miami Center Associates court, it could have required —
as it did in other sections of the Bankruptcy Code — that the secured
creditor receive 'cash on the effective date of the plan equal to the allowed
amount of such claim[,]' … but it did not do so.").  Further, the facts that
drove the Monarch and Miami Center decisions are not present here.

and in light of the City's cash needs to provide services to its residents.  In

addition, notwithstanding the Objecting Parties' alleged rights, as a practical

matter, the Plan offers creditors greater recoveries than they would achieve if the

City's case were dismissed.  The Plan does not violate the absolute priority rule

with respect to either (a) LTGO Bond Claims because these claims are not entitled

to priority in chapter 9 or (b) secured claims because the absolute priority rule is

inapplicable to such claims.  Additionally, with respect to secured creditors, the

Plan is fair and equitable because it provides that secured creditors will retain their

liens and receive the present value of their claims as of the Effective Date and

otherwise imposes only permissible impairments of such creditors' claims.

The Plan, therefore, is in the best interests of creditors and is fair and equitable.

## IV.      THE PLAN IS FEASIBLE (11 U.S.C. § 943(b)(7))

183.   Pursuant to section 943(b)(7) of the Bankruptcy Code, the

Court shall confirm the plan if, among other things, the plan is "feasible."

See 11 U.S.C. § 943(b)(7).  The City is not required to guarantee that the Plan will

succeed; rather, it must establish that the assumptions and projections underlying

the Plan are reasonable and that, as a result, the Plan is more likely than not to

succeed.  See Mount Carbon, 242 B.R. at 34-35 ("Although success need not be

certain or guaranteed, more is required than mere hopes, desires and speculation.

The probability of future success will depend upon reasonable income and

expense projections....  [P]rojections of future income and expenses must be based

upon reasonable assumptions and must not be speculative or conjectural.")

(internal citations and quotation marks omitted); <u>In re Connector 2000 Ass'n</u>,

447 B.R. 752, 765-66 (Bankr. D.S.C. 2011) (chapter 9 plan was feasible based on

reasonable projections regarding debtor's ability to make payments under the

plan); <u>Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health</u>

<u>Sys.)</u>, 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (chapter 9 plan is feasible if "it

offers a reasonable prospect of success and is workable"); <u>In re Tammarine</u>,

405 B.R. 465, 470 (Bankr. N.D. Ohio 2009) ("preponderance of the evidence

means 'more likely than not'") (citing <u>Gafford v. Gen. Elec. Co.</u>, 997 F.2d 150,

160 (6th Cir. 1993), <u>abrogated on other grounds by</u> <u>Hertz Corp. v. Friend</u>,

559 U.S. 77 (2010)).

     184.   To prove that the Plan is feasible, the City must satisfy two

requirements:  (a) that the City will be able to maintain adequate municipal

services going forward and (b) that the City will be able to make the payments set

forth in the Plan.  <u>See</u>, <u>e.g.</u>, <u>Mount Carbon</u>, 242 B.R. at 34-35 ("[D]etermination

of the feasibility of the plan covers both repayment of pre-petition debt and future

services....  The Court must, in the course of determining feasibility, evaluate

whether it is probable that the debtor can both pay pre-petition debt and provide

future public services at the level necessary to its viability as a municipality.");

Corcoran Hosp. Dist., 233 B.R. at 453-54 (finding that chapter 9 plan was feasible based on reliable testimony that the debtor would be able to make the payments provided under the plan and that the plan was based on reasonable projections of future income and expenses).

185.   The City will demonstrate, through development of the factual record at and before the Confirmation Hearing, that (a) the City's revenue and expense projections are accurate and based on reasonable assumptions, (b) the City will be able to provide long-term, adequate levels of municipal services following its emergence from bankruptcy and (c) the City will be financially viable after the conclusion of the Chapter 9 Case.  Accordingly, the City will establish, by a preponderance of the evidence, that the Plan is feasible under section 943(b)(7) of the Bankruptcy Code.

**A.    The Plan will Enable the City
 to Provide Adequate Municipal Services**

**1.    *The City Has Established Restructuring
 Initiatives to Improve Operational Efficiency***

186.   The Plan is designed to ensure the City's delivery of adequate municipal services after the Effective Date.  Indeed, in furtherance of this goal, the City has already implemented restructuring initiatives to improve the City's operational efficiency.  These include, among other things:

- *Modification of Retiree Benefits.*  Effective March 1, 2014, the City changed the health insurance coverage offered to retirees.

-121-
13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 141 of 256

Going forward, retirees are generally required to obtain health insurance through Medicare or the Affordable Care Act, with retirees under the age of 65 provided a modest stipend, and the City will no longer subsidize dental and vision coverage.[73]

- *Healthcare Redesign for Active Employees.* Starting in 2014, active employees will be offered medical coverage that is equivalent to "Gold" level coverage under the Affordable Care Act instead of "Platinum" level coverage, thus providing health insurance that can attract and retain employees yet which is no longer beyond the City's means.[74]

- *Transition of Lighting Grid.* The City has entered into an "Energy Service Delivery Agreement" with DTE Energy Corporation, pursuant to which the City will exit the electricity business by migrating customers to DTE over a seven-year period. This transition is designed to improve the performance of electrical services, to decommission a power plant and certain substations and to increase revenue collection from customers.[75]

- *Transition of Lighting Work.* The City has begun a systematic effort to address bulb outages through the creation of the Public Lighting Authority (the "PLA"). The PLA also will construct, improve, operate and maintain the public street lighting system.[76]

---

[73] See Plan, Ex. I.A.236; 2014 City of Detroit Retiree Health Care Plan, available at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/Retiree%20Health%20Care%20Plan.pdf.

[74] See 2014 City of Detroit Active Employee Benefits, available at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/Active%20Employee%20Health%20Care%20Plan.pdf.

[75] See Memorandum from David Whitaker, Director, Legislative Policy Division Staff to Detroit City Council (Dec. 18, 2013), available at https://www.detroitmi.gov/Portals/0/docs/legislative/LegislativePolicy/2013/Energy%20Delivery%20Services%20Agreement%20-%20DTE.pdf.

[76] See Emergency Manager Orders No. 6, 14 and 18, available at http://www.detroitmi.gov/EmergencyManager/Orders.aspx.

- *Belle Isle Lease.* In September 2013, the City signed an agreement with the State whereby the State agreed to lease Belle Isle Park for at least 30 years. The State also will invest between $10 and $20 million to upgrade and repair the park, which began operating as a state park in February 2014.[77]

- *Joe Louis Arena.* Olympia Entertainment and the Detroit Red Wings have agreed to the terms of a new sublease with the City, pursuant to which Olympia will pay the City $1 million per year in rent and the Red Wings will pay the City $12 million over three years. A new arena will be completed in 2016, which will be funded by private monies and revenue bonds issued by the Michigan Strategic Fund, which will not constitute debts of the City.[78]

## 2. *The City Will Invest Nearly $1.4 Billion in Reinvestment Initiatives*

187. More importantly, and more demonstrative of the feasibility of the Plan, the Plan also provides that the City will invest approximately $1.4 billion (the "Reinvestment Funds") over a ten-year period to revitalize the City and, among other things, (a) comprehensively address and remediate residential urban blight, (b) improve the operating performance and infrastructure of its police, fire, EMS and transportation departments (among other departments), (c) modernize its

---

[77] See Belle Isle, City of Detroit, http://www.detroitmi.gov/ DepartmentsandAgencies/RecreationDepartment/BelleIsle.aspx (last visited May 26, 2014); Paul Egan & Matt Helms, Michigan Loan Board Approves 30-Year Deal to Lease Belle Isle to State, Detroit Free Press (Nov. 12, 2013), http://www.freep.com/article/20131112/NEWS01/311120055/Michigan-board-to-consider-Belle-Isle-lease-proposals.

[78] See Memorandum from David Whitaker, Director, Legislative Policy Division Staff to Detroit City Council (Mar. 26, 2014), available at http://www.detroitmi.gov/Portals/0/docs/legislative/LegislativePolicy/ 2014/Joe%20Louis%20Arena%20Lease%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.pdf.

information technology systems on a City-wide basis and (d) improve service at all levels to Detroit's citizens.

188.   The Reinvestment Funds are allocated among numerous initiatives based on a department-by-department review that identified and analyzed opportunities to enhance revenues, improve the City's services and operations, make capital expenditures for information technology and invest in fleet and facility improvements, among other department-specific needs. Accordingly, the City, with the assistance of its professionals, developed a comprehensive restructuring initiative that it believes will maximize the benefits of the Reinvestment Funds and ensure the adequacy of municipal services after the Effective Date of the Plan.

189.   A majority of the Reinvestment Funds (over $850 million) will be used as follows for blight removal and the improvement of the City's police, fire and EMS services — two causes that the City has recognized, from the outset of this case, as crucial to the City's restructuring:

- *Blight Removal.*  The City will invest $450 million for blight removal and refurbishing efforts, including an increase in the rate of residential demolitions from 450 per month to 725 per month.

- *Police.*  Over a ten-year period, the City will invest $101.3 million to initiate and maintain a fleet vehicle replacement program, $75.2 million to hire 250 additional civilian personnel, $38.2 million to replace other equipment, $42.8 million in capital expenditures at police facilities,

$17.3 million in technology infrastructure and $8.5 million in other improvements

- *Fire and EMS.*  Over a ten-year period, the City will invest $58.6 million to replace apparatus, $55.3 million in facility-related capital expenditures, $19.0 million in other capital improvements, $19.1 million in labor and training costs and $3.4 million in technology infrastructure.

<u>See</u> Ten-Year Summary of Restructuring Initiatives (Disclosure Statement Ex. I) at 7-13.

190.   The remaining Reinvestment Funds will be used for a variety of purposes to improve municipal services for the City's residents, including:

- *General Services.*  The City will invest the following amounts in the General Services Department, which supports other departments by managing and maintaining much of the City's property:  $60 million in labor, benefits and training, $65.1 million in materials and supplies, $46.4 million in facility improvements, $16.1 million to replace or update vehicles and equipment and $2.4 million in other expenditures.

- *Finance.*  The City's Finance Department manages all financial aspects of City government.  The City will invest $94.6 million in labor, benefits and training costs, $94.8 million in technology, and $19.9 million in other expenditures. In addition, the City will implement cost-saving measures that will save over $65 million, including a $35.8 million reduction in the cost of materials and supplies, $18.0 million in savings on risk management, $7.6 million in savings through the use of new tax software and a $4.4 million reduction in accounting costs.

- *Department of Transportation.*  The City will invest $59.8 million in labor costs to improve service delivery, $40.2 million to expand the DDOT's service network and $10.3 million in capital expenditures.

-125-

- *Other Reinvestment Initiatives.* The City will invest in other miscellaneous initiatives, including $40.3 million for recreation, $32.9 million for human resources, $27.3 million in the Coleman A. Young airport, $22.5 million in the Planning and Development Department and $16.6 million toward improving the Office of the Ombudsperson.

See id. at 18, 21-22, 64-65.

191.   The Reinvestment Funds will be invested over a ten-year period through fiscal year 2023 and, in most cases, the restructuring initiatives are front-loaded, with greater contributions scheduled to occur in the first few years following the Effective Date[79] to put these initiatives into effect as soon as possible without putting undue strain on the City's financial resources.  See id. at 4.

### 3.  *The City Seeks to Increase Tax Revenues Through Strategic Tax Reforms*

192.   The City seeks to strengthen its long-term cash position and its ability to provide adequate municipal services by reforming the assessment and collection of taxes.  First, the City expects that its tax base will increase modestly over time based on the aggregate effects of its restructuring and reinvestment initiatives.  As crime and blight are removed and municipal services are improved, the City can attract local businesses, which will promote economic growth, encourage construction and lead to appreciation in the value of existing real estate.

---

[79]   Over a third of the Reinvestment Funds are scheduled to be spent in fiscal years 2015 ($301 million) and 2016 ($216 million).  See id. at 4.

The City is also considering lowering certain income and property tax rates, which could cause tax revenues to decrease in the short term, but which will encourage long-term growth. Finally, the City is implementing certain initiatives to enhance tax collection efforts, including efforts to identify non-filers and collect past-due taxes. The City has already recovered approximately $3.8 million in additional tax revenue through these efforts as of January 31, 2014.

**4.     *Feasibility Objections Regarding the City's Ability to Provide Adequate Municipal Services are Unfounded***

193.   Several parties have objected to the Plan on feasibility grounds, asserting that the City will not be able to provide adequate municipal services under the Plan. For example, in their objections, Oakland County and Macomb County assert that the Plan does not provide adequate capital improvements to the DWSD and, therefore, is not feasible. See Oakland County Objection, at ¶¶ 25-40; Macomb County Objection, at ¶ 33. The counties, however, do not provide any evidence that the Plan fails to provide adequate capital improvements to the DWSD. Instead, Oakland County vaguely asserts only that "representatives of Oakland County (along with representatives of Macomb and Wayne Counties) reviewed the OHM Report and the City's CIP and determined that the OHM Report and the CIP were severely deficient in terms of the magnitude and cost of the desperately needed capital improvements within the DWSD system." See Oakland County Objection, at ¶ 28. Likewise, Macomb

County states that "forecasts developed by the Counties led by the Macomb County Office of Public Works" show that the DWSD may need capital improvements beyond those provided in the Plan and that the DWSD will have "less cash flow than necessary to operate its system to provide necessary public services."[80] These speculations do not support a denial of confirmation.

194.    Contrary to the counties' assertions, the City remains committed to providing adequate water and sewerage services for its constituents. The City's Financial Projections show that total capital spending for water and sewer projects will exceed $2.85 billion between fiscal years 2014 and 2023. See Disclosure Statement Ex. M ("Capital Improvement Program Financing"). These funds will be used, among other things, to replace water mains; rehabilitate and upgrade water and wastewater treatment plants, pumping stations and reservoirs; rehabilitate or replace sewer lines and outfalls; and construct combined

---

[80]    The DPOA Objection asserts that the Plan is not feasible, although the basis for its objection is unclear. See DPOA Objection, at ¶¶ 44-53. It appears that the DPOA asserts that the Plan is not feasible entirely on the basis of low morale among police officers. Id. at ¶¶ 50, 52. The DPOA, however, cites no authority in support of its objection. Further, as discussed above, the City is taking active measures to improve police services. See Ten-Year Summary of Restructuring Initiatives (Disclosure Statement Ex. I) at 7-10 (showing $38.4 million in technology infrastructure improvements, $34.2 million in capital expenditures and $101.3 million in other expenditures for police over a ten-year period).

sewer outflow control facilities to ensure that sewer systems effectively handle storm water flows and protect the environment.[81]

195.   Importantly, the capital plan for DWSD, while significant, is designed to be implemented without causing a spiking of rates for customers — many of whom cannot afford massive rate increases.  The DWSD business plan is posited on expected rate increases of about 4% annually — which is *substantially* lower than historical rate increases in every year since 2001 (except for 2006).  Thus, the counties have not established, and cannot establish, that the Plan fails to provide adequate funding for DWSD.

## 5.   *The Plan Provides Adequate Post-Effective Date Governance*

196.   Several parties have objected to the Plan on the grounds that it is not feasible because it fails to provide adequate restrictions on the City's post-Effective Date governance.  See, e.g., COPs Objection, at ¶ 81 ("[T]he Plan clearly is feasible from a purely economic viewpoint.  Nonetheless, the plan is not feasible from an execution standpoint because there are inadequate mechanisms to ensure future City leaders do not engage in the same flawed decision making and are not hampered by the same insurmountable obstacles to reform and

---

[81]   See FY 2015 Water Supply System Capital Improvement Program, available at http://www.dwsd.org/downloads_n/about_dwsd/cip/water_fy_2015_cip_bowc_approved_2013-12-18.pdf; FY 2015 Sewage Disposal System Capital Improvement Program, available at http://www.dwsd.org/downloads_n/about_dwsd/cip/sewer_fy_2015_cip_bowc_approved_2013-12-18.pdf.

improvement of City government that greatly contributed to the City's dramatic decline and, ultimately, bankruptcy."); FGIC Objection, at ¶ 34 ("the City has not provided sufficient assurance that whoever is running the City after the Effective Date … will be required to implement the Plan or adhere to the assumptions on which it is based").

197.    These objections rely entirely on speculation and are neither factually nor legally persuasive.  Financial Guaranty Insurance Company ("FGIC"), for example, assumes and argues that the City, following the Effective Date, will ignore the terms of the Plan and triple the budget for restructuring initiatives, willfully violating its duty to implement the Plan as confirmed.  See FGIC Objection, at ¶ 34 (the Plan does not "guaranty that future governing bodies will implement the Plan and will not, for example, decide to triple the budget for the reinvestment initiatives described in Section IX and Exhibit I of the Disclosure Statement").

198.    Contrary to these objections, there are adequate safeguards — including within the Plan itself — to ensure that the Plan is implemented as confirmed.  The Plan requires the establishment of a financial oversight board to "ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that should result in more efficient and effective delivery of services to City residents."  See Plan at § IV.U.  The

financial oversight board will be comprised of individuals with recognized financial competence and experience, and the board will have the authority to impose limits on the City's borrowing and expenditures and to require the City to maintain financial best practices. See Plan at § IV.U.

199.   In aid thereof, on May 22, 2014, the Michigan House of Representatives passed legislation that would create a commission with the authority and duty to oversee the City's operations post-Effective Date. See House Bill No. 5566, available at http://www.legislature.mi.gov/documents/2013-2014/billengrossed/House/pdf/2014-HEBH-5566.pdf; House Bill No. 5567, available at http://www.legislature.mi.gov/documents/2013-2014/billengrossed/House/pdf/2014-HEBH-5567.pdf (together with House Bill 5566, the "State Legislation").

200.   House Bill 5566 provides, among other things, that a nine member financial review commission (the "Financial Review Commission") will be created to "ensure that [the City] is complying with the terms ... of the plan for adjustment," "establish and maintain programs and requirements for the responsible fiscal management of [the City]," "increase[] managerial accountability," "streamlin[e] the provisions of city services and "improve[] collection of outstanding tax revenues." See House Bill No. 5566 at §§ 6(2), 6(5). With respect to the City, the State Legislation provides that the Financial Review

-131-

13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 21:04:59   Page 151 of 256
13-53846-swr   Doc 8054   Filed 10/22/14   Entered 10/22/14 21:04:59   Page 151 of 256

Commission will have the authority to "[r]eview, modify and approve proposed and amended operational budgets," "[r]eview and approve requests ... to issue debt" and "[r]equire the development and implementation of financial best practices." Id. at § 7.  House Bill 5567 requires any city with a population of more than 600,000 to hire a chief financial officer who is responsible for supervising all financial and budget activity and coordinating the city's budgets, financial plans and financial management, among other things.  See House Bill 5567 at § 4S(1)-(2).

201.   The City expects the Michigan Senate to take up the State Legislation over the next few weeks.  In addition, the Court has requested, and the Plan will include, continuing reporting obligations to the Court regarding the Plan's implementation.

202.   Finally, the individuals running the City after the Effective Date will be required to adhere to the Plan.  See 11 U.S.C. § 944(a) ("The provisions of a confirmed plan bind the debtor and any creditor ...."); In re City of Colo. Springs Spring Creek Gen. Improvement Dist., 177 B.R. 684, 690 (Bankr. D. Colo. 1995) ("Section 944(a) specifically provides that a confirmed plan bind[s] the debtor and any creditor...."); see also Official Comm. of Unsecured Creditors v. Qwest Commc'ns Corp. (In re A.P. Liquidating Co.), 283 B.R. 456, 459 (Bankr. E.D. Mich. 2002) (noting that under section 1141(a) of

the Bankruptcy Code, which contains language similar to section 944(a), "the effect of plan confirmation is to bind all parties to the terms of a plan of reorganization"), aff'd, 350 B.R. 752 (E.D. Mich. 2006).

203.   In light of the Plan's governance structure, the State Legislation and the requirements of the Bankruptcy Code, the Objecting Parties' concern that the individuals responsible for implementing the Plan will simply ignore it cannot succeed as an objection to Plan confirmation.

**B.      The City Will Be Able to Make
the Payments Required Under the Plan**

204.   To satisfy its burden of proof, the City must show that the Plan is based on financial projections that are reasonable and not speculative, conjectural or overly optimistic.  See ¶ 184, *supra.*  The City has prepared, with the assistance of its restructuring advisors, Ernst & Young LLP ("E&Y") and Conway MacKenzie, Inc. ("Conway MacKenzie"), financial projections, which are attached as Exhibits I through M of the Disclosure Statement (collectively, the "Financial Projections").  These Financial Projections include, among other things:  (a) a ten-year summary of the Plan's restructuring and reinvestment initiatives, on a department-by-department basis, including revenues, expenditures, total reorganization/investment and incremental headcounts; (b) ten-year and 40-year financial projections under the Plan, including projections for tax and other revenues, expenditures, reinvestment initiatives,

capital investments, operating expenditures and debt service; and (c) ten-year projections for the City's funding of the water and sewerage disposal systems.

205.   Several parties have objected to the Plan on the grounds that the Financial Projections are not reasonable.  Oakland County, for example, challenges the DWSD revenue projections, alleges that the City's projections fail to resolve delinquent accounts and asserts that the DWSD will have limited access to capital markets.  See Oakland County Objection, at ¶¶ 41-49.  Macomb County similarly argues that the Plan will prevent the DWSD from obtaining financing.  See Macomb County Objection, at ¶ 33.  Syncora Assured Capital and Syncora Guarantee Inc. (collectively, "Syncora") assert, without further elaboration, that the City's financial projections are "indiscernible" and "likely flawed."  See Syncora Objection, at ¶ 88.[82]

206.   These objections should be overruled because (a) the Financial Projections are objectively reasonable, (b) the objectors have not submitted any evidence that the Financial Projections are unreasonable and (c) the testimony and opinions of the City's fact and expert witnesses will further support the conclusion that the Financial Projections are reasonable.

---

[82]   The Assured Objection also argues that the City will not be able to make payments to holders of GRS Pension Claims, and that the Plan is therefore not feasible, because DWSD revenues cannot be used to pay GRS Pension Claims under applicable state law.  See Assured Objection, at ¶ 137.  For the reasons set forth at paragraphs 216-42 of this Reply, Assured's legal analysis is flawed.

### (a) The Financial Projections Are Objectively Reasonable

207. Several Objecting Parties vaguely assert that the Plan is not feasible because the Financial Projections are "flawed" or because the Plan is a "visionary scheme." See, e.g., Syncora Objection, at ¶¶ 88-89; Oakland County Objection, at ¶¶ 17-24 (citing Mount Carbon). To the contrary, the Financial Projections are objectively reasonable and are nothing like the "inflexible," "overly optimistic" and "conjectural assumptions" that have been found to be unreliable for feasibility purposes under section 943(b)(7) of the Bankruptcy Code.

208. In Mount Carbon, the court found that the debtor's financial projections were unreasonable because, among other things: (a) the projections provided that land value would increase at a rate of 5% per year, every year for 40 years, an aggregate increase of over 670%, which was inconsistent with historical real estate trends; (b) the anticipated sale of over 1,800 homes and 4.5 million square feet of commercial space was unrealistic given that the debtor lacked any material infrastructure; (c) the projections required development densities that exceeded any other area in the vicinity and violated zoning restrictions; (d) the debtor failed to provide any expense projections at all; and (e) the debtor assumed that office and high-tech industrial development would

occur at a rate more than double what could reasonably be expected.  See Mount Carbon, 242 B.R. at 28-29.

209.   In light of these flaws, an expert witness in the case, whose testimony was largely unchallenged, determined that the debtor had overstated likely revenues by more than 1,300%.  Id. (debtor projected revenues of $1.4 billion, but realistic revenues were only $100 million).  Furthermore, the court found that the payments under the debtor's plan could not be paid in full unless every single optimistic assumption in the projections came true.  Id. at 27 ("The Development Projections leave no room for error.  They must be met precisely or exceeded in order for the District to repay the Exchange Bonds within the 40-year window.").  Thus, the court concluded that the debtor's projections were unreasonable and that the debtor's plan was not feasible.

210.   The City's Financial Projections, unlike the projections in Mount Carbon, are based on reasonable assumptions developed by the City and its professionals.  For example, the Financial Projections assume that certain tax revenues, like municipal income taxes, will eventually increase modestly based on the City's general improved employment outlook whereas other tax revenues, like wagering taxes, will decrease as a result of increased economic competition. See Ten-Year Financial Projections (Disclosure Statement Ex. J) at 4-5.  Salaries and wages for uniformed employees are expected to increase beginning in fiscal

year 2015 as the City begins to provide improved levels of service to City residents.  Id.  One time revenues and expenses, like the potential sale of Veteran's Memorial Building and certain capital expenditures, are appropriately factored into the Financial Projections.  Id.

211.   A review of the Financial Projections highlights their reasonableness.  For example, the City's 10-year projections suggest that total revenues will remain relatively static, and in fact, are likely to decrease slightly, in the short term.  The City predicts that total revenues will be $1.081 billion in 2014 — a 5% decrease from 2013 revenues — and will remain between $1.018 billion and $1.081 billion every year through fiscal year 2023.  See Ten-Year Financial Projections (Disclosure Statement Ex. J) at 6.  Operating expenditures are similarly expected to increase only modestly on a yearly basis from a low of $671.1 million in 2014 to a high of $794.9 million in 2023.  See id.  These projections are consistent with recent historical data, which shows that operating expenditures decreased every year from 2008 to 2013, with total operating expenditures in 2013 of $714.3 million.  Id.

212.   The City's 40-year projections also are reasonable because they forecast only modest growth based on the City's numerous restructuring and reinvestment initiatives.  The 40-year projections indicate that municipal income tax revenue will increase at a rate of between 2.4% and 2.8% per year after 2023,

and that other revenue sources will increase at rates between 0.1% and 2.2%.

See 40-Year Financial Projections (Disclosure Statement Ex. K).  Likewise, the

City's expenses are expected to increase, after 2023, at a rate of around 2% per

year.  Id.  The 40-year projections forecast a total surplus of nearly $149 million

over 40 years, which provides the City with flexibility that did not exist in the

unreasonable projections in Mount Carbon.  See id.

### (b)     The Evidence Adduced At and Before the Confirmation Hearing Will Further Confirm the Reasonableness of the Financial Projections

213.   The Objecting Parties have not provided any evidence that the

Financial Projections are unreasonable.  Through discovery and testimony at the

Confirmation Hearing, the City will provide the Court with ample support for the

reasonableness of the Financial Projections.[83]  See Corcoran Hosp. Dist., 233 B.R.

at 452 (chapter 9 debtor proved that plan was feasible based primarily on the

testimony of three fact witnesses: the debtor's CEO, the debtor's CFO and the city

manager of the city in which the hospital district was located); Sanitary &

Improvement Dist., No. 7, 98 B.R. at 975 (chapter 9 plan satisfied feasibility

requirement where debtor submitted testimony of two expert witnesses regarding

debtor's ability to make plan payments).

---

[83]     See City's Amended List of Fact Witnesses Related to the Proposed Plan for the Adjustment of Debts (Apr. 18, 2014) (Docket No. 4187).  The City reserves the right to further amend its list of fact witnesses as necessary.

214.   The Oakland County Objection, Macomb County Objection, Syncora Objection and FGIC Objection contain only bare assertions that the City will be unable to make the required payments under the Plan, and these objections are not supported by any evidence.  Once discovery is complete and all fact and expert witnesses testify at or before the Confirmation Hearing, the evidence will demonstrate that these objections are meritless and that the Plan is feasible because the City will be able to make all payments required under the Plan.

## V.   THE CITY IS NOT PROHIBITED BY LAW FROM TAKING ANY ACTION NECESSARY TO CARRY OUT THE PLAN (11 U.S.C. § 943(b)(4))

215.   Section 943(b)(4) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the debtor is not prohibited by law from taking any action necessary to carry out the plan."  11 U.S.C. § 943(b)(4).  As set forth below, the Plan satisfies section 943(b)(4) and all Objections to the contrary should be overruled.

### A.   The DWSD Pension Funding is Lawful

216.   Under the Plan, during the period from the Effective Date through June 30, 2023, DWSD will make payments to GRS on account of what is currently calculated to be DWSD's full allocable share of the unfunded actuarially accrued liabilities ("UAAL") of GRS remaining *after* the pension modifications contemplated by the Plan (as proposed, the "DWSD Pension Funding").

A number of Objecting Parties argue, in a nutshell, that the DWSD Pension

Funding violates state and local law by diverting collateral subject to the DWSD

bondholders' liens to pay the City's pension liabilities.[84]  For the reasons set forth

below, the DWSD Pension Funding is entirely lawful and does not violate

section 943(b)(4) of the Bankruptcy Code.

1.    *The DWSD Pension Funding*

217.    As employees and retirees of a City department, DWSD

employees and retirees participate in the GRS along with other non-uniform City

employees and retirees.  As set forth below, applicable state law permits DWSD

to be charged, and pay directly to the GRS, its allocable share of the periodic

contributions required to be made to the GRS as a cost and expense of operating

the City's Water Supply System (the "Water System") and the Sewage Disposal

---

[84]    See Assured Objection, at ¶¶ 96, 115-122; NPFG Objection ,at ¶¶ 83-90; DWSD Bond Trustee Objection, at ¶¶ 1-4, 25-27, 45-47; Oakland County Objection, at ¶¶ 58-65; Macomb County Objection, at ¶¶ 19-21.

Notably, according to the Macomb County Objection, the City sells wastewater disposal (i.e., sewerage) services to the Oakland-Macomb Interceptor Drain Drainage District ("OMI") pursuant to the "OMI-Detroit Agreement."  Macomb County Objection, at ¶ 1.  Macomb County claims to be a third party beneficiary of the OMI-Detroit Agreement, but apparently is not party to a contract with the City directly and, thus, its standing to object is not immediately apparent.  Id. at ¶ 3.  Moreover, in its argument that the DWSD Pension Funding violates Michigan law, the Macomb County Objection cites M.C.L. § 123.141(2), which governs the sale of water.  As noted, Macomb County's relationship with the City, however attenuated, relates to sewerage services, not water.

System (the "<u>Sewage System</u>" and, together with the Water System,
the "<u>Systems</u>").  The share of GRS contributions allocated to DWSD represents
the accumulated cost of providing pensions to employees and retirees of DWSD.

218.  The Plan proposes to modify benefits that already are accrued
under the GRS pension plan.  In connection with the Plan, the City has calculated
the aggregate amount of the claims of participants in GRS for the unfunded
accrued actuarial liabilities of the GRS utilizing, among other assumptions, a
6.75% discount rate to value liabilities and a 6.75% investment return rate for
future growth of assets.  <u>See</u> Disclosure Statement at 13.  The resulting amount is
the $1.879 billion amount of the Allowed GRS Claims in Class 11.  The Plan then
impairs the Allowed GRS Claims by providing to holders of such claims their
"GRS Adjusted Pension Amount," which represents an amount less than the full
amount of their claims.  <u>See</u> Plan at § II.B.3.r.ii.C; Disclosure Statement at § II.B.

219.  After determining the reduced amount that the City will be
required to pay under the Plan on account of the total accrued liabilities of GRS
(<u>i.e.</u>, *after* benefit reductions are taken into account), the City determined how
much of that amount is attributable to DWSD's employees and retirees based on
how GRS has allocated those amounts in the past.[85]  It is this amount — DWSD's
share of pension liabilities as modified by the Plan — that DWSD will pay in the

---

[85]      DWSD historically has been expected to account for approximately 30-33%
of the contributions to GRS.

DWSD Pension Funding, together with certain related administrative costs and about $20 million in overall restructuring costs related to this chapter 9 case.

**2.** ***Applicable Law (a) Requires DWSD to Make Contributions to GRS and (b) Permits DWSD to Charge Fees Proportionate to the Costs of Providing Services***

220. Pursuant to the City Charter and State law, an enterprise system, such as DWSD, may charge fees for services conferred on the ratepayers/users of the Systems that are proportionate to the necessary costs of the service. Specifically, section 7-1203 of the City Charter provides that "[a]ll moneys paid into the city treasury from fees collected for water, drainage or sewerage services shall be used exclusively for the payment of expenses incurred in the provision of these services, including the interest of principal of any obligations issued to finance the water supply and sewerage disposal facilities of the city, and shall be kept in separate funds." City Charter at § 7-1203. In addition, the case of <u>Bolt v. City of Lansing</u>, 587 N.W.2d 264 (Mich. 1998), establishes that the Systems cannot charge rates in excess of those that are necessary to fund the "direct and indirect costs" of administering the Systems. <u>See</u> <u>id.</u> at 270 ("The revenue to be derived from the [storm water sewer] charge is clearly in excess of the direct and indirect costs of actually using the storm water system over the next thirty years and, being thus disproportionate to the costs of the service provided and the benefits rendered, constitutes a tax.").

221.   By ordinance, DWSD is charged and pays directly to GRS its allocable share of the periodic contributions required to be made to GRS by the City.  Specifically, section 47-2-18(h)(2) of the Detroit City Code provides that "City contributions to [GRS] to the extent necessary to provide pensions on account of members who are employees of a revenue-supported division of the City *shall be made from the revenues of the said division*.  Any City contribution to [GRS] from any Fund by law with a certain and definite purpose shall at the direction of the Finance Director, be accounted for separately."  Detroit City Code § 47-2-18(h)(2) (emphasis added).[86]  As set forth below, DWSD makes these payments as a cost and expense of operating the Systems ahead of debt service.

**3.      *Under the Ordinances and the Indentures,
Bondholders Do Not Have Liens on Revenues
Transferred to the Operation and Maintenance Funds***

222.   The Water System and Sewage System that serve the City are operated, managed and accounted for by the City as separate enterprise funds through the DWSD.  Over the years, the Water System has issued multiple series

---

[86]      This is the only provision of the Detroit City Code in which contributions from an enterprise fund, such as DWSD, are addressed.  Elsewhere throughout Chapter 47 of the Detroit City Code (which governs the GRS), contributions are uniformly referred to as City obligations, and there are no references to different classes or groups of City members or beneficiaries; they are referred to simply in one group as City employees or City retirees. Section 47-2-18(h)(2) of the Detroit City Code discusses the accounting of the funds so as to ensure that enterprise funds pay only their proportionate share of the total liability.

of bonds pursuant to (A) Michigan Public Act 94 of 1933, the Revenue Bond Act, M.C.L. §§ 141.101 *et seq.* (as amended) ("Act 94") and (B) City Council Ordinance No. 30-02, adopted November 27, 2002 (the "Water Ordinance"). The securities issued pursuant to the Water Ordinance are governed by a Trust Indenture, dated as of February 1, 2013, among the City, the Department and U.S. Bank National Association ("U.S. Bank"), as trustee (the "Water Indenture"). Similarly, over the years, the Sewage System has issued a number of securities pursuant to (A) Act 94 and (B) City Council Ordinance No. 18-01, adopted October 18, 2001 (the "Sewer Ordinance" and, together with the Water Ordinance, the "Ordinances"),which securities are governed by a Trust Indenture, dated as of June 1, 2012, among the City, the Department and U.S. Bank, as trustee (the "Sewer Indenture" and, together with the Water Indenture, the "Indentures"). Pursuant to the Ordinances, an "Operation and Maintenance Fund," among other funds and accounts, has been established for each System. See Water Ordinance, § 12(A)(1); Sewer Ordinance, § 12(A)(a).

223. Both Ordinances provide that the revenues from the Systems are to be collected and credited to a "Receiving Fund." See Water Ordinance, § 12(B); Sewer Ordinance, § 12(B). Amounts credited to the Receiving Fund then are transferred initially into the Operation and Maintenance Fund. Once the required amount has been credited to the Operation and Maintenance Fund,

amounts are transferred to the second fund listed in the Ordinances and, once the

maximum amount has been credited to that fund, amounts are transferred to the

third fund listed in the Ordinances, and so on, thereby creating a "waterfall" of

transfers.  <u>See</u> Water Ordinance, § 12(B); Sewer Ordinance, § 12(B).  The

Ordinances and the Indentures also provide that amounts in the Operation and

Maintenance Funds are to "be used to pay the expenses of administration and

operation of the System … and such current expenses for the maintenance thereof

as may be necessary to preserve the same in good repair and working order"

(collectively, the "<u>Administration and Operation Expenses</u>").  Water Ordinance,

§ 13(B); Sewer Ordinance, § 13(B); Water Indenture § 2.04(c); Sewer Indenture

§ 2.04(c); <u>see</u> <u>also</u> Water Ordinance, § 12(B); Sewer Ordinance, § 12(B).

224.   Under both Ordinances, DWSD bondholders have liens on

"<u>Pledged Assets</u>," which consist of, in relevant part:  (a) "Net Revenues," which

consist of revenues *other than those transferred to the Operation and

Maintenance Fund*; and (b) "the funds and accounts established by or pursuant to

[the Ordinances] *except for the Operation and Maintenance Fund* and the

Construction Fund *and any account thereof*."  Sewer Ordinance § 1; Water

Ordinance § 1.

225.   Both Indentures further provide, among other things, that:

(a) the Operation and Maintenance Fund is *not* part of the trust estate held for the

benefit of DWSD bondholders; (b) funds at any time on deposit in or credited to the Operation and Maintenance Fund (i.e., the Administration and Operation Expenses) are not Pledged Assets (i.e., do not serve as collateral for the DWSD bonds and are not subject to the liens in favor of the DWSD bondholders); and (c) the DWSD "shall have sole and exclusive authority to withdraw funds from the Operation and Maintenance Fund for such purposes as it, in its sole discretion, may at any time and from time to time deem necessary or appropriate." Water Indenture § 2.04(b), (c); Sewer Indenture, § 2.04(b), (c).

### 4. *DWSD's GRS Contributions Are Properly Paid from the Operation and Maintenance Funds*

226. Historically, DWSD has made its periodic contributions required to be made to the GRS as a cost and expense of operating the Systems from the Systems' respective Operation and Maintenance Funds. This practice is consistent with the terms of the various DWSD bond offerings. See, e.g. Official Statement for the $500,675,000 City of Detroit Water Supply System Revenue & Refunding Senior Lien Bonds — Series 2011(A), Series 2011(B) & Series 2011(C), at 27, 31-32 ("Department employees are members of [GRS]. *Payments to the pension fund are charged administratively by the City to the Water Supply System and are treated as an administrative expense of the Water Supply System. These amounts are calculated to be amounts necessary to fund financial benefits as earned (Normal costs) as well as an amount necessary to*

*amortize unfunded accrued liabilities (UAAL)…*. As described earlier, the City annually allocates a portion of its cost of payments to the [GRS] to the Water Supply System as an administrative decision and the Water Supply System pays these costs from amounts held under the Ordinance…. *The City has paid pension costs, including Service Payments allocated to the Water Supply System, from Revenues as part of the expenses of administration and operation of the Water Supply System. The Ordinance provides that expenses of administration and operation of the Water Supply System and current expenses of maintenance of the Water Supply System are payable from the Operation and Maintenance Fund in accordance with Act 94….*") (emphasis added); Remarketing Circular for the Remarketing of Series 2001(C-1) and Series 2003(B) Sewage Disposal System Bonds, at 26 ("Department employees are members of the City's General Retirement System. *Payments to the pension fund are made as an administrative expense of the Sewage Disposal System* as a percentage of payroll, based on annual actuarial studies. These studies determine the amount necessary to fund the financial benefits as earned *as well as an amount necessary to amortize unfunded accrued liabilities*.") (emphasis added).

227. Thus, DWSD's contributions to the GRS always have been payable as Administration and Operation Expenses and never have been subject to the DWSD bondholders' liens on the Pledged Assets. To the contrary, whatever

amounts are paid as the "expenses of administration and operation of the System"

(i.e., from the Operation and Maintenance Fund) are expressly excluded from the

Pledged Assets and are, therefore, free from the DWSD bondholders' liens.[87]

228.    DWSD's contributions to the GRS fall within the meaning of

the "expenses of administration and operation of the System" under the Ordinances

because they are directly related to the "ordinary and typical activities" of the

Systems.  See Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.),

503 B.R. 849 (Bankr. N.D. Ala. 2013).  In Jefferson County, the question before

the court was the extent to which professional fees actually incurred by Jefferson

County during its municipal bankruptcy were payable out of revenues generated

from its sewer system.  503 B.R. at 856.  Jefferson County's sewer warrants were

governed by a trust indenture that created a payment "waterfall" much like the one

at issue in the City's case — after the payment of specified "Operating Expenses,"

the remaining "System Revenues" were subjected to a lien in favor of the warrant

---

[87]    The Objecting Parties seem to imply that, because the Systems determine
Administration and Operation Expenses monthly, and such monthly amounts
are exempted from the bondholders' lien, somehow all future projected
pension expenses are subject to the bondholders' lien.  This is a fallacy.  In
reality and in practice, DWSD determines what it needs to expend for
Administration and Operation Expenses for the next month (including
pension expenses), and the month's Administration and Operation Expenses
are then first diverted to the Operation and Maintenance Fund, which is not
subject to the bondholders' lien.  This pattern will repeat itself each month
for the next nine years of the DWSD Pension Funding.  Indeed, it will repeat
itself, as it has for decades past, until all the bonds are paid off.

holders.  Id. at 857-58.  The trust indenture in that case defined "Operating

Expenses" as:

> ***the reasonable and necessary expenses of efficiently
> and economically administering and operating the
> [Sewer] System***, including, without limitation, the costs
> of all items of labor, materials, supplies, equipment
> (other than equipment chargeable to fixed capital
> account), premiums on insurance policies and fidelity
> bonds maintained with respect to the [Sewer] System
> (including casualty, liability and any other types of
> insurance), fees for engineers, attorneys and accountants
> (except where such fees are chargeable to fixed capital
> account) and all other items, except depreciation,
> amortization, interest and payments made pursuant to
> Qualified Swaps, ***that by generally accepted accounting
> principles are properly chargeable to expenses of
> administration and operation and are not characterized
> as extraordinary items***….

Id. at 865-66 (emphasis in original).

229.   After extensive consideration of the trust indenture as a whole,

Alabama state law and generally accepted accounting principles to determine

whether the fees were excluded "extraordinary items," the Jefferson County court

determined that those professional fees incurred by the debtor that involved the

"ordinary and typical activities of the Sewer System" would fall within "Operating

Expenses" under the indenture.  Id. at 887-90.  Thus, interpreting an indenture with

a definition of "Operating Expenses" that is significantly more restrictive than the

definition of Administration and Operation Expenses here, the court found that

professional fees actually incurred by the debtor in operations would be "Operating Expenses" not subject to the warrant holders' liens.

230. Here, DWSD's pension contributions involve the "ordinary and typical" activities of the Systems — i.e., the payment of accrued retirement benefits directly attributable to its employees — and, thus, are expenses of administration and operation of the Systems payable from the Operation and Maintenance Funds.

231. As noted above, the DWSD Pension Funding also includes approximately $20 million in restructuring expenses related to this chapter 9 case. These costs also are properly paid from the Systems ahead of the debt service on the bondholders' liens. In Jefferson County, the court found that those professional fees incurred by the debtor that were "directly related" to the chapter 9 case were "extraordinary items" that were not part of the sewer system's "Operating Expenses" under the terms of the indenture. In re Jefferson Cnty., 503 B.R. at 887. *However, the court found that those professional fees nevertheless were free of — and could be paid ahead of the debt service on* — the warrant holders' liens as "necessary operating expenses" under section 928(b) of the Bankruptcy Code. Id. at 903 ("The remaining portion [of professional fees], those that are not [i]ndenture defined Operating Expenses, are within those categories of expenditures that are 'necessary operating expenses' for purposes of 11 U.S.C. § 928(b)'s alteration of

-150-

13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:10:45   Page 170 of 256
13-53846-swr   Doc 8065   Filed 10/17/14   Entered 10/17/14 22:10:59   Page 170 of 256

the contracted-for flow of monies and allowance of their payment ahead of application of the pledged special revenues…. In other words, the lien on the post-petition acquired Net Revenues that is preserved during the period following the County's chapter 9 filing by 11 U.S.C. § 928(a) is subjected by 11 U.S.C. § 928(b) to payment of this part of the categories of the Professional Fees as 'necessary operating expenses' of the Sewer System.").

232. Thus, that portion of the DWSD Pension Funding that consists of restructuring costs related directly to this chapter 9 case (even if not Administration and Operation Expenses under the Ordinances and Indentures), also is free of, and properly paid by the Systems ahead of the debt service on, the DWSD bondholders' liens.

**5.** ***The DWSD Pension Funding is Consistent with Historical Practice and Comports with Applicable Law***

233. As set forth above, DWSD lawfully and historically has made its required contributions to GRS from the Systems' Operation and Maintenance Funds. Also as set forth above, neither the Operation and Maintenance Funds nor the Systems' revenues transferred thereto are subject to the DWSD bondholders' liens. The DWSD Pension Funding proposed in the Plan is entirely consistent with this lawful practice. The only thing that will change is the timing — the DWSD Pension Funding amortizes DWSD's allocable share of GRS UAAL over a

period of nine years instead of a longer period, which, as set forth below, is lawful.

### (a) The DWSD Pension Funding is Consistent with <u>Bolt</u> and the City Charter

234. The DWSD Pension Funding is consistent with limits established by State and local law. The contributions from DWSD to GRS contemplated by the Plan, which will be derived — as they have been historically — from rates that DWSD will charge to users of the Systems during the period through June 30, 2023, are on account of *accrued liabilities attributable to DWSD.* Thus, consistent with <u>Bolt</u> and contrary to the unsupported allegations of certain Objecting Parties, the rates that DWSD will charge to users of the Systems will not exceed the amounts necessary to fund the direct and indirect costs of administering the Systems. <u>See</u> <u>Bolt</u>, 587 N.W.2d at 270.

235. The DWSD Pension Funding causes DWSD to pay *only* that portion of the GRS UAAL that is directly attributable to DWSD's employees and retirees. Such payments, thus, are on account of "expenses incurred in the provision of [DWSD's] services" in accordance with section 7-1203 of the City Charter. Provided that the assumptions underlying the Plan hold true, DWSD will

not be required to make any additional contributions on account of its allocable share of GRS UAAL after June 30, 2023.[88]

236. Furthermore, it is not expected that the DWSD Pension Funding will be accompanied by rate increases. In particular, any increase in the amount of DWSD's contributions to GRS resulting from the shorter amortization period contemplated by the DWSD Pension Funding is expected to be offset by the Plan's elimination of substantial OPEB and COPs liabilities attributable to DWSD. See Section III.E.1.d, *supra*. Thus, the DWSD Pension Funding is consistent with Bolt and the City Charter, and any Objections to the contrary should be overruled.

**(b)  The DWSD Pension Funding is a Current Expense of the Systems That May be Amortized Over a Period of Nine Years**

237. The Ordinances provide that the amount of the Systems' revenues that shall be transferred to their respective Operation and Maintenance Funds shall be "a sum sufficient to provide for the payment of the next month's expenses of administration and operation of the System … and such current expenses for the maintenance thereof as may be necessary to preserve the same in good repair and working order." Water Ordinance, § 12(B); Sewer Ordinance,

---

[88]  The Objecting Parties incorrectly assert that the City will not make contributions to GRS from the General Fund during the nine year period ending June 30, 2023. In fact, as set forth in Section II.B.3.r.ii.A of the Plan and Exhibit II.B.3.r.ii.A to the Plan, the City plans to make approximately $114 million in contributions from the General Fund to GRS over this nine-year period.

§ 12(B). Several Objecting Parties argue that the DWSD Pension Funding is not a "current expense" of the Systems, and is therefore unlawful, because (a) the GRS pension plan is "frozen" and (b) DWSD's allocable share of the GRS UAAL is a "long term liability that can be amortized over thirty years."[89] These arguments fail.

238. DWSD's contributions to GRS under the Plan are not rendered non-current expenses due to the fact that (a) the GRS pension plan will be frozen as of June 30, 2014 and (b) the UAAL, though due and owing ***now***, is traditionally amortized over time simply to avoid cash flow crunches for payments of very large liabilities. The DWSD Pension Funding consists of payments on account of unfunded, ***already accrued*** liabilities attributable to DWSD that DWSD is required to pay under State law.[90] This requirement is not excused by the fact that the pension system will be frozen, and no case law or statute provides otherwise. Moreover, that a presently due liability is amortized over time does not make it

---

[89] See DWSD Bond Trustee Objection, at ¶¶ 30-38, 45-47; Assured Objection, at ¶¶ 22-25, 95-96, 123-127; NPFG Objection, at ¶¶ 83-88.

[90] See Shelby Twp. Police & Fire Ret. Bd. v. Charter Twp. of Shelby, 475 N.W.2d 249, 252 (Mich. 1991) (finding that Article IX, Section 24 of the Michigan Constitution "expressly mandates townships and municipalities to fund all public employee pension systems to a level which includes unfunded accrued liabilities"); M.C.L. § 38.1140m (stating that the annual required employer contribution "shall consist of a current service cost payment and a payment of at least the annual accrued amortized interest on any unfunded actuarial liability and the payment of the annual accrued amortized portion of the unfunded principal liability").

-154-

13-53846-swr   Doc 8045   Filed 10/17/14   Entered 10/17/14 22:04:59   Page 174 of 256
13-53846-swr   Doc 8054   Filed 10/17/14   Entered 10/17/14 22:10:45   Page 174 of 256

"non-current." A "now due" payment on an amortized liability is a current expense. Thus, amortized UAAL payments, such as those contemplated by the DWSD Pension Funding, are current expenses of the Systems properly paid from the Operation and Maintenance Funds. Certainly, no one can credibly argue that the portion of such liability that comes due each month for the Systems is not a current expense of the Systems for that month.

239. Further, the amortization of DWSD's allocable share of the GRS UAAL over a period of nine years under the Plan is consistent with applicable law. Although Michigan law provides that the amortization period for UAAL can be *no greater than* 30 years, it does not prohibit the use of a shorter amortization period. See M.C.L. § 38.1140m; see also Bd. of Trs. v. City of Detroit, 714 N.W.2d 658, 662 (Mich. Ct. App. 2006) (holding that retirement system board's decision to set amortization period at 14 years trumped a City ordinance that required the use of a 20-year amortization period). As of the Petition Date, GRS was using a 30-year open-ended amortization for the GRS UAAL. At other times, however, GRS has used shorter amortization periods.[91] Thus, amortization rates for pension UAALs can change — and have in fact

---

[91] See, e.g., Official Statement for Series 2003-A, 2003-B and 2003-C Water System Bonds, Appendix C, at C-14 (providing that, as of June 30, 2002, GRS UAAL amortized over a period of 20 years); Official Statement for Series 2005-A and 2005-B Sewage System Bonds, Appendix C, at C-14 (providing that, as of June 30, 2004, GRS UAAL amortized over a period of 15 years).

changed. The decision to amortize DWSD's allocable share of the GRS UAAL over nine years is, thus, proper and lawful.

### (c) The DWSD Pension Funding Does Not Strip the Bondholders of Their Liens

240. Several Objecting Parties argue that the DWSD Pension Funding violates section 928 of the Bankruptcy Code by requiring the payment of expenses that are not "expenses of administration and operation" of the Systems ahead of DWSD bondholder debt service, thereby "stripping" the DWSD bondholders of their liens.[92] This argument also fails.

241. Section 928(a) of the Bankruptcy Code provides that, subject to section 928(b), "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). Section 928(a), thus, preserves the DWSD bondholders' liens during the City's chapter 9 case, subject to section 928(b). Section 928(b) of the Bankruptcy Code provides that "[a]ny such lien on special revenues … derived from a project or system shall be subject to the necessary operating expenses of such project or system …." 11 U.S.C. § 928(b).

---

[92] See DWSD Bond Trustee Objection, at ¶¶ 35-36; NPFG Objection, at ¶¶ 83-90; Assured Objection, at ¶ 96.

242.  For "pledges of special revenues that allow payment of at least some operating expenses ahead of debt" (i.e., "for pledges that are not gross revenues") — such as the pledges at issue here — the Court "should defer to the agreed to pledge and distributive design … that is expressed in the contract" between the parties for purposes of determining whether section 928(b) applies. Jefferson Cnty., 482 B.R. at 442.  As explained in detail above:  (a) under the Indentures, the DWSD bondholders' liens expressly do not extend to the Operation and Maintenance Funds and the revenues transferred thereto; and (b) under applicable law, the DWSD Pension Funding is properly paid from the Operation and Maintenance Funds.  See ¶¶ 222-32, *supra*.  Because the DWSD bondholders' lien does not extend to the funds from which the DWSD Pension Funding is properly paid, the DWSD Pension Funding does not — and cannot possibly — "strip" the DWSD bondholders of their liens.

## B.  The Plan's Allocation of Proceeds from a Potential Qualifying DWSD Transaction Does Not Violate Section 943(b)(4)

243.  Several Objecting Parties argue that the Plan violates applicable nonbankruptcy law through its incorporation of the concept of the DWSD CVR.  See Macomb County Objection, at ¶ 22; Assured Objection, at ¶¶ 132-33.  In particular, the Macomb County Objection argues that the issuance of the DWSD CVR to the Restoration Trust is a violation of the City Charter provision that requires that "moneys paid into the city treasury from fees

collected for water, drainage or sewerage services … be used exclusively for the

payment of expenses incurred in the provision of these services."  Macomb

County Objection, at ¶ 22.  This argument misapprehends what the DWSD CVR

is and does.  The Plan, via the DWSD CVR, merely allocates and shares a portion

of any value *that might properly be paid to the General Fund* from any potential

future Qualifying DWSD Transaction.  If a Qualifying DWSD Transaction ever

occurs, but the General Fund receives no value from that Qualifying DWSD

Transaction, no value can or will be shared (i.e., no value will arise under the

DWSD CVR).

    244.  Assured argues that "by allocating the potential proceeds of a

Qualifying DWSD Transaction to the pension Restoration Trust," the Plan violates

the Ordinances, which, according to Assured, prohibit the City "from disposing of

the DWSD Systems, or any substantial portion thereof, unless the DWSD

Bondholders 'have been paid in full as to both principal and interest.'"  Assured

Objection, at ¶ 132.  This objection is speculative, as it is not yet known whether a

Qualifying DWSD Transaction will be consummated, what form it might take or

whether it would implicate the Ordinances at all.  Should the City decide to

consummate a Qualifying DWSD Transaction, the City would have to comply

with applicable law in connection therewith.  Thus, the possibility of the

consummation of a Qualifying DWSD Transaction and the issuance of the DWSD

CVR simply do not render the Plan unconfirmable under section 943(b)(4) of the Bankruptcy Code.

### C. The Plan Provisions Enjoining Modification of Pension Benefits for Ten Years Are Lawful and Proper

245. The DPOA Objection and DFFA Objection argue that section 943(b)(4) of the Bankruptcy Code prohibits confirmation of the Plan because the Plan envisions this Court issuing an injunction against modification of the pension benefits established in the Plan for ten years. In the Objecting Parties' view, such an injunction would violate the City's duty to collectively bargain over pension benefits under Michigan Public Act 336 of 1947, the Public Employment Relations Act ("PERA"), M.C.L. §§ 423.201 *et seq.* (as amended). For several reasons, however, section 943(b)(4) does not preclude confirmation of the Plan on these grounds.

246. As an initial matter, the Plan's injunction does not run afoul of section 943(b)(4) because the injunction does not require the "debtor" to take "any action." Indeed, under the terms of the injunction, the City is expressly *prohibited* from taking certain actions. The Plan's injunction is, therefore, nothing like the bonds at issue in (a) Colorado Springs, 177 B.R. at 694, which were to be issued by the debtor without the required electoral approval, or (b) Sanitary & Improvement District, No. 7, 98 B.R. at 974-75, which were to be issued by the debtor without promising full payment as required by state law. In each of those

cases, the plan contemplated that *the debtor* would take an affirmative action in connection with the implementation of the plan that it was not authorized by state law to take — namely, issuing the illegal bonds. In this case, by contrast, the Plan contemplates action only by *the Court* in enjoining the debtor and third parties from engaging in an activity that might otherwise be required by state law, but, in fact, as set forth below, is not.

247. In any event, even if the Plan's injunction could be construed as requiring some "action" by the City, the Plan would still be confirmable because the injunction does not violate PERA. PERA provides that "[a] public employer shall bargain collectively with the representatives of its employees … and may make and enter into collective bargaining agreements with those representatives." M.C.L. § 423.215(1); <u>see also</u> M.C.L. § 423.210(1)(e) ("A public employer ... shall not ... [r]efuse to bargain collectively with the representatives of its public employees …."). As relevant here, the term "bargain collectively" is defined as "the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." M.C.L. § 423.215(1). Properly understood, these provisions of Michigan law pose no obstacle to confirmation of the City's Plan.

248. First, as the Objecting Parties acknowledge, PERA's duty to collectively bargain is not absolute. Rather, Michigan law anticipates that the City's obligation to bargain collectively may be suspended during a financial crisis. See M.C.L. § 141.1567(3) (providing that a local government placed in receivership is automatically exempt from M.C.L. § 423.215(1)'s collective bargaining requirement "for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first"); see also M.C.L. § 423.215(9) (providing that a local government that "enters into a consent agreement under the local government and school district fiscal accountability act … is not subject to subsection (1) for the term of the consent agreement"). In fact, the City's obligation *has already been automatically suspended* for up to five years. See M.C.L. § 141.1567(3). That the automatic suspension provision expires after five years says nothing about whether the City's obligation may be suspended, pursuant to an injunction or other court order, for a longer period of time. While a longer suspension is not *automatic*, nothing suggests that it is impermissible, particularly where it is consistent with the legislature's goal of "assist[ing] a local government in a financial emergency," M.C.L. § 141.1543(b), and is inextricably linked to the Plan's overall feasibility.

249.     Second, PERA does not impose an obligation to bargain collectively at particular intervals, but rather requires the City to bargain collectively "at reasonable times."  M.C.L § 423.215(1).  Neither PERA nor case law defines the term "reasonable times," and the Objecting Parties have been unable to articulate a statutory obligation to bargain collectively at any specific time in the future.  Given that the City is in the midst of an unprecedented financial emergency, and that its obligation to bargain collectively is already suspended for up to five years, see M.C.L. § 141.1567(3), the ten-year period envisioned by the Plan is reasonable.  The City has not proposed to suspend its obligation to bargain collectively indefinitely or for all time, nor was the ten-year period for the injunction selected at random.  Rather, it was specifically chosen to allow for a limited period during which the City's pension obligations will remain steady and predictable so that it may recover and ultimately emerge from the depths of its current financial crisis.  PERA requires no more.

250.     Because the Plan's injunction does not require "the debtor" to take "any action" that is "prohibited by law," section 943(b)(4) does not preclude confirmation of the Plan on these grounds.

## D.     The Plan-Mandated PFRS and GRS Pension Discount Rates Are Appropriate

251.     The Ambac Objection argues that the Plan treatment of Class 10 and Class 11 violates M.C.L. § 38.1140m and, therefore, cannot meet the

requirements of Bankruptcy Code section 943(b)(4). Ambac Objection,

at 47 n.16. This State law establishes that pension boards have the authority to

determine required employer pension contributions in conjunction with an

actuarial evaluation. Ambac asserts that "[t]he City is requiring that the

Retirement Systems adopt and maintain an investment return assumption and

discount rate of 6.75%" in violation of the board's statutory authority to determine

employer contributions. As discussed below, this argument fails because the Plan

does not require the City to take any action in violation of State law.

251. As noted above, section 943(b)(4) prohibits Plan confirmation

only when the Plan forces the "debtor" to "take any action" that is "prohibited by

law." Here, as a binding order of the Court, the Plan mandates "the trustees [of

the pension plans] shall adopt and maintain an investment return assumption and

discount rate [of] 6.75%." Disclosure Statement at 36, 38. As set forth above, the

Plan in no way requires the City to take any action in violation of

M.C.L. § 38.1140m. Instead, the Plan directs that the pension system trustees will

utilize certain assumptions that have been agreed to by the pension funds with

respect to the future investment decisions. Even had the pension systems not

agreed to utilize this 6.75% assumption, because the City is responsible for

funding the pensioners' benefits, the City could reasonably impose the 6.75% rate

in the Plan because such a rate, along with other safeguards contemplated by the

State Legislation and the State Contribution Agreement, is expected to ameliorate the risky investment behavior of the past that led to the drastic underfunding of GRS and PFRS. Under either scenario, this restriction is necessary to protect the integrity of the City's financial projections and enable the City to recover from its dire financial crisis while, at the same time and to the City's benefit, requiring the pension trustees to act in a reasonably prudent manner with respect to investment decisions in the future. For these reasons, the Plan's pension investment and return discount restrictions do not violate the requirements of section 943(b)(4).

### E.   The UTGO Settlement Does Not Violate Michigan Law

253.   Syncora asserts the Plan fails to satisfy section 943(b)(4) of the Bankruptcy Code because the UTGO Settlement violates Michigan Public Act 189 of 1979, the Unlimited Tax Election Act, M.C.L. §§ 141.161 *et seq.* (the "UTEA"), and the RMFA.[93]  Specifically, the Syncora Objection claims that the UTGO Settlement "violates Michigan law [because] it redirects UTGO tax levy proceeds … to the pension systems." Syncora Objection, at ¶ 74. This assertion is wrong, as it fails to accurately characterize the structure of the UTGO Settlement.

---

[93]   The Syncora Objection also asserts the Plan does not comply with M.C.L. § 141.2509. This statute permits the City to establish a reserve fund for the payment of municipal securities. It is not clear what relevance this statute has to Syncora's objection. To the extent that the City will create a reserve fund under the Plan, it will do so in a manner that complies with all applicable laws.

254. The UTEA provides that the City may levy certain *ad valorem* taxes in an amount necessary to pay unlimited tax obligations (each, a "UTGO").[94] The RMFA mandates, among other things, that the City utilize such *ad valorem* taxes solely to pay unlimited tax obligations and further provides that the *ad valorem* taxes must cease when the UTGO is retired.[95] Thus, so long as any UTGOs remain outstanding, the City may continue to assess the *ad valorem* tax and utilize revenues from such tax to satisfy the UTGOs. See M.C.L. § 141.164 (establishing a voting process that allows a public corporation authority to tax without regard to charter, statutory or constitutional tax limits to satisfy unlimited tax obligations).

255. The UTGO Settlement in no way conflicts with these statutory requirements. It provides that the Stub UTGOs will remain outstanding after the Effective Date, and the *ad valorem* taxes will continue to serve as the source of payment for the Stub UTGOs. See Plan, Exhibit I.A.285. The UTGO Settlement also directs that the City or its designee receive all debt millage payments

---

[94] "[The] tax which may be levied shall not be excess of a rate or amount sufficient for payment of the obligations." M.C.L. § 141.164(3).

[95] "Debt retirement funds … shall be used only to retire the municipal securities of the municipality for which the debt retirement fund was created." M.C.L. § 141.2705(1). "When any municipality completes the retirement of a debt evidenced by a municipal security or accumulates sufficient funds in the debt retirement fund for the retirement of the debts … the county treasurer shall no longer be required to recognize a levy for the debt or municipal security issue." M.C.L. § 141.2705(3).

associated with the Stub UTGOs.  Importantly, the RMFA and UTEA contain no

limitation on how the City or its designee ultimately utilizes the payments it will

receive on account of the Stub UTGOs.  Thus, contrary to Syncora's assertions,

the City or its designee is entirely free to transfer the payments received on

account of the Stub UTGOs as set forth under the Plan.

256.   Accordingly, the City's maintenance of the relevant UTGO tax

levy is consistent with the UTEA and RMFA and does not violate

section 943(b)(4) of the Bankruptcy Code.

### F.  The DIA Settlement Will Not Constitute a Fraudulent Transfer

257.   FGIC and Syncora argue that the DIA Settlement "amounts to

a fraudulent transfer under Michigan law" because the value the City will receive

is less than reasonably equivalent value.  FGIC Objection, at ¶ 13; Syncora

Objection, at ¶ 75 n.59.  Under applicable law (as quoted by both Objecting

Parties), a constructively fraudulent transfer requires, among other things, that the

debtor be insolvent *at the time of the transfer.*  M.C.L. § 566.35.  Pursuant to the

Plan, the DIA Settlement will be consummated on the Effective Date.

Plan at § IV.F.  The City will not be insolvent on the Effective Date because that

is the date on which all of the restructuring transactions contemplated by the Plan

(including the adjustment of the City's debts) will occur.  For the same reasons, on

the Effective Date, the City will not be rendered insolvent by the consummation of

the DIA Settlement.  Therefore, the DIA Settlement cannot and will not constitute

a fraudulent transfer, and these Objections fail.

VI.    **ALL REGULATORY AND ELECTORAL
APPROVAL NECESSARY UNDER APPLICABLE
LAW TO CARRY OUT THE PLAN HAS BEEN OR
WILL BE OBTAINED (11 U.S.C. §§ 943(b)(6), 1129(a)(6))**

258.    Section 943(b)(6) of the Bankruptcy Code provides that the

Court shall confirm the Plan if "any regulatory or electoral approval necessary

under applicable nonbankruptcy law in order to carry out any provision of the plan

has been obtained, or such provision is expressly conditioned on such approval."

11 U.S.C. § 943(b)(6).  Somewhat similarly, section 1129(a)(6) of the Bankruptcy

Code provides that the Court shall confirm the Plan only if "[a]ny governmental

regulatory commission with jurisdiction, after confirmation of the plan, over the

rates of the debtor has approved any rate change provided for in the plan, or such

rate change is expressly conditioned upon such approval."  11 U.S.C.

§ 1129(a)(6).

259.    As a threshold matter, Section III.A.5 of the Plan requires, as a

condition to the effectiveness of the Plan, that "[a]ll authorizations, consents and

regulatory approvals, if any, required in connection with the consummation of the

Plan have been obtained and not revoked…"  Plan at § III.A.5.  This Plan

provision effectively refutes any arguments that the Plan violates

section 943(b)(6) of the Bankruptcy Code.  In any event, as set forth below, the

Plan satisfies sections 943(b)(6) and 1129(a)(6) of the Bankruptcy Code with respect to those particular matters raised by the Objecting Parties.

### A. The Board of Water Commissioners Will Continue to Have Rate-Making Authority

260. Several Objecting Parties argue that the Plan violates section 1129(a)(6) of the Bankruptcy Code by purporting to set water and sewer rates without the requisite regulatory approval.[96]  These parties correctly point out that the Board of Water Commissioners (the "BOWC") is vested with the authority to set and approve the Systems' water and sewerage rates.  These parties incorrectly assert, however, that the Plan sets water and sewerage rates and, therefore, usurps the BOWC's rate-making authority.  The Plan does not set water and sewerage rates.  The Plan merely provides that DWSD, through the BOWC, will maintain Fiscal Year 2015 rate setting *protocols* for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues."  Plan at § IV.A.1.  The BOWC will continue to have all rate-making authority under the Plan, consistent with section 1129(a)(6) of the Bankruptcy Code, and the City will add a sentence to the Plan to make that explicit.

---

[96]    See DWSD Bond Trustee Objection, at ¶¶ 84-85; Macomb County Objection, at ¶¶ 27-28.

**B.** **The City Does Not Have to Satisfy Section 943(b)(6) With Respect to Hypothetical Qualifying DWSD Transactions**

261.    The Macomb County Objection and Oakland County Objection argue that the City has failed to obtain the requisite electoral approvals for any Qualifying DWSD Transaction in violation of section 943(b)(6) and that such transaction does not comply with applicable law.[97]  These arguments fail.  Presently, there is no Qualifying DWSD Transaction.  No "public-private partnership" involving either the operation or management of the DWSD exists, and the Plan does not seek to implement any such transaction.  No "authority transaction" currently exists, and the Plan does not seek to implement any such transaction.  The Plan merely establishes a mechanism for the allocation of any proceeds of a potential transaction that may occur at some point in the future.  Because any Qualifying DWSD Transaction is, at yet, speculative, the City need not obtain, or condition the Plan on, electoral approval for such transaction.  Thus, sections 943(b)(4) and 943(b)(6) of the Bankruptcy Code are not implicated.

**C.** **The DWSD Pension Funding and DWSD CVR Do Not Constitute a Tax Requiring Electoral Approval**

262.    The Macomb County Objection argues that the DWSD Pension Funding and provisions of the Plan relating to the DWSD CVR "constitute an impermissible tax on suburban ratepayers for non-DWSD purposes"

---

[97]    See Macomb County Objection, at 14 n.7; Oakland County Objection, at ¶¶ 71-72.

and that, because (a) the requisite electoral approval for such alleged tax has not been obtained and (b) the Plan is not conditioned on the outcome of any such allegedly required election, the Plan violates section 943(b)(6) of the Bankruptcy Code. Macomb County Objection, at ¶¶ 25-26. As set forth at paragraphs 220-21 and 234-36 above, the DWSD Pension Funding is not a tax, but rather a direct cost of administering the Systems, consistent with <u>Bolt</u>. Moreover, no DWSD Transaction currently exists, such that section 943(b)(6) is neither implicated nor violated.

## VII.    <u>THE ASF RECOUPMENT IS LAWFUL AND PROPER</u>

263. Under the terms of an Annuity Savings Fund ("<u>ASF</u>") program offered as part of GRS, active City employees have been (and are) allowed to elect to invest zero, three, five or seven percent of their salaries on an after-tax basis into a defined contribution pension arrangement. The employee contributions were credited with interest based on a rate of return established at the discretion of the GRS Trustees. These employee contributions were aggregated and invested with the other assets of the GRS on a commingled basis. In many years, however, the GRS Trustees chose to credit employees' ASF accounts with rates of return that were far greater than the actual rate of return earned on investments by the GRS. These inflated rates of return on ASF accounts were funded by diverting assets attributable to the City's contributions to fund the GRS's traditional defined benefit

pension plan (the "GRS Traditional Pension Plan").  Hundreds of millions of

dollars of GRS Traditional Pension Plan assets intended to support the defined

benefit pensions that the City had promised were reallocated to the ASF accounts,

and these dollars provided a windfall to the ASF account-holders.  These inflated

rates of interest had the effect of improperly boosting the value of ASF accounts

while  increasing the underfunding, and consequent need for cuts, in the GRS

Traditional Pension Plan.

264.    The Plan provides for a partial reversal of some of these

transactions, which it calls "ASF Recoupment."  Indeed, in the absence of ASF

Recoupment, the cuts in the GRS Traditional Pension Plan likely would have been

greater.  See Disclosure Statement at 23-25.  Several Objecting Parties assert that

the ASF Recoupment is unlawful.[98]   For the reasons set forth below, the diversion

of GRS Traditional Pension Plan assets to individuals' ASF accounts was in breach

of trust; under long-standing law, such diverted assets belong to the GRS

Traditional Pension Plan and must be returned to it; and any Objections to the

contrary should be overruled.

---

[98]    See Taubitz Objection, at ¶¶ 5-6; Sole Objection, at ¶ 2; Jean Vortkamp
       Objection, at 2; Mary Jo Vortkamp Objection, at 3; Industrious Objection,
       at ¶¶ 5-6.

## A. Use of GRS Traditional Pension Plan Assets to Subsidize ASF Returns was Improper

265. As the entity responsible for investing a retirement system's assets, the GRS Trustees have fiduciary duties under Michigan Public Act 314 of 1965, the Public Employee Retirement System Investment Act, M.C.L. §§ 38.1132 *et seq.* (as amended) ("PERSIA")*,* as well as the common law of trusts. See, e.g., Bd. of Trs. v. City of Detroit, No. 259592, 2006 WL 2061403, at *4 (Mich. Ct. App. July 25, 2006) ("Plaintiffs have fiduciary obligations, specified by the common law and [PERSIA] ...."). The City believes that the GRS Trustees breached their duties to the GRS Traditional Pension Plan, and its participants and beneficiaries, by using GRS Traditional Pension Plan assets to subsidize ASF returns significantly above what the ASF assets actually returned.

266. The City also believes that the GRS Trustees breached their duty of loyalty to all GRS Traditional Pension Plan participants; i.e., their duty to "discharge [their] duties solely in the interest of the participants and the beneficiaries" and use assets for the "exclusive benefit of the participants and their beneficiaries." M.C.L. §§ 38.1133(3), (8); Restatement (Third) of Trusts § 78(1). The Michigan Court of Appeals recently held that this duty of loyalty was violated where a county ordinance required funds set aside for one pension benefit to be used to support a different pension benefit. Wayne Cnty. Emps. Ret. Sys. v. Wayne Cnty., 836 N.W.2d 279, 296 (Mich. Ct. App. 2013), appeal granted,

843 N.W.2d 924 (Mich. 2014). That ordinance violated the duty of loyalty because it "dipped into assets that had already been set aside for a particular purpose …, capturing and diverting assets pledged for a different use." Id. at 299. Similarly, here, GRS Traditional Pension Plan assets were required to be held solely for the exclusive benefit of all GRS Traditional Pension Plan participants, and the GRS Trustees violated their duty of loyalty by using GRS Traditional Pension Plan assets to artificially inflate returns for those who participated — and participated most aggressively — in the ASF.

267.    The use of GRS Traditional Pension Plan assets to fund ASF benefits constituted other fiduciary breaches as well. For example, the GRS Trustees must act as a prudent person would in a similar situation. M.C.L. § 38.1133(3)(a); Restatement (Third) of Trusts § 77(1). Expending GRS Traditional Pension Plan assets on non-GRS Traditional Pension Plan benefits — i.e., giving away GRS Traditional Pension Plan assets — is clearly an action that no prudent person in a similar situation would undertake. See In re Meridian Funds Grp. Secs. & ERISA Litig., 917 F. Supp. 2d 231, 240 (S.D.N.Y. 2013) (investing assets in a vehicle that promised "mathematically impossible" returns is breach of the duty of prudence).

268.    Further, the common law imposes a duty of impartiality upon the GRS Trustees to act "with due regard for the diverse beneficial interests

created by the terms of the trust," Restatement (Third) of Trusts § 79(1), which Michigan has long recognized to mean that a trustee "cannot lawfully prefer one set of interests to another." First Nat'l Bank v. Barnum Wire & Iron Works, 25 N.W. 202, 202-03 (Mich. 1885) (recognizing right to challenge trustee's action that was alleged to have advantaged some over others). Transferring GRS Traditional Pension Plan assets to the ASF was a clear preference for ASF benefits and participants to the detriment of GRS Traditional Pension Plan benefits and participants.

269. Finally, a funding scheme that requires or permits the use of contributions related to GRS Traditional Pension Plan participant service to fund ASF accounts is unconstitutional, and therefore unenforceable. See Kosa v. Treasurer, 292 N.W.2d 452, 458 (Mich. 1980) (funding scheme that "borrowed" assets contributed for one group of plan participants to provide benefits for a different group of participants was unconstitutional); Restatement (Third) of Trusts § 72 ("A trustee has a duty not to comply with a provision of the trust that … is invalid because the provision is unlawful or contrary to public policy.").

## B. Recoupment is the Proper Remedy

270. Under centuries of common law precedent, the recipients of the unlawfully diverted GRS Traditional Pension Plan assets (i.e., the ASF participants) took those assets as trustees for the GRS Traditional Pension Plan,

and are liable to the GRS Traditional Pension Plan to return those assets.  "[I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, *the third person takes the property subject to the trust*, unless he has purchased the property for value and without notice of the fiduciary's breach of duty.  The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom."  Harris Trust & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 250 (2000) (emphasis added) (citations omitted).  This is true "whether he has notice of the trust or not.  This has been settled for 300 years, since the time of uses."  Otis v. Otis, 45 N.E. 737, 737 (Mass. 1897).

271.   More specifically, "if a beneficiary receives trust property to which the beneficiary is not entitled (... without regard to whether the beneficiary knew the distribution was improper), the beneficiary is liable to the trust for the improper distribution, except to the extent that a defense to restitution applies."  Restatement (Third) of Trusts § 104 cmt. g(3).  If a beneficiary is liable to the trust, "the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability."  Id. at § 104(2).

272.  Consequently, to remedy the breach of trust:  (a) the GRS trust (and individual ASF account balances) should be corrected so that the GRS Traditional Pension Plan assets that are currently improperly accounted for as ASF assets are properly accounted for as GRS Traditional Pension Plan assets; and (b) ASF participants, who received a distribution of GRS Traditional Pension Plan assets attributable to the excess ASF returns, must repay the GRS Traditional Pension Plan those amounts improperly distributed (through a charge against the amounts due from the GRS Traditional Pension Plan).  The Plan accomplishes these objectives, while limiting both the property to be recovered from ASF participants and the amount of the recovery.

## C. <u>Recoupment is Equitable</u>

273.  The Plan's recoupment of the excess ASF returns fully comports with the equitable remedy requirements — indeed, it is more favorable than required — and nothing prevents this recoupment.  For instance, an innocent beneficiary is liable to return improper trust distributions despite the role a culpable trustee may have played in the transfer.  In fact, an action to recover the property "may be maintained against a third party by the *very trustee* who made the improper transfer."  Restatement (Third) of Trusts § 107 cmt. (b)(1) (emphasis added).  This is because the recovery is on behalf of the innocent trust beneficiaries, and not for the benefit of the culpable trustee.

274. While, under specific circumstances, restitution can sometimes be limited, none of those circumstances apply here. For example, restitution is permitted here despite the fact that the recipients of the improper distributions may have spent those payments. The mere "fact that the recipient has spent the money is not itself a defense to liability in restitution, because an expenditure of funds — without more — does not constitute a change of position" that may limit restitution. Restatement (Third) of Restitution and Unjust Enrichment § 65 cmt. c.

275. Nevertheless, the Plan recognizes the hardship that may be caused by requiring the excess returns to be repaid in a single lump sum, and structures the recoupment so that it is repaid over the individual's lifetime, from pension benefits that are yet to be paid. Such a repayment program is permitted and equitable by the standards set in the common law. <u>See</u> Restatement (Third) of Restitution and Unjust Enrichment § 50 cmt. g (allowing structuring of restitution); Restatement (Third) of Trusts § 104(2) (permitting charge against beneficiary's interest in the trust to secure repayment).

276. Nor is recoupment inequitable because an ASF participant made employee contributions to the ASF or otherwise gave something of value in return for the excess ASF returns (<u>e.g.</u>, constituting a bona fide purchaser for value). As an initial matter, ***the Plan of Adjustment does not seek to recoup the contributions made by the ASF participants*** — indeed, the ASF participants are

permitted to keep those contributions, increased by a reasonable rate of interest. More fundamentally, there was never any entitlement to the excess ASF returns. The ASF is funded exclusively by discretionary employee contributions. The City simply does not contribute to the ASF, and thus there are no sources from which to provide the excess returns. The unlawful use of GRS Traditional Pension Plan assets cannot support those excess ASF returns. <u>See</u> Restatement (Third) of Restitution and Unjust Enrichment § 67, cmt. e ("[A] recipient of payment under an illegal contract is liable in restitution to the person whose money was used to make the payment.").

277.    Indeed, the excess ASF returns had more in common with a Ponzi scheme than a retirement plan. ASF participants were paid the excess returns using GRS Traditional Pension Plan contributions, dwindling away the assets available to pay GRS Traditional Pension Plan benefits. In the Ponzi scheme situation, an innocent investor is permitted to keep the investment returns up to the amount of the original investment. <u>See</u>, <u>e.g.</u>, <u>Chosnek v. Rolley</u>, 688 N.E.2d 202, 210 (Ind. Ct. App. 1997) ("[A]n innocent investor in a Ponzi scheme is not unjustly enriched when he receives returns on his investment in good faith and while ignorant of the scheme, so long as the returns do not exceed the amount of the original investment."). The Plan here provides a superior result for the ASF participants: in addition to keeping their original investment

(i.e., their contributions), the recoupment period is limited, and a reasonable rate of return is provided without any charge for the investment losses that occurred during the recoupment period (which included the recent worldwide financial crises). In other words, the Plan takes pains to recoup the funds equitably and as fairly as possible, providing the ASF participants with a more favorable result than what the common law otherwise provides.

## VIII. THE PLAN WAS PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW (11 U.S.C. § 1129(a)(3))

278. Section 1129(a)(3) of the Bankruptcy Code provides that, for a plan to be confirmed, the bankruptcy court must find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). This requirement is made applicable in chapter 9 by operation of sections 943(b)(1) and 901(a) of the Bankruptcy Code. See 11 U.S.C. §§ 901(a), 943(b)(1). For the reasons set forth below, the Plan has been "proposed in good faith and not by any means forbidden by law," within the meaning of section 1129(a)(3) of the Bankruptcy Code.

279. There is no single controlling standard for determining whether a plan has been proposed in good faith. In both the chapter 9 and chapter 11 contexts, courts have employed a variety of tests. This Court summarized some common interpretations of the "good faith" standard in In re Gregory Boat Co., 144 B.R. 361 (Bankr. E.D. Mich. 1992), as follows:

> Under one view, the good faith requirement of § 1129(a)(3) is met if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Under another view, the good faith requirement is met if the plan was proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected. Under a third view, good faith requires fundamental fairness in dealing with one's creditors.

Id. at 366 (internal citations omitted). As noted by the court in Dow Corning,

"[c]ourts have taken a variety of approaches when applying [section 1129(a)(3) of

the Bankruptcy Code].… This is not surprising, however, for it is difficult to place

precise boundaries around such a fuzzy concept." In re Dow Corning Corp.,

244 B.R. 673, 675 (Bankr. E.D. Mich. 1999), aff'd in relevant part, 255 B.R. 445

(E.D. Mich. 2000), aff'd in relevant part sub nom. Class Five Nev. Claimants v.

Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).

> What constitutes "good faith" must be determined on a case by case basis, based upon the totality of the circumstances. The determination of what constitutes "good faith" based upon the totality of the circumstances in a particular case will necessarily be a *sui generis* fact dependent exercise. As such, the case law simply provides examples of how different courts have analyzed the issue given varying fact patterns.

6 Collier on Bankruptcy ¶ 943.03[1][b].

280. Courts in chapter 9 cases also have applied a variety of factors

to determine whether a plan satisfies section 1129(a)(3) of the Bankruptcy Code.

For example, in Mount Carbon, 242 B.R. 18, the court determined that the

following non-exhaustive list of factors should be considered in analyzing whether a plan was proposed in good faith:

> (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair.

Id. at 40-41.

281.   Regardless of the factors employed, courts agree that the touchstone of the inquiry required by section 1129(a)(3) of the Bankruptcy Code is an analysis of the totality of the circumstances.  See, e.g., In re Dow Corning Corp., 255 B.R. 445, 498 (E.D. Mich. 2000) ("… good faith must be reviewed based on the totality of the circumstances), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002); In re Waterford Hotel, Inc., 497 B.R. 255, 266 (Bankr. E.D. Mich. 2013) (same).  In the chapter 13 case Metro Employees Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah), 836 F.2d 1030 (6th Cir. 1988), the Sixth Circuit interpreted section 1325(a)(3) of the Bankruptcy Code — which consists of language identical to that in section 1129(a)(3) of the Bankruptcy Code — as follows:

> Good faith is an amorphous notion, largely defined by factual inquiry.  In a good faith analysis, the infinite variety of factors facing any particular debtor must be

weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation.… The decision should be left simply to the bankruptcy court's common sense and judgment.

Id. at 1033.

282. According to the United States District Court for the Eastern District of Michigan, "[p]repetition behavior is irrelevant. The focus is on the plan itself. Good faith may exist when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." Dow Corning, 255 B.R. at 498 (citations and quotation marks omitted). In this context, the Mount Carbon court posed the question, "What does it mean to satisfy the purpose of Chapter 9?" Mount Carbon, 242 B.R. at 41. Its answer was that "[t]his question leads back to the legislative purpose underlying it, which is to allow an insolvent municipality to restructure its debts in order to continue to provide public services." Id.

283. As discussed above at length with respect to the City's satisfaction of the "best interests of creditors" and "fair and equitable" tests, the City's primary objective in proposing the Plan is to restructure its debts and continue providing services to its residents, and the Plan achieves precisely that result. See ¶¶ 103-82, *supra*. The City has arrived at the terms of the Plan after extensive and, in some cases, ongoing arms-length negotiations and mediations

with all of its key stakeholders, including many of the Objecting Parties.
Although the Objecting Parties may be disappointed with their anticipated
recoveries under the proposed Plan, the City has remained open and honest at all
stages regarding its motivations for structuring the Plan as it is presented and the
need to balance such recoveries against funds required for reinvestment in the
City.

284.    Several Objecting Parties nevertheless argue that the Plan does
not satisfy section 1129(a)(3) of the Bankruptcy Code.  Many of these Objections
reiterate arguments made with respect to other confirmation standards and recast
such arguments as good faith objections.  For example, several Objections
contend that the City's Plan is not proposed in good faith because it does not
provide for the maximization of creditor recoveries and the sale of specific City
assets.[99]  In addition, Objecting Parties argue that the City lacks good faith in
proposing the Plan because (a) the preferential treatment of certain classes of
creditors constitutes unfair discrimination (see FGIC Objection, at ¶ 37) or (b) the
Plan violates state and local law (see Oakland County Objection, at ¶¶ 57-70).

285.    Good faith arguments that merely reiterate an objecting party's
broader confirmation arguments generally should be rejected.  See Dow Corning,
244 B.R. at 676, 677 (rejecting the "good faith" objections of the official

---

[99]    See, e.g., FGIC Objection, at ¶ 36; COPs Objection, at ¶ 80; Syncora
Objection, at ¶ 78; Berkshire Hathaway Objection, at ¶ 31.

committee of unsecured creditors because its arguments were "basically no more than attempts to revisit and reargue objections it made to the Plan under other provisions"); Waterford Hotel, 497 B.R. at 266 (rejecting an objector's good faith arguments because such objector "object[ed] that the Plan is not proposed in good faith as required by § 1129(a)(3), *because of* the four alleged deficiencies" including, among other things, whether the plan was fair and equitable and feasible) (emphasis in original).

286. Two Objections to the City's good faith merit further comment, however. Oakland County, which claims to be a contingent creditor of the City, argues that the City lacked good faith in negotiating the terms of a possible transaction involving DWSD by failing to provide the county with adequate information to permit it to assess the merits of the transaction and by refusing to negotiate regarding the amount of the payment to be made by Oakland County. Oakland County Objection, at ¶¶ 74-76. On its face, Oakland County's argument concerns its negotiations with the City over the terms of a potential transaction involving DWSD, in its capacity as a potential counterparty to the transaction. The City disputes that Oakland County's complaints bear any direct relationship to the City's propounding of the Plan. Moreover, the City disputes (a) that it has not negotiated in good faith with Oakland County with a view to developing a potential transaction involving Oakland County and other parties and (b) all of the

unsupported allegations that Oakland County makes in that vein.  In fact, the City

(a) negotiated in good faith with Oakland County and others for months regarding

DWSD when the Counties broke off negotiations and (b) is currently engaged in

ongoing confidential facilitative mediation with Oakland County on precisely this

topic.  Section 1129(a)(3) is easily satisfied on this point.

287.    In addition, Syncora argues that the City did not propose the

Plan with honesty and good intentions because it did not (a) account for the true

value of all of its assets in the Plan and (b) accurately state the aggregate amount

of Pension Claims.  Syncora Objection, at ¶¶ 81-82.  In support of its argument

that the City must value all of its assets in the Plan, Syncora cites to Tenn-Fla

Partners v. First Union Nat'l Bank of Fla., 229 B.R. 720, 734 (W.D. Tenn. 1999),

aff'd sub nom. Tenn-Fla Partners v. First Union Nat'l Bank of Fla. (In re Tenn-Fla

Partners), 226 F.3d 746 (6th Cir. 2000).  That case involved the revocation of

confirmation of a plan of reorganization of a chapter 11 debtor.  Id. at 735.

The court found that the debtor lacked good faith because its failure to disclose the

subject information prevented secured creditors from capturing the value of their

collateral.  Id. at 734.  Tenn-Fla is inapposite to the facts of this case.

288.    The City is a debtor under chapter 9 of the Bankruptcy Code

and, as such and pursuant to all of the authority previously discussed, cannot be

compelled to liquidate its assets for the benefit of its creditors.  Accordingly,

unlike in chapter 11, obtaining and disclosing complete valuations of all of the
City's assets is not a necessary or appropriate use of the City's scant resources.[100]

289.    The estimated aggregate allowed amount ascribed by the City
to Pension Claims in the Disclosure Statement equally does not exhibit a lack of
good faith.  Since the outset of this case, the City consistently has maintained that
it believes that the amount of actuarially accrued unfunded liabilities published by
the Retirement Systems were substantially understated, and the estimated
aggregate allowed amount of Pension Claims in the Plan represents a slight
decrease in the amount disclosed by the City at the outset of this case.
Compare Decl. of Kevyn D. Orr in Support of City of Detroit, Michigan's
Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code
(Docket No. 11) at n.3 (estimating pension liabilities at $3.5 billion) with
Disclosure Statement, at § II.B (providing an estimated aggregate allowed amount
of GRS and PFRS Pension Claims of $3.1 billion).

IX.     THE PLAN SATISFIES
        SECTION 1123(A)(4) OF THE BANKRUPTCY CODE

290.    Section 1123(a)(4) of the Bankruptcy Code provides that a
plan shall "provide the same treatment for each claim or interest of a particular
class, unless the holder of a particular claim or interest agrees to a less favorable

---

[100]    As discussed above, to the extent that Syncora's objection to the City's good
faith merely recasts its other objections to confirmation, it may also be
rejected on those grounds.

treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The

DPOA Objection argues that the Plan violates section 1123(a)(4) by "propos[ing]

less favorable treatment for the prospective pension benefits of DPOA members."

DPOA Objection, at ¶¶ 21-37.  This argument conflates the treatment of claims in

the Plan with the City's provision of future benefits for its employees.

291.   As set forth in the statutory language, section 1123(a)(4) of the

Bankruptcy Code is concerned with the treatment of **claims**.  The DPOA

Objection has confused the treatment of **claims** with the benefits that **claimants**

who are employees will receive from the City in the future as a result of their

future employment.  See In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D.

Ill. 1992) (noting that the debtor had confused "equal treatment of *claims* with

equal treatment of *claimants*") (emphasis in original), rev'd on other grounds

sub nom. UNR-Rohn, Inc. v. Bloomington Factory Workers (In re UNR Indus.,

Inc.), 173 B.R. 149 (N.D. Ill. 1994).[101]

292.   Here, Class 10 Claims are for the unfunded actuarially accrued

liabilities (UAAL) of the PFRS (i.e., the underfunding of the PFRS).  The Plan

provides identical treatment for all Class 10 **claims**:  holders of Class 10 claims

will receive, on account of such claims, the PFRS Adjusted Pension Amount,

---

[101]   See also 7 Collier on Bankruptcy ¶ 1123.01[4][b] (explaining that
section 1123(a)(4)'s requirement that the plan provide the "same treatment
for each claim … of a particular class" does not apply "to the plan's overall
treatment of the creditors holding such claims").

subject to certain adjustments as set forth in the Plan.  See Plan at § II.B.3.q.ii.C.

The disparate "treatment" complained of in the DPOA Objection relates to the

parties' relationship going forward and is unrelated to treatment on a *claim* within

the meaning of section 1123(a)(4).

293.    The NPFG Objection argues that the Plan violates

section 1123(a)(4) of the Bankruptcy Code as a result of the election afforded to

holders of Impaired DWSD Bond Claims.[102]  This argument also must fail.  Case

law interpreting section 1123(a)(4) of the Bankruptcy Code makes clear that,

unless the particular holder has agreed to less favorable treatment, the requirement

of "same treatment" means that each holder of a particular claim within a class

must be afforded the same *opportunity* or process.[103]  Under the Plan, all holders

of Impaired DWSD Bond Claims have the same opportunity to make the election

---

[102]    See NPFG Objection, at ¶ 51 n.25; Plan at § II.B.3.a.ii.B ("Each Holder of an Allowed DWSD Bond Claim in an impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds …").

[103]    See, e.g., In re Dow Corning, 255 B.R. at 501 ("The requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the *same process* for claim satisfaction.'") (citation omitted) (emphasis in original); Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").

described at Section II.B.3.a.ii.B of the Plan.  Thus, the NPFG Objection on this point must be overruled.

## X.    THE PLAN'S RELEASE, INJUNCTION AND EXCULPATION PROVISIONS ARE APPROPRIATE UNDER PREVAILING LAW

294.    Contrary to the assertions of several Objecting Parties,[104] the exculpation, injunction and consensual and nonconsensual release provisions set forth in the Plan are appropriate under prevailing law.

### A.    The Consensual Release Provisions are Appropriate

295.    The majority of Objecting Parties that object to the Plan's release provisions are creditors that are affected only by the consensual releases set forth in Section III.D.7.a of the Plan.  The nonconsensual releases set forth in Section III.D.7.b of the Plan — the appropriateness of which is discussed in paragraphs 299-312 below — affect *only* holders of Pension Claims and become effective only if the State Contribution Agreement is consummated.  See Plan at § III.D.7.b.

296.    The releases set forth in Section III.D.7.a of the Plan about which the Objecting Parties complain are, by their terms, *consensual* releases in that they apply only to Holders of Claims who vote to accept the Plan.  Such

---

[104]    See, e.g., COPs Objection, at ¶¶ 84-89, 94; Oakland County Objection, at ¶¶ 80-84; Ad Hoc Committee Objection, at ¶ 11; FGIC Objection, at ¶ 38; Macomb County Objection, at ¶¶ 43-46; DPOA Objection, at ¶ 55; see also Swap Counterparties Objection, at 4-6.

releases are clearly permissible under applicable law.  See Dow Corning, 255 B.R. at 490 ("A voluntary and consensual release is not a discharge in bankruptcy and does not run afoul with the Bankruptcy Code.").  That the releases set forth in Section III.D.7.a of the Plan extend to non-debtor third parties is of no consequence because any such releases will be voluntary and consensual. Any Objections to the contrary fail.

## B.    The Exculpation Provisions are Appropriate

297.    With respect to the Plan's exculpation provision related solely to postpetition and Plan-related conduct, certain Objecting Parties incorrectly argue that such provision must be limited to the City's professionals, the Retiree Committee and the Retiree Committee's professionals.[105]  To the contrary, a properly tailored exculpation provision may extend beyond the professionals of the debtor and any official committees appointed in the case under appropriate circumstances.  See, e.g., Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.), 519 F.3d 640, 655-58 (7th Cir. 2008) (exculpation of third party financier/creditor appropriate where (a) the provision (i) contained a carve out for willful misconduct and (ii) was limited to claims arising out of or in connection with the bankruptcy case; and (b) the creditor required the limitation before it would provide the requisite financing, which was essential to the reorganization);

---

[105]    See Macomb County Objection, at ¶¶ 43-46; COPs Objection, at ¶ 94; FGIC Objection, at ¶ 38.

<u>In re Granite Broad. Corp.</u>, 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that included creditor/financier and controlling shareholder, where the provision (a) contained a carve out for gross negligence and intentional misconduct and (b) was limited to claims arising in connection with the plan and the bankruptcy cases).

298.   Here, the Plan's exculpation provision contains a carve out for gross negligence and willful misconduct and is limited to claims arising out of the City's restructuring efforts and the Chapter 9 Case.  <u>See</u> Plan at § III.D.6. In addition, the Plan's exculpation provision extends only to certain parties who either have settled with the City or have actively participated in the City's restructuring activities, and does so only at the insistence of such parties.  <u>See</u> <u>id.</u> The provision, thus, is appropriate and should be approved.

### C.   <u>The Nonconsensual Release Provisions are Appropriate</u>

299.   The Plan's nonconsensual third party releases — which apply only to holders of Pension Claims and only if the State Contribution Agreement is consummated — also are lawful and warranted under the circumstances.

### 1.   <u>*The Dow Corning Chapter 11 Standard*</u>

300.   Nonconsensual third party release and injunction provisions are permissible in the Sixth Circuit in "unusual circumstances."  <u>Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)</u>, 280 F.3d 648, 658

(6th Cir. 2002).  According to the <u>Dow Corning</u> court, in the chapter 11 context,

"when the following seven factors are present, the bankruptcy court may enjoin a

non-consenting creditor's claims against a non-debtor:

> (1) There is an identity of interests between the debtor
> and the third party, usually an indemnity relationship,
> such that a suit against the non-debtor is, in essence, a
> suit against the debtor or will deplete the assets of the
> estate; (2) The non-debtor has contributed substantial
> assets to the reorganization; (3) The injunction is
> essential to reorganization, namely, the reorganization
> hinges on the debtor being free from indirect suits against
> parties who would have indemnity or contribution claims
> against the debtor; (4) The impacted class, or classes, has
> overwhelmingly voted to accept the plan; (5) The plan
> provides a mechanism to pay for all, or substantially all,
> of the class or classes affected by the injunction; (6) The
> plan provides an opportunity for those claimants who
> choose not to settle to recover in full and; (7) The
> bankruptcy court made a record of specific factual
> findings that support its conclusions.

<u>Id.</u> (remanding the case to the district court for additional findings on whether

"unusual circumstances" were present).

301.   Although the <u>Dow Corning</u> panel framed its inquiry

conjunctively, courts have applied the <u>Dow Corning</u> standard as necessary to suit

the specific factual circumstances before them, and have not required the

satisfaction of all seven factors where the application of all such factors was not

appropriate.  <u>See</u>, <u>e.g.</u>, <u>In re Friedman's, Inc.</u>, 356 B.R. 758, 761-63 (Bankr. S.D.

Ga. 2005) (approving third party releases over the objection of the United States

Trustee under the <u>Dow Corning</u> standard without having found that all seven factors were satisfied, either at all or as to all of the parties being released); <u>In re Global Indus. Techs., Inc.</u>, No. 02-21626, 2013 WL 587366, at \*\*39-40 (Bankr. W.D. Pa. Feb. 13, 2013) (finding that a channeling injunction that protected a number of non-debtor third parties from claims "substantially satisfies [some but not all of] the factors enunciated in <u>Dow Corning</u>" such that "the injunction is appropriate"); <u>In re Condustrial, Inc.</u>, No. 09-04425, 2011 WL 3290389, at \*\*5-7 (Bankr. D.S.C. Aug. 1, 2011) (approving third party releases under the <u>Dow Corning</u> standard without having found that all seven factors were satisfied; finding that those factors that were applicable were "satisfied in the case").

## 2. *Third Party Releases in Chapter 9*

302. <u>Dow Corning</u> was decided in a chapter 11 context that involved mass tort claims that were being channeled to either a litigation trust or a settlement trust, and the tort insurers were contributing insurance proceeds. That is a far cry from the facts here where a struggling municipality (which cannot liquidate) is seeking to reorder its debts while improving services for its residents. Given the vastly different posture and the purpose of rehabilitation in a chapter 9 case discussed in paragraphs 110 and 282 above, one must review the <u>Dow Corning</u> precedent in that same light.

303.    The few courts that have analyzed the <u>Dow Corning</u> precedent

explicitly in the chapter 9 context have approved nonconsensual releases.  In

<u>Connector 2000</u>, the chapter 9 debtor was a "public benefit corporation" organized

under South Carolina law to "assist" the South Carolina Department of

Transportation ("<u>SCDOT</u>") with financing, building and maintaining highways.

447 B.R. at 754.  The debtor's plan of adjustment, which incorporated provisions

of a global settlement between the debtor and many of its largest creditors

(principally, bondholders), provided that the bondholders would release all claims

and causes of action against SCDOT (and affiliated individuals and entities) in

return for which release SCDOT would provide a number of "significant

concessions."  <u>Id.</u> at 766.

304.    The <u>Connector 2000</u> court applied the <u>Dow Corning</u> factors,

but with a crucial statutory caveat.  The <u>Connector 2000</u> court stated that the

"third party releases and injunctions contained in the [p]lan may be proper without

regard to the [Dow Corning] factor test because [section] 901 [of the Bankruptcy

Code] does not incorporate [section] 524(e)" of the Bankruptcy Code.  <u>Id.</u> at 767;

<u>see</u> <u>also</u> 6 <u>Collier on Bankruptcy</u> ¶ 943.03[1] (stating, within the context of a

discussion regarding the application of section 524(e) in chapter 9, that "[t]hose

sections of title 11 not incorporated into chapter 9 that otherwise may limit the

contents of a plan of adjustment, or impose conditions to confirmation of a plan of

adjustment, do not apply.").  The court concluded that "even applying the [Dow Corning] factors," the third party releases provided under the plan were "appropriate and necessary, and do not adversely or unfairly impact any particular class of creditors."  Id.

305.  Importantly, the Connector 2000 court found that, because the global settlement depended on the releases at issue, the "various forms of value and consideration provided by [the d]ebtor and [the p]lan [r]eleasees are mutually dependent upon one another and therefore not severable from one another." Connector 2000, 447 B.R. at 768.  According to the court, "[t]he failure to obtain approval of and effect the release, injunction, exculpation and discharge provisions of the [p]lan would seriously impair the [d]ebtor's ability to confirm the [p]lan."  Id.  The court, thus, confirmed the debtor's plan, emphasizing that "[t]he contributions and concessions by the third party releasees are an essential component to the reorganization of [the] [d]ebtor and the future success of the [toll highway] and contribute to the feasibility of the [p]lan."  Id. at 766.

306.  Similarly, in approving nonconsensual third party releases, the court in the chapter 9 case of Jefferson County, Alabama, focused on the fact that the releases were a crucial element of a beneficial global settlement that depended upon plan confirmation for effectuation.  In that case, the court confirmed a plan of adjustment that incorporated the terms of a settlement of certain litigation

brought by customers of the debtor's sewer system, which terms released certain parties — defined in the plan as "Sewer Released Parties" — and certain "Related Parties" from claims (defined in the plan as "Ratepayer Claims") asserted by non-settling (and, thus, non-consenting) plaintiffs.  <u>See</u> Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9 Plan of Adjustment for Jefferson Cnty., Ala., <u>In re Jefferson Cnty.</u>, No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (Docket No. 2248), at 25-26.  In doing so, the <u>Jefferson County</u> court reasoned that "[e]njoining further litigation of Ratepayer Claims and other Sewer Released Claims … is an essential and critical element of the global settlement to be effected pursuant to the [p]lan, is reasonable, and is fair and equitable to all parties."  <u>Id.</u> at 26.

307.    Perhaps in recognition of the unique concerns present in a chapter 9 case, a number of other courts have approved third party releases in chapter 9 plans of adjustment, at times over the objections of creditors.  <u>See</u>, <u>e.g.</u>, <u>In re S. Brunswick Water & Sewer Auth.</u>, No. 04-09053 (Bankr. E.D.N.C.), Docket Nos. 253, 303, 419 (approving nonconsensual third party releases of all claims against the debtor, the debtors' directors, *and officials and employees of any North Carolina political subdivision*);[106] <u>In re Natchez Reg'l Med. Ctr.</u>,

---

[106]    First Am. Plan of Adjustment, <u>In re S. Brunswick Water & Sewer Auth.</u>, No. 04-09053 (Bankr. E.D.N.C. Oct. 28, 2005) (Docket No. 253); Objection by Special Comm. of Landowners/Taxpayers to Confirmation of Debtor's

No. 09-00477 (Bankr. S.D. Miss.), Docket Nos. 582, 527 at § 4.8 (confirming a chapter 9 plan that provided that (a) certain non-debtor parties would be released from all obligations to creditors of the debtor, other than claims based on fraud or negligence; and (b) holders of allowed claims against the debtor would have no recourse against the reorganized debtor, a county board of supervisors for the county where was the debtor was located, the board of trustees of the debtor hospital and any of their respective professionals, successors or assigns).[107]

### 3. *Unusual Circumstances Exist to Approve the Plan's Nonconsensual Third Party Release Provisions*

308. Unusual circumstances exist here to warrant approval of the nonconsensual releases set forth in Section III.D.7.b of the Plan. As far as the City is aware, this is the first chapter 9 plan that has ever sought to compromise pension benefits for a municipality's active and retired workforce. Also as far as the City is aware, this is the first chapter 9 case where third parties, such as several notable charitable foundations, DIA Corp. and the State, which have no obligation

---

(continued…)

Am. Plan of Adjustment, In re S. Brunswick Water & Sewer Auth., No. 04-09053 (Bankr. E.D.N.C. Dec. 9, 2005) (Docket No. 303); Order Confirming Plan, In re S. Brunswick Water & Sewer Auth., No. 04-09053 (Bankr. E.D.N.C. Oct. 25, 2006) (Docket No. 419).

[107] Am. Plan for the Adjustment of Debt, In re Natchez Reg'l Med. Ctr., No. 09-00477 (Bankr. S.D. Miss. Nov. 4, 2009) (Docket No. 527); Agreed Order Confirming Am. Plan, In re Natchez Reg'l Med. Ctr., No. 09-00477 (Bankr. S.D. Miss. Dec. 17, 2009) (Docket No. 582).

to contribute to the City's underfunded pensions, have stepped up to provide several hundred million dollars in funding to shore up those plans. The circumstances of this case are not simply "unusual" — they are groundbreaking.

309. As part of this unprecedented solution to Detroit's pension crisis, the State has agreed to contribute substantial assets — the net present value of $350 million — to reduce the Retirement Systems' underfunding. The State's agreement to contribute these assets is entirely contingent upon the State and the State Related Entities obtaining the nonconsensual release set forth in Section III.D.7.b of the Plan. The release is, therefore, absolutely essential to the City's restructuring. Indeed, the settlements that the City reached with the representatives of its affected retirees and employees were conditioned upon receiving this funding from the State, as well as the funding from the DIA Settlement. In turn, receipt of the DIA Settlement funding is conditioned upon the State providing its funding (and vice-versa). Thus, if the nonconsensual release in favor of the State and the State Related Entities is not approved, *no outside funding will be available* for the benefit of Class 10 and Class 11 claimants.

310. In addition, for the nonconsensual releases to become effective, the State Contribution Agreement must be consummated, which will occur only if Classes 10 and 11 vote to accept the Plan. Thus, the classes impacted by these releases necessarily will have voted to accept the Plan. Further,

there is an identity of interest between the City and the State because if the State does not make its contribution, the amount that the City would have to pay in the future to reduce the Retirement Systems' underfunding would increase. Finally, the Plan also provides a mechanism to pay all of the adjusted pension benefits for all Class 10 and 11 claimants, even if they vote to reject the Plan.

311. The remaining <u>Dow Corning</u> factor, if even applicable in chapter 9 generally, is not applicable to the circumstances of this case. <u>See</u>, <u>e.g.</u>, <u>Connector 2000</u>, 447 B.R. at 766 (finding, among other things, that the "opt out" factor "is typically employed in mass tort cases" and, therefore, "is not applicable in this case"). Unlike the <u>Dow Corning</u> plan, the Plan does not provide for a continuing litigation path for pension claimants such that they could choose to "opt out" and continue to litigate an entitlement to full pension funding, while at the same time receiving the benefit of both the State Contribution and the DIA Settlement funds — both of which are contingent upon Classes 10 and 11 accepting the Plan and the cessation of related pension funding litigation. Accordingly, an "opt out" mechanism could not be part of the Plan if Classes 10 and 11 wish to benefit from $816 million worth of outside funding. Hence, this factor is inapplicable in the City's case.

312. It is clear that unusual — indeed, unprecedented — circumstances exist that warrant including a nonconsensual release provision in

favor of the State and the State Related Entities under which *only* those who

benefit directly from the State's monetary contribution (holders of claims in

Classes 10 and 11) are deemed to have given such a release.

**XI.     THE PLAN'S TREATMENT OF
          CLAIMS AGAINST THE 36TH DISTRICT
          COURT IS APPROPRIATE UNDER PREVAILING LAW**

313.    Two Objections — the ASFCME Local Objection and the

Court Officers Objection — argue that the Plan's treatment of claims against the

36th District Court constitutes a nonconsensual third party release that does not

satisfy <u>Dow Corning</u>.  For the reasons set forth below, this argument fails.

314.    The Plan enjoins certain claims against the 36th District Court

for which the 36th District Court is entitled to receive funding from the City, and

which claim for funding from the City is resolved pursuant to the Plan.  <u>See</u> Plan

at §§ I.A.166, III.D.5.a.  The Plan defines such enjoined claims against the 36th

District Court as follows:

> "Indirect 36th District Court Claim" means any claim
> arising in connection with a Cause of Action against the
> 36th District Court, solely to the extent that (a) the 36th
> District Court is entitled to receive funding from the City
> to satisfy any such claim and (b) any Claim for such
> funding by the 36th District Court is resolved pursuant to
> the Plan and the treatment accorded to any Allowed
> Other Unsecured Claims held by the 36th District Court
> pursuant to Section II.B.3.u.

Plan at § I.A.166.  The Plan enjoins holders of Indirect 36th District Court Claims

from prosecuting such Indirect 36th District Court Claims, as follows:

> On the Effective Date, except as otherwise provided herein or in the Confirmation Order,
>
> a.     ***all Entities that have been, are or may be holders of*** Claims against the City, ***Indirect 36th District Court Claims*** or Indirect Employee Indemnity Claims, along with their Related Entities, ***shall be permanently enjoined from taking any of the following actions*** against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):
>
> 1.     ***commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including*** (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) ***Indirect 36th District Court Claims*** and (C) Indirect Employee Indemnity Claims)….

Plan at § III.D.5.a.  The Plan, thus, enjoins not only the 36th District Court's claims

against the City, but also third parties' claims against the 36th District Court to the

extent the 36th District Court is entitled to receive funding from the City to satisfy

such claims.

315.   The AFSCME Local Objection and the Court Officers

Objection argue that, to the extent the Plan enjoins holders of claims against the

36th District Court from seeking satisfaction of those claims from the State or the State Related Entities, the Plan contains nonconsensual third party releases that do not satisfy the <u>Dow Corning</u> standard discussed above.[108]  This argument fails for two primary reasons.

316.   First, the City is not seeking to relieve the State of any obligation it may have to the holders of Indirect 36th District Court Claims. Indeed, after discussion with State officials regarding this matter, the City intends to amend the Plan to make this clear and to expressly carve out the State and the State Related Entities from the injunction against the Indirect 36th District Court Claims.  This will make clear that holders of Indirect 36th District Court Claims may seek satisfaction of such claims from the State and the State Related Entities through the State courts.

317.   Second, pursuant to the injunction against Indirect 36th District Court Claims, the City seeks only to prevent *the City's* payment in full of prepetition claims against the City — whether they are asserted directly by the 36th District Court against the City or indirectly by the 36th District Court's creditors against the City.  Pursuant to State law, the City is the sole "district funding unit" for the thirty-sixth judicial district of the State, such that the City is responsible for maintaining and financing the operations of the 36th District

---

[108]   <u>See</u> ASFCME Local Objection, at 10-12; Court Officers Objection, at 4-16.

Court, except as otherwise provided in Michigan Public Act 236 of 1961, the

Revised Judicature Act, M.C.L. §§ 600.101 *et seq.* (as amended).  M.C.L.

§§ 600.8103, 600.8104(1)(b).  Regardless of whether the State ultimately may be

liable for satisfying judgments against the 36th District Court — which at best is

an open question[109] and which the City believes is properly answered in the

negative — it is clear that, under Michigan statutory law, the City is the sole

source of funding for the 36th District Court.  Claims against the 36th District

Court, therefore, are indirect claims against the City that are properly enjoined.

Moreover, the City understands that much of the 36th District Court's property is

actually owned by the City.  Thus, and subject to the addition of the

aforementioned carve out for the State, the Plan's injunction against Indirect 36th

---

[109]    See ASFCME Local Objection, at 6 (stating that, "[a]dmittedly, no state
court decision has had to deal with the situation presented here, which is
what happens to the funding of a trial court or judgments against it when the
local funding unit is in bankruptcy?" and that describing a line of federal
cases involving sovereign immunity as answering this question with a "firm
'maybe'").  State courts arguably have been less equivocal in finding that the
State has no such funding obligation.  See, e.g., Grand Traverse Cnty. v.
State, 538 N.W.2d 1, 8 (Mich. 1995) (rejecting the argument that the State is
constitutionally obligated to fund trial court obligations itself, noting that
"[w]hile strong arguments can be made that state funding would be a more
desirable system of court financing, it is for the Legislature to determine
whether to adopt such a system"); Cameron v. Monroe Cnty. Probate Court,
579 N.W.2d 859, 861 (Mich. 1998) (stating that "[b]ecause there is no
statutory authority specifying who will pay a judgment entered against the
probate court for civil rights violations of a probate court employee, it must
be paid by the local funding unit, the county.").  Regardless, the issue will be
explicitly carved out of the Plan and left for the state courts to adjudicate.

District Court Claims does not enjoin actions against third parties and the application of <u>Dow Corning</u> is, therefore, inappropriate.

**XII.** **ASSUMPTION OF CONTRACTS**

318. The Macomb County Objection argues that the City cannot assume or assign the OMI-Detroit Agreement. Macomb County Objection, at ¶¶ 37-39. For the reasons set forth below, these objections must be overruled.

319. As a threshold matter, the "Macomb Parties" that filed the Macomb County Objection are not party to the OMI-Detroit Agreement and have stated no grounds on which they should be permitted to assert OMI's rights. <u>See</u> <u>also</u> note 84, *supra*. The Macomb County Objection argues that the City cannot satisfy section 365(b) of the Bankruptcy Code because "the use of DWSD funds for non-DWSD purposes would cause the [City] to immediately default on the OMI-Detroit Agreement upon emergence from bankruptcy," which alleged default allegedly could not be cured because it would be caused by the Plan. Macomb County Objection, at ¶ 38. This argument fails because, as discussed in detail at paragraphs 215-39 above, neither the DWSD Pension Funding nor any other provision of the Plan requires "the use of DWSD funds for non-DWSD purposes."

320. The Macomb County Objection argues further that section 365(c)(1) of the Bankruptcy Code prohibits assumption or assignment of

the OMI-Agreement because, "[i]n contracting with the DWSD, … the members of the OMI relied on the identity of the DWSD and intended that the obligations be performed by the DWSD alone." Id. at ¶ 39. This argument also fails because the OMI-Detroit Agreement clearly is not the type of personal services contract that is covered by section 365(c)(1) of the Bankruptcy Code. See 3 Collier on Bankruptcy ¶ 365.07[1][b] (stating that "Section 365(c) gives recognition to the common law restriction" that "duties under a contract to perform personal services could not be assigned. If a party contracted for the services of a particular person, and that person's services were unique and could not equally be performed by another, the contract could not be assigned."). DWSD is a City department; it is not a person, it has no "identity" other than as a department of the City, and the water and sewerage services that it provides will still be provided by DWSD as a department of the City.

321. Finally, Macomb County might consider the immediate effect on its ability to provide water and sewerage services to its residents if (a) DWSD or the City were to reject the OMI-Detroit Agreement (as Macomb County seems to argue for) and (b) DWSD were to immediately cease providing services thereunder (as it would be entitled to do).

## XIII.   A WAIVER OF THE 14-DAY STAY IS APPROPRIATE UNDER BANKRUPTCY RULE 3020(e)

322.   Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, *unless the court orders otherwise*."  Fed. R. Bankr. P. 3020(e) (emphasis added).  In the Plan, the City requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 3020(e) and order that the Plan shall be effective upon Confirmation.  See Plan at § VIII.J.  Several Objecting Parties object to this request.  See COPs Objection, at ¶ 96; DWSD Bond Trustee Objection, at ¶¶ 95-97.  These Objections should be overruled.

323.   As the plain language of Bankruptcy Rule 3020(e) suggests, the Court may, in its sound discretion, order that the 14-day stay be waived. See Fed. R. Bankr. P. 3020(e) Advisory Committee Note (1999) ("The court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately.").  Courts have granted requests to waive the requirements of Bankruptcy Rule 3020(e) in cases where consummation of a transaction integral to the plan was conditioned upon the occurrence of the effective date.[110]  Courts also frequently waive the Bankruptcy Rule 3020(e) stay without articulating specific reasons for doing so.[111]

---

[110]   See, e.g., In re McCommas LFG Processing Partners, LP, Nos. 07-32222 and 07-32219, 2007 WL 4234139, at *11 (Bankr. N.D. Tex. Nov. 29, 2007)

324. Waiving the 14-day stay imposed by Bankruptcy Rule 3020(e) is appropriate in this case, and is in the best interests of both the City and its creditors, because such a waiver would enable the City to: (a) consummate the DIA Settlement and the State Contribution Agreement expeditiously, both of which are conditioned upon the occurrence of the Effective Date; (b) begin implementing, and making distributions to the City's creditors pursuant to, the Plan; and (c) emerge from bankruptcy as expeditiously as possible to minimize costs to all parties and remedy its service delivery insolvency. Accordingly, the Objections to the City's request for such relief should be overruled.

---

(continued…)

("Good cause exists for waiving and eliminating the stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). In particular, the Plan represents a fair and equitable compromise by and among the major parties in interest and should be consummated as expeditiously as possible. If the stay is not waived and eliminated, the ability of the Trustee to consummate the sale … may be lost or materially delayed.").

[111] See, e.g., In re Rosedale Park Baptist Church, No. 09-75364, 2010 WL 4813563, at *11 (Bankr. E.D. Mich. Apr. 23, 2010) ("The stay set forth in Bankruptcy Rule 3020(e) is hereby waived. This Confirmation Order shall take effect immediately..."); Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama, In re Jefferson Cnty., No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (Docket No. 2248) ("This Confirmation Order … for good cause shown, based on the record of the Confirmation Hearing, shall not be subject to any stay otherwise applicable under the Bankruptcy Rules, including Bankruptcy Rule 3020(e)."); Barnwell Cnty. Hosp., 471 B.R. at 875 ("Notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan."); Connector 2000, 447 B.R. at 774 (same).

## CONCLUSION

325. For the reasons set forth herein, the City requests that the Court overrule the Objections and confirm the Plan.

Dated:  May 26, 2014                Respectfully submitted,


                                    /s/ Heather Lennox
                                   David G. Heiman (OH 0038271)
                                   Heather Lennox (OH 0059649)
                                   Thomas A. Wilson (OH 0077047)
                                   JONES DAY
                                   North Point
                                   901 Lakeside Avenue
                                   Cleveland, Ohio  44114
                                   Telephone:  (216) 586-3939
                                   Facsimile:  (216) 579-0212
                                   dgheiman@jonesday.com
                                   hlennox@jonesday.com
                                   tawilson@jonesday.com

                                   Bruce Bennett (CA 105430)
                                   JONES DAY
                                   555 South Flower Street
                                   Fiftieth Floor
                                   Los Angeles, California 90071
                                   Telephone:  (213) 243-2382
                                   Facsimile:  (213) 243-2539
                                   bbennett@jonesday.com

                                   Robert S. Hertzberg (P30261)
                                   Deborah Kovsky-Apap (P68258)
                                   PEPPER HAMILTON LLP
                                   4000 Town Center, Suite 1800
                                   Southfield, MI 48075
                                   Telephone:  (248) 359-7300
                                   Facsimile:  (248) 359-7700
                                   hertzbergr@pepperlaw.com
                                   kovskyd@pepperlaw.com

                                   ATTORNEYS FOR THE CITY

# EXHIBIT A

SUMMARY OF THE CITY'S RESPONSES TO INITIAL PLAN OBJECTIONS

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **1.** Retirement Systems' Objection and Brief Regarding Classification of Retiree Pension Claims in the City's Proposed Plan of Adjustment (Docket No. 3142) | |
| The Objecting Parties argue that the Plan violates: (i) sections 1122(a) and 1123(a)(4) of the Bankruptcy Code by (A) enhancing certain Class 10 and 11 Claims with income stabilization payments, and (B) providing that, if a Great Lakes Water Authority (a "GLWA") is created, the recoveries of certain holders of GRS Pension Claims would be funded from the assets of the GLWA, while the funding for recoveries of other Claims within the same Class would come from other sources; and (ii) section 1126 of the Bankruptcy Code, by classifying together differently-treated claims for voting purposes. | The Retirement Systems' objections with respect to the proposed classification of Pension Claims and OPEB Claims under the Plan have been resolved. |
| **2.** Objection to City of Detroit's Plan of Adjustment [filed by Catherine Tuttle] (Docket No. 3194) | |
| The Objecting Party, a City retiree, argues that the Plan should not be confirmed because the Objecting Party feels inadequately represented by the Retiree Committee and the Retiree Associations. | The treatment of Pension Claims and OPEB Claims under the Plan and the OPEB Settlement are appropriate. See, e.g., §§ I.C, II, III, V, VII, VIII. The Plan incorporates hard-fought settlements with the Retiree Committee, the Retirement Systems and other parties. Nevertheless, the Objecting Party is free to vote to accept or reject the Plan according to her preference. |
| **3.** Objection to City of Detroit's Plan of Adjustment [filed by Gerald Galazka] (Docket No. 3205) | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) discriminates unfairly between Classes 10 and 11, (ii) fails to provide for sufficient funding of the Retirement Systems, (iii) establishes inadequate oversight mechanisms for the City and the Retirement Systems and (iv) fails to address recent reductions in State revenue sharing. | The Plan does not discriminate unfairly among the City's creditors. See § II (the "Unfair Discrimination Response"). The treatment of Pension Claims and OPEB Claims under the Plan and the OPEB Settlement are appropriate. See, e.g., §§ I.C, II, III, V, VII, VIII. The Plan provides for adequate post-Effective Date governance. See § IV.A.5 (the "Governance Response"). The Plan is feasible. See § IV (the "Feasibility Response"). |

Asterisks [*] denote objections (i) filed after the deadline of May 12, 2014, set forth in the Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 4202) (the "Scheduling Order"), "[f]or parties other than individual bondholders and individual retirees to file objections to the plan;" and (ii) that do not expressly indicate whether the objector is a bondholder or a retiree, i.e., a party for whom the Scheduling Order provides a deadline of July 11, 2014 for the filing of objections to the Plan. Capitalized terms not defined herein have the meanings given to them in the accompanying brief to which this summary is attached.

| **OBJECTION** | **SUMMARY OF CITY'S RESPONSE**<br>(INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **4.** **Objection to Plan for the Adjustment of Debts by Creditor, Ben McKenzie, Jr. (Docket No. 3230); Objection to Amended Plan for the Adjustment of Debts by Creditor, Ben McKenzie, Jr. (Docket No. 3853)** | |
| The Objecting Party argues that the Plan should not be confirmed because it does not provide for the payment of claims relating to the operation of motor vehicles for which the City is self-insured. | The City intends to modify the Plan to provide for the payment of such claims. |
| **5.** **Objection to City of Detroit's Plan of Adjustment [filed by Marie L. Thornton] (Docket No. 3249)** | |
| The Objecting Party argues that the Plan should not be confirmed because it violates Michigan Public Act 344 of 1945 by enabling the Emergency Manager to usurp local control of neighborhood blight removal efforts. | The City is not prohibited by law from taking any action necessary to carry out the Plan. See § V (the "Lawful Plan Response"). |
| **6.** **Joint Objection to Chapter 9 Plan by Creditors T&T Management, Inc., HRT Enterprises, and the John W. and Vivian M. Denis Trust Regarding Treatment of Claims for Taking of Private Property Without Just Compensation (Docket No. 3412)** | |
| The Objecting Parties argue that the Plan should be amended to provide that "claims based in inverse condemnation and condemnation, which are based on the taking of property without just compensation, are not subject to reduction or compromise as a result of the City of Detroit's bankruptcy." | The Objecting Parties' litigation claims for damages related to condemnation are unsecured "claims" within the meaning of section 101(5) of the Bankruptcy Code and, therefore, are subject to impairment under the Plan. See 11 U.S.C. § 101(5). |

| **OBJECTION** | **SUMMARY OF CITY'S RESPONSE**<br>(INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **7.**      **Objections to City Plan of Adjustment [filed by Carl Williams and Hassan Aleem] (Docket Nos. 3421 and 4129)** | |
| The Objecting Parties argue that the Plan should not be confirmed because (i) the City's chapter 9 case was improperly filed by an unelected Emergency Manager; (ii) the City failed to negotiate in good faith prior to commencing its chapter 9 case; (iii) creditors were not provided with copies of the Plan and/or adequate notice of the Confirmation Hearing; (iv) the City deliberately created its own "service delivery" insolvency; and (v) the City failed to file a list of creditors. | The Emergency Manager was authorized to commence the City's chapter 9 case.  See In re City of Detroit, 504 B.R. 97, 161-62 (Bankr. E.D. Mich. 2013).  See Lawful Plan Response, § V.  The City proposed the Plan in good faith and not by any means prohibited by law.  See § VIII (the "Good Faith Response").  Creditors were provided with adequate notice of the solicitation of the Plan and the occurrence of the Confirmation Hearing.  See Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2984); Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment With Respect to Pension and OPEB Claims (Docket No. 4400).  The City filed a list of creditors.  See Notice of Filing and Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059). |
| **8.**      **Objection to City of Detroit's Plan of Adjustment [filed by Matthew Evans] (Docket No. 3492)** | |
| The Objecting Party argues that the Plan should not be confirmed because it contemplates the potential privatization of DWSD, which would increase the cost of, and limit access to, water-related services. | The Plan does not provide for or require the privatization of DWSD.  See also Lawful Plan Response, § V. |
| **9.**      **Objection to City of Detroit's Plan of Adjustment [filed by Joshua Klarr] (Docket No. 3494)** | |
| The Objecting Party argues that the Plan should not be confirmed because it contemplates the potential privatization of DWSD. | The Plan does not provide for or require the privatization of DWSD.  See also Lawful Plan Response, § V. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **10.**     **Corrected Objection to Amended Plan of Reorganization by Plaintiffs in Hyde Park Cooperative, et al. v. City of Detroit (Docket No. 3497)** | |
| The Objecting Parties argue that the Plan should not be confirmed because the Plan is not in the best interests of creditors and is not feasible because (i) the Plan's classification scheme is "confusing" and the Objecting Parties "cannot determine to which class they belong;" (ii) the Plan creates multiple classes of unsecured creditors; and (iii) unsecured creditors are entitled to greater recoveries than the Plan provides, in light of the City's income projections. | The Plan is in the best interests of creditors and is fair and equitable. See § III. See Feasibility Response, § IV. The classification and treatment of claims under the Plan is appropriate. See, e.g., § IX. |
| **11.**     **Corrected Objection to Proposed Plan of Reorganization and Amended Proposed Plan of Reorganization by the Housing Is a Human Rights Coalition (Docket No. 3511)** | |
| The Objecting Party argues that the Plan should not be confirmed because it "ignores" sections 37-2-1 through 37-2-9 of the Detroit City Charter, dealing with nuisance abatement. | See Lawful Plan Response, § V. |
| **12.**     **Objection to City of Detroit's Plan of Adjustment [filed by Kenneth Anthony Joyce] (Docket Nos. 3551 and 3557)** | |
| The Objecting Party argues that the Plan should not be confirmed because it does not contemplate a sale of the DIA Collection. | The City's goal in chapter 9 is not the unconditional maximization of creditor recoveries, and the City cannot be compelled to sell its assets. See § III.B.1-2 (the "Asset Sale Response"). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **13.** Objection of Jamie S. Fields to the City of Detroit's Amended Plan of Adjustment Dated March 31, 2014 (Docket No. 3830); Objection of Jamie S. Fields to the City of Detroit's Fourth Amended Plan of Adjustment Dated May 5, 2014 (Docket No. 4404) | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan: (i) improperly combines Classes 10 and 11 for voting purposes; (ii) fails to comply with applicable law because it does not require the City to fully fund pensions post-confirmation, in violation of the Pensions Clause; (iii) does not satisfy the best interests of creditors test because the City has not attempted to maximize creditor recoveries by increasing tax revenues and liquidating assets, such as the DIA Collection; (iv) is not feasible, because it lacks projections regarding service delivery insolvency and fails to define "adequate" levels of police and fire services; (v) unfairly discriminates against Class 12; and (vi) is not "fair and equitable" because the Plan "does not offer retirees more than they could receive outside of bankruptcy." | The Plan does not combine Classes 10 and 11 for voting purposes. See Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2984) (the "Solicitation Procedures Order"); Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment With Respect to Pension and OPEB Claims (Docket No. 4400) (the "Supplemental Solicitation Procedures Order"). See Lawful Plan Response, § V. See Asset Sale Response, § III.B.1-2. Any attempt to raise additional taxes would be counterproductive and futile. See § III.B.3 (the "Increased Revenue Response"). See Feasibility Response, § IV. The Plan provides a better alternative than dismissal. See § III.C (the "Dismissal Alternative Response"). |
| **14.** Objections to Debtor's Amended Plan of Adjustment [filed by Dennis Taubitz] (Docket No. 3845); Creditor Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Dennis Taubitz] (Docket No. 4789)* (the "Taubitz Objection") | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the Plan proposes greater recoveries for retiree claims than for other classes of unsecured claims and treats GRS claims differently from PFRS claims; (ii) the City failed to value and liquidate many of its assets, including the DIA Collection; (iii) the Plan violates the Pensions Clause; (iv) the assumed rate of return for investments set forth in the Plan is "not justified;" and (v) there is "no basis in law" for the ASF Recoupment, and the ASF Recoupment is barred by applicable statutes of limitations. | See Unfair Discrimination Response, § II. See Asset Sale Response, § III.B.1-2. See Lawful Plan Response, § V. See Feasibility Response, § IV. The ASF Recoupment is lawful and proper. See § VII (the "ASF Recoupment Response"). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **15.**     **Objection to the Plan of Adjustment [filed by William Ochadleus] (Docket No. 4082)** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) PA 436 is unconstitutional and was enacted illegally in light of the rejection of PA 4; (ii) the Retiree Committee does not adequately represent City retirees; (iii) retiree healthcare and pension benefits should not be impaired; and (iv) the Comprehensive State Release is inappropriate. | See Lawful Plan Response, § V. The Plan incorporates hard-fought settlements with the Retiree Committee, the Retirement Systems and other parties. Nevertheless, the Objecting Party is free to vote to accept or reject the Plan according to his preference. The treatment of Pension Claims and OPEB Claims under the Plan and the OPEB Settlement are appropriate. See, e.g., §§ I.C, II, III, V, VII, VIII. The third-party release provisions of the Plan are appropriate. See § X.A, X.C (the "Third-Party Release Response"). |
| **16.**     **Objections of Creditors Deborah Ryan, Walter Swift, Cristobal Mendoza, and Annica Cuppetelli, Interested Parties, to Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4099) (the "Ryan Objection"); Amended "Corrected" Objections of Creditors Deborah Ryan, Walter Swift, Cristobal Mendoza and Annica Cuppetelli, Interested Parties, to Amended Plan for the Adjustment of Debts of the City of Detroit and Certificate of Service (Docket No. 4228); Second Amended Objections of Creditors Deborah Ryan, Walter Swift, Cristobal Mendoza and Annica Cuppetelli, Interested Parties, to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and Certificate of Service (Docket No. 4608)** | |
| The Objecting Parties, holders of 1983 Claims, argue that the Plan should not be confirmed because the Plan: (i) improperly classifies 1983 Claims as Other Unsecured Claims, which classification violates the Objecting Parties' rights under the Fourteenth Amendment and other, unspecified provisions of the United States Constitution; and (ii) denies the Objecting Parties their right to a jury trial and the full amount of any potential jury verdict. | The Objecting Parties' litigation claims for damages are unsecured "claims" within the meaning of section 101(5) of the Bankruptcy Code and, therefore, are subject to impairment under the Plan and are properly classified as Other Unsecured Claims. See 11 U.S.C. § 101(5). |
| **17.**     **Objections of Creditors Dwayne Provience, Richard Mack, and Gerald and Alecia Wilcox, Interested Parties, to Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4224); Objections of Creditors Dwayne Provience, Richard Mack, and Gerald and Alecia Wilcox, Interested Parties, to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and Certificate of Service (Docket No. 4618)** | |
| The Objecting Parties, holders of 1983 Claims, (i) argue that the Plan should not be confirmed because the Plan improperly classifies 1983 Claims as Other Unsecured Claims, which classification violates the Objecting Parties' rights under the Fourteenth Amendment and other, unspecified provisions of, the United States Constitution; and (ii) incorporate by reference the Ryan Objection. | The Objecting Parties' litigation claims for damages are unsecured "claims" within the meaning of section 101(5) of the Bankruptcy Code and, therefore, are subject to impairment under the Plan and are properly classified as Other Unsecured Claims. See 11 U.S.C. § 101(5). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **18.** **Interested Party David Sole's Objection to City of Detroit's Third Amended Plan of Adjustment (Docket No. 4318) (the "Sole Objection")** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) ASF Recoupment is improper; (ii) any impairment of pensions under the Plan violates the Pensions Clause; (iii) the proposed funding for the VEBAs to be established pursuant to the Plan is inadequate; (iv) the claims of DWSD bondholders should be impaired; (v) the City's consulting fees should not be paid in full; (vi) the Plan fails to address property tax "chargebacks;" (vii) "the banks" should be required to finance blight removal in the City; (viii) the Plan does not provide for the recovery of State shared revenues of which the City has been "deprived;" and (ix) the Plan fails to address property tax abatements and the "diversion" of public funds to build the City's new sports arena and entertainment district. | See ASF Recoupment Response, § VII.  See Lawful Plan Response § V.  See Feasibility Response, § IV.  See Increased Revenue Response, § III.B.3.  See Asset Sale Response, § III.B.1-2.  The City disputes the remainder of the Objection, which fails to assert any legally cognizable arguments against confirmation of the Plan. |
| **19.** **Objection to Debtor's Proposed Plan of Adjustment [filed by Kristen A. Hamel] (Docket No. 4343)** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the Plan fails to contemplate a challenge to the legality of the swaps transactions; (ii) "[t]his Court, in clear bias to the Debtor and its law firm, Jones Day," inappropriately approved the settlement between the City and the swap counterparties; and (iii) the Plan is merely a "ruse" to "attack … retirees and pension plans," and is part of a scheme with which the State and the Court are complicit. | The City disputes the factual allegations of the Objection, which fails to assert any legally cognizable arguments against confirmation of the Plan.  Issues regarding the swaps transactions have been resolved by order of the Court.  See Order (I) Approving Settlement and Plan Support Agreement With UBS AG and Merrill Lynch Capital Services, Inc. Pursuant to Bankruptcy Rule 9019 and (II) Granting Related Relief (Docket No. 4094) (the "Swap Settlement Order"). |
| **20.** **Creditor John Cato's Objections to Detroit's Third Amended Proposed Bankruptcy Plan and Detroit's Attempt to Force Claimant/Creditor Cato to Litigate His Wayne County Circuit Court Case Prior to a Final Order Stating the Actual Reduced Percentage of Claimed Monies Owed to Him, and/or Request for Clarification (Docket No. 4376)** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) does not propose to pay him 100% of his claim immediately and (ii) improperly classifies his claim (the Objecting Party asserts that his claim should be classified as a pension claim, but does not describe the nature of his claim or explain why it is improperly classified). | The treatment of Claims proposed in the Plan is fair and equitable and in the best interests of creditors.  See § III.  Any claims disputes will be addressed through the claims process. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **21.** Local 3308 and Local 917 of the American Federation of State, County and Municipal Employees' Objection and Brief Regarding the Classification of 36th District Court in the City's Proposed Plan of Adjustment (Docket No. 4552) | |
| The Objecting Parties argue that the Plan should not be confirmed because the Plan impermissibly classifies claims relating to the 36th District Court as Other Unsecured Claims. The Objecting Parties argue that (i) claims against the 36th District Court are distinguishable from other unsecured claims against the City because the State guarantees the 36th District Court's funding; (ii) the 36th District Court is a creature of the State, and not the City; and (iii) the City has not established that extending bankruptcy protections to a non-debtor third party is appropriate with respect to the 36th District Court. | The Plan's treatment of claims against the 36th District Court is appropriate under prevailing law. See § XI (the "36th District Court Response"). |
| **22.** Objection to Fourth Amended Chapter 9 Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) Filed by Debtor in Possession City of Detroit, Michigan [filed by Jean Vortkamp] (Docket No. 4578) (the "Jean Vortkamp Objection"); Objection to City of Detroit's Plan of Adjustment [filed by Mary Jo Vortkamp] (Docket No. 4579) (the "Mary Jo Vortkamp Objection") | |
| The Objecting Parties argue that the Plan should not be confirmed because (i) Plan provisions regarding (A) ASF Recoupment, (B) governance of the Retirement Systems, (C) releases and (D) the DIA Settlement, are improper; and (ii) the Plan should impair the claims of secured bondholders. | See ASF Recoupment Response, § VII. See Governance Response, § IV.A.5. See Third-Party Release Response, § X.A, X.C. The DIA Settlement is appropriate. See § I.D (the "DIA Settlement Response"). The treatment of Claims proposed in the Plan is fair and equitable and in the best interests of creditors. See § III. |
| **23.** Limited and Cautionary Objection and Reservation of Rights of the Bank of New York Mellon, as Custodian Under the Global Custody Agreements with: (A) the General Retirement System; (B) the Policemen and Firemen Retirement System; and (C) the Board of Trustees of the City of Detroit Employees' Benefit Plan, to the Confirmation of the Fourth Amended Plan of Adjustment of Debts of the City of Detroit (Docket No. 4610) | |
| The Objecting Party argues that the Plan should not be confirmed to the extent that it provides for (i) "any modification, release, discharge, injunction against, or similar limitations of claims of BNY Mellon against persons or entities other than the Debtor;" (ii) any modification or rejection of certain "custody agreements" between BNY Mellon and, respectively, PFRS, GRS and the City of Detroit Employees' Benefit Plan; (iii) "non-consensual releases by non-creditors of the Debtor in favor of non-debtors;" (iv) "the classification and treatment of claims against non-debtors as claims against the Debtor;" and (v) "the release and discharge of, and injunction against, claims of non-creditors against non-debtors." | See Third-Party Release Response, § X.A, X.C. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **24.**   **Objection to the City of Detroit's Plan of Adjustment [filed by Michael D. Shane] (Docket No. 4622)** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) fails to account for the ongoing housing foreclosure crisis in the City; (ii) does not require mortgage lenders to reduce the principal amounts owed by City homeowners; (iii) fails to "pursue property taxes not paid by the banks and investment firms" involved in the foreclosure crisis and to require such "banks and investment firms" to fund blight removal efforts; (iv) should provide for the "clawback" of certain "swap termination fees" paid by DWSD in 2011 and 2012; and (v) violates the Pensions Clause. | See Lawful Plan Response, § V. The Pensions Clause does not prohibit the City from impairing Pension Claims in chapter 9. See In re City of Detroit, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). Issues regarding the swaps transactions have been resolved by order of the Court. See Swap Settlement Order. The City disputes the remainder of the Objection, which fails to assert any legally cognizable arguments against confirmation of the Plan. |
| **25.**   **Carlton Carter, Bobby Jones, Roderick Holley & Richard T. Weatherly's Objection to the City of Detroit's Proposed Chapter 9 Plan (Docket No. 4625)** | |
| The Objecting Parties — who hold claims against the 36th District Court — argue that the Plan should not be confirmed because (i) the Plan's injunction provisions impermissibly bar parties holding claims against the 36th District Court from suing the 36th District Court and the State; (ii) the Plan improperly classifies the claims of the Objecting Parties in Class 14; (iii) the Plan unfairly discriminates against the claims of the Objecting Parties; (iv) the Plan fails to provide for the payment of the Objecting Parties' claims; and (v) the Plan improperly fails to identify the individual creditors who are holders of Indirect 36th District Court Claims. | See 36th District Court Response, § XI. See Unfair Discrimination Response, § II. |
| **26.**   **Oakland County's Objection to Confirmation of the City of Detroit, Michigan's Proposed Fourth Amended Plan of Adjustment (Docket No. 4627) (the "Oakland County Objection")** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) is not feasible because it "fails to make sufficient funding available to the DWSD for operations" and impermissibly requires DWSD to fund GRS UAAL; (ii) has not been proposed in good faith because Plan provisions regarding DWSD funding of GRS pension obligations violate applicable State and local law; and (iii) contains overly broad third-party releases. | The Plan provides adequate funding to DWSD. See § IV.A.4 (the "DWSD Funding Response"). The DWSD Pension Funding is lawful. See § V.A (the "DWSD Pension Funding Response"). See Good Faith Response, § VIII. See Third-Party Release Response, § X.A, X.C. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **27.**  Objection of the United States of America to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4629) | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the Plan's release and injunction provisions should contain certain carve-outs requested by the United States; and (ii) the United States Department of Housing and Urban Development disputes the estimated aggregate allowed amount provided in the Plan for Class 4 – HUD Installment Note Claims. | The City is reviewing the factual assertions contained in the Objection with respect to the allowed amount of Class 4 Claims, and will revise the Plan as appropriate to the extent such assertions prove accurate. The City otherwise disputes such factual assertions. The Plan's release and injunction provisions are appropriate. See § X. The City believes that the scope of certain of the release and injunction carve-outs requested by the Objecting Party may be unnecessarily broad, and does not believe that the absence of such carve-outs renders the Plan unconfirmable. |
| **28.**  Objection to City of Detroit's Plan of Adjustment [filed by Dawn DeRose] (Docket No. 4632) | |
| The Objecting Party argues that the Plan should not be confirmed because (i) any reduction of pension benefits would violate the Michigan Constitution; (ii) the City has not vigorously sought to collect debts owing to the City; and (iii) assets of the DIA, DWSD and other City assets should not be transferred but should remain property of the City. | The Pensions Clause does not prohibit the City from impairing Pension Claims in chapter 9. See In re City of Detroit, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). See Increased Revenue Response, § III.B.3. |
| **29.**  Objections of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Cecily McClellan (Docket No. 4633); Hassan Aleem (Docket No. 4634); Bernard Arnold (Docket No. 4639); Joan E. Robinson-Cheeks (Docket No. 4640); Carl Williams (Docket No. 4691); Barbara A. Magee (Docket Nos. 4692 and 4740*); Joann Jackson (Docket No. 4693); Girlie Gideon (Docket Nos. 4694 and 4739*); Gladys Woolfork (Docket No. 4697); Vera C. Magee (Docket No. 4698); Errol Griffin (Docket No. 4699); Hassan Aleem and Carl Williams (Docket No. 4725*); Valerie A. Glenn-Simons (Docket No. 4701); Elmore N. Simons (Docket No. 4702); William M. Davis (Docket No. 4705); Theresa Penson (Docket No. 4736*); Frank M. Sloan, II (Docket Nos. 4635 and 4737*); and Debra Pernell-Simons (Docket No. 4724*)] | |
| The Objecting Parties argue that the Plan should not be confirmed because (i) the City did not negotiate in good faith prepetition; (ii) this Court "concealed the fact and deceived the people from knowing he was a Magistrate Judge over the age of 70 and had limited powers to address Constitutional issues," such as whether pension benefits are protected by the Michigan Constitution; and (iii) the rights of creditors and objectors under the Fifth and Fourteenth Amendments to the United States Constitution have been violated in this case because this Court lacks jurisdiction to adjudicate certain (unspecified) matters at issue in this case. | See Good Faith Response, § VIII. The City disputes the remaining factual allegations and legal contentions of the Objections. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **30.**    **Objection of County of Macomb, Michigan, By and Through Its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit and the Assumption of Sewer Contracts (Docket No. 4636) (the "Macomb County Objection")** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) Plan provisions regarding DWSD pension funding violate State and local law, meaning that the Plan violates section 943(b)(4) of the Bankruptcy Code; (ii) such provisions constitute a "disguised tax on suburban ratepayers" because DWSD rates will have to be increased for DWSD to satisfy its pension funding requirements; (iii) the Plan violates DWSD bylaws and certain wholesale contracts; (iv) Plan provisions regarding DWSD pension funding are "practically imprudent;" (v) the Plan is not feasible because the requirement that DWSD fund GRS pension obligations would strain DWSD's budget and deprive DWSD of capital to make necessary improvements; (vi) the Plan unfairly discriminates against general unsecured creditors, in light of the proposed recoveries of holders of pension claims; and (vii) the Plan's exculpation provisions are impermissibly broad.  In addition, the Objecting Party argues that the City is not entitled to assume or assign its sewer contracts with Macomb County because the City is unable to cure defaults and provide adequate assurance of future performance with respect to such contracts. | See DWSD Pension Funding Response, § V.A.  See DWSD Funding Response, § IV.A.4.  The DWSD Pension Funding and DWSD CVR do not constitute a tax.  See § VI.C.  See Lawful Plan Response, § V.  See Feasibility Response, § IV.  See Unfair Discrimination Response, § II.  The Plan's exculpation provisions are appropriate.  See § X.B (the "Exculpation Response").  See Third-Party Release Response, § X.A, X.C.  The proposed assumption of DWSD contracts under the Plan is appropriate.  See § XII.  The City disputes the standing of the Macomb Parties to assert the Macomb County Objection. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **31.** **The DWSD Bond Trustee's Objection to the City's Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4647) (the "DWSD Bond Trustee Objection")** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the Plan does not comply with title 11 or chapter 9 because it alters the terms of the City's bargain with holders of DWSD Bonds and strips such holders' liens on net revenues of DWSD; (ii) Plan provisions regarding DWSD funding of GRS UAAL violate section 928(a) of the Bankruptcy Code and are not necessary to the Plan's feasibility; (iii) the Plan violates sections 927 and 1111(b) of the Bankruptcy Code by providing no call protection for New Existing Rate DWSD Bonds and limited call protection for New DWSD Bonds; (iv) the Plan violates section 943(b)(4) of the Bankruptcy Code because it proposes to issue securities that do not comply with applicable State and local law; (v) the Plan does not satisfy the best interests of creditors test because, outside of bankruptcy, State and local law would offer protections to holders of DWSD Bonds not provided for under the Plan, and because the Plan does not afford the holders of DWSD Bonds "the greatest economic return" from the DWSD; (vi) the Plan is not conditioned upon the City obtaining any necessary regulatory and electoral approvals, as required by section 943(b)(6) of the Bankruptcy Code; (vii) even if the claims of holders of DWSD Bonds can be impaired in chapter 9, the Plan is not "fair and equitable" and violates section 1129(b)(2)(A)(i) of the Bankruptcy Code because (A) the Plan strips holders of DWSD Bonds of the liens securing their claims, (B) Plan provisions regarding DWSD pension funding increase such holders' risk of nonpayment and (C) the Plan fails to pay such holders an appropriate interest rate; (viii) the Plan violates section 1129(b)(2)(A)(iii) of the Bankruptcy Code because it fails to provide holders of DWSD Bond claims the "indubitable equivalent" of such holders' existing collateral; (ix) the plan is not "fair and equitable" under section 1129(b)(1) of the Bankruptcy Code because it violates the absolute priority rule; (x) the Plan does not satisfy section 1129(a)(6) of the Bankruptcy Code because confirmation is not conditioned upon the approval of future water and sewer rates by the Board of Water Commissioners; (xi) the Plan was not proposed in good faith; and (xii) the Plan improperly attempts to waive the 14-day stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). | The Plan's treatment of DWSD Bond Claims is appropriate. See § III.E. See DWSD Pension Funding Response, § V.A. The Plan's modification of call protection rights is a permissible impairment. See § III.E.1.c (the "Call Protection Response"). See Lawful Plan Response. See Dismissal Alternative Response, § III.C. See Asset Sale Response, § III.B.1-2. The City has obtained or will obtain all necessary regulatory and electoral approvals. See § VI. The Plan satisfies the best interests of creditors and fair and equitable tests with respect to DWSD Bond Claims. See § III.E (the "DWSD Best Interests/Fair and Equitable Response"). The Plan satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code. See § III.E.1. The absolute priority rule is not applicable to secured claims. See § III.E.2. The Board of Water Commissioners will retain its rate-making authority under the Plan. See § VI.A. See Good Faith Response, § VIII. The waiver of the 14-day stay under Bankruptcy Rule 3020(e) is appropriate. See § XIII (the "3020(e) Response"). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **32.**     **COPs Holders' Objection to Confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Hypothekenbank Frankfort AG; Hypothekenbank Frankfort International S.A.; Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; Deutsche Bank AG, London; Dexia Crédit Local; Dexia Holdings, Inc.; and FMS Wertmanagement AöR] (Docket No. 4653) (the "COPs Objection")** | |
| The Objecting Parties argue that the Plan should not be confirmed because (i) the Plan unfairly discriminates against holders of claims in Class 9 by (A) providing a materially lower percentage recovery for such holders as compared to holders of pension claims (the Objecting Parties also assert that the City's pension claim figures are artificially inflated) and (B) allocating significantly more risk to holders of Class 9 claims than to holders of pension claims; (ii) the Plan does not satisfy the best interests of creditors test because (A) the Plan "squanders [the City's] extremely valuable non-core assets" — including the DIA Collection, DWSD, City-owned real estate and accounts receivable — "all of which could be monetized by the City" without compromising the City's ability to provide adequate services and (B) outside of bankruptcy, the City could be compelled to pay the claims of the Objecting Parties by levying additional taxes; (iii) the DIA Settlement does not satisfy the requirements of Bankruptcy Rule 9019; (iv) the DIA Collection can be monetized because it is not held in charitable trust or protected by the public trust doctrine; (v) the City's proposed reinvestment initiatives are improper because (A) there is no evidence that such reinvestment will fix the root causes of Detroit's decline and (B) the Plan does not provide for creditors to share in any potential revenue increases resulting from such reinvestment; (vi) the Plan is not feasible because it contains inadequate post-confirmation oversight mechanisms; (vii) the City did not propose the Plan in good faith; (viii) the Plan's injunction, release and exculpation provisions are impermissibly broad; and (ix) the Plan improperly attempts to waive the 14-day stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). | See Unfair Discrimination Response, § II.  See Asset Sale Response, § III.B.1-2.  See Increased Revenue Response, § III.B.3.  See DIA Settlement Response, § I.D.  See Feasibility Response, § IV. See Good Faith Response, § VIII.  See Third-Party Release Response, § X.A, X.C.  See 3020(e) Response, § XIII. |
| **33.**     **Joinder to Objection of Certain COPs Holders and Limited Objection of Wilmington Trust, National Association, as Successor Contract Administrator, to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4656)** | |
| The Objecting Party joins in the COPs Objection and argues that the Plan should not be confirmed because the Plan fails to provide for (i) "the collection, receipt, and distribution to Class 9 COP Claims by the Contract Administrator" as required by the Contract Administrator Agreement related to the COPs; and (ii) payment of the expenses of the Contract Administrator and the Trustee under the Trust Agreement related to the COPs transactions. | See Unfair Discrimination Response, § II.  See Asset Sale Response, § III.B.1-2.  See Increased Revenue Response, § III.B.3.  See DIA Settlement Response, § I.D.  See Feasibility Response, § IV. See Good Faith Response, § VIII.  See Third-Party Release Response, § X.A, X.C.  See 3020(e) Response, § XIII. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **34.**     **Objection of Berkshire Hathaway Assurance Corporation to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4657) (the "<u>Berkshire Hathaway Objection</u>")** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) does not satisfy the best interests of creditors test with respect to the DWSD Bond Claims because it does not provide bondholders with the full value to which they are entitled; (ii) was not proposed in good faith because the Plan fails to set forth a rationale for the proposed impairment of DWSD Bond Claims or explain whether other alternatives to such impairment were considered; (iii) is not "fair and equitable," because the Plan does not provide holders of DWSD Bond Claims (A) deferred payments with a value, as of the Effective Date, of at least the value of such holders' interest in the relevant pledged revenues, or (B) the "indubitable equivalent" of such holders' claims. | <u>See</u> DWSD Best Interests/Fair and Equitable Response, § III.E. The Plan satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code with respect to the DWSD Bond Claims. <u>See</u> § III.E.1. |
| **35.**     **Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4660) (the "<u>FGIC Objection</u>")** | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the Plan is not in the best interests of creditors because it fails to (A) maximize the value of City-owned assets and (B) provide creditors a better alternative than what they would have outside of bankruptcy; (ii) the Plan unfairly discriminates against Class 9 claims by providing substantially greater recoveries to other similarly-situated classes and allocating materially greater risk to Class 9 claims as compared to claims in Classes 10 and 11; (iii) the Plan is not "fair and equitable" with respect to Class 9 because the City has not attempted to value and monetize many valuable assets, such as the DIA Collection and City-owned land; (iv) the Plan is not feasible because (A) the Plan does not address how the City would fund the recoveries contemplated in the Plan in the event that the Retirement Systems are forced to disgorge the proceeds from the COPs transactions, and (B) the Plan's provisions regarding post-bankruptcy governance are insufficient; (v) the Plan was not proposed in good faith and "is an abuse of the chapter 9 process" because it unfairly discriminates and does not maximize creditor recoveries; (vi) the Plan improperly exculpates the Retirement Systems from liability regarding the COPs transactions; and (vii) the DIA Settlement is a fraudulent transfer under Michigan law. | <u>See</u> Asset Sale Response, § III.B.1-2.  <u>See</u> Increased Revenue Response, § III.B.3.  <u>See</u> Unfair Discrimination Response, § II. <u>See</u> Feasibility Response, § IV.  <u>See</u> Governance Response, § IV.A.5.  <u>See</u> Good Faith Response, § VIII.  The DIA Settlement will not constitute a fraudulent transfer under Michigan law. <u>See</u> § V.F (the "<u>Fraudulent Transfer Response</u>"). |
| **36.**     **Wayne County's Concurrence in, and Adoption of, the Objections of Macomb County and Oakland County to Confirmation of the Debtor's Fourth Amended Plan of Adjustment (Docket No. 4663)** | |
| The Objecting Party adopts and concurs in the Macomb County Objection and the Oakland County Objection. | <u>See</u> responses to Macomb County and Oakland County Objections. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **37.**     **National Public Finance Guarantee Corporation's Objection to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4665) (the "<u>NPFG Objection</u>")** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) provides for the impairment of special revenue debt, which is impermissible under sections 922, 927 and 928 of the Bankruptcy Code; (ii) is not in the best interests of creditors because the Plan (A) does not provide a better alternative for holders of DWSD Bonds than what such holders already have and (B) fails to provide such holders with all they can reasonably expect under the circumstances; (iii) unfairly discriminates against impaired DWSD Bond claims as compared with unimpaired DWSD Bond claims; (iv) violates section 1123(a)(4) of the Bankruptcy Code by classifying impaired and unimpaired DWSD Bond claims in the same class; (v) is not "fair and equitable" because, in light of the fact that DWSD is solvent, the Plan does not provide holders of DWSD Bond claims all they can reasonably expect under the circumstances; (vi) fails to satisfy section 1129(b)(2)(A) of the Bankruptcy Code because (A) the cramdown interest rates for the DWSD Bonds do not provide holders of DWSD Bond claims the present value of their claims, (B) the Plan does not compensate holders of DWSD Bond claims for the loss of call protection and (C) Plan provisions regarding DWSD pension funding impermissibly strip the liens of DWSD bondholders; and (vii) the Plan was not proposed in good faith. | <u>See</u> DWSD Best Interests/Fair and Equitable Response, § III.E. <u>See</u> Dismissal Alternative Response, § III.C. <u>See</u> Asset Sale Response, § III.B.1-2. <u>See</u> Increased Revenue Response, § III.B.3. <u>See</u> Unfair Discrimination Response, § II. The Plan satisfies section 1123(a)(4) of the Bankruptcy Code. <u>See</u> § IX (the "<u>1123(a)(4) Response</u>"). <u>See</u> Call Protection Response, § III.E.1.c. <u>See</u> Good Faith Response, § VIII. |
| **38.**     **Limited Objection of Merrill Lynch Capital Services, Inc. and UBS AG to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit or Request for Clarification with Respect Thereto (Docket No. 4668) (the "<u>Swap Counterparties Objection</u>")** | |
| The Objecting Parties request modifications to certain Plan provisions regarding (i) exculpation, to add the Swap Counterparties as "Exculpated Parties" or "to expressly limit the exculpation provision, such that the included parties are not being exculpated in their capacities as creditors;" (ii) releases, to provide an opt-out mechanism with respect to such releases or to carve-out the Swap Counterparties from such releases; and (iii) the Plan injunction, to clarify that such injunction is not broader than or inconsistent with the settlement agreement between the Swap Counterparties and the City. | The Plan's release, injunction and exculpation provisions are appropriate. <u>See</u> § X. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **39.**      **Objection of the Ad Hoc Committee of DWSD Bondholders to the City's Fourth Amended Plan of Adjustment and Joinder to the DWSD Bond Trustee's Objection to the City's Fourth Amended Plan of Adjustment (Docket No. 4671) (the "<u>Ad Hoc Committee Objection</u>")** | |
| The Objecting Party (i) joins in the DWSD Bond Trustee Objection and (ii) argues that the Plan should not be confirmed because the Plan violates section 510(a) of the Bankruptcy Code and the absolute priority rule (and thus is not "fair and equitable") because the Plan fails to enforce certain subordination agreements applicable to the DWSD Bonds. | <u>See</u> DWSD Best Interests/Fair and Equitable Response, § III.E. |
| **40.**      **Objection of Assured Guaranty Municipal Corp. to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) (Docket No. 4674) (the "<u>Assured Objection</u>")** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) is not in the best interests of creditors because, in chapter 9, fully secured revenue bond creditors have "an inviolable right to timely payment, in full, of both principal and interest at the contract rate and a valid and enforceable lien on a revenue stream sufficient to ensure such payment;" (ii) is not "fair and equitable" because the Plan (A) does not provide all holders of DWSD Bonds with recoveries that are equal in value to such holders' current interests in the relevant collateral, (B) fails to compensate holders of DWSD Bonds for the loss of call protection, (C) partially strips holders of DWSD Bonds of their liens and (D) does not provide holders of DWSD Bonds with the "indubitable equivalent" of their claims; (iii) is not "fair and equitable" "in a broad sense," in light of "broader principles of fairness and equity;" (iv) unfairly discriminates against certain classes of DWSD Bonds insured by the Objecting Party; (v) violates section 943(b)(4) of the Bankruptcy Code because the Plan would "break" the "closed loop" waterfall applicable to revenue bonds under Michigan and local law (and the relevant Plan provisions are not authorized under section 928 of the Bankruptcy Code); and (vi) is not feasible because the Plan proposes to fund GRS pension claims with DWSD revenues to which holders of GRS pension claims are not entitled. | <u>See</u> DWSD Best Interests/Fair and Equitable Response, § III.E. <u>See</u> Unfair Discrimination Response, § II.  <u>See</u> Lawful Plan Response, § V.  <u>See</u> Feasibility Response, § IV. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **41.**     **Objection of Ambac Assurance Corporation to Fourth Amended Plan of Adjustment of Debts of the City of Detroit (Docket No. 4677) (the "Ambac Objection")** | |
| The Objecting Party argues that the Plan should not be confirmed because the Plan (i) is not in the best interests of creditors because holders of LTGO Bond claims would receive more if the case were dismissed than they would receive under the Plan; (ii) is not "fair and equitable" because (A) the Plan fails to reflect the alleged "structural seniority" of LTGO bonds under Michigan law over the City's other unsecured obligations and (B) the absolute priority rule requires that holders of LTGO Bond claims must receive full value of their claims before junior claims may recover anything; (iii) discriminates unfairly against LTGO Bond claims, in light of the treatment afforded to pension claims; and (iv) fails to maximize creditor recoveries through increased taxation, asset monetization and other means (in contravention of both the best interests of creditors test and the "fair and equitable" requirement).. | Holders of LTGO Bond Claims would not receive more if the City's chapter 9 case were dismissed.  See § III.C.2.a.  The Plan's treatment of LTGO Bond Claims does not violate the absolute priority rule. See § III.D.  See Unfair Discrimination Response, § II.  See Asset Sale Response, § III.B.1-2.  See Increased Revenues Response, § III.B.3. |
| **42.**     **Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment (Docket No. 4679) (the "Syncora Objection")** | |
| The Objecting Parties argue that the Plan should not be confirmed because the Plan (i) is not in the best interests of creditors because holders and insurers of COP claims would receive greater recoveries if the case were dismissed than they would under the Plan; (ii) unfairly discriminates between the COP claims and pension claims, with respect to percentage recoveries and risk allocation; (iii) is not "fair and equitable" because the City has (A) "purposefully and unjustifiably sheltered" valuable non-core assets, including the DIA Collection and City-owned land, from creditors, and (B) failed to maximize cost savings through operational restructuring; (iv) violates section 943(b)(4) of the Bankruptcy Code because (A) the Plan "redirects UTGO tax levy proceeds under the UTGO settlement to the pension systems," in contravention of Michigan law, and (B) the DIA Settlement is a fraudulent transfer under Michigan law; (v) was not proposed in good faith because the Plan (A) is inconsistent with the principles underlying the Bankruptcy Code, (B) was not proposed with honesty and good intentions and (C) fails to treat creditors in a fundamentally fair manner; and (vi) is not feasible because the City's projections are "opaque and unreliable." | See Dismissal Alternative Response, § III.C.  See Unfair Discrimination Response, § II.  See Asset Sale Response, § III.B.1-2.  See Increased Revenue Response, § III.B.3.  See Lawful Plan Response, § V.  See Fraudulent Transfer Response § V.F.  See Good Faith Response, § VIII.  See Feasibility Response, § IV. |
| **43.**     **Joinder of BlackRock Financial Management, Inc. in Ambac Assurance Corporation's Objection to the Fourth Amended Plan of Adjustment of Debts of the City of Detroit (Docket No. 4681)** | |
| The Objecting Party joins in the Ambac Objection. | See response to Ambac Objection (Row 41). |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **44.** Objections of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Katrina Henry] (Docket No. 4695) | |
| The Objecting Party argues that the Plan should not be confirmed because (i) insufficient time was provided for parties to object to the Plan; (ii) the City failed to negotiate in good faith with creditors prior to commencing its chapter 9 case; (iii) the Plan was not filed in good faith; and (iv) OPEB Claims should not be impaired under the Plan. | Creditors were provided with adequate notice of the solicitation of the Plan and the occurrence of the Confirmation Hearing consistent with orders of the Court. See Solicitation Procedures Order; Supplemental Solicitation Procedures Order; Fourth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 4202) (the "Scheduling Order"). See Good Faith Response, § VIII. The treatment of Pension Claims and OPEB Claims under the Plan and the OPEB Settlement are appropriate. See, e.g., §§ I.C, II, III, V, VII, VIII. |
| **45.** Objections of the Notice of Filing of Redlined Versions of (A) Fourth Plan for the Adjustment Fourth Plan for the Adjustment of the City of Detroit [sic] and (B) Fourth Amended Plan for the Adjustment of Debts of the City of Detroit Issued May 5, 2014 [filed by Carl Williams and Hassan Aleem] (Docket Nos. 4808* and 4867); Sarah B. J. Vans (Docket Nos. 4810* and 4832); Martha Jones (Docket Nos. 4811* and 4862); Katrina Henry (Docket Nos. 4812* and 4868); Debra Pernell-Simmons (Docket No. 4813*); Dorothea Harris (Docket No. 4814*); Bernard Arnold (Docket No. 4815*); Leslie C. Little (Docket Nos. 4817* and 4864); Dorothy J. Anderson (Docket Nos. 4820* and 4869); Vera C. Magee (Docket Nos. 4821* and 4827); Raphael W. Robinson (Docket No. 4822*); Valerie A. Glenn-Simons (Docket No. 4823); Elmore N. Simons (Docket No. 4824); Theresa Penson (Docket No. 4825); Joan E. Robinson-Cheeks (Docket No. 4826); Joann Jackson (Docket Nos. 4828 and 4866); Earline Jones (Docket No. 4829); Lory Parks (Docket No. 4830); Mary Diane Bukowski (Docket No. 4831); William M. Davis (Docket No. 4833); Gladys Woolfork (Docket No. 4860); Wanda Jan Hill (Docket No. 4861); and Cecily McClellan (Docket No. 4870)] | |
| The Objecting Parties argue that (i) insufficient notice and time to respond was provided regarding unspecified filings related to the Plan; (ii) the filing of the City's chapter 9 petition was improper under PA 436; (iii) Plan voting procedures violate creditors' due process and equal protection rights; and (iv) Jones Day has a conflict of interest in this case because it has represented certain of the City's creditors. | Creditors were provided with adequate notice of the solicitation of the Plan and the occurrence of the Confirmation Hearing consistent with orders of the Court. See Solicitation Procedures Order; Supplemental Solicitation Procedures Order; Scheduling Order. The commencement of the City's chapter 9 case was lawful. See In re City of Detroit, 504 B.R. 97, 190-91 (Bankr. E.D. Mich. 2013). See Lawful Plan Response, § V. The City otherwise disputes the factual allegations of the Objection. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **46.**      Creditor Objection to the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [filed by Irma Industrious] (Docket No. 4895*) (the "<u>Industrious Objection</u>") | |
| The Objecting Party argues that the Plan should not be confirmed because (i) the City has failed to liquidate many assets, including the DIA Collection; (ii) the City proposes to spend money on reinvestment initiatives while not maximizing creditor recoveries; (iii) the DIA Settlement contemplates that the City will transfer the DIA Assets for less than their actual value; (iv) the investment return assumptions are unrealistic; (v) the ASF Recoupment "has no basis in law" and is barred by an (unspecified) statute of limitations; and (vi) the Plan does not comply with State law because it violates the Pensions Clause. | <u>See</u> Asset Sale Response, § III.B.1-2. <u>See</u> DIA Settlement Response, § I.D. <u>See</u> Feasibility Response, § IV. <u>See</u> ASF Recoupment Response, § VII. <u>See</u> Lawful Plan Response, § V. |
| **47.**      Objections to Fourth Amended Plan of Adjustment by Detroit Police Officers Association (Docket No. 4901) (the "<u>DPOA Objection</u>"); Corrected Objections to Fourth Amended Plan of Adjustment by Detroit Police Officers Association (Docket No. 4938) | |
| The Objecting Party argues that: (i) the Plan violates section 1123(a)(4) of the Bankruptcy Code by not providing the same treatment for each claim in Class 10, based on the differing terms of the New PFRS Active Pension Plan for different groups; (ii) the Plan violates section 943(b)(4) of the Bankruptcy Code by proposing to enjoin the Objecting Party from bargaining for improved pension benefits until at least June 2023 in violation of state and federal law; (iii) the Plan is not feasible unless the City can provide essential government services, which it cannot without treating holders of PFRS Pension Claims better; and (iv) the Plan's release and injunction provisions are illegal to the extent they can be construed to release the prospective rights of the Objecting Party or its members. | <u>See</u> 1123(a)(4) Response, § IX. <u>See</u> Lawful Plan Response, § V. <u>See</u> Feasibility Response, § IV. <u>See</u> Third-Party Release Response, § X.A, X.C. |
| **48.**      DFFA Objections to the City's Fourth Amended Plan of Adjustment [filed by Detroit Fire Fighters Association] (Docket No. 4918) (the "<u>DFFA Objection</u>") | |
| The Objecting Party argues that the Plan violates sections 943(b)(4) and 1129(a)(3) of the Bankruptcy Code by proposing to enjoin the Objecting Party from bargaining for improved pension benefits until at least June 2023 in violation of state and federal law. | <u>See</u> Lawful Plan Response, § V. |

| OBJECTING PARTY AND DOCKET NUMBER | SUMMARY OF CITY'S RESPONSE |
|---|---|
| 49. **Objections (a) raising non-specific concerns or objecting generally to the Plan; (b) generally requesting that the Court not allow any modifications to retirement benefits pursuant to the Plan; or (c) requesting other relief unrelated to the confirmability of the Plan.** | |
| Jeffrey Sanders (Docket No. 2827); Patricia A. Beamon (Docket No. 2840); Judy Flowers-Tisdale (Docket No. 2841); Paula Ford (Docket No. 2842); Geraldine Chatman (Docket Nos. 2843; 3103); Bernice Jenkins (Docket No. 2844); Willie Chaffould (Docket No. 2848); Phyllis Fuller (Docket No. 2849); Dorian L. Walker (Docket No. 2850); Eddie Ranger (Docket No. 2851); Barbara Curl (Docket No. 2852); Janine McCallum (Docket No. 2855); Nehanda Green (Docket No. 2858); Yvonne Holliday Roberts (Docket No. 2860); Barbara Hunt (Docket No. 2861); Sylvester A. Tobias, Jr. (Docket No. 2863); Terry Graves (Docket No. 2864); Angela D. Bean (Docket No. 2866); Bonnie Bizzell (Docket No. 2868); Laurence Aurbach (Docket Nos. 2869; 3735); Rosie M. Woods (Docket No. 2870); Barbara Harding (Docket No. 2871); Yvonne Williams-Jones (Docket No. 2872); Laura Wilson (Docket No. 2874); Willie Howard (Docket No. 2876); Adriane L. Girty (Docket No. 2877); Gloria J. Whitfield (Docket No. 2878); Rita Dickerson (Docket No. 2879); Morris Hartman (Docket No. 2880); [unknown] (Docket No. 2881); Octavius E. Sapp (Docket No. 2882); Patricia Robinson (Docket No. 2883); David Fedenis (Docket No. 2884); Dino Braddy (Docket No. 2885); [unknown] (Docket No. 2886); Constance J. Spight (Docket No. 2887); Eric Davis (Docket No. 2888); [unknown] (Docket No. 2889); John Robinson (Docket No. 2890); Cynthia Haskin (Docket No. 2891); Angles L. Hunt (Docket No. 2892); [unknown] (Docket No. 2893); Helen Everett (Docket No. 2894); Josephine Walters (Docket No. 2895); Ronald Danowski (Docket No. 2896); [unknown] (Docket No. 2897); Randy Walker (Docket No. 2898); William Curtis Walton (Docket No. 2899); Cecily McClellan (Docket No. 2900); Larry and Diane Leipprandt (Docket No. 2901); Ora Mae Mott (Docket No. 2902); Anthony S. Murphy (Docket No. 2903); August Germany (Docket No. 2904); Rita Jordan (Docket No. 2905); Joan Robinson-Cheeks (Docket No. 2906); Wilson Allen (Docket No. 2907); Mashuk Meah (Docket No. 2908); Hope Humbert (Docket No. 2909); Belinda Myers-Florence (Docket No. 2910); Alvin Brooks (Docket No. 2911); Charles Jenkins (Docket No. 2912); Gracie Webster (Docket No. 2914); Ortha D. White (Docket No. 2915); Eloise Abram (Docket No. 2916); Joyce Johnson-Jones (Docket No. 2917); Sylvia F. Robinson (Docket No. 2918); Daniel Lopez (Docket Nos. 2919; 2930); Amru Mean (Docket No. 2920); Felicia Jones (Docket No. 2922); Dino Wright and Kathy Wright (Docket No. 2923); Frances Teague (Docket No. 2924); Judge Caston, Jr. (Docket No. 2925); Cheryl Labash (Docket No. 2926); Lucille Nicks (Docket No. 2927); Aaron Jones (Docket No. 2928); Albert Jackson (Docket No. 2929); Daniel Lapaz (Docket No. 2930); Constance M. Moore (Docket No. 2931); Mary E. Reed (Docket No. 2932); Darlene Starks (Docket No. 2933); | The Objections raise nonspecific concerns regarding the Plan, generally request that the Court not allow any modifications to retirement benefits pursuant to the Plan, object generally to the Plan or certain features of the Plan or request other relief unrelated to the confirmability of the Plan. In most cases, these Objections do not raise legally cognizable or discernible challenges to the Plan that merit a response. To the extent that any discernible issues have been raised, they are addressed in the City's response brief. In addition, the Court previously has determined that retirement benefits may be modified in chapter 9. <u>See</u> In re City of Detroit, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). Accordingly, the Objections should be overruled. |

Binnie L. Boatner (Docket No. 2934); Mattie Johnson (Docket No. 2938); Linda Lovelady (Docket Nos. 2939; 3069); Pearl Lewis (Docket No. 2965); Roy Harris (Docket No. 2966); Vicki Herron (Docket No. 2967); Isabell Sykes (Docket No. 2968) Oletha Stanfield (Docket No. 2969); Carlottie Shaw (Docket No. 2970); Lois J. Drafts (Docket No. 2971); Linda Appling (Docket No. 2972); Diana Lawrence (Docket No. 2973); Sandra Evans (Docket No. 2974); Michael Houston (Docket No. 2975); Elaine E. Thayer (Docket No. 2976); Beverly A. Holman (Docket No. 2977); Catherine Jones (Docket No. 2978); Stephen L. Gold (Docket No. 2979); Constance M. Phillips (Docket Nos. 2980; 3604; 4308); Spurgeon L. Walker (Docket No. 2982); Dale A. Seaton (Docket No. 2983);Gwendolyn Montgomery (Docket Nos. 2985; 3102); Peggy A. Heade (Docket No. 2986); Jacqueline M. Anderson-Hutchings (Docket No. 2987); Robert Cox, Jr. (Docket No. 2988); Angela Newell (Docket No. 2989); Mary Eatmon (Docket No. 2990); Alicia K. Zagar (Docket No. 2991); David Draft (Docket No. 2992); Ronald Slay (Docket No. 3064); Donald E. McRenolds (Docket No. 3065); KoeKen C. Ong (Docket No. 3066); Eileen Burns (Docket No. 3067); Cleotha Wilson Jr. (Docket No. 3068); Andrew L. Starks (Docket No. 3086); Donna Glanton (Docket No. 3088); Sharon K. Jordan (Docket No. 3089); A. I. Andrews (Docket No. 3090); Marcien Turner Taylor (Docket No. 3091); Gwendolyn Flowers (Docket No. 3092); Kenneth Stechuk (Docket No. 3093); Antonio D. Cassone (Docket No. 3095); Paul C. Wells (Docket No. 3096); Michael E. Ogletree (Docket No. 3097); Nancy A. Capers (Docket No. 3111); Orville B. Johnson (Docket No. 3112); Diane Gary (Docket No. 3113); David Wiggins Jr. (Docket No. 3114); Abena Hogan (Docket No. 3115); Michael McGlaun (Docket No. 3116); Emma Thomas (Docket No. 3117); Herbert Russell (Docket No. 3118); Claudia M. Clark (Docket No. 3119); Mary A. White (Docket No. 3120); Rosie L. Coleman (Docket No. 3121); Gerald Thomas (Docket No. 3122); Ann Shell (Docket No. 3123); Walter Parham (Docket No. 3124); Amber A. Lee (Docket No. 3125); Wade Wesson (Docket No. 3126); Niwana Dewhart (Docket No. 3127); Rochelle Smith (Docket No. 3128); Marie Attaway (Docket No. 3129); Gladys L. Johnson(Docket No. 3130); Lee Joy Lee (Docket No. 3131); Michael J. Lee (Docket No. 3132); Amber Ogletree (Docket No. 3133); Linda Jones-Ogletree (Docket No. 3134); Alicia C. Minter (Docket No. 3135); Lynda Jordan (Docket No. 3136); Mildred C. Hooper (Docket No. 3137); Sandra Battle (Docket No. 3138); Estella Lanier (Docket No. 3139); Lenora Hall (Docket No. 3140); Dacota Craft (Docket No. 3164); Rose Parker (Docket No. 3166); Laura Wilson (Docket No. 3167); Roger A. Wilson (Docket No. 3168); Raymond Watson (Docket No. 3169); Robert Jackson (Docket No. 3177); Derek S. Hicks (Docket No. 3178); Vernon Oree (Docket No. 3179); Nobbie L. Dawsey (Docket Nos. 3180; 3246; 3355); Arthur T. Smith (Docket No. 3181); Doris Smith (Docket No. 3182); Angela Smith (Docket No. 3183); Dorothy May Smith (Docket No. 3184); John P. Smith (Docket No. 3185); Regena Oree (Docket No. 3186); Janet Scandrick (Docket No. 3187); Terri Ann Perkins (Docket No. 3188); Kim Fletcher (Docket No. 3189); Deborah Knight (Docket No. 3190); Bonita Carey Powers (Docket No. 3190); Willie Leroy; Walker (Docket No. 3192); Ronald Oree (Docket No. 3193); Carol Shorter (Docket

No. 3204); Branson M. Sam (Docket No. 3206); Sandra M. Brunson (Docket No. 3207);
Edward L. Gaines (Docket No. 3209); Ricardo C. Jenkins (Docket No. 3210); Linda
Mulder (Docket No. 3212); Bonita Perry (Docket No. 3213); Heidi Peterson (Docket
No. 3214); Gisele Caver (Docket No. 3215); Deborah Alycia Pollard (Docket No. 3216);
Stina M. Santiestevan (Docket No. 3217); Willie N. Ham (Docket No. 3218); Andrea
Hackett (Docket No. 3219); Douglas Kuykendall (Docket No. 3221); Mattie Lewis (Docket
No. 3222); James R. Younger (Docket No. 3223); Nancy Kuykendall (Docket No. 3225);
Willie Bennett (Docket No. 3228); Samual Williams (Docket No. 3229); Thomas A. Agens
(Docket No. 3241); Reginald D. Amose (Docket No. 3244); Tierra Parks (Docket
No. 3245); Tiffany Moore (Docket No. 3247); Brenda C. Jones (Docket No. 3248); Harold
Franklin Bryant (Docket No. 3250); Laura E. Bryant (Docket No. 3251); Gueelma Brown
(Docket No. 3253); LaShae Currie (Docket No. 3254); Anthony Fuller 9Docket No. 3255);
Robbin C. Rivers (Docket No. 3256); Harriett M. Billingslea (Docket No. 3264); Martha
Childress (Docket No. 3265); Karen Tyson (Docket No. 3266); Alma Cozart (Docket
No. 3267); Linda Mulder (Docket No. 3269); Michael E. Diegel (Docket No. 3270);
Carolyn J. Lamb (Docket No. 3271); Keith Davis (Docket No. 3272); Dan Headapohl
(Docket No. 3273); Shinesta L. Ireland (Docket No. 3277); Daljit Singh Benipal (Docket
No. 3278); Alexander D. MacDonald (Docket No. 3279); Rhonda Anderson (Docket
No. 3281); Aaron D. Bird (Docket No. 3282); Min Yang (Docket No. 3283); Neil Samaan
(Docket No. 3284); Anthony Campbell (Docket No. 3285); Vincent A. Cooley (Docket
No. 3286); Chris A. Cleveland (Docket No. 3288); Pamela Smith (Docket No. 3290);
Karen Anderson (Docket No. 3292); Michael A. Chandler, Jr. (Docket No. 3293); Michael
Addison (Docket No. 3294); Rajesh Moradija (Docket No. 3295); Dilip Patel (Docket
No. 3296); Andrew DeRamer (Docket No. 3297); Michelle Watkins (Docket No. 3298);
Kevin Pierson (Docket No. 3299); Kevin A. Brinkley (Docket Nos. 3300; 3309); Michael
Walter (Docket No. 3301); Joseph M. Walter (Docket No. 3306); Lawrence A. Muhammad
(Docket No. 3307); Nabil Jaafar (Docket No. 3308); Arthur Leon Edge (Docket No. 3310);
Darrin F, Williams (Docket No. 3332); Moncy Chacko (Docket No. 3333); Lenetta Walker
(Docket No. 3350); Stephen Johnson (Docket No. 3351); Gerald Thompson (Docket
No. 3352); Eddie L. Smith (Docket No. 3354); Pamela W. Cunningham (Docket No.
3358); Charles Bruce Idelsohn (Docket No. 3366); Carlottie Shaw (Docket No. 3374);
Alfred Thacker (Docket No. 3400); Raphael W. Robinson (Docket No. 3400); Michelle
George (Docket No. 3403); William J. Ridella (Docket No. 3405); Gladys M. Cannon
(Docket No. 3406); Tina Sumner (Docket No. 3407); Corey Thomas (Docket No. 3408);
Nancy Hurston-Carter (Docket No. 3409); Valerie A. Glenn-Simons (Docket No. 3410);
Doris Wojtala (Docket No. 3411); Vera C. Magee (Docket Nos. 3413; 3423); Charlene
Olson (Docket No. 3414); Bertram Johnson (Docket No. 3415); John Telford (Docket
No. 3417); Barbara Magee (Docket No. 3419); Renla Session (Docket No. 3420); Ruby P.
Magee (Docket No. 3426); Murphy Wilbert Magee (Docket No. 3430); Shirley Walker
(Docket No. 3435); Gregory T. Waller (Docket No. 3439); Carl Howell (Docket No. 3440);
Bobby Lewis (Docket No. 3441); James F. Bish (Docket No. 3443); Cynthia Fischer

(Docket No. 3444); Lewis M. Dickens III (Docket No. 3445); Scott Odum (Docket No. 3446); Barbara Turner (Docket No. 3469); Audrey Bellamy (Docket No. 3470); Reshanda Banks (Docket No. 3471); Tijuana Morris (Docket No. 3472); Carl E. Jones Sr. (Docket No. 3473); Teresa Duncan (Docket No. 3474); Beverly A. Holman (Docket No. 3475); Lula Millender (Docket No. 3477); Deirdre Green (Docket No. 3476); Emma Holden (Docket No. 3479); Lillette M. Benn (Docket No. 3480); Douglas Yee (Docket No. 3481); Earnest Bell (Docket No. 3482); Barbara Yee (Docket No. 3484); Wayne Bernard (Docket No. 3486); Sekov Ujamaa (Docket No. 3487); Kimberly D. Greene (Docket No. 3489); Joan E. Robinson-Cheeks (Docket No. 3490); David D. Espie (Docket No. 3491); Clarence Presberry (Docket No. 3493); Arnoldine J. Calhoun (Docket No. 3495); George Cannon (Docket No. 3496); Rhonda Leary (Docket No. 3498); James Mora (Docket No. 3499); Shelle Cannon (Docket No. 3501); James J. Ford (Docket No. 3502); Margaret Gutshall (Docket No. 3504); Annie J. Kuykendall (Docket No. 3505); Linda Lovelady (Docket No. 3506); Cynthia A. Rhoades (Docket No. 3507); Willie Davis (Docket Nos. 3508; 3704); Daniel J. Solano (Docket No. 3509); Hal G. Parish (Docket No. 3510); Steven K. Leggat (Docket No. 3512); Jean Irwin (Docket No. 3514); Amru Meah (Docket No. 3515); Helen P. Moore (Docket No. 3516); Beverly A. Welch (Docket No. 3518); Barbara Wright (Docket No. 3519); Marilyn B. Daniels (Docket No. 3520); Hal Stokes (Docket No. 3521); Edna Keys (Docket No. 3522); Dannie L. Gallman-Gomes (Docket No. 3523); Joseph G. Maples (Docket No. 3524); David D. Dudley (Docket No. 3525); Rolland W. Wilkins (Docket No. 3526); Donnavon O'Neal (Docket No. 3527); Bennie Loyd (Docket No. 3528); Latonya Emanuel (Docket No. 3529); Donnie Wright (Docket No. 3530); Teulaina Richardson (Docket No. 3531); Charles Williams II (Docket No. 3532); Lory Parks (Docket No. 3533); Terry Coleman-Hannon (Docket No. 3534); Samuel Jennings (Docket No. 3535); Joseph Soloman Jr. (Docket No. 3536); Bruce Callaway (Docket No. 3537); Michael Smith (Docket No. 3538); Robert Gibson (Docket No. 3539); Collis Edwards (Docket No. 3540); Troy Kauffman (Docket No. 3541); Arthur Hill (Docket No. 3542); Eric Wilson (Docket No. 3543); Julie Logart (Docket No. 3544); Robert Ross (Docket No. 3545); Boris McLeod (Docket No. 3546); Gwendolyn Bush-Smith (Docket No. 3548); Samuel Harrison (Docket No. 3550); Keith M. Hines (Docket No. 3552); Renee Lee (Docket No. 3553); Juanita Austin (Docket No. 3554); Aquanetta Longmie-Boyd (Docket No. 3555); Kimberlee Davis (Docket No. 3556); Shrywee Ford (Docket No. 3558); William D. Sparks (Docket No. 3559); Monica Sparks (Docket No. 3560); Cameron Cummings (Docket No. 3561); Samuel W. Flemings (Docket No. 3562); Keya Mitchell (Docket No. 3563); Darrell Evans (Docket No. 3564); Gerrick Fudge (Docket No. 3565); Karen Anderson (Docket No. 3566); Marian Swint (Docket No. 3567); Percy R. Ross III (Docket No. 3568); Damon Spann (Docket No. 3569); Jason E. Daniels (Docket No. 3570); Paul Gantz (Docket No. 3571); Shivani Buright (Docket No. 3572); Anthony D. Gentry (Docket No. 3573); Laurie M. Williams (Docket No. 3575); Douglas Glavaz (Docket No. 3576); Leotine Person (Docket No. 3577); Corwin Taylor (Docket No. 3578); Rosie M. Woods (Docket No. 3579); Jerome Cullors (Docket

No. 3580); Charlene Wysinger (Docket No. 3581); Cordell Lovelady (Docket No. 3582); Sheila Jones (Docket No. 3583); Peggy Heade (Docket No. 3584); Peenal K. Shah (Docket No. 3585); Leonard Brogdon (Docket No. 3586); James Boyd (Docket No. 3587); Dannie Shufford (Docket No. 3588); Joyce Davis (Docket No. 3589); Jan Kruszewski (Docket No. 3590); Ramez Ibrahim (Docket No. 3591); Jacqueline Allen (Docket No. 3592); William Gardner (Docket No. 3593); William M. Davis (Docket No. 3594); Randall Thomas (Docket No. 3595); Alfred C. Jefferson (Docket No. 3596); Russell Baker Jr. (Docket No. 3597); Khalid Abdulbarr (Docket No. 3598); Donoval Craig (Docket No. 3599); David S. Korona (Docket No. 3600); Frankin Bumphus Jr. (Docket No. 3601); Maretta L. Foster-Jackson (Docket No. 3602); Mark L. Smith (Docket No. 3603); Alanna L. Ali (Docket No. 3605); Bettie Cook Scott (Docket No. 3672); James Lovely (Docket Nos. 3683; 4134); Herman McCord (Docket No. 3685); Gerald F. Fischer (Docket No. 3686); Bonnie Bizzell (Docket No. 3687); Garry Williams (Docket No. 3688); Durand G. Capers (Docket No. 3689); Balchand P. Patel (Docket No. 3690); Jaide D. Highgate (Docket No. 3691); Sylvester Davis (Docket No. 3692); Stephen Willson (Docket No. 3693); Richard Lewandowski (Docket No. 3694); Michael Smith (Docket No. 3696); Ellen Burns (Docket No. 3697); Jo Ann Cooper (Docket No. 3698); Ronald Clegg (Docket No. 3699); Harriett M. Billingslea (Docket No. 3700); Deborah Graham (Docket No. 3701); Gerald Kent (Docket Nos. 3702; 4159); Leonard and Minnie Brogdon (Docket No. 3705); Jesse J. Florence Sr. (Docket No. 3706); Mark L. Smith (Docket No. 3707); H. Jean Powell (Docket No. 3716); Ezza R. Brandon (Docket No. 3718); Terrence Crite (Docket No. 3719); Walter C. Griggs (Docket No. 3721); Gail Barnard (Docket No. 3723); Darlene Williams (Docket No. 3724); Jeffrey Vedua (Docket No. 3726); Tony Smith (Docket No. 3727); LaTonya Callaway (Docket No. 3728); John Callaway (Docket No. 3729); David Allen (Docket No. 3730); Vivian Jones (Docket No. 3731); Arlington Jones (Docket No. 3732); Roger D. Rice (Docket No. 3734); Phyllis Hampton (Docket No. 3736); Anna Ferrante (Docket No. 3737); Thelma Blackburn (Docket No. 3738); Delores Dunn (Docket No. 3739); Thomas Mills (Docket No. 3740); Bonnie D. Armstrong (Docket No. 3741); Harriet Madison (Docket No. 3742); Gina Clay (Docket No. 3743); Cathryn M. Williams (Docket No. 3744); Ruby McBee (Docket No. 3745); Vonetta Lipscomb (Docket No. 3746); Fredia M. Butler (Docket No. 3747); Mary Jackson (Docket No. 3748); Amber Harris (Docket No. 3750); Anetta Stevenson (Docket No. 3751); Bettina Moore (Docket No. 3752); Ida Patton (Docket No. 3753); Caroline L. Jackson (Docket No. 3756); Barbara Williams (Docket No. 3757); Dorothy King (Docket No. 3758); Barbara A. Hill (Docket No. 3759); Mary L. Driscoll (Docket No. 3760); Mary Cocanougher (Docket No. 3761); Kimberly A. Small (Docket No. 3773); Frances A. Rivers (Docket No. 3774); Cheryl Rayford (Docket No. 3776); Constance Rodgers (Docket No. 3777); Casendra White (Docket No. 3778); Leona Jackson (Docket No. 3779); Carletha Fludd (Docket No. 3780); Owen C. Creteau Jr. (Docket No. 3782); Paul Clifford Wells (Docket No. 3783); Carol A. Johnson (Docket No. 3787); Maegan Murphy (Docket No. 3788); Tonya Murphy (Docket No. 3789); Cynthia S. Blair (Docket No. 3790); Evelyn

Case (Docket No. 3791); Zelma Kinchloe (Docket No. 3793); Linda Appling (Docket No. 3794); Glenda Brownlee (Docket No. 3795); Calvin C. Turner (Docket No. 3805); Alpha Drane (Docket No. 3810); Timothy Joy King (Docket No. 3859); Michaela Terrell (Docket No. 3906); Rita Jordan (Docket No. 3909); Gregory Hicks (Docket No. 3910); Dorothy M. W. Baker (Docket Nos. 3911; 4162; 4256; 4257; 4321; 4520); A. Hill-Higgins (Docket No. 3913); Carolyn Bryant (Docket No. 3982); Rosalind V. Worthy (Docket No. 3983); Steven W. Cabral (Docket No. 3984); George R. Fluker (Docket No. 3985); Joseph Jones (Docket No. 3987); Richard Fields (Docket No. 3988); Cheryl Jones (Docket No. 3989); Erin Martinez (Docket No. 3991); Joann Jackson (Docket No. 3992); Nancy A. Moran (Docket No. 3993); Brenda Boone (Docket No. 3995); Diane Lynn Crawford (Docket No. 3996); Dolores Harold (Docket No. 3998); Dorothy Heide (Docket No. 3999); Colette Belenger (Docket No. 4005); Madonna Perdue (Docket No. 4008); Hilanius H. Phillips (Docket No. 4128); Randy Heard (Docket No. 4133); Patricia A. Boyd (Docket No. 4136); Charllotte Asaka (Docket No. 4157); Cortez Steele (Docket No. 4158); Geri Bugeja (Docket No. 4160); Helen Fischer (Docket No. 4161); Alfonso Frankilin, Jr. (Docket No. 4176); Lucinda J. Darrah (Docket Nos. 4185; 4239; 4809); Fred Vitale (Docket No. 4186); Rickie Allen Holt (Docket No. 4229); Alvin C. and Patricia Boyd (Docket No. 4236); Joann Watson (Docket No. 4258); Robert Brewer (Docket No. 4268); Francina Knall (Docket No. 4286); Walter Gary Knall (Docket No. 4287); Keith Davis (Docket No. 4288); Marie T. Vortkamp (Docket No. 4289); Deborah A. and James R. Milliner (Docket No. 4292); Dempsey Addison (Docket No. 4295); Thomas Cattron (Docket No. 4296); Denise Cattron (Docket No. 4297); Janice Guy-Simmons (Docket No. 4306); Sheryl J. Davis (Docket No. 4307); Marianne Yared McGuire (Docket No. 4342); Paulette Brown (Docket No. 4344); Sandra Starr (Docket No. 4345); Orlando Fuller (Docket No. 4346); Lonel Black (Docket No. 4347); Clifford Junious (Docket No. 4348); Bonita Cosby (Docket No. 4349); Angela C. King (Docket No. 4350); Elmarie Dixon (Docket No. 4351); Joann Jackson (Docket No. 4352); Ernest Shazor (Docket No. 4353); Monique Ruckes-Crawley (Docket No. 4355); Al Williams (Docket No. 4356); Mildred White (Docket No. 4357); Arthur Simons (Docket No. 4358); Juanita E. Wright (Docket No. 4359); Forest Flagg (Docket No. 4360); LaBarbara Wilson (Docket No. 4361); Dora Jackson (Docket No. 4362); Katrice Robinson (Docket No. 4363); Angela M. Carter (Docket No. 4364); Lula M. Swett (Docket No. 4365); Clifford Swett (Docket No. 4366); Maggie M. Duncan (Docket No. 4367); Vina Wilson (Docket No. 4368); Bernice H. Jones (Docket No. 4369); Dan Headapohl (Docket No. 4433); Lorraine DeRose Denchak (Docket No. 4631); James Capizzo (Docket No. 4997*).

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 26th day of May, 2014.


/s/ Heather Lennox