# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------------

In re                                          :   Chapter 9
                                               :
CITY OF DETROIT, MICHIGAN,                      :   Case No. 13-53846
                                               :
                            Debtor.             :   Hon. Steven W. Rhodes
                                               :

-------------------------------------------------------------

## OFFICIAL COMMITTEE OF RETIREES' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF FIFTH AMENDED PLAN FOR ADJUSTMENT OF DEBTS FILED BY THE CITY OF DETROIT, MICHIGAN

Claude D. Montgomery
Carole Neville
DENTONS US LLP
1221 Avenue of the Americas
New York New York 10020
Tel: (212) 768-6700
claude.montgomery@dentons.com
carole.neville@dentons.com

Sam J. Alberts
Daniel D. Barnowski
DENTONS US LLP
1301 K Street, NW, Suite 600 East Tower
Washington, DC 20005
Tel: (202) 408-6400
Fax: (202) 408-6399
sam.alberts@dentons.com
dan.barnowski@dentons.com

Matthew E. Wilkins
Paula A. Hall
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Tel: (248) 971-1800
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ............................................................................ 1

I.    THE STANDARD FOR CONFIRMATION OF THE PLAN ..................... 5

II.    THE PLAN'S TREATMENT FOR RETIREES ................................... 6

    A.    The Original Plan Imposed Severe Cuts on Retiree Pensions............................ 6

    B.    The Current Plan Imposes Serious But Less Drastic Pension Reductions Than Under the Original Plan............................ 7

        1.    The Value of COLA Reductions ................................... 8

        2.    ASF Recoupment Is A Funding Mechanism Taken From Defined Contribution Accounts of Retirees and Active Employees........................ 10

        3.    Pension Clause Considerations Remain Extant under Section 943(b)(4) ... 13

III.    THE PLAN'S TREATMENT OF RETIREE HEALTH PROVIDES A BASE LEVEL RECOVERY OF $450 MILLION WITH THE PROSPECT OF ADDITIONAL RECOVERIES .................................................... 15

    A.    Litigation Against The City To Impose Post-Petition OPEB Cuts ................... 15

    B.    The Plan Meets the Rule 9019 Standard For Compromises.............................. 20

        1.    The Compromise on the Allowed Claim Amount is Fair and Reasonable ................................................................. 21

        2.    The Provisions for Post Effective Date Benefits Should Be Approved ...... 25

        3.    The OPEB Settlement Meets the Standards of Rule 9019 ......................... 26

IV.    THE COPS PARTIES OBJECTIONS TO RETIREE TREATMENT SHOULD BE OVERRULED ...................................................................... 28

    A.    The Class 9 COPs Claims and Classes 10 and 11 Pension Claims are not Comparable.................................................................. 30

    B.    The Pension Claims are Protected by the Pension Clause ................................ 32

    C.    The COPs Parties Understate the Pension Claims and Overstate the Plan Recovery.................................................................. 35

        1.    The Retiree Claims are Greater than the Allowed Amounts in the Plan..... 35

2.    The Projected Recovery Fails to Take into Account a Change in the
Discount Rate ........................................................................................ 38

D.    The Presumption of Discrimination Is Rebuttable ............................................. 39

V.    THE PLAN'S PROVISIONS RELATING TO DWSD, DWSD'S FUNDING OF
PENSION LIABILITY AND RESTRUCTURING OF DWSD BONDS
COMPLY WITH THE BANKRUPTCY CODE AND MICHIGAN LAW ............... 42

A.    The DWSD Pension Funding and DWSD CVR Comply with Bankruptcy
Code Sections 928 and 943(b)(4) ......................................................... 42

1.    DWSD Pension Funding Complies with Michigan State and Local
Law, and Bankruptcy code Section 928 ..................................................... 43

2.    The DWSD CVR is consistent with Michigan State and Local Law.......... 45

B.    The Plan Complies with Bankruptcy Codes §§ 943(b)(6) and 1129(a)(6)
which Require that the City Obtain the Necessary Regulatory or Electoral
Approval ........................................................................................... 45

C.    The Plan is Fair and Equitable with Respect to DWSD Bondholders. .............. 48

VI.    RESERVATION OF RIGHTS ................................................................... 49

CONCLUSION.................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFSCME v. City of Detroit*,
    662 N.W.2d 695 (Mich. 2003)........................................................................13

*Ass'n of Prof'l & Technical Emps. v. City of Detroit*,
    398 N.W.2d 436 (Mich. App. 1986)...............................................................33

*Ass'n of Surrogates v. New York*,
    940 F.2d 766 (2d Cir. 1991)...........................................................................19

*Bank of N.Y. Mellon v. Jefferson Cnty.*,
    482 B.R. 404 (Bankr. N.D. Ala. 2012) .....................................................44, 45

*Bender v. Newell Window Furnishings, Inc.*,
    681 F.3d 253 (6th Cir. 2012) ..........................................................................18

*Bolt v. City of Lansing*,
    587 N.W.2d 264 (Mich. 1998).........................................................................47

*Boyd v. Engman*,
    404 B.R. 467 (W.D. Mich. 2009) ....................................................................27

*Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings., LLC)*,
    475 B.R. 563 (E.D.Mich. 2012).......................................................................27

*Cf. Freeland v. City of Sturgis*,
    248 Mich. 190 (1929) .....................................................................................43

*Charles v. Baesler*,
    910 F.2d 1349 (6th Cir. 1990) ........................................................................14

*Cole v. ArvinMeritor, Inc.*,
    549 F.3d 1064 (6th Cir. 2008) ........................................................................18

*Cowherd v. Million*,
    380 F.3d 909 (6th Cir. 2004) ..........................................................................14

*Detroit Police Officers Ass'n v. Detroit*,
    214 N.W.2d 803 (Mich. 1974).........................................................................33

*Fields v. Elected Officials' Ret. Plan*,
    320 P.3d 1160 (Ariz. 2014).............................................................................13

iv

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000)........................................................................................10

*Harvard Drug Grp., LLC v. Linehan*,
No. 08-13617, 2010 U.S. Dist. LEXIS 103072 (E.D.Mich. Sept. 3, 2010)............................28

*Hengartner v. Chet Swanson Sales, Inc.*,
348 N.W.2d 15 (Mich. App. 1984)...........................................................................13

*Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*,
477 Fed. Appx. 310 (6th Cir.2012)..........................................................................26

*In re 28th Legislative Dist. Cmty. Dev. Corp.*,
No. 10-14804, 2011 Bankr. LEXIS 4411 (Bankr. E.D. Tenn. Nov. 9 2011) ........................41

*In re A & C Props.*,
784 F.2d 1377 (9th Cir. 1986) ...............................................................................27

*In re Aztec Co.*,
107 Bankr. 585 (Bankr. M.D. Tenn 1989)....................................................................29

*In re Bagby*,
218 B.R. 878 (Bankr. W.D. Tenn. 1998)....................................................................29

*In re Bamberg Cnty. Mem. Hosp.*,
No. 11-03877, 2012 Bankr. LEXIS 2321 (Bankr. D. S.C. May 23, 2012)............................5

*In re Bard*,
49 F. App'x 528 (6th Cir. 2002) .............................................................................27

*In re BWP Transport, Inc.*,
462 B.R. 225 (Bankr. E.D. Mich. 2011) ....................................................................30

*In re Cent. Med. Ctr., Inc.*,
122 B.R. 568 (Bankr. E.D. Mo. 1990) ......................................................................8

*In re City of Colo. Spring Creek Gen. Improvement Dist.*,
187 B.R. 683 (Bankr. D. Colo. 1995) ......................................................................5

*In re City of Detroit, Mich.*,
504 B.R. 97 (Bankr. E.D. Mich. 2013) .....................................................................32

*In re City of Stockton, Cal.*,
486 B.R. 194, 195 (Bankr. E.D. Cal 2013)................................................................26

*In re Connector 2000 Ass'n, Inc.*,
447 B.R. 752 (Bankr. D. S.C. 2011) ........................................................................5

*In re Constitutionality of*
    *2011 PA 38*, 806 N.W.2d 683 (Mich. 2011) ................................................................33

*In re Corcoran Hosp. Dist.*,
    233 B.R. 449 (Bankr. E.D. Cal 1999) ......................................................................41

*In re Creekstone Apartments Assocs., L.P.*,
    168 B.R. 639 (Bankr. E.D. Tenn. 1994) ..................................................................29

*In re Crosscreek Aparts., Ltd.*,
    213 B.R. 521 (Bankr. E.D. Tenn 1997) ..................................................................28

*In re Dow Corning*,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ..................................................................29

*In re Dow Corning Corp.*,
    255 B.R. 445 (E.D. Mich. 2000) ........................................................................28, 29

*In re Enrolled Senate Bill 1269 (Advisory Opinion re Constitutionality of 1972 PA
    258)*,
    209 N.W.2d 200 (Mich. 1973) ................................................................................34

*In re Graphic Commc'ns, Inc.*,
    200 B.R. 143 (Bankr. E.D. Mich. 1996) ..................................................................29

*In re Gretag Imaging, Inc.*,
    485 B.R. 39 (Bankr. D. Mass. 2013) ......................................................................22

*In re Jersey City Med. Ctr.*,
    817 F2d 1055 (3rd Cir. 1987) ................................................................................41

*In re Mace*,
    No. 08-06124, 2011 Bankr. LEXIS 280 (Bankr. M.D. Tenn. 2011) ......................29

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ........................................................................5

*In re Oakwood Homes Corp.*,
    449 F.3d 588 (3d Cir. 2006) ..................................................................................22

*In re Parke Imperial Canton, Ltd.*,
    No. 93-61004, 1995 WL 362873 (Bankr. N.D. Ohio May 24, 1995) ....................43

*In re Pierce Cnty. Hous. Auth.*,
    414 B.R. 702 (Bankr. W.D. Wash. 2009) ................................................................5

*In re Quigley Co., Inc.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007) ....................................................................41

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Yard-Man, Inc.*,
716 F.2d 1476 (6th Cir. 1983) ....................................................................18

*Jackson Cnty. v. City of Jackson*,
836 N.W. 2d 903 (Mich. App. 2013) ..........................................................47

*Kosa v. Treasurer of Mich.*,
292 N.W.2d 452 (Mich. 1980) ....................................................................33

*Kucin v. Devan*,
251 B.R. 269 (D. Md. 2000) ..................................................................22, 23

*Lockheed Corp. v. Spink*,
517 U. S. 882 (1996) ..................................................................................10

*Musselman v. Governor of Michigan*,
533 N.W.2d 237 (1995) ..............................................................................34

*Prime Health Care Mgmt. v. Valley Health Sys. (In re Valley Health Sys.)*,
429 B.R. 692 (Bankr. C.D. Cal. 2010) ........................................................5

*Seitz v. Probate Judges' Ret. System*,
474 N.W.2d 125 (Mich. App. 1991) ............................................................33

*Shelby Twp. Police & Fire Ret. Bd. v. Charter Twp. of Shelby*,
475 N.W.2d 249 (Mich. 1991) ..............................................................13, 33

*State Bank of Florence v. Miller (In re Miller)*,
513 Fed. Appx. 566 (6th Cir. 2013) ............................................................37

*Studier v. Mich. Pub. Sch. Emps.' Ret. Bd.*,
698 N.W.2d 350 (Mich. 2005) ....................................................................33

*Syntex Laboratories, Inc. v. Dep't of Treasury*,
470 N.W.2d 665 (Mich. App. 1991) ............................................................13

*Taunt v. Gen. Ret. Sys. (In re Wilcox)*,
233 F.3d 899 (6th Cir. 2000) ......................................................................11

*Toledo Area AFL-CIO Council v. Pizza*,
154 F.3d 307 (6th Cir. 1998) ................................................................18, 19

*U.S. Trust Co. of N.Y. v. New Jersey*,
431 U.S. 1 (1977) ..................................................................................19, 20

*Welch v. Brown*,
935 F.Supp2d 875 (E.D.Mich. 2013), *aff'd* 551 Fed. Appx. 804 (6th Cir.
2014.) ...................................................................................................................17, 19

## RULES & STATUTES

Fed. R. Bankr. P. 3001(f) .......................................................................................37

Fed. R. Bankr. P. 9019 ...........................................................................20, 21, 26

11 U.S.C. § 365(a) ..................................................................................................30

11 U.S.C. § 502 .......................................................................................................21

11 U.S.C. § 502(b) ...........................................................................................21, 22

11 U.S.C. § 502(b)(1) .............................................................................................31

11 U.S.C. § 510(b) ..................................................................................................30

11 U.S.C. § 904 ................................................................................................20, 26

11 U.S.C. § 928 ..........................................................................................42, 43, 45

11 U.S.C. § 928(a) ..................................................................................................45

11 U.S.C. § 943 .........................................................................................................5

11 U.S.C. § 943(b) ....................................................................................................5

11 U.S.C. § 943(b)(4) .......................................................................................13, 42

11 U.S.C. § 943(b)(6) ..............................................................................................45

11 U.S.C. § 1123(a)(4) ..............................................................................................8

11 U.S.C. § 1129(a)(3) ............................................................................................41

11 U.S.C. § 1129(a)(6) ......................................................................................45, 46

11 U.S.C. § 1129(a)(7) ............................................................................................22

11 U.S.C. § 1129(a)(9) ............................................................................................22

11 U.S.C. § 1129(a)(15) ..........................................................................................22

11 U.S.C. § 1129(b) ..........................................................................................28, 41

11 U.S.C. §1129(b)(1) .........................................................................................5, 28

11 U.S.C. § 1129(b)(2) ...................................................................................22, 48

11 U.S.C. § 1129(b)(2)(A)(i) ..........................................................................48

11 U.S.C. § 1173(a)(2) ....................................................................................22

11 U.S.C. § 1225(a)(4) ....................................................................................22

11 U.S.C. § 1225(a)(5) ....................................................................................22

11 U.S.C. § 1325(a)(4) ....................................................................................22

11 U.S.C. § 1325(a)(5) ....................................................................................22

11 U.S.C. § 1328(b)(2) ....................................................................................22

11 U.S.C. § 2002 ..............................................................................................26

29 U.S.C. § 502(a)(3) .......................................................................................10

Detroit City Charter § 7-1203 .........................................................................43

Detroit Code §§ 13-8-1 to -3 ...........................................................................16

Detroit Code § 47-1-18 ....................................................................................11

Detroit Code § 47-4-3 ......................................................................................32

M.C.L. § 38.1140m ..........................................................................................33

M.C.L. § 141.101 *et seq.* ...............................................................................43

M.C.L. § 141.133 .............................................................................................46

M.C.L. § 141.2303 ...........................................................................................46

Mich. Const, art. IX, § 24 ..........................................................................18, 33

U. S. Const, art. I, § 10, cl. 1............................................................................18

OTHER AUTHORITIES

Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*
    *("A New Perspective")*, 72 Am. Bankr. L.J. 227 (1998)..................................29, 30

The New York City Retirement System, *Comprehensive Annual Financial Report*
    *(CAFR)*, 2013 https://www.nycers.org .......................................................36

The Official Committee of Retirees of the City of Detroit, Michigan (the "Committee") submits this memorandum of law with respect to the Fifth Amended Plan for Adjustment of Debts of the City of Detroit (the "Plan") [Docket No. 6257] filed on July 25, 2014 and in response to the objections of the DWSD Parties, defined below, and COPs Parties, defined below, who object to the treatment of retiree claims under the Plan. The Committee generally supports the Plan, and respectfully states as follows:[1]

## INTRODUCTION

Since its formation in August 2013, the Committee has had one central objective: to protect the interests of the more than 23,000 uniform and non uniform retirees and their beneficiaries with respect to promised payments of pension, health care and other post employment benefits ("OPEB"). These retirees, who on average receive less than $20,000 in annual pensions payments (or $31,000 in the case of uniformed workers) sacrificed private-sector salaries, and often risked life and limb -- in exchange for Constitutionally protected pension and OPEB benefits. At bottom, the Plan, if confirmed, will alter these fundamental promises to retirees and will place significant burdens on them in serious ways.

Notwithstanding such seismic changes to these retiree promises, the Committee agreed to support the Plan's treatment of Classes 10 (General Retirement System), 11 (Police and Fire System) and 12 (OPEB). This support was not easily given. It followed nearly a year of actual and threatened litigation, including an appeal to the Sixth Circuit on issues of eligibility and Constitutional protections to retirees and intense negotiations. It is predicated not only upon the treatment provided to retirees under the Plan, but the City's representations of what assets are otherwise available to creditors.

---

[1] See Reservation of Rights section at VI below.

The Committee's efforts to support Plan approval was manifested in various communications to retirees, including direct letters, press statements and multiple town-hall meetings. Notwithstanding significant and, in many justified concerns, voiced by retirees to treatment of retiree pension and OPEB claims, retirees have voted in favor of the Plan.

Although the Plan has been accepted by the retiree classes, it is impossible not to take into account the fact that many retirees have raised legitimate concerns to confirmation asserting, among other objections, that their pensions were fully protected from impairment by the Michigan Constitution and/or the Federal Transit Act; ASF Recoupment is improper; the retirees in the same classes received different recoveries; the Plan release is improper; and the cuts to health care are more drastic than necessary. *See* e.g. Dkt. Nos. 5788, 5825, 5887, 5893, 5970, 5971, 5923. The Court has already devoted a day to hearing certain objections of the individual retirees and has indicated its intention to give individual retirees the opportunity to address their confirmation objections. Order Regarding Motion for Expedited Hearing, Dkt. No. 6220.

These same issues, however, were previously raised by the Committee and vetted in countless mediations and negotiations by and among various parties, including the mediators, the City, the Committee, the retirement systems, the retiree associations, and the unions. The negotiations resulted in a number of compromises and settlements, incorporated into the Plan, designed to minimize to the greatest extent possible the harm across the board to retirees from the City's restructuring and rehabilitation. Based upon the compromises and settlements in the final Plan, discussed more fully below, the possibility of even more severe pension cuts in addition to the drastic health care cuts without an agreement with the City, and the Committee's assessment of the uncertainty of timely appellate relief with respect to the complex

Constitutional issues, the Committee determined to support the Plan, as it was presented in Alternative A of the Fourth Amended Plan.

Both Class 10 PFRS Pension Claims and Class 11 GRS Pension Claims have accepted the Plan. If the Plan is confirmed, the City will impose less severe cuts to retiree pension benefits than the City originally proposed and that would have been imposed if the Plan had been rejected.[2] All the retirees also face a permanent reduction in their health care coverage at a time when their need is greatest and their income is being reduced. Notwithstanding the severity of the benefit reductions under the Plan, as shown below, the treatment under the Plan is a significant improvement on the City's first proposals to the retirees and is far better than the alternative threatened under this Plan.

Despite the profound sacrifices that the retirees are required to make under the Plan and the economic and administrative benefits for the City, the retiree treatment under the Plan has come under attack by the Class 9 holders of certificates of participation ("COPs") and their insurers (together, the "COPs Parties"), the DWSD bondholders, and three counties (Macomb, Oakland and Wayne) whose commercial and individual residents are indirect retail customers of DWSD (together, the "DWSD Parties"). The COPs Parties complain that the plan discriminates unfairly against them by providing a purportedly greater, less risky recovery for the pension claims in Classes 10 and 11 than the recovery to what they mistakenly assert are their similarly situated claims in Class 9. They argue that the discrimination is even greater than the City shows in its estimated percentage of recovery in the disclosure statement because the City overstates the

---

[2] The pension benefits reductions include across the board cuts to Class 10 and 11 pension benefits in the form of reduced or eliminated annual escalators ("COLA"). For Class 11 GRS retirees, the Plan provides an additional 4.5% across the board pension cut. For some GRS retirees, the Plan requires recoupment of interest allocated to the retirees' annuity savings accounts, which is called "ASF Recoupment." The total pension reduction for GRS retirees who are subject to ASF Recoupment is capped at 20% of benefits, plus the loss of COLA. As a result of post filing negotiations and modifications, retirees may elect to pay the Annuity Recoupment in a lump sum up to an aggregate amount of $30 million.

82584123\V-5
- 3 -
13-53846-tjt   Doc 8866   Filed 02/04/14   Entered 02/04/14 18:22:55   Page 12 of 60
13-53846-swr   Doc 6056   Filed 08/04/14   Entered 08/04/14 18:28:25   Page 12 of 60

pension claims and understates value of the contributions. *See* COP Holders' Objection to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit. Dkt. No. 4653 pp. 6-13. In fact, they conclude, based on somewhat confused mathematical and actuarial assumptions, notwithstanding the actual and significant reduction in benefits, that the retirement systems and the pension plan participants are recovering more than 100% on their claims for unfunded pension benefits. *See* Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment, Dkt. No. 4679 at pp. 30-31. The COPs Parties objections should be overruled because the Plan does not unfairly discriminate in favor of the retirees under any test and under the circumstances, the separate treatment of retirees claims is justified and reasonable.

Despite the fact that employment costs are obviously operating and maintenance expenses, the DWSD Parties argue, without support from the express language of the provisions of the bond documents or historical practice, that the post Effective Date DWSD contributions to the GRS pension plan violate the provisions in the indentures of the water and sewer bonds, governing ordinances, and Sixth Circuit law. They contend that the DWSD contributions strip liens and impair the ability of the DWSD to make the payments on the bonds or provide services at the going rates. In addition to the misreading of the operative documents, the arguments of the DWSD Parties ignore the fact that the contributions to the GRS pension plan make up for the historical underfunding from DWSD for its own retirees. The DWSD Parties benefit directly from the immediate and increasing reductions to the pensions of GRS retirees' pensions and the elimination of the City's ongoing obligation for OPEB benefits. DWSD also is freed from continuing obligations to the current retirees after nine years of reduced payments, thereby

82584123\V-5
- 4 -
13-53846-swr    Doc 8066-2    Filed 08/07/14    Entered 08/07/14 18:22:55    Page 13 of 60
13-53846-tjt    Doc 8066-2    Filed 08/07/14    Entered 08/07/14 18:22:55    Page 13 of 60

making possible, continuing independent operations, creation of a regional authority or a sale of the facilities.

Based on the above, the Committee respectfully requests that the Court overrule the objections to confirmation of the Plan.

## I.       THE STANDARD FOR CONFIRMATION OF THE PLAN

To secure confirmation of its Plan, the City must demonstrate that its Plan meets the select provisions of chapter 11 regarding plan formulation, solicitation, voting and confirmation that are expressly incorporated into chapter 9 cases by virtue of section 901, as well as the unique requirements for confirmation of a plan of adjustment in a chapter 9 case set forth in section 943. *See In re Connector 2000 Ass'n, Inc.,* 447 B.R. 752 (Bankr. D. S.C. 2011) (confirming a plan, including consensual third party release, as meeting all requirements of the Code); *Prime Health Care Mgmt. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 710 (Bankr. C.D. Cal. 2010) (confirming plan over objections of parties that were not preexisting creditors); *In re City of Colo. Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 686, 692 (Bankr. D. Colo. 1995) (confirmation of plan, including modification of trust agreement, based on class acceptance).  To secure confirmation over the objections of creditors in an impaired class that has rejected the Plan, the City must meet those requirements (including the mandatory requirements of good faith and compliance with law) **and** demonstrate that the Plan does not discriminate unfairly and is fair and equitable.  11 U.S.C. §1129(b)(1).

The City has the burden of satisfying the confirmation requirements of § 943(b) by a preponderance of the evidence.  *See In re Bamberg Cnty. Mem. Hosp.*, No. 11-03877, 2012 Bankr. LEXIS 2321, *9 (Bankr. D. S.C. May 23, 2012); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr.

D. Colo. 1999). The Committee believes the City will meet its burden and the Plan should be confirmed.

## II. THE PLAN'S TREATMENT FOR RETIREES

The Plan provides the retirees with the best alternative under the circumstances. The treatment of pension claims is the product of a number of mediation sessions involving retiree representatives, the Emergency Manager, and State representatives.

### A. The Original Plan Imposed Severe Cuts on Retiree Pensions

On February 20, 2014, the City filed its initial plan and accompanying disclosure statement [Dkt. Nos. 2708, 2709].[3] In that plan, the retiree claims were grouped in two classes: Class 10 included both the pension and OPEB claims of the PFRS participants and Class 11 consisted of both the pension and OPEB claims of the GRS participants. Although the Committee opposed for voting purposes a classification that grouped fundamentally different claims for pension and OPEB in the same retiree class, the classification in the City's original plan recognized that the retirees' actual recovery under the City's Plan reasonably could be measured by the combined treatment of the City's obligations for both pension and OPEB.

Under the original plan, PFRS participants faced pension reductions by an estimated 10% (subject to adjustment for settlement with the State) and loss of all COLA. The pension trustees were required to adopt and maintain a 6.5% investment return assumption and discount rate for determining the assets and liabilities. With respect to GRS participants, they would have faced pension reductions of an estimated 34% (subject to adjustment for agreement with the State) and

---

[3] Shortly after the City filed its original plan, the Sixth Circuit accepted the direct appeal from this Court's eligibility determination by the Retiree Committee and the Retirement System in cases no 14-1208 and 14-1209. (February 21, 2014). Other appellants followed suit in cases 14-1211 (Council 25, American Association of Sate Local and Municipal Employees), 14-1212(Flowers Plaintiffs and UAW), 14-1213(Detroit Retired Police and Fire Fighters Association and Detroit City Retired Employees Association), 14-1214 (Detroit Safety Unions) and 14-1215 (Retired Detroit Police Members Association). At the request of the City, State, Michigan Attorney General. The Retirement Systems and other appellants, the Court of Appeals stayed consideration of the eligibility appeals as of August 1, 2014.

the loss of all COLA. The GRS pension trustees were required to adopt and maintain a 6.25%

investment return assumption and discount rate for determining the assets and liabilities. The

plan also proposed recoupment from annuity savings accounts or pensions from the active and

retired GRS participants based on the allocation of excess interest during the lengthy period

beginning January 1, 1999 and ending December 31, 2012. Pension benefits were then to be

increased by a formula to take into account the amount of ASF restitution reductions. In the

event of a transaction for DWSD, the plan provided that any reconstituted authority would

assume the reduced pension liabilities associated with DWSD employees and retirees accrued

through the closing date.[4]

The option for the treatment of pension if Classes 10 and 11 had rejected the Fourth

Amended Plan was also extremely harsh. In the Alternative B for Classes 10 and 11 under the

Plan, retirees would have lost not only the State and DIA party funding, but also the funding

from the DWSD--funding that was intended to compensate for the DWSD's historical

underfunding of the department's own employees' pensions. The City proposed to cut pensions

for the GRS retirees by 27% and to deduct in full the allocation of interest credited to retirees'

annuity savings accounts from retirees' pensions to make up for the nearly complete lack of

funding from the City's general fund. The City proposed complete elimination of the COLA for

police and fire-fighters.

      B.     The Current Plan Imposes Serious But Less Drastic Pension Reductions
            Than Under the Original Plan

After mediation led by Chief Judge Rosen and in settlement of the legal issues on appeal

before the Sixth Circuit, the City materially modified the treatment of its obligations to retirees in

---

[4] The original plan created a VEBA to provide health care, life and other authorized benefits to all retirees funded by the proceeds of a note.

Classes 10 and 11. In contrast to the prior versions, the Plan contemplates no immediate reduction to pension payments for the PFRS retirees, but rather eliminates from the police and firefighters of the majority of their negotiated annual COLA. Approximately 68% of the GRS retirees will see a 4.5% reduction in their monthly pensions and lose their COLA entirely. Several thousand retirees and vested active GRS employees will be subject to ASF Recoupment based on excess interest attributed to their accounts or withdrawn during the period from July 1, 2003 through June 30, 2013 in addition to the 4.5% reduction and loss of COLA. Although the pension reductions under the Plan are undeniably harsh for the retirees, the more severe potential alternatives necessitated the legal and economic compromises, the Committee's support of the Plan included the compromises and settlements, and the acceptance of the Plan by retirees.

1.     The Value of COLA Reductions

The reduction and loss of COLA for PFRS and GRS, respectively, is a significant concession on the part of the retiree and an undeniable benefit for the City.

The Committee's actuaries, The Segal Company ("Segal"), assessed the impact of the loss of COLA on various groups of retirees and calculated the value of the reductions from the City's perspective. *See* Expert Report of Kim Nicholl dated July 22, 2014.[5] Retiree COLA benefits are determined by various formulas in their collective bargaining agreements.[6] The

---

[5]     The Nicholl Report was served on the City and the objectors on July 22, 2014, but not filed on the docket. Per the Court's instructions, it has not been filed with this brief as an exhibit.

[6]     Depending on the date of retirement and employee election, COLA for PFRS is based upon different formulas. For the most part, the COLA for PFRS retirees is compound, which means that COLA is based upon each year's prior benefit amount. Nicholl Report at ¶61. The COLA for GRS is simple so that the benefit increase each year as a result of COLA is the same.

Although certain PFRS retirees have argued that the loss of COLA affects different groups of PFRS differently and therefore, the Plan does not comply with section 1123(a)(4), the same reduction is applicable to all PFRS retirees. The Plan is not violative of section 1123(a)(4) if creditors in the class are all subject to the same process or have the same opportunity for recovery. *See, e.g., In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (concluding that a plan that "subjects all members of the same class to the same means of claim determination" is "sufficient to satisfy the requirements of Section 1123(a)(4)").

reduction of COLA for the police and firefighters, who are subject to comparatively young mandatory retirement ages and do not have the backstop of social security benefits with cost of living adjustment, is a substantial loss. Although the actual reduction in the present value of pension benefits for individuals due solely to loss of COLA vary by gender, current age and other factors, the average reduction for PFRS is 12.7% of benefits. Nicholl Report at ¶65. Chart 62A shows how the loss of a compound COLA will affect a retiree with an average $30,000 per year salary. That retiree, whose pension would have increased to $58,482 in thirty years, will have a pension of $40,586 after the same period. The present value of the COLA reductions for PFRS retirees is $688 million. Nicholl Report at ¶64.

The average reduction in the present value of pensions for GRS retirees due solely to COLA is 16.2% of benefits, and in combination with the direct pension cuts, is 22.3% of benefits. Nicholl Report at ¶57-58. No amount of fanciful recovery computations will change that result. Chart 55 shows how the loss of COLA will affect a retiree with an average $20,000 per year salary. A retiree whose pension would have reached $35,500 after thirty years with COLA, will have a $20,000 pension after thirty years, assuming no partial restoration of COLA. The present value of COLA reductions for the GRS retirees is $616 million. Nicholl Report at ¶56.

The retiree recovery under the Plan must take into account the value of the loss of COLA. In addition, the Court should consider the reduction or elimination of COLA in assessing the value of the COLA reduction to the City's restructuring and its ability to meet its long term obligations to retirees.

82584123\V-5

- 9 -

13-53846-tjt  Doc 8866-2   Filed 12/17/14   Entered 12/17/14 12:12:25   Page 18 of 60
13-53846-swr  Doc 6056-2   Filed 07/17/14   Entered 07/17/14 12:12:15   Page 18 of 60

2.  ASF Recoupment Is A Funding Mechanism Taken From
    Defined Contribution Accounts of Retirees and Active
    Employees

The Plan continues to provide for ASF Recoupment with the goal of capturing

approximately $231 million (present value) from the vested active employees and the retirees.

As a result of the negotiations, the City has reduced the proposed recoupment period from 1999-

2013 to 2003-2013 and capped the recovery to 20% of the retiree's largest annuity savings

account balance during that period.  From the Committee's perspective, the justification for ASF

Recoupment is that it saves most GRS retirees, including many of them who are subject to ASF

Recoupment, from substantially greater across the board cuts in monthly benefits.[7]   ASF

Recoupment funds the GRS pension plan with interest at 6.75%.

The Committee's actuaries analyzed the effect of ASF Recoupment on the GRS retirees.

According to the Nicholl Report at p. 16, approximately 68% of the GRS retirees (8,222) are not

subject to ASF Recoupment because they did not maintain or take a distribution from their

individual annuity savings accounts after July 1, 2003.  However, an additional 1,216 retirees

---

[7]     The City's stated authority for ASF Recoupment is *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*,
530 U.S. 238 (2000) -- a case arising under section 502(a)(3) of the Employee Retirement Income Security Act of
1974 ("ERISA"), which arguably is not controlling and of little probative value.  The central issue in the *Harris*
case was whether section 502(a)(3) authorized an action against a non-fiduciary participant in a transaction
prohibited by ERISA.  *Id.* at 241.  The defendant in that case was the broker who put the pension fund into a
worthless investment.  *Id.* at 242.  Cited as the source for the right of restitution, the case actually provides no direct
support for the City's ASF Recoupment for several reasons.  First, the case turns on an interpretation of ERISA
provisions that are not applicable to the City's pension plans.   The Court's analysis of trust law *in dicta* is by
analogy to the ERISA provision.  Moreover, read in its entirety, the common law of trusts cited by the court militates
against the City's right to restitution from the innocent retirees.  The trust law cited in the *Harris* case actually
imposes a limitation on the recovery of alleged misappropriated trust assets from an innocent recipient.

The Supreme Court in *Harris* stated:

    Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he
has purchased for value) knew or should have known of the existence of the trust and the circumstances that
rendered the transfer in breach of the trust. Translated to the instant context, the transferee must be demonstrated to
have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful.  *Id.* at 251
(citing *Lockheed Corp. v. Spink*, 517 U. S. 882, 888–889 (1996)).

Whatever may have been the knowledge of individual City finance department employees, the City does not contend
that secretaries, sanitation workers or even legal department retirees knew or should have known that interest
allocation was excessive or improper.

13-53846-swr   Doc 8056-2   Filed 08/04/14   Entered 08/04/14 12:22:25   Page 19 of 60

will see their pensions reduced by 4.5% plus an additional .01% to 3.09% on account of ASF Recoupment and 819 other GRS retirees will see their pensions reduced by 4.5% plus an additional 3.10% to 9.29%. All of these retirees would have had substantially greater across the board monthly benefit reductions if the Plan did not include the ASF Recoupment. The remaining retirees subject to ASF Recoupment are retirees who worked for decades for the City and accepted the City's encouragement to put up to 7% of their salary into their annuity savings account or who, by virtue of their salaries, were able to invest a larger sum into their accounts.[8] All of the vested actives included in Class 11 lose their individual ASF Recoupment Amount from their annuity savings accounts.

The ASF Recoupment will be applied for the remainder of a retiree's lifetime and if the retiree is receiving a Joint and Survivor pension, the spouse's lifetime. Mortality tables were used to estimate the future lifetime of the retiree and spouse, if applicable. Some retirees will live longer and pay back more than their ASF Recoupment Amount; others will not live as long as expected and pay back less than the amount. Nicholl Expert Report at ¶48. The effect of ASF Recoupment on retirees is shown by example in the Nicholl Report. *See* Nicholl Report at ¶¶ 49-51. The ASF Recoupment Amount was calculated using a 6.75% interest rate. The 6.75%

---

[8]    Pursuant to the City Ordinances, the GRS offered employees the option to contribute zero percent (0%), three percent (3%), five percent (5%), or seven percent (7%) of their annual compensation to an annuity savings fund, which amount was deducted from their compensation. On retirement, the accumulated contributions with interest were transferred from the Annuity Savings Fund to an Annuity Reserve Fund to be paid out to the plan participant, refunded to him or her, or distributed in some combination thereof. Prior to 2011 when the Ordinance was amended, the GRS Board had discretion to credit additional interest over and above the "regular interest" and to take the excess interest from the pension fund. Detroit Code Sec.47-1-18 (2010).

The annuity savings ordinance was expressly incorporated into American Federation of State City & Municipal Employees' ("AFSCME") collective bargaining agreements with the City and was a consideration in the bargaining process. When the City was planning to adopt an amended ordinance capping interest allocation, AFSCME argued that the City was judicially estopped from curtailing the allocation because the City had already conceded that the excess earnings practice was a condition of employment in prior litigation. *See Taunt v. Gen. Ret. Sys. (In re Wilcox)*, 233 F.3d 899, 902 (6th Cir. 2000) ("Since 1974, when a new charter was adopted by the City of Detroit, the [annuity savings] plan has been the subject of collective bargaining between the city and various unions."). It is clear that the City had knowledge of allocation of interest to the annuity savings account and took advantage of it in the bargaining process.

interest addition was not disclosed to retirees in the earlier versions of the Plan or accompanying Disclosure Statement.[9] However, each Class 11 ballot disclosed the estimated monthly deduction from each retiree's pension on account of ASF Recoupment, which amount incorporates the interest rate charge.

In contrast to the treatment under the original plan, in the current ASF Recoupment is subject to a second cap of 15.5% of current benefits. In addition, the period of recoupment has been reduced to July 1, 2003 through June 30, 2013, and there is an option to pay the ASF Recoupment Amount in a lump sum, subject to certain conditions and limitations, including a $30 million cap.[10] Finally, although it is fairly remote possibility, the ASF Recoupment Amount may be restored if the GRS pension plan performs exceptionally well and/or a DWSD transaction occurs in connection with the Plan.

The benefit of ASF Recoupment to the City should be taken into account in considering the overall fairness of the compromises embedded in the Plan. The Nicholl Report states: "The totality of the ASF offset is being taken from individuals who are themselves retirees. The amounts being recouped are then being applied by the City to fund the reduced pension payments. Thus, the City is effectively using the ASF recoupments to force retirees, in a very significant degree, to fund their own pensions." ASF Recoupment lowers the overall pension reductions for GRS retirees and current active employees and, at the same time, reduces the City's contribution obligations required for the Grand Bargain. This is a key circumstance that explains the low level of City contributions needed in the first ten years under the Plan and must be taken into consideration when measuring the retirees' recovery under the Plan.

---

[9]   The Plan now discloses that ASF Recoupment is calculated using a 6.75 interest rate. *See* II.B.r.ii.D.2.i.

[10]   The Plan now discloses that ASF Recoupment is calculated using a 6.75% interest rate. *See* II.B.r.ii.D.2.i. The effect of non disclosure is mitigated by the lump sum buyout option. Certain retirees may now be able to find the ASF Recoupment at lower interest rates by utilization of the lump sum option.

82584123\V-5

- 12 -

13-53846-tjt  swr  Doc 8866-2  Doc 8500   Filed 08/04/14   Filed 12/07/14   Entered 08/04/14 12:12:55   Entered 12/07/14 12:12:25   Page 21 of 60   Page 21 of 60

As will be discussed later, the objectors ignore a very critical difference between themselves and Classes 10 and 11 claim holders. Bankruptcy Code section 943(b)(4) requires continued compliance with Michigan law. The Pension Clause is an absolute prohibition on state actors. *Shelby Twp. Police & Fire Ret. Bd. v. Charter Twp. of Shelby*, 475 N.W.2d 249, 255-56 (Mich. 1991). This would include the Emergency Manager. The Plan treatment of retirees includes a compromise of the retirees' unique Constitutional claims.

The Pension Clause cannot be read as simply extending Contract Clause protections to accrued pension benefits. At the outset, such a reading would render language in the Pension Clause -- promising that accrued financial benefits "shall not be diminished or impaired [by a state or its political subdivisions]" -- superfluous, a result flatly prohibited by Michigan law. *Hengartner v. Chet Swanson Sales, Inc.*, 348 N.W.2d 15, 17 (Mich. App. 1984); *AFSCME v. City of Detroit*, 662 N.W.2d 695, 702 (Mich. 2003); *Syntex Laboratories, Inc. v. Dep't of Treasury*, 470 N.W.2d 665, 667-68 (Mich. App. 1991). In *Fields v. Elected Officials' Ret. Plan*, 320 P.3d 1160 (Ariz. 2014), the Arizona Supreme Court was similarly asked to hold that the Pension Clause in the Arizona Constitution, which like the Michigan Pension Clause provides that public retirement benefits are contractual benefits that "shall not be diminished or impaired," merely made Arizona public pensions subject to the Arizona Contract Clause. The Fields Court summarily disposed of that contention, writing that:

> … accepting this argument would render superfluous the latter portion of §
> 1(C), the Pension Clause, which prohibits diminishing or impairing public
> retirement benefits. Because the legislature generally avoids redundancy,
> we reject this argument. … [T]he Pension Clause confers additional,
> independent protection for public retirement benefits separate and distinct
> from the protection afforded by the Contract Clause.

*Id.* at 1164-65 (citations omitted.)

The same conclusion is compelled here: under Michigan law, courts must give effect to each word or phrase used in a statute, and construing the Michigan Pension Clause as doing nothing more than extending Contract Clause protections to accrued pension benefits would render the clause stating that such benefits "shall not be diminished or impaired" – the entirety of the Pension Clause's first paragraph after "thereof" -- wholly superfluous. And, while the foregoing is dispositive, such a construction would further render superfluous the legislature's deliberate choice of the disjunctive – accrued pension benefits cannot be either "diminished" or "impaired.[11]

The Committee appealed the decision of this Court entered on December 5, 2013 based, in part, upon the Pension Clause protections and along with others, sought direct review of the appeal by the Sixth Circuit Court of Appeals thereafter. The petition for review was docketed in the Court of Appeals on December 31, 2013. Permission for review was granted on February 21, 2014. Dkt No. 14-1209. On or about March 19, 2014, the Committee filed a motion to, among other things, expedite oral argument. On April 1, 2014, the Sixth Circuit denied the request for expedited oral argument. As promised to this Court by Committee counsel, negotiations with City continued despite the Sixth Circuit's acceptance and the parties' vigorous prosecution of the direct appeals.

The Plan now contains legal and economic compromises reflecting claim quantification issues, constitutional and statutory protections and questions of allocation of sacrifices among competing groups of pensioners. *See* discussion below at 31-38, infra. Despite the clarity of the

---

[11]    *See also Cowherd v. Million*, 380 F.3d 909, 913 (6th Cir. 2004) ("[I]t is a basic principle of statutory construction that terms joined by the disjunctive 'or' must have different meanings because otherwise the statute or provision would be redundant") (internal quotations and citation omitted). The Pension Clause's use of both the words "impair" and "diminish" is not a mere tautology without substantive import. For example, as the Sixth Circuit wrote in *Charles v. Baesler*, 910 F.2d 1349, 1356 (6th Cir. 1990), so long as a claim for damages is available, a breach of contract does not rise to the level of an "impairment" for purposes of the Contract Clause.

82584123\V-5                                        - 14 -
13-53846-tjt  Doc 8662  Filed 08/04/14  Entered 08/04/14 13:12:55  Page 23 of 60
13-53846-swr  Doc 6056  Filed 07/17/14  Entered 07/17/14 22:22:25  Page 23 of 60

Pension Clause, based on consideration of the alternatives and the delay and risk inherent in the appellate process, the Committee determined to support the Plan  and recommend that the retirees vote for the Plan.  As shown by the vote totals for Classes 10, 11 and 12, the City's retirees agreed through their acceptance of the Plan.

### III.    THE PLAN'S TREATMENT OF RETIREE HEALTH PROVIDES A BASE LEVEL RECOVERY OF $450 MILLION WITH THE PROSPECT OF ADDITIONAL RECOVERIES

The Plan's treatment of retiree OPEB claims is also the product of negotiation between the City, the Committee and other retiree representatives.  In several respects, it reflects and otherwise incorporates multiple settlements reached during the case in response to lawsuits filed by the Committee.

#### A.    Litigation Against The City To Impose Post-Petition OPEB Cuts

One of the City's goals in entering into the chapter 9 case was to extricate itself, to the greatest extent possible, from its financial and administrative obligations of vested retiree health care benefits.[12]  By 2013, such obligations had grown to more than $144 million per year for retirees, and were expected to continue to grow given expected rising healthcare costs.  For the first several months of the bankruptcy case, however, the City provided health care coverage to the retirees in the manner that existed prepetition.  In the fall of 2013 and then again at the beginning of 2013, however, the City announced proposed unilateral reductions to health care program for retirees that would continue during the case to confirmation.

In both instances, the Committee-- joined by two retiree associations and AFSCME -- filed litigation to enjoin these unilateral changes.  The first suit resulted in an agreement by

---

[12]    The Emergency Manager's Financial and Operating Plan for the City of Detroit, dated May 12, 2013, estimated the City's  unfunded  OPEB liabilities at $5.7 billion and  presaged the City's efforts to reduce the liability: "As part of his comprehensive restructuring plan, the Emergency Manager will evaluate options to reduce or eliminate certain healthcare costs for both active and retired employees."

which the City would continue its existing 2013 healthcare program for a period of at least two months, to February 28, 2014. Plan, Exhibit 1A.261, p. 3.

The City's second attempt and corresponding injunctive litigation resulted in reduced healthcare benefits (although not as reduced as the City had unilateral proposed) for the remaining 10 months of 2014. With respect to the second efforts, on or around January 3, 2014, the City mailed to more than 20,000 retirees its "March 1, 2014 through December 31, 2014 City of Detroit Retiree Health Care Plan," which reported the City's program to unilaterally: (a) reduce City funding of health care benefits by approximately 87% per year; (b) reduce City funding for retirees who are not Medicare eligible from 72% of the share of costs to 15%;[13] and (c) provide Medicare-eligible retirees with coverage that substantially increased their share of costs for both medical care and prescription drugs. The effect on retirees of these reductions, as the Court has heard from the retirees, would have been devastating.

In response, the Committee, the Retired Detroit Police and Fire Fighters Association, the Detroit Retired City Employees Association and AFSCME Sub-Chapter 98, City of Detroit Retirees (collectively, the "Retiree Representatives") sought to enjoin the City from unilaterally imposing these drastic benefit cuts upon the retirees who are beneficiaries of the City's lifetime benefit promises. The evidence upon which the Retiree Representatives were prepared to rely, and which remains probative of the Plan's global settlement with the retirees demonstrated that: (a) the City was bound by written contracts (and the City Code of Ordinances[14]) to provide lifetime healthcare benefits to its retired employees and their spouses at no or very low cost; (b) the rights are vested pursuant to collective bargaining agreements and a class settlement for most

---

[13] There are approximately 8,000 Retirees who are not Medicare-eligible because either: (a) they are under 65 years of age, or (b) over 65 but not Medicare eligible.

[14] *See* Detroit Code §§ 13-8-1 to -3.

82584123\V-5

- 16 -

13-53846-tjt   Doc 8056   Filed 10/22/14   Entered 10/22/14 12:13:55   Page 25 of 60
13-53846-swr   Doc 8362   Filed 10/04/14   Entered 10/04/14 22:22:25   Page 25 of 60

retired firefighters and police (the "Weiler Class Settlement"), (c) the rights are protected from substantial impairment by the Contract Clauses of the United States and Michigan Constitutions and other legal authority that recognize such protection; and (d) there were less harmful alternative measures available to the City.

By way of example, the vested nature of retiree healthcare benefits are reflected in collective bargaining agreements (and the Weiler Class Settlement) which require the City to provide healthcare benefits at no cost or significantly-reduced cost, both during and after employment. Examples of these agreements include, but are not limited to:

> a. Agreement with District Council 77 of AFSCME, by which the City agreed to pay the premium for retirees who retire on or after July 1, 1974, and one-half of the premium for spouses, for hospitalization and medical coverage;

> b. Master Agreement with Michigan Council 25 of AFSCME, AFL-CIO, for 1977-80, by which the City agreed to "pay the premium for regular retirees and their spouses" who retire on or after July 1, 1977; and

> c. Settlement Agreement with all police officers who retired before April 9, 2007, all police lieutenants/sergeants/investigators and command officers who retired before August 1, 2008, and all firefighters (and their spouses) who retired at commensurate ranks. The City agreed to pay all premiums for their lifetimes for certain of those retirees and their spouses and to cap the premium share at 20% of the total premium for all other retirees and spouses.

The terms of these agreements are virtually identical to the terms of the collective bargaining agreements that the United States District Court for the Eastern District of Michigan held provided retirees a vested contract right over the objection of the City of Flint. *Welch v. Brown*, 935 F.Supp2d 875 (E.D.Mich. 2013), *aff'd* 551 Fed. Appx. 804 (6th Cir. 2014.) The district court held that those agreements provide retirees with vested rights to healthcare benefits unless "the language of a CBA indicates that certain rights are temporally limited." *Id*. at 885.

The City's agreements are not temporally limited.[15]  The City repeatedly confirmed that these benefits were vested in its communications with the retirees.  Thus, the health care benefit terms of a retiree in place at retirement bind the City to keep them in place throughout the life of the retiree.  In fact, in the injunctive suits filed by the Committee and others, the City did not take issue with the vested nature of such benefits.

The City did dispute, however, whether its proposed unilateral modification of such retiree health care benefits gave rise to Constitutional violations that could be enjoined during the pendency of the Chapter 9 case.  The benefits conferred on retirees under the City's collective bargaining agreements are protected by the Contract Clauses of both the Michigan and United States Constitutions that limit a state's ability to impair contracts.  The United States Constitution, Art. I, § 10, cl. 1, provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  The Michigan Constitution of 1963, Art. I, § 10, contains a similar prohibition: "[n]o … law impairing the obligation of contract shall be enacted."  The Retiree Representatives asserted that the City's drastic modifications to the retiree healthcare benefits violated the Contract Clauses.  This much did not appear to be in dispute.

However, to prove a violation of the Contract Clauses, the retirees were required to demonstrate a substantial impairment of a contract.  *See Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998).  If a substantial impairment exists, the burden would shift to the City to provide a "significant and legitimate" public purpose for the impairment.  *Id.* (citation omitted).  If the City provided such a purpose, then the Court would have been required to

---

[15] Collective bargaining agreements are contracts, and the usual rules of contract construction apply to them.  *See Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008).  Rights that continue beyond the expiration of a CBA, such as rights to health care benefits, vest in retirees if the parties so intended.  *Id.*  Retiree benefits carry an inference that the parties intended them to continue in the same form for as long as the beneficiary remains a retiree.  *Id.* (citing *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983)); *Bender v. Newell Window Furnishings, Inc.*, 681 F.3d 253, 261 (6th Cir. 2012).

82584123\V-5
- 18 -
13-53846-tjt  Doc 8660-2  Filed 12/04/14  Entered 12/04/14 18:22:25  Page 27 of 60
13-53846-swr  Doc 8306  Filed 11/07/14  Entered 11/07/14 18:23:35  Page 27 of 60

determine whether the impairment is "necessary," "reasonable" and "appropriate" in light of the impairment's public purpose. *Id.* at 323-24. The Court would have had to examine whether less drastic options exist that would not impair the protected contracts. *Welch*, 551 Fed. Appx. at 811. Far greater scrutiny is required when a state impairs its own contract than when private parties impair their contract:

> [A]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. . . . If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25-26 (1977).

When a state impairs its own contract, its actions are inherently suspect. *See Toledo Area*, 154 F.3d at 323. "[C]ourts are not so deferential when the state's legislation is self-serving and impairs the obligations of its own contracts. In this situation, a more searching analysis under the contract clause is appropriate." *Ass'n of Surrogates v. New York*, 940 F.2d 766, 771 (2d Cir. 1991). Such an impairment survives only if it is "necessary" and reasonable to achieving an important government interest. *U.S. Trust*, 431 U.S. at 25-26; *Ass'n of Surrogates*, 940 F.2d at 771-72. It is not enough that the state would prefer to use the money for other public purposes. As the Supreme Court explained:

> Mass transportation, energy conservation, and environmental protection are goals that are important and of legitimate public concern. Appellees contend that these goals are so important that any harm to bondholders from repeal of the 1962 covenant is greatly outweighed by the public benefit. We do not accept this invitation to engage in a utilitarian comparison of public benefit and private loss. . . . Thus a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors.

*U.S. Trust*, 431 U.S. at 28-29.

While the Retiree Representatives were prepared to show that the impairment was substantial and the City's actions were neither necessary nor reasonable, a significant question existed as to whether this or any Court could enjoin the City from taking such actions in view of language of Bankruptcy Code Section 904.

The second OPEB litigation -- similar to the first -- was settled in mediation, although on different terms. On February 14, 2014, the Retiree Representatives entered into a settlement agreement, which is attached to the Plan as Exhibit 1A.261.[16] In the agreement, the City agreed to make certain changes to the retiree health care plans for the period from March 1, 2014 through December 31 2014. These changes included additional stipends for retirees with lower household income, spouses and those retirees who are not Medicare eligible but are 65 years old and older. Although the changes made by the City ameliorated to a degree certain of the harshest effects of the City's post petition health care program, it nevertheless shifted the lion's share of heath care costs on to the retirees at a time in their lives when such coverage becomes most essential and their financial resources are the most limited.

B.     The Plan Meets the Rule 9019 Standard For Compromises

In connection with the Fourth Amended Plan, the City and the Committee reached a compromise related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of the Allowed OPEB Claims. The parties contemplated that the Confirmation Order will constitute an order approving such compromise pursuant to Bankruptcy Rule 9019.[17] In

---

[16]    The Plan provides: "The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.261, are incorporated herein by reference and shall be binding upon the parties thereto." Plan, section IV.O.

[17]    The Plan, in section IV, G provides: "The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the

82584123\V-5

- 20 -

13-53846-tjt   13-53846-swr   Doc 8866-2   Doc 8300-2   Filed 08/04/14   Filed 12/17/14   Entered 08/04/14 12:12:55   Entered 12/17/14 18:38:25   Page 29 of 60   Page 29 of 60

summary, the Plan allows the retiree OPEB claim in the amount of $4.303 billion -- and amount the Retiree Committee believes is low - and shifts the responsibility for the provision of health coverage for retirees to two voluntary employee benefit associations ("VEBAs"). The Plan makes it clear that the City has no further obligation to provide OPEB benefits: "From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits." See Plan, II.B.3.s.ii.C.

1.  The Compromise on the Allowed Claim Amount is Fair
    and Reasonable

By agreement with the Committee, the allowed claim for OPEB as of the Petition Date has been set at $4.303 billion (the "Allowed OPEB Claim"), which reflects a $143 million reduction to the compromise claim amount of $4.446 billion for the cost of post petition health care through December 31, 2014. The Allowed OPEB Claim in the Plan represents a substantial compromise of the retirees' OPEB Claim. The determination of the OPEB claim by the City and the Committee's actuaries ranged from a low of $3.2 billion calculated for financial reporting purposes to more than $8 billion for claim calculation depending on the discount rate and retiree population included in the calculation.

In fact, if one were to utilize a discount rate of 0% for the calculation of the OPEB claim, the value of the OPEB claim would be in excess of $8 billion. Such a 0% discount rate (0% non-discount rate) is being used in in the Stockton California Chapter 9 case and is supported by the plain language of the Bankruptcy Code.

Bankruptcy Code section 502 governs how claims are allowed. Section 502(b), which governs allowance of such claims, does not provide for use of reduction of claims by calculating

---

terms of which are reflected in the Plan. the Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019."

present value.  In fact, this provision uses different language than the Bankruptcy Code provisions that require discounting claims to net present value. Section 502(b) requires that the court "determine the *amount*" of a claim "as of the date of the filing of the petition." 11 U.S.C. § 502(b) (emphasis added).

By contrast, in the other portions of the Bankruptcy Code that require discount to present value, the statute requires a determination of the *value* as of a specific date. 11 U.S.C. §§ 1129(a)(7), (9), (15); 1129(b)(2); 1173(a)(2); 1225(a)(4), (5); 1325(a)(4), (5); 1328(b)(2).  This difference in language indicates that section 502(b) does not require present value discount of all claims. *In re Oakwood Homes Corp.,* 449 F.3d 588, 597 (3d Cir. 2006) ("'amount' does not mean the same thing as 'value.' . . . where the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term 'value, as of' a certain date").

In addition, section 502(b) contains a list of exceptions specifically limiting the allowance of some claims (such as the cap on landlord claims), but conspicuously does not require a net present value calculation. Interpreting section 502(b) to require discounting to present value would be an additional exception that does not exist in the Bankruptcy Code. *In re Gretag Imaging, Inc.*, 485 B.R. 39, 46 (Bankr. D. Mass. 2013) ("[s]ection 502(b) contains a series of - 45 - exceptions…[i]f § 502(b) required all claims to be present-valued, there would be no need for these exceptions"). *Oakwood*, 449 F.3d at 593 (interpreting section 502(b) as generally requiring present value discount of all claims would result in impermissible double discount of claims for which 502(b)(2) disallows unmatured interest).

Such a result for benefits was upheld by the District Court of Maryland in the case of *Kucin v. Devan*, 251 B.R. 269 (D. Md. 2000).  There, the Court held:

> In her cross-appeal, the Trustee faults the Bankruptcy Court for failing to take into consideration the risk of nonpayment in determining the present

value of the Executives' claims. According to William Kerr, the Trustee's expert economist, the value of the unfunded promise to make future retirement payments should have been discounted based on MGRE's creditworthiness. He argued that the Bankruptcy Court by discounting the agreements as though they were like government bonds was "essentially saying we're going to make what's a very risky, a promise that has some degree of risk to it, we're going to turn it into 100 percent certainty." Even though Kerr's analysis is unsupported by case law, it has a certain intuitive appeal. Obviously, MGRE's promise to make payments in the future is worth less than the same promise from the United States government. However, Kerr's methodology completely ignores fundamental principles of contract law. *Cf. In re Highland Superstores, Inc.*, 154 F.3d 573, 579–80 (6th Cir.1998) (declining to apply two different discount rates accounting for relative creditworthiness of debtor-tenant, who rejected the lease, and the replacement tenant). In contract law, the nonbreaching party is entitled to damages for its "expectation interest," which are damages sufficient to place the nonbreaching party in as good a position as the party would have been had the contract been performed. *See* Restatement (Second) of Contracts §§ 344, 347 (1981). Here, the Executives expected to receive from MGRE their retirement benefits upon reaching the age of sixty-five (age sixty for Rice). Therefore, their claims for retirement benefits, discounted to present value, are a legal certainty and need not be further discounted for the risk of nonpayment. Otherwise, the risk of nonpayment would be accounted for twice since the Executives already stand to receive only a fraction of their claims.

*Id.* at 273.

The settlement amount of allowance of a $4.446 billion claim for retiree OPEB, therefore, is well within a reasonable point in that range.[18]

---

[18] According to the Report of Susan Taranto, the City's actuary, as of the petition date, the City contracted for or self insured for approximately ten different health plans for Medicare eligible retirees and 14 plans for non Medicare eligible retirees. None of the plans were prefunded. The City provided health care benefits for approximately 17,000 retirees and their spouses and other dependents for a total of approximately 25,400 individuals. Taranto Report at 2. The City contends that OPEB liabilities were high because of the fact that retirees could chose from the large number of plans which contributed to the cost of administration and benefits were generous. Disclosure Statement, Dkt. No. 4391 at 123. However, it is important to note that health care benefits, like pension benefits, constituted significant components of the bargained for compensation of City employees.

Both the valuations used by the Committee and the City in the negotiations were based, in part, on the data and assumptions used by Gabriel Roeder Smith & Company ("GRSC") in its determination of the present value of projected benefits for retirees and beneficiaries as of June 30, 2011. GRSC used a 4% discount rate in calculating the present value of OPEB for the City's financial reporting and determined the present value of benefits for existing retirees at $3.507 billion. The valuation assumed that retirees who had opted out of currently receiving medical and prescription drug coverage from the City would not opt back in, although it was always their right to opt in at any time. In addition, the GRSC valuations excluded the Detroit Library members, who fall under the City coverage,

Moreover, the *pro rata* treatment of that claim *vis-a-vie* other creditors is more than reasonable.[19]

---

but are employees of a separate legal entity, the Library. The GRSC calculation was performed for financial reporting purposes and not for claim calculation. Finally, for purposes of valuing the claim as of the petition date, the GRSC valuation had to be adjusted for an increased retiree population and healthcare cost increases.

The Committee's actuaries, Segal, used the GRSC data with adjustments for alternative discount rates, the inclusion of both the previously opted out employees (approximately 4,281 opt outs) and the library employees whose benefits were valued at an additional $47.7 million and the projected retiree population as of the petition date. *See* Expert Report of Howard Atkinson, Jr. ("Atkinson Report"). Segal used the annuity valuation discount rate comparable to the rate as of the July 2013 petition date that the Pension Benefit Guaranty Corporation would apply for calculating a claim for long term retiree benefits on termination of a private employer defined benefit plan. Using the annuity rate as of the petition date, Segal used a 2.60% discount rate for the first 20 years, and 3.43% thereafter and arrived at a present value of $5.086 for OPEB benefits. Atkinson Report at ¶10. Then, Segal calculated the present value of benefits based on projected 2013 data using a discount rate of zero and including the opt outs. Segal made other adjustments, including an adjustment for benefits paid during the period from 2011 to 2013 and for the known, rather than projected number of employees. The projected present value as of July 1, 2013 at the zero discount rate was $8,004,162, 538 based on the rate used in the Stockton chapter 9 case to value OPEB. Atkinson Report at ¶12. The use of a low or no risk discount rate is supported by the City's actuary. In reaching a compromise of the Allowed Claim Amount the Committee took into account an offset of continued post petition health care benefits at full rate through March 2014 and reduced coverage through December 31, 2014.

The City relied in the negotiations on the determinations of its actuary, Suzanne Taranto of Milliman. *See* Report of Suzanne Taranto ("Taranto Report"). Ms. Taranto modeled the City's projected health care costs for the next several fiscal years, which the City will eliminate through the chapter 9 process. Had the City continued its health care programs for retirees, Ms. Taranto projected that the costs for the next nine years alone would have been over $2 billion. Taranto Report at 4. The modifications to retiree health care effective March 2014 slashed the City's cost from approximately $164 million annually to $3 million per month while in the chapter 9. Using the GRSC data and the same assumptions and benefit provisions outlined in GRSC's July 1, 2011 Detroit Retiree Health Care Plan Actuarial Report, described above, and bringing the valuation forward to July 1, 2012, Ms. Taranto determined that present value of all future benefits to be paid under the retiree health plans to current retirees and their covered dependents using a 4% discount rate was $3.2 billion. Taranto Report at 6.

Thereafter, Ms. Taranto used a variety of discount rates and changed certain assumptions for purposes of calculating the claim for OPEB in the chapter 9 case. Ms. Taranto included approximately 3200 retirees and their beneficiaries who opted out of or were not electing health care benefits but were legally entitled to opt back in. In addition, Ms. Taranto used the same discount rate used by the PBGC for valuing long term pension liabilities for terminated plans that Segal tested in its valuation report. Based on those assumptions, Ms. Taranto determined that the present value of the City's liabilities to current retirees was $4.49 billion. Ms. Taranto justified application of a low discount rate in a situation like this, where the employer wishes to defease its liabilities and turn over to its retirees a sum of money to pay benefits for the retiree's lives. Taranto Report at 6.

[19] It is predicated on the possibility that recovery to Class 12 claimholders will increase if COP Claim Holders are disallowed or reduced, or other moneys are located. The Committee is prepared to demonstrate that the treatment of retiree OPEB benefits under the plan was predicated upon not only the ability to eliminate and reduce the COPs holders, but also a *pro rata* distribution of distributions with any allowed COPs holder claims. Should any additional amount be found for COPs holders, Class 12 OPEB holders are entitled to receive its *pro rated* distribution of such amounts.

82584123\V-5

\- 24 -

13-53846-tjt   Doc 6056-2   Filed 08/04/14   Entered 08/04/14 13:13:55   Page 33 of 60
13-53846-swr   Doc 6056-2   Filed 08/04/14   Entered 08/04/14 18:28:25   Page 33 of 60

2.      The Provisions for Post Effective Date Benefits Should Be
        Approved

As stated above the City's goal with respect to health care coverage for its retirees was to
reduce or eliminate its financial and operational obligations.  The City's modifications during the
chapter 9 case met the goal of significantly reducing the City's health care costs.  The key to
achieving that goal is the establishment of a tax qualified voluntary employee benefit association
("VEBA") to act as the provider of benefits with the limited funding made available under the
plan.

The Plan provides that health care benefits for retirees will be provided to general city
retirees by the Detroit General VEBA and to uniformed retirees by the Detroit Police and Fire
VEBA.  The VEBA structure assures retirees that the City's distribution of notes will not be
immediately taxable to the individual retirees and retirees will not be taxed on income earned by
the VEBA trust prior to payment of benefits to retirees.  The Plan provides that Detroit General
VEBA will be funded with " New B Notes in the aggregate principal amount of $218,000,000, in
satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries.  The
Detroit General VEBA shall also be entitled to contingent additional distributions from the
Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B." See Plan, II.B.3.s.ii.A.  The
Plan provides that the Detroit Police and Fire VEBA  will be funded by "New B Notes in the
aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held
by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be
entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth
in Section II.B.3.p.iii.B."  Plan,II.B.3.s.ii.B.[20]

---

[20]    The terms of the VEBA funding were determined by the circumstances known by the Committee at the time.  If
any additional non contingent economic consideration is given to holders of claim in Classes 7. 9. 14 or 15, the
Committee's position is that the VEBAs should be given their proportionate share.

The Plan will provide that the VEBA trustees will manage the prosecution and disposition of the COPs litigation with the consent of the LTGOs in a litigation trust. *See* Plan Exhibit I.A.198. The Committee's goal is for the VEBAs to meet at a minimum the coverage that retirees currently have, the cost of which is between $2.5 and $3 million per month and hopefully to enhance that coverage in the future. The Committee and the mediators have been soliciting third party funding for the VEBAs. The Committee has secured a commitment for $5.5 million of additional funding from a trust controlled by the Employee Benefits Board, subject to the fulfillment of certain circumstances.

### 3. The OPEB Settlement Meets the Standards of Rule 9019

Although the City and the Committee need not seek approval of the settlement pursuant to Rule 9019,[21] the parties have agreed to seek such approval of the settlement as a part of the Plan. Bankruptcy Rule 9019 states in relevant part:

> (a) Compromise. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Courts in this jurisdiction are in accord with the proposition that settlements and compromise are favored over the expense and burden of litigation. *See Hindelang v. Mid-State Aftermarket Body Parts, Inc. (In re MQVP, Inc.)*, 477 Fed. Appx. 310, 312 (6th Cir.2012) ("The very purpose of such a compromise agreement 'is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'"

---

[21] *See In re City of Stockton, Cal.*, 486 B.R. 194, 195 (Bankr. E.D. Cal 2013) (judicial scrutiny of compromises was not required under chapter IX, then none is required in chapter 9.). In that case, the court held that § 904 "means that the City can expend its property and revenues during the chapter 9 case as it wishes. It can pay any debt in full without permission from this court. If it wishes to spend $55,000 settling a lawsuit, it is entitled to do so without needing a permission from this court; such permission would imply a power to disapprove and thereby to interfere with the City's property or revenues that would offend § 904." *Id.* at 199.

(citing *In re Bard*, 49 Fed. Appx. 528, 530 (6th Cir. 2002)) (quoting *In re A & C Props.*, 784 F.2d 1377, 1380-81 (9th Cir. 1986)).  Although the court must be apprised of the relevant facts and the law underlying the settlement, it need not conduct a mini trial to determine whether the settlement is fair and reasonable.  In determining whether to approve a settlement where there is litigation or the likelihood of litigation, the courts in this jurisdiction consider: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *See Bard*, 49 Fed. Appx. at 530.  In approving the settlement, the Court may also consider whether the settlement is the product of arms length negotiations.  *See Buchwald Capital Advisors, LLC v. Papas (In re Greektown Holdings., LLC)*, 475 B.R. 563, 584 (E.D.Mich. 2012) (testimony established that the settlement was the product of arms' length negotiation).  The court may also consider the benefit to the estate.  *Boyd v. Engman*, 404 B.R. 467, 479 (W.D. Mich. 2009).

Although the exact application of the customary settlement factors is difficult in this matter, the Committee maintains that it would be likely to prevail on establishing an OPEB claim over the settlement amount. Recent Sixth Circuit decisions support the validity of the claim as well as the constitutional protection for health care benefits under a virtually identical situation involving changes to retiree health care benefits by an emergency manager.  The Committee is prepared to support the settlement through the testimony of fact witnesses, and expert witnesses Howard Atkinson and Stuart Wohl of The Segal Company, who have, respectively, valued the claim and assessed the City's health care programs and alternatives on behalf of the Committee. As shown above, the amount of the Allowed OPEB Claim is well within the range of

reasonableness.  There is a reasonable basis for the calculation of the claim. *See Harvard Drug Grp., LLC v. Linehan*, No. 08-13617, 2010 U.S. Dist. LEXIS 103072, at *22-23 (E.D.Mich. Sept. 3, 2010) (court need not compute claim with mathematical precision, provided that there is a reasonable basis for the calculation).

The fact that the compromise is the product of lengthy arms length negotiations under the mediation umbrella is amply demonstrated by the number and length of the mediation sessions (in addition to frequent and extended inter party discussions).  Finally, the compromise unequivocally benefits the estate by allowing the City to reduce its obligations by billions of dollars without prolonged litigation. Based on the above, the Committee requests that the Court approve the OPEB compromise.

## IV.  THE COPS PARTIES OBJECTIONS TO RETIREE TREATMENT SHOULD BE OVERRULED

The COPs in Class 9 rejected the Plan.[22]  In anticipation of the rejection, the COPs Parties objected to the Plan on the grounds, among others, the Plan can not be confirmed under section 1129(b) because it discriminates unfairly in favor of the retirees with respect its treatment of retiree pension claims.  11 U.S.C. §1129(b)(1).

The term "unfair discrimination" is not defined under the Bankruptcy Code but the prevailing view is that a plan will not unfairly discriminate if there is "'a rational or legitimate basis for discrimination and [if] the discrimination [is] … necessary for the reorganization." *In re Dow Corning Corp.*, 255 B.R. 445, 537-38 (E.D. Mich. 2000) (citing *In re Crosscreek Apartments, Ltd.,* 213 B.R. 521, 537 (Bankr. E.D. Tenn. 1997)).  In order to determine whether a plan meets the confirmation cram down requirement, courts have developed various standards to

---

[22]    The Macomb Interceptor, which holds a disputed claim in Class 14 that has been allowed for voting purposes, has also challenged the treatment of retiree claims on unfair discrimination grounds.

82584123\V-5
- 28 -

13-53846-tjt  Doc 8003-2   Filed 02/17/14   Entered 02/17/14 18:22:35   Page 37 of 60
13-53846-swr  Doc 8003   Filed 08/04/14   Entered 08/04/14 22:22:25   Page 37 of 60

test the extent or basis for disparate treatment of classes. The focus of these tests is primarily on the classification and treatment of claims and interests *vis-à-vis* other claims or interests.

Courts in this circuit and others have adopted a four-part test to determine when discrimination is not unfair. Under this test, the Court should examine: (1) whether the discrimination has a reasonable basis; (2) whether the debtor can carry out the plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against. *See In re Aztec Co.*, 107 Bankr. 585, 590 (Bankr. M.D. Tenn. 1989); *In re Mace*, No. 08-06124, 2011 Bankr. LEXIS 280, at *10 (Bankr. M.D. Tenn. 2011); *In re Graphic Commc'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996); *In re Creekstone Apartments Assocs., L.P.*, 168 B.R. 639, 644 (Bankr. E.D. Tenn. 1994) (size of the claims justified difference in timing of payments); *In re Bagby*, 218 B.R. 878, 879 (Bankr. W.D. Tenn. 1998) (same test in chapter 13); *but see In re Dow Corning*, 244 B.R. 696, 703 (Bankr. E.D. Mich. 1999) (rejecting the *Aztec* test and adopting the *Markell* test). As shown below, the Plan easily meets the *Aztec* test justifying different treatment of the retiree pension classes.

The COPs Parties rely on another, decidedly more mechanical test that was developed in a law review article and applied, along with the *Aztec* test, by the bankruptcy court in the *Dow Corning* case: Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227 (1998). Markell's approach is that a **rebuttable** presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

82584123\V-5

- 29 -

13-53846-swr  Doc 8050-2   Filed 08/04/14   Entered 08/04/14 18:22:55   Page 38 of 60
13-53846-tjt   Doc 8066-2   Filed 10/22/14   Entered 10/22/14 12:18:25   Page 38 of 60

*See* Syncora Objection, Dkt. No. 4679 at 22; Financial Guaranty Insurance Company, Objection ("FGIC") Dkt. No, 4660 at 14 *et seq.* The presumption is rebuttable. As shown below, the treatment of the pension claims in the Plan can also comfortably withstand the challenge under the *Markell* test.

> A. The Class 9 COPs Claims and Classes 10 and 11 Pension Claims are not Comparable

The initial focus under the *Markell* test, assuming there is a dissenting class, is on the comparison of classes of claims of creditors "who hold similar legal claims against the debtor…." *In re BWP Transport, Inc.*, 462 B.R. 225, 231 (Bankr. E.D. Mich. 2011).[23] The COPs Parties assume incorrectly that Classes 9 and 10 and Class 11 are similarly situated unsecured claims against the City.

The Class 9 COPs claims are not similarly situated to the pension claims in Classes 10 and 11. Structurally, the claims of the COPs holders are not indebtedness of the City or direct claims against the City. The Offering Circular for the 2006 COPs attached to the Objection to Motion to assume Lease or Executory Contract /Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such filed by Ambac Assurance Corporation. Dkt. No. 348 dated August 16, 2013 made it clear to the purchasers that

---

[23] The *BWP Transport* case turns on the difference in claims under the priority scheme of the Bankruptcy Code. The difference here is structural. The COPs are creditors of a creditor of the City. Any claim of the COPS or the insurers for rescission or damages arising from the purchase or sale of the COPs asserted in Class 9 or 14 would be subordinated to the pension claims by operation of section 510(b) of the Bankruptcy Code. Section 510(b) provides in relevant part:

> For purposes of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security…shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security… .

11 U.S.C. § 510(b).

82584123\V-5
- 30 -
13-53846-tjt  Doc 8062  Filed 08/07/14  Entered 08/07/14 13:23:55  Page 39 of 60
13-53846-swr  Doc 6056  Filed 08/04/14  Entered 08/04/14 12:12:25  Page 39 of 60

the sole source of payment on the COPs was the payments from the service contracts from the Service Corporations:

> The 2006 Certificates evidence individual undivided proportionate interests in the rights to receive certain payments (2006 COP Service Payments) to be made by the City of Detroit, Michigan (City) under two Service Contracts of the City, namely, its (i) Detroit General Retirement System Service Contract 2006 (2006 GRS Service Contract) with the Detroit General Retirement System Service Corporation, and (ii) Detroit Police and Fire Retirement System Service Contract 2006 with the Detroit Police and Fire Retirement System Service Corporation (2006 PFRS Service Contract, and together with the 2006 GRS Service Contract, 2006 Service Contracts). Offering Circular at 1

> ***

> The 2006 Certificates are payable solely from all 2006 COP Service Payments which may be received by the Trustee pursuant to the 2006 Service Contracts. Offering Circular at 9.

Moreover, as the Court is aware, the COPs are thoroughly disputed claims. On January 31 2014, the City filed an adversary proceeding (No. 14-04112(SWR)) against the General Retirement System Service Corporation, the Police and Fire Fighters Retirement System Service Corporation and the Detroit Retirement Systems Funding Trusts detailing the history of the issuance of the COPs and seeking a determination that: "The 2005 and 2006 Service Contracts are thus illegal under Michigan law, and the Service Contracts and all other contractual or other obligations incurred by the City in connection with the COPs transactions are unenforceable and void *ab initio*." Adv. Pro. at ¶41. In addition, the City seeks to disallow the COPs claims in their entirety: "City's obligations to make the City Payments under the Service Contracts on account of the COPs should be disallowed pursuant to 11 U.S.C. § 502(b)(1) because the agreements creating those obligations are unenforceable, void, and of no effect. Adv. Pro. at ¶49. The COPs, then, are indirect, disputed claims against the City.

In contrast, the retirees' claim for pension benefits arises from multiple sources including:

(a)     the City's Charter and its predecessor provisions of the Detroit Municipal Code, as amended;

(b)     various collective bargaining agreements between recognized collective bargaining agents for uniformed employees and the City as amended from time to time; and

(c)     under the City's breach of its obligations to provide undiminished pension benefits upon retirement and to fund the pension plans as required by the Constitution of the State of Michigan, other laws of the State of Michigan, and other agreements between the City and its employees and Retirees.

In addition to the specific retirement benefits promised to retirees under the City Code and the agreements with the City, the retirees have direct right of action against the City for the enforcement of benefits under the plan. *See e.g.* Detroit Code Sec. 47-4-3. Enforcement; Civil action ("A civil action for relief against any act or practice which violates the state law, the 1997 Detroit City Charter, 1984 Detroit City Code or the terms of this Plan, may be brought by: (1) A Plan Participant who is or may become eligible to receive benefit; (2) A Beneficiary who is or may become eligible to receive a benefit….").There is no dispute with respect to the legitimacy of the retiree claims, including COLA.[24]

The significant differences between these groups of claims on its own justifies different treatment.

B.     The Pension Claims are Protected by the Pension Clause

Relying solely on this Court's decision on eligibility reported at 504 B.R. 191, 153-54, the COPs Parties also assume incorrectly that the COPs and the pension claims have the same legal protections solely under the Contract Clauses of the United States and Michigan

---

[24]     COLA appeared through annual escalator clauses beginning in 1992. Examples of annual escalator provisions for COLA appear in DFFA collective bargaining agreements and reference 1992 from 2001 - 2008 and were not changed duiring the period 2009 - 2013,  *See* Section 22(B)((14)(j) "Pension Multiplier", DFFA Collective Bargaining Agreement. Examples for the DPOA appear in the 1998- 2012 collective bargaining agreements also referencing 1992 . *See* Section 33 (k), DPOA Collective Bargaining Agreement.

82584123\V-5
- 32 -
13-53846-tjt   Doc 8888-2   Filed 08/04/14   Entered 08/04/14 18:28:25   Page 41 of 60
13-53846-swr   Doc 6056   Filed 07/16/14   Entered 07/16/14 12:22:25   Page 41 of 60

Constitutions. See Syncora Objection, at 38. The Committee and others appealed this Court's ruling directly to the Sixth Circuit and the appeal is currently pending. In the interim, it is clear that the retirees' pension rights are protected by the Pension Clause, Michigan Constitution Article XI, section 24, and those protections extend beyond the Contracts Clause.

The first provision of the Pension Clause renders accrued pension liabilities sacrosanct, immune from any action by the State or any subdivision to impair or diminish them. The Pension Clause (unlike the Contract Clause), has a second paragraph, which affirmatively obligates the State and City to ensure that vested pension benefits are fully funded.[25] *See generally Studier v. Mich. Pub. Sch. Emps.' Ret. Bd.*, 698 N.W.2d 350, 358 (Mich. 2005); *Shelby Twp.*, 475 N.W.2d at 255-56. These two obligations, to protect the pension from impairment and to fund the pensions, have been repeatedly affirmed in the State courts.

The Michigan State courts have held that any action that diminishes or impairs "accrued financial benefits" is in violation of a "solemn" obligation between public employees and the Legislature "guaranteeing that pension benefit payments cannot be constitutionally impaired." *Kosa v. Treasurer of Mich.*, 292 N.W.2d 452, 465 (Mich. 1980); *see also Studier*, 698 N.W.2d at 355*; Detroit Police Officers Ass'n v. Detroit*, 214 N.W.2d 803, 816 (Mich. 1974); *Ass'n of Prof'l & Technical Emps. v. City of Detroit*, 398 N.W.2d 436, 438 (Mich. App. 1986).

Under the Pension Clause, a vested "retirement benefit cannot be reduced." *Seitz v. Probate Judges' Ret. System*, 474 N.W.2d 125, 128 (Mich. App. 1991); *In re Constitutionality of*

---

[25] The funding obligation is expanded and codified in State law. Michigan's Public Employees Retirement System Investment Act (MCL §38.1140m) ("PERSIA") provides that a Michigan municipality's required annual contribution to its employee retirement system must be no less than an actuarially determined contribution amount, consisting of:

1) a current service cost payment;
2) a payment of at least the annual accrued amortized interest on any unfunded accrued actuarial liability ("UAAL"); and

3) a payment of the annual accrued amortized portion of the unfunded principal liability over not more than 30 years.

*2011 PA 38*, 806 N.W.2d 683, 694 (Mich. 2011) (under Pension Clause, public pensions are contractual obligations "that, once earned, could not be diminished"); *Musselman v. Governor of Michigan*, 533 N.W.2d 237, 243 (1995) ("pension obligations differ from nearly every other type of governmental spending insofar as they simply cannot be reduced or cut . . . . Michigan governmental units do not have the option … of not paying retirement benefits"); *In re Enrolled Senate Bill 1269 (Advisory Opinion re Constitutionality of 1972 PA 258)*, 209 N.W.2d 200, 202-03 (Mich. 1973) ("Under [the Pension Clause] the legislature cannot diminish or impair accrued financial benefits. . . "). The analysis of claims under the Pension Clause is entirely different from a Contract Clause analysis. In his brief on appeal of the Court's Eligibility Decision to the Sixth Circuit Court of Appeals, Attorney General Schuette reasoned that the protection of pensions under the Michigan Constitution was actually a matter of City governance, not merely compliance with contract obligations: "[T]he Pension Clause regulates the City's legal relationship, its fiscal responsibility and limits the City's exercise of its governmental powers by prohibiting the impairment or diminishment of accrued financial benefits." *See* Michigan Attorney General's Appellee's Brief Addressing Michigan's Constitutional Protection of Vested Pension, at 9.

Equally important, the constitutional differences between the balancing of interests that occurs under a Contract Clause analysis, the absolute nature of protections under the Pension Clause further highlights the differences between Classes 9 and 14 on one hand and Classes 10 and 11 on the other. In sum, the COPs do not enjoy the same protections as the pension claims under Michigan law.

C. The COPs Parties Understate the Pension Claims and Overstate the Plan Recovery

The challenge to the treatment of the retiree pension claims is based on (a) the value of the claims, as allowed in the Plan and as adjusted by actuarial assumptions and (b) the source and value of the consideration contributed under the Plan on account of the claims. The COPs parties understate the value of the claims and overstate the retiree recovery by, among other things, including restricted third party contributions in their calculation.

1. The Retiree Claims are Greater than the Allowed Amounts in the Plan

The Plan allows the pension claims in the amount of $1,879 million and $1,250 million for GRS and PFRS, respectively. *See* Plan II.B. 3.r.i and II.B.3.s.i. The Plan Allowed Claims are the product of extensive negotiations. *See* Nicholl Report at ¶67. The claims have been calculated by the City's actuary, Milliman, using the 6.75% interest rate and the Entry Age Normal ("EAN") cost method. Under the EAN method, the actuarial present value of the projected benefits of each individual included in an actuarial valuation is allocated on a level basis over the earnings or service of the individual between entry age and assumed exit age(s). Milliman's calculations include a portion for active and inactive members with benefits for each pension plan.

The objectors fail to note that Classes 10 and 11 claims include current retirees and those active, who grow into benefits, and inactive members with vested benefits. The calculation of the claims using this method is appropriate for valuing a pension plan's unfunded accrued actuarial liability in order to determine the amount of underfunding that will have to be made up from sources other than the value of the assets. Nicholl report at ¶73.

Although the COPs Parties claim that the claims are overstated for purposes of calculating recovery, Segal's Report demonstrates that the actual claims of the retirees are

significantly greater than the Plan Allowed Claims. Nicholl Report at 71. The difference in value arises from the purpose for which the claim is measured. The purpose of the valuation will affect both the discount rate and the methodology.[26]

In this case, the actual retiree claims, from the claimants' perspective, are based on the promised pension benefits under the retirees' contracts and agreements with the City. The discount rate should reflect the fact that the benefits prior to bankruptcy were free from payment risk, protected by the Pension Clause as well as state and City law. Thus, discount rate is not the plan's expected or targeted investment rate of return as is used in calculating UAAL. Instead, it is Segal's opinion that the claim "should be measured using a yield curve based upon Treasury strips that could be purchased on the open market with durations matched to the forecast future benefit payment stream." Nicholl Report ¶78. That rate ranges from 0.10% for one year Treasury strips to 3.29% for thirty year Treasury strips.[27]

The method of determining the claim amount is the Present Value of Future Accrued Benefits ("PVFAB") pursuant to which Segal calculated the present value as of June 30, 2013, the valuation/petition date, of expected benefits based on service as of June 30, 2014, which is the pension plan freeze date. PVFAB values only benefits allocable to past service and does not include any amounts allocable to future service. Using the Treasury strip discount rates and PVFAB, Segal determined that the value of the claims of the GRS members is $3,541 million compared to the Allowed Amount in the Plan of $1,879 million. Nicholl Report at 81. To arrive

---

[26]    Actuarial Standard of Practice Number 27 ("ASOP 27") recommends that the actuary consider the purpose of the measurement or valuation and the perspective of different parties as the factors in determining the appropriate discount rate. Nicholl Report at ¶¶75-6.

[27]    The New York City Retirement System's Comprehensive Annual Financial Report (CAFR) for 2013 at https://www.nycers.org discloses "Market Value Accumulated Benefit for 2012, at the discount rate of 2.4%. at 177. For reporting purposes, the obligations for benefits are "[c]alculated based on actuarial assumptions used for determining Employer Contributions except that projected benefit payments are discounted using annual yields derived from US Treasury Spot Rates." Note 4 at 178. NYCRC's funding assumption is, however, is 7% - 25 basis points above the 6.75% rate used for the Plan.

82584123\V-5
- 36 -

13-53846-tjt  Doc 8300  Filed 11/07/14  Entered 11/07/14 12:12:55  Page 45 of 60
13-53846-swr  Doc 8300-2  Filed 08/04/14  Entered 08/04/14 22:28:25  Page 45 of 60

at that amount, Segal calculated the present value of accrued future accrued benefits, which was is $5,138 million and deducted the market value of existing plan assets ($1,597 million). Using the same method, Segal determined that the value of the PFRS claim is $3,871 million compared to $1,250 million. Nicholl Report at 81. For PFRS, Segal calculated the present value of future accrued benefits at $6,906 million and deducted from that number the market value of existing assets, which is $3,035 million.[28]

The 6.75% rate used for valuing plan liabilities, investment rate and the discount rate for contributions is a compromise percentage. The actuaries for the City historically used higher investment rates (7.9% and 8%) as do most public pension plans. However, the City was intent on lowering its risk of high contributions in the future. To meet that goal, the City insisted on a lower discount rate (6.25% and 6.5% for GRS and PFRS, respectively) for all purposes and correspondingly, more significant cuts in retiree benefits. The Plan rate is not based on historical practice of the Retirement System or the public pension plan practice generally. It was accepted by the parties for purposes of the Plan.

Based on the value of the retiree claims from the retiree perspective and the present value of the City's contributions, the recovery rate is 31% and for PFRS is 17%. See Nicholl Report at ¶98. The percentage recovery for retirees under the Plan should also factor in their recovery on their OPEB claims, which would bring the percentage recovery down substantially lower. Based on the value of claims, the difference in recoveries under the Plan among the classes is not disproportionate.

---

[28] The Committee filed proofs of claim on behalf of the PFRS retirees and the GRS retirees using the interest rate based upon reaching an amount that would be required, in addition to assets on hand in trust, so that the anticipated future benefit obligations could be fulfilled with no investment risk. Bases on the data that was available, the Committee calculated the claims for PFRS pension would be closer to $3,840,000,0000 and for GRS pension claim $3,540,000,000. *See State Bank of Florence v. Miller (In re Miller)*, 513 Fed. Appx. 566, 570 (6th Cir. 2013) ("Rule 3001(f) provides that a 'proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.'").

The COPs Parties rely on the recovery percentage for pension claims set forth in the

Disclosure Statement as a basis for alleging that the pension funds receive a disproportionately

large distribution.    The calculation underlying the City's projected recovery assumes

contributions calculated in accordance with the 6.75% interest rate for three decades or more.

The Plan, however, mandates the use of a 6.75% discount rate only through the period ending

June 30, 2023.  In the settlement valuation, the assets for the Retirement Systems accordingly are

projected to earn, on average, 6.75% per year over the long term, and this same 6.75% is used as

the discount rate for calculation of the allowed settlement claim and future contributions. The

investment/discount/contribution rate may not always remain at 6.75%.[29]

Beginning on and after July 1, 2023, the City will be responsible for contributing

amounts necessary to fund the GRS pension plan to meet the reduced pension obligations.  The

City's Disclosure Statement projects contributions of $630 million for the period July 1, 2023 to

June 30, 2033 based on the 6.75% investment rate and the addition of $188 million of outside

funding.  However, the Plan allows the trustees to change the investment rate of return/discount

rate for any period after June 30, 2023.  If the asset investment policy and capital markets were

to justify the use of a 7.9% investment rate of return/discount rate, then the nominal amount of

contributions for the ten-year period ending June 30, 2033 could drop to $329 million, including

the outside funding.  However, benefits cuts would remain unchanged unless higher funding

levels were also achieved.  According to the Committee's actuary, if one were to exxclude the

outside funding, the City's contribution for the ten-year period would be approximately $141

million or only $14.1 million per year under the higher investment scenario.  Nicholl Report at

---

[29]    The objectors also assume without any basis that the portfolio of the pension plans will remain the same.

¶27. Similarly, the Disclosure Statement projects City contributions of $474 million for the ten-year period beginning July 1, 2033 and $317.7 million for the period from July 1, 2043 to June 30 2053 for a total of $791.7 for the twenty-year period at the investment rate of 6.75%. If the asset investment policy and the capital markets were to justify the use of a 7.9% investment rate at that point, Segal projects that the nominal amount of the contributions for this period would be $658 million or approximately $33 million per year. Nicholl Report at ¶29. Again benefit cuts would remain in place unless the higher funding level triggers were also reached. The same analysis is applicable to PFRS, with slightly higher funding levels when the investment rate is adjusted. Nicholl Report at ¶¶ 34-36.

Syncora argues that the increase in the investment rate increases the percentage of recovery on the pension claims because Syncora incorrectly assumes the allocations of property set forth in the Plan and Disclosure Statement would remain the same if the discount rate were increased. *See* Syncora Objection, n. 33 and 34. But benefit reductions for the retirees remain the same unless funding levels also increase. With the appropriate adjustment to the contributions, the recovery goes down. Under the scenario where the investment rate is properly raised, the retiree's recovery is lower than the City estimates because it is measured by the return on pension plan assets and third party contributions that are not available to other alleged creditors, rather than on contributions from the City under the Plan.

D.     The Presumption of Discrimination Is Rebuttable

The COPs Parties overlook a crucial consideration in the comparison of the class recoveries. The pension claims are funded from sources that are not available for the satisfaction of any other party for a number of legitimate reasons. The State Contribution Agreement, attached to the Plan as Exhibit 1.A.294, for example, makes it clear that the State Contribution to the Plan is not an estate asset otherwise available for creditor recoveries. Rather, it is source of

funding restricted to the pension claims and expressly given not for satisfaction of a claim, but instead in exchange for consideration in the form of a release:

> In support of confirmation of the City's Fourth Amended Plan of Adjustment dated May 5, 2014 (as may be further amended from time to time, the "Plan"), the State has agreed, subject to satisfaction of the terms and conditions set forth herein and in the Plan, to make a contribution to the GRS and PFRS in return for releases from, among others, the GRS and PFRS as set forth in the Support and Release Agreement entered into by the State and each of the Systems in connection with this matter.

State Contribution Agreement at F.[30]  The *quid pro quo* for receipt by the plans of the State Contribution of $350 million (with a present value of $194.5 million using a 6.75% discount rate) is a release of all claims by the retirees against the State and State Related Entities relating to the violation of the Pension Clause of Michigan Constitution and the filing of the chapter 9 petition to reduce pension benefits, pension oversight, and other restrictions on pension plan governance.

In this case, nearly a third of the initial pension plan funding comes from the State Contribution.  An additional approximately $428 million contribution to the GRS pension fund constitutes a payment from the DWSD for historical underfunding of the GRS pension plan, reduced by the benefit cuts imposed upon DWSD retiree and actives..  As shown below, payment of pension claims is included in the operational charges of the DWSD pursuant to the organization documents and applicable ordinances and historically has been contributed directly to the pension fund.  In fact, only $110 million over the nine years following the Effective Date of the Plan targeted as contributions to the GRS consists of unrestricted funds from the City's

---

[30]    The Conditions Precedent in paragraph 4 of the State Contribution Agreement lists a number of conditions for contribution of  $350 million to the pension plans, including support of the Plan by all the retiree representatives, pension plan governance, releases and dismissal of claims, among other commitments.

82584123\V-5

- 40 -

13-53846-tjt  Doc 8563-2   Filed 08/04/14   Entered 08/04/14 18:28:25   Page 49 of 60
13-53846-swr  Doc 6056   Filed 07/18/14   Entered 07/18/14 18:28:25   Page 49 of 60

general fund. The City does not contemplate any distribution from the general fund to the PFRS plan.

Discrimination or, more appropriately, different treatment between creditor classes has been justified when the source of funding for one class was restricted to that class. *See In re 28th Legislative Dist. Cmty. Dev. Corp.*, No. 10-14804, 2011 Bankr. LEXIS 4411, at *32-33 (Bankr. E.D. Tenn. Nov. 9 2011) (discrimination allowed because the funds available to settle one claim were restricted and could not be used for other similarly situated creditor classes); *In re Jersey City Med. Ctr.*, 817 F2d 1055 (3rd Cir. 1987) (plan confirmed over objection that it violated 11 U.S.C. §1129(a)(3) and 1129(b)) when recovery for only for some classes was available from third parties.);[31] *In re Corcoran Hosp. Dist.*, 233 B.R. 449 (Bankr. E.D. Cal 1999) (plan with four classes of unsecured creditors paid different amounts based upon agreement to support the plan pursuant to a settlement with the debtor in which it had compromised its claim.); *see also In re Quigley Co., Inc.*, 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007) ("The …payments do not…affect the equality of treatment because all similarly situated ….Claimants will receive the same distribution under the Plan. The …settlement is being funded by a non-debtor and is being paid outside of the Plan.").

Under circumstances where the funding for certain claims is restricted or dedicated, courts have determined that the plan does not discriminate unfairly and the different treatment of creditor classes was justified. The rationale is applicable here.

---

[31] In that case, the debtor's plan divided unsecured creditors into four separate classes, which received their recovery from different sources, including third party sources. Class 2 creditors were doctors with claims arising out of agreements with the debtor for indemnity against medical malpractice awards. Class 3 creditors were holders of pre-petition medical malpractice claims against the debtor who were to receive 30% of their allowed claims. Classes 2 and 3 were to be paid directly from the New Jersey Insurance Fund pursuant to a contract with the debtor. They received a different recovery from creditors who did not have access to the fund.

## V. THE PLAN'S PROVISIONS RELATING TO DWSD, DWSD'S FUNDING OF PENSION LIABILITY AND RESTRUCTURING OF DWSD BONDS COMPLY WITH THE BANKRUPTCY CODE AND MICHIGAN LAW

Notwithstanding the sacrifices that the retirees suffer under the Plan, the DWSD bondholders, who are being paid in full, their insurers, who are protected by the bondholder recovery and the Macomb, Oakland and Wayne counties[32] have objected to the treatment of pension claims in Classes 10 and 11. Their objections focus primarily on the DWSD "catch up" payment to the GRS pension plan and the potential additional recovery in the event of transaction involving DWSD. See generally the objections of Macomb County and Macomb Interceptor Drainage District, Dkt. No. 4637; Wayne County, Dkt. No. 4663; Oakland County, Dkt. No. 4627; the DWSD Bond Trustee, Dkt. No. 4647; Berkshire Hathaway, Dkt. No. 4657; National Public Finance Guarantee Corp. ("NPFG"), Dkt. No. 4665; Assured Guaranty Municipal Corp. ("Assured"), Dkt. 4674.

### A. The DWSD Pension Funding and DWSD CVR Comply with Bankruptcy Code Sections 928 and 943(b)(4)

Several objections to the Plan erroneously assert that the DWSD payments to the GRS under the Plan and the DWSD CVR violate state law and applicable bond Ordinances (as defined below) and are thus prohibited by Bankruptcy Code sections 928 and/or 943(b)(4).[33] However, as shown herein and as further set forth in the City of Detroit's Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts [Dkt. 5034] (the "City Reply"), both (a) the DWSD's payment of its allocable share of UAAL of the GRS (after pension reductions under the Plan) and (b) allocation of proceeds pursuant to the DWSD

---

[32]    While Wayne and Oakland counties are parties in interest with standing to object to the Plan with respect to contract assumption purposes, their standing to object to the Plan should be limited to those objections derived from their legal issues.

[33]    *E.g.*, "NPFG" Objection, at ¶¶ 86, 87; Assured Objection, at ¶¶ 121, 122; DWSD Bond Trustee Objection, ¶¶ 35, 36; Macomb County Objection, Dkt No. 4636 at ¶¶ 20, 21; Oakland County Objection Dkt. No. 4627 ¶¶ 60, 62.

82584123\V-5

- 42 -

13-53846-tjt  Doc 8062  Filed 08/07/14  Entered 08/07/14 18:18:55  Page 51 of 60
13-53846-swr  Doc 6056  Filed 08/04/14  Entered 08/04/14 23:23:25  Page 51 of 60

CVR, comply with applicable bankruptcy and state law. DWSD and its rate payers are major beneficiaries of the Plan's elimination of OPEB benefits and pension benefit reductions.[34] That significant reduction in liability and annual expense is only due to settlements embodied in the plan.

> 1. DWSD Pension Funding Complies with Michigan State
> and Local Law, and Bankruptcy code Section 928

Under the Plan, DWSD will pay its allocable share of the reduced UAAL of the GRS over an approximate nine year period ending June 30, 2023. These payments comply with section 7-1203 of the City Charter in that such payments are only on account of that portion of accrued pension liabilities that are directly attributable to services rendered by DWSD employees and retirees. Detroit City Charter § 7-1203. Similarly, the payments are consonant with Michigan common law in that they do not exceed the amounts necessary to fund the cost of such services rendered for the benefit of the DWSD systems. *Cf. Freeland v. City of Sturgis*, 226 N.W. 897, 898 (Mich. 1929) (holding actions illegal where city was funding expenses unrelated to municipally owned public utility). The contributions to the GRS fund generally are consistent with the historical practice of the GRS in funding actuarially determined an allocable share of the UAAL as an operating expense.[35] However, under the Plan, DWSD will no longer be excused from paying less than the UAAL attributable to the past services of its employees.

DWSD payments of UAAL under the Plan similarly comply with the bond Ordinances and Indentures applicable to outstanding DWSD water and sewer bonds,[36] which permit

---

[34] The DWSD Paries do not complain about being excuses from paying OPEB benefits to DWSD retirees.

[35] That the Plan, on a consensual basis, allows all eligible employees and retirees in Class 11 to receive benefits from DWSD's payment of its liability is authorized under well-settled bankruptcy law. *In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1995 WL 362873, at *2 n. 4 (Bankr. N.D. Ohio May 24, 1995) ("[C]reditors are free to do what they want with dividends received including sharing them with other creditors.").

[36] As set forth in the City's Reply, the DWSD water system has issued multiple series of bonds pursuant to (A) Michigan Public Act 94 of 1933, the Revenue Bond Act, M.C.L. §§ 141.101 *et seq.* (as amended) ("Act 94") and

82584123|V-5

- 43 -

13-53846-tjt   Doc 8866-2   Filed 08/04/14   Entered 08/04/14 18:22:25   Page 52 of 60
13-53846-swr   Doc 6056   Filed 07/17/14   Entered 07/17/14 18:18:55   Page 52 of 60

"expenses of administration and operation of the System" - such as accrued pension liabilities - to be paid out of the DWSD's Operation and Maintenance Fund. Water Ordinance, § 13(B); Sewer Ordinance, § 13(B); Water Indenture § 2.04(c); Sewer Indenture § 2.04(c).Under the Ordinances, DWSD bondholders have liens on "Pledged Assets", which expressly exclude the "Operation and Maintenance Fund and the Construction Fund and any account thereof." Water Ordinance, § 1; Sewer Ordinance, § 1.[37]

Consistent with the express terms of the Ordinances and Indentures, the DWSD has historically and allocated funds to and paid pension liabilities out of the Operation and Maintenance Fund on a monthly basis. City Reply, at ¶ 148 n. 87. This long term historical practice is the best evidence of the City and DWSD bondholders' collective understanding - that the Ordinances and Indentures require pension liabilities be allocated and paid monthly ahead of debt service on DWSD bonds. This basic fact completely controverts objections that payment of the pension expense is not a current or monthly expense.[38]

As explained in *Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty., Ala.)*, "[t]he practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as anything else. There is no surer way to find out what parties meant, than to see what they have done." 482 B.R. 404, 419 (Bankr. N.D. Ala. 2012) (internal quotations and citation omitted). In *In re Jefferson Cnty.*, historical

---

(B) City Council Ordinance No. 30-02, adopted November 27, 2002 (the "Water Ordinance"). The securities issued pursuant to the Water Ordinance are governed by a Trust Indenture, dated as of February 1, 2013, among the City, the DWSD and U.S. Bank National Association ("U.S. Bank") as trustee (the "Water Indenture").

[37] The DWSD sewage system has also issued a number of securities pursuant to (A) Act 94 and City Council Ordinance No. 18-01, adopted October 18, 2001 (the "Sewer Ordinance" and, together with the Water Ordinance, the "Ordinances"), which securities are governed by a Trust Indenture, dated as of June 1, 2012, among the City, the DWSD and U.S. Bank, as trustee (the "Sewer Indenture" and, together with the Water Indenture, the "Indentures").

[38] *E.g.* NPFG Objection, at ¶¶ 86, 87; Assured Objection, at ¶¶ 121, 122; DWSD Bond Trustee Objection, ¶¶ 35, 36.

practice was conclusive as to whether certain expenses were properly part of an operation and maintenance fund not subject to a bondholders' lien. *Id*. at 423.

Contrary to several Plan objections,[39] payment of DWSD's allocable share of UAAL of the GRS does not implicate Section 928 of the Bankruptcy Code, which merely preserves, but does not expand, liens on special revenues "resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a). As the lien held by DWSD bondholders never covered DWSD revenues allocated to and paid out of the Operation and Maintenance Fund for accrued pension liabilities, such revenues are not protected by Bankruptcy Code § 928.

        2.        The DWSD CVR is consistent with Michigan State and Local Law

While it is premature to speculate as to the final form of a Qualifying DWSD Transaction (as defined in the Plan), nothing in the Plan indicates that such a transaction, however structured, would violate Michigan state or local law. Contrary to the Macomb County Objection (¶ 22), such a transaction would not implicate moneys paid into the city treasury from fees collected for water, drainage or sewerage services—it would merely share value that might properly be paid to the City's General Fund. City Reply, at ¶ 243.

        B.        The Plan Complies with Bankruptcy Codes §§ 943(b)(6) and 1129(a)(6) which Require that the City Obtain the Necessary Regulatory or Electoral Approval

Several objectors erroneously assert that confirmation of the Plan would violate § 943(b)(6) of the Bankruptcy Code, which requires that:

---

[39]   *E.g.* NPFG Objection, at ¶ 28; Assured Objection, at ¶ 58; DWSD Bond Trustee Objection, at ¶ 36.

"[A]ny regulatory or electoral approval necessary under applicable non-bankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval . . .."[40]

The short answer is that § III.A.5 of the Plan (at p. 39) expressly requires, as a condition precedent to the Effective Date, that: "All authorizations, consents and regulatory approvals have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement." Plan, at § III.A.5.

One Objector, the DWSD Bond Trustee, states that this condition is "illusory" because the Plan has general language, applicable to numerous different Effective Date conditions, which would permit the City to waive conditions, in whole or in part. Plan, at § III.B. But, as set forth by the City Reply, the objectors have not set forth any matter requiring such waiver. As the DWSD Bond Trustee concedes, "refunding bonds" and "bonds issued to comply with an order of a court" are expressly exempted from the notice and referendum provisions of Section 33 of the Revenue Bond Act, M.C.L. § 141.133. See DWSD Bond Trustee Objection, at ¶ 62 n. 31. Thus the DWSD Bond Trustee's concern about these provisions is unfounded. Moreover, the DWSD Bond Trustee has not given any reason for its concern that the Michigan Department of the Treasury might deny approval for issuance of bonds under M.C.L. § 141.2303, if such further approval is needed—a point not established by the DWSD Bond Trustee. *Id.* ¶ 63.

---

[40] Bankruptcy code section 1129(a)(6) applies specifically to rate charges:

> Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

11 U.S.C. § 1129(a)(6).

Contrary to the DWSD Bond Trustee and Macomb County Objections, nothing in the Plan takes away the rate-making authority of Board of Water Commissioners, and the City has undertaken to "add a sentence to the Plan to make that explicit." City Reply, at ¶ 260.

The objection by Macomb and Oakland Counties that a "Qualifying DWSD Transaction" as defined in § I.A. (¶ 224) and referenced in § IV.G ("Contingent Payment Rights") of the Plan would require electoral approval is total speculation—since the City has not yet proposed any such transaction. In any event the contribution to the GRS pension fund from the CVR to a certain extent compensates for the significant benefit DWSD receives as a result of the pension reductions and the calculation of its payments at a 6.75% discount rate.

Contrary to the objections of the DWSD Parties, the DWSD's funding of its pension liability does not violate *Bolt v. City of Lansing*, 587 N.W.2d 264 (Mich. 1998) or *Jackson Cnty. v. City of Jackson*, 836 N.W. 2d 903 (Mich. App. 2013) as asserted by Macomb and Oakland counties. Under those cases, a fee charged for water or sewer service could be viewed as a tax, subject to electoral approval, if the charge were not proportionate to the costs of the service. Under the Plan, during the nine year period through June 30, 2023, DWSD will make payments (approximately $428.5 million) to the GRS on account of its allocable share of UAAL remaining after the pension modifications contemplated by the Plan. *See* supra, at ¶ 2. In other words, the Counties water and sewer rate payers get the benefit of the City's debt relief from accrued operating expenses despite the Pension Clause.

Contrary to the Macomb County Objection ¶¶ 25-26, DWSD's payment of this accrued pension liability is not "a disguised tax on suburban ratepayers." It is a payment of an accrued pension liability—a direct cost of administration of the water and sewer systems, for which ratepayers must pay. Further, the Objections by Macomb County (¶¶ 25-26) and Oakland

County (¶ 71) that a "Qualifying DWSD Transaction" would violate the Bolt principle ignores the cost of services provided by the City to DWSD. In any event, the assertion is total speculation, since no such transaction has yet been proposed and the restoration payment to the GRS, if any, would be made from the City's general fund.

In addition to reinforcing the DWSD's water and sewer customer rate base through reinvestment, the Plan substantially decreases the DWSD's aggregate funding of pension costs, which, as stated above, are paid ahead of debt service. The Plan reduces approximately 90% of the City's OPEB liabilities asking nothing from DWSD to cover its share of the $450 million Note B obligation to Class 12. The Plan also eliminates 100% of DWSD's exposure to the COPs. City Reply, at ¶ 178. In total, the City estimates $500 million in cost savings for DWSD under the Plan that is expected to ease upward pressure on DWSD rates and allow for increased capital improvements to DWSD systems. City Reply, at ¶ 178. Affordable rates and improved capital structure only serve to improve the stability of debt service payments to DWSD bondholders.

C. The Plan is Fair and Equitable with Respect to DWSD Bondholders.

Section 1129(b)(2) of the Bankruptcy Code sets forth that, with respect to a class of secured claims, a plan satisfies the statutory fair and equitable requirement, if, inter alia, such plan allows: (i) secured creditors to "retain the liens securing [their secured] claims … to the extent of the allowed amount of such claims;" and (ii) "each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(A)(i).

Objecting parties argue that the Plan is not fair and equitable in that the Plan strips DWSD bondholders of their lien by paying pension liabilities ahead of debt service. However, as set forth above, payment of UAAL has historically been and lawfully may be paid from

13-53846-tjt Doc 8056-2 Filed 08/04/14 Entered 08/04/14 22:22:25 Page 57 of 60

DWSD revenues allocated to the operation and maintenance funds, which are not part of the DWSD bondholders' collateral. *See* supra, at ¶¶ 2-6...

## VI. RESERVATION OF RIGHTS

As shown above, the Committee's support of the Plan and the vote of the retirees to accept the Plan depends on confirmation of the Plan on terms at least as acceptable to retirees as the Alternative A under the Fourth Amended Plan. The Plan, however, is still an evolving document. The Committee, therefore, reserves its rights to reevaluate its position in the event any subsequent amendment adversely impacts the treatment of retirees.

Conversely, the Committee reserves its rights to seek additional consideration for pension and OPEB claims to the extent that unsecured creditors in Classes 7, 9, or 14 receives any addition consideration.

## CONCLUSION

For the reasons set forth herein, the Committee requests that the Court overrule objections and confirm the Plan.

Dated: August 4, 2014                      Respectfully submitted,
       New York, New York

*/s/     Carole Neville*

| | |
|---|---|
| Claude Montgomery | Sam Alberts |
| Carole Neville | Dan Barnowski |
| DENTONS US LLP | DENTONS US LLP |
| 1221 Avenue of the Americas | 1301 K Street, NW, Suite 600 East Tower |
| New York, New York 10020 | Washington, DC 20005 |
| Tel:   (212) 768-6700 | Tel: (202) 408-6400 |
| Fax:   (212) 768-6800 | Fax: (202) 408-6399 |
| claude.montgomery@dentons.com | sam.alberts@dentons.com |
| carole.neville@dentons.com | dan.barnowski@dentons.com |

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins
Paula A. Hall
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Direct: (248) 971-1711
Cell: (248) 882-8496
Fax: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

*Attorneys for the Official Committee of Retirees of the City of Detroit, Michigan*

82584123\V-5

- 50 -

13-53846-tjt  Doc 6056  Filed 08/04/14  Entered 08/04/14 18:18:55  Page 59 of 60
13-53846-swr  Doc 6608-2  Filed 08/07/14  Entered 08/07/14 22:22:25  Page 59 of 60

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 4, 2014, the foregoing Official Committee of Retirees' Memorandum of Law in Support of Confirmation of Fifth Amended Plan for Adjustment of Debts Filed By The City of Detroit, Michigan was filed and served using the Court's CM/ECF system which provides electronic notification of such filings to all counsel of record.

Dated: August 4, 2014                              By:  _/s/ Carole Neville_____
                                                                      Carole Neville