# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------ x
                                              :
In re                                         :    Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                     :    Case No. 13-53846
                                              :
              Debtor.                         :    Hon. Steven W. Rhodes
                                              :
                                              :
------------------------------------------------------------ x
```

---

## CORRECTED FIFTH AMENDED PLAN
## FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
### (July 29, 2014)

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.    Defined Terms. ............................................................................................................. 1

    B.    Rules of Interpretation and Computation of Time. ..................................................... 26

        1.    Rules of Interpretation. ................................................................................. 26

        2.    Computation of Time. ................................................................................... 26

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................................................................................................. 27

    A.    Unclassified Claims. .................................................................................................. 27

        1.    Payment of Administrative Claims. .............................................................. 27

        2.    Bar Dates for Administrative Claims. .......................................................... 27

    B.    Classified Claims. ..................................................................................................... 28

        1.    Designation of Classes. ................................................................................ 28

        2.    Subordination; Reservation of Rights to Reclassify Claims. ........................ 29

        3.    Treatment of Claims. .................................................................................... 29

    C.    Confirmation Without Acceptance by All Impaired Classes. ..................................... 41

    D.    Treatment of Executory Contracts and Unexpired Leases. ......................................... 41

        1.    Assumption. .................................................................................................. 41

        2.    Assumption of Ancillary Agreements. ......................................................... 41

        3.    Approval of Assumptions and Assignments. ................................................ 41

        4.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases. .......................................................................................................... 42

        5.    Contracts and Leases Entered Into After the Petition Date............................ 42

        6.    Rejection of Executory Contracts and Unexpired Leases............................... 42

        7.    Rejection Damages Bar Date. ....................................................................... 42

        8.    Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. ........................................................................................ 42

        9.    Insurance Policies. ........................................................................................ 43

ARTICLE III CONFIRMATION OF THE PLAN............................................................................. 43

    A.    Conditions Precedent to the Effective Date. .............................................................. 43

    B.    Waiver of Conditions to the Effective Date. .............................................................. 44

    C.    Effect of Nonoccurrence of Conditions to the Effective Date. .................................. 44

    D.    Effect of Confirmation of the Plan. ........................................................................... 44

        1.    Dissolution of Retiree Committee. ............................................................... 44

        2.    Preservation of Rights of Action by the City................................................ 44

        3.    Comprehensive Settlement of Claims and Controversies.............................. 44

        4.    Discharge of Claims. .................................................................................... 45

|   |   | 5. | Injunction. | 45 |
|   |   | 6. | Exculpation. | 46 |
|   |   | 7. | Releases | 47 |
|   | E. | No Diminution of State Power | 48 |
|   | F. | Effectiveness of the Plan. | 48 |
|   | G. | Binding Effect of Plan. | 48 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | | 49 |
|   | A. | DWSD. | | 49 |
|   |   | 1. | Rates and Revenues. | 49 |
|   |   | 2. | DWSD CBAs. | 49 |
|   |   | 3. | The New DWSD Bonds and New Existing Rate DWSD Bonds. | 49 |
|   | B. | The New B Notes and New LTGO Bonds. | | 49 |
|   | C. | The UTGO Settlement. | | 49 |
|   | D. | The State Contribution Agreement. | | 50 |
|   |   | 1. | State Contribution. | 50 |
|   |   | 2. | Income Stabilization Payments. | 50 |
|   |   | 3. | Conditions to State's Participation. | 50 |
|   |   | 4. | Release of Claims Against the State and State Related Entities. | 51 |
|   | E. | The DIA Settlement. | | 51 |
|   |   | 1. | Funding Contributions. | 51 |
|   |   | 2. | Transfer of DIA Assets. | 51 |
|   |   | 3. | Conditions to the DIA Funding Parties' Participation. | 52 |
|   | F. | Contingent Payment Rights | | 52 |
|   |   | 1. | Special Restoration. | 52 |
|   |   | 2. | General Restoration. | 53 |
|   | G. | The OPEB Settlement. | | 53 |
|   | H. | The LTGO Settlement. | | 53 |
|   | I. | Prosecution of COP Litigation. | | 53 |
|   |   | 1. | Creation of Litigation Trust. | 53 |
|   |   | 2. | Direction of COP Litigation. | 53 |
|   |   | 3. | Payment of Fees and Expenses. | 54 |
|   |   | 4. | Settlement of COP Litigation. | 54 |
|   | J. | Issuance of the New Securities. | | 54 |
|   | K. | Cancellation of Existing Bonds and Bond Documents. | | 55 |
|   | L. | Release of Liens. | | 55 |
|   | M. | Professional Fees | | 55 |
|   |   | 1. | Professional Fee Reserve | 55 |

| | | | |
|---|---|---|---|
| | 2. | Fee Review Order | 56 |
| | 3. | Dismissal of the Fee Examiner | 56 |
| | 4. | Court-Appointed Expert | 56 |
| N. | | Assumption of Indemnification Obligations. | 56 |
| O. | | Incorporation of Retiree Health Care Settlement Agreement. | 56 |
| P. | | Payment of Workers' Compensation Claims. | 56 |
| Q. | | 36th District Court Settlement. | 57 |
| R. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | 57 |
| S. | | Payment of Tax Refund Claims. | 57 |
| T. | | Utility Deposits. | 57 |
| U. | | Pass-Through Obligations. | 57 |
| V. | | Exit Facility. | 58 |
| W. | | Post-Effective Date Governance. | 58 |

**ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN** ... 58

| | | | |
|---|---|---|---|
| A. | | Appointment of Disbursing Agent. | 58 |
| B. | | Distributions on Account of Allowed Claims. | 58 |
| C. | | Certain Claims to Be Expunged. | 58 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | 58 |
| E. | | Means of Cash Payments. | 59 |
| F. | | Selection of Distribution Dates for Allowed Claims | 59 |
| G. | | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 59 |
| H. | | City's Rights of Setoff Preserved. | 59 |
| I. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 60 |
| | 1. | Delivery of Distributions Generally | 60 |
| | 2. | Delivery of Distributions on Account of Bond Claims. | 60 |
| | 3. | De Minimis Distributions / No Fractional New Securities. | 60 |
| | 4. | Undeliverable or Unclaimed Distributions. | 60 |
| | 5. | Time Bar to Cash Payment Rights. | 60 |
| J. | | Other Provisions Applicable to Distributions in All Classes. | 61 |
| | 1. | No Postpetition Interest. | 61 |
| | 2. | Compliance with Tax Requirements. | 61 |
| | 3. | Allocation of Distributions. | 61 |
| | 4. | Surrender of Instruments. | 61 |

**ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ... 62

| | | | |
|---|---|---|---|
| A. | | Treatment of Disputed Claims. | 62 |
| | 1. | General | 62 |

|  | 2. | ADR Procedures. | 62 |
|  | 3. | Tort Claims. | 62 |
| B. | | Disputed Claims Reserve. | 63 |
| C. | | Objections to Claims. | 63 |
|  | 1. | Authority to Prosecute, Settle and Compromise. | 63 |
|  | 2. | Expungement or Adjustment of Claims Without Objection. | 63 |
|  | 3. | Extension of Claims Objection Bar Date. | 64 |
|  | 4. | Authority to Amend List of Creditors | 64 |

**ARTICLE VII RETENTION OF JURISDICTION** ................................................................ 64

**ARTICLE VIII MISCELLANEOUS PROVISIONS** ............................................................. 65

| A. | Plan Supplements. | 65 |
| B. | Modification of the Plan. | 65 |
| C. | Revocation of the Plan. | 65 |
| D. | Severability of Plan Provisions. | 66 |
| E. | Effectuating Documents and Transactions. | 66 |
| F. | Successors and Assigns. | 66 |
| G. | Plan Controls. | 66 |
| H. | Notice of the Effective Date. | 66 |
| I. | Governing Law. | 66 |
| J. | Request for Waiver of Automatic Stay of Confirmation Order. | 67 |
| K. | Term of Existing Injunctions and Stays. | 67 |
| L. | Service of Documents | 67 |

|  | 1. | The City | 67 |
|  | 2. | The Retiree Committee | 68 |

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit I.A.6 | Principal Terms of 36th District Court Settlement |
| Exhibit I.A.72 | Schedule of COP Swap Agreements |
| Exhibit I.A.89 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.93 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.102 | Principal Terms of DIA Settlement |
| Exhibit I.A.103 | Form of DIA Settlement Documents |
| Exhibit I.A.121 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.128 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.131 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.146 | Principal Terms of Exit Facility |
| Exhibit I.A.172 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.182 | Interest Rate Reset Chart |
| Exhibit I.A.187 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.198 | Form of LTGO Settlement Agreement |
| Exhibit I.A.206 | Principal Terms of New B Notes |
| Exhibit I.A.207 | Form of New B Notes Documents |
| Exhibit I.A.209 | Principal Terms of New DWSD Bonds |
| Exhibit I.A.211 | Principal Terms of New Existing Rate DWSD Bonds |
| Exhibit I.A.212.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.212.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.216.a | Form of New PFRS Active Pension Plan |
| Exhibit I.A.216.b | Principal Terms of New PFRS Active Pension Plan |
| Exhibit I.A.244 | Prior GRS Pension Plan |
| Exhibit I.A.245 | Prior PFRS Pension Plan |
| Exhibit I.A.255 | Restoration Trust Agreement |

| | |
|---|---|
| Exhibit I.A.261 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.270 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.294 | State Contribution Agreement |
| Exhibit I.A.310 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.317 | Form of UTGO Settlement Agreement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

## INTRODUCTION

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.    Defined Terms.

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.      "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.      "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.      "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.      "36th District Court" means the district court for the thirty-sixth judicial district of the State.

6.      "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.6.

7.      "Active Employee" means an active employee of the City on and after the Confirmation Date.

8.       "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

9.       "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

10.      "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

11.      "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

12.      "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

13.      "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

14.      "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

15.      "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

16.      "Ambac" means Ambac Assurance Corporation.

17.      "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

18.      "Annuity Savings Fund Excess Amount" means the following, as calculated by the GRS: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of

-2-

13-53846-tjt   Doc 8839  Filed 12/17/14  Entered 12/17/14 20:34:20  Page 9 of 299
13-53846-swr   Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:20  Page 9 of 78

such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

19.     "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.167, plus the ASF Recoupment.

20.     "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

21.     "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

22.     "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

23.     "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

24.     "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

25.     "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

26.     "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

27.     "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

28.     "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

29.     "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

-3-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 10 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 10 of 298

30.     "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

31.     "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

32.     "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.317.

33.     "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

34.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

35.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

36.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

37.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

38.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

39.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

40.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

41.     "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims, the Parking Bond Claims and the Secured GO Bond Claims.

42.     "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents, the Parking Bond Documents and the Secured GO Bond Documents.

43.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes, the Parking Bonds or the Secured GO Bonds.

44.     "Bondholder" means any beneficial or record holder of a Bond.

-4-

13-53846-tit   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 11 of 299
13-53846-swr   Doc 6379   Filed 07/25/14   Entered 07/25/14 17:20:30   Page 11 of 298

45.     "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

46.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

47.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

48.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

49.     "Cash" means legal tender of the United States of America and equivalents thereof.

50.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

51.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

52.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

53.     "City" means the City of Detroit, Michigan.

54.     "City Council" means the duly-elected City Council of the City.

55.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

56.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

57.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

58.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

59.     "Class" means a class of Claims, as described in Section II.B.

60.     "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation,

which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

61.    "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

62.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

63.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

64.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

65.    "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

66.    "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

67.    "COP Claim" means a Claim under or evidenced by the COP Service Contracts.  For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to:  (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

68.    "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

69.    "COP Litigation Counsel" means counsel to the Litigation Trust in the COP Litigation.

70.    "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

71.    "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

72.     "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.72, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

73.     "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

74.     "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

75.     "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

76.     "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

77.     "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

78.     "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

79.     "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

80.     "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

81.     "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

82.     "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

83.     "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

84.     "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

85.     "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

86.     "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

87.     "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

88.     "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

89.     "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.89.

90.     "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

91.     "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

92.     "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

93.     "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.93.

94.     "DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

95.     "DIA Assets" means the "Museum Assets" as defined in the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102.

96.     "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

97.     "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments to contribute monies in furtherance of the DIA Settlement, solely in their capacity as participants in the DIA Settlement.

98.     "DIA Funding Parties" means the Foundations, the DIA Funders and DIA Corp.

99.     "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

100.    "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

101.    "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

102.    "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.102.

103.    "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.103, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.102.

104.    "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

105.    "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

106.    "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

107.    "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

108.    "Disputed Claim" means any Claim that is not Allowed.

109.    "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.A.

110.    "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

111.    "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

112.    "Distribution Date" means any date on which a Distribution is made.

113.    "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

114.    "District Court" means the United States District Court for the Eastern District of Michigan.

115.    "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

116.    "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

-9-

13-53846-tjt   Doc 8832   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 16 of 298
13-53846-swr   Doc 6379   Filed 07/25/14   Entered 07/25/14 17:20:30   Page 16 of 78

117. "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the City of Detroit Downtown Development Authority, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

118. "DRCEA" means the Detroit Retired City Employees Association.

119. "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

120. "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

121. "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.121, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

122. "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.121.

123. "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

124. "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

125. "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

126. "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

127. "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

128. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.128, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

129. "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.128.

130. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

131. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.131, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

-10-

13-53846-tjt  Doc 8329  Filed 12/17/14  Entered 12/17/14 20:24:03  Page 17 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 17 of 98

132. "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.131.

133. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

134. "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

135. "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

136. "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

137. "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

138. "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

139. "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

140. "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

141. "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

142. "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

143. "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors, attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties and (j) the UTGO Exculpated Parties. For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

144. "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

-11-

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 18 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 18 of 298

145. "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website. For the avoidance of doubt, Exhibits I.A.103 and I.A.146 will be Filed only if the transactions related to or underlying such Exhibits are to be consummated by the City.

146. "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.146.

147. "Exit Facility Agent" means the agent under the Exit Facility.

148. "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

149. "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

150. "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

151. "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

152. "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

153. "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

154. "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, (b) those additional professionals retained by third parties to provide services in connection with the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan and (c) the Fee Examiner Parties. For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

155. "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

-12-

13-53846-tjt Doc 8272 Filed 12/17/14 Entered 12/17/14 20:34:13 Page 19 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 19 of 78

156. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

157. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

158. "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

159. "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

160. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

161. "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.102.

162. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

163. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

164. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

165. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

166. "GRS" means the General Retirement System for the City of Detroit.

167. "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, <u>plus</u> an additional 27% reduction in the Current Accrued Annual Pension amount, <u>plus</u> the ASF Recoupment; <u>provided</u> that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and <u>provided further</u>, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

168.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

169.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

170.    "Holder" means an Entity holding a Claim.

171.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

172.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.172, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

173.    "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.172.

174.    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

175.    "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

176.    "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

177.    "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

178.    "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners.  The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

179.    "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

180.    "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

181.    "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

182.    "Interest Rate Reset Chart" means a chart identifying interest rates for the New DWSD Bonds, attached as Exhibit I.A.182.

183.    "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

184.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

185.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

186.    "Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

187.    "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.187, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

188.    "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.187.

189.    "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

190.    "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to

-15-

13-53846-tjt   Doc 8332   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 22 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 22 of 78

Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

191.    "Litigation Trust" means a trust to be established on the Effective Date to which the City will transfer all of its rights and interest in the COP Litigation.

192.    "Litigation Trustee" means the trustee of the Litigation Trust, which shall be selected by the LTGO Insurer and the Retiree Committee and must be acceptable to the City.

193.    "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

194.    "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

195.    "LTGO Independent Party" means an entity chosen by the Retiree Committee, the LTGO Insurer and the City to resolve certain disputes regarding the COP Litigation involving the City, VEBA Trust Representatives or the LTGO Insurer pursuant to the LTGO Settlement Agreement.

196.    "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

197.    "LTGO Litigation Parties" means, collectively, the LTGO Insurer, the VEBA Trust Representatives and the City.

198.    "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.198.

199.    "Macomb County" means the County of Macomb, Michigan.

200.    "Mayor" means the duly-elected mayor of the City.

201.    "MFA" means the Michigan Finance Authority.

202.    "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

203.    "NPFG" means National Public Finance Guarantee Corporation.

204.    "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

205.    "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction. In applying this definition, the City and the

-16-

13-53846-tjt    Doc 8372    Filed 12/17/14    Entered 12/17/14 20:34:13    Page 23 of 298
13-53846-swr    Doc 6379    Filed 07/29/14    Entered 07/29/14 17:20:30    Page 23 of 298

Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

206. "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.206.

207. "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.207.

208. "New DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New DWSD Bonds.

209. "New DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.209.

210. "New Existing Rate DWSD Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed to be executed with respect to the New Existing Rate DWSD Bonds.

211. "New Existing Rate DWSD Bonds" means the secured bonds to be issued by the City pursuant to the New Existing Rate DWSD Bond Documents, substantially on the terms set forth on Exhibit I.A.211.

212. "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.212.a and the material terms of which are attached hereto as Exhibit I.A.212.b.

213. "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

214. "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

215. "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

216. "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.216.a and the material terms of which are set forth at Exhibit I.A.216.b.

217. "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five or ten years of service, as set forth on Exhibit I.A.216.b, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime,

-17-

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 24 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 24 of 76

longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

218.    "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes, the New LTGO Bonds and the Municipal Obligation.

219.    "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

220.    "Oakland County" means the County of Oakland, Michigan.

221.    "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

222.    "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

223.    "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

224.    "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a Subordinated Claim.  For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

225.    "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

226.    "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

227.    "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

228.    "Parking Bonds" means the secured $27,000,000 City of Detroit Building Authority Revenue Bonds (Parking and Arena System), Series 1998A, issued pursuant to the Parking Bond Documents in the outstanding principal amount of $8,080,000 as of the Petition Date.

229.    "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

230.    "Pass-Through Recipients" means, collectively, the (a) City of Detroit Downtown Development Authority, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City

of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

231.    "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

232.    "Petition Date" means July 18, 2013.

233.    "PFRS" means the Police and Fire Retirement System for the City of Detroit.

234.    "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)    If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b)    If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

235.    "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

236.    "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

237.    "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

238.    [Paragraph intentionally left blank.]

239.    "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

240.    "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

241.     "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

242.     "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

243.     "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

244.     "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.244.

245.     "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.245.

246.     "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

247.     "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.M.1.

248.     "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

249.     [Paragraph intentionally left blank.]

250.     "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

251.     "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.  "Reinstate" and "Reinstatement" shall have correlative meanings.

-20-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:20   Page 27 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 27 of 78

252.     "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

253.     "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the DIA Funding Parties and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

254.     "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

255.     "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.255.

256.     "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

257.     "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

258.     "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

259.     "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

260.     "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

261.     "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.261.

262.     "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

263.     "Retirement Systems" means, collectively, the GRS and the PFRS.

-21-

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 28 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 28 of 78

264.  "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

265.  "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

266.  "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

267.  "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

268.  "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

269.  "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

270.  "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

271.  "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

272.  "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

273.  "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

274.  "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

275.  "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

276.  "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

-22-

13-53846-tjt   Doc 8372   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 29 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 29 of 298

277.     "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

278.     "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

279.     "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

280.     "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

281.     "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

282.     "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

283.     "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

284.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

285.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.270, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

286.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

287.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

288.     "Settled COP Claims" means those Disputed COP Claims with respect to which the City enters into a settlement prior to the Effective Date.

289.     "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.6.

-23-

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 20:24:13  Page 30 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 30 of 298

290.     "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

291.     "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

292.     "State" means the state of Michigan.

293.     "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

294.     "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.294.

295.     "State Related Entities" means, collectively: (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

296.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

297.     "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

298.     "Subject COP Litigation Action" means any of the following actions, if proposed to be taken by the COP Litigation Trustee: (a) replacing the COP Litigation Counsel with new counsel to the Litigation Trust in the COP Litigation; (b) a determination not to appeal an adverse decision on any claim or defense related to the COP Litigation; or (c) the voluntary dismissal of a substantive claim or counterclaim in the COP Litigation or termination by any other means of the COP Litigation.

299.     "Subject COP Litigation Settlement" means any settlement with a Holder or Holders of COP Claims with respect to 40% or more of the face amount of COP Claims held by such Holder(s) that proposes to release a Pro Rata share of New B Notes (or equivalent currency) from the Disputed COP Claims Reserve to such Holder(s).

300.     "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

301.     "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

302.     "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing

-24-

13-53846-tjt   Doc 8279   Filed 12/17/14   Entered 12/17/14 20:34:30   Page 31 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 31 of 298

authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

303.     "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of:  (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

304.     "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

305.     "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class.  For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

306.     "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

307.     "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

308.     "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

309.     "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

310.     "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.310, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

311.     "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.310.

312.     "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

313.     "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

314.     "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

-25-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 32 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 32 of 298

315. "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

316. "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

317. "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.317.

318. "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

319. "VEBA Trust Representatives" means (a) the chair of the board of trustees of the Detroit General VEBA and (b) the chair of the board of trustees of the Detroit Police and Fire VEBA.

320. "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

321. "Wayne County" means the Charter County of Wayne, Michigan.

**B.      Rules of Interpretation and Computation of Time.**

**1.      Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.      Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

-26-

13-53846-tjt   Doc 8329   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 33 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 39 of 298

# ARTICLE II
## CLASSIFICATION OF CLAIMS; CRAMDOWN;
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

**A.** **Unclassified Claims.**

**1.** **Payment of Administrative Claims.**

**a.** **Administrative Claims in General.**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

**b.** **Claims Under the Postpetition Financing Agreement.**

Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

**2.** **Bar Dates for Administrative Claims.**

**a.** **General Bar Date Provisions.**

Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

-27-

13-53846-tjt Doc 8272 Filed 12/17/14 Entered 12/17/14 20:34:13 Page 34 of 298
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 34 of 298

### b. Ordinary Course Claims

Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

### c. Claims Under the Postpetition Financing Agreement.

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

### d. No Modification of Bar Date Order.

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

## B. Classified Claims.

### 1. Designation of Classes.

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| *Secured Claims* | | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.121) | Unimpaired/Nonvoting or Impaired/Voting, as set forth on Exhibit I.A.121 |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.128) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.131) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Parking Bond Claims | Unimpaired/Nonvoting |

-28-

13-53846-tjt Doc 8832 Filed 12/17/14 Entered 12/17/14 20:34:13 Page 35 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 35 of 298

| CLASS | NAME | IMPAIRMENT |
|:---:|---|---|
| | **Unsecured Claims** | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

      **2.**      **Subordination; Reservation of Rights to Reclassify Claims.**

      Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to re-classify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

      **3.**      **Treatment of Claims.**

      **a.**      **Class 1A – DWSD Bond Claims.**

      **i.**      **Classification and Allowance.**

      DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.121, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.121.

      **ii.**      **Treatment.**

      **A.**      **Unimpaired Classes.**

      Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Unimpaired on Exhibit I.A.121 shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

### B.     Impaired Classes.

Each Holder of an Allowed DWSD Bond Claim in a Class of DWSD Bond Claims that is identified as Impaired on Exhibit I.A.121 shall receive on or as soon as reasonably practicable after the Effective Date, in full satisfaction of such Allowed Claim, at the option of the City, either (1) New DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder; or (2) Cash in the full amount of the principal and interest portion of such Allowed DWSD Bond Claim, unless such Holder agrees to a different treatment of such Claim.  Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents shall be paid in full in Cash once Allowed.

<u>Treatment Option for Classes that Accept the Plan</u>:  Each Holder of an Allowed DWSD Bond Claim in an Impaired Class of DWSD Bond Claims that accepts the Plan may elect to receive New Existing Rate DWSD Bonds having a principal amount equal to the principal amount of the DWSD Bonds held by such Holder in lieu of New DWSD Bonds.

Accrued and unpaid interest as of the Distribution Date with respect to those DWSD Bonds for which a Holder of an Allowed DWSD Bond Claim receives New DWSD Bonds or New Existing Rate DWSD Bonds pursuant to the Plan shall be, at the option of the City, either (1) paid in Cash on the first Distribution Date following the date on which such DWSD Bond Claim is Allowed or (2) added to the principal amount of the New DWSD Bonds or New Existing Rate DWSD Bonds, as applicable, distributed to such Holder pursuant to the Plan.

### b.     Class 1B – DWSD Revolving Sewer Bond Claims

#### i.     Classification and Allowance.

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.128, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.128.

#### ii.     Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### c.     Class 1C – DWSD Revolving Water Bond Claims

#### i.     Classification and Allowance.

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.131, with each Class receiving the treatment set forth below.  On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.131.

#### ii.     Treatment.

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### d.     Class 2A – Secured GO Series 2010 Claims.

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its

-30-

13-53846-tjt   Doc 8279   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 37 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 20:34:13   Page 37 of 298

Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

e.    **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

f.    **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

g.    **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

h.    **Class 2E - Secured GO Series 2012(B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

i.    **Class 2F – Secured GO Series 2012(B2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

j.    **Class 3 – Other Secured Claims.**

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

k.    **Class 4 – HUD Installment Note Claims.**

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

l.    **Class 5 – COP Swap Claims.**

i.    **Allowance.**

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

### ii.    Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either: (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

### m.    Class 6 – Parking Bond Claims.

On the Effective Date, (i) the Parking Bond Claims shall be deemed Allowed in the amount of $8,099,287 and (ii) each Holder of an Allowed Parking Bond Claim shall have its Allowed Parking Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### n.    Class 7 – Limited Tax General Obligation Bond Claims.

### i.    Allowance.

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

### ii.    Treatment.

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions from the Disputed COP Claims Reserve in accordance with Section II.B.3.p.iii.B.

### iii.    Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

-32-

13-53846-tjt  Doc 8339  Filed 12/17/14  Entered 12/17/14 20:24:13  Page 39 of 298
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 39 of 298

o.    **Class 8 – Unlimited Tax General Obligation Bond Claims.**

        i.    **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

        ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.32 and IV.C, which Stub UTGO Bonds shall be reinstated.

p.    **Class 9 – COP Claims.**

        i.    **Disputed.**

The COP Claims are Disputed Claims and are not Allowed by the Plan, and the City reserves all rights to (A) object to, avoid or subordinate such Claims on any and all available grounds, including through the assertion of any and all grounds asserted in the COP Litigation, and (B) assign the right to object to, avoid or subordinate such Claims or the City's rights in the COP Litigation to the Litigation Trust.  If the City seeks to settle the COP Litigation on terms other than those set forth herein, the City will use its best efforts to reach agreement with the Retiree Committee or the Detroit General VEBA and the Detroit Police and Fire VEBA, as applicable, on any such settlement.

        ii.    **Assignment.**

Those COP Claims or portions thereof that relate to, and are measured by, the payment schedule under the COPs shall be deemed assigned to the beneficial holders of the COPs on a Pro Rata basis on and as of the Effective Date, solely for purposes of facilitating Distributions under this Plan and for no other purpose.  Each beneficial holder shall be deemed to receive such COP Claims or portions thereof in an amount equal to the proportion that the unpaid principal amount of such holder's COPs bears to the aggregate unpaid principal amount of all COPs.

        iii.    **Treatment.**

Each beneficial holder of COPs shall receive the following treatment on account of its COP Claims unless such holder agrees to a different treatment of such Claims:

        A.    **Disputed COP Claims Reserve.**

On the Effective Date, the City shall establish the Disputed COP Claims Reserve.  The Disputed COP Claims Reserve shall contain:  (a) an Unsecured Pro Rata Share of New B Notes calculated as if such Disputed COP Claims were Allowed in an amount equal to the aggregate unpaid principal amount as of the Petition Date for the COPs other than those giving rise to the Settled COP Claims (or such other amount as may be required by an order of the Bankruptcy Court); and (b) any distributions made on account of New B Notes held in the Disputed COP Claims Reserve.  In addition, in the event any Holder of a Disputed COP Claim enters into a settlement of such Claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and distributed from the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.B.

### B.       Distributions From The
###          Disputed COP Claims Reserve.

If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve of no less than (a) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (b) any distributions received by the Disputed COP Claims Reserve on account of such portion of New B Notes. Upon the entry of a Final Order resolving any objection to any Disputed COP Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for: (a) an amount of New B Notes or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed to the City, on the terms set forth in Section IV.I; and (b) following such distribution, the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (ii) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (iii) 15% to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14.

### iv.     Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q.     Class 10 – PFRS Pension Claims.

### i.      Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

### ii.     Treatment.

### A.      Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

### B.      Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

-34-

13-53846-tjt   Doc 8832   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 41 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 42 of 298

### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### E. Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

### F. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### G. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement,

-35-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:30   Page 42 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 42 of 298

PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii. Treatment.

##### A. Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

##### B. Investment Return Assumption

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

##### C. Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

##### D. Annuity Savings Fund Recoupment.

###### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed

-36-

13-53846-tit Doc 8329 Filed 12/17/14 Entered 12/17/14 20:32:03 Page 43 of 298
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 43 of 78

the ASF Recoupment Cap.  In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

## 2.    ASF Distribution Recipients.

### i.    Monthly Deduction

For each ASF Distribution Recipient that does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, gender and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

### ii.    Single Lump Sum Payment

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF  Election Date.  ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check.  If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.  The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

## E.    Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

## F.    Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for

-37-

service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s. Class 12 – OPEB Claims.

#### i. Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii. Treatment.

##### A. Detroit General VEBA.

Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.89, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees. With respect to the initial appointment of the board of trustees, the DRCEA and the Retiree Committee will each appoint two board members, and the City will appoint three board members. The DRCEA will fill board member vacancies created by the departure of members

initially appointed by the Retiree Committee or the DRCEA, and the City will fill board member vacancies created by the departure of members initially appointed by the City. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

## B.     Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.93, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. With respect to the initial appointment of the board of trustees, the RDPFFA and the Retiree Committee will each appoint two board members, and the City will appoint three board members. The RDPFFA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee and the RDPFFA, and the City will fill board member vacancies created by the departure of members initially appointed by the City. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.

## C.     No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

-39-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 46 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 46 of 98

t.     **Class 13 – Downtown Development Authority Claims.**

i.     **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

ii.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

u.     **Class 14 – Other Unsecured Claims.**

i.     **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

v.     **Class 15 – Convenience Claims.**

i.     **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.65) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

w.     **Class 16 – Subordinated Claims.**

i.     **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

x.     **Class 17 – Indirect 36th District Court Claims.**

i.     **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive: (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

-40-

13-53846-tjt   Doc 8832   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 47 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 47 of 298

ii.    **Further Obligation of City, State and 36th District Court.**

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

**C.    Confirmation Without Acceptance by All Impaired Classes.**

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

**D.    Treatment of Executory Contracts and Unexpired Leases.**

**1.    Assumption.**

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.

**2.    Assumption of Ancillary Agreements.**

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

**3.    Approval of Assumptions and Assignments.**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

-41-

13-53846-tjt   Doc 8329   Filed 12/17/14   Entered 12/17/14 20:34:20   Page 48 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 49 of 76

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8.      **Preexisting Obligations to the City Under**
        **Rejected Executory Contracts and Unexpired Leases.**

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach

-42-

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 20:32:13   Page 49 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 49 of 78

shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

        **9.**        **Insurance Policies.**

        From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

## ARTICLE III
## CONFIRMATION OF THE PLAN

**A.**        **Conditions Precedent to the Effective Date.**

        The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

        1.        The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

        2.        The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

        3.        The Confirmation Order shall not be stayed in any respect.

        4.        All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

        5.        All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

        6.        Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

        7.        The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

        8.        The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

        9.        The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

10.     If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

11.     The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

## B.     Waiver of Conditions to the Effective Date.

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in Section III.A.7 and Section III.A.8, which conditions cannot be waived.

## C.     Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

## D.     Effect of Confirmation of the Plan.

### 1.     Dissolution of Retiree Committee.

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

### 2.     Preservation of Rights of Action by the City.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3.     Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or

-44-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:20   Page 51 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 51 of 98

any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable. For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

4.      **Discharge of Claims.**

a.      **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b.      **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; <u>provided</u> that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5.      **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a.      all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

**1.      commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

**2.      enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

**3.      creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

-45-

13-53846-tjt   Doc 8832   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 52 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 52 of 298

4.      asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;

5.      proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

6.      taking any actions to interfere with the implementation or consummation of the Plan.

b.      All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.  Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

6.      Exculpation.

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement) and (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement); provided, further, that the foregoing provisions shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date.  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan; provided, further, that this Section III.D.6 shall not affect any liability of any of the COP Swap Exculpated Parties to Syncora Guarantee Inc., Syncora Capital Assurance Inc. or Financial Guaranty Insurance Company in connection with the COP Swap Settlement.

-46-

13-53846-tjt   Doc 8839   Filed 12/17/14   Entered 12/17/14 20:34:20   Page 53 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 53 of 298

7.    **Releases**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.    each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.    all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity; and

ii.    all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

b.    if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect

-47-

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 20:34:30   Page 54 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 54 of 298

to (i) pensions as modified by the Plan or (ii) labor-related obligations.  Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.  For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims or any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds.

## E.   No Diminution of State Power

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

## F.   Effectiveness of the Plan.

The Plan shall become effective on the Effective Date.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## G.   Binding Effect of Plan.

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan.  Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.  As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

-48-

13-53846-tjt   Doc 8372   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 55 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 59 of 78

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    DWSD.

#### 1.    Rates and Revenues.

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Rates will be determined by the Board of Water Commissioners. The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

#### 2.    DWSD CBAs.

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

#### 3.    The New DWSD Bonds and New Existing Rate DWSD Bonds.

DWSD shall, as necessary:  (a) execute the New DWSD Bond Documents, issue the New DWSD Bonds substantially on the terms set forth on Exhibit I.A.209, and distribute the New DWSD Bonds as set forth in the Plan; and (b) execute the New Existing Rate DWSD Bond Documents, issue the New Existing Rate DWSD Bonds substantially on the terms set forth on Exhibit I.A.211, and distribute the New Existing Rate DWSD Bonds as set forth in the Plan.

### B.    The New B Notes and New LTGO Bonds.

On the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.206, and distribute the New B Notes as set forth in the Plan; and (b) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.198, and distribute the New LTGO Bonds as set forth in the Plan.

### C.    The UTGO Settlement.

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.317. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things:  (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

-49-

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 20:34:13  Page 56 of 298
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 56 of 298

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

### D. The State Contribution Agreement.

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.294.

#### 1. State Contribution.

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

#### 2. Income Stabilization Payments.

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State.  Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus.  The Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner.  In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.  In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

#### 3. Conditions to State's Participation.

The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following:  (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and

retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations to fund $366 million (or the net present value thereof) as part of the DIA Settlement; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

### 4.     Release of Claims Against the State and State Related Entities.

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### E.     The DIA Settlement.

On the Effective Date, the City, the Foundations and DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.103 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.102. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

### 1.     Funding Contributions.

The DIA Settlement will be funded as follows:  (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations; and (b) in addition to its continuing commitments outside of the DIA Settlement, an irrevocable commitment from DIA Corp. to raise at least $100 million from its donors (subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20-year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the Foundations' and the DIA Funders' option at any time for the "Present Value Discount," as set forth in Exhibit I.A.102. Amounts committed by the Foundations will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

### 2.     Transfer of DIA Assets.

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

-51-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 58 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 58 of 298

3. **Conditions to the DIA Funding Parties' Participation.**

The DIA Funding Parties participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.102; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; (k) the occurrence of the Effective Date no later than December 31, 2014; and (l) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

F. **Contingent Payment Rights**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust. The City shall issue the DWSD CVR to the Restoration Trust. If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire. The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS. If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made. The DWSD CVR may not be transferred.

1. **Special Restoration**

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration. In such case, the City will perform a Value Determination and arrive at the Discounted Value. The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable. In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither

-52-

13-53846-tjt  Doc 8379  Filed 07/29/14  Entered 07/29/14 21:24:30  Page 59 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 59 of 299

the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

### 2. General Restoration

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

## G. The OPEB Settlement.

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

## I. Prosecution of COP Litigation.

### 1. Creation of Litigation Trust.

From and after the Effective Date, the City will remain a named plaintiff and defendant in the COP Litigation, but shall transfer all of its rights and interests in the COP Litigation to the Litigation Trust. The beneficiaries of the Litigation Trust, for the purpose of the COP Litigation, shall be the LTGO Litigation Parties and the Holders of Allowed Other Unsecured Claims. The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Insurer and the City.

### 2. Direction of COP Litigation.

The Litigation Trustee shall follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein. The Litigation Trustee and VEBA Trust Representatives shall meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Litigation Parties, as requested, to discuss the COP Litigation. The Litigation Trustee shall provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the LTGO Litigation Parties. Upon request from a LTGO Litigation Party, the Litigation Trustee will provide to such LTGO Litigation Party drafts of court papers that will be Filed by the Litigation Trustee as early as practicable under the circumstances.

-53-

13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 20:24:13 Page 60 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 60 of 298

3.    **Payment of Fees and Expenses.**

The cost of all fees and expenses incurred by the Litigation Trustee in connection with the COP Litigation shall be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii.A.  The Litigation Trustee's fees shall be fixed and consented to by the LTGO Insurer and the VEBA Trustee Representatives.

The Litigation Trustee shall submit to the City on a monthly basis invoices for its fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees.  The City shall pay such invoices within 30 days of receipt of such invoices, pending reimbursement from the Disputed COP Claims Reserve.  Reimbursement of the City from the Disputed COP Claims Reserve will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.

In the event that a Final Order is entered against the City or the Litigation Trust, as successor in interest to the City, in the COP Litigation such that the New B Notes in the Disputed COP Claims Reserve are subject to Distribution to the Holders of Allowed COP Claims in accordance with the Plan, the City will reimburse the Disputed COP Claims Reserve for any amounts withdrawn from the Disputed COP Claims Reserve prior to the date of such Final Order becoming a Final Order.

4.    **Settlement of COP Litigation.**

The Litigation Trustee shall consult with the LTGO Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee shall provide the LTGO Litigation Parties with advance notice, as early as practicable under the circumstances, of any COP Litigation settlement negotiations, and the LTGO Litigation Parties and their counsel shall have the right to participate in such negotiations.  Any potential settlement of the COP Litigation must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against any party.  The Litigation Trustee will not take any Subject COP Litigation Actions without the consent of the LTGO Litigation Parties.  The Litigation Trustee will not enter into a Subject COP Litigation Settlement without the consent of the LTGO Insurer.

In the event that, after consultation with the Litigation Trustee, (i) the LTGO Insurer does not consent to the Litigation Trustee entering into a Subject COP Litigation Settlement or (ii) the LTGO Litigation Parties do not consent to the Litigation Trustee taking a Subject COP Litigation Action, the Litigation Trustee or any LTGO Litigation Party may present the issue to the LTGO Independent Party for mediation and resolution.  The LTGO Independent Party shall conduct a mediation to attempt to consensually resolve the issue.  If a consensual resolution cannot be reached, the LTGO Independent Party shall resolve the issue or issues, which resolution will be binding on the LTGO Insurer or the LTGO Litigation Parties, as the case may be, and the Litigation Trustee.  Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction in the COP Litigation.  The City, the COP Litigation Counsel, the VEBA Trust Representatives and the LTGO Insurer shall take any steps that may be required to preserve applicable privileges of the City and the COP Litigation Counsel with regard to the COP Litigation.

J.    **Issuance of the New Securities.**

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

-54-

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 20:34:03   Page 61 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 61 of 298

### K. Cancellation of Existing Bonds and Bond Documents.

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan, on the Effective Date, the Bonds and the Bond Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the parties, as applicable, under the Bonds and the Bond Documents shall be discharged; provided, however, that the Bonds and Bond Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent or similar entity under the Bond Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution and (iii) as may be necessary to preserve any claim by a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers or (b) Holders of COP Claims with respect to claims under applicable policies or other instruments insuring the COPs and obligations related thereto. For the avoidance of doubt, this Section IV.K shall not apply to any Bonds that are Reinstated pursuant to the Plan.

### L. Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.L.

### M. Professional Fees

#### 1. Professional Fee Reserve

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks) and (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that

are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

### 2. Fee Review Order

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order. For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

### 3. Dismissal of the Fee Examiner

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder. The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

### 4. Court-Appointed Expert

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

### N. Assumption of Indemnification Obligations.

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; provided that this Section IV.N shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.N.

### O. Incorporation of Retiree Health Care Settlement Agreement.

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.261, are incorporated herein by reference and shall be binding upon the parties thereto.

### P. Payment of Workers' Compensation Claims.

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is

-56-

13-53846-tjt  Doc 8279  Filed 12/17/14  Entered 12/17/14 20:34:13  Page 63 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 69 of 98

responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law. The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

## Q. 36th District Court Settlement.

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.6. The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

## R. Payment of Certain Claims Relating to the Operation of City Motor Vehicles.

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.R, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

## S. Payment of Tax Refund Claims.

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

## T. Utility Deposits.

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

## U. Pass-Through Obligations.

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

-57-

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 20:34:30 Page 64 of 299
13-53846-swr Doc 6379 Filed 07/25/14 Entered 07/25/14 17:20:30 Page 64 of 298

## V.       Exit Facility.

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

## W.      Post-Effective Date Governance.

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act.  The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents.  The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission.  Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

## A.       Appointment of Disbursing Agent.

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan.  Any Disbursing Agent appointed by the City will serve without bond.  Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

## B.       Distributions on Account of Allowed Claims.

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent the Distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

## C.       Certain Claims to Be Expunged.

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

## D.       Record Date for Distributions; Exception for Bond Claims.

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution

-58-

13-53846-tjt   Doc 8279   Filed 12/17/14   Entered 12/17/14 20:24:13   Page 65 of 299
13-53846-swr   Doc 8279   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 65 of 298

Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date. Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**F.      Selection of Distribution Dates for Allowed Claims.**

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

**G.      Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.**

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

**H.      City's Rights of Setoff Preserved.**

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

-59-

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 66 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 66 of 298

I.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions.**

1.    **Delivery of Distributions Generally.**

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

2.    **Delivery of Distributions on Account of Bond Claims.**

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

3.    **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4.    **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.    **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

-60-

13-53846-tjt  Doc 8832  Filed 12/17/14  Entered 12/17/14 20:34:13  Page 67 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 66 of 298

**J.**     **Other Provisions Applicable to Distributions in All Classes.**

**1.**     **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

**2.**     **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.**     **Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.**     **Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository

-61-

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 68 of 299
13-53846-swr   Doc 6379   Filed 07/25/14   Entered 07/25/14 17:20:30   Page 69 of 78

or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

## ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.      **Treatment of Disputed Claims.**

   1.      **General.**

         No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

   2.      **ADR Procedures.**

         At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

   3.      **Tort Claims.**

         At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction

-62-

13-53846-tjt  Doc 8329  Filed 12/17/14  Entered 12/17/14 20:24:32  Page 68 of 298
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 69 of 299

imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan.  Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan.  Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

**B.  Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court.  On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property.  Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim.  Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

**C.  Objections to Claims.**

**1.  Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved.  Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.  On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2.  Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

-63-

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 22:42:13   Page 70 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 70 of 78

3. **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

4. **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.      Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C.      Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.      Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

-64-

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 71 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 71 of 298

H.     Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.     Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.     Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

K.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M.     Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

N.     Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

O.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

A.     **Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

B.     **Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

C.     **Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be: (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

-65-

13-53846-tjt   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:24:13   Page 72 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 72 of 78

D.      **Severability of Plan Provisions.**

        If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

E.      **Effectuating Documents and Transactions.**

        The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

F.      **Successors and Assigns.**

        Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

G.      **Plan Controls.**

        In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

H.      **Notice of the Effective Date.**

        On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

I.      **Governing Law.**

        Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation,

-66-

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 20:34:30   Page 73 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 73 of 96

similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.      Request for Waiver of Automatic Stay of Confirmation Order.**

        The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.      Term of Existing Injunctions and Stays.**

        **All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**L.      Service of Documents**

        Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

       **1.      The City**

        David G. Heiman, Esq.
        Heather Lennox, Esq.
        Thomas A. Wilson, Esq.
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio  44114
        Telephone:  (216) 586-3939
        Facsimile:  (216) 579-0212

        Bruce Bennett, Esq.
        JONES DAY
        555 South Flower Street
        Fiftieth Floor
        Los Angeles, California  90071
        Telephone:  (213) 243 2382
        Facsimile:  (213) 243 2539

        Jonathan S. Green, Esq.
        Stephen S. LaPlante, Esq.
        MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
        150 West Jefferson
        Suite 2500
        Detroit, Michigan  48226
        Telephone:  (313) 963-6420
        Facsimile:  (313) 496-7500

        (Counsel to the City)

-67-

13-53846-tjt   Doc 8332   Filed 12/17/14   Entered 12/17/14 20:34:03   Page 74 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 74 of 298

2.      **The Retiree Committee**

Claude Montgomery, Esq.
Carole Neville, Esq.
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800

Sam J. Alberts, Esq.
DENTONS US LLP
1301 K Street NW, Suite 600, East Tower
Washington, DC 20005-3364
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  July 29, 2014                Respectfully submitted,

                                     The City of Detroit, Michigan

                                     By:      /s/  Kevyn D. Orr
                                     Name:   Kevyn D. Orr
                                     Title:    Emergency Manager for the City of Detroit, Michigan

-68-

13-53846-tjt   Doc 8332   Filed 12/17/14   Entered 12/17/14 20:34:13   Page 75 of 298
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 75 of 76

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243 2382
Facsimile:  (213) 243 2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

**EXHIBIT I.A.6**

PRINCIPAL TERMS OF 36TH DISTRICT COURT SETTLEMENT

## TERM SHEET REGARDING CLAIMS INVOLVING 36TH DISTRICT COURT

| | |
|---|---|
| I. Parties | • The City of Detroit, Michigan (the "<u>City</u>")<br>• The 36th District Court, State of Michigan (the "<u>36th District Court</u>")<br>• Local 917 and Local 3308 of the American Federation of State, County and Municipal Employees (the "<u>AFSCME Locals</u>")<br>• Bobby Jones, Richard T. Weatherly, Roderick Holley and Carlton Carter (collectively, the "<u>Individual Claimants</u>" and, together with the City, the 36th District Court and the AFSCME Locals, the "<u>Parties</u>") |
| II. Resolved Proofs of Claim | This Term Sheet applies to all proofs of claim (collectively, the "<u>Claims</u>") filed by: (a) the AFSCME Locals, (b) the individuals and entities identified in the AFSCME Locals Claim (as defined below), with the exception of any proof of claim filed by Arnette Rodgers solely to the extent such proof of claim asserts liabilities that arise from that certain proceeding pending in the United States District Court for the Eastern District of Michigan and captioned <u>Arnette Rodgers, et al. v. 36th District court and Chief Judge Marilyn Adkins</u>, Case No. 10-cv-11799 (E.D. Mich.); (c) the Individual Claimants; and (d) the 36th District Court. The Claims include, without limitation, the following proofs of claim:<br><br>• Proof of claim number 1828 filed by Bobby Jones (the "<u>Jones Claim</u>") asserting a general unsecured nonpriority claim in the amount of $1,039,242.40;<br>• Proof of claim number 1843 filed by Richard T. Weatherly (the "<u>Weatherly Claim</u>") asserting the total amount of $1,580,708.74 (consisting of $1,568,233.74 asserted as a general unsecured nonpriority claim and $12,475.00 asserted as a priority claim pursuant to section 507(a)(4) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"));<br>• Proof of claim number 2280 filed by Roderick Holley (the "<u>Holley Claim</u>") asserting the total amount of $1,408,200.13 (consisting of $1,395,725.13 asserted as a general unsecured nonpriority claim and $12,475.00 asserted as a priority claim pursuant to section 507(a)(4) of the Bankruptcy Code);<br>• Proof of claim number 2281 filed by Carlton Carter (the "<u>Carter Claim</u>") asserting a general unsecured nonpriority claim in the total amount of $1,621,760.41;<br>• Proof of claim number 2422 filed by the 36th District Court (the "<u>36th District Court Claim</u>") asserting contingent and unliquidated liabilities against the City; and<br>• Proof of claim number 2841 filed by the AFSCME Locals (the "<u>AFSCME Locals Claim</u>") asserting general unsecured nonpriority claims in the total amount of $8,747,322.44 on behalf of the AFSCME Locals' members and themselves arising from grievances, administrative actions and other legal proceedings that the AFSCME Locals commenced against the 36th District Court. |

| III. Agreed Liquidated Amounts of Claims | By agreement of the Parties, (a) the 36th District Court Claim is withdrawn with prejudice and (b) the remaining Claims (collectively, the "Allowed Claims") are liquidated and deemed allowed as follows: |
|---|---|
| | <ul><li>The Jones Claim is liquidated as a nonpriority unsecured claim in the amount $1,061,716.99.</li><li>The Weatherly Claim is liquidated as a nonpriority unsecured claim in the amount of $1,486,820.23.</li><li>The Holley Claim is liquidated as a nonpriority unsecured claim in the amount of $1,438,322.30.</li><li>The Carter Claim is liquidated as a nonpriority unsecured claim in the amount of $1,656,869.17.</li><li>The AFSCME Locals Claim is liquidated as a nonpriority unsecured claim in the amount of $319,721.00, consisting of the following amounts relating to the grievance claims of the following parties with respect to the 36th District Court (collectively, the "Grievances"):</li></ul><ul><li>Donnita Cleveland (Grievance Nos. BH31808 and NKC11-1-7) - $85,000.00</li><li>Arnette Rodgers (Grievance Nos. BH022709 and BH120408) - $125,000.00</li><li>Jonathan Mapp (Case No. 13-154132) - $75,000.00</li><li>Annette Walton (Grievance No. BH102408) - $500.00</li><li>Quanetta Anderson (Grievance No. BH081007) - $1,250.00</li><li>Pamela Muldron (Grievance No. BH081110) - $1,500.00</li><li>Samuel Jamison (Arbitration No. AJ-30512/AJ-32712) - $10,000.00</li><li>Kiambu Boyd (Grievance No. 4-BH091710) - $2,940.00</li><li>Selena Wilson (wrongful suspension claim) - $488.00</li><li>Laticia Lemus (Grievance No. YM5208) - $750.00</li><li>Michele Hembree (Arbitration No. A17671-3308-07) - $293.00</li><li>AFSCME Local 3308 (Grievance No. BH011608) - $16,500.00</li></ul><ul><li>All (a) Claims other than the Allowed Claims and the 36th District Court Claim and (b) liabilities asserted in the AFSCME Locals Claim other than the Grievances are liquidated in the amount of $0.00.</li></ul> |
| IV. Mutual Releases | Effective upon the date of approval of this settlement by the Bankruptcy Court, each of the Parties shall for itself and for each of its successor firms, parents, subsidiaries, affiliates, assigns, agents, attorneys, representatives, executors and administrators, present and former members, principals, judges, officers and employees, and each of their respective assigns, agents, representatives, partners, heirs, executors and administrators release each and every other Party and each of its successor firms, parents, subsidiaries, affiliates, assigns, agents, attorneys, representatives, executors and administrators, present and former members, principals, judges, officers and employees, and each of their respective assigns, agents, representatives, partners, heirs, executors and administrators of all claims and causes of action, whether legal or equitable, known or unknown, that arose prior to such date (including, without limitation, the reinstatement claims of Richard T. Weatherly and Arnette Rodgers) provided, however, that the Parties agree that the AFSCME Locals and the Individual Claimants (other than Richard T. Weatherly) shall not release the 36th District Court or any other parties with respect to that certain proceeding captioned In the Matter of: 36th District Court, Respondent v. AFSCME Council 25, Local 917, Charging Party (13-012254-MERC / C13 I-163). |

| V. Treatment of Claims Under the City's Fourth Amended Plan of Adjustment [Docket No. 4392] (as it may be modified, amended or supplemented, the "Plan") | Capitalized terms not otherwise defined in this section shall have the meanings given to them in the Plan.<br><br>• All of the Allowed Claims shall be Indirect 36th District Court Claims under the Plan.<br>• All Indirect 36th District Court Claims shall be reclassified into a new Class 17 under the Plan, which will provide for the following treatment of Indirect 36th District Court Claims:<br><br>Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive: (a) if the Allowed Amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed Amount of such Allowed Indirect 36th District Court Claim; or (b) if the Allowed Amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash, equal to 33% of the Allowed Amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent *per annum*, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a business day, on the first business day thereafter.<br><br>Subject to the terms of the 36th District Court Settlement, the foregoing shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in the foregoing prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.<br><br>• The City shall make such other modifications to the Plan as are necessary or appropriate to effectuate the foregoing treatment of Indirect 36th District Court Claims including, solely by way of example, by modifying the definition of "Other Unsecured Claim" under the Plan to exclude Indirect 36th District Court Claims.<br>• Solely for the purpose of the treatment under the Plan of the AFSCME Locals Claim, each of the Grievances shall be deemed to be a separate Indirect 36th District Court Claim. |

ATI-2613368v3

-3-

13-53846-tjt   Doc 8882-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 80 of 299
13-53846-swr   Doc 6874-1   Filed 12/17/14   Entered 12/17/14 13:42:20   Page 80 of 290

|  |  |
|---|---|
|  | • For the avoidance of doubt, based on the foregoing treatment of the Allowed Claims in Class 17, the Individual Claimants and the AFSCME Locals will receive the following distributions in Cash on account of the Allowed Claims:<br><br>  ○ The Jones Claim ($350,366.61 payable in five equal annual payments in the amount of $77,072.24)<br>  ○ The Weatherly Claim ($490,650.68 payable in five equal annual payments in the amount of $107,931.37)<br>  ○ The Holley Claim ($474,646.36 payable in five equal annual payments in the amount of $104,410.81)<br>  ○ The Carter Claim ($546,766.83 payable in five equal annual payments in the amount of $120,275.58)<br>  ○ The AFSCME Locals Claim ($105,507.93), consisting of the following amounts relating to the claims of the following parties: (a) Donnita Cleveland ($28,050.00 lump sum), (b) Arnette Rodgers ($41,250.00 payable in five equal annual payments in the amount of $9,074.01), (c) Jonathan Mapp ($24,750.00 lump sum), (d) Annette Walton ($165.00 lump sum), (e) Quanetta Anderson ($412.50 lump sum), (f) Pamela Muldron ($495.00 lump sum), (g) Samuel Jamison ($3,300.00 lump sum), (h) Kiambu Boyd ($970.20 lump sum), (i) Selena Wilson ($161.04 lump sum), (j) Laticia Lemus ($247.50 lump sum), (k) Michele Hembree ($96.69 lump sum) and (l) AFSCME Local 3308 ($5,445.00 lump sum). |
| VI.   Plan Voting | The AFSCME Locals and the Individual Claimants each shall be deemed to have voted their applicable Claims in favor of the Plan in the amounts established by the Order Regarding the Voting of Claims Relating to the 36th District Court (Docket No. 5905). |
| VII.  Discharge, Release and Injunction | • Section III.D.5.b of the Plan shall be revised to add the following provision:<br><br>  **Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to the liabilities asserted in the Indirect 36th District Court Claims, to the extent not satisfied pursuant to the Plan.**<br><br>• Section III.D.7.a of the Plan shall be revised to provide that no Holders of Indirect 36th District Court Claims shall, by voting in favor of the Plan, be deemed to release, waive and discharge the State and the State Related Entities with respect to any liabilities asserted in the Indirect 36th District Court Claims. |
| VIII. | The AFSCME Locals, the Individual Claimants and the 36th District Court shall stipulate to the entry of judgment against the 36th District Court in that certain proceeding pending in the Circuit Court for the County of Wayne and captioned <u>36th District Court v. Michigan American Federation of State, County and Municipal Employees Council 25, et al.</u>, Case No. 13-013170-CL, in the respective liquidated amounts set forth in Section III above with respect to the Jones Claim, the Weatherly Claim, the Holley Claim and the Carter Claim (the "<u>Judgment</u>"), <u>provided</u>, <u>however</u>, that the AFSCME Locals and the Individual Claimants shall waive all right to collect upon the Judgment from the City and the 36th District Court except pursuant to the terms of this settlement and the Plan. |
| IX.   Definitive Documentation/ Court Approval | • The foregoing terms are subject to definitive documentation reasonably acceptable to the Parties and approval of the Bankruptcy Court, which may be as part of the order confirming the Plan. |

**EXHIBIT I.A.72**

SCHEDULE OF COP SWAP AGREEMENTS

## SCHEDULE OF COP SWAP AGREEMENTS

| COP Swap Agreements |
|---|
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between Detroit Police and Fire Retirement System Service Corporation ("<u>DPFRS Service Corporation</u>") and Merrill Lynch Capital Services, Inc. (as successor to SBS Financial Products Company LLC) ("<u>Merrill Lynch</u>") and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DFPRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between Detroit General Retirement System Service Corporation ("<u>DGRS Service Corporation</u>") and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) (as amended, modified or supplemented). |
| ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS Service Corporation and Merrill Lynch and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 (as amended, modified or supplemented). |
| ISDA Master Agreement between DFPRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 (as amended, modified or supplemented). |
| ISDA Master Agreement between DGRS Service Corporation and UBS AG, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 (as amended, modified or supplemented). |

<u>**EXHIBIT I.A.89**</u>

FORM OF DETROIT GENERAL VEBA TRUST AGREEMENT

## CITY OF DETROIT RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") and [_____Bank] (the "Bank").

### W I T N E S S E T H :

WHEREAS, the Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit Retiree Health Care Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

# ARTICLE I
## DEFINITIONS

Section 1.1    Bank.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by Detroit in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

Section 1.2    Board of Trustees or Board.  The Board is the body described in Article VIII to which Detroit has delegated responsibility for: (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

Section 1.3    Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

Section 1.4    Detroit VEBA Beneficiary.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.5    Detroit VEBA Contribution.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.6    Eligible Dependent.  Means an Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

Section 1.7    Eligible Retiree Member.  Means a former employee of Detroit who is a Detroit VEBA Beneficiary.

Section 1.8    Investment Act.  Means Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.

Section 1.9    Investment Manager.  An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof.

Section 1.10    New B Notes.  Has the meaning given to that term in the Plan of Adjustment.

Section 1.11    OPEB Claims Notes.  Means the New B Notes contributed to the Trust pursuant to the Detroit VEBA Contribution.

Section 1.12    Participant.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

13-53846-tj   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 86 of 299
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 10 of 99
209

Section 1.13    <u>Plan</u>.  The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

Section 1.14    <u>Plan of Adjustment</u>.  The Plan for the Adjustment of Debts of the City of Detroit.

Section 1.15    <u>Trust Agreement</u>.  This agreement as it may be amended thereafter from time to time by the parties hereto.

Section 1.16    <u>Trust or Trust Fund</u>.  The Detroit Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established for the purpose of providing health care benefits, directly or through the purchase of insurance, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2    Receipt of Funds.  The Bank shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

13-53846-tjt  Doc 8363-79  Filed 12/17/14  Entered 12/17/14 20:47:20  Page 88 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 12 of
209

## ARTICLE III
## CONTRIBUTIONS TO THE TRUST FUND

Section 3.1     Detroit Contributions.  The Trust Fund shall accept from Detroit the Detroit VEBA Contribution.  Apart from the Detroit VEBA Contribution, Detroit shall have no further obligation to contribute to the Trust or otherwise fund the Plan.

13-53846-tjt   Doc 8362-79   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 89 of 299
209
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 13 of 99

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b)    To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability.  Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2    Method of Payments.  The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board, is settled by written stipulation of the parties concerned.

Section 4.3    Excessive Payments.  If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or Bank's agent of such excessive or improper payment upon the Bank's request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

13-53846-tjt   Doc 8862-79   Filed 12/17/14   Entered 12/17/14 20:34:17   Page 90 of 299
13-53846-swr   Doc 8379-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 14 of
209

## ARTICLE V
## BANK POWERS AND DUTIES

Section 5.1    Powers of the Bank Generally.    The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2    Powers Exercisable by the Bank in Its Discretion.    The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

> (a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement. Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States. Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

> (b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

> (c)    To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

> (d)    To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3    Powers Exercisable by the Bank Only Upon the Direction of the Board.    The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager):

> (a)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

13-53846-tjt  Doc 8882-79  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 91 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 91 of 299
209

(b)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)     To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be necessary and appropriate, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as the Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Section 5.4     Title to Trust Fund.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank.

Section 5.5     General Duties and Obligations of Bank.

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager, shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust.  Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

13-53846-tjt  Doc 8862-79  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 92 of 299
13-53846-swr  Doc 8379-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 93 of 99
209

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)       The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6      Determination of Rights.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7      Continuance of Plan; Availability of Funds.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8      Payment of Expenses.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred  by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan.  The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9      Bank Compensation.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates [set forth in Exhibit A].  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10     Reliance on Written Instruments.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

13-53846-tj   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:30  Page 93 of 299
13-53846-swr   Doc 8379-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 179 of 209
209

# ARTICLE VI
## BANK ACCOUNTS

Section 6.1     Records.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2     Annual Audit.  The Trust Fund shall be audited annually, and a statement of the results of such audit shall be provided to the Bank and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3     No Interest by Participants.  In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants and beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4     Furnishing Written Accounts.  The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing.  Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5     Accounting Year, Cash Basis.  The accounting year of the Trust shall be the calendar year.  All accounts of the Bank shall be kept on a cash basis.

Section 6.6     Judicial Proceedings.  If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties. No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

## ARTICLE VII
## PROCEDURES FOR THE BANK

Section 7.1    Removal.  The Bank may be removed by Detroit at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2    Resignation.  The Bank may resign by filing with Detroit a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board.  In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed.  If Detroit fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3    Successor.

      (a)    Detroit may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of Detroit, appointing such successor entity, and by delivering to the removed or resigning Bank an acceptance in writing, executed by the successor so appointed.  Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

      (b)    Alternatively, Detroit may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of Detroit, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

      (c)    If no appointment of a successor institutional trustee or custodian is made by Detroit within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to Detroit and the retiring Bank, as such court may deem suitable and proper.

Section 7.4    Effect of Removal or Resignation of Bank.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5    Merger or Consolidation of the Bank.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

13-53846-tjt   Doc 8883-79   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 95 of 299
13-53846-swr   Doc 8379-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 95 of 99
209

## ARTICLE VIII
## COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES

Section 8.1     Number and Appointment of Members.  The Board of Trustees shall consist of seven (7) voting members, who are selected by the Mayor of Detroit and by the Eligible Retiree Members (directly or indirectly through a representative) as provided below.

> (a)     The Mayor of Detroit shall appoint three (3) voting members, both of whom shall be residents of the State of Michigan and neither of whom may be an employee, contractor, agent or affiliate of the City or any labor union representing employees of the City, a member of any such labor union, or a Participant.  At least one (1) of such independent members shall have expert knowledge or extensive experience with respect to economics, finance, or institutional investments, and at least one (1) of such independent members shall have expert knowledge or extensive experience with respect to administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science.  The voting members of the Board selected by the Mayor as of the Effective Date shall be [_____, _____ and _____.]

> (b)     The Eligible Retiree Members shall select four (4) voting members pursuant to procedures established by the Board; provided, however, that two (2) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and two (2) such voting members shall initially be designated by the Detroit Retired City Employees Association on behalf of such Eligible Retiree Members.  The members initially selected on behalf of the Eligible Retiree Members are [_____, _____ , _____and _____.]

Each Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2     Term of Office.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed as provided in Section 8.1.

Section 8.3     Resignation. A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to Detroit stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4     Fees and Expenses.  The Board members appointed by the Mayor shall each be paid a stipend of [$12,000] per year (payable ratably on a monthly basis).  The Board members selected by the Eligible Retiree Members shall each be paid a stipend of [$_____] per year (payable ratably on a monthly basis.  Each Board member may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of its duties.  Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

13-53846-swr  Doc 8272  Filed 12/17/14  Entered 12/17/14 20:30:30  Page 96 of 299
13-53846-swr  Doc 8279  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 26 of 299
209

Section 8.5     <u>Operation of the Board; Quorum</u>.  The Board shall select from among its members a chair and a vice chair.   The Board shall hold regular meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Five (5) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

13-53846-tjt   Doc 8279   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 97 of 299
13-53846-swr   Doc 8379   Filed 07/29/15   Entered 07/29/15 17:20:30   Page 21 of 290
209

## ARTICLE IX
## POWERS AND DUTIES OF THE BOARD OF TRUSTEES

Section 9.1    General. The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein. Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust. The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent allowed by law.

Section 9.2    Plan Design and Administration.

(a)    Adoption of Plan. The Board shall adopt a Plan to offer health care benefits to Participants. All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder. The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b)    Benefits. The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing, that the Board from time to time determines appropriate or desirable in its sole discretion. The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion. In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund. Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

(c)    Method of Providing Benefits. Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole discretion. The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d)    Plan Documentation. The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

Section 9.3    Investment of the Trust. The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Bank shall comply with the

13-53846-tj wr Doc 8882-9 Filed 12/17/14 Entered 12/17/14 20:34:72:30 Page 99 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 22 of
209

proper written direction of the Board concerning those assets.  The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund.  Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act.

Section 9.4     Appointment of Investment Managers.  The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account").   The Board shall determine that each Investment Manager satisfies the requirements of section 38.1133(11) of the Investment Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority.  If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager.  Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5     Government Reports and Returns.  The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6     Compromise or Settle Claims.  The Board may compromise, settle and release claims or demands in favor of or against the Trust or the Board on such terms and conditions as the Board may deem advisable.

Section 9.7     Appointment of Administrator.  The Board may appoint a third party to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8     Employment of Assistance.  The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust. The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services.  In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund.  The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9     Reliance on Written Instruments.  The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any

13-53846-tjt   Doc 8862-79   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 99 of 299
13-53846-swr   Doc 8379-1   Filed 07/29/15   Entered 07/29/15 17:20:30   Page 23 of
209

investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10   No Individual Liability on Contracts.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts. Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 9.11   Detroit Not Liable for Conduct of Board.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12   Liability Insurance.   The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13   Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 9.14   Subrogation and Reimbursement.   If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.   The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue,

13-53846-tjt  Doc 8363-79  Filed 12/17/14  Entered 12/17/14 17:20:30  Page 100 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 24 of
209

and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses. If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient. In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund. If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)     The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust. Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund. The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents. By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds. The Benefit Recipient, directly or through his or her representatives, shall not do anything to

impair the Trust Fund's rights.  If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)     This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason.  The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received.  Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f)     The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole.   Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

## ARTICLE X
## AMENDMENT, TERMINATION AND MERGER

Section 10.1 <u>Amendment</u>.  The Trust Agreement may be amended at any time in writing by Detroit or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

Section 10.2 <u>Termination</u>.

(a)      The Trust and this Trust Agreement may be terminated at any time in writing by Detroit with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Board in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  The Trust Fund shall remain in existence until all assets have been distributed.

(b)      Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3 <u>Transfer of Assets and/or Liabilities</u>.  To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

# ARTICLE XI
## MISCELLANEOUS

**Section 11.1** <u>Rights in Trust Fund</u>.  No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

**Section 11.2** <u>Non-Alienation</u>.  Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

**Section 11.3** <u>Controlling Laws</u>.  The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

**Section 11.4** <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

**Section 11.5** <u>Headings</u>.  The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

**Section 11.6** <u>Notices</u>.  All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the Bank</u>:

 [**insert name and address**]

<u>If to the Board</u>:

[**insert name and address**]

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.

_____      Dated: _____

**[insert name]**


BANK
[_____ Bank]

By:    _____

       _____
       Print Name

CITY OF DETROIT

By:    _____

       _____
       Print Name

       _____
       Title
Dated:   _____

**EXHIBIT A**

**Bank Compensation**

**EXHIBIT I.A.93**

FORM OF DETROIT POLICE AND FIRE VEBA TRUST AGREEMENT

# CITY OF DETROIT POLICE AND FIRE RETIREE HEALTH CARE TRUST

THIS TRUST AGREEMENT, entered into effective _____, 2014, by and among, the City of Detroit ("Detroit" or the "City") and [_____Bank] (the "Bank").

## W I T N E S S E T H:

WHEREAS, Detroit filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code on July 18, 2013 in the United States Bankruptcy Court for the United States Bankruptcy Court Eastern District of Michigan (the "Court");

WHEREAS, pursuant to the Plan for the Adjustment of Debts of the City of Detroit (the "Plan of Adjustment"), the City agreed to establish a voluntary employees beneficiary association ("VEBA") to provide health care benefits to certain retirees and their Eligible Dependents;

WHEREAS, Detroit hereby establishes this City of Detroit Retiree Health Care Trust (the "Trust");

WHEREAS, the Board of Trustees shall be responsible for: (i) managing the property held by, and administration of, this Trust; and (ii) designing, adopting, maintaining and administering the "Health Care Plan for Retirees of the City of Detroit" (the "Plan"), through which all health care benefits to the Trust's beneficiaries shall be provided;

WHEREAS, the Board of Trustees is willing to exercise the authority granted to it herein with regard to the Trust and Plan;

WHEREAS, through this Trust Agreement, Detroit intends to designate the Bank to serve in the capacity of the institutional trustee with respect to the Trust and to maintain custody of the Trust assets;

WHEREAS, the Bank is willing to receive, hold, and invest the assets of the Trust in accordance with the terms of this Trust Agreement; and

WHEREAS, the Trust and the interdependent Plan are intended to comply with the requirements of section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code"), and are together intended to constitute a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act of 1974;

NOW THEREFORE, in consideration of the premises and the covenants contained herein, Detroit and the Bank agree as follows:

# ARTICLE I
## DEFINITIONS

**Section 1.1**   Bank.  The entity referred to in the Preamble to this Trust Agreement named to perform the duties set forth in this Trust Agreement, or any successor thereto appointed by Detroit in accordance with Section 7.3.  Any corporation continuing as the result of any merger or consolidation to which the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed automatically to be continuing as the Bank.

**Section 1.2**   Board of Trustees or Board.  The Board of Trustees is the body described in Article VIII to which Detroit has delegated responsibility for: (i) managing the property held by, and administering, this Trust; and (ii) designing, adopting, maintaining and administering the Plan, through which all benefits to the Trust's beneficiaries shall be provided.  It shall be constituted and operated in accordance with Article IX.

**Section 1.3**   Code.  The Internal Revenue Code of 1986, as amended, and any successor statute thereto.

**Section 1.4**   Detroit Police and Fire VEBA Beneficiary.  Has the meaning given to that term in the Plan of Adjustment.

**Section 1.5**   Detroit Police and Fire VEBA Contribution.  Has the meaning given to that term in the Plan of Adjustment.

**Section 1.6**   Eligible Dependent.  Means an Eligible Retiree Member's dependent, within the meaning of Code section 501(c)(9) and the regulations promulgated thereunder, who is eligible to receive benefits under the Plan in accordance with its terms.

**Section 1.7**   Eligible Retiree Member.  Means a former employee of Detroit who is a Detroit Police and Fire VEBA Beneficiary.

**Section 1.8**   Investment Act.  Means Act No. 314 of the Public Acts of 1965, being sections 38.1132 et seq. of the Michigan Compiled Laws, as amended, which governs the investment of assets of public employee retirement systems or plans.

**Section 1.9**   Investment Manager.  An investment manager appointed by the Board or its successor in accordance with the provisions of Section 9.4 hereof.

**Section 1.10**   New B Notes.  Has the meaning given to that term in the Plan of Adjustment.

**Section 1.11**   OPEB Claims Notes.  Means the New B Notes contributed to the Trust pursuant to the Detroit Police and Fire VEBA Contribution.

**Section 1.12**   Participant.  An Eligible Retiree Member or Eligible Dependent who is entitled to health care benefits pursuant to the terms of the Plan.

13-53846-tjt   Doc 8379   Filed 12/17/14   Entered 12/17/14 12:30:09   Page 109 of 299
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 93 of
209

Section 1.13    Plan.  The Health Care Plan for Retirees of the City of Detroit, to be adopted and thereafter amended from time to time by the Board, as specified herein, and which will provide health care benefits permitted to be provided by a VEBA under Code section 501(c)(9).

Section 1.14    Plan of Adjustment.  The Plan for the Adjustment of Debts of the City of Detroit.

Section 1.15    Trust Agreement.  This agreement as it may be amended thereafter from time to time by the parties hereto.

Section 1.16    Trust or Trust Fund.  The Detroit Police and Fire Retiree Health Care Trust established by this Trust Agreement, comprising all property or interests in property held by the Bank from time to time under this Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF TRUST

Section 2.1    Purpose.  The Trust is established for the purpose of providing health care benefits, directly or through the purchase of insurance, to the Participants in accordance with the Plan and consistent with Section 501(c)(9) of the Code and the regulations and other guidance promulgated thereunder.  The Trust, together with the Plan, is intended to constitute a VEBA under Section 501(c)(9) of the Code.

Section 2.2    Receipt of Funds.  The Bank shall accept all sums of money and other property contributed to the Trust by Detroit pursuant to Article III.  The Bank shall hold, manage and administer the Trust Fund without distinction between principal and income.  The Bank shall be accountable for the contributions or transfers it receives, but shall not be responsible for the collection of any contributions or transfers to the Trust or enforcement of the terms of the OPEB Claims Notes.

Section 2.3    Inurement and Reversion Prohibited.  At no time shall any part of the principal or income of the Trust Fund be used for, or diverted to, any purpose other than sponsoring, operating and administering the Plan and Trust to provide benefits that are permitted under Code section 501(c)(9) to Participants.  Nothing in this Trust Agreement shall be construed in such a way as to prohibit the use of assets of the Trust Fund to pay reasonable fees and other expenses and obligations incurred in maintaining, administering and investing the Trust Fund or in sponsoring, administering and operating the Plan in accordance with the provisions of this Trust Agreement.  At no time shall any part of the net earnings inure to the benefit of any individual other than through the provision of benefits as permitted under Code section 501(c)(9) and the regulations promulgated thereunder.  In no event will the assets held in the Trust Fund revert to Detroit.  Upon termination of the Trust Fund, any assets remaining upon satisfaction of all liabilities to existing Participants shall be applied, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits under Code section 501(c)(9) and the rules and regulations promulgated thereunder, pursuant to criteria consistent with such rules and regulations.

Section 2.4    No Guarantee.  Nothing contained in the Trust or the Plan shall constitute a guarantee that the assets of the Trust Fund will be sufficient to pay any benefit to any person or make any other payment.  The obligation of the Plan to pay any benefit provided under the Plan is expressly conditioned on the availability of cash in the Trust to pay the benefit, and no plan fiduciary or any other person shall be required to liquidate the OPEB Claims Notes or any other Plan asset in order to generate cash to pay benefits.  Detroit shall not have any obligation to contribute any amount to the Trust except as provided in Article III.  Except for payments of benefits under the Plan, no Participant shall receive any distribution of cash or other thing of current or exchangeable value, either from the Board or the Bank, on account of or as a result of the Trust Fund created hereunder.

Section 2.5    No Interest.  Detroit shall not have any legal or equitable interest in the assets of the Trust Fund at any time, including following the termination of the Trust.

**ARTICLE III**
**CONTRIBUTIONS TO THE TRUST FUND**

Section 3.1     <u>Detroit Contributions</u>.  The Trust Fund shall accept from Detroit the Detroit
Police and Fire VEBA Contribution.  Apart from the Detroit Police and Fire VEBA
Contribution, Detroit shall have no further obligation to contribute to the Trust or otherwise fund
the Plan.

## ARTICLE IV
## PAYMENTS FROM THE TRUST FUND

Section 4.1    Payments from the Trust Fund.

(a)    Subject to paragraph (b) below, the Bank shall make payments from the Trust Fund to provide, directly or through the purchase of insurance, benefits under the Plan as directed by the Board.

(b)    To the extent permitted by law, the Bank shall be fully protected in making payments out of the Trust Fund, and shall have no responsibility to see to the application of such payments or to ascertain whether such payments comply with the terms of the Plan, and shall not be liable for any payment made by it in good faith and in the exercise of reasonable care without actual notice or knowledge of the impropriety of such payments hereunder.  The Bank may withhold all or any part of any payment as the Bank in the exercise of its reasonable discretion may deem proper, to protect the Bank and the Trust against any liability or claim on account of any income or other tax whatsoever; and with all or any part of any such payment so withheld, may discharge any such liability.  Any part of any such payment so withheld by the Bank that may be determined by the Bank to be in excess of any such liability will upon such determination by the Bank be paid to the person or entity from whom or which it was withheld.

Section 4.2    Method of Payments.  The Bank may make any payment required to be made by it hereunder, unless directed otherwise by the Board, by direct electronic deposit of the amount thereof to the financial institution where the person or entity to whom or to which such payment is to be made maintains an account, or by mailing a check in the amount thereof by first class mail in a sealed envelope addressed to such person or entity to whom or to which such payment is to be made, according to the direction of the Board.  If any dispute arises as to the identity or rights of persons who may be entitled to benefits hereunder, the Bank may withhold payment until such dispute is resolved by a court of competent jurisdiction or, at the discretion of the Board, is settled by written stipulation of the parties concerned.

Section 4.3    Excessive Payments.  If the payment of any benefit under the Plan is determined to have been excessive or improper, and the recipient thereof fails to make repayment to the Bank or Bank's agent of such excessive or improper payment upon the Bank's request, the Bank shall deduct the amount of such excessive or improper payment from any other benefits thereafter payable to such person.  Until repaid to the Bank or Bank's agent, the amount of said excessive or improper payment shall not be included in the Trust Fund.

13-53846-tsw  Doc 8379  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 113 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:39  Page 97 of
209

**ARTICLE V**
**BANK POWERS AND DUTIES**

Section 5.1    Powers of the Bank Generally.    The Bank has whatever powers are required to discharge its obligations and to accomplish any of the purposes of this Trust Agreement, including (but not limited to) the powers specified in the following Sections of this Article, and the powers and authority granted to the Bank under other provisions of this Trust Agreement. The enumeration of any power herein shall not be by way of limitation, but shall be cumulative and construed as full and complete power in favor of the Bank.

Section 5.2    Powers Exercisable by the Bank in Its Discretion.    The Bank is authorized and empowered to exercise the following powers at its discretion in satisfaction of the duties imposed on it under this Trust Agreement:

      (a)    To place securities orders, settle securities trades, hold securities in custody, deposit securities with custodians or securities clearing corporations or depositories or similar organizations, and other related activities as shall be necessary and appropriate in performing its duties under this Trust Agreement. Any indicia of ownership of any Trust Fund assets, however, shall not be maintained outside the jurisdiction of the district courts of the United States. Trades and related activities conducted through a broker shall be subject to reasonable fees and commissions established by the broker, which may be paid from the Trust Fund or netted from the proceeds of trades.

      (b)    To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

      (c)    To cause any investment in the Trust Fund to be registered in, or transferred into, its name as the institutional trustee or the name of its nominee or nominees, or to retain such investments unregistered in a form permitting transfer by delivery, but the books and records of the Bank shall at all times show that all such investments are part of the Trust Fund, and the Bank shall be fully responsible for any misappropriation in respect of any investment held by its nominee or held in unregistered form and shall cause the indicia of ownership to be maintained within the jurisdiction of the district courts of the United States;

      (d)    To deliver to the Board, or the person or persons identified by the Board, on a timely basis as required under Section 5.5, proxies and powers of attorney and related informational material, for any shares or other property held in the Trust.

Section 5.3    Powers Exercisable by the Bank Only Upon the Direction of the Board.    The Bank shall exercise the following powers only upon the direction of the Board (or, in the case of subparagraphs (a) and (b)), a duly appointed Investment Manager):

      (a)    To receive, hold, invest and reinvest Trust Fund assets and income under provisions of law from time to time existing and in accordance with Article IX.

(b)     To exercise or abstain from exercising any option, privilege or right attaching to any Trust Fund assets.

(c)     To make payments from the Trust Fund for the provision of benefits in accordance with Article IV and for the payment of expenses as provided in Section 5.8.

(d)     To employ suitable agents and depositaries (domestic or foreign), public accountants, brokers, custodians, ancillary trustees, appraisers, enrolled actuaries, and legal counsel as shall be necessary and appropriate, and to pay their reasonable expenses and compensation.

(e)     To pay any income or other tax or estimated tax, charge or assessment attributable to any property or benefit out of such property or benefit in its sole discretion, or any tax on unrelated business income of the Trust, if any, out of the Trust Fund.

(f)     To vote, in person or by general or limited proxy, at any election of any corporation in which the Trust Fund is invested, and similarly to exercise, personally or by a general or limited power of attorney, any right appurtenant to any investment held in the Trust Fund.

(g)     To accept, compromise or otherwise settle any obligations or liability due to or from them as Bank hereunder, including any claim that may be asserted for taxes, assessments or penalties under present or future laws, or to enforce or contest the same by appropriate legal proceedings.

Section 5.4     <u>Title to Trust Fund</u>.  All rights, title and interest in and to the Trust Fund shall at all times be vested exclusively in the Bank.

Section 5.5     <u>General Duties and Obligations of Bank.</u>

(a)     In accordance with Article II, the Bank shall hold all property received by it and any income and gains thereupon.  In accordance with this Article and Article IX, the Bank shall manage, invest and reinvest the Trust Fund following the directions of the Board or a duly appointed Investment Manager, shall collect the income therefrom, and shall make payments or disbursements as directed by the Board.

(b)     Subject to the provisions of Articles VII and X, the Bank shall comply with any directive issued by the Board to withdraw and transfer all or any part of the Trust Fund to another institutional trustee, custodian or a funding agent.

(c)     The Board shall have responsibility for directing the Bank as to the voting (by proxy or in person) of any shares or other property held in the Trust. Accordingly, the Bank shall deliver to the Board (or the person or persons identified by the Board), on a timely basis, proxies, powers of attorney and related informational material that are necessary for the Board to fulfill its responsibility.

The Bank may use agents to effect such delivery to the Board (or the person or persons identified by the Board).

(d)     The Bank shall discharge its duties in the interests of Participants and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Trust and the Plan and shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in conduct of an enterprise of like character and with like aims.  The Bank will be under no liability or obligation to anyone with respect to any failure of the Board to perform any of its obligations under the Plan or Trust Agreement or for any error or omission of the Board.

Section 5.6     <u>Determination of Rights</u>.  The Bank shall have no power, authority, or duty hereunder in respect to the determination of the eligibility of any person to coverage under the Plan, or the entitlement of any person to any benefit payments under the Plan.

Section 5.7     <u>Continuance of Plan; Availability of Funds</u>.  Neither the Board, the Bank nor Detroit assumes any contractual obligation as to the continuance of the Plan and shall not be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan, and the Bank's obligation to make any payment shall be limited to amounts held in the Trust Fund at the time of the payment.

Section 5.8     <u>Payment of Expenses</u>.  The Bank shall apply the assets of the Trust Fund to pay all reasonable costs, charges, and expenses (including, but not limited to, all brokerage fees and transfer tax expenses and other expenses incurred in connection with the sale or purchase of investments, all real and personal property taxes, income taxes and other taxes of any kind at any time levied or assessed under any present or future law upon, or with respect to, the Trust Fund or any property included in the Trust Fund and all legal, actuarial, accounting and financial advisory expenses) reasonably incurred  by the Bank or the Board in connection with establishing, sponsoring, administering or operating the Trust or Plan.  The Board shall by written certificate provided to the Bank request payment for any expenses related to the administration of the Trust and/or the Plan.  Upon receipt of the written certificate, the Bank may make the payment requested by the Board.  The expenses of the Bank shall constitute a lien on the Trust Fund.

Section 5.9     <u>Bank Compensation</u>.  The Bank will apply the assets of the Trust Fund to pay its own fees in the amounts and on the dates [set forth in Exhibit A].  The Bank's compensation shall constitute a lien on the Trust Fund.

Section 5.10    <u>Reliance on Written Instruments</u>.  The Bank shall be fully protected in acting upon any instrument, certificate or paper believed by it to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

# ARTICLE VI
## BANK ACCOUNTS

Section 6.1     <u>Records</u>.  The Bank shall maintain accurate and detailed records and accounts of all investments, receipts, disbursements, and other transactions with respect to the Trust, and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by the Board or such person or persons as the Board may designate.

Section 6.2     <u>Annual Audit</u>.  The Trust Fund shall be audited annually, and a statement of the results of such audit shall be provided to the Bank and also made available for inspection by interested persons at the principal office of the Trust.

Section 6.3     <u>No Interest by Participants</u>.  In no event shall any Participant or beneficiary have any interest in any specific asset of the Trust Fund.  At no time shall any account or separate fund be considered a savings account or investment or asset of any particular Participant, beneficiary, or class of Participants and beneficiaries, and no Participant or beneficiary shall have any right to any particular asset which the Board or Bank may have allocated to any account or separate fund for accounting purposes.

Section 6.4     <u>Furnishing Written Accounts</u>.  The Bank shall file with the Board a written account setting forth a description of all securities and other property purchased and sold, and all receipts, disbursements, and other transactions effected by it during the accounting period to which the Board and the Bank have agreed, and showing the securities and other properties held, and their fair market values at such times and as of such dates as may be agreed by the Board and the Bank in writing.  Such written account shall be filed with the Board within thirty (30) days after the close of each calendar quarter.

Section 6.5     <u>Accounting Year, Cash Basis</u>.  The accounting year of the Trust shall be the calendar year.  All accounts of the Bank shall be kept on a cash basis.

Section 6.6     <u>Judicial Proceedings</u>.  If the Bank and the Board cannot agree with respect to any act or transaction reported in any statement, the Bank shall have the right to have its accounts settled by judicial proceedings in which only the Bank and the Board shall be necessary parties.  No Participant shall have any right to compel an accounting, judicial or otherwise, by the Bank.

# ARTICLE VII
## PROCEDURES FOR THE BANK

Section 7.1    Removal.  The Bank may be removed by Detroit at any time upon thirty (30) days' advance written notice.  Such removal shall be effective on the date specified in such written notice, provided that notice has been given to the Bank of the appointment of a successor institutional trustee or custodian in the manner set forth in Section 7.3 below.

Section 7.2    Resignation.  The Bank may resign by filing with Detroit a written resignation that shall take effect ninety (90) days after the date of such filing, unless prior thereto a successor institutional trustee or custodian has been appointed by the Board.  In no event may the Bank's resignation take effect before a successor institutional trustee or custodian has been appointed.  If Detroit fails to appoint a successor institutional trustee or custodian, the retiring Bank may seek the appointment of a successor entity in the manner set forth in Section 7.3.

Section 7.3    Successor Bank.

> (a)    Detroit may appoint a successor institutional trustee or custodian by delivering to such successor an instrument in writing, executed by an authorized representative of Detroit, appointing such successor entity, and by delivering to the removed or resigning Bank an acceptance in writing, executed by the successor so appointed.  Such appointment shall take effect upon the date specified in Section 7.1 or 7.2 above, as applicable.

> (b)    Alternatively, Detroit may appoint a successor institutional trustee or custodian by securing from such successor an amendment to this Trust Agreement, executed by both the successor and an authorized representative of Detroit, which replaces the current Bank with the successor institutional trustee or custodian, appointing such successor institutional trustee or custodian, and by delivering to the removed or resigning Bank an executed copy of the amendment.  Such appointment shall take effect upon the date specified in the amendment.

> (c)    If no appointment of a successor institutional trustee or custodian is made by Detroit within a reasonable time after such resignation, removal or other event, any court of competent jurisdiction may, upon application by the retiring Bank, appoint a successor institutional trustee or custodian after such notice to Detroit and the retiring Bank, as such court may deem suitable and proper.

Section 7.4    Effect of Removal or Resignation of Bank.  Upon the removal or resignation of the Bank in accordance with Section 7.1 or 7.2 above, the Bank shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law.

Section 7.5    Merger or Consolidation of the Bank.  Any corporation continuing as the result of any merger or resulting from any consolidation, to which merger or consolidation the Bank is a party, or any corporation to which substantially all the business and assets of the Bank may be transferred, will be deemed to be continuing as the Bank.

**ARTICLE VIII**
**COMPOSITION OF AND PROCEDURES FOR THE BOARD OF TRUSTEES**

Section 8.1    <u>Number and Appointment of Members.</u>  The Board of Trustees shall consist of seven (7) voting members, who are selected by the Mayor of Detroit and by the Eligible Retiree Members (directly or indirectly through a representative) as provided below.

> (a)    The Mayor of Detroit shall appoint three (3) voting members, both of whom shall be residents of the State of Michigan and neither of whom may be an employee, contractor, agent or affiliate of the City or any labor union representing employees of the City, a member of any such labor union, or a Participant.  At least one (1) of the such independent members shall have expert knowledge or extensive experience with respect to economics, finance, or institutional investments, and at least one (1) of such independent members shall have expert knowledge or extensive experience with respect to administration of public or private health and welfare benefit plans, executive management, benefits administration or actuarial science.  The voting members of the Board selected by the Mayor as of the Effective Date shall be [_____ , _____ and _____.]

> (b)    The Eligible Retiree Members shall select four (4) voting members pursuant to procedures established by the Board; provided, however, that two (2) such voting members shall initially be designated by the Official Committee of Retirees of the City of Detroit, Michigan, and two (2) such voting members shall initially be designated by the Retired Detroit Police and Fire Fighters Association on behalf of such Eligible Retiree Members.  The members initially selected on behalf of the Eligible Retiree Members are [_____, _____ , _____ and _____.]

Each Board member shall acknowledge his or her appointment and acceptance of the duties and responsibilities set forth in this Trust Agreement in writing.

Section 8.2    <u>Term of Office</u>.  Each member of the Board shall serve a period of four (4) years, or if earlier, until his or her death, incapacity to serve hereunder, or resignation.  In the event of a vacancy, the replacement Board member shall be appointed as provided in Section 8.1.

Section 8.3    <u>Resignation</u>. A Board member may resign, and shall be fully discharged from further duty or responsibility under this Trust Agreement to the extent permitted by law, by giving at least ninety (90) days' advance written notice to Detroit stating a date when such resignation shall take effect, which notice or time period may be waived by the Board.

Section 8.4    <u>Fees and Expenses</u>.  The Board members appointed by the Mayor shall each be paid a stipend of [$12,000] per year (payable ratably on a monthly basis).  The Board members selected by the Eligible Retiree Members shall each be paid a stipend of [$_____] per year (payable ratably on a monthly basis).  Each Board member may be reimbursed by the Trust for reasonable expenses properly and actually incurred in the performance of its duties.  Compensation payable to the Board members and all reimbursed expenses shall be payable out of the Trust.

Section 8.5    Operation of the Board; Quorum.  The Board shall select from among its members a chair and a vice chair.   The Board shall hold regular meetings, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure and shall keep a record of proceedings.  Each Board Member shall be entitled to one vote on each question before the Board.  Five (5) members shall constitute a quorum at any meeting.  A majority vote of the members present at a meeting of the Board at which a quorum exists shall be necessary for a decision by the Board.

## ARTICLE IX
## POWERS AND DUTIES OF THE BOARD OF TRUSTEES

Section 9.1    <u>General</u>.  The Board shall be responsible for designing, adopting, maintaining and administering the Plan, as well as administering the Trust and managing the Trust assets as provided herein.  Subject to the provisions of this Trust Agreement, the Plan documents and applicable laws, the Board shall have sole, absolute and discretionary authority to adopt such rules and regulations and take all actions that it deems desirable for the administration of the Plan and Trust, and to interpret the terms of the Plan and Trust.  The decisions of the Board will be final and binding on all Participants and all other parties to the maximum extent allowed by law.

Section 9.2    <u>Plan Design and Administration</u>.

(a)    <u>Adoption of Plan</u>.  The Board shall adopt a Plan to offer health care benefits to Participants. All terms of the Plan shall be determined by the Board; provided that such terms shall be consistent with this Trust Agreement, Code section 501(c)(9) and the regulations promulgated thereunder.  The Board shall be under no obligation to design the Plan to assure that the assets of the Trust Fund are sufficient to provide benefits to all potential Participants of the Plan in subsequent years.

(b)    <u>Benefits</u>.  The Plan shall include benefits and any other features including, without limitation, premium-sharing or other cost-sharing, that the Board from time to time determines appropriate or desirable in its sole discretion.  The Plan may provide for different benefit structures or programs for different groups of Participants, as determined by the Board in its sole discretion.  In designing the Plan and the benefits to be provided thereunder, the Board may take into account relevant circumstances, including, without limitation, the degree to which Participants may have alternative resources or coverage sources, as well as the resources of the Trust Fund.  Benefits provided under the Plan shall be limited to those health care benefits permitted by Code Section 501(c)(9), and any Plan eligibility restrictions established by the Board shall conform with the requirements set forth in Treasury Regulation Section 1.501(c)(9)-2.

(c)    <u>Method of Providing Benefits</u>.  Benefits under the Plan may be fully insured, partially insured or self-insured, as determined by the Board from time to time in its sole discretion.  The expected cost of benefits under the Plan shall not exceed the amount expected to be available under the Trust.

(d)    <u>Plan Documentation.</u>  The Board shall be responsible for creating, adopting and/or executing any documents necessary to set forth the Plan's governing terms, and shall be responsible for communicating the terms of the Plan to the Eligible Retiree Members and Eligible Dependents in accordance with applicable law.

Section 9.3    <u>Investment of the Trust</u>.  The Board shall have full power and authority to manage, control, invest and reinvest the money and other assets of the Trust Fund subject to all terms, conditions, limitations, and restrictions imposed on the investment of assets of public employee retirement systems or plans by the Investment Act, and the Bank shall comply with the

proper written direction of the Board concerning those assets. The Board may employ outside advisors, including investment advisors, to advise it with regard to the investment of the assets of the Trust Fund. Any outside advisors who are investment fiduciaries (as defined in the Investment Act) shall satisfy any applicable requirements of the Investment Act.

Section 9.4    <u>Appointment of Investment Managers</u>. The Board, from time to time, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust (hereinafter referred to as an "Investment Account"). The Board shall determine that each Investment Manager satisfies the requirements of section 38.1133(11) of the Investment Act and, is entitled (under its investment management agreement) to direct the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Board determines shall modify the scope of such authority. If an Investment Manager is appointed, it shall have the authority of the Bank specified in Section 5.1 hereof with respect to the Investment Account over which it has investment discretion and the Bank's duties with respect to such Investment Account shall be limited to following the instructions of the Investment Manager. Provided that an Investment Manager is prudently selected and monitored by the Board, the Board shall have no liability (a) for the acts or omissions of such Investment Manager; (b) for following directions of such Investment Manager which are given in accordance with this Trust Agreement; or (c) for any loss of any kind which may result by reason of the manner of division of the Trust into Investment Accounts.

Section 9.5    <u>Government Reports and Returns</u>. The Board shall file all reports and returns that are required to be made with respect to the Trust and the Plan.

Section 9.6    <u>Compromise or Settle Claims</u>. The Board may compromise, settle and release claims or demands in favor of or against the Trust or the Board on such terms and conditions as the Board may deem advisable.

Section 9.7    <u>Appointment of Administrator</u>. The Board may appoint a third party to perform any administrative functions it has with regard to the Trust or Plan.

Section 9.8    <u>Employment of Assistance</u>. The Board has the exclusive authority to employ, contract and pay for all professional services including, but not limited to, actuarial, investment, legal, accounting, medical, and any other services that the Board considers necessary for the proper operation and administration of the Plan and Trust. The powers granted to the Board in this subparagraph include complete control of the procurement process, including contracts for office space, computer hardware and software, and human resource services. In accordance with the provisions of Section 5.3 hereof, the Board may direct the Bank to pay reasonable compensation therefor from the Trust Fund. The Board may take or may refrain from taking any action in accordance with or reliance upon the opinion of counsel or such expert advisors.

Section 9.9    <u>Reliance on Written Instruments</u>. The Board shall be fully protected in acting upon any instrument, certificate or paper believed by him or her to be genuine and to be signed or presented by a duly authorized person or persons, and shall be under no duty to make any

investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

Section 9.10   No Individual Liability on Contracts.  The Board shall not be liable personally for any debts, obligations, or undertakings contracted by them, or for the breach of any contracts. Such claims and obligations shall be paid out of the Trust; provided, however, that the Board shall not be exempt from personal liability for willful misconduct, intentional wrongdoing, breach of applicable fiduciary duty, or fraud, and the Trust shall not indemnify the Board for such liabilities, or to the extent that application of this sentence would violate any law.

Section 9.11   Detroit Not Liable for Conduct of Board.  The Board is not in its capacity as Board an officer, agent, employee, or representative of Detroit.  In its capacity as Board, the Board is a principal acting independently of Detroit, which shall not be liable for any act, omission, contract, obligation, or undertaking of the Board or its officers, agents, or representatives.

Section 9.12   Liability Insurance.  The Board may obtain and keep current a policy or policies of insurance, insuring the members of the Board from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under this Trust Agreement or the Plan.  To the extent permitted by applicable law, the premiums on such policies may be paid from the Trust Fund.

Section 9.13   Reimbursement for Defense of Claims.  To the extent permitted by applicable law and not otherwise covered by liability insurance purchased by the Trust (without regard to any non-recourse rider purchased by the insured), the Board, employees of the Board and persons acting on the Board's behalf pursuant to an express written delegation (each separately, the "Indemnified Party") shall be reimbursed by the Trust Fund for reasonable expenses, including without limitation attorneys fees, incurred in defense of any claim that seeks a recovery of any loss to the Plan or Trust Fund or for any damages suffered by any party to, or beneficiary of this Trust Agreement (a) for which the Indemnified Party is adjudged not liable, or (b) which is dismissed or compromised in a final settlement, where the Board – or, where required by applicable law, an independent fiduciary – determines that the settling Indemnified Party was not primarily responsible (in such cases, all or only a portion of the settling Indemnified Party's reasonable expenses may be reimbursed, as directed by the Board or an independent fiduciary), provided that, the Board shall have the right to approve of the retention of any counsel whose fees would be reimbursed by the Trust Fund, but such approval shall not be withheld unreasonably.

Section 9.14   Subrogation and Reimbursement.  If the Plan is self-insured, the following provisions regarding subrogation and third-party reimbursement will apply.

(a)      If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of an individual ("Benefit Recipient"), the Trust Fund shall be subrogated as provided in this Section 9.14 to all the Benefit Recipient's rights of recovery with respect to the illness or injury for which the payment of benefits is made by the Trust Fund.  The right of recovery referred to in the preceding sentence shall include the right to make a claim, sue,

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 17:20:39  Page 123 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:39  Page 4 of 99
209

and recover against any person or entity from the first dollars of any funds which are paid or payable as a result of a personal injury claim or any reimbursement of health care expenses. If requested in writing by the Board, the Benefit Recipient shall take, through any representative designated by the Board, such action as may be necessary or appropriate to recover such payment from any person or entity, said action to be taken in the name of the Benefit Recipient. In the event of a recovery or settlement, the Trust Fund shall be reimbursed in full on a first priority basis out of such recovery or settlement for expenses, costs, and attorneys' fees incurred by it in connection therewith.

(b)     If the Trust Fund pays, or is obligated to pay, any amount to or on behalf of a Benefit Recipient for an illness or injury, the Trust Fund shall be entitled to, and shall have a first priority equitable lien on, the proceeds of any recovery, by judgment, settlement or otherwise, with respect to the illness or injury, and if paid to the Benefit Recipient, the Benefit Recipient shall immediately pay any such proceeds to the Trust Fund. If the Benefit Recipient fails to pay such proceeds, or does not cause such proceeds to be paid, to the Trust Fund, the Board may, in addition to any other remedy to which it may be entitled, recover the proceeds directly or by offset against claims for benefits under the Plan and Trust made with respect to the affected Benefit Recipient (or such Benefit Recipient's beneficiaries, heirs, attorneys, agents, representatives, or estate).

(c)     The Trust Fund shall have the right of subrogation and reimbursement set forth in this Section 9.14 regardless of whether the Benefit Recipient is made whole and regardless of whether the recovery, or any part thereof, is designated as payment for health care expenses, pain and suffering, loss of income or any other specified or unspecified damages or reason, and without regard to whether recovery is designated as including or excluding the health care expenses covered by the Plan and Trust. Any recovery by a Benefit Recipient, an attorney or other third party shall be deemed to be for the benefit of the Plan and Trust and shall be held in constructive trust for the Trust Fund until the Trust Fund is reimbursed in full for all amounts paid by the Trust Fund. The subrogation and reimbursement rights of the Trust Fund described in this Section 9.14 include all rights against, and include all rights with respect to, proceeds from or held by any attorney, third party, insurance carrier or payer of medical benefits, including an uninsured or under-insured motorist carrier, a no-fault carrier and a school insurance carrier, even if such coverage was purchased by the Benefit Recipient, and without regard to whether the proceeds have been paid or are payable.

(d)     By participating in the Plan, each Benefit Recipient agrees to cooperate fully with the Plan and Trust and to execute and deliver agreements, liens and other documents and do whatever else the Board deems necessary to enable and assist the Trust Fund in exercising its rights under this Section 9.14, but the Trust Fund's rights under this Section 9.14 shall be effective regardless of whether the Benefit Recipient actually signs any agreements, liens or other documents. By participating in the Plan, each Benefit Recipient also agrees (i) that he or she will not make or maintain any make whole, common trust fund or apportionment action or claim in contravention of the subrogation and reimbursement provisions of this Section 9.14; and (ii) that he or she will not oppose any proceeding by the Trust Fund to obtain reimbursement on procedural grounds. The Benefit Recipient, directly or through his or her representatives, shall not do anything to

impair the Trust Fund's rights. If the Board determines that any Trust Fund recovery rights under Section 9.14 have been impaired by any action of the Benefit Recipient or his or her representatives or by the Benefit Recipient's or such other person's failure to comply with the Benefit Recipient's obligations under Section 9.14, the Board may, in addition to any other remedy to which it may be entitled, determine the amount by which the Trust Fund's recovery rights have been impaired and recover such amount directly or by offset against claims for benefits under the Trust Fund made with respect to the affected Benefit Recipient.

(e)      This Section 9.14 entitles the Trust Fund to subrogation and reimbursement equal to the entire amount paid by the Trust Fund for the illness or injury to which the subrogation or reimbursement relates, including related expenses, costs and attorneys' fees, which shall be from the first dollars payable to or received by the Benefit Recipient, his representatives, heirs, legal counsel, estate or any other third party from any settlement, judgment or other payment, without reduction for attorneys' fees or for any other reason. The common fund, make-whole, apportionment or any similar doctrines shall not apply to any amounts received. Any attorneys' fees shall be the responsibility solely of the Benefit Recipient, and the Trust Fund shall not pay any attorneys' fees or costs associated with a Benefit Recipient's claim or lawsuit without the Board's prior written authorization.

(f)      The intention of this Section 9.14 is to give the Trust Fund the first right of subrogation and reimbursement in full with respect to the first dollars paid or payable, even though the Benefit Recipient is not made whole. Each Benefit Recipient agrees that as a condition to receiving benefits under the Plan and from the Trust Fund, the Benefit Recipient shall comply with the requirements of this Section 9.14.

# ARTICLE X
# AMENDMENT, TERMINATION AND MERGER

Section 10.1    Amendment.  The Trust Agreement may be amended at any time in writing by Detroit or by Court order upon proper motion, provided, however, that no amendment may impose a contribution obligation on Detroit; and provided further that no amendment shall adversely affect the exempt status of the Trust or Plan under Section 501(c)(9) of the Code.  No amendment to the Trust Agreement shall modify the responsibilities of the Bank hereunder unless the Bank has first consented to such amendment.

Section 10.2    Termination.

(a)    The Trust and this Trust Agreement may be terminated at any time in writing by Detroit with a copy of such written instrument to be provided to the Bank, or by Court order upon proper motion.  Upon termination of this Trust Agreement, the assets of the Trust Fund shall be paid out at the direction of the Board in the following order of priority:  (i) the payment of reasonable and necessary administrative expenses (including taxes); (ii) the payment of benefits to Participants entitled to payments for claims arising prior to such termination; and (iii) upon satisfaction of all liabilities to existing Participants, either directly or through the purchase of insurance, to provide life, sick accident or other permissible benefits in accordance with Code section 501(c)(9) and the rules and regulations promulgated thereunder.  Neither Detroit nor the Board shall have any beneficial interest in the Trust Fund.  The Trust Fund shall remain in existence until all assets have been distributed.

(b)    Upon termination, the Bank and the Board shall continue to have all of the powers provided in this Trust Agreement as are necessary or desirable for the orderly liquidation and distribution of the Trust Fund in accordance with the provisions hereof.

Section 10.3    Transfer of Assets and/or Liabilities.  To the extent permitted by Code section 501(c)(9) and other applicable law, some or all of the assets and/or liabilities of the Trust Fund may at the discretion of the Board be transferred directly to another trust for the purpose of providing health or welfare benefits to some or all of the Participants on such terms and conditions as the Board may determine.

# ARTICLE XI
## MISCELLANEOUS

**Section 11.1** <u>Rights in Trust Fund</u>. No Participant or other person shall have any right, title or interest in the Trust Fund or any legal or equitable right against the Bank, the Board, or Detroit, except as may be otherwise expressly provided in the Plan or in this Trust Agreement.

**Section 11.2** <u>Non-Alienation</u>. Except to the extent required by applicable law, the rights or interest of any Participant to any benefits or future payments hereunder or under the provisions of the Plan shall not be subject to attachment or garnishment or other legal process by any creditor of any such Participant, nor shall any such Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments which he may expect to receive, contingent or otherwise, under this Trust Agreement.

**Section 11.3** <u>Controlling Laws</u>. The Trust shall be construed and the terms hereof applied according to the laws of the state of Michigan to the extent not superseded by federal law.

**Section 11.4** <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be considered as an original.

**Section 11.5** <u>Headings</u>. The headings and subheadings of this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement.

**Section 11.6** <u>Notices</u>. All notices, requests, demands and other communications under this Trust Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of receipt if served personally or by confirmed facsimile or other similar communication; (b) on the first business day after sending if sent for guaranteed next day delivery by Federal Express or other next-day courier service; or (c) on the fourth business day after mailing if mailed to the party or parties to whom notice is to be given by registered or certified mail, return receipt requested, postage prepaid, and properly addressed as follows:

<u>If to the Bank</u>:

 [**insert name and address**]


<u>If to the Board</u>:

[**insert name and address**]

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 127 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 9 of 9
209

IN WITNESS WHEREOF, and as evidence of the establishment of the Trust created hereunder, the parties hereto have caused this instrument to be executed as of the date above first written.


_____          Dated: _____
**[insert name]**



BANK
[_____ Bank]

By:      _____

        _____
        Print Name

CITY OF DETROIT

    By:      _____

        _____
        Print Name
        _____
        Title
Dated: _____

# EXHIBIT A

## Bank Compensation

**EXHIBIT I.A.102**

PRINCIPAL TERMS OF DIA SETTLEMENT

# Term Sheet

| | |
|---|---|
| | For the purposes of this Term Sheet the following terms have the meanings provided below:<br><br>**CFSEM** means Community Foundation for Southeast Michigan.<br><br>**City** means the City of Detroit.<br><br>**Closing** means the closing of the transactions contemplated herein.<br><br>**Definitive Documentation** means the definitive agreements and other transaction documents to be executed and delivered at Closing.<br><br>**DIA Funders** means those persons, businesses, business-affiliated foundations and other foundations that are listed on Exhibit C to this Term Sheet and all additional persons, businesses, business-affiliated foundations and any other foundations from which The DIA secures commitments to contribute monies as "DIA Funders" in furtherance of the transactions contemplated by this Term Sheet.<br><br>**Foundation Funders** means the foundations that are listed on Exhibit B to this Term Sheet and any additional foundations (other than foundations that are DIA Funders) that, subsequent to the date of this Term Sheet, agree to contribute monies as "Foundation Funders" in furtherance of the transactions contemplated by this Term Sheet.<br><br>**Funder** means a Foundation Funder, a DIA Funder, or The DIA (collectively, the "**Funders**").<br><br>**Museum** means the museum that is commonly referred to as the Detroit Institute of Arts.<br><br>**Museum Assets** means the Museum art collection, operating assets, buildings, parking lots and structures, and any other assets having title vested in the City that are used primarily in servicing the Museum, including those covered by the 1997 Operating Agreement between the City and The DIA (the "**Operating Agreement**") all as more particularly described on Exhibit A to this Term Sheet.<br><br>**Payment Amount** means at least $815 million without interest and, to the extent applicable, reduced by any Present Value Discount. |
| **Definitions** | |

| | |
|---|---|
| | **Payment Period** means the twenty year period commencing on and immediately following the date of the Closing.<br><br>**State** means the State of Michigan.<br><br>**Supporting Organization** means the Foundation for Detroit's Future, a Michigan nonprofit corporation, which is a supporting organization of CFSEM, which was established to accommodate the contribution and payment of monies from the Funders, as contemplated under this Term Sheet, and will obtain 501(c)(3) status prior to the Closing.<br><br>**The DIA** means The Detroit Institute of Arts, a Michigan not-for-profit corporation.<br><br>**Tri-Counties** means the Counties of Macomb, Oakland and Wayne, all in the State.<br><br>Other capitalized terms are defined elsewhere in this Term Sheet. |
| **Scope of Settlement** | The consummation of the transactions contemplated in this Term Sheet shall be in full and final settlement of all disputes relating to the rights of the City, the Police and Fire Retirement System and the General Retirement System for the City (collectively, the "**Pensions**"), The DIA, and the State with respect to the Museum, including the Museum Assets. Disputes held by other of the City's creditors pertaining to the foregoing subject matter shall be resolved by confirmation of the Plan of Adjustment (defined below). |
| **Reservation of Rights** | This Term Sheet proposes a settlement of disputed factual and legal issues. Nothing in this Term Sheet constitutes an admission as to any factual or legal issue or a waiver of any claim or defense, and all rights of the City, The DIA, the Funders and all other parties in the City's bankruptcy case regarding the Museum and the Museum Assets are fully preserved until the Closing. |
| **Treatment of Museum Assets** | As a result of this settlement, at Closing, all right, title and interest in and to the Museum Assets shall be conveyed to The DIA to be held in perpetual charitable trust for the benefit of the people of the City and the State, including the citizens of the Tri-Counties, permanently free and clear of all liens, encumbrances, claims and interests of the City and its creditors (the "**Transfer**"). |

13-53846-tjt-swr Doc 8879 Filed 12/17/19 Entered 12/17/19 14:20:50 Page 132 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:50 Page 96 of 209
209

| | |
|---|---|
| **Funding Commitments** | All commitments of the Funders shall, subject to the terms and conditions of this Term Sheet and the Definitive Documentation, be the irrevocable, authorized, valid and binding commitments by the Funders, enforceable against such Funders, except that the commitment of The DIA as to any DIA Deficiency will be subject to its right of substitution as discussed in "*DIA Commitment Regarding Funding*" below. Exhibit B and Exhibit C, as applicable, set forth the commitment amount and, to the extent known prior to the date of this Term Sheet, the payment schedule for each Funder. Prior to execution of the Definitive Documentation, each Funder with respect to which the payment schedule was not known as of the date of this Term Sheet (unless such party becomes a "**Funder**" only after the date of the Definitive Documentation) shall agree to a payment schedule. Each Funder shall have the right to prepay its commitment in whole or in part at any time without penalty and no interest will be owed on any Funder's payments.

All payments by the Funders shall be made as set forth in "*Payment Mechanism*" of this Term Sheet. (The mechanics, timing and terms of all payments by the State shall be determined between the State and the City.)

The parties acknowledge that Funder payments are conditioned on the City meeting certain conditions both initially and on a continuing basis. See "*Conditions to Future Funding Obligations*" of this Term Sheet. Failure of the City to meet those conditions in any material respect may result in the delay of a scheduled payment by the Funders to the Supporting Organization and a delay of a scheduled payment by the Supporting Organization to the City until (i) all material requisite conditions for that payment are met; or (ii) cancellation of that payment if the material requisite conditions are not met within any established cure period.

Funding commitments of the following amounts (before giving effect to any Present Value Discount, as applicable) are required as a condition to Closing:

Foundation Funders (net)     $366 million
DIA Funders and DIA        $100 million\*
State                              $350 million

                 \*inclusive of the intended funding amounts for the indentified Foundation Funders |

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 133 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 97 of 91
209

| | |
|---|---|
| | listed in Exhibit B |
| | To the extent the City fails to meet its indemnity obligations further described in Exhibit D, the Funders', the Supporting Organization's and The DIA's (with respect to a DIA Deficiency or under the Guaranty) funding commitments will be reduced by any litigation or defense costs, damages or settlement costs incurred by the applicable Funder, the Supporting Organization or The DIA in connection therewith. Similarly, the Funders, the Supporting Organization and The DIA may reduce their funding commitments to the extent that any litigation or defense costs, damages or settlement costs incurred by them and arising from the transactions contemplated by this Term Sheet and the Definitive Documentation are not otherwise covered by the City's indemnity obligations described in Exhibit D. |
| **Present Value Discount** | To the extent that the DIA Funders and The DIA have agreed upon an aggregate payment schedule (determined as of the Closing and adjusted after the Closing for any New Donor Commitments), that provides for the payment of greater than an aggregate of $5 million per year during the Payment Period (the "**Agreed Required Minimum Schedule**"), the amount and timing of such annual excess in commitments shall, applying a discount rate to be agreed upon hereafter but prior to Closing, which may or may not be the same earnings rate that the Pensions use as provided for in the confirmed Plan of Adjustment as the Pensions' assumed future investment return, result in a present value discount in an amount which reflects the payments required to be made being instead made more rapidly than required by the Agreed Required Minimum Payment Schedule, which present value discount shall reduce the aggregate amount of the commitments that The DIA is required to secure or, as to any DIA Deficiency, undertake itself (the "**Present Value Discount**").

Each Foundation Funder which funds its commitment more rapidly than ratably over twenty years shall likewise be entitled to a Present Value Discount determined in the same manner as set forth in the preceding paragraph.

Any disputes regarding the calculation or application of a Present Value Discount will be irrevocably determined, |

13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 17:20:39 Page 134 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:39 Page 93 of
209

| | |
|---|---|
| | based upon the formula described in this Term Sheet, by an independent auditing firm to be agreed upon in the Definitive Documentation. |
| **The DIA Commitment Regarding Funding** | The DIA undertakes to secure commitments for contributions of $100 million (subject to the Present Value Discount) from the business community (and their related foundations), other foundations and individuals. As of the Closing, The DIA shall be responsible for any portion of the $100 million (subject to the Present Value Discount) for which it has not secured commitments from DIA Funders as of the Closing (the "**DIA Deficiency**"). However, The DIA shall have the right after the Closing to substitute for its obligation to pay any or all of the DIA Deficiency commitments from new DIA Funders or an increased funding commitment from an existing DIA Funder (each a "**New Donor Commitment**") for such amount of the DIA Deficiency. Subject to the terms of this Term Sheet, all New Donor Commitments shall be payable according to payment schedules which shall not run later than the end of the Payment Period. In addition, The DIA agrees that it will have no claims against the Foundation Funders for failure to fund their commitments and that the Foundation Funders have made no commitments beyond those set forth in this Term Sheet (as will be reflected in the Definitive Documentation). |
| **DIA Guaranty** | Subject to the terms and conditions of this Term Sheet, The DIA shall guaranty (the "**Guaranty**") the payment by all DIA Funders of all amounts such DIA Funders pledge against the $100 million (subject to the Present Value Discount) commitment of The DIA under the "*Funding Commitment*" section of this Term Sheet. The City may take action to collect Default Amounts under the Guaranty as permitted under the "*Default and Remedies*" section of this Term Sheet. The City shall not otherwise take action to collect any amounts under the Guaranty, and under no circumstances will anyone other than the City have any right to take any action to collect any amounts under the Guaranty. The DIA Guaranty shall be in form and substance acceptable to the City and the Funders. |
| **Default and Remedies** | All Funders (including The DIA, both as to any DIA Deficiency and with respect to the Guaranty) shall have the right to rely upon the determination of the Board of Directors of the Supporting Organization as to whether the conditions |

to a scheduled payment have been satisfied and, if not initially satisfied, whether they have been timely cured. In the event that the Supporting Organization has determined that the conditions have not been satisfied (or timely cured) and the City disputes that determination, the City's only recourse shall be to dispute the Supporting Organization's determination. The City shall have no claim against any Funder (or under the Guaranty) for such Funder's reliance upon the determination of the Board of Directors of the Supporting Organization. Any dispute between the City and the Supporting Organization regarding whether the conditions had been satisfied or timely cured shall be determined in accordance with the "*Dispute Resolution*" section of this Term Sheet.

In the event it is determined by the Supporting Organization or through arbitration that the conditions to a scheduled payment have been satisfied or timely cured, all Funders shall be required to make their scheduled payments to the Supporting Organization (or, as to DIA Funders that so elect in accordance with the "*Payment Mechanism*" section of this Term Sheet, to The DIA, which will be required to make its scheduled payments to the Supporting Organization). If a Foundation Funder, a DIA Funder or The DIA (either with respect to a Deficiency Amount or on behalf of a DIA Funder who elects to make its payments to The DIA) has made its scheduled payment to the Supporting Organization, the City shall have recourse only to the Supporting Organization (and not any Funder that made its scheduled payment) for such payment. If a Foundation Funder, a DIA Funder or The DIA (either with respect to a Deficiency Amount or on behalf a DIA Funder who elects to make its payments to The DIA) has not made its scheduled payment after it is determined by the Supporting Organization or through arbitration that the conditions to such payment have been satisfied or timely cured, the Supporting Organization shall, after making reasonable efforts to collect the scheduled payment from the Funder (the "**Non-funding Party**"), assign its right to enforce payment of that scheduled payment (the "**Default Amount**") to the City in full satisfaction of the Supporting Organization's obligation to make such payment to the City.

If the Supporting Organization assigns to the City, in accordance with the preceding paragraph, the Supporting Organization's right to enforce payment of a Default Amount from a DIA Funder (a "**Defaulted DIA Funder**"), during the twelve-month period following the assignment of the claim

13-53846-tjt Doc 8379 Filed 07/29/14 Entered 07/29/14 12:30:09 Page 136 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 12:30:09 Page 60 of 91
209

| | to the City (the "**City Collection Period**"), the City shall exercise commercially reasonable efforts to collect the Default Amount from that Defaulted DIA Funder, and any amounts collected from that Defaulted DIA Funder shall reduce the amount subject to the Guaranty.  If the City is unable to collect the Default Amount from a Defaulted DIA Funder during the City Collection Period, upon the expiration of the City Collection Period, the City may collect the Default Amount from The DIA under the Guaranty and, in such event, assign to The DIA all right and title to (and exclusive authority to collect) the Default Amount. |
|---|---|
| | In no event will any Funder other than the Non-funding Party have any responsibility for the payment or obligations of such Non-funding Party (except, as to The DIA, under the Guaranty), and the City will not have any right to collect any amounts from any Funder except as set forth above. Moreover, there will be no third-party beneficiaries to the rights of the City or the Supporting Organization, and no party other than the City or the Supporting Organization (or The DIA in respect of the Guaranty), as applicable, shall have the right to assert any claim against any Funder in respect of the obligations arising under the Definitive Documentation. Without limiting the foregoing, the failure of any Funder or the Supporting Organization to make a scheduled payment shall give rise to such a claim by the City against such Non-funding Party, as set forth above, and not against any other Funder, the Supporting Organization, The DIA or the Museum Assets; provided, however, (i) as contemplated in "*The DIA Commitment Regarding Funding*" above, The DIA will be obligated for any DIA Deficiency except to the extent the DIA Deficiency is replaced during the Payment Period with a New Donor Commitment, and (ii) The DIA will have its obligations under the Guaranty. |
| | The City will be responsible for all costs of its enforcement against the Non-funding Party and will not seek reimbursement of costs of enforcement from any other party or the Supporting Organization.  No other person or entity shall have the right to enforce payment. |
| **Initial Payment** | At and as a condition to the Closing (a) each of the Foundation Funders and the State shall pay at least 5% of its commitment under this Term Sheet and (b) The DIA and the DIA Funders in the aggregate shall pay at least $5 million. |

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:30:59  Page 137 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 6 of 9
209

| | |
|---|---|
| **Transfer on Initial Payment** | The Transfer shall be irrevocably consummated upon the Initial Payment to the City Account (defined in "*Conditions to Future Funding Obligations*" of this Term Sheet) (which shall be made at the Closing). In addition, at the Closing, the City and The DIA will enter into an agreement that (1) terminates the Operating Agreement, (2) includes a mutual release of pre-Closing claims, and (3) assigns (without recourse) from the City to The DIA all current and future commitments or gifts made or intended for the benefit of the Museum or The DIA, including without limitation money and works of art. The City will not, however, make any representations or warranties relating to the condition of, or title to, the Museum Assets or such commitments and will not have any liability with respect thereto. |
| **Payment Mechanism** | All payments by the Funders shall be made directly to the Supporting Organization which shall hold such payments in a segregated account (the "**Account**") pending payment to the City. Notwithstanding the foregoing, any DIA Funder may make its payments to The DIA instead of to the Supporting Organization; payments by The DIA (either with respect to a Deficiency Amount or on behalf a DIA Funder who elects pursuant to the preceding sentence to make its payments to The DIA) to the Supporting Organization shall be pursuant to the terms of an agreement which will be entered into between The DIA and the Supporting Organization in connection with the execution of the Definitive Documentation. As set forth under "*Default and Remedies*" above, only the City will have recourse or claims against the Account, provided all conditions specified in "Conditions to Future Funding Obligations" of this Term Sheet have been satisfied and as otherwise provided in this Term Sheet, and the City shall be paid when due, directly from the Account for the exclusive payment of the Pensions. The City will not be entitled to any interest or earnings on the balances of the Account. The City shall then pay such amounts to and for the exclusive payment of the Pensions in accordance with the allocation determined by the City and agreed by the Funders. |
| **DIA Commitment for State-wide Services for State Contribution** | In addition to continuing to operate the Museum for the benefit of the City and the State, including the citizens of the Tri-Counties, and continuing to provide the special services to the residents of the Tri-Counties during the millage term that are provided for in the millage |

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:30:09 Page 138 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:50 Page 62 of 209
209

agreements, during the Payment Period The DIA will provide an array of art programs at no or discounted costs to the residents of the State. In determining which programs to offer, both the cost to The DIA of developing and operating these programs and The DIA's other fundraising obligations, including its need to raise funds for general operations and its stated goal of building endowment funds, as well as any fundraising obligation under this settlement, will be taken into account. As appropriate, The DIA will collaborate with its Michigan museum colleagues in the development of these programs. Given the length of the Payment Period, it is expected that these programs would be developed and adjusted over time. Such programs could include at the outset:

- Two exhibitions in each twelve-month period, with the first such period beginning six months after the Closing, of objects from the Museum collection that would rotate through museums and art centers around the State on a schedule to be determined by The DIA and the recipient museums. Each exhibition will be developed and organized by The DIA and will include installation and de-installation of the objects, a marketing package (logo and advertising template) and, possibly, input on programming and education opportunities.

- An annual professional development program coordinated with the Michigan Museums Association designed to strengthen museum professionals and introduce museum job opportunities to student audiences.

- An expansion of the Museum's popular Inside/Out program (during the tenure of the program), which places high-quality art reproductions in Southeast Michigan communities, to include two additional outstate locations annually, supporting tourism, cultural awareness and life-long learning.

- Art object conservation services at a discounted rate to Michigan museums conducted in consultation with the Museum conservators and the curatorial staff of the requesting museum.

- The development of an educational program based on the Museum collection that supports National Common Core Standards, to be offered in two

| | |
|---|---|
| | Michigan communities annually and to include follow-up support for educators. |
| **DIA Operating and Maintenance Commitments** | (1) Subject to the terms set forth herein and the Definitive Documentation, The DIA shall have complete responsibility for and control over Museum operations, capital expenditures, collection management, purchase or sale of assets, *etc.* and will be responsible for all related liabilities, including existing liabilities of The DIA to its employees, contractors and vendors.<br><br>(2) The permanent primary situs of The DIA and its art collection will remain in the City in perpetuity. This Term Sheet and the Definitive Documentation will not otherwise restrict the ability of The DIA to lend or to otherwise allow works to travel outside of the City or the State, consistent with ordinary Museum operations and the state-wide services proposed under this settlement. Notwithstanding anything to the contrary set forth in this Term Sheet, The DIA acknowledges and agrees that the Museum shall be operated primarily for the benefit of the people of the City and the State, including the citizens of the Tri-Counties.<br><br>(3) The DIA will be required to operate the Museum as an encyclopedic art museum in the City, in accordance with changing future demands in the operation of such a Museum. The DIA will not deaccession from its collection or sell, lease, pledge, mortgage, or otherwise encumber art that is accessioned to or otherwise held in its collection except in accordance with the code of ethics or applicable standards for museums published by the American Alliance of Museums (the "**AAM**") as amended or modified by the accreditation organization. If the AAM ceases to exist or to be generally regarded by leading American art museums as the preeminent American art museum accreditation organization, then the AAM's successor organization or such other organization that is at that time generally regarded by leading American art museums as the preeminent American art museum accreditation organization shall be substituted for the AAM. |

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 140 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 64 of 99
209

| | |
|---|---|
| | (4) In the event of a liquidation of The DIA, the Museum Assets will be transferred only to another not-for-profit entity (which entity shall be subject to the reasonable approval of the City and the Supporting Organization, if then in existence, and otherwise by majority vote of the City and the then-existing Foundation Funders). Such successor entity would subject itself to the same conditions as set forth in this Term Sheet and the Definitive Documentation, including but not limited to holding the Museum Assets in perpetual charitable trust for the people of the City and the State, including the citizens of the Tri-Counties. For the purposes of determining the majority vote described above, and for the avoidance of doubt, the parties agree that the City and each of the then-existing Foundation Funders shall each have one vote with respect to such approval. |
| **City Commitments Relating to Pensions** | (1) The City will adopt and maintain pension governance mechanisms that meet or exceed commonly accepted best practices reasonably satisfactory to the Funders and the State to ensure acceptable fiscal practices and procedures for management and investment of pensions and selection of acceptable pension boards to ensure the foregoing. |
| | (2) The City will establish, by the Effective Date (as defined below), a Receivership Transition Review Board ("**Review Board**") or other independent fiduciary that is independent of the City and any association of City employees or retirees for future supervision of the Pensions' management, administration and investments for at least twenty years after the Effective Date. |
| | (3) Any commitments by the City to make payments hereunder, or cause payments to be made, to the Pensions shall be subject to receipt of the related payment amount from the Supporting Organization which, in turn, will be conditioned on the City's compliance with the above. |
| | (4) The Pension funds themselves shall agree as part of the settlements approved through the confirmed Plan of Adjustment that they waive and release |

| | | |
|---|---|---|
| | | any and all claims against, and shall have no recourse directly against, the Funders or the Supporting Organization with respect to enforcement of the City's commitment to make payments to the Pensions or any such party, nor for any matter arising from the contemplated transaction. The agreement of the Pension funds, as implemented through the Plan of Adjustment and any associated court orders shall be binding on the Pensions and all entities or persons claiming through the Pensions, including without limitation any successors or assigns and any plan participants, and any of their representatives, successors or assigns. |
| **Other City Commitments** | (1) | The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Museum, The DIA or museums within the City generally which such charter, ordinance or other provision has a material adverse impact on the Museum or The DIA (it being understood that a "material adverse impact" shall include any adverse financial impact or any contradiction, or adverse impact on the enforceability, of the terms of this settlement), except pursuant to State-enabling legislation, and the City agrees that the Detroit Arts Commission will henceforth have no oversight of The DIA, the Museum or the Museum Assets. |
| | (2) | The City shall not impose any fee, tax or other cost on the Museum or The DIA that solely affects or primarily targets the Museum, The DIA or museums within the City generally. |
| | (3) | The City shall provide (or cause to be provided) utilities and other City services to The DIA at the same pricing and on the same terms upon which the City offers to provide utilities and such other City services to arm's-length third parties generally. |
| | (4) | The City agrees that there are no further commitments from the Funders, the Supporting Organization, The DIA or the State relating to the Museum or the Museum Assets beyond those contained in the Term Sheet or the Definitive |

| | |
|---|---|
| | Documentation. |
| | (5)  The City agrees to the indemnification, jurisdiction, venue and choice of law language contained in Exhibit D for the benefit of the Funders. |
| **Bankruptcy Court Approval Process** | The settlement between the City and The DIA over the Transfer in exchange for the Funders' and the State's commitments for the Payment Amount and The DIA's commitment to provide for the operation and maintenance of the Museum is subject to the Bankruptcy Court's approval in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of the Definitive Documentation for the settlement. |
| **Conditions to The DIA's, the City's and the Funders' Commitments and Initial Payments under the Settlement** | The City's and the Funders' obligations under the settlement will become binding only upon:<br><br>(1)  execution of Definitive Documentation acceptable in all respects to The DIA, the City, the State and the Funders, memorializing the terms of this Term Sheet, including irrevocable commitments (subject to The DIA's right of substitution as to the DIA Deficiency) of the Funders, in the aggregate, for the full Payment Amount,<br><br>(2)  Bankruptcy Court entry of an order confirming the Plan of Adjustment of Debts of the City of Detroit, Michigan (the "**Plan of Adjustment**") that is binding on The DIA, the City and all of the City's creditors and provides, among other things, for approval and inclusion of all of the terms of this settlement, including treatment of the Payment Amount in accordance with this Term Sheet and protection of the Museum Assets as provided in "*Treatment of Museum Assets*" of this Term Sheet, and not stayed on appeal,<br><br>(3)  occurrence of the Effective Date,<br><br>(4)  approval of the settlement by the Michigan Attorney General as consistent with Michigan law and with Attorney General Opinion No. 7272,<br><br>(5)  agreement by the millage authorities for each of the Tri-Counties to the settlement for protection of the three-county millage payable to the Museum for the balance of the millage period approved in 2012, |

| | |
|---|---|
| | (6) approval of the relevant City and State persons or entities specified in the Local Financial Stability and Choice Act (PA 436) to the extent applicable, including, but not limited to, the Emergency Manager, the Governor of the State and/or the Treasurer of the State and (if needed) the Detroit City Council and/or Detroit Arts Commission, in each case, for the Transfer, |
| | (7) The DIA, the Foundation Funders, the City and the State being satisfied with The DIA's governance structure, mechanisms and documents, program for provision of statewide services, multi-year fundraising plan, insurance coverage, policies, practices and procedures and such other matters as the Funders determine are critical to their decision to fund and the City determines are critical to its decision to execute the Definitive Documentation, |
| | (8) Closing occurring no later than December 31, 2014, |
| | (9) All existing agreements and other arrangements between the City and The DIA are either affirmed, modified or terminated, as provided in this Term Sheet or as otherwise agreed between the City and The DIA. |
| | (10) The DIA agrees to indemnify and hold harmless the Foundation Funders, the City and the Supporting Organization from any and all claims against them (together with all reasonable associated costs and expenses) that result from The DIA's failure to perform any of its obligations under the Definitive Documentation.  The DIA acknowledges that the Foundation Funders and the Supporting Organization have no financial obligations other than, in the case of the Foundation Funders, the amount specified in the "*Funding Commitments*" of this Term Sheet and are not guaranteeing payment to the City of any amount committed by the DIA Funders or The DIA. |
| **Closing of Settlement** | Upon satisfaction of all "*Conditions to The DIA's, the City's, the State's and the Funders' Commitments and Initial Payments under the Settlement*" under this Term Sheet (any of which may be waived by agreement of all parties to this Term Sheet for whose benefit the condition exists) and the occurrence of the |

13-53846-tjt-swr  Doc 8383-79  Filed 12/17/14  Entered 12/17/14 7.20.30  Page 144 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 66 of 91
209

| | effective date of the Plan of Adjustment ("**Effective Date**"). |
|---|---|
| **Conditions to Future Funding Obligations** | The Funders' obligations to continue to fund the settlement (and the Supporting Organization's obligation to continue to pay funds provided by the Funders to the City) are conditioned on the following:<br><br>(1) all amounts paid by the Funders shall be used only to pay Pensions as provided in this Term Sheet and the confirmed Plan of Adjustment,<br><br>(2) the Funders' receipt of an annual certification from the Review Board or other oversight authority reasonably acceptable to the Funders that the City is in compliance with its obligation to use the amounts paid by the Funders solely for the benefit of the pensioners and that the amounts received from the Funders are unencumbered by the City or any other entity,<br><br>(3) the amounts paid by the Funders and transmitted by the Supporting Organization to the City are placed into a segregated account to be used for payments to the Pensions only and shown separately on the City's books ("**City Account**"),<br><br>(4) the Funders' receipt of an annual reconciliation report of the City Account prepared by external auditors reasonably satisfactory to the Funders at the City's expense, certifying use of funds in a manner consistent with the settlement,<br><br>(5) full compliance by the City with the terms of the funding agreements with the Funders or the Supporting Organization, and<br><br>(6) the City's continued compliance with the first two commitments set forth above in the provision entitled "*City Commitments Relating to Pensions*" of this Term Sheet.<br><br>The City shall have the opportunity to cure any breach or failure of these conditions within 180 days of issuance of notice of the same by the Funders or the Supporting Organization Notwithstanding the foregoing, to the extent that the applicable event of default cannot reasonably be cured within the period specified above, and as long as the City has commenced to cure, and diligently pursues the cure of such default in good faith, such cure period shall be |

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 145 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 69 of 91
209

| | |
|---|---|
| | extended by a reasonable period of time to permit the City to cure such event of default; provided, however, such additional extended cure period shall not extend beyond the later of: (i) 180 days beyond the initial cure period; and (ii) the date that the next applicable payment is due the City by the Supporting Organization. The City's ability to receive the benefit of the extended cure period, beyond the initial cure period, shall be subject to the approval of the Supporting Organization upon receipt of a written request from the City setting forth why the City is entitled to such extended cure period by meeting the requirements set forth above, which approval shall not be unreasonably withheld, conditioned or delayed. All obligations of the Funders and Supporting Organization to make payments shall be suspended for the duration of the cure period. If the City fails to cure a breach or failure during the cure period each Funder and the Supporting Organization shall have the right to cancel its remaining commitments. |
| **Changes in DIA Governance** | The DIA shall establish an ad-hoc committee (the "**Governance Committee**") to review best practices in museum governance, gather input from the parties to this Term Sheet and the State, and make recommendations regarding the future governance of The DIA. In addition to three members representing the perspective of The DIA, The DIA shall appoint to the Governance Committee one member representing each of the following perspectives: 1) the Foundation Funders; 2) the City; and 3) the State. In addition, The DIA shall appoint to the Governance Committee one person who is selected by agreement of the millage authorities of the Tri-Counties**.** The parties believe the proposed make-up of the Governance Committee will appropriately represent the perspectives of The DIA, the City, the State, the millage authorities and the Foundation Funders, but The DIA will consider adjustments to the proposed membership to the extent necessary to address any concerns raised by the State. Susan Nelson, principal of Technical Development Corporation, will facilitate and advise the process, with funding as required from the Foundation Funders. The process will be completed as quickly as possible but in any event prior to the Closing, with the Governance Committee's recommendations taking effect upon their approval by The DIA's Board of Directors and prior to Closing. The goal of the Governance Committee will be to ensure that The DIA has the best possible governance |

| | |
|---|---|
| | structure for maintaining its position as one of America's great art museums. |
| **Future Obligations of The DIA** | The DIA will provide to the other Funders and the City, or their representatives, on an annual basis, a narrative report covering overall operations, fundraising and state services, as well as audited financial statements. |
| **Dispute Resolution** | In connection with the negotiation of the Definitive Documentation, the parties shall use good faith efforts to work with the State to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes surrounding whether conditions to a scheduled payment have been satisfied or cured while considering the ability of the public, Pensions and other stakeholders to monitor such alternative dispute resolution process. |

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 21:20:30 Page 147 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 7 of 9
209

**EXHIBIT A**

**MUSEUM ASSETS**

1.  The Museum building and grounds, and the employee parking lot located at 5200 Woodward Avenue, Detroit, Michigan, comprised of land and improvements bounded by Woodward Avenue as widened, existing John R Street, existing East Kirby Avenue and the South line of Farnsworth Avenue, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in Commitment for Title Insurance No. 58743275 revision 5, with an effective date of December 16, 2013, and Commitment for Title Insurance No. 58781215, with an effective date of December 26, 2013, (collectively, the "Title Commitment") issued by Title Source Inc., as follows:

    PARCEL 1:  Block A; together with the Northerly half of vacated Frederick Douglass Avenue adjacent thereto, of Ferry's Subdivision of Park Lot 40 and of Lots 1 to 18 inclusive of Farnsworth's Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 18 of Plats, Page 71, Wayne County Records.

    PARCEL 6:  Lots 43 through 78, both inclusive, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 43 through 58, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 63 through 78, and together with vacated alleys appurtenant to said lots.

    PARCEL 11:  Lots 103 through 120, both inclusive, together with the Southerly half of vacated Farnsworth Avenue adjacent to Lots 103 through 118, and vacated portions of Farnsworth Avenue adjacent to the South of Lots 103 through 117 and Lot 120, and vacated alleys appurtenant to said lots, of Farnsworth Subdivision of Park Lots 38 and 39, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

2.  The Frederick Lot (across from the Museum, Easterly from existing John R to existing Brush) located, in the City of Detroit, Wayne County, Michigan, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in the Title Commitment as follows:

    PARCEL 4:  Lots 31 to 37 of Farnsworth Subdivision of Park Lots 38 and 39, together with the southerly half of vacated Frederick Douglass Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, according to the recorded plat thereof, as recorded in Liber 1, Page 16, Wayne County Records.

    PARCEL 7:  Lots 79 and 80 of Farnsworth Subdivision of Park Lots 38 and 39, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

PARCEL 9: The East 5 feet of Lot 85 and Lots 86 and 87 and the West 16 feet of Lot 88, together with the Northerly half of vacated Farnsworth Avenue adjacent to said lots and together with the vacated alley appurtenant to said lots of Farnsworth Subdivision of Park Lots 38 and 39, as recorded in Liber 1, Page 16 of Plats, Wayne County Records.

PARCEL 12: Lots 1 through 5, both inclusive, and Lots 10 through 14, both inclusive, Block 25, together with the Southerly half of vacated Frederick Douglass Avenue adjacent to Lots 1 through 5, Block 25, and the Northerly half of vacated Farnsworth Avenue adjacent to Lots 10 through 14, Block 25 and together with the vacated alley appurtenant to said lots of Brush's Subdivision of that part of the Brush Farm lying between the North line of Farnsworth Street and South line of Harper Avenue, as recorded in Liber 17, Page 28 of Plats, Wayne County Records.

3.      The cultural center underground garage[1] i.e., the parking garage with all appurtenant utilities, equipment, drives, pedestrian and vehicular entrances and easements therefor, on the south side of the Museum building located at 40 Farnsworth, Detroit, Michigan, depicted on the attached Exhibit A-1 AERIAL PHOTO MAP, and more particularly described in the Title Commitment as follows:

PARCEL 14: A parking structure in the City of Detroit occupying space under and on the following described parcel of land. Land in the City of Detroit, being a part of Lots 62 through 68 inclusive; parts of Lot 112 and 118 through 120 inclusive; all that part of Lots 113 through 117 inclusive not set aside as a part of Farnsworth Avenue, parts of public alleys and Farnsworth Avenue (60 feet wide) vacated by the Common Council on October 7, 1924 and January 11, 1927; all as platted in "Farnsworth's Subdivision of Park Lots 38 and 39, City of Detroit" recorded in Liber 1, Page 16 of Plats, Wayne County Records and also a portion of the Northerly 49 feet of Farnsworth Avenue (70 feet wide), which was opened as a public street by action of the Common Council on October 7, 1924. Being more particularly described as follows: Commencing at the intersection of the South line of Farnsworth Avenue 70 feet wide and the East line of Woodward Avenue as widened August 2, 1932, J.C.C. Page 1279, thence North 29 degrees 42 minutes 10 seconds West 22.17 feet, thence North 60 degrees 17 minutes 50 seconds East 6.00 feet to the point of beginning of this parcel, thence North 29 degrees 42 minutes 10 seconds West 248.16 feet; thence North 60 degrees 11 minutes 50 seconds East 268.00 feet; thence South 29 degrees 42 minutes 10 seconds East 15.79 feet; thence North 60 degrees 17 minutes 50 seconds East 1.00 feet to a point of curve; thence 11.77 feet along the arc of a curve concave to the Northeast with a Radius of 14.00 feet, a Delta of 48 degrees 11 minutes 23 seconds with a Long Chord of 11.43 feet which bears South 53 degrees 47 minutes 52 seconds East to a point of reverse curve; thence 26.07 feet along the arc of curve concave to the Southwest, with a Radius of 31 feet, a Delta 48

---

[1] In connection with the preparation for Closing, the City will advise on the mechanics for the release of existing encumbrances on title to the garage.

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 12:30:09  Page 149 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 73 of
209

degrees 11 minutes 23 seconds with a Long Chord of 25.31 feet which bears South 53 degrees 47 minutes 52 seconds East; thence South 29 degrees 42 minutes 10 seconds East 140.50 feet; thence 78.54 feet along the arc of a curve concave to the Northwest, with a Radius of 50.00 feet, a Delta of 90 degrees with a Long Chord of 70.71 feet which bears South 15 degrees 17 minutes 50 seconds West; thence South 60 degrees 17 minutes 50 seconds West 0.50 feet; thence South 29 degrees 42 minutes 10 seconds East 4.00 feet; thence South 60 degrees 17 minutes 50 seconds West 4.00 feet; thence South 29 degrees 42 minutes 10 seconds East 6.00 feet; thence South 60 degrees 17 minutes 50 seconds West 39.50 feet; thence North 29 degrees 42 minutes 10 seconds West 1.67 feet; thence South 60 degrees 17 minutes 50 seconds West 190 feet to the point of beginning.

The bottom floor of this structure is at elevation 129.10 feet as related to the City of Detroit Datum Plane; the structure has two (2) floors of vehicle parking with the top of the roof at elevation 149.34 feet. The structure has three (3) pedestrian exit buildings, four (4) air exhaust shafts and a vehicular ramp all of which extend upwards from the garage roof to the ground surface at elevations varying from 150.6 to 153.7 feet.

Together with the Easements created in Liber 20846, Page 762, Wayne County Records.

4.      The collection of works of art owned by the City and located primarily at the Museum, the Museum's off-site warehouse or the Josephine Ford Sculpture Garden located at or about 201 East Kirby Street, Detroit, Michigan (which included at the effective date of the Operating Agreement the items listed in Exhibit 2 to the Operating Agreement) or included in the Museum collection (whether or not accessioned), whether or not reflected on any inventory and irrespective of the manner in which acquired by the City.

5.      All assets of any kind located on or within the real estate described in items 1-4 above and used in the operations of the Museum, as well as any easements or other property rights benefiting such real estate.

6.      All intangible property solely to the extent used in connection with the Museum and its art collection, including trademarks, copyrights and intellectual property, whether or not related to collection pieces.

7.      All City records, books, files, records, ledgers and other documents (whether on paper, computer, computer disk, tape or other storage media) presently existing to the extent relating to the Museum, its art collection or its operations or to The DIA (other than those documents which are confidential to the City and not The DIA).

8.      All monies held by the City that are designated for The DIA or the Museum or that were raised for the benefit of, or express purpose of supporting, The DIA or the Museum, including the approximately $900,000 balance of proceeds of bonds issued for the benefit of The DIA by the City in 2010.

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 150 of 299
13-53846-swr  Doc 8279  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 74 of 91
209

# EXHIBIT B

## FOUNDATION FUNDERS

**NOTE: The list of Foundation Funders below is being provided based on information known as of March 27, 2014. Foundation Funder commitments remain subject to: (i) final approval of the commitments by the appropriate governing body of the respective foundation listed below; (ii) all conditions otherwise contained in the Term Sheet and Definitive Documentation being met; (iii) approval of the Definitive Documentation by the Foundation Funder; and (iv) approval of the Plan of Adjustment through the bankruptcy proceedings.**

| Foundation Funder | Intended Funding Amount |
|---|---|
| Community Foundation for Southeast Michigan | $10,000,000 |
| William Davidson Foundation | 25,000,000 |
| The Fred A. and Barbara M. Erb Family Foundation | 10,000,000 |
| Max M. and Marjorie S. Fisher Foundation | 2,500,000* |
| Ford Foundation | 125,000,000 |
| Hudson-Webber Foundation | 10,000,000 |
| The Kresge Foundation | 100,000,000 |
| W. K. Kellogg Foundation | 40,000,000 |
| John S. and James L. Knight Foundation | 30,000,000 |
| McGregor Fund | 6,000,000 |
| Charles Stewart Mott Foundation | 10,000,000 |
| A. Paul and Carol C. Schaap Foundation | 5,000,000* |
| **Total** | **$373,500,000** |
| Less Credits to DIA Commitments | (7,500,000) |
| **Net Total** | **$366,000,000** |

*The payment of the intended funding amount by these Foundation Funders will be credited against the $100 million to be paid by DIA Funders and the DIA provided under *Funding Commitments* of the Term Sheet.

## Payment Schedule

Each Foundation Funder intends to make payments available at 5% of the total intended funding amount per year over the 20 year term, subject to the right of any Foundation Funder to pay early without penalty and as otherwise provided in the Term Sheet and Definitive Documentation. Collectively, this will result in an annual payment of **$18,300,000** (exclusive of Foundation Funder commitments credited to the DIA) to the City of Detroit as provided in the Term Sheet and Definitive Documentation.

**EXHIBIT C**

**DIA FUNDERS**

**[to be provided]**

# EXHIBIT D

## INDEMNIFICATION, JURISDICTION, VENUE AND CHOICE OF LAW

*All capitalized terms used but not defined in this Exhibit D are defined in the Term Sheet.*

(a)     To the maximum extent permitted by law, the City shall indemnify, defend, and hold the Foundation Funders, the DIA Funders, The DIA and the Supporting Organization and their affiliates and all their respective shareholders, officers, directors, members, managers, employees, successors, assigns, representatives, attorneys and agents (the "**Indemnified Parties**") harmless from, against, and with respect to any claim, liability, obligation, loss, damage, assessment, judgment, cost and expense (including, without limitation, actual out-of-pocket attorney fees and actual expenses incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, hearing, proceeding or demand) of any kind or character, arising out of or in any manner, incident, relating or attributable to the following (provided indemnification will not be available to an Indemnified Party to the extent resulting from such Indemnified Party's breach of contract, sole ordinary negligence, gross negligence or intentional wrongful acts):

(i)     *Any claims by third parties or the City arising out of any action properly taken by the Indemnified Parties under the Definitive Documentation with respect to the contemplated transaction including, but not limited to, any payment, non-payment or other obligation of the Indemnified Parties permitted thereunder;*

(ii)    *Any breach or failure of any representation or warranty of the City contained in the Definitive Documentation between the City and the Indemnified Parties and/or other parties related to the contemplated transaction;*

(iii)   *Any failure by the City to perform, satisfy or comply with any covenant, agreement or condition to be performed, satisfied or complied with by the City under the Definitive Documentation with the Indemnified Parties or under agreements with any third parties contemplated by this transaction;*

(iv)    *Reliance by the Indemnified Parties upon any books or records of the City or reliance by them on any written information furnished by the City or any of the City's employees, officials or agents to them to the extent any such information should prove to be false or materially inaccurate or misleading (including, without limitation, by omission), but only to the extent that such books, records or written information was furnished by the City in connection with the City showing its compliance with the conditions to initial or future funding as set forth in the Term Sheet;*

(v)     *Any claim or objection made in the City's Chapter 9 Bankruptcy (Case No. 13-53846) or any other action brought against, or involving, the Indemnified Parties with respect to their participation in any transaction contemplated by the proposed or confirmed Plan of Adjustment;*

D-1

13-53846-tsw   Doc 8879   Filed 12/17/14   Entered 12/17/14 21:20:30   Page 153 of 209
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:50   Page 67 of 99

(vi)     *The transfer, assignment or sale by the City to The DIA of any assets or property (real or personal) and any rights, title and interests therein including, but not limited to, the Museum and all of the Museum Assets;*

(vii)    *Any action or claim against the Indemnified Parties made by the Pensions, including any successors or assigns and any plan participants, or their representatives, successors or assigns (collectively, the "Pension Funds"), as nothing under the Term Sheet or the Definitive Documentation is intended to, nor are they to be construed or interpreted to, make the Indemnified Parties a party in privity with, or having an obligation in any capacity to the Pension Funds. By way of illustration and not limitation, the following statements apply:*

         *First, the Indemnified Parties have no responsibility for the operation or administration of the Pension Funds and have no fiduciary responsibility for the Pension Funds as plan sponsor, plan administrator, investment advisor or otherwise.*

         *Second, the Indemnified Parties have no obligation to contribute towards the funding of the Pension Funds and are not a funding guarantor.*

(viii)   *Any action or claim brought by the City, The DIA, the Pension Funds or any other party concerning non-payment of the contributions pursuant to the contemplated transaction by the Indemnified Parties due to the breach of the Definitive Documentation by the City, the DIA, the Pension Funds or any other party, so long as the Indemnified Parties have made a good faith determination of the breach of the Definitive Documentation or payment condition.*

(b)      An Indemnified Party shall notify the City in a timely manner of any matters as to which the Indemnified Party is entitled to receive indemnification and shall set forth in such notice reasonable detail regarding specific facts and circumstances then known by the Indemnified Party which pertain to such matters. Failure or delay in providing such notice shall not relieve the City of its defense or indemnity obligations except to the extent the City's defense of an applicable claim against an Indemnified Party is actually prejudiced by such Indemnified Party's failure or delay.

(c)      The City shall not contest on any grounds the enforceability of its indemnification obligations hereunder.

(d)      Notwithstanding the foregoing, the parties acknowledge that the City is not making any representations to The DIA regarding the City's title to the Museum Assets prior to the Closing and that The DIA will not be entitled to indemnification in connection with its defense of any post-Closing claims by third parties challenging The DIA's title to any Museum Asset to the extent that such claim is based on an allegation that the City did not have legal title to the particular Museum Asset prior to the Closing (a "**Quitclaim Challenge**"). To be clear, however, The DIA will be entitled to indemnification by the City under this Exhibit D in connection with any post-Closing challenges to The DIA's title to Museum Assets that are in any way based upon a claim that the title that the City

D-2

had to the Museum Assets prior to Closing was not effectively conveyed to The DIA at and as a result of the Closing.

**Defense of Indemnity Claims**

(a)  To the extent the City is notified of claim for which it is required to indemnify an Indemnified Party, the City shall be solely responsible for responding to or otherwise defending such claim. In such event, the City shall assume exclusive control of the defense of such claim at its sole expense using counsel of its sole choosing and may settle such claim in its sole discretion; provided, however, that (i) with respect to any claim that involves allegations of criminal wrongdoing, the City shall not settle such claim without the prior written approval of the Indemnified Party, which approval may be withheld in such Indemnified Party's sole discretion, and (ii) with respect to any other claim, the City shall not settle such claim in a manner that requires the admission of liability, fault, or wrongdoing on the part of an Indemnified Party, that fails to include a release of all covered claims pending against the Indemnified Party, or that imposes any obligation on the Indemnified Party without the prior written approval of the Indemnified Party, which approval may be withheld in such Indemnified Party's sole discretion.  The City will keep the Indemnified Party reasonably informed of the status of any negotiations or legal proceedings related to any claim, and the Indemnified Party shall be entitled to engage counsel (at its own expense) to monitor the handling of any claim by the City.  Notwithstanding the foregoing, other than as relates to a Quitclaim Challenge (for which The DIA will not be entitled to indemnification, as set forth above), The DIA shall be entitled to defend on its own behalf any claims regarding title to, interest in or control of the Museum Assets or operation of the Museum.  To the extent The DIA intends to exercise such right, the City and The DIA shall use their commercially reasonable efforts in good faith to coordinate a joint defense of such claim (including as to selection of joint counsel).  If the City and The DIA cannot agree on a joint defense of the claim, each party shall undertake its own defense, reserving all rights against the other for indemnification hereunder with respect to such claim, but, in such case, The DIA shall not be entitled to indemnification of its defense costs in connection therewith.

(b)  Notwithstanding anything to the contrary set forth in this Exhibit D or the Term Sheet, to the extent that the City is required to indemnify an Indemnified Party hereunder, and the underlying claim being indemnified does not arise out of the City's breach of contract, sole ordinary negligence, gross negligence or intentional wrongful acts and is not due to a claim brought by the City, the City may reimburse itself for the costs of such indemnity out of the payments from the Supporting Organization, in which case the amount payable by the City to the Pensions shall be reduced by the amount reimbursed to the City for such indemnity.

**Jurisdiction/Venue/Choice of Law**

The parties agree that, except as to disputes that are subject to arbitration in accordance with the "*Dispute Resolution*" section of the Term Sheet, jurisdiction shall be retained by

the United States Bankruptcy Court for the Eastern District of Michigan for all matters related to the contemplated transaction and venue shall be in Detroit.  The parties agree that this agreement is to be governed by Michigan law.

**EXHIBIT I.A.121**

SCHEDULE OF DWSD BOND DOCUMENTS & RELATED DWSD BONDS

**SCHEDULE OF (I) DWSD BOND DOCUMENTS, (II) RELATED DWSD BONDS,
(III) CLASSES OF DWSD BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD BOND CLAIMS**

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1] Trust Indenture dated as of February 1, 2013 among the City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture") Bond Resolution adopted on October 14, 1993 Resolution adopted October 22, 1993 Final Report of the Finance Director delivered to City Council December 22, 1993 | Series 1993 | 251255TP0 | Class 1A-1 | $24,725,000.00 | Unimpaired |
| Water Bond Ordinance Water Indenture Bond Resolution adopted July 9, 1997 Sale Order of the Finance Director of the City of Detroit dated August 6, 1997 | Series 1997-A | 251255XM2 | Class 1A-2 | $6,520,000.00 | Unimpaired |
| | | 251255XN0 | Class 1A-3 | $6,910,000.00 | Unimpaired |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

13-53846-tit Doc 8383 79 Filed 12/17/14 Entered 12/17/14 7:20: Page 158 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 92-of
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[2]<br><br>Trust Indenture dated February 1, 2013 among City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution of City Council adopted January 31, 2001 and Resolution Amending Bond Authorizing Resolution, adopted April 25, 2001<br><br>Sale Order of Finance Director of City of Detroit dated May 17, 2001 | Series 2001-A | 251255A21 | Class 1A-4 | $73,790,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 25, 2001<br><br>Sale Order of the Finance Director of the City of Detroit dated May 31, 2001 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2001-C | 2512556U4 | Class 1A-5 | $350,000.00 | Unimpaired |
| | | 2512556V2 | Class 1A-6 | $365,000.00 | Unimpaired |
| | | 2512556W0 | Class 1A-7 | $380,000.00 | Unimpaired |
| | | 2512556X8 | Class 1A-8 | $390,000.00 | Unimpaired |
| | | 2512556Y6 | Class 1A-9 | $415,000.00 | Unimpaired |
| | | 2512556Z3 | Class 1A-10 | $12,510,000.00 | Impaired |
| | | 2512557A7 | Class 1A-11 | $13,235,000.00 | Impaired |
| | | 2512557B5 | Class 1A-12 | $14,025,000.00 | Impaired |
| | | 2512557C3 | Class 1A-13 | $14,865,000.00 | Impaired |
| | | 2512557D1 | Class 1A-14 | $15,750,000.00 | Impaired |
| | | 2512557E9 | Class 1A-15 | $16,690,000.00 | Impaired |
| | | 2512557F6 | Class 1A-16 | $17,690,000.00 | Impaired |
| | | 2512557G4 | Class 1A-17 | $18,735,000.00 | Impaired |
| | | 2512557H2 | Class 1A-18 | $19,945,000.00 | Impaired |
| | | 2512557J8 | Class 1A-19 | $4,000,000.00 | Impaired |
| | | 2512557L3 | Class 1A-20 | $20,090,000.00 | Unimpaired |
| | | 2512557K5 | Class 1A-21 | $18,815,000.00 | Unimpaired |

---

[2]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted Nov. 27, 2002 ("2003 Water Resolution")<br><br>Sale Order of the Finance Director of the City of Detroit dated January 24, 2003 and Supplement to Sale Order of the Finance Director – 2003 Bonds, dated February 6, 2003 (collectively, "2003 Sale Order") | Series 2003-A | 251255D77 | Class 1A-22 | $500,000.00 | Unimpaired |
| | | 251255D93 | Class 1A-23 | $250,000.00 | Unimpaired |
| | | 251255E27 | Class 1A-24 | $3,550,000.00 | Unimpaired |
| | | 2512555F8 | Class 1A-25 | $9,970,000.00 | Unimpaired |
| | | 251255K20 | Class 1A-26 | $20,955,000.00 | Unimpaired |
| | | 251255K38 | Class 1A-27 | $21,900,000.00 | Unimpaired |
| | | 251255E68 | Class 1A-28 | $121,660,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-B | 2512555H4 | Class 1A-29 | $41,770,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2003 Water Resolution<br><br>2003 Sale Order | Series 2003-C | 251255J22 | Class 1A-30 | $2,120,000.00 | Unimpaired |
| | | 251255J30 | Class 1A-31 | $2,620,000.00 | Unimpaired |
| | | 251255J48 | Class 1A-32 | $2,655,000.00 | Unimpaired |
| | | 251255J55 | Class 1A-33 | $2,930,000.00 | Unimpaired |
| | | 251255J63 | Class 1A-34 | $2,790,000.00 | Unimpaired |
| | | 251255J71 | Class 1A-35 | $2,965,000.00 | Unimpaired |
| | | 251255J89 | Class 1A-36 | $4,580,000.00 | Unimpaired |
| | | 251255J97 | Class 1A-37 | $4,665,000.00 | Unimpaired |
| | | 251255H99 | Class 1A-38 | $2,330,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted November 27, 2002<br><br>Sale Order of Finance Director of the City of Detroit dated February 5, 2003 | Series 2003-D | 2512552T1 | Class 1A-39 | $325,000.00 | Unimpaired |
| | | 2512552U8 | Class 1A-40 | $335,000.00 | Unimpaired |
| | | 2512552V6 | Class 1A-41 | $350,000.00 | Unimpaired |
| | | 2512552W4 | Class 1A-42 | $360,000.00 | Unimpaired |
| | | 2512552X2 | Class 1A-43 | $370,000.00 | Unimpaired |
| | | 2512552Y0 | Class 1A-44 | $2,585,000.00 | Impaired |
| | | 2512552Z7 | Class 1A-45 | $29,410,000.00 | Impaired |
| | | 2512553A1 | Class 1A-46 | $23,920,000.00 | Impaired |
| | | 2512553B9 | Class 1A-47 | $82,930,000.00 | Unimpaired |

3

209

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 21:20:30 Page 160 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 94 of 91

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution of the City Council adopted January 21, 2004 ("2004 Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated May 12, 2004 ("2004 Sale Order") | Series 2004-A | 2512553G8 | Class 1A-48 | $4,250,000.00 | Unimpaired |
| | | 2512553H6 | Class 1A-49 | $4,475,000.00 | Unimpaired |
| | | 2512553J2 | Class 1A-50 | $4,710,000.00 | Impaired |
| | | 2512553K9 | Class 1A-51 | $4,955,000.00 | Impaired |
| | | 2512553L7 | Class 1A-52 | $5,215,000.00 | Impaired |
| | | 2512553M5 | Class 1A-53 | $5,490,000.00 | Impaired |
| | | 2512553N3 | Class 1A-54 | $5,780,000.00 | Impaired |
| | | 2512553P8 | Class 1A-55 | $6,085,000.00 | Impaired |
| | | 2512553Q6 | Class 1A-56 | $6,400,000.00 | Impaired |
| | | 2512553R4 | Class 1A-57 | $6,735,000.00 | Impaired |
| | | 2512553S2 | Class 1A-58 | $14,505,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2004 Bond Resolution<br><br>2004 Sale Order | Series 2004-B | 2512554A0 | Class 1A-59 | $85,000.00 | Unimpaired |
| | | 2512554B8 | Class 1A-60 | $90,000.00 | Unimpaired |
| | | 2512554C6 | Class 1A-61 | $10,000,000.00 | Impaired |
| | | 2512554D4 | Class 1A-62 | $3,545,000.00 | Unimpaired |
| | | 2512554E2 | Class 1A-63 | $13,925,000.00 | Impaired |
| | | 2512554F9 | Class 1A-64 | $350,000.00 | Unimpaired |
| | | 2512554G7 | Class 1A-65 | $14,940,000.00 | Impaired |
| | | 2512554H5 | Class 1A-66 | $15,810,000.00 | Impaired |
| | | 2512554J1 | Class 1A-67 | $16,665,000.00 | Impaired |
| | | 2512554K8 | Class 1A-68 | $16,085,000.00 | Impaired |
| | | 2512554L6 | Class 1A-69 | $16,935,000.00 | Impaired |
| | | 2512554M4 | Class 1A-70 | $6,280,000.00 | Impaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council adopted January 26, 2005 ("2005-A/C Bond Resolution")<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-A) | Series 2005-A | 251255M85 | Class 1A-71 | $50,000.00 | Unimpaired |
| | | 251255Q81 | Class 1A-72 | $2,070,000.00 | Unimpaired |
| | | 251255M93 | Class 1A-73 | $85,000.00 | Unimpaired |
| | | 251255Q99 | Class 1A-74 | $2,145,000.00 | Unimpaired |
| | | 251255N27 | Class 1A-75 | $95,000.00 | Unimpaired |
| | | 251255R23 | Class 1A-76 | $2,265,000.00 | Unimpaired |
| | | 251255N35 | Class 1A-77 | $125,000.00 | Unimpaired |
| | | 251255R31 | Class 1A-78 | $2,370,000.00 | Unimpaired |
| | | 251255N43 | Class 1A-79 | $20,000.00 | Unimpaired |
| | | 251255R49 | Class 1A-80 | $2,615,000.00 | Unimpaired |
| | | 251255N50 | Class 1A-81 | $2,790,000.00 | Unimpaired |
| | | 251255N68 | Class 1A-82 | $2,955,000.00 | Unimpaired |
| | | 251255N76 | Class 1A-83 | $3,030,000.00 | Unimpaired |
| | | 251255N84 | Class 1A-84 | $3,225,000.00 | Unimpaired |
| | | 251255N92 | Class 1A-85 | $3,430,000.00 | Unimpaired |
| | | 251255P25 | Class 1A-86 | $3,650,000.00 | Unimpaired |

4

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 7:20:36 Page 161 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:36 Page 95 of
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| | | 251255P33 | Class 1A-87 | $3,790,000.00 | Unimpaired |
| | | 251255P41 | Class 1A-88 | $4,080,000.00 | Unimpaired |
| | | 251255P58 | Class 1A-89 | $4,290,000.00 | Unimpaired |
| | | 251255P66 | Class 1A-90 | $4,615,000.00 | Unimpaired |
| | | 251255P74 | Class 1A-91 | $4,890,000.00 | Unimpaired |
| | | 251255P82 | Class 1A-92 | $5,145,000.00 | Unimpaired |
| | | 251255P90 | Class 1A-93 | $5,415,000.00 | Unimpaired |
| | | 251255Q24 | Class 1A-94 | $5,715,000.00 | Unimpaired |
| | | 251255Q32 | Class 1A-95 | $19,525,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Amended and Restated Resolution of the City Council dated March 22, 2005 (Series 2005-B)<br><br>Sale Order of Finance Director of the City of Detroit dated March 22, 2005 (Series 2005-B), Amendment No. 1 to Sale Order of the Finance Director dated April 23, 2008 and Supplement to Prior Sale Orders of Finance Director dated May 6, 2008 | Series 2005-B | 2512557R0 | Class 1A-96 | $2,125,000.00 | Unimpaired |
| | | 2512557S8 | Class 1A-97 | $2,225,000.00 | Unimpaired |
| | | 2512557T6 | Class 1A-98 | $2,305,000.00 | Unimpaired |
| | | 2512557U3 | Class 1A-99 | $2,385,000.00 | Unimpaired |
| | | 2512557V1 | Class 1A-100 | $2,465,000.00 | Impaired |
| | | 2512557W9 | Class 1A-101 | $2,575,000.00 | Impaired |
| | | 2512557X7 | Class 1A-102 | $2,690,000.00 | Impaired |
| | | 2512557Y5 | Class 1A-103 | $2,905,000.00 | Impaired |
| | | 2512557Z2 | Class 1A-104 | $3,025,000.00 | Impaired |
| | | 2512558A6 | Class 1A-105 | $3,145,000.00 | Impaired |
| | | 2512558B4 | Class 1A-106 | $3,270,000.00 | Impaired |
| | | 2512558C2 | Class 1A-107 | $3,490,000.00 | Impaired |
| | | 2512558D0 | Class 1A-108 | $3,620,000.00 | Impaired |
| | | 2512558E8 | Class 1A-109 | $3,850,000.00 | Impaired |
| | | 2512558F5 | Class 1A-110 | $3,980,000.00 | Impaired |
| | | 2512558G3 | Class 1A-111 | $28,415,000.00 | Unimpaired |
| | | 2512558H1 | Class 1A-112 | $57,365,000.00 | Impaired |
| | | 2512558J7 | Class 1A-113 | $57,500,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005-A/C Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit dated March 3, 2005 (Series 2005-C) | Series 2005-C | 251255S63 | Class 1A-114 | $9,270,000.00 | Unimpaired |
| | | 251255S71 | Class 1A-115 | $9,735,000.00 | Unimpaired |
| | | 251255S89 | Class 1A-116 | $17,545,000.00 | Unimpaired |
| | | 251255S97 | Class 1A-117 | $18,425,000.00 | Unimpaired |
| | | 251255T21 | Class 1A-118 | $18,700,000.00 | Unimpaired |
| | | 251255T39 | Class 1A-119 | $8,245,000.00 | Unimpaired |
| | | 251255T47 | Class 1A-120 | $8,655,000.00 | Unimpaired |
| | | 251255T54 | Class 1A-121 | $9,090,000.00 | Unimpaired |
| | | 251255T62 | Class 1A-122 | $9,540,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted November 18, 2005 | Series 2006-A | 251255V36 | Class 1A-123 | $7,285,000.00 | Unimpaired |
| | | 251255V44 | Class 1A-124 | $7,650,000.00 | Unimpaired |
| | | 251255V51 | Class 1A-125 | $8,030,000.00 | Impaired |
| | | 251255V69 | Class 1A-126 | $8,430,000.00 | Impaired |
| | | 251255V77 | Class 1A-127 | $8,855,000.00 | Impaired |

5

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 7:20:30 Page 162 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 7:20:30 Page 96 of 91
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| ("2006 Bond Resolution") Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-A) | | 251255V85 | Class 1A-128 | $9,295,000.00 | Impaired |
| | | 251255V93 | Class 1A-129 | $9,760,000.00 | Impaired |
| | | 251255W27 | Class 1A-130 | $10,250,000.00 | Impaired |
| | | 251255W35 | Class 1A-131 | $10,760,000.00 | Impaired |
| | | 251255W43 | Class 1A-132 | $11,300,000.00 | Impaired |
| | | 251255W50 | Class 1A-133 | $11,865,000.00 | Impaired |
| | | 251255W68 | Class 1A-134 | $12,460,000.00 | Impaired |
| | | 251255W76 | Class 1A-135 | $13,080,000.00 | Impaired |
| | | 251255W84 | Class 1A-136 | $131,150,000.00 | Unimpaired |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated August 15, 2006 (Series 2006-B) | Series 2006-B | 251256AG8 | Class 1A-137 | $100,000.00 | Unimpaired |
| | | 251256AH6 | Class 1A-138 | $100,000.00 | Unimpaired |
| | | 251256AJ2 | Class 1A-139 | $100,000.00 | Unimpaired |
| | | 251256AK9 | Class 1A-140 | $100,000.00 | Unimpaired |
| | | 251256AL7 | Class 1A-141 | $100,000.00 | Unimpaired |
| | | 251256AM5 | Class 1A-142 | $100,000.00 | Impaired |
| | | 251256AN3 | Class 1A-143 | $400,000.00 | Impaired |
| | | 251256AP8 | Class 1A-144 | $56,600,000.00 | Impaired |
| | | 251256AQ6 | Class 1A-145 | $62,100,000.00 | Impaired |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-C) | Series 2006-C | 251255X83 | Class 1A-146 | $1,100,000.00 | Unimpaired |
| | | 251255X91 | Class 1A-147 | $3,725,000.00 | Unimpaired |
| | | 251255Y25 | Class 1A-148 | $3,795,000.00 | Impaired |
| | | 251255Y33 | Class 1A-149 | $4,010,000.00 | Impaired |
| | | 251255Y41 | Class 1A-150 | $4,765,000.00 | Impaired |
| | | 251255Y58 | Class 1A-151 | $5,860,000.00 | Impaired |
| | | 251255Y66 | Class 1A-152 | $14,880,000.00 | Impaired |
| | | 251255Y74 | Class 1A-153 | $32,045,000.00 | Unimpaired |
| | | 251255Y82 | Class 1A-154 | 146,500,000 | Unimpaired |
| Water Bond Ordinance Water Indenture 2006 Bond Resolution Sale Order of Finance Director of the City of Detroit dated July 19, 2006 (Series 2006-D) | Series 2006-D | 251255Z81 | Class 1A-155 | $15,000.00 | Unimpaired |
| | | 251255Z99 | Class 1A-156 | $15,000.00 | Unimpaired |
| | | 2512552A2 | Class 1A-157 | $15,000.00 | Unimpaired |
| | | 2512552B0 | Class 1A-158 | $20,000.00 | Unimpaired |
| | | 2512552C8 | Class 1A-159 | $20,000.00 | Unimpaired |
| | | 2512552D6 | Class 1A-160 | $2,650,000.00 | Impaired |
| | | 2512552E4 | Class 1A-161 | $3,200,000.00 | Impaired |
| | | 2512552F1 | Class 1A-162 | $20,135,000.00 | Impaired |
| | | 2512552G9 | Class 1A-163 | $27,425,000.00 | Impaired |
| | | 2512552H7 | Class 1A-164 | $9,955,000.00 | Impaired |
| | | 2512552J3 | Class 1A-165 | $21,105,000.00 | Unimpaired |

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| | | 2512552K0 | Class 1A-166 | $57,650,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Resolution of the City Council adopted April 5, 2011 ("2011 Bond Resolution")<br><br>Sale Order of the Finance Director dated as of December 15, 2011 ("2011 Sale Order") | Series 2011-A | 251256BA0 | Class 1A-167 | $3,410,000.00 | Unimpaired |
| | | 251256BB8 | Class 1A-168 | $3,550,000.00 | Unimpaired |
| | | 251256BC6 | Class 1A-169 | $3,695,000.00 | Impaired |
| | | 251256BD4 | Class 1A-170 | $3,845,000.00 | Impaired |
| | | 251256BE2 | Class 1A-171 | $4,000,000.00 | Impaired |
| | | 251256BF9 | Class 1A-172 | $3,160,000.00 | Impaired |
| | | 251256BG7 | Class 1A-173 | $3,225,000.00 | Impaired |
| | | 251256BH5 | Class 1A-174 | $4,215,000.00 | Impaired |
| | | 251256BJ1 | Class 1A-175 | $4,195,000.00 | Impaired |
| | | 251256BK8 | Class 1A-176 | $4,170,000.00 | Impaired |
| | | 251256BL6 | Class 1A-177 | $4,140,000.00 | Impaired |
| | | 251256BM4 | Class 1A-178 | $4,085,000.00 | Impaired |
| | | 251256BN2 | Class 1A-179 | $4,020,000.00 | Impaired |
| | | 251256BP7 | Class 1A-180 | $3,930,000.00 | Impaired |
| | | 251256BQ5 | Class 1A-181 | $14,665,000.00 | Impaired |
| | | 251256BR3 | Class 1A-182 | $28,890,000.00 | Unimpaired |
| | | 251256BT9 | Class 1A-183 | $49,315,000.00 | Impaired |
| | | 251256BS1 | Class 1A-184 | $224,300,000.00 | Unimpaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-B | 251256AV5 | Class 1A-185 | $1,970,000.00 | Unimpaired |
| | | 251256AW3 | Class 1A-186 | $3,760,000.00 | Impaired |
| | | 251256AX1 | Class 1A-187 | $9,740,000.00 | Impaired |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2011 Bond Resolution<br><br>2011 Sale Order | Series 2011-C | 251256BV4 | Class 1A-188 | $2,700,000.00 | Impaired |
| | | 251256BW2 | Class 1A-189 | $9,965,000.00 | Impaired |
| | | 251256BX0 | Class 1A-190 | $10,490,000.00 | Impaired |
| | | 251256BY8 | Class 1A-191 | $11,035,000.00 | Impaired |
| | | 251256BZ5 | Class 1A-192 | $11,615,000.00 | Impaired |
| | | 251256CA9 | Class 1A-193 | $5,000,000.00 | Impaired |
| | | 251256CC5 | Class 1A-194 | $7,230,000.00 | Unimpaired |
| | | 251256CB7 | Class 1A-195 | $44,630,000.00 | Unimpaired |

7

13-53846-tjt   Doc 8879   Filed 12/17/14   Entered 12/17/14 12:30:09   Page 164 of 299
13-53846-swr   Doc 6379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 98 of 209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[3] | Series 1998-A | 251237S87 | Class 1A-196 | $3,110,000.00 | Unimpaired |
| | | 251237S95 | Class 1A-197 | $3,225,000.00 | Unimpaired |
| Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture") | | 251237T29 | Class 1A-198 | $3,540,000.00 | Impaired |
| | | 251237T37 | Class 1A-199 | $3,660,000.00 | Impaired |
| | | 251237T45 | Class 1A-200 | $3,885,000.00 | Impaired |
| | | 251237T52 | Class 1A-201 | $4,095,000.00 | Impaired |
| Resolution of the City Council adopted May 6, 1998 ("1998 Bond Resolution") | | 251237T60 | Class 1A-202 | $7,415,000.00 | Impaired |
| | | 251237T78 | Class 1A-203 | $7,745,000.00 | Impaired |
| Sale Order of the Finance Director of the City of Detroit dated December 9, 1998 ("1998 Sale Order") | | 251237T86 | Class 1A-204 | $12,585,000.00 | Impaired |
| | | 251237T94 | Class 1A-205 | $13,350,000.00 | Impaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1998 Bond Resolution<br><br>1998 Sale Order | Series 1998-B | 251237U92 | Class 1A-206 | $3,125,000.00 | Unimpaired |
| | | 251237V26 | Class 1A-207 | $3,240,000.00 | Unimpaired |
| | | 251237V34 | Class 1A-208 | $3,455,000.00 | Impaired |
| | | 251237V42 | Class 1A-209 | $3,575,000.00 | Impaired |
| | | 251237V59 | Class 1A-210 | $3,895,000.00 | Impaired |
| | | 251237V67 | Class 1A-211 | $4,015,000.00 | Impaired |
| | | 251237V75 | Class 1A-212 | $7,330,000.00 | Impaired |
| | | 251237V83 | Class 1A-213 | $7,665,000.00 | Impaired |
| | | 251237V91 | Class 1A-214 | $12,600,000.00 | Impaired |
| | | 251237W25 | Class 1A-215 | $13,265,000.00 | Impaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Resolution adopted on November 24, 1999<br><br>Sale Order of the Finance Director of the City of Detroit dated December 10, 1999 | Series 1999-A | 251237VM2 | Class 1A-216 | $7,924,628.15 | Unimpaired |
| | | 251237VN0 | Class 1A-217 | $7,759,578.75 | Unimpaired |
| | | 251237VP5 | Class 1A-218 | 7,704,816.00 | Impaired |
| | | 251237VQ3 | Class 1A-219 | $7,157,798.95 | Impaired |
| | | 251237VR1 | Class 1A-220 | $6,738,459.00 | Impaired |
| | | 251237VS9 | Class 1A-221 | $6,365,288.40 | Impaired |
| | | 251237VT7 | Class 1A-222 | $5,690,933.60 | Impaired |
| | | 251237VU4 | Class 1A-223 | $6,235,125.30 | Impaired |

---

[3] Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

8

13-53846-tjt swr Doc 8379 Filed 12/17/14 Entered 12/17/14 12:30:05 Page 165 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 95 of 91
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted on August 1, 2001 and Amendment dated October 10, 2001 (collectively, "2001 Bond Resolution")<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 ("2001 Sale Order") | Series 2001-B | 251237WV1 | Class 1A-224 | $110,550,000.00 | Impaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order | Series 2001-C(1) | 2512376G3 | Class 1A-225 | $575,000.00 | Unimpaired |
| | | 2512376H1 | Class 1A-226 | $600,000.00 | Unimpaired |
| | | 2512376J7 | Class 1A-227 | $625,000.00 | Impaired |
| | | 2512376K4 | Class 1A-228 | $655,000.00 | Impaired |
| | | 2512376L2 | Class 1A-229 | $690,000.00 | Impaired |
| | | 2512376M0 | Class 1A-230 | $720,000.00 | Impaired |
| | | 2512376P3 | Class 1A-231 | $110,510,000.00 | Impaired |
| | | 2512376N8 | Class 1A-232 | $38,000,000.00 | Impaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order and Amendment No. 1 to Sale Order of the Finance Director (2001(C-2) and (E)) dated April 23, 2008 ("2001 Sale Order Amendment") and Supplement to Prior Sale Orders (2001(C-2), 2001(E) and 2006(A)) dated May 1, 2008 ("2001/2006 Supplement to Sale Orders") | Series 2001-C(2) | 2512374G5 | Class 1A-233 | $310,000.00 | Unimpaired |
| | | 2512374H3 | Class 1A-234 | $325,000.00 | Unimpaired |
| | | 2512374J9 | Class 1A-235 | $345,000.00 | Unimpaired |
| | | 2512374K6 | Class 1A-236 | $365,000.00 | Unimpaired |
| | | 2512374L4 | Class 1A-237 | $380,000.00 | Unimpaired |
| | | 2512374M2 | Class 1A-238 | $400,000.00 | Unimpaired |
| | | 2512374N0 | Class 1A-239 | $4,090,000.00 | Unimpaired |
| | | 2512374P5 | Class 1A-240 | $21,600,000.00 | Impaired |
| | | 2512374Q3 | Class 1A-241 | $93,540,000.00 | Impaired |

9

13-53846-tjt Doc 8272 Filed 12/17/14 Entered 12/17/14 12:00:00 Page 166 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 90 of 91
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[4]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit, Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted August 1, 2001; Amendment October 10, 2001<br><br>Composite Sale Order of the Finance Director of the City of Detroit dated August 1, 2001 | Series 2001-D | 251237WY5 | Class 1A-242 | $21,300,000.00 | Unimpaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2001 Bond Resolution<br><br>2001 Sale Order, 2001 Amendment and 2001/2006 Supplement to Sale Orders | Series 2001-E | 2512374R1 | Class 1A-243 | $136,150,000.00 | Impaired |
| Sewage Bond Ordinance Sewage Indenture Bond Authorizing Resolution of the City Council adopted May 7, 2003 ("2003 Bond Resolution") Composite Sale Order of the Finance Director of the City of Detroit dated May 14, 2003 | Series 2003-A | 251237YK3 | Class 1A-244 | $3,815,000.00 | Unimpaired |
| | | 251237Q89 | Class 1A-245 | $10,000.00 | Unimpaired |
| | | 251237ZE6 | Class 1A-246 | $25,000.00 | Unimpaired |
| | | 251237ZB2 | Class 1A-247 | $50,000.00 | Unimpaired |
| | | 251237R21 | Class 1A-248 | $180,000.00 | Unimpaired |
| | | 251237YQ0 | Class 1A-249 | $190,000.00 | Unimpaired |
| | | 251237YT4 | Class 1A-250 | $250,000.00 | Unimpaired |
| | | 251237YM9 | Class 1A-251 | $275,000.00 | Unimpaired |
| | | 251237YZ0 | Class 1A-252 | $300,000.00 | Unimpaired |
| | | 251237YW7 | Class 1A-253 | $535,000.00 | Unimpaired |
| | | 251237ZG1 | Class 1A-254 | $1,000,000.00 | Unimpaired |
| | | 251237Q97 | Class 1A-255 | $3,200,000.00 | Unimpaired |
| | | 251237K77 | Class 1A-256 | $3,225,000.00 | Unimpaired |
| | | 251237K85 | Class 1A-257 | $3,325,000.00 | Unimpaired |
| | | 251237ZD8 | Class 1A-258 | $4,795,000.00 | Unimpaired |
| | | 251237ZF3 | Class 1A-259 | $5,440,000.00 | Unimpaired |

---

[4]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

10

13-53846-tit Doc 8879 Filed 12/17/14 Entered 12/17/14 21:20:30 Page 167 of 299
13-53846-swr Doc 8279 Filed 07/29/14 Entered 07/29/14 17:20:59 Page 167 of 299
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| | | 251237ZH9 | Class 1A-260 | $7,935,000.00 | Unimpaired |
| | | 251237Y80 | Class 1A-261 | $9,005,000.00 | Unimpaired |
| | | 251237YN7 | Class 1A-262 | $11,880,000.00 | Unimpaired |
| | | 251237YR8 | Class 1A-263 | $12,535,000.00 | Impaired |
| | | 251237Y72 | Class 1A-264 | $13,210,000.00 | Unimpaired |
| | | 251237YU1 | Class 1A-265 | $13,215,000.00 | Impaired |
| | | 251237YX5 | Class 1A-266 | $13,950,000.00 | Impaired |
| | | 251237ZJ5 | Class 1A-267 | $18,215,000.00 | Unimpaired |
| | | 251237Y98 | Class 1A-268 | $19,485,000.00 | Unimpaired |
| | | 251237Z22 | Class 1A-269 | $38,290,000.00 | Unimpaired |
| Sewage Bond Ordinance Sewage Indenture 2003 Bond Resolution Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | 2512376Q1 | Class 1A-270 | $150,000,000.00 | Impaired |
| Sewage Bond Ordinance Sewage Indenture Bond Authorizing Resolution of the City Council adopted May 7, 2003 Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | 251237B69 | Class 1A-271 | $7,310,000.00 | Unimpaired |
| | | 251237B77 | Class 1A-272 | $14,830,000.00 | Impaired |
| | | 251237B85 | Class 1A-273 | $15,605,000.00 | Impaired |
| | | 251237B93 | Class 1A-274 | $5,525,000.00 | Impaired |
| | | 251237C27 | Class 1A-275 | $5,545,000.00 | Impaired |
| | | 251237C35 | Class 1A-276 | $5,835,000.00 | Impaired |
| | | 251237C43 | Class 1A-277 | $6,145,000.00 | Impaired |
| Sewage Bond Ordinance Sewage Indenture Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution") Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | 251237E41 | Class 1A-278 | $625,000.00 | Unimpaired |
| | | 251237E58 | Class 1A-279 | $490,000.00 | Unimpaired |
| | | 251237E66 | Class 1A-280 | $510,000.00 | Unimpaired |
| | | 251237E74 | Class 1A-281 | $545,000.00 | Unimpaired |
| | | 251237E82 | Class 1A-282 | $555,000.00 | Unimpaired |
| | | 251237E90 | Class 1A-283 | $830,000.00 | Unimpaired |
| | | 251237F24 | Class 1A-284 | $860,000.00 | Unimpaired |
| | | 251237F32 | Class 1A-285 | $905,000.00 | Unimpaired |
| | | 251237F40 | Class 1A-286 | $925,000.00 | Unimpaired |
| | | 251237F57 | Class 1A-287 | $970,000.00 | Unimpaired |
| | | 251237F65 | Class 1A-288 | $490,000.00 | Unimpaired |
| | | 251237Z55 | Class 1A-289 | $19,415,000.00 | Unimpaired |
| | | 251237Z63 | Class 1A-290 | $24,820,000.00 | Unimpaired |
| | | 251237F99 | Class 1A-291 | $138,945,000.00 | Unimpaired |
| | | 251237G23 | Class 1A-292 | $47,000,000.00 | Unimpaired |
| Sewage Bond Ordinance Sewage Indenture | Series 2005-B | 251237G64 | Class 1A-293 | $7,775,000.00 | Unimpaired |
| | | 251237G72 | Class 1A-294 | $8,010,000.00 | Unimpaired |

11

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 168 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:50 Page 168 of 209
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| 2005 Bond Resolution | | 251237G80 | Class 1A-295 | $10,420,000.00 | Impaired |
| Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | | 251237G98 | Class 1A-296 | $10,990,000.00 | Impaired |
| Sewage Bond Ordinance | Series 2005-C | 251237J20 | Class 1A-297 | $4,140,000.00 | Unimpaired |
| Sewage Indenture | | 251237J38 | Class 1A-298 | $4,345,000.00 | Unimpaired |
| | | 251237J46 | Class 1A-299 | $4,570,000.00 | Unimpaired |
| 2005 Bond Resolution | | 251237J53 | Class 1A-300 | $4,795,000.00 | Unimpaired |
| Sale Order of the Finance Director of the City of Detroit, Series 2005-C, dated March 9, 2005 | | 251237J61 | Class 1A-301 | $5,030,000.00 | Unimpaired |
| | | 251237J79 | Class 1A-302 | $5,280,000.00 | Unimpaired |
| | | 251237J87 | Class 1A-303 | $7,355,000.00 | Unimpaired |
| | | 251237J95 | Class 1A-304 | $7,720,000.00 | Unimpaired |
| | | 251237K28 | Class 1A-305 | $6,345,000.00 | Unimpaired |
| Sewage Bond Ordinance Sewage Indenture Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution") Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated April 23, 2008 and 2001/2006 Supplement to Sale Orders | Series 2006-A | 2512373Z4 | Class 1A-306 | $123,655,000.00 | Unimpaired |
| | Series 2006-B | 251237M83 | Class 1A-307 | $1,835,000.00 | Unimpaired |
| | | 251237M91 | Class 1A-308 | $1,825,000.00 | Unimpaired |
| Sewage Bond Ordinance | | 251237N25 | Class 1A-309 | $1,430,000.00 | Impaired |
| Sewage Indenture | | 251237N33 | Class 1A-310 | $1,505,000.00 | Impaired |
| 2006 Bond Resolution | | 251237N41 | Class 1A-311 | $1,590,000.00 | Impaired |
| Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | | 251237N58 | Class 1A-312 | $7,515,000.00 | Unimpaired |
| | | 251237N66 | Class 1A-313 | $6,540,000.00 | Unimpaired |
| | | 251237N74 | Class 1A-314 | $24,400,000.00 | Unimpaired |
| | | 251237N82 | Class 1A-315 | $40,000,000.00 | Unimpaired |
| | | 251237N90 | Class 1A-316 | $156,600,000.00 | Unimpaired |
| Sewage Bond Ordinance Sewage Indenture | Series 2006-C | 251237P31 | Class 1A-317 | $8,495,000.00 | Impaired |

12

13-53846-tjt Doc 8379 Filed 12/17/14 Entered 12/17/14 17:20:30 Page 169 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 93 of 209
209

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class | Impairment |
|---|---|---|---|---|---|
| 2006 Bond Resolution<br><br>Sale Order of Finance Director of the City of Detroit, Series 2006(C), dated August 4, 2006 | | 251237P49 | Class 1A-318 | $8,915,000.00 | Impaired |
| | | 251237P56 | Class 1A-319 | $9,150,000.00 | Impaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006<br><br>Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | 251237W66 | Class 1A-320 | $288,780,000.00 | Unimpaired |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted July 19, 2011<br><br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | 251250AC0 | Class 1A-321 | $8,880,000.00 | Impaired |
| | | 251250AE6 | Class 1A-322 | $9,750,000.00 | Impaired |
| | | 251250AS5 | Class 1A-323 | $50,000,000.00 | Unimpaired |
| | | 251250AA4 | Class 1A-324 | $5,820,000.00 | Unimpaired |
| | | 251250AB2 | Class 1A-325 | $6,005,000.00 | Unimpaired |
| | | 251250AD8 | Class 1A-326 | $6,430,000.00 | Impaired |
| | | 251250AF3 | Class 1A-327 | $19,930,000.00 | Impaired |
| | | 251250AG1 | Class 1A-328 | $13,925,000.00 | Impaired |
| | | 251250AH9 | Class 1A-329 | $9,845,000.00 | Impaired |
| | | 251250AJ5 | Class 1A-330 | $14,860,000.00 | Impaired |
| | | 251250AK2 | Class 1A-331 | $22,275,000.00 | Impaired |
| | | 251250AN6 | Class 1A-332 | $13,170,000.00 | Impaired |
| | | 251250AP1 | Class 1A-333 | $9,890,000.00 | Impaired |
| | | 251250AQ9 | Class 1A-334 | $120,265,000.00 | Impaired |
| | | 251250AR7 | Class 1A-335 | $292,865,000.00 | Unimpaired |
| | | 251250AL0 | Class 1A-336 | $23,630,000.00 | Impaired |
| | | 251250AM8 | Class 1A-337 | $32,240,000.00 | Impaired |

13

13-53846-tjt swr Doc 8383 Filed 12/17/14 Entered 12/17/14 12:36:09 Page 170 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:39 Page 94 of 209

209

**EXHIBIT I.A.128**

SCHEDULE OF DWSD REVOLVING SEWER BONDS
DOCUMENTS & RELATED DWSD REVOLVING SEWER BONDS

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1]<br><br>Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture")<br><br>Bond Authorizing Resolution adopted September 9, 1992<br><br>Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1B-1 | $115,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 30, 1993<br><br>Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1B-2 | $775,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 30, 1997<br><br>Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1B-3 | $1,870,000.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December  9, 1986, as amended.

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1B-4 | $8,750,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1B-5 | $25,860,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1B-6 | $14,295,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1B-7 | $18,725,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1B-8 | $21,947,995.00 |

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1B-9 | $36,051,066.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1B-10 | $54,145,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1B-11 | $39,430,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1B-12 | $10,660,000.00 |

3
13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 12:... Page 174 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 98 of
209

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1B-13 | $865,369.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1B-14 | $19,189,466.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1B-15 | $34,215,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1B-16 | $16,390,370.00 |

4

13-53846-tjt swr Doc 8383-79 Filed 12/17/14 Entered 12/17/14 4:20:59 Page 175 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 7:20:59 Page 99 of 209

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1B-17 | $1,890,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1B-18 | $11,888,459.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1B-19 | $8,232,575.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1B-20 | $140,109,096.00 |

13-53846-tjt   Doc 8272   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 176 of 299
13-53846-swr   Doc 8379   Filed 07/29/15   Entered 07/29/14 17:20:30   Page 176 of 299
209

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1B-21 | $9,806,301.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1B-22 | $3,358,917.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1B-23 | $4,302,413.00 |

6

209

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 12:30 Page 177 of 299
13-53846-swr Doc 8379 Filed 11/21/14 Entered 11/21/14 17:20:36 Page 101 of 209

**EXHIBIT I.A.131**

SCHEDULE OF DWSD REVOLVING WATER BOND
DOCUMENTS & RELATED DWSD REVOLVING WATER BONDS

13-53846-tjt  Doc 8279  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 178 of 299
13-53846-swr  Doc 8379  Filed 07/29/15  Entered 07/29/15 17:20:30  Page 102 of
209

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("<u>Water Bond Ordinance</u>")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit ("<u>City</u>"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("<u>Water Indenture</u>")<br><br>Bond Authorizing Resolution adopted April 29, 2005 ("<u>2005 SRF Resolution</u>")<br><br>Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("<u>Authority</u>") and Michigan Department of Environmental Quality ("<u>DEQ</u>") | Series 2005-SRF-1 | Class 1C-1 | $9,960,164.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005 SRF Resolution<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1C-2 | $6,241,730.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution adopted February 15, 2006<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1C-3 | $3,715,926.00 |

---

[1]      Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:37:20 Page 179 of 299
13-53846-swr Doc 8379 Filed 12/17/14 Entered 12/17/14 17:20:30 Page 103 of
209

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1C-4 | $1,535,941.00 |

2

209

13-53846-tjt Doc 8883-79 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 180 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:36 Page 104 of 299

**EXHIBIT I.A.172**

SCHEDULE OF HUD INSTALLMENT NOTE
DOCUMENTS & RELATED HUD INSTALLMENT NOTES

| **HUD Installment Note Documents** (Identified by note number. Ancillary instruments and agreements related thereto are not separately identified) | **HUD Installment Notes** | **Estimated Allowed Amount** (The estimated allowed amount is the sum of all advances and conversion date advances under the HUD Installment Notes identified in this schedule, less principal amounts paid, plus interest due on principal amounts outstanding. The estimated aggregate allowed amount is the sum of the estimated allowed amount for all the HUD Installment Notes identified in this schedule) |
| --- | --- | --- |
| City Note No. B-94-MC-26-0006-A | Garfield Project Note[*] | $549,142.50 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note* | $95,929.50 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note* | $1,837,217.00 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note* | $10,371,138.25 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note* | $1,923,209.50 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note* | $4,255,498.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1* | $8,935,901.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2* | $3,071,773.50 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3[°] | $7,262,461.03 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4° | $1,554,180.43 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note* | $8,532,290.00 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note* | $9,324,475.35 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note° | $6,177,291.95 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note* | $10,457,437.75 |

---

[*] HUD Installment Note has a fixed interest rate. Estimated allowed amount represents the aggregate of outstanding principal and fixed interest payments set forth in the amortization schedule for the HUD Installment Note.

[°] HUD Installment Note has a variable interest rate. Estimated allowed amount represents the aggregate of outstanding principal and an estimate of the variable interest payments at the rate set forth in the HUD Installment Note.

13-53846-tjr Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 181 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 103 of 209
209

| | | |
|---|---|---|
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II* | $13,547,692.80 |
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note* | $24,447,587.50 |

**EXHIBIT I.A.182**

INTEREST RATE RESET CHART

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Sewer Bonds** | | | | | | | | |
| Sewer1998A | 251237S87 | Senior | NPFG | 7/1/2014 | 3,110,000 | 5.50% | N/A | Unimpaired |
| Sewer1998A | 251237S95 | Senior | NPFG | 7/1/2015 | 3,225,000 | 5.50% | N/A | Unimpaired |
| Sewer1998A | 251237T29 | Senior | NPFG | 7/1/2016 | 3,540,000 | 5.50% | N/A | 0.87% |
| Sewer1998A | 251237T37 | Senior | NPFG | 7/1/2017 | 3,660,000 | 5.50% | N/A | 1.20% |
| Sewer1998A | 251237T45 | Senior | NPFG | 7/1/2018 | 3,885,000 | 5.25% | 7/1/2017 | 1.54% |
| Sewer1998A | 251237T52 | Senior | NPFG | 7/1/2019 | 4,095,000 | 5.25% | 7/1/2017 | 1.93% |
| Sewer1998A | 251237T60 | Senior | NPFG | 7/1/2020 | 7,415,000 | 5.25% | 7/1/2017 | 2.37% |
| Sewer1998A | 251237T78 | Senior | NPFG | 7/1/2021 | 7,745,000 | 5.25% | 7/1/2017 | 2.81% |
| Sewer1998A | 251237T86 | Senior | NPFG | 7/1/2022 | 12,585,000 | 5.25% | 7/1/2017 | 3.17% |
| Sewer1998A | 251237T94 | Senior | NPFG | 7/1/2023 | 13,350,000 | 5.25% | 7/1/2017 | 3.47% |
| | | | | | 62,610,000 | | | |
| Sewer1998B | 251237U92 | Senior | NPFG | 7/1/2014 | 3,125,000 | 5.50% | N/A | Unimpaired |
| Sewer1998B | 251237V26 | Senior | NPFG | 7/1/2015 | 3,240,000 | 5.50% | N/A | Unimpaired |
| Sewer1998B | 251237V34 | Senior | NPFG | 7/1/2016 | 3,455,000 | 5.50% | N/A | 0.87% |
| Sewer1998B | 251237V42 | Senior | NPFG | 7/1/2017 | 3,575,000 | 5.50% | N/A | 1.20% |
| Sewer1998B | 251237V59 | Senior | NPFG | 7/1/2018 | 3,895,000 | 5.25% | 7/1/2017 | 1.54% |
| Sewer1998B | 251237V67 | Senior | NPFG | 7/1/2019 | 4,015,000 | 5.25% | 7/1/2017 | 1.93% |
| Sewer1998B | 251237V75 | Senior | NPFG | 7/1/2020 | 7,330,000 | 5.25% | 7/1/2017 | 2.37% |
| Sewer1998B | 251237V83 | Senior | NPFG | 7/1/2021 | 7,665,000 | 5.25% | 7/1/2017 | 2.81% |
| Sewer1998B | 251237V91 | Senior | NPFG | 7/1/2022 | 12,600,000 | 5.25% | 7/1/2017 | 3.17% |
| Sewer1998B | 251237W25 | Senior | NPFG | 7/1/2023 | 13,265,000 | 5.25% | 7/1/2017 | 3.47% |
| | | | | | 62,165,000 | | | |
| Sewer2001C1 (Ins) | 2512376G3 | Senior | Assured Guaranty | 7/1/2014 | 575,000 | 5.25% | N/A | Unimpaired |
| Sewer2001C1 (Ins) | 251237H1 | Senior | Assured Guaranty | 7/1/2015 | 600,000 | 5.25% | N/A | Unimpaired |
| Sewer2001C1 (Ins) | 2512376J7 | Senior | Assured Guaranty | 7/1/2016 | 625,000 | 5.25% | N/A | 0.87% |
| Sewer2001C1 (Ins) | 2512376K4 | Senior | Assured Guaranty | 7/1/2017 | 655,000 | 5.25% | N/A | 1.20% |
| Sewer2001C1 (Ins) | 2512376L2 | Senior | Assured Guaranty | 7/1/2018 | 690,000 | 5.25% | N/A | 1.54% |
| Sewer2001C1 (Ins) | 2512376M0 | Senior | Assured Guaranty | 7/1/2019 | 720,000 | 5.25% | N/A | 1.93% |
| Sewer2001C1 (Ins) | 2512376P3 | Senior | Assured Guaranty | 7/1/2027 | 110,510,000 | 7.00% | 7/1/2019 | 4.05% |
| | | | | | 114,375,000 | | | |
| Sewer2001C1 (Unins) | 2512376N8 | Senior | N/A | 7/1/2024 | 38,000,000 | 6.50% | 7/1/2019 | 3.44% |
| | | | | | 38,000,000 | | | |
| Sewer2001C2 | 2512374G5 | Senior | NPFG / BHAC | 7/1/2014 | 310,000 | 4.00% | N/A | Unimpaired |
| Sewer2001C2 | 2512374H3 | Senior | NPFG / BHAC | 7/1/2015 | 325,000 | 4.00% | N/A | Unimpaired |
| Sewer2001C2 | 2512374J9 | Senior | NPFG / BHAC | 7/1/2016 | 345,000 | 4.00% | N/A | Unimpaired |
| Sewer2001C2 | 2512374K6 | Senior | NPFG / BHAC | 7/1/2017 | 365,000 | 4.00% | N/A | Unimpaired |
| Sewer2001C2 | 2512374L4 | Senior | NPFG / BHAC | 7/1/2018 | 380,000 | 4.00% | N/A | Unimpaired |
| Sewer2001C2 | 2512374M2 | Senior | NPFG / BHAC | 7/1/2019 | 400,000 | 4.00% | 7/1/2018 | Unimpaired |
| Sewer2001C2 | 2512374N0 | Senior | NPFG / BHAC | 7/1/2027 | 4,090,000 | 4.50% | 7/1/2018 | Unimpaired |
| Sewer2001C2 | 2512374P5 | Senior | NPFG / BHAC | 7/1/2028 | 21,600,000 | 5.25% | 7/1/2018 | 4.42% |
| Sewer2001C2 | 2512374Q3 | Senior | NPFG / BHAC | 7/1/2029 | 93,540,000 | 5.25% | 7/1/2018 | 4.49% |
| | | | | | 121,355,000 | | | |

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2003A (Call) | 251237K77 | Senior | Assured Guaranty | 7/1/2014 | 3,225,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237YM9 | Senior | Assured Guaranty | 7/1/2015 | 275,000 | 3.65% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237K85 | Senior | Assured Guaranty | 7/1/2015 | 3,325,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237YQ0 | Senior | Assured Guaranty | 7/1/2016 | 190,000 | 3.70% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Q89 | Senior | Assured Guaranty | 7/1/2016 | 10,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237YT4 | Senior | Assured Guaranty | 7/1/2017 | 250,000 | 3.80% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Q97 | Senior | Assured Guaranty | 7/1/2017 | 3,200,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237YW7 | Senior | Assured Guaranty | 7/1/2018 | 535,000 | 4.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237R21 | Senior | Assured Guaranty | 7/1/2018 | 180,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237YZ0 | Senior | Assured Guaranty | 7/1/2019 | 300,000 | 4.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZB2 | Senior | Assured Guaranty | 7/1/2020 | 50,000 | 4.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZD8 | Senior | Assured Guaranty | 7/1/2021 | 4,795,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZE6 | Senior | Assured Guaranty | 7/1/2022 | 25,000 | 4.25% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZF3 | Senior | Assured Guaranty | 7/1/2022 | 5,440,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZG1 | Senior | Assured Guaranty | 7/1/2023 | 1,000,000 | 4.30% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZH9 | Senior | Assured Guaranty | 7/1/2023 | 7,935,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237ZJ5 | Senior | Assured Guaranty | 7/1/2024 | 18,215,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Y72 | Senior | Assured Guaranty | 7/1/2025 | 13,210,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Y80 | Senior | Assured Guaranty | 7/1/2026 | 9,005,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Y98 | Senior | Assured Guaranty | 7/1/2028 | 19,485,000 | 5.00% | 7/1/2013 | Unimpaired |
| Sewer2003A (Call) | 251237Z22 | Senior | Assured Guaranty | 7/1/2032 | 38,290,000 | 5.00% | 7/1/2013 | Unimpaired |
| | | | | | **128,940,000** | | | |
| Sewer2003A (Not Call) | 251237YK3 | Senior | Assured Guaranty | 7/1/2014 | 3,815,000 | 3.50% | N/A | Unimpaired |
| Sewer2003A (Not Call) | 251237YN7 | Senior | Assured Guaranty | 7/1/2015 | 11,880,000 | 5.50% | N/A | Unimpaired |
| Sewer2003A (Not Call) | 251237YR8 | Senior | Assured Guaranty | 7/1/2016 | 12,535,000 | 5.50% | N/A | 0.87% |
| Sewer2003A (Not Call) | 251237YU1 | Senior | Assured Guaranty | 7/1/2017 | 13,215,000 | 5.50% | N/A | 1.20% |
| Sewer2003A (Not Call) | 251237YX5 | Senior | Assured Guaranty | 7/1/2018 | 13,950,000 | 5.50% | N/A | 1.54% |
| | | | | | **55,395,000** | | | |
| Sewer2003B | 2512376Q1 | Senior | Assured Guaranty | 7/1/2033 | 150,000,000 | 7.50% | 7/1/2019 | 4.84% |
| | | | | | **150,000,000** | | | |
| Sewer2004A | 251237B69 | Senior | Assured Guaranty | 7/1/2014 | 7,310,000 | 5.00% | N/A | Unimpaired |
| Sewer2004A | 251237B77 | Senior | Assured Guaranty | 7/1/2019 | 14,830,000 | 5.25% | N/A | 1.93% |
| Sewer2004A | 251237B85 | Senior | Assured Guaranty | 7/1/2020 | 15,605,000 | 5.25% | N/A | 2.37% |
| Sewer2004A | 251237B93 | Senior | Assured Guaranty | 7/1/2021 | 5,525,000 | 5.25% | N/A | 2.81% |
| Sewer2004A | 251237C27 | Senior | Assured Guaranty | 7/1/2022 | 5,545,000 | 5.25% | N/A | 3.17% |
| Sewer2004A | 251237C35 | Senior | Assured Guaranty | 7/1/2023 | 5,835,000 | 5.25% | N/A | 3.47% |
| Sewer2004A | 251237C43 | Senior | Assured Guaranty | 7/1/2024 | 6,145,000 | 5.25% | N/A | 3.68% |
| | | | | | **60,795,000** | | | |
| Sewer2006C | 251237P31 | Senior | NPFG | 7/1/2016 | 8,495,000 | 5.25% | N/A | 0.87% |
| Sewer2006C | 251237P49 | Senior | NPFG | 7/1/2017 | 8,915,000 | 5.00% | 7/1/2016 | 1.20% |
| Sewer2006C | 251237P56 | Senior | NPFG | 7/1/2018 | 9,150,000 | 5.00% | 7/1/2016 | 1.54% |
| | | | | | **26,560,000** | | | |

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2012A (Ins) | 251250AC0 | Senior | Assured Guaranty | 7/1/2016 | 8,880,000 | 5.00% | N/A | 0.87% |
| Sewer2012A (Ins) | 251250AE6 | Senior | Assured Guaranty | 7/1/2018 | 9,750,000 | 5.00% | N/A | 1.54% |
| Sewer2012A (Ins) | 251250AS5 | Senior | Assured Guaranty | 7/1/2039 | 50,000,000 | 5.00% | 7/1/2022 | Unimpaired |
| | | | | | 68,630,000 | | | |
| Sewer2012A (Unins - 22 Call) | 251250AA4 | Senior | N/A | 7/1/2014 | 5,820,000 | 5.00% | N/A | Unimpaired |
| Sewer2012A (Unins - 22 Call) | 251250AB2 | Senior | N/A | 7/1/2015 | 6,005,000 | 5.00% | N/A | Unimpaired |
| Sewer2012A (Unins - 22 Call) | 251250AD8 | Senior | N/A | 7/1/2017 | 6,430,000 | 5.00% | N/A | 1.20% |
| Sewer2012A (Unins - 22 Call) | 251250AF3 | Senior | N/A | 7/1/2019 | 19,930,000 | 5.00% | N/A | 1.93% |
| Sewer2012A (Unins - 22 Call) | 251250AG1 | Senior | N/A | 7/1/2020 | 13,925,000 | 5.00% | N/A | 2.37% |
| Sewer2012A (Unins - 22 Call) | 251250AH9 | Senior | N/A | 7/1/2021 | 9,845,000 | 5.00% | N/A | 2.81% |
| Sewer2012A (Unins - 22 Call) | 251250AJ5 | Senior | N/A | 7/1/2022 | 14,860,000 | 5.00% | N/A | 3.17% |
| Sewer2012A (Unins - 22 Call) | 251250AK2 | Senior | N/A | 7/1/2023 | 22,275,000 | 5.00% | 7/1/2022 | 3.47% |
| Sewer2012A (Unins - 22 Call) | 251250AN6 | Senior | N/A | 7/1/2026 | 13,170,000 | 5.25% | 7/1/2022 | 4.08% |
| Sewer2012A (Unins - 22 Call) | 251250AP1 | Senior | N/A | 7/1/2027 | 9,890,000 | 5.25% | 7/1/2022 | 4.24% |
| Sewer2012A (Unins - 22 Call) | 251250AQ9 | Senior | N/A | 7/1/2032 | 120,265,000 | 5.00% | 7/1/2022 | 4.72% |
| Sewer2012A (Unins - 22 Call) | 251250AR7 | Senior | N/A | 7/1/2039 | 292,865,000 | 5.25% | 7/1/2022 | Unimpaired |
| | | | | | 535,280,000 | | | |
| Sewer2012A (Unins - 17 Call) | 251250AL0 | Senior | N/A | 7/1/2024 | 23,630,000 | 5.50% | 7/1/2017 | 3.68% |
| Sewer2012A (Unins - 17 Call) | 251250AM8 | Senior | N/A | 7/1/2025 | 32,240,000 | 5.50% | 7/1/2017 | 3.88% |
| | | | | | 55,870,000 | | | |
| Sewer2001B | 251237WV1 | Second | NPFG | 7/1/2029 | 110,550,000 | 5.50% | N/A | 4.49% |
| | | | | | 110,550,000 | | | |
| Sewer2001E | 2512374R1 | Second | FGIC / BHAC | 7/1/2031 | 136,150,000 | 5.75% | 7/1/2018 | 5.01% |
| | | | | | 136,150,000 | | | |
| Sewer2005A | 251237E41 | Second | NPFG | 7/1/2014 | 625,000 | 3.60% | N/A | Unimpaired |
| Sewer2005A | 251237E58 | Second | NPFG | 7/1/2015 | 490,000 | 3.70% | N/A | Unimpaired |
| Sewer2005A | 251237E66 | Second | NPFG | 7/1/2016 | 510,000 | 3.75% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237E74 | Second | NPFG | 7/1/2017 | 545,000 | 4.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237E82 | Second | NPFG | 7/1/2018 | 555,000 | 4.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237E90 | Second | NPFG | 7/1/2019 | 830,000 | 4.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F24 | Second | NPFG | 7/1/2020 | 860,000 | 4.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F32 | Second | NPFG | 7/1/2021 | 905,000 | 4.10% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F40 | Second | NPFG | 7/1/2022 | 925,000 | 4.13% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F57 | Second | NPFG | 7/1/2023 | 970,000 | 4.25% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F65 | Second | NPFG | 7/1/2024 | 490,000 | 4.25% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237Z55 | Second | NPFG | 7/1/2028 | 19,415,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237Z63 | Second | NPFG | 7/1/2033 | 24,820,000 | 5.13% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237F99 | Second | NPFG | 7/1/2035 | 138,945,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005A | 251237G23 | Second | NPFG | 7/1/2035 | 47,000,000 | 4.50% | 7/1/2015 | Unimpaired |
| | | | | | 237,885,000 | | | |

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Sewer2005B | 251237G64 | Second | NPFG | 7/1/2014 | 7,775,000 | 5.00% | N/A | Unimpaired |
| Sewer2005B | 251237G72 | Second | NPFG | 7/1/2015 | 8,010,000 | 5.00% | N/A | Unimpaired |
| Sewer2005B | 251237G80 | Second | NPFG | 7/1/2021 | 10,420,000 | 5.50% | N/A | 3.12% |
| Sewer2005B | 251237G98 | Second | NPFG | 7/1/2022 | 10,990,000 | 5.50% | N/A | 3.48% |
| | | | | | **37,195,000** | | | |
| | | | | | | | | |
| Sewer2005C | 251237J20 | Second | NPFG | 7/1/2014 | 4,140,000 | 5.00% | N/A | Unimpaired |
| Sewer2005C | 251237J38 | Second | NPFG | 7/1/2015 | 4,345,000 | 5.00% | N/A | Unimpaired |
| Sewer2005C | 251237J46 | Second | NPFG | 7/1/2016 | 4,570,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237J53 | Second | NPFG | 7/1/2017 | 4,795,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237J61 | Second | NPFG | 7/1/2018 | 5,030,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237J79 | Second | NPFG | 7/1/2019 | 5,280,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237J87 | Second | NPFG | 7/1/2020 | 7,355,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237J95 | Second | NPFG | 7/1/2021 | 7,720,000 | 5.00% | 7/1/2015 | Unimpaired |
| Sewer2005C | 251237K28 | Second | NPFG | 7/1/2025 | 6,345,000 | 5.00% | 7/1/2015 | Unimpaired |
| | | | | | **49,580,000** | | | |
| | | | | | | | | |
| Sewer2006A | 2512373Z4 | Second | NPFG / BHAC | 7/1/2036 | 123,655,000 | 5.50% | 7/1/2018 | Unimpaired |
| | | | | | **123,655,000** | | | |
| | | | | | | | | |
| Sewer2006B | 251237M83 | Second | NPFG | 7/1/2014 | 1,835,000 | 5.00% | N/A | Unimpaired |
| Sewer2006B | 251237M91 | Second | NPFG | 7/1/2015 | 1,825,000 | 5.00% | N/A | Unimpaired |
| Sewer2006B | 251237N25 | Second | NPFG | 7/1/2016 | 1,430,000 | 5.00% | N/A | 1.13% |
| Sewer2006B | 251237N33 | Second | NPFG | 7/1/2017 | 1,505,000 | 5.00% | 7/1/2016 | 1.47% |
| Sewer2006B | 251237N41 | Second | NPFG | 7/1/2018 | 1,590,000 | 5.00% | 7/1/2016 | 1.82% |
| Sewer2006B | 251237N58 | Second | NPFG | 7/1/2022 | 7,515,000 | 4.50% | 7/1/2016 | Unimpaired |
| Sewer2006B | 251237N66 | Second | NPFG | 7/1/2025 | 6,540,000 | 4.25% | 7/1/2016 | Unimpaired |
| Sewer2006B | 251237N74 | Second | NPFG | 7/1/2033 | 24,400,000 | 5.00% | 7/1/2016 | Unimpaired |
| Sewer2006B | 251237N82 | Second | NPFG | 7/1/2034 | 40,000,000 | 4.63% | 7/1/2016 | Unimpaired |
| Sewer2006B | 251237N90 | Second | NPFG | 7/1/2036 | 156,600,000 | 5.00% | 7/1/2016 | Unimpaired |
| | | | | | **243,240,000** | | | |

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Sewer Capital Appreciation and Variable Bonds** | | | | | | | | |
| Sewer1999A[1] | 251237VM2 | Senior | NPFG | 7/1/2014 | 8,395,000 | N/A | N/A | Unimpaired |
| Sewer1999A[1] | 251237VN0 | Senior | NPFG | 7/1/2015 | 8,228,111 | 6.04% | N/A | Unimpaired |
| Sewer1999A[1] | 251237VP5 | Senior | NPFG | 7/1/2016 | 8,174,016 | 6.09% | N/A | 0.87% |
| Sewer1999A[1] | 251237VQ3 | Senior | NPFG | 7/1/2017 | 7,597,422 | 6.14% | N/A | 1.20% |
| Sewer1999A[1] | 251237VR1 | Senior | NPFG | 7/1/2018 | 7,155,785 | 6.19% | N/A | 1.54% |
| Sewer1999A[1] | 251237VS9 | Senior | NPFG | 7/1/2019 | 6,762,707 | 6.24% | N/A | 1.93% |
| Sewer1999A[1] | 251237VT7 | Senior | NPFG | 7/1/2020 | 6,048,715 | 6.29% | N/A | 2.37% |
| Sewer1999A[1] | 251237VU4 | Senior | NPFG | 7/1/2021 | 6,628,298 | 6.31% | N/A | 2.81% |
| | | | | | 58,990,054 | | | |
| Sewer2006D[2] | 251237W66 | Senior | Assured Guaranty | 7/1/2032 | 288,780,000 | 0.77% | 7/1/2011 | Unimpaired |
| | | | | | 288,780,000 | | | |
| Sewer2001D[3] | 251237WY5 | Second | NPFG | 7/1/2032 | 21,300,000 | 0.28% | 7/1/2012 | Unimpaired |
| | | | | | 21,300,000 | | | |

### Notes

(1) Sewer 1999A capital appreciation bonds amount outstanding as of 7/1/2014. Effective interest rate calculated.

(2) Variable interest rate: 67% of Three Month LIBOR plus 0.60%. New bonds will retain existing rate. Current coupon approximated to be 0.749%.

(3) Variable interest rate calculated per Auction Rate. New bonds will retain existing rate. Current coupon approximated to be 0.28%.

# DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| **Water Bonds** | | | | | | | | |
| Water1993 | 251255TP0 | Senior | NPFG | 7/1/2015 | 24,725,000 | 6.50% | N/A | Unimpaired |
| | | | | | 24,725,000 | | | |
| Water1997A | 251255XM2 | Senior | NPFG | 7/1/2014 | 6,520,000 | 6.00% | N/A | Unimpaired |
| Water1997A | 251255XN0 | Senior | NPFG | 7/1/2015 | 6,910,000 | 6.00% | N/A | Unimpaired |
| | | | | | 13,430,000 | | | |
| Water2001A | 251255A21 | Senior | NPFG | 7/1/2030 | 73,790,000 | 5.00% | 7/1/2011 | Unimpaired |
| | | | | | 73,790,000 | | | |
| Water2003A | 251255D77 | Senior | NPFG | 7/1/2019 | 500,000 | 4.50% | 7/1/2013 | Unimpaired |
| Water2003A | 251255D93 | Senior | NPFG | 7/1/2021 | 250,000 | 4.70% | 7/1/2013 | Unimpaired |
| Water2003A | 251255E27 | Senior | NPFG | 7/1/2022 | 3,550,000 | 4.75% | 7/1/2013 | Unimpaired |
| Water2003A | 2512555F8 | Senior | NPFG | 7/1/2026 | 9,970,000 | 5.00% | 7/1/2013 | Unimpaired |
| Water2003A | 251255K20 | Senior | NPFG | 7/1/2026 | 20,955,000 | 5.00% | 7/1/2013 | Unimpaired |
| Water2003A | 251255K38 | Senior | NPFG | 7/1/2027 | 21,900,000 | 5.00% | 7/1/2013 | Unimpaired |
| Water2003A | 251255E68 | Senior | NPFG | 7/1/2034 | 121,660,000 | 5.00% | 7/1/2013 | Unimpaired |
| | | | | | 178,785,000 | | | |
| Water2003C (Fix) | 251255J22 | Senior | NPFG | 7/1/2015 | 2,120,000 | 4.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J30 | Senior | NPFG | 7/1/2016 | 2,620,000 | 5.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J48 | Senior | NPFG | 7/1/2017 | 2,655,000 | 5.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J55 | Senior | NPFG | 7/1/2018 | 2,930,000 | 5.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J63 | Senior | NPFG | 7/1/2019 | 2,790,000 | 5.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J71 | Senior | NPFG | 7/1/2020 | 2,965,000 | 5.25% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J89 | Senior | NPFG | 7/1/2021 | 4,580,000 | 5.00% | 7/1/2013 | Unimpaired |
| Water2003C (Fix) | 251255J97 | Senior | NPFG | 7/1/2022 | 4,665,000 | 5.00% | 7/1/2013 | Unimpaired |
| | | | | | 25,325,000 | | | |
| Water2003D | 2512552T1 | Senior | NPFG | 7/1/2014 | 325,000 | 4.00% | N/A | Unimpaired |
| Water2003D | 2512552U8 | Senior | NPFG | 7/1/2015 | 335,000 | 4.10% | N/A | Unimpaired |
| Water2003D | 2512552V6 | Senior | NPFG | 7/1/2016 | 350,000 | 4.20% | N/A | Unimpaired |
| Water2003D | 2512552W4 | Senior | NPFG | 7/1/2017 | 360,000 | 4.25% | 7/1/2016 | Unimpaired |
| Water2003D | 2512552X2 | Senior | NPFG | 7/1/2018 | 370,000 | 4.25% | 7/1/2016 | Unimpaired |
| Water2003D | 2512552Y0 | Senior | NPFG | 7/1/2024 | 2,585,000 | 5.00% | 7/1/2016 | 2.95% |
| Water2003D | 2512552Z7 | Senior | NPFG | 7/1/2027 | 29,410,000 | 5.00% | 7/1/2016 | 4.07% |
| Water2003D | 2512553A1 | Senior | NPFG | 7/1/2028 | 23,920,000 | 5.00% | 7/1/2016 | 4.42% |
| Water2003D | 2512553B9 | Senior | NPFG | 7/1/2033 | 82,930,000 | 5.00% | 7/1/2016 | Unimpaired |
| | | | | | 140,585,000 | | | |

13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 20:30 Page 189 of 299
13-53846-swr Doc 6879 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 113 of
209

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2004B | 2512554A0 | Senior | NPFG | 7/1/2014 | 85,000 | 4.00% | N/A | Unimpaired |
| Water2004B | 2512554B8 | Senior | NPFG | 7/1/2015 | 90,000 | 4.00% | N/A | Unimpaired |
| Water2004B | 2512554C6 | Senior | NPFG | 7/1/2016 | 10,000,000 | 5.00% | N/A | 0.87% |
| Water2004B | 2512554D4 | Senior | NPFG | 7/1/2016 | 3,545,000 | 4.25% | N/A | Unimpaired |
| Water2004B | 2512554E2 | Senior | NPFG | 7/1/2017 | 13,925,000 | 5.00% | 7/1/2016 | 1.20% |
| Water2004B | 2512554F9 | Senior | NPFG | 7/1/2017 | 350,000 | 4.25% | 7/1/2016 | Unimpaired |
| Water2004B | 2512554G7 | Senior | NPFG | 7/1/2018 | 14,940,000 | 5.00% | 7/1/2016 | 1.54% |
| Water2004B | 2512554H5 | Senior | NPFG | 7/1/2019 | 15,810,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2004B | 2512554J1 | Senior | NPFG | 7/1/2020 | 16,665,000 | 5.00% | 7/1/2016 | 2.37% |
| Water2004B | 2512554K8 | Senior | NPFG | 7/1/2021 | 16,085,000 | 5.00% | 7/1/2016 | 2.81% |
| Water2004B | 2512554L6 | Senior | NPFG | 7/1/2022 | 16,935,000 | 5.00% | 7/1/2016 | 3.17% |
| Water2004B | 2512554M4 | Senior | NPFG | 7/1/2023 | 6,280,000 | 5.00% | 7/1/2016 | 3.47% |
| | | | | | **114,710,000** | | | |
| Water2005A | 251255M85 | Senior | NPFG | 7/1/2014 | 50,000 | 3.75% | N/A | Unimpaired |
| Water2005A | 251255Q81 | Senior | NPFG | 7/1/2014 | 2,070,000 | 5.00% | N/A | Unimpaired |
| Water2005A | 251255M93 | Senior | NPFG | 7/1/2015 | 85,000 | 3.85% | N/A | Unimpaired |
| Water2005A | 251255Q99 | Senior | NPFG | 7/1/2015 | 2,145,000 | 5.00% | N/A | Unimpaired |
| Water2005A | 251255N27 | Senior | NPFG | 7/1/2016 | 95,000 | 3.90% | 7/1/2015 | Unimpaired |
| Water2005A | 251255R23 | Senior | NPFG | 7/1/2016 | 2,265,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N35 | Senior | NPFG | 7/1/2017 | 125,000 | 4.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255R31 | Senior | NPFG | 7/1/2017 | 2,370,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N43 | Senior | NPFG | 7/1/2018 | 20,000 | 4.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255R49 | Senior | NPFG | 7/1/2018 | 2,615,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N50 | Senior | NPFG | 7/1/2019 | 2,790,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N68 | Senior | NPFG | 7/1/2020 | 2,955,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N76 | Senior | NPFG | 7/1/2021 | 3,030,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N84 | Senior | NPFG | 7/1/2022 | 3,225,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255N92 | Senior | NPFG | 7/1/2023 | 3,430,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P25 | Senior | NPFG | 7/1/2024 | 3,650,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P33 | Senior | NPFG | 7/1/2025 | 3,790,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P41 | Senior | NPFG | 7/1/2026 | 4,080,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P58 | Senior | NPFG | 7/1/2027 | 4,290,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P66 | Senior | NPFG | 7/1/2028 | 4,615,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P74 | Senior | NPFG | 7/1/2029 | 4,890,000 | 4.50% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P82 | Senior | NPFG | 7/1/2030 | 5,145,000 | 4.50% | 7/1/2015 | Unimpaired |
| Water2005A | 251255P90 | Senior | NPFG | 7/1/2031 | 5,415,000 | 4.50% | 7/1/2015 | Unimpaired |
| Water2005A | 251255Q24 | Senior | NPFG | 7/1/2032 | 5,715,000 | 4.50% | 7/1/2015 | Unimpaired |
| Water2005A | 251255Q32 | Senior | NPFG | 7/1/2035 | 19,525,000 | 4.50% | 7/1/2015 | Unimpaired |
| | | | | | **88,385,000** | | | |

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 17:20:30  Page 190 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 114 of 209
209

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2005B | 2512557R0 | Senior | FGIC / BHAC | 7/1/2014 | 2,125,000 | 5.00% | N/A | Unimpaired |
| Water2005B | 2512557S8 | Senior | FGIC / BHAC | 7/1/2015 | 2,225,000 | 4.00% | N/A | Unimpaired |
| Water2005B | 2512557T6 | Senior | FGIC / BHAC | 7/1/2016 | 2,305,000 | 4.00% | N/A | Unimpaired |
| Water2005B | 2512557U3 | Senior | FGIC / BHAC | 7/1/2017 | 2,385,000 | 4.00% | N/A | Unimpaired |
| Water2005B | 2512557V1 | Senior | FGIC / BHAC | 7/1/2018 | 2,465,000 | 5.50% | N/A | 1.54% |
| Water2005B | 2512557W9 | Senior | FGIC / BHAC | 7/1/2019 | 2,575,000 | 5.50% | 7/1/2018 | 1.93% |
| Water2005B | 2512557X7 | Senior | FGIC / BHAC | 7/1/2020 | 2,690,000 | 5.50% | 7/1/2018 | 2.37% |
| Water2005B | 2512557Y5 | Senior | FGIC / BHAC | 7/1/2021 | 2,905,000 | 5.50% | 7/1/2018 | 2.81% |
| Water2005B | 2512557Z2 | Senior | FGIC / BHAC | 7/1/2022 | 3,025,000 | 5.50% | 7/1/2018 | 3.17% |
| Water2005B | 2512558A6 | Senior | FGIC / BHAC | 7/1/2023 | 3,145,000 | 5.50% | 7/1/2018 | 3.47% |
| Water2005B | 2512558B4 | Senior | FGIC / BHAC | 7/1/2024 | 3,270,000 | 5.50% | 7/1/2018 | 3.68% |
| Water2005B | 2512558C2 | Senior | FGIC / BHAC | 7/1/2025 | 3,490,000 | 5.50% | 7/1/2018 | 3.88% |
| Water2005B | 2512558D0 | Senior | FGIC / BHAC | 7/1/2026 | 3,620,000 | 5.50% | 7/1/2018 | 4.08% |
| Water2005B | 2512558E8 | Senior | FGIC / BHAC | 7/1/2027 | 3,850,000 | 5.50% | 7/1/2018 | 4.24% |
| Water2005B | 2512558F5 | Senior | FGIC / BHAC | 7/1/2028 | 3,980,000 | 5.50% | 7/1/2018 | 4.42% |
| Water2005B | 2512558G3 | Senior | FGIC / BHAC | 7/1/2034 | 28,415,000 | 4.75% | 7/1/2018 | Unimpaired |
| Water2005B | 2512558H1 | Senior | FGIC / BHAC | 7/1/2035 | 57,365,000 | 5.50% | 7/1/2018 | 4.93% |
| Water2005B | 2512558J7 | Senior | FGIC / BHAC | 7/1/2035 | 57,500,000 | 5.25% | 7/1/2018 | Unimpaired |
| | | | | | **187,335,000** | | | |
| | | | | | | | | |
| Water2005C | 251255S63 | Senior | NPFG | 7/1/2014 | 9,270,000 | 5.00% | N/A | Unimpaired |
| Water2005C | 251255S71 | Senior | NPFG | 7/1/2015 | 9,735,000 | 5.00% | N/A | Unimpaired |
| Water2005C | 251255S89 | Senior | NPFG | 7/1/2016 | 17,545,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255S97 | Senior | NPFG | 7/1/2017 | 18,425,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255T21 | Senior | NPFG | 7/1/2018 | 18,700,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255T39 | Senior | NPFG | 7/1/2019 | 8,245,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255T47 | Senior | NPFG | 7/1/2020 | 8,655,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255T54 | Senior | NPFG | 7/1/2021 | 9,090,000 | 5.00% | 7/1/2015 | Unimpaired |
| Water2005C | 251255T62 | Senior | NPFG | 7/1/2022 | 9,540,000 | 5.00% | 7/1/2015 | Unimpaired |
| | | | | | **109,205,000** | | | |
| | | | | | | | | |
| Water2006A | 251255V36 | Senior | Assured Guaranty | 7/1/2014 | 7,285,000 | 5.00% | N/A | Unimpaired |
| Water2006A | 251255V44 | Senior | Assured Guaranty | 7/1/2015 | 7,650,000 | 5.00% | N/A | Unimpaired |
| Water2006A | 251255V51 | Senior | Assured Guaranty | 7/1/2016 | 8,030,000 | 5.00% | N/A | 0.87% |
| Water2006A | 251255V69 | Senior | Assured Guaranty | 7/1/2017 | 8,430,000 | 5.00% | 7/1/2016 | 1.20% |
| Water2006A | 251255V77 | Senior | Assured Guaranty | 7/1/2018 | 8,855,000 | 5.00% | 7/1/2016 | 1.54% |
| Water2006A | 251255V85 | Senior | Assured Guaranty | 7/1/2019 | 9,295,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2006A | 251255V93 | Senior | Assured Guaranty | 7/1/2020 | 9,760,000 | 5.00% | 7/1/2016 | 2.37% |
| Water2006A | 251255W27 | Senior | Assured Guaranty | 7/1/2021 | 10,250,000 | 5.00% | 7/1/2016 | 2.81% |
| Water2006A | 251255W35 | Senior | Assured Guaranty | 7/1/2022 | 10,760,000 | 5.00% | 7/1/2016 | 3.17% |
| Water2006A | 251255W43 | Senior | Assured Guaranty | 7/1/2023 | 11,300,000 | 5.00% | 7/1/2016 | 3.47% |
| Water2006A | 251255W50 | Senior | Assured Guaranty | 7/1/2024 | 11,865,000 | 5.00% | 7/1/2016 | 3.68% |
| Water2006A | 251255W68 | Senior | Assured Guaranty | 7/1/2025 | 12,460,000 | 5.00% | 7/1/2016 | 3.88% |
| Water2006A | 251255W76 | Senior | Assured Guaranty | 7/1/2026 | 13,080,000 | 5.00% | 7/1/2016 | 4.08% |
| Water2006A | 251255W84 | Senior | Assured Guaranty | 7/1/2034 | 131,150,000 | 5.00% | 7/1/2016 | Unimpaired |
| | | | | | **260,170,000** | | | |

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2006D | 251255Z81 | Senior | Assured Guaranty | 7/1/2014 | 15,000 | 4.00% | N/A | Unimpaired |
| Water2006D | 251255Z99 | Senior | Assured Guaranty | 7/1/2015 | 15,000 | 4.10% | N/A | Unimpaired |
| Water2006D | 2512552A2 | Senior | Assured Guaranty | 7/1/2016 | 15,000 | 4.20% | N/A | Unimpaired |
| Water2006D | 2512552B0 | Senior | Assured Guaranty | 7/1/2017 | 20,000 | 4.25% | 7/1/2016 | Unimpaired |
| Water2006D | 2512552C8 | Senior | Assured Guaranty | 7/1/2018 | 20,000 | 4.30% | 7/1/2016 | Unimpaired |
| Water2006D | 2512552D6 | Senior | Assured Guaranty | 7/1/2019 | 2,650,000 | 5.00% | 7/1/2016 | 1.93% |
| Water2006D | 2512552E4 | Senior | Assured Guaranty | 7/1/2020 | 3,200,000 | 5.00% | 7/1/2016 | 2.37% |
| Water2006D | 2512552F1 | Senior | Assured Guaranty | 7/1/2023 | 20,135,000 | 5.00% | 7/1/2016 | 3.47% |
| Water2006D | 2512552G9 | Senior | Assured Guaranty | 7/1/2024 | 27,425,000 | 5.00% | 7/1/2016 | 3.68% |
| Water2006D | 2512552H7 | Senior | Assured Guaranty | 7/1/2025 | 9,955,000 | 5.00% | 7/1/2016 | 3.88% |
| Water2006D | 2512552J3 | Senior | Assured Guaranty | 7/1/2032 | 21,105,000 | 4.63% | 7/1/2016 | Unimpaired |
| Water2006D | 2512552K0 | Senior | Assured Guaranty | 7/1/2032 | 57,650,000 | 5.00% | 7/1/2016 | Unimpaired |
| | | | | | 142,205,000 | | | |
| | | | | | | | | |
| Water2011A | 251256BA0 | Senior | N/A | 7/1/2014 | 3,410,000 | 5.00% | N/A | Unimpaired |
| Water2011A | 251256BB8 | Senior | N/A | 7/1/2015 | 3,550,000 | 5.00% | N/A | Unimpaired |
| Water2011A | 251256BC6 | Senior | N/A | 7/1/2016 | 3,695,000 | 5.00% | N/A | 0.87% |
| Water2011A | 251256BD4 | Senior | N/A | 7/1/2017 | 3,845,000 | 5.00% | N/A | 1.20% |
| Water2011A | 251256BE2 | Senior | N/A | 7/1/2018 | 4,000,000 | 5.00% | N/A | 1.54% |
| Water2011A | 251256BF9 | Senior | N/A | 7/1/2019 | 3,160,000 | 5.00% | N/A | 1.93% |
| Water2011A | 251256BG7 | Senior | N/A | 7/1/2020 | 3,225,000 | 5.00% | N/A | 2.37% |
| Water2011A | 251256BH5 | Senior | N/A | 7/1/2021 | 4,215,000 | 5.00% | N/A | 2.81% |
| Water2011A | 251256BJ1 | Senior | N/A | 7/1/2022 | 4,195,000 | 5.25% | 7/1/2021 | 3.17% |
| Water2011A | 251256BK8 | Senior | N/A | 7/1/2023 | 4,170,000 | 5.25% | 7/1/2021 | 3.47% |
| Water2011A | 251256BL6 | Senior | N/A | 7/1/2024 | 4,140,000 | 5.25% | 7/1/2021 | 3.68% |
| Water2011A | 251256BM4 | Senior | N/A | 7/1/2025 | 4,085,000 | 5.25% | 7/1/2021 | 3.88% |
| Water2011A | 251256BN2 | Senior | N/A | 7/1/2026 | 4,020,000 | 5.25% | 7/1/2021 | 4.08% |
| Water2011A | 251256BP7 | Senior | N/A | 7/1/2027 | 3,930,000 | 5.25% | 7/1/2021 | 4.24% |
| Water2011A | 251256BQ5 | Senior | N/A | 7/1/2031 | 14,665,000 | 5.00% | 7/1/2021 | 4.56% |
| Water2011A | 251256BR3 | Senior | N/A | 7/1/2036 | 28,890,000 | 5.00% | 7/1/2021 | Unimpaired |
| Water2011A | 251256BT9 | Senior | N/A | 7/1/2037 | 49,315,000 | 5.75% | 7/1/2021 | 5.02% |
| Water2011A | 251256BS1 | Senior | N/A | 7/1/2041 | 224,300,000 | 5.25% | 7/1/2021 | Unimpaired |
| | | | | | 370,810,000 | | | |
| | | | | | | | | |
| Water2011B | 251256AV5 | Senior | N/A | 7/1/2016 | 1,970,000 | 3.61% | N/A | Unimpaired |
| Water2011B | 251256AW3 | Senior | N/A | 7/1/2021 | 3,760,000 | 5.00% | N/A | 2.01% |
| Water2011B | 251256AX1 | Senior | N/A | 7/1/2033 | 9,740,000 | 6.00% | 7/1/2021 | 4.22% |
| | | | | | 15,470,000 | | | |
| | | | | | | | | |
| Water2011C | 251256BV4 | Senior | N/A | 7/1/2021 | 2,700,000 | 5.00% | N/A | 2.81% |
| Water2011C | 251256BW2 | Senior | N/A | 7/1/2023 | 9,965,000 | 5.25% | 7/1/2021 | 3.47% |
| Water2011C | 251256BX0 | Senior | N/A | 7/1/2024 | 10,490,000 | 5.25% | 7/1/2021 | 3.68% |
| Water2011C | 251256BY8 | Senior | N/A | 7/1/2025 | 11,035,000 | 5.25% | 7/1/2021 | 3.88% |
| Water2011C | 251256BZ5 | Senior | N/A | 7/1/2026 | 11,615,000 | 5.25% | 7/1/2021 | 4.08% |
| Water2011C | 251256CA9 | Senior | N/A | 7/1/2026 | 5,000,000 | 5.25% | 7/1/2021 | 4.24% |
| Water2011C | 251256CC5 | Senior | N/A | 7/1/2027 | 7,230,000 | 4.50% | 7/1/2021 | Unimpaired |
| Water2011C | 251256CB7 | Senior | N/A | 7/1/2041 | 44,630,000 | 5.00% | 7/1/2021 | Unimpaired |
| | | | | | 102,665,000 | | | |

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 17:20: Page 192 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:36 Page 116 of 199
209

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2001C | 2512556U4 | Second | FGIC / BHAC | 7/1/2014 | 350,000 | 3.50% | N/A | Unimpaired |
| Water2001C | 2512556V2 | Second | FGIC / BHAC | 7/1/2015 | 365,000 | 4.25% | N/A | Unimpaired |
| Water2001C | 2512556W0 | Second | FGIC / BHAC | 7/1/2016 | 380,000 | 4.25% | N/A | Unimpaired |
| Water2001C | 2512556X8 | Second | FGIC / BHAC | 7/1/2017 | 390,000 | 4.25% | N/A | Unimpaired |
| Water2001C | 2512556Y6 | Second | FGIC / BHAC | 7/1/2018 | 415,000 | 4.25% | N/A | Unimpaired |
| Water2001C | 2512556Z3 | Second | FGIC / BHAC | 7/1/2019 | 12,510,000 | 5.75% | 7/1/2018 | 2.21% |
| Water2001C | 2512557A7 | Second | FGIC / BHAC | 7/1/2020 | 13,235,000 | 5.75% | 7/1/2018 | 2.66% |
| Water2001C | 2512557B5 | Second | FGIC / BHAC | 7/1/2021 | 14,025,000 | 5.75% | 7/1/2018 | 3.12% |
| Water2001C | 2512557C3 | Second | FGIC / BHAC | 7/1/2022 | 14,865,000 | 5.75% | 7/1/2018 | 3.48% |
| Water2001C | 2512557D1 | Second | FGIC / BHAC | 7/1/2023 | 15,750,000 | 5.75% | 7/1/2018 | 3.79% |
| Water2001C | 2512557E9 | Second | FGIC / BHAC | 7/1/2024 | 16,690,000 | 5.75% | 7/1/2018 | 4.00% |
| Water2001C | 2512557F6 | Second | FGIC / BHAC | 7/1/2025 | 17,690,000 | 5.75% | 7/1/2018 | 4.22% |
| Water2001C | 2512557G4 | Second | FGIC / BHAC | 7/1/2026 | 18,735,000 | 5.75% | 7/1/2018 | 4.43% |
| Water2001C | 2512557H2 | Second | FGIC / BHAC | 7/1/2027 | 19,945,000 | 5.75% | 7/1/2018 | 4.59% |
| Water2001C | 2512557J8 | Second | FGIC / BHAC | 7/1/2028 | 4,000,000 | 5.75% | 7/1/2018 | 4.78% |
| Water2001C | 2512557L3 | Second | FGIC / BHAC | 7/1/2029 | 20,090,000 | 4.50% | 7/1/2018 | Unimpaired |
| Water2001C | 2512557K5 | Second | FGIC / BHAC | 7/1/2029 | 18,815,000 | 4.75% | 7/1/2018 | Unimpaired |
| | | | | | **188,250,000** | | | |
| | | | | | | | | |
| Water2003B | 2512555H4 | Second | NPFG | 7/1/2034 | 41,770,000 | 5.00% | 7/1/2013 | Unimpaired |
| | | | | | **41,770,000** | | | |
| | | | | | | | | |
| Water2004A | 2512553G8 | Second | NPFG | 7/1/2014 | 4,250,000 | 5.25% | N/A | Unimpaired |
| Water2004A | 2512553H6 | Second | NPFG | 7/1/2015 | 4,475,000 | 5.25% | N/A | Unimpaired |
| Water2004A | 2512553J2 | Second | NPFG | 7/1/2016 | 4,710,000 | 5.25% | N/A | 1.13% |
| Water2004A | 2512553K9 | Second | NPFG | 7/1/2017 | 4,955,000 | 5.25% | 7/1/2016 | 1.47% |
| Water2004A | 2512553L7 | Second | NPFG | 7/1/2018 | 5,215,000 | 5.25% | 7/1/2016 | 1.82% |
| Water2004A | 2512553M5 | Second | NPFG | 7/1/2019 | 5,490,000 | 5.25% | 7/1/2016 | 2.21% |
| Water2004A | 2512553N3 | Second | NPFG | 7/1/2020 | 5,780,000 | 5.25% | 7/1/2016 | 2.66% |
| Water2004A | 2512553P8 | Second | NPFG | 7/1/2021 | 6,085,000 | 5.25% | 7/1/2016 | 3.12% |
| Water2004A | 2512553Q6 | Second | NPFG | 7/1/2022 | 6,400,000 | 5.25% | 7/1/2016 | 3.48% |
| Water2004A | 2512553R4 | Second | NPFG | 7/1/2023 | 6,735,000 | 5.25% | 7/1/2016 | 3.79% |
| Water2004A | 2512553S2 | Second | NPFG | 7/1/2025 | 14,505,000 | 4.50% | 7/1/2016 | Unimpaired |
| | | | | | **68,600,000** | | | |
| | | | | | | | | |
| Water2006B | 251256AG8 | Second | Assured Guaranty | 7/1/2014 | 100,000 | 3.90% | N/A | Unimpaired |
| Water2006B | 251256AH6 | Second | Assured Guaranty | 7/1/2015 | 100,000 | 4.00% | N/A | Unimpaired |
| Water2006B | 251256AJ2 | Second | Assured Guaranty | 7/1/2016 | 100,000 | 4.25% | N/A | Unimpaired |
| Water2006B | 251256AK9 | Second | Assured Guaranty | 7/1/2017 | 100,000 | 4.60% | N/A | Unimpaired |
| Water2006B | 251256AL7 | Second | Assured Guaranty | 7/1/2018 | 100,000 | 4.80% | N/A | Unimpaired |
| Water2006B | 251256AM5 | Second | Assured Guaranty | 7/1/2019 | 100,000 | 5.00% | N/A | 2.21% |
| Water2006B | 251256AN3 | Second | Assured Guaranty | 7/1/2023 | 400,000 | 5.50% | 7/1/2019 | 3.26% |
| Water2006B | 251256AP8 | Second | Assured Guaranty | 7/1/2036 | 56,600,000 | 7.00% | 7/1/2019 | 5.40% |
| Water2006B | 251256AQ6 | Second | Assured Guaranty | 7/1/2036 | 62,100,000 | 6.25% | 7/1/2019 | 5.40% |
| | | | | | **119,700,000** | | | |

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 193 of 299
13-53846-swr Doc 6379-1 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 11 of 99

209

## DWSD Debt Analysis - Interest Rate Reset

| Series Name | CUSIP | Lien | Insurer | Final Maturity | Total Principal | Coupon | Call Date | New Interest Rate |
|---|---|---|---|---|---|---|---|---|
| Water2006C | 251255X83 | Second | Assured Guaranty | 7/1/2014 | 1,100,000 | 4.00% | N/A | Unimpaired |
| Water2006C | 251255X91 | Second | Assured Guaranty | 7/1/2015 | 3,725,000 | 5.00% | N/A | Unimpaired |
| Water2006C | 251255Y25 | Second | Assured Guaranty | 7/1/2016 | 3,795,000 | 5.00% | N/A | 1.13% |
| Water2006C | 251255Y33 | Second | Assured Guaranty | 7/1/2017 | 4,010,000 | 5.00% | 7/1/2016 | 1.47% |
| Water2006C | 251255Y41 | Second | Assured Guaranty | 7/1/2018 | 4,765,000 | 5.00% | 7/1/2016 | 1.82% |
| Water2006C | 251255Y58 | Second | Assured Guaranty | 7/1/2022 | 5,860,000 | 5.00% | 7/1/2016 | 2.89% |
| Water2006C | 251255Y66 | Second | Assured Guaranty | 7/1/2026 | 14,880,000 | 5.00% | 7/1/2016 | 4.28% |
| Water2006C | 251255Y74 | Second | Assured Guaranty | 7/1/2029 | 32,045,000 | 5.00% | 7/1/2016 | Unimpaired |
| Water2006C | 251255Y82 | Second | Assured Guaranty | 7/1/2033 | 146,500,000 | 5.00% | 7/1/2016 | Unimpaired |
|  |  |  |  |  | 216,680,000 |  |  |  |
|  |  |  | **Water Variable Bonds** |  |  |  |  |  |
| Water2003C (Var)[4] | 251255H99 | Senior | NPFG | 7/1/2014 | 2,330,000 | 2.41% | 7/1/2013 | Unimpaired |

**Notes**

(4) Variable interest rate based on MUNI - CPI Rate. New bonds will retain existing rate. Current coupon estimated at approximately 2.41%.

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:30:09  Page 194 of 299
13-53846-swr  Doc 6879-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 118 of
209

**EXHIBIT I.A.187**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

13-53846-tjt Doc 8079 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 195 of 299
13-53846-swr Doc 8379 Filed 07/29/15 Entered 07/29/14 17:20:30 Page 113 of
209

## SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 196 of 299
13-53846-swr  Doc 6379-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 126 of 209

**EXHIBIT I.A.198**

FORM OF LTGO SETTLEMENT AGREEMENT

# SETTLEMENT AGREEMENT
## (LTGO)

This Settlement Agreement ("**Agreement**") is entered into as of July 24, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), and BlackRock Financial Management, on behalf of certain managed funds and accounts listed on Exhibit B ("**Uninsured Bondholder**," and together with Ambac, the "**LTGO Parties**")). In this Agreement, the City and the LTGO Parties are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $160,970,000 in outstanding principal amount of limited tax general obligation bonds, excluding any limited tax general obligation bonds secured by distributable state aid and sold to the Michigan Finance Authority (the "**Prior LTGO Bonds**");

**WHEREAS,** more than two thirds in amount of the Prior LTGO Bonds are either insured by Ambac under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with certain Prior LTGO Bonds (the "**Insured Prior LTGO Bonds**") or held by the Uninsured Bondholder;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770;

**WHEREAS,** on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211 and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

**WHEREAS,** on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents

contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

WHEREAS, on November 8, 2013, Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior LTGO Bonds that is pending before the Bankruptcy Court (Adv. Proc. No. 13-05310) (the "**Ambac Action**");

WHEREAS, on or before February 21, 2014, each of the LTGO Parties and other owners of Prior LTGO Bonds filed proofs of claim in the Bankruptcy Case (the "**LTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior LTGO Bonds were issued (including post-petition interest), and Ambac filed a proof of claim for amounts due Ambac for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by Ambac in connection with the Bond Insurance Policies; and

WHEREAS, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action as it pertains to the Prior LTGO Bonds, and the LTGO Claims.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2    Definitions.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in

this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Beneficiaries**" has the meaning ascribed to it in Section 2.2.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**City Representative**" shall mean a representative chosen by the City to be on the fee committee described in Section 2.2(b).

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**COP Claims**" shall have the meaning ascribed to it in the Plan.

"**COP Litigation**" shall have the meaning ascribed to it in the Plan.

"**Disputed COP Claims Reserve**" shall have the meaning ascribed to it in the Plan.

"**Distribution Agent**" shall mean U.S. Bank National Association, Detroit, Michigan.

"**Distribution Agreement**" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

"**DTC**" shall mean the Depository Trust Company or any successor provider of a book entry and securities depository system for the Prior LTGO Bonds.

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit A.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Final Order**" shall mean an order or judgment (including any associated findings of fact and conclusions of law) of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Holder**" shall mean the holder of a Claim.

"**Independent Party**" shall mean a party agreed to by the Retiree Committee, LTGO Representative and the City.

"**Insured Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Exculpated Parties**" means Ambac solely in its capacity as insurer of the Insured Prior LTGO Bonds, and the Uninsured Bondholder, solely in its capacity as an owner of a portion of the Prior LTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

"**LTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Claim Holders**" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owner of any Prior LTGO Bonds that are not Insured Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"**LTGO Parties**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Representative**" shall mean Ambac.

4

CLI-2233676v8

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:31:12 Page 201 of 299
13-53846-swr Doc 8379 Filed 11/21/14 Entered 11/21/14 17:20:30 Page 125 of 209

"**New B Notes**" shall have the meaning ascribed to it in the Plan.

"**New LTGO Bonds**" has the meaning ascribed to it in Section 2.2.

"**OPEB Claim**" has the meaning ascribed to it in the Plan.

"**Petition Date**" has the meaning ascribed to it in the recitals hereof.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, solely as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the LTGO Parties.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.3 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan-related documents effectuating this Agreement.

"**Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"**Reserve B Notes**" shall have the meaning ascribed to it in Section 2.2.

"**Resolved COP Claims**" has the meaning ascribed to it in Section 2.2.

"**Retiree Committee**" shall have the meaning ascribed to it in the Plan.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the New LTGO Bonds, and all documents related to the New LTGO Bonds.

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**VEBA Trust Representatives**" shall mean the chair of the Board as defined by and created by the City of Detroit Retiree Health Care Trust and the chair of the Board as defined by and created by the City of Detroit Police and Fire Retiree Health Care Trust.

Section 1.3    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties

5

CLI-2233676v8

13-53846-swr  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:31:20  Page 202 of 299
13-53846-tjt  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 126 of 209

hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4    <u>General Rules of Construction</u>.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.  All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application.

(c)    All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)    The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)    All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)    The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

# ARTICLE II
# SETTLEMENT TERMS

Section 2.1    (a)    <u>Claim Allowance and Treatment; Other Plan Terms</u>.  The City hereby agrees that the total Allowed Claim relating to the Prior LTGO Bonds will be $163,544,770.

(b)    Holders of Allowed Claims for Prior LTGO Bonds will be treated in the Plan as follows:

(i)    all uninsured Prior LTGO Bonds will be cancelled and discharged, and LTGO Claim Holders will receive their Pro Rata share of New LTGO Bonds and Reserve B Notes in accordance with Section 2.2(e) of this Agreement;

6

CLI-2233676v8

13-53846-tjt   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 203 of 299
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 127 of 209

(ii)    all Insured Prior LTGO Bonds will be cancelled and discharged as to the City but deemed outstanding solely for recourse to the Bond Insurance Policies, i.e., the City will have no liability relating to the Prior LTGO Bonds, and any liability of the City in respect of Prior LTGO Bonds and Class 7 Claims in the Plan shall be cancelled and discharged; and

(iii)    a Pro Rata share of New LTGO Bonds and Reserve B Notes attributable to the Insured Prior LTGO Bonds will be delivered to a Distribution Agent in accordance with Section 2.1(d) and, for the Reserve B Notes, Section 2.2(e) of this Agreement.

(c)    The Distribution Agent shall be the beneficial owner of the Pro Rata share of the New LTGO Bonds and the Reserve B Notes attributable to the Insured Prior LTGO Bonds pursuant to the Distribution Agreement.  The Distribution Agreement shall  provide that, unless the Distribution Agent receives, no later than noon on  a principal or interest payment date for the Prior LTGO Bonds, written notice from Cede & Co., as the registered owner of the outstanding Insured Prior LTGO Bonds, or any subsequent registered owner (the "Registered Owner") that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on the Insured Prior LTGO Bonds on that date, the Distribution Agent shall remit each payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to Ambac.  In the event that the Distribution Agent receives, no later than noon on a principal or interest payment date for the Prior LTGO Bonds, written notice from the Registered Owner that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on that date, the Distribution Agent shall remit the  payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to the paying agent for the Insured Prior LTGO Bonds for payment to the Holders of the Insured Prior LTGO Bonds, and shall provide notice thereof to Ambac, the paying agent for the Insured Prior LTGO Bonds and the Holders of the Insured Prior LTGO Bonds.  The Distribution Agreement will provide that, once Ambac has paid the Holders of Insured Prior LTGO Bonds in full,  the Distribution Agent will assign its beneficial ownership interest in the New LTGO Bonds and Reserve B Bonds to Ambac.

Section 2.2    Issuance of New LTGO Bonds, Delivery of New LTGO Bonds, and Delivery of Reserve B Notes.

(a)    (i) On or before the Effective Date, by execution of the Emergency Manager Order the City will authorize the issuance and delivery of its Financial Recovery Bonds (Limited Tax General Obligation) under Section 36a of the Home Rule Act ("**New LTGO Bonds**") in accordance with applicable law, which New LTGO Bonds shall be distributed Pro Rata to the LTGO Claim Holders pursuant to the Plan. The New LTGO Bonds will have the principal amount, interest rate, amortization schedule and other financial terms as set forth in Schedule 1 (the "**Financial Terms**") and the Emergency Manager Order.  The New LTGO Bonds will be limited tax general obligations of the City issued in accordance with applicable law.  The New LTGO Bonds

7

shall be taxable. The New LTGO Bonds will be callable prior to maturity at the option of the City on any date at a price of par plus accrued interest to the date of redemption and without premium or penalty. If the City intends to redeem the New LTGO Bonds during any time that the Insured Prior LTGO Bonds are outstanding as set forth in Section 2.1(b)(ii) then:

(v)     at least 35 days prior to such intended redemption, the City will direct the paying agent for the New LTGO Bonds to send a redemption notice to the New LTGO Bondholders;

(w)     at least 34 days prior to the redemption date the Distribution Agent will direct the paying agent for the Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in an aggregate principal amount equal to the proportion that the principal amount of the New LTGO Bonds then outstanding of which the Distribution Agent is the beneficial owner bears to the total principal amount of New LTGO Bonds then outstanding, in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

(x)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption price of the New LTGO Bonds to the paying agent for the New LTGO Bonds, and upon receipt of the redemption price of the portion of the New LTGO Bonds of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date, the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds on the same day;

(y)     if Ambac issues endorsements to its Bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such Bond Insurance Policies will be so reduced; and

(z)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above and such reduction in principal shall be deemed a redemption, in part, of such the Insured Prior LTGO Bonds.

(ii)     Any redemption of the New LTGO Bonds will be in whole and not in part.

(iii)     In the event the City decides not to issue the New LTGO Bonds by the Effective Date but instead to pay cash to the LTGO Claim Holders, the Holders of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above will receive pro rata, cash equal to the Insured Prior LTGO Bonds' Pro Rata shares of such cash. The City understands that the paying agent for the Insured Prior LTGO

Bonds will apply such cash, pro rata, to reduce the principal of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption, in part, of such Insured Prior LTGO Bonds.

(iv)     All Settlement-Related Documents will be in form and substance reasonably satisfactory to the LTGO Parties (and in the case of the Plan Documents, solely as they relate to this Agreement).

(v)     Each of the New LTGO Bonds will be freely transferable through the DTC System under a unique CUSIP identification number or, if the DTC System is discontinued with respect to the New LTGO Bonds, in such other manner as is permitted in accordance with their terms.

(vi)     The City will not optionally redeem Insured Prior LTGO Bonds except as set forth in this Agreement.

(b)     In addition to issuing and delivering the New LTGO Notes to the LTGO Claims Holders, the City shall also deliver and distribute to the LTGO Claim Holders the Pro Rata share of the Reserve B Notes in accordance with Section 2.2(e) of this Agreement.  The Plan will provide in the event the City intends to redeem all or a portion of principal amount of New B Notes during any time that the Insured Prior LTGO Bonds are outstanding pursuant to Section 2.1(b)(ii) then:

(i)     at least 35 days prior to the redemption date, the Distribution Agent will direct the paying agent for the Reserve B Notes to send a redemption notice to the New B Note Holders

(ii)     at least 34 days prior to the redemption date, the Distribution Agent will direct the paying agent for the  Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in an aggregate  principal amount equal to the proportion that the principal  amount of the New B Notes held by the Distribution Agent which are to be redeemed bears to the total principal amount of Insured Prior LTGO Bonds then outstanding pursuant to Section 2.1(b)(ii), in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

(iii)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption price of the New B Notes to the paying agent for the New B Notes, and upon receipt of the redemption price of the portion of the New B Notes of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds on the same day;

(iv)     if Ambac issues endorsements to its bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such

9

CLI-2233676v8

13-53846-swr   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:31:20   Page 206 of 299
13-53846-tjt   Doc 8279   Filed 11/07/14   Entered 11/07/14 17:20:36   Page 206 of 299
209

Bond Insurance Policies will re so reduced; and

(v)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption in part, of such Insured Prior LTGO Bonds.

(c)     The Plan will provide that, from and after the Effective Date:

(i)     The City will remain a named plaintiff and defendant in the COP Litigation but will transfer all of its rights and interests in the COP Litigation to a Litigation Trust whose beneficiaries, for the purpose of the COP Litigation, shall be the Litigation Parties and the Holders of Allowed Class 14 Claims.  The Litigation Trustee will be selected by the LTGO Representative and the Retiree Committee and must be acceptable to the City.  The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Representative and the City.

(ii)     The Litigation Trustee will follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein.  The Litigation Trustee and VEBA Trust Representatives will meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Representative, the VEBA Trust Representatives and the City (the "**Litigation Parties**") as requested to discuss the status, progress and prosecution of the COP Litigation.  The Litigation Trustee will provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the Litigation Parties.  Upon request from a Litigation Party, the Litigation Trustee will provide to such Litigation Party drafts of court papers that will be filed by the Litigation Trustee as early as practicable under the circumstances to allow for comments, which may be accepted or rejected.

(iii)     The cost of all fees and expenses incurred in connection with the COP Litigation will be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii of the Plan.  The City will advance payment of all such fees and expenses within 30 days of receipt of the statements for the same pending reimbursement from the Disputed COP Claims Reserve.  Reimbursement of the City will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.  In the event that the COP Litigation is unsuccessful and a final, nonappealable judgment is entered against the City or the Litigation Trust as successor in interest to the City, such that the notes in the Disputed COP Claims Reserve are subject to release and distribution in full to the holders of Allowed Class 9 Claims in accordance with the Plan, the City will reimburse the

CLI-2233676v8
13-53846-tjt   Doc 8883-79   Filed 12/17/14   Entered 12/17/14 20:31:20   Page 207 of 299
13-53846-swr   Doc 8879   Filed 12/17/14   Entered 12/17/14 17:20:30   Page 181 of 209
209

Disputed COP Claims Reserve for any amounts withdrawn prior to the date of such adverse judgment.

(iv)   The Litigation Trustee will submit invoices for the fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees to the City on a monthly basis, and the City will pay such invoice within 30 days after receipt, subject to reimbursement as provided in paragraph (c)(iii) above.  The Litigation Trustee fees will be fixed and consented to by the LTGO Representative and the VEBA Trustee Representatives.

(v)   The Litigation Trustee will consult with the Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee will provide the Litigation Parties advance notice as early as practicable under the circumstances of any settlement negotiations, and the Litigation Parties and their counsel will have the right to participate in such negotiations.  Any potential settlement must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against anyone.  The Litigation Trustee will not take action on the matters set forth below unless all of the Litigation Parties agree with the decision relating to (B), (C) and (D) below, and the LTGO Representative agrees with the settlement described in (A) below:

(A)      Any settlement that releases from the Disputed COP Claims Reserve to any of the COP Holders a pro rata share of the B Notes (or equivalent currency) based on 40% or more of the face amount of their claim.

(B)      Any change of COP Litigation counsel.

(C)      Any decision not to appeal an adverse decision on any claim or defense related to the COP Litigation.

(D)      Any decision to voluntarily dismiss a substantive claim or counterclaim or to end the COP Litigation

To the extent the Litigation Parties are unable to reach agreement on the above matters, the Litigation Trustee or any Litigation Party may refer the matter to the Independent Party for mediation.  Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction.  If a consensual resolution cannot be reached, the Independent Party will decide a substantive resolution of the issue or issues based upon the Independent Party's assessment of the merits of the legal claims, counterclaims and legal liabilities in the COP Litigation, which decision will be binding on the Litigation Parties and Litigation Trustee.

The City, the COP Litigation counsel, the VEBA Trust Representatives and the LTGO Representative will take any steps that may be required to preserve applicable privileges of the City and the COP Litigation counsel.

(d)	In the event any Holder of a Disputed COP Claim enters into a settlement of such claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and then distributed from the Disputed COP Claims Reserve pursuant to Section 2.2(e).

(e)	Following the occurrence of the Effective Date, upon a settlement, or the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims, resolving any objection to any disputed COP Claim ("**Resolved COP Claims**") and after all distributions on account of Allowed Claims respecting such Resolved COP Claim have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve with respect to such Resolved COP Claim shall be distributed as follows, and valued at face value for the purposes of the distribution: (I) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City to reimburse it for attorneys' fees relating to the COP Litigation, subject to and in accordance with the provisions of Section 2.2(c)(iii) above; (II) following such distribution, the balance of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve allocated to or with respect to such Resolved COP Claim shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B of the Plan; and (ii) 20% to the LTGO Claim Holders (the "**Reserve B Notes**") to be allocated Pro Rata; and (iii) 15% is to be allocated as determined by the City.

Section 2.3	Confirmation Order and Findings.  The Plan Confirmation Order shall (i) approve the terms and conditions of this Agreement, (ii) direct that each month monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds must be segregated and deposited into a debt service fund and not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding, (iii) provide that Plan treatment of the Prior LTGO Bonds is part of a settlement of the Ambac Action as it relates to the Prior LTGO Bonds, (iv) provide that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and (v) be in form and substance reasonably satisfactory to the LTGO Parties.

Section 2.4	Conditions to Plan Effectiveness.  The Plan shall provide that the effectiveness of the Plan is subject to the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

CLI-2233676v8
13-53846-tjt  Doc 8883-79  Filed 12/17/14  Entered 12/17/14 20:37:20  Page 209 of 299
13-53846-swr  Doc 6379-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 183 of
209

Section 2.5    Stay of Litigation, Proofs of Claim.

(a)    The Ambac Action, as it pertains to the Prior LTGO Bonds, shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon Ambac and the City shall ask the Bankruptcy Court to dismiss the Ambac Action as it pertains to the Prior LTGO Bonds without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.  If the Ambac Action is dismissed without prejudice and subsequently refiled pursuant to this Agreement, then the statute of limitations for the causes of action asserted in the Ambac Action, and all other defenses based on the passage of time, shall be tolled for 60 days after the date of the event that would permit a refiling.

(b)    As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, Ambac and the City shall take any and all action as is appropriate to (i) stay the Ambac Action as provided in subsection (a) above, (ii) maintain the status quo in the Ambac Action as it pertains to the Prior LTGO Bonds as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the LTGO Parties relating to the Prior LTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the Ambac Action as it pertains to the Prior LTGO Bonds; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)    In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then Ambac may resume the Ambac Action and terminate this Agreement by written notice to the other Parties.

(d)    The LTGO Parties agree that all proofs of claims filed by any of them with respect to Prior LTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Confirmation Order or an Approval Order, as applicable, which is a Final Order.

Section 2.6    Additional Covenants

(a)    Paying Agent and Distribution Agent.  The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior LTGO Bonds, (ii) the paying agent in respect of all transactions contemplated by this Agreement, and (iii) the Distribution Agent pursuant to the Distribution Agreement.

13

CLI-2233676v8
13-53846-tjt   Doc 8879   Filed 12/07/14   Entered 12/07/14 20:37:20   Page 210 of 299
13-53846-swr   Doc 8379   Filed 11/07/14   Entered 11/07/14 17:20:30   Page 184 of
209

        (b)    <u>Further Action</u>.  To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.

## ARTICLE III
## PLAN OF ADJUSTMENT AND PLAN SUPPORT

        Section 3.1    <u>Plan Commitment Regarding Voting and Abstention From Objection</u>.  From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, each LTGO Party shall withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds no later than August 1, 2014.  The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all LTGO Claim Holders.  The Uninsured Bondholder will vote its Prior LTGO Bonds and Ambac will vote its Prior LTGO Bonds and reimbursement claims in support of such Plan treatment promptly following the execution of this Agreement or as otherwise agreed by the City.  Upon the finalization of the terms of this Agreement, the Parties will file a stipulation and proposed order with the Bankruptcy Court that will permit each LTGO Party to modify its previous vote(s) and submit a vote in support of the Plan, pursuant to Federal Rule of Bankruptcy Procedure 3018.  For the absence of doubt, nothing contained in this Agreement shall require any LTGO Party to vote for the treatment of any class of claims under the Plan other than the LTGO Bonds, or refrain from objecting to the Plan with respect to issues other than the treatment of the LTGO Bonds.

        Section 3.2    <u>Solicitation Required in Connection with Plan</u>.  Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan.

        Section 3.3    <u>Plan Document Provisions</u>.  All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the LTGO Parties and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior LTGO Bonds is part of a settlement of the pending Ambac Action as it pertains to the Prior LTGO Bonds.

## ARTICLE IV
## DEFAULTS AND REMEDIES

        Section 4.1    <u>Events of Default</u>.  The breach by any Party of any material agreement or covenant set forth in this Agreement will be an event of default ("**Event of Default**") under this Agreement.

        Section 4.2    <u>Remedies</u>.  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties set forth in this Agreement shall be enforceable by an order compelling specific performance issued by the

14

CLI-2233676v8

13-53846-tjt   Doc 8872-5  Filed 12/17/14  Entered 12/17/14 20:37:12  Page 211 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 183 of
209

Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise. Any LTGO Party may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

Section 4.3    Termination.

(a)    This Agreement may be terminated by the mutual agreement of all of the LTGO Parties upon an Event of Default caused by the City. This Agreement may be terminated by less than all of the LTGO Parties as to such LTGO Party or LTGO Parties upon an Event of Default caused by the City if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more LTGO Parties before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b)    This Agreement may be terminated by the City if (i) any of the LTGO Parties fails to withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds on or before August 1, 2014, or (ii) any of the LTGO Parties fails to submit a ballot to vote its Class 7 Claims to accept the Plan promptly following the execution of this Agreement or as otherwise agreed by the City. This Agreement may be terminated by the City upon an Event of Default caused by the LTGO Parties, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after notice and a hearing, that an Event of Default caused by the applicable LTGO Party has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable LTGO Party of this Agreement or the applicable covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable LTGO Party fails to comply with the order.

(c)    Upon any such termination, Ambac may resume the Ambac Action unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1    Representations and Warranties of the City. The City represents and warrants to the LTGO Parties that:

(a)    It is a municipal corporation of the State of Michigan.

15

CLI-2233676v8

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:31:12  Page 212 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 186 of 209

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i) approvals of the State Treasurer, the Emergency Loan Board and the City Council to be obtained prior to delivery of the New LTGO Bonds, which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2    Representations and Warranties of the LTGO Parties.  Each of the LTGO Parties represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)     All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.3    Representations and Warranties of Ambac.  Ambac had and has standing to bring and resolve the Ambac Action as it pertains to the Prior LTGO Bonds that it insures.

Section 5.4    Mutual Representations and Warranties.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

16

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1     <u>Exculpation</u>.  The Plan will include the LTGO Exculpated Parties as exculpated parties for acts and omissions (other than those constituting gross negligence or willful misconduct) in connection with the Plan as it relates to this Agreement and this Agreement.

Section 6.2     <u>Releases</u>.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the Ambac Action as it pertains to the Prior LTGO Bonds, Ambac and the City shall be deemed to have released each other, and each of their respective officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the Prior LTGO Bonds and the Ambac Action.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1     <u>Effect of Dismissal of the Bankruptcy Case</u>.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2     <u>Effect of Termination</u>.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing

17

CLI-2233676v8

13-53846-tjt   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:31:20   Page 214 of 299
13-53846-swr   Doc 8379   Filed 11/07/14   Entered 11/29/14 17:20:30   Page 188 of 209

contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties. If the Ambac Action is reinstated, and this Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the Ambac Action; (ii) seek discovery with respect to any of the matters described in subsection (i) in the Ambac Action; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the Ambac Action.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1    <u>Amendments</u>.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2    <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3    <u>Good Faith Negotiations</u>.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts

18

CLI-2233676v8

13-53846-tjt    Doc 8279-5    Filed 12/17/14    Entered 12/17/14 20:34:12    Page 215 of 299
13-53846-swr    Doc 8279    Filed 07/29/14    Entered 07/29/14 17:20:36    Page 189 of
209

and his or its rights in connection therewith, and that it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4  Rights and Remedies.  Nothing in this Agreement is intended to augment, impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior LTGO Bonds.

Section 8.5  Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6  Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all New LTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding.  Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

19

CLI-2233676v8

13-53846-tjt  Doc 8279  Filed 11/07/14  Entered 11/07/14 20:31:20  Page 216 of 299
13-53846-swr  Doc 8379  Filed 07/29/15  Entered 07/29/15 17:20:30  Page 14 of 99
209

Section 8.7    Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8    Binding Agreement Successors and Assigns; Joint and Several Obligations.  This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9    Entire Agreement.  This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject matter hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) business days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226

20

CLI-2233676v8

13-53846-tjr  Doc 8279  Filed 12/07/14  Entered 12/07/14 20:34:12  Page 217 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 141 of
209

Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

Corporation Counsel
City of Detroit Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit MI 48226
Phone: (313) 237-3018
Fax: (313) 224-5505

Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
Attention: Jonathan Green
Email: green@millercanfield.com
Attention: Amanda Van Dusen
Email: vandusen@millercanfield.com

If to the LTGO Parties, to:

Ambac Assurance Corporation
One State Street Plaza
New York, New York 10004
Attention: Surveillance Department and General Counsel's Office
Fax: (212) 208-3384

with a copy given in like manner to:

Arent Fox LLP
1675 Broadway
New York, New York 10019
Attention: David L. Dubrow, Esq.
Telecopy: (212) 484-3990
Email: david.dubrow@arentfox.com

-and

BlackRock Financial Management
1 University Square Drive
Princeton, New Jersey 08540
Attn: Jim Schwartz
Phone: (609) 282-1784
Email: jim.schwartz@blackrock.com

with a copy given in like manner to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Amy Caton
Phone: (212) 713-7772
Email: acaton@kramerlevin.com

Section 8.12 <u>Further Assurances</u>. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13 <u>Non-Severability of Agreement.</u> This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement, the Approval Order (if applicable) or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement, are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
    Name:
    Title:

AMBAC ASSURANCE CORPORATION

By: _____
    Name:
    Title:

BLACKROCK FINANCIAL MANAGEMENT, on behalf of its managed funds and accounts as reflected in Exhibit B

By: _____
    Name:
    Title:

_____

23

CLI-2233676v8

13-53846-tjt  Doc 8882-9  Filed 12/17/14  Entered 12/17/14 20:34:17  Page 220 of 299
13-53846-swr  Doc 8379-1  Filed 07/29/14  Entered 07/29/14 17:20:36  Page 144 of 209

## Schedule 1

## Financial Terms of New LTGO Bonds

Principal:  $55 million

Interest Rate:  5.65% per annum (first 10 years, 5.00% payable in cash and 0.65% capital appreciation added to principal)

Final Maturity:  23 years

Amortization:  Interest payable semi-annually

On each anniversary from the sixth through tenth anniversary—$2 million principal due per year

On each anniversary from the eleventh through twenty-third anniversary—principal payment equal to one-thirteenth (1/13) of the principal outstanding immediately prior to the eleventh anniversary (approximately $3,735,115 per year)

Debt Service on Notes for LTGOs

| $ in MMs | 2015 Yr 1 | 2016 Yr 2 | 2017 Yr 3 | 2018 Yr 4 | 2019 Yr 5 | 2020 Yr 6 | 2021 Yr 7 | 2022 Yr 8 | 2023 Yr 9 | 2024 Yr 10 | 2025 Yr 11 | 2026 Yr 12 | 2027 Yr 13 | 2028 Yr 14 | 2029 Yr 15 | 2030 Yr 16 | 2031 Yr 17 | 2032 Yr 18 | 2033 Yr 19 | 2034 Yr 20 | 2035 Yr 21 | 2036 Yr 22 | 2037 Yr 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debt Service and Amortization** | | | | | | | | | | | | | | | | | | | | | | | |
| Opening Balance | 55.0 | 55.4 | 55.7 | 56.1 | 56.4 | 56.8 | 55.2 | 53.5 | 51.9 | 50.2 | 48.6 | 44.8 | 41.1 | 37.3 | 33.6 | 29.9 | 26.1 | 22.4 | 18.7 | 14.9 | 11.2 | 7.5 | 3.7 |
| Principal | - | - | - | - | - | - | 2.0 | 2.0 | 2.0 | 2.0 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Cash Interest | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.7 | 2.6 | 2.5 | 2.7 | 2.5 | 2.3 | 2.1 | 1.9 | 1.7 | 1.5 | 1.3 | 1.1 | 0.8 | 0.6 | 0.4 | 0.2 |
| Total Cash DS | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 4.8 | 4.7 | 4.6 | 4.5 | 6.5 | 6.3 | 6.1 | 5.8 | 5.6 | 5.4 | 5.2 | 5.0 | 4.8 | 4.6 | 4.4 | 4.2 | 3.9 |
| PIK Interest | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | - | | | | | | | | | | | | |
| **Interest Rate** | | | | | | | | | | | | | | | | | | | | | | | |
| Cash | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% |
| PIK | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**Exhibit A**

**EMERGENCY MANAGER ORDER**

AFDOCS/11065646.6
CLI-2233676v8

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000 FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:37:30 Page 224 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 148 of
209

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND INTERPRETATION .............................................. 3
     Section 101. Definitions................................................................................. 3
     Section 102. Interpretation ............................................................................ 8

ARTICLE II DETERMINATIONS.................................................................... 8
     Section 201. Finding, and Declaration of Need to Issue Bonds ..................... 8

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
                BONDS ......................................................................... 9
     Section 301. Authorization of Bonds to Satisfy the Claims and Pledge........... 9
     Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
                 to Satisfy the Claims .................................................. 9
     Section 303. Execution, Authentication and Delivery of Bonds ................... 10
     Section 304. Authentication of the Bonds .................................................... 10
     Section 305. Transfer of Registration and Exchanges on the Bonds............. 11
     Section 306. Regulations with Respect to Exchanges and Transfers ............ 11
     Section 307. Form of the Bonds ................................................................... 12
     Section 308. Registration .............................................................................. 19
     Section 309. Mutilated, Destroyed, Stolen or Lost Bonds............................ 19
     Section 310. Book-Entry-Only System Permitted ........................................ 19

ARTICLE IV FUNDS AND ACCOUNTS ...................................................... 20
     Section 401. Establishment of Accounts and Funds ..................................... 20
     Section 402. Debt Retirement Fund.............................................................. 20
     Section 403. Investment of Monies in the Funds and Accounts.................... 20

ARTICLE V THE PAYING AGENT ............................................................... 21
     Section 501. Paying Agent ........................................................................... 21

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS....................... 22
     Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
                 Holders of the Bonds ................................................. 22
     Section 602. Bond Counsel Opinion............................................................. 22

ARTICLE VII DEFEASANCE ........................................................................ 22
     Section 701. Defeasance ............................................................................... 22

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 23
     [Section 801. RESERVED] ......................................................................... 23
     Section 802. Approval of Other Documents and Actions.............................. 23
     Section 803. Delegation of City to, and Authorization of Actions of Authorized
                 Officers ..................................................................... 23
     Section 804. Approving Legal Opinions with Respect to the Bonds ............ 24
     Section 805. Appointment of Bond Counsel; Engagement of Other Parties.. 24
     Section 806. Preservation of Records ........................................................... 24
     Section 807. Parties in Interest..................................................................... 24
     Section 808. No Recourse Under Order ....................................................... 24

-i-

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 225 of 299
13-53846-swr Doc 8379 Filed 11/21/14 Entered 11/21/14 17:20:36 Page 149 of
209

**TABLE OF CONTENTS**
(continued)

**Page**

Section 809.  Severability ................................................................................. 24
Section 810.  Cover Page, Table of Contents and Article and Section Headings ............ 24
Section 811.  Conflict ...................................................................................... 25
Section 812.  Governing Law and Jurisdiction .................................................... 25
Section 813.  Order and Supplemental Order are a Contract ........................................ 25
Section 814.  Effective Date .............................................................................. 25
Section 815.  Notices ....................................................................................... 25

-ii-

13-53846-tjt  Doc 8272  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 226 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:36  Page 156 of
209

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000 FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.


WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $160.97 million in outstanding principal amount of limited tax general obligation bonds, excluding any limited general obligation bonds secured by distributable state aid and sold to the Michigan Finance Authority (the "Prior LTGO Bonds"); and

**WHEREAS,** more than two thirds in amount of the Prior LTGO Bonds are either held by BlackRock Financial Management (the "Uninsured Bondholder") or insured by Ambac Assurance Corporation ("Ambac") under financial guaranty insurance policies (the "Bond Insurance Policies") that were issued contemporaneously with certain Prior LTGO Bonds (the "Insured Prior LTGO Bonds"); and

1

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 227 of 299
13-53846-swr Doc 8879-5 Filed 12/17/14 Entered 12/17/14 17:20:30 Page 151 of 209

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770; and

WHEREAS, on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211, and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on May 5, 2014, the Emergency Manager filed on behalf of the City a Fourth Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, on _____, 2014, the City, Ambac and the Uninsured Bondholder (together the "LTGO Parties") entered into a Settlement Agreement (LTGO) (the "Settlement Agreement") regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action (as defined in the Settlement Agreement) and the claims of the LTGO Parties (the "LTGO Claims"); and

WHEREAS, the Plan of Adjustment and the Settlement Agreement provide, among other things, for the satisfaction of the claims of the holders of Allowed Claims on account of Prior LTGO Bonds who are (i) record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond (each, a "LTGO Claims Holder") in exchange for the receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New LTGO Notes, in the form of the Bonds authorized herein, in the form of Financial Recovery Bonds authorized for settlement of unsecured claims under the Plan of Adjustment and a portion of the New B Notes, referred to as "Reserve B Notes" in the Settlement Agreement, to be authorized by separate order of the Emergency Manager; and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or before the Effective Date, the City shall issue Financial Recovery Bonds (Limited Tax General Obligation) (the "Bonds") under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute Pro Rata Shares of the Bonds, to the LTGO Claim Holders as provided in the Plan of Adjustment; and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of the Bonds in one or more series, in the aggregate principal amount of not to exceed Fifty Five Million Dollars ($55,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of the Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the claims of the LTGO Claim Holders; and

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:


# ARTICLE I

## DEFINITIONS AND INTERPRETATION


Section 101. <u>Definitions</u>.    The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Accretion Date" means April 1 and October 1 of each year after the Date of Original Issue and the Conversion Date.

3

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 229 of 299
209
13-53846-swr  Doc 8379  Filed 11/07/14  Entered 11/07/14 11:20:30  Page 153 of 299

"Accretion Rate" means a rate of accretion in principal borne by the Bonds of 0.65% per annum compounded semiannually on each Accretion Date from the Date of Original Issue until the Conversion Date.

"Accretion Value" means as of any particular date of calculation, the original principal amount of the Bond, plus all accretion in principal accrued and compounded to the particular date of calculation. A table setting forth the Accreted Values per $5,000 original principal amount of the Bonds at each Accretion Date shall be set forth in the Bonds and as an exhibit to the Supplemental Order.

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Code" has the meaning ascribed to it in the recitals hereof.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Bonds (Limited Tax General Obligation), Series 2014 of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $55,000,000, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

"Bond Insurance Policies" has the meaning ascribed to it in the recitals hereof.

4

13-53846-tjt   Doc 8829-5   Filed 12/17/14   Entered 12/17/14 20:47:12   Page 230 of 299
13-53846-swr   Doc 6379-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 154 of 209

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to the Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called by the Indenture, as the case may be.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claim" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Class" means each class of Claims established under the Plan.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Conversion Date" means the last Accretion Date on the tenth anniversary of the Date of Original Issue of the Bonds, after which the Bonds shall no longer accrete in value.

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Distribution Agent" shall mean U.S. Bank National Association, Detroit, Michigan.

"Distribution Agreement" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

5

13-53846-tjt Doc 8879-1 Filed 12/17/14 Entered 12/17/14 20:31:12 Page 231 of 299
13-53846-swr Doc 8379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 153 of 209

"DTC System" shall mean the system maintained by The Depository Trust Company used for trading municipal securities.

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Holder" shall mean the holder of a Claim under or evidenced by the Prior LTGO Bonds.

"Insured Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Interest Payment Date" means April 1 and October 1 of each year commencing with the April 1 or October 1 specified in the Supplemental Order.

"Interest Rate" means a rate of interest borne by the Bonds, payable currently on each Interest Payment Date, of 5% per annum from the Date of Original Issue until the Conversion Date, and thereafter at a rate of interest of 5.65% per annum payable currently until the Maturity Date.

"LTGO Claims" has the meaning ascribed to it in the recitals hereof.

"LTGO Claims Holder" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"LTGO Parties" has the meaning set forth in the recitals hereof.

"Maturity Date" means the twenty-third (23rd) anniversary of the Date of Original Issue or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"New LTGO Bonds" means the Bonds.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VI.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

  (A)     Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

6

13-53846-tjr   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:47:12   Page 232 of 299
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 156 of
209

(B)     Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

(C)     Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

(D)     Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

(E)     Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Pro Rata" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Reserve New B Notes" shall have the meaning set forth in the recitals hereto.

"Security Depository" has the meaning given such term in Section 310.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

Section 102.  Interpretation.  (a)  Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)     Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

7

209

13-53846-tjt  Doc 8879-5  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 233 of 299
13-53846-swr  Doc 6379-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 15 of 99

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201.  <u>Finding, and Declaration of Need to Issue Bonds</u>. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $55,000,000 as of the Date of Original Issue (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying a portion of the LTGO Claims. The Maximum Aggregate Principal Amount shall not include the accretion of principal at the Accretion Rate as provided in this Order.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301.  <u>Authorization of Bonds to Satisfy the Claims and Pledge</u>.  The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy the LTGO Claims.  The principal of and interest on the Bonds shall hereby be secured by the limited tax full faith and credit pledge of the City. The City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302.  <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims</u>. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2014" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order.  The Bonds shall be dated and issued in such denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)     The Bonds of each series shall mature on the April 1, 2037 or such other April 1 which is not in excess of 23 years from the Date of Original Issue and shall accrete in principal amount, bear interest at the Interest Rate on a taxable or tax exempt basis, payable on the Interest

8

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 234 of 299
13-53846-swr  Doc 8879  Filed 12/17/14  Entered 12/17/14 17:20:36  Page 158 of
209

Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. The Bonds shall be subject to mandatory sinking fund redemption on April 1 in the years and in the Accretion Values set forth in the form of Bond provided in Section 307 hereof. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of the actual number of days elapsed in a 360 day year. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     The Bonds shall also accrete in principal amount at the Accretion Rate starting from the Date of Original Issue and compounded semiannually on each Accretion Date until the Conversion Date. Thereafter, the Bonds at their Accretion Value shall bear interest at the Interest Rate on a taxable or tax exempt basis, payable on a current basis on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order.

(d)     Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

(e)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner. The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(f)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(g)     The Bonds shall be subject to redemption prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order, provided, however, that redemption at the option of the City prior to maturity may occur on any Interest Payment Date for which notice is given as provided herein and such redemption shall be in whole.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City. Such notice shall be dated

9

13-53846-tjt  Doc 8882  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 235 of 299
13-53846-swr  Doc 6379  Filed 12/17/14  Entered 12/17/14 17:20:30  Page 155 of 219

209

and shall contain at a minimum the following information: original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption, the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Emergency Manager and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds. Additional Bonds bearing the manual or facsimile signatures of the Emergency Manager or Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds. The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304. <u>Authentication of the Bonds</u>. (a) No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent

together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306.  <u>Regulations with Respect to Exchanges and Transfers</u>.  (a)  In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order.  All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b)     For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c)     The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307.  <u>Form of the Bonds</u>.  The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

[Forms of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND

(LIMITED TAX GENERAL OBLIGATION), SERIES 2014

| Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|
| April 1, 20__ | _____, 2014 | |

Registered Owner:

Original Principal Amount:                                                                     Dollars

The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Accretion Value specified below, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate of 5.0% per annum from the Date of Original Issue specified above until the tenth (10th) anniversary of the Date of Original Issue (the "Conversion Date"), and thereafter at an Interest Rate of 5.65% per annum on Accretion Value prior to the next Accretion Date, until the Maturity Date specified above or until the Accretion Value is paid in full. Interest is payable semiannually on April 1 and October 1 in each year commencing on _____ (each an "Interest Payment Date"). The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to

12

the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date, or may be paid at any time in any other lawful manner. The bonds of this series shall also accrete in value at an Accretion Rate of 0.65% per annum, compounded semiannually on each April 1 and October 1 to the Accreted Value as of any date of calculation (as hereinafter set forth), until the Conversion Date. Thereafter, the Bonds at their Accreted Value in principal amount shall pay current interest at the Interest Rate of 5.65% per annum, payable semiannually on each Interest Payment Date. Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

THE BELOW CHART OF ACCRETION VALUES OF THIS BOND PER $5,000 ORIGINAL PRINCIPAL AMOUNT WILL REQUIRE MODIFICATION IF THE BONDS ARE ISSUED ON A DATE OTHER THAN 10/01/14 BASED ON INTEREST CALCULATIONS AT 0.65% ANNUALLY.

## Chart of Accretion Values

| Accretion Date | Accretion Amount |
|---|---|
| 04/01/2015 | $5,016.25 |
| 10/01/2015 | 5,032.55 |
| 04/01/2016 | 5,048.91 |
| 10/01/2016 | 5,065.32 |
| 04/01/2017 | 5,081.78 |
| 10/01/2017 | 5,098.30 |
| 04/01/2018 | 5,114.87 |
| 10/01/2018 | 5,131.49 |
| 04/01/2019 | 5,148.17 |
| 10/01/2019 | 5,164.90 |
| 04/01/2020 | 5,181.68 |
| 10/01/2020 | 5,198.52 |
| 04/01/2021 | 5,215.42 |
| 10/01/2021 | 5,232.37 |
| 04/01/2022 | 5,249.37 |
| 10/01/2022 | 5,266.43 |
| 04/01/2023 | 5,283.55 |
| 10/01/2023 | 5,300.72 |
| 04/01/2024 | 5,317.95 |
| 10/01/2024 | 5,335.23 |
| Thereafter | 5,335.23 |

The Accretion Value of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying

Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain LTGO Claims, as defined in the Order. Pursuant to the Order, the bonds of this series (the "Bonds") are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption*. The Bonds are subject to redemption prior to maturity, in whole, at the option of the Issuer, on any Interest Payment Date after the Date of Original Issue, at a redemption price equal to the Accretion Value as of the date of redemption plus accrued interest to the date fixed for redemption.

*(b) Mandatory Redemption.*

The Bonds shall be subject to mandatory redemption, in part, by lot, on the redemption dates and in the Accretion Values set forth below, and at a redemption price equal to the Accretion Value thereof as of the date of redemption, without premium, plus accrued interest to the date fixed for redemption.

14

13-53846-tjt   Doc 8829   Filed 12/17/14   Entered 12/17/14 17:20:30   Page 240 of 299
13-53846-swr   Doc 8379   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 164 of 209

| Redemption Date<br>October 1 | Principal<br>Amount |
|---|---|
| 2020 | $2,000,000 |
| 2021 | 2,000,000 |
| 2022 | 2,000,000 |
| 2023 | 2,000,000 |
| 2024 | 2,000,000 |
| 2025 | 3,735,115 |
| 2026 | 3,735,115 |
| 2027 | 3,735,115 |
| 2028 | 3,735,115 |
| 2029 | 3,735,115 |
| 2030 | 3,735,115 |
| 2031 | 3,735,115 |
| 2032 | 3,735,115 |
| 2033 | 3,735,115 |
| 2034 | 3,735,115 |
| 2035 | 3,735,115 |
| 2036 | 3,735,115 |
| 2037* | 3,735,115 |

*Final Maturity

The Accretion Value of the Bonds to be redeemed on the dates set forth above shall be reduced by the Accretion Value of Term Bonds that has been redeemed (other than by mandatory sinking fund redemption) or otherwise acquired by the City and delivered to the Paying Agent prior to giving the notice of redemption described below. The City may satisfy any mandatory redemption requirement by the purchase and surrender of Term Bonds of the same maturity and interest rate in lieu of calling such Term Bonds for mandatory redemption.

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights,

15
13-53846-tjt   Doc 8879   Filed 12/17/14   Entered 12/17/14 20:17:20   Page 241 of 299
13-53846-swr   Doc 8879   Filed 12/17/14   Entered 12/17/14 11:20:30   Page 165 of
209

duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Order upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

16
209
13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 242 of 299
13-53846-swr  Doc 6379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 166 of 199

IN WITNESS WHEREOF, the City of Detroit, by its Emergency Manager, has caused this bond to be signed in the name of the City by the facsimile signatures of its Emergency Manager and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
       Emergency Manager


By: _____
       Finance Director


(SEAL)

(Form of Paying Agent's Certificate of Authentication)


DATE OF AUTHENTICATION:


CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.


_____
_____
_____, Michigan
Paying Agent


By:    _____
       Authorized Signatory

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____
(Please print or typewrite name and address of transferee)

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to transfer the within bond on the books kept for
registration thereof, with full power of substitution in the premises.

Dated:                                              _____

_____        _____

Signature Guaranteed:                           NOTICE: The signature(s) to this assignment
must correspond with the name as it appears
upon the face of the within bond in every
particular, without alteration or enlargement
or any change whatever. When assignment is
made by a guardian, trustee, executor or
administrator, an officer of a corporation, or
anyone in a representative capacity, proof of
such person's authority to act must
accompany the bond.

Signature(s) must be guaranteed by a commercial bank or trust company or by a
brokerage firm having a membership in one of the major stock exchanges. The transfer agent
will not effect transfer of this bond unless the information concerning the transferee requested
below is provided.

Name and Address: _____

PLEASE INSERT SOCIAL
SECURITY NUMBER OR OTHER        _____
IDENTIFYING NUMBER OF
TRANSFEREE.                     _____
                                (Include information for all joint owners
                                if the bond is held by joint account.)

_____
|                               |
|                               |
|_____|
(Insert number for first named
transferee if held by joint account.)

19

209

13-53846-tjt  Doc 8279  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 245 of 299
13-53846-swr  Doc 8379  Filed 07/29/15  Entered 07/29/14 17:20:30  Page 169 of 299

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b) If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c) Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b) If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  Establishment of Accounts and Funds.  (a)  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(b)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds, to accommodate the requirements of such series of Bonds.

Section 402.  Debt Retirement Fund.  General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof shall be used to pay the principal of and interest on the Bonds when due. The City shall set aside in the Debt Retirement Fund each month, (i) beginning the first day of the first month following the date of delivery of the Bonds, an amount equal to 1/6 of the interest coming due on the Bonds on the next Interest Payment Date and, (ii) beginning on the first day of the first month which is 11 months prior to the date on which the first mandatory sinking fund redemption occurs, an amount equal to 1/12 of the principal or Accretion Value coming due on the next mandatory sinking fund redemption date for the Bonds The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal or Accretion Value of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal or Accretion Value and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  Investment of Monies in the Funds and Accounts.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)    Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____ _____, Detroit, Michigan, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

## ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)    to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)    to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

22

13-53846-tjt   Doc 8272-5   Filed 11/07/14   Entered 11/07/14 20:34:12   Page 248 of 299
13-53846-swr   Doc 6379-1   Filed 07/29/14   Entered 07/29/14 17:20:36   Page 172 of 209

Section 602.  <u>Bond Counsel Opinion</u>.  Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

## ARTICLE VII

## DEFEASANCE

Section 701.  <u>Defeasance</u>.  Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

[Section 801.  <u>Reserved</u>]

Section 802.  <u>Approval of Other Documents and Actions</u>.  The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 803.  <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a)  Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the

23

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 249 of 299
13-53846-swr  Doc 8279  Filed 07/29/14  Entered 07/29/14 17:20:36  Page 173 of
209

Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 804.  <u>Approving Legal Opinions with Respect to the Bonds</u>.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 805.  <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>   The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 806.  <u>Preservation of Records</u>.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 807.  <u>Parties in Interest</u>.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 808.  <u>No Recourse Under Order</u>.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

24

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 20:31:20  Page 250 of 299
13-53846-swr  Doc 8379  Filed 12/17/14  Entered 12/17/14 17:20:30  Page 250 of 299
209

Section 809. <u>Severability</u>. If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 810. <u>Cover Page, Table of Contents and Article and Section Headings</u>. The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 811. <u>Conflict</u>. All orders or resolutions or parts of orders or resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 812. <u>Governing Law and Jurisdiction</u>. This Order shall be governed by and construed in accordance with the laws of the State.

Section 813. <u>Order and Supplemental Order are a Contract</u>. The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent, and the Bondowners.

Section 814. <u>Effective Date</u>. This Order shall take effect immediately upon its adoption by the Council.

Section 815. <u>Notices</u>. All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt. Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:

City of Detroit
Finance Department
1200 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Attention: Finance Director

If to the Paying Agent, to:

U.S. Bank National Association

_____

_____

Attention: _____

25

13-53846-tjt Doc 8879 Filed 12/17/14 Entered 12/17/14 20:47:12 Page 251 of 299
13-53846-swr Doc 6379 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 173 of 209

SO ORDERED this _____ day of _____, 2014.

_____
Kevyn D. Orr
Emergency Manager
City of Detroit, Michigan

22545852.5\022765-00202

## **Exhibit B**

BlackRock Core Bond Trust

BlackRock Income Opportunity Trust, Inc.

BlackRock High Yield Municipal Fund

BlackRock Global Funds - Fixed Income Global Opportunities Fund

Ford Motor Company Defined Benefit Master Trust

BlackRock MuniAssets Fund, Inc.

BlackRock MuniAssets Fund, Inc.

The Obsidian Master Fund

United Technologies Stable Value (Met SA 100C) FIGO Portfolio

AFDOCS/11065646.6
CLI-2233676v8

**EXHIBIT I.A.206**

**EXHIBIT I.A.206**

NEW B NOTES

SUMMARY OF PRINCIPAL TERMS

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS**[1]

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $632.0 million. |
| Interest Rate | 4.0% for the first 20 years; 6.0% for years 21 through 30. |
| Maturity | 30 years. |
| Amortization | Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |
| Disclosure | The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.207**

FORM OF NEW B NOTES DOCUMENTS

ORDER NO. _____

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 257 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 181 of 209
209

# TABLE OF CONTENTS

**Page**

ARTICLE I           DEFINITIONS AND INTERPRETATION ............................................... 3
     Section 101. Definitions ..................................................................................... 3
     Section 102. Interpretation ................................................................................. 6

ARTICLE II DETERMINATIONS ............................................................................ 7
     Section 201. Finding, and Declaration of Need to Issue Bonds ....................... 7

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
                         BONDS ............................................................................... 7
     Section 301. Authorization of Bonds to Satisfy the Claims and Pledge ........... 7
     Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
                         to Satisfy the Claims ..................................................... 7
     Section 303. Execution, Authentication and Delivery of Bonds ....................... 9
     Section 304. Authentication of the Bonds ......................................................... 9
     Section 305. Transfer of Registration and Exchanges on the Bonds ............... 9
     Section 306. Regulations with Respect to Exchanges and Transfers ............... 9
     Section 307. Form of the Bonds ...................................................................... 10
     Section 308. Registration ................................................................................ 17
     Section 309. Mutilated, Destroyed, Stolen or Lost Bonds .............................. 17
     Section 310. Book-Entry-Only System Permitted ........................................... 17

ARTICLE IV FUNDS AND ACCOUNTS ............................................................... 18
     Section 401. Establishment of Accounts and Funds ....................................... 18
     Section 402. Debt Retirement Fund ................................................................ 18
     Section 403. Investment of Monies in the Funds and Accounts ..................... 19
     Section 404. Satisfaction of Claims ................................................................ 19

ARTICLE V THE PAYING AGENT ........................................................................ 20
     Section 501. Paying Agent .............................................................................. 20

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS ....................... 21
     Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
                         Holders of the Bonds ..................................................... 21
     Section 602. Bond Counsel Opinion ............................................................... 21

ARTICLE VII DEFEASANCE .................................................................................. 21
     Section 701. Defeasance .................................................................................. 21

ARTICLE VIII         OTHER PROVISIONS OF GENERAL APPLICATION ...................... 22
     [Section 801. Credit Enhancement ................................................................. 22
     Section 802. Approval of Other Documents and Actions .............................. 22
     Section 803. Delegation of City to, and Authorization of Actions of Authorized
                         Officers .......................................................................... 22
     Section 804. Approving Legal Opinions with Respect to the Bonds .............. 23
     Section 805. Appointment of Bond Counsel; Engagement of Other Parties ... 23
     Section 806. Preservation of Records ............................................................. 23
     Section 807. Parties in Interest ....................................................................... 23

-i-

13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 258 of 299
13-53846-swr Doc 8279 Filed 07/29/14 Entered 07/29/14 17:20:36 Page 182 of 209

# TABLE OF CONTENTS
## (continued)

**Page**

Section 808. No Recourse Under Resolution ................................................................. 23
Section 809. Severability ............................................................................................... 23
Section 810. Cover Page, Table of Contents and Article and Section Headings............ 23
Section 811. Conflict ..................................................................................................... 24
Section 812. Governing Law and Jurisdiction............................................................... 24
Section 813. Order and Supplemental Order are a Contract.......................................... 24
Section 814. Effective Date ........................................................................................... 24
Section 815. Notices ...................................................................................................... 24

EXHIBIT A THE UNSECURED CLAIMS....................................................................... A-1

-ii-

13-53846-tjt Doc 8272 Filed 12/17/14 Entered 12/17/14 17:20:30 Page 259 of 299
13-53846-swr Doc 8279 Filed 12/17/14 Entered 12/17/14 17:20:30 Page 183 of 209

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; And

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on _____, 2014, the Emergency Manager filed on behalf of the City a _____ Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, the Plan of Adjustment provides, among other things, for the satisfaction of certain claims of unsecured creditors as set out in the Plan of Adjustment in exchange for the

1

receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New B Notes (the "New B Notes"); and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or as reasonably practicable after the Effective Date, the City shall execute New B Notes Documents and issue New B Notes in the form of Financial Recovery Bonds authorized under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute the New B Notes, in the form of the Financial Recovery Bonds, to the holders of the particular unsecured claims, as provided in the Plan of Adjustment and described on Exhibit A hereto (collectively, the "Claims"); and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of Financial Recovery Bonds in one or more series (the "Bonds"), in the aggregate principal amount of not to exceed Six Hundred Thirty Two Million Dollars ($632,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the Claims [and to pay certain administrative and other costs related to the issuance of the bonds, upon the terms and conditions and parameters approved by the Board; and]

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:

2

13-53846-tjt  Doc 8879-5  Filed 12/17/14  Entered 12/17/14 20:31:72  Page 261 of 299
13-53846-swr  Doc 8379  Filed 11/21/14  Entered 11/21/14 17:20:30  Page 183 of
209

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>.     The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Allowed Limited Tax General Obligation Bond Claims" shall mean such claims under Class 7 of the Plan of Adjustment.

"Allowed Other Unsecured Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court" has the meaning set forth in the Plan of Adjustment.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

3

"Bond" or "Bonds" means the Financial Recovery Bonds, Series 2014B of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $632,000,000, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Bonds" means the City's Financial Recovery Bonds, Series 2014B, with such series designations as may be determined by the Authorized Officer in the Supplemental Order.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Order.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claimants" means the beneficial owners of the Claims.

"Claims" has the meaning set forth recitals hereto.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"Contingent General VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Contingent Police and Fire VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"COP Litigation" has the meaning set forth in the Plan of Adjustment.

"COPs Claims" has the meaning set forth in the recitals and Exhibit A hereto.

4

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"DDA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Disbursing Agent" means the Registered Owner of the Bonds issued on behalf of the Claimants entitled to distributions of Bonds and/or cash from the Disputed COPs Claims Reserve.

"Disbursing Agent Agreement" means the agreement between the City and the Disbursing Agent to provide for the distributions of Bonds and/or cash to Claimants from the Disputed COPs Claims Reserve.

"Disputed COPs Claims" has the meaning set forth in the Plan of Adjustment.

"Disputed COPs Claims Reserve" means the Disputed COP Claims Reserve established under Section 401(b).

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Interest Payment Date" means April 1 and October 1 of each year commencing with the April 1 or October 1 specified in the Supplemental Order.

"Interest Rate" means 4% per annum from the Date of Original Issue until the twentieth (20th) anniversary of the Date of Original Issue, and thereafter 6% per annum until the Maturity Date, or such other interest rates as confirmed in the Supplemental Order.

"Litigation Trust" has the meaning set forth in the Plan of Adjustment.

"Maturity Date" means the thirtieth (30th) anniversary of the Date of Original Issue or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VII.

5

13-53846-tjt Doc 8279 Filed 12/17/14 Entered 12/17/14 20:37:12 Page 264 of 299
13-53846-swr Doc 8379 Filed 07/29/15 Entered 07/29/15 17:20:30 Page 188 of 209

"Other Unsecured Claims" has the meaning set forth in the recitals hereto.

"Outstanding" when used with respect to:

(1)    the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

    (A)    Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

    (B)    Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

    (C)    Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

    (D)    Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

    (E)    Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Police and Fire VEBA Claims" has the meaning set forth in the recitals and Exhibit A hereto.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Security Depository" has the meaning given such term in Section 310.

"Settled COP Claims" has the meaning set forth in the Plan of Adjustment.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

6

13-53846-tjt  Doc 8883-9  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 265 of 299
13-53846-swr  Doc 8379-1  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 189 of
209

"Unsecured Pro Rata Share" has the meaning set forth in the Plan of Adjustment.

Section 102. Interpretation. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)     Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201.  Finding, and Declaration of Need to Issue Bonds. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $632,000,000 (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying the Claims.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301.  Authorization of Bonds to Satisfy the Claims and Pledge.  The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy the Claims as determined by the Authorized Officer in the Supplemental Order or subsequently confirmed by the Authorized Officer to Bond Counsel.  The principal of and interest on the Bonds shall hereby be secured by the limited tax full faith and credit pledge of the City.

The City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302.  Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS,

7

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 266 of 299
13-53846-swr  Doc 8379  Filed 11/21/14  Entered 11/21/14 17:20:36  Page 196 of 209

SERIES 2014B" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order. The Bonds shall be dated and issued in such denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)     The Bonds of each series shall mature on such Maturity Dates not in excess of 30 years from the Date of Original Issue and shall bear interest at the Interest Rate on a taxable basis, payable on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of the actual number of days elapsed in a 360 day year. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

(d)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner. The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(e)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(f)     The Bonds shall be subject to redemption and/or tender for purchase prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City. Such notice shall be dated and shall contain at a minimum the following information: original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption,

the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Emergency Manager and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds. Additional Bonds bearing the manual or facsimile signatures of the Emergency Manager or Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds. The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304. <u>Authentication of the Bonds</u>. (a) No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

9

Section 306.  <u>Regulations with Respect to Exchanges and Transfers</u>.  (a)  In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order.  All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b)      For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c)      The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307.  <u>Form of the Bonds</u>.  The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

10

13-53846-tjt   Doc 8279   Filed 12/17/14   Entered 12/17/14 20:31:20   Page 269 of 299
13-53846-swr   Doc 8279-1   Filed 07/29/15   Entered 07/29/15 17:20:36   Page 193 of
209

[Forms of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND, SERIES 2014B


| Interest Rate | Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|---|
| | | _____, 2014 | |

Registered Owner:

Principal Amount:                                                                                     Dollars

       The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Principal Amount specified above, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate of 4.0% per annum from the Date of Original Issue specified above until the twentieth (20th) anniversary of the Date of Original Issue, and thereafter at 6.0% per annum, until the Maturity Date specified above or until the Principal Amount specified above is paid in full.  Interest is payable semiannually on April 1 and October 1 in each year commencing on _____ (each an "Interest Payment Date").  The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date.  Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date,

11

13-53846-tjt  Doc 8879  Filed 12/07/14  Entered 12/07/14 20:34:12  Page 270 of 299
13-53846-swr  Doc 8379  Filed 10/17/14  Entered 10/17/14 17:20:30  Page 194 of
209

or may be paid at any time in any other lawful manner. Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

The principal of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain Claims, as defined in the Order. Pursuant to the Order, the bonds of this series (the "Bonds") are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.* Bonds or portions of bonds in Authorized Denominations of multiples of $1,000 or integral multiples of $1.00 in excess thereof are subject to redemption prior to maturity, at the option of the Issuer, in such order as the Issuer may determine, and by lot within a maturity on any date after the Date of Original Issue, at a redemption price of par plus accrued interest to the date fixed for redemption.

*(b) Mandatory Redemption.* [TO BE DETERMINED]

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than

12

13-53846-tjt Doc 8279 Filed 12/07/14 Entered 12/07/14 20:37:20 Page 271 of 299
13-53846-swr Doc 8279 Filed 12/07/14 Entered 12/07/14 17:20:30 Page 193 of
209

sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights, duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Resolution upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

13

13-53846-tjt  Doc 8279  Filed 12/17/14  Entered 12/17/14 20:31:20  Page 272 of 299
13-53846-swr  Doc 8379  Filed 07/29/15  Entered 07/29/15 17:20:30  Page 196 of 209

IN WITNESS WHEREOF, the City of Detroit, by its Emergency Manager, has caused this bond to be signed in the name of the City by the facsimile signatures of its Emergency Manager and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
      Emergency Manager

By: _____
      Finance Director

(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____
_____
_____, Michigan
Paying Agent

By: _____
Authorized Signatory

15

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____
(Please print or typewrite name and address of transferee)

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                                  _____
_____               _____

Signature Guaranteed:                          NOTICE: The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever. When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.

Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges. The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

PLEASE INSERT SOCIAL
SECURITY NUMBER OR OTHER
IDENTIFYING NUMBER OF
TRANSFEREE.

Name and Address: _____

_____

_____
(Include information for all joint owners
if the bond is held by joint account.)

_____
(Insert number for first named
transferee if held by joint account.)

16

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:17:20  Page 275 of 299
13-53846-swr  Doc 8379-1  Filed 07/29/14  Entered 07/29/14 17:20:36  Page 195 of
209

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)     Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b)     If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

17

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 276 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 276 of 299
209

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  <u>Establishment of Accounts and Funds</u>.  (a)  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(b)     On the Effective Date, the City shall establish and create the Disputed COPs Claims Reserve (the "Disputed COPs Claims Reserve") which shall be held for and on behalf of the City by the Disbursing Agent under the Disbursing Agent Agreement pursuant to Section 401(d).

(c)     The Disputed COP Claims Reserve shall contain no less than (i) an Unsecured Pro Rata Share of Bonds, calculated as if such Disputed COP Claims were Allowed in an amount equal to the sum of (A) aggregate unpaid principal amount as of the Petition Date for the COPs other than those giving rise to the Settled COP Claims (or such other amount as may be required by an order of the Bankruptcy Court), and (B) with respect to the Settled COPs Claims, the aggregate unpaid principal amount as of the Petition Date for the COPs giving rise to the Settled COPs claims less the amounts expended in settlement of such Settled COP Claims; and (ii) any distributions made on account of Bonds held in the Disputed COP Claims Reserve.

(d)     An Authorized Officer is authorized and directed to designate a Disbursing Agent and negotiate and enter into a Disbursing Agent Agreement (the "Disbursing Agent Agreement") between the City and the Disbursing Agent, setting forth the duties and obligations of the Disbursing Agent with respect to the distribution of Bonds and/or cash from the Disputed COPs Claims Reserve to the Claimants thereof pursuant to Section 404(h).

(e)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds, and the Dispute COPS Claims Reserve to accommodate the requirements of such series of Bonds and the Disputed COPS Claims Reserve.

18

Section 402.  Debt Retirement Fund.  General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof [and any amounts transferred from the debt retirement funds related to the COPs, if any,] shall be used to pay the principal of and interest on the Bonds when due.  The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  Investment of Monies in the Funds and Accounts.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)    Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

Section 404. Satisfaction of Claims.  (a)  On the Effective Date, the City shall issue the Bonds in an amount sufficient to satisfy the Claims.  An Authorized Officer shall arrange for delivery of the Bonds to the Claimants and the Disbursing Agent to satisfy the Claims on behalf of the Claimants of each class of creditors entitled to New B Notes and/or cash as provided in the Plan of Adjustment and as set forth in this Section 404 in subsections (b) through (g), inclusive. Upon delivery of the Bonds to the Disbursing Agent and the Claimants, an Authorized Officer shall take all necessary steps to extinguish any related existing debt, including the cancellation of any related bonds or notes of the City representing portions of the Claims.

(b)    On the Effective Date, the City shall distribute to the Detroit General VEBA, Bonds in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by the Detroit General VEBA Beneficiaries.  The Detroit General VEBA shall also be paid any contingent additional distributions from the Disputed COPs Claims Reserve as set forth in Section 404(g).

(c)    On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA, Bonds in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by the Detroit Police and Fire VEBA Beneficiaries.  The Detroit Police and Fire VEBA shall also be paid any contingent additional distributions from the Disputed COPs Claims Reserve as set forth in Section 404(g).

(d)    On the Effective Date, the Downtown Development Authority Claims shall be allowed in the amount of $33,600,000.  Unless the Holder agrees to a different treatment of its Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive from the City, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of the Bonds.

(e)     Unless such Holder agrees to a different treatment of such claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive from the Disbursing Agent, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of Bonds.

(f)     If and to the extent that Disputed COP Claims become Allowed Claims, the Holders of such Allowed Claims shall be sent a Distribution from the Disputed COP Claims Reserve by the Disbursing Agent of no less than (i) the portion of New B Notes held in the Disputed COP Claims Reserve initially allocated to the Disputed COP Claims that became Allowed Claims; and (ii) any distributions received by the Disputed COP Claims Reserve on account of such portion of Bonds.

(g)     Upon the entry of a Final Order resolving any objection to any Disputed COP Claim and after all Distributions on account of Allowed COP Claims respecting such resolved Disputed COP Claims have been made or provided for (i) an amount of Bonds or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred by the Litigation Trust from and after the Effective Date shall be distributed by the Disbursing Agent to the City subject to the terms of the Plan of Adjustment; (ii) following such distribution, the Bonds and any distributions thereon remaining in the Disputed COP Claims Reserve shall be distributed as follows: (A) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the Bonds allocated to each pursuant to Sections 404(b) and 404(c); (B) 20% to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7 under the Plan of Adjustment; and (C) 15% to holders of Allowed Other Unsecured Claims in Class 14 under the Plan of Adjustment.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____ _____, Detroit, Michigan, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

20

## ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)      to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)     to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)    to cure any ambiguity or formal defect or omission in this Order; and

(iv)     such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 602.  <u>Bond Counsel Opinion</u>.  Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

## ARTICLE VII

## DEFEASANCE

Section 701.  <u>Defeasance</u>.  Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held

21

13-53846-tjt  Doc 8883-9  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 280 of 299
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 204 of
209

for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

[Section 801. <u>Credit Enhancement</u>. (a) There is hereby authorized to be obtained municipal bond insurance or other credit enhancement or a combination thereof to secure the payment of all or part of the Bonds, if, and provided that, it shall be determined by an Authorized Officer that obtaining such Municipal Bond Insurance Policy or other credit enhancement or a combination thereof is in the best interest of the City. Such municipal bond insurance or other credit enhancement providers may be afforded certain rights and remedies to direct the proceedings with respect to the enforcement of payment of the Bonds as shall be provided in the documents relating thereto. In the event a commitment for a Municipal Bond Insurance Policy is obtained or a commitment for other credit enhancement is obtained, an Authorized Officer is hereby authorized, to approve the terms, perform such acts and execute such instruments that shall be required, necessary or desirable to effectuate the terms of such commitment and the transactions described therein and in this Order and the Supplemental Order provided that such terms are not materially adverse to the City.

(b) In connection with the execution of any of the agreements authorized by this Section, an Authorized Officer is authorized to include therein such covenants as shall be appropriate.]

Section 802. <u>Approval of Other Documents and Actions</u>. The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 803. <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a) Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 804.   <u>Approving Legal Opinions with Respect to the Bonds</u>.   Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 805.   <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>   The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 806.   <u>Preservation of Records</u>.   So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 807.   <u>Parties in Interest</u>.   Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 808.   <u>No Recourse Under Resolution</u>.   All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 809.   <u>Severability</u>.   If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 810.   <u>Cover Page, Table of Contents and Article and Section Headings</u>.   The cover page, table of contents and Article and Section headings hereof are solely for convenience

of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 811.  <u>Conflict</u>.  All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 812.  <u>Governing Law and Jurisdiction</u>.  This Order shall be governed by and construed in accordance with the laws of the State.

Section 813.  <u>Order and Supplemental Order are a Contract</u>.  The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent, the Bond Insurer and the Bondowners.

Section 814.  <u>Effective Date</u>.  This Order shall take effect immediately upon its adoption by the Council.

Section 815.  <u>Notices</u>.  All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt.  Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:


If to the City, to:                           City of Detroit
Finance Department
1200 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Attention: Finance Director

24

13-53846-tjt  Doc 8882  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 283 of 299
209
13-53846-swr  Doc 8379  Filed 07/29/14  Entered 07/29/14 17:20:30  Page 207 of

If to the Paying Agent, to:

_____

_____

_____

Attention: _____

SO ORDERED this \_\_\_\_ day of _____, 2014.

_____

Kevyn D. Orr

Emergency Manager

City of Detroit, Michigan

25

13-53846-tjt   Doc 8883-9   Filed 12/17/14   Entered 12/17/14 20:34:12   Page 284 of 299
13-53846-swr   Doc 6379-1   Filed 07/29/14   Entered 07/29/14 17:20:30   Page 208 of 209

**EXHIBIT A**

**THE UNSECURED CLAIMS**

1.     Class 7 Allowed Limited Tax General Obligation Bond Claims.

2.     Class 9 Disputed COPS Claims which become Allowed Claims.

3.     Class 12 OPEB Claims - Detroit General VEBA Claims ("General VEBA Claims") in the amount of $218,000,000, plus contingent additional distributions from the Disputed COP Claims Reserve ("Contingent General VEBA Claims");

4.     Class 12 OPEB Claims - Detroit Police and Fire VEBA Claims ("Police and Fire VEBA Claims") in the amount of $232,000,000, plus contingent additional distributions from the Disputed COP Claims Reserve ("Contingent Police and Fire VEBA Claims");

5.     Class 13 Allowed Downtown Development Authority Claims ("DDA Claims") in the amount of $33,600,000; and

6.     Class 14 Allowed Other Unsecured Claims ("Other Unsecured Claims").

22096296.5\022765-00202

A-1

**EXHIBIT I.A.209**

NEW DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

**NEW DWSD BONDS**
**<u>SUMMARY OF PRINCIPAL TERMS</u>**[1]

On the Effective Date, the City shall issue the New DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal shall be equal to (i) the amount of DWSD Bonds receiving New DWSD Bonds, plus (ii) amounts necessary to pay expenses of the financing, plus (iii) at the City's option, an amount equal to accrued and unpaid interest as of the first Distribution Date following the date on which the applicable DWSD Bond Claim is Allowed. |
| Interest Rate | The interest rate of the New DWSD Bonds shall be calculated by reference to the Interest Rate Reset Chart attached as Exhibit I.A.159 to the Plan. |
| Maturity Dates | The maturity date(s) of the New DWSD Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New DWSD Bonds issued to a holder of DWSD Bonds at any time on or after the earlier of (i) the date that is five years after the date such New DWSD Bonds are issued or (ii) the date upon which the DWSD Bonds for which such New DWSD Bonds were exchanged pursuant to the Plan would have matured. |
| Other Terms | The New DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New DWSD Bonds. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.211**

NEW EXISTING RATE DWSD BONDS

SUMMARY OF PRINCIPAL TERMS

# NEW EXISTING RATE DWSD BONDS
## SUMMARY OF PRINCIPAL TERMS[1]

On the Effective Date, the City shall issue the New Existing Rate DWSD Bonds and distribute them as set forth in the Plan. The definitive documentation governing the New Existing Rate DWSD Bonds shall provide generally for the following terms:

| | |
|---|---|
| Principal | The principal of the New Existing Rate DWSD Bonds shall be equal to (i) the amount of DWSD Bonds receiving New Existing Rate DWSD Bonds, plus (ii) amounts necessary to pay expenses of the financing, plus (iii) at the City's option, an amount equal to accrued and unpaid interest as of the first Distribution Date following the date on which the applicable DWSD Bond Claim is Allowed. |
| Interest Rate | The interest rate(s) of the New Existing Rate DWSD Bonds shall be the same as existing interest rates of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Maturity Dates | The maturity date(s) of the New Existing Rate DWSD Bonds shall be the same as the existing maturity(ies) of each CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |
| Prepayment | The City may prepay or redeem all or any portion of the New Existing Rate DWSD Bonds at any time at its option and without penalty or premium. |
| Other Terms | The New Existing Rate DWSD Bonds otherwise shall have the same terms and conditions as the applicable CUSIP of DWSD Bonds receiving New Existing Rate DWSD Bonds. |

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

# EXHIBIT I.A.212.a

FORM OF NEW GRS ACTIVE PENSION PLAN

# COMBINED PLAN
# FOR THE
# GENERAL RETIREMENT SYSTEM
# OF THE
# CITY OF DETROIT, MICHIGAN

**Effective July 1, 2014**

# COMPONENT I

# TABLE OF CONTENTS

**Page**

ARTICLE 1     – GENERAL PROVISIONS ....................................................................1

Sec. 1.1.     General Retirement System Established; Adoption of 2014 Combined Plan Document....................................................................................1

Sec. 1.2.     Retirement System Intended to be Tax-Qualified ................................1

Sec. 1.3.     Board of Trustees.................................................................................1

Sec. 1.4.     Board of Trustees – Membership; Appointment ................................1

Sec. 1.5.     Board of Trustees; Retiree Member Election ......................................2

Sec. 1.6.     Board of Trustees; Oath; Term; Vacancies.........................................2

Sec. 1.7.     Board of Trustees; Officers and Employees .......................................3

Sec. 1.8.     Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum ....3

Sec. 1.9.     Board of Trustees; Compensation; Expenses .....................................3

Sec. 1.10.     Rules for Administration of Funds ......................................................4

Sec. 1.11.     Board of Trustees; Certain Data to be Kept.........................................4

Sec. 1.12.     Board of Trustees;   Annual Audit Report ...........................................4

Sec. 1.13.     Board of Trustees; Legal Advisors .....................................................4

Sec. 1.14.     Designation of Actuary; Authority to Engage Additional Actuaries...................4

Sec. 1.15.     Board of Trustees; Adoption of Mortality and Other Tables of Experience and Rates of Interest; Limitations on Payments by the Retirement System......................................................................................5

Sec. 1.16.     Board of Trustees; Annual Actuarial Valuation of Assets and Liabilities...........5

Sec. 1.17.     Board of Trustees; Powers and Duties; Fiduciary Status; Fiduciary Duties.................................................................................................5

Sec. 1.18.     Investment Committee; Establishment; Purpose; Fiduciary Status; Fiduciary Duties..................................................................................6

Sec. 1.19.     Investment Committee; Membership; Appointment............................6

Sec. 1.20.     Investment Committee; Term; Resignation and Removal; Vacancies .................7

Sec. 1.21.     Investment Committee; Operation; Meetings; Quorum; Voting .........8

Sec. 1.22.     Investment Committee; Expenses........................................................8

ARTICLE 2     – DEFINITIONS................................................................................10

Sec. 2.1.     Definitions.........................................................................................10

ARTICLE 3     – MEMBERSHIP ..............................................................................16

Sec. 3.1.     Eligible Employees............................................................................16

Sec. 3.2.     Cessation of Membership; Re-Employment by the Employer ..........16

Sec. 3.3.          Report of the Employer ...................................................................17

ARTICLE 4      – SERVICE CREDIT .............................................................................18

Sec. 4.1.          Credited Service ..............................................................................18

Sec. 4.2.          Vesting Service ................................................................................18

Sec. 4.3.          Service Credit; Military Service ......................................................18

Sec. 4.4.          Service Credit; Qualified Military Service .....................................19

ARTICLE 5      – ELIGIBILITY FOR RETIREMENT BENEFITS ....................................20

Sec. 5.1.          Eligibility for Unreduced Normal Retirement Benefit ..................20

Sec. 5.2.          Eligibility for Reduced Early Retirement Benefit ..........................20

Sec. 5.3.          Eligibility for Deferred Vested Retirement Benefit........................20

Sec. 5.4.          Eligibility for Retirement Benefit – Disabled Members.................20

Sec. 5.5.          Return of Accumulated Mandatory Contributions to Non-Vested
                   Member ............................................................................................20

ARTICLE 6      – RETIREMENT ALLOWANCE; VARIABLE PENSION IMPROVEMENT
                   FACTOR (ESCALATOR) ................................................................21

Sec. 6.1.          Retirement Allowance ......................................................................21

Sec. 6.2.          Variable Pension Improvement Factor (Escalator) ..........................21

ARTICLE 7      – DEATH BENEFITS .............................................................................22

Sec. 7.1.          Accidental Death Benefit; Performance of Duty ............................22

Sec. 7.2.          Death Benefits for Surviving Spouses Generally ..........................22

Sec. 7.3.          Refund of Accumulated Mandatory Contributions Upon Death of
                   Member ............................................................................................22

Sec. 7.4.          Benefits Offset by Compensation Benefits; Subrogation ...............22

ARTICLE 8      – FORMS OF PAYMENT .......................................................................24

Sec. 8.1.          Retirement Allowance Options........................................................24

Sec. 8.2.          Disposition of Surplus Benefits upon Death of Retiree and Beneficiary ..........25

ARTICLE 9      – FUNDING AND RESERVES ................................................................26

Sec. 9.1.          Funding Objective of the Retirement System ................................26

Sec. 9.2.          Funds................................................................................................26

Sec. 9.3.          Method of Financing Retirement System Benefits...........................27

Sec. 9.4.          Member Contributions Picked-Up ..................................................27

Sec. 9.5.          Fiscal Responsibility: Increased Funding Obligations and Benefit
                   Reductions .......................................................................................28

ARTICLE 10    – VOLUNTARY EMPLOYEE CONTRIBUTIONS ...................................30

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Sec. 10.1. | Voluntary Employee Contributions; Amount; Vesting | 30 |
| Sec. 10.2. | Changing an Election to Contribute | 30 |
| Sec. 10.3. | Individual Member Accounting; Crediting of Earnings | 30 |
| Sec. 10.4. | Distribution of Accumulated Voluntary Employee Contributions | 30 |
| ARTICLE 11 | – LOAN PROGRAM FOR VOLUNTARY EMPLOYEE CONTRIBUTIONS | 32 |
| Sec. 11.1. | The Loan Program | 32 |
| Sec. 11.2. | Eligibility for Loan | 32 |
| Sec. 11.3. | Amount of Loan | 32 |
| Sec. 11.4. | Terms and Conditions | 32 |
| Sec. 11.5. | Loan Balance | 33 |
| Sec. 11.6. | Default | 33 |
| Sec. 11.7. | Distribution | 33 |
| ARTICLE 12 | - LIMITATION ON BENEFITS AND CONTRIBUTIONS | 34 |
| Sec. 12.1. | Compliance With Code Section 415(b) And Regulations | 34 |
| Sec. 12.2. | Compliance with Code Section 415(c) and Regulations | 36 |
| ARTICLE 13 | - RETIREMENT SYSTEM ADMINISTRATION | 38 |
| Sec. 13.1. | Board of Trustees as Retirement System Administrator | 38 |
| Sec. 13.2. | Powers and Duties of Board | 38 |
| Sec. 13.3. | Executive Director; Employees | 40 |
| Sec. 13.4. | Discretionary Authority | 40 |
| Sec. 13.5. | Administrator's Decision Binding | 40 |
| ARTICLE 14 | – MANAGEMENT OF FUNDS | 41 |
| Sec. 14.1. | Board as Trustee of Retirement System Assets | 41 |
| Sec. 14.2. | Maintenance of Segregated Funds | 41 |
| Sec. 14.3. | Custodian of Funds | 41 |
| Sec. 14.4. | Exclusive Purpose | 41 |
| Sec. 14.5. | Prohibited Conduct | 41 |
| ARTICLE 15 | – INVESTMENT OF RETIREMENT SYSTEM ASSETS | 43 |
| Sec. 15.1. | Investment Powers of the Board and the Investment Committee | 43 |
| Sec. 15.2. | Investment Management | 44 |
| Sec. 15.3. | Best Practices | 45 |
| Sec. 15.4. | Chief Investment Officer | 45 |

-iii-

13-53846-tjt Doc 8379 Filed 12/17/49/ Entered 12/17/49/ 18 41 20 3 4 12 Page 205 of 299
13-53846-swr Doc 8379-2 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 90 of 91
199

# TABLE OF CONTENTS
## (continued)

**Page**

|  | Sec. 15.5. | Investment Consultants | 46 |
| ARTICLE 16 | – MISCELLANEOUS |  | 48 |
|  | Sec. 16.1. | Nonduplication of Benefits | 48 |
|  | Sec. 16.2. | Assignments Prohibited | 48 |
|  | Sec. 16.3. | Protection Against Fraud | 48 |
|  | Sec. 16.4. | Amendment; Termination; Exclusive Benefit | 48 |
|  | Sec. 16.5. | Forfeitures Not to Increase Benefits | 49 |
|  | Sec. 16.6. | Required Distributions - Compliance with Code Section 401(a)(9) and Regulations | 49 |
|  | Sec. 16.7. | Direct Rollovers | 49 |
|  | Sec. 16.8. | Construction | 50 |
|  | Sec. 16.9. | Severability | 50 |

-iv-

13-53846-tjt Doc 8363-2 Filed 12/17/14 Entered 12/17/14 20:34:12 Page 296 of 299
13-53846-swr Doc 6379-2 Filed 07/29/14 Entered 07/29/14 17:20:30 Page 112 of 199

# ARTICLE 1 – GENERAL PROVISIONS

## Sec. 1.1.  General Retirement System Established; Adoption of 2014 Combined Plan Document

Effective July 1, 1938, a General Retirement System for the employees of the City of Detroit was established for the purpose of providing retirement and survivor benefits for eligible City employees and their beneficiaries.  The provisions of the Detroit General Retirement System, as in effect July 1, 2014, are set forth in this Combined Plan Document.  Component I of the Combined Plan Document applies to benefits accrued by Members on and after July 1, 2014 and to operation of the Detroit General Retirement System on and after July 1, 2014.  Component II of the Combined Plan Document applies to benefits accrued by Members prior to July 1, 2014.  Except as specifically provided in Component II, benefits provided under Component II of the Combined Plan Document are frozen effective June 30, 2014.

This Combined Plan Document shall replace in its entirety Chapter 47 of the Detroit City Code as in effect on June 30, 2014 and any conflicting provisions in any collective bargaining agreements covering Members (including, without limitation, the City Employment Terms that applied to Members effective July 18, 2012). All resolutions and policies of the Retirement Board previously adopted which are inconsistent with the provisions of this Combined Plan Document are also hereby also repealed to the extent of such inconsistency.

## Sec. 1.2.  Retirement System Intended to be Tax-Qualified

The Retirement System is a governmental plan under Section 414(d) of the Internal Revenue Code which is intended to be a qualified plan and trust pursuant to applicable provisions of the Internal Revenue Code.  The Board shall construe and administer the provisions of the Retirement System in a manner that gives effect to the tax-qualified status of the Retirement System.

## Sec. 1.3.  Board of Trustees

Effective July 1, 1938, a Board of Trustees of the Detroit General Retirement System was created. The Board is vested with responsibility for the general administration, management and operation of the Detroit General Retirement System and with the trust and investment powers conferred in this Combined Plan Document.

## Sec. 1.4.  Board of Trustees – Membership; Appointment

The Board of Trustees of the Detroit General Retirement System shall consist of ten Trustees, as follows:

(1)     The Mayor, *ex officio*, or the Mayor's designee;

(2)     One City Council Member, *ex officio*, who is selected by that body;

(3)     The City Treasurer, *ex officio*;

(4)     Five active employee members of the Retirement System to be elected by the Members in accordance with such rules and regulations as may be adopted by the Board. No more than one Trustee shall be elected from any one City Department;

(5)     One Detroit resident, appointed by the Mayor subject to the approval of the Board, who is neither an employee of the City nor is eligible to receive benefits under the Retirement System; and

1

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 20:34:12  Page 297 of 299
13-53846-swr  Doc 8379-2  Filed 07/29/14  Entered 07/29/14 17:20:39  Page 92 of
199

(6)     One retiree who is receiving benefits under the Retirement System and who is elected by Retirees in accordance with procedures described in Section 1.5.

## Sec. 1.5.  Board of Trustees; Retiree Member Election

The procedures for the election of the Retiree member of the Board of Trustees shall be as follows:

(1)     *Notice*.  Notice of a primary election shall be sent to each Retiree by United States Mail.

(2)     *Nominating petitions*.  No candidate's name shall be placed on the primary election ballot unless a nominating petition containing the signatures of at least one hundred and twenty-five Retirees is filed with the secretary of the Board.  The form of the nominating petition, the filing of the petition, and the procedure for verification of signatures shall be in accordance with rules and regulations adopted by the Board.

(3)     *Ballot*.  Each candidate whose name appears on the ballot at any election held for the office of Retiree Trustee shall be identified by the title of the position held by the Retiree at the time of retirement and by the word "incumbent" if the candidate is a current trustee seeking re-election. No ballot shall contain any organizational or political designation or mark.  Rotation and arrangement of names on the ballot shall be in accordance with the rules and regulations of the Board.

(4)     *Voting*.  Procedures regarding mailing of ballots, poll lists, custody of ballots, marking of ballots, return of ballots, handling of return envelopes received, and sealed ballot boxes shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(5)     *Procedures*.  Procedures regarding the selection and certification of successful candidates for nomination, the selection of Trustees from nominees, tie votes, and the destruction of ballots shall be the same as those adopted and followed by the Board in the immediately preceding election of an active employee Trustee.

(6)     *Board Rules*.  Any matters relative to the election of the Retiree member of the Board not covered by this Section 1.5 shall be handled in accordance with such rules and regulations as the Board may adopt.

## Sec. 1.6.  Board of Trustees; Oath; Term; Vacancies

Within ten days after appointment or election, each Trustee shall take an oath of office to be administered by the Detroit City Clerk.

The regular term of office for the elected Member Trustees and the appointed Detroit resident Trustee shall be for a period of six years, one such Trustee to be elected or appointed, as the case may be, each year. The term of office for the Retiree Trustee shall be two years.

If an active employee Trustee leaves the employ of the City, or if an elected or appointed Trustee fails to attend four consecutive scheduled Board meetings without being excused for cause by the Trustees attending such meetings, the Trustee shall be considered to have resigned from the Board. By resolution, the Board shall declare the office vacated as of the date of adoption of such resolution. If a

2

13-53846-tjt  Doc 8379  Filed 12/17/14  Entered 12/17/14 17:20:30  Page 298 of 299
13-53846-swr  Doc 8379-2  Filed 07/29/14  Entered 07/29/14 14:20:59  Page 93 of 91
199

vacancy occurs in the office of Trustee, the vacancy shall be filled at the next regular election held by the Board, or at any special election ordered by resolution adopted by the Board.

### Sec. 1.7.  Board of Trustees; Officers and Employees

The Board shall elect a chair and vice-chair from its members. The executive director of the Retirement System shall serve as secretary of the Board.  The Board may employ such actuarial, medical and other employees as shall be required, subject to the powers and authority reserved to the Investment Committee and subject to the *Public Employee Retirement System Investment Act*, as amended, MCL 38.1132 *et seq*.

### Sec. 1.8.  Board of Trustees; Meetings; Rules of Procedure; Votes; Quorum

(1)     The Board shall hold regular weekly meetings, at least one in each month, and shall designate the time and place thereof in advance. The Board shall adopt its own rules of procedure, including provisions for special meetings and notice thereof, and shall keep a record of proceedings.  All meetings of the Board shall be public and are subject to the *Michigan Open Meetings Act,* MCL 15.261 *et seq.*

(2)     Each Trustee shall be entitled to one vote on each question before the Board.  A majority vote of the Trustees present shall be necessary for a decision by the Trustees at any meeting of the Board.

(3)     Five Trustees shall constitute a quorum.

### Sec. 1.9.  Board of Trustees; Compensation; Expenses

Members of the Board of Trustees shall serve without additional compensation from the Employer, but they shall be compensated by the Retirement System as follows:

(1)     *Stipend*.  Trustees are eligible for a meeting stipend, provided the Trustee attends one or more regular or special Board meetings during a month. The stipend amount shall be a minimum of sixty-seven dollars ($67.00) per week multiplied by the Trustee's years of service.  Eligibility rules and the amount of the stipend shall be set by Board resolution. However, the amount of the weekly meeting stipend shall not exceed two hundred dollars ($200.00).

(2)     *Ex Officio Trustees*.  Ex Officio Trustees are not eligible for a stipend payment.

(3)     *Attendance*.  For purposes of this Section 1.9, attendance at a Board meeting shall include actual attendance at a meeting or being otherwise available to attend a Board meeting canceled for lack of a quorum.

Trustees shall be reimbursed from the Expense Fund for all actual, reasonable and necessary expenses incurred in the performance of their duties as Trustees.

### Sec. 1.10.  Rules for Administration of Funds.

Subject to the limitations contained in this Plan document, the Board of Trustees shall, from time to time, establish rules and regulations for the administration of the funds created by this Plan document and for the transaction of its business.

3

13-53846-tjt  Doc 8879  Filed 12/17/14  Entered 12/17/14 17:20:39  Page 299 of 299
13-53846-swr   Doc 8279   Filed 07/29/14   Entered 07/29/14 17:20:39   Page 94 of
199