| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| | | 251237ZH9 | Class 1A-260 | $7,935,000.00 |
| | | 251237Y80 | Class 1A-261 | $9,005,000.00 |
| | | 251237YN7 | Class 1A-262 | $11,880,000.00 |
| | | 251237YR8 | Class 1A-263 | $12,535,000.00 |
| | | 251237Y72 | Class 1A-264 | $13,210,000.00 |
| | | 251237YU1 | Class 1A-265 | $13,215,000.00 |
| | | 251237YX5 | Class 1A-266 | $13,950,000.00 |
| | | 251237ZJ5 | Class 1A-267 | $18,215,000.00 |
| | | 251237Y98 | Class 1A-268 | $19,485,000.00 |
| | | 251237Z22 | Class 1A-269 | $38,290,000.00 |
| Sewage Bond Ordinance Sewage Indenture 2003 Bond Resolution Composite Sale Order of the Finance Director of the City of Detroit dated May 22, 2003 | Series 2003-B | 2512376Q1 | Class 1A-270 | $150,000,000.00 |
| Sewage Bond Ordinance Sewage Indenture Bond Authorizing Resolution of the City Council adopted May 7, 2003 Composite Sale Order of the Finance Director dated January 9, 2004 | Series 2004-A | 251237B69 | Class 1A-271 | $7,310,000.00 |
| | | 251237B77 | Class 1A-272 | $14,830,000.00 |
| | | 251237B85 | Class 1A-273 | $15,605,000.00 |
| | | 251237B93 | Class 1A-274 | $5,525,000.00 |
| | | 251237C27 | Class 1A-275 | $5,545,000.00 |
| | | 251237C35 | Class 1A-276 | $5,835,000.00 |
| | | 251237C43 | Class 1A-277 | $6,145,000.00 |
| Sewage Bond Ordinance Sewage Indenture Resolution of the City Council authorizing sale of the 2005 adopted November 17, 2004 ("2005 Bond Resolution") Sale Order of the Finance Director of the City of Detroit, Series 2005-A, dated March 9, 2005 | Series 2005-A | 251237E41 | Class 1A-278 | $625,000.00 |
| | | 251237E58 | Class 1A-279 | $490,000.00 |
| | | 251237E66 | Class 1A-280 | $510,000.00 |
| | | 251237E74 | Class 1A-281 | $545,000.00 |
| | | 251237E82 | Class 1A-282 | $555,000.00 |
| | | 251237E90 | Class 1A-283 | $830,000.00 |
| | | 251237F24 | Class 1A-284 | $860,000.00 |
| | | 251237F32 | Class 1A-285 | $905,000.00 |
| | | 251237F40 | Class 1A-286 | $925,000.00 |
| | | 251237F57 | Class 1A-287 | $970,000.00 |
| | | 251237F65 | Class 1A-288 | $490,000.00 |
| | | 251237Z55 | Class 1A-289 | $19,415,000.00 |
| | | 251237Z63 | Class 1A-290 | $24,820,000.00 |
| | | 251237F99 | Class 1A-291 | $138,945,000.00 |
| | | 251237G23 | Class 1A-292 | $47,000,000.00 |
| Sewage Bond Ordinance Sewage Indenture | Series 2005-B | 251237G64 | Class 1A-293 | $7,775,000.00 |
| | | 251237G72 | Class 1A-294 | $8,010,000.00 |

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| 2005 Bond Resolution | | 251237G80 | Class 1A-295 | $10,420,000.00 |
| Sale Order of the Finance Director of the City of Detroit, Series 2005-B, dated March 9, 2005 | | 251237G98 | Class 1A-296 | $10,990,000.00 |
| Sewage Bond Ordinance | Series 2005-C | 251237J20 | Class 1A-297 | $4,140,000.00 |
| | | 251237J38 | Class 1A-298 | $4,345,000.00 |
| Sewage Indenture | | 251237J46 | Class 1A-299 | $4,570,000.00 |
| | | 251237J53 | Class 1A-300 | $4,795,000.00 |
| 2005 Bond Resolution | | 251237J61 | Class 1A-301 | $5,030,000.00 |
| Sale Order of the Finance Director | | 251237J79 | Class 1A-302 | $5,280,000.00 |
| of the City of Detroit, Series 2005-C, dated March 9, 2005 | | 251237J87 | Class 1A-303 | $7,355,000.00 |
| | | 251237J95 | Class 1A-304 | $7,720,000.00 |
| | | 251237K28 | Class 1A-305 | $6,345,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  Resolution of the City Council adopted February 15, 2006 ("2006 Bond Resolution")  Sale Order of Finance Director of the City of Detroit, Series 2006(A), dated August 4, 2006, Amendment No. 1 to Sale Order dated  April 23, 2008 and  2001/2006 Supplement to Sale Orders | Series 2006-A | 2512373Z4 | Class 1A-306 | $123,655,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  2006 Bond Resolution  Sale Order of Finance Director of the City of Detroit, Series 2006(B), dated July 27, 2006 | Series 2006-B | 251237M83 | Class 1A-307 | $1,835,000.00 |
| | | 251237M91 | Class 1A-308 | $1,825,000.00 |
| | | 251237N25 | Class 1A-309 | $1,430,000.00 |
| | | 251237N33 | Class 1A-310 | $1,505,000.00 |
| | | 251237N41 | Class 1A-311 | $1,590,000.00 |
| | | 251237N58 | Class 1A-312 | $7,515,000.00 |
| | | 251237N66 | Class 1A-313 | $6,540,000.00 |
| | | 251237N74 | Class 1A-314 | $24,400,000.00 |
| | | 251237N82 | Class 1A-315 | $40,000,000.00 |
| | | 251237N90 | Class 1A-316 | $156,600,000.00 |
| Sewage Bond Ordinance  Sewage Indenture  2006 Bond Resolution  Sale Order of Finance Director of | Series 2006-C | 251237P31 | Class 1A-317 | $8,495,000.00 |
| | | 251237P49 | Class 1A-318 | $8,915,000.00 |

| DWSD Bond Documents | DWSD Bond Series | CUSIP | Class | Allowed Amount of DWSD Bond Claims in Class |
|---|---|---|---|---|
| the City of Detroit, Series 2006(C), dated August 4, 2006 | | 251237P56 | Class 1A-319 | $9,150,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted February 15, 2006<br><br>Sale Order of Finance Director of the City of Detroit dated November 29, 2006 | Series 2006-D | 251237W66 | Class 1A-320 | $288,780,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Resolution of the City Council adopted July 19, 2011<br><br>Sale Order of the Finance Director of the City of Detroit dated June 20, 2012 | Series 2012-A | 251250AC0 | Class 1A-321 | $8,880,000.00 |
| | | 251250AE6 | Class 1A-322 | $9,750,000.00 |
| | | 251250AS5 | Class 1A-323 | $50,000,000.00 |
| | | 251250AA4 | Class 1A-324 | $5,820,000.00 |
| | | 251250AB2 | Class 1A-325 | $6,005,000.00 |
| | | 251250AD8 | Class 1A-326 | $6,430,000.00 |
| | | 251250AF3 | Class 1A-327 | $19,930,000.00 |
| | | 251250AG1 | Class 1A-328 | $13,925,000.00 |
| | | 251250AH9 | Class 1A-329 | $9,845,000.00 |
| | | 251250AJ5 | Class 1A-330 | $14,860,000.00 |
| | | 251250AK2 | Class 1A-331 | $22,275,000.00 |
| | | 251250AN6 | Class 1A-332 | $13,170,000.00 |
| | | 251250AP1 | Class 1A-333 | $9,890,000.00 |
| | | 251250AQ9 | Class 1A-334 | $120,265,000.00 |
| | | 251250AR7 | Class 1A-335 | $292,865,000.00 |
| | | 251250AL0 | Class 1A-336 | $23,630,000.00 |
| | | 251250AM8 | Class 1A-337 | $32,240,000.00 |

-13-

13-53846-tjr  Doc 8821-1  Filed 12/07/14  Entered 12/07/14 04:04:17  Page 3 of 110
13-53846-swr  Doc 8823  Filed 12/07/14  Entered 12/07/14 03:55:17  Page 292 of
569

**EXHIBIT I.A.156**

SCHEDULE OF DWSD REVOLVING SEWER BOND DOCUMENTS
& RELATED DWSD REVOLVING SEWER BONDS

**SCHEDULE OF (I) DWSD REVOLVING SEWER BOND DOCUMENTS, (II) RELATED
DWSD REVOLVING SEWER BONDS, (III) CLASSES OF DWSD REVOLVING SEWER BOND
CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING SEWER BOND CLAIMS**

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 18-01 adopted October 18, 2001 ("Sewage Bond Ordinance")[1] <br><br> Trust Indenture dated as of June 1, 2012 among the City of Detroit ("City"), Detroit Water and Sewage Department and U.S. Bank National Association, as trustee ("Sewage Indenture") <br><br> Bond Authorizing Resolution adopted September 9, 1992 <br><br> Supplemental Agreement dated September 24, 1992, among City, Michigan Bond Authority ("Authority") and the State of Michigan acting through the Department of Natural Resources | Series 1992-B-SRF | Class 1B-1 | $115,000.00 |
| Sewage Bond Ordinance <br><br> Sewage Indenture <br><br> Bond Authorizing Resolution adopted September 30, 1993 <br><br> Supplemental Agreement regarding $6,603,996 Sewage Disposal System Revenue Bond Series 1993-B -SRF, among the City, Authority and DEQ | Series 1993-B-SRF | Class 1B-2 | $775,000.00 |
| Sewage Bond Ordinance <br><br> Sewage Indenture <br><br> Bond Authorizing Resolution adopted July 30, 1997 <br><br> Supplemental Agreement dated September 30, 1997, among City, the Authority and the State of Michigan acting through the Department of Environmental Quality ("DEQ") | Series 1997-B-SRF | Class 1B-3 | $1,870,000.00 |

---

[1]     Ordinance No. 18-01 amended and restated Ordinance No. 27-86 adopted on December 9, 1986, as amended.

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 12, 1999<br><br>Supplemental Agreement regarding $21,475,000 City Sewage Disposal System Revenue Bond, Series 1999-SRF1, dated June 24, 1999, among City, Authority and DEQ | Series 1999-SRF-1 | Class 1B-4 | $8,750,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted August 4, 1999 ("1999 SRF Resolution")<br><br>Supplemental Agreement regarding $46,000,000 SRF-2, $31,030,000 SRF-3, $40,655,000 SRF-4 dated September 30, 1999 ("1999 SRF Supplemental Agreement"), among City, Authority and DEQ | Series 1999-SRF-2 | Class 1B-5 | $25,860,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-3 | Class 1B-6 | $14,295,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>1999 SRF Resolution<br><br>1999 SRF Supplemental Agreement | Series 1999-SRF-4 | Class 1B-7 | $18,725,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted February 9, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien), Series 2000-SRF1, dated March 30, 2000, among City, Authority and DEQ | Series 2000-SRF-1 | Class 1B-8 | $21,947,995.00 |

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 19, 2000<br><br>Supplemental Agreement regarding Sewage Disposal System Revenue Bond (SRF Junior Lien) Series 2000-SRF2 dated September 28, 2000, among City, Authority and DEQ | Series 2000-SRF-2 | Class 1B-9 | $36,051,066.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted March 7, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System Revenue Bonds (SRF Junior Lien), Series 2001-SRF-1, dated June 28, 2001 among City, Authority and DEQ | Series 2001-SRF-1 | Class 1B-10 | $54,145,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 21, 2001<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2001-SRF2, dated December 20, 2001 among City, Authority and DEQ | Series 2001-SRF-2 | Class 1B-11 | $39,430,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF1, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-1 | Class 1B-12 | $10,660,000.00 |

3
569
13-53846-tjw Doc 8802-1 Filed 12/07/14 Entered 12/07/14 03:09:17 Page 7 of 110
13-53846-swr Doc 8803-1 Filed 12/07/14 Entered 12/07/14 04:47:16 Page 7 of 110

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted June 5, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF2, dated June 27, 2002 among City, Authority and DEQ | Series 2002-SRF-2 | Class 1B-13 | $865,369.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 13, 2002<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2002-SRF3, dated December 19, 2002 among City, Authority and DEQ | Series 2002-SRF-3 | Class 1B-14 | $19,189,466.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 14, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF1, dated June 26, 2003 among City, Authority and DEQ | Series 2003-SRF-1 | Class 1B-15 | $34,215,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted July 9, 2003<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2003-SRF2, dated September 25, 2003 among City, Authority and DEQ | Series 2003-SRF-2 | Class 1B-16 | $16,390,370.00 |

4

569

13-53846-tjw  Doc 8823-1  Filed 12/07/14  Entered 12/07/14 03:09:17  Page 8 of 110
13-53846-swr  Doc 8823-1  Filed 12/07/14  Entered 12/07/14 03:09:17  Page 8 of 110

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted April 21, 2004 ("2004 SRF Resolution")<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF1, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-1 | Class 1B-17 | $1,890,000.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF2, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-2 | Class 1B-18 | $11,888,459.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>2004 SRF Resolution<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2004-SRF3, dated June 24, 2004 among City, Authority and DEQ | Series 2004-SRF-3 | Class 1B-19 | $8,232,575.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted May 16, 2007<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2007-SRF1, dated September 20, 2007 among City, Authority and DEQ | Series 2007-SRF-1 | Class 1B-20 | $140,109,096.00 |

| DWSD Revolving Sewer Bonds Documents | Series of DWSD Revolving Sewer Bonds | Class | Allowed Amount of DWSD Revolving Sewer Bonds Claims in Class |
|---|---|---|---|
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted November 5, 2008<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2009-SRF1, dated April 17, 2009 among City, Authority and DEQ | Series 2009-SRF-1 | Class 1B-21 | $9,806,301.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted September 29, 2009<br><br>Supplemental Agreement regarding Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2010-SRF1, dated January 22, 2010 among City, Authority and DEQ | Series 2010-SRF-1 | Class 1B-22 | $3,358,917.00 |
| Sewage Bond Ordinance<br><br>Sewage Indenture<br><br>Bond Authorizing Resolution adopted December 13, 2011<br><br>Supplemental Agreement regarding City of Detroit Sewage Disposal System SRF Junior Lien Revenue Bonds, Series 2012-SRF1, dated August 30, 2012 among City, Authority and DEQ | Series 2012-SRF | Class 1B-23 | $4,302,413.00 |

**EXHIBIT I.A.159**

SCHEDULE OF DWSD REVOLVING WATER BOND DOCUMENTS
& RELATED DWSD REVOLVING WATER BONDS

**SCHEDULE OF (I) DWSD REVOLVING WATER BOND DOCUMENTS, (II) RELATED DWSD REVOLVING WATER BONDS, (III) CLASSES OF DWSD REVOLVING WATER BOND CLAIMS AND (IV) ALLOWED AMOUNTS OF DWSD REVOLVING WATER BOND CLAIMS**

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Ordinance No. 01-05 adopted January 26, 2005 ("Water Bond Ordinance")[1]<br><br>Trust Indenture dated as of February 1, 2013 among the City of Detroit ("City"), Detroit Water and Sewerage Department and U.S. Bank National Association, as trustee ("Water Indenture")<br><br>Bond Authorizing Resolution adopted April 29, 2005 ("2005 SRF Resolution")<br><br>Supplemental Agreement dated as of September 22, 2005 among City, Michigan Municipal Bond Authority ("Authority") and Michigan Department of Environmental Quality ("DEQ") | Series 2005-SRF-1 | Class 1C-1 | $9,960,164.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>2005 SRF Resolution<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2005-SRF2, dated September 22, 2005 among City, Authority and DEQ | Series 2005-SRF-2 | Class 1C-2 | $6,241,730.00 |
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution adopted February 15, 2006<br><br>Supplemental Agreement regarding the Water Supply System SRF Junior Lien Revenue Bond, Series 2006-SRF1, dated September 21, 2006 among City, Authority and DEQ | Series 2006-SRF-1 | Class 1C-3 | $3,715,926.00 |

---

[1]     Ordinance No. 0-05 amends and restates Ordinance No. 30-02 adopted November 27, 2002, which amended and restated Ordinance No. 06-01 adopted October 18, 2001, which amended and restated Ordinance No. 32-85, as amended.

| DWSD Revolving Water Bonds Documents | Series of DWSD Revolving Water Bonds | Class | Allowed Amount of DWSD Revolving Water Bonds Claims in Class |
|---|---|---|---|
| Water Bond Ordinance<br><br>Water Indenture<br><br>Bond Authorizing Resolution and Bond Ordinance, adopted July 15, 2008<br><br>Supplemental Agreement regarding Water Supply System SRF Junior Lien Revenue Bonds, Series 2008-SRF1, dated September 29, 2008 among City, Authority and DEQ | Series 2008-SRF-1 | Class 1C-4 | $1,535,941.00 |

## EXHIBIT I.A.183

PRINCIPAL TERMS OF EXIT FACILITY

**EXIT FACILITY**
**<u>SUMMARY OF PRINCIPAL TERMS</u>[1]**

The definitive documentation governing the Exit Facility shall provide generally for the following terms:

| | |
|---|---|
| Issuer | City of Detroit. |
| Initial Bond Purchaser | The bonds will initially be sold to the Michigan Finance Authority (the "<u>MFA</u>"). The MFA will issue bonds secured by the City's bonds. |
| Amount and Type | $325 million, consisting of Financial Recovery Bonds issued pursuant to section 36a(7) of the Michigan Home Rule City Act, excluding any amounts raised to fund (if required) debt service reserve funds consistent with municipal markets practice. |
| Taxation | An amount up to $200 million is contemplated to be tax-exempt financing. |
| Use of Proceeds | As approved by the Local Emergency Financial Assistance Loan Board, proceeds of the exit facility will be used to fund: (i) the retirement of the City's $120,000,000 post-petition financing, (ii) certain of the City's reinvestment and revitalization initiatives and (iii) the retirement of the City's obligations with respect to holders of Class 5 Claims (COP Swap Claims) and potentially holders of Class 7 Claims (Limited Tax General Obligation Bond Claims) under the City's Seventh Amended Plan of Adjustment. |
| Pricing on Sale to Purchaser | Tax-Exempt Bonds: SIFMA Municipal Swap Index + 4.25% |
| | Taxable Bonds: 1-month USD-LIBOR + 4.75% |
| Pricing on Public Offering | Tax-Exempt Bonds: The sum of (i) the yield on Thomson Reuters Municipal Market Data 15-year AAA Index, <u>plus</u> (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), <u>plus</u> (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014). |
| | Taxable Bonds: The sum of (i) the yield on 7-year US Treasury Notes, <u>plus</u> (ii) the Base Spread (as set forth in the Commitment Letter, dated September 17, 2014), <u>plus</u> (iii) the applicable Market Flex (as set forth in the Commitment Letter, dated September 17, 2014). |
| Maturity | No longer than 15 years on Tax-Exempt Bonds; no longer than 8 years on Taxable Bonds. |
| Security | The obligations owing by the City with respect to the Exit Facility will be secured by a first priority lien on certain income tax revenues of the City. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Plan.

## EXHIBIT I.A.197

FORM OF FGIC/COP SETTLEMENT DOCUMENTS

13-53846-swr    Doc 8029-1    Filed 10/27/14    Entered 10/27/14 23:47:47    Page 205 of
559
13-53846-swr    Doc 8024-1    Filed 10/27/14    Entered 10/27/14 03:08:19    Page 16 of
110

## Structure Outline

This structure outline (the "*Outline*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts, term sheets and outlines, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters. Nothing herein is intended to imply that Discussions prior to the date of this Outline were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*"). This Outline and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

| | |
|---|---|
| Definitions | "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan presiding over the City's chapter 9 case. <br><br> "City" means the City of Detroit, Michigan. <br><br> "COPs Holders" means the holders of COPs originally insured by FGIC with a claim for principal or interest. <br><br> "Developer" means FGIC and/or its designee(s). <br><br> "Excluded Actions" shall mean any claims against the COP Swap Counterparties, COP Holders not party hereto, or affiliates or related parties of the foregoing. <br><br> "FGIC" means Financial Guaranty Insurance Company. <br><br> "Plan" means the City's Seventh Amended Plan of Adjustment, as amended or supplemented. <br><br> Capitalized terms used herein, but not otherwise defined, have the meanings set forth in the Plan. |
| Stipulation | The City and FGIC shall enter into a stipulation, which shall be so ordered by the Bankruptcy Court, and which shall provide: |

| | |
|---|---|
| | 1. All objections by FGIC to the City's Plan shall be withdrawn, without prejudice to FGIC refiling such objections in the event that (i) the Plan is not confirmed, (ii) the Stipulation (described herein) is not approved, or (iii) the 9019 Settlement (described herein) is not approved.<br><br>2. FGIC shall, on behalf of the COPs Holders, opt-into the Plan COP Settlement with respect to the COPs originally insured by FGIC without impairing the COPs Holders' insurance claims against FGIC.<br><br>3. In accordance with the Plan COP Settlement, FGIC shall be deemed to vote in favor of the Plan.<br><br>4. The Plan shall be amended to revise the definition of "Class 9 Eligible City Assets" to exclude Joe Louis Arena and the Joe Louis Parking Garage shall be excluded from the City's RFQ.<br><br>5. The consideration provided under the Stipulation and the Plan COP Settlement set forth herein is solely for the benefit of FGIC and the COPs Holders, and such consideration shall be administered and distributed to COPs Holders in a manner consistent herewith.<br><br>6. The parties acknowledge that time is of the essence.<br><br>7. Pending approval of the Stipulation, FGIC shall take no action in furtherance of any objection, joinder, reservation of rights, or opposition to the Plan.  For the avoidance of doubt, while approval for the Stipulation is pending, FGIC shall refrain from calling or examining any witnesses, introducing other evidence or advancing legal argument in connection with the confirmation trial on the City's Plan.<br><br>8. The Plan shall be amended to provide for FGIC, the Trustee, and the COPs Holders as Exculpated Parties, subject to agreed carve-outs.<br><br>9. The City shall not amend the POA in a way that would have a materially adverse effect on Class 9 without the consent of FGIC. |
| **9019 Settlement** | The City and FGIC shall enter into a settlement, which |

2

| | |
|---|---|
| | shall be approved by the Bankruptcy Court, and which shall provide: |
| | 1. The City shall dismiss the COP Litigation. |
| | 2. FGIC shall dismiss or cause to be dismissed all counterclaims filed in the COP Litigation. |
| | 3. Except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the COP Litigation, including any claims against the retirement systems or any City-related party arising in connection with the COPs. |
| | 4. The City shall enter into the Development Agreement with the Developer. |
| | 5. FGIC shall take appropriate steps to direct Wilmington Trust to effectuate the Stipulation, the 9019 Settlement and the Plan COP Settlement. |
| | 6. The order approving the 9019 Settlement shall contain a finding that the Development Agreement is legal and the City can legally comply with its obligations thereunder. |
| | 7. The consideration provided under the 9019 Settlement set forth herein is solely for the benefit of FGIC and the COPs Holders, and such consideration shall be administered and distributed to COPs Holders in a manner consistent herewith. |
| Swap Claim Settlement | In full satisfaction and discharge of FGIC's swap insurance and related claims against the City, FGIC shall receive: (a) an Allowed Class 14 claim in the amount of $6.11 million, and (b) the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the plan on account of its $33.6 million Class 13 claim. This consideration is solely for FGIC's benefit. |
| Development Agreement | The City and Developer will enter into a Development Agreement on the terms and conditions set forth in the |

3

13-53846-swr  Doc 8029-1  Filed 10/21/14  Entered 10/21/14 20:47:47  Page 19 of
13-53846-swr  Doc 8024-1  Filed 12/27/14  Entered 12/27/14 23:08:47  Page 19 of
110
159

| | |
|---|---|
| | Development Agreement Term Sheet dated October 16, 2014. |
| **FGIC Approval Process** | The Stipulation, 9019 Settlement and Development Agreement described above are subject to the approval, consents or waivers that FGIC determines are necessary or desirable from FGIC's Board of Directors and the New York State Department of Financial Services, which FGIC shall seek promptly after the signing of this Term Sheet. |

**FGIC:**

Financial Guaranty Insurance Company

By: _____
Name: Timothy S. Travers
Title: CEO
Dated: October 16, 2014

[Signature Page to Structure Outline]

**CITY:**

CITY OF DETROIT, a Michigan
municipal corporation

By: _____
Name: *KEVYN D. ORR*
Title: *EMERGENCY MANAGER*
Dated: October *16*, 2014

[Signature Page to Structure Outline]

**EXHIBIT I.A.198**

FORM OF FGIC DEVELOPMENT AGREEMENT

## JLA Development Agreement
## Term Sheet

This term sheet proposal (the "*Term Sheet*") and any and all past, present or future discussions, negotiations, conferences, meetings, telephone conferences, drafts of agreements, correspondence and writings, submissions of data, financial information, financial projections and forecasts and term sheets, whether oral, written or both, relating to the various transactions contemplated herein (the "*Discussions*") shall be considered to be communications to compromise and settle disputed matters.  Nothing herein is intended to imply that Discussions prior to the date of this Term Sheet were not "compromise negotiations" as defined in the Federal R. Evid. 408 and similar state laws and rules limiting the admissibility or discoverability of evidence concerning "compromise negotiations" or other communications to compromise and settle disputed matters (the "*Rules*").  This Term Sheet and all Discussions shall be considered "compromise negotiations" pursuant to the Rules and no such Discussions shall ever be considered "otherwise discoverable" or be permitted to be discoverable or admissible or constitute evidence in connection with any legal proceeding, case, litigation or bankruptcy proceeding for any purpose, including proving bias, admission of default, prejudice, interest of a witness or a party, or negating a contention of undue delay, as provided by the Rules.

The term sheet herein is a summary and does not purport to include all terms or related documentation that would need to be required in any final agreement.  Such terms and conditions will be included in definitive documentation that the parties will use commercially reasonable efforts to execute following execution of this Term Sheet, which documents shall not be inconsistent with the terms set forth herein.

| | |
|---|---|
| **Definitions** | For the purposes of this Term Sheet the following terms have the meanings provided below: |
| | "City" means the City of Detroit, Michigan. |
| | "City Parties" means any department, subdivision or agency of the City and/or any governmental authority within the direct or indirect control or supervision of the City. |
| | "Commercial Redevelopment Act" means the Public Act 255 of 1978, MCL § 207.651 *et seq.* |
| | "Commercial Rehabilitation Act" means the Public Act 210 of 2005, MCL § 207.841 *et seq.* |
| | "CRP Incentives" means incentives available from the Michigan Strategic Fund, in cooperation with MEDC, through the Community Revitalization Program under Public Act 252 of 2011. |
| | "Demolition Completion Date" means the date upon which |

CHI-181944433v7

13-53846-swr   Doc 8024-1   Filed 12/27/14   Entered 12/27/14 23:07:46   Page 24 of
13-53846-swr   Doc 8029-1   Filed 10/27/14   Entered 10/27/14 20:03:40   Page 24 of
110

Demolition at the JLA Demolition Parcel is complete.

"Developer" means FGIC or its designee (and any permitted successor or assignee thereof).

"Development" means that certain mixed use facility consisting of (i) a first-class hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreation, residential and/or condominium units as shall be determined by the Developer (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with a height above ground not to exceed 30 floors, to be constructed upon the JLA Parcel by the Developer, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances as approved by the City in accordance herewith, which approval shall not be unreasonably withheld, conditioned or delayed to the extent consistent with the City's urban planning policies and the City's comprehensive development plan as existing on the date any applicable Required Approvals (as defined below) are obtained by the Developer.

"FGIC" means Financial Guaranty Insurance Company

"Force Majeure Delay" means an event, casualty, occurrence, condition, or circumstance of any kind or nature reasonably beyond the control of the applicable party hereto which renders such party unable to perform any of its obligations contemplated hereunder, in full or in part, including, without limitation, (i) acts of declared or undeclared war by a foreign enemy; (ii) civil commotion, insurrection or riots; (iii) fire or casualty or condemnation; (iv) floods, hurricanes or other materially adverse weather conditions; (v) earthquakes; (vi) acts of God; (vii) governmental preemption in the case of emergency; (viii) unavailability of materials to the extent not within the reasonable control of the applicable party (other than shortage of funds); (ix) strikes, lockouts or other labor trouble; (x) inability to secure labor or access to the JLA Parcel including, without limitation, holdover of the tenant under the JLA Lease (as defined below) beyond any stated expiration date (inclusive of all renewal options thereunder);

(xi) acts of terrorism; (xii) the suspension of government operations; (xiii) any act, omission, rule, order or regulation of any governmental authority or any department or subdivision thereof (other than, with respect to the City, the City, any department, subdivision or agency of the City or any governmental authority within the direct or indirect control or supervision of the City and other than, with respect to the Developer, the failure of the Developer to secure the Required Approvals if the Developer does not apply for and diligently prosecute the applications for such Required Approvals); (ix) the presence of hazardous materials on the JLA Parcel and any related remedial action; and (x) any other cause, event or circumstance not within the reasonable control of the applicable party (other than shortage of funds).

"JLA Demolition Parcel" means the real property located in the City upon which is presently situated the improvements commonly referred to as the Joe Louis Arena (not including the parcel upon which the Joe Louis Arena Garage is situated).

"JLA Lease" means that certain Sublease of Riverfront Arena between the City, Olympia Entertainment, Inc. and the Detroit Red Wings, Inc., dated June 15, 2014, as may be amended, restated or modified.

"JLA Parcel" means the real property located in the City upon which is presently situated the improvements commonly referred to as the Joe Louis Arena and the Joe Louis Arena Garage.

"MEDC" means the Michigan Economic Development Corporation.

"POA" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended.

"State" means the State of Michigan, acting by and through the MEDC, or otherwise.

"TIF Incentives" means certain redevelopment incentives awarded by the Michigan Strategic Fund (MSF) under the Brownfield Tax Increment Financing Program (Act 381 of 1996), as administered by MEDC.

Other capitalized terms are defined elsewhere in this Term

| | Sheet. |
|---|---|
| **Development Agreement Terms** | In consideration of FGIC and the City entering into that certain Settlement Agreement, dated as of [●], contemplating, without limitation, withdrawal by FGIC of its objections to the POA, the City and Developer agree to enter into a development agreement (the "<u>Agreement</u>") as follows:<br><br>1.  *Developer Option*.<br><br>On or before a date which is thirty-six (36) months following full and complete execution of the Agreement (the "<u>Development Proposal Deadline</u>"), the Developer shall identify a developer or a development partner (either as an equity partner or as a construction or development manager) and prepare a comprehensive development plan for the Development, and shall submit such information along with such plan (in form and substance reasonably acceptable to the City) to the City for its prompt review and approval (the "<u>Development Proposal</u>"), which approval shall not be unreasonably withheld, conditioned or delayed, including, without limitation, any condition in such approval that would interfere with the eligibility of the Development for CRP Incentives and TIF Incentives as contemplated hereby. The Development Proposal does not need to disclose any additional equity partners, provided that the Developer will not partner with any third party that is prohibited from doing business with the City, and the Development Proposal does not need to identify a development partner if the rights under the Agreement have been transferred to a developer, which has previously been approved by the City, which approval shall not be unreasonably withheld, conditioned or delayed.  Upon request of the Developer, the City may approve an extension of the Development Proposal Deadline by up to twenty-four (24) additional months, which approval shall not be unreasonably withheld, delayed or conditioned.  The City agrees that it would be unreasonable to withhold its approval if (i) the Developer requested the extension because development in the immediate vicinity of the JLA Parcel has materially decreased or the general economic condition of the City has deteriorated to such a level that it would not be economically feasible for the Developer to pursue development of the JLA Parcel or (ii) it is reasonable given the complexity of the development |

contemplated by the Developer.

The City will review the Development Proposal and within ninety (90) days after receipt either (i) approve the Development Proposal or (ii) provide the Developer with the specific reasons why the Development Proposal is not acceptable, which may include unacceptability of the proposed development partner (if required). If the City does not approve the Development Proposal, the Developer may provide a revised Development Proposal to the City for its approval pursuant to the process herein, which shall continue until the Development Proposal is approved.

Without limiting the Developer's ability to identify and receive approval of a different development partner, the Detroit Regional Convention Facility Authority is deemed an approved development partner for purposes hereof. The Development Proposal shall include an application for the CRP Incentives and the brownfield plan necessary for the application for TIF Incentives, and it shall also identify which components of the Development Proposal are eligible for the CRP Incentives and TIF Incentives, disbursement of which shall be governed by the Economic Incentive Agreements (as defined in Section 3 below), and the City shall use its commercially reasonable efforts to cause the State to grant any approvals necessary for those CRP Incentives and TIF Incentives no later than 120 days after the date of approval of the Development Proposal, subject to the terms hereof.

The Developer shall have until a date which is one hundred eighty (180) days prior to the Development Proposal Deadline to give the City written notice of its intent to inspect the JLA Parcel (the "Diligence Notice"), which inspection may include, without limitation, (i) conducting physical inspections of the JLA Parcel, (ii) performing environmental studies of the JLA Parcel, which studies shall be of a scope acceptable to Developer in its sole discretion, and shall include the right to do invasive soil and groundwater testing, provided, however, the methodology of any such study shall be subject to the City's reasonable approval, and (iii) obtaining surveys of the JLA Parcel (the "Diligence Activities"). The City shall order a title commitment and

survey for the JLA Parcel (the "<u>Title Commitment and Survey</u>") promptly following execution of this Term Sheet and shall deliver the Title Commitment and Survey to the Developer.  Within twenty (20) business days after the Developer's receipt of the Title Commitment and Survey (in form reasonably acceptable to the Developer) and copies of each of the title exceptions referenced in the Title Commitment and Survey,  the Developer shall have examined the Title Commitment and Survey and shall make any objections to any items therein that would cause title to the JLA Parcel to not be marketable or that would unreasonably interfere with the construction of the Development ("<u>Title Defects</u>") by written notice to the City (the "<u>Title Objection Notice</u>").  The Title Objection Notice shall state with specificity the reasons for Developer's objection(s) and the curative steps requested by the Developer which would remove the basis for the Developer's objection(s).  The City shall cure any Title Defects prior to the Closing Date.  If the Developer orders an update to the Title Commitment and Survey prior to Closing, and such update shows an additional Title Defect not caused by the Developer, the City shall cause such Title Defect to be cured prior to Closing.

To the extent within the possession of the City and the City Parties, as reasonably determined by the City's corporation counsel upon due inquiry, and not otherwise in the public record, the City shall, promptly upon the request of the Developer, provide, and shall cause all City Parties to provide, to the Developer (i) copies of all environmental studies, asbestos reports or other environmental reports on the JLA Parcel, (ii) copies of all title reports and the underlying documents referenced therein, (iii) copies of all surveys of the JLA Parcel, (iv) copies of any other records, documents, instruments, agreements or files with respect to the use or ownership of the JLA Parcel, to the extent materially relevant after Closing, (v) to the extent not included in the above, copies of the correspondence to or from the City or any City Parties related to the use or ownership of the JLA Parcel, to the extent materially relevant after Closing and (vi) such other documentation as is reasonably requested by Developer with respect to the JLA Parcel.  The City shall use its commercially reasonable efforts during the Diligence Period (as defined below) to provide the Developer and its contractors, consultants and their

respective agents with such access to the JLA Parcel as may be reasonably requested by the Developer from time to time, subject to any access limitation of the JLA Lease. Prior to conducting any of the Diligence Activities, the Developer and its contractors and consultants performing any of the Diligence Activities shall maintain the insurance coverage and comply with the insurance requirements specified in the City's form of Right of Entry.

The Developer shall notify the City in writing, no later than one hundred twenty (120) days following the Diligence Notice (the "Diligence Period"), that either (i) the Developer intends to proceed to Closing (as defined below) on the JLA Parcel (the "Notice to Proceed"), or (ii) the condition of the JLA Parcel is such that, in Developer's reasonable judgment, the condition adversely affects Developer's ability to timely complete the development or adversely affects the value of the JLA Parcel (the "Objection Notice"), which Objection Notice shall state with reasonable specificity the particular diligence matter unacceptable to the Developer, including Title Defects ("Objections"). The City, in its sole discretion, shall have the option to cure or remove such Objections within sixty (60) days following the Objection Notice (the "Cure Period"), provided that the City must cure such Objections that are encumbrances for the benefit of the City or the City Parties. Without limiting the generality of the foregoing, the City shall be obligated to cause to be removed of record: (i) mechanics' liens; (ii) judgment liens against the City or any City Parties; (iii) mortgages, similar loan documents and voluntary liens with respect to indebtedness of the City or any City Party; (iv) delinquent taxes, charges, impositions or assessments; (v) fines issued by any governmental or quasi-governmental authority or other liens encumbering the JLA Parcel or any portion thereof which are in liquidated amounted; and (vi) any other monetary liens against the property. To the extent the Developer issues an Objection Notice and Objections are cured to Developer's reasonable satisfaction during the Cure Period or the Developer desires to waive the Objections and proceed to Closing, the Developer shall provide a Notice to Proceed to the City within fifteen (15) days after expiration of the Cure Period.

To the extent the Developer issues a Notice to Proceed prior to the later of (i) expiration of the Diligence Period, and (ii) fifteen (15) days after the expiration of the Cure Period, if applicable, the City and the Developer shall proceed to closing on the JLA Parcel on a mutually agreed upon date which is the later of (i) two (2) years following approval by the City of the Development Proposal, and (ii) six (6) months following completion of Demolition (as defined below) (the "Closing Date"). On the Closing Date, the City shall, subject to satisfaction of commercially reasonable conditions precedent and Developer's satisfaction of the requirements of any title company insuring title to the JLA Parcel, convey the JLA Parcel to the Developer by quit-claim deed (the "Closing"). Developer shall pay all costs associated with Closing, including, without limitation, all title charges, escrow, closing and recording fees associated with any conveyance hereunder, with the exception of transfer taxes, if any, and any other costs normally paid by the seller of property under applicable law.

The Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City as a result of the Diligence Activities other than any such loss, liability, cost or expense resulting from the negligence or willful misconduct of the City or any City Parties.

The City represents that the City or an instrumentality of the City has the right, power and authority to transfer the JLA Parcel or will have such right, power and authority as of the Closing.

2. *JLA Demolition*.

Promptly upon expiration of the JLA Lease, but in no event more than ninety (90) days after expiration of the JLA Lease, the City shall commence or cause to be commenced the demolition of the JLA Demolition Parcel (the "Demolition Commencement Date"), which demolition shall include (i) removal and disposal of all building improvements and materials located thereon and (ii) certain excavation work to be completed at the JLA Demolition Parcel, which excavation work shall include, without limitation, clearing and grubbing, soil erosion and control, and site excavation and embankment

on the JLA Demolition Parcel, all in accordance with plans and specifications reasonably acceptable to the Developer and all applicable laws ("Demolition"). For the avoidance of doubt, if the City commences staging for the Demolition by the Demolition Commencement Date, the City will be deemed to have commenced the Demolition.

The Demolition shall include (i) remediation or removal of materials, substances or wastes classified or regulated as hazardous, toxic, or a pollutant or contaminant ("Regulated Hazardous Substances") (including, but not limited to, asbestos-containing materials) related to the removal and disposal of materials from the JLA Demolition Parcel to the extent required by or necessary to comply with applicable laws or is customary for demolition projects of a similar scope and nature and (ii) the investigation, control or removal of any Regulated Hazardous Substances at, on or below the surface of the JLA Parcel that is sufficient under and otherwise causes the JLA Parcel to comply with applicable law for Developer to develop and use the JLA Parcel site consistent with the Development Proposal for its intended purposes as a multiuse hotel, residential condominium, office or retail development ("Sufficient Environmental Remediation"). Sufficient Environmental Remediation may, at the City's election, include controls that do not unreasonably interfere with the Development Proposal; provided such are acceptable to the governmental authorities with jurisdiction over the JLA Parcel. Developer agrees that, in conjunction with Developer, the City may have prepared and submitted to the Michigan Department of Environmental Quality a Baseline Environmental Assessment (Phase II) and associated Due Care Plans approved by and for the benefit of Developer, which approval shall not be unreasonably withheld, delayed or conditioned; however, the submission of such shall not alleviate the City's obligation to undertake such other actions necessary to perform Sufficient Environmental Remediation to allow for the implementation of the Development Proposal. The Developer agrees that in conducting Sufficient Environmental Remediation, the City may rely on protective barriers to prevent contact with affected soil and deed restrictions to limit groundwater use and other due care requirements

CHI- 181944433v7

9

13-53846-swr   Doc 8034-1   Filed 12/27/14   Entered 12/27/14 20:47:47   Page 32 of
13-53846-swr   Doc 8029-1   Filed 10/27/14   Entered 10/27/14 23:08:10   Page 32 of
110

approved by the governmental authorities and reasonably acceptable to Developer. Sufficient Environmental Remediation shall not include the construction of measures adopted as controls to the extent that they are otherwise specifically part of the Development Proposal, in which case Developer shall construct them as part of the Development; however, if the costs to do so are increased as a result of government approved controls, the City shall reimburse Developer for the increased costs to satisfy any government imposed controls. Developer or any future owner will be responsible for maintaining any reasonable controls or due care measures adopted as part of the Sufficient Environmental Remediation.

The Demolition Commencement Date is expected to occur on or before September 15, 2017. Demolition shall be completed within one (1) year following the Demolition Commencement Date. The State shall make available to the City certain CRP Incentives set forth below, of which up to $6,000,000 will be for the purpose of reimbursing the City for the costs and expenses incurred in connection with the Demolition (the "Demolition CRP Incentives"). If there are any remaining Demolition CRP Incentives following the Demolition and the Sufficient Environmental Remediation, such funds shall be made available to reimburse the Developer for other eligible costs for the Development.

3. *Economic Development Incentives*.

In order to facilitate construction of the Development on the JLA Parcel, the State has agreed to reimburse the Developer for certain eligible project costs through CRP Incentives and TIF Incentives, as more particularly set forth in this Section 3, below.

To the extent that the Development Proposal, as approved by the City pursuant to Section 1 above, meets the eligibility requirements for CRP Incentives and TIF Incentives, the Developer shall be provided up to $4,000,000 in CRP Incentives, and up to $14,000,000 in TIF Incentives, which TIF Incentives will accrue interest at 3% per annum on any outstanding balance thereof, pursuant to one or more subsequent final written grants and loans (forgivable or otherwise), as applicable, and a

development agreement or other economic assistance agreement, as applicable, shall be entered into by the Developer and the State no later than 120 days after approval of the Development Proposal (which may be increased by 60 days if the CRP Incentives or TIF Incentives require review by the Michigan Department of Environmental Quality), which shall include (i) a schedule of performance- based project milestones for construction of the Development, and (ii) a pro-forma budget for the Development, as agreed upon between the City, the State and the Developer (collectively, the "Economic Incentive Agreements").  The City will use good faith efforts to cause the cap on the TIF Incentives to be increased to $18,000,000 in exchange for eliminating the $4,000,000 in CRP Incentives that are to be provided to the Developer.  The Economic Incentive Agreements will be executed in accordance with the standard process, including the filing of any necessary applications.

The Economic Incentive Agreements shall govern disbursement of the CRP Incentives and TIF Incentives, including those project costs related to the Development that are eligible for CRP Incentives and TIF Incentives, as well as conditions precedent, milestones and timing for such disbursement, and shall include customary periodic reporting requirements of the Developer for data related to the Development both during and after construction.

To the extent the Development includes residential uses, the Economic Incentive Agreement shall also provide for designation of the Development as a Neighborhood Enterprise Zone ("NEZ"), and the City and each of the City Parties shall cooperate with and assist the Developer in applying for the NEZ certificate.

The City and each of the City Parties shall establish either a Commercial Redevelopment Zone (as defined in the Commercial Redevelopment Act) or a Commercial Rehabilitation Zone (as defined in the Commercial Rehabilitation Act), as requested by the Developer, such that the JLA Parcels will be eligible for the property tax abatements available for properties in the applicable zone.  The City and each of the City Parties shall cooperate with and assist the Developer in applying for the tax abatements for which the Development is eligible under the Commercial Rehabilitation Act or the

Commercial Redevelopment Act.

Until title to the Joe Louis Arena Garage is transferred to the Developer, the City shall also fund or cause to be funded all costs and expenses for the repairs specified on page 15 "Opinion of Expected Construction Costs – July 2014" in the Physical Conditions Due Diligence Review and Evaluation dated September 2014 prepared by Desman Associates, except for Item #3 identified therein.

The City shall use its commercially reasonable efforts to assist the Developer in obtaining any additional sources of developer financings and grants not already provided for herein that are identified in writing to the City by the Developer.

4. _Further Terms and Conditions_.

Subject to Force Majeure Delays, the Developer shall commence the Development within twelve (12) months following the Closing Date (the "Commencement Milestone") and shall achieve substantial completion of the Development within thirty-six (36) months following the Closing Date. For these purposes, commencing the Development on the JLA Parcel shall be deemed to have occurred when the Developer shall have commenced site preparation work on the JLA Parcel, which site preparation work may include renovation or demolition of existing structures located on the JLA Parcel by the Developer, as applicable. In the event the Developer shall fail to achieve the Commencement Milestone, the JLA Parcel will automatically revert to the City. As part of the Closing, the Developer shall provide the City with a commercially reasonable completion guarantee.

To the extent the Developer proceeds to Closing, it shall accept the JLA Parcel on an "as-is, where-is" basis, subject to the City's obligations to perform the Sufficient Environmental Remediation. Other than with respect to the Sufficient Environmental Remediation, the City makes no implied or express representations or warranties of any kind as to its condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever. By proceeding to Closing after completion of the Diligence Activities, Developer will acknowledge that it is satisfied with the

condition of the JLA Parcel. By accepting title to the JLA Parcel at Closing, Developer shall be deemed to have waived any right to object to the status of title or to the condition of the JLA Parcel, regardless of the result of any Diligence Activities, and shall be deemed to have declared its full satisfaction with the status of title to and condition of the JLA Parcel, except as otherwise provided in this Agreement.

Upon Closing and subject to the City's obligation to perform the Sufficient Environmental Remediation, the Developer shall release the City and the State, and their respective officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the JLA Parcel, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party.

Prior to the Closing, the City will (i) subject to the Demolition, maintain the JLA Parcel in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (ii) below) as of the date of the Agreement, (ii) not, through its own action (or the action of any agency, department, employee, agent, or contractor), alter the environmental condition of the JLA Parcel, as such exists on the date of the Agreement, in a material and adverse manner, (iii) not take zoning or land use action on the JLA Parcel without Developer's written consent, and (iv) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to the JLA Parcel, or amend, modify, renew, extend or terminate any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed.

Time is of the essence with respect to the deadlines set forth herein.

The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Developer or its rights under the Development Agreement which charter, ordinance or other provision

| | |
|---|---|
| | has a material adverse impact on the Developer or its rights under this Agreement (it being understood that a "material adverse impact" shall include any adverse financial impact or any contradiction, or adverse impact on the enforceability, of the terms of this Agreement or the Economic Incentive Agreements). |
| **Zoning and Required Approvals** | The City shall change the zoning requirement for the JLA Parcel to be designated "B-5", which will permit the Developer to develop the JLA Parcel as a mixed-use development, provided that the City administratively approves the site plans, which approval will not be unreasonably withheld, delayed or conditioned. Approval by the City of the Development Proposal shall not be deemed approval with respect to any site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required for the Development (the "Required Approvals"); provided, however, upon approval by the City of the Development Proposal and prior to Closing (as defined below), the Developer may proceed with securing the Required Approvals at its sole cost and expense. |
| | With respect to any formal requests made by Developer or its designee to the City or State for any Required Approvals, the City or State, as applicable: (a) agrees to process such requests promptly and to use commercially reasonable efforts to process them within 30 days of submission by the Developer, (b) shall not unreasonably withhold, condition or delay approvals of the applicable requests, provided that the City or State have the legal authority to grant such approval and that such approval does not violate any applicable law, rule or regulation of general application, (c) shall not unreasonably impede or interfere with the Development, (d) shall not discriminate against Developer in the consideration or approval of such Required Approvals on account of the circumstances surrounding the Settlement Agreement and this Agreement and the events leading up thereto, and (e) shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted thereby for similarly situated developments and uses as those contemplated for the Development; provided, however, the City or State, as applicable, shall process such requests for all Required Approvals pursuant to all then applicable rules, |

| | regulations, statutes and similar requirements. |
|---|---|
| JLA Lease | The City shall not renew or otherwise extend the JLA Lease beyond the date currently set forth in such lease, subject to the right of the existing tenant under the JLA Lease to extend the JLA Lease. |
| Transferability | Developer shall be entitled to freely transfer or assign its rights hereunder at any time, as long as it provides the City written notice thereof and it does not transfer its rights hereunder to a party that is prohibited from doing business with the City. |
| Costs and Expenses | The parties hereto shall bear their own costs and attorneys' fees with respect to the matter set forth herein. |
| PA 436 Approval | The Agreement described above upon the material terms and conditions set forth herein is subject to the approval required pursuant to the State's Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 – 1575 in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of definitive documentation for the Agreement. |
| Bankruptcy Court Approval Process | The Agreement described above upon the material terms and conditions set forth herein is subject to the Bankruptcy Court's approval in a manner acceptable to the parties hereto, which the City shall seek promptly after the signing of definitive documentation for the Agreement. |
| Dispute Resolution | In connection with the negotiation of the definitive documentation to effect the various settlements of claims provided for in this Term Sheet, the parties shall use good faith efforts to identify and agree upon alternative dispute resolution mechanisms that provide a process for resolution of disputes. |
| Jurisdiction/Venue/Choice of Law | The parties agree that, except as provided in the "Dispute Resolution" section of the Term Sheet, jurisdiction shall be retained by the Bankruptcy Court for all matters related hereto and venue shall be in Detroit. The parties agree that this Term Sheet is to be governed by Michigan law. |

CHI- 181944433v7

IN WITNESS WHEREOF, the Parties have duly caused this term sheet to be executed as of the day and year provided for below.

**CITY:**

CITY OF DETROIT, a Michigan
municipal corporation

By: _____
Name: *KEVIN D. ORR*
Title: *EMERGENCY MANAGER*
Dated: October *16*, 2014

**DEVELOPER:**

Financial Guaranty Insurance Company

By: _____

Name: Timothy S. Travers

Title: CEO

Dated: October 16, 2014

*[Signature Page – FGIC-JLA Development Term Sheet]*

**STATE:**

STATE OF MICHIGAN, solely with
respect to its obligation to provide the
CRP Incentives and the TIF Incentives

By: _Michael Gadola_
Name: _Michael Gadola_
Title: _Legal Counsel, Governor Rick Snyder_
Dated: October _16_, 2014

**EXHIBIT I.A.216**

SCHEDULE OF HUD INSTALLMENT NOTE DOCUMENTS
& RELATED HUD INSTALLMENT NOTES

13-53846-swr    Doc 8029-1    Filed 12/27/14    Entered 12/27/14 23:47:47    Page 42 of
13-53846-swr    Doc 8024-1    Filed 10/27/14    Entered 10/27/14 03:03:47    Page 23 of
110
550

| HUD Installment Note Documents (Identified by note number. Ancillary instruments and agreements related thereto are not separately identified) | HUD Installment Notes | Estimated Allowed Amount (The estimated allowed amount is the sum of all advances and conversion date advances under the HUD Installment Notes identified in this schedule, less principal amounts paid, plus interest due on principal amounts outstanding. The estimated aggregate allowed amount is the sum of the estimated allowed amount for all the HUD Installment Notes identified in this schedule) |
|---|---|---|
| City Note No. B-94-MC-26-0006-A | Garfield Project Note* | $549,142.50 |
| City Note No. B-94-MC-26-0006-D | Stuberstone Project Note* | $95,929.50 |
| City Note No. B-97-MC-26-0006 | Ferry Street Project Note* | $1,837,217.00 |
| City Note No. B-98-MC-26-0006-A | New Amsterdam Project Note* | $10,371,138.25 |
| City Note No. B-98-MC-26-0006-B | Vernor Lawndale Project Note* | $1,923,209.50 |
| City Note No. B-02-MC-26-0006 | Mexicantown Welcome Center Project Note* | $4,255,498.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 1* | $8,935,901.00 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 2* | $3,071,773.50 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 3° | $7,262,461.03 |
| City Note No. B-03-MC-26-0006 | Garfield II Note 4° | $1,554,180.43 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 1 Note* | $8,532,290.00 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 2 Note* | $9,324,475.35 |
| City Note No. B-05-MC-26-0006 | Woodward Garden Project 3 Note° | $6,177,291.95 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note* | $10,457,437.75 |
| City Note No. B-05-MC-26-0006-A | Book Cadillac Project Note II* | $13,547,692.80 |
| City Note No. B-05-MC-26-0006-B | Fort Shelby Project Note* | $24,447,587.50 |

---

* HUD Installment Note has a fixed interest rate. Estimated allowed amount represents the aggregate of outstanding principal and fixed interest payments set forth in the amortization schedule for the HUD Installment Note.

° HUD Installment Note has a variable interest rate. Estimated allowed amount represents the aggregate of outstanding principal and an estimate of the variable interest payments at the rate set forth in the HUD Installment Note.

2

13-53846-swr   Doc 8029-1   Filed 10/21/14   Entered 10/21/14 20:47:46   Page 43 of
13-53846-swr   Doc 8024-1   Filed 10/21/14   Entered 10/21/14 23:03:46   Page 232 of
159
550

**EXHIBIT I.A.230**

SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND DOCUMENTS
& RELATED LIMITED TAX GENERAL OBLIGATION BONDS

## SCHEDULE OF LIMITED TAX GENERAL OBLIGATION BOND
## DOCUMENTS & RELATED LIMITED TAX GENERAL OBLIGATION BONDS

| Limited Tax General Obligation Bond Documents | Series of Limited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Bond Authorizing Resolution adopted May 26, 2004<br><br>Finance Director's Order approving sale of General Obligation Self-Insurance Bonds (Limited Tax) Series 2004, dated August 27, 2004 | Self Insurance - Series 2004 | $13,186,559 |
| Bond Authorizing Resolution adopted May 6, 2005 ("2005 LTGO Resolution")<br><br>Finance Director's Order dated June 24, 2005 ("2005 Sale Order") | Series 2005-A(1) | $60,776,168 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-A(2) | $11,080,060 |
| 2005 LTGO Resolution<br><br>2005 Sale Order | Series 2005-B | $9,003,535 |
| Resolution of the City Council adopted November 17, 2006 ("2006 LTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 LTGO Sale Order") | Series 2008-A(1) | $43,905,085 |
| 2006 LTGO Resolution<br><br>2008 LTGO Sale Order | Series 2008-A(2) | $25,591,781 |

## EXHIBIT I.A.237

FORM OF LTGO SETTLEMENT AGREEMENT

13-53846-swr    Doc 8029-1    Filed 10/27/14    Entered 10/27/14 23:47:47    Page 46 of
110
13-53846-swr    Doc 8024-1    Filed 10/27/14    Entered 10/21/14 03:08:17    Page 235 of
559

# SETTLEMENT AGREEMENT
## (LTGO)

This Settlement Agreement ("**Agreement**") is entered into as of July 24, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), and BlackRock Financial Management, on behalf of certain managed funds and accounts listed on Exhibit B ("**Uninsured Bondholder**," and together with Ambac, the "**LTGO Parties**"). In this Agreement, the City and the LTGO Parties are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $160,970,000 in outstanding principal amount of limited tax general obligation bonds, excluding any limited tax general obligation bonds secured by distributable state aid and sold to the Michigan Finance Authority (the "**Prior LTGO Bonds**");

**WHEREAS**, more than two thirds in amount of the Prior LTGO Bonds are either insured by Ambac under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with certain Prior LTGO Bonds (the "**Insured Prior LTGO Bonds**") or held by the Uninsured Bondholder;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770;

**WHEREAS**, on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211 and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

**WHEREAS**, on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents

contemplate the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim;

WHEREAS, on November 8, 2013, Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior LTGO Bonds that is pending before the Bankruptcy Court (Adv. Proc. No. 13-05310) (the "**Ambac Action**");

WHEREAS, on or before February 21, 2014, each of the LTGO Parties and other owners of Prior LTGO Bonds filed proofs of claim in the Bankruptcy Case (the "**LTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior LTGO Bonds were issued (including post-petition interest), and Ambac filed a proof of claim for amounts due Ambac for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by Ambac in connection with the Bond Insurance Policies; and

WHEREAS, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action as it pertains to the Prior LTGO Bonds, and the LTGO Claims.

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2    Definitions.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in

2

this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Beneficiaries**" has the meaning ascribed to it in Section 2.2.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**City Representative**" shall mean a representative chosen by the City to be on the fee committee described in Section 2.2(b).

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**COP Claims**" shall have the meaning ascribed to it in the Plan.

"**COP Litigation**" shall have the meaning ascribed to it in the Plan.

"**Disputed COP Claims Reserve**" shall have the meaning ascribed to it in the Plan.

"**Distribution Agent**" shall mean U.S. Bank National Association, Detroit, Michigan.

"**Distribution Agreement**" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

"**DTC**" shall mean the Depository Trust Company or any successor provider of a book entry and securities depository system for the Prior LTGO Bonds.

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

3

CLI-2233676v8

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit A.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Final Order**" shall mean an order or judgment (including any associated findings of fact and conclusions of law) of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Holder**" shall mean the holder of a Claim.

"**Independent Party**" shall mean a party agreed to by the Retiree Committee, LTGO Representative and the City.

"**Insured Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Exculpated Parties**" means Ambac solely in its capacity as insurer of the Insured Prior LTGO Bonds, and the Uninsured Bondholder, solely in its capacity as an owner of a portion of the Prior LTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

"**LTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Claim Holders**" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owner of any Prior LTGO Bonds that are not Insured Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"**LTGO Parties**" has the meaning ascribed to it in the recitals hereof.

"**LTGO Representative**" shall mean Ambac.

4

"**New B Notes**" shall have the meaning ascribed to it in the Plan.

"**New LTGO Bonds**" has the meaning ascribed to it in Section 2.2.

"**OPEB Claim**" has the meaning ascribed to it in the Plan.

"**Petition Date**" has the meaning ascribed to it in the recitals hereof.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, solely as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the LTGO Parties.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.3 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan-related documents effectuating this Agreement.

"**Prior LTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"**Reserve B Notes**" shall have the meaning ascribed to it in Section 2.2.

"**Resolved COP Claims**" has the meaning ascribed to it in Section 2.2.

"**Retiree Committee**" shall have the meaning ascribed to it in the Plan.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the New LTGO Bonds, and all documents related to the New LTGO Bonds.

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**VEBA Trust Representatives**" shall mean the chair of the Board as defined by and created by the City of Detroit Retiree Health Care Trust and the chair of the Board as defined by and created by the City of Detroit Police and Fire Retiree Health Care Trust.

Section 1.3    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties

hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4    <u>General Rules of Construction</u>.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)    All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles.  All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application.

(c)    All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)    The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)    All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)    The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

**ARTICLE II**
**SETTLEMENT TERMS**

Section 2.1    (a)    <u>Claim Allowance and Treatment; Other Plan Terms</u>. The City hereby agrees that the total Allowed Claim relating to the Prior LTGO Bonds will be $163,544,770.

(b)    Holders of Allowed Claims for Prior LTGO Bonds will be treated in the Plan as follows:

(i)    all uninsured Prior LTGO Bonds will be cancelled and discharged, and LTGO Claim Holders will receive their Pro Rata share of New LTGO Bonds and Reserve B Notes in accordance with Section 2.2(e) of this Agreement;

6

(ii)     all Insured Prior LTGO Bonds will be cancelled and discharged as to the City but deemed outstanding solely for recourse to the Bond Insurance Policies, i.e., the City will have no liability relating to the Prior LTGO Bonds, and any liability of the City in respect of Prior LTGO Bonds and Class 7 Claims in the Plan shall be cancelled and discharged; and

(iii)     a Pro Rata share of New LTGO Bonds and Reserve B Notes attributable to the Insured Prior LTGO Bonds will be delivered to a Distribution Agent in accordance with Section 2.1(d) and, for the Reserve B Notes, Section 2.2(e) of this Agreement.

(c)     The Distribution Agent shall be the beneficial owner of the Pro Rata share of the New LTGO Bonds and the Reserve B Notes attributable to the Insured Prior LTGO Bonds pursuant to the Distribution Agreement.  The Distribution Agreement shall  provide that, unless the Distribution Agent receives, no later than noon on  a principal or interest payment date for the Prior LTGO Bonds, written notice from Cede & Co., as the registered owner of the outstanding Insured Prior LTGO Bonds, or any subsequent registered owner (the "Registered Owner") that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on the Insured Prior LTGO Bonds on that date, the Distribution Agent shall remit each payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to Ambac.  In the event that the Distribution Agent receives, no later than noon on a principal or interest payment date for the Prior LTGO Bonds, written notice from the Registered Owner that Ambac has failed to timely pay a properly submitted claim for principal and/or interest which was due and payable on that date, the Distribution Agent shall remit the  payment of principal and/or interest received by it from the paying agent for the New LTGO Bonds or the paying agent for the New B Notes to the paying agent for the Insured Prior LTGO Bonds for payment to the Holders of the Insured Prior LTGO Bonds, and shall provide notice thereof to Ambac, the paying agent for the Insured Prior LTGO Bonds and the Holders of the Insured Prior LTGO Bonds.  The Distribution Agreement will provide that, once Ambac has paid the Holders of Insured Prior LTGO Bonds in full,  the Distribution Agent will assign its beneficial ownership interest in the New LTGO Bonds and Reserve B Bonds to Ambac.

Section 2.2     Issuance of New LTGO Bonds, Delivery of New LTGO Bonds, and Delivery of Reserve B Notes.

(a)     (i) On or before the Effective Date, by execution of the Emergency Manager Order the City will authorize the issuance and delivery of its Financial Recovery Bonds (Limited Tax General Obligation) under Section 36a of the Home Rule Act ("**New LTGO Bonds**") in accordance with applicable law, which New LTGO Bonds shall be distributed Pro Rata to the LTGO Claim Holders pursuant to the Plan. The New LTGO Bonds will have the principal amount, interest rate, amortization schedule and other financial terms as set forth in Schedule 1 (the "**Financial Terms**") and the Emergency Manager Order.  The New LTGO Bonds will be limited tax general obligations of the City issued in accordance with applicable law.  The New LTGO Bonds

7

CLI-2233676v8

shall be taxable.  The New LTGO Bonds will be callable prior to maturity at the option of the City on any date at a price of par plus accrued interest to the date of redemption and without premium or penalty.  If the City intends to redeem the New LTGO Bonds during any time that the Insured Prior LTGO Bonds are outstanding as set forth in Section 2.1(b)(ii) then:

       (v)     at least 35 days prior to such intended redemption, the City will direct the paying agent for the New LTGO Bonds to send a redemption notice to the New LTGO Bondholders;

       (w)    at least 34 days prior to the redemption date the Distribution Agent will direct the paying agent for the Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in  an aggregate  principal amount equal to the proportion that the principal amount of the New LTGO Bonds then outstanding of which the Distribution Agent is the beneficial owner bears to the total principal amount of New LTGO Bonds then outstanding, in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

       (x)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption  price of the New LTGO Bonds to the paying agent for the New LTGO Bonds, and upon receipt of the redemption price of the portion of the New LTGO Bonds of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date, the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds  on the same day;

       (y)     if Ambac issues endorsements to its Bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such Bond Insurance Policies will be so reduced; and

       (z)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above and such reduction in principal shall be deemed a redemption, in part, of such the Insured Prior LTGO Bonds.

       (ii)    Any redemption of the New LTGO Bonds will be in whole and not in part.

       (iii)   In the event the City decides not to issue the New LTGO Bonds by the Effective Date but instead to pay cash to the LTGO Claim Holders, the Holders of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) above will receive pro rata, cash equal to the Insured Prior LTGO Bonds' Pro Rata shares of such cash.  The City understands that the paying agent for the Insured Prior LTGO

Bonds will apply such cash, pro rata, to reduce the principal of Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption, in part, of such Insured Prior LTGO Bonds.

(iv)     All Settlement-Related Documents will be in form and substance reasonably satisfactory to the LTGO Parties (and in the case of the Plan Documents, solely as they relate to this Agreement).

(v)     Each of the New LTGO Bonds will be freely transferable through the DTC System under a unique CUSIP identification number or, if the DTC System is discontinued with respect to the New LTGO Bonds, in such other manner as is permitted in accordance with their terms.

(vi)     The City will not optionally redeem Insured Prior LTGO Bonds except as set forth in this Agreement.

(b)     In addition to issuing and delivering the New LTGO Notes to the LTGO Claims Holders, the City shall also deliver and distribute to the LTGO Claim Holders the Pro Rata share of the Reserve B Notes in accordance with Section 2.2(e) of this Agreement.  The Plan will provide in the event the City intends to redeem all or a portion of principal amount of New B Notes during any time that the Insured Prior LTGO Bonds are outstanding pursuant to Section 2.1(b)(ii) then:

(i)     at least 35 days prior to the redemption date, the Distribution Agent will direct the paying agent for the Reserve B Notes to send a redemption notice to the New B Note Holders

(ii)     at least 34 days prior to the redemption date, the Distribution Agent will direct the paying agent for the  Insured Prior LTGO Bonds to send a redemption notice to Insured Prior LTGO Bondholders providing for a pro rata redemption of Insured Prior LTGO Bonds in an aggregate  principal amount equal to the proportion that the principal  amount of the New B Notes held by the Distribution Agent which are to be redeemed bears to the total principal amount of Insured Prior LTGO Bonds then outstanding pursuant to Section 2.1(b)(ii), in accordance with the procedures for redemption in the Prior LTGO Bonds documents;

(iii)     no later than noon, Eastern Time, on the business day prior to the redemption date the City will pay the redemption price of the New B Notes to the paying agent for the New B Notes, and upon receipt of the redemption price of the portion of the New B Notes of which it is the beneficial owner, but no later than 10:00 a.m. Eastern Time, on the redemption date the Distribution Agent shall promptly transfer the redemption price for the portion of the Insured Prior LTGO Bonds to be redeemed to the paying agent for the Insured Prior LTGO Bonds to effectuate the redemption of the Insured Prior LTGO Bonds on the same day;

(iv)     if Ambac issues endorsements to its bond Insurance Policies decreasing such Policies by the redemption principal amount, the holders of Insured Prior LTGO Bonds will be deemed to consent to such endorsements and such

9

Bond Insurance Policies will re so reduced; and

(v)     the City understands that the paying agent for the Insured Prior LTGO Bonds will apply the amount received to reduce the principal amount, pro rata, of the Insured Prior LTGO Bonds which then remain outstanding as provided in Section 2.1(b) and such reduction in principal shall be deemed a redemption in part, of such Insured Prior LTGO Bonds.

(c)     The Plan will provide that, from and after the Effective Date:

(i)     The City will remain a named plaintiff and defendant in the COP Litigation but will transfer all of its rights and interests in the COP Litigation to a Litigation Trust whose beneficiaries, for the purpose of the COP Litigation, shall be the Litigation Parties and the Holders of Allowed Class 14 Claims.  The Litigation Trustee will be selected by the LTGO Representative and the Retiree Committee and must be acceptable to the City.  The document creating the Litigation Trust shall include indemnification of the Litigation Trustee by the City and will contain such other terms satisfactory to the Retiree Committee, the LTGO Representative and the City.

(ii)     The Litigation Trustee will follow the day to day direction of the VEBA Trust Representatives in prosecuting and defending the COP Litigation, including defending any counterclaims and third-party claims therein.  The Litigation Trustee and VEBA Trust Representatives will meet, in person or by phone at reasonable times and with reasonable advance notice, with all or any of the LTGO Representative, the VEBA Trust Representatives and the City (the "**Litigation Parties**") as requested to discuss the status, progress and prosecution of the COP Litigation.  The Litigation Trustee will provide copies of all court filings by any party in the COP Litigation and such other documents relating to the COP Litigation as may be reasonably requested by the Litigation Parties.  Upon request from a Litigation Party, the Litigation Trustee will provide to such Litigation Party drafts of court papers that will be filed by the Litigation Trustee as early as practicable under the circumstances to allow for comments, which may be accepted or rejected.

(iii)     The cost of all fees and expenses incurred in connection with the COP Litigation will be borne by the Disputed COP Claims Reserve, subject to the funding of the Disputed COP Claims Reserve pursuant to Section II.B.3.p.iii of the Plan.  The City will advance payment of all such fees and expenses within 30 days of receipt of the statements for the same pending reimbursement from the Disputed COP Claims Reserve.  Reimbursement of the City will be effected by an offset in the amount of fees and expenses paid to the date of such reimbursement against the amount to be paid by the City to the Disputed COP Claims Reserve on that date.  In the event that the COP Litigation is unsuccessful and a final, nonappealable judgment is entered against the City or the Litigation Trust as successor in interest to the City, such that the notes in the Disputed COP Claims Reserve are subject to release and distribution in full to the holders of Allowed Class 9 Claims in accordance with the Plan, the City will reimburse the

10

Disputed COP Claims Reserve for any amounts withdrawn prior to the date of such adverse judgment.

(iv)   The Litigation Trustee will submit invoices for the fees and expenses incurred in connection with the COP Litigation, including for the Litigation Trustee's professional fees to the City on a monthly basis, and the City will pay such invoice within 30 days after receipt, subject to reimbursement as provided in paragraph (c)(iii) above.  The Litigation Trustee fees will be fixed and consented to by the LTGO Representative and the VEBA Trustee Representatives.

(v)   The Litigation Trustee will consult with the Litigation Parties in connection with any potential settlement of the COP Litigation. The Litigation Trustee will provide the Litigation Parties advance notice as early as practicable under the circumstances of any settlement negotiations, and the Litigation Parties and their counsel will have the right to participate in such negotiations.  Any potential settlement must resolve the settled claims in their entirety, including the release by the settling party of all counterclaims and third party claims relating to the settled claims that it made or could have made against anyone.  The Litigation Trustee will not take action on the matters set forth below unless all of the Litigation Parties agree with the decision relating to (B), (C) and (D) below, and the LTGO Representative agrees with the settlement described in (A) below:

(A)      Any settlement that releases from the Disputed COP Claims Reserve to any of the COP Holders a pro rata share of the B Notes (or equivalent currency) based on 40% or more of the face amount of their claim.

(B)      Any change of COP Litigation counsel.

(C)      Any decision not to appeal an adverse decision on any claim or defense related to the COP Litigation.

(D)      Any decision to voluntarily dismiss a substantive claim or counterclaim or to end the COP Litigation

To the extent the Litigation Parties are unable to reach agreement on the above matters, the Litigation Trustee or any Litigation Party may refer the matter to the Independent Party for mediation.  Subject to such mediation, the Litigation Trustee shall have the authority to take whatever action may be required to avoid potentially adverse or prejudicial consequences of inaction.  If a consensual resolution cannot be reached, the Independent Party will decide a substantive resolution of the issue or issues based upon the Independent Party's assessment of the merits of the legal claims, counterclaims and legal liabilities in the COP Litigation, which decision will be binding on the Litigation Parties and Litigation Trustee.

11

The City, the COP Litigation counsel, the VEBA Trust Representatives and the LTGO Representative will take any steps that may be required to preserve applicable privileges of the City and the COP Litigation counsel.

(d)     In the event any Holder of a Disputed COP Claim enters into a settlement of such claim with the City prior to the Effective Date, including pursuant to the Plan, the portion of the New B Notes allocable to such Disputed COP Claim if such Disputed COP Claim had been allowed in full that is not used to satisfy the Disputed COP Claim pursuant to the terms of such settlement shall be deposited into the Disputed COP Claims Reserve and then distributed from the Disputed COP Claims Reserve pursuant to Section 2.2(e).

(e)     Following the occurrence of the Effective Date, upon a settlement, or the entry of an order by the trial court having jurisdiction over the objections to the Disputed COP Claims, resolving any objection to any disputed COP Claim ("**Resolved COP Claims**") and after all distributions on account of Allowed Claims respecting such Resolved COP Claim have been made or provided for, any and all New B Notes and distributions thereon remaining in the Disputed COP Claims Reserve with respect to such Resolved COP Claim shall be distributed as follows, and valued at face value for the purposes of the distribution: (I) an amount of New B Notes and/or distributions thereon in an amount equal to the costs, fees and expenses related to the COP Litigation incurred from and after the Effective Date shall be distributed to the City to reimburse it for attorneys' fees relating to the COP Litigation, subject to and in accordance with the provisions of Section 2.2(c)(iii) above; (II) following such distribution, the balance of the New B Notes and any distributions thereon remaining in the Disputed COP Claims Reserve allocated to or with respect to such Resolved COP Claim shall be distributed as follows: (i) 65% to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B of the Plan; and (ii) 20% to the LTGO Claim Holders (the "**Reserve B Notes**") to be allocated Pro Rata; and (iii) 15% is to be allocated as determined by the City.

Section 2.3    Confirmation Order and Findings.  The Plan Confirmation Order shall (i) approve the terms and conditions of this Agreement, (ii) direct that each month monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds must be segregated and deposited into a debt service fund and not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding, (iii) provide that Plan treatment of the Prior LTGO Bonds is part of a settlement of the Ambac Action as it relates to the Prior LTGO Bonds, (iv) provide that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and (v) be in form and substance reasonably satisfactory to the LTGO Parties.

Section 2.4    Conditions to Plan Effectiveness.  The Plan shall provide that the effectiveness of the Plan is subject to the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

CLI-2233676v8

Section 2.5     Stay of Litigation, Proofs of Claim.

(a)     The Ambac Action, as it pertains to the Prior LTGO Bonds, shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon Ambac and the City shall ask the Bankruptcy Court to dismiss the Ambac Action as it pertains to the Prior LTGO Bonds without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.  If the Ambac Action is dismissed without prejudice and subsequently refiled pursuant to this Agreement, then the statute of limitations for the causes of action asserted in the Ambac Action, and all other defenses based on the passage of time, shall be tolled for 60 days after the date of the event that would permit a refiling.

(b)     As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, Ambac and the City shall take any and all action as is appropriate to (i) stay the Ambac Action as provided in subsection (a) above, (ii) maintain the status quo in the Ambac Action as it pertains to the Prior LTGO Bonds as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the LTGO Parties relating to the Prior LTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the Ambac Action as it pertains to the Prior LTGO Bonds; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)     In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then Ambac may resume the Ambac Action and terminate this Agreement by written notice to the other Parties.

(d)     The LTGO Parties agree that all proofs of claims filed by any of them with respect to Prior LTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Confirmation Order or an Approval Order, as applicable, which is a Final Order.

Section 2.6     Additional Covenants

(a)     Paying Agent and Distribution Agent.  The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior LTGO Bonds, (ii) the paying agent in respect of all transactions contemplated by this Agreement, and (iii) the Distribution Agent pursuant to the Distribution Agreement.

13

(b)    Further Action. To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.

## ARTICLE III
## PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1    Plan Commitment Regarding Voting and Abstention From Objection. From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, each LTGO Party shall withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds no later than August 1, 2014. The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all LTGO Claim Holders. The Uninsured Bondholder will vote its Prior LTGO Bonds and Ambac will vote its Prior LTGO Bonds and reimbursement claims in support of such Plan treatment promptly following the execution of this Agreement or as otherwise agreed by the City. Upon the finalization of the terms of this Agreement, the Parties will file a stipulation and proposed order with the Bankruptcy Court that will permit each LTGO Party to modify its previous vote(s) and submit a vote in support of the Plan, pursuant to Federal Rule of Bankruptcy Procedure 3018. For the absence of doubt, nothing contained in this Agreement shall require any LTGO Party to vote for the treatment of any class of claims under the Plan other than the LTGO Bonds, or refrain from objecting to the Plan with respect to issues other than the treatment of the LTGO Bonds.

Section 3.2    Solicitation Required in Connection with Plan. Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan.

Section 3.3    Plan Document Provisions. All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the LTGO Parties and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior LTGO Bonds is part of a settlement of the pending Ambac Action as it pertains to the Prior LTGO Bonds.

## ARTICLE IV
## DEFAULTS AND REMEDIES

Section 4.1    Events of Default. The breach by any Party of any material agreement or covenant set forth in this Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2    Remedies. The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Agreement shall be enforceable by an order compelling specific performance issued by the

Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith. Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise. Any LTGO Party may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

Section 4.3 <u>Termination</u>.

(a) This Agreement may be terminated by the mutual agreement of all of the LTGO Parties upon an Event of Default caused by the City. This Agreement may be terminated by less than all of the LTGO Parties as to such LTGO Party or LTGO Parties upon an Event of Default caused by the City if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more LTGO Parties before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred <u>and</u> (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b) This Agreement may be terminated by the City if (i) any of the LTGO Parties fails to withdraw its objections to the Plan regarding the treatment of the Prior LTGO Bonds on or before August 1, 2014, or (ii) any of the LTGO Parties fails to submit a ballot to vote its Class 7 Claims to accept the Plan promptly following the execution of this Agreement or as otherwise agreed by the City. This Agreement may be terminated by the City upon an Event of Default caused by the LTGO Parties, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after notice and a hearing, that an Event of Default caused by the applicable LTGO Party has occurred <u>and</u> (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable LTGO Party of this Agreement or the applicable covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable LTGO Party fails to comply with the order.

(c) Upon any such termination, Ambac may resume the Ambac Action unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1 <u>Representations and Warranties of the City</u>. The City represents and warrants to the LTGO Parties that:

(a) It is a municipal corporation of the State of Michigan.

15

CLI-2233676v8

13-53846-swr   Doc 8034-1   Filed 10/27/14   Entered 10/27/14 23:47:46   Page 25 of
13-53846-swr   Doc 8029-1   Filed 10/27/14   Entered 10/27/14 23:08:17   Page 61 of
159
110

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i)  approvals of the State Treasurer, the Emergency Loan Board and the City Council to be obtained prior to delivery of the New LTGO Bonds, which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2     <u>Representations and Warranties of the LTGO Parties</u>.  Each of the LTGO Parties represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)     All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.3     <u>Representations and Warranties of Ambac</u>.  Ambac had and has standing to bring and resolve the Ambac Action as it pertains to the Prior LTGO Bonds that it insures.

Section 5.4     <u>Mutual Representations and Warranties</u>.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

16

13-53846-swr    Doc 8034    Filed 10/31/14    Entered 10/31/14 20:03:47    Page 23 of
159

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1     <u>Exculpation</u>.  The Plan will include the LTGO Exculpated Parties as exculpated parties for acts and omissions (other than those constituting gross negligence or willful misconduct) in connection with the Plan as it relates to this Agreement and this Agreement.

Section 6.2     <u>Releases</u>.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the Ambac Action as it pertains to the Prior LTGO Bonds, Ambac and the City shall be deemed to have released each other, and each of their respective officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the Prior LTGO Bonds and the Ambac Action.

## ARTICLE VII
## DISMISSAL OF CASE AND TERMINATION

Section 7.1     <u>Effect of Dismissal of the Bankruptcy Case</u>.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2     <u>Effect of Termination</u>.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing

17

contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties. If the Ambac Action is reinstated, and this Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the Ambac Action; (ii) seek discovery with respect to any of the matters described in subsection (i) in the Ambac Action; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the Ambac Action.

### ARTICLE VIII
### MISCELLANEOUS

Section 8.1    <u>Amendments</u>.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2    <u>No Admission of Liability</u>.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3    <u>Good Faith Negotiations</u>.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts

18

and his or its rights in connection therewith, and that it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

Section 8.4    Rights and Remedies.  Nothing in this Agreement is intended to augment, impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior LTGO Bonds.

Section 8.5    Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all New LTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding.  Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement.

CLI-2233676v8

13-53846-swr    Doc 8034-1    Filed 10/27/14    Entered 10/27/14 20:47:46    Page 25 of
13-53846-swr    Doc 8029-1    Filed 10/27/14    Entered 10/27/14 23:08:47    Page 65 of
110

Section 8.7  Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8  Binding Agreement Successors and Assigns; Joint and Several Obligations.  This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9  Entire Agreement.  This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject matter hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11  Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) business days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

Chief Financial Officer
City of Detroit
1126 Coleman A. Young Municipal Center
Two Woodward Avenue
Detroit MI 48226

CLI-2233676v8

13-53846-tjt    Doc 8829-1    Filed 12/27/14    Entered 12/27/14 23:47:46    Page 66 of
13-53846-swr    Doc 8024    Filed 10/17/14    Entered 10/17/14 23:03:47    Page 265 of
559

Phone: (313) 224-3382
Fax: (313) 224-2827

with a copy given in like manner to:

Corporation Counsel
City of Detroit Law Department
Coleman A. Young Municipal Center
2 Woodward Avenue
Detroit MI 48226
Phone: (313) 237-3018
Fax: (313) 224-5505

Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
Attention: Jonathan Green
Email: green@millercanfield.com
Attention: Amanda Van Dusen
Email: vandusen@millercanfield.com

If to the LTGO Parties, to:

Ambac Assurance Corporation
One State Street Plaza
New York, New York 10004
Attention: Surveillance Department and General Counsel's Office
Fax: (212) 208-3384

with a copy given in like manner to:

Arent Fox LLP
1675 Broadway
New York, New York 10019
Attention: David L. Dubrow, Esq.
Telecopy: (212) 484-3990
Email: david.dubrow@arentfox.com

-and

BlackRock Financial Management
1 University Square Drive
Princeton, New Jersey 08540
Attn: Jim Schwartz
Phone: (609) 282-1784
Email: jim.schwartz@blackrock.com

with a copy given in like manner to:

21

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:  Amy Caton
Phone:  (212) 713-7772
Email:  acaton@kramerlevin.com

Section 8.12   <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13   <u>Non-Severability of Agreement.</u>   This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together.  Notwithstanding anything in this Agreement, the Approval Order (if applicable)  or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement,  are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

CLI-2233676v8
13-53846-swr   Doc 8029-1   Filed 12/27/14   Entered 12/27/14 23:47:46   Page 68 of 110

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
Name:
Title:

AMBAC ASSURANCE CORPORATION

By: _____
Name:
Title:

BLACKROCK FINANCIAL MANAGEMENT, on behalf of its managed funds and accounts as reflected in Exhibit B

By: _____
Name:
Title:

_____

## Schedule 1

## Financial Terms of New LTGO Bonds

| | |
|---|---|
| Principal: | $55 million |
| Interest Rate: | 5.65% per annum (first 10 years, 5.00% payable in cash and 0.65% capital appreciation added to principal) |
| Final Maturity: | 23 years |
| Amortization: | Interest payable semi-annually |

On each anniversary from the sixth through tenth anniversary—$2 million principal due per year

On each anniversary from the eleventh through twenty-third anniversary—principal payment equal to one-thirteenth (1/13) of the principal outstanding immediately prior to the eleventh anniversary (approximately $3,735,115 per year)

# Debt Service on Notes for LTGOs

| $ in MMs | 2015 Yr 1 | 2016 Yr 2 | 2017 Yr 3 | 2018 Yr 4 | 2019 Yr 5 | 2020 Yr 6 | 2021 Yr 7 | 2022 Yr 8 | 2023 Yr 9 | 2024 Yr 10 | 2025 Yr 11 | 2026 Yr 12 | 2027 Yr 13 | 2028 Yr 14 | 2029 Yr 15 | 2030 Yr 16 | 2031 Yr 17 | 2032 Yr 18 | 2033 Yr 19 | 2034 Yr 20 | 2035 Yr 21 | 2036 Yr 22 | 2037 Yr 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Debt Service and Amortization** | | | | | | | | | | | | | | | | | | | | | | | |
| Opening Balance | 55.0 | 55.4 | 55.7 | 56.1 | 56.4 | 56.8 | 55.2 | 53.5 | 51.9 | 50.2 | 48.6 | 44.8 | 41.1 | 37.3 | 33.6 | 29.9 | 26.1 | 22.4 | 18.7 | 14.9 | 11.2 | 7.5 | 3.7 |
| Principal | - | - | - | - | - | - | 2.0 | 2.0 | 2.0 | 2.0 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 | 3.7 |
| Cash Interest | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.7 | 2.6 | 2.5 | 2.7 | 2.5 | 2.3 | 2.1 | 1.9 | 1.7 | 1.5 | 1.3 | 1.1 | 0.8 | 0.6 | 0.4 | 0.2 |
| Total Cash DS | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 2.8 | 4.8 | 4.7 | 4.6 | 4.5 | 6.5 | 6.3 | 6.1 | 5.8 | 5.6 | 5.4 | 5.2 | 5.0 | 4.8 | 4.6 | 4.4 | 4.2 | 3.9 |
| PIK Interest | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Interest Rate** | | | | | | | | | | | | | | | | | | | | | | | |
| Cash | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% | 5.65% |
| PIK | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.65% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

**Exhibit A**

**EMERGENCY MANAGER ORDER**

AFDOCS/11065646.6
CLI-2233676v8

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000 FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.

13-53846-swr    Doc 8034-1    Filed 10/27/14    Entered 10/27/14 20:07:47    Page 73 of
13-53846-swr    Doc 8029-1    Filed 10/24/14    Entered 10/24/14 23:03:16    Page 232 of
550
110

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND INTERPRETATION ............................................ 3
    Section 101. Definitions.................................................................................. 3
    Section 102. Interpretation ............................................................................ 8

ARTICLE II DETERMINATIONS............................................................................ 8
    Section 201. Finding, and Declaration of Need to Issue Bonds ...................... 8

ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
           BONDS ................................................................................ 9
    Section 301. Authorization of Bonds to Satisfy the Claims and Pledge........................ 9
    Section 302. Designations, Date, Interest, Maturity and Other Terms of the Bonds
           to Satisfy the Claims .................................................................. 9
    Section 303. Execution, Authentication and Delivery of Bonds ................................... 10
    Section 304. Authentication of the Bonds ................................................................. 10
    Section 305. Transfer of Registration and Exchanges on the Bonds............................ 11
    Section 306. Regulations with Respect to Exchanges and Transfers ........................... 11
    Section 307. Form of the Bonds ............................................................................... 12
    Section 308. Registration ......................................................................................... 19
    Section 309. Mutilated, Destroyed, Stolen or Lost Bonds.......................................... 19
    Section 310. Book-Entry-Only System Permitted ...................................................... 19

ARTICLE IV FUNDS AND ACCOUNTS .................................................................... 20
    Section 401. Establishment of Accounts and Funds ................................................... 20
    Section 402. Debt Retirement Fund.......................................................................... 20
    Section 403. Investment of Monies in the Funds and Accounts................................... 20

ARTICLE V THE PAYING AGENT .......................................................................... 21
    Section 501. Paying Agent ....................................................................................... 21

ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS....................................... 22
    Section 601. Supplemental Orders and Resolutions Not Requiring Consent of
           Holders of the Bonds ................................................................. 22
    Section 602. Bond Counsel Opinion.......................................................................... 22

ARTICLE VII DEFEASANCE .................................................................................. 22
    Section 701. Defeasance .......................................................................................... 22

ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 23
    [Section 801. RESERVED] ....................................................................................... 23
    Section 802. Approval of Other Documents and Actions........................................... 23
    Section 803. Delegation of City to, and Authorization of Actions of Authorized
           Officers ..................................................................................... 23
    Section 804. Approving Legal Opinions with Respect to the Bonds ............................ 24
    Section 805. Appointment of Bond Counsel; Engagement of Other Parties.................. 24
    Section 806. Preservation of Records ....................................................................... 24
    Section 807. Parties in Interest................................................................................. 24
    Section 808. No Recourse Under Order .................................................................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

Section 809. Severability ................................................................................................ 24
Section 810. Cover Page, Table of Contents and Article and Section Headings............ 24
Section 811. Conflict ..................................................................................................... 25
Section 812. Governing Law and Jurisdiction............................................................... 25
Section 813. Order and Supplemental Order are a Contract.......................................... 25
Section 814. Effective Date ........................................................................................... 25
Section 815. Notices ...................................................................................................... 25

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $55,000,000 FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION) IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN CLAIMS OF THE HOLDERS AND INSURER OF CERTAIN LIMITED TAX GENERAL OBLIGATION BONDS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS IN FULL SATISFACTION OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; and

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $160.97 million in outstanding principal amount of limited tax general obligation bonds, excluding any limited general obligation bonds secured by distributable state aid and sold to the Michigan Finance Authority (the "Prior LTGO Bonds"); and

**WHEREAS,** more than two thirds in amount of the Prior LTGO Bonds are either held by BlackRock Financial Management (the "Uninsured Bondholder") or insured by Ambac Assurance Corporation ("Ambac") under financial guaranty insurance policies (the "Bond Insurance Policies") that were issued contemporaneously with certain Prior LTGO Bonds (the "Insured Prior LTGO Bonds"); and

1

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, as of the Petition Date, the balance due on the Prior LTGO Bonds, including prepetition interest accrued as of that date, was $163,554,770; and

WHEREAS, on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211, and Ambac paid claims in the amount of $2,266,586 on account of the Insured Prior LTGO Bonds and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on April 1, 2014, the City defaulted on its obligation to make interest payments in the amount of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Insured Prior LTGO Bonds insured by it and was subrogated to the rights of the owners for such payments, and the insurance documents contemplate for the assignment of the Insured Prior LTGO Bonds to Ambac upon payment of a claim; and

WHEREAS, on May 5, 2014, the Emergency Manager filed on behalf of the City a Fourth Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, on _____, 2014, the City, Ambac and the Uninsured Bondholder (together the "LTGO Parties") entered into a Settlement Agreement (LTGO) (the "Settlement Agreement") regarding a consensual resolution of their disputes under or in respect of the Prior LTGO Bonds, the Ambac Action (as defined in the Settlement Agreement) and the claims of the LTGO Parties (the "LTGO Claims"); and

WHEREAS, the Plan of Adjustment and the Settlement Agreement provide, among other things, for the satisfaction of the claims of the holders of Allowed Claims on account of Prior LTGO Bonds who are (i) record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond (each, a "LTGO Claims Holder") in exchange for the receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New LTGO Notes, in the form of the Bonds authorized herein, in the form of Financial Recovery Bonds authorized for settlement of unsecured claims under the Plan of Adjustment and a portion of the New B Notes, referred to as "Reserve B Notes" in the Settlement Agreement, to be authorized by separate order of the Emergency Manager; and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

2

13-53846-swr   Doc 8029-1   Filed 10/27/14   Entered 10/27/14 23:08:46   Page 77 of 110
13-53846-swr   Doc 8024-1   Filed 10/22/14   Entered 10/22/14 20:47:47   Page 260 of 550

WHEREAS, on or before the Effective Date, the City shall issue Financial Recovery Bonds (Limited Tax General Obligation) (the "Bonds") under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute Pro Rata Shares of the Bonds, to the LTGO Claim Holders as provided in the Plan of Adjustment; and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of the Bonds in one or more series, in the aggregate principal amount of not to exceed Fifty Five Million Dollars ($55,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of the Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the claims of the LTGO Claim Holders; and

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:


# ARTICLE I

## DEFINITIONS AND INTERPRETATION


Section 101. <u>Definitions</u>.    The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Accretion Date" means April 1 and October 1 of each year after the Date of Original Issue and the Conversion Date.

"Accretion Rate" means a rate of accretion in principal borne by the Bonds of 0.65% per annum compounded semiannually on each Accretion Date from the Date of Original Issue until the Conversion Date.

"Accretion Value" means as of any particular date of calculation, the original principal amount of the Bond, plus all accretion in principal accrued and compounded to the particular date of calculation. A table setting forth the Accreted Values per $5,000 original principal amount of the Bonds at each Accretion Date shall be set forth in the Bonds and as an exhibit to the Supplemental Order.

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Code" has the meaning ascribed to it in the recitals hereof.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means the Financial Recovery Bonds (Limited Tax General Obligation), Series 2014 of the City authorized to be issued by the Order in the aggregate principal amount not to exceed $55,000,000, in one or more series, and bearing such other designations as determined by the Authorized Officer in the Supplemental Order.

"Bond Insurance Policies" has the meaning ascribed to it in the recitals hereof.

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means any day other than (i) a Saturday, Sunday or legal holiday, (ii) a day on which the Paying Agent or banks and trust companies in New York, New York are authorized or required to remain closed, (iii) a day on which the New York Stock Exchange is closed, or (iv) a day on which the Federal Reserve is closed.

"Certificate" means (i) a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to the Indenture or (ii) the report of an Authorized Officer as to audits or other procedures called by the Indenture, as the case may be.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Claim" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Class" means each class of Claims established under the Plan.

"Closing Date" means the Date of Original Issue.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Order" has the meaning set forth in recitals hereto.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Conversion Date" means the last Accretion Date on the tenth anniversary of the Date of Original Issue of the Bonds, after which the Bonds shall no longer accrete in value.

"Date of Original Issue" means the date upon which all conditions precedent set forth in the Bond Purchase Agreement to the transactions contemplated therein and herein have been satisfied and the Bonds have been issued to the Purchaser.

"Debt Retirement Fund" means the Debt Retirement Fund established under Section 501 hereof, and any subaccounts thereof established hereunder for the payment of principal of and premium and interest on the Bonds.

"Distribution Agent" shall mean U.S. Bank National Association, Detroit, Michigan.

"Distribution Agreement" shall mean the Insured Prior LTGO Bonds Distribution Agreement among the  Distribution Agent the City, Ambac and the paying agent for the Insured Prior LTGO Bonds, in form and substance satisfactory to the City and Ambac, relating to the distribution of payments of principal and interest on the Insured Prior LTGO Bonds.

"DTC System" shall mean the system maintained by The Depository Trust Company used for trading municipal securities.

"Emergency Manager" has the meaning set forth in the recitals hereto.

"Final Order" has the meaning set forth in the Plan of Adjustment.

"Fiscal Year" means the period from July 1 to and including June 30 of the immediately succeeding calendar year or such other fiscal year of the City as in effect from time to time.

"Holder" shall mean the holder of a Claim under or evidenced by the Prior LTGO Bonds.

"Insured Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Interest Payment Date" means April 1 and October 1 of each year commencing with the April 1 or October 1 specified in the Supplemental Order.

"Interest Rate" means a rate of interest borne by the Bonds, payable currently on each Interest Payment Date, of 5% per annum from the Date of Original Issue until the Conversion Date, and thereafter at a rate of interest of 5.65% per annum payable currently until the Maturity Date.

"LTGO Claims" has the meaning ascribed to it in the recitals hereof.

"LTGO Claims Holder" shall mean holders of Allowed Claims on account of Prior LTGO Bonds who are (i) the record owners of any Prior LTGO Bonds and (ii) Ambac as to any Insured Prior LTGO Bond.

"LTGO Parties" has the meaning set forth in the recitals hereof.

"Maturity Date" means the twenty-third (23rd) anniversary of the Date of Original Issue or such other final date of maturity of each series of the Bonds as specified in the Supplemental Order.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"New LTGO Bonds" means the Bonds.

"Order" means this Order of the Emergency Manager as supplemented by the Supplemental Order, and as amended from time to time pursuant to Article VI.

"Outstanding" when used with respect to:

(1)     the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Order, except:

    (A)     Bonds theretofore canceled by the Paying Agent or delivered to such Paying Agent for cancellation;

6

(B)    Bonds for whose payment money in the necessary amount has been theretofore deposited with the Paying Agent in trust for the registered owners of such Bonds;

(C)    Bonds delivered to the Paying Agent for cancellation in connection with (x) the exchange of such Bonds for other Bonds or (y) the transfer of the registration of such Bonds;

(D)    Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Order or otherwise pursuant to law; and

(E)    Bonds deemed paid as provided in Section 701.

"Paying Agent" means the bond registrar, transfer agent and paying agent for the Bonds.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan of Adjustment" has the meaning set forth in the recitals hereto.

"Prior LTGO Bonds" has the meaning ascribed to it in the recitals hereof.

"Pro Rata" shall mean the proportion that a claim of one LTGO Claims Holder bears to the aggregate amount of all claims of all of the LTGO Claims Holders.

"Registered Owner" means the registered owner of a Bond as the registered owner's name appears on the Bond Registry under Section 305.

"Regular Record Date" has the meaning given such term in Section 302.

"Reserve New B Notes" shall have the meaning set forth in the recitals hereto.

"Security Depository" has the meaning given such term in Section 310.

"State" has the meaning set forth in the recitals hereto.

"State Treasurer" means the Treasurer of the State of Michigan.

"Supplemental Order" means the order or orders of the Authorized Officer making certain determinations and confirming the final details on the Bonds upon issuance, in accordance with the parameters of this Order.

Section 102.  <u>Interpretation</u>.  (a)  Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)    Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

7

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Order.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Order, refer to this Order as a whole unless otherwise expressly stated.

# ARTICLE II

# DETERMINATIONS

Section 201.  <u>Finding, and Declaration of Need to Issue Bonds</u>. The Emergency Manager hereby finds and declares that it is necessary for the City to issue the Bonds hereunder in such sum as shall be determined and approved by the Emergency Manager, not in excess of $55,000,000 as of the Date of Original Issue (the "Maximum Aggregate Principal Amount"), and to evidence such debt by the issuance of the Bonds in one or more series not in excess of the Maximum Aggregate Principal Amount, in Authorized Denominations, pursuant to and in accordance with the provisions of Section 36a of Act 279, for the purpose of satisfying a portion of the LTGO Claims. The Maximum Aggregate Principal Amount shall not include the accretion of principal at the Accretion Rate as provided in this Order.

# ARTICLE III

# AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301.  <u>Authorization of Bonds to Satisfy the Claims and Pledge</u>.  The City hereby authorizes the issuance of the Bonds as hereinafter defined in such principal amount as shall be confirmed in the Supplemental Order to satisfy the LTGO Claims.  The principal of and interest on the Bonds shall hereby be secured by the limited tax full faith and credit pledge of the City. The City pledges to pay the principal of and interest on the Bonds as a first budget obligation from its general funds and in case of insufficiency thereof, from the proceeds of an annual levy of ad valorem taxes on all taxable property of the City, subject to applicable constitutional, statutory and charter tax rate limitations.

Section 302.  <u>Designations, Date, Interest, Maturity and Other Terms of the Bonds to Satisfy the Claims</u>. (a) The Bonds shall be designated "FINANCIAL RECOVERY BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2014" and may bear such later or earlier dates and additional or alternative designations, series or subseries as the Authorized Officer may determine in the Supplemental Order, shall be issued in fully registered form and shall be consecutively numbered from "R-1" upwards, unless otherwise provided by the Authorized Officer in the Supplemental Order.  The Bonds shall be dated and issued in such denominations all as determined by the Authorized Officer and confirmed by the Authorized Officer in the Supplemental Order.

(b)     The Bonds of each series shall mature on the April 1, 2037 or such other April 1 which is not in excess of 23 years from the Date of Original Issue and shall accrete in principal amount, bear interest at the Interest Rate on a taxable or tax exempt basis, payable on the Interest

Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order. The Bonds shall be subject to mandatory sinking fund redemption on April 1 in the years and in the Accretion Values set forth in the form of Bond provided in Section 307 hereof. Unless otherwise provided by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be calculated on the basis of the actual number of days elapsed in a 360 day year. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     The Bonds shall also accrete in principal amount at the Accretion Rate starting from the Date of Original Issue and compounded semiannually on each Accretion Date until the Conversion Date. Thereafter, the Bonds at their Accretion Value shall bear interest at the Interest Rate on a taxable or tax exempt basis, payable on a current basis on the Interest Payment Dates, all as shall be determined and confirmed by the Authorized Officer in the Supplemental Order.

(d)     Except as may be otherwise determined by the Authorized Officer in the Supplemental Order, interest on the Bonds shall be payable to the Registered Owner as of the 15th day of the month, whether or not a Business Day (a "Regular Record Date"), prior to each Interest Payment Date. Interest on the Bonds shall be payable to such Registered Owners by check or draft drawn on the Paying Agent on each Interest Payment Date and mailed by first class mail or, upon the written request of the Owner of $1,000,000 or more in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Owner. Such a request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent.

(e)     Interest on Bonds not punctually paid or duly provided for on an Interest Payment Date shall forthwith cease to be payable to the Registered Owners on the Regular Record Date established for such Interest Payment Date, and may be paid to the Registered Owners as of the close of business on a date fixed by the Paying Agent (a "Special Record Date") with respect to the payment of such defaulted interest to be fixed by the Paying Agent, or may be paid at any time in any other lawful manner. The Paying Agent shall give notice to the Registered Owners at least seven days before any such Special Record Date.

(f)     The principal of the Bonds shall be payable to the Registered Owners of the Bonds upon the presentation of the Bonds to the Paying Agent at the principal corporate trust office of the Paying Agent.

(g)     The Bonds shall be subject to redemption prior to maturity or shall not be subject thereto, upon such terms and conditions as shall be determined by the Authorized Officer and confirmed in the Supplemental Order, provided, however, that redemption at the option of the City prior to maturity may occur on any Interest Payment Date for which notice is given as provided herein and such redemption shall be in whole.

Unless waived by any registered owner of Bonds to be redeemed, official notice of redemption shall be given by the Paying Agent on behalf of the City. Such notice shall be dated

and shall contain at a minimum the following information: original issue date; maturity dates; interest rates, CUSIP numbers, if any; certificate numbers, and in the case of partial redemption, the called amounts of each certificate; the redemption date; the redemption price or premium; the place where Bonds called for redemption are to be surrendered for payment; and that interest on Bonds or portions thereof called for redemption shall cease to accrue from and after the redemption date.

In addition, further notice shall be given by the Paying Agent in such manner as may be required or suggested by regulations or market practice at the applicable time, but no defect in such further notice nor any failure to give all or any portion of such further notice shall in any manner defeat the effectiveness of a call for redemption if notice thereof is given as prescribed herein.

Section 303. <u>Execution, Authentication and Delivery of Bonds</u>. The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Emergency Manager and the Finance Director of the City and authenticated by the manual signature of the Finance Director or an authorized representative of the Paying Agent, as the case may be, and a facsimile of the seal of the City shall be imprinted on the Bonds. Additional Bonds bearing the manual or facsimile signatures of the Emergency Manager or Mayor of the City and the Finance Director, and upon which the facsimile of the seal of the City is imprinted may be delivered to the Paying Agent for authentication and delivery in connection with the exchange or transfer of Bonds. The Paying Agent shall indicate on each Bond the date of its authentication.

Section 304. <u>Authentication of the Bonds</u>. (a) No Bond shall be entitled to any benefit under this Order or be valid or obligatory for any purpose unless there appears on such Bond a Certificate of Authentication substantially in the form provided for in Section 307 of this Order, executed by the manual or facsimile signature of the Finance Director or by an authorized signatory of the Paying Agent by manual signature, and such certificate upon any Bond shall be conclusive evidence, and the only evidence, that such Bond has been duly authenticated and delivered hereunder.

(b) The Paying Agent shall manually execute the Certificate of Authentication on each Bond upon receipt of a written direction of the Authorized Officer of the City to authenticate such Bond.

Section 305. <u>Transfer of Registration and Exchanges on the Bonds</u>. (a) The registration of each Bond is transferable only upon the Bond Registry by the Registered Owner thereof, or by his attorney duly authorized in writing, upon the presentation and surrender thereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner thereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor.

(b) Each Bond may be exchanged for one or more Bonds in equal aggregate principal amount of like maturity and tenor in one or more authorized denominations, upon the presentation and surrender thereof at the principal corporate trust office of the Paying Agent

together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing.

Section 306.  <u>Regulations with Respect to Exchanges and Transfers</u>.  (a)  In all cases in which the privilege of exchanging Bonds or transferring the registration of Bonds is exercised, the City shall execute and the Paying Agent shall authenticate and deliver Bonds in accordance with the provisions of this Order.  All Bonds surrendered in any such exchanges or transfers shall be forthwith canceled by the Paying Agent.

(b)      For every exchange or transfer of Bonds, the City or the Paying Agent may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer and, except as otherwise provided in this Order, may charge a sum sufficient to pay the costs of preparing each new Bond issued upon such exchange or transfer, which shall be paid by the person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.

(c)      The Paying Agent shall not be required (i) to issue, register the transfer of or exchange any Bond during a period beginning at the opening of business 15 days before the day of the giving of a notice of redemption of Bonds selected for redemption as described in the form of Bonds contained in Section 307 of this Order and ending at the close of business on the day of that giving of notice, or (ii) to register the transfer of or exchange any Bond so selected for redemption in whole or in part, except the unredeemed portion of Bonds being redeemed in part. The City shall give the Paying Agent notice of call for redemption at least 20 days prior to the date notice of redemption is to be given.

Section 307.  <u>Form of the Bonds</u>.  The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Order or as approved by an Authorized Officer in the Supplemental Order:

13-53846-swr    Doc 8029-1    Filed 10/27/14    Entered 10/27/14 20:07:47    Page 86 of
13-53846-tjt    Doc 8024-1    Filed 10/27/14    Entered 10/27/14 23:08:47    Page 275 of
110

[Forms of Bonds]

[Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("DTC") to the City (as hereinafter defined), or its agent for registration of transfer, exchange, or payment and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is requested by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein.]

UNITED STATES OF AMERICA
STATE OF MICHIGAN
COUNTY OF WAYNE

CITY OF DETROIT

FINANCIAL RECOVERY BOND

(LIMITED TAX GENERAL OBLIGATION), SERIES 2014

| Maturity Date | Date of Original Issue | CUSIP |
|---|---|---|
| April 1, 20__ | _____, 2014 | |

Registered Owner:

Original Principal Amount:                                                                    Dollars

      The City of Detroit, County of Wayne, State of Michigan (the "City"), acknowledges itself to owe and for value received hereby promises to pay to the Registered Owner specified above, or registered assigns, the Accretion Value specified below, in lawful money of the United States of America, on the Maturity Date specified above, unless prepaid prior thereto as hereinafter provided, with interest thereon at the Interest Rate of 5.0% per annum from the Date of Original Issue specified above until the tenth (10th) anniversary of the Date of Original Issue (the "Conversion Date"), and thereafter at an Interest Rate of 5.65% per annum on Accretion Value prior to the next Accretion Date, until the Maturity Date specified above or until the Accretion Value is paid in full. Interest is payable semiannually on April 1 and October 1 in each year commencing on _____ (each an "Interest Payment Date"). The interest so payable, and punctually paid or duly provided for, will be paid, as provided in the hereinafter defined Order, to the person in whose name this Bond is registered on the books maintained for such purpose by the hereinafter defined Paying Agent (the "Bond Registry"), on the close of business on the Regular Record Date for such interest payment, which shall be the fifteenth day (whether or not a Business Day) of the calendar month immediately preceding such Interest Payment Date. Any such interest not so punctually paid or duly provided for shall herewith cease to be payable to the Registered Owner on such Regular Record Date, and may be paid to

the person in whose name this Bond is registered at the close of business on a Special Record Date for the payment of such defaulted interest to be fixed by the Paying Agent, notice of which shall be given to Registered Owners at least seven days before such Special Record Date, or may be paid at any time in any other lawful manner.  The bonds of this series shall also accrete in value at an Accretion Rate of 0.65% per annum, compounded semiannually on each April 1 and October 1 to the Accreted Value as of any date of calculation (as hereinafter set forth), until the Conversion Date.  Thereafter, the Bonds at their Accreted Value in principal amount shall pay current interest at the Interest Rate of 5.65% per annum, payable semiannually on each Interest Payment Date.  Capitalized terms used herein but not defined herein, shall have the meanings ascribed to them in the Order.

THE BELOW CHART OF ACCRETION VALUES OF THIS BOND PER $5,000 ORIGINAL PRINCIPAL AMOUNT WILL REQUIRE MODIFICATION IF THE BONDS ARE ISSUED ON A DATE OTHER THAN 10/01/14 BASED ON INTEREST CALCULATIONS AT 0.65% ANNUALLY.

## Chart of Accretion Values

| Accretion Date | Accretion Amount |
|---|---|
| 04/01/2015 | $5,016.25 |
| 10/01/2015 | 5,032.55 |
| 04/01/2016 | 5,048.91 |
| 10/01/2016 | 5,065.32 |
| 04/01/2017 | 5,081.78 |
| 10/01/2017 | 5,098.30 |
| 04/01/2018 | 5,114.87 |
| 10/01/2018 | 5,131.49 |
| 04/01/2019 | 5,148.17 |
| 10/01/2019 | 5,164.90 |
| 04/01/2020 | 5,181.68 |
| 10/01/2020 | 5,198.52 |
| 04/01/2021 | 5,215.42 |
| 10/01/2021 | 5,232.37 |
| 04/01/2022 | 5,249.37 |
| 10/01/2022 | 5,266.43 |
| 04/01/2023 | 5,283.55 |
| 10/01/2023 | 5,300.72 |
| 04/01/2024 | 5,317.95 |
| 10/01/2024 | 5,335.23 |
| Thereafter | 5,335.23 |

The Accretion Value of this Bond is payable in lawful money of the United States of America upon presentation and surrender of this Bond at the designated corporate trust office of _____, _____, _____, as registrar, transfer agent and paying agent under the Order (such bank and any successor as paying agent, the "Paying Agent"). Interest on this Bond is payable in like money by check or draft drawn on the Paying

Agent and mailed to the Registered Owner entitled thereto, as provided above, by first class mail or, upon the written request of a Registered Owner of at least $1,000,000 in aggregate principal amount of Bonds (with complete wiring instructions no later than the Regular Record Date for such Interest Payment Date), by wire transfer by the Paying Agent to such Registered Owner, and such request may provide that it will remain in effect with respect to subsequent Interest Payment Dates unless and until changed or revoked at any time prior to a Regular Record Date by subsequent written notice to the Paying Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months. For prompt payment of this Bond, both principal and interest, the full faith, credit and resources of the City are hereby irrevocably pledged.

This bond is one of a series of bonds aggregating the principal sum of $_____, issued under and in full compliance with the Constitution and statutes of the State of Michigan, and particularly Section 36a of Act No. 279, Public Acts of Michigan, 1909, as amended ("Act 279"), for the purpose of satisfying certain LTGO Claims, as defined in the Order. Pursuant to the Order, the bonds of this series (the "Bonds") are limited tax general obligations of the City, and the City is obligated to levy annually ad valorem taxes on all taxable property in the Issuer, subject to applicable constitutional, statutory and charter tax rate limitations.

The "Order" is an Order of the Emergency Manager issued on _____, 2014, supplemented by a Supplemental Order of an Authorized Officer of the City issued on _____, 2014, authorizing the issuance of the Bonds.

The bonds of this series shall be subject to redemption prior to maturity as follows:

*(a) Optional Redemption.* The Bonds are subject to redemption prior to maturity, in whole, at the option of the Issuer, on any Interest Payment Date after the Date of Original Issue, at a redemption price equal to the Accretion Value as of the date of redemption plus accrued interest to the date fixed for redemption.

*(b) Mandatory Redemption.*

The Bonds shall be subject to mandatory redemption, in part, by lot, on the redemption dates and in the Accretion Values set forth below, and at a redemption price equal to the Accretion Value thereof as of the date of redemption, without premium, plus accrued interest to the date fixed for redemption.

14

| Redemption Date October 1 | Principal Amount |
|---|---|
| 2020 | $2,000,000 |
| 2021 | 2,000,000 |
| 2022 | 2,000,000 |
| 2023 | 2,000,000 |
| 2024 | 2,000,000 |
| 2025 | 3,735,115 |
| 2026 | 3,735,115 |
| 2027 | 3,735,115 |
| 2028 | 3,735,115 |
| 2029 | 3,735,115 |
| 2030 | 3,735,115 |
| 2031 | 3,735,115 |
| 2032 | 3,735,115 |
| 2033 | 3,735,115 |
| 2034 | 3,735,115 |
| 2035 | 3,735,115 |
| 2036 | 3,735,115 |
| 2037* | 3,735,115 |

*Final Maturity

The Accretion Value of the Bonds to be redeemed on the dates set forth above shall be reduced by the Accretion Value of Term Bonds that has been redeemed (other than by mandatory sinking fund redemption) or otherwise acquired by the City and delivered to the Paying Agent prior to giving the notice of redemption described below. The City may satisfy any mandatory redemption requirement by the purchase and surrender of Term Bonds of the same maturity and interest rate in lieu of calling such Term Bonds for mandatory redemption.

*General Redemption Provisions.* In case less than the full amount of an outstanding bond is called for redemption, the Paying Agent, upon presentation of the bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new bond in the principal amount of the portion of the original bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than thirty (30) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Paying Agent to redeem such Bonds.

Reference is hereby made to the Order for the provisions with respect to the nature and extent of the security for the Bonds, the manner and enforcement of such security, the rights,

duties and obligations of the City, and the rights of the Paying Agent and the Registered Owners of the Bonds. As therein provided, the Order may be amended in certain respects without the consent of the Registered Owners of the Bonds. A copy of the Order is on file and available for inspection at the office of the Finance Director and at the principal corporate trust office of the Paying Agent.

The City and the Paying Agent may treat and consider the person in whose name this Bond is registered on the Bond Registry as the absolute owner hereof, whether this Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal hereof and interest hereon and for all other purposes whatsoever, and all such payments so made to such person or upon his order shall be valid and effectual to satisfy and discharge the liability hereon to the extent of the sum or sums so paid.

The registration of this Bond is transferable only upon the Bond Registry by the Registered Owner hereof or by his attorney duly authorized in writing upon the presentation and surrender hereof at the designated corporate trust office of the Paying Agent together with a written instrument of transfer satisfactory to the Paying Agent, duly executed by the Registered Owner hereof or his attorney duly authorized in writing, and thereupon one or more fully executed and authenticated Bonds in any authorized denominations of like maturity and tenor, in equal aggregate principal amount shall be issued to the transferee in exchange therefor as provided in the Order upon the payment of the charges, if any, therein prescribed.

It is hereby certified, recited and declared that all acts, conditions and things required by law to exist, happen and to be performed, precedent to and in the issuance of the Bonds do exist, have happened and have been performed in due time, form and manner as required by the Constitution and statutes of the State of Michigan, and that the total indebtedness of the City, including the Bonds does not exceed any constitutional, statutory or charter limitation.

This Bond is not valid or obligatory for any purpose until the Paying Agent's Certificate of Authentication on this Bond has been executed by the Paying Agent.

IN WITNESS WHEREOF, the City of Detroit, by its Emergency Manager, has caused this bond to be signed in the name of the City by the facsimile signatures of its Emergency Manager and Finance Director of the City, and a facsimile of its corporate seal to be printed hereon, all as of the Date of Original Issue.

CITY OF DETROIT

By: _____
     Emergency Manager

By: _____
     Finance Director

(SEAL)

(Form of Paying Agent's Certificate of Authentication)

DATE OF AUTHENTICATION:

## CERTIFICATE OF AUTHENTICATION

This bond is one of the bonds described in the within-mentioned Order.

_____
_____
_____, Michigan
Paying Agent

By: _____
     Authorized Signatory

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

(Please print or typewrite name and address of transferee)

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:                                    _____

_____          _____

Signature Guaranteed:

NOTICE:  The signature(s) to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever.  When assignment is made by a guardian, trustee, executor or administrator, an officer of a corporation, or anyone in a representative capacity, proof of such person's authority to act must accompany the bond.

Signature(s) must be guaranteed by a commercial bank or trust company or by a brokerage firm having a membership in one of the major stock exchanges.  The transfer agent will not effect transfer of this bond unless the information concerning the transferee requested below is provided.

PLEASE INSERT SOCIAL
SECURITY NUMBER OR OTHER
IDENTIFYING NUMBER OF
TRANSFEREE.

Name and Address:  _____

_____

_____

(Include information for all joint owners
if the bond is held by joint account.)

_____
|                                       |
|                                       |
_____

(Insert number for first named
transferee if held by joint account.)

Section 308. <u>Registration</u>. The City and the Paying Agent may treat and consider the Registered Owner of any Bond as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal (and premium, if any) thereof and interest thereon and for all other purposes whatsoever, and all such payments so made to such Bondowner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

Section 309. <u>Mutilated, Destroyed, Stolen or Lost Bonds</u>. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the Paying Agent or the City and the Paying Agent and the City receive evidence to their satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City and the Paying Agent such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the City or the Paying Agent that such Bond has been acquired by a bona fide purchaser, the City shall execute and the Paying Agent shall authenticate and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)     Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds issued under this Order.

Section 310. <u>Book-Entry-Only System Permitted</u>. (a) If determined by the Authorized Officer in the Supplemental Order, the Bonds or portions of the Bonds shall be issued to a securities depository selected by the Authorized Officer (the "Security Depository") to be held pursuant to the book-entry-only system maintained by the Security Depository and registered in the name of the Security Depository or its nominee. Ownership interests in Bonds held under such book-entry-only system shall be determined pursuant to the procedures of the Security Depository and Article 8 of the applicable Uniform Commercial Code (such persons having such interests, "Beneficial Owners").

(b)     If (i) the City and the Paying Agent receive written notice from the Security Depository to the effect that the Security Depository is unable or unwilling to discharge its responsibilities with respect to the Bonds under the book-entry-only system maintained by it or (ii) the Authorized Officer determines that it is in the best interests of the Beneficial Owners that they be able to obtain Bonds in certificated form, then the City may so notify the Security Depository and the Paying Agent, and, in either event, the City and the Paying Agent shall take appropriate steps to provide the Beneficial Owners with Bonds in certificated form to evidence their respective ownership interests in the Bonds. Whenever the Security Depository requests the City and the Paying Agent to do so, the Authorized Officer on behalf of the City and the Paying Agent will cooperate with the Security Depository in taking appropriate action after

reasonable notice to make available Bonds registered in whatever name or names the Beneficial Owners transferring or exchanging Bonds shall designate.

(c)     Notwithstanding any other provision of the Order to the contrary, so long as the Bonds are held pursuant to the book-entry-only system maintained by the Security Depository:

(i)     all payments with respect to the principal and interest on such Bonds and all notices with respect to such Bonds shall be made and given, respectively, to the Security Depository as provided in the representation letter from the City and the Paying Agent to the Security Depository with respect to such Bonds; and

(ii)     all payments with respect to principal of the Bonds and interest on the Bonds shall be made in such manner as shall be prescribed by the Security Depository.

## ARTICLE IV

## FUNDS AND ACCOUNTS

Section 401.  <u>Establishment of Accounts and Funds</u>.  (a)  The City hereby establishes and creates the Debt Retirement Fund as a special, separate and segregated account and fund which shall be held for and on behalf of the City by the Paying Agent.

(b)     The Finance Director is hereby authorized to establish such additional accounts, subaccounts or funds as shall be required for the Bonds, to accommodate the requirements of such series of Bonds.

Section 402.  <u>Debt Retirement Fund</u>.  General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof shall be used to pay the principal of and interest on the Bonds when due. The City shall set aside in the Debt Retirement Fund each month, (i) beginning the first day of the first month following the date of delivery of the Bonds, an amount equal to 1/6 of the interest coming due on the Bonds on the next Interest Payment Date and, (ii) beginning on the first day of the first month which is 11 months prior to the date on which the first mandatory sinking fund redemption occurs, an amount equal to 1/12 of the principal or Accretion Value coming due on the next mandatory sinking fund redemption date for the Bonds The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Paying Agent, and so long as the principal or Accretion Value of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal or Accretion Value and interest.  Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds and the fees and expenses of the Paying Agent shall be retained by the City to be used for any lawful purpose.

Section 403.  <u>Investment of Monies in the Funds and Accounts</u>.  (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder, and the Paying Agent, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts in accordance with such direction.

(b)     Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

## ARTICLE V

## THE PAYING AGENT

Section 501.  <u>Paying Agent</u>.  The Paying Agent for the Bonds shall act as bond registrar, transfer agent and paying agent for the Bonds and shall be initially _____ _____, Detroit, Michigan, or such other bank or trust company located in the State which is qualified to act in such capacity under the laws of the United States of America or the State.  The Paying Agent means and includes any company into which the Paying Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Paying Agent may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Paying Agent as determined by an Authorized Officer, shall be authorized by law to perform all the duties imposed upon it by this Order, and shall be the successor to the Paying Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.  An Authorized Officer is authorized to enter into an agreement with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Paying Agent and enter into an agreement therewith for such services.

## ARTICLE VI

## SUPPLEMENTAL ORDERS AND RESOLUTIONS

Section 601.  <u>Supplemental Orders and Resolutions Not Requiring Consent of Holders of the Bonds</u>.  The City may without the consent of any Bondowner adopt orders or resolutions supplemental to this Order for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Order; and

(iv)    such other action not materially, adversely and directly affecting the security of the Bonds.

provided that (A) no supplemental order or resolution amending or modifying the rights or obligations of the Paying Agent shall become effective without the consent of the Paying Agent and (B) the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 602.  <u>Bond Counsel Opinion</u>.  Before any supplemental order or resolution under this Article shall become effective, a copy thereof shall be filed with the Paying Agent, together with an opinion of Bond Counsel that such supplemental order or resolution is authorized or permitted by this Article; provided that, Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of an Authorized Officer or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

## ARTICLE VII

## DEFEASANCE

Section 701.  <u>Defeasance</u>.  Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturity, irrevocable instructions to call such Bonds for redemption shall be given to the Paying Agent.  Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds.  After such deposit, such Bonds shall no longer be entitled to the benefits of this Order (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Order for the benefit of such Bonds shall be discharged.

## ARTICLE VIII

## OTHER PROVISIONS OF GENERAL APPLICATION

[Section 801.  <u>Reserved</u>]

Section 802.  <u>Approval of Other Documents and Actions</u>.  The Mayor, the Finance Director, the Treasurer, the City Clerk and any written designee of the Emergency Manager are each hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Order.

Section 803.  <u>Delegation of City to, and Authorization of Actions of Authorized Officers</u>. (a)  Each Authorized Officer is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Order, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the

Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from available funds, for and on behalf of the City.

(b)     Except as otherwise provided herein, all determinations and decisions of the Authorized Officer with respect to the issuance and sale of the Bonds or the negotiation, execution or delivery of agreements as permitted or required by this Order shall be confirmed by this Authorized Officer in a Supplemental Order or Supplemental Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Authorized Officer have been fulfilled.

Section 804.  <u>Approving Legal Opinions with Respect to the Bonds</u>.  Delivery of the Bonds shall be conditioned upon receiving, at the time of delivery of the Bonds; the approving opinion of Bond Counsel, approving legality of the Bonds.

Section 805.  <u>Appointment of Bond Counsel; Engagement of Other Parties.</u>  The appointment by the Emergency Manager of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds.  The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel and other accumulated bond related fees and expenses shall be payable from available funds in accordance with the agreement of such firm on file with the Finance Director.

Section 806.  <u>Preservation of Records</u>.  So long as any Bond remains Outstanding, all documents received by the Paying Agent under the provisions of this Order shall be retained in its possession and shall be subject at all reasonable times to the inspection of the City, and the Bondowners, and their agents and representatives, any of whom may make copies thereof.

Section 807.  <u>Parties in Interest</u>.  Nothing in this Order, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Paying Agent and the Owners of the Bonds, any right, remedy or claim under or by reason of this Order or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Order contained by and on behalf of the City or Paying Agent shall be for the sole and exclusive benefit of the City, the Paying Agent and the Bondowners.

Section 808.  <u>No Recourse Under Order</u>.  All covenants, agreements and obligations of the City contained in this Order shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Order against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

24

13-53846-swr   Doc 8024-1   Filed 10/27/14   Entered 10/27/14 23:03:47   Page 99 of
13-53846-swr   Doc 8024-1   Filed 10/27/14   Entered 10/27/14 20:47:46   Page 23 of
110

Section 809.  <u>Severability</u>.  If any one or more sections, clauses or provisions of this Order shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 810.  <u>Cover Page, Table of Contents and Article and Section Headings</u>.  The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Order, and none of them shall affect its meaning, construction or effect.

Section 811.  <u>Conflict</u>.  All orders or resolutions or parts of orders or resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 812.  <u>Governing Law and Jurisdiction</u>.  This Order shall be governed by and construed in accordance with the laws of the State.

Section 813.  <u>Order and Supplemental Order are a Contract</u>.  The provisions of this Order and the Supplemental Order shall constitute a contract between the City, the Paying Agent,  and the Bondowners.

Section 814.  <u>Effective Date</u>.  This Order shall take effect immediately upon its adoption by the Council.

Section 815.  <u>Notices</u>.  All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt.  Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:                             City of Detroit
                                                Finance Department
                                                1200 Coleman A. Young Municipal Center
                                                Detroit, Michigan 48226
                                                Attention: Finance Director


If to the Paying Agent, to:                     U.S. Bank National Association
                                                _____
                                                _____
                                                Attention:  _____

25

13-53846-swr   Doc 8029-1   Filed 10/17/14   Entered 10/17/14 20:47:36   Page 100 of
13-53846-swr   Doc 8024-1   Filed 10/17/14   Entered 10/17/14 03:03:17   Page 100 of
110

SO ORDERED this _____ day of _____, 2014.


_____
Kevyn D. Orr
Emergency Manager
City of Detroit, Michigan

22545852.5\022765-00202

26

13-53846-swr   Doc 8024-1   Filed 10/17/14   Entered 10/17/14 20:47:46   Page 101 of
13-53846-tjt   Doc 8029-1   Filed 10/17/14   Entered 10/17/14 03:03:17   Page 129 of
159

**EXHIBIT I.A.246**

PRINCIPAL TERMS OF NEW B NOTES

**NEW B NOTES**
**SUMMARY OF PRINCIPAL TERMS[1]**

On the Effective Date, the City shall issue the New B Notes and distribute them as set forth in the Plan. The definitive documentation governing the New B Notes shall provide generally for the following terms:

| | |
|---|---|
| Obligation | The City's obligations with respect to the New B Notes shall be a general and unsecured obligation of the City. |
| Initial Principal Amount | $632.0 million. |
| Interest Rate | 4.0% for the first 20 years; 6.0% for years 21 through 30. |
| Maturity | 30 years. |
| Amortization | Interest only for 10 years; amortization in 20 equal annual installments beginning on the interest payment date nearest to the 11th anniversary from issuance. |
| Disclosure | The City will provide a continuing disclosure undertaking under 17 C.F.R. § 240.15c2-12 in connection with the delivery of the New B Notes. |

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan.

**EXHIBIT I.A.247**

FORM OF NEW B NOTES DOCUMENTS

ORDER NO. _____

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

# TABLE OF CONTENTS

ARTICLE I        DEFINITIONS AND INTERPRETATION ............................................. 3
    Section 101.  Definitions.................................................................................... 3
    Section 102.  Interpretation.............................................................................. 6
ARTICLE II DETERMINATIONS.............................................................................. 7
    Section 201.  Finding, and Declaration of Need to Issue Bonds ...................... 7
ARTICLE III AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE
                 BONDS ........................................................................................... 7
    Section 301.  Authorization of Bonds to Satisfy the Claims and Pledge.......... 7
    Section 302.  Designations, Date, Interest, Maturity and Other Terms of the Bonds
                     to Satisfy the Claims ................................................................. 7
    Section 303.  Execution, Authentication and Delivery of Bonds ..................... 9
    Section 304.  Authentication of the Bonds ....................................................... 9
    Section 305.  Transfer of Registration and Exchanges on the Bonds.............. 9
    Section 306.  Regulations with Respect to Exchanges and Transfers ............. 9
    Section 307.  Form of the Bonds ..................................................................... 10
    Section 308.  Registration ................................................................................ 17
    Section 309.  Mutilated, Destroyed, Stolen or Lost Bonds.............................. 17
    Section 310.  Book-Entry-Only System Permitted .......................................... 17
ARTICLE IV FUNDS AND ACCOUNTS .................................................................. 18
    Section 401.  Establishment of Accounts and Funds ....................................... 18
    Section 402.  Debt Retirement Fund................................................................ 18
    Section 403.  Investment of Monies in the Funds and Accounts..................... 19
    Section 404.  Satisfaction of Claims ............................................................... 19
ARTICLE V THE PAYING AGENT ......................................................................... 20
    Section 501.  Paying Agent .............................................................................. 20
ARTICLE VI SUPPLEMENTAL ORDERS AND RESOLUTIONS....................... 21
    Section 601.  Supplemental Orders and Resolutions Not Requiring Consent of
                     Holders of the Bonds ................................................................. 21
    Section 602.  Bond Counsel Opinion................................................................ 21
ARTICLE VII DEFEASANCE .................................................................................. 21
    Section 701.  Defeasance .................................................................................. 21
ARTICLE VIII        OTHER PROVISIONS OF GENERAL APPLICATION...................... 22
    [Section 801.  Credit Enhancement ................................................................. 22
    Section 802.  Approval of Other Documents and Actions............................... 22
    Section 803.  Delegation of City to, and Authorization of Actions of Authorized
                     Officers ...................................................................................... 22
    Section 804.  Approving Legal Opinions with Respect to the Bonds .............. 23
    Section 805.  Appointment of Bond Counsel; Engagement of Other Parties.................. 23
    Section 806.  Preservation of Records ............................................................. 23
    Section 807.  Parties in Interest....................................................................... 23

# TABLE OF CONTENTS
(continued)

Section 808. No Recourse Under Resolution ................................................................. 23
Section 809. Severability ................................................................................................ 23
Section 810. Cover Page, Table of Contents and Article and Section Headings............ 23
Section 811. Conflict ..................................................................................................... 24
Section 812. Governing Law and Jurisdiction............................................................... 24
Section 813. Order and Supplemental Order are a Contract.......................................... 24
Section 814. Effective Date ........................................................................................... 24
Section 815. Notices ...................................................................................................... 24

EXHIBIT A THE UNSECURED CLAIMS......................................................................... A-1

ORDER NO. ___

ORDER OF THE EMERGENCY MANAGER OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $632,000,000 FINANCIAL RECOVERY BONDS IN ONE OR MORE SERIES FOR THE PURPOSE OF SATISFYING CERTAIN UNSECURED CLAIMS AS PROVIDED IN THE BANKRUPTCY CASE PLAN OF ADJUSTMENT; AND AUTHORIZING THE EMERGENCY MANAGER TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE DELIVERY AND EXCHANGE OF SAID BONDS TO THE HOLDERS OF SAID CLAIMS.

WHEREAS, on March 1, 2013, the Governor (the "Governor") of the State of Michigan (the "State") determined that a financial emergency existed within the City of Detroit, County of Wayne, State of Michigan (the "City") pursuant to the Local Government Fiscal Responsibility Act, Act 72, Public Acts of Michigan, 1990, as amended ("Act 72"); and

WHEREAS, on March 14, 2013, the Governor confirmed that a financial emergency existed within the City and, pursuant to Act 72, assigned to the Local Emergency Financial Assistance Loan Board established pursuant to the Emergency Municipal Loan Act, Act 243 Public Acts of Michigan, 1980, as amended (the "Board") the responsibility for managing the financial emergency; and

WHEREAS, on March 14, 2013, pursuant to Act 72, the Board appointed Kevyn D. Orr as Emergency Financial Manager for the City; And

WHEREAS, by operation of law the financial emergency continues to exist within the City pursuant to the Local Financial Stability and Choice Act, Act 436, Public Acts of Michigan, 2012 ("Act 436") and the Emergency Financial Manager continues in the capacity of the Emergency Manager for the City (the "Emergency Manager"); and

WHEREAS, on July 18, 2013 (the "Petition Date"), in accordance with Act 436 and the approval of the Governor, the Emergency Manager filed on behalf of the City a petition for relief pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. Sections 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

WHEREAS, on _____, 2014, the Emergency Manager filed on behalf of the City a _____ Amended Plan for the Adjustment of the Debts of the City of Detroit (now and as subsequently amended, the "Plan of Adjustment") in the Bankruptcy Court to provide for the adjustment of the debts of the City pursuant to and in accordance with Chapter 9 of the Bankruptcy Code; and

WHEREAS, the Plan of Adjustment provides, among other things, for the satisfaction of certain claims of unsecured creditors as set out in the Plan of Adjustment in exchange for the

1

13-53846-swr   Doc 8804-1   Filed 12/17/14   Entered 12/17/14 20:47:36   Page 108 of
13-53846-swr   Doc 8029-1   Filed 10/21/14   Entered 10/21/14 03:04:17   Page 107 of
110
159

receipt of unsecured pro rata shares ( each a "Pro Rata Share") of New B Notes (the "New B Notes"); and

WHEREAS, upon satisfaction of all of the terms and conditions required of the City related to the confirmation of the Plan of Adjustment, the City shall establish the Business Day upon which the Plan of Adjustment shall become effective (the "Effective Date"); and

WHEREAS, on or as reasonably practicable after the Effective Date, the City shall execute New B Notes Documents and issue New B Notes in the form of Financial Recovery Bonds authorized under Section 36a of the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and this Order, and distribute the New B Notes, in the form of the Financial Recovery Bonds, to the holders of the particular unsecured claims, as provided in the Plan of Adjustment and described on Exhibit A hereto (collectively, the "Claims"); and

WHEREAS, the Emergency Manager of the City deems it necessary to authorize the issuance of Financial Recovery Bonds in one or more series (the "Bonds"), in the aggregate principal amount of not to exceed Six Hundred Thirty Two Million Dollars ($632,000,000) pursuant to Section 36a of Act 279; and

WHEREAS, the Bonds will be secured by a pledge of the City's limited tax full faith and credit; and

WHEREAS, Section 36a of Act 279 authorizes a city, for which a financial emergency has been determined to exist, such as the City, to borrow money and issue Financial Recovery Bonds subject to the terms and conditions approved by the Board; and

WHEREAS, the City must receive prior approval of the terms and conditions for the issuance of the Bonds from the Board in accordance with Section 36a of Act 279; and

WHEREAS, the Emergency Manager desires to submit this Order to the Board proposing the issuance by the City of Financial Recovery Bonds, in one or more series, under Section 36a of Act 279, to provide for a portion of the financing of the City under the Plan of Adjustment, solely to satisfy the Claims [and to pay certain administrative and other costs related to the issuance of the bonds, upon the terms and conditions and parameters approved by the Board; and]

WHEREAS, prior to submission of this Order to the Board, pursuant to Sections 12(1)(u) and 19(i) of Act 436, the Emergency Manager must obtain approval of the issuance of the Bonds by the City Council of the City (the "City Council"), and if the City Council disapproves the issuance of the Bonds, the issuance of the Bonds must be approved by the Board.

NOW, THEREFORE, BE IT ORDERED AS FOLLOWS:

# ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. <u>Definitions</u>.     The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Order shall have the meanings ascribed therein, herein or in the Plan of Adjustment to them unless a different meaning clearly appears from the context:

"Act 243" means Act No. 243, Public Acts of Michigan, 1980, as amended.

"Act 279" means Act No. 279, Public Acts of Michigan, 1909, as amended.

"Act 436" means Act No. 436, Public Acts of Michigan, 2012.

"Allowed Claims" has the meaning set forth in the Plan of Adjustment.

"Allowed Limited Tax General Obligation Bond Claims" shall mean such claims under Class 7 of the Plan of Adjustment.

"Allowed Other Unsecured Claims" has the meaning set forth in the Plan of Adjustment.

"Authorized Denominations" shall mean denominations of Bonds equal to multiples of $1,000 or integral multiples of $1.00 in excess thereof.

"Authorized Officer" means (i) the Emergency Manager or his designee or successor, or if the City is no longer operating under a financial emergency pursuant to Act 436, the chief administrative officer of the City, the Finance Director or his or her designee, or (ii) any other person authorized by a Certificate of an Authorized Officer to act on behalf of or otherwise represent the City in any legal capacity, which such certificate shall be delivered, if at all, in the City's sole discretion.

"Bankruptcy Case" means the City's Bankruptcy Case No. 13-53846 in the U.S. Bankruptcy Court for the Eastern District of Michigan.

"Bankruptcy Court" has the meaning set forth in the Plan of Adjustment.

"Board" has the meaning set forth in recitals hereto.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

3