UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

Debtor.

No. 13-53846

Chapter 9

HON. STEVEN W. RHODES

## EXHIBIT 69

## APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

In connection with Notice of Appeal filed by
William M. Davis and DAREA [Dkt. #8369].

| Item | Date Filed | Docket Number | Description |
|------|-----------|---------------|-------------|
| 69 | 8/18/2014 | 6864 | Motion to Object to 5th Amendment Plan and All Corrections filed by Creditors Yvonne Williams Jones/Cecily McCellan |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT
SOUTHERN DIVISION

FILED (I)

2014 AUG 18 P 4 10

U.S. _____ COURT
E.D. _____ DETROIT

Yvonne Williams Jones/ Cecily McLellan
        Creditors/objectors

Chapter 9

Case #13-53846
Judge Steven W. Rhodes

V.

In re: City of Detroit, Michigan and
Emergency Manager Kevin Orr
          Debtor/City of Detroit

---

## MOTION TO OBJECT TO 5TH AMENDMENT PLAN AND ALL CORRECTIONS.

Now comes creditors/objector s Yvonne Williams Jones/ Cecily McCellan , Doc. # 2872, 6114 pursuant to Hon. Steven Rhodes ,Doc. 6584, stating the value of General Retirement Fund is sufficient to pay all current retirees. The value of the General Retirement Fund is sufficient to cover outstanding liabilities with its present assets and returns on investments. Therefore, The Plan of Adjustment failed to meet requirements of U.S. 1129 a (3).

### I. Subject Matter of Proposed Testimony:

The General Retirement System has followed the discipline that requires level percent of payroll financing liabilities for active member contribution on deposit and liabilities for benefits as a result retirees benefits will be fully covered by present assets. In addition, the liabilities for services already rendered by active members will be partially covered by the remainder of present assets. The General Retirement System is sound and funded to meet all current retirees' pension obligations. Therefore, the Plan of Adjustment was not proposed in good faith.

    A. As evidence by the Plan of Adjustment, the City secured $817 million after the City filed bankruptcy     state of Michigan and benefactors came up with $817 million to contribute to the pension, this could have been achieve outside of bankruptcy, therefore the bankruptcy was not enter into in good faith, wherefore the Plan of Adjustment is flawed.

    B. The Detroit of City negotiated a new retirement plan with active employees which will also reduce the projected under funding after filing bankruptcy this new retirement plan could have been done without going into bankruptcy. Therefore the Plan of Adjustment is not fair, equitable or just. As is evidence the City of Detroit could have ensured solvency of the pension plan prior to filing for bankruptcy.

II. The proposed evidence is not duplicative of other evidence and no one in Class 11has made this argument exclusively.

III. Witnesses

David T. Kausch, Gabriel Roeder Smith & Company
Judith A. Kermans, Gabriel Roeder Smith & Company
We reserve the right to amend the witness list as may be necessary.


IV. Time 15-30 minutes

III. Exhibits:

A. Gabriel Roeder Smith & Company Report of the June 30, 2013 75th Annual Actuarial Valuation, pg. A-8, A9.
B. Annual report of the Board of Trustees for the Year Ended Jun 30, 2012, pg 2-3,
C. Annual report of the Board of Trustees for the Year Ended June 30, 2011, pg. 2-3, 21
D. The Plot Against Pensions, pg 1-11

 Wherefore, the Plan of Adjustment is flawed, not fair, equitable or just.  Therefore it should not be confirmed.


Respectfully Submitted,

Yvonne Williams Jones

153 Arden Park Blvd

Detroit, Michigan  48202

313-872-0973

Cecily McCellan
111 Calvert
Detroit, MI 48202

## COMMENTS (CONCLUDED)

## GASB Changes

For plan years beginning in 2013, new reporting standards will be required. The new reporting standards will be substantially different than the current standards. Some of the changes include reporting of:

- Liabilities that may be materially different than the liabilities currently developed for funding;
- Unfunded liabilities based on the market value of assets;
- Annual plan expenses that may differ materially from the contribution developed for current funding.

Some of the calculations that will need to be performed will differ depending on the existence of a formal written policy. As such, the Board should consider developing a formal written funding policy if one does not currently exist.

## Recommendations

**As of June 30, 2013, the annual benefits were approximately 9% of the market value of assets. Failure to receive employer contributions on a timely basis could jeopardize the sustainability of the fund. We recommend that all previously computed employer contributions be deposited into the fund as soon as possible.**

The development of the employer contribution is based on a stable (or growing) total covered payroll. Payroll actually declined during the year ending June 30, 2013. If future payroll contraction is expected over the next 1-2 years, we recommend making employer contributions based on the computed dollar amount shown on page A-1, instead of the percent of payroll, to avoid the contribution loss that occurs with a declining payroll.

## Conclusion

**The Retirement System is 70% funded as of June 30, 2013, based on the funding value of assets (58% on a market value of assets basis). Based upon the funding policy established by the Board, the data furnished by the Retirement System and the actuarial assumptions shown in the Appendix, the weighted average recommended employer contribution rate for the 2014-2015 fiscal year is 43.83% of covered payroll assuming past due and currently due contributions are not made or 41.88% of covered payroll if they are made with the rate for each separate division as shown on page A-1.**

# SOLVENCY TESTS

The DGRS funding objective is to meet long-term benefit promises through contributions made during members' working careers which, combined with investment income on System assets, will be sufficient to pay benefits throughout their retired lives. If the contributions to the System are received in a timely manner, the System will pay all promised benefits when due -- the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test.*

*A short-term solvency test* is one means of checking a System's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1)  Active member contributions on deposit;
2)  The liabilities for future benefits to present retired lives;
3)  The liabilities for service already rendered by active members.

In a System that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

## SHORT-TERM SOLVENCY TEST
## 5-YEAR COMPARATIVE STATEMENT
## ($ IN MILLIONS)

| June 30 | Actuarial Accrued Liabilities | | | Valuation Assets | Portion of Accrued Liabilities Covered by Assets | | | |
|---|---|---|---|---|---|---|---|---|
| | (1) Active Member Contr. | (2) Retirees and Benef. | (3) Present Members (Employer-Financed Portion) | | (1) | (2) | (3) | Total |
| 2009 | $ 709 | $1,901 | $1,080 | $3,412 | 100% | 100% | 74% | 92% |
| 2010(a) | 649 | 1,949 | 1,121 | 3,238 | 100% | 100% | 57% | 87% |
| 2011 | 596 | 2,059 | 1,065 | 3,080 | 100% | 100% | 40% | 83% |
| 2012 | 485 | 2,306 | 854 | 2,806 | 100% | 100% | 2% | 77% |
| 2013 | 402 | 2,414 | 794 | 2,525 | 100% | 88% | 0% | 70% & |

*(a) After changes in actuarial assumptions and/or methods.*
*& 58% on a market value basis. Assumes past due contributions of $36M are NOT made.*

13-53846-tjt  Doc 8869-60   Filed 12/18/14   Entered 12/18/14 16:54:48   Page 5 of 23
13-53846-swr  Doc 8089-9   Filed 09/18/14   Entered 09/18/14 10:31:48   Page 5 of 23

# BOARD OF TRUSTEES LETTER

*to all active members & retirees of the
general retirement system of the city of detroit*



Susan Glaser
Chairperson
Board of Trustees

## DEAR MEMBERS:

On behalf of the Board of Trustees of the General Retirement System of the City of Detroit, I am pleased to present the annual report of the Retirement System for the 2010 – 2011 fiscal year ended June 30, 2011. This report will provide you with a summary of the plan benefit provisions, the financial condition of the Retirement System, assumptions used for actuarial valuations, and the Retirement System's investments.

Your Board of Trustees is pleased to report that the Retirement System is in sound actuarial condition. The Board invests all available funds in a diversified portfolio of investments with the objective of maximizing the overall long term appreciation of the Retirement System's assets while generating sufficient current income to pay the benefits which the members of the System have earned. This diversified portfolio is built around the Board's asset allocation plan which is detailed on pages 29, and 30 and summarized on page 32.

The Board's asset allocation is built upon the foundation that the obligations of the Retirement System to pay the benefits promised to its members and retirants are very long term obligations. Accordingly, the Board of Trustees must make investment decisions which it believes will be the most beneficial to the Retirement System over many years, not just one or two years.

The Retirement System exists to pay the benefits which its members have earned. The assets of the System provide the means to pay these benefits. The total assets of the System on June 30, 2011 were $2,421,566,956. During the fiscal year ended June 30, 2011 the System paid

- $221,498,249 *in benefits to retirants and beneficiaries, plus*

- $112,728,838 *in lump sum defined contribution plan benefits*

The Board's asset allocation delivered an overall market value rate of return for the current year, net of all expenses, equal to 20.9%. The Board has adopted the policy of computing the recognized rate of return by using a "smoothing" formula to average the market value rate of return over seven years. For the current year the recognized rate of return was 3.5%.

# BOARD OF TRUSTEES LETTER CON'T

The General Retirement System is *stable and secure and expects to meet all future retirement obligations to its members.* As of June 30, 2011 the ratio of the System's assets to its liabilities to pay future benefits was 83%. When comparing the Retirement System with other public employee retirement plans, the Retirement System ranks very favorably against other such plans as measured by its solvency and ability to meet all future retirement obligations to its members.

With the objective of providing the active and retired members of the System with better service, the Retirement System:

- *Established an annuity loan program for active members.*

- *Added staff at the front counter to handle ever increasing service requirements from its members.*

- *Upgraded the Retirement Systems internet web site (www.rscd.org)*

*which is available for member access to include enhancements to the pension benefit estimator.*

- *Enhanced its computer systems to improve response time to member inquiries.*

- *Continued to provide an 800 toll free telephone number (1-800-339-8344).*

These accomplishments reflect the continued hard work and dedication of the Board of Trustees, advisors, consultants and staff of the Retirement System. We ask for your continued support so that we can maintain a strong and financially secure Retirement System for all participants.

The Board of Trustees and its staff welcome your suggestions regarding the Retirement System and encourage you to inform us how we might better serve you. If you have any suggestions for the 2011 – 2012

Annual Report, please send them to the Annual Report Committee at 908 Coleman A. Young Municipal Center, Detroit, Michigan 48226.

Sincerely,

Susan Glaser
Chairperson
Board of Trustees

# SOLVENCY TESTS

The DGRS funding objective is to meet long-term benefit promises through contributions that remain approximately level from year to year as a percent of member payroll. If the contributions to the System are level in concept and soundly executed, the System will pay all promised benefits when due – the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test.*

*A short-term solvency test* is one means of checking a system's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

1) Active member contributions on deposit;
2) The liabilities for future benefits to present retired lives;
3) The liabilities for service already rendered by active members.

In a system that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

## SHORT-TERM SOLVENCY TEST
### 5-YEAR COMPARATIVE STATEMENT
#### ($ IN MILLIONS)

| | ACTUARIAL ACCRUED LIABILITIES | | | | PORTION OF ACCRUED LIABILITIES COVERED BY ASSETS | | | |
|---|---|---|---|---|---|---|---|---|
| JUNE 30 | (1) ACTIVE MEMBER CONTR. | (2) RETIRANTS AND BENEF. | (3) PRESENT MEMBERS (EMPLOYER-FINANCED PORTION) | VALUATION ASSETS | (1) | (2) | (3) | TOTAL |
| 2007 ....... | 733 ....... | 1,804 ....... | 1,092 ....... | 3,587 ....... | 100 ....... | 100 ....... | 96 ....... | 99 |
| 2008(a) ....... | 732 ....... | 1,805 ....... | 1,073 ....... | 3,641 ....... | 100 ....... | 100 ....... | 103 ....... | 101 |
| 2009 ....... | 709 ....... | 1,901 ....... | 1,080 ....... | 3,412 ....... | 100 ....... | 100 ....... | 74 ....... | 92 |
| 2010(a) ....... | 649 ....... | 1,949 ....... | 1,121 ....... | 3,238 ....... | 100 ....... | 100 ....... | 57 ....... | 87& |
| 2011 ....... | $596 ....... | $2,059 ....... | $1,065 ....... | $3,080 ....... | 100% ....... | 100% ....... | 40% ....... | 83%& |

(a) After changes in actuarial assumptions and/or methods.
& 65% on a market value basis.



# BOARD OF TRUSTEES LETTER

*to all active members & retirees of the general retirement system of the city of detroit*



Susan Glaser
Chairperson
Board of Trustees

## DEAR MEMBERS:

On behalf of the Board of Trustees of the General Retirement System of the City of Detroit, I am pleased to present the annual report of the Retirement System for the 2011 – 2012 fiscal year ended June 30, 2012. This report will provide you with a summary of the plan benefit provisions, the financial condition of the Retirement System, assumptions used for actuarial valuations, and the Retirement System's investments.

Your Board of Trustees is pleased to report that the Retirement System is in sound actuarial condition. The Board invests all available funds in a diversified portfolio of investments with the objective of maximizing the overall long term appreciation of the Retirement System's assets while generating sufficient current income to pay the benefits which the members of the System have earned. This diversified portfolio is built around the Board's asset allocation plan which is detailed on pages 29 through 33 and summarized on pages 34. The Board's asset allocation is built upon the foundation that the obligations of the Retirement System to pay the benefits promised to its members and retirants are very long term obligations. Accordingly, the Board of Trustees must make investment decisions which it believes will be the most beneficial to the Retirement System over many years, not just one or two years.

The Retirement System exists to pay the benefits which its members have earned. The assets of the System provide the means to pay these benefits. The total assets of the System on June 30, 2012 were $2,158,837,848. During the fiscal year ended June 30, 2012 the System paid

• *$230,915,545 in benefits to retirants and beneficiaries, plus*

• *$156,865,860 in lump sum defined contribution plan benefits*

The Board's asset allocation delivered an overall market value rate of return for the current year, net of all expenses, equal to 2.2%. The Board has adopted the policy of computing the recognized rate of return by using a "smoothing" formula to average the market value rate of return over seven years. For the current year the recognized rate of return was 1.4%.

# BOARD OF TRUSTEES LETTER CON'T

The General Retirement System is *stable and secure and expects to meet all future retirement obligations to its members. As of June 30, 2012 the ratio of the System's assets to its liabilities to pay future benefits was 77%. When comparing the Retirement System with other public employee retirement plans, the Retirement System ranks very favorably against other such plans as measured by its solvency and ability to meet all future retirement obligations to its members.*

With the objective of providing the active and retired members of the System with better service, the Retirement System:

- *Established an annuity loan program for active members.*

- *Added staff at the front counter to handle ever increasing service requirements from its members.*

- *Upgraded the Retirement Systems internet web site (www.rscd.org)*

which is available for member access to include enhancements to the pension benefit estimator.

- *Enhanced its computer systems to improve response time to member inquiries.*

- *Continued to provide an 800 toll free telephone number (1-800-339-8344).*

These accomplishments reflect the continued hard work and dedication of the Board of Trustees, advisors, consultants and staff of the Retirement System. We ask for your continued support so that we can maintain a strong and financially secure Retirement System for all participants.

The Board of Trustees and its staff welcome your suggestions regarding the Retirement System and encourage you to inform us how we might better serve you. If you have any suggestions for the 2012 - 2013

Annual Report, please send them to the Annual Report Committee at 908 Coleman A. Young Municipal Center, Detroit, Michigan 48226.

Sincerely,

Susan Glaser
Chairperson
Board of Trustees

# SOLVENCY TESTS

The DGRS funding objective is to meet long-term benefit promises made during members' working careers which, combined with investment income on system assets, will be sufficient to pay benefits throughout their retired lives. If the contributions to the Systemare received in a timely manner, the System will pay all promised benefits when due – the ultimate test of financial soundness. Testing for level contribution rates is *the long-term solvency test.*

*A short-term solvency test* is one means of checking a system's progress under its funding program. In a short-term solvency test, the plan's present assets (cash and investments) are compared with:

   1) Active member contributions on deposit;
   2) The liabilities for future benefits to present retired lives;
   3) The liabilities for service already rendered by active members.

In a system that has been following the discipline of level percent-of-payroll financing, the liabilities for active member contributions on deposit (liability 1) and the liabilities for future benefits to present retired lives (liability 2) will be fully covered by present assets (except in rare circumstances). In addition, the liabilities for service already rendered by active members (liability 3) will be partially covered by the remainder of present assets. The larger the funded portion of liability 3, the stronger the condition of the System.

## SHORT-TERM SOLVENCY TEST
## 5-YEAR COMPARATIVE STATEMENT
### ($ IN MILLIONS)

### ACTUARIAL ACCRUED LIABILITIES

| JUNE 30 | (1) ACTIVE MEMBER CONTRL. | (2) RETIRANTS AND BENEF. | (3) PRESENT MEMBERS (EMPLOYER-FINANCED PORTION) | VALUATION ASSETS | PORTION OF ACCRUED LIABILITIES COVERED BY ASSETS (1) | (2) | (3) | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 2008(a) | $732 | $1,805 | $1,073 | $3,641 | 100% | 100% | 103% | 101% |
| 2009 | 709 | 1,901 | 1,080 | 3,412 | 100 | 100 | 74 | 92 |
| 2010(a) | 649 | 1,949 | 1,121 | 3,238 | 100 | 100 | 57 | 87 |
| 2011 | 596 | 2,059 | 1,065 | 3,080 | 100 | 100 | 40 | 83 |
| 2012 | $485 | $2,306 | $854 | $2,806 | 100% | 100% | 2% | 77%& |

(a) After changes in actuarial assumptions and/or methods.

& 50% on a market value basis.

# Executive Summary

This report evaluates both the general state of the national debate over pensions and the specific effects of the partnership between the Pew Charitable Trusts' Public Sector Retirement Systems Project and the Laura and John Arnold Foundation. The following is a summary of the report's findings:

**Finding: Conservative activists are manufacturing the perception of a public pension crisis in order to both slash modest retiree benefits and preserve expensive corporate subsidies and tax breaks.**

■ States and cities have for years been failing to fully fund their annual pension obligations. They have used funds that were supposed to go to pensions to instead finance expensive tax cuts and corporate subsidies. That has helped create a real but manageable pension shortfall. Yet, instead of citing such a shortfall as reason to end expensive tax cuts and subsidies, conservative activists and lawmakers are citing it as a reason to slash retiree benefits.

**Finding: The amount states and cities spend on corporate subsidies and so-called tax expenditures is far more than the pension shortfalls they face. Yet, conservative activists and lawmakers are citing the pension shortfalls and not the subsidies as the cause of budget squeezes. They are then claiming that cutting retiree benefits is the solution rather than simply rolling back the more expensive tax breaks and subsidies.**

*SHORTFALL IN PERSPECTIVE*

*Public pensions face a 30-year shortfall of $1.38 trillion, or $46 billion on an annual basis. This is dwarfed by the $80 billion a year states and cities spend on corporate subsidies.*

■ According to Pew, public pensions face a 30-year shortfall of $1.38 trillion, or $46 billion on an annual basis. This is dwarfed by the $80 billion a year states and cities spend on corporate subsidies. Yet, conservatives cite the pension shortfall not as reason to reduce the corporate subsidies and raise public revenue, but instead as proof that retiree benefits need to be cut.

**Finding: The pension "reforms" being pushed by conservative activists would slash retirement income for many pensioners who are not part of the Social Security system. Additionally, the specific reforms they are pushing are often more expensive and risky for taxpayers than existing pension plans.**

■ Whether "cash balance" schemes or 401(k)-style defined contribution plans, many of the pension "reforms" being championed by conservative activists risk incurring more costs and increasing risks for taxpayers.

**Finding: The Pew Charitable Trusts and the Laura and John Arnold Foundation are working together in states across the country to focus the debate over pensions primarily on slashing retiree benefits rather**

**than on raising public revenues.**

- Pew's Public Sector Retirement Systems Project and the Laura and John Arnold Foundation are working in tandem on public pension policy to manufacture the perception of crisis and press for cuts to guaranteed retirement income. This campaign has played an integral role in states passing legislation that cuts guaranteed retirement income – all while those states preserve more expensive corporate subsidies.

**Finding: The Laura and John Arnold Foundation is run by conservative political operatives and funded by an Enron billionaire.**

- John Arnold is an Enron billionaire whose only major experience with pension management was his role in a company that decimated public pension funds. Well-known conservative political operatives and consultants run his foundation.

**Finding: The techniques used by conservative activists to gain public support to privatize the public pensions that public workers have instead of Social Security are, if successful, likely to be used in efforts to privatize Social Security in the future.**

- The current campaign to slash public pension benefits has relied on many of the same public relations strategies as President Bush's earlier campaign to privatize Social Security. In that sense, the campaign against public pensions is an exercise in perfecting methods that manufacture the perception of a crisis – and then result in cuts to guaranteed retirement income. If the state-based crusade against public pensions is successful, it will probably fuel a renewed effort to privatize Social Security.

# Table Of Contents

This report is broken into three sections, each of which build on one another to tell the story of the assault on public pensions. This story exemplifies how Americans' retirement security is now being undermined by an unholy alliance between public foundations and private billionaires.

**Part I: Manufacturing the Perception of a Crisis**

- A review of the manufactured "crisis" around public pensions and how the problems facing public pensions can be easily fixed with modest proposals that do not slash retirement benefits.

- A look at how, despite the fact that public pensions are not in crisis, conservative ideologues and business interests are nonetheless championing radical proposals to slash those pensions. In the process, they suppress a discussion about reducing the rampant corporate welfare that is draining revenues from public coffers.

**Part II: The Roots of a Powerful Partnership**

- A look at how Pew's recent jump into pension advocacy is moving the foundation away from its modern moderate brand and back toward its historical roots in conservative economic causes.

- An examination of John Arnold's ideological background, his ties to Republican leaders and operatives, his worldview of public pension policy, and his recent jump into state-based conservative politics.

**Part III: The Pew-Arnold Assault**

- A detailing of Pew and Arnold's overlapping pension work in 2011-12 in California, Florida, Rhode Island and Kansas.

- A look at Pew and Arnold's formal partnership pushing retirement benefit cuts between 2012-2013 in Arizona, Kentucky and Montana.

- An analysis of how the Pew-Arnold partnership will expand into more states in the next legislative sessions.

# Introduction

In May of 2013, the Pew Charitable Trusts released a report that sounded a frightening alarm. Entitled "Retirement Security Across Generations" and widely cited throughout the national media, the study found that a lack of retirement savings, less guaranteed pension income and the economic downturn have collectively exposed the next generation of Americans "to the real possibility of downward mobility in retirement."[1]

Summing up the study's implicit push to stabilize Americans' retirement future, a Pew official declared that lawmakers must focus on creating policies that help workers "make up for these losses and prepare for the future."

Pew's analysis, though eye-opening, was not particularly controversial. Writing in the *Wall Street Journal*, conservative Martin Morse Wooster acknowledges that the Pew Trusts are "treated as benign truth-tellers, so high-minded as to be beyond politics"[2] – and the call to shore up Americans' retirement security, indeed, upheld the organization's promise to "generate objective data."[3] Based on indisputable evidence, it proved that the country's move away from guaranteed pension income – and states' willingness to raid worker pension plans to finance massive corporate subsidies – will have disastrous consequences.

What was surprising was the fact that at the same time one branch of Pew was rightly sounding this moderate non-ideological alarm to shore up retirement security, and Pew's Economic Development Tax Incentives Project was warning of states' wasteful tax subsidies,[4] a more political branch of the organization was working in tandem with controversial Enron billionaire John Arnold to begin championing an ideologically driven plan to make the retirement problem far worse.

This Pew-Arnold partnership began informally in 2011 and 2012 when both organizations marshaled resources to try to set the stage for retirement benefit cuts in California, Florida, Rhode Island and Kansas. With legislative success in three of those four states, Pew and Arnold created a formal partnership in late 2012 that targeted another three states, Arizona, Kentucky and Montana. This formal partnership continues today, with the organizations issuing joint reports and conducting joint legislative briefings advocating cuts to guaranteed retirement income. It is widely expected that this partnership will continue working in these same states and potentially expand operations into Colorado, Pennsylvania, Oklahoma and Nevada.

## Should an Enron Executive Be Dictating Public Pension Policy?

In the lead-up to his anti-pension partnership with Pew, Arnold's most relevant connection to pensions and retirement security came from working at Enron – a company whose collapse destroyed its own workers' pensions and helped to damage the financial stability of public pension funds across America. Indeed, as *The New York Times* reported, "The rapid decline of the Enron Corporation devastated its employees' retirement plan."[5] Meanwhile, in a separate story, the newspaper noted that "across the United States,

1:13-cv-53846-swr   Doc 8669   Filed 12/18/14   Entered 12/18/14 10:54:18   Page 15 of 22

23

pension funds for union members, teachers, government employees and other workers have lost more than $1.5 billion because of the sharp decline in their Enron holdings."[6]

In light of Arnold's corporate pedigree, it's no surprise that, rather than "laying the foundation for effective government solutions," as Pew's mission promises, the Pew-Arnold partnership has been a campaign to reduce guaranteed retirement income for pensioners. As *Marketwatch* reported in 2013, Pew and Arnold are "advocat(ing) for cash balance plans."[7] They are advocating for 401(k)-style defined contribution plans as well.[8]

Like President George W. Bush's proposal to radically alter Social Security, many of these plans would transform stable public pension funds into individualized accounts. They also most often reduce millions of Americans' guaranteed retirement benefits. In many cases, they would also increase expenses for taxpayers and enrich Wall Street hedge fund managers.[9]

## A Pension-Cutting Movement That Ignores Data

These pension-slashing initiatives are part of a larger movement that aims to reduce or eliminate guaranteed retirement income for public workers. Leading this movement under the euphemistic guise of "reform," Pew's Public Sector Retirement Systems Project and the Arnold Foundation are trying to distract attention from what McClatchy Newspapers documented: namely, that "there's simply no evidence that state pensions are the current burden to public finances that their critics claim."[10]

ECONOMIC REALITY CHECK

*"There's simply no evidence that state pensions are the current burden to public finances that their critics claim."*

*— McClatchy Newspapers*

Rather than acknowledge that truth, Pew and Arnold have successfully manufactured the perception of crisis – which has prompted demands for dramatic action. Pew and Arnold have consequently helped shape those general demands into specific efforts to cut guaranteed retirement income – all while downplaying (or altogether omitting) any discussion of the possibility of raising revenue through, for instance, ending taxpayer-funded corporate subsidies and so-called "tax expenditures." This deceptive message persists, even though these annual subsidies are typically far larger than the annual pension shortfalls. Indeed, to advocate cuts in retirement benefits, Pew and Arnold cite a 30-year, $1.38 trillion pension gap – a $46 billion annual shortfall.[11] Yet, they rarely ever mention that, as *The New York Times* reports, "states, counties and cities are giving up more than $80 billion each year to companies" in the form of subsidies and tax expenditures.[12]

Such an insidiously selective message is eerily reminiscent of Margaret Thatcher's infamous "There Is No Alternative" framing. It suggests that harming millions of middle-class workers is the only way forward – and that states shouldn't dare consider raising pension-fund revenue by eliminating corporate subsidies. Thanks to Pew, Arnold and other groups, this has now become the dominant argument even though the amount state and local

governments now spend on such wasteful handouts is far greater than the pension shortfalls.

Perhaps the most famous illustration of the pervasiveness of this deceptive argument comes from Detroit, Michigan. When the city recently declared bankruptcy, much of the media and political narrative around the fiasco simply assumed that public pension liabilities are the problem. Few noted that both Detroit and the state of Michigan have for years been spending hundreds of millions of dollars on wasteful corporate subsidies.[13] Worse, the very same political leaders pleading poverty to demand cuts to municipal pensions were simultaneously promising to spend more than a quarter-billion taxpayer dollars on a professional hockey arena.[14]

But as outrageous as the blame-the-pensioners mythology from Detroit is, it is the same misleading mythology that is now driving public policy in states across America. In Rhode Island, the state government slashed guaranteed pension benefits while handing $75 million to a retired professional baseball player for his failed video game scheme.[15] In Kentucky, the state government slashed pension benefits while continuing to spend $1.4 billion on tax expenditures. In Kansas, the state government slashed guaranteed pension benefits despite being lambasted by a watchdog group for its penchant for spending huge money on corporate welfare "megadeals."

In each of these states and many others now debating pension "reform," Pew and Arnold have colluded to shape a narrative that suggests cutting public pension benefits is the only viable path forward. This, despite the fact that A) cutting wasteful corporate welfare could raise enough revenues to prevent such cuts; B) the pension "reform" proposals from Pew and Arnold could end up costing more than simply shoring up the existing system; and C) pension expenditures are typically more reliable methods of economic stimulus than corporate welfare.[16]

BUYING PENSION POLICY
*"From Blackstone Group co-founder Peter Peterson to New York City Mayor Michael Bloomberg, some of the wealthiest Americans are beginning to pay increasing attention to this issue...(Pensioners) have to get used to billionaires brandishing checkbooks."*

— *Institutional Investor*

Those inconvenient facts have been ignored in the political debate over pensions. Thanks to the combination of Pew's well-known brand and Arnold's vast resources, the pension-slashing movement's extremist message has been able to dominate the political discourse in states throughout America.

The result is a skewed national conversation about state budgets – one in which middle-class public sector workers are increasingly asked to assume all the financial sacrifice for balancing the government books, and corporations and the wealthy are exempted from any sacrifice whatsoever.

## A Microcosmic Story for the *Citizens United* Age

This is the story not merely of two nonprofits nor merely of one set of economic issues – it is a microcosmic tale of how in the *Citizens United*

age, politically motivated billionaires can quietly implement an ideological agenda in local communities across the country.

Operating in state legislatures far away from the national media spotlight, these billionaires can launder their ideological agenda through seemingly nonpartisan foundations, with devastating legislative consequences for millions of taxpayers and families. And as the battle over America's retirement proves, it isn't just the infamous Koch Brothers at work anymore.

In this particularly important fight over pensions, Arnold is leveraging his Enron fortune and his ties to top Republican activists to forge a powerful partnership with Pew. Having already spent at least $10 million on his crusade to cut retirement benefits, Arnold's partnership with Pew is now driving and distorting the legislative debate over public pensions in at least seven states – and has helped enact huge cuts to retirement benefits in many of them.[17]

With other billionaires now reportedly following Arnold's lead and investing in the campaign to cut public workers' retirement benefits, the Pew-Arnold plot is poised to expand into every state in America. Indeed, as Institutional Investor reports, "From Blackstone Group co-founder Peter Peterson to New York City Mayor Michael Bloomberg, some of the wealthiest Americans are beginning to pay increasing attention to this issue," meaning that pensioners will "have to get used to billionaires brandishing checkbooks" in their political crusade to cut retiree benefits.[18]

## The Corporate Bait-and-Switch

The goals of the plot against pensions are both straightforward and deceptive. On the surface, the primary objective is to convert traditional defined-benefit pension funds that guarantee retirement income into riskier, costlier schemes that reduce benefits and income guarantees, and subject taxpayers and millions of workers' retirement funds to Enron's casino-style economics.

At the same time, waging a high-profile fight for such an objective also simultaneously helps achieve the conservative movement's larger goal of protecting profligate corporate subsidies.

The bait-and-switch at work is simple: The plot forwards the illusion that state budget problems are driven by pension benefits rather than by the far more expensive and wasteful corporate subsidies that states have been doling out for years. That ends up 1) focusing state budget debates on benefit-slashing proposals and therefore 2) downplaying proposals that would raise revenue to shore up existing retirement systems. The result is that the Pew-Arnold initiative at once helps the right's ideological crusade against traditional pensions and helps billionaires and the business lobby preserve corporations' huge state tax subsidies.

In bequeathing its brand to an Enron billionaire and embracing this campaign, Pew is being steered back toward its ultraconservative roots. In the process, the retirement security of millions of Americans is being jeopardized.

# Part I **Manufacturing a Crisis**

To appreciate just how radical the push to slash guaranteed public pension benefits really is, one must first appreciate that 1) the "crisis" language around pensions is, unto itself, fraudulent and 2) what pension financing problems do exist can be fixed without risky and radical schemes.

A brief review of the data shows that the "crisis" language is being employed to create a misleading portrait. As a recent Center for American Progress report notes, it is an illusion that pretends "a short-term shortfall caused by a large recession requires moving to a more expensive system that will cost (taxpayers) more in the long run."[19] That illusion aims to hide what McClatchy Newspapers documented when it declared that "there's simply no evidence that state pensions are the current burden to public finances that their critics claim."[20] It also aims to mainstream the economically and ideologically extreme.

### A Redux of Bush's Social Security Scheme

Just as conservative ideologues during the Bush era employed "crisis" language to try to convince America that Social Security is going "bankrupt" and therefore requires extreme benefit cuts and privatization, so too have they employed the same language to pretend current public pension shortfalls are an emergency requiring similar reductions. In Social Security's case, government data prove that the overall system is solvent and that the modest challenges the system faces can be easily addressed with policies that avoid radical cuts.[21] The same is true for public pensions.

According to Pew's estimates, "The gap between states' assets and their obligations for public sector (pension promises) is $1.38 trillion."[22] As the Center for Economic and Policy Research (CEPR) says, "It is important to note that this estimate is over a 30-year period, the normal planning period for public pensions."[23] It is also important to note that this shortfall is not the result of unsustainable increases in retirement benefits.

As CEPR's data analyses show, up until 2007, pension funds with the same benefits were running surpluses. That, of course, changed in recent years. Today there is certainly a gap between pension liabilities and pension funds. But the gap exists for two reasons that have been largely ignored in the ideological push to cut guaranteed retirement income: 1) $77 billion of the new gap was created by lawmakers recently raiding retirees'

**THE PENSION GAP
IN PERSPECTIVE**

**COMPARED TO STATE ECONOMIES:**

*The total pension shortfall "is less than 0.2 percent of projected gross state product over the next 30 years."*
*– Center for Economic and Policy Research*

**COMPARED TO STATE BUDGETS:**

*Pension costs "account for only 3.8 percent of state and local spending."*
*– Boston College*

**COMPARED TO CORPORATE WELFARE:**

*The $1.38 trillion state pension gap is roughly $46 billion a year over 30 years. That is far less than the $120 billion a year in public revenues that states and localities lose to offshore tax loopholes and corporate subsidies.*
*– The New York Times & U.S. PIRG study*

---

13-53846-swr   Doc 8869469  Filed 03/12/14  Entered 03/12/14 10:54:18  Page 19 of 22
23

pension monies to finance other public programs, and 2) most of the rest of the gap was created by the stock market plunge that came with the 2008 financial collapse.[24]

Of course, regardless of the cause, a $1.38 trillion shortfall can sound to casual onlookers like a crisis. But it is a comparatively modest problem over the long haul. That's because, as the CEPR report points out, in most states the shortfall "is less than 0.2 percent of projected gross state product over the next 30 years" and "even in the cases of the states with the largest shortfalls, the gap is less than 0.5 percent of projected state product."[25]

Budget-wise, Boston College's Center for Retirement Research notes that pension contributions are not budget busters; on the contrary, they "account for only 3.8 percent of state and local spending."[26]

To put those numbers into perspective, remember that the 30-year $1.38 trillion pension shortfall is just $46 billion a year – and "just" is the operative word in comparison to the amount of public revenues states currently give away in the form of corporate subsidies, wasteful tax expenditures and tax loopholes.

A 2013 study by the U.S. Public Interest Research Group found that states lose roughly $40 billion a year thanks to loopholes that let corporations engage in offshore tax avoidance.[27] Additionally, a *New York Times* analysis recently found that "states, counties and cities are giving up more than $80 billion each year to companies."[28] Over 30 years, that combined $120 billion a year is $3.6 trillion in lost revenue – or almost three times the size of America's combined public pension gap.

## The Retirement Bait-and-Switch

The aforementioned data is why, as the National Association of State Retirement Administrators says, "The idea of imminent (public pension) insolvency is a gross distortion." It is also why the head of the Milken Institute's Center for Emerging Domestic Markets concludes that the manageable pension problem "in this moment is revenue" – not allegedly unaffordable retirement benefits. And it is why the attempt to create the perception of a "crisis" as a means to slash guaranteed retirement income – rather than raise public revenue – is so deceptive.

In repeatedly refusing to devote the money needed to fulfill states' negotiated obligations to public pension funds, lawmakers have effectively raided their workers' retirement benefits to finance subsidies to already wealthy corporations – many of which are undoubtedly those lawmakers' major campaign donors.

When the housing crisis hit, the stock market's subsequent crash should have prompted legislators to slash corporate subsidies, close tax loopholes and return more of the raided money to pensioners.[29] After all, as *The Washington Post*'s Ezra Klein points out, "Republicans and some Democrats and business interests passed (the) massive unfunded tax cuts that turned pension programs into ticking time bombs."[30] Those tax cuts could have just

as easily been repealed when the stock market dropped.

Instead, though, those business interests that want their subsidies and tax breaks preserved have convinced politicians to blame public workers' alleged greed and cite the pension shortfalls as reason to radically change the pension system for the long haul.

## Prioritizing Risky, More Expensive Schemes Over Pragmatic Solutions

That gets to the second point about solutions: with states currently giving away so much cash in the form of corporate handouts, the most pragmatic way to deal with manageable pension shortfalls is to simply give away a little less. By limiting tax loopholes and slightly reducing corporate welfare, states would have more than enough resources to make public pension systems whole again.

States could, for example, close the tax loopholes that allow 68 Fortune 500 companies to pay no state corporate income tax in at least one year between 2008 and 2010.[31] Similarly, they could follow the lead of states like Oregon, Alaska and West Virginia, which have recently moved to close loopholes that let corporations exploit offshore tax havens and avoid contributing to the public coffers.[32]

Under such proposals, revenues can be reclaimed from corporate welfare programs that have no proven record of creating jobs. It can then be invested in public pension funds, which data prove boost economies by putting money in the hands of those middle-class retirees who will spend it locally – and quickly.[33] Indeed, as the National Institute on Retirement Security reports, when it comes to traditional defined benefit retirement plans, "For each dollar paid out in pension benefits, $2.37 in total economic output" is generated and "for every dollar contributed by taxpayers to state and local pension funds, $8.72 in total output" was supported.[34]

In contrast to such a pragmatic path forward, proposals being championed by conservative ideologues and business interests look all the more extreme. These initiatives typically propose to cut pension benefits, convert traditional pensions to 401(k)-style defined contribution plans[35] and/or replace traditional pensions with so-

### PENSIONS: JOB-CREATING ECONOMIC STIMULUS

*Taxpayer subsidies to corporations are typically portrayed as job creating necessities, while public pensions are usually depicted as job-killing drains on state economies. But it is exactly the opposite – often times, corporate welfare does not produce promised economic benefits, while expenditures on defined-benefit pension plans typically create jobs and boost economies. Here's what the National Institute on Retirement Security reported in 2012:*

### BENEFITS AS STIMULUS:

*"For each dollar paid out in pension benefits, $2.37 in total economic output was supported."*

### CONTRIBUTIONS AS STIMULUS:

*"For every taxpayer dollar contributed to state and local pensions, $8.72 in total output was supported nationally."*

### PENSIONS AS JOB CREATORS:

*"Pension expenditures support 6.5 million jobs...represent(ing) a full 4.2 percentage points of the national labor force."*

**Why traditional pensions cost less**

The cost of a defined-benefit pension plan and a
defined-contribution pension plan as a percent of payroll



Legend:
- No longevity risk pooling
- Less balanced portfolio
- Lower investment returns
- Defined-benefit cost

Defined-contribution plan    Defined-benefit plan

Source: Beth Almeida and William B. Fornia, "A Better Bang for the Buck:
The Economic Efficiencies of Defined Benefit Pension Plans," (Washington, DC:
National Institute for Retirement Security, 2008.

*The National Institute on Retirement Security notes that "to deliver the same level of retirement benefits, a defined-benefit plan can do the job at almost half the cost of a defined contribution plan."*

called "cash balance" schemes.

The latter schemes are often the most deceptive because they are still labeled as traditional defined benefit plans. However, they replace current systems that pool risk and guarantee retirement income with ones whose benefits are based on the cash balance of an employee's individual account. As Pew notes, "The state retirement agency manages the investments and guarantees a minimum annual rate of return" — but not guaranteed retirement *income.*

There are three fundamental problems with moving to either 401(k)-style defined contribution plans or cash balance schemes:

**They add volatility rather than reduce it.** For many current workers, such plans would mean cuts to guaranteed pension income.[36] For many public employees, a lack of guaranteed retirement income is particularly problematic because many of them as public employees are not eligible for Social Security's defined benefits and would therefore have no consistent retirement income whatsoever.

**They threaten to cost taxpayers more.** The possibility of benefit reductions open up states to expensive lawsuits asking courts to uphold contracts preventing such cuts. Additionally, converting traditional defined-benefit pension plans to 401(k)-style defined-contribution plans can end up raising costs for taxpayers because the latter are often less cost effective and more expensive.[37] As the National Institute on Retirement Security documents, because traditional pension plans better pool and manage risk, they typically "offer the same retirement benefit at close to half the cost of a (defined contribution) retirement savings plan."[38]

**They threaten to drive employees into poverty.** Reuters' Mark Miller points out that because they eliminate the guarantee of minimum retirement income, "there's a real risk that pension reforms could push public sector retirees into poverty." This is particularly true because many public employees do not participate in the Social Security system, so they have no guaranteed retirement income security. The result would create the likelihood of additional taxpayer costs for public assistance.[39]

Evidence from states confirms these problems. For example:

**Kentucky:** An independent actuarial analysis of the state's new cash balance plan found that it "would make paying Kentucky's unfunded pension liability

FILED (I)

2014 AUG 18 P 4: 18

U.S. [illegible] COURT
ED [illegible]

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

IN RE: *City of Detroit*

CASE NO: *13-53846*
CHAPTER: *Chapter 9*

                    Debtor.
_____/

## CERTIFICATE OF SERVICE

I hereby certify that on _____ *8-14-14* _____ (date of mailing), I served

copies as follows:

1. Document(s) served:

   *Motion to Object to 5th Amended Plan of Adjustment and all correction*

2. Served upon [name and address of each person served]:

   *David Heiman*
   *Jones Day*
   *901 Lakeside Ave.*
   *Cleveland, Ohio 44114*

3. By First Class Mail.

Dated: *8/18/ 2014*

*Yvonne Williams Jones*
(Signature)

Print Name: *Yvonne Williams Jones*