# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## EXHIBIT 102

### APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

In connection with Notice of Appeal filed by
William M. Davis and DAREA [Dkt. #8369].

| Item | Date Filed | Docket Number | Description |
|---|---|---|---|
| 102 | 10/31/2014 | 8154 | Notice of Filing Proposed Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit |

3.      Prior to the filing of this Notice, the City circulated drafts or excerpts of the Proposed Confirmation Order to, and solicited comments thereon from, the following parties or their counsel (collectively, the "Review Parties"): (a) Ambac; (b) Assured; (c) Barclays Capital, Inc.; (d) Blackrock Financial Management; (e) the Community Foundation for Southeast Michigan; (f) the COP Swap Counterparties; (g) DIA Corp.; (h) FGIC; (i) the FGIC COP Holders; (j) NPFG; (k) the Retiree Committee; (l) the Retirement Systems; (m) the State; and (n) Syncora. The City has engaged in discussions with the Review Parties regarding any proposed revisions to the draft Proposed Confirmation Order and has incorporated all agreed-upon changes suggested by the Review Parties.

4.      The City reserves the right to further amend, modify or supplement the Proposed Confirmation Order as it deems necessary or appropriate.

5.      Copies of the Plan can be obtained, free of charge, from the City's restructuring website at https://www.kccllc.net/detroit.

Dated: October 31, 2014

Respectfully submitted,

/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# ANNEX A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------x
                                                     :
In re                                                :        Chapter 9
                                                     :
CITY OF DETROIT, MICHIGAN,                            :        Case No. 13-53846
                                                     :
                              Debtor.                 :        Hon. Steven W. Rhodes
                                                     :
                                                     :
-------------------------------------------------------x

## ORDER CONFIRMING EIGHTH AMENDED PLAN FOR
## THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

13-53846-swr   Doc 8294-10   Filed 10/11/14   Entered 10/11/14 56:54:18   Page 5 of 163
13-53846-swr   Doc 8294-10   Filed 10/11/14   Entered 10/11/14 56:54:18   Page 5 of 163
163

# TABLE OF CONTENTS

FINDINGS OF FACT AND CONCLUSIONS OF LAW .........................................5

Jurisdiction and Venue ..............................................................5

Modifications of the Plan ...........................................................5

Standards for Confirmation Under Section 943 of the
Bankruptcy Code .....................................................................6

    Section 943(b)(1)..................................................................7

        Section 1122 .....................................................................7

        Section 1123(a)(1)................................................................7

        Section 1123(a)(2)................................................................8

        Section 1123(a)(3)................................................................8

        Section 1123(a)(4)................................................................8

        Section 1123(a)(5)...............................................................10

        Section 1123(b)(1) ...............................................................11

        Section 1123(b)(2) ...............................................................11

        Section 1123(b)(3) ...............................................................11

        Section 1123(b)(5) ...............................................................12

        Section 1123(b)(6) ...............................................................12

        Section 1123(d) ..................................................................12

        Section 1127(d) ..................................................................13

        Section 1129(a)(2)...............................................................13

        Section 1129(a)(3)...............................................................20

        Section 1129(a)(6)...............................................................21

        Section 1129(a)(8)...............................................................22

        Section 1129(a)(10) ..............................................................22

        Section 1129(b)(1) – Unfair Discrimination............................23

        Sections 1129(b)(1), (b)(2) – Fair and Equitable.....................29

    Section 943(b)(2)..................................................................33

    Section 943(b)(3)..................................................................34

Section 943(b)(4) ..........................................................................35

    ASF Recoupment .................................................................37

Section 943(b)(5) ..........................................................................41

Section 943(b)(6) ..........................................................................41

Section 943(b)(7) ..........................................................................42

    Best Interests of Creditors..................................................42

    Feasibility ............................................................................44

Executory Contracts................................................................................58

Settlements and Releases ........................................................................59

    The DIA Settlement............................................................61

    The UTGO Settlement .......................................................66

    The LTGO Settlement ........................................................70

    The OPEB Settlement ........................................................72

    The 36th District Court Settlement ....................................73

    The Syncora Settlement .....................................................74

    The FGIC/COP Settlement .................................................77

    Plan Releases ......................................................................80

Miscellaneous .........................................................................................84

    Exit Facility ........................................................................84

    Waiver of Stay of Confirmation Order ..............................85

ORDER ....................................................................................................86

  A.    Confirmation of Plan ...............................................................86

  B.    Findings of Fact and Conclusions of Law.............................87

  C.    Approval of Settlements.........................................................88

  D.    Approval of Releases and Exculpation ..................................96

  E.    Order Binding on All Parties................................................103

  F.    Discharge of Claims .............................................................105

  G.    Release of Liens ...................................................................105

  H.    Injunction.............................................................................106

| | | |
|---|---|---|
| I. | State Contribution Agreement | 110 |
| J. | DWSD Authority Transaction | 111 |
| K. | ASF Recoupment | 112 |
| L. | Survival of Indemnities | 115 |
| M. | Issuance of New Securities and Exemption From Securities Laws | 116 |
| N. | Executory Contracts and Unexpired Leases | 117 |
| O. | Plan Distributions | 119 |
| P. | Retained Causes of Action | 119 |
| Q. | Claims Bar Dates and Other Claims Matters | 120 |
| R. | Plan Implementation | 126 |
| S. | Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents | 127 |
| T. | Binding Effect of Prior Orders | 131 |
| U. | Final Order; Waiver of Stay | 131 |
| V. | Reversal | 131 |
| W. | Notice of Confirmation of Plan | 132 |
| X. | Miscellaneous Provisions | 133 |
| Y. | No Diminution of State Power | 140 |
| Z. | Post-Effective Date Governance | 140 |
| AA. | Retention of Jurisdiction | 140 |

| | |
|---|---|
| Appendix I | Plan of Adjustment |
| Appendix II | Modifications to Plan |
| Appendix III | Confirmation Notice |

The City of Detroit (the "City" or the "Debtor") having proposed its Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014) (**[as modified by the Modifications,]** the "Plan" or the "Eighth Amended Plan"),[1] a true and correct copy of which (without exhibits) is attached hereto as Appendix I**[, as modified by errata notices/modifications (collectively, the "Modifications," true and correct copies of which are annexed hereto as Appendix II])]**; the Court having conducted a 24-day evidentiary hearing to consider confirmation of the Plan on August 18, September 2-5, September 8-9, September 15-18, September 29 to October 3, October 6, October 14-16, October 20-22 and October 27, 2014 (the "Confirmation Hearing"); the Court having conducted a hearing on July 15, 2014, at which 46 individuals who (i) filed objections to Confirmation of the Plan with the Court and (ii) appeared in the Chapter 9 Case *pro se* made presentations with respect to such objections to the Court (the "*Pro Se* Hearing") and the Court having considered the arguments of such parties at the *Pro Se* Hearing;[2] the Court having conducted hearings on certain

---

[1]     On May 5, 2014, the City filed its Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014) (the "Fourth Amended Plan"), which version of the Plan was included in the contents of the solicitation packages distributed to creditors entitled to vote thereon.

All capitalized terms used but not defined herein have the meanings given to them in the Plan.

[2]     *See* Notice of Hearing to Individuals Who Filed Plan Objections (Docket No. 5264) (June 10, 2014).

legal issues related to confirmation of the Plan on July 16, 2014 and

August 19, 2014; the Court having considered:  (i) the testimony of the

41 witnesses called at the Confirmation Hearing, as well as the affidavits and

declarations included among the 2,327 exhibits admitted into evidence at the

Confirmation Hearing; (ii) the arguments of counsel presented at the Confirmation

Hearing; (iii) the pleadings filed by the City in support of the Plan, including the

following:

- Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "Consolidated Reply"), filed by the City on May 26, 2014;

- Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5707), filed by the City on June 30, 2014;

- City's Supplemental Brief Regarding Standing of Syncora to Raise Certain Objections to Confirmation (Docket No. 6010), filed by the City on July 14, 2014;

- The City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842), filed by the City on August 18, 2014;

- Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections (Docket No. 7143), filed by the City on August 27, 2014 (the "Pretrial Brief"), including the summary of the City's compliance with the standards of

section 943 of the Bankruptcy Code (inclusive of the standards of sections 1122, 1123(a)(1)-(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a)-1126(c), 1126(e)-1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code) attached as Exhibit A thereto (the "<u>Confirmation Standards Exhibit</u>");

- Consolidated Response to Certain *Pro Se* Objections to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7303) (the "<u>Response to *Pro Se* Objections</u>"), filed by the City on September 5, 2014;

- Consolidated Reply to Supplemental Objections to Confirmation of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7707), filed by the City on September 26, 2014, as well as all other pleadings filed in support of the Plan by parties in interest; and

- Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (October 22, 2014) (Docket No. 8045), including all Exhibits thereto.

(iv) the objections filed with respect to Confirmation of the Plan;[3] (v) the

resolution, settlement or withdrawal of timely objections to Confirmation of the

Plan filed by, among others, FGIC, Syncora, the FGIC COP Holders, the DWSD

---

[3] *See* Summary of the City's Responses to Initial Plan Objections, attached as Exhibit A to the Consolidated Reply; Summary of the City's Responses to (I) Supplemental Objections and (II) Objections filed by (A) the UAW and (B) AFSCME, attached as Exhibit B to the Pretrial Brief; Summary of the City's Responses to (I) *Pro Se* Objections Specified in the Order Requiring City to Respond to Certain *Pro Se* Objections to Confirmation [Docket No. 6640] and (II) *Pro Se* Objections Not Addressed in the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit [Docket No. 5034], attached as Exhibit A to the Response to *Pro Se* Objections.

-3-
163
13-53846-swr Doc 8099-1 Filed 10/31/14 Entered 10/31/14 16:54:18 Page 11 of
13-53846-swr Doc 8994-1 Filed 12/18/14 Entered 12/18/14 17:58:34 Page 11 of 163

Settlement Parties, the LTGO Insurer, certain insurers of Unlimited Tax General

Obligation Bonds, Michigan Council 25 of the American Federation of State,

County and Municipal Employees, AFL-CIO ("AFSCME"), the International

Union, UAW, each of the Counties and the Macomb Interceptor Drain Drainage

District; and the Court being familiar with the Plan and other relevant factors

affecting this Chapter 9 Case; the Court having taken judicial notice of the entire

docket of the City's Chapter 9 Case maintained by the Clerk of the Court and/or its

duly appointed agent, pursuant to Federal Rule of Evidence 201(c) (made

applicable to this case by Bankruptcy Rule 9017), including, but not limited to,

those orders, pleadings and other documents set forth in the Confirmation

Standards Exhibit; the Court having found that due and proper notice has been

given with respect to the Confirmation Hearing and the deadlines and procedures

for filing objections to the Plan; the appearance of all interested parties having

been duly noted in the record of the Confirmation Hearing; and upon the record of

the Confirmation Hearing, and after due deliberation thereon, and sufficient cause

appearing therefor;

IT IS HEREBY FOUND AND CONCLUDED, that:

## JURISDICTION AND VENUE

A.      The Court has jurisdiction over this matter and this Chapter 9
Case pursuant to 28 U.S.C. § 1334 and Rule 83.50(a) of the Local Rules of the
United States District Court for the Eastern District of Michigan.

B.      Confirmation of the Plan is a core proceeding pursuant to
28 U.S.C. § 157(b)(2)(L), and this Court has jurisdiction to enter a final order with
respect thereto.

C.      The City is a proper debtor under section 109 of the Bankruptcy
Code[4] and the proper proponent of the Plan under section 941 of the Bankruptcy
Code.

D.      On the Effective Date of the Plan, or as soon thereafter as is
practicable, all appeals of the Opinion Regarding Eligibility and the Order for
Relief, in accordance with settlements by and among the appellants and the City,
shall be withdrawn.

## MODIFICATIONS OF THE PLAN

E.      Neither the Plan nor the Modifications materially and adversely
affect or change the treatment of any Claim against the City under the Fourth

---

[4]     *See* Opinion Regarding Eligibility (Docket No. 1945), entered on
December 5, 2013 (the "Opinion Regarding Eligibility"); Order for Relief
Under Chapter 9 of the Bankruptcy Code (Docket No. 1946), entered on
December 5, 2013 (the "Order for Relief").

-5-

13-53846-swr   Doc 8099-10   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 13 of 163
13-53846-swr   Doc 8994-10   Filed 12/18/14   Entered 12/18/14 16:54:18   Page 13 of 163

Amended Plan. Pursuant to sections 942 and 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, neither the Plan nor the Modifications require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Fourth Amended Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against the City be afforded an opportunity to change previously cast acceptances or rejections of the Fourth Amended Plan as filed with the Court. The filing of the Plan and the Modifications, and the disclosure of certain modifications and amendments to the Fourth Amended Plan contained therein on the record at the Confirmation Hearing, constitute due and sufficient notice thereof under the circumstances of the Chapter 9 Case. Accordingly, the Plan is properly before the Court, and, except as set forth in the Plan or later orders of the Court, all votes cast with respect to the Fourth Amended Plan prior to the filing of the Plan and the Modifications shall be binding and shall apply with respect to the Plan.

## STANDARDS FOR CONFIRMATION
## UNDER SECTION 943 OF THE BANKRUPTCY CODE

F. The evidentiary record of the Confirmation Hearing and the Confirmation Standards Exhibit support the findings of fact and conclusions of law set forth in the following paragraphs.

-6-
13-53846-swr   Doc 8099-102   Filed 10/12/14   Entered 10/12/14 16:54:18   Page 14 of
163
13-53846-swr   Doc 8274   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 14 of 163

G.    Section 943(b)(1).  The Plan complies with the provisions of the Bankruptcy Code made applicable to this Chapter 9 Case by sections 103(e) and 901 of the Bankruptcy Code.[5]  In particular:

1.    *Section 1122*.  In accordance with section 1122(a) of the Bankruptcy Code, Section II.B of the Plan classifies each Claim against the City into a Class containing only substantially similar Claims.  The legal rights under applicable law of each holder of Claims within each Class under the Plan are substantially similar in nature and character to the legal rights of all other holders of Claims within such Class.  No Claims were separately classified under the Plan to gerrymander favorable votes with respect to the Plan.  In accordance with section 1122(b) of the Bankruptcy Code, Convenience Claims are separately classified in Class 15 under the Plan solely for the purpose of administrative convenience.[6]

2.    *Section 1123(a)(1)*.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Section II.B of the Plan properly classifies all Claims that require classification.  Valid factual and legal reasons

_____

[5]    Section 901 of the Bankruptcy Code incorporates into chapter 9 the following chapter 11 provisions relevant to plan confirmation: sections 1122, 1123(a)(1)-(5), 1123(b), 1123(d), 1125, 1126(a)-(c) and (e)-(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1) and 1129(b)(2)(A)-(B) of the Bankruptcy Code.  *See* 11 U.S.C. § 901(a).

[6]    S*ee* Confirmation Standards Exhibit, at 2-4.

exist for the separate classification of (a) certain secured Claims from Other

Secured Claims and (b) certain unsecured Claims from Other Unsecured Claims.[7]

3. *Section 1123(a)(2)*.  In accordance with

section 1123(a)(2) of the Bankruptcy Code, Section II.B of the Plan properly

identifies and describes each Class of Claims that is not impaired under the Plan.[8]

4. *Section 1123(a)(3)*.  In accordance with

section 1123(a)(3) of the Bankruptcy Code, Section II.B of the Plan properly

identifies and describes the treatment of each Class of Claims that is impaired

under the Plan.[9]

5. *Section 1123(a)(4)*.  In accordance with

section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment

for each Claim of a particular Class unless the holder of such a Claim has agreed to

less favorable treatment.[10]  Because ASF Recoupment is a restorative mechanism

---

[7]     S*ee id.* at 2-5.

[8]     *See id.* at 5; Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered on August 25, 2014 (the "DWSD Tender Order"); Notice of Occurrence of Settlement Date and Unimpairment of Class 1A Claims and (B) Withdrawal of DWSD Plan Objections by Financial Creditors (Docket No. 7268), filed on September 4, 2014 (the "DWSD Settlement Notice").

[9]     *See* Confirmation Standards Exhibit, at 2-4.

[10]    S*ee id.* at 6.

designed to (a) implement a critical component of the City's comprehensive settlement of pension-related issues and (b) enable the trustees of the GRS (collectively, the "GRS Trustees") to recover a portion of excess interest improperly allocated to members' Annuity Savings Fund accounts from the GRS's traditional defined benefit pension plan (the "GRS Traditional Pension Plan"), ASF Recoupment is (x) separate and distinct from the calculation of recoveries provided to holders of GRS Pension Claims and, thus, (y) has been disregarded for purposes of determining whether the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

6.  The consideration provided to Syncora in connection with the Syncora Settlement that is not provided on account of the Plan COP Settlement (a) is separate and distinct from the treatment of Class 9 COP Claims held or insured by Syncora under the Plan, (b) is provided on account of (i) Syncora's commercial relationships with the City that are unrelated to COP Claims held or insured by Syncora and (ii) Syncora's agreement to resolve all of its pending litigation against the City and, thus, (c) has been disregarded for purposes of determining whether the Plan complies with section 1123(a)(4) of the Bankruptcy Code.[11] The consideration provided to FGIC in connection with the FGIC/COP Settlement that is not provided on account of the Plan COP Settlement

_____

[11] *See* 10/3 Transcript, at 139:18-140:10 (Testimony of James Doak).

(a) is separate and distinct from the treatment of Class 9 COP Claims held or

insured by FGIC under the Plan, (b) is provided on account of FGIC's agreement to

resolve all of its pending litigation against the City and, thus, (c) has been

disregarded for purposes of determining whether the Plan complies with

section 1123(a)(4) of the Bankruptcy Code.[12]

       7.    *Section 1123(a)(5).*  In accordance with

section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for

its implementation, including, without limitation, (a) the issuance of the New

Securities pursuant to the Plan, (b) the consummation of the Settlements (as such

term is defined below) described in the Plan, (c) the consummation of the State

Contribution Agreement, (d) the assumption or rejection of Executory Contracts

and Unexpired Leases, (e) the establishment and funding of the Professional Fee

Reserve, (f) the City's assumption of certain indemnification obligations, (g) the

City's entry into the Exit Facility and any agreements and ancillary notes related

thereto and (h) the provisions regarding Effective Date transactions and transfers in

Article IV of the Plan.[13]

---

[12]    *See* 10/21 Transcript, at 109:9-18, 110:8-19, 135:14-136:3 (Testimony of Kevyn Orr).

[13]    S*ee* Confirmation Standards Exhibit, at 7.

8.   *Section 1123(b)(1).*  In accordance with

section 1123(b)(1) of the Bankruptcy Code, Section II.B of the Plan impairs or

leaves unimpaired, as the case may be, each Class of Claims.[14]

9.   *Section 1123(b)(2).*  In accordance with

section 1123(b)(2) of the Bankruptcy Code, Section II.D and other provisions of

the Plan provide for the assumption, assumption and assignment, or rejection of the

Executory Contracts or Unexpired Leases of the City that have not been previously

assumed, assumed and assigned, or rejected pursuant to section 365 of the

Bankruptcy Code and orders of the Court.[15]

10.   *Section 1123(b)(3).*  In accordance with

section 1123(b)(3) of the Bankruptcy Code, Section III.D.2 of the Plan provides

that, except as otherwise provided in the Plan or in any contract, instrument,

release or other agreement entered into or delivered in connection with the Plan,

the City will retain and may enforce any claims, demands, rights, defenses and

Causes of Action that it may hold against any Entity (including but not limited to

(a) any and all Causes of Action against any party relating to the past practices of

the Retirement Systems and (b) the currently pending actions and claims brought

---

[14]   S*ee id.*

[15]   *See id.*

by the City identified on Exhibit III.D.2 to the Plan), to the extent not expressly released under the Plan or by any Final Order of the Court.[16]

11. *Section 1123(b)(5)*. In accordance with section 1123(b)(5) of the Bankruptcy Code, Section II.B of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class.[17]

12. *Section 1123(b)(6)*. In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, the provisions of Article III, Article IV, Article V, Article VI, Article VII and Article VIII of the Plan.[18]

13. *Section 1123(d)*. In accordance with section 1123(d) of the Bankruptcy Code, Section II.D.4 of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All Cure Amount Claims will be determined in accordance with the underlying agreements and applicable law.[19]

---

[16] *See id.*

[17] S*ee id.* at 8.

[18] *See id.*

[19] *See id.* at 9.

14. *Section 1127(d)*. All creditors entitled to vote on the Plan received proper notice of the Confirmation Hearing, and were provided an adequate opportunity to object to any amendments and Modifications to the Fourth Amended Plan.[20]

15. *Section 1129(a)(2)*. The City has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof. In particular, the Plan complies with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

a) In compliance with the (i) Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2984) (the "Solicitation Procedures Order"), entered on March 11, 2014, and (ii) Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment with Respect to Pension and OPEB Claims (Docket No. 4400) (together with the Solicitation Procedures Order, the "Solicitation Orders"), entered on May 5, 2014, on or before May 12, 2014, the City, through its claims, noticing, balloting and solicitation agent, Kurtzman Carson Consultants LLC ("KCC"), caused copies of the following materials to be transmitted to all holders of Claims in Classes that were entitled to vote to accept or reject the Fourth Amended Plan

---

[20] *See* Certificate of Service (Docket No. 6177).

-13-

(*i.e.*, Allowed Claims in impaired Classes within Class 1A[21] and Classes 5, 7, 8, 9, 10, 11, 12, 13, 14 and 15):

- the Disclosure Statement (together with the exhibits thereto, including the Fourth Amended Plan);

- a notice of the Confirmation Hearing and other matters (the "<u>Confirmation Hearing Notice</u>");

- an appropriate form of Ballot;

- a notice summarizing certain dispute resolution procedures to be employed with respect to voting;

- for holders of Claims in Classes 10, 11 and 12, a "<u>Plain Language Supplement</u>," drafted in collaboration with, among others, the Retiree Committee and the Retirement Systems, describing the treatment of such Claims in non-technical terms;

- the procedures for the solicitation and tabulation of votes to accept or reject the Plan, including approval of (i) the deadline for creditors' submission of Ballots, (ii) the rules for tabulating votes to accept or reject the Plan and (iii) the proposed record date for Plan voting (collectively with the materials described in the preceding bullets, the "<u>Solicitation Package</u>"); and

- cover letters from the City, the DRCEA, the RDPFFA, the Detroit Police Lieutenants and Sergeants Association (the "<u>DPLSA</u>") and the

---

[21]   Subsequent to the City's solicitation of acceptances of the Fourth Amended Plan, the Plan was amended to unimpair all Classes in Class 1A, and such Classes are therefore deemed to have accepted the Plan. *See* DWSD Tender Order; DWSD Settlement Notice. As a result, all votes and elections previously delivered with respect to Class 1A Claims shall not be counted and shall be of no force and effect.

Detroit Police Command Officers Association (the "DPCOA") recommending acceptance of the Plan.[22]

b) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, caused copies of the Solicitation Package (not including Ballots) to be transmitted to parties entitled to receive notice pursuant to Bankruptcy Rule 2002.[23]

c) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, transmitted (i) the Confirmation Hearing Notice and (ii) a "Notice of Non-Voting Status" to all holders of Claims in the Classes not entitled to vote on the Plan (*i.e.*, holders of Claims in unimpaired Classes within Class 1A and in Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and 16) that were not entitled to vote on the Plan.[24]

d) In compliance with the Solicitation Procedures Order, on or before May 12, 2014, the City, through KCC, transmitted the Confirmation Hearing Notice to: (i) all other creditors of the City; and (ii) all parties in interest that had filed requests for notice in accordance with Bankruptcy Rule 2002 in the Chapter 9 Case.[25]

e) In compliance with the Solicitation Procedures Order, on May 9, 2014, the City caused a copy of the Confirmation Hearing Notice to be published in the national editions of

---

[22] *See* Certificate of Service (Docket No. 6177), at ¶¶ 1-41; City Exhibit 764, at ¶¶ 11, 15-18, 30-31, 40-41. A separate communication recommending acceptance of the Plan was mailed to holders of Class 10, Class 11 and Class 12 Claims by the Retiree Committee contemporaneously with the solicitation of votes undertaken by the City.

[23] *See* Certificate of Service (Docket No. 6177), at ¶ 21.

[24] *See id.* at ¶ 20.

[25] *See id.* at ¶ 19.

-15-

163

13-53846-swr   Doc 8899-102   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 23 of 163
13-53846-swr   Doc 8194   Filed 10/18/14   Entered 10/18/14 16:54:18   Page 23 of

*The Wall Street Journal* and *USA Today* and the daily editions of the *Detroit Free Press* and the *Detroit News*.[26]

f)    Pursuant to the Order Approving the Stipulation Regarding Certain Class 11 and Class 10 Ballots (Docket No. 5209), entered on June 4, 2014, the City mailed replacement ballots to certain members of Classes 10 and 11.[27]

g)    On July 3, 2014, the City filed (and made available on the Document Website) the following Exhibits: (i) Exhibit I.A.189.a (Form of New GRS Active Pension Plan) (renumbered as Exhibit I.A.250.a to the Eighth Amended Plan); (ii) Exhibit I.A.191.a (Form of New PFRS Active Pension Plan) (renumbered as Exhibit I.A.254.a to the Eighth Amended Plan); (iii) Exhibit I.A.220 (Form of Prior GRS Pension Plan) (renumbered as Exhibit I.A.280 to the Eighth Amended Plan); and (iv) Exhibit I.A.221 (Form of Prior PFRS Pension Plan) (renumbered as Exhibit I.A.281 to the Eighth Amended Plan).[28]

h)    On July 3, 2014, the City filed (and made available on the Document Website) Exhibit II.D.6 (Executory Contracts and Unexpired Leases to be Rejected).[29]

i)    On August 7, 2014, the City filed (and made available on the Document Website) Exhibit I.A.103 (Form of DIA

---

[26]    *See* Affidavit of Publication of Confirmation Hearing Notice in the *Detroit Free Press* and the *Detroit News*, dated July 22, 2014 (Docket No. 6209), at page 2; Affidavit of Publication of Confirmation Hearing Notice in *USA Today*, dated July 22, 2014 (Docket No. 6211), at page 2; Affidavit of Publication of Confirmation Hearing Notice in the *Wall Street Journal*, dated July 24, 2014 (Docket No. 6253), at page 2.

[27]    *See* Certificate of Service (Docket No. 6177), at ¶¶ 11, 27, Exhibit P.

[28]    *See* Notice of Filing of Plan Supplement (Docket No. 5755).

[29]    *See* Notice of Filing of Plan Supplement (Docket No. 5756).

Settlement Documents) (renumbered as Exhibit I.A.127 to the Eighth Amended Plan).[30]

j)    On August 11, 2014, the City filed (and made available on the Document Website) the following Exhibits: (i) Exhibit I.A.146 (Principal Terms of Exit Facility) (renumbered as Exhibit I.A.183 to the Eighth Amended Plan); (ii) Exhibit I.A.255 (Form of Restoration Trust Agreement) (renumbered as Exhibit I.A.292 to the Eighth Amended Plan); (iii) Exhibit II.D.5 (Schedule of Postpetition Collective Bargaining Agreements); and (iv) Exhibit III.D.2 (Retained Causes of Action).[31]

k)    The Confirmation Hearing Notice and the subsequent scheduling orders entered by the Court provided due and proper notice of the Confirmation Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline, the Objection Deadline (as such term was defined in the Confirmation Hearing Notice), the time, date and place of the Confirmation Hearing and the release provisions in the Plan.[32]

l)    All persons entitled to receive notice of the Disclosure Statement, the Plan and the Confirmation Hearing received proper, timely and adequate notice in accordance with the Solicitation Orders, applicable provisions of the Bankruptcy Code and the Bankruptcy

---

[30]    *See* Notice of Filing of Plan Supplement (Docket No. 6576).

[31]    *See* Notice of Filing of Plan Supplement (Docket No. 6647).

[32]    *See* Solicitation Procedures Order at ¶ 17; Motion of the City of Detroit for Entry of an Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (Docket No. 2789), at Exhibit 6A.

Rules, and have had an opportunity to appear and be heard with respect thereto.[33]

m)   The City solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Orders, including, without limitation, the inclusion of letters from the City, the DRCEA, the RDPFFA, the DPLSA and the DPCOA recommending acceptance of the Plan in the solicitation materials and the separate mailing of a solicitation letter from the Retiree Committee.[34] Accordingly, the City, the Retiree Committee, the DRCEA and the RDPFFA are entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section III.D.6 of the Plan.

n)   Claims in Classes 1A, 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3 and 4 under the Plan are unimpaired, and such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.[35]

o)   KCC has made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in Classes 5, 7, 8, 9, 10, 11, 12, 13, 14 and 15 under the Plan.[36]

---

[33]   *See* Confirmation Standards Exhibit, at 10-11; Certificates of Service (Docket Nos. 6174, 6177).

[34]   *See* Confirmation Standards Exhibit, at 10-11.

[35]   *See id.* at 11-12; 15; DWSD Settlement Notice. Subsequent to the filing of the Fourth Amended Plan, the Parking Bonds giving rise to Parking Bond Claims in Class 6 of the Plan were paid in full by the City, mooting the proposed treatment of such Parking Bond Claims in the Fourth Amended Plan (as reflected in the Plan).

[36]   *See* City Exhibit 764, at ¶¶ 26-27, 33-34, 43-44; City Exhibit 765, at ¶¶ 9-10, 16-18; Second Supplemental Declaration of Michael J. Paque Regarding the

-18-

13-53846-swr   Doc 8099-102   Filed 10/12/14   Entered 10/12/14 16:54:18   Page 26 of 163
13-53846-swr   Doc 8251-4   Filed 11/18/14   Entered 11/18/14 17:58:34   Page 26 of 163

p) Holders of Claims in Class 17 (Indirect 36th District Court Claims) were previously classified in Class 14 under the Fourth Amended Plan.[37] The City solicited acceptances or rejections of the Plan from the holders of Indirect 36th District Court Claims in their previous capacity as holders of Class 14 Claims.[38] Pursuant to the Order Authorizing Certain Holders of Indirect 36th District Court Claims to Change Their Votes on the City's Plan of Adjustment (Docket No. 6288), entered on July 28, 2014, by agreement of the parties, the votes of all known holders of Indirect 36th District Court Claims rejecting the Plan under Class 14 were deemed to be votes accepting the Plan under Class 17.

q) Under the Plan, Class 16 (Subordinated Claims) is Impaired and holders of Claims in such Class will receive no distributions under the Plan.[39] Therefore, Class 16 is conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code, and no votes were solicited from holders of Class 16 Claims.[40]

r) The Plan was voted on by each Class of impaired Claims that was entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Solicitation Orders.[41]

s) Each of Classes 5, 7, 8, 9, 10, 11, 12, 13 and 17 have accepted the Plan by at least two-thirds in amount and a

---

(continued…)

Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Plan for the Adjustment of Debts of the City of Detroit (Docket No. 8072), filed on October 23, 2014 (the "Second Supplemental Voting Declaration"), at ¶¶ 8-9.

[37] *See* City Exhibit 765, at ¶¶ 12-15; Confirmation Standards Exhibit, at 12.

[38] *See* City Exhibit 765, at ¶¶ 12-15; Confirmation Standards Exhibit, at 12.

[39] *See* Plan, at § II.B.3.w.i.

[40] *See id.*; Confirmation Standards Exhibit, at 12.

[41] *See* City Exhibit 764, at ¶ 14.

majority in number of the Claims in such Classes actually voting.[42]

t)    The voting declarations admitted into evidence as City Exhibits 764 and 765, and the Second Supplemental Voting Declaration, set forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.[43]

16.   *Section 1129(a)(3).*  The Plan has been proposed (a) in good faith; (b) with honesty, sincerity and good intentions; (c) with a basis for expecting that an adjustment of the City's debts and an operational restructuring of the City can be effected; and (d) not by any means forbidden by law.[44]  The Plan and the treatment of Claims thereunder are, and the process pursuant to which the City has sought Confirmation thereof has been, fundamentally fair to the City's creditors.[45]  The purpose of the Plan is to adjust the City's debts to enable the City to reverse its decades-long financial decline, eliminate its service delivery insolvency, restore adequate municipal services to its residents and meet its future financial obligations, consistent with the overarching remedial purpose of chapter 9

---

[42]   *See* City Exhibit 764, at ¶¶ 25, 26-27, 33-34, 43-44; City Exhibit 765, at ¶¶ 9-10, 14-15; Second Supplemental Voting Declaration, at ¶¶ 8-9.

[43]   *See* City Exhibit 764, at Exhibits B-L; City Exhibit 765, at Exhibits C, D, I, J; Second Supplemental Voting Declaration, at Exhibits A-C.

[44]   *See* 10/1 Transcript, at 158:12-162:1, 175:24-176:9 (Testimony of Kevyn Orr); 10/2 Transcript, at 111:12-112:5, 150:9-12 (Testimony of Kevyn Orr); Confirmation Standards Exhibit, at 13-14.

[45]   *See* 10/2 Transcript, at 88:13-89:9, 150:9-10 (Testimony of Kevyn Orr); Confirmation Standards Exhibit, at 13-14.

and the objectives and purposes of the Bankruptcy Code.[46]  The City's good faith in

proposing the Plan and its prior versions, and fundamental fairness in dealing with

its creditors, is further evidenced by the fact that the Plan (a) incorporates multiple

key settlements that are the result of extensive arm's length negotiations (often

conducted within the context of Court-ordered mediation) between the City and

representatives of a large proportion of its creditors, (b) has been proposed with the

support of the City's largest creditor constituencies and (c) is feasible

(*see* ¶¶ M.4-14 below).[47]  In so finding, the Court has considered the totality of the

circumstances in this Chapter 9 Case.

17.  *Section 1129(a)(6).*  Section III.A.7 of the Plan provides

that the obtaining of any authorizations, consents and regulatory approvals

necessary under applicable nonbankruptcy law is a specific condition to the

effectiveness of the Plan, consistent with the language of section 1129(a)(6) of the

Bankruptcy Code.[48]  The Board of Water Commissioners will continue to have all

authority to set and approve the water and sewerage rates charged by the DWSD,

---

[46]    *See* 10/1 Transcript, at 120:24-129:20, 155:16-23; 158:12-162:1,
        175:24-176:9 (Testimony of Kevyn Orr); 10/2 Transcript, at 88:13-89:9,
        109:23-112:5, 150:13-22 (Testimony of Kevyn Orr); Confirmation
        Standards Exhibit, at 13-14.

[47]    *See* 10/1 Transcript, at 167:19-168:23, 177:1-24, 196:3-6 (Testimony of
        Kevyn Orr); 10/2 Transcript, at 9:1-2, 22:16-17, 51:3-9, 56:25-57:5, 86:9-10,
        93:7-13 (Testimony of Kevyn Orr); Confirmation Standards Exhibit,
        at 13-14.

[48]    *See* Confirmation Standards Exhibit, at 15; Plan, at § III.A.7.

-21-
163
13-53846-swr   Doc 8994-102   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 29 of 163
13-53846-swr   Doc 8154   Filed 10/18/14   Entered 10/18/14 16:54:18   Page 29 of 163

provided that, if a DWSD Authority is approved and formed, such rates would be determined by the board of such DWSD Authority.[49]

      18.   *Section 1129(a)(8)*.  The Plan has not been accepted by all impaired Classes of Claims because (a) Classes 14 and 15 (collectively, the "<u>Impaired Rejecting Classes</u>") have voted to reject the Plan[50] and (b) consistent with section 1126(g) of the Bankruptcy Code, the holders of Claims in Class 16 (Subordinated Claims) (who receive no Distributions pursuant to Section II.B.3.w.i of the Plan) are deemed to have rejected the Plan.[51]  Nevertheless, as more fully explained below, the Plan is confirmable because it satisfies section 1129(b) of the Bankruptcy Code with respect to such Impaired Rejecting Classes.[52]

      19.   *Section 1129(a)(10)*.  The Plan has been accepted by the following impaired Classes of Claims that are entitled to vote on the Plan, determined without including any acceptance of the Plan by any insider:  Classes 5, 7, 8, 9, 10, 11, 12, 13 and 17.[53]

---

[49]    *See* Plan, at § IV.A.1.

[50]    S*ee* City Exhibit 764, at ¶¶ 26-27, 43-44; City Exhibit 765, at ¶¶ 16-18; Second Supplemental Voting Declaration, at ¶¶ 8-9.

[51]    *See* Solicitation Procedures Order, at ¶ 10.

[52]    *See* Confirmation Standards Exhibit, at 16-20.

[53]    *See* City Exhibit 764, at ¶ 26-27, 33-34, 43-44; City Exhibit 765, at ¶¶ 9-10, 14-18; Second Supplemental Voting Declaration, at ¶¶ 8-9.

20.    *Section 1129(b)(1):  Unfair Discrimination*.  The Plan

does not discriminate unfairly against the Impaired Rejecting Classes.[54]

For purposes of the unfair discrimination analysis, and based on the facts and

circumstances of this case, it is appropriate to discount the City's future pension

liabilities to present value using either risk-free rates or a surrogate for commercial

annuity rates (such as rates established by the Pension Benefit Guaranty

Corporation (the "PBGC")) because the use of a higher rate would shift undue risk

onto the City's pensioners.[55]  Contributions made by parties other than the City that

are directed toward holders of Pension Claims (including any such contributions

made pursuant to the State Contribution Agreement and the DIA Settlement)

should be disregarded for purposes of the unfair discrimination analysis.[56]  After

adopting appropriate discount rates for the valuation of Pension Claims and

disregarding contributions directed towards holders of Pension Claims by third

parties, estimated recoveries on Pension Claims are reduced to (a) ___%, with

respect to GRS Pension Claims, and (b) ___%, with respect to PFRS Pension

Claims.

---

[54]    *See* Confirmation Standards Exhibit, at 16-19.

[55]    *See* 9/16 Transcript, at 221:3-221:9, 224:19-224:22 (Testimony of Kim
Nicholl).

[56]    *See* 9/16 Transcript, at 193:5-15 (Testimony of Kim Nicholl).

21.     The valuation and treatment of Pension Claims and

OPEB Claims by the City and the Retiree Committee is reasonable.  Specifically,

the calculation of the aggregate amount of Pension Claims is accurate and based

upon a reasonable methodology and reasonable assumptions.[57]  In addition, based

on the facts and circumstances of this case, the negotiated assumed investment rate

of return of 6.75% on pension assets is a reasonable prescribed assumption by a

government entity that concurrently addresses investment volatility and benefit

funding issues.[58]  The calculations and treatment of (a) the aggregate amount of

OPEB Claims by the City prior to the settlement between the City and the Retiree

Committee related to the allowance and calculation of OPEB Claims (the "OPEB

Settlement") and (b) the aggregate amount of OPEB Claims agreed upon by the

City and the Retiree Committee pursuant to the OPEB Settlement are accurate and

based upon reasonable methodologies and reasonable assumptions.[59]  Moreover,

the use of PBGC discount rates for governmental retiree liabilities to calculate the

---

[57]     *See* 9/15 Transcript, at 38:16-88:13 (Testimony of Glenn Bowen);
        9/16 Transcript, at 150:10-224:25 (Testimony of Kim Nicholl).

[58]     *See* 9/16 Transcript, at 56:14-56:20 (Testimony of Alan Perry);
        10/22 Transcript, at 65:11-66:6 (Testimony of Martha E.M. Kopacz).

[59]     *See* 9/17 Transcript, at 109:16-120:15, 138:19-156:12 (Testimony of
        Suzanne Taranto).

present value of retiree health liabilities in the context of the City's settlement with the Retiree Committee is reasonable.[60]

22.     The extent of any differential in treatment between Classes of unsecured Claims under the Plan is: (a) fair, whether the City's future pension liabilities are discounted to present value using the 6.75% rate set forth in the Disclosure Statement or, in the alternative, a risk-free or commercial annuity rate; (b) proposed in good faith; and (c) not motivated by animus.  Critical business considerations justify the differential treatment of Pension Claims.  Such considerations include, but are not limited to, the need for the City to:  (a) address its service delivery insolvency; (b) maintain a stable and motivated workforce and strong union and employee relations; (c) address the expectations of creditors under the Michigan Constitution; and (d) confirm a workable plan of adjustment.[61] The reasonable expectations of creditors further demonstrates that the differential treatment of Pension Claims is fair and reasonable because, while many of the City's institutional creditors affirmatively chose to invest in the City and possessed both the experience and sophistication necessary to evaluate the risks related to

---

[60]     *See* 9/17 Transcript, at 160:8-161:13 (Testimony of Suzanne Taranto).

[61]     *See* 10/1 Transcript, at 166:19-167:18, 167:25-168:6 (Testimony of Kevyn Orr); 10/2 Transcript, at 91:4-99:6, 100:6-102:5, 103:12-107:9, 108:1-109:13 (Testimony of Kevyn Orr); 10/6 Transcript, at 140:10-141:14 (Testimony of Mayor Michael Duggan); *id.* at 26:22-27:20 (Testimony of City Council President Brenda Jones).

such an investment, individual holders of Pension Claims had no meaningful

opportunity to protect themselves from such risk because they had little control

over how much the City contributed to pensions, how pension assets were invested

and how the Retirement Systems were operated.[62]  In addition, the treatment of

Pension Claims, COP Claims, Limited Tax General Obligation Bond Claims and

Unlimited Tax General Obligation Bond Claims is fair because, in each instance, it

is the result of arm's-length, intensely negotiated settlements between the City and

the respective creditors and their representatives and is based on the asserted

differing legal rights of, and litigation brought by, such parties.[63]

      23.    The extent of any differential in treatment between

Classes of unsecured Claims under the Plan is fair under the standard articulated in

In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989).  In each instance, there is

a rational and legitimate basis for the differential treatment, which is necessary for

the City's restructuring.  The Plan's treatment of Pension Claims is supported by a

reasonable basis because it:  (a) minimizes the adverse impact of necessary pension

benefit reductions on the City's current employees, whose ongoing motivation and

cooperation (as well as that of the unions that represent the employees) is vital to

---

[62]    *See* 10/2 Transcript, at 93:22-94:5, 103:12-107:9, 108:1-109:13 (Testimony of Kevyn Orr).

[63]    *See* 10/2 Transcript, at 101:15-103:11, 113:6-114:14 (Testimony of Kevyn Orr).

the City's recovery and to the health, welfare and safety of its residents; (b) is the result of settlements between the City and the Retiree Committee, the Retirement Systems and certain unions and retiree associations; and (c) reflects the reasonable expectations of the holders of Pension Claims, as set forth above.[64]

24.     A reasonable basis also exists for the differential treatment of (a) Limited Tax General Obligation Bond Claims and Unlimited Tax General Obligation Bond Claims, because the treatment of such Claims reflects (i) the results of protracted and comprehensively negotiated settlements between the City and the holders of such Claims and (ii) the claimants' arguments to relative priority and security under State law; and (b) COP Claims, because the treatment of such Claims reflects (i) the results of protracted and comprehensively negotiated settlements between the City and the holders of such Claims and the resolution of substantial litigation in connection therewith and (ii) the long-term value to the City of the substantial investment in, and redevelopment of, City assets under the settlements between the City and the holders of such Claims.[65]

---

[64]     *See* 10/2 Transcript, at 91:4-99:6, 100:6-102:5, 93:22-94:5, 103:12-107:9, 108:1-109:13 (Testimony of Kevyn Orr).

[65]     *See* 10/2 Transcript, at 72:8-12, 74:3-16, 85:24-87:19, 113:6-114:14 (Testimony of Kevyn Orr); 10/3 Transcript, at 22:8-10 (Testimony of Kevyn Orr); *id.* at 118:22-119:17, 145:2-6 (Testimony of James Doak); 10/21 Transcript, at 119:25-121:2 (Testimony of Kevyn Orr).

25.     It would be practically impossible to confirm a workable

plan without discriminating among unsecured creditors because, with respect to

Pension Claims in particular, the City's recovery will turn in large part on its ability

to marshal the support of its residents in general and its retirees, employees and

their labor unions in particular.[66]  With respect to Limited Tax General Obligation

Bond Claims, Unlimited Tax General Obligation Bond Claims and COP Claims,

the settlements achieved by the City removed the risk of ongoing litigation over

their respective asserted priorities, which litigation posed a significant obstacle to

the City's ability to confirm a workable plan.[67]  The City's proposal of the

differential treatment between Classes of unsecured Claims under the Plan was

made in good faith and was not motivated by personal animosity or antipathy.[68]

The Plan treats holders of Claims in the Impaired Rejecting Classes as well as

possible under the circumstances.[69]

26.     The Plan does not discriminate unfairly against Class 16

(Subordinated Claims) because the Claims within such Class are subordinated to

all other Claims classified under the Plan in accordance with section 510(b) of the

---

[66]     *See* 10/1 Transcript, at 166:19-167:18, 167:25-168:6 (Testimony of Kevyn Orr); 10/2 Transcript, at 93:7-101:14 (Testimony of Kevyn Orr).

[67]     *See* 10/1 Transcript, at 186:12-191:8, 204:7-207:5 (Testimony of Kevyn Orr); 10/21 Transcript, at 91:16-101:23 (Testimony of Kevyn Orr).

[68]     *See* 10/2 Transcript, at 150:5-12 (Testimony of Kevyn Orr).

[69]     *See* 10/2 Transcript, at 130:16-132:8 (Testimony of Kevyn Orr).

Bankruptcy Code and are entitled to Distributions under the Plan only to the extent that Classes that are senior in priority are paid in full.[70]

27.　*Section 1129(b)(1), (b)(2): Fair and Equitable*. The Plan is "fair and equitable" with respect to the Impaired Rejecting Classes. Under the Plan, the holders of Claims in the Impaired Rejecting Classes will receive all that they can reasonably expect under the circumstances.[71]

28.　The City is legally prohibited from raising tax rates above their current levels, which rates are higher than those in neighboring communities and among the highest in Michigan.[72]  Even if the City could legally increase tax rates, doing so would not increase the City's revenues because the City has reached its practical taxable limit, *i.e.*, tax saturation, meaning that any further tax increases on Detroit residents most likely would (a) exacerbate the City's already high tax collection delinquency rate, (b) continue the flight of residents and businesses from the City, (c) disincentivize inflow of prospective residents and businesses, (d) destabilize growth and (e) ultimately reduce the City's overall tax

---

[70]　*See* Confirmation Standards Exhibit, at 12.

[71]　*See* 10/2 Transcript, at 130:16-132:8 (Testimony of Kevyn Orr).

[72]　*See* 9/5 Transcript, at 8:17-9:10 (Testimony of John Hill); 9/8 Transcript, at 185:11-186:9 (Testimony of Caroline Sallee); 10/1 Transcript, at 153:17-18 (Testimony of Kevyn Orr); 10/6 Transcript, at 113:4-23 (Testimony of Mayor Michael Duggan).

revenues.[73] Even if the City could legally raise property tax rates, for example, doing so would yield little if any additional revenue.[74] The loss of population in Detroit has compounded the City's financial difficulties and led to additional cutbacks in municipal services – which cutbacks, in turn, have led to continuing losses of population, industry and tax revenues. Increasing the tax burden on Detroit residents would only perpetuate this vicious cycle.[75]

29. Although the City is unable to increase creditor recoveries by raising tax rates, the Plan provides for multiple new sources of revenue, cost saving initiatives and settlements that improve recoveries for creditors.[76] The transactions associated with the "Grand Bargain" will generate at least an additional $816 million in nominal revenue for the benefit of the holders of

---

[73]    *See* 9/4 Transcript, at 201:23-202:10 (Testimony of John Hill);
10/1 Transcript, at 153:19-154:1, 154:25-155:9 (Testimony of Kevyn Orr);
10/2 Transcript, at 126:18-129:15 (Testimony of Kevyn Orr);
10/6 Transcript, at 113:24-115:5 (Testimony of Mayor Michael Duggan);
City Exhibit 33.

[74]    *See* 10/2 Transcript, at 126:18-129:15 (Testimony of Kevyn Orr);
10/6 Transcript, at 112:23-25 (Testimony of Mayor Michael Duggan).

[75]    *See* 10/2 Transcript, at 126:18-129:18 (Testimony of Kevyn Orr);
10/6 Transcript, at 113:24-115:5 (Testimony of Mayor Michael Duggan).

[76]    *See* 9/4 Transcript, at 185:14-186:4 (Testimony of John Hill); 9/5 Transcript,
at 9:23-10:22 (Testimony of John Hill); 9/5 Transcript, at 56:12-65:3
(Testimony of Charles Moore); 9/30 Transcript, at 92:1-93:21 (Testimony of
Kenneth Buckfire); City Exhibits 519, 583.

Pension Claims.[77]  In addition, the City has entered into favorable settlements with representatives of the holders of Pension Claims, OPEB Claims, COP Claims, Unlimited Tax General Obligation Bond Claims, Limited Tax General Obligation Bond Claims and Indirect 36th District Court Claims.[78]  The difference between the amounts asserted by such claimants and the amounts accepted in settlement of such Claims redounds to the benefit of all the City's stakeholders.  The successful implementation of the reinvestment initiatives incorporated into the Plan (the "Reinvestment Initiatives") is indispensable to the City's efforts to provide its creditors with as significant a recovery as could be expected under the circumstances, and the maximization of such creditor recoveries influenced the design of the Reinvestment Initiatives.[79]  In addition, absent confirmation of the Plan, the City would not have the ability to access the capital markets on reasonable terms, meaning that the issuance of numerous and large judgments against the City would quickly deplete the City's limited resources and its tax base.[80]

---

[77]     *See* 9/29 Transcript, at 143:13-146:20 (Testimony of Gaurav Malhotra).

[78]     *See* 10/1 Transcript, at 177:1-22 (Testimony of Kevyn Orr).

[79]     *See* 9/5 Transcript, at 223:8-25, 225:1-8, 226:20-227:2 (Testimony of Charles Moore).

[80]     *See* 9/30 Transcript, at 92:1-93:22 (Testimony of Kenneth Buckfire).

30.    Because Michigan Public Act 236 of 1961, the Revised
Judicature Act, M.C.L. §§ 600.101, *et seq.* (the "Revised Judicature Act"),
provides the sole remedy under State law for the City's creditors to recover on their
claims, under State law, the City cannot be compelled to liquidate City-owned
assets to satisfy creditors' claims.[81]  The City also cannot be compelled to sell any
City-owned assets under the Bankruptcy Code, because, in chapter 9 cases,
section 904 of the Bankruptcy Code prohibits the Court from interfering with
"(1) any of the political or governmental powers of the debtor; (2) any of the
property or revenues of the debtor; or (3) the debtor's use or enjoyment of any
income-producing property."[82]

31.    It would be impracticable for the City to liquidate the art
collection housed at the DIA (the "DIA Collection") in an attempt to maximize
creditor recoveries.[83]  Because (a) many works within the DIA Collection are
subject to donor restrictions and (b) the Michigan Attorney General and DIA Corp.
contend that the entire DIA Collection is held in trust, any attempt to liquidate the
DIA Collection or any material portion thereof to satisfy the claims of creditors
most likely would result in costly, complex and time-consuming litigation
regarding the City's precise ownership interests in the approximately 60,000 works

---

[81]    *See* M.C.L. § 600.6093.

[82]    11 U.S.C. § 904.

[83]    *See* 10/2 Transcript, at 29:6-35:1 (Testimony of Kevyn Orr).

of art that comprise the DIA Collection.[84]  A forced liquidation of the DIA

Collection would generate only a fraction of its true economic value.[85]  The DIA

adds significant economic and cultural value to the City, and its preservation is an

important component of the City's revitalization effort.[86]

      H.    Section 943(b)(2).  The Plan complies with the provisions of

chapter 9 of the Bankruptcy Code.  The Plan complies with section 941 of the

Bankruptcy Code because the City filed the Plan for the Adjustment of Debts of

the City of Detroit (Docket No. 2708) on February 21, 2014, consistent with the

First Order Establishing Dates and Deadlines (Docket No. 280), entered on

August 2, 2013, which order established March 1, 2014 as the deadline for the City

to file its plan of adjustment.  The Plan complies with section 942 of the

Bankruptcy Code because (1) the amendments made to the Fourth Amended Plan

and (2) the Modifications are either immaterial to, or do not adversely affect the

treatment of, any Claim under the Plan.

---

[84]   *See* 9/18 Transcript, at 29:14-30:5, 30:9-15, 53:4-13 (Testimony of Michael
      Plummer); *id.* at 91:12-19, 92:6-14, 115:20-116:24, 117:14-21 (Testimony
      of Annmarie Erickson); 10/2 Transcript, at 32:13-33:15 (Testimony of
      Kevyn Orr).

[85]   *See* 9/18 Transcript, at 14:19-25, 15:22-25, 16:4-23, 18:8-19:9, 20:1-8,
      21:5-19, 23:20-21, 26:6-15, 30:16-33:1, 34:10-23 (Testimony of Michael
      Plummer); Confirmation Standards Exhibit, at 20.

[86]   *See* 9/18 Transcript, at 38:17-25 (Testimony of Michael Plummer);
      *id.* at 76:10-82:22, 157:18-164:12 (Testimony of Annmarie Erickson);
      10/6 Transcript, at 110:16-111:14 (Testimony of Mayor Michael Duggan);
      *id.* at 59:3-17 (Testimony of City Council President Brenda Jones).

-33-

163

13-53846-swr   Doc 8994-1   Filed 10/31/14   Entered 10/31/14   Page 41 of
13-53846-swr   Doc 8994-1   Filed 12/18/14   Entered 12/18/14 16:54:18   Page 41 of

I.      Section 943(b)(3).  All amounts to be paid by the City (or by any person) for services and expenses in the Chapter 9 Case and incident to the Plan have been fully disclosed and are reasonable.  Pursuant to the Fee Review Order and the Fee Examiner Order, and with the City's consent, the Fee Examiner was appointed in the Chapter 9 Case as an officer of the Court and has reviewed, or will review, the fees and expenses of all Fee Review Professionals (other than the Fee Examiner Parties) submitted to the Fee Examiner for review in accordance with the Fee Review Order for the period beginning on the Petition Date.  The fee review process established by the Fee Review Order will continue for fees and expenses incurred through the Effective Date pursuant to Section IV.N.2 of the Plan.  In accordance with the Fee Review Order, each quarterly report and supplemental quarterly report filed by the Fee Examiner to date has determined that all Fee Review Professional Fees (other than fees and expenses of the Fee Examiner Parties) incurred during the relevant reporting periods have been fully disclosed and are reasonable.[87]  Further, the fees and expenses of the Fee Examiner

---

[87]     *See* Fee Examiner's Quarterly Report for Months of July, August and September 2013 (Docket No. 2642), at ¶ 15; Fee Examiner's First Supplemental Quarterly Report for Months of July, August and September 2013 (Docket No. 3457), at ¶ 14; Fee Examiner's Second Supplemental Quarterly Report for Months of July, August and September 2013 (Docket No. 7574), at ¶ 14; Fee Examiner's Second Quarterly Report for Months of October, November and December 2013 (Docket No. 4498), at ¶ 16; Fee Examiner's First Supplemental Quarterly Report for Months of October, November and December 2013 (Docket

-34-
163
13-53846-swr   Doc 8099-10   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 42 of
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/22/14 16:54:18   Page 42 of 163

Parties are subject to Court review and approval under the terms of the Fee Review

Order and the Plan. This fee review process, as established in the Fee Review

Order and adopted in the Plan, ensures that all relevant professional fees and

expenses related to the Chapter 9 Case satisfy the requirements of Section 943(b)(3)

of the Bankruptcy Code. In addition, the Court has authorized the DWSD to

reimburse certain professional fees and expenses incurred by professionals retained

by certain creditors of the DWSD in connection with the City's Chapter 9 Case.[88]

J.    Section 943(b)(4).

1.    All actions to be taken by the City to carry out the Plan

are consistent with, do not violate and are not prohibited by applicable law,

including, but not limited to, the following actions:

- the creation of the Detroit General VEBA and the Detroit Police and Fire VEBA;[89]

- payments to be made by the DWSD during the period from the Effective Date through June 30, 2023 on account of (a) the DWSD's $428.5 million

---

(continued…)

No. 7575), at ¶ 17; Fee Examiner's Third Quarterly Report for Months of January, February and March 2014 (Docket No. 6528), at ¶ 18; Fee Examiner's First Supplemental Quarterly Report for Months of January, February and March 2014 (Docket No. 7332), at ¶ 19.

[88]    *See* Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), at ¶ 27.

[89]    *See* 10/2 Transcript, at 18:23-19:16 (Testimony of Kevyn Orr).

currently-calculated allocable share of the unfunded actuarially accrued liabilities of the GRS (as modified by the Plan and consistent with paragraph 24 of the DWSD Tender Order), (b) related administrative costs and (c) restructuring costs incurred by the City in connection with the Chapter 9 Case allocable to the DWSD (the "DWSD Pension Funding");[90]

- all actions taken in connection with the UTGO Settlement Agreement and all provisions of the Plan addressing recoveries upon Unlimited Tax General Obligation Bond Claims, including Sections II.B.3.n, II.B.3.o, II.B.3.p and IV.C of the Plan (such provisions of the Plan as they relate to such recoveries, and, collectively with the UTGO Settlement Agreement, the "UTGO Settlement"), including, but not limited to, the City's designation of an entity or entities to receive the Assigned UTGO Bond Tax Proceeds;[91]

- the transfer of the DIA Assets to DIA Corp. pursuant to the DIA Settlement;[92] and

- all actions taken in connection with the Syncora Development Agreement (including the garage option), the Tunnel Lease and the FGIC Development Agreement.[93]

---

[90] *See* 9/5 Transcript, at 204:22-206:7, 208:8-209:14 (Testimony of Charles Moore); 9/8 Transcript, at 46:1-47:9, 47:12-53:19 (Testimony of Charles Moore).

[91] *See* 10/1 Transcript, at 194:3-195:15 (Testimony of Kevyn Orr).

[92] *See* 10/2 Transcript, at 43:9-24 (Testimony of Kevyn Orr); Attorney General's Approval of DIA Settlement (Docket No. 5338), filed on June 17, 2014.

[93] *See* 10/2 Transcript, at 72:20-23, 74:3-77:2 (Testimony of Kevyn Orr); 10/21 Transcript, at 110:8-116:10 (Testimony of Kevyn Orr).

2.    *ASF Recoupment*.  ASF Recoupment, as set forth at Section II.B.3.r.ii.D of the Plan, is lawful, proper and an integral component of the City's global settlement of pension- and other labor-related issues negotiated with, among others, the Retiree Committee.  During the period beginning in the mid-1980s until fiscal year 2012, Annuity Savings Fund accounts maintained on behalf of certain participants (who voluntarily contributed after tax dollars into the Annuity Savings Fund maintained by the GRS) were often credited with interest in excess of the actual or market rate of return for assets in the GRS Traditional Pension Plan (such interest, the "ASF Excess Interest").[94]  The aggregate total of such ASF Excess Interest credited during the period from 2003 through 2013 was approximately $450 million.[95]  The ASF Recoupment contemplated by the Plan would recover approximately $190 million of a much higher sum in total ASF Excess Interest credited to Annuity Savings Fund accounts through reductions to retiree pension benefits and asset transfers from active GRS participants.[96]

3.    Because the assets credited to such Annuity Savings Fund accounts were coinvested with the assets of the GRS Traditional Pension

---

[94]    *See* 9/5 Transcript, at 166:23-167:16 (Testimony of Charles Moore); 9/8 Transcript, at 45:2-20 (Testimony of Charles Moore); City Exhibits 60, 482.

[95]    *See* 9/5 Transcript, at 174:2-174:15 (Testimony of Charles Moore).

[96]    *See* 9/5 Transcript, at 184:10-187:9 (Testimony of Charles Moore); 9/8 Transcript, at 32:1-6 (Testimony of Charles Moore).

Plan, assets of the GRS Traditional Pension Plan were allocated to the applicable

Annuity Savings Fund accounts to fund such ASF Excess Interest.[97]  The GRS

Trustees owe a fiduciary duty to the GRS Traditional Pension Plan under Michigan

Public Act 314 of 1965, the Public Employee Retirement System Investment Act,

as well as the common law of trusts.[98]  In addition, the GRS Trustees owe a duty of

loyalty to all GRS Traditional Pension Plan participants to discharge their duties

solely in the interest of the participants and their beneficiaries and to use the assets

of the GRS Traditional Pension Plan prudently and for the exclusive benefit of all

participants and their beneficiaries.[99]  The City has argued that the crediting of

ASF Excess Interest to Annuity Savings Fund accounts constitutes a violation of

these fiduciary duties owed to the GRS Traditional Pension Plan by the GRS

Trustees.

    4.  No provision of the Detroit City Code authorized the

GRS Trustees to credit Annuity Savings Fund accounts with excess interest.[100]

Under Section 47-1-3 of the Detroit City Code, the grant of authority to the GRS

Trustees is limited to the administration, management and proper operation of the

---

[97]   *See* 9/5 Transcript, at 171:6-14, 173:17-25 (Testimony of Charles Moore); 9/8 Transcript, at 19:4-11 (Testimony of Charles Moore).

[98]   *See* M.C.L. §§ 38.1132, *et seq.*

[99]   *See* M.C.L. §§ 38.1133(3), (8).

[100]   *See* Detroit City Code, Chapter 47.

GRS.[101]  Accordingly, the GRS Trustees' decision to credit the accounts of ASF participants with ASF Excess Interest, at the expense of the GRS Traditional Pension Plan, constituted an *ultra vires* act that was not authorized under the Detroit City Code.[102]

       5.    ASF Recoupment does not violate Sections 47-2-17 and 47-2-18 of the Detroit City Code.[103]  The City possesses a basis independent of Section 47-1-18(c) of the Detroit City Code for recovering the GRS Traditional Pension Plan assets credited to ASF participants.  ASF Recoupment is not an unconstitutional *ex post facto* application of any statute or ordinance.[104]

       6.    ASF participants received due process of law with respect to ASF Recoupment.  In particular, ASF participants received (a) the Plain Language Supplement as part of their Solicitation Packages describing in detail the effect of ASF Recoupment (as well as subsequent communications from the City, the Retiree Committee, the Retirement Systems and certain retiree associations)

---

[101]    *See* Detroit City Code § 47-1-3.

[102]    *See id.*

[103]    *See* Detroit City Code § 47-2-17, *repealed*, Ord. No. 19-14, effective June 30, 2014; Detroit City Code § 47-2-18, *repealed*, Ord. No. 19-14, effective June 30, 2014.

[104]    Detroit City Code § 47-1-18(c), *repealed*, Ord. No. 19-14, effective June 30, 2014.

and (b) sufficient opportunity to object to the Plan and ASF Recoupment, an opportunity exercised by many ASF participants.[105]

   7. ASF Recoupment will not cause the amounts recovered from ASF Distribution Recipients to exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap as such amounts are amortized over time using a 6.75% interest rate.[106]  Subject to Section II.B.3.r of the Plan, GRS participants subject to ASF Recoupment have the option to pay the ASF Recoupment Amount in a lump sum.

   8. The 6.75% interest rate used in annuitizing ASF Recoupment payments for ASF Distribution Recipients who do not elect the lump-sum payment option is not usurious under applicable law.  The City did not unfairly or fraudulently conceal the interest rate applicable to ASF Recoupment. Neither the "wrongful conduct" rule nor the doctrine of *in pari delicto*, as interpreted under applicable State law, are implicated by ASF Recoupment because there is no allegation or evidence that the City violated any penal or criminal statute with respect to the allocation of Annuity Savings Fund Excess Amounts to ASF participants.

---

[105] *See* Certificate of Service (Docket No. 6177), at ¶¶ 10, 14.

[106] *See* 9/5 Transcript, at 183:20-184:9 (Testimony of Charles Moore).

K.     _Section 943(b)(5)_.  The Plan satisfies the requirements of section 943(b)(5) of the Bankruptcy Code.  The Plan expressly provides for the cash payment, in full, of Allowed Administrative Claims, including administrative expenses allowed under section 503(b) of the Bankruptcy Code either (1) on the Effective Date or as soon as reasonably practicable thereafter or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.[107]

L.     _Section 943(b)(6)_.  The Plan satisfies the requirements of section 943(b)(6) of the Bankruptcy Code.  The effectiveness of the Plan is expressly conditioned upon the obtaining of any authorizations, consents and regulatory approvals necessary under applicable nonbankruptcy law.[108]  Neither the DWSD Pension Funding nor the provisions of the Plan relating to the DWSD CVR constitute a tax upon any DWSD ratepayer subject to electoral approval. The restructuring of the City's obligations pursuant to the Plan, and the consequent restructuring (and lowering) of DWSD's costs, will not necessitate an increase in the rates charged by DWSD in excess of normally scheduled rate increases.[109]

---

[107]     _See_ Confirmation Standards Chart, at 27; Plan, at § II.A.1.a.

[108]     _See_ Confirmation Standards Exhibit, at 15; Plan, at § III.A.7.

[109]     _See_ 9/8 Transcript, at 53:20-54:13 (Testimony of Charles Moore).

M.    Section 943(b)(7).

1.    *Best Interests of Creditors*. The Plan is in the best interests of creditors. The Plan provides the City's creditors with a better alternative than dismissal of the Chapter 9 Case. Outside of bankruptcy, the City would face several billion dollars in cumulative deficits over the next ten years, even if it attempted only to maintain the current level of inadequate public services.[110] Although the automatic stay has allowed the City to enhance its cash position during the bankruptcy, the fundamentals of the City's financial forecasts have not changed materially since the City first created the baseline financial forecasts in June 2013.[111] Moreover, if the City's Chapter 9 Case were dismissed, the City would lose the benefit of the settlements it has reached with its creditors. The City does not have sufficient excess revenues to continue paying its creditors outside of bankruptcy.[112]

2.    The effect of dismissal of the City's Chapter 9 Case would be the issuance of myriad judgment levies under State law.[113] In a dismissal

---

[110]    *See* 9/29 Transcript, at 173:12-174:18 (Testimony of Gaurav Malhotra); 10/2 Transcript, at 138:2-140:4 (Testimony of Kevyn Orr); City Exhibit 109, at 6; City Exhibit 593; City Exhibit 733, at 6.

[111]    *See* 9/29 Transcript, at 77:7-78:5 (Testimony of Gaurav Malhotra).

[112]    *See* 10/2 Transcript, at 139:12-140:4 (Testimony of Kevyn Orr); City Exhibit 109, at 6; City Exhibit 733, at 6.

[113]    *See* M.C.L. § 600.6093.

scenario, the Revised Judicature Act would require the City to satisfy any

judgments obtained by creditors either through bond issuances or property tax

levies.[114] If the Chapter 9 Case were dismissed, the City's creditors would not

realize greater recoveries than they would receive under the Plan because the City

would lack the resources and ability to satisfy such judgment levies.[115] In such a

scenario, the City's pension obligations alone likely would quickly eradicate any

meaningful recoveries for other unsecured creditors outside of chapter 9.[116]

       3.      Dismissal of the Chapter 9 Case would deprive the City

of the benefit of the Reinvestment Initiatives.[117] Without such reinvestment, the

City's ability to provide basic services would continue to decline below even

today's inadequate levels.[118] Without the ability to provide adequate levels of basic

services, the City would find itself unable to reverse the exodus of residents and

businesses from the City that has depleted the City's tax base, reduced land values

and led to widespread abandonment and blight.[119] In addition, the Plan offers

---

[114]   *See id.*

[115]   *See* 10/2 Transcript, at 132:9-139:10 (Testimony of Kevyn Orr); City
Exhibit 593; City Exhibit 109, at 6, 8, 9; City Exhibit 733, at 6, 8, 9.

[116]   *See* City Exhibit 109, at 6; City Exhibit 733, at 6.

[117]   *See* 9/29 Transcript, at 71:23-72:2 (Testimony of Gaurav Malhotra);
10/2 Transcript, at 136:16-25 (Testimony of Kevyn Orr).

[118]   *See* 10/2 Transcript, at 110:9-16 (Testimony of Kevyn Orr).

[119]   *See* 10/2 Transcript, at 110:5-111:11 (Testimony of Kevyn Orr);
10/6 Transcript, at 83:17-84:25 (Testimony of Mayor Michael Duggan).

financial benefits that would be unavailable to the City in the event of dismissal, including the $816 million that will be contributed to the Retirement Systems in connection with the Grand Bargain, the Exit Financing and the cost savings to be realized by the Reinvestment Initiatives and the Settlements under the Plan.[120]

        4.    *Feasibility*.  The Plan is feasible, within the meaning of section 943(b)(7) of the Bankruptcy Code.  On and after the Effective Date, it is more likely than not that the City will be able to (a) make all payments contemplated by the Plan without a significant probability of default and (b) sustainably provide adequate municipal services to its residents.[121]  The City has demonstrated a reasonable prospect that the City will successfully implement the Plan and the Reinvestment Initiatives.[122]

---

[120]    *See* 9/29 Transcript, at 71:23-72:2 (Testimony of Gaurav Malhotra); 10/2 Transcript, at 27:16-19, 136:16-25 (Testimony of Kevyn Orr).

[121]    *See* 9/29 Transcript, at 160:20-161:11, 166:1-17 (Testimony of Gaurav Malhotra); 10/1 Transcript, at 176:2-9 (Testimony of Kevyn Orr); 10/2 Transcript, at 88:19-89:9, 89:15-90:3, 150:13-22 (Testimony of Kevyn Orr); 10/6 Transcript, at 108:11-110:8 (Testimony of Mayor Michael Duggan); *id.* at 32:7-16 (Testimony of City Council President Brenda Jones); 10/22 Transcript, at 10:8-11:11, 15:22-18:9 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[122]    *See* 9/4 Transcript, at 142:4-144:6, 161:25-162:20 (Testimony of John Hill); 9/29 Transcript, at 220:25-221:12 (Testimony of Gaurav Malhotra); 10/6 Transcript, at 109:22-110:8 (Testimony of Mayor Michael Duggan); 10/22 Transcript, at 10:8-11:11, 69:12-21, 83:5-84:12 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12000 (Expert Report of Martha E.M.

5.      The City's revenue and expense projections contained in (a) the ten-year summary of the Reinvestment Initiatives (the "10-Year Reinvestment Initiative Summary") introduced into evidence as City Exhibit 108 (July 2014); (b) the ten-year statement of projected cash flows (the "10-Year Forecast") introduced into evidence as City Exhibits 109 (July 2014), 733 (September 2014), 780 (October 2014), 781 (October 2014) and 782 (October 2014); (c) the forty-year statement of projected cash flows (the "40-Year Forecast") introduced into evidence as City Exhibits 111 (July 2014), 734 (September 2014), 779 (October 2014) and 793 (October 2014); and (d) the ten-year statement of projected cash flows of the City's water and sewage disposal funds introduced into evidence as part of City Exhibit 3 (collectively with the 10-Year Reinvestment Initiative Summary, the 10-Year Forecast and the 40-Year Forecast, the "Projections"), are reasonable, made in good faith, accurate, consistent with other financial projections made by the City and based upon assumptions that are reasonable when considered individually or collectively.[123]

---

(continued…)

Kopacz), at 29, 164-65, 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6; City Exhibit 599.

[123]    *See* 8/18 Transcript, at 58:17-23, 62:3-25, 65:14-66:12, 68:7-14, 72:15-73:2, 76:17-25, 77:18-25; 81:9-15, 82:7-12 (Testimony of Robert Cline); 9/4 Transcript, at 98:6-21, 126:14-129:14, 154:16-23, 279:24-280:4 (Testimony of John Hill); 9/5 Transcript, at 75:3-24 (Testimony of Charles Moore); 9/8 Transcript, at 225:23-226:5, 237:13-23, 240:20-241:4,

The contingency reserves set forth in the Projections are reasonably conservative and comply with applicable law.[124]

6.    The City has taken steps to harmonize its operating budgets with the Projections.[125]  The City will possess adequate human resources to implement, and perform according to the terms of, the Plan and adequate systems, controls and procedures (as modified, modernized and developed by the Reinvestment Initiatives) have been and will be established to (a) monitor the City's financial and operational performance and (b) minimize and eliminate fraud, abuse and waste (both in the City's day-to-day operations and in the

---

(continued…)

256:9-257:22 (Testimony of Caroline Sallee); 9/17 Transcript, at 50:12-51:20 (Testimony of Sue McCormick); 9/29 Transcript, at 90:20-91:19, 160:20-161:11 (Testimony of Gaurav Malhotra); 9/30 Transcript, at 9:4-10:8, 12:1-15:2 (Testimony of Vyto Kaunelis); 10/2 Transcript, at 124:14-126:17 (Testimony of Kevyn Orr); 10/22 Transcript, at 10:11-15, 15:22-16:22, 18:18-19:9, 36:3-37:21, 38:21-42:9, 43:15-44:16, 47:18-21 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 10, 200-01; Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[124]    *See* 9/8 Transcript, at 14:3-15:9 (Testimony of Charles Moore); 9/29 Transcript, at 161:7-23 (Testimony of Gaurav Malhotra).

[125]    *See* 9/4 Transcript, at 198:24-201:13, 209:24-210:17 (Testimony of John Hill); 9/17 Transcript, at 90:13-91:18, 121:5-127:15 (Testimony of Sue McCormick); 9/29 Transcript, at 103:9-25 (Testimony of Gaurav Malhotra); 10/22 Transcript, at 31:20-24 (Testimony of Martha E.M. Kopacz).

implementation of the Reinvestment Initiatives).[126] The City has agreed to retain

Ernst & Young through December 2016, which continued retention will support

the City's efforts to restructure its finance department and implement sound cash

monitoring and cash management practices.[127] The City has effected a

comprehensive reorganization of the office of its Chief Financial Officer –

including by hiring a Deputy Mayor for Economic Policy to work in partnership

with the Chief Financial Officer – to promote efficiency, centralize accountability

and assist with the implementation of the Reinvestment Initiatives.[128] In addition,

the City has undertaken a comprehensive review of its human resources operations

---

[126] *See* 9/4 Transcript, at 81:15-91:22, 103:10-21, 106:6-16, 134:24-136:4,
165:8-169:9, 172:25-173:24 (Testimony of John Hill); 9/5 Transcript,
at 17:20-19:23, 21:17-22:8, 22:19-23:5 (Testimony of John Hill);
id. at 140:18-141:22, 149:17-151:11, 157:15-158:2, 265:25-266:11
(Testimony of Charles Moore); 9/8 Transcript, at 15:14-16:5, 57:21-58:10,
60:11-66:19 (Testimony of Charles Moore); 10/1 Transcript,
at 157:18-158:7 (Testimony of Kevyn Orr); 10/2 Transcript,
at 121:12-122:13, 123:9-124:9, 146:4-147:3 (Testimony of Kevyn Orr);
10/6 Transcript, at 79:1-83:1 (Testimony of Mayor Michael Duggan);
id. at 28:23-31:11 (Testimony of City Council President Brenda Jones);
10/22 Transcript, at 53:4-54:8, 69:12-72:3, 83:5-84:12 (Testimony of Martha
E.M. Kopacz); Court's Exhibit 12002 (Second Supplemental Expert Report
of Martha E.M. Kopacz), at 29-30; City Exhibit 552.

[127] *See* 10/22 Transcript, at 54:24-56:4 (Testimony of Martha E.M. Kopacz).

[128] *See* 9/4 Transcript, at 75:23-80:5, 84:23-85:5 (Testimony of John Hill);
10/22 Transcript, at 56:15-57:12, 83:19-84:12 (Testimony of Martha E.M.
Kopacz); Court's Exhibit 12002 (Second Supplemental Expert Report of
Martha E.M. Kopacz), at 29-30; City Exhibit 598.

and practices, and has hired a new Human Resources Director whose employment will begin in January 2015.[129]

       7.     Appropriate controls will be in place to reasonably ensure the City's ongoing compliance with the terms of the Plan.[130]  These controls include, but are not limited to:  (a) the Michigan Financial Review Commission (the "Financial Review Commission") established pursuant to Public Act 181 of 2014, M.C.L. §§ 141.1631, *et seq.* ("PA 181" or the "Financial Review Commission Act"); (b) the requirements imposed by Public Act 182 of 2014, M.C.L. § 117.4s-t ("PA 182" and, together with PA 181, the "Grand Bargain Legislation"), that the City (i) adopt a sound, multi-year financial plan, (ii) appoint a Chief Financial Officer and (iii) post its financial forecasts and contracts to the City's official website; and (c) the adoption of governance and financial oversight mechanisms for the Retirement Systems in connection with the State Contribution Agreement.[131]

---

[129]    *See* 10/22 Transcript, at 71:17-72:3, 83:15-18 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 30.

[130]    *See* 10/6 Transcript, at 118:14-121:1 (Testimony of Mayor Michael Duggan); *id.* at 28:18-32:6 (Testimony of City Council President Brenda Jones); 10/22 Transcript, at 69:1-11 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 175, 202.

[131]    *See* 9/4 Transcript, at 73:20-74:6, 98:22-99:22, 101:7-13 (Testimony of John Hill); 9/8 Transcript, at 67:17-74:5 (Testimony of Charles Moore); 9/30 Transcript, at 81:16-19 (Testimony of Kenneth Buckfire);

8. The Financial Review Commission will consist of the following members: (a) the State Treasurer of Michigan; (b) the Director of the Michigan Department of Technology, Management and Budget, or his or her designee; (c) the Mayor of the City of Detroit, or the Mayor's designee; (d) the President of the Detroit City Council; and (e) five appointees of the Governor of Michigan "who have knowledge, skill, or experience in the field of business or finance and who shall possess knowledge, training, skill, or experience in budgeting, revenue forecasting, debt management or borrowing, actuarial science, law, or business operations," one of which will be nominated by the Majority Leader of the Michigan Senate, and one of which will be nominated by the Speaker of the Michigan House of Representatives.[132] Although, under PA 181, the members of the Financial Review Commission will serve in a volunteer capacity, the State has agreed to fund the appointment of a full-time Executive Director, and

---

(continued…)

10/1 Transcript, at 91:24-110:12 (Testimony of Brom Stibitz);
10/2 Transcript, at 123:21-124:1, 147:4-148:8 (Testimony of Kevyn Orr);
10/3 Transcript, at 15:5-20:21 (Testimony of Kevyn Orr); 10/6 Transcript, at 118:14-121:1 (Testimony of Mayor Michael Duggan); *id.* at 28:18-32:6 (Testimony of City Council President Brenda Jones).

[132] *See* 10/1 Transcript, at 104:21-105:21 (Testimony of Brom Stibitz); M.C.L. § 141.1635.

-49-

13-53846-swr  Doc 8199-1  Filed 10/31/14  Entered 10/31/14 17:58:34  Page 57 of 163
13-53846-swr  Doc 8994-1  Filed 12/18/14  Entered 12/18/14 16:54:18  Page 57 of 163

up to six full-time staff members, to ensure that the Financial Review Commission

will have the resources necessary to consistently carry out its duties.[133]

9.      Under the Grand Bargain Legislation, the Financial

Review Commission is empowered to approve or reject, among other things,

(a) the City's four-year financial plan, (b) operating budgets for the City, (c) new

debt issuances, (d) contracts for more than $750,000 or for a term exceeding two

years and (e) collective bargaining agreements.[134]  If the Financial Review

Commission were to reject two successive four-year financial plans submitted for

approval by the City, the Financial Review Commission would have authority

under the Grand Bargain Legislation to (a) require the City to address certain

deficiencies in such plan or (b) impose an alternative four-year financial plan upon

the City until the Financial Review Commission approves a plan submitted by the

City.[135]  PA 182 provides a list of specific information the City's multi-year

financial plan must contain, including but not limited to (a) revenue and expense

projections, (b) cash flow projections, (c) anticipated capital commitments for each

fiscal year and (d) measures to ensure compliance with applicable state and federal

---

[133]     *See* Court's Exhibit 12002 (Second Supplemental Expert Report of Martha
E.M. Kopacz), at 30.

[134]     *See* 10/1 Transcript, at 93:18-94:4 (Testimony of Brom Stibitz);
M.C.L. §§ 141.1636, 141.1637.

[135]     *See* 10/1 Transcript, at 95:9-23 (Testimony of Brom Stibitz);
M.C.L. § 141.1636.

law.[136]  The Financial Review Commission will have broad authority, under the

Grand Bargain Legislation, to obtain and review the City's financial records on an

ongoing basis, and to conduct financial audits of the City.[137]  In addition, as a

means of ensuring the City's cooperation with the Financial Review Commission

and ongoing compliance with the oversight mechanisms established by the Grand

Bargain Legislation, the Financial Review Commission will have both approval

and termination power with respect to the City's Chief Financial Officer.[138]

> 10.     The Reinvestment Initiatives provide for the

reinvestment of approximately $1.7 billion in the City between the Effective Date

and June 30, 2023.[139]  The Reinvestment Initiatives will allow the City to achieve

approximately $483 million in additional revenue and $358 million in cost savings

during that same period, resulting in net reinvestment in the City of approximately

---

[136]     *See* 10/1 Transcript, at 95:24-96:10 (Testimony of Brom Stibitz);
M.C.L. § 117.4t(1)(b).

[137]     *See* 10/1 Transcript, at 97:9-12 (Testimony of Brom Stibitz);
M.C.L. § 141.1636.

[138]     *See* 10/1 Transcript, at 97:13-98:13 (Testimony of Brom Stibitz);
M.C.L. § 141.1637.

[139]     *See* 9/5 Transcript, at 42:24-45:24 (Testimony of Charles Moore);
10/2 Transcript, at 115:18-22 (Testimony of Kevyn Orr); City Exhibits 579,
617, 619.

$877 million.[140]  The Reinvestment Initiatives are the result of a "bottom up" analysis, conducted by the City's professionals in collaboration with City officials and employees, of the City and its various departments and certain enterprise funds designed to identify and address service deficiencies within such departments and funds.[141]  The Reinvestment Initiatives are reasonably designed to, and more likely than not will, ensure that the City will be able to (a) remedy its service delivery insolvency and provide adequate municipal services to its residents, (b) meet its financial obligations on a prospective basis, (c) promote the stability of the City's population and (d) provide a platform for the growth of both the City's resident and business populations.[142]

   11.    The costs associated with the Reinvestment Initiatives are reasonable.[143]  The goals of the Reinvestment Initiatives are achievable.[144]

---

[140]   *See* 9/5 Transcript, at 45:25-47:20, 48:16-49:5, 50:20-53:5, 54:20-55:14 (Testimony of Charles Moore); 10/22 Transcript, at 44:17-45:24 (Testimony of Martha E.M. Kopacz); City Exhibits 54, 55, 575, 576, 577, 581, 582, 619.

[141]   *See* 9/5 Transcript, at 66:17-75:24 (Testimony of Charles Moore); 9/8 Transcript, at 13:9-23 (Testimony of Charles Moore); 10/2 Transcript, at 116:20-117:5, 117:18-118:1, 121:5-12 (Testimony of Kevyn Orr).

[142]   *See* 9/4 Transcript, at 136:5-137:20, 185:14-186:4 (Testimony of John Hill); 9/5 Transcript, at 42:13-42:18 (Testimony of Charles Moore); 9/8 Transcript, at 66:20-67:16 (Testimony of Charles Moore); 10/2 Transcript, at 122:14-123:8 (Testimony of Kevyn Orr); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202.

[143]   *See* 9/4 Transcript, at 150:19-154:15 (Testimony of John Hill); 10/2 Transcript, at 134:1-136:22 (Testimony of Kevyn Orr); 10/22 Transcript, at 32:14-21 (Testimony of Martha E.M. Kopacz).

The Reinvestment Initiatives are structured to (a) prioritize Reinvestment Initiatives that either will (i) generate additional revenue, (ii) create cost savings or (iii) allow the City to provide adequate services and (b) provide for significant amounts of reinvestment in the first two years following the Effective Date in order to maximize the benefit thereof.[145] The City can arrest the reinforcing trends of population loss, declining property values and declining revenues if adequate services are restored, blight is remediated and the City becomes a more attractive place to live and work.[146] The Reinvestment Initiatives will accelerate investment

(continued…)

[144] *See* 9/4 Transcript, at 142:4-144:6, 149:13-150:9, 161:25-162:20 (Testimony of John Hill); 9/5 Transcript, at 151:25-152:13 (Testimony of Charles Moore); 10/1 Transcript, at 51:23-52:6 (Testimony of Daniel Gilbert); 10/2 Transcript, at 189:19-190:10, 193:2-20 (Testimony of Rip Rapson); 10/3 Transcript, at 20:22-25 (Testimony of Kevyn Orr); 10/6 Transcript, at 108:11-110:8 (Testimony of Mayor Michael Duggan); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02; City Exhibit 599.

[145] *See* 9/4 Transcript, at 136:5-137:20, 161:17-24, 283:2-7 (Testimony of John Hill); 9/5 Transcript, at 42:7-42:12, 55:15-56:4 (Testimony of Charles Moore); City Exhibit 55.

[146] *See* 9/4 Transcript, at 132:13-25 (Testimony of John Hill); 9/5 Transcript, at 95:20-96:9 (Testimony of Charles Moore); 10/1 Transcript, at 40:1-12 (Testimony of Daniel Gilbert); 10/2 Transcript, at 206:16-207:21 (Testimony of Rip Rapson); 10/3 Transcript, at 40:3-9, 50:16-51:1 (Testimony of Roger Penske).

-53-

13-53846-swr   Doc 8291   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 61 of 163

13-53846-swr   Doc 8994-102   Filed 12/18/14   Entered 12/18/14 16:54:18   Page 61 of 163

in the City by business, community and philanthropic organizations.[147]  None of

the Reinvestment Initiatives is unnecessary or excessively costly.[148]

> 12.     Absent the Reinvestment Initiatives, the City cannot

provide a sustainable level of services to its residents.[149]  The categories of the

Reinvestment Initiatives identified in the Projections include, but are not limited to,

(a) blight remediation initiatives, (b) public safety initiatives (including, but not

limited to, initiatives focused on the Detroit Police Department and the Detroit Fire

Department), (c) resident service initiatives (including, but not limited to,

initiatives focused on the Detroit Department of Transportation), (d) business

service initiatives, (e) organizational efficiency initiatives (including, but not

limited to, initiatives focused on information technology and support services),

(f) management initiatives and (g) non-departmental initiatives.  Each of the

foregoing categories is necessary to (a) remedy the City's service delivery

insolvency, (b) reduce blight and strengthen neighborhoods, (c) improve the

efficiency of, and adequately fund, the City's operations (including, but not limited

to, its administrative and support departments and the operations of the

36th District Court), (d) allow elected officials to more effectively manage the City,

---

[147]     *See* 9/5 Transcript, at 80:23-81:7, 124:3-19 (Testimony of Charles Moore);
10/1 Transcript, at 35:23-36:18 (Testimony of Daniel Gilbert);
10/2 Transcript, at 193:2-20, 207:4-21 (Testimony of Rip Rapson).

[148]     *See* 10/2 Transcript, at 120:11-121:4 (Testimony of Kevyn Orr).

[149]     *See* 10/22 Transcript, at 32:3-9 (Testimony of Martha E.M. Kopacz).

(e) enhance the City's revenues, (f) reduce the City's costs and (g) ensure the provision of adequate and significantly improved municipal and public safety services to City residents and businesses.[150] The Mayor's office and the City Council have been consulted in connection with the City's restructuring and are committed to working in concert to implement the Plan and the Reinvestment Initiatives.[151] The transition plan reflected in the documents attached to the Joint

---

[150] *See* 9/4 Transcript, at 82:17-84:6, 87:24-88:14, 89:1-20, 131:22-132:25 (Testimony of John Hill); 9/5 Transcript, at 40:18-42:6, 80:3-83:17 (Testimony of Charles Moore); 9/8 Transcript, at 121:12-128:12, 129:7-10, 131:12-136:17 (Testimony of Beth Niblock); 9/9 Transcript, at 100:7-103:17, 122:10-125:10 (Testimony of James E. Craig, Detroit Police Chief); *id.* at 33:7-43:2, 47:25-51:1, 52:13-53:10, 86:7-13, 86:15-89:6 (Testimony of Edsel Jenkins, Detroit Executive Fire Commissioner); 10/1 Transcript, at 41:25-42:12 (Testimony of Daniel Gilbert); 10/2 Transcript, at 189:21-190:10, 207:1-21 (Testimony of Rip Rapson); 10/3 Transcript, at 49:16-51:1 (Testimony of Roger Penske); 10/6 Transcript, at 24:23-26:4, 28:18-32:6, 58:14-24 (Testimony of City Council President Brenda Jones); *id.* at 109:5-15 (Testimony of Mayor Michael Duggan); 10/22 Transcript, at 53:4-15, 72:19-74:21 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02; City Exhibits 464, 617.

[151] *See* 9/4 Transcript, at 92:17-95:25 (Testimony of John Hill); 10/2 Transcript, at 123:14-20 (Testimony of Kevyn Orr); 10/3 Transcript, at 21:1-22:7 (Testimony of Kevyn Orr); 10/6 Transcript, at 99:25-102:7, 109:22-110:8 (Testimony of Mayor Michael Duggan); *id.* at 26:5-18 (Testimony of City Council President Brenda Jones); 10/22 Transcript, at 53:4-54:8, 69:12-21 (Testimony of Martha E.M. Kopacz); Joint Notice of Transition Plan (Docket No. 7681), Exhibit A (Detroit City Council Resolution adopted Sept. 25, 2014), at 2-3 ("The City Council supports the confirmation and implementation of a Plan of Adjustment.… After, and assuming, confirmation of the Plan of Adjustment, the City Council will support the City's implementation of the confirmed Plan of Adjustment.").

-55-
163
13-53846-swr   Doc 8099-102   Filed 10/31/14   Entered 10/31/14 16:54:18   Page 63 of 163
13-53846-swr   Doc 8154-1   Filed 12/18/14   Entered 12/18/14 17:58:34   Page 63 of 163

Notice of Transition Plan (Docket No. 7681), filed on September 26, 2014, enhances the feasibility of the Plan by providing for an orderly transition of authority from the Emergency Manager to the Mayor and City Council, and enabling the City's elected officials to focus upon implementing operational restructuring initiatives while the Emergency Manager retains decisionmaking authority with respect to the City's chapter 9 case.[152]

13.     It is more likely than not that the Plan is sustainable over the long term.[153]  Based on the Projections, the City will have sufficient liquidity to sustain normal municipal operations, issue and perform under the New Securities, satisfy the Settlements and otherwise meet its financial obligations after the Effective Date.[154]  The amount of the Exit Financing is reasonable, the City will have sufficient resources to service the Exit Financing and the Exit Financing will enable the City to resolve onerous debts related to the City's excessive prepetition

---

[152]     *See* 10/22 Transcript, at 75:21-76:11 (Testimony of Martha E.M. Kopacz); Joint Notice of Transition Plan (Docket No. 7681), Exhibits A-C.

[153]     *See* 10/6 Transcript, at 109:22-110:8 (Testimony of Mayor Michael Duggan); 10/22 Transcript, at 10:8-11:11 (Testimony of Martha E.M. Kopacz); Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4.

[154]     *See* 9/29 Transcript, at 160:20-161:11, 165:15-166:17 (Testimony of Gaurav Malhotra); 10/22 Transcript, at 15:22-16:22 (Testimony of Martha E.M. Kopacz).

-56-
163
13-53846-swr   Doc 8099-2   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 64 of
13-53846-swr   Doc 8124   Filed 10/22/14   Entered 10/22/14 16:54:18   Page 64 of 163

borrowing.[155]  The Settlements (a) will enable the City to avoid the risks and expense of protracted litigation with the parties to the Settlements, (b) demonstrate that a broad consensus has been achieved in favor of the Plan and (c) thus enhance the feasibility of the Plan.[156]  The City's commitment, under the Plan, to use its best efforts to prepay the New LTGO Bonds on the Effective Date, or as soon as reasonably practicable thereafter, is both reasonable and feasible.[157]  It is a reasonable assumption that the City will be able to service the New C Notes using parking revenues, and the City's projections regarding such revenues are based upon reasonable assumptions.[158]  Credit markets likely (a) will be receptive to the newly de-leveraged City and (b) would be closed to the City absent the restructuring to be implemented pursuant to the Plan and the Reinvestment Initiatives.[159]  Although future economic risks cannot be predicted with certainty, and some economic risk factors are outside of the City's control, under the Plan,

---

[155]  *See* 10/22 Transcript, at 23:25-24:20, 77:15-25 (Testimony of Martha E.M. Kopacz).

[156]  *See id.* at 75:5-17 (Testimony of Martha E.M. Kopacz).

[157]  *See id.* at 16:23-17:10 (Testimony of Martha E.M. Kopacz).

[158]  *See id.* at 19:17-21:22 (Testimony of Martha E.M. Kopacz).

[159]  *See* 9/30 Transcript, at 80:20-22, 86:19-91:25 (Testimony of Kenneth Buckfire).

the City more likely than not will be able to adapt to unforeseen circumstances as necessary to preserve its revitalization.[160]

14. Under the Plan, the DWSD will have sufficient resources to make the capital improvements necessary to enable the DWSD to continue to provide an adequate level of water and sewer service to its customers, and the DWSD's current capital improvement plans are reasonable for this purpose.[161] There is no material risk of a system-wide failure that would prevent the DWSD from providing adequate levels of service.[162] In addition, the DWSD Pension Funding does not negatively impact the feasibility of the Plan.[163]

## **EXECUTORY CONTRACTS**

N. Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code (incorporated into this Chapter 9 Case by section 901 of the Bankruptcy Code), upon the occurrence of the Effective Date, Section II.D of the Plan provides for the assumption, assumption and assignment, or rejection of certain Executory Contracts and Unexpired Leases. The City's determinations regarding the

---

[160] *See* 9/30 Transcript, at 90:18-25, 102:16-103:11 (Testimony of Kenneth Buckfire); 10/6 Transcript, at 109:22-110:8 (Testimony of Mayor Michael Duggan).

[161] *See* 9/17 Transcript, at 91:23-100:6 (Testimony of Sue McCormick); 9/30 Transcript, at 14:8-15:1; 29:17-30:3, 32:2-15 (Testimony of Vyto Kaunelis).

[162] *See* 9/17 Transcript, at 99:18-100:1 (Testimony of Sue McCormick); 9/30 Transcript, at 32:9-15 (Testimony of Vyto Kaunelis).

[163] *See* 10/22 Transcript, at 74:22-75:4 (Testimony of Martha E.M. Kopacz).

-58-

13-53846-swr   Doc 8099-102   Filed 10/31/14   Entered 10/31/14 16:54:18   Page 66 of 163
13-53846-swr   Doc 8194-1   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 66 of 163

assumption, assumption and assignment, or rejection of Executory Contracts and

Unexpired Leases are based on and within the sound business judgment of the City,

are necessary to the implementation of the Plan and are in the best interests of the

City, holders of Claims and other parties in interest in the Chapter 9 Case.

The City has filed Exhibit II.D.6 to the Plan (as it may have been amended or

supplemented) and either has provided or will provide notice of the City's

determinations regarding the assumption, assumption and assignment, or rejection

of Executory Contracts or Unexpired Leases and any related Cure Amount Claims

consistent with the procedures (collectively, the "Contract Procedures") set forth in

the Order, Pursuant to Sections 365, 901 and 1123 of the Bankruptcy Code,

(A) Establishing Procedures with Respect to the Proposed Assumption and

Rejection of Executory Contracts and Unexpired Leases and (B) Approving the

Form and Manner of Notice Thereof (Docket No. 6512), entered on

August 4, 2014 (the "Contract Procedures Order").

## <u>SETTLEMENTS AND RELEASES</u>

O.     Pursuant to Bankruptcy Rule 9019(a) or otherwise, and in

consideration for the distributions and other benefits provided under the Plan, the

provisions of the Plan constitute a good faith compromise and settlement of all

Claims and controversies resolved pursuant to the Plan.

P.      Based upon the representations and arguments of counsel to the City, the Retiree Committee, the Retirement Systems, Syncora, FGIC, the State, DIA Corp., the RDPFFA and the DRCEA, and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of this Chapter 9 Case, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Court's approval of all Settlements provided for herein or in the Plan because, among other things, all aspects of such Settlements have been fully disclosed and such Settlements (and, as applicable, the agreements underlying such Settlements): (1) were negotiated and entered into in good faith and at arm's length; (2) comport with the policies and purposes of chapter 9 of the Bankruptcy Code; (3) reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation of the Chapter 9 Case; (4) fall well within the range of reasonableness for the resolution of complex litigation; (5) are fair, equitable and reasonable and in the best interests of the City, its creditors and other parties in interest; (6) represent appropriate exercises of the City's business judgment; (7) are essential to the successful implementation of the Plan; and (8) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.[164]

---

[164]      *See* 10/1 Transcript, at 176:10-22 (Testimony of Kevyn Orr);

Q.  <u>The DIA Settlement</u>.  The DIA Settlement resolves a

substantial dispute surrounding the extent of the City's property rights with respect

to the DIA Assets.[165]  Under the DIA Settlement, as reflected in Section IV.E.2 of

the Plan, the City will irrevocably transfer all of its right, title and interest in and to

the DIA Assets to DIA Corp., as trustee, to hold in perpetual charitable trust, and

within the City limits, for the primary benefit of the residents of the City and the

Counties and the citizens of the State.[166]

1.  The City cannot be compelled to liquidate the DIA

Collection.[167]  Even if such a liquidation could be compelled, however, many

works in the DIA Collection are subject to donor restrictions and, contrary to the

City's position, the Michigan Attorney General and DIA Corp. assert that the entire

DIA Collection is held in trust.[168]  The City's likelihood of success in potential

_____

(continued…)

10/2 Transcript, at 18:6-22, 43:9-45:13 (Testimony of Kevyn Orr).

[165]  *See* 9/18 Transcript, at 29:14-30:5, 30:9-15, 53:4-13 (Testimony of Michael Plummer); *id.* at 91:12-19, 92:6-14, 115:20-116:24, 117:14-21 (Testimony of Annmarie Erickson); 9/30 Transcript, at 148:7-12 (Testimony of Kenneth Buckfire); 10/2 Transcript, at 26:16-27:15 (Testimony of Kevyn Orr).

[166]  *See* Plan, at Exhibit I.A.127 (DIA Settlement Documents).

[167]  *See supra*, ¶ G.30; 11 U.S.C. § 904.

[168]  *See* 9/18 Transcript, at 29:14-30:5, 30:9-15, 53:4-13 (Testimony of Michael Plummer); *id.* at 91:12-19, 92:6-14, 115:20-116:24, 117:14-21 (Testimony of Annmarie Erickson); 10/2 Transcript, at 28:7-29:12, 30:15-32:12, 249:5-8, 249:21-250:2 (Testimony of Kevyn Orr); Michigan Attorney General Opinion No. 7272 (June 13, 2013).

13-53846-swr   Doc 8099-1   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 69 of 163
13-53846-swr   Doc 8994-2   Filed 12/18/14   Entered 12/18/14 16:54:18   Page 69 of 163

litigation over whether the City has sufficient interest in the DIA Assets (or in any of them) to permit it to sell any such assets and use the proceeds of sale for its own purposes, including payment of operating expenses or debt, is uncertain.[169] Any such litigation would likely take substantial time and cause the City to incur substantial expense.[170]

 2. Even if the City were to prevail in whole or in part in such litigation, it would not be in the City's best interests to liquidate the DIA Assets because (a) the City's ability to realize, on a timely basis, the full value of each of the DIA Assets it would be permitted to sell is uncertain and (b) a forced liquidation of the DIA Collection likely would yield only a fraction of the DIA Collection's true economic value.[171] A proposed sale or other deaccession of the DIA Assets would have been resisted, and likely would have provoked adverse action, including litigation, by (a) DIA Corp. and donors to DIA Corp. and to the DIA and (b) the international art community.[172] Preservation of the DIA Assets

---

[169] *See* 10/2 Transcript, at 32:13-22 (Testimony of Kevyn Orr).

[170] *See* 10/2 Transcript, at 32:23-33:15 (Testimony of Kevyn Orr).

[171] *See* 9/18 Transcript, at 14:19-15:25, 26:16-28:1 (Testimony of Michael Plummer); 9/16 Transcript, at 112:3-9 (Testimony of Vanessa Fusco); 10/2 Transcript, at 40:9-41:7 (Testimony of Kevyn Orr).

[172] *See* 9/18 Transcript, at 114:6-11 (Testimony of Annmarie Erickson); *id.* at 31:2-32:23 (Testimony of Michael Plummer); 10/2 Transcript, at 29:13-30:12, 248:12-23, 255:17-256:4 (Testimony of Kevyn Orr); 10/3 Transcript, at 25:23-26:7 (Testimony of Kevyn Orr).

and the DIA is strongly in the interest of the City and its residents, is an important element in the revitalization of the City, and therefore is in the interest of its creditors, who are receiving under the Plan payments over a period of time.[173]

    3.    The compromises and settlements embodied in the DIA Settlement (a) accurately reflect and effectively resolve a substantial dispute surrounding the extent of the property rights the City possesses with respect to the DIA Assets, (b) avoid objections to confirmation of the Plan regarding the Plan's treatment of Pension Claims, (c) resolve pending appeals regarding the Court's ability to impair pensions under chapter 9 of the Bankruptcy Code, (d) provide adequate funding to the Retirement Systems through fiscal year 2023 and (e) are, collectively, a key compromise upon which several provisions of the Plan rest.[174] In the absence of the DIA Settlement, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses.[175]

---

[173]    *See* 9/18 Transcript, at 38:17-25 (Testimony of Michael Plummer); *id.* at 76:10-82:22, 157:18-164:12 (Testimony of Annmarie Erickson); 9/30 Transcript, at 163:14-23 (Testimony of Kenneth Buckfire); 10/1 Transcript, at 46:21-47:19, 48:19-49:5 (Testimony of Daniel Gilbert); 10/2 Transcript, at 204:18-205:9 (Testimony of Rip Rapson); 10/3 Transcript, at 48:22-49:7 (Testimony of Roger Penske); 10/6 Transcript, at 110:16-20 (Testimony of Mayor Michael Duggan).

[174]    *See* 10/2 Transcript, at 44:6-23, 56:25-57:22 (Testimony of Kevyn Orr).

[175]    *See* 9/9 Transcript, at 195:16-196:13 (Testimony of Terri Renshaw); 9/18 Transcript, at 117:14-21 (Testimony of Annmarie Erickson); 10/2 Transcript, at 32:13-33:25 (Testimony of Kevyn Orr).

4. The City's transfer of the DIA Assets is made for fair value and fair consideration.[176] The DIA Settlement proceeds total $466 million in nominal revenue.[177] It is more likely than not that DIA Corp. and the DIA Funders have the ability to fulfill their commitments under the DIA Settlement.[178] Christie's Inc. appraised approximately 2,300 works within the DIA Collection purchased in whole or in part with City funds, estimating their fair market value between $454 million and $867 million.[179] Hilco Real Estate Appraisal, LLC determined that an institutional user seeking to acquire the DIA Assets constituting real property would pay approximately $43 million whereas an investor seeking to purchase and convert such real property would pay only $18.5 million.[180] Various alternatives to the DIA Settlement did not promise value to the City, its residents, its creditors or the surrounding communities in excess of the value of the DIA Settlement.[181]

---

[176]   *See* 10/2 Transcript, at 34:15-35:1 (Testimony of Kevyn Orr).

[177]   *See* 9/29 Transcript, at 146:12-16 (Testimony of Gaurav Malhotra); 10/2 Transcript, at 52:21-54:17 (Testimony of Kevyn Orr); City Exhibit 352.

[178]   *See* 9/18 Transcript, at 117:4-13 (Testimony of Annmarie Erickson); 10/2 Transcript, at 53:3-5, 55:5-9, 234:13-20 (Testimony of Kevyn Orr).

[179]   *See* 9/16 Transcript, at 105:10-14 (Testimony of Vanessa Fusco); 10/2 Transcript, at 35:8-39:17 (Testimony of Kevyn Orr); City Exhibit 341.

[180]   *See* 9/18 Transcript, at 190:10-194:1 (Testimony of John Satter).

[181]   *See* 10/2 Transcript, at 42:2-43:6 (Testimony of Kevyn Orr); 10/6 Transcript, at 146:19-147:3 (Testimony of Mayor Michael Duggan).

5.     The DIA Settlement has not been entered into fraudulently, nor with the intent to hinder, delay or defraud any entity to which the City is, or may become, indebted on or after the Effective Date.[182]  The City will neither be insolvent on the date of the transfer of the DIA Assets nor, by reason of the transfer, rendered insolvent or unable to meet its obligations as they mature.[183]

6.     The transfer of the DIA Assets to the DIA Corp. serves the public purpose of providing civic, artistic and cultural activities to the general public.[184]  Such transfer is authorized by law, including by Section 4k of the Michigan Home Rule City Act, M.C.L. § 117.4k, and Section 1-102 of the Detroit City Charter.

7.     The DIA Settlement (a) eliminates the risk and expense of litigation regarding the DIA Assets and the Plan's treatment of Pension Claims and (b) leverages the DIA Assets for the benefit of the City's pensioners while also protecting the DIA Assets from the threat of liquidation and preserving the DIA Assets for the benefit of the City, its residents and surrounding communities.[185]

---

[182]     *See* 10/2 Transcript, at 150:11-12 (Testimony of Kevyn Orr).

[183]     *See* City Exhibits 109, 111, 733, 734.

[184]     *See* 9/18 Transcript, at 38:17-25 (Testimony of Michael Plummer); *id.* at 157:18-164:12 (Testimony of Annmarie Erickson); 10/6 Transcript, at 110:16-111:14 (Testimony of Mayor Michael Duggan).

[185]     *See* 9/29 Transcript, at 146:12-20 (Testimony of Gaurav Malhotra); 10/2 Transcript, at 33:16-35:1, 43:9-45:13 (Testimony of Kevyn Orr).

-65-
13-53846-swr   Doc 8299-10   Filed 10/31/14   Entered 10/31/14 16:54:18   Page 73 of
163
13-53846-swr   Doc 8134   Filed 10/22/14   Entered 10/22/14 17:58:34   Page 73 of 163

Based on the evidence of the value of the DIA Assets and on (a) the amount of the consideration to be provided under the DIA Settlement directly to the Retirement Systems, (b) DIA Corp.'s commitments to the City under the DIA Settlement, including the obligation to maintain for the benefit of the public an encyclopedic art museum the permanent primary situs of which will be in the City, and (c) the settlement of litigation over the extent of the City's right, title or interest in the DIA Assets, the DIA Settlement is for fair value and fair consideration and is fair, equitable, reasonable and in the best interests of the City and its creditors and residents.[186]

      R.    <u>The UTGO Settlement</u>.  After sufficient notice and opportunity for all parties to be heard, and after due deliberation, based on the Court's thorough review and full consideration of the UTGO Settlement Agreement and good and sufficient cause appearing therefor, the Court makes the following findings of fact and conclusions of law with respect to the UTGO Settlement:

      1.    The UTGO Settlement described in the Plan and the UTGO Settlement Agreement are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.  The UTGO Settlement Agreement is the result of extensive arm's length negotiations among the City and the Settling UTGO Bond Insurers – all of whom were represented by sophisticated

---

[186]    *See* 10/2 Transcript, at 43:9-45:13 (Testimony of Kevyn Orr).

counsel.[187]  The compromises and settlements embodied in the UTGO Settlement

(a) resolve all disputes with respect to claims classified in Class 8 under the Plan

and the issues raised by the Settling UTGO Bond Insurers in the UTGO Litigation

and (b) are, collectively, a key compromise upon which several provisions of the

Plan rest.  In the absence of such compromises and settlements, the City's

emergence from chapter 9 would likely have been delayed by litigation and

burdened with additional expenses.[188]

> 2.    The UTGO Settlement and the UTGO Settlement

Agreement:  (a) were negotiated and entered into in good faith; (b) comport with

the policies and purposes of chapter 9; (c) are fair, equitable and reasonable; (d) are

in the best interests of the City and its creditors and residents as they not only fully

resolve the UTGO Litigation but also permit the City's assignees to receive value

from the Assigned UTGO Bond Tax Proceeds as set forth in the Plan, which

receipt fulfills a requirement of the State Contribution Agreement; (e) are within

the range of reasonable results if the disputes resolved by the UTGO Settlement,

including the UTGO Litigation, were instead litigated to a conclusion; (f) fall

above the lowest point in the range of reasonableness; and (g) meet the standards

---

[187]    *See* 10/1 Transcript, at 191:12-21, 197:2-10 (Testimony of Kevyn Orr).

[188]    *See* 10/1 Transcript, at 186:12-189:25 (Testimony of Kevyn Orr).

for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.[189]

        3.     Without limiting any of the foregoing, the Court hereby finds that:

- The Plan incorporates the UTGO Settlement Agreement, and the effectiveness of the Plan is expressly conditioned upon: (a) the MFA board having approved the issuance of the Restructured UTGO Bonds and such bonds having been issued; and (b) the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.[190]

- As of the Effective Date, the Plan represents a full, final and complete compromise, settlement, release and resolution of, among other matters, all disputes and pending or potential litigation (including any appeals), including, without limitation, the UTGO Litigation, regarding the allowability, amount, priority and treatment of the Unlimited Tax General Obligation Bond Claims. The treatment of Class 8 Unlimited Tax General Obligation Bond Claims under the Plan is a component of a settlement and compromise of the UTGO Litigation.[191]

- Good and valuable consideration has been provided for all releases and exculpations granted pursuant to the UTGO Settlement Agreement,

---

[189]    *See* 10/1 Transcript, at 190:1-14, 193:2-197:1, 197:11-24 (Testimony of Kevyn Orr).

[190]    *See* Plan, at §§ III.A.9, III.A.10.

[191]    *See* Plan, at § II.B.3.o.ii, Exhibit I.A.360.

including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement. Such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.[192]

- The Court confirms that, as of the Effective Date and pursuant to Emergency Manager Bond Order No. 4, the Municipal Obligation shall be secured, to the extent permitted by law, including without limitation section 12(1)(x) of PA 436, by a lien granted by the City on the UTGO Bond Tax Levy for so long as either the Municipal Obligation or the Stub UTGO Bonds are outstanding.[193]

- As of the Effective Date, the UTGO Bond Tax Levy shall constitute "special revenues," as defined in section 902 of the Bankruptcy Code, and "pledged special revenues," as that term is used in section 922(d) of the Bankruptcy Code.[194]

- As of the Effective Date, the MFA shall possess a valid and enforceable statutory fourth lien and trust on the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and Michigan Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act, M.C.L. §§ 141.901, *et seq.*, as amended ("Distributable State Aid"), as provided in section 15(2) of Michigan Public Act 227 of 1985, the Shared Credit Rating Act, M.C.L. §§ 141.1051, *et seq.*, or as otherwise provided under applicable law.[195]

---

[192]   *See* Plan, at Exhibit I.A.360.

[193]   *See id.*

[194]   *See id.*; 11 U.S.C. §§ 902, 922(d).

[195]   *See* Plan, at Exhibit I.A.360.

- As of the Effective Date, Holders of the Restructured UTGO Bonds shall possess all of the MFA's rights and interest in the Municipal Obligation including all the rights and interest provided herein and under the UTGO Settlement Agreement, subject to the reservation by the MFA of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the Municipal Obligation and related documents. Accordingly, the Restructured UTGO Bonds will be payable from and secured by (a) payments made by the City on the Municipal Obligation and to the extent permitted by law, including without limitation section 12(1)(x) of PA 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation and (b) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the Restructured UTGO Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the Restructured UTGO Bonds, which include, without limitation, all payments of (i) the proceeds of the UTGO Bond Tax Levy and (ii) Distributable State Aid.[196]

S.    <u>The LTGO Settlement</u>.  The LTGO Settlement Agreement and

all Sections of the Plan pertaining to recoveries upon Limited Tax General

Obligation Bond Claims, including Sections II.B.3.n and II.B.3.p.i.A of the Plan

(such sections of the Plan, collectively with the LTGO Settlement Agreement, the

"<u>LTGO Settlement</u>") are fair, equitable, reasonable and in the best interests of the

---

[196]    *See id.*

City and its creditors and residents.  The LTGO Settlement is the result of

extensive arm's length negotiations among the City, the LTGO Insurer and

BlackRock Financial Management (on behalf of certain managed funds and

accounts) ("BlackRock").[197]  The compromises and settlements embodied in the

LTGO Settlement (1) resolve all disputes with respect to (a) the Plan and any

objections filed by the LTGO Insurer or BlackRock related to the Plan, (b) the

Claims classified in Class 7 under the Plan and (c) all issues relating to Limited

Tax General Obligation Bonds raised in the adversary proceeding brought before

the Bankruptcy Court, captioned as *Ambac Assurance Corp. v. City of Detroit,*

*Michigan*, No. 13-5310 (Bankr. E.D. Mich.) (the "Ambac Action"); and (2) are,

collectively, a key compromise upon which several provisions of the Plan rest.[198]

In the absence of such compromises and settlements, the City's emergence from

chapter 9 likely would have been delayed by litigation and burdened with

additional expenses, with no assurance of a better result for the City.[199]

The treatment of Limited Tax General Obligation Bonds and related Limited Tax

---

[197]    *See* 10/1 Transcript, at 199:13-20 (Testimony of Kevyn Orr);
         10/2 Transcript, at 6:7-16 (Testimony of Kevyn Orr).

[198]    *See* 10/1 Transcript, at 206:7-207:8 (Testimony of Kevyn Orr);
         10/2 Transcript, at 6:7-10:16 (Testimony of Kevyn Orr); Plan,
         at Exhibit I.A.237 (LTGO Settlement Agreement).

[199]    *See* 10/1 Transcript, at 204:7-206:6 (Testimony of Kevyn Orr).

General Obligation Bond Claims under the Plan is part of the settlement of the Ambac Action, as such proceeding relates to such Bonds and Claims.

      T.    <u>The OPEB Settlement</u>.  The OPEB Settlement is the result of extensive arm's length negotiations between the City and the Retiree Committee, which was represented by sophisticated counsel, and is an integral component of the City's global settlement of pension- and other labor-related issues negotiated with, among others, the Retiree Committee.[200] The compromises and settlements embodied in the OPEB Settlement (1) resolve all disputes with respect to the aggregate valuation of Claims classified in Class 12 under the Plan and the issues raised by the Retiree Committee in the Retiree Health Care Litigation; and (2) are, collectively, a key compromise upon which several provisions of the Plan rest.[201] In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.[202]

      1.    The OPEB Settlement is in the best interests of the City and its creditors and residents as it fully resolves (a) the dispute between the City and the Retiree Committee regarding the aggregate valuation of OPEB Claims and

---

[200]    *See* 10/2 Transcript, at 19:23-20:6 (Testimony of Kevyn Orr).

[201]    *See* 10/2 Transcript, at 20:10-23:11 (Testimony of Kevyn Orr); City Exhibit 720.

[202]    *See* 9/9 Transcript, at 195:16-196:13 (Testimony of Terri Renshaw); 10/2 Transcript, at 15:20-18:5 (Testimony of Kevyn Orr).

the treatment of OPEB Claims under the Plan and (b) the Retiree Health Care Litigation.[203]  The OPEB Settlement is within the range of reasonable results if the disputes resolved by the OPEB Settlement, including the Retiree Health Care Litigation, were instead litigated to a conclusion.[204]

     U.    <u>The 36th District Court Settlement</u>.  The 36th District Court Settlement is the result of extensive arm's length negotiations among the City, the 36th District Court and the Settling 36th District Court Claimants.[205] The compromises and settlements embodied in the 36th District Court Settlement resolve all disputes with respect to (1) the Plan and any objections filed by Settling 36th District Court Claimants related to the Plan and (2) the treatment of Indirect 36th District Court Claims under the Plan.[206]  In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.[207]

     1.    The 36th District Court Settlement is in the best interests of the City and its creditors and residents as it not only resolves the treatment of

---

[203]   *See* 10/2 Transcript, at 13:3-17, 15:2-15, 18:23-19:20, 20:10-23:11 (Testimony of Kevyn Orr).

[204]   *See* 10/2 Transcript, at 18:6-22 (Testimony of Kevyn Orr).

[205]   *See* 10/2 Transcript, at 63:5-9 (Testimony of Kevyn Orr).

[206]   *See* 10/2 Transcript, at 63:20-64:22 (Testimony of Kevyn Orr).

[207]   *See* 10/2 Transcript, at 61:9-62:21 (Testimony of Kevyn Orr).

Indirect 36th District Court Claims under the Plan, but also provides for the payment of the Settling 36th District Court Claimants' Claims at a significant discount while enabling the City to avoid further litigation with the Settling 36th District Court Claimants regarding the City's power to impair Indirect 36th District Court Claims under the Plan. The 36th District Court Settlement is within the range of reasonable results if the disputes resolved by the 36th District Court Settlement were instead litigated to a conclusion.[208]

        V.   <u>The Syncora Settlement</u>. The Syncora Settlement is the result of extensive arm's length negotiations among the City, Syncora and other interested parties impacted by the Syncora Settlement, including the Retiree Committee and the LTGO Insurer.[209] The Syncora Settlement includes a long term commitment by Syncora to the revitalization of core areas of the City and a partnership between Syncora and the City focused on the City's growth.[210] Without limiting the foregoing, the Court hereby finds as follows with respect to the Syncora Settlement:

---

[208]   *See* 10/2 Transcript, at 62:22-63:4, 63:10-64:22 (Testimony of Kevyn Orr); City Exhibit 722.

[209]   *See* 10/2 Transcript, at 72:8-12 (Testimony of Kevyn Orr); 10/3 Transcript, at 145:2-6 (Testimony of James Doak).

[210]   *See* 10/2 Transcript, at 74:3-16, 85:24-87:19 (Testimony of Kevyn Orr); 10/3 Transcript, at 22:8-10 (Testimony of Kevyn Orr); *id.* at 118:22-119:17 (Testimony of James Doak).

1.      The compromises and settlements embodied in the

Syncora Settlement resolve all disputes between the City and Syncora with respect

to (a) any Class 9 Claim or Class 14 Claim held by Syncora, (b) the Plan and all

objections filed by Syncora related to the Plan (including any objection related to

the UTGO Settlement) and (c) all issues arising in connection with the Dismissed

Syncora Litigation, including, but not limited to, issues arising in connection with

the COP Swap Settlement and the Tunnel Lease.[211]  In the absence of the Syncora

Settlement, the City's emergence from chapter 9 likely would have been delayed by

additional litigation and burdened with additional expenses, with no assurance of a

better result for the City.[212]  The Syncora Settlement is (a) a reasonable exercise of

the City's business judgment and (b) within the range of reasonable results if the

disputes resolved by the Syncora Settlement were instead litigated to a

conclusion.[213]

2.      As part of the Syncora Settlement and to resolve all

pending litigation involving the City and Syncora, the parties have agreed to enter

into certain transactions (collectively, the "Syncora Redevelopment Transactions"),

---

[211]    *See* 10/2 Transcript, at 66:13-68:8, 82:7-84:10, 85:24-87:19 (Testimony of
        Kevyn Orr); 10/3 Transcript, at 139:18-25 (Testimony of James Doak).

[212]    *See* 10/2 Transcript, at 68:13-70:8 (Testimony of Kevyn Orr).

[213]    *See* 10/2 Transcript, at 70:9-72:7, 72:16-73:5 (Testimony of Kevyn Orr);
        10/3 Transcript, at 104:21-105:2, 109:23-113:17, 113:19-24, 117:10-120:18,
        121:12-17, 124:21-125:22 (Testimony of James Doak).

13-53846-swr   Doc 8099-10   Filed 10/31/14   Entered 10/31/14 17:58:34   Page 83 of 163
13-53846-swr   Doc 8994-10   Filed 12/18/14   Entered 12/18/14 16:54:18   Page 83 of 163

which include:  (a) the amendment, assumption and extension of the Tunnel Lease;[214] (b) the Syncora Development Agreement;[215] and (c) the agreement between the City and Pike Pointe Holdings, LLC (the "Developer"), a subsidiary of Syncora, that provides the Developer, for a period of one year following the Effective Date, with the option to enter into a 30-year concession agreement to operate and maintain the Grand Circus Parking Garage.[216]  The Syncora Redevelopment Transactions will provide the City with benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership between the City and Syncora that promises to provide substantial investment in, and rehabilitation of, City assets on a mutually beneficial basis.[217]  In addition, pursuant to the Syncora Settlement, the City will pay Syncora the sum of $5 million (the "Swap-Related Consideration") in consideration for Syncora's (a) dismissal of Syncora's appeals of the COP Swap Settlement Approval

---

[214]     *See* 10/2 Transcript, at 73:1-5, 79:15-82:3 (Testimony of Kevyn Orr); 10/3 Transcript, at 105:21-106:3 (Testimony of James Doak); Plan, at Exhibit I.A.344.

[215]     *See* 10/2 Transcript, at 72:20-23, 74:3-77:2 (Testimony of Kevyn Orr); 10/3 Transcript, at 113:19-24 (Testimony of James Doak); Plan, at Exhibit I.A.340.

[216]     *See* 10/2 Transcript, at 72:18-20, 74:20-75:1, 77:3-79:11 (Testimony of Kevyn Orr); 10/3 Transcript, at 121:1-17 (Testimony of James Doak).

[217]     *See* 10/2 Transcript, at 74:3-82:3 (Testimony of Kevyn Orr); 10/3 Transcript, at 22:8-10 (Testimony of Kevyn Orr); *id.* at 118:22-120:6 (Testimony of James Doak).

Order (Docket No. 4094) and the Order Regarding Casino Revenues and Automatic Stay (Docket No. 670) and (b) withdrawal of Syncora's other litigation claims arising from the COP Swap Documents.[218] The Swap-Related Consideration, and any consideration provided by the City to Syncora in connection with the Syncora Redevelopment Transactions, is separate and distinct from, and constitutes no part of, the treatment under the Plan of Class 9 COP Claims.[219] The Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth in the Plan for payment of COP Agent Fees). The Syncora Settlement provides benefits to Classes 7, 12 and 14 under the Plan that would otherwise have been unavailable thereto.[220]

       W.     The FGIC/COP Settlement. The FGIC/COP Settlement is the result of extensive good faith, arm's length negotiations among the City, FGIC, the FGIC COP Holders and the State.[221] The FGIC/COP Settlement is founded on a long term commitment by FGIC to the revitalization of core areas of the City and a partnership among FGIC, the City and the State focused on the City's growth.[222]

---

[218]    *See* 10/2 Transcript, at 72:23-25, 84:11-19 (Testimony of Kevyn Orr); Plan, at § IV.I.

[219]    10/3 Transcript, at 139:18-140:10 (Testimony of James Doak).

[220]    *See* 10/2 Transcript, at 85:7-23 (Testimony of Kevyn Orr).

[221]    *See* 10/21 Transcript, at 87:11-89:24 (Testimony of Kevyn Orr).

[222]    *See* 10/21 Transcript, at 111:18-118:6, 119:25-121:2 (Testimony of Kevyn Orr).

Without limiting the foregoing, the Court hereby finds as follows with respect to the FGIC/COP Settlement:

1.      The compromises and settlements embodied in the FGIC/COP Settlement resolve all disputes between the City, FGIC and the FGIC COP Holders with respect to (a) all Class 9 or Class 14 Claims held by FGIC and all Class 9 Claims held by the FGIC COP Holders, (b) the Plan and any objection filed by FGIC or the FGIC COP Holders related to the Plan and (c) all issues arising in connection with the Dismissed FGIC/COP Litigation.[223]  In the absence of the FGIC/COP Settlement, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.[224]  The FGIC/COP Settlement is (a) a reasonable exercise of the City's business judgment and (b) within the range of reasonable results if the disputes resolved by the FGIC/COP Settlement were instead litigated to a conclusion.[225]

2.      As part of the FGIC/COP Settlement and to resolve all pending litigation involving the City and FGIC, the City and FGIC have agreed to

---

[223]    *See* 10/21 Transcript, at 89:25-91:9, 104:1-7, 119:22-120:11 (Testimony of Kevyn Orr).

[224]    *See* 10/21 Transcript, at 91:16-101:23 (Testimony of Kevyn Orr).

[225]    *See* 10/21 Transcript, at 92:2-101:23, 119:22-121:2, 135:14-136:3 (Testimony of Kevyn Orr).

enter into the FGIC Development Agreement.[226]  The FGIC Development

Agreement will provide the City with various benefits that the City otherwise

would be unable to realize, including by laying the groundwork for a decades-long

partnership among the City, FGIC and the State that promises to provide

substantial investment in, and rehabilitation of, City assets.[227]  Any consideration

provided by the City to FGIC in connection with the FGIC Development

Agreement is separate and distinct from, and constitutes no part of, the treatment

under the Plan of Class 9 COP Claims.[228]  The FGIC Settlement Consideration and

the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC

COP Holders (subject to any provision set forth in the Plan for payment of COP

---

[226]   *See* 10/21 Transcript, at 109:9-18, 110:8-19 (Testimony of Kevyn Orr).

[227]   *See* 10/21 Transcript, at 110:8-116:10, 120:12-121:2 (Testimony of Kevyn Orr).

[228]   *See* 10/21 Transcript, at 109:9-18, 110:8-19, 135:14-136:3 (Testimony of Kevyn Orr).

Agent Fees).[229]  The FGIC/COP Settlement provides benefits to Classes 7, 12 and

14 under the Plan that would otherwise have been unavailable thereto.[230]

        3.      The consideration to be paid by the City pursuant to the

Syncora Settlement and the FGIC/COP Settlement is expected to be offset by

certain newly-identified sources of revenue not incorporated into the City's July

and September 2014 Projections (the "Prior Projections"), meaning that (a) the

City's overall cash position set forth in the Prior Projections remains materially

unchanged in the City's October 2014 Projections (incorporating the costs of the

Syncora Settlement and the FGIC/COP Settlement) and (b) the City will have

sufficient cash and revenues to satisfy its obligations under the Settlements and

meet its operating expenses going forward.[231]

        X.    Plan Releases.  Each non-Debtor party that will benefit from the

releases, exculpations and related injunctions set forth in, among others,

---

[229]    In addition, pursuant to the FGIC/COP Settlement, in full satisfaction and discharge of FGIC's Claims against the City related to the COP Swap Documents, FGIC will receive an Allowed Class 14 Claim in the amount of $6.13 million and the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the Plan on account of its $33.6 million Class 13 Claim.  This consideration is solely for FGIC's benefit.

[230]    *See* 10/21 Transcript, at 57:8-58:12, 61:19-62:11, 82:14-83:1 (Testimony of Gaurav Malhotra; City Exhibits 789, 790.

[231]    *See* 10/21 Transcript, at 71:21-78:9 (Testimony of Gaurav Malhotra); *id.* at 121:6-130:25 (Testimony of Kevyn Orr).

Sections III.D.5, III.D.6 and III.D.7 of the Plan (collectively, the "Plan Releases")
either shares an identity of interest with the City, was instrumental to the
successful prosecution of the Chapter 9 Case or provided substantial consideration,
which value will allow for distributions that would not otherwise be available but
for the contributions made by such non-Debtor parties.[232]  The Plan Releases are,
individually and collectively, integral to, and necessary for the successful
implementation of, the Plan, essential to the City's restructuring and supported by
reasonable consideration.[233]  The City and all creditors that voted to accept the Plan
have expressly consented to the Plan Releases.  Releases of non-Debtor parties
pursuant to Section III.D.7 of the Plan were appropriately disclosed by the City in
the Disclosure Statement, on each Ballot mailed to creditors and in the Plain
Language Supplement.[234]  Accordingly, in light of all of the circumstances, the
Plan Releases are consonant with the prevailing law in this District and are fair to
the releasing parties.  Without limiting the foregoing, the Court hereby finds as
follows with respect to the Plan Releases:

---

[232]  *See* 10/2 Transcript, at 140:6-142:13 (Testimony of Kevyn Orr);
10/21 Transcript, at 118:13-121:2 (Testimony of Kevyn Orr).

[233]  *See* 10/2 Transcript, at 140:6-142:13 (Testimony of Kevyn Orr);
10/21 Transcript, at 118:13-121:2 (Testimony of Kevyn Orr).

[234]  *See*, *e.g.*, Disclosure Statement, at 16, 28-29, 37, 39, 50, 52, 60.

1.     The releases set forth in Section III.D.7.a of the Plan are consensual releases that apply only to holders of Claims that voted to accept the Plan.  The Plan's consensual release provisions are lawful and appropriate.

2.     The exculpation provision contained in Section III.D.6 of the Plan complies with applicable law and is appropriate.  Such provision contains a carve-out for gross negligence and willful misconduct and is limited to claims arising out of the City's restructuring efforts and the Chapter 9 Case.  In addition, the Plan's exculpation provision extends only to certain parties who either have settled with the City or have actively participated in the City's restructuring activities.

3.     The non-consensual third party releases and related injunctions contained in the Plan are lawful and appropriate because unusual circumstances exist in the City's Chapter 9 Case that justify their application. As far as this Court is aware, this is the first chapter 9 case wherein (a) the debtor has sought to compromise pension benefits for a municipality's active and retired workforce *and* (b) third parties under no obligation to contribute funds to creditors of a municipal debtor have volunteered to provide funding in addition to proposed recoveries under the debtor's plan of adjustment.

4.     As part of the Grand Bargain, the State has agreed to contribute the present value of $350 million over twenty years (or $194.8 million)

to reduce the Retirement Systems' underfunding.[235]  The settlements the City

reached with representatives of its retirees and employees are conditioned upon

the receipt of the State funding.[236]  The contributions to be made by the State

pursuant to the State Contribution Agreement are made in exchange for the release

of, among other things, (a) the constitutionally-based claims asserted by the

Retirement Systems and holders of Pension Claims that such Claims may not be

impaired and (b) certain litigation identified in the State Contribution

Agreement.[237]  The funding obligation of the State under the State Contribution

Agreement is expressly conditioned upon the State and the State Related Entities

obtaining the release set forth in Section III.D.7.b of the Plan.[238]  The funding

obligation of the DIA Funders under the DIA Settlement Documents is expressly

conditioned upon the State's provision of funding pursuant to the State

Contribution Agreement.[239]  Because (a) the consummation of both the State

Contribution Agreement and the DIA Settlement – and, thus, the State's and DIA

---

[235]     *See* 9/29 Transcript, at 144:12-145:11 (Testimony of Gaurav Malhotra);
10/2 Transcript, at 45:17-46:11, 47:6-18 (Testimony of Kevyn Orr); Plan,
at Exhibit I.A.332 (State Contribution Agreement).

[236]     *See* Plan, at Exhibits I.A.127, I.A.332.

[237]     *See* 10/2 Transcript, at 46:20-47:4, 47:6-18, 56:1-8, 140:9-15 (Testimony of
Kevyn Orr).

[238]     *See* 10/2 Transcript, at 141:22-25, 142:6-13 (Testimony of Kevyn Orr); Plan,
Exhibit I.A.332, at 5.

[239]     *See* 10/2 Transcript, at 142:6-13 (Testimony of Kevyn Orr); Plan,
Exhibit I.A.127, at 3.

Funders' respective contributions pursuant thereto – depends upon the approval of the releases set forth at Section III.D.7.b of the Plan, (b) the releases set forth at Section III.D.7.b of the Plan apply only with respect to holders of Class 10 and Class 11 Claims, *i.e.*, direct beneficiaries of both the State Contribution Agreement and the DIA Settlement, and (c) such provisions otherwise comply with applicable law, the Court hereby finds that the releases set forth at Section III.D.7.b of the Plan and any related injunctions are lawful and appropriate under the unusual circumstances of the City's Chapter 9 Case.

## **MISCELLANEOUS**

Y.    <u>Exit Facility</u>.  The terms and conditions of the Exit Facility and all of the transaction documents governing the Exit Facility, including, but not limited to, bond purchase agreements, indentures, bond forms, account control agreements and all other related documents and agreements (collectively, the "<u>Exit Facility Documents</u>") and the fees to be paid thereunder (1) are fair and reasonable, (2) reflect the City's exercise of prudent judgment, (3) are supported by reasonably equivalent value and fair consideration, (4) are proposed in good faith, (5) are critical to the success and feasibility of the Plan and (6) are in the best interests of the City.[240]  The Exit Facility and the fees to be paid thereunder are the result of a full and fair marketing process conducted by the City and its agents and

---

[240]    *See* 9/30 Transcript, at 85:15-86:12, 95:16-139:4, 211:16-220:23 (Testimony of Kenneth Buckfire); City Exhibit 641.

advisors.[241]  The Exit Facility and the Exit Facility Documents and the fees to be paid thereunder were negotiated in good faith, without fraud or collusion and at arm's length among the parties, without the intent to hinder, delay or defraud any creditor of the City, and are supported by reasonably equivalent value and fair consideration.[242]  Credit extended under the Exit Facility and the Exit Facility Documents is extended in good faith for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable nonbankruptcy law, and the Exit Facility (including the transactions contemplated by the Exit Facility Documents) is not prohibited by applicable bankruptcy or nonbankruptcy law.  Each of (1) the MFA, (2) Barclays Capital Inc. (or such other qualifying affiliate as transferee), (3) the indenture trustee to be named under the Exit Facility Documents and (4) the holders of the bonds to be issued in connection with the Exit Facility (collectively, the "Exit Bonds"), therefore, shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the Order for Relief or any other order.

        Z.    <u>Waiver of Stay of Confirmation Order.</u>  To enable the City to (1) consummate the DIA Settlement and the State Contribution Agreement

---

[241]    *See* 9/30 Transcript, at 99:10-100:13, 104:11-114:4 (Testimony of Kenneth Buckfire); City Exhibit 642.

[242]    *See* 9/30 Transcript, at 85:15-86:12, 95:16-139:4, 211:16-220:23 (Testimony of Kenneth Buckfire); City Exhibits 641, 642.

expeditiously, both of which settlements are conditioned upon the occurrence of the Effective Date, (2) begin implementing, and making distributions to the City's creditors pursuant to, the Plan and (3) emerge from bankruptcy as expeditiously as possible to minimize costs to all parties and remedy its service delivery insolvency, good cause exists to support a waiver of the stay imposed by Bankruptcy Rule 3020(e).

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS:

## A.    Confirmation of Plan

1.    The Plan and each of its provisions (whether or not specifically approved herein) are CONFIRMED in each and every respect, pursuant to section 943 of the Bankruptcy Code.  Failure specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.

2.    The Effective Date of the Plan shall occur on the date determined by the City when the conditions set forth in Section III.A of the Plan have been satisfied or, if applicable, have been waived in accordance with Section III.B of the Plan.

3.    Any objections or responses to Confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

## B.    Findings of Fact and Conclusions of Law

4.    Any finding of fact set forth in this Order constitutes a finding of fact even if it is stated as a conclusion of law, and any conclusion of law set forth in this Order constitutes a conclusion of law even if it is stated as a finding of fact.  All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing are incorporated herein by reference.[243]  The findings of fact and conclusions of law set forth herein, in the accompanying opinion of the Court (Docket No. ____) and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal

---

[243]    The findings of fact and conclusions of law set forth herein and announced on the record during the Confirmation Hearing shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided*, *however*, that if there is any direct conflict that cannot be reconciled, then, solely to the extent of such conflict, the provisions of this Order shall govern and shall control and take precedence over any findings of fact or conclusions of law announced on the record at the Confirmation Hearing.

Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.

**C.      Approval of Settlements**

5.      Consistent with the findings herein, the DIA Settlement, the State Contribution Agreement, the UTGO Settlement, the LTGO Settlement, the 36th District Court Settlement, the OPEB Settlement, the Syncora Settlement and the FGIC/COP Settlement (collectively, the "Settlements"), including, without limitation, any and all of the transactions contemplated, liens granted and protections created therein, are approved in all respects as good faith, fair, reasonable and equitable compromises and settlements of all disputes with respect to the subject matter thereof that are in the best interests of the City and its creditors and residents.

6.      The entry of this Order constitutes:  (a) approval of the each of the Settlements pursuant to, as applicable, (i) the Bankruptcy Rules, including Bankruptcy Rule 9019, (ii) the Bankruptcy Code, including section 1123 thereof and (iii) any and all applicable State law, including, but not limited to, (A) Act 279, Public Acts of Michigan, 1909, as amended, (B) PA 436, (C) Act 34, Public Acts of Michigan, 2001, as amended, and (D) Act 80, Public Acts of Michigan, 1981, as amended; and (b) authorization for the City to enter into each Settlement and take

any and all actions necessary or appropriate to perform under or implement the terms of the applicable agreements.

7.     The transfer under the Plan and the DIA Settlement of the DIA Assets, including without limitation (a) the real property located at 5200 Woodward Avenue, Detroit, Michigan, (b) the underground parking garage commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan, (c) the parking lot located at 5200 Woodward Avenue, Detroit, Michigan, (d) the parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan and (e) the art collection located in the DIA, shall be free and clear of all liens, claims and interests (as such terms are defined in the Bankruptcy Code) of the City and its creditors.

8.     As provided in the Plan, on the Effective Date, the UTGO Settlement Agreement shall be binding on the City, Ambac, Assured and NPFG. All exculpations and releases granted pursuant to the UTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement, are hereby approved in their entirety. The Court approves such settlements and releases on the grounds that good and valuable consideration has been provided therefor, and that such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.

9.     The proceeds of the UTGO Bond Tax Levy collected by the City shall be segregated and transmitted to the Debt Millage Escrow Trustee (as such term is defined at Section 2.4(a) of the UTGO Settlement Agreement) under the Debt Millage Escrow Agreement (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), and the Debt Millage Escrow Trustee shall segregate and transmit the proceeds allocable to the Municipal Obligation to the Master Trustee (as such term is defined at Section 1.2 of the UTGO Settlement Agreement) in accordance with Section 2.4(a) of the UTGO Settlement Agreement.

10.     Pursuant to the Section 2.7(b) of the UTGO Settlement Agreement, the City shall certify annually, not later than June 30 of each year, that it has imposed the debt millage levy as required by and in accordance with the terms of the UTGO Settlement Agreement.

11.     All exculpations and releases granted pursuant to the LTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the LTGO Settlement Agreement, are hereby approved in their entirety.  The Court hereby approves such settlements and releases on the grounds that good and valuable consideration has been provided therefor, and that such provisions are fair, equitable, reasonable and integral elements of the LTGO Settlement.

12. All consent rights granted by the City to the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims, as reflected in the LTGO Settlement and specifically in Section II.B.3.p.i.A of the Plan, with respect to pre-Effective Date and post-Effective Date settlements of the COP Litigation are integral elements of the LTGO Settlement and supported by good and valuable consideration.

13. In accordance with the LTGO Settlement, each month, the City shall segregate and deposit into a debt service fund monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds, which monies shall not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding.

14. The Syncora Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and Syncora, dated _____, 2014, (b) the Syncora Development Agreement (including the garage option) and (c) the Tunnel Lease, and all transactions contemplated thereby, are hereby approved in all respects. The Syncora Development Agreement shall be administered by, and consideration related thereto shall be distributed to, Syncora in a manner consistent with this Order and the Plan.

15. Notwithstanding anything to the contrary in this Order or the Plan (including, without limitation, Sections II.B.3.p.i.A, III.D.6 or IV.L of the

Plan, the FGIC/COP Settlement or the Syncora Settlement): (a) none of the form, method, mechanics or allocation of distributions in Section II.B.3.p.i.A of the Plan, nor any findings or orders of the Bankruptcy Court related thereto, shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties, on the one hand, and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) or COP Insurer, on the other hand. Subject to the proviso at the end of this paragraph, the preceding sentence hereby amends and replaces in its entirety the fourth paragraph of Section II.B.3.p.i.A of the Plan; (b) neither (i) any determinations, adjudications, findings or rulings in the Plan or by the Bankruptcy Court regarding the distributions or consideration provided to the COP Insurers or the Settling COP Claimants under the Plan, including whether such distributions or consideration are solely for the benefit of any particular parties nor (ii) any acceleration or deemed acceleration of any COPs provided for in the Plan or by the Bankruptcy Court shall in any way affect or prejudice any rights, claims or defenses of the COP Swap Counterparties, including with respect to such distributions or consideration; and (c) no release or agreement by any COP Agent provided for in the Plan (including, without limitation any agreement not to sue any COP Holder or any COP Insurer in Section II.B.3.p.i.A of the Plan) or by the Bankruptcy Court, shall in any way affect any liability of such COP Holder, COP Insurer or COP Agent to any COP

-92-
13-53846-swr Doc 8294-1 Filed 11/14/14 Entered 11/14/14 15:34:18 Page 100 of 163

Swap Counterparty (or to any COP Agent on behalf of such COP Swap Counterparty) or impair in any way the rights or obligations of any COP Swap Counterparty or COP Agent (on behalf of any COP Swap Counterparty) to sue any COP Holder, COP Insurer or COP Agent; *provided, however* that, notwithstanding anything in this paragraph to the contrary, the COP Swap Counterparties have agreed not to, and shall not, seek to enjoin, block, prevent, subject to any lien (other than a judgment lien) or otherwise interfere with (a) the distribution by the Debtor of the Class 9 Settlement Asset Pool and New B Notes to, as applicable, FGIC, the FGIC COP Holders, Syncora and the Settling COP Claimants under and as provided for in Section II.B.3.p.i.A of the Plan, (b) any performance, operation, administration of, sale of, transfer of, assignment of or other action with respect to the FGIC Development Agreement, the Syncora Development Agreement or the Tunnel Lease (it being understood that this clause (b) shall not impair any rights or claims of the COP Swap Counterparties to monetary damages related to such agreements or the value thereof), or (c) except as a defense, counterclaim or claim against and in response to a party asserting a counterclaim, in each case asserted by either of the COP Swap Counterparties, distributions to FGIC, the FGIC COP Holders, Syncora and the Settling COP Claimants (as applicable) of the proceeds of any of the foregoing.

16.     The FGIC/COP Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and FGIC, dated _____, 2014, (b) the Stipulation Regarding FGIC Plan COP Settlement and FGIC COP Swap Settlement, dated _____, 2014 and (c) the FGIC Development Agreement, and all transactions contemplated thereby are hereby approved in all respects.  The FGIC Settlement Consideration and the FGIC Development Agreement shall be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent with this Order and the Plan. The allocation of Plan distributions among FGIC and the FGIC COP Holders shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed with the Court on October 22, 2014, as the same was amended on October 27, 2014 and may be subsequently amended (with the written consent of the parties thereto) and more fully documented (the "FGIC/FGIC COP Holders Term Sheet").  Pursuant to the FGIC/COP Settlement, the Downtown Development Authority shall, as of the Effective Date, irrevocably assign to FGIC all of the New B Notes that the Downtown Development Authority is entitled to receive pursuant to its Class 13 Allowed Claim.

17.     The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request

with respect to their respective insured COPs as long as such Supplemental Trust Agreements (a) do not impose any additional obligations or liability on the COP Service Corporations and (b) are consistent with the allocation of Plan distributions among FGIC and the FGIC COP Holders agreed to by and among FGIC and the FGIC COP Holders pursuant to the FGIC/FGIC COP Holders Term Sheet.

18.     Pursuant to and in accordance with the New C Notes Documents, revenues collected by the City related to (a) tickets issued for parking violations (including, but not limited to, meter collections, towing, storage fees and booting fees), other than revenues that would otherwise be paid to the 36th District Court, and (b) if the New C Notes are issued in a principal amount greater than $21,271,804, garage operations at the Parking Garages (collectively, the "City Parking Revenues") shall be directly remitted to a bank or banks or other financial institution which the Emergency Manager designates as a depository of the City (such institution, the "Depository Bank").  The Depository Bank shall deposit City Parking Revenues received by it into a special, separate and segregated fund (the "City Parking Revenue Fund") established at the Depository Bank.  Beginning on the date of delivery of the New C Notes and commencing on the first day of each fiscal year thereafter, each day, City Parking Revenues deposited into the City Parking Revenue Fund shall be remitted by the Depository Bank to a special, separate and segregated account held for and on behalf of the City (the "Debt

Retirement Fund") by the bond registrar, transfer agent and paying agent for the New C Notes until sufficient funds are on deposit in the Debt Retirement Fund to pay the principal and interest payable on the New C Notes on the last day of that Fiscal Year (such amount, the "Annual Deposit Requirement").  Once the Annual Deposit Requirement is satisfied for that fiscal year, any additional City Parking Revenues deposited in the City Parking Revenue Fund during that fiscal year may be remitted to the City for deposit into the General Fund and may be used by the City for any other purposes permitted by law.

## D.    Approval of Releases and Exculpation

19.    The Plan Releases set forth in Section III.D.7 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party.

20.    Without limiting any other applicable provisions of, or releases contained in, the Plan, this Order or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the

Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is hereby deemed to forever release, waive and discharge all Liabilities in any way relating to: (a) the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436), *provided that*, for the avoidance of doubt, any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and (b) (i) Claims that are compromised, settled or discharged under or in connection with the Plan, (ii) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (iii) the Plan, (iv) the Exhibits, (v) the Disclosure Statement or (vi) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released

Parties; *provided*, *however*, that any such Liability of the Foundations, the DIA

Funders and the CFSEM Supporting Organization and their Related Entities shall

be released only to the extent that such Liability, if any, arises from any such

entity's participation in the DIA Settlement.

21.     Nothing in paragraph 20 hereof shall (a) affect the liability of

the City, its Related Entities and the Released Parties that otherwise would result

from any act or omission to the extent that act or omission subsequently is

determined in a Final Order to have constituted gross negligence or willful

misconduct; or (b) release (i) the City's obligations under the Plan or (ii) any

defenses that any party may have against the City, its Related Entities, the State,

the State Related Entities or the Released Parties.

22.     If the State Contribution Agreement is consummated, each

holder of a Pension Claim will be deemed forever to release, waive and discharge

all Liabilities arising from or related to the City, the Chapter 9 Case, including the

authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure

Statement, PA 436 and its predecessor or replacement statutes, and Article IX,

Section 24 of the Michigan Constitution that such party has, had or may have

against the State and any State Related Entities.  For the avoidance of doubt, the

foregoing sentence does not provide for a release, waiver or discharge of

obligations of the City that are established in the Plan or that arise from and after

the Effective Date with respect to (a) pensions as modified by the Plan or (b) labor-related obligations, which post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, the GRS or the PFRS.

23.     As a condition to the State funding, the State and certain parties, including Michigan Council 25, Sub-Chapter 98, Local 3308 and Local 917 of AFSCME, entered into certain Support and Release Agreements and, for the avoidance of doubt, in the event of an express conflict between any such Support and Release Agreement, on the one hand, and the Plan, Plan Supplements or this Order, on the other hand, as to the parties to these Support and Release Agreements, their respective Support and Release Agreement shall govern.

24.     Notwithstanding Sections III.D.5 through III.D.7 and IV.L of the Plan or paragraphs X, 19 through 21 and 28 through 32 hereof, except as set forth in the COP Swap Settlement, nothing in the Plan or this Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.

-99-

13-53846-swr   Doc 8099-102  Filed 10/31/14  Entered 10/31/14 13:54:18  Page 107 of 163
13-53846-swr   Doc 8134-1  Filed 10/31/14  Entered 10/31/14 17:53:54  Page 107 of 163

25.     Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall be, and hereby is, to the fullest extent permitted under law, deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (a) the GRS, (b) the PFRS or (c) Related Entities of either the GRS or the PFRS.  At the direction of FGIC, which shall be, and hereby is, deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (a) Sections 6.5 and 9.1 of the Contract Administration Agreements, (b) Section 8.03 of the COP Service Contracts, (c) distributions made pursuant to or in connection with Section II.B.3.p.i.A of the Plan, (d) the FGIC/COP Settlement or (e) the Syncora Settlement.  On the Effective Date,

Syncora and FGIC shall be, and hereby are, to the fullest extent permitted under law, deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with Section II.B.3.p.i.A of the Plan, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

26.     The exculpation provision set forth in Section III.D.6 of the Plan is approved in all respects, is incorporated herein in its entirety, is so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such exculpation or any other party.  From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this paragraph, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed

under the Plan, the settlements implemented under the Plan, the Exhibits, the

Disclosure Statement, any contract, instrument, release or other agreement or

document provided for or contemplated in connection with the consummation of

the transactions set forth in the Plan or the management or operation of the City;

*provided that* the foregoing provisions shall, and hereby do, apply to (a) the LTGO

Exculpated Parties solely in connection with acts or omissions taken in connection

with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO

Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection

with acts or omissions taken in connection with the UTGO Settlement Agreement

or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD

Exculpated Parties solely in connection with acts or omissions taken in connection

with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the

Syncora Exculpated Parties solely in connection with acts or omissions taken in

connection with the Syncora Settlement Documents and any actions or litigation

positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the

FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in

connection with the FGIC/COP Settlement Documents and any actions or litigation

positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the

RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such

and solely in connection with any Distributions made pursuant to the terms of the

Plan; *provided*, *further*, that the foregoing provisions of this paragraph shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date.  The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan.  This paragraph shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or the FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

**E.     Order Binding on All Parties**

27.     Subject to the provisions of Section III.A of the Plan, in accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of:  (a) the

City; (b) any and all holders of Claims (irrespective of whether (i) any such Claim is impaired under the Plan, (ii) proof of any such Claim has been filed or deemed filed under section 501 of the Bankruptcy Code, (iii) any such Claim is allowed under section 502 of the Bankruptcy Code or (iv) whether the holders of such Claims accepted, rejected or are deemed to have accepted or rejected the Plan); (c) the registered and beneficial holders of COPs; (d) any other person giving, acquiring or receiving property under the Plan; (e) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the City; (f) any party to any Settlement; and (g) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing. All settlements (including, without limitation, the Settlements), compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations and injunctions set forth in the Plan shall be, and hereby are, operative, effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date. The compromises and settlements (including, without limitation, the Settlements) embodied in the Plan, along with the treatment of any associated Allowed Claims,

shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.

## F.     Discharge of Claims

28.     The Plan discharge provisions set forth in Section III.D.4 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court or any other party.

29.     In accordance with Section III.D.4 of the Plan, except as specifically provided otherwise in the Plan or this Order, as of the Effective Date, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, all debts of the City shall be, and hereby are, discharged, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; *provided that* such discharge shall not apply to (a) debts specifically exempted from discharge under the Plan and (b) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

## G.     Release of Liens

30.     The release and discharge of all Liens against the City's property set forth in Section IV.M of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately

effective on the Effective Date of the Plan without further order or action on the part of the Court. As of the Effective Date, (a) the holders of such Liens are hereby authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such holder and to take such actions as may be requested by the City to evidence the release of such Lien, including (i) the execution, delivery, filing or recording of appropriate releases and (ii) the taking of any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and (b) the City shall be authorized to execute and file on behalf of creditors such forms as may be necessary or appropriate to implement the provisions of Section IV.M of the Plan and this paragraph. All entities holding Claims against the City shall be, and hereby are, bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan. Upon the entry of this Order, all entities holding Claims against the City that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be, and hereby are, enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## H.    Injunction

31.     On the Effective Date, except as otherwise provided in the Plan or in this Order, all Entities that have been, are or may be holders of Claims against

the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be, and hereby are, permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from this Order):  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (i) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (ii) Indirect 36th District Court Claims and (iii) Indirect Employee Indemnity Claims); (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Order, the Plan or the Settlements (to the extent such Settlements

have been approved by the Court herein); and (f) taking any actions to interfere with the implementation or consummation of the Plan.

32.     All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan shall be, and hereby are, permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or this Order.  Notwithstanding the provisions of this paragraph and without limiting the injunctions in Section III.D.5.a of the Plan or

paragraph 31 hereof, the holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

33.     During the period that ends on June 30, 2023, the trustees of the PFRS, the trustees of the GRS, or the trustees of any successor trust or pension plan to either the PFRS or the GRS shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS or the GRS (as applicable) that shall be 6.75%.  Except as may be required to maintain the tax-qualified status of the PFRS or the GRS, or to comply with the terms of the Plan or this Order, the City, the trustees of the PFRS, the trustees of the GRS and all other persons or entities shall be, and hereby are, enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of either the PFRS, the GRS or any successor plan or trust to either the PFRS or the GRS, that govern the calculation of pension benefits (including, as applicable, the PFRS Adjusted Pension Amount, the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the Prior GRS Pension Plan, the PFRS Restoration Payment, the GRS Restoration Payment, the New PFRS Active Pension Plan Formula, the New GRS Active Pension Plan Formula, the terms of

the New PFRS Active Pension Plan and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumptions described in Section II.B.3.q.ii.B of the Plan (with respect to the PFRS) or Section II.B.3.r.ii.B of the Plan (with respect to the GRS), the contributions to the PFRS or the GRS, or the calculation or amount of PFRS pension benefits or GRS pension benefits (as the case may be), for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

I.      **State Contribution Agreement**

34.     The State Contribution Agreement is approved in all respects, and the City is hereby authorized to enter into, and take any action necessary to perform under or implement, the terms thereof.  The State shall file and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution (as set forth at Section IV.D.3 of the Plan) have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

35.     In accordance with Section IV.D.2 of the Plan, the Income

Stabilization Funds of the GRS and the PFRS shall receive not less than an

aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax

Proceeds in the form of annual installment payments pursuant to a payment

schedule approved by the State.

36.     In accordance with Section 4.f.ii of the State Contribution

Agreement, filed as Exhibit I.A.332 to the Plan, the governing documents of the

GRS and the governing documents of the PFRS shall be amended to include (a) the

governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B

of the State Contribution Agreement and (b) the Income Stabilization Payments

and Income Stabilization Fund described in Paragraph 3 of the State Contribution

Agreement.

## J.     DWSD Authority Transaction

37.     The Memorandum of Understanding Regarding the Formation

of the Great Lakes Water Authority (the "Memorandum of Understanding"), filed

as Exhibit A to the Notice of Execution of Framework for Creating a Water and

Sewer Authority (Docket No. 7357), is approved in all respects.  The City is

hereby authorized to enter into, and take any action necessary to perform under or

implement, the terms of the Memorandum of Understanding and any final

agreement resulting therefrom creating a regional water and sewer/stormwater

authority to be called the Great Lakes Water Authority (the "GLWA") in accordance with, and subject to approvals and consents required under, State law. The GLWA transaction contemplated in the Memorandum of Understanding, if consummated, would constitute a Qualifying DWSD Transaction as such term is defined in the Plan.

## K.     ASF Recoupment

38.     ASF Recoupment, as set forth at Section II.B.3.r.ii.D of the Plan, is lawful, proper and approved in all respects.  The City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date: (a) calculate the Annuity Savings Fund Excess Amount for each ASF Current Participant and (b) deduct the Annuity Savings Fund Excess Amount from each such participant's Annuity Savings Fund account, which deducted amounts shall be used to fund the accrued pension benefits of all GRS participants; *provided*, *however*, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap and the Current GRS Retiree Adjustment Cap.  In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

39.     For each ASF Distribution Recipient who, after receipt of notice as required by the Plan and this Order, does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii of the Plan and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date:  (a) calculate the Annuity Savings Fund Excess Amount; (b) convert such amount into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (c) deduct such monthly annuity amounts from the ASF Distribution Recipient's monthly pension check; *provided*, *however*, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap, if applicable.  The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

40.     Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.  No later than seven days following the Effective Date,

the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (a) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (b) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

41. The GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date,

the GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan and paragraph 39 hereof. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

## L.    Survival of Indemnities

42.    Notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 of the Plan and paragraph 31 hereof and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen,

-115-

13-53846-swr    Doc 8272    Filed 11/12/14    Entered 11/12/14 13:54:18    Page 123 of 163
13-53846-swr    Doc 8994-1    Filed 01/31/24    Entered 01/31/24 17:59:34    Page 123 of 163
of 163

asserted or unasserted; *provided that* this paragraph shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in paragraph 31 hereof.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan or this Order and shall be, and hereby are, discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this paragraph.

## M.   Issuance of New Securities and Exemption From Securities Laws

43.     The issuance of the New Securities by the City on the Effective Date or on a subsequent Distribution Date (as applicable) is hereby approved and authorized.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities pursuant to the Plan is, and shall be, exempt from Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities.  The New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are, and shall be, freely tradable and transferable by any initial recipient (including the Detroit General VEBA and the Detroit Police and Fire VEBA) thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in

Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within

90 days of such transfer and (iii) is not an entity that is an "underwriter" as defined

in subsection (b) of Section 1145 of the Bankruptcy Code.  It is hereby expressly

found and determined that the Detroit General VEBA and the Detroit Police and

Fire VEBA are not affiliates of the City within the meaning of Rule 144(a)(1)

under the Securities Act.

**N.     Executory Contracts and Unexpired Leases**

44.     The Executory Contract and Unexpired Lease provisions of

Section II.D of the Plan are specifically approved in all respects, are incorporated

herein in their entirety and are so ordered.  The City is authorized to assume,

assume and assign, or reject Executory Contracts or Unexpired Leases in

accordance with Section II.D of the Plan and the Contract Procedures Order.

45.     The assumption of Executory Contracts and Unexpired Leases

pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as

of the Effective Date is hereby approved, except for Executory Contracts or

Unexpired Leases that:  (a) have been rejected pursuant to a Final Order of the

Court, (b) are subject to a pending motion for reconsideration or appeal of an order

authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are

subject to a motion to reject such Executory Contract or Unexpired Lease filed on

or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan

or (e) are designated for rejection in accordance with the last sentence of this paragraph. If an objection to a proposed assumption, assumption and assignment, or Cure Amount Claim filed in accordance with the Contract Procedures is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be, and hereby is, deemed effective as of the Effective Date.

46.     Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of this Order.

47.     The rejection of each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan is hereby approved pursuant to section 365 of the Bankruptcy Code as of the later of (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City may, at any time on or prior

to the Effective Date, amend Exhibit II.D.6 to the Plan to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 of the Plan, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Section II.D.6 of the Plan. The City will provide notice of any such amendments to Exhibit II.D.6 to the Plan in accordance with the terms of the Contract Procedures Order.  Listing a contract or lease on Exhibit II.D.6 to the Plan shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

## O.    Plan Distributions

48.    On and after the Effective Date, Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to Section II.B and Article V of the Plan.  The Distribution Record Date shall be 5:00 p.m., Eastern Time, on the date of entry of this Order.

## P.    Retained Causes of Action

49.    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with

the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the

City shall retain and may enforce any claims, demands, rights, defenses and Causes

of Action that it may hold against any Entity, including but not limited to, (a) any

and all Causes of Action against any party relating to the past practices of the

Retirement Systems (including any investment decisions related to, and the

management of, the Retirement Systems' respective pension plans or assets) and

(b) the currently pending actions and claims brought by the City and identified on

Exhibit III.D.2 to the Plan, to the extent not expressly released under the Plan or

pursuant to any Final Order of the Court.  The City's inclusion of, or failure to

include, any right of action or claim on Exhibit III.D.2 to the Plan shall not be

deemed an admission, denial or waiver of any claims, demands, rights or Causes of

Action that the City may hold against any Entity.

## Q.    Claims Bar Dates and Other Claims Matters

50.    <u>General Administrative Claim Bar Date Provisions</u>.  Except as

otherwise provided in Section II.A.2.b or Section II.A.2.c of the Plan or in a Bar

Date Order or other order of the Court, unless previously filed, requests for

payment of Administrative Claims must be filed and served on the City no later

than 45 days after the Effective Date.  Holders of Administrative Claims that are

required to file and serve a request for payment of such Administrative Claims and

that do not file and serve such a request by the applicable Bar Date will be forever

barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be filed and served on the City and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The foregoing procedures shall be specified in the notice of entry of this Order and served on all parties in interest.

51.     Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to file or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the holders of such Claims or further action or approval of the Court.

52.     Holders of Administrative Claims that are Postpetition Financing Claims will not be required to file or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

53.     <u>Professional Fee Reserve</u>.  On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where

applicable, the DWSD's funds, in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3 of the Plan, as determined by the City in consultation with the Fee Examiner. The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties. Any amounts remaining in the

Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable. If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

54. <u>Bar Date for Rejection Damage Claims</u>. Except as otherwise provided in a Final Order of the Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

55. Notwithstanding anything to the contrary in the Plan or this Order, neither FGIC nor the COP Trustee shall be required to file any Claims

arising out of the rejection of the COP Service Contracts pursuant to the Plan, which Claims are resolved and treated pursuant to the terms of the FGIC/COP Settlement Documents and the Plan.

56. <u>Workers' Compensation Claims</u>. From and after the Effective Date, (a) the City shall continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan or this Order shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law; *provided that* the City shall retain the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

57. <u>Claims Related to Operation of City Motor Vehicles</u>. From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to M.C.L. § 500.3101 in connection with the operation of the City's motor vehicles consistent with the terms of Section IV.S of the Plan. Nothing in the Plan or this

-124-

Order shall discharge, release or relieve the City from any current or future liability

with respect to Claims subject to insurance coverage pursuant to

M.C.L. § 500.3101 or Claims within the minimum coverage limits in

M.C.L. § 500.3009(1); *provided that* the City shall retain the right to challenge the

validity of any Claim subject to Section IV.S of the Plan or this paragraph, and

nothing therein or herein shall be deemed to expand the City's obligations or any

claimant's rights with respect to such Claims under State law.

58.     <u>Payment of Tax Refund Claims</u>.  From and after the Effective

Date, the City shall continue to administer (either directly or through a third party

administrator) and pay all valid claims for income tax refunds and property tax

refunds for which the City is responsible under applicable law, regardless of when

the applicable right to a refund arose, in accordance with the City's prepetition

practices and procedures; *provided that* the City shall retain the right to challenge

the validity of any claim for an income tax refund or property tax refund.

59.     <u>Utility Deposits</u>.  From and after the Effective Date, the City

will continue to administer utility deposits in accordance with the City's prepetition

practices and procedures, including the payment of any undisputed, non-contingent,

liquidated claims against the City for the refund of a utility deposit.

60.     <u>Pass-Through Obligations</u>.  The City has certain Pass-Through

Obligations to the Pass-Through Recipients with respect to which the City acts, or

may in the future act, as tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under the respective tax increment financing enabling statutes. The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**R.     Plan Implementation**

61.     In accordance with section 1142 of the Bankruptcy Code, without further action by the Court, the City is authorized to:  (a) take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, this Order or the transactions contemplated thereby or hereby, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements (including the Settlements), releases (including the Plan Releases) and other agreements or documents entered into or delivered in connection with the Plan; and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases, agreements and documents necessary to implement, effectuate and consummate the Plan, including, without limitation, those contracts, instruments, releases, agreements and documents identified in Article IV of the Plan.  All transactions effected by the City during the pendency of the Chapter 9 Case from the Petition Date through the Confirmation Date are approved and ratified.

62.     Each federal, state, commonwealth, county, municipal, local, foreign or other governmental agency is hereby directed and authorized to accept any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

**S.      Cancellation of Existing Bonds,
          Bond Documents, COPs and COP Documents**

63.     Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan or this Order (including any rejection of Executory Contracts pursuant to Section II.D of the Plan or paragraph 47 hereof), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; *provided*, *however*, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (a) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with

respect thereto; (b) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution; (c) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City; (d) as may be necessary to preserve any claim by (i) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (ii) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer or (iii) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder; and (e) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. For the avoidance of doubt, this paragraph shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii of the Plan.

64.     As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be, and hereby are, deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to FGIC and the FGIC COP Holders.  The foregoing acceleration of principal and cessation of interest shall affect only the rights of each FGIC COP Holder to the receipt of proceeds of distributions under the Plan and not the rights of each such FGIC COP Holder against FGIC and shall not in any way modify payments currently required of FGIC under its existing insurance policies or the First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 (the "FGIC Rehabilitation Plan").

65.     FGIC (irrespective of the terms of FGIC's COP Insurance Policies including, without limitation, the definition of "Due for Payment") may elect on or prior to the earlier to occur of (a) the Effective Date and (b) December 15, 2014, by filing a notice with the Court on or prior to such date, to treat all (but not less than all) of the outstanding principal owing on all (but not less than all) series of the FGIC-insured COPs as having been accelerated and currently "Due for Payment" (as such term is defined in the applicable FGIC COP Insurance Policy for purposes of such policy) as of the Effective Date, in which case, with respect to each FGIC COP Insurance Policy there shall be deemed a

Permitted Policy Claim (as defined in the FGIC Rehabilitation Plan) in the amount of (a) the outstanding principal amount of the FGIC-Insured COPs in each CUSIP, as of the Effective Date, insured by such policy and (b) interest accrued and unpaid on such principal amount of such FGIC-Insured COPs through the Effective Date, in which case no interest shall accrue on or after the Effective Date. If FGIC does not elect to accelerate its COP Insurance Policies pursuant to the preceding sentence, FGIC's and the FGIC COP Holders' respective rights and obligations with respect to FGIC's COP Insurance Policies shall be governed by the FGIC/FGIC COP Holders Term Sheet.

66.     Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or the COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto.

67.     No provision of this Order or the Plan shall (a) enjoin any holder of a COP from enforcing its rights against any COP Insurer or (b) exculpate, release or affect any rights any holder of a COP may have with respect to any COP Insurance Policy.

**T.    Binding Effect of Prior Orders**

68.    Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 9 Case, all documents and agreements executed by the City as authorized and directed thereunder and all motions or requests for relief by the City pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto.

**U.    Final Order; Waiver of Stay**

69.    This Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.  The stay of this Order otherwise imposed by Bankruptcy Rule 3020(e) is hereby waived as of the date hereof.

**V.    Reversal**

70.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other federal appellate court with appropriate jurisdiction, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the City's receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in

-131-

13-53846-swr   Doc 8294-1   Filed 11/14/14   Entered 11/14/14 17:59:54   Page 139 of 163

reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

## W.    Notice of Confirmation of the Plan

71.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), on or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all creditors a notice (the "Confirmation Notice"), substantially in the form of Appendix III hereto, that informs such creditors of: (a) entry of this Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline and procedures for the filing of Claims arising from any such rejection; (d) the deadline and procedures for the filing of Administrative Claims; and (e) such other matters as the City deems to be appropriate; *provided*, *however*, that the City shall be obligated to serve the Confirmation Notice only on the record holders of Claims as of the Confirmation Date.  The City is directed to publish the Confirmation Notice once in the national editions of *The Wall Street Journal* and *USA Today* and the daily edition of the *Detroit Free Press* no later than ten Business Days after the Effective Date.  As soon as practicable after the entry of this Order, the City shall make copies of this Order and the form Confirmation

Notice available on (a) the City's official website at www.detroitmi.gov and (b) the Document Website at www.kccllc.net/Detroit.

## X.    Miscellaneous Provisions

72.    The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court.  In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the City shall be, and hereby is, authorized and empowered to make non-material modifications to the documents filed with the Court, including Exhibits or documents forming part of the evidentiary record at the Confirmation Hearing, in its reasonable business judgment as may be necessary.

73.    The City shall not, without FGIC's prior written consent, amend the Plan in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect FGIC; *provided, however*, that, notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan is intended to or shall be deemed to limit any rights of the FGIC COP Holders to object to any such Plan amendment.

74.    On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of

the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

75.     Pursuant to the Order Resolving Corrected Motion of the Official Committee of Retirees for Entry of An Order Allowing an Administrative Expense Claim, entered on March 31, 2014 (Docket No. 3334), approving a stipulation and settlement agreement that requires the City to include a provision under the Barton doctrine first developed in Barton v. Barbour, 104 U.S. 126 (1881), and this Court having previously held that the Barton doctrine is applicable to members of the Retiree Committee, each and every member of the Retiree Committee is not only subject to protections under the release and injunction provisions of the Plan but is further protected by the provisions of the Barton doctrine and thus no action may be taken against any member of the Retiree Committee without separate relief granted by this Court.

76.     The terms and conditions of the Exit Facility are fair and reasonable, and the Exit Facility has been negotiated in good faith and at arm's length.  The City is hereby authorized to enter into, execute, deliver, file, record and issue the Exit Facility Documents and to incur the obligations under the Exit Facility, including the granting of liens thereunder, the payment of all fees, expenses, indemnities and other amounts provided for in each of the Exit Facility and the other instruments, agreements, guaranties and documents entered into in

connection therewith, all of which are hereby approved. The City is authorized

and empowered to incur and to perform its obligations in accordance with, and

subject to, the Exit Facility Documents and to perform all acts, and make, execute

and deliver all instruments and documents which may be required for the

performance by the City under the Exit Facility Documents and the creation and

perfection of the liens described in and provided for by the Exit Facility

Documents. Subject to (a) the terms and conditions set forth in the Exit Facility

Documents and (b) the City's compliance with the procedures for authorizing the

borrowing of money under Sections 12(1) and 19 of PA 436 and the State Local

Emergency Financial Assistance Loan Board's approval of the Exit Facility under

Section 36a of Michigan Public Act 279 of 1909, the Home Rule City Act,

M.C.L. §§ 117.1, *et seq.* (as amended), the City is hereby authorized to issue the

Exit Bonds for purchase by the MFA in accordance with the terms and conditions

set forth in the Exit Facility Documents.

      77.    The Exit Facility Documents and the obligations of the City

thereunder, including all related pledges and security agreements, shall, upon

execution, constitute legal, valid, binding and authorized obligations of the City,

enforceable in accordance with their terms. The loans, advances and financial

accommodations to be extended under the Exit Facility are being extended, and

shall be, and hereby are, deemed to have been extended, in good faith, for

legitimate purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers or conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

78. Notwithstanding any other provision of this Order or the Plan, as to the United States, its agencies, departments or agents, nothing in the Plan or this Order shall discharge, release or otherwise preclude: (a) any liability of the City arising on or after the Effective Date; (b) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid defense of setoff or recoupment with respect to a Claim; or (d) any liability of any entity under environmental laws arising, continuing or springing anew after the Effective Date that any entity would be subject to as a post-Effective Date owner or operator of property, *provided that*, for the avoidance of doubt and without limiting the liabilities previously described in sub-paragraph (d), any liability that is a dischargeable "claim" within the meaning of section 101(5) of the Bankruptcy Code and arose before the Effective Date, including any liabilities for costs expended or paid by the United States under environmental laws before the Effective Date or any penalties or fines owed to the United States for days of

violation of environmental laws before the Effective Date, shall be treated as otherwise provided in the Plan.

79.     The Plan does not, and shall not be deemed to, modify, limit, release, discharge or enjoin any claims (a) related to the Retirement Systems that Bank of New York Mellon in its capacity as custodian under (i) the Global Custody Agreement with the Policemen and Firemen Retirement System of the City of Detroit, (ii) the Global Custody Agreement with the General Retirement System of the City of Detroit and (iii) the Global Custody Agreement with The Board of Trustees of The City of Detroit Employees' Benefit Plan (in such capacity, "BNY Mellon") may have against persons or entities other than the City or (b) against property of the Retirement Systems held by BNY Mellon in its capacity as custodian.

80.     Any document related to the Plan that refers to a plan of adjustment of the City other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of adjustment of the City in such document shall mean the Plan confirmed by this Order, as appropriate.

81.     Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of a direct conflict between the Plan, on the one hand, and any other agreement,

instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument, or document). In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

82. In accordance with Section III.C of the Plan, if the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 944 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts or Unexpired Leases pursuant to Section II.D of the Plan and (iii) the releases described in Section III.D.7 of the Plan; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the City or (ii) prejudice in any manner the rights of the City or any other party in interest.

83. To the extent that (a) the Court has held that any term or provision of the Plan is invalid, void or unenforceable and (b) with the consent of the City, the Court altered and interpreted such term or provision, consistent with Section VIII.D of the Plan, to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable: (a) such term or provision, as altered or interpreted,

shall be (i) valid and enforceable pursuant to its terms, (ii) considered integral to the Plan and shall not be deleted or modified without the City's consent and (iii) non-severable and mutually dependent; and (b) notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

84.     Pursuant to Section IV.N of the Plan and in accordance with the Fee Review Order, the Fee Examiner shall continue to review and assess all Fee Review Professional Fees for the period through, but not including, the Effective Date pursuant to the standard of section 943(b)(3) of the Bankruptcy Code. The Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses.  All fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Court pursuant to the terms of the Fee Review Order.  Upon completing his review of all Fee Review Professional Fees and submitting all reports related thereto (as required by the Fee Review Order), the Fee Examiner shall have no further duties or obligations under the Fee Review Order other than obligations of confidentiality thereunder (which obligations, including, but not limited to, the confidentiality obligations set forth at

paragraph 22 of the Fee Review Order, shall remain binding from and after the

Effective Date).

## Y.     No Diminution of State Power

85.     No provision of the Plan or this Order shall be construed:  (a) to

limit or diminish the power of the State to control, by legislation or otherwise, the

City in the exercise of the political or governmental powers of the City, including

expenditures for such exercise; or (b) as a waiver by the State of its rights as a

sovereign or rights granted to it pursuant to the Tenth Amendment to the United

States Constitution, or limit or diminish the State's exercise of such rights.

## Z.     Post-Effective Date Governance

86.     The City shall promptly provide to the Court copies of any

reports given to, or received from, the Financial Review Commission.  Nothing in

the Plan or this Order shall expand, limit or otherwise modify the role or powers of

the Financial Review Commission.

## AA.   Retention of Jurisdiction

87.     The Court shall, and hereby does, retain such jurisdiction over

the City and the Chapter 9 Case as is consistent with section 1334 of title 28 and

title 11 of the United States Code until the Effective Date.  Notwithstanding the

entry of this Order, from and after the Effective Date, the Court shall retain such

jurisdiction over the Chapter 9 Case to the fullest extent permitted by law,

including, among other things, jurisdiction over those matters and issues described

in Article VII of the Plan, *provided, however*, that notwithstanding Article VII of the Plan, the Court shall not have jurisdiction over any dispute between or among FGIC and the FGIC COP Holders with respect to agreements between or among them that do not involve the City, the State or any Released Party (other than FGIC and the FGIC COP Holders) as a party.

88.     Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement. For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds and the Municipal Obligation. As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the Municipal Obligation, Stub UTGO Bonds or Restructured UTGO Bonds are outstanding.

89.     Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the settlement of Limited Tax General Obligation Bond Claims and the LTGO Settlement and any dispute arising from or related to the LTGO Settlement.  For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the LTGO Settlement and all Settlement-Related Documents, including, without limitation, all exhibits to the LTGO Settlement Agreement and the New LTGO Bonds.  As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the New LTGO Bonds are outstanding.

90.     Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement or the Syncora Development Agreement.

**APPENDIX I**


**PLAN OF ADJUSTMENT**

# APPENDIX II


# MODIFICATIONS TO PLAN

# APPENDIX III

## CONFIRMATION NOTICE

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
------------------------------------------------------- x
                                              :
In re                                         :          Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                    :          Case No. 13-53846
                                              :
                          Debtor.             :          Hon. Steven W. Rhodes
                                              :
                                              :
                                              :
------------------------------------------------------- x
```

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND (II) OCCURRENCE OF EFFECTIVE DATE

### PLEASE TAKE NOTICE OF THE FOLLOWING:

**1.    Confirmation of the Plan and Occurrence of the Effective Date.**

On _____, 2014, the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") entered an order (Docket No. ____) (the "<u>Confirmation Order</u>") confirming the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (as it may have been amended, supplemented or modified, the "<u>Plan</u>"), in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "<u>City</u>").  The Effective Date of the Plan occurred on _____, 20___.  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

**2.    Discharge of Claims.**

a.    Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, the City is discharged from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt was Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt was allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt accepted the Plan.

b.    In accordance with the foregoing, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge voids any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; <u>provided</u> that such discharge does not apply to

(i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

**3.    Releases.**

a.    <u>General Releases by Holders of Claims</u>.  Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.    all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); <u>provided</u> <u>further</u>, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii.    all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; <u>provided</u>, <u>however</u>, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities are released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

<u>provided</u>, <u>however</u>, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that nothing in Section III.D.7.a of the Plan shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties.

b.    <u>Release by Holders of Pension Claims</u>.  Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), if the State Contribution Agreement is consummated, each holder of a Pension Claim is deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State

and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

    **4.**     **Injunctions.**

**On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order:**

    **a.**     **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, are permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims); (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan; and**

    **b.**     **all Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan are permanently enjoined from taking any of the following actions**

against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in sub-paragraph 4(a) above, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

**5.        Treatment of Executory Contracts and Unexpired Leases.**

a.        <u>Assumption</u>.  Except for Executory Contracts and Unexpired Leases rejected in the Plan or by other court order, or as requested in any motion Filed by the City on or prior to the Effective Date, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City has been deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations have not been assumed under the Plan and have been discharged.  For the avoidance of doubt, the City has assumed the Tunnel Lease pursuant to Section II.D.1 of the Plan.

b.        <u>Assumption of Ancillary Agreements</u>.  Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan includes any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

c.        <u>Approval of Assumptions and Assignments</u>.  The Confirmation Order constitutes an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph.  The City has provided separate notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease are set forth in the Contract Procedures Order (Docket No. 6512).  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract

or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

      d.     <u>Payments Related to the Assumption of Executory Contracts and Unexpired Leases</u>.  To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City:  (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease.  If there is a dispute regarding:  (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

      e.     <u>Contracts and Leases Entered Into After the Petition Date</u>.  Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

      f.     <u>Rejection of Executory Contracts and Unexpired Leases</u>.  Each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan was deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Each contract or lease listed on Exhibit II.D.6 to the Plan is rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.D.6 to the Plan does not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

      **g.**     **<u>Rejection Damages Bar Date</u>.  Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of:  (a) 45 days after the Effective Date, <u>i.e.</u>, _____, 20\_\_; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.**

      h.     <u>Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases</u>.  Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection.  Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive,

-5-

13-53846-swr   Doc 8099-1   Filed 10/31/14   Entered 10/31/14 17:59:34   Page 158 of 163
13-53846-swr   Doc 8194-1   Filed 11/3/14   Entered 11/3/14 15:53:54   Page 159 of 163

or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

i. <u>Insurance Policies</u>. From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date are reinstated and continue in full force and effect in accordance with their terms and, to the extent applicable, are deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in Section II.D.9 of the Plan shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

**6. Payment of Administrative Claims.**

a. <u>Administrative Claims in General</u>. Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

**7. Bar Dates for Administrative Claims.**

**a. <u>General Bar Date Provisions</u>. Except as otherwise provided in subparagraphs 7(b) or 7(c) below or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date, <u>i.e.</u>, _____, 20__. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, <u>i.e.</u>, _____, 20__ , (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.**

**b. <u>Ordinary Course Claims</u>. Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations are not required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.**

**c. <u>Claims Under the Postpetition Financing Agreement</u>. Holders of Administrative Claims that are Postpetition Financing Claims are not required to File or serve any**

request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied as set forth in subparagraph 7(b) above.

      **d.**    <u>No Modification of Bar Date Order</u>. The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

      **8.**    **ASF Recoupment Cash Option.**

      a.    <u>ASF Recoupment Cash Option Election</u>. No later than seven days following the Effective Date, *i.e.*, _____, 20__, the City, through its Claims and Balloting Agent, will send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Notice will notify ASF Distribution Recipients that each ASF Distribution Recipient may elect to pay the total amount of his or her ASF Recoupment in a single lump sum by timely returning a properly-completed ASF Election Form. The ASF Election Form will explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (i) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (ii) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. ***An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date, <u>i.e.</u>, 35 days after the date on which the ASF Election Form is mailed.***

      b.    <u>ASF Recoupment Cash Payment</u>. GRS will mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. The ASF Final Cash Payment Notice is a notice that will be sent to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option, and will indicate the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment. ***ASF Distribution Recipients shall have until the ASF Final Cash Payment Date – <u>i.e.</u>, the later of (i) 90 days after the Effective Date, <u>i.e.</u>, _____, 20__ or (ii) 50 days after the date of mailing of an ASF Final Cash Payment Notice – to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan.*** The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**9. Copies of the Plan and Confirmation Order.** Copies of the Plan, Confirmation Order and all other documents Filed in the Chapter 9 Case may be obtained, free of charge, from the City's restructuring website at https://www.kccllc.net/detroit or from Kurtzman Carson Consultants LLC by calling (877) 298-6236 (toll-free).

BY ORDER OF THE COURT

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date was filed and served via the Court's electronic case filing and noticing system on this _____ day of _____, 2014.

/s/  Heather Lennox

## <u>CERTIFICATE OF SERVICE</u>

I, Heather Lennox, hereby certify that the foregoing Notice of Filing of Proposed Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit was filed and served via the Court's electronic case filing and noticing system on this 31st day of October, 2014.


/s/ Heather Lennox