UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

**EXHIBIT 6**

**APPELLEE STATE OF MICHIGAN'S DESIGNATION OF
ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**
in connection with Notice of Appeal filed by Lucinda Darrah
[Dkt. #8812]

| Item | Date Filed | Docket Number | Description |
|---|---|---|---|
| 6 | 9/6/2013 | 765 | City of Detroit Consolidated Reply to Objectors to Entry of an Order for Relief |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:
In re          :  Chapter 9
:
CITY OF DETROIT, MICHIGAN,  :  Case No. 13-53846
:
      Debtor.  :  Hon. Steven W. Rhodes
:
:
------------------------------------------------------x

## CITY OF DETROIT'S CONSOLIDATED REPLY TO
## <u>OBJECTIONS TO THE ENTRY OF AN ORDER FOR RELIEF</u>

1353846130906000000000034

# TABLE OF CONTENTS

I.    Preliminary Statement ..................................................................1

II.   The Court Has Authority and Jurisdiction to Determine the
      Constitutionality of Chapter 9 and PA 436 ...................................5

III.  Chapter 9 is Constitutional Under Longstanding Supreme Court
      Precedent ......................................................................................9

      A.    The Supreme Court's Decision in <u>Bekins</u> Remains
            Binding Precedent ..............................................................10

      B.    Subsequent Legal Developments Have Not Undermined the
            Soundness of <u>Bekins</u> and the Constitutionality of Chapter 9 ...........13

IV.   The City Was Properly Authorized to Commence This
      Chapter 9 Case ............................................................................19

V.    The State's Authorization of Chapter 9 Did Not Violate the
      Pensions Clause ..........................................................................21

      A.    The Authorization of Chapter 9 Does Not "Diminish or
            Impair" Pension Benefits ...................................................21

      B.    The Pensions Clause Simply Extends the Protection of the
            Federal and State Contracts Clauses to Cover Public
            Pensions.............................................................................22

      C.    The Pensions Clause Does Not Require Chapter 9
            Authorization to Be Conditioned on the Non-Impairment
            of Pensions .......................................................................28

VI.   Collateral Estoppel Does Not Preclude This Court from
      Determining the City's Eligibility for Chapter 9 .........................32

VII.  PA 436 is Constitutional ............................................................38

      A.    PA 436 Does Not Conflict with Home Rule and
            Reflects the State Legislature's Power to Address Local
            Fiscal Emergencies. ...........................................................38

      B.    PA 436 Does Not Delegate Power to Pass Local Legislation ..........41

  C.  PA 436 Does Not Violate the Non-Delegation Doctrine...................42

VIII. The City Satisfies Section 109(c)(5) of the Bankruptcy Code
  Because It Was Impracticable to Bargain with Thousands of
  Bondholders and Over 20,000 Retirees.........................................45

IX. The City's Good Faith Negotiations with Its Creditors Satisfy
  Section 109(c)(5) of the Bankruptcy Code ...................................53

X. The City is Insolvent ...................................................................59

XI. The City Desires to Effect a Plan to Adjust Its Debts..................61

XII. The City Filed Its Petition in Good Faith....................................62

XIII. Notice of the Deadline for Objections to Eligibility Was
  Proper and Sufficient..................................................................69

XIV. Conclusion..................................................................................71

## EXHIBITS

Exhibit A: Non-Individual Objections to Eligibility, Summary of
    Arguments Set Forth Therein & City's Responses

Exhibit B: Individual Objections to Eligibility, Summary of Arguments
    Set Forth Therein & City's Responses

Exhibit C: Letters from various union representatives to Brian Easley

Exhibit D: Letter from Brian Easley to James Williams, President,
    AFSCME, dated June 27, 2013

Exhibit E: Letter from Evan Miller to Dennis McNamara, President,
    Detroit Fire Fighters Association, *et al.*, dated July 17, 2013

Exhibit F: Letter from Steven Kreisberg, Director of Collective Bargaining
    and Health Care Policy, AFSCME, to Brian Easley, dated
    July 2, 2013

# TABLE OF AUTHORITIES

## CASES

Agostini v. Felton,
   521 U.S. 203 (1997)........................................................................12

Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.
   (In re Nat'l Century Fin. Enters., Inc.),
   423 F.3d 567 (6th Cir. 2005) ...........................................................35

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
   298 U.S. 513 (1936)........................................................................10

Ass'n of Retired Emps. v. City of Stockton
   (In re City of Stockton),
   478 B.R. 8 (Bankr. E.D. Cal. 2012).......................................17, 30, 31

Blue Cross & Blue Shield of Mich. v. Demlow,
   270 N.W.2d 845 (Mich. 1978)...........................................................43

Blue Cross & Blue Shield of Mich. v. Milliken,
   367 N.W.2d 1 (Mich. 1985)........................................................42, 43

Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,
   575 N.W.2d 751 (Mich. 1998)...........................................................40

Bd. of Trs. v. Cary,
   373 So.2d 841 (Ala. 1979)................................................................27

Bd. of Trs. v. City of Detroit,
   373 N.W.2d 173 (Mich. Ct. App. 1985)..............................................39

Brimmer v. Vill. of Elk Rapids,
   112 N.W.2d 222 (Mich. 1961)...........................................................40

City of Pontiac Retired Emps. Ass'n v. Schimmel,
   No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013)......................2

Control Module, Inc. v. Morello (In re Morello),
   No. 07-02052, 2012 WL 1945509
   (Bankr. D. Conn. May 30, 2012) ................................................ 35-36

-iii-
13-53846-tjt Doc 8990-6 Filed 12/19/14 Entered 12/19/14 19:59:38 Page 5 of 136
13-53846-swr Doc 8765 Filed 09/06/14 Entered 09/06/14 19:59:38 Page 5 of 136

Cnty. of Orange v. Merrill Lynch & Co., Inc.
    (In re Cnty. of Orange),
    191 B.R. 1005 (Bankr. C.D. Cal. 1996) ..................................................... 30-31

Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA,
    592 N.W.2d 408 (Mich. Ct. App. 1998) ................................................. 37

Detroit City Council v. Mayor of Detroit,
    770 N.W.2d 117 (Mich. Ct. App. 2009) ................................................. 39

Easley v. Pettibone Mich. Corp.,
    990 F.2d 905 (6th Cir. 1993) ............................................................ 35

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
    459 U.S. 400 (1983) ..................................................................... 13, 15

Faitoute Iron & Steel Co. v. City of Asbury Park,
    316 U.S. 502 (1942) .................................................................. 12, 14-15

First Horizon Home Loan Corp. v. Apostle (In re Apostle),
    467 B.R. 433 (Bankr. W.D. Mich. 2012) ............................................ 8

Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),
    527 N.W.2d 468 (Mich. 1994) ......................................................... 23

Hanover Nat'l Bank v. Moyses,
    186 U.S. 181 (1902) ................................................................... 18-19

Houston v. Governor,
    810 N.W.2d 255 (Mich. 2012) ......................................................... 40

In re City of Prichard,
    No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) ................................... 27

In re City of Stockton,
    486 B.R. 194 (Bankr. E.D. Cal. 2013) ............................................ 11, 44

In re City of Stockton,
    493 B.R. 772 (Bankr. E.D. Cal. 2013) .......................................... 22, 27, 64-65

In re City of Vallejo,
    403 B.R. 72 (Bankr. E.D. Cal. 2009) ................................................ 30

In re Constitutionality of 2011 PA 38,
806 N.W.2d 683 (Mich. 2011)............................................................... 23, 25-26

In re Cottonwood Water & Sanitation Dist.,
138 B.R. 973 (Bankr. D. Colo. 1992)........................................................ 58-59

In re Cnty. of Orange,
183 B.R. 594 (Bankr. C.D. Cal. 1995) .......................................................64, 65

In re Ellicott Sch. Bldg. Auth.,
150 B.R. 261 (Bankr. D. Colo. 1992)......................................................... 56-57

In re Enrolled Senate Bill
(Advisory Opinion re Constitutionality of 1972 PA 258),
209 N.W.2d 200 (Mich. 1973) ......................................................................23

In re Jefferson Cnty.,
474 B.R. 228 (Bankr. N.D. Ala. 2012) ............................................................14

In re McCurtain Mun. Auth.,
No. 07-80363, 2007 WL 4287604
(Bankr. E.D. Okla. Dec. 4, 2007) ............................................................. 66-67

In re Sanitary & Improvement Dist., No. 7,
98 B.R. 970 (Bankr. D. Neb. 1989)..........................................................25, 59

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
165 B.R. 60 (Bankr. D.N.H. 1994)............................................................58, 64

In re Valley Health Sys.,
383 B.R. 156 (Bankr. C.D. Cal. 2008) ............................................................52

In re Vasko,
6 B.R. 317 (Bankr. N.D. Ohio 1980)...............................................................19

In re Vills. at Castle Rock Metro. Dist. No. 4,
145 B.R. 76 (Bankr. D. Colo. 1990)..........................................................47, 64

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
(In re City of Vallejo),
408 B.R. 280 (B.A.P. 9th Cir. 2009) .................................................... 27, 46-47

Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo
    (In re City of Vallejo),
    432 B.R. 262 (E.D. Cal. 2010) ...................................................................30, 31

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980)............................................................................24

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) .............................................................................35

Mascio v. Pub. Emps. Ret. Sys. of Ohio,
    160 F.3d 310 (6th Cir. 1998) ............................................................................15

Mich. State Highway Comm'n v. Vanderkloot,
    220 N.W.2d 416 (Mich. 1974)...........................................................................43

Mission Indep. Sch. Dist. v. Texas,
    116 F.2d 175 (5th Cir. 1940) ............................................................................31

Monat v. State Farm Ins. Co.,
    677 N.W.2d 843 (Mich. 2004)....................................................................32, 36

Murray v. Charleston,
    96 U.S. 432 (1877)............................................................................................15

Murray's Lessee v. Hoboken Land & Improvement Co.,
    59 U.S. 272 (1856)..............................................................................................5

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012)......................................................................................17

New York v. United States,
    505 U.S. 144 (1992)..........................................................................................16

Olson v. Cory,
    636 P.2d 532 (Cal. 1980) ............................................................................ 26-27

People ex rel. Le Roy v. Hurlbut,
    24 Mich. 44 (1871) .................................................................................. 38, 40-41

Printz v. United States,
    521 U.S. 898 (1997)..........................................................................................16

Richardson v. Schafer (In re Schafer),
    689 F.3d 601 (6th Cir. 2012) ..................................................19, 31

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
    490 U.S. 477 (1989).............................................................12

Sloan v. City of Madison Heights,
    389 N.W.2d 418 (Mich. 1986)................................................37

South Dakota v. Dole,
    483 U.S. 203 (1987)............................................................17

Stern v. Marshall,
    131 S. Ct. 2594 (2011).......................................................5-8

Twin City Fire Ins. Co. v. Adkins,
    400 F.3d 293 (6th Cir. 2005) ...............................................34

United States v. Bekins,
    304 U.S. 27 (1938)...............................................9-13, 15-16, 24

United States Trust Co. of N.Y. v. New Jersey,
    431 U.S. 1 (1977) ........................................................... 13-15

W.B. Worthen Co. v. Kavanaugh,
    295 U.S. 56 (1935)............................................................15

Webster v. Michigan,
    No. 13-734-CZ (Ingham Cnty. Cir. Ct.) ................................. 32-38

Weisberg v. Powell,
    417 F.2d 388 (7th Cir. 1969) ..............................................32

**FEDERAL CONSTITUTION AND STATUTES**

U.S. Const. art. I, § 8, cl. 4.................................................18, 29

U.S. Const. art. I, § 10...........................................................9

U.S. Const. art. VI, cl. 2.........................................................30

11 U.S.C. § 101(32)(C) ...................................................... 59-60

-vii-
13-53846-tjt  Doc 8990-6  Filed 12/09/14  Entered 12/09/14 11:59:38  Page 9 of 136
13-53846-swr  Doc 697  Filed 09/06/13  Entered 09/06/13 15:19:58  Page 9 of 136

11 U.S.C. § 109(c) .......................................................................passim

11 U.S.C. § 362 ...................................................................................34

11 U.S.C. § 903 ...................................................................................18

11 U.S.C. § 904 ...................................................................................44

11 U.S.C. § 921 .........................................................5, 6, 33, 53, 62-64, 66

11 U.S.C. § 943 ...................................................................................58

11 U.S.C. § 1129 .................................................................................44

28 U.S.C. § 157 ...................................................................................33

28 U.S.C. § 1334 ............................................................................32-33

28 U.S.C. § 2403 ...................................................................................2

## State Constitution and Statutes

Mich. Const. art. IV, § 29 .................................................................. 41-42

Mich. Const. art. VII, § 21 .......................................................................40

Mich. Const. art. VII, § 22 .......................................................................37

Mich. Const. art. IX, § 24 ..............................................................21, 23, 25

Public Act 72 of 1939 - MCL § 141.201(1) .........................................26

Public Act 279 of 1909 - MCL § 117.36 ..............................................39

Public Act 336 of 1947 - MCL § 423.215 ............................................56

Public Act 436 of 2012 - MCL § 141.1543 ..........................................40

Public Act 436 of 2012 - MCL § 141.1549 .....................................41, 43

Public Act 436 of 2012 - MCL § 141.1551 ..........................................54

Public Act 436 of 2012 - MCL § 141.1552 ...................................... 41-42

Public Act 436 of 2012 - MCL § 141.1558 ............................................. 3, 19-21, 43

Public Act 436 of 2012 - MCL § 141.1567(3) ........................................................56

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 921.04[2]
   (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013) ...............................69

DETROIT CITY CHARTER § 1-102 ...........................................................................39

1 RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) .........................................36

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection")[1] to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I. PRELIMINARY STATEMENT

Confronting a state-declared "financial emergency" that includes approximately $18 billion in debt, over 100,000 creditors, over 100 discrete bond issuances and related loans (as well as multiple insurers of such bonds) and nearly 50 union bargaining units representing the City's employees – all of which rendered any out of court solution impracticable – the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition"). The financial condition of the City is detailed in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum") and the City's first-day declarations.[2] These documents demonstrate the City's overwhelming need for debt relief.

---

[1] Attached hereto as Exhibit A and Exhibit B, and incorporated herein by reference, are charts specifying, for Objections filed by non-individual entities and individuals, respectively, on an Objection-by-Objection basis: (a) each Objection's docket number; (b) the arguments set forth therein (identified by category where appropriate); and (c) the City's response thereto.

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Declaration of Kevyn D. Orr in Support of City of Detroit,

13-53846-swr    Doc 7884-6    Filed 02/19/14    Entered 02/19/14 15:53:38    Page 12 of 35
13-53846-swr    Doc 734    Filed 09/06/13    Entered 09/06/13 19:59:53    Page 11 of 135
136

Despite these realities, over 100 persons and entities objected to the City's eligibility for relief under chapter 9 and to the entry of an Order for Relief.  Most Objectors rely on anticipated treatments of their claims as a platform to argue that the City is not authorized to be a chapter 9 debtor.  However, as this Court has observed,[3] neither the determination of claim amounts nor the potential treatment of claims in a plan of adjustment are before the Court at this time.

Notwithstanding the Objectors' arguments, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. First, the City is authorized to be a chapter 9 debtor because:

- After the fulfillment of certain conditions, PA 436 – which was validly passed by the Michigan legislature[4] – "empowers the local government for which an emergency manager has been appointed to become a debtor

---

(continued…)

Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "<u>Orr Declaration</u>"), filed on the Petition Date.

[3] Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642) (the "<u>Eligibility Scheduling Order</u>"), entered on August 26, 2013.

[4] Recently, the Sixth Circuit questioned the validity of PA 4 (the predecessor statute to PA 436) on the grounds that the Michigan legislature may have violated the Michigan Constitution when it declared PA 4 immediately effective.  <u>City of Pontiac Retired Emps. Ass'n v. Schimmel</u>, No. 12-2087, 2013 WL 4038582, at *5-6 (6th Cir. Aug. 9, 2013).  No such potential constitutional infirmity afflicts PA 436, which became effective on March 28, 2013, more than 90 days after its enactment on December 27, 2012.

under title 11 of the United States Code ... as required by section 109 of title 11 of the United States Code" (<u>see</u> MCL § 141.1558(1));

- Each of the requirements of PA 436 relating to the authorization of the commencement of the City's chapter 9 case – <u>i.e.</u>, a recommendation by the Emergency Manager to the Governor and Treasurer that the City be authorized to proceed under chapter 9 and the written approval of that recommendation by the Governor – were satisfied prior to the filing of the Petition;

- Following the satisfaction of the foregoing conditions, PA 436 specifically authorizes emergency managers to commence chapter 9 cases (<u>see</u> MCL § 141.1558(1));

- The actual text of the Michigan Constitution does not prohibit the commencement of chapter 9 cases by municipalities or condition the steps that might be taken by any State or municipal official in connection with authorizing or effecting such a filing;

- The actual text of the Michigan Constitution does not create or require the imposition of any condition on actions the City might take in this chapter 9 case; and

- No statute passed by the Michigan legislature prohibits the commencement of chapter 9 cases by municipalities.

None of the Objections contest any of the foregoing points. Instead, the

Objectors invent additional requirements, not found in the Michigan Constitution,

and then allege that these additional requirements have not been met. We

demonstrate below that there are no conditions to the City's becoming a debtor

under chapter 9 other than those identified above. Accordingly, the City satisfied

section 109(c)(2) of the Bankruptcy Code prior to the commencement of this case.

Moreover, objections contending that the City does not desire to adjust its

debts, that the City may not be insolvent, that negotiations to adjust debts owed to

more than 100,000 holders were practicable and that the City did not file the

Petition in good faith likewise fall short. The Objections:

- do not include any evidence contradicting or undermining the extensive showing of the City's insolvency included in the Eligibility Memorandum (indeed, the majority of relevant Objectors do not actually state a cognizable objection on the issue, thereby conceding that no information available to them as of the objection deadline supports their Objection);

- (A) implicitly admit that none of the Objectors represent all of the City's more than 20,000 retirees in prepetition negotiations and some Objectors that claim to represent retirees do not represent any of the active employees who have vested pension benefits, (B) ignore certain Objectors' prepetition *refusal* to represent retirees in negotiations concerning pension and retiree healthcare benefits and (C) ignore the impracticability of negotiations with the City's bondholders altogether, all of which are facts that demonstrate that it was impracticable for the City to negotiate an out of court settlement of its debts and other legacy liabilities;

- mischaracterize and omit inconvenient facts relevant to the City's demonstrated efforts to negotiate in good faith a restructuring of its debts with its creditors; and

- misapply the standards governing whether the Petition was filed in good faith to side-step the demonstrated reality that the City intends to file a chapter 9 plan to adjust the City's unsustainable $18 billion debt burden.

Accordingly, as set forth in the Statement of Qualifications, the Eligibility

Memorandum and herein, the City is eligible to be a debtor under chapter 9, and

the Court should promptly enter an Order for Relief.

## II. THE COURT HAS AUTHORITY AND JURISDICTION TO DETERMINE THE CONSTITUTIONALITY OF CHAPTER 9 AND PA 436

There is no doubt that this Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. Eligibility is a question of federal law, governed by section 109(c) of the Bankruptcy Code, relevant only for purposes of accessing the federal bankruptcy scheme and the determination of which is specifically committed to the bankruptcy court by section 921(c) of the Bankruptcy Code. As the United States Supreme Court (the "Supreme Court") made clear in Stern v. Marshall, 131 S. Ct. 2594 (2011), non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights," which are matters "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Stern, 131 S. Ct. at 2612 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). Included within this category are cases that "can be pursued only by grace of the other branches" of the federal government (id. at 2614) because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all,' so Congress could limit the extent to which a judicial forum was available." Id. at 2612 (quoting Murray's Lessee, 59 U.S. at 284).

The eligibility proceeding fits squarely within this category of "public rights" cases recognized by the Supreme Court. The City's ability to adjust its debts in a federal bankruptcy case is, of course, only possible because Congress enacted the Bankruptcy Code. Because a chapter 9 case "can be pursued only by grace" of Congress (Stern, 131 S. Ct. at 2614), Congress can control access to chapter 9 by tasking a non-Article III judge with determining a municipality's eligibility, as it has done. 11 U.S.C. §§ 109(c), 921(c). Stern, therefore, poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9.

Indeed, no Objector has challenged the Court's ability to make a final determination regarding the City's eligibility for chapter 9. However, by selective quotation to Stern, some Objectors argue that this Court is powerless to rule on certain *objections* to the City's eligibility for chapter 9 that involve federal or state constitutional questions. See AFSCME Objection, at ¶ 70 (substituting Stern's actual reference to "common law counterclaims such as Vickie's" with "constitutional questions such as this one; misleadingly quoting Stern's actual language "on a common law cause of action" as "on a [constitutional] cause of action").[5] Such a radical expansion of Stern is unsupported by that case or any subsequent authority.

---

[5] See Stern, 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving *common law counterclaims such as Vickie's* are the Article III

-6-
136
13-53846-tjt   Doc 8804-6   Filed 02/19/14   Entered 02/19/14 19:53:38   Page 17 of 135
13-53846-swr   Doc 7804   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 16 of 134

Stern involved a statutorily core, state common law counterclaim asserted by the debtor against a creditor. Stern, 131 S. Ct. at 2620. The Supreme Court contrasted this "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" with claims "that were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims." Id. at 2611. While the former required the bankruptcy court to impermissibly exercise the judicial power of the United States, the latter "stem[med] from the bankruptcy itself" and could, as a result, be resolved by the bankruptcy court. Id. at 2618; see also id. ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").[6]

---

(continued…)

> courts, and it is with those courts that her claim must stay…. What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a *common law* cause of action….") (emphasis added). See also Crittendon Objection at ¶¶ 9-10.

[6] The Supreme Court was careful to clarify that its holding should be interpreted narrowly. Stern, 131 S. Ct. at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one."); id. (noting that Congress had exceeded constitutional limitations "in one isolated respect").

-7-

Stern poses no obstacle for the Court in this case because there are no state or federal constitutional *claims* before the Court on which it could even purport to enter a final judgment. What is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself."[7] Id. at 2618. That this determination requires the Court to consider federal and state constitutional questions does not implicate Stern. Even if the Court were to conclude that chapter 9 or PA 436 is unconstitutional, it has not been called upon – indeed, it would not be permitted – to issue any relief based on those arguments beyond declaring that the City is ineligible for chapter 9 and dismissing the Petition.

For the foregoing reasons, Stern is simply not implicated by the Objectors' constitutional arguments against eligibility. See First Horizon Home Loan Corp. v. Apostle (In re Apostle), 467 B.R. 433, 436 (Bankr. W.D. Mich. 2012) ("[T]he Stern decision is extremely narrow; except for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings.").

---

[7]     Even if federal or state constitutional *claims* were before the Court, Stern would still pose no obstacle to this Court's ability to resolve the City's eligibility for chapter 9 in the first instance because the constitutionality of PA 436 is a pure legal issue, which will be reviewed *de novo* on appeal. Thus, none of the concerns regarding deferential review of bankruptcy court judgments animating Stern would be present (see Stern, 131 S. Ct. at 2611), and any error would be harmless after appellate review.

## III. CHAPTER 9 IS CONSTITUTIONAL UNDER LONGSTANDING SUPREME COURT PRECEDENT

The constitutionality of chapter 9 has been settled for more than 70 years. In United States v. Bekins, 304 U.S. 27 (1938), the Supreme Court upheld against constitutional challenge the municipal bankruptcy provisions of the Bankruptcy Act of 1937, the predecessor of the current chapter 9. Although the relevant statutory provisions have remained substantially unchanged since then, the Objectors argue nevertheless that intervening developments in the Supreme Court's jurisprudence on both the Contracts Clause of the United States Constitution (the "Contracts Clause")[8] and federalism have "*effectively* overruled" Bekins and that chapter 9 is no longer constitutional.[9] The Objectors' argument is wrong for two reasons. First, because the Supreme Court does not overrule binding precedents by mere implication, Bekins remains good law. Second, nothing in the Supreme Court's developing jurisprudence on either the Contracts Clause or federalism casts even the slightest doubt on the fundamental soundness of Bekins and the constitutionality of chapter 9.

---

[8]     U.S. Const., art. I, § 10 ("No State shall … pass any … Law impairing the Obligation of Contracts").

[9]     See AFSCME Objection, at ¶¶ 44-46 (emphasis added).

A.    The Supreme Court's Decision in
       _Bekins_ Remains Binding Precedent

AFSCME contends that chapter 9 is unconstitutional in light of federalism

principles because it "allows Congress to set rules controlling State fiscal

self-management – an area of exclusive state sovereignty."[10]  This argument is

nothing short of an attempt to relitigate an issue that the Supreme Court resolved

over seven decades ago.

In _Bekins_, the Supreme Court specifically addressed "whether the exercise

of the federal bankruptcy power in dealing with a composition of the debts of [a

municipality], upon its voluntary application and with the State's consent, must be

deemed to be an unconstitutional interference with the essential independence of

the State as preserved by the Constitution."  _Bekins_, 304 U.S. at 49.  Two years

earlier, in _Ashton v. Cameron County Water Improvement District Number One_,

298 U.S. 513 (1936), the Supreme Court had held that municipal bankruptcy was

unconstitutional because it "might materially restrict [the subdivision's] control

over its fiscal affairs," such that it would "no longer [be] free to manage [its] own

affairs."  _Ashton_, 298 U.S. at 530-31.  Responding to the Supreme Court's

concerns, Congress enacted a slightly revised version of the municipal bankruptcy

---

[10]    AFSCME Objection, ¶¶ at 40.

statute. <u>Bekins</u>, 304 U.S. at 50; <u>In re City of Stockton</u>, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).

This revised statute was challenged and upheld in <u>Bekins</u>. The Supreme Court concluded that the revised statute was "carefully drawn so as not to impinge upon the sovereignty of the State." <u>Bekins</u>, 304 U.S. at 51. Specifically, the Court explained that the "State retains control of its fiscal affairs" and that the "bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the [political subdivision] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." <u>Id.</u>

Central to the Court's reasoning was its observation that "the essence of sovereignty" is the ability to "give consents bearing upon the exertion of governmental power." <u>Id.</u> at 51-52. Because the adjustment of debts "was not available under state law by reason of the [Contracts Clause]," the Court held that the "bankruptcy power [was] competent to give relief," and "if there [was] any obstacle to its exercise … it [was] in the right of the State to oppose federal interference." <u>Id.</u> at 54.

The Objectors do not point to any subsequent change in the text of chapter 9 that would warrant a different outcome than Bekins.[11]  None of the cases cited by the Objectors addresses the constitutionality of chapter 9 or casts doubt on Bekins.[12]  Nevertheless, the Objectors invite this Court to treat Bekins as having been implicitly overruled.  To do so, however, would violate the fundamental and well-established precept that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."  Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989); see also Agostini v. Felton, 521 U.S. 203, 237 (1997) (same).  Because Bekins directly controls the Objectors' constitutional challenge to chapter 9, the Court must follow it and hold that chapter 9 is constitutional.

---

[11]    See AFSCME Objection, at ¶¶ 44-46.

[12]    Indeed, only one of the cases cited by the Objectors – Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942) – so much as mentions Bekins.

B.     Subsequent Legal Developments
       Have Not Undermined the Soundness of
       _Bekins_ and the Constitutionality of Chapter 9

Although Bekins is dispositive of the Objectors' constitutional claim, it is

also evident that legal developments since Bekins do not undermine the Bekins

decision, the soundness of its reasoning or the constitutionality of chapter 9.

First, contrary to the Objectors' contention,[13] States are not generally free to

adjust municipal debts by unilateral state action.  If the Objectors were correct, the

Contracts Clause would be a dead letter, but the Supreme Court has made clear that

"[w]hen a State itself enters into a contract, it cannot simply walk away from its

financial obligations."  Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,

459 U.S. 400, 412 n.14 (1983).  When a State seeks to impair its own contracts,

"complete deference to a legislative assessment of [the] reasonableness and

necessity [of the impairment] is not appropriate because the State's self-interest is

at stake."  United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 26 (1977).

For that reason, "a state is not completely free to consider impairing the obligations

of its own contracts on a par with other policy alternatives."  Id. at 30-31.

In chapter 9, by contrast, there is no risk of state self-interest because the

impairment can be carried out only by an impartial federal judge.  Indeed, as one

bankruptcy court put it:  "A financially prostrate municipal government has one

---

[13]     See AFSCME Objection, at ¶¶ 44-45.

viable option to resolve debts in a non-consensual manner. It is in a bankruptcy case. Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible." In re Jefferson Cnty., 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), aff'd, No. CV-12-J-2203-5, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

It comes as no surprise, therefore, that Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942), the case so prominently relied upon by the Objectors, is the *only* case "in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case." In re Jefferson Cnty., 474 B.R. at 279 n.21; see also United States Trust Co., 431 U.S. at 27. In Asbury Park, the Court rejected a Depression-era Contracts Clause challenge to a state-law-approved plan of adjustment pursuant to which certain defaulted bonds could only be converted into new bonds with the same principal amount but bearing a lower interest rate. Asbury Park, 316 U.S. at 504-07. Clarifying that "[w]e do not go beyond the case before us" and that "[d]ifferent considerations may come into play in different situations" (Asbury Park, 316 U.S. at 516), the Court was careful not to extend its holding beyond the facts of the case.

Therefore, far from being an authoritative pronouncement of the States' sweeping authority to adjust municipal debts, Asbury Park is an outlier and stands

-14-
13-53846-swr Doc 8004-6 Filed 09/06/19 Entered 09/06/19 19:53:38 Page 24 of 135
136
13-53846-swr Doc 7994-6 Filed 10/18/14 Entered 10/18/14 19:53:38 Page 25 of

only for the unremarkable point that States may adjust municipal debts in very limited ways under extraordinary circumstances without violating the Contracts Clause. "In almost every case," however, "the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing United States Trust Co., 431 U.S. at 25-28; W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Murray v. Charleston, 96 U.S. 432 (1877)); see also, e.g., Mascio v. Public Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313-15 (6th Cir. 1998) (barring the enforcement of a State law impairing vested pension benefits).

　　　States must seek the aid of federal bankruptcy courts under chapter 9 precisely because they are *not* at liberty under the Contracts Clause to impair their own contracts. See Bekins, 304 U.S. at 54. For this reason, the Objectors' next contention – that a State unconstitutionally relinquishes its sovereignty to the Federal Government by authorizing chapter 9[14] – is also fundamentally flawed. As the Bekins Court explained: when a State authorizes chapter 9, it "acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of

---

[14]　　　See AFSCME Objection, at ¶¶ 46-57.

-15-
13-53846-tjt　　Doc 8004-6　Filed 09/06/19　Entered 09/06/19 14:59:53　Page 26 of 135
13-53846-swr　　Doc 7304-6　Filed 09/06/19　Entered 09/06/19 14:59:53　Page 26 of 135
136

state sovereignty, has reduced both sovereigns to helplessness in such a case."
Bekins, 304 U.S. at 54. The irony of the Objectors' argument is that it would
actually impede, rather than protect, the States' sovereignty.

The Objectors also rely on the Supreme Court's anti-commandeering cases –
New York v. United States, 505 U.S. 144 (1992), and Printz v. United States,
521 U.S. 898 (1997) – which involved involuntary federal regulatory regimes that
"commandeered" State legislative processes or officials. In New York, the
challenged statute required States either to take title to low-level radioactive waste
or to enact legislation regulating the waste pursuant to Congress's direction. New
York, 505 U.S. at 174-75. In Printz, the challenged statute required State law
enforcement officers to participate in the administration of a federal regulatory
scheme. Printz, 521 U.S. at 903-04. The Supreme Court invalidated both statutes
because "[t]he Federal Government may not compel the States to enact or
administer a federal regulatory program." Id. at 933 (quoting New York, 505 U.S.
at 188).

Chapter 9, by contrast, does not *compel* the States to enact, administer or
otherwise participate in the federal bankruptcy scheme. Most fundamentally,
chapter 9 is "administered" by the federal bankruptcy court, not by States.
Moreover, States cannot be "forced" to participate in chapter 9 because their
participation is completely voluntary. By extending the benefits of bankruptcy to

consenting States, chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements. E.g., South Dakota v. Dole, 483 U.S. 203, 205-06 (1987) (conditioning federal transportation funds on the States' adoption of a national minimum drinking age). Such programs are not constitutionally problematic where the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2602-03 (2012) (plurality opinion).

Because States have a "legitimate choice" whether to allow their municipalities to invoke chapter 9, chapter 9 is not an unconstitutional infringement of State sovereignty. Nor is there any danger of misplaced political accountability.[15] Where, as here, the State has a "legitimate choice" whether to participate in the federal scheme, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2603 (plurality opinion).

Indeed, even after a State authorizes its municipalities to proceed under chapter 9, the bankruptcy court's powers are designed "to preserve the niceties of the state-federal relationship." Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). For that reason, the

---

[15]     See AFSCME Objection, at ¶¶ 47-57.

Objectors are wrong to suggest that State consent to chapter 9 is a futile effort to cure "an otherwise unconstitutional infringement of state sovereignty."[16] Even if there is some non-delegable core of sovereign state functions that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions. 11 U.S.C. § 903 (prohibiting the bankruptcy court from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality").

Finally, the Objectors also argue that chapter 9 violates the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution.[17] "[B]y ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy," argue the Objectors, "Chapter 9 permits the promulgation of non-uniform bankruptcies within states." Id. The very case that the Objectors cite, Hanover National Bank v. Moyses, 186 U.S. 181 (1902), proves otherwise. In Hanover National Bank, the Supreme Court approved federal bankruptcy provisions that relied on state law for determining exempt property. Id. at 188-90. The Supreme Court held that such a system was, "in the constitutional sense, uniform throughout the United States," even though "it may result in certain

---

[16]    AFSCME Objection, at ¶¶ 60-62.

[17]    AFSCME Objection, at ¶ 58.

-18-
13-53846-tjt    Doc 8304-6    Filed 09/06/19    Entered 09/06/19 19:53:38    Page 29 of
136
13-53846-swr    Doc 7004-6    Filed 08/19/14    Entered 08/19/14 19:59:38    Page 29 of 135

particulars differently in different States." Id. at 190. Insofar as the Objectors

contend that chapter 9 is unconstitutional because PA 436 is non-uniform within

Michigan, that argument is erroneous because the uniformity requirement is "only

controlling as to the congressional exercise of power," not as to the underlying

state law. In re Vasko, 6 B.R. 317, 320 (Bankr. N.D. Ohio 1980). In any event,

the process set forth in PA 436 is plainly uniform because it applies to all local

governments. E.g., MCL § 141.1558. Notwithstanding the Objectors' speculation

that PA 436 might have "wildly divergent effects on different cities" (AFSCME

Objection, at ¶ 58), "it is not the outcome that determines the uniformity, but the

uniform process" by which a defined class of debtors is treated. Richardson v.

Schafer (In re Schafer), 689 F.3d 601, 611 (6th Cir. 2012).

## IV.    THE CITY WAS PROPERLY
##        AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE

On July 16, 2013, consistent with MCL § 141.1558, the Emergency

Manager provided the Governor and Treasurer with his written recommendation

that the City be authorized to file for chapter 9 relief.[18] The recommendation was

predicated upon, among other things, the Emergency Manager's:

---

[18]    Orr Declaration, at Exhibit J (copy of Emergency Manager's written
        recommendation); MCL § 141.1558(1) ("If, in the judgment of the
        emergency manager, no reasonable alternative to rectifying the financial
        emergency of the local government which is in receivership exists, then the
        emergency manager may recommend to the governor and the state treasurer
        that the local government be authorized to proceed under chapter 9.").

13-53846-tjt    Doc 8004-6    Filed 09/06/19    Entered 09/06/19 14:59:38    Page 30 of 135
13-53846-swr    Doc 7304    Filed 09/06/14    Entered 09/06/14 14:59:38    Page 29 of 135
136

(A) determination that the City could not adopt a feasible financial plan that can satisfactorily rectify its financial emergency in a timely manner; and (B) judgment that no reasonable alternative to chapter 9 would allow him to rectify the City's financial emergency in a timely manner.[19]

On July 18, 2013, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case.[20] Finally, also on July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case.[21] Accordingly, under applicable State law and pursuant to the specific approval of the Governor in accordance with MCL § 141.1558(1), the City has

---

[19] MCL § 141.1558(2)(a) (requiring that an emergency manager's recommendation include, among other things, "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.").

[20] Orr Declaration, at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation); MCL § 141.1558(1) ("the governor shall inform the state treasurer and the emergency manager in writing of the decision [to approve]….").

[21] Orr Declaration, at Exhibit L (copy of Emergency Manager's order directing commencement); MCL § 141.1558(1) (providing that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.").

-20-
13-53846-tjt   Doc 8304-6   Filed 09/02/19   Entered 09/02/19 14:13:38   Page 31 of
13-53846-swr   Doc 7904-6   Filed 09/06/14   Entered 09/06/14 19:50:53   Page 30 of 135
136

been specifically authorized to be a debtor under chapter 9 of the Bankruptcy Code.

## V. THE STATE'S AUTHORIZATION OF CHAPTER 9 DID NOT VIOLATE THE PENSIONS CLAUSE

Several of the Objectors claim, in one form or another,[22] that the State's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause").[23] They are mistaken. As explained below, the Pensions Clause itself makes no mention of bankruptcy or chapter 9 authorization. Nor does the State's authorization of a chapter 9 filing, or even the City's becoming a chapter 9 debtor, "diminish[ ] or impair[ ]" any pension. These are simply steps that begin the bankruptcy process, where pensions *may* be impaired by order of a federal bankruptcy court at some later date.

### A. The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits

In authorizing the City to file for chapter 9, the State did not violate the Pensions Clause because it did not "diminish[ ] or impair[ ]" any pension. The authorization was merely one of several conditions to the City's becoming a

---

[22] See, e.g., AFSCME Objection, at ¶¶ 76-81; Retiree Associations Objection, at ¶¶ 35-50; UAW Objection, at ¶¶ 27-40; Detroit Retirement Systems Objection, at pp. 30-43.

[23] Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

chapter 9 debtor. After the Governor authorized the City to file this case, and even after the City filed the Petition, the City's pension obligations have remained unimpaired. The Objectors frame their argument as if nothing stands between authorization and the confirmation of a plan that may reduce pension benefits. The only way pensions could be impaired without the consent of the pertinent beneficiaries, however, is by an order of this Court at some future date. As another court has recently indicated, the "main event" of pension impairment is not properly addressed until well after the eligibility stage – at the time of plan confirmation. In re City of Stockton, 493 B.R. 772, 797 (Bankr. E.D. Cal. 2013).

For the same reason, there is no merit to the Objectors' argument that the enactment of PA 436 violated the Pensions Clause (and, thus, that PA 436 is unconstitutional as a threshold matter)[24]. The enactment of the underlying statute empowering the Governor to authorize (and the Emergency Manager to file) a chapter 9 case is even further removed from any possible impairment of pensions than the Governor's authorization itself.

B.    The Pensions Clause Simply Extends the Protection of the Federal and State Contracts Clauses to Cover Public Pensions

The unmistakable function of the Pensions Clause is to extend the protection of the federal and state contracts clauses to cover public pensions by treating them

---

[24]    See, e.g., Detroit Retirement Systems Objection, at p. 43.

as contractual obligations.[25]  The text of the Pensions Clause states that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions *shall be a contractual obligation thereof* which shall not be diminished or impaired thereby."  Mich. Const. art. IX, § 24 (emphasis added).  As the Michigan Supreme Court has recognized, "*[t]he obvious intent* of § 24 … was to ensure that public pensions *be treated as contractual obligations* that, once earned, could not be diminished."  In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011) (emphasis added).

It is important to note that prior to the adoption of the Pensions Clause in 1963, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation."  In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973).  Against this backdrop, public employees in Michigan sought "[t]o gain protection of their pension rights," and thus "effectively lobbied for a constitutional

---

[25]   The contracts clause contained in the Michigan Constitution (the "State Contracts Clause") is indistinguishable from the federal version, and the Michigan courts have accordingly interpreted the two as having the same effect.  See Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question), 527 N.W.2d 468, 473-74 (Mich. 1994) (noting "virtually identical" language of state and federal contracts clauses, and relying on federal case law to apply state clause).

amendment *granting contractual status* to retirement benefits." Kosa v. State

Treasurer, 292 N.W.2d 452, 454-55 (Mich. 1980) (emphasis added).  The result

was the Pensions Clause, which elevated public pensions to the same level of

constitutional protection that applied to "obligations of contract" under the

Contracts Clause.

     While the Contracts Clause prohibits States from impairing contracts, it does

not pose any obstacle to chapter 9.  As the Supreme Court has recognized, a State's

authorization of municipal bankruptcy does not itself constitute an impairment of

contracts but merely "invites the intervention of the bankruptcy power to save its

agency which the State itself is powerless to rescue. " Bekins, 304 U.S. at 54.

Consequently, Bekins makes clear that the Contracts Clause is perfectly consistent

with chapter 9 proceedings from start to finish.  This is true for two reasons.  First,

a State does not impair contracts merely by authorizing a municipality to file for

bankruptcy, because no contracts are impaired at the time of authorization.  Second,

any impairment of contracts that occurs in chapter 9 does not implicate the

Contracts Clause, because the Contracts Clause only prohibits impairment *by the*

*State*, while chapter 9 only allows impairment by the federal bankruptcy court.  As

one court has observed, "the Bankruptcy Code … permits *the federal courts*

*through confirmation of a Chapter 9 plan* to impair contract rights … and such

impairment is not a violation by the state or the municipality of [the Contracts

-24-
13-53846-tjt    Doc 8004-6    Filed 09/06/19    Entered 09/06/19 11:53:38    Page 34 of 135
13-53846-swr    Doc 7804-6    Filed 09/18/14    Entered 09/18/14 19:50:53    Page 35 of
136

Clause] which prohibits a state from impairing such contract rights." <u>In re Sanitary</u> <u>& Improvement Dist., No. 7</u>, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) (emphasis added). Indeed, if chapter 9 truly involved an impairment of contractual obligations by the State, then the Contracts Clause would prevent the impairment of any contract in municipal bankruptcy (or at least require a stringent Contracts Clause analysis for every contractual impairment).

Like the Contracts Clause, the Pensions Clause applies only to impairments that are imposed "[ ]by" the State and its political subdivisions. Mich. Const. art. IX, § 24. Thus, as with the Contracts Clause, chapter 9 is not limited by the Pensions Clause because the impairment of pensions and other contractual obligations in chapter 9 can only occur by order of a federal bankruptcy court.

The framework of chapter 9, including the role of States in authorizing municipal bankruptcy, was well established when the Pensions Clause was ratified in 1963. Nevertheless, the Pensions Clause does not include any restriction on the authorization or filing of municipal bankruptcy cases. Given the absence of any language regarding bankruptcy in the Pensions Clause, and the well-established principle that constitutional protection for "contractual obligations" is not a bar to chapter 9, there is no basis for concluding that the Pensions Clause was intended to give pensioners a right to block municipal bankruptcy. <u>Cf.</u> <u>In re Constitutionality</u> <u>of 2011 PA 38</u>, 806 N.W.2d at 697, n.24 ("Given that neither the actual language

-25-
13-53846-tjt   Doc 8304-6   Filed 09/06/19   Entered 09/06/19 14:59:53   Page 36 of
136
13-53846-swr   Doc 7304-6   Filed 09/13/14   Entered 09/13/14 13:53:38   Page 36 of 135

of § 24 nor the Address to the People mentions [a right to tax-free pension benefits], the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating" such a right).

Indeed, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. See Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982) ("Any … instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] … may proceed under the terms and conditions of such acts to secure a composition of its debts…. The governing authority of any such … instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress ….").  It seems extremely unlikely that, by enacting the Pensions Clause, the framers of the Michigan Constitution intended to overrule Public Act 72 of 1939, which remained on the books for another 20 years, without so much as mentioning the Act's existence.

No court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor.  For example, in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some "new comparable or offsetting benefit

-26-
136
13-53846-tjt   Doc 8004-6   Filed 09/06/19   Entered 09/06/19 14:59:53   Page 37 of 135
13-53846-swr   Doc 7394-6   Filed 09/06/14   Entered 09/06/14 14:59:53   Page 36 of 135

appear[s] in the modified plan." Olson v. Cory, 636 P.2d 532, 541 (Cal. 1980).

Nonetheless, California courts have found municipalities eligible to be chapter 9

debtors in several recent cases where pensions might be vulnerable to impairment

in the bankruptcy process. E.g., Stockton, 493 B.R. 772; Int'l Ass'n of Firefighters,

Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280 (B.A.P.

9th Cir. 2009). Similar constitutional protection for pensions applies in Alabama

(see Bd. of Trs. v. Cary, 373 So.2d 841 (Ala. 1979)), where chapter 9 has not only

been authorized but, consistent with constitutional protections for contracts, has

also been used to reduce pensions (see In re City of Prichard, No. 99-13465 (Bankr.

S.D. Ala. Oct. 6, 2000) (Docket No. 123), at pp. 6-7 (order confirming plan of

adjustment reducing all existing and future pension benefits payments by 8.5%)).

As in these cases, the Pensions Clause does not prohibit the State from authorizing

the City to be a debtor under chapter 9.

Indeed, if the mere prospect of impairing pensions in bankruptcy were

enough to violate the Pensions Clause, then the same prospect of impairing

contracts in bankruptcy would be enough to violate the State Contracts Clause (and,

for that matter, the federal Contracts Clause). If that were true, no Michigan

municipality (or any municipality in any other State throughout the nation) could

ever enter chapter 9, where the impairment of contracts is always on the table.

That absurd result proves that the authorization of a chapter 9 case does not equate to an impermissible impairment under the Pensions Clause.

C.   The Pensions Clause Does Not
     Require Chapter 9 Authorization to
     Be Conditioned on the Non-Impairment of Pensions

The Objectors fare no better in their argument that the Pensions Clause allows the State to authorize chapter 9 only on the condition that pensions not be impaired.[26]  Once again, the Objectors cite no authority in support of this novel argument, which has no basis in text or precedent.

To begin,  the only relevant question at the eligibility stage is whether the State has specifically authorized the City "to be a debtor under … chapter [9]." 11 U.S.C. § 109(c)(2).  If the State has granted authorization, it is entirely irrelevant for eligibility purposes whether the State has also purported to impose some further conditions.

Perhaps conceding this point, the Objectors appear to argue that the State has not validly authorized the City to become a chapter 9 debtor because the State violated the Pensions Clause by failing to make the non-impairment of pensions a condition of authorization.[27]  This argument, too, is incorrect.  As we have already seen, the Pensions Clause nowhere mentions bankruptcy in general or chapter 9

---

[26]   See AFSCME Objection, at ¶ 82; UAW Objection, at ¶ 30; Detroit Retirement Systems Objection, at pp. 43-44.

[27]   See AFSCME Objection, at ¶ 82-84; UAW Objection, at ¶ 30.

authorization in particular. It also does not say anything about conditions that must be imposed on the authorization of chapter 9. As discussed above, the Pensions Clause simply has the same effect as the Contracts Clause, which has never been interpreted by any Court to require any conditions on the authorization of chapter 9.

Apparently dissatisfied with the actual wording of the Michigan Constitution, the Objectors base their argument on a constitutional provision of their own imagining. Instead of adhering to the plain terms of the Pensions Clause that require the State to *refrain* from impairing pensions, the Objectors contend that the Pensions Clause should be read to require State officials to take *affirmative steps* to prevent even the possibility of the federal bankruptcy court from impairing pensions in chapter 9. This is not an interpretation of the Pensions Clause but a complete rewriting of it.

Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's *use* of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law. The Bankruptcy Clause of the United States Constitution empowers Congress to "establish … uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. Pursuant to that authority, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy, including

various powers that a municipal debtor may invoke to adjust its debts. Under the Supremacy Clause of the United States Constitution,[28] this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. "The federal bankruptcy power … by operation of the Supremacy Clause, trumps the … state constitution." Stockton, 478 B.R. at 16. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.

In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." In re City of Vallejo, 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009), aff'd sub nom. Int'l Bhd. Of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo), 432 B.R. 262 (E.D. Cal. 2010); see also Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (deviating from federal scheme would "violate the constitutional mandate for uniform bankruptcy laws" by determining creditor

---

[28]    U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

priorities based on factors that vary from state to state).[29]  Thus, a State "must

accept chapter 9 in its totality; it cannot cherry pick what it likes while

disregarding the rest."  Cnty. of Orange, 191 B.R. at 1021; see also Stockton,

478 B.R. at 16 (holding that "[a] state cannot … condition or [ ] qualify, i.e. to

'cherry pick,' the application of the Bankruptcy Code provisions that apply in

chapter 9 cases after such a case has been filed"); Vallejo, 432 B.R. at 267-68

(same); Mission Indep. Sch. Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940)

(same).

For these reasons, the Pensions Clause by its plain terms did not require the

Governor to impose any of the conditions sought by the Objectors, and in any

event, such conditions would be prohibited by federal law.[30]

---

[29]  In establishing uniform bankruptcy laws, it is for Congress to determine how
and whether State law will be incorporated.  See In re Schafer, 689 F.3d
at 611 (noting that Congress "may" incorporate state law in bankruptcy).  In
chapter 9, Congress has chosen to allow state law to govern the question of
whether a municipality is authorized to become a debtor but not to govern
the powers that debtors may invoke to adjust their debts.

[30]  The City raises these arguments not to seek the Court's determination today
whether pension benefits can or should be modified in this case but merely
to respond to the Objectors' argument that the Governor's authorization of
this case must necessarily have placed a condition on the filing.  It need not
have.  It could not have.

In this vein, the Court – consistent with its findings at Section VI of the
Eligibility Scheduling Order – should reject the request that any Order for
Relief require that all actions taken by the Emergency Manager, including
the eventual proposal of a plan of adjustment, "comply with the State

-31-
13-53846-swr    Doc 7804-6    Filed 09/06/14    Entered 09/06/14 13:53:38    Page 42 of 135
13-53846-swr    Doc 8004-6    Filed 10/22/14    Entered 10/22/14 19:59:33    Page 42 of 135
136

## VI. COLLATERAL ESTOPPEL DOES
## NOT PRECLUDE THIS COURT FROM
## DETERMINING THE CITY'S ELIGIBILITY FOR CHAPTER 9

Pointing to the declaratory judgment entered in Webster v. Michigan,

No. 13-734-CZ (Ingham Cnty. Cir. Ct.), certain of the Objectors contend that the

City is barred by collateral estoppel from litigating whether the City's authorization

to file for chapter 9 bankruptcy was valid under the Michigan Constitution.[31]  The

Objectors' collateral estoppel argument fails for numerous reasons.

Collateral estoppel applies only to issues that have been "actually litigated

and determined by a valid and final judgment." Monat v. State Farm Ins. Co.,

677 N.W.2d 843, 845 (Mich. 2004).  But the judgment in Webster was not "valid"

because the state court lacked jurisdiction at the time the judgment was entered.

Under 28 U.S.C. § 1334(a), federal district courts have "exclusive" jurisdiction

over "all cases under title 11."  An essential component of that exclusive

_____

(continued…)

Constitution." See AFSCME Objection, at ¶¶ 82-84.  Such amorphous and premature requests, including requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.

[31]  See Retirement Systems Objection, at pp. 44-58.  The Objectors' resort to collateral estoppel is necessary, of course, because a state trial court's interpretation of state law is not binding on this Court.  See Weisberg v. Powell, 417 F.2d 388, 393 (7th Cir. 1969) ("We are not necessarily bound by the decision of a state trial court on a point of state law where the highest court of the state has not spoken on it.").

jurisdiction is to determine whether a municipality was "specifically authorized …

to be a debtor under [chapter 9] by State law." 11 U.S.C. § 109(c)(2); see also

11 U.S.C. § 921(c) (instructing the court, as part of the bankruptcy case, to

determine whether "the petition … meet[s] the requirements of this title");

Transcript of Hearing, dated July 24, 2013, at pp. 71-72 ("The Court concludes that

the issue of eligibility and each of the elements relating to eligibility are within this

Court's exclusive jurisdiction under 28 U.S.C., Section 1334(a).  Under that statute,

United States District Courts have original and exclusive jurisdiction of all cases

under Title 11, that original and exclusive jurisdiction referred to the Bankruptcy

Courts of each jurisdiction under 28 U.S.C., Section 157.  Our District Court has

referred all matters relating to bankruptcy jurisdiction to the Bankruptcy Court

under Local Rule 83.30. This is not a proceeding within 28 U.S.C., Section 1334,

over which Bankruptcy Courts would have concurrent jurisdiction with the state

courts.").

        In Webster, after the City had already filed the Petition, the state court

purported to determine that the City was not validly authorized to be a debtor

under State law.  See Order of Declaratory Judgment, at 2, Webster,

No. 13-734-CZ (July 19, 2013) (declaring that the State could not "authoriz[e] an

emergency manager … to proceed under Chapter 9 in a manner which threatens to

diminish or impair accrued pension benefits").  By passing judgment on the

validity of the City's authorization to proceed under chapter 9, the <u>Webster</u> court purported to adjudicate an issue that fell squarely within this Court's exclusive jurisdiction. Because the <u>Webster</u> court lacked jurisdiction, the judgment is void. <u>See</u> <u>Twin City Fire Ins. Co. v. Adkins</u>, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.").

Even if the <u>Webster</u> court had been able to exercise jurisdiction over eligibility questions (which it was not), the declaratory judgment in <u>Webster</u> would still be invalid because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code as of the time of the filing of the Petition. The Objectors argue that the automatic stay did not apply to suits against the <u>Webster</u> defendants – the State of Michigan, the Governor, and the Treasurer – until the stay was extended to those defendants on July 25, 2013.[32]

As the City made clear in its motion to extend the automatic stay, certain prepetition lawsuits – including <u>Webster</u> – violated the automatic stay imposed as of the Petition Date to the extent that such suits sought "directly or indirectly to

---

[32]    <u>See</u> Order Extending the Chapter 9 Stay (Docket No. 166); Retirement Systems Objection, at p. 51.

enforce the plaintiffs' claims against the City or to exercise control over the City's property rights, including its powers and rights under chapter 9." Motion of Debtor for Entry of Order Extending the Chapter 9 Stay (Docket No. 56) at p. 15 n.4; see Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.), 423 F.3d 567, 578 (6th Cir. 2005) (holding that "[a]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision") (quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997)). By entering judgment – a day after the Petition Date – declaring that the City's bankruptcy filing was not properly authorized under the Michigan Constitution, the Webster court sought to exercise control over the City's legal and property rights in violation of the automatic stay. Such a judgment is likely void *ab initio* (see Easley v. Pettibone Mich. Corp., 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the [automatic] stay are invalid and voidable and shall be voided absent limited equitable circumstances")) and, thus, would be invalid for purposes of collateral estoppel. See Control Module, Inc. v. Morello (In re Morello), No. 07-02052, 2012 WL 1945509, at *18 (Bankr. D. Conn. May 30, 2012) (holding, where a state court entered a postpetition "supplemental judgment" against a debtor, that "because the Supplemental Judgment was issued after the filing of the Debtor's bankruptcy, the judgment of

the [state] court is void and neither side may claim that the [state] court's finding[s] are entitled to collateral estoppel…..").

Collateral estoppel further fails because the City did not have "a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 845 (quotation marks and alteration omitted). "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts…." Id. at 845 n.2 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 28, at 273 (1982)). The state court in Webster took the unusual step of issuing a final declaratory judgment on an expedited basis after the Petition had already been filed and without the benefit of full briefing on the merits. At the time of the declaratory judgment, the Webster case was little more than two weeks old, and the defendants' briefs had focused mainly on justiciability issues and the preliminary injunction standard rather than the merits of the plaintiffs' arguments. Indeed, the Webster court's failure to provide a well-reasoned explanation for its decision attests to the gross inadequacy of the process afforded to the defendants. Thus, even if (somehow) collateral estoppel otherwise could apply, the abbreviated nature of the proceedings in the state court would warrant a fresh determination of the issue by this Court.

Finally, even if (A) the Michigan state court's postpetition exercise of jurisdiction over Webster had been proper (which it was not), (B) the automatic

13-53846-swr    Doc 8994-6    Filed 09/06/19    Entered 09/06/19 14:59:38    Page 46 of 135

stay did not apply to the Webster litigation (which it did) and (C) the City had a full and fair opportunity to litigate (which it did not), collateral estoppel *still* would not apply because the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants. Collateral estoppel "precludes relitigation of an issue in a different, subsequent action between the same parties or their privies…." Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA, 592 N.W.2d 408, 411 (Mich. Ct. App. 1998). "In its broadest sense, privity has been defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." Sloan v. City of Madison Heights, 389 N.W.2d 418, 422 (Mich. 1986) (internal quotation marks omitted).

The Objectors contend that, although the City was not a party to the Webster litigation, the City was in sufficient privity with the Webster defendants to trigger collateral estoppel,[33] but the Objectors cannot have it both ways. They cannot maintain that there is an *insufficient* identity of interest between the Webster defendants and the City for purposes of the automatic stay but a *sufficient* identity of interest between the two for purposes of collateral estoppel. If there was

---

[33]    The two plaintiffs in Webster are potentially in privity only with the General Retirement System of the City of Detroit, in which they were participants, not with any other Objector. See Complaint, at ¶¶ 2-3, Webster, No. 13-734-CZ (July 3, 2013).

sufficient privity between the City and the <u>Webster</u> defendants for collateral estoppel to apply, then, by necessity, that privity would have triggered the protections of the automatic stay.

## VII.  PA 436 IS CONSTITUTIONAL

The Objectors also claim that PA 436 violates the Michigan Constitution because:  (A) the enactment of PA 436 violated the Pensions Clause by authorizing a chapter 9 filing without prohibiting the impairment of pension obligations therein; (B) PA 436 violates Michigan's home rule doctrine; and (C) PA 436 unconstitutionally delegates power to the Emergency Manager.  PA 436's consistency with the Pensions Clause is addressed at Section V.A *supra*.  The remaining objections to PA 436's constitutionality generally have nothing to do with eligibility, and, where they might, are baseless.

   A.    PA 436 Does Not Conflict with Home Rule and Reflects the
         <u>State Legislature's Power To Address Local Fiscal Emergencies</u>

The home rule provisions of Michigan law give municipalities and their residents rights of self governance by empowering residents to elect their own officials (<u>e.g.</u>, <u>People ex rel. Le Roy v. Hurlbut</u>, 24 Mich. 44, 46-47 (1871)), and by according "the electors of each city" with "the power and authority to frame, adopt and amend [the municipality's] charter."  Mich. Const. art. VII, § 22. The Objectors contend that PA 436 violates home rule provisions by placing the

Emergency Manager in the shoes of local officials and allowing the Emergency

Manager to take actions that are arguably inconsistent with the city's charter.[34]

The Objectors are mistaken. As an initial matter, most of the Objectors'

challenges – such as their concerns about the Emergency Manager's ability to set

budgets and pass ordinances – have nothing to do with the Emergency Manager's

authority to file for chapter 9 and thus need not be addressed here. Moreover, there

is, in fact, no conflict because Detroit's charter recognizes that its provisions are

"subject … to the limitations … imposed by statute." DETROIT CITY

CHARTER § 1-102; see Detroit City Council v. Mayor of Detroit, 770 N.W.2d 117,

124 (Mich. Ct. App. 2009) (recognizing that by its own terms Detroit's Charter

gives way to statutes).

Even if there were a conflict between PA 436 and Detroit's Charter

regarding the Emergency Manager's authority to commence this chapter 9 case,

PA 436 would prevail. "Where a city charter provision conflicts with general

statutory law, the statute controls in all matters which are not of purely local

character." Bd. of Trs. v. City of Detroit, 373 N.W.2d 173, 175 (Mich. Ct.

App. 1985); see also Public Act 279 of 1909, the Home Rule City Act,

MCL § 117.36 ("No provision of any city charter shall conflict with or contravene

the provisions of any general law of the state."). General laws are those capable of

---

[34]     See AFSCME Objection, at ¶¶ 85-94.

covering new localities over time.  See, e.g., Houston v. Governor,

810 N.W.2d 255, 257 (Mich. 2012).

PA 436, including its authorization to file for chapter 9, is most certainly a

general state law.  As the Michigan legislature's findings with respect to the impact

of local financial emergencies on the rest of the State make clear

(MCL § 141.1543), how financially distressed local governments overcome their

situation is decidedly not a matter of "purely local" character or concern.

See, e.g., Brimmer v. Village of Elk Rapids, 112 N.W.2d 222, 226 (Mich. 1961)

(statutes involving municipal utility rates, municipal debt limitations and municipal

tax rates are general rather than purely local).  Indeed, the Michigan Constitution

itself instructs the State legislature to pass "general laws … restrict[ing] the powers

of cities and villages to borrow money and contract debts."  Mich. Const. art. VII,

§ 21.

Nor does temporarily substituting the Emergency Manager for Detroit's

elected officials violate home rule by eliminating Detroit's residents' right to

choose their officials.  "[A] municipal corporation['s] … existence is entirely

dependent on the legislation that created it, and the Legislature that may also

destroy it."  Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,

575 N.W.2d 751, 760 (Mich. 1998).  Accordingly, the Michigan Supreme Court

has long recognized that the legislature must have authority to temporarily replace

local officials when exercising its undisputed power to "supervis[e] and control in matters of municipal regulation." Hurlbut, 24 Mich. at 111 (opinion of Cooley, J.). That is all PA 436 does: it authorizes the Governor to appoint an emergency manager in a fiscal crisis (MCL § 141.1549(1)), but the emergency manager's term ends once the crisis ends or, if he has been in office more than 18 months, if an elected local government votes him out (MCL §§ 141.1549(6)(b), (c)).

B.    PA 436 Does Not Delegate Power to Pass Local Legislation

Article IV, Section 29 of the Michigan Constitution provides that "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable" and that "[n]o local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected." Because PA 436 grants the Emergency Manager authority to adopt local ordinances (MCL § 141.1552(1)(dd)), the Objectors contend it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the State legislature could pass.[35]

Once again, this objection has nothing to do with the City's eligibility for bankruptcy: filing a chapter 9 case is not passing legislation, the only conduct covered by Article IV, Section 29. In any event, Article IV, Section 29 restricts

_____

[35]    AFSCME Objection, at ¶¶ 95-97.

only the State *legislature*; municipalities are free to enact "local" laws as they see fit.  When the Emergency Manager acts, he exercises the *local government's* powers, not the State legislature's, so the legislature did not (and could not) violate Article IV, Section 29 when it enacted PA 436.  <u>See</u>, <u>e.g.</u>, MCL § 141.1552(1)(dd); <u>see</u> <u>also</u> MCL § 141.1552(2) (allowing local leaders to repeal the Emergency Manager's ordinances after his term ends).

      C.    <u>PA 436 Does Not Violate the Non-Delegation Doctrine</u>

      Under Michigan's non-delegation doctrine, the legislature may not task executive officials with formulating "legislative policy" unless the legislature provides "sufficient standards and safeguards" to "check[ ] the exercise of delegated power."  <u>Blue Cross & Blue Shield of Mich. v. Milliken</u>, 367 N.W.2d 1, 27 (Mich. 1985).  The Objectors argue that PA 436 runs afoul of this rule by giving the Emergency Manager authority to act for the City in chapter 9 without providing guidance as to what he should do.[36]

      The Objectors are again mistaken.  First, as explained above, the Emergency Manager exercises the local government's authority, not powers of the State legislature's.  The Emergency Manager acts for the City, not the State.  Thus the anti-delegation principles that govern when the State legislature delegates the State legislature's powers do not apply here.

---

[36]    <u>See</u> AFSCME Objection, at ¶¶ 98-99.

Second, when deciding whether the legislature has provided "reasonably precise" standards (Blue Cross, 367 N.W.2d at 27) in delegating its powers, Michigan courts have emphasized that the statute "must be read as a whole" and "carries a presumption of constitutionality." Id. As a result, the "reasonably precise" test is easy to satisfy (see, e.g., Blue Cross & Blue Shield of Mich. v. Demlow, 270 N.W.2d 845, 854 (Mich. 1978) (approving delegation using a "fair and reasonable" standard)); Mich. State Highway Comm'n v. Vanderkloot, 220 N.W.2d 416, 419 (Mich. 1974) (approving use of eminent domain upon an executive finding of "necessity")).

PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection. It clearly tells the Emergency Manager to look at various possibilities for fixing the City's financial problems and instructs him to recommend bankruptcy only if "no reasonable alternative to rectifying the financial emergency … exists." MCL § 141.1558(1). PA 436 also instructs the Emergency Manager to ameliorate those problems while "assur[ing] the fiscal accountability of the local government and the local government's capacity to provide … necessary governmental services essential to the public health, safety, and welfare." MCL § 141.1549(2).

The Objectors also contend that PA 436 unconstitutionally delegates authority by not providing for judicial review of the Emergency Manager's actions

in bankruptcy.[37]  The Objectors, however, ignore the fact that, in many circumstances, this Court will review actions of the Emergency Manager.[38]  The Objectors argue that the Emergency Manager can escape judicial review because, under 11 U.S.C. § 904, municipalities need not seek court approval of settlements. Yet, if the City does not seek this Court's approval of a particular settlement, that settlement does not escape scrutiny forever:  "the day of reckoning comes at the plan confirmation hearing," where any "untoward settlements" would shed considerable light on whether a cram-down plan "discriminate[s] unfairly," is "fair and equitable," and has been "proposed in good faith."  <u>Stockton</u>, 486 B.R. at 199-200 (quoting 11 U.S.C. § 1129(a)(2), (b)(1)).

In sum, PA 436 neither violates Michigan's home rule doctrine nor unconstitutionally delegates authority to the Emergency Manager.  To the extent, if any, that such claims have anything to do with eligibility, the Objectors' arguments in support of these claims lack merit, and this Court should determine that PA 436 is constitutional.

---

[37]  <u>See</u> AFSCME Objection, at ¶100.

[38]  Whether or not <u>Stern</u> prohibits this Court from considering "freestanding state-law claims," it does not impact this Court's role in implementing provisions of the Bankruptcy Code that may involve determination of state law issues.  <u>See</u> Section II *supra*.

-44-
13-53846-swr    Doc 8004-6    Filed 09/06/19    Entered 09/06/19 14:59:53    Page 55 of 136
13-53846-tjt    Doc 7904    Filed 10/02/14    Entered 10/02/14 11:33:38    Page 54 of 135

# VIII. THE CITY SATISFIES SECTION 109(c)(5) OF THE BANKRUPTCY CODE BECAUSE IT WAS IMPRACTICABLE TO BARGAIN WITH THOUSANDS OF BONDHOLDERS AND OVER 20,000 RETIREES

In the Eligibility Memorandum, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor negotiations. See Eligibility Memorandum, at pp. 40-53. None of the Objectors succeeds in undermining any of the foregoing.

As a threshold matter, certain facts that, by themselves, establish impracticability under section 109(c)(5)(C) of the Bankruptcy Code are ignored by the Objectors. Thousands of separate entities hold the City's billions of dollars in bond debt. For the reasons set forth in the Eligibility Memorandum (i.e., the inability to restructure key terms of the City's bond debt absent unanimous bondholder consent and the lack of any representatives with authority to bind all

such bondholders) (Eligibility Memorandum, at pp. 46-47), negotiations with the City's bondholders were impracticable. No Objection disputes this. Moreover, no holder of bonds has objected to the City's eligibility on the ground that negotiations with bondholders were practicable. These realities demonstrate that the requirements of section 109(c)(5)(C) of the Bankruptcy Code have been met.

Many of the Objectors explicitly or implicitly assert that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied if negotiations with *any* creditor constituency (specifically, the City's retirees) were potentially practicable. This cannot possibly be the law. It would be an absurdity to interpret the phrase "is unable to negotiate with creditors" to mean "[can negotiate with some creditors but] is unable to negotiate with [other] creditors" as there will always be *some* creditor with which a municipality could negotiate.[39] Thus, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with any significant creditor constituency is impracticable. See Vallejo, 408 B.R. at 298 (holding that the impracticability of debtor's negotiations with its unions satisfied section 109(c)(5)(C) of the Bankruptcy Code because "labor costs comprised the

---

[39]    For example, if such an interpretation were credited, a municipality would be required to delay filing its chapter 9 petition while it engaged those creditors with whom it could negotiate despite the facts that (a) negotiations with other creditors were impracticable and (b) the municipality ultimately would have to file and effectively restart the negotiation process.

-46-
13-53846-swr   Doc 8004-6   Filed 09/06/14   Entered 09/06/14 19:53:38   Page 57 of 135
13-53846-swr   Doc 7304-6   Filed 09/06/14   Entered 09/06/14 19:53:38   Page 56 of 135
136

largest slice of Vallejo's budget [and] it would have been futile to negotiate with other creditors without an agreement with the Unions"); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one third of the debtor's total bond debt would have been futile).

In any event, the Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, the RDPFFA and the DRCEA characterize themselves as "the natural representative capable of bargaining on [the retirees'] behalf" and argue that the City's alleged failure to engage the RDPFFA/DRCEA in negotiations forecloses the City's ability to argue that negotiations with its retiree constituency were impracticable. See Retiree Association Objection, at ¶¶ 64-74. The premise that the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct. First, the RDPFFA and the DRCEA are but two of at least five associations purporting to represent City retirees.[40] Neither the RDPFFA nor the DRCEA have any greater claim to being the natural representative of the retirees than any other

---

[40] The Detroit Firemen's Fund Association, the Detroit Police Benefit and Protective Association and the recently-formed Retired Detroit Police Members Association also purport to represent the interests of at least some percentage of the City's retirees.

informal retiree association (and the Retiree Association Objection offers no such reason). Second, neither the RDPFFA nor the DRCEA are "the" anything. They are two separate organizations, and there is no reason to believe that the RDPFFA and the DRCEA will agree on every – or any – relevant issue. Third, the RDPFFA and the DRCEA are not the only entities claiming to be natural bargaining representatives for the City's retirees. The City's unions now claim to be appropriate bargaining representatives for their retirees as well.[41] These competing claims to bargaining authority undermine the RDPFFA/DRCEA's assertion that they are "the natural bargaining representatives" for retirees. Fourth, the Retiree Association Objection concedes that the RDPFFA and the DRCEA lacked – and still lack – the authority to bind the City's retirees. See Retiree Association Objection, at *14 (noting that the RDPFFA and the DRCEA are just now in the process of obtaining proxy forms from their retiree members and have collected only 5,000 such proxies to date (there are over 20,000 retirees and active employees that have vested pension benefits)). RDPFFA/DRCEA's assertion that

---

[41]    See AFSCME Objection, at ¶ 123 (stating that "creditors such as AFSCME and similar union representatives … could have negotiated regarding the largest portion of the City's unsecured debt"); Objection (Docket No. 506) filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), at ¶ 9 (stating that the "UAW is representing the interests of active and retired employees in this case."). As set forth below, these claims are directly at odds with these Objectors' prepetition refusal to negotiate on behalf of retirees.

-48-

13-53846-tjt   Doc 3804-6   Filed 09/02/14   Entered 09/02/14 19:53:38   Page 59 of 135
13-53846-swr   Doc 7984-6   Filed 09/18/14   Entered 09/18/14 19:59:53   Page 59 of 136

they are the "natural representative[s] capable of bargaining on [the retirees']

behalf" cannot be reconciled with their recognition of a lack of legal authority to

bind retirees absent express authorization.  Fifth, even if the RDPFFA and the

DRCEA had been able to bind their retiree members (which they could not), the

associations themselves only purport to represent "approximately 70% of all City

retirees."  Retiree Association Objection, at ¶ 9.  Accordingly, there was no

possibility that negotiations with the RDPFFA and the DRCEA – or, for much the

same reasons, any other party – could have bound the more than 20,000 City

retirees to a proposed restructuring, thus rendering the City's good faith attempt at

such negotiations impracticable.[42]  Finally, even if there were a "natural bargaining

representative" of all retirees, that would still not make negotiations concerning

pension benefits practicable; approximately 8,225 active employees have vested

pension benefits too.  Neither the RDPFFA nor the DRCEA even purports to

represent the interests of these people and it is not clear that active employees

would rely on such representation even if the RDPFFA and DRCEA both declared

that they were "natural representatives of active employees having vested

benefits."

---

[42]  Moreover, the RDPFFA and the DRCEA attended multiple meetings at which the City set forth its restructuring proposals and solicited counter-proposals and other feedback.  Neither the RDPFFA nor the DRCEA responded to any proposals made by the City.

The AFSCME Objection's similar argument that negotiations with "creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt" (AFSCME Objection, at ¶ 123) would have been practicable rewrites the history of those negotiations. In fact, the City *did* reach out to AFSCME and the City's other Unions regarding their willingness to represent the interests of their respective retirees in negotiations over the City's restructuring proposal.

As set forth in the Eligibility Memorandum, *the majority of the Unions either expressly indicated unwillingness or legal inability to represent retirees or neither agreed nor refused to represent retirees*. Only eight Unions (comprising 10 of the City's 47 bargaining units) agreed to represent retirees in connection with the City's restructuring. <u>See</u> Eligibility Memorandum, at p. 51. Notably, both AFSCME and the UAW – each of which filed Objections challenging the impracticability of negotiations with retirees – *expressly declined* to represent retirees.[43] It is difficult to see how it would be practicable for the City to conduct

---

[43] Letter from Edward L. MacNeil, Special Assistant to the President of AFSCME to Brian Easley of Jones Day, dated May 24, 2013 (advising that AFSCME "has no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive." ); Letter from Laurie Townsend Stuart, President of UAW Local 2200, to Brain Easley of Jones Day, dated May 23, 2013 (stating that the UAW would represent the interests only of "current employees" of the local Union); Letter from Robyn Brooks, President of UAW Local 2211, to Brian Easley of Jones Day, dated

negotiations with AFSCME and other Unions that refused to negotiate with the City on retirees' behalf.

Both the AFSCME and the UAW argue that, because the City allegedly made no effort to negotiate with creditors in good faith, the City should not be able to claim that such negotiations were impracticable.[44]  Thus, AFSCME and the UAW essentially argue that, if the City cannot satisfy section 109(c)(5)(B) of the Bankruptcy Code (which requires good faith negotiations with creditor constituencies), then the City cannot satisfy the disjunctive requirement for eligibility set forth in section 109(c)(5)(C) of the Bankruptcy Code either.  Neither the UAW nor AFSCME offer any precedent or citation for this reading of the Bankruptcy Code and the plain meaning of the statute (which connects the clauses of section 109(c)(5) with the word "or") contradicts such a reading.  Indeed, the courts that have considered section 109(c)(5) of the Bankruptcy Code have

--------

(continued…)

> May 22, 2013 (stating that "[t]his Union does not… represent current retirees and has no authority to negotiate on their behalf"); Letter from John Cunningham, International Representative, UAW Region 1, to Brian Easley of Jones Day, dated May 22, 2013 (stating that UAW Local 412 and UAW Local 212 "do not … represent current retirees and have no authority to negotiate on their behalf"), attached hereto, collectively, as Exhibit C.

[44]  AFSCME Objection, at ¶¶ 121-123; UAW Objection, at ¶ 46, n.19 and Public Safety Unions Objection (Docket No. 512), at p. 17 ("It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate….").

determined that it is sufficient for a chapter 9 debtor to demonstrate the existence of one of the four alternatives included in that section.  In re Valley Health Sys., 383 B.R. 156, 162, 163 (Bankr. C.D. Cal. 2008) (noting that "§ 109(c)(5) is written in the disjunctive" and, as such, must be construed "as setting out separate and distinct alternatives;" holding that "[t]here is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case.").

Finally, the argument that the City "manufactured" impracticability through the imposition of artificial time constraints is just false.[45]  If anything, the fact that the City could not delay filing its Petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments.   See Valley Health Sys., 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets.").  That the City's cash was rapidly dwindling and public health and

---

[45]     See Public Safety Unions Objection, at pp. 16-17 ("The difficulty in the negotiation process is the result of an artificial time constraint…. The Court should not find that negotiations were impracticable, because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing.").

safety would have been threatened by any further delay in the filing of the Petition (Eligibility Memorandum, at pp. 52-53), (A) mandated a shorter time frame for determining if good faith negotiations with creditors could generate an agreement capable of implementation outside chapter 9 and (B) is a separate ground showing satisfaction of section 109(c)(5) of the Bankruptcy Code.  They are not reasons for reading that section *out* of the Bankruptcy Code.

For all of the foregoing reasons (and those set forth in the Eligibility Memorandum), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

## IX. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5) OF THE BANKRUPTCY CODE

Numerous objections assert that the City failed to negotiate in good faith with its creditors within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.[46]  The Objections generally sound a common theme:  that the City's restructuring proposals were presented to creditor constituencies at non-interactive

---

[46]  E.g., AFSCME Objection, at ¶¶ 101-114; UAW Objection, at ¶¶ 44-46; Joinder of Local 324, International Union of Operating Engineers as Interested Party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code (Docket No. 484) (stating, without reference to or inclusion of supporting affidavits, that "the City consistently and continuously refused to engage in any bargaining with representatives of Local 324, and presented its proposals only on a 'take it or leave it' basis.").

-53-

13-53846-swr    Doc 8004-6    Filed 09/06/19/14    Entered 09/06/19/14 19:59:38    Page 64 of 135
13-53846-swr    Doc 7304-6    Filed 09/06/14    Entered 09/06/14 19:59:38    Page 63 of 135
136

meetings on a "take it or leave it" basis that precluded any prospect of actual

"negotiation."[47] The Objections' characterization of the discussions initiated by the

City and the multiple meetings that the City conducted with its creditors is false

and misleading. The City did *not* present its restructuring proposal as an

immutable, "take it or leave it" proposition with respect to which the City had no

intention of honestly engaging its creditors. Rather, the evidence demonstrates that

the City (A) actively sought continuing dialogue with, *and counter-proposals from*,

its counterparties but (B) received no concrete proposal or comprehensive

feedback from any Objector prior to the commencement of this case.[48]

---

[47]    See id.

[48]    Also false and misleading is the attempt by certain Objectors to characterize
statements made by the Emergency Manager in connection with the issuance
of his "Financial and Operating Plan," dated May 12, 2013, as having been
made within the context of negotiations with creditors over the restructuring
of their claims. See, e.g., AFSCME Objection, at p.2 (quoting the
Emergency Manager as having stated, on May 12, 2013, that "The public
can comment [on the City's proposed financial restructuring plan], but it is
under the statute, it is my plan and it's within my discretion and obligation to
do it. This isn't a plebiscite, we are not, like, negotiating the terms of the
plan. It's what I'm obligated to do.") (bracketed text in original; emphasis
removed from original). As the Objectors know, the "proposed financial
restructuring plan" addressed by the foregoing quote is not the June 14
Creditor Proposal (i.e., the starting point for creditor negotiations), but a
discrete "Financial and Operating Plan" issued *a month earlier* (which plan
did *not* address the specific treatment of creditors' claims against the City).
As the Objectors also know, the "statute" referenced in the foregoing quote
is not section 109(c)(5)(B) of the Bankruptcy Code, but section 11 of
PA 436. See MCL § 141.1551(2) (requiring an emergency manager to
submit a financial and operating plan 45 days after appointment). Put

As set forth at pages 55-59 of the Eligibility Memorandum, in addition to the June 14 Creditor Meeting (at which the City initially presented its restructuring proposal to all creditors in attendance and answered every question asked), the City held numerous additional meetings with creditors in the weeks prior to the Petition Date. At these meetings (including the City's meetings with its unions and four retiree associations), the City repeatedly stated that it welcomed its creditors' feedback with respect to its proposed restructuring and invited counter-proposals from all parties. E.g., Letter from Brian Easley to James Williams, President, AFSCME, dated June 27, 2013) (the "June 27 Easley Letter") (noting the City's appreciation of questions and input received from AFSCME at the June 20 Union/Retiree Meeting; offering access to City data room; requesting feedback and additional ideas with respect to the City's restructuring proposal), attached hereto as Exhibit D.[49] The City urged that any feedback and/or counter-proposals be

_____

(continued…)

simply, the foregoing quote is *completely unrelated* to the City's negotiations with creditors over the treatment of their claims. The Objectors' flagrant misuse of the Emergency Manager's words out of context speaks volumes about the sincerity of their protests that the City refused to negotiate in good faith.

[49] The complaint that the City refrained from characterizing its discussions with its unions as "negotiations" is a red herring. The City has generally avoided characterizing its meetings and discussions with its unions as formal "bargaining negotiations" to avoid any argument that it has triggered obligations to collectively bargain under Michigan law that are currently

-55-

136

13-53846-swr   Doc 8304-6   Filed 09/02/19   Entered 09/02/19 15:53:38   Page 66 of 135
13-53846-swr   Doc 7904-6   Filed 10/06/14   Entered 10/06/14 15:53:38   Page 66 of 135

consistent with the City's financial condition but otherwise placed no restrictions on the form or substance of any counter-proposal.  See, e.g., id. (requesting "additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations"; offering access to the Data Room and assistance acquiring any additional information); Letter from Evan Miller to Dennis McNamara, President Detroit Fire Fighters Association, et al., dated July 17, 2013 ("We are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze."), attached hereto as Exhibit E.

Accordingly, comparisons between the City's good faith negotiation efforts and the facts of In re Ellicott School Building Authority, 150 B.R. 261 (Bankr. D. Colo. 1992), are inapposite.  The Ellicott court held that, in addition to its failure to satisfy sections 109(c)(1), 109(c)(2), 109(c)(3) and 109(c)(5)(C) of the Bankruptcy Code, the putative debtor failed to satisfy section 109(c)(5)(B) of the Bankruptcy

---

(continued…)

suspended by PA 436.  See MCL § 141.1567(3) ("A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first.").  The City's reticence to jeopardize its legal rights under PA 436, however, does not alter the fundamental character of the meetings conducted by the City (as described herein), nor the fact that its requests for feedback and counter-proposals were unanswered.

Code where (A) its efforts at prepetition negotiation were limited to three public meetings and (B) the debtor conceded that it had presented its proposed plan of restructuring as non-negotiable. Ellicott, 150 B.R. at 266. In this case, however, (A) in addition to the public June 14 Creditor Meeting (i.e., the analogue to the three public meetings held by the Ellicott debtor), the City held numerous, non-public meetings with representatives of creditors, and (B) the City never presented its restructuring proposal as "non-negotiable." Indeed, the City solicited responses and counter-proposals from other parties.

Moreover, it is especially significant that no Objector transmitted a written counter-proposal on any aspect of the City's restructuring proposal. Some of the City's invitations for further dialogue were essentially rebuffed (and in a manner that seemed designed to support a future objection to eligibility rather than actually engage in discussions with the City). See Letter from Steven Kreisberg, Director of Collective Bargaining and Health Care Policy, AFSCME, to Brian Easley, dated July 2, 2013 (meeting the City's request for feedback with respect to its restructuring proposal with a request for further meetings and statements that the City "has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues"), attached hereto as Exhibit F.

Of course, good faith negotiation is a two-way street. All of the City's creditors – including each of the Objectors – had more than a month to provide the

-57-
136

13-53846-swr   Doc 8004-6   Filed 09/06/14   Entered 09/06/14 19:50:53   Page 68 of 135
13-53846-swr   Doc 7304-6   Filed 09/06/14   Entered 09/06/14 19:50:53   Page 67 of 135

City with counter-proposals to, or other ideas concerning, the restructuring plan set out and supported in the June 14 Creditor Proposal. All of those entities had multiple opportunities to meet with the City's representatives to discuss the restructuring proposal and access to the information necessary to formulate an informed response. That none of the Objectors chose to respond to any aspect of the June 14 Creditor Proposal does not render the City's efforts to engage and negotiate with its creditors as having been undertaken in anything other than good faith.

Finally, the Court should reject the argument that the City is unable to satisfy section 109(c)(5)(B) of the Bankruptcy Code unless it can demonstrate that the terms of its restructuring proposal constitute a confirmable plan of adjustment under section 943(b) of the Bankruptcy Code. No Objector cites to any authority that supports this proposition in any way.[50] Consistent with Section VI of the

---

[50]    AFSCME's citation to In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60 (Bankr. D.N.H. 1994), and In re Cottonwood Water & Sanitation District, 138 B.R. 973 (Bankr. D. Colo. 1992), in support of this argument is misleading. Neither of those cases addresses the confirmability of the debtors' proposed restructuring plan within the context of section 109(c)(5)(B) of the Bankruptcy Code at all. Rather, each case requires only that negotiations be based on "some sort of comprehensive plan." Sullivan Cnty., 165 B.R. at 78 (noting that the debtor need not even propose a "formal plan," but finding that debtor's failure to propose *any* plan could not satisfy section 109(c)(5)(B) of the Bankruptcy Code); Cottonwood, 138 B.R. at 978 (addressing the requirements of section 109(c)(5)(B) of the Bankruptcy Code with no reference to whether a proposed plan must satisfy

Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable.

For the reasons set forth above and in the Eligibility Memorandum, the City has satisfied the requirements of section 109(c)(5)(B) of the Bankruptcy Code.

## X.    THE CITY IS INSOLVENT

The Eligibility Memorandum demonstrates that, unfortunately, the City meets all of the disjunctive tests for municipal insolvency contained in section 101(32)(C) of the Bankruptcy Code.  Specifically, the City demonstrated that:  (A) it was not paying its debts as they came due; (B) it was "cash insolvent," "budget insolvent" and "service delivery insolvent;" (C) applicable law does not require it to exhaust all possible opportunities for revenue generation or adopt every conceivable cost-cutting measure prior to seeking relief under chapter 9; (D) it has experienced and, absent restructuring, will continue to experience negative cash flows for years; (E) its revenues cannot be meaningfully increased; and (F) its expenditures cannot be further reduced.  Eligibility Memorandum,

---

(continued…)

confirmation standards).  In re Sanitary & Improvement District, Number 7, 98 B.R. 970 (Bankr. D. Neb. 1989), cited by multiple Objectors on this point, does not address the standards governing eligibility at all.

at pp. 12-35. All of the foregoing is supported by evidence, including the

extensive data contained in or accompanying the Orr Declaration and Malhotra

Declaration.

No Objector challenges any of this with evidence. Indeed, the Objections

offer little more than innuendo and supposition.[51]

For example, multiple Objectors accuse the City of having "deliberately

budgeted and spent itself into insolvency (so as to qualify under § 101(32)(C)(ii)),

when other realistic avenues and scenarios were possible." AFSCME Objection,

at ¶ 137; RDPMA Objection, at p. 22. Of course, no Objection offers any

---

[51]     The City notes that, despite a wealth of financial information having been available to all interested parties for months (e.g., the City's cash flow projections and other financial data were set forth in the June 14 Creditor Proposal and contained in the Data Room (which was accessible to and accessed by many of the Objectors, including AFSCME and the Retirement Systems), none of the Objectors cite any facts already known to support their Objections to insolvency. Although the City is aware that, pursuant to Section VII of the Eligibility Scheduling Order, the Court has permitted discovery with respect to the matter of the City's insolvency, the filing of placeholder objections to insolvency is inconsistent with the direction provided by the Court during a colloquy with the City's counsel at a hearing on August 2, 2013. See Transcript of Hearing, dated August 2, 2013, at pp. 26-27 ("Mr. Bennett: …. We fully understand that facts currently unknown could conceivably surface later, and we would certainly not object if a fact unknown today found its way into a subsequent brief, but we think the August 19th deadline should require and call for an objection – all grounds stated and facts then known to support the objection…. The Court: I agree, counsel. There certainly are circumstances in which the law permits amendments to pleadings. They are limited. They apply here, but as a general matter, the Court wants to set a firm deadline for the filing of objections to eligibility.").

-60-

13-53846-tjt   Doc 8004-6   Filed 09/06/19   Entered 09/06/19 19:53:38   Page 70 of 135
13-53846-swr   Doc 2304-6   Filed 12/19/14   Entered 12/19/14 19:53:38   Page 71 of
136

examples of "realistic avenues and scenarios" that might have allowed the City to have avoided insolvency. The AFSCME Objection essentially recommends a more aggressive approach to the collection of unspecified accounts receivable, and the RDPMA Objection does no more than cite to examples of revenue generation applicable *in an entirely different case*. There is no suggestion how these "realistic avenues and scenarios" might eliminate the negative cash flows identified in the Orr and Malhotra Declarations.

Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. Thus, the data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence.

All Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.

## XI. THE CITY DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

At Section VI of the Eligibility Scheduling Order, this Court determined that, despite the "extraordinary importance of the pension rights of the City's employees and retirees in this case and of how the City will ultimately propose to treat those rights," (A) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and

(B) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4) of the Bankruptcy Code.  Eligibility Scheduling Order, at § VI.

Only two objections – the UAW Objection and the RDPMA Objection – argue that the City does not satisfy section 109(c)(4) of the Bankruptcy Code.[52] Each of these Objections, however, is based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits.  Thus, in light of Section VI of the Eligibility Scheduling Order, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) of the Bankruptcy Code on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum.

## XII.   THE CITY FILED ITS PETITION IN GOOD FAITH

Certain Objectors have challenged the City's Petition on the grounds that it was not filed in "good faith" within the meaning of section 921(c) of the

---

[52]   Three other Objectors – (a) Local 324, International Union of Operating Engineers (Docket No. 484); (b) Local 517M, Service Employees International Union (Docket No. 486); and (c) Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (Docket No. 504) – filed joinders in the UAW Objection, but their Objections do not contain any additional facts related to section 109(c)(4) of the Bankruptcy Code.

Bankruptcy Code.[53]  These challenges generally rely on the following arguments:

(A) the filing of the Petition in advance of a hearing in Michigan state court

requesting a temporary restraining order is evidence of the City's hasty decision to

file the Petition and, thus, of its bad faith (AFSCME Objection, at ¶ 130; RDPMA

Objection, at p.13); and (B) the City never investigated alternatives that might have

avoided the need to file the Petition (AFSCME Objection, at ¶ 131; RDPMA

Objection, at p.13).  Even if taken at face value (which they should not be), neither

of these arguments demonstrate any lack of good faith on the part of the City in

filing the Petition.

---

[53]  The brief attached to the Public Safety Unions Objection (the "Public Safety Unions Brief") states that "[t]his Objection focuses on the requirements of § 109(c)(2) and (5) and the good faith requirement of Section 921(c)." Public Safety Unions Brief, at p. 2.  However, at no point in the Public Safety Unions Objection or the Public Safety Unions Brief is any standard for "good faith" identified or applied to the City's conduct or Petition. Rather, the Public Safety Unions Objection appears to regard an analysis of "good faith" within the meaning of section 921(c) of the Bankruptcy Code as co-extensive with the determination of whether the City has satisfied the eligibility requirements set forth in section 109(c) of the Bankruptcy Code. The Retirement Systems Objection also incorrectly equates these differing standards.  See Retirement Systems Objection, at p.16, n.10 ("While the arguments in this Objection focus on the City's inability to satisfy the eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy Code, the same arguments support a dismissal of the City's petition for lack of good faith."). Because the Public Safety Unions Objection and the Retirement Systems Objection rely on the City's alleged failure to satisfy such requirements as evidence of the City's lack of good faith in filing the Petition, those Objections should be overruled.

The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code.  Stockton, 493 B.R. at 794 (observing that the good faith requirement "serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code."); In re Cnty. of Orange, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) ("[T]he purpose of the filing must be to achieve objectives within the legitimate scope of the bankruptcy laws."); Sullivan Cnty., 165 B.R. at 80 (looking to chapter 11 case law for guidance and stating that "[t]he primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."); Vills. at Castle Rock, 145 B.R. at 81 (good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").

A municipality's good faith "is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9." Stockton, 493 B.R. at 794.  "Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing

are consistent with chapter 9, the extent of the City's prepetition efforts to address

the issues, the extent that alternatives to chapter 9 were considered, and whether

the City's residents would be prejudiced by denying chapter 9 relief." Id.;[54]

see also Cnty. of Orange, 183 B.R. at 608 (applying chapter 11 case law and

finding the debtor's financial condition and motives, local financial realities and

whether the debtor was seeking to "unreasonably deter and harass its creditors or

attempting to effect a speedy, efficient reorganization on a feasible basis" as

relevant factors).

In light of the foregoing, the City's good faith in filing the Petition is

manifest. The City's reasons for filing – to adjust its debts and resolve its liquidity

crises – are perfectly congruent with the rehabilitative purposes of chapter 9.[55]

The Objectors' suggestion that the City's Petition was prompted not by its financial

collapse, but rather by the hurried and urgent need to evade an adverse ruling from

a Michigan state court is wrong as a matter of fact. As the Objectors are aware, the

Emergency Manager had always indicated that the commencement of a chapter 9

---

[54]    Both the AFSCME Objection (at ¶ 128) and the RDPMA Objection (at p.12)
        cite the factors set forth by the Stockton court as the relevant considerations
        under the "good faith" analysis.

[55]    Moreover, the City's financial problems – $18 billion in debt, cash
        insolvency, budget insolvency, service delivery insolvency and the inability
        to either materially increase revenues or slash expenditures – are clearly
        problems of the sort contemplated by chapter 9.

case was an option for the City if its negotiations with creditors regarding an out-of-court restructuring proved impracticable or fruitless. Once the City determined that it was impracticable for the City to negotiate with all of its creditors and achieve a settlement that could be implemented outside of chapter 9 and that some creditors were unwilling to either accept the necessary adjustments to the City's debts or to engage the City at all, a chapter 9 filing became the City's only feasible option. Moreover, the process for authorizing the City's chapter 9 filing had been set in motion in advance of the state court hearing that ostensibly prompted the City's actions. The Emergency Manager sent his written recommendation that the City be authorized to file for chapter 9 relief to the Governor and the Treasurer on July 16, 2013 – two days in advance of the emergency, *ex parte* hearing before the Michigan state court.[56]

Finally, even if the state court hearing were a factor in the timing of the City's Petition, that fact would not render the filing as having been made in bad faith. In re McCurtain Municipal Authority, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), is instructive on this point. In McCurtain, a creditor sought the dismissal of the debtor's petition under section 921(c) of the Bankruptcy Code on the grounds that "the Debtor demonstrated a lack of good

---

[56] Indeed, it seems far more likely that the state court's hearing was prompted by the City's preparations for bankruptcy (which had been reported based upon rumors and anonymous sources in advance of the Petition Date).

faith because its purpose in filing for bankruptcy relief was to avoid the appointment of a receiver." McCurtain, 2007 WL 4287604, at *5. An application for the appointment of a receiver for the debtor had been filed the day before a previously-noticed meeting at which the debtor's board of trustees voted to retain a bankruptcy attorney. Id. The McCurtain court determined that "[w]hile the appointment of a receiver certainly was a concern to the Debtor, it was not the only reason for filing bankruptcy," citing testimony from the chairman of the debtor's board of trustees that the motivation for the filing of the debtor's petition was its economic circumstances (specifically, its inability to pay a large judgment). Id.

The reasoning of the McCurtain court translates to the City's circumstances. Even if the state court hearing were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either (A) the city's primary motivation for commencing this case in light of the City's well-established financial crisis or (B) evidence of any bad faith on the part of the City.

The Objectors' remaining argument – that the City did not adequately explore alternatives to bankruptcy prior to the filing of the Petition – is easily dispatched. The Orr Declaration is filled with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. See Orr Declaration, at ¶¶ 58-73 (describing various measures taken by the City over the past 16 months to address its financial challenges and avoid bankruptcy, including,

but not limited to: the execution of a consent agreement with the State of Michigan and creation of a financial advisory board; employee headcount reductions; reduction of labor costs through the implementation of CETs; the increase of corporate tax rates; and the implementation of tax collection initiatives). The Objections, on the other hand, fail to identify even one unexplored alternative that might demonstrate a lack of good faith on the part of the City.

Finally, there can be no question that the residents of the City would be prejudiced by the dismissal of the Petition. As set forth in the Orr Declaration and the Eligibility Memorandum, the City's ability to provide even the most basic municipal services to its citizens has been crippled by its dire financial circumstances. See Orr Declaration, at ¶¶ 31-44 (describing how acute underfunding of the City's core services has contributed to a violent crime rate that is the highest of any large U.S. city and five times the national average, compromised EMS and fire-fighting capabilities, resulted in a lack of adequate lighting and prevented the city from adequately addressing blight); Eligibility Memorandum, at pp. 2-3, 23-26 (describing how massive debt and other legacy liabilities have prevented the City from adequately addressing shortfalls in its provision of basic services for years, and establishing that the City is "service delivery insolvent").

This chapter 9 case is the City's sole remaining option to address its financial condition and enhance its ability to provide its citizens with core municipal services. As COLLIER ON BANKRUPTCY states:

> For the financially distressed municipality, chapter 9 may be the only forum for protecting the long-term interests of the municipality and its residents…. A finding that a municipality did not file its chapter 9 petition in good faith will result in the municipality's not being able to impair its contractual obligations, and may result in considerable prejudice to the residents of the municipality. Accordingly, a finding that a municipality did not file in good faith should be reserved for those situations in which the evidence is compelling.

6 COLLIER ON BANKRUPTCY ¶ 921.04[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013). Here, the evidence that the City filed the Petition in anything other than good faith is not only not compelling, it is non-existent. The arguments that the City did not file its Petition in good faith should be rejected.

## XIII. NOTICE OF THE DEADLINE FOR OBJECTIONS TO ELIGIBILITY WAS PROPER AND SUFFICIENT

Numerous Objections argue that the notice of the deadline for objections to the Petition and the Statement of Qualifications (the "Eligibility Objection Deadline") – i.e., August 19, 2013 – was inadequate. See, e.g., Objection (Docket No. 384) filed by Krystal Crittendon, at ¶ 8 ("This Notice provides inadequate notice and opportunity to be heard by the date of August 19, 2013 when objections

-69-

13-53846-tjt    Doc 8004-6    Filed 09/06/19    Entered 09/06/19 15:53:38    Page 80 of 136
13-53846-swr    Doc 764    Filed 08/19/14    Entered 08/19/14 15:53:38    Page 99 of 135

may be filed, as the Notice was received less than two (2) weeks before the date by which Objections must be filed.").

All Objections related to the alleged inadequacy of notice of these proceedings should be overruled. A motion setting forth a preliminary timeline for eligibility issues – which schedule proposed a deadline for objections to eligibility that was consistent with the Eligibility Objection Deadline ultimately adopted by the Court – was filed by the City on the day after the Petition Date, and all interested parties had ample opportunity to object. See Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration (Docket No. 18). The order granting that motion (Docket No. 296) (the "Case Commencement Order") established the form of the notice of commencement of this chapter 9 case, which notice (A) conspicuously identified the Eligibility Objection Deadline and (B) was served on all interested parties within three business days of its entry. Certificate of Service re: Documents Served on August 6, 2013 (Docket No. 325).

The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the number and substance of the Objections received. Over 100 parties filed Objections to the Petition and Statement of Qualifications, many

of which are elaborately argued (as indicated above). Accordingly, all interested parties were provided sufficient notice of the Eligibility Objection Deadline, and Objections to any alleged inadequacy of notice should be overruled.

## XIV. CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for Relief in this case.

Dated: September 6, 2013          Respectfully submitted,


 /s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

-72-

13-53846-tjt    Doc 7384-6    Filed 09/06/14    Entered 09/06/14 14:59:38    Page 82 of 135
13-53846-swr    Doc 984-6    Filed 09/19/14    Entered 09/19/14 14:59:38    Page 83 of 136

# EXHIBIT A

13-53846-tjt   Doc 8304-6   Filed 02/19/14   Entered 02/19/14:11:13:38   Page 84 of 135
13-53846-swr   Doc 7804-6   Filed 09/06/13   Entered 09/06/13 19:50:53   Page 93 of 135
136

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Federal Structure Violation | Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling state fiscal self-management, which is an area of exclusive state sovereignty.<br><br>The Supreme Court's justifications for upholding a municipal bankruptcy statute in <u>United States v. Bekins</u>, 304 U.S. 27 (1938), are no longer valid because: (i) a federal municipal bankruptcy statute is no longer necessary to accomplish an adjustment of municipal debts, where states are permitted to pass their own municipal debt adjustment legislation; and (ii) the Supreme Court's development of constitutional federalism doctrine has effectively overruled <u>Bekins</u>.<br><br>Chapter 9 eviscerates the accountability of Michigan to its citizens and creditors.<br><br>Chapter 9's requirement of state consent cannot cure its violation of individual constitutional rights under the Tenth Amendment. | The Supreme Court's decision in <u>Bekins</u> — to uphold the constitutionality of a municipal bankruptcy statute that (i) provided for states to retain control of their fiscal affairs and (ii) constrained the bankruptcy power to cases authorized by state law — remains binding precedent. The Objecting Parties do not point to any change in statutory text that would warrant a different outcome than <u>Bekins</u>, and binding Supreme Court precedent cannot be overruled by mere implication. <u>See</u> Reply, at § III.A.<br><br>Subsequent legal developments have not undermined the <u>Bekins</u> decision, the soundness of its reasoning or the constitutionality of chapter 9. States are not at liberty under the Contracts Clause of the United States Constitution to impair their own contracts. States must seek the aid of federal bankruptcy courts to impair contracts by authorizing chapter 9. In making the decision to do so, states exercise their sovereignty rather than relinquish it. Once a state authorizes a municipality to proceed under chapter 9, the bankruptcy court's powers are designed to preserve the state-federal relationship and prohibit intrusion on the state's core functions. <u>See</u> Reply, at § III.B.<br><br>Chapter 9 relies on state law for determining which municipalities are authorized to seek bankruptcy protection. Although this rule may result in differences in and among states, the rule itself is "uniform throughout the United States," such that chapter 9 does not violate the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution. <u>See</u> Reply, at § III.B. |

| Term | Description | City's Response |
|---|---|---|
| Lack of Jurisdiction: <u>Stern</u> | The Bankruptcy Court lacks jurisdiction to decide whether chapter 9 violates the United States Constitution as a result of <u>Stern v. Marshall</u>. | The Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. As the Supreme Court made clear in <u>Stern</u>, non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights." Included within the category of "public rights" are cases that "can be pursued only by grace of the other branches" of the federal government. Here, the City's ability to adjust its debts in a federal bankruptcy case is only possible because Congress enacted the Bankruptcy Code and, thus, this case involves "public rights." As such, <u>Stern</u> poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9. <u>See</u> Reply, at § II. <br><br>The argument that the Court is powerless to rule on certain *objections* to the City's eligibility that involve federal or state constitutional questions would constitute a radical expansion of <u>Stern</u> that is unsupported by that case or any subsequent authority. Under <u>Stern</u>, while state law actions independent of the federal bankruptcy law cannot be decided by the bankruptcy courts, federal claims stemming from the bankruptcy itself can be. Here, there are no state or federal constitutional *claims* before the Court; what is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself." Thus, <u>Stern</u> simply is not implicated by the Objectors' constitutional arguments against eligibility. <u>See</u> Reply, at § II. |

CLI-2134971v8

# Non-Individual Objections to Eligibility, Summary of Arguments Set Forth Therein and City's Responses

| Term | Description | City's Response |
|------|-------------|-----------------|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(2)** | | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." <br><br> This includes arguments that: <br><br> • The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights; <br><br> • The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly; <br><br> • The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and <br><br> • The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that: <br><br>    ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law; <br><br>    ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A. <br><br> The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B. <br><br> When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B. <br><br> The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

CLI-2134971v8

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

-4-

CLI-2134971v8

13-53846-tjt    Doc 3004-6    Filed 02/19/14    Entered 02/19/14 11:13:38    Page 88 of 135
13-53846-swr    Doc 7804    Filed 09/06/19    Entered 09/06/19 19:59:53    Page 87 of 135
136

| TERM | DESCRIPTION | CITY'S RESPONSE |
|------|-------------|-----------------|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This include arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. <u>See</u> Reply, at § V.C. |

-5-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. See Reply, at § VII.C. |

CLI-2134971v8

| Term | Description | City's Response |
|------|-------------|-----------------|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. See Reply, at § X. |
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(4)** | | |
| Desires to Effect a Plan to Adjust Debts | The City has not satisfied section 109(c)(4) of the Bankruptcy Code — which requires the debtor to desire to effect a plan to adjust its debts — because the City has proposed a restructuring plan that cannot be confirmed under section 943(b)(4) of the Bankruptcy Code, which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." | At Section VI of the Eligibility Scheduling Order, the Court determined that (i) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and (ii) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4). The Objections that argue that the City does not satisfy section 109(c)(4) are based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits. Thus, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum. See Reply, at § XI. |

-7-

CLI-2134971v8

13-53846-tjt Doc 8804-6 Filed 02/19/14 Entered 02/19/14 11:53:38 Page 91 of 135<br>13-53846-swr Doc 7934-6 Filed 09/06/13 Entered 09/06/13 15:59:53 Page 90 of 135
136

| Term | Description | City's Response |
|---|---|---|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

| Term | Description | City's Response |
|---|---|---|
| Negotiations Not Impracticable | The City has not satisfied section 109(c)(5)(C) of the Bankruptcy Code because the City has not proven that it was unable to negotiate with creditors because such negotiation is impracticable.<br><br>This includes arguments that:<br><br>• The proper standard is whether there is a "natural representative capable of bargaining" on a creditor's behalf (not whether a party can bind creditors); that the City's retiree associations are such natural representatives; and that the City cannot argue that it would have caused extreme and unreasonable difficulty to engage in negotiations with such associations;<br><br>• The City predetermined that negotiations would fail and should not be able to claim that negotiations were impracticable where it had no sincere intent to negotiate and the time for negotiations was limited;<br><br>• The City has in the past negotiated for retiree health and pension benefits outside of a chapter 9 proceeding; and<br><br>• The City created an impediment to negotiations based on the artificial time constraint created by the filing on July 18. | The Objectors have not succeeded in undermining the City's showing that it has satisfied section 109(c)(5)(C) of the Bankruptcy Code.<br><br>The Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, even if the City's retiree associations are the "natural representatives of retirees" (which is incorrect), they cannot bind the City's 20,000 plus retirees, rendering the City's good faith attempt at such negotiations impracticable.<br><br>The City could not have conducted practicable negotiations with its unions where only 8 unions (comprising 10 of the City's 47 bargaining units) agreed to represent their retirees in connection with the City's restructuring and many unions expressly declined to represent their retirees.<br><br>Section 109(c)(5) is written in the disjunctive, such that section 109(c)(5)(C) (regarding impracticability) can be satisfied even if section 109(c)(5)(B) (regarding good faith negotiations) is not. Section 109(c)(5)(C) can be satisfied even if negotiations with certain creditors, such as retirees, are potentially practicable.<br><br>The argument that the City manufactured impracticability through the imposition of artificial time constraints also fails. To the contrary, the fact that the City could not delay filing its petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments. See Reply, at § VIII. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. See Reply, at § XII. |
| **ARGUMENTS RELATING TO 11 U.S.C. § 943** | | |
| Best Interests of Creditors | The City's proposed restructuring plan could not be confirmed pursuant to the "best interests of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code and, thus, the City has failed to satisfy section 109(c)(5)(B). | No Objector cites to any authority that supports this proposition in any way. Consistent with Section VI of the Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable. See Reply, at § IX. |

13-53846-tjt    Doc 8004-6    Filed 09/06/19    Entered 09/06/19 11:13:38    Page 94 of 135
13-53846-swr    Doc 7384-6    Filed 09/13/14    Entered 09/13/14 15:59:53    Page 93 of 135
136

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Unconfirmable Plan | The City's proposed restructuring plan cannot be confirmed under section 943(b)(4) of the Bankruptcy Code — which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan" — such that the City has failed to satisfy either section 109(c)(2) or (c)(5) of the Bankruptcy Code. | Requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.  See Reply, at § V.C. |
| | **OTHER ARGUMENTS** | |
| Collateral Estoppel | Collateral estoppel precludes the City from relitigating the issue of whether the City received valid authorization from the Governor to commence the chapter 9 case because that issue has already been litigated and a declaratory judgment rendered.  This includes arguments that (a) the declaratory judgment entered in the state court Webster litigation is entitled to full faith and credit; (b) the preclusive effect of the declaratory judgment is governed by Michigan law; and (c) the elements for collateral estoppel under Michigan law are satisfied. | Collateral estoppel applies only to issues that have been "actually litigated and determined by a valid and final judgment."  The Webster court exceeded its jurisdiction by entering its declaratory judgment after the commencement of the City's case because the Bankruptcy Court has original and exclusive jurisdiction over the case, including questions related to eligibility.  As such, the declaratory judgment is void and not "valid" for purposes of collateral estoppel.  In any event, the declaratory judgment in Webster is void ab initio and not "valid" for purposes of collateral estoppel because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code.  In addition, other elements of collateral estoppel are not satisfied.  The City did not have a full and fair opportunity to litigate the issue where the declaratory judgment was issued on an expedited basis, and the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants.  See Reply, at § VI. |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 438; 453 (Notice of Constitutional Challenges); 505 (Corrected Motion); 509 (Corrected Kreisburg Declaration) | Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("AFSCME") | • Federal Structure Violation (¶¶ 40-62).<br>• Lack of Jurisdiction (¶¶ 67-71).<br>• Governor's Authorization Invalid (¶¶ 75-84).<br>• PA 436 Unconstitutional (¶¶ 85-100).<br>• No Good Faith Negotiations (¶¶ 101-108).<br>• Unconfirmable Plan (¶¶ 109-110).<br>• Best Interests of Creditors (¶ 111).<br>• Negotiations Not Impracticable (¶¶ 115-123).<br>• Filing Not in Good Faith (¶¶ 124-131).<br>• Reserves the right to argue Insolvency (¶¶ 132-140). | • See Reply, at §§ III (Federal Structure Violation); II (Lack of Jurisdiction); V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Unconfirmable Plan); IX (Best Interests of Creditors); VIII (Negotiations Not Impracticable); XII (Filing Not in Good Faith). |
| 481 | Attorney General Bill Schuette | • Concedes that the City is eligible to be a chapter 9 debtor, but argues that the City remains subject to the Michigan Constitution (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 5-19). | • See Reply, at § V.C (Michigan Law Not Preempted). |
| 482 | Association of Professional and Technical Employees | • PA 436 Unconstitutional.<br>• Insolvency.<br>• Michigan Law Not Preempted.<br>• Wages and fringe benefits are subject to collective bargaining according to state and federal labor laws. | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); X (Insolvency); V.C (Michigan Law Not Preempted). |

-12-

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 484 | Local 324, International Union of Operating Engineers | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 486 | Local 517M, Service Employees International Union | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • See Response to UAW's Objection; AFSCME's Objection. |
| 497; 502 (502 appears to be duplicative of 497) | Retired Detroit Police & Fire Fighters Association ("RDPFFA"); Donald Taylor, individually and as President of RDPFFA; Detroit Retired City Employees Association ("DRCEA"); Shirley V. Lightsey, individually and as President of DRCEA | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 31-50).<br>• Insolvency (¶¶ 51-57).<br>• No Good Faith Negotiations (¶¶ 58-63).<br>• Negotiations Not Impracticable (¶¶ 63-74). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 506 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 16-34, 40).<br>• Michigan Law Not Preempted (¶¶ 35-39).<br>• Desires to Effect a Plan to Adjust Debts (¶¶ 41-42).<br>• Filing Not in Good Faith/No Good Faith Negotiations (¶¶ 43-47).<br>• Negotiations Not Impracticable (¶ 46, n.19). | • See Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); XII (Filing Not in Good Faith); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 512 | Detroit Fire Fighters Association; Detroit Police Officers Association; Detroit Police Lieutenants & Sergeants Association; Detroit Police Command Officers Association | • Emergency Manager's Commencement Invalid (Brief at pp. 3-8).<br>• Filing Not in Good Faith (Brief at pp. 4-5, 18).<br>• Unconfirmable Plan (Brief at pp. 4-6).<br>• No Good Faith Negotiations (Brief at pp. 8-16).<br>• Negotiations Not Impracticable (Brief at pp. 16-18). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); XII (Filing Not in Good Faith); V.C (Unconfirmable Plan); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 514 | Center for Community Justice and Advocacy | • Emergency Manager's Commencement Invalid (¶¶ 13-14).<br>• Michigan Law Not Preempted (pp. 7-12).<br>• Alternatively, PA 436 Unconstitutional (pp. 12-13). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); V.A, VII (PA 436 Unconstitutional). |
| 517 | Michigan Auto Recovery, Inc. | • No Good Faith Negotiations (¶¶ 3-5). | • <u>See</u> Reply, at § IX (No Good Faith Negotiations). |
| 519 | Police and Fire Retirement System of the City of Detroit; General Retirement System of the City of Detroit | • Michigan Law Not Preempted (pp. 19-25).<br>• Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (pp. 27-43).<br>• Alternatively, PA 436 Unconstitutional (pp. 43-44).<br>• Collateral Estoppel (pp. 44-58).<br>• No Good Faith Negotiations/Negotiations Not Impracticable (pp. 59-61). | • <u>See</u> Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional); VI (Collateral Estoppel); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

CLI-2134971v8

## Non-Individual Objections to Eligibility, Summary of Arguments Set Forth Therein and City's Responses

| Objection Docket No(s) | Objector(s) | Summary Of Arguments | City Response |
|---|---|---|---|
| 520 | Retired Detroit Police Members Association | • PA 436 Unconstitutional (pp. 9-10).<br>• Emergency Manager's Commencement Invalid (pp. 10-11).<br>• Governor's Authorization Invalid (pp. 11-12).<br>• Filing Not in Good Faith (pp. 12-13).<br>• Michigan Law Not Preempted (pp. 14-19).<br>• Desires to Effect a Plan to Adjust Debts (pp. 18-19).<br>• No Good Faith Negotiations (pp. 13, 19-22).<br>• Insolvency (pp. 22-23). | • <u>See</u> Reply, at §§ V.A, VII (PA 436 Unconstitutional); V, VII.A (Emergency Manager's Commencement Invalid); V (Governor's Authorization Invalid); XII (Filing Not in Good Faith); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); IX (No Good Faith Negotiations); X (Insolvency). |
| 660 | St. Martins Cooperative | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 665). |

CLI-2134971v8

# EXHIBIT B

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | | |
| Due Process | The notice of the commencement of the City's bankruptcy case (the "Case Commencement Notice") did not provide adequate notice or opportunity to be heard. | The Case Commencement Notice conspicuously identified the Eligibility Objection Deadline and, consistent with the Case Commencement Order, was served on all interested parties within three business days of its entry. The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the fact that over 100 parties filed Objections to the Petition and Statement of Qualifications, many of which are elaborately argued. See Reply, at § XIII. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(2)** | | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."<br><br>This includes arguments that:<br><br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights;<br><br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly;<br><br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and<br><br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that:<br><br>   o Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law;<br><br>   o Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B.<br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B.<br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

CLI-2136816v4

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This includes arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. <u>See</u> Reply, at § V.C. |

-4-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the Legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. <u>See</u> Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. <u>See</u> Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manger to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. <u>See</u> Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. <u>See</u> Reply, at § VII.C. |

CLI-2136816v4

# Individual Objections to Eligibility, Summary of Arguments Set Forth Therein & City's Response

| Term | Description | City's Response |
|------|-------------|-----------------|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. See Reply, at § X. |
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

-6-

CLI-2136816v4

13-53846-swr    Doc 8064-6    Filed 09/06/13    Entered 09/06/13 19:59:38    Page 106 of 135
13-53846-swr    Doc 8004-6    Filed 02/19/14    Entered 02/19/14 11:13:38    Page 105 of 135
136

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. _See_ Reply, at § XII. |
| **OTHER ARGUMENTS** | | |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 335 | Lou Ann Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 337 | Michael K. Pelletier | • Michigan Law Not Preempted. | • <u>See</u> Reply, at § V.C. |
| 338 | Regina G. Bryant | • As a property owner, objects to changes in tax status, any property value changes, and any deterioration or privatizing of City services. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 339 | Regina G. Bryant | • Seeks reinstatement of position with DWSD and full salary restoration, with sick and vacation time, for the period March 1, 2010 to August 31, 2013. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 388 | Michael G. Benson | • Insolvency.<br>• Michigan Law Not Preempted.<br>• Asserts that bankruptcy case illegal and morally wrong. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted).<br>• Objection that chapter 9 filing morally wrong does not address eligibility of City to be a chapter 9 debtor. |
| 398 | Karl E. Shaw | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |
| 401 | Olivia Gillon | • Insolvency.<br>• Michigan Law Not Preempted. | • <u>See</u> Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 402 | Russ Bellant | • Objects to the transfer of the Public Lighting Department to a private party.<br>• Due Process. | • Objection to transfer of PLD does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 405 | Russ Bellant | • Objects to the outsourcing of the City's waste removal services.<br>• Due Process. | • Objection to outsourcing of waste removal services does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 411 | William Curtis Walton | • Michigan Law Not Preempted (¶¶ 1-5).<br>• No Good Faith Negotiations (¶ 6).<br>• Emergency Manager's Commencement Invalid (¶ 7). | • See Reply, at §§ V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations); V, VII.A (Emergency Manager's Commencement Invalid). |
| 412 | Dwight Boyd | • Insolvency. | • See Reply, at § X. |
| 415 | Mary W. Dugans | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 417 | William D. Ford | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 418 | Stephen Johnson | • Michigan Law Not Preempted.. | • See Reply, at § V.C. |
| 426 | Kwabena Shabu | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• See also Response to all other Objections. |

CLI-2136816v4

13-53846-swr Doc 3054-6 Filed 02/19/14 Entered 02/19/14 11:13:38 Page 109 of 135
13-53846-swr Doc 765-6 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 109 of 135
136

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 435 | Sylvester Davis | • Emergency Manager's Commencement Invalid. | • <u>See</u> Reply, at § V, VII.A. |
| 446 | Dennis Taubitz | • Due Process (pp. 1-3).<br>• Insolvency (pp. 3-4).<br>• No Good Faith Negotiations (pp. 4-5). | • <u>See</u> Reply, at §§ XIII (Due Process); X (Insolvency); IX (No Good Faith Negotiations). |
| 448 | David Dye | • Insolvency (pp. 1-2).<br>• Swap contracts not valid (p. 2).<br>• PA 436 Unconstitutional (p. 3).<br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City (p. 3).<br>• Michigan Law Not Preempted (pp. 3-4).<br>• No Good Faith Negotiations (p. 4). | • <u>See</u> Reply, at §§ X (Insolvency); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations).<br>• Allegations of fraud related to interest rate swap contracts (which fraud allegedly renders such contracts invalid) are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br>• The Emergency Manager's alleged conflict of interest is (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 459 | Phebe Lee Woodberry | • Michigan Law Not Preempted.<br>• Asserts that City holds in escrow an undisclosed amount of money for its taking of her apartment using its power of eminent domain. | • <u>See</u> Reply, at § V.C (Michigan Law Not Preempted).<br>• Issues related to funds allegedly held by City in connection with alleged eminent domain proceeding are unrelated to the City's eligibility to be a chapter 9 debtor. |

-10-

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 460; 491 (Corrected) | Charles D. Brown | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• <u>See</u> <u>also</u> Response to all other Objections. |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 461 | Thomas Stephens | <ul><li>Due Process (¶ 2).</li><li>Seeks a stay of the bankruptcy case and suggests that the Court formally request expedited consideration of all pending litigation raising legal and constitutional challenges to PA 436 (¶¶ 3-6).</li><li>Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City. Emergency Manager and Jones Day are acting in their private interests rather than the interest of the City (¶¶ 8, 12).</li><li>City and its professionals have violated the First Amendment in connection with public informational meetings held in April and June of 2013 (¶ 9).</li><li>PA 436 Unconstitutional (¶¶ 10-12, 14).</li><li>PA 436 abridges citizens' rights to engage in core First Amendment activities (¶ 13).</li><li>Michigan Law Not Preempted (¶ 10).</li><li>This court lacks jurisdiction to enter final orders implicating constitutionality of PA 436 (¶ 14).</li></ul> | <ul><li>Argument that chapter 9 case should be stayed pending the resolution of state court litigation challenging authority of Governor and Emergency Manager should be overruled. Only state court litigation identified by Objector (a) is subject to the automatic stay pursuant to (i) sections 362 and 922 of the Bankruptcy Code and (ii) this Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities and (b) has been administratively closed by the relevant state court. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility.</li><li>The Emergency Manager's/Jones Day's alleged conflicts of interest and alleged actions in their private interests are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.</li><li>Allegations of violations of First Amendment rights are framed generically and are not supported by any specific instance of such a violation.</li><li>See Reply, at §§ XIII (Due Process); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted).</li></ul> |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 472 | Alice R. Pruitt | • PA 436 Unconstitutional.<br>• No Good Faith Negotiations.<br>• Michigan Law Not Preempted.<br>• Emergency Manager's Commencement Invalid.<br>• Insolvency. | • <u>See</u> Reply, at §§ V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency). |
| 474 | Linda Bain | • Asserts that (a) the Emergency Manager's priority will be to sell Detroit's "precious and valuable assets" to stakeholders who have "illegally set up the emergency management operations"; and (b) the Emergency Manager is not going to address the inadequacy of the various City services in the bankruptcy case. | • Objector's allegations of bad faith and illegality on the part of the Emergency Manager, the Governor and the Treasurer are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 477 | Lucinda J. Darrah | • Objects to alleged secured status of "predatory and criminal acting" banks (p. 1).<br>• Michigan Law Not Preempted (p. 2).<br>• Objects to potential privatization of PLD (p. 3). | • Secured status of institutional creditors and potential privatization of PLD unrelated to City's eligibility to be a chapter 9 debtor.<br>• <u>See</u> Reply, at § V.C (Michigan Law Not Preempted). |
| 489 | Timothy King | • Emergency Manager's Commencement Invalid.<br>• PA 436 Unconstitutional. | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional). |

-13-

CLI-2136816v4

13-53846-swr    Doc 8004-6   Filed 09/06/13 / 02/19/14   Entered 09/06/13 / 02/19/14 19:59:53 / 11:53:38   Page 113 / 112 of 135 / 136

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 490 | Jo Ann Watson | • Governor's Authorization Invalid.<br>• PA 436 Unconstitutional.<br>• Michigan Law Not Preempted.<br>• Reserves the right to join in "the objections raised by others which are relevant to my specific objection or this matter in general." | • Objector's unsupported argument that the Bankruptcy Code requires that "local elected officials" commence any municipal bankruptcy is contrary to the plain language of section 109(c)(2) of the Bankruptcy Code and applicable case law.<br>• Objector's argument that PA 72 was invalid at the time of the Emergency Manager's appointment is false, unsupported and contrary to applicable case law.<br>• See Reply, at §§ V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted). |
| 492 | Cynthia Blair | • Due Process.<br>• Emergency Manager's Commencement Invalid.<br>• Michigan Law Not Preempted.<br>• Objects to the assertion that pensions are underfunded.<br>• Insolvency.<br>• No Good Faith Negotiations. | • See Reply, at §§ XIII (Due Process); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); X (Insolvency); IX (No Good Faith Negotiations).<br>• Challenge to underfunding amount of pensions unrelated to City's eligibility to be a chapter 9 debtor. |

CLI-2136816v4

13-53846-swr   Doc 8004-6   Filed 12/19/14   Entered 12/19/14 11:13:38   Page 114 of 135
136
13-53846-swr   Doc 785-1   Filed 09/06/13   Entered 09/06/13 15:55:53   Page 115 of 135

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 493 | James Thomas McBride, filing as The Chair of Saint Peter | • Insolvency.<br>• Asserts that: (a) the 300 year old "City of Detroit" is solvent, but the 80 year old legal fiction "The City of Detroit" is intentionally insolvent; (b) the "petition" is "intentionally confusing and misleading" and contains words with "diabolically opposed meanings;" (c) the City has tricked people into pledging their property as collateral, which has fraudulently converted the "true Creditors" into debtors, reducing the creditors to the status of insolvent paupers with no rights; and (d) the City holds "private matching funds" and refuses to execute the set off of debt for the settlement and closure of the accounts to return the City to solvency. | • See Reply, at § X (Insolvency).<br>• Allegation that "petition" is "intentionally confusing and misleading" unrelated to City's eligibility to be a chapter 9 debtor. Objector also fails to (a) specify which document filed by the debtor is "confusing and misleading;" and (b) comprehensibly explain how certain words in the referenced document have "diabolically opposed meanings."<br>• Allegations that (a) the City has tricked people into pledging their property as collateral; and (b) the City refuses to apply "private matching funds" to set off its debts are non-specific, factually unfounded and unrelated to the City's eligibility to be a chapter 9 debtor. |
| 494 | Gretchen R. Smith | • Emergency Manager's Commencement Invalid.<br>• No Good Faith Negotiations. | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); IX (No Good Faith Negotiations). |
| 495 | David Sole | • Emergency Manager's Commencement Invalid (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 8-11). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted). |
| 496 | Floreen Williams | • PA 436 Unconstitutional. | • See Reply, at §§ V.A, VII. |

-15-

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 504 | Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman | • Joinder in UAW's Objection (Docket No. 506) (¶¶ 9-10).<br>• Michigan Law Not Preempted / Governor's Authorization Invalid (¶¶ 11-18). | • See Response to UAW's Objection.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid). |
| 510 | Michael Joseph Karwoski | • Objects to the "inclusion" of GRS in these proceedings without an objective determination of the extent to which GRS is underfunded (¶ 1).<br>• Michigan Law Not Preempted (¶ 2).<br>• Emergency Manager's Commencement Invalid (¶¶ 3-11). | • Extent to which GRS is underfunded is unrelated to City's eligibility to be a chapter 9 debtor.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid). |
| 513 | Heidi Peterson | • No Good Faith Negotiations (¶ 11(a), (c)).<br>• The City's dealings with Ms. Peterson with respect to her pending lawsuit were fraudulent (¶ 11(b)).<br>• The City allowed itself to become overburdened with debt "by virtue of down right idiotic business practices" (i.e., policies regarding the assessment and collection of property taxes) (¶ 12). | • See Reply, at § IX (No Good Faith Negotiations).<br>• Objector fails to substantiate vague allegation that the City's failure to negotiate with the Objector prior to filing for bankruptcy protection constituted fraud. Challenged City actions were the result of the imposition of the automatic stay.<br>• City policies relating to the assessment and collection of property taxes unrelated to City's eligibility to be a chapter 9 debtor. |
| 530 | Diane Hutchersun | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 532 | Andrea Edwards | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 534 | Nettie Reeves | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 536; 568 (Order Denying Motion for Extension of Time) | Richard Johnson El-Bey | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 539 | Charles E. Chatman | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 541 | Xylia Hall | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 549 | Michael D. Jones | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 565 | Hassan Aleem; Carl Williams | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 633 | Donald Richardson | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 650 | Alma Armstrong | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 672). |
| 651 | Brenda Taylor | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 664). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 667 | Josué Zizi | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 674). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 384; 385; 386; 387; 389; 390; 391; 392; 393; 394; 395; 396; 397; 399; 400; 403; 404; 407; 408; 409; 413; 414; 416; 419; 420; 421; 422; 423; 425; 427; 428; 429; 430; 431; 432; 433; 436; 437; 439; 440; 442; 443; 444; 447; 451; 454; 455; 456; 457; 458; 462; 463; 464; 465; 466; 467; 468; 469; 470; 475; 479; 480; 485 | Krystal A. Crittendon; Michael J. Abbott; Donald Glass; Calvin Turner; Joseph H. Jones; Tracey Tresvant; Charles Williams II; Joyce Davis; David Bullock; Lewis M. Dukens; Shirley Tolliver; Zelma Kinchloe; LaVern Holloway; Althea Long; Alma Cozart; Lorene Brown; Helen Powers; Preston West; Claudette Campbell; Raleigh Chambers; Johnnie R. Carr; Elmarie Dixon; Jacqueline Esters; Sallie M. Jones; Larene Parrish; Deborah Pollard; Samuel L. Riddle; Charles Taylor; Edward Lowe; Keetha R. Kittrell; Lorna Lee Mason; Ulysses Freeman; William Davis; Paulette Brown; Jerry Ford; William L. Howard; Frank M. Sloan, Jr.; Joann Jackson; Jean Vortcamp; Mary Diane Bukowski; William Hickey; Michael D. Shane; Judith West; Lucinda J. Darrah; Sheilah Johnson; Leola Regina Crittendon; Angela Crockett; Dolores A. Thomas; Ailene Jeter; Cheryl Smith Williams; Aleta Atchison-Jorgan; Arthur Evans; Horace E. Stallings; Lavarre W. Greene; Leonard Wilson; Rakiba Brown; Roosevelt Lee Sr.; Sandra Caven; Deborah Lela Moore; Marzelia Taylor; Fraustine Williams; Randy R. Beard; Anthony G. Wright, Jr. | • "Form" objections entitled "Objections to the Petition Filed by One Kevyn D. Orr Seeking to Commence a Case Under Chapter 9 of Title 11 of the United States Code on Behalf of the City of Detroit, Michigan," into which creditors insert their name and date of birth and the date on which they received the Case Commencement Notice.<br><br>• Due Process.<br><br>• Seek a stay of the bankruptcy case pending the resolution of all litigation raising legal and constitutional challenges to PA 436. | • <u>See</u> Reply at § XIII (Due Process).<br><br>• Argument that chapter 9 case should be stayed pending the resolution of all litigation raising legal and constitutional challenges to PA 436 should be overruled. The state court lawsuits referenced by Objectors are subject to the automatic stay pursuant to (a) sections 362 and 922 of the Bankruptcy Code and (b) the Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility. |

# **EXHIBIT C**

13-53846-tjt   Doc 8004-6   Filed 02/19/14   Entered 02/19/14 11:13:38   Page 120 of 135
13-53846-swr   Doc 761   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 119 of 135
136



**MICHIGAN COUNCIL 25**
American Federation of State, County, and Municipal Employees, AFL-CIO
Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226
Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

**Albert Garrett**
*President*

**Lawrence A. Roehrig**
*Secretary-Treasurer*

**Executive Board**

Sylvester Austin
*Region 2*

Carlos Bass
*Region 3*

David Brandt
*Region 9*

Donna Cangemi
*Region 3*

Susan Christensen
*Region 11*

Sandra Crayton
*Region 6*

Barbara Dauble
*Region 3*

Lorna Davison
*Region 2*

Jonathan Drake
*Region 2*

Caryette Fenner
*Region 4*

Michael Harris
*Region 1*

Bennette Henley
*Region 1*

Lorraine Jacobson
*Region 10*

Keith January
*Region 1*

Laura Kinch
*Region 6*

Arlean King
*Region 1*

J. Phil McGuire
*Region 2*

Phyllis McMillon
*Region 1*

Dennis Moore
*Region 7*

Sam Muma
*Region 6*

Doug Murch
*Region 5*

Lois Murray
*Region 3*

Stephanie Nahas
*Region 3*

Dennis Overmyer
*Region 7*

Gloria Peterson
*Region 4*

Patricia Ramirez
*Region 6*

James Rhodes, Jr.
*Region 5*

Roger Rice
*Region 1*

Ronnie Skorupski
*Region 8*

Cindy Spurlock
*Region 2*

Chris Vandenbussche
*Region 3*

Russell Williams
*Region 11*

Sam Zettner
*Region 3*

*Advanced copy via facsimile*
*(312) 782-8585*

May 24, 2013

Brian West Easley, Esq.
Jones Day
77 West Wacker
Chicago, IL 60601-1692

**Re:** **Letter from Brian West Easley Dated 5/20/13 Entitled** *"City of Detroit Restructuring"*

Dear Mr. Easley:

This communication is sent in response to your letter concerning the above stated matter, in which you requested to meet concerning restructuring of Pension and Retiree Medical Benefit liabilities. Please be advised that in accordance with Michigan law, we have no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive. However, we are willing to meet with you per your request. Please propose several alternative dates in which you are available.

Further you should be aware that for the first time in history, over 30 Unions came together in negotiating concessions. The cost-savings and revenues within this proposed Coalition Contract reached **hundreds of millions of dollars annually**. The Contract also contained many restructuring ideas for the City to engage. Ernst & Young participated during every facet of the negotiations and approved the final deal on behalf of the State. The Unions then ratified the concessions. The Coalition and the City celebrated the Ratification.

Unfortunately, the City did not execute the Coalition Contract. The Mayor claimed the State ordered him not to do so. City Council was not permitted to vote to ratify the Contract. By doing this, the City lost **tens of millions of dollars** in actual savings that the City should have realized from these concessions. This has been acknowledged by the City's financial expert.

Indeed, the Milliman Company being used by the City now, acknowledged that the City could have saved well over **50 million dollars** by the healthcare package called for in the Tentative Agreement. Given that the changes were not implemented as of

July 1, 2012, as called for in the Contract, the City lost the savings. Even when the City did unilaterally impose a healthcare plan, it botched the implementation with an excessive amount of plans and problematic rollouts.

We have repeatedly asked the reason why the Governor ordered the City not to execute and implement the Tentative Agreement. Indeed, during a hearing in Federal Judge, Arthur Tarnow's courtroom, he asked the City and State attorneys the same question, as well as what were the work rule changes they were seeking. The lawyers could give no answer.

You should know that we stand ready to meet and negotiate in an effort to save the City. We have been doing so for decades. We hope; however, that the City takes a look at the concessions our Unions already offered in lengthy negotiations last February. The Governor and the Mayor have talked frequently about **"shared sacrifices."** However, employees are the only ones who have "**truly sacrificed**."

I look forward to hearing from you in the near future.

Sincerely yours,

*Edward L. McNeil*

Edward L. McNeil
Special Assistant to the President

cc:     LaMont Satchel, Labor Relations, City of Detroit

dat/324iuoeaflcio

-2-

13-53846-tjt   Doc 8064-6   Filed 02/19/14   Entered 02/19/14 11:53:38   Page 122 of 136
13-53846-swr   Doc 7064   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 122 of 135
136



# UAW LOCAL 2211
## (Public Attorneys Association)

CAYMC
2 Woodward. Ave., Ste. 500

• Detroit, Michigan 48226



May 22, 2013

Brian West Easley
Jones Day
77 West Wacker
Chicago, IL 60601-1692

Re:     City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts. I write to confirm that this Union – Local No. 2211 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") – represents active employees, and thus future retirees, within its bargaining unit. This Union does not, however, represent current retirees and has no authority to negotiate on their behalf. On behalf of the active employees it does represent, I accept your invitation to participate in the discussions concerning health care and pension benefits. Because these issues are so vital to members, this Union requests bargaining with respect to any changes which the Emergency Manager (or City) might propose to make in those benefits. The Union requests the earliest possible dates for meeting, and proposes that the meetings be held at the Office of Labor Relations, on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.

Please advise me of possible dates and location for our meeting at your earliest convenience.

Also, if the City has developed any proposals, potential options, or possible modifications to health care or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting. Also in advance of our meeting, please provide documents showing any calculations relating to health care costs and pension costs (both present and future) as well as the assumptions upon which the calculations are based.

Sincerely,

Robyn Brooks
President

cc:     Jack Dietrich
        Lamont Satchel

13-53846-swr   Doc 8004-6   Filed 09/06/19   Entered 09/06/19:59:53:38   Page 122 of 135
13-53846-tjt   Doc 8004-6   Filed 02/19/14   Entered 02/19/14:11:53:38   Page 123 of 135
136

# Metropolitan Detroit Professionals

UAW-Local 2200
5201 Woodward Avenue
Detroit, Michigan 48202



May 23, 2013

Brian West Easley
Attorney
Jones Day
77 West Wacker
Chicago, IL 60601

Dear Mr. Easley:

I am in receipt of your letter dated May 20, 2013 regarding City of Detroit Restructuring.

Today I spoke with Ms. Ms. Samantha Woo in your office. I gave her my verbal reply that UAW LU 2200 will participate in discussions and represent the interests of current employees at the Detroit Water and Sewerage Department's Wastewater Treatment Plant who are members of this Local Union.

Please contact me at your earliest convenience with proposed dates and times for the discussions. Telephone: 313-706-0081 or email: mimilaurie@yahoo.com.

Sincerely,

Laurie Townsend Stuart
President, UAW LU 2200

cc:     Gloria Morgan, International Representative, UAW Region 1
        Tiffani Simon, Vice President, UAW LU 2200
        DeShawn Benson, Unit Chair,
        Wastewater Treatment Plant Supervisors, UAW LU 2200
        Samantha Woo, Jones Day



PAGE 1/1 * RCVD AT 5/29/2013 12:14:39 PM [Eastern Daylight Time] * SVR:NAFX02MS/22 * DNIS:60572 * CSID:3138335012 * DURATION (mm-ss):00-55

13-53846-swr   Doc 8004-6  Filed 06/19/14  Entered 06/19/14 15:53:38  Page 124 of 135
136

**REGION 1**
27800 George Merrelll Drive
Warren, MI 48092

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA–UAW**

BOB KING, *PRESIDENT*          DENNIS D. WILLIAMS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:   JOE ASHTON   •   CINDY ESTRADA   •   GENERAL HOLIEFIELD   •   JIMMY SETTLES

CHARLES E. HALL
DIRECTOR, UAW REGION 1

May 22, 2013

Mr. Brian West Easley
Jones Day
77 W. Wacker
Chicago, IL  60601-1692

RE: City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts.  I am writing to confirm that Local No. 412 and Local No. 212 of the International Union, United Automobile, Aerospace and Agricultural Implement workers of America ("UAW") represent active employees, and thus future retirees, within their bargaining units.  These locals do not, however, represent current retirees and have no authority to negotiate on their behalf.  On behalf of the active employees we do represent, I accept your invitation to participate in discussions concerning healthcare and pension benefits.  Because these issues are so vital to members, the locals request bargaining with respect to any changes which the Emergency Manager (or city) might propose to make in those benefits.  We request the earliest possible dates for meeting, and propose that the meetings be held at the Office of Labor Relations on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.*

Please advise me of possible dates and location of our meeting at your earliest convenience.

Also, if the city has developed any proposals, potential options or possible modifications to healthcare or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting.  Any calculations regarding healthcare and pension costs (both present and future) are likewise requested.

Sincerely,

John Cunningham
International Representative
UAW Region 1

JC:ja/opeiu494
cc:     Tony Feyers, UAW Region 1
        Jeff Hagler, UAW Local 412
        Jeff Jarema, UAW Local 212
        Gloria Morgan, UAW Region 1
        Frank Stuglin, UAW Region 1

*Your letter made reference to UAW Local 414 – apparently a typographical error.  Please be advised that it is Local No. 412 which represents legal assistants.

13-53846-tjt   Doc 8904-6   Filed 02/19/14   Entered 02/19/14 11:53:38   Page 125 of 135
13-53846-swr   Doc 7881-6   Filed 09/06/13   Entered 09/06/13 19:55:58   Page 124 of 135
136

# **EXHIBIT D**

13-53846-tjt Doc 8304-6 Filed 02/19/14 Entered 02/19/14 11:13:38 Page 126 of 135
13-53846-swr Doc 780-4 Filed 09/06/13 Entered 09/06/13 19:59:53 Page 125 of 135
136

# JONES DAY

77 WEST WACKER  •  CHICAGO, ILLINOIS 60601-1692

TELEPHONE: 312-782-3939  •  FACSIMILE: 312-782-8585

June 27, 2013

**VIA E-MAIL**

James Williams
President
AFSCME, Local 207 – Non-Supervisory Unit
600 W. Lafayette, Ste. L-106
Detroit, MI 48226
afscme207@sbcglobal.net

Re:     City of Detroit Restructuring

Dear Mr. Williams:

Thank you for participating in the June 20, 2013 informational meetings pertaining to the City of Detroit's (the "City's") proposals to restructure the City's retiree medical and pension obligations.  We appreciated your questions and input and look forward to discussing these issues with the American Federation of State, County and Municipal Employees, Local 207 – Non-Supervisory Unit in the coming weeks.

The City recognizes that representatives of active and retired employees will need access to additional information to analyze the restructuring proposals outlined in the June 20 meetings.  Information relevant to these proposals will be made available in the on-line data room established for creditors and other stakeholders.  If you do not yet have access to the data room, please contact Dan Merrett (dmerrett@jonesday.com/ (404) 581-8476), who will provide you with further instructions.

To the extent you will need additional information beyond that provided in the data room to analyze and provide input with respect to the City's retiree benefits restructuring proposals, please forward requests for such information directly to my attention.  We will make every effort to make responsive and relevant information available in a timely manner.

The City is very much looking forward to the unions' feedback with respect to the City's retiree benefits restructuring proposal.  As we repeatedly stated during the meeting, to the extent that your organization has additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations, the City will consider any such ideas.  Please let me know if you would like to set up a time to further discuss these issues.

Sincerely,

Brian West Easley

cc:     Kevyn Orr, Esq.
        Mr. Lamont Satchel

ATLANTA  •  BEIJING  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  DUBAI  •  FRANKFURT  •  HONG KONG  •  HOUSTON
IRVINE  •  LONDON  •  LOS ANGELES  •  MADRID  •  MEXICO CITY  •  MILAN  •  MOSCOW  •  MUNICH  •  NEW DELHI  •  NEW YORK  •  PARIS
PITTSBURGH  •  SAN DIEGO  •  SAN FRANCISCO  •  SÃO PAULO  •  SHANGHAI  •  SILICON VALLEY  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

# EXHIBIT E

13-53846-tjt   Doc 8304-6   Filed 02/19/14   Entered 02/19/14 11:13:38   Page 128 of 135
13-53846-swr   Doc 764-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 127 of 135
136

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

DIRECT NUMBER: (202) 879-3840
EMILLER@JONESDAY.COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
   & Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:    City of Detroit Pension Restructuring

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it makes sense to first try to reach common ground with key unions and association leaders on actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle contributions and attendant benefit changes. Nonetheless, we are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues: (1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age 55 early retirees and not begin at age 55; and (2) if there were to be a hard freeze at PFRS, active employees who do not have sufficient service at the freeze date to obtain a vested pension be given an opportunity to earn such service and not lose their entire pensions. The City's advisors are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

Thank you for your letter and please keep the lines of communication open.

Sincerely,

Evan Miller

cc:     David G. Heiman, Esq.

# **EXHIBIT F**

13-53846-tjt   Doc 8304-6   Filed 02/19/14   Entered 02/19/14 11:13:38   Page 131 of 135
13-53846-swr   Doc 760-6   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 130 of 135
136



**AFSCME**
*We Make America Happen*

1625 L Street, NW
Washington, DC 20036
Phone: 202-429-1215, Fax: 202-223-3255
Website: www.afscme.org



**AFSCME**

# Fax



## Department of Research and Collective Bargaining Services

To: *Brian West Easterly*     From: *Steve Kreisberg*

Fax: *312 - 782 - 8585*     Pages: *4* , including cover

Phone:     Date: *7 - 2 - 2013*

Re:     CC:

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

PAGE 1/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-tjt   Doc 8904-6   Filed 12/19/14   Entered 12/19/14 11:53:38   Page 132 of
136



**AFSCME®**
*We Make America Happen*

Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

July 2, 2013

Mr. Brian West Easterly
Jones Day
77 West Wacker
Chicago, IL 60601

Via Fax: (312) 782-8585

Dear Mr. Easterly:

You have contacted a number of Local unions affiliated with AFSCME for the purpose of offering information and inviting "feedback" on the Emergency Financial Manager's (EFM) proposal to "restructure" retiree benefits. The undersigned, in conjunction with AFSCME Council 25 President Albert Garrett and Council 25's Assistant to the President Ed McNeil will be representing our affiliated Locals in these matters. We are not representing current retirees.

I have followed the procedures and have been provided access to the on-line data room established by the EFM. I have also been in touch with Kyle Herman from Miller Buckfire as instructed by the EFM in his "Proposal to Creditors" on June 14. As I stated in an e-mail message to Mr. Herman, the electronic data room does not have all of the information I have requested of the EFM in a letter dated June 17, 2013 (copy enclosed). To reiterate, I have requested the following:

1.  A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll. Subsequent to June 17, I have been given access to Milliman analysis of the pension system which is partially responsive to my request.

2.  The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.  A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

PAGE 2/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 8004-6   Filed 09/06/19   Entered 09/06/19 15:53:38   Page 133 of 135
136

Brian West Easterly
July 2, 2013
Page 2 of 2

4.  A description of all assumptions, data, and documents relied upon to support the following revenue projections:
    a.  Municipal income tax
    b.  Wagering taxes
    c.  Property taxes
    d.  State revenue sharing
    e.  Utility users' and other taxes
    f.  "Other revenue" (page 52 of the Proposal to Creditors)

5.  A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

To clarify, we are seeking the data relied upon by the EFM as he developed his retiree benefits restructuring proposal. Detailed information related to reorganization and restructuring initiatives consists of a one page financial summary. I am seeking the data relied upon to develop that summary, especially and including, the back-up data associated with estimated expenditures addressing "blight."

In response to your offer to provide "feedback" on the proposed restructuring of retirement benefits, we hereby request to meet with authorized representatives of the EFM on July 10, 2013 at 10:00 a.m. To date, your representatives have provided presentations, and scheduled an additional presentation on pension benefits for the afternoon of July 10, but the EFM has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues. That process should start as soon as possible. We suggest we meet at our offices in Detroit, 600 West Lafayette. It would be extremely helpful if you could provide the requested information in advance of the meeting.

Please contact me at (202)429-1237 or skreisberg@afscme.org to discuss these matters, if necessary, and to confirm our proposed meeting.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK/dd

cc:  Albert Garrett, AFSCME Council 25 President
     Kevyn Orr, Emergency Financial Manager

PAGE 3/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 8904-6   Filed 02/19/14   Entered 02/19/14 15:58:38   Page 134 of 135
136



**AFSCME®**
We Make America Happen®

Lee Saunders
President

Laura Reyes
Secretary-Treasurer

**Vice Presidents**

Ken Allen
Portland, OR

Henry L. Bayer
Chicago, IL

Ken Deitz, RN
San Dimas, CA

Greg Devereaux
Olympia, WA

Danny Donohue
Albany, NY

David R. Fillman
Harrisburg, PA

Michael Fox
Harrisburg, PA

Kathleen Garrison
Latham, NY

Raglan George Jr.
New York, NY

Mattie Harrell
Williamstown, NJ

Johanna Puno Hester
San Diego, CA

Danny J. Homan
Des Moines, IA

Salvatore Luciano
New Britain, CT

John A. Lyall
Worthington, OH

Kathryn Lybarger
Oakland, CA

Roberta Lynch
Chicago, IL

Christopher Mabe
Westerville, OH

Glenard S. Middleton Sr.
Baltimore, MD

Ralph Miller
Los Angeles, CA

Gary Mitchell
Madison, WI

Douglas Moore Jr.
San Diego, CA

Frank Moroney
Boston, MA

Henry Nicholas
Philadelphia, PA

Randy Perreira
Honolulu, HI

Greg Powell
Austin, TX

Lillian Roberts
New York, NY

Eddie Rodriguez
New York, NY

Lawrence A. Roehrig
Lansing, MI

Joseph P. Rugola
Columbus, OH

Eliot Seide
South St. Paul, MN

Mary E. Sullivan
Albany, NY

Braulio Torres
San Juan, PR

David Warrick
Indianapolis, IN

Jeanette D. Wynn
Tallahassee, FL

1064-12
12/12

June 17, 2013

Mr. Kyle Herman
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, NY 10022
kyle.herman@millerbuckfire.com

Dear Mr. Herman:

In accordance with the instructions of the Detroit Office of the Emergency Financial Manager (EFM), I request the following information:

1. A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll.

2. The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3. A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

4. A description of all assumptions, data, and documents relied upon to support the following revenue projections:
   a. Municipal income tax
   b. Wagering taxes
   c. Property taxes
   d. State revenue sharing
   e. Utility users' and other taxes
   f. "Other revenue" (page 52 of the Proposal to Creditors)

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000   FAX (202) 429-1293   TDD (202) 659-0446   WEB www.afscme.org   1625 L Street, NW, Washington, DC 20036-5687

PAGE 4/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 8004-6  Filed 09/06/19  Entered 09/06/19 15:53:38  Page 135 of 135
136

Mr. Kyle Herman
June 17, 2013
Page 2

5. A description of all projected services and investments included in the "Reorganization (Capital investments and Professional fees)" budget line item in the ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the development of major initiatives (for example, investments on technology) should be provided as well. Documents and other supporting data that support the cost projections should be provided as well. If the identity of vendors has been established, please provide that information.

I am assisting AFSCME locals and AFSCME Council 25 with issues related to the Proposal. We have been asked to meet with the EFM's representatives on Thursday. Accordingly, information related to items 1 through 3 should be provided prior to our meeting and the remaining information as soon as possible. I appreciate your cooperation. Feel free to call me at (202)429-1237 or email skreisberg@afscme.org if you have any questions or are in need of clarification.

Sincerely,

Steven Kreisberg
Director of Collective Bargaining and
Health Care Policy

SK:tem

PAGE 5/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr   Doc 8004-6   Filed 02/19/14   Entered 02/19/14 11:53:38   Page 136 of 135
136