UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

Debtor.

No. 13-53846

Chapter 9

HON. STEVEN W. RHODES

**EXHIBIT 18 – PART 3**

**APPELLEE STATE OF MICHIGAN'S DESIGNATION OF
ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**
In connection with Notice of Appeal filed by Johnathan Brown
[Dkt. #8469]

| Item | Date Filed | Docket Number | Description |
|------|-----------|---------------|-------------|
| 18 | 9/16/2014 | 7502 | Seventh Amended Chapter 9 Plan for the Adjustment of Debts of the City of Detroit Filed by Debtor In Possession City of Detroit, Michigan (Attachments: # 1 Exhibit I.A.9 through I.A.242 # 2 Exhibit I.A.243 through I.A.275 # 3 Exhibit I.A.276 through I.A.338 # 4 Exhibit I.A.348 # 5 Exhibit I.A.355-Part 1 # 6 Exhibit I.A.355-Part 2 # 7 Exhibit I.A.355-Part 3 # 8 Exhibit II.B.3.q.ii.A through III.D.2) |

**EXHIBIT B – PFRS Governance Terms**

13-53846-tjt Doc 8975-3 Filed 02/19/14 Entered 02/19/14 12:46:52 Page 2 of 76
13-53846-swr Doc 8750-3 Filed 09/16/14 Entered 09/16/14 01:20:42 Page 105 of

201

**EXHIBIT C**

1. General Retirement System

2. Police and Fire Retirement System

3. AFSCME

4. UAW

5. Detroit Police Officers Association

6. Detroit Police Command Officers Association

7. Detroit Police Lieutenants and Sergeants Association

8. Detroit Fire Fighters Association

9. Retired Detroit Police and Fire Fighters Association

10. Retired Detroit Police Members Association

11. Detroit Retired City Employees Association

12. Official Retirees Committee

13. City of Detroit

**EXHIBIT D**

Cases to be dismissed:

1.     GRS et al. v. Emergency Manager of Detroit (Ingham County Circuit Court)
2.     Webster et al. v. State of Michigan, Governor, and State Treasurer (Ingham County Circuit Court)
3.     Detroit Library Commission v. Governor, State Treasurer, and Detroit Public Schools Emergency Manager (Ingham County)
4.     Flowers et al. v. Governor, State Treasurer, and State of Michigan (Ingham County Circuit Court)
5.     DPOA v. City of Detroit (Michigan Court of Appeals)

The settling parties will not attempt to amend to include the City of Detroit or its Emergency Manager as a defendant, or collaterally or retroactively attack the Detroit bankruptcy or actions of Detroit or its EM, or otherwise participate, support, fund or appeal in the following cases:

1.     Phillips et al v. Governor and State Treasurer (E.D. Mich.)
2.     Michigan AFSCME Council 25 v. Governor, State Treasurer, et al. (E.D. Mich.)
3.     NAACP v. Governor, State Treasurer, and Secretary of State (E.D. Mich.)
4.     Robert Davis/Citizens United Against Corrupt Government v. Governor, State of Michigan, Dept. of Treasury, Dept. of State Police, et al. (Ingham County Circuit Court)
5.     Robert Davis/Citizens United Against Corrupt Government v. Michigan Department of Treasury and Carla Robert (Wayne County Circuit Court)
6.     Robert Davis v. Local Emergency Financial Assistance Loan Board (Ingham Court)
7.     Robert Davis v. Weatherspoon, Governor, Attorney General, and State Treasurer (E.D. Mich.)
8.     Allen Park Retirees v. EM Parker, City of Allen Park (Wayne Circuit)
9.     Allen Park Retirees v. State (Court of Claims)
10.    Deborah Moore-El v. Snyder (E.D. Mich.)
11.    Faith, et al. v. Snyder (E.D. Mich.)
12.    Sarella Johnson, et al. v. Snyder (E.D. Mich.)
13.    United Retired Government Employees (URGE) et al. v. Governor, et al. (E.D. Mich.)

DETROIT 56620-1 1314985v13

**EXHIBIT I.A.338**

FORM OF SYNCORA SETTLEMENT DOCUMENTS

13-53846-tjr Doc 8945-2 Filed 12/19/14 Entered 12/19/14 12:46:59 Page 5 of 76
13-53846-swr Doc 8750-3 Filed 09/16/14 Entered 09/16/14 01:25:42 Page 106 of
201

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of September __, 2014, among the City of Detroit, Michigan (the "<u>City</u>"), Syncora Guarantee, Inc. and Syncora Capital Assurance Inc. (collectively, "<u>Syncora</u>"). The City and Syncora are referred to herein each individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("<u>DGRS</u>"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("<u>PFRS</u>" and, together with DGRS, each a "<u>Service Corporation</u>" and collectively the "<u>Service Corporations</u>") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "<u>2005 Pension Funding Trust</u>") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "<u>2006 Pension Funding Trust</u>") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "<u>2005 Pension Funding Securities</u>") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "<u>2006 Pension Funding Securities</u>" and collectively with the 2005 Pension Funding Securities, the "<u>Certificates of Participation</u>");

**WHEREAS**, the Service Corporations are parties to swap transactions under certain ISDA Master Agreements referred to as the COP Swap Agreements;

**WHEREAS**, the City issued $44,020,000 in General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Certificates of Participation;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the Swap Agreements;

**WHEREAS**, Syncora has issued insurance policies in respect of certain of the General Obligation Bonds (Unlimited Tax), Series 2003-A;

**WHEREAS**, Syncora beneficially owns or insures Certificates of Participation in the amounts set forth herein;

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation and the COP Swap Agreements;

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1          Definitions and Interpretations.**

    **1.1     Plan Definitions.**  Capitalized terms used herein, but not otherwise defined, shall have the meaning ascribed to such terms in the POA.

    **1.2     Additional Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

    "Class 9" means that class of claims associated with COPs as set forth in the Sixth Amended POA.

    "POA" means that certain Plan for the Adjustment of Debts of the City of Detroit, as amended in accordance herewith.

    "Sixth Amended POA" shall mean that certain Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, as filed with the Bankruptcy Court.

    **1.3     Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

**Section 2          Plan.**

    **2.1     Proofs of Claim.**  The Parties agree Section 2, Section 4 and Section 5 hereof fully resolve, address, satisfy and discharge Proofs of Claim # 1352 and 1354; provided that, except as expressly provided to the contrary herein, this Agreement shall have no effect regarding any UTGO Claims asserted in such Proofs of Claim or otherwise held or insured by Syncora, and any such UTGO Claims shall receive the treatment provided for all UTGO Claims by the POA and the UTGO Settlement Agreement.  The City shall not file or otherwise assert any objection to such Proofs of Claim.

    **2.2     Voting.**  All votes cast by Syncora to accept or reject the Sixth Amended POA shall be deemed to have been cast as accepting the POA.

**2.3    Approval.**    The City shall (i) use its best efforts to seek approval of this Agreement in connection with confirmation of the POA, and (ii) seek a Confirmation Order, which Confirmation Order shall be in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora), that approves (A) this Agreement and all transactions contemplated hereby, (B) the Development Agreement and all transactions contemplated thereby, and (C) the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC.

**2.4    Plan Support.**

(a)    Syncora shall (i) use commercially reasonable efforts to support the City's efforts to seek approval of this Agreement in connection with confirmation of the proposed POA, (ii) support confirmation of the POA, and (iii) not object to confirmation of the POA and withdraw all objections, oppositions and reservations of rights to confirmation of the POA (collectively, the "Syncora Plan Objections"), including those objections filed with the Bankruptcy Court at ECF #'s 4679, 5706, 6009, 6651, 7041, 7150 and its participation in 7103 (A) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (B) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA.

(b)    Without limiting the foregoing, Syncora shall withdraw all objections to the UTGO Settlement Agreement (including those contained in Syncora's objections to the Plan) (i) without prejudice (and subject to Syncora's retaining the right to assert such objections in the event this Agreement is terminated) as soon as reasonably practicable after execution of this Agreement and (ii) with prejudice as soon as reasonably practicable after Bankruptcy Court approval of this Agreement and confirmation of the POA. The City shall not alter or amend the treatment provided to holders of Allowed Class 8 Claims in the Plan.

(c)    Without limiting the foregoing, Syncora shall not object to inclusion of the COP Swap Counterparties in the definition of "Exculpated Parties" under the POA.

**2.5    Plan Amendment.**    The City shall not, without Syncora's prior written consent, amend the POA in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect Syncora.

**Section 3         Global Resolution; Litigation Support; Etc.**

**3.1    Global Resolution.**    The Parties agree that this Agreement shall constitute a global resolution of all matters among the Parties as and to the extent set forth herein, and all litigation (including appeals) outstanding between the City and Syncora arising out of or related to the City's Chapter 9 Case shall be dismissed as and to the extent set forth herein.

**3.2    Withdrawal of Syncora Plan Objections.**    Syncora shall withdraw the Syncora Plan Objections as set forth in Section 2.4 hereof.

**3.3      Stay and Withdrawal or Dismissal of Appeals.**   As soon as reasonably practicable after execution of this Agreement, Syncora and the City shall file joint motions with the applicable courts requesting stays of those certain appeals styled: 2:14-cv-10501-BAF-PJK (PLA appeal); 2:14-cv-11995-BAF-PJK (PPF appeal); 2:14-cv-12062-BAF-PJK (COP Swap Settlement appeal); 2:13-cv-14305-BAF-PJK (property of the debtor appeal); and 2:14-cv-13044-BAF-PJK (Mediation Order Appeal) (collectively, the "Syncora Appeals").   As soon as reasonably practicable after Bankruptcy Court approval of this Agreement and the occurrence of the Effective Date with respect to the POA, Syncora will voluntarily dismiss with prejudice the Syncora Appeals.

**3.4      Litigation Support.**   Syncora shall provide such reasonable, active support as may be reasonably requested by the City, the Litigation Trust or any successor plaintiffs in the COP Litigation.

**3.5      Retention of Counsel.**   Syncora shall continue to retain Kirkland & Ellis LLP in connection with satisfying the support obligations set forth in Sections 2.4(a) and 3.2 hereof.

**Section 4          Class 9 Treatment.**

**4.1      Amendment to Sixth Amended POA.**   The City shall amend the Sixth Amended POA as set forth on Schedule 1.

**Section 5          Swap Related Claims; Etc.**

**5.1      Swap Related Claims.**   On the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Swap Insurance Policies and the COP Swap Collateral Agreement.

**Section 6          Representations and Warranties.**

**6.1      Representations and Warranties of the City.**   The City represents to Syncora that:

(a)      It is a municipal corporation of the State of Michigan.

(b)      It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)      Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)      Other than (i) approvals by the City Council, the Emergency Loan Board, the State Treasurer, the execution of the  Emergency Manager Order, and the approvals required by Section 19 of Act 436, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of

4

13-53846-swr   Doc 8975-2   Filed 12/18/14   Entered 12/18/14 12:46:52   Page 9 of 76
13-53846-tjt   Doc 8975-2   Filed 09/18/14   Entered 09/18/14 01:46:52   Page 1 of 76
201

the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

**6.2    Representations and Warranties of Syncora.**  Syncora represents to the City that:

(a)    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)    It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)    Syncora owns or insures COPs in the principal amount of $299,155,000.00; Syncora paid insured principal claims in an amount not less than $52,750,000.00; and, as of the Petition Date, Syncora paid insured interest claims in an amount not less than $1,649,692.00.

(f)    The *Stipulation by and Between the City of Detroit, Michigan and the COPs Creditors Regarding Certain Facts and the Admission of Certain Exhibits for the Confirmation Trial* remains in effect.

**Section 7        No Admission.**

This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties hereto.  If this Agreement is terminated, this Agreement will not be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding.  However, this Agreement will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact.  The admissibility of all negotiations related to this Agreement shall be governed by the *Mediation Order* [Docket No. 322] entered by the Bankruptcy Court, as the same has been amended and supplemented.  Notwithstanding the foregoing, nothing herein shall limit the scope or effect of the Mediation Order.

**Section 8**          **Termination.**

Any Party may terminate this Agreement upon one Business Day's prior written notice to the other Party if: (a) the Bankruptcy Court denies approval of this Agreement or the transactions contemplated hereby, the Development Agreement or the transactions contemplated thereby, or the assumption of the Tunnel Lease, as amended pursuant to the First Amendment to Lease dated as of ___, 2014 between the City of Detroit and the Detroit Windsor Tunnel LLC, or confirmation of the POA; (b) if the Confirmation Order is not in form and substance reasonably acceptable to Syncora (solely with respect to any terms thereof that affect the rights of Syncora or any Related Entity with respect to Syncora) or is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party; or (c) the other Party is in material breach of any provision of this Agreement, and such breach is continuing and has not been cured within 5 Business Days.

In the event that this Agreement is terminated as set forth herein, then neither this Agreement, nor any document filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any res judicata or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement. For the avoidance of doubt, in the event this Agreement is terminated, Syncora shall retain the right to make any arguments, objections, or other assertions (other than res judicata or collateral estoppel as set forth in the preceding sentence), pursue any litigation, appeals, or other disputes related to confirmation of the POA (or any other plan) or any other matter otherwise resolved by this Agreement.

**Section 9**          **Miscellaneous.**

**9.1**      **Execution of this Agreement**. This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**9.2**      **Binding Obligation; Successors and Assigns**. This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees. This Agreement grants no rights to any third party.

**9.3**      **Complete Agreement; Interpretation**. This Agreement and the POA constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner. There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party

having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

 9.4    **Costs**.  Each Party will bear its own costs and expenses (including legal and other professional fees and expenses) incurred in connection with all matters set forth herein, including in connection with Sections 2 and 3 of this Agreement.  Syncora agrees to pay any Allowed Claim for COP Agent Fees held by the COP Agent in accordance with and as set forth in the POA.

 9.5    **Amendment, Modification and Waiver**.  This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party.  No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

 9.6    **Notices**.  All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

 If to the City:

 City of Detroit, Michigan
 1200 Coleman A. Young Municipal Center
 2 Woodward Avenue
 Detroit, Michigan 48226
 Attention: CFO

 with copies (which shall not constitute notice) to:

 City of Detroit Law Department
 First National Building, Suite 1650
 660 Woodward Avenue
 Detroit, Michigan 48226
 Attention: Corporation Counsel

 and

 Jones Day
 222 East 41st Street
 New York, NY 10017-6702
 Attn: Corinne Ball (cball@JonesDay.com)

 If to Syncora:

 Syncora Guarantee, Inc.
 Syncora Capital Assurance Inc.
 Attn: Claude LeBlanc
 135 West 50th Street, 20th Floor

7

New York, NY 10020
claude.leblanc@scafg.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
Attn: Ryan B. Bennett
300 N. LaSalle
Chicago, IL 60654
rbennett@kirkland.com

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by telecopier will be effective upon oral or machine confirmation of transmission. Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

   9.7   **Headings**. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

   9.8   **Governing Law and Jurisdiction**.   THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.   By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement.   Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 9.6 hereof.   Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

   9.9   **Waiver of Jury Trial**.   TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE CITY OF DETROIT

By: _____
    Name:
    Title:

13-53846-swr   Doc 8314-25   Filed 09/16/14   Entered 09/16/14 12:46:52   Page 147 of
13-53846-swr   Doc 7362-3   Filed 09/16/14   Entered 09/16/14 11:26:42   Page 14 of
761
76

SYNCORA GUARANTEE, INC.

By:_____
    Name:
    Title:

SYNCORA CAPITAL ASSURANCE INC.


By: _____
      Name:
      Title:

13-53846-swr   Doc 7302-5   Filed 09/19/14   Entered 09/19/14 12:46:52   Page 16 of
76
13-53846-tjt   Doc 8914-25   Filed 12/10/14   Entered 12/10/14 21:20:42   Page 17 of
701

# TUNNEL LEASE AMENDMENT

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made and entered into as of the ___ day of _____, 2014 (the "**Date Hereof**"), by and between the City of Detroit, a Michigan municipal corporation (the "**City**"), and Detroit Windsor Tunnel LLC, a Michigan limited liability company ("**Tenant**").

## R E C I T A L S

A.      The City, as landlord, and Tenant, as successor-in-interest to Detroit & Canada Tunnel Corporation ("**DCTC**"), as tenant, are parties to the Tube Lease, dated March 20, 1978 (the "**Tube Lease**"), whereby the City leases to Tenant the portion of the Detroit Windsor Tunnel (the entire such tunnel, the "**Tunnel**") located in Detroit, which portion is more particularly defined in the Tube Lease and referenced herein as the "**Tube**."

B.      The City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Tenant, as tenant, as successor-in-interest to DCTC as subtenant, are parties to the Sublease, dated March 20, 1978 (the "**Plaza Lease**"; together with the Tube Lease, the "**Lease**"), whereby the City leases to Tenant certain property defined in the Plaza Lease as the "New Tunnel Plaza" (such premises, the "**Plaza Premises**"; together with the Tube, the "**Property**").

C.      The term of the Lease (the "**Term**") expires on November 3, 2020, and the period commencing on the Effective Date through and including November 3, 2020 shall be referenced herein as the "**Existing Remainder Term**".

D.      The City desires to enter into a long-term agreement regarding the operation of the Property to assure that (i) the Tunnel will continue to provide to residents of Detroit and to other Tunnel passengers a safe and efficient route between Detroit and Windsor; (ii) the Property will be maintained and enhanced; and (iii), to promote such goals, there is transparency to the City regarding the operation of the Property.

E.      In furtherance of the goals of the City, the Tenant desires to enter into a long-term agreement with the City regarding the leasing and operation of the Property.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Capitalized Terms; Effective Date</u>.  Any capitalized term used herein and not otherwise defined shall have the meaning ascribed to such term in the Plaza Lease.  "**Effective Date**" means the first day of the month next succeeding the month in which occurs the Date Hereof.

2.      <u>Extension of Term</u>.  The term of the Tube Lease is extended for the period beginning November 4, 2020 and ending on December 31, 2040 (such period, the "**Extension Term**"), upon all the terms and conditions as contained in the Tube Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.  The term

of the Plaza Lease is extended for the Extension Term, upon all the terms and conditions as contained in the Plaza Lease and applicable during the Third Renewal Option (as defined in the Plaza Lease), except as amended hereby.

3.    <u>Existing Term CapEx Credit; CapEx Schedule</u>.

(a)    For any Capital Expenditures (as defined below) paid by Tenant during the Existing Remainder Term (the "**Existing Remainder Term Capital Expenditures**"), Tenant shall receive a credit equal to the amount of such Existing Remainder Term Capital Expenditures (a "**CapEx Credit**") against the aggregate rentals payable by Tenant pursuant to Article IV of the Plaza Lease (such amounts, the "**Rent**") during the Existing Remainder Term; *provided, however*, that the aggregate CapEx Credit to which Tenant is entitled pursuant to this Paragraph 3 shall not exceed the aggregate Rent payable by Tenant during the Existing Remainder Term. Tenant shall not claim a CapEx Credit for any Capital Expenditures paid in advance of the performance of the related work, other than for progress payments customary in the industry (or payments required due to emergency) without the City's prior written approval, which shall not be unreasonably withheld, delayed or conditioned. Subject to Paragraph 5, Tenant may not take a CapEx Credit during the Extension Term for an Existing Remainder Term Capital Expenditure.

(b)    "**Capital Expenditures**" means (i) capital expenditures, as determined by generally accepted accounting principles consistently applied in the United States ("**GAAP**"), paid for work to or at the Plaza Premises and (ii) (x) while the Existing JOA (as defined herein) or any successor agreement between Tenant (or its affiliate) and the City of Windsor (or its instrumentality) (any such agreement, a "**D/W Agreement**") is in effect, 50% of the total capital expenditures, determined in accordance with GAAP, paid by Tenant (or its affiliate) and the City of Windsor (or its instrumentality) pursuant to a D/W Agreement for work to or at all or any portion of the underground tube of the Tunnel (i.e., the tube from and including the Detroit portal to and including the Windsor portal; such tube, the "**Underground Portion**"); provided, however, that Capital Expenditures made to the Underground Portion while a D/W Agreement is in effect shall be made such that the Detroit side of the Underground Portion is in a condition commensurate with the condition of the Windsor side of the Underground Portion; or (y) if no D/W Agreement is in effect, 100% of the capital expenditures, determined in accordance with GAAP, paid by Tenant for work to or at all or any portion for the Tube.

(c)    Within ninety (90) days after the Effective Date, Tenant shall provide the City a detailed plan and schedule for the capital improvements planned to be made to the Tunnel during the year in which the Effective Date occurs and the approximately five (5) years following the Effective Date. On or before each January 31st during the Term, Tenant shall deliver to the City an annual update of such plan together with a plan for the succeeding five (5) years.

4. <u>Extension Term CapEx Credit</u>.

(a)     For any Capital Expenditures paid by Tenant during the Extension Term (the "**Extension Term Capital Expenditures**"), Tenant shall receive a CapEx Credit against the Rent payable by Tenant during the Extension Term equal to the amount of such Extension Term Capital Expenditures; *provided, however*, the aggregate CapEx Credit to which Tenant is entitled during the Extension Term pursuant to this Paragraph 4 shall not exceed $8,000,000; and *provided, further,* that the annual CapEx Credit claimed by Tenant under this Paragraph 4 in any given calendar year of the Extension Term shall not exceed 75% of the Rent payable for such calendar year (but such annual limitation shall not in any way reduce the aggregate CapEx Credit to which Tenant is entitled under this Paragraph 4). If the Lease (as amended from time to time) terminates prior to December 31, 2040, other than due to a default by Tenant, then the City shall pay to Tenant, on thirty (30) days' written notice from Tenant, the amount of CapEx Credits that have accrued to Tenant but have not been applied against the Rent.

(b)     No more than sixty (60) days prior to November 4, 2020, Tenant shall provide the City a high-level, strategic plan for the capital improvements that may be made to the Tunnel during the Extension Term to the extent such plan is known or is customary in the tunnel operations field.

5. <u>CapEx Credit Documentation</u>.

(a)     Tenant may offset the amount of any accrued but uncredited CapEx Credits against any monthly payments of Rent, subject to the limitations in Paragraphs 3 and 4. On or prior to the date of claiming any CapEx Credit (i.e., on or before the date of payment of any monthly installment of Rent, or if none is payable, on or before the date such monthly installment of Rent would otherwise have been payable) or requesting payment pursuant to the last sentence of Paragraph 4(a), Tenant shall submit to the City a notice setting forth the amount of the claimed CapEx Credit, together with reasonably detailed written documentation of the Capital Expenditures (and the work associated therewith) for which Tenant is entitled to a CapEx Credit (such notice, a "**CapEx Notice**"). Within five (5) days after receipt of any CapEx Notice, the City shall have the right to ask for reasonable additional information to verify such Capital Expenditures were paid and to determine the nature of work associated with such Capital Expenditure. If the City in good faith believes that a CapEx Credit was claimed for an expenditure that does not fall within the definition of "Capital Expenditure," as such term is defined in Paragraph 3(b) above, then the City shall give Tenant notice thereof (a "**Dispute Notice**") within fifteen (15) days after receipt of the applicable CapEx Notice, and the date on which Rent is due shall be extended by fifteen (15) days. If the City timely delivers a Dispute Notice, Tenant shall receive the portion of the CapEx Credit that is undisputed, if any, and shall pay the amount of disputed Rent, subject to the provisions of Article XVIII(2) of the Plaza Lease regarding disputed payments.

(b)     Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely provides a Dispute Notice in connection with a CapEx Credit claimed for Existing Remainder Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due; provided, however, if (i) the aggregate accrued but unapplied CapEx Credit to which Tenant is entitled under Paragraph 3, plus the formerly disputed CapEx Credit, exceed the aggregate Rent payable during the portion of the Existing Remainder Term commencing at the time the dispute is resolved; or (ii) at the time the dispute is resolved, the Existing Remainder Term has ended; then in addition to, and without in any way reducing, the CapEx Credits to which Tenant is entitled under Paragraph 4, Tenant may take such formerly disputed CapEx Credit as a credit against the Rents payable during the Extension Term. Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for the Existing Remainder Term Capital Expenditures in excess of the aggregate Rent payable during the Existing Remainder Term.

(c)     Notwithstanding anything to the contrary in the Lease, as amended hereby, if the City timely delivers a Dispute Notice in connection with a CapEx Credit claimed for Extension Term Capital Expenditures, and if and to the extent such dispute is resolved in Tenant's favor, then the City shall promptly pay an amount equal to the formerly disputed CapEx Credit to Tenant, or at Tenant's option, Tenant may credit such formerly disputed CapEx Credit against the Rent next coming due (in addition to, and not in limitation of, any CapEx Credit due under Paragraph 4). Notwithstanding the foregoing, in no event shall Tenant be entitled to aggregate CapEx Credits for Extension Term Capital Expenditures in excess of $8,000,000.

(d)     The provisions of this Paragraph 5 shall survive the expiration or sooner termination of the Lease, as amended hereby.

6.     <u>Repair and Maintenance Standards</u>.  Notwithstanding anything to the contrary in the Lease, but subject to the casualty and condemnation provisions therein, Tenant shall maintain the Property in a good and safe condition and repair, in compliance with all applicable laws, and in accordance with the following sections of the Existing JOA (as defined below): Sections 8.1(d), (e) and (f), and the first grammatical paragraph of Section 8.1; Sections 8.3(a), (b) and (c); Section 8.4; Section 8.6;  Section 9; Exhibit 8.1 and Sections 1, 2 and the first paragraph of Section 3 of Exhibit  9.1, provided that the second sentence of that first paragraph of Section 3 of Exhibit 9.1 shall be replaced with "The program shall include regular and customary cleaning and grounds maintenance."    In the event that the Existing JOA is terminated or amended, these standards shall continue to apply (to the extent applicable).

7.     <u>Reporting</u>.  In addition to its reporting obligations under the Lease, but subject to Paragraph 10 hereof, Tenant shall deliver, at its sole cost and expense, the following reports and information to the City:

(a)     Within one hundred eighty (180) days following the end of each calendar year ending during the term of the Lease: (i) a copy of the audited balance sheets of Tenant at the end of each such calendar year and the related audited statements of income, calculation of annual rental, changes in equity and cash flows for such year, including, in each case, the notes thereto, together with the report thereon of the independent certified public accountants of Tenant, in each case in a manner and containing information consistent with Tenant's current practices and certified by Tenant's chief financial officer that such financial statements fairly present the financial condition and the results of operations, changes in equity and cash flows of Tenant as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States consistently applied; (ii) a report, in a format reasonably acceptable to the City, certified by the Tenant's chief financial officer, providing reasonably detailed information regarding any work associated with Capital Expenditures undertaken by the Tenant with respect to the Property, including such information as may be reasonably requested by the City, which shall include the type of work associated with such Capital Expenditures, the expected cost therefor, the expected completion date, the contractor engaged to perform such work associated with such Capital Expenditures, and any expected disruption of traffic in the Property as a result of the work associated with such Capital Expenditures; and (iii) a report, in a format reasonably acceptable to the City, detailing the amount of traffic through the Property on a weekly, monthly and quarterly basis, the make-up of that traffic and the Tenant's projections for the traffic in the upcoming calendar year and the Tenant's basis therefor;

(b)     Within thirty (30) days after the end of each six-month period, commencing with the six-month period ending June 30, 2015, a report, in a format reasonably acceptable to the City, detailing all material incidents that occurred in the Tunnel, including, but not limited to, vehicular accidents and hazardous material releases, but in each case only if such incidents materially impeded the normal operations of the Tunnel;

(c)     promptly after the occurrence thereof, an email  report on any incident occurring in the Tunnel and causing material damage to property or injury to persons, if such incident results in the closure of any portion of the Tunnel for at least an hour;

(d)     within thirty (30) days after receipt by Tenant, a copy of (i) the engineering reports required by Sections 8.7 and 8.8 of the Joint Operating Agreement by and among the Corporation of the City of Windsor, the Windsor Tunnel Commission and Tenant (as successor-in-interest to DCTC and The Detroit and Windsor Subway Company, Ltd.)  dated November 1, 1997 (the "**Existing JOA**"); or (ii) if the Existing JOA is amended or modified to change the requirements for those reports, (x) every year, an engineering report based on visual inspection of the Tunnel made by an independent, licensed engineer reasonably acceptable to Tenant and (y) every five (5) years a comprehensive engineering report on the Tunnel prepared by an independent, licensed engineer reasonably acceptable to

the City, which report shall include, but not be limited to, an analysis of the structural integrity of the Tunnel, a description of the current state of the Tunnel, including its fixtures and mechanical systems, recommended capital expenditures for the Tunnel and such other information as the City may reasonably request; and

(e)  Within thirty (30) days after such request, any information regarding the Property reasonably requested by the City, provided that such information is in the possession or control of Tenant.

8.  <u>Right to Inspect</u>.  The City shall have the right, upon at least three (3) business days' written notice to Tenant, at reasonable times, provided that such inspection does not unreasonably interfere with the normal operation of the Property (and as to any portion of the Property subleased as of the date hereof or subsequently subleased to a governmental authority, does not violate the applicable sublease) and at the City's sole cost and expense, to have the Property inspected by an engineer, who is (i) either employed directly by the City or with whom the City has contracted; and (ii) licensed and has at least ten (10) years' experience in engineering matters related to construction, maintenance and repair of infrastructure projects or tunnels.  Inspections made pursuant to this Paragraph 8 may only be performed once in each calendar year, except such limitation shall not apply when Tenant is in default of its obligations under Paragraph 6 of this Amendment or any other of its obligations regarding the repair, maintenance and operation of the Tunnel.  Tenant shall make the Property and a senior officer who is responsible for maintenance and/or operations of the Property reasonably available to such engineer for the purposes of such inspection and shall provide such engineer any documentation in Tenant's possession or control, reasonably requested by such engineer, subject to Paragraph 10.  Without limiting any provision hereof, any such engineering inspections conducted by or on behalf of the City shall be performed in accordance with all applicable laws and with all reasonable operating rules and regulations applicable to the Property.  The City shall cause any individual or firm performing an inspection pursuant to this Paragraph 8 to be bound by the confidentiality obligations of the City pursuant to the provisions of Paragraph 10 hereof.

9.  <u>Calculation of Net Operating Income</u>.  For the avoidance of doubt, in calculating "net operating income" as defined in Section IV(2)(b) of the Plaza Lease, Tenant shall not include any expenses that are not attributable to the operation, maintenance and repair of the Property or to Tenant's obligations under the Lease; and, to the extent Tenant or Tenant's affiliates incur costs that are only partially attributable to the Property, Tenant shall not include as an expense for Section IV(2)(b) of the Plaza Lease the portion of those costs that are not attributable to the Property.  Allocations will be prepared consistent with GAAP and the specific methodology and allocation shall be reflected and set forth in the companies' audited financial statements.

10.  <u>Confidentiality</u>.

(a)  Notwithstanding anything to the contrary in the Lease, no information or document provided by Tenant to the City pursuant to or in connection with the Lease, as amended hereby, shall be subject to any confidentiality restrictions, and the City may publicly disclose such information or disclose such information to

third parties as it deems appropriate in its sole discretion; *provided, however*, that Tenant shall have no obligation to deliver to the City (and Tenant may redact from information it delivers to the City) any Confidential Information (as defined below); and *provided, further*, that if Tenant delivers to the City any Confidential Information (and labels it as such), then the City shall not disclose such information to third parties (other than to its professional advisors, employees, third-party report providers, affiliates, officers, members, underwriters, agents, consultants, lenders, investors and legal counsel and as to those, only on a need-to-know basis, as reasonably determined by the City, provided such parties are bound by the confidentiality obligations of the City set forth in this Paragraph 10).

(b)     "**Confidential Information**" means information that (i) relates to maintaining national security and/or to maintaining security at the Tunnel; (ii) is required to be kept confidential by applicable law, regulation or order; or (iii) is a trade secret or is other information that is proprietary to Tenant (including, without limitation, information regarding Tenant's proprietary toll and revenue collecting and accounting system and Tenant's mobile app for express payments, and other technical and business information relating to Tenant's proprietary ideas, patentable ideas, copyrights, and other proprietary systems and software).

(c)     If Tenant chooses to withhold Confidential Information from the City, Tenant shall promptly provide written notice that it has done so. The City, through its authorized representative, shall have the right, upon reasonable advance written notice to Tenant, to inspect any Confidential Information, which shall not be redacted, at the offices of Tenant within the City to verify during customary business hours that such information is Confidential Information and to review such Confidential Information, provided that the City may not make a copy of such Confidential Information.

(d)     Notwithstanding anything to the contrary in Lease (as amended hereby), in an effort to ensure that the City, Tenant and the City of Windsor can effectively and efficiently operate the Tunnel in an integrated and seamless manner, the City shall have the right to share with Windsor all information regarding the Tunnel it receives, and Tenant shall cause it and its affiliates to not restrict the City of Windsor, or its affiliates, from providing the City any information related to the Tunnel.

(e)     Nothing contained in this Lease (as amended hereby) shall be construed to limit or reduce the rights and powers of the State of Michigan or the United States of America.

11.     Ineligible Parties. It shall be a default under the Lease, as amended hereby, if any Ineligible Party (as defined below) shall be involved in the operation, financing, construction or management of the Property or the improvements thereon, or if such Ineligible Party has a direct or indirect beneficial interest in Tenant. "**Ineligible Party**" means any individual or entity, or any entity controlled by, controlling or under common control with any individual or entity, maintaining a controlling interest in any crossing of the border between the State of Michigan

and Canada, such as any tunnel, bridge or other similar infrastructure; *provided, however* that the term "Ineligible Party" shall not include Pike Pointe Holdings, LLC; any entity controlled, controlling or under common control with Pike Pointe Holdings LLC; or Windsor.

12.    Operation of an Integrated Tunnel.    The parties acknowledge that it is in their respective and joint interests to cause the entire Tunnel to be operated in a harmonious and integrated manner.    The City understands that to effect such operation, Tenant intends to negotiate a new or amended operating agreement with the City of Windsor (or an agency or instrumentality thereof), and that Tenant will negotiate such agreement in good faith (but that Tenant shall have no obligation to enter into such an agreement).    The City also understands that achieving such purpose may require amendments to the Lease  (as amended hereby) and agrees to be reasonable, and to act in good faith, in discussing and considering any such amendments. For avoidance of doubt, (i) Tenant will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) the City's obligations under the Lease, as amended from time to time; and (ii) the City will not have any obligation to enter into any such amendment that would (x) adversely affect (other than in a de minimis manner) its rights under the Lease, as amended hereby, (y) increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time or (z) decrease (other than in a de minimis manner) Tenant's obligations under the Lease, as amended from time to time.

13.    Notices.    Article XVIII(3) of the Plaza Lease and Article XV(3) of the Tube Lease are each amended and restated as follows:

3. All notices and other communications authorized or required hereunder, to be given to the City or the Tenant, shall be in writing and shall be given by hand delivery or by nationally recognized overnight courier to the following addresses:

If to the City, to

> **The City of Detroit**
> Office of the Mayor
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, Suite 1126
> Detroit, MI 48226
> Attn: Mayor

with a copy to (which will not constitute notice):

> **The City of Detroit**
> Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, 5th Floor
> Detroit, MI 48226
> Attention: Corporation Counsel

If to Tenant, to

Detroit Windsor Tunnel LLC
100 East Jefferson Avenue
Detroit, MI 48226
Attn:   Neal Belitsky

with a copy to

Dykema Law Firm
400 Renaissance Center
Detroit, MI 48243
Sherrie L Farrell, Esq.

Notices shall be effective if given by a party's attorneys.  Any party may change its address for notices by a notice given in accordance with this section.  Notices shall be deemed given and received on the date received, as evidenced by receipt.

14.    Counterparts.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.    Conflict.   In the event the terms of the Lease conflict with the terms of this Amendment, the terms of this Amendment shall control and govern in all instances.

16.    Full Force and Effect.  The Lease, as modified hereby, remains in full force and effect.

17.    Severability.  If any provision of this Amendment or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

18.    Inter-Governmental Authority.  Expressly subject and subordinate to the terms of the Lease (as amended hereby and as amended from time to time), the City may enter into an agreement with Windsor to establish an intergovernmental authority concerning the Tunnel.   For avoidance of doubt, no such agreement shall adversely affect (other than in a de minimis manner) Tenant's rights nor increase (other than in a de minimis manner) its obligations under the Lease, as amended from time to time.

19.    Memorandum of Lease.  This Amendment shall not be recorded; *provided, however,* that upon the request of either party, the other party shall join in the execution of a memorandum or short form of the Lease, as amended hereby, which shall describe the parties, the Demised Premises, the term of the Lease, and special provisions and shall incorporate the Lease, as amended hereby, only by reference.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

**CITY:**

CITY OF DETROIT

By: _____

    Name:

    Title:


**TENANT:**

DETROIT WINDSOR TUNNEL LLC

By: _____

    Name:

    Title:

OPTION AGREEMENT

# OPTION AGREEMENT

THIS OPTION AGREEMENT (this "**Agreement**") is made and entered into as of the ___ day of _____, 2014, by and between Pike Pointe Holdings, LLC ("**Pike Pointe**") and the City of Detroit, a Michigan municipal corporation (the "**City**").

## R E C I T A L S

A.     The City owns that certain parking garage, commonly known as the Grand Circus Parking Garage, located at 1600-01 Woodward Avenue, Detroit, Michigan, as more particularly described in Exhibit 1 (the "**Circus Garage**").

B.     The Detroit Building Authority (the "**DBA**") had previously owned the Circus Garage and had leased it to the City pursuant to the Contract of Lease No. 2 by and between the City and the DBA, dated October 1985, (as amended, the "**DBA Lease**").

C.     The DBA Lease has previously terminated pursuant to its terms, and pursuant to the terms of the DBA Lease, title to the property leased thereunder, including the Circus Garage, reverted back to the City.

D.     Syncora Capital Assurance Inc. and Syncora Guarantee Inc. (collectively, "**Syncora**") own the entire beneficial interest in Pike Pointe.

E.     Syncora, through one or more of its affiliates, including Pike Pointe, owns and operates certain public infrastructure projects.

F.     In connection with the continued improvement of the City, the City desires to grant an option to Pike Pointe with respect to the possibility of negotiating and entering into a mutually agreeable concession agreement for the operation and maintenance of the Circus Garage pursuant to the terms of this Agreement, and Pike Pointe desires to accept such option.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Option.  Pike Pointe shall have the option, in its sole discretion, to enter into a concession for the Circus Garage (the "**Option**") on the terms set forth herein.  In order to exercise the Option, Pike Pointe must deliver written notice to the City notifying the City that Pike Pointe has exercised the Option (the "**Exercise Notice**"), which Exercise Notice must be delivered within one (1) year from the effective date of the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit, as it may be further amended and as modified (the "**Plan of Adjustment**").  After delivery of the Exercise Notice, the City and Pike Pointe shall promptly and in good faith, negotiate a concession agreement in accordance with the terms set forth in Exhibit 2; provided, however, that neither party shall be obligated to execute a concession agreement.  If, within ninety (90) days following the delivery of the Exercise Notice, an agreement has not been reached between the City and Pike Pointe regarding the Circus Garage, either party may, by delivery of notice to the other party, terminate this Option, and thereafter Pike Pointe shall have no right with respect to the Circus Garage.

2.    Failure to Exercise.  If Pike Pointe fails to send the Exercise Notice within one (1) year after the effective date of the Plan of Adjustment, Pike Pointe will be deemed to have not exercised the Option and will have no further right to do so nor shall it have any interest in the Circus Garage.  At such time, this Agreement and the Option will have no further force or effect.

3.    Anti-Assignment.  Pike Pointe may not assign to any third party (other than a wholly owned subsidiary or other affiliate of Syncora in which Syncora is the direct or indirect beneficial owner (a "**Pike Pointe Affiliate**"), any interest in this Agreement or the Option without the City's prior written consent, which consent may be withheld in the City's sole discretion.  Any attempted assignment without the City's consent shall be void ab initio and of no force and effect, and such purported transferee shall have no right to exercise the Option nor shall it have any interest in the Circus Garage.  Notwithstanding anything to the contrary in this Agreement, Pike Pointe shall have no right to exercise the Option if, at the time of such exercise and the execution of the Concession Agreement, Syncora is not a direct or indirect beneficial owner of Pike Pointe.

4.    Title to Circus Garage.    The City shall cause the DBA to execute such documentation as is necessary to confirm the transfer of ownership of the Circus Garage to the City promptly after execution of this Agreement.   The City shall retain title to the Circus Garage during such time as Pike Pointe has the right to exercise the Option and shall maintain the Circus Garage in at least the same condition and repair as of the date hereof.

5.    Development Agreements.  Pike Pointe hereby acknowledges that the City has entered into certain development agreements with third party developers, which agreements contemplate that those developers will have the right to use parking spots within the Circus Garage at fair market rates (as determined by Pike Pointe from time to time and consistent with the rates provided to other patrons of the Circus Garage), and Pike Pointe agrees that it shall execute leases, licenses or other usage agreements with such developers on those terms.  The City will provide the material terms and conditions of those development agreements with respect to developers' use of Circus Garage as soon as is reasonably practicable following execution of this Agreement.

6.    Due Diligence Activities.

(a)    Prior to delivery of the Exercise Notice, Pike Pointe shall have a period commencing on the date hereof and continuing through and including the date of the delivery of the Exercise Notice or the expiration or termination of this Option, whichever is sooner, (the "Due Diligence Period") to conduct its due diligence activities on the Circus Garage, which shall not unreasonably interfere with the use and operation of the Circus Garage.   For purposes of this Agreement, "Due Diligence Activities" include but are not limited to the following:

(A)    such physical inspections, soil borings and bearing tests, surveys, and possible relocation of utilities on or for the Circus Garage as Pike Pointe deems appropriate, all of which shall be completed at Pike Pointe's expense;

(B)   investigations, environmental site assessments, including Phase I and Phase II site assessments, sampling and testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint), and/or a Baseline Environmental Assessment, ("**BEA**"), as defined in Part 201 of the Natural Resources and Environmental Protection Act ("**NREPA**"), being MCL 324.20101 et seq., and such other investigations and assessments as Pike Pointe may deem needed in its sole discretion to determine the condition of the Circus Garage and the Circus Garage's compliance with applicable law, all of which shall be completed at Pike Pointe's expense; and

(C)   a review of the title evidence, survey, entitlements, and payment of taxes and assessments, all of which shall be completed at Pike Pointe's expense;

(D)   a review of financing sources related to Pike Pointe's proposed use of the Circus Garage, or any other matter that in Pike Pointe's sole discretion is relevant to Pike Pointe's use of the Circus Garage;

(E)   a review of all City Information and all publicly-available information with respect to the Circus Garage;

(F)   a review of available public and private utilities and public accesses necessary for the proposed use of the Circus Garage; and

(G)   application and procurement of any zoning, site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required or appropriate for the proposed use of the Circus Garage.  The City hereby authorizes Pike Pointe to submit and apply for all such approvals, permits, and variances upon the commencement of the Due Diligence Period.

(b)   <u>Restoration of City Property</u>.  Promptly following completion of a Due Diligence Activity, Pike Pointe shall restore the Circus Garage and all property therein to the state in which it existed prior to the commencement of the Due Diligence Activity.

(c)   <u>City Information</u>.  The City shall use reasonable efforts to make available to Pike Pointe all information in the City's (or the City's agencies' or departments') possession or control related to the Circus Garage within thirty (30) days following the effective date of the Plan of Adjustment, including but not limited to existing leases, licenses, permits, approvals, contracts, warranties, title searches and policies, surveys, appraisals, environmental audits, Phase I environmental site assessments, Phase II reports or other testing or sampling data, asbestos surveys, reports, specifications, from the Planning, Building, Assessing, Environmental

Affairs and Fire Departments, notices of violations of applicable laws, regulations and ordinances or other documents in the City's possession or control related to the Circus Garage, to the extent the City is not required by law or applicable agreement to keep such information confidential (collectively, the "**City Information**"). The City shall cooperate with Pike Pointe and use reasonable efforts to facilitate Pike Pointe's Due Diligence Activities, all at no material incremental cost to the City, including providing information, coordinating with third party users of the Circus Garage as applicable, and executing such documentation as may be reasonable and necessary for Pike Pointe's access to the site and completion of the Due Diligence Activities including the preparation of a BEA.

(d) <u>Insurance</u>. Prior to entering onto the Circus Garage for any Due Diligence Activities, Pike Pointe or its contractors shall enter into a right-of-entry agreement regarding the entry into the Circus Garage to be reasonably agreed to by the City and Pike Pointe.

(e) <u>Indemnity</u>. Pike Pointe shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Pike Pointe's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Due Diligence Activities; provided, however, that Pike Pointe shall in no circumstance have any obligation or liability with respect to any conditions pre-existing at the Circus Garage including without limitation any environmental condition, soil or groundwater contamination or other environmental conditions that may be discovered in the course of the Pike Pointe's Due Diligence Activities and thereafter disclosed to the City, except to the extent such conditions are materially exacerbated due to the negligence or willful acts of Pike Pointe or any of its duly authorized employees, agents, engineers or other representatives, and (ii) Pike Pointe shall not be responsible for any loss, liability, cost, or expense resulting from the discovery of any adverse information or condition regarding the Circus Garage or from the City's (or the City's agencies' or departments') negligence or misconduct.

7. <u>Notices</u>. All notices, demands and other communications given or delivered under this Agreement shall be given in writing to the address indicated below (or such other address as the recipient specifies in writing) and will be deemed to have been given when delivered personally, three (3) business days after mailed by certified or registered mail, return receipt requested and postage prepaid, or when delivery is guaranteed if sent via a nationally recognized overnight carrier, or when receipt is confirmed if sent via facsimile or other electronic transmission to the recipient with telephonic confirmation by the sending party.

> **[The City of Detroit**
> Office of the Mayor
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, Suite 1126
> Detroit, Michigan 48226

Facsimile: (313)224-4128
Attention: Mayor ]

with a copy to (which will not constitute notice):

> The City of Detroit
> Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue, 5th Floor
> Detroit, Michigan 48226
> Telephone: (313)224-1352
> Facsimile: (313)224-5505
> Attention: Corporation Counsel

with a copy to (which will not constitute notice):

> The City of Detroit
> Municipal Parking Department
> 1600 W. Lafayette
> Detroit, Michigan 48216
> Telephone: (313)221-2500
> Facsimile: (313)221-2501
> Attention: Director of Municipal Parking

> **[Pike Pointe]**
>
> _____
> _____
> _____
> _____

8.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.     <u>Time of Essence</u>.  Time is of the essence of this Agreement.

10.     <u>Severability</u>.  If any provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be declared invalid, illegal or unenforceable by a court of competence jurisdiction, all other provisions and applications hereof shall remain in full force and effect.

11.     <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof.

12.     <u>Governing Law; Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.  By its execution and delivery of this

Agreement, each of the City and Pike Pointe irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement, or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding shall be brought in the Bankruptcy Court for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan; provided that if the United States District Court for the Eastern District of Michigan does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan. By execution and delivery of this Agreement, each of the City and Pike Pointe irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

13.    _Amendments_.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by the parties hereto.

14.    _Captions_.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

15.    _Successors and Assigns_.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their permitted respective successors, heirs, administrators and assigns.

16.    _No Strict Construction_.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**CITY:**

CITY OF DETROIT

_____

By:
Its:


**TENANT:**

[PIKE POINTE]

_____

By_____
Its _____

# EXHIBIT 1

## DESCRIPTION OF GRAND CIRCUS PARKING GARAGE

Grand Circus is a three level underground parking structure, situated below the two parcels described below.  Grand Circus includes all ramps, walkways, stairwells and other ingress and egress points to the parking structure existing as of the date hereof.

**Parcel 02001886: 1883 Woodward Ave**
Legal Description: W WOODWARD ALL THAT PT OF GOVERNOR AND JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS ST & PARK AVE A K A WLY PT OF GRAND CIRCUS PARK2/--- 357 IRREG

**Parcel 01004139: 1600 Woodward Ave**
Legal Description: E WOODWARD ALL THAT PT OF GOVERNOR & JUDGES PLAN BOUNDED BY WOODWARD AVE, E ADAMS AND WITHERELL STS A K A ELY PT OF GRAND CIRCUS PARK1/--- 357 IRREG

## EXHIBIT 2

## CONCESSION AGREEMENT TERMS

- 30 year term, structured as a concession agreement
- Pike Pointe (or a Pike Pointe Affiliate) is obligated to operate and maintain the Circus Garage during the term at its sole cost and expense and has the right to collect all parking revenue derived from the Circus Garage
- Pike Pointe (or a Pike Pointe Affiliate) shall be responsible, at its sole cost and expense, for all necessary capital expenditures to the Circus Garage, including, without limitation, $13.5 million in capital expenditures during the first 5 years of the term.
- Rent to the City will be calculated as 25% of Free Cash Flow. Free Cash Flow is defined as revenue collected from the Circus garage minus operating expenses minus capital expenditures, which shall not include the $13.5 million in initial capital expenditures made by Pike Pointe.
- No Rent shall be due to the City until Pike Pointe has received a return of 140% on its initial capital expenditures of $13.5 million.
- Pike Pointe (or a Pike Pointe Affiliate) will enter into market-rate long term leases, licenses or usage agreements with the developers of properties adjacent to the Circus Garage pursuant to existing development agreements between the City and such developers.

**EXHIBIT I.A.348**

SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND
DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS

**SCHEDULE OF UNLIMITED TAX GENERAL OBLIGATION BOND**
**DOCUMENTS & RELATED UNLIMITED TAX GENERAL OBLIGATION BONDS**

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted March 3, 1999<br><br>Finance Director's Order dated April 1, 1999 | Series 1999-A | $18,747,364 |
| Amended and Restated Resolution of the City Council adopted April 6, 2001 and Supplement No. 1 to Amended and Restated Resolution, adopted June 13, 2001 (collectively, "2001 UTGO Resolution")<br><br>Finance Director's Order dated August 1, 2001 ("2001 UTGO Sale Order") | Series 2001-A(1) | $78,787,556 |
| 2001 UTGO Resolution<br><br>2001 UTGO Sale Order | Series 2001-B | $4,063,616 |
| Resolution of the City Council adopted July 24, 2002<br><br>Finance Director's Order dated August 2, 2002 | Series 2002 | $6,745,767 |
| Resolution of the City Council adopted September 19, 2003<br><br>Finance Director's Order dated October 9, 2003 | Series 2003-A | $34,908,150 |
| Bond Authorizing Resolution adopted June 14, 2004 ("2004 UTGO Resolution")<br><br>Finance Director's Order dated August 27, 2004 ("2004 UTGO Sale Order") | Series 2004-A(1) | $39,872,258 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(1) | $38,206,678 |
| 2004 UTGO Resolution<br><br>2004 UTGO Sale Order | Series 2004-B(2) | $736,241 |
| Resolution of the City Council adopted July 6, 2005 ("2005 UTGO Resolution")<br><br>Finance Director's Order dated December 5, 2005 ("2005 UTGO Sale Order") | Series 2005-B | $45,452,501 |
| 2005 UTGO Resolution<br><br>2005 UTGO Sale Order | Series 2005-C | $18,671,105 |

| Unlimited Tax General Obligation Bond Documents | Series of Unlimited Tax General Obligation Bonds | Balance as of Petition Date |
|---|---|---|
| Resolution of the City Council adopted November 17, 2006 ("2008 UTGO Resolution")<br><br>Finance Director's Order dated May 30, 2008 ("2008 UTGO Sale Order") | Series 2008-A | $59,487,564 |
| 2008 UTGO Resolution<br><br>2008 UTGO Sale Order | Series 2008-B(1) | $28,982,532 |

**EXHIBIT I.A.355**

FORM OF UTGO SETTLEMENT AGREEMENT

## SETTLEMENT AGREEMENT

This Settlement Agreement ("**Agreement**") is entered into as of July 18, 2014, among the City of Detroit (the "**City**"), Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty Municipal Corp. and Assured Guaranty Corp. (together, "**Assured**"), and National Public Finance Guarantee Corporation ("**NPFG**"). In this Agreement, each of the City, Ambac, Assured, and NPFG is referred to individually as a "**Party**"; Ambac, Assured, and NPFG (including their successors and assigns) are referred to collectively as the "**Bond Insurers**"; and the City and the Bond Insurers are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, as of the close of Fiscal Year 2013 (*i.e.*, June 30, 2013), the City had $369.115 million in outstanding principal amount of unlimited tax general obligations bonds, excluding the 2010 Series A Bonds hereinafter mentioned (the "**Prior UTGO Bonds**");

**WHEREAS,** more than 90% of the Prior UTGO Bonds are insured by one of the three Bond Insurers under financial guaranty insurance policies (the "**Bond Insurance Policies**") that were issued contemporaneously with the respective Prior UTGO Bonds;

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013 that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "**Emergency Manager**") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013 (the "**Petition Date**"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing Bankruptcy Case No. 13-53846 (the "**Bankruptcy Case**") before the United States Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**");

**WHEREAS**, as of the Petition Date, the balance due on the Prior UTGO Bonds, including prepetition interest accrued as of that date, was $374,686,297;

**WHEREAS,** on October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior UTGO Bonds in the amount of $9,372,276 and the Bond Insurers paid claims and were subrogated to the rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

**WHEREAS,** on April 1, 2014, the City defaulted on its obligations on the Prior UTGO Bonds to pay interest in the amount of $9,372,276 and to pay principal in the amount of $38,205,000, and the Bond Insurers paid claims and were subrogated to the

rights of the owners for such payments, and the insurance documents contemplate the assignment of the Prior UTGO Bonds to the Bond Insurers upon payment of a claim;

WHEREAS, on November 8, 2013, Assured and NPFG filed an adversary proceeding against the City seeking declaratory relief with regard to their rights in respect of the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05309) (the "**Assured/NPFG Action**"), and Ambac filed an adversary proceeding against the City seeking declaratory relief with regard to its rights in respect of, *inter alia*, the Prior UTGO Bonds pending before the Bankruptcy Court (Adv. Proc. No 13-05310) (the "**Ambac Action**");

WHEREAS, on or about February 21, 2014, each of the Bond Insurers filed proofs of claim in the Bankruptcy Case (the "**UTGO Claims**") asserting claims against the City for the full amount of principal and interest due under the documents pursuant to which the Prior UTGO Bonds were issued (including post-petition interest), amounts due the Bond Insurers for payments pursuant to the Bond Insurance Policies, and contractual reimbursements due for charges, fees, costs, losses, liabilities and expenses incurred by the Bond Insurers in connection with the Bond Insurance Policies; and

WHEREAS, the Parties have engaged in good faith and arms' length negotiations regarding a consensual resolution of their disputes under or in respect of the Prior UTGO Bonds, the Assured/NPFG Action, the Ambac Action, and the UTGO Claims;

NOW, THEREFORE, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.  Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.  Definitions.  In addition to the capitalized terms defined in the preamble and recitals, the following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"**Act 436**" shall mean the Local Financial Stability and Choice Act of the State, Act 436 of 2012, Public Acts of Michigan, 2012.

"**Additional Bonds**" shall mean any unlimited tax general obligation bonds issued on a parity with the Prior UTGO Bonds, the UTGO Bonds and the 2010 Series A Bonds as to the Aggregate UTGO Tax Levy.

"**Additional DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Agreement to Deposit State Aid**" shall mean the agreement, dated as of the date of the issuance of the MFA Bonds, among the City, the State Treasurer and U.S. Bank National Association, as Master Trustee, providing for the deposit of Distributable State Aid payments by the State Treasurer directly into the funds and accounts held by the Master Trustee pursuant to the Master Indenture for purposes of retiring the Municipal Obligation for so long as the Municipal Obligation remains outstanding.

"**Aggregate UTGO Tax Levy**" shall mean all proceeds of the ad valorem tax millage levies, including delinquent millage payments received from Wayne County or otherwise, on account of unlimited tax general obligation bonds of the City, including the Prior UTGO Bonds (or after the Effective Date, the UTGO Bonds), the 2010 Series A Bonds and any Additional Bonds hereafter issued by the City.

"**Allowed Claim**" has the meaning ascribed to it in the Plan.

"**Ambac Action**" has the meaning ascribed to it in the recitals hereof.

"**Approval Motion**" shall mean a motion filed by the City with the Bankruptcy Court in accordance with Section 2.8(c), seeking entry of the Approval Order pursuant to Federal Rule of Bankruptcy Procedure 9019, which motion shall be in form and substance reasonably satisfactory to the Parties.

"**Approval Order**" shall mean an order of the Bankruptcy Court (other than the Plan Confirmation Order) approving the compromise and settlement set forth in this Agreement authorizing and directing the consummation of the transactions contemplated herein, which order shall be in a form and substance reasonably satisfactory to the Parties.

"**Assigned UTGO Bond Tax Proceeds**" has the meaning ascribed to it in Section 2.1(b)(i).

"**Assured/NPFG Action**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereof.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurance Policies**" has the meaning ascribed to it in the recitals hereof.

"**Bond Insurer Claims**" has the meaning ascribed to it in Section 2.1.

13-53846-swr   Doc 8901-25   Filed 09/19/14   Entered 09/19/14 02:46:59   Page 45 of 54
76

"**Bond Insurer Exculpated Parties**" means the Bond Insurers solely in their capacity as insurers of the Prior UTGO Bonds, and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

"**Claim**" shall mean a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"**Class**" means each class of Claims established under the Plan.

"**Debt Millage Escrow Agreement**" shall mean an escrow agreement substantially in the form of Exhibit A hereto between the City and U.S. Bank National Association as escrow trustee providing, among other things, for the deposit and distribution of the Aggregate UTGO Tax Levy collected by the City, to be executed and delivered on the date of this Agreement.

"**Debt Millage Escrow Trustee**" has the meaning ascribed to it in Section 2.4(a).

"**Distributable State Aid**" shall mean the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and the provisions of the Glenn Steil State Revenue Sharing Act, Act 140, Public Acts of Michigan, 1971, as amended ("**Act 140**") in each City fiscal year ending June 30.

"**DSA Deposit**" has the meaning ascribed to it in Section 2.5(c).

"**DSA Deposit Date**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement(s)**" has the meaning ascribed to it in Section 2.5(c).

"**Deposit Date Balance Requirement for the Municipal Obligation**" has the meaning ascribed to it in Section 2.5(e).

"**DSA Escrow Funds**" has the meaning ascribed to it in Section 2.5(b).

"**DTC System**" shall mean the system maintained by the Depository Trust Company used for trading municipal securities.

"**Effective Date**" shall mean the effective date of any Plan.

"**Emergency Manager**" has the meaning ascribed to it in the recitals hereof.

"**Emergency Manager Order**" shall mean an order of the Emergency Manager in substantially the form attached hereto as Exhibit B.

"**Event of Default**" has the meaning ascribed to it in Section 4.1.

"**Existing DSA Debt**" has the meaning ascribed to it in Section 2.6(a).

"**Final Order**" shall mean an order or judgment including any associated findings of fact and conclusions of law of the Bankruptcy Court  or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or rehearing is pending; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Federal Rule of Bankruptcy Procedure 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"**Financial Terms**" has the meaning ascribed to it in Section 2.2.

"**Hard Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(i).

"**Holders Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Holder**" shall mean the holder of a Claim under or evidenced by the Prior UTGO Bonds.

"**Impaired Financial Creditors**" has the meaning ascribed to it in Section 2.11(a).

"**Insurer Owned Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1(a).

"**Master Indenture**" shall mean the Master Debt Retirement Trust Indenture dated as of March 1, 2010 by and between the City and U.S. Bank National Association, Detroit, Michigan, as Master Trustee, as supplemented by the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, by the Second Supplemental Debt Retirement Trust Indenture dated as of December 1, 2010, the Third Supplemental Debt Retirement Trust Indenture dated as of March 1, 2012,  the Fourth Supplemental Debt Retirement Trust Indenture dated as of August 1, 2012 and by the Fifth Supplemental Debt Retirement Trust Indenture to be dated as of the first day of the

month of the issuance of the MFA Bonds, by and between the City and the Master Trustee.

"**Master Trustee**" shall mean U.S. Bank National Association, Detroit, Michigan, as trustee under the Master Indenture or any successor trustee appointed pursuant to the terms of the Master Indenture.

"**MFA Bonds**" has the meaning ascribed to it in Section 2.2.

"**Municipal Obligation**" has the meaning ascribed to it in Section 2.2.

"**Plan**" shall mean the chapter 9 plan of adjustment filed by the City and incorporating the terms and conditions set forth in this Agreement, in substantially the form of the draft thereof dated May 5, 2014, as such plan may be amended, modified or supplemented from time to time, which plan, as it relates to this Settlement Agreement, shall be in form and substance reasonably satisfactory to the Bond Insurers.

"**Plan Confirmation Order**" shall mean findings of fact and an order of the Bankruptcy Court confirming the Plan and meeting the requirements of Section 2.9 of this Agreement.

"**Plan Documents**" shall mean the Plan, the Plan Confirmation Order and any Plan related documents effectuating this Agreement.

"**Plan Instruments**" shall have the meaning ascribed to it in Section 2.11(a)(ii).

"**Prior UTGO Bonds**" has the meaning ascribed to it in the recitals hereof.

"**Pro Rata**" shall mean the proportion that a claim of one Holder of Restructured UTGO Bonds bears to the aggregate of all claims of all of the Holders of Restructured UTGO Bonds.

"**Restructured UTGO Bonds**" has the meaning ascribed to it in Section 2.1.

"**Series 2014 DSA Escrow Fund**" has the meaning ascribed to it in Section 2.5(d).

"**Settlement Escrow Agreement**" has the meaning ascribed to it in Section 2.8.

"**Settlement-Related Documents**" shall mean this Agreement, the Plan Documents, the Approval Order (if applicable), the Debt Millage Escrow Agreement, the Settlement Escrow Agreement, the Restructured UTGO Bonds, the Stub UTGO Bonds, the Municipal Obligation, the MFA Bonds and all documents related to the MFA Bonds

(other than a Bond Insurer's insurance policies related to the MFA Bonds, Restructured UTGO Bonds and the Stub UTGO Bonds), each of which shall be in form and substance reasonably satisfactory to the Parties (and, in the case of the Plan Documents, solely as they relate to this Agreement).

"**Shared Credit Rating Act**" shall mean the Shared Credit Rating Act, Act No. 227 of the Public Acts of 1985 of the State, as from time to time amended.

"**Soft Pay Instruments**" has the meaning ascribed to it in Section 2.11(a)(ii).

"**State**" shall mean the State of Michigan.

"**State Treasurer**" shall mean the State Treasurer of the State.

"**Stub UTGO Bonds**" has the meaning ascribed to it in Section 2.1(b).

"**Stub UTGO Challenge**" has the meaning ascribed to it in Section 6.3(b).

"**Syncora**" shall mean Syncora Capital Assurance Inc. and Syncora Guarantee Inc. as insurer of the Series 2003(A) Unlimited Tax General Obligation Bonds.

"**2010 Senior Bonds**" has the meaning ascribed to it in Section 2.3(d)(i).

"**2010 Series A Bonds**" shall mean the City's $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010 (A) (Taxable Recovery Zone Economic Development Bonds-Direct Payment).

"**Third Lien Bonds**" has the meaning ascribed to it in Section 2.3(d)(iii).

"**Top-Off Payments**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Event**" has the meaning ascribed to it in Section 2.11(b).

"**Trigger Payments**" has the meaning ascribed to it in Section 2.11(b).

"**UTGO Bond Tax Levy**" shall mean that portion of the Aggregate UTGO Tax Levy in the amount that was allocable to the Prior UTGO Bonds.

"**UTGO Bonds**" shall mean the Municipal Obligation and the Stub UTGO Bonds.

"**UTGO Claims**" has the meaning ascribed to it in the recitals hereof.

"**UTGO Litigation**" has the meaning ascribed to it in Section 2.13.

Section 1.3.  Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party hereto because of the authorship of any provision of this Agreement.

Section 1.4.  General Rules of Construction.  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires

(a)  Defined terms in the singular shall include the plural as well as the singular, and vice versa.

(b)  All accounting terms not otherwise defined herein shall have the meanings assigned to them, and all computations herein provided for shall be made, in accordance with generally accepted accounting principles. All references herein to "generally accepted accounting principles" refer to such principles as they exist at the date of application there.

(c)  All references in this instrument to designated "Articles", "Sections" and other subdivisions are to the designated Articles, Sections and subdivisions of this instrument as originally executed.

(d)  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

(e)  All references in this instrument to a separate instrument are to such separate instrument as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(f)  The term "person" shall include any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization and any government or agency or political subdivision thereof.

## ARTICLE II
## SETTLEMENT TERMS

Section 2.1.  Claim Treatment.  The City hereby agrees that the total Allowed Claim relating to the Prior UTGO Bonds will be $388,000,000, allocated as follows:

(a)  $287,560,790 of the Prior UTGO Bonds which mature on or after April 1, 2015 will be restructured and allocated (i) among the Holders of the Prior UTGO Bonds which mature on or after April 1, 2015 on a Pro Rata basis, as set forth on

Schedule 1a annexed hereto (the "**Holders Restructured UTGO Bonds**") and (ii) the Bond Insurers and Syncora, as set forth on Schedule 1b (the "**Insurer Owned Restructured UTGO Bonds**" and, together with the Holders Restructured UTGO Bonds, the "**Restructured UTGO Bonds**"), and the Restructured UTGO Bonds will be restructured by delivery of the Municipal Obligation to the MFA and the delivery by the MFA of the MFA Bonds as described in Section 2.2 below, which, as restructured through the MFA, will be a full faith and credit general obligation payable from all legally available resources and secured, to the extent permitted by law, including Section 12(1)(x) of Act 436, by a lien upon the UTGO Bond Tax Levy, and payable and further secured by a lien on Distributable State Aid as provided in Section 2.3(a)(iii); and

(b)     The remainder of the Prior UTGO Bonds (the "**Stub UTGO Bonds**") which mature on or after April 1, 2015, in the principal amount of $43,349,210, will be reinstated and remain outstanding, and will be payable from the UTGO Bond Tax Levy, subject to the following terms and conditions:

(i)     The Holders' rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation) will be assigned under and pursuant to the Plan (without any consent or action on the part of, or additional consideration payable to, the Bond Insurers or the Holders) to a designee or designees of the City (the "**Assigned UTGO Bond Tax Proceeds**"), and such proceeds will not be paid to the paying agent for the UTGO Bonds.

(ii)     The obligations of the Bond Insurers to the Holders of the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds under the existing applicable Bond Insurance Policies shall be unchanged.

(c)     The Bond Insurers shall be granted Allowed Claims for all amounts actually paid by the Bond Insurers to Holders of the Prior UTGO Bonds together with any policy advances made from and after the Effective Date by the Bond Insurers in respect of the Stub UTGO Bonds pursuant to this Agreement up to an aggregate amount of $100.5 million (the "**Bond Insurer Claims**"), which Allowed Claims shall receive distributions only when and if the Most Favored Nations clause set forth in Section 2.11 becomes operative and only pursuant to the terms of such Most Favored Nations clause.

Section 2.2.     Restructuring of Restructured UTGO Bonds by Delivery of Municipal Obligation to MFA and Delivery of MFA Bonds.

(a)     On or before the Effective Date (i), the Restructured UTGO Bonds will be restructured as follows: By execution of the Emergency Manager Order the City will authorize the issuance and delivery of a local government municipal obligation (the "**Municipal Obligation**") to the Michigan Finance Authority ("**MFA**"), in accordance with applicable law, (ii) the City will request the MFA to issue its Local Government Loan Program Revenue Bonds, Series 2014 (City of Detroit Unlimited Tax General Obligation Restructured Local Project Bonds) (the "**MFA Bonds**"), and (iii) the

13-53846-tvt    Doc 7001-5   Filed 09/16/14   Entered 09/16/14 12:06:59   Page 51 of 64
76

MFA Bonds shall be distributed Pro Rata to the Holders of the Holders Restructured UTGO Bonds as set forth on Schedule 1a annexed hereto and among the Bond Insurers and Syncora as set forth on Schedule 1b annexed hereto. The Municipal Obligation and the MFA Bonds will have the same principal amount (rounded down for each denomination to the nearest whole dollar), interest rate, payment dates, amortization schedule, prepayment terms (including first call date) and other financial terms (other than the pledge of Distributable State Aid and the priority of payment from the UTGO Bond Tax Levy relative to the Stub UTGO Bonds) as the Restructured UTGO Bonds (the "**Financial Terms**"). The MFA Bonds will be limited obligations of the MFA, payable from and secured by (i) payments made by the City on the Municipal Obligation and all right, title and interest in and to the Municipal Obligation, which shall include, to the extent permitted by applicable law, including without limitation Section 12(1)(x) of Act 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation as required by Section 2.3(a), and (ii) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the MFA Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the MFA Bonds, which include, without limitation, all payments of (x) the proceeds of the UTGO Bond Tax Levy and (y) Distributable State Aid deposited as described in Sections 2.4 and 2.5.

(b) All documents relating to the Municipal Obligation and the MFA Bonds will be in form and substance reasonably satisfactory to the Bond Insurers. Such documentation will include that the Master Indenture will not be amended in any manner which adversely affects the MFA Bonds or the rights of the Bond Insurers. Each Bond Insurer will insure the Series of MFA Bonds relating to the Holders Restructured UTGO Bonds originally insured by such Bond Insurer set forth on Schedule 1a attached hereto by either (i) issuing a new bond insurance policy (and to the extent applicable canceling the existing policy), (ii) endorsing its existing Bond Insurance Policy or (iii) amending its existing Bond Insurance Policy.

(c) Each of the MFA Bonds will be freely transferable through the DTC System under a unique CUSIP identification number that is separate and distinct from the CUSIP identification number for the Stub UTGO Bonds or, if the DTC System is discontinued with respect to the MFA Bonds, in such other manner as is permitted in accordance with their terms.

(d) The paying agent for the Prior UTGO Bonds shall issue new certificates representing the Stub UTGO Bonds to the Holders in principal amounts representing the balance of each Holder's Prior UTGO Bonds not restructured through the delivery of the MFA Bonds.

Section 2.3. <u>The Municipal Obligation and Distributable State Aid</u>. The City agrees, with the cooperation of the MFA, to restructure the Restructured UTGO Bonds as the Municipal Obligation as of the Effective Date. The City covenants and agrees that:

(a)     The Municipal Obligation:

(i)     will be approved  pursuant to the Emergency Manager Order and in accordance with all applicable laws;

(ii)    will be payable from the unlimited tax full faith, credit and resources of the City and the UTGO Bond Tax Levy and secured, to the extent permitted by law, including without limitation Section 12(1)(x) of Act 436, by a lien granted by the City on the UTGO Bond Tax Levy pursuant to the Emergency Manager Order, the grant of which will be confirmed by the Bankruptcy Court in the Plan Confirmation Order (or, if applicable, the Approval Order);

(iii)   also will be secured by and payable from a portion of the City's Distributable State Aid, subject to a statutory lien and trust as provided in section 15(2) of the Shared Credit Rating Act;

(iv)    will have the same rights (other than priority) in and to the Distributable State Aid, and have the same protections (including, without limitation, a statutory lien to the  same extent the 2010 Series A Bonds are secured by a statutory lien), as the 2010 Series A Bonds, except that the City's Deposit Date Balance Requirement (as defined in Section 2.5) with respect to the Municipal Obligation shall be as described in paragraph 2.5(e) below;

(v)     will have the identical Financial Terms as the Restructured UTGO Bonds; and

(vi)    will be pledged by the MFA to the bond trustee for the holders of the MFA Bonds pursuant to a resolution of the MFA authorizing the issuance of the MFA Bonds.

(b)     The UTGO Bond Tax Levy shall be escrowed and used to pay the Municipal Obligation prior to the use of Distributable State Aid in the same manner as provided for the 2010 Series A Bonds, as described herein.

(c)     Distributable State Aid will be pledged by the City and secured by a lien under the Master Indenture to be used for the purpose of paying principal of and interest on the Municipal Obligation and any additional bonds or other future obligations issued by the City and secured by Distributable State Aid.

(d)     The lien on  Distributable State Aid for the Municipal Obligation will be a fourth priority lien, subordinate, as of the MFA Bonds  issuance date, only to the following:

(i)     the first priority lien on Distributable State Aid for the City's $249,790,000 Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 (the "**2010 Senior Bonds**");

(ii)　　the second priority lien on Distributable State Aid for the City's 2010 Series A Bonds, which lien in favor of the 2010 Series A Bonds is subordinate to the lien in favor of the 2010 Senior Bonds; and

(iii)　　the third priority lien on Distributable State Aid for the City's third-lien limited tax general obligations bonds (the "**Third Lien Bonds**") securing the MFA's $129,520,000 Local Government Loan Program Revenue Bonds, Series 2012C (City of Detroit Limited Tax General Obligation Local Project Bonds Third Lien), which lien in favor of the Third Lien Bonds is subordinate to the lien in favor of the 2010 Series A Bonds.

(e)　　The Emergency Manager shall issue the Emergency Manager Order in substantially the form attached hereto as Exhibit B.

Section 2.4.　　Escrow and Application of Aggregate UTGO Tax Levy.

(a)　　The City agrees that, pursuant to documentation in form and substance satisfactory to the Parties, proceeds of the Aggregate UTGO Tax Levy collected by the City will be segregated and transmitted no less often than as provided in the schedule of Statutory Tax Collection Distribution Dates published by the Bureau of Local Government Services of the Michigan Department of Treasury, and in any event, no less often than (x) bi-monthly during the period beginning each July 1 and ending the following March 31, and (y) monthly during the period beginning April 1 and ending the following June 30 of each year, to U.S. Bank National Association as escrow trustee (the "**Debt Millage Escrow Trustee**"), to be held and distributed pursuant to the terms and conditions of the Debt Millage Escrow Agreement. The Debt Millage Escrow Trustee shall be required to allocate the revenue pro rata, as required by the Debt Millage Escrow Agreement, among the outstanding UTGO Bonds, the 2010 Series A Bonds, and any Additional Bonds.

(b)　　Proceeds of the Aggregate UTGO Tax Levy allocated to the UTGO Bonds will be transferred promptly by the Debt Millage Escrow Trustee (i) first, for deposit to the Tax Levy Account held by the Master Trustee for the Municipal Obligation in an amount sufficient, together with funds already on deposit therein to pay debt service due on the Municipal Obligation on or before the April 1 following such deposit, together with any past due debt service on the Municipal Obligation, and (ii) second, to the assignee of the rights to payment from the Assigned UTGO Bond Tax Levy of amounts payable on the Stub UTGO Bonds on or before the April 1 following such deposit, an amount equal to the scheduled debt service on the Stub UTGO Bonds. Proceeds of the Aggregate UTGO Bond Tax Levy transferred to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust under applicable State law.

(c)　　Neither the Holders of the MFA Bonds nor the Bond Insurers will seek payment from the proceeds of the UTGO Bond Tax Levy in excess of the amounts necessary to pay the Municipal Obligation scheduled annual debt service

plus any amount necessary to pay past due Municipal Obligation debt service plus any amounts required by Section 2.14(b).

Section 2.5.    Distributable State Aid and Flow of Funds.

(a)    Pursuant to the Agreement to Deposit Distributable State Aid, the State Treasurer has agreed to deliver 100% of the Distributable State Aid due the City to the Master Trustee for deposit under the Master Indenture for as long as the Municipal Obligation is outstanding.  Payments by the State Treasurer of Distributable State Aid will be deposited directly into the funds and accounts held by the Master Trustee in accordance with and as provided by the Agreement to Deposit Distributable State Aid and the Master Indenture.  Distributable State Aid payments made to the Master Trustee for the purpose of paying debt service on the Municipal Obligation will be held in trust and subject to a statutory lien under applicable State law.

(b)    The Master Trustee will be required to deposit all of the City's Distributable State Aid in the Debt Retirement Fund established under the Master Indenture and allocate and set aside Distributable State Aid into the various Distributable Aid Escrow Funds as provided in the Master Indenture, including, without limitation, the Series 2014 DSA Escrow Fund defined in Section 2.5(d) below (the "**DSA Escrow Funds**") created pursuant to one or more supplemental indentures to the Master Indenture for the purpose of accumulating Distributable State Aid in amounts required by such supplemental indentures to be deposited in the DSA Escrow Funds by the dates specified in such supplemental indentures to pay debt service on the bonds and obligations of the City secured by a pledge of Distributable State Aid.

(c)    On each date that the State Treasurer deposits a payment of the City's Distributable State Aid (each a "**DSA Deposit**") with the Master Trustee (each a "**DSA Deposit Date**"), the Master Trustee shall set-aside such amounts as shall be sufficient to fund the minimum balances required to be on deposit in each DSA Escrow Fund to pay the then current annual principal and interest requirements on the related obligation as provided in the Master Indenture (each, a "**Deposit Date Balance Requirement**" and collectively the "**Deposit Date Balance Requirements**").  Any amounts remaining in the Debt Retirement Fund after the setting aside of the amounts necessary to satisfy the Deposit Date Balance Requirements of all DSA Escrow Funds, shall be released to the City for deposit to the General Fund of the City.

(d)    On or before the Effective Date, the City pursuant to a supplemental indenture to the Master Indenture shall establish with the Master Trustee a Series 2014 DSA Escrow Fund (the "**Series 2014 DSA Escrow Fund**") for the purpose of accumulating Distributable State Aid in sufficient amounts to pay debt service on the Municipal Obligation.  Moneys on deposit in the Series 2014 DSA Escrow Fund shall be held and withdrawn by the Master Trustee solely for the purpose of paying to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA) the principal of and interest on the Municipal Obligation when due and payable, which payments will be used to make corresponding payments of principal and interest on the MFA Bonds.  Within the

13-53846-tjt   Doc 7904-5   Filed 09/16/14   Entered 09/16/14 12:06:59   Page 55 of 64
76

Series 2014 DSA Escrow Fund there shall be created three separate and segregated sub-accounts designated the "Distributable Aid Account," the "Tax Levy Account," and the "General Account." Proceeds of the Aggregate UTGO Tax Levy allocated to the Municipal Obligation and transferred to the Master Trustee by the Escrow Agent pursuant to Section 2.4(b)(i) shall be deposited to the Tax Levy Account and used as described in subsection (f) below. That portion of Distributable State Aid necessary to pay the principal of and interest on the Municipal Obligation when due, shall be set aside and maintained in the Distributable Aid Account and used as described in subsection (e) below. All other moneys deposited to the Series 2014 DSA Escrow Fund from time to time by the City shall be set aside and maintained in the General Account and used as described in subsection (f) below.

(e)     To the extent the Master Trustee does not have on deposit in the Tax Levy Account the required portions of principal and interest due on the next October 1 or April 1 on the first day of each month set forth below (the "**Deposit Date Balance Requirement for the Municipal Obligation**"), the Master Indenture will provide for the deposit of all, or such lesser amount as is necessary to correct the deficiency in the Deposit Date Balance Requirement for the Municipal Obligation, of that month's distribution of Distributable State Aid into the Distributable State Aid Account of the Series 2014 DSA Escrow Fund (after all deposits to DSA Escrow Funds established to pay debt service on obligations of the City having priority over the Municipal Obligation). The Deposit Date Balance Requirement for the Municipal Obligation will be as follows:

DEPOSIT DATE BALANCE REQUIREMENT

| MONTH OF DSA PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION INTEREST PAYMENT | PORTION OF NEXT MUNICIPAL OBLIGATION PRINCIPAL PAYMENT |
|---|---|---|
| November | 1/3 | 4/6 |
| January | 2/3 | 5/6 |
| March | 100% | 100% |
| September | 100% | 3/6 |

(f)     Amounts on deposit in the Series 2014 DSA Escrow Fund shall be withdrawn from the DSA Escrow Fund for the purpose of paying debt service on the Municipal Obligation when due to the bond trustee for the holders of the MFA Bonds (as assignee of the MFA), which payments will be used to make corresponding payments of principal and interest on the MFA Bonds. Amounts shall be debited first from the Tax Levy Account in an amount necessary to pay the principal of and interest on the

Municipal Obligation on the corresponding payment date, and thereafter, if the amount on deposit in the Tax Levy Account is not sufficient to make the payments required, the amount necessary to satisfy the deficiency shall be debited, first, from the Distributable Aid Account, and second, from the General Account.

Section 2.6. <u>Additional Indebtedness</u>. From and after the date of this Agreement and, pursuant to documentation in form and substance satisfactory to the Parties, until the MFA Bonds have been paid in full:

(a)     the City shall not incur, or permit to be outstanding, debt secured by a lien on the Distributable State Aid that is senior to the lien securing the Municipal Obligation, other than debt secured by a lien on the Distributable State Aid on the date of this Agreement ("**Existing DSA Debt**") and additional debt ("**Additional DSA Debt**") secured on a second or third lien level so that the aggregate principal amount of (x) Existing DSA Debt (as of the effective date of this Agreement – i.e., $479,310,000) plus (y) the Additional DSA Debt thereafter issued will not exceed $560,000,000, provided that, with respect to any Additional Debt the existing financial covenants in the Master Indenture restricting the issuance of additional bonds under the Master Indenture are satisfied.

(b)     Notwithstanding clause (a), the City may issue first, second or third lien refunding bonds secured pursuant to the Master Indenture so long as any such refunding issuance results in debt service savings by the City in each year that such refunding bonds will be outstanding (based upon the amortization schedule in effect prior to the time of such refunding) or, if the last maturity of the MFA Bonds is prior to final maturity of the refunding bonds then to be issued, then in each year during which the MFA Bonds are outstanding.

(c)     The City shall not incur debt secured by a lien on the Distributable State Aid that is pari passu with the lien securing the Municipal Obligation.

(d)     The City may incur debt secured by a lien on the Distributable State Aid that is junior and subordinate to the lien securing the Municipal Obligation.

Section 2.7. <u>Levy and Collection of the Ad Valorem Debt Millage</u>.

The Settlement-Related Documents will provide that:

(a)     The City shall impose in each year a separate debt millage levy reasonably projected to be in an amount necessary to pay the debt service coming due on all unlimited tax general obligation bonds (including both the Municipal Obligation and the Stub UTGO Bonds) before the next annual tax levy, including any past due amounts, plus any amounts necessary to reimburse the City for other City funds used to pay prior debt service, less any millage proceeds or other funds already on deposit with the Debt Millage Escrow Trustee which are available to pay the debt service next

coming due. The City shall comply with applicable law in levying and collecting ad valorem millage levied to pay all unlimited tax general obligation bonds.

(b)     The City shall certify annually not later than June 30 in each year that it has imposed the debt millage levy as required by and in accordance with Section 2.7(a). Such annual certification shall be in the form attached hereto as Exhibit C and shall be promptly provided to the Bond Insurers.

(c)     The City shall furnish to the Bond Insurers promptly upon request such information reasonably requested by the Bond Insurers to confirm the imposition of the debt millage levy and to monitor collections. The Bond Insurers shall have the right to discuss such information with the City, and the City will use reasonable efforts to explain the collection process to the Bond Insurers, including the allocation methods used for partial property tax payments.

Section 2.8.     Plan Effectiveness and Escrowing of Payments.

(a)     If the Effective Date of the Plan does not occur on or prior to September 30, 2014 for any reason other than proximately by reason of the actions or positions taken by any of the executing Bond Insurers, or their failure to support the Plan as provided in Section 3.1 below, solely in their capacity as the insurers of the Prior UTGO Bonds and not in any other capacity (including, for the avoidance of doubt in their capacity as insurers of any other obligations of the City), the City will pay into an escrow to be established with the current paying agent for the Prior UTGO Bonds the pro rata portion of the October 2014 scheduled interest debt service payment and any pro rata payments of principal and interest due thereafter, which would otherwise be paid on the Restructured UTGO Bonds, as if the transaction contemplated by this Agreement (other than the MFA Bond issuance) had closed. Specifically, and for clarification of the City's obligation under this paragraph, the City will pay into escrow the pro rata portion of scheduled debt service payments on the $287.56 million of Restructured UTGO Bonds due after September 30, 2014 through the Effective Date of the Plan, on the same terms and schedule as set forth in the current documents governing the Prior UTGO Bonds, which, subject to Section 2.8(b) below, such escrowed funds shall be released to the Bond Insurers on the Effective Date of the Plan. Such escrow shall be pursuant to the Settlement Escrow Agreement ("**Settlement Escrow Agreement**") in the form of Exhibit D attached hereto, which will be executed and delivered on the date of the execution and delivery of this Agreement.

(b)     If the Plan is not effective by March 31, 2015, and the Bankruptcy Court has issued an Approval Order (that is not stayed pending appeal) approving the settlement embodied in this Agreement, then on [March 31, 2015] the monies in such escrow will be released to the Bond Insurers, and the City will make all subsequent debt service payments, including the payment due on April 1, 2015, directly to the paying agent for the Prior UTGO Bonds as if the Restructured UTGO Bonds transaction (other than the MFA Bond issuance) had closed. If an Approval Order is entered but is subject to a stay pending appeal, the City shall continue to pay into escrow

13-53846-swr    Doc 7904-5    Filed 09/16/14    Entered 09/16/14 12:06:42    Page 58 of 64
76

the scheduled debt service on the Prior UTGO Bonds for so long as such stay remains in effect, and shall release all monies in the escrow accounts as soon as such order is no longer subject to stay.

(c)     If the Plan is not effective by September 30, 2014, then within fifteen (15) days of a request by the Bond Insurers, the City shall file an Approval Motion pursuant to Bankruptcy Rule 9019 with the Bankruptcy Court. The City and the Bond Insurers may mutually make an Approval Motion pursuant to Bankruptcy Rule 9019 at any time upon mutual agreement of the City and the Bond Insurers.

Section 2.9.     Confirmation Order and Findings.  The Plan Confirmation Order shall include provisions substantially in the form of Exhibit E.  Any material modification to such provisions shall be reasonably satisfactory to the Parties.

Section 2.10.     Conditions to Plan Effectiveness.  The Plan shall provide that the effectiveness of the Plan is subject to the following conditions:

(a)     The Michigan Finance Authority board shall have approved the issuance of the MFA Bonds and such bonds shall have been issued; and

(b)     The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of this Agreement.

Section 2.11.     Most Favored Nation.  In recognition of the unique features of the UTGO Bonds and in consideration of the settlement, the City agrees that the Bond Insurers will benefit from a "most favored nation" provision consisting of the two fundamental protections below and that such provision will be described in the Plan. Further, the City agrees that, if a class of Impaired Financial Creditors receives treatment other than the current treatment in the *Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (May 5, 2014)* [Docket No. 4392], such class' treatment in the Plan will include the existence of this "most favored nation" provision.

(a)     Recovery Percentage Projected as of Confirmation Date. Under no circumstances shall the terms of the Plan permit either of the Limited Tax General Obligation Claims or the COP Claims (each as defined in the Plan and collectively, the "**Impaired Financial Creditors**") to recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation.  In determining whether a Class of Impaired Financial Creditors will recover more on a percentage basis than the UTGO Claims as projected at Plan confirmation, the recovery percentage for each of the Impaired Financial Creditors' Claims will be the sum of:

(i)     the percentage that any cash payments and the principal amount of any "hard pay" instrument, combination of instruments or any other evidences of indebtedness or payment obligations of any kind (collectively, the "**Hard Pay Instruments**") provided to such Impaired Financial Creditor Class under the Plan is

13-53846-tjt    Doc 7904-5    Filed 09/16/14    Entered 09/16/14 01:20:59    Page 59 of 64
76

of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class; and

(ii)     the percentage that the reasonably anticipated recovery (as reasonably determined by the City as of Plan confirmation and as disclosed to creditors subject to the Bond Insurers' right to contest such determination as part of the confirmation hearing) on account of any "soft pay", contingent, or similar type of instrument, combination of instruments or any other evidences of indebtedness, contracts or settlements creating payment obligations of any kind including, without limitation, payment obligations relating to a sale, lease, privatization, public private partnership or similar arrangement or the value of any assets projected to be distributed or promised revenue streams or recoveries of any kind (collectively, the "**Soft Pay Instruments**" and together with the Hard Pay Instruments, the "**Plan Instruments**") provided to such Impaired Financial Creditor Class under the Plan is of the aggregate amount of all the Allowed Claims in such Impaired Financial Creditor Class.

(b)     Actual Recovery Percentage Post-Confirmation.  In the event the actual recovery percentage of any Impaired Financial Creditor Class on the aggregate Plan Instruments provided to such Impaired Financial Creditor's Class would result in such Class receiving 69.5% or more of the aggregate amount of all the Allowed Claims in any such Class (the "**Trigger Event**"), then payments that contribute to the Impaired Financial Creditor Class receiving a recovery over 69.5% (the "**Trigger Payments**") shall be made under such Plan Instruments to the Bond Insurers ("**Top-Off Payments**") on account of the Bond Insurer Claims in amounts equal to the following:

(i)     the amount of the Trigger Payment, multiplied by

(ii)     the quotient of

(A)     $100.5 million, divided by

(B)     the sum of (x) 30.5% of the aggregate amount of all the Allowed Claims in the particular Impaired Financial Creditor Class, and (y) $100.5 million.

For purposes of this sub-section, all actual recoveries for Impaired Financial Creditor Classes shall be determined by discounting the payments using a 5% discount rate back to the date of Plan confirmation.  Amounts payable to the Bond Insurers pursuant to the provisions of this Section 2.11 will be allocated to the Bond Insurers as set forth on Schedule 2 attached hereto.

(c)     Reporting.  The City shall deliver to the Bond Insurers:

(i)     promptly after the first payment is made thereunder, a written notice of any payment under any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class, including the amount and date of such payment;

     (ii) on each January 15 of every year beginning in the year after the first payment is made on any Soft Pay Plan Instrument benefiting any Impaired Financial Creditor Class and until the maturity date of the Soft Pay Instrument, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

     (iii) after any Impaired Financial Creditor Class achieves a recovery percentage on the aggregate amount of all the Allowed Claims in such class equal to or greater than 60%, on each January 15 and July 15, a written report calculating the aggregate recovery percentage of each Impaired Financial Creditor Class;

     (iv) after a Trigger Event occurs, a written report on each date that a payment is made under any Plan Instruments held by or benefiting an Impaired Financial Creditor Class that explains the calculation for the Trigger Payment and the Top-Off Payment and demonstrates compliance with the terms of this Agreement; and

     (v) written notice in the event any Impaired Financial Creditor challenges or disagrees in any manner with the determination of any payments related to a Trigger Payment.

The City official executing any written notice or written report described above will respond within a reasonable time to written inquiries from any Bond Insurer regarding such notice or report.  In the event any Bond Insurer or Insurers make a written request to meet with such City official, such City Official will meet within a reasonable time period with such Bond Insurer or Insurers to answer their reasonable questions regarding any such notice or report.

     (d) <u>Dispute Resolution</u>.  In the event any of the Bond Insurers provides a written notice to the City articulating disagreement with the City's determination of whether a Trigger Event has occurred or with the amount of shared payments after a Trigger Event pursuant to subsection 2.11(c)(iv), the City will notify all Bond Insurers and meet with the Bond Insurers within 15 business days of such written notice.  At the meeting the Parties will attempt in good faith to resolve the differences.  If the Parties are unable to reach a resolution of the differences the Bond Insurers will have the right to bring an enforcement action in the Bankruptcy Court.

    Section 2.12. <u>Legal Opinions</u>.

     Bond counsel will provide at closing customary legal opinions relating to the validity, priority and enforceability of any MFA transaction in form and substance reasonably satisfactory to the Bond Insurers; such opinions to include standard bankruptcy opinion exceptions. Bond counsel will also provide a customary opinion in form and substance reasonably satisfactory to the Bond Insurers, on the exemption of interest from Federal and State taxation of the MFA Bonds and the Municipal Obligation.

No opinion will be provided with respect to any aspect of any lien on the UTGO Bond Tax Levy.

Section 2.13.  Stay of Litigation, Proofs of Claim.

(a)  The Assured/NPFG Action and Ambac Action (the "**UTGO Litigation**") as it relates to the Prior UTGO Bonds shall be stayed pending the issuance of an Approval Order or Plan Confirmation Order and the occurrence of the Effective Date, whereupon the Parties shall ask the Bankruptcy Court to dismiss the UTGO Litigation without prejudice until the Approval Order or the Plan Confirmation Order, as applicable, is a Final Order, when such dismissal shall be deemed to be with prejudice.

(b)  As soon as practicable subsequent to the execution and delivery of this Agreement by each of the Parties, but in no event later than five (5) business days subsequent thereto, the Parties shall take any and all action as is appropriate to (i) stay the UTGO Litigation as provided in subsection (a) above, (ii) maintain the status quo of the Parties in the UTGO Litigation as of the execution of this Agreement, and (iii) ensure that no action (including separate litigation and any objection to proofs of claim filed by the Bond Insurers relating to the Prior UTGO Bonds) is undertaken or commenced inconsistent with seeking a stay of and maintaining the status quo of the UTGO Litigation; provided, however, that any such stay shall terminate on the first (1st) business day following termination of this Agreement.

(c)  In the event (i) an Approval Motion is made by the City and denied by the Bankruptcy Court, (ii) an Approval Order is issued but is not consistent with this Agreement in any material respect or is overturned on appeal, (iii) a Plan consistent with this Agreement in all material respects is not confirmed by the Bankruptcy Court other than changes regarding payments relating to the Stub UTGO Bonds, or (iv) a Plan Confirmation Order is entered by the Bankruptcy Court but is not consistent in all material respects with this Agreement, or is overturned on appeal, then any Party (including one or more of the Bond Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation and terminate this Agreement as to such Party by written notice to the Parties.

(d)  The Bond Insurers agree that all proofs of claims filed by any of them with respect to Prior UTGO Bonds shall be deemed resolved and fully satisfied by approval of this Agreement in the Plan Confirmation Order, which is a Final Order or an Approval Order, which is a Final Order, as applicable.

Section 2.14.  Additional Covenants

(a)  City Will Not Contest.  The City shall not contest the validity or enforceability of any of the liens or interests granted under this Agreement or any of the obligations of the City set forth in this Agreement.

(b)    Paying Agent, Master Trustee and Escrow Agent Fees.
The City shall pay the reasonable and customary fees and expenses (including reasonable attorneys' fees) of (i) the paying agent with respect to the Prior UTGO Bonds (including the paying agent relating to the Prior UTGO Bonds that are not Holders Restructured UTGO Bonds) and (ii) of the paying agent, the Master Trustee, the Debt Millage Escrow Trustee and the escrow agent identified in the Settlement Escrow Agreement in respect of all transactions contemplated by this Agreement.

(c)    Further Action. To the extent that the City has not taken all necessary action to authorize the execution, delivery and performance of this Agreement, it will do so.

# ARTICLE III
## PLAN OF ADJUSTMENT AND PLAN SUPPORT

Section 3.1.    Plan Support Commitment. From and after the date hereof, and so long as the City has complied, and is complying, with its covenants and obligations under this Agreement, the Bond Insurers will each support the treatment of the Prior UTGO Bonds in the Plan by, at a hearing or in a court filing, expressing such support solely as insurers of the Prior UTGO Bonds and, if each Bond Insurer has established its right to vote, will each vote Prior UTGO Bonds and reimbursement claims in support of such Plan treatment. The Plan shall provide that such treatment, consistent with this Agreement, is the treatment for all holders of the Prior UTGO Bonds. For the absence of doubt, nothing contained in this Agreement shall require any Bond Insurer to support or vote for the treatment of any class of claims under the Plan other than the UTGO Bonds.

Section 3.2.    Solicitation Required in Connection with Plan. Notwithstanding anything contained in this Article III or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. The City and the Bond Insurers acknowledge and agree that the acceptance of the Plan will not be solicited until the Bankruptcy Court has approved the Disclosure Statement and related ballots, and such Disclosure Statement and ballots have been transmitted to parties entitled to receive same.

Section 3.3.    Plan Document Provisions. All Plan Documents, as they relate to the settlement embodied in this Agreement must (i) be in form and substance reasonably satisfactory to the Bond Insurers and to the City and be consistent with this Agreement, (ii) provide that the Plan treatment for Prior UTGO Bonds is part of a settlement of the pending UTGO Litigation.

13-53846-swr    Doc 7801-5    Filed 09/16/14    Entered 09/16/14 01:26:59    Page 23 of 64
76

## ARTICLE IV
## DEFAULTS AND REMEDIES

Section 4.1.    Events of Default.  The breach by any Party of any material agreement or covenant set forth in this Agreement or the Settlement Escrow Agreement will be an event of default ("**Event of Default**") under this Agreement.

Section 4.2.    Remedies.  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage.  Therefore, the obligations of the Parties set forth in this Agreement and the Settlement Escrow Agreement shall be enforceable by an order compelling specific performance issued by the Bankruptcy Court, and appropriate injunctive relief may be applied for and granted in connection therewith.  Upon an Event of Default by the City, any Bond Insurer will have the right to compel immediate payment of amounts held under the Settlement Escrow Agreement by order of the Bankruptcy Court.  Such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement, the Settlement Escrow Agreement or otherwise. Any Bond Insurer may exercise its rights hereunder on its own. Consistent with Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

Section 4.3.    Termination.

(a)    This Agreement may be terminated by the mutual agreement of all of the Bond Insurers upon an Event of Default caused by the City.  This Agreement may be terminated by less than all of the Bond Insurers as to such Bond Insurer or Bond Insurers upon an Event of Default caused by the City  if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by one or more Bond Insurers before the Bankruptcy Court, (ii) the Bankruptcy Court, after notice and a hearing, finds that an Event of Default caused by the City has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the City of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the City fails to comply with the order.

(b)    This Agreement may be terminated by the City if any of the Bond Insurers fails to (i) support the Plan with respect to Class 8 – UTGO Claims or (ii) if it has the right to vote its Class 8 Claims as determined by the voting procedures process approved by the Bankruptcy Court in an order entered on March 11, 2014 (Docket No. 2984) (as such order may have been amended from time to time), vote its Class 8 Claims to accept the Plan.  This Agreement may be terminated by the City upon an Event of Default caused by the Bond Insurers, or any of them, if (i) an action or proceeding seeking to enforce the material agreement or covenant purported to be breached is brought by the City before the Bankruptcy Court, (ii) the Bankruptcy Court finds, after

notice and a hearing, that an Event of Default caused by the applicable Bond Insurer has occurred and (iii) either (A) the Bankruptcy Court declines to issue an order compelling specific performance by the applicable Bond Insurer of the applicable agreement or covenant purported to be breached or (B) the Bankruptcy Court issues such an order compelling specific performance but the applicable Bond Insurer fails to comply with the order.

(c)     Upon any such termination, any Party (including one or more of the Bonds Insurers as to such Bond Insurer or Bond Insurers) may resume the UTGO Litigation unless it has been previously dismissed with prejudice or has been previously deemed dismissed with prejudice.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.1.    Representations and Warranties of the City.  The City represents and warrants to the Bond Insurers that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken or will take all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any order or judgment of any court or other agency of government applicable to it, or any material agreements specifically applicable to it or any of its assets.

(d)     Other than (i) approvals by the MFA, the State Treasurer, the execution of the Emergency Manager Order, and the approvals required by Section 19 of Act 436 to be obtained prior to delivery of the Municipal Obligation, all of which the City reasonably expects to be obtained prior to the Effective Date, and (ii) the approval of the Bankruptcy Court, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it as of the date of execution of this Agreement with respect to the execution, delivery and performance of this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

Section 5.2.    Representations and Warranties of the Bond Insurers.  Each of the Bond Insurers represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary corporate action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it, or any agreements specifically applicable to it or any of its assets.

(d)     All corporate or governmental consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

(e)     Each of the respective Bond Insurers had and has standing to bring and resolve the UTGO Litigation related to the Prior UTGO Bonds that it insures (Assured and NPFG represent that each had and has standing to bring and resolve the Assured/NPFG Action, and Ambac represents that it had and has standing to bring and resolve the Ambac Action).

Section 5.3.     Mutual Representations and Warranties.  Unless otherwise noted, each Party makes the following representations, warranties and covenants (on a several basis, with respect to such Party only) to each of the other Parties:

(a)     Each person signing this Agreement warrants that he or she is legally competent and authorized to execute this Agreement on behalf of the Party whose name is subscripted at or above such person's signature.

(b)     The Parties have not made any statement or representation to each other regarding any facts relied upon by them in entering into this Agreement, and each of them specifically does not rely upon any statement, representation or promise of the other Parties hereto or any other person in entering into this Agreement, except as expressly stated herein or in the exhibits hereto.  Each party has relied upon its own investigation and analysis of the facts and not on any statement or representation made by any other party in choosing to enter into this Agreement and the transactions contemplated herein.

(c)     The Parties and their respective attorneys have made such investigation of the facts pertaining to this Agreement and all of the matters pertaining thereto as they deem necessary.

## ARTICLE VI
## EXCULPATION

Section 6.1.     Exculpation.  The Plan will include the Bond Insurer Exculpated Parties as exculpated parties for acts and omissions (other than those

constituting gross negligence or willful misconduct) in connection with (i) the Plan as it relates to this Agreement and (ii) this Agreement.

Section 6.2.   Releases.  Upon the dismissal with prejudice or deemed dismissal with prejudice of the applicable UTGO Litigation, the Parties to the applicable UTGO Litigation shall be deemed to have released each other, and the Parties' officials, officers, directors, employees and representatives, of and from any and all claims and causes of action related to the applicable UTGO Litigation and the Prior UTGO Bonds.

Section 6.3.   Defense Against Challenges.  (a) Subject to the terms of Section 6.3(b) below, if, after the issuance of the Plan Confirmation Order or the Approval Order, the validity or enforceability of any term or provision of this Agreement or the Settlement-Related Documents (as they relate to the settlement set forth in this Agreement) is challenged in any action, suit or proceeding, each of the named Parties in such action, suit or proceeding shall assume its own defense of such action, suit or proceeding.

(b) If, after the issuance of the Plan Confirmation Order or the Approval Order, an action, suit or proceeding is brought, an issue in which is the validity or enforceability of the Stub UTGO Bonds, including, without limitation, a challenge to the Assigned UTGO Bond Tax Proceeds (a "**Stub UTGO Challenge**"), the City shall assume the defense of such issue in any such action, suit or proceeding.  If any of the Bond Insurers are named as a party in a Stub UTGO Challenge, the City will appoint counsel to the named Bond Insurers, which may or may not be counsel to the City.  In all events, such counsel must be reasonably acceptable to the named Bond Insurers, and the City will pay the reasonable costs of such counsel.

**ARTICLE VII**
**DISMISSAL OF CASE AND TERMINATION**

Section 7.1.   Effect of Dismissal of the Bankruptcy Case.  In the event the Bankruptcy Case is dismissed, any Party may at any time within 60 days after such dismissal immediately terminate this Agreement by written notice to the other Parties.

Section 7.2.   Effect of Termination.  In the event of the termination of this Agreement by any Party pursuant to any provisions of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party hereto (or of any of its elected or appointed officials, directors, officers, employees, consultants, contractors, agents, legal and financial advisors or other representatives) arising from such termination, and no Party shall have any obligations to any other Party arising out of this Agreement.  Upon termination, neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were as a result of negotiations and compromises of the respective positions of the Parties.  If this

Agreement is terminated, then no Party hereto may (i) use this Agreement, any of its terms or any discussions or negotiations conducted in respect of this Agreement, or any part of the foregoing, in the UTGO Litigation; (ii) seek discovery with respect to any of the matters described in subsection (i) in the UTGO Litigation; or (iii) seek to admit any of the matters described in subsection (i) into evidence in the UTGO Litigation.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1.   Amendments.  This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement.

Section 8.2.   No Admission of Liability.

(a)   The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other person with respect to any of the matters addressed in this Agreement.

(b)   None of this Agreement (including, without limitation, the recitals and exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:  (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim or of any wrongdoing or liability of any Party; or (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement, and except that any Party may file this Agreement in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

Section 8.3.   Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement.  Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith, and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this

Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.

        Section 8.4.   Rights and Remedies.  Nothing in this Agreement is intended to augment or impair any rights, remedies and interests, including without limitation, liens, of any of the Parties hereto other than with respect to the Prior UTGO Bonds.

        Section 8.5.   Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

        Section 8.6.   Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan, without giving effect to any principles of conflicts of law and applicable federal law.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. In the event any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof. The City agrees that the Bankruptcy Court will have exclusive post-confirmation authority and power to enforce this Agreement and all Settlement-Related Documents and to hear and adjudicate any challenge, action, suit or proceeding brought by any third party challenging the validity or enforceability of any provision of this Agreement, until all UTGO Bonds have been paid in full and all Plan Instruments are no longer outstanding.  Pursuant to Section 904 of the Bankruptcy Code, the City hereby consents to the Bankruptcy Court enforcing the terms of this Agreement and the Settlement Escrow Agreement.

        Section 8.7.   Headings.  The headings of the Articles and Sections of this Agreement are inserted for convenience only and are not part of this Agreement and do

not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8.    Binding Agreement Successors and Assigns; Joint and Several Obligations.  This Agreement shall be binding upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another.

Section 8.9.    Entire Agreement.  This Agreement shall constitute the full and entire agreement among the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11.    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (a), when personally delivered by courier service or messenger, (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (c) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the City, to:

> Chief Financial Officer
> City of Detroit
> 1126 Coleman A. Young Municipal Center
> Two Woodward Avenue
> Detroit MI 48226
> Phone: (313) 224-3382
> Fax: (313) 224-2827

with a copy given in like manner to:

> Corporation Counsel
> City of Detroit Law Department
> Coleman A. Young Municipal Center
> 2 Woodward Avenue
> Detroit MI 48226
> Phone: (313) 237-3018
> Fax: (313) 224-5505

> Miller, Canfield, Paddock and Stone, PLC
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> Attention: Jonathan Green
> Email: green@millercanfield.com
> Attention: Amanda Van Dusen
> Email: vandusen@millercanfield.com

If to the Bond Insurers, to:

> Ambac Assurance Corporation
> One State Street Plaza
> New York, New York 10004
> Attention: Surveillance Department and General Counsel's Office
> Fax: (212) 208-3384

with a copy given in like manner to:

> Arent Fox LLP
> 1675 Broadway
> New York, New York 10019
> Attention: David L. Dubrow, Esq.
> Telecopy: (212) 484-3990
> Email: david.dubrow@arentfox.com

> Assured Guaranty Municipal Corp and Assured Guaranty Corp.
> 31 West 52nd Street
> New York, NY 10019
> Attention: Kevin J. Lyons
> Email: klyons@assuredguaranty.com
> Attention: Terence Workman
> Email: tworkman@assuredguaranty.com

with a copy given in like manner to:

Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY 10112
Attention: Lawrence A. Larose
Fax: (212) 541-5369
Email: llarose@chadbourne.com
Attention: Samuel S. Kohn
Fax: (212) 541-5369
Email: skohn@chadbourne.com

National Public Finance Guarantee Corporation
113 King Street
Armonk, NY 10504
Attention: Kenneth Epstein and William J. Rizzo
Telecopy: (914) 765-3259
Email: kenneth.epstein@optinuityar.com
Email: bill.rizzo@nationalpfg.com

with a copy given in like manner to:

Sidley Austin LLP
555 West 5th Street
40th Floor
Los Angeles, CA 90013
Attention: Jeffrey E. Bjork
Telecopy: (213) 896-6600
Email: jbjork@sidley.com

Sidley Austin LLP
555 California Street
Suite 2000
San Francisco, CA 94104
Attention: Eric D. Tashman
Telecopy: (415) 772-7400
Email: etashman@sidley.com

Section 8.12. <u>Further Assurances</u>. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 8.13. <u>Non-Severability of Agreement</u>. This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement, the Approval Order (if applicable) or the Plan Confirmation Order to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (i) a court of

competent jurisdiction enters a Final Order ruling that any of the transactions contemplated in this Agreement are void, invalid, illegal or unenforceable in any material respect, (ii) any of the transactions contemplated by this Agreement are reversed, vacated, overturned, voided or unwound in any material respect, or (iii) the Approval Order or Plan Confirmation Order as it relates to the transactions contemplated in this Agreement is reversed, vacated, overturned or amended in any material respect, then in each case, the entirety of this Agreement (other than this Section 8.13) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect.

(Signature page follows)

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE CITY OF DETROIT, as Debtor

By: _____
      Name:
      Title:

AMBAC ASSURANCE CORPORATION

By: _____
      Name:
      Title:

ASSURED GUARANTY CORP.

By: _____
      Name:
      Title:

ASSURED GUARANTY MUNICIPAL CORP.

By: _____
      Name:
      Title:

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION

By: _____
      Name:
      Title:

# Schedule 1

## (Pro Rata Allowed Claims for Restructured UTGO Bonds and Stub UTGO Bonds)

## Schedule 1a - Holders Restructured UTGO Bonds

| Series | Outstanding UTGO Bond Principal | Restructured % | Holders Restructured UTGO Bond Principal |
|---|---|---|---|
| UTGO1999A (Assured) | $15,765,000 | 84.50% | $13,321,425 |
| UTGO2001A1 (National) | 74,800,000 | 84.50% | 63,206,000 |
| UTGO2001B (National) | - | - | - |
| UTGO2002 (National) | 6,645,000 | 84.50% | 5,615,025 |
| UTGO2003A (Syncora) | 31,675,000 | 84.50% | 26,765,375 |
| UTGO2004A1 (Ambac) | 39,270,000 | 84.50% | 33,183,150 |
| UTGO2004B1 (Ambac) | 29,365,000 | 84.50% | 24,813,425 |
| UTGO2004B2 (Ambac) | 575,000 | 84.50% | 485,875 |
| UTGO2005B (Assured) | 42,615,000 | 84.50% | 36,009,675 |
| UTGO2005C (Assured) | 15,525,000 | 84.50% | 13,118,625 |
| UTGO2008A (Assured) | 55,895,000 | 84.50% | 47,231,275 |
| UTGO2008B1 (Assured) | 18,780,000 | 84.50% | 15,869,100 |
| Total | $330,910,000 | | $279,618,950 |