# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## EXHIBIT 5

## APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

In connection with Notice of Appeal filed by Thomas J. Cipollone
[Dkt. #8462]

| Item | Date Filed | Docket Number | Description |
|---|---|---|---|
| 5 | 8/27/2014 | 7143 | Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections Filed by Debtor In Possession City of Detroit, Michigan |

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

```
------------------------------------------------------x
                                        :
In re                                   :        Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :        Case No. 13-53846
                                        :
                        Debtor.         :        Hon. Steven W. Rhodes
                                        :
                                        :
------------------------------------------------------x
```

# CONSOLIDATED (A) PRETRIAL BRIEF IN SUPPORT OF CONFIRMATION OF SIXTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND (B) RESPONSE TO (I) CERTAIN OBJECTIONS FILED BY INDIVIDUAL BONDHOLDERS AND INDIVIDUAL RETIREES AND (II) SUPPLEMENTAL OBJECTIONS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................1

REQUEST FOR JUDICIAL NOTICE ...................................................14

FACTS RELEVANT TO CONFIRMATION.........................................14

SUMMARY OF OBJECTIONS...............................................................15

ARGUMENT ............................................................................................17

I.      THE PLAN DOES NOT DISCRIMINATE UNFAIRLY ...........................18

        A.      The Extent of Differential Treatment Between Pension Claims
                and Other Classes of Unsecured Claims is Limited...........................21

                1.      The City's Pension Liability for Purposes of an Unfair
                        Discrimination Analysis Is Significantly Higher Than the
                        Settlement Amount Used by Agreement with Retiree
                        Representatives That Was Reflected in the Disclosure
                        Statement...............................................................................22

                2.      The Outside Funding Must Be Excluded from Recoveries
                        for Purposes of an Unfair Discrimination Analysis.................30

        B.      The Differential Treatment of Pension Claims, Unlimited Tax
                General Obligation Claims and Limited Tax General Obligation
                Bond Claims is Fair.............................................................................33

                1.      Business Considerations Justify the Differential
                        Treatment of Pension Claims...................................................35

                2.      The Differential Treatment of Claims That Results From
                        Settlements of Significant Issues of Law Is Fair ....................38

                3.      The Differing Expectations of Creditor Classes Justify
                        the Differential Treatment of Pension Claims .........................42

                4.      Any Differential Treatment is Proposed in Good Faith...........46

        C.      There Is No Unfair Discrimination Against COP Claims..................47

        D.      There Is No Unfair Discrimination Arising from Macomb
                County's Claim ..................................................................................51

II.     THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO
        EACH CLASS OF CLAIMS THAT HAS NOT ACCEPTED THE
        PLAN .......................................................................................................52

-ii-

13-53846-tjt   Doc 8120   Filed 08/29/14   Entered 08/29/14 23:25:52   Page 3 of 293
13-53846-swr   Doc 8745   Filed 08/29/14   Entered 08/29/14 23:45:50   Page 2 of 292

A.   The City Cannot Improve Creditor Recoveries Through Increased Taxation ...........................................................56

B.   The City Is Nevertheless Making Reasonable Efforts to Maximize Revenues and Achieve Cost Savings...............62

C.   Arguments That the City Must Liquidate the DIA Collection or Other City-Owned Assets to Maximize Creditor Recoveries Must Be Rejected .......................................................64

    1.   The City Cannot Simply Sell the DIA Collection Free and Clear .....................................................................65

    2.   The City Cannot Be Compelled to Liquidate Its Assets..........66

    3.   A Forced Liquidation of the DIA Collection Would Yield Only a Fraction of the DIA Collection's True Economic Value and Would Deprive the City of a Unique and Irreplaceable Cultural Asset.....................................70

III.   THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.................71

A.   Unsecured Creditors' State Law Remedies Are Meaningless in the Context of the City's Continuing (and Worsening) Insolvency ........................................................................74

B.   Dismissal of the Chapter 9 Case Would Deprive the City and Its Residents of the Reinvestment Initiatives Upon Which the City's Economic Recovery Depends ................................79

C.   Dismissal of the Chapter 9 Case Would Cause the Financial Benefits of the Plan to Disappear........................................81

IV.   THE PLAN IS FEASIBLE.................................................................82

A.   The City's Revenue and Expense Projections are Accurate and Based on Reasonable Assumptions.....................................87

B.   The Contingency Provided for in the Projections Complies with Applicable Law ...................................................................91

C.   The City Will Possess Adequate Human Resources to Perform According to the Terms of the Plan ...................................93

D.   Adequate Systems and Procedures Will Be Established to Monitor the City's Performance .........................................94

E.   Appropriate Controls Will Ensure the City's Compliance with the Plan .............................................................................96

F. The Reinvestment Initiatives Will Elevate Municipal Services to Adequate Levels ..................................................................99

    1. The Blight Remediation Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services ..............................................................102

    2. The Public Safety Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services ..............................................................103

    3. The Public Transportation Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services ..............................................................104

    4. The Business Service Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services ..............................................................104

    5. The Information Technology and Support Services Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services ..........................105

    6. The Remaining Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services .................107

G. The City Can Sustain Its Recovery Over the Long Term ................107

V. THE CLASSIFICATION OF CLAIMS UNDER THE PLAN SATISFIES SECTION 1122 OF THE BANKRUPTCY CODE ..............110

A. All Claims Within Each Particular Class Are Similar in Legal Nature or Character ..........................................................112

B. The Plan Does Not Gerrymander Affirmative Votes .......................113

C. The Pension and OPEB Claims of Detroit Public Library and Detroit Regional Convention Facility Authority Employees Are Substantially Similar to Other Pension Claims and OPEB Claims ..............................................................116

VI. ALL CLAIMS WITHIN EACH CLASS WILL RECEIVE THE SAME TREATMENT UNDER THE PLAN ............................................122

VII. THE PLAN PROVIDES ADEQUATE MEANS FOR ITS IMPLEMENTATION ..............................................................124

A. The City Has Provided Sufficient Information to Syncora Regarding Implementation of the Plan ............................125

B.    The City Has Not Violated Due Process by Complying with the Court's Mediation Confidentiality Order .........................................130

VIII.  THE PLAN'S DISCHARGE, RELEASE AND EXCULPATION PROVISIONS ARE LAWFUL AND APPROPRIATE ...........................132

A.    The Plan's Exculpation and Consensual Release Provisions Are Lawful and Appropriate ....................................................132

B.    The Plan's Non-Consensual Release Provisions Are Lawful and Appropriate.......................................................................135

1.    Non-Consensual Third Party Releases and Injunctions Are Permissible in Unusual Circumstances..........................136

2.    The Approval of Non-Consensual Third Party Releases Is Particularly Appropriate in Chapter 9 Cases in Which the Effectuation of a Broad Settlement Depends Upon Such Releases................................................................138

3.    Unusual Circumstances Exist in the City's Chapter 9 Case That Warrant Approval of the Plan's Non-Consensual Release Provisions ...................................141

IX.    THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW ...........................................144

A.    There Is Ample Evidence of the City's Good Faith in Proposing the Plan ..............................................................................145

B.    The Plan Has Not Been Proposed by Any Means Forbidden by Law......................................................................................152

X.    ALL REGULATORY AND ELECTORAL APPROVALS NECESSARY UNDER APPLICABLE LAW TO CARRY OUT THE PLAN HAVE BEEN OR WILL BE OBTAINED....................................153

XI.    THE CITY IS NOT PROHIBITED BY LAW FROM TAKING ANY ACTION NECESSARY TO CARRY OUT THE PLAN .........................155

A.    The Plan's Allocation of DWSD Pension Funding Is Lawful and Appropriate.......................................................................156

B.    The Plan's Allocation of Restructuring Fees to the DWSD Is Lawful and Appropriate ................................................................158

C.    The DIA Settlement Does Not Constitute a Fraudulent Transfer....162

D.    The DIA Settlement Is Not an Illusory Contract ...........................167

E.    Other Alleged Violations ................................................169

XII.  THE POST-SOLICITATION MODIFICATIONS TO THE PLAN
      COMPLY WITH THE BANKRUPTCY CODE ......................172

XIII. THE PLAN SETTLEMENTS SHOULD BE APPROVED UNDER
      BANKRUPTCY RULE 9019.................................................181

    A.    The Requirements of Bankruptcy Rule 9019 are Satisfied With
         Respect to Each of the Plan Settlements ........................183

         1.    The Pre-Solicitation Settlements ..........................183

         2.    The Post-Solicitation Settlements ........................192

XIV. ADDITIONAL RESPONSES TO SUPPLEMENTAL OBJECTIONS ....201

    A.    Confirmation Should Not Be Denied Based Upon Syncora's
         Various Pending Appeals ...............................................201

    B.    Claims Arising Under 42 U.S.C. § 1983 May Be Impaired
         Under the Plan ...............................................................202

         1.    Section 1983 Claims May Be Impaired in Chapter 9 ...........202

         2.    The Injunction Provisions with Respect to Indirect
             Employee Indemnity Claims Are Lawful and Proper ...........205

    C.    Wilmington Trust's Concerns with  Respect to the COPs Are
         Unfounded .....................................................................209

    D.    The Retiree Committee's and Retirement Systems' Comments
         Have Been Addressed ....................................................212

CONCLUSION ..................................................................212

-vi-

13-53846-tjt  Doc 8945  Filed 08/29/14  Entered 08/29/14 23:45:52  Page 7 of 293
13-53846-swr  Doc 8945  Filed 08/29/14  Entered 08/29/14 23:45:52  Page 7 of 293

## TABLE OF EXHIBITS

Exhibit A:   Confirmation Standards Exhibit

Exhibit B:   Summary of Responses of the City to Supplemental Objections

Exhibit C:   Excerpted Portions of Certain Collective Bargaining Agreements Relating to the Detroit Public Library and the Detroit Regional Convention Facility Authority

# TABLE OF AUTHORITIES

CASES

Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp.
(In re Dana Corp.), 412 B.R. 53 (S.D.N.Y. 2008)............................123

Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court
(In re Chateaugay Corp.), 89 F.3d 942 (2d Cir. 1996) ......................44

Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.),
519 F.3d 640 (7th Cir. 2008) ...................................... 132-33

Americredit Fin. Servs., Inc. v. Nichols (In re Nichols), 440 F.3d 850
(6th Cir. 2006)............................................................170

Bank of N.Y. Mellon v. Jefferson Cnty. (In re Jefferson Cnty.), 503 B.R. 849
(Bankr. N.D. Ala. 2013) ............................................ 159-60

Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc),
622 F.2d 872 (5th Cir. 1980) ................................. 33, 43-44

Citicorp Acceptance Co. v. Ruti-Sweetwater (In re Sweetwater),
57 B.R. 354 (D. Utah 1985)........................................ 175-76

City of Roosevelt Park v. Norton Twp., 47 N.W.2d 605 (Mich. 1951) .................68

Class Five Nev. Claimants v. Dow Corning Corp.
(In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002)...............110, 136, 143

Conway v. Icahn & Co., 16 F.3d 504 (2d Cir. 1994) ............................48

Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange),
191 B.R. 1005 (Bankr. C.D. Cal. 1996) ............................73

Dugan v. PBGC (In re Rhodes, Inc.), 382 B.R. 550 (Bankr. N.D. Ga. 2008).........23

Estes v. Titus, 751 N.W.2d 493 (Mich. 2008)................................. 163-64

Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942)................61

Ile v. Foremost Ins. Co., 809 N.W.2d 617 (Mich. Ct. App. 2011)........................168

In re 11,111, Inc., 117 B.R. 471 (Bankr. D. Minn. 1990) ........................43

In re 28th Legislative Dist. Cmty. Dev. Corp., No. 10-14804,
2011 WL 5509140 (Bankr. E.D. Tenn. Nov. 10, 2011) ....................................115

In re Addison Cmty. Hosp. Auth., 175 B.R. 646
(Bankr. E.D. Mich. 1994) ........................................................................ 54, 67-68

In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989) ......................................18

In re Bamberg Cnty. Mem'l Hosp., No. 11-03877, 2012 WL 1890259
(May 23, 2012)..........................................................................................74

In re Barnwell Cnty. Hosp., 459 B.R. 903 (Bankr. D.S.C. 2011) ...........................54

In re Barnwell Cnty. Hosp., 471 B.R. 849 (Bankr. D.S.C. 2012) ..............17, 34, 74

In re Baugh, 73 B.R. 414 (Bankr. E.D. Ark. 1987) ...............................................46

In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,
187 B.R. 683 (Bankr. D. Colo. 1995)................................................................73

In re City of Columbia Falls, Mont., Special Improvement Dist. No. 25,
143 B.R. 750 (Bankr. D. Mont. 1992)..............................................................155

In re City of Detroit, 504 B.R. 97
(Bankr. E.D. Mich. 2013) ..................................... 3, 57, 59, 99, 169-70

In re City of San Bernardino, 499 B.R. 776 (Bankr. C.D. Cal. 2013)...................148

In re City of Stockton, 484 B.R. 372 (Bankr. E.D. Cal. 2012)..............................206

In re Condustrial, Inc., No. 09-04425, 2011 WL 3290389
(Bankr. D.S.C. Aug. 1, 2011) .........................................................................137

In re Connector 2000 Ass'n, 447 B.R. 752 (Bankr. D.S.C. 2011)............ 83, 138-40

In re Cooper, No. 08-20473, 2009 WL 1110648
(Bankr. N.D. Tex. Apr. 24, 2009)......................................................................33

In re Corcoran Hosp. Dist., 233 B.R. 449 (Bankr. E.D. Cal. 1999) ...... 41, 53, 83-84

In re Corcoran Irrigation Dist., 27 F. Supp. 322 (S.D. Cal. 1939) ................... 56-58

In re Crawford, 324 F.3d 539 (7th Cir. 2003)........................................................34

In re D2 Abatement, Inc., No. 10-45074, 2010 WL 4961705
(Bankr. E.D. Mich. Aug. 9, 2010) ..................................................175

In re Dow Corning Corp., 237 B.R. 374 (Bankr. E.D. Mich. 1999) .............. 174-75

In re Dow Corning Corp., 244 B.R. 634 (Bankr. E.D. Mich. 1999) ....................111

In re Dow Corning Corp., 244 B.R. 673 (Bankr. E.D. Mich. 1999) ....................150

In re Dow Corning Corp., 244 B.R. 696 (Bankr. E.D. Mich. 1999) ................ 41-42

In re Dow Corning Corp., 255 B.R. 445
(E.D. Mich. 2000)................................................122-23, 135, 145-46

In re Drainage Dist. No. 7, 25 F. Supp. 372 (E.D. Ark. 1938)...............................61

In re Eagle-Picher Indus., Inc., 203 B.R. 256
(S.D. Ohio 1996)......................................................... 110, 146-47, 175

In re Food City, Inc., 110 B.R. 808 (Bankr. W.D. Tex. 1990)............................152

In re Friedman's, Inc., 356 B.R. 758 (Bankr. S.D. Ga. 2005)............................137

In re Global Indus. Techs., Inc., No. 02-21626, 2013 WL 587366
(Bankr. W.D. Pa. Feb. 13, 2013) .......................................................137

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007) ............... 132-33

In re Graphic Commc'ns, Inc., 200 B.R. 143 (Bankr. E.D. Mich. 1996) ...............46

In re Gregory Boat Co., 144 B.R. 361 (Bankr. E.D. Mich. 1992)........................145

In re Leslie Fay Cos., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ......................147, 151

In re MCorp Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993).........................................32

In re Mount Carbon Metro. Dist., 242 B.R. 18
(Bankr. D. Colo. 1999) .........................................54, 72-73, 82-85, 147

In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I,
79 B.R. 305 (Bankr. S.D. Ohio 1987) ...............................................175

In re Nat'l Heritage Found., Inc., 478 B.R. 216 (Bankr. E.D. Va. 2012) ........ 133-34

In re Parke Imperial Canton, Ltd., No. 93-61004, 1994 WL 842777
(Bankr. N.D. Ohio Nov. 14, 1994) ................................................................. 31-32

In re Pierce Cnty. Hous. Auth., 414 B.R. 702 (Bankr. W.D. Wash. 2009)..............72

In re Quincy Med. Ctr., Inc., No. 11-16394, 2011 WL 5592907
(Bankr. D. Mass. Nov. 16, 2011) ........................................................134

In re Resorts Int'l, Inc., 145 B.R. 412 (Bankr. D.N.J. 1990) .................................122

In re Richmond Unified Sch. Dist., 133 B.R. 221
(Bankr. N.D. Cal. 1991)..................................................................34, 67

In re Rivers End Apartments, Ltd., 167 B.R. 470 (Bankr. S.D. Ohio 1994)...........43

In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970
(Bankr. D. Neb. 1989) ...................................................................72, 74

In re Simmons, 288 B.R. 737 (Bankr. N.D. Tex. 2003) .........................................18

In re Sovereign Grp., 1984-21 Ltd., 88 B.R. 325 (Bankr. D. Colo. 1988)............152

In re Stella, No. 05-05422, 2006 WL 2433443
(Bankr. D. Idaho June 28, 2006)..................................................................34

In re Sullivan Cnty. Reg'l Refuse Disposal Dist., 165 B.R. 60
(Bankr. D.N.H. 1994) .........................................................................61

In re Syncora Guar. Inc., No. 14-1719, 2014 WL 2959242
(6th Cir. July 2, 2014).......................................................................201

In re Tammarine, 405 B.R. 465 (Bankr. N.D. Ohio 2009).......................................85

In re U.S. Airways Grp., Inc., 303 B.R. 784 (Bankr. E.D. Va. 2003) ............... 23-24

In re UNR Indus., Inc., 143 B.R. 506 (Bankr. N.D. Ill. 1992) ..............................123

In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76
(Bankr. D. Colo. 1990) .................................................................... 60-61

In re Washington Mut., Inc., 442 B.R. 314 (Bankr. D. Del. 2011) ................. 133-34

In re Waterford Hotel, Inc., 497 B.R. 255 (Bankr. E.D. Mich. 2013)...........145, 150

In re W. Real Estate Fund, Inc., 75 B.R. 580 (Bankr. W.D. Okla. 1987) ..............41

In re Worldcom, Inc., No. 02-13533, 2003 WL 23861928
    (Bankr. S.D.N.Y. Oct. 31, 2003) ........................................................31

Johnson v. Howard, 24 F. App'x 480 (6th Cir. 2001).............................................48

JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC
    (In re Charter Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................182

Kleinert v. Lefkowitz, 259 N.W. 871 (Mich. 1935) ................................................163

Lorber v. Vista Irrigation Dist., 127 F.2d 628 (9th Cir. 1942) .........................53, 67

LTV Corp. v. PBGC (In re Chateaugay Corp.), 126 B.R. 165
    (Bankr. S.D.N.Y. 1991) ....................................................................................24

McCune v. Xerox Corp., 225 F.3d 654 (4th Cir. 2000) .................................... 48-49

Metro Emps. Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah),
    836 F.2d 1030 (6th Cir. 1988) ......................................................................146

Murphy v. Weathers, No. 07-00027, 2008 WL 4426080
    (M.D. Ga. Sept. 25, 2008).............................................................................133

New Magma Irrigation & Drainage Dist. v. Bd. of Supervisors
    (In re New Magma Irrigation & Drainage Dist.),
    193 B.R. 528 (Bankr. D. Ariz. 1994)..........................................................54, 60

Newhouse v. Corcoran Irrigation Dist., 114 F.2d 690 (9th Cir. 1940)...................67

Nino v. Moyer, 437 B.R. 230 (W.D. Mich. 2009).................................................163

Owen v. City of Independence, 445 U.S. 622 (1980)...................................... 203-04

Parker v. Klochko Equip. Rental Co., 590 F.2d 649 (6th Cir. 1979) ............... 68-69

Payton v. City of Highland Park, 536 N.W.2d 285 (Mich. Ct. App. 1995) ............68

PBGC v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505 (6th Cir. 2000)....... 25-26

Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture
    (In re Greystone III Joint Venture), 995 F.2d 1274 (5th Cir. 1991).................111

Prime Healthcare Mgmt., Inc. v. Valley Health Sys.
(In re Valley Health Sys.), 429 B.R. 692 (Bankr. C.D. Cal. 2010) ....................83

Silver Sage Partners v. City of Desert Hot Springs
(In re City of Desert Hot Springs), 339 F.3d 782 (9th Cir. 2003) ................ 66-67

Studier v. Mich. Pub. Sch. Emps.' Ret. Bd., 698 N.W.2d 350 (Mich. 2005) ..........45

Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.
(In re U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986).............................. 115-116

Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII),
129 B.R. 440 (M.D.N.C. 1991) ...........................................................32

V. W. ex rel. Barber v. City of Vallejo, No. 12-1629, 2013 WL 3992403
(E.D. Cal. Aug. 2, 2013) ..................................................................... 208-09

Yaesu Elecs. Corp. v. Tamura, 28 Cal. App. 4th 8 (Cal. Ct. App. 1994)........ 163-64


**UNREPORTED ORDERS**

In re Jefferson Cnty., Findings of Fact, Conclusions of Law, and Order
Confirming the Chapter 9 Plan of Adjustment for Jefferson Cnty., Ala.,
No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (Docket No. 2248)..............140

In re Natchez Reg'l Med. Ctr., No. 09-00477 (Bankr. S.D. Miss.),
Docket Nos. 527 (Nov. 4, 2009), 582 (Dec. 17, 2009)............................... 140-41

In re S. Brunswick Water & Sewer Auth., No. 04-09053 (Bankr. E.D.N.C.),
Docket Nos. 253 (Oct. 28, 2005), 303 (Dec. 9, 2005),
419 (Oct. 25, 2006) ...............................................................................140


**FEDERAL STATUTES, RULES & LEGISLATIVE HISTORY**

11 U.S.C. § 101 ..........................................................................................118

11 U.S.C. § 362 ..............................................................................................7

11 U.S.C. § 502 ................................................................................. 25, 50-51

11 U.S.C. § 524 ..........................................................................................139

11 U.S.C. § 901 ................................................................................139, 173

11 U.S.C. § 904 .................................................................................. 67-68

11 U.S.C. § 922 .........................................................................................7

11 U.S.C. § 928 ................................................................................ 158-61

11 U.S.C. § 942 ...............................................................................173, 181

11 U.S.C. § 943 ...............................................................................*passim*

11 U.S.C. § 1122 ...................................................................... 110-22, 181

11 U.S.C. § 1123 ..............................................................................*passim*

11 U.S.C. § 1127 ............................................................................... 173-75

11 U.S.C. § 1129 ..............................................................................*passim*

11 U.S.C. § 1325 ..................................................................................146

42 U.S.C. § 1983 .............................................................................. 202-09

Fed. R. Bankr. P. 3019 ...................................................................... 173-74

Fed. R. Bankr. P. 8005 .........................................................................202

Fed. R. Bankr. P. 9017 ...........................................................................14

Fed. R. Bankr. P. 9019 ........................................................... 12, 181-200

Fed. R. Evid. 201 ..................................................................................14

H.R. Rep. No. 95-595 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963 ..................123

## STATE CONSTITUTION & STATUTES

Mich. Const. art. IX, § 24 ............................................6, 20, 26-27, 38, 45, 169-71

Mich. Public Act 181 of 2014, M.C.L. §§ 141.1631, <u>et seq.</u> ...................... 96, 98-99

Mich. Public Act 182 of 2014, M.C.L. § 117.4s-t ...................................... 92-99

Mich. Public Act 236 of 1961, M.C.L. §§ 600.101, <u>et seq.</u> ................................8, 76

Mich. Public Employment Relations Act, M.C.L. §§ 423.201, et seq. ........... 171-72

Mich. Public Employment Retirement System Investment Act,
M.C.L. §§ 38.1132, et seq. .............................................................. 171-72

Mich. Unform Fraudulent Transfer Act, M.C.L. §§ 566.31, et seq. ............... 162-66

M.C.L. § 141.1635 ......................................................................................96

M.C.L. § 141.1636 ......................................................................................97

M.C.L. § 141.1637 ......................................................................................97

M.C.L. § 566.34 ........................................................................................164

M.C.L. § 566.35 ........................................................................................165

M.C.L. § 600.621 ......................................................................................163

M.C.L. § 600.1405 ....................................................................................168

M.C.L. § 600.6021 ......................................................................................68

M.C.L. § 600.8103 ........................................................................................8

M.C.L. § 600.8104 ........................................................................................8

M.C.L. § 691.1408 ....................................................................................205

## LOCAL LAWS

Detroit City Code § 47-2-18 ....................................................................118

Detroit City Code § 47-2-19 ....................................................................118

## OTHER AUTHORITIES

4 Collier on Bankruptcy ¶ 943.03 (15 ed. 1995) ......................................73

6 Collier on Bankruptcy ¶ 900.01 (16th ed. rev. 2014) ...........................34

6 Collier on Bankruptcy ¶ 943.03 (16th ed. rev. 2014) .........................145

6 Norton Bankr. L. & Prac. 3d § 113:5 (2011) ......................................115

7 <u>Collier on Bankruptcy</u> ¶ 1123.01 (16th ed. rev. 2014) .......................................123

7 <u>Collier on Bankruptcy</u> ¶ 1129.03 (16th ed. rev. 2014) .................................. 41-42

7 <u>Collier on Bankruptcy</u> ¶ 1129.04 (15th ed. rev. 2002) .........................................18

Markell, Bruce A., <u>A New Perspective on Unfair Discrimination in</u>
<u>Chapter 11</u>, 72 Am. Bankr. L.J. (1998) ..............................................................43

Michigan Attorney General Opinion No. 7272 (June 13, 2013) ............................65

The City of Detroit ("<u>Detroit</u>" or the "<u>City</u>") hereby submits this consolidated brief (this "<u>Brief</u>") as its: (i) pretrial brief in support of confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6908) (the "<u>Sixth Amended Plan</u>" or, as it may be further modified or amended, the "<u>Plan</u>")[1] and (ii) response to (A) certain objections filed by individual bondholders and individual retirees by July 11, 2014 (collectively, the "<u>Individual Objections</u>") and (B) timely-filed supplemental objections arising from discovery, the results of plan voting or revisions of the Plan (collectively, the "<u>Supplemental Objections</u>").

<div align="center"><u>PRELIMINARY STATEMENT</u></div>

1.      Just over one year ago, on July 18, 2013 (the "<u>Petition Date</u>"), the City of Detroit filed its petition for relief under chapter 9 of title 11 of the

---

[1]     The City solicited acceptance of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (the "<u>Fourth Amended Plan</u>"). On August 20, 2014, the City filed the Sixth Amended Plan, which contained non-material or favorable modifications and clarifications to the Fourth Amended Plan. On August 21, 2014, the City filed an errata sheet (Docket No. 6942) (the "<u>Errata Sheet</u>") to correct certain revisions that were inadvertently omitted from the Sixth Amended Plan as filed. The modifications contained in the Sixth Amended Plan and the Errata Sheet are more fully discussed in Section XII below.

Except as expressly provided herein, capitalized terms not otherwise defined in this Brief have the meanings given to them in the Plan and, if not defined therein, the Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4391) (the "<u>Disclosure Statement</u>").

United States Code (the "Bankruptcy Code"), commencing this Chapter 9 Case. As of the Petition Date, the City was – and remains today – enmeshed in a financial crisis of unsurpassed proportions and complexity. For many years, the City has been trapped in an escalating cycle of decline: its population and business base has contracted consistently for five decades resulting in a depleted tax base, plummeting revenues despite increased tax rates, crippling long-term debt obligations incurred to cover revenue shortfalls, inadequate municipal services and minimal investment, all of which has fueled a continuing exodus of residents from the City, further exacerbating the problem.

2.     The City and the State of Michigan (the "State") have both exerted efforts to extricate the City from this downward trend. In recent years, these measures have included multiple reviews of the City's financial condition, the entry into a Consent Agreement between the City and the State, the related appointment of a Financial Advisory Board and, in March 2013, the appointment of Kevyn D. Orr as emergency manager for the City (in such capacity, the "Emergency Manager"). At every stage, reports concerning the financial condition of the City contain similar findings, i.e., that the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets.

3.     The City is choking on its legacy liabilities.  As of

June 30, 2013 – the end of the City's 2013 fiscal year – the City was forced to

devote fully 40% of its general fund revenue to servicing long term debt, pension

and OPEB obligations, leaving inadequate funds for the City's core purpose –

i.e., the provision of basic municipal services.

4.     Nowhere is this more important or apparent than in the delivery

of public safety services and in the woeful working conditions of the City's

uniformed employees, as this Court has already found.

> Most powerfully, … the testimony of Chief Craig
> established that the City was in a state of "service
> delivery insolvency" as of July 18, 2013, and will
> continue to be for the foreseeable future.  He testified that
> the conditions in the local precincts were "deplorable."
> "If I just might summarize it in a very short way, that
> everything is broken, deplorable conditions, crime is
> extremely high, morale is low, the absence of
> leadership."   He described the City as "extremely
> violent," based on the high rate of violent crime and the
> low rate of "clearance" of violent crimes.  He stated that
> the officers' low morale is due, at least in part, to "the fact
> that they had lost ten percent pay; that they were forced
> into a 12–hour work schedule," and because there was an
> inadequate number of patrolling officers, and their
> facilities, equipment and vehicles were in various states
> of disrepair and obsolescence.

In re City of Detroit, 504 B.R. 97, 169 (Bankr. E.D. Mich. 2013) (citations

omitted).

5.      The impact of all of this on Detroiters' quality of life is compounded by evidence of broader neglect throughout the City.  Chief among these problems are the City's  widespread unremediated blight, lack of functioning street lights and obsolete and inefficient systems and information technology. As the Court correctly observed – and every resident of the City cannot fail to be aware – Detroit is in a state of "service delivery insolvency."  Id.

6.      During the course of this Chapter 9 Case, the City has employed all means at its disposal to address a limited number of discrete problems on an emergency basis, including by:  (a) improving management and accountability within City government; (b) replacing certain police and EMS vehicles through a donation from the Downtown Detroit Partnership; and (c) addressing the City-wide lack of adequate street lighting through the formation of a new public lighting authority to reform, operate and maintain lighting operations.  Although these efforts have yielded some positive results, the City has only scratched the surface in its effort to address its chronic inability to provide adequate services across all departments.

7.      Yet, as dire as the City's circumstances are today, it has not yet experienced the full impact of its insolvency.  Absent a comprehensive restructuring, the percentage of general fund revenues that must be devoted to servicing its legacy liabilities is set to almost double to more than 70% by 2020.

The vast majority of this dramatic projected increase in the City's legacy liabilities will be pension and healthcare obligations, which represent at least $9 billion of the City's current $11 billion in unsecured Claims and which are the subject of core settlements under the Plan. If the City is trapped in a downward spiral *today* (and it is), imagine the severity and speed of that spiral when the revenues available to provide municipal services are *cut in half*.



8.     The City's inability to provide even a basic level of municipal services as of the Petition Date should not suggest that it nevertheless was using its limited resources to successfully service its legacy liabilities. Quite the contrary: to preserve its dwindling cash reserves, prior to the Petition Date, the City had (a) deferred approximately $108 million of current and prior year pension

contributions and (b) failed to make scheduled payments of $39.7 million due on the COPs. Even with the savings associated with these missed payments, however, as of the Petition Date, the City projected that its net negative cash position (after required property tax distributions) would continue to worsen, reaching negative $143.3 million as of the end of the 2014 fiscal year and negative $404.5 million as of the end of fiscal year 2015.

9. In addition to its prepetition deferrals and defaults, following the Petition Date, the City has missed an additional approximately $111.8 million in pension contributions and defaulted on other debt obligations, including (a) approximately $56.9 million in payment defaults on the Unlimited Tax General Obligation Bonds, (b) approximately $52.1 million in payment defaults on the Limited Tax General Obligation Bonds and (c) a further $66.9 million in postpetition payment defaults on the COPs.

10. The City's defaults and financial distress unsurprisingly resulted in a torrent of lawsuits both before and after the Petition Date asserting control over the City's scarce revenues or seeking to block efforts to address the City's financial crisis under PA 436. These lawsuits have included prepetition actions: (a) filed by current and former City employees and the GRS asserting their rights under Article IX, Section 24 of the Michigan Constitution (the "Pensions Clause") to full payment of pension liabilities; (b) seeking to invalidate PA 436 and related

relief; and (c) seeking to curb the powers of emergency managers generally, including with respect to an emergency manager's power under PA 436 to impair healthcare benefits. Lawsuits commenced since the Petition Date have included: (a) a lawsuit seeking to segregate certain tax revenues from the City's other sources of revenue and apply them solely to servicing the Unlimited Tax General Obligation Bonds (the "UTGO Proceeding"); (b) a lawsuit seeking to compel the City to use general tax revenues collected within the City's charter, statutory or constitutional limitations to service the Limited Tax General Obligation Bonds (the "LTGO Proceeding"); and (c) lawsuits filed by the Retiree Committee and various unions against the City and the Emergency Manager seeking an injunction to prevent the City from modifying OPEB benefits (the "OPEB Proceedings").

11.     The City has negotiated settlements with respect to the UTGO Proceeding, the LTGO Proceeding and the OPEB Proceedings, in addition to the settlement of its pension obligations, all of which are contingent on confirmation of the Plan. In addition, the City is temporarily protected from other lawsuits and the consequences of its payment defaults by the automatic stay of sections 362 and 922 of the Bankruptcy Code (the "Automatic Stay"). If the Plan is not confirmed, it is expected that the City's creditors will resort to their State law remedies and the UTGO Proceeding, LTGO Proceeding and OPEB Proceedings undoubtedly will be reinstated. Moreover, if the Chapter 9 Case were dismissed, all other proceedings

that were pending as of the Petition Date no longer will be subject to the Automatic Stay. In that scenario, the holders of Unlimited Tax General Obligation Bond Claims, Limited Tax General Obligation Bond Claims, COP Claims, Pension Claims and OPEB Claims all can be expected to promptly seek to enforce rights to payment under State law. All of the City's creditors may be able to obtain judgments against the City compelling it to increase property taxes under Michigan Public Act 236 of 1961, the Revised Judicature Act, M.C.L. §§ 600.101, et seq. (as amended) (the "RJA"), to the level necessary to satisfy its obligations. See M.C.L. §§ 600.8103, 600.8104(1)(b).

12.     Under the circumstances, however, these remedies would be meaningless. Levying yet more property taxes on the City's residents under the RJA would merely cause a corresponding decline in property values, thereby yielding no expected increase in tax revenues. Moreover, the City's tax base is at the point of tax saturation and could not possibly absorb the crushing levies that would be necessary to satisfy the City's obligations under State law. Indeed, the City already cannot satisfy its current obligations, and would lack access to credit markets to obtain funds to honor judgments in a dismissal scenario because of its multiple creditor lawsuits and projected deficits. Moreover, dismissal of the Chapter 9 Case would give rise to a default on the City's postpetition financing

obligations, triggering payments to its postpetition lenders of approximately $4 million per month.

13.     Despite the futility of attempting to enforce their State law rights, several creditors continue to contest confirmation of the City's Plan, taking the position that some unspecified windfall awaits them outside of bankruptcy court (despite the fact that the City has no resources to satisfy their claims).[2] However, certain consequences of the dismissal of this case are clear:  all of the City's stakeholders will lose the benefit of (a) not less than $816 million in outside funding that will voluntarily be contributed to shore up pensions under a confirmed Plan and (b) the revitalization of the City provided for by the reinvestment initiatives contemplated by the Plan (the "Reinvestment Initiatives").  Moreover, well-heeled creditors will again put the City into a position of negotiating under duress.

14.     The Plan is a manifestly preferable alternative to this predictable disaster.  The Plan is premised upon a near consensus that reflects in large part the rights of the various claimant groups under applicable nonbankruptcy law.  To this end, the Plan incorporates settlements and negotiated adjustments of the overwhelming majority of the City's debt burden, achieved through extensive

---

[2]     Absent a restructuring, for example, the City is unable even to present a balanced budget for fiscal year 2016.

Court-supervised mediation. As a result, the Plan is supported by, among others: (a) the Retiree Committee; (b) the Retirement Systems; (c) the largest City retiree organizations; (d) the majority of the City's unions (including, most notably, AFSCME[3] and the City's largest public safety union, the Detroit Police Officers' Association); (e) the majority of insurers of the City's limited tax and unlimited tax general obligation debt (in their capacity as such); (f) the Swap Counterparties; (g) the insurers of the City's DWSD-related special revenue debt; (h) City Mayor Michael E. Duggan; (i) the Detroit City Council; and (j) the State of Michigan.

15. The Reinvestment Initiatives form the backbone of the Plan and are the *sine qua non* of its success. They will enable the City to reinvest approximately $1.7 billion in a wide array of revitalization projects (e.g., blight remediation; improvements to public safety, public transportation and business services; and a sweeping overhaul of the City's information technology systems), and are designed to assure that the City can fulfill the purpose of chapter 9 and sustainably provide adequate municipal services to its residents going forward.

16. As set forth herein, the City will prove at the Confirmation Hearing both (a) the likelihood that the Plan and the related Reinvestment

---

[3]     As noted in Section V.C. and XI.E below, a discrete dispute remains between certain AFSCME locals and the City regarding employees of the Detroit Public Library and the Detroit Regional Convention Facility Authority.

Initiatives will indeed effect a turnaround of the City's decades-long decline and (b) that the Plan meets the confirmation standards set forth in section 943(b) of the Bankruptcy Code. The City will present testimony from the Emergency Manager, its current political leadership, high-ranking City personnel and operational, financial and appraisal experts, as well as other evidence, demonstrating the City's satisfaction of all legal standards for confirmation, including the following:

- the feasibility of the Plan pursuant to section 943(b)(7) of the Bankruptcy Code, including:

    - the reasonableness of the financial assumptions and projections underlying the Plan, including those related to (a) future revenues and expenses, (b) assumed rates of return on pension investments and (c) incremental costs and revenue resulting from the Reinvestment Initiatives;

    - the ability of the City to meet its financial obligations under the Plan;

    - the expected effectiveness of the City's proposed Reinvestment Initiatives in eliminating the City's current service delivery insolvency (and the inability of the City to correct such insolvency in the absence of the Reinvestment Initiatives); and

    - the commitment of the City's current political leadership to the implementation of the Plan, the system improvements to be implemented by the City to monitor compliance with the Plan and the meaningful post-Confirmation oversight to be provided by the Financial Review Commission to be established under recently-enacted State law;

- the Plan's satisfaction of the "unfair discrimination" standard set forth in section 1129(b) of the Bankruptcy Code,

- the Plan's satisfaction of the "best interests of creditors" and "fair and equitable" requirements set forth in, respectively, sections 943(b)(7) and 1129(b) of the Bankruptcy Code, including:

  - the maximization of creditor recoveries in light of the City's (a) desperate financial and operational circumstances and (b) inability to raise additional revenue through increased taxation;

  - the City's need for a cooperative, motivated and highly-qualified workforce going forward; and

  - the expected course of events that would follow the hypothetical dismissal of the City's Chapter 9 Case, including the magnitude of judgments that the City would face in the event of dismissal and the City's inability to meet its obligations outside of bankruptcy;

- the good faith of the City in proposing the Plan;

- the compliance of the Plan with all applicable law, including the propriety of the ASF Recoupment and third-party releases proposed in the Plan; and

- the City's satisfaction of the standards for approval of the numerous settlements included in the Plan (e.g., the DIA Settlement, the OPEB Settlement, the LTGO Settlement, the UTGO Settlement and the 36th District Court Settlement) under Bankruptcy Rule 9019, including evidence demonstrating (a) the City's exercise of appropriate business judgment, (b) the sufficiency of the consideration received in connection therewith and (c) that each such settlement is within the pertinent range of reasonableness.

17.     If the City's Plan is ambitious, it is because the City cannot

afford to forgo this opportunity to arrest its downward spiral and improve the lives

of its citizens or dilute the efficacy of that effort with short term patches and half

measures.  Just over twelve months removed from the commencement of this Chapter 9 Case, the City stands poised to stabilize its financial condition and create a foundation that will reverse decades of decline.  Accordingly, the City hereby requests Confirmation of the Plan pursuant to sections 943 and 1129(b) of the Bankruptcy Code.

~~~~~~~~~~~~~~~~~~~~~~~

18.    The Plan has been accepted by seven impaired Classes of unsecured Claims (including, importantly, both Classes of Pension Claims and the Plan's Class of OPEB Claims, as well as both impaired Classes of general obligation debt).  Nevertheless, some objections to the Plan (collectively, the "Objections") remain unresolved.  These Objections assert that the Plan includes a wide range of defects and contain arguments that are occasionally inconsistent.  The Objections allege, for example:  (a) that the Claims of many key creditor groups, including, among others, pensioners, certain bondholders and certain litigation claimants, are not subject to impairment in chapter 9; (b) that the Plan allows too great – or not enough of – a recovery for Pension Claims and certain other Claims over other Classes of Claims; and (c) that the City cannot feasibly operate under the Plan as presented, or else that the Plan devotes too much money toward maintaining and improving City services and not enough toward creditor recoveries.  These conflicting Objections highlight the challenges that the

City has faced in developing and proposing a Plan that considers the interests of all parties within the confines of the Bankruptcy Code. They also suggest that the City's Plan reconciles these interests in a fair and balanced way.

## REQUEST FOR JUDICIAL NOTICE

19.     The City respectfully requests, pursuant to Rule 201(c) of the Federal Rules of Evidence,[4] which is incorporated into these proceedings pursuant to Bankruptcy Rule 9017,[5] that the Court take judicial notice of the entire docket of the Chapter 9 Case, including, without limitation, all filings made and all orders entered thereon, and all evidence and arguments made, proffered or adduced at the hearings held before the Court during the pendency of the Chapter 9 Case. Without limiting the foregoing, the City requests that the Court take judicial notice of all findings of fact and conclusions of law issued by the Court, whether contained in an order, opinion or other document or issued in open court.

---

[4]     Federal Rule of Evidence 201(c) provides that a court may take judicial notice "on its own" and "must" take judicial notice "if a party requests it and the court is supplied with the necessary information." See Fed. R. Evid. 201(c).

[5]     Bankruptcy Rule 9017 provides that "[t]he Federal Rules of Evidence … apply in cases under the Code." Fed. R. Bankr. P. 9017.

## FACTS RELEVANT TO CONFIRMATION

20.     The facts relevant to confirmation of the Plan are set forth in the Disclosure Statement, the Plan, the Voting Declarations,[6] the Prior Briefing (as defined below) and the evidence presented or testimony that will be adduced at the Confirmation Hearing.

## SUMMARY OF OBJECTIONS

21.     Since the City filed the initial version of the Plan (Docket No. 2708), hundreds of Objections have been filed.[7]  The City previously

---

[6]     The "Voting Declarations" are, collectively:  (a) the Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6179) (the "Paque Declaration"); (b) the Declaration of Peter J. Walsh Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6179-1); (c) the Supplemental Declaration of Michael J. Paque Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6665) (the "Supplemental Paque Declaration"); and (d) the Supplemental Declaration of Peter J. Walsh Regarding the Solicitation and Tabulation of Votes On, and the Results of Voting with Respect to, Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6665-1).

[7]     Initial Objections to the Plan were due by May 12, 2014 pursuant to the fourth amended Scheduling Order (Docket No. 4202).  The fifth amended Scheduling Order (Docket No. 5259) established a deadline of July 11, 2014 for "individual bondholders and individual retirees" to file Individual Objections.  The seventh amended Scheduling Order (Docket No. 6560) (the "Seventh Amended Scheduling Order") provided that "any party that filed a timely objection to the plan" could file a Supplemental Objection on

responded to many of the Objections in accordance with the scheduling orders

issued by the Court (the "Scheduling Orders") and, to the extent practicable, has

not repeated its responses here.[8]  Thereafter, the City and 19 parties in interest filed

briefs addressing issues the Court identified as potentially matters of law

---

or before August 12, 2014, "but only to the extent that additional or modified objections result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment."  In addition, the eighth amended Scheduling Order (Docket No. 6699) provided that parties could file additional Supplemental Objections by August 25, 2014 "but only to the extent that additional or modified objections result from changes incorporated in [the Sixth Amended Plan]."

On August 11, 2014, the Court entered the Order Requiring City to Respond to Certain *Pro Se* Objections to Confirmation (Docket No. 6640) (the "*Pro Se* Order").  The *Pro Se* Order requires the City to submit a brief (the "*Pro Se* Brief") on certain specific issues raised in the Individual Objections.  Pursuant to the eighth amended Scheduling Order, the *Pro Se* Brief is due on September 5, 2014.  Issues to be addressed by the City in the *Pro Se* Brief are not addressed herein.

[8]  In this regard, the City has filed, among other documents, (a) the Consolidated Reply to Certain Objections to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5034) (the "Consolidated Reply") responding to the timely filed Objections identified on Exhibit A thereto (collectively, the "Initial Objections"), (b) the Debtor's Supplemental Brief on Legal Issues Relating to Confirmation of Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 5707) (the "City Legal Issues Brief"), (c) the City's Supplemental Brief Regarding Standing of Syncora to Raise Certain Objections to Confirmation (Docket No. 6010) (the "Standing Brief") and (d) the City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (the "Fees Brief" and, collectively with the Consolidated Reply, the City Legal Issues Brief and the Standing Brief, the "Prior Briefing").

(collectively, the "Legal Issues Briefs").[9] Hearings on certain of these legal issues were held on July 16 and 17, 2014, with an additional hearing on one legal issue held on August 19, 2014. More than 200 Individual Objections, and 17 Supplemental Objections, were timely filed subsequent to the City's filing of the Consolidated Reply.

22. The Plan's compliance with each of the confirmation requirements of section 943(b) of the Bankruptcy Code is summarized on the chart attached hereto as Exhibit A (the "Confirmation Standards Exhibit"). The Supplemental Objections and those portions of the Individual Objections that will not be addressed in the *Pro Se* Brief are addressed in this Brief and in Exhibit B hereto.

## **ARGUMENT**

23. A bankruptcy court "shall" confirm a plan of adjustment if such plan satisfies the requirements set forth in section 943(b) of the Bankruptcy Code. 11 U.S.C. § 943(b). The City is required to prove that it has satisfied the confirmation requirements of section 943(b) of the Bankruptcy Code by a preponderance of the evidence. In re Barnwell Cnty. Hosp., 471 B.R. 849, 855-56 (Bankr. D.S.C. 2012). As demonstrated (a) herein, (b) in the Voting Declarations

---

[9]   The Legal Issues Briefs were filed pursuant to the Order Identifying Legal Issues, Establishing Supplemental Briefing Schedule and Setting Hearing Dates and Procedures (Docket No. 5235).

and the Prior Briefing and (c) through evidence to be presented at the Confirmation

Hearing, the City will demonstrate, by a preponderance of the evidence, that the

Plan satisfies such requirements and should be confirmed.

24.     As set forth above, the Plan's compliance with each of the

confirmation requirements of section 943(b) of the Bankruptcy Code is

summarized on the Confirmation Standards Exhibit.  This Brief provides further

discussion regarding certain disputed confirmation requirements.

## I.     <u>THE PLAN DOES NOT DISCRIMINATE UNFAIRLY</u>

25.     A determination of the question of whether the Plan

discriminates unfairly with respect to any Class of Claims necessarily involves

consideration of (a) the extent of any differential treatment and (b) whether that

treatment is nevertheless fair.  <u>See</u> <u>In re Aztec Co.</u>, 107 B.R. 585, 588-89

(Bankr. M.D. Tenn. 1989) (stating that section 1129(b)(1) of the Bankruptcy Code

"prohibits only *unfair* discrimination, not all discrimination") (emphasis added);

<u>In re Simmons</u>, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (stating that it is

"necessarily inherent in the term 'unfair discrimination' ... that there may be 'fair'

discrimination in the treatment of classes of creditors") (citing 7 <u>Collier on</u>

<u>Bankruptcy</u> ¶ 1129.04[3] (15th ed. rev. 2002)).

26.     The extent of any differential treatment between Classes of

Claims under the Plan is limited.  In particular, the disparity between recoveries on

Pension Claims and other unsecured Claims for the purposes of an unfair discrimination analysis is less than might appear based upon a comparison of percentage recovery estimates included in the Disclosure Statement. The estimated percentage recoveries for Claims in Classes 10 and 11 provided in the Disclosure Statement were arrived at through extensive negotiations with the Retiree Committee, the Retirement Systems and other retiree representatives and reflect the use of assumed discount rates that mirror the pension plans' assumed rates of return on investments (such matching rates being a convention in the pension industry).

27.     The numbers expressed in the Disclosure Statement – while completely accurate for their specific purpose – do not represent:  (a) the most economically relevant description of recovery percentages on Pension Claims, as such Claims must be determined pursuant to applicable law; or (b) a calculation that allows for an "apples to apples" comparison of recovery percentages upon Pension Claims and COP Claims and other Classes of unsecured Claims. A comparison of the recoveries of holders of Pension Claims and holders of COP Claims (assuming that the claims asserted by the latter are allowed) requires adjustments to the distribution percentages applicable to Pension Claims so that the percentages can be more directly compared to the proposed distributions made on account of claims for borrowed money.  To achieve this comparison, the Pension

Claim distributions should be calculated using a commercially appropriate discount rate for pension liabilities, which (a) is consistent with applicable law and (b) more appropriately reflects the extent of the City's pension liabilities (in contrast to the estimates resulting from the negotiations between the City and the representatives of holders of Pension Claims that resulted in the settlement presented in the Disclosure Statement). Moreover, this comparison must exclude the effect on Pension Claim recoveries of distributions funded by entities other than the City.

28. In any event, ample justification exists to support the fairness of the differential treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims in light of the nature of these claims, the City's circumstances and the purposes of chapter 9. With respect to Pension Claims in particular, the treatment of such Claims is fair even if the settlement discount rate of 6.75% were used to value such Claims, based upon, among other things: (a) critical business justifications impacting the City's ability to provide essential services to promote the health, welfare and safety of its citizens, including the imperative of maintaining a stable motivated workforce and reasonable employee relations; (b) the different expectations of holders of Pension Claims and insurers of COP debt, which was understood by the insurers as subject to extraordinary risks; and (c) the risks of litigation with the holders of Pension Claims concerning the ability of the City to impair accrued

pension benefits (and to fund pension benefits at levels lower than already-accrued amounts) consistent with the Pensions Clause. These later risks were mitigated by settlements negotiated vigorously at arm's length and in good faith among the City and representatives of the affected creditors that resulted in the treatment of Pension Claims included in the Plan. For all of these reasons, the Plan does not discriminate unfairly between Classes of Claims.

## A. The Extent of Differential Treatment Between Pension Claims and Other Classes of Unsecured Claims is Limited

29.     The differential in treatment between Pension Claims and unsecured Claims in Classes 9, 12, 13 and 14 is substantially less significant than may be indicated by a superficial comparison of the relevant estimated recovery percentages in the Disclosure Statement, which percentages reflected Claim values calculated by reference to the negotiated "settlement" discount rate agreed upon by the City and representatives of the City's pensioners. These percentages do *not* represent a meaningful estimate of the total recovery on the City's aggregate pension liabilities for the purposes of comparisons with the recoveries of other Plan Classes.

30.     Testimony at the Confirmation Hearing will establish that a comparison of the treatment of Pension Claims against other unsecured Claims requires the use of a consistent methodology to value recoveries, i.e., the value of the assets of the debtor proposed to be distributed under the Plan for the payment

of Allowed Claims in a specific Class expressed as a percentage of the City's aggregate liability to the holders of Claims in such Class as of the Petition Date (or a date very close to the Petition Date). As the City's witnesses will explain, in the case of Pension Claims, the aggregate amount of the City's liability as of the Petition Date consists of (a) the aggregate present value of the PFRS Pension Claims and GRS Pension Claims less (b) the value of the assets held by the PFRS or GRS, as applicable, *at or near the time of the chapter 9 petition*.

> **1.** ***The City's Pension Liability for Purposes***
> ***of an Unfair Discrimination Analysis Is***
> ***Significantly Higher Than the Settlement Amount***
> ***Used by Agreement with Retiree Representatives***
> ***That Was Reflected in the Disclosure Statement***

31.     In the Plan, the City employed the pension settlement's assumed investment rate of return of 6.75% with respect to pension assets, and used the same rate of 6.75% to discount pension liabilities.  See Disclosure Statement, at 13. At the Confirmation Hearing, the City will present evidence that the use of matching assumed return on investment rates and discount rates is conventional in the pension industry.  These rates were agreed upon between the City and the representatives of holders of Pension Claims after extensive negotiation and are integral to the settlements achieved.

32.     Notwithstanding the pension industry's convention of using matching return on investment and discount rates, from an economic perspective,

the use of a discount rate as high as 6.75% substantially understates the City's fair pension liability. As a legal matter, use of a lower discount rate, such as a risk-free rate or near risk-free rate, is required to accurately calculate the amount of the City's pension liabilities (and, thus, provide an economically meaningful comparison with the City's other liabilities). The City anticipates offering testimony at the Confirmation Hearing to support this. The use of a lower and more appropriate discount rate has the effect of increasing the allowable amount of Pension Claims.

33. The methodology for determining economically reasonable discount rates for valuing pension liabilities is well established and has been embraced by the courts. In the private sector, the Pension Benefit Guaranty Corporation (the "PBGC") values the pension liabilities of a bankrupt debtor when taking over a pension plan by reference to commercial annuity rates.[10]

See In re U.S. Airways Grp., Inc., 303 B.R. 784, 798 (Bankr. E.D. Va. 2003) (stating that the PBGC's discount rate for pension claims "seeks to replicate the cost of a private-sector annuity paying the promised benefits"). The PBGC's

---

[10] As of July 2013, the PBGC's discount rates for valuing pension liabilities were between 2.60% and 3.43%. See July 15, 2013 Interest Rate Update, Pension Benefit Guaranty Corp. (July 15, 2013), http://www.pbgc.gov/prac/interest/monthly/miru071513.html (interest rates to value annuity benefits in single employer and multiemployer plans for the month of July 2013 were 2.60% for the first twenty years of liability payments and 3.43% for the remaining liability period).

discount rate is used by the majority of courts to value private-sector pension

benefits.  E.g., Dugan v. PBGC (In re Rhodes, Inc.), 382 B.R. 550, 560

(Bankr. N.D. Ga. 2008) (mandating use of PBGC's discount rate, and not the

higher "prudent investor rate," to value pension liabilities); U.S. Airways,

303 B.R. at 798 (same).

34.    The use of commercial annuity rates to value aggregate pension

liabilities avoids shifting investment return risk from the City, which assumed all

investment return risk in the prepetition pension plans, onto pensioners.  In U.S.

Airways, for example, the court found that using a prudent investor rate would

understate the debtor's pension liabilities and "impermissibly shift[] the risk of loss

from adverse stock market performance … to the retirees."  U.S. Airways,

303 B.R. at 798.

> The real issue is one of risk.  Annuity issuers base their
> pricing on returns offered by low-risk investments
> (typically high-quality corporate bonds).  Those returns
> are lower than the returns that might be achieved by
> investing in the stock market.  The stock market,
> however, is highly volatile and far from certain, as amply
> demonstrated by both the debtors' and the PBGC's
> investment results in 2001 and 2002.  While it is easy to
> run computer simulations, the simple fact is that no one
> can predict with certainty what returns the stock market
> will produce over the next 50 years.  ***Given the strong
> societal interest in protecting pension benefits, a
> risk-free or nearly risk-free rate to value the pension
> liability is more appropriate than a rate based on
> optimistic projections (even if those projections are***

> *widit; widely-shared by fund managers) as to the stock*
> *market's future long-term performance.*

Id. at 795-96 (emphasis added).[11]

35.     The Sixth Circuit's decision authorizing the use of a discount rate other than the commercial annuity-based PBGC discount rate to value pension claims does not hold to the contrary.  In CSC Industries, the Sixth Circuit ruled that bankruptcy law, and not the PBGC's regulatory framework, governed the establishment of appropriate discount rates for valuing pension liabilities. CSC Indus., 232 F.3d at 510 (holding that "[t]he PBGC's authority to promulgate regulations governing the valuation of unfunded benefit liabilities does not extend so far as to subordinate the authority of the bankruptcy courts to value claims in bankruptcy proceedings").  The Sixth Circuit held that the bankruptcy court was, therefore, acting within its discretion in valuing the debtor's pension liabilities according to the "prudent investor" standard, in light of the fact that other claims *in the same class* were valued using the same discount rate.  See id. at 509 ("we believe that the bankruptcy court's authority under 11 U.S.C. §§ 502(b) and 1123(a)(4) to determine the amount of claims in bankruptcy proceedings *and treat*

---

[11]     The prudent investor rates applied by courts also have proven wildly inaccurate over time.  See, e.g., LTV Corp. v. PBGC (In re Chateaugay Corp.), 126 B.R. 165, 177 (Bankr. S.D.N.Y. 1991) (ordering the application of a prudent investor rate of 11.5%), vacated by order approving settlement agreement, Nos. 89-CV-6012, 90-CV-6048, 1993 WL 388809 (S.D.N.Y. June 16, 1993); PBGC v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505, 508 (6th Cir. 2000) (affirming the use of a 10% prudent investor rate).

-25-
13-53846-swr   Doc 2143-5  Filed 12/17/14   Entered 12/17/14 23:40:25   Page 42 of
293
13-53846-swr   Doc 2143-5  Filed 12/17/14   Entered 12/17/14 23:40:25   Page 43 of 292

*creditors in the same class equally* gives it the authority to value unfunded benefit liabilities claims using a 'prudent investor rate'") (emphasis added).

36.     The gravamen of <u>CSC Industries</u> is that, in this jurisdiction, bankruptcy courts – as opposed to the PBGC – may determine the appropriate discount rate for use in valuing pension liabilities.  Notably, nothing in <u>CSC Industries</u> requires or endorses the use of an elevated "prudent investor rate" to value pension liabilities.  Moreover, the concern that prompted the bankruptcy court in <u>CSC Industries</u> to adopt a "prudent investor" rate is not relevant here because Pension Claims are classified separately from other unsecured Claims under the Plan.[12]

37.     In this case, there are both strong societal and state-based legal interests in protecting municipal pensions.   <u>See</u> Mich. Const. art. IX, § 24.  Those interests compel that, in calculating the claims of retirees and active City employees to their pension benefits, discount rates should not be employed that effectively shift the risk of loss back to these very persons to whom the City promised pensions.  Prior to the commencement of the City's Chapter 9 Case, the

---

[12]     COP Claims, for example, are not classified with Pension Claims and are not discounted at all and are allowed at their full principal amount (without postpetition interest).  Indeed, as some of the COPs accrue interest at very low rates, the present value of the amounts owed under the COPs using a "prudent investor rate" would result in a very substantial reduction of the amount of the COP Claims.

City's pensioners were protected from investment risk because the City was obligated to fund pensions in full regardless of the investment returns actually realized. Using a "prudent investor" rate would effectively strip the value of this investment risk protection from pensioner's Claims. Use of risk-free rates, or a surrogate for commercial annuity rates (e.g., PBGC rates), to value the City's pension liabilities is thus appropriate, and is the only method properly correlated to the societal interests and the protections of the Pensions Clause that governed pensioners' rights as of the Petition Date.

38. At the Confirmation Hearing, the City expects that testimony will establish that, by relying on an assumed, and far higher, discount rate of 6.75% for Pension Claims for purposes of the Disclosure Statement (consistent with its negotiated settlement and utilizing the pension funding convention of matching the assumed asset investment return and discount rates), the City in fact dramatically *understated* the present value of its pension liabilities. Consequently, it *overstated* the disparity between recoveries on Pension Claims versus other unsecured Claims. The use of a more economically appropriate discount rate to value the pension liabilities (such as risk-free rates or PBGC rates) would increase the aggregate allowable amount of the Pension Claims and, correspondingly, decrease the relative recoveries of the holders of Pension Claims, appropriately reflecting economic realities in so doing.

39.     In the Expert Report of Martha E.M. Kopacz Regarding the
Feasibility of the City of Detroit Plan of Adjustment (the "Feasibility Report"),
Martha E.M. Kopacz, the Court-appointed expert feasibility witness (the "Court
Feasibility Expert"), agrees with the City's position, recognizing that a discount
rate of 6.75% likely understates the City's pension liabilities.  Feasibility Report,
at 145-47 (discussing that the use of a discount rate at, or near, the risk free rate
may be more appropriate to value pension liabilities than the Plan's "heavily
negotiated" discount rate of 6.75%; stating with respect to a discount rate of 6.75%
that "[h]ighlighting that the City's assumptions are low relative to history, a history
that got them to this place, and low relative to their peers – peers who collectively
may be underfunded by $2 trillion or more, is not much consolation").

40.     Ironically, certain objecting parties have argued that the Plan
discriminates unfairly by ***overstating*** the present value of the City's pension
liabilities, arguing that the 6.75% discount rate used to calculate the amount of the
Pension Claims is unreasonably *low*.  Syncora,[13] for example, has asserted that if a
discount rate of 7.5% were assumed – which rate Syncora argues is more
appropriate – the amount of the Pension Claims would be lower and, thus the
estimated percentage recoveries of Pension Claims would increase, as would the

---

[13]     "Syncora" is, together, Syncora Guarantee Inc. and Syncora Capital
Assurance Inc.

-28-

differential between such recoveries and the recoveries provided on account of Allowed COP Claims under the Plan. Syncora Capital Assurance Inc. and Syncora Guarantee Inc.'s Objection to the Debtor's Plan of Adjustment (Docket No. 4679) (the "Syncora Objection"), at ¶ 39. For the reasons previously expressed, and consistent with the comments of the Court Feasibility Expert, the discount rate proposed by Syncora does not give rise to a reasonable calculation of the City's pension liabilities. Using such a discount rate shifts disproportionate risk from the City's financial creditors, including Syncora, onto the holders of Pension Claims, by requiring higher-risk investments to achieve expected amounts on the anticipated timeline. The Court should, therefore, reject Syncora's argument and calculate the allowable amount of Pension Claims using a risk-free or near risk-free rate. In any event, even were it legally appropriate to value the Pension Claims by shifting the risk of investment performance to retirees and active employees, using a 6.75% rate is a reasonably prudent rate.

41.     At the Confirmation Hearing, the City will offer the testimony of Alan Perry, a Principal and Consulting Actuary at Milliman, Inc., to establish that the 6.75% assumed future investment rate of return on assets of the Retirement Systems is reasonable. The City anticipates that Mr. Perry will testify that the City's assumed rate of return falls within a range of actuarial "best estimates" calculated using Milliman's proprietary capital markets model. Specifically,

Mr. Perry will testify that the best estimate range and median of expected investment returns for GRS and PFRS for the ten years ending December 31, 2023, is as follows:

|  | GRS | PFRS |
|---|---|---|
| **Best-Estimate Range** | 3.67% to 9.45% | 3.91% to 9.31% |
| **Best-Estimate (Median)** | 6.52% | 6.58% |

42.    Mr. Perry's testimony will further show that the best estimate range and median of expected investment returns for GRS and PFRS for the 30 years ending December 31, 2043, is as follows:

|  | GRS | PFRS |
|---|---|---|
| **Best-Estimate Range** | 5.48% to 8.63% | 5.65% to 8.60% |
| **Best-Estimate (Median)** | 7.04% | 7.12% |

43.    This testimony will thus demonstrate that the Plan's use of a 6.75% interest return assumption for GRS and PFRS falls within the reasonable range of expected investment returns given the current asset allocations of each Retirement System, and indeed may enable these Systems to reduce risk and volatility over the long term.  Consequently, the estimated Pension Claim amounts set forth in the Disclosure Statement are overstated for unfair discrimination analysis purposes.

## 2. *The Outside Funding Must Be Excluded from Recoveries for Purposes of an Unfair Discrimination Analysis*

44.    Furthermore, testimony at the Confirmation Hearing will establish that the estimated percentage recoveries provided in the Disclosure Statement are not instructive for the purposes of unfair discrimination because they include substantial amounts that will not be paid by the City, but will be provided by other entities.

45.    In particular, the City anticipates that Kevyn Orr and Gaurav Malhotra, Principal and Midwest Restructuring Leader at Ernst & Young LLP ("EY"), will testify that, considering only those funds over which the City has control, holders of PFRS Pension Claims and GRS Pension Claims will receive estimated percentage recoveries under the Plan of 39% and 48%, respectively – even using the Pension Claims calculations included in the Disclosure Statement. Disclosure Statement, at § II.B.  Where the source of a particular class's enhanced recovery is a party other than the debtor, courts consistently find that the resulting differential in recoveries between classes is not "unfair discrimination." As explained by the bankruptcy court in In re Worldcom, Inc.:

> Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes *is not a treatment of these Claims under the plan and does not constitute unfair discrimination…. The greater value received by the members of [Class 6B] is not the result of the Debtors' distribution of estate property to such creditors.*

<u>Worldcom</u>, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003) (emphasis added).[14] Thus, the amount of any differential in estimated recoveries should be measured with reference to estimated recoveries on Pension Claims after excluding contributions from entities other than the City.

46. When the allowable amount of the City's pension liabilities are calculated using a discount rate equal to that employed by the PBGC as of July 2013, and excluding – as the Court should – the distributions that holders of Pension Claims will receive on account of contributions made by the DIA Funding Parties and the State, recoveries for holders of Pension Claims fall dramatically. In that scenario, the estimated recovery percentage for holders of GRS Pension

---

[14] <u>See also</u>, <u>e.g.</u>, <u>In re Parke Imperial Canton, Ltd.</u>, No. 93-61004, 1994 WL 842777, at *11 (Bankr. N.D. Ohio Nov. 14, 1994) (finding no unfair discrimination and confirming plan pursuant to which debtor's principal secured creditor guaranteed a certain level of recovery to only one of two classes of unsecured creditors, the funds for which guarantee would come from the secured creditor's proceeds of the sale of the debtor's principal asset); <u>In re MCorp Fin., Inc.</u>, 160 B.R. 941, 960 (S.D. Tex. 1993) (finding no unfair discrimination where, in order to facilitate a settlement, senior bondholders agreed to "share" a portion of their recoveries under the plan to enhance the recovery of a settling junior class); <u>Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII)</u>, 129 B.R. 440, 445 (M.D.N.C. 1991) (where all unsecured creditors would receive a 3.5% recovery from the debtor's estate under the plan, but certain unsecured creditors would receive additional monies from the debtor's general partner and partner guarantor resulting in a 100% recovery for those creditors, the plan did not unfairly discriminate because nonbankruptcy law, not the plan, was "the source of [the objecting creditor's] disadvantage"), <u>rev'd on other grounds</u>, 961 F.2d 496 (4th Cir. 1992).

Claims falls to approximately 20.7% and the estimated recovery percentage for holders of PFRS Pension Claims falls to approximately 8.6%, which latter recovery is *lower* than the estimated recovery percentage for other Classes of unsecured Claims.[15]  Accordingly, the extent of differential treatment between unsecured Classes of Claims is fair and not prohibited by section 1129(b) of the Bankruptcy Code.

**B.  The Differential Treatment of Pension Claims, Unlimited Tax General Obligation Claims and Limited Tax General Obligation Bond Claims is Fair**

47.    The tests employed by courts to determine the fairness of differential treatment between classes under a plan are set forth in detail in the Consolidated Reply.  See Consolidated Reply, at ¶¶ 39-49.  By making "fair[ness]" the touchstone of the legal standard, Congress eschewed any rigid mechanical test and instead made clear that courts should apply a flexible standard that takes all relevant circumstances into account.  Broadly stated, "[a] bankruptcy court can permit discrimination when the facts of the case justify it."  Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc), 622 F.2d 872, 879 (5th Cir. 1980).  The precise justification may vary from case to case; "there is great discretion left to the bankruptcy court to determine whether the

---

[15]    The estimated recovery for Allowed Claims in (a) Class 9 under the Plan is 10% and (b) Classes 12, 13 and 14 under the Plan is 10-13%. See Disclosure Statement, at II.B.

discrimination is fair." In re Cooper, No. 08-20473, 2009 WL 1110648, at *5

(Bankr. N.D. Tex. Apr. 24, 2009). As the Seventh Circuit explained in the context

of chapter 13's discrimination provision, the proper course is for "the first-line

decision maker, the bankruptcy judge, to seek a result that is reasonable in light of

the purposes of the relevant law." In re Crawford, 324 F.3d 539, 542 (7th Cir.

2003). The fairness inquiry is properly "committed to [the court's] informed

discretion and should be decided, case by case, based upon competent evidence

and cogent argument as to what is fair and reasonable" in light of the purposes of

the relevant law. In re Stella, No. 05-05422, 2006 WL 2433443, at *4

(Bankr. D. Idaho June 28, 2006).

48.     Because of its unique role, chapter 9 provides greater flexibility

to the debtor than any other chapter of the Bankruptcy Code. In re Richmond

Unified Sch. Dist., 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("[U]nlike the other

Chapters, Chapter 9 does not attempt to balance the rights of the debtor and its

creditors, but rather, to meet the special needs of a municipal debtor.");

6 Collier on Bankruptcy ¶ 900.01[2] (16th ed. rev. 2014) (quoting same).

Accordingly, courts assessing plans of adjustment in chapter 9 have emphasized

the unique need to consider the general welfare of a municipality's residents when

addressing issues of plan confirmation. See, e.g., Barnwell Cnty. Hosp.,

471 B.R. at 869 ("[O]f particular importance to the Court is that the [p]lan

preserves the availability of healthcare services to citizens and patients in the [c]ounty"); In re Corcoran Hosp. Dist., 233 B.R. 449, 454 (Bankr. E.D. Cal. 1999) (describing the area's economic woes and noting that "[t]he hospital is very important to the community of Corcoran" and that it was "an essential element to the survival of Corcoran as a community").

49.    The unique concerns of chapter 9 are especially pronounced here, where the City is not just any municipal debtor, but a major American city providing critical services for one of the largest metropolitan populations in the country.  No debtor seeking to confirm a plan has ever borne the same level of responsibility for the social welfare of so many individuals (including thousands of retirees and employees), the majority of whom have little capacity to absorb the financial hardships that are an unavoidable consequence of the City's need to adjust billions of dollars of unsecured debt.  The challenge presented by the City's restructuring is literally unprecedented, and the City's (and its creditors') circumstances do not fit neatly into prior case law.  Standards articulated in dissimilar contexts should not be adopted mechanically here, but should be applied as necessary to fit both the unique purposes of chapter 9 and the unique circumstances of the City's financial crisis.  When properly examined through the lens of chapter 9, that case law supports the conclusion that Plan's discriminatory treatment of different types of unsecured claims is fair.

### 1. Business Considerations Justify the Differential Treatment of Pension Claims

50. Critical business considerations demonstrate that the differential treatment of Pension Claims is fair, including the City's need to (a) address its service delivery insolvency, (b) maintain a stable and motivated workforce and strong union and employee relations and (c) confirm a workable plan of adjustment. The City expects that its witnesses will testify that the City cannot remedy its service delivery insolvency and provide adequate services to Detroit residents going forward without the continuing goodwill, cooperation and motivation of the City's existing workforce and the ability to attract qualified employees in the future.[16] In this regard, Mr. Orr, Mayor Duggan and Detroit City Council President Brenda Jones will testify that the City's relationship with its employees is critical to its future success, and that City employees are motivated not only by current compensation but also by the expectation of future benefits. Detroit Police Chief James E. Craig and Edsel Jenkins, Detroit Executive Fire Commissioner, are expected to testify, for example, that (a) the City's police

---

[16] Attracting and retaining qualified and dedicated employees is especially important where, as in the Chapter 9 Case, the feasibility of a plan of adjustment depends in part upon the debtor's capability to upgrade the skill level and improve the motivation and accountability of its workforce. See Feasibility Report, at 159, 201 (stating that "increasing the average talent base of the employees is a cornerstone for success of the Plan and the City" and "[t]o meet the projections in the [Plan], the City will need to recruit a significant number of employees with improved skill level and continue to change the culture of performance and accountability").

-36-

officers and fire fighters have been following the Chapter 9 Case closely and have expressed concern regarding the impairment of the pensions that they have earned to date and (b) the City's ability to recruit and retain qualified public safety workers depends upon its ability to compensate holders of Pension Claims in a manner that is widely viewed as fair to prospective public safety applicants. The City thus expects that its testimony will demonstrate that, to restore adequate services – and thus fulfill the broad remedial purpose of chapter 9 – the Plan must provide reasonable recoveries to holders of Pension Claims to preserve some modicum of goodwill of the City's workforce, and enable the City, prospectively, to hire and retain competent and motivated employees.

51. Moreover, testimony by the City's witnesses will establish that confirmation of a workable plan of adjustment without providing favorable treatment to the holders of Pension Claims would be practically impossible. The favorable treatment of Pension Claims reflects the serious difficulties inherent in confirming and implementing a plan in the absence of such treatment. In addition, as the City's witnesses will testify, if the City had not taken into account the settlement of OPEB Claims in reaching its settlement on Pension Claims – had it instead insisted on far more drastic cuts in pension liabilities, thus reducing recoveries on the Pension Claims – the City would likely have been unable to reach agreements with its unions and retirees on *either* pension or OPEB

matters.  And in all events, settlement or otherwise, the double dose of drastic

pension and OPEB cuts would have so tainted relations with the City's unions and

employees it would have all but sacrificed the City's future ability to make the

necessary progress to restore adequate City service.  Consequently, the City also

took proper measure of the relationship between OPEB benefits and pension

benefits in exercising its prudent business judgment to provide more favorable

treatment to the Pension Claims.

52.     The City's recovery will turn in large part on its ability to

marshal the support of its residents in general and its retirees, employees and their

labor unions in particular.  Settling with this group of creditor representatives was

critical to bring finality to the Chapter 9 Case and avoid workforce problems and

further damaging the City's ability to provide basic municipal services.

### 2. *The Differential Treatment of Claims That Results From Settlements of Significant Issues of Law Is Fair*

53.     At the Confirmation Hearing, Mr. Orr will testify that the Plan's

treatment of Pension Claims is the result of arm's length, intensely negotiated

settlements between the City and the Retiree Committee, the Retirement Systems

and certain unions and retiree associations, including the potential settlement of

ongoing, costly litigation regarding the Court's authority to impair Michigan

pensions in light of the Pensions Clause, as well as complex related agreements

with the DIA and the State.  These settlements are the outcome of hard-fought

negotiations between the City and its active and retired employees on virtually every element of their pension plans. Mr. Orr's testimony is expected to establish that these settlements will substantially reduce the amount of litigation surrounding confirmation of the Plan while also enabling the City to avoid the risk that an appellate tribunal will reverse this Court's decision that the Michigan Constitution does not prevent the impairment of vested pension benefits in chapter 9.

54. Similarly, Mr. Orr will testify at the Confirmation Hearing that the UTGO Settlement reflects the potentially significant litigation risk with respect to the UTGO Adversary Proceedings (as defined in the Consolidated Reply). Ambac Assurance Corporation ("Ambac"), National Public Finance Guarantee Corporation ("NPFG") and Assured Guaranty Municipal Corporation ("Assured" and, collectively with Ambac and NPFG, the "Settling Bond Insurers") alleged, among other things, that certain portions of the City's *ad valorem* millage could lawfully be collected and used only for Unlimited Tax General Obligation Bond debt service and that the Settling Bond Insurers held a statutory lien on such millage. The Settling Bond Insurers further asserted that such lien was upon special revenues protected under the Bankruptcy Code. The Settling Bond Insurers argued that these alleged protections (a) gave them the status of secured creditors and (b) required the repayment in full of the Unlimited Tax General Obligation Bonds from the *ad valorem* taxes. The UTGO Settlement (a) resolves these

disputes on terms that are acceptable to the City (and permit the implementation of

a feasible plan) and (b) moreover allows the City to preserve, and designate the

payment rights associated with, the Stub UTGOs (as defined in the Consolidated

Reply).

55.     Mr. Orr will also testify that the LTGO Settlement is the result

of extensive negotiations between the City, Ambac and BlackRock Financial

Management Inc., on behalf of certain managed funds and accounts listed on

Exhibit B to the LTGO Settlement Agreement ("BlackRock"), regarding the claims

asserted by Ambac in the LTGO Proceeding and the objections to the Plan filed by

Ambac and BlackRock.  As described in greater detail in Section XIII.A.2.a below,

the LTGO Settlement resolves:  (a) a dispute between Ambac and the City

regarding whether the City is obligated to use general tax revenues collected within

the City's charter, statutory or constitutional limitations to service the Prior LTGO

Bonds (as defined in Section X.III.A.2.a below); and (b) Objections to

confirmation of the Plan filed by Ambac and BlackRock arguing that Limited Tax

General Obligation Bond Claims in Class 7 under the Plan were entitled to secured

status or priority treatment over and above other unsecured Claims.  Mr. Orr will

testify that:  (a) litigating the issues in the LTGO Proceeding likely would be both

time-consuming and expensive; (b) settling the LTGO Proceeding avoids both the

expenses of litigation and the risk that the Court might ultimately conclude that

13-53846-swr   Doc 7143-5   Filed 08/27/14   Entered 08/27/14 23:40:25   Page 57 of 292
13-53846-swr   Doc 2143-5   Filed 08/27/14   Entered 08/27/14 13:48:25   Page 56 of
293

Limited Tax General Obligation Bond Claims have priority over other unsecured Claims; and (c) the LTGO Settlement is in the best interests of creditors, including holders of Claims in Classes 9 and 14.

56.     That the Plan's treatment of Pension Claims, Unlimited Tax General Obligation Claims and Limited Tax General Obligation Bond Claims is the result of settlements with major creditor constituencies *supports* the conclusion that any resulting discrimination is reasonable and should be approved. See Corcoran Hosp. Dist., 233 B.R. at 456-57 (holding that disparity in treatment of settling class over other classes of claims was not unfair where the settlement in issue saved the chapter 9 debtor from continued litigation that may have jeopardized its ability to propose a feasible, confirmable plan); In re W. Real Estate Fund, Inc., 75 B.R. 580, 586 (Bankr. W.D. Okla. 1987) ("that those creditors which have reached an accommodation with the debtors ... are to receive differing treatment from that of the remaining creditors[] does not constitute impermissible discrimination").

57.     Moreover, in determining the fairness of the treatment of any Class of Claims, it is appropriate for the Court to consider the treatment that such Claims would be accorded under State law.  See In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (providing that a debtor may rebut the *Markell* presumption of unfair treatment with evidence of the relative treatment of

the claims under nonbankruptcy law); 7 <u>Collier on Bankruptcy</u> ¶ 1129.03[3][b][v] (16th ed. rev. 2014) ("a plan proponent may pay classes of claims different amounts if there is a nonbankruptcy rationale for doing so, and if the discrimination is tailored to the nonbankruptcy rationale").  The City entered into each of the foregoing settlements with creditors that assert varying rights to priority of payment under State law, including the asserted rights (a) to compel the City to maintain and fully fund pension benefits under the Michigan Constitution, (b) to enjoin the City from modifying OPEB benefits, (c) of the holders of Unlimited General Obligation Tax Claims to segregate the millage for the payment of their Claims (and to secured status) and (d) of the holders of Limited Tax General Obligation Claims to priority among the City's general liabilities (and to secured status).  The differential treatment of Claims that are the subject of these settlements reflects the claimants' arguments to relative priority under State law that, while opposed by the City, were eventually compromised in the foregoing settlements.  Such treatment is thus fair, consistent with <u>Dow Corning</u>.

**3.** ***The Differing Expectations of Creditor Classes Justify the Differential Treatment of Pension Claims***

58.    The relative expectations of the City's creditors justify the differential in Claim treatment between Classes.  Specifically, the Plan's treatment of Pension Claims is fair because the individual holders of such Claims had little control over how much the City contributed to pensions, how pension assets were

invested and how their pension programs operated.  Courts have permitted the

favorable treatment of creditors whose claims against the debtor arose from

circumstances where the creditors had no "real opportunity to protect themselves."

LeBlanc, 622 F.2d at 879 (affirming more favorable treatment of trade creditors

than insiders, in part because "[t]he trade creditors advanced goods and services to

the debtor in the ordinary course of business, frequently without any knowledge of

the debtor's financially perilous condition and without any real opportunity to

protect themselves," while "the insiders made loans to the debtor when they were

in a position to know of the debtor's financial condition and the risks involved with

those loans").[17]

      59.    At the Confirmation Hearing, the testimony of (a) Kevyn Orr,

(b) Mayor Duggan, (c) Council President Jones, (d) Rip Rapson of the Kresge

Foundation, (e) Dan Gilbert of Rock Ventures LLC and (f) Roger Penske of

---

[17]    See also In re Rivers End Apartments, Ltd., 167 B.R. 470, 488
(Bankr. S.D. Ohio 1994) (upholding differential treatment in part because
"[t]rade creditors generally hold claims that arise from short-term debt and,
as such, anticipate payment on a short-term basis," while "[a] lender with a
deficiency claim usually holds long term debt and has no reasonable
anticipation of quick payment"); In re 11,111, Inc., 117 B.R. 471, 478
(Bankr. D. Minn. 1990) (finding that discriminatory treatment among
unsecured creditor classes was not unfair where the disadvantaged creditors
(insiders) "knew they were putting their money at risk when they loaned
money to the debtor"); Bruce A. Markell, A New Perspective on Unfair
Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227, 248-49 (1998)
(noting that the parties' risk expectations should factor into the unfair
discrimination analysis).

Penske Corporation will establish that the Plan's favorable treatment of the City's active and retired employees is fair and reasonable because the City's employees chose to work as public servants based on the promise that they would sacrifice higher wages for receipt of pensions upon retirement as a form of deferred compensation. See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Court (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996) (holding that the different treatment of unpaid workers over sureties was appropriate, in part, because the benefits in issue – workers' compensation benefits – were "considered by [the debtor's] employees to be an entitlement under state law" and "often are the employees' only form of wage replacement"). Here, it should not be overlooked that the City did not pay into the Social Security System for its police and fire employees. For these retirees, who are Class 10 holders, absent other retirement income, their City pensions are the only form of wage replacement available following their exit from the workplace. These individuals were not given any "real opportunity to protect themselves" with respect to whether and how much to invest in their pensions or how their pension assets would be managed. LeBlanc, 622 F.2d at 879.

60. By contrast, the relatively disadvantaged creditors are, for the most part, financial institutions and bond insurers who hold themselves out as having greater sophistication and experience than other persons and entities about

municipalities and the debt instruments issued by them. The bond insurers in particular should have a better appreciation than anyone else of the risks inherent in investing in or loaning money to the City. They sell this knowledge and experience by insuring municipal debt obligations for premiums and fees. The amounts of these premiums and fees are not fixed. They vary and reflect differences in the risks that the insurers knowingly and voluntarily assume. The bond insurers and the financial creditors had both the opportunity to conduct due diligence and a choice with respect to whether and how much to invest in the City. Pensioners simply were not in the same "position to know of the debtor's financial condition and the risks involved" when they became creditors of the City, nor did they make knowing investment choices. Id.

61. The treatment of retirees' OPEB Claims also sheds light on why the treatment of the retirees' Pension Claims was not unfair discrimination. The City's retirees, who comprise a significant majority of the holders of Claims in Classes 10 and 11, have historically looked to the City for health care coverage and thus comprise the Class 12 claimants. The City recognized that, unlike the legal uncertainty surrounding whether the Pension Claims could be impaired, the ability to modify significantly OPEB Claims was clear. See Studier v. Mich. Pub. Sch. Emps.' Ret. Bd., 698 N.W.2d 350, 358 (Mich. 2005) (holding that retiree health care benefits are not constitutionally protected under the Pensions Clause because

they are not financial benefits and they do not accrue over time). Consistent with that legal clarity, and as the City's witnesses will testify, the City settled the OPEB Claims at recovery percentages that are entirely consistent with – and arguably even less than – those of the financial institution creditors. Thus, in settling retirees' claims for pension and OPEB, the City did nothing more than properly distinguish between potential strength in legal position, and it treated retirees fairly in a manner consistent with the legal risks presented by their respective claims.

**4.** *Any Differential Treatment is Proposed in Good Faith*

62. The differential treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims under the Plan is proposed in good faith. To assess good faith for purposes of section 1129(b)(1) of the Bankruptcy Code, courts ask whether the decision to treat some claims better than others stems from animus rather than from legitimate, objective differences between the claimants. See In re Graphic Comm'ns, Inc., 200 B.R. 143, 149 (Bankr. E.D. Mich. 1996) (holding that a recovery of 10% for the claims of one creditor when other unsecured trade creditors would receive 100% constituted unfair discrimination because the discrimination reflected "personal animosity" and "antipathy" by the debtor toward the affected creditor); see also In re Baugh, 73 B.R. 414, 417 (Bankr. E.D. Ark. 1987) (differential

treatment prohibited where it was based on the debtor's "obvious antipathy" to the creditor in question).

63.     Here, the City's proposed treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims was not motivated by ill will against its other unsecured creditors.  Rather, in each case, the Plan's treatment of its various Classes of Claims is a result of (a) recognition of the applicable objective criteria discussed above (e.g., employee and retiree relations, the settlement of litigation and the creditors' varying expectations); and (b) mediation that included extensive, intensive, good faith, arm's length bargaining and produced the pension settlement, the UTGO Settlement and the LTGO Settlement that are reflected in the Plan. Thus, the City's treatment of such Claims was not motivated by antipathy toward other unsecured creditors.

~~~~~~~~~~~~~~~~~~~~~~~

64.     The differential treatment under the Plan between (a) Pension Claims, Unlimited Tax General Obligation Claims and Limited Tax General Obligation Bond Claims and (b) other Classes of unsecured Claims is, therefore, fair and not grossly disparate under the unique circumstances of this Chapter 9 Case.

### C. There Is No Unfair Discrimination Against COP Claims

65. In their Supplemental Objections, Financial Guaranty Insurance Company ("FGIC") and Wilmington Trust, National Association ("Wilmington Trust") argue that the Plan unfairly discriminates against the disputed COP Claims, in particular, because the Plan reserves on account of such claims the full face amount of all of the certificates of participation, but does not reserve for multiples of the face amount on account of duplicative, alternate legal theories advanced by the claimants.[18] Syncora asserts a similar argument (but styles it as an Objection under section 1123(a)(4) of the Bankruptcy Code).[19] These contentions lack merit.

66. "A party is not entitled to recover twice for the same loss, even if the party would otherwise be able to recover for that loss under separate theories of liability." Johnson v. Howard, 24 F. App'x. 480, 484, 2001 U.S. App. LEXIS 26666, at *4 (6th Cir. Dec. 12, 2001); accord Conway v. Icahn & Co., 16 F.3d 504, 511 (2d Cir. 1994) ("Where a plaintiff seeks recovery for the same

---

[18]  See Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6674) (the "FGIC Supplemental Objection"), at ¶ 8; Joinder to Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit and Supplemental Limited Objection of Wilmington Trust, National Association, Successor Contract Administrator (Docket No. 6678), at ¶¶ 6-13.

[19]  See Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Debtor's Plan of Adjustment (Docket No. 6651) (the "Syncora Supplemental Objection"), at ¶¶ 64-73.

damages under different legal theories, only a single recovery is allowed.");
McCune v. Xerox Corp., 225 F.3d 654, 2000 U.S. App. LEXIS 17847, at *16
(4th Cir. July 24, 2000) (same).

67.     Here, certain holders of COP Claims assert multiple legal
theories for the same damages.  Syncora, for example, asserts claims on account of
its insurance obligations and COPs holdings, breach of contract, unjust enrichment,
and restitution, each in the precise amount of $484,943,168.[20]  The fact that the
damages alleged on account of each of these claims are exactly the same is not a
coincidence – there can be no doubt that the proof of claim filed by Syncora simply
asserts different legal theories to address the same alleged harm.  Similarly,
Syncora asserts a claim for fraud/fraudulent inducement that alleges the City made
false representations to Syncora that caused Syncora to purchase COPs and serve
as a COPs insurer.[21]  Any damages associated with this alleged fraud in the
inducement claim are the same as the damages sought in Syncora's other claims.
See, e.g., McCune, 2000 U.S. App. LEXIS 17847, at *15-17 (affirming that claim
for fraudulent inducement to enter into contract and claim for breach of that
contract are duplicative claims for the same harm).

---

[20]     See Addendum to Syncora Proof of Claim (Claim No. 1352), at ¶ 2.

[21]     See id. at ¶¶ 2, 33.

68.    FGIC similarly alleges that its counterclaims against the City in the COP Litigation are also entitled to be included within the Plan reserve.  These claims are alternative claims that, like Syncora's claims, are based on unjust enrichment, fraudulent inducement and misrepresentation.  Counterclaims of Defendant Financial Guaranty Insurance Company, <u>City of Detroit v. Detroit Gen. Ret. Sys. Serv. Corp. (In re City of Detroit)</u>, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich. Aug. 13, 2014) (Adv. Proc. Docket No. 129), at 34-49.  The success of such claims is *expressly* premised, in each case, on the invalidation and disallowance of FGIC's claims on the COPs.  <u>Id.</u> at ¶¶ 123, 137, 153, 159, 164.  Thus, these claims, even if allowed, would not result in a cumulative recovery with FGIC's alleged claims on the COPs.  Instead, these claims on their face represent alternative legal theories to recover the same amounts of money.  Contrary to the objectors' argument, no basis exists to reserve for the same alleged damages multiple times.

69.    FGIC and Wilmington Trust also assert that the claims reserve improperly fails to include amounts for interest on the COPs or related fee claims.[22]  The City intends to supplement the Disputed COP Claims Reserve to account for accrued but unpaid prepetition interest and applicable fees (while reserving the right to object thereto on any and all available grounds).  FGIC's and

---

[22]    FGIC Supplemental Objection, at ¶ 8.

Wilmington Trust's suggestion that the disputed claims reserve must also account for un*matured* interest, however, is simply incorrect.  Consistent with section 502(b)(2) of the Bankruptcy Code, Section V.J.1 of the Plan provides – and the Plan has always provided – that claims for unmatured interest will not be allowed.  No objector has suggested any reason why section 502(b)(2) of the Bankruptcy Code is inapplicable in this case.  As such, no reason exists to include such amounts in the Disputed COP Claims Reserve.

### D. There Is No Unfair Discrimination Arising from Macomb County's Claim

70.     Macomb County alleges in a footnote to its Objection that the recovery on Class 14 Claims is lower than the 10-13% estimated by the City in the Disclosure Statement because the estimated aggregate allowed amount of Class 14 Claims provided in the Disclosure Statement did not include Macomb County's subsequently filed proof of claim in the amount of $26 million.[23]  Although Macomb County is correct that the estimated aggregate allowed amount of

---

[23]     See Supplemental Objection of County of Macomb, Michigan, by and Through Its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6666) (the "Macomb County Supplemental Objection"), at n.2. Macomb County also alleges without support that the New B Notes allegedly are not worth their face amount. Id.  At the Confirmation Hearing, the City anticipates that Kenneth Buckfire (President and Managing Director of Miller Buckfire & Co.) will testify that he expects the New B Notes to trade at par.

Class 14 Claims in the Disclosure Statement did not originally include any

allowance for Macomb County's Claim, the City has refreshed its Class 14 estimate

to add certain liabilities that were not previously accounted for (including an

estimate of its potential liability on account of Macomb County's Claim). As a

result, the City intends to provide for the issuance of adequate additional New B

Notes, if necessary, to reflect its refreshed estimate, including an appropriate

reserve for Macomb County's disputed Claim.[24] Accordingly, the City's estimated

recovery percentage for Class 14 of 10 to 13% is not overstated.[25]

## II.      THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO EACH CLASS OF CLAIMS THAT HAS NOT ACCEPTED THE PLAN

71.     Section 1129(b)(1) of the Bankruptcy Code requires a

bankruptcy court to confirm a chapter 9 plan if the plan is, among other things,

---

[24]     Macomb County's Claim was estimated by the Court at $26 million solely for the purpose of voting without any findings as to the ultimate validity or amount of such Claim. See Order Regarding Motion for Temporary Allowance of Claim of the Macomb Interceptor Drain Drainage District (MIDDD) Pursuant to Fed. R. Bankr. P. 3018(a) (Docket No. 6162) ("The Court now concludes that the claim of MIDDD shall be valued at $26 million *for voting purposes only*.") (emphasis added).

[25]     Of course, the estimated recovery percentages remain estimates, and actual recoveries may be higher or lower than these percentages.

"fair and equitable" with respect to each dissenting impaired class of claims. See 11 U.S.C. § 1129(b)(1).[26]

72.     The Plan is fair and equitable with respect to impaired Classes of unsecured Claims, because, under the plan, such creditors will receive all that they can reasonably expect under the circumstances.  Consolidated Reply, at ¶¶ 105-156.  Section 1129(b)(2)(B) of the Bankruptcy Code – the codification of the absolute priority rule – provides that, for a plan to be fair and equitable, unsecured creditors may receive less than the value of their claims as of the effective date of a plan only if no class of junior claims or interests receives any distribution on account of the claims therein. 11 U.S.C. § 1129(b)(2)(B). Application of the absolute priority rule to unsecured creditors of a municipal debtor generally is not possible, however, because, in chapter 9, there can be no junior class of equity interests – the class most commonly prevented from receiving or retaining property by the application of the absolute priority rule. See Corcoran Hosp. Dist., 233 B.R. at 458 (holding that the proposed chapter 9 plan did not implicate the absolute priority rule because there were no holders of

---

[26]     For the applicable statutory language, see Confirmation Standards Exhibit, at § XII.A.1.  As the City has previously stated in the Prior Briefing, the Plan satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code and thus is fair and equitable with respect to impaired Classes of secured Claims.  Moreover, if the DWSD Tender is consummated, all secured Claims would be unimpaired under the Plan.  See Plan, at § II.B.3.a.ii.

equity interests in the debtor hospital).[27]  Some courts, therefore, have suggested

that the requirement that a plan be fair and equitable as to unsecured creditors of a

municipal debtor is satisfied where creditors receive "all that they can reasonably

expect in the circumstances."  See, e.g., Lorber v. Vista Irrigation Dist.,

127 F.2d 628, 639 (9th Cir. 1942) (collecting cases).

73.     An analysis of whether the Plan provides creditors with "all that

they can reasonably expect in the circumstances" necessarily must consider the

overarching purpose of chapter 9 – and the City's chapter 9 case in particular –

which is to relieve City residents from the effects of declining services and

spiraling taxation caused by the City's crippling debt.  See In re Mount Carbon

Metro. Dist., 242 B.R. 18, 41 (Bankr. D. Colo. 1999) (stating that the legislative

purpose underlying chapter 9 "is to allow an insolvent municipality to restructure

its debts in order to continue to provide public services").[28]

---

[27]     The absolute priority rule is applicable with respect to unsecured Claims in
the City's Chapter 9 Case because of the existence of a Class of
Subordinated Claims (Class 16).  Because Subordinated Claims receive no
distribution under the Plan, however, the absolute priority rule necessarily is
satisfied.  See Plan, at § II.B.3.w.

[28]     See also In re Barnwell Cnty. Hosp., 459 B.R. 903, 907 (Bankr. D.S.C. 2011)
("The purpose of chapter 9 is to allow municipalities the opportunity to
remain in existence through debt adjustment and obtain temporary relief from
creditors."); In re Addison Cmty. Hosp. Auth., 175 B.R. 646, 650
(Bankr. E.D. Mich. 1994) (same); New Magma Irrigation & Drainage Dist. v.
Bd. of Supervisors (In re New Magma Irrigation & Drainage Dist.),

74.     Although a chapter 9 debtor should not disregard its obligation
to provide creditors with recoveries that are reasonable under the circumstances,
nothing in the Bankruptcy Code requires the City to maximize creditor recoveries
by (a) liquidating assets, (b) reducing services to or maintaining services at
inadequate levels or (c) adding to the exceedingly high tax burden already imposed
upon City residents.  This is not surprising, because imposing such requirements
upon the City would elevate the unconditional maximization of creditor recoveries
over the health, safety and welfare of the City's residents, which is antithetical to
applicable law and the purposes of chapter 9.

75.     At the Confirmation Hearing, the testimony of:  Kevyn Orr;
Gaurav Malhotra; Caroline Sallee, Manager at EY; John Hill, the City's Chief
Financial Officer; Mayor Duggan; and Council President Jones will establish that,
under the Plan, the City's creditors will receive all that they can reasonably expect
under the circumstances.  Mr. Orr is expected to testify that, consistent with the
purpose of chapter 9, the City's overarching goals in proposing the Plan are to:
(a) restore services to a level that ends the exodus of residents and businesses from
the City and enables the City to attract new residents and new businesses and
promote the health, welfare and safety of all residents and visitors; and (b) adjust

193 B.R. 528, 532 (Bankr. D. Ariz. 1994) (stating that the ultimate purpose
of chapter 9 is to beneficially affect the debtor's "citizens").

the City's crippling debt burden to a level it can afford while providing adequate levels of services. Council President Jones, Mayor Duggan, Mr. Hill and Mr. Orr will testify that these goals cannot be accomplished through increased taxation or one-time sales of significant assets. The City's witnesses will further testify that the Plan is fair and equitable because it is designed to ensure the continuing viability of the City, which will benefit both residents and many creditors over the long term.[29]

### A. The City Cannot Improve Creditor Recoveries Through Increased Taxation

76. The City cannot raise taxes to improve creditor recoveries because, even if the City were legally permitted to increase its already exceedingly high tax rates (which it is not), doing so would be futile (as any additional taxes would be, in large measure, uncollectible) and would not reverse Detroit's population loss or increase the City's revenues.

---

[29] At the Confirmation Hearing, the testimony of Gaurav Malhotra will further establish that the financial projections upon which the Plan is based are updated as of July 2, 2014. Accordingly, the argument raised by certain objecting parties that the Plan is not fair and equitable with respect to Class 11 because distributions to Holders of Claims in Class 11 under the Plan do not take into account improvements to the City's financial condition since the Petition Date, are unfounded. See Objection of Diane Martin-Parker (Docket No. 5776), at 7-8; see also substantially similar Objections of Terrance James Sims (Docket No. 5881), Gloria C. Williams (Docket No. 5882), Mattie D. Pritchett (Docket No. 5887) and Estella L. Ball (Docket No. 5889).

77.     Nothing in chapter 9 or relevant case law requires the City to increase the already-high tax burden on Detroit residents in an effort to maximize creditor recoveries.  See Consolidated Reply, at ¶¶ 132-36.  In addition, as Mr. Orr and other City witnesses will testify at the Confirmation Hearing, raising taxes on City residents at this time would be counterproductive and inevitably futile. In considering whether a municipal debtor's plan of adjustment is fair and equitable, it is appropriate for the bankruptcy court to consider whether the tax base can absorb an additional levy to finance enhanced creditor recoveries.

> [T]here is a limit beyond which the taxing power of a taxing agency cannot go, even in the absence of legal limitations.  And that is the ability of the taxpayer or toll payer to pay.  And so, when we find delinquencies amounting to 46.93 per cent in a taxable year, when we find that even now 9.1 per cent of the area of the district has been deeded to the district for delinquent taxes, we must be guided by the determination of its officers … that, in their opinion, the taxable limit had been reached. Whenever such a situation exists in a public taxing body, it has reached tax saturation.

In re Corcoran Irrigation Dist., 27 F. Supp. 322, 326-27 (S.D. Cal. 1939), aff'd sub nom. Newhouse v. Corcoran Irrigation Dist., 114 F.2d 690 (9th Cir. 1940).[30]

---

[30]     See also Corcoran Hosp. Dist., 233 B.R. at 459 (rejecting the argument that a chapter 9 debtor "should be obligated to raise taxes or at least attempt to raise taxes to pay the unsecured creditors in full;" holding that the debtor's plan was fair and equitable because any attempt to levy additional taxes would be futile).

-57-
13-53846-swr   Doc 2143-5   Filed 12/12/14   Entered 12/12/14 23:40:52   Page 74 of
293
13-53846-swr   Doc 3143-5   Filed 03/27/14   Entered 03/27/14 23:40:52   Page 74 of 292

78.     It is a matter of record in this case that the City is legally prohibited from raising taxes above their current levels.  See City of Detroit, 504 B.R. at 121 ("The City cannot legally increase its tax revenues.  Nor can it reduce its employee expenses without further endangering public health and safety.").  Mayor Duggan is expected to testify at the Confirmation Hearing that, even if raising taxes would generate sustainably increased revenues for the City (which it would not, as discussed below), the Michigan Legislature is unlikely to increase the statutory maximum tax rates applicable to Detroit.  For example, the City expects Mayor Duggan to testify that Michigan Senate Majority Leader Randy Richardville, in communications with Mayor Duggan, has expressed a willingness to discuss anything related to the City's restructuring efforts *with the exception of more taxes*.[31]

---

[31]     On August 18, 2014, Robert Cline, Director of State-Local Tax Policy Economics at EY, testified that the State is unlikely to raise statutory limits on the City's tax rates any time soon, as follows:

> [Mr. Smith]: And you agree with me that you can't tell one way or the other whether there will be changes in the current tax law over the next ten years?
>
> [Mr. Cline]: If you would like for me to answer that question, I would say in the current political environment in Lansing, Michigan, it would be very unlikely that there will be a state tax rate increase in the near or foreseeable future.

79.    The testimony of (a) Kevyn Orr; (b) Council President Jones; (c) Mayor Duggan; (d) Caroline Sallee; (e) John Hill; and (f) Gaurav Malhotra will show that even if the City could legally raise tax rates – like the debtor in <u>Corcoran Irrigation District</u> – the City has reached its practical taxable limit, <u>i.e.</u>, tax saturation.  Specifically, the testimony offered by the City's witnesses will demonstrate that the low *per capita* income of Detroit residents, declining property values and low tax collection rates would substantially inhibit any attempt to augment the City's revenues through increased taxation.  Indeed, this Court has recognized that, as of the Petition Date, even as the tax burden on Detroit residents was one of the highest in Michigan, the City's tax revenue from virtually all sources was in a steady state of decline.  <u>See</u> <u>City of Detroit</u>, 504 B.R. at 118 (finding that, among other things (a) municipal income tax revenues have declined by 30% since 2002 and 15% since 2008, (b) property tax revenues have declined by 10% since 2012 and (c) utility users' tax revenues have declined by 28% since 2003); <u>id.</u> at 189 (stating that "[w]ithout revitalization, revenues will continue to plummet as residents leave Detroit for municipalities with lower tax rates and acceptable services").  In addition, as necessary or appropriate on rebuttal, Ms. Sallee will testify that the taxable property in the City is over-assessed and that the City has low collection rates, especially with respect to residential property, for

Cline Hr'g Tr. 107:16-22 Aug. 18, 2014.

which the City has only a 50% collection rate.  Thus, even if the "fair and

equitable" standard required the City to increase taxes above their already-high

levels to maximize creditor recoveries (which it does not), from a practical

standpoint, doing so would be futile (and in fact counterproductive).

80.     At the Confirmation Hearing, testimony offered by the City's

witnesses, including Mayor Duggan, Council President Jones and Kevyn Orr, will

further demonstrate that, even if the City could legally increase taxes (which it

cannot), any further tax increases on Detroit residents most likely would

(a) exacerbate the City's already-high tax collection delinquency rate, (b) continue

flight from the City, (c) disincentivize inflow of prospective residents and

businesses, (d) destabilize growth and (e) ultimately reduce the City's overall tax

revenues.  The loss of population in Detroit has compounded the City's financial

difficulties and led to additional cutbacks in municipal services – which cutbacks,

in turn, have led to continuing losses of population, industry and tax revenues.

This creates a vicious cycle that the Plan seeks to rectify.

81.     Indeed, a municipality that is forced to increase tax rates

imposed on a populace that has reached "tax saturation" to satisfy debt will soon

find itself in what courts have dubbed a "death spiral" or "debt spiral" as residents

and businesses leave the municipality, eroding the tax base and further diminishing

the municipality's ability to pay its creditors.  See New Magma, 193 B.R. at 535-36

-60-

13-53846-swr   Doc 2143-5   Filed 03/27/14   Entered 03/27/14 23:40:25   Page 67 of 252
13-53846-swr   Doc 3043   Filed 03/12/14   Entered 03/12/14 18:42:50   Page 77 of
293

(enjoining the city in which the debtor (an irrigation and drainage district) was located from raising property taxes on landowners within the debtor's boundaries; noting that chapter IX of the Bankruptcy Act of 1898 was enacted for the purpose of saving municipalities from the "debt spiral" that occurs when municipalities with high tax delinquency rates raise taxes further, compounding delinquency and default, and driving away residents); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 84 (Bankr. D. Colo. 1990) ("The required level of taxation would certainly discourage new home construction, thereby eliminating tap fee income and preventing a broadening of the tax base. Moreover, if unpaid taxes are enforced through tap sales, purchasers will be difficult to find since an excessive mill levy would make the homes uneconomic. Land is removed from the tax rolls if no bid is received at tax sale. The mill levy on any property remaining on the tax rolls then must be increased still further in order to maintain the same theoretical level of revenue. [A creditor's] brief aptly describes this cycle as a 'death spiral.'") (internal citation omitted); In re Sullivan Cnty. Reg'l Refuse Disposal Dist., 165 B.R. 60, 66 (Bankr. D.N.H. 1994) ("eventually the tipping fees became so high that any further increase would be counterproductive, i.e., the 'death spiral' would occur whereby increased fees result in lower total dollar collections by driving away customers because of the higher fees").[32] As the evidence adduced at the

32 See also Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502,

Eligibility Hearing demonstrated, the City has already reached this unfortunate state.

**B.  The City Is Nevertheless Making Reasonable Efforts to Maximize Revenues and Achieve Cost Savings**

82.     Although, for all the reasons previously stated, the City is unable to raise revenues through attempts at increased taxation, the Plan provides for multiple new sources of revenue, cost saving initiatives and settlements that improve recoveries for creditors.  The testimony of Charles M. Moore, Senior Managing Director and Shareholder of Conway MacKenzie, Inc. ("CM"), at the Confirmation Hearing will establish that the Reinvestment Initiatives more fully described in Section IV below provide for a total of $841.1 million in additional revenue and cost savings (which amounts to almost one half of the total Reinvestment Initiative spending).  This amount includes $482.9 million in revenue initiatives consisting of:  (a) $72.3 million in outside funding from the

---

509-10 (1942) ("The notion that a city has unlimited taxing power is, of course, an illusion.  A city cannot be taken over and operated for the benefit of its creditors, nor can its creditors take over the taxing power.…  In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power."); In re Drainage Dist. No. 7, 25 F. Supp. 372, 384 (E.D. Ark. 1938) ("The real ability of a drainage district to pay debts is dependent upon the ability and willingness of the taxpayers to produce funds with which to pay and the evidence shows that when the rate in the present district goes too high, tax payments decrease, so that a reasonably low rate produces more money than an excessive rate."), aff'd sub nom. Luehrmann v. Drainage Dist. No. 7, 104 F.2d 696 (8th Cir. 1939).

federal Hardest Hit Fund and the State Fire Insurance Escrow Funds to assist with blight remediation; (b) $119.7 million in increased billings and collections with respect to the public safety services; (c) $52.0 million in increased revenue for residential services, including $51.4 million from DDOT; (d) $61.9 million in increased revenue for business services; (e) $98.2 million in additional revenue for organizational efficiency initiatives, including additional income tax collections of $40.5 million; and (f) $78.8 million in additional non-departmental initiative revenue.

83.     In addition, Mr. Moore will testify that the Reinvestment Initiatives provide for a total of $358.2 million in cost savings.  These savings include:  (a) $148.2 million in savings related to public safety services; (b) $64.7 million in cost savings attributable to DDOT; (c) $24.3 million in savings related to business services; (d) $109.0 million in savings related to organizational efficiency initiatives, including $36.0 million in savings related to general fund purchasing; (e) $2.2 million in management service savings; and (f) $9.8 million in non-departmental initiative savings.

84.     These revenue generating initiatives and cost savings are complemented by the revenue and savings the City will receive as a result of the settlements under the Plan.  Most prominently, the transactions associated with the "Grand Bargain" will generate at least an additional $816 million in nominal

revenue for the benefit of the holders of Pension Claims. In addition, the City has

entered into favorable settlements with representatives of the holders of Pension

Claims, OPEB Claims, Unlimited Tax General Obligation Bond Claims, Limited

Tax General Obligation Bond Claims and Indirect 36th District Court Claims, all

of whom claimed a priority right to full payment under applicable nonbankruptcy

law. The difference between the amounts asserted by such claimants and the

amounts accepted in settlement of such Claims redounds to the benefit of all the

City's stakeholders.

85.     Thus, taking into account the City's current service delivery

insolvency and inability to raise revenues through further taxation, the revenue

initiatives, cost savings, outside funding and settlements described above

demonstrate that the City has made more than a reasonable effort to maximize

revenues and minimize unnecessary spending under the Plan for the benefit of all

creditors.

### C.     Arguments That the City Must Liquidate the DIA Collection or Other City-Owned Assets to Maximize Creditor Recoveries Must Be Rejected

86.     Several objecting parties have argued that the Plan cannot be

fair and equitable unless the City sells City-owned assets – and the DIA Collection

in particular – to maximize creditor recoveries. These arguments fail because

(a) the City is not in a position to sell the DIA Collection free and clear of

encumbrances; (b) even if the entire DIA Collection were unencumbered, the City cannot be compelled to sell the DIA Collection – or any City-owned assets – in chapter 9; and (c) it would be imprudent for the City to consider liquidating the DIA Collection because a forced sale would yield only a fraction of the DIA Collection's true economic value and would deprive the City of an important cultural asset that is both unique and irreplaceable.

### 1. *The City Cannot Simply Sell the DIA Collection Free and Clear*

87. From a purely practical standpoint, liquidating the DIA Collection would be difficult – if not impossible – due to significant disputes that exist concerning the nature of the City's interests in the works contained therein. The Michigan Attorney General, in an opinion dated June 13, 2013 (Opinion No. 7272) (the "Opinion"), asserted that "[t]he art collection of the Detroit Institute of Arts is held by the City of Detroit in charitable trust for the people of Michigan, and no piece of the collection may thus be sold, conveyed, or transferred to satisfy the City's debts or obligations." Opinion, at p. 1. The DIA also has argued that the DIA Collection is held in public trust.[33]

---

[33] <u>See</u>, <u>e.g.</u>, DIA Statements Regarding the City of Detroit Bankruptcy, http://www.dia.org/news/1511/DIA-Statements-Regarding-the-City-of-Detroit-Bankruptcy.aspx (last visited August 13, 2014) ("[T]he DIA's art collection is not subject to sale because it is protected by a public trust and, as recognized by the attorney general, a charitable trust that dates back to 1885.").

88.     In addition, many works within the DIA Collection – including several of the DIA's most valuable works – are subject to explicit donor restrictions.  These restrictions likely would be enforced by donors or their heirs in a liquidation scenario.  Thus, any attempt to liquidate the DIA Collection or any material portion thereof most likely would result in costly, complex and time-consuming litigation regarding the City's precise ownership interests in the approximately 65,000 works of art housed at the DIA.  The discovery involved in such litigation necessarily would be extensive, given that donor agreements and related documents governing the City's interests in these works of art date back to 1885, and it has been estimated that the records relating to the DIA Assets include "over a million pages of hard-copy documents, many of which are originals that can be more than a half century old."[34]

## 2.     *The City Cannot Be Compelled to Liquidate Its Assets*

89.     Even if, as a practical matter, the DIA Collection could be liquidated, the City cannot be compelled to sell any of the DIA Assets – or any other City-owned assets.  In the Consolidated Reply, the City specifically

---

[34]     See Objection by the Detroit Institute of Arts to the Relief Requested in the Revised Proposed Order Filed in Connection with the Corrected Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Directing the Debtor to Cooperate with Interested Parties Seeking to Conduct Due Diligence on the Art Collection Housed at the Detroit Institute of Arts, at 3-4 (Docket No. 4675).

addressed the argument that the City must liquidate "non-core" assets – including the DIA Collection – to maximize creditor recoveries – for the Plan to be fair and equitable. Consolidated Reply, at ¶¶ 115-31. This argument fails because it is well settled that a chapter 9 debtor cannot be compelled to liquidate assets. See Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs), 339 F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for … an involuntary liquidation of any of the debtor's assets.") (quoting Richmond Unified Sch. Dist., 133 B.R. at 225).[35]

90.     Section 904 of the Bankruptcy Code – which protects the constitutionality of chapter 9 under the Tenth Amendment of the United States Constitution – prohibits the Court from interfering with "(1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property." See 11 U.S.C. § 904. As this Court recently stated, "chapter 9 strictly limits the Court's power in a municipal bankruptcy case. This is to ensure that the separation of powers contemplated in the United States Constitution is upheld and the Court does not overstep its bounds into the sovereign powers of states." Opinion and

---

[35]     See also Newhouse v. Corcoran Irrigation Dist., 114 F.2d 690, 691 (9th Cir. 1940) (stating that the debtor's property "cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor"); Lorber, 127 F.2d at 637 (same).

Order Denying Motion for Permissive Intervention, Etc. (Docket No. 6708)

(the "Permissive Intervention Order"), at 2.[36]

91.　　In light of section 904 of the Bankruptcy Code and its constitutional underpinnings, the Court lacks jurisdiction to order the City to liquidate the DIA Collection – or any other City-owned assets – which hypothetical order would (a) interfere with the City's use of its property and (b) effectively mandate the discontinuation of a municipal service that is vital to the economic and cultural life of the City.  Accordingly, caselaw interpreting the "fair and equitable" requirement in chapter 9 cannot be read to license that which the United States Constitution and Congress have forbidden, i.e., the compelled liquidation of City property.

92.　　This doctrine is consistent with Michigan law, which does not allow creditors to levy against or otherwise compel the sale of any City-owned asset as a remedy to pay debt.  See M.C.L. § 600.6021(1) ("No execution may

---

[36]　　In the Permissive Intervention Order, the Court explained that section 904 of the Bankruptcy Code "means that the Court cannot interfere with the 'choices a municipality makes as to what services and benefits it will provide.'"  Id. (quoting In re Addison Cmty. Hosp. Auth., 175 B.R. 646, 649 (Bankr. E.D. Mich. 1994)).  The Court further stated that "chapter 9 was created to give courts only enough jurisdiction to provide meaningful assistance to municipalities that require it, not to address the policy matters that such municipalities control."  Id. (quoting Addison Cmty. Hosp. Auth., 175 B.R. at 649).  The "services and benefits" provided by the City are wide-ranging and include cultural services, such as preserving and displaying the DIA Collection for the benefit of City residents and visitors.

issue upon a judgment against [any city]."); City of Roosevelt Park v. Norton Twp., 47 N.W.2d 605, 606 (Mich. 1951) (creditors may not reach public funds by execution under a judgment or by garnishment); Payton v. City of Highland Park, 536 N.W.2d 285, 285 (Mich. Ct. App. 1995) (same); see also Parker v. Klochko Equip. Rental Co., 590 F.2d 649, 653 (6th Cir. 1979) (interpreting Michigan law and noting that "it was, and is, well-understood and established that it is contrary to public policy to allow private liens on public property") (quotation marks omitted).

93.    Moreover, neither chapter 9 nor relevant caselaw draws any distinction between "core" and "non-core" assets of a municipal debtor. See Consolidated Reply, at ¶¶ 119-21. Even if the distinction between "core" and "non-core" assets bore legal significance with respect to whether a chapter 9 plan is fair and equitable (which it does not), the DIA – and the DIA Collection in particular – would be considered a "core" asset. At the Confirmation Hearing, the testimony of Mr. Orr, Mayor Duggan and Council President Jones will establish that the DIA provides incalculable value to the City and that the nationally-recognized DIA Collection is a unique and irreplaceable asset that is central to the cultural life of the City. In addition, the City expects that Michael Plummer of Artvest Partners LLC, Roger Penske, Rip Rapson and Dan Gilbert will testify that, in fact, the DIA is the single most important cultural asset the City owns. Such an asset would plainly be considered "core" under any standard. By placing that asset

in a trust for the benefit of the City and its residents pursuant to the DIA Settlement incorporated into the Plan, the City is acting prudently to protect this singular cultural asset.

### 3. *A Forced Liquidation of the DIA Collection Would Yield Only a Fraction of the DIA Collection's True Economic Value and Would Deprive the City of a Unique and Irreplaceable Cultural Asset*

94. The testimony at the Confirmation Hearing of Michael Plummer also will establish that, for a variety of reasons, a forced liquidation of the DIA Collection would leave the City with only a fraction of its true economic value.[37] In particular, the City would be highly unlikely to realize the true value of the DIA Collection because (a) a liquidation scenario would oversaturate the market and dramatically depress prices for the DIA Collection by as much as 50%; (b) there would be significant backlash against all participants in such a sale for its impact on the DIA, including potential buyers as well as the world's leading

---

[37] At the Confirmation Hearing, Vanessa Fusco, Vice President and Associate Director of Museum Services at Christie's Inc., will testify regarding a valuation undertaken by Christie's Inc. in 2013, which concluded that the works in the DIA Collection purchased in whole or in part with City funds have an estimated fair market value in the range of approximately $454 million to $867 million. Mr. Plummer will testify that, in his opinion, liquidating the *entire* DIA Collection could only return between $1.1 billion to $1.8 billion, setting aside the threshold question of whether the City could even legally sell the collection. Mr. Plummer will further testify that the options for monetizing the DIA Collection asserted by certain creditors are neither feasible nor likely to generate proceeds even approaching those of the DIA Settlement.

auction houses; and (c) even in an orderly liquidation scenario that would necessarily take place over a number of years, the net present value of realized proceeds would be lower than current estimates of value of individual pieces.

95.     From a practical standpoint, therefore, the DIA Collection cannot be liquidated.  The City has determined not to sell its cultural assets – and the DIA Collection in particular – because they add significant cultural and economic value to the City and are essential to the City's future success. Moreover, a forced liquidation of the DIA Collection would generate only a fraction of the DIA Collection's salable value even assuming that no interests or restrictions encumber that value – an unrealistic assumption.  In this context, settling the questions of ownership through an agreement that generates substantial revenue to fund a settlement of Pension Claims under the Plan, but retains for the City and State total (and risk free) access to a core cultural asset is a reasonable effort to raise revenue and is not tantamount to liquidating the asset for creditors. In that context, directed use of those revenues is permissible and fair.  The City retains the most important attributes of what it had before its bankruptcy – access to and enjoyment of a core cultural asset – and it will gain substantial additional cash as well to fund the Plan.  In light of the foregoing, the objecting parties' argument that the City should be forced to liquidate assets such as the DIA Collection must be rejected.

## III. THE PLAN IS IN THE BEST INTERESTS OF CREDITORS

96.     The Plan is in the best interests of the City's creditors because the Plan provides them with a better alternative than dismissal of the Chapter 9 Case.  Dismissal would merely result in the issuance of numerous judgment levies against a City that is insolvent and unable to meet its obligations through yet more borrowing or taxation.  In such a scenario, the City would be legally obligated to levy substantial new property taxes on a saturated tax base, thus (a) depleting the value of the City's taxable property, (b) driving away residents and investment and (c) continuing the current downward spiral of lost revenues, ever-increasing tax rates, tax delinquency, blight and abandonment.  Indeed, if the case were dismissed, the City's pension obligations *alone* would quickly deplete the City's limited resources.  Dismissal of the Chapter 9 Case also would deprive the City and its residents of the Reinvestment Initiatives provided for under the Plan, upon which the City's economic recovery and revitalization depends.

97.     In the chapter 9 context, the best interests of creditors test "has been described as a 'floor, requiring a reasonable effort at payment of creditors by the municipal debtor.'"  In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quoting Mount Carbon, 242 B.R. at 34).  The best interests of creditors test "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives."  In re Sanitary

& Improvement Dist., No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989). "This is

often easy to establish. Since creditors cannot propose a plan; cannot convert to

Chapter 7; cannot have a trustee appointed; and cannot force sale of municipal

assets under state law, their only alternative to a debtor's plan is dismissal." Mount

Carbon, 242 B.R. at 34.[38] Consequently, courts apply the best interests of creditors

test "to require a reasonable effort by the municipal debtor that is a better

alternative to the creditors than dismissal of the case." Cnty. of Orange v. Merrill

Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020 (Bankr. C.D. Cal.

1996) (quoting 4 Collier on Bankruptcy ¶ 943.03[7] (15th ed. 1995)).

  98. The possibility that any individual creditor would win a "race to

the courthouse" in the event of dismissal, and thereby be paid in full at the expense

of other creditors, does not undermine – and, in fact supports – the City's position

---

[38] The best interests of creditors test set forth in section 943(b)(7) of the
Bankruptcy Code thus differs from the best interests of creditors analysis
undertaken in chapter 11 cases. Importantly, because a municipal debtor
cannot be liquidated, in chapter 9, the best interests of creditors test does not
contemplate – and cannot possibly require – a liquidation analysis.
See In re City of Colo. Springs Spring Creek Gen. Improvement Dist.,
187 B.R. 683, 690 (Bankr. D. Colo. 1995) (the best interests of creditors test
in section 943(b) of the Bankruptcy Code "is not the same requirement
found in § 1129(a)(7)(A)"); Mount Carbon, 242 B.R. at 33 ("unlike
Chapter 11, Chapter 9 cases … cannot result in liquidation of the
municipality's assets under Chapter 7"); 6 Collier on Bankruptcy ¶ 943.03[7]
(16th ed. rev. 2014) (a liquidation analysis "does not work for a chapter 9
case. A municipality cannot be liquidated, its assets sold, and the proceeds
used to pay its creditors.").

that the Plan satisfies the best interests of creditors. Unlike in chapter 11, the best

interests of creditors test in chapter 9 is a holistic analysis pursuant to which the

Court must review the effect of dismissal on the creditor body at large, not merely

on a claim-by-claim basis, and on the debtor's continuing ability to provide

municipal services. See In re Bamberg Cnty. Mem'l Hosp., No. 11-03877,

2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) (holding that a chapter 9

plan was in the best interests of creditors because (a) dismissal would allow those

creditors that would be able most promptly to obtain judgments on their claims to

benefit at the expense of others and (b) the plan preserved the availability of

healthcare services to local citizens); Barnwell Cnty. Hosp., 471 B.R. at 869

(same); Sanitary & Improvement Dist., No. 7, 98 B.R. at 975-76 (overruling

objection to confirmation on grounds that chapter 9 plan was not in the best

interests of creditors because, in the event of dismissal, all members of the creditor

body would seek judgments that the municipal debtor would be unable to pay and

the state court system would be powerless to compromise).

99.    In the event of dismissal of the Chapter 9 Case, creditors' State

law remedies would be meaningless in the context of the City's deep and

worsening insolvency, and the City's operations would be unsustainable. The Plan

is, therefore, overwhelmingly in the best interests of creditors.

## A. Unsecured Creditors' State Law Remedies Are Meaningless in the Context of the City's Continuing (and Worsening) Insolvency

100.    The Plan provides creditors with a better alternative than dismissal and, therefore, satisfies the "best interests of creditors" because the effect of dismissal of the City's chapter 9 case would be the issuance of myriad judgment levies under state law.  Several objecting parties holding unsecured claims have argued that the Plan fails to provide a better alternative than dismissal because, outside of bankruptcy, the applicable objecting party could compel the City to satisfy its debt to such objecting party in full.[39]  These arguments fail because they focus only on the alleged rights of particular objecting parties under nonbankruptcy law and generally ignore or discount the practical effect of the simultaneous assertion of similar rights by many or all other creditors.  In fact, obtaining judgment levies in a dismissal scenario would be little more than an academic

---

[39]    See Syncora Capital Assurance Inc. and Syncora Guarantee Inc's Objection to the Debtor's Plan of Adjustment (Docket No. 4679), at ¶¶ 14-27; Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4660), at ¶¶ 17-18; COPs Holders' Objection to Confirmation of the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4653), at ¶¶ 74-76; Objection of Diane Martin-Parker (Docket No. 5776), at 9 (arguing that holders of GRS Pension Claims would receive greater recoveries if the City's chapter 9 case were dismissed because the Michigan Constitution protects pension benefits); Objection of William Ochadleus, et al. (Docket No. 5964) (the "Ochadleus Objection"), at 7-11 (arguing that holders of PFRS Pension Claims and OPEB Claims would obtain greater recoveries outside of bankruptcy); Consolidated Reply, at ¶¶ 137-49.

-75-

13-53846-swj  Doc 7943-5  Filed 08/27/14  Entered 08/27/14 23:40:52  Page 93 of 292
13-53846-swr  Doc 7143  Filed 08/27/14  Entered 08/27/14 18:02:50  Page 91 of
293

exercise, because the crippling tax bills that would ensue, as discussed at paragraphs **[__]**-**[__]** above, cannot possibly be satisfied by the City's tax base.

101.   The City expects Kevyn Orr, Kenneth Buckfire and Gaurav Malhotra to testify during the Confirmation Hearing that, in the event of dismissal of the Chapter 9 Case, the City's creditors would not recover more than they would receive under the Plan.[40]  Because the RJA would require the City to satisfy any judgments obtained by creditors either through bond issuances or property tax levies,[41] the issuance of numerous and large judgments in the event of dismissal would quickly deplete the City's limited resources and its remaining tax base. In such a scenario, creditors would *not* realize greater recoveries than they would receive under the Plan.  If the Chapter 9 Case were dismissed, judgments to recover the City's pension obligations alone – which, according to figures disclosed by the Retirement Systems that the City believes are substantially understated,

---

[40]   Because the chapter 9 tests of whether (a) the debtor has made a reasonable effort in its plan to provide creditors with a better alternative than they would possess if the case were dismissed (i.e., the best interests of creditors test) and (b) whether the plan provides creditors with all they can reasonably expect under the circumstances (i.e., the fair and equitable test applicable to unsecured creditors) overlap considerably, the City expects that some of the testimony it presents at the Confirmation Hearing will show that both of these tests are satisfied.

[41]   As discussed below, in a dismissal scenario, the City most likely would not have the ability to access the capital markets, meaning that property tax levies would be the only available means by which the City could attempt to satisfy such judgments.

totaled nearly $1.5 billion as of June 30, 2013[42] – would quickly eradicate any meaningful recoveries for all other unsecured creditors outside of chapter 9. If one were to add to the mix a possible OPEB judgment in connection with a retiree class action suit to ensure maintenance of pre-Chapter 9 health insurance coverage, it is hard to imagine any sums left for other unsecured creditors.

102.    At the Confirmation Hearing, Mr. Buckfire will testify regarding the financial consequences of dismissal of the Chapter 9 Case. Specifically, Mr. Buckfire is expected to testify that, in a dismissal scenario: (a) the City's post-petition financing obligations would accelerate and trigger remedies pursuant to which the relevant lenders potentially would be entitled to receive approximately $4 million per month of the City's income tax revenues; (b) the City's budget deficits likely would increase during the next ten years; (c) the City would not have the ability to access the capital markets on reasonable terms; (d) numerous of the City's creditors – including retirees, and holders of Unlimited

---

[42]    See The General Retirement System of the City of Detroit, 75th Annual Actuarial Valuation (June 30, 2013), available at http://www.rscd.org/GRS%202013%20Actuarial%20report.pdf, at A-4 (stating unfunded actuarially accrued pension liabilities of $1,084,210,716 as of June 30, 2013); The Police and Fire Retirement System of the City of Detroit, 72nd Annual Actuarial Valuation (June 30, 2013), available at http://www.pfrsdetroit.org/Files/download/June%2030,%202013%20Police %20and%20Fire%20Actuarial%20Valuation.pdf, at 4 (stating unfunded actuarially accrued pension liabilities of $415,605,320 as of June 30, 2013). Using what the City believes are more reliable assumptions, that underfunding would be substantially higher.

Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims – likely would commence litigation asserting that their claims are entitled to special priority under State law; (e) the City's pension underfunding obligations, which would be immediately payable, likely would consume the City's revenues; and (f) taking into account these and other factors, the City would be financially unsustainable going forward.

103.    Any significant increase in property taxes would lead to a corresponding drop in the fair market value of the taxable property against which such new taxes are levied.  Decreasing property value assessments, in turn, would leave the City with no option but to further increase property taxes, thus exacerbating the City's current downward spiral without meaningfully increasing revenues available for creditors.  The City's already-high property tax delinquency and nonpayment rates would likely increase, the exodus of residents out of the City would continue and blight would become so widespread as to be intractable. In such a scenario, any creditor recoveries would be *de minimis* (and less than the recoveries proposed by the Plan, in any event).  Moreover, as explained in Section II.A above, any new taxes levied by the City to satisfy judgments in the event of dismissal of the Chapter 9 Case would be, in large measure,

uncollectible[43] and counterproductive to the City's efforts to rectify its financial

difficulties, improve City services and attract and retain residents.

See Consolidated Reply, at ¶¶ 146-47.

104.    The City's evidence will further demonstrate that, if the City's

chapter 9 case were dismissed, holders of unsecured claims would compete with

the City's vast body of secured creditors – and a multitude of other creditors

holding unsecured claims, some of which also would assert priority under State

law – for a share of the limited resources of an insolvent City.  Dismissal also

likely would deprive the City and its residents of vital public health and safety

services because, in view of the heightened risk of non-payment that would result

in a dismissal scenario, third-party vendors likely would either refuse to do

---

[43]    The objecting parties who filed the Ochadleus Objection argue that the Plan
is not in the best interests of creditors because the City has not done enough
to collect delinquent taxes.  See Ochadleus Objection, at 11-12.  These
objecting parties fail to observe, however, that one of the stated goals of the
restructuring initiatives proposed under the Plan is to reform the City's tax
collection operations to increase revenues.  See Disclosure Statement,
at 168-69; Feasibility Report, at 57 (discussing planned improvements in
property tax collection rates); id. at 89 (discussing projected increases in
civil fine and infraction collection rates); id. at 89-90 (discussing projected
increases in income tax collection rates).  Moreover, the objecting parties'
assertion that "[t]he City has the lowest revenue collection rate of any city in
the country," if true, only underscores the fact that the City cannot simply
tax its way out of its present financial predicament.  See Ochadleus
Objection, at 11.

business with the City or would insist upon extraordinary terms that would further exacerbate the City's financial crisis.

**B.    Dismissal of the Chapter 9 Case Would Deprive the City and Its Residents of the Reinvestment Initiatives Upon Which the City's Economic Recovery Depends**

105.    The Plan also is in the best interests of creditors because the hypothetical dismissal of the City's Chapter 9 Case would deprive the City of the benefit of the $1.7 billion in Reinvestment Initiatives that are incorporated into the Plan.  The likely decline in services below even today's inadequate levels would result in a continuing exodus of both residents and businesses from the City, thereby further depleting its tax base and land values and compounding the inability of creditors to realize on their state law rights.

106.    This cycle of decline cannot be reversed without the Reinvestment Initiatives.  The City expects Mr. Orr, Mr. Hill, Mayor Duggan and Council President Jones to testify at the Confirmation Hearing that the chapter 9 process – and the Plan specifically – provides the only viable avenue for the City to restore adequate levels of services and reduce its unsustainable liabilities.  Mayor Duggan and Mr. Hill will testify, for example, that the City's department heads are in general agreement that the Reinvestment Initiatives are necessary to restore adequate levels of municipal services.  The City has been unable to restore these

services outside of chapter 9 and, instead, has experienced years of continuing decline even as the City has deferred certain financial obligations.[44]

107.   The testimony of these witnesses will further establish that no objecting unsecured creditor has agreed to assist with the City's renewal by, for example, restructuring its debt, staying its enforcement rights, providing a payment holiday or otherwise working with the City to provide the breathing space necessary for the City to implement its urgently-needed restructuring initiatives. These witnesses, and Mr. Buckfire, will testify that, if the Chapter 9 Case were dismissed and the Reinvestment Initiatives were not implemented, the City would quickly return to a state of extreme insolvency and would succumb to further population loss, plummeting revenues and deteriorating services.  The only way that the City can restore its tax base and increase property values for the benefit of creditors is through confirmation of the Plan.

**C.    Dismissal of the Chapter 9 Case Would Cause the Financial Benefits of the Plan to Disappear**

108.   Dismissal of the Chapter 9 Case will result in the loss of a host of financial benefits to be provided the City under the Plan.  In a dismissal scenario, the City obviously would lose access to the $816 million in funds it is due to receive in connection with the Grand Bargain.  In addition, the City would

---

[44]   As Mr. Orr will testify, absent confirmation of the Plan, the City's legacy liabilities are expected to consume more than 70% of the City's General Fund revenue by fiscal year 2020.

lose the benefit of the Exit Financing and all of the cost savings to be realized by settlements under the Plan, including, among others, the settlements of Pension Claims, OPEB Claims, Unlimited Tax General Obligation Claims and Limited Tax General Obligation Claims. Moreover, if the Chapter 9 Case were dismissed, the City would be forced to forgo the $482.9 million in additional revenue and $358.2 million in cost savings anticipated by the Reinvestment Initiatives through the restoration of public safety services, improved information technology, improved collection of taxes and fees and review by an independent financial review commission.

109. Accordingly, because dismissal of the Chapter 9 Case would leave the City's creditor body in a worse position than it is under the Plan, cause the City to lose (a) the operational benefits of the Reinvestment Initiatives and (b) the substantial revenue and cost savings associated with the settlements to be approved under the Plan and the Reinvestment Initiatives, the Plan is in the best interests of creditors.

## IV. THE PLAN IS FEASIBLE

110. Section 943(b)(7) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the plan is … feasible." 11 U.S.C. § 943(b)(7). Testimony offered by the City's witnesses at the Confirmation Hearing will demonstrate the feasibility of the Plan, as set forth in

greater detail below.  Importantly, Mayor Duggan, Council President Jones and John Hill each will testify that the Plan is feasible and that both City Council and the Mayor's Office are committed to working in concert to implement the Plan and the Reinvestment Initiatives.

111.    "The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible."  Mount Carbon, 242 B.R. at 31.  Caselaw interpreting the feasibility requirement is limited, and no single, clearly defined test is employed by courts to assess the feasibility of chapter 9 plans of adjustment.  Nevertheless, courts ultimately evaluate the debtor's ability to (a) make the payments projected under the plan and (b) provide adequate municipal services in the future.  See id. at 34-35 ("[D]etermination of the feasibility of the plan covers both repayment of pre-petition debt and future services ....  The Court must, in the course of determining feasibility, evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality.");  see also Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.), 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (stating that a chapter 9 plan is feasible if "it offers a reasonable prospect of success and is workable").

112.     A chapter 9 debtor's ability to make the payments contemplated under its plan of adjustment is dependent upon the accuracy of its revenue and expense projections and the reasonableness of the assumptions on which they rely. See In re Connector 2000 Ass'n, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011) (chapter 9 plan was feasible based on reasonable projections regarding debtor's ability to make payments under the plan); Corcoran Hosp. Dist., 233 B.R. at 453-54 (finding that chapter 9 plan was feasible based on reliable testimony that the debtor would be able to make the payments provided under the plan and that the plan was based on reasonable projections of future income and expenses).

113.     Consistent with the case law addressing feasibility in the context of chapter 9, the Court Feasibility Expert developed a definition of feasibility that is captured in the following question:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without a significant probability of a default?

Feasibility Report, at 13.

114.     Importantly, the City is not required to do the impossible and guarantee that the Plan will succeed.[45]  See Mount Carbon, 242 B.R. at 34-35

---

[45]     The Court Feasibility Expert agrees and further notes that guaranteed feasibility would implicate the best interests of creditors test.

("Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation.  The probability of future success will depend upon reasonable income and expense projections ....  [P]rojections of future income and expenses must be based upon reasonable assumptions and must not be speculative or conjectural.") (internal citations and quotation marks omitted).  Rather, the City must establish feasibility by a preponderance of the evidence.  Id. at 31; see also In re Tammarine, 405 B.R. 465, 470 (Bankr. N.D. Ohio 2009) ("preponderance of the evidence means 'more likely than not'").

115.   The Court Feasibility Expert bifurcated the feasibility analysis into two distinct groups of considerations, i.e., quantitative and qualitative considerations.  Feasibility Report, at 14.  According to the Court Feasibility Expert, quantitative considerations include (a) the accuracy of the City's projections, (b) the reasonableness of the assumptions on which they are based and (c) the reasonableness of any contingency provided for in the projections.  Id.  Qualitative considerations include (a) the availability of adequate human resources

---

First, and foremost, feasibility is not a guarantee.  If the City were to propose a plan under which, based on reasonable assumptions, the City could not help but meet its obligations – effectively a guaranteed outcome – it is likely that while feasible, such plan would not satisfy the best interests of creditors test under section 943(b)(7) of the Bankruptcy Code.

Feasibility Report, at 19.

to implement the Plan, (b) the establishment of performance monitoring systems and procedures, (c) the existence of appropriate controls to reasonably ensure the City's compliance with the terms of the Plan, (d) whether the City likely will be able to provide a minimum level of municipal services under the Plan and (e) whether the City likely will be able to sustain improvements over the long term. <u>Id.</u>

116.   In the Feasibility Report, despite identifying challenges that the City must overcome following confirmation of the Plan, the Court Feasibility Expert confirms the City's assessments that (a) the projections and other financial data on which the Plan relies are reasonable, (b) the Reinvestment Initiatives proposed by the City are reasonable and necessary for the provision of adequate municipal services and sustainable and (c) the Plan is, therefore, feasible.

> It is likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default.

Feasibility Report, at 203.

117.   The Plan is premised upon three distinct sets of projections, which were attached to the Disclosure Statement as Exhibit I through Exhibit K (collectively, as updated as of July 2, 2014, the "<u>Projections</u>").  The Projections consist of (a) the ten-year summary of the Reinvestment Initiatives, (b) the ten-year

statement of projected cash flows (the "10-Year Forecast") and (c) the forty-year

statement of projected cash flows (the "40-Year Forecast").

118.    The City agrees that each factor identified by the Court

Feasibility Expert is relevant to the issue of feasibility and presents its arguments

consistently with the Court Feasibility Expert's approach, thereby establishing by a

preponderance of the evidence that the Plan is feasible.

### A.    The City's Revenue and Expense Projections are Accurate and Based on Reasonable Assumptions

119.    At the Confirmation Hearing, the City will present – or, with

respect to Robert Cline, has presented – the testimony of the following witnesses in

support of the revenue and expense Projections incorporated into the Plan:

(a) Gaurav Malhotra; (b) Robert Cline; (c); Caroline Sallee; (d) John Hill;

(e) Charles Moore; (f) Kevyn Orr; and (g) Mayor Duggan.[46]

---

[46]    The City notes that the Court Feasibility Expert agrees that the Projections are accurate in all material terms and based upon reasonable assumptions.

It is my opinion that, except where otherwise noted in my Report, the projections are generally mathematically correct and materially reasonable and therefore fall within the Feasibility Standard I have defined.

It is my opinion that, except where otherwise noted in my Report, the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard.

Feasibility Report, at 203.

120.    The revenue projections in the 10-Year Forecast are accurate and based on reasonable assumptions.  The testimony of Robert Cline offered at the hearing before this Court on August 18, 2014 demonstrates the reasonableness of the City's revenue Projections with respect to (a) corporate and individual income taxes, (b) wagering taxes and (c) utility users' taxes.[47]  The City expects that the testimony of Mr. Malhotra and Ms. Sallee will establish the accuracy and reasonableness of the assumptions used in developing the revenue projections in the 10-Year Forecast.  In that regard, the City expects that Mr. Malhotra and Ms. Sallee will testify that they developed the revenue projections contained in the 10-Year Forecast by examining five key components of revenue:  (a) income taxes, (b) property taxes, (c) wagering taxes, (d) state revenue sharing and (e) utility users' taxes.  Mr. Malhotra further developed the revenue forecasts by reference to: (a) other General Fund operating revenues (based largely on historic trends); (b) revenues expected to be generated through the Reinvestment Initiatives, as reported to Mr. Malhotra; and (c) the net proceeds of the Quality of Life Loan and

---

[47]    See Cline Hr'g Tr. 58:17-23, 65:14-66:12, 68:7-14, 72:15-73:2 Aug. 18, 2014 (demonstrating the reasonableness of the Projections with respect to individual and corporate income tax revenues); id. at 76:17-25, 77:18-25 (demonstrating the reasonableness of the Projections with respect to wagering tax revenues); id. at 81:9-15, 82:7-12 (demonstrating the reasonableness of the Projections with respect to utility users' tax revenues); id. at 62:3-25 (stating that the Projections developed by Mr. Cline and his colleagues took into account the anticipated effects of the Reinvestment Initiatives).

the Exit Financing.  Ms. Sallee will testify regarding the reasonableness of the

Projections with respect to property tax revenues and state revenue sharing.

In addition, Mr. Malhotra and Mr. Hill also will testify that the revenue projections

account for all material City revenue streams.

121.   The expense projections in the 10-Year Forecast also are

accurate and based on reasonable assumptions.  The City expects Mr. Malhotra to

testify that EY developed baseline projections contained in the 10-Year Forecast

into which EY incorporated expenses associated with the City's restructuring.

The City expects that Mr. Moore, Mr. Hill and Mayor Duggan will testify that the

amounts allocated for the specific Reinvestment Initiatives reasonably reflect the

anticipated costs of such initiatives.

122.   In addition to baseline revenue and expense calculations, the

City will offer testimony at the Confirmation Hearing with respect to the revenue

expected to be generated and savings incurred as a result of the Reinvestment

Initiatives.  In this regard, the City expects Mr. Hill, Mr. Moore, Mr. Orr and Beth

Niblock, Chief Information Officer for the City, to testify that the Reinvestment

Initiatives likely will give rise to $250 million in additional net revenues[48] and over

---

[48]     This amount consists of $482.9 million in projected gross revenues less
approximately $220.0 million in projected costs of generation.

$250 million in net cost savings[49] over the course of the next ten years, as provided for in the Projections.  Mr. Buckfire and Mr. Hill also will testify that, excluding the DWSD, the City anticipates that it will be able to realize the revenues set forth in the Projections without the need to access capital markets during the first ten years following the Effective Date of the Plan (although it is more likely than not that the City will elect to access the capital markets during that period).

123.   In further support of the accuracy and reasonableness of the 10-Year Forecast, the City will offer testimony that the 10-Year Forecast is consistent with other projections developed by the City.  In particular, the City expects Mr. Hill to testify that the 10-Year Forecast is consistent with projections developed independently by Mr. Hill and the directors and staff of several of the City's key financial departments for the period from fiscal year 2014 through fiscal year 2016.[50]

124.   The 40-Year Forecast is a reliable extrapolation of the 10-Year Forecast.  In this regard, the City expects Mr. Malhotra to testify that the 40-Year Forecast was developed by extending the 10-Year Forecast and by making

---

[49]   This amount consists of $358.2 million in projected cost savings less approximately $96.7 million in expenses associated with achieving the savings.

[50]   As Mr. Hill will testify, on March 18, 2014, the projections developed by Mr. Hill and his team were adopted by the Financial Advisory Board established pursuant to the Financial Stability Agreement entered into by the City and the State in 2012.

appropriate adjustments.  Mr. Malhotra's testimony will support the soundness of the methodology used to extrapolate the 10-Year Forecast for a further 30 years and the reasonableness of the additional assumptions upon which it relies.

125.   As Mr. Hill will testify, the Projections will be harmonized with the City's budget to the extent possible.  The Projections cannot simply be incorporated into the City's budget at this time because, by their nature, the Projections contemplate the receipt of funding that is contingent upon, among other things, confirmation of the Plan, the consummation of settlements and the successful implementation of the Reinvestment Initiatives.  The wholesale incorporation of the Projections into the City's budget would, in effect, license the City to spend money it has not yet received.

126.   Mr. Hill is expected to testify, however, that he has developed a model for fiscal years 2015 through 2017 that matches the revenue and expenditure totals in the Projections.  The City expects Mr. Hill to testify that he is in the process of aligning operating budgets with the Projections and developing protocols to prevent departments from attempting to spend Reinvestment Initiative money before it is available and before the relevant department has authority to spend the money.  To this end, Mr. Hill is expected to testify that he will require a detailed implementation plan from the applicable department director before releasing Reinvestment Initiative funds.

**B.     The Contingency Provided for in the
         Projections Complies with Applicable Law**

127.    The contingency reserves provided for under the Plan are

reasonably conservative and comply with applicable law.  At the Confirmation

Hearing, Mr. Malhotra will testify that the contingency reserve in the amount of

1% of revenue per year throughout the forecast period identified in the Projections

is intended to allow the City to address unanticipated events that cannot be

foreseen or assigned to specific programs.  In addition to this contingency reserve,

the Projections contemplate that the City will hold a minimum cash balance of

approximately $75 million at all times.

128.    In the Feasibility Report, the Court Feasibility Expert expresses

concern that the projected cash reserves in the Plan may not comply with the

requirement in Public Act 182 of 2014, M.C.L. § 117.4s-t ("<u>PA 182</u>"), that the City

incorporate into its "financial plan" a contingency of not less than 5% of projected

*expenditures* for the applicable fiscal year.  <u>See</u> Feasibility Report, at 110, 177-78.

In so concluding, the Court Feasibility Expert considers only the contingency

reserve of 1% of revenues.  The Court Feasibility Expert's concern that the Plan

does not provide for a contingency of at least 5% of projected expenditures does

not take into account the additional reserves in the amount of not less than

$75 million, which alone exceed the amount of 5% of projected expenditures

throughout the projected period, even absent any further contingency.[51]  The City

expects that Mr. Malhotra will testify with respect to (a) the existence of these

additional funds, (b) their availability to address unforeseen contingencies and

(c) the replenishment of these funds if applied.  Moreover, notwithstanding the

concerns raised by the Court Feasibility Expert with respect to the amount of the

contingency reserve, the Court Feasibility Expert generally agrees that the

assumptions in the Projections are sufficiently conservative to offer reasonable

protection against unforeseen events.  See Feasibility Report, at 200.  Accordingly,

the Plan and the related Projections demonstrate the existence of a reasonable

contingency that exceeds the amount that would be required of a "financial Plan"

under PA 182.

> **C.** **The City Will Possess Adequate Human**
> **Resources to Perform According to the Terms of the Plan**

129.  Although the City currently employs more than 9,000 people,

its ability to implement the terms of the Plan with its current workforce remains a

matter of concern.  The Court Feasibility Expert agrees that the hiring of additional

employees is necessary to the success of the Reinvestment Initiatives and expresses

confidence that the City's leadership will move forward with this process.

---

[51]  Ms. Kopacz also notes that the Plan is not the "financial plan" contemplated
by PA 182.  Accordingly, the requirement of a contingency equal to 5% of
expenditures does not apply to the Plan as a technical matter.  See Feasibility
Report, at 27.

> To meet the projections in the POA, the City will need to recruit a significant number of employees with improved skill level and continue to change the culture of performance and accountability[.] I believe that the City has identified human capital as an issue and is addressing this both formally and informally. I am relying on Mayor Duggan, CFO John Hill, and the other capable executives I have met at the City to execute effectively on the human capital strategy.

Feasibility Report, at 201.

130.  To this end, the City plans to invest substantial resources in connection with the Reinvestment Initiatives in (a) the hiring of additional appropriately qualified employees and (b) upgrading the skills of current employees through retraining. The testimony of Mayor Duggan, Council President Jones, Charles Moore and John Hill will support the human capital improvements contemplated by the Plan. In particular, the City expects that Mayor Duggan and Council President Jones will testify to the City's commitment to successfully implementing the Reinvestment Initiatives by increasing both (a) the size of the City's workforce and (b) the skill level of the average City employee. The City expects Mr. Moore to testify that, under the Reinvestment Initiatives, the City will expand its workforce by establishing almost 700 new positions *net* of attrition, by the end of fiscal year 2023. In addition, the Reinvestment Initiatives include an annual employee training budget of $2,000 per non-uniformed employee during the period through 2016 and $1,500 thereafter. Finally, the testimony of Mayor

Duggan will provide further information on current and planned initiatives with respect to the recruitment of additional, qualified employees and reforms to the City's Human Resources Department.

### D.    Adequate Systems and Procedures Will Be Established to Monitor the City's Performance

131.    The Plan provides for adequate systems and procedures to monitor the City's performance.  At the Confirmation Hearing, the City expects Charles Moore and John Hill to testify that the City currently lacks adequate staffing to implement and track the Reinvestment Initiatives.  Moreover, as the Court Feasibility Expert has remarked, the City historically has closed its books only on an annual basis, which further has confounded any real-time monitoring of the City's performance.[52]  Mr. Moore and Mr. Hill are expected to testify, however, that the Reinvestment Initiatives themselves provide $23.6 million for the hiring and training of nine additional employees within Finance Administration to monitor the City's financial performance on an ongoing basis.  In addition, the Reinvestment Initiatives assume additional hiring by the City's Accounting Division for the purpose of producing monthly accounting statements and completing bank reconciliations.

132.    In the Feasibility Report, the Court Feasibility Expert states that the preparation of daily, weekly and monthly reports of cash, revenue and

---

[52]    <u>See</u> Feasibility Report, at 113.

expenditures will continue to be important following the Effective Date.[53]

The Court Feasibility Expert expresses concern that preparations do not appear to be underway for the City to take over this function from EY, and there appears to be no budget for EY to continue to perform this function after the Effective Date.[54] At the Confirmation Hearing, however, the City expects Mr. Moore and Mr. Hill to further testify that this function will be transferred to the City, which will be able to perform this function on a prospective basis. Accordingly, the City's systems, as modified, modernized and developed by the Reinvestment Initiatives, will provide adequate structures for monitoring the City's performance following the Effective Date.

### E. Appropriate Controls Will Ensure the City's Compliance with the Plan

133. Under the Plan, the City's improved financial reporting will be backstopped by appropriate controls that will reasonably ensure the City's ongoing compliance with the terms of the Plan.[55] The City's compliance with the terms of the Plan will be subject to meaningful oversight established by recent State legislation. In particular, on June 20, 2014, the State passed a package of bills that

---

[53]  Id. at 115.

[54]  Id.

[55]  In this regard, the City expects that John Hill will testify that he already has implemented a rigorous process with respect to qualification for proceeds of the Quality of Life Loan involving the demonstration of an appropriate "business justification" for any expense.

contains comprehensive measures to provide oversight for the financial planning and management of the City. Public Act 181 of 2014, M.C.L. §§ 141.1631, et seq. ("PA 181"), created the Michigan Financial Review Commission (the "Commission"). The Commission will consist of nine members, including the State Treasurer and the Director of the Department of Technology, Management and Budget. See M.C.L. § 141.1635. The Commission is authorized to contract for professional services and, for the fiscal year ending September 30, 2014, the State has appropriated $900,000 to provide the Commission with the necessary resources to exercise its powers.

134. The Commission's tasks, among others, are to ensure that the City (a) complies with the terms of the Plan, (b) uses financially sound budgets, (c) develops realistic financial plans and (d) manages expenses to meet all obligations. See M.C.L. § 141.1636. To fulfill these purposes, the Commission possesses broad powers, including the power to (a) approve the City's budget, (b) approve any debt issuance by the City and (c) establish other requirements for the City's financial performance and management. See M.C.L. § 141.1637. In support of these powers, the Commission is permitted to audit and inspect the City's financial statements, actuarial reports, revenue statements and other documents in the discretion of the Commission and may require the City to provide periodic reports, certified as to their accuracy by the Chief Financial Officer.

See M.C.L. § 141.1636(7).  Twice annually, the Commission is required to file a report on the City with the Governor of the State of Michigan and provide a copy to the Senate Majority Leader and the Speaker of the House of Representatives. See M.C.L. § 141.1636(8).

135.   In addition, PA 182 requires the City to adopt a sound, multi-year financial plan that, among other requirements, (a) is based upon reasonable forecasts, (b) results in a balanced budget and (c) maintains adequate reserves.  See M.C.L. § 117.4t.  PA 182 also fosters greater fiscal transparency by requiring the City to post its financial forecasts and contracts to the City website. Id.  Moreover, Public Act 182 requires the City to appoint and maintain a Chief Financial Officer with extensive municipal finance, labor relations and pension-related experience to supervise the City's finances and ensure its compliance with these measures.[56]

---

[56]   In addition to these controls mandated by State law, Rip Rapson will testify at the Confirmation Hearing that many of these same considerations are conditions of the funding to be provided by the Foundations in support of the DIA Settlement.  The effectiveness of the DIA Settlement is conditioned upon, among other things, the adoption of governance and financial oversight mechanisms for the Retirement Systems.  See Plan, at § IV.E.3. For this reason and because the City's compliance with the Plan will be supported by rigorous controls (as explained above), the objection of William Ochadleus, et al. – asserting that the Plan is not feasible because, in the past, the City allegedly "ignore[d] abuses" of the Retirement Systems' boards of directors – must be rejected.  See Objection of William Ochadleus, et al. (Docket No. 6995) (the "Second Supplemental Ochadleus Objection"), at § B.

136.     At the Confirmation Hearing, the City will offer the testimony of Brom Stibitz, Director of Executive Operations at the Michigan Department of Treasury, John Hill, Mayor Duggan and Council President Jones regarding continuing oversight by the Commission and the State.  Specifically, in response to the Court's directive contained in the Eighth Amended Scheduling Order, these witnesses will offer testimony regarding:  (a) the implementation of PA 181; (b) the power and authority of the Commission; (c) the composition, staff support and resources of the Commission (to the extent known); (d) how the Commission will carry out its duties set forth in section 6 of PA 181; (e) how the Commission will become operational; and (f) the time by which the Commission will become operational.  Mayor Duggan and Council President Jones will further testify that, taken as a whole, the post-confirmation oversight mechanism established by PA 181 and PA 182 is appropriate and reasonable.

### F.     The Reinvestment Initiatives Will Elevate Municipal Services to Adequate Levels

137.     For the City, the provision of adequate municipal services requires far more than maintaining the *status quo*.  As set forth above, the Court previously has found that the City is "service delivery insolvent."  City of Detroit, 504 B.R. at 169-70.  At the Confirmation Hearing, the testimony of:  (a) Kevyn Orr; (b) Mayor Duggan; (c) Charles Moore; (d) Council President Jones; (e) John Hill; (f) Beth Niblock; (f) Rip Rapson; (g) Dan Gilbert; and (h) Roger Penske will

demonstrate that the City's ability to provide adequate levels of municipal services and meet its financial obligations going forward depends upon, and will be ensured by, the successful implementation of the Restructuring Initiatives. Notably, Mayor Duggan is expected to testify at the Confirmation Hearing that he knows of *no City department* that currently is providing adequate municipal services. In addition, the City's witnesses will testify that the Restructuring Initiatives are essential because the City can only reverse the reinforcing trends of population loss and declining revenues if adequate services are restored, blight is remediated and the City becomes a more attractive place in which to live and work.

138.   As part of the Plan, the City proposes spending on Reinvestment Initiatives totaling approximately $1.7 billion through the fiscal year ending June 30, 2023. Mr. Orr's testimony at the Confirmation Hearing will demonstrate that receipt of the Outside Funding associated with the "Grand Bargain" will greatly reduce the City's annual pension payments through 2023, thus enabling the City to focus on implementing the Reinvestment Initiatives. The successful implementation of the Reinvestment Initiatives, in turn, will place the City in a better position to attract and retain residents and businesses, and generate revenues sufficient to meet the City's obligations going forward.

139.   The Reinvestment Initiatives were developed from the bottom up to identify spending required to improve the performance of, and the services

rendered by, each department. The testimony of Charles Moore at the

Confirmation Hearing will establish that CM, with the assistance of the City's

employees, contractors and other advisors, analyzed the services provided by and

the functions and performance of each of the City's departments that impact the

General Fund. Mr. Moore will testify that the Reinvestment Initiatives were

developed based on this analysis. In addition, CM identified various areas where

cost savings or revenue opportunities may be available to mitigate the cost of the

Reinvestment Initiatives. Mr. Moore will further testify that (a) the costs

associated with the Reinvestment Initiatives are reasonable, (b) the goals of the

Reinvestment Initiatives cannot be achieved at a lower cost, (c) implementation of

the Reinvestment Initiatives will enable the City to remedy its service delivery

insolvency and (d) despite certain challenges that exist with respect to

implementation of the Reinvestment Initiatives – such as the need for the City to

attract and retain qualified employees – the Reinvestment Initiatives are

achievable.

140. Mayor Duggan, Mr. Moore and Mr. Hill will offer testimony

regarding the prioritization and timing of the Reinvestment Initiatives.

Specifically, these witnesses will testify that the Reinvestment Initiatives are

structured to prioritize Reinvestment Initiatives that either will (a) generate

additional revenue, (b) create cost savings or (c) allow the City to provide adequate

services.  Mayor Duggan will further testify that he supports the Reinvestment Initiatives – and the Plan as a whole – and will work to implement the Reinvestment Initiatives if the Plan is confirmed.  In addition, the City anticipates that Mr. Gilbert, Mr. Penske and Mr. Rapson will testify that each supports the Plan and will engage in complementary initiatives to assist the City in implementing the Restructuring Initiatives, including with respect to blight removal, City planning and improving the City's public safety forces.  Mr. Rapson will further testify that the Reinvestment Initiatives will accelerate investment in the City by business, community and philanthropic organizations.

141.    The Reinvestment Initiatives are divided into seven broad categories.[57]  With respect to each such category, the City's witnesses will testify that reinvestment in each of the foregoing areas is necessary for the City to provide adequate municipal services.

1.    ***The Blight Remediation Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services***

142.    Charles Moore, Dan Gilbert, Rip Rapson, Mayor Duggan and Council President Jones will testify that the $440.3 million in proposed blight

---

[57]    These categories are:  (a) blight remediation, (b) public safety operations and infrastructure improvements, (c) transportation and other services provided to residents, (d) enhancing the attractiveness of the City as a place to invest and do business, (e) modernizing the City's information technology systems, (f) increasing executive support while reducing redundancy and (g) reducing the burden of non-departmental operations on the general fund.

remediation initiatives are a necessary step toward alleviating the City's chronic

problems with abandoned and dilapidated property. Thirty percent of the City's

lots containing residential or commercial structures (along with five percent of the

vacant lots) are blighted and require remediation. Mr. Moore will testify that the

proposed blight remediation initiatives are reasonably expected to achieve various

benefits, including, among other things, (a) stabilizing and revitalizing

neighborhoods, (b) increasing demand for property and property tax revenues,

(c) reducing crime and (d) promoting public safety. In addition, Mayor Duggan

will testify that, under the Plan, blight remediation will be approached in an

economically efficient manner, in coordination with public and private

organizations that are anticipated to offer assistance with the City's blight removal

efforts.

### 2. *The Public Safety Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services*

143. The City suffers from poor emergency service response times

and high crime rates relative to national averages, in addition to low citizen

confidence. The $558.7 million in Reinvestment Initiatives devoted to public

safety includes necessary spending on, among other things, labor, benefits,

training, fleet, facilities, equipment and information technology. At the

Confirmation Hearing, (a) James E. Craig, Detroit Police Chief, and (b) Edsel

Jenkins, Detroit Executive Fire Commissioner are expected to testify as to their

requirements to provide adequate levels of police, fire and EMS services, and the City expects Mr. Moore to testify regarding the cost of satisfying those requirements.

144.    Chief Craig is expected to testify that the Detroit Police Department has many urgent needs, including for more vehicles, new equipment, upgraded information technology systems and more officers.  Commissioner Jenkins is expected to offer testimony that the Detroit Fire Department faces similar challenges, including antiquated facilities, equipment, vehicles and staffing. Both Chief Craig and Commissioner Jenkins are expected to testify that shortages of serviceable equipment and manpower, among other things, have negatively impacted employee morale, and that the Reinvestment Initiatives are essential to improving the effectiveness of the City's public safety forces.

### 3.    *The Public Transportation Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services*

145.    Mr. Moore will testify that the City's public transportation system has been contracting in recent years due to budget cuts.  In addition, bus maintenance issues frequently cause delayed or cancelled services, and driver and passenger safety incidents arising from criminal conduct aboard City buses are common.  Other neighborhood services, such as the provision and maintenance of City parks have been dramatically scaled back in recent years.  Mr. Moore and Mayor Duggan will testify that the $170.9 million in Reinvestment Initiatives

related to these and other services provided to City residents are necessary to reverse declines and reestablish adequate service levels.

**4.    *The Business Service Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services***

146.    Mr. Moore also will testify that the $51.4 million in Reinvestment Initiatives allocated to business services, including those services provided by the Department of Administrative Hearings, Coleman A. Young International Airport, the Board of Zoning Appeals, the Building, Safety Engineering and Environmental Department, the Municipal Parking Department and the Planning and Development Department are necessary to reverse the underfunding of these departments in recent years and thereby allow the City to at least compete for businesses seeking these services and their related investment dollars.

**5.    *The Information Technology and Support Services Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services***

147.    The Plan also provides for $479.9 million in Reinvestment Initiatives with respect to information technology and other support departments including general services, finance, law, the Office of the Auditor General, the Office of the Inspector General, human resources, labor relations, human rights and elections (collectively, the "Support Departments").

148.   Ms. Niblock will testify that the City's information technology – including the City's hardware, software and network – is badly outdated, inefficient and otherwise deficient and will provide detail on the specific nature of the Reinvestment Initiatives relating to the Information Technology Services Department.  Ms. Niblock's testimony will specifically address the steps to be taken by the City to mitigate against the risks, such as integration issues or premature obsolescence, that often are inherent with any investment in information technology infrastructure.  Ms. Niblock is expected to further testify that the first priority of the Restructuring Initiatives related to information technology will be to improve the City's technological infrastructure, which improvement will lay the foundation for all other information technology upgrades.  Ms. Niblock's testimony also will demonstrate that the funds devoted to information technology reinvestment under the Plan will enable the City to build a functional information technology system.  Finally, Ms. Niblock is expected to testify that the improvements to the City's information technology systems contemplated in the Reinvestment Initiatives will enable City employees to accomplish tasks with greater efficiency, and will streamline many City services.

149.   Mr. Moore will testify that the Support Departments provide essential support services to other City departments including maintaining City-owned property, facilities and vehicles as well as providing other support

services.  In addition, the testimony of Mr. Moore and Mr. Hill will establish that the remaining Reinvestment Initiatives associated with these departments will: (a) provide necessary support for investments elsewhere; (b) improve revenue and collections of City billings, financial reporting, maintenance of City property and vehicles; and (c) reduce related costs.

**6.** *The Remaining Reinvestment Initiatives Are Necessary to the Provision of Adequate Municipal Services*

150.   Mr. Moore also will testify that the $3.6 million in Reinvestment Initiatives targeted for the offices of the City Clerk and Mayor are warranted.  In addition, Mr. Moore will testify that the $16.9 million in non-departmental Reinvestment Initiatives related to the 36th District Court are necessary and will result in cost savings and additional revenues totaling $88.6 million.

151.   Thus, the testimony of the City's witnesses will establish that the Reinvestment Initiatives provide a necessary and comprehensive plan to address the major deficiencies in the City's operations that more likely than not will result in the provision of adequate municipal services.

**G.    The City Can Sustain Its Recovery Over the Long Term**

152.   The Plan was developed for the specific purpose of being sustainable over the long term.  The testimony of Mr. Malhotra and Mr. Hill will demonstrate that, based on the Projections, the City will have the capacity to

sustain normal municipal operations, provide adequate services and satisfy its obligations going forward if the Plan is confirmed. These witnesses will testify, for example, that the City can afford to issue the New B Notes and satisfy the settlements contemplated in the Plan while rectifying its service delivery insolvency. Mr. Buckfire will testify at the Confirmation Hearing that credit markets likely will be receptive to the newly deleveraged City. As a result, the City likely will succeed in attracting the Exit Financing contemplated under the Plan.[58] In addition, over time, the Reinvestment Initiatives are expected to begin a reversal of the population decline that has plagued the City for five decades. The resultant influx of businesses and residents will increase the tax base, thereby increasing revenues. Importantly, Mr. Buckfire will testify that the Reinvestment Initiatives are themselves relatively flexible with respect to the timing of necessary payments (in contrast to, for example, the inflexible payment schedules of the City's prepetition long term debt obligations). Accordingly, the City will be able to adapt to unforeseen circumstances as necessary to preserve its revitalization.

153. Moreover, the Commission is designed to promote the City's recovery and long-term financial health. The Commission – which, as discussed

---

[58] Accordingly, the assertion of William Ochadleus, <u>et al.</u> that the Plan is not feasible because the City has not established that it is likely to obtain exit financing is premature and must be rejected. <u>See</u> Second Supplemental Ochadleus Objection, at § C.

above, will possess broad oversight authority with respect to, among other things, the City's (a) compliance with the terms of the Plan and (b) implementation of sound budgeting practices and realistic financial planning – is expected to help the City implement the Plan and the Reinvestment Initiatives and support the City's long-term financial recovery.

~~~~~~~~~~~~~~~~~~~~~~~

154.   In sum, to establish the feasibility of the Plan, the City must show, by a preponderance of the evidence, that the Plan is based upon reliable quantitative and workable qualitative underpinnings.  The revenue and expense projections upon which the Plan is premised were accurately calculated and are based on reasonable assumptions.  As a result of the Reinvestment Initiatives, the City will possess adequate (a) human resources to implement the Plan and (b) systems in place to monitor the City's compliance with the Plan.  Moreover, recent State legislation has established controls and oversight to ensure (a) improved visibility of and regular reporting on the City's compliance with the terms of the Plan and (b) the City's implementation of the Restructuring Initiatives and financial best practices.

155.   The City does not currently provide adequate municipal services to its residents.  The City, therefore, developed the Reinvestment Initiatives from the bottom up to identify and prioritize key areas for reinvestment.

In each case, these Reinvestment Initiatives are necessary for the provision of adequate municipal services. In addition, the City likely can sustain its recovery because the capital markets likely will be receptive to the City's credit and the timing of the Reinvestment Initiatives is relatively flexible. Most importantly, however, the anticipated commitment of City leadership to this process supports the feasibility of the Plan.

## V. THE CLASSIFICATION OF CLAIMS UNDER THE PLAN SATISFIES SECTION 1122 OF THE BANKRUPTCY CODE

156. Section 1122 of the Bankruptcy Code sets forth the basic rule governing the classification of claims and interests: that is, with the exception of "convenience classes" of unsecured claims, the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class. See 11 U.S.C. § 1122(a). Notably, the Bankruptcy Code does not require the converse – that all similar claims be placed in one class. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 661 (6th Cir. 2002) ("Section 1122(a) does not demand that all similar claims be in the same class."). According to the Sixth Circuit Court of Appeals, "the bankruptcy court has substantial discretion to place similar claims in different classes .… Congress incorporated into section 1122 … broad discretion to determine proper classification according to the factual circumstances of each individual case." Id. (citations and quotation marks omitted).

157.   "A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the classification scheme, and the claims or interests within each particular class are substantially similar." In re Eagle-Picher Indus., Inc., 203 B.R. 256, 270 (S.D. Ohio 1996); 11 U.S.C. § 1122(a).  "To be substantially similar" for purposes of section 1122 of the Bankruptcy Code, "claims need not be identical; … [a]nd there is certainly no requirement that claims be classified according to their values." In re Dow Corning Corp., 244 B.R. 634, 655 (Bankr. E.D. Mich. 1999) (citations omitted), aff'd, 255 B.R. 445 (E.D. Mich. 2000), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).  Rather, under section 1122 of the Bankruptcy Code, "claims will be substantially similar if they are similar in legal nature or character." Id.

158.   A plan proponent must not separately classify substantially similar claims solely to gerrymander favorable votes.  Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991) (under section 1122 of the Bankruptcy Code, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").  Where there is no evidence that similar claims have been classified separately for purposes of gerrymandering, however, a plan proponent need not offer proof that "legitimate reasons" exist for such separate classification.

See Dow Corning, 244 B.R. at 650 (Section 1122(a) of the Bankruptcy Code "should be construed in accordance with its plain language" and, accordingly, "should not be viewed as prohibiting a plan proponent from placing substantially similar claims in different classes regardless of whether it has proven a 'legitimate reason' for doing so.").

### A. All Claims Within Each Particular Class Are Similar in Legal Nature or Character

159.    Here, the Plan utilizes a classification scheme that comports with the Bankruptcy Code with respect to all Claims and is reasonable and appropriate under the circumstances.[59]  At a threshold level, the Plan separately classifies secured and unsecured Claims.  As set forth in the Plan, secured Claims are classified in Classes 1A through 6, whereas unsecured Claims are classified in Classes 7 through 17.  See Plan, at § II.B; Confirmation Standards Exhibit, at § II.A.1.

160.    As demonstrated in the Confirmation Standards Exhibit, valid factual and legal reasons exist for the separate classification under the Plan of (a) certain secured Claims from Other Secured Claims and (b) certain unsecured Claims from Other Unsecured Claims.  See Confirmation Standards Exhibit, at § II.A.2.  Moreover, the legal rights of each of the holders of Claims within each

---

[59]    In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified.

Class under the Plan are substantially similar to the legal rights of other holders of Claims within that Class.  See id.  In light of the rational basis for the separate classification of certain Classes of Claims, the Plan's classification scheme is not an attempt to manufacture an impaired class that will vote in favor of the Plan – indeed, as demonstrated in Section VIII.A of the Confirmation Standards Exhibit, seven impaired Classes of unsecured Claims have accepted the Plan – and does not discriminate unfairly between or among holders of Claims.

**B.     The Plan Does Not Gerrymander Affirmative Votes**

161.   Several parties have filed Individual Objections alleging that the Plan's classification scheme is improper.  One Individual Objection (the "Gerrymandering Objection") asserts that the Plan improperly "gerrymander[s]" Class 10 by including both impaired and unimpaired Claims in such Class.  See Ochadleus Objection, at 13-14.  According to the Gerrymandering Objection, certain retirees holding PFRS Pension Claims are essentially unimpaired under the Plan because (a) the impairment of Class 10 Claims arises solely from the elimination of the claimants' entitlement to COLA adjustments to future benefit levels and (b) such allegedly unimpaired retirees have no imminent

-113-

13-53846-swr    Doc 8149-5  Filed 08/27/14  Entered 08/27/14 23:40:25  Page 130 of 292
13-53846-swr    Doc 7143  Filed 08/27/14  Entered 08/27/14 18:05:50  Page 130 of
293

likelihood of receiving COLA benefits regardless of whether the Plan is confirmed.[60] Id.

162. The Gerrymandering Objection misapprehends the requirements of section 1122 of the Bankruptcy Code. With respect to claims that are classified together, as long as such claims are similar in legal nature or character, section 1122 of the Bankruptcy Code is satisfied. Under the Plan, all PFRS Pension Claims are properly classified together precisely because they are substantially similar in legal nature and character. Specifically, both the Claims termed "unimpaired" and the "impaired" Claims referenced in the Gerrymandering Objection are clearly "PFRS Pension Claims" as defined in the Plan.[61]

163. In any event, all PFRS Pension Claims are in fact impaired under the Plan. Notwithstanding the somewhat differing methodologies used for

---

[60] The reason such retirees are alleged to have no prospect of receiving COLA increases is because (a) their right to future COLA payments is tied to the pay increases received by active employees and (b) active employees have not recently received pay increases (and indeed have received pay cuts). The argument, of course, neglects the prospect of future increases in the salaries of Detroit police and firefighters, which could lead to the very receipt of COLA benefits asserted to be without prospect.

[61] Under the Plan, "PFRS Pension Claims" are claims that are "based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for: (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees; or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS." Plan, at § I.A.261.

calculating the COLA benefits of holders of PFRS Pension Claims, under the Plan, all holders of PFRS Pension Claims possess a right to receive COLA benefits and sustain a 55% reduction in that right going forward. This modification to the COLA benefits – which applies to all holders of PFRS Pension Claims – falls within the Bankruptcy Code's definition of impairment. See 11 U.S.C. § 1124 (providing, in relevant part, that "a class of claims … is impaired under a plan unless … the plan … leaves unaltered the legal, equitable, and contractual rights to which such claim … entitles the holder of such claim"); In re 28th Legislative Dist. Cmty. Dev. Corp., No. 10-14804, 2011 WL 5509140, at *10 (Bankr. E.D. Tenn. Nov. 10, 2011) (impairment "can be of nominal financial significance, since Congress rejected the Commission's recommendation that impairment be deemed to exist only if the class is materially and adversely affected") (citing 6 Norton Bankr. L. & Prac. 3d § 113:5 (2011)).

164. Moreover, the prohibition on gerrymandering with respect to classification applies in circumstances other than those presented here. Courts within the Sixth Circuit have held that the issue of gerrymandering is properly asserted only in connection with allegations that a plan proponent has *separately classified similar claims* to obtain favorable votes. The Dow Corning court explained this rule as follows:

> It may well be that one of Congress' primary motivations
> for limiting class membership to substantially similar

claims was … to ensure that the votes cast by the class will reflect the joint interests of the class. But to accomplish this goal, Congress enacted a single requirement, which is that a class may consist only of substantially similar claims. When determining whether claims within a single class meet this requirement, assertions of attempted vote gerrymandering are simply irrelevant. If all claims within a class are substantially similar, then the class is properly constituted.… *Consequently, accusations that a classification scheme has been designed to gerrymander the vote on a proposed plan need be addressed, if at all, only when the plan proponent has placed substantially similar claims in separate classes.*

Dow Corning, 244 B.R. at 665 (citing Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986)) (internal citation and quotation marks omitted) (emphasis added). Here, the objecting parties make no suggestion that the Plan "place[s] substantially similar claims in separate classes." Because the Plan properly classifies only substantially similar claims in Class 10, no grounds exist for allegations of gerrymandering.

**C.  The Pension and OPEB Claims of Detroit Public Library and Detroit Regional Convention Facility Authority Employees Are Substantially Similar to Other Pension Claims and OPEB Claims**

165. The UAW's Objection[62] regarding the classification of claims also fails. The UAW argues, among other things, that the Pension Claims and OPEB Claims held by employees and retirees of the Detroit Public Library (the "Library") may not be impaired under the Plan because the Library is a

---

[62]     Objection of the UAW (Docket No. 6464) (the "UAW Objection").

separate legal entity from the City and not a debtor in the Chapter 9 Case.

See UAW Objection, at 6-18.  AFSCME repeats a similar argument throughout its Objection[63] with respect to both the Library and the Detroit Regional Convention Facility Authority (the "DRCFA").  See AFSCME Objection, at 2, 4, 7, 10, 12, 15, 20-21.  In addition, the UAW argues that the Plan violates section 1122(a) of the Bankruptcy Code by classifying such Claims in Classes 11 and 12 together with, respectively, non-Library GRS Pension Claims and non-Library OPEB Claims, i.e., according to the objectors, Claims that *are* subject to impairment.

See UAW Objection, at 21 n.14.

166.    The UAW and AFSCME misapprehend the nature and treatment of the Pension Claims and OPEB Claims held by employees and retirees of the Library and, in the case of AFSCME, the DRCFA.  The City does not seek to impair the liabilities of the Library or the DRCFA under the Plan; the arguments by the UAW and AFSCME that the City may not do so are irrelevant.  In making this argument, the UAW and AFSCME characterize GRS as a mere "administrator" of the pension obligations of the Library and the DRCFA, separate and apart from GRS as the administrator for the pension obligations of the City.

See UAW Objection, at 17-18 (arguing that the GRS is "simply the mechanism by which the pension benefits [of Library employees] are administered and paid");

---

[63]    Objection of AFSCME (Docket No. 6468) (the "AFSCME Objection").

AFSCME Objection, at 3 (arguing that the Library and DRCFA "merely have their benefits administered by the [GRS]").

167. Those factual assertions miss the salient factual and legal points. GRS does, indeed, administer one of the City's pension plans. However, the Plan affects liabilities against *the City* – not against GRS. It is *the City* that bears ultimate responsibility for the underfunding of the GRS pension plan. The City is the sole sponsor of the GRS pension. <u>See</u> Detroit City Code § 47-2-18(c) (providing that the Pension Accumulation Fund of the GRS, from which pensions are paid, shall consist of "accumulated reserves for the pensions and other benefits payable from the contributions made *by the City* …") (emphasis added); Detroit City Code § 47-2-19 (specifying how the City's annual contribution to GRS shall be calculated and providing for no funding source other than the City).

168. The City's status as the sole sponsor of GRS means that, if the Library and DRCFA were unable to pay into the GRS at any time for any reason, the City would ultimately bear the responsibility of providing funding for the benefits promised to Library and DRCFA retirees. <u>See</u> Detroit City Code §§ 47-2-18(c)(4), 47-2-19. Put simply, as the sole GRS sponsor and funding agent of last resort, the City is indebted to all participants in GRS for the cost of their pensions. Thus, the underfunding of GRS results in a claim within the meaning of

section 101(5) of the Bankruptcy Code *against the City* by the Library and DRCFA employees and retirees who participate in GRS and look to GRS for payment of their pensions.

169.    In addition, although the Library may be a separate legal entity from the City, because its employees and retirees participate in GRS, these employees and retirees have GRS Pension Claims subject to impairment in chapter 9, and their Claims are the same as those of all other current and former *City* employees who similarly participate in GRS and look to GRS to pay and the City to fund their pensions.  Accordingly, the UAW's classification argument with respect to Class 11 Claims of Library GRS participants fails.

170.    The argument asserted by the UAW and AFSCME regarding OPEB Claims held by retirees of the Library and the DRCFA also must be rejected.  The City has no obligations to any party under the collective bargaining agreements between the Library and the UAW or AFSCME, as applicable.[64]

---

[64]    Attached hereto collectively as Exhibit C are excerpted copies of the collective bargaining agreements between the Detroit Library Commission and the following entities:  (a) the Skilled Trades Unit of Local 2200 of the UAW (Oct. 1, 2007) (the "STU Agreement"); (b) the Association of Professional Librarians of the Detroit Public Library Unit of Local 2200 of the UAW (July 1, 2008) (the "APL Agreement"); (c) the Professional Organization of Librarians Unit of Local 2200 of the UAW (July 1, 2008) (the "POOL Agreement"); (d) Michigan Council 25 of AFSCME, Local 1231 (Jan. 1, 2011) (the "AFSCME Local 1231 Agreement"); (e) Local Union 1259, Council 25 of AFSCME (Oct. 1, 2010).

Nonetheless, those contracts provide that the parties have agreed that the applicable entity's retirees will participate in the City's retiree welfare programs.[65]

171. Because the City has no contractual obligation whatsoever to provide retiree welfare benefits to the Library or DRCFA retirees, the City is entitled to be reimbursed by the Library and the DRCFA for the cost of providing retiree health and welfare benefits for their respective retirees. When the City substantially modified its retiree health programs on March 1, 2014, which affected the Library and DRCFA retirees, neither the UAW nor AFSCME objected to such action. Nor did the Library or DRCFA.

---

Employees of DRCFA that are members of AFSCME Local 1220 have been operating under the terms of the former Master Agreement between the City and AFSCME that expired on June 30, 2008 (the "DRCFA Agreement"). An excerpted copy of the DRCFA Agreement also is included within Exhibit C. All of the City's obligations under the DRCFA Agreement passed to DRCFA upon its creation, pursuant to the terms of the successorship clause. DRCFA Agreement, at 67.

[65] See, e.g., STU Agreement, at Sched. D., § E ("All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau."), Sched. F ("The City of Detroit administers all health care related matters for the Detroit Public Library."); APL Agreement, at § 16.21(E) ("All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau."), Sched. C (providing that "Health Care Benefits Upon Separation" are "administered by the City of Detroit"); POOL Agreement, at § 16.21(E) ("All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau."), Sched. C (providing that "Health Care Benefits Upon Separation" are "administered by the City of Detroit"); AFSCME Local 1231 Agreement, at Sched. C ("The City of Detroit administers all health care related matters for the Detroit Public Library.").

172. Because none of the Library, the DRCFA, the UAW or AFSCME objected to the modification of retiree welfare benefits on March 1, 2014, the City continued to provide and administer such modified benefits. Assuming that the Library or DRCFA wished to continue with the City's programs and to continue to reimburse the City for such programs (an assumption which the City subsequently confirmed), the City included in Class 12 the Library and DRCFA retirees participating in City health care programs, along with all other retirees receiving City health care benefits. Classification in and of itself is proper.

173. The UAW and AFSCME now, for the first time, object to the impairment of the Library and DRCFA retirees' OPEB benefits. As set forth above, the City has no contractual obligation to provide these benefits at all. With respect to OPEB obligations, Library and DRCFA retirees have not been considered Class 12 claimants for the purpose of impairing any rights such retirees may have against the City because the retirees have no such rights. Rather, they are considered Class 12 claimants solely for the purpose of continuing the past practice between the City and the Library and DRCFA, as applicable, of administering the Library's and the DRCFA's obligations for OPEB benefits. Should the Library, the DRCFA or their unions demand that the City remove their retirees and related OPEB liabilities from the Detroit General VEBA, the City will

accommodate them.  In such case, the Library or the DRCFA and their respective unions can determine what benefits and at what levels the Library or DRCFA themselves can and will provide to their current and future retirees.

174.    Thus, for all of the foregoing reasons, the Plan properly classifies Claims, and section 1122 of the Bankruptcy Code is satisfied.

## VI.    ALL CLAIMS WITHIN EACH CLASS WILL RECEIVE THE SAME TREATMENT UNDER THE PLAN

175.    The Plan provides the same treatment for each Claim in a particular Class unless the party consents to different treatment, as required by section 1123(a)(4) of the Bankruptcy Code.  See Plan, at § II.B. Section 1123(a)(4) of the Bankruptcy Code requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  This provision "'is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure [of equality].'"  In re Dow Corning Corp., 255 B.R. 445, 497 (E.D. Mich. 2000) (quoting In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990)), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).

176.    Section 1123(a)(4) of the Bankruptcy Code does *not* require that every claim within a class receive exactly the same distribution.  Rather,

section 1123(a)(4)'s requirement of "same treatment" means that, except where the holder of a claim consents to less favorable treatment, each holder of a particular claim within a class must be afforded the same opportunity or be subject to the same process.  See, e.g., Dow Corning, 255 B.R. at 501 ("The requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the same process for claim satisfaction.'") (citation omitted) (emphasis in original); Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").  Moreover, section 1123(a)(4) of the Bankruptcy Code "applies to claims, not creditors."  H.R. Rep. No. 95-595, at 407 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6363; see also In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (noting that the debtor had confused "equal treatment of *claims* with equal treatment of *claimants*") (emphasis in original), rev'd on other grounds sub nom. UNR-Rohn, Inc. v. Bloomington Factory Workers (In re UNR Indus., Inc.), 173 B.R. 149 (N.D. Ill. 1994).[66]

---

[66]  See also 7 Collier on Bankruptcy ¶ 1123.01[4][b] (16th ed. rev. 2014) (explaining that section 1123(a)(4)'s requirement that the plan provide the "same treatment for each claim … of a particular class" does not apply "to the plan's overall treatment of the creditors holding such claims").

177.   The Plan satisfies section 1123(a)(4) of the Bankruptcy Code in all respects.  In the Consolidated Reply, the City responded to certain Initial Objections arguing that the Plan violated section 1123(a)(4) of the Bankruptcy Code.  <u>See</u> Consolidated Reply, at ¶¶ 290-93.  Specifically, the Plan's treatment of PFRS Pension Claims satisfies section 1123(a)(4) of the Bankruptcy Code.  Certain objecting parties have argued that classifying the PFRS Pension Claims held by retirees in Class 10 together with the PFRS Pension Claims held by Active Employees is impermissible because, under the Plan, Active Employees who continue to work for the City post-confirmation would be eligible for future increases in PFRS pension benefits as a result of their future employment.  <u>See</u> City Legal Issues Brief, at ¶¶ 39-41.  As set forth in the City Legal Issues Brief, however, these Objections confuse the future opportunities available to Active Employees with the treatment of such Active Employees' PFRS Pension Claims.  In other words, the objectors conflate the treatment of *Claims* with the treatment of *claimants*.  <u>See</u> City Legal Issues Brief, at ¶¶ 39-41.  Because the Plan provides the same treatment for each Class 10 Claim, section 1123(a)(4) of the Bankruptcy Code is satisfied with respect to Class 10.

## VII.   THE PLAN PROVIDES ADEQUATE <u>MEANS FOR ITS IMPLEMENTATION</u>

178.   Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and provides a

non-exclusive list of examples of plan provisions that provide such means of implementation.  See 11 U.S.C. § 1123(a)(5).

179.   In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, (a) the issuance of new securities pursuant to the Plan, (b) the consummation of the settlements described in the Plan, (c) the consummation of the State Contribution Agreement, (d) the assumption or rejection of Executory Contracts and Unexpired Leases, (e) the consummation of the DIA Settlement Documents, (f) the establishment and funding of the Professional Fee Reserve, (g) the City's assumption of certain indemnification obligations and (h) the City's entry into the Exit Facility and any agreements and ancillary notes related thereto.  See Plan, at Article IV.

A.    **The City Has Provided Sufficient Information to Syncora Regarding Implementation of the Plan**

180.   In its Supplemental Objection, Syncora appears to argue that it lacks sufficient information regarding the transactions contemplated by the Plan to raise objections pursuant to section 1123(a)(5) of the Bankruptcy Code – and that the City's alleged failure to provide certain documents constitutes a due process violation and an abuse of the mediation privilege.[67]  Specifically, Syncora argues that it has been denied due process because the City has failed to provide Syncora

_____

[67]    See Syncora Supplemental Objection, at ¶¶ 48-55.

with (a) definitive documentation with respect to the Exit Financing and (b) every new collective bargaining agreement (each, a "CBA") into which the City has entered or will enter.  Syncora Supplemental Objection, at ¶ 51.  Although it styles its argument as an objection under section 1123(a)(5) of the Bankruptcy Code, Syncora fails to explain precisely how the relevant statutory language – requiring a plan to "provide adequate means for the plan's implementation" – relates to its due process allegations.

181.    In any event, Syncora's Objections fail because the City has provided Syncora with ample information with respect to the transactions contemplated by the Plan.  As the Court is aware, on August 11, 2014, the City filed a plan supplement containing the principal terms of the Exit Facility.[68]  By the time the Confirmation Hearing begins, Syncora will have had nearly three weeks to review the terms of the Exit Facility.  In addition, to date, the City has provided Syncora with dozens of approved CBAs constituting *every* relevant CBA to which the parties have given final approval.  Syncora's assertion that the City has failed to turn over CBAs and documents relating to the Exit Financing thus is false.

---

[68]    See Notice of Filing Plan Supplement:  Exhibit I.A.146 (Principal Terms of Exit Facility); Exhibit I.A.255 (Form of Restoration Trust Agreement); Exhibit II.D.5 (Schedule of Postpetition Collective Bargaining Agreements); Exhibit III.D.2 (Retained Causes of Action) (Docket No. 6647).

182.   In the Syncora Second Supplemental Objection, Syncora reiterates – in some cases verbatim – arguments it previously raised in its objection to approval of the DWSD Tender by asserting that it is incapable of evaluating the DWSD Tender and its impact on Plan confirmation.[69]  In support of its argument, Syncora makes generalized allegations of the need for further discovery with respect to the DWSD Tender but provides no specifics.  Id.  As of the filing of Syncora's latest Objection, however, the Court already had approved the DWSD Tender and the related transactions.[70]  Accordingly, Syncora's arguments against the validity of the DWSD Tender are untimely and must fail.

183.   Syncora raises several additional issues arising from the DWSD Tender.  See id. at ¶ 11.  Syncora argues, for example, that, to the extent City assets become encumbered as a result of the DWSD Tender, such assets should nevertheless be considered to be available for the satisfaction of Syncora's Claims for purposes of the best interests of creditors test.  Id.  In addition, Syncora asserts

---

[69]   See Syncora Guarantee Inc. and Syncora Capital Assurance Inc. Limited Supplemental Objection and Reservation of Rights to Debtor's Sixth Amended Plan of Adjustment (Docket No. 7041) (the "Syncora Second Supplemental Objection"), at ¶ 10.

[70]   See Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028) (the "DWSD Tender Order") (order granting the DWSD Tender Motion and overruling all objections thereto, including Syncora's).  Id. at 17.

that the Plan is no longer fair and equitable because Syncora expected that

now-encumbered assets would be available to Syncora for recovery on its Claims.

Id. These arguments are misplaced. The best interests of creditors test and fair and

equitable analysis are to be conducted at the time of confirmation, not as of some

prior date that Syncora feels better serves its arguments against approval of the

Plan. Accordingly, the Court should consider a hypothetical dismissal of the

Chapter 9 Case and Syncora's reasonable expectations as of the Confirmation

Hearing, not a week (or a month) earlier.

184. Syncora also argues that the DWSD Tender increases the risk

premium of New B Notes, thereby reducing their value. At the Confirmation

Hearing, however, Kenneth Buckfire is expected to testify with respect to the fact

that the New B Notes should be valued at par. In addition, Syncora alleges that the

DWSD Tender adds risk to the City's ability to fund its operations, thereby

implicating the feasibility requirement for confirmation of the Plan. Syncora's

generalized allegations, however, are utterly unsupported by any specific facts or

theories and should be discounted.[71]

---

[71] Syncora also objects to the extent that the DWSD Tender constitutes a Qualifying DWSD Transaction under the Plan. Syncora Second Supplemental Objection, at ¶ 11. The DWSD Tender is not a Qualifying DWSD Transaction.

185.    Syncora's due process arguments generally fail to acknowledge the measures taken by the Court throughout this Chapter 9 Case to accommodate and preserve the due process rights of all creditors.  With respect to Plan confirmation specifically, the Court has entered a total of eight Scheduling Orders to date and postponed the Confirmation Hearing by more than two months, often at the urging of Syncora.  Syncora's complaints with regard to the notice and opportunity to object it has received over the DWSD Tender are particularly unfounded.  At a hearing on August 12, 2014, the Court considered the concerns of Syncora and other creditors regarding the short interval between the initiation of the DWSD Tender and the commencement of the Confirmation Hearing. In response to these concerns, the Court postponed the Confirmation Hearing a further eight days and provided creditors with an opportunity to file objections to the City's motion for approval of the DWSD Tender[72] and additional supplemental objections to the Plan prior to the commencement of the Confirmation Hearing. Taking advantage of these opportunities, Syncora filed its objection to the DWSD Tender Motion (Docket No. 6903) and the Syncora Second Supplemental Objection against confirmation of the Plan.

---

[72]    See Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644) (the "DWSD Tender Motion").

186. Thus, regardless of how styled, Syncora's due process allegations lack merit and must be rejected.

## B. The City Has Not Violated Due Process by Complying with the Court's Mediation Confidentiality Order

187. Syncora further argues that it lacks the information necessary "to evaluate the extent to which [its] property interests are affected by the Plan" because the City supposedly has "abuse[d] … the mediation privilege."  Syncora Supplemental Objection, at ¶ 52.  Syncora is again mistaken.  Syncora already knows how its Claims and interests will be affected by the Plan.  See Plan, at § II.B.  Syncora does not need to pry into other parties' mediation efforts to understand these provisions.

188. More importantly, Syncora's argument ignores that the City is not merely asserting a privilege but complying with a court order.  See, e.g., 6/26 Hr'g Tr. 47-48 (the Court explaining that "'mediation privilege'" is not "the appropriate language to use" in this context "because what we have is a court order").  The Court ordered the City to maintain confidentiality with respect to the mediation process; as a result, it cannot choose when to "invoke" the mediation privilege, let alone "abuse" it.  Indeed, the City and its counsel recently were ordered to pay $10,000 in costs for *inadvertently* revealing protected mediation materials.  See Order Regarding Motion for Costs Relating to Clawback of Debtor's Document Production (Docket No. 5326).  The City did not violate the

Due Process Clause by objecting to Syncora's interrogatories, subpoenas and deposition questions insofar as they demanded information subject to the Court's order. <u>See</u> Syncora Supplemental Objection, at ¶¶ 52-53. Rather, it simply did what the Court instructed it to do – an obligation the Court has strictly enforced.

189.   In addition, the City has not sought to expand the scope of the Court's order. Syncora attempts to make hay from the fact that the City generally objected to interrogatory requests that sought information subject to the mediation confidentiality order. <u>See id.</u> at ¶ 52. This argument is disingenuous, however, because it fails to acknowledge that Syncora included a similar disclaimer in its own response to the City's requests.[73] Syncora also criticizes the City's motion to quash Syncora's subpoena to the Foundations. <u>See</u> Syncora Supplemental Objection, at ¶ 52. The Court granted that motion, however, demonstrating that the City acted appropriately.[74]

190.   In short, the City has disclosed ample information to allow Syncora to pursue its objections to the Plan, and the City has done nothing wrong in complying with the Court's mediation confidentiality order. Syncora's challenge

---

[73]   <u>See</u> Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Responses and Objections to Debtor's Request for Production of Documents (Docket No. 4275), at 12 ("Syncora objects to each request to the extent it seeks documents covered by … the mediation privilege ….").

[74]   <u>See</u> Order Regarding Foundations' Joint Motion to Quash (Docket No. 5623).

to confirmation under due process principles and section 1123(a)(5) of the

Bankruptcy Code, therefore, must fail.

## VIII.  THE PLAN'S DISCHARGE, RELEASE AND EXCULPATION PROVISIONS ARE LAWFUL AND APPROPRIATE

191.   Sections 1123(b) and 1123(d) of the Bankruptcy Code identify

certain discretionary provisions that may be included in a chapter 9 plan, provided

they are "not inconsistent with" applicable provisions of the Bankruptcy Code.

See 11 U.S.C. § 1123(b)(6).  The Plan includes several such discretionary

provisions, as set forth in the Confirmation Standards Exhibit.  See Confirmation

Standards Exhibit, at § IV.

### A.    The Plan's Exculpation and Consensual Release Provisions Are Lawful and Appropriate

192.   The Plan's exculpation provision comports with applicable law.

A properly tailored exculpation provision may extend beyond the professionals of

the debtor and any official committees appointed in the case under appropriate

circumstances.  E.g., Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns,

Inc.), 519 F.3d 640, 655-58 (7th Cir. 2008) (exculpation of third party

financier/creditor appropriate where (a) the provision (i) contained a carve out for

willful misconduct and (ii) was limited to claims arising out of or in connection

with the bankruptcy case; and (b) the creditor required the limitation before it

would provide the requisite financing, which was essential to the reorganization);

<u>In re Granite Broad. Corp.</u>, 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that included creditor/financier and controlling shareholder, where the provision (a) contained a carve out for gross negligence and intentional misconduct and (b) was limited to claims arising in connection with the plan and the bankruptcy cases).

193.   The exculpation provision in the Plan is lawful and appropriate. It contains a carve-out for gross negligence and willful misconduct and is limited to claims arising out of the City's restructuring efforts and the Chapter 9 Case. <u>See</u> Plan, at § III.D.6.  In addition, the Plan's exculpation provision extends only to certain parties who either have settled with the City or have actively participated in the City's restructuring activities, and does so only at the insistence of such parties.

194.   FGIC argues for this Court to adopt a strict limitation on exculpation provisions to estate fiduciaries employed by certain Delaware bankruptcy courts.  FGIC Supplemental Objection, at ¶ 9 (citing <u>In re Washington Mut., Inc.</u>, 442 B.R. 314 (Bankr. D. Del. 2011)).  The approach advocated by FGIC is a minority position that has not been adopted by the Sixth Circuit.[75]

---

[75]   The majority approach allows exculpation provisions to extend beyond estate fiduciaries in appropriate circumstances.  <u>See</u>, <u>e.g.</u>, <u>Airadigm Commc'ns</u>, 519 F.3d at 655-58 (approving exculpation provision covering third party financier/creditor); <u>Murphy v. Weathers</u>, No. 07-00027, 2008 WL 4426080, at *6 (M.D. Ga. Sept. 25, 2008) (affirming confirmation of plan containing exculpation provisions protecting parties including the unsecured creditors committee, its members, the debtor's chief restructuring

195.    The Court should not adopt the narrow approach of the

Delaware court in <u>Washington Mutual</u>, which would be overly restrictive in the

City's case because, in addition to fiduciaries, the Plan seeks to exculpate certain

parties that have entered into key settlements with the City as a condition of such

settlements.  Syncora describes these parties as a "laundry list of creditors," and,

without support, attempts to (a) equate the Plan's exculpation provision with

nonconsensual third-party releases and (b) argue that the provision fails to satisfy

<u>Dow Corning</u>'s "unusual circumstances" standard discussed below.  <u>See</u> Syncora

Supplemental Objection, at ¶ 59 (stating that the exculpation provision is a

non-consensual third party release).  There is no basis, however, for the conflation

---

officer and the agents of the chapter 11 trustee); <u>In re Nat'l Heritage Found.,</u>
<u>Inc.</u>, 478 B.R. 216, 233 (Bankr. E.D. Va. 2012) (approving exculpation
provision covering "the Debtor, Reorganized Debtor, the Committee, the
members of the Committee and their designated representatives in their
capacity as such, any of such parties' respective current … officers, directors
or employees, and any of such parties' successors and assigns), <u>aff'd sub nom.</u>
<u>Nat'l Heritage Found., Inc. v. Behrmann</u>, No. 12-1329, 2013 WL 1390822
(E.D. Va. Apr. 3, 2013), <u>aff'd sub nom.</u> <u>Nat'l Heritage Found., Inc. v.</u>
<u>Highbourne Found.</u>, No. 13-1608, 2014 WL 2900933 (4th Cir.
June 27, 2014), <u>aff'd on reh'g</u>, No. 13-1608, 2014 WL 3700582 (4th Cir.
July 25, 2014); <u>In re Quincy Med. Ctr., Inc.</u>, No. 11-16394,
2011 WL 5592907, at *3 (Bankr. D. Mass. 2011) (approving exculpation of
the "debtors, the liquidation trustee, the creditors' committee, the
bondowners, the indenture trustee and their representatives and
professionals" because each was either a fiduciary or had provided financial
or other consideration to the estate); <u>Granite Broad. Corp.</u>, 369 B.R.
at 139-40 (approving exculpation provision that included creditor/financier
and controlling shareholder).

of standards advocated by Syncora, and Syncora cites to none. Accordingly, the Plan's exculpation provision is appropriate and should be approved.

196. The Plan's consensual release provisions likewise conform with applicable law and should be approved. Consensual releases are clearly permissible under applicable law. See Dow Corning, 255 B.R. at 490 ("A voluntary and consensual release is not a discharge in bankruptcy and does not run afoul with the Bankruptcy Code."). As the City demonstrated in the Consolidated Reply, the releases set forth in Section III.D.7.a of the Plan are consensual releases that apply only to Holders of Claims who vote to accept the Plan. See Consolidated Reply, at ¶¶ 295-96. Accordingly, the Plan's consensual release provisions are both lawful and appropriate.

**B.    The Plan's Non-Consensual Release Provisions Are Lawful and Appropriate**

197. The Plan's non-consensual third party releases – which apply only to holders of Pension Claims and only if the State Contribution Agreement is consummated – should be approved because "unusual circumstances" exist in this Chapter 9 Case that justify their application. Specifically, approval of the Plan's non-consensual third party release provisions is appropriate because (a) the City's Chapter 9 Case presents facts which are not merely unusual, but are in fact unique, and (b) the effectuation of the "Grand Bargain" – and thus the City's rehabilitation under the terms of the Plan – requires the granting of such releases.

1. ***Non-Consensual Third Party Releases and Injunctions Are Permissible in Unusual Circumstances***

198. Non-consensual third party release and injunction provisions are permissible in the Sixth Circuit in "unusual circumstances." <u>Dow Corning</u>, 280 F.3d at 658.[76]

199. According to the <u>Dow Corning</u> court, in the chapter 11 context, "when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

---

[76] As such, the argument in one Objection that the Court lacks jurisdiction to authorize non-consensual third party releases in appropriate circumstances does not reflect the law in the Sixth Circuit. <u>See</u> Ochadleus Objection, at 27-28.

Id. (remanding the case to the district court for additional findings on whether "unusual circumstances" were present).

200. Although the Dow Corning panel framed its inquiry conjunctively, courts have applied the Dow Corning standard as necessary to suit the specific factual circumstances before them, and have not required the satisfaction of all seven factors where the application of all such factors was not appropriate. See, e.g., In re Friedman's, Inc., 356 B.R. 758, 761-63 (Bankr. S.D. Ga. 2005) (approving third party releases over the objection of the United States Trustee under the Dow Corning standard without having found that all seven factors were satisfied, either at all or as to all of the parties being released); In re Global Indus. Techs., Inc., No. 02-21626, 2013 WL 587366, at **39-40 (Bankr. W.D. Pa. Feb. 13, 2013) (finding that a channeling injunction that protected a number of non-debtor third parties from claims "substantially satisfies [some but not all of] the factors enunciated in Dow Corning" such that "the injunction is appropriate"); In re Condustrial, Inc., No. 09-04425, 2011 WL 3290389, at **5-7 (Bankr. D.S.C. Aug. 1, 2011) (approving third party releases under the Dow Corning standard without having found that all seven factors were satisfied; finding that those factors that were applicable were "satisfied in the case").

## 2. *The Approval of Non-Consensual Third Party Releases Is Particularly Appropriate in Chapter 9 Cases in Which the Effectuation of a Broad Settlement Depends Upon Such Releases*

201.  Dow Corning was a chapter 11 case in which mass tort claims were channeled to either a litigation trust or a settlement trust to which tort insurers were contributing insurance proceeds.  In contrast, where a struggling municipality (which cannot liquidate) is seeking to reorder its debts while improving services for its residents, the Dow Corning standards should be applied in view of the posture and the purpose of rehabilitation in a chapter 9 case.

202.  The few courts that have analyzed the Dow Corning precedent explicitly in the chapter 9 context have approved non-consensual releases.  In Connector 2000, the chapter 9 debtor was a "public benefit corporation" organized under South Carolina law to "assist" the South Carolina Department of Transportation ("SCDOT") with financing, building and maintaining highways.  Connector 2000, 447 B.R. at 754.  The debtor's plan of adjustment, which incorporated provisions of a global settlement between the debtor and many of its largest creditors (principally, bondholders), provided that the bondholders would release all claims and causes of action against SCDOT (and affiliated individuals and entities) in return for which release SCDOT would provide "significant concessions."  Id. at 766.

203.   The Connector 2000 court's decision with respect to whether the third party releases proposed under the debtor's plan were permissible demonstrates that (a) third party releases are not prohibited in chapter 9 and (b) the Dow Corning test arguably does not apply in chapter 9.  The court applied the Dow Corning factors, but with an important caveat.  The Connector 2000 court stated that the "third party releases and injunctions contained in the [p]lan may be proper without regard to the [Dow Corning] factor test because [section] 901 [of the Bankruptcy Code] does not incorporate [section] 524(e)" of the Bankruptcy Code.  Id. at 767.  Thus, according to the Connector 2000 court, the non-incorporation in chapter 9 of section 524(e) of the Bankruptcy Code – which section provides in relevant part that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt" – militates against a strict application of the Dow Corning factors in a chapter 9 case.  See 11 U.S.C. § 524(e).

204.   The Connector 2000 court concluded that "even applying the [Dow Corning] factors," the third party releases provided under the plan were "appropriate and necessary, and do not adversely or unfairly impact any particular class of creditors."  Id.  Importantly, the court found that, because the global settlement depended on the releases at issue, the "various forms of value and consideration provided by [the d]ebtor and [the p]lan [r]eleasees are

mutually dependent upon one another and therefore not severable from one another." Connector 2000, 447 B.R. at 768. According to the court, "[t]he failure to obtain approval of and effect the release, injunction, exculpation and discharge provisions of the [p]lan would seriously impair the [d]ebtor's ability to confirm the [p]lan." Id. The court, thus, confirmed the debtor's plan, emphasizing that "[t]he contributions and concessions by the third party releasees are an essential component to the reorganization of [the] [d]ebtor and the future success of the [toll highway] and contribute to the feasibility of the [p]lan." Id. at 766.

205. Similarly, in approving non-consensual third party releases, the court in the chapter 9 case of Jefferson County, Alabama, focused on the fact that the releases were a crucial element of a beneficial global settlement that depended upon plan confirmation for effectuation. See Findings of Fact, Conclusions of Law, and Order Confirming the Chapter 9 Plan of Adjustment for Jefferson Cnty., Ala., In re Jefferson Cnty., No. 11-05736 (Bankr. N.D. Ala. Nov. 22, 2013) (Docket No. 2248), at 25-26. A number of other courts also have approved non-consensual third party releases in chapter 9 plans of adjustment, at times over the objections of creditors.[77]

---

[77]    See, e.g., In re S. Brunswick Water & Sewer Auth., No. 04-09053 (Bankr. E.D.N.C.), Docket Nos. 253 (Oct. 28, 2005), 303 (Dec. 9, 2005), 419 (Oct. 25, 2006) (approving non-consensual third party releases of all

**3.** ***Unusual Circumstances Exist***
***in the City's Chapter 9 Case That Warrant***
***Approval of the Plan's Non-Consensual Release Provisions***

206.    The City's Chapter 9 Case presents "unusual circumstances"

that warrant approval of the non-consensual releases contained in Section III.D.7.b

of the Plan.  See Consolidated Reply, at ¶¶ 308-12.  The City expects that Kevyn

D. Orr, the City's Emergency Manager, will testify at the Confirmation Hearing

that, as far as the City is aware, this is the first chapter 9 case wherein (a) the

debtor has sought to compromise pension benefits for a municipality's active and

retired workforce and (b) third parties under no obligation to contribute funds to

creditors of a municipal debtor have volunteered to provide funding in addition to

proposed recoveries under the debtor's plan of adjustment.  See id. at ¶¶ 308-09.

The circumstances of this case are not merely unusual, they are unprecedented and

justify the non-consensual third-party releases contained in the Plan.[78]

---

claims against the debtor, the debtors' directors and officials and employees
of any North Carolina political subdivision); In re Natchez Reg'l Med. Ctr.,
No. 09-00477 (Bankr. S.D. Miss.), Docket Nos. 527 (Nov. 4, 2009) at § 4.8,
582 (Dec. 17, 2009), (confirming a chapter 9 plan that provided that
(a) certain non-debtor parties would be released from all obligations to
creditors of the debtor, other than claims based on fraud or negligence; and
(b) holders of allowed claims against the debtor would have no recourse
against the reorganized debtor, a county board of supervisors for the county
where was the debtor was located, the board of trustees of the debtor
hospital and any of their respective professionals, successors or assigns).

[78]    AFSCME has asserted that the impairment under the Plan of pension and
OPEB benefits of current and former employees of the Library and the
DRCFA amounts to an imposition of non-consensual third party releases.

207.    As part of the solution to Detroit's pension crisis, the State has

agreed to contribute substantial assets – the net present value of $350 million over

twenty years (i.e., approximately $194.8 million) – to reduce the Retirement

Systems' underfunding.  The State's agreement to contribute these assets is entirely

contingent upon the State and the State Related Entities obtaining the

non-consensual release set forth in Section III.D.7.b of the Plan.  Plan, at § IV.D.3.

As Mr. Orr will testify, the release is, therefore, absolutely essential to the City's

restructuring.  Indeed, the settlements that the City reached with the representatives

of its affected retirees and employees were conditioned upon receiving this funding

---

AFSCME Objection, at 22-24.  This argument, however, rests upon the false
premise that employees and retirees of the Library and the DRCFA hold no
Claims against the City that are subject to impairment under the Plan.  For
the reasons set forth in Section V.C above, AFSCME is incorrect.  Because
(a) the pension benefits of retired employees of the Library and the DRCFA
are provided by the GRS and (b) the City is the sole sponsor of such GRS
pensions, the underfunding in the GRS pension plan gives rise to GRS
Pension Claims, which are properly subject to impairment under the Plan.
The Plan does not seek to impair the claims of Library and DRCFA
employees against the Library or DRCFA.  Manifestly, the impairment of
unsecured claims against the City pursuant to the Plan cannot fairly be
characterized as the imposition of a non-consensual third party release.
Moreover, as also set forth above, the City, which has no obligation to pay
the OPEB liability of Library employees and proposes to serve as the
administrative conduit with respect to a portion of such liability (subject to
the City's ability to assess the Library) solely as an accommodation, is
willing to remove all Library retirees from the Detroit General VEBA (and,
thus, treatment under the Plan) altogether, thereby eliminating any concerns
AFSCME may have with respect to the imposition of a non-consensual
release.

from the State, as well as the funding from various philanthropic entities as part of the DIA Settlement. In turn, receipt of the DIA Settlement funding is conditioned upon the State providing its funding (and *vice versa*). Thus, if the non-consensual release in favor of the State and the State Related Entities is not approved, no outside funding will be available to support the Plan as contemplated by the treatment of Class 10 and 11 Claims.

208. Finally, to the extent that the <u>Dow Corning</u> factors apply in chapter 9 (which they arguably do not, as discussed above), the <u>Dow Corning</u> factor which considers whether "[t]he plan provides an opportunity for those claimants who choose not to settle to recover in full" cannot be rigidly applied under the unique circumstances of this Chapter 9 Case. <u>Dow Corning</u>, 280 F.3d at 658. The Plan simply *cannot* provide such an "opt out" mechanism without also forgoing the Outside Funding. As addressed in the Consolidated Reply, under the terms of the State Contribution Agreement and the DIA Settlement, Holders of Pension Claims may not "opt out" and continue to litigate an entitlement to full pension funding while at the same time receiving the benefit of the State Contribution and the DIA Settlement funds. Consolidated Reply, at ¶ 311. Consummation of both the State Contribution Agreement and the DIA Settlement is contingent upon Classes 10 and 11 accepting the Plan and the cessation of related pension funding litigation.

209.   Thus, for the reasons set forth above and in the Consolidated Reply, unusual circumstances manifestly exist that warrant the Plan's non-consensual release provisions in favor of the State and the State Related Entities under which only those who benefit directly from the State's monetary contribution (holders of claims in Classes 10 and 11) are deemed to have given such a release.   Therefore, such releases are lawful, necessary to consummate the Plan and should be approved.

## IX.   THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW

210.   The Plan has been proposed in good faith because its purpose is to adjust the City's debts to enable the City to reverse its downward spiral and restore adequate municipal services, meaning that the Plan is consistent with the overarching remedial purpose of chapter 9.   The City's good faith in proposing the Plan is further evidenced by the fact that the Plan (a) incorporates several key settlements that are the result of extensive arm's length negotiations between the City and representatives of a large proportion of its creditors and (b) has been proposed with the support of many of the City's largest creditor constituencies.

**A.   There Is Ample Evidence of the
       City's Good Faith in Proposing the Plan**

211.   Courts have interpreted the good faith requirement of

section 1129(a)(3) of the Bankruptcy Code in a number of ways, as this Court has

noted:

> Under one view, the good faith requirement of
> § 1129(a)(3) is met if the plan will fairly achieve a result
> consistent with the objectives and purposes of the
> Bankruptcy Code.  Under another view, the good faith
> requirement is met if the plan was proposed with honesty
> and good intentions, and with a basis for expecting that a
> reorganization can be effected.  Under a third view, good
> faith requires fundamental fairness in dealing with one's
> creditors.

In re Gregory Boat Co., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992).

212.   Courts agree, however, that "[w]hat constitutes 'good faith' must

be determined on a case by case basis, based upon the totality of the

circumstances."  6 Collier on Bankruptcy ¶ 943.03[1][b] (16th ed. rev. 2014).

Accordingly, "[t]he determination of what constitutes 'good faith' based upon the

totality of the circumstances in a particular case will necessarily be a *sui generis*

fact dependent exercise.  As such, the case law simply provides examples of how

different courts have analyzed the issue given varying fact patterns."  Id.;

see also Dow Corning, 255 B.R. at 498 ("good faith must be reviewed based on the

totality of the circumstances"); In re Waterford Hotel, Inc., 497 B.R. 255, 266

(Bankr. E.D. Mich. 2013) (same).  In Metro Employees Credit Union v.

Okoreeh-Baah (In re Okoreeh-Baah), 836 F.2d 1030 (6th Cir. 1988), the Sixth

Circuit Court of Appeals interpreted section 1325(a)(3) of the Bankruptcy Code –

which consists of language identical to that in section 1129(a)(3) of the Bankruptcy

Code – as follows:

> Good faith is an amorphous notion, largely defined by
> factual inquiry. In a good faith analysis, the infinite
> variety of factors facing any particular debtor must be
> weighed carefully. We cannot here promulgate any
> precise formulae or measurements to be deployed in a
> mechanical good faith equation.… The decision should
> be left simply to the bankruptcy court's common sense
> and judgment.

Id. at 1033.

213. In analyzing whether a plan satisfies section 1129(a)(3) of the

Bankruptcy Code, courts frequently focus on whether a proposed plan is consistent

with the overarching purposes of the Bankruptcy Code. See, e.g., Dow Corning,

255 B.R. at 498 ("Prepetition behavior is irrelevant. The focus is on the plan itself.

Good faith may exist when there is a reasonable likelihood that the plan will

achieve a result consistent with the objectives and purposes of the Bankruptcy

Code.") (citations and quotation marks omitted). Good faith, for purposes of

section 1129(a)(3) of the Bankruptcy Code, also may be found where the plan is

the result of extensive arm's length negotiations with creditors and is supported by

key creditor constituencies. E.g., Eagle-Picher, 203 B.R. at 274 (finding that the

plan was proposed in good faith when, among other things, it was based on

extensive arm's length negotiations among plan proponents and other parties in interest); In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith.").

214.   In the chapter 9 context, courts have applied a variety of factors to determine whether a plan satisfies section 1129(a)(3) of the Bankruptcy Code. In the chapter 9 case of Mount Carbon, for example, the court determined that the following factors should be considered in analyzing whether a plan was proposed in good faith:

> (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair.

Mount Carbon, 242 B.R. at 40-41.  The Mount Carbon court posed the question, "What does it mean to satisfy the purpose of Chapter 9?"  Id. at 41.  Its answer was that "[t]his question leads back to the legislative purpose underlying it, which is to allow an insolvent municipality to restructure its debts in order to continue to provide public services."  Id.

215.   The Plan has been proposed in good faith because it is consistent with the purposes of chapter 9 of the Bankruptcy Code.  The testimony

of several City witnesses at the Confirmation Hearing[79] will establish that the Plan is designed to restructure the City's debts to enable the City to remedy its chronic service delivery insolvency, reverse its decades-long downward financial spiral and meet its future financial obligations and the needs of its residents.  This is precisely the purpose for which chapter 9 was intended.  <u>In re City of San Bernardino</u>, 499 B.R. 776, 791 (Bankr. C.D. Cal. 2013) (the purpose of chapter 9 is "to give a municipality a breathing space from a cash crunch and an opportunity to address its long term solvency through an organized process of proposing a long term plan of adjustment").

216.    The Plan is the result of extensive arm's length negotiations, incorporates several key settlements achieved through the mediation process established by the Court (<u>see</u> Section XIII) and, thus, has been proposed with the support of many of the City's largest creditor constituencies.  Specifically, the Plan is proposed with the support of the Retiree Committee and other key financial and non-financial creditor groups, including:  (a) unions representing the vast majority of the City's employees; (b) the Retirement Systems; (c) the two largest associations of City retirees; (d) three of the four insurers of Unlimited Tax General Obligation Bond Claims; (e) the insurer and a major holder of the Limited

---

[79]    These witnesses include:  (a) Kevyn Orr; (b) Gaurav Malhotra; (c) Charles Moore; and (d) John Hill.

Tax General Obligation Bond Claims; (f) holders of COP Swap Claims and Indirect 36th District Court Claims; and (g) the DWSD financial creditors. These groups represent $16 billion of the City's estimated approximately $18 billion in prepetition debt. The City's willingness to negotiate with honesty and sincerity during the process of developing a plan of adjustment is evidenced by the significant progress the City has made in reaching consensual resolutions with representatives of these key creditor constituencies in a manner that (a) serves the long-term interests of the City and its residents, (b) treats the City's creditors fairly and equitably, (c) is feasible and (d) fulfills the remedial purpose of chapter 9. These settlements simply would not have been possible had the City failed to negotiate Plan provisions, and subsequent modifications thereto, in good faith.

217. In the Consolidated Reply, the City responded to arguments asserted by several objecting parties that the Plan does not satisfy section 1129(a)(3) of the Bankruptcy Code. See Consolidated Reply, at ¶¶ 278-89. In large measure, those objections reiterated arguments made with respect to other confirmation standards, such as arguments that the Plan (a) fails to maximize creditor recoveries through asset sales and tax increases and (b) unfairly discriminates between creditor classes.[80] Good faith arguments that merely

---

[80] One such objection was filed subsequent to the City's filing of the Consolidated Reply. See Objecting Creditor Michael J. Karwoski's Objections to Confirmation of the Fourth Amended Plan of Adjustment

reiterate an objecting party's broader confirmation arguments should be rejected.

See In re Dow Corning Corp., 244 B.R. 673, 676-77 (Bankr. E.D. Mich. 1999)

(rejecting the "good faith" objections of the official committee of unsecured

creditors because its arguments were "basically no more than attempts to revisit

and reargue objections it made to the Plan under other provisions"), aff'd,

255 B.R. 445 (E.D. Mich. 2000); Waterford Hotel, 497 B.R. at 266 (rejecting an

objector's good faith arguments because such objector "object[ed] that the Plan is

not proposed in good faith as required by § 1129(a)(3), *because of* the four alleged

deficiencies" including, among other things, whether the plan was fair and

equitable and feasible) (emphasis in original).[81]

  218. In addition, certain objecting parties have accused the City and

the Emergency Manager – and, in some cases, the City's professionals and other

---

(Docket No. 5923), at 1-7 (challenging the legality of Plan provisions regarding ASF Recoupment and characterizing such argument as an objection to good faith).

[81] In its second Supplemental Objection, Macomb County asserts that the Plan violates section 1129(a)(3) of the Bankruptcy Code because it provides that the City's entry into a potential DWSD Authority Transaction is conditioned upon, among other things, the withdrawal of Macomb County's Objections to confirmation of the Plan. See Supplemental Objection of County of Macomb, Michigan, By and Through Its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7039), at 1-4. Macomb County does not explain, and cites no authority supporting, its contention that by including this provision in the Plan the City failed to propose the Plan in good faith. Accordingly, this Objection must be overruled.

parties – of engaging in unethical or illegal behavior in an attempt to obtain

confirmation of the Plan.[82]  These arguments are frivolous and must be rejected.

None of these objections cites any evidence whatsoever to substantiate the

allegations contained therein.  In contrast, as set forth above, the City's track

record, since the outset of this Chapter 9 Case, of participating in court-ordered

mediation and other negotiations with many of the City's largest creditor

constituencies – which negotiations have resulted in the consensual resolution of

numerous Plan-related issues among an array of disparate creditor groups – serves

as "strong evidence" that the City proposed the Plan in good faith.  See Leslie Fay,

207 B.R. at 781.[83]

---

[82]  See, e.g., Objections of Michael Pelletier and Lou Ann Pelletier (Docket No. 5062), at ¶ 3 (alleging that City officials used "coercion and intimidation" to "force" retirees to vote in favor of the Plan); Demetria Wright (Docket No. 5795), at ¶ 8 (accusing the Emergency Manager of "perpetrating a fraud by impersonating an elected official"); Hassan Aleem, et al. (Docket No. 5851), at 1 (arguing that the Emergency Manager fraudulently concealed his alleged lack of authority to commence the City's Chapter 9 Case); and Mary Diane Bukowski (Docket No. 5966), at 3 (alleging that the Plan is the product of a conspiracy among the City and its professionals, the State and various unnamed banks to enrich themselves at the expense of the citizens of Detroit).

[83]  In its Supplemental Objection, Syncora asserts that the Plan was not proposed in good faith.  See Syncora Supplemental Objection, at ¶¶ 2, 8, 11, 13-32.  The City has addressed these objections in The City of Detroit's Motion to Strike in Part Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Debtor's Plan of Adjustment (Docket No. 6845) (the "Motion to Strike").

## B. The Plan Has Not Been Proposed by Any Means Forbidden by Law

219. Syncora argues in its Supplemental Objection that the Plan "has been proposed" by a "means forbidden by law" in violation of section 1129(a)(3) of the Bankruptcy Code because, according to Syncora, the DIA Settlement constitutes a fraudulent transfer under applicable Michigan law.[84] There is no basis for this argument. The plain language of section 1129(a)(3) of the Bankruptcy Code requires that a plan must not be *proposed* in a manner "forbidden by law." 11 U.S.C. § 1129(a)(3). As such, the behavior of a plan proponent, rather than the actual contents of a plan, is the central focus of section 1129(a)(3) of the Bankruptcy Code. See Dow Corning, 244 B.R. at 675-76 ("[I]t is the plan's *proposal* which must be … not by a means forbidden by law.") (emphasis in original); In re Food City, Inc., 110 B.R. 808, 811-12 (Bankr. W.D. Tex. 1990) (same; In re Sovereign Grp., 1984-21 Ltd., 88 B.R. 325, 328 (Bankr. D. Colo. 1988) ("[T]he purpose of 1129(a)(3) [is to ensure] that the *proposal* of a plan of reorganization was … not in a way that was forbidden by law.") (emphasis in original). Of course, any argument regarding whether the transfer of the DIA Assets may constitute a fraudulent transfer under applicable Michigan law has no relation to the City's conduct in propounding the Plan. Syncora's argument that

---

[84]     Syncora Supplemental Objection, at 24 (alleging that the DIA Settlement is a fraudulent transfer violating section 1129(a)(3) of the Bankruptcy Code).

the transfer of the DIA Assets constitutes a fraudulent transfer is, therefore, irrelevant for purposes of determining whether the Plan complies with section 1129(a)(3) of the Bankruptcy Code.[85]   Accordingly, for the foregoing reasons, the City has satisfied the requirements of section 1129(a)(3) of the Bankruptcy Code, and the relevant Objections should be overruled.

## X.   ALL REGULATORY AND ELECTORAL APPROVALS NECESSARY UNDER APPLICABLE LAW TO CARRY OUT THE PLAN HAVE BEEN OR WILL BE OBTAINED

220.   Section 943(b)(6) of the Bankruptcy Code provides that the Court shall confirm the Plan if "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 11 U.S.C. § 943(b)(6).  Section 1129(a)(6) of the Bankruptcy Code similarly provides that the Court shall confirm the Plan if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned upon such approval."  11 U.S.C. § 1129(a)(6).

221.   The foregoing standards are satisfied with respect to the Plan because the obtaining of any necessary authorizations, consents and regulatory approvals is a specific condition to the effectiveness of the Plan, consistent with

---

[85]   Moreover, for all of the reasons set forth in Section XI.C below, the DIA Settlement does not constitute a fraudulent transfer.

the express language of sections 943(b)(6) and 1129(a)(6) of the Bankruptcy Code.

See Plan, at § III.A.5 (providing that, as a condition to the effectiveness of the

Plan, that "[a]ll authorizations, consents and regulatory approvals, if any, required

in connection with the consummation of the Plan have been obtained and not

revoked…").

      222.   Notwithstanding the foregoing, various parties asserted

Objections arguing that the City lacks regulatory or electoral approvals necessary

to implement certain transactions under the Plan. The City responded to those

Objections in the Consolidated Reply. See Consolidated Reply, at ¶¶ 258-62.

For example, the City demonstrated that the terms of the Plan do not usurp the

rate-making authority of the Board of Water Commissioners. See id. at ¶ 260.

In this regard, the City has modified the Plan to further clarify that all rates with

respect to DWSD will be determined by the Board of Water Commissioners.

See Plan, at § IV.A.1. In addition, the City demonstrated that it is not required, as

a condition to confirmation of the Plan, to establish that it satisfies

section 943(b)(6) of the Bankruptcy Code with respect to any hypothetical

Qualifying DWSD Transaction because the DWSD CVR merely establishes a

mechanism for the allocation of the proceeds of any such Qualifying DWSD

Transaction. See Consolidated Reply, at ¶ 261. Finally, the City established that

the DWSD Pension Funding (as defined below) and the DWSD CVR do not

constitute taxes requiring electoral approval because, respectively, (a) the DWSD

Pension Funding is a direct cost of administering the Systems rather than a tax and

(b) no Qualifying DWSD Transaction currently exists.  See id. at ¶ 262.

Accordingly, sections 943(b)(6) and 1129(a)(6) of the Bankruptcy Code are

satisfied with respect to the Plan.

## XI.    THE CITY IS NOT PROHIBITED BY LAW FROM TAKING ANY ACTION NECESSARY TO CARRY OUT THE PLAN

223.    Section 943(b)(4) of the Bankruptcy Code provides that the

Court shall confirm the Plan if, among other things, "the debtor is not prohibited by

law from taking any action necessary to carry out the plan."  11 U.S.C. § 943(b)(4).

This requirement is prospective and applies only to post-confirmation actions

proposed in a plan of adjustment; it does not restrict a debtor's ability to impair

claims pursuant to a plan.  See, e.g., In re City of Columbia Falls, Mont., Special

Improvement Dist. No. 25, 143 B.R. 750, 760 (Bankr. D. Mont. 1992)

("Section 943(b)(4) does not prevent the debtors from proposing a plan that

impairs the rights of [creditors].  This provision applies to postpetition actions after

confirmation of the plan.").

224.    The City is not prohibited by law from taking any action

necessary to carry out the Plan.  In the Prior Briefing, the City responded to the

allegations of various parties that certain transactions contemplated by the Plan

were unlawful under applicable nonbankruptcy law.  See Consolidated Reply,

at ¶¶ 215-57, 263-77; City Legal Issues Brief, at ¶¶ 1-22, 42-45.  In particular, the

City demonstrated that the following aspects of the Plan comply with the

requirements of applicable law:  (a) the payments to be made by DWSD to GRS on

account of DWSD's currently-calculated full allocable share of the unfunded

actuarially accrued liabilities ("UAAL") of GRS, as reduced by the Plan

(the "DWSD Pension Funding") (see Consolidated Reply, at ¶¶ 216-42);

(b) the allocation of proceeds from a potential Qualifying DWSD Transaction

(see id. at ¶¶ 243-44); (c) the Plan provisions enjoining modification of pension

benefits for ten years (see id. at ¶¶ 245-50; City Legal Issues Brief, at ¶¶ 1-7);

(d) the Plan-mandated assumed pension investment rates of return

(see Consolidated Reply, at ¶¶ 251-52); (e) the assignment of the payment rights of

the Stub UTGO Bonds (see id. at ¶¶ 253-56; City Legal Issues Brief, at ¶¶ 42-45);

(f) the conveyance of the Museum Assets in connection with the DIA Settlement

(see Consolidated Reply, at ¶ 257); and (g) ASF Recoupment (see Consolidated

Reply, at ¶¶ 263-77).

  **A.**  **The Plan's Allocation of**
     **DWSD Pension Funding Is Lawful and Appropriate**

    225.  At the Confirmation Hearing, the City will present the

testimony of several witnesses supporting the legality of the DWSD Pension

Funding.  In particular, the City expects that Sue McCormick, Director at DWSD

will testify with respect to:  (a) the City's operation, management and accounting of

its Water System and Sewage Disposal System through DWSD; and (b) DWSD's historical practice of funding its share of GRS UAAL through the Operation and Maintenance Fund.  In addition, Gaurav Malhotra is expected to testify regarding the potential for a Qualifying DWSD Transaction and the allocation of proceeds therefrom.

226.   In their Supplemental Objections, Macomb County and Oakland County assert that the City's calculation of UAAL attributable to the DWSD is inflated because the 6.75% estimated rate of investment return used to calculate GRS UAAL is excessively conservative.[86]  As set forth in Section I.A.1, supra, however, this argument fails because (a) the 6.75% assumed rate of return to determine pension funding contributions falls within the actuarially-determined "best estimate" range of investment returns, taking into account the specific asset profile of GRS; and (b) as the Feasibility Expert has suggested, if anything, the assumed rate of return used to calculate GRS UAAL under the Plan may be too *high*. Oakland County further articulates a number of single-sentence objections regarding the calculation of DWSD's allocated share of GRS UAAL, none of

---

[86]   See Macomb County Supplemental Objection, at ¶¶ 9-11; Oakland County's Supplemental Objection to Confirmation of the City of Detroit, Michigan's Proposed Plan of Adjustment (Docket No. 6648) (the "Oakland County Supplemental Objection"), at ¶ 3.

which is substantiated with citations or otherwise explained.[87]  These Objections

fail, in any event, because evidence offered by the City at the Confirmation

Hearing will show that the calculation of DWSD's allocable share of GRS UAAL

under the Plan is reasonable.

**B.    The Plan's Allocation of Restructuring
Fees to the DWSD Is Lawful and Appropriate**

227.    Macomb County and Assured also contend that the allocation to

the DWSD of $20 million of the professional fees for the City's bankruptcy case is

improper because that amount is not for "necessary operating expenses" of the

DWSD under 11 U.S.C. § 928(b).[88]  According to Assured, the professional fees

---

[87]    See, e.g., Oakland County Supplemental Objection, at ¶ 3.d.i
("The calculation of its market value of the assets of the GRS is based on
unreasonable and unreliable methods, including the miscalculation or
non-calculation of the actual market value of the GRS assets[.]")

[88]    See Macomb County Supplemental Objection, at ¶ 10; Supplemental
Objection of Assured Guaranty Municipal Corp. to Confirmation of
Corrected Fifth Amended Plan for the Adjustment of Debts of the City of
Detroit (July 29, 2014) (Docket 6677) (the "Assured Supplemental
Objection"), at ¶¶ 1-23.  Several other parties have joined in Assured's
objection.  See Joinder by Berkshire Hathaway Insurance Corporation in
Supplemental Objection of Assured Guaranty Municipal Corp. to
Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts
of the City of Detroit (July 29, 2014) (Docket No. 6680); Joinder of the
DWSD Bond Trustee to the Supplemental Objection of Assured Guaranty
Municipal Corp. to Confirmation of Corrected Fifth Amended Plan for the
Adjustment of Debts of the City of Detroit (July 29, 2014) (Docket
No. 6679); National Public Finance Guarantee Corporation's Joinder to the
Supplemental Objection of Assured Guaranty Municipal Corp. to
Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts
of the City of Detroit (July 29, 2014) (Docket No. 6687).

cannot qualify as necessary operating expenses because DWSD is solvent and "would certainly have been able to 'keep going' even had this chapter 9 case never been commenced," and because the City allocated DWSD's share of budgeted (rather than actual amounts paid for restructuring advisors). <u>See</u> Assured Supplemental Objection, at ¶¶ 20, 22. These arguments must be rejected.

228. The portion of the DWSD Pension Funding that consists of restructuring costs related directly to this Chapter 9 Case is free of, and properly paid by the DWSD ahead of, the debt service on the DWSD bondholders' liens. <u>See</u> Consolidated Reply, at ¶¶ 231-32. The court in <u>Bank of New York Mellon v. Jefferson County (In re Jefferson County)</u>, 503 B.R. 849 (Bankr. N.D. Ala. 2013), addressed this precise question, on facts similar to those present here. The <u>Jefferson County</u> court held that professional fees incurred by the debtor in connection with its chapter 9 bankruptcy case could properly be paid ahead of the debt service arising from warrant holders' liens on revenues of Jefferson County's sewer system as "necessary operating expenses" under section 928(b) of the Bankruptcy Code. <u>See</u> <u>id.</u> at 903.

229. In <u>Jefferson County</u>, the primary question before the court was the extent to which professional fees incurred by the debtor during its municipal bankruptcy were payable out of revenues generated from its sewer system. <u>Id.</u> at 856. Jefferson County's sewer warrants were governed by a trust indenture

that created a payment "waterfall" much like the one at issue in the City's case; after the payment of specified "Operating Expenses," the remaining "System Revenues" were subjected to a lien in favor of the warrant holders. Id. at 857-58. The court determined that professional fees incurred by the debtor that involved the "ordinary and typical activities of the Sewer System" constituted "Operating Expenses" under the indenture, but professional fees incurred by the debtor that were "directly related" to the chapter 9 case were "extraordinary items" that were not part of the sewer system's "Operating Expenses." Id. at 887-90. The court found, however, that those professional fees nevertheless were free of – and could be paid ahead of the debt service on – the warrant holders' liens as "necessary operating expenses" under section 928(b) of the Bankruptcy Code.[89] Thus, on similar facts to those present here, the Jefferson County court held that restructuring fees allocated to the debtor's sewer system were properly paid ahead of the debt service on sewer system bonds.

---

[89] Id. at 903 ("The remaining portion [of professional fees], those that are not [i]ndenture defined Operating Expenses, are within those categories of expenditures that are 'necessary operating expenses' for purposes of 11 U.S.C. § 928(b)'s alteration of the contracted-for flow of monies and allowance of their payment ahead of application of the pledged special revenues…. In other words, the lien on the post-petition acquired Net Revenues that is preserved during the period following the County's chapter 9 filing by 11 U.S.C. § 928(a) is subjected by 11 U.S.C. § 928(b) to payment of this part of the categories of the Professional Fees as 'necessary operating expenses' of the Sewer System.").

230. Nevertheless, Assured asserts that the Plan's allocation of restructuring fees to the DWSD is improper because (a) DWSD is separate from the City and "self-sustaining," (b) DWSD is solvent and (c) the City's fees associated with this Chapter 9 Case are "not related to the DWSD." <u>See</u> Assured Supplemental Objection, at ¶¶ 19, 21. These arguments fail for the simple reason that the DWSD *is a department of the City*, and its obligations are obligations of the City. Accordingly, the professional expenses associated with this Chapter 9 Case plainly are "related to" DWSD. DWSD, like every City department, stands to benefit if the Plan is confirmed. The City's negotiations during the Chapter 9 Case with various creditor constituencies, in fact, have resulted in several hundred million dollars of expected savings for DWSD related to pension, OPEB and COPs obligations. The fees allocated to DWSD represent the City's best estimate of the portion of professional fees it paid to negotiate over DWSD's obligations (which ultimately are obligations of the City). It thus is both necessary and appropriate under section 928 of the Bankruptcy Code for the City to allocate to the DWSD its share of the expenses of these negotiations.

## C.    The DIA Settlement Does Not Constitute a Fraudulent Transfer

231.    In their Supplemental Objections, Syncora and FGIC revisit (in contravention of the Court's Seventh Amended Scheduling Order)[90] the argument that the DIA Settlement allegedly constitutes a fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act, M.C.L. §§ 566.31, et seq. ("UFTA") and thereby violates section 943(b)(4) of the Bankruptcy Code.[91] Specifically, Syncora and FGIC allege that the transfer of the DIA Collection will be entered into:  (a) with the actual intent to hinder, delay and defraud creditors; and (b) for less than reasonably equivalent value.[92]  These arguments are unpersuasive and must be rejected.

232.    The law of fraudulent transfers simply does not apply to the transfer of the DIA Assets because the DIA Assets are unavailable to serve as a source of recovery for the City's creditors under both federal bankruptcy law and Michigan law.  As set forth in the City's Consolidated Reply and herein, there is no

---

[90]    The Seventh Amended Scheduling Order permitted parties to file Supplemental Objections, "but only to the extent that additional or modified objections result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment."  Seventh Amended Scheduling Order, at ¶ 4.

[91]    Syncora Supplemental Objection, at ¶¶ 33-47; FGIC Supplemental Objection, at ¶ 11.  The City responded to this argument, in part, in the Motion to Strike.

[92]    Syncora Supplemental Objection, at ¶¶ 33-47; FGIC Supplemental Objection, at ¶ 11.

requirement for the City to liquidate any of its assets, including the DIA Assets, to achieve confirmation of the Plan under applicable bankruptcy law.[93]  Further, Michigan law specifically prevents the City's creditors from executing a judgment against any of the City's tangible assets.  See M.C.L. § 600.621.

233.   Under the so-called "no harm, no foul" rule, fraudulent conveyance actions are inapplicable to transfers of property that are otherwise exempt from creditor claims.  E.g., Nino v. Moyer, 437 B.R. 230, 238 (W.D. Mich. 2009) ("the UFTA is consistent with the 'no harm, no foul' rule in that exempt property … cannot be subject to a claim of fraudulent transfer under the UFTA"); Estes v. Titus, 751 N.W.2d 493, 498 (Mich. 2008) ("[property] held as tenants by the entirety cannot be the subject matter of a UFTA claim if only one spouse is the debtor.  This conclusion fits into the larger statutory purpose of avoiding fraudulent transfers because it is difficult to comprehend how disposing of property that a creditor cannot reach could 'defraud' that creditor"); Kleinert v. Lefkowitz, 259 N.W. 871, 874 (Mich. 1935) ("A man's homestead is exempt from the claims of all his creditors.  As to his homestead, there can be no creditors, and there can be no fraudulent disposition of a homestead."); Yaesu Elecs. Corp. v. Tamura, 28 Cal. App. 4th 8, 13 (Cal. Ct. App. 1994) ("[A] conveyance will not be considered fraudulent if the debtor merely transfers property which is otherwise

---

[93]     See supra, at § II.C.2; Consolidated Reply, at ¶¶ 115-21.

exempt from liability for debts. That is, because the theory of the law is that it is fraudulent for a judgment debtor to divest himself of assets against which the creditor could execute, if execution by the creditor would be barred while the property is in the possession of the debtor, then the debtor's conveyance of that exempt property to a third person is not fraudulent.").

234. Even if FGIC and Syncora's fraudulent transfer arguments were relevant (which they are not), the transfer of the DIA Assets does not constitute a fraudulent conveyance under UFTA. To prove the existence of an actual fraudulent conveyance, a plaintiff must show that, among other things, a debtor transferred an asset with the "actual intent to hinder, delay, or defraud any creditor of the debtor." M.C.L. § 566.34. UFTA provides a list of eleven "factors" – commonly referred to as "badges of fraud" – which may give rise to an inference of fraudulent intent. See M.C.L. § 566.34(2). To state a claim for actual fraud under Michigan law, at a bare minimum, a party "must allege at least one badge of fraud under MCL 566.34(2)." Estes, 751 N.W.2d at 504. However, "[a]s a practical matter, a creditor will normally allege multiple badges of fraud to establish an actual intent to defraud under the Michigan version of the UFTA as well." Id. at 506. Syncora essentially ignores UFTA's "badges of fraud"[94] and,

---

[94]    Syncora halfheartedly argues, as an aside, that DIA Corp. is a "quasi-insider" of the City, in an apparent attempt to establish the presence of a single "badge of fraud," i.e., that "[t]he transfer or obligation was to an

instead, appears to take the position that the alleged fraudulent intent of all parties

involved in proposing and contributing to the DIA Settlement – notably including

mediators Chief Judge Gerald Rosen and Eugene Driker – is self-evident.

The "badges of fraud" enumerated in UFTA – and the requirement under Michigan

law that at least one "badge of fraud" be proven – serve a critical limiting function

by requiring a party alleging fraudulent intent to substantiate its allegations with

actual facts.  Syncora does not even attempt to satisfy this requirement.

Accordingly, its allegations of actual fraud must be rejected.

     235.   FGIC and Syncora's constructive fraudulent conveyance theory

also fails because it cannot be established that the City will either (a) receive less

than reasonably equivalent value for the transfer or (b) be insolvent at the time of

the transfer or rendered insolvent by it.  M.C.L. § 566.35.  To prove the existence

of a constructive fraudulent conveyance, a plaintiff must show that, among other

things, a debtor was insolvent at the time of an asset's transfer and received less

than "reasonably equivalent value" in exchange for the transfer.  M.C.L. § 566.35.

As set forth in the Consolidated Reply, the City will receive funds with a nominal

value of approximately $816 million over the course of the twenty-year period

---

insider."  See Syncora Supplemental Objection, at ¶ 41; M.C.L.
§ 566.35(2)(a).  In fact, DIA Corp. is an independent nonprofit corporation
that contracts with the City to operate the DIA and preserve and maintain the
DIA Collection.  Syncora offers no explanation whatsoever for its bare
assertion that DIA Corp. is a "quasi-insider" of the City.

following the Effective Date.  The City is receiving these funds despite the

significant dispute discussed in Section II.C.1, <u>supra</u>, as to whether the City even

possesses an interest in the DIA Assets that are capable of monetization.

For purposes of comparison, and assuming the City possessed the absolute right to

sell the DIA Assets, their orderly liquidation value falls between approximately

$1.1 billion and $1.8 billion, as set forth below.  Given the significant dispute as to

which of the DIA Assets the City possesses the right to transfer, the value provided

to the City under the DIA Settlement is appropriate and easily eclipses the

threshold for "reasonably equivalent value."

236.  In addition, the City will not be insolvent on the date of the

transfer and will not be rendered insolvent thereby.  The transfer of the DIA Assets

will occur on the Plan's Effective Date.  On the same date, all of the restructuring

transactions contemplated under the Plan (including the adjustment of the City's

debts) also will occur, and the City's prepetition obligations will be discharged.

As a result, the City will be solvent at the time it transfers the DIA Assets and

claims that such transfer is constructively fraudulent must fail.

**D.     The DIA Settlement Is Not an Illusory Contract**

237.   One objector argues – in three separate Individual Objections –

that the DIA Settlement is an illusory contract in violation of Michigan law.[95]

According to these Individual Objections, the DIA Settlement is an illusory

contract because the principal terms of the DIA Settlement set forth on

Exhibit I.A.118 to the Plan (the "DIA Settlement Term Sheet") provide the

DIA Funding Parties with the right to rely on a determination by the CFSEM

Supporting Organization – the entity established to accommodate the contribution

and payment of monies by the DIA Funding Parties – as to whether the conditions

for making any scheduled payment have been satisfied.[96]  See DIA Settlement

Term Sheet, at 6-7.  In addition, the objecting party argues that the express

provision in the DIA Settlement Term Sheet that there are no third-party

beneficiaries to the DIA Settlement renders the agreement illusory.[97]  See id. at 8.

238.   The objecting party, however, fails to explain how (a) the

proposed right of the DIA Funding Parties to rely on the determination of the

payment administrator as to whether their payment obligations are due and owing

and (b) the express absence of third-party beneficiaries to the DIA Settlement

---

[95]     See Objections of Jamie S. Fields (Docket No. 5162); William Ochadleus,
et al. (Docket Nos. 5788, 5964).

[96]     See, e.g., Docket No. 5162, at 3.

[97]     See, e.g., Docket Nos. 5788 and 5964, at 19.

renders the agreement illusory. The objecting party relies on M.C.L. § 600.1405, apparently for the proposition that any party for whose benefit a promise is made has the right to enforce the promise.[98] Although the relevance of this provision is not clear to the City, the City notes that the same provision of Michigan law quoted by the objecting party expressly provides contracting parties with the right to extinguish third-party beneficiary rights by so providing in the contract. See M.C.L. § 600.1405(2)(A).

239. An illusory contract is "an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation. The insubstantial promise renders the agreement unenforceable." Ile v. Foremost Ins. Co., 809 N.W.2d 617, 622 (Mich. Ct. App. 2011), rev'd on other grounds, 823 N.W.2d 426 (Mich. 2012). The promises made by the DIA Funding Parties in connection with the DIA Settlement are anything but insubstantial. The DIA Settlement imposes substantial funding obligations on the DIA Funding Parties and, moreover, contains various enforcement mechanisms pursuant to which the City may enforce those obligations. In particular, the DIA Settlement Term Sheet provides that the City, as counterparty, can enforce the DIA Funding Parties' payment obligations through arbitration or by drawing down on the guaranty provided by the DIA itself, among other mechanisms.

_____

[98]     See id.

<u>See</u> DIA Settlement Term Sheet, at 7-8.  The DIA Settlement, therefore, manifestly

is *not* an illusory contract.

### E.    Other Alleged Violations

240.    Certain Individual Objections revisit arguments on which the

Court already has ruled.  These arguments include the following:  (a) PA 436 is

unconstitutional; (b) the City is ineligible to be a debtor under chapter 9; and

(c) the City may not impair pensions under the Plan by operation of the Pensions

Clause.[99]  For all of the reasons set forth by the City in its briefing with respect to

eligibility and at the eligibility hearings, and pursuant to the Court's Opinion

Regarding Eligibility (Docket No. 1945), these arguments must fail.  <u>See</u> <u>City of</u>

<u>Detroit</u>, 504 B.R. at 154, 162 ("The evidence establishes that the City was

authorized to file this case;" "The Court concludes that the emergency manager's

authorization to file this bankruptcy case under PA 436 was valid under the

---

[99]    <u>See</u>, <u>e.g.</u>, Objections of William Ochadleus (Docket No. 5094; 5788; 5964);
Judy Flowers-Tisdale (Docket No. 5329); Sylvester Tobias (Docket
No. 5330); Diane Martin-Parker (Docket No. 5776); Terrance James Sims
(Docket No. 5881); Mattie D. Pritchett (Docket No. 5887); Demetria Wright
(Docket No. 5795); Billy Sercey (Docket No. 5796); Calvin Turner (Docket
No. 5797); Mark L. Smith (Docket No. 5798); Barbara A. Magee (Docket
No. 5800); Vera C. Magee (Docket No. 5801); Douglas Yee (Docket
No. 5802); Barbara Yee (Docket No. 5803); Krystal A. Crittendon (Docket
No. 5836); Gloria C. Williams (Docket No. 5882); Estella L. Ball (Docket
No. 5889); Mary Diane Bukowski (Docket No. 5966) and Dennis Taubitz
(Docket No. 5971).

Michigan Constitution, even though he was not an elected official."); id. at 154

("Public Act 436 Does Not Violate the Michigan Constitution.").

241.   One Objection raises the additional argument that the

impairment of Pension Claims constitutes a "taking" of employees' funds without

due process of law because employees do not have the power to "opt out" of the

New GRS Active Pension Plan or the New PFRS Active Pension Plan (together,

the "Hybrid Plans"), as applicable.[100]  The Plan's treatment of Pension Claims

seeks merely to impair the contractual right of holders of such Claims, however,

and not to confiscate their property.  See City of Detroit, 504 B.R. at 154 (holding

that pension rights are contractual rights under the Pensions Clause that are subject

to impairment in chapter 9); see also Americredit Fin. Servs., Inc. v. Nichols

(In re Nichols), 440 F.3d 850, 854 (6th Cir. 2006) ("Bankruptcy laws have long

been construed to authorize the impairment of contractual obligations.").

The objecting party fails to articulate any theory as to how (a) the holders of

Pension Claims have not received due process of law with respect to the

impairment of their Claims or (b) the lack of an option to decline participation in

the Hybrid Plans (presumably in favor of retaining pre-impairment levels of

benefits under the City's current pension plans) constitutes a "taking" of the

---

[100]   See Objection of Krystal A. Crittendon, at 3.

property of holders of Pension Claims without such due process.  Accordingly, this Objection should be overruled.

242.    The UAW argues that the Plan violates the Pensions Clause by purporting to impair the nondebtor Library's pension liabilities.  See UAW Objection, at 28.  In addition, the UAW argues that the proposed treatment of OPEB Claims of Library employees violates the requirements of the Public Employment Retirement System Investment Act, M.C.L. §§ 38.1132, et seq. ("PERSIA") and other Michigan public employee labor relations statutes that require employers to comply with the terms of their collective bargaining agreements.  See id.  AFSCME similarly argues that the Plan violates the Pensions Clause, the United States Constitution and the Public Employment Relations Act M.C.L. § 423.201, et seq. ("PERA") by impairing the pension and OPEB liabilities of the nondebtor Library and DRCFA.  See AFSCME Objection, at 21.  For the reasons previously stated in Section V.C, however:  (a) the Plan does not effect the impairment of the pension or OPEB liabilities of the Library or the DRCFA; and (b) the City is not a signatory to any collective bargaining agreement with respect to the Library or DRCFA employees.  Accordingly, the proposed treatment of the Pension Claims and OPEB Claims of Library and DRCFA employees does not constitute a violation of the Pensions Clause, the United States Constitution,

PERSIA, PERA or any other public employee labor relations statute, and the UAW Objection and the AFSCME Objection should be overruled.

243. If the UAW, AFSCME and the Library wished to insulate the Library GRS participants from benefit reductions, the City legally could sever the liabilities related to such participants and a proportionate share of assets from GRS, and the Library could establish its own pension plan. The Library then, as plan sponsor, would be responsible for any current and future funding and underfunding of such pension plan. In addition, as set forth in Section V.C above, if the Library or the DRCFA and their unions wish to remove their retirees from the City's OPEB programs and provide their own programs, the City will accommodate their wishes and remove such retirees as participants from the Detroit General VEBA.

## XII. THE POST-SOLICITATION MODIFICATIONS TO THE PLAN COMPLY WITH THE BANKRUPTCY CODE

244. In the interests of clarifying the Fourth Amended Plan and consensually resolving certain objections to confirmation of the Plan, the City has made certain modifications to the Plan (collectively, the "Modifications") that are reflected in the Sixth Amended Plan and identified in the redline attached as Exhibit B to the Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910) (the "Redline") – comparing the Sixth Amended Plan with the solicited Fourth Amended Plan – and incorporated herein by reference. The Modifications included in the Sixth

Amended Plan do not materially or adversely affect the treatment of any Claim as set forth in the Fourth Amended Plan, acceptances of which were solicited as described in Section V of the Confirmation Standards Exhibit.

245.    The Bankruptcy Code specifically contemplates and permits modifications to a plan of adjustment.  In particular, section 942 of the Bankruptcy Code provides that:

> The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this chapter.  After the debtor files a modification, the plan as modified becomes the plan.

11 U.S.C. § 942.

246.    Section 1127(d) of the Bankruptcy Code, which is made applicable in chapter 9 by section 901 of the Bankruptcy Code further provides that:

> Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. § 1127(d).

247.    Bankruptcy Rule 3019, designed to implement section 1127(d) of the Bankruptcy Code, in turn, provides in relevant part that:

> In a chapter 9 ... case, after a plan has been accepted and before its confirmation, the proponent may file a

> modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor … who has not accepted in writing the modification, it shall be deemed accepted by all creditors … who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

248. Section 1127 of the Bankruptcy Code gives a plan proponent the right to modify the plan "at any time" before confirmation. This right would be meaningless if the promulgation of all plan modifications, ministerial or substantive, necessitated the resolicitation of votes. Accordingly, in keeping with traditional bankruptcy practice, courts have typically allowed a plan proponent to make non-material or favorable changes to a plan without any special procedures or vote resolicitation.

> Bankruptcy Rule 3019 explains when it is necessary to resolicit parties who have previously voted on the plan. It enforces the practical and logical assumption that anyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan "does not adversely change the treatment of [that creditor's] claim." ... If the Rule were otherwise, or simply did not exist, it would require resolicitation of hundreds, or as in this case, thousands of individuals for no real reason.

In re Dow Corning Corp., 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999); see also Eagle-Picher, 203 B.R. at 278 (providing that resolicitation of a plan was

unnecessary where the debtor made modifications to the plan for the purpose of resolving Objections and clarifying plan provisions and the modifications did not adversely affect the claim of any creditor); In re D2 Abatement, Inc., No. 10-45074, 2010 WL 4961705, at *2 (Bankr. E.D. Mich. Aug. 9, 2010) (deeming modified plan accepted by all creditors where the modifications did not adversely change the treatment of any claim); In re Mount Vernon Plaza Cmty. Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted the chapter 11 plan, as modified, because "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest").

249. This rule permitting nonmaterial or favorable modifications promotes the efficient resolution of objections and the ability of the plan proponent to make other corrections and clarifications that support the plan process. Because all creditors in the Chapter 9 Case received notice of the Confirmation Hearing, and will have an opportunity to object to any proposed Modifications at that time, the requirements of section 1127(d) of the Bankruptcy Code have been met. See Eagle-Picher, 203 B.R. at 278 (disclosure of plan modifications at the confirmation hearing provided adequate and proper notice); Citicorp Acceptance Co. v. Ruti-Sweetwater (In re Sweetwater), 57 B.R. 354, 358 (D. Utah 1985)

(creditors who had knowledge of pending confirmation hearing had sufficient opportunity to raise objections to modification of the plan).

250.   None of the Modifications to the Sixth Amended Plan (as described in the following paragraphs) materially or adversely affect the treatment of any Claim under the Plan.

251.   The Sixth Amended Plan incorporates the terms of the LTGO Settlement, as summarized in Section XIII.A.2.a below.  See Redline, at § IV.H.  The LTGO Settlement, as incorporated in the Sixth Amended Plan: (a) improves the recoveries available to holders of Limited Tax General Obligation Bond Claims relative to the treatment provided under the Fourth Amended Plan (see id. at § II.B.3.n); (b) provides for the exculpation, with certain express limitations, of Ambac and BlackRock (solely as it relates to the LTGO Settlement Agreement) and certain entities and individuals related to such parties (see id. at § III.D.6); (c) provides for the transfer of a portion of the City's rights and interests in the COP Litigation to a litigation trust, the beneficiaries of which will be Ambac, the VEBA Trust Representatives, the City and holders of allowed Other Unsecured Claims (thereby improving the treatment of Class 14 Claims under the Plan), and, accordingly, eliminates the prior concept of a "Creditor Representative" that would have, among other things, controlled the COP Litigation (see id. at §§ I.A.223, IV.I); and (d) otherwise has no effect on the Claims of other

creditors. The LTGO Settlement, therefore, does not materially or negatively affect the interests of any creditor.

252. The Sixth Amended Plan includes new provisions that contemplate the potential consummation of the DWSD Tender. <u>See</u> Redline, at §§ I.A.142, I.A.153-159, II.B.3.a.ii, III.D.6. The Sixth Amended Plan provides that if the DWSD Tender is consummated, (a) each holder of an Allowed DWSD Bond Claim shall have such Claim Reinstated, unless such holder agrees to a different treatment, and (b) the votes cast by holders of Allowed DWSD Bond Claims shall be ignored. <u>See</u> <u>id.</u> at § II.B.3.a.ii.A. If the DWSD Tender is not consummated, the treatment of Allowed DWSD Bond Claims under the Sixth Amended Plan would not change, <u>i.e.</u>, Allowed DWSD Bond Claims would receive the same treatment provided for such Claims in the Fourth Amended Plan. <u>See</u> <u>id.</u> at § II.B.a.ii.B. The Sixth Amended Plan also provides for the limited exculpation of certain parties in connection with the DWSD Tender, the DWSD Tender Motion and any order of this Court approving such motion. <u>See</u> <u>id.</u> at § III.D.6. These Modifications, if they become applicable, would (a) improve recoveries provided to holders of Class 1A Claims under the Plan and (b) have no effect on the recoveries provided to holders of Claims in any other Class. The potential consummation of the DWSD Tender, therefore, does not materially

or negatively affect the interests of any creditor other than those in Class 1A for which the treatment is potentially improved or, if not improved, remains the same.

253.    In accordance with the Order Resolving Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment from Retirees (Docket No. 5775), the Sixth Amended Plan provides an option for certain retirees who are subject to ASF Recoupment to make a single lump-sum cash payment rather than having ASF Recoupment effected by a diminution in monthly pension payments. See Redline, at § II.B.3.r.ii.D.2.ii.  The Sixth Amended Plan also provides clarification that ASF Recoupment for individuals who do not elect the lump-sum payment option – as proposed in the Fourth Amended Plan – will be annuitized using common actuarial assumptions and a 6.75% interest rate.  See id. at § II.B.3.r.ii.D.2.i.  Because (a) the option of a lump-sum payment was not previously available to retirees subject to ASF Recoupment, (b) ASF Recoupment under the Fourth Amended Plan was premised upon the annuitization and amortization of payments and (c) each Ballot distributed to a Class 11 claimant subject to ASF Recoupment disclosed the estimated amount of ASF Recoupment attributable to such claimant and calculated such amount by utilizing a 6.75% interest rate, the modifications to the Plan relating to ASF Recoupment clarify and

improve the positions of retirees subject to ASF Recoupment and do not materially or adversely impact any other creditor.

254. The City made certain structural changes to the Plan to implement the 36th District Court Settlement. Among other modifications, the Plan (a) creates a new Class 17 that contains all Indirect 36th District Court Claims and provides a Cash recovery on such claims pursuant to the terms summarized in Section XIII.A.2.b below and (b) provides that holders of Indirect 36th District Court Claims are not enjoined from taking actions against the State or the State Related Entities to the extent that their claims are not satisfied under the Plan. See Redline, at § II.B.3.x. The Modifications made in connection with the 36th District Court Settlement, therefore, (a) improve the recoveries available to the Holders of Allowed Indirect 36th District Court Claims (while also providing a small improvement in recovery to the holders of Claims that will share in distributions of New B Notes by removing Indirect 36th District Court Claims from that pool) and (b) will have no adverse effect on any other Claim. Accordingly, the incorporation of the 36th District Court Settlement into the Plan will not negatively and materially affect the Claim of any creditor. Moreover, the separate classification of these creditors is appropriate since they hold indirect, rather than direct, claims against the City inasmuch as their direct claims are held against the 36th District Court.

255. In addition, at the request of the trustee for Class 9 COPs Claims, the Sixth Amended Plan provides clarification regarding (a) the cancellation of the COPs and the COP Documents under the Plan (see Redline, at § IV.K) and (b) mechanics relating to the delivery of distributions on account of COP Claims (see id. at V.I.3). These clarifying Modifications relate to discrete issues and do not impact the treatment of COP Claims under the Plan. Accordingly, they do not materially or adversely affect the Plan's treatment of any creditor.[101]

256. On August 21, 2014, the City filed the Errata Sheet to correct certain revisions that were inadvertently omitted from the Sixth Amended Plan as filed. The Modifications set forth in the Errata Sheet add additional detail regarding the composition and appointment of the boards of trustees of the Detroit General VEBA and the Detroit Police and Fire VEBA. These Modifications were implemented to track similar revisions contained in revised Exhibits I.A.102 (Form of Detroit General VEBA Trust Agreement) and I.A.106 (Form of Detroit Police and Fire VEBA Trust Agreement) to the Sixth Amended Plan and do not materially or adversely affect the Plan's treatment of any creditor.

---

[101] In addition to the foregoing Modifications, the Sixth Amended Plan provides further detail and clarification regarding several matters associated with the implementation of the Plan, as set forth in the Confirmation Standards Exhibit. See Confirmation Standards Exhibit, at §XVIII.

257.    Because, as set forth above and in the Confirmation Standards

Exhibit, (a) the proposed Modifications (and any additional modifications that may

be made prior to or at the Confirmation Hearing) do not materially and adversely

affect the treatment of any creditor that has previously accepted the Plan; and

(b) the Plan, as modified, continues to comply with the applicable requirements of

sections 1122 and 1123 of the Bankruptcy Code, resolicitation of the Plan is not

required.

258.    Thus, because the City and the Plan satisfy sections 941 and

942 of the Bankruptcy Code – as well as the other applicable provisions of

chapter 9, as addressed herein – section 943(b)(2) of the Bankruptcy Code is

satisfied.

## XIII.  THE PLAN SETTLEMENTS SHOULD BE
##         <u>APPROVED UNDER BANKRUPTCY RULE 9019</u>

259.    The Plan includes various settlements (collectively, the "<u>Plan</u>

<u>Settlements</u>") that resolve certain disputes between and among the City and other

parties.  The Plan Settlements include (a) the UTGO Settlement (Plan, § IV.C),

(b) the DIA Settlement (Plan, § IV.E), (c) the OPEB Settlement (Plan, § IV.G),

(d) the LTGO Settlement (Plan, § IV.H) and (e) the 36th District Court Settlement

(Plan, § II.B.3.x).  As the testimony of Kevyn Orr and other City witnesses will

demonstrate, each of the Plan Settlements:  (a) constitutes a fair, equitable and

reasonable settlement of complex issues; (b) is a result of good faith, arms-length

negotiations in the context of the mediation process established by the Court; (c) furthers the policies and purposes of chapter 9; and (d) is in the best interests of the City and its residents, creditors of the City and other parties in interest.

The testimony of Gaurav Malhotra will establish that the Plan Settlements are both affordable for, and beneficial to, the City. Testimony offered by the City at the Confirmation Hearing will further demonstrate that, taken together, the Plan Settlements are likely to enable the City to sustain balanced budgets over the long term.

260. The Consolidated Reply thoroughly addresses the legal standards that govern this Court's evaluation of the Plan settlements. See Consolidated Reply, at ¶¶ 7-15. Briefly summarized, each settlement must (a) be "fair and equitable" and (b) fall within the lowest point of the "range of reasonableness." The debtor's business judgment is an important factor to be considered in determining whether a settlement satisfies the requirements of Bankruptcy Rule 9019. See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("while the approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored") (citation and quotation marks omitted), aff'd sub nom. $R^2$ Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.), 691 F.3d 476 (2d Cir. 2012), cert. denied, 133 S. Ct. 2021 (2013).

As applied in the Sixth Circuit, the "fair and equitable" analysis weighs (a) the probability of success in litigation, (b) the potential difficulties in collection, (c) the litigation complexity and (d) the reasonable interests of creditors. See Consolidated Reply, at ¶¶ 7-15. The Court should exercise its discretion in light of the public policy favoring settlements and the deference generally accorded negotiated agreements in bankruptcy. See id. at ¶ 14.

### A. The Requirements of Bankruptcy Rule 9019 are Satisfied With Respect to Each of the Plan Settlements

#### 1. *The Pre-Solicitation Settlements*

261. In the Prior Briefing, the City established that the UTGO Settlement, the OPEB Settlement and the DIA Settlement satisfy the requirements for approval under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and responded to the Objections of various parties. A summary of the City's arguments is provided below.

#### (a) **The UTGO Settlement**

262. The Prior Briefing extensively discusses the legal and factual bases demonstrating that the UTGO Settlement is legal, fair and equitable and within the range of reasonableness. See Consolidated Reply, at ¶¶ 16-20; City Legal Issues Brief, at ¶¶ 42-45. At the Confirmation Hearing, the City will offer the testimony of Kevyn Orr and Gaurav Malhotra in support of the UTGO Settlement and the facts summarized below.

263.    The UTGO Settlement provides for (a) the allowance of Class 8 Unlimited Tax General Obligation Bond Claims in the amount of $388 million and (b) the refunding of $287.5 million of the Unlimited Tax General Obligation Bonds by new bonds issued by the Michigan Finance Authority on a *pro rata* basis.  The new bonds will be secured by (a) the payment rights associated with an unlimited tax general obligation levy (to the extent permitted by applicable law) and (b) a fourth lien on certain distributable state aid.  The UTGO Settlement also provides for the assignment of the payment rights associated with the remaining outstanding Unlimited Tax General Obligation Bonds (the "Stub UTGOs") to the City or its designee, the proceeds of which will be distributed over a 14-year period to the Income Stabilization Funds of the GRS and the PFRS and to the funds themselves.  The UTGO Settlement further provides that the insurance policies providing payment coverage to the holders of the Unlimited Tax General Obligation Bonds will remain in place to ensure payment of debt service as originally provided for under the Unlimited Tax General Obligation Bond Documents.

264.    The City expects that Mr. Orr will testify at the Confirmation Hearing that, prior to the City's and the Settling UTGO Bond Insurers' entry into the UTGO Settlement, there was a significant dispute involving the Unlimited Tax General Obligation Bonds, primarily related to whether the Unlimited Tax General

13-53846-swr    Doc 7149-5 Filed 08/27/14 Entered 08/27/14 23:40:52 Page 201 of 292
13-53846-swr    Doc 8149    Filed 08/27/14    Entered 08/27/14 23:18:25    Page 200 of
293

Obligation Bonds were secured and entitled to payment significantly in excess of what the Plan provides to unsecured creditors generally.

265. Mr. Orr is anticipated to further testify that the dispute involved complicated (and in some aspects untested) issues involving both Michigan law and federal bankruptcy law, and the City's ability to prevail was uncertain. In the City's judgment, the terms of the UTGO Settlement are fair and equitable because an adverse result would have imposed a substantial liability on the City and created serious obstacles to the City's ability to continue plan negotiations with its other stakeholders and ultimately formulate a plan of adjustment.

266. The City expects that its testimony will show that, by removing this uncertainty and facilitating the City's adjustment of debts, the UTGO Settlement is favorable to, and in the best interest of, the City. In addition, the UTGO Settlement allows the City or its designee to receive the payment rights associated with the Stub UTGOs, the proceeds of which will be distributed to the Retirement Systems and the Income Stabilization Funds for the benefit of pensioners whose incomes fall below the threshold specified in Section I.A.161 of the Plan and who meet certain other eligibility criteria.

267. Prior to the UTGO Settlement, the range of potential recoveries to the Settling UTGO Bond Insurers was, therefore, between approximately 10% (the minimum estimated percentage recovery for Other Unsecured Claims under

the Plan) and 100% (if the Unlimited Tax General Obligation Bonds ultimately

were found to be fully secured). The City expects that Mr. Orr will testify that the

recovery of 74% to be provided for the holders of Unlimited Tax General

Obligation Bond Claims under the Plan pursuant to the UTGO Settlement reflects

his informed assessment of the risks and costs associated with litigating this

dispute and falls comfortably within the range of reasonableness. For these

reasons, the UTGO Settlement is fair and equitable, well in excess of the lowest

end of the range of reasonableness and should be approved.

(b)     **The OPEB Settlement**

268.    In the Prior Briefing, the City established that the OPEB

Settlement is fair and equitable and within the range of reasonableness.

<u>See</u> Consolidated Reply, at ¶¶ 21-28. At the Confirmation Hearing, the City will

offer the testimony of the following witnesses in support of the OPEB Settlement

and the facts summarized below: (a) Kevyn Orr; (b) Gaurav Malhotra; and

(c) Suzanne Taranto, representing Milliman, Inc., the City's actuary.

269.    As set forth in greater detail in the Consolidated Reply, prior to

entering into the OPEB Settlement, the present value of OPEB Claims was the

subject of a dispute between the City and the Retiree Committee. The City

estimated the aggregate amount of OPEB Claims at approximately $3.771 billion

using data provided by the City and the Retirement Systems' actuaries. In contrast,

the Retiree Committee's actuaries estimated the aggregate amount of OPEB Claims at approximately $5 billion.

270.    The OPEB Settlement greatly benefits the feasibility of the Plan by: (a) establishing the aggregate allowed amount of OPEB Claims in the reduced amount of $4.303 billion; (b) converting the OPEB liability into $450 million of New B Notes, thereby eliminating healthcare inflation risks; and (c) providing for the payment of interest on the New B Notes to be distributed by the City at the rate of 4 percent for the initial 20 years and 6 percent thereafter.

271.    The OPEB Settlement represents the hard-fought resolution of issues involving the appropriate value of the estimated aggregate allowed amount of the OPEB Claims and their corresponding treatment under the Plan.  The OPEB Settlement allows the City to avoid protracted, complicated and uncertain litigation over a significant dispute regarding the size of the aggregate multi-billion dollar OPEB Claim.  The agreed-upon amount of the Allowed Class 12 Claim of $4.303 billion is approximately $530 million more than the amount asserted by the City and $700 million less than the amount claimed by the Retiree Committee and, therefore, falls comfortably within the range of reasonable outcomes of the dispute. In this regard, Mr. Orr is expected to testify that the agreed-upon Allowed Claim falls between the parties' respective litigation positions and represents a reasonable compromise of the factual and legal arguments under the circumstances.

272.    The City expects that Mr. Orr will further testify that the OPEB

Settlement serves the best interests of the City and its creditors, including City

retirees, by averting litigation over the aggregate OPEB Claim and bringing the

City's chapter 9 case closer to conclusion by resolving one of the largest (if not the

largest) unsecured Claim in the case.  The City anticipates that Mr. Orr will testify

at the Confirmation Hearing that litigation regarding OPEB Claims most likely

would be protracted and costly and would involve (a) complex discovery regarding

actuarial calculations of the City's liability with respect to OPEB Claims, such as

retiree census data and health cost experience, and (b) complex legal issues as to

the appropriate discount rates to employ to value retirees' claims.  For these

reasons, the OPEB Settlement is fair and equitable, well in excess of the lowest

end of the range of reasonableness and should be approved.

<center>(c)    <b>The DIA Settlement</b></center>

273.    The City provided an extensive discussion of the factual bases

demonstrating that the DIA Settlement is fair and equitable and within the range of

reasonableness in the Prior Briefing.  <u>See</u> Consolidated Reply, at ¶¶ 29-38.  At the

Confirmation Hearing, the factual assertions set forth therein and summarized

below will be established by the testimony of:  (a) Kevyn Orr; (b) Mayor Duggan;

(c) Council President Jones; (d) Rip Rapson; (e) Dan Gilbert; (f) Roger Penske;

(g) Vanessa Fusco; (h) Annemarie Erickson, Executive Vice President and Chief Operating Officer of the DIA; and (i) Michael Plummer.

274.   The DIA Settlement allows the City to obtain a substantial economic benefit stemming from its interests in the DIA Assets while also ensuring that the DIA Assets will continue to serve as the City's cultural centerpiece for future generations.  Under the DIA Settlement, the City will place the DIA Collection into a formal trust.  In exchange for receiving this certainty that the City will not sell the DIA Assets and that such assets will remain available for the enjoyment and benefit of City residents and visitors in the future, certain philanthropic foundations (collectively, the "Foundations") and DIA Corp. have agreed to contribute approximately $466 million to reduce the Retirement Systems' current levels of underfunding over the next 20 years.  Complementing the DIA Settlement, the City and the State have agreed to the principal terms of a separate contribution agreement (the "State Contribution Agreement") that will govern the State's contribution of the present value of an additional $350 million over a 20-year period to reduce the Retirement Systems' current levels of underfunding.

275.   The City believes the DIA Settlement is "fair and equitable" because it accurately reflects – and effectively resolves – the uncertainty surrounding the City's interests in the DIA Assets.  Mr. Orr will testify at the

Confirmation Hearing that there exists a substantial dispute surrounding the extent of the property rights the City possesses with respect to the DIA Assets and, even if the City decided to attempt to sell the DIA Assets, resolving the City's precise ownership interests in the approximately 65,000 works of art housed at the DIA inevitably would result in complicated, time-consuming, expensive and uncertain litigation.  Mr. Orr will testify that, although the City holds title to the DIA Assets, arguments have been made by various parties – including by the Michigan Attorney General – that most if not all of the works within the DIA Collection are held by the City in charitable or public trust and cannot be sold to satisfy the City's debts to its creditors.  Thus, given the uncertainty surrounding the City's precise interests in the DIA Assets, the DIA Settlement and its corresponding benefits are in the best interests of the City and its various constituents.

276.   The City anticipates that Mr. Orr will further testify that the DIA Settlement is "fair and equitable" because it will:  (a) avoid objections to confirmation of the Plan regarding the Plan's treatment of vested pension benefits; (b) resolve pending appeals regarding the Court's ability to impair pensions under chapter 9 of the Bankruptcy Code; and (c) provide adequate funding to the Retirement Systems through fiscal year 2023.  In addition, Mr. Orr and Mayor Duggan are expected to testify that the City has not received – and could not possibly expect to receive – any other proposals that would keep the

DIA Collection intact and in Detroit, enhance recoveries for holders of Pension Claims and eliminate the risk and expense of litigation regarding the DIA Assets. Mr. Orr also will testify that alternatives to the DIA Settlement – such as offering the DIA Assets as collateral for a loan – would saddle the City with unnecessary debt and risk and could not possibly support the levels of recoveries on Pension Claims proposed in the Plan. Mr. Orr will testify that the DIA Settlement is the best available alternative because it leverages the DIA Assets for the benefit of the City's pensioners while also protecting the DIA Collection from the threat of liquidation and the risks that would arise from its use as collateral.

277. The anticipated testimony of Michael Plummer will further demonstrate that the value to be realized from the DIA Assets, pursuant to the DIA Settlement, is reasonable under the circumstances because (a) a liquidation sale most likely would yield only a fraction of the DIA Collection's true value, (b) the purported sale opportunities cited by certain of the City's creditors are either "not plausible or not likely to net the dollar values quoted" and (c) non-liquidation monetization alternatives – such as creating a "masterpiece trust" or a traveling exhibition – would not have a reasonable chance of raising even $100 million. The lower end of the range of reasonableness for the DIA Settlement is therefore less than $100 million, and if the Attorney General is correct, potentially zero. In contrast, the upper end of the settlement range in the context of a forced sale of

the DIA Collection would be the liquidation value of the assets. At the Confirmation Hearing, the City expects that Mr. Plummer will testify that the likely liquidation value of the DIA Collection would be between $1.1 billion and $1.8 billion, assuming hypothetically that the entire DIA Collection can be sold and the City can be forced to sell it. Importantly, however – and as Mr. Plummer will testify – these estimates assume that all works in the DIA Collection would, in fact, be salable in a forced liquidation. As explained above, however, many works in the DIA Collection are subject to donor restrictions that would prohibit a disposition via liquidation, meaning that a real-world liquidation of the DIA Collection most likely would yield far less than Mr. Plummer's baseline estimates, at first glance, appear to suggest.

278. Thus, as the testimony of the City's witnesses will establish at the Confirmation Hearing, the consideration the City will receive under the DIA Settlement falls toward the center of possible outcomes and well within the range of reasonableness necessary for the Court to determine the DIA Settlement is "fair and equitable."

### 2. *The Post-Solicitation Settlements*

279. Since the City filed the Prior Briefing, it has entered into the LTGO Settlement and the 36th District Court Settlement, both of which are incorporated into the Plan. Like the pre-solicitation settlements, these settlements

also are fair and equitable and should be approved pursuant to the standards set forth in the Prior Briefing and summarized above.

(a)     **The LTGO Settlement**

280.    The City has entered into the LTGO Settlement Agreement with Ambac and BlackRock.[102]  At the Confirmation Hearing, the City will provide the testimony of Kevyn Orr in support of approval of the LTGO Settlement Agreement and the facts summarized below.

281.    As provided in the LTGO Settlement Agreement, as of the close of the City's 2013 fiscal year (i.e., as of June 30, 2013), the City had $160,970,000 in outstanding principal amount of Limited Tax General Obligation Bonds, excluding any Limited Tax General Obligation Bonds secured by distributable state aid (the "Prior LTGO Bonds").  More than two-thirds in amount of the Prior LTGO Bonds either are insured by Ambac or held on an uninsured basis by BlackRock.

282.    Since the Petition Date, the City has twice defaulted on payments due under the Prior LTGO Bonds.  On October 1, 2013, the City defaulted on its obligation to make interest payments on the Prior LTGO Bonds in the amount of $4,348,211, and Ambac paid claims in the amount of $2,266,586 on account of the Prior LTGO Bonds it insures.  On April 1, 2014, the City defaulted

---

[102]    A copy of the LTGO Settlement Agreement is attached as Exhibit I.A.224 to the Plan.

on its obligation to make interest payments of $4,348,211 and principal payments in the amount of $43,420,000 on the Prior LTGO Bonds, and Ambac paid claims in the amount of $20,686,586 on account of the Prior LTGO Bonds it insures.

283.    On November 8, 2013, Ambac filed a complaint against the City commencing adversary proceeding number 13-05310 in this Court (the "LTGO Proceeding") alleging that the City is obligated to use general tax revenues collected within the City's charter, statutory or constitutional limitations to service the Prior LTGO Bonds.  In addition, Ambac filed, and BlackRock joined in, an Objection to confirmation of the Plan arguing that Limited Tax General Obligation Bond Claims in Class 7 under the Plan were entitled to priority treatment over and above other unsecured claims.[103]

284.    Pursuant to the LTGO Settlement Agreement, Ambac and each holder of uninsured Limited Tax General Obligation Bonds will receive under the Plan:  (a) a *pro rata* share of either, at the City's option, (i) $55 million in cash or (ii) New LTGO Bonds; and (b) under certain circumstances, distributions from the reserve established for disputed COP Claims.  In accordance with the LTGO Settlement Agreement, the Plan provides for the exculpation, with certain express

---

[103]    See Objection of Ambac Assurance Corporation to Fourth Amended Plan of Adjustment of Debts of the City of Detroit (Docket No. 4677); Joinder of Blackrock Financial Management, Inc. in Ambac Assurance Corporation's Objection to the Fourth Amended Plan of Adjustment of Debts of the City of Detroit (Docket No. 4681) (together, the "LTGO Objections").

limitations, of Ambac and BlackRock (solely as it relates to the LTGO Settlement Agreement), and certain entities and individuals related to such parties.

285.   In addition, various provisions of the LTGO Settlement Agreement relate to the pending COP Litigation.  In particular, pursuant to Section IV.I.1 of the Plan, the City will transfer its rights and interests in the COP Litigation to a Litigation Trust, the beneficiaries of which will be Ambac, the VEBA Trust Representatives (i.e., each chair of the boards of trustees of the Detroit General VEBA and the Detroit Police and Fire VEBA), the City and holders of allowed Other Unsecured Claims.  A Litigation Trustee will be selected by Ambac and the Retiree Committee, with the City's approval, to, among other things, prosecute and defend the COP Litigation under the day-to-day direction of the VEBA Trust Representatives.

286.   The range of potential recoveries to the holders of Limited Tax General Obligation Bonds prior to the LTGO Settlement, therefore, was between approximately 10% (the minimum estimated percentage recovery for Other Unsecured Claims under the Plan) and 100% (if the Limited Tax General Obligation Bond Claims ultimately were found to be entitled to priority treatment over and above other unsecured Claims).  The City believes that the LTGO Settlement falls comfortably within the range of reasonable outcomes of the LTGO Proceeding and the LTGO Objections and reasonably reflects the strength of the

City's litigation position.  Mr. Orr will testify at the Confirmation Hearing that the LTGO Settlement obviates the need for the City to continue to pursue potentially expensive and complex litigation and appeals with respect to the LTGO Proceeding and allows the City to better project its future liabilities.  Mr. Orr is expected to further testify that the LTGO Settlement eliminates the risk that a court would determine that the Limited Tax General Obligation Bond Claims are entitled to priority treatment, in which case the City would lose access to revenues it always has regarded as unencumbered to pay holders of Limited Tax General Obligation Bond Claims as priority creditors.  In addition, the City anticipates that Gaurav Malhotra will testify at the Confirmation Hearing as to the impact of the LTGO Settlement on the City's projections, creditor recoveries and the transactions contemplated by the Plan.

287.  For the reasons stated above, the City believes that the LTGO Settlement falls within the range of reasonableness and should be approved.

(b)    **The 36th District Court Settlement**

288.  The 36th District Court Settlement, the principal terms of which are attached as Exhibit I.A.9 to the Plan, also falls within the range of reasonableness necessary for approval.

289.  The 36th District Court Settlement among the City, the 36th District Court and the Settling 36th District Court Claimants resolves the

treatment of Indirect 36th District Court Claims under the Plan. Kevyn Orr and John Hill will testify during the Confirmation Hearing that, although the 36th District Court is a legally distinct entity from the City, the City generally is responsible for funding the 36th District Court's operations under applicable Michigan law. Accordingly, claims against the 36th District Court are, in practical effect, claims against the City. During the pendency of the Chapter 9 Case, the City has continued to fund the 36th District Court's daily operations but the collection of judgments and awards entered against the 36th District Court has been stayed pursuant to the Order, Pursuant to Section 105(a) of the Bankruptcy Code, Extending the Chapter 9 Stay to the 36th District Court and Certain Related Parties (Docket No. 1388).

      290.   As the testimony of Mr. Orr will establish, in accordance with the Bar Date Order, the Settling 36th District Court Claimants filed proofs of claim against the City asserting Indirect 36th District Court Claims.[104] In addition, the 36th District Court filed a protective proof of claim against the City with respect to the City's funding obligations. The Indirect 36th District Court Claims filed by the Settling 36th District Court Claimants assert liquidated and unliquidated, contingent and noncontingent liabilities associated with labor grievances,

---

[104]     The Settling 36th District Court Claimants consist of all known holders of timely filed Indirect 36th District Court Claims.

arbitrations and causes of action involving the 36th District Court, which liabilities the City normally would be required to satisfy on behalf of the 36th District Court.

291.    The Fourth Amended Plan classified Indirect 36th District Court Claims among Other Unsecured Claims in Class 14 and sought to enjoin further actions by Holders of Indirect 36th District Court Claims with respect to their Claims.  See Fourth Amended Plan, at §§ I.A.166, III.D.5.a.  The Settling 36th District Court Claimants objected to confirmation of the Plan, arguing that the City should not be permitted to impair the Indirect 36th District Court Claims under the Plan because, according to the Settling 36th District Court Claimants, the Indirect 36th District Court Claims are liabilities of the 36th District Court and not the City, notwithstanding the City's obligation to fund the 36th District Court.[105] The City argued that the proposed treatment of Indirect 36th District Court Claims under the Plan was appropriate under prevailing law.

292.    Pursuant to the 36th District Court Settlement, the City and the Settling 36th District Court Claimants have agreed to specific liquidated amounts for each of the Indirect 36th District Court Claims filed by the Settling 36th District Court Claimants, including a substantial reduction in the liquidated

---

[105]    See Objection of Local 3308 and Local 917 of the American Federation of State, County and Municipal Employees (Docket No. 4552); Objection of Carlton Carter, et al. (Docket No. 4625); Legal Issues Brief of Local 3308 and Local 917 of the American Federation of State, County and Municipal Employees (Docket No. 5682), Carlton Carter, et al. (Docket No. 5079).

amount of the contingent liabilities asserted therein.  In addition, the 36th District

Court has agreed to withdraw its claim with prejudice.  As set forth in Section

V.A.2 of the Confirmation Standards Exhibit, the Plan now separately classifies

Indirect 36th District Court Claims in Class 17 under the Plan.  Pursuant to the

Plan, each Holder of an Indirect 36th District Court Claim will receive Cash equal

to 33% of the allowed amount of such claim, payable:  (a) as soon as reasonably

practicable following the Effective Date, if the allowed amount of such claim is

less than $100,000; or (b) in five equal annual installments commencing as soon as

reasonably practicable following the Effective Date subject to simple interest at a

rate of five percent *per annum*.

293.   Pursuant to the 36th District Court Settlement, the City also

amended Section III.D.5.a of the Plan to allow the Holders of Indirect 36th District

Court Claims to pursue the State of Michigan for any liabilities that remain

unsatisfied under the Plan.  Except as provided in the 36th District Court

Settlement, however, the Holders of Indirect 36th District Court Claims will have

no further recourse against the City or the 36th District Court with respect to

liabilities arising prior to the date of approval of the settlement.

294.   Thus, as Mr. Orr will further testify, the City has agreed to

compromise and pay the Settling 36th District Court Claimants' claims at a

significant discount under the Plan rather than incur the expense and risk

-199-

associated with engaging in further litigation with the Settling 36th District Court Claimants regarding the City's power to impair Indirect 36th District Court Claims under the Plan and, potentially, having to satisfy in full the Indirect 36th District Court Claims as part of the City's future funding of the 36th District Court.

295.  The range of potential recoveries for the holders of Indirect 36th District Court Claims, therefore was between 10% (if the City prevailed in its position that such claims could be treated as Other Unsecured Claims under the Plan) to 100% (if the Settling 36th District Court Claimants prevailed in their position that the Indirect 36th District Court Claims could not be impaired under the Plan).  Mr. Orr will offer testimony at the Confirmation Hearing demonstrating that the 36th District Court Settlement is "fair and equitable" for the reasons set forth above, and that the proposed recovery of 33% (subject to the additional terms set forth above) falls comfortably within the range of reasonable outcomes necessary for approval of such settlement.  Moreover, the City's witnesses will testify that the 36th District Court Settlement allows the City to further clarify its future financial obligations and eliminates potential significant exposure that may have resulted from the City's future obligation to fund the 36th District Court.  As a result, the City submits the 36th District Court Settlement should be approved.

# XIV. **ADDITIONAL RESPONSES TO SUPPLEMENTAL OBJECTIONS**

### A. **Confirmation Should Not Be Denied Based Upon Syncora's Various Pending Appeals**

296.    Syncora concludes its Supplemental Objection with the argument that the pendency of various appeals initiated by Syncora itself precludes this Court from confirming the Plan because the outcome of any of Syncora's various appeals potentially "could affect the Plan."  Syncora Supplemental Objection, at § 5.  In support of its argument, Syncora relies on the decision of the Sixth Circuit Court of Appeals directing the District Court to lift its stay of the appeal of this Court's ruling that Syncora has no right to trap the City's casino revenues (the "Casino Revenue Appeal") and, in particular, the Sixth Circuit's comment that, generally, appeals from decisions incorporated into a plan should be reviewed prior to confirmation.  Syncora Supplemental Objection, at ¶ 86; In re Syncora Guar. Inc., No. 14-1719, 2014 WL 2959242, at *5-6 (6th Cir. July 2, 2014) (granting petition for writ of mandamus requiring District Court to lift stay of Casino Revenue Appeal).

297.    Syncora inverts the import of the Circuit Court's comments.  The Circuit Court's decision (a) instructs the District Court not to maintain the stay of the Casino Revenue Appeal and (b) counsels any parties aggrieved by the District Court's decision to act promptly if they wish to obtain review of the District Court's decision prior to confirmation of the Plan.  See id. at *6 (advising

any parties that wish to seek further review to file a notice of appeal within three days). Nothing in the Circuit Court's opinion even remotely suggests that the confirmation of a chapter 9 debtor's plan of adjustment should be delayed or denied pending the adjudication of all appeals that might have an effect on the Plan. See id. To hold otherwise would allow any hold-out parties seeking to disrupt confirmation of a plan of adjustment to delay confirmation interminably by filing and prosecuting multiple appeals in the hope of leveraging a better deal from a debtor at the expense of other stakeholders. If Syncora wishes to delay the effectiveness of any order confirming the Plan pending the adjudication of some or all of its various pending appeals, then the Bankruptcy Rules provides a mechanism for such relief. See Fed. R. Bankr. P. 8005 (authorizing motions for the stay of a "judgment, order or decree" of a bankruptcy judge and for approval of supersedeas bonds and other relief pending appeal). Syncora's litigation tactics seeking delay should not be validated. Accordingly, the objection should be overruled.

**B.    Claims Arising Under 42 U.S.C. § 1983 May Be Impaired Under the Plan**

**1.    *Section 1983 Claims May Be Impaired in Chapter 9***

298.    Certain claimants (collectively, the "1983 Claimants") asserting claims ("1983 Claims") arising from causes of action under 42 U.S.C. § 1983 ("Section 1983") for alleged Constitutional violations filed a Supplemental

Objection (Docket No. 6764) (the "1983 Supplemental Objection") revisiting the question of whether 1983 Claims may be impaired under the Plan.

299.   In the 1983 Supplemental Objection, the 1983 Claimants advocate at length for the unremarkable proposition that the rights protected by Section 1983 emanate from the United States Constitution.  1983 Supplemental Objection, at 1-7.  The 1983 Claimants attempt to extend this argument, however, by arguing that the remedy for their 1983 Claims also is provided by the Constitution.  Id. at 7-8.  In support of this position, the 1983 Claimants cite to several cases holding that Constitutional rights cannot be protected absent some form of remedy.  Id.

300.   The 1983 Claimants' truncated analysis confuses their right to a damages remedy with the City's right to impair that damages remedy. The 1983 Claimants argue that the remedy – as opposed to the right – that forms the basis of their 1983 Claims arises "with the Constitution, and the Constitution alone."  This argument is incorrect.  Indeed, the authority on which the 1983 Claimants rely for the proposition that their damages claims originate from the Constitution and not Section 1983 expressly states the reverse.  As the Supreme Court held in Owen v. City of Independence, 445 U.S. 622, 651 (1980), upon which the 1983 Claimants rely:

> By creating an express federal remedy, Congress sought
> to enforce provisions of the Fourteenth Amendment

against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.

…

A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.

…

Moreover, [Section] 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well.

Id. at 651.

301.   The authority cited by the 1983 Claimants establishes, therefore, that the damages remedy they assert to vindicate constitutional guarantees is firmly rooted in the federal statutory scheme.  As the City previously explained in the City Legal Issues Brief, because Congress created the damages remedy available under Section 1983 as a matter of legislative grace, it is free to define the limits of – and the effect of other applicable law on – that remedy.  See City Legal Issues Brief, at 9-13.  Accordingly, because Congress determined not to except 1983 Claims from discharge in bankruptcy or otherwise protect them from impairment under the Bankruptcy Code, the City may impair 1983 Claims under the Plan.

## 2. *The Injunction Provisions with Respect to Indirect Employee Indemnity Claims Are Lawful and Proper*

302.   The 1983 Claimants also object to the Plan's injunction against the assertion of Indirect Employee Indemnity Claims to the extent the injunction applies to lawsuits against police officers or other employees acting in their "individual capacity."  1983 Supplemental Objection, at 10-11.  The 1983 Claimants argue that the injunction will allow the applicable officers to be "immunized" by the Plan.  Id.  This objection ignores the 1983 Claimants' purpose in pursuing the Indirect Employee Indemnity Claims and extols the form of the underlying lawsuit over the practical effect of the claim.  Accordingly, the Court should exercise its broad equitable discretion to enjoin Indirect Employee Indemnity Claims under the unique circumstances of this Chapter 9 Case.

303.   As a practical matter, as the 1983 Claimants are well aware, the purpose of asserting 1983 Claims against officers acting in their individual capacity is not to recover from the applicable officer, but rather to access the City's assets via its legal obligation to indemnify such officers.[106]  See In re City of

---

[106]   Notably, the Plan does not seek to enjoin lawsuits asserted against its employees to the extent the City has no obligation to indemnify the employee under applicable nonbankruptcy law.  The City's legal obligation to indemnify its police officers and other employees arises under applicable Michigan law, the Detroit Municipal Code and the terms of applicable employment agreements.  See, e.g., M.C.L. § 691.1408 (authorizing the indemnification of government employees in civil suits for actions "in the course of employment with or actions on behalf of the governmental

Stockton, 484 B.R. 372, 376 (Bankr. E.D. Cal. 2012) (discussing the "strategy of

suing a sovereign by falsely pretending to sue an officer").  As such, Indirect

Employee Indemnity Claims are, for all intents and purposes, Claims against the

City, and such Claims are, in fact, defined by the Plan as Other Unsecured Claims.

See Plan, at § I.A.250.

304.    Without an injunction, the Indirect Employee Indemnity Claims

will undermine the relief otherwise available to the City in chapter 9.  In chapter 9,

the City theoretically possesses the power to insulate itself from Indirect Employee

Indemnity Claims by impairing the indemnification claims of the City's officers

and employees.[107]  It is, however, *impossible*, as a practical matter, for the City to

do so.  The City's obligation to indemnify its public safety officers is more than a

sterile statutory or contractual requirement; the City must indemnify officers who

act within the scope of their employment to protect the public health, welfare and

safety.  The City's service delivery insolvency and public safety issues are a matter

---

agency and while acting within the scope of his or her authority"); Detroit
Municipal Code § 13-11-1 (authorizing the City to indemnify employees for
injuries arising out of the officer or employee's performance in good faith of
his or her official duties, among other things).  The potential for the City to
indemnify an officer generally is converted into an obligation pursuant to the
terms of applicable employment agreements.

[107]    See 11 U.S.C. § 1123(b) (providing that "a plan may … impair or leave
unimpaired any class of claims, secured or unsecured, or of interests").

of record with this Court.[108]  If the City were to abandon its indemnification obligation wholesale, the risk of catastrophic financial loss to individual officers likely would paralyze City officers from the performance of even routine duties and encourage them to move to jurisdictions offering more favorable working protections and conditions.  It would also affect the City's ability to attract and retain new recruits.

305.   Gripped, as it is, by its own service delivery insolvency, and needing the maximum number of skilled and experienced personnel to support the Reinvestment Initiatives, the City has *no practical option* but to assume its employee indemnification obligations under the Plan.  See Plan, at § IV.N (providing that "nothing in the Plan shall discharge or impair the obligations of the City … to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City ….").  Any other approach would severely jeopardize the City's attempts to restructure.

306.   Thus, although the Indirect Employee Indemnity Claims technically are asserted against third parties, they are, in all practical effect, Claims against the City from the perspective of both the City and the 1983 Claimants. Without an injunction, the 1983 Claimants will continue to sue the City's officers and employees, and the City will be unable to protect itself from the resulting

---

[108]   See supra, Prelim. Stmt.

indemnification claims being channeled to the City for payment through its own public safety officers. As a result, the 1983 Claimants would succeed in leapfrogging their general unsecured, nonpriority litigation claims over all other unsecured claims in the Chapter 9 Case. This impermissibly circumvents the City's ability to avail itself of the relief provided by chapter 9.

307.    The relevant <u>Dow Corning</u> factors establish a sound basis for the requested relief. Not only is the injunction necessitated by an indemnification relationship, but, as previously discussed, the unusual circumstances of the Chapter 9 Case compel the City to continue to indemnify its officers despite its theoretical ability to impair these claims. Moreover, the City's public safety officers put their lives on the line on a daily basis for the good of the City and its residents. As such, their contribution is absolutely critical to the City's ability to provide municipal services to its citizens and to effectuate the Reinvestment Initiatives that are the backbone of the Plan. In addition, the holders of Indirect Employee Indemnity Claims are not deprived of their remedy by the injunction. To the contrary, their Claims are classified in Class 14 under the Plan along with all other similarly situated litigation claimants.

308.    In contrast, the authority cited by the 1983 Claimants is inapposite. The 1983 Claimants rely almost entirely on the unpublished decision of <u>V. W. ex rel. Barber v. City of Vallejo</u>, No. 12-1629, 2013 WL 3992403

(E.D. Cal. Aug. 2, 2013), for the proposition that claims arising from lawsuits against the employees of a municipal debtor cannot be discharged (or, presumably, enjoined) through the debtor's chapter 9 case.  1983 Supplemental Objection, at 9-11.  The 1983 Claimants misconstrue Vallejo.  In Vallejo, the court merely held that claims against the chapter 9 debtor's employees were not discharged along with claims against the debtor because the debtor's plan of adjustment did not provide for any such discharge.  Vallejo, 2013 WL 3992403, at *7.

309.   Here, the Plan seeks an injunction against the Indirect Employee Indemnity Claims, not a discharge.  Moreover, unlike in Vallejo, the Plan expressly provides for the disputed injunction.  Plan, at § IV.N.  For the reasons set forth above, the injunction over Indirect Employee Indemnity Claims (a) maintains the integrity of the relief available to the City in chapter 9, (b) is consistent with the requirements for such relief in this jurisdiction and (c) is in the best interests of the City, its residents and its creditor body at large.  Accordingly, the Court should approve the injunction, and decline to sanction the 1983 Claimants' transparent attempt to circumvent the protections of the Bankruptcy Code.

## C.  Wilmington Trust's Concerns with Respect to the COPs Are Unfounded

310.   Wilmington Trust, National Association ("Wilmington Trust"), as contract administrator with respect to the COPs, raises several new arguments

against confirmation of the Plan in its second Supplemental Objection (Docket No. 7050) (the "Wilmington Trust Second Supplemental Objection").  For the following reasons, these arguments should be overruled.

311.  Wilmington Trust argues that the City is attempting to restrict trading on the COPs by providing that the COPs will be deemed assigned to the beneficial holders as of the Effective Date solely for purposes of facilitating distributions under the Plan when distributions are to be made to the COPs Agent under the Plan.  Wilmington Trust Second Supplemental Objection, at ¶ 6; see also Plan, at § II.B.3.p.ii-iii.  Wilmington Trust cites to no confirmation standard that the foregoing concern might violate, and the City is aware of none.  Moreover, the deemed assignment of the COPs to their beneficial holders for the purposes provided in the Plan is not intended to be, and is not expected to function as, a restriction on trading of the COPs.

312.  Wilmington Trust also objects to confirmation of the Plan "to the extent the City is attempting to assert [Wilmington Trust] would have any post-Effective Date obligations to the City pursuant to the terms of the COP Service Contracts" notwithstanding the City's planned rejection of these agreements.  Wilmington Trust Second Supplemental Objection, at ¶ 7; see also Plan, at Ex. II.D.6.  Nothing in the Plan, however, seeks to impose any additional obligations on Wilmington Trust as a result of the rejection of the COP Service

Contracts.  The provision in question does nothing more than preserve pre-existing obligations owing to the City under rejected agreements; rejection constituting a breach rather than termination of such agreements pursuant to section 365 of the Bankruptcy Code.

313.    Wilmington Trust also complains that insured COP Claims – unlike insured Bond Claims and COP Swap Claims – are not excluded from the Plan's provision requiring creditors to exhaust the proceeds of any insurance before they may receive a distribution on account of their Claims.  Wilmington Trust Second Supplemental Objection, at ¶ 8; <u>see</u> <u>also</u> Plan, at § V.G.  As a threshold matter, this objection does not result from changes incorporated into the Sixth Amended Plan, in contravention of the Court's Eighth Amended Scheduling Order. Moreover, there is no legal basis for this complaint.  The City's agreement to exclude Bond Claims and COP Swap Claims from the requirements of Section V.G of the Plan in no way requires the City also to exclude COP Claims from this provision.  Because nothing in the City's decision to exclude certain claims from the requirement to exhaust insurance proceeds is contrary to the Bankruptcy Code or otherwise improper, Wilmington Trust's second Supplemental Objection should be overruled.

**D.    The Retiree Committee's and Retirement
       Systems' Comments Have Been Addressed**

314.    The Retiree Committee and Retirement Systems filed

documents (Docket Nos. 6675 and 6676, respectively) stating that, contrary to the

terms of the Fifth Amended Plan, the City's actuarial and financial advisors – and

not the GRS – calculated the Annuity Savings Fund Excess Amounts.  The Sixth

Amended Plan incorporates this revision, and, consequently, the City considers

that the comments of the Retiree Committee and the Retirement Systems to have

been addressed.  See Plan, at § I.A.22.

## CONCLUSION

315.    For the reasons set forth herein, the City submits that (a) the

Plan fully satisfies all applicable requirements of the Bankruptcy Code, (b) all

objections to the Plan should be overruled and (c) the Plan should be approved and

confirmed by the Court.

Dated: August 27, 2014     Respectfully submitted,


 /s/ Bruce Bennett
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M .Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001.2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

## Confirmation Standards Exhibit

CONFIRMATION OF THE SIXTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

THE PLAN COMPLIES WITH EACH OF THE
REQUIREMENTS OF SECTION 943(b) OF THE BANKRUPTCY CODE

This chart summarizes the requirements for confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit, dated August 20, 2014 (Docket No. 6908) (as it may be modified or amended, the "Plan") under section 943(b) of title 11 of the United States Code (the "Bankruptcy Code"), and is provided in support of the Plan and the City's Consolidated (A) Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections, filed with the Bankruptcy Court on August 27, 2014 (the "Brief"). Capitalized terms not otherwise defined herein have the meanings given to them in the Brief.

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** | **I. The Plan Complies With the Applicable Provisions of Title 11 (Section 943(b)(1))** | |
| **11 U.S.C. § 943(b)(1)** | A. Section 943(b)(1) of the Bankruptcy Code requires that, to be confirmed, a plan of adjustment must "compl[y] with the provisions of this title made applicable by sections 103(e) and 901 of this title."[1] Section 901 of the Bankruptcy Code incorporates into chapter 9 the following chapter 11 provisions relevant to plan confirmation: sections 1122, 1123(a)(1)-(5), 1123(b), 1123(d), 1125, 1126(a)-(c) and (e)-(g), 1127(d), 1128,[2] 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1) and 1129(b)(2)(A)-(B) of the Bankruptcy Code. See 11 U.S.C. § 901(a). "[T]he most important of these for purposes of confirming a plan are those provisions of section 1129 … that are made applicable in chapter 9 cases." 6 Collier on Bankruptcy ¶ 943.03[1]. | A. The Plan fully complies with each applicable section of the Bankruptcy Code, as set forth below and in the Brief. |

---

[1]   Section 103(e) of the Bankruptcy Code was redesignated section 103(f) pursuant to the Consolidated Appropriations Act of 2001, effective December 21, 2000. See H.R. Res. 4577, 106th Cong. (2000) (enacted). Section 103(f) of the Bankruptcy Code provides that "[e]xcept as provided in section 901 of this title, only chapters 1 and 9 of this title apply in a case under such chapter 9." 11 U.S.C. § 103(f).

[2]   Section 1128 of the Bankruptcy Code simply provides that (1) "[a]fter notice, the court shall hold a hearing on confirmation of the plan," and (2) "[a] party in interest may object to confirmation of a plan." 11 U.S.C. § 1128.

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1122)*[3] | **II. Classification of Claims and Interests (Section 1122)** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1122)* | A. Section 1122 of the Bankruptcy Code establishes the requirements for the classification of claims and interests in a chapter 9 plan. | A. The Plan satisfies the requirements of section 1122 of the Bankruptcy Code. |
| | 1. Section 1122 of the Bankruptcy Code provides that, except in the case of unsecured claims separately classified for administrative convenience, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122.<br><br>"A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the classification scheme, and the claims or interests within each particular class are substantially similar." In re Eagle-Picher Indus., Inc., 203 B.R. 256, 270 (S.D. Ohio 1996); 11 U.S.C. § 1122(a).  "To be substantially similar" for purposes of section 1122 of the Bankruptcy Code, "claims need not be identical …." In re Dow Corning Corp., 244 B.R. 634, 655 (Bankr. E.D. Mich. 1999) (citations omitted), aff'd, 255 B.R. 445 (E.D. Mich. 2000), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002).  Rather, under section 1122 of the Bankruptcy Code, "claims will be substantially similar if they are similar in legal nature or character." Id. | 1. The legal rights under the Bankruptcy Code of each of the holders of Claims within each Class under the Plan are substantially similar in legal nature and character to the legal rights of other holders of Claims within that Class.  See Brief, at §§ V.A, V.C.<br><br>The Plan separately classifies secured and unsecured Claims.  Secured Claims are classified in Classes 1A through 6.  These Classes consist of:  (a) all Classes of DWSD Bond Claims (one Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.139 to the Plan) (Class 1A Claims); (b) all Classes of DWSD Revolving Sewer Bond Claims (one Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.147 to the Plan) (Class 1B Claims); (c) all Classes of DWSD Revolving Water Bond Claims (one Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.150 to the Plan) (Class 1C Claims); (d) Secured GO Series 2010 Claims (Class 2A Claims); (e) Secured GO Series 2010(A) Claims (Class 2B Claims); (f) Secured GO Series 2012(A)(2) Claims (Class 2C Claims); (g) Secured GO Series 2012(A2-B) Claims (Class 2D Claims); (h) Secured GO Series 2012(B) Claims (Class 2E Claims); (i) Secured GO Series 2012(B2) Claims (Class 2F Claims); (j) Other Secured Claims (Class 3 Claims); (k) HUD Installment Notes Claims (Class 4 Claims); (l) COP Swap Claims (Class 5 Claims); and (m) Parking Bond Claims (Class 6 Claims).  See Plan, at § II.B.<br><br>Unsecured Claims are classified in Classes 7 through 17.  These Classes consist of:  (a) Limited Tax General Obligation Bond Claims (Class 7 Claims); (b) Unlimited Tax General Obligation Bond Claims (Class 8 Claims); (c) COP Claims (Class 9 Claims); (d) PFRS Pension Claims (Class 10 Claims); (e) GRS Pension Claims (Class 11 Claims); (f) OPEB Claims (Class 12 Claims); (g) Downtown Development Authority Claims (Class 13 Claims); (h) Other Unsecured Claims (Class 14 Claims); (i) Convenience Claims (Class 15 Claims); (j) Subordinated Claims (Class 16 Claims); and |

---

[3]     Italicized terms herein refer to (a) the relevant provisions of chapter 11 of the Bankruptcy Code made applicable to confirmation of the Plan by operation of sections 103(e) and 901 of the Bankruptcy Code pursuant to section 943(b)(1) of the Bankruptcy Code and (b) the relevant provisions of chapter 9 applicable to confirmation of the Plan pursuant to section 943(b)(2) of the Bankruptcy Code.

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | | (k) Indirect 36th District Court Claims (Class 17 Claims).  See Plan, at § II.B. |
| | 2.  A plan proponent must not separately classify substantially similar claims solely for the purpose of gerrymandering favorable votes.  Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991) (under section 1122 of the Bankruptcy Code, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").  Where there is no evidence that similar claims have been classified separately for purposes of gerrymandering, however, a plan proponent need not offer proof that "legitimate reasons" exist for such separate classification.  See Dow Corning, 244 B.R. at 650 (Section 1122(a) of the Bankruptcy Code "should be construed in accordance with its plain language" and, accordingly, "should not be viewed as prohibiting a plan proponent from placing substantially similar claims in different classes regardless of whether it has proven a 'legitimate reason' for doing so."). | 2.  No Claims were separately classified under the Plan solely to gerrymander favorable votes on the Plan.  See Brief, at § V.B.  Valid factual and legal reasons exist for the separate classification under the Plan of certain secured Claims from Other Secured Claims, as follows:<br><br>a.  Claims in Classes 1A, 1B and 1C, i.e., DWSD Bond Claims, are classified separately from Other Secured Claims because they are Bond Claims secured by specific DWSD revenue streams.<br><br>b.  Claims in Classes 2A, 2B, 2C, 2D, 2E and 2F, i.e., Secured GO Bond Claims, are classified separately from Other Secured Claims because they are Bond Claims secured by liens on distributable state aid.<br><br>c.  Claims in Class 4, i.e., HUD Installment Note Claims, are classified separately from Other Secured Claims because they relate to the HUD Installment Notes and are secured by future block grant revenues.<br><br>d.  Claims in Class 5, i.e., COP Swap Claims, are classified separately from Other Secured Claims because they (i) arise under the COP Swap Documents, (ii) are secured by the City's casino tax revenues and other developer payments and (iii) are subject to the Swap Settlement.<br><br>e.  Claims in Class 6, i.e., Parking Bond Claims, are classified separately from Other Secured Claims because they consist of Claims arising under the Parking Bond Documents and are secured by revenues of the City's parking system.<br><br>Likewise, there are reasonable grounds for the separate classification of certain unsecured Claims from Other Unsecured Claims, as follows:<br><br>a.  Claims in Classes 7, 8, 9 and 13 – i.e., respectively, Limited Tax General Obligation Bond Claims, Unlimited Tax General Obligation Bond Claims, COP Claims and Downtown Development Authority Claims – are classified separately from Other Unsecured Claims because, in each case, they arise pursuant to discrete debt instruments.  In addition, certain of the creditors holding Claims within certain of these Classes assert that that they have liens or other rights related to specific revenues.  Further, certain insurers and certain holders of |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | | Limited Tax General Obligation Bond Claims and the majority of insurers of Unlimited Tax General Obligation Bond Claims have entered into settlements with the City that are incorporated into the Plan. |
| | | b. Claims in Classes 10 and 11, i.e., PFRS Pension Claims and GRS Pension Claims, respectively, are classified separately from Other Unsecured Claims because they are Claims related solely to the underfunding of the City's pensions. In addition, creditors holding Claims in Classes 10 and 11 have asserted that the Michigan Constitution bars impairment of their claims even in a chapter 9 case, which issue has been decided pursuant to the Opinion Regarding Eligibility (In re City of Detroit, 504 B.R. 97 (Bankr. E.D. Mich. 2013)), and settled as set forth in the Plan. |
| | | c. Claims in Class 12, i.e., OPEB Claims, are classified separately from Other Unsecured Claims because they are Claims related solely to OPEB Benefits. |
| | | d. Claims in Class 15, i.e., Convenience Claims, are classified separately from Other Unsecured Claims for the purpose of administrative convenience pursuant to section 1122(b) of the Bankruptcy Code. |
| | | e. Claims in Class 16, i.e., Subordinated Claims, are classified separately from Other Unsecured Claims because they are subordinated to all other unsecured Claims. |
| | | f. Claims in Class 17, i.e., Indirect 36th District Court Claims, are classified separately from Other Unsecured Claims because they arise in connection with causes of action against the 36th District Court rather than directly against the City and are resolved pursuant to the 36th District Court Settlement. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a))* | **III.    Mandatory Contents of a Plan (Section 1123(a))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a))* | A.  Section 1123(a) of the Bankruptcy Code identifies five requirements applicable to the contents of a chapter 9 plan.  See 11 U.S.C. §§ 1123(a), 901(a).[4] | A.  The Plan contains each of the mandatory plan provisions. |

---

[4]    Sections 1123(a)(1)-(5) of the Bankruptcy Code are incorporated into chapter 9; the remaining provisions of section 1123(a) are inapplicable in chapter 9 cases. See 11 U.S.C. § 901(a).

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a)(1))* | 1. Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate classes of claims other than priority claims under section 507(a)(2), 507(a)(3) or 507(a)(8) of the Bankruptcy Code. | 1. The Plan designates Classes of Claims and does not classify Administrative Claims or priority claims under sections 507(a)(3) and 507(a)(8) of the Bankruptcy Code. See Plan, at § II.B, Ex. I.A.139. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a)(2))* | 2. Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify classes of claims that are not impaired under the plan. | 2. The Plan identifies and describes each Class of Claims that is not Impaired under the Plan (i.e., Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and certain Classes within Class 1A). See Plan, at § II.B, Ex. I.A.139. If the DWSD Tender is consummated, all Classes within Class 1A will be Unimpaired. Id. at § II.B.3.a.ii. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a)(3))* | 3. Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify the treatment of any class of claims that is impaired under the plan. | 3. The Plan identifies and describes the treatment of each Class of Claims that is Impaired under the Plan (i.e., Classes 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 and 17 and certain Classes within Class 1A). See Plan, at § II.B, Ex. I.A.139. If the DWSD Tender is consummated, all Classes within Class 1A will be Unimpaired. Id. at § II.B.3.a.ii. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)**<br>*(11 U.S.C. § 1123(a)(4))* | 4.  Section 1123(a)(4) of the Bankruptcy Code requires that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).<br><br>Section 1123(a)(4) of the Bankruptcy Code does not require that every claim within a class receive exactly the same distribution. Rather, section 1123(a)(4)'s requirement of "same treatment" means that, except where the holder of a claim consents to less favorable treatment, each holder of a particular claim within a class must be afforded the same opportunity or be subject to the same process. See, e.g., In re Dow Corning Corp., 255 B.R. 445, 501 (E.D. Mich. 2000) ("The requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the same process for claim satisfaction.'") (citation omitted) (emphasis in original), aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002); Ad Hoc Comm. of Pers. Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").<br><br>Section 1123(a)(4) of the Bankruptcy Code "applies to claims, not creditors." H.R. Rep. No. 95-595, at 407 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6363; see also In re UNR Indus., Inc., 143 B.R. 506, 523 (Bankr. N.D. Ill. 1992) (noting that the debtor had confused "equal treatment of *claims* with equal treatment of *claimants*") (emphasis in original), rev'd on other grounds sub nom. UNR-Rohn, Inc. v. Bloomington Factory Workers (In re UNR Indus., Inc.), 173 B.R. 149 (N.D. Ill. 1994). | 4.  Section II.B of the Plan provides for the same treatment of all Claims or within each Class of Claims unless the holder of such a Claim has agreed to less favorable treatment. See Plan, at § II.B; Brief, at § VI; Consolidated Reply, at ¶¶ 290-93; City Legal Issues Brief, at ¶¶ 39-41. |

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(a)(5))* | 5. Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and provides a non-exclusive list of examples of plan provisions that provide such means of implementation. *See* 11 U.S.C. § 1123(a)(5). | 5. In accordance with the requirements of section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, (a) the issuance of new securities pursuant to the Plan, (b) the consummation of the settlements described in the Plan, (c) the consummation of the State Contribution Agreement, (d) the assumption or rejection of Executory Contracts and Unexpired Leases, (e) the consummation of the DIA Settlement Documents, (f) the establishment and funding of the Professional Fee Reserve, (g) the City's assumption of certain indemnification obligations and (h) the City's entry into the Exit Facility and any agreements and ancillary notes related thereto. *See* Plan, at Article IV; Brief, at § VII.<br><br>The City has provided all parties in interest, including Syncora, with sufficient information regarding implementation of the Plan, and has not violated the due process rights of any party by complying with the Court's mediation confidentiality order. *See* Brief, at §§ VII.A, VII.B. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b))* | **IV.     Permitted Contents of a Plan (Section 1123(b))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b))* | A. Section 1123(b) of the Bankruptcy Code identifies certain discretionary provisions that may be included in a chapter 9 plan, provided they are "not inconsistent with" applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(6). | A. The Plan contains many of these discretionary plan provisions, each of which satisfies section 1123(b) of the Bankruptcy Code. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b)(1))* | 1. Section 1123(b)(1) of the Bankruptcy Code allows a plan to impair or leave unimpaired any class of claims (secured or unsecured). | 1. The Plan impairs or leaves unimpaired, as the case may be, each Class of Claims. *See* Plan, at § II.B. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b)(2))* | 2. Section 1123(b)(2) of the Bankruptcy Code allows a plan, subject to section 365 of the Bankruptcy Code, to provide for the assumption, rejection or assignment of any executory contract or unexpired lease not previously rejected. | 2. The Plan provides for the assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases of the City that were not previously either assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and orders of the Bankruptcy Court. *See* Plan, at § II.D. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b)(3))* | 3. Section 1123(b)(3) of the Bankruptcy Code allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor" or "the retention and enforcement by the debtor … of any such claim …." 11 U.S.C. § 1123(b)(3). | 3. The Plan provides for the retention and enforcement of certain claims, demands, rights, defenses and causes of action by the City. *See* Plan, at § III.D.2, Ex. III.D.2. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b)(5))* | 4. Section 1123(b)(5) of the Bankruptcy Code allows a plan to modify the rights of holders of claims or leave unaffected the rights of holders of any class of claims. | 4. The Plan provides for the modification of the rights of certain holders of secured Claims and unsecured Claims, and the unimpairment of holders of certain Claims. See Plan, at Article II. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1123(b)(6))* | 5. Section 1123(b)(6) of the Bankruptcy Code allows a plan to include any other appropriate provisions not inconsistent with the provisions of title 11 of the United States Code. | 5. The Plan contains other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code, including, but not limited to, provisions: (a) governing distributions on account of Allowed Claims (see Plan, at Article V); (b) establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims from the Disputed Unsecured Claims Reserve once resolved (see Plan, at Article VI); (c) regarding the discharge, release and injunction against the pursuit of claims (see Plan, at § III.D); and (d) regarding the retention of jurisdiction by the Court over certain matters after the Effective Date (see Plan, at Article VII). |
| | a. A properly tailored exculpation provision may extend beyond the professionals of the debtor and any official committees appointed in the case under appropriate circumstances. See, e.g., Airadigm Comm'ns, Inc. v. FCC (In re Airadigm Comm'ns, Inc.), 519 F.3d 640, 655-58 (7th Cir. 2008); In re Granite Broad. Corp., 369 B.R. 120, 139-40 (Bankr. S.D.N.Y. 2007). | a. The Plan's exculpation provision is lawful and appropriate because it (i) contains a carve-out for gross negligence and willful misconduct, (ii) incorporates the terms of various settlements, (iii) extends only to certain parties who either have settled with the City or have actively participated in the City's restructuring activities and (iii) otherwise complies with applicable law. See Plan, at § III.D.6; Brief, at § VIII.A. |
| | b. Consensual releases are clearly permissible under applicable law. See Dow Corning, 255 B.R. at 490 ("A voluntary and consensual release is not a discharge in bankruptcy and does not run afoul with the Bankruptcy Code."). | b. The Plan's consensual release provisions, which apply only to holders of Claims who voted to accept the Plan, are lawful and appropriate. See Brief, at § VIII.A. |
| | c. Non-consensual third party release and injunction provisions are permissible in the Sixth Circuit in "unusual circumstances." Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002). | c. The Plan's non-consensual release and injunction provisions are lawful and appropriate, because: (i) non-consensual third party releases and injunctions are permissible in unusual circumstances; (ii) the approval of non-consensual third party releases is particularly appropriate in chapter 9 cases in which the effectuation of a broad settlement depends upon such releases; and (iii) unusual circumstances exist in the City's Chapter 9 Case that warrant approval of the Plan's non-consensual release and injunction provisions. See Brief, at § VIII.B. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| 11 U.S.C. § 943(b)(1) *(11 U.S.C. § 1123(d))* | 6. Section 1123(d) of the Bankruptcy Code requires the amount necessary to cure a default, if such cure is proposed by the plan, to be determined in accordance with the underlying agreement and applicable nonbankruptcy law. | 6. The Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan, in accordance with section 365 of the Bankruptcy Code. All Cure Amount Claims will be determined according to the underlying agreements and applicable law. <u>See</u> Plan, at § II.D.4.[5] |
| 11 U.S.C. § 943(b)(1) *(11 U.S.C. § 1129(a)(2))* | **V. The City Has Complied With the Applicable Provisions of Title 11 (Section 1129(a)(2))** | |
| 11 U.S.C. § 943(b)(1) *(11 U.S.C. § 1129(a)(2))* | A. While section 1129(a)(1) of the Bankruptcy Code focuses on a *plan's* compliance with the Bankruptcy Code, section 1129(a)(2) focuses on the *proponent's* compliance with the Bankruptcy Code. The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to ensure that the proponent complies with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code. <u>See</u> S. Rep. No. 95-989, at 126 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6368; <u>In re Dow Corning Corp.</u>, 244 B.R. 721, 733 (Bankr. E.D. Mich. 1999), <u>aff'd in part, rev'd in part on other grounds</u>, 255 B.R. 445 (E.D. Mich. 2000), <u>aff'd and remanded sub nom.</u> <u>Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)</u>, 280 F.3d 648 (6th Cir. 2002); <u>In re Trenton Ridge Investors, LLC</u>, 461 B.R. 440, 467 (Bankr. S.D. Ohio 2011); <u>In re Aleris Int'l, Inc.</u>, No. 09-10478, 2010 Bankr. LEXIS 2997, at *66 (Bankr. D. Del. May 3, 2010). | A. The City has complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and Plan solicitation. |

---

[5] The procedures set forth in the Order, Pursuant to Sections 363, 901 and 1123 of the Bankruptcy Code, (A) Establishing Procedures with Respect to the Proposed Assumption and Rejection of Executory Contracts and Unexpired Leases and (B) Approving the Form and Manner of Notice Thereof (Docket No. 6512) complement the Plan's provisions regarding Executory Contracts and Unexpired Leases.

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)**<br>*(11 U.S.C. § 1129(a)(2))*<br>*(11 U.S.C. § 1125)* | 1. Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 9 plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved … by the court as containing adequate information." 11 U.S.C. § 1125(b). | 1. After hearings held on April 17, 2014 and April 28, 2014, the Bankruptcy Court approved the Disclosure Statement by an order entered on May 5, 2014. <u>See</u> Order Approving the Proposed Disclosure Statement (Docket No. 4401) (the "<u>Disclosure Statement Order</u>"). The Disclosure Statement Order specifically found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code. <u>See</u> Disclosure Statement Order, at ¶ 3.<br><br>Following hearings held on March 5, 2014 and March 11, 2014, the Bankruptcy Court entered an order approving certain procedures proposed by the City for the solicitation and tabulation of votes on the Plan, and certain confirmation-related notice procedures. <u>See</u> Order (I) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment and (II) Approving Notice Procedures Related to Confirmation of the Plan of Adjustment (March 11, 2014) (Docket No. 2984) (the "<u>Solicitation Procedures Order</u>"). On May 5, 2014, the Bankruptcy Court approved supplemental solicitation procedures proposed by the City in consultation with the Retiree Committee and other creditor representatives, applicable to Pension Claims and OPEB Claims. <u>See</u> Order Establishing Supplemental Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Adjustment with Respect to Pension and OPEB Claims (Docket No. 4400) (the "<u>Supplemental Solicitation Procedures Order</u>").<br><br>Pursuant to the Solicitation Procedures Order and the Supplemental Solicitation Procedures Order, the Bankruptcy Court approved, prior to the solicitation of acceptances of the Plan, among other things: (a) all materials to be transmitted to creditors entitled to vote on the Plan (collectively, the "<u>Solicitation Materials</u>"), including (i) a cover letter describing the contents of the Solicitation Materials, (ii) the Plan and the Disclosure Statement (together with certain exhibits thereto),[6] (iii) a notice of the Confirmation Hearing and other matters (the "<u>Confirmation Hearing Notice</u>"), (iv) for holders of Claims in voting Classes, an appropriate form of Ballot, (v) a notice summarizing the dispute resolution procedures to be employed with respect to voting and (vi) a "Plain Language Supplement" for holders |

---

[6] The Disclosure Statement and the solicitation version of the Plan, including exhibits, totaled more than 700 pages in length. Accordingly, to reduce substantially the administrative costs associated with printing and mailing such a voluminous document, the City was authorized to serve, and served, the Disclosure Statement and the Plan (including any exhibits thereto) via computer disk (the "<u>Disk</u>") instead of in printed format. The City provided parties receiving the Solicitation Materials instructions for the use of such Disk and information about how to obtain, at no charge, paper copies of any materials provided on the Disk.

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| | | of Pension Claims and OPEB Claims; (b) certain materials to be transmitted to creditors not entitled to vote on the Plan (i.e., the Confirmation Hearing Notice and a notice of non-voting status); (c) the procedures for the solicitation and tabulation of votes to accept or reject the Plan, including approval of (i) the deadline for creditors' submission of Ballots, (ii) the rules for tabulating votes to accept or reject the Plan[7] and (iii) the proposed record date for Plan voting; and (d) the proposed date for the Confirmation Hearing and certain related notice procedures.  See Solicitation Procedures Order, at ¶ 6; Supplemental Solicitation Procedures Order, at ¶¶ 4-5<br><br>Thereafter, the City – through its claims, noticing, balloting and solicitation agent, Kurtzman Carson Consultants LLC ("KCC") – transmitted the approved Solicitation Materials in accordance with the Solicitation Procedures Order and the Supplemental Solicitation Procedures Order.  See Certificate of Service (Docket No. 6177), at ¶¶ 1-41; Paque Declaration, at ¶¶ 11, 15-18, 30 31, 40-41.[8]<br>In addition, the Plan and the Disclosure Statement have been available, free of charge, on the City's restructuring website at http://www.kccllc.net/Detroit.<br><br>Thus, the Solicitation Materials were served in accordance with the requirements of section 1125 of the Bankruptcy Code, the Solicitation Procedures Order and the Supplemental Solicitation Procedures Order. |
| **11 U.S.C. § 943(b)(1)**<br>*(11 U.S.C. § 1129(a)(2))*<br>*(11 U.S.C. § 1126)* | 2. Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 9 plan.  Specifically, section 1126(a) of the Bankruptcy Code provides that "[t]he holder of a claim or interest allowed under section 502 of this title may accept or reject a plan."  11 U.S.C. § 1126(a).  Section 1126(f) of the Bankruptcy Code provides that "a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required."  11 U.S.C. § 1126(f).  In addition, section 1126(g) of the Bankruptcy Code provides that "a class is deemed not to have | 2. The City solicited acceptances from all known holders of Claims in each Class of Impaired Claims under the Plan in a manner that complies with the requirements of section 1126 of the Bankruptcy Code.  Specifically:<br><br>a. Holders of Claims in Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and Unimpaired Classes within Class 1A were not entitled to vote on the Plan because Claims in those Classes are designated under the Plan as Unimpaired.  (If the DWSD Tender is consummated, all Class 1A Claims will be Unimpaired, see Plan, at § II.B.3.a.ii.).  Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and Unimpaired |

---

[7]    The Bankruptcy Court approved (a) tabulation rules of general applicability (see Solicitation Procedures Order, at ¶ 11), and (b) additional tabulation rules applicable to Pension Claims and OPEB Claims (see Supplemental Solicitation Procedures Order, at ¶ 7).

[8]    In accordance with paragraph 18 of the Solicitation Procedures Order, the City, on or before May 9, 2014, published notice of the Confirmation Hearing, approval of the Disclosure Statement and procedures and deadlines regarding Confirmation of the Plan in the Detroit Free Press and The Detroit News, and national editions of USA Today and The Wall Street Journal.  See Affidavits of Publication at Docket Nos. 6209, 6211 and 6253.

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests." 11 U.S.C. § 1126(g). | Classes within Class 1A were conclusively presumed to have accepted the Plan and votes on the Plan were not solicited with respect to such Claims.[9]<br><br>b. Holders of Claims in Classes 5, 7, 8, 9, 10, 11, 12, 13, 14, 15 and Impaired Classes within Class 1A were entitled to vote on the Plan because Claims in those Classes are Impaired under the Plan. Accordingly, pursuant to section 1126(a) of the Bankruptcy Code, the City solicited acceptances of the Plan with respect to such Claims.[10] If the DWSD Tender is consummated, all Class 1A Claims will be Unimpaired and the votes cast by Holders of such Claims will be not be counted and shall be of no force and effect. Plan, at § II.B.3.a.ii.<br><br>c. Holders of Claims in Class 17 (Indirect 36th District Court Claims) were previously classified in Class 14 under the Fourth Amended Plan. As set forth above, Claims in Class 14 are designated as Impaired under the Plan. Accordingly, the City solicited acceptances or rejections of the Plan from the holders of Indirect 36th District Court Claims in their previous capacity as holders of Class 14 Claims. Pursuant to the Order Authorizing Certain Holders of Indirect 36th District Court Claims to Change Their Votes on the City's Plan of Adjustment (Docket No. 6288), by agreement of the parties, the votes of all known holders of Indirect 36th District Court Claims rejecting the Plan under Class 14 are deemed to be votes accepting the Plan under Class 17.<br><br>d. Under the Plan, Class 16 is Impaired and holders of Claims in such Class will receive no distributions under the Plan; therefore, Class 16 is conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code, and no votes were solicited from holders of Class 16 Claims.[11]<br><br>See Disclosure Statement, at §§ I.A.1, I.A.4; Paque Declaration, at ¶¶ 11, 15-18, 30-31, 40-41. |

---

[9]    The City, through KCC, timely served a notice of non-voting status upon all known holders of such Claims. See Certificate of Service (Docket No. 6174); Certificate of Service (Docket No. 6177).

[10]    The City, through KCC, timely served the relevant Solicitation Materials upon all known holders of such Claims. See Certificate of Service (Docket No. 6174); Certificate of Service (Docket No. 6177).

[11]    The City, through KCC, timely served a notice of non-voting status upon all known holders of such Claims. See Certificate of Service (Docket No. 6177).

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(3))* | **VI.** **The Plan Has Been Proposed in Good Faith and Not By Any Means Forbidden By Law (Section 1129(a)(3))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(3))* | A. Section 1129(a)(3) of the Bankruptcy Code provides that, for a plan to be confirmed, the bankruptcy court must find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Courts have interpreted the good faith requirement of section 1129(a)(3) of the Bankruptcy Code in a number of ways: Under one view, the good faith requirement of § 1129(a)(3) is met if the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. Under another view, the good faith requirement is met if the plan was proposed with honesty and good intentions, and with a basis for expecting that a reorganization can be effected. Under a third view, good faith requires fundamental fairness in dealing with one's creditors. In re Gregory Boat Co., 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992). Whether a plan has been proposed in good faith is determined on a case-by-case basis in view of the totality of the circumstances. Dow Corning, 255 B.R. at 498 ("good faith must be reviewed based on the totality of the circumstances"). In the chapter 9 context, courts have applied a variety of factors to determine whether a plan satisfies section 1129(a)(3) of the Bankruptcy Code. See, e.g., In re Mount Carbon Metro. Dist., 242 B.R. 18, 40-41 (Bankr. D. Colo. 1999) (analyzing the factors of "(1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair"). | A. The Plan has been proposed in good faith because its purpose is to adjust the City's debts to enable the City to reverse its downward financial spiral and restore adequate municipal services, consistent with the overarching remedial purpose of chapter 9. The City's good faith in proposing the Plan is further evidenced by the fact that the Plan (1) incorporates several key settlements that are the result of arm's length negotiations between the City and representatives of a large proportion of its creditors and (2) has been proposed with the support of many of the City's largest creditor constituencies. See Brief, at § IX. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | 1. In analyzing whether a plan satisfies section 1129(a)(3) of the Bankruptcy Code, courts frequently focus on whether a proposed plan is consistent with the overarching purposes of the Bankruptcy Code. See, e.g., Dow Corning, 255 B.R. at 498 ("Prepetition behavior is irrelevant. The focus is on the plan itself. Good faith may exist when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (citations and quotation marks omitted). | 1. The Plan is consistent with the purposes of chapter 9 of the Bankruptcy Code because its purpose is to restructure the City's debts to enable the City to remedy its service delivery insolvency, reverse its decades-long downward spiral and meet its future financial obligations. See Brief, at § IX.A. |
| | 2. Good faith also may be found where the plan is the result of extensive arm's length negotiations with creditors and is supported by key creditor constituencies. See, e.g., Eagle-Picher, 203 B.R. at 274 (finding that the plan was proposed in good faith when, among other things, it was based on extensive arm's length negotiations among plan proponents and other parties in interest); In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) ("The fact that the plan is proposed by the committee as well as the debtors is strong evidence that the plan is proposed in good faith."). | 2. The Plan is the result of extensive arm's length negotiations, incorporates multiple key settlements and, thus, has been proposed with the support of many of the City's largest creditor constituencies. See Brief, at § IX.A. |
| | 3. The plain language of section 1129(a)(3) of the Bankruptcy Code requires that a plan must not be *proposed* in a manner "forbidden by law." 11 U.S.C. § 1129(a)(3). As such, the behavior of a plan proponent, rather than the actual contents of a plan, is the central focus of section 1129(a)(3) of the Bankruptcy Code. See In re Dow Corning Corp., 244 B.R. 673, 675-76 (Bankr. E.D. Mich. 1999) ("[I]t is the plan's *proposal* which must be … not by a means forbidden by law.") (emphasis in original); In re Food City, Inc., 110 B.R. 808, 811-12 (Bankr. W.D. Tex. 1990) (same); In re Sovereign Grp., 1984-21 Ltd., 88 B.R. 325, 328 (Bankr. D. Colo. 1988) ("[T]he purpose of 1129(a)(3) [is to ensure] that the *proposal* of a plan of reorganization was … not in a way that was forbidden by law.") (emphasis in original). | 3. The Plan has not been proposed in any manner forbidden by law. See Brief, at IX.B. |

13-53846-swr   Doc 8049-5   Filed 08/27/14   Entered 08/27/14 23:40:52   Page 246 of 292
13-53846-swr   Doc 7143-5   Filed 08/27/14   Entered 08/27/14 13:25:50   Page 246 of 292
293

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(6))* **11 U.S.C. § 943(b)(6)** | **VII. All Regulatory and Electoral Approval Necessary Under Applicable Law to Carry Out the Plan Has Been or Will Be Obtained (Sections 1129(a)(6) and 943(b)(6))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(6))* **11 U.S.C. § 943(b)(6)** | A. Section 943(b)(6) of the Bankruptcy Code provides that the Court shall confirm the Plan if "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 11 U.S.C. § 943(b)(6). Section 1129(a)(6) of the Bankruptcy Code similarly provides that the Court shall confirm the Plan if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned upon such approval." 11 U.S.C. § 1129(a)(6). | A. These standards are satisfied with respect to the Plan because the obtaining of any necessary authorizations, consents and regulatory approvals is a specific condition to the effectiveness of the Plan, consistent with the express language of sections 943(b)(6) and 1129(a)(6) of the Bankruptcy Code. See Plan, at § III.A.5 (providing that, as a condition to the effectiveness of the Plan, "[a]ll authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked…"); Brief, at § X. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(8))* | **VIII. The Plan Has Been Accepted By the Requisite Classes of Creditors (Section 1129(a)(8))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(8))* | A. Subject to the "cramdown" exceptions contained in section 1129(b) of the Bankruptcy Code, section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests under a plan has either accepted the plan or is not impaired under the plan. | A. No fewer than eight Impaired Classes of Claims (comprised of Classes 5, 7, 8, 10, 11, 12, 13, 17) have accepted the Plan. See Paque Declaration, at ¶¶ 25, 26-27, 33-34, 43-44; Supplemental Paque Declaration, at ¶¶ 9-10, 14-15. In addition, all Unimpaired Classes of Claims under the Plan (i.e., Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 6 and the Unimpaired Classes within Class 1A) are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. (If the DWSD Tender is consummated, all Classes within Class 1A will be Unimpaired, as set forth above). Accordingly, the requirements of section 1129(a)(8) of the Bankruptcy Code are met with respect to Classes 1B, 1C, 2A, 2B, 2C, 2D, 2E, 2F, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 17 and all Unimpaired Classes – and, at a minimum, certain Impaired Classes – within Class 1A.

Impaired Classes 9, 14 and 15 (collectively, the "Impaired Rejecting Classes") have voted to reject the Plan. See Paque Declaration, at ¶¶ 26-27, 43-44. (Certain Impaired Classes within Class 1A also voted to reject the Plan. If the DWSD Tender is consummated, however, all Classes within Class 1A will be Unimpaired and votes cast by Holders of Class 1A Claims to reject the Plan shall not be counted and will be of nor force and effect.) Consistent with section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan because the holders of Claims in Class 16 will not receive any Distributions under the Plan (see Plan, at § II.B.3.w.i). Accordingly, the requirements of |

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| | | section 1129(a)(8) of the Bankruptcy Code are not satisfied with respect to the Impaired Rejecting Classes. |
| | B. Section 1129(a)(8) of the Bankruptcy Code is the only confirmation requirement that is not mandatory. If section 1129(a)(8) is not satisfied with respect to certain classes of claims, a plan nevertheless may be confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. | B. For the reasons set forth below and in the Brief, the Plan satisfies the "cramdown" requirements under section 1129(b) of the Bankruptcy Code to the extent necessary to obtain confirmation of the Plan. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(10))* | **IX.    The Plan Has Been Accepted By At Least One Impaired Class of Claims (Section 1129(a)(10))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(a)(10))* | A. Section 1129(a)(10) of the Bankruptcy Code requires that a chapter 9 plan be accepted by at least one class of claims that is impaired under the plan, determined without including the acceptance of the plan by any insider (as such term is defined in section 101(31) of the Bankruptcy Code). | A. The City has satisfied this requirement because, at a minimum, Impaired Classes 5, 7, 8, 10, 11, 12, 13 and 17 have accepted the Plan, after excluding the votes of any insiders. See Paque Declaration, at ¶¶ 26-27, 33-34, 43-44; Supplemental Paque Declaration, at ¶¶ 9-10, 14-15. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b))* | **X.    The Plan Satisfies the Cramdown Requirements of Section 1129(b)** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b))* | A. Section 1129(b) of the Bankruptcy Code provides that, if all the requirements of section 1129(a) of the Bankruptcy Code are satisfied, other than the requirement of acceptance by all impaired classes under section 1129(a)(8) of the Bankruptcy Code, a plan nevertheless may be confirmed so long as the plan "does not discriminate unfairly" and is "fair and equitable" with respect to impaired, non-consenting classes. 11 U.S.C. § 1129(b)(1). | A. The Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code because it does not discriminate unfairly and is fair and equitable with respect to each Class of Claims that has not accepted the Plan, as further discussed below and in the Brief. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b)(1))* | **XI.    The Plan Does Not Discriminate Unfairly (Section 1129(b)(1))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b)(1))* | A. The City is required to establish the absence of unfair discrimination only with respect to the Impaired Rejecting Classes. See 11 U.S.C. § 1129(b)(1) (plan must not discriminate unfairly "with respect to each class of claims or interests that ... has not accepted the plan"). | A. Classes 5, 7, 8, 10, 11, 12, 13 and 17 (collectively, the "Impaired Accepting Classes") have accepted the Plan. See supra, at §§ VIII.A, IX.A. Whether the Plan discriminates unfairly with respect to the Impaired Accepting Classes is therefore irrelevant to any unfair discrimination analysis, and any objection to the Plan on the grounds that the Plan unfairly discriminates against an Impaired Accepting Class must be denied. |
| | B. By its terms, section 1129(b)(1) of the Bankruptcy Code prohibits only *unfair* discrimination. A determination of the question of whether the Plan discriminates unfairly with respect to any Class of | B. The Plan does not discriminate unfairly against any Impaired Rejecting Class. See Brief, at § I.

The extent of any differential treatment between Classes of Claims under |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | Claims necessarily involves consideration of (a) the extent of any differential treatment and (b) whether that treatment is nevertheless fair.  See In re Aztec Co., 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (stating that section 1129(b)(1) of the Bankruptcy Code "prohibits only *unfair* discrimination, not all discrimination") (emphasis added); In re Simmons, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.04[3]) (stating that it is "necessarily inherent in the term 'unfair discrimination' ... that there may be 'fair' discrimination in the treatment of classes of creditors").

In determining the fairness of the treatment of any Class of Claims, it is appropriate for the Court to consider the treatment that the Claims would be accorded under State law.  See In re Dow Corning Corp., 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (providing that a debtor may rebut the *Markell* presumption of unfair treatment with evidence of the relative treatment of the claims under nonbankruptcy law); 7 Collier on Bankruptcy ¶ 1129.03[3][b][v] ("a plan proponent may pay classes of claims different amounts if there is a nonbankruptcy rationale for doing so, and if the discrimination is tailored to the nonbankruptcy rationale"). | the Plan is limited.  In particular, the disparity between recoveries on Pension Claims and other unsecured Claims for the purposes of an unfair discrimination analysis is less than might appear based upon a comparison of percentage recovery estimates included in the Disclosure Statement.  The estimated percentage recoveries for Claims in Classes 10 and 11 provided in the Disclosure Statement were arrived at through extensive negotiations with the Retiree Committee, the Retirement Systems and other retiree representatives and reflect the use of assumed discount rates that mirror the pension plans' assumed rates of return on investments (such matching rates being a convention in the pension industry).

The numbers expressed in the Disclosure Statement – while completely accurate for their specific purpose – do not represent:  (a) the most economically relevant description of recovery percentages on Pension Claims, as such Claims must be determined pursuant to applicable law; or (b) a calculation that allows for an "apples to apples" comparison of recovery percentages upon Pension Claims and COP Claims and other Classes of unsecured Claims.  A comparison of the recoveries of holders of Pension Claims and holders of COP Claims (assuming that the claims asserted by the latter are allowed) requires adjustments to the distribution percentages applicable to Pension Claims so that the percentages can be more directly compared to the proposed distributions made on account of claims for borrowed money.  To achieve this comparison, the Pension Claim distributions should be calculated using a commercially appropriate discount rate for pension liabilities, which (a) is consistent with applicable law and (b) more appropriately reflects the extent of the City's pension liabilities (in contrast to the estimates resulting from the negotiations between the City and the representatives of holders of Pension Claims that resulted in the settlement presented in the Disclosure Statement).  Moreover, this comparison must exclude the effect on Pension Claim recoveries of distributions funded by entities other than the City.

In any event, ample justification exists to support the fairness of the differential treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims in light of the nature of these claims, the City's circumstances and the purposes of chapter 9.  With respect to Pension Claims in particular, the treatment of such Claims is fair even if the settlement discount rate of 6.75% were used to value such Claims, based upon, among other things: (a) critical business justifications impacting the City's ability to provide essential services to promote the health, welfare and safety of its citizens, including the imperative of maintaining a stable motivated workforce and reasonable employee relations; (b) the different expectations of holders of |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | | Pension Claims and insurers of COP debt, which was understood by the insurers as subject to extraordinary risks; and (c) the risks of litigation with the holders of Pension Claims concerning the ability of the City to impair accrued pension benefits (and to fund pension benefits at levels lower than already-accrued amounts) consistent with the Pensions Clause. These later risks were mitigated by settlements negotiated vigorously at arm's length and in good faith among the City and representatives of the affected creditors that resulted in the treatment of Pension Claims included in the Plan. For all of these reasons, the Plan does not discriminate unfairly between Classes of Claims.<br><br>Specifically, the Plan does not discriminate unfairly for the following reasons:<br><br>1. The extent of differential treatment between Pension Claims and other Classes of unsecured Claims is limited. See id. at § I.A.<br><br>   a. The City's pension liability for purposes of an unfair discrimination analysis is significantly higher than the settlement amount used by agreement with retiree representatives that was reflected in the Disclosure Statement. See id. at § I.A.1. Notwithstanding the pension industry's convention of using matching return on investment and discount rates, from an economic perspective, the use of a discount rate as high as 6.75% substantially understates the City's fair pension liability. Id. As a legal matter, use of a lower discount rate, such as a risk-free rate or near risk-free rate, is required to accurately calculate the amount of the City's pension liabilities (and, thus, provide an economically meaningful comparison with the City's other liabilities). Id.<br><br>   b. The Outside Funding must be excluded from recoveries for the purposes of an unfair discrimination analysis. See id. at § I.A.2.<br><br>2. The differential treatment of Pension Claims, Unlimited Tax General Obligation Bond Claims and Limited Tax General Obligation Bond Claims is fair. See id. at § I.B.<br><br>   a. Business considerations justify the differential treatment of Pension Claims. See id. at § I.B.1.<br><br>   b. The differential treatment of Claims that results from settlements of significant issues of law is fair. See id. at § I.B.2.<br><br>   c. The differing expectations of creditor Classes justify the differential treatment of Pension Claims. See id. at § I.B.3.<br><br>   d. Any differential treatment is proposed in good faith. See id. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | | at § I.B.4. |
| | | 3. There is no unfair discrimination against COP Claims, or with respect to the Claim of Macomb County. See id. at §§ I.C, I.D. |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b)(1), (2))* | **XII. The Plan Is Fair and Equitable With Respect to Each Class of Claims That Has Not Accepted the Plan (Section 1129(b)(1), (2))** | |
| **11 U.S.C. § 943(b)(1)** *(11 U.S.C. § 1129(b)(1), (2))* | A. Section 1129(b)(1) of the Bankruptcy Code requires a bankruptcy court to confirm a chapter 9 plan if the plan is, among other things, fair and equitable with respect to each dissenting impaired class. See 11 U.S.C. § 1129(b)(1) (providing that, where not all impaired classes have accepted the plan, "the court, on request of the proponent of the plan, shall confirm the plan … if the plan … is fair and equitable …"). Section 1129(b)(2) of the Bankruptcy Code provides that "[f]or the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes" certain enumerated, disjunctive requirements. 11 U.S.C. § 1129(b)(2). | A. The Plan is fair and equitable with respect to each Class of Claims that has not accepted the Plan, for the reasons stated below and in the Brief. See Brief, at § II. |
| | 1. *Secured Creditors.* "With respect to a class of secured claims," a plan satisfies the statutory "fair and equitable" requirement if such plan provides as follows:<br><br>(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and<br><br>(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.]<br><br>11 U.S.C. § 1129(b)(2)(A)(i)(I)-(II). Section 1129(b)(2)(A)(i) of the Bankruptcy Code thus provides that an impaired secured creditor is "entitled to retain its lien and to receive property with a present value equal to the allowed amount of its claim." In re Coventry Commons Assocs., 149 B.R. 109, 115 (Bankr. E.D. Mich. 1992). | 1. The Plan satisfies section 1129(b)(2)(A)(i) of the Bankruptcy Code, and therefore is "fair and equitable" with respect to Classes of secured Claims impaired by the Plan, because it provides that secured creditors will: (a) retain their liens in the collateral securing their Claims; and (b) receive the present value, as of the Effective Date, of such Claims. Moreover, if the DWSD Tender is consummated, no Class of Secured Claims will be Impaired under the Plan. See Plan, at § II.B.3.a.ii. |
| | 2. *Unsecured creditors.* Section 1129(b)(2)(B) of the Bankruptcy Code – the codification of the absolute priority rule – provides | 2. The Plan is fair and equitable with respect to impaired Classes of unsecured Claims that have not accepted the Plan because, under the |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | that, for a plan to be fair and equitable with respect to unsecured creditors, such creditors may receive less than the value of their claims as of the effective date of a plan only if no class of junior claims or interests receives any distribution on account of the claims therein. 11 U.S.C. § 1129(b)(2)(B). Application of the absolute priority rule to unsecured creditors of a municipal debtor generally is not possible, however, because, in chapter 9, there can be no junior class of equity interests. See In re Corcoran Hosp. Dist., 233 B.R. 449, 458 (Bankr. E.D. Cal. 1999) (holding that the proposed chapter 9 plan did not implicate the absolute priority rule because there were no holders of equity interests in the debtor hospital). Some courts, therefore, have suggested that the requirement that a plan be fair and equitable as to unsecured creditors of a municipal debtor is satisfied where creditors receive "all that they can reasonably expect in the circumstances." See, e.g., Lorber v. Vista Irr. Dist., 127 F.2d 628, 639 (9th Cir. 1942) (collecting cases).<br><br>An analysis of whether the Plan provides creditors with "all that they can reasonably expect in the circumstances" necessarily must consider the overarching purpose of chapter 9 – and the City's chapter 9 case in particular – which is to relieve City residents from the effects of declining services and spiraling taxation caused by the City's crippling debt. See Mount Carbon, 242 B.R. at 41 (holding that a chapter 9 plan was not proposed in good faith and was not feasible because it provided for the satisfaction of debt over the provision of governmental services; stating that the legislative purpose underlying chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services").<br><br>It is well settled that a chapter 9 debtor cannot be compelled to liquidate assets. See Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs), 339 F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for … an involuntary liquidation of any of the debtor's assets.") (quoting In re Richmond Unified Sch. Dist., 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991)). Section 904 of the Bankruptcy Code – which protects the constitutionality of chapter 9 under the Tenth Amendment to the United States Constitution – prohibits the Court from interfering with, among other things, the property and revenues of the City or its use and enjoyment of income-producing property. See 11 U.S.C. § 904. | Plan, such creditors will receive all that they can reasonably expect under the circumstances. See Brief, at § II.<br><br>Although a chapter 9 debtor should not disregard its obligation to provide creditors with recoveries that are reasonable under the circumstances, nothing in the Bankruptcy Code requires the City to maximize creditor recoveries by (a) liquidating assets, (b) reducing services to or maintaining services at inadequate levels or (c) adding to the exceedingly high tax burden already imposed upon City residents. This is not surprising, because imposing such requirements upon the City would elevate the unconditional maximization of creditor recoveries over the health, safety and welfare of the City's residents, which is antithetical to applicable law and the purposes of chapter 9.<br><br>The Plan is "fair and equitable" with respect to unsecured creditors, for the following reasons:<br><br>a. The City cannot improve creditor recoveries through increased taxation. See id. at § II.A.<br><br>b. The City is nevertheless making reasonable efforts to maximize revenues and achieve cost savings. See id. at § II.B.<br><br>c. Arguments that the City must liquidate the DIA Collection or other City-owned assets to maximize creditor recoveries must be rejected. See id. at § II.C.<br><br>   i. The City cannot simply sell the DIA Collection free and clear. See id. at § II.C.1.<br><br>   ii. The City cannot be compelled to liquidate its assets. See id. at § II.C.2.<br><br>   iii. A forced liquidation of the DIA Collection would yield only a fraction of the DIA Collection's true economic value and would deprive the City of a unique and irreplaceable cultural asset. See id. at § II.C.3. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(4)** | **XIII.   The City Is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan (Section 943(b)(4))** | |
| **11 U.S.C. § 943(b)(4)** | A.  Section 943(b)(4) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  This requirement is prospective and applies only to post-confirmation actions proposed in a plan of adjustment; it does not restrict a debtor's ability to impair claims pursuant to a plan.  See, e.g., In re City of Columbia Falls, Mont., Special Improvement Dist. No. 25, 143 B.R. 750, 760 (Bankr. D. Mont. 1992) ("Section 943(b)(4) does not prevent the debtors from proposing a plan that impairs the rights of [creditors]. This provision applies to postpetition actions after confirmation of the plan."). | A.  The City is not prohibited by law from taking any action necessary to carry out the Plan.  See Brief, at § XI.[12]<br><br>In the Prior Briefing, the City demonstrated that the following aspects of the Plan comply with the requirements of applicable law:<br><br>1.  The payments to be made by DWSD to GRS on account of DWSD's currently-calculated full allocable share of the unfunded actuarially accrued liabilities of GRS, as reduced by the Plan (the "DWSD Pension Funding").  See Consolidated Reply, at ¶¶ 216-42.<br><br>2.  The allocation of proceeds from a potential Qualifying DWSD Transaction.  See id. at ¶¶ 243-44.<br><br>3.  The Plan provisions enjoining modification of pension benefits for ten years.  See id. at ¶¶ 245-50; City Legal Issues Brief, at ¶¶ 1-7.<br><br>4.  The Plan-mandated assumed pension investment rates of return and discount rates.  See Consolidated Reply, at ¶¶ 251-52.<br><br>5.  The assignment of the payment rights of the Stub UTGO Bonds. See id. at ¶¶ 253-56; City Legal Issues Brief, at ¶¶ 42-45.<br><br>6.  The conveyance of the Museum Assets in connection with the DIA Settlement.  See Consolidated Reply, at ¶ 257.<br><br>7.  ASF Recoupment.  See id. at ¶¶ 263-77.<br><br>The City also is not prohibited by law from taking any action necessary to carry out the Plan, with respect to the following:<br><br>1.  The DWSD Pension Funding.  See Brief, at § XI.A.<br><br>2.  The Plan's allocation of restructuring fees to the DWSD.  See id. at § XI.B.<br><br>3.  The DIA Settlement.  See id. at §§ XI.C, XI.D.<br><br>4.  The impairment of Pension Claims.  See id. at § XI.E.<br><br>5.  The impairment of Pension Claims and OPEB Claims of active and retired employees of the Library and the DRCFA.  See id. |

[12]     The lawfulness of certain of these enumerated features of the Plan will be discussed more fully in the *Pro Se* Brief to be filed by the City on or before September 5, 2014.

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| **11 U.S.C. § 943(b)(7)** | **XIV.   The Plan Is in the Best Interests of Creditors (Section 943(b)(7))** | |
| **11 U.S.C. § 943(b)(7)** | A.  Section 943(b)(7) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the plan is in the best interests of creditors …."  11 U.S.C. § 943(b)(7).<br><br>In the chapter 9 context, the best interests of creditors test "has been described as a 'floor, requiring a reasonable effort at payment of creditors by the municipal debtor.'"  In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quoting Mount Carbon, 242 B.R. at 34).  The best interests of creditors test "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives."  In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989).  "This is often easy to establish.  Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force sale of municipal assets under state law, their only alternative to a debtor's plan is dismissal."  Mount Carbon, 242 B.R. at 34.  Consequently, courts apply the best interests of creditors test "to require a reasonable effort by the municipal debtor that is a better alternative to the creditors than dismissal of the case."  Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996) (quoting 4 Collier on Bankruptcy ¶ 943.03[7] (15th ed.)).<br><br>In chapter 9 – unlike in chapter 11 – the best interests of creditors test is a holistic analysis pursuant to which the Court must review the effect of dismissal on the creditor body at large, not merely on a claim-by-claim basis, and on the debtor's continuing ability to provide municipal services.  See In re Bamberg Cnty. Mem'l Hosp., No. 11–03877, 2012 WL 1890259, at *8 (Bankr. D.S.C. May 23, 2012) (holding that a chapter 9 plan was in the best interests of creditors because (1) dismissal would allow those creditors that would be able most promptly to obtain judgments on their claims to benefit at the expense of others and (2) the plan preserved the availability of healthcare services to local citizens); In re Barnwell Cnty. Hosp., 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (same); Sanitary & Improvement Dist., No. 7, 98 B.R. at 975-76 (overruling objection to confirmation on grounds that chapter 9 plan was not in the best interests of creditors because, in the event of dismissal, all members of the creditor body would seek judgments that the municipal debtor would be unable to pay and the state court system would be powerless to compromise). | A.  The Plan is in the best interests of the City's creditors because the Plan provides them with a better alternative than dismissal of the Chapter 9 Case.  Dismissal would merely result in the issuance of numerous judgment levies against a City that is insolvent and unable to meet its obligations through yet more borrowing or taxation.  In such a scenario, the City would be legally obligated to levy substantial new property taxes on a saturated tax base, thus (a) depleting the value of the City's taxable property, (b) driving away residents and investment and (c) continuing the current downward spiral of lost revenues, ever increasing tax rates, tax delinquency, blight and abandonment.  Indeed, if the case were dismissed, the City's pension obligations *alone* would quickly deplete the City's limited resources.  Dismissal of the Chapter 9 Case would also deprive the City and its residents of the Reinvestment Initiatives provided for under the Plan, upon which the City's economic recovery and revitalization depends.  See Brief, at § III.<br><br>Specifically, the Plan is in the best interests of creditors for the following reasons:<br><br>1.  Unsecured creditors' State law remedies are meaningless in the context of the City's continuing (and worsening) insolvency.  See id. at § III.A.<br><br>2.  Dismissal of the Chapter 9 Case would deprive the City and its residents of the Reinvestment Initiatives upon which the City's economic recovery depends.  See id. at § III.B.<br><br>3.  Dismissal of the Chapter 9 Case would cause the financial benefits of the Plan to disappear.  See id. at § III.C. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| **11 U.S.C. § 943(b)(7)** | **XV.    The Plan Is Feasible (Section 943(b)(7))** | |
| 11 U.S.C. § 943(b)(7) | A.   Section 943(b)(7) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the plan is … feasible." 11 U.S.C. § 943(b)(7).  "The Code does not define feasibility in Chapter 9 nor does it specify what factors the Court should consider in determining whether the Plan is feasible." Mount Carbon, 242 B.R. at 31.<br><br>Caselaw interpreting the feasibility requirement is limited, and no single, clearly defined test is employed by courts to assess the feasibility of chapter 9 plans of adjustment.  Nevertheless, courts ultimately evaluate the debtor's ability to (1) make the payments projected under the plan and (2) provide adequate municipal services in the future.  See id. at 34-35 ("[D]etermination of the feasibility of the plan covers both repayment of pre-petition debt and future services....  The Court must, in the course of determining feasibility, evaluate whether it is probable that the debtor can both pay pre-petition debt and provide future public services at the level necessary to its viability as a municipality."); see also Prime Healthcare Mgmt., Inc. v. Valley Health Sys. (In re Valley Health Sys.), 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (stating that a chapter 9 plan is feasible if "it offers a reasonable prospect of success and is workable").<br><br>A chapter 9 debtor's ability to make the payments contemplated under its plan of adjustment is dependent upon the accuracy of its revenue and expense projections and the reasonableness of the assumptions on which they rely.  See In re Connector 2000 Ass'n, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011); Corcoran Hosp. Dist., 233 B.R. at 453-54.<br><br>Importantly, the City is not required to do the impossible and guarantee that the Plan will succeed.  See Mount Carbon, 242 B.R. at 34-35 ("Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation.<br>The probability of future success will depend upon reasonable income and expense projections ....  [P]rojections of future income and expenses must be based upon reasonable assumptions and must not be speculative or conjectural.") (internal citations and quotation marks omitted).  Rather, the City must establish feasibility by a preponderance of the evidence.  Mount Carbon, 242 B.R. at 31; see also In re Tammarine, 405 B.R. 465, 470 (Bankr. N.D. Ohio 2009) ("preponderance of the evidence means 'more likely than | A.   The Plan is feasible within the meaning of section 943(b)(7) of the Bankruptcy Code.  See Brief, at § IV.<br><br>Evidence offered by the City at the Confirmation Hearing is expected to establish, among other things, that:<br><br>1.   The City's revenue and expense projections are accurate and based on reasonable assumptions.  See id. at § IV.A.<br><br>2.   The contingency provided for in the Projections complies with applicable law.  See id. at § IV.B.<br><br>3.   The City will possess adequate human resources to perform according to the terms of the Plan.  See id. at § IV.C.<br><br>4.   Adequate systems and procedures will be established to monitor the City's performance.  See id. at § IV.D.<br><br>5.   Appropriate controls will ensure the City's compliance with the Plan. See id. at § IV.E.<br><br>6.   The Reinvestment Initiatives will elevate the City's municipal services to adequate levels.  See id. at § IV.F.<br><br>a.   The Reinvestment Initiatives, including with respect to (i) blight remediation, (ii) public safety, (iii) public transportation, (iv) business services and (v) information technology, are necessary to the provision of adequate municipal services. See id. at § IV.F.1-6.<br><br>7.   The City can sustain its recovery over the long term.  See id. at § IV.G. |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | not'") (citing <u>Gafford v. Gen. Elec. Co.</u>, 997 F.2d 150, 160 (6th Cir. 1993), <u>abrogated on other grounds by</u> <u>Hertz Corp. v. Friend</u>, 559 U.S. 77 (2010)). | |
| **11 U.S.C. § 943(b)(2)** | **XVI.   The Requirements of Section 943(b)(2) of the Bankruptcy Code Are Satisfied** | |
| **11 U.S.C. § 943(b)(2)** | A.   Section 943(b)(2) of the Bankruptcy Code provides that a bankruptcy court shall confirm a plan of adjustment if, among other things, "the plan complies with the provisions of this chapter." 11 U.S.C. § 943(b)(2).  Other than the subsections of section 943 of the Bankruptcy Code – each of which are addressed herein – chapter 9 contains two provisions relevant to plan confirmation: section 941 (regarding the filing of a plan of adjustment) and section 942 (regarding plan modifications).  <u>See</u> 11 U.S.C. §§ 941, 942. | A.   The City and the Plan comply with the requirements of section 943(b)(2) of the Bankruptcy Code, as set forth below. |
| **11 U.S.C. § 943(b)(2)**<br>*(11 U.S.C. § 941)* | **XVII.  The City Filed the Plan Within the Time Specified By the Bankruptcy Court (Section 941)** | |
| **11 U.S.C. § 943(b)(2)**<br>*(11 U.S.C. § 941)* | A.   Section 941 of the Bankruptcy Code provides, simply, that "[t]he debtor shall file a plan for the adjustment of the debtor's debts," and that such plan may be filed with the debtor's petition or at a later time fixed by the court.  11 U.S.C. § 941. | A.   In the First Order Establishing Dates and Deadlines (Docket No. 280), the Court required the City to file a plan of adjustment on or before March 1, 2014.  Because the City filed the Plan for the Adjustment of Debts of the City of Detroit (Docket No. 2708) on February 21, 2014, the City has complied with section 941 of the Bankruptcy Code. |
| **11 U.S.C. § 943(b)(2)**<br>*(11 U.S.C. § 942)* | **XVIII.  The Post-Solicitation Modifications to the Plan Comply with the Bankruptcy Code (Section 942)** | |
| **11 U.S.C. § 943(b)(2)**<br>*(11 U.S.C. § 942)* | A.   The Bankruptcy Code specifically contemplates and permits modifications to a plan of adjustment.  In particular, section 942 of the Bankruptcy Code provides that:<br><br>The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this chapter.  After the debtor files a modification, the plan as modified becomes the plan.<br><br>11 U.S.C. § 942.<br><br>Section 1127(d) of the Bankruptcy Code, which is made applicable in chapter 9 by section 901 of the Bankruptcy Code further provides that: | A.   The Plan satisfies section 942 of the Bankruptcy Code.<br><br>In the interests of clarifying the Fourth Amended Plan and consensually resolving certain objections to confirmation of the Plan, the City has made certain modifications to the Plan that are reflected in the Sixth Amended Plan and identified in the redline attached as <u>Exhibit B</u> to the Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910) (the "<u>Redline</u>").  The modifications included in the Sixth Amended Plan are either immaterial to or do not adversely affect the treatment of any Claim under the Plan.  <u>See</u> Brief, at § XII.<br><br>The Corrected Fifth Amended Plan and the Sixth Amended Plan modified the Fourth Amended Plan to make certain minor corrections and to:<br><br>1.   Incorporate the terms of the LTGO Settlement (<u>see</u> <u>id.</u>; Redline, |

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| | Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.<br><br>11 U.S.C. § 1127(d).<br><br>Bankruptcy Rule 3019, designed to implement section 1127(d) of the Bankruptcy Code, in turn, provides in relevant part that:<br><br>In a chapter 9 ... case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor … who has not accepted in writing the modification, it shall be deemed accepted by all creditors … who have previously accepted the plan.<br><br>Fed. R. Bankr. P. 3019(a).<br><br>Section 1127 of the Bankruptcy Code gives a plan proponent the right to modify the plan "at any time" before confirmation. This right would be meaningless if the promulgation of all plan modifications, ministerial or substantive, necessitated the resolicitation of votes. Accordingly, in keeping with traditional bankruptcy practice, courts have typically allowed a plan proponent to make non-material or favorable changes to a plan without any special procedures or vote resolicitation.<br><br>Bankruptcy Rule 3019 explains when it is necessary to resolicit parties who have previously voted on the plan. It enforces the practical and logical assumption that anyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan "does not adversely change the treatment of [that creditor's] claim." ... If the Rule were otherwise, or simply did not exist, it would require resolicitation of hundreds, or as in this case, thousands of individuals for no real reason.<br><br><u>In re Dow Corning Corp.</u>, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999); <u>see also</u> <u>Eagle-Picher</u>, 203 B.R. at 278 (providing that | at §§ II.B.3.n, III.D.6, IV.H);<br><br>2. Provide an option for certain retirees who are subject to ASF Recoupment to make a single lump-sum cash payment rather than having ASF Recoupment effected by a diminution in monthly pension payments, in accordance with the Order Resolving Motion of the General Retirement System of the City of Detroit to Designate and Determine Additional Legal Issue Regarding Methodology for ASF Recoupment from Retirees (Docket No. 5775) (<u>see</u> Brief, at § XII; Redline, at § II.B.3.r.ii.D.2);<br><br>3. Clarify that ASF Recoupment for individuals who do not elect the lump-sum payment option – as proposed in the Fourth Amended Plan – will be annuitized using common actuarial assumptions and subject to amortization using a 6.75% interest rate (<u>see</u> Brief, at § XII; Redline, at § II.B.3.r.ii.D.2);<br><br>4. Implement the 36th District Court Settlement, including to (a) create a new Class 17 that contains all Indirect 36th District Court Claims and provides a Cash recovery on such claims and (b) provide that holders of Indirect 36th District Court Claims are not enjoined from taking actions against the State or the State Related Entities to the extent that their claims are not satisfied under the Plan (<u>see</u> Brief, at § XII; Redline, at § II.B.3.x);<br><br>5. Provide additional detail regarding the City's post-Effective Date governance, including with respect to the establishment of the Financial Review Commission pursuant to Public Act 181 of 2014, M.C.L. §§ 141.1631, <u>et seq.</u> (<u>see</u> Redline, at § IV.W);<br><br>6. Clarify the procedures for filing Administrative Claims and provide, among other things, that holders of claims for post-petition ordinary course liabilities need not file a request for payment or take any further action; the City will continue to pay such claims in the ordinary course of its operations (<u>see</u> Redline, at § II.A.1);<br><br>7. Clarify that the exclusive sources of contributions to GRS through Fiscal Year 2023 will be the DWSD, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments and the Detroit Public Library (<u>see</u> Redline, at § II.B.3.r.ii.A);<br><br>8. Provide additional information regarding the boards of trustees for the Detroit General VEBA and the Detroit Police and Fire VEBA (<u>see</u> Redline, at § II.B.3.s.ii; City of Detroit's Errata Sheet With Respect to Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6942)); |

| Code Section | Statutory Requirement | Plan Compliance |
|---|---|---|
| | resolicitation of a plan was unnecessary where the debtor made modifications to the plan for the purpose of resolving Objections and clarifying plan provisions and the modifications did not adversely affect the claim of any creditor); In re D2 Abatement, Inc., No. 10-45074, 2010 WL 4961705, at *2 (Bankr. E.D. Mich. Aug. 9, 2010) (deeming modified plan accepted by all creditors where the modifications did not adversely change the treatment of any claim); In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted the chapter 11 plan, as modified, because "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest").<br><br>This rule permitting nonmaterial or favorable modifications promotes the efficient resolution of objections and the ability of the plan proponent to make other corrections and clarifications that support the plan process. | 9. Clarify that, for a minimum of five years following the Effective Date, DWSD rates will be determined by the Board of Water Commissioners (see Redline, at § IV.A.1);<br><br>10. Provide additional detail regarding conditions to the State's participation in the State Contribution Agreement, and conditions to the DIA Funding Parties' participation in the DIA Settlement (see Redline, at §§ IV.D.3, IV.E.3);<br><br>11. Remove the concept of the Plan COP Settlement (since no claimant elected to participate in the proposed settlement) (see Redline, at § I.A.213);<br><br>12. Add clarifying language regarding (a) the definition of COP Claim, (b) the cancellation of the COPs and the COP Documents under the Plan and (c) the delivery of distributions on account of COP Claims (see Redline, at §§ I.A.74, IV.K, V.I.3);<br><br>13. Provide for the exculpation, with certain express limitations, of the settling UTGO bond insurers (solely as it relates to the UTGO Settlement Agreement), the COP Swap Counterparties and certain entities and individuals related to such parties (see Redline, at § III.D.6);<br><br>14. Clarify, for the avoidance of doubt, that nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of any holder of a Claim to enforce a subordination agreement against any entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law (see Redline, at § II.B.2);<br><br>15. Clarify certain aspects of the Plan's release provisions, including to expressly state that the Plan's consensual release provision applies with respect to liabilities relating to any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436 (see Redline, at § III.D.7.a.ii);<br><br>16. Provide that (a) if the City accepts some or all of the DWSD Tendered Bonds for purchase and (b) the DWSD Settlement Date occurs, then, on the Effective Date, each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.  If, on the other hand, the City accepts none of the DWSD Tendered Bonds for purchase or the DWSD Settlement Date does not occur, then DWSD Bond Claims will receive the same treatment provided for such Claims under the Fourth Amended Plan (see Redline, at § II.B.3.a.ii); |

| CODE SECTION | STATUTORY REQUIREMENT | PLAN COMPLIANCE |
|---|---|---|
| | | 17. Add clarifying language regarding the City's potential entry into a DWSD Authority Transaction (see Redline, at § IV.A.4); and |
| | | 18. Clarify that the City shall have the right to request that the Court determine the reasonableness of certain fees and expenses not subject to the Fee Review Order (see Redline, at § IV.M.4). |
| | | In addition, because all creditors in the Chapter 9 Case received notice of the Confirmation Hearing, and will have an opportunity to object to any proposed modifications at that time, the requirements of section 1127(d) of the Bankruptcy Code have been met. |
| **11 U.S.C. § 943(b)(3)** | **XIX. All Amounts to Be Paid for Services or Expenses Have Been Fully Disclosed and Are Reasonable (Section 943(b)(3))** | |
| 11 U.S.C. § 943(b)(3) | A. Section 943(b)(3) of the Bankruptcy Code provides that the Bankruptcy Court "shall confirm the plan" if, among other things, "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable." 11 U.S.C. § 943(b)(3). | A. The Plan and the City satisfy section 943(b)(3) of the Bankruptcy Code, for the reasons set forth in the City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842). |
| **11 U.S.C. § 943(b)(5)** | **XX. The Plan Provides for the Payment of Administrative Claims (Section 943(b)(5))** | |
| 11 U.S.C. § 943(b)(5) | A. Section 943(b)(5) of the Bankruptcy Code provides that the Court shall confirm the Plan if, among other things, "the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(2) of this title will receive on account of such claim cash equal to the allowed amount of such claim," unless the holder of such claim agrees to a different treatment. 11 U.S.C. § 943(b)(5). Section 507(a)(2) of the Bankruptcy Code lists certain types of priority claims, of which only "administrative expenses allowed under section 503(b) of this title" are relevant to the City's case. See 11 U.S.C. § 507(a)(2). | A. The Plan expressly provides for the cash payment, in full, of Allowed Administrative Claims, including "administrative expenses allowed under section 503(b) [of the Bankruptcy Code]." See Plan, at § I.A.14 (defining an "Administrative Claim" as including, among other things, "a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under section[ ] … 503(b) … of the Bankruptcy Code …"); id. at § II.A.1.a (providing that "each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim"). Accordingly, the Plan satisfies the requirements of section 943(b)(5) of the Bankruptcy Code. |

# EXHIBIT B

**Summary of Responses of the City to Supplemental Objections**

| OBJECTION | SUMMARY OF CITY'S RESPONSE<br>(INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **1.** | **Corrected American Federation of State, County and Municipal Employees Council 25 (AFSCME) Objections to the Fifth Amended Plan of Adjustment of Debts, Due to Impairment of Non-City Employees/Retirees (Docket No. 6468)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan may not impair pension and OPEB benefits of employees and retirees of (i) the Detroit Public Library (the "Library") and (ii) the Detroit Regional Convention Facility Authority (the "DRCFA") because the Library and the DRCFA are independent of the City and employees of those entities are not employees of the City; (b) the Pensions Clause, the Michigan Public Employment Relations Act and applicable CBAs prohibit the impairment of pension benefits of employees and retirees of the Library and the DRCFA; and (c) to "extend bankruptcy protections" to non-debtor third parties such as the Library and the DRCFA, the City must satisfy the seven-factor test set forth in Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648 (6th Cir. 2002), which it has not done. | The City does not seek to impair the liabilities of the Library or the DRCFA under the Plan. As the sole GRS sponsor and funding agent of last resort, the City is indebted to all participants in GRS for the cost of their pensions. Thus, the underfunding of GRS results in a claim against the City by the Library and DRCFA employees and retirees who participate in GRS and look to GRS for payment of their pensions. The City has no contractual obligation whatsoever to provide retiree welfare benefits to the Library or DRCFA retirees. Because none of the Library, the DRCFA or AFSCME objected to modification of retiree welfare benefits on March 1, 2014, the City continued to provide and administer such modified benefits. Library and DRCFA employees have not been considered Class 12 claimants for the purpose of impairing their rights because the retirees have no such rights. Rather, they are considered Class 12 claimants solely for the purpose of continuing the past practice of the City administering the Library and DRCFA's obligations for OPEB benefits. If the Library, the DRCFA or their unions demand that the City remove their retirees and the related OPEB liabilities from the Detroit General VEBA, the City will accommodate them. See Brief, at §§ V.C., XI.E. |

* The Seventh Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 6560) (the "Seventh Amended Scheduling Order") permitted parties that "filed timely objection[s] to the plan" to file Supplemental Objections on or before August 12, 2014, "but only to the extent that additional or modified objections result from discovery, the results of plan voting, or changes incorporated in the City's latest plan of adjustment." Seventh Amended Scheduling Order, at ¶ 4. In addition, the Eighth Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment (Docket No. 6699) (the "Eighth Amended Scheduling Order" and, together with the Seventh Amended Scheduling Order, the "Scheduling Orders") provided that parties could file additional Supplemental Objections on or before August 25, 2014, to the extent that such Supplemental Objections resulted from modifications in the Sixth Amended Plan. See Eighth Amended Scheduling Order, at ¶ 6(a). The City addresses herein only Supplemental Objections that were timely filed and otherwise in compliance with the Scheduling Orders. Pursuant to the Eighth Amended Scheduling Order, on September 5, 2014, the City is required to file its response to the objections raised in the Court's Order Requiring City to Respond to Certain Pro Se Objections to Confirmation (Docket No. 6640) (the "Pro Se Response"). A chart summarizing Individual Objections responded to in the accompanying Brief and the Pro Se Response will be filed with the Pro Se Response.

Capitalized terms not defined herein have the meanings ascribed to them in the accompanying Brief (which is incorporated herein by reference) or, if not defined therein, the Plan.

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **2.** **Objection of International Union, UAW to Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6464)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan may not impair the Pension Claims and OPEB Claims held by employees and retirees of the Library because (i) the Library is a separate and independent municipal corporation and (ii) employees of the Library are not employees of the City; (b) the Plan violates section 1123(a)(1)-(3) of the Bankruptcy Code by failing to designate classes of Pension Claims and OPEB Claims specifically for employees and retirees of the Library, which classes must be separate from, respectively, Classes 11 and 12; (c) the Plan violates section 1122(a) of the Bankruptcy Code by classifying Claims held by employees and retirees of the Library in Classes 11 and 12, because such Claims are not substantially similar to the Claims held by non-Library employees and retirees in such classes; (d) the Plan may not apply ASF Recoupment to any employees or retirees of the Library because (i) doing so violates the Pensions Clause, (ii) Library employees are not employees of the City and (iii) ASF Recoupment is invalid under Michigan law governing restitution; (e) the Plan is not in the best interests of creditors because of the alleged deficiencies set forth above; (f) the Plan violates section 1129(a)(3) of the Bankruptcy Code because it was not proposed in good faith with respect to employees and retirees of the Library because (i) the Plan proposes to impair the pension and OPEB benefits of such employees and retirees in violation of the Pensions Clause, (ii) the Plan's ten-year collective bargaining injunction violates collective bargaining agreements applicable to employees of the Detroit Public Library and (iii) ASF Recoupment violates the Michigan Public Employee Retirement System Investment Act ("PERSIA"); (g) the Plan violates sections 943(b)(1) and (2) of the Bankruptcy Code by impairing pension and OPEB benefits in contravention of collective bargaining agreements applicable to employees of the Library; and (h) the Plan violates section 943(b)(4) of the Bankruptcy Code because such impairment violates the Pensions Clause and PERSIA. The objecting party further (a) argues that the Court should condition confirmation of the Plan upon irrevocable commitments of the Outside Funding; (b) requests certain other procedural safeguards to ensure that the City will not unilaterally impose "Alternative B" pension cuts; (c) joins in the Karwoski Objection to the extent that such Objection challenges the legality of ASF Recoupment; and (d) argues that the Court should not waive the 14-day stay imposed by Bankruptcy Rule 3020(e). | The City does not seek to impair the liabilities of the Library under the Plan. As the sole GRS sponsor and funding agent of last resort, the City is indebted to all participants in GRS for the cost of their pensions. Thus, the underfunding of GRS results in a claim against the City by Library employees and retirees who participate in GRS and look to GRS for payment of their pensions. The City has no contractual obligation whatsoever to provide retiree welfare benefits to Library retirees. Because neither the Library nor the UAW objected to modification of retiree welfare benefits on March 1, 2014, the City continued to provide and administer such modified benefits. Library employees have not been considered Class 12 claimants for the purpose of impairing their rights because the retirees have no such rights. Rather, they are considered Class 12 claimants solely for the purpose of continuing the past practice of the City administering the Library's obligations for OPEB benefits. If the Library or its unions demand that the City remove their retirees and the related OPEB liabilities from the Detroit General VEBA, the City will accommodate them. See Brief, at § V.C., XI.E. A waiver of the 14-day stay imposed by Bankruptcy Rule 3020(e) is appropriate in this Chapter 9 Case. See Consolidated Reply, at § XIII. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **3.**     **Oakland County's Supplemental Objection to Confirmation of the City of Detroit, Michigan's Proposed Plan of Adjustment (Docket No. 6648)** | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan violates applicable law, is not "fair and equitable" and was not proposed in good faith because the DWSD Pension Funding is improper; and (b) the DWSD Pension Funding amount is inflated because the 6.75% assumed rate of return used to calculate GRS UAAL is unreasonably low. | The DWSD Pension Funding is lawful and appropriate.  See Brief, at § XI.A. The use of an assumed investment rate of return of 6.75% is appropriate and does not undervalue the City's current pension assets.  See id. at § I.A.1.  The Plan is "fair and equitable."  See id. at § II.  The Plan was proposed in good faith and not by any means forbidden by law.  See id. at § IX. |
| **4.**     **Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Debtor's Plan of Adjustment (Docket No. 6651) (the "Syncora Supplemental Objection")** | |
| The objecting parties argue that the Plan should not be confirmed because (a) the "Grand Bargain" is the product of improper mediation; (b) the DIA Settlement constitutes a fraudulent transfer; (c) the Plan violates section 1123(a)(5) of the Bankruptcy Code in connection with City's alleged failure to provide certain documents relating to the means of implementation of the Plan (which alleged failure, according to the objecting parties, constitutes a due process violation and an abuse of the mediation privilege); (d) the Plan's exculpation provision is impermissibly broad and violates applicable law; (e) the Plan's treatment of COP Claims is inappropriate because it accounts for only principal-based Claims; and (f) the Court should not confirm the Plan while Syncora's appeals remain pending. | The "Grand Bargain" is not the product of improper mediation, for the reasons set forth in The City of Detroit's Motion to Strike in Part Syncora Guarantee Inc. and Syncora Capital Assurance Inc.'s Second Supplemental Objection to the Debtor's Plan of Adjustment (Docket No. 6845).  The DIA Settlement does not constitute a fraudulent transfer.  See Brief, at § XI.C.  The Plan does not violate section 1123(a)(5) of the Bankruptcy Code, and the City has provided sufficient information to Syncora regarding implementation of the Plan.  See id. at § VII.A. The City has not violated due process by complying with the Court's mediation confidentiality order.  See id. at § VII.B.  The Plan's exculpation provision is lawful and appropriate.  See id. at § VIII.A.  The Plan's treatment of COP Claims complies with the Bankruptcy Code.  See id. at § I.C.  Confirmation should not be denied based upon Syncora's various pending appeals.  See id. at § XIV.A. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **5.** Supplemental Objection of County of Macomb, Michigan, By and Through Its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6666) | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan unfairly discriminates against Class 14, and the disparity between the recoveries of Class 14 and Class 7 under the Plan is greater than the City has suggested because the estimated aggregate allowed amount of Class 14 Claims set forth in the Disclosure Statement does not take into account the $26 million claim of the Michigan Interceptor Drain Drainage District; (b) the Plan is not in the best interests of creditors because creditors would recover more if the Chapter 9 Case were dismissed; (c) the Plan's allocation of GRS pension funding obligations to DWSD is excessive because the 6.75% estimated rate of investment return applied by the City is too low and overstates the DWSD's allocable share of GRS UAAL; and (d) the Plan was not proposed in good faith. | The Plan does not discriminate unfairly against Class 14 or any other Class of Claims. See Brief, at § I. Although Macomb County is correct that the estimated aggregate allowed amount of Class 14 Claims in the Disclosure Statement did not originally include any allowance for Macomb County's Claim, the City has refreshed its Class 14 estimate to add certain liabilities that were not previously accounted for (including an estimate of its potential liability on account of Macomb County's Claim). As a result, the City intends to provide for the issuance of adequate additional New B Notes, if necessary, to reflect its refreshed estimate, including an appropriate reserve for Macomb County's disputed Claim. See id. at § I.D. The Plan is in the best interests of creditors because the City's creditors would not recover more if the Chapter 9 Case were dismissed. See id. at § III. The Plan's allocation of DWSD pension funding is lawful, and the estimated rate of investment return used to calculate DWSD's portion of GRS UAAL is appropriate. See id. at § XI.A. The Plan was proposed in good faith. See id. at § IX. |
| **6.** Objections in Opposition to the Fifth Amended Plan for the Adjustment of Debts of the City of Detroit of Creditors William Ochadleus, et al. (Docket No. 6671) | |
| The objecting parties argue that the Plan should not be confirmed because (a) the Court's prior ruling that Pension Claims may be impaired in chapter 9 notwithstanding the Pensions Clause denied retirees procedural due process; (b) the Plan is not feasible because (i) the City has not established that it will be able to obtain financing sufficient to carry out the Plan, (ii) the City's past mismanagement suggests that the City will not be able to successfully implement the Plan and (iii) the contingency reserve provided for under the Plan is insufficient. | The objecting parties' contention regarding the Court's prior ruling on the impairment of Pension Claims in chapter 9 does not constitute a cognizable objection to confirmation of the Plan. See Brief, at § XI.E. The Plan is feasible. See Brief, at § IV. Testimony offered by the City at the Confirmation Hearing will demonstrate that the City likely will succeed in attracting the Exit Financing and will be able to sustain its recovery over the long term if the Plan is confirmed. See id. at § IV.G; see also Supplemental Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment, at 3-4 (opining that the success of the DWSD Tender "provides some encouraging data that may benefit the City in its future efforts to tap the capital markets"). Adequate systems and procedures will be established to monitor the City's performance under the Plan, and appropriate controls will ensure the City's compliance with the Plan. See id. at §§ IV.D-E. The contingency provided for under the Plan is appropriate and lawful. See id. at § IV.B. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **7.**    Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6674) | |
| The objecting party argues that the Plan should not be confirmed because (a) the Plan unfairly discriminates against COP Claims because the Plan reserves on account of such claims the full face amount of all of the certificates of participation, but does not reserve for multiples of the face amount on account of duplicative, alternate legal theories advanced by the claimants; (b) the Plan's exculpation provision is impermissibly broad because it extends to non-fiduciary parties; (c) the City is unable to prove that (i) the DIA Settlement is reasonable and (ii) the City has maximized the value of the DIA Assets; and (d) the DIA Settlement constitutes an actual fraudulent transfer. | The Plan does not discriminate unfairly against COP Claims. See Brief, at § I.C. The Plan's exculpation provision is lawful and appropriate. See id. at § VIII.A. The DIA Settlement is reasonable and should be approved. See id. at § XIII.A.1.c. Under the Plan, the City extracts significant value from the DIA Assets for the benefit of the City's pensioners while preserving the DIA Collection for the benefit of the City and its residents. See id. The City (a) cannot simply liquidate the DIA Assets, (b) is not required to sell its assets to maximize creditor recoveries and (c) would receive only a fraction of the DIA Collection's true economic value in a forced liquidation. See id. at § II.C. The DIA Settlement is not a fraudulent transfer. See id. at § XI.C. |
| **8.**    Corrected Limited Objection of the Detroit Retirement Systems to the Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014) (Docket No. 6676) | |
| The objecting parties argue that language added to the Fifth Amended Plan, providing as follows, is incorrect: "'Annuity Savings Fund Excess Amount' means the following, *as calculated by the GRS* …." Fifth Amended Plan, at § I.A.18 (emphasis added). | The City removed the relevant language from the Sixth Amended Plan. See Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910), Ex. A, at § I.A.22. Accordingly, the issue is resolved. |
| **9.**    Supplemental Objection of Assured Guaranty Municipal Corp. to Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014) (Docket No. 6677) | |
| The objecting party argues that the Plan's allocation of professional fees related to the City's restructuring to the DWSD is not authorized under section 928 of the Bankruptcy Code because (a) the DWSD is solvent and "self-sustaining;" and (b) the allocated restructuring fees are not related to the DWSD. | The Plan's allocation of a portion of the City's restructuring fees to the DWSD as a "necessary operating expense" is lawful and appropriate under section 928 of the Bankruptcy Code. See Brief, at § XI.B. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **10.** Joinder to Supplemental Objection of Financial Guaranty Insurance Company to Plan for the Adjustment of Debts of the City of Detroit and Supplemental Objection of Wilmington Trust, National Association, Successor Contract Administrator (Docket No. 6678) | |
| The objecting party joins in the Supplemental Objection of Financial Guaranty Insurance Company and further argues that the Plan should not be confirmed because (a) the Plan unfairly discriminates against COP Claims; (b) the Plan allegedly fails to disclose certain fees and expenses to be paid by the City in the future; (c) the Plan's exculpation and release provisions are impermissibly broad; and (d) the Plan fails to provide for the assumption or rejection of the Service Contracts. | The Plan does not unfairly discriminate against COP Claims. See Brief, at § I.C. The City and the Plan comply with section 943(b)(3) of the Bankruptcy Code, regarding fees and expenses, for the reasons stated in The City of Detroit's Brief Regarding the Court's Authority to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3) (Docket No. 6842). The Plan's exculpation and release provisions are lawful and appropriate. See Brief, at § VIII. The Sixth Amended Plan provides for the rejection of the Service Contracts. See Plan, at Ex. II.D.6. |
| **11.** Joinder of the DWSD Bond Trustee to the Supplemental Objection of Assured Guaranty Municipal Corp. to Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (July 29, 2014) (Docket No. 6679) | |
| The objecting party joins in the Supplemental Objection of Assured Guaranty Municipal Corp. | See Summary of City's Response to Item No. 9, supra. |
| **12.** Joinder By Berkshire Hathaway Assurance Corporation in Supplemental Objection of Assured Guaranty Municipal Corp. to Confirmation of Corrected Fifth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6680) | |
| The objecting party joins in the Supplemental Objection of Assured Guaranty Municipal Corp. | See Summary of City's Response to Item No. 9, supra. |
| **13.** Supplemental Objection of the Ad Hoc Committee of DWSD Bondholders to the City's Corrected Fifth Amended Plan of Adjustment (Docket No. 6681) | |
| The objecting parties argue that the Plan's consensual and non-consensual release provisions are ambiguous and proposes certain specific modifications. | The Sixth Amended Plan incorporates certain language proposed by the objecting parties with respect to the Plan's non-consensual release provision. See Notice of Filing of Redlined Version of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 6910), Ex. A, at § III.D.7. To the extent that the Objection, or a portion thereof, remains unresolved, it should be overruled because the Plan's release provisions are lawful and appropriate. See Brief, at § VIII. |

| | OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|---|
| 14. | **Second Supplemental Brief of Ryan, Swift, Mendoza and Cuppetelli, Interested Parties/§ 1983 Plaintiffs, in Support of Their Objections Previously Filed [Dkts. #4099, #4228, #4608, #5690] on the Constitutionality of Allowing the Diminishment of the Fundamental Right to a Damages Remedy for the Violation of Constitutional Rights (Docket No. 6764)** | |
| | The objecting parties argue that the Plan should not be confirmed because it violates the Fourteenth Amendment to the United States Constitution by purporting to impair the Claims held by the objecting parties, who are plaintiffs in actions against the City brought under 42 U.S.C. § 1983. The objecting parties contend that claims arising from the liability of a City officer acting in his or her individual capacity cannot be impaired or discharged in chapter 9. | Claims arising under 42 U.S.C. § 1983 may be impaired under the Plan. See Brief, at § XIV.B.1. The injunction provisions with respect to Indirect Employee Indemnity Claims are lawful and proper. See id. at § XIV.B.2. |
| 15. | **Objections in Opposition to the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit of Creditors William Ochadleus, et al. (Docket No. 6995)** | |
| | The objecting parties argue that the Plan should not be confirmed because (a) the Supplemental Report of Caroline Sallee contains incorrect legal conclusions; (b) the Plan is not feasible because the City has not done enough to address the alleged prior mismanagement of the Retirement Systems by their respective boards of trustees; and (c) the City has failed to demonstrate that it will be able to obtain the Exit Financing. | In arguing that the Supplemental Report of Caroline Sallee contains inaccurate legal conclusions, the objecting parties fail to articulate a cognizable objection to confirmation of the Plan. Moreover, the objecting parties – one of whom is Jamie S. Fields, who is, upon information and belief, an attorney licensed to practice in the State of Michigan – had ample opportunity to voice their concerns regarding Ms. Sallee's potential testimony by filing an appropriate motion but elected not to do so. The Plan is feasible and provides for rigorous controls and oversight regarding, among other things, the boards of trustees of the Retirement Systems. See Brief, at § IV.E. Testimony offered by the City at the Confirmation Hearing will establish that the City is likely to obtain the Exit Financing contemplated in the Plan. See id. at § IV.G; see also Supplemental Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment, at 3-4 (opining that the success of the DWSD Tender "provides some encouraging data that may benefit the City in its future efforts to tap the capital markets"). Accordingly, the objecting parties' argument regarding exit financing is groundless. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **16.** Supplemental Objection of County of Macomb, Michigan, by and Through Its County Agency, the Macomb County Public Works Commissioner, and the Macomb Interceptor Drain Drainage District to Sixth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7039) | |
| The objecting party argues that the Plan violates section 1129(a)(3) of the Bankruptcy Code and should not be confirmed because new language in the Sixth Amended Plan regarding a potential DWSD Authority Transaction improperly conditions the City's entry into any DWSD Authority Transaction upon the withdrawal of the objecting party's objections to confirmation of the Plan. | The Objection does not explain, and cites no authority supporting, its contention that, by including this provision in the Plan, the City failed to propose the Plan in good faith. See Brief, at § IX.A. |
| **17.** Syncora Guarantee Inc. and Syncora Capital Assurance Inc. Limited Supplemental Objection and Reservation of Rights to Debtor's Sixth Amended Plan of Adjustment (Docket No. 7041) | |
| The objecting parties argue that the Plan should not be confirmed because the City has not provided creditors with sufficient information regarding the DWSD Tender, and asserts additional objections to the extent that the DWSD Tender (a) "is used by the Debtor to assert that assets that would otherwise be available to pay COP Claims if the bankruptcy case were dismissed are no longer available for purposes of the best interests test because the DWSD Transaction encumbers them;" (b) "provides for certain liens on assets that COP holders could reasonably expect to be used to pay COP principal and interest … thereby solidifying that the Plan is not fair and equitable because it fails to meet reasonable creditor expectations;" (c) constitutes a Qualified DWSD Transaction, in which case the recovery differential between Pension Claims and other unsecured Claims would increase; (d) "increases the risk premium of New B Notes, thereby reducing their value and consequently implicating plan confirmation objections based on the Plan's failure to satisfy the fair and equitable, best interests, and unfair discrimination tests;" and (e) "increases the risk of the Debtor's ability to fund its general fund and pay for operations, causing a financial strain on the Debtor, thereby implicating the Plan's ability to satisfy the feasibility requirement for plan confirmation." The objecting parties further argue that the Plan should not be confirmed because (a) "the current definition of 'COP Claims' is an improper objection to Syncora's Other Unsecured Claims as it lumps certain of Syncora's Class 14 Claims into Class 9 without providing a corresponding treatment for those claims and, also, further solidifies a Bankruptcy Code section 1123(a)(4) violation regarding Class 9." The objecting parties also object to Plan modifications providing that COP Claims be paid to, and distributed by, the COP Agent, to the extent that such modifications may prejudice the objecting parties' rights. | The objecting parties' arguments regarding the need for further discovery regarding the DWSD Tender are vague, untimely and do not implicate any chapter 9 plan confirmation standard. See Brief, at § VII.A. The objecting parties' arguments that the Plan violates the best interests of creditors and "fair and equitable" tests also fail because such analyses are conducted at the time of confirmation, not at some prior date that would better suit the arguments of certain objecting parties. See id. In any event, the Plan is in the best interests of creditors and is fair and equitable. See id. at §§ II, III. The objecting parties' argument that the DWSD Tender increases the risk premium, and therefore reduces the value, of the New B Notes, is groundless. Testimony offered by the City at the Confirmation Hearing will demonstrate that the New B Notes should be valued at par. See id. at § VII.A. The objecting parties fail to substantiate their generalized allegations that the DWSD Tender adds risk to its ability to fund its operations (and, therefore, to the feasibility of the Plan). See id. The objecting parties' argument that the DWSD Tender is a Qualifying DWSD Transaction is unfounded because the DWSD Tender is not a Qualifying DWSD Transaction. See id. The objecting parties' arguments regarding the treatment of COP Claims under the Plan essentially restate prior arguments asserted by the objecting parties in the Syncora Supplemental Objection. These arguments should be rejected because they do not comply with the Eighth Amended Scheduling Order, and for the reasons set forth in Section I.C of the Brief. |

| OBJECTION | SUMMARY OF CITY'S RESPONSE (INCLUDING CITATIONS TO APPLICABLE SECTIONS OF BRIEF) |
|---|---|
| **18.** Supplemental Objection to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit filed by (a) Financial Guaranty Insurance Company; (b) Dexia Crédit Local and Dexia Holdings, Inc.; (c) Panning Capital Management, LP, on behalf of funds and accounts managed by it; (d) Monarch Alternative Capital LP, on behalf of funds and accounts managed by it; (e) Bronze Gable, LLC.; (f) Aurelius Capital Management, LP, on behalf of its managed entities; (g) Stone Lion Capital Partners L.P., on behalf of funds and accounts managed by it; (h) BlueMountain Capital Management, LLC, on behalf of funds and accounts managed by it; and (i) Deutsche Bank AG, London (Docket No. 7046) | |
| The objecting parties object to confirmation of the Sixth Amended Plan, "[o]ut of an abundance of caution," to the extent that modifications to Section IV.K of the Plan, regarding the cancellation of the COPs and the COP Documents, purport to impair the objecting parties' rights with respect to (a) the COP Litigation or (b) potential post-confirmation appeals of the orders of this Court. | The Objection does not identify any legal requirement for confirmation of the Plan that is allegedly violated by the relevant Plan language. To the extent that the objecting parties seek to compel the City to modify specific language contained in the Plan, the City believes that the objecting parties are not entitled to demand such modifications. The City continues to negotiate with the objecting parties, however, regarding this and other issues. |
| **19.** Joinder to Supplemental Objection to Confirmation of the Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and Supplemental Limited Objection of Wilmington Trust, National Association, Successor Contract Administrator (Docket No. 7050) | |
| The objecting party joins in the Supplemental Objection of FGIC, et al. (Docket No. 7046). The objecting party argues that the Plan should not be confirmed because (a) Section II.B.3.p.ii of the Plan improperly restricts trading on the COPs; and (b) Section V.G of the Plan is ambiguous because it fails to expressly state that such section does not apply to COP Insurance Policies. The objecting party further objects to the Plan to the extent that Section II.D.8 of the Plan suggests that the objecting party would have any post-Effective Date obligations to the City under the Service Contracts. | The objecting party's argument regarding Section II.B.3.p.ii of the Plan does not implicate any legal requirement of confirmation and, in any event, Section II.B.3.p.ii of the Plan does not restrict trading on the COPs. See Brief, at § XIV.C. The objecting party's argument regarding Section V.G contravenes the Eighth Amended Scheduling Order because that section was not modified in the Sixth Amended Plan. Moreover, (a) Section V.G is not ambiguous and (b) the Objection regarding such section implicates no legal requirement of confirmation of the Plan. See id. Section II.D.8 of the Plan does not purport to impose any post-Effective Date obligations upon the objecting party; rather, it merely reserves the City's rights with respect to pre-existing obligations, in accordance with the Bankruptcy Code. See id. |

**EXHIBIT C**

**Excerpted Portions of Certain Collective
Bargaining Agreements Relating to the Detroit
Public Library and the Detroit Regional Convention Facility Authority**

# STU AGREEMENT

Agreement Between







Detroit
Public
Library

and

Skilled Trades Unit
UAW

**JULY 1, 2007 - JUNE 30, 2011**

# AGREEMENT

This AGREEMENT is entered into this 1$^{st}$ day of October 2007, between the Detroit Library Commission (hereinafter referred to as the "EMPLOYER") and the Skilled Trades Unit of Local 2200 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (hereinafter referred to as the "UNION").

## SCHEDULE D
## FRINGE BENEFITS AS AFFECTED BY BREAKS IN SERVICE

(As approved by City Council)

### A. Leave of Absence with Pay

If the employee's pay is being continued by the use of sick leave or vacation time, the normal premiums will continue to be deducted and the Employer will make its normal contribution toward the cost of hospitalization and retirement.

### B. Leave of Absence without Pay

1) An employee granted a leave of absence without pay may continue in force all of the optional insurances (hospitalization, dental, eye care, life insurance and death benefits) by paying the full cost of all premiums. Coverage may be continued by making payments for as long as the approved leave lasts. Payments for insurance to be kept in force should be made directly to the Pension Bureau. If insurances are not maintained, it will be necessary for the returned employee to contact the Human Resources Office to receive information on re-enrollment at which time coverages will be reinstated.

2) An employee will be covered under the $10,000 Employee Death Benefit Plan until the end of the month in which an employee receives his/her last paycheck.

### C. Layoff

1) Health Care Benefits - See Schedule E

2) Life Insurance - Employees insured under the group term plan with the John Hancock Life Insurance Company will continue to receive coverage until the end of the month in which an employee receives his/her last paycheck. During this grace period, an employee desiring to convert the group term policy to a life policy should contact the Group Conversion Clerk at the John Hancock Life Insurance Company. While no physical examination is required for this conversion, the premium charge will be at the rate applicable to the employee's current age and the amount of insurance coverage desired.

3) Death Benefit Plan - The Death Benefit Plan ($10,000) will continue until the end of the month in which an employee receives his/her last paycheck.

### D. Termination

In the case of termination, insurance will be affected as follows:

1) Health Care Benefits - See Schedule E

2) Life Insurance - Term life insurance may be converted to a life insurance policy by contacting the Group Conversion Clerk at the John Hancock Life Insurance Company.

3) Death Benefit Plan - The $10,000 Employee Death Benefit Plan will continue until the end of the month in which an employee receives his/her last paycheck.

E. Retirement - All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau.

53

## SCHEDULE F
## HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

### (As approved by City Council)
(The City of Detroit administers all health care related matters for the Detroit Public Library)


A. The Library shall continue to provide hospitalization and medical insurance for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents.

Effective with the implementation of the City's new payroll/benefit system, coverage for new hires or employees re-instated to active employment status (e.g., from lay-off, leave of absence) shall begin on the first day of the first full pay period and end on the last day of the month that employment ends.

B. The Library's contribution for the cost of hospitalization on a monthly basis shall be as follows:

1. BCBSM Traditional Plan: If the Blue Cross/Blue Shield Traditional Plan, as modified by the new plan design, continues to be offered as an option the Library's contribution for such coverage will be based *on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2)* and will pay up to the following amount per month:

| | |
|---|---|
| **Single person** | **$100.06** |
| **Two person** | **$238.29** |
| **Family** | **$253.54** |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

2. Blue Cross Blue Shield Community Blue PPO Plan: The Library will contribute 90% of the monthly premium for single person, two person, and family coverage. The employee is responsible for the remaining 10%.

3. For all HMO plans: The Library will contribute 80% of the monthly premium for single person, two person, and family coverage. The employee is responsible for the remaining 20%.

When the Library's payroll system has the capability of allowing employees to pay these amount through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

C. Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D. The Library will provide regular retirees and their spouses hospitalization and medical insurance for only as long as they receive a pension from the Library.

56

**APL AGREEMENT**

# AGREEMENT

This Agreement is entered into this 1st day of July, 2008 by and between the Detroit Library Commission (hereinafter referred to as the Employer) and the Association of Professional Librarians of the Detroit Public Library Unit of Local 2200 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (hereinafter referred to as the Union).



13-53846-swr    Doc 8249-5   Filed 08/27/14   Entered 08/27/14 23:40:50   Page 276 of 292
293

3. <u>Death Benefit Plan:</u>  The $10,000 Employee Death Benefit Plan will continue until the end of the month in which an employee receives his/her last paycheck.

E. <u>Retirement:</u>  All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau.



<div align="center">

**SCHEDULE C**
**HEALTH CARE BENEFITS UPON SEPARATION**

(As administered by the City of Detroit)

</div>

The Employer is required by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) to offer employees, their spouses, and their eligible dependents the opportunity for a temporary extension of health care benefits (medical, dental, eye care) at group rates in certain instances where coverage under the group would otherwise end.

EMPLOYEE CONTINUATION OF COVERAGE - Coverage is available to employees, spouses, and eligible dependents for a period of eighteen (18) months when they no longer meet the Employer's eligibility requirements due to separation or reduction in hours.

DEPENDENT CONTINUATION OF COVERAGE - Coverage is available for a spouse or an eligible dependent for a period of thirty-six (36) months when they are no longer eligible under your contract. This includes:

1. A surviving spouse and eligible dependents.
2. A divorced or legally separated spouse who was covered as of the date of the divorce or separation.
3. A child of a covered employee who no longer meets eligibility requirements.

Continuation of coverage decisions can be made by a spouse, or eligible dependent independent of employee choice.

NOTICE REQUIREMENTS - The Employer will automatically notify employees and/or their spouse and eligible dependents of the option to continue group health coverage (medical, dental, eye care) within forty-four (44) days of:

1. Death of covered employee.
2. Termination of a covered employee.
3. Reduction in hours of employee.

Notice will only be sent within fourteen (14) calendar days in the following situations, after the Employer has been notified by the spouse or eligible dependent within sixty (60) days of the qualifying event:

1. Divorce or legal separation.

2. Dependent child who becomes disqualified as a dependent under the plan.

ELECTION PERIOD - The qualified beneficiary (employee, spouse, and/or eligible dependent) will have sixty (60) calendar days to notify the Employer that they want continued coverage from the later of 1) the date of the qualifying event or 2) the date of notice by the Employer.

COST OF GROUP HEALTH CARE BENEFIT CONTINUATION - Qualified beneficiaries choosing to continue health care benefits (medical, dental, eye care) will be charged 102% of the "applicable premium". Premiums are reviewed once each fiscal year with changes effective July 1st. All premiums must be remitted to the Employer by the first of each month.

# **POOL AGREEMENT**

# Agreement Between



DETROIT
PUBLIC
LIBRARY

Metropolitan
Detroit
Professionals
UAW LOCAL 2200

# Detroit Public Library
# and
# Professional Organizations of Librarians
# UAW

# AGREEMENT

This Agreement is entered into this 1$^{st}$ day of July, 2008 by and between the Detroit Library Commission (hereinafter referred to as the Employer) and the Professional Organization of Librarians Unit of Local 2200 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (hereinafter referred to as the Union).

3. <u>Death Benefit Plan:</u>  The $10,000 Employee Death Benefit Plan will continue until the end of the month in which an employee receives his/her last paycheck.

E.  <u>Retirement:</u>  All benefits offered at the time of retirement are administered through the City of Detroit's Pension Bureau.

## SCHEDULE C
## HEALTH CARE BENEFITS UPON SEPARATION

(As administered by the City of Detroit)

The Employer is required by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) to offer employees, their spouses, and their eligible dependents the opportunity for a temporary extension of health care benefits (medical, dental, eye care) at group rates in certain instances where coverage under the group would otherwise end.

EMPLOYEE CONTINUATION OF COVERAGE - Coverage is available to employees, spouses, and eligible dependents for a period of eighteen (18) months when they no longer meet the Employer's eligibility requirements due to separation or reduction in hours.

DEPENDENT CONTINUATION OF COVERAGE - Coverage is available for a spouse or an eligible dependent for a period of thirty-six (36) months when they are no longer eligible under your contract. This includes:

1. A surviving spouse and eligible dependents.
2. A divorced or legally separated spouse who was covered as of the date of the divorce or separation.
3. A child of a covered employee who no longer meets eligibility requirements.

Continuation of coverage decisions can be made by a spouse, or eligible dependent independent of employee choice.

NOTICE REQUIREMENTS - The Employer will automatically notify employees and/or their spouse and eligible dependents of the option to continue group health coverage (medical, dental, eye care) within forty-four (44) days of:

1. Death of covered employee.
2. Termination of a covered employee.
3. Reduction in hours of employee.

Notice will only be sent within fourteen (14) calendar days in the following situations, after the Employer has been notified by the spouse or eligible dependent within sixty (60) days of the qualifying event:

1. Divorce or legal separation.
2. Dependent child who becomes disqualified as a dependent under the plan.

ELECTION PERIOD - The qualified beneficiary (employee, spouse, and/or eligible dependent) will have sixty (60) calendar days to notify the Employer that they want continued coverage from the later of 1) the date of the qualifying event or 2) the date of notice by the Employer.

COST OF GROUP HEALTH CARE BENEFIT CONTINUATION - Qualified beneficiaries choosing to continue health care benefits (medical, dental, eye care) will be charged 102% of the "applicable premium". Premiums are reviewed once each fiscal year with changes effective July 1st. All premiums must be remitted to the Employer by the first of each month.

# AFSCME LOCAL 1231 AGREEMENT

# AGREEMENT

  This Agreement entered into this 1st day of January 2011, by and between the Detroit Library Commission (hereinafter referred to as the Employer) and Michigan Council 25, of the American Federation of State, County and Municipal Employees, AFL-CIO, Local 1231 (hereinafter referred to as the Union).

AFSCME 1231 2011-2016

## SCHEDULE C
## HOSPITALIZATION/MEDICAL INSURANCE
### (As approved by City Council)

(The City of Detroit administers all health care related matters for the Detroit Public Library)

A.　　Employees will be eligible for hospitalization coverage after reaching 1040 paid hours in a fiscal year without a break in service of more than six (6) weeks.*

B.　　The Library shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (three dollar $3.00 effective May 1, 1996) deductible for Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and the duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.

C.　　The Library's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| | |
|---|---|
| Single Person | $100.06 |
| Two Person | $238.29 |
| Family | $253.54 |

Fifty percent (50%)of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%)shall be paid by the employer.

D.　　Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

E.　　The Library will provide regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by the City Council in the 1977-78 Closing Resolution. The Library will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the Library. For employees who retire (except for vested retirees) on or after May 1, 1996, the co-pay for the Prescription Drug benefit shall be increased to three dollars ($3.00).

AFSCME 1231 2011-2016

# DRCFA AGREEMENT

# MASTER AGREEMENT

BETWEEN THE

# CITY OF DETROIT

AND

## MICHIGAN COUNCIL 25
### OF THE AMERICAN FEDERATION OF STATE COUNTY AND
### MUNICIPAL EMPLOYEES, AFL-CIO
### (NON-SUPERVISORY BARGAINING UNIT)

## July 1, 2005 - June 30, 2008

DRAFT 01/16/2008

F. Jury duty shall be considered as time worked.

G. An employee on jury duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

## 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

A. The City shall continue to provide hospitalization and medical insurance for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents.

Effective with the implementation of the City's new payroll/benefit system, coverage for new hires or employees re-instated to active employment status (e.g., from lay-off, leave of absence) shall begin on the first day of the first full pay period and end on the last day of the month that employment ends.

B. The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

1. BCBSM Traditional Plan: If the Blue Cross/Blue Shield Traditional Plan, as modified by the new plan design, continues to be offered as an option the City's contribution for such coverage will be based *on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2)* and will pay up to the following amount per month:

    | Single person | $100.06 |
    |---|---|
    | Two person | $238.29 |
    | Family | $253.54 |

    Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

2. Blue Cross Blue Shield Community Blue PPO Plan: The City will contribute 90% of the monthly premium for single person, two person, and family coverage. The employee is responsible for the remaining 10%.

3. For all HMO plans: The city will contribute 80% of the monthly premium for single person, two person, and family coverage. The employee is responsible for the remaining 20%.

13-53846-swr    Doc 7249-5 Filed 08/27/14 Entered 08/27/14 13:02:50 Page 290 of 292
293

D.  This Article shall be administered according to the Resolution of the City Council of May 9, 1974 (J.C.C. p. 1107).

# 43.  SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors and assignees of the parties hereto, and no provisions, terms or obligations herein contained shall be affected, modified, altered, or changed to the detriment of the other party in any respect whatsoever by the consolidation, merger, sale, transfer, lease, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of either party hereto.

# 44.  EMPLOYEE ASSISTANCE PROGRAM

A.  The City and the Union recognize and acknowledge that behavioral-medical problems have an adverse effect on the employee's job performance and merits special attention. Examples of these problems include but are not limited to substance abuse, including alcohol and drugs, physical illness, mental or emotional illness, marital or family maladjustments and other personal problems. These behavior-medical problems impair the employee's ability to function, and contribute to increased absenteeism and tardiness, and violations of other rules, regulations, and procedures. The combination of factors is recognized as having potentially damaging effects on the employee, the work site and the well-being of co-workers. The City and Union believe most behavioral-medical problems are treatable. The Employee Assistance Program is designed to provide assistance to employees who are experiencing behavior-medical problems that may result in deteriorating job performance.

B.  The City and AFSCME believe that constructive measures are possible to deal with the problem through labor/management cooperative efforts. Toward this end, the City and the Union agree to continue to have the Central Committee composed of three (3) representatives of Council 25 of AFSCME and three (3) representatives of the City of Detroit. Central Committee members will be allowed to attend meetings of the Central Committee without loss of time or pay.

C.  It shall be the responsibility of this committee to:

1.  Oversee the establishment of mandatory local employee assistance committees in each department and assist such departmental committees to establish effective programs consistent with the purposes of this Article.

2.  Promote further understanding of this program by establishing guidelines and disseminating program information to employees, supervisors and Union representatives.

# 47. EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION STATEMENT

A.  The City and the Union agree to cooperate in a policy of equal opportunity for all employees: to continue to prohibit discrimination because of race, color, creed, national origin, age, political orientation, sex, sexual orientation, or disability, (See Memorandum of Understanding Re: Precedence of Americans with Disabilities and Michigan Handicappers' Civil Rights Act Obligations to Disabled Persons), and to promote a full realization of equal employment opportunity through a positive and continuing effort.

B.  The City agrees to periodically provide the Union with copies of statistical minority employment information reports and such reports concerning policies and programs for equal opportunity in employment regarding City employees.

C.  The City further agrees that a crucial part of an effective affirmative action program is development of an effective training and education program designed to provide existing minority employees maximum opportunity to advance so as to perform at their highest potential.

D.  Upon request, the Human Resources Director or his/her designated representative(s) shall meet with the Joint Career Development and Training Committee.

# 48. RETIREMENT

A.  Eligibility for Service Retirement Allowance – Any employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired. On the date so specified for his/her retirement he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service. Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code. Employees may retire on or after July 1, 1992, with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall be known as the Actuarially Reduced 25 Year Option of the Retirement Plan. Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.

After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

# CERTIFICATE OF SERVICE

I, Bruce Bennett, hereby certify that the foregoing Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objections was filed and served via the Court's electronic case filing and noticing system on this 27th day of August, 2014.

/s/  Bruce Bennett