UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| In re | No. 13-53846 |
|---|---|
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

# EXHIBIT 74

## APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

In connection with Notice of Appeal filed by
William M. Davis and DAREA [Dkt. #8473].

| Item | Date Filed | Docket Number | Description |
|---|---|---|---|
| 74 | 8/21/2014 | 7095 | Supplemental Objection to Chapter 9 Plan filed by Mark L. Smith |

Judge Steven W. Rhodes
c/o Clerk of Court
U.S. Bankruptcy Court
Eastern District of Michigan
Southern District
211 W. Fort Street, Suite 1800
Detroit, MI 48226

CASE # 13-53846

August 15, 2014

Dear Sir:

I appreciated addressing the Court on July 15, 2014 regarding the many ramifications of a City of Detroit ("City") bankruptcy. As promised at the end of my appearance, I am following up with this writing to restate, clarify, and embellish some of my objections to the subject case. Thus I include the following points of interest.

Few people in City government have access to bank, short-term asset, and cash flow information adequate to demarcate a true liquidity crisis. As an accountant, I was employed in the unit that daily transferred inter-bank cash by wire. I never knew nor saw any cash flow projection of the General Fund nor heard talk of such. I have serious doubts of an inadequacy of cash resources even after the recent feeble attempt to showcase a theoretical 'equity bankrupt' position on the fiscal year ended June 30, 2013 financial statements. I ask the Court: was sufficient pertinent evidence presented to determine an impaired cash-flow status?

I was also employed in other City agencies as one of authority over multiple sets of non-General Fund accounting entities. Cash flow projections were often made. Cash flow was always managed to meet salaries, wages, federal payroll taxes, and related obligations as the absolute highest priority in primal position as well as highest priority in timing of cash outflow. This means City pensions, as well as active employee payrolls, have the absolute highest position in all fiscal priority. It is strongly implied, in the Michigan Constitution of 1963 (Article IX, Section 24), that pensions should not be included in political sub-division bankruptcies, but it is **absolutely clear** that pension obligations are to be met wholly and without prejudice. Some say salary and wage obligations are a "trust", while others say the obligation is only met after personal service is provided. These opinions are not fully consequential to the issue of pensions. For City retirees the pension is a result of personal services provided over many years. Whether it is some kind of "trust" or not, pensions as well as active employee payrolls have the highest priority. The proposal to cut municipal pensions appears to be very illegal and un-constitutional.

In regard to my point discussed in the preceding paragraph, I ask the Court: if salaries and wages for previously performed personal services have been abated in any other bankruptcy case, were the conditions of a more distressed or more bizarre nature?

Frequent criticisms of the City retirement systems include low funding ratios and poor returns on investments. It is widely known nationally, that most pension funding ratios deteriorated as a result of the "great recession" of 2009. The City's pension funds are no different from the majority. The City pension funds generally have investment returns superior to the State of Michigan pension funds (MERS). Pension payouts should not be reduced because of a few years of net losses. The City's pension funding ratios have also declined from decisions by the emergency manager ("EM") to suspend contributions.

Another cause of decline is the City purged employees and three departments that contributed to the General Retirement System ("GRS") nearly 100% from sources emanating from federal and state grants. At a point of pre-purge, I estimate from City budget and actual financial statements of City fiscal year 2010-2011, employees of Health, Workforce Development, and Neighborhood Services departments contributed approximately 5.2% of the City's Employer Contribution of the GRS. As the debt of GRS trends lower when some City departments are purged, taken, or given away, these acts still have the effect of decreasing the contributions at a higher ratio than corresponding debts.

In the preceding paragraph I stated that I used estimates extracted from official budgets and financial statements. I calculated estimates because I don't have access to the existing information of the City's financial systems. These estimates are supported by several schedules and documents which I could supply on request. It is vitally important to the bulk of the unincorporated bankruptcy objectors ("objectors") that we make clear some of the bias in the Bankruptcy Case of subject. Included in the official ballot packages were documents supporting opposing views. We objectors should have equal opportunity and more importantly, equal access, to the means of broadcasting our analysis, views, opinions, explanations to the entire City pensioner/retiree population. We believe the opposing views are not truthful and our retorts have been deliberately stymied by lack of timely access to financial information and deliberate exclusion from communicating with the bulk of City retirees. Will the Court arrange for objectors to have access to the database of retiree contact information, and any other pertinent information?

Another obvious immoral bias is the manipulation of creditors within Class 11 in a manner that a probable majority were given terms significantly different from the probable minority. The terms are arranged to give the debtor and the majority creditors a huge financial advantage and incentive for approval. This probable majority are pensioners who are excluded from the illegal claw back of annuity savings interest ("ASF"). The creditors in Class 11 should have been separated between those with ASF claw back and those creditors that have no claw back. It is commonly known that taking back previously paid interest is only connected to sinister, illegal, or criminal acts. The claw back is illegal and the procedure is immoral. I re-state my analogy that this claw back is deliberate robbery by hateful elements in broad daylight in clear sight of the victims. Will the Court correct this immoral illegality?

Information presented at the GRS Informational sessions in June, 2014 appears to be erroneous and is another scare tactic to entice persons with significant ASF clawback to consent to the proposed cuts. The proposed annuity interest rates presented by GRS are hidden and below 6.75%. They are closer to 5.9% and 4.1% in Illustrations One and Two respectively. See Exhibits B and C.

If the proposed cut of General Retirement System retiree ("General retirees") pensions have improved from 26% to 4.5% based upon 'Grand Bargain' funding of approximately $816 million, then the remaining amount of funds owed to the City by the State of Michigan ("State") of over $500 million should be more than

sufficient to totally abate the 4.5% cut to General retiree pensions, abate the cut of General and uniformed retiree cost of living allowances ("COLA"), and retract the proposed claw back of annuity savings, and any other City retiree benefit cuts.

I can speak for myself but I also know that many, if not most, retirees did not lay their security on the ability of pension fund trustees but rather many of us rely on the grace of God and the stability of America's legal system. Such is quite a contrast to local hateful elements who desire to place blame of this debacle on City officials and Pension Trustees. More specifically the Michigan constitution has been relied upon for security of retiree benefits. Personally, this interpretation of constitutional protections have been backed up by persons of expertise in the City's Human Resource Department, Pension Bureau, Labor Relations Section, and the City Law Department. But hateful elements are usually quick to infer that those who maintain an existence by the "public trough", take 'no personal responsibility' for their own well-being.

Many City retirees did plan for retirement and included our annuity savings as a diversified source of income. We did take 'personal responsibility' in preparing for retirement. It becomes obvious that the hateful elements, have invented reasons and mechanisms to effectuate acts of affliction and retribution based on their own adverse political, economic, and social ideologies.

The Fourth Plan of Adjustment stipulates funding from corporate and foundation sources that have long term instability because of national and international economic cycles. It is almost a certainty that there will be multiple recessions of varying magnitude within 20 years. The corporate funding is especially vulnerable during economic downturns. There is no certainty of the 'Grand Bargain' funds even though GRS retirees were hood winked into approving it. Despite any contract or agreement by foundations or corporate benefactors, all parties will know these covenants are worthless on a basis of the Court agreeing to break the Michigan Constitution by any reduction of City pensions, cost of living allowances ("COLA"), and ASF claw back.

Contrary to popular myth spread by the local media and other hateful elements, GRS retiree incomes will decline by much more than 4.5%. After 10 years, the actual loss of pension and COLA, as compared to current GRS terms is 22%. See Exhibit D. This does not include loss due to ASF claw back and changes in health care. Before the 4th Plan of Adjustment my personal health care cost has risen 645%.

Finally I would like to note a courtroom procedure on July 15, 2014. The objector speakers of that afternoon were not informed of the time use of the green, amber, and red lights in front of the witness stand.

I strongly urge the Court to forgo any and all negative changes to City retiree pensions and all other benefits.

Sincerely,

*[signature: Mark L. Smith]*

Mark L. Smith

EXHIBIT B

City of Detroit Bankruptcy
Illustration ONE - Annuity Interest According to GRS Presentation
June, 2014

| a<br>Fiscal Year/<br>Previous<br>Year July 1 | b<br>Fiscal Year<br>Beginning<br>Balance | c<br>Contribu-<br>tions | d<br><br><br>b+c | f<br><br>P.O.A.<br>Interest | j<br>P.O.A.<br>June 30<br>Balance | l<br>Imputed<br>P.O.A<br>Rate | m |
|---|---|---|---|---|---|---|---|
| 2004 | $29,647 | $3,117 | $32,764 | $2,464 | $35,228 | 5.9195% | $ 1,847.21 |
| 2005 | $35,228 | $3,140 | $38,368 | $2,910 | $41,278 |  | $ 2,287.60 |
| 2006 | $41,278 | $3,337 | $44,615 | $3,500 | $48,115 |  | $ 2,677.63 |
| 2007 | $48,115 | $2,929 | $51,044 | $4,474 | $55,518 |  | $ 3,093.36 |
| 2008 | $55,518 | $3,201 | $58,719 | $0 | $58,719 |  | $ 3,564.24 |
| 2009 | $58,719 | $3,343 | $62,062 | $0 | $62,062 |  | $ 3,785.80 |
| 2010 | $62,062 | $3,291 | $65,353 | $4,130 | $69,483 |  | $ 3,995.27 |
| 2011 | $69,483 | $3,295 | $72,778 | $8,157 | $80,935 |  | $ 4,447.07 |
| 2012 | $80,935 | $3,129 | $84,064 | $598 | $84,662 |  | $ 5,146.80 |
| 2013 | $84,662 | $3,045 | $87,707 | $10,018 | $97,725 |  | $ 5,406.36 |
|  |  | $31,827 |  | $36,251 |  |  | $36,251 |

EXHIBIT C

City of Detroit Bankruptcy
Illustration TWO - Annuity Interest According to GRS Presentation
June, 2014

| a<br>Fiscal Year/<br>Previous<br>Year July 1 | b<br>Fiscal Year<br>Beginning<br>Balance | c<br>Contribu-<br>tions | d<br><br><br>b+c | f<br><br>P.O.A.<br>Interest | j<br>P.O.A.<br>June 30<br>Balance | l<br>Imputed<br>P.O.A<br>Rate | m |
|---|---|---|---|---|---|---|---|
| 2004 | $139,315 | $2,838 | $142,153 | $11,116 | $153,269 | 4.1675% | $ 5,865.09 |
| 2005 | $153,269 | $3,068 | $156,337 | $12,230 | $168,567 |  | $ 6,695.84 |
| 2006 | $168,567 | $3,169 | $171,736 | $13,880 | $185,616 |  | $ 7,370.11 |
| 2007 | $185,616 | $3,385 | $189,001 | $16,975 | $205,976 |  | $ 8,113.23 |
| 2008 | $205,976 | $4,473 | $210,449 | $0 | $210,449 |  | $ 9,015.37 |
| 2009 | $210,449 | $4,890 | $215,339 | $0 | $215,339 |  | $ 9,248.07 |
| 2010 | $215,339 | $5,257 | $220,596 | $14,644 | $235,240 |  | $ 9,469.21 |
| 2011 | $235,240 | $796 | $236,036 | $19,319 | $255,355 |  | $ 10,214.84 |
| 2012 | $255,355 | $0 | $255,355 | $0 | $255,355 |  | $ 11,067.62 |
| 2013 | $255,355 | $0 | $255,355 | $0 | $255,355 |  | $ 11,103.16 |
|  |  | $27,876 |  | $88,164 |  |  | $88,163 |

City of Detroit Bankruptcy
Pro Forma Effect of Proposed Cuts to Pensions and COLA
4th Plan of Adjustment

| | Pension base: | COLA: |
|---|---|---|
| | $ 30,000.00 | $ 675.00 |

| Year | Income of Current Terms | Income of Grand Bargain |
|---|---|---|
| 1 | $ 30,675.00 | $ 28,650.00 |
| 2 | $ 31,350.00 | $ 28,650.00 |
| 3 | $ 32,025.00 | $ 28,650.00 |
| 4 | $ 32,700.00 | $ 28,650.00 |
| 5 | $ 33,375.00 | $ 28,650.00 |
| 6 | $ 34,050.00 | $ 28,650.00 |
| 7 | $ 34,725.00 | $ 28,650.00 |
| 8 | $ 35,400.00 | $ 28,650.00 |
| 9 | $ 36,075.00 | $ 28,650.00 |
| 10 | $ 36,750.00 | $ 28,650.00 |

| | |
|---|---|
| New income vs. old | 77.96% |
| Loss as of 10 years | 22.04% |

The analysis above does not include the effect
of State tax increase, annuity interest lawback,
health insurance cost increase