**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                          Chapter 9

City of Detroit, Michigan,                                      Case No. 13-53846

     Debtor                                             Hon. Steven W. Rhodes

_____/


**<u>Supplemental Opinion Regarding Plan Confirmation,</u>**
**<u>Approving Settlements, and Approving Exit Financing</u>**

# Table of Contents

I. INTRODUCTION ................................................................................................. 1

II. THE PLAN CONFIRMATION PROCESS ............................................................... 3

    A. The City's Plans of Adjustment .................................................................. 3

    B. An Overview of the City's Eighth Amended Plan of Adjustment ................ 6

    C. Objections Filed by Represented Parties .................................................... 7

    D. The Participation by Unrepresented Parties ............................................... 10
        1. The Unrepresented Parties' Oral Presentations ................................... 11
        2. The Unrepresented Parties' Participation in the Confirmation Hearing .............. 12

    E. The City Tour ............................................................................................. 12

III. THE SETTLEMENTS IN THE PLAN ................................................................... 15

    A. Mediation .................................................................................................. 15

    B. The Applicable Law ................................................................................... 15

    C. The *Bard* Considerations Applicable to All of the Settlements ................... 17

    D. The Grand Bargain .................................................................................... 18

    E. The State Contribution Agreement ............................................................. 19
        1. The Potential Claim Against the State of Michigan ............................. 19
        2. The Terms of the State Contribution Agreement ................................. 20
        3. The State Contribution Agreement Is Fair and Equitable .................... 21
            a. The State Contribution Agreement Is Reasonable in Amount ............ 22
            b. The Releases in the State Contribution Agreement Are Reasonable .......... 23

    F. The DIA Settlement .................................................................................... 30
        1. The Dispute over the DIA Art .............................................................. 30
        2. The Terms of the DIA Settlement ........................................................ 30
        3. The DIA Settlement Is Fair and Equitable ........................................... 32

    G. The Pension Global Settlement .................................................................. 35
        1. The Terms of the Pension Global Settlement ....................................... 36
            a. The Treatment of Pension Claims ................................................. 36
            b. Restoration of Pension Benefits ................................................... 37
            c. Governance and Oversight ........................................................... 38
        2. The Pension Global Settlement Is Fair and Equitable .......................... 39

    H. The Annuity Savings Fund Recoupment Settlement ................................... 41
        1. The Dispute Over the Excess ASF Credits ........................................... 41
        2. The Terms of the ASF Settlement ........................................................ 42
        3. Objections to the ASF Settlement ........................................................ 43
        4. The ASF Settlement Is Fair and Equitable, and Does Not Violate the Bankruptcy
           Code .................................................................................................. 44

    I. The OPEB Settlement ................................................................................. 46

       1. The Disputes Over the OPEB Claims ................................................ 46

       2. The Terms of the OPEB Settlement ................................................ 47

       3. The OPEB Settlement Is Fair and Equitable .................................... 48

    J. The 36th District Court Settlement ....................................................... 50

    K. The UTGO Settlement ........................................................................ 51

       1. The Dispute Regarding the UTGO Bonds ........................................ 52

       2. The Terms of the UTGO Settlement ............................................... 53

       3. The UTGO Settlement Is Fair and Equitable .................................... 54

    L. The LTGO Settlement ........................................................................ 56

       1. The Dispute Regarding the LTGO Bonds ........................................ 57

       2. The Terms of the LTGO Settlement ............................................... 57

       3. The LTGO Settlement Is Fair and Equitable .................................... 58

    M. The Settlements Related to the Certificates of Participation ................. 59

       1. The Dispute Relating to the COPs Transactions ............................... 60

       2. The Terms of the COPs Settlement ............................................... 62

       3. The Terms of the Syncora Global Settlement .................................. 64

       4. The Syncora Global Settlement Is Fair and Equitable ........................ 66

       5. The Terms of the FGIC Global Settlement ...................................... 67

       6. The FGIC Global Settlement Is Fair and Equitable ........................... 69

IV. Settlements That the Court Approved During the Case ............................ 69

    A. The Swaps Settlement ...................................................................... 70

    B. The DWSD Bondholders Settlement ................................................... 71

    C. The MIDDD Settlement .................................................................... 71

V. The Creation of the Great Lakes Water Authority .................................... 72

VI. The Classes of Claims in the City's Plan and the Results of the Balloting ........... 73

VII. The Statutory Requirements for Chapter 9 Plan Confirmation .............................. 74

VIII. The Court's Findings Regarding Confirmation of the City's Eighth Amended Plan
of Adjustment ......................................................................................... 78

IX. The Outstanding Objections to the City's Plan ......................................... 80

    A. Objections Filed by Represented Parties ............................................ 80

    B. Objections Filed by Unrepresented Parties ......................................... 80

X. Issues Relating to Plan Confirmation ..................................................... 81

    A. The City's Professional Fees Will Be Fully Disclosed and Reviewed for
    Reasonableness As Soon As Practicable, As Required by § 943(b)(3) ........ 81

       1. The City's Professional Fees Will Be Fully Disclosed ...................... 82

       2. Section 943(b)(3) Requires the Court to Determine Whether the City's
       Professional Fees in the Case Are Reasonable ................................. 84

          a. The Scope of § 943(b)(3) ........................................................ 85

b. Deferring to the Fee Examiner's Determination of Reasonableness in This Case Is Insufficient to Comply with § 943(b)(3) and *City of Avon Park*.... 92

c. The Process for Reviewing Fees ................................................................. 93

B. The Debtor Is Not Prohibited by Law from Taking Any Action Necessary to Carry Out the Plan, As Required by § 943(b)(4)................................................................ 94

C. The Plan Is in the Best Interests of Creditors, As Required by § 943(b)(7).................. 95

1. The Applicable Law ......................................................................... 96

2. If the Case Were Dismissed, State Law Remedies Would Not Provide Creditors with a Better Result Than the Plan .......................................................... 97

a. The Creditors' Legal Remedies in the Event of a Dismissal ...................... 97

b. The Creditors' Recoveries in the Event of a Dismissal ........................... 100

c. The Creditors' Loss of Other Plan Benefits ....................................... 104

3. The Creditors Can Access No Other Assets in This Bankruptcy Case .............. 105

4. The Best Interests of Creditors and Feasibility.................................... 107

D. The Plan Is Feasible, As Required by § 943(b)(7) ........................................ 108

1. Applicable Law............................................................................ 108

2. An Overview of Feasibility .............................................................. 109

3. Evidentiary Issues Regarding the Report and Testimony of the Court's Feasibility Expert.......................................................................................... 112

4. The Expert's Standard for Feasibility.................................................. 113

5. The City's Plan Is Feasible ............................................................. 114

6. The City's Revenue and Expense Projections ........................................... 115

a. The City's Ten-Year Revenue Projections........................................... 116

b. The City's Ten-Year Expense Projections ........................................... 117

c. The City's Forty-Year Revenue Projections ......................................... 118

d. The City's Forty-Year Expense Projections ......................................... 118

e. The Resulting Forty-Year Projections............................................... 119

f. The Expert's Review of the Plan Projections ....................................... 119

g. The Revenue in the Plan Projections ............................................... 120

h. The Expenditures, Revenue and Cost Savings Associated with the RRIs . 124

7. The City's Obligations to Creditors Under the Plan................................... 125

a. The City's Post-Bankruptcy Debt .................................................... 125

b. The Cost of Servicing the Post-Bankruptcy Debt.................................... 126

c. The City Will Be Able to Service Its Post-Bankruptcy Debt....................... 128

8. The Feasibility of the City's Plan to Address Its Pension Obligations............... 129

a. The City's Plan Regarding Its Pension Obligations................................. 130

b. Evaluating the Risks in the City's Plan to Address Its Pension Obligations .......................................................................................... 131

c. Recommendations for Enhanced Disclosures to Reduce the Risk of Unmanageable Pension Obligations.......................................................... 133

9. The City Will Be Able to Sustainably Provide Adequate Services..................... 134

a. The Blight Initiatives................................................................ 136

b. The Public Safety Initiatives ....................................................... 138

c. The Organizational Efficiency Initiatives .......................................... 142

d. The Resident Services Initiatives .................................................. 145

e. The Business Services Initiatives ................................................................ 146

10. The City's Commitment to Implement the Plan ............................................ 148

11. Final Thoughts and Recommendations on Feasibility .................................. 153

E. Each of the Claims in Each Class Is Substantially Similar to the Other Claims in the
Class, As Required by § 1122(a) ...................................................................... 155

1. The Applicable Law ........................................................................................ 155

2. Creditors' Objections to Classification Are Overruled ................................ 156

F. The City Proposed the Plan in Good Faith, As Required by § 1129(a)(3) .................. 158

1. The Applicable Law ........................................................................................ 159

2. The City's Good Faith .................................................................................... 160

3. The City's Long-Term Solvency .................................................................... 161

4. Federalism Considerations in the Court's Good Faith Analysis ................ 163

G. The City Has Complied with the Applicable Provisions of the Bankruptcy Code, As
Required by § 1129(a)(2) .................................................................................. 166

1. The ASF Interest Rate Disclosure Issue ........................................................ 167

2. Successive Plan Modifications Did Not Require Re-Solicitation of Ballots ....... 168

H. The Plan Does Not Discriminate Unfairly Against Dissenting Classes 14 and 15, As
Required by § 1129(b)(1) .................................................................................. 169

1. The Plan Discriminates Against Dissenting Classes 14 and 15 ................... 170

2. The Unfair Discrimination Standard .............................................................. 173

3. The Discrimination Against the Classes of General Unsecured Creditors and
Convenience Creditors Is Not Unfair .......................................................... 176

a. The Discrimination in Favor of the Pension Classes Is Not Unfair ........... 176

b. The Discrimination in Favor of the UTGO, LTGO and 36th District Court
Classes Is Not Unfair .................................................................................... 178

c. The Discrimination Against Classes 14 and 15 Is Not Unfair Even Though
Some Creditors in Those Classes May Be Involuntary Creditors ............. 179

I. The Plan Is Fair and Equitable with Respect to the Dissenting Classes, As Required by
§ 1129(b)(1) ....................................................................................................... 181

1. The Test of "Fair and Equitable" in Chapter 9 .............................................. 182

2. The Plan Is "Fair and Equitable" ................................................................... 184

J. The Objections of the Creditors with Constitutional Claims Are Sustained in Part and
Overruled in Part .............................................................................................. 186

1. The Relevant Plan Provisions ........................................................................ 187

2. The § 1983 Creditors' Objections ................................................................... 187

a. Impairing and Discharging the § 1983 Claims Against the City Does Not
Violate the Fourteenth Amendment ........................................................... 188

b. The Bankruptcy Code Does Not Provide for the Discharge of § 1983 Claims
Against the City's Officers in Their Individual Capacity ........................... 191

c. The City Has Not Established That a Third-Party Release of § 1983 Claims
Against Its Officers in Their Individual Capacity Is Essential to Its Plan  193

3. The Takings Clause Creditors' Objection ...................................................... 195

a. Discharging Takings Clause Claims Would Violate the Fifth Amendment
.......................................................................................................................... 196

      b. The Takings Clause Claims Must Be Excepted from Discharge ............... 200

   K. The Plan Does Not Violate the Funding Clause of the Michigan Constitution .......... 201

   L. The Pension Creditors' Claims Are Against the City, Not the Retirement Systems .... 203

   M. The Pensions of DWSD and Library Employees Are Properly Included in the Plan . 204

   N. The Plan Does Not Violate the Blighted Area Rehabilitation Act ............................... 205

   O. The Grand Bargain Is Not an Improper Use of Tobacco Settlement Money .............. 206

   P. The Plan Does Not Violate the Federal Transit Act .................................................... 207

XI. THE EXIT FINANCING PROPOSED IN THE PLAN IS APPROVED ................................................. 210

XII. CONCLUSION ................................................................................................................. 212

# I. INTRODUCTION[1]

In chapter 9 of the bankruptcy code, the federal government offers help to the states in solving a problem that, under our constitutional structure, the states cannot solve by themselves. That problem is the adjustment of the debts of an insolvent municipality. In this case, this Court grants that help to the State of Michigan (the "State") and the City of Detroit (the "City").

On December 5, 2013, the Court entered an order for relief finding that the City was eligible to file a chapter 9 bankruptcy case under § 109(c).[2] (Dkt. #1946) Both before and after that, nearly every creditor group filed litigation against the City seeking the full protection of its claims.

The City filed its first plan and disclosure statement on February 21, 2014. At that time, the City had no approved settlements with any of its creditors. After that, every creditor group filed objections to the City's plan.

Since then, however, through court-ordered mediation, the City has achieved settlements with every creditor group that was represented by counsel, with one exception—creditors with claims that the City or its officers had violated their constitutional rights. Successive settlements resulted in successive plans. The settlements also resulted in the settling creditors' support of the plan and their withdrawal of their litigation against the City and their objections to the plan.

The City now seeks confirmation of its eighth amended plan of adjustment, filed on October 22, 2014. (Dkt. #8045)

_____

[1] This opinion supplements the opinion that the Court announced on the record on November 7, 2014. *See* Trial Tr., Nov. 7, 2014. (Dkt. #8257)

[2] Unless otherwise specified, all references to code sections in this opinion are to the bankruptcy code, title 11 of the United States Code.

1

In the context of seeking confirmation of its plan, the City also seeks approval of its several settlements with creditors under bankruptcy rule 9019:

- The Grand Bargain settlement, which includes the State Contribution Agreement, the DIA settlement and the global pension settlement;

- The OPEB settlement;

- The 36th District Court settlement;

- The UTGO settlement;

- The LTGO settlement;

- The COPs settlement, including the Syncora settlement and the FGIC settlement.

As more fully described in parts III and IV below, the Court has reviewed each settlement included in the plan and determines that each is fair and equitable, and within the range of reasonableness. Accordingly, the Court approves those settlements.

Based upon its findings in part VIII below, the Court concludes that the City's eighth amended plan of adjustment meets the legal requirements for confirmation. Most significantly, the Court finds that:

- The plan was proposed in good faith.

- The plan is feasible.

- The plan is in the best interests of creditors.

- The Court will determine the reasonableness and disclosure of the professional fees for which the City is responsible in connection with this case.

- The City's proposed exit financing meets the requirements of the bankruptcy code.

- The plan was accepted by all creditor classes but two—the classes of other unsecured claims and convenience claims.

- As to the two dissenting creditor classes, the plan is fair and equitable.

- As to the two dissenting creditor classes, the plan does not unfairly discriminate against them.

Accordingly, the Court confirms the plan.

It does so, however, with conditions. First, for the reasons stated in part X.J.2. below, creditors' claims against City employees in their individual capacity are neither discharged nor released. Second, for the reasons stated in part X.J.3. below, creditors' claims against the City that are based in the Takings Clause of the Fifth Amendment of the United States Constitution are excepted from the discharge.

The Court's confirmation of the City's plan also comes with recommendations in parts X.D.8.c. and X.D.11. below to take specific actions to assure that what happened in Detroit never happens again.

## II. THE PLAN CONFIRMATION PROCESS

### A. The City's Plans of Adjustment

The City filed ten plans of adjustment. Most of the amended plans were the result of successive creditor settlements and agreements.

The City filed its first plan and disclosure statement on February 21, 2014 (Dkt. ##2708 and 2709), ahead of the March 1, 2014, deadline that this Court first set.

On March 31, 2014, the City filed an amended plan and disclosure statement. (Dkt. ##3380 and 3382) This plan incorporated the Court-approved swap settlement agreement and the initial stages of the Grand Bargain, discussed in parts IV.A. and III.D., respectively.

On April 16, 2014, the City filed its second amended plan and disclosure statement. (Dkt. ##4140 and 4141) It clarified and expanded on aspects of the Grand Bargain and added the settlements relating to the restoration of benefits, the ASF recoupment and the income stabilization program, discussed in parts III.G.1.b., III.H and III.E.2, respectively. It also clarified and expanded on aspects of the OPEB settlement, discussed in part III.I. below,

3

incorporated the UTGO settlement, discussed in part III.K. below, and introduced the concept of post-effective date oversight for the City.

On April 25, 2014, the City filed its third amended plan and disclosure statement.  (Dkt. ##4271 and 4272)  This plan incorporated the parties' agreements that clarified and expanded upon the provisions for restoration of PFRS pension benefits and other aspects of the Grand Bargain and the OPEB settlement.  It also clarified the treatment of claims relating to the operation of City vehicles, tax refund claims, utility deposits and pass-through claims.

On May 5, 2014, the City filed its fourth amended plan and disclosure statement.  (Dkt. ##4391 and 4392)  The Court approved that disclosure statement.  (Dkt. #4401)  The City served solicitation packages, including this plan and disclosure statement, and plan ballots.  (Dkt. ##4421 and 6179)  It also published notice of the plan and the disclosure statement in the Detroit News, the Detroit Free Press, USA Today and the Wall Street Journal.  (Dkt. ##6209, 6211 and 6253)  This amended plan incorporated the final aspects of the Grand Bargain, including final agreements relating to restoration of pension benefits and pension plan governance, as well as the OPEB settlement.[3]

---

[3] To fill out this chronology, it is important to note that on June 3, 2014, the Michigan Legislature enacted, and on June 19 and 20, 2014, the governor signed into law, the package of bills necessary to implement the Grand Bargain and for other purposes related to the City's plan of adjustment.  These bills became effective on June 20, 2014.  They include:

  PA 181 (2014), "Michigan Financial Review Commission Act"
  PA 182 (2014), "An Act to amend 1909 PA 279"
  PA 183 (2014), "An Act to amend 1909 PA 279"
  PA 184 (2014), "An Act to amend 2011 PA 152"
  PA 185 (2014), "An Act to amend 1965 PA 314"
  PA 186 (2014), "An Act to amend 2000 PA 489"
  PA 187 (2014), "Michigan Settlement Administration Authority Act"
  PA 188 (2014), "An Act to amend 1984 PA 431"
  PA 189 (2014), "An Act to amend 1969 PA 312"

*Continued…*

4

On July 25, 2014, the City filed a fifth amended plan. (Dkt. #6257) This plan incorporated the LTGO settlement, discussed in part III.L. below, and the 36th District Court settlement, discussed in part III.J. below. It also added the cash payment option for the ASF recoupment settlement, and specified the composition of the two Voluntary Employee Benefit Association ("VEBA") boards created as part of the OPEB settlement. Clarifications and changes were also made to the Grand Bargain and the UTGO settlement.

On July 29, 2014, the City filed a corrected fifth amended plan. (Dkt. #6379) This plan removed the provisions for post-confirmation reporting to the bankruptcy court that were apparently included in the fifth amended plan by mistake.

On August 20, 2014, the City filed its sixth amended plan. (Dkt. #6908) This plan incorporated the DWSD bondholders settlement, discussed in part IV.B below.

On September 16, 2014, the City filed its seventh amended plan. (Dkt. #7502) This plan incorporated the Syncora global settlement and set forth the treatment of COPs claims in class 9, discussed in part III.M. below. It also incorporated agreements with the retiree committee and the LTGO parties regarding the residual interests in the COP claims reserve. It also reflected the closing and completion of the DWSD bond tender offer and further specified how the two VEBA boards would be comprised. It also provided for the prepayment to creditors in classes 7, 12 and 14 of the October 2015 interest payment on the Excess New B Notes.

On October 22, 2014, the City filed its eighth and last amended plan. (Dkt. #8045) This final plan reflects the City's settlement with FGIC, its last objecting financial creditor, discussed

---

PA 190 (2014), "An Act to amend 1978 PA 566"
A summary of this package of bills prepared by the Michigan House Fiscal Agency is available at: www.legislature.mi.gov/documents/2013-2014/billanalysis/House/pdf/2013-HLA-5566-7780ED85.pdf.

in part III.M. below.  It also reflects the settlement with the UAW and AFSCME regarding the treatment of retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority.

For the reasons discussed in part X.G.2. below, the Court concluded that the plans that the City filed after the fourth amended plan did not require new balloting and therefore did not require a new disclosure statement.

## B. An Overview of the City's Eighth Amended Plan of Adjustment

The plan that the City ultimately requested this Court to confirm contemplates a complete restructuring of the City's debt.  The City has settled with every major creditor group.  Because of the plan, the City has eliminated approximately $7 billion in liabilities.  Trial Tr. 70:4-7, Sept. 30, 2014.  (Dkt. #7821)  Upon exiting bankruptcy, the City will issue "New B Notes" in the aggregate face amount of $632 million and "New C Notes" in the aggregate face amount of $88 million.  These new notes will be used to restructure the City's obligations for post-retirement health benefits, debt service on several types of bonds and other unsecured liabilities.  Ex. 791. The City has also restructured its unlimited tax general obligation bonds at a significant savings and will use exit financing to retire many of its limited tax general obligation bonds.  Ex. 791.  In addition, the settlements with FGIC, the City's largest creditor, and Syncora include real estate development agreements that give these creditors vested stakes in the City's recovery.

The plan also contemplates post-bankruptcy financial oversight of the City to ensure that the fiscal exigencies that resulted in the City's chapter 9 bankruptcy never happen again.  The state legislation that implemented the Grand Bargain created a financial review commission to review the City's finances and budgets to ensure that the City adheres to the plan and continues

to implement needed financial and operational reforms.  Mich. Comp. Laws § 141.1631 *et seq.*  The GRS and PFRS are also required to create investment committees whose role will be to make recommendations to, and approve certain actions by, the respective system's board of trustees.  Mich. Comp. Laws § 38.1133g; Eighth Am. Plan of Adjustment (hereafter cited as "Plan"), Ex. I.A.332 at 2.  (Dkt. #8045)

Finally, because of the financial reforms contained in the plan, the City is able to invest approximately $1.7 billion in several reinvestment and restructuring initiatives ("RRIs") over ten years to help improve the City government's infrastructure and its provision of services.  Ex. 579.  These RRIs are designed to "substantially improve and provide adequate levels of services, as well as enhance revenue and reduce costs."  Trial Tr. 42:11-12, Sept. 5, 2014.  (Dkt. #7434)  The City believes these RRIs will also result in approximately $841 million in revenue savings and that they are critical to the City's recovery after bankruptcy.  Ex. 592; *see also* Fourth Am. Disclosure Statement (hereafter cited as "Disc. Stmt.") at 160.  (Dkt. #4391)  The RRIs will, among other things:

> (a) Provide basic, essential services to City residents; (b) attract new residents and businesses to foster growth and redevelopment; (c) reduce crime; (d) demolish blighted and dangerous properties; (e) provide functional streetlights that are aligned with the current population footprint; (f) improve information technology systems, thereby increasing efficiency and decreasing costs; and (g) otherwise set the City on a path toward a better future.

Disc. Stmt. at 10.  (Dkt. #4391)

## C. Objections Filed by Represented Parties

The following represented parties objected to the plan and subsequently withdrew their objections due to settlements with the City:

- Oakland County (Dkt. ##4627 and 6648);

7

- The United States (Dkt. #4629);

- Macomb County (Dkt. ##4636, 6666 and 7039);

- U.S. Bank National Association (Dkt. ##4647 and 6679);

- BlackRock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management (the "DWSD Bondholders") (Dkt. ##4650, 4671 and 4681);

- Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., Deutsche Bank AG, London; Dexia Crédit Local, Dexia Holdings, Inc., and FMS Wertmanagement AöR (Dkt. ##4653 and 5979);

- Wilmington Trust, N.A. (Dkt. ##4656, 6678, 7050 and 7603);

- Berkshire Hathaway Assurance Corporation (Dkt. ##4657 and 6680);

- Financial Guaranty Insurance Company ("FGIC") (Dkt. ##4660, 6674 and 7611);

- Wayne County (Dkt. #4663);

- National Public Finance Guarantee Corporation ("NPFG") (Dkt. ##4665 and 6687);

- Merrill Lynch Capital Services, Inc. and UBS AG ("the Swap Counterparties") (Dkt. #4668);

- Assured Guaranty Municipal Corp. (Dkt. ##4674 and 6677);

- Ambac Assurance Corp. (Dkt. #4677);

- Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") (Dkt. ##4679, 6651, 7041 and 7213);

- BlackRock Financial Management, Inc. (Dkt. #4681);

- The Detroit Police Officers Association (Dkt. ##4901 and 4938);

- The Detroit Fire Fighters Association (Dkt. #4918);

- The UAW (Dkt. #6464);

- AFSCME Council 25 (Dkt. ##6466, 6468 and 7063);

- BlueMountain Capital Management, LLC (Dkt. #6506);

- The Detroit Retirement Systems (Dkt. ##6659, 6676, 6762 and 7052);

8

- FGIC, Dexia Crédit Local and Dexia Holdings, Inc., Panning Capital Management, LP, Monarch Alternative Capital LP, Bronze Gable, L.L.C., Aurelius Capital Management, LP, Stone Lion Capital Partners L.P., BlueMountain Capital Management, LLC, and Deutsche Bank AG, London ("the COPs Holders") (Dkt. ##7046 and 7615); and

- The Macomb Interceptor Drain Drainage District (Dkt. #7612).

The objecting parties who were represented by attorneys and who have maintained their objections include:

- Ben McKenzie, Jr. (Dkt. #3230);

- T&T Management, Inc., HRT Enterprises, and the John W. and Vivian M. Denis Trust (Dkt. #3412);

- Hyde Park Cooperative (Dkt. #3497);

- The Housing Is a Human Rights Coalition (Dkt. #3511);

- Deborah Ryan, Walter Swift, Cristobal Mendoza and Annica Cuppetelli (Dkt. ##4099, 4608 and 5690);

- Dwayne Provience, Richard Mack, and Gerald and Alecia Wilcox (Dkt. ##4224, 4226, 4228, 6764 and 6900);

- David Sole (Dkt. #4318);

- John Cato (Dkt. #4376);

- Carlton Carter, Bobby Jones, Roderick Holley and Richard T. Weatherly (Dkt. #4625);

- Robert Cole (Dkt. ##4930 and 4950);

- the Ochadleus parties[4] (Dkt. ##5788, 5964, 6642, 6671, 6995 and 7523);

---

[4] These parties are William Ochadleus, Shelton Hayes, Shirley Berger, Raymond Yee, Frederick T. McClure Jr., John Clark, Jim Benci, Janice Butler, Morris Wells, Melvin F. Williams Sr., Kimberly Ann Sanders, Sarah E. Giddens, Deborah Ward, Jackie Fulbright, Catherine Tuttle, Rita Serra, Martin Treadwell, Ed Gaines, Barbara Triplett-Decrease, John J. O'Neill, Roy McCalister, Polly McCalister, Gail Wilson Turner, Loletha Porter Coleman, Afford Coleman, Jessie Banks, Lester Coleman, Deborah Lark, Moses Lark, Sharon Cowling, Michael

*Continued…*

9

- the Section 1983 Plaintiffs[5] (Dkt. #6911); and

- Johnathan Brown (Dkt. #8170).

### D. The Participation by Unrepresented Parties

Unrepresented creditors filed 1159 objections to confirmation of the City's plan. Of these, 836 were timely filed. The Court permitted some of these parties to participate in the confirmation process through oral argument before the confirmation hearing commenced, and by presenting evidence and questioning witnesses during the confirmation hearing.

---

Cowling, Robert Jackson, Rashelle Pettway, Michael A. Adams, John Hawkins, Laura Isom, Duane McKissic, Herbert Moreland, Cynthia Diane Moreland, Henry Ellis, Keith Jackson Sr., Deborah Robinson, James Alexander Jr., Debra J. Fair, Brenda Goss Andrews, Jamie Fields, Ricardo C. Jenkins, Jacqueline Jackson, Tommie Carodine, Lawrence V. Porter, Robbin Rivers, James R. Younger, Roscoe Mayfield, Charles Barbieri, Craig Schwartz, Glenda Cole-Dixon, Walter Long Jr., George Graves, Terrance Anderson, David Anderson, Nancy Fowler, George Chester, Anthony Klukowski Jr., Todd Klukowski, Roger Klukowski, Lois Klukowski-Hogen, Patricia E. McCabe, Daniel P. Root, Jeannetta Washington, Mike Foley, James Jones, Joe Smith, Reggie Barnes, Calvin Adkins, Jack Aliotta, Patti Graves, Andy Smith, Steve Leggatt, Paula Day, Deborah McCreary, Greg Jones, Andrew White, Christine Marie Jepsen, John Jepsen, Alicia Terry, Joyce Daniel, Bryan Glover, Tobi Ascione Young, Greg Huizar, Lori Gallman, Beverly Hoffman-Nichols, Barbara Stafford, Micelle Pierson, Shelley I. Foy, Parrie Lee Highgate, Renee Ellis-Sumpter, David Pomeroy, Jim Lemaux, Eric Heckman, Shelley Holderbaum, Keith Oleniacz, Edgardo Aponte, Jon Gardner, Judith Norwood, Kenneth Emerson, Patricia Lofton, Karen Leskie, Roosevelt Lawrence Jr., Sonja Hollis, William Anderson, Derek Hicks, Marsha Thompson-Kidd, Yvonne Williams Jones, Lula Millender, William Davis, Evelyn Owen Smith, Cecily McClellan, Belinda A. Myers-Florence, Jesse J. Florence, Sr., Paulette Brown, Linda White, Jo Fuller, David Malhalab, Gerald Williams, Douglas Kuykendall, Nancy Kuykendall, Roger Saledo, Darius Clay, Nyra Turner Blackmon, and Rheuben Blackmon.

[5] These parties are Jerry Ashley, Shumithia Baker, David Booth, Branden Brooks, Angel Brown, Teran Brown, Wendy Jefferson, Floyd Brunson, Laverne Covington, Ezekiel Davis, Jeremiah Duren, Otis Evans, Darnell Fields, Keitha Gomez, Cheval Gomez, Jermaine Green, Terry Hardison IV, Anthony Harmon, Donald Harris, Rodney Heard, Tommie Hickey, Kevin Ivie, James Jackson, Leinathan Jelks, Quentin King, Daniel Lattanzio, April Lee, Mario Littlejohn, Ray Lizzamore, Orlando Marion, James Matson, Dave Mazur, Kevin McDonald, Kevin McGillivary, Robert McCowen, Michael McKay, Melvin Miller, Eddie Moore, Curtis Morris, Gary Musser, Winter Owens, Porter Hondra, Woodrow Roberson, Bradley Schick, Ali Sobh, Daniel Soto, Samiya Speed, Douglas Taylor, Jeffrey Theriot, Raymond Thompson, Jr., Bernard White, Christina Wilmore, and Joseph Wright.

## 1. The Unrepresented Parties' Oral
## Presentations

After reviewing all of the filed objections, the Court invited 79 individuals, constituting a cross-section of the objecting parties and their objections, to state and argue their objections at a hearing on July 15, 2014.

At the hearing, 46 of these 79 objectors appeared before the Court. They are: Dempsey Addison, Hassan Aleem, Audry Bellamy, Harold Franklin Bryant, Thomas Cattron, Gisele Caver, Ronald Clegg, Jo Ann Cooper, Rita Dickerson, Jamie Fields, Fabris Fiorenzo, Jesse Florence, Sr., Gerald Galazka, Deborah Graham, Andrea Hackett, Kristen A. Hamel, Patricia Beamon, Cynthia Haskin, Beverly Holman, Irma Industrious, Felicia Jones, Gerald Kent, Richard C. Lewandowski, David L. Malhalab, Cecily McClellan, Mashuk Meah, Amru Meah, Constance Phillips, H. Jean Powell, Roger D. Rice, Renla C. Session, Mark L. Smith, Michael Smith, Elaine Thayer, Marie Lynette Thornton, Jean Vortkamp, Mary Jo Vortkamp, Shirley J. Walker, William Curtis Walton, Beverly A. Welch, Paul C. Wells, Carl Williams, Yvonne Williams-Jones, Laura Wilson, Steven Wojtowicz, and Lucinda Darrah. *See generally* Trial Tr. July 15, 2014. (Dkt. #6141)

The objectors were each given five minutes to address the Court. These parties were uniformly articulate, thoughtful, sincere, well prepared and appreciative. Most focused on the City's proposal to reduce pension benefits and the ASF recoupment settlement, and the impact that these proposals would have on them. They told stories of the real hardship that the plan will cause them and their families. Some still object to the filing of the bankruptcy and blame the City's problems on State leadership.

## 2. The Unrepresented Parties' Participation in
the Confirmation Hearing

The Court also invited unrepresented parties to file motions requesting to participate in the confirmation hearing. The Court required each motion to state: (a) the names of the witnesses sought to be questioned or presented; (b) the subject matter of the proposed testimony; (c) the expected duration of the testimony; (d) an explanation of why the proposed evidence would not be duplicative of other evidence; and (e) a list of the exhibits to be offered into evidence during the proposed testimony. (Dkt. #6584)

Parties filed 36 such motions. Upon its review of each motion, the Court allowed seven parties to testify: Fredia M. Butler, Elaine E. Thayer, Estella L. Ball, Walter Gary Knall, JoAnn Watson, Wanda Jan Hill, and Steven Wojtowicz.

The Court permitted Michael J. Karwoski and John P. Quinn, attorneys and retirees from the City's law department, to participate fully in the confirmation hearing within a certain time limit.

The Court also permitted Jamie Fields to cross-examine Charles Moore; Estella L. Ball to examine Kevyn Orr; Thomas Cattron to submit documents; Wanda Jan Hill to examine Kevyn Orr and Heather Lennox; and Yvonne Williams Jones and Cecily McClellan, jointly, to examine David T. Kausch. The Court also granted the motions to participate filed by Irma Industrious, Frenchie Williamson and Gloria C. Williams, but they did not appear at the hearing.

## E. The City Tour

On June 6, 2014, the City filed a motion for a site visit by the Court. (Dkt. #5250) The motion argued:

In order to be able to put into context the evidence that it will hear, the Court needs to experience what the witnesses will describe. Witnesses will testify about the planned reinvestment in the City of $1.4 billion over the next ten years, in areas ranging from blight remediation and public safety to transportation, recreation and public works – but in the courtroom, these are mere abstractions. To give meaning to the testimony, the Court must see what this reinvestment means for the people of Detroit.

For example, the Court will hear ample testimony about the problem of blight in the City. But no amount of testimony or even photographs can fully express the devastating impact that blight has had on Detroit's neighborhoods, or convey to the Court what it is like for Detroit residents to have to walk down half-empty streets of burnt-out buildings and abandoned dumping-ground lots. Without that context, the City's plan to spend $440 million on blight remediation has little meaning.

*Id*. at 3-4.

Over the objections of several creditors, the Court granted the motion and participated in a tour of the City just before the commencement of the evidentiary hearing on confirmation. (Dkt. #5629)  In addition to counsel for the City, the Court also permitted participation by two representative attorneys for objecting creditors.  The tour was video recorded and a stenographic record was made of the verbal descriptions that the City's attorney provided during the tour. Notice of Filing R. of Site Visit, Ex. A and B. (Dkt. #8673)  The tour covered 59 miles in the City through many neighborhoods, both well maintained and blighted.  It included the police department's combined 5th/9th precinct and ended at the Detroit Institute of Arts (the "DIA").

The primary impression that remains with the Court following the tour is that blight in Detroit is extensive.  The statistics do not fully convey its extent or impact.  In neighborhood after neighborhood, short and long stretches of streets have abandoned structures—they can no longer be called homes—that are intimidating hulks.  Some are partially or mostly burned out. Some have gaping holes in their roofs or collapsed garages.  Many have missing doors and windows, and broken front steps and porches.  Some are strewn with illegal dumping.  All are

13

vivid statements of their former owners' emotional and financial struggles, and of community loss.

These streets also have vacant lots, or collections of vacant lots, on which unmanaged and unsightly vegetation has taken over from the structures after their removal. On the commercial streets, block after block of abandoned, boarded up and graffiti-littered strip shopping centers far outnumbered the occasional small businesses that have survived.

It is heartbreaking, maddening and sad. No one should have to endure, day in and day out, the damage to the human spirit that can result from living in those surroundings. City residents who live, work and play in these neighborhoods deserve better. Detroit deserves better.

The precinct building is past its useful life by years, or perhaps decades, and shows obvious signs of long-term inadequate maintenance. The interior is dilapidated and its layout is ill suited to the needs of a modern, efficient and effective police precinct. The brick façade over the front door was loose and in danger of falling, so that a scaffold is necessary to protect against injury. No expert is required to find that the building should be torn down and replaced.[6]

The Court also witnessed, however, many signs of hope and determination among the residents of these neighborhoods—new residential construction, gardens, parks and outdoor art where the City has removed blight. There were also historic neighborhoods that are beautiful and remarkable in their preservation.

And then there is the DIA. For present purposes, it is enough to observe that the tour demonstrated for the Court that the DIA is a critical and immeasurable sign of great hope and

---

[6] The City's plan to address its blight and to modernize its police, fire and EMS services is addressed in the Court's discussion of the feasibility of the plan of adjustment in part X.D.9. below.

determination in the City. In part X.C.3. below, the Court addresses why preserving the DIA is essential to the City's future.

It was an enlightening and valuable tour.

## III. THE SETTLEMENTS IN THE PLAN

### A. Mediation

As the Court was hearing evidence and considering the parties' objections, another process that was fundamental to the City's plan and its revitalization was unfolding. On August 13, 2013, the Court appointed Chief United States District Judge Gerald Rosen to be the mediator in the case. (Dkt. #322) Chief Judge Rosen then appointed a team of mediators—District Judge Victoria Roberts, District Judge Sean Cox, District Judge Wiley Daniel, Bankruptcy Judge Elizabeth Perris, and attorney Eugene Driker—to assist in the mediations. Over the next fourteen months, Chief Judge Rosen and his team worked tirelessly and diligently in the spirit of public service to supervise settlement negotiations between the City and each of the various creditor groups.

Those efforts were fully successful. The City and its settling creditors have already placed on the record their sincere expressions of gratitude and appreciation for the skill, patience, commitment, dedication and creativity that the mediators demonstrated throughout the process. This Court now adds its thanks and appreciation to the mediators for this monumental and historic achievement.

### B. The Applicable Law

In connection with its request that the Court confirm its plan, the City has requested approval of those settlements. Under bankruptcy rule 9019(a), "the court may approve a

15

compromise or settlement." Fed. R. Bankr. P. 9019(a). Section 1123(b)(3)(A) states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."

In *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968), the Supreme Court addressed the importance of bankruptcy settlements and the bankruptcy court's responsibilities in reviewing them:

> Compromises are 'a normal part of the process of reorganization.' *Case v. Los Angeles Lumber Prods. Co*., 308 U.S. 106, 130, 60 S. Ct. 1, 14, 84 L. Ed. 110 (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the 'informed, independent judgment' of the bankruptcy court. *National Surety Co. v. Coriell*, 289 U.S. 426, 436, 53 S. Ct. 678, 682, 77 L. Ed. 1300 (1933). The requirements of §§ 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. §§ 574, 621(2), that plans of reorganization be both 'fair and equitable,' apply to compromises just as to other aspects of reorganizations. *Ashbach v. Kirtley*, 289 F.2d 159 (C.A. 8th Cir. 1961); *Conway v. Silesian-American Corp*., 186 F.2d 201 (C.A. 2d Cir. 1950). The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co*., 196 F.2d 484 (C.A. 7th Cir. 1952). There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Id*. at 424-25.

16

In *Bard v. Sicherman* (*In re Bard*), 49 F. App'x 528 (6th Cir. 2002), the Sixth Circuit reflected on *Protective Committee*, observing:

> The federal courts of appeal have in turn implemented this directive by considering:
>
> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id*. at 530. The Court will apply these *Bard* considerations in determining whether to approve the City's settlements with its creditors.

## C. The *Bard* Considerations Applicable to All of the Settlements

Several factors relevant to the reasonableness of each of the settlements are common to all of them. These include the following:

- All of the creditors in these settlements filed and vigorously pursued both objections to the plan and litigation with the City to protect their claims.

- All of the creditors were highly motivated to pursue those objections and that litigation, and had the resources to do so. This would include the appellate process if necessary.

- Many of the objections and much of the litigation raised issues that were novel, legally and factually complex, and significant beyond this case.

- All of the parties were well represented and well prepared for litigation.

- For the City, litigating with creditors was incompatible with its goal of a prompt and efficient exit from bankruptcy and start to its revitalization.

- For all parties, the stakes were high. On the City's part, even a single loss in litigation against any major creditor would seriously compromise its goals in this case.

- Each settlement was at arm's length and hard-fought. Each required perseverance, creativity and compromise by all involved.

17

With these factors in mind, the Court will now examine each settlement in depth.

## D. The Grand Bargain

The cornerstone of the plan is the Grand Bargain. It is a collection of settlements among a number of parties with an interest in the City's two pension plans and in protecting the City's art at the DIA. The parties to the Grand Bargain include:

- The City

- The State

- The Official Committee of Retirees

- The General Retirement System ("GRS")

- The Police and Fire Retirement System ("PFRS")

- The American Federation of State, County and Municipal Employees ("AFSCME")

- The United Auto Workers Union

- The Detroit Retired City Employees Association

- The Retired Detroit Police Members Association

- The Retired Detroit Police & Fire Fighters Association

- The Detroit Police Lieutenants and Sergeants Association

- The Detroit Police Command Officers Association

- The Detroit Police Officers Association

- The Detroit Fire Fighters Association

- A number of charitable foundations, including the Ford Foundation, the Kresge Foundation, the W.K. Kellogg Foundation, the Knight Foundation, the William Davidson Foundation, the Community Foundation for Southeastern Michigan, the Fred A. and Barbara M. Erb Family Foundation, the Hudson-Webber Foundation, the Charles Stewart Mott Foundation, the McGregor Foundation, the Max M. and Marjorie S. Fisher Foundation and the A. Paul and Carol C. Schaap Foundation

- The DIA.

18

The settlements represented in the Grand Bargain are the State Contribution Agreement, the DIA settlement, and the pension settlement. The Court addresses each of these settlements below. The plan reflects the Grand Bargain in its treatment of class 10, which consists of the PFRS pension claims, and class 11, which consists of the GRS pension claims.

## E. The State Contribution Agreement

The City has asserted that the GRS and the PFRS have substantial unfunded actuarial accrued liabilities ("UAAL") and that its obligation to reduce the UAAL was one of the reasons that it filed bankruptcy.

## 1. The Potential Claim Against the State of Michigan

It has been suggested that because pensions are protected by the Michigan constitution, the State may be obligated to pay all or a portion of the UAAL. Article IX, § 24 of the Michigan constitution provides:

> The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.
>
> Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities.

Some argue that this language can be read to require the State to assume the responsibility for any underfunding of a municipal pension in Michigan. The State disputes that claim.

## 2. The Terms of the State Contribution Agreement

In settlement of the State's potential liability for the GRS and PFRS underfunding and in support of the City's plan, the City, the State, the GRS and the PFRS have agreed to enter into the State Contribution Agreement.

Under the State Contribution Agreement, the State has agreed to contribute $98.8 million to the GRS and $96 million to the PFRS for a total of $194.8 million (the "State Contribution"). The City and State contend that this amount is equal to the net present value of $350 million payable over a twenty-year period at a discount rate of 6.75%. The State Contribution may only be used to fund payments to holders of GRS pension claims and PFRS pension claims.

The State Contribution Agreement requires the GRS and the PFRS to establish investment committees for the purpose of making recommendations to, and approving certain actions by, the respective system's board of trustees under the terms and conditions set forth in the State Contribution Agreement.

As part of this agreement, the City, the GRS and the PFRS will also establish an income stabilization program. The goal of this program is to ensure that pension creditors will not be forced into poverty as a result of the pension reductions in the plan. Under the income stabilization program, the State will identify all pensioners who, as of the effective date of the plan, are at least 60 years old and had a household income equal to or less than 140% of the Federal Poverty Guideline in 2013. The GRS and the PFRS will be required to make annual supplemental payments to these pensioners equal to the lesser of (a) the amount needed to restore such pensioner's benefits to the amount received in 2013 or (b) the amount needed to bring such pensioner's annual household income up to 130% of the 2013 Federal Poverty Guideline.

20

In addition, to the extent any such pensioner's annual household income in any year is less than 105% of the Federal Poverty Guideline for that year, the City must make an additional payment to that pensioner equal to the lesser of (a) 100% restoration of pension benefits, including escalators and inflation adjustments, or (b) the amount needed to bring that pensioner's annual household income up to 105% of the Federal Poverty Guideline for that year.

The proceeds of the Stub UTGO Bonds, described in part III.K. below, will be used to help fund the income stabilization program.

The PFRS and the GRS must keep separate recordkeeping sub-accounts for the purpose of making payments under and crediting assets to the income stabilization program, including the proceeds of the Stub UTGO Bonds. In 2022, if the investment committee of either GRS or PFRS determines that the sub-account for its system is more than fully funded to meet all future liabilities for income stabilization payments, it may recommend that the excess assets, but not more than $35 million, be used to fund the restoration of pension benefits.

In exchange for the State Contribution, the parties will cease all litigation challenging Public Act 436 (2012) or seeking enforcement of article IX, § 24 of the Michigan constitution relating to pension benefits. In addition, each holder of a pension claim, regardless of whether such holder voted in favor of the plan, must release the State and its related entities from all liabilities arising from or related to the City, the chapter 9 case, PA 436 or article IX, § 24 of the Michigan constitution.

### 3. The State Contribution Agreement Is Fair and Equitable

In determining the reasonableness of this settlement, the Court must analyze two issues: (1) whether the State Contribution is reasonable in amount under the circumstances, and (2)

whether the release of liabilities against the State and its related entities, who are third parties in this bankruptcy case, is necessary, appropriate and reasonable.

### a. The State Contribution Agreement Is Reasonable in Amount

The claims settled by the State Contribution Agreement are not frivolous. The obligation not to impair municipal pensions established in the Michigan constitution is absolute. Moreover, the State is in a much better position than individual retirees to enforce that obligation. There is, nonetheless, no precedent for such a claim. Therefore, judging the likelihood that this claim would be successful is challenging.

If the claim were successful, the State would be responsible for the City's pension underfunding, potentially in the neighborhood of $3 billion. The State might also then be responsible for the entire unfunded liability of every municipality in the state. Needless to say, this would be disastrous for the State. Indeed, the litigation would be high-risk for all concerned. In addition, any litigation of the claim would be lengthy, complex and expensive.

In settlement of a claim against the State valued at potentially $3 billion, the State's contribution is $194.8 million. The many skilled and capable representatives of the pension creditors have concluded that the State Contribution Agreement is fair. They recommended it to their pension creditors, who, in turn, voted strongly to support the plan and to release their potential litigation claims, as discussed in part VI below.

In the circumstances, the Court finds that the State's monetary contribution in the State Contribution Agreement is reasonable, although perhaps at the lowest end of the range of reasonable settlements.

22

### b. The Releases in the State Contribution
### Agreement Are Reasonable

As noted, under the State Contribution Agreement and the plan, each holder of a pension claim releases the State and its related entities from all liabilities arising from or related to the City, this case, PA 436, or article IX, § 24 of the Michigan constitution. Several parties maintain their objections to these releases.

In *Class Five Nevada Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648 (6th Cir. 2002), the Sixth Circuit addressed the circumstances in which releases are permitted in a chapter 11 plan.[7] In that decision, the Sixth Circuit held that it is "not inconsistent with the Code" for a bankruptcy court to enjoin "a non-consenting creditor's claim against a non-debtor." *Id*. at 658. The court explained the basis for this conclusion:

> [B]ankruptcy courts, "as courts of equity, have broad authority to modify creditor-debtor relationships." *United States v. Energy Resources Co.*, 495 U.S. 545, 549, 110 S. Ct. 2139, 109 L. Ed. 2d 580 (1990). For example, section 105(a) of the Bankruptcy Code grants a bankruptcy court the broad authority to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This section grants the bankruptcy court the power to take appropriate equitable measures needed to implement other sections of the Code. *See In re Granger Garage, Inc.*, 921 F.2d 74, 77 (6th Cir. 1990).
>
> Consistent with section 105(a)'s broad grant of authority, the Code allows bankruptcy courts considerable discretion to approve plans of reorganization. *Energy Resources Co.*, 495 U.S. at 549, 110 S. Ct. 2139. Section 1123(b)(6) permits a reorganization plan to "include any . . . appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Thus, the bankruptcy court, as a forum for resolving large and complex

---

[7] Another release in the plan is also the subject of objections. Specifically, the § 1983 creditors object to the provision in the plan that would release officers of the City from claims against them in their individual capacity under 42 U.S.C. § 1983. Relying on the discussion of *Dow Corning* here, the Court sustains that objection in part X.J.2.c. below.

mass litigations, has substantial power to reorder creditor-debtor relations needed to achieve a successful reorganization.

*Id.* at 656.[8]

The court cautioned, however, "Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'" *Id.* at 658. The Court then announced the seven elements that must be met for granting a third-party release:

> We hold that when the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.*

Initially, the City makes the interesting argument that *Dow Corning* is inapplicable in a chapter 9 case because § 901 does not incorporate § 524(e) in chapter 9. Section 524(e)

---

[8] In *In re Valley Health System*, 429 B.R. 692, 714 n.57 (Bankr. C.D. Cal. 2010), the court suggested in dicta, "Section 105(a) is not applicable to chapter 9 cases." This is mistaken. Section 103(f) states, "Except as provided in section 901 of this title, only chapters 1 and 9 of this title apply in a case under such chapter 9." Because § 105 is in chapter 1, it does apply in a chapter 9 case. As a result, the statutory premise on which *Dow Corning* authorized third party releases in chapter 11 case also applies in chapter 9.

24

provides, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." In support, the City cites *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 767 (Bankr. D.S.C. 2011). The argument is based on the premise that it is the application of § 524(e) in chapter 11 cases that compels courts to be cautious about approving third-party releases.

The Court rejects this argument. *Dow Corning* explicitly concluded that § 524(e) is no obstacle to third-party releases:

> However, this language [of § 524(e)] explains the effect of a debtor's discharge. It does not prohibit the release of a non-debtor. *See In re Specialty Equip. Co.*, 3 F.3d 1043, 1047 (7th Cir. 1993) ("This language does not purport to limit or restrict the power of the bankruptcy court to otherwise grant a release to a third party."); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987); *In re A.H. Robins Co.*, 880 F.2d [694] at 702 [4th Cir. 1989].

280 F.3d at 657.

More than that, even if the inapplicability of § 524(e) in chapter 9 did, by itself, free a chapter 9 debtor to include third-party releases in its plan, such releases would still be subject to the other requirements of confirmation, including the requirements that the plan is proposed in good faith and that the releases in the plan are fair and equitable.

Accordingly, the Court rejects the City's argument that *Dow Corning* is inapplicable in this case and will consider its guidance here.

Some courts have, however, tailored the seven *Dow Corning* elements to suit the needs of the case and have not required satisfaction of all seven factors. *See, e.g.*, *Nat'l Heritage Found., Inc., v. Highbourne Found.*, No. 13-1608, 2014 WL 2900933, at *6 (4th Cir. June 27, 2014) (In denying a third-party release, the court noted, "A debtor need not demonstrate that every *Dow Corning* factor weighs in its favor to obtain approval of a non-debtor release. But . . . a debtor must provide adequate factual support to show that the circumstances warrant such exceptional

relief[.]"); *In re Friedman's, Inc.*, 356 B.R. 758, 761-3 (Bankr. S.D. Ga. 2005) (approving a third-party release over objection without having specifically found that all seven *Dow Corning* factors were met).

It must be recognized that the *Dow Corning* holding is in the context of a chapter 11 business reorganization of a debtor beset by mass tort claims. Its direct application in a chapter 9 municipal debt adjustment case is therefore awkward and uncertain. Much debate could be had regarding which of the *Dow Corning* factors should apply in a chapter 9 case and whether any other factors should apply.

There is little case law applying the *Dow Corning* test in the chapter 9 context. However, the Court does find *Connector 2000* instructive and persuasive on this matter. In that case, a "public benefit corporation," formed to assist the South Carolina Department of Transportation ("SCDOT") in financing and operation of transportation facilities, filed a chapter 9 bankruptcy case. The plan of adjustment included broad releases of SCDOT in consideration for "significant concessions" by SCDOT. *Connector 2000*, 447 B.R. at 766.

The court found that the release of SCDOT met the *Dow Corning* standard. It held that the release was "an essential means of implementing the Plan; . . . an integral element of the settlements and transactions incorporated into the Plan; . . . fair, equitable, appropriate and reasonable; . . . confers material benefits on, and is in the best interests of, the Debtor and its creditors; . . . [and] is important to the overall objectives of the Plan to finally resolve all claims among or against the parties-in-interest in the case with respect to the Debtor . . . ." *Id.* at 768-69.

This Court concludes that the releases of the State and its related entities required under the State Contribution Agreement and the plan meet the *Dow Corning* standard as applied in

*Connector 2000*, and are reasonable, necessary and appropriate to implementation of the plan. The Court therefore approves them.

With regard to the *Dow Corning* analysis, the Court concludes:

First, there is an identity of interests between the City and the State. The City is a political arm of the State. It, like all municipalities in Michigan, was created to further the objectives of the State by providing for the health, safety and welfare of the State's residents. The City has no sovereign powers other than those conferred on it by the State. The protection of municipal pensions in the Michigan constitution binds both.

Second, the State is contributing substantial assets to the reorganization—$194.8 million to classes 10 and 11.

Third, the release and injunction are essential to the reorganization of the City. Importantly, the Court observes that this element arises from the fundamental premise of *Dow Corning*—that a bankruptcy court's power to order a third-party release is based in its "power to reorder creditor-debtor relations *needed to achieve a successful reorganization*." 280 F.3d at 656 (emphasis added). As noted, the Grand Bargain, which includes the State Contribution Agreement and the DIA settlement, is the cornerstone of the City's plan. *See, e.g.*, Trial Tr. 57:7-22, Oct. 2, 2014. (Dkt. #7878) The release of the State is a condition precedent to the effectiveness of the State Contribution Agreement and, thus, the DIA settlement. Without these settlements, several other creditor settlements would also collapse. In addition, the approximately $816 million in outside funding provided as part of the Grand Bargain would not

be available.[9]  As discussed in part X.C.3. below, the DIA is essential to the City's continuing recovery and revitalization.  Without the DIA settlement, the City might not be able to ensure that the DIA art would remain in the City or that the art would be protected from future creditor recoveries.

Fourth, the impacted classes have overwhelmingly voted to accept the plan.  The non-consensual releases of the State in the State Contribution Agreement and the plan apply only to the pension creditors in classes 10 and 11.  These classes voted in favor of the plan by 82% and 73%, respectively.  *See* part VI below.

Fifth, the plan provides a mechanism to pay a substantial portion of the claims in the classes affected by the release—classes 10 and 11.  The contributions by the State under the State Contribution Agreement, and by the DIA and the foundations under the DIA settlement, enable classes 10 and 11 to receive their recoveries.  Without these contributions, the impairment to these classes would have been much more significant.  *See* Disc. Stmt. at 17.  (Dkt. #4391)

The sixth element of the *Dow Corning* test requires that the plan provide an opportunity for non-consenting creditors to recover in full.  The City's plan does not have such a provision.  Accordingly, this element is not met.  The City argues that this element should not apply here because the release of liabilities is a condition precedent to receiving the State Contribution and the DIA funding.  Therefore, there can be no "opt out" option for pension creditors.  City's

---

[9] As discussed in part III.E., under the DIA settlement, the DIA and certain donors and foundations will pay $466 million to the GRS and the PFRS over 20 years.  The State Contribution of $194.8 million is payable immediately, but is considered to be the net present value of $350 million paid over 20 years at a 6.75% discount rate.  The amount payable over 20 years, therefore, would be $816 million: $466 million from the DIA settlement and $350 million from the State Contribution.  Although confusing, this is the amount that the parties commonly identify as the funding that the Grand Bargain makes available to the pension plans.

Consol. Pretrial Br. at 143. (Dkt. #7143) The Court concludes that it is unnecessary to determine whether this element applies here. Instead, it concludes that the other *Dow Corning* factors weigh so heavily in favor of approving the releases that it is appropriate to do so even if this element is not met.

Finally, regarding the seventh element, this opinion contains the specific findings of facts supporting the Court's conclusion that the non-consensual releases of the State and its related entities are appropriate.

Accordingly, the Court concludes that the plan meets the *Dow Corning* requirements for the approval of the releases that the State Contribution Agreement requires and that the plan proposes.

The Court additionally concludes that it is reasonable for the State to require these releases. Both the City and State need finality regarding the City's pension liabilities and the City's eligibility to file this chapter 9 case. Those are legitimate objectives in a chapter 9 case and these releases help to achieve those objectives. Thus, like in *Connector 2000*, the releases of the State and related entities here are "an essential means of implementing the Plan; . . . an integral element of the settlements and transactions incorporated into the Plan; . . . fair, equitable, appropriate and reasonable; . . . confers material benefits on, and [are] in the best interests of, the Debtor and its creditors; . . . [and are] important to the overall objectives of the Plan to finally resolve[s] all claims among or against the parties-in-interest in the case with respect to the Debtor . . . ." 477 B.R. at 768-69.

Consequently, under *Dow Corning* and *Connector 2000*, the Court approves the releases of the State and its related entities that are included in the State Contribution Agreement and in the plan.

29

The Court approves the State Contribution Agreement under bankruptcy rule 9019.

## F. The DIA Settlement

### 1. The Dispute over the DIA Art

The second component of the Grand Bargain is the DIA settlement. One of the most contentious issues in this case has been the extent to which the bankruptcy code requires the City to sell or otherwise monetize the art at the DIA to pay creditors.

Several parties, including at times the City itself, have taken the position that the City holds title to several significant pieces of art in the DIA and has the right to sell them outright to pay its obligations to creditors. Several other parties, including the State Attorney General and the DIA, have taken the position that the art that the City purchased or that others contributed to it is held in public trust for the citizens of the City and the State, and cannot be sold to satisfy the City's debts.

### 2. The Terms of the DIA Settlement

The DIA settlement represents the full and final settlement of all disputes relating to the rights of all parties with respect to the DIA and the art.

By this settlement, the DIA pledges to secure and guaranty commitments for contributions of $100 million from individuals, local foundations and the business community (collectively, the "DIA Funders"). From these contributions, the DIA will make payments of $50 million each to the GRS and the PFRS over twenty years.

In addition, various other local and national foundations (collectively, the "Foundation Funders") have pledged to make payments totaling $366 million over twenty years, to be divided equally between the GRS and the PFRS.

30

Upon the closing of the DIA settlement, the Foundation Funders will pay at least 5% of the amounts they have committed to pay, and the DIA and DIA Funders will pay at least $5 million.

In exchange for these payments, the City has agreed to transfer all of its right, title and interest in the art to the DIA to be held in a perpetual charitable trust for the benefit of the people of the City and the State. This will be a permanent transfer, free and clear of all liens, encumbrances, claims and interests of the City or its creditors.

Also as a condition precedent to the continued payment commitments of the DIA, the DIA Funders and the Foundation Funders, the City is required to adopt and maintain certain pension governance mechanisms, including the creation of a review board and the production of annual reports. The requirements are intended to ensure acceptable fiscal practices and procedures for management and investment of pensions.

As a further condition of the commitments of the DIA Funders and Foundation Funders, the DIA will also provide an array of art programs at no cost or discounted cost to the residents of the State.

The retirement systems agree to waive and release any and all claims against the DIA Funders and Foundation Funders related to the DIA settlement or the City's commitment to make payments to the retirement systems. The DIA settlement also includes mutual indemnification provisions.

Most of the objections to the DIA settlement have been withdrawn as part of settlements reached with those objecting creditors. However, some objections that *pro se* pension creditors filed do remain. These objections assert that the City should be required to sell the DIA art so

that their claims can be paid in full. For the reasons stated in the next part and in part X.C.3. below relating to the best interests of creditors test, the Court overrules these objections.

### 3. The DIA Settlement Is Fair and Equitable

Two issues arise here. The first is whether the DIA settlement is a fair settlement. The Court will address that issue here. The second is whether the settlement, which is incorporated into the plan, is in the best interests of creditors as required by § 943(b)(7). The Court will address that issue in part X.C.3. below.

In determining the fairness of the DIA settlement, the Court must examine the strengths and weaknesses of the parties' positions.

The Michigan Attorney General and the DIA take the position that all of the art at the DIA is held in charitable trust for the benefit of the people of the State and so it cannot be sold to pay the City's debts. Trial Tr. 76:13-16, Sept. 18, 2014 (Dkt. #7634); Mich. Att'y Gen. Op. 7272 (June 13, 2013).

The DIA further asserts that the donors of many of the pieces of art imposed specific transfer restrictions on them. Trial Tr. 103:25-106:6, Sept. 18, 2014. (Dkt. #7634)

The City presented credible evidence that the Attorney General, the DIA itself and even many of its individual donors would vigorously challenge any attempt by the City to sell any of the art. *See, e.g.*, Trial Tr. 28:8-15, 30:3-12, Oct. 2, 2014. (Dkt. #7878)

Any sale could result in the cancellation of the tri-county millage taxes that support almost 70% of the DIA's operating budget. Trial Tr. 113:6-19, Sept. 18, 2014. (Dkt. #7634)

The DIA also presented credible historical documentary evidence in support of its position that the City holds the art in trust. Public Act 67 of 1919, which provided for the transfer of the DIA real property and its art from the Detroit Museum of Art (the predecessor to

the DIA) to the City, required that the "property so conveyed shall in the hands of said city be faithfully used for the purposes for which the [Detroit Museum of Art] was organized." Ex. 286. In January 1920, after the 1919 transfer of the art, the trustees of the Detroit Museum of Art held a special meeting to determine its future. The minutes of that meeting reflect that the trustees believed the restrictions in PA 67 of 1919 "give assurance that the property cannot be used excepting for the same purposes as were provided for in the incorporation of the Detroit Museum of Art." Ex. 269 at 4. At that same meeting, the trustees resolved to continue in existence to "encourage and receive in trust and to administer future gifts and legacies." *Id.* at 5; s*ee also* Ex. 268 at 11 (minutes of meeting of City Arts Commission in 1961 noting that the purpose of the Founders Society, the successor to the Detroit Museum of Art, was to "assist the City of Detroit in the operation of the DIA and . . . to promote the people's interest in and knowledge of art matters").

Further, the recitals in the Operating Agreement between the City and the Founders Society dated May 15, 1984, first state that the City "has maintained and operated the DIA for over 60 years for the benefit of the citizens of the City and the State of Michigan." It later states that the City would use state-allocated funds solely for the DIA, which was consistent with "the goal of continuing to benefit the citizens of the City and the State by preserving for their enjoyment the treasures of the DIA[.]" Ex. 281 at 1, 3.

Finally, the DIA's current Collection Management Policy states that "the [DIA] must be ever aware of its role as trustee of the collection for the benefit of the public." Ex. 267 at 11. Even the façade of the DIA itself, built by the City in 1927, states that it is "Dedicated by the People of Detroit to the Knowledge and Enjoyment of Art." *See* Trial Tr. 101:4-13, Sept. 18, 2014. (Dkt. #7634)

This is strong evidence that the DIA was founded for the benefit of the residents of the City and the State, that the City believed that this was the case when the City received title to the art in 1919, and that the City has treated the DIA as a public trust for over one hundred years.

The evidence further establishes that nationally accepted standards for museums prohibit the de-acquisition of art to pay debt. Annmarie Erickson, the executive vice president and chief operating officer of the DIA, testified that the DIA is a member of the Association of Art Museum Directors (the "AAMD"), which represents over one hundred sixty art museums throughout the United States, Canada and Mexico. The AAMD standards provide that "proceeds from the sale of accessioned works of art by an art museum be used only to replenish the collection through the acquisition of other works of art." Ex. 273 at 2. A violation of this standard "will be considered a serious breach of professional responsibility and sanctions may be recommended by a vote of the members of [AAMD]. The imposition of sanctions or penalties may mean suspension of all professional interchange, including loans and shared exhibitions." *Id.* at 3. This standard refers to the prohibition of the sale of art to pay operating expenses of a museum. However, Ms. Erickson testified that the standard would also apply to the sale of art for the purpose of paying City debt. Trial Tr. 114:16-115:19, Sept. 18, 2014. (Dkt. #7634) Accordingly, it is likely that if the City sold any of its art to pay its debts, the national and international art community would refuse to do business with the DIA. Trial Tr. 29:17-23, Oct. 7, 2014 (Dkt. #7878); Trial Tr. 115:2-19, Sept. 18, 2014. (Dkt. #7634)

Further, the City presented credible evidence that de-accessing many highly valuable pieces at the same time would flood the art market and could cause prices to fall significantly. Trial Tr. 112:5-9, Sept. 16, 2014 (Dkt. #7618); Trial Tr. 14:19-15:18, Sept. 18, 2014. (Dkt.

#7634)  Consequently, there is no guaranty that the City would achieve the high returns that many creditors asserted.

On the other hand, the creditors did submit substantial evidence and legal grounds to support the contrary view that the City can legally sell or monetize the DIA art.  For example, the current DIA Operating Agreement states that "[t]he *City* shall retain title to and ownership of the (a) *City art collection* and (b) the *DIA properties*."  Ex. 254 at 15 (italics in original).

On balance, the Court concludes that in any potential litigation concerning the City's right to sell the DIA art, or concerning the creditors' right to access the art to satisfy their claims, the position of the Attorney General and the DIA would almost certainly prevail.

However, the evidence also establishes that any such litigation would take years to conclude and would be costly to pursue.  It also would be difficult for the City to endure that delay and expense while at the same time attempting to revitalize itself.

In addition, because of the DIA settlement and the Grand Bargain, the GRS and the PFRS will receive $816 million in outside funding that would not be available to them otherwise.

The Court therefore concludes that the DIA settlement was a most reasonable and favorable settlement for the City and its pension creditors.  The Court overrules any remaining objections and approves the settlement under bankruptcy rule 9019.

## G. The Pension Global Settlement

The final component of the Grand Bargain is the global settlement of pension-related issues, including the treatment of claims relating to the UAAL of the GRS and the PFRS.

35

## 1. The Terms of the Pension Global Settlement

The GRS, the PFRS and the retiree committee, on one hand, and the City, on the other hand, aggressively disputed the pension plans' UAAL. The GRS and PFRS reported that as of June 30, 2013, the GRS was 70% funded and the PFRS was 89.3% funded with a combined total UAAL for both retirement systems of only $1.5 billion. Disc. Stmt. at 105. (Dkt. #4391) The City claimed that the UAAL is actually $2 billion for the GRS and $1.4 billion for the PFRS, for a total of $3.4 billion. *Id.* at 107.

## a. The Treatment of Pension Claims

As part of the settlement, the parties agreed to an allowed aggregate UAAL claim of $1.25 billion for the PFRS and $1.879 billion for the GRS.

Because of the Grand Bargain, the GRS and the PFRS will receive $816 million in outside funding that would not have been available to them otherwise. Consequently, the pension reductions for retirees on account of the UAAL are now significantly less than the City had originally concluded would be necessary.

For PFRS pension claims, the accrued pension amount will not be reduced. However, the annual cost of living adjustment ("COLA") will be reduced to 45% of the amount provided in pre-petition collective bargaining agreements.

For GRS pension claims, the accrued pension amount will be reduced by 4.5% and COLAs will be eliminated. Some GRS retirees will also be subject to the terms of an annuity savings fund ("ASF") recoupment. Some of those GRS retirees have objected to this ASF recoupment. The Court addresses this issue separately in part III.H. below.

Because of the outside money committed as part of the Grand Bargain, the City will have little responsibility for funding the GRS and the PFRS through June 2023. During that time

36

period, the PFRS will be funded exclusively from contributions from the DIA, the DIA Funders, the Foundation Funders and the State under the Grand Bargain, as described previously.

Through 2023, GRS funding will come from: (a) the DWSD; (b) a portion of the contributions from the State, the DIA, the DIA Funders, and the Foundation Funders as part of the Grand Bargain, (c) the proceeds from the Stub UTGO Bonds as part of the UTGO settlement, described in part III.K. below, and (d) certain revenues from City departments, (e) the Detroit Public Library and (f) the Detroit Regional Convention Facility Authority.

In addition, the parties agree that the pension plans in effect on the petition date will be frozen as of July 1, 2014. Active employees continuing to work for the City after July 1, 2014, will have benefits accrue under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the prior plans.

### b. Restoration of Pension Benefits

As part of the settlement, the parties agree upon certain provisions for the restoration of pension benefit payments if funding levels for the retirement systems exceed certain targets. Through 2023, the funding targets for purposes of benefit restoration are 75% for GRS and 78% for PFRS. *See* Disc. Stmt. at 19-23 (Dkt. #4391); Plan, Exs. II.B.3.q.ii.C. and II.B.3.r.ii.C. (Dkt. #8045) If at any time these targets are exceeded, the amount by which the targets are exceeded will be credited to a restoration reserve account. When the assets credited to the restoration reserve account can fully fund certain percentages of the reduced benefits (for example, when the GRS reserve account can fund 0.5% of the 4.5% benefit reduction), restoration payments will begin. As more money becomes available in the restoration reserve accounts, more benefits will be restored. If funding levels for the retirement systems drop, money in the restoration reserve accounts may no longer be available and restoration payments will be suspended.

37

### c. Governance and Oversight

As described previously, the parties have agreed to establish investment committees for the PFRS and the GRS as required by the State Contribution Agreement. The retiree committee has also agreed to defer to the retirement systems, the City and the State regarding post-effective date governance of the prior pension plans and restoration mechanics.

The parties have further agreed that until June 30, 2023, the boards of trustees of each system will adopt and maintain an investment return assumption and discount rate of 6.75% for purposes of determining the assets and liabilities of the pension systems.

The plan also includes a provision that all parties are enjoined until June 30, 2023 from making any amendment to the terms, conditions and rules of operation of the GRS and the PFRS relating to the calculation of pension benefits, the selection of investment return assumptions, or the contributions to the pension systems.

The City has also set certain targets at which the UAAL for the GRS and the PFRS must be funded. For 2023, the funding targets are 70% for the GRS and 78% for the PFRS. For 2053, in 40 years, the targets are 100% for each. Ex. 723.

Finally, the retiree committee has agreed that it will support the plan and advise retirees to vote in favor of the plan. The committee further agreed to suspend its appeal of the Court's eligibility order and to dismiss the appeal upon the effective date of the plan.

The pension classes voted to accept the plan by 82% in class 10 (PFRS) and 73% in class 11 (GRS).

## 2. The Pension Global Settlement Is Fair and Equitable

Despite these strong votes in favor of the plan, the treatment of pension claims in the City's plan has been a significant issue in this case. In the Court's eligibility opinion, it held that because of the Bankruptcy Clause of the U.S. Constitution, the federal bankruptcy power could be used to impair pension rights in this case, even if the Michigan constitution protects them. *In re City of Detroit, Mich.*, 504 B.R. 97, 150-54 (Bankr. E.D. Mich. 2013). The Court stands by that decision.

Here at the confirmation stage, the Court must determine whether the plan's treatment of pension claims meets the legal requirements for plan confirmation and settlement approval. The plan confirmation issues include good faith, best interests of creditors, feasibility and others. The Court addresses these questions separately in other parts of this opinion. The Court will now address whether the pension settlement is a reasonable settlement under bankruptcy rule 9019.

Despite the acceptance of the plan by the pension classes, a significant number of pension creditors still strongly oppose the impairment of their pension rights. They believe and assert in their many objections that under the Michigan constitution, their pension rights are not subject to impairment. They credibly state that they worked hard for the City, that they did nothing wrong, and that these pension impairments will cause them real hardship. Some also argue that the pension impairments in the plan are unnecessary because the pension plans are in fact fully funded. They further argue that if the pension plans are underfunded, as the City asserts, the City should sell the art at the DIA or other City assets. As discussed in part II.D. above, many of these objecting parties took the time to come to court to give a strong, sincere and personal voice to their objections.

39

The Court, however, finds that the pension settlement is a reasonable settlement and overrules those objections to the plan and to the pension settlement.

Several representatives of the pension classes appealed this Court's eligibility decision. The City, of course, takes the position that the eligibility decision was correct and should be affirmed. To determine the reasonableness of the settlement, it is incumbent upon this Court to estimate the parties' likelihood of success of the appeal. That is challenging here. The issue of whether pensions can be impaired in bankruptcy despite state constitutional protection is a novel one. However, this Court believes that its reasoning in the eligibility decision is sound. The Court therefore estimates that the pension creditors' chances of success on appeal would be in the range of 25%.

The next step is to determine each side's best-case scenario. For the City, that would plainly be to prevail on appeal and to continue in this chapter 9 case. For the pension creditors, however, the best-case scenario is much less clear. The City presented convincing evidence at the confirmation hearing that it would have no ability to pay the UAAL even if the pension creditors were to prevail on appeal. Gaurav Malhotra, an expert on restructuring and financial analysis at Ernst & Young, LLP, testified that without restructuring, the City would have a $4 billion deficit over the next ten years, or $390 to $400 million per year, due largely to the City's unsustainable legacy costs. Trial Tr. 71:10-13, Sept. 29, 2014 (Dkt. #7819); Ex. 109 at 6.

It is therefore a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. Without the outside funding from the Grand Bargain, the City anticipated having to reduce pensions by as much as 27%. Disc. Stmt. at 17. (Dkt. #4391) The

pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

At the same time, the Court recognizes that even these relatively minor pension reductions will cause real and, in some cases, severe hardship. However, this bankruptcy, like most, requires shared sacrifice because the City is insolvent and desperately needs confirmation of this plan to fix its future.

As noted, a substantial majority of both classes 10 and 11 voted in favor of the City's plan and accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

Accordingly, the Court finds that the pension settlement is reasonable and approves it.

## H. The Annuity Savings Fund Recoupment
## Settlement

In the City's long-standing Annuity Savings Fund program, GRS employees could voluntarily contribute a percentage of their gross pay to a separate pension account. The GRS then invested these ASF contributions with the other GRS assets that the City contributed or that the GRS earned on its investments. Each participant's ASF account increased in value based on the participant's contributions and the interest that the GRS credited to that account.

### 1. The Dispute Over the Excess ASF Credits

For many years, the GRS credited interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less.

The City claims that this diversion of assets increased the GRS UAAL. It therefore contends that recoupment of the excess interest from the ASF participants is necessary and

appropriate to offset the increased UAAL. That recoupment in turn reduces the pension cuts to the GRS retirees. The City calculates that the total of this claim is approximately $387 million.

The ASF participants assert that there is no basis for recoupment.

## 2. The Terms of the ASF Settlement

The parties have settled this issue as part of the global pension settlement. The City and the retiree committee have agreed that the ASF recoupment amount for each retiree will be limited to the total amount of excess interest that was credited between July 1, 2003, and June 20, 2013. The GRS will amortize each ASF participant's recoupment amount over the participant's life expectancy with interest at 6.75%, to be deducted from the participant's monthly pension check or ASF account. In no event will the total ASF recoupment from any participant exceed the amount necessary to amortize the ASF excess amount calculated for the participant at 6.75% interest. Each ASF participant will have the option to pay the ASF recoupment amount in a single lump sum cash payment.

The parties also agreed upon limitations on the ASF recoupment. The ASF recoupment will be capped at 20% of the highest value of each participant's ASF account between July 1, 2003, and June 30, 2013. An additional cap limits the combined pension reduction and ASF recoupment for each participant to 20% of such participant's annual pension.

The City anticipates that this settlement will result in an additional $190 million for the GRS. City's Consol. Resp. to Certain *Pro Se* Objections, ¶ 8 at 9. (Dkt. #7303) This is approximately 49% of the City's ASF claim.

### 3. Objections to the ASF Settlement

Several GRS participants object to the ASF recoupment in the plan. These include: Hassan Aleem (Dkt. #5057); George Cannon (Dkt. #5126); Roger N. Cheek (Dkt. #5947); Jamie S. Fields (Dkt. #4404); Michael J. Karwoski (Dkt. ##5089 and 5923); Mattie D. Pritchett (Dkt. #5887); John P. Quinn (Dkt. #5723); Dennis Taubitz (Dkt. #5971); Gerald G. Thompson (Dkt. #3352); Jean Vortkamp (Dkt. #4578); Mary Jo Vortkamp (Dkt. #4579); Steven Wojtowicz (Dkt. #6870); and Demetria Wright (Dkt. #5795). They argue:

1. The ASF recoupment violates the applicable statute of limitations.

2. Under state law, the City's recoupment claim has no merit.

3. They did nothing that justifies imposing this liability on them.

4. The GRS board of trustees did nothing wrong and was acting within its complete discretion under Sections 47-2-17 and 47-2-18 of the Detroit City Code by allocating the excess interest payments to ASF participants.

5. The City has no standing to assert the recoupment claim.

6. They do not consent to the lesser treatment of their pension claim in class 11 that results from the recoupment.

7. The treatment of the City's recoupment claim in the plan violates their right to be heard on the merits.

8. The City did not properly disclose the 6.75% interest rate.

9. The 6.75% interest rate is illegal, usurious and unfair.

10. The Court should carve the ASF settlement out of the plan and then approve the plan.

11. The ASF recoupment proposes a seizure of the assets of creditors holding class 11 claims without due process of law because the City has not brought any action under bankruptcy or non-bankruptcy law that would provide a legal basis for ASF recoupment.

12. The ASF recoupment settlement in the plan constitutes an improperly asserted preference or fraudulent transfer action.

13. The City is precluded from recouping the ASF excess interest amounts because the City had knowledge of, or participated in, the allocation of these amounts to the ASF participants.

14. As a result of the imposition of the 6.75% interest rate to annuitize the ASF excess amounts, amounts recovered from ASF distribution recipients will "greatly exceed" the ASF recoupment cap, which is 20% of the highest value of the ASF distribution recipient's annuity savings account during the ASF recoupment period.

### 4. The ASF Settlement Is Fair and Equitable, and Does Not Violate the Bankruptcy Code

The ASF recoupment settlement is a part of the global pension settlement and therefore a part of the Grand Bargain. It is also a part of the City's plan. The bankruptcy code provides that a class of claims accepts a plan "if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c). Although there are dissenting creditors in class 11, "[i]n a Chapter 9 [case], dissenting creditors in an accepting class are bound by the accepting vote of the other members." *In re City of Colorado Springs Spring Creek Gen'l Improvement Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995).

The Court, therefore, has only two issues to consider. The first is whether the settlement is fair and equitable. The second is whether the plan provisions that incorporate the ASF settlement violate the bankruptcy code.

It is not for the Court to rule on the merits of the City's ASF recoupment claim. Nor is it for the Court to rule on the merits of the participants' defenses to that claim. The Court only reviews the parties' respective positions to determine whether the settlement is fair and equitable.

The Court finds that the City's recoupment claim would quite likely succeed. As noted, the practice was to credit interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less. The legal authority of the GRS board to do that is

doubtful. The prudence of the practice is even more doubtful. The practice ignored the practical reality that over the long term, the GRS needs to retain its earnings that exceed the assumed rate of return to offset the earnings shortfalls that result when the actual rate of return is less than the assumed rate of return. The City's claims of breach of fiduciary duties and diversion of assets are therefore quite strong. Its claim that recoupment against ASF participants is the proper equitable remedy is also quite strong.

On the other hand, the Court considers that the asserted defenses have less merit.

On balance, it appears that the City's recoupment claim would have a reasonable likelihood of success, in the range of 60-70%.

However, the length, complexity and expense of litigation would be substantial. If the City prevails, issues of collectability against ASF participants could also be substantial, depending upon the structure of the final judgment.

The Court also considers that this settlement is part of the much larger settlement of all pension-related issues. The class of claims affected by the settlement, class 11, accepted the settlement by a vote of 73%. Finally, the Court notes that the caps and other limitations on the recoupment amount that the parties negotiated should reduce the hardship of it.

Fairly weighing these factors suggests that the ASF recoupment settlement is well within the range of possible reasonable settlements. The Court, therefore, overrules the objections and finds the ASF recoupment portion of the pension settlement is fair and equitable. The Court further concludes that nothing about the ASF settlement violates the bankruptcy code.

## I. The OPEB Settlement

In addition to their pension claims, retirees also have claims against the City for loss of other post-employment benefits ("OPEB claims") including post-employment health, vision, dental, life and death benefits.  These OPEB claims constitute class 12 in the plan.

### 1. The Disputes Over the OPEB Claims

The amount of the City's outstanding obligation related to OPEB claims has been the subject of intense dispute, described more fully below.  However, all estimates put the liability in the multi-billion dollar range.  OPEB claims represent the single largest portion of the City's unsecured debt obligation.  Trial Tr. 11:5-9, Oct. 2, 2014.  (Dkt. #7878)

In early 2014, the City notified its retirees that it would drastically change the healthcare plans that it offered to them, resulting in significantly lower benefit payments.  In response, the retiree committee filed an adversary proceeding against the City seeking an injunction to prohibit it from unilaterally changing the healthcare benefits that it provided to retirees.  The committee asserted largely equitable grounds relating to the hardship that terminating these benefits would naturally cause retirees.  There did not appear to be any substantial legal grounds for the requested relief.  *See*, Complaint, *Official Comm. of Retirees v. City of Detroit* (*In re City of Detroit*), No. 13-05244 (Bankr. E.D. Mich. Oct. 22, 2013).  (Dkt. #1)

The City and the retiree committee disputed the present value of the OPEB claims.  The City estimated the amount of the claim to be roughly $3.77 billion.  The retiree committee estimated it to be approximately $5 billion.  City's Consol. Reply to Certain Objections to Confirmation of Fourth Am. Plan at 13.  (Dkt. #5034)  The difference in the estimated values of the claim is the result of differing actuarial assumptions and discount rates that the parties used.  *Id*.

46

The City and the retiree committee also disagreed on the characterization of payments that the City made on OPEB benefits after the City filed this case. The City's position was that these payments were a partial satisfaction of the OPEB claim and should reduce the amount of New B Notes that, under the plan, would be distributed on account of the allowed OPEB claim on a dollar-for-dollar basis. The retiree committee argued that the payments should be ignored for purposes of calculating the OPEB claim amount. *Id.* at 14.

## 2. The Terms of the OPEB Settlement

The City and the retiree committee reached a settlement of their disputes related to the OPEB claim as part of the pension global settlement.

Pursuant to the settlement, the total allowed amount of the OPEB claim is fixed at $4.303 billion—$2.208 billion for PFRS retirees and $2.095 billion for GRS retirees.

In addition, the City and retiree committee have settled on the treatment of the OPEB claim. The City will establish VEBAs for the PFRS and the GRS. On the effective date, the City will distribute $232 million in New B Notes to the PFRS VEBA and $218 million in New B Notes to the GRS VEBA. The retiree committee also negotiated an improved interest rate for the New B Notes—4.0% for the first twenty years and 6.0% for the last ten years. The New B Notes have a thirty-year maturity.

The City will also distribute $42.7 million in New B Notes to the VEBAs from the Excess New B Notes. As described in part III.M. below, the Excess New B Notes are a result of the settlement agreements with holders of class 9 claims.

The start-up costs for the VEBAs will be funded by: (1) $8 million from a reserve fund held in the currently existing benefits plans; (2) approximately $3.5 million from charitable contributions; (3) an advance of the interest payment on the Excess New B Notes due in October

of 2015; and (4) $18 million in grants from various local foundations and the Detroit Benefits Board. Ex. 720; *see also* Letter Agreement with Retiree Committee at 2-3, Nov. 4, 2014. (Dkt. #8183)

The VEBAs will provide health benefits, including life insurance, to retirees and certain of their beneficiaries and dependents. Each VEBAs will be governed by boards of trustees that will be responsible for the management of its assets, for its administration, and for determining the beneficiaries' benefits.

As a result of this settlement and the creation of the VEBAs, the City will have no further responsibility to provide retiree healthcare or other benefits for retirees. Further, the City will have no responsibility to provide life insurance or death benefits to current or former employees. The current death benefit plan will be frozen and will be self-liquidating. Any existing retirees who participate in the death benefit plan will be given a one-time opportunity to receive a lump sum distribution of the present value of the actuarially determined death benefit.

The plan treats the OPEB claim in class 12. The estimated recovery for the class 12 OPEB claim is 10%. Class 12 accepted the plan by over 88%.

### 3. The OPEB Settlement Is Fair and Equitable

The City contends that the OPEB settlement is fair and reasonable for several reasons. First, the City believes that the settlement avoids protracted and expensive litigation to resolve intense factual and legal disputes. Second, the City asserts that, given the range of estimated OPEB claim values between $3.771 billion and $5 billion, the settled allowed claim amount of $4.303 billion is reasonable. Lastly, the City argues that the settlement is in the best interests of the City and its creditors because it settles one of the City's largest liabilities and at the time, allowed the City to bring the bankruptcy closer to its conclusion.

48

The Court agrees that litigation to resolve the amount of the City's OPEB liability would be complex, lengthy and very expensive. Resolution of the litigation would turn largely on actuarial opinion testimony with extensive discovery regarding multiple competing experts. Disc. Stmt. at 15. (Dkt. #4391) The evidence would be intensely fact-specific. Trial Tr. 18:1-5, Oct. 2, 2014. (Dkt. #7878) As the City points out, any litigation could also involve resolution of other fact-intensive issues, such as retiree census data and the proper discount rate to be applied to liabilities. Disc. Stmt. at 152. (Dkt. #4391)

The outcome of any potential litigation to resolve the claim would be uncertain. The City's view that the retiree committee would zealously oppose the City's position is justified. Trial Tr. 17:12-15, Oct. 2, 2014. (Dkt. #7878) It is also significant that the City would be responsible for the committee's professional fees in any such litigation. A settled claim amount that falls almost exactly midway between the disputed values is therefore reasonable.

The Court also finds that creation of the VEBAs to address the OPEB claim is reasonable. The City presented evidence that, without restructuring, OPEB liabilities would account for as much as 26% of expenditures from the City's general fund by the year 2023. Trial Tr. 177:10-13, Oct. 1, 2014 (Dkt. #7850); Ex. 721. Such a large liability would destroy the City's ability to make the financial and operational changes necessary to provide adequate municipal services.

The City's evidence also shows that transferring the OPEB legacy costs to the VEBAs will reduce the City's obligation to a much more manageable 3% of general fund expenditures over the next 30 years. Trial Tr. 173:21-174:15, Oct. 1, 2014 (Dkt. #7850); Ex. 721.

Accordingly, the Court finds that the OPEB settlement is reasonable and approves it.

## J. The 36th District Court Settlement

Although the 36th District Court is a separate legal entity from the City, under state law, the City is required to fund the operations of the court. Mich. Comp. Laws §§ 600.8103 and 600.8104. When the City filed this bankruptcy case, the 36th District Court was defending various employment-related claims. Because the City is required to fund the 36th District Court, it would ultimately be liable for the payment of any judgments against the 36th District Court on those claims.

During the bankruptcy proceeding, the creditors with claims against the 36th District Court participated in arbitration and obtained awards in the aggregate amount of approximately $14 million. Trial Tr. 58:14-17, 59:24-25, Oct. 2, 2014. (Dkt. #7878)

AFSCME is the bargaining agent for employees of the 36th District Court. AFSCME, the individual creditors and the 36th District Court itself filed proofs of claim related to the obligations arising from those arbitration awards.

The parties have settled. Under this settlement, the 36th District Court creditors are classified into class 17 and the aggregate liquidated allowed amount of their claims is fixed at $6 million. The parties have agreed to settle the claims for a recovery of $2 million (33%) and the 36th District Court will withdraw its proof of claim entirely with prejudice.

The 36th District Court creditors whose claims are less than $100,000 will receive 33% of their allowed claim in cash. Creditors whose claims are more than $100,000 will receive 33% of their allowed claims payable in five equal annual installments plus simple interest at a rate of 5% per year.

The parties have also agreed to release all of the claims that they may have against each other, except that AFSCME and some of the individual creditors do not release claims that they have against the 36th District Court related to certain identified pending proceedings. The City

50

has also agreed to carve out an exception to the broad third-party releases in the plan to allow the 36th District Court creditors to pursue actions against the State and its related entities with respect to the liabilities that the 36th District Court creditors assert to the extent that the plan does not satisfy those liabilities.

AFSCME and the individual creditors are deemed to have voted their respective claims in favor of the plan in the amounts established by the Order Regarding the Voting of Claims Relating to the 36th District Court. (Dkt. #5905)

The Court finds that this settlement is reasonable. The claims against the 36th District Court were obviously not frivolous, as they have been reduced to substantial awards in arbitration. Outside of bankruptcy, the City would be liable to pay those claims on behalf of the court. If the City had chosen instead to continue to contest those claims, the number of claims would have made the expense of the litigation significant. Trial Tr. 62:2-10, Oct. 2, 2014. (Dkt. #7878)

Settling the dispute for an allowed claim of $6 million with an ultimate distribution of $2 million is reasonable. Consequently, the Court approves the 36th District Court settlement.


### K. The UTGO Settlement

Under Michigan law, the City is authorized to issue variable rate unlimited tax general obligation bonds ("UTGO Bonds") with approval from voters. Each year, the City is required to levy sufficient *ad valorem* property taxes to pay the debt service on those bonds without limitation as to rate or amount. Mich. Comp. Laws § 141.2701(1).

When the City filed this case, it had as much as $480 million in outstanding UTGO Bonds, including principal and accrued interest ("Prior UTGO Bonds"). The claims related to Prior UTGO Bonds are in class 8.

## 1. The Dispute Regarding the UTGO Bonds

On October 1, 2013, and April 1, 2014, the City defaulted on its obligation to make principal and interest payments on the Prior UTGO Bonds. On both occasions, Ambac Assurance Corp., Assured Guaranty Municipal Corp. and National Public Finance Guarantee Corp. (collectively, the "UTGO Bond Insurers") paid bondholders' claims on the defaulted payments under insurance policies held with them and became subrogated to the rights of those bondholders.

On November 8, 2013, the UTGO Bond Insurers filed adversary proceedings against the City seeking declaratory relief regarding their rights with respect to the Prior UTGO Bonds. *See* First Am. Compl. for Declaratory J., *Nat'l Pub. Fin. Guar. Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05309 (Bankr. E.D. Mich. Dec. 23, 2013) (Dkt. #41) ("NPFG Complaint"); Am. Compl. for Declaratory J., *Ambac Assurance Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05310 (Bankr. E.D. Mich. Dec. 23, 2013) (Dkt. #57) ("Ambac Complaint").

The UTGO Bond Insurers contended that the Prior UTGO Bond debt should be subject to special treatment under the plan. They argued that because taxpayers specifically voted to approve the issuance of these bonds, the taxes levied to pay them are special revenues that can only be used to service the Prior UTGO Bond debt. NPFG Complaint, ¶¶ 83-86 at 33-34; Ambac Complaint, ¶ 77 at 35-36. The UTGO Bond Insurers also argued that they had statutory and contractual liens on the tax revenues. NPFG Complaint, ¶¶ 80-82 at 32-33; Ambac Complaint, ¶¶ 66-76 at 32-35. Finally, the UTGO Bond Insurers relied on various trust theories to argue that the City was simply a pass-through entity between the taxpayers and the bondholders. NPFG Complaint, ¶¶ 76-79 at 31.

The City disputed these claims, arguing that the Prior UTGO Bonds are general unsecured obligations. The City also argued that the UTGO Bond Insurers did not have standing

to seek relief under the Michigan Revised Municipal Act because that act does not provide a private right of action and because § 904 prohibits the bankruptcy court from interfering with the City's decisions regarding its property. *See, e.g.*, Br. in Supp. at 7-16, *in* City's Motion to Dismiss, Ex. 3, *Nat'l Pub. Fin. Guar. Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05309 (Bankr. E.D. Mich. Dec. 23, 2013). (Dkt. #38)

## 2. The Terms of the UTGO Settlement

The City and the UTGO Bond Insurers entered into negotiations and reached a settlement of their disputes. The parties agreed to an allowed claim in the amount of $388 million relating to the Prior UTGO Bonds.

Just under $288 million of the Prior UTGO Bonds will be restructured and reallocated among the holders of the bonds ("Restructured UTGO Bonds"), as more fully described below. The Restructured UTGO Bonds represent a 74% recovery for holders of the Prior UTGO Bonds.

As part of the restructuring of the Prior UTGO Bonds, the City will issue to the Michigan Finance Authority ("MFA") an unlimited tax obligation bond (the "Municipal Obligation") on the same terms as the Prior UTGO Bonds and secured by a pledge of the UTGO Bond tax levy and certain distributable state aid that the City expects to receive. The MFA will then issue the Restructured UTGO Bonds on the same terms as the Municipal Obligation. These Restructured UTGO Bonds will be payable from and secured by the Municipal Obligation, the City's pledge of the UTGO Bond tax levy and the distributable state aid the City expects to receive. The Restructured UTGO Bonds will then be exchanged for roughly $288 million of Prior UTGO Bonds. In this way, the Prior UTGO Bondholders will then hold bonds issued by the MFA that are secured by the payment rights associated with the UTGO Bond tax levy and a fourth lien on certain distributable state aid. Plan, Ex. I.A.285. (Dkt. #8045)

The distributable state aid will only be used to pay the Restructured UTGO Bonds if the collection and deposit of the UTGO Bond tax levy has not reached specified amounts by the dates on which installments of the distributable state aid are deposited into the City's accounts.

The remainder of the Prior UTGO Bonds (the "Stub UTGO Bonds") in the principal amount of roughly $43 million will be reinstated and will be payable from the UTGO Bond tax levies. The holders' rights to payment of the Stub UTGO Bonds will be assigned to a designee of the City for use in funding the income stabilization program that is part of the State Contribution Agreement described in part III.E. above.

In exchange, the parties agree that upon confirmation of the plan, all litigation related to the Prior UTGO Bonds will be dismissed with prejudice and all proofs of claim filed with respect to the Prior UTGO Bonds will be deemed resolved and fully satisfied.

The parties also agree that the UTGO Bond Insurers will be included as exculpated parties under the plan. The parties further agree that they release each other from any and all liabilities related to the Prior UTGO Bonds or the adversary proceedings filed by the UTGO Bond Insurers.

### 3. The UTGO Settlement Is Fair and Equitable

The UTGO Bond Insurers' arguments, while novel, may have some merit. When the Prior UTGO Bonds were issued, the City had arguably reached its maximum statutory limitations for *ad valorem* taxes. Ambac Complaint, ¶ 34 at 16. However, because of voter approval for these specific bonds, the City was able to collect additional tax revenues to pay them. Further, Michigan law provides strict controls and limitations over use of *ad valorem* taxes that are levied to retire debt. *See, e.g.*, Mich. Comp. Laws § 141.2701(1)-(3). For example, the City is required to segregate the additional *ad valorem* taxes into separate accounts

and use those monies to pay the debt service on the Prior UTGO Bonds. Mich. Comp. Laws § 141.2701(1)(d)(i). The UTGO Bond Insurers argued that this created a statutory lien on the *ad valorem* taxes collected to service the Prior UTGO Bonds. The UTGO Bond Insurers also had at least a colorable argument that the City intended to pledge a security interest in the revenues from the *ad valorem* property taxes.

The City contested these claims and argued that the Prior UTGO Bonds were only general unsecured claims. *See, e.g.*, Br. in Supp. at 15-16, *in* City's Mot. to Dismiss the Complaint, Ex. 3, *Ambac Assurance Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05310 (Bankr. E.D. Mich. Dec. 23, 2013) (Dkt. #53); City's Consol. Reply, ¶ 19 at 12 (Dkt. #5034).

Mr. Orr, the emergency manager for the City, testified that if the UTGO Bond Insurers had been successful in litigation, the City could have faced a large secured claim that could not be impaired in bankruptcy. This would also have precluded the City from access to the additional tax revenue. Trial Tr. 187:6-10, Oct. 1, 2014. (Dkt. #7850) In addition, Mr. Orr testified that the City could have been required to raise taxes if the UTGO Bond Insurers were successful in their arguments. *Id.* at 190:3-6.

This settlement resolves all issues relating to the UTGO Bonds in adversary proceedings 13-05309 and 13-05310. These cases had already been vigorously litigated before the settlement was reached and any further litigation would have been lengthy, complex and time consuming. The UTGO Bond Insurers were not only motivated to protect their claims in this proceeding but were also highly motivated to avoid any negative precedent that could be used by other municipalities with UTGO bond financing. *Id.* at 188:1-189:25.

55

For this reason, even a favorable outcome for the City in litigation could have had negative consequences for the City. The City may have lost access to the capital markets when it emerges from bankruptcy or it may been required to pay higher interest rates for bond debt. *Id.* at 191:1-8. The settlement avoids these potential outcomes.

The outcome of the litigation was not certain. If the Prior UTGO Bonds claims were determined to be general unsecured claims, the dividends on the UTGO bond claims would have been about 10%. On the other hand, if the UTGO Bond Insurers were successful in their arguments that their claims were secured, the dividend would likely have been 100%.

On balance, the Court finds that the City's chance of success on the merits of the litigation was a coin-toss. The Court concludes that the other circumstances do warrant the premium that the 74% recovery settlement reflects. Accordingly, the Court finds that this recovery is within the range of reasonable settlements, although perhaps at the upper end of that range.

The settlement is also beneficial to other creditors. The Stub UTGO Bonds will be assigned to the City for use in the income stabilization program to ensure that pension reductions do not force City retirees into poverty.

Class 8 accepted the plan by a vote of 87%.

The Court finds that the UTGO settlement is fair and reasonable, and approves it.

## L. The LTGO Settlement

Michigan law also allows the City to issue limited tax obligation bonds ("LTGO Bonds"), payable from *ad valorem* tax revenues. Mich. Comp. Laws § 141.2101 *et seq*. Unlike UTGO Bonds, LTGO Bonds are subject to applicable charter, statutory or constitutional rate limitations. Mich. Comp. Laws § 141.2701(3). State law does require the City, however, to set aside enough

revenues from the *ad valorem* tax collections to pay LTGO Bonds as a "first budget obligation." *Id.*

## 1. The Dispute Regarding the LTGO Bonds

When the City filed this case, it had almost $164 million in outstanding LTGO Bonds, including principal and accrued interest.

On October 1, 2013, and April 1, 2014, the City defaulted on its obligation to make interest payments on the LTGO Bonds. On both occasions, Ambac, insurer of two-thirds of the LTGO Bonds, paid claims on the defaulted payments and became subrogated to the rights of the bondholders. On November 8, 2013, Ambac filed a complaint against the City seeking declaratory relief regarding its rights with respect to the LTGO Bonds. *See* Ambac Complaint.

The City asserted that the LTGO claims are merely unsecured claims. *See, e.g.*, Br. in Supp. at 22-33, *in* City's Mot. to Dismiss, Ex. 3, *Ambac Assurance Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05310 (Bankr. E.D. Mich. Dec. 23, 2013). (Dkt. #83)

## 2. The Terms of the LTGO Settlement

The City, Ambac and BlackRock Financial Management, on behalf of certain managed funds and accounts holding uninsured LTGO Bonds, entered into negotiations and reached a settlement of their disputes. Under the settlement agreement, the City has the option either to issue new LTGO Bonds in the amount of $55 million or to pay $55 million in cash using exit financing. Mr. Malhotra testified that the City has elected to make the $55 million cash payment. Trial Tr. 58:16-22, Oct. 21, 2014. (Dkt. #8098)

The LTGO Bond creditors will also receive $17.3 million in Excess New B Notes from the class 9 settlement, described in part III.M. below.

57

As part of the settlement, Ambac has agreed to cease all litigation and the parties agree that the LTGO settlement resolves and fully satisfies all proofs of claim filed with respect to the LTGO Bonds. In addition, Ambac and BlackRock Financial Management will be considered exculpated parties under the plan. Finally, Ambac and the City agree to release each other from any and all claims related to the LTGO Bonds and the adversary proceeding that Ambac filed.

The plan classifies the LTGO Bonds claims in class 7. The total estimated recovery for holders of LTGO Bond claims is 41%. The class accepted the plan by a vote of 63%.

### 3. The LTGO Settlement Is Fair and Equitable

The Court finds that the LTGO settlement is reasonable. The parties' arguments are very similar in nature to those described in the UTGO section above.

The LTGO Bond creditors had the additional argument that they were entitled to priority over other unsecured claims because the City had to pay them as a "first budget obligation" under state law. Mich. Comp. Laws § 141.2701(3); Ambac's Obj. to Fourth Am. Plan at 27-31. (Dkt. #4677) The meaning of this obligation in the statute is unclear in a bankruptcy context. However, if the LTGO Bond creditors had been successful in this argument, the City could have been required to pay them before it paid for its operating expenses. Trial Tr. 203:3-6, Oct. 1, 2014. (Dkt. #7850)

The Court concludes that the City had a substantial likelihood of prevailing in the LTGO Bond litigation, perhaps a 75% chance. If the LTGO Bond claims were determined to be general unsecured claims, recovery for the LTGO creditors would be approximately 10%. If the LTGO Bond claims were found to have priority over other unsecured claims, the recovery would be 100%. Accordingly, a 41% recovery is well within the range of reasonable settlements.

58

As noted, the LTGO recovery is estimated to be 41% while the UTGO recovery is estimated to be 74%. The City's justification for this difference is that the LTGO Bond creditors had somewhat weaker arguments on the merits of their claims. Trial Tr. 9:12-10:1, October 2, 2014. (Dkt. #7878) For example, the LTGO Bond creditors could not point to a dedicated *ad valorem* tax stream that had been approved through voter referendum. In addition, the City felt that the state law requirement that the UTGO Bonds must be paid without limitation meant the UTGO Bondholders had a more robust position than the LTGO Bondholders. *Id.* Nothing in the record contradicts these conclusions and the Court finds that they are reasonable.

Consequently, the Court approves the settlement with the LTGO Bond creditors.

## M. The Settlements Related to the Certificates of Participation

By 2005, the City had fallen behind in its constitutional and statutory requirements to make contributions to the PFRS and the GRS. At the time, the City did not have sufficient resources to fully fund its pension plans, and the amounts it needed to borrow would have exceeded the debt limits under the Home Rule City Act ("HRCA"), Mich. Comp. Laws § 117.1.

In an attempt to meet its funding obligations without violating the HRCA, the City entered into a series of complex financial transactions. First, the City created two service corporations and entered into contracts with them in which the City agreed to make payments to the service corporations (the "City Payments") for the service of helping the City with its funding obligations to the retirement systems (the "Service Contracts").

The service corporations then created two funding trusts to sell certificates of participation ("COPs") in the City Payments. In order to make the COPs marketable to

investors, the City sought out monoline insurers, including FGIC and Syncora, to issue policies guaranteeing the payments of principal and interest on certain of the COPs.

The proceeds from the sale of the COPs were remitted by the funding trusts to the service corporations, which in turn remitted the funds to the PFRS and the GRS to satisfy the unfunded pension obligations of the City. Finally, the service corporations assigned their rights to receive the City Payments to the funding trusts, which used the payments to pay the COPs Holders the interest and principal that they were due. A structurally identical transaction was also completed in 2006. The Court will refer to these transactions collectively as the "COPs Transaction."

By creating this structure, the City could characterize the payments that it made as contractual obligations for future services under the Service Contracts, rather than debt service. This allowed the City to avoid (or evade) the debt limitations in the HRCA.

### 1. The Dispute Relating to the COPs Transactions

Immediately before filing its chapter 9 petition, the City stopped making the City Payments. FGIC made payments to the COPs Holders under the insurance policies that it issued for the payments that the City did not make. When the City filed this case, the outstanding COPs obligation was approximately $1.2 billion.

On January 31, 2014, the City filed an adversary proceeding against the service corporations and the funding trusts seeking a declaratory judgment that the Service Contracts were void *ab initio* and unenforceable. *See* Compl. for Declaratory J. and Inj. Relief, *City of Detroit v. Detroit General Retirement System Service Corp.*, No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014) (Dkt. #1) ("City Complaint"). The Court later permitted FGIC and the COPs Holders to intervene in that adversary proceeding. (Dkt. ##73 and 93)

60

The City argued that the service corporations were simply sham entities that it created for the sole purpose of making a one-time payment of the COPs proceeds to the PFRS and the GRS. The City claimed that the Service Contracts were thus not future service contracts at all but rather a means for the City to incur debt in contravention of the HRCA. Because the Service Contracts were illegal under state law when they were created, the City argued, they were unenforceable and void *ab initio*.

The City also argued that the COPs Transaction is void because the City did not obtain the required approvals from the Michigan Department of Treasury before undertaking a debt financing of that magnitude as required by the Revised Municipal Finance Act, Mich. Comp. Laws 141.2101, *et seq.*

These arguments have substantial merit. According to the allegations in the City Complaint, the service corporations have no staff, no budgets, do not hold annual board meetings and have no real ongoing functions. City Complaint, ¶¶ 13-14 at 7. If these allegations were proven, they would strongly suggest that the service corporations are sham entities. If the service corporations were shams and could be disregarded, then the City would be left as the sole obligor for payment of the debt service on the COPs. This would arguably violate the HRCA.

On the other hand, FGIC and the COPs Holders argued that the doctrines of estoppel, unjust enrichment and *in pari delicto*, and unclean hands bar the City from claiming that the Service Contracts are illegal. At the time of the transaction, the City made several representations and warranties that the City was authorized to enter into the COPs Transaction, that the transaction would be valid and binding and that it did not represent indebtedness. *See, e.g.*, GRS Service Contract 2005, General Terms at § 3.02, *in* City Complaint, Ex. C. At the time, the City also provided evidence to FGIC and the COPs Holders of its due diligence and

legal opinions on these issues. The Detroit City Council also passed ordinances approving the COPs Transaction. *See*, *e.g.*, FGIC Countercl., ¶ 66 at 21-22, *City of Detroit v. Detroit General Retirement System Service Corp.*, No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014) (Dkt. #129); City of Detroit Ordinance No. 05-05 (Feb. 4, 2005).

To this, the City countered that the insurers and COPs purchasers were aware that the structure of the COPs Transaction was precarious and that the City had reached its debt limit under state law. This information was included in the offering circulars and underwriting agreements provided at the time. *See*, *e.g.*, 2005 Offering Circular at 5, *in* City Complaint, Ex. A; Underwriting Agreement 2005 at 2, *in* Wilmington Trust's Answer with Affirm. Defenses and Countercl., Ex. 1., *City of Detroit v. Detroit General Retirement System Service Corp.*, No. 14-04112 (Bankr. E.D. Mich. Jan. 31, 2014). (Dkt. #10) Therefore, the City argues, there were no misrepresentations or breaches of warranty.

The outcome of the litigation of these issues is not clear. On balance, the Court finds that the City would have a reasonable likelihood of success on the merits. However, the litigation would likely have taken years, may have affected other parties such as the PFRS and the GRS, and would have been costly, time consuming and distracting for all involved. With these considerations in mind, the Court now turns to the settlements reached with the various parties to the COPs Transaction.

## 2. The Terms of the COPs Settlement

Class 9 consists of holders and insurers of COPs, including Syncora and FGIC. Each class 9 creditor has settled with the City and has chosen to participate in the class 9 settlement option. Under this settlement, each class 9 creditor will sell all of its claims to a settlement trust. In exchange, they will receive their pro rata share of (1) $97.7 million in New B Notes and (2)

the class 9 settlement asset pool. The class 9 settlement asset pool consists of New C Notes and class 9 settlement credits.

The New C Notes have an aggregate amount of $88 million with a twelve-year maturity and bear interest at 5%. Ex. 791. The New C Notes are unsecured obligations; however, the City will segregate certain parking revenues each year in an amount sufficient to pay the annual debt service on the New C Notes. This means that approximately $10 million of parking revenues will be set aside annually in a single general government bank account. Although the New C Notes are due in 2026, the City must prepay them in the event certain parking assets are liquidated or otherwise monetized. In addition, the City may prepay them at any time without penalty or premium.

Settlement credits are credits in the aggregate amount of $25 million and may be used to offset up to 50% of the purchase price of certain eligible City assets. To use the credits, the owner of the credits must participate in the normal procurement or auction process, be the final party selected in such process, and otherwise satisfy all requirements associated with such process. They are assignable and transferable.

Before the class 9 settlements were reached, the City established a litigation trust to hold an amount of New B Notes equal to the total amount of allowed class 9 claims. As a result of the settlements with the class 9 creditors, the City has designated "Excess New B Notes" in the aggregate face amount of approximately $48.71 million. This amount represents the difference between the New B Notes that would have been distributed to class 9 creditors if their claims had been allowed in full and the amount they are actually receiving as part of the settlements. These additional monies have now been designated for other classes of claims as follows: $42.68

million to the GRS VEBA and the PFRS VEBA in class 12, $17.34 million to the LTGO Bond creditors in class 7, and $4.12 million to the class 14 general unsecured creditors.

The settling class 9 creditors are included as exculpated parties in the plan and they release any claims that they may have against the GRS, the PFRS and each other. However, they do not release their claims against the Swap Counterparties.

### 3. The Terms of the Syncora Global Settlement

Syncora's claim against the City is $354 million related to Syncora's purchase and insurance of COPs. As a settling class 9 creditor, Syncora will receive its pro rata share of New B Notes and the class 9 settlement asset pool. This equates to $23.5 million in New B Notes, $21.3 million in New C Notes and $6.25 million in class 9 settlement credits. Syncora's recovery is estimated to be 13% of its class 9 claims.

Syncora also asserted certain secured claims and other litigation claims against the City. In settlement of those claims, the City agreed to make an additional $5 million cash payment to Syncora.

Syncora agreed to support the plan and withdraw all objections. In addition, Syncora agreed to withdraw all its appeals with prejudice.

Syncora and the City have also entered into a development agreement. Under this agreement, a subsidiary of Syncora (the "Developer") is granted a five-year option to acquire certain properties owned by the City. If the Developer exercises the option, the Developer has fifteen months to develop the property into parking facilities, residential housing, commercial retail space or any other suitable use that is consistent with the City's urban planning policies and comprehensive development plan. If the Developer does not begin development of the property within fifteen months after the option is exercised, ownership of the property will revert to the

64

City. The Developer must also complete construction within three years and three months of exercising the option.

The development agreement also includes a one-year option for the Developer to enter into a thirty-year concession with respect to the parking garage located under Grand Circus Park. If the Developer exercises the option, it will have the right to operate the garage and will also be obligated to invest $13.5 million in capital expenditures within the first five years of assuming garage operations. The settlement contemplates that the Developer will retain all revenues from the parking garage until it has recouped 140% of its capital expenditures. After that, the Developer will be required to pay to the City 25% of the revenues of the garage.

The final component of the Syncora settlement relates to the lease of the Detroit-Windsor Tunnel. Syncora owns the company that currently leases and operates the Detroit side of the tunnel that runs under the Detroit River to Windsor, Ontario (the "Tunnel Company"). By its present terms, that lease expires in November 2020. As part of the settlement, the City agrees to assume the lease and to extend it to December 2040. The lease will also be amended to require the Tunnel Company to maintain the City portion of the tunnel to the same standard as the Windsor portion. This will alleviate the concerns that the City of Windsor has historically expressed with operation of the tunnel. The amended lease will also require additional reporting by the Tunnel Company.

Under the amended lease, the Tunnel Company will be permitted to offset certain capital expenditures made to improve the tunnel against the Tunnel Company's rent obligations to the City. Through November 2020, the Tunnel Company will be allowed to credit capital expenditures against rent up to the full amount of the rent. During the extension term of the lease, November 2020 through December 2040, the Tunnel Company may credit capital

65

expenditures against up to 75% of the annual rent. However, in no event may the Tunnel Company credit more than $8 million of capital expenditures during the extension term.

### 4. The Syncora Global Settlement Is Fair and Equitable

The Court finds that the Syncora global settlement is reasonable. Syncora has been one of the fiercest opponents of the City's plan. Syncora objected to or appealed almost every action by the Court in this case, including approval of the public lighting authority, the post-petition financing, the swaps settlement, and the mediation process itself. Without a settlement with Syncora, there is no doubt that it would have continued to litigate its positions on these issues through the appellate courts.

Even if the City were successful in the litigation with Syncora, it would have spent years and millions of dollars defending the results. Confirmation and the effectiveness of the plan may have been held in limbo as these issues made their way through the appellate process.

If Syncora had been successful in any of its appeals, especially its appeals relating to use of the City's gaming revenue or to the approval of the post-petition financing, it would have been devastating for the City and would have prevented the City from accessing vital revenue needed for its RRIs. Trial Tr. 70:12-13, Oct. 2, 2014. (Dkt. #7878)

The settlement avoids the extraordinary time, expense and uncertainty of litigation. It gives the City finality to these many issues and definitive access to its revenues. It allows the City to focus on proposing a more complete plan for confirmation. *Id.* at 86:1-87:2.

The value of the monetary portion of the settlement is estimated to be 13% of Syncora's class 9 claims. The Court finds that this aspect of the settlement is well within the range of reasonableness. It is only slightly more than the recovery of general unsecured creditors.

In addition, this aspect of the settlement agreement benefits several other classes of creditors. Because of the settlement, $162 million in New B Notes that would have been held in reserve in a separate COPs litigation trust will be reallocated to the VEBAs, the LTGO Bond creditors, and the general unsecured creditors. This is clearly in the best interests of the City and its creditors.

The Court also specifically approves the development agreement and the assumption and extension of the tunnel lease. Because of these agreements, Syncora assumes a stake in the City's recovery. In addition, the City gets the benefit of improved management of the Detroit-Windsor Tunnel. If Syncora exercises its option, it will also be obligated to make desperately needed capital expenditures to the Grand Circus parking garage and to develop vacant city-owned properties.

The City presented credible evidence from James Doak, an expert from Miller Buckfire & Co., an investment banking firm retained by the City, that the business aspects of the Syncora settlement are a reasonable exercise of the City's business judgment. Trial Tr. 117:10-120:25, Oct. 3, 2014. (Dkt. #7894) The Court so finds.

Therefore, the Court finds that the Syncora settlement is well within the reasonable range of settlements and approves it.

### 5. The Terms of the FGIC Global Settlement

The City and FGIC, on behalf of itself and the COPs Holders, have also entered into a settlement agreement. Under the class 9 settlement option, FGIC will receive $74.2 million in New B Notes, $67.2 million in New C Notes and $19.75 million in class 9 settlement credits. This represents roughly 13% of FGIC's class 9 claims. FGIC and the COPs Holders will divide

the consideration provided under the class 9 settlement option under terms agreed upon between them.

In exchange, FGIC and the COPs Holders have withdrawn their objections to the plan and are deemed to have voted in favor of the plan.

As part of the settlement, the parties agree to dismiss the COPs litigation. FGIC also agrees to waive any and all claims it may have against any other party, including the GRS and the PFRS related to the COPs litigation.

In addition to FGIC's share of the class 9 settlement option, FGIC and the City will enter into a development agreement for the Joe Louis Arena site. Under this agreement, an entity to be formed and controlled by FGIC and the COPs Holders will have the option to acquire and develop the land upon which Joe Louis Arena and its garage currently sit. The City will demolish the structures on the land and perform any necessary environmental remediation.

Within thirty-six months after exercising the option, the new entity must prepare a comprehensive development plan for the site. If the City approves development plan, the City and the new entity must close on the sale of the parcels within two years of that approval, or within six months of completion of the demolition of the structures, whichever is later. The State has agreed to reimburse the new entity for eligible project costs and tax increment financing incentives. The City has also agreed to zone the property such that certain tax abatements will be available. The new entity is required to have the development substantially completed within thirty-six months after closing on the sale of the structure.

FGIC also has claims against the City relating to the swap agreements. In settlement of those claims, FGIC will have an allowed class 14 claim for $6.11 million. In addition, the Downtown Development Authority will assign to FGIC its right, title and interest to its

distribution of New B Notes under the plan on account of its $33.6 million class 13 claim. The City estimates that FGIC will receive approximately $4.5 million in New B Notes in settlement of its swap-related claims.

### 6. The FGIC Global Settlement Is Fair and Equitable

FGIC holds one of the largest claims against the City and it has zealously litigated its objections. The COPs litigation involved highly complex and novel issues that would have taken significant time and expense to resolve. As with Syncora, FGIC's estimated monetary recovery is 13% of its class 9 claims. This is comparable to what the general unsecured creditors are receiving. Accordingly, the Court readily finds that this aspect of the settlement is reasonable.

In addition, the Joe Louis Arena development agreement is of incalculable value to the City. The City has presented credible evidence that the Joe Louis Arena is currently considered a liability because of the cost of removing the existing structures and the necessary environmental remediation. Trial Tr. 135:14-20, Oct. 21, 2014. (Dkt. #8098) This evidence has not been contradicted and the Court accepts it. Because of this agreement, land that might have stood vacant and unused will become a shining demonstration of Detroit's recovery.

Accordingly, the Court finds that the Joe Louis Arena development agreement is reasonable and approves it.

### IV. SETTLEMENTS THAT THE COURT APPROVED DURING THE CASE

During the case, pursuant the requests of the City, the Court approved settlements with the Swap Counterparties, the Ad Hoc Committee of DWSD Bondholders and the Macomb Interceptor Drain Drainage District ("MIDDD").

## A. The Swaps Settlement

The Swap Counterparties settled their claims of approximately $288 million arising from the termination of the interest rate swap agreements that related to the COPs Transaction.[10] The settlement gives these creditors a secured claim for $85 million, to be paid upon the effective date of the plan from the City's exit financing. In exchange, these creditors withdrew their objections to the plan and agreed to support it.

This settlement was significant because it was the first settlement with any of the City's creditors and because it created an impaired accepting class, as required for plan confirmation under § 1129(a)(10). Because the plan could then be confirmed over the dissent of other impaired classes (assuming the other confirmation requirements were met), this settlement paved the way for further settlements with other classes of impaired creditors. It also gave the City continued access to its gaming tax revenue, which these creditors, along with the swap insurers, had sought to bar through litigation.

On April 15, 2014, the Court approved the settlement, finding that it was reasonable in amount and overruling Syncora's objection that it violated its rights under the various COPs and swap agreements. (Dkt. #4094) This settlement is incorporated into the treatment of class 5 in the plan.

---

[10] This settlement was actually the third settlement that these parties had reached. The first was for approximately $230 million, which the parties had reached before the City filed this case. The City deemed that this settlement was an executory contract, so it filed a motion and a corrected motion to assume this contract under § 365. (Dkt. ##17 and 157) When the parties determined that the Court was not likely to approve that settlement, they engaged in mediation and negotiated a second settlement for $165 million. (Dkt. #2341) On January 17, 2014, the Court denied approval of that settlement, concluding that it was too high under the *Bard* standards. (Dkt. #2511) The parties then negotiated the settlement for $85 million, which the Court did approve.

## B. The DWSD Bondholders Settlement

The DWSD bondholders settlement, reached in early August 2014, involved a tender offer for all existing DWSD bonds in the amount of $5.3 billion, resulting in a restructuring of the debt and substantial interest cost savings for the City.  It also included $190 million in needed capital improvement financing.

By the time that this settlement was reached, the impaired class of these bondholders, class 1A, had voted to reject the plan.  Many bondholders had also objected to the plan on several grounds, including that the plan is not fair and equitable because it does not give the bondholders the present value of their claims, impermissibly modifies the call protections of existing bonds, and does not provide them indubitable equivalent value.

By this settlement, these plan objections were resolved and the claims were left unimpaired.  On August 11, 2014, the City filed a motion to approve this secured financing and to approve the settlement.  (Dkt. #6644)  On August 22, 2014, the City announced the success of the tender offer in the market.  (Dkt. #6989)  On August 25, 2014, following a hearing, the Court granted the City's motion.  (Dkt. #7028)  The settlement was incorporated into the City's sixth amended plan filed on August 20, 2014.  (Dkt. #6908)

## C. The MIDDD Settlement

The settlement with MIDDD resolved its plan objections and the City's objection to MIDDD's proof of claim.  MIDDD's claim was a complex fraud claim asserting that the City intentionally misrepresented the amount of the expenses that MIDDD had reimbursed to the City for repairing a collapsed water line.  By stipulation filed on October 16, 2014, the settlement fixed the claim at $22 million, provided for its treatment in class 14 as a general unsecured

claim, and obligated MIDDD to withdraw its plan objections. (Dkt. #7987)  On October 20, 2014, following a hearing, the Court approved the settlement. (Dkt. #8025)

## V. THE CREATION OF THE GREAT LAKES WATER AUTHORITY

Another major achievement in the case is the mediated agreement that the City entered into with Wayne, Oakland and Macomb Counties for the creation of the Great Lakes Water Authority.  These counties and their customers obtain their water and sewer services from the Detroit Water and Sewerage Department ("DWSD").  By this agreement, the assets of the DWSD will be governed by representatives of the region that it serves.  In exchange, the GRS pension plan will be paid $428.5 million as DWSD's share of the City's unfunded pension liability and for its share of restructuring expenses and professional fees.  Although this agreement resulted in the counties' withdrawal of their objections to the plan and involved the transfer of City assets, the City exercised its right under § 904 not to request Court approval of this memorandum of understanding.[11]

---

[11] *See In re City of Stockton, Cal.*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) ("Hence, § 904 means that the City can expend its property and revenues during the chapter 9 case as it wishes. . . .  When a chapter 9 debtor files a Rule 9019 motion to have the court approve a compromise or settlement, the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction.").

In *Stockton*, the court suggested that an unapproved settlement in a chapter 9 case might still be the basis for a confirmation objection under § 1129(b)(1) that the plan unfairly discriminates or is not fair and equitable, or an objection under § 1129(a)(2) that the plan is not proposed in good faith or by a means forbidden by law. *Id.* at 199-200.  No such objections are raised in this case as to the Great Lakes Water Authority.

Moreover, although in a chapter 11 case, § 363(b) requires court approval of a non-ordinary course transfer like this, § 901 does not make that section applicable in a chapter 9 case. *See In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991) ("[T]he debtor is free to use, sell or lease property without regard to the restrictions in section 363.").

## VI. The Classes of Claims in the City's Plan
## and the Results of the Balloting

In the City's plan, classes 1-5 are secured and classes 7-17 are unsecured. Class 6 has already been paid.

Secured classes 1-4 are unimpaired and therefore, under § 1126(f), are deemed to have accepted the plan. These claims are:

- Class 1A - All Classes of DWSD Bond Claims

- Class 1B - All Classes of DWSD Revolving Sewer Bond Claims

- Class 1C - All Classes of DWSD Revolving Water Bond Claims

- Class 2A - Secured GO Series 2010 Claims

- Class 2B - Secured GO Series 2010(A) Claims

- Class 2C - Secured GO Series 2012(A)(2) Claims

- Class 2D - Secured GO Series 2012(A2-B) Claims

- Class 2E - Secured GO Series 2012(B) Claims

- Class 2F - Secured GO Series 2012(B2) Claims

- Class 3 - Other Secured Claims

- Class 4 - HUD Installment Notes Claims

Class 5 consists of swap claims arising from the COPs Transaction. These claims are secured but impaired. The amount and treatment of these claims is the result of the Court-approved Swaps Settlement, described in part IV.A. above. The class accepted the plan by 100% (two votes).

The classes of unsecured claims are impaired. Classes 7 through 13 and 17 settled their objections to confirmation and accepted the plan. The Court approved these settlements in part

III above.  Classes 14 and 15 rejected the plan.  Class 16 is deemed to have rejected the plan under § 1126(g).  The classes and the results of the balloting are:

- Class 7 - LTGO Bond Claims accepted by 62.98% in number, 83.39% in amount.

- Class 8 - UTGO Bond Claims accepted by 87.26% in number, 97.35% in amount.

- Class 9 - COPs Claims accepted by 92.50% in number and 96.61% in amount.

- Class 10 - PFRS Pension Claims accepted by 82.17% in number, 82.10% in amount.

- Class 11 - GRS Pension Claims accepted by 73.15% in number, 72.94% in amount.

- Class 12 - OPEB Claims accepted by 88.25% in number, 84.62% in amount.

- Class 13 - Downtown Development Authority Claims accepted by 100% in number and amount (one vote).

- Class 14 - Other Unsecured Claims rejected by 51.05% in number, 57.49% in amount.

- Class 15 - Convenience Claims rejected by 55.26% in number, 57.92% in amount.

- Class 16 - Subordinated Claims are deemed to have rejected.

- Class 17 - Indirect 36th District Court Claims accepted by 100%.

(Dkt. ##6179, 6665 and 8072)

## VII. THE STATUTORY REQUIREMENTS FOR CHAPTER 9 PLAN CONFIRMATION

Section 943(b) provides:

> The court shall confirm the plan if—
>
> (1) the plan complies with the provisions of this title made applicable by sections 103(e) and 901 of this title;
>
> (2) the plan complies with the provisions of this chapter;
>
> (3) all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable;
>
> (4) the debtor is not prohibited by law from taking any action necessary to carry out the plan;

74

(5) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in section 507(a)(2) of this title will receive on account of such claim cash equal to the allowed amount of such claim;

(6) any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval; and

(7) the plan is in the best interests of creditors and is feasible.

11 U.S.C. § 943(b).[12]

Section 901 provides, "Sections . . . 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), 1129(b)(2)(B) . . . of this title apply in a case under this chapter."[13]

In pertinent part, § 1129 provides:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . .

---

[12] The reference in § 943(b)(1) to § 103(e) appears to be a mistake. Section 103(e) states:
Scope of Application.— Subchapter V of chapter 7 of this title shall apply only in a case under such chapter concerning the liquidation of an uninsured State member bank, or a corporation organized under section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

11 U.S.C. § 103(e). The reference probably should be to § 103(f), which provides, "Except as provided in section 901 of this title, only chapters 1 and 9 of this title apply in a case under such chapter 9."

[13] Section 901 also identifies other sections of chapter 11 that apply in chapter 9 cases. These include §§ 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1124, 1125, 1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), and 1128. These sections will be reviewed as necessary to address the parties' objections to confirmation.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

. . . .

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

. . . .

(8) With respect to each class of claims or interests—

  (A) such class has accepted the plan; or

  (B) such class is not impaired under the plan.

. . . .

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

. . . .

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

  (A) With respect to a class of secured claims, the plan provides—

    (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is

retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129.

The City bears the burden of establishing each of the required elements for confirmation of its plan by a preponderance of the evidence. *In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, at *4 (Bankr. D.S.C. May 23, 2012); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D. Wash. 2009); *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31 (Bankr. D. Colo. 1999).

Moreover, "the court has an independent obligation to determine that a proposed plan meets the confirmation requirements of § 943(b), notwithstanding creditor approval." *Prime Healthcare Mgmt. Inc. v. Valley Health Sys.* (*In re Valley Health Sys.*), 429 B.R. 692, 710 n.45 (Bankr. C.D. Cal. 2010).

## VIII. THE COURT'S FINDINGS REGARDING CONFIRMATION OF THE CITY'S EIGHTH AMENDED PLAN OF ADJUSTMENT

Regarding confirmation of the eighth amended plan of adjustment, the Court specifically finds:

1. The plan complies with the provisions of title 11 that are made applicable in chapter 9 by §§ 103(f) and 901.

2. Each of the claims in each class is substantially similar to the other claims in the class, as required by § 1122(a).

3. Class 15, the class of convenience claims consisting only of every unsecured claim that is less than or reduced to $25,000, is approved as reasonable and necessary for administrative convenience, as required by § 1122(b).

4. The plan complies with the "contents of plan" requirements of § 1123(a)(1)-(5), (b), and (d).

5. The classes of claims that the plan designates as unimpaired, classes 1 through 4, are unimpaired under § 1124.

6. The City complied with the "postpetition disclosure and solicitation" requirements of § 1125.

7. The plan complies with the provisions of chapter 9 of title 11 of the United States Code, as required by § 943(b)(2).

8. All amounts paid or to be paid by the City for services or expenses in the case or incident to the plan will be fully disclosed and reviewed for reasonableness as soon as practicable, as required by § 943(b)(3).

9. The debtor is not prohibited by law from taking any action necessary to carry out the plan, as required by § 943(b)(4).

10. Except to the extent agreed, the plan provides that on the effective date of the plan, each holder of a claim specified in § 507(a)(2) will receive cash equal to the allowed amount of the claim, as required by § 943(b)(5).

11. Any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, as required by § 943(b)(6).

12. The plan is in the best interests of creditors, as required by § 943(b)(7).

13. The plan is feasible, as required by § 943(b)(7).

14. The City has complied with the applicable provisions of title 11, as required by § 1129(a)(2).

15. The plan has been proposed in good faith, as required by § 1129(a)(3).

16. The plan has not been proposed by any means forbidden by law, as required by § 1129(a)(3).

17. Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval, as required by § 1129(a)(6).

18. All classes accepted the plan under § 1126 except class 14 (other unsecured claims), class 15 (convenience claims), and class 16 (subordinated claims). Therefore the requirement of § 1129(a)(8) that each impaired class has accepted the plan is not met. However, the plan meets the alternative requirements of § 1129(b).

19. At least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider, as required by § 1129(a)(10).

20. The plan does not discriminate unfairly with respect to rejecting classes 14 and 15 (the other unsecured claims and the convenience claims), as required by § 1129(b)(1).

21. The plan is fair and equitable with respect to classes 14 and 15, as required by § 1129(b)(1).

Accordingly, the Court confirms the City's eighth amended plan of adjustment.

### IX. THE OUTSTANDING OBJECTIONS TO THE
### CITY'S PLAN

## A. Objections Filed by Represented Parties

Because of the settlements, the only remaining objections to the plan that represented parties filed are the objections of creditors with claims under 42 U.S.C. § 1983 and the objections of creditors with claims under the Takings Clause of the Fifth Amendment to the United States Constitution. Both groups assert that because their claims are based in the Constitution, their claims cannot be discharged in bankruptcy. These objections are addressed in part X.J. below.

## B. Objections Filed by Unrepresented Parties

Unrepresented parties filed 836 timely objections to confirmation. These objections were thoughtful, articulate, sincere and substantive. The Court has attempted to summarize these objections with language that both captures the essence of the objections and appropriately speaks to the statutory requirements for chapter 9 plan confirmation:

1. The ASF recoupment is improper.

2. The plan is not in the best interests of creditors.

3. The plan unfairly discriminates.

4. The plan violates § 1123(a)(4) by providing different treatment among class 11 creditors.

5. The plan is not feasible.

6. The plan violates the funding clause of the Michigan constitution because it does not require the City to make up missed payments to the pension fund if outside funding does not happen.

7. The City did not provide adequate notice of amended plans and disclosure statements, objection deadlines, or voting rights.

80

8. The due process rights of creditors have been violated by the Court's haste in this entire process.

9. The plan impairs pension holders' claims against the retirement systems.

10. The DWSD and library pensions were fully funded so they should not be impaired.

11. The vote solicitation and balloting procedures were unlawful and unfair.

12. The plan's third-party release provisions are improper.

13. The plan improperly offers a higher recovery to classes 10 and 11 if they vote in favor of the plan.

14. The UTGO settlement violates state law.

15. The plan violates the Blighted Area Rehabilitation Act (Mich. Comp. Laws. §§ 125.71-125.84).

16. The Grand Bargain is an improper use of tobacco settlement money.

17. The plan violates the Federal Transit Act (49 U.S.C. § 5333(b)) with respect to DDOT employees.

18. The pension underfunding is overstated and therefore the pensions are improperly impaired.

19. The use of a 6.75% discount rate in the pension settlement is improper.

## X. ISSUES RELATING TO PLAN CONFIRMATION

In this section, the Court addresses the confirmation issues and requirements that it concludes require discussion. The Court overrules all other objections without further discussion.

### A. The City's Professional Fees Will Be Fully Disclosed and Reviewed for Reasonableness As Soon As Practicable, As Required by § 943(b)(3)

Section 943(b)(3) requires that "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."

81

Section 943(b)(3) is clear in its requirement that the City's professional fees be fully disclosed.  As discussed below, however, § 943(b)(3) is not clear on the extent to which it requires that the City's professional fees are reasonable.

## 1. The City's Professional Fees Will Be Fully Disclosed

The Court concludes that all amounts to be paid by the debtor for services or expenses in the case or incident to the plan will be fully disclosed.

On August 19, 2013, the Court entered an order appointing a fee examiner.  (the "Fee Examiner Order") (Dkt. #383)  That order requires the fee examiner "to assure the Court, the City, the creditors, and the public that the City's Professional Fee Expenses are fully disclosed and are reasonable, as required by § 943(b)(3)."  *Id*. at ¶ 3.  Under the Fee Examiner Order, "Professional Fee Expenses" are defined to include "professional compensation and reimbursement of expense obligations . . . that the City incurs in connection with this case whether payable to professionals employed by the City or by others."  *Id*. at ¶ 2.

The Fee Examiner Order was followed by an order on September 11, 2013, establishing the process by which the fee examiner would review fees.  (the "Fee Review Order") (Dkt. #810)  The Fee Review Order requires the professionals whose fees the City must pay to submit detailed monthly fee statements to the fee examiner.  The examiner then responds to the professionals with a preliminary report regarding the reasonableness of the fees.  The professionals and the examiner then meet and confer in an effort to resolve any issues regarding the fees.  Thereafter, the fee examiner files quarterly reports disclosing the fees and stating whether the fees were fully disclosed and reasonable under § 943(b)(3).  These reports are then

82

posted on the Emergency Manager's website. If the fee examiner finds that the fees were not reasonable, the affected professional can bring the issue before the Court.

On May 29, 2014, the Court entered an Order Amending and Clarifying Fee Review Order of September 11, 2013. (the "DWSD Trustee Fee Order") (Dkt. #5150) The DWSD Trustee Fee Order clarifies that "[a]ll fees and expenses of the professionals retained by, and the employees of, U.S. Bank National Association in its capacity as Trustee . . . , to provide services in connection with the City's Bankruptcy case, shall be subject to review by the Fee Examiner under the Fee Review Order of September 11, 2013."[14]

Pursuant to these orders, the fee examiner has filed quarterly reports that have fully disclosed the City's Professional Fee Expenses through June 2014. These include:

- Fee Examiner's Quarterly Report for Months of July, August and September 2013, filed February 4, 2014 (Dkt. #2642);

- Fee Examiner's First Supplemental Quarterly Report for Months of July, August and September 2013, filed April 1, 2014 (Dkt. #3457);

- Fee Examiner's Second Quarterly Report for Months of October, November and December 2013, filed May 6, 2014 (Dkt. #4498);

- Fee Examiner's Third Quarterly Report for Months of January, February and March 2014, filed August 5, 2014 (Dkt. #6528);

- Fee Examiner's First Supplemental Quarterly Report for Months of January, February and March 2014, filed September 8, 2014 (Dkt. #7332);

- Fee Examiner's Second Supplemental Quarterly Report for Months of July, August and September 2013, filed September 18, 2014 (Dkt. #7574);

- Fee Examiner's First Supplemental Quarterly Report for Months of October, November and December 2013, filed September 18, 2014 (Dkt. #7575); and

---

[14] Subsequently, as part of the DWSD settlement, the parties agreed that the fees and expenses of the U.S. Bank National Association in its capacity as trustee would be subject to a separate arbitration process to determine their reasonableness. (Dkt. #7028)

- Fee Examiner's Fourth Quarterly Report for Months of April, May and June 2014, filed November 5, 2014 (Dkt. #8186).

Subsequently, the Court entered an order requiring the City to fully disclose all of its professional fees in the case through the effective date of the plan. (Dkt. #8710)

## 2. Section 943(b)(3) Requires the Court to Determine Whether the City's Professional Fees in the Case Are Reasonable

As a condition of plan confirmation, § 943(b)(3) further requires that these amounts for services or expenses in the case or incident to the plan are "reasonable." In chapter 11, the court's authority and obligation to review professional fees is firmly established in § 330 of the bankruptcy code. *Cupps & Garrison, LLC v. Riehl* (*In re Two Gales, Inc.*), 545 B.R. 427, 432-33 (6th Cir. BAP 2011); *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833 (3d Cir. 1994). However, § 330 is omitted from the list of sections identified in § 901 that apply in chapter 9. As a result, the professionals in the case have not filed applications for the award of fees under § 330.

It is not readily apparent how to reconcile the fee reasonableness requirement of § 943(b)(3) with the inapplicability of § 330 in chapter 9. The Court therefore requested interested parties to brief this issue.

The City's brief asserts that § 943(b)(3) is satisfied by the fee examiner's findings that the fees disclosed are reasonable, together with the opportunity that the process establishes for any party to seek further review by the Court. It further argues that because of § 904 and the Tenth Amendment, the Court's role in reviewing fees should be more limited and circumspect than in a chapter 11 case. (Dkt. #6842)

The retiree committee restates the City's argument and also makes a broader argument. It asserts that under § 943(b)(3), only those fees remaining "to be paid" upon confirmation are subject to the reasonableness requirement, not the fees that the City paid during the case.

Two issues are raised here:

(1) Does § 943(b)(3) of the bankruptcy code require that all of the City's professional fees be reasonable or only those fees that remain unpaid at the moment of confirmation?

(2) Should the Court accept, without further review, the fee examiner's findings that the fees have been reasonable?

For the reasons set forth below, the Court concludes that § 943(b)(3) does require that all of the City's professional fees in connection with the case be reasonable. The Court further concludes that it is not appropriate to accept, without further judicial review, the fee examiner's findings that the fees have been reasonable.

### a. The Scope of § 943(b)(3)

No case has closely analyzed the specific question of whether § 943(b)(3) requires that the reasonableness of all of the City's professional fees be reviewed or only those fees that remain unpaid at the moment of confirmation. The practices and procedures that the courts have followed appear to have split on the question. The majority of the decisions have adopted the practice of reviewing all fees. For example, in *In re Barnwell County Hospital*, 471 B.R. 849 (Bankr. D.S.C. 2012), the court stated in its opinion and order confirming the plan, entered on May 23, 2012:

> As set forth in the Disclosure Statement, the Debtor disclosed the amounts paid to professionals due and owing as of February 28, 2012. Thereafter, counsel submitted an update of the amounts paid and due through March 31, 2012. There have been no objections to the Plan based upon these disclosures. The foregoing amounts

are reasonable and necessary to effectuate the Plan and reorganization in this complex case, and thus § 943(b)(3) is satisfied.

*Id*. at 868. *See also Bamberg Cnty. Mem'l Hosp.*, 2012 WL 1890259, at *7 (decision by the same judge and entered on the same date).

Similarly, in *In re Colorado Centre Metropolitan District*, 139 B.R. 534, 535 (Bankr. D. Colo. 1992), the court stated, "In a Chapter 9, the Court must determine if the fees paid by the Debtor or any person have been fully disclosed and are reasonable." *See also In re East Shoshone Hosp. Dist.*, 226 B.R. 430, 433 (Bankr. D. Idaho 1998) ("§ 943(3) requires as a condition of confirmation that all amounts paid by debtor for services or expenses in the case or incident to the plan have been (1) disclosed and (2) are reasonable."); *In re Sanitary & Improvement Dist. No. 7 of Lancaster Cnty., Neb.*, 96 B.R. 966, 967 (Bankr. D. Neb. 1989) ("Sections 943(b)(3) and (b)(5) permit this Court to confirm a plan if the Court determines administrative expenses to be reasonable and if the plan provides for payment on the effective date of all administrative expenses.").

On the other hand, some decisions appear to review the reasonableness of only unpaid fees. One example here is *In re Corcoran Hospital District*, 233 B.R. 449 (Bankr. E.D. Cal. 1999):

> The debtor has agreed that "after confirmation, the Debtor will seek to pay its attorneys and Committee counsel compensation and reimbursement in an amount and on a schedule to be approved by the Court. The Debtor will not make any final payments to either counsel without a finding from the Court that such payment is reasonable; therefore it is unnecessary to make a finding of reasonableness at this time." Thus, this requirement of § 943(b)(3) is met, provided that the order confirming the Plan shall contain language consistent with the debtor's representation.

*Id.* at 452-53 (footnote omitted); *see also Connector 2000 Ass'n, Inc.*, 447 B.R. at 764-65.

Interestingly, these two decisions were by the same judge that decided *In re Barnwell County Hospital* and *In re Bamberg County Memorial Hospital*, cited above.[15]

---

[15] It is worth observing that almost all of the secondary sources seem to agree with the majority of the courts that review all of the fees. This observation, however, must be tempered by the further observation that, like the cases, the secondary authorities have also not rigorously analyzed the question. *See, e.g.*, 5 Norton Bankr. L. & Prac. 3d § 90:20 (2014) ("Third, the municipality must disclose all amounts paid for services in the case incident to the plan, and the amounts must be reasonable. This includes attorney's fees.") (footnotes omitted); Francis J. Lawall & J. Gregg Miller, Debt Adjustments for Municipalities under Chapter 9 of the Bankruptcy Code: A Collier Monograph, § 8[ix] (2012)("Section 943(b)(3) requires that the plan fully disclose all amounts paid for services or expenses in the chapter 9 case or incident to the plan. Section 943(b)(3) further requires that all such services or expenses be reasonable.") (footnotes omitted); 1981 Norton Ann. Survey of Bankr. Law 5 ("[T]he municipality must disclose all amounts paid for services in the case as incident to the plan and such amounts must be reasonable."); Elizabeth M. Watkins, In Defense of the Chapter 9 Option: Exploring the Promise of a Municipal Bankruptcy as a Mechanism for Structural Political Reform, 39 J. Legis. 89, 95 (2012-2013) ("A municipality must pay legal and financial professionals to administer the case and to subsequently monitor compliance with the reporting requirements of the readjustment plan. These costs can easily range in the seven figures. Of course, this carries the risk that the bankruptcy court might reject the readjustment plan entirely . . . .") (footnotes omitted); Eric S. Pommer & Mark M. Friedman, Municipal Bankruptcy and Its Effects on Governmental Contractors, 25 Pub. Cont. L.J. 249, 259 (1996) ("all amounts paid by the debtor-municipality or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable"); and David S. Kupetz, Municipal Debt Adjustment Under the Bankruptcy Code, 27 Urb. Law. 531, 568 (1995) ("The only court approval required is the retroactive approval necessary in order to satisfy the condition for confirmation of a plan of adjustment set forth in § 943(b)(3).").

One secondary source specifically acknowledges the issue but concludes without discussion that § 943(b)(3) applies only to fees to be paid. *See* Stanley H. McGuffin, Chapter 9 As a Remedy for Financially Stressed Municipalities, 2011 WL 5053634, at *9 ("It should be noted that the statute appears to have prospective application by virtue of the phrase 'to be paid.' Consequently, it is unclear whether the debtor must disclose fees previously paid or if the court must make a reasonableness determination as to such fees.").

Collier on Bankruptcy adopts both positions. *Compare* 6 Collier on Bankruptcy ¶ 943.03[3] at 943-19 ("Section 943(b)(3) requires that the plan must disclose all amounts paid for services or expenses in the case and that the amounts paid be reasonable.") *with* 6 Collier on Bankruptcy, ¶ 901.04[13][c] at 901-26.2 ("Indeed, section 943(b)(3) requires that professional fees to be paid under a plan must be disclosed and must be reasonable.").

The plain language of § 943(b)(3) requires only that fees "to be paid" must be reasonable. The argument that the plain language of the statute should be applied is always strong. *Lamie v. United States Trustee*, 540 U.S. 526, 536 (2004) ("We should prefer the plain meaning since that approach respects the words of Congress."); *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993) ("A statute's plain meaning must be enforced, of course[.]"); *Patterson v. Shumate*, 504 U.S. 753, 760 (1992) (party seeking to defeat plain meaning of bankruptcy code text bears an "exceptionally heavy burden") (internal quotation marks omitted).

The Court concludes, however, that it must construe § 943(b)(3) as giving the Court the responsibility to determine the reasonableness of all of the professional fees incurred by the City, whether paid or unpaid at the point of confirmation.[16]

---

[16] The Court notes that in another significant respect, the plain language of the statute leads to a bizarre and demonstrably unintended result. To repeat, the language of § 943(b)(3) is "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable." Applying this language literally would require a determination of the reasonableness of any fees paid by "any person for services in the case." This would include determining the reasonableness of the fees of all of the professionals in the case, including the professionals retained by all of the creditors.

*In re Colorado Centre Metro. Dist.*, 139 B.R. 534 (Bankr. D. Colo. 1992), pointed out exactly how bizarre this can become. It observed, "[I]f the Court determines that the fees paid by a creditor to its attorney are unreasonable, the debtor's plan cannot be confirmed. Such an interpretation would enable an antagonistic creditor to purposefully overpay his attorney in order to defeat the debtors plan—a truly absurd result." *Id.* at 535.

The legislative history readily solves this problem by explaining what the phrase "by any person" was intended to accomplish. It states:

> The inclusion of the phrase "by any person" is intended solely to prevent the petitioner from circumventing the requirement of this paragraph by making payments indirectly through some third person for the benefit of the petitioner. It is not intended that the court examine all payments made to all attorneys and agents that are in any way connected with the case.

H.R. REP. No. 94-686, 33-34(1975), *reprinted in* 1976 U.S.C.C.A.N. 539, 571-72.

*Continued…*

In reaching this conclusion, the Court is guided by *U.S. National Bank of Oregon:*

> [T]ext consists of words living "a communal existence," in Judge Learned Hand's phrase, the meaning of each word informing the others and "all in their aggregate tak[ing] their purport from the setting in which they are used." *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (CA2 1941). Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L. Ed. 1009 (1849) (quoted in more than a dozen cases, most recently *Dole v. Steelworkers*, 494 U.S. 26, 35, 110 S. Ct. 929, 934, 108 L. Ed. 2d 23 (1990)); see also *King v. St. Vincent's Hospital*, 502 U.S. 215, 221, 112 S. Ct. 570, 574, 116 L. Ed. 2d 578 (1991). No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning. Statutory construction "is a holistic endeavor," *United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 630, 98 L. Ed. 2d 740 (1988), and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.

*Id.*, 508 U.S. at 454-55.

The Court therefore concludes that determining the issue of whether it must review all fees or only those to be paid after confirmation compels it to consider which result accounts for the bankruptcy code's "full text, language as well as punctuation, structure, and subject matter." *Id.* at 455.

Initially, the Court notes that requiring the Court to determine the reasonableness of unpaid fees but not paid fees creates an arbitrary line that the parties can readily manipulate to avoid judicial review of their fees.

---

The point is that this legislative history explicitly admits that Congress did not intend for the language of § 943(b)(3) to be applied literally, at least in this respect. It also casts doubt on how carefully § 943(b)(3) was drafted.

It is possible that chapter 9 contemplates that a municipal debtor would pay the professionals to whom it is obligated only after confirmation and not during the pendency of the case, as here. Indeed, two cases so suggest. *See In re Valley Health Sys.*, 381 B.R. 756, 765 n.10 (Bankr. C.D. Cal. 2008); *In re Cnty. of Orange*, 179 B.R. 195, 199-200 (Bankr. C.D. Cal. 1995). This would fully harmonize the language in § 934(b)(3)—"all amounts to be paid"—with the court's obligation to review all fees, if that is what Congress intended. In a complex case like this one, however, this is not a practical answer. No professional would take on a retention in a complex chapter 9 case if fees could only be paid upon judicial review upon confirmation.

A more practical and satisfactory answer grows out of the suggestion in Norton on Bankruptcy that § 943(b)(3) codifies the result in *American United Mutual Life Insurance Co. v. City of Avon Park*, 311 U.S. 138 (1940). *See* 5 Norton Bankr. L. & Prac. 3d § 90:20, n.13 (2014). In *City of Avon Park,* the Supreme Court discussed at length the legal and equitable necessity of the bankruptcy court reviewing the professional fees for which the municipal debtor is liable:

> We have emphasized that full disclosure is the minimum requirement in order not to imply that it is the limit of the power and duty of the bankruptcy court in these situations. As this court stated in *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S. Ct. 1044, 1053, 84 L. Ed. 1293: 'A bankruptcy court is a court of equity, § 2, 11 U.S.C. § 11, 11 U.S.C.A. § 11, and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act. . . . A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest.' And see *Papper v. Litton*, 308 U.S. 295, 304 *et seq.*, 60 S. Ct. 238, 244, 84 L. Ed. 281. These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto.
>
> . . . .

> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. . . . That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy. The necessity for its exercise (*Pepper v. Litton*, *supra*, 308 U.S. page 308, 60 S. Ct. 246, 84 L. Ed. 281) is based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle.

311 U.S. at 145-46.

Thus, as a court of equity, a bankruptcy court has the authority, "guided by equitable doctrines and principles," to "safeguard the public interest" as a condition of granting relief, unless the condition is inconsistent with the bankruptcy code. *Id*. at 145. It also has the authority, inherent in its jurisdiction and "not dependent on express statutory provisions" to remedy the "existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers," all as part of the Court's responsibility to ensure that the plan is "fair and equitable" and "devoid of overreaching." *Id*. at 146. Of course, as much in the professional fee context as in another context, a bankruptcy court must zealously protect against "unfair dealing, a breach of fiduciary obligations, profiting from a trust, [or] special benefits for the reorganizers." *Id.*

In *City of Avon Park*, the professional fees at issue—the fees of the debtor's bond agent—were unpaid upon confirmation, but the Supreme Court's mandate to review professional fees was surely not so spineless as to permit an exception for paid fees. Rather, the Court's mandate is an important and powerful one, to be observed with the greatest consideration and care. It simply cannot be obeyed by reviewing only unpaid fees.

Accordingly, the Court concludes that it has the obligation, as a condition of confirming a chapter 9 debtor's plan, to determine the reasonableness of all of the professional fees for which the debtor is obligated. Only this construction of § 943(b)(3) holistically accounts for the bankruptcy code's "full text, language as well as punctuation, structure, and subject matter." *U.S. Nat'l Bank of Or.,* 508 U.S. at 455.

### b. Deferring to the Fee Examiner's Determination of Reasonableness in This Case Is Insufficient to Comply with § 943(b)(3) and *City of Avon Park*

The Court concludes that because its obligation under § 943(b)(3) is so closely linked to its obligation to determine whether the plan is fair and equitable, the Court simply cannot outsource this responsibility to the fee examiner. It must make an independent determination that § 943(b)(3) is met.

There is, in addition, a practical reason why this must be the result. Without hesitancy, the Court finds that the work of the fee examiner has been valuable, important and significant. It has, however, been limited by two significant circumstances that would not limit this Court's review of fees. One is that the fee examiner has not presided over the litigation and witnessed first-hand the services of the professionals whose fees must be reviewed. The second is that the fee examiner does not have the benefit of our time-honored adversary process to facilitate and advance the task of reviewing fees. At the same time, however, the Court also recognizes that the fee examiner has had resources to assist him—a staff of experienced attorneys and paralegals, as well as a retained accounting firm—that the Court does not have available.

Regardless, the Court must comply with § 943(b)(3) and *City of Avon Park*. Therefore, it must independently review the fees.

### c. The Process for Reviewing Fees

In *Corcoran Hospital District*, 233 B.R. 449, the court found that the debtor could satisfy § 943(b)(3) through a post-confirmation process in which fees would be reviewed for reasonableness. This Court agrees that § 943(b)(3) only requires that the Court determine that the fees are reasonable and does not require the Court to make this determination before it enters an order confirming the plan.

Indeed, it is physically impossible to comply with the literal requirement of § 943(b)(3)— to find, before confirming the plan, that "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable." Fees subject to this requirement include fees through the effective date of the plan. Those fees will not be known, let alone incurred, until after confirmation. Accordingly, to facilitate confirmation, the Court will defer this issue and will request the assistance of counsel in establishing a process for determining the reasonableness of the fees for which the City is obligated.

Another issue will have to be addressed. As noted, reasonableness of fees is a requirement for confirmation in chapter 9. This is unlike chapter 11 where objections to fees are not confirmation objections. The general deadline to object to the City's plan was May 12, 2014, and for bondholders and retirees it was July 11, 2014. As far as the Court can determine, only one party, David Sole, asserted a timely objection to the reasonableness of fees in this case. The issue then becomes whether all other parties in the case have waived the issue.

Regardless, the Court reaffirms that even if there has been such a waiver, the Court intends to fulfill its independent obligation to review the reasonableness and disclosure of fees.

**B. The Debtor Is Not Prohibited by Law from
Taking Any Action Necessary to Carry Out the
Plan, As Required by § 943(b)(4)**

As a condition of plan confirmation, section 943(b)(4) requires that "the debtor is not

prohibited by law from taking any action necessary to carry out the plan[.]" Several creditors

object to the plan on the grounds that it violates Art. IV. § 24 of the Michigan constitution,

prohibiting the impairment of pensions, and that therefore the plan does not comply with

§ 943(b)(4).

The Court overrules this objection. An important distinction applies here. Under

§ 1123(b)(1), the plan may impair unsecured claims. As the Court held in its eligibility opinion,

pension claims are unsecured contract claims under the Michigan constitution and are therefore

subject to impairment in bankruptcy. *In re City of Detroit*, 504 B.R. at 150-54. Section

943(b)(4) does not prohibit that. If it did, then no unsecured claims could be impaired in a

chapter 9 case.

Rather, the effect of § 943(b)(4) is limited to the actions that the municipality must take

to implement the plan once the Court confirms it. For example, if a municipal debtor's plan

called for the issuance of new bonds to creditors, that bond issuance must comply with

applicable law. As the Court held in *In re Sanitary & Improvement District, No. 7*, 98 B.R. 970,

974 (Bankr. D. Neb. 1989):

> The Bankruptcy Code permits modification of bondholder rights.
> The Bankruptcy Code permits an issuance of new bonds with
> different face amounts and different interest rates and different
> payment periods than the original bonds held by bondholders prior
> to the bankruptcy filing. However, those "new bonds" simply
> become a substitute for the original obligation and they must be
> issued in conformance with state law and the terms of their
> redemption and payment must be in conformance with state law.

94

In this case, the Court finds that the implementation of the City's plan is in conformance with all applicable law, as § 943(b)(4) requires. Accordingly, this objection is overruled.

## C. The Plan Is in the Best Interests of Creditors, As Required by § 943(b)(7)

Section 943(b)(7) requires that the plan is in the best interests of creditors. Most of the best interests objections under § 943(b)(7) have been withdrawn or resolved. Some retiree creditors, however, do maintain this specific objection to confirmation. For example, several parties assert that the plan violates § 943(b)(7) because retirees could receive greater recoveries on their pension and OPEB claims under Michigan law than under the plan. *See, e.g.*, Jamie Fields *et al*. Obj. to Confirmation of the Fourth Am. Plan. (Dkt. #5964)

In *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943), the Supreme Court stated, "[T]he fact that the vast majority of securities holders may have approved a plan is not the test of whether that plan satisfies the statutory standard." *Id.* at 418-19 (quoting *City of Avon Park*, 311 U.S. at 148).

The Supreme Court also explained the scope of the findings that this Court must make on this issue:

> The nature and degree of exactness of the findings required depends on the circumstances of the particular case. . . .
>
> Delusive exactness of findings is . . . not required in cases of municipal bankruptcy. But where future tax revenues are the only source to which creditors can look for payment of their claims, considered estimates of those revenues constitute the only available basis for appraising the respective interests of different classes of creditors. In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors.

*Id.* at 419-20.

After discussing the substantive legal requirements of the best interests of creditors requirement in chapter 9, the Court will discuss the relevant evidence in the record supporting its findings, both as to the issues raised by the retiree creditors and the best interests of the City's creditors more generally.

## 1. The Applicable Law

At the outset, it is important to note that the best interests requirement of chapter 9 differs significantly from the best interests requirement in chapter 11, which involves considering a liquidation analysis. *See In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 187 B.R. 683, 690 (in a chapter 9 case, an objecting creditor is not "protected by the best interest test of § 1129(a)(7)").

Courts generally agree that the best interests of creditors test in § 943(b)(7) requires "'that a proposed plan provide a better alternative for creditors than what they already have.'" *In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 718 (quoting *In re Mount Carbon Metro. Dist.*, 242 B.R. at 34); *see also In re Sanitary & Improvement Dist., No. 7*, 98 B.R. at 974.

This Court adopts that test.

As the court reasoned in *In re Mount Carbon*, "This is often easy to establish. Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force sale of municipal assets under state law, their only alternative to a debtor's plan is dismissal." 242 B.R. at 34. *See also Silver Sage Partners, Ltd. v. City of Desert Hot Springs* (*In re City of Desert Hot Springs*), 339 F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for conversion of the case to another chapter or for an involuntary liquidation of any of the debtor's assets.") (quoting *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991)).

96

Section 943(b)(7) is therefore subject to § 904, which states:

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904.

The issue, therefore, is primarily whether the available state law remedies could result in a greater recovery for the City's creditors than confirmation of the plan. This analysis will also point out that losing the benefits of the plan will actually impair creditors' recoveries under these state law remedies. The Court will also address the argument of some creditors that the City could pay them more by raising taxes, by monetizing assets, such as the art at the DIA, or by adjusting its budget forecasts. Finally, the Court will briefly discuss the impact of its findings regarding the feasibility of the plan.

### 2. If the Case Were Dismissed, State Law Remedies Would Not Provide Creditors with a Better Result Than the Plan

### a. The Creditors' Legal Remedies in the Event of a Dismissal

The Michigan Revised Judicature Act ("RJA") explicitly states, "No execution may issue upon a judgment against (1) Any township, village, city . . . ." Mich. Comp. Laws § 600.6021(1). Accordingly, if the case was dismissed, the unsecured creditors' only remedy under Michigan law would be § 6093 of the RJA. That section provides that when a party obtains a money judgment against a municipality, the party has the right to take the judgment to

the "supervisor" or "assessing officer" of the municipality, who then "shall proceed to assess the amount [of the judgment] . . . upon the taxable property" of the municipality, "upon the then next tax roll." Mich. Comp. Laws § 600.6093(1). No party disputes this proposition, and the Court finds that it is supported by Michigan statutes and case law.

In *Faitoute Iron & Steel, Co. v. City of Asbury Park,* 316 U.S. 502 (1942), the Supreme Court observed:

> The principal asset of a municipality is its taxing power and that, unlike an asset of a private corporation, can not be available for distribution. An unsecured municipal security is therefore merely a draft on the good faith of a municipality in exercising its taxing power. . . . In effect, therefore, the practical value of an unsecured claim against the city is inseparable from reliance upon the effectiveness of the city's taxing power. The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes.

*Id*. at 509.

In *City of Roosevelt Park v. Norton Township*, 47 N.W.2d 605 (Mich. 1951), the Michigan Supreme Court stated:

> The basis for this rule is that municipal funds constitute a trust fund for the accomplishment of certain municipal functions, *see Vanderpoel v. Borough of Mt. Ephraim*, 111 N.J.L. 423, 168 A. 575, 89 A.L.R. 862; that to subject municipal funds to levy of execution and garnishment would restrict, thwart and interfere with the proper and orderly functioning of the municipal governmental machinery, *see Underhill v. Calhoun*, 63 Ala. 216, and that to allow an individual municipal creditor to reach municipal funds for the satisfaction of his claim would effect a preference in favor of such creditor to the prejudice of other creditors and to the ultimate prejudice of the credit of the municipality, *Vanderpoel v. Borough of Mt. Ephraim*, *supra*.
>
> A township is a municipal corporation and as such an instrumentality of the State for purposes of local government. *See Hanslovsky v. Township of Leland,* 281 Mich. 652, 275 N.W. 720. Township funds are in the nature of trust funds and are placed for disposition in accordance with appropriations previously made. Public policy forbids disturbance of these funds as to do so would

have a tendency to curtail governmental activities for which these funds were appropriated.

In our opinion the sole remedy for the collection of a judgment against a township is provided by CL 1948, § 624.5[.]

*Id.* at 606; *see also Parker v. Klochko Equip. Rental Co.*, 590 F.2d 649, 653 (6th Cir. 1979) (holding that it is well established under Michigan law, "that it is contrary to public policy to allow private liens on public property"); *Herter v. City of Detroit*, 219 N.W. 617, 617 (Mich. 1928) ("The rule in this state is fixed by statute . . . . The method of collection judgments against cities is by mandamus to compel the property city authorities to spread the tax to pay them.") (citing *Griswold v. Common Council of Ludington*, 75 N.W. 609, 609 (Mich. 1898)).

If the case were dismissed, therefore, unsecured creditors, including retiree creditors, would be limited to any additional property tax revenues that the City could levy in addition to the City's existing property tax collections for its general fund.

The Supreme Court has described the right to compel a municipality to raise taxes to satisfy judgments against it as an "empty right to litigate," particularly in times of economic crisis. *Faitoute Iron & Steel,* 316 U.S. at 510.

More recently, the court in *In re Sanitary & Improvement District, No. 7* recognized this conundrum:

The alternative to confirmation of a plan similar to the one before the Court is dismissal of the case. That would permit the parties to go back to state court and permit the state judge to order the debtor to levy sufficient taxes to pay all prepetition bonds plus accrued interest in full. There is evidence before this Court which this court finds convincing that such a procedure would create such a high level of taxes for the district and the homeowners of the district that it is likely the revenues would not be made available to the district by taxpayers and the bondholders would still not be paid. This Court sees no benefit in permitting this matter to go back through the state court system which has no power to permit compromise of the debt structure without consent of all parties.

99

98 B.R. at 975-76.

### b. The Creditors' Recoveries in the Event of a
### Dismissal

The record in this case also establishes that the City's unsecured creditors would find the

RJA to be an "empty right to litigate." *Faitoute Iron & Steel*, 316 U.S. at 510.

Caroline Sallee, an accountant from Ernst & Young, was the City's expert witness on

property tax revenue forecasts. Assuming that property tax rates remain the same, as is the

standard practice in tax revenue forecasting, Ms. Sallee credibly testified that the taxable value of

the City's property tax base will continue to decline in the years to come. Without the RRIs that

the City intends to implement, Ms. Sallee projects that the City's annual property tax revenues

will fall from approximately $130 million in FY2013 to approximately $90 million by FY2021,

primarily due to population and employment decline and lower real property assessed values.

She testified that in her expert opinion, the City will not experience even modest positive year-

to-year growth rates in property tax revenue until FY2022. With the implementation of the

RRIs, the City's property tax revenue is likely to increase, and more quickly, Ms. Sallee

explained, but primarily because of the favorable economic conditions that the RRIs will

produce. This, she testified, will increase "people's ability to pay." *See* Trial Tr. 238, Sept. 8,

2014. (Dkt. #7472)

The City's chief financial officer, John Hill, supervises the City's tax levying and

collections. He credibly testified that the "chronic state of decline in assessed [property] value is

expected to continue beyond 2016." Trial Tr. 123, Sept. 4, 2014. (Dkt. #7411) (quoting Ex. 38,

the 2014 Revenue Consensus Conference Report). He further testified that "collection of taxes

in an economy that we [are] dealing with [in] Detroit is very difficult." Trial Tr. 228, Sept. 4,

2014.  (Dkt. #7411)  Mr. Hill, unlike Ms. Sallee, did consider the possibility of increasing the property tax rates in Detroit (for example, to satisfy RJA judgments), but concluded it would not result in increased revenues:

> One thing that certainly happens with taxing, it's not always clear whether or not increasing tax rates will actually produce greater revenues.  As a matter of fact, in some cases increasing tax rates actually [results] in lower taxes, and it's called getting into . . . a death spiral.  And Detroit, which is a highly taxed jurisdiction and also one that is obviously suffering from a long-term economic crisis, I would not at all think that raising the tax rates at this time would be an appropriate strategy here.

Trial Tr. 7-8, Sept. 5, 2014.[17]  (Dkt. #7434)

The evidence establishes that raising tax rates is not a viable option for the City, legally or practically.  In the eligibility opinion, the Court found that the City cannot legally increase its tax rates.  *See In re City of Detroit,* 504 B.R. at 121.  Mayor Duggan testified that the likelihood is remote that the people of Detroit or the state legislature would vote to raise taxes.  Trial Tr. 112-14, Oct. 6, 2014.  (Dkt. #7917)

Further, a property tax increase would produce very little additional revenue.  Mayor Duggan testified that taxes in Detroit are among the highest relative to surrounding communities and the level of services is comparatively low.  *Id.* at 83-84.  Mr. Orr credibly testified that the City is at tax saturation and that raising taxes would likely add to the population decline.  Trial Tr. 109-11, Oct. 2, 2014.  (Dkt. #7878)

---

[17] The City did not offer expert testimony on whether an increase in tax rates might yield greater revenue for property taxes, arguing that expert testimony is generally not required on the subject of "tax saturation."  Trial Tr. 49-53, Oct. 27, 2014.  (Dkt. #8156)  The Court finds that the City's proof is sufficient on this issue even though the City did not proffer expert testimony.  This finding does not suggest, however, that an expert is never required on this issue.  It may be that in some cases, expert testimony is necessary to meet the requirements of *Everglades Drainage District*, 319 U.S. at 419-420, discussed above.

The other side of the equation is the amount of the judgments that the City would face. By all accounts, as detailed earlier in this opinion, this number would be astronomical, potentially several billion dollars.

Some have argued that the City's liability estimations are exaggerated because the entirety of the City's debts (for example, its long-term OPEB costs) would not accelerate upon dismissal. For the purpose of determining whether the plan is in the best interests of creditors, however, the Court finds that this argument lacks merit. Without the benefits of the plan, the portion of the City's annual budget that will be consumed with current legacy liabilities[18] is projected to increase dramatically over time. Ernst & Young's baseline financial projections show that the annual cost of the City's legal liabilities will grow from approximately $588 million in FY2014, to $713 in FY2018, to $767 million, or roughly 70% of the City's annual budget, in FY2023. Ex. 33 at 91.

The City is simply unable to pay these judgments by raising taxes. Moreover, the Court finds that chaos would ensue if the City's creditors engaged in the proverbial "race to the courthouse" to obtain judgments against the City upon the dismissal of the chapter 9 case. Moreover, the state courts would be powerless to order the City's creditors to compromise their debts to ensure anything like an equitable or fair distribution. *Cf. Sanitary & Improvement Dist., No. 7*, 98 B.R. at 975-76.

---

[18] Mr. Malhotra explained that "legacy costs" include debt service on the LTGO and UTGO bonds, principal and interest payments on the COPs, payments owed to the COP Swap Counterparties, pension contributions, and retiree health benefits. *See* Ex. 33, City of Detroit Proposal for Creditors dated June 14, 2013 at 90-91; *see also* Trial Tr. 70, Sept. 29, 2014. (Dkt. #7819) (further describing legacy costs as, "the costs that were not associated with providing service or operations today, so . . . exclude[ing] the majority of the share of the costs related to the active employees and supplies as well as . . . the costs associated with debt that the city had taken on in prior periods.").

Mr. Fields and some creditors argue that if even one class of creditors could theoretically receive a better recovery if the case were dismissed, by "winning" the race to the courthouse, then the plan is not in the best interests of creditors.

As noted, section 943(b)(7) requires that "the plan is in the best interests of creditors." 11 U.S.C. § 943(b)(7). Under this language, the question is whether the plan is in the best interests of creditors as a whole. Confirmation may not be denied simply because some creditors may do better upon dismissal. The plain language of the statute compels this result. The Court finds that the plan is in the best interests of the creditors as a whole. Accordingly, the Court rejects this argument.

Mr. Fields relies upon *ACC Bondholder Group v. Adelphia Communications Corp.* (*In re Adelphia Communications Corp.*), 361 B.R. 337 (S.D.N.Y. 2007), and *In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Calif. 1997). This reliance is misplaced, however, because these cases relate to the "best interests of creditors" test applicable in chapter 11, which is a liquidation analysis. As discussed above, this test is not applicable in this chapter 9 proceeding. *See* 11 U.S.C. § 901(a) (not incorporating § 1129(a)(7)).

The argument rings particularly hollow in this case due to the differences in financial and legal sophistication among the City's many classes of creditors. Upon dismissal, many of these creditors would commence high-stakes litigation against the City, as the Court observed on its own docket. *See, e.g.*, *Official Committee of Retirees v. City of Detroit* (*In re City of Detroit*), No. 13-05244 (Bankr. E.D. Mich. Oct. 22, 2013) (seeking injunction to maintain OPEB benefits; settled); *Official Committee of Retirees v. City of Detroit* (*In re City of Detroit*), No. 14-04015 (Bankr. E.D. Mich. Jan. 9, 2014) (same); *Nat'l Pub. Fin. Guar. Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05309 (Bankr. E.D. Mich. Nov. 8, 2013) (seeking declaratory judgment

103

regarding parties' rights under UTGO bonds; settled); *Ambac Assurance Corp. v. City of Detroit* (*In re City of Detroit*), No. 13-05310 (Bankr. E.D. Mich. Nov. 8, 2013) (seeking declaratory judgment regarding parties' rights under LTGO bonds; settled). The record establishes, however, that this scenario would likely harm all creditors, as well as the City's residents.

### c. The Creditors' Loss of Other Plan Benefits

The record further establishes that if the case were dismissed, the creditors' recoveries would be substantially impaired. The vast majority of plan settlements are conditioned upon confirmation of the plan, most notably the Grand Bargain. If the plan were not confirmed and the case were dismissed, the City would lose the State Contribution and the contributions from the DIA and the charitable foundations.

In addition to losing the benefits of the plan settlements, the City would be required to finance the balance of its obligation to the swap counterparties arising from the Swap Settlement. *See* Trial Tr. 210-11, Sept. 30, 3014. (Dkt. #7821)

Moreover, the plan provides that the City will use a portion of the exit financing proceeds to retire the $120 million post-petition financing facility. *See* Plan, Ex. I.A.183. (Dkt. #8045) The post-petition financing is secured by the City's income tax revenue and casino tax revenue. Therefore, if the City defaulted, those income streams would also be in jeopardy. *See* Trial Tr. 210-11, Sept. 30, 2014. (Dkt. #7821)

The City would also lose any potential enhancement of its credit rating that it could experience due to the elimination of "the uncertainties of the OPEB and pension costs" that would resulting from the plan. *Id*. at 67-68 (Mr. Buckfire explaining that these "should give the markets a great deal of confidence that the borrowings . . . by the city will get repaid in the ordinary course.").

Most importantly, the City and its creditors would lose the benefits of the RRIs, one of which is the creation of a sufficient operating budget surplus for the City to pay its obligations under the plan. *See* Trial Tr. 71-72, Sept. 29, 2014. (Dkt. #7819) (Mr. Malhotra testifying that "it was probably unlikely that the city would have been able to" implement the RRIs without the plan); Trial Tr. 228-29, Sept. 5, 2014. (Dkt. #7434) (Mr. Moore testifying that "clearly" the RRIs "would not have been able to get undertaken without some sort of restructuring based on the structural deficit that existed within the city in June of 2013").

The evidence establishes, therefore, that the plan is a much better alternative for creditors than dismissal.

### 3. The Creditors Can Access No Other Assets in This Bankruptcy Case

Whether in bankruptcy or outside of bankruptcy, no provision of law allows the creditors to access City assets, most importantly including the DIA art, to satisfy their claims. The market value of the City's assets, including its art is, therefore, irrelevant in this case. As observed above, a judgment creditor's sole remedy is a court-ordered property tax assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

Some creditors argue that even if the assets would not be accessible to unsecured creditors outside of bankruptcy, the best interests test in chapter 9 requires this Court's full consideration of all of the City's assets, including the art.

The Court rejects this argument. The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy. Neither the bankruptcy code nor the case law suggests otherwise.

As noted, the City determined not to sell or monetize the DIA art in the art market. Under § 904, that decision is off-limits to the Court.

However, even if the law did give the Court some authority here, the Court would not have interfered with the City's decision. The City made the only appropriate decision. Maintaining the art at the DIA is critical to the feasibility of the City's plan and to the City's future. The Court toured parts of the DIA and saw the art there, as well as how its many visitors were experiencing the art. It also accepts the testimony of Ms. Erickson on the priceless value that the DIA and the art create for the City, the region and the state. Trial Tr. 157-64, Sept. 18, 2014. (Dkt. #7634)

The evidence unequivocally establishes that the DIA stands at the center of the City as an invaluable beacon of culture, education for both children and adults, personal journey, creative outlet, family experience, worldwide visitor attraction, civic pride and energy, neighborhood and community cohesion, regional cooperation, social service, and economic development. Every great city in the world actively pursues these values. They are the values that Detroit must pursue to uplift, inspire and enrich its residents and its visitors. They are also the values that Detroit must pursue to compete in the national and global economy to attract new residents, visitors and businesses. To sell the DIA art would only deepen Detroit's fiscal, economic and social problems. To sell the DIA art would be to forfeit Detroit's future. The City made the right decision.

Some creditors proposed using the art as collateral for a loan to pay creditors' claims. The City also rejected that concept. That decision was sound for at least two good reasons. First, that proposal would just substitute debt for debt and would not help the City. Second, if the City defaulted, it might lose the art. The City made the right decision here too.

Beyond that, the record reflects that the City has made reasonable efforts to monetize other assets, including the Detroit Windsor Tunnel, certain real estate properties, certain parking properties, the Joe Louis arena property and certain other property that it no longer needs. It also entered into the Great Lakes Water Authority memorandum of understanding with Wayne, Oakland and Macomb Counties, which benefits all creditors. The Court finds that the City has made reasonable efforts to monetize its assets to satisfy the best interests of creditors test.

### 4. The Best Interests of Creditors and Feasibility

Finally, the Court finds that the "best interests of creditors" in chapter 9 is necessarily constrained by the second confirmation requirement found in § 943(b)(7)—that the plan is feasible. *See* 11 U.S.C. § 943(b)(7). In *In re Mount Carbon*, the court observed that the "'best interests' test acts as a floor requiring a reasonable effort at payment of creditors by the municipal debtor and that the 'feasibility' requirement sets a corresponding ceiling which prevents the Chapter 9 debtor from promising more than it can deliver." 242 B.R. at 34. *See also In re Pierce Cnty. Hous. Auth.*, 414 B.R. at 718.

As a result, the City "may obtain confirmation of a plan, over objection, which does not utilize all of the assets of the estate to retire its obligations." *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. at 974. This is a straightforward observation that if a city "gives away" too much under a plan, its future ability to fund its plan obligations and daily operations is lessened.

As the Court's expert witness on feasibility, Ms. Martha Kopacz, stated in her second supplemental report:

> I want to emphasize, however, that there is little space remaining on the continuum of [feasibility]. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they

107

> have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern.

Ex. 12002 at 6.

The Court addresses Ms. Kopacz's conclusions as they impact feasibility in part X.D. below. However, the Court finds that Ms. Kopacz's observation supports a finding that the City has effectively done all that it can do for its creditors in its plan.

There is no more money available for creditors in the City's already tight budget projections. Every dollar is accounted for in providing necessary services, in implementing the necessary RRIs, and in meeting plan obligations. All of those cash uses are essential to the City's future. In this plan, the floor of the best interest test and the ceiling of the feasibility test have, for all practical purposes, converged.

Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is therefore in their best interests, as required by § 943(b)(7).

### D. The Plan Is Feasible, As Required by § 943(b)(7)

#### 1. Applicable Law

Section 943(b)(7) provides, "The court shall confirm the plan if— . . . (7) the plan is . . . feasible." Few creditors substantively challenge the feasibility of the City's plan. Regardless, the Court has an independent duty to determine the issue and to make specific findings of fact. *See In re Mount Carbon*, 242 B.R. at 36 ("Not only is feasibility an express requirement set out in § 943(b)(7), but the long history of Chapter 9 requires an objective evaluation of the [chapter 9 debtor's] proposed reorganization.") (citing *Everglades Drainage Dist.*, 319 U.S. at 418-19).

As with cases in chapter 11, a chapter 9 feasibility finding should ""prevent confirmation of visionary schemes which promise creditors . . . more under a proposed plan than the debtor can possibly attain after confirmation.'" A plan should offer a reasonable prospect of success and be workable. In Chapter 9, this requires a practical analysis of whether the debtor can accomplish what the plan proposes and provide governmental services. Although success need not be certain or guaranteed, more is required than mere hopes, desires and speculation. The probability of future success will depend upon reasonable income and expense projections. As with plans proposed under Chapter 11, if performance of a Chapter 9 plan is based upon deferred payments, projections of future income and expenses must be based upon reasonable assumptions and must ""not be speculative or conjectural.'" Plan terms which provide for negative amortization, or for deferred payments over an extensive period of time, may make the showing of feasibility difficult. *Indeed a feasibility showing premised upon long-term repayment or negative amortization may be particularly difficult for the Chapter 9 debtor, which must not only demonstrate a probability that it will be able to pay on pre-petition debt in accordance with the plan, but most also demonstrate the probability that it can continue to provide public services while it repays debt.*

*In re Mount Carbon*, 242 B.R. at 35 (citations omitted) (emphasis added).

## 2. An Overview of Feasibility

In this case, examining the feasibility of the plan is difficult for a number of reasons. The City's debt is enormous and the City proposes to pay most of its creditors over a long period of time. As the Court discusses below, the City's revenue and expense projections extend forty years into the future.

Second, the feasibility of the plan depends upon the City's ability to fix and maintain its broken governmental operations. This is significant because the chapter 9 feasibility inquiry requires an analysis of whether the City can reasonably provide sustainable municipal services, as the court found in *In re Mount Carbon*. It is also significant because the City's ability to repay its creditors pursuant to the plan depends upon the City's ability to increase its revenues

109

from taxes and fees by improving the efficiency of City operations and by identifying and accessing untapped sources of revenue.

The feasibility analysis is yet more complex because several key parts of the plan depend upon performance by parties who are completely beyond the City's control. For example, because the City's contributions to the retirement systems are fixed through FY2023, a risk remains that the pension plans will be significantly more underfunded than anticipated if one of the many organizations participating in the Grand Bargain fails to perform in the time or manner promised.

As the City itself succinctly states in its pretrial brief in support of plan confirmation, "[T]he City was—and remains today—enmeshed in a financial crisis of unsurpassed proportions and complexity." City's Pretrial Br. ¶ 1 at 17-18. (Dkt. #7143) Despite efforts from both the City and the State of Michigan, "the City is trapped in a vicious circle of cash crises, general fund deficits, crushing long-term liabilities and tumbling credit ratings exacerbated by the City's bureaucratic structure and frequent deviations from established budgets." *Id.* ¶ 2 at 18.

Finally, overlaying these concerns is that throughout these proceedings, the City's creditors have focused much more heavily on whether the plan provides them with a sufficient recovery, rather than on whether the City is "promising more than it can deliver." *See In re Mount Carbon*, 242 B.R. at 34. Thus their litigation focus was on whether the plan is in the best interests of creditors, unfairly discriminates, and is fair and equitable, rather than on whether it is feasible.

For these reasons, the Court found that the adversarial system would not function to clarify the issues and elucidate the facts relating to feasibility. Accordingly, it decided to seek out an independent expert witness on the feasibility of the City's plan. After interviewing

several candidates from diverse backgrounds, on April 22, 2014, the Court appointed Martha Kopacz as its expert witness on feasibility. *See generally* Order Appt'ing Expert Witness. (Dkt. #4215) Ms. Kopacz is an experienced restructuring professional from the Boston-based firm, Phoenix Management Services. The Court instructed Ms. Kopacz to "investigate and reach a conclusion on: (a) Whether the City's plan is feasible as required by 11 U.S.C. § 943(b)(7); and (b) Whether the assumptions that underlie the City's cash flow projections and forecasts regarding its revenues, expenses and plan payments are reasonable." *Id.* ¶ 2 at 1.

After an evidentiary *Daubert* hearing on September 15, 2014, the Court determined Ms. Kopacz was qualified under Federal Rule of Evidence 702 to give expert testimony concerning these two questions, and that her opinion was the product of the application of reliable methods to sufficient facts and data. *See* Order Re: Expert Test. at 2-3. (Dkt. #7511)

Ms. Kopacz fulfilled her assignment, as set forth in three expert reports, Ex. 12000, 12001, 12002, and in her testimony on October 22, 2014. *See generally* Trial Tr. 1-89, Oct. 22, 2014. (Dkt. #8082) She provided the Court with a critical analysis of the City's financial projections and its qualitative assumptions, as well as invaluable guidance for interpreting and understanding the mountain of data that the City's financial professionals produced. Thus, although the City admirably shouldered the burden of producing the necessary raw financial data and projections, the efforts of Ms. Kopacz and her team were essential for the Court to discharge its duty under § 943(b)(7).

The Court finds Ms. Kopacz testified credibly. Therefore, the Court adopts Ms. Kopacz's findings and conclusions as expressed in her testimony and in her three expert reports almost in their entirety, and incorporates them into the Court's feasibility analysis. The only

conclusion that the Court cannot quite accept relates to her concerns about the expedited pace of this proceeding. The Court addresses this question in part X.F.4. below.

Before turning to the substance of Ms. Kopacz's findings and conclusions and the supporting evidence that the City's financial professionals compiled and testified to, the Court must address two evidentiary issues concerning Ms. Kopacz's testimony and expert reports.

### 3. Evidentiary Issues Regarding the Report and Testimony of the Court's Feasibility Expert

Although the GRS and the PFRS do not object generally to Ms. Kopacz's expertise, they did file a joint motion to exclude certain portions of Ms. Kopacz's testimony relating to the systems' historical performance and management, and their future governance and reporting requirements. In their motion, the GRS and the PFRS assert that Ms. Kopacz lacks the necessary qualifications to give pension-related opinions and further that her investigation of these issues exceeded the scope of her assignment from the Court. Retirement Systems' Mot. to Exclude at 1-2. (Dkt. #7061)

The GRS and the PFRS also moved to exclude these same portions of Ms. Kopacz's opinion and findings from admission into the evidentiary record as part of her expert reports. They argued that not only does Ms. Kopacz lack the expertise to give these opinions, but that any mention of them in her reports constitutes inadmissible hearsay. Retirement Systems' Br. in Opp'n to Admis. of Expert Report at 1-2. (Dkt. #6847) Relying on *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728-29 (6th Cir. 1994), the GRS and the PFRS argue that expert reports in general may only be admitted into evidence to show the basis for the expert's opinion, "but not as general proof of the underlying matter." Br. in Opp'n at 9. (Dkt. #6847)

The Court concludes that the motion to exclude the expert's testimony is moot because the expert's testimony is now concluded and the testimony did not address the challenged matter. Accordingly, the Court denies that motion.

The Court further concludes that the motion to exclude the challenged matter from the expert's report should be denied. All of the challenged matter is within Ms. Kopacz's expertise to investigate and pertinent to her opinion on the feasibility of the plan. Her supplemental report of August 27, 2014, clarifies that she derived her statements regarding these matters from either the disclosure statement (Dkt. #4391) or the July 18, 2013 declaration of Charles M. Moore. (Dkt. #13) These are hearsay sources, but under Fed. R. Evid 703, an expert may rely on hearsay. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

While the challenged matter may be of marginal relevance to the greater issues before the Court, its prejudice to the GRS and the PFRS is equally marginal. The Court concludes that there is no cause to exclude it and denies this motion as well.

### 4. The Expert's Standard for Feasibility

Ms. Kopacz began her work by developing and articulating a standard for measuring the feasibility of the City's plan. The Court finds that Ms. Kopacz's articulation is appropriate and adopts it here:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default?

113

Ex. 12000 at 13. It closely tracks the standard articulated by the *Mount Carbon* court, set forth above. *See Mount Carbon Metro. Dist.*, 242 B.R. at 35.

Intertwined here are also the questions of whether the City is committed to implement the plan and whether it has sufficient resources to monitor its performance under the plan. The first question requires a review of the testimony of City leaders. The second question requires an examination of the Financial Review Commission and the other controls under Public Acts 181 and 182 of 2014 (hereafter, "Grand Bargain Legislation"), Mich. Comp. Laws §§ 141.1631-141.1643, 141.117.4s-t, as well as the internal systems created by the Mayor and the City's chief financial officer.

### 5. The City's Plan Is Feasible

The Court finds that the plan is feasible. As detailed below, this finding is based on the testimony and documentary evidence presented by Ms. Kopacz, Trial Tr. Oct. 22, 2014 (Dkt. #8082), Kevyn Orr, Trial Tr. Oct. 1-3, 2014 (Dkt. ##7850, 7878, 7894), and by the following independent professionals that the City retained:

- Gaurav Malhotra of Ernst & Young, Trial Tr. Sept. 29 & Oct. 21, 2014 (Dkt. ##7819 and 8098);

- Dr. Robert Cline, formerly of Ernst & Young, Trial Tr. Aug. 18, 2014 (Dkt. #7015);

- Caroline Sallee of Ernst & Young, Trial Tr. Sept. 8-9, 2014 (Dkt. ##7472 and 7473);

- Charles Moore of Conway MacKenzie, Inc., Trial Tr. Sept. 5 & 8, 2014 (Dkt. ##7434 and 7462);

- Kenneth Buckfire of Miller Buckfire and Co., Trial Tr. Sept. 30, 2014 (Dkt. #7821);

- James Doak of Miller Buckfire and Co., Trial Tr. Oct. 3, 2014 (Dkt. #7894);

- Alan Perry of Milliman, Inc., Trial Tr. Sept. 15-16, 2014 (Dkt. ##7617 and 7618);

- Glenn Bowen of Milliman, Inc., Trial Tr. Sept. 15, 2014 (Dkt. #7617); and

114

- Gerald Salzman of Desman Associates, Trial Tr. Oct. 21, 2014 (Dkt. #8098).

This finding is also based on the testimony and documentary evidence presented by the following elected and appointed leadership of the City and the State:

- Michael Duggan, Mayor of the City of Detroit, Trial Tr. Oct. 6, 2014 (Dkt. #7917);

- Brenda Jones, Detroit City Council President, Trial Tr. Oct. 6, 2014 (Dkt. #7917);

- John Hill, the City's Chief Financial Officer, Trial Tr. Sept. 4-5, 2014 (Dkt. ##7411 and 7434);

- Beth Niblock, the City's Chief Information Officer, Trial Tr. Sept. 8, 2014 (Dkt. #7462);

- James Craig, Detroit Police Chief, Trial Tr. Sept. 9, 2014 (Dkt. #7473);

- Edsel Jenkins, Detroit Executive Fire Commissioner, Trial Tr. Sept. 9, 2014 (Dkt. #7473);

- Sue McCormick, Director of the Detroit Water and Sewerage Department, Trial Tr. Sept. 17, 2014 (Dkt. #7638); and

- Brom Stibbitz, Senior Policy Advisor for the Michigan Department of Treasury, Trial Tr. Oct. 1, 2014 (Dkt. #7850).

It is also based on the testimony and documentary evidence presented by:

- Annmarie Erickson, Executive Vice President and Chief Operating Officer of the DIA, Trial Tr. Sept. 18, 2014 (Dkt. #7634);

- Rip Rapson, President of the Kresge Foundation, Trial Tr. Oct. 2, 2014 (Dkt. #7878);

- Dan Gilbert, Chairman of Rock Holdings, Trial Tr. Oct. 1, 2014 (Dkt. #7850); and

- Roger Penske, Chairman of the Penske Corporation, Trial Tr. Oct. 3, 2014 (Dkt. #7894).

### 6. The City's Revenue and Expense Projections

*It is my opinion that, except where otherwise noted in my Report, the projections are generally mathematically correct and materially reasonable and therefore fall within the Feasibility Standard I have defined.*

> *It is my opinion that, except where otherwise noted in my Report, the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard.*

Martha Kopacz, Ex. 12000 at 200.

Exhibit 793, to which Mr. Malhotra testified on October 21, 2014, sets forth the City's income and expense projections over ten and forty-year periods of time. *See generally* Trial Tr. 45:16-86:8, Oct. 21, 2014. (Dkt. #8098)

### a. The City's Ten-Year Revenue Projections

The City projects that it will receive approximately $11.6903 billion in revenue under the plan[19] from FY2014-FY2023. Ex. 793 at 7-8. This total amount includes $11.1815 billion in general fund revenue from the City's eight primary sources:

1. Municipal income tax;

2. State revenue sharing payments;

3. Wagering taxes;

4. Property taxes;

5. Utility users' taxes;

6. Sales and charges for services;

7. Other revenue, such as permits and parking tickets; and

8. Normal general fund reimbursements and receipts from enterprise funds.

---

[19]The Court uses the phrase "under the plan" here to refer to the City's financial projections that take into account all of the benefits of the plan, including the RRIs.

It also includes $482.9 million in new revenue initiatives to be implemented under the plan and $241.1 million in proceeds from cash loans. *Id.* at 7. The City will also receive $508.8 million in plan-related reimbursements to the general fund from City enterprise funds, including $464.4 million in reimbursements from the DWSD and $44.4 million from other enterprise funds, including the library and parking systems. *Id.* at 7-8.

In addition, the City will receive approximately $404.5 million from the Grand Bargain and the State Contribution Agreement over this ten-year period (and $256.3 million over the next ten-year period from FY2024-FY2033) to be paid to the City's pension plans. *Id.* at 5.

### b. The City's Ten-Year Expense Projections

On the operating expenditures side, the City projects that it will spend a total of $10.3609 billion from FY2014-FY2023. *Id.* at 7. This amount includes payroll and active employee healthcare and pension contributions (but not the pension underfunding claims), as well as repayment of the cash loans, an annual contingency,[20] several one-time costs of restructuring, and additional operating expenditures associated with the implementation of the RRIs. This leaves approximately $1.3294 billion for the City's plan obligations to its creditors from FY2014-FY2023, plus approximately $404.5 million in Grand Bargain and State Contribution Agreement funds for the pension claims, for a total of $1.7339 billion. *Id.* at 7-8.

---

[20] Here, the Court is not referring to the cash balance required by the Grand Bargain Legislation. *See* Mich. Comp. Laws §117.4t(1)(c)(vi) ("A financial plan . . . shall . . . (c) Include a general fund reserve for each fiscal year to cover potential reductions in projected revenues or increases in projected expenditures equal to not less than 5% of the projected expenditures for the fiscal year."). The Court is referring to the contingency that is built into the City's annual budget as an operating expense. *See* Ex. 793 at 7; Trial Tr. 160, Sept. 29, 2014. (Dkt. #7819)

### c. The City's Forty-Year Revenue Projections

The forty-year revenue projections are grouped by decade and are largely an extension of the ten-year projections. *See, e.g.*, Trial Tr. 62-63, 83, 154, Sept. 29, 2014 (describing previous version of the forty-year projections). (Dkt. #7819) For the most part, after FY2023 (the end of the first ten-year period) the City's experts applied a flat, positive growth rate for each component of the City's general fund revenue streams and the new general fund revenue initiatives. Ex. 793 at 4 ("Growth after FY23"). Other income components drop off. For example, most of the plan-related DWSD reimbursements to the general fund will end after the first decade. This is because most of the DWSD plan-related reimbursements will be used to satisfy DWSD's portion of the current pension underfunding, which the plan requires DWSD to pay over a ten-year period in annual payments of $45.4 million. Ex. 793 at 8. Also, the City will receive all of the proceeds from the cash loans in the first two decades following the effective date of the plan. *Id.* at 5.

### d. The City's Forty-Year Expense Projections

On the operating expenditures side, the City similarly assumes a flat growth rate in expenditures for employee salary, overtime, and other fringe benefits, as well as for active employee pensions and the additional operating costs arising from the Restructuring and Reinvestment Initiatives. *Id.* at 4. Other operating expenditures have growth assumptions built into the plan. For example, the City projects that it will be required to contribute $2.2 million to the Income Stabilization Fund from FY2024-FY2033. *Id.*; *see also* Plan, § IV.D.2 at 55-56. (Dkt. #8045)

### e. The Resulting Forty-Year Projections

The resulting forty-year projections provide as follows:

1) From FY2024-FY2033, the City projects that it will collect $12.2321 billion in revenue and have $10.6993 billion in operating expenditures, leaving $1.5328 billion to satisfy its plan obligations to creditors, plus $256.3 million in Grand Bargain funds for satisfaction of the pension claims, for a total of $1.7891 billion.

2) From FY2034-FY2043, the City projects that it will collect $14.4455 billion and have $13.0563 billion in operating expenditures, leaving $1.3892 billion to satisfy its last remaining plan obligations to creditors.

3) From FY2044-FY2053, the City projects that it will receive $17.3359 billion and have $16.5230 billion in operating expenses, leaving $812.9 million to satisfy its plan obligations to creditors. Ex. 793 at 4-5.

The City began building these projections by constructing a baseline scenario that projects the City's finances in the absence of "the quantitative impacts of the restructuring initiatives, the cancellation of debt, the cash flow ramifications from the alterations in the City's pension plans and OPEB, and other impacts of the bankruptcy proceedings." Ex. 12000 at 32; Trial Tr. 72:13-17, Sept. 29, 2014. (Dkt. #7819) Building from this baseline projection, the City constructed the projections in Exhibit 793 by taking into account all of these costs and benefits of the plan and the RRIs (hereafter, "Plan Projections"). Ex. 12000 at 25-26; Trial Tr. 78:7-15, Sept. 29, 2014. (Dkt. #7819)

### f. The Expert's Review of the Plan Projections

Ms. Kopacz and her team reviewed the Plan Projections in great detail. They interviewed the City's elected and appointed officials, the emergency manager, many City employees,

advisors, creditors, leaders and members of labor unions, as well as representatives of the GRS and the PFRS, the DIA, the Land Bank Authority, and many charitable organizations. *Id.* at 4. They also reviewed thousands of pages of documents that the City and third parties produced. They then "critiqued the methodology used to develop the financial projections, as well as the data and information used as the foundation for the assumptions." *Id.* at 5.

Ms. Kopacz concluded that the projections are "mathematically correct and materially reasonable." *Id.* at 200. She further concluded that "the individual assumptions used to build the projections fall into a reasonable range and, that when taken as a group, these assumptions are also reasonable and fall within the Feasibility Standard." *Id.*

### g. The Revenue in the Plan Projections

On the revenue side, Ms. Kopacz examined Dr. Cline's expert opinion with regard to the City's corporate and individual income taxes and wagering taxes, which are two of the City's largest sources of revenue. Trial Tr. 58-68, Aug. 18, 2014. (Dkt. #7015) Dr. Cline explained that for income taxes, the Plan Projections are higher than the baseline projections due to "stronger growth in the underlying tax bases." *Id.* at 67. This is a function of more optimistic assumptions about wage and employment growth as the plan is implemented and the economic conditions of the City improve. *Id.* Ms. Kopacz reported that when compared to state and national estimates for wage and employment growth, the City's assumptions are "more conservative." Ex. 12000 at 47. She testified there is a reasonable chance that employment and wages will be higher than projected. Trial Tr. 37:8-11, Oct. 22, 2014. (Dkt. #8082)

For wagering taxes, Dr. Cline testified that the key factor is the impact of new casinos in Toledo, Ohio, on the gross revenues of the City's casinos. Trial Tr. 75:2-77:25, Aug. 18, 2014. (Dkt. #7015) As a result, he assumed a negative growth rate for the early years of the

projections, but eventually returned to a 1% annual increase. *Id.* at 75:18-76:16; *see also* Ex. 112-C. Ms. Kopacz agreed with Dr. Cline's assessment of the risks, adding that it was completely outside the City's control and that the assumptions adequately took the Toledo casinos into account. Trial Tr. 40, Oct. 22, 2014. (Dkt. #8082)

Ms. Sallee gave expert testimony with regard to the City's property taxes and state revenue sharing payments. In creating her projections for property tax revenues, Ms. Sallee testified that she assumed the revenue would decrease in the short term as a result of a citywide property reassessment, but that eventually revenues would increase due to improved collections and long-term rebounding property values. Trial Tr. 234, Sept. 8, 2014 (Dkt. #7472) Ms. Sallee explained that increased collections will result from residents' improved "ability to pay," based on the lower amount of taxes and the improvements in wage and employment growth that Dr. Cline projected. *Id.*

Ms. Kopacz agreed that it is reasonable to assume that "reduced assessments will result in improved property tax collection rates and, in the longer term, increased property values as Detroit becomes a more desirable location." Ex. 12000 at 59. Ms. Kopacz also testified that she found the City's property tax revenue projections and assumptions to be "conservative," particularly in the later years of the Plan Projections as the City begins to experience the full benefits of the implementation of the RRIs. Trial Tr. 44, Oct. 22, 2014. (Dkt. #8082)

As for the state revenue sharing payments, Ms. Sallee testified that the City receives two types: 1) constitutional payments, which are calculated as a percentage of the statewide sales tax (15% of the first 4% of sales tax revenues), divided among Michigan municipalities based upon population, and 2) Economic Vitality Incentive Program ("EVIP") payments, which are set forth in the state's annual appropriation legislation and are thus at the discretion of the state

legislature. Trial Tr. 241:10-21, 247:3-15, Sept. 8, 2014. (Dkt. #7472) The legislature distributes the EVIP payments based on a municipality's financial "accountability and transparency," "consolidation of services," and whether it has established a plan to deal with any existing pension underfunding. Ex. 12000 at 51. Ms. Sallee testified that she assumed the constitutional payments would decrease after the next census, in line with Dr. Cline's population decline projections, and that the EVIP payments would remain constant throughout the forecast period. Trial Tr. 250:1-9, 252:14-255:10, Sept. 8, 2014. (Dkt. #7472)

Ms. Kopacz agreed that these projections were reasonable. In particular, she testified that she finds it "hard to fathom" that the City would not receive the full EVIP payments going forward, "given the capability of the current Mayor and the CFO." Trial Tr. 39:16-18, Oct. 22, 2014. (Dkt. #8082)

As explained above, although the DWSD operates as an enterprise fund, it is another major source of revenue for plan payments. Exhibit M to the City's Fourth Amended Disclosure Statement (Dkt. #4391) and Exhibit 178 set forth the City's projections of the DWSD's revenues, operating and legacy expenditures, and capital improvement plan for FY2014-FY2023. Ms. Kopacz expressed skepticism in her original report regarding the feasibility of the DWSD payments under the plan. Ex. 12000 at 196 ("While DWSD's debt is impacted by the POA, the DWSD operations are not included in the Plan. DWSD does play a significant role in funding the City's pension obligations during the forecast period.").

However, following the Court's approval of the DWSD Bondholders settlement on August 25, 2014 (Dkt. #7028), Ms. Kopacz testified, "Based on the DWSD settlement [], the risk that I had identified with the DWSD contribution to the pension funding is now removed." Trial Tr. 75, Oct. 22, 2014. (Dkt. #8082) Ms. McCormick also testified that the DWSD will have

122

sufficient resources to make all the necessary capital improvements to infrastructure so that it can continue providing adequate water and sewer services to its customers.  Trial Tr. 99:4-100:6, Sept. 17, 2014.  (Dkt. #7638)

The City's parking department is another important source for revenues needed in the plan.[21]  James Doak and Gerald Salzman testified about the City's projected parking revenues. *See* Trial Tr. 123-126, Oct. 3, 2014 (Dkt. #7894); Trial Tr. 9-45, Oct. 21, 2014.  (Dkt. #8098)  Mr. Salzman works for Desman, a firm that designs parking garages and optimizes parking system revenue.  City Exhibit 783 reflects Mr. Salzman's projections of the City's parking revenues under four different scenarios—a "status quo" scenario; an "optimized," but still City-run scenario; a "private" investment and development scenario; and a "private upside" scenario, which is identical to the private scenario except that parking rates increase every three years.  Ex. 783 at 47, 52.

Mr. Doak testified that the Plan Projections include an assumption that the City's parking revenues will exceed $10 million per year, and that the status quo scenario would not be sufficient.  Trial Tr. 130:2-9, Oct. 3, 2014.  (Dkt. #7894)  However, he also testified that the City has "the prospective capacity to either run the parking operations more efficiently and more economically generating more cash flow, or seek a private partner" in order to achieve the projected parking revenues in the plan.  *Id.* at 130.

Ms. Kopacz further confirmed that the assumptions underlying the plan's parking revenue projections are "by and large . . . not significantly different than the historical trend,"

---

[21] As explained in part III.L.3. above, the primary use of the parking revenues will be to satisfy the New C Notes that the City will issue under the plan.  However, for the sake of clarity, the Court discusses them here as simply a source of City revenue.

thus, while there is "some rate increase," and "some increased usage," she explained that "it's not a hockey stick" projection, and she concluded, "from the revenue side, I think they're reasonable." Trial Tr. 20-21, Oct. 22, 2014. (Dkt. #8082)

### h. The Expenditures, Revenue and Cost Savings Associated with the RRIs

Mr. Moore provided expert testimony regarding the projected expenditures, revenue, and cost savings associated with the implementation of the RRIs. He testified that the projected expenses and gains associated with the RRIs are "reasonable and achievable." *See, e.g.*, Trial Tr. 75, 80-82, 152, Sept. 5, 2014. (Dkt. #7434) To reduce risk, Mr. Moore and his team at Conway MacKenzie specifically targeted areas with historically high costs and within the City's immediate control. These include labor inefficiencies, high levels of employee downtime and overtime, inefficient processes, ineffective or non-existent management metrics and tools, and improper deployment and use of assets. Ex. 464 at 10-11. In determining which initiatives should be included in the RRIs, the Conway team omitted any initiative that had a high degree of risk in implementation or that was outside the reasonable influence of the City's leadership (for example, an initiative requiring state legislative action). Trial Tr. 74, Sept. 5, 2014. (Dkt. #7434)

Mr. Orr also testified that the increased revenues and cost savings projections associated with the RRIs are reasonable "and achievable." Trial Tr. 124-25, Oct. 2, 2014. (Dkt. #7878)

### 7. The City's Obligations to Creditors Under the Plan

> *While my opinion is the Plan of Adjustment remains feasible and there is not yet a 'significant probability of default' as described in the Standard, there is no denying the possibility of default has increased. It is not realistic or prudent to believe that the City could take on any additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility.*

Martha Kopacz, Ex. 12002 at 6.

The plan reduces the City's debt burden by over $7 billion. *See, e.g.*, Trial Tr. 70:4-7, Sept. 30, 2014. (Dkt. #7821) This is a truly remarkable achievement for the City, unprecedented in the history of municipal bankruptcy. However, the Court begins with the statement from Ms. Kopacz above to emphasize the magnitude of debt that the City is undertaking and retaining under the plan, particularly in light of the ambitious revitalization plan that the City intends to implement over the next ten years.

### a. The City's Post-Bankruptcy Debt

As Mr. Malhotra testified, and as reflected in Exhibit 791, the City will issue $1.063 billion in new notes under the plan. This amount includes:

1. $55 million in New LTGO Bonds, to be paid on the effective date from a part of the proceeds of the exit financing;

2. $88 million in New C Notes, payable over twelve years at 5%;

3. $288 million in Restructured UTGO Notes, payable over fourteen years, at the various pre-bankruptcy interest rates of between 3.7% and 5.375%; and

4. $632 million in New B Notes, payable over thirty years at 4% for the first twenty years and 6% over the last ten years and interest-only for the first ten years.

*See* Ex. 791; Trial Tr. 63, Oct. 21, 2014. (Dkt. #8098) In addition, the City is obligated under the plan to pay $2.2 million in cash to class 17, the 36th District Court creditors, and $20 million in cash to cover the VEBA start-up costs. Ex. 793 at 2. These obligations total $1.0852 billion.

125

This is in addition to other debts that the City retains, including debts associated with the DWSD and secured GO bonds. *See* Plan, § II.B.3.a-k at 33-35. (Dkt. #8145)

The plan also obligates the City to pay $3.795 billion to the GRS and the PFRS on account of the class 10 and 11 pension claims. *Id.* at 3. Of this amount, $661 million will be paid through contributions from the Grand Bargain and the State Contribution Agreement. *Id.*

Finally, the City is required by the Grand Bargain Legislation to maintain a minimum cash balance equal to 5% of annual projected expenditures. Mich. Comp. Laws § 117.4t(1)(c)(vi). Although this is not a debt-service obligation, the Court must nevertheless determine whether it is feasible that this amount will be available after all other plan obligations are satisfied. Because the City's forecasted annual expenditures hover around $1 billion, the minimum cash balance amount is approximately $50 million. City Ex. 793 at 7.

### b. The Cost of Servicing the Post-Bankruptcy Debt

The cost of servicing these obligations and maintaining the minimum cash balance over the same ten and forty-year periods for which the City projected its income and operating expenditures is also reflected in City Exhibit 793, and was testified to by Mr. Malhotra. *See generally* Ex. 793; Trial Tr. Oct. 21, 2014. (Dkt. #8098)

For the time period FY2014-FY2023, the City will be required to spend $709.5 million to service the notes and satisfy its cash obligations. This amount includes $20 million in cash to the VEBAs, $2.2 million in cash to the 36th District Court creditors in class 17, and $687.3 million payable to service the B Notes. The City will also expend $979.2 million to service its obligations to the GRS and PFRS on account of the UAAL. This totals $1.6887 billion. Ex. 793 at 5.

As discussed above, the City projects that it will have $1.7339 billion available to pay plan-related expenses.

Therefore, after paying its operating expenditures and satisfying its obligations to creditors, the City projects a surplus of $45.2 million. *Id.* When added to the City's then-existing cash balance, the City projects that it will have a cash balance of $81.2 million at the end of FY2023, which is sufficient to meet the requirements of the Grand Bargain Legislation.[22] *Id.* at 8.

For the period FY2024-FY2033, the City will be required to spend $541 million servicing the B Notes, C Notes, and Restructured UTGO Notes. The City projects that it will be required to spend $1.2481 billion to service its obligations to the GRS and PFRS UAAL,[23] for a total of $1.7891 billion. *Id.* at 5. The City projects that it will also have $1.7891 billion for plan-related expenses during that time period. Therefore, the City projects that it will break even at the end of this time period, after paying its operating expenses and satisfying its plan obligations. *Id.* at

---

[22] Page 8 of City Exhibit 793 shows the cash balance on a year-by-year basis. The City's actual cash balance at the end of FY2014 was $154.4 million, due to a surplus of $118.4 million for FY2014. *Id.* at 8.

Because of a projected deficit in FY2015 of $78.8 million related to the implementation of certain RRIs, the City's projected cash balance drops to $75.6 million at the end of FY2015. *Id.* at 8. The City then projects that it will be able to maintain that cash balance of $75.6 million through FY2019 by deferring implementation of other Reinvestment and Restructuring Initiatives and selling certain assets, such as older city-owned vehicles and copper wire from the decommissioning of the Public Lighting Authority. *Id.* at 10-12. At that point, the City projects that its cash balance will begin to slightly improve each year, such that by the end of FY2023, the City will have this $81.2 million cash balance. *Id.* at 8.

[23] As discussed in part III.F. above, the City's obligations to the GRS and the PFRS are fixed under the plan from FY2014-FY2023. During this time, as the City works to stabilize its finances and implement the RRIs, the majority of the City's contributions to the GRS and the PFRS will come from the DWSD, the State Contribution Agreement, and the Grand Bargain funding. *See* Ex. 793 at 3. However, after 2023, the City projects the retirement systems will remain somewhat underfunded. *See* Ex. 12000 at 133. The balance of the underfunding in 2023 will be amortized over a thirty year period of time. *Id.*

127

4-5.  The City also projects that it will be able to maintain the $81.2 million cash balance carried over from the first decade of projections through the end of FY2033.  *Id.* at 5.  The New C Notes, the New LTGO Bonds, the New UTGO Bonds, and the City's cash obligations to the 36th District Court creditors and the VEBAs are projected to all be satisfied by the end of FY2033. (Ex. 791; Ex. 793 at 5)

For the time period FY2034-FY2043, the City will be required to spend $450.6 million servicing the New B Notes.  Ex. 793 at 5.  The City projects that it will also be required to contribute $938.5 to the GRS and PFRS UAAL, for a total of $1.3892 billion.  *Id.*  As detailed above, the City projects that it will have $1.3892 billion in funds left over after its operating expenses are paid, thus breaking even again for this ten-year period.  *Id.* at 4-5.  However, again, the City projects that it will be able to maintain the $81.2 million cash balance through the end of FY2043.  *Id.* at 5.

Finally, for the time period FY2044-FY2053, the City will be required to spend only $68.9 million to fully satisfy the B Notes.  *Id.*  The City also projects that it will be required to contribute $628.9 million to complete payment on the pension underfunding, for a total of $697.8 million in plan obligations.  *Id.*  During this time period, the City projects that it will have $813.0 million in revenue funds after paying its operating expenses, leaving a surplus of $115.2 million.  When this surplus is added to the City's projected then-existing cash balance, the City projects it will have an overall cash balance of $196.4 million by the end of FY2053.  *Id.*

### c. The City Will Be Able to Service Its Post-Bankruptcy Debt

As Ms. Kopacz's opening cautionary note suggests, and the Court's review of the projections demonstrates, the Plan Projections do not leave much room for error.  In two of the

four ten-year periods, the City projects that it will only "break even" after paying its operating expenses and its obligations to creditors. *Id.* at 4-5. For the first thirty years of the plan, the City maintains its mandated cash balance only by deferring certain RRIs and selling assets. *Id.* at 10-14.

Nevertheless, as the Court concludes above, the City's projections are reasonable. Ms. Kopacz reported that a number of the assumptions underlying the projections are even "conservative." Ex. 12000 at 200. In addition, as counsel for the City pointed out in closing arguments, a narrow margin of error is to be expected in a broadly consensual plan:

> [T]he fact that the deals that were reached with creditors had the result of leaving the City with just about enough to accomplish its principal objectives through reinvestment and service improvement but did not create an overwhelming margin is the result you should exactly expect from a largely consensual plan. That's how they come out. Every side tries for as much as they can get and leaves for the other side only what is perceived they need. No one gets extra.

Trial Tr. 130-131, Oct. 27, 2014. (Dkt. #8156)

Accordingly, the Court concludes that the City is reasonably likely to have a balanced annual operating budget and to satisfy its plan obligations to creditors, while maintaining a cash balance that is sufficient to meet the requirements of the Grand Bargain legislation for the life of the plan.

### 8. The Feasibility of the City's Plan to Address Its Pension Obligations

*The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations.*

Martha Kopacz, Ex. 12000 at 147.

### a. The City's Plan Regarding Its Pension
### Obligations

The plan provides the City with fixed payments toward the pension underfunding for FY2014-FY2023. For the PFRS, 100% of the payments are covered by the funds from the State Contribution Agreement and the Grand Bargain. Ex. 732. For the GRS, which has a larger underfunding claim, the State Contribution Agreement and the Grand Bargain funds cover only 20%. *Id.* The City is obligated to contribute $575 million in cash. However, approximately $428.5 million of that will come from DWSD revenues to cover DWSD's portion of the GRS underfunding liability, and another $31.7 million will come from the UTGO millage, as described in III.K. above. This leaves a balance of $114.6 million. *Id.* Mr. Malhotra testified that $80 million of this $114.6 million will come from the City's general fund and that it is included in the Plan Projections. Trial Tr. 84, Oct. 21, 2014. (Dkt. #8098) The balance will come from the City's parking and library revenues. *Id.* at 81.

However, at the end of FY2023, the GRS and PFRS will remain significantly underfunded. Using the assumptions from the global pension settlement, including the 6.75% discount rate, the City projects that the PFRS will only achieve 78% funding, leaving a UAAL of $681 million. Ex. 793 at 2. For the GRS, the City projects a 70% funded status by the end of FY2023, leaving a UAAL of $695 million. *Id.* The City will then amortize the remaining UAAL for both plans over the next thirty years at an interest rate of 6.75%. *Id.* Between FY2024 and FY2033, the City will receive an additional $68 million in Grand Bargain proceeds to pay toward the UAAL amortization for PFRS, and $188 million for GRS. The balance of the amortized UAAL will come from the City. *Id.* at 5.

The plan greatly reduces the City's pension obligations, thanks to the State Contribution Agreement, the Grand Bargain funding, and the modification of the City's obligations to its

current retirees. The Grand Bargain legislation reflects the State's ability and commitment to make its contribution. *See* Mich. Comp. Laws § 141.1602. Ms. Erickson credibly testified that the DIA has already raised $85 million of the $100 million that it committed, and that she is "completely confident" the DIA will be able to raise the balance. Trial Tr. 117, Sept. 18, 2014. (Dkt. #7634) Mr. Rapson testified that the Kresge Foundation is fully committed to making its promised $100 million contribution to the Grand Bargain, and furthermore that it "should not eat into the normal investments we would normally make in the City of Detroit." Trial Tr. 202, Oct. 2, 2014. (Dkt. #7878)

Mr. Orr testified that he has received letters also expressing commitment from representatives of the Ford Foundation, the Kellogg Foundation, the Davidson Foundation, the Erb Family Foundation, the Mott Foundation, the McGregor Fund, the Hudson-Webber Foundation, the Community Foundation for Southeast Michigan, and the Knight Foundation. *See* Ex. 352; Trial Tr. 54, Oct. 2, 2014. (Dkt. #7878)

### b. Evaluating the Risks in the City's Plan to Address Its Pension Obligations

However, the risk remains that at the end of FY2023, the UAAL could be much larger than currently projected. Ms. Kopacz testified that the fixed nature of the City's obligations for the next ten years supports the plan's feasibility. Trial Tr. 62, Oct. 22, 2014. (Dkt. #8082) The primary risk that Ms. Kopacz cites is the City's decision to discount the pension underfunding (and thus reduce all pension contributions) by 6.75%, which is based on the City's assumption that its pension investments will grow at that rate if properly managed. Ex. 12000 at 144-51. Her report stated:

> The City's assumption of a 6.75% rate of return implicitly requires the City to accept risk and volatility. Volatility is, of

course, a positive and a negative force. At times, the City should be expected to achieve returns above 6.75% and, at times, the City should expect returns below this level. Over the past 10 years, the Retirement Systems have seen significant variations in their investment returns both above and below the average return. Because the City's defined benefit plans [as opposed to the new hybrid pension plans] are essentially in runoff, they will inevitably experience declining asset levels. In this environment of declining assets and volatility, returns over time are not equally weighted.

. . . . In an environment in which expected returns are low in the short term—as the current low-interest-rate, low-inflation environment may be—funds cannot simply balance low returns in the short term with high returns later; they will need much higher returns later because investible assets will be lower than they otherwise would have been.

*Id.* at 149-50 (footnote omitted).

She echoed this concern in her testimony:

The concern that I have is that if the City does not monitor the [pension] obligation that is going to be there in 2023 and beyond, . . . is that they could wake up with a bad nightmare, not unlike what they've been through with the pension systems to get to this point.

Trial Tr. 60, Oct. 22, 2014. (Dkt. #8082)

The GRS and the PFRS have historically used significantly higher assumed investment rates of return, and thus discount rates, of 7.9 and 8.0%. Ex. 12000 at 127. Nevertheless, Ms. Kopacz stated, "Highlighting that the City's assumptions are low relative to history, a history that got them to this place, . . . is not much consolation." *Id.* at 147

The City presented testimony from actuaries to support the assumption that the City's investments will achieve the projected 6.75% growth rate. Glenn Bowen of Milliman testified that the 6.75% rate assumes a lower inflation rate than the vast majority of large public pension plans. Trial Tr. 121, Sept. 15, 2014. (Dkt. #7617) The City also presented testimony from Alan Perry, another actuary from Milliman, who testified that the 6.75% rate is "at or near the bottom

of the assumption that we would see for the largest public [pension] plans." *Id.* at 222:10-15. These two points support a conclusion that the City's assumptions regarding the investment return rate are conservative.

Mr. Bowen also testified that in November 2013, Milliman performed a series of calculations based on the City's asset allocations, and determined that the City could reasonably expect an investment return assumption of at least 7.2%. *Id.* at 91; Ex. 496.

Based on this evidence, the Court concludes that the City's projection of the UAAL for both retirement systems at the end of FY2023, including the 6.75% investment return assumption, is reasonable and supports a finding that the plan is feasible.

### c. Recommendations for Enhanced Disclosures to Reduce the Risk of Unmanageable Pension Obligations

To improve the feasibility of the plan, Ms. Kopacz makes several recommendations to enhance the disclosures in the annual reports of the status of the pension UAAL. In her report, Ms. Kopacz recommends that on an annual basis, the City disclose three funding benchmarks:

> The expected standard deviation of investment returns of the asset portfolio on the report date;

> The plan liability and normal cost calculated at the risk-free rate, which estimates the investment risk being taken in the investment earnings assumption; and

> A standardized plan contribution for assessing the aggregate risks to the adequacy of the recommended contribution.

Ex. 12000 at 155-56 (citing the Society of Actuaries "Report of the Blue Ribbon Panel on Public Pension Plan Funding," February 2014).

Ms. Kopacz further recommended "that the City disclose the gross liability and the UAAL by year on an undiscounted basis." *Id.* at 156. She explained, "This will allow third parties a better understanding of the changes in the liabilities from year to year." *Id.*

The Court strongly recommends that the City, the GRS and the PFRS give serious consideration to these additional disclosures. Based on the record, the Court agrees that "[t]imely, accurate financial reporting relating to the City's pension plans will be an essential tool as the retirement systems manage the plans' assets and liabilities and make critical decisions regarding future estimated rates of returns and annual funding requirements." *Id.* at 155.

### 9. The City Will Be Able to Sustainably Provide Adequate Services

> *The RRIs are one of the positive outcomes of the bankruptcy process. The RRIs provide the backbone of improved services to the citizens of Detroit.*

Martha Kopacz, Ex. 12000 at 207.

The Court has determined the City's financial projections and the assumptions that underlie them are reasonable, including the projected expenditures and increased revenues associated with the RRIs. Therefore, the only remaining feasibility questions are 1) whether the RRIs, if implemented, are reasonably likely to enable the City to sustainably provide adequate services, and 2) whether the City is reasonably likely to be able to implement the RRIs.

Charles Moore is the chief architect of the RRIs. He was qualified as an expert in "advising municipal and corporate entities on organizational turnarounds and restructuring, including operational and financial revitalization." Trial Tr. 75-76, Sept. 5, 2014. (Dkt. #7434) During his testimony, he explained that the RRIs can be broken down into seven categories:

1. Blight initiatives, which focus on the remediation of primarily residential blight;

134

2. Public safety initiatives, which focus on police and fire services to improve overall public safety;

3. Resident service initiatives, which focus on departments that primarily interact with residents (such as the Department of Transportation);

4. Business service initiatives, which focus on departments that interact with businesses (such as Buildings, Safety Engineering and Environmental Department);

5. Organizational initiatives, which focus on the departments that serve primarily to support City operations (such as the Finance Department and General Services);

6. Management initiatives, which relate to the mayor's office, city council and the city clerk; and

7. Non-departmental initiatives, which relate to the 36th District Court.

*Id.* at 40-41.

In developing the RRIs, Mr. Moore and his team at Conway MacKenzie reviewed each of the general fund departments and the enterprise funds that impact the general fund. This was done to understand the nature of each department, the services that each provides, and the way in which those services are provided. That information was reviewed against benchmark data to determine the level of deficiency in each department. From there, initiatives for improving the level of services were developed and compiled into the reinvestment plan. *Id.* at 66-67.

This process was conducted from the bottom up, meaning that Conway MacKenzie worked department by department with employees and department heads to develop individual projects and initiatives to address specific service deficiencies. *Id.* at 66. For example, with regard to labor requirements for a given department, it looked at how many employees would be required to complete all necessary tasks, the appropriate pay levels, and the amount of training required. It looked at departmental information technology requirements, the associated costs, and the necessity of outside contractors and consultants. *Id.* at 68-69. Where necessary, it relied on outside experts for additional input. For example, the Tridata Group was consulted as to the

fire department, and both the Manhattan Institute and the Bratton Group were consulted as to the police department. Trial Tr. at 69-72, 263-64, Sept. 5, 2014. (Dkt. #7434)

Mr. Moore testified that in his expert opinion, each specific RRI is necessary and that if successfully implemented, the RRIs will improve City services to an adequate level. *Id.* at 82-83. The specific facts supporting these conclusions for the most significant RRIs are summarized below.

### a. The Blight Initiatives

In assessing the scope of the blight problem, Mr. Moore relied, in part, on a report issued by the Detroit Blight Removal Task Force in May 2014. *Id.* at 88:7-10. The Task Force was created in September 2013 to focus on reducing or eliminating blight in the City. *See* Ex. 73. The Task Force surveyed over 99% of the City's 380,000 lots and compiled the results in a comprehensive database known as the Motor City Mapping Project. Trial Tr. at 90:5-91:7, Sept. 5, 2014. (Dkt. #7434) The Task Force identified an estimated 80,000 properties in the City that were either blighted or showing signs of blight. Approximately 30% of residential structures and 30% of commercial structures were blighted. Ex. 464 at 13-14, tables 1a and 1b.

In addition to relying on the Task Force report, Mr. Moore visited multiple blight removal sights, spoke with residents living in areas where blight removal activities were undertaken, met with members of the blight removal task force, and spoke with City personnel involved in blight removal from the planning and development department and the building department. Trial Tr. at 89-90, Sept. 5, 2014. (Dkt. #7434)

The proposed blight initiatives contemplate $440.3 million in total investment and $72.3 million in revenue initiatives, resulting in net reinvestment of $368 million. *Id.* at 92-93; Ex. 464 at 15, tables 1c and 1d.

This level of investment will not completely eradicate blight in the City. Eliminating all 80,000 properties that are "blighted or showing signs of blight" would cost approximately $850 million. Ex. 464 at 17, table 1e. The initiative is focused primarily on structural blight (buildings) as opposed to non-structural blight (brush and other debris).

There is no direct financial revenue projected from these initiatives. There are, however, indirect benefits from blight removal. These include:

- The improved appearance of the City;

- The stabilization of neighborhoods;

- Reduced migration from the City;

- Increased demand for property;

- Decreased crime;

- Reduction in the number of fires;

- Improved fire rating (which ties to insurance rates);

- Reduced maintenance burden on the City;

- Efficient land utilization;

- More efficient delivery of City services; and

- Enhanced development opportunities.

Ex. 464 at 14-15; Trial Tr. 95-96, Sept. 5, 2014. (Dkt. #7434)

The City's disclosure statement further states, "In developing its blight removal initiative, the City has taken into account the proposals set forth in the Detroit Future City Strategic Framework . . . and the City believes that its strategies for blight removal are consistent with the goals set forth in the Strategic Framework." Disc. Stmt. § IX.B.1, at 162. (Dkt. #4391)

Mr. Rapson testified about the Detroit Future City Plan, which was developed primarily by the Kresge Foundation. Trial Tr. 182, Oct. 2, 2014. (Dkt. #7878) He explained that the Blight Task Force is "nested within" the Detroit Future City project. *Id.* at 183. More importantly, he testified that incorporating City's blight removal initiative into the highly-developed Detroit Future City plan the increases its feasibility. *Id.* at 182 ("[T]he Detroit Future City plan is really in many ways the way by which the City will operationalize its approach to blight.").

Finally, the Court finds Mr. Rapson credibly testified that the blight removal initiatives "will help the City return to providing adequate services." *Id*. at 203. He elaborated:

> [T]hese investments in City services represent a return to the kind of investments that are going to be necessary for us to make progress on blight remediation and to improve the kind of public services and emergency services that any city depends on for its long-term health.
>
> . . . .
>
> I think they will [] help stabilize the environment [so that the City can] build these other investments on top of an environment that is safe and that is not characterized by massive swaths of blighted land, but I think it will also serve as an accelerant. My sense is that what the plan of adjustment . . . does is to really accelerate the kind of progress that we need to make as a community if we're going to return to health . . . .

*Id*. at 203-04.

### b. The Public Safety Initiatives

The public safety initiatives are intended to improve the overall performance of the police and fire departments and to increase safety in the City.

In assessing how well the police department is currently functioning, Mr. Moore relied on numerous reports that have been written about the City, as well as nationwide data sources

regarding the effectiveness of police departments (for example, the FBI's uniformed crime reporting statistics). The benchmarking data measures crime rates, case closures and response times. Trial Tr. 97-99, Sept. 5, 2014. (Dkt. #7434)

The initiatives for the police department contemplate an investment of $339.8 million, cost savings of $87.6 million and revenue initiatives of $32.6 million, for a net reinvestment of about $220 million. *Id.* at 96-98; Ex. 464 at 20, table 2a. The specific investments required for the police department were determined by working closely with Police Chief James Craig as well as the finance and IT departments. Trial Tr. 105-06, Sept. 5, 2014. (Dkt. #7434)

The $339.8 million in proposed expenditures for the police department include:

> 1) $175 million in operating expenses. This is primarily to address staffing issues such as shifting 250 uniformed officers who currently perform duties that civilians could perform back to patrol duty and hiring civilians to fill the open positions. This represents about 12% of the police force.
>
> 2) $91.3 million in fleet expenditures. More than half of the department's vehicles are over ten years old; this investment will put the fleet replacement cycle at 3½ to 4 years, which is not ideal, but is a significant improvement.
>
> 3) $38.4 million in technology related expenses. This includes replacing handheld and vehicle radios as well as implementing an integrated police information system. That system allows for sharing information between precincts, accessing background information on individuals, automating paperwork and improving data access for management.
>
> 4) $34.2 million in capital expenditures. This includes funds for improving existing facilities ($24 million for substantial repairs that have been delayed) as well as opening three new precincts ($7 million) and a new training facility ($3 million).

*Id.* at 100-06.

Chief Craig confirmed that these investments will enable the police department to adequately serve the residents of Detroit. He described a "plan of action," prepared under his

supervision and direction, that is designed to transform the department into a "premier law enforcement agency." *See* Ex. 66; Trial Tr. 108-09, Sept. 9, 2014. (Dkt. #7473) Chief Craig testified that the plan of action was his way of incorporating the public safety initiatives described in the disclosure statement into the actual day-to-day functioning of the police department. Trial Tr. 109-10, Sept. 9, 2014. (Dkt. #7473) He testified that the police department's implementation of the plan of action is "roughly 65 percent complete," citing, *inter alia*, an overall crime reduction of 19 percent from 2013, a murder clearance rate of 67% (up from 11% previously), and the successful transition out of an eleven year Department of Justice consent decree. *Id.* at 109-12. He also testified that "in-service training" has increased, and the department has successfully implemented its own "neighborhood police officer initiative," designed to establish relationships between officers and the neighborhoods they protect. *Id.* at 115-16.

Chief Craig also testified that they had recently hired 133 new officers, but that they were only keeping up with attrition. *Id.* at 113. Part of the problem, he explained, is that officers in neighboring cities offer higher pay.

However, several weeks later Mayor Duggan testified that he has made efforts to address this problem. Trial Tr. 82, Oct. 6, 2014. (Dkt. #7917) He testified that he was able to re-negotiate contracts with the police unions in order to give all officers an 8% increase in base pay by reducing annual sick days and by moving 150 uniformed officers out of "non-core" roles, such as traffic enforcement, crime statistics, and prisoner transport, and into patrol positions. *Id.* He testified that the department plans to hire retired officers to fill the non-core positions at a lower hourly wage with no benefits, explaining, "It'll save us a huge amount of money, and when we bring the retired officers back, we can move the 150 cops back to the street. And with

140

the money we save, we can give [the] officers a base pay increase of eight percent." *Id.* Mayor Duggan testified that these changes will allow the police department "to effectuate the plan . . . much more quickly," particularly by "putting officers on the street." *Id*. at 82-83.

In assessing the Fire Department, Mr. Moore looked to the National Fire Protection Association's published standards and concluded that the City is not meeting those standards. The NFPA standard response time for firefighting and EMS is six minutes. The City department's response times were 9 minutes for firefighting and 18 minutes, 20 seconds for EMS. This is due to a lack of resources, both people and equipment. Trial Tr. 107-08, Sept. 5, 2014. (Dkt. #7434)

The initiatives for the Fire Department contemplate a total investment of $218.9 million, with cost savings of $60.6 million and revenue initiatives of $87 million, for a net reinvestment of $71.3 million. Ex. 464 at 20, table 2a. This includes:

1. $85.3 million in additional operating expenses. This is primarily for hiring additional firefighters. This will be offset by some attrition, as well as increased efficiency as the department moves towards cross-training and cross-utilization of its fire and EMS resources.

2. $58.6 million in fleet expenditures. This anticipates the purchase of about 17 vehicles per year. About 30% of the fleet will be replaced in 2015 and about 12% each year thereafter.

3. $71.3 million in capital expenditures. This addresses repairing or replacing facilities. Many of the older facilities were not built to accommodate modern equipment and must be replaced or upgraded. $30 million is allocated for that. In order to meet NFPA standards regarding response times, some firehouses need to be relocated. $20 million is allocated for equipment replacement.

4. $300,000 to combine firefighting and EMS. Most of this money has already been spent implementing Tridata's recommendations

Trial Tr. 107-11, Sept. 4, 2014. (Dkt. #7434) *See also* Ex. 464 at 20, 26-28.

Executive Fire Commissioner Edsel Jenkins confirmed Mr. Moore's testimony that the proposed initiatives dedicated to the fire department will enable the department to come into

compliance with—or close to compliance with—the NFPA standards. Trial Tr. 53, Sept. 9, 2014. (Dkt. #7473) He explained that certain kinds of complex, large fires will likely continue to impact the Department's compliance with the NFPA standards. He explained, "[I]f we have all [of] our resources tied up at one or two fires, that's going to leave us really hard-pressed to meet the response times for EMS and fire for regular runs." *Id*. at 88. However, he further explained that the RRIs provide a "great cash injection that the department needs," and that while he could not say the department would be "perfect," he testified, "we'll be very close." *Id*. at 89.

The Court finds that Chief Craig and Commissioner Jenkins are fully committed to and capable of implementing the RRIs in their departments. The Court further finds that if these RRIs are implemented, they will enable the City to provide an adequate level of public safety service that will be sustainable over the long term.

### c. The Organizational Efficiency Initiatives

These initiatives relate to departments that provide support for the City's operations, specifically: the finance department, the general services department, the human resources department, the law department, the office of the auditor general, the department of elections, and the human rights department. Implementation of the RRIs associated with these departments is essential to the City's improvement in its operations and ultimately the services it provides.

The RRIs for organizational efficiency contemplate a total investment of $479.9 million, offset by cost savings of $109 million, and revenue initiatives of $98.2 million, for a net reinvestment of $272.7 million. Ex. 464, at 57-58, tables 5a and 5b. The Court addresses the main components of the organizational efficiency initiatives below.

The income tax division of the finance department is marked for a $12.2 million investment, primarily for the implementation of a tax software program known as "City Tax,"

which is expected to create cost savings of $10.4 million. Trial Tr. 142, Sept. 5, 2014. (Dkt. #7434) The City also hopes to increase its income tax revenue by working with the IRS to obtain information on individuals whose federal tax returns suggest that they should be filing a tax return with the City but who have not done so. *Id.* at 143. Mr. Stibbitz testified that the State is similarly hoping to assist the City in collecting income taxes. He stated, "[W]e've been working on an agreement and building a system, . . . through which we could actually collect city income taxes on behalf of the City." Trial Tr. 91, Oct. 1, 2014. (Dkt. #7850)

Mr. Orr testified that the investments in the income tax division will address another serious problem in the City—people who are trying to pay their municipal income taxes frequently have to wait in line for several hours to make their payments. Trial Tr. 122-23, Oct. 2, 2014. (Dkt. #7878)

The grants division of the finance department is new and budgeted for a $19 million investment. Trial Tr. 143, Sept. 5, 2014. (Dkt. #7434) It is responsible for establishing a grants management system. The City gets a fair amount of grant revenue each year, but the money is not properly tracked. HUD and other granting authorities have indicated that without changes, the City is at risk of losing future grants and also possibly having to reimburse grants already received. *Id.* at 143-44. The new initiatives are designed to prevent this from happening. Mr. Hill testified that the City will continue to use an interim grants management program until the City completes all of its planned information technology upgrades. Trial Tr. 87-88, Sept. 4, 2014. (Dkt. #7411) The expectation is to use the grant management module in the new financial control system once it is fully implemented. *Id.* at 88.

One major area that needs improvement is the human resources department, in which the City plans to invest $40 million. Trial Tr. 152, Sept. 5, 2014. (Dkt. #7434) Mr. Moore

described reinvestment in this department as "another one of those critical elements that underlies all of the reinvestment initiatives." *Id.* The department is understaffed and under-resourced. As a result, it can take the City six months to fill open positions. The plan calls for the City to eventually add over 800 employees. To free that process from the current constraints imposed by the condition of the HR department, the City plans to spend $25 million in additional labor and training, including adding eleven employees dedicated to monitoring the City's compliance with union contracts. *Id.* at 152-56. In addition, the City has hired a new director of human resources, who will start in January 2015. Trial Tr. 71, Oct. 22, 2014. (Dkt. #8082)

The City plans to direct the bulk of the remaining organizational efficiency investment in the finance department. The plan calls for a $221.4 million reinvestment in the finance department, $101 million of which will be dedicated toward information technology upgrades, including the implementation of a new enterprise resource planning system ("ERP"), as well as support staff, hardware and software. Trial Tr. 140, Sept. 5, 2014. (Dkt. #7434) The City also intends to spend $24.9 million on labor, including hiring new employees and budgeting for future training. The City plans to hire nine new people to track, monitor and maintain the implementation of the RRIs citywide. These employees' responsibilities will include "making sure that the City is able to close its books on a monthly basis, perform bank reconciliations, activities that you would expect any accounting and finance area to be able to accomplish." *Id.* at 140-41.

Because these RRIs are fundamental to the success of the plan, the City built flexibility into other RRIs to ensure that the organizational efficiency initiatives would not be deferred. *See* Trial Tr. 71-72, Oct. 21, 2014. (Dkt. #8098)

Ms. Niblock testified that the IT reinvestment initiatives are reasonable and, when implemented, will address the City's IT deficiencies. Trial Tr. 129, Sept. 8, 2014. (Dkt. #7472) Mr. Hill will work with Ms. Niblock on the implementation of the finance department's IT upgrades. *Id.* at 130. He testified that they have been working toward implementing best practices over the past several months, so that the finance department will be fully prepared when the new ERP system is implemented. Trial Tr. 172, Sept. 4, 2014. (Dkt. #7411) To further reduce implementation risk, Mr. Hill explained that the City decided to use one of two cloud-based ERP systems. He testified that the benefit of a cloud-based system is that the responsibility for storage of information is not with the City, so it does not need to allocate assets and resources to data storage and organization. This is done by the cloud servicing company. *Id.* at 171-73.

Mr. Hill testified that the finance department will use the IT upgrades to improve the state of its financial controls systems, its ability to issue periodic accounting statements, and its cash management functions. *Id.* at 84-86.

### d. The Resident Services Initiatives

The resident services initiatives focus on non-public-safety departments "that have the front facing impact on residents," specifically transportation, ombudsperson, public works (solid waste), recreation and vital records (health and wellness). Trial Tr. 114, Sept. 5, 2014. (Dkt. #7434)

The RRIs for resident services contemplate total investment of $170.9 million, with cost savings of $64.7 million and revenue initiatives of $52 million, for a net reinvestment of $54.2 million. The largest expenditures are for transportation and recreation. Ex. 464 at 33, tables 3a and 3b.

First, the City contemplates spending $111 million for the department of transportation ("DDOT"). The number of miles serviced by DDOT has declined significantly over the past five years, from sixteen million miles annually in 2009 to twelve million miles today. Trial Tr. 115, Sept. 5, 2014. (Dkt. #7434) Mayor Duggan intends to restore service back to 2009 levels by the end of fiscal year 2023. This means DDOT will need between 225 and 230 buses for peak afternoon times. Presently, DDOT only has about 190 functioning buses. *Id.* at 115-16.

To address these problems, the $111 million in proposed expenditures includes $101 million in additional operating expenses (fuel, maintenance, parts, supplies, additional drivers, cameras and security personnel) and $10.3 million in capital expenditures for facility improvements. *Id.* at 117-18.

Mayor Duggan's testimony supports the feasibility of the City's plan to improve its transportation services. He testified that the City is set to receive fifty new buses in early 2015. Trial Tr. 89, Oct. 6, 2014. (Dkt. #7917)

The bulk of the remaining resident services investments relate to the reopening of the City's parks. Under the plan, the City will invest $37.8 million to reopen 180 of the City's closed parks. Trial Tr. 122, Sept. 5, 2014. (Dkt. #7434) Mayor Duggan testified that churches and business people have come together to sponsor parks that were not covered by the reinvestments in the plan. As a result, the City plans to reopen all 275 of its parks. Trial Tr. 89, Oct. 6, 2014. (Dkt. #7917)

### e. The Business Services Initiatives

The business services initiatives relate to the City departments that primarily interact with businesses, including the department of planning and development, and the buildings, safety engineering and environmental department (BSEED). These initiatives also cover reinvestment

146

in the Coleman A. Young Municipal Airport, the parking department, the board of zoning appeals and the department of administrative hearings. These departments address overall planning for the City, licensing and permits for businesses, and monitoring how businesses operate within the City. Trial Tr. 124-25, Sept. 5, 2014. (Dkt. #7434)

The RRIs for business services contemplate $51.4 million in investment offset by cost savings of $24.3 million and revenue initiatives of $61.9 million. Thus, these initiatives are a net gain for the City. Ex. 464 at 43, tables 4a and 4b.

First, to reduce redundancies, the City planning commission will be combined with the City's department of planning and development. The City plans to spend $22.5 million on this department, offset by $1.9 million in cost savings. The most important component of the City planning commission initiatives is $11 million directed toward the creation of a new master plan for development in the City, which will include provisions for tracking blight removal efforts and facility location planning for the fire and police departments. Trial Tr. 125-26, Sept. 5, 2014. (Dkt. #7434)

The City also plans to invest $20 million in the airport so that it can remain in compliance with federal guidelines and maintain its operating certificate. A portion of this amount will go toward developing a long-term plan for the airport and the remaining $15.7 million will be dedicated to facility updates. *Id.* at 127-28.

For the municipal parking department, in addition to the Desman improvements addressed above, the City plans to spend $8.2 million to improve the condition of City-owned impound lots, parking meters, and the department's vehicles. *Id.* at 128.

The Court concludes that the overall effect of these RRIs, and others not discussed here but detailed in the disclosure statement, will enable the City to sustainably provide adequate public services.

### 10. The City's Commitment to Implement the Plan

> *I can say, unequivocally, that without the positive and capable leadership of Mayor Duggan and the constructive relationship between the City Council and the Mayor, I would be unable to opine that the plan, as currently proposed, is feasible. The near term future will require course adjustments as undoubtedly revenues and expenses will vary from projections and unforeseen events will demand changes in plan. The democratic system has put in plan individuals who, at least for the next three years, can choose to continue the positive course for the City. I believe they will do so.*

Martha Kopacz, Ex. 12000 at 29.

Having concluded that the RRIs are likely to restore services, the Court will now address whether the City is likely to implement the RRIs. Mr. Orr testified that as his tenure as Emergency Manager draws to a close, he is confident the City will be able to implement the RRIs and sustain them over the long term:

> First, the mayor and the city council have shown me since the time I've been here in the last nine months that they are working hard. We started out a little rough, and there was some concern, but we've managed to work together and push some of these reforms through. And they're working together . . . to move the City forward.
>
> Secondly, there's going to be a level of oversight in place with the Financial Review Commission, which is modeled on other commissions, the MAC, the DC Control Board, others. That commission is designed to be a robust commission to make sure after all this effort and work that the City keeps fidelity with the plan going forward.
>
> Third, my sense is at city hall there's a very high degree of sensitivity and concern that the eyes of the county, if not . . . the

world, are on them; that they have an obligation to this Court; that they recognize we're in a federal process, and this is going to be ordered. I certainly have emphasized that to them. And . . . my impression is they feel very sincerely that they have an obligation to make this work.

Trial Tr. 123-24, Oct. 2, 2014. (Dkt. #7878)

Mayor Duggan testified credibly that the City is committed to implementing the RRIs, and that he has already developed effective methods of tracking progress on the improvement of city services. Trial Tr. 84-88, Oct. 6, 2014. (Dkt. #7917) He testified that the City is "probably about ten percent of where we need to be" in terms of providing adequate city services, but that under the plan and the RRIs, "we're building in the right order," meaning the RRIs are properly prioritized to enable the City to maintain financial stability as it works to improve services. *Id.* at 96-97. He testified, "[I]t's going to be a multi-year process before the people of the city get the kind of services that people in a major city deserve, but it's getting a little bit closer every month." *Id.* at 97. For example, he testified that the City has seen 20,000 new LED street lights installed since January. *Id.* at 88.

Mayor Duggan further testified that he believes the City will be able to attract and train a sufficient number of qualified employees to fill the positions needed for implementation of the RRIs. He described a job fair in March of 2014, at which the City recruited bus drivers, bus mechanics, police officers and firefighters. *Id.* at 135. He testified that the City received hundreds of applications for every open position. *Id.* at 135.

He also enthusiastically testified that the City plans to invest $15 million in training City employees to use "lean processes," or methods designed to achieve maximum efficiency. Mayor Duggan first began using this type of training while working as the Director of the Detroit Medical Center, and testified that it was "very successful." *Id.* at 69, 95-96. He testified that he identified eighteen of the "most screwed up processes in the City of Detroit," and used a

149

combination of outside "lean process" experts and City employees to develop ways to improve them. *Id.* at 95-96. He continued:

> I went to the meetings [related to lean process implementation] . . . and it's great to hear our employees reporting out on what they've done . . . . And we're going to continue to do this over and over until we get 400, 500 employees lean certified so that any employee can participate in a process to make their department more efficient.

*Id.* at 96.

City Council President Brenda Jones reiterated that the City is committed to implementing the plan. Trial Tr. 58, Oct. 6, 2014. (Dkt. #7917) She characterized the RRIs as "help[ing] the City restructure so that the citizens can receive adequate services," and testified that the level of service the City is currently providing its citizens is "improving." *Id.* at 17, 21-22. To make sure the RRIs are fully carried out, she testified:

> [The City Council] will work as a team with the mayor collaboratively and the departments collaboratively to make sure that the services are improving and are adequate for the citizens in the City of Detroit. We will do our part with contracts and with the budget to ensure that the dollars that are being reinvested into the City will be spend where they should be spent.

*Id.* at 26.

Ms. Kopacz testified that the Mayor's decision to hire Mr. Hill as the CFO also supports feasibility, as does his decision to hire Ms. Niblock as the new CIO. Trial Tr. 53-54, Oct. 22, 2012. (Dkt. #8082) She also testified that the Mayor has hired a "top notch" head of HR, who will start in January, as well as a new deputy mayor for economic policy. *Id.* at 83. The new deputy mayor for economic policy will focus on ensuring the City is achieving the plan's revenue projections. *Id.* Regarding the City's middle management, Ms. Kopacz testified, "I think there is a genuine desire to right the ship, to help the City prosper." *Id.* at 70.

One of Ms. Kopacz's early concerns about the feasibility of the plan was that the City had not made sufficient efforts to harmonize the Plan Projections with the City's budgets and its finances more generally. Ex. 12000 at 25-29. Mayor Duggan testified that the City began addressing this concern on April 17, 2014, when he became aware that the Court required his input on whether the plan is feasible. Trial Tr. 99, Oct. 6, 2014. (Dkt. #7917) He testified:

> After the Court indicated that it expected me to testify as to whether I thought [the plan] was feasible, the relationship between the emergency manager and me changed dramatically. The inclusion in analysis in the operations changed. But what I did immediately was this went from some theoretical document the emergency manager was preparing to the blueprint that we were going to have to operate on. . . . And I wanted to validate every number in here and every risk so that I could be comfortable in my own mind either saying to the Court I believe it was feasible or I did not. And so I put out a directive to each department head to first give me a preliminary analysis of how feasible they thought [the RRIs] were, and then over a six-week period from late May to early July I spent hours with the different departments—most of them came back two and three times until I was satisfied.

*Id.* at 100-01.

Another one of Ms. Kopacz's early concerns was the City's ability to monitor plan compliance.

The record establishes that the City will have adequate resources to monitor compliance with the plan. In addition to the initiatives in the finance department, Mr. Orr testified that the investments in the human resources department will allow the City to continue to monitor its progress and compliance with the plan throughout all of the City's departments:

> So a particular component is that the City be able to [] assess, train, and gauge the efficacy of a particular job or function so that we can measure whether we're meeting the RRIs, and [the HR-related RRIs] are designed to put those types of systems in place throughout the City's roughly . . . 28 departments.

Trial Tr. 122, Oct. 2, 2014. (Dkt. #7878)

The City also plans to invest $15 million to implement a "311 system" to allow residents to report issues to the City and for the City to track resolution of those issues. *See* Trial Tr. 112, Sept. 8, 2014. (Dkt. #7472)

Most importantly, Mr. Hill testified that the City now has "budget strings" to prevent City employees from spending money without a specific provision covering the expense in the budget. He testified, "[T]he City cannot spent money and pay for things unless they have a budget string." Trial Tr. 103, Sept. 4, 2014. (Dkt. #7411)

Finally, in addition to these systems of internal control, the Court finds that the Grand Bargain Legislation enhances the feasibility of the plan. As Ms. Kopacz testified, "The existence of the Financial Review Commission, the oversight commission, I think is a very positive qualitative factor in ensuring that the City conducts itself in a way that—that ensures or helps to ensure that the—commitments of the plan are going to be met." Trial Tr. 69, Oct. 22, 2014. (Dkt. #8082)

The Grand Bargain Legislation establishes a nine-member Financial Review Commission, comprised of the state treasurer, the director of the department of technology, management, and budgeting, three members appointed by the governor, the mayor (or a designee of the mayor), two members chosen by the governor from nominations by the Speaker of the House and the Senate Majority Leader, and the president of the city council (or a designee). *See* Mich. Comp. Laws § 141.1635.

The statute provides for wide-ranging oversight of the City's finances and, more specifically, of the City's compliance with the plan. *See* Mich. Comp. Laws §§ 141.1636 and 141.1637. One significant responsibility of the commission is to review the City's 4-year financial plans required by § 117.4t of the Home Rule City Act. The commission may require

modifications to the plan where necessary.  Mich. Comp. Laws § 141.1636(4).  The commission is also empowered to review and approve the City's collective bargaining agreements and to "review, modify, and approve proposed and amended operational budgets."  *Id.* at §§ 141.1636(9) and 141.1637(c).

### 11. Final Thoughts and Recommendations on Feasibility

For the foregoing reasons, the Court concludes that the plan is feasible, as required by § 943(b)(7).  Specifically, the Court finds it is likely that the City will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the plan without the significant probability of default.

Nevertheless, significant risks remain.  Most are beyond the City's control, but the Court recommends certain actions to the City and other stakeholders to improve the feasibility of the plan— from both a qualitative and quantitative perspective.  While remaining cautious due to the limitations on the Court's authority imposed by §§ 903 and 904, and the Tenth Amendment of the United States Constitution, the Court feels a duty to make these recommendations because of the unique position that the Court has held in this case over the past eighteen months.

The Court first appeals to the City's labor unions and retiree associations.  In his closing argument, counsel for the City perceptively asserted that the goal of protecting municipal pensions in this City and in this country requires these parties to enhance their vigilance of municipal pension funding.  Trial Tr. 32-33, 134, Oct. 27, 2014.  (Dkt. #8156)  The Court agrees. The Court would only additionally ask these parties to consider whether this goal of protecting municipal pensions in the City and indeed the broader goal of revitalizing the City suggests that

they should take a longer-term and broader view of the best interests of their members and retirees.

The second recommendation is to the State. The Revised Municipal Finance Act unequivocally states that the Michigan department of treasury is "directed to protect the credit of this state and its municipalities." Mich. Comp. Laws § 141.2201. The argument is powerful that this provision of State law, together with the constitutional protections of pensions, requires the State to take full responsibility to vigorously supervise and regulate its municipalities to assure adequate pension funding. The municipal employees and retirees of this City and State need and deserve the State's robust commitment to that obligation.

The Court has found that the State Contribution of $194.8 million in exchange for a release of liability on the pensioners' constitutional claims is a reasonable settlement. *See* part III.E.3. History will judge the correctness of this finding. It will judge that this finding was correct only if what happened here in Detroit never happens again. The State can sustain that finding in history only by fulfilling its constitutional, legal, and moral obligations to assure that the municipalities in this state adequately fund their pension obligations. If the State fails, history will judge that this Court's approval of that settlement was a massive mistake.

However, the City's labor and retiree associations and the State can effectively carry out their responsibilities only if the City provides them with adequate accurate financial information. It is unrealistic and wasteful for these entities to replicate all of the City's accounting functions. Rather, the City must provide the State, labor unions, and the public with the information they need.

154

Therefore, in addition to the requirements imposed by the Grand Bargain Legislation, the Court recommends that the City adopt the annual reporting requirements that Ms. Kopacz advocates in her expert report, discussed in part X.D.8.

### E. Each of the Claims in Each Class Is Substantially Similar to the Other Claims in the Class, As Required by § 1122(a)

#### 1. The Applicable Law

Section 1122 sets forth the basic rule governing the classification of claims and interests. With the exception of "convenience classes" of unsecured claims, the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class. 11 U.S.C. § 1122(a). To be "substantially similar" for purposes of § 1122, "claims need not be identical . . . [a]nd there is certainly no requirement that claims be classified according to their values." *In re Dow Corning Corp.,* 244 B.R. 634, 655 (Bankr. E.D. Mich. 1999) (citations omitted), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd in relevant part sub nom. Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648 (6th Cir. 2002). Under that section, "claims will be substantially similar if they are similar in legal nature or character." 244 B.R. at 655.

The bankruptcy code does not require the converse, that all similar claims be placed in one class. *In re Dow Corning Corp.*, 280 F.3d at 661 ("Section 1122(a) does not demand that all similar claims be in the same class.").

The Sixth Circuit has stated, "the bankruptcy court has substantial discretion to place similar claims in different classes. . . . Congress incorporated into section 1122 . . . broad discretion to determine proper classification according to the factual circumstances of each individual case." *Id.* (citations and quotation marks omitted).

"A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the classification scheme, and the claims or interests within each particular class are substantially similar." *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270 (S.D. Ohio 1996).

A plan proponent must not separately classify substantially similar claims solely to gerrymander favorable votes. As explained by the Sixth Circuit:

> [T]here must be some limit on a debtor's power to classify creditors in such a manner . . . . Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class.

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 586 (6th Cir. 1986) (footnote omitted). *See also Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture* (*In re Greystone III Joint Venture*), 995 F.2d 1274, 1279 (5th Cir. 1991) (Under § 1122 of the bankruptcy code, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan.").

Upon a review of the classes in the plan, the Court finds that all of the claims in each class are similar and that therefore the plan complies with § 1122(a)

### 2. Creditors' Objections to Classification Are Overruled

Certain individual objectors argue that the plan's classification scheme improperly gerrymanders class 10 (PFRS pension claims) by including both impaired and unimpaired claims in the class. They assert that certain retirees holding PFRS pension claims are essentially unimpaired under the plan because: (a) the impairment of class 10 claims arises solely from the elimination of future, not existing, claims to COLA adjustments, and (b) some retirees with

156

claims in class 10 have no imminent likelihood of receiving COLA benefits regardless of whether the plan is confirmed.  *See* Obj. of William Ochadleus, *et. al.* (Dkt. #5788); Obj. of Jamie S. Fields (Dkt. #4404).

These objections misapprehend the requirements of § 1122.  If claims in a class are similar in legal nature or character, § 1122 is satisfied regardless of whether the ultimate treatment of those claims is different.  Under the plan, all holders of PFRS pension claims are in class 10 and all such holders have similar claims.  Each has a right to receive COLA benefits and the plan reduces that benefit by 55%.  The plan, therefore, complies with § 1122.

Further, as a general rule, courts in the Sixth Circuit have held that the issue of gerrymandering is properly asserted only in connection with allegations that a plan proponent has separately classified similar claims to obtain favorable votes.  The *Dow Corning* court explained this rule:

> It may well be that one of Congress' primary motivations for limiting class membership to substantially similar claims was . . . to ensure that the votes cast by the class will reflect the joint interests of the class.  But to accomplish this goal, Congress enacted a single requirement, which is that a class may consist only of substantially similar claims.  When determining whether claims within a single class meet this requirement, assertions of attempted vote gerrymandering are simply irrelevant.  If all claims within a class are substantially similar, then the class is properly constituted. . . . Consequently, accusations that a classification scheme has been assigned to gerrymander the vote on a proposed plan need be addressed, if at all, only when the plan proponent has placed substantially similar claims in separate classes.

*Dow Corning*, 244 B.R. at 665 (citing *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581 (6th Cir. 1986)) (internal citation and quotation marks omitted).

In the present case, the objecting parties do not object that the plan places substantially similar claims in separate classes.

Because the plan properly classifies substantially similar claims in class 10, the Court overrules the objections alleging improper gerrymandering under § 1122(a).

## F. The City Proposed the Plan in Good Faith, As Required by § 1129(a)(3)

Section 1129(a)(3) requires that the plan has been proposed in good faith.

This is the second time during this chapter 9 case that the Court has been called upon to examine the City's good faith. During the eligibility phase of these proceedings, the Court was confronted with the question of whether the City filed its petition for chapter 9 relief in good faith under § 921(c). The City's good faith in filing its chapter 9 petition was "a central issue" at the eligibility hearing. *In re City of Detroit*, 504 B.R at 180. The Court found, "in one form or another, all of the objecting parties have taken the position that the City did not file its chapter 9 petition in good faith and that this Court should exercise its discretion under 11 U.S.C. § 921(c) to dismiss the case." *Id.*

The Court ultimately concluded that the City did file its petition in good faith. Nevertheless, the Court found that "in some particulars, the record does support the objectors' view of the reality that led to this bankruptcy filing," including that State officials, Mr. Orr, and the City's hired professionals had misrepresented their intentions regarding seeking bankruptcy relief and reducing pension benefits. *Id.* at 183-87.

Much has changed. By the close of the hearing on confirmation of the plan, almost all of the objections to the City's good faith had been withdrawn or otherwise resolved.

The only remaining objections arising under § 1129(a)(3) relate to the ASF recoupment, which the Court addressed in part III.H. above. Some of the other arguments raised by individual objectors could be construed as arguments that the City did not propose the plan in

good faith in violation of § 1129(a)(3).  For example, one objection asserts that the City used "coercion and intimidation . . . to influence and force the retirees" to vote for the plan.  Obj. by Ms. Lou Ann and Mr. Michael K. Pelletier.  (Dkt. #5062)  Another asserts that Mr. Orr fraudulently impersonated an elected official.  Obj. by Demetria Wright.  (Dkt. #5795)  Yet another contends that the plan fails to address the loss of some state revenue sharing funds and the City's use of certain other funds.  Obj. by David Sole.  (Dkt. #4318)  Ms. Estella Ball, a City retiree, argues that the plan "is a redistribution of the resources of Detroit into the hands of persons who do not live in Detroit," as evidenced by the number of non-Detroit and non-Michigan companies Mr. Orr and Mayor Duggan have contracted to provide City services.  Trial Tr. 69-71, Oct. 3, 2014.  (Dkt. #7894)

To the extent that these objections raise independent "good faith" objections, the Court overrules them now, for the reasons described below.

## 1. The Applicable Law

Neither the bankruptcy code nor the Sixth Circuit defines "good faith" for purposes of § 1129(a)(3).  There are, however, guiding principles.  Good faith under § 1129(a)(3) is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Waterford Hotel, Inc.*, 497 B.R. 255, 266 (Bankr. E.D. Mich. 2013) (quoting *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 468 (Bankr. S.D. Ohio 2011)); *see also In re Dow Corning*, 244 B.R. 673, 675 (Bankr. E.D. Mich. 1999).

In chapter 9, that purpose is "to allow municipalities created by state law to adjust their debts through a plan voted on by creditors and approved by the Bankruptcy Court."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr D. Colo. 1999).  "The primary purpose of debt

159

restructure for a municipality is not future profit, but rather continued provision of public services." *Id.* at 34. Another is to provide "a municipality a breathing space . . . and an opportunity to address its long term solvency through an organized process." *In re City of San Bernadino, Cal.*, 499 B.R. 776, 791 (Bankr. C.D. Cal. 2013).

Good faith also generally requires that the plan be proposed "with honesty and good intentions, and with a basis for expecting that a reorganization can be effected," and that the plan proponent deal with its creditors in a manner that is fundamentally fair. *In re Gregory Boat Co.*, 144 B.R. 361, 366 (Bankr. E.D. Mich. 1992) (citations omitted).

In one sense, the inquiry under § 1129(a)(3) is limited; in another sense it is broad. The Court's focus must be on the plan itself. At the plan confirmation stage, "pre-petition behavior is largely irrelevant." *In re Dow Corning*, 244 B.R. at 675. However, when considering the plan, courts consider the "totality of the circumstances," and the court's own "common sense and judgment." *In re Okoreeh-Baah*, 836 F.3d 1030, 1033 (6th Cir. 1988). It is thus an intensely fact-specific inquiry.

### 2. The City's Good Faith

The record overwhelmingly establishes that:

1. The City filed its plan with honest, good intentions and the reasonable expectation that the plan is feasible.

2. The process the City undertook to seek confirmation of the plan was fundamentally fair to the City's creditors.

3. Most importantly for the good faith analysis, the plan is designed to achieve the objectives and purposes of chapter 9.

Based on those findings, the Court concludes that the City filed its plan in good faith.

The City's good faith in proposing this plan shines with the greatest brilliance in the Grand Bargain and in the settlements with Syncora, FGIC and the COPs Holders. Those

160

settlements are more than just creditor claim settlements. They create new ventures and relationships that enable all of the stakeholders in the case to achieve their long-term missions and goals. As one of the City's investment bankers, James Doak, testified regarding the Syncora settlement, "it would be in the City's best interest to convey stewardship in these properties . . . to have private actors thinking about how to develop and how to create economic activity on them." Trial Tr. 117, Oct. 3, 2014. (Dkt. #7894) The Court finds that this conclusion also applies to the FGIC settlement and the COPs Holders settlement. This accomplishment is extraordinary in bankruptcy and an ideal model for future municipal debt restructurings.

Beyond that, the almost complete level of consensus in support of the plan among the City's major creditor groups demonstrates that the City has treated its creditors fairly in seeking confirmation of its plan. It is also strong evidence that the City's detailed financial projections support its reasonable expectation that the plan is feasible in the long term.

The City has proven through witness after witness that upon confirmation, it intends to implement its plan. The City has also proven its commitment and ability to begin the challenging process of revitalization.

The Court is compelled, however, to expand upon its conclusion that the plan is designed to achieve the objectives and purposes of chapter 9.

### 3. The City's Long-Term Solvency

Over the course of this case, many creditors, including retirees, have challenged the City's good faith in allocating as much as $1.7 billion toward its RRIs while not satisfying all of its financial obligations to its creditors.

The Court rejects this challenge. The vast majority of the $1.7 billion for the RRIs comes from improved efficiency of City operations, new revenue initiatives and the exit financing.

More importantly, however, the plan is designed so that the City's creditors will share in any potential financial upside realized from the RRIs. This upside is in the form of reduced risk that the City will default on its financial obligations in the future. In turn, this should result in enhanced market values for the notes that the City is distributing in satisfaction of many of the creditors' claims.

Charles Moore, the chief architect of the RRIs, testified that the "ultimate goal" of the RRIs is "really stability within the City, stability of the population base and providing a platform so that both resident population as well as business growth can occur." Trial Tr. 42, Sept. 5, 2014. (Dkt. #7434)

Particularly significant here is the testimony of Ron Bloom, the head of the financial advisory team for the retiree committee. Regarding the City's good faith, he testified:

> What I'm trying to convey is that we saw the City taking a fresh start to how it dealt with long-seated problems, to be honest about them, and some of that came back on us in a bad way because we had substantial reductions in benefits that we'd been promised, and we didn't like that. . . . *But I think one of the things the City persuaded us over the course of the case was [that] they were sincere . . . we didn't like what they had to say often, but we felt that their commitment to revitalization was sincere. And when we saw evidence of that . . . for instance how they were treating the active workers, that was to us a positive sign that our long-term interest was going to be served and the revised promises we got would eventually be honored.*

Trial Tr. 26, Sept. 17, 2014 (emphasis added). (Dkt. #7638)

Mr. Bloom testified that the retiree committee realized early on that because a one-time "payout" for the retirement plans was simply not feasible, the City would have to pay the retirees' claims over a long period of time. Mr. Bloom added that without some major (and potentially very expensive) improvements in City operations to slow the long-term decline in the

City, the committee's constituents would face a huge risk that the City would not be able to honor even its revised, reduced promises in the long term. *Id.* at 20-21.

The Court notes that the same observation holds true for virtually all of the City's creditors.

The Court finds that the City's plan, particularly the RRIs and the settlements, demonstrates a good faith effort to achieve the purposes of chapter 9.

### 4. Federalism Considerations in the Court's Good Faith Analysis

The Court here addresses some findings that Ms. Kopacz made and clarifies the Court's own role in the City's bankruptcy case. Ms. Kopacz wrote in her first report, "This bankruptcy has been largely focused on deleveraging the City, often to the exclusion of fixing the City's broken operations." Ex. 12000 at 23. She further testified:

> The speed of this proceeding has been a two-edged sword. And the good side of that is that . . . in a little bit over a year the City will have gone through a massive restructuring process.
>
> And [the City] will have significantly de-levered its balance sheet. So going from in excess of $10 [billion] down to . . . less than $4 [billion] is a huge de-levering of the City and that's a really good thing.
>
> But because the focus has been on that de-levering and the speed [of] getting that done, there has not been until recently as much energy put into restructuring the operations of the City. . . . So fundamentally the City operationally was broken. And that's evident . . . . I believe you said it's service delivery insolvent, right?
>
> . . . I believe the Emergency Manager had to pick one of two options. And, the focus was on de-levering, not fixing the operations. So . . . the speed cut against what are necessary long term things that will now have to be accomplished outside of the bankruptcy which could be more difficult to accomplish . . . than in the bankruptcy under the power of the Emergency Manager.

163

The Court agrees with Ms. Kopacz that the City's focus on debt has created challenges, as has the expedited pace that this Court imposed on this bankruptcy. However, the Court finds this path is entirely consistent with the limitations of federalism that the Tenth Amendment of the United States Constitution imposes and that §§ 903 and 904 manifest.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Consistent with (or perhaps required by) that amendment, § 903 provides that chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality[.]" 11 U.S.C. § 903. Whether for clarity or emphasis, § 904 underscores that restriction on this Court's authority by providing, "Notwithstanding any power of the court, . . . the court may not . . . interfere with" a chapter 9 debtor's property, revenue, or use thereof, or with any of its "political or governmental powers." 11 U.S.C. § 904.

Unlike chapter 11, chapter 9 requires that the debtor municipality establish that it is "insolvent" before it can receive the protection of the bankruptcy court. 11 U.S.C. § 109(c)(3). The court in *In re Mount Carbon* astutely observed the significance of this distinction in identifying the purpose of chapter 9:

> Consistent with the concept of limited federal jurisdiction over governmental entities created by state law, the insolvency requirement limits eligibility under Chapter 9. It also suggests that Chapter 9 is a means to remedy insolvency, unlike Chapter 11 which can be used by a solvent entity to restructure its affairs for business purposes.

242 B.R. at 33.

The Court finds that the City's plan, the manner in which the City has prosecuted this bankruptcy case and assembled the plan, and the speed that the Court has imposed on the case have been entirely consistent with the constitutional and statutory limitations on this Court's authority and the policy underlying chapter 9. Properly, the focus has been on de-leveraging the City to the extent negotiated and allowed by law, and restructuring the City's remaining debt so that the City's remaining obligations are more predictable and manageable. The focus has also been on setting the City on a path to recovery. Under the Tenth Amendment, however, it is for the City, not this Court, to supervise the execution of that recovery. Accordingly, the City's plan represents a good faith acknowledgement of the demands of the United States Constitution and of the needs of democracy.

As Ms. Kopacz also testified, "[T]he debt that the City is taking on as part of the restructuring [has] enabled it to resolve its bad borrowing practices and bad financial decisions of the past. . . . It is a debt level that the City can manage." Trial Tr. 24, Oct. 22, 2014. (Dkt. #8082) She also testified, "[T]he good news is that some of the [City's expenses] as a result of the restructuring have been fixed at reasonable levels going forward, i.e., pension[s]."). *Id.* at 48

Ms. Kopacz's report and testimony are irrefutable proof that the City's plan was filed to achieve a result consistent with the objectives and purposes of chapter 9—to adjust the City's debts so that it can reinvest in itself, address its operational problems, recover its ability to provide adequate municipal services, and maintain long-term solvency.

For these reasons, the Court finds that the City proposed its plan in good faith, as required by § 1129(a)(3).

### G. The City Has Complied with the Applicable
### Provisions of the Bankruptcy Code, As Required
### by § 1129(a)(2)

Section 1129(a)(2) requires, "The proponent of the plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(2). "The principal purpose of section 1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the disclosure requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the plan." *In re Trans World Airlines, Inc.*, 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000); *In re G-I Holdings Inc.*, 420 B.R. 216, 262 (D.N.J. 2009); *In re Texaco Inc.*, 84 B.R. 893, 906-7 (Bankr. S.D.N.Y. 1988); *In re Butler*, 42 B.R. 777, 782 (Bankr. E.D. Ark. 1984); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

The City has complied with the requirements of § 1125 in the solicitation of acceptances to the plan. That section requires:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information[.]

11 U.S.C. § 1125(b).

On May 5, 2014, the Court entered an order approving the City's fourth amended disclosure statement. (Dkt. #4401) Nothing in the record suggests, and no party argues, that the City solicited acceptances before that approval. That is all that § 1125(b) and 1129(a)(2) require. *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 763 (Bankr. D.S.C. 2011).

Two issues, however, do require further discussion. The first is whether the ASF interest rate was properly disclosed. The second is whether a new disclosure statement and new

balloting was required for any of the amended plans that the City filed after the balloting was underway or completed.

## 1. The ASF Interest Rate Disclosure Issue

Several objecting parties have argued that the City did not adequately disclose the terms of the ASF recoupment because it failed to disclose that the amortization of the ASF recoupment amount over each creditor's life expectancy would include interest at 6.75%.

Under § 1125(a)(1), the issue is whether the disclosure statement and the accompanying materials were "in sufficient detail" that would enable a creditor in class 11 "to make an informed judgment about the plan."

The detail that the City did disclose on this point was an individualized calculation of the monthly ASF recoupment amount for each affected creditor in class 11. This amount included the interest but the disclosure did not separately identify the interest rate or the dollar amount of the interest.

Nevertheless, the Court finds that the City's disclosure would enable an employee or retiree in class 11 to make an informed judgment about the plan. The disclosure statement would have been more complete if it had included the dollar amount of the interest and the rate of interest, but that is not the test. Every disclosure statement can always include more information. The only issue is whether the information that was disclosed was sufficient for creditors in class 11 to make an informed judgment about the plan.

In the Court's experience, two facts were most important to these creditors in making an informed judgment about whether to accept the amount of the ASF recoupment that the plan proposes and therefore whether to accept the plan. The first fact is the actual dollar impact of ASF recoupment that the creditor would repay. The second fact is how long the ASF

167

recoupment payments would last. As noted, the City did disclose to each class 11 creditor the full dollar amount of the ASF recoupment, including interest, and the time period of the recoupment.

Another factor fully persuades the Court that disclosure of the interest rate and amount was not necessary under § 1125(a)(1). A diverse group of attorneys reviewed the City's proposed disclosures on the ASF recoupment before the Court approved them. This group included attorneys for the City, the retiree committee, the two pension plans, and the several retiree associations. Apparently, none of those attorneys considered that disclosing the interest rate or amount was necessary to comply with § 1125. That is important here because those representatives, especially those on the creditor side, were the closest to the creditors in class 11 and therefore were in the best position to judge whether the City's disclosure statement was adequate under § 1125. Significantly, none of those representative groups or their representatives opposed confirmation on this ground.

Accordingly, the Court concludes that the City's disclosures of the ASF recoupment settlement did meet the disclosure requirements of § 1125. The Court overrules this objection and finds that the City complied with § 1125, as required by § 1129(a)(2).

## 2. Successive Plan Modifications Did Not Require Re-Solicitation of Ballots

The City modified the plan several times after the Court approved the disclosure statement and the City served it on creditors, and even after the deadlines to vote had passed. Section 942 permits this, stating, "The debtor may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the

168

requirements of this chapter.  After the debtor files a modification, the plan as modified becomes the plan." 11 U.S.C. § 942.

Bankruptcy rule 3019(a) identifies the circumstances in which a plan modification requires a new solicitation of ballots:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

The Court finds that none of the modifications in any of the successive amended plans adversely changed the treatment of any claims.  As noted in part II.A. above, the City modified its plan to incorporate creditor settlements that in each case, maintained or improved the treatment of claims or otherwise clarified various plan provisions.  Accordingly, the Court concludes that the City was not required to re-solicit ballots after the initial solicitation.

### H. The Plan Does Not Discriminate Unfairly Against Dissenting Classes 14 and 15, As Required by § 1129(b)(1)

As noted, two classes of claims voted to reject the plan.  These are class 14, consisting of the other unsecured claims, and class 15, consisting of the convenience claims under $25,000.  Section 1129(b) allows the Court to confirm the City's plan despite those dissenting class votes if, with respect to those dissenting classes, "the plan does not discriminate unfairly, and is fair and equitable."

169

The Court will first address the unfair discrimination test. In doing so, the Court will first identify the discrimination against the classes of other unsecured claims and convenience claims. Next, it will discuss the test for determining whether the discrimination in the plan is unfair. Finally, it will address its conclusion that the discrimination is not unfair.

In the next section, the Court will address the fair and equitable test.

## 1. The Plan Discriminates Against Dissenting Classes 14 and 15

The recoveries for the rejecting classes are 13% for class 14 and 25% for class 15.

It is readily apparent that the plan discriminates in favor of class 7, the LTGO claims with a 41% recovery; class 8, the UTGO claims with a 74% recovery; and class 17, the 36th District Court claims with a 33% recovery.

Determining whether the plan discriminates in favor of the pension class 10, the PFRS claims, and class 11, the GRS claims, is challenging because properly calculating the percentage recoveries for those classes is complex.

The City's disclosure statement states that the recoveries are 59% for class 10 and 60% for class 11. If those recoveries are accurate, then the plan does discriminate in their favor and against classes 14 and 15.

Based on a number of complex arguments, however, the City now asserts that the true recovery percentages are much lower, in the range of 9% to 21%, and that therefore the plan does not materially discriminate in favor of classes 10 and 11.

The recoveries that the City asserted in the disclosure statement were calculated using the agreed upon 6.75% assumed rate of return as the discount rate to calculate the liability. Those

recovery calculations also include the contributions from the state, the foundations and the DIA Corp.

To justify its more recent and substantially lower recovery calculations, the City proposes to value the liability using a discount rate that is much lower than 6.75%. The City suggests using either the risk free rate, the Pension Benefit Guaranty Corporation discount rate or a commercial annuity rate—all in the range of about 3-4%. Using a lower discount rate to calculate the liability results in a higher liability amount and therefore a lower recovery percentage for the pension creditors.

The City argues that a lower discount rate is appropriate for essentially three reasons. First, it argues that this is necessary to accurately calculate the City's liability. Second, it argues that it is appropriate to avoid shifting investment return risk to the City. Finally, it argues that it is fair to calculate the pension creditors' recovery in a way that is comparable to the way that the recoveries of other long-term creditors, such as bondholders, are commonly calculated under the bankruptcy code.

In support of using a lower discount rate to value its pension liabilities for unfair discrimination purposes, the City relies on *In re U.S. Airways Group., Inc.*, 303 B.R. 784, 798 (Bankr. E.D. Va. 2003), and *Dugan v. Pension Benefit Guaranty Corporation* (*In re Rhodes, Inc.*), 382 B.R. 550, 560 (Bankr. N.D. Ga. 2008).

In addition, the City also argues that the third-party contributions to the pension plans should be excluded from the recovery calculation on the grounds that an unfair discrimination analysis should only consider distributions of the debtor's property. In support, the City cites *In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *60-61 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Parke Imperial Canton, Ltd.*, No. 93-61004, 1994 WL 842777, at *11 (Bankr. N.D.

171

Ohio Nov. 14, 1994); *In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993); *Travelers Ins. Co. v. Bryson Props. XVIII* (*In re Bryson Props. XVIII*), 129 B.R. 440, 445 (M.D.N.C. 1991), *rev'd on other grounds*, 961 F.2d 496 (4th Cir. 1992).

The City finally argues that in considering whether the plan unfairly discriminates against pension creditors, the Court should consider that the plan's overall treatment of them is substantially diminished by the plan's treatment of their OPEB claims. The City states that a majority of creditors in classes 10 and 11 also hold OPEB claims in class 12 and that the recovery on their OPEB claims is only 10%.

In part X.H.3. below, the Court concludes that even if the pension classes' recoveries are as high as stated in the disclosure statement, the resulting discrimination against the unsecured and convenience classes is not unfair. Accordingly, it is not necessary to address the difficult issues that the City raises here.[24]

---

[24] As a matter of dicta, the Court finds merit in the City's argument that the discount rate for valuing a long-term liability should reflect the nature of that liability rather than the market rate of return on assets. It does appear to the Court that the conventional linking of the assumed rate of return and the discount rate for municipal pensions in this country is a substantial contributing factor in their UAAL and that it is time to reconsider that convention.

The Court finds less merit in excluding the third party contributions from the calculation of the pension plans' recovery percentage in this case. It is at least arguable that those contributions were on account of City assets, specifically, the DIA assets and the claim by the City's pension plans against the State for relief from their unfunded liability based on article IX, § 24 of the Michigan constitution and the State's failure to act to prevent the underfunding. If the connection between those assets and the third party contributions is found to exist, then the cases that the City cites in support of excluding the third party contributions are distinguishable and in fairness, those contributions arguably should be included in the recovery calculations.

Moreover, *City of Avon Park* seems to require that result. There, the City's fiscal agent, Crummer, could have potentially recovered on three financial stakes in the City's plan. The district court found one reasonable but did not evaluate the other two. 311 U.S. at 143. The Supreme Court stated, "Clearly, however, no finding could be made . . . that the compensation to be received by the fiscal agent was reasonable without passing on the worth of the aggregate of

*Continued…*

## 2. The Unfair Discrimination Standard

The bankruptcy code permits discrimination in the treatment of classes of claims. It only prohibits unfair discrimination. *See In re Mullins*, 435 B.R. 352, 358 (Bankr. W.D. Va. 2010); *In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 894 (Bankr. N.D. Ohio 2004); *In re Aztec Co.*, 107 B.R. 585, 588–89 (Bankr. M.D. Tenn. 1989).

The bankruptcy code does not, however, specify a standard for determining the fairness of discrimination in a plan. Over the years, courts have considered various factors to determine whether discrimination is unfair. Three approaches have emerged. These are the *Aztec* approach, articulated in *In re Aztec Co.*, 107 B.R. at 590, the Markell "rebuttable presumption test," proposed by Professor Bruce Markell in his article, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227 (Spring 1998), and the *Crawford* standard, adopted in *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003).

In *Aztec*, the court approved a four-part test to determine if discrimination is unfair, considering (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) the treatment of the classes discriminated against. *Id.* at 590. Several courts, including this Court, have used this test. *See, e.g.*, *In re*

---

all the emoluments accruing to the Crummer interests as a result of consummation of the plan[.]" *Id*. at 144 (citation omitted).

As a final matter of dicta, the Court finds that whether to consider the 10% recovery on pension creditors' OPEB claims when deciding whether the treatment of their pension claims discriminates against unsecured creditors is a closer question. Normally, it would not seem appropriate to consider the recovery that creditors will realize on their claims in one class when determining whether the treatment of their claims in another class unfairly discriminates. The equities arguably tip, however, when the creditors are employees and retirees, and are or were mission-critical, contributing their time, labor and skill to advance the interests of not only the City, but also its other creditors, as discussed in part X.H.3.A. below.

*Graphic Comm'ns, Inc.*, 200 B.R. 143, 148 (Bankr. E.D. Mich. 1996); *In re Riviera Drilling &*
*Exploration Co.*, No. 10-11909, 2012 WL 6719591 (Bankr. D. Colo. Dec. 19, 2012); *In re*
*Snyders Drug Stores, Inc.*, 307 B.R. at 894-95, *Ownby v. Jim Beck, Inc. (In re Jim Beck, Inc.*),
214 B.R. 305, 307 (W.D. Va. 1997); *In re Sea Trail Corp.*, No. 11-07370-8, 2012 WL 5247175
(Bankr. E.D.N.C. Oct. 23, 2012).

Under the Markel "rebuttable presumption test," a rebuttable presumption of unfair
discrimination arises where there is: 1) a dissenting class, 2) another class of the same priority,
and 3) a difference in the plan's treatment that results in either, a) a materially lower percentage
recovery for the dissenting class, or b) an allocation of materially greater risk to the dissenting
class in connection with its proposed distribution.  72 Am. Bankr. L.J. at 228.  For the plan
proponent to rebut the presumption, it must show that outside of bankruptcy, the dissenting class
would receive less than the class receiving a greater recovery, or that the alleged preferred class
infused new value that offsets its gain.  *Id.  See also Armstrong World Indus., Inc.*, 348 B.R. 111,
122 (D. Del. 2006); *In re Dow Corning*, 244 B.R. at 701-03.

In *Crawford*, the Seventh Circuit admitted its struggle with articulating a test for unfair
discrimination, stating, "We haven't been able to think of a good test ourselves."  324 F.3d at
542.  It decided simply "to instruct the first-line decision maker, the bankruptcy judge, to seek a
result that is reasonable in light of the purposes of the relevant law, which in this case is Chapter
13 of the Bankruptcy Code[.]"  *Id.*

The Court concludes that neither the *Aztec* standard, the Markell standard, nor the
*Crawford* instruction is faithful to the language of § 1129(b).  The test in § 1129(b) is only
whether the discrimination is unfair.  Congress certainly could have established in § 1129(b) a
more specific standard for courts to determine an unfair discrimination issue, including any of

174

the standards that the cases adopt or that the commentators propose. It did not. Accordingly, the Court rejects these standards.

Instead, the Court concludes that determining fairness is a matter of relying upon the judgment of conscience. That is all that Congress intended in so broadly articulating the unfair discrimination test in § 1129(b).

Several factors naturally inform this judgment of conscience. As *Crawford* suggests, these factors include the circumstances in the case that bear upon the fairness of the discrimination in light of the purpose of chapter 9. As noted, the purpose of chapter 9 is to restructure the municipality's debt so that it can provide adequate municipal services. *Bennett v. Jefferson County, Ala.*, No. 2:14-CV-0213-SLB, 2014 WL 4926261, at *19 (N.D. Ala. Sept. 30, 2014) (citing *In re Mount Carbon*, 242 B.R. at 34-35). To that end, chapter 9 leaves the municipality in control of its affairs while facilitating its debt restructuring. This suggests that a more flexible standard of unfair discrimination in chapter 9 cases is appropriate.

The factors that inform this judgment of conscience also naturally, and equally importantly, include the Court's experience and sense of morality.

That is what this Court meant in its eligibility opinion when it addressed the potential for the impairment of pension rights in the City's plan. It stated that when considering any such impairment, the bankruptcy code demands "this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan." *In re City of Detroit,* 504 B.R. at 154.

### 3. The Discrimination Against the Classes of
### General Unsecured Creditors and Convenience
### Creditors Is Not Unfair

The Court will first address the fairness of the discrimination in the plan in favor of the pension classes. Then it will discuss the fairness of the discrimination in favor of the UTGO, LTGO and 36th District Court classes.

### a. The Discrimination in Favor of the Pension
### Classes Is Not Unfair

The Court finds that the City has demonstrated a substantial mission-related justification to propose a higher recovery to its pension creditors. The City is a municipal service enterprise. Viewed broadly, its mission is to provide municipal services to its residents and visitors to promote their health, welfare and safety. Its employees and retirees are and were the backbone of the structures by which the City fulfills its mission. The City, therefore, has a strong interest in preserving its relationships with its employees, in enhancing their motivation, and in attracting skilled new employees, consistent with its financial resources. The City has reasonably and properly concluded that the discrimination in favor of the pension claims in its plan is necessary to its mission.

In contrast, the City has no similar mission-related investment in its relationships with its other unsecured creditors in classes 14 and 15.

Second, the City is an agency of the State of Michigan. Its existence, its mission, and its means of fulfilling that mission are all subject to the provisions of the constitution and laws of the State of Michigan. Among these provisions is article IX, § 24 of the Michigan constitution, which singles out municipal pension claims for special protection.

In the Court's eligibility opinion, it held that because of the Supremacy Clause of the United States Constitution, this specific protection of the state constitution is not entitled to vindication in a federal bankruptcy proceeding. Nevertheless, that provision of the Michigan constitution does express the considered judgment of the people of the State of Michigan. The Court concludes that in determining the fairness of the discrimination against unsecured claims proposed in the City's plan, this judgment of the people of the State of Michigan is entitled to substantial consideration and deference.

Another consideration that appeals to the Court's conscience is the reasonable expectations of the parties. Generally, unsecured creditors reasonably expect similar treatment in bankruptcy. The difference here, however, is that the Michigan constitution gives notice to all unsecured creditors of a municipality that the rights of pension creditors are distinctive and of special value to the citizens of this state, even if their pension claims are legally unsecured. That constitutional notice reasonably justifies the enhanced expectations of the pension creditors in this case. At the same time, that notice should lower the reasonable expectations of the other unsecured creditors in the case.

A final consideration suggests that this discrimination is not unfair. The Court has already observed that the City's plan is largely a collection of interconnected settlements. Counsel for the retiree committee astutely argued that if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair. Trial Tr. 171, Oct. 27, 2014. (Dkt. #8156) The Court agrees. The factors that inform the reasonableness of each individual settlement are the same factors that inform the Court's judgment about whether the resulting discrimination is fair.

Here, the classes that did not settle and instead rejected the plan, classes 14 and 15, are classes of general unsecured claims. There is, however, nothing about those claims that warrants any favorable consideration in the Court's unfair discrimination analysis.

Before closing this discussion, the Court must point out one factor that it has decided not to consider in evaluating this issue—the financial needs of the retirees. This is a challenging issue, because the record firmly establishes that many retirees need their full pensions, or at least pensions with the least possible impairment, while the record supports no similar finding for any other class of creditors. This, facially at least, appears to further support the discrimination in favor of the pension creditors.

However, it does not. As explained above, the Court must judge the fairness of the discrimination not in the abstract, but informed by the goals and purposes of the chapter 9 case. This judgment, therefore, necessarily excludes the relative needs of the creditors in the disparately treated classes.

On this point, the Court would further note that no case law in any of the rehabilitative chapters suggests that creditors' needs are an appropriate consideration in determining whether a plan unfairly discriminates.

In the Court's judgment, therefore, the discrimination in the City's plan in favor of the pension creditors is not unfair.

### b. The Discrimination in Favor of the UTGO, LTGO and 36th District Court Classes Is Not Unfair

The Court comes to the same conclusion about the discrimination in the plan in favor of the UTGO, LTGO and 36th District Court classes. The Court has already found that these settlements are reasonable settlements. They fairly and reasonably reflect the strengths and

178

weakness of the creditors' claims and the City's defenses, the complexity and expense of possible litigation, and collectability issues. These considerations also justify discriminating in their favor and against the other unsecured claims and the convenience claims.

The Court only adds that the City also has two mission-related reasons to favor the 36th District Court claims. First, it has a strong interest in maintaining efficiency of court operations and therefore in maintaining the employees' morale. Second, it has a continuing legal and funding relationship with the court. Mich. Comp. Laws §§ 600.8103, 600.8104(1)(b) and 600.8104(2).

### c. The Discrimination Against Classes 14 and 15 Is Not Unfair Even Though Some Creditors in Those Classes May Be Involuntary Creditors

The Court further recognizes that the dissenting classes of unsecured creditors, classes 14 and 15, may appear to include two distinct types of creditors—voluntary creditors and involuntary creditors.

Voluntary creditors generally have contract claims against the City. They likely had an opportunity to perform due diligence and therefore to assess and knowingly accept the risk of the City's non-payment. They may well also have had the opportunity to limit that risk in their contract negotiations with the City.

Involuntary creditors, on the other hand, generally have statutory, tort, or constitutional claims against the City. They presumably had no opportunity to perform due diligence or to limit the risk of non-payment.

As a result, the Court's conscience suggests that it should consider whether involuntary creditors have a stronger argument for unfair discrimination. Ultimately however, two considerations suggest otherwise.

179

First, the City has no mission-related justification to discriminate in favor of involuntary unsecured creditors. As noted in part X.H.3.a. above, the primary focus of the Court's consideration here is on the needs of the City.

Second, the line between voluntary creditors and involuntary creditors is not as sharp as it may first appear. The assumption underlying the distinction is that some creditors voluntarily assume the risk of nonpayment, while other creditors do not voluntarily assume that risk. The difficulty with this distinction is that everything that people do in life entails risks—the risk of injury, damage or loss, as well as the risk of inadequate subsequent compensation, whether for legal or practical reasons.

It is not clear, for example, whether the pension creditors in this case are voluntary or involuntary creditors. Although each voluntarily accepted a contract of employment with the City and presumably understood and accepted its terms, it is not clear that each understood and accepted the risk that, perhaps decades later, the City would not be able to pay its resulting pension obligation. Beyond that, an employee who might at some point feel the need to protect himself or herself against the risk of the City's non-payment has only the relatively unsatisfactory option of finding a new job with a new employer. In any event, it is also inappropriate to judge all 20,000-30,000 pension creditors the same on the issue of knowing assumption of risk.

These deeper considerations suggest that the line between voluntary and involuntary creditors is a false line. More accurately, there is a continuum. More troublesome yet, the litigation to determine where to place each of the tens of thousands of unsecured creditors on that continuum, and where to draw the line on that continuum between voluntary and involuntary creditors for purposes of unfair discrimination, would be unwieldy, inefficient and expensive.

180

In our legal system, justice and fairness are not only about the legal and factual accuracy of the result. They are also about the efficiency and economy of the process. Our adversary system constantly struggles with this tension. In every judicial proceeding, the court must consider and account for all of these interests. This is especially challenging in bankruptcy, where the court must consider the diverse interests of multiple parties in a case. It is even more so in a municipal bankruptcy case, where the municipality's residents, visitors and businesses await the restoration of necessary municipal services.

In the Court's judgment, therefore, it is not unfair to discriminate against all of the unsecured creditors in classes 14 and 15, even though some creditors in those classes might be able to establish that they are at the involuntary end of this continuum.

Accordingly, the Court finds that the City's plan does not unfairly discriminate against the two dissenting unsecured classes, 14 and 15.

## I. The Plan Is Fair and Equitable with Respect to the Dissenting Classes, As Required by § 1129(b)(1)

As noted, substantial majorities of all but two classes accepted the debtor's plan. This does not by itself, however, establish that the plan is fair and equitable. *City of Avon Park,* 311 U.S. at 148 ("The fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not a substitute for the latter. They are independent."); *Everglades Drainage Dist.*, 319 U.S. at 418 ("[T]he fact that only a very small minority of creditors have objected to the plan does not relieve the courts of the duty of appraising its fairness, and of making the findings necessary to support such an appraisal.").

### 1. The Test of "Fair and Equitable" in Chapter 9

As noted, under § 1129(b)(1), one of the requirements to confirm a plan when a class has rejected the plan is that the plan is "fair and equitable" to those dissenting classes. Under § 1129(b)(2), "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements . . ." The section then describes in § 1129(b)(2)(A), (B) and (C) specific standards for determining the issue as to holders of secured claims, unsecured claims and interests. Section § 1129(b)(2)(B), applicable to unsecured creditors, establishes the absolute priority rule that they must be paid in full before a junior class of claims or interests can receive or retain any value. *See Bank of Am. Nat'l. Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 444 (1999); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).

Three observations are important here. First, because municipalities have no junior class of shareholders, the absolute priority rule provides unsecured creditors with no protection. *In re Corcoran Hosp. Dist.*, 233 B.R. at 458. *Cf. In re Whittaker Mem'l Hosp. Ass'n, Inc.*, 149 B.R. 812, 816 (Bankr. E.D. Va. 1993).

Second, under § 102(3), the word "includes" in § 1129(b)(2)(B) is not limiting. Accordingly, the standards that follow in that section are not the only standards for determining whether a plan is fair and equitable in its treatment of the claims of dissenting classes. *Sandy Ridge Dev. Corp. v. La. Nat'l Bank* (*In re Sandy Ridge Dev. Corp.*), 881 F.2d 1346, 1352 (5th Cir. 1989) ("[S]imple technical compliance with the requirements of section 1129(b)(2) does not assure that the plan is fair and equitable. Instead, this section merely sets minimal standards that a plan must meet, and does not require that every plan not prohibited be approved.") (citations and internal quotation marks omitted); *Fed. Sav. & Loan Ins. Corp. v. D&F Constr. Inc.* (*In re*

*D&F Constr. Inc.*), 865 F.2d 673, 675 (5th Cir. 1989) ("Section 1129(b)(2) sets minimal standards plans must meet.").

The third important observation here is that the standard for determining fair and equitable must not, if possible, be redundant of any other confirmation standards. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995) (Courts should avoid interpreting statutes in a way that "renders some words altogether redundant.").

To properly determine the meaning of the fair and equitable test, it is important to understand its effect. In practical consequence, the law allows the judge, who has no stake in the outcome of the plan, to substitute his or her judgment about the fairness and equity of the plan for the judgment of the dissenting class of creditors, who have every stake in the outcome. Ultimately, the issue is whether the Court should force a debt adjustment on unwilling creditors. We colloquially call this "cramdown." That is the power that the City requests this Court to exercise here.

The language "fair and equitable" suggests the same kind of process of adjudication that the Court just adopted for the unfair discrimination test. Indeed, the words of these two requirements overlap somewhat, but the fair and equitable test has a broader focus, as the Court will discuss below.

In *City of Avon Park*, which the Court discussed above in part X.A.2. relating to fees in chapter 9 cases, the Supreme Court reviewed at length the bankruptcy court's role in determining whether a chapter 9 plan is fair and equitable. 311 U.S. at 146.

The Court concludes that under *City of Avon Park*, the City's plan is fair and equitable as to dissenting classes 14 and 15. That case first mandates this Court to investigate whether there is evidence of any misconduct that would require the Court's remedy as a condition of

confirmation, or whether the City or any class of creditors has committed any overreaching. *Id.* The Court readily finds that there is no such evidence in this case.

Under *City of Avon Park*, however, overriding the dissenting creditors' judgment about a plan requires more than just the absence of misconduct. The Court concludes that the fair and equitable requirement asks whether there are circumstances in the case that suggest to the Court's conscience that it is fair and equitable to impose the plan on the dissenting creditors against their stated will.

## 2. The Plan Is "Fair and Equitable"

The Court finds that several circumstances in this case do suggest that it is fair and equitable to impose the plan on the dissenting creditors against their stated will.

First, it is appropriate to look at exactly how this class reacted to the plan. Very few of the creditors in classes 14 and 15 filed objections to the plan. Also, although the classes did vote to reject the plan, the margins were small. In class 14, the margin was slim—51% rejecting, 49% accepting. In class 15, it was a bit more significant—58% rejecting, 42% accepting.

The numbers behind those percentages tell a story here, too. The actual vote in class 14 was 97 rejecting, 93 accepting. This means that if 3 rejecting votes had gone the other way, the necessary majority in number would have been achieved. The actual vote in class 15 was 189 rejecting and 153 accepting. That means that if 19 rejecting creditors in this class had accepted, the necessary majority would have been reached.

These circumstances raise the question whether it is fair and equitable to confirm the plan over the dissent of a handful of unsecured creditors, most of whom have claims under $25,000, when thousands of creditors with claims amounting to billions of dollars support the plan. To the Court's conscience, this is fair and equitable.

184

The Court accepts the likelihood that the dividend to the creditors in classes 14 and 15 will cause those creditors real hardship. But as the Court concluded in connection with the unfair discrimination test, the Court's analysis of the fair and equitable requirement must focus on the purposes of chapter 9. The Court must therefore analyze whether imposing the plan on dissenting classes of creditors is an appropriate and necessary means to achieve that purpose.

A large number of people in this City are suffering hardship because of what has been antiseptically called service delivery insolvency. What this means is that the City is unable to provide basic municipal services such as police, fire and emergency medical services to protect the health and safety of the people here. Detroit's inability to provide adequate municipal services runs deep and has for years. It is inhumane and intolerable, and it must be fixed. This plan can fix these problems and the City is committed to it. If to fix these problems and to accomplish the purposes of chapter 9 in this case, the Court must require these few creditors that rejected the plan to nevertheless share in the sacrifice that the other creditors have agreed to endure, then so be it.

There is really no choice here. There are no viable alternatives to this plan that will solve the City's problems and at the same time pay more to classes 14 and 15 to obtain their support.

To revitalize itself for the good of all of its stakeholders, the City desperately needs the shared sacrifice that this plan will impose on all of its creditors, even these few rejecting creditors, and the City needs it now.

Accordingly, the Court concludes that it should exercise its power under the bankruptcy code to impose the plan on classes 14 and 15 despite their dissenting votes. The Court finds that the plan is fair and equitable.

### J. The Objections of the Creditors with
### Constitutional Claims Are Sustained in Part and
### Overruled in Part

Objections were filed by two distinct groups of class 14 unsecured creditors that have constitutional claims against the City or its officers. One group has filed lawsuits seeking to recover damages for the deprivation of their constitutional rights under 42 U.S.C. § 1983 (collectively, "the § 1983 creditors"). (Dkt. ##4099, 4224, 4608, 5690, 5693 and 6764) The other group has lawsuits to recover on their just compensation claims under the Fifth Amendment for the City's alleged taking of their property (collectively, "the Takings Clause creditors"). (Dkt. ##3412, 5671 and 6262) Both groups of objectors assert that because their claims are constitutionally protected, the plan may not be confirmed unless it provides full payment for those claims.

The City argues that under the bankruptcy code, both types of claims are unsecured claims and are therefore properly discharged and impaired in class 14.

The Court entered an order permitting the Attorney General of the United States to intervene to address these two objections because they raised questions regarding the constitutionality of chapter 9. For reasons similar to those argued by the City, the Attorney General contends that the plan's proposed discharge of the § 1983 claims does not present a constitutional issue under the Fourteenth Amendment. The Attorney General does assert, however, that impairing claims under the Takings Clause of the Fifth Amendment would raise substantial constitutional concerns. The Attorney General suggested that to avoid that issue, if the plan is confirmed, the confirmation order should explicitly except the Takings Clause claims from discharge, as § 944(c)(1) permits in the Court's discretion.

The Court agrees with the Attorney General's analysis of both issues.

## 1. The Relevant Plan Provisions

The City's plan treats Takings Clause claims and § 1983 claims identically, offering them a recovery of approximately 10-13% in class 14. Disc. Stmt. at 41. (Dkt. #4391) Under § 944, confirmation of the plan would discharge these debts and foreclose any opportunity for either group of creditors to recover the full amount of their claims.

## 2. The § 1983 Creditors' Objections

The § 1983 creditors are Dwayne Provience, Richard Mack, Gerald and Alecia Wilcox, Deborah Ryan, Walter Swift, Cristobal Mendoza, and Annica Cuppetelli. Prior to the City's bankruptcy filing, those individuals filed separate lawsuits seeking damages against the City under 42 U.S.C. § 1983. Their lawsuits allege that the City is liable for its officers' various violations of their constitutional rights, including those guaranteed by the First, Fourth, Fifth, Sixth, Seventh, and Fourteenth Amendments.

These creditors have two objections. First, they assert that treatment of their claims as unsecured claims in the City's plan violates their Fourteenth Amendment right to receive compensation for the violations of their constitutional rights. The essence of their position is that the Fourteenth Amendment guarantees compensation through § 1983 when state actors violate those constitutional protections. The § 1983 creditors further contend that the impairment of their constitutional claims is prohibited by law and that therefore the plan does not comply with § 943(b)(4).

Second, the § 1983 creditors also argue that the plan impermissibly discharges claims brought against the City's officers in their individual capacity.

The City responds that the text of the Fourteenth Amendment does not establish a claim for damages but only delegates to Congress the power to create appropriate mechanisms to

187

enforce its provisions. U.S. Const. amend. XIV, § 5. The City reasons that because a claim under § 1983 is a claim for relief created by Congress and not by the Constitution, Congress is free to restrict that remedy, which it has done in chapter 9. The City thus denies that the plan requires any action prohibited by law in contravention of § 943(b)(4).

With respect to the discharge of individual police officer liability, the City responds that its plan properly seeks to release those claims.

### a. Impairing and Discharging the § 1983 Claims Against the City Does Not Violate the Fourteenth Amendment

Section 1 of the Fourteenth Amendment of the U.S. Constitution provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

Section 5 of the Fourteenth Amendment delegates to Congress the power to "enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Under that authority, Congress enacted the Civil Rights Act of 1871. That act included what is now codified at 42 U.S.C. § 1983. It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

Congress enacted this provision "for the express purpose of enforc(ing) the Provisions of the Fourteenth Amendment." *Mitchum v. Foster*, 407 U.S. 225, 238 (1972) (citations omitted). It "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (internal quotations omitted).

Although a § 1983 claim for damages is statutory, the § 1983 creditors contend that this statute merely provides the procedural mechanism to bring these claims and that the Fourteenth Amendment constitutionally entitles them to that damages remedy. They contend that therefore the impairment and discharge of their claims violates the Fourteenth Amendment. The § 1983 creditors rely on the Supreme Court's decisions in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978); *Owen v. City of Independence*, 445 U.S. 622 (1980); and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* 403 U.S. 388 (1971).

The Court concludes that none of these decisions supports that result.

In *Monell*, the Supreme Court held that a municipality is a "person" under § 1983 and therefore potentially liable for damages. *Monell* overruled the previous contrary decision in *Monroe v. Pape*, 365 U.S. 167 (1961). *Monell* neither held nor suggested that overruling *Monroe* was necessary because a party has a constitutional right to money damages. To the contrary, in *Monell*, the Supreme Court attributed its decision to its "analysis of the legislative history of the Civil Rights Act of 1871." 436 U.S. at 690. Thus, *Monell* recognized that § 1983, not the Constitution, provides the right to compensation against municipalities.

*Owen* addressed whether a municipality can assert a common law qualified immunity defense to a § 1983 claim. In denying this defense, the Supreme Court observed, "A damages

remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees . . . ."  445 U.S. at 651.

Again however, this observation does not rise to the level of holding that the Fourteenth Amendment itself establishes a right to damages.  Indeed, nothing in the opinion suggests that denying a qualified immunity defense to a § 1983 claim is a matter of necessity because the Fourteenth Amendment establishes a right to damages.  To the contrary, in summarizing the basis of its holding, the *Owen* court notably failed to identify a constitutional basis.  It stated, "rejection of a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violations is compelled both by the legislative purpose in enacting the statute and by considerations of public policy." *Id.* at 650.

Finally, the § 1983 creditors argue that *Bivens* held that all substantive constitutional rights include a right to compensation.  Therefore, they argue, § 1983 is unnecessary and merely codifies an existing constitutional right to damages.

The Court rejects this argument.  In *Bivens*, the Supreme Court created a new claim for relief for a constitutional violation by a federal officer.  It did not recognize that the Constitution includes a right to damages.

Subsequent Supreme Court decisions confirm this view of *Bivens*.  In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court stated, "*Bivens* . . . holds that in appropriate circumstances a federal district court *may* provide relief in damages for the violation of constitutional rights *if* there are 'no special factors counseling hesitation in the absence of affirmative action by Congress.'" *Id*. at 245 (emphasis added) (quoting *Bivens*, 403 U.S. at 396). In *Bush v. Lucas*, 462 U.S. 367, 378 (1983), the Supreme Court stated, "The federal courts' statutory jurisdiction to decide federal questions confers adequate power to award damages to the

190

victim of a constitutional violation." Similarly, in *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), the Supreme Court stated, "Our authority to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases 'arising under the Constitution, laws, or treaties of the United States.' We first exercised this authority in *Bivens* . . . ." *Id.* at 66 (quoting 28 U.S.C. § 1331). None of these cases suggests that *Bivens* found a constitutional right to damages.

The Court concludes that the Fourteenth Amendment does not provide a substantive constitutional right to compensation for damages. Accordingly, the Court overrules this objection to the plan.

The § 1983 creditors further argue that "the Supreme Court made clear that § 1983 is a vehicle for vindicating rights emanating from the Constitution." Ryan's Second Supplemental Br. 7. (Dkt. #6764) This distinction between a substantive constitutional right and the means of enforcing that right is precisely what drives this Court's conclusion. The § 1983 remedial scheme may "emanate" or "flow from" the Fourteenth Amendment, as the § 1983 creditors argue. This does not, however, elevate that remedy to a constitutionally protected status.

Accordingly, the plan does not violate the Fourteenth Amendment by discharging § 1983 claims.

Further, because discharging and impairing a § 1983 claim is not "prohibited by law," the Court also rejects the § 1983 creditors' argument that the plan violates § 943(b)(4).

### b. The Bankruptcy Code Does Not Provide for the Discharge of § 1983 Claims Against the City's Officers in Their Individual Capacity

The City asserts that its plan properly seeks to release claims against its employees in their individual capacity under § 1983. It asserts that because of its obligation to defend and

indemnify these claims, they are, as a matter of practical reality, claims against the City. The § 1983 creditors contend that these claims are not claims against the City.

In *V.W. ex rel. Barber v. City of Vallejo*, CIV.S-12-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013), the court analyzed whether a § 1983 claim brought against a police officer of the City of Vallejo was discharged in its chapter 9 bankruptcy. The court explained that "[t]o the degree plaintiff sues [the city's officer] 'in his . . . official capacity,' those claims are dismissed for the same reason the claims against the City are dismissed." *Id.* at *4 n.9. On the other hand, the court concluded that "a claim against a City official is not essentially one against the City for bankruptcy discharge purposes, even if state law requires the City to indemnify the official." *Id.* at *6. The court further observed that § 524(a), which § 901(a) makes applicable in a chapter 9 case, only discharges debts that are a "personal liability of the debtor." The court also noted the Supreme Court's direction that "'an award of damages against an official in his personal capacity can be executed only against the official's personal assets.'" *Id.* at *5 (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

The City attempts to distinguish *Barber* on the grounds that the Vallejo plan did not include a discharge or release of claims against officers in their individual capacity, but its plan does. The difficulty with this argument is that, as discussed in the next section, the record fails to establish the grounds for a release under the Sixth Circuit's decision in *Dow Corning*, 280 F.3d 648. Because the Court cannot approve the release here, this case is analytically identical to *Barber*.

The Court concludes, therefore, that a claim against a City employee in his or her individual capacity is not a claim against the City for bankruptcy purposes. Accordingly, such a

claim is neither discharged nor subject to impairment.  To this extent, the objections of the § 1983 creditors are sustained.

### c. The City Has Not Established That a Third-Party Release of § 1983 Claims Against Its Officers in Their Individual Capacity Is Essential to Its Plan

As noted, the plan purports to discharge and release claims against the City's officers in their individual capacity.  The § 1983 creditors object to this.

In part III.E.3.b. above, the Court addressed the application of *Dow Corning* to the release of the State in the State Contribution Agreement.  The Court observed that the third of the seven factors that the Sixth Circuit adopted expresses the fundamental premise of *Dow Corning* that a bankruptcy court's power to order a third-party release is based on its "power to reorder creditor-debtor relations *needed to achieve a successful reorganization*."  280 F.3d at 656 (emphasis added).  This factor requires that the release "is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor[.]"  *Id*. at 658.

That factor is not met for the plan's proposed release of § 1983 claims against officers of the City in their individual capacity.  The record of this case fails to establish that this release is essential to the success of the City's plan.

The Court accepts that the City has a strong interest in the efficient and effective functioning of the police department and that protecting its officers from personal liability for § 1983 claims is necessary to that mission.  However, that protection appears to be fully accomplished by the contractual indemnity obligations that the City assumes in the plan,

specifically the indemnity obligations in the City's collective bargaining agreements with its public safety unions.

The record is devoid of any evidence suggesting that the additional protection of a third-party release for these officers is necessary to the City's efficient and effective functioning, to its revitalization, or to the success of its plan. In these circumstances, the Court must find that the standard of *Dow Corning* is not met.

The City expresses concern that the failure to release these third-party claims will effectively create a class of creditors that will be paid in full. This is true. The City's assumption of its contractual indemnity obligations will result in the City's full payment of valid § 1983 claims against employees in their individual capacity.

However, this is perfectly proper. Under § 365, a debtor's assumption of an executory contract requires the debtor to comply with the contract and specifically here to meet its indemnity obligations in the contract. In principle, the City's mission-based reason for assuming the executory contract justifies that result and presumably the City entered into the contract and assumed it precisely because it concluded that it is mission-justified.

Moreover, the bankruptcy code allows the impairment and discharge of unsecured claims against a debtor, such as the § 1983 claims against the City here. However, as held in *Dow Corning*, absent demonstrated necessity, the bankruptcy code does not allow the impairment and discharge of unsecured claims against third parties, such as the City's officers.

The bankruptcy code astutely recognizes and accepts the economic reality behind this. Post-confirmation, the City must pay whatever costs are essential to its operations and is therefore legally authorized to do that. Because the City reasonably considers that indemnifying officers for valid § 1983 claims against the officers is essential to its operations, it is authorized

to pay those claims.  On the other hand, because paying § 1983 claims against the City is not essential to its operations, the City can legally impair those claims.

In part III.E.3.b. above, the Court approved the third-party release of the State that was part of the Grand Bargain.  As the Court explained, however, that release was fully justified as part of that settlement because the State Contribution is crucial to the City's revitalization and the release is crucial to confirmation of the City's plan.  *See Connector 2000*, 447 B.R. at 766. The releases under consideration here carry no such weight.

Therefore, the Court sustains the § 1983 creditors' objections to the provisions in the City's plan that would have the effect of discharging and releasing their claims against City officers in their individual capacity.

### 3. The Takings Clause Creditors' Objection

The Takings Clause creditors are T&T Management, Inc., HRT Enterprises, and the John W. and Vivian M. Denis Trust.  T&T Management, through its merger with Merkur Steel, Inc., has obtained a liquidated final judgment against the City for an ongoing Fifth Amendment Takings violation due to certain land use restrictions.  That judgment entitles T&T Management, as successor in interest, to a prospective monthly just compensation damage award until the City terminates those restrictions.  The other two creditors have pending suits against the City for just compensation but have not obtained a judgment.  Although these claims differ in their procedural postures, the distinction is irrelevant here as both suits seek just compensation arising out of an alleged taking of property by the City.

The Takings Clause creditors argue that because the City's plan treats their claims as general unsecured claims and impairs them, the plan is unconstitutional.  They contend that to comply with the Fifth Amendment, the City's plan must pay their just compensation awards in

full, instead of the fractional dividend that the plan proposes for class 14. In support of their argument, they rely on two Supreme Court cases, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935), and *United States v. Security Industrial Bank*, 459 U.S. 70 (1982).

The City responds that a Takings Clause claim under the Fifth Amendment is merely an unsecured claim that is subject to impairment under the bankruptcy code. Although the City concedes that *Radford* and *Security Industrial Bank* recognize that the Fifth Amendment restricts the bankruptcy code, it attempts to distinguish those cases. The City also argues that it is not relevant that the Constitution itself provides the right to just compensation.

### a. Discharging Takings Clause Claims Would Violate the Fifth Amendment

The Takings Clause of the Fifth Amendment mandates that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. This amendment is made applicable to the states, and thus to municipalities, through the Fourteenth Amendment. U.S. Const. amend. XIV; *Dolan v. City of Tigard*, 512 U.S. 374, 383 (1994); *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 122 (1978).

The Supreme Court has explained that "because the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 n.13 (1985). The Supreme Court further stated, "Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking." *Id.* at 194 (citation omitted). "[T]he property owner cannot claim a violation of

the Just Compensation Clause until it has used the procedure [for seeking just compensation] and been denied . . . ." *Id.* at 195.

Thus, a Takings Clause violation is defined by two elements: (1) the public taking of private property, and (2) the subsequent denial of just compensation for that taking. *See Williamson*, 473 U.S. at 195 n.13. If confirmed, the City's plan would satisfy both of those elements and, therefore, would violate the Fifth Amendment.

The Supreme Court has consistently held that bankruptcy laws are subject to the prohibition against governmental taking of private property without just compensation. Nevertheless, the specific issue of whether a municipal debtor in a chapter 9 bankruptcy case may impair a creditor's claim for just compensation under the Fifth Amendment is one of first impression.

In *Radford*, 295 U.S. 555, the Supreme Court first announced that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Id*. at 589 (footnote omitted). In that case, the Supreme Court analyzed the constitutionality of the Frazier-Lemke Act, which added § 75 to the Bankruptcy Act. *Id.* at 573. That amendment permitted the debtor to elect one of two alternative options with respect to his mortgaged property. *Id.* at 575. Either the debtor could purchase the property at its appraised value by agreeing to make certain deferred payments with the mortgagee's consent or, if the mortgagee did not consent, the debtor was entitled to stay proceedings for five years and pay rent annually. *Id.* at 575-76.

The Supreme Court held the Frazier-Lemke Act unconstitutional. *Id.* at 596. It concluded that the act impermissibly took property rights from the mortgagee without just compensation. *Id.* at 595. The Supreme Court stated:

> The province of the Court is limited to deciding whether the Frazier-Lemke Act (11 USCA § 203(s)) as applied has taken from the bank without compensation, and given to Radford, rights in specific property which are of substantial value. As we conclude that the act as applied has done so, we must hold it void; for the Fifth Amendment commands that, however great the nation's need, private property shall not be thus taken even for a wholly public use without just compensation.

*Id.* at 601-02 (citations omitted); *see also Sec. Indus. Bank*, 459 U.S. at 75 (reaffirming the holding in *Radford* and explaining, "The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation.").

In a more recent decision, the Supreme Court examined the Takings Clause in the context of an emergency railroad reorganization statute. In *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102 (1974), the Court addressed a constitutional challenge to the Rail Act, which was a specialized amendment to the Bankruptcy Act that Congress passed pursuant to its bankruptcy power. The Rail Act consolidated eight insolvent railroads into one privately owned for-profit corporation. *Id.* at 109. To accomplish that goal, the Rail Act established the "Final System Plan," which mandated that the reorganized railroads would transfer their assets to a new private corporation (Conrail), and then this entity would issue securities to repay the current creditors of the eight railroads. *Id.* at 111-12.

Several creditors challenged the Rail Act on the basis that it imposed a reorganization plan that violated the Fifth Amendment Takings Clause. *Id.* at 137. Specifically, they "assert[ed] that . . . because compensation is not in cash but largely in stock of an unproved entity, [the Rail Act] will necessarily work an unconstitutional taking." *Id.* (footnote omitted). Although each creditor was entitled "to get[] all the value of his lien and his share of any free assets" from the reorganization, because of the speed of the reorganization mandated by the Rail Act, it was impossible to judicially determine the values of those liens and whether the

replacement Conrail securities were actually equivalent in value *prior* to the reorganization. *Id.* at 154-55. Thus, the Court concluded that "any deficiency of constitutional magnitude in the value of the limited compensation provided under the Act will indeed be a taking of private property for public use." *Id.* at 155.

However, the Supreme Court further reasoned that because the plaintiffs were able to pursue "a Tucker Act suit in the Court of Claims for a cash award to cover any constitutional shortfall, the Rail Act does provide adequate assurance that any taking will be compensated." *Id.* Thus, the Court found that the Rail Act did not violate the Takings Clause. *Id.*

*Blanchette* and *Radford* establish that bankruptcy proceedings are subject to the Fifth Amendment's prohibition on public takings of private property without just compensation.

The City argues that even if the right to just compensation is protected in bankruptcy, the interest of the Takings Clause creditors in their claims against the City is not a property interest that must be protected in bankruptcy. The City seeks to distinguish *Radford* and *Security Industrial*, arguing that in those cases, the Supreme Court faced a Takings Clause issue only because the applicable bankruptcy law itself destroyed an existing property right. S*ee Radford*, 295 U.S. at 588-89; *Sec. Indus. Bank*, 459 U.S. at 78-82. The City argues that the Takings Clause creditors have no such property interest and that chapter 9 does not extinguish any such property right. The City cites several cases establishing the principle that an unsecured creditor's mere right to collect payment is not a property interest. *See, e.g.*, *Bank of N.Y. v. Treco* (*In re Treco*), 240 F.3d 148 (2d Cir. 2001).

The Court rejects this argument. The taken property here is not the creditor's unsecured claim in bankruptcy. Moreover, the source of the taking is immaterial. In the present case, the City took, or allegedly took, the creditors' property. In *Radford* and *Security Industrial*, the

bankruptcy code itself resulted in the taking.  Nevertheless, all that matters under the Fifth Amendment is that the owner of private property must be justly compensated if that property was taken for public use, whenever and however that taking occurred.

If confirmed, this plan would deny that just compensation.  The plan would allow the City to impair the property owners' constitutional claim for just compensation after the City took their private property.  That violates the Fifth Amendment.

### b. The Takings Clause Claims Must Be Excepted from Discharge

The Attorney General argues that chapter 9 is not necessarily unconstitutional for failing to exempt Takings Clause claims from discharge.  He suggests that in the interest of avoiding a finding of unconstitutionality, the Court should use its discretion under § 944(c)(1) to order the nondischargeability of Takings Clause claims in the confirmation order.

The Court agrees.  Section 944(c)(1) provides, "The debtor is not discharged under subsection (b) of this section for any debt— (1) excepted from discharge by the plan or order confirming the plan[.]"  The Court finds that when the Constitution requires a money damage award—as is the case here—§ 944(c)(1) allows the Court to except claims for that award from discharge in the confirmation order.  This eliminates all issues regarding the constitutionality of chapter 9 in this respect.

Courts should avoid "interpreting [a statute] in a manner that would render it clearly unconstitutional . . . if there is another reasonable interpretation available." *Edmond v. United States*, 520 U.S. 651, 658 (1997); *see Lorillard v. Pons*, 434 U.S. 575, 577 (1978) ("[I]t is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided.").

Pursuant to § 944(c)(1), therefore, the Court provided in the confirmation order that the valid claims of these Takings Clause creditors are excepted from the discharge. (Dkt. #8272) This result harmonizes chapter 9 with the Fifth Amendment while giving full effect to the principle that the Court should avoid interpreting chapter 9 in such a way that renders it unconstitutional.

## K. The Plan Does Not Violate the Funding
## Clause of the Michigan Constitution

Several objectors argue that the plan violates article IX, § 24 of the Michigan constitution (the "funding clause") because the City will not make up missed pension payments in the event that outside funding expected pursuant to the Grand Bargain is not received. They also assert that the plan impermissibly provides the City with a 10-year holiday on making pension contributions. These objecting creditors include Dorothy M.W. Baker (Dkt. #4520); Fiorenzo Fabris (Dkt. #5211); Jamie S. Fields (Dkt. #4404); William Ochadleus (Dkt. #4082); Mattie D. Prichett (Dkt. #5887); Cheryl Rayford (Dkt. #3776); Jean Vortkamp (Dkt. #4578); Mary Jo Vortkamp (Dkt. #4579); William Curtis Walton (Dkt. #2899); and Demetria Wright (Dkt. #5795).

The funding clause of article IX, § 24 of the Michigan constitution provides, "Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and such funding shall not be used for financing unfunded accrued liabilities."

Its purpose is "to check legislative bodies, requiring them to fund pension obligations annually, and thereby preventing back door spending." *Musselman v. Governor*, 533 N.W.2d 237, 241 (Mich. 1995), *overruled on other grounds by Studier v. Mich. Pub. Sch. Employees' Ret. Bd.*, 698 N.W.2d 350 (Mich. 2005). "Article 9, § 24 arose out of concern about legislative

bodies failing to fund pension obligations at the time they were earned, so that the liabilities of several public pension funds greatly exceeded their assets." *Musselman*, 533 N.W.2d at 241. The funding clause "expressly mandates townships and municipalities to fund employee pension systems to a level which includes unfunded accrued liabilities." *Shelby Twp. Police and Fire Ret. Bd. v. Charter Twp. of Shelby,* 475 N.W.2d 249, 255-56 (Mich. 1991). The Michigan Supreme Court has "acknowledge[d] that the Michigan constitution does not provide the specifics for meeting funding obligations upon a retirement plan's unfunded accrued liabilities." *Id.*

The Court concludes that the plan does not violate the funding clause of the Michigan constitution. The first step in determining whether a municipality is complying with its obligation under the funding clause is to identify its funding obligation. This Court has held that municipal pension obligations are contractual obligations subject to impairment in a confirmed plan in a chapter 9 bankruptcy case. *In re City of Detroit*, 504 B.R. at 150-54. It follows that the City's plan defines the City's pension funding obligation.

The plan, which incorporates the pension settlement, provides for funding of the City's pension plans from a variety of sources, including the City itself. The plan further states that the City has no obligation to provide substitute funding if the pension plans do not receive the outside funding. *See* Plan, §§ II.B.3.q.ii.A and II.B.3.r.ii.A. (Dkt. #8045) Because the City's only pension funding obligation is fixed in the plan, the City will fully comply with the funding clause when it fulfills those obligations.

Accordingly, the Court overrules this objection.

## L. The Pension Creditors' Claims Are Against the City, Not the Retirement Systems

Several objecting parties argue that by reducing pension benefits, the plan seeks to improperly impair claims that employees and retirees hold against the retirement systems (as opposed to the City). These creditors include Denise Cattron (Dkt. #4297), Thomas Cattron (Dkt. #4296), John P. Quinn (Dkt. #5723), and Sylvester Tobias (Dkt. #5330). Because these objections misunderstand the legal nature of the pension obligations owing to employees and retirees, they are overruled.

The pension clause of the Michigan constitution expressly provides, "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. Art. IV. § 24. The Detroit city charter, consistent with the Michigan constitution, provides, "The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired." Detroit City Charter § 11-101(3). Pursuant to these provisions, the liability for pension obligations lies with the City.

The Detroit city charter established the GRS and the PFRS as separate entities for the purpose of administering the pensions. Detroit City Charter § 11-103. The retirement systems act pursuant to specific provisions of the Detroit City Code. *See* Detroit City Code Chapter 47. Both the City Charter and the Code make it clear that the City is the sole sponsor of the GRS and the PFRS and that liability for funding the pensions rests solely with the City.[25]

---

[25]*See* Detroit City Code § 47-2-18(c) (providing that the Pension Accumulation Fund of the GRS, from which pensions are paid, shall consist of the "accumulated reserves for the

*Continued…*

Because the City is the sole entity liable to the GRS and the PFRS participants on account of their pension claims, the creditors' claims are not claims against the retirement systems, they are claims against the City. Accordingly, the plan's impairment of pension claims does not constitute the improper impairment of claims against the retirement systems.

At least one of the objectors, Mr. Quinn, argues that the phrase "shall be a contractual obligation thereof" in the pension clause of the Michigan constitution should be read to apply to both the City and the retirement systems. (Dkt. #5723) He then draws a distinction between the City's obligation to fully fund employees' accrued pension benefits each year (along with any underfunding thereof) and the mechanical distribution of pension benefits by the retirement systems. The Court finds that these distinctions are unwarranted in light of the provisions in the Michigan constitution and the Detroit City Charter that clearly place the obligation for pension funding on the City, not the retirement systems.

### M. The Pensions of DWSD and Library Employees Are Properly Included in the Plan

Certain objecting parties argue that the plan cannot properly impair the pension claims of the employees of the DWSD and the Detroit Public Library, and grant-funded employees,

---

pensions and other benefits payable from the contributions made by the City . . .."); Detroit City Code § 47-2-19 (specifying how the City's annual contribution to GRS shall be calculated and providing for no funding source other than the City); 1964 Detroit City Code § 54-2-1 (Ord. No. 77-H) ("'Pension' means the portion of a retirement allowance which is paid for by appropriations made by the city.") (Chapter 54 of the 1964 Detroit City Code (as amended and supplemented from time to time by City Ordinance) was saved from repeal by Section 11-102 of the 1974, 1997 and 2012 Detroit City Charters and is incorporated by reference in Chapter 47 of the 1984 Detroit City Code.); 1964 Detroit City Code §§ 54-43-4 (Ord. No. 76-H), 54-43-5 (Ord. No. 04-05) (providing that the City shall fund the Pension Accumulation Fund of the PFRS), §§ 54-2-3 (Ord. No. 77-H), 54-2-4 (Ord. No. 77-H), 54-2-6 (Ord. No. 77-H), 54-2-7 (Ord. No. 77-H), 54-43-3 (Ord. No. 39-05) (specifying how the City's annual contribution to the PFRS shall be calculated and providing for no funding source other than the City).

204

because these entities have fully funded their allocated portion of the City's pension obligations. These objecting creditors include Dorothy M.W. Baker (Dkt. ##4520 and 6019), Keith Davis (Dkt. #4288), Lenetta Walker (Dkt. #3350), and Shirley Walker (Dkt. #3435).

The Court overrules these objections. The GRS is a single pension fund and the City is its sole sponsor. *See* Detroit City Code § 47-1-2, *et seq*. (providing for the establishment of a single GRS). As a result, the City's underfunding liability impacts the claims of all GRS participants.

It is true that the library is an entity distinct from the City. It may therefore have, pursuant to collective bargaining agreements, contractual obligations to employees and retirees that are independent of the City's obligations. To the extent that the library has independent contractual obligations to its employees or retirees, the plan does not purport to affect those obligations. The library and its unions are free to address, enforce, resolve or renegotiate any such contractual obligations. Nevertheless, where the City itself also has an obligation, such as it does for pensions, the City's obligation is properly compromised as part of this chapter 9 case.

Accordingly, this objection is overruled.

### N. The Plan Does Not Violate the Blighted Area Rehabilitation Act

Certain objecting parties allege that the plan violates the Blighted Area Rehabilitation Act, Mich. Comp. Laws §§ 125.71-.84. They assert that the plan does not provide for the involvement of residents and interested parties in blight remediation and rehabilitation, as the statute requires. These creditors include Marie L. Thornton (Dkt. #3249) and Douglas Yee (Dkt. #3481).

The Blighted Area Rehabilitation Act was enacted to authorize Michigan municipalities to adopt plans for the prevention and rehabilitation of blighted areas and to acquire real property for the purpose of implementing the rehabilitation plans. It authorizes the acquisition of land by various means to carry out this purpose. It also provides for the establishment of citizens' district councils to consult with the local governing body regarding the rehabilitation plans.

As part of its restructuring, the City intends to spend $440.3 million on blight remediation projects to stabilize and revitalize Detroit's neighborhoods. Ex. 626 at 2. This is included as a budget line item in the projections and forecasts. Nothing in the plan, however, commits the City to any particular blight remediation projects. More importantly, nothing in the plan establishes a blight removal process that if implemented, would violate the Blighted Area Rehabilitation Act. The plan is not permission for the City to violate the Act.

Accordingly, these objections are overruled.

### O. The Grand Bargain Is Not an Improper Use of Tobacco Settlement Money

At least one objector argues that the State Contribution Agreement to the Grand Bargain allocates funds derived from the settlement of a class action lawsuit between the state of Michigan and the tobacco industry. According to the objection, those funds belong, "equitably and morally," to the City and other cities around the state. Krystal A. Crittendon filed this objection. (Dkt. #5836)

The source of funds identified by the State to fund its contribution to the Grand Bargain is irrelevant to whether the plan meets the requirements for confirmation under the bankruptcy code. Moreover, the objection cites no legal limitation on the State's authority to distribute tobacco settlement money within its discretion or any legal basis for the argument that the City is

"equitably and morally" entitled to the money. The State Contribution does aid the City by supporting the City's retirees. Because there is no legal basis for this objection, the Court overrules it.

### P. The Plan Does Not Violate the Federal Transit Act

Certain DDOT retirees allege that the impairment of their pension and OPEB claims under the plan violates § 5333(b) of the Federal Transit Act. 49 U.S.C. § 5301-5340 ("Federal Transit Act") (formerly known as the "Urban Mass Transportation Act"). These retirees are Thomas Cattron (Dkt. #4296), Judy Flowers-Tisdale (Dkt. #5329), Sylvester Tobias (Dkt. #5330), and Gail M. Wilson (Dkt. #5883).

Section 5333(b) of the Federal Transit Act requires that employers receiving federal assistance under that act provide certain labor protections to their employees, including the preservation of rights under collective bargaining agreements and the continuation of collective bargaining rights. Specifically, § 5333(b) states:

> (1) As a condition of financial assistance under . . . this title, the interests of employees affected by the assistance shall be protected under arrangements the Secretary of Labor concludes are fair and equitable. . . .
>
> (2) Arrangements under this subsection shall include provisions that may be necessary for: (A) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise;[and] (B) the continuation of collective bargaining rights[.]

49 U.S.C. § 5333(b).

With respect to active employees, the City bargained with and ultimately entered into agreements with each of the six unions representing DDOT employees. The City's response to this objection stated:

The City entered into memoranda of understanding with five of the six Unions representing DDOT employees as a result of collective bargaining. The City and two AFSCME locals initially disagreed on the amount of benefit reductions, however, and the parties entered into a fact-finding proceeding administered by the Michigan Employee Relations Commission ("MERC"). On April 22, 2014, the MERC-appointed fact-finder (the "Fact Finder") entered his decision (the "Decision") recommending that the City's requested impairment of pension and OPEB benefits be implemented. A copy of the Decision is attached hereto as Exhibit C. On May 1, 2014, the City accepted the Fact Finder's decision in its entirety. On May 2, 2014, the two AFSCME locals accepted the Fact Finder's Decision with respect to the impairment of pension and OPEB benefits, among other things (although they rejected certain other aspects of the Decision). Copies of the e-mails accepting the Fact Finder's Decision with respect to pension and OPEB benefits are attached hereto as Exhibit D. As such, the City's proposed reductions in pension and OPEB benefits were accepted by and are binding upon all parties.

City's Consol. Resp. to Certain *Pro Se* Objections at 75, n.64. (Dkt. #7303)

As to those employees, therefore, the City has complied with the requirements of the Federal Transit Act.

The City is not required to collectively bargain with retirees to satisfy the Federal Transit Act. By its express terms, § 5333(b) of the Federal Transit Act applies only to employees and not retirees. *See* 49 U.S.C. § 5333(b)(1).

The Eleventh Circuit has confirmed that the purpose of the Federal Transit Act is to protect active employees:

Although it was not the intent of the [Federal Transit Act] to curtail collective bargaining rights, Congress recognized that in some instances, transit employees might be adversely affected by the introduction of new equipment or the reorganization of existing transit operations promoted by the legislation. In particular, since the Act was to authorize grants or loans of federal funds to state or local public authorities to enable them to acquire private transit companies, employees of those companies would foreseeably become employees of the public agencies. When it passed the Act, Congress was concerned that such employees might lose collective bargaining rights, the right to strike, or pension and retirement

208

benefits. Section 13(c) of the Act [(now 49 U.S.C. § 5333(b))] is designed to protect affected employees from such losses.

*Local Div. 732 Amalgamated Transit Union v. Metro. Atlanta Rapid Transit Auth.*, 667 F.2d 1327, 1335 (11th Cir. 1982) (internal citation omitted).

Both the plain language and the stated purpose of the Federal Transit Act, therefore, suggest that the purpose of § 5333(b) is to preserve the collective bargaining rights of active employees, not retirees. The Court therefore concludes that the Federal Transit Act did not require the City to collectively bargain proposed pension and OPEB benefit reductions with its retirees.

The City's response to this objection also stated:

> As a practical matter, it would not have been possible for the City to collectively bargain with retirees because, under applicable Michigan law, unions generally are prohibited from representing retirees absent their individual, express consent. *See, e.g., Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 817-18 (6th Cir. 2006) (requiring that union obtain the consent of retirees to be authorized to act on their behalf); *see also Amos v. PPG Indus., Inc.*, 699 F.3d 448, 453 (6th Cir. 2012) (holding that federal action was not "brought by the unions 'in a representative capacity' on behalf of the plaintiff retirees" for the purposes of nonparty preclusion because unions did not obtain the assent of the retirees), *cert. denied*, 133 S. Ct. 2008 (2013).

City's Consol. Resp. to Certain *Pro Se* Objections at 76-77, n.65. (Dkt. #7303)

While the City was under no obligation to collectively bargain with retirees, the City did, in fact, negotiate extensively with the retiree committee (together with the other retiree representatives) and obtained its agreement on the terms of the plan, including the proposed reductions in pension and OPEB benefits. The City is therefore modifying its DDOT-related pension and OPEB obligations in a manner that is not inconsistent with § 5333(b) of the Federal Transit Act. The Court therefore overrules this objection.

## XI. THE EXIT FINANCING PROPOSED IN THE PLAN
## IS APPROVED

The City's plan contemplates exit financing of up to $325 million. However, the City has stated, its intent to borrow $275 million. It is a private loan that is intended to be bridge financing for 150 days. At that time, the debt will be the subject of a public offering at market rates. The loan is secured by a lien on the City's income tax revenues. The proceeds of the loan will be used to repay the post-petition financing, to pay the LTGO settlement, and to begin to implement the RRIs.

Mr. Buckfire gave expert testimony regarding the annual costs of repaying the exit financing. He testified that the City currently projects the exit financing will have a long-term interest rate of 5%. However, he believes there are several factors that "lead one to conclude that the exit financing will be priced below the levels indicated in our projections." Trial Tr. 217:16-18, Sept. 30, 2014. (Dkt. #7821) These factors include the shedding of a large amount of debt and the implementation of new financial oversight mechanisms. *Id*. at 81:9-19. Mr. Buckfire further testified, "Detroit uniquely [will] not have to go back into the market to borrow to repay maturing debt which every other city routinely has to do." *Id*. at 217:3-5. He explained that his conclusion was also based on the City's experience with the post-petition financing. The City originally projected this cash loan would bear an interest rate of 5%, but that the market had been so receptive to the City's improved credit position that the rate is closer to 3.5%. *Id*. at 86-88.

The City argues that § 364 does not apply to post-confirmation exit financing. The Court agrees. *See In re SAI Holdings Ltd.*, No. 06-33227, 2012 WL 3201893, at *7 (Bankr. N.D. Ohio Aug. 3, 2012) ("By its express terms, § 364(c) and (d) refer only to the obtaining of credit by the bankruptcy trustee, or Debtors–in–Possession in this case, and refer to incurring debt secured by a lien on 'property of the estate.' After confirmation of the Plan, Debtors were no longer

210

Debtors–in–Possession . . .”); *In re Les Ruggles & Sons, Inc.*, 222 B.R. 344, 345 (Bankr. D. Neb. 1998) (“[S]ection 364(d)(1) does not apply to post-confirmation borrowings.”); *In re Hickey Props., Ltd.*, 181 B.R. 173, 174 (Bankr. D. Vt. 1995) (same).

Nevertheless, such financing is contemplated in the plan and the City seeks the Court's approval of it in that context. The record establishes and the Court finds:

- The proposed exit financing and the City's proposed uses of the proceeds of the exit financing are necessary and appropriate to implement the plan under § 1123(a)(5);

- The financing is not inconsistent with any other provisions of the bankruptcy code under § 1123(b)(6);

- The fees associated with the financing are reasonable under § 943(b)(3);

- The City is not prohibited by law from entering into the exit financing transaction under § 943(b)(4);

- The terms of the exit financing are fair and reasonable;

- The financing reflects prudent judgment on the City's part; that the City obtained all necessary regulatory approval to enter into this transaction, including approvals from the Detroit City Council, the Michigan Finance Authority, and the Emergency Financial Assistance Loan Board; that the City implemented a full marketing process to identify exit financing on the most favorable available terms;

- The terms were negotiated at arm's length; that the lender has acted in good faith in the transaction;

- Upon closing it is not subject to avoidance on any grounds by any party;

- Its terms are legal, valid and binding on all parties; and

- The transaction should not be affected by the reversal or modification of any of this Court's orders, including the order confirming the plan.

For these reasons, the Court approves the proposed exit financing.

## XII. Conclusion

There has been much discussion throughout this case about how a chapter 9 case is different from the other types of bankruptcy cases. It is, but only around the edges. In fundamental ways, the Detroit bankruptcy case is just like every one of the other 30,609 bankruptcy cases that were filed in our court in 2013. In every case, a debtor needs help, made mistakes, took unwarranted risks, accepted bad advice, exercised bad judgment, was too long in denial, or had just plain bad luck.

But no matter, our society holds dear the values of a fresh start and of second chances. That value is manifested with brilliant clarity in our bankruptcy laws. And that value is manifested the same in this $18 billion case as it was in the no asset chapter 7 cases that were filed just before and just after this case was filed on July 18, 2013.

The current leadership of the City is now getting the City back from the emergency manager and from us in the bankruptcy world. The City will have the fresh start that it needs and deserves under our federal bankruptcy laws. It is now the responsibility of City leadership to implement this plan. The City's true and full fresh start depends on it.

The people of the City of Detroit have a passion for this City that is remarkable in its breadth, in its expression, and in its unwavering endurance. They are about to get their City back. It is their City.

A large number of them told the Court that they were angry that their City was taken from them and put into bankruptcy. They said that in their court papers. They said that in their statements in court. They said that in their blogs, letters, and protests. The Court heard them.

The Court urges the people of the City of Detroit not to forget that anger. Their enduring and collective memory of what happened here, and their memory of their anger about it, will be exactly what will prevent this from ever happening again. It must never happen again.

When Fredia Butler testified during the confirmation hearing, she quoted the great wisdom of Marian Wright Edelman, who said, "Democracy is not a spectator sport." Trial Tr. 44:3-4, Oct. 15, 2014. (Dkt. #8033) And so the Court asks the people of the City, for the good of the City's fresh start, to move past their anger, to join in the work that is necessary to fix this City, and to help your City leaders do that. It is your City.

We have used the fitting phrase, the Grand Bargain, to describe the group of agreements that will fix the City's pension problem. In our nation, we join together in the promise and in the ideal of a much grander bargain. It is the bargain by which we interact with each other and with our government, all for the common good. That grander bargain, enshrined in our Constitution, is democracy. It is now time to restore democracy to the people of the City of Detroit. The Court urges the people of the City of Detroit to participate in that democracy, and hopes that they will soon realize its full, vibrant and everlasting potential.


Signed on December 31, 2014

<div style="text-align:right">

_____/s/ Steven Rhodes_____
Steven Rhodes
United States Bankruptcy Judge

</div>