# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                 Case No. 13-53846

            Debtor.               Hon. Steven W. Rhodes

_____/

AFSCME Council 25 and its Affiliated Detroit Locals

            Appellant,             Case No. 2:14-cv-14548-BAF-RSW

   v                                     Hon. Bernard A. Friedman

City of Detroit, Michigan,                 Mag. Judge R. Steven Whalen

            Appellee.

_____/

## APPELLANT AFSCME APPENDIX FOR BRIEF ON APPEAL

# TABLE OF CONTENTS
## (FRBP, Rule 8018(b)(1))

1.  AFSCME Proof of Claim No. 2958
    February 21, 2014 ........................................................................ 1
    [This item omits an exhibit containing irrelevant grievances]

2.  Decision and Recommended Order of ALJ
    October 4, 2013 ............................................................................ 9

3.  Roots, et al. v City of Detroit
    June 27, 2012 .............................................................................. 34

4.  4th Amended Plan for the Adjustment of Debts,
    May 5, 2014 ................................................................................ 89
    [This item contains excerpts of the entire document]

5.  4th Amended Disclosure Statement,
    May 5, 2014 .............................................................................. 107
    [This item contains excerpts of the entire document]

6.  City Objection to AFSCME Proof of Claim,
    May 15, 2014 ............................................................................ 110
    [This item omits the exhibits to the pleading]

7.  AFSCME Response to City Objection to Proof of Claim,
    September 2, 2014 ..................................................................... 127
    [This item omits the exhibits to the pleading, other than Exhibit 6]

8.  City Supplemental Brief for Objection to Proof of Claim,
    October 16, 2014 ...................................................................... 155

9.  AFSCME Supplemental Brief for City Objection to Proof of Claim,
    October 16, 2014 ...................................................................... 177

10. AFSCME Second Supplement to City Objection to Proof of Claim,
    October 17, 2014 ...................................................................... 203

11.    Transcript of Court Ruling on Proof Of Claim Objection,
October 20, 2014 ...................................................................... 234

12.    Court Order on Proof of Claim Objection
October 20, 2014 ...................................................................... 246

13.    AFSCME Notice of Appeal to October 20, 2014 Court Order
October 30, 2014 ...................................................................... 247

14.    *In re Monclova Care Center, Inc.,*
59 Fed.Appx. 660, 662 (6th Cir 2003) (attached)........................................ 256
[*unpublished opinion Cited in Appellant brief*]

Dated: January 1, 2015       /s/ Richard G. Mack, Jr.
                      Richard G. Mack, Jr., Esq.
                      Jack W. Schulz, Esq.
                      *Counsel to Appellant AFSCME*
                      600 West Lafayette Blvd., 4th Floor
                      Detroit, MI 48226-3191
                      Telephone: (313) 964-4454
                      richardmack@millercohen.com
                      jschulz@millercohen.com

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT    EASTERN DISTRICT of MICHIGAN

**FILED**

Name of Debtor: City of Detroit, Michigan     Case Number: 13-53846

FEB 2 1 2014

US Bankruptcy Court
MI Eastern District

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Michigan AFSCME Council 25 and its affiliated Detroit Locals**

Name and address where notices should be sent:
Richard G. Mack Jr.
Miller Cohen, PLC
600 W. Lafayette Blvd. 4th Floor
Detroit, MI 48226

**RECEIVED**

FEB 2 4 2014

Telephone number: 313-964-4454   email: richardmack@millercohen.com **KURTZMAN CARSON CONSULTANTS**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
   (*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:    email:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed: Not less than $8,718,697,854.82**
See Attached (Note: AFSCME Council 25 has filed an additional Proof of Claim)

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☒ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** See attached Addendum for additional details.

**3. Last four digits of any number by which creditor identifies debtor:**    **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐Real Estate ☐Motor Vehicle ☐Other

Describe:

Value of Property:

Annual Interest Rate (when case was filed)_____% ☐Fixed or ☐Variable

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: See Attached

Amount of Secured Claim:   $0

Amount Unsecured:

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**    $ 0

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____    $ 0

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: See attached Addendum. Further, the underlying documents relative to this claim are in the City's possession

**8. Signature: (See instruction # 8)**
Check the appropriate box.

☐ I am the creditor.   ☒ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Richard G. Mack Jr.
Title: Attorney and Authorized Agent
Company: Miller Cohen, PLC
Address and telephone number (if different from notice address above):
600 W. Lafayette Blvd. 4th Floor
Detroit, MI 48226
313-964-4454   email: richardmack@millercohen.com

(Signature)     2/21/2014   (Date)

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571

**Addendum to the Proof of Claim of**
**Michigan AFSCME Council 25, and its affiliated Locals of the City of Detroit**

This proof of claim (the "Claim") is for all claims due to Michigan AFSCME Council 25 and its affiliated Locals within the City of Detroit (the "Claimant"), and its members, and former members/retirees (or future retirees with pension or other post-employment benefit obligations vested prior to the City of Detroit's (the "City") bankruptcy filing), relating to:

(i) unfunded or underfunded pension obligations (including annuity savings fund obligations) owed with respect to the City's General Retirement System (the "Pension Obligations"),

(ii) other unfunded or underfunded post-employment benefit obligations (the "OPEB Obligations", including obligations owed with respect to the City's Health and Life Insurance Benefit Plan and/or the Supplemental Death Benefit Plan and/or other non-pension post-employment welfare benefits, including unfunded actuarially accrued liabilities),

(iii) grievances and other disputes under the various union contracts, the City Employment Terms or other contractual obligations,

(iv) monies owed for violations of local, state or federal law, unfair labor practice charges,

(v) monies owed due to uncompensated services performed,

(vi) any other claims which arose before July 18, 2013.

**The calculated aggregate amount owed pursuant to these claims amount to not less than $8,718,697,854.82.** The not less than $8,718,697,854.82 amount asserted in this Claim consists of several separate claims.[1] (See attachment)

---

[1] The amount set forth in this Claim are estimates based on data provided to Claimant by the City, Collective Bargaining Agreements, the City's General Retirement System and other third

28579/2
02202014 28725506 1
13-53846-swr   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 6 of 113
13-53846-swr   Doc 4876-1   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 3 of 40

Appendix 2

On November 21, 2013, the Court entered its order establishing bar dates for filing proofs of claim and approving the form and manner of notice thereof [Docket No. 1782] (the "Bar Date Order") establishing February 21, 2014 at 4:00 p.m. Eastern Time as the general claims bar date for filing poofs of claim in this case. While individuals or entities holding claims for, *inter alia*, Pension Obligations and OPEB Obligations were not required to file proofs of claim pursuant to the Bar Date Order, as the City has not (to date) determined how the claims for Pension Obligations and/or OPEB Obligations will be asserted and/or allowed, portions of this claim are in reference to Pension Obligations and OPEB Obligations as a protective measure.

As the documents supporting this Claim – including without limitation the relevant statutes, charter and ordinances, collective bargaining agreements, City Employment Terms, grievances, arbitration awards, unfair labor practice charges, the books and records of the City and its General Retirement System, and the City's communications with its employees and retirees – are voluminous, they are not attached to this Claim. Copies of the relevant documents supporting this Claim are or should be, upon information and belief, in the possession of the City.

Claimant expressly reserves the right to amend this Claim to re-characterize or further characterize all or any portion of these claims as administrative expenses or priority claims or to include such modifications, deletions or additions as may be just and proper.

Pursuant to the Bar Date Order, individual members of AFSCME Council 25, its affiliated Locals, and the Coalition of Unions have a right to file a proof of claim on their own

---

parties. Claimant reserves the right to amend this Claim to include updated data, any appropriate changes in applicable actuarial assumptions which serve as the basis for the calculations of the amounts set forth herein, and any appropriate updates for Claimant's members or former Claimant members who have or may become eligible in the future for pension benefits but whose data was not included in the herein calculations.

-2-

13-53846-tjt Doc 8986-1 Filed 01/04/15 Entered 01/04/15 21:46:43 Page 4 of 113
13-53846-swr Doc 8986-1 Filed 05/15/14 Entered 05/15/14 21:07:59 Page 4 of 46

Appendix 3

behalf. Thus, Claimant reserves the right for other units or individual members to file proof of claims in addition to this claim. Claimant has put forth a good faith effort to provide an exhaustive list of all outstanding claims while avoiding duplicative filings; any unnecessary duplication is not intentional and will be resolved.

The filing of this Proof of Claim is not and should not be deemed a waiver of any Claimant's challenge to the legal validity of this bankruptcy or any legal claims relating to the bankruptcy and/or Detroit's assets. Furthermore, this Claim shall not be deemed or construed to be a waiver of the rights of the Claimant (1) to have final orders with respect to non-core matters entered only after *de novo* review by the United States District Court, (2) to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases, (3) to have the United States District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (4) to assert any other rights, claims, actions, setoff or recoupments to which the Claimant is or may be entitled in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupment the Claimant expressly reserves, and (5) to assert any and all rights or claims against others jointly or severally liable for the sums claimed herein.

-3-

13-53846-tjt wr Doc 8986-1 Filed 01/01/15 Entered 01/01/15 21:46:43 Page 8 of 113
13-53846-swr Doc 4076-1 Filed 05/15/14 Entered 05/15/14 21:07:39 Page 5 of 40

# EXHIBIT 1 TO MICHIGAN AFSCME COUNCIL 25 PROOF OF CLAIM

| ISSUE NAME | DESCRIPTION |
|---|---|
| Underfunded pension and post employment benefit obligations | Based upon data from the City and elsewhere, it is projected that the pension and health care obligations of the City's active employees and retirees amounts, in total, to no less than $8.1 billion dollars. |
| Violations of local, state or federal law | Claimant asserts any and all claims arising from or related to every City breach of local, state or federal law, the orders of the Emergency Manager, or any other failure of the City or its agents to fulfill such legal obligations, to Claimant or its present or former members. This applies to legal violations impacting present or former union members for injury which has been, is presently or will be realized in the future. This applies whether or not such violations are identified herein. |
| Refusal to bargain AFSCME Local 1023: MERC Case Number D13 C-0331 | AFSCME Local 1023 is a public safety local, and therefore its bargaining disputes must be resolved with binding arbitration pursuant to state law, if so requested by a negotiating party. The state labor board, in another case, ruled that 2012 Public Act 436 denied binding arbitration to public safety locals. AFSCME Local 1023 was not a party to that case and filed its own request for negotiation assistance with the state labor board. Local 1023 maintains a claim for the City's unilateral imposition of employment conditions, prior to binding arbitration, and contends that the state labor board interpreted Public Act 436 in error (by, for instance, not properly accounting for the other state law which requires binding arbitration). |
| Local 207, 2394 and 2920 DWSD refusal to bargain / Case Number C13 D-069 | AFSCME water department locals were refused the opportunity to bargain a new contract, and incurred illegal changes in employment conditions. |
| Imposition of furloughs days in February 2013 | In February 2013, the City unilaterally imposed furlough days, in violation of its obligation to bargain with its unions. The City required employees to take unpaid days off work at least twice per month. These furlough days were realized through the bulk of the 2013 calendar year, causing significant losses in wages and benefits that would have been earned or accrued during the lost time. |
| Detroit refusal to bargain concerning Transportation Locals: Case Number C12 H-157 | The City has committed to bargain with AFSCME Locals 214 and 312. The members of these Locals work in the Detroit Department of Transportation. These locals, however, are part of a city-wide bargaining unit, as determined by Michigan courts. By refusing to bargain with the entire bargaining unit, but only select portions of the bargaining unit, the City is violating state labor law. Any changes in employment conditions realized by the entire unit – due to the City's failure to bargain – represent a claim. |

Ex 1 AFSCME Proof Of Claim – Pg 1

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 9 of 113
13-53846-swr   Doc 4076-1   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 6 of 40

Appendix 5

| | |
|---|---|
| AFSCME Council 25 (13th check ULP). MERC Case No. C12-E-092 | On about November 30, 2011, the City passed an ordinance which curtailed payments into employee annuity accounts and stopped "13th checks" being paid to retirees. By applying this change to union-negotiated benefits, the City violated state labor laws, by ignoring its bargaining obligation and repudiating its contractual obligations. An administrative law judge recommended a finding in favor of the Unions and estimated the award to be as high as $174,000,000. |
| City of Detroit 2012 negotiations and implementation with Coalition: MERC Case No. C12 D-065, C12 F-125, C13 G-129 | Following the negotiation of a Coalition tentative agreement in February 2012, the City violated state labor laws by refusing to execute that contract but illegally imposing other terms and conditions of employment. This includes wage and benefit concessions for all AFSCME members, which remain in existence today. The reader is referred to the Coalition of Detroit Unions Proof Of Claim, addressing the losses discussed therein. AFSCME's share of the Coalition proof of claim amount is in the range of 60% - 70%. |
| Violation of Privatization Ordinance | The City has repeatedly violated the City's Privatization Ordinance, prior to letting contracts to vendors to perform work normally performed by unionized employees. These claims are held by individual members of the Unions, as opposed to the union itself. Nonetheless, the claims seek all relief available to the employees under the law. |
| City of Detroit/DFFA/MERC: MERC Case No. C11 K-201 | The union filed an unfair labor practice charge concerning removal of work from the applicable bargaining unit. This change impacted the employees who had previously performed the work. |
| City of Detroit longevity claim for AFSCME employees: Claim number 12-000522 and 12-000523; Wayne County Circuit Court Number 13-003430-AA | Under the 2005-2008 AFSCME union contract, employees had received a yearly payment, in December, based upon the number of hours they worked since the previous December; receiving the full longevity payment for hitting 1600 hours. Effective October 2010, the City imposed new contract terms on AFSCME employees, which removed the longevity pay. However, many AFSCME members had already worked the 1600 hours since the December 2009, entitling them to full longevity pay. Further, for members who had worked less than the 1600 hour threshold, they were entitled to prorated longevity payments for hours worked in each month during that year. The City refused any AFSCME members longevity pay, despite the clear contractual obligation. AFSCME members filed claims with the state for this payment, and the City challenged the payments. The claims were initially denied by the administrative law judge, and placed on appeal before Wayne County Circuit Court. |

| | |
|---|---|
| Negotiation of Local 542 supplemental agreement: MERC Case Number C07 L-033 | MERC ruled that the City was obligated to negotiate a supplemental bargaining agreement with Local 542. Failure of the City to do so caused financial harm to members of this bargaining unit. |
| Detroit & SEMHA: MERC Case No. C05 H-194 | The charge was filed to protest the layoff of four individuals from the Detroit Health Department and rehiring of them by a Detroit contractor, to perform the same work. The charge alleged a violation of state labor law. In the process of the hearing (despite repeated appeals, ancillary litigation and cancelations), the Union learned of other positions for which this occurred. The charge sought back pay and benefits for those impacted employees. The Union lost dues for those laid off members as well. |
| **Grievance Claims** | |
| Breach of contract claims | Claimant asserts any and all claims arising from or related to every City breach of the Council 25 Master Agreement, local supplemental agreements, Council or local memoranda or letters of understanding, the imposed City Employment Terms, the orders of the Emergency Manager, or any other failure of the City or its agents to perform any contractual obligation to the Claimant or its present or former members. This applies to breaches impacting present or former union members for injury which has been, is presently or will be realized in the future. This applies to all such breaches, whether or not listed specifically herein. |
| Exhibit 2 Listing of Specific Grievances | Exhibit 2, attached to this Proof Of Claim, contains a listing of a number of specific grievances filed by AFSCME Council 25 local unions. While this is intended to be a list of all active grievances currently in existence, derived after diligent search, Claimant reserves the right to add to or otherwise modify the list of grievances, or the description of any grievance listed therein. |
| City of Detroit/Human Services department: Grievance No. 25-01-12 / COA: 12-0077708-CL | In July and October, 2012, approximately 174 AFSCME Locals 1642 and 457 members, working at the Detroit Health Department and Workforce Development Department, were permanently laid off and replaced with employees from third party companies. The arbitrator found the City's actions to be in violation of the union contract, and awarded back pay and benefits to the members. The arbitrator's decision, confirmed by Circuit Court, is now on appeal. |
| City of Detroit Retirees Health Care: Grievance No. C10 A-025 | In 2006, the City changed retiree health care benefits, requiring retirees to incur greater cost for health care. AFSCME filed a grievance on behalf of all AFSCME retirees (approximately 6,000), because the changes violated specific provisions of the union contracts under which the employees retired. |
| Payroll disputes | Repeatedly, the City of Detroit payroll system will not issue correct amounts of pay or benefits on payroll checks of AFSCME members. This problem has escalated over the years, resulting in significant losses of money and benefits for AFSCME members. |

Ex 1 AFSCME Proof of Claim – Pg 3

13-53846-tjt    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 11 of
13-53846-swr    Doc 4876-1    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 8 of 40
113

Appendix 7

| | |
|---|---|
| Detroit Service and Maintenance Outsourcing in Downtown Detroit: Grievance Number C09-078 | In 2009, the City reduced the overtime of AFSCME members, due to work performed by private contractors, in the downtown Detroit area. This violation of Article 19 of the AFSCME Master Agreement continued for years after the fact. The violations impacted 40-60 employees throughout the period. |
| Tree Artisan failure to secure license: Grievance Number 727May08 | Tree artisan employees in the AFSCME bargaining unit were discharged. The grievance was granted in that the City was required to pay for training and restore seniority to some employees. To the extent these benefits were not awarded, those employees have claims. |
| **TOTAL CLAIM AMOUNT** | **Not less than $8,718,697,854.82 (estimated)** |

Ex 1 AFSCME Proof Of Claim – Pg 4

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 12 of
13-53846-swr   Doc 4876-1   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 9 of 40
113

Appendix 8

# EXHIBIT 2

TRUE COPY

STATE OF MICHIGAN
MICHIGAN ADMINISTRATIVE HEARING SYSTEM
EMPLOYMENT RELATIONS COMMISSION

In the Matter of:

CITY OF DETROIT,
      Employer-Respondent,

    -and-

AFSCME COUNCIL 25,
      Labor Organization-Charging Party.

Case No. C12 E-092
Docket 12-000777-MERC

_____/

APPEARANCES:

Richard G. Mack, Jr, Miller Cohen, PLC,
for the Labor Organization-Charging Party

Letitia C. Jones, Assistant Corporation Counsel,
for Respondent-Public Employer

## DECISION AND RECOMMENDED ORDER
## OF ADMINISTRATIVE LAW JUDGE
## ON SUMMARY DISPOSITION

Pursuant to the Public Employment Relations Act (PERA), 1965 PA 379, MCL 423.201, *et seq*, as amended, this case was assigned to Doyle O'Connor, Administrative Law Judge (ALJ) of the Michigan Administrative Hearing System, acting on behalf of the Michigan Employment Relations Commission (MERC). The following findings of fact, conclusions of law, and recommended order are based upon the entire record:

### The Unfair Labor Practice Charge:

On May 10, 2012, a Charge was filed in this matter by AFSCME Council 25 (Charging Party) against the City of Detroit (Employer or Respondent). The Charge alleged that the Employer had violated PERA by unilaterally altering an established condition of employment. The Union alleged that the City had adopted an ordinance on November 30, 2011, which materially altered the handling of certain retirement benefits. Specifically, the Charge alleged that the long-standing agreement between the parties was that the annual rate of return on employees

1

annuity retirement accounts was essentially guaranteed by the City at a rate of 7.9%, with excess earnings flowing directly to employee accounts, and with any shortfalls covered by the City. The Unions asserted that changes implemented pursuant to the new ordinance adversely affected the approximately 2,600 individuals represented by AFSCME. The Union's contract with the City was alleged to have run from January 2011 and to have been set to expire June 30, 2012.

The Charge asserted that the new ordinance change was implemented without bargaining with AFSCME, during the term of an existing contract, and was therefore unlawful. It was asserted, and ultimately not disputed, that the contract expressly provide that "*all retirement and pension plan provisions provided for by the City Charter and·Municipal Code are incorporated herein by reference unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133*". Under the prior Ordinance, excess pension earnings were allocated by the General Retirement System (GRS) Board to further fund employee annuities and to provide for a reserve fund to pay for the issuance of "13th checks". The City filed a response in which it acknowledged that the City Council had substantively amended the pension Ordinance, but denied that its unilateral actions were unlawful.

The matter was scheduled for trial on July 24, 2012, with that date adjourned by mutual consent, with a new trial date of November 14, 2012. Shortly before the trial date, an Amended Charge was filed, and the Employer requested and was granted an adjournment of the trial. The Amended Charge added allegations that a portion of the excess earnings had been utilized by the General Retirement System's Board of Trustees to fund a hedge against inflation for retirees in the form of a "13th Check" issued annually. The amount of the annual allocation of excess earnings, if any, was calculated by the Trustees pursuant to an established formula. It was alleged that, but for the November ordinance change, individual retirees would have received a 13th check in December 2011 and again in 2012.

A pre-trial conference was held on December 6, 2012. The parties concurred that there were no material disputes of fact and that proceeding on summary disposition would be appropriate. The Union's motion for summary disposition was filed on December 28, 2012, with the City's response and cross-motion for summary disposition filed on January 25, 2013. Oral arguments were heard on February 8, 2013, with a bench opinion issued in the Union's favor. After the hearing and issuance of the bench opinion, the parties sought and were granted the opportunity to file supplemental briefs on the question of relief and regarding an intervening appellate decision. The Union's supplemental

2

brief was filed on June 24, 2013, with the City's supplemental brief filed
July 15, 2013.

Subsequent to the supplemental briefing by the parties, Detroit
was placed in receivership under State law and an emergency manager
with extraordinary powers was put in charge of Detroit's affairs, in place
of its elected officials. A bankruptcy filing followed shortly; with its
attendant automatic stay of most, if not all, other litigation involving
claims against the City. In deference to the bankruptcy proceeding, the
bench opinion in this case was not followed by the issuance of a formal
decision, as it ordinarily would have been. The multiple City of Detroit
related proceedings pending before MERC, and before the several
Administrative Law Judges, have all been held in abeyance. This
occurred both in deference to the automatic bankruptcy stay and in
recognition of the obvious fact that with the appointment of an
emergency manager, of a term of uncertain duration, with the attendant
suspension of any bargaining obligations, the subsequent bankruptcy
filing, it is apparent that the nature of the relationship of the parties,
their collective bargaining disputes, and their respective positions on
myriad issues will be materially changed and the dormant pending
litigation, and the relief sought therein, will all likely be moot.

<u>Discussion and Conclusions of Law</u>:

Counsel for the parties appeared for oral argument on February 8,
2013. Preliminary to the oral argument, I stated on the record my
understanding of the position of the parties, as set forth below:[1]

JUDGE O'CONNOR:

We're here on cross motions for summary judgment. I
have reviewed the pleadings. I have a couple introductory
comments.

The Union's motion for summary disposition in this case
relates to the adoption of a new City ordinance which
prohibited [certain actions by] the General Retirement
System Pension Board, GRS Board, which handles pension
questions for all City employees or virtually all City
employees other than police and fire. The ordinance
prohibited the Board from granting a rate of return on
annuities greater than the actual return, and which had the

---

[1] The transcript excerpt reproduced herein, which to aid clarity is set off in an alternate font, contains
typographical corrections and other non-substantive edits for clarity purposes. Insertions of explanatory text
are bracketed. The completed unedited transcript is maintained within the Commission case file.

3

apparent impact of precluding the issuance of the 13th checks to retirees[2].

The Employer has responded and asserted its own cross motion for summary disposition. There's no dispute over the fact that a changed ordinance was adopted in November of 2011 and that a timely charge was filed. There's likewise no dispute over the fact that the terms of the pension plan are mandatory subjects of bargaining, which the City concedes in its brief.

It's alleged, and seemingly undisputed, that in November 2011 the City adopted a pension ordinance to be effective December 20, 2011 which altered certain prior practices of the Pension Board. That change occurred without bargaining and during the term of an existing collective bargaining agreement. That existing collective bargaining agreement incorporated by reference the prior version of the pension ordinance and City charter provisions.

Based on the pleadings, I have relied on several documents which both advocates also relied on, and I will denominate [those documents] as exhibits.

As I understand it, the Union's assertion is that the change was an unlawful unilateral change in an existing condition of employment, and a repudiation of the then in place collective bargaining agreement. The Union's motion is additionally supported by a facially competent affidavit.

The City earlier asserted the defense that the question of the Pension Board's exercise of discretion in the distribution of excess earnings was not an established condition of employment, and rather was in essence an ultra vires act by the Board. The Union addressed that assertion at least in part by its reliance on the decision in *AFSCME et al v Detroit*, 218 Mich App 263 (1996), in which the City

---

[2] The 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system which created dedicated funding streams to provide an annual bump which while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

4

Appendix 12

prevailed. In that case, the City had sought a similar change regarding distribution of excess earnings; in that case via charter amendment, and according to the Court, the City acknowledged at the time that no such change could actually be implemented without first bargaining because the then current system of distribution of earnings was an established condition of employment. [Such a legal concession by the City in 1996 was regardless mandated by the earlier holding in *Detroit Police Officers Ass'n v Detroit*, .391 Mich 44, 54-55 (1974), which expressly held that while the City could change its pension ordinances, or Charter, as the City Council saw fit, changes to existing retirement benefits could not actually be implemented without fulfilling bargaining obligations.]

As both parties are presumably aware, the wisdom of the prior practice and the wisdom of the ordinance change are not issues before me for review. The only question before MERC is whether a change in mandatory [subjects of bargaining related to] conditions of employment was implemented in an unlawful manner. Similarly, the wisdom of the Court of Appeals decision in 1996 is not before me. It's a published decision involving these same two parties.

After considering the pre-hearing briefs and extensive arguments of both parties, I concluded that there were no questions of material fact and that a decision on summary disposition was appropriate, as urged by both parties, pursuant to Commission Rule R 423.165. See also *Detroit Public Schools*, 22 MPER 19 (2009) and *Oakland County and Oakland County Sheriff v Oakland County Deputy Sheriffs Assoc*, 282 Mich App 266 (2009). Accordingly, I rendered a bench decision, with the substantive portion of my findings of fact and conclusions of law from my bench opinion set forth below:

**JUDGE O'CONNOR:**

I am prepared to issue a bench opinion, which will be followed by a written decision.

I find that this case is controlled by the indistinguishable decision in the 1996 published Court of Appeals decision involving these same parties, AFSCME and Detroit. It is further controlled by judicial estoppel where the City

5

prevailed in that case by asserting the very thing they deny today, and that is the City, in the '96 case as recounted by the Court of Appeals conceded, as it must have done under the then existing law, that regardless of charter provision or any change to it, regardless of ordinance or any change to it, the City could not unilaterally change aspects of the pension plan without bargaining first with the Union.

The City today acknowledges in its brief its duty to bargain, but then asserts to the contrary, there was no duty to bargain under 2011 PA 4, which I'll address later.

The City never addressed, either in oral argument or its brief, the impact of the clearly controlling published decision between these same two parties. I find that shocking and troubling that it wasn't even addressed, because it is so clearly controlling.

The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment the very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change. The [difference between a charter amendment and an ordinance change] is not a distinction [which would alter the statutory duty to bargain].

[In the 1996 case, the Court of Appeals found that the City sought to change the City Charter to: *require so-called "excess earnings" prom pension investments to be allocated among certain pension benefit funds in proportion to each fund's percentage of total system assets, with the remainder to be credited to the fund contributed to by the city, thereby reducing the city's future contribution obligations. This revision would limit the discretion exercised under the current charter by the pension board of trustees to allocate excess earnings among the several pension funds in its sole determination"*. The 1996 charter amendment effort was therefore functionally indistinguishable from the 2011 ordinance amendment in the goal of diverting funds from benefiting employees and

6

into the City coffers while taking away from the trustees the discretion to allocate funds to pay out the 13th checks. In the 1996 decision, the Court, in denying AFSCME relief, expressly relied on the City acknowledgment that it could not unilaterally accomplish that goal by charter amendment.]

Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual--an assertion I find frivolous given the prior litigation, given the City's concession in the prior litigation that it was an established prior practice. It's also -- I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter[3], which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocated by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. [The contractual reaffirmation of the obligation included] the 2008-2012 agreement which was initially unilaterally imposed on the Union and then expressly acquiesced [in] by the Union which incorporates by reference the very pension ordinance that the City [has now] sought to unilaterally change. It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

Then — in 1996 that is -- and now, [until] the change in 2011, the excess earnings have always been allocated at the discretion of the Pension Board. The Board, as set forth in the City's exhibits, allocated the so-called excess earnings, that is earnings above a projected target rate of

---

[3] Letter of November 2011 from Irvin Corley, Jr., director of the City Council's fiscal analysis division to the City Council.

7

return, to essentially three different funds; the retiree 13th check; secondly to supplement the holdings in individual employee annuity funds; and third to reduce the City pension contribution. The Esuchanko charts which the City submitted made clear that in each and every year where there were excess earnings the Pension Board allocated them amongst those three funds at the Pension Board's discretion and in roughly comparable amounts each time.

There was no dispute even in 1996 that the practice had been longstanding. It's obvious that the City's preference, for understandable reasons, was to change that practice. It attempted to do so unilaterally in 1996 and again in 2011. As I said, I see no distinction between the City's unilateral effort to change it by pension ordinance or by charter amendment. In each case, as the City rightly conceded in 1996, regardless of a change to those ordinances or charter provisions, the duty to bargain remained.

In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, *"Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining"*. [The 1996 decision further found that the City did not dispute *"plaintiffs' contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining".*]

The City's concession in 1996 that there was a duty to maintain these precise conditions of employment absent bargaining was correct under the law then, and remains correct under current case law interpreting PERA. Regardless, I would otherwise find the City bound by *res judicata* and by collateral estoppel by that 1996 decision involving these two parties before me today on that same mixed question of fact and law.

It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, *"We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance,"* and the Michigan Supreme Court said,

8

Appendix 16

"You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

[The City was] right in 1996 in acknowledging that they had to bargain before they could make a change, and it's not just wrong, but frivolous today to argue otherwise.

The City adopted the change disputed in this case by not just amending a pension ordinance. It's undisputed that after the [2011] pension ordinance was adopted, the City unilaterally implemented that change, unlike the position the City took in 1996, which was that they needed to change the charter, and that even if the charter were changed, which has a higher status than a pension ordinance, the City acknowledged they would still not be able to implement the change until they bargained with the Unions over it. Here the City threw out that concession and actually implemented the change without bargaining.

It's undisputed and supported by affidavit submitted by the Union and not contradicted by the City, that in each year in which there were excess earnings, the Pension Board allocated those earnings, then divided the monies as I've described into three separate pots, essentially; part to reduce the City's contribution under the defined benefit plan, part to the 13th check, and part to the annuity accounts. The Corley and Esuchanko documents submitted by and relied on by the City unequivocally establish that the practice was consistent and of longstanding.

Again, the 1996 Court of Appeals decision alone would have regardless established [that] this process was an established condition of employment. If it existed in 1996 and still existed in 2011, it's an established condition of employment.

The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking. [In *DPOA*, the Supreme Court allowed the unilateral change to stand,

9

because the law had been uncertain in 1973, but the Court expressly cautioned the City that it must bargain over any future changes to the pension. Quite literally, the Supreme Court ruled that because the law had been unclear, the City could get away with a unilateral change to the pension plan that one time, but to not ever try it again.] The City's conduct [here] was unlawful and constitutes a refusal to bargain in good faith by unilaterally changing an existing condition of employment as to active employees.

Additionally, the City's conduct occurred at a point in time when the parties had in place a negotiated collective bargaining agreement. This is really the second half of the charge, and it's subject to a separate analysis.

That binding collective bargaining agreement expressly incorporated by reference the prior version of the pension ordinance and charter provisions, and taking judicial notice, was negotiated in the context of both parties understanding and being aware of the 1996 Court of Appeals decision on this very topic as they were both parties to that case. They can't deny knowledge of it having previously litigated the very dispute that we're here on today.

The law, the case law, and PERA did not change in any relevant aspect between the 1996 decision by the Court of Appeals and the 2011 action by the Employer.

The City had and has no colorable claim that it did not face a clear and binding contractual obligation to keep in place the preexisting and previously litigated method of allocating excess earnings. As such, the City's conduct further constituted an unfair labor practice as it was an unlawful repudiation of the binding 2008-2012 collective bargaining agreement, which obviously was still in effect at the point of the November 2011 pension ordinance change.

Union Counsel appropriately cited to the ATU past practice case [*Amalgamated Transit Union v SMART*, 437 Mich 441 (1991)] and the line of cases following ATU. This was, I think, beyond a tacit agreement, but it was at minimum a tacit agreement. A practice that continues for three decades is a tacit agreement. A practice where the City has previously sought a charter amendment unsuccessfully to

10

end the practice is, at minimum, a tacit agreement. I think, frankly, it rises to the level of an express agreement where the parties, having previously fought over the terms of the charter and the pension ordinance, then incorporate them by reference in the collective bargaining agreement.

The City's sole proffered defense really was, in its brief, that the financial stability agreement entered into under 2011 PA 4 suspended the duty to bargain.[4]   [At oral argument I strongly suggested to the City that such an argument was inapposite based on the timing of relevant events. Subsequent to the bench opinion, the City sought and was granted leave to withdraw that issue and argument from contention.]

The City has further raised the question of AFSCME's standing to represent already retired, former employees. The City is incorrect in its assertions that the case law cited provides that AFSCME former employees who are retirees are not members of AFSCME. They may well be, they may not be. Its individual-- some retirees continue to belong to unions, some don't. They are, however, no longer part of the bargaining unit. The City was correct to that extent.

It is axiomatic that neither the Employer nor the Union can demand to bargain over changes in conditions affecting already retired former employees.   It doesn't alter the Union's claim as to the impact on active employees who were promised that the Pension Board would have the discretion to allocate certain funds, excess earnings, to their annuity accounts and were promised that upon

<hr>

[4] Effective March 28, 2013, the Local Financial Stability And Choice Act, (LFSCA), PA 436 of 2012, MCL 141.1541 *et seq.* was enacted by the Legislature for the stated purpose of placing financial checks and balances on public employers in a state of financial stress or emergency. As part of that statutory scheme, the Act authorizes the state treasurer to enter into a consent agreement with a local government in a state of financial stress or emergency for a period necessary to achieve the goals and objectives of the agreement. Section 8(11) of the LFSCA suspends the duty to bargain set forth in Section 15(1) of PERA for employers subject to a consent agreement, including consent agreements entered into pursuant to the Act's predecessor, Public Act 4 of 2011. Similarly, Section 27(3) of the LFSCA provides that a local government placed in receivership under the Act is not subject to Section 15(1) of PERA for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first. For purposes of the LFSCA, "receivership" means the process under the Act by which a financial emergency is addressed through the appointment of an emergency manager. MCL 141.1542(q). No provisions of that Act applied to Detroit at the time of the adoption or implementation of the disputed ordinance.

11

retirement they would be eligible for 13th checks to the
extent that there were excess earnings above the
[projected rate of return].

As I said, there's no duty to bargain over changes in
conditions affecting already retired former employees.
However, that doesn't fully answer the question in this
case. The parties may, of course, voluntarily enter into
negotiations over permissive subjects of bargaining. The
question of possibly raising a pension benefit for people
who already are retired is a permissive subject of
bargaining. It's not prohibited. The parties can, if they
choose to, negotiate over it.

Here the Union has not sought as relief any demand over
any right to bargain as to former employees. Rather the
Union is seeking to enforce the Employer's obligation to not
make unilateral changes in promises that had already been
made and were still in effect, both [as to] the current
employees regarding their entitlements once they retire,
which is a perfectly ordinary mandatory subject of
bargaining, and as to individuals who were part of the
bargaining unit and since retired.

The Union is asserting, and I have found the Employer in
implementing unilaterally the changes to the pension
ordinance and cutting off the 13th check, has repudiated .
the terms of an existing collective bargaining agreement.
Under PERA, the repudiation of the clear, undisputed terms
of an existing contract is more than a mere contract breach
which would otherwise be left to the grievance procedure or
circuit court suit over damages or whatnot. Rather it's
treated as a refusal to bargain in good faith and is therefore
an unfair labor practice even if related to a permissive
subject of bargaining over which there was necessarily no
duty to bargain as in the Commission decisions in the
*Kalamazoo County Sheriff* case [*Kalamazoo County &
Sheriff*, 24 MPER 17 (2010] where the Commission held
that where there is a mixed question, a collective
bargaining agreement that covers both mandatory subjects
and permissive subjects, the package is the package. It's a
single package. Neither side can unilaterally carve it up
into pieces and say, *"We'll comply with one piece. We
won't comply with this other piece,"* unilaterally and without

12

violating the duty to bargain. Once a contract has been reached, it must be treated as binding on both parties, as the Commission held in *Kalamazoo County Sheriff*, or the possibility of productive future bargaining is destroyed.

I will be recommending the restoration of the status quo by restoring to the Pension Board the discretion it previously exercised, by the City being ordered to not interfere in the exercise of that discretion by the Pension Board regarding excess earnings, that the Retirement Board be notified by the City of the restoration of their preexisting discretion, that affected retirement plan participants, both active employees and retirees, be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants whole otherwise.

The most practical resolution may be for the Pension Board to reallocate those assets. Either way, it is ultimately the obligation of the City to correct the problem it caused by its unilateral action which, again, was taken in direct rejection of the obligations it conceded that it had in the 1996 litigation.

I will recommend a posting of a notice at the work places to reaffirm for active employees that the contractual promises made to them must be kept.

***

[In response to a question from counsel] Well, what I've indicated I intend to order is that the *status quo* be restored, the steps that I'll be recommending be ordered are that the City restore to the Pension Board the discretion previously exercised, specifically that the City notify the Pension Board that the discretion has been restored. The Pension Board will have to act based on that discretion and determine what they think is necessary to put back together what would have otherwise happened. And the Pension Board has a prior history as laid out by Corley and Esuchanko of how they typically did that, but it is within the discretion of the Pension Board how precisely they do that. . . my expectation is that the first level response will be by the Pension Board just using their discretion to decide what they think should happen.

13

What I propose to order is that to the extent that there's any practical impediment to the Pension Board making the participants whole, it will be upon the City to make the participants whole.

In my bench opinion, I failed to address a part of how this controversy arose, which I found inexplicable. Before it adopted the November 2011 ordinance changes, the City Council had before it an advice memo from the corporation counsel's office on which presumably they were intended to rely. That memo, which was introduced in the record in this hearing at the behest of the City, has a section titled *"Labor Law Considerations"*. The memo acknowledges that the benefits were calculated and paid out in an unaltered fashion for decades. The memo inexplicably asserts that the benefits were not "bargained" for, but the memo fails to ever address the *DPOA v Detroit* 1974 decision, which established as a matter of first impression the obligation to bargain over the implementation of any legislated changes to the detailed provisions of the Detroit pension plan. Likewise, the memo fails to address the impact of, or even advise the Council of the existence of, the 1996 *AFSCME v Detroit* appellate decision in which the City prevailed expressly premised on the City's acknowledgment that it was aware that it could legislate changes to the pension plan, but that it could not implement those changes without bargaining. That the City Council acted on such an advice memo does not excuse their conduct; nonetheless, that such a fundamental matter was decided on by the Council in the absence of a review of the directly controlling law, including two directly relevant appellate cases wherein the City was the defendant, is troubling.

Further, the Corporation Counsel advice memo to City Council has, as a starting point, the 1997 Charter amendments adopted by the vote of the City electorate. An analysis was offered that the excess earnings distribution system was not "specifically authorized" in the 1997 Charter provisions regarding the pension plan. What is entirely omitted from the analysis is the occurrence of the 1996 decision of the Court of Appeals in *AFSCME v Detroit*, supra, and its sequelae. The proposal that would become the 1997 Charter initially included a provision, offered by the City administration, which would have ended the excess earnings distribution system and turned over that funding stream almost entirely to the City. The Wayne Circuit Court enjoined the Detroit Charter Revision Commission from including the disputed "excess earnings" related proposed Charter revisions in the ballot proposal which passed on August 6, 1996, and which became the 1997 Charter for the City. The Corporation Counsel memo relies on the Charter as adopted in August 1996.

14

In ignoring the decision in *AFSCME et al v Detroit*, the City likewise ignores the fact that the Court ruled just one week after that August 1996 election, finding that the injunction regarding the disputed Charter provision on excess earnings was improvidently granted, and allowing the disputed provisions to be placed before the voters in the election of November 1996. At that election, the electorate of the City, at a point in time when they still had a seemingly effective right to vote on such matters, voted down the specific proposal to shift the "excess earnings" away from deferred compensation for employees for the benefit of the City, and rejected the Charter amendment. Notwithstanding that express voicing of the will of the electorate, the 2011 ordinance amendment by the City Council, without so much as a nod of recognition, sought to mandate exactly what the voters had prohibited.

The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13th checks amounted to a gift, a gratuity, or a bonus. They were not.[5] In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It was replaced by concepts such as the 13th check system, which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but the annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded, consistent with the earlier decision in *DPOA v Detroit*, that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

---

[5] The reference to retirement obligations for public employees as "gratuities" is not without historical precedent, *albeit* not supportive of the City's position. In *Bowler v Nagel*, 228 Mich 434 (1924), the Court specifically rejected Detroit's assertion that amounts paid from retirement funds were "gratuities". However, in *Brown v Highland Park*, 320 Mich 108 (1948), the Court faced a financially beleaguered city and held that, despite *Bowler*, such pension obligations were not individually enforceable "contractual" obligations in nature, such that the City of Highland Park could cut the widows of police and firemen off from their pensions, by the expedient of a Charter amendment, without offending State law or the Federal Constitutional impairment of contracts clause. Outrage over the impact of that decision helped lead to the 1963 Constitution, which in article 9, section 24, put the theory to rest and defined such public pension benefits as Constitutionally protected entitlements. The same Constitutional Convention adopted article 4, section 48, which authorized the creation of PERA, the unionization of public employees, and the negotiation of enforceable collective bargaining agreements.

15

Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13th checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.[6]

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining, and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

It is also notable that the advice memo upon which the City Council relied was itself substantially premised on a favorable reading of the then quite recent Wayne County Circuit Court decision in *Wayne County Retirement Commission v Wayne County*, Case No 10-013013 (Hon. Michael Sapala, September 29, 2011). In that case, at the trial level, relief was granted to Wayne County in a similar dispute over the

---

[6] The 2008-2012 terms were held to be a binding and voluntary collective bargaining agreement between the parties, which fulfilled their bargaining obligations for the period 2008-2012, in *City of Detroit and AFSCME, Case No. C10 L-295*, (ALJ Peltz, August 2012)(on exceptions).

16

Appendix 24

distribution of excess earnings from its pension fund, and in which Wayne County, via a comparable ordinance amendment, seized some $32 million from its employees' pension funds. It is certainly understandable that such a transfer of wealth seemed attractive to both the City and County; however, the Circuit Court decision · was subsequently reversed· in *Wayne County Retirement System · v Wayne County*, 301 Mich App 1 (2013), with the County ordered to restore the funds to its pension plan. Like the City's own legal counsel's memo, the Sapala decision reviewed both Constitutional and Charter issues, but ignored the well-settled labor law implications of such unilateral actions by Employers who are subject to bargaining obligations.

## The Post-Bench Opinion Supplemental Pleadings

As noted above, after issuance of the bench opinion, the parties sought and were granted an opportunity to provide supplemental briefing on· the question of relief and on the impact of an intervening appellate decision. AFSCME proposed several refinements to the scope or nature of the intended relief that I had described in the bench opinion.

AFSCME began by noting the substantial uncertainties inherent in attempting to restore the *status quo* in a dispute of this nature which goes well beyond the ordinary order of reinstatement of an employee with backpay. Pointing to the decision in *MSU Clerical Technical Union v MSU*, 214 Mich App 42 (1995), a case in which MERC was reversed for a failure to provide a full measure of relief, AFSCME understandably and correctly notes that the burden of uncertainty as to the amount or extent of a remedy awarded should be upon the wrongdoer and not upon the prevailing claimant. In my bench opinion, it was indicated that what was intended was a full make whole remedy, and that the first step response would be to restore to the pension board its proper freedom to exercise its discretion. I also noted from the bench that all of the parties, and the pension board, are aware of and capable of calculating and addressing the average prior annual payouts, and the basis·on which they were in turn calculated, should this case ever reach the remedy stage.

Specifically, AFSCME proposes that I direct that the excess earnings be premised on a specific averaging of the percentages used over a multiple year period to divide up the money among the three recipient funds. AFSCME notes, based on the City's own figures, that going back for an eleven year period, the total excess earnings were divided so that the active employee share averaged 55% annually, while the amount devoted to the 13th checks averaged 17% annually of the total fund, with the remaining 28% going to the City itself. While such a mechanism is plausible, the City unsurprisingly faults AFSCME for selecting a specific period of years, rather than a longer period of time.

17

Appendix 25

The City offers no alternative method of calculating the remedy, proposing instead that I revisit the merits and deny relief, a suggestion which is hereby rejected.[7]

Neither party has proposed, in their supplemental pleadings, a dollar figure for the relief. This very omission underscores the fundamental uncertainty of the amount which would be necessary to afford make-whole relief. In their arguments for summary disposition, both parties relied on the November 2011 memo from Irvin Corley, Jr., director of the City Council's fiscal analysis division, which provided specific advice to City Council regarding the prior handling of the excess earnings distribution system. In that memo, which was introduced in the record by the City, Corley provides dollar figures which were not placed in dispute. For 2008, the last year Corley analyzed, the excess earnings distribution was $121,100,000. With approximately 72% of that money going for the benefit of the employee deferred compensation system, and the remaining 28% going for the City's benefit, the amount distributed for the benefit of employees was $87,120,000 for that one year. Pursuant to its new ordinance, the City withheld the payments which otherwise would have been made in 2011 and 2012. The record does not reflect the amounts earned and paid out in 2009 and 2010. If one made the enormous assumption that the excess earnings, if any, which would have been the basis for payments in 2011 and 2012 were in any way comparable, the City would need to reserve something on the order of $174,240,000 to satisfy claims. It is entirely unwarranted at this stage of the proceedings to order the reservation or payment of such a sum, which absent agreement of the parties on a specific amount, will require proofs as to what amount of gross excess earnings were generated relative to the withheld payments for 2011 and 2012. No relief can be ordered as to 2013, as the appointment of an emergency manager suspended the duty to bargain and thereby the enforceability under PERA of such obligations.

AFSCME's post-hearing suggestion that the remedial order direct payment based on some averaging of prior payments merely restates the obvious suggestion made in the bench opinion of a benchmark method for assessing compliance, when and if the question becomes relevant. Parties frequently find themselves successfully agreeing upon appropriate make whole remedies post-judgment in MERC cases, whether by compromise, rough estimate or with mathematical certainty. Failing at that, the statute and Commission Rule R423.177 provide for post-judgment compliance proceedings which are fully capable of resolving the question of the calculation of necessary payments, should

---

[7] Incredibly, the City's supplemental post-judgment brief persisted in aggressively ignoring the controlling 1974 *DPOA v Detroit* and 1996 *AFSCME v Detroit* decisions.

18

this dispute reach that stage. That Rule would require Charging Party to
file a detailed specification of amounts claimed, with Respondent
required to promptly respond with equal specificity. The parties are
obviously far from a terminal point in this litigation and it would require
an unwarranted degree of speculation upon speculation to attempt, at
this stage, to engineer a more specific directive regarding relief.

AFSCME next raises a concern with the real possibility that, when
and if this dispute resurfaces, the composition of the pension board of
trustees may well have changed, either through the mere passage of time
or through direct action by the emergency manager utilizing his
extraordinary powers. The prospect is very real that the remedial order
restoring discretion over the funding decision to the pension board may
well place it in the hands of a new cast of characters, which may well
have been selected in whole or in part by the emergency manager. While
a legitimate concern, this is, at this point, speculation which cannot be
addressed in a mere recommended remedial order. Again, regardless of
who might constitute the pension board when, and if, this matter ever
returns to them, there remain the compliance procedures to resolve
disputes over implementation of any relief ultimately ordered.
Regardless, it is implausible to suggest that this Agency could or should
attempt to prospectively reconfigure the membership of an elected
pension board.

Finally, despite noting in its supplemental pleading the intervening
appointment in 2013 of an emergency manager, AFSCME proposes that
the remedial order direct the City to bargain with the Union and to
refrain from making any further changes in conditions until fulfilling its
bargaining obligations. The City of course opposes such relief, which
would be an ordinary portion of a standard MERC remedial order. The
appointment of an emergency manager, under recently adopted Michigan
law, suspends the obligation to bargain and with it, the obligation to
maintain conditions of employment. The emergency manager is free to
bargain with AFSCME, but cannot, under PERA, be compelled to do so,
nor can the City be compelled, under PERA, to maintain pre-existing
conditions of employment.

In its supplemental pleadings, the City, equally and similarly
implausibly, proposes that I re-visit the question of summary disposition
and dismiss the Charge. The City makes that request without, as noted
above, any substantive discussion of the 1974 *DPOA v Detroit* and 1996
*AFSCME v Detroit* decisions. The City grants a mere nod to the existence
of the decisions, placing the citations in footnote, *sans* discussion. The
request for reconsideration of the substantive decision as issued from the
bench is denied.

19

The City suggests, again, in its supplemental pleadings, that the matter should have been arbitrated. That suggestion was first made by the City in its first responsive pleading in September 2012, by which point the 2008-2012 collective bargaining agreement between the parties had been expired for months. Therefore, arbitration was not available. MERC does leave the parties to their available contractual remedies when there is a *bona fide* dispute over the interpretation of the parties' collective bargaining agreement and arbitration is available. Here, there was never a *bona fide* good-faith dispute over the question of the contractually mandated benefits, or over the right of either party to unilaterally abandon or modify its own obligations. There is no question amenable to arbitration here, as the City has repudiated its obligations rather than asserted a good faith dispute over some detail of its duties. The Commission will not find repudiation on the basis of an isolated breach, *Crawford County Bd of Comm'rs*, 1998 MERC Lab Op 17, 21; however, here the deferred compensation benefit cut applied across the board to the entirety of the AFSCME unit. The cut was indisputably unilateral and occurred during a period when a collective bargaining agreement was in place.

The City proposal to the Commission to remand the matter to arbitration is merely a tactic intended to avoid substantive and effective review or remedy. The Commission has the authority to interpret the terms of a collective bargaining agreement where necessary to determine whether a party has breached its collective bargaining obligations. *University of Michigan*, 1971 MERC Lab Op 994, 996, citing *NLRB v C & C Plywood Corp*, 385 US 421 (1967). If the term or condition in dispute is "covered by" a provision in the collective bargaining agreement, and the parties have agreed to a grievance resolution procedure ending in binding arbitration, the details and enforceability of the provision are generally left to arbitration, but only where there is a good faith dispute as to the nature of the contractual obligation. *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich. 309, 317-321 (1996).

Here, there is no good faith dispute over the parameters of the Employer's obligations; rather, the City seeks to instead unlawfully reject its existing obligations contrary to its then-existant duty to bargain. Where such repudiation has occurred, the Commission is prohibited, by prior decision of our Supreme Court, from deferring to contractual arbitration and must instead enforce the statutory obligations on behalf of the people of the State. See, *Detroit Fire Fighters Ass'n v. City of Detroit*, 408 Mich. 563, 676 (Mich 1980).

Moreover, the City's asserted defenses are statutory and Constitutional rather than contractual and are not within the purview of

20

a private arbitrator. An arbitrator is not specially suited to resolve the dispute about the interplay between collective bargaining agreements, ordinances, City Charter provisions, and PERA bargaining obligations. The complexity of those very issues so vexed the Michigan Supreme Court in 1974 that it found the unilateral pension changes made by Detroit to have been improper, but gave the City a free pass for that event, while cautioning it to never similarly violate its bargaining obligations via charter or ordinance amendment. See, *DPOA v Detroit*. This is not a proper case for review by an arbitrator.

In its supplemental brief on remedies, the City raised the intervening decision of the Michigan Supreme Court in *Macomb County v AFSCME Council 25, ___Mich___* (No. 144303, June 12, 2013).[5] In that case, the Court reversed MERC in its earlier finding of a violation where Macomb County, acting through its retirement board, altered a long standing reliance on a particular actuarial table used to calculate benefits, to the disadvantage of some retirees. The decision functioned primarily to return the Commission to a closer hewing to the standard provided under *Port Huron Education Ass'n v Port Huron Sch Dist*, 452 Mich 309 (1996).

In *Macomb County*, at the MERC ALJ level, no violation of the statute was found. The Commission decision reversing ALJ Stern was in turn ultimately reversed by the Supreme Court. The grounds prove not relevant to the present matter. The Supreme Court found the underlying collective bargaining agreement in Macomb to be unambiguous and that it expressly provided discretion to the retirement board to make the challenged change in mortality tables. The Court held that MERC had erred by relying on a past practice, albeit of several decades duration, of using the same actuarial table as a basis for finding an unlawful unilateral change, rather than respecting the unambiguous language of the contract which, even if long unused, expressly allowed the retirement board to make the change in mortality tables.

The Court in *Macomb* reaffirmed the right of parties to rely on their agreements, as held in the earlier *Port Huron* case, the holding of which remains controlling law. Here, the finding of a violation is not based on any asserted past-practice; rather the unambiguous language of the then recently re-negotiated contract between the parties supports a finding of a repudiation. The parties here expressly provided for a particular benefit to be funded and disbursed in a particular manner. Their agreements were memorialized both in contract and in ordinance. The City Council

---

[5] While AFSCME sought to strike the City pleading as having gone beyond the leave granted to file a supplemental brief on the issue of remedies, I determined that the raising of intervening appellate authority was proper.

21

acted unilaterally in passing and then enforcing an ordinance to unilaterally take away a negotiated benefit. The *Macomb* decision affirms rather than detracts from the enforcement of rights as to an unambiguous agreement.

A portion of the *Macomb* decision re-affirmed earlier case law requiring MERC to refer back to arbitration disputes "covered by" a collective bargaining agreement which had in it an arbitration clause where there was any colorable claim that the complained of conduct was allowed under the contract. The Supreme Court held that such disputes are for arbitrators, not the Commission, to decide. Here, the "covered by" analysis is inapposite for two separate reasons. First, there was no contract in place when this Charge was brought and no arbitration clause to which the parties could defer to. Second, as more fully discussed above, the City simply advanced no arguable basis under the prior ordinance or several collective bargaining agreements which could excuse its conduct. Simply, no plausible contractual defense was proffered. Rather, the Employer here advanced statutory and Constitutionally based defenses which, as noted above, are not amenable to resolution by a private arbitrator.

Moreover the City's theory would turn the *Macomb* decision on its head. In *Macomb*, the Court found that the contract language expressly granted the retirement board the discretion to make certain decisions, and the retirement board made such a decision well within its established discretion. Here, the unilaterally imposed new ordinance took away from the pension board the discretion which the parties had expressly agreed the pension board alone would wield.

### The Bankruptcy Court Related Developments

On the petition of AFSCME, and at 2:41 PM on October 2, 2013, the Bankruptcy Court issued an order which in relevant part provided that the automatic stay was *"modified through 11:59 PM on October 4, 2013 to permit Administrative Law Judge Doyle O'Connor to execute his recommended decision"* in this pending case. While this Decision is being released consonant with the Bankruptcy Court's partial lifting of the stay at AFSCME's request, and with full consideration of the significant claims of the parties, its release may well offer little more solace than a an assurance of a full ticket-price refund offered while still on the sharply tilting deck of the *Titanic*.

The parties are cautioned that, as they well know, the Bankruptcy Court also ordered that *"all deadlines for any party to act under state law that would otherwise result from any opinion or recommendation issued by the ALJ are tolled indefinitely pending further order of the Court"*. The

22

parties are further reminded that this Decision and Recommended Order, and the relief recommended herein, is premised on the finding that the City failed, as to the complained of events, to meet its obligations under Sections 15 and 10(1)(e) of PERA to bargain in good faith and to refrain from unilaterally implementing changes to established conditions of employment contrary to that good faith bargaining obligation. Pursuant to State law, that obligation to bargain was suspended upon the appointment of an emergency manager, such that the Employer, acting through the Emergency Manager, is empowered in 2013 to now engage in just the sort of unilateral action which would otherwise be unlawful under PERA. For that reason, no prospective relief has been ordered, beyond 2012, as any such relief would be both speculative and inappropriate until such time as the City of Detroit is no longer exempted from the ordinary obligations under Section 15 of PERA.

### Conclusion

I have carefully considered any additional arguments asserted by the parties in this matter and have determined that they do not warrant a change in the result. For the reasons set forth above, I find that the deferred compensation related benefit cuts were an unlawful unilateral change in basic conditions of employment implemented in violation of the City's well-established obligations under Section 10(1)(e) of PERA to bargain in good faith, to refrain from repudiating prior agreements, and to refrain from unilaterally imposing adverse changes in conditions of employment. I recommend that the Commission issue the following order:

### RECOMMENDED ORDER

The City of Detroit, its officers, agents, and representatives shall:

1. Cease and desist, during such periods when the bargaining obligation is not otherwise suspended by operation of law, from:

   a. Failing to bargain in good faith with the representative of its employees;

   b. Unilaterally altering any established conditions of employment during the term of any collective bargaining agreement;

   c. Seizing or transferring, or failing to return, assets held for the benefit of employees in pension funds or accounts or which were or are otherwise under the control or possession of the pension board of trustees;

23

Appendix 31

d.  Where an unexpired collective bargaining agreement is in place, repudiating the terms of such agreements by refusing to comply with the unambiguous obligations under such agreement;

e.  Interfering in the pension board's distribution of the excess earnings, if any, for the years 2011 and 2012;

f.  Interfering in the holding and distribution of assets by the retirement board when it is acting pursuant to authority expressly granted to it by the parties, whether through agreement memorialized in the pension ordinance or in separate written collective bargaining agreements.

2. Take the following affirmative action necessary to effectuate the purposes of the Act:

a.  Affirmatively renounce reliance on and cease any effort at enforcement of the November 30, 2011, pension ordinance amendment;

b.  Restore to the control of the pension board the entirety of any assets diverted from the control of the board following the adoption of the November 30, 2011 ordinance amendment and as anticipated by that ordinance change, including restoring to the board's control any "excess earnings" as previously defined by the pension board and attributable to 2011 and 2012;

c.  Take whatever steps are necessary to facilitate the distribution of the 2011 and 2012 excess earnings, if any, in keeping with the previously utilized methodology whereby a portion was utilized for 13th checks, a portion was transferred to active employee annuity accounts, and a portion was transferred for the benefit of the Employer;

d.  Provide statutory interest to, or otherwise make whole, the pension plan for the diversion of assets and the intervening lost earnings on those assets;

e.  Refrain from any interference in the distribution of the so-called "13th checks" by the retirement board, including in the distribution of any make-up or backpay checks for the years 2011 and 2012, as may be issued in the discretion of the retirement board;

24

f.   Refrain from any interference in the distribution of funds by the retirement board for the benefit of active employee annuity accounts for the years 2011 and 2012;

g.   Otherwise make whole all AFSCME bargaining unit members adversely effected by the unilateral changes in conditions of employment found unlawful in this Decision, to the extent that such individuals are not made whole by remedial steps taken by the pension board;

h.   Provide the Union with the full calculation of amounts reimbursable to the pension plan, or unit members, and interest on same;

i.   Maintain all existing conditions of employment throughout the bargaining and fact-finding process, during such periods when the bargaining obligation is not otherwise suspended by operation of law.

3.  Post an appropriate notice, as may be directed by the Commission, to employees in a conspicuous place at each City worksite and post it prominently on any website maintained by the City for employee access for a period of thirty (30) consecutive days, and additionally deliver a copy of the notice by mail or email to each employee in the AFSCME bargaining units.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

_____
Doyle O'Connor
Administrative Law Judge
Michigan Administrative Hearing System

Dated:  October 4, 2013
        Released to the parties at 5:55 PM.

25

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ROSE ROOTS, MARK PHILLIPS, WILLIAM
HARPER, EARNEST JOHNSON, FELICIA
JONES, CLARENCE L. WRIGHT, JR., ANGELA
OBEY-YOUNG, Individually and on behalf of all
others similarly situated,

Case No. 12-12848-CV

        Plaintiffs,

THE CITY OF DETROIT,

        Defendant.

_____/

## <u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>

     Plaintiffs, Rose Roots, Mark Phillips, William Harper, Earnest Johnson, Felicia Jones, Clarence L. Wright, Jr., and Angela Obey-Young, on behalf of themselves and all others similarly situated, by and through their attorneys, The Miller Law Firm, P.C., state as follows for their Class Action Complaint:

## <u>INTRODUCTION</u>

     1.  This case is brought on behalf of the thousands of individuals who retired from their employment with the City of Detroit ("City") with vested health benefits and who are being denied those vested contractual benefits in breach of: (1) contract, (2) statutory, (3) common law, (4) the City Charter, (5) the Municipal Code of the City of Detroit, (6) Resolutions of the City Council, and (7) fundamental federal Constitutional rights.

     2.  The City is balancing its budget on the backs of its former employees – retired senior citizens – by making devastating and draconian changes to their promised health care benefits. These seniors have worked for decades, based upon promised health care benefits, and earned the right to these health care benefits. Moreover, the retirees made irrevocable decisions like

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 40 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 1 of 194
113
Appendix 34

selecting survivorship benefits and/or benefit levels, based upon the benefits promised to them. At a time, when they are living on fixed incomes and incurring the medical expenses of old age, the City seeks to deprive them of these promised and earned benefits upon which they so justly relied.

3.    The City of Detroit adopted an Employee Health Benefit Plan ("Plan") pursuant to City Charter and the Municipal Code, and the specific terms of that Plan were subject to collective bargaining agreements ("CBAs"), with the CBAs to take precedence over the Plan.

4.    Under the terms of the CBAs, individuals, who retired from eligible employment with the City of Detroit, are entitled to fully paid hospitalization and medical insurance, based on ward service under the Michigan Variable Fee coverage (MVF-2), and subject to the benefits and premium contributions in effect at the time of retirement, and Drug Prescription coverage. The prescription drug plan was subject to a $2.00 deductible for retirees. With the May 9, 1996 execution of the 1995-1998 CBA, the prescription drug deductible was increased to $3.00 for future retirees. These benefits, co-payments, deductibles and premium contribution rates were part of the contract in force at the time of each employee's retirement from the City.

5.    After July 2006, the City began to, and continues to, unilaterally modify the retiree health insurance benefits and premium contribution rates. Health care rates were modified again in 2012. Also, the City has undertaken steps to again unilaterally modify the retiree health insurance benefits and premium contribution rates and these changes are imminent and substantial.

6.    These unlawful, unilateral modifications negatively impact retirees who are senior citizens living on fixed incomes and who are among the most vulnerable members of society and, in many instances, residents of the City.

2

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 41 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 2 of 194
113

Appendix 25

7.      Plaintiffs seek a declaration that the City's unilateral changes to the retiree health insurance plan, including but not limited to, changes in covered benefits provided to retirees; increases in deductibles and co-payments assessed to retirees; and increases in premium contribution rates paid by retirees, substantially impair and breach the applicable collective bargaining agreements, and constitute a violation of Plaintiffs' constitutional rights. Plaintiffs seek injunctive relief to prevent further changes and to require the City to return the contractual benefits owed to the retirees. Plaintiffs also seek compensatory damages for all the wrongfully incurred charges caused by Defendant's unlawful policy and practice.

## THE PARTIES

8.      Plaintiff Rose Roots is a resident of the City of Detroit, County of Wayne, and State of Michigan. She worked for the City for approximately 28 years, the vast majority of that time as a member of the American Federation of State, County and Municipal Employees ("AFSCME"). She retired from employment with the City of Detroit in 1997. Plaintiff was a member of the Senior Accountants, Analysts and Appraisers Association ("SAAA") bargaining unit.

9.      Plaintiff Mark Phillips is a resident of the City of Detroit, County of Wayne, State of Michigan. He worked for the City for approximately 30 years, the vast majority of that time as a member of AFSCME. He retired from employment with the City of Detroit in 2002, at which time he was a member of the Associated Paving Foreman's Association.

10.     Plaintiff William Harper is a resident of the City of Detroit, County of Wayne, State of Michigan. He was employed by the City for approximately 31 years until he retired in 1992. For his entire employment, he was a member of AFSCME.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 42 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 3 of 194
113

11.     Plaintiff Earnest Johnson is a resident of the City of Detroit, County of Wayne, State of Michigan.  He was employed by the City for approximately 34 years until he retired in 2002.  For his entire employment, he was a member of AFSCME.

12.     Plaintiff Felicia Jones is a resident of the City of Detroit, County of Wayne, and State of Michigan.  She retired from employment with the City of Detroit in 2010.  During her thirty-one and one-half years of employment with the City, she was a member of AFSCME.

13.     Plaintiff Clarence L. Wright, Jr. is a resident of the City of Detroit, County of Wayne, State of Michigan.  He retired from employment with the City of Detroit in 2005.  During his almost 31 year employment with the City, he was primarily a non-union employee.  At the time of his retirement, he was employed as a non-union Manager in the Recreation Department.

14.     Plaintiff Angela Obey-Young is a resident of the City of Detroit, County of Wayne, State of Michigan.  She retired from employment with the City of Detroit in 2009.  During her approximately 32-year employment with the City, she was a member of AFSCME for 22 years and of SAAA for approximately two years.  At the time of her retirement, she had been employed as a non-union supervisory employee for approximately eight years.

15.     Defendant the City of Detroit is a municipal corporation with its principal place of business located at The Coleman Young Municipal Center, Two Woodward Avenue, Detroit, Michigan, the County of Wayne, and State of Michigan.  The City of Detroit was established pursuant to the Constitution of the State of Michigan; the Home Rule Cities Act, the Charter of the City of Detroit and governed by applicable state and federal law; the Charter and its Ordinances and the Municipal Code.

4

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 43 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 4 of 194
113

Appendix 37

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction over the subject matter of the action

pursuant to 28 U.S.C. §§ 1331 and 1343· It is a civil action alleging, inter alia, violations of the

Fifth and Fourteenth Amendments and impairment of contract arising under Article X of the

Constitution of the United States. This is an action for, inter alia, declaratory, injunctive and

monetary relief pursuant to 28 U.S.C. §§ 2201 and 2202 and money damages to redress the

Defendant's deprivation of Plaintiffs' rights pursuant to the Contracts Clause (Article 1, Section

10, Clause 1) and the Due Process Clause (Amendments V and XIV of the United States

Constitution) and violations of 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant

to U.S.C. § 1367.

18.     Venue is proper in this Court because the municipal corporation Defendant and

Plaintiffs are located in this District and a substantial part, if not all, of the events or omissions

giving rise to the claims arose in the Eastern District of Michigan. 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS – PART I
## THE ESTABLISHMENT OF THE EMPLOYEE HEALTH BENEFIT PLAN

19.     The City adopted its first Home Rule City Charter in 1918. That charter was

amended on July 1, 1974, January 1, 1997 and January 1, 2012.

20.     The City Employee Health Benefit Plan was established by Title 9, Chapter 8 of

the 1918 City Charter as amended. *See also* Charters 1974, 1997 and 2012, Article 13-105.

21.     Further, since at least some time at around June 1, 1946, the City provided for the

establishment of an Employee Health Benefit Plan "for the purpose of providing hospital,

surgical and death benefits" to eligible employees and retirees. *City of Detroit Municipal Code
[Code], Chapter 13, Article VIII, Division 1, Sec. 13-8-1; (Charter of the City of Detroit*

5

13-53846-tit    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 44 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 5 of 194
113
Appendix 28

*[Charter] 1918, T-IX, C-VIII, § 1). See also Charter, Art. 13, Sect. 13-10; Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-6(b). (Charter 1918, T-I, C-VIII, § 11; Code 1964; 16-9-4).*

22.    A "[m]ember [of the plan] shall mean any person included in the membership of the plan" and "[s]ubscriber [of the plan] shall mean a member of the plan or his family as defined in section 13-8-7 who is receiving a retirement allowance from the city." *Code, Chapter 13, Art VIII, Division 1, Sec. 13-8-2. (Charter 1918, T-IX, -VIII, § 2; Code 1964, § 16-9-1).*

23.    An individual remains a member in the plan "[a]fter his retirement from city service with a pension or workman's compensation benefits paid in whole or in part out of funds provided by the city..." *Code, Chapter 13, Art. VIII, Division 1, Sec. 13-8-3(e) (Charter 1918, T-IX, C-VII, § 8).*

24.    A city employee who retires with a pension shall continue to be a member of the city employees benefit plan. *Code, Chapter 13, Article 8-3(e), 8-10; Charter 1918, T-IX, C-VIII, § 8, 12; Code 1964 § 16-9-7; Ord. No. 22-97 § 1, 7-2-97.*

25.    "The governing board of the city employees' benefit plan shall pay to the insurer providing the hospital and surgical, and, if applicable major medical services to the members the cost of such services, as provided by contract." *Code, Chapter 13, Article 8-5 (Code 1964 § 16-9-10)*

26.    The Code provides in pertinent part that the City shall pay "the full cost of surgical and hospitalization coverage and major medical coverage, if applicable for individual employees...." *Code, Chapter 13, Article 8-11 (Charter 1918, T-IX, C-VIII, § 13; Code 1964 § 16-9-8).*

27.    Further, effective July 1, 1976, the City Council passed a resolution providing for "Drug Prescription" coverage for active employees and retirees who had retired since July 1,

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 45 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 6 of 194
113

1974. That prescription drug coverage provided for a $2.00 deductible and payment of premiums by the City.

28. In December, 1976, the City Council passed a resolution to provide the same Drug Prescription coverage with a $2.00 deductible to be effective January 1, 1977, for those retirees of the City who had retired prior to July 1, 1974.

### GENERAL ALLEGATIONS – PART II
### THE BENEFITS AND PROVISIONS OF THE EMPLOYEE HEALTH BENEFIT PLAN WERE SUBJECT TO COLLECTIVE BARGAINING FOR EMPLOYEES WHO WERE MEMBERS OF A UNION

29. The Public Employment Relations Act "PERA" provides that public employees have the right to "bargain collectively with their public employers through representatives of their own free choice." Mich. Comp. Laws § 423.209, Public Act 379 of 1965.

30. The City Charter provides that "[e]mployees of the City have the right to collective organization and collective bargaining." *Charter of 1997, Article. 6, Chapter 5, Human Resources Department, Sect. 6-507; Charter 2012, Article 6, Chapter 4, Sect. 4-407.*

31. "The terms of any collective bargaining contract, and all rules and rulings made under it, shall take precedence over any inconsistent classifications, rules or policies of the human resources department." *Charter of 1997, Art. 6, Chapter 5, Human Resources Department, Sect. 6-508; Charter of 2012, Art. 6, Chapter 4, Human Resources Department, Sect. 4-408.*

32. The employees of the City are represented by many different unions and bargaining units.

33. Historically, to establish a uniform bargaining policy as to matters such as issues related to the Employee Health Benefit Plan, the City through its labor relations personnel, have

7

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 46 of 113
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 7 of 194

Appendix 40

always bargained first with AFSCME the union which has the largest enrollment of City employees.

34.   Then, the same bargained-for provisions are applied uniformly to other collective bargaining agreements. Indeed, many of the contracts contain "me too" provisions which call for identical provisions across bargaining groups.

35.   Upon information and belief, such collective bargaining contracts have been negotiated regarding the terms of the Employee Health Benefit Plan since at least 1947. Mich. Comp. Laws § 423.201, et. seq., Act 336 of Public Act of 1947. See also Exhibit 1, Master Agreement between the City of Detroit and Michigan Council 25 of the American Federation of State County and Municipal Employees, AFL-CIO, 1977-80 (Michigan District Council 77 prior to March 3, 1978), Article 1.[1] The various Master Agreements are within the City of Detroit's possession.

36.   The negotiated contractual terms of the collective bargaining contracts have consistently provided that the retiree healthcare benefits, co-payments and deductibles applicable to Plaintiffs and other similarly situated class members were established through the collectively bargained labor agreements in force at the time of their retirements.

37.   Under the terms of all contracts, including the Agreements entered into between the City and AFSCME, the retirees' health care plan, benefits, deductibles, co-payments and premium contributions were governed by the CBA in effect at the time of retirement.

---

[1]   Memorandum of Understanding Between the City of Detroit and Michigan Council 25, American Federation of State, County and Municipal Employees, dated 3-22-78, provided that AFSCME 25 was the successor in interest to AFSCME 77, and that the agreement between the City and Council 77 which was effective 9-7-77 and which expires on 6-30-80 shall be the City and Counsel 77, which was effective 9-7-77 and which expires on 6-30-80, shall be the Master Agreement between the parties for its term and otherwise in accordance with Article 47 of the adopted Master Agreement.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 47 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 8 of 194
113
Appendix 41

38.     The specific CBA under which each retiree retired established vested rights to the healthcare coverage in effect at the time of retirement and the City promised to continue these vested rights the entire period of retirement.

39.     Once the employee retires, the employee is no longer a member of the Union and is no longer subject to future CBAs.

40.     The retired employees are entitled to these benefits for life and they are vested at retirement, and not subject to unilateral modification and/or revocation.

41.     Non-union employees received the same benefits as union employees with regard to Health Care Benefits.

42.     Article 34 of each of the CBAs (Article 36 in the 1977-1980 and 1980-1983 Agreements) consistently provided that retirees would receive fully paid hospitalization and medical insurance, including prescription drug coverage.

43.     Plaintiffs set forth in Subsections A-I below the provisions in the Agreements from 1977 to 2005.  To the extent that there may be retirees subject to Agreements that pre-dated the Agreements cited in Subsections A-I below, upon information and belief, those contracts are in the possession of Defendant and also provided for fully paid hospitalization and medical insurance.

## A.    The 1977-1980 Master Agreement

44.     Article 36 of the 1977-1980 Master Agreement between the City and Michigan Council 25 of AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries

9

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 48 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 9 of 194
113
Appendix 42

and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. For those employees selecting the optional Metropolitan Health Plan of Blue Cross/Blue Shield the coverage shall be the MHP "AA" program with the City's contribution limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

* * *

For employees who retire on or after July 1, 1977, the City will pay the premium for regular retirees and their spouses effective as provided by City Council in 1977-78 closing resolutions.

* * *

If, during the term of this Agreement, a Federal Health Security Act is enacted, the City of Detroit will pay during the term of the Agreement any premium, taxes or contributions employees may be required to pay under a Federal Health Security Act that are specifically earmarked or designated for the purpose of the Federal Program.

* * *

The City agrees to institute a Health Maintenance Organization insurance plan prior to June 30, 1980. The employees shall have the further option of choosing this alternative. The City's contribution to this plan shall be limited to the premium cost for Blue Cross/Blue Shield health insurance, ward service rates.

(*See* Exhibit, Article 36, ¶¶ A,C, D and E.)

45.     The Agreement also provided for Optical Care Insurance through the Employee

Benefit Board. (Id., ¶ B.)

### B.     The 1980-1983 Master Agreement.

46.     Article 36 of the 1980-1983 Master Agreement between the City and Michigan

Council 25 of AFSCME provided in pertinent part:

The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate

10

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 49 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 10 of
194
Appendix 42

with two dollar ($2.00) co-pay (Certificate #87), known as the two dollar ($2.00) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 16, Article 9 of the Municipal Code for the City of Detroit.

\* \* \*

Employees shall have the option of choosing alternative hospitalization medical coverage made available by the City. The City's contribution to the alternative plans shall be limited to the premium cost for Blue Cross/Blue Shield ward service rates, excluding dental insurance. Total Health Alliance Plan shall comprise the list of alternative hospitalization plans. If at the end of any fiscal year an alternative hospitalization plan has failed to enroll 5% of the bargaining unit employees, the City shall have the option of removing that plan from the list of eligible carriers.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. **The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.** (Emphasis added.)

(*See* Exhibit 2, Article 36, ¶¶ A, B, and C.)

47.     The CBA also provided (1) effective 7-1-81, the City would improve its BC hospitalization plan for active employees and their dependents by providing BC Master Medical insurance with a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100.00) for two or more in a family; (2) a Dental Plan effective 7-1-80; (3) the continuation of Optical Care Insurance and (4) that the City would pay the costs if a Federal Health Security Act was enacted. (*Id.*, ¶¶ D, E, F and G.)

11

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 50 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 11 of
194

### C.   The 1983-1986 Master Agreement

48.     Article 34 of the 1983-1986 Master Agreement between the City of Detroit and

Michigan Council 25 of AFSCME provided in pertinent part:

> Not later than January 1, 1984, for active employees and employees who
> retire on or after January 1, 1984, coverage shall be as described in the
> Memorandum of Understanding re: Health Care Cost Containment and
> Exhibit III.
>
> * * *
>
> The City shall provide hospitalization and medical insurance based on the
> Blue Cross/Blue Shield ward service under the Michigan Variable Fee
> coverage (MVF-2) and the Prescription Drug Group Benefit Certificate
> with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar
> ($2.00) deductible Drug Rider for employees and their legal dependents,
> duty disability retirees and their legal dependents and duty death
> beneficiaries and their legal dependents, as provided by Chapter 16,
> Article 9 of the Municipal Code for the City of Detroit.
>
> * * *
>
> Employees shall have the option of choosing alternative hospitalization
> medical coverage made available by the City.  The City's contribution to
> the alternative plans shall be limited to the premium cost of Blue
> Cross/Blue Shield ward service rates, excluding dental insurance.  Total
> Health Care, Michigan Health Maintenance Organization and Health
> Alliance Plan shall comprise the list of alternative hospitalization plans.  If
> at the end of any fiscal year an alternative hospitalization plan has failed to
> enroll 5% of the bargaining unit employees, the City shall have the option
> of removing that plan from the list of eligible carriers.
>
> * * *
>
> The City will pay the premium for regular retirees and their spouses for
> hospitalization and medical insurance based on the Blue Cross/Blue Shield
> ward service under the Michigan variable Fee coverage (MVF-2) and the
> Prescription Drug Group Benefit Certificate with the two dollar ($2.00)
> co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug
> Rider as provided by City Council in the 1977-78 closing resolution. **The
> City will pay this premium for regular retirees and their spouses for
> only as long as they receive a pension from the City.** (Emphasis added)

(*See* Exhibit 3, Article 34, ¶¶ A, B, C and D.)

12

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 51 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 12 of
194

49.     The 1983-1986 Agreement also provided that (1) the hospitalization plan for

active employees and their dependents would include Blue Cross Master Medical Insurance with

a 20% copay benefit and a fifty dollar ($50) per person annual deductible ($100) for two or more

in a family; (2) a Dental Plan for actives effective 7-1-80; (3) the continuation of Optical Care

Insurance;   (4) effective 11-1-83, employees who wish to insure sponsored dependents were

required to pay the premium cost of that coverage and "the City will pay the health insurance

premium for dependents who are 19 to 25 as long as they are regularly attending an accredited

vocational school, college...and are dependent....Employees at their own expense may provide

coverage for these dependents; and (5) the City would pay the costs if a Federal Health Security

Act was enacted. (*Id.,* ¶¶ E, F, G, H and I.)

50.     The 1983-1986 Contract included a Memorandum of Understanding Re: Health

Care Cost Containment signed 11-28-1983 which provided:

> ....[t]he parties agree that the most effective way to control health care
> costs is to limit the choice of hospitals, out-patient laboratories, providers
> of prescription drugs and other medical services to those who deliver
> quality care at reasonable prices.  In order to achieve this goal the parties
> agree to implement the following plan, in lieu of Article 36, not later than
> January 1, 1984:
>
> A.     The parties agree to create a Health Care Cost Containment
> Committee made up of an equal number of members from the City and
> from the Union.  The committee will agree on securing the services of a
> health care consultant or administrator to assist the committee in designing
> and implementing a health care cost containment program.  This
> committee shall review and agree to a health care cost containment plan
> which will cover active AFSCME employees and **future retirees** and will
> be implemented by the City no later than January 1, 1984. The plan will
> provide for quality health care and will limit the fees of physicians,
> hospitals, laboratories and druggists to those that charge reasonable fees
> including approved H.M.O.'s, health care networks and preferred drug
> providers.   Further cost containment alternatives such as preferred
> providers, generic mail order drugs, a maintenance drug program,

13

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 52 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 13 of
194

Appendix 46

restrictive weekend admission rules, preadmission certification for elective surgery, second opinions, ambulatory surgery, control of out-patient psychiatric care, birthing centers, hospice care coverage other than hospitals, patient incentive audit of hospital bills, worksite blood pressure tests and employee health care education programs will be reviewed and implemented by the Committee.  No insurance carrier shall be allowed to underwrite City Health Care insurance unless they offer coordination of benefits.  Any savings realized from this effort will be disposed of in accordance with paragraph B.

B.      The Committee will review the costs of this program, on an annual basis, and will report to the Union and the City the amount of savings which the plan has generated.  The accounting will be performed by a CPA mutually agreed upon by the parties if so desired to assure accuracy.  A similar review and report will be made thereafter on an annual basis.  The City and the Union agree that savings associated with this program will be shared equally by the employer and active AFSCME employees.  The percentage of savings to be credited to the AFSCME bargaining unit employees shall be equal to one-half of the percentage of the difference in cost per employee of the active and **future retirees** of AFSCME in the general City hospitalization plan during the 1982-83 fiscal year versus the same base and equivalent accounting period in subsequent years.  The general City hospitalization plan includes all active AFSCME employees **and future retirees** including those at the Department of Transportation and civilian employees of the Police and Fire Departments.  Distribution of the savings attributed to the employees will be used as a bonus."

C.      In the event that the January 1 – June 30, 1984 premium cost exceeds the 1982-83 base year cost, the City will pay up to 50% over the 1982-83 base year costs.  In the event that the July 1, 1984 – June 30, 1985 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.  In the event that the July 1, 1985 – June 30, 1986 premium cost exceeds the 1982-83 base year cost the City will pay up to 50% over the 1982-83 base year cost.

D.      Effective July 1, 1983, the health care coverage premium for sponsored dependents must be borne by the employee.

E.      No later than January 1, 1984, the City will also implement a cost containment dental and optical insurance program.  The City and the Union agree that savings associated with this program will be shared equally by the employer and the employees in accordance with the formula shown in paragraph B." (Emphasis added.)

14

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 53 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 14 of
194

Appendix 47

51.     Exhibit III to the 1983-1986 Agreement provided "Re: HEALTH CARE PLAN"

and outlined the health care benefits under the program:

> The following is a description of the City of Detroit's Basic Health
> Care Plan for employees **and retirees**. They may choose to elect
> coverage under this plan or they may choose alternative coverage
> through one of the Health Maintenance Organizations offered by
> the City. The City will pay the premium for this alternative health
> care coverage up to an amount equal to the amount the City pay
> (sic) for the Basic Plan.
>
> The basic plan described herein will give member coverages,
> which are nearly the same as they currently enjoy. It does,
> however, include several cost containment features not found in
> our current program which will control costs of hospitalization and
> other medical services. Furthermore, the joint union/management
> health cost containment committee will be studying additional cost
> containment programs which shall include prescreening and
> employee awareness programs during the term of the agreement
> and will implement them if they fulfill or object of quality health
> care at reasonable prices. In the event that different optical, dental
> or prescription drug programs are less costly than the current ones
> used, they may be adopted in lieu of them." (Emphasis added.)

(*See* Exhibit 3, which lists the benefits provided by the Plan.)

### D.     The 1986-1989 Master Agreement

52.     Article 34 to the 1986-1989 Master Agreement between the City Council 25 of

AFSCME provided in pertinent part:

> The City shall provide hospitalization and medical insurance based
> on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group
> Benefit Certificate with two dollar ($2.00) co-pay (Certificate
> #87), known as the two-dollar ($2.00) deductible  Drug Rider for
> employees and their legal dependents, duty disability retirees and
> their legal dependents and duty death beneficiaries and their legal
> dependents, as provided by Chapter 13, Article 11 of the Municipal
> Code of the City of Detroit.

* * *

15

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 54 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 15 of
194

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person   $100.06
Two person      $238.29
Family          $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

* * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87) known as the two dollar ($2.00) deductible Drug Rider as provided by City Council in the 1977-78 closing resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person   $100.06
Two person      $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 55 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 16 of
194
Appendix 40

> dollar ($50.00) per person annual deductible ($100.00) for two or more in a family.
>
> * * *
>
> Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:
>
> Single Person
> Two persons
> Family.
>
> * * *
>
> Effective January 1, 1987, the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 4, Article 34, ¶¶ A,B, C, D, F and L.)

53.     The 1986-1989 Agreement also provided a dental plan for active employees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted and that any insurer would be required to offer coordination of benefits (*Id.,* ¶¶ G, H, I and J)

54.     The parties also agreed to form a "Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph "B" the City will pay

17

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 56 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 17 of
194

fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

(*Id.*, ¶ K.)

55.   Exhibit III "RE: HEALTH CARE PLANS" included as part of the 1986-1989

Agreement provided that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City.  The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan.  A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 4.)

### E.   The 1989-1992 Master Agreement

56.   Article 34 to the 1989-1992 Master Agreement provided in pertinent part:

> The City shall provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2.00) co-pay (Certificate #87), known as the two-dollar ($2.00) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 11 of the Municipal Code of the City of Detroit.
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> | | |
> |---|---|
> | Single person | $100.06 |
> | Two person | $238.29 |
> | Family | $253.54 |
>
> Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.
>
> * * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person     $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees citywide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person

19

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 58 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 19 of
194

Two persons
Family.

\* \* \*

Effective January 1, 1987, the City shall implement a Preferred Provider
Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 5, Article 34, ¶¶ A, B, C, D, E, F and L.)

57.   The 1989-1992 Agreement provided a dental plan for active employees and their

Dependents;   continued optical care insurance; that the City would pay the costs if a Federal

Health Security Act was enacted and that any insurer would be required to offer coordination of

benefits. (*Id.*, ¶¶ G, and H, I and J.)

58.   The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union
> which will review and agree to further cost containment programs to cover
> both active employees and future retirees during the term of the Contract.
> Said cost containment programs shall not diminish the levels of benefits
> provided in the basic plans but may require the insured to follow
> procedures prescribed by the carrier in order to be eligible for benefits. If
> premium levels remain below the amounts listed in the 1982-83 base
> premium levels for insurance listed in paragraph B the City will pay fifty
> percent (50%) of that amount to an escrow account which shall be used to
> offset health care costs or increase health care benefits. Furthermore, the
> parties agree during the term of this agreement to continue to discuss the
> City's hospitalization plans.   The parties are committed to investigate
> programs which will reduce costs and bring about a corresponding
> reduction in premium sharing by employees. Programs to be considered
> would   include   alternative   health   care   providers,   additional   cost
> containment programs, and alternative traditional plans.   Any programs
> agreed to by the parties will be implemented during the term of this
> agreement.

(*Id.*, ¶ K.)

59.   Exhibit III "Re: HEALTH CARE PLANS" to the 1989-1992 Agreement
provides:

> [T]he City of Detroit offers a traditional hospitalization plan for
> employees and retirees plus they may choose alternative coverage through

20

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 59 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 20 of
194
113

Appendix 53

one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 5.)

### F.   The 1992-1995 Master Agreement.

60.     Upon information and belief, the City imposed an Agreement for the 1992-1995

Plan year which contained the exact or substantially similar language in Article 34. It is believed

that a copy of this document is in the possession of Defendant.

### G.   The 1995-1998 Master Agreement.

61.     Article 34 of the 1995-1998 Agreement which was executed on May 9, 1996

provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two-dollar ($2) deductible  Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit until such time during this agreement cost containment/reduction modifications are implemented pursuant to the Memorandum of Understanding Re; Lowered Health Care Costs dated August 31, 1995. Such modifications may impact all or part of the provisions contained, including but not limited to medical, dental and optical care coverages.

* * *

> The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:
>
> Single person $100.06
> Two person   $238.29
> Family       $253.54

21

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 60 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 21 of
104

Fifty percent (50%) of any premium charges that exceed the above amounts will be paid by the employees and fifty percent (50%) shall be paid by the employer.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person $100.06
Two person    $238.29

Fifty percent (50%) of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50

22

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 61 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 22 of
194
Appendix 55

employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

* * *

Effective January 1, 1995 the City shall implement a Preferred Provider Prescription Drug program in its traditional hospitalization plan.

(*See* Exhibit 6, Article 34, ¶¶ A, B, C, D, E, F and L.)

62.    The Agreement provided a dental plan for active employees, duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits. (Id., ¶¶ G, H, I, J and M.)

63.    The parties also agreed to form a Health Care Cost Containment Committee:

...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

23

13-53846-tjt    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 62 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 23 of
194
Appendix 66

(*Id.*, ¶ K.)

64.    The    1995-1998    Agreement    included    a    "MEMORANDUM    OF

UNDERSTANDING INITIATIVE NO. 6 RE: LOWERED HEALTH CARE COSTS" which

provided:

> The parties agree to negotiate agreements which will achieve cost savings
> on the following four initiatives.  It is understood, however, that in
> addition to these mandatory cost reducing changes, the parties' Health
> Care Cost Reductions Committee (HCCRC) will continue to pursue
> potential means of further reducing costs or stunting their escalation in the
> future through other initiatives.
>
> A.    Health Insurance Premiums, Employee Portions Paid with "125K
> Pre-Tax" Dollars (This will be instituted forthwith, as soon as possible,
> upon ratification of the labor agreement.)
>
> B.    Prescription Drugs at $3.00
>
> C.    Mail-Order Prescription Drugs Program
>
> D.    COB Administrative Change (Verify then Pay)
>
> The following issues are **NOT AGREED TO** but are still being mutually
> examined by the Committee with regard to the parameters of such a rule
> as stated:
>
> E.    Emergency Room "Non-Admitting Usage Fee"
>
> F.    Opt-Out Payments When Alternate Coverage Exists
>
> Further, this HCCRC will endeavor to coordinate its activities with and
> make its efforts compatible with any beneficial outcomes from the
> operations between the City and the AFL-CIO Coalition of Unions
> Committee on Health Care Issues.  In that regard, the union has already
> expressed at the contract bargaining table its interest in adopting the
> potential lower-costing "HMO/POS" program now being carefully
> considered by that City/Coalition Committee, subject to the Union's
> concerns about maintenance of the present benefits in the traditional
> BC/BS.
>
> The benefits of this initiative will be initially realized in Year I for
> initiative A and in Year II for initiatives B, C and D.  For initiatives E and
> F, if the parties should come to agreement on them, the benefits will take

24

13-53846-tjt    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 63 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 24 of
104

> effect in accordance with the understanding reached between the parties. And lastly, further benefits will be realized to the extent the HMO/POS program is adopted and saves the parties health care costs.

*(See* Exhibit 6.)

65.     The 1995-1998 Agreement included A Memorandum of Understanding between the parties applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits."*(See* Exhibit 6.)

66.     Exhibit II "RE: HEALTH CARE PLANS" to the 1995-1998 Agreement provides:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

*(See* Exhibit 6.)

### H.     The 1998-2001 Master Agreement.

67.     Article 34 to the 1998-2001 Master Agreement executed on March 8, 2000 provided in pertinent part:

> The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1: the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3.

25

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 64 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 25 of
194

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person $100.06
Two person    $238.29
Family        $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer.

* * *

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person $100.06
Two person    $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1: the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 65 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 26 of
194

Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

> Single Person
> Two persons
> Family.

(See Exhibit 7, Article 34, ¶¶ A, B, C, D, E, and F.)

68.     The 1998-2001 Agreement also provided a dental plan for active employees, their dependents and duty disability retirees;  continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted;  that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (Id., ¶¶ G,  H, I, J and L.)

69.     The parties also agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits

27

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 66 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 27 of

> provided in the basic plans but may require the insured to follow
> procedures prescribed by the carrier in order to be eligible for benefits. If
> premium levels remain below the amounts listed in the 1982-83 base
> premium levels for insurance listed in paragraph B the City will pay fifty
> percent (50%) of that amount to an escrow account which shall be used to
> offset health care costs or increase health care benefits. Furthermore, the
> parties agree during the term of this agreement to continue to discuss the
> City's hospitalization plans. The parties are committed to investigate
> programs which will reduce costs and bring about a corresponding
> reduction in premium sharing by employees. Programs to be considered
> would include alternative health care providers, additional cost
> containment programs, and alternative traditional plans. Any programs
> agreed to by the parties will be implemented during the term of this
> agreement.

(*Id.,* ¶ K.)

70.     A Memorandum of Understanding between the parties applied to National Health

Care provided that "[I]f, during the term of this Agreement, a Federal Health Care Law is

enacted, the parties shall enter into immediate collective bargaining negotiations over the impact

of such a law on the existing arrangements for funding and providing health care benefits." (*See*

Exhibit 7.)

71.     Exhibit II "RE: HEALTH CARE PLANS" to the 1998-2001 Agreement provides

that:

> [T]he City of Detroit offers a traditional hospitalization plan for
> employees and retirees plus they may choose alternative coverage through
> one of the health maintenance organizations or preferred provider plans
> offered by the City. The City will pay the premium for this alternative
> health care coverage up to an amount equal to amount equal to the amount
> the City pays for the traditional Plan. A list of the City's current
> hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 7.)

28

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 67 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 28 of
194

Appendix 61

I.    **The 2001-2005 Master Agreement.**

72.    Article 34 of the 2001-2005 Master Agreement, which was executed on July 1,

2003, provided in pertinent part:

> 34.  Hospitalization, Medical, Dental and Optical Care insurance Status
> quo of existing hospitalization, medical dental and optical care benefits
> will be maintained while the parties work cooperatively to institute
> mutually agreeable changes.
>
> The City shall continue to provide hospitalization and medical insurance
> based on the Blue Cross/Blue Shield ward service under the Michigan
> Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit
> Certificate with two dollar ($2) co-pay (Certificate #87) [fn1], known as
> the two dollar ($2) deductible  Drug Rider for employees and their legal
> dependents, duty disability retirees and their legal dependents and duty
> death beneficiaries and their legal dependents, as provided by Chapter 13,
> Article 8 of the Municipal Code of the City of Detroit.
>
> fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above,
> reflects the benefit at the time the premium sharing arrangement was
> instituted.  Currently, the co-pay for the Prescription Drug benefit is $3.
> Retirees shall be responsible for the co-pay amount in effect at the time of
> retirement.)
>
> * * *
>
> The City's contribution for the cost of hospitalization on a monthly basis
> shall be as follows:
>
> Single person  $100.06
> Two person     $238.29
> Family         $253.54
>
> Fifty percent of any premium charges that exceed the above amounts will
> be paid by the employees and fifty percent shall be paid by the employer.
> When the City's payroll system has the capability of allowing employees
> to pay these amount (sic) through the pre-tax IRS code 1225K mechanism,
> all bargaining unit members shall be entitled to participate.
>
> * * *
>
> Employees who wish to insure sponsored dependents shall pay the
> premium cost of this coverage.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 68 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 29 of
104

* * *

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City. For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person  $100.06
Two person    $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1:  the $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

* * *

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

* * *

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City.  The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable.  If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs.  Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges

30

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 69 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 30 of
194

without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family.

*(See* Exhibit 8, Article 34, ¶¶ A, B, C, D, E, and F.)

73.     The 2001-2005 Agreement also provided a dental plan for active employees and duty disability retirees and their dependents; continued optical care insurance; that the City would pay the costs if a Federal Health Security Act was enacted; that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (I. (Id., ¶¶ G, H, I and J.)

74.     The parties agreed to form a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agree during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees.  Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans.  Any programs agreed to by the parties will be implemented during the term of this agreement.

*(Id.,* ¶ K.)

75.     The Agreement included a Memorandum of Understanding between the parties

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 70 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 31 of
104

which applied to National Health Care, "[I]f, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangements for funding and providing health care benefits." (*Id.*, ¶ I.)

76.    Exhibit II "Re: Health Care Plans" to the 2001-2005 Agreement provides that:

> [T]he City of Detroit offers a traditional hospitalization plan for employees and retirees plus they may choose alternative coverage through one of the health maintenance organizations or preferred provider plans offered by the City. The City will pay the premium for this alternative health care coverage up to an amount equal to amount equal to the amount the City pays for the traditional Plan. A list of the City's current hospitalization carriers and coverage descriptions is contained herein.

(*See* Exhibit 8.)

**J.    In 2006, the City Unilaterally Modified the Retirees' Health Care Plan.**

77.    Subsequent to the 2001-2005 CBA, when it came time to negotiate the terms of the 2005-2008 CBA, the collective bargaining representatives for AFSCME engaged in negotiations with the City's labor relations personnel. The City unilaterally imposed contract terms for the 2005-2008 CBA, effective September 2006.

78.    Notwithstanding the absence of a contract, in 2006, the City unilaterally and improperly modified the terms of the Employee Health Care Plan for union and non-union active employees and retirees although such a move was illegal.

79.    The new plan changed the contribution rates, deductibles and benefits for retirees who had retired under prior collective bargaining agreements and had vested benefits in effect prior to July 2006.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 71 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 32 of
194

80.     Notwithstanding that the City had no right to change the terms of the Health Care plan as to those retirees who had retired with vested rights to retiree health care, the City unilaterally changed the terms of the health care plan.

81.     The terms of the health care plan were mandatory subjects of collective bargaining under the state labor law, past practice and the agreements between the parties.

82.     Yet, after the imposition of the contract, which was accepted by the Union as to the active employees only, the City impermissibly continued to make changes to the imposed contract, including unlawful changes as to retiree health care.

83.     Under the City's new unilateral health care plan, co-payments and contributions were changed for retirees. By way of example and not limitation, changes to the Blue Cross traditional plan included the following:

| BLUE CROSS TRADITIONAL | Prior to change | Post change |
|---|---|---|
| Annual Deductible/Individual | $50 | $175 |
| Annual Deductible/Family | $100 | $350 |
| Urgent care | 100% | 80% after deductible co-payment |
| Prescription Drug Co-pay Generic | $2 | $5 |
| Prescription Brand | $2 | $15 |
| Mail Order Generic (90 days) | $2 | $10 copay |
| Mail Order Brand (90 days) | $2 | $30 copay |

(*See* Exhibit 9.)

84.     These changes were effective in the latter half of 2006.

85.     The City continued to make unilateral, illegal and improper changes to the terms of the health care plan, adversely affecting the retirees.

86.     Thereafter, the City prepared a draft of the Master Agreement dated October 24, 2006 which provided in Article 33:

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 72 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 33 of
104

*The parties have reached an agreement in regard to health care plan changes in accordance with MOU Re: Concession Agreement. However, the hospitalization, medical, dental and optical care benefits as of June 30, 2005, will be maintained until the new care design plan changes are implemented. That implementation is to occur on or after July 17, 2006. Changes to this article are reflected in the Memorandum of Understanding RE: Alternative Health Care Plan.*

\* \* \*

The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two dollar ($2) deductible   Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

fn 1:  The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted.  Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

Single person  $100.06
Two person     $238.29
Family         $253.54

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amounts through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

\* \* \*

Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

34

\* \* \*

The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) [fn1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The city will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986 the City will pay the following amounts for hospitalization and medical insurance:

Single person   $100.06
Two person      $238.29

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

fn 1: The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.)

\* \* \*

The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical Insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

\* \* \*

Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88

35

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 74 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 35 of
194

fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

Single Person
Two persons
Family. (Emphasis added)

(*See* Exhibit 10, Article 33, ¶¶ A, B, C, D, E and F.)

87.     The October 24, 2006 draft agreement provided a dental plan for active employees and duty disability retirees; continued optical coverage; that the City would pay the costs if a Federal Health Security Act was enacted; and that any insurer would be required to offer coordination of benefits and an opt-out program if the employee was covered by another health insurance plan. (*Id.*, ¶¶ G, H, I, J and L.)

88.     The October 24, 2006 draft agreement included a provision for a Health Care Cost Containment Committee:

> ...made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-83 base premium levels for insurance listed in paragraph B the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits. Furthermore, the parties agreed during the term of this agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this agreement.

(*Id.*, ¶ K.)

36

13-53846-tjt    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 75 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 36 of
194

89.     The October 24, 2006 draft included Exhibit II, "RE: HEALTH ARE PLANS." which added "SECTION VIII, City Alternative Health Care Plan."  In pertinent part, it provided that "Currently, all retirees and their dependents who are eligible for Medicare regardless of age must enroll in Medicare Parts A and B at their own expense to be eligible for continued coverage, and this provision shall remain unchanged and applicable to all persons who retire in the future." (*Id.*, § 8, ¶E at p 154.)

90.     The City did not have the right to unilaterally change the terms of the Employee Health Care Plan for these retirees who had retired with vested benefits.

91.     Even more improperly, the City reduced the health care plan in 2008 from what it unilaterally imposed in 2006.

92.     The City specifically promised the retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.[2]

93.     Retiree medical benefits are vested lifetime benefits. Once the City of Detroit received the benefit of the retirees' completed service, it could not unilaterally alter or revoke the terms.

94.     The health benefits that are at issue had remained the same until the City of Detroit unilaterally and improperly modified the health care benefits.

### K.     In 2009, 2010, 2011 and 2012 the City Again
### Unilaterally Changed the Retirees' Health Care Plan.

95.     In 2009, 2010, 2011 and 2012 the City continued to unilaterally raise premiums and make other improper changes to the retirees' health care benefits.

---

[2] For example, the website for the General Retirement System City of Detroit provides that the benefits applicable to a retiree are those that were in effect at the time of the retiree's retirement. Other documents published by the City of Detroit and provided to the retirees set forth this same information to retirees.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 76 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 37 of
104

L.     **The City Imminently Plans to Implement Substantial Modifications to the Retirees' Health Care Plan to the Detriment of Retirees.**

96.     The City imminently plans to unilaterally and wrongfully further modify the employee benefit plan applicable to these retirees including increasing premiums and changing the value of the contracted for benefits.

**GENERAL ALLEGATIONS – PART III**
**THE NON-UNION RETIREES HAVE THE SAME VESTED BENEFITS AS THOSE RETIREES WHO WERE COVERED BY A COLLECTIVE BARGAINING AGREEMENT**

97.     The City agreed to provide non-Union employees with the same Employee Benefit Plan and same terms and provisions as employees who were members of a Union and subject to collective bargaining agreements. In fact, the Code and Charter make no distinction.

98.     The non-Union employees who retired with vested benefits were unlawfully subject to modifications in July, 2006 and thereafter. Further, additional unlawful changes were made in 2012.

99.     The City promised these non-Union retirees that they would enjoy the medical benefits and contribution rates applicable at the time of their retirements.

100.     The City as a matter of practice provided the non-Union retirees with the same benefits as the Union retirees and represented that they would continue to obtain the same benefits as Union retirees.

**CLASS ACTION ALLEGATIONS**

101.     This is a class action suit which seeks injunctive and declaratory relief and damages in the amount of wrongfully incurred sums paid by retirees for contributions to both

38

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 77 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 38 of
194

premiums and deductibles and other health care costs due to Defendant's unilateral breaches of the contracts and violations of Plaintiffs' constitutional rights.

102.    Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals and seek to represent a class comprised of all persons who have been or will be subject to Defendant's unlawful policy, practice, procedure of breaching the contracts between the parties and also depriving them of their constitutional rights.

103.    During the periods at issue, Plaintiffs were retirees covered under the City of Detroit Employee Health Care Plan.

104.    Plaintiffs bring this action on their own behalf and on behalf of the following proposed class:

> All persons who retired from the City of Detroit with vested health care benefits and whose health care plan, including, premium contributions, benefits and deductibles, were unilaterally changed by the City of the Detroit.

105.    The class is so numerous that joinder of all members is impracticable.  Class members number in the thousands.  The precise number of Class members and their addresses are unknown to the Plaintiffs, but can be obtained from the records of the City of Detroit.

106.    There are questions of law or fact common to the Class, including at least the following:

a.    Whether the City's retirees had vested health care benefits that could not retroactively changed by the City.

b.    Whether the City unilaterally modified the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees;

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 78 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 39 of
194

c.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees breached the vested rights of the retirees;

d.      Whether such unilateral modification of the health care plan, including health care benefits, prescription drug benefits, deductibles and premium contributions applicable to the benefit program for retirees, violated the retirees' constitutional rights under the Contract Clause of the U.S. Constitution and the 5th and 14th Amendments of the U.S. Constitution;

e.      Whether Plaintiffs were harmed as a result of the City's wrongful conduct; and

f.      What relief should be imposed in favor of the Plaintiffs and the Class, including declaratory and injunctive relief.

107.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs have the same interests in this matter as all other members of the Class, and their claims are substantially identical to and typical of the claims of all members of the Class. Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Class.

108.    Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in class actions. Plaintiffs will fairly and adequately represent the interests of the Class members.

109.    The prosecution of separate actions by members of the Class could create a risk of establishing incompatible standards of conduct for Defendant.

110.    Overall, the claims of the individual class members may be too small to warrant individual litigation, especially as to a group of retirees on fixed incomes, but cumulatively the

40

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 79 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 40 of
194

amount of potential damage is significant and injunctive relief is required to preclude the City's on-going wrongful conduct.

111.   The prosecution of individual actions may, as a practical matter, be dispositive of the interests of the Class.

112.   Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia,* equitable remedies with respect to the Class as a whole.

113. The common questions of law and fact at issue here, some of which have been enumerated above, predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.

114.   The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation, particularly when Plaintiffs are retirees living on fixed incomes.

115.   Plaintiffs are not likely to be able to vindicate and enforce their constitutional and contractual and statutory rights unless this action is maintained as a class action.

116.   The issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions.

117.   The resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations

118.   Defendant has acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate.

119.   To Plaintiffs' knowledge, no similar litigation is currently pending by other members of the Class.

41

13-53846-tjt    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 80 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 41 of
113
194
Appendix 74

120.    Plaintiffs' counsel, who is highly experienced in class actions, foresees little difficulty in the management of this case as a class action.

## COUNT I --BREACH OF CONTRACT

121.    Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

122.    Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable Agreements.

123.    The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is a bargained for part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

124.    Each of the Agreements under which these Plaintiffs and the Class Members retired is a binding and enforceable agreement between them and the City to provide health insurance and prescription drug benefits and coverage at the benefit and contribution levels during the term of the Contract then in effect when each Plaintiff and Class Member retired.

125.    The City is thereby obligated to maintain the same health insurance and prescription drug benefits and coverage at the same contribution levels as in effect when each Plaintiff and Class Member retired.

126.    For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

127.    This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

128.    The retirees did not consent to the change.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 81 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 42 of
194

129.   The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

130.   Plaintiffs and the Class Members relied on the CBAs in good faith and fully performed all of their obligations under them.

131.   The Plaintiffs and Class Members relied on Defendant's past practice and promises.

132.   The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July 2006 and each time thereafter.

133.   Plaintiffs and the Class Members have each been damaged by Defendant's breaches of the referenced CBAs and past practice and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the CBAs.

134.   Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the CBAs, and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

43

13-53846-tit    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 82 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 43 of
194

## COUNT II – BREACH OF IMPLIED CONTRACT

Plaintiffs repeat and re-allege all of the preceding paragraphs as if full set forth herein.

135.    Plaintiffs rendered services to the City of Detroit and performed their duties pursuant to the applicable agreements.

136.    The maintenance of the contribution rate, employee health insurance benefits, and coverage for medical and prescription drugs is an agreed upon part of the compensation for services rendered by these Plaintiffs and the Class Members to the City.

137.    For decades, the City engaged in the practice of providing health insurance to all of its retirees, union and non-union, at the benefit levels and contribution rates applicable at the time of their retirements.

138.    This practice was based on mutual agreement and was a term and condition of employment that cannot be changed without the consent of the parties.

139.    The retirees did not consent to the change.

140.    The retirees relied on these agreements and past practices in good faith and fully performed all of their obligations under these agreements.

141.    The City has violated its promise to the retirees to provide these benefits for life as applicable at the time of retirement.

142.    The City breached its contractual obligations to Plaintiffs and the Class Members by failing to maintain the required contribution levels for health insurance and the same benefit levels in effect at the time of retirement, when the City unilaterally changed same benefits effective first in July, 2006 and each time thereafter.

44

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 83 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 44 of
194
Appendix 77

143.   Plaintiffs and the Class Members have each been damaged by Defendant's breaches of these promises and will continue to sustain injury and further damage if Defendant is allowed to continue to breach the terms and conditions of the agreement between the parties.

144.   Plaintiffs and the Class Members are entitled to relief because of Defendant's breaches of the agreements and breaches of past practice, including the modification of benefits and contribution rates.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargaining agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT III --VIOLATION OF THE CONTRACTS CLAUSE OF THE UNITED STATES CONSTITUTION (U.S. CONST. ART I, SEC. 10, CL. 1)

145.   Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

146.   At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

147.   At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

45

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 84 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 45 of
194

148.    The Constitution of the United States provides that "[n]o State shall....pass any...law impairing the obligation of contracts." U.S. Const. Article I, Sec. 10, Cl. 1

149.    Defendant violated the contract clause of the United States Constitution when it took actions impairing its contractual obligations to vested retirees by unilaterally increasing the contribution rates for premiums, the co-payments and deductibles, and other modifications to the health care plan to which it was contractually bound.

150.    Under the collective bargaining agreements, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

151.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance prescription drug benefits for retired union and non-union members and their dependents substantially impaired the contractual obligations under the parties' CBAs, and violated past practice and federal, state and municipal law.

152.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents contravened the **reasonable expectations** of Plaintiffs and the Class of retired individuals and their dependents under the CBAs, past practice, and federal, state and municipal law.

153.    Defendant's unilateral increases and modifications to the contribution rates, premiums and benefits for health insurance and prescription drug coverage for retired union and non-union members and their dependents violated essential terms and conditions under the CBAs, past practice and federal, state and municipal law upon which Plaintiffs and the Class of retired individuals they seek to represent reasonably and materially relied.

46

Appendix 79

154.    Defendant's unilateral increase and modification of contribution rates, co-payments and deductibles diminish the benefit coverage and the contracts with these retirees and has no legitimate public purpose and/or constitutes an abuse of power.

155.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements.

156.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will continue to sustain injury and damages, including but not limited, to the deprivation of their rights under the U.S. Constitution.

157.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their **reasonable expectations** under the CBAs, past practice and Municipal and State law, that Defendant would continue to comply with its contractual obligations; (2) interference with the protections under Municipal and State law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 86 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 47 of
194

## COUNT IV -- VIOLATION OF THE PROCEDURAL AND SUBSTANTIVE DUE PROCESS CLAUSES OF THE 5TH AND 14TH AMENDMENTS.

158.   Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

159.   At all times relevant hereto, Defendant and its agents and employees were individuals acting under color of State and Municipal law.

160.   At all times relevant hereto, Plaintiffs and the putative Class Members were "citizen(s) of the United States or other person(s) within the jurisdiction" entitled to bring suit pursuant to 42 U.S.C. § 1983.

161.   The Constitution of the United States provides that no person "shall be deprived of life, liberty, or property, without due process of law..." U.S. Const. Amendment V.

162.   The rights and protections of the Fifth Amendment are fully applicable to state action. U.S. Const. Amendment XIV.

163.   Plaintiffs have a vested contractual and constitutionally protected property interest in Defendant's compliance with its contractual obligations; to wit, to continue providing the same retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice; to return the retiree contribution rate, co-payments, deductible and benefits under the CBAs and past practice to the agreed upon rates and benefits; and to refrain from unilaterally altering and modifying the contribution rates, deductibles, benefits and financial obligations under the collective bargaining agreements and past practice as provided to retired employees.

164.   Under the collective bargaining agreement and past practice, Defendant is contractually obligated to provide health insurance and ancillary benefits at the same levels as the effective date of the CBAs under which the retirees retired.

165.   Plaintiffs vested contractual and constitutionally protected interests derive from, inter alia, the CBA's, the past practice, municipal, state and federal law.

48

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 87 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 48 of
194

166.    Defendant does not have the right to unilaterally modify the contractual obligations.

167.    Defendant deprived Plaintiffs and the retired Class Members of these vested contractual and constitutionally protected interests without notice and without an opportunity to be heard before the deprivation took place, thus, causing a forfeiture of property without due process in violation of the due process clause.

168.    Plaintiffs did not waive their right to adequate notice or the reasonable opportunity to be heard before being deprived of their vested contractual and constitutionally protected interest.

169.    The risks of depriving Plaintiffs and retired Class members of these vested contractual and constitutionally protected interests without first providing notice and a reasonable opportunity to be heard are high.

170.    Defendant's interest to deprive Plaintiffs without first providing notice and a reasonable opportunity to be heard are non-existent or minimal.

171.    The actions at issue substantially impair the provisions in Plaintiffs' contractual agreements and deprive them of a constitutionally protected property interest.

172.    As a direct and proximate result of Defendant's actions, Plaintiffs sustained and will sustain injury and damages, including but not limited, to the deprivation of their rights under the US Constitution.

173.    Defendant's substantial impairment of these contractual obligations has proximately caused, and will continue to cause Plaintiffs and their dependents and the putative Class Members irreparable injury and damage, including (1) denial of their reasonable expectations under the CBAs, past practice and State law, that Defendant would continue to

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 88 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 49 of
113
194

comply with its contractual obligations; (2) interference with the protections under the law to collectively bargain under the procedures provided under state law and municipal law; and (3) denial of their constitutional rights under the U.S. Constitution.

174.    Plaintiffs have a Constitutionally-protected property interest in the health care benefits and contribution rates that they are entitled to receive.

175.    Defendant has denied Plaintiffs the health care benefits and contribution rates without any cognizable procedure whatsoever.

176.    The Charter for the City of Detroit recognizes that these retirees are entitled to representation, to wit, "[r]etired general city employees are entitled to be represented in the city legislative and budgetary proceedings on issues affecting their interest by persons elected by them," but such representation was not given.  *Charter, Article 9, Chapter 6.*

177.    Defendant's actions in unilaterally modifying the retirees' health care benefits and contributions, as set forth herein, deprives and continues to deprive Plaintiffs of their constitutionally protected right to equal protection of the laws and substantive due process as secured by the Fourteenth Amendment of the United States Constitution.

178.    Plaintiffs have been subject to adverse treatment by Defendant as set forth and described herein.

179.    As a direct and proximate result of the Defendant's unfair treatment, Plaintiffs have suffered and will continue to suffer substantial injury, including but not limited to irreparable harm.

180.    As a direct and proximate result of Defendant's failure to provide adequate due process, Plaintiffs have suffered and will continue to suffer substantial injury, including but not

13-53846-tit    Doc 8996-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 89 of
13-53846-swr    Doc 8274-3    Filed 11/12/14    Entered 11/12/14 17:08:28    Page 50 of
194

limited to irreparable harm by the City's continued implementation of unilateral changes to the retirees' property interest in their health care benefits.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT V -- VIOLATION OF 42 U.S.C. § 1983

181.   Plaintiffs repeat and re-allege all the preceding paragraphs as if fully set forth herein.

182.   The City through its actions and decisions has deprived Plaintiffs and the Class Members of their federally protected rights, provided by federal law and the United States Constitution.

183.   The policies, decisions and actions of the City were based on considerations other than those proper to the good faith administration of justice.

184.   The City's actions constitute a deliberate denial, under color of law, of Plaintiffs' federal rights guaranteed under the 5th Amendment Due Process and Equal Protection Clauses of the 14th Amendment of the United States Constitution, as well in violation of 42 U.S.C. § 1983.

185.   Plaintiffs have, as a direct and proximate result of the City of Detroit's action, suffered and will continue to suffer substantial and irreparable harm and injury.

51

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 90 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 51 of
194

186.    Defendant's actions have substantially harmed Plaintiffs and the putative Class Members and the City has announced future actions which will irreparably harm Plaintiffs and the putative Class Members. Thus, injunctive relief is required.

187.    The City acted in an arbitrary, capricious and discriminatory manner and their actions show a reckless disregard and callous indifference for Plaintiffs' federally protected rights. Plaintiffs are therefore entitled to exemplary damages, costs and attorney fees pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request: (a) certification of this action as a class action under Fed. R. Civ. P. 23, (b) a declaration that Defendant's actions are unconstitutional and/or constitute a breach of the collective bargain agreements at issue, (c) permanent injunctive relief to prevent further irreparable Constitutional injury and breaches of the collective bargaining agreements, (d) entry of Judgment in Plaintiffs' favor in whatever amount Plaintiffs may be found to be entitled, plus interest, costs and attorneys' fees, and (e) any and all other relief which Plaintiffs are found to be entitled.

## COUNT VI - INJUNCTIVE RELIEF AND IRREPARABLE HARM

188.    Defendant has undertaken steps to increase the rates of contribution and increase the o-payments and deductibles and otherwise unilaterally modify the agreed upon contractual terms of the retirees health care.  Upon information and belief, such changes are scheduled to be implemented in July 2012 or some time shortly thereafter to union retirees and have already been implemented as to non-union retirees.

189.    The City Administration, Labor Relations and City Council have authorized these changes.

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 91 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 52 of
194
Appendix 85

190.    These changes impair the obligation of contract as to Plaintiffs and the proposed class members.

191.    It is also an unconstitutional impairment of obligation of contract in violation of Section 10 of the United States Constitution.

192.    It is also an unconstitutional impairment of obligation in violation of the City Charter.

193.    It is also an unconstitutional impairment of obligation in violation of the Municipal Code.

194.    The retirees will be forced to make choices to allocate sparse resources, including foregoing health care coverage, prescriptions and medical care which will result in irreparable harm, and a permanent detrimental impact on health and well-being.

195.    The imposition of additional insurance costs on retirees constitutes irreparable harm because of the financial hardship on retirees on fixed incomes, emotional distress and possible deprivation of life's necessities by reallocating scant resources to pay for needed healthcare.  They will have to choose between medical care, food or other life essentials.

196.    These retirees cannot afford to contribute the increased amounts, thus, they may have to reduce their health insurance or lose their level of coverage.

197.    Even if the retirees prevail, reimbursing them at the end of the litigation will not compensate them for the impact on their health in the interim.

198.    The balance of hardships weigh in favor of granting Plaintiffs injunctive relief because the harm to Plaintiffs cannot be undone.

199.    Despite the manifest illegality, invalidity and unconstitutionality of these actions, Defendant, its officials, agents, and employees, unless restrained by order of this Court, will

53

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 92 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 53 of
194
Appendix 86

enforce these changes against Plaintiffs, causing them irreparable injury, including the fact that they will be deprived of the ability to afford adequate health care and by reason of which Plaintiffs do not have an adequate remedy at law.

200. The Plaintiffs are likely to succeed on the merits as Plaintiffs have vested contractual rights to the health care benefits at issue.

201. A preliminary injunction is not contrary to the public interest.

WHEREFORE, Plaintiffs respectfully request the Court to issue a temporary injunction restraining Defendant from enforcing its resolution and these changes in the Employee Health Benefit Plan as to retirees and restore the non -union retirees to the status quo prior to the 2012 changes.

### **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A. Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Declare that the actions of Defendant described constitute violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments to the Constitution;

C. Enter a permanent injunction prohibiting Defendant from engaging in the violations of the Contracts Clause of the United States Constitution and the 5th and 14th Amendments;

D. Enter a Judgment finding that Defendant's actions in unilaterally changing the retirees' health care plan, modifying the contribution rate, benefits, deductibles and other terms of the plan constitutes a breach of the parties' CBAs;

54

13-53846-tit  Doc 8996-1  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 93 of
13-53846-swr  Doc 8274-3  Filed 11/12/14  Entered 11/12/14 17:08:28  Page 54 of
194
Appendix 87

E.      Award Plaintiffs and the Class they seek to represent compensatory damages in an

        amount to be determined at trial to fully compensate them for their injuries;

F.      Award any other damages that are permissible;

G.      Award attorneys' fees and costs; and

H.      Award such other relief as the Court deems appropriate and just.


## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Ann L. Miller (P43578)
Sharon S. Almonrode (P33938)
950 West University Dr. Ste. 300
Rochester, MI 48307
(248) 841-2200

Dated: June 27, 2012

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 94 of
13-53846-swr   Doc 8274-3   Filed 11/12/14   Entered 11/12/14 17:08:28   Page 55 of
194
113
Appendix 98

# EXHIBIT 4

THE BANKRUPTCY COURT HAS NOT APPROVED THE PROPOSED DISCLOSURE STATEMENT TO ACCOMPANY THIS PLAN. THE DISTRIBUTION OF THIS PLAN AND THE DISCLOSURE STATEMENT IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED AS, A SOLICITATION OF VOTES ON THIS PLAN. THE CITY OF DETROIT, MICHIGAN RESERVES THE RIGHT TO MODIFY, AMEND, SUPPLEMENT, RESTATE OR WITHDRAW THIS PLAN, THE DISCLOSURE STATEMENT AND ALL ANCILLARY DOCUMENTS AT ANY TIME.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------ x
                                          :
In re                                     :        Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :        Case No. 13-53846
                                          :
                Debtor.                   :        Hon. Steven W. Rhodes
                                          :
                                          :
------------------------------------------------ x
```

## FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT
### (May 5, 2014)

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

13-53846-tjt  Doc 8996-1  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 96 of
13-53846-swr  Doc 4392  Filed 05/05/14  Entered 05/05/14 11:52:07  Page 1 of 301
113

Appendix 89

Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

8. "Adjusted Pension Amount" means the GRS Adjusted Pension Amount and/or the PFRS Adjusted Pension Amount, as applicable.

9. "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code and/or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee (other than the Retiree Committee) or any member thereof shall be considered an Administrative Claim.

10. "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

11. "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

12. "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

13. "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

14. "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

15. "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

16. "Annuity Savings Fund Excess Amount" means: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual

-2-

13-53846-tjt    Doc 8096-1    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 97 of
13-53846-swr    Doc 4392    Filed 05/05/14    Entered 05/05/14 11:52:07    Page 9 of 301
113

Appendix 90

44. "City Council" means the duly-elected City Council of the City.

45. "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

46. "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

47. "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) one year after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court.

48. "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

49. "Class" means a class of Claims, as described in Section II.B.

50. "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements.

51. "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

52. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

53. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

54. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

55. "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

56. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

57. "COP Claim" means a Claim under or evidenced by the COP Service Contracts.

58. "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

59. "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006,

dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

60.    "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

61.    "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.61, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

62.    "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

63.    "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

64.    "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

65.    "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

66.    "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

67.    "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

68.    "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

69.    "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

70.    "Creditor Representative" means (a) if all Retiree Classes accept the Plan and the Retiree Committee supports the Plan, the Retiree Committee, (b) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 accepts the Plan, a person or committee of persons appointed by the five largest beneficial holders of Class 7 Claims other than the LTGO Insurer and (c) if any Retiree Class rejects the Plan or the Retiree Committee does not support the Plan, and Class 7 rejects the Plan, a person or committee of persons appointed by the Emergency Manager.

71.    "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

72.    "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue

pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

73.    "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension of a person who was a current retiree as of June 30, 2014.

74.    "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

75.    "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OBEB Claim.

76.    "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

77.    "Detroit General VEBA Beneficiary" means a Holder of an Allowed OPEB Claim who is a Detroit General Retiree.

78.    "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.78.

79.    "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

80.    "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

81.    "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

82.    "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.82.

83.    "DIA" means The Detroit Institute of Arts, a museum and cultural facility located at 5200 Woodward Avenue, Detroit, Michigan 48202.

84.    "DIA Assets" means the assets identified on Exhibit A to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, to the extent that the City holds title to any such assets as of the Effective Date.

85.    "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

86.    "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations listed on Exhibit C to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, and all additional persons, businesses, business-affiliated foundations and any other foundations from which DIA Corp. secures commitments to contribute monies in furtherance of the DIA Settlement.

87. "DIA Funding Parties" means the Foundations, the DIA Funders and DIA Corp.

88. "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.F.1.

89. "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

90. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

91. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.F and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.91.

92. "DIA Settlement Documents" means the definitive documentation, including grant award letters, to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.92, which documents will substantially conform to the term sheet attached hereto as Exhibit I.A.91.

93. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

94. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented or otherwise modified.

95. "Disclosure Statement Order" means the [_____] (Docket No. [___]), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on [_____], 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

96. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

97. "Disputed Claim" means any Claim that is not Allowed.

98. "Disputed COP Claims Reserve" means the reserve for Disputed COP Claims established pursuant to Section II.B.3.p.iii.B.1.

99. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

100. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

101. "Distribution Date" means any date on which a Distribution is made.

102. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 101 of
13-53846-swr   Doc 4392   Filed 05/05/14   Entered 05/05/14 11:52:07   Page 15 of 301
113

official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

144. "Fee Review Professional Fees" means the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date.

145. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

146. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

147. "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year. A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

148. "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.91, solely in their capacity as participants in the DIA Settlement.

149. "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

150. "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

151. "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

152. "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

153. "GRS" means the General Retirement System for the City of Detroit.

154. "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

13-53846-tjt   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 102 of
13-53846-swr   Doc 4392-1   Filed 05/05/14   Entered 05/05/14 11:52:07   Page 19 of 301
113
Appendix 95

(b) If Classes 10 and 11 do **not** vote to accept the Plan and/or funding is **not** received from the DIA Settlement and the State Contribution Agreement: for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

155.    "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

156.    "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

157.    "Holder" means an Entity holding a Claim.

158.    "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

159.    "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.159, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160.    "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.159.

161.    "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

162.    "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

163.    "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

164.    "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 103 of
13-53846-swr   Doc 4392   Filed 05/05/14   Entered 05/05/14 11:52:07   Page 20 of 301
113

Appendix 96

employee's years of service after July 1, 2014. For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

191. "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.191.a and the material terms of which are set forth at Exhibit I.A.191.b.

192. "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014. For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

193. "New Securities" means, collectively, the New DWSD Bonds, the New Existing Rate DWSD Bonds, the New B Notes and the Municipal Obligation.

194. "Oakland County" means the County of Oakland, Michigan.

195. "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan and the Employees Death Benefit Plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

196. "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

197. "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim, a Parking Bond Claim or a Secured GO Bond Claim.

198. "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim or a Subordinated Claim. For the avoidance of doubt, Section 1983 Claims, Indirect Employee Indemnity Claims and Indirect 36th District Court Claims are included within the definition of Other Unsecured Claim.

199. "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

200. "Parking Bond Claim" means any Claim against the City arising under or evidenced by the Parking Bond Documents, including a Claim for principal and interest on the Parking Bonds.

201. "Parking Bond Documents" means the resolutions adopted, ordinances passed and orders issued with respect to the Parking Bonds, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

-16-

113

13-53846-swr   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 104 of
13-53846-swr   Doc 4392-1   Filed 05/05/14   Entered 05/05/14 11:52:07   Page 23 of 301

Appendix 97

224. "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water and/or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

225. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

226. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

227. "Reinstated Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,410,000 that, from and after the Effective Date, will remain outstanding and will be payable from the UTGO Bond Tax Levy, as more particularly described on Exhibit I.A.285.

228. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

229. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the DIA Funding Parties and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

230. "Restoration Trust" means a trust to be established (a) to hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

231. "Restructured UTGO Bonds" means the bonds to be issued by the Michigan Finance Authority to the current Holders of Unlimited Tax General Obligation Bonds in the amount of $287,500,000 pursuant to the UTGO Settlement, which bonds shall be limited obligations of the Michigan Finance Authority and shall be secured as more particularly described on Exhibit I.A.285.

232. "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

233. "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

234. "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of

13-53846-tit  Doc 8996-1  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 105 of
-19-
113
13-53846-swr  Doc 4392  Filed 05/05/14  Entered 05/05/14 11:52:07  Page 26 of 301
Appendix 98

273. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

274. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

275. "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

276. "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

277. "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

278. "Unlimited Tax General Obligation Bond Claims" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

279. "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.279, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all instruments and agreements related thereto.

280. "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.279.

281. "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

282. "Unsecured Pro Rata Share" means, when used with reference to a Distribution of New B Notes to Holders of Allowed Claims within Classes 7, 9, 12, 13 and 14 entitled to receive a distribution of New B Notes, the proportion that an Allowed Claim bears to the sum of all Allowed Claims and Disputed Claims within such Classes. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating the Unsecured Pro Rata Share of property to be distributed to Holders of Allowed Claims in such Class, unless otherwise ordered by the Bankruptcy Court.

283. "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

284. "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

285. "UTGO Settlement" means the comprehensive settlement regarding Unlimited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, the principal terms of which are attached hereto as Exhibit I.A.285 and described in Section IV.D.

### G.     No Changes in Terms for Ten Years.

Except as may be required to maintain the tax-qualified status of the PFRS, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### H.     State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r.     Class 11 – GRS Pension Claims.

#### i.     Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

#### ii.     Treatment.

##### A.     Contributions to GRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain City sources, pension-related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution and certain DIA Proceeds. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

##### B.     Investment Return Assumption.

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

##### C.     Modification of Benefits for GRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that

Appendix 100

such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.F.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Annuity Savings Fund Recoupment.

#### 1. ASF Current Participants.

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

#### 2. ASF Distribution Recipients.

The Annuity Savings Fund Excess Amount will be calculated for each ASF Distribution Recipient, will then be converted into monthly annuity amounts based on each ASF Distribution Recipient's life expectancy and other factors and will be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension checks exceed the ASF Recoupment Cap or, if applicable, the Current GRS Retiree Adjustment Cap.

### E. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.G.

### F. Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, GRS shall establish an Investment Committee in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date.

### H. No Changes in Terms for Ten Years.

Except as may be required to maintain the tax-qualified status of the GRS, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that

13-53846-tit   Doc 8996-1   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 108 of
13-53846-swr   Doc 4392   Filed 05/05/14   Entered 05/05/14 11:52:07   Page 41 of 301
113
Appendix 101

govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

### I. State Contribution Agreement

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s. Class 12 – OPEB Claims.

#### i. Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii. Treatment.

##### A. Detroit General VEBA.

Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.78, and shall, among other things, identify the members of the Detroit General VEBA's initial board of trustees. The DRCEA and the Retiree Committee will each be able to appoint board members in equal numbers, and such appointees will constitute a majority of the initial Detroit General VEBA board; the City will appoint the remaining members. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

##### B. Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a board of trustees that will be responsible for, among other things, management of property held by the Detroit

Appendix 102

Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.82, and shall, among other things, identify the members of the Detroit Police and Fire VEBA's initial board of trustees. The initial board members will be appointed by the City, the Retiree Committee and the RDPFFA. Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

        <u>Distributions to Detroit Police and Fire VEBA</u>: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to contingent additional distributions from the Disputed COP Claims Reserve as set forth in Section II.B.3.p.iii.B.2.

### C.  No Further Responsibility.

        From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to current or former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary. The Employees Death Benefit Plan will be self-liquidating, and existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General Authority or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

    t.  **Class 13 – Downtown Development Authority Claims.**

        i.  **Allowance.**

        On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

        ii.  **Treatment.**

        Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

    u.  **Class 14 – Other Unsecured Claims.**

        i.  **Treatment.**

        Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, an Unsecured Pro Rata Share of New B Notes.

# ARTICLE VI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**A.** **Treatment of Disputed Claims.**

**1.** **General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

**2.** **ADR Procedures.**

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

**3.** **Tort Claims.**

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction selected by the City that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

-55-

**B.** **Disputed Claims Reserve.**

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim. Notwithstanding the foregoing, the disputed claim reserve established pursuant to this Section shall not include any reserve of property on account of Disputed COP Claims, which shall receive the treatment set forth in Section II.B.3.p.iii.

**C.** **Objections to Claims.**

**1.** **Authority to Prosecute, Settle and Compromise.**

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. Except as otherwise provided in Section II.B.3.p.i with respect to Disputed COP Claims, as of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

**2.** **Application of Bankruptcy Rules.**

To facilitate the efficient resolution of Disputed Claims, the City shall be permitted to File omnibus objections to claims notwithstanding Bankruptcy Rule 3007(c).

**3.** **Expungement or Adjustment of Claims Without Objection.**

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

**4.** **Extension of Claims Objection Bar Date.**

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

**5.** **Authority to Amend List of Creditors.**

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such

amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.    Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B.    Enforce the term (maturity) of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, notwithstanding any state law to the contrary;

C.    Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D.    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H.    Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I.    Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;