# EXHIBIT 5

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------------x
:
In re                          :     Chapter 9
:
CITY OF DETROIT, MICHIGAN,     :     Case No. 13-53846
:
          Debtor.      :     Hon. Steven W. Rhodes
:
-------------------------------------------------------------x

## FOURTH AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FOURTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
   PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

13-53846-swr Doc 4391 Filed 05/05/14 Entered 05/05/14 21:46:47 Page 2 of 101
13-53846-tjt Doc 8996-2 Filed 01/01/15 Entered 01/01/15 21:46:47 Page 2 of 101
Appendix 10

applicable type of debt. References to Class 1A, Class 1B or Class 1C should, therefore, be construed as references to the applicable collection of Classes or to any discrete Class within such collection, as applicable or as warranted by context. The following sets forth which Classes are entitled to vote on the Plan and which are not:

- The City is not seeking votes from the Holders of Claims in Classes 1B (DWSD Revolving Sewer Bond Claims), 1C (DWSD Revolving Water Bond Claims), 2A (Secured GO Series 2010 Claims), 2B (Secured GO Series 2010(A) Claims), 2C (Secured GO Series 2012(A2) Claims), 2D (Secured GO Series 2012(A2-B) Claims), 2E (Secured GO Series 2012(B) Claims), 2F (Secured GO Series 2012(B2) Claims), 3 (Other Secured Claims), 4 (HUD Installment Notes Claims) and 6 (Parking Bonds Claims) because the City believes those Claims are not impaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Holders of these Claims are conclusively presumed to have accepted the Plan. Accordingly, Holders of Claims in these classes will not have the right to vote with respect to the Plan.

- The City is not seeking votes from the Holders of those certain Claims in Class 1A (DWSD Bond Claims) that are identified as unimpaired on Exhibit I.A.110 to the Plan, which Claims shall be Reinstated on the Effective Date.

- Holders of Claims in Class 16 (Subordinated Claims) will be impaired under the Plan. Because the City does not anticipate that such Holders will receive any Distributions pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each Holder of a Claim in this Class will be deemed to have rejected the Plan and will not have the right to vote with respect to the Plan.

- The City is seeking votes from the Holders of Allowed Claims in Class 1A (DWSD Bond Claims) (except for Claims in Class 1A that are identified as unimpaired on Exhibit I.A.110 to the Plan), Class 5 (COP Swap Claims), Class 7 (Limited Tax General Obligation Bond Claims), Class 8 (Unlimited Tax General Obligation Bond Claims), Class 9 (COP Claims), Class 10 (PFRS Pension Claims), Class 11 (GRS Pension Claims), Class 12 (OPEB Claims), Class 13 (Downtown Development Authority Claims), Class 14 (Other Unsecured Claims) and Class 15 (Convenience Claims) because those Claims are impaired under the Plan, and the Holders of Allowed Claims in such Classes are receiving a distribution under the Plan on account of such Allowed Claims. The Holders of such Claims will have the right to vote to accept or reject the Plan.

- **IF YOU ARE RETIRED OR SEPARATED FROM THE CITY OF DETROIT AND ARE RECEIVING OR ENTITLED TO RECEIVE A PENSION, OR ARE AN ACTIVE EMPLOYEE ENTITLED TO A PENSION UPON YOUR RETIREMENT, OR ARE RECEIVING RETIREE HEALTH BENEFITS FROM THE CITY, YOU ARE A HOLDER OF A CLAIM IN CLASS 10, CLASS 11 AND/OR CLASS 12 AND YOU ARE ENTITLED TO VOTE ON THIS PLAN OF ADJUSTMENT. FOR FURTHER INFORMATION, PLEASE SEE THE SPECIAL NOTICES ENCLOSED WITH THIS DISCLOSURE STATEMENT.**

For a detailed description of the Classes of Claims and their treatment under the Plan, see Section II of this Disclosure Statement, "Summary of Classification and Treatment of Claims Under the Plan."

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim, the plan (i) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (ii) reinstates the maturity of such claim as it existed before the default, (iii) compensates the holder of such claim for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (iv) does not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder of such claim.

Except as otherwise provided in the Plan and/or any applicable orders of the Bankruptcy Court, the Holder of a Claim that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (a) the Plan provides a distribution in respect of such Claim, (b) the Claim has been scheduled by the City (and is not scheduled as disputed, contingent, or unliquidated), (c) the Holder of such Claim has timely filed a proof of Claim or (d) a proof of Claim was deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline.

-2-

13-53846-swr Doc 4391 Filed 05/05/14 Entered 05/05/14 11:50:12 Page 17 of 197
13-53846-tjt Doc 8996-2 Filed 01/01/15 Entered 01/01/15 21:46:47 Page 3 of 101

Appendix 1C

In addition, to the extent an Eligible Pensioner's Estimated Adjusted Annual Household Income (as defined below) in any calendar year after the first year of the program is less than 105% of the Federal Poverty Level in that year, the Eligible Pensioner will receive an additional benefit – the **"Income Stabilization Benefit Plus."** The Income Stabilization Benefit Plus for a calendar year will be equal to the lesser of either (i) the amount needed to restore 100% of the Eligible Pensioner's pension benefit, including COLAs or "escalators;" or (ii) the amount needed to bring the Eligible Pensioner's Estimated Adjusted Annual Household Income in that calendar year up to 105% of the Federal Poverty Level in that year.

An Eligible Pensioner's **"Estimated Adjusted Annual Household Income"** for any year will be the sum of (i) the Eligible Pensioner's 2013 total household income (per his (or in the case of minor children, their legal guardian's) 2013 income tax return or equivalent documentation), less the pension benefit paid to the Eligible Pensioner in 2013, as adjusted for inflation or Social Security COLA increases; (ii) the reduced pension benefit that PFRS or GRS, as applicable, will pay the Eligible Pensioner for that year; (iii) any PFRS or GRS pension restoration payment to the Eligible Pensioner due to an improved PFRS or GRS funding level; and (iv) the Eligible Pensioner's Income Stabilization Benefit.

Notwithstanding the foregoing, Income Stabilization Payments under both GRS and PFRS will not exceed $20 million in the aggregate.

The Income Stabilization Benefit and Income Stabilization Benefit Plus will be paid from the Income Stabilization Funds of PFRS and GRS. The Income Stabilization Funds of PFRS and GRS will be funded with certain proceeds of a settlement with certain bond creditors, up to an aggregate amount of $20 million to be divided between the Income Stabilization Fund of GRS and the Income Stabilization Fund of PFRS.

Under the Plan, PFRS and GRS each will establish an **"Investment Committee"** for the purpose of making recommendations to the boards of trustees of PFRS and GRS with respect to certain matters, and for purposes of making some determinations. Each Investment Committee will consist of five independent members and two or more non-independent members, which non-independent members may include employees of the City or members or retirees of PFRS or GRS, as applicable, provided that at all times during the 20-year period following disbursement of the State Contribution, the independent members shall have at least 70% of the voting power. Each independent Investment Committee member shall possess, by reason of training or experience or both, a minimum level of expertise in managing or advising pension systems, all as agreed to by the City, the State and PFRS or GRS, as applicable, after consultation with the Foundations.

In the event that, in 2022 (provided that the State has not issued a certificate of default with respect to PFRS or GRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the respective Investment Committee that the Income Stabilization Fund of PFRS or GRS, as applicable, has more assets than it needs to provide Income Stabilization Benefits and Income Stabilization Benefits Plus, such Investment Committee may recommend to the board of trustees that the excess assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by PFRS or GRS, as applicable. In the event that any funds remain in the relevant Income Stabilization Fund on the date upon which no Eligible Pensioners under PFRS or GRS, as applicable, remain, such funds shall be used to fund the Adjusted Pension Amounts payable by PFRS or GRS, as applicable.

**"Eligible Pensioners"** are those retirees, surviving spouses or surviving minors who hold a Pension Claim and who are eligible to receive Income Stabilization Benefits because such Holder (i) is, as of the effective date of the Plan, at least 60 years of age or a minor child receiving survivor benefits from PFRS or GRS, and (ii) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (per their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation). No new persons will be eligible to receive Income Stabilization Benefits or Income Stabilization Benefits Plus at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

### How The Plan Affects OPEB Claims (Retiree Health, Dental, Vision & Death Benefits)

Under the Plan, the City will no longer sponsor and maintain retiree health or death benefits programs for existing retirees, surviving beneficiaries and their dependents. Instead, the City will establish two voluntary employees' beneficiary association trusts (known as a **"VEBA"**) – one for PFRS-related retirees and one for GRS-related retirees. The two VEBAs will be responsible for providing retiree health benefits beginning January 1, 2015 to existing retirees, surviving beneficiaries and their eligible dependents. The VEBAs will be funded with a portion of a note (the "New B Note") that will be issued to satisfied the OPEB claims and other unsecured claims. It is not likely that the funding will be sufficient to

-26-

13-53846-swr   Doc 4391   Filed 05/05/14   Entered 05/05/14 11:50:12   Page 41 of 197
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 4 of 101
Appendix 1(

# EXHIBIT 6

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-----------------------------------------------x
:
In re                          :       Chapter 9
:
CITY OF DETROIT, MICHIGAN,   :       Case No. 13-53846
:
          Debtor.       :       Hon. Steven W. Rhodes
:
:
-----------------------------------------------x

**OBJECTION OF THE CITY OF DETROIT, PURSUANT TO**
**SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE,**
**BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1,**
**TO PROOF OF CLAIM NUMBER 2958 FILED BY MICHIGAN**
**AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALS**

The City of Detroit (the "City") hereby objects, pursuant to

sections 105 and 502(b) of title 11 of the United States Code (the "Bankruptcy

Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and Rule 3007-1 of the Local Rules of the Bankruptcy Court for

the Eastern District of Michigan (the "Local Rules") to proof of claim

number 2958 (the "Claim") filed by Michigan AFSCME Council 25 and its

affiliated Detroit Locals (the "Claimant") for the reasons set forth below. A copy

of the Claim is attached hereto as Exhibit 1. In support of this Objection, the City

respectfully represents as follows:

ATI-2604933v6
  13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 1 of 15
  13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 6 of 101
Appendix 11

## General Background

1.      On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2.      As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities). As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

3.      In February 2013, a state review team determined that a local government financial emergency exists in the City. Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case. MCL § 141.1558.

4.      On May 5, 2014, the City filed the Fourth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 4392) (as it may be further amended, modified or supplemented from time to time, the "Plan") and the Fourth Amended Disclosure Statement with Respect to Fourth Amended Plan for

ATI-2604933v6

-2-

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 2 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 7 of 101

Appendix 11

the Adjustment of Debts of the City of Detroit (Docket No. 4391) (the "Disclosure Statement"). That same day, the Court entered the Order Approving the Proposed Disclosure Statement (Docket No. 4401), thereby approving the Disclosure Statement as containing "adequate information" with respect to the Plan, pursuant to section 1125(a)(1) of the Bankruptcy Code.

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background Regarding the Claims Process and the Claim

6.      On November 21, 2013, the Court entered the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782) (the "Bar Date Order"). The Bar Date Order established February 21, 2014 at 4:00 p.m., Eastern Time (the "General Bar Date"), as the general deadline for the filing of proofs of claim in the City's chapter 9 case.

7.      On the General Bar Date, the Claimant filed the Claim, asserting liabilities in the aggregate amount of not less than $8,718,697,854.82. The Claim expressly provides that it consists of a number of separate claims.

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 3 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 8 of 101

Appendix 11

Claim, at 1.  The Claimant filed the Claim for all amounts due to the Claimant and its members and former member retirees and future retirees with respect to an array of potential liabilities.  Id.  The Claim is protective in nature, identifying a series of broad categories of claims, as well as "any other claims which arise before July 18. 2014."

8.     For example, the Claim generally asserts liabilities against the City arising from the following:  (a) unfunded or underfunded pension obligations (including annuity savings fund obligations) owed with respect to the City's General Retirement System (the "GRS"); (b) unfunded or underfunded other post-employment benefit ("OPEB") obligations (including obligations owed with respect to the City's Health and Life Insurance Benefit Plan and/or the Supplemental Death Benefit Plan and/or other non-pension postemployment welfare benefits, including unfunded actuarially accrued liabilities); (c) grievances and other disputes under the various union contracts, the City Employment Terms (the "CETs") or other contractual obligations; (d) monies owed for violations of local, state or federal law and unfair labor practice charges; and (e) monies owed due to uncompensated services performed.  Claim, at 1.

9.     The Claimant asserts that not less than $8.1 billion of the total liability asserted in the Claim arises in connection with underfunded pension and OPEB obligations.  Claim, at Ex. 1.  Otherwise, with the exception of certain

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 4 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 9 of 101
Appendix 11

individual grievance claims and other matters, the aggregate amount of the Claim generally is not allocated between the diverse categories of liability asserted therein. See id. Moreover, it is unclear how the total asserted claim of $8,718,697,854.82 was calculated.

## Relief Requested

10.     Pursuant to sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, the City seeks the entry of an order or orders disallowing and expunging the Claim to the extent invalid and liquidating any remaining portion of the Claim.

## Objection to the Claim

11.     Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a debtor only to the extent that it has a "right to payment" for the asserted liability. See 11 U.S.C. §§ 101(5), 101(10).[1] By contrast, there is no right to payment — and therefore no claim — to the extent that the asserted liability is not due and owing by a debtor. Section 502(b)(1) of the Bankruptcy Code further provides that a claim asserted in a proof of claim shall be allowed,

---

[1]     Section 101(10) of the Bankruptcy Code defines a "creditor" in pertinent part as "an entity that has a claim against the debtor." 11 U.S.C. § 101(10). Section 101(5) in turn defines a "claim" as a "right to payment" or "the right to an equitable remedy for breach of performance if such breach gives rise to a right for payment." 11 U.S.C. § 101(5).

ATI-2604933v6

-5-

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 5 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 10 of
101                                                                      Appendix 11

except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. §502(b)(1).[2]

12.     The Claim is the single largest partially liquidated claim filed against the City in this chapter 9 case. For all practical purposes, however, the Claim is unliquidated. The Claim is an extremely broad-based protective claim filed by the Claimant collectively on behalf of the individuals that it represents. The Claim provides on its face that it consists of a number of separate claims and asserts generalized and often unliquidated liabilities against the City covering dozens of topics and hundreds of individual grievances.

13.     The City contests many elements of the Claim to the extent it understands them, but the liabilities asserted in the Claim frequently are too vague to permit the City to respond in a meaningful way. See, e.g., Claim, at 1 (providing that the Claim asserts liabilities for, among other things, "monies owed for violations of local, state or federal law" and "any other claims which arose prior to [the Petition Date]"). Other portions of the claims relate to hundreds of individual grievances and causes of action that cannot adequately be addressed in a single claim objection. An efficient process to resolve or adjudicate these disparate matters must be established.

---

[2]     Section 502 of the Bankruptcy Code is made applicable in the City's chapter 9 case by section 901 of the Bankruptcy Code. See 11 U.S.C. § 901.

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 6 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 11 of
                                        101                                        Appendix 11

14.     The largest amount of the Claim consists of $8.1 billion in GRS pension and OPEB liabilities.  Although the City contests the calculation of these amounts, the Plan addresses all pension and OPEB liabilities independent of the Claim by providing for the continuation of modified post-employment benefits for the individuals that the Claimant seeks to protect by filing the Claim.  See, e.g., Plan, at §§ II.B.3.r, II.B.3.s (providing for, respectively, the preservation and treatment of GRS pension and OPEB claims).  Accordingly, the Claim is unnecessary to preserve these individuals' rights to payment on account of such liabilities.  Subject to the confirmation of the Plan, this portion of the Claim may be disallowed.

15.     In addition, the Claim expressly asserts liabilities against the City arising from the imposition of the CETs.  This element of the Claim is duplicative of proof of claim number 2851 filed by the Claimant and other labor organizations (the "Coalition Claim"), which claim asserts approximately $242.6 million in liabilities arising from the imposition of the CETs.[3]  Although difficult to determine, the Claim also asserts liabilities that appear to be included in claims filed by City employees or retirees.  The duplicative portions of the claim should be disallowed.

---

[3]     The City is objecting separately to the Coalition Claim contemporaneously with the filing of this Objection.

13-53846-swr   Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 7 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15    Entered 01/01/15 21:46:47    Page 12 of
                                        101                                    Appendix 11

16.     Other elements of the claim involve far reaching disputes and grievances of all sorts. For example, the Claim includes a 73-page chart identifying hundreds of individual grievances held by individuals represented by the Claimant. See Claim, at Ex. 2. These grievances are based on a wide array of employment and workplace issues, such as promotions, absenteeism, harassment, work assignments, suspensions, health insurance matters, work performance, overtime, wage calculation, theft, reductions in force and workplace conditions – to name just a few. Although the City anticipates that certain portions of these grievance claims could represent valid liabilities of the City in some unknown amount, the City generally disputes each of these individual grievance claims or portions thereof and believes that the total asserted amount of these claims (to the extent liquidated) is substantially overstated. In addition, many of the grievance claims asserted by the Claimant do not identify any liquidated amount of asserted damages. See id.

17.     The City previously has contested many of these matters when they were asserted as individual grievances. Although arbitration of these prepetition grievances currently is stayed pursuant to sections 362 and 922 of the Bankruptcy Code, the City is engaged in active and productive mediations and negotiations with AFSCME regarding all grievances. In fact, AFSCME and the City have reached a tentative agreement on all outstanding prepetition grievances

ATI-2604933v6                                    -8-

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 8 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 13 of
101                                                            Appendix 11

asserted on behalf of individual employees for which AFSCME seeks monetary relief. As part of the settlement, the City expects AFSCME will withdraw its bankruptcy claims related to the settled matters.

18.     In a similar vein, the Claim identifies several alleged liabilities related to various other proceedings identified in Exhibit 1 to the Claim, including a number of proceedings before the Michigan Employment Relations Commission. To the extent any such proceedings have not been adjudicated on a full and final basis before the applicable tribunal, the City disputes its liability to the Claimant or the individuals it represents on account of such liabilities.

19.     In sum, the City has determined that it contests each of the diverse elements of the Claim and that the Claim should be disallowed to the extent each of the claims contained within these elements is (a) overstated or lacking in any legal basis, (b) duplicative of other claims asserted in the City's chapter 9 case by the Claimant or others or (c) otherwise addressed under the Plan independent of the filing of the Claim. Any potentially valid portion of the Claim would have to be liquidated after an appropriate briefing of the legal issues and, if necessary, the development of an appropriate factual record.

### Request for a Status Conference

20.     Given the size and scope of the hundreds of individual claims asserted in this single proof of claim, the City believes that, as a practical matter,

ATI-2604933v6                                                                    -9-

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 9 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 14 of
                                          101                                    Appendix 11

the Claim cannot be adjudicated through a typical claim objection proceeding. To the extent not resolved by the parties, the City submits that an efficient process must be developed to adjudicate or liquidate the various elements of the Claim on a rational and timely basis. As noted, the City has been negotiating with the Claimant about the various individual grievances incorporated into the claim and has initiated a dialog with the Claimant regarding the overall resolution of the Claim. The City intends to continue this dialog with the goal of proposing to the Court a process to efficiently brief and adjudicate each of the remaining elements of the Claim that cannot be resolved consensually. Based on the progress in negotiations over individual grievances, the City believes that the number of contested issues and the involvement of this court can be minimized.

21. Accordingly, the City requests that the initial hearing on this Objection be conducted as a status conference pursuant to section 105(d)(1) of the Bankruptcy Code, at which the parties may (a) report to the Court on their progress in resolving the liabilities asserted in the Claim, (b) report on any proposed procedures for completing the resolution of the Claim or, if necessary, adjudicating or liquidating any unresolved portions of the Claim and (c) seek the Court's guidance on these issues.

ATI-2604933v6

-10-

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 10 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 15 of
101                                                                    Appendix 11

## Reservation of Rights

22.     The City files this Objection without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

23.     The City reserves the right to amend or supplement this Objection as necessary or appropriate.

## Notice

24.     Notice of this Objection has been given to the Claimant and all parties that have requested notice in this case pursuant to Bankruptcy Rule 2002. The City submits that no other or further notice need be provided.

## No Prior Request

25.     No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, the City respectfully requests that the Court: (a) sustain this Objection and (b) grant such other and further relief to the City as the Court may deem proper.

ATI-2604933v6

-11-

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 11 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 16 of
101                                                                                Appendix 12

Dated: May 15, 2014                    Respectfully submitted,


                                       /s/  Heather Lennox
                                       David G. Heiman (OH 0038271)
                                       Heather Lennox (OH 0059649)
                                       Thomas A. Wilson (OH 0077047)
                                       JONES DAY
                                       North Point
                                       901 Lakeside Avenue
                                       Cleveland, Ohio  44114
                                       Telephone:  (216) 586-3939
                                       Facsimile:  (216) 579-0212
                                       dgheiman@jonesday.com
                                       hlennox@jonesday.com
                                       tawilson@jonesday.com

                                       Bruce Bennett (CA 105430)
                                       JONES DAY
                                       555 South Flower Street
                                       Fiftieth Floor
                                       Los Angeles, California 90071
                                       Telephone:  (213) 243-2382
                                       Facsimile:  (213) 243-2539
                                       bbennett@jonesday.com

                                       John A. Simon (P61866)
                                       Tamar N. Dolcourt (P73425)
                                       FOLEY & LARDNER LLP
                                       500 Woodward Avenue, Suite 2700
                                       Detroit, Michigan 48226
                                       Telephone:  (313) 234-7100
                                       Facsimile:  (313) 234-2800
                                       jsimon@foley.com
                                       tdolcourt@foley.com

                                       ATTORNEYS FOR THE CITY

ATI-2604933v6                          -12-

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 12 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 17 of
101                                                              Appendix 12

Form B20B (Official Form 20B)
12/1/2010

# UNITED STATES BANKRUPTCY COURT
## Eastern District of Michigan

**In re:**

**CITY OF DETROIT, MICHIGAN,**

**Chapter: 9**

**Case No.: 13-53846**

**Debtor.**

**Judge: Hon. Steven W. Rhodes**

Address: 2 Woodward Avenue, Suite 1126
      Detroit, Michigan 48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any): 38-6004606

### NOTICE OF OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(B) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 2958 FILED BY MICHIGAN AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALS

The City of Detroit (the "City") has filed an objection to your claim in this bankruptcy case.

**Your claim may be reduced, modified, or denied.** **You should read these papers carefully and discuss them with your attorney, if you have one.**

If you do not want the Court to deny or change your claim, then on or before June 18, 2014, you or your lawyer must:

1.     File with the Court a written response to the objection, explaining your position, at:

**United States Bankruptcy Court**
United States Bankruptcy Court
211 W. Fort Street, Suite 2100
Detroit, Michigan 48226

If you mail your response to the Court for filing, you must mail it early enough so that the Court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

ATI-2604933v6
13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 13 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 18 of
101           Appendix 12

You must also mail a copy to:

David G. Heiman, Esq.
Heather Lennox, Esq.
Thomas A. Wilson, Esq.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

Bruce Bennett, Esq.
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539

John A. Simon, Esq.
Tamar N. Dolcourt, Esq.
FOLEY & LARDNER LLP
500 Woodward Avenue, Suite 2700
Detroit, Michigan 48226
Telephone: (313) 234-7100
Facsimile: (313) 234-2800

2.      Attend the hearing on the objection, scheduled to be held on June 25, 2014, at 10:00 a.m. in Courtroom 100, Theodore Levin U.S. Courthouse, 231 W. Lafayette, Detroit, Michigan 48226, unless your attendance is excused by mutual agreement between yourself and counsel for the City. (Unless the matter is disposed of summarily as a matter of law, the hearing shall be a pre-trial conference only; neither testimony nor other evidence will be received. A pre-trial scheduling order may be issued as a result of the pre-trial conference.)

**If you or your attorney do not take these steps, the Court may deem that you do not oppose the objection to your claim, in which event the hearing will be canceled, and the objection sustained.**

ATI-2604933v6                    -2-

13-53846-swr    Doc 4876    Filed 05/15/14    Entered 05/15/14 21:07:39    Page 14 of 15
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 19 of
101                                                                    Appendix 12

Dated:  May 15, 2014                 Respectfully submitted,


                                     /s/  Heather Lennox
                                     David G. Heiman (OH 0038271)
                                     Heather Lennox (OH 0059649)
                                     Thomas A. Wilson (OH 0077047)
                                     JONES DAY
                                     North Point
                                     901 Lakeside Avenue
                                     Cleveland, Ohio  44114
                                     Telephone:  (216) 586-3939
                                     Facsimile:  (216) 579-0212
                                     dgheiman@jonesday.com
                                     hlennox@jonesday.com
                                     tawilson@jonesday.com

                                     Bruce Bennett (CA 105430)
                                     JONES DAY
                                     555 South Flower Street
                                     Fiftieth Floor
                                     Los Angeles, California 90071
                                     Telephone:  (213) 243-2382
                                     Facsimile:  (213) 243-2539
                                     bbennett@jonesday.com

                                     John A. Simon (P61866)
                                     Tamar N. Dolcourt (P73425)
                                     FOLEY & LARDNER LLP
                                     500 Woodward Avenue, Suite 2700
                                     Detroit, Michigan 48226
                                     Telephone:  (313) 234-7100
                                     Facsimile:  (313) 234-2800
                                     jsimon@foley.com
                                     tdolcourt@foley.com

                                     ATTORNEYS FOR THE CITY

ATI-2604933v6                        -3-

13-53846-swr   Doc 4876   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 15 of 15
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 20 of
                                    101                                Appendix 12

**EXHIBIT 1**

ATI-2604933v6

13-53846-swr   Doc 4876-1   Filed 05/15/14   Entered 05/15/14 21:07:39   Page 1 of 40
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 21 of
101   Appendix 12

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Objection of the City of Detroit, Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by Michigan AFSCME Council 25 and Its Affiliated Detroit Locals was filed and served via the Court's electronic case filing and noticing system on this 15th day of May, 2014.

/s/  Heather Lennox

# EXHIBIT 7

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |
|  | ) |  |

## CREDITOR MICHIGAN AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALs' RESPONSE TO DEBTOR's OBJECTION TO PROOFS OF CLAIM (DOCKET NUMBER 2958)

Now comes Michigan AFSCME Council 25 and its affiliated Detroit Locals,

with this response to the Objection of the City of Detroit (Docket No. 4876), filed

pursuant to Sections 105 and 502(b) of title 11 of the United States Code (the

"Bankruptcy Code"), and the Federal Rules of Bankruptcy Procedure Local Rules

of the Bankruptcy Court of the Eastern District of Michigan (the "Local Rules"),

concerning proof of claim number 2958 ("Claim") filed by said Coalition, and

states as follows:

### I. INTRODUCTION

Michigan AFSCME Council 25 and its affiliated Detroit Locals (AFSCME)

have filed proof of claim number 2858 (AFSCME Claim), alleging varied sources

of liability. The City of Detroit objects generally, due to purported lack of legal

merit or duplication of claims. The objections are not specific about any particular element of the Claim, but make broad brush observations.

AFSCME concurs that continued efforts at resolution between the parties is in order. It is true that a number of the grievances addressed in the Claim have been resolved in principle, with signed agreements forthcoming. It is also true that certain aspects of the asserted damages within the Claim are duplicated within the City's proposed plan of adjustment; the proof of claim as filed on February 21, 2014 could not have accounted for subsequent developments in the bankruptcy litigation. AFSCME disagrees, however, that the Claim is without merit. Thus, resolution efforts amongst the parties should establish all aspects of the Claim still left in dispute.

With its Objections, the City has sought to treat the October 1, 2014 hearing date (Docket No. 5454) as a pre-hearing conference, because the volume of disputes within the Claim prevents "a typical claim objection proceeding." AFSCME concurs with this suggestion. Even more, AFSCME suggests that disputed aspects of the Claim be placed before a labor arbitrator for his/her assessment of the merit and value of the claims.

Nonetheless, below AFSCME reviews the legal merit of its claims.[1]

---

[1] The length or absence of a summary below is not indicative of a diminution in the value of the claim. Further, AFSCME reserves all rights to advance all arguments and categories of claims contained within its Proof of Claim but not specifically

2

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 2 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 25 of
101                                                                    Appendix 12

## II. EVIDENCE AND ARGUMENT TO BE PRESENTED
## REGARDING THE PROOFS OF CLAIM

**A.    Refusal to bargain AFSCME Local 1023: MERC Case Number D13 C-0331**

AFSCME Local 1023 is a union which represents emergency service operators (911 operators) for the City of Detroit Police Department. As a "public safety" union (representing public safety employees), the local resolves its disputes in negotiating a new union contract with the City through "binding arbitration"; where a neutral third party decides on the provisions to be contained within a union contract.[2] This statute is commonly known as "Act 312", MCLA §§ 423.231-423.247. Importantly, Act 312 is a separate statute from the Public Employment Relation Act, MCLA §§ 423.201-423.217. Under Act 312, either the union or employer may initiate a binding arbitration proceeding. MCLA § 423.233.

On March 16, 2011, the state of Michigan passed Public Act 4 – the emergency manager law.[3] Among other things, this statute permitted a public employer, in certain conditions, to avoid compliance with one section of PERA, MCLA § 423.215(1). MCL § 141.1514a(10) (no duty to comply thirty days after a consent agreement is executed); MCL § 141.1526(3) (no duty to comply where the

---

addressed here.

[2] Technically, Act 312 sets up a three-person panel of arbitrators to rule on pending disputes in contract negotiations. The union and employer each select a panel member, and the chair of the panel is the neutral arbitrator. MCLA § 423.235

[3] The Local Government and School District Fiscal Accountability Act.

3

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 3 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 26 of
101                                                                    Appendix 12

local government is placed in receivership). Section 215(1) obligates the employer to bargain with its unions. On April 10, 2012, the City's consent agreement with the state became effective, thus the City was no longer subject to Section 215(1) of PERA as of May 10, 2012. In November 2012, Public Act 4 was rejected by a state-wide vote of Michigan's citizenry. On December 26, 2012, Public Act 436 (MCLA §§ 141.1541-141.1575) was passed, and made effective March 28, 2013.[4] Public Act 436 also contains similar provisions alleviating a public employer from complying with Section 215(1).

On March 12, 2013, AFSCME Local 1023 requested MERC mediation to assist in negotiations (*Exhibit 1*) and made a written request to bargain a new contract to the City. (*Exhibit 1*) After the effective date of Public Act 436, on April 3, 2013, the City responded by refusing to bargain with the Local, citing to Public Act 436 and the fact that the City was under receivership. (*Exhibit 2*) On June 3, 2013, Local 1023 requested binding arbitration under Act 312. (*Exhibit 3*)

In requesting Act 312 arbitration, despite the suspension of Section 215(1), AFSCME took the position that Act 312 – a separate state statute from PERA – mandated the binding arbitration process, irrespective of the Public Act 436 and its

---

[4] Between the November 2012 repeal of Public Act 4 and the March 28, 2013 effective date of Public Act 436, the "emergency manager" law in effect in Michigan was a 1990 statute commonly known as Public Act 72.

4

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 4 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 27 of
101                                                                    Appendix 13

reference to Section 215(1) of PERA. The City took the position that PA 436 obviated its Act 312 obligation to participate in binding arbitration.

In a proceeding with other public safety Detroit unions, the MERC issued a split decision that public safety unions of employers placed in receivership, under PA 436, are not eligible for Act 312. *City of Detroit*, 27 MPER ¶ 6 (2013) Thus, on June 21, 2013, MERC's staff ordered that AFSCME Local 1023's Act 312 petition was being dismissed administratively, based upon the June 14th decision of the MERC in other Detroit public safety unions. (*Exhibit 4*)

For its Claim, AFSCME contends that this decision was in error. The Act 312 statute is clear as to how a union establishes eligibility for participation in binding arbitration:

> "Whenever in the course of mediation of a public police or fire department employee's dispute, except a dispute concerning the interpretation or application of an existing agreement (a "grievance" dispute), the dispute has not been resolved to the agreement of both parties within 30 days of the submission of the dispute to mediation, or within such further additional periods to which the parties may agree, the employees or employer may initiate binding arbitration proceedings by prompt request therefor, in writing, to the other, with copy to the employment relations commission.

MCLA § 423.233. The Act continues by mandating what the parties must do in the furtherance of binding arbitration: Section 234 (the parties "shall" choose a panel member within 10 days), Section 235 (MERC "shall" select a neutral arbitrator within 7 days of the request for arbitration), Section 236 (the arbitrator "shall" call and begin the hearing within 15 days after appointment), Section 240

5

13-53846-swr  Doc 7235  Filed 09/02/14  Entered 09/02/14 21:50:35  Page 5 of 23
13-53846-tjt  Doc 8996-2  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 28 of
101                                                                    Appendix 13

(the decision of the arbitrator "shall" be final and binding, "if supported by competent, material, and substantial evidence on the whole record …").

Importantly, the statute prohibits the employer (and union) from changing employment terms during the pendency of the Act 312 proceeding:

> "During the pendency of proceedings before the arbitration panel, existing wages, hours and other conditions of employment shall not be changed by action of either party without the consent of the other but a party may so consent without prejudice to his rights or position under this act."

MCLA § 423.243. Thus, according to the statute, the City cannot unilaterally implement employment terms (i.e., CET) on a party which has sought binding arbitration under Act 312.

The requirements to engage in Act 312 proceedings are contained within the statute. A request in writing is the chief requirement. The Commission has confirmed that Appellant here made such a request. (*Exhibit 4*) MERC's opinion in *City of Detroit*, 27 MPER ¶ 6 (2013) relied on the fact that the duty to bargain in PERA – as referenced in another statute – was no longer present. However, there is no need for the duty to bargain within PERA to exist, in order for Act 312 to be operative. Indeed, the above-quoted Section 240 of Act 312 outlines that statute's self-contained duty to bargain. The employment conditions "shall not be changed by action of either party" without "consent of the other [party]"; stated another way, without bargaining to agreement. The duty to bargain within Act 312 is actually stronger than the duty to bargain within PERA. An employer under PERA

6

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 6 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 29 of
101                                                                          Appendix 13

is allowed to make adjustments in employment conditions after bargaining with the union to a state of "impasse". Under Act 312, however, even reaching impasse does not permit the employer to change employment conditions without agreement of the union.

Act 312 is supplementary to PERA. However, the state legislature clearly expressed its will of maintaining the employer's obligations to comply with Act 312 – even *vis-a-vis* the emergency manager law. The legislature amended Act 312 with 2011 Public Act 116, during the same legislative session in which it passed the initial emergency manager law – PA 4. In doing so, the legislature did not exempt governments subject to PA 4 from applicability to Act 312. This fact demonstrates a willingness of the legislature to permit Act 312 proceedings to continue, even in the event of an emergency manager being appointed. Act 312 contains certain exemptions from the Act. It defines the employees who may utilize the act and exempts certain groups. It also clarifies that the Act does not apply to "persons employed by a private emergency medical service company who work under a contract with a governmental unit ..." or administrative or supporting employees working in emergency medical services. MCLA § 423.233. The legislature could have easily exempted employees who work for governments subject to PA 4 in Section 233; it did not. *Expressio unius est exclusio alterius*.[5]

---

[5] The express mention in a statute of one thing implies the exclusion of other

7

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 7 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 30 of
101                                                                    Appendix 1:

Even more, explicit language of the 2011 amendments to Act 312 acknowledges that public employers under an emergency manager will still be obligated to participate in Act 312 proceedings. Under 2011 PA 116, The legislature adopted certain factors that the arbitration panel must consider in reaching a final decision. One of those factors is: "Any law of this state or any directive issued under the local government and school district fiscal accountability act, **2011 PA 4**, MCL 141.1501 to 141.1531, that places limitations on a unit of government's expenditures or revenue collection." MCLA § 423.239(1)(a)(iv)(**emphasis** added). Thus, the state legislature clearly contemplated Act 312 when it drafted the PA 4. Nowhere in PA 116 are localities under an emergency manager not obligated to comply with Act 312. Instead, the arbitration panel is merely supposed to include "limitations . . . [on] expenditures or revenue collection" – due to the application of the emergency manager law – as a factor in reaching a decision. Hence, the interpretation of Act 436 to exempt governments in receivership altogether creates a clear conflict with the amended Act 312, and makes the above-quoted Section 9(1)(a)(iv) completely superfluous.

The Legislature is presumed to be aware of all existing statutes when enacting a new statute. *Cameron v. Auto Club Ins Ass'n.,* 263 Mich. App. 95, 98 (2004). Statutes that appear to conflict should be read together and reconciled, if

similar things." *Bradley v. Saranac Community Schools Bd. of Ed.*, 455 Mich. 285, 298 (1997).

8

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 8 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 31 of
101                                                                Appendix 13

possible. *World Book, Inc. v. Dep't. of Treasury,* 459 Mich. 403, 416 (1999). When two statutes lend themselves to an interpretation that avoids conflict, that interpretation should control. *Jackson Community College v. Dep't. of Treasury,* 241 Mich. App. 673, 681 (2000). The interpretation should give effect to each statute "'without repugnancy, absurdity, or unreasonableness.'" *Livonia Hotel, LLC v. City of Livonia,* 259 Mich. App. 116, 131 (2003), quoting *Michigan Humane Society v. Natural Resources Comm.,* 158 Mich. App. 393, 401 (1987). Here, MERC's ruling nullifies Act 312, in violation of these doctrines.

For these and other reasons, Claimant contends that MERC erred in dismissing its Act 312 petition and denying that local binding arbitration. As a result of this dismissal, the City imposed significant wage and benefit concessions upon the Local 1023 membership.

**B.    Local 207, 2394 and 2920 DWSD refusal to bargain / Case Number C13 D-069**

AFSCME represents three locals within the City of Detroit Water and Sewerage Department; Locals 207, 2920 and 2934. Prior to the time the City was no longer subject to Section 215(1) of PERA, due to the City being place in receivership, the AFSCME unions sought to bargain a new union contract. AFSCME was unable to secure contracts for all three locals due to the City's bad faith bargaining. This Claim seeks damages due to the City's illegal conduct.

9

13-53846-swr    Doc 7235    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 9 of 23
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 32 of
101                                                                    Appendix 13

## C.    Imposition of furloughs days in February 2013

In February 2013, the City unilaterally imposed furlough days requiring City employees to take unpaid days off work at least twice per month. (*Exhibit 5*) These furlough days represented a 10% loss in income for those employees placed on furlough. Since most civilian employees had already incurred a 10% loss in base pay, this change brought the total loss in income for these employees to 20%.

As described in the Response to Objections filed by the Coalition of Detroit Unions (filed September 1, 2014 and responding to Docket No. 4874), during the period between November 2012 and May 10, 2013, the City's continued obligation with its unions before unilateral change in employment conditions is beyond dispute. The evidence will reveal that in this instance, the City failed to bargain to impasse prior to imposing the additional furlough days. Thus, the imposition violated PERA. The imposition lasted nearly one year for hundreds of furloughed employees. The damages associated with this element of the Claim are the financial losses so incurred.

## D.    Detroit refusal to bargain concerning Transportation Locals: Case Number C12 H-157

AFSCME represents two locals within the City Department of Transportation, Locals 214 and 312. The City has refrained from imposing employment conditions on these two locals in the same manner it imposes employment conditions on other employees. This is because the federal

10

13-53846-swr    Doc 7235    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 10 of 23
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 33 of
101                                                                          Appendix 13

government provides funding for transportation departments of municipalities, released pursuant to the Federal Transit Act, 49 U.S.C. 5333(b) (aka "13(c)"). Under that federal statute, the municipality in receipt of federal funds is obligated to bargain with its unionized employees in good faith. Thus, the City has entered into a 13(c) protective agreement with AFSCME and it two locals.

These locals, however, are part of a city-wide bargaining unit, as determined by Michigan courts. AFSCME Council 25 Detroit locals have been considered one bargaining unit throughout the City. *Michigan Ass'n of Public Employees v. Michigan AFSCME Council 25*, 172 Mich. App. 761 (1988) As such, the changes made to the non-DDOT locals were improper, in that they represented the City severing the city-wide bargaining unit.

**E.     AFSCME Council 25 (13th check ULP). MERC Case No. C12-E-092**

On about November 30, 2011, the City passed an ordinance which limited payments into employee annuity accounts and stopped "13[th] checks" being paid to retirees. By applying this change to union-represented employees and concerning union-negotiated contractual benefits for retirees, the City violated state labor laws. By making these changes, the City ignored its bargaining obligation and repudiated its contractual obligations. AFSCME filed a charge contesting the changes. (*Exhibit 6*)

11

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 11 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 34 of
101                                                        Appendix 13

In February 2013, Administrative Law Judge ("ALJ") Doyle O'Connor of the Michigan Employment Relations Commission ("MERC") heard oral argument on AFSCME's motion for partial summary disposition. Following this Honorable Court's authorization via modification of the automatic stay, on October 4, 2013, ALJ O'Connor issued his Decision and Recommended Order (DRO) granting the AFSCME motion for summary disposition. (*Exhibit 7*) ALJ O'Connor's DRO "restore[s] to the Pension Board" of the Detroit General Retirement System "the discretion previously exercised . . . regarding [distribution of annual] excess earnings" of GRS to "affected retirement plan participants" and explicitly orders that these participants "be made whole by the City to the extent that there is any practical impediment to the Pension Board making those participants whole otherwise." (*Exhibit 7*, pg 24)

In his order, ALJ O'Connor considered the losses realized during the 2011 and 2012 years as the damages in the charge. After that point, the City was under PA 436 and, therefore, the City could make such a change unilaterally. (*Exhibit 7*, pg 18) The ALJ also indicated that the proceedings had not developed to the point where a dollar figure could be conclusively ascertained as to the value of the award. He nonetheless stated the award could be as high as $174,000,000. (Id)

12

13-53846-swr    Doc 7235    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 12 of 23
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 35 of
101                                                                        Appendix 13

**F.     City of Detroit 2012 negotiations and implementation with Coalition: MERC Case No. C12 D-065, C12 F-125, C13 G-129**

Following the negotiation of a Coalition tentative agreement in February 2012, the City violated state labor laws by refusing to execute that contract but illegally imposing other terms and conditions of employment. This includes wage and benefit concessions for all AFSCME members, which remain in existence today. The reader is referred to the Coalition of Detroit Unions proof of claim, the Coalition response (filed September 1, 2014) to the City Objections to the Coalition proof of claim. (Docket No. 4874) The AFSCME claim represents a share of the Coalition claim, as AFSCME is a member of the Coalition.

**G.     Violation of Privatization Ordinance**

The City of Detroit is a home rule city and is governed by its Charter. In 1997, the citizens of Detroit voted to have a Privatization Ordinance, when it approved the City of Detroit City Charter. The Charter included Section 6-307, which contained provisions requiring the City Council ("Council") to adopt an ordinance establishing procedures for the letting of work to private entities that would displace regularly employed city workers. This Charter provision was adopted by the voters of the City of Detroit.

On March 31, 2004 the City Council of the City of Detroit ("City") exercising its proprietary function adopted Ordinance No. 13-04, City Code Section 18-5-100 et seq., to govern the process of hiring entities to perform

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 13 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 36 of
101                                                                          Appendix 1

services for the City of Detroit, which are performed by individuals employed by the City.   Prior to hiring a vendor to perform services performed by City employees, there are various steps which must be completed to provide transparency and properly allow for the existing city employees to actively participate in the bidding process. The Privatization Ordinance requires City Council approval in order to solicit entities for bids, and that the City employees must be provided certain information which will enable them to make a bid.  Most notably, the ordinance prohibits the letting of the work without a 2/3 affirmative vote of the City Council.

## H.     City of Detroit/DFFA/MERC: MERC Case No. C11 K-201

AFSCME has approximately thirteen (13) members assigned to the Fire Department of the City of Detroit, Apparatus Unit.   Beginning May, 2011, AFSCME received notice that members of the Detroit Fire Fighters Association, Local 344 ("DFFA") were performing the duties performed by the AFSCME membership.  In November 2011, AFSCME filed an unfair labor practice charge concerning removal of work from the bargaining unit.  (*Exhibit 8*)   AFSCME contends that the City illegally removed such work.   This element of the claim consists of the lost earnings of the AFSCME members.

14

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 14 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 37 of
101                                                                      Appendix 1

**I.**  **City of Detroit longevity claim for AFSCME employees: Claim number 12-000522 and 12-000523; Wayne County Circuit Court Number 13-003430-AA**

Under Article 25 of the 2005-2008 AFSCME collective bargaining agreement ("CBA"), employees who worked a minimum amount of hours received a yearly "longevity payment." The amount of the payment was based upon the number of years of seniority, starting with $150 for those who have served for five years and escalating up to a maximum of $750.

Effective October 2010, the City imposed new contract terms on AFSCME employees, which removed the longevity pay. However, many AFSCME members had already worked the requisite number of hours, entitling them to full longevity pay. Further, the members who had worked less than the hour-threshold for a full longevity payment were entitled to prorated longevity payments for hours worked in each month during that year. Despite the clear contractual obligation, confirmed by City managers at the hearing, the City refused to pay any AFSCME members the longevity pay owed.

AFSCME City of Detroit employees, Dean Story and Rosemarie Haynesworth, and on behalf of all members of the AFSCME union who were entitled to longevity pay in December 2010, filed claims with the state of Michigan's Department of Licensing and Regulatory Affairs, Wage and Hour Division ("The Division") for this payment. However, the Division rejected

15

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 15 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 38 of
101                                                                                            Appendix 14

Plaintiffs' claim. (*Exhibits 9* and *10*) It rationalized that AFSCME had agreed to eliminate the longevity payment as of January 2011, which is accurate. However, the claims were for longevity earned during the prior year, which the employees earned and which AFSCME had not agreed to waive on their behalf.

Presently, the claims are on appeal before Wayne County Circuit Court. (*Exhibit 11*)

## J. Negotiation of Local 542 supplemental agreement: MERC Case Number C07 L-033

A number of AFSCME locals negotiate "supplemental agreements" with various departments in the City of Detroit. These supplemental agreements, separate and apart from the Master Agreement which most of the AFSCME Detroit Locals negotiate collectively (there are thirteen Detroit Locals which negotiate the Master Agreement), contain provisions unique to that Local and department. AFSCME Local 542 filed an unfair labor practice charge, challenging the City's failure to negotiate its supplemental agreement.

## K. Detroit & SEMHA: MERC Case No. C05 H-194

In 2005, AFSCME filed a charge to protest the layoff of four individuals from the Detroit Health Department who were immediately rehired by a Detroit contractor, Southeastern Michigan Health Association ("SEMHA"), to perform the same work. AFSCME alleged that the contractors' performance of unit work was in violation of PERA, and sought to have these employees placed back into the

16

13-53846-swr    Doc 7235    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 16 of 23
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 39 of
101    Appendix 14

AFSCME unit. During the litigation of the charge, AFSCME discovered that there were many other former City employees, who had been replaced as SEMHA employees. After a series of motions to dismiss, motions for reconsideration, subpoena litigation, appeals, hearing delays, etc., the evidentiary hearing has yet to be concluded. The charge seeks back pay and benefits for those impacted employees. Additionally, AFSCME Local 457 lost dues for those laid off members as well and the members who were improperly removed from the Local.

## L.    Breach of contract claims

AFSCME lists a general category of breach of contract claims, including but not limited to grievances. It is believed that a number of the grievances may be resolved in principle, and further discussion will ascertain any remaining grievances or contract claims.

## M.    City of Detroit/Human Services department: Grievance No. 25-01-12 / COA: 12-0077708-CL

In July and October, 2012, approximately 174 AFSCME members, in Locals 1642, 273 and 457 members, were permanently laid off and replaced with employees from third party companies. These employees were employed at the Health Department, the Department of Human Services and the Workforce Development Department for the City of Detroit. AFSCME argued that the City's actions violated language in the parties' collective bargaining agreement ("CBA").

17

Initially, the issue was arbitrated. Agreeing with AFSCME, the arbitrator found the City's actions to be in violation of the union contract, and awarded back pay and benefits to the members. (*Exhibit 12*) The City refused compliance with the award, requiring AFSCME to seek and secure confirmation of the award in Wayne County Circuit Court. (*Exhibit 13*) The matter is currently in the Court of Appeals.

**N.    City of Detroit Retirees Health Care: Grievance No. C10 A-025**

In 2006, the City changed retiree health care benefits, requiring retirees to incur greater cost for health care. AFSCME filed a grievance on behalf of all AFSCME retirees (approximately 6,000), because the changes violated specific provisions of the union contracts under which the employees retired. After some advancement of the grievance, the parties decided to hold the grievance in abeyance because the retirees had decided to proceed with the litigation in federal court, *Roots et al., v. City of Detroit*, Case No. 12-12848 (E.D. Mich, Cohn).

**O.    Payroll disputes**

Repeatedly, the City of Detroit payroll system will not issue correct amounts of pay or benefits on payroll checks of AFSCME members. This problem has escalated over the years, resulting in significant losses of money and benefits for AFSCME members. AFSCME has sought to remedy these discrepancies with the City, however, its efforts have been met with inaction.

18

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 18 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 41 of 101   Appendix 14

**P. Detroit Service and Maintenance Outsourcing in Downtown Detroit: Grievance Number C09-078**

Beginning in 2009 and successively each year thereafter, the City has reduced the overtime of AFSCME members, due to work performed by private contractors, in the downtown Detroit area. This violation of Article 19 of the AFSCME Master Agreement continued for years. The violations impacted 40-60 employees throughout the period and until the termination of the Master Agreement in July 2012. In the dispute, AFSCME relies upon an arbitration decision concerning similar circumstances on Belle Isle in 2008.

**Q. Tree Artisan failure to secure license: Grievance Number 727May08**

Arbitrator George Roumell issued a ruling regarding eleven "tree artisan helpers", discharged from the AFSCME bargaining unit. The grievance was granted in that the City was required to pay for training and restore seniority to some employees. The remaining controversy involves one employee, Hayward Prather, who was not reinstated. Ultimately, Mr. Prather became employed within the water department approximately two years later. However, he is owed damages for the two year period in which he was wrongfully discharged.

## III. ARGUMENT

The Bankruptcy Code broadly defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 19 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 42 of
101

Appendix 14

unsecured." 11 U.S.C. § 101(5)(A). Claims also include "a cause of action or right to payment that has not yet accrued or become cognizable." 2 COLLIER ON BANKRUPTCY ¶ 101.05 at 101-38 (2011).

"Tort claims constitute claims, and thus are payable out of the estate...." Id. ¶ 101.05[6] at 101-49; see also In re Edge, 60 B.R. 690, 694 (Bankr. M.D. Tenn. 1986). Claims also include adversarial administrative proceedings. See e.g., In re Halo Wireless, Inc., Nos. 11–42464–btr–11, 3: 11–cv–0058–DCR, 3: 11–cv–0059–DCR; 2012 WL 1190722, at *2-3 (E.D. Kent. April 9, 2012) Courts give the term "claim" the "broadest possible definition. In re Lipa, 433 B.R. 668, 669 (Bankr. E.D. Mich. 2010).

A properly filed proof of claim is prima facie evidence of the validity and amount of the claim. Fed.R.Bankr.P. 3001(f). A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Chapter 9 bankruptcies follow § 502 of the bankruptcy code. Objections may be based upon one of the specific, statutory grounds:

Except as provided in subsection (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that –

13-53846-swr    Doc 7235    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 20 of 23
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 43 of
101                                                                              Appendix 14

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

(2) such claim is for unmatured interest;

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

(4) if such claim is for service of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

(5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property...;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract...;

(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

(9) proof of such claim is not timely filed....

11 U.S.C. § 502(b).

The party objecting to a proof of claim bears the burden of proof to overcome the prima facie validity of the claim. 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][f] at 502-17. "To defeat the claim, the objector must come forward with sufficient evidence and 'show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves.'" In re McLaughlin, 320 B.R. 661, 665 (Bankr. N.D. Ohio 2005)(quoting Wright v Holm (In re Holm), 931 F.2d 620, 623 (9th Cir.1991)).

AFSCME contends that the City's Objection falls short of reaching the necessary burden of proof. The Objection does little more than spell out general

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 21 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 44 of
101                                                                        Appendix 1

observations in the proof of claim as opposed to specific concerns addressed. The Objections should be overruled.

WHEREFORE, Michigan AFSCME Council 25 respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: September 2, 2014        /s/ Richard G. Mack, Jr.
                              Richard G. Mack, Jr., Esq.
                              Jack W. Schulz, Esq.
                              MILLER COHEN PLC
                              600 West Lafayette Blvd., 4th Floor
                              Detroit, MI 48226-3191
                              Telephone: (313) 964-4454
                              Facsimile: (313) 964-4490
                              richardmack@millercohen.com
                              jschulz@millercohen.com

                              Herbert A. Sanders
                              THE SANDERS LAW FIRM PC
                              615 Griswold St., Ste. 913
                              Detroit, MI 48226
                              Telephone: (313) 962-0099
                              Facsimile: (313) 962-0044
                              hsanders@miafscme.org

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO*

22

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on September 2, 2014, the Michigan AFSCME Council 25 certifies that *Creditor Michigan AFSCME Council 25 and its Affiliated Detroit Locals' Response to Debtor's Objection to Proofs of Claim (Docket Number 2958)* was electronically with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard, 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com

23

13-53846-swr   Doc 7235   Filed 09/02/14   Entered 09/02/14 21:50:35   Page 23 of 23
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 46 of
101

Appendix 14

# EXHIBIT 6

13-53846-swr    Doc 7235-6    Filed 09/02/14    Entered 09/02/14 21:50:35    Page 1 of 5
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 47 of
101                                                                    Appendix 1B



AMENDED

# CHARGE

Michigan Department of Licensing and Regulatory Affairs
Employment Relations Commission (MERC)
Labor Relations Division
313-456-3510

Authority: P.A. 380 of 1965, as amended. Case No. C12 E-092

---

INSTRUCTIONS: File an **original** and **4 copies** of this charge (including attachments) with the Employment Relations Commission at: Cadillac Place, 3026 W. Grand Boulevard, Suite 2-750, PO Box 02988, Detroit MI 48202-2988 or 1375 S. Washington St., Lansing MI 48910. **The Charging Party must serve the Charge on the opposing side within the applicable statute of limitations, and must file a statement of service with MERC.** *(Refer to the "How to File a Charge" document under the "Forms" link at www.michigan.gov/merc.)*

**Complete Section 1** if you are filing charges against an employer and/or its agents and representatives. —or—
**Complete Section 2** if you are filing charges against a labor organization and/or its agents and representatives.

---

**1. EMPLOYER AGAINST WHICH THE CHARGE IS BROUGHT**  Check appropriate box: ☐ Private ☑ Governmental

Name and Address:  Lamont Satchel, Director of Labor Relations
City of Detroit
2 Woodward Ave., Ste. 332
Detroit, MI 48226

**RECEIVED**

**2. LABOR ORGANIZATION AGAINST WHICH THE CHARGE IS BROUGHT**

Name and Address:

NOV 08 2012

MICHIGAN ADMIN HEARING SYSTEM

RECEIVED

---

**3. CHARGE**

Pursuant to the Labor Mediation Act (LMA) or Public Employment Relations Act (PERA) *(cross out one)*, the undersigned charges that the above-named party has engaged in or is engaging in unfair labor practices within the meaning of the Act.

**On an attached sheet you must provide a clear and concise statement of the facts** which allege a violation of the LMA or PERA, including the date of occurrence of each particular act and the names of the agents of the charged party who engaged in the complained of conduct. The charge should describe who did what and when they did it, and briefly explain why such actions constitute a violation of the LMA or PERA.

The Commission may reject a charge for failure to include the required information. However, it is not necessary to present your case in full at this time. Documentary material and exhibits ordinarily should not be submitted with this charge form.

---

4. Name and Address of Party Filing Charge (Charging Party)
(if labor organization, give full name, including local name and number)
Michigan AFSCME Council 25
600 W. Lafayette Blvd., Ste. 400, Detroit, MI 48226

Telephone Number:

(313) 964-1171

---

5. List ALL related MERC case(s) (if any): _____

(Name of parties)

Case No.: _____  Judge: _____

Case No.: _____  Judge: _____

---

I have read this charge and it is true to the best of my knowledge and belief.

_Signature of Representative/Person Filing Charge_

Email:
kflynn@millercohen.com

Telephone/Cell No.:  313-964-4454

Print Name and Title:  **Keith D. Flynn, Attorney**

Fax No.:  313-964-4490

Street Address:
600 W. Lafayette Blvd., 4th Floor

City:
Detroit

State:
MI

Zip Code:
48226

The Department does not discriminate on the basis of race, age, sex, height, weight, religion, national origin, color, marital status, disability, or political beliefs. If you need assistance with reading, writing, hearing, etc., under the Americans with Disabilities Act, you may make your needs known to this agency.

13-53846-swr  Doc 7285-6  Filed 09/02/14  Entered 09/02/14 21:50:35  Page 2 of 5

13-53846-tjt  Doc 8996-2  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 48 of 101    Appendix 15

### City of Detroit and AFSCME Council 25

### ATTACHMENT TO AMENDED UNFAIR LABOR PRACTICE CHARGE

Charging Party, AFSCME Council 25 and the Coalition of Detroit Unions alleges that Respondent, City of Detroit, violated the Public Employment Relations Act ("PERA"), Sections 10(1)(a, c, e) and Section 15 in the following manner:

1.     The City of Detroit employs approximately 2,600 persons who are public employees and are represented by Michigan AFSCME Council 25. There are approximately 9,000 unionized employees in the City total.

2.     The parties AFSCME and the City of Detroit have a collective bargaining agreement, which was in existence from approximately January 2011 through June 30, 2012.

3.     The City's actions, described below, constitute repudiation of the AFSCME-City agreement, a violation of the status quo, and constitute a unilateral modification of a mandatory subject of bargaining without bargaining to impasse. It also constitutes a mid-term modification of the AFSCME bargaining agreement.

4.     Certain employees have annuity plans with the City, in which either 3%, 5% or 7% of salary is contributed into the plan. As for retirees, they receive a check each month from the Retirement System.

5.     Prior to November 30, 2011, if the market performed above 7.9%, this was considered "excess earnings".

6.     Prior to November 2011, a portion of these excess earnings were distributed to the active employees' annuity accounts, wherein the active employees would receive an enhanced interest rate of return for that year of excess earnings.

7.     Prior to November 2011, a portion of these excess earnings would also be distributed to retirees in the form of a 13th check. This 13th check would be distributed to retirees toward the end of the year, in addition to their normal pension check.

8.     Prior to November 30, 2011, the GRS Board would review the excess earnings of the System in November or December of each year, and make the excess earnings distributions as outlined above.

9.     On or about November 30, 2011, the Detroit City Council passed an ordinance requiring that active and retiree participants no longer receive excess earnings. This change eliminated excess earnings being given to active employee annuity accounts in the form of enhanced investments. The change also eliminated the excess earnings being distributed to retired participants, in the form of a "13[th] check".

10.     This change in the City ordinance changed the City of Detroit prior language, granting such discretion to the GRS Board in paying out excess earnings. For decades, the GRS Board had paid out excess earnings to active employees via enhanced annuity earnings, and 13th checks to retirees. The November 30, 2011 ordinance change ended the past practice.

11.     The ordinance change was effective as of December 2011. At that time, the GRS considered that the investment return of the System was higher than 7.9%. However, because of the new Ordinance, the System did not make excess earnings distributions to retirees in the form of a 13th check. Also, the System did not grant any annuity accounts of active employees a higher investment return beyond the 7.9%.

12.     But for the City Council Ordinance as of November 30, 2011, the current retirees would have received an excess distribution in the form of a 13th check. The active employees would have received an excess earnings distribution in the form of enhanced investment return for their annuity account.

13.     The changes of paragraphs 9-12 above applied to all City employees, including the City's unionized workforce. Indeed, in the Corporation Counsel's description of the change, she took the position that the ordinance change could be appropriately applied to unionized City employees, regardless of their bargaining relationship.

14.     The City did not seek to negotiate this change in the treatment of the investment earnings beyond 7.9% with any City union. Charging Party was presented with this change as a fait accompli. Further, the change was made during the existence of the collective bargaining agreement.

15.     The AFSCME bargaining agreement, in Article 47.T., indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133." Thus, the previous ordinance which established the past practice of the GRS Board making excess earnings distributions was incorporated into the AFSCME bargaining agreement.

16.     By changing the Ordinance, and applying that Ordinance change to the AFSCME membership, the City was violating PERA. As a consequence, active employees are losing both their annuity account investments, as well as the right to a 13th check upon their retirement.

17.     Charging Party requests that this City apply the language of the previous ordinance to the City's unionized workforce, return the practice of the excess earnings distributions to the annuity accounts and the retiree 13th checks, make whole any union employees who suffered a loss as a result of the City's actions, ask that the City post a notice of the violation of the act, and any other relief this Commission deems appropriate.

STATE OF MICHIGAN
DEPARTMENT OF ENERGY, LABOR & ECONOMIC GROWTH
EMPLOYMENT RELATIONS COMMISSION

AFSCME COUNCIL 25,

　　　　　　　　Union/Charging Party,

-and-

CITY OF DETROIT,

　　　　　　　　Employer/Respondent.

Case No. C12 E-092
MCL No. 12-000777
*Administrative Law Judge*
Doyle O'Connor

MILLER COHEN, P.L.C.
ATTORNEYS AND COUNSELORS AT LAW
600 WEST LAFAYETTE BLVD.
DETROIT, MICHIGAN 48226-0840
(313) 964-4454

## PROOF OF SERVICE

MICHELLE COIL says that on *November 5, 2012* she served a copy of *AFSCME Council 25's Amended Charge*, along with this *Proof of Service* upon:

Letitia C. Jones
City of Detroit Law Department
660 Woodward Avenue, Suite 1650
Detroit, Michigan 48226-353

via *facsimile* and *U.S. First-Class Mail* and placing said document in a prepaid postage envelope and depositing same in a United States Postal Receptacle in Detroit, Michigan.

MICHELLE COIL

Subscribed and sworn to before me on
November 5, 2012

Kathryn L. Golba, Notary Public
Wayne County, MI
My Commission Expires: 2/20/2019

# EXHIBIT 8

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
--------------------------------------------------x
                                      :
In re                                 :      Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            :      Case No. 13-53846
                                      :
             Debtor.                  :      Hon. Steven W. Rhodes
                                      :
                                      :
                                      :
--------------------------------------------------x
```

## SUPPLEMENTAL BRIEF OF THE CITY OF DETROIT IN SUPPORT OF OBJECTION OF THE CITY OF DETROIT, PURSUANT TO SECTIONS 105 AND 502(B) OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007 AND LOCAL RULE 3007-1, TO PROOF OF CLAIM NUMBER 2958 FILED BY MICHIGAN AFSCME COUNCIL 25 AND ITS AFFILIATED DETROIT LOCALS

The City of Detroit, Michigan (the "City") hereby files this

supplemental brief (the "Brief")[1] in support of the Objection of the City of Detroit,

Pursuant to Sections 105 and 502(b) of the Bankruptcy Code, Bankruptcy

Rule 3007 and Local Rule 3007-1, to Proof of Claim Number 2958 Filed by

Michigan AFSCME Council 25 and Its Affiliated Detroit Locals (Docket No. 4876)

(the "Claim Objection") and respectfully represents as follows:

---

[1]    Capitalized terms not otherwise defined in this Brief have the meanings given to them in the Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (Docket No. 7502) (as it may be further supplemented, modified or amended, the "Plan").

## Background

      1.      On November 21, 2013, the Court entered the Order, Pursuant

to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002

and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving

Form and Manner of Notice Thereof (Docket No. 1782) (the "Bar Date Order").

The Bar Date Order established February 21, 2014 at 4:00 p.m., Eastern Time

(the "General Bar Date"), as the general deadline for the filing of proofs of claim in

the City's chapter 9 case.

      2.      On the General Bar Date, Michigan AFSCME Council 25 and

Its Affiliated Detroit Locals ("AFSCME") filed proof of claim number 2958

(the "Claim"), asserting liabilities in the aggregate amount of not less than

$8,718,697,854.82.  The Claim expressly provides that it consists of a number of

separate claims.  Claim, at 1.  AFSCME filed the Claim for all amounts allegedly

due to AFSCME and its members and former member retirees and future retirees

with respect to an array of potential liabilities.  Id.  The Claim is protective in

nature, identifying a series of broad categories of claims, as well as "any other

claims which arise before July 18, 2014."  Id.

      3.      On May 15, 2014, the City filed the Claim Objection.  By the

Claim Objection, the City objected to the Claim on the ground that, among other

things, the liabilities asserted therein frequently are too vague to permit the City to

ATI-102623040v5

-2-

13-53846-swr  Doc 7981  Filed 10/16/14  Entered 10/16/14 14:54:41  Page 2 of 80
13-53846-tjt  Doc 8998-2  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 54 of

101

Appendix 15

evaluate them. Claim Objection, at ¶ 13. The City suggested that an efficient

process be established to resolve or adjudicate the various aspects of the Claim. Id.

4.      On September 2, 2014, AFSCME filed Creditor Michigan

AFSCME Council 25 and Its Affiliated Detroit Locals' Response to the Debtor's

Objection to Proofs of Claim (Docket Number 2958) (Docket No. 7235)

(the "AFSCME Response").

5.      By agreement of the parties, the hearing on the Claim Objection

was continued to November 5, 2014 at 10:00 a.m., Eastern Time, and the Claim

and the Claim Objection were referred to facilitative mediation (the "Mediation")

before the Honorable Judge Victoria A. Roberts. See Order (I) Referring to

Facilitative Mediation Objections to Certain Claims Filed by Michigan AFSCME

Council 25 and its Affiliated Detroit Locals and the Coalition of Detroit Unions,

(II) Continuing Hearing on Related Claim Objections and (III) Modifying Briefing

Schedule (Docket No. 7663), at ¶¶ 2, 7.

6.      On October 14, 2014, legal issues relating to two potential

theories of liability asserted by AFSCME in the Claim (together, the "Issues") were

referred back to this Court for expedited adjudication. The Issues consist of the

following:

> (a)     Whether the City has any additional liability to AFSCME
> or the parties AFSCME represents, above and beyond the
> treatment provided for GRS Pension Claims under the
> Plan, arising from the elimination of the so-called

13-53846-swr   Doc 7981   Filed 10/16/14   Entered 10/16/14 14:54:41   Page 3 of 80
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 55 of
101                                                              Appendix 15

"13th Check" program. See Claim, at Ex. 1, row 7 (the "13th Check Claim").[2]

    (b)    Whether the City has any additional liability to AFSCME or the parties AFSCME represents, above and beyond the treatment provided for OPEB Claims under the Plan, arising from modifications to retiree health care benefits made by the City in 2006. See Claim, at Ex. 1, row 17 (the "Health Care Modification Claim").

7.    AFSCME asserts the 13th Check Claim and the Health Care Modification Claim as Other Unsecured Claims in Class 14 under the Plan, and seeks a recovery separate and apart from the Plan recoveries for pension and other post-employment benefit claims. However, with the public agreement and support of AFSCME and other parties, the City has resolved its obligations on account of: (a) all GRS Pension Claims, including, by definition, the liabilities asserted in the 13th Check Claim (the "Alleged 13th Check Liabilities"); and (b) all OPEB Claims, including the liabilities asserted in the Health Care Modification Claim (the "Alleged OPEB Liabilities"). This resolution was developed after months of

---

[2]    In support of the 13th Check Claim, attached to the AFSCME Response is a copy of the Decision and Recommended Order of Administrative Law Judge on Summary Disposition (the "ALJ Opinion") issued in the Michigan Employment Relations Commission ("MERC") proceeding In the Matter of City of Detroit and AFSCME Council 25, Case No. C12 E 092 (the "13th Check Proceeding"). See AFSCME Response at Exhibit 7. AFSCME asserts that the ALJ Opinion establishes the 13th Check Claim "to be as high as $174,000,000." In fact, the ALJ Opinion states that reserving any amount for this claim would be "entirely unwarranted at this stage" and that establishing an amount for this claim "would require an unwarranted degree of speculation upon speculation." ALJ Opinion, at 18-19.

negotiations and is unambiguously reflected in the terms of the Plan by the treatment provided to Class 11 (GRS Pension Claims) and Class 12 (OPEB Claims). Accordingly, the City requests that the Court disallow the 13th Check Claim and the Health Care Modification Claim consistent with the terms of the Plan and the settlements embodied therein.

## Argument

### The 13th Check Claim Was Resolved by the Agreed-Upon Treatment of GRS Pension Claims Under the Plan

8. Under the 13th Check program, annual earnings on GRS pension assets over and above the assumed rate of return of 7.9% were distributed, at the discretion of the GRS board of trustees (the "Board"), in the form of additional contributions to active employees' annuity savings fund accounts or additional checks to retirees in excess of the 12 monthly pension checks retirees otherwise would receive each year. ALJ Opinion, at 2. In the 13th Check Proceeding, AFSCME (a) alleged that the City failed to collectively bargain regarding the elimination of the 13th Check program in 2011 and (b) sought to recover amounts that individual retirees allegedly would have received in 2011 and 2012 had the 13th Check program remained in place during that period. Id.

9. The 13th Check Proceeding was stayed as a result of the commencement of the Chapter 9 Case. The automatic stay of sections 362 and 922 of the Bankruptcy Code was lifted by the Court for the limited purpose of

permitting the retiring Administrative Law Judge to issue the ALJ Opinion based on an earlier bench ruling. See Order Modifying the Automatic Stay to Allow Administrative Law Judge to Execute His Opinion (Docket No. 1070), at ¶ 2.

        10.    Once issued on October 2013, the ALJ Opinion acknowledged that the nature of the relationship between the City and the counterparties to pending MERC proceedings would be materially changed by the Chapter 9 Case, "and the dormant pending litigation, and the relief sought therein, will all likely be moot." ALJ Opinion, at 3. This statement is correct as to the 13th Check Proceeding. The Plan establishes the treatment of the City's pension-related liabilities regardless of the outcome of the 13th Check Proceeding.

        11.    The liabilities asserted in the 13th Check Proceeding, to the extent valid at all (which they are not, for the reasons discussed below), are classified as GRS Pension Claims under the Plan. In particular, Section I.A.203 of the Plan provides as follows:

> "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, *arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation,*

> *ordinance, statute or law* for (a) any pension, disability
> or other post retirement payment or distribution in
> respect of the employment of current or former
> employees or (b) *the payment by the GRS to persons who
> at any time participated in, were beneficiaries of or
> accrued post-retirement pension or financial benefits
> under the GRS.*

Plan, at § I.A.203 (emphasis added).[3]

      12.    This definition is broad, covering all types of GRS

pension-related liabilities. It cannot reasonably be disputed that the payments

made to employees and pensioners under the 13th Check program constitute

payments "by the GRS to persons who at any time participated in, were

beneficiaries of or accrued post-retirement pension or financial benefits under the

GRS." Id. The definition includes "any Claim" of this type, without any relevant

exception. As such, the Alleged 13th Check Liabilities patently are GRS Pension

Claims, as such term is defined in the Plan.

      13.    The Plan provides for the clearly defined treatment of all GRS

Pension Claims – in the estimated aggregate allowed amount of $1.879 billion – in

Class 11 under the Plan. See Plan, at § II.B.3.r (providing for the treatment of all

---

[3]     The Plan defines the term "Claim" with reference to section 101(5) of the
Bankruptcy Code. Plan, at § I.A.60. Section I.A.257 of the Plan makes
clear that any Claim that meets the definition of a GRS Pension Claim,
among other claims, cannot also be an Other Unsecured Claim in Class 14
under the Plan. See Plan, at § I.A.257 (providing that "'Other Unsecured
Claim' means any Claim that is not . . . a GRS Pension Claim [or] an OPEB
Claim" among other Claims).

GRS Pension Claims). The express Plan provisions will govern the treatment of all claims falling within the definition of GRS Pension Claims. The filing of proofs of claim by AFSCME with respect to such liabilities, as permitted by the Bar Date Order, does not somehow transform these liabilities into Claims that fall outside the Plan or its definition of GRS Pension Claims.[4] It is a fundamental aspect of the bankruptcy plan process that proofs of claim are subject to the treatment specified in the Plan; the Plan is not subject to the proposed treatment of liabilities that individual claimants may include in proofs of claim.

14. Once classified as GRS Pension Claims by the Plan, these claims cannot be asserted by the claimant in another class to obtain additional or preferred treatment. As noted above, the Plan expressly prohibits AFSCME's preferred treatment of this alleged claim in Class 14. See Plan, at § I.A.257 (providing that "'Other Unsecured Claim' means any Claim that is not . . . a GRS

---

[4] By the Bar Date Order, AFSCME was permitted to file "one or more omnibus proofs of claim on behalf of AFSCME-represented employees and former employees, regardless of the nature of such claims, including, without limitation, claims for post-retirement health obligations, pension obligations (whether benefits, underfunding or otherwise) or other compensation, subject to the City's right to object to any such claims." Bar Date Order, at ¶ 14. Notwithstanding this general authorization, however, it is not clear to the City whether the individual retiree Holders of the Claims constituting the Alleged 13th Check Liabilities and the Alleged OPEB Liabilities are, in fact, represented by AFSCME – and, therefore, that AFSCME possesses standing to assert these portions of the Claim – because AFSCME expressly declined to represent retired employees in the Chapter 9 Case in pre-bankruptcy correspondence with the City.

Pension Claim [or] an OPEB Claim" among other Claims). In sum, because the Alleged 13th Check Liabilities fit squarely into the Plan's definition of GRS Pension Claims, they are subsumed within the treatment provided all such Claims in Class 11 under the Plan.[5]

15.    The Plan further makes clear that Holders of Claims are entitled to no satisfaction of their Claims other than that provided in the applicable Class under the Plan. Section III.D.4.a of the Plan, for example, provides that "the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date .... whether or not ... a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code." Plan, at § III.D.4.a.

16.    Section III.D.4.b of the Plan similarly confirms that "the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City ... and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt ...." Plan, at § III.D.4.b. In addition, as of the Effective Date, AFSCME and all other Holders of Claims against the City will be enjoined from

---

[5]    Among other things, AFSCME already has agreed to withdraw $8.1 billion of the Claim relating to pension liabilities. See Order Dismissing Claims from Mediation (Docket No. 7877).

taking any actions to enforce any Claim against the City pursuant to

Section III.D.5.a of the Plan. Thus, to the extent the Alleged 13th Check

Liabilities constitute a valid Claim against the City – which they do not for all of

the reasons set forth below – such Claim would be entirely subject to the treatment

provided GRS Pension Claims in Class 11 under the Plan and cannot be a Class 14

Claim. Likewise, by the terms of the Plan, the 13th Check Proceeding will be

permanently enjoined and must be "withdrawn or dismissed with prejudice." <u>See</u>

Plan, § III.D.5.a.1.[6]

***The City Has No Liability on Account of the 13th Check Claim***

       17.    Even if the Court were to find that the 13th Check Claim is not

subsumed by the treatment of GRS Pension Claims under the Plan (which it is),

the City has no liability with respect to the 13th Check Claim.

       18.    AFSCME seeks to compel the City's payment of "13th check"

distributions to retirees for 2011 and 2012 based on the ALJ Opinion, which found

that elimination of the 2011 and 2012 payments violated the Michigan Public

Employment Relations Act, MCL § 423.201, <u>et seq.</u> ("PERA"), because the

elimination of the 13th Check program was implemented by the City without first

bargaining with AFSCME.

---

[6]     This principle applies equally to the numerous other union claims and claims
filed by individuals asserting similar liabilities.

19.     In reaching its conclusion, the ALJ Opinion assumes for the purpose of its analysis that the practice of paying 13th checks was lawful under the Michigan Public Employee Retirement System Investment Act, MCL § 38.1132, et seq. ("PERSIA"). It was not. The Board's practice of awarding additional benefits to active employees and retirees who participate in GRS, including the "13th check" distributions, was a clear breach of the Board's fiduciary duties under applicable state law, and it is beyond purview that an employer does not violate labor law by failing to bargain to continue an illegal practice.

20.     GRS was established pursuant to Article 11 of the Charter of the City of Detroit (the "Charter"). Section 11-101 of the Charter provides that "The city shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees." Chapter 47 of the Detroit City Code of 1984 (the "Ordinance"), in effect at the times relevant for this dispute, sets forth the benefits available to participants and other terms of the GRS. Section 47-1-3 of the Ordinance creates the Board as the responsible party for administration of the GRS as follows:

> A Board of Trustees of the General Retirement System is hereby created. The Board is vested with the general administration, management and responsibility for the proper operation of the System, and for making effective the provisions of [this] chapter.

21.     No provision of the Charter or the Ordinance authorizes the Board to increase or decrease benefits provided by GRS, or to create benefits not otherwise described in the Ordinance.  The grant of authority to the Board is limited to administration, management and proper operation – not the creation of new benefits.

22.     The Charter and Ordinance further provide that the authority to amend GRS is vested in the City Council.  Section 47-3-14(h) of the Ordinance provides that collective bargaining agreements that accept the terms of the Ordinance are subject to the Board's power to modify or amend "*the administrative rules and procedures*" (emphasis added) governing the defined contribution benefits provided in Article III of GRS, and Section 47-3-12(b) of the Ordinance provides that the Board may amend the "Participant Loan Program," but each of these limited exceptions highlight the general rule that only the City Council had general amendment authority over GRS.

23.     Although, for many years prior to 2011, the Board took the position that it had authority to designate GRS funds as "excess earnings" for distribution to active employees and retirees pursuant to the 13th Check program, the Ordinance did not expressly authorize these additional benefits.

24.     PERSIA requires that, among other things, a fiduciary "discharge his or her duties solely in the interest of the participants and the

beneficiaries, and ... (a) [a]ct with the same care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a similar capacity and familiar with those matters would use in the conduct of a similar enterprise with similar aims." MCL § 38.1133(13)(3)(a).

25. This requirement is almost identical to the federal Employee Retirement Income Security Act of 1974, as amended ("ERISA") requirement that a fiduciary "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); see generally Bd. of Trs. of Birmingham Emps. Ret. Sys. v. Comerica Bank, 767 F. Supp. 2d 793, 798 (E.D. Mich. 2011) ("Michigan courts ... look to ERISA and interpretive case law as persuasive authority in applying PERSIA ...."); Estes v. Adrian Anderson & N. Point Advisors, 2012 Mich. App. LEXIS 2236 at **7-8 (Mich. Ct. App. Nov. 15, 2012) (PERSIA is analogous to ERISA with respect to fiduciary requirements);[7] accord Bd. of Trs. of Birmingham Emps. Ret. Sys., 767 F. Supp. 2d at 798.

26. To meet ERISA's prudence standard, fiduciaries must undertake a careful and impartial investigation of all relevant facts and circumstances. The prudence requirement focuses on whether the fiduciaries, at the time they

---

[7] Copies of all unpublished decisions cited herein are attached hereto as Exhibit A.

ATI-102623040v5

engaged in the challenged transaction, "employed the appropriate methods to investigate the merits" of the transaction. Donovan v. Mazzola, 716 F.2d 1226, 1231-32 (9th Cir. 1983); Bussian v. RJR Nabisco Inc., 223 F.3d 286, 299-300 (5th Cir. 2000) (fiduciary must conduct a thorough and impartial investigation and make an objectively reasonable decision). A showing that a plan fiduciary failed to follow reasonable procedures is sufficient to show a breach of fiduciary duty. Howard v. Shay, 100 F.3d 1484, 1488-90 (9th Cir. 1996). Prudence is an objective standard that focuses on the fiduciary's conduct. Good faith will not excuse a lack of procedural prudence. For purposes of satisfying the duty of prudence, "a pure heart and an empty head are not enough." Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983).

27. In at least one instance, a federal district court has held that allegations that trustees continued to issue 13th checks despite their knowledge that doing so would put the plan in financial jeopardy, are sufficient to state a claim for breach of fiduciary duty. Saxton v. Central Pennsylvania Teamsters Pension Fund, 2003 U.S. Dist. LEXIS 23983 (E.D. Pa. 2003). In that case, the trustees had explicit authority to issue 13th checks so long as certain funding prerequisites were satisfied. Id. at *35. Although the plan's actuary certified that the funding prerequisites had been met, it was alleged that the plan trustees allowed the funding analysis to be performed with outdated and improper actuarial methods, all

with the knowledge that continued payments would put the plan's funding status at risk. Id. In those circumstances, the court held that the plaintiffs had stated a claim for breach of fiduciary duty. Id. at *38. The court held that ERISA's fiduciary obligations include "monitoring the plan's solvency." Id. at *37.

28.     In the case of the City's 13th Check program, there is no indication that the Board ever thoroughly analyzed the determination of "excess earnings," or the impact of their decisions on the financial stability of GRS. Nor is there any indication that the Board made any attempt to understand the actuarial risk associated with "13th checks" and other extra benefits, or to question the Board's actuaries regarding the basis for their projections. If the Board had fulfilled its duty, it undeniably would have understood that the very concept of "excess earnings" in a pension system like GRS is the product of a conceptual mistake.

29.     Actuaries project pension costs and assets over the long term, and when trustees spend "excess" money from the good years, they defeat one of the fundamental aspects of actuarial models – that investment gains, rather than employer contributions or local taxpayers, will defray a significant portion of total pension costs. The very actuarial consulting firm that GRS uses and the Board has long retained, Gabriel Roeder Smith & Company, has publicly conceded that use

of a 13th check program in public pension plans poses imprudent actuarial and financial risks to the retirement system.

30.     In a New York Times article (the "Article") published October 22, 2013, Rick Roeder, a founding member of Gabriel Roeder Smith & Company, said the following about the 13th Check program:  "There is no actuarial justification for 13th checks .... A 7-year-old child could understand this. *It's laughable that this could happen, but it did.*" (emphasis added).  A copy of the Article is attached hereto as Exhibit B.  To put it mildly, laughably unsound practices hardly satisfy the heightened duty of care imposed by PERSIA on the GRS Board.

31.     The Article also notes that "a study in 2011 by an outside actuary showed that the extra payouts were actually costing Detroit billions of dollars . . . . Actuaries model pension costs over the long term, and when trustees find 'excess' money year by year and spend it, they defeat the fundamental premise of the plan — that investment gains, not local taxpayers, will pay most of the cost." A copy of this study is attached hereto as Exhibit C.

32.     It is black-letter law that one of the common-law duties of a trustee under PERSIA and ERISA is to preserve and maintain the assets of the trust.  See Central States Pension Fund v. Central Transit., 472 U.S. 559, 559-60 (1985).  By continuing to pay benefits not required by the terms of GRS without

careful and thorough analysis of the financial impact to GRS, and without an

adequate understanding of (or willful blindness to) the consequences of their

actions, the Board breached its fiduciary duty to GRS and its participants.

33. Because the Board breached its fiduciary duty by issuing

13th checks, the City could not have breached any duty to bargain under PERA

over the elimination of the unlawful practice.

34. "In construing and applying PERA, the Michigan Supreme

Court has held that the Michigan legislature intended Michigan courts to rely on

analogous federal precedent." <u>Rogers v. Board of Educ.</u>, 2 F.3d 163, 166 (6th Cir.

1993) (compiling authority).

35. In this vein, the Michigan Supreme Court has held that subjects

of bargaining that are mandatory, permissive or illegal have the same meaning

under PERA as under the NLRA:

> Mandatory subjects of collective bargaining are those within the scope of 'wages, hours, and other terms and conditions of employment'. [MCL § 423.215; MSA § 17.455(15).] If either party proposes a mandatory subject, both parties are obligated to bargain about it in good faith.

> Permissive subjects of collective bargaining are those which fall outside the scope of 'wages, hours, and other terms and conditions of employment', and may be negotiated only if both parties agree.

> Illegal subjects are those which even if negotiated will
> not be enforced because adoption would be violative of
> the law or of the NLRA.

Central Michigan University Faculty Assoc. v. Central Michigan University,
404 Mich. 268, 289-90 (Mich. 1978), citing Pontiac Police Officers Ass'n v
Pontiac, 397 Mich 674, 679 (Mich. 1976).

36. The City could not have violated PERA by failing to bargain over a change to the 13th Check program because any negotiated resolution other than to eliminate this illegal practice would violate PERSIA.

37. As such, were the City to appeal the ALJ Opinion, there is virtually no doubt that the decision would be set aside. The standard for setting aside a decision such as the ALJ Opinion requires a showing that the decision was (a) in violation of the constitution or a statute, (b) in excess of the statutory authority or jurisdiction of the agency, (c) made upon unlawful procedure resulting in material prejudice to a party, (d) not supported by competent, material and substantial evidence on the whole record, (e) arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion or (f) affected by other substantial and material error of law. MCL § 24.306.

38. Based on the foregoing, AFSCME's claim for any amount related to the elimination of the 13th check should be disallowed.

***The Health Care Modification Claim Was Resolved by the
Agreed-Upon Treatment of OPEB Claims Under the Plan***

39.     Just as with respect to the Alleged 13th Check Liabilities,

the Alleged OPEB Liabilities constitute OPEB Claims under the Plan and are

subject to the Plan treatment in Class 12.  According to AFSCME, the Alleged

OPEB Liabilities arise from the modification of retiree health-care benefits by the

City in 2006 that caused retirees to incur increased costs for such health care.

Claim, at 3.

40.     The Plan defines OPEB Claims as "any Claim against the City

for OPEB Benefits held by a retiree who retired on or before December 31, 2014

and is otherwise eligible for OPEB Benefits, and any eligible surviving

beneficiaries of such retiree."  Plan, at § I.A.255.  The Plan defines "OPEB

Benefits" as follows:

> post-retirement health, vision, dental, life and death
> benefits provided to retired employees of the City and
> their surviving beneficiaries pursuant to the Employee
> Health and Life Insurance Benefit Plan and the
> Employees Death Benefit Plan, including the members of
> the certified class in the action captioned Weiler *et. al.* v.
> City of Detroit, Case No. 06-619737-CK (Wayne County
> Circuit Court), pursuant to the "Consent Judgment and
> Order of Dismissal" entered in that action on August 26,
> 2009.

Plan, at § I.A.254.

41.     Based on the totality of the information provided by AFSCME,
the City is not aware of any basis for AFSCME to argue that the Alleged OPEB
Liabilities do not arise from "post-retirement health, vision, dental, life and death
benefits" or that such Claims are not held by retirees who retired on or before
December 31, 2014.  The description of the Health Care Modification Claim states
that it is for "retiree health care benefits" dating back to 2006, establishing that the
Alleged OPEB Liabilities fit squarely within the Plan definition of "OPEB
Claims."  Accordingly, the Alleged OPEB Liabilities are subsumed within the
treatment provided all such Claims in Class 12 under the Plan.  See Plan, at
§ II.B.3.s.  As noted above, a Claim within the definition of OPEB Claim cannot
also be asserted as an Other Unsecured Claim in Class 14 of the Plan.  See Plan, at
§ I.A.257 (providing that "'Other Unsecured Claim' means any Claim that is
not . . . a GRS Pension Claim [or] an OPEB Claim" among other Claims).
Moreover, for all of the reasons set forth above with respect to the Alleged 13th
Check Liabilities, the Alleged OPEB Liabilities will be discharged as of the
Effective Date and are entitled to no further recovery except as set forth in Class 12
under the Plan.

## Reservation of Rights

42.     The City is filing this Brief to address certain specific
arguments relating to the 13th Check Claim and the Health Care Modification

Claim.  The City continues to seek the relief requested in the Claim Objection with respect to the remaining liabilities asserted in the Claim, and this Brief does not constitute a waiver of any such request for relief.  The City reserves all of its rights with respect to the Claim Objection and currently expects to file its reply in support of the additional relief requested in the Claim Objection on October 17, 2014.

WHEREFORE, for the foregoing reasons, the City requests that the Court promptly disallow the 13th Check Claim and the Health Care Modification Claim and grant such other and further relief to the City as the Court determines to be appropriate.

ATI-102623040v5
-21-
13-53846-swr  Doc 7981  Filed 10/16/14  Entered 10/16/14 14:54:41  Page 21 of 80
13-53846-tjt  Doc 8996-2  Filed 01/01/15  Entered 01/01/15 21:46:47  Page 73 of 101
Appendix 17

Dated: October 16, 2014        Respectfully submitted,

/s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY

ATI-102623040v5             -22-
13-53846-swr   Doc 7981   Filed 10/16/14   Entered 10/16/14 14:54:41   Page 22 of 80
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 74 of   Appendix 17
101

# EXHIBIT 9

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |
|  | ) |  |

## CREDITOR AFSCME COUNCIL 25'S SUPPLEMENTAL
## BRIEF IN SUPPORT OF PROOF OF CLAIM 2958 PURSUANT TO
## SECTIONS 105 AND 502(b) OF THE BANKRUPTCY CODE
## 3007 AND LOCAL RULE 3007-1

NOW COMES Creditor, AFSCME Council 25, by and through its attorneys, with its Supplemental Brief in Support of Proof of Claim 2958, and states as follows:

### I. INTRODUCTION

In early November 2011, Detroit Mayor Dave Bing issued a public call to the City of Detroit's forty-seven unions, asking them to accept concessions in wages and benefits because the City was cash strapped. The City's unions responded, forming a civilian-side Coalition of approximately thirty unions, and negotiated with the City intensely for several months. On February 1, 2012, the Coalition agreed to new contractual arrangements which resulted hundreds of

1

13-53846-swr   Doc 7982   Filed 10/16/14   Entered 10/16/1...   1353846141016000000000017
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 76 of
101
Appendix 17

millions of dollars in savings for the City; including 10% wage cuts and steep healthcare and pension cuts.

While soliciting these concessions, the City neglected to place the 13th Check issue on the table. This negotiated benefit entitled active employees to certain annuity savings fund credits, and retirees to a separate pension check each year depending on the pension system investment return. At the same time the City sought wage and benefit concessions, on November 30, 2011 the City acted unilaterally to eliminate this 13th Check benefit. The City brief spends substantial time on the wisdom of giving away "excess earnings". The City fails to address why it simply did not follow the law and negotiate-away this benefit, especially given its success in securing concessions from an unprecedented coalition of unions. Instead, the unions were forced to respond to the City's illegal conduct.

This issue was litigated before an Administrative Law Judge (ALJ) at the Michigan Employment Relations Commission (MERC). He described the context and history for why the 13th Check system was implemented at the City's request, in his October 4, 2013 Decision and Recommended Order:

> The rationale for the 2011 ordinance change was premised on what has now become a convenient public relations gambit: that the 13th checks amounted to a gift, a gratuity, or a bonus. They were not. In fact, the 13th check system is utilized by many employers as a method of giving some rough protection against inflation in deferred compensation systems. In the 1970s, it was not unusual to have formal inflation hedges in such systems tied directly to the cost of living indicators. That system became perceived as both unpredictable and prohibitively expensive by the late 1970s-early 1980s. It

was replaced by concepts such as the 13th check system which created separate dedicated funding streams to provide an annual bump which, while guaranteed to be paid, was not guaranteed to actually match the rate of inflation. It might be higher than a traditional COLA payment; it would likely be lower; but eh annual receipt was assured.

The 13th check system was such a well-established part of the City's deferred compensation system in 1996 that the City conceded . . . that regardless of a Charter or ordinance change, the City could not revoke the payments without fulfilling the bargaining obligation. It is uncontestable that the 13th check system was a mutually agreed upon obligation.

(*Exhibit A*, pg 15) In other words, it was a negotiated system to slow the impact of inflation. As such, it was a violation of the Public Employment Relations Act (PERA), MCL § 423.201 *et seq.* for the City to unilaterally terminate the benefit.

Michigan AFSCME Council 25 has filed a proof of claim in this court's claims register (Claim No. 2958), consisting of this 13th Check matter, as well as a retiree healthcare grievance and litigation from changes beginning in 2006. The City seeks to disallow the 13th Check and retiree healthcare claims. The City's arguments are without merit, and should be rejected.

## II.     STATEMENT OF FACTS

The parties AFSCME and the City of Detroit had a prior collective bargaining agreement, which was in existence from approximately January 2011 through June 30, 2012. (*Exhibit B*, portion of AFSCME Master Agreement that was attached to the City's Response).

3

Certain employees have annuity plans with the City, in which either 3%, 5% or 7% of their salary is contributed into the plan. As for retirees, they receive a check each month from the Retirement System for their pension. Prior to November 30, 2011, if the market performed above 7.9%, this was considered "excess earnings." Indeed, the GRS Board actuary determined that a normal rate of return for investments to be 7.9%. If earnings in the market realized a return in excess of this percentage figure, it considers the amount by which the actual returns exceed the assumed rate of 7.9% to constitute "excess earnings."

Also, a portion of these "excess earnings" would also be distributed to retirees in the form of a 13th check. This 13th check would be distributed to retirees toward the end of the year, in addition to their normal pension check. The City acknowledges that this distribution system of excess earnings, for annuity accounts and 13th checks, has been in effect since at least the 1980s.

On or about November 30, 2011, the Detroit City Council passed an ordinance prohibiting active and retiree participants from receiving excess earnings. (*Exhibit C*, Ordinance revision) This change eliminated "excess earnings" credits being given to active employee annuity accounts. Further, the Ordinance change caused the assumed rate of investment return to be the ceiling of annuity enhancement, as opposed to the floor. Now, for instance, the annuity rate of enhancement will be no greater than 7.9%, despite how much above that rate the

investments actually perform. The change also eliminated the excess earnings being distributed to retired participants, in the form of a "13th check". This change in the City ordinance changed the City of Detroit prior language, granting such discretion to the GRS Board in paying out excess earnings.

No retiree received the check in 2011 or in 2012. The City did not seek to negotiate this change in the treatment of the excess earnings beyond 7.9% with any City union. Further, the change was made during the existence of the collective bargaining agreement.

The AFSCME bargaining agreement, in Article 47.T, indicates that "[a]ll Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133." Thus, the previous ordinance which established the past practice of the GRS Board making excess earnings distributions was incorporated into the AFSCME bargaining agreement.

By changing the Ordinance, and applying that Ordinance change to the AFSCME membership, the City was violating PERA. As a consequence, active employees are losing both their annuity account investments, as well as the right to a 13th check upon their retirement.

# III. ARGUMENT

## A. The Language of the Plan Does Not Release the 13th Check Claim

The Debtor relies almost exclusively on the definition of GRS Pension Claim to argue that the 13th Check Claim is subsumed within Class 11. AFSCME argues that the language of the GRS Pension Claim creates, at the least, an ambiguity – in light of how the definition is used throughout the Class 11. The Mediation Confidentiality Order prevents all of the material facts from being disclosed, yet the below argument will disclose certain non-confidential facts.

The City's brief fails to outline the proper context of the dispute. The question presented is whether AFSCME, in agreeing to encourage its members to vote in favor of the Plan, thereby agreed to the City's interpretation of the Plan; an interpretation releasing the City from liability with two of AFSCME's claims that were properly filed in Class 14 and never formally, or informally, withdrawn. At this juncture, the Plan has not been confirmed, and there is no contract binding AFSCME to support the City's interpretation of the Plan.

Further, there is no document or any indication whatsoever from AFSCME that it released any aspect of its Proof of Claim, filed February 21, 2014.

Even if there were a "contractual" relationship between AFSCME and the City, there must exist a meeting of the minds on all material facts. *Fisk v Fisk*, 328 Mich 570, 574, 44 NW2d 184 (1950). "A meeting of the minds is judged by an

objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Heritage Broadcasting Co v Wilson Communications*, 170 Mich App 812, 818, 428 NW2d 784 (1988); See also *Jamaica Ave, LLC v S & R Playhouse Realty Co*, 540 F3d 433, 440 (6th Cir.2008) Under Michigan law, when you have a contract provision which is ambiguous – or subject to more than one interpretation – parol or extrinsic evidence may be used "for the purpose of aiding in the interpretation or construction of a written instrument, where the language of the instrument itself taken alone is such that it does not clearly express the intention of the parties or the subject of the agreement." *Edoff v Hecht*, 270 Mich 689, 695, 260 NW 93, 96 (1935) Here, given the use of the phrase GRS Pension Plan, at the least an ambiguity exists.

The use of the phrase "GRS Pension Claim" throughout makes clear that the definition is intended to include prospective payment or distribution, as distinct from credits or disbursements which should have been made in the past and are now considered contingent liability. Overall, Class 11 includes "GRS Pension Claims", defined as:

> "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including, but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other

7

obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) *any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS. (emphasis* added)[1]

This is the same definition found within the initial Plan of Adjustment, filed on February 21, 2014[2] – the same day AFSCME's Proof of Claim was filed. The words "payment or distribution" are not defined in the Plan. The Fourth Disclosure Statement discusses the ASF program, and indicates that the GRS Trustees are "granted discretion to determine the annual interest to be credited on the employee contributions to the ASF accounts." (Fourth Disclosure, pg 23-24) An "interest credit" into an employee's ASF account is not a "pension, disability or other post-retirement payment or distribution", as required by subclause (a) of the GRS Pension Claim definition. When something is "credited", according to Black's Law Dictionary, it is "enter[ed] (as an amount) on the credit side of an account". The word "credit" is defined as the "availability of funds from either a financial institution or under a letter of credit." Black's Law Dictionary, Ninth Ed., 2004, pg 424. Receiving a "credit" is distinct from a "payment or distribution."

---

[1] Section 1.A.203

[2] http://www.detroitmi.gov/Portals/0/docs/EM/Bankruptcy%20Information/Plan%20for%20the%20Adjustment%20of%20Debts%20of%20the%20City%20of%20Detroit.pdf

Nor are these credits considered "payments" to persons who "at any time" participated in GRS, as per subclause (b) of the above definition. This language is a clear reference to the individuals who are currently retirees, whereas conversely persons entitled to ASF interest credits are current employees.

The treatment of Class 11 "GRS Pension Claims" is discussed in Section II.B.3.r. However, this Section makes no reference of the treatment of 13th Check distributions. Indeed, there is no language which suggests the City will attempt to recapture 13th Check payments. Nor has there been any literature or information provided to 13th Check recipients to suggest such.

Critically important is the discussion of the modification of the GRS Pension Claim in the Plan. Under the heading "Modification of Benefits for GRS Participants", the Plan explains that

> "During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment."[3]

The phrase AFS/GRS Reduction states as follows:

> "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the

---

[3] Section II.B.3.r.ii.C

9

Current Accrued Annual Pension amount described in Section I.A.202, plus the ASF Recoupment.[4]

Within Class 11, it is clear from the above that the intent of the Plan is to impair future pension benefits of retirees. The Plan makes adjustments in the pension benefit initially until June 30, 2023. It then lists the specific impairments that are applicable to future pension benefits. The Plan does not indicate any impairments of the ASF credits or 13th Checks owed prior to the July 18, 2013 petition.

The Fourth Amended Disclosure Statement also discusses the GRS Pension Claim phrase. *See Pg. 14 and 174.* Much like the Plan, the Disclosure Statement confirms that the pension benefit impairment is due to the "unfunded" – or future liability – of the City.

The omission of the 13th Check Claim from the language of Class 11 was intentional. As noted, the AFSCME 13th Check Claim is a pending claim before the Michigan Employment Relations Commission ("MERC"). The claim itself is one rooted in state labor law and contract law. The City unilaterally changed the terms of the collective bargaining agreement it had with its AFSCME city employees and must reimburse them. Notably, the City has been meticulous in its defining its inclusion and treatment of claims within the Plan. Presently, the Plan, which has been amended numerous times to address each inefficiency, is on its 7th amended version. Thus, the City's "void" as to these claims is not unintentional.

---

[4] Section 1.A.23

The City acted as if the 13th Check Claim was a live claim, when the Fourth Amended Plan was published. As stated before, February 21st was the day AFSCME filed its Proof of Claim, and that the City filed its first Plan of Adjustment. The definition of GRS Pension Claim was the same as in the current version. In the second week of April 2014 (on or about April 12th), AFSCME reached a deal with the City concerning the pension impairments for GRS Participants. On May 5, 2014, the City filed its Fourth Amended Plan of Adjustment (Docket No 4392), which was intended to encompass the terms of the AFSCME (and other employee creditor groups') pension deals.

Importantly, on May 15, 2014, the City filed its objection to the AFSCME Proof of Claim. (Docket No. 4876) In that objection, the City addressed the specific claims within AFSCME's plan. The first claim AFSCME made in its February 21st Claim concerned the potential impairment to all City retirees regarding their pension and OPEB, valued at $8.1 billion. The City responded to that claim by indicating that

> "the Plan addresses all pension and OPEB liabilities independent of the Claim by providing for the continuation of modified post-employment benefits for the individuals that the Claimant seeks to protect by filing the Claim. See, e.g., Plan, at §§ II.B.3.r, II.B.3.s (providing for, respectively, the preservation and treatment of GRS pension and OPEB claims). Accordingly, the Claim is unnecessary to preserve these individuals' rights to payment on account of such liabilities. Subject to the confirmation of the Plan, this portion of the Claim may be disallowed."

(Claim Objection, ¶ 14) Thus, the City considered Sections II.B.3.r, II.B.3.s of the plan to "preserve" the "continuation of <u>modified</u> post-employment benefits" – in other words, the future pension and OPEB benefits were being continued but modified. Those Sections of the Plan then set out specifically the modifications of the future pension and OPEB benefits, respectively. However, the Sections never address the modification of any past-due ASF interest credit, or pension check not yet received. Thus, this language clarifies that the City did not consider the 13th Check Claim to be encompassed within Class 11.

Further, in these same objections, the City does address the 13th Check Claim. The City writes as follows:

> "the Claim identifies several alleged liabilities related to various other proceedings identified in Exhibit 1 to the Claim, *including a number of proceedings before the Michigan Employment Relations Commission. To the extent any such proceedings have not been adjudicated on a full and final basis before the applicable tribunal,* the City disputes its liability to the Claimant or the individuals it represents on account of such liabilities."

Id., at ¶ 18. This is the objection the City recorded a mere ten days after the City filed the Fourth Amended Plan of Adjustment, which embodied the retiree pension deal. It did not indicate that the 13th Check MERC charge was addressed within the May 5th Plan. Instead, it indicated as its only objection to the claim was that it had not been fully adjudicated before MERC.

Without disclosing confidential communications, the City's assertion, of the 13th Check Claim being subsumed within the Plan, is a recent one.

12

**B.    The Language of the Plan Does Not Release the Retiree Healthcare Claim**

The Retiree Health Care Claim within AFSCME's Proof of Claim is not substantially similar to the other claims or interests of Class 12. As discussed above, a claim can only be placed on a particular class if the "claim or interest is substantially similar to the other claims or interests of such class." 11 U.S. Code § 1122. The Retiree Health Care Claim, which does not deal with prospective payments of distributions, is not substantially similar to the other claims or interests of Class 12.

Specifically, Class 12 deals exclusively with prospective payments or distributions moving forward. The definition of OPEB Claim does not include a claim for past due health care. Instead, the OPEB Claim is clearly intended to encompass the City's future obligations to pay retiree health care. OPEB Claims are defined as:

> "OPEB Claim" means any Claim against the City for *OPEB Benefits* held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree. (*Emphasis* Added)[5]

The Plan continues by establishing the two VEBAs, followed by Section II.B.3.s.ii.C which states that:

---

[5] Section 1.A.255

"From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits."

The Effective Date is defined as a date following Plan Confirmation.[6] Thus, the clear intent is to impair the provision of retiree healthcare benefits following the Effective Date of the Plan. The Disclosure Statement further addresses the definition of OPEB Claim stating:

> *If you are a retiree or a surviving beneficiary and are receiving retiree health benefits, or are entitled to retiree death benefits from the City, you are a holder of what the Plan calls an "OPEB Claim" and your OPEB Claim is included in Class 12 of the Plan.* (emphasis in original)

> The estimated amount of all OPEB Claims for purposes of voting on the Plan is $4,095,000,000. *This amount represents the estimated present value of the cost of the City's future obligations*, as of June 30, 2013, *for the City to continue to provide retiree health benefits* (including dental and vision) and death benefits *into the future under the programs that were in effect at the time the City filed its chapter 9 petition.*" (emphasis added)

The Plan clearly contemplates that the Plan intends to impair future liability of the City, not past due debts.

## C.    AFSCME Did Not Withdraw Its Proof of Claim

Federal Rule of Bankruptcy Procedure ("FRBP"), Rule 3006 speaks to the withdrawal or release of a proof of claim:

> A creditor may withdraw a claim as of right by filing a notice of withdrawal, except as provided in this rule. *If after a creditor has filed a proof of claim an objection is filed thereto or a complaint is filed against*

---

[6] "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived. Section 1.A.168

14

13-53846-swr Doc 8998-2   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 14 of 26
13-53846-tjt  Doc 8998-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 89 of
101                                                                        Appendix 19

*that creditor in an adversary proceeding, or the creditor has accepted or rejected the plan or otherwise has participated significantly in the case, the creditor may not withdraw the claim except on order of the court after a hearing on notice to the trustee or debtor in possession, and any creditors' committee elected pursuant to § 705(a) or appointed pursuant to § 1102 of the Code.* The order of the court shall contain such terms and conditions as the court deems proper. Unless the court orders otherwise, an authorized withdrawal of a claim shall constitute withdrawal of any related acceptance or rejection of a plan.

FRBP 3006. (*Emphasis added*) *See also In re County of Orange,* 203 BR 977

(BankrCDCal1996*).* Federal Rules of Civil Procedure ("FRCP") Rule 41 governs

the interpretation of this Rule, concerning the withdrawal of a proof of claim. *In re*

*Empire Coal Sales Corp,* 45 FSupp 974, 976 (S.C.N.Y.), aff'd sub nom. *Kleid v*

*Ruthbell Coal Co,* 131 F2d 372, 373 (2d Cir1942); *Kelso v MacLaren*, 122 F2d

867, 870 (8th Cir.1941). After an objection has been filed a proof of claim may be

withdrawn <u>only subject to approval by the court.</u> *Id.*

Similar to FRCP Rule 41(a), it is the filing of an objection to the claim

which initiates a contest that must be disposed of by the court. Thus, a leave of

court is required in order for a party to obtain dismissal over the objection of a

defendant. *See* Rule FRCP 41(a)(2). On May 15, 2014, the City filed its objection

to AFSCME's Proof of Claim. Therefore, AFSCME is unable to release or

withdraw its claim following this point without an order of this Court.

**D.** **The City Unilaterally Changed a Mandatory Subject of Bargaining**

The City argues the merits of AFSCME's charge inaccurately. Pursuant to the Michigan Public Employment Relations Act (PERA), it is unlawful for a public sector employer to fail to bargain collectively in good faith with a labor organization over mandatory subjects of bargaining like wages, hours, and other terms and conditions of employment. MCL § 425.215(1). A public sector employer may not unilaterally change a mandatory subject of bargaining without providing the labor organization with notice and opportunity to bargain. *Central Michigan Univ Faculty Ass'n v Central Michigan Univ*, 404 Mich 268, 277 (1978); *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974). Both refusal to bargain and unilateral changes are unlawful under MCL § 425.215(1). A mandatory subject of bargaining is defined as wages, hours, and other terms and conditions of employment. All other subjects are either permissive or illegal. As noted by ALJ O'Connor, retirement benefits are mandatory subjects of bargaining regardless of city charter provisions on ordinances to the contrary:

> It's particularly notable that one of the earliest cases interpreting and enforcing PERA involved the City of Detroit and the DPOA [Detroit Police Officers Association], and an assertion by the City that, "*We don't have to bargain about pensions because they're controlled by our charter, and our pension ordinance*," and the Michigan Supreme Court said, "You're wrong". [See, *Detroit Police Officers Ass'n v Detroit*, 391 Mich 44, 54-55 (1974).]

*\*\*\*\*\**

The change directly affected an existing and fundamental condition of employment. Again, *DPOA v Detroit* held that pension plans and promises made under them were a fundamental condition of employment such that the City of Detroit had to bargain over them in the DPOA case, notwithstanding a preexisting charter provision which set terms different than the DPOA was seeking.

(*Exhibit A*, pg 9-10) The credits into the ASF accounts and the 13th check was a mandatory subject of bargaining.

Indeed, the City has previously acknowledged that a change in the "excess earnings" calculation would be a mandatory subject of bargaining that could not be changed without first bargaining with the union. *AFSCME et al v Detroit*, 218 Mich App 263 (1996). ALJ O'Connor spent a large portion of his Decision and Recommended Order discussing the relevance of that case and the acknowledgement that the City could not implement changes to the pension ordinance without bargaining:

> The City, in the 1996 dispute [*AFSCME et al v Detroit*, 218 Mich App 263 (1996)], sought to change by charter amendment this very issue, or at least part of the very underlying issue at stake here today, and that is the Pension Board's allocation of excess earnings. In 1996, the City sought to change [the handling of excess earnings] by charter amendment. In 2011, the City sought to change [the handling of excess earnings] by pension ordinance change.
>
> *****
>
> In the 1996 decision, which is a published decision binding on the parties and binding on me, the Court recounts that the City in response to AFSCME's challenge, "Agrees that the challenged provision cannot be legally implemented even if enacted by the voters without first bargaining". [The 1996 decision further found that the City did not dispute "plaintiffs'

17

contention that these challenged provisions may not be legally implemented as to the city's union employees without bargaining".]

ALJ O'Connor then noted:

> Then and now there was no factual dispute; there is no factual dispute. The excess earnings have always been allocated at the discretion of the Pension Board. The Union has argued that that's a binding past practice. The City asserts that it wasn't mutual—an assertion I find frivolous given the prior litigation, given the City's concession in prior litigation that it was an established prior practice. It's also—I also find it frivolous based on the exhibits produced by the City in this case. The Corley letter, which was an advice letter to City Council by its own staff which recounts in very specific terms that there was an existing prior practice that was well recognized, but the City did not like that prior practice and wanted to change it. [The advice letter] acknowledged with incredible specificity the prior practice that existed for over 20 years, spelling out year by year the amount of money allocate by the Pension Board over the City's concern about how it was being allocated, but with the City's acquiescence in collective bargaining agreement after collective bargaining agreement, and the City repeatedly re-adopted collective bargaining agreements [with the same language]. . . . It was more than a tacit agreement. It was an express agreement with full understanding by both parties.

(*Exhibit A*, pg 7-9)

The City has argued that the financial emergency dramatically changes the situation, but this emergency is nothing new. There were other legal mechanisms that the City could have utilized. Judge O'Connor mentioned a few possibilities in his Decision and Recommended Order:

> Notwithstanding the *DPOA v Detroit* and *AFSCME v Detroit* decisions, the City was not locked in perpetuity to the continued payment of the 13[th] checks. It could have forthrightly bargained the obligation away. It could have traded it away. It could have in good faith exhausted its bargaining obligations and then, under controlling labor law, taken the entitlement away. It did none of those things. Instead, it continued over the years to re-

commit itself to the system. In 2010, the parties had been in bargaining and reached what appeared to be, and what the City asserted to be, a good faith impasse in bargaining. In November 2010, the City imposed new conditions of bargaining in place of a 2008-2012 collective bargaining agreement, which the parties had been unable to resolve. The imposed terms altered many conditions of employment for AFSCME members and wrung significant financial concessions from the workforce. In January of 2011, AFSCME conceded the City's position that the parties had reached a lawful impasse and AFSCME expressly acquiesced in treating the City-imposed terms as the 2008-2012 collective bargaining agreement governing the relationship of the parties.

Although the City could have, in November 2010, included in the post-bargaining impasse imposed terms a cut-off of the 13th check obligations, it did not. The resulting agreement, drafted by and initially unilaterally imposed by the City, left intact the 13th check system and expressly re-committed the parties, in Article 47(T) of the Contract, to compliance with the terms of the pension ordinance as it then existed. One year later, without bargaining and during the unexpired terms of that Contract, the City Council voted to materially change the pension ordinance and the Employer followed up by unilaterally implementing the change, in derogation of the City's obligations under PERA, the mandate of *DPOA v Detroit*, and the City's own admission of unalterable obligations as set forth in *AFSCME v Detroit*. The ordinance maneuver by the City administration was a unilateral do-over in the midst of the 2008-2012 contract term which materially, and necessarily unlawfully, and adversely altered existing conditions of employment.

(*Exhibit A*, pg 16)

MERC found that the City violated the law on a number of fronts, as detailed in the opinion.

## E.   There is No Violation of the Pension Board's Fiduciary Duty in this Case

The statute of limitations prohibits the City's claim that the Pension Board Trustees violated the Michigan Public Employee Retirement System Act

19

(PERSIA), MCLA § 38.1132, et seq. The City is complaining about fiduciary breaches that occurred continuously for decades, which would have been known at the time for purposes of accrual. The statute of limitations for breach of a fiduciary duty is three years. MCL 600.5805(10); *The Meyer & Anna Prentis Family Foundation, Inc. v Barbara Ann Karmanos Cancer Institute*, 266 Mich App 39, 47, 698 NW2d 900 (2005); *Miller v Magline, Inc*, 76 Mich App 284, 313, 256 NW2d 761 (1977). This City's claims should be rejected as untimely.

Moreover the City does not have standing to complain about violations of PERSIA. MCL 38.1133(3) provides that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Since the City is not a participant or beneficiary, it may not challenge the discharge of the Board's fiduciary duties. In *Wayne County Employees Retirement System v Wayne County*, 301 Mich App 1 (2013), the County contended that the 13th-checks were issued despite the underfunded status of benefit plans, that ineligible recipients received 13th-checks, and there were no written policies with respect to financial losses. *Id.* at 67. The court found that "[t]he appropriate party for pursuing a claim based on imprudent 13th-check disbursements would be a retiree or survivor beneficiary concerned with the solvency of the IEF program and the availability of future 13th checks." *Id.* at 68. Thus the court held that the County

20

13-53846-tjt Doc 8996-2 Filed 01/01/15 Entered 01/01/15 21:46:47 Page 95 of
13-53846-swr Doc 7983 Filed 10/16/14 Entered 10/16/14 15:08:02 Page 29 of 36

101

Appendix 19

did not have standing to bring the claims because the fiduciary duties were owed to retirees and surviving beneficiaries, not the County.

In *Wayne County Employees Retirement System v Wayne County*, 301 Mich App 1 (2013), Wayne County argued that the Wayne County Employees Retirement System breached its fiduciary duties under MCL § 38.1133(3). The court held that that the Retirement Commission had not breached its fiduciary duties. And for a number of the claims, the court held that Wayne County did not have standing to enforce the fiduciary duties. Wayne County's first claim was that the Retirement Commission had failed to allocate losses in proportion to and in correlation with IEF's percentage of the investment pool. Although the court assumed that the County had standing for purposes of the argument, it still held that the Retirement Commission had no fiduciary duty to make IEF loss allocations. Wayne County's second argument was that setting rates of return for purposes of funding the IEF during unfunded years breached the Retirement Commission's duty of care. The court assumed standing for purposes of the argument for this claim as well but held that the Retirement Commission's actions were not financially imprudent from the position that it owed the duty of care to the retirees and surviving beneficiaries.

In terms of the Detroit City Charter, the City adopted a retirement ordinance as Chapter 47 of the Code. AFSCME's charge at MERC related to the City's

21

13-53846-swr Doc 7982 Filed 10/16/14 Entered 10/16/14 15:08:02 Page 21 of 26
13-53846-tjt Doc 8996-2 Filed 01/01/15 Entered 01/01/15 21:46:47 Page 96 of
101

Appendix 19

adoption of a new City ordinance, which prohibited certain actions by the General Retirement System Pension Board. This change in the City ordinance changed the City of Detroit's prior language, granting such discretion to the GRS Board in paying out excess earnings. It is well established that a public employer, under PERA, cannot change a mandatory subject of bargaining by passing a law or ordinance. *AFSCME et al, supra.* at (finding that "[n]either the city nor the commission disputes plaintiff's contention that these challenged provisions [of the city charter] may not be legally implemented as to the city's union employees without bargaining."); See *DPOA v City of Detroit*, 212 Mich App 383, 389 (1995)

Contrary to the City's claim, the Board did not violate its fiduciary duties under PERSIA. MCL 38.1133(3) does provide that "[a]n investment fiduciary shall discharge his or her duties solely in the interest of the participants and the beneficiaries[.]" Its distribution of excess earnings was done solely in the interest of participants and beneficiaries. The 13th check was designed to maintain the value of benefits that would otherwise be wiped out by inflation.

The City provides no evidence of the Board's alleged breaches of fiduciary duties. There is no evidence that the Board failed to investigate or to follow reasonable procedures. The only evidence on which the City relies consists of newspaper articles, which should be rejected as hearsay. *See* Fed.R.Evid. 801(c).

.

22

13-53846-swr    Doc 7982    Filed 10/16/14    Entered 10/16/14 15:08:02    Page 22 of 26
13-53846-tjt    Doc 8996-2    Filed 01/01/15    Entered 01/01/15 21:46:47    Page 97 of
101

Appendix 1

*See also Turner v City of* Taylor, 412 F3d 629, 652 (6th Cir 2005) (finding newspaper article to be inadmissible hearsay).

The evidence is lacking regarding the Board's attempts to understand the actuarial risk associated with 13th checks and other benefits. In *Jurva v Attorney General of State of Michigan*, 419 Mich 209, 351 NW2d 813 (1984) the court considered a hypothetical burden on the actuarial basis of the pension system. The court first found that the school board had authority under the school code to provide early retirement incentives. It then held that "[t]he presumed adverse effect on the actuarial soundness of the plan cannot defeat a clear delegation of broad authority to provide fringe benefits of an economic nature." *Id.* at 223. Similarly here, a hypothetical burden on the actuarial basis of the pension system cannot defeat a clear statutory mandate, such as the duty to bargain under PERA.

The City inappropriately cites to cases under ERISA. But ERISA does not apply to the City's retirement system. See *Wayne County Employees Retirement System*, 301 Mich App at 44 n26 (holding "ERISA has no application to the Wayne County Employees Retirement System because it is a governmental pension plan.")

The City simply could have bargained the desired change in the retirement benefits. That is the only issue in this case, not the alleged breach of a fiduciary duty. Nor does MERC have jurisdiction to consider the issue. Indeed MERC's

23

13-53846-swr   Doc 7982   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 23 of 26
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 98 of
101                                                                        Appendix 1S

jurisdiction is limited to interpretation of PERA. But even if the court were to consider the City's untimely fiduciary duty claim, the *Wayne County* decision, supra, 301 Mich App 1, should persuade this Court that no such breach occurred.

## IV. CONCLUSION

WHEREFORE, the Coalition of Detroit Unions respectfully requests that this Honorable Court overrule the City of Detroit's Objections.

Dated: October 16, 2014

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Blvd., 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 964-4454
Facsimile: (313) 964-4490
richardmack@millercohen.com

Sharon L. Levine
Philip J. Gross
LOWENSTEIN SANDLER LLP
65 Livingston Ave.
Roseland, New Jersey 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-6247
slevine@lowenstein.com
pgross@lowenstein.com

Herbert A. Sanders
THE SANDERS LAW FIRM PC
615 Griswold St., Ste. 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
hsanders@miafscme.org

24

13-53846-swr   Doc 7982   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 24 of 26
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 99 of
101

Appendix 20

*Counsel to Michigan Council 25 of the
American Federation of State, County and
Municipal Employees (AFSCME), AFL-CIO*

25

13-53846-swr   Doc 7982   Filed 10/16/14   Entered 10/16/14 15:08:02   Page 25 of 26
13-53846-tjt   Doc 8996-2   Filed 01/01/15   Entered 01/01/15 21:46:47   Page 100 of   Appendix 20
101

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
|  | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## PROOF OF SERVICE

The undersigned certifies that on August 1, 2014, the American Federation of State, County and Municipal Employees Council 25 (AFSCME) filed Objections to the Fifth Amended Plan of Adjustment of Debts, Due to Impairment of Non-City Employees/Retirees were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

/s/ Richard G. Mack, Jr.
Richard G. Mack, Jr., Esq.
MILLER COHEN PLC
600 West Lafayette Boulevard, 4th Floor
Detroit, MI 48226-3191
Telephone: (313) 566-4787
Facsimile: (313) 964-4490
richardmack@millercohen.com

1