

# SEGAL

THE SEGAL COMPANY
1920 N Street NW  Suite 400  Washington, DC 20036-1659
T 202.833.6450  F 202.833.6490  www.segalco.com

Margery Sinder Friedman
Senior Vice President & General Counsel
mfriedman@segalco.com

January 15, 2015

The Honorable Steven W. Rhodes
United States District Judge
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd., Room 564
Detroit, MI 48226

Re: <u>Case No. 13-53846 – Comment on Fees</u>

Dear Judge Rhodes:

In response to your January 5, 2014 Order Regarding Process to Determine the Reasonableness of Fees Under 11 U.S.C. § 943(b)(3), The Segal Group, Inc. ("Segal") submits this statement regarding Segal's fees. As discussed below, Segal provided high-level actuarial services to both the Retiree Committee and the City of Detroit, and billed amounts that were demonstrably reasonable. When asked to reduce our fees, we met in mediation with the City, and quickly agreed to a reduction of $99,000. In fact, the Mayor of the City of Detroit noted his satisfaction with Segal's work, and we were told that we received the "nicest" Mediation Statement that the Mayor's office had submitted to Judge Rosen. We believe that our billed amounts, coupled with the agreed-upon reduction of $99,000, were appropriate professional fees for sophisticated, high-level work that contributed significantly to the Retiree Committee's acceptance of the Plan of Adjustment and to the successful resolution of the bankruptcy in a timeframe much shorter than initially anticipated.

**Summary of Engagement**

The Retiree Committee retained Segal in September 2013 to provide professional health and pension actuarial and plan design consulting. Our original role was to provide financial analyses of proposed changes to the pension and retiree health care benefits, and to educate the Retiree Committee on the effects of proposed changes. As the bankruptcy progressed, our role was significantly expanded to include advising the City and serving as the pension expert at trial. To this engagement, we brought top talent who were responsive, strategic, thoughtful and productive. Moreover, we gave the Detroit bankruptcy engagement the highest priority, forfeiting other client opportunities. Segal provided quality consulting to the Retiree Committee and the City regardless of the complexity of the work or the deadline requirements.

Benefits, Compensation and HR Consulting   ATLANTA  BOSTON  CHICAGO  CLEVELAND  DENVER  HARTFORD  HOUSTON  LOS ANGELES  MINNEAPOLIS
NEW ORLEANS  NEW YORK  PHILADELPHIA  PHOENIX  SAN FRANCISCO  TORONTO  WASHINGTON, DC



Multinational Group of Actuaries and Consultants   BARCELONA  BRUSSELS  DUBLIN  GENEVA  HAMBURG  JOHANNESBURG  LONDON
MELBOURNE  MEXICO CITY  OSLO  PARIS

Segal's fees are less than 2%[1] of the total professional fees in this matter, but we provided far more than that in value. In addition, we already built in a substantial discount for the Retiree Committee in the way that we structured our fees and did not bill for time and services that could readily have been billed.

In our role, we informed and advised the Retiree Committee by:

- Performing complex actuarial calculations and projections of plan design alternatives for the Retiree Committee's consideration for both pension and retiree health plans;
- Attending numerous mediation sessions; and
- Counseling the Retiree Committee on:
  - the impact of the ballot options,
  - the current and projected funded status of the defined benefit plans,
  - the impact of revenue on funded status from the Grand Bargain, and
  - the alternative approaches for retiree health care that leveraged the new federal health care program.

Because of Segal's efforts, the Retiree Committee, representing more than half of the pension liabilities and the majority of the retiree health care liabilities, supported the Plan of Adjustment. To achieve this outcome, Segal tirelessly provided the Retiree Committee, other Committee professionals, the Mediators, and the City with benefit design options, in depth actuarial analyses, cost estimates, pension plan funding projections, and benefit level assessments. No other actuarial consultant to this bankruptcy provided the level of expertise, benefits knowledge, and innovative solutions to the Retiree Committee and the City.

As the bankruptcy negotiations progressed, Segal took on an expanded role, particularly in connection with the pension issues. Although the City retained Milliman to serve as its actuarial consultant, the City expanded Segal's responsibilities and relied on us to perform calculations and to serve as actuarial expert at trial. These services included:

- Working with the City's attorneys to draft the ballots;
- Calculating the pension claim amounts that were shown on the retirees' ballots;
- Calculating the individual pension data that was shown on the retirees' ballots;
- Writing the expert report related to the pension plans;
- Analyzing the opposing parties' actuarial expert reports and attending their depositions;
- Preparing calculations for the City including claim amounts under alternative scenarios that the City had intended to use in its bankruptcy case;
- Preparing a rebuttal report that the City intended to use during the bankruptcy trial, and
- Testifying on behalf of the City on pension issues at the trial.

---

[1] Percentages and dollar amounts set forth in this letter are as of the date of the December 3 Mediation.

Segal's taking on the dual role of providing actuarial services to the City and the Retiree Committee resulted in significant savings to the City. We estimate that the City would have incurred, based upon the tasks identified above, hundreds of thousands of dollars in additional fees. The City thought it so important to have our expert available to testify at trial, and to testify in a specific order that best represented the City's interests, that our expert rescheduled long-planned personal travel to accommodate the City's request and the Court's schedule. Our commitment, quality and responsiveness to the needs of the Retiree Committee, the City and the Court were unyielding.

With regard to the retiree health plan design and actuarial analyses, Segal worked with the Retiree Committee and the Mediators on the implications of the City's proposal to pay stipends to participants not eligible for Medicare in lieu of providing health benefits. While the City said that retirees would be able to purchase coverage on the Health Insurance Exchanges (as established under the Affordable Care Act), the City had not completed any analysis. Our services included:

- Preparing detailed exhibits of the costs and benefits under the Health Insurance Exchanges and briefing the Retiree Committee, the City and the Mediators on those options. As the Health Insurance Exchanges were not even in existence at this time, Segal's work laid the critical foundation for the Retiree Committee's ultimate acceptance of the 2014 settlement;
- Identifying classes of participants who would need extra assistance and identifying additional funding to assist those participants; and
- Developing options to permit retirees to receive federal subsidies under the Voluntary Employee Beneficiary Associations (VEBAs) proposed by the City and contained in the Plan of Adjustment. Segal took a lead role in the design that permits payments from VEBAs to continue in a way that allows retirees to receive federal subsidies under the Health Insurance Exchanges. As far as we know, these options have never been used before to supplement insurance provided under the Health Insurance Exchanges. The implementation of these options, which will start in 2015, influenced the Retiree Committee to accept the City's proposal.

**Billing Rates and Unbilled Time**

*Rates:* Although Segal did not advertise its billing rates as discounted, in fact, we purposely quoted only our standard rates and not the higher rates that we frequently charge for high-level bankruptcy and other litigation work. Because the City is a public entity suffering under dire economic conditions, we decided not to charge the higher rates.

Had we quoted higher rates similar to what we charge for expert witness consulting, and then reduced our rates to our standard rates, we could have described our fees as "discounted." Under this scenario, there would have been no reduction in our bills but the perception would have been that we reduced our rates. The difference between the standard rates that we have billed and our "expert witness" rates amounts to hundreds of thousands of dollars that could have been labeled as a discount. In addition, we included in our standard billing rates the cost of administrative

expenses, such as administrative support services, printing, conference call provider services, internet connections during travel, overnight delivery, and long distance charges. This is not the practice of other professionals who separately bill for these services.

Segal performed a role different from the other two actuarial firms involved in the bankruptcy and was an integral part of the professional team. As such, our value and fees should be compared to the other Retiree Committee professionals and other actuarial professionals who performed the same level of consulting. The hourly rates for the Segal professionals who were deposed, provided written reports, and testified before the Court ranged from $500 to $550. The actuarial professionals that the opposing parties used for the same activities during the bankruptcy charged hourly rates that ranged from $625 to $900. Moreover, Segal did not request or expect a transaction fee.

We believe a review of our rates will demonstrate that Segal's rates are reasonable for the value we brought to the Detroit bankruptcy case. In particular, we note that the actuary who billed the highest number of hours on this case billed at an hourly rate of $550 (in contrast to her $675 rate for expert witness work). The fees that Segal has forgone by not charging our expert witness rates amounted to a concession of $208,000.

Moreover, a deliberate decision was made not to have Segal's Chief Actuary, who bills at the rate of $790, play the role requiring the greatest number of hours. This resulted in significant savings while still providing the Retiree Committee and the City with the highest level of professional service.

*2014 Rates*: At the beginning of each year, we increase billing rates for our staff. We made a conscious effort to keep our fees at reasonable level on this project and, as a result, we decided not to increase the rates for our senior employees. This should be taken into account when assessing the reasonableness of our fees. These fee concessions amounted to $37,000.

*Unbilled Staff Time:* We also had unrecorded time which we did not include in our bills because we felt that while time was spent on this project and was of some value, it was not as valuable as the project-related time we did record and bill.

*Unbilled Travel Time:* Travel time is extremely valuable time for our most senior consultants. As you know, this time is billed at 50% of our standard rates. The value of the 50% of travel time, which has not been billed, we believe can be categorized as discounted fees. This would equate to a discount of $300,000.

**Margins and Rewards**

The Segal actuaries and consultants who worked on this project were totally dedicated to providing valuable and timely information. They worked long hours, were available 24/7, and were able to meet any deadline requested regardless of how short the notice might have been. For this effort, they expect to receive year-end financial rewards. Our bonus pool is an important part of our overall compensation program, but it is entirely dependent upon profit. Segal is

expected to produce a reasonable and consistent level of profitability for our shareholders, which means that any additional reduction in our fees would have a direct and negative impact on the bonuses of those who worked so diligently to produce such a positive outcome.

**Credentials and Experience**

To become a credentialed actuary requires substantial post-graduate work and the passing of a series of rigorous exams. In addition to the qualified actuaries on this project, we have assigned some of the most experienced professionals in the country in the area of governmental health and pension benefit programs. We pride ourselves on putting our clients first and keeping our billing rates and fees at levels that are affordable to our clients, taking into account their specific situations.

**Mediation**

On December 3, 2014, Segal met in mediation with representatives of the City. Mayor Mike Duggan had previously submitted a Mediation Statement, a copy of which is attached. In that statement, the Mayor noted that he "is not in any way dissatisfied with the quality of the services provided by Segal." Prior to the individual session between Segal, the City, and the Mediator, the parties had been given some information regarding the City's financial needs, including the need for more police. When we met with City Representatives, we offered to pay the basic first-year salary ($33,000) for two rookie police officers (a total of $66,000). Following a very brief discussion, Segal agreed to lower fees by $99,000, equivalent to the first-year salary for three rookie police officers. The meeting was very cordial on both sides, and Segal understands that the City was satisfied with the result.

**Summary**

The following points support a determination that Segal's fees, as originally negotiated and as reduced in mediation, are reasonable:

➢ Our dual role in providing expert actuarial work for both the Retiree Committee and the City resulted in an estimated $250,000 in savings.

➢ Our extreme effort and original benefit approaches contributed significantly to the pension settlement that the Court quite properly described as "miraculous" and that led in turn to the retiree votes in support of the Plan of Adjustment.

➢ Our existing discounts, including the reduction from expert witness/litigation rates, the concession on 2014 rate increases, and unbilled travel time amounted to $545,000 or 14 % of our overall time charges of $3,916,046.

➢ The City and Segal very quickly and amicably agreed to an additional reduction of $99,000 in fees.

We have demonstrated the value of the discounts, concessions and cost savings that we have provided to the City, and most of all, the value we provided to a successful and speedy outcome for the City. Segal was instrumental in achieving the expedited restructuring while saving the City money and the threat of litigation.

Please let us know if we can provide any additional information.

Sincerely yours,

Margery Sinder Friedman