UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
------------------------------------------------------x
                                                      :
In re                                                 : Chapter 9
                                                      :
CITY OF DETROIT, MICHIGAN,                            : Case No. 13-53846
                                                      :
                    Debtor.                           : Hon. Steven W. Rhodes
                                                      :
------------------------------------------------------x
```

**STATEMENT OF JONES DAY ON
THE REASONABLENESS OF FEES AND EXPENSES
IT INCURRED AS LEAD COUNSEL TO THE CITY OF DETROIT**

Pursuant to the Court's order of January 5, 2015 (Docket No. 8999), Jones Day submits this Statement in support of the reasonableness, under section 943(b)(3) of title 11 of the United States Code (the "Bankruptcy Code"), of the fees and expenses incurred by Jones Day as lead counsel to the City of Detroit (the "City") in the City's bankruptcy case (the "Chapter 9 Case").

**Statement**

*Postpetition Fees and Expenses Incurred by Jones Day*

1.  Taking into account all agreed-upon reductions, Jones Day's total charges for its work in the Chapter 9 Case were $53,726,088.15 (the "Postpetition Fees and Expenses"), comprised of $51,015,864.51 in fees and $2,710,223.64 in expenses for the period from the commencement of the Chapter 9

Case on July 18, 2013 (the "Petition Date") through December 10, 2014 (the "Effective Date"), the date that the City's confirmed plan of adjustment (the "Plan") became effective in accordance with its terms.[1]

2. In the aggregate, the total amount of Jones Day's Postpetition Fees and Expenses is nearly $4.2 million less than the $57.90 million disclosed in the *City of Detroit's Disclosure of Fees and Expenses* (Docket No. 8997) (the "Fee Disclosure").[2] This discrepancy arises because the Fee Disclosure includes fees and expenses incurred by Jones Day (and other firms) prior to the Petition Date. See Fee Disclosure, at n.1 (stating that the Fee Disclosure includes amounts incurred prior to the Petition Date, but paid with fiscal year 2014 funds).

***Agreed Upon Reductions in Jones Day's Fees and Expenses***

3. Jones Day's Postpetition Fees and Expenses reflect a total of $17,748,398.79 in reductions agreed to by Jones Day. These reductions include: (a) a 10% discount on all professional fees, which was agreed to by Jones Day in connection with its original engagement by the City; (b) voluntary reductions in

---

[1] Due to delays in the billing cycle for certain expenses, Jones Day expects that additional expenses incurred for the period through the Effective Date will be processed and billed to the City in the normal course. Jones Day does not expect these amounts to be material.

[2] The City filed the Fee Disclosure pursuant to the Court's *Scheduling Order Regarding Process to Determine the Disclosure and Reasonableness of Fees Under 11 U.S.C. § 943(b)(3)* (Docket No. 8710).

fees and expenses taken by Jones Day in reviewing its invoices and in response to the comments of City and the Court-appointed, independent fee examiner (the "Fee Examiner"); (c) a reduction of 50% of non-working travel time consistent with the Court's Fee Review Order (Docket No. 810) (the "Fee Review Order"); (d) reductions for certain rate increases that Jones Day otherwise was authorized to charge pursuant to the terms of its engagement with the City; and (e) reductions agreed upon as part of the confidential Court-ordered mediation of fee issues with the City in December 2014 (the "Fee Mediation").

***The Reasonableness Standard Requires That
the Fees and Expenses Be Disclosed and Not Overreaching***

4. Section 943(b)(3) of the Bankruptcy Code does not define what constitutes "reasonableness" of professional fees or establish any standard for courts to use in reaching this determination. Similarly, courts in chapter 9 cases have not adopted any particular standard to determine the reasonableness of professional fees. In fact, most reported cases appear to have determined reasonableness without a significant or probing inquiry. See *City of Detroit's Brief Regarding the Court's Authority to Determine Reasonableness Under 11 U.S.C. § 943(b)(3)* (Docket No. 6842) (citing cases). This approach is consistent with the fact that bankruptcy courts in chapter 9 do not approve professional fees under the terms of sections 330 and 331 of the Bankruptcy Code, which are applicable and used in chapter 11, but are not incorporated into chapter 9. See 11 U.S.C. § 901(a).

5. In the absence of any specific requirements — or chapter 11 style review — it appears that the reasonableness inquiry in chapter 9 is designed to ensure that the costs of the process are disclosed and are rational, and do not represent overreaching by the parties or reflect a restructuring for the benefit of private (rather than public) interests. See COLLIER ON BANKRUPTCY ¶ 943.03[3] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). Nothing in the Chapter 9 Case suggests that Jones Day's fees and expenses were irrational or overreaching. In fact, the circumstances of the Chapter 9 Case manifestly support a finding that Jones Day's Postpetition Fees and Expenses were reasonable.

***Jones Day's Fees and Expenses Already Have Been
Subject to Substantial and Serious Review for
Reasonableness, Including a Settlement in the Fee Mediation***

6. Throughout the Chapter 9 Case, Jones Day conducted a thorough and rigorous review of its bills prior to submitting them to the City and the Fee Examiner. This review reflected the Firm's commitment to the City to ensure that the bills are appropriate, as well as the need to comply with the detailed rules established by the Fee Examiner and the Court's Fee Review Order.

7. The fee review process established by the Fee Review Order was a serious and rigorous process conducted by an independent party precisely to address the reasonableness of fees based on the confirmation standard in the

Bankruptcy Code.[3]  The Fee Review Order established numerous rules, restrictions and guidelines for fees and expenses.  It incorporates many of the rules and requirements developed over the years in chapter 11 practice, including key aspects of the United States Trustee guidelines.  See, e.g., Fee Review Order at ¶ 26.  The fee review process established the "rules of the road" that Jones Day endeavored to follow.  The scrutiny of the Fee Examiner specifically provided a check on the type of "overreaching" that the chapter 9 process is intended to address.

    8.  In accordance with the Fee Review Order, Jones Day submitted monthly statements to the City and the Fee Examiner.  After submission of those statements, the Fee Examiner raised any concerns to be addressed by Jones Day, including requests for fee reductions, and Jones Day responded.  For each month through June 2014, the Fee Examiner filed reports finding the fees and expenses of the City's professionals, as they eventually emerged from the fee review process, to be reasonable or otherwise "commensurate with the complexity and speed of the [Chapter 9 Case], and the quality of the services that the Professionals have

---

[3]  The Fee Examiner is an experienced bankruptcy practitioner who was appointed as an agent of the Court with the "responsibility … to assure the Court, the City, the creditors, and the public that the City's Professional Fee Expenses are fully disclosed and are reasonable, as required by [section 943(b)(3) of the Bankruptcy Code]." *Order Appointing Fee Examiner* (Docket No. 383).

provided." See Fee Examiner's Quarterly Reports (Docket Nos. 2642, 4498, 6528 and 8186).

9. In addition to the Fee Examiner's fine-combed review, the City conducted its own examination of the invoices. The City raised a series of comments and requests over time that resulted in yet additional reductions by Jones Day. Ultimately, for each month through October 2014 (the final month that, pursuant to the Court's instructions, the fees of the City's professionals were subject to review by the Fee Examiner), the City provided verifications that it had reviewed the monthly invoices submitted, had no objections to the requested fees and expenses and found them to be reasonable.

10. Notwithstanding this extensive review, at the instruction of the Court, Jones Day participated in the Fee Mediation with the City to address certain additional concerns raised by the City's Mayor (the "Mayor"). The Fee Mediation was conducted by a skilled group of Court-appointed mediators, with the assistance of the Fee Examiner and the full participation by the City. As a result of the Fee Mediation, Jones Day agreed to a significant further reduction of its fees and expenses to resolve the issues and concerns raised by the Mayor.

11. This was the most rigorous and transparent fee process ever utilized in a chapter 9 case and should be given due and appropriate consideration by the Court. As a result of Jones Day's internal review of its invoices, discussions

with the Fee Examiner and the City, the Fee Mediation and other concessions, Jones Day has reduced its invoices by almost one quarter of all fees and expenses incurred during the Chapter 9 Case. Most of these reductions related to productive and valuable services provided by Jones Day professionals, with the adjustment designed only to comply with the fee review process, to fulfill commitments to the City, in recognition of the need to manage costs and ultimately to reach a settlement in the Fee Mediation.

12. Together, the review and resolution of fees and expenses by the City and the Fee Examiner through the review process under the Fee Review Order and the Fee Mediation support a finding of reasonableness and should be given significant weight by this Court.

*The Size and Complexity of the Chapter 9 Case*
*Supports the Reasonableness of Jones Day's Fees*

13. The City's Chapter 9 Case indisputably has been the largest and most complex in history. Unlike many other chapter 9 cases that focused on a discrete issue, the City's bankruptcy was an all-encompassing debt and operational restructuring that left virtually no stone unturned. Jones Day had the leading role in almost every initiative of the City, including pension reform, healthcare changes, bond debt restructuring, new financings, new labor agreements, asset monetization and various operational restructuring initiatives, not to mention all

aspects of the Chapter 9 Case itself and compliance with Michigan Public Act 436 of 2012 ("PA 436").

14. Jones Day is one of the few firms that has the breadth, depth and integrated client service approach needed to undertake and successfully accomplish a task of this magnitude, particularly at the pace and level of efficiency and professionalism demanded here.

15. The tasks presented not only were complex, numerous and multi-disciplinary, but also were on the cutting edge in untested areas of municipal law and chapter 9 practice. The Chapter 9 Case has involved consideration of numerous complex issues and matters of first impression, including with respect to (a) the constitutionality of PA 436, (b) the City's power to impair pension obligations in chapter 9, (c) the City's ability to impair general obligation debt, (d) the various competing priorities under Michigan law of the City's general fund obligations, (e) the City's ability to consummate the transactions contemplated by the so-called "Grand Bargain," (f) the enforceability of the City's pension certificates of participation (the "COPs") and (g) the creation of a regional water and sewer authority. State, federal and constitutional issues all have been addressed throughout this case. These matters required the substantial creativity and effort of Jones Day and the City's other professionals.

16. Moreover, at every stage, the City has faced concerted resistance from sophisticated and well financed creditors. As a result, Jones Day was required to litigate virtually every matter of importance during the Chapter 9 Case — often against multiple opponents — including, by way of example, litigation regarding: (a) the validity of the bankruptcy filing under PA 436 and the City's eligibility to be a debtor under section 109(c) of the Bankruptcy Code; (b) all aspects of the complex transactions concerning the COPs and related interest rate swaps (the "Swaps"), including disputes about access to critical casino revenues, the City's efforts to settle and terminate the Swaps and, ultimately, the validity and enforceability of COPs themselves; (c) efforts by bondholder groups to secure special treatment for their claims arising from both the City's unlimited and limited tax general obligation bonds; (d) the financing of the City's operational restructuring, including the funding of the new Public Lighting Authority; (e) the modification of legacy pension and healthcare costs, the City's largest overall obligations; and (f) the City's efforts to confirm the Plan, which prompted a months-long adversarial process with numerous opposing parties.[4] These and

---

[4] The confirmation trial, in particular, involved, among many other things, 1.2 million pages of documents reviewed in discovery, thousands of pages of briefing in myriad court-ordered briefs, over 90 depositions, multiple expert reports and discovery disputes, 23 days of trial plus many other days in court and continuous modifications to trial planning as parties raised new

other matters required an intensive multi-disciplinary approach to manage many disputes in parallel on a tightly compressed schedule.

17. Engaging in virtually daily mediation sessions and settlement discussions while also locked in expedited litigation on multiple fronts required extraordinary commitment, effort and resources by Jones Day. The settlements — often with the help and guidance of the mediators — called for creativity and collaboration among various practice areas, as well as the preparation of complex documentation on an accelerated timeline. Overarching all of this, Jones Day prepared eight amended versions of the City's complex Plan, along with hundreds of pages of exhibits and several successive iterations of a comprehensive disclosure statement. The Court and the mediators kept this project on a fast track, on a timeline embraced by the City, but that required the concentration of effort reflected in Jones Day's bills.

18. Ultimately, Jones Day completed what could have been years of work in record-setting time, allowing the City now to move forward with a much needed revitalization. The never-ending effort to shorten this process and to achieve consensus — while also remaining committed to achieving the City's

---

objections or entered into separate settlements with the City that had to be justified over the opposition of other groups.

fundamental restructuring goals — helped minimize its cost and maximize its benefits.

*Jones Day's Fees Are Reasonable in Light of
the Extraordinary Benefits Achieved by the Restructuring*

19. The fees incurred by Jones Day are dwarfed by the benefits of the City's restructuring. The City stands to realize an estimated total of at least $10 billion in purely economic benefits through the Chapter 9 Case. The City's total liabilities were reduced by approximately 50% under the Plan, and its unsecured liabilities by 75%, enabling the City to avoid a projected $3.9 billion deficit over the next ten years. In addition, the Plan provides for a comprehensive restructuring of the City's operations and $1.7 billion in reinvestment in City services.

20. The list of accomplishments is long. Fundamental pension and healthcare restructuring has been achieved, with an extraordinary infusion of public and private funding through the Grand Bargain. Collective bargaining agreements have been renegotiated and substantially overhauled from past models for the City's benefit. The operational structure of City government has been revamped, with improved operational and financial controls. In addition, the reinvestment provided for under the Plan is expected to (a) improve the City's infrastructure dramatically, (b) eliminate residential blight, (c) reduce crime and (d) improve street lighting and other City services.

21. Despite hundreds of objections to eligibility and Plan confirmation, the City — with the assistance of Jones Day — achieved confirmation of an almost fully consensual Plan that establishes the foundation to address decades of problems and negative trends. The importance of achieving a consensual Plan — which obviates years of expensive litigation and appeals — cannot be overstated. Moreover, Jones Day's successful efforts to conclude the Chapter 9 Case in only 16 months (a) allows the revitalization of the City to move forward without the additional cost and uncertainty of a protracted process and (b) compares very favorably with many smaller and less complicated chapter 9 cases, including: (a) Jefferson County (24 months), (b) City of Stockton (29 months), (c) City of San Bernardino (29 months to date) and (d) City of Vallejo (39 months).[5] The results obtained in Detroit's case are unprecedented both in their scope and in the short time in which they were achieved.

---

[5] The successful and swift outcome of the Chapter 9 Case has been heralded in the media. See, e.g., Matthew Dolan, *Detroit Exits Municipal Bankruptcy Case*, THE WALL STREET JOURNAL (Dec. 10, 2014) (calling the reorganization plan "a massive re-engineering of and reinvestment in the municipal government after years of high crime, population decline, business disinvestment, elevated levels of poverty and unemployment turned large swaths of the city into a ghost town" and noting that White House officials "certainly are pleased" with the outcome), *Detroit Rises to Its Greatest Challenge*, DETROIT FREE PRESS (Nov. 9, 2014) ("So how much more remarkable it seems that a bankruptcy many predicted would be the coup de grâce for Michigan's largest city has ended on such a hopeful note, leaving Detroit and its 680,000 residents with genuinely auspicious

### *Jones Day's Fees Are Reasonable in Light of the Costs of Other Large Restructuring Matters*

22. The reasonableness conclusion is further bolstered by examining the market for restructuring services. Although the size, complexity and breadth of the City's historic chapter 9 restructuring make it unique, Jones Day's fees are well below the level of fees incurred by lead counsel in other recent large restructurings. As set forth on Exhibit A attached hereto, the approximately $53.7 million in fees and expenses requested by Jones Day represents a significantly smaller portion of the City's restructured debt than in the Stockton and Jefferson County chapter 9 cases, and pales in comparison to amounts earned in comparably sized chapter 11 cases. Cases like Kodak, Residential Capital, Tribune and Nortel — all with several billion dollars less in debt to restructure than the City — tallied lead-counsel fees far in excess of those billed by Jones Day (from

---

prospects for the decade ahead."); Steven Church, *Detroit Bankruptcy Plan Approval Opens Way for Revival*, BLOOMBERG (Nov. 8, 2014) ("Yesterday, [Judge Rhodes] called the plan an 'ideal model' for other distressed municipalities. . . . The [Grand Bargain] . . . 'borders on the miraculous,' he added."), Matthew Dolan, *Judge Approves Detroit's Bankruptcy-Exit Plan*, THE WALL STREET JOURNAL (Nov. 7, 2014) ("The city's restructuring roadmap calls for trimming $7 billion, or more than one-third of Detroit's estimated long-term debt, from its balance sheet. It was a rare milestone decision for cash-strapped cities, even among those that have sought bankruptcy protection."); Monica Davey and Mary Williams Walsh, *Plan to Exit Bankruptcy Is Approved for Detroit*, THE NEW YORK TIMES (Nov. 7, 2014) (emphasizing the "remarkable speed" of the Chapter 9 Case).

$64 million to $291 million and in each case representing a much larger percentage of the total debt).

23. Compared to other large and complex bankruptcy restructurings, the cost to the City for the services Jones Day has provided has been entirely reasonable. At all times, Jones Day has participated in good faith in the fee process in this Chapter 9 Case, including the Fee Mediation, and has agreed to substantial reductions in its fees and expenses for the benefit of the City.

## Conclusion

24. For all of the foregoing reasons, Jones Day requests that the Court find its Postpetition Fees and Expenses to be reasonable pursuant to section 943(b)(3) of the Bankruptcy Code.

Dated: January 16, 2015               Respectfully submitted,

  /s/ Heather Lennox
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY

# **EXHIBIT A**

# SUMMARY OF LEAD COUNSEL FEES
# IN RECENT LARGE BANKRUPTCY CASES

| Debtor | Chapter | Year of Confirmation | Approximate Duration of Case Through Confirmation (months) | Approximate Debts as of Case Commencement ($MM) | Estimated or Reported Total Lead Counsel Fees and Expenses ($MM) | Lead Counsel Fees and Expenses as a Percentage of Debt | Fee Examiner or Fee Committee Appointed? |
|---|---|---|---|---|---|---|---|
| Detroit | 9 | 2014 | 16 | $18,000 | $54 | 0.30% | Yes |
| Stockton | 9 | 2014 | 28 | est. $847 (bond and pension) | $11 | 1.24% | No |
| Jefferson County | 9 | 2013 | 24 | $4,230 | $26 (combined fees of co-counsel) | 0.61% | No |
| Nortel | 11 | Not yet confirmed | 72 (as of December 2014) | $11,800 | $291 (as of November 18, 2014) | 2.47% | Yes |
| Residential Capital | 11 | 2013 | 19 | $15,276 | $99 | 0.65% | No |
| American Airlines | 11 | 2013 | 23 | $29,000 | $77 | 0.27% | Yes |
| Tribune | 11 | 2011 | 36 | $13,000 | $106 | 0.82% | Yes |
| Kodak | 11 | 2013 | 19 | $6,751 | $64 | 0.94% | Yes |

# CERTIFICATE OF SERVICE

      I, Heather Lennox, hereby certify that the foregoing *Statement of Jones Day on the Reasonableness of Fees and Expenses It Incurred as Lead Counsel to the City of Detroit* was filed and served via the Court's electronic case filing and noticing system on this 16th day of January, 2015.

                                            /s/ Heather Lennox