# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
--------------------------------------------------------x
                                    :
In re                               :          Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :          Case No. 13-53846
                                    :
                    Debtor.         :          Hon. Steven W. Rhodes
                                    :
                                    :
--------------------------------------------------------x
```

## NOTICE OF FILING OF COMMENTS OF
## JAMES DOAK ON THE FEES OF MILLER BUCKFIRE & CO., LLC

Attached hereto as <u>Annex A</u> is the *Comments of James Doak on the Fees of Miller Buckfire & Co., LLC*.

Dated: January 16, 2015               Respectfully submitted,


                                      /s/ Heather Lennox
                                      Heather Lennox (OH 0059649)
                                      JONES DAY
                                      North Point
                                      901 Lakeside Avenue
                                      Cleveland, Ohio 44114
                                      Telephone: (216) 586-3939
                                      Facsimile: (216) 579-0212
                                      hlennox@jonesday.com

# ANNEX A

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| **City of Detroit, Michigan** | Case No. 13-53846 |
| Debtor | Hon. Steven W. Rhodes |

## COMMENTS OF JAMES DOAK ON THE FEES OF
## MILLER BUCKFIRE & CO., LLC

James Doak declares as follows:

1.     I am a Managing Director of the investment banking and financial

advisory firm Miller Buckfire & Co., LLC ("**Miller Buckfire**"), which has its

principal office at 601 Lexington Avenue, 22nd Floor, New York, NY 10022.  I

am authorized to execute this declaration on behalf of Miller Buckfire.  I have

personal knowledge of the facts herein unless otherwise stated.  Certain of the facts

herein relate to matters within the personal knowledge of other professionals at

Miller Buckfire and are based on information provided by them.

2.     Miller Buckfire served as the City of Detroit's investment banker and

financial advisor before and throughout its Chapter 9 process.  Miller Buckfire is

continuing to work for the City following its emergence from Chapter 9 on

1

December 10, 2014. These comments are being submitted in support of the pre-emergence fees and expenses of Miller Buckfire, upon this Court's invitation to professionals and other parties "to file comments on the reasonableness of fees under 11 U.S.C. § 943(b)(3)" in its order of January 5, 2015, ECF No. 8999 (the "**Fee Comment Order**").

## Miller Buckfire's Services to the City of Detroit

3.     Miller Buckfire provides restructuring, sale and financing services to organizations that are in financial distress. The City of Detroit retained Miller Buckfire to assist in restructuring the City's debts, raising needed financing and selling certain assets.

4.     Miller Buckfire played a major role in developing the City's restructuring plans, and it actively participated in the major mediations and transactions through which the City's restructuring was accomplished. In brief and among other services, Miller Buckfire:

- helped the City to negotiate reductions of more than $1.7 billion of funded obligations under outstanding bonds, Certificates of Participation ("**COPs**") and COPs Swaps claims;

- developed processes and assisted with transactions that allowed the Detroit Water and Sewerage District (the "**DWSD**") to save over $113 million in present value of debt service costs and positioned

2

DWSD and its stakeholders to participate in a regionalization that enables the flow of hundreds of millions of dollars into both infrastructure upgrades and the City's GRS obligations;

- helped the City to develop the framework by which the mediators and others implemented the "Grand Bargain";

- secured financing of $120 million, the first-ever large scale municipal post-petition financing, at only 3.5% interest;

- secured "exit" financing for the City's use post-emergence (for which Miller Buckfire continues to provide public resyndication advisory services); and

- performed additional substantial services that are more fully described in Miller Buckfire's prior submissions to the Fee Examiner (exhibits to ECF Nos. 2642, 4498, 6528 and 8186) and to the Emergency Manager.

### The Retention Agreement, Amendments and Fee Reductions

5.     In response to this Court's invitation in its Fee Comment Order, ¶ 7, this section summarizes the changes over time to Miller Buckfire's work for the City of Detroit, together with the substantial fee discounts the City and State achieved, both before and during the mediations conducted late last year:

3

6.     *Initial Period*:  Miller Buckfire began providing advice to the City and the State in early 2011.  Miller Buckfire participated in numerous meetings with City and State representatives to discuss options that might be pursued.  The initial advice was provided without charge to the City, but with the expectation that if the City proceeded with a restructuring, Miller Buckfire might be retained to provide assistance.

7.     *December 2012 Engagement*:  In December 2012, after a formal RFP process, the City entered into a services contract with Miller Buckfire, **Exhibit 1-A**.  That agreement did not contemplate a bankruptcy filing or the completion of any particular transaction.  Instead, it contemplated that Miller Buckfire would provide financial advice as to the amounts of debts that needed to be restructured and the means by which a restructuring might be accomplished.  Miller Buckfire agreed to provide that initial advice for a fee of $1.8 million, which was to be paid in twelve monthly installments of $150,000.

8.     *2013 Amendments*:  During the first half of 2013, the City's advisors and Emergency Manager determined that the City's financial circumstances were bleak and that the City needed immediate, full-scale assistance to negotiate and complete multiple restructuring, sale and/or financing transactions.  Miller Buckfire, the City and the State extensively negotiated what services Miller Buckfire was to provide and what fees were to be paid.  After these negotiations,

4

Miller Buckfire entered into amendments to the services contract with the City, dated July 16, 2013 and August 26, 2013, **Exhibits 1-B** and **1-C**.  These amendments, as negotiated by the City and State, implemented significant reductions from Miller Buckfire's market-based proposal, chiefly as follows:

|  | Miller Buckfire Proposal | Agreed Terms |
|---|---|---|
| Restructuring Fee | 0.5% of non-DWSD debts | 0.4% of non-DWSD debts |
| Asset Monetization Fees | 0.75% of aggregate consideration of DWSD, capped at $8 million unless a marketing process was commenced; and 1% of aggregate consideration for other asset monetization, not credited | 0.75% of aggregate consideration of DWSD, capped at $8 million unless a marketing process was commenced; and 1% of aggregate consideration for other asset monetization, with 50% of such fees credited against restructuring fees |
| Financing Fees | 0.25% of gross proceeds from DWSD financings; and 0.5% of gross proceeds from other financings | No fee for assisting with DWSD financings; and 0.15% of gross proceeds of interim non-DWSD financings |
| Monthly Fees | $150,000, not credited | $500,000 through December 2013 and $300,000 thereafter, with 50% of fees after September 2013 credited against restructuring fees |

These concessions reduced Miller Buckfire's prospective fees from $37 million to $31.6 million, based upon the transactions eventually undertaken by the City.

9.      *2014 Amendment Prior to Mediation*:  In the spring of 2014, Miller

Buckfire was again asked to expand the work it was doing for the City to include a

restructuring of DWSD funded debt and the arrangement of exit financing.  At that

time, the City also asked to negotiate more predictable fixed fees instead of some

of the percentage fees previously agreed.  Miller Buckfire, the City and the State

engaged in a new round of negotiations that led to the signing of the June 16, 2014

amendment, **Exhibit 1-D**, which augmented the services Miller Buckfire would

provide but reduced its fees in four principal ways: first, it changed the

restructuring fee from a 0.40% percentage-based fee to a flat fee of $28 million,

payable 80% upon confirmation of a plan of adjustment and 20% upon

consummation of such restructuring; second, it provided that if such fee were paid,

there would be no separate transaction fee for any transfer of DWSD or third-party

operating agreement; third, it provided that 100% rather than 50% of monthly fees

for September 2013 through September 2014 would be credited against any

restructuring fee, amounting to an additional $2,350,000 of crediting; and, fourth,

it provided that 100% of any financing and asset monetization fees would be

credited against any restructuring fees.  These concessions further reduced Miller

Buckfire's prospective fees to $29.074 million (the "**Pre-Mediation Fees**").

10.      *Mediation-Related Amendment in Late 2014:*  Five months later, in

the context of mediation by Judge Rosen, in his capacity as Chief Judicial

Mediator for the Detroit Bankruptcy, the City obtained further substantial reductions to Miller Buckfire's fees that led to the signing of the December 10, 2014 amendments, **Exhibit 1-E** (the "**Mediation Amendment**"). These further reduced Miller Buckfire's prospective fees for the chapter 9 period to $22 million (the "**Reduced Fees**"). (Expenses totaled $562,939.62 for the chapter 9 period, as reduced to reflect requests of the Fee Examiner.)

11. The Mediation Amendment conditions the reduction from the Pre-Mediation Fees to the Reduced Fees on payment by the City of the balance due Miller Buckfire, active support by the City of a finding by this Court that the Reduced Fees are reasonable, and entry of an order so finding (the "**Reduction Conditions**"). Upon fulfilment of the Reduction Conditions, the Mediation Amendment also provides that Miller Buckfire will make a donation of $1 million to a specified local charity. The Mediation Amendment preserves Miller Buckfire's rights with respect to the Pre-Mediation Fees if the Reduction Conditions are not met. Miller Buckfire supports approval of the Reduced Fees, and will accept them upon fulfillment of the Reduction Conditions, but otherwise respectfully reserves its rights, including in relation to any argument regarding the fee and mediation process and the time and nature of reasonableness findings for fees in a chapter 9 context.

## Reasonableness of Fees

12. Miller Buckfire and comparable investment banks providing similar services do not charge hourly fees. Instead, they are compensated through the payment of percentage-based fees or fixed fees. These fees are agreed in advance but are not payable until the completion of a restructuring, sale, financing or other transaction, together with interim payments of fixed monthly fees, which are sometimes credited against (that is, reduce) the transaction fees. Also, related out-of-pocket expenses are reimbursed.

13. Unlike professionals with hourly fees, Miller Buckfire's compensation is deferred until and contingent upon the completion of the restructuring or other transaction that the client wishes to have accomplished. Investment banking compensation that is structured in this way – as transaction fees and interim monthly fees – is customary in the market and has been approved as reasonable in hundreds of chapter 11 cases, including the fifteen cases for which fees for comparable services are described in **Exhibit 2**, which are the chapter 11 cases we have located from the last five years with prepetition liabilities between $3 billion and $30 billion. This comparison has been provided as suggested by the Fee Comment Order, ¶ 6. These market comparisons indicate that the Reduced Fees, as well as the Pre-Mediation Fees, are typical in relation to fees that have been

considered and approved as reasonable by Bankruptcy Courts for similar work by similar professionals.

14. Furthermore, it was reasonable for the City to retain an investment banker of Miller Buckfire's caliber. Various creditor groups took aggressive positions with the assistance of their own experienced professionals. The City required sufficient professional firepower to obtain the results it achieved on behalf of its citizens and other stakeholders. Chapter 9 preserves a municipal debtor's discretion to retain its own restructuring professionals. (Section 901(a) of the Bankruptcy Code does not apply sections 327 through 331 of the Bankruptcy Code to chapter 9 cases.) Here, the City retained Miller Buckfire on terms that are not only consistent with market practices, but also with arrangements that have been approved as reasonable by numerous Bankruptcy Courts in a multitude of cases.

15. Miller Buckfire's restructuring services on behalf of the City have been extensive. By this work, Miller Buckfire delivered substantial value to the City. That value and the extent of services rendered also support a finding that Miller Buckfire's fees are reasonable.

16. The unusual, vigorous and repeated negotiations of reductions to Miller Buckfire's fees, both by the City and by the State, is a robust body of evidence further supporting a finding that the resulting fees are reasonable. The Fee Examiner reviewed payments through June 2014 and raised no objection. The

9

mediation process included further inquiry into Miller Buckfire's services and compensation. Throughout, the terms of Miller Buckfire's retention were available to the relevant constituencies representing the City and State, and the Contract and amendments were entered into without objection.

17.     Both the Pre-Mediation Fees and the Reduced Fees were finalized late in the City's restructuring process, when the City and State had a good understanding of the work Miller Buckfire had already done, the work remaining, and the value Miller Buckfire has brought to the process. This was not an instance of unforeseen developments resulting in higher fees than the parties contemplated when the deal was struck. To the contrary: Miller Buckfire's fees have been repeatedly and substantially reduced from levels that had been agreed and were themselves reasonable. The Reduced Fees are more than reasonable.

*[The remainder of this page is intentionally blank.]*

## Conclusion

18.     For the reasons set forth above, Miller Buckfire supports a finding by this Court that Miller Buckfire's fees and expenses are reasonable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my belief and knowledge.

January 16, 2015

Respectfully submitted,

James Doak
Managing Director
Miller Buckfire & Co. LLC

601 Lexington Avenue, Floor 22
New York, NY 10022
(212) 895-1800
james.doak@millerbuckfire.com

11

**Exhibit 1-A**

**Service Contract, December 20, 2012**

SERVICES CONTRACT

BETWEEN

CITY OF DETROIT, MICHIGAN

AND

MILLER BUCKFIRE & CO., LLC

CONTRACT NO.

———————————————————

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

# CONTRACT PROVISIONS

Article 1.      Definitions..................................................................................1

Article 2.      Engagement of Contractor .........................................................3

Article 3.      Contractor's Representations and Warranties ...........................5

Article 4.      Contract Effective Date and Time of Performance...................6

Article 5.      Data to Be Furnished Contractor ..............................................7

Article 6       Personnel and Contract Administration.....................................7

Article 7.      Compensation ............................................................................8

Article 8.      Maintenance and Audit of Records...........................................9

Article 9.      Indemnity ................................................................................11

Article 10.     Insurance .................................................................................12

Article 11.     Default and Termination .........................................................14

Article 12.     Assignment .............................................................................18

Article 13.     Subcontracting ........................................................................18

Article 14.     Conflict of Interest .................................................................19

Article 15.     Confidential Information ........................................................20

Article 16.     Compliance with Laws ...........................................................21

Article 17.     Amendments ...........................................................................21

Article 18.     Fair Employment Practices.....................................................22

Article 19.     Notices ....................................................................................22

Article 20.     Proprietary Rights and Indemnity...........................................23

Article 21.     Force Majeure .........................................................................25

Article 22.     Waiver......................................................................................25

Article 23.     Miscellaneous .........................................................................26

Signature Page .........................................................................................27

        Exhibit A—Scope of Services

        Exhibit B—Fee Schedule

# CITY OF DETROIT
## SERVICES CONTRACT

**This Services Contract** ("Contract") is entered into by and between the

City of Detroit, a Michigan municipal corporation, acting by and through its Finance Department ("City"), and **MILLER BUCKFIRE & CO., LLC**, a Delaware Limited Liability Company, with its principal place of business located at 601 Lexington Avenue, 22nd Floor, New York, NY 10022 ("Contractor").

### Recitals:

Whereas, the City desires to engage the Contractor to render certain financial advisory services ("Services") as set forth in this Contract; and

Whereas, the Contractor desires to perform the Services as set forth in this Contract; and

Accordingly, the parties agree as follows:

### Article 1.
### Definitions

1.01    The following words and expressions or pronouns used in their stead shall be construed as follows:

"Additional Services" shall mean any services in addition to the services set forth in Exhibit A that are related to fulfilling the objectives of this Contract and are agreed upon by the parties by written Amendment.

1

"Amendment" shall mean modifications or changes in this Contract that have been mutually agreed upon by the City and the Contractor in writing and approved by the City Council.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

"Associates" shall mean the personnel, employees, consultants, subcontractors, agents, and parent company of the Contractor or of any Subcontractor, now existing or subsequently created, and their agents and employees, and any entities associated, affiliated, or subsidiary to the Contractor or to any subcontractor, now existing or subsequently created, and their agents and employees.

"City" shall mean the City of Detroit, a municipal corporation, acting through the office or department named in the Contract as contracting for the Services on behalf of the City.

"City Council" shall mean the legislative body of the City of Detroit.

"Contract" shall mean each of the various provisions and parts of this document, including all attached Exhibits and all Amendments, as executed and approved by the appropriate City departments or offices and by the City Council.

"Contractor" shall mean the party that contracts with the City by way of this Contract, whether an individual, sole proprietorship, partnership, corporation, or other form of business organization, and its heirs, successors, personnel, agents, employees, representatives, executors, administrators and assigns.

"Exhibit A" is the Scope of Services for this Contract and sets forth all pertinent data relating to performance of the Services.

"Exhibit B" is the Fee Schedule for this Contract and sets forth the amount of compensation to be paid to the Contractor, including any Reimbursable Expenses.

"Records" shall mean all books, ledgers, journals, accounts, documents, and other collected data in which information is kept regarding the performance of this Contract.

2

"Reimbursable Expenses" shall mean only those costs incurred by the Contractor in the performance of the Services, such as travel costs and document reproduction costs, that are identified in Exhibit B as reimbursable.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

"Services" shall mean all work that is expressly set forth in Exhibit A, the Scope of Services, and all work expressly or impliedly required to be performed by the Contractor in order to achieve the objectives of this Contract.

"Subcontractor" shall mean any person, firm or corporation, other than employees of the Contractor, that contracts with the Contractor, directly or indirectly, to perform in part or assist the Contractor in achieving the objectives of this Contract.

"Technology" shall mean any and all computer-related components and systems, including but not limited to computer software, computer code, computer programs, computer hardware, embedded integrated circuits, computer memory and data storage systems, whether in the form of read-only memory chips, random access memory chips, CD-ROMs, floppy disks, magnetic tape, or some other form, and the data retained or stored in said computer memory and data storage systems.

"Unauthorized Acts" shall mean any acts by a City employee, agent or representative that are not set forth in this Contract and have not been approved by City Council as part of this Contract.

"Work Product" shall mean the originals, or copies when originals are unavailable, of all materials prepared by the Contractor under this Contract or in anticipation of this Contract, including but not limited to Technology, data, studies, briefs, drawings, maps, models, photographs, files, records, computer printouts, estimates, memoranda, computations, papers, supplies, notes, recordings, and videotapes, whether such materials are reduced to writing, magnetically or optically stored, or kept in some other form.

### Article 2.
### Engagement of Contractor

2.01   By this Contract, the City engages the Contractor and the Contractor hereby agrees to faithfully and diligently perform the Services set forth in Exhibit A, in accordance with the terms and conditions contained in this Contract.

3

2.02    The Contractor shall perform in a satisfactory manner as shall be determined within the reasonable discretion of the City. The City will rely on its own counsel, accountants, and similar expert advisors for legal, accounting, tax and other similar advice.

2.03    The Contractor shall confer as necessary and cooperate with the City in order that the Services may proceed in an efficient and satisfactory manner. The Services are deemed to include all conferences, consultations and public hearings or appearances deemed necessary by the City to ensure that the Contractor will be able to properly and fully perform the objectives as set forth in this Contract.

2.04    All Services are subject to review and approval of the City for completeness and fulfillment of the requirements of this Contract. Neither the City's review, approval nor payment for any of the Services shall be construed to operate as a waiver of any rights under this Contract.

2.05    The Services shall be performed as set forth in Exhibit A, or at such other locations as are deemed appropriate by the City and the Contractor for the proper performance of the Services.

2.06    The City and the Contractor expressly acknowledge their mutual understanding and agreement that there are no third party beneficiaries to this Contract other than Indemnified Parties as contemplated by Article 9 hereof and that this Contract shall not be construed to benefit any persons other than the City and the Contractor other than Indemnified Parties as contemplated by Article 9 hereof.

2.07    It is understood that this Contract is not an exclusive services contract, that during the term of this Contract the City may contract with other firms, and that the Contractor is free to render the same or similar services to other clients, provided the rendering of such services does not affect the Contractor's obligations to the City in any way.

4

**Article 3.**

**Contractor's Representations and Warranties**

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

To induce the City to enter into this Contract, the Contractor represents and warrants that the Contractor is authorized to do business under the laws of the State of Michigan and is duly qualified to perform the Services as set forth in this Contract, and that the execution of this Contract is within the Contractor's authorized powers and is not in contravention of federal, state or local law.

### Article 4.
### Contract Effective Date and Time of Performance

4.01    This Contract shall be approved by the required City departments, approved by the City Council, and signed by the City's Purchasing Director. The effective date of this Contract shall be the date upon which the Contract has been authorized by resolution of the City Council.

4.02    Prior to the approvals set forth in Section 4.01, the Contractor shall have no authority to begin work on this Contract. The Finance Director shall not authorize any payments to the Contractor, nor shall the City incur any liability to pay for any services rendered or to reimburse the Contractor for any expenditure, prior to such award and approvals.

4.03    The City and the Contractor agree that the term of this Contract and commencement and duration of the Contractor's performance under this Contract shall be determined as set forth in Exhibit A.

6

### Article 5.
### Data To Be Furnished Contractor

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

5.01    Copies of all information, reports, records, and data as are existing, available, and deemed necessary by the City for the performance of the Services shall be furnished to the Contractor upon the Contractor's request. With the prior approval of the City, the Contractor will be permitted access to City offices during regular business hours to obtain any necessary data. In addition, the City will schedule appropriate conferences at convenient times with administrative personnel of the City for the purpose of gathering such data.

5.02    The City recognizes and confirms that in advising the city and completing its engagement hereunder, Contractor will be using and relying on publicly available information and on data, material and other information furnished to Contractor by the City and other parties. It is understood that in performing under this engagement Contractor may assume and rely upon the accuracy and completeness of, and is not assuming any responsibility for independent verification of, such publicly available information and other information so furnished provided that such reliance conforms to standards prevailing in Contractor's business.

## Article 6.
## Contractor Personnel and Contract Administration

6.01    The Contractor represents that, at its own expense, it has obtained or will obtain all personnel and equipment required to perform the Services. It warrants that all such personnel are qualified and possess the requisite licenses or other such legal qualifications to perform the services assigned. If requested, the Contractor shall supply a résumé of the managerial staff or consultants it proposes to assign to this Contract, as well as a dossier on the Contractor's professional activities and major undertakings.

6.02    The City may interview the Contractor's managerial staff and other employees assigned to this Contract. The Contractor shall not use any managerial staff or other employees to whom the City objects and shall replace in an expedient manner those rejected by the City. The Contractor shall not replace any of the personnel working on this Contract with new personnel without the prior written consent of the City not to be unreasonably withheld.

6.03    When the City deems it reasonable to do so, it may assign qualified City employees or others to work with the Contractor to complete the Services subject to applicable law and

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

regulation. Nevertheless, it is expressly understood and agreed by the parties that the Contractor shall remain ultimately responsible for the proper completion of the Services.

6.04  The relationship of the Contractor to the City is and shall continue to be that of an independent contractor and no liability or benefits, such as workers' compensation, pension rights or liabilities, insurance rights or liabilities, or other rights or liabilities arising out of or related to a contract for hire or employer/employee relationship shall arise or accrue to either party or either party's agent, Subcontractor or employee as a result of the performance of this Contract. No relationship other than that of independent contractor shall be implied between the parties or between either party's agents, employees or Subcontractors. The Contractor agrees to indemnify, defend, and hold the City harmless against any claim based in whole or in part on an allegation that the Contractor or any of its Associates qualify as employees of the City, and any related costs or expenses, including but not limited to legal fees and defense costs.

6.05  The Contractor warrants and represents that all persons assigned to the performance of this Contract shall be regular employees or independent contractors of the Contractor, unless otherwise authorized by the City. The Contractor's employees' daily working hours while working in or about a City of Detroit facility shall be the same as those worked by City employees working in the facility, unless otherwise directed by the City.

6.06  The Contractor shall comply with and shall require its Associates to comply with all security regulations and procedures in effect on the City's premises.

## Article 7.
### Compensation

7.01  Compensation for Services provided shall not exceed the amount of One Million Eight Hundred Thousand and 00/100 Dollars ($1,800,000), inclusive of expenses, and will be paid in the manner set forth in Exhibit B. Unless this Contract is amended pursuant to Article 16, this amount shall be the entire compensation to which the Contractor is entitled for the performance of Services under this Contract.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

7.02    Payment for Services provided under this Contract is governed by the terms of Ordinance No. 42-98, entitled "Prompt Payment of Vendors," being Sections 18-5-71 through 18-5-79 of the 1984 Detroit City Code.

The City employee responsible for accepting performance under this Contract is:

       (Name) Cheryl Johnson
       (Title) finance Director
       (Address) 1126 Coleman A. Young Municipal Center, 2 Woodward Ave.
       Detroit, Michigan 48226
       Telephone: (313) 224-2359
       Facsimile: (313) 224-4466

The City employee from whom payment should be requested is:

       (Name) Cheryl Johnson
       (Title) Finance Director
       (Address) 1126 Coleman A. Young Municipal Center, 2 Woodward Ave.
       Detroit, Michigan 48226
       Telephone: (313) 224-2359
       Facsimile: (313) 224-4466

### Article 8.
### Maintenance and Audit of Records

8.01    The Contractor shall maintain full and complete Records reflecting all of its operations related to this Contract. The Records shall be kept in accordance with generally accepted

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

accounting principles and maintained for a minimum of three (3) years after the Contract completion date.

8.02    The City and any government-grantor agency providing funding under this Contract shall have the right at any time without notice to examine and audit all Records and other supporting data of the Contractor as the City or any agency deems necessary.

(a)     The Contractor shall make all Records available for examination during normal business hours at its Detroit offices, if any, or alternatively at its facility nearest Detroit. The City and any government-grantor agency providing funds for the Contract shall have this right of inspection. The Contractor shall provide copies of all Records to the City or to any such government-grantor agency upon request.

(b)     If in the course of such inspection the representative of the City or of another government-grantor agency should note any deficiencies in the performance of the Contractor's agreed upon performance or record-keeping practices, such deficiencies will be reported to the Contractor in writing. The Contractor agrees to promptly remedy and correct any such reported deficiencies within ten (10) days of notification.

(c)     Any costs disallowed as a result of an audit of the Records shall be repaid to the City by the Contractor within thirty (30) days of notification or may be set off by the City against any funds due and owing the Contractor, provided, however, that the Contractor shall remain liable for any disallowed costs exceeding the amount of the setoff.

(d)     Each party shall pay its own audit costs. However, if the dollar amount of the total disallowed costs, if any, exceeds three percent (3%) of the dollar amount of this Contract, the Contractor shall pay the City's audit costs.

(e)     Nothing contained in this Contract shall be construed or permitted to operate as any restriction upon the powers granted to the Auditor General by the City Charter, including but not limited to the powers to audit all accounts chargeable against the City and to settle disputed claims.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

8.03   The Contractor agrees to include the covenants contained in Sections 8.01 and 8.02 in any contract it has with any Subcontractor, consultant or agent whose services will be charged directly or indirectly to the City for Services performed pursuant to this Contract.

## Article 9.
### Indemnity

9.01   The Contractor agrees to indemnify, defend, and hold the City harmless against and from any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City or its departments, officers, employees, or agents by reason of any of the following occurring during the term of this Contract:

(a)   To the extent they result from any negligent or tortious act, error, or omission of the Contractor or any of its Associates; and

(b)   Any failure by the Contractor or any of its Associates to perform their obligations, either express or implied, under this Contract; and

(c)  Any and all injury to the person or property of an employee of the City where such injury arises out of the Contractor's or any of its Associates performance of this Contract.

(d).  In consideration of Contractor's agreement to perform the services required in connection with this engagement, the City agrees, to the extent permitted by law, to indemnify, hold harmless and defend the Contractor and its officers, members and employees (each, an "Indemnified Party") by reimbursing an Indemnified Party for the cost of any expenses incurred for the defense and payment of any claims, actions, proceedings or final judgments resulting from liabilities imposed on them arising out of this engagement; provided that such claims, actions, proceedings or final judgments are not at least 50% caused by the negligence of the Contractor. Any disagreement as to the existence or extent of any such negligence will be subject to binding arbitration between the parties pursuant to the rules of the American Arbitration Association. The total of any indemnification of the Indemnified Parties provided pursuant to this Section 9.01 shall not under any circumstances exceed the greater of $2,500,000 or the aggregate amount of all fees paid by the City to the Contractor under this agreement.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

The Contractor acknowledges that it has been advised that Article VII, Section 26 of the Constitution of the State of Michigan may limit the authority of the City to enter into a contract of indemnity.

If for any reason the foregoing indemnification is unavailable to the Indemnified Parties or insufficient to hold them harmless, then the City shall contribute to the amount paid or payable by an Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect (i) the relative economic benefits to the City, on the one hand, and to the Contractor, on the other hand, of the matters covered by this agreement; or (ii) if the allocation provided by the immediately preceding clause is not permitted by applicable law, not only such relative economic benefits, but also the relative fault of the City, on the one hand, and the Contractor, on the other hand, with respect to such loss, claim, damage or liability and any other relevant equitable considerations. For purposes of this Section 9.01, the relative economic benefits to the Contractor shall be deemed to be the fees paid or to be paid to Contractor under this agreement. The total of any contribution or contributions paid by the City pursuant to this Section 9.01 shall not under any circumstances exceed the greater of $2,500,000 or the aggregate amount of all fees paid by the City to the Contractor under this agreement.

9.02    The Contractor shall examine all places where it will perform the Services in order to determine whether such places are safe for the performance of the Services. The Contractor undertakes and assumes all risk of dangerous conditions when not performing Services inside City offices. The Contractor also agrees to waive and release any claim or liability against the City for personal injury or property damage sustained by it or its Associates while performing under this Contract on premises that are not owned by the City.

9.03    In the event any action shall be brought against the City by reason of any claim covered under this Article 9, the Contractor, upon notice from the City, shall at its sole cost and expense defend the same.

9.04    The Contractor agrees that it is the Contractor's responsibility and not the responsibility of the City to safeguard the property that the Contractor or its Associates use while performing this Contract. Further, the Contractor agrees to hold the City harmless for any loss of such property used by any such person pursuant to the Contractor's performance under this Contract.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

9.05    Notwithstanding anything herein to the contrary, Contractor's liability under this Article 9 shall be limited to the lesser of the amount of fees paid by the City to the Contractor under this agreement or $500,000. Notwithstanding anything herein to the contrary, the Contractor shall not be liable to the City for any loss or damage except such as is a direct result of the Contractor's negligence. The Contractor will in no case be liable for special, incidental, consequential, punitive or indirect loss or damage, including lost profits or lost savings, whether or not such are foreseeable or Contractor has been advised of the possibility of such damage.

9.06    The Contractor would not be liable to indemnify the City for any claims settled by the City without the written consent of the Contractor.

9.07    The indemnification provisions included in this Article 9 shall survive the termination or completion of this Contract.

## Article 10.
## Insurance

10.01    During the term of this Contract, the Contractor shall maintain the following insurance, at a minimum and at its expense:

| TYPE | | AMOUNT NOT LESS THAN |
|------|--|---------------------|
| (a) | Workers' Compensation | Michigan Statutory minimum |
| (b) | Employers' Liability | $500,000.00 minimum each disease<br>$500,000.00 minimum each person<br>$500,000.00 minimum each accident |
| (c) | Commercial General Liability Insurance (Broad Form Comprehensive) | $1,000,000.00 each occurrence<br>$2,000,000.00 aggregate |

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

(d)  Automobile Liability Insurance    $1,000,000.00 combined single limit
     (covering all owned, hired and    for bodily injury and property damage
     personal and property protection
     insurance, including residual
     liability insurance under Michigan
     no fault insurance law)

10.02   The commercial general liability insurance policy shall include an endorsement naming
        the "City of Detroit" as an additional insured.  The additional insured endorsement shall
        provide coverage to the additional insured with respect to liability arising out of the
        named insured's ongoing work or operations performed for the additional insured under
        the terms of this Contract.  The commercial general liability policy shall state that the
        Contractor's insurance is primary and not excess over any insurance already carried by
        the City of Detroit and shall provide blanket contractual liability insurance for all written
        contracts.

10.03   Each such policy shall contain the following cross-liability wording: "In the event of a
        claim being made hereunder by one insured for which another insured is or may be liable,
        then this policy shall cover such insured against whom a claim is or may be made in the
        same manner as if separate policies had been issued to each insured hereunder."

10.04   All insurance required by this Contract shall be written on an occurrence-based policy
        form, if the same is commercially available.

10.05   The Commercial General Liability policy shall be endorsed to have the general aggregate
        apply to the Services provided under this Contract only.

10.06   If during the term of this Contract changed conditions or other pertinent factors should, in
        the reasonable judgment of the City, render inadequate the insurance limits, the
        Contractor shall furnish on demand such additional coverage or types of coverage as may
        reasonably be required under the circumstances.  All such insurance shall be effected at
        the Contractor's expense, under valid and enforceable policies, issued by insurers licensed
        to conduct business in Michigan and are otherwise acceptable to the City.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

10.07  All insurance policies shall name the Contractor as the insured and shall provide a commitment that such policies shall not be canceled or reduced without notice to the City. Certificates of insurance evidencing the coverage required by this Article 10 shall, in a form acceptable to the City, be submitted to the City prior to the commencement of the Services and at least fifteen (15) days prior to the expiration dates of expiring policies.

10.08  If any work is subcontracted in connection with this Contract, the Contractor shall require each Subcontractor to effect and maintain the types and limits of insurance set forth in this Article 10 and shall require documentation of same, copies of which documentation shall be promptly furnished the City.

10.09  The Contractor shall be responsible for payment of all deductibles contained in any insurance required under this Contract. The provisions requiring the Contractor to carry the insurance required under this Article 10 shall not be construed in any manner as waiving or restricting the liability of the Contractor under this Contract.

## Article 11.
## Default and Termination

11.01  This Contract shall remain in full force and effect until the end of its term unless otherwise terminated for cause or convenience according to the provisions of this Article 11.

11.02  The City reserves the right to terminate this Contract for cause. Cause is an event of default.

    (a)  An event of default shall occur if there is a material breach of this Contract, and shall include the following:

        (1)  The Contractor fails to begin work in accordance with the terms of this Contract; or

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

(2)     The Contractor, in the judgment of the City, is unnecessarily, unreasonably, or willfully delaying the performance and completion of the Work Product or Services; or

(3)     The Contractor ceases to perform under the Contract; or

(4)     The City is of the opinion that the Services cannot be completed within the time provided and that the delay is attributable to conditions within the Contractor's control; or

(5)     The Contractor, without just cause, reduces its work force on this Contract to a number that would be insufficient, in the judgment of the City, to complete the Services within a reasonable time, and the Contractor fails to sufficiently increase such work force when directed to do so by the City; or

(6)     The Contractor assigns, transfers, conveys or otherwise disposes of this Contract in whole or in part without prior approval of the City; or

(7)     Any City officer or employee acquires an interest in this Contract so as to create a conflict of interest; or

(8)     The Contractor violates any of the provisions of this Contract, or disregards applicable laws, ordinances, permits, licenses, instructions or orders of the City; or

(9)     The performance of the Contract, in the sole judgment of the City, is substandard, unprofessional, or faulty and not adequate to the demands of the task to be performed; or

(10)    The Contractor fails in any of the agreements set forth in this Contract; or

(11)    The Contractor ceases to conduct business in the normal course; or

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

(12)   The Contractor admits its inability to pay its debts generally as they become due.

(b)   If the City finds an event of default has occurred, the City may issue a Notice of Termination for Cause setting forth the grounds for terminating the Contract. Upon receiving a Notice of Termination for Cause, the Contractor shall have ten (10) calendar days within which to cure such default. If the default is cured within said ten (10) day period, the right of termination for such default shall cease. If the default is not cured to the satisfaction of the City, this Contract shall terminate on the thirtieth calendar day after the Contractor's receipt of the Notice of Termination for Cause, unless the City, in writing, gives the Contractor additional time to cure the default. If the default is not cured to the satisfaction of the City within the additional time allowed for cure, this Contract shall terminate for cause at the end of the extended cure period.

(c)   If, after issuing a Notice of Termination for Cause, the City determines that the Contractor was not in default, the rights and obligations of the parties shall be the same as if the Notice of Termination had been issued as a Notice of Termination for Convenience. Alternatively, in the City's discretion, the Notice of Termination for Cause may be withdrawn and the Contract, if terminated, may be reinstated.

(d)   The City's remedies outlined in this Article 11 shall be in addition to any and all other legal or equitable remedies permissible.

11.03   The City shall have the right to terminate this Contract at any time at its convenience by giving the Contractor five (5) business days written Notice of Termination for Convenience. As of the effective date of the termination, the City will be obligated to pay the Contractor the following: (a) the fees or commissions for Services completed and accepted in accordance with Exhibit A in the amounts provided for in Exhibit B; (b) the fees for Services performed but not completed prior to the date of termination in accordance with Exhibit A in the amounts set forth in the Contractor's rate schedule as provided in Exhibit B; and (c) the Contractor's costs and expenses incurred prior to the date of the termination for items that are identified in Exhibit B. The amount due to the

Contractor shall be reduced by payments already paid to the Contractor by the City. In no event shall the City pay the Contractor more than maximum price, if one is stated, of this Contract.

11.04    After receiving a Notice of Termination for Cause or Convenience, and except as otherwise directed by the City, the Contractor shall:

(a)    Stop work under the Contract on the date and to the extent specified in the Notice of Termination;

(b)    Obligate no additional Contract funds for payroll costs and other costs beyond such date as the City shall specify, and place no further orders on subcontracts for material, services, or facilities, except as may be necessary for completion of such portion of the Services under this Contract as is not terminated;

(c)    Terminate all orders and subcontracts to the extent that they relate to the portion of the Services terminated pursuant to the Notice of Termination;

(d)    Preserve all Records and submit to the City such Records and reports as the City shall specify, and furnish to the City an inventory of all furnishings, equipment, and other property purchased for the Contract, if any, and carry out such directives as the City may issue concerning the safeguarding or disposition of files and property; and

(e)    Submit within thirty (30) days a final report of receipts and expenditures of funds relating to this Contract, and a list of all creditors, Subcontractors, lessors and other parties, if any, to whom the Contractor has become financially obligated pursuant to this Contract.

11.05    After termination of the Contract, each party shall have the duty to assist the other party in the orderly termination of this Contract and the transfer of all rights and duties arising under the Contract, as may be necessary for the orderly, un-disrupted continuation of the business of each party.

**Article 12.**

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

## Assignment

12.01 The Contractor shall not assign, transfer, convey or otherwise dispose of any interest whatsoever in this Contract without the prior written consent of the City; however, claims for money due or to become due to the Contractor may be assigned to a financial institution without such approval. Notice of any assignment to a financial institution or transfer of such claims of money due or to become due shall be furnished promptly to the City. If the Contractor assigns all or any part of any monies due or to become due under this Contract, the instrument of assignment shall contain a clause stating that the right of the assignee to any monies due or to become due shall be subject to prior liens of all persons, firms, and corporations for Services rendered or materials supplied for the performance of the Services called for in this Contract.

## Article 13.
### Subcontracting

13.01 None of the Services covered by this Contract shall be subcontracted without the prior written approval of the City and, if required, any grantor agency. The City reserves the right to withhold approval of subcontracting such portions of the Services where the City determines that such subcontracting is not in the City's best interests.

13.02 Each subcontract entered into shall provide that the provisions of this Contract shall apply to the Subcontractor and its Associates in all respects. The Contractor agrees to bind each Subcontractor and each Subcontractor shall agree to be bound by the terms of the Contract insofar as applicable to the work or services performed by that Subcontractor.

13.03.1 The Contractor and the Subcontractor jointly and severally agree that no approval by the City of any proposed Subcontractor, nor any subcontract, nor anything in the Contract, shall create or be deemed to create any rights in favor of a Subcontractor and against the City, nor shall it be deemed or construed to impose upon the City any obligation, liability or duty to a Subcontractor, or to create any contractual relation whatsoever between a Subcontractor and the City.

13.04 The provisions contained in this Article 13 shall apply to subcontracting by a Subcontractor of any portion of the work or services included in an approved subcontract.

13.05 The Contractor agrees to indemnify, defend, and hold the City harmless against any claims initiated against the City pursuant to any subcontracts the Contractor enters into in performance of this Contract. The City's approval of any Subcontractor shall not relieve the Contractor of any of its responsibilities, duties and liabilities under this Contract. The Contractor shall be solely responsible to the City for the acts or defaults of its Subcontractors and of each Subcontractor's Associates, each of whom shall for this purpose be deemed to be the agent or employee of the Contractor.

### Article 14.
### Conflict of Interest

14.01 The Contractor covenants that it presently has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of the Services under this Contract. The Contractor further covenants that in the performance of this Contract no person having any such interest shall be employed by it.

19

14.02 The Contractor further covenants that no officer, agent, or employee of the City and no other public official who exercises any functions or responsibilities in the review or approval of the undertaking or performance of this Contract has any personal or financial interest, direct or indirect, in this Contract or in its proceeds, whether such interest arises by way of a corporate entity, partnership, or otherwise.

14.03 The Contractor warrants (a) that it has not employed and will not employ any person to solicit or secure this Contract upon any agreement or arrangement for payment of a commission, percentage, brokerage fee, or contingent fee, other than bona fide employees working solely for the Contractor either directly or indirectly, and (b) that if this warranty is breached, the City may, at its option, terminate this Contract without penalty, liability or obligation, or may, at its option, deduct from any amounts owed to the Contractor

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

under this Contract any portion of any such commission, percentage, brokerage, or contingent fee.

14.04    The Contractor covenants not to employ an employee of the City for a period of one (1) year after the date of termination of this Contract without written City approval.

## Article 15.
## Confidential Information

15.01    In order that the Contractor may effectively fulfill its covenants and obligations under this Contract, it may be necessary or desirable for the City to disclose confidential and proprietary information to the Contractor or its Associates pertaining to the City's past, present and future activities.  Since it is difficult to separate confidential and proprietary information from that which is not, the Contractor shall regard, and shall instruct its Associates to regard, all information gained as confidential and such information shall not be disclosed to any organization or individual without the prior consent of the City. The above obligation shall not apply to information already in the public domain or information required to be disclosed by a court order or other legal or regulatory requirement.

15.02    The Contractor agrees to take appropriate action with respect to its Associates to ensure that the foregoing obligations of non-use and non-disclosure of confidential information shall be fully satisfied.

20

## Article 16.
## Compliance With Laws

16.01    The Contractor shall comply with and shall require its Associates to comply with all applicable federal, state and local laws.

16.02    The Contractor shall hold the City harmless with respect to any damages arising from any violation of law by it or its Associates.  The Contractor shall commit no trespass on any public or private property in performing any of the Services encompassed by this Contract.  The Contractor shall require as part of any subcontract that the Subcontractor comply with all applicable laws and regulations.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

## Article 17.
## Amendments

17.01   The City may consider it in its best interest to change, modify or extend a covenant, term or condition of this Contract or require the Contractor to perform Additional Services that are not contained within the Scope of Services as set forth in Exhibit A. Any such change, addition, deletion, extension or modification of Services may require that the compensation paid to the Contractor by the City be proportionately adjusted, either increased or decreased, to reflect such modification. If the City and the Contractor mutually agree to any changes or modification of this Contract, the modification shall be incorporated into this Contract by written Amendment.

17.02   Compensation shall not be modified unless there is a corresponding modification in the Services sufficient to justify such an adjustment. If there is any dispute as to compensation, the Contractor shall continue to perform the Services under this Contract until the dispute is resolved.

17.03   No Amendment to this Contract shall be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing, is signed and acknowledged by duly authorized representatives of both parties, is approved by the appropriate City departments and the City Council, and is signed by the Purchasing Director.

21

17.04   The City shall not be bound by Unauthorized Acts of its employees, agents, or representatives with regard to any dealings with the Contractor and any of its Associates.

## Article 18.
## Fair Employment Practices

18.01   The Contractor shall comply with, and shall require any Subcontractor to comply with, all federal, state and local laws governing fair employment practices and equal employment opportunities.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

18.02 The Contractor agrees that it shall, at the point in time it solicits any subcontract, notify the potential Subcontractor of their joint obligations relative to non-discrimination under this Contract, and shall include the provisions of this Article 18 in any subcontract, as well as provide the City a copy of any subcontract upon request.

18.03 Breach of the terms and conditions of this Article 18 shall constitute a material breach of this Contract and may be governed by the provisions of Article 11, "Default and Termination."

### Article 19,
### Notices

19.01 All notices, consents, approvals, requests and other communications ("Notices") required or permitted under this Contract shall be given in writing, mailed by postage prepaid, certified or registered first-class mail, return receipt requested, and addressed as follows:

If to the Finance Department on behalf of the City:

> City of Detroit
> Finance Department
> 1126 Coleman A. Young Center, 2 Woodward Ave.
> Detroit, MI 48226
> Attention: Mr./Ms. Cheryl Johnson, Finance Director

If to the Contractor:

> Miller Buckfire & Co., LLC
> 601 Lexington Avenue, 22nd floor
> New York, NY 10022
> Attention: Mr. Kenneth A. Buckfire

19.02 All Notices shall be deemed given on the day of mailing. Either party to this Contract may change its address for the receipt of Notices at any time by giving notice of the

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

address change to the other party. Any Notice given by a party to this Contract must be signed by an authorized representative of such party.

19.03 The Contractor agrees that service of process at the address and in the manner specified in this Article 19 shall be sufficient to put the Contractor on notice of such action and waives any and all claims relative to such notice.

## Article 20.
## Proprietary Rights and Indemnity

20.01 The Contractor shall not relinquish any proprietary rights in its intellectual property (copyright, patent, and trademark), trade secrets or confidential information as a result of the Services provided under this Contract. Any Work Product provided to the City under this Contract shall not include the Contractor's proprietary rights, except to the extent licensed to the City.

20.02 The City shall not relinquish any of its proprietary rights, including, but not limited to, its data, privileged or confidential information, or methods and procedures, as a result of the Services provided under this Contract.

## Article 21.
## Force Majeure

21.01 No failure or delay in performance of this Contract, by either party, shall be deemed to be a breach thereof when such failure or delay is caused by a force majeure event including, but not limited to, any Act of God, strikes, lockouts, wars, acts of terrorism, riots, epidemics, explosions, sabotage, breakage or accident to equipment, the binding order of any court or governmental authority, or any other cause, whether of the kind herein enumerated or otherwise, not within the control of a party. In the event of a dispute between the parties with regard to what constitutes a force majeure event, the City's reasonable determination shall be controlling.

## Article 22.
## Waiver

22.01   The City shall not be deemed to have waived any of its rights under this Contract unless such waiver is in writing and signed by the City.

22.02   No delay or omission on the part of either party in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one (1) occasion shall not be construed as a waiver of any right on any future occasion.

22.03   No failure by either party to insist upon the strict performance of any covenant, agreement, term or condition of this Contract or to exercise any right, term or remedy consequent upon its breach shall constitute a waiver of such covenant, agreement, term, condition, or breach.

## Article 23.
## Miscellaneous

23.01   If any provision of this Contract or its application to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Contract shall not be affected and shall remain valid and enforceable to the fullest extent permitted by law.

23.02   This Contract contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Contract.  Neither the City nor the City's agents have made any representations except those expressly set forth in this Contract, and no rights or remedies are, or shall be, acquired by the Contractor by implication or otherwise unless expressly set forth in this Contract.  The Contractor waives any defense it may have to the validity of the execution of this Contract.

23.03   Unless the context otherwise expressly requires, the words "herein," "hereof," and "hereunder," and other words of similar import, refer to this Contract as a whole and not to any particular section or subdivision.

23.04   The headings of the sections of this Contract are for convenience only and shall not be used to construe or interpret the scope or intent of this Contract or in any way affect the same.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

23.05 This Contract and all actions arising under it shall be governed by, subject to, and construed according to the law of the State of Michigan. The Contractor agrees, consents and submits to the exclusive personal jurisdiction of any state or federal court of competent jurisdiction in Wayne County, Michigan, for any action arising out of this Contract. The Contractor also agrees that it shall not commence any action against the City because of any matter whatsoever arising out of or relating to the validity, construction, interpretation and enforcement of this Contract in any state or federal court of competent jurisdiction other than one in Wayne County, Michigan.

23.06 If any Associate of the Contractor shall take any action that, if done by a party, would constitute a breach of this Contract, the same shall be deemed a breach by the Contractor.

23.07 The rights and remedies set forth in this Contract are not exclusive and are in addition to any of the rights or remedies provided by law or equity.

23.08 For purpose of the hold harmless and indemnity provisions contained in this Contract, the term "City" shall be deemed to include the City of Detroit and all other associated, affiliated, allied or subsidiary entities or commissions, now existing or subsequently created, and their officers, agents, representatives, and employees.

23.09 The Contractor covenants that it is not, and shall not become, in arrears to the City upon any contract, debt, or other obligation to the City including, without limitation, real property, personal property and income taxes, and water, sewage or other utility bills.

23.10 This Contract may be executed in any number of originals, any one of which shall be deemed an accurate representation of this Contract. Promptly after the execution of this Contract, the City shall provide a copy to the Contractor.

23.11 As used in this Contract, the singular shall include the plural, the plural shall include the singular, and a reference to either gender shall be applicable to both.

23.12 The rights and benefits under this Contract shall inure to the City of Detroit and its agents, successors, and assigns.

23.13 The City shall have the right to recover by setoff from any payment owed to the Contractor all delinquent withholding, income, corporate and property taxes owed to the

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

City by the Contractor, any amounts owed to the City by the Contractor under this Contract or other contracts, and any other debt owed to the City by the Contractor.

(Signatures appear on next page)

The City and the Contractor, by and through their duly authorized officers and representatives, have executed this Contract as follows:

Witnesses:

Contractor:

1. _____
   Name  KYLE HERMAN

By: _____
    Name  JAMES L. DOAK

2. _____
   Name  SANDAY MARKER

Its: __MANAGING DIRECTOR__
     Title

Witnesses:

City of Detroit

__Finance_____ Department:

1. _____
   Name  Kennis Wooten

By: _____
    Name

2. _____
   Name  Adam Holler

Its: _Deputy Finance Director_
     Title

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

THIS CONTRACT WAS APPROVED
BY THE CITY COUNCIL ON:

APPROVED BY LAW DEPARTMENT
PURSUANT TO § 6-406 OF THE
CHARTER OF THE CITY OF DETROIT

_____
Date

_____          _____ 12/26/2012
Purchasing Director          Date          Corporation Counsel          Date

**THIS CONTRACT IS NOT VALID OR AUTHORIZED UNTIL APPROVED BY
RESOLUTION OF THE CITY COUNCIL AND SIGNED BY THE PURCHASING
DIRECTOR.**

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

**EXHIBIT A**

**<u>SCOPE OF SERVICES</u>**

**I.**      **<u>Notice to Proceed</u>**

The term of this Contract shall begin on January 9, 2013 and shall terminate on December 31, 2013. The Contractor shall commence performance of this Contract upon receipt of a written "Notice to Proceed" from the City and in the manner specified in the Notice to Proceed.

**II.**      **<u>Services to be Performed</u>**

**Miller Buckfire will conduct an independent financial review of the City of Detroit to evaluate its short-term and long-term financial situation and develop strategic and transactional recommendations to address the City's ongoing financial needs. The components of the reviews and recommendations may include the following:**

-      Review the City's current cash flow forecast to understand projected liquidity and potential downside risks and develop alternatives to address near-term funding issues, if necessary.

-      Review long-term financial projections developed by the City and its financial advisors, as well as the potential savings from City initiatives, to understand drivers of forecast and the ability to service the City's current and future obligations.

-      Analyze the output of the revenue/expense and cash flow analyses to assess (a) the adequacy of City's short-term liquidity, (b) the City's ability to remain solvent in the long-term, and (c) the sensitivity of those findings to underlying economic, execution and timing assumptions.

-      Analyze the outstanding obligations of the City, including general obligation bonds, revenue bonds, other indebtedness, swaps, pension obligations and OPEB obligations. The analysis will include an assessment of the key terms, pledged revenues/guarantees and forecasted future costs of each obligation.

**Miller Buckfire will perform analyses and provide advice regarding alternatives to address the City's structural deficit, including the following.**

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

- Assess the amount of debt and other obligations that can be serviced by the City, based on its existing revenue and expense profile, the initiatives identified by the City and its financial advisors and the analyses developed as indicated above. Determine optimal credit rating and credit profile for the City, and develop a comprehensive plan to achieve these targets. Provide advice to the City on the potential types of debt that should be employed and/or may be available to the City in the debt capital markets.

- Identify alternatives to address the City's obligations, including but not limited to financings and refinancings, amendments, paydowns/defeasances, swap novations, exchange offers, asset sales and negotiated deleveraging transactions, analyzing the potential benefits, risks and implications of each.

- Analyze City assets to identify monetization alternatives, including asset-based financing, asset sales and sale-leasebacks.

- Identify and propose alternatives and processes to raise capital on a short-term basis, if needed by the City.

- Develop potential execution strategies for the alternatives listed above.

- Provide assistance with constituent negotiations, as requested by the City, including negotiating, preparation of materials used or presented in negotiations and analyses of the financial impact of various competing proposals and initiatives.

## EXHIBIT B

## FEE SCHEDULE

I.    **General**

(a) The Contractor shall be paid for those Services performed pursuant to the Contract a maximum amount of One Million Eight Hundred Thousand and 00/100 Dollars ($1,800,000).

(b) The Contractor shall be paid for those Services performed pursuant to the Contract a monthly financial advisory fee of $150,000 (the "Monthly Advisory Fee"). Monthly Advisory Fee shall be invoiced promptly upon the end of each month and on a prorated basis for the initial month and any months subject to the provisions of the Suspension Period (as defined below). Any Monthly Advisory Fee paid in respect of this engagement shall be credited (but only once) against any other fee or fees earned by Contractor under separate contract pursuant to advising or assisting the City with any transaction(s).

(c) Notwithstanding the foregoing, the City and the State may, at their mutual discretion and with written notice to Contractor, elect during the term of the engagement to suspend the City's use of Contractor's services pursuant to the Contract (such period, a "Suspension Period"). During the Suspension Period, Contractor will not be obligated to perform any of the services described pursuant to the Contract. If the City and the State mutually desire Contractor to recommence the provision of services hereunder, the City and State shall notify Contractor in writing as to the date on which services are to recommence (a "Resumption Date"). Notwithstanding the foregoing, the City and State may not elect to commence an additional Suspension Period in the 90 days following a Resumption Date. The election by the City to suspend Contractor's services hereunder shall not in any way limit the City's obligation to pay Monthly Advisory Fees already due to Contractor or any of the City's other obligations hereunder, including indemnification provisions referred to in Article 9.

(d) Payment for the proper performance of the Services shall be contingent upon receipt by the City of invoices for payment. Each invoice must be received by the City not more than thirty (30) days after the close of the calendar month in which the services were rendered and must be signed by an authorized officer or designee of the Contractor.

II.    **Project Fees**

Not applicable

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

### III.   Project Billing

Not applicable

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

# CITY ACKNOWLEDGMENT

STATE OF _MICHIGAN_ )
                  )SS.
COUNTY OF _WAYNE_ )

The foregoing contract was acknowledged before me the _20th_ day of _December_
20_12_, by _MICHAEL JAMISON_ ,
                       (name of person who signed the contract)

the _DEPUTY FINANCE DIRECTOR_ ,
              (title of person who signed the contract as it appears on the contract)

of _FINANCE DEPARTMENT_ ,
                (complete name of the City department)

on behalf of the City.

_Sue Ann Ray_

Notary Public, County of _WAYNE_

State of _MICHIGAN_

My commission expires: _4-7-14_

## LIMITED LIABILITY COMPANY
## ACKNOWLEDGMENT

STATE OF **NEW YORK** )
                    )SS.
COUNTY OF **NEW YORK** )

The foregoing contract was acknowledged before me the **19** day of **December**
20**12**, by **JAMES L. DOAK** ,
                       (name of person who signed the contract)

the **MANAGING DIRECTOR** ,

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

(title of person who signed the contract as it appears on the contract)

of  MILLER BUCKFIRE & CO., LLC ,
(complete name of the limited liability company)

on behalf of the limited liability company.

_Harold A. Neu_ (signature)

Notary Public, County of _____

State of _____

My commission expires: _____

HAROLD A. NEU
Notary Public, State of New York
No. 02NE5089029
Qualified in New York County
Commission Expires February 25, 2015

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2694.DOC}

# LIMITED LIABILITY COMPANY

## CERTIFICATE OF AUTHORITY

I, _MB Advisory Group, LLC_ , a Manager or Member of
(name of manager)

_Miller Buckfire & Co._, L.L.C., a limited liability company (the "Company"), DO HEREBY
(name of company)

CERTIFY that I am a Manager or Member of the Company who has the authority to act as an agent of

the Company in executing this Certificate of Authority. I further certify that the following individuals are
_officers or employees_
~~Managers or Members~~ of the Company who have the authority to execute and commit the Company to

the conditions, obligations, stipulations and undertakings contained in the foregoing Contract between the

City and the Company:

_Kenneth A. Buckfire_                  _____

_Michael Elpern_                       _____

_Harold A. Neu_                        _____

_James C. Doak_                        _____

FURTHER, I CERTIFY that all necessary approvals by the Managers or Members of the
Company have been obtained with respect to the execution of said Contract.

IN WITNESS THEREOF, I have set my hand this _19_ day of _December_, 20 _12_.
COMPANY SEAL
(if any)                    _MB Advisory Group, LLC_
                            _By: Harold A. Neu_
                            ~~Manager or Member~~ _NAME: HAROLD A. NEU_
                            _TITLE: MANAGING DIRECTOR and_

PLEASE NOTE THAT THE PERSON WHO SIGNS THE CONTRACT ON BEHALF OF YOUR _Secretary_
LIMITED LIABILITY COMPANY **MUST** BE ONE OF THE INDIVIDUALS LISTED ABOVE
AS A PERSON AUTHORIZED TO EXECUTE CONTRACTS IN THE NAME OF AND ON
BEHALF OF THE LIMITED LIABILITY COMPANY.

{G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2453.DOC}

# LIMITED LIABILITY COMPANY
## ACKNOWLEDGMENT

STATE OF _New York_ )
)SS.
COUNTY OF _New York_ )

The foregoing contract was acknowledged before me the _12th_ day of _November_, 20_12_, by _James Doak_

(name of person who signed the contract)

the _Managing Director_

(title of person who signed the contract as it appears on the contract)

of _Miller Buckfire & Co., LLC_

(complete name of the limited liability company)

on behalf of the limited liability company.

Notary Public, County of _New York_

State of _New York_

My commission expires: _____

HAROLD A. NEU
Notary Public, State of New York
No. 02NE5089029
Qualified in New York County
Commission Expires February 25, 2015

[G:\DOCS\CONTRACT\EDWAJ\A32000\FORM\JE2453.DOC]

**Exhibit 1-B**

**Amendment to Service Contract, July 16, 2013**

## CHANGE ORDER #1

## ADDENDUM TO EXHIBITS A & B TO INCLUDE ADDITIONAL REQUESTED SERVICES AND FEES

This amendment, dated July 16, 2013 (the "Amendment") amends the Services Contract, dated as of January 9, 2013, between City of Detroit, Michigan and Miller Buckfire & Co., LLC (the "Original Contract" and as modified by this Amendment, the "Contract"). Capitalized terms used, but not otherwise defined in this Amendment have the respective meanings ascribed to them in the Original Agreement. Except as modified by this Amendment, all terms and conditions of the Original Agreement shall continue in full force and effect and be unaffected by this Amendment.

Exhibit A and Exhibit B of the Original Contract are hereby amended and supplemented by adding the following additional services to be performed by Contractor and fees to be paid by the City to Contractor.

## EXHIBIT A

## SCOPE OF SERVICES

## II.    Services to be Performed

Contractor's engagement team will be led and directed by Kenneth A. Buckfire with the support of other Managing Directors and bankers of Contractor.

Liability Restructuring

Contractor, in its capacity as financial advisor to the City, will perform the following financial advisory services with regard to a Restructuring (as defined below):

(A)    Provide financial advice and assistance to the City in developing and seeking approval of a Restructuring plan (as the same may be modified from time to time, a "Plan"), which

1

may be a plan under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code");

(B)    If requested by the City, in connection therewith, provide financial advice and assistance to the City in structuring any new securities to be issued under the Plan;

(C)    If requested by the City, assist the City and/or participate in negotiations with entities or groups affected by the Plan;

(D)    If requested by the City, participate in hearings before the bankruptcy court with respect to the matters upon which Contractor has provided advice, including, as relevant, coordinating with the City's counsel with respect to testimony in connection therewith; and

(E)    Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Contractor and the City.

For purposes of this Scope of Services, the term "Restructuring" shall mean any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the City's debt securities and/or other indebtedness, obligations or liabilities (including swap contracts, unfunded pension and retiree medical liabilities, other employee obligations, lease obligations and/or contract or tort obligations), including pursuant to a repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations.

In connection with a Restructuring, Contractor will serve as a "Designated Qualified Independent Representative" (within the meaning of CFTC Regulation 23.450) of the City and of the Detroit General Retirement System Service Corporation and the Detroit General Retirement System Service Corporation (in this context, each a "CP") in negotiations with certain swap dealers to settle such CP's obligations under certain existing derivative contracts. Accordingly, Contractor represents to each CP as follows:

(1)    Contractor has written policies and procedures reasonably designed to ensure that Contractor satisfies the applicable requirements of CFTC Regulation 23.450(b)(1);

(2)    Contractor is exercising independent judgment in evaluating all "recommendations" (as such term is used in CFTC Regulations 23.434 and

2

23.440) with respect to any swaps provided by any swap dealer that are presented to Contractor;

(3)    unless Contractor otherwise notifies the CP and a swap dealer in writing:

    a.  Contractor is not and, within one year of representing such CP in connection with a swap with swap dealer has not been, an "associated person" (as that term is defined in Section 1a(4) of the Commodity Exchange Act) of such swap dealer;

    b.  There is no "principal relationship" (as that term is defined in CFTC Regulation 23.450(a)(1)) between Contractor and any swap dealer entering a swap with the CP in which Contractor has acted as a Designated Qualified Independent Representative;

    c.  Contractor (i) provides timely and effective disclosures to each CP of all material conflicts of interest that could reasonably affect Contractor's judgment or decision making with respect to Contractor's obligations to such CP and (ii) complies with policies and procedures reasonably designed to manage and mitigate such material conflicts of interest;

    d.  Contractor is not directly or indirectly, through one or more persons, controlled by, in control of, or under common control with any swap dealer entering a swap with a CP in respect of which Contractor has acted as a Designated Qualified Independent Representative; and

    e.  To the best of Contractor's knowledge, no swap dealer entering a swap with a CP in respect of which Contractor has acted as a Designated Qualified Independent Representative has referred, recommended, or introduced Contractor to such CP within one year of Contractor's representation of such CP in connection with any Swap with such swap dealer; and

(4)    Contractor is legally obligated to comply with the applicable requirements of CFTC Regulation 23.450(b)(1) by agreement, condition of employment, law, rule, regulation, or other enforceable duty.

<u>DWSD Transaction</u>

Contractor, in its capacity as financial advisor to the City, will perform the following financial advisory services with regard to a DWSD Transaction (as defined below) with respect to the City's interest in the Detroit Water and Sewerage Department ("<u>DWSD</u>"):

3

(A)    Study and evaluate DWSD and its business prospects;

(B)    Identify and analyze the financial alternatives available to the City with respect to DWSD;

(C)    Develop the strategy and tactics to be used in evaluating these alternatives in the market;

(D)    If a DWSD Transaction is pursued:

        a.  Provide analysis and advice in connection with the consideration of offers received relating to a DWSD Transaction;

        b.  As directed by the City, assist in the negotiation of definitive agreement(s) with prospective operator(s) and/or investor(s); and

        c.  If requested by the City in connection with a DWSD Transaction, Contractor will provide, in accordance with its customary practice, an opinion (the "Opinion") to the City, with respect to the adequacy or fairness, from a financial point of view, of the consideration to be received by the City in such Monetization, it being understood that the Opinion shall be in such form as Contractor shall determine and Contractor may qualify the Opinion in such manner as Contractor believes appropriate. The Opinion shall not address the City's underlying strategic decision to effect a DWSD Transaction; and

(E)    Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Contractor and the City.

For purposes of this Scope of Services, the term "DWSD Transaction" shall mean the disposition of DWSD or a significant portion of its assets or businesses to one or more third parties and/or a combination of the business(es) of DWSD with the business(es) of one or more third parties, in any such case, in one transaction or a series or combination of transactions, other than in the ordinary course of business, including, without limitation, through a sale, purchase or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, the formation of a governmental or quasi-governmental authority or agency, joint venture, partnership or similar entity, or any similar transaction.

Asset Monetization

4

**Execution Version**

Upon the request of the City, Contractor, in its capacity as financial advisor to the City, will perform the following financial advisory services in respect of each Asset Monetization (as defined below) of the City's saleable assets and operations (including executory contracts) that the City undertakes (each, a "Marketed Asset"):

(A)   Study and evaluate each Marketed Asset;

(B)   Provide financial advice and assistance to the City in connection with an Asset Monetization, identify potential acquirors and, at the City's request, contact such potential acquirors;

(C)   If requested by the City, assist the City in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum") to be used in soliciting potential acquirors, it being agreed that (A) the Sale Memorandum shall be based entirely upon information supplied by the City, (B) the City shall be solely responsible for the accuracy and completeness of the Sale Memorandum, and (C) other than as contemplated by this subparagraph (C)(ii), the Sale Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Contractor's prior written consent;

(D)   If requested by the City, assist the City and/or participate in negotiations with potential acquirors; and

(E)   Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Contractor and the City.

For purposes of this Scope of Services, the term "Asset Monetization" shall mean the disposition to one or more third parties in one or a series of related transactions of any Marketed Assets, other than in the ordinary course of business, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, the formation of a governmental or quasi-governmental authority or agency, joint venture, partnership or similar entity, or any similar transaction.

The assets and operations of DWSD shall not constitute Marketed Assets for purposes of this Contract.

5

Financing

Upon the request of the City, and upon separate written agreement or amendment to this Contract, Contractor, in its capacity as financial advisor to the City, will perform the following financial advisory services with regard to a Financing (as defined below):

(A)     Provide financial advice and assistance to the City in structuring and effecting a Financing, identify potential Investors (as defined below) and, at the City's request, contact such Investors;

(B)     If Contractor and the City deem it advisable, assist the City and any other advisors hired to assist with the Financing in developing and preparing a memorandum (with any amendments or supplements thereto, the "Financing Offering Memorandum") to be used in soliciting potential Investors, it being agreed that (A) the Financing Offering Memorandum shall be based entirely upon information supplied by the City, (B) the City shall be solely responsible for the accuracy and completeness of the Financing Offering Memorandum, and (C) other than as contemplated by this subparagraph (B)(ii), the Financing Offering Memorandum shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Contractor's prior written consent;

(C)     If requested by the City, assist the City and/or participate in negotiations with potential Investors; and

(D)     Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Contractor and the City.

For purposes of this agreement, the term "Financing" shall mean (i) any issuance, sale or placement of debt securities, instruments or obligations of the City with one or more lenders and/or investors except to the extent issued to existing security holders of the City in exchange for their existing securities, or (ii) any loan or other financing, including any "debtor in possession financing" or "exit financing" in connection with a case under the Bankruptcy Code (each such lender or investor, an "Investor").

6

**Execution Version**

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Contractor to act in any capacity or to underwrite, place or purchase any financing or securities.

If appropriate in connection with performing its services for the City hereunder, Contractor may utilize the services of one or more of its affiliates, in which case references herein to Contractor shall as applicable be deemed to include such affiliates.

# EXHIBIT B
## FEE SCHEDULE

Exhibit B to the Original Contract is amended to add the following cash fees as compensation for Services rendered pursuant to this Contract as follows:

## I.    General

(a) removed.

(b) Effective upon the execution and delivery of this Amendment, the Contractor shall be paid a financial advisory fee of $500,000 per month through December 2013, and $300,000 per month thereafter (the "Monthly Advisory Fee"). Monthly Advisory Fee shall be invoiced promptly upon the end of each month and on a prorated basis for the initial month. Fifty percent of any Monthly Advisory Fee paid in respect of this engagement after the first full Monthly Advisory Fee shall be credited (but only once) against any Restructuring Transaction Fee earned by Contractor.

(c) removed.

(d) In addition to any fees payable by the City to Contractor hereunder, the City shall, reimburse Contractor on a monthly basis for its travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Contractor's activities under or contemplated by this engagement hereunder.

(e) Payment for the proper performance of the Services shall be contingent upon receipt by the City of invoices for payment. Each invoice must be received by the City not more than thirty (30) days after the close of the calendar month in which the services were rendered and must be signed by an authorized officer or designee of the Contractor.

## II.    Project Fees

Restructuring

8

If at any time during (i) the term of this Contract or (ii) within the twelve full months following the expiration of this Contract or the termination of this Contract by the City other than for cause (such period including the term of this engagement, the "Fee Period"), (x) any Restructuring is consummated or (y)(1) an agreement in principle, definitive agreement or Plan to effect a Restructuring is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring is consummated, the City shall pay Contractor a transaction fee (a "Restructuring Transaction Fee"), contingent upon the consummation of a Restructuring and payable at the closing thereof, equal to 0.40% of the sum of (i) the aggregate principal amount of the City's funded indebtedness (including accrued and unpaid interest, but excluding the indebtedness of DWSD), and (ii) the face value of any other Obligations (as defined below), in the case of clauses (i) and (ii), restructured or recapitalized (including without limitation, through any exchange, conversion, cancellation, forgiveness, retirement, purchase, repurchase, settlement at a discount of any derivative contracts and/or material modification or amendment to the terms, conditions or covenants thereof). For purposes of this Contract, "Obligations" means payment obligations under any derivative contracts and other liabilities, but excluding the funded indebtedness of DWSD, pension benefit obligations and other post-employment benefit obligations.

DWSD Transaction

If the City requests that the Contractor provide an Opinion in connection with a potential DWSD Transaction, the City shall pay to Contractor a fee of $2,000,000 (an "Opinion Fee"), which fee will be due and shall be paid on the date on which Contractor advises the City that it is prepared to render such Opinion. The Opinion Fee shall be credited against any DWSD Transaction Fee (as defined below) payable to the Contractor.

If at any time during the Fee Period, (x) a DWSD Transaction is consummated or (y)(1) an agreement in principle or definitive agreement to effect a DWSD Transaction is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any DWSD Transaction is consummated, the City shall pay to Contractor a transaction fee (a "DWSD Transaction Fee"), contingent upon the consummation of the DWSD Transaction and payable on the closing date thereof, equal to the greater of (i) 0.75% of the Aggregate Consideration (as defined below) and (ii) $8,000,000; provided that if the DWSD operations are

9

conveyed to a public authority or agency without a marketing process having been conducted by Contractor, then the DWSD Transaction Fee shall be $8,000,000.

For purposes of this Scope of Services, the term "Aggregate Consideration" shall mean the total amount of (i) any upfront cash payments, (ii) the present value (upon the date of the closing of such DWSD Transaction and as determined by the City and Contractor in good faith) of any ongoing lease payments, payments in lieu of taxes, or similar recurring cash or non-cash payments, and (iii) the fair market value (on the date of payment and as determined by the City and Contractor in good faith) of all securities and other property, paid or payable, directly or indirectly, by the acquiring party (the "Acquiror") to the acquired party or the City (in either case, the "Acquired"), or to the Acquired's contract parties, claim holders and security holders, or by the Acquired to the Acquired's contract parties, claim holders and security holders, in connection with a DWSD Transaction or an Asset Monetization, as the case may be.

Asset Monetization

If at any time during the Fee Period (x) any Asset Monetization of a Marketed Asset is consummated or (y)(1) an agreement in principle or definitive agreement to effect any Asset Monetization of a Marketed Asset is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Asset Monetization of the Marketed Asset is consummated, the City shall pay to Contractor a transaction fee (each, a "Asset Monetization Fee") equal to 1.0% of the Aggregate Consideration paid or payable in respect of each such Asset Monetization, which fee or fees shall be contingent upon and payable at the closing of each such Asset Monetization. 50% of any Asset Monetization Fee paid in respect of this engagement shall be credited (but only once) against any Restructuring Transaction Fee earned by Contractor.

Financing

If the City requests that the Contractor perform financial advisory services with regard to a Financing, the City shall pay to Contractor such placement fees or other compensation in amounts to be mutually agreed upon under separate written agreement or amendment to this Contract.

10

The City and Contractor acknowledge and agree that more than one fee may be payable to Contractor pursuant to this Contract (as amended) in connection with any single transaction or a series of transactions, it being understood and agreed that (i) if more than one fee becomes so payable to Contractor in connection with a series of transactions, each such fee shall be paid to Contractor, (ii) if more than one fee becomes so payable to Contractor in connection with a single transaction, the highest of such fees shall be paid to Contractor, (iii) in no event shall the City be liable for more than one Restructuring Transaction Fee or more than one DWSD Transaction Fee, and (iv) an Asset Monetization Fee shall be payable in respect of each Asset Monetization.

The maximum amount limitation on the Compensation for Services set forth in Section 7.01 and Exhibit B of the Original Contract are eliminated and the terms, conditions, limitations and crediting of Compensation set forth in this Exhibit B set forth in this Amendment shall control for all purposes.

Notwithstanding anything to the contrary in the Original Agreement, in addition to any fees payable by the City to Contractor hereunder, the City shall, whether or not any transaction contemplated by this Contract shall be proposed or consummated, reimburse Contractor on a monthly basis for its travel and other reasonable out-of-pocket expenses incurred in connection with, or arising out of Contractor's activities under or contemplated by this Contract or in the enforcement of Contractor's rights hereunder, including all fees, disbursements and other charges of counsel to be retained by Contractor and of other consultants and advisors retained by Contractor with the City's consent. Such reimbursements shall be made promptly upon submission by Contractor of statements for such expenses.

11

**Execution Version**

If the City files for bankruptcy protection under Chapter 9 of the Bankruptcy Code, the City shall pay Contractor all outstanding fees and expenses by wire transfer of immediately available funds immediately prior to the commencement of such case.

This Amendment and the Contract as so amended are hereby approved and ratified in all respects as valid and binding obligations of Contractor and the City.

In witness whereof, the parties have executed this Amendment as of the date set forth above.

Contractor:
Miller Buckfire & Co., LLC

By: _Kenneth A. Buckfire_
    Kenneth A. Buckfire
    President

City of Detroit

By: _____
    Kevin Orr
    Emergency Manager
    City of Detroit

12

**Exhibit 1-C**

**Amendment to Service Contract, August 26, 2013**

Execution Version

## ADDENDUM #1 TO CHANGE ORDER #1

Reference is made to that certain amendment, dated July 16, 2013 (the "Amendment"), amending the Services Contract, dated as of January 9, 2013, between City of Detroit, Michigan and Miller Buckfire & Co., LLC (the "Original Contract" and as modified by the Amendment, the "Contract"). Capitalized terms used, but not otherwise defined in this Addendum #1 to the Contract have the respective meanings ascribed to them in the Contract. Except as modified by this Addendum, all terms and conditions of the Contract shall continue in full force and effect and be unaffected by this Addendum.

Exhibit A and Exhibit B of the Contract contemplated that the City may from time to time request that Contractor provide Services in respect of identified Financings.

Accordingly, the City hereby requests that Contractor provide the City, and Contractor hereby agrees to provide, the Financing Services identified in the Contract in respect of a debtor in possession Financing proposed to be raised by the City.

The City hereby agrees to pay Contractor a financial advisory fee of 0.15% of the gross proceeds of such debtor in possession Financing, which fee shall be contingent upon and payable at the closing of such Financing.

It is understood and agreed that nothing contained herein shall constitute an expressed or

1

implied commitment by Contractor to act in any capacity or to underwrite, place or purchase any financing or securities.

This Addendum #1 and the Contract are hereby approved and ratified in all respects as valid and binding obligations of Contractor and the City.

In witness whereof, the parties have executed this Addendum #1 to the Contract as of August 26, 2013.

Contractor:
Miller Buckfire & Co., LLC

By: _Kenneth A. Buckfire_

Kenneth A. Buckfire
President

City of Detroit

By: _____

Kevyn D. Orr
Emergency Manager
City of Detroit

2

## ADDENDUM #1 TO CHANGE ORDER #1

Reference is made to that certain amendment, dated July 16, 2013 (the "Amendment"), amending the Services Contract, dated as of January 9, 2013, between City of Detroit, Michigan and Miller Buckfire & Co., LLC (the "Original Contract" and as modified by the Amendment, the "Contract"). Capitalized terms used, but not otherwise defined in this Addendum #1 to the Contract have the respective meanings ascribed to them in the Contract. Except as modified by this Addendum, all terms and conditions of the Contract shall continue in full force and effect and be unaffected by this Addendum.

Exhibit A and Exhibit B of the Contract contemplated that the City may from time to time request that Contractor provide Services in respect of identified Financings.

Accordingly, the City hereby requests that Contractor provide the City, and Contractor hereby agrees to provide, the Financing Services identified in the Contract in respect of a debtor in possession Financing proposed to be raised by the City.

The City hereby agrees to pay Contractor a financial advisory fee of 0.15% of the gross proceeds of such debtor in possession Financing, which fee shall be contingent upon and payable at the closing of such Financing.

It is understood and agreed that nothing contained herein shall constitute an expressed or

1

implied commitment by Contractor to act in any capacity or to underwrite, place or purchase any financing or securities.

This Addendum #1 and the Contract are hereby approved and ratified in all respects as valid and binding obligations of Contractor and the City.

In witness whereof, the parties have executed this Addendum #1 to the Contract as of August 26, 2013.

Contractor:
Miller Buckfire & Co., LLC

By: *Kenneth A Buckfire*

Kenneth A. Buckfire
President

City of Detroit

By: *[signature]*

Kevyn D. Orr
Emergency Manager
City of Detroit

2

**Exhibit 1-D**

**Amendment to Service Contract, June 16, 2014**

## AMENDED AND RESTATED CHANGE ORDER #1

This Amended and Restated Change Order #1, dated June _16_, 2014, (the "Amended and Restated Change Order") amends and restates, in its entirety, Change Order #1, dated July 16, 2013, to that certain Services Contract, dated January 9, 2013, by and between the City of Detroit, Michigan (the "City") and Miller Buckfire & Co., LLC ("Miller Buckfire") (the "Original Contract"), including Addendum #1 to Change Order #1, dated August 26, 2013 ("Addendum #1", and together with Change Order #1, the "Prior Change Order").

Capitalized terms used, but not otherwise defined in this Amended and Restated Change Order, have the respective meanings ascribed to them in the Original Contract. Except as modified by this Amended and Restated Change Order, all terms and conditions of the Original Contract shall continue in full force and effect and be unaffected by this Amended and Restated Change Order.

The Prior Change Order is hereby amended and restated by the following:

## EXHIBIT A

### SCOPE OF SERVICES

**I.     Definitions**

The following words and expressions or pronouns used in their stead shall be construed as follows, for the purposes of this Scope of Services:

"Asset Monetization" shall mean the disposition to one or more third parties in one or a series of related transactions of any Marketed Assets, other than in the ordinary course of business, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, the formation of a governmental or quasi-governmental authority or agency, joint venture, partnership or similar entity, or any similar transaction.

"Contract" shall mean the Original Contract as modified by this Amended and Restated Change Order.

"Debtor-in-Possession Financing" shall mean the post-petition Financing secured by the City to advance certain key investment initiatives of the City ("Quality of Life" initiatives), in advance of the City's exit from bankruptcy.

"DWSD" shall mean the Detroit Water and Sewerage Department.

"DWSD Financing" shall mean, in connection with the City's exit from bankruptcy protection: (i) any issuance, sale or placement of debt securities, instruments or obligations of DWSD and/or its successor with one or more lenders or investors except to the extent issued to existing holders of DWSD indebtedness in exchange for their existing securities, or (ii) any loan or other financing of DWSD, including any "exit financing", in connection with the City's plan of adjustment under the Bankruptcy Code.

"DWSD Restructuring" shall mean any recapitalization or restructuring (including, without limitation, any reduction in interest rates or elimination of call protection) of DWSD's debt securities and/or other indebtedness, obligations or liabilities, including pursuant to any exchange, conversion, cancellation, forgiveness, retirement, material modification or amendment to the terms, conditions or covenants, repurchase, a plan of adjustment or a solicitation of consents, waivers, acceptances or authorizations.

"DWSD Transaction" shall mean the disposition of DWSD or a significant portion of its assets or businesses to one or more third parties and/or a combination of the business(es) of DWSD with the business(es) of one or more third parties, in any such case, in one transaction or a series or combination of transactions, other than in the ordinary course of business, including, without limitation, through a sale, purchase or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, the formation of a governmental or quasi-governmental authority or agency, joint venture, partnership or similar entity, or any similar transaction.

"Financing" shall mean (i) any issuance, sale or placement of debt securities, instruments or obligations of the City with one or more lenders and/or investors except to the extent issued to existing security holders of the City in exchange for their existing securities, or (ii) any loan or other financing, including any Debtor-in-Possession Financing" or "exit financing" in connection with a case under the Bankruptcy Code (each such lender or investor, an "Investor").

"Marketed Asset" shall mean any of the City's saleable assets and operations (including executory contracts) that the City undertakes to sell, lease, convey, assign, or otherwise use or transfer.

"Restructuring" shall mean any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the City's debt securities and/or other indebtedness, obligations or liabilities (including swap contracts, unfunded pension and retiree medical liabilities, other employee obligations, lease obligations and/or contract or tort obligations), including pursuant to a repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations.

"Swap Settlement" shall mean any Restructuring of the obligations under certain existing derivative contracts of the Detroit General Retirement System Service Corporation and the Detroit General Retirement System Service Corporation.

## II.     **Services to be Performed**

Miller Buckfire's engagement team will be led and directed by Kenneth A. Buckfire with the support of other Managing Directors and bankers of Miller Buckfire. If requested by the City, Miller Buckfire, in its capacity as financial advisor to the City, will perform the following services:

### Liability Restructuring

(1)     Provide financial advice and assistance to the City in developing and seeking approval of a Restructuring plan (as the same may be modified from time to time, a "Plan"), including a DWSD Restructuring, which may be a plan under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code");

(2)     Provide financial advice and assistance to the City in structuring any new securities to be issued under the Plan;

(3)     Assist the City and/or participate in negotiations with entities or groups affected by the Plan;

(4)     Participate in hearings and, if requested, testify before the bankruptcy court with respect to the matters upon which Miller Buckfire has provided advice, including, as relevant, coordinating with the City's counsel with respect to testimony in connection therewith;

(5)     Serve as an Independent Registered Municipal Advisor for the purposes of issuance of municipal securities under the Plan pursuant to rules pertaining to the registration of municipal advisors issued by the U.S. Securities and Exchange Commission that become effective July 1, 2014;

Page 3

    (6)    Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Miller Buckfire and the City; and,

    (7)    Serve as a "Designated Qualified Independent Representative" (within the meaning of CFTC Regulation 23.450) of the City and of the Detroit General Retirement System Service Corporation and the Detroit General Retirement System Service Corporation (in this context, each a "CP") in negotiations with certain swap dealers to settle such CP's obligations under certain existing derivative contracts. As such, Miller Buckfire represents to each CP as follows:

        a.    Miller Buckfire has written policies and procedures reasonably designed to ensure that Miller Buckfire satisfies the applicable requirements of CFTC Regulation 23.450(b)(1);

        b.    Miller Buckfire is exercising independent judgment in evaluating all "recommendations" (as such term is used in CFTC Regulations 23.434 and 23.440) with respect to any swaps provided by any swap dealer that are presented to Miller Buckfire;

        c.    unless Miller Buckfire otherwise notifies the CP and a swap dealer in writing:

            i.    Miller Buckfire is not and, within one year of representing such CP in connection with a swap with swap dealer has not been, an "associated person" (as that term is defined in Section 1a(4) of the Commodity Exchange Act) of such swap dealer;

            ii.    There is no "principal relationship" (as that term is defined in CFTC Regulation 23.450(a)(1)) between Miller Buckfire and any swap dealer entering a swap with the CP in which Miller Buckfire has acted as a Designated Qualified Independent Representative;

            iii.    Miller Buckfire (i) provides timely and effective disclosures to each CP of all material conflicts of interest that could reasonably affect Miller Buckfire's judgment or decision making with respect to Miller Buckfire's obligations to such CP and (ii) complies with policies and procedures reasonably designed to manage and mitigate such material conflicts of interest;

            iv.    Miller Buckfire is not directly or indirectly, through one or more persons, controlled by, in control of, or under common control with any swap dealer entering a swap with a CP in respect of which Miller Buckfire has acted as a Designated Qualified Independent Representative; and

            v.    To the best of Miller Buckfire's knowledge, no swap dealer entering a swap with a CP in respect of which Miller Buckfire has acted as a Designated Qualified Independent Representative has referred, recommended, or introduced Miller Buckfire to such CP within one year of Miller Buckfire's representation of such CP in connection with any Swap with such swap dealer; and

        d.    Miller Buckfire is legally obligated to comply with the applicable requirements of CFTC Regulation 23.450(b)(1) by agreement, condition of employment, law, rule, regulation, or other enforceable duty.

## Asset Monetization

    (1)    Study and evaluate each Marketed Asset;

    (2)    Provide financial advice and assistance to the City in connection with an Asset Monetization, identify potential acquirors and, at the City's request, contact such potential acquirors;

(3)  Assist the City in preparing memoranda (with any amendments or supplements thereto, the "Sale Memoranda") to be used in soliciting potential acquirors, it being agreed that (A) the Sale Memoranda shall be based entirely upon information supplied by the City, (B) the City shall be solely responsible for the accuracy and completeness of the Sale Memoranda, and (C) other than as contemplated by this subparagraph (C)(ii), the Sale Memoranda shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Miller Buckfire 's prior written consent;

(4)  Assist the City and/or participate in negotiations with potential acquirors; and

(5)  Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Miller Buckfire and the City.

### Financing

(1)  Provide financial advice and assistance to the City in structuring and effecting a Financing, identify potential Investors and, at the City's request, contact such Investors;

(2)  Assist the City and any other advisors hired to assist with the Financing in developing and preparing memoranda (with any amendments or supplements thereto, the "Financing Offering Memoranda") to be used in soliciting potential Investors, it being agreed that (A) the Financing Offering Memoranda shall be based entirely upon information supplied by the City, (B) the City shall be solely responsible for the accuracy and completeness of the Financing Offering Memoranda, and (C) other than as contemplated by this subparagraph (B)(ii), the Financing Offering Memoranda shall not be used, reproduced, disseminated, quoted or referred to at any time in any way, except with Miller Buckfire's prior written consent;

(3)  Assist the City and/or participate in negotiations with potential Investors;

(4)  Serve as an Independent Registered Municipal Advisor for the purposes of issuance of municipal securities under a Financing pursuant to rules pertaining to the registration of municipal advisors issued by the U.S. Securities and Exchange Commission that are effective July 1, 2014;

(5)  Provide Financing services in connection with a debtor-in-possession Financing proposed to be raised by the City;

(6)  Provide Financing services in connection with a financing proposed to be raised by the City in connection with the City's exit from bankruptcy protection (an "Exit Financing"); and

(7)  Provide Financing services in connection with a DWSD Financing proposed to be raised by the City; and

(8)  Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Miller Buckfire and the City;

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Miller Buckfire to act in any capacity or to underwrite, place or purchase any financing or securities.

### DWSD Transaction

(1)  Study and evaluate DWSD and its business prospects;

(2)  Identify and analyze the financial alternatives available to the City with respect to DWSD;

(3)  Develop the strategy and tactics to be used in evaluating these alternatives in the market and conduct a marketing process for DWSD that may result in a DWSD

Transaction and/or an operating and maintenance agreement with respect to the operation and maintenance of DWSD;

(4) If a DWSD Transaction is pursued:

    a. Provide analysis and advice in connection with the consideration of offers received relating to a DWSD Transaction; and

    b. As directed by the City, assist in the negotiation of definitive agreement(s) with prospective operator(s) and/or investor(s).

(5) Provide such other financial advisory services as may from time to time be specifically agreed upon in writing by Miller Buckfire and the City.

Opinions

(1) If requested by the City in connection with a DWSD Transaction, or other Asset Monetization, Miller Buckfire will provide, in accordance with its customary practice, an opinion (the "Opinion") to the City, with respect to the adequacy or fairness, from a financial point of view, of the consideration to be received by the City in such monetization, it being understood that the Opinion shall be in such form as Miller Buckfire shall determine and Miller Buckfire may qualify the Opinion in such manner as Miller Buckfire believes appropriate. The Opinion shall not address the City's underlying strategic decision to effect any such transaction.

## III.   **General**

Notwithstanding the provisions of Section I of Exhibit A to the Contract, this Services Contract shall be effective as of January 9, 2013, and shall terminate upon consummation of a Restructuring of the City unless extended by the City and Miller Buckfire pursuant to a written agreement except for those provisions of the Contract which by their terms survive termination.

## **EXHIBIT B**

## **FEE SCHEDULE**

### I. **General**

(1) The Contractor shall be paid a financial advisory fee of $500,000 per month through December 2013, and $300,000 per month thereafter through the consummation of a plan of adjustment or the termination of this Contract by the City (the "Monthly Advisory Fee"). The Monthly Advisory Fee shall be invoiced promptly upon the end of each month. One hundred percent of any Monthly Advisory Fee paid in respect of this engagement, for the period beginning on September 1, 2013 and ending on September 30, 2014, shall be credited against the Restructuring Fee (as defined below) earned by Miller Buckfire. Fifty percent of any Monthly Advisory Fee paid in respect of this engagement for the period beginning October 1, 2014 and thereafter shall be credited against any Restructuring Fee earned by Miller Buckfire.

(2) One hundred percent of any fees actually paid in connection with any Debtor-in-Possession Financing services and Swap Settlement services pursuant to the Prior Change Order, shall be credited against the Restructuring Fee earned by Miller Buckfire.

(3) The fee for any such Opinion, as defined in Exhibit A, shall be mutually agreed upon in writing by Miller Buckfire and the City . One hundred percent of any fees paid in connection with any Opinion shall be credited against the Restructuring Fee earned by Miller Buckfire.

(4) If at any time during (i) the term of this Contract or (ii) within twelve full months following the expiration of this Contract or the termination of this Contract by the City other than for cause (such period including the term of this engagement, the "Fee Period"), any Restructuring is consummated or an agreement in principle, definitive agreement or Plan to effect a Restructuring is entered into and concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), any Restructuring is consummated, the City shall pay Miller Buckfire a flat fee (the "Restructuring Fee") of $28,000,000 (Twenty-Eight Million Dollars).

    a. Notwithstanding anything to the contrary in the Original Contract, the Restructuring Fee shall be payable 80% upon confirmation of a plan of adjustment of the City and 20% upon consummation of such Restructuring.

    b. Notwithstanding anything to the contrary in the Original Contract, Miller Buckfire acknowledges that the City may cause DWSD to pay any transactions fees due to Miller Buckfire related to a DWSD Transaction or DWSD Restructuring on behalf of the City. However, any such allocation to DWSD does not impact the City's obligation to Miller Buckfire until and unless such fees are paid.

    c. It is understood and agreed that the Restructuring Fee is the total amount of fees to be paid in respect of any and all services performed under this Amended and Restated Change Order as described in Exhibit A, subject to amounts to be credited as described in this Exhibit B.

This Amended and Restated Change Order and the Original Contract are hereby approved and ratified in all aspects as valid and binding obligations of Miller Buckfire and the City notwithstanding anything to the contrary in the Original Contract, including without limitation the requirements set forth in Article 17 or any other provision of the Original Contract requiring approval of appropriate City departments, the City Council and the signature of the Purchasing Director.

In witness whereof, the parties have executed this Amended and Restated Change Order to the Contract as of June 16, 2014.

Contractor:
Miller Buckfire & Co., LLC

By: _Kenneth R Buckfire_

Kenneth A. Buckfire
President

City of Detroit

By: _____

Kevyn D. Orr
Emergency Manager
City of Detroit

## Exhibit 1-E

## Amendment to Service Contract, December 10, 2014

## AMENDED AND RESTATED CHANGE ORDER #1
### ADDENDUM TO EXHIBITS A & B TO INCLUDE ADDITIONAL REQUESTED SERVICES AND REVISED FEES

This amendment, dated December 10, 2014 (the "Amendment") amends the Amended and Restated Change Order #1, dated June 16, 2014, (the "Amended and Restated Change Order"), to that certain Services Contract, dated January 9, 2013, by and between the City of Detroit, Michigan (the "City") and Miller Buckfire & Co., LLC ("Miller Buckfire") (the "Original Contract" and as modified by this further Amendment, the "Contract").

Capitalized terms used, but not otherwise defined in this Amendment have the respective meanings ascribed to them in the Original Agreement. Except as specifically modified by this Amendment, all terms and conditions of the Amended and Restated Change Order shall continue in full force and effect and be unaffected by this Amendment.

Exhibit A and Exhibit B of the Contract are hereby amended and supplemented by adding the following additional services to be performed by Contractor and fees to be paid by the City to Contractor.

### ADDENDUM TO EXHIBIT A

#### SCOPE OF SERVICES

(1)     Pursuant to Section II and Section III of Exhibit A, the City and Miller Buckfire agree that Miller Buckfire shall provide ongoing advisory services beyond the consummation of a Restructuring related to Financing.

### ADDENDUM TO EXHIBIT B

#### FEE SCHEDULE

(1)     After Emergence, the Monthly Advisor Fee shall be $200,000 (the "Post-Emergence Monthly Fee"). If the City terminates this Contract before May 10, 2015, the City shall pay to Miller Buckfire upon notice of termination, a supplemental cash fee calculated as (a) $1,000,000, less (b) the Post-Emergence Monthly Fees already paid (an "Early Termination Fee"). Any Early Termination Fee or Monthly Advisory Fees paid for the period after Emergence will not be credited against the Restructuring Fee.

(2)     The total of Miller Buckfire's Restructuring Fee, Asset Monetization Fees, Financing Fees and Monthly Advisory Fees (net of all credits) for the period from the filing of the City's chapter 9 petition through the City's emergence from chapter 9 (excluding fees paid for periods prior to the chapter 9 case and excluding the fees for post-emergence Financing services described in the preceding paragraph) shall be $22,000,000 (Twenty-Two Million Dollars) (the "Agreed Chapter 9 Fee"), subject to the following:

(a) Payment in full to Miller Buckfire of the balance of the Agreed Chapter 9 Fee not yet paid ($951,243.55) by December 17, 2014; and

(b) The entry of an Order by the Bankruptcy Court, with the City's active support, of a finding of reasonableness with respect to Miller Buckfire's revised compensation.

Page 1

*In the event that the contractor's revised compensation not reflects*

Otherwise, Miller Buckfire's rights with respect to its compensation (including the Restructuring Fee of $28,000,000) as previously agreed are preserved.

(3)     Within five days of the Court finding that Miller Buckfire's revised compensation is reasonable, Miller Buckfire and/or its affiliates will fund a $1,000,000 cash donation to Detroit Residential Water Assistance Program (DRWAP), as administrated by The Heat and Warmth Fund (THAW).

This **ADDENDUM** is hereby approved and ratified in all aspects as valid and binding obligations of Miller Buckfire and the City notwithstanding anything to the contrary in the Original Contract, including without limitation the requirements set forth in Article 17 or any other provision of the Original Contract requiring approval of appropriate City departments, the City Council and the signature of the Purchasing Director.

In witness whereof, the parties have executed this Amended and Restated Change Order to the Contract as of December 10, 2014.

Contractor:
Miller Buckfire & Co., LLC

By: _____

James Doak
Managing Director

City of Detroit

By: _____

City of Detroit

**Exhibit 2**

**Comparable Chapter 11 Engagements and Fees**

# COMPARABLE TRANSACTIONS: DEBTOR ADVISOR FEES[1]

| Company | Petition Date | Debtor Advisor | Post-Petition Engagement Duration (Months)[2] | Total Obligations ($MM) | | Total Fees ($MM)[3] | All-in Fees % of Obligations |
|---|---|---|---|---|---|---|---|
| Tribune Company | Dec-08 | Lazard | 48 | $12,973 | | $20.8 | 0.160% |
| Lyondell Chemical Company | Jan-09 | Evercore | 15 | 23,864 | | 41.0 | 0.172% |
| Smurfit Stone | Jan-09 | Lazard | 17 | 4,147 | | 10.8 | 0.260% |
| Charter Communications, Inc. | Mar-09 | Lazard | 8 | 21,700 | | 16.5 | 0.076% |
| Idearc Inc. | Mar-09 | Moelis | 9 | 9,250 | | 10.2 | 0.110% |
| General Growth Properties | Apr-09 | Miller Buckfire | 19 | 27,300 | | 28.9 | 0.106% |
| AbitibiBowater Inc. | Apr-09 | Blackstone | 20 | 6,696 | | 20.6 | 0.307% |
| R.H. Donnelley Corporation | May-09 | Lazard | 9 | 10,402 [4] | | 16.4 [5] | 0.158% |
| Extended Stay America Inc. | Jun-09 | Lazard | 16 | 7,409 | | 15.6 | 0.211% |
| Lear Corporation | Jul-09 | Miller Buckfire | 4 | 3,600 | | 10.6 [6] | 0.295% |
| Capmark | Oct-09 | Lazard | 23 | 9,212 | | 18.5 [7] | 0.200% |
| AMR Corporation | Nov-11 | Rothschild | 25 | 21,384 [4][8] | | 29.5 | 0.138% |
| Residential Capital | May-12 | Centerview | 19 | 4,642 | | 22.0 [9] | 0.473% |
| Edison Mission Energy | Dec-12 | Perella Weinberg | 16 | 5,067 | | 12.0 | 0.237% |
| Cengage Learning Inc. | Jul-13 | Lazard | 8 | 5,804 | | 10.7 | 0.184% |

| | |
|---|---|
| High | 0.473% |
| Mean | 0.206% |
| Median | 0.184% |
| Low | 0.076% |

*Not included in summary statistics*

| Company | Petition Date | Debtor Advisor | Post-Petition Engagement Duration (Months)[2] | Total Obligations ($MM) | | Total Fees ($MM)[3] | All-in Fees % of Obligations |
|---|---|---|---|---|---|---|---|
| City of Detroit | Jul-13 | Miller Buckfire | 17 | $15,779 [6] | Pre-Mediation Fees | $29.1 | 0.184% |
| | | | | | Reduced Fees | 22.0 | 0.139% |

(1) Approved fees for debtors' investment bankers in cases commenced between December 2008 and December 2014 with prepetition obligations between $3 billion and $30 billion.
(2) Calculated from the petition date to the date of emergence.
(3) Includes all court-approved post-petition fees and pre-petition transaction fees, where such disclosure is available.
(4) Based on Plan of Adjustment Allowed Claim Amounts. Includes Total Debt and Unfunded Pension and Other Post-employment Benefits.
(5) Includes the $8.4 million in fees that the debtor paid Lazard pre-petition.
(6) Restructuring fee would have been $1.875 million higher had there been no pre-packaged plan.
(7) Includes $2.54 million in fees that the debtor paid Lazard pre-petition.
(8) Includes AMR's debt liabilities, off-balance sheet liabilities and guarantor subsidiaries' debt obligations.
(9) Includes DIP financing, interim and completion fees. If other restructurings had occurred, Centerview restructuring fees would have been higher.

none
none

none


MILLER BUCKFIRE
A Stifel Company

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing *Notice of Filing of Comments of James Doak on the Fees of Miller Buckfire & Co., LLC* was filed and served via the Court's electronic case filing and noticing system on this 16th day of January, 2015.

/s/ Heather Lennox