UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) ) ) | |
| Debtor. | ) ) ) | Case No. 13-53846 |
| | ) | Hon. Steven W. Rhodes |

**GREENHILL & CO., LLC, STATEMENT OF FEES AND EXPENSES SUBMITTED PURSUANT TO "ORDER REGARDING PROCESS TO DETERMINE THE REASONABLENESS OF FEES UNDER 11 U.S.C. § 943(b)(3)" [Docket No. 8999] ENTERED ON JANUARY 5, 2015**

### Summary Background

Name of Financial Advisor: Greenhill & Co., LLC

Financial Advisor to: The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit

Date of Retention: June 7, 2013

  Greenhill & Co., LLC ("Greenhill"), as financial advisor for The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS", and together with PFRS, the "Retirement Systems") respectfully makes this submission in support of the reasonableness of its compensation for actual and necessary financial advisory services rendered by Greenhill to the Retirement Systems and reimbursement of Greenhill's actual and necessary expenses, all in accordance with the terms of Greenhill's engagement letter, dated June 7, 2013 ("Engagement Letter") with the Retirement Systems, as

modified pursuant to agreement reached by and among representatives of Greenhill and the City of Detroit, in court-ordered mediation proceedings completed on December 10, 2014.[1]

In support hereof, Greenhill respectfully submits as follows:

### Background of Greenhill's Engagement

1. In April 2013, counsel to the Retirement Systems invited Greenhill to compete, along with a number of other nationally known financial advisory firms, for the role of financial advisor to the Retirement Systems in connection with the anticipated restructuring of the City of Detroit (sometimes referred to herein as the "Debtor").

2. Greenhill and its professionals have extensive experience providing independent advice and creative solutions to creditors in large and complex bankruptcy situations. This experience includes addressing pension plan funding issues for the PBGC in multiple cases, and retiree health obligations for the UAW with respect to General Motors.

3. After multiple interviews and arm's length fee negotiations, Greenhill was selected by the Retirement Systems because of: its extensive knowledge and reputation in this field; its familiarity with the issues involved in the case; the firm's sole focus on providing advice to clients (without conflicts from asset management, trading or lending activities); and because the Retirement Systems believed that Greenhill possessed the requisite resources and qualifications to represent the Retirement Systems.

### Terms and Conditions of Compensation of Greenhill

4. Arm's length negotiations between Greenhill and the Retirement Systems resulted in significant fee concessions by Greenhill, with no expectations for court review. The Retirement Systems agreed to pay Greenhill a retainer fee of $150,000 per month for the term of the engagement and a transaction fee of $3,550,000 upon the consummation of a Restructuring (the Debtor's confirmed Plan of Adjustment constitutes a "Restructuring" under the Engagement Letter). The Retirement Systems also agreed to reimburse Greenhill for its reasonable and actual out-of-pocket expenses and to indemnify Greenhill in accordance with the indemnification letter attached to the Engagement Letter (such fees, expense reimbursement and indemnity being referred to herein as the "Fee and Expense Structure").

---

[1] In the event the agreement reached in mediation is not approved by the Court or otherwise honored by the City of Detroit, Greenhill reserves the right to invoice and receive payment of the additional $750,000 in fees payable under the Engagement Letter, to challenge the Bankruptcy Court's jurisdiction to review the Retirement System's professional fees under Section 943 (b)(3) of the Bankruptcy Code, and to pursue its pending appeal of the Court's November 26, 2014 Opinion and Order Determining that the Fees and Expenses of the Retirement Systems' Professionals are Subject to 11 U.S.C. § 943(b)(3).

2

13-53846-tjt    Doc 9079    Filed 01/16/15    Entered 01/16/15 17:16:18    Page 2 of 8

5. Consistent with industry practice, Greenhill does not charge for its services on an hourly basis, but customarily charges a monthly advisory fee plus an additional deferred fee that is contingent upon the occurrence of a specified type of transaction. This customary type of fee structure benefits the clients as the full fee is not payable unless a restructuring (or other desired transaction) is achieved. The Fee and Expense Structure appropriately reflects the nature of the services provided by Greenhill and is comparable to the fee structures utilized by leading financial and restructuring advisors for comparable engagements, both in- and out-of-court.

6. The following table demonstrates that Greenhill's fee arrangement compares favorably to the fees charged by investment banking firms representing large creditor constituencies in other large, complex bankruptcies[2,3]:

| Range of Pre-petition Debt | Monthly Fee | Restructuring Fee | Restructuring Fee Calculation[i] | | |
|---|---|---|---|---|---|
| | | | 17 Monthlies Post-petition | Restructuring Fee | Total Fee[ii] |
| $3,000mm-5,000mm | $170,000 | $4,400,000 | $2,890,000 | $4,400,000 | $6,417,500 |
| $5,000mm-10,000mm | 195,833 | 5,348,503 | 3,379,167 | 5,348,503 | 8,266,675 |
| $10,000mm+ | 225,000 | 10,000,000 | 3,825,000 | 10,000,000 | 13,170,833 |

Note: Average fees based on Court filings regarding approved investment banker retentions in fourteen Chapter 11 cases over $3 billion filed between Q1-2008 and Q4-2014. Please see Appendix A for further detail underlying the table
(i) Assumes a 17-month bankruptcy process for comparability purposes
(ii) Does not include capital raising or M&A fees
Source: PACER

## Mediation and Total Adjusted Fees

7. Pursuant to the terms of the Engagement Letter, Greenhill would have invoiced the Retirement Systems for a total of $6,262,500 split between Monthly Retainer Fees and the Transaction Fee, plus out-of-pocket expenses of $199,928.

8. Following the court-ordered fee mediation on December 3, December 4 and December 10, Greenhill and representatives of the City of Detroit agreed to total compensation of $5,512,500 plus expenses, representing a $750,000 reduction from Greenhill's compensation pursuant to the Engagement Letter. The $750,000 reduction includes a $550,000 reduction in the Transaction Fee to $3,000,000 and an agreement by Greenhill not to bill the last two Monthly Retainer Fees in the prorated amount of $200,000 otherwise payable under the Engagement Letter. The $750,000 reduction in fees plus the reduction in fees negotiated with the Retirement

---

[2] Given the unprecedented size of the Debtors' chapter 9 case and the limited number of precedent chapter 9 cases in general, Greenhill's view of market fees is focused on precedent chapter 11 cases.
[3] In all but 3 of the 14 cases included in the table, the unsecured creditors' committees retained two financial advisors to perform services that, in aggregate, are similar to the services Greenhill performed as the sole financial advisor to the two Retirement Systems. The fees summarized in the table only include the fees associated with the investment banker for each unsecured creditors committee and do not include the fees charged by second financial advisors.

3

Systems prior to entering into the Engagement Letter together represent a material reduction from Greenhill's original fee proposal.[4]

9. Greenhill's transaction fee is market-based, deferred compensation that is triggered upon the occurrence of specific events described in the Engagement Letter, including the consummation of a Restructuring. The transaction fee is not an arbitrary "bonus" fee, but, rather, is a fee deferral that benefits the Retirement Systems. When Greenhill previously represented large creditors in AMR's and Delphi's chapter 11 cases on a monthly fee basis without any transaction fee, cases of size and complexity comparable to the chapter 9 case of the City of Detroit, Greenhill's monthly fee was $450,000. Over the approximately 17 months of Greenhill's retention by the Retirement Systems, this fee arrangement would have resulted in total fees of $7,650,000, an amount that is in excess of the total fees Greenhill would have earned in this case based on its Engagement Letter.

## Summary of Services Rendered

10. Greenhill committed a highly experienced team of restructuring professionals, with active involvement of the most senior members of the team, who devoted significant time and effort to perform effectively and expeditiously the required professional services. Each of the Greenhill professionals engaged in this matter spent a substantial portion of their professional time working on the case during most of the 18 months of the assignment and, during significant periods over the course of the engagement, its core team spent well over a majority of their professional time on the case.

11. Greenhill provided valuable insight and guidance to the Boards of the Retirement Systems, identified substantial additional sources of funding, and played a leading role in negotiations and mediations that ultimately paved the way for a successful restructuring for the City of Detroit.

12. The following summaries highlight certain key areas in which Greenhill provided essential services to the Retirement Systems.

> (a) <u>Debtor's Business Plans:</u> Greenhill extensively reviewed and analyzed multiple iterations of the Debtors' proposed business plan. Greenhill conducted substantial due diligence on the Debtors' operations, financial condition and proposed business plans and actively participated in extensive due diligence meetings with the Debtors' advisors and various parties-in-interest. To assist the Retirement Systems in evaluating the Debtors' restructuring proposals, Greenhill analyzed the financial projections for, among other things, the underlying assumptions, implementation risk and ability to execute given the Debtors' financial performance.

---

[4]To the extent Greenhill has any actual additional out-of-pocket expenses in connection with the assignment, Greenhill expects to invoice these additional out-of-pocket expenses to the Retirement Systems.

(b) <u>Pension Plan Status and Assumptions:</u> Greenhill assisted in reviewing actuarial and plan funding status based on the reports of third party actuaries, compared funded levels and asset return and other assumptions to other public pension plans and analyzed future benefit payment streams together with Gabriel Roeder. Greenhill also operated and used the "3 corner model" developed by Gabriel Roeder to help drive the negotiated settlement.

(c) <u>Value Available to Creditors:</u> Greenhill reviewed the Debtors' current and forecasted cash flows, capital structure, debt capacity and liquidity relative to future operational and funding needs. Greenhill also reviewed and championed additional potential sources of value and cash including DWSD, the Library, State contributions, parking, Detroit Windsor Tunnel and the DIA, among other sources.

(d) <u>Restructuring Negotiations:</u> Greenhill played a leadership role in negotiating the financial aspects of the restructuring and the resulting treatment of pension claims. In this capacity, Greenhill analyzed the impact of the Debtor's restructuring proposals, analyzed alternative sources of value and proposals, developed the financial terms of counter-proposals, and led the negotiations with respect to financial aspects of the restructuring. Greenhill also prepared numerous presentations to the mediators, State of Michigan representatives and the Debtor's representatives supporting the Retirement Systems' position in the restructuring negotiations.

(e) <u>Communication with Clients:</u> Greenhill regularly attended weekly Board meetings for each of GRS and PFRS either in person or telephonically to discuss due diligence findings and the status of restructuring negotiations among other topics. Greenhill also participated in additional regular telephonic and in-person meetings with the Retirement Systems' other professionals, including Clark Hill and Gabriel Roeder. Greenhill drafted and made numerous presentations to the Retirement Systems to keep them current on case developments, due diligence findings, analysis, negotiations and other matters.

(f) <u>Other:</u> Greenhill testified at the Debtor's eligibility trial and worked with the Retirement Systems and its counsel in preparing, developing, reviewing and revising numerous court filings, including numerous iterations of the Plan of Adjustment. Greenhill also represented the Retirement Systems at multiple "town hall" meetings after the final pension treatment was negotiated to help answer pensioners' questions and increase the likelihood that individual pensioners would vote in favor of the plan.

**Impact on Recoveries and Client Support for the Plan**

13. The Debtor's restructuring was accomplished on an expedited basis and resulted in a successful outcome for pension beneficiaries. After initially being offered only their pro rata share (~32%) of interest on a $2 billion non-recourse note (implying a base recovery of $182 million with amortization and revenue participation payments as potential upside), the

5

Retirement Systems are now estimated to receive ~$3.8 billion of contributions through the confirmed Plan of Adjustment. With respect to PFRS, the confirmed plan resulted in no cuts to existing benefits and reduced future COLA from 2.25% to 1.0%. With respect to GRS, the confirmed plan resulted in a 4.5% cut to existing benefits and no future COLA. The Retirement Systems also have the opportunity to benefit from a future restoration of cut benefits if investment returns outperform the 6.75% rate of return assumption in the Plan of Adjustment.

14. The favorable treatment of pension obligations was the result of multiple parties' efforts and the benefits of the Grand Bargain. As the financial advisor to the Retirement Systems, Greenhill performed an instrumental role in achieving this successful outcome. Key aspects of the pension settlement in which Greenhill took a leadership role include the following:

- Identifying, analyzing, promoting and bargaining for significant, direct contributions of value from DWSD to GRS that are expected to result in approximately $429 million of inflows to GRS through 2023;

- Helping persuade the Debtor to consider cash flows available to creditors beyond the original 10 year horizon to include 40 years of cash flows, in which an additional 30 years of cash flows are forecast to provide approximately $2,559 million of value to GRS and PFRS;

- Advocating for, and demonstrating the affordability of, maintaining defined benefit plans for plan participants;

- Leading the financial aspects of negotiating pension recoveries on behalf of the Retirement Systems including identifying sources of contributions and value, amounts of contributions, target funding ratios, and assumed investment returns among other factors;

- Leading the financial aspects of the pension restoration negotiation; and

- Explaining and advocating support for the treatment of pension claims embodied in the Plan of Adjustment with the GRS and PFRS boards and retirees.

Each of these items in which Greenhill played a critical role resulted in a substantial improvement in recoveries for pension beneficiaries and built support for the Plan of Adjustment amongst Greenhill's clients and their constituents. Ultimately, both Boards voted to support and recommend approval of the Plan of Adjustment inclusive of the pension modifications, Grand Bargain and board governance changes. Approximately 82% of PFRS claimholders and 73% of GRS claimholders voted to approve the Plan.

**Conclusion**

  Greenhill has provided valuable services to the Retirement Systems and has made a substantial contribution to the outcome of the case for its clients.  Greenhill's compensation was negotiated and agreed to by the Retirement Systems, previously reviewed by the Retirement Systems' respective counsel and Boards for reasonableness, and further reduced pursuant to agreement reached by and among representatives of Greenhill and the City of Detroit, in court-ordered mediation proceedings completed on December 10, 2014.  Moreover, Greenhill's compensation is commensurate with the complexity, importance and nature of the problems, issues and tasks involved, reflective of the significance of the work performed and outcomes achieved, and consistent with fees customarily charged in similar bankruptcy and non-bankruptcy situations**.**  Accordingly, Greenhill respectfully submits that its fees are reasonable.


  Respectfully Submitted,

**STEINBERG SHAPIRO & CLARK**


  /s/  Mark H. Shapiro

**Mark H. Shapiro (P43134)**
**Attorney for Greenhill & Co., LLC**
**25925 Telegraph Road, Ste. 203**
**Southfield, MI 48033**
**(248) 352-4700**
shapiro@ssc-law.com


**Date:  January 16, 2015**

# Appendix A: Summary of Selected Fee Comparables

| Debtor | Date Filed | Engagement Period (months) | Pre-Petition Debt ($mm) | Fees per Final Fee Order ||||| % of Total (Net) Restructuring Fees || Other |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Monthlies | Restructuring Fee || Total (Net) Restructuring Fees | Other Fees | Total Fees | Monthlies | Net Restructuring Fee | Additional Financial Advisor |
| | | | | | Gross | Net of Credits | | | | | | |
| Energy Future Holdings [1] | 29-Apr-14 | Pending | $41,776 | Case pending. Approved retention reflects a monthly fee of $250,000 and a restructuring fee of $10,000,000. Contingent fee of $3,000,000 payable upon consummation of any restructuring supported by the Committee. 50% of all monthly fees paid in respect of any month commencing with February 2015 shall be credited against the contingent fee. |||||| | | Yes |
| MPM Silicones [2] | 13-Apr-14 | 6.0 | 4,209 | Case pending. Approved retention reflects a monthly fee of $150,000 and a restructuring fee of $2,500,000 subject to plan support of the relevant majority of the committee. 50% of all monthly fees paid in excess of $900,000 shall be credited against the Restructuring fee. |||||| | | Yes |
| Residential Capital | 14-May-12 | 19.5 | 4,642 | $7,991,129 [3] | $7,750,000 | $6,625,000 | $14,616,129 | - | $14,616,129 | 55% | 45% | Yes |
| AMR Corporation | 29-Nov-11 | 23.0 | 10,900 | 3,940,323 | 7,500,000 | 5,913,710 | 9,854,032 | $5,000,000 | 14,854,032 | 40% | 60% | Yes |
| Dynegy | 7-Nov-11 | 10.5 | 3,570 | 1,565,000 | 3,750,000 | 3,417,500 | 4,982,500 | - | 4,982,500 | 31% | 69% | No |
| NewPage Corporation | 7-Sep-11 | 15.0 | 3,405 | 1,727,957 | 2,000,000 | 1,386,022 | 3,113,979 | - | 3,113,979 | 55% | 45% | Yes |
| Capmark Financial Group | 25-Oct-09 | 23.0 | 8,922 | 4,586,667 | 16,691,018 | 16,691,018 [4] | 21,277,684 | - | 21,277,684 | 22% | 78% | Yes |
| Station Casinos | 28-Jul-09 | 22.5 | 5,931 | 2,400,000 [5] | 3,000,000 | 3,000,000 | 5,400,000 | - | 5,400,000 | 44% | 56% | No |
| Extended Stay America | 15-Jun-09 | 16.0 | 7,430 | 2,442,903 [6] | 2,500,000 | 1,928,548 | 4,371,452 | 341,129 [7] | 4,712,581 | 56% | 44% | No |
| R.H. Donnelley | 28-May-09 | 7.5 | 9,669 | 1,301,210 | 4,000,000 | 3,920,968 | 5,222,177 | - | 5,222,177 | 25% | 75% | Yes |
| AbitibiBowater | 16-Apr-09 | 19.5 | 6,696 | 3,800,000 | 3,000,000 | 2,250,000 | 6,050,000 | - | 6,050,000 | 63% | 37% | Yes |
| General Growth Properties | 16-Apr-09 | 18.5 | 27,300 | 4,897,957 | 12,500,000 | 11,000,000 [8] | 15,897,957 | - | 15,897,957 | 31% | 69% | Yes |
| Smurfit-Stone Container | 26-Jan-09 | 17.0 | 4,147 | 3,342,857 | 6,000,000 | 5,000,000 | 8,342,857 | - | 8,342,857 | 40% | 60% | Yes |
| Nortel | 14-Jan-09 | 43.5 | 4,485 | 8,500,000 | 2,900,000 | 825,000 | 9,325,000 | - | 9,325,000 | 91% | 9% | Yes |
| **Mean** | | 18.6 | | $3,874,667 | $5,965,918 | $5,163,147 | $9,037,814 | N.M. | $9,482,908 | 46% | 54% | |
| **Median** | | 18.5 | | 3,571,429 | 3,875,000 | 3,669,234 | 7,196,429 | N.M. | 7,196,429 | 42% | 58% | |
| **RSCD per Engagment Letter** | | 17.5 | | $2,712,500 [9] | $3,550,000 | $3,550,000 | $6,262,500 | N.M. | $6,262,500 | 43% | 57% | |
| **RSCD Adjusted** | | 17.5 | | 2,512,500 [9] | 3,000,000 | 3,000,000 | 5,512,500 | N.M. | 5,512,500 | 46% | 54% | |

Note: Engagement Periods rounded to the nearest half year; Other Fees include M&A, capital raising and other fees; %s of Total Net Restructuring Fees exclude Other Fees
(1) Case pending. Retention approved
(2) Case pending and final fee application submitted. Final fee application did not include restructuring fee
(3) Includes $3,600,000 in Monthlies earned from Moelis' supplementary engagement as financial advisor to the UCC in the UCC's evaluation of a proposed $8.7 billion RMBS settlement and other related RMBS claims
(4) Equals the sum of Houlihan's approved $13.1mm Total Incentive Fee and $3.6mm Net Base Fee
(5) Moelis voluntarily waived its right to continued Monthlies after the SCI Debtors confirmed their plan of reorganization in August 2010
(6) Jefferies ceased charging Monthly Fees as of July 20, 2010. Had Jefferies continued charging Monthly Fees through the end of the case, it would have been owed an additional $222,984
(7) Includes Jefferies' $100,000 Transaction Fee increase post-authorization and $25,000 Incremental Transaction Fee for each month after the sixth month of the Engagement Letter
(8) Includes a $1,500,000 Deferred Fee reduction established per Houlihan's Amended Engagement Letter filed with the Court on July 27, 2009
(9) Includes pre-petition monthly fees of $199,597
Source: PACER