# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                               :          Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :          Case No. 13-53846
                                    :
                     Debtor.        :          Hon. Thomas J. Tucker
                                    :
-----------------------------------------------------x

## POST-CONFIRMATION
## STATUS REPORT OF THE CITY OF DETROIT, MICHIGAN

The City of Detroit, Michigan (the "City") hereby files this

Post-Confirmation Status Report (the "Status Report") pursuant to this Court's

*Order Scheduling Post-Confirmation Status Conference* (Docket No. 9292)

(the "Status Report Order").  For its Status Report, the City respectfully represents

as follows:

## BACKGROUND

1.      The City filed its petition for relief under chapter 9 of title 11 of

the United States Code (the "Bankruptcy Code") on July 18, 2013.  On

December 5, 2013, the Court entered an order for relief after finding that the City

was eligible to be a debtor in a chapter 9 bankruptcy case (Docket No. 1946)

(the "Order for Relief").

2.      The City filed its first plan of adjustment and related disclosure statement on February 21, 2014. As a result of settlements with creditors achieved over time (including through extensive Court-ordered mediation) and other developments, the City filed successive revised plans of adjustment and disclosure statements.

3.      On October 22, 2014, the City filed the *Eighth Amended Plan for the Adjustment of Debts of the City of Detroit* (the "Plan")[1] reflecting settlements with virtually all major creditor groups. After the conclusion of a 24-day evidentiary hearing, the Court announced confirmation of the Plan in a bench ruling on November 7, 2014.[2] The Court subsequently issued an Order confirming the Plan on November 12, 2014 (Docket No. 8272) (the "Confirmation Order").

4.      On December 10, 2014 (the "Effective Date"), the Plan became effective in accordance with its terms. See *Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date* (Docket No. 8649). As further described in this Status Report, in connection with the Effective Date and thereafter, the City has

---

[1]      Except as otherwise defined herein, capitalized terms have the meanings given to them in the Plan.

[2]      On December 31, 2014, the Court entered the *Supplemental Opinion Regarding Plan Confirmation, Approving Settlements, and Approving Exit Financing* (Docket No. 8993), which supplemented this bench ruling.

consummated the vast majority of the transactions and distributions outlined in the Plan.

5.     Since the Effective Date, among other things, the City has (a) defended appeals of the Confirmation Order; (b) analyzed preferential transfers for potential avoidance and recovery under sections 547 and 550 of the Bankruptcy Code; (c) continued the process of resolving or objecting to Disputed Claims in accordance with the Plan, including claims related to the assumption or rejection of Unexpired Leases and Executory Contracts; and (d) addressed the few remaining matters to complete the implementation of the Plan.  The City also continued to participate in court-ordered mediation relating to the regional water authority, as further described below.

6.     On February 19, 2015, following the appointment of Judge Thomas J. Tucker as successor to retired Judge Steven W. Rhodes in this Chapter 9 Case, the Court issued the Status Report Order (a) scheduling a status conference (the "Status Conference") and (b) ordering the City to file a report in advance of the Status Conference briefly addressing nine identified issues relating to the Plan and the Chapter 9 Case.  Each of the nine issues identified by the Court in the Status Report Order is addressed in turn below.

7.     The City has retained the following legal professionals to assist in different aspects of the Chapter 9 Case following the Effective Date:

CHI-181957597v8

- Jones Day, which served as lead counsel in the Chapter 9 Case, continues to represent the City in appeals of the Confirmation Order, the Claims Reserve Motion (as defined below), a contract rejection dispute Wayne County and a handful of other discrete matters.

- Foley & Lardner, LLP represents the City with respect to most claims matters, including the prosecution of most claim objections.

- Miller Canfield represents the City with respect to (a) certain disputes relating to the assumption or rejection of Executory Contracts and Unexpired Leases and related cure and rejection damage claims, (b) union claims, (c) certain administrative claims and (d) other case administration matters. Miller Canfield also continues to advise the City with respect to the debt issued under the Plan, the disbursement process for Class 14 claims and in the lease negotiations for the Great Lakes Water Authority.

- Togut, Segal & Segal LLP represents the City with respect to potential preference actions.

- The City's Law Department is directly addressing the substantial number of litigation claims and certain other claims and contract matters, as well as coordinating and directing the remaining matters relating to the Chapter 9 Case.

      8.     This Status Report was jointly prepared by the City and its outside legal advisors.

# STATUS OF THE CHAPTER 9 CASE

## A.    Status of Plan Implementation[3]

9.    Through the efforts of the City and other parties, the Plan has

been substantially consummated.  As described in greater detail below, these

actions have included:  (a) transfers and transactions that occurred in connection

with the Effective Date, including the issuance of new debt and the steps needed to

implement the so-called "Grand Bargain" and the other settlements incorporated

into the Plan; (b) management of, and transfer of certain, City property pursuant to

the Plan; and (c) distributions to or on behalf of creditors pursuant to the Plan.

As a result of these efforts, virtually all steps needed to implement the Plan have

been completed.

### *Transfers and Transactions Effectuated Pursuant to the Plan*

10.    The major transfers and transactions contemplated by the Plan

and the Confirmation Order have occurred, including the following:

- *Disbursement of State Contribution.*  Pursuant to the State Contribution Agreement, on February 9, 2015, the State of Michigan disbursed $194.8 million to the City's Retirement Systems.

- *Commencement of DIA Funding Parties' Pension Payments.*  Pursuant to the DIA Settlement, the DIA and the Foundations have disbursed

---

[3]    In particular, the Status Report Order poses the questions:  "What is the status of the implementation of the confirmed plan?  What, if anything, is left to be done to implement the plan, and how soon will it be done?"  Status Report Order at ¶ 1.

$23 million to the CFSEM Supporting Organization. On the Effective Date, the CFSEM Supporting Organization disbursed $23 million to an escrow account held in the name of the City. On that same date, the City then caused the $23 million to be disbursed to the Retirement Systems, as required by the escrow agreement governing the escrow account.

- *Commencement of DIA Funding Parties' VEBA Payments.* Pursuant to the comprehensive settlement of pension, healthcare and other labor-related issues that the City entered into with employee and retiree representatives (the "Global Retiree Settlement"), on the Effective Date, the CFSEM Supporting Organization transferred $3,632,857 to an escrow account held in the name of the City to partially fund the two voluntary employee benefit associations established pursuant to Section II.B.s.ii of the Plan. On that same date, as required pursuant to the escrow agreement governing such escrow account, the City caused such funds to be disbursed to the Detroit General Retiree Health Care Trust (for the Detroit General VEBA) and the City of Detroit Police and Fire Retiree Health Care Trust (for the Detroit Police and Fire VEBA).

- *Issuance of Exit Facility Bonds.* On the Effective Date, the City issued $275 million in Financial Recovery Bonds, pursuant to the Exit Facility, for the (a) retirement of certain postpetition financing debt; (b) payment of certain claims; and (c) reinvestment in City services, infrastructure and equipment.

- *Issuance of Restructured UTGO Bonds.* On the Effective Date, the City issued and delivered $287.5 million in Distributable State Aid Fourth Lien Restructured Bonds (Unlimited Tax General Obligation) to the Michigan Finance Authority, which in turn delivered its corresponding bonds to the UTGO bondholders and insurers in exchange for $287.5 million of Prior UTGO Bonds in settlement of their Claims.

- *Issuance and Distribution of New B Notes.* The City has issued, and distributed the majority of, $632 million in New B Notes to satisfy Claims pursuant to the Plan. This includes the issuance of approximately $20.6 million in New B Notes to the Disbursing Agent for Class 14 Claims.

- *Issuance and Distribution of New C Notes.* The City has issued and distributed approximately $88 million in New C Notes to satisfy Claims pursuant to the Plan.

- *Transfer of Art Collection and Related Assets.* On the Effective Date, pursuant to the DIA Settlement, the City irrevocably transferred all of its right, title and interest in the DIA Assets to a perpetual charitable trust, including: (a) the DIA Collection; (b) the real property located at 5200 Woodward Avenue, Detroit, Michigan (the site of the DIA); and (c) associated parking lots and garages.

- *Modifications to Pension Plans.* The Retirement Systems have commenced implementation of pension plan modifications pursuant to the Plan, including implementation of (a) pension and COLA reductions, (b) ASF Recoupment and (c) income stabilization benefits for eligible applicants. The Retirement Systems have represented that they have taken steps so that the modifications will be reflected in the pension payments distributed by the Retirement Systems on March 1, 2015.

- *Debiting of Current ASF Accounts.* Pursuant to the Global Retiree Settlement, on January 2, 2015, excess interest totaling, in the aggregate, approximately $58.5 million was debited from the annuity savings fund accounts of substantially all current account holders.[4] ASF Recoupment thus is complete with respect to substantially all such account holders.

- *Receipt of ASF Lump Sum Payment Commitments.* Each annuity savings fund participant who previously received a distribution of the contents of his or her account has been provided the opportunity to elect to return excess interest in the form of a lump-sum payment, and the election period closed on January 21, 2015. Reductions in pension payments to ASF participants who declined to make a lump-sum payment will commence on March 1, 2015. For each ASF participant who elected to make a lump-sum payment but fails to timely remit the ASF Recoupment Cash Payment, deductions of annuitized excess amounts will begin on March 24, 2015.

- *Consummation of Syncora Settlement.* Pursuant to the Syncora Settlement: (a) the options to purchase certain land provided to Syncora were executed on the Effective Date, and memoranda thereof were

---

[4] Annuity savings fund excess amounts were debited – and thus ASF Recoupment was completed – for 5,278 of 5,283 current ASF account holders. Debits from the ASF accounts of five current ASF account holders failed for technical reasons and are being investigated by GRS.

CHI-181957597v8

recorded on December 11, 2014; (b) on the Effective Date, the lease of the Detroit Windsor Tunnel was amended and extended for approximately 20 years; and (c) the City paid $5 million to Syncora in satisfaction of claims relating to the COP Swap Agreements and certain related agreements.

- *Consummation of FGIC/COP Settlement.* On the Effective Date, pursuant to the FGIC/COP Settlement, the City executed the Development Agreement associated with the properties related to such settlement (specifically the property commonly referred to as the Joe Louis Arena and its parking structure). As part of this transaction, the City has also entered into a Memorandum of Understanding transferring property to Wayne County Community College District to obtain clean title on the Joe Louis Arena Garage.

- *Transfer of DDA Plan Recovery to FGIC.* Pursuant to the FGIC/COP Settlement, the Detroit Downtown Development Authority (the "DDA") has assigned to FGIC the New B Notes that the DDA was entitled to receive under the Plan.

- *Transfer of Settlement Credits.* On the Effective Date, pursuant to the Syncora Settlement and the FGIC/COP Settlement, the City transferred settlement credits to a trustee (on behalf of Syncora and FGIC) in the aggregate amount of $25 million that may be applied to the purchase price of certain eligible City assets, subject to the terms and conditions of those settlement credits.

### *Management of City Property Pursuant to the Plan*

11.    Since the occurrence of the Effective Date, the City and other appropriate entities have resumed or initiated management of substantially all of the property dealt with by the Plan. Such actions include the following:

- *Resignation of Emergency Manager.* Upon the occurrence of the Effective Date, the City's emergency manager, Kevyn D. Orr (the "Emergency Manager"), resigned, thereby fully restoring day-to-day management of the City to the Mayor and City Council.

- *Termination of Financial Emergency.* On December 9, 2014, pursuant to Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, M.C.L. §§ 141.1541, et seq. ("PA 436"), the Governor of Michigan, Richard D. Snyder, approved the termination of (a) the City's financial emergency status and (b) the Emergency Manager's contract, in both cases upon the occurrence of the Effective Date.

- *End of Receivership.* On December 9, 2014, pursuant to Section 9(7) of PA 436, Governor Snyder determined that the financial condition of the City had been corrected in a sustainable fashion so as to justify removing the City from receivership upon the occurrence of the Effective Date.

- *Implementation of Reinvestment Initiatives.* The City began implementation of the $1.7 billion program of reinvestment initiatives (the "Reinvestment Initiatives") contemplated in, and made possible by confirmation of, the Plan. The Reinvestment Initiatives provide urgently needed funds for (a) public safety equipment, facilities and services; (b) blight remediation; (c) upgrades to City infrastructure, operations and information technology; and (d) public transportation improvements. On February 2, 2015, the City drew down approximately $24.9 million in proceeds of the Exit Facility to fund Reinvestment Initiatives, including approximately $8.4 million for the Detroit Police Department, $3.8 million for the Detroit Fire Department, $3.5 million for blight remediation and $1.9 million to upgrade information technology used by the City's Income Tax Division.

- *Budget Implementation.* Pursuant to Section 21(1) of PA 436, the City implemented a two-year budget, which includes contractual agreements assumed pursuant to the Plan and employment terms negotiated during the pendency of the Chapter 9 Case (including the implementation of new collective bargaining agreements negotiated with approximately 40 unions and incorporated into the Plan) and reflects the debt relief provided by the Plan.

- *Establishment of GLWA.* As contemplated by the Plan, the City, the State and the Counties of Oakland, Wayne and Macomb (collectively, the "Counties") entered into an agreement establishing a regional water and sewer authority known as the Great Lakes Water Authority (the "GLWA"). As part of this transaction, the City will lease its regional

water supply and sewer disposal systems for a 40-year period in exchange for an annual $50 million payment that will fund City water and sewer infrastructure projects or related expenses. The City and the Counties have adopted articles of incorporation for the GLWA. A Board of Directors for the GLWA has been appointed and began meeting, on a bimonthly basis, in December 2014. The State has awarded a $3.8 million grant for payment of costs associated with the transition of operations and oversight to the GLWA. Professionals have been hired to assist in all aspects of the transition and currently are preparing documents related to (a) the lease of the City's regional water supply and sewer disposal systems, (b) bondholder consents to the transfer and assumption of outstanding City water and sewer bonds by the GLWA and (c) the issuance of GLWA bonds.

- *Establishment of VEBAs.* Pursuant to the Global Retiree Settlement, two VEBAs have been established to assume the responsibility for providing healthcare benefits to City retirees who retired on or before December 31, 2014. The trustees of the VEBAs will assume day-to-day responsibility for providing benefits beginning on April 1, 2015 and are currently (a) working with vendors to monetize the New B Notes distributed to the VEBAs under the Plan, (b) negotiating contracts with insurers and (c) designing benefits plans.

- *Appointment of Detroit Financial Review Commission.* Pursuant to Michigan Public Act 181 of 2014, the Michigan Financial Review Commission Act, M.C.L. §§ 141.1631, et seq., the Michigan Financial Review Commission has undertaken its oversight responsibilities, which include broad authority to review the City's financial records, approve budgets and contracts and conduct financial audits of the City to ensure that the City uses sound budgets, develops realistic financial plans and manages its expenses to meet its financial obligations going forward.

- *Adoption of Pension Plan Governance Provisions.* Pursuant to the DIA Settlement and the State Contribution Agreement, both of the Retirement Systems adopted new governance and financial oversight mechanisms.

### **Substantial Completion of Plan Distributions**

12.     The City has substantially completed numerous payments and

distributions under the Plan, including the following:

- *Payment of Administrative Claims.* The City has made payments on account of Allowed Administrative Claims, including, on the Effective Date, cash payments satisfying allowed Postpetition Financing Claims. In addition, on the Effective Date, the City funded the Professional Fee Reserve.

- *Distributions on Account of Class 7 Claims (Cash).* Pursuant to the LTGO Settlement Agreement, on the Effective Date, the City paid approximately $55 million in cash to holders of allowed Class 7 Claims from proceeds of the Exit Facility and pledged gaming revenues.

- *Distributions on Account of Class 7 Claims (New B Notes).* On the Effective Date, the City issued approximately $17 million in New B Notes to the LTGO Distribution Agent for distribution to holders of allowed Limited Tax General Obligation Bond Claims.

- *Distributions on Account of Class 8 Claims.* On the Effective Date, pursuant to the UTGO Settlement Agreement, the City issued (a) approximately $280 million in Restructured UTGO Bonds to holders of Allowed Class 8 Claims and (b) approximately $8 million in Unlimited Tax General Obligation Bonds to the Settling UTGO Bond Insurers.

- *Distributions on Account of Class 9 Claims.* The City has distributed the Class 9 Settlement Asset Pool, including approximately $88 million in New C Notes distributed on the Effective Date, to the COP Trustee for the benefit of certain settling insurers of certificates of participation and settling Class 9 claimants.

- *Distributions on Account of Class 12 Claims.* On the Effective Date, the City distributed approximately $493 million in New B Notes to the VEBAs in satisfaction of allowed Class 12 Claims.

- *Distributions on Account of Class 13 Claims.* On the Effective Date, the City distributed approximately $3.7 million in New B Notes to FGIC as the assignee of the DDA, which was the holder of the Allowed Class 13 Claims.

- *Distributions on Account of Class 14 Claims.* On the Effective Date, the City distributed approximately $20.6 million in New B Notes to

CHI-181957597v8

the Disbursing Agent for subsequent distribution to holders of Allowed Class 14 Claims.

- _Distributions on Account of Class 15 Claims._  The City has retained a Disbursing Agent with respect to the Class 15 Claims and preparations are underway for initial distributions to holders of Allowed Class 15 Claims.

- _Distributions on Account of Class 17 Claims._  On the Effective Date, pursuant to the 36th District Court Settlement, the City made cash payments in partial or complete satisfaction of Class 17 Claims.

- _Payment of Cure Amount Claims._  Beginning on December 12, 2014, the City made cash payments to holders of certain Allowed Cure Amount Claims.

13.    The foregoing tasks substantially completed the implementation of the Plan.  The City represents that the primary tasks remaining to implement the Plan are:  (a) the establishment of the Disputed Claims Reserve for Class 14, (b) the resolution of remaining Disputed Administrative Claims, Disputed Cure Amount Claims and Disputed Claims in Classes 14 and 15; and (c) the completion of distributions on account of the remaining Administrative Claims, Cure Amount Claims and Claims in Classes 14 and 15.  Each of these matters is described in subsequent sections of this Status Report.[5]

---

[5]    In addition, the City will continue to take steps to address the requirements of the various settlements, debt instruments and other agreements approved by the Plan and the Confirmation Order.  These matters, however, are expected to be addressed in the normal course without the further involvement of the Court.

14.     The City intends to move promptly to complete the remaining plan implementation items.  Particularly given the number of litigation claims being liquidated in non-bankruptcy forums, the resolution of Class 14 Claims and related final distributions in Class 14 may not be completed for an extended period that is difficult to predict.  Nevertheless, these activities in other tribunals would not necessarily delay the closing of the Chapter 9 Case.

**B.     <u>Status of Claim Objections</u>**[6]

15.     The City's claim process is ongoing.  Over 3,900 proofs of claim were filed in the Chapter 9 Case.  Based upon its review of these proofs of claim, the City and its advisors believe most of the filed proofs of claim do not require a substantive objection.

16.     During the Plan confirmation process, the Court deferred further hearings on claims objections, and the City focused most of its limited resources on achieving the confirmation and the effectiveness of the Plan.  Following the occurrence of the Effective Date, the City has accelerated its review of proofs of claim to identify those that require objections.  The City will file objections to such proofs of claim as expeditiously as possible.

---

[6]     In particular, the Status Report Order poses the questions:  "What and how many further claim objections, if any, does the Debtor expect to file, and how soon will such claim objections be filed?"  Status Report Order at ¶ 2.

17.     The City already has objected to approximately 500 claims

through eleven omnibus objections, as well as many individual objections.

The claims that have been subject to objection are almost exclusively Class 14

Claims.  Thus far, the City has resolved over 400 claims pursuant to such

objections and through negotiations with creditors.  Six individual objections and

four omnibus objections, addressing over 100 proofs of claim, currently are

pending before this Court.

18.     Presently, the City, with its professionals, is reviewing

approximately 250 non-litigation claims (e.g., trade claims, rejection damage

claims and union claims) for potential objections.  The City plans to file additional

claims objections, including omnibus objections and individual objections,

between now and the Claims Objection Bar Date of June 8, 2015.  Although

the exact number of objections necessary is uncertain at this time, the City has

identified at least 25 additional proofs of claim that will require an objection;

however, the actual number of claims ultimately subject to additional objections is

likely to be significantly higher.  The City is working to have all claims objections

filed by the Claim Objection Bar Date.[7]

---

[7]     Nevertheless, the City reserves its right to seek an extension of the Claims
        Objection Bar Date, as permitted by Section VI.C.3 of the Plan, if necessary.

CHI-181957597v8

19.     More than 1,500 creditors filed proofs of claim for claims that have been allowed or otherwise are entitled to specific treatment in the Plan. These include, among others, PFRS Pension Claims in Class 10, GRS Pension Claims in Class 11 and OPEB Claims in Class 12, as well as various claims that are unaffected by the Plan (e.g., workers' compensation claims subject to Section IV.Q of the Plan, certain self-insured claims under Section IV.S of the Plan, utility deposit claims subject to Section IV.U of the Plan and tax refund claims subject to Section IV.T of the Plan).  The City is evaluating the best approach to these claims.  Because these claims already are specifically addressed by the Plan, the filing and service of notice of classification and treatment may be sufficient in some (if not all) cases.  However, to avoid any controversy in the future (e.g., that these claims are deemed "allowed" in Class 14), the City may file objections to some or all of these claims to obtain a Court order confirming that they are subject to the proper classification and treatment under the Plan (or, where appropriate, disallowing the claims since they will be addressed outside of the bankruptcy claim process).

20.     The City is reviewing approximately 12 Administrative Claims (excluding claims under section 503(b)(9) of the Bankruptcy Code).  Three of these Administrative Claims were not timely filed, and the City intends to file objections on that basis.  Another Administrative Claim is expected to be

withdrawn by the claimant. With respect to the remaining eight Administrative Claims, the City is in discussions with four parties to reconcile their claims and is evaluating the other four claims. The City's deadline to object to the timely filed Administrative Claims is May 11, 2015.

21. Finally, the City is continuing the complex and time intensive process of addressing approximately 1,400 litigation claims.[8] These include some of the largest claims asserted in Class 14, as well as numerous unliquidated claims. The City's Law Department has been administering these claims, most of which were subject to the Court's ADR Procedures Order. To date, more than 470 of the litigation claims have been resolved, nearly 60 have been withdrawn and approximately 70 have been expunged. Of the remaining approximately 700 litigation claims, approximately 520 have been subject to stay modification notices under the ADR Procedures Order to date and are expected to be liquidated by non-bankruptcy tribunals if not otherwise resolved. Given the nature of the litigation claims – many of which are personal injury claims – and the number of these claims already being liquidated in non-bankruptcy tribunals, it is not

---

[8] The City continues to review the filed proofs of claim, including late-filed claims, to identify any additional litigation claims that must be addressed. Based on this review, approximately 100 additional litigation claims recently were identified.

expected that many (if any) of these claims will come before this Court for adjudication.

**C.  Impact of Claim Objections and the Claims Objection Process on Distribution of New B Notes to Class 14 Creditors**[9]

22.    The Plan provides for a *pro rata* distribution of certain New B Notes to the holders of Allowed Other Unsecured Claims in Class 14. Specifically, the Plan provides that holders of such Allowed Class 14 Claims are entitled to receive, unless they agree otherwise and in full satisfaction of such Claims, "a Pro Rata share of approximately $16.48 million in New B Notes" in addition to certain Excess New B Notes in the amount of approximately $4.1 million provided in connection with the Plan COP Settlement. Plan § II.B.3.u.i.  To permit distributions to holders of Allowed Class 14 Claims as expeditiously as practicable following the Effective Date and before all Disputed Claims are resolved, the Plan provides for the establishment and maintenance of a reserve (the "Disputed Unsecured Claims Reserve") to provide a source of recovery to holders of Disputed Claims in Class 14 that eventually become

---

[9]    In particular, the Status Report Order poses the question:  "What is the impact, if any, of the planned claim objections, and the resulting claims objection process, on the distribution of B Notes for Class 14 creditors under the confirmed plan?"  Status Report Order at ¶ 3.

CHI-181957597v8

Allowed Claims. Plan § VI.B. Currently, there are a substantial number of

Disputed Class 14 Claims, many of which are unliquidated (e.g., litigation claims).

23. As contemplated by the Plan, the City intends to file a motion

in the near term seeking Court approval of the proposed Disputed Unsecured

Claims Reserve (the "Claim Reserve Motion"). At this juncture, the City

anticipates that the Disputed Unsecured Claim Reserve (together with the amount

of Allowed Class 14 Claims) will substantially exceed the projected final allowed

amount of all Class 14 Claims as set forth in the Disclosure Statement.

See Disclosure Statement at 41 (estimating $150 million in aggregate Allowed

Class 14 Claims).

24. The City believes that many of the Disputed Class 14 Claims

included in the Disputed Unsecured Claims Reserve will be disallowed or

substantially reduced over time as a result of settlements, the prosecution of claim

objections before this Court and the liquidation of personal injury and other

litigation claims in non-bankruptcy forums. The ultimate recoveries for holders of

Allowed Class 14 Claims will depend on the outcome of the claims process.

Notably, there are a number of large Disputed Class 14 Claims (some exceeding

$100 million) that individually may have a substantial impact on the final

recoveries in Class 14.

**D.   Expected Adversary Proceedings
to Avoid and Recover Preferential Transfers**[10]

25.    The City identified and conducted a preliminary analysis of

transfers to approximately 3,000 parties made during the 90 days prior to

the Petition Date that may be avoidable and recoverable pursuant to sections 547

and 550 of the Bankruptcy Code (collectively, the "Preferential Transfers").

The City does not intend to pursue the recovery of Preferential Transfers received

by certain categories of transferees, including, without limitation, (a) healthcare

providers and insurers, (b) unions, (c) governmental agencies, (d) not-for-profit

entities and (e) transferees (primarily individual citizens) that each received

aggregate transfers of less than $25,000.

26.    With the assistance of its retained professionals, the City is

devoting time to an examination of Preferential Transfers made to the remaining

approximately 300 transferees – focusing its efforts on developing an estimate of

potential recoveries in light of potential defenses.  At this stage, the City cannot

accurately calculate the projected recovery amount.  The City deferred the analysis

of potential preferences until after the Effective Date because, prior to that time,

---

[10]    In particular, the Status Report Order poses the questions:  "How many
adversary proceedings seeking to avoid and recover alleged preferential
transfers, under 11 U.S.C. §§ 547 and 550, does the Debtor expect to file,
and how soon will such preference actions be filed?"
Status Report Order at ¶ 4.

CHI-181957597v8

the City's limited resources were consumed by (a) Plan negotiations, (b) Plan and Disclosure Statement preparation, (c) numerous contested hearings on Plan confirmation and other matters, (d) mediations relating to the Plan and other topics, (e) implementation of the Plan and (f) numerous other time-sensitive matters.

27.     To date, the City has identified Preferential Transfers totaling approximately $110 million made to those 300 remaining transferees. The diligence work for potential claims and defenses is still in its early stages and is ongoing.  Under the confirmed Plan, the City has preserved the right to commence adversary proceedings to pursue the avoidance and recovery of these Preferential Transfers.  Plan § III.D.2.

28.     It is not possible at this time to estimate the number of adversary proceedings that the City ultimately may commence to recover Preferential Transfers.  The City hopes that most of the preference claims can be resolved informally without the need for the commencement or prosecution of adversary proceedings.  To be timely, adversary proceedings to avoid and recover Preferential Transfers must be filed by December 5, 2015, which is two years from the entry of the Order for Relief.  See 11 U.S.C. § 546(a)(1)(A).

29.     As negotiations with recipients of Preferential Transfers progress, the City may determine that a resolution cannot be achieved without a formal complaint filed with this Court.  In that instance, the City will promptly file such a complaint, but the City expects such situations will be the exception rather than the norm.  The City will advise the Court if that expectation changes and more than a relatively small number of adversary proceedings will be required.

**E.     <u>Omnibus Scheduling Orders With Respect to Preference Actions</u>**[11]

30.     The City has not yet determined whether it will need omnibus scheduling orders with respect to preference actions.  Following the City's analysis of the remaining Preferential Transfers, and if complaints regarding the Preferential Transfers must be filed, the City will seek one or more omnibus scheduling orders as necessary or appropriate.

---

[11]     In particular, the Status Report Order poses the question:  "Whether one or more omnibus/blanket scheduling orders should be entered with respect to the preference actions to be filed?"  Status Report Order at ¶ 5.

-21-

CHI-181957597v8

13-53846-tjt     Doc 9306     Filed 02/26/15     Entered 02/26/15 17:59:08     Page 21 of 33

**F.** **Mediation Orders for Preference Actions and Claim Objections**[12]

31.     The City cannot determine whether mediation will facilitate the resolution of claim objections or any preference actions until more facts are known.  The City also submits that these decisions should be made on a case-by-case basis.  The City believes that subjecting all disputed claim objections and preference actions to mediations would add unnecessary costs and delays.  Where the City determines based on the facts and its experience that mediation would assist in resolving a claim objection or a preference action, it will ask the Court to submit these matters to mediation.[13]

---

[12]     In particular, the Status Report Order poses the question:  "Whether and to what extent mediation orders, including orders for mediation under the procedures of L.B.R. 7016-2, are likely to be appropriate for the preference actions to be filed, and/or for claims objections to be filed?"  Status Report Order at ¶ 6.

[13]     By order of the Court dated September 25, 2014, the City's largest asserted claim, filed by AFSCME Counsel 25 and its affiliated Detroit locals ("AFSCME") in a liquidated amount of approximately $8.7 billion plus unliquidated amounts (Proof of Claim No. 2958) (the "AFSCME Claim"), was submitted to facilitative mediation before the Honorable Judge Victoria Roberts.  See Docket No. 7663.  This mediation ultimately proved unsuccessful in resolving the parties' disputes.

## G.    Other Expected Adversary Proceedings[14]

32.    At this time, other than potential preference actions, the City is not aware of any matters for which an adversary proceeding is likely to be filed. Nevertheless, the City expects that it may become necessary at some point to bring adversary proceedings to enjoin any actions of third parties that violate the terms of the Plan and the Confirmation Order.

## H.    Contested Matters[15]

33.    The City currently is aware of a small number of contested matters (in addition to any claim objections and the Claims Reserve Motion described above).

### *Assumed Contract Disputes*

34.    There are several matters pending with respect to the Plan's treatment of Executory Contracts and Unexpired Leases.  On August 4, 2014, the Court entered an Order (Docket No. 6512) (the "Contract Procedures Order")

---

[14]    In particular, the Status Report Order poses the questions:  "What is the nature and number of any other types of adversary proceedings, if any, that the Debtor expects to file, and how soon will any such actions be filed?" Status Report Order at ¶ 7.

[15]    In particular, the Status Report Order poses the question:  "What other contested matters, if any, does the Debtor expect will be filed and need to be resolved before this bankruptcy case can be closed?" Status Report Order at ¶ 8.

CHI-181957597v8

approving certain procedures with respect to the proposed rejection, assumption or assumption and assignment of Executory Contracts and Unexpired Leases pursuant to the Plan. In accordance with the Contract Procedures Order, on November 21, 2014, the City filed the *Notice of Filing Non-Exclusive List of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Eighth Amended Plan for the Adjustment of Debts of the City of Detroit* (Docket. No. 8387). The City received approximately 30 responses. Currently, there are five pending objections and nine other parties whose objection deadlines have been extended by the City. <u>See</u> Docket. Nos. 8629, 8952, 8959, 9105 & 9117. The City's deadlines to reply to each of the pending objections occur on various dates within the first week of March. The City is hopeful that the majority of the contract assumption responses will be resolved without the need for a Court hearing.

### ***Rejected Contract Dispute with Wayne County***

35. There is one pending dispute related to a rejected Executory Contract. Pursuant to Section II.D.6 of the Plan and the terms of the Confirmation Order, the City rejected the *Agreement to Purchase and Develop Land,* dated July 28, 1976 (the "<u>Purchase Agreement</u>"), between the City and Wayne County under section 365 of the Bankruptcy Code. On January 26, 2015, Wayne County filed a late opposition to the rejection of the Purchase Agreement (Docket No. 9108), and the City filed a reply on February 2, 2015 (Docket No. 9174). On

February 9, 2015, Wayne County and the City entered into a stipulation to extend the time to meet and confer regarding this dispute under the Contract Procedures Order until February 26, 2015 (Docket No. 9215). The Court entered an order approving this stipulated extension of time (Docket No. 9243).

36.     Despite the additional time, the City and Wayne County have not reached a resolution of this dispute, and the City will ask the Court to schedule a hearing on this matter in the near term.

### *Other Contested Matters*

37.     The City expects that creditors and other third parties may file requests for relief that it may need to oppose.[16] In addition, the City expects that it may become necessary at some point to file motions to address any actions of third parties that violate the terms of the Plan and the Confirmation Order.

---

[16]     For example, on February 19, 2015, Frazier Cunningham filed his *Corrected Motion to Exclude Claim by Citizen Against Detroit Police Office for Intention Act/Civil Rights Violation from Detroit's Bankruptcy and to Allow the Case to Proceed in Wayne County (Michigan) Circuit Court* (Docket. No. 9293). Later on February 19, 2015 the Court entered a Notice of Deficient Filing with respect to this motion (Docket No. 9295). If re-filed in a manner that corrects the deficiency, the City expects to oppose this motion.

CHI-181957597v8

## I.     Other Matters[17]

38.     The City notes the following other matters relevant to the

Chapter 9 Case:

### *Pending Appeals of the Confirmation Order*

39.     A small number of parties have filed appeals of

the Confirmation Order to the United States District Court for the Eastern District

of Michigan (the "District Court").  Currently, there are seven separate appeals of

the Confirmation Order pending before the District Court (together,

the "Confirmation Appeals"):

- Six appeals were initiated by individual City retirees or retiree groups objecting to the treatment of their pension claims under the Plan;[18] and

- One appeal was initiated by Jonathon Aaron Brown on behalf of a class of others allegedly similarly situated, objecting to the classification of

---

[17]     In particular, the Status Report Order poses the question:  "What other matters relating to the future and/or the closing of this case, if any, does the Debtor wish to discuss with the Court at the status conference?"  Status Report Order at ¶ 9.

[18]     The appellants and case numbers of the Confirmation Appeals related to the treatment of pension claims under the Plan are as follows:

- William Ochadleus, et al., Case No. 14-14872 (E.D. Mich.);
- John P. Quinn, Case No. 14-14899 (E.D. Mich.);
- Thomas J. Cipollone, Case No. 14-14910 (E.D. Mich.);
- Irma Industrious & Dennis Taubitz, Case No. 14-14917 (E.D. Mich.);
- William Davis, Case No. 14-14920 (E.D. Mich.); and
- Lucinda Darrah, Case No. 15-10036 (E.D. Mich.).

certain Section 1983 Claims as Class 14 Claims and alleging related violations of the United States Constitution.[19]

40.     Each appellant has filed an opening brief in the Confirmation Appeals.  Thereafter, the City filed motions to dismiss each of the Confirmation Appeals as equitably moot (collectively, the "Motions to Dismiss").  The Motions to Dismiss remain pending, with responses due in approximately three weeks.

41.     One of the City's appellate briefs is due on February 27, 2015, but the responsive briefing in the other appeals has been extended until 14 days after the appellants respond to the Motion to Dismiss.

### *AFSCME Claim Classification Appeal*

42.     On October 20, 2014, the Court entered an order (Docket No. 8015) (the "Claim Classification Order") determining that two components of the AFSCME Claim were properly classified as a GRS Pension Claim in Class 11 under the Plan and as an OPEB Claim in Class 12 under the Plan, respectively.  AFSCME (a) alleges that these claims should be classified as Other Unsecured Claims in Class 14 under the Plan and (b) appealed the Claim Classification Order to the District Court.  See Case No. 14-14548 (E.D. Mich.). AFSCME filed its opening brief, and the City's responsive brief is due on March 2, 2015.

---

[19]     Case No. 14-14919 (E.D. Mich.).

## *Mediation Related to the GLWA*

43.     As noted above, the City, the State and the Counties entered

into an agreement establishing the GLWA as contemplated by the Plan.  On

November 26, 2014, the Court entered a Mediation Order (Docket No. 8468)

("GLWA Mediation Order") ordering parties "to continue to engage in facilitative

mediation of any matters regarding the formation of the Great Lakes Water

Authority . . . ."  Id. at 1.  The Honorable Judge Sean Cox of the District Court

serves as the mediator for GLWA matters.  Id. at ¶ 1.

44.     The Mediation Order provides that this mediation will not

extend beyond 200 days past the formation of the GLWA (i.e., June 14, 2015).  Id.

at ¶ 8.  The Court subsequently issued a Mediation Confidentiality Order

(Docket No. 9176) on February 6, 2015 that prohibited the disclosure of

discussions and documents by members of a working group tasked with

negotiating a lease and related agreements between the GLWA and the City,

except as permitted by that order.

45.     At this time, the City does not contemplate that any relief will

be sought from this Court with respect to the GLWA or the matters subject to the

GLWA Mediation Order.

~ ~ ~ ~ ~

46.    The City and its counsel will be available to answer

the questions on these matters at the Status Conference set for March 4, 2015.

CHI-181957597v8

Dated: February 26, 2015       Respectfully submitted,


/s/  Heather Lennox
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
hlennox@jonesday.com

ATTORNEYS FOR THE CITY


/s/ Jonathan S. Green
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

By: /s/ Melvin Butch Hollowell
Melvin Butch Hollowell
Corporation Counsel
Coleman A. Young Municipal Center
2 Woodward Avenue - Suite 500
Detroit, Michigan  48226
Telephone:  (313) 224-4550
Facsimile:  (313) 224-5505

ATTORNEY FOR THE CITY


By: /s/ John A. Simon
John A. Simon (P61866)
Jeffrey S. Kopp (P59485)
Tamar N. Dolcourt (P73425)
FOLEY & LARDNER LLP
500 Woodward Ave., Ste. 2700
Detroit, Michigan  48226
Telephone:  (313) 234-7100
Facsimile:  (313) 234-2800
jsimon@foley.com
jkopp@foley.com
tdolcourt@foley.com

ATTORNEYS FOR THE CITY

CHI-181957597v8

By: /s/ Albert Togut
Albert Togut
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
altogut@teamtogut.com

ATTORNEYS FOR THE CITY

CHI-181957597v8

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Post-Confirmation Status Report of the City of Detroit, Michigan was filed and served via the Court's electronic case filing and noticing system on this 26th day of February, 2015.

/s/  Heather Lennox

CHI-181957597v8