B10 (Official Form 10) (04/13)



| UNITED STATES BANKRUPTCY COURT   EASTERN DISTRICT OF MICHIGAN | | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor:<br><br>City of Detroit, MI<br>Terry Sutton<br>Sharon Nichols | Case Number:<br><br>13-53846 |
|---|---|

**FILED**

FEB 1 9 2014

US Bankruptcy Court
MI Eastern District ONLY

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Delania Patterson, as Personal Representative for the Estate of Sherrill Turner, Deceased, et a

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Fieger, Fieger, Kenney, Giroux & Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075

Telephone number: (248) 355-5555   email: j.harrington@fiegerlaw.com; d.berry@fiegerlaw.com

Court Claim Number: _____
   (*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above):




Telephone number:              email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**   $_____10,000,000.00_____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Personal Injury/Wrongful Death
   (See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as:<br><br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br><br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❏Real Estate ❏Motor Vehicle ❏Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate** _____% ❏ Fixed  or  ❏ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❏ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

❏ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(__).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

13-53846-tjt   Doc 9486-2   Filed 03/23/15   Entered 03/23/15 15:12:54   Page 1 of 71

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:   Please refer to Addendum attached.

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor,   ☐ I am a guarantor, surety, indorser, or other codebtor.
                                                                  or their authorized agent.     (See Bankruptcy Rule 3005.)
                                                                  (See Bankruptcy Rule 3004.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:   James J. Harrington, IV
Title:        Attorney/Partner
Company:      Fieger, Fieger, Kenney, Giroux & Harrington                              2/19/14
Address and telephone number (if different from notice address above)    (Signature)   (Date)

Telephone number:                           email:
*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**
*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*
**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

# PROOF OF CLAIM

## ADDENDUM

TABLE OF CONTENTS

1.  Wayne County Circuit Court Complaint, Case No. 08-111034-NO

2.  Michigan Court of Appeals Opinion & Order, dated 12/07/2010

3.  Michigan Supreme Court Order, dated 01/04/2012

4.  Plaintiffs' Facilitation Summary

5.  Agreement to Arbitrate

6.  Detroit City Counsel - Regular Session Agenda

1



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DELAINA PATTERSON, as Personal Representative
for the Estate of SHERRILL TURNER, deceased, and
ROBERT TURNER, a minor, Individually, by his
Next Friend, DELAINA PATTERSON,

                Plaintiffs,

vs.

SHERRY NICHOLS,
and TERRI SUTTON,

                Defendants.

08-111034 NO  4/30/2008
JDG:JOHN A MURPHY
PATTERSON DELANIA PER REP
VS
NICHOLS SHERRY

_____/

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Johnson, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

_____/

## COMPLAINT AND JURY DEMAND

**A civil action between these parties or other parties arising out
of the transaction or occurrence alleged in the complaint has
been previously filed in this court, Wayne County Circuit Court,
where it was given docket number 06-610386 NO and was
assigned to Judge John A. Murphy. The action is dismissed.**

NOW COME Plaintiffs, DELAINA PATTERSON, as Personal Representative for the

Estate of SHERRILL TURNER, deceased, and ROBERT TURNER, a minor, Individually,

by his Next Friend, DELAINA PATTERSON, by and through their attorneys, FIEGER,

FIEGER, KENNEY & JOHNSON, P.C., and for their First Amended Complaint against the

above named Defendants state as follows:

      1.     At all times relevant hereto, Plaintiff's decedent, SHERRILL TURNER was

resident of the City of Detroit, County of Wayne, State of Michigan.

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

FIEGER, FIEGER, KENNEY, JOHNSON & GROUIX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

2.     At all times relevant hereto, Plaintiff ROBERT TURNER, a minor, was a resident of the City of Detroit, County of Wayne, State of Michigan.

3.     At all times relevant hereto, DELAINA PATTERSON has been duly appointed Personal Representative of the Estate of SHERRILL TURNER by the Wayne County Probate Court.

4.     At all times relevant hereto, DELAINA PATTERSON has been duly appointed Next Friend for ROBERT TURNER, a minor.

5.     At all times relevant hereto and upon information and belief, Defendant SHERRY NICHOLS was a resident of the City of Detroit, County of Wayne, State of Michigan.

6.     At all times relevant hereto and upon information and belief, Defendant TERRI SUTTON was a resident of the City of Detroit, County of Wayne, State of Michigan.

7.     At all times relevant hereto, the City of Detroit, owned, controlled, and operated the 911 dispatch calls placed within the city limits of the City of Detroit.

8.     At all times relevant and upon information and belief, the City of Detroit was the employer of both Defendants, SHERRY NICHOLS and TERRI SUTTON.

9.     The acts, errors and omissions enumerated herein, all amount to gross negligence and also constitute an infliction of emotional distress committed by Defendants SHERRY NICHOLS and TERRI SUTTON and were all committed while acting within the course and scope of their employment with the City of Detroit.

10.     Defendants are not immune from suit by governmental immunity for claims of gross negligence and/ or intentional infliction of emotional distress.

2

11.     The acts, transactions, occurrences, and/or omissions occurred within the City of Detroit, County of Wayne, State of Michigan.

12.     The amount in controversy herein exceeds the sum of Twenty-Five Thousand ($25,000.00) Dollars exclusive of costs, interest, and attorney fees.

## COUNT I
## GROSS NEGLIGENCE

13.     Plaintiffs hereby restate and reallege Paragraphs 1 through 12 as if fully set forth herein.

14.     On or about February 20, 2006, minor Plaintiff, ROBERT TURNER, was at 1950 Spruce, Street Apartment 3, in Detroit, Michigan with his mother, SHERRILL TURNER.

15.     Shortly before 5:59 pm on February 20, 2006, minor Plaintiff, ROBERT TURNER noticed that his mother had fallen and was suffering from a serious medical condition requiring immediate medical attention.

16.     At approximately 5:59 pm on February 20, 2006, minor Plaintiff, ROBERT TURNER called 911 to summon emergency medical assistance for his mother who was still alive.

17.     After minor Plaintiff, ROBERT TURNER called 911 he was connected and spoke with Defendant, SHERRY NICHOLS and/ or TERRI SUTTON.

18.     Minor Plaintiff, ROBERT TURNER, informed Defendant, SHERRY NICHOLS and/ or TERRI SUTTON, that his mother was in need of medical treatment including telling Defendant, SHERRY NICHOLS and/ or TERRI SUTTON that his mother

3

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

had passed out. At all times relevant Defendant, SHERRY NICHOLS and/ or TERRI SUTTON, had enough information that Plaintiff's decedent, SHERRILL TURNER, was suffering from an emergency medical requiring immediate medical attention.

19.     At all times relevant, the Defendants' SHERRY NICHOLS and/ or TERRI SUTTON, failed to summon emergency response.

20.     At approximately 9:02 pm on February 20, 2006, minor Plaintiff, ROBERT TURNER called 911 a second time in an attempt to summon emergency medical treatment for his mother, SHERRILL TURNER.

21.     When minor Plaintiff, ROBERT TURNER called 911 a second time, he spoke with Defendant, SHERRY NICHOLS and/ or TERRI SUTTON.

22.     During the second 911 call, Minor Plaintiff, ROBERT TURNER informed Defendant, SHERRY NICHOLS and/ or TERRI SUTTON that his mother was in need of medical treatment including telling SHERRY NICHOLS and/ or TERRI SUTTON his mother had passed out. At all times relevant Defendant, SHERRY NICHOLS and/ or TERRI SUTTON had enough information that Plaintiff's Decedent, SHERRILL TURNER was suffering from an emergency medical condition requiring immediate medical attention.

23.     Defendant SHERRY NICHOLS and/ or TERRI SUTTON insulted, frightened, falsely accused, and completely ignored minor Plaintiff, ROBERT TURNER's pleas for help given his mother's failing medical condition.

24.     At all times relevant, Defendants, SHERRY NICHOLS and/ or TERRI SUTTON, subjected minor Plaintiff, ROBERT TURNER, to intentional, extreme, and outrageous conduct.

4

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

25.     At all times relevant, the Defendants, SHERRY NICHOLS and/ or TERRI SUTTON, demonstrated conduct that was so reckless that it demonstrates a substantial lack of concern for whether any injury would result to Plaintiff's decedent SHERRILL TURNER and/ or minor Plaintiff, ROBERT TURNER.

26.     Defendant SHERRY NICHOLS and/ or TERRI SUTTON acted recklessly by ignoring and failing to respond to Plaintiff's decedent, SHERRILL TURNER's emergency medical condition.

27.     At all times relevant, Defendants, SHERRY NICHOLS and/ or TERRI SUTTON should have sent emergency response to Plaintiff's decedent, SHERRILL TURNER to provide immediate medical attention.

28.     Defendants SHERRY NICHOLS and/ or TERRI SUTTON failed to summon any medical attention to Plaintiff's Decedent, SHERRILL TURNER.

29.     At all times relevant, De fendants, SHERRY NICHOLS and/ or TERRI SUTTON, handled the phone calls from minor Plaintiff, ROBERT TURNER in a reckless manner without any regard as to whether injury would occur to Plaintiff's decedent, SHERRILL TURNER and/ or to the minor Plaintiff, ROBERT TURNER.

30.     Upon all information and belief, when EMS finally arrived at 1950 Spruce, Apartment 3, in Detroit, Michigan, any opportunity Plaintiff's decedent, SHERRILL TURNER, had to survive had been lost by the Defendants gross negligence and/or reckless misconduct.

31.     At all times relevant, had either Defendants timely and appropriately responded to the 911 phone call(s) Plaintiff's decedent, SHERRILL TURNER would not have suffered

5

the injuries complained of including, conscious pain and suffering and eventually death and ROBERT TURNER would not have suffered the injuries complained of including but not limited to emotional injuries.

32.    At all times relevant hereto, the Defendants SHERRY NICHOLS and/ or TERRI SUTTON, performed their job duties in such a reckless and careless manner as to demonstrate a complete disregard as to whether or not any injury would occur.

33.    At all times relevant hereto, Defendants, SHERRY NICHOLS and/ or TERRI SUTTON, had a duty to refrain from committing acts of intentional misconduct, acts of malfeasance, and gross negligence.

34.    At all times relevant hereto, Defendants, SHERRY NICHOLS and/ or TERRI SUTTON, breached their respective duties and committed acts of intentional misconduct, acts of malfeasance, and gross negligence, including, but not limited to, the following:

  a. Failing to timely summon emergency medical treatment to Plaintiff's decedent, SHERRILL TURNER;

  b. Demonstrating conduct so reckless that it demonstrates a substantial lack of concern for whether any injury would result;

  c. Intentionally causing SHERRILL TURNER and her son ROBERT TURNER to suffer extreme emotional distress;

  d. Improper threatening ROBERT TURNER for requesting emergency assistance for his mother;

  e. Using their authority as City of Detroit dispatchers to intentionally inflict emotional distress on minor Plaintiff, ROBERT TURNER;

  f. Actively withholding and concealing information from

6

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

the authorities as to timely provide medical assistance to SHERRILL TURNER;

g.    Affirmatively abrogating their obligations as City of Detroit dispatchers to timely respond to Plaintiff decedent's emergency medical condition; and

h.    Engaging in other acts of misconduct, gross negligence and/or intentional malfeasance which may become known prior to trial.

35.    As the direct and proximate result of these acts and/or omissions by Defendants SHERRY NICHOLS and/ or TERRI SUTTON, Plaintiff's decedent , SHERRILL TURNER, and the Estate of SHERRILL TURNER suffered serious injuries including, but not limited to, the following:

a.    Conscious pain and suffering;

b.    Reasonable medical, funeral and burial expenses;

c.    Fright, shock and terror;

d.    Loss of the love, society, companionship, and parental guidance of the decedent;

e.    Loss of service of Plaintiffs' decedent;

f.    Future loss of income and/ or earning capacity;

g.    Miscellaneous economic damages, past, present and future;

h.    Exemplary damages and/ or punitive damages; and

i.    Any and all damages allowable under the Michigan Wrongful Death Act (MCL §600.2922) and otherwise learned through the course of discovery.

36.    The Defendants, SHERRY NICHOLS and/ or TERRI SUTTON were the

7

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

proximate cause of the Plaintiffs' injuries.

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants for an amount in excess of One Million ($1,000,000.00) Dollars, together with interest, costs and attorney fees.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

37.     Plaintiffs hereby restate and reallege Paragraphs 1 through 36 as if fully set forth herein.

38.     The acts of the Defendants, SHERRY NICHOLS and/ or TERRI SUTTON, as described above were extreme, outrageous, and committed with gross negligence.

39.     Said acts of both Defendants, as described above were intentionally and/or recklessly done and had the effect of harassing the minor Plaintiff, ROBERT TURNER which physically and emotionally harmed him.

40.     As the direct and proximate result of the outrageous conduct of all Defendants and their agents and/ or employees, the minor Plaintiff, ROBERT TURNER suffered severe emotional distress and horrible injuries and damages including, but not limited to the following:

    a.    Emotional injuries;

    b.    Mortification and humiliation;

    c.    Mental anguish;

    d.    Fright, shock, and terror;

    e.    Nightmares;

8

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

f.      Economic loss;

g.      Loss of great sums of money for medical, emotional and/or psychological care and treatment, past, present and future, which is expected to continue indefinitely into the future, as well the loss of earnings and/or earning capacity from these injuries;

h.      Punitive and exemplary damages for Defendants' intentional conduct; and

i.      Any other additional injuries recoverable under Michigan law including economic loss, as well as past, present and future medical treatment needed as learned through continued discovery.

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants

for an amount in excess of One Million ($1,000,000.00) Dollars, together with interest, costs

and attorney fees.

Respectfully submitted,

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C.

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555

Dated: April 30, 2008

9

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DELAINA PATTERSON, as Personal Representative
for the Estate of SHERRILL TURNER, deceased, and
ROBERT TURNER, a minor, Individually, by his
Next Friend, DELAINA PATTERSON,

        Plaintiff,

vs.                                    Case No. 08-        NO
                                       HON.

SHERRY NICHOLS,
and TERRI SUTTON,

        Defendants.
_____/

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
Fieger, Fieger, Kenney & Johnson, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555
_____/

## **DEMAND FOR TRIAL BY JURY**

    NOW COME Plaintiffs, DELAINA PATTERSON, as Personal Representative for the

Estate of SHERRILL TURNER, deceased, and ROBERT TURNER, a minor, Individually,

by his Next Friend, DELAINA PATTERSON, by and through their attorneys, FIEGER,

FIEGER, KENNEY & JOHNSON, P.C., and hereby demands a jury trial.

        Respectfully submitted,

        FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C.


        GEOFFREY N. FIEGER (P30441)
        JAMES J. HARRINGTON, IV (P65351)
        Attorneys for Plaintiff
        19390 West Ten Mile Road
        Southfield, Michigan 48075
        (248) 355-5555

Dated: April 30, 2008

FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-5463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

**2**

# STATE OF MICHIGAN

# COURT OF APPEALS

---

Estate of SHERRILL TURNER v NICHOLS.

---

DELAINA PATTERSON, as Personal
Representative for the Estate of SHERRILL
TURNER, deceased, and ROBERT TURNER, a
minor, Individually, by his Next Friend,
DELAINA PATTERSON,

        Plaintiff-Appellee,

v

SHERRY NICHOLS,

        Defendant,

and

TERRI SUTTON,

        Defendant-Appellant.

UNPUBLISHED
December 7, 2010

Nos. 288375 and 291287
Wayne Circuit Court
LC No.  08-111034-NO

---

DELAINA PATTERSON, as Personal
Representative for the Estate of SHERRILL
TURNER, deceased, and ROBERT TURNER, a
minor, Individually, by his Next Friend,
DELAINA PATTERSON,

        Plaintiff-Appellee,

-1-

V

SHERRY NICHOLS a/k/a SHARON J.
NICHOLS,

           Defendant-Appellant,

and

TERRI SUTTON,

           Defendant.

No. 296198
Wayne Circuit Court
LC No. 08-111034-NO

---

Before: BORRELLO, C.J., and CAVANAGH and OWENS, JJ.

PER CURIAM.

In this consolidated appeal, defendants appeal as of right the denials of their motions for summary disposition. We affirm.

## I. FACTS

The facts in these cases are largely undisputed. On February 20, 2006, Robert Turner was at home with his mother, decedent Sherrill Turner. Just before six o'clock that evening, Robert noticed that his mother had fallen unconscious. Robert called 911, and Nichols answered. The following conversation occurred between Robert and Nichols:

> *Nichols.* Emergency 9-1-1, where is the problem?
>
> *Robert.* My mom has passed out.
>
> *Nichols.* You over on Spruce?
>
> *Robert.* Huh?
>
> *Nichols.* You on Spruce?
>
> *Robert.* My mom . . .

-2-

*Nichols.* Where's Mrs. [or Mr.][1] Turner at?

*Robert.* Right here.

*Nichols.* Let me speak to her [or him].

*Robert.* She's not gonna . . . she not gonna talk.

*Nichols.* Okay, well I'm gonna send the police to your house and find out what's going on with you. [Giving the address of the Turner residence.]

Nichols did not send the police, or any response. At about 9:00 p.m., Robert again dialed 911, and Sutton answered. The following conversation occurred between Robert and Sutton:

*Sutton.* Emergency 9-1-1, where is the problem?

*Robert.* My mom has passed out in her room.

*Sutton.* [Giving the Turners' address]. Is that the Robert Turner residence?

*Robert.* Yeah.

*Sutton.* Where the grown-up at?

*Robert.* In her room. My mom . . .

*Sutton.* Let me speak to her. Let me speak to her before I send the police over there.

*Robert.* (speaking over Sutton) She passed out.

*Robert.* (after Sutton) She's not gonna talk.

*Sutton.* Huh?

*Robert.* She's not gonna talk.

*Sutton.* Okay. Well, you know what then? She's gonna talk to the police. Okay. She's gonna talk to the police because I'm sending them over there.

---

[1] The parties disagree on certain details of the first call. The differences in the transcripts, while potentially relevant to the ultimate disposition of this case, are not relevant to the disposition of this appeal.

-3-

*Robert.* She's still not gonna talk.

*Sutton.* I don't care. You shouldn't be playing on the phone. (Pause.) Now put her on the phone before I send the police out there to knock on the door and you gonna be in trouble.

*Robert.* Argh!

Sutton dispatched a police officer, who arrived at the Turner home at about 9:30 p.m., responding to Sutton's report of "child playing on phone." The officer found Sherrill supine and unresponsive. The officer contacted emergency medical services, who arrived at about 9:40 p.m., and declared Sherrill dead at 9:59 p.m.

Plaintiffs sued defendants for wrongful death and for intentional infliction of emotional distress. Defendants moved for summary disposition based on governmental immunity. The trial court denied both defendants' motions on both counts.

## II. STANDARD OF REVIEW

The circuit court's determination of a motion for summary disposition is reviewed de novo. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 52; 684 NW2d 320 (2004). When reviewing a motion for summary disposition under MCR 2.116(C)(7), "the court may consider all affidavits, pleadings, and other documentary evidence, construing them in the light most favorable to the nonmoving party." *Alcona Co v Wolverine Environmental Production, Inc*, 233 Mich App 238, 246; 590 NW2d 586 (1998).

## III. WRONGFUL DEATH

Plaintiffs argue that the trial court erred in denying their motions for summary disposition of the wrongful death claim. We disagree.

MCL 691.1407(2) provides that governmental employees are immune from tort liability unless their conduct amounts to "gross negligence that is the proximate cause of the injury or damage." MCL 691.1497(2)(c). "Gross negligence" is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a).

In *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000), our Supreme Court held that "the proximate cause" means the "one most immediate, efficient, and direct cause of the injury or damage." This definition was first set forth in *Stoll v Laubengayer*, 174 Mich 701; 140 NW 532 (1913), and the *Robinson* Court relied on this case in support of its holding, stating that "the Legislature has nowhere abrogated this . . . ." *Robinson*, 462 Mich at 462. Thus, we turn to *Stoll* for guidance.

In *Stoll*, it appears that the defendant had allegedly parked his team of horses across a particular path in a negligent manner. *Stoll*, 174 Mich at 701. A five-year-old child who was sledding down a hill sledded "under defendant's wagon and against the heels of his horses" and was either run over by the wheel or the wagon or kicked by a horse. *Id.* She died from her injuries and the defendant was sued for negligence. After a judgment was rendered against

-4-

defendant, he appealed arguing, in part, that his negligence was not the proximate cause of the child's death. *Id.* The Supreme Court agreed, holding that the defendant's alleged negligent act preceded the girl's decision to slide down the hill. The immediate cause of the injury was the child's act of "voluntarily starting her sleigh down the incline." *Id.* at 706. "But for this act of hers (subsequent to defendant's alleged negligent act, and therefore proximate to the injury) no accident could have occurred." *Id.* The *Stoll* Court concluded that, with regard to the girl's action, "[w]hether willful or accidental, it was still proximate—the immediate, efficient, direct cause preceding the injury." *Id.* at 706.

In *Robinson*, 462 Mich at 439, the plaintiffs, in relevant part, sued the police officers involved in police pursuits that eventually resulted in crashes and subsequent injuries to the plaintiffs. The individual officers claimed that they were not "the proximate cause" of the plaintiffs' injuries. The Supreme Court agreed, holding that—consistent with *Stoll*—the "one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles." *Id.* at 462. That is, but for the fleeing, no accident could have occurred.

In our cases, the claimed injury is the decedent's death. We conclude that there is a genuine issue of material fact whether the grossly negligent conduct of defendants was the proximate cause—the one most immediate, efficient, and direct cause—of the decedent's death. Although it is unclear at this point what caused the decedent's initial medical emergency, it appears to be cardiac-related. However, there is no evidence which indicates that the decedent's death was either immediate, i.e., that she was deceased at the time her son called 911, or was certain to occur. In fact, there is evidence to the contrary. According to records of the Wayne County Medical Examiner, when officers arrived—three hours after the initial call to 911—the decedent was "warm to the touch with no rigor present."

Thus, unlike in the cases of *Stoll* and *Robinson*, there is no other act or circumstance that could be the "one most immediate, efficient, and direct cause" of the decedent's death, other than the underlying medical event. But, a question of fact clearly exists regarding whether the underlying medical event or defendants' failure to provide the requested medical assistance was "the proximate cause," i.e., the one most immediate, efficient, and direct cause of decedent's death. In other words, there is no evidence that the underlying medical event would have certainly killed decedent, i.e., there was no chance of survival, or that the decedent would not have survived even with proper and timely medical assistance. Accordingly, there appears to be evidence from which a reasonable jury could conclude that defendants' gross negligence was the one most immediate, efficient, and direct cause of death.

Under the circumstances of our cases, the issue whether defendants' gross negligence was the proximate cause of the decedent's death cannot be determined as a matter of law according to the evidence before us. It appears that reasonable minds could differ regarding the proximate cause of decedent's death, and, as a result, the trial court did not err in denying defendants' motions for summary disposition on this count.

-5-

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants argue that they are also immune from liability for intentional infliction of emotional distress. They argue that, absent a specific intent to cause emotional distress, the GTLA shields them from liability because they were acting within the scope of their employment and performing discretionary, as opposed to ministerial, acts. They further argue that assuming they are not entitled to governmental immunity, the claims against them should nevertheless have been dismissed because plaintiffs cannot meet all of the elements of the tort. We disagree.

### A. GOVERNMENTAL IMMUNITY FOR INTENTIONAL TORTS

Subsection 7(2) of the GTLA only governs tort liability for negligence. Subsection 7(3) specifies that "[s]ubsection (2) does not alter the law of intentional torts as it existed before July 7, 1986." MCL 691.1407(3). Our Supreme Court has explained that the purpose of § 7(2) is to eliminate the distinction laid out in *Ross v Consumers Power Co*, 420 Mich 567; 363 NW2d 641 (1984) between discretionary and ministerial acts, as that distinction relates to immunity from tort liability. *Odom v Wayne Co*, 482 Mich 459, 470; 760 NW2d 217 (2008). The purpose of § 7(3) is to clarify that the *Ross* distinction was only being eliminated for negligent torts, and preserved for intentional torts. *Id.* at 470-471. The standard for governmental immunity from liability for intentional torts, then, remains governed by common law, specifically by *Ross* and *Odom*. *Id.* at 472-473.

Under the *Ross* test, there are three requirements for a lower-level[2] governmental employee to be immune from liability for intentional torts: the employee must be "1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." *Ross*, 420 Mich at 633-634. The parties agree that the first requirement was satisfied, but dispute the second and third requirements.

#### 1. GOOD FAITH

In *Odom*, our Supreme Court discussed good and bad faith. And noted that bad faith includes "'malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of an intentional abuse of power.'" *Odom*, 482 Mich at 474, quoting Prosser, Torts (4th ed), § 132, p 989. According to *Odom*, "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Id.* (emphasis in original). The Court stated "an 'action may lie only if the [defendant] has utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates of humanity.'" *Odom*, 482 Mich at 474, quoting *Dickey v Fluhart*, 146 Mich App 268, 276; 380 NW2d 76 (1985). Another cited case "described a lack of good faith as 'malicious intent, capricious action or corrupt conduct,'" *id.*, quoting *Veldman v Grand Rapids*, 275 Mich 100, 113; 265 NW 790

---

[2] Defendants are lower-level employees because they are not "judges, legislators, [or] the highest executive officials of [any level] of government." *Ross*, 420 Mich at 633.

-6-

(1936), while another stated that "'willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does.'" *Id.* at 475, quoting *Burnett v Adrian*, 414 Mich 448, 455; 326 NW2d 810 (1982).

Thus, contrary to defendants' arguments, specific intent is *not* required to overcome immunity with respect to intentional torts. Rather, a lack of good faith may be shown by wanton or reckless conduct.

Recklessness may be shown by showing that "any reasonable person would know emotional distress would result" from a defendant's conduct. *Haverbush v Powelson*, 217 Mich App 228, 236-237; 551 NW2d 206 (1996). *Haverbush* held that such a showing is sufficient, not necessary, to show recklessness. *Id.* at 237. Black's Law Dictionary defines recklessness as "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk." Black's Law Dictionary (8th ed).

On the facts before this Court, a reasonable juror could find that defendants' conduct, failing to send assistance in response to a 911 call indicating a need for medical assistance, amounted to recklessness. Certainly a 911 operator is not infallible and must have some level of discretion in gauging the legitimacy of a report, the type of emergency, and the necessity and urgency of a response. But defendants arguably did not exercise such discretion. Rather it appears they ignored the information Robert was providing, including the fact that his mother could not come to the phone because she had passed out. A reasonable juror could find that treating a 911 call as a prank entails a risk of causing severe emotional distress to the caller, that defendants ignored this risk, and that their conduct therefore amounted to recklessness. Because reckless conduct, under *Odom*, is sufficient to demonstrate lack of good faith, defendants are not entitled to immunity from this claim.

## 2. DISCRETIONARY ACTS

Even if it were the case that defendants were acting in good faith, they are not entitled to immunity because their acts were ministerial, not discretionary. Defendants argue that, in fielding 911 calls, they are vested with the discretion to determine the priority of calls, and decide whether to send assistance and what kind of assistance to send. But this argument overlooks the gravamen of plaintiffs' complaint. Plaintiffs have alleged that Robert's emotional distress was caused by defendants' treatment of him on the phone. In other words, the allegedly tortious conduct was not defendants' failure to properly carry out the duties they describe as discretionary, but their interaction with Robert.

As plaintiffs point out, the treatment of a 911 caller is governed by a number of policies that strictly limit the discretion an operator has. Plaintiffs cite the Detroit Police Department's General Order 78-11 as a source of several of these policies, including subsections 8.1: "An employee shall meet the public with consideration, answering questions civilly and courteously"; 8.2: "An employee shall, when on duty or acting in an official capacity, address citizens in a businesslike and courteous manner"; 8.3: "An employee shall not use disrespectful, . . . demeaning, belittling or insulting language . . . to any citizen"; and especially 8.4: "All employees shall give all possible consideration to citizens seeking information or assistance or

-7-

desiring to make any report" and 8.9: "An employee shall, when questioning a citizen, do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective towards all persons." Following an internal investigation by the Detroit Police Department, both defendants were found to be in violation of subsections 8.4 and 8.9.

Even if Nichols were acting within her discretion in not sending assistance, and Sutton were acting within her discretion in sending a police officer instead of medical assistance, neither had the discretion to violate policies by interacting unprofessionally and inconsiderately with Robert. The mandatory language of the subsections quoted above governing defendants' performance of their duties makes clear that the conduct complained of was ministerial, not discretionary.

In addition to showing that they were acting within the course of their employment, defendants must, in order to claim governmental immunity, show that they were acting in good faith and that their acts were discretionary. Because a reasonable juror could find that, we affirm the trial court's decision to deny them governmental immunity.

## B. THE ELEMENTS OF THE TORT

The elements of intentional infliction of emotional distress are "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597; 374 NW2d 905 (1985). Defendants argue that plaintiffs cannot, as a matter of law, establish the first two of these elements.

In *Roberts*, this Court described "the prevailing view of what constitutes 'extreme and outrageous' conduct," drawing from two paragraphs from the Second Restatement of Torts:

> "The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

> "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an

-8-

unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." [*Roberts*, 422 Mich at 602-603, quoting Restatement Torts, 2d, § 46, comment d, pp 72-73.]

Here, the circumstances surrounding defendants' conduct indicate that a reasonable juror could find the conduct to be extreme and outrageous. The mere words spoken, if spoken in another context or to another listener, might well be considered, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Given, however, defendants' positions as 911 operators, and the fact that their words were directed against a child, who they had been told was seeking emergency medical assistance for his unconscious mother (even if they did not believe it), this case may well be "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Because a reasonable juror might find that defendants' conduct was extreme and outrageous under this standard, the trial court was correct in holding that summary disposition is not appropriate on this element.

Additionally, as discussed, a reasonable juror could find that defendants acted recklessly. A reasonable juror could find that defendants were aware of the risk that their conduct would cause emotional distress to Robert, and acted in disregard of that risk. The trial court therefore did not err in finding that there was a triable issue of fact with respect to recklessness.

Triable issues of fact remain. A reasonable juror could find that the conduct of one or both defendants was extreme and outrageous, and that one or both defendants behaved recklessly. We find no error.

Affirmed.

/s/ Stephen L. Borrello
/s/ Mark J. Cavanagh
/s/ Donald S. Owens

-9-

**3**

# Order

**Michigan Supreme Court**
Lansing, Michigan

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
Justices

January 25, 2012

4/January 2012

142441

ESTATE OF SHERRILL TURNER v NICHOLS

DELAINA PATTERSON, as Personal
Representative for the Estate of Sherrill Turner,
Deceased, and Robert Turner, a Minor, Individually,
by his Next Friend, DELAINA PATTERSON,
     Plaintiff-Appellee,

v

                                        SC: 142441
                                        COA: 296198
SHERRY NICHOLS, a/k/a SHARON J.                    Wayne CC: 08-111034-NO
NICHOLS,
          Defendant-Appellant,
and

TERRI SUTTON,
          Defendant.

_____/

     On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of May 25, 2011. The application for leave to appeal the December 7, 2010 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the questions presented should be reviewed by this Court.



     I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 25, 2012

_____        _____
                                                   Clerk

t0118

**4**

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DELAINA PATTERSON, as Personal Representative
for the Estate of SHERRILL TURNER, deceased, and
ROBERT TURNER, a minor, Individually, by his
Next Friend, DELAINA PATTERSON,

        Plaintiffs,

        vs.

SHERRY NICHOLS,

        Defendants.

Case No. 08-111034-NO
Hon. John A. Murphy

| | |
|---|---|
| GEOFFREY N. FIEGER (P30441) JAMES J. HARRINGTON, IV (P65351)Attorneys for Plaintiff Fieger, Fieger, Kenney, Giroux & Danzig, P.C. 19390 West Ten Mile Road Southfield, MI 48075 (248) 355-5555 | WILSON A. COPELAND, II (P23837) Attorney for Defendant, Nichols 615 Griswold St., Ste. 400 Detroit, MI 48226 (313) 961-2600 |

## PLAINTIFFS' FACILITATION SUMMARY

    HEARING DATE:   August 16, 2012

    HEARING TIME:   1:30 p.m.

    LOCATION:      Law Offices Of Pamela Harwood, P.C.

# I. INTRODUCTION

**Type of Case:**   Gross Negligence - 911 Operator Misconduct

**Plaintiff:**   Plaintiff, 5 year old Robert Turner placed a 911 phone call after his mother had fallen to the ground. His mother died in his presence while he was trapped inside of the home for over 4 hours before police arrived. Robert Turner makes an excellent witness.

**Defendant:**   Sharon Nichols was the first emergency service operator (ESO) to answer the 911 call placed by Robert. She did nothing. She was criminally charged and convicted of neglect of duty for failing to properly handle Robert Turner's phone call. She makes a poor witness.

**Liability:**   Liability in this case indefensible. Sharon Nichols was convicted for neglecting her duties. This case has gone up to the Court of Appeals and then the Michigan Supreme Court and all issues including issues of immunity and intentional infliction of emotional distress have fully resolved in Plaintiff's favor.

**Damages:**   Robert Turner was trapped in his mothers house as she was dying. This has had a profound emotional effect on him. He has an independent claim for intentional infliction of emotional distress.

There is also the wrongful death claim. The loss of Sherrill has devastated the family. She was deeply loved and now missed. Her loss also has had a significant financial impact to young Robert.

FIEGER, FIEGER, KENNEY, GIROUX & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

FEIGER, FEIGER, KENNEY, GIROUX & DANZOY · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

## I.  DISCUSSION OF FACTS

This action arises out of the deplorable and egregious conduct of Detroit Emergency Service Operator ("ESO"), Sharon Nichols, who, despite assurances otherwise, failed to summon emergency medical assistance for Sherill Turner, who was passed out on the floor of her home for several hours while her five-year-old son, Robert Turner, pleaded for help. Contrary to well established protocol and their duties as ESOs, Defendants failed to verify the validity of the phone calls, failed to ascertain the actual circumstances, and failed to request an Emergency Response Unit. Instead, Defendants responded to Robert Turner's emergency calls to 911 with callousness and threatened the young boy with police involvement.

When the police arrived on the scene nearly 3 ½ hours after Robert's first call to 911, they found Mrs. Turner unresponsive. When EMS arrived approximately 20 minutes later, Mrs. Turner was declared dead at the scene. Notably, when the medical examiner arrived on the scene shortly thereafter (four hours after Robert's first call to 911), he noted that Mrs. Turner was warm to the touch with no rigor present, which indicated that her death had been not long before his arrival.

Defendant's actions/inactions in handling young Robert Turner's calls to 911 resulted in suspensions. In addition, Sharon Nichols was criminally charged with Willful Neglect of Duty in violation of MCL 750.478. Ultimately, a jury found Defendant Nichols guilty and she was sentenced. As a result of her criminal conviction, Defendant Nichols was fired by the City of Detroit.

Plaintiffs brought this action against Defendant Nichols, alleging gross negligence and intentional infliction of emotional distress. Defendant moved for summary disposition, which the trial court denied and the Court of Appeals affirmed. Defendant Nichols sought leave to

-3-

appeal, arguing that she did not owe a duty to Mrs. Turner, that her conduct did not amount to gross negligence, and that her conduct was not the proximate cause of Mrs. Turner's death. Defendant Nichols further maintained that she was entitled to governmental immunity with regard to Robert Turner's claim for intentional infliction of emotional distress because she acted in good faith and the challenged act was discretionary. Leave was ultimately granted by the Michigan Supreme Court.

Contrary to Defendant Nichols' bold assertions, she clearly owed a duty to summon assistance for Mrs. Turner. Moreover, since a criminal jury has already concluded that Defendant Nichols was guilty of willful neglect of duty for her knowing and purposeful deviation from the established protocol and disregard of the totality of the circumstances in evaluating the 911 call from Robert Turner, there can be no dispute that Defendant Nichols' actions and/or inactions amounted to gross negligence, i.e., conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. This question of fact has already been actually litigated and determined by a valid and final judgment and Defendant Nichols had a full and fair opportunity to litigate this issue. Accordingly, therefore, the doctrine of collateral estoppel should preclude her from relitigating the issue in this matter.

However, in the event that this Court concludes that collateral estoppel does not apply, Plaintiffs assert that, accepting Plaintiffs' allegations as true and construing them in a light most favorable to Plaintiffs, a reasonable juror could conclude that Defendant Nichols' conduct was so reckless that it demonstrated a substantial lack of concern for whether injury would result. The facts, viewed in the light most favorable to Plaintiffs, reveal that Defendant Nichols failed to ascertain the nature of the call or treat it as an emergency; that she willfully and deliberately

-4-

FAX (248) 355-5148 · TELEPHONE (248) 355-5555 · SOUTHFIELD, MICHIGAN 48075-2463 · 19990 WEST TEN MILE ROAD · ATTORNEYS AND COUNSELORS AT LAW · A PROFESSIONAL CORPORATION · FIEGER, FIEGER, KENNEY, GIROUX & DANZOS

ignored the young child's pleas for help, that she labeled the call as a prank, and that she failed to dispatch police or an EMS unit to the scene.

A reasonable juror could further conclude that Defendant Nichols' gross negligence was the one most immediate, efficient, and direct cause preceding Mrs. Turner's death. It is undisputed that Defendant Nichols did not dispatch police or an EMS unit to the Turner household and that the EMS did not arrive on scene until more than 3 ½ hours after Nichols answered Robert Turner's call to 911. The medical examiner indicated that Mrs. Turner's body was warm to the touch and that rigor had not set in when he arrived on the scene more than four hours after Robert's first call was placed to 911. There is no evidence that Mrs. Turner's death was immediate or was certain to occur. In fact, there is evidence that Mrs. Turner languished for hours before she died and, more likely than not, she could have survived the underlying cardiac event. But for Defendant Nichols' failure to treat Robert's call as an emergency and wilfully and deliberately ignoring Robert Turner's pleas for help (which was subsequent to the underlying cardiac event and therefore proximate to the injury) Mrs. Turner would not have died.

A.  **Five-Year-Old Robert Called 911 at 5:59 p.m. and 9:02 p.m. Trying to Summon Help For His Mother.**

On or about February 20, 2006, minor Plaintiff, Robert Turner, was at 1950 Spruce, Street Apartment 3, in Detroit, Michigan with his mother, Sherrill Turner. Shortly before 5:59 pm that evening, Robert noticed that his mother had fallen, was unresponsive and needed help. At approximately 5:59 p.m., Robert called 911 to summon emergency medical assistance for his mother, who was still alive. Robert was connected with and spoke to Defendant, Sherry

-5-

Nichols, and informed her that his mother had passed out:

> ESO Nichols: Emergency 911, where is the problem?
>
> Robert: **My mom has passed out**.
>
> ESO Nichols: You over at Spruce?
>
> Robert: Huh?
>
> ESO Nichols: You on Spruce?
>
> Robert: My mom . . .
>
> ESO Nichols: Where's Mr. Turner at?
>
> Robert: Right here.
>
> ESO Nichols: Let me speak to him.
>
> Robert: **She's not gonna talk**.
>
> ESO Nichols: Okay, well I'm gonna send the police to your house and find out what's going on with you.
>
> ESO Nichols: 1950 Spruce Apt. 3
>
> Called Ended: 0:43 seconds

[Exhibit A; 911 Call Transcripts[1] (emphasis added).]

In contravention of established protocol, Defendant Nichols failed to verify the validity of the telephone call, failed to treat it as an emergency, and failed to request an Emergency Response Unit. Instead, she willfully and deliberately ignored the young child's pleas for help and terminated the call after a mere 43 seconds. Despite the fact that she told Robert that she

---

[1] Plaintiffs suggest you listen to the audio CD of the 911 calls, which is attached. [Ex B; CD of 911 Calls]

-6-

was sending the police, Defendant Nichols did not dispatch a police unit and simply logged the call in as a prank call and closed the call record.

When help failed to arrive, Robert called 911 a second time, at approximately **9:02 p.m.**, in an attempt to summon emergency medical treatment for his mother. During his second call, Robert spoke with Defendant Sutton and informed her that his mother had passed out:

| | |
|---|---|
| ESO Sutton: | Emergency 911, where is the problem? |
| Robert: | **My mom has passed out**. |
| ESO Sutton: | 1950 Spruce. Is that the Robert Turner residence? |
| Robert: | Yeah. |
| ESO Sutton: | Where the grown-up at? |
| Robert: | In her room. My mom . . . |
| ESO Sutton: | Let me speak to her. Let me speak to her before I send the police over there. |
| Robert: | **She passed out**. |
| ESO Sutton: | Huh? |
| Robert: | **She's not gonna talk**. |
| ESO Sutton: | Okay. Well, you know what then? She's gonna talk to the police. Okay. She's gonna talk to the police because I'm sending them over there. |
| Robert: | She's still not gonna talk. |
| ESO Sutton: | I don't care. You shouldn't be playing on the phone. [pause] Now put her on the phone before I send the police out there to knock on the door and you gonna be in trouble. |
| Robert: | Argh!!! |

-7-

Call Ended: 1:16 seconds

[Ex A].

The police arrived on the scene at approximately **9:20 p.m.** and found Ms. Turner unresponsive. EMS was dispatched to the home at that time. When EMS arrived at approximately **9:40 p.m.**, Ms. Turner was declared dead at the scene. Thereafter, Medical Examiner Investigator Vernon Humes arrived at the scene. Of significant importance, MEI Humes made the following finding at **9:59 pm**:

> MEI Humes to scene where decedent is found lying supine on bedroom floor, **she is warm to the touch with no rigor present** and clad only in a T-Shirt, decedent's five year old son called police who thought he was playing on phone, when they arrived at residence they discovered decedent on floor. [Ex C; Excerpts from Wayne County M.E. Records, Appellees' Appendix, p. 49b, (emphasis added).]

Francisco Diaz, M.D. of the Wayne County Medical Examiner's Officer performed the autopsy of Mrs. Turner. Dr. Diaz testified that he relied on the MEI findings, since MEIs are trained to determine if rigor mortis has set in as well as temperature of the body. **(Ex D; Deposition of Dr. Diaz, p. 8, Appellees' Appendix, p. 4b).** Dr. Diaz indicated in his report that Sherrill Turner's death was due to dilated cardiomyopathy, which is simply an enlarged heart (Ex D; Dep of Diaz, p. 9, Appellees' Appendix p. 5b). While dilated cardiomyopathy was the cause of Mrs. Turner's death, is was not the mechanism of death. Based on what Dr. Diaz saw upon examination, he felt that the mechanism of death was suggestive of a cardiac insufficiency, which meant that, more likely than not, Mrs. Turner lingered for a period of time before she expired (Ex D; Dep of Diaz, pp. 16-18, 21, Appellees' Appendix pp. 6b-7b, 8b). Given the fact that rigor mortis sets in within two hours of death, and four hours after Robert's

-8-

first call to 911 no rigor had set in and Ms. Turner was warm to the touch, Dr. Diaz opined that Ms. Turner had not been dead for a significant period of time. **(Ex D; Dep of Diaz, pp. 23-25, Appellees' Appendix, pp. 8b-9b).**

In addition, Plaintiff's expert, Werner Spitz, M.D., a forensic pathologist, testified within a reasonable degree of medical certainty that Ms. Turner was not dead when Robert made his first call to 911 at 5:59 p.m. and, more likely than not, had the appropriate response been provided, Mrs. Turner could have been saved. **(Ex E; Deposition of Dr. Spitz, pp. 26, 41-42, 47-48, Appellees' Appendix, pp. 12b, 13b, 14b).**

**B.    Defendant Nichols Was Suspended, Found Guilty of Wilful Neglect of Duty, and, Ultimately, Fired for Her Gross Negligence in the Performance of Her Duties.**

Defendant Nichols' actions/inactions resulted in a suspension for violations of the following section of General Order 78-11:

(1) Section 21, Neglect of Duty;

(2) Section 8, Contact with Citizens, Subsection 8.4, All Possible Consideration, and

(3) Section 8, Contact with Citizens, Subsection 8.9, Professionalism and Objectivity.

[Ex F; See Inter Office Memorandum, Appellees' Appendix, p. 16b]

Specifically, General Order 78-11, Section 21, Neglect of Duty, provides as follows:

An employee shall not intentionally fail to take action as required by department rules, regulations, orders or procedures which are applicable to his duties and responsibilities. [Ex F; Prosecutor's Memorandum, Training Bulletins and General Orders, Appellees' Appendix, p. 31b].

General Order 78-11, Section 8, Contact with Citizens, Subsection 8.4, All Possible Consideration, states:

All employees shall give all possible consideration to citizens seeking

-9-

FISHER, FISHER, KENNY, GREENE & BACANI · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

information or assistance or desiring to make any report whether in person or by telephone. **[Ex F; Appellees' Appendix, p. 28b].**

General Order 78-11, Section 8, Contact with Citizens, Subsection 8.9, <u>Professionalism</u> and Objectivity, states:

> An employee shall, when questioning a citizen, do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective towards all persons. **[Ex F; Appellees' Appendix, p. 29b].**

In addition, Defendant Nichols was criminally charged with Willful Neglect of Duty in violation of MCL 750.478, which provides as follows:

> When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00.

> The Misdemeanor Warrant indicates that Defendant Nichols willfully neglected to perform her duty, to wit: she purposefully and knowingly deviated from the established protocol and disregarded the totality of the circumstances in evaluating the 911 call from Robert Turner. She misled Robert Turner into believing she was dispatching the police to his home, contrary to MCL 750.478. **[Ex G; Misdemeanor Warrant, Appellees' Appendix, p. 1b]**

In bringing the charges, the Wayne County Prosecutor's office determined that Defendant Nichols violated Training Bulletin 78-2 E9-1-1 "Interview Procedure," which details the information that must be ascertained from a caller. The prosecutor stated:

> Of note in this situation is that neither ESO listened to little Robert Turner's words to them. He clearly stated that his mom had "passed out" at the outset of both calls thereby relaying the "WHAT" information, which should have at least signaled to a ESO that his call could not be summarily dismissed as a prank call or a child playing on the phone. **[Ex F; Appellees' Appendix, p. 19b.]**

The prosecutor's office further determined that Defendant Nichols violated Training

-10-

Bulletin 74-3-R-B "Telephone Deportment", which states "Our purpose is to serve the public. Answer promptly – **treat each call as an emergency**." **(Ex F; Appellees' Appendix, p. 19b (emphasis added).** In particular, the prosecutor concluded:

> ESO Nichols willfully deviated from established protocol when she took Robert's 911 call lasting only 43 seconds. Nichols did not adhere to the pattern of questions designed to evaluate a call and she did not treat the call as an emergency. She disregarded Robert's first statement in response to her question "what is the problem?" when Robert answered, "My mom has passed out." Finally Nichols did not listen to her caller or pay attention to the totality of the circumstances of the individual situation before her. Namely, a young child calling 911 saying his mom was passed out, and in response to ESO request to talk to mom, Robert's response was "she is not gonna talk." She assumed information and lost empathy for her caller.

> Nichols is guilty of willful neglect of duty under MCL 750.478 because she willfully and deliberately did nothing. She did not ask questions in compliance with Training Bulletin 78-2. She did not treat the call as an emergency in violation of the established protocol contained in Training Bulletin 74-3-R-B. She did not properly evaluate the call in accordance with Training Bulletin 98-1. Finally Nichols had notice that a conscious, intentional decision not to follow protocol could result in liability. **[Ex F; Appellees' Appendix, p. 21b.]**

The prosecutor recommended that ESOs Sutton and Nichols both be charged with neglect of duty under MCL 750.478, opining:

> Neither ESO followed the pattern of questioning established by protocol. Neither ESO treated the call as an emergency. Both Nichols and Sutton discounted Robert's clear statement that his mom was passed out because he was a young child. Neither ESO considered that when Robert said that his mom was not going to talk that there may be a problem. They did not assess the call and the totality of the circumstances in accordance with established department protocols. They made uninformed assumptions, lost empathy for their caller and [caused] irreparable harm to this little boy. Sutton and Nichols knew the proper procedures and consciously and deliberately decided not to follow them. They also had notice that failure to follow protocol could result in liability. There is overwhelming evidence supporting this charge. **[Ex F; Appellees' Appendix, p. 22b.]**

Ultimately, a jury found Defendant Nichols guilty of Wilful Neglect of Duty in violation

-11-

FEHER, FEHER, KENNEY GROUP & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 1990 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2465 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

of MCL 750.478. She was sentenced to one year of probations and fifteen (15) days of community service. As a result of the criminal conviction, Defendant Nichols was fired from her position as an ESO, with the following explanation given by the City of Detroit:

> For the following reason(s): **Gross negligence in the Performance of Duties on February 20, 2006 and Violation of General Order 78-11, Sections 8.4 "All Possible Consideration" and Section 8 "Contact With Citizens"** [Notice of Discharge Form, Appellees' Appendix, p. 51b (emphasis added).]

### C. Procedural History

On April 30, 2008, Plaintiff commenced this action against Defendants, alleging gross negligence on behalf of Sherrill Turner and intentional infliction of emotional distress on behalf of young Mr. Turner. Defendant Nichols moved for summary disposition. Defendant Nichols asserted that her actions were not grossly negligent, but she failed to raise any facts, law or arguments in support of her position. Instead, her argument was confined to whether her actions and/or inactions were "the" proximate cause of Mrs. Turner's death. Defendant Nichols also argued, in two brief sentences, that she did not owe a duty to Mrs. Turner or Robert. In a supplemental motion, Defendant Nichols asserted that there was no genuine issue of material fact that her conduct did not amount to intentional infliction of emotional distress that she was entitled to summary disposition pursuant to MCR 2.116(C)(10). The trial court rejected all of Defendant Nichols' arguments, adopting the same basis as both of its rulings from the other ESO Terri Sutton's motions for summary disposition Defendant Nichols appealed the trial court's order.

In a December 7, 2010 unpublished opinion, the Court of Appeals affirmed the denial of both Defendants' motions for summary disposition. *Turner v Nichols*, unpublished per

-12-

curiam opinion of the Court of Appeals, issued December 7, 2010 (Docket Nos. 288375, 291287, 296198) **(Ex H; Appellant's Appendix, pp. 4a-12a)**. With regard to Plaintiffs' gross negligence claim, the Court of Appeals concluded that there was evidence from which a reasonable jury could conclude that Defendants' gross negligence was the one most immediate, efficient, and direct cause of death and, therefore, the trial court did not err in denying Defendants' motions for summary disposition on the gross negligence claim. Turning to *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000) and *Stoll v Laubengayer*, 174 Mich 701; 140 NW 532 (1913) for guidance, the Court of Appeals concluded:

> We conclude that there is a genuine issue of material fact whether the grossly negligent conduct of defendants was the proximate cause – the one most immediate, efficient, and direct cause – of the decedent's death. Although it is unclear at this point what caused the decedent's initial medical emergency, it appears to be cardiac-related. However, there is no evidence which indicates that the decedent's death was either immediate, i.e., that she was deceased at the time her son called 911, or was certain to occur. In fact, there is evidence to the contrary. According to records of the Wayne County Medical Examiner, when officers arrived – three hours after the initial call to 911 – the decedent was "warm to the touch with no rigor present."

> [A] question of fact clearly exists regarding whether the underlying medical event or defendants' failure to provide the requested medical assistance was "the proximate cause," i.e., the one most immediate, efficient, and direct cause of decedent's death. In other words, there is no evidence that the underlying medical event would have certainly killed decedent, i.e., there was no chance of survival, or that the decedent would not have survived even with proper and timely medical assistance. Accordingly, there appears to be evidence from which a reasonable jury could conclude that defendants' gross negligence was the one most immediate, efficient, and direct cause of death. [Ex H; Appellant's Appendix, p. 8a.]

The Court of Appeals further held that Defendants were not immune from liability for Robert Turner's claim of intentional infliction of emotional distress because (1) a reasonable juror could find that Defendants' conduct amounted to recklessness, which is sufficient to

-13-

demonstrate lack of good faith under *Odom v Wayne Co*, 482 Mich 459; 760 NW2d 217 (2008), and (2) Defendants acts were ministerial, not discretionary. Finally, the Court of Appeals concluded that, assuming that Defendants are not entitled to governmental immunity, the trial court did not err in denying Defendants' motions for summary disposition on Robert's claim for intentional infliction of emotional distress because a reasonable juror could find that the Defendants' conduct was extreme and outrageous and that Defendants acted recklessly. Specifically, the Court of Appeals concluded:

> Here, the circumstances surrounding defendants' conduct indicate that a reasonable juror could find the conduct to be extreme and outrageous. The mere words spoken, if spoken in another context or to another listener, might well be considered, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Given, however, defendants' positions as 911 operators, and the fact that their words were directed against a child, who they had been told was seeking emergency medical assistance for his unconscious mother (even if they did not believe it), this case may well be "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Because a reasonable juror might find that defendants' conduct was extreme and outrageous under this standard, the trial court was correct in holding that summary disposition is not appropriate on this element.
>
> Additionally, as discussed, a reasonable juror could find that defendants acted recklessly. A reasonable juror could find that defendants were aware of the risk that their conduct would cause emotional distress to Robert, and acted in disregard of that risk. The trial court therefore did not err in finding that there was a triable issue of fact with respect to recklessness. **[Ex H; Appellant's Appendix, p. 12a.]**

Thereafter, Defendant Nichols filed an application for leave to appeal with the Michigan Supreme Court. On May 25, 2011, the Michigan Supreme Court entered an order granting Defendant Nichols' application and directed the parties to include among the issues to be briefed: (1) whether the defendant had a duty to the decedent; (2) if so, whether the defendant's

-14-

FEIGER, FEIGER, KENNEY, GIROUX & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

conduct can be viewed as the proximate cause of the decedent's death; (3) whether the defendant's conduct can be viewed as "so reckless as to demonstrate a substantial lack of concern for whether an injury results"; (4) whether a claim for intentional infliction of emotional distress is cognizable under the circumstances of this case; (5) if so, whether the defendant's conduct can be viewed as "extreme and outrageous"; (6) the degree of recklessness sufficient to meet the standard required to establish intentional infliction of emotional distress; (7) whether the defendant showed that she acted in good faith; and (8) whether the defendant was performing ministerial acts, as opposed to discretionary acts.

Within 2 weeks of oral argument the Supreme Court stated that "we VACATE our order of May 25, 2011." As such this case is set to be tried to a jury on all issues. (**Ex I; 01/25/2012 Supreme Court Order**).

## II.    DISCUSSION OF LIABILITY

These actions and inactions of both defendants is deplorable and egregious. Defendant handled the Robert Turner emergency call to 911 with callousness and the only responses that was sent was police to the Turner residence to investigate what was coded as a prank call. This case is indefensible from a liability standpoint. Defendant may be best served admitting to liability.

Additionally, the Michigan Supreme Court has already decided the immunity issue. Defendant will not be able to seek protection from the appellate courts from a plaintiff's verdict on the legal issues of immunity and intentional infliction emotional distress.

In further support of liability, the violations of General Order 78-11, section 8, Contact with Citizens, subsections 8.4 and 8.9. (**Ex F; Inter Office Memorandum and General**

-15-

FEIGER, FEIGER, KENNEY, GIROUX & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

**Orders)** Subsection 8.4, All Possible Consideration, provides as follows:

> All employees shall give all possible consideration to citizens seeking information or assistance or desiring to make any report whether in person or by telephone.

**(Ex F)**

Subsection 8.9, Professionalism and Objectivity provides as follows:

> An employee shall, when questioning a citizen, do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective towards all persons.

**(Ex F)**

In addition, both Defendants were criminally charged with Wilful Neglect of Duty in violation of MCL 750.478. **(Ex P; Wayne County Prosecuting Attorney's Recommendations) & (Ex G; 2nd Amended Warrant - Misdemeanor)** In bringing the charges, the Wayne County Prosecutor's office determined that Defendants had violated Training Bulletin 78-2 E9-1-1 "Interview Procedure", Training Bulletin 74-3-R-B "Telephone Deportment", and Training Bulletin 98-1, "Emergency Call Taker Liability and Discretion". In particular, the prosecutor concluded that Defendants did not ask questions in compliance with Training Bulletin 78-2, did not treat the call as an emergency in violation of the established protocol contained in Training Bulletin 74-3-R-B and did not properly evaluate the call in accordance with Training Bulletin 98-1. **(Ex F; Prosecutor's Memorandum)**

As a result of the criminal prosecution, Defendant Nichols was convicted and fired from her position and was placed on Probation for officer neglect. **(Ex J; Order of Probation)** On July 26, 2006 Defendant Nichols was fired from her position as an ESO. **(Ex K; Notice of Discharge Form)** Of importance this Notice gives the following explanation as to why she was

-16-

FISHER, FIEGER, KENNY, GIROUX & DANZIG · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

discharged:

> **For the following reason(s): <u>Gross negligence in the Performance of Duties</u> on February 20, 2006 and Violation of General Order 78-11, Sections 8.4 "All Possible Consideration" and Section 8"Contact With Citizens"**

(Ex J)

## IV.   DISCUSSION OF CAUSATION OF MS. TURNER'S DEATH

Francisco Diaz, M.D. of the Wayne County Medical Examiner's Officer performed the autopsy of Ms. Turner. **(Ex L; Autopsy Report)** He relies on the MEI findings as they are trained to determine if rigor mortis has set in as well as temperature of the body.

Dr. Diaz indicated in his report that the death was due to dilated cardiomyopathy which is simply an enlarged heart. This is the cause, not the mechanism of death. Dr. Diaz also explained that the two possibilities of the mechanism of death was either a cardiac insufficiency (congestive heart failure) or an arrhythmia. If the mechanism of death was a cardiac insufficiency one could linger for a period of time before they expire. If the mechanism of death was due to an arrhythmia, then Ms. Turner could have experienced several arrhythmias then expired.

Based on what Dr. Diaz saw upon examination, he felt that the mechanism of death was suggestive of a cardiac insufficiency. (Ex D, p. 21; Deposition of Francisco Diaz, M.D.) The finding of pulmonary edema is supportive of the fact that Ms. Turner languished for a significant period of time.

> Q.   And so if an arrhythmia had killed Ms. Turner instantaneously, there would be no pulmonary edema, do you agree?

-17-

A.    If a person has a pre-existing condition and the condition that kills that person, the immediate cause of death is an arrhythmia induced by specific disturbance, electric disturbance of the heart. **The person will die instantaneously and they will have no pulmonary edema.** For the benefit of the jury, let me put myself as an example . If I die of an arrhythmia right now, chances are I will have no edema.

(Ex D, p. 22)

Pulmonary edema was present with Ms. Turner. **(Ex D, p. 19)**

Dr. Diaz also explained that Nephrosclerosis are changes in the kidneys usually as a result of increased pressure from the circulatory system that lead to changes in the kidneys. **(Ex D, p. 9)** This is also a process that would occur if Ms. Turner had languished for a period of time.

The coup de grâce of whether Ms. Turner languished for hours is found within the finding of MEI Humes who noted that Ms. Turner was warm to the touch with no rigor present as explained by Dr. Diaz:

Q.    Now when will rigor mortis first start manifesting itself?

A.    It usually happens within two hours of death....

(Ex D, p. 14)

Understanding that the 1st 911 call was placed at 5:59 pm, and 4 hours later at 9:59 pm no rigor had set in and Ms. Turner was warm to the touch then she had been deceased for very long. In fact, given Dr. Diaz's time frame it would be unlikely that Ms. Turner died before 8:00 pm. Additionally Plaintiff has retained Werner Spitz, M.D. who has testified that more likely than not, had the appropriate response been provided, Ms. Turner would have been saved.

-18-

FISCHER, FISCHER, KENNEY GROSS & DANIY • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

## III.   DISCUSSION OF DAMAGES

When Sherrill Turner died, her family lost years of time, memories, holidays for over 40 years of her life. Her son, Robert Turner has also lost 13 years of financial support and household services. The verdict potential of this case is 8 figures.

According to the Michigan Wrongful Death Act, the Estate of Sherrill Turner is entitled to the following damages:

1.   Pain and Suffering;

2.   Loss of Love, Society and Companionship;

3.   Loss of Financial Support;

4.   Loss of Household Services;

5.   Loss of Parental Services and Guidance;

6.   Loss of Gifts and Gratuities; and

7.   Costs Related to Ms. Turner's Funeral and Burial.

The estate is an extremely large estate with 10 heirs at law.

### A.   Loss of Household Services

Plaintiff has hired Dr. Nitin Paranjpe of Thompson Econometrics to provide the testimony concerning loss of financial support and household services suffered by the Estate of Sherrill Turner, namely for Robert Turner. Robert Turner was 5 years old when his mother died. Sherrill provided Robert with everything. Dr. Paranjpe has created a calculation of the economic impact for the loss of services. His report is attached. (Ex M; Report of Nitin Paranjpe, Ph.D.)

Dr. Paranjape calculated that the loss of services based on a 24 hour live in aide using a $250/ day (approx $10.00/ hr) in 2007 adjusted for growth would result in a projected loss

-19-

FRGER, FRIEGER, KENNEY GROWN & PANOFE · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19190 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2405 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

of services of $1,208,091.00. See Chart 1 of Dr. Paranjape's report. **(Ex M).**

The $10.00 an hour figure is a very conservative figure. Showing this is conservative, Dr. Paranjape calculated the loss of services based on a minimum wage figure of $7.00/ hr. This loss is $842,720.00.

### B.    Loss of Parental Services, Guidance & Training

Dr. Paranjpe also prepared additional calculations in the event that the loss of Robert's mother has prevented him from attaining a college degree and only a high school degree then he would have a lifetime loss of $5,421,565.00 **(Ex M)**.

### C.    Loss of Love, Society and Companionship

The non-economic losses suffered by the Turner family are tremendously large. Everyone loved Sherrill and she is deeply missed. There is a large estate consisting of 10 children and one brother. A verdict into the millions for non-economic claims for the members of the Estate is likely.

### D.    Emotional Impact For Robert Turner

The passing of Robert's mother has had a profound impact on him. After his mother's passing he lived with his older sister Delaina Patterson in Atlanta, Georgia. In Atlanta, Delaina enrolled Robert into Kate's Club which is an organization designed to help children who are facing life after a death of a parent or sibling. He applied with Kate's Club on January 31, 2007 and discontinued after it was felt that the sessions were not helping as desired.

On March 2, 2007 Robert was evaluated by Gerald Shiener, M.D. for a psychiatric evaluation. His diagnostic impression of Robert was as follows:

Axis I:       Complicated bereavement; post-traumatic disorder.

Axis II:      No personality disorder is diagnosed.

Axis III:     No physical condition is diagnosed.

-20-

Axis IV:   Psychosocial stressors - severe.   Mother's death under conflicted circumstances.

Axis IV:   Psychosocial stressors - severe.   Mother's death under conflicted circumstances.

Axis V:   Highest level of functioning over the past year - Good and without impairment. Current level - Fair.  (GAF: 50)

He further writes:

> The patient spent a period of several hours alone in the house with his mother during her period of unconscious and death, and since that time has had difficulty separating.  He has been depressed, withdrawn, having sleep disturbances - troubling dreams with a theme of threat or wish-fulfillment, decrease in appetite....
>
> * * *
>
> Robert Turner has been **profoundly affected** by his mother's death in a complicated way, and **his reaction arises to the level of a psychiatric illness.  <u>This death will affect him for the rest of his life</u>,** it will effect more so then the death of his **mother under more conventional or typical circumstances.** The complication of him attempting to get her help, and being frustrated in his attempts to do so, have **set him up for a lifelong impairment that will impair his ability to make attachments, trust adults, trust authority figures, and as for help.  He will be plagued by lifelong feelings of guilt.**

(Exhibit N; 3/2/07 Report from Dr. Shiener).

### E.   Funeral and Burial Expenses

Under the Michigan Wrongful Death Act the funeral and burial expenses are recoverable.  They total $3,722.49.  (Ex O; Funeral and Burial expenses)

## IV.   CONCLUSION

Here is the chronology for February 20, 2006:

| | |
|---|---|
| 5:59 pm | 1st 911 call placed - received by Defendant Nichols |
| 9:02 pm | 2nd 911 call placed - received by Defendant Sutton |

-21-

FIEGER, FIEGER, KENNEY, GIROUX & DANZOS · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

FIEGER, FIEGER, KENNY, GIROUX & DANZOS • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

| 9:20 pm | Detroit Police arrive |
| 9:35 pm | EMS Dispatched |
| 9:40 pm | EMS Arrived |
| 9:59 pm | Wayne County Medical Examiner's office pronounces Ms. Turner deceased noting that she is warm to touch with no rigor present. |

Sherrill could have been saved. She wasn't. Robert could have been spared being with his mother as she suffered for a prolonged period of time. He wasn't. This is an indefensible case for the Defendants with a likelihood of a very large jury verdict and no remedy from the appellate courts.

Respectfully submitted,

GEOFFREY N. FIEGER (P-30441)
JAMES J. HARRINGTON, IV (P-65351)
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: August 13, 2009

-22-



Turner 911 Calls
Call #1 at 5:59pm: Monday, February 20, 2006
Call #2 at 9:02pm: Monday, February 20, 2006

*CD*

Video Enterprises
30903 Northwestern Highway, Suite 110
Farmington Hills, MI 48334
248.851.6759

EXHIBIT
B

OFFICE of the **WAYNE COUNTY MEDICAL EXAMINER**
1300 East Warren Avenue
Detroit, Michigan 48207
Case Registration Summary

| | |
|---|---|
| M.E. CASE No. | 06-01746 |
| | Turner, Sherrill |
| POLICE FILE No. | |

DATE REPORTED
02/20/2006   9:53pm/LJP
Page 2

---

Police Comments (continued)

DR. UNKNOWN

NO ADULTS PRESENT ONLY A FIVE YEAR OLD.

BODY TO MEO

- - - - - - - - - - -

Provisional Manner of Death: Pending

Type of place where injury occurred: (unspecified)
Address where injury occured: (not entered)
Date of Injury:

- - - - - - - - - - -

Certifier:              WCMEO
Current Disposition:  Ordered To Meo

Removal Ordered:     20 Feb 2006  10:08pm
Removal Service: Professional Removal Service
Contact Person:    KIM                  By whom: Prentice, Lorita J.

Additional Case Comments:
MEI HUMES TO SCENE WHERE DECEDENT IS FOUND LYING SUPINE ON
BEDROOM FLOOR, SHE IS WARM TO THE TOUCH WITH NO RIGOR PRESENT
AND CLAD ONLY IN A T-SHIRT, DECEDENTS FIVE YEAR OLD SON
CALLED POLICE WHO THOUGHT HE WAS PLAYING ON PHONE, WHEN THEY
ARRIVED AT RESIDENCE THEY DISCOVERED DECEDENT ON FLOOR.

HX; ASTHMA, OTHER UNKNOWN

NO PROPERTY TO MEO

MEDICATION CONVEYED TO WCMEO.

**EXHIBIT**

tabbies*

C



**RECEIVED**

AUG 0 3 2009

Fleger, Fleger, Kenney & Johnson, P.C.

# PATTERSON, ET AL v. NICHOLS, ET AL

# FRANCISCO DIAZ, M.D.

## July 27, 2009

*Prepared for you by*



COURT REPORTING & VIDEO
NATIONWIDE

Bingham Farms | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE: 248.644.8888    FAX: 248.644.1120

www.bienenstock.com

EXHIBIT
**D**

FRANCISCO DIAZ, M.D.
July 27, 2009

---

**Page 1**

1         STATE OF MICHIGAN
2    IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE
3
4  DELAINA PATTERSON, as Personal
5  Representative for the Estate of
6  SHERRILL TURNER, deceased, and
7  ROBERT TURNER, a minor, Individually,
8  by his Next Friend, DELAINA PATTERSON,
9        Plaintiffs,
10    vs.       Case No. 08-111034-NO
11         Hon. John Murphy
12  SHERRY NICHOLS and TERRI SUTTON,
13     Defendants.
14  _____
15
16
17    The Deposition of FRANCISCO DIAZ, M.D,
18    Taken at 1300 East Warren,
19    Detroit, Michigan,
20    Commencing at 10:25 a.m.,
21    Monday, July 27, 2009,
22    Before Carolyn Grittini, CSR-3381.
23
24
25

---

**Page 2**

1  APPEARANCES:
2
3  JAMES J. HARRINGTON, IV
4  Fieger, Fieger, Kenney, Johnson & Giroux
5  19390 West Ten Mile Road
6  Southfield, Michigan 48075
7  (248) 355-5555
8    Appearing on behalf of the Plaintiffs.
9
10  WILSON A. COPELAND, II
11  Grier, Copeland & Williams
12  615 Griswold Street, Suite 400
13  Detroit, Michigan 48226
14  (313) 961-2600
15    Appearing on behalf of the Defendant, Nichols.
16
17  JOHN A. COTHORN
18  Cothorn & Mackley
19  535 Griswold Street, Suite 530
20  Detroit, Michigan 48226
21  (313) 964-7600
22    Appearing on behalf of the Defendant, Sutton.
23
24
25

---

**Page 3**

1        TABLE OF CONTENTS
2
3  Witness          Page
4  FRANCISCO DIAZ, M.D.
5
6  EXAMINATION
7  BY MR. HARRINGTON:...........................4
8  EXAMINATION
9  BY MR. COPELAND:...........................27
10  RE-EXAMINATION
11  BY MR. HARRINGTON:.........................27
12
13      INDEX TO EXHIBITS
14
15  Exhibit          Page
16  (Exhibits attached to transcript.)
17  DEPOSITION EXHIBIT 1.....................4
18  DEPOSITION EXHIBIT 2.....................4
19  DEPOSITION EXHIBIT 3.....................4
20  DEPOSITION EXHIBIT 4.....................4
21  DEPOSITION EXHIBIT 5.....................6
22
23
24
25

---

**Page 4**

1  Detroit, Michigan
2  Monday, July 27, 2009
3  10:25 a.m.
4
5      MARKED FOR IDENTIFICATION:
6      DEPOSITION EXHIBITS 1-4
7      10:25 a.m.
8
9        FRANCISCO DIAZ,
10  was thereupon called as a witness herein, and after
11  having first been duly sworn to testify to the truth,
12  the whole truth and nothing but the truth, was
13  examined and testified as follows:
14    MR. HARRINGTON:  Let the record reflect
15  this is the deposition of Dr. Francisco Diaz, taken
16  pursuant to notice, agreement of counsel and to be
17  used for all purposes under the Michigan Court Rules,
18  Rules of Evidence and any applicable statutes.
19    Good morning, doctor.
20    THE WITNESS:  Good morning.
21        EXAMINATION
22  BY MR. HARRINGTON:
23  Q.  Thank you for being here today.  We're here for your
24  deposition and you've been deposed many times?
25  A.  Yes, I have.

---



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

1 (Pages 1 to 4)

FRANCISCO DIAZ, M.D.
July 27, 2009

Page 5

1  Q.  My name is Jim Harrington, I represent the estate of
2       Sherrill Turner as well as Robert Turner in this
3       matter.  Mr. Copeland and Mr. Cothorn are here as
4       well.  This is a duces tecum deposition, and before we
5       went on the record, I marked as Exhibit 1 the
6       deposition notice, and you've seen that before,
7       correct?
8  A.  Yes, I have.
9  Q.  And in response to that, you brought the medical
10      examiner file; is that correct?
11 A.  Yes, I did.
12 Q.  And the medical examiner file is 06-01746; is that
13      correct?
14 A.  That is correct.
15 Q.  And were there any photographs that were taken of Miss
16      Turner?
17 A.  No.
18 Q.  Exhibit 2 that we've marked before your deposition is
19      your current and up-to-date CV?
20 A.  Yes, it is.
21 Q.  We've also marked as Exhibit 3 the Case Registration
22      Summary?
23 A.  Yes.
24 Q.  And Exhibit 4 is the actual Autopsy Report and
25      Toxicology Screen, correct?

Page 6

1  A.  Yes, it is.
2  Q.  Doctor, you are currently employed; is that correct?
3  A.  Yes, I am.
4  Q.  You are employed where?
5  A.  I'm assistant medical examiner for the office of Wayne
6       County Medical Examiner here in Wayne County,
7       Michigan.
8  Q.  And how long have you been with the Wayne County
9       Medical Examiner's Office?
10 A.  Since July 1st of the year 2001.
11 Q.  And since you've been with the Wayne County Medical
12      Examiner's Office, that's been your only position?
13 A.  Yes.
14 Q.  Let me just take a minute and look at your CV.
15      Doctor, do you have any problem if we mark the outside
16      jacket of the Medical Examiner's file?
17 A.  You may do that.
18          MARKED FOR IDENTIFICATION:
19          DEPOSITION EXHIBIT 5
20          10:30 a.m.
21          MR. COTHORN: Is that 1?
22          MR. HARRINGTON:  The Medical Examiner's
23      file will be 5.  Exhibit 1 was the CV.  I'm sorry, 1
24      was the deposition notice, 2 is the CV, 3 is the Case
25      Registration Summary from the Wayne County Medical

Page 7

1       Examiner's Office, 4 is the actual autopsy with tox
2       screen and 5 will be the outside jacket.
3          MR. COTHORN:  With the complete file?
4          MR. HARRINGTON:  5 is the complete file.
5  BY MR. HARRINGTON:
6  Q.  Doctor, if you could identify for the record the
7       documents that are maintained within the medical
8       examiner's file.
9  A.  All the documents?
10 Q.  Just identify them.
11 A.  Certainly.  There is the Autopsy Report signed by me
12      as well as the Toxicology Report, a copy of the
13      Registration Summary, a copy of the original Death
14      Certificate, a copy of the instruction to amend the
15      death certificate as well as request from attorney's
16      office from the Fieger Fieger law firm requesting an
17      autopsy and a receipt of the amount that is stipulated
18      by Wayne County to send copies and another request by
19      another attorney's office as well as a letter by the
20      office of Grier & Copeland, Grier is spelled
21      G-R-I-E-R, regarding a meeting that they request with
22      me on the year 2007.  And there is an ID card, an
23      identification card identifying the remainings for the
24      funeral home for Mrs. Turner, decedent.
25 Q.  Thank you, doctor.  And after, we want a copy of the

Page 8

1       complete file, is that something that can be arranged?
2  A.  Yes.
3  Q.  You performed the autopsy of Miss Turner; is that
4       correct?
5  A.  I did, yes.
6  Q.  And you've also had the opportunity to review the Case
7       Registration Summary?
8  A.  Yes.
9  Q.  Did you have the opportunity to review the Case
10      Registration Summary prior to performing the autopsy?
11 A.  Yes.
12 Q.  Also, when you were going through the file, there was
13      something in there about amending the death
14      certificate?
15 A.  Yes.
16 Q.  What was that about?
17 A.  What that is about is that when an autopsy is
18      performed, a death certificate has to be issued;
19      therefore, the decedent can be sent to a funeral home
20      and the remains disposed properly.  When we don't have
21      an obvious cause of death or we have to wait for
22      further testing, the standard procedure is to issue
23      the death certificate with the cause and manner of
24      death pending.  That way, the next of kin can take
25      care of the decedent in the sense of going to a



FRANCISCO DIAZ, M.D.
July 27, 2009

Page 9

1 funeral home and so forth and when all the testing
2 comes back, then we issue the permanent death
3 certificate.
4      And in the case of Mrs. Turner, which the
5 autopsy was performed on the 21st of February of 2006,
6 the pending death certificate was issued the same day
7 and then the instruction to amend the death
8 certificate with definitive cause of death was issued
9 on March the 29th of the year 2006.
10 Q.   And what was the cause of death identified on that
11      death certificate?
12 A.   The cause of death, the immediate cause of death
13      stated in part 26 of the death certificate is dilated
14      cardiomyopathy. I'm going to spell cardiomyopathy.
15      C-A-R-D-I-O-M-Y-O-P-A-T-H-Y, as the main cause of
16      death, and part two other significant condition,
17      nephrosclerosis.
18 Q.   What is dilated cardiomyopathy?
19 A.   Cardiomyopathy, dilated cardiomyopathy is an
20      enlargement of the heart.
21 Q.   And what is nephrosclerosis?
22 A.   Nephrosclerosis are changes in the kidneys usually as
23      a result of increased pressure from the circulatory
24      system that lead to changes in the kidneys.
25 Q.   The Case Registration Summary on page 2 indicates that

Page 10

1 MEI Humes was at the scene and found Miss Turner to be
2 warm to the touch with no rigor present. What do you
3 make of that?
4 A.   What that means, as you can tell from the Case
5      Registration Summary, whenever a death is called into
6      the Medical Examiner's Office and a number is
7      assigned, then we decide if the case pertain to our
8      jurisdiction or not. In the case of Mrs. Turner,
9      because of her age and lack of medical history at that
10      point, she became a medical examiner's case.
11      And because she was dead at a private home;
12      therefore, an investigator from the Medical Examiner's
13      Office goes to the scene, in this case, Mr. Humes went
14      to the scene. And what investigators do when they go
15      to the scene is that they describe this scene to the
16      pathologist in the written form and describe what they
17      found in terms of the position of the body and
18      observations that they make of the body. So the
19      pathologist can have an idea as to the circumstances
20      on how that decedent was found.
21      To answer your question specifically, when
22      Mr. Humes went to the scene, it is worth of note that
23      Mrs. Turner was officially pronounced dead on the 20th
24      of February of 2006 at 9:59 p.m. That is not the time
25      she died, that is the official time of pronouncement

Page 11

1 by our office. The observations by Mr. Humes was that
2 she was warm to the touch and no rigor was present.
3      Mr. Humes is an investigator from our
4 office and he made that observation at the time he
5 went there, the decedent was still warm.
6 Q.   Did you ever speak with investigator Humes about this
7      finding?
8 A.   No.
9 Q.   Is investigator Humes still employed with the Wayne
10      County Medical Examiner's Office?
11 A.   He is.
12 Q.   What's his first name?
13 A.   I'm not sure.
14 Q.   After somebody passes away, their body undergoes a
15      process, correct?
16 A.   Correct.
17 Q.   And some of those things in that process would include
18      rigor mortis?
19 A.   Yes.
20 Q.   Would that include livor mortis?
21 A.   Yes.
22 Q.   Would there also be a temperature loss?
23 A.   Yes.
24 Q.   Do you know at what rate the body will lose
25      temperature? Is it two degrees an hour, more than

Page 12

1 that, less than that?
2 A.   Those changes occur after people die. And the rate
3      that those changes happen is different on every
4      individual in every circumstance. That's why it's
5      extremely difficult to determine the exact time of
6      death. As opposed to what you see depicted in popular
7      culture where the medical examiner and the coroner can
8      give you a definitive time of death.
9      The changes you describe rigor mortis, that
10      is a stiffening of the muscles due to lack of
11      biochemical substrate for the muscles to act. And in
12      regular environment, that happens within two hours.
13      Within two hours you see the stiffening of the muscles
14      and because the body is not producing any biochemicals
15      anymore, as time passes on, the stiffening of the
16      muscles will disappear because the body will start to
17      decompose and it will breakdown the muscles that
18      aren't contracted. So rigor mortis usually starts
19      within two hours of death, depending on the
20      circumstances and the environment as well as the
21      physical characteristics of the decedent. It's not
22      the same in a person that is morbidly obese as opposed
23      to a person that is slim. It tend to disappear after
24      a few hours, eight hours or so and it's completely
25      gone by 24 hours.



FRANCISCO DIAZ, M.D.
July 27, 2009

Page 13

1      Livor mortis is another change that you
2 acquire, it is the deposition of blood in the
3 dependent areas of the blood due to gravity. In other
4 words, blood basically leaves the blood vessels and
5 goes to the tissues beneath the skin because of
6 defective gravity. If not a lot of time has passed,
7 then if you touch it with your finger, you can
8 separate that area of discoloration on the skin. If
9 more time passes, it becomes what we call fixed,
10 meaning that it becomes so attached to the tissue
11 underneath the skin, that you cannot remove it by
12 applying pressure.
13      In terms of decreasing -- decrease of the
14 temperature after you die, that happens because your
15 body is not generating any heat. However, that is one
16 factor that depends a lot on not only the environment
17 which is the most important, what was the temperature,
18 where did decedent die, what was the ventilation, how
19 many layers of clothing did decedent have that can
20 retain heat and so forth, but also the physical
21 characteristics of the decedent, obesity versus slim,
22 previous medical condition. For example, if a person
23 is having fever, obviously will have a higher
24 temperature and will lose that temperature at
25 different degree.

Page 14

1      So all those factors put together give you
2 an idea. However, as a medical examiner, it is
3 extremely difficult to pinpoint an exact time of
4 death.
5 Q.  Now, when will rigor mortis first start manifesting
6     itself? Is that -- can that happen within the first
7     half hour?
8 A.  It usually happens within two hours of death. There
9     are instances that have been described in the forensic
10     literature where you can have it starting almost
11     immediately, because again, that depends on, for
12     example, what the decedent was doing before death.
13     And I will give you an example. If somebody is
14     chasing somebody else and they are exercising due to
15     that chase, and that person gets killed, which is
16     something we see commonly in an environment in this
17     type of work, somebody dies during -- they are chasing
18     them and then that person gets shot, rigor mortis may
19     start immediately because of that strenuous activity
20     basically depletes all the biochemicals that supply
21     the muscles. So they are gone immediately. So as
22     soon as the person dies, you might start seeing the
23     rigor mortis developing instantaneously, it's been
24     described even instantaneously. Therefore, for you to
25     know when rigor mortis starts, you need to know what

Page 15

1 were the circumstances of the decedent before the
2 decedent died. Was the decedent running, exercising,
3 did the decedent have fever because also that plays a
4 role. High fever indicates high metabolism. And
5 there are so many variables in terms of what you have
6 to take into account, that's what make it extremely
7 difficult to determine a specific time of death on
8 every death.
9 Q.  With the livor mortis, can that manifest itself within
10     the first half hour after death?
11 A.  It could, because that goes by the fact of gravity.
12     Usually people die or are found face up; therefore, by
13     gravity, you find livor or the lividity in the back,
14     and usually you can have that occurring at any rate
15     within the first couple of hours as well.
16 Q.  As far as the timing of when this happened, I want you
17     to assume that young Robert Turner placed the first
18     911 phone call at 5:59 p.m. and then the second 911
19     phone call was placed at 9:02 p.m. First of all, did
20     you hear the 911 tapes on this case?
21 A.  No.
22 Q.  I want you to assume that the 911, first 911 call was
23     to seek help for his mother for who he believed had
24     passed out. Given that time of the 5:59 first phone
25     call and that the 9:59 pronouncement of death, and

Page 16

1 this is all p.m., do you have an opinion as to what
2 the mechanism of death was?
3 A.  The mechanism of death, and I assume the position is
4     for the benefit of a prospective jury, the mechanism
5     of death is different than the cause of death. The
6     cause of death is why the person died. The mechanism
7     is the physiologic derangement that leads to the cause
8     of death. The cause of death is dilated card
9     myopathy, that is a physical finding where this lady
10     who was still young, only 46 years of age, had a heart
11     that was extremely large for her frame.
12     The heart is a skeletal muscle as opposed
13     to any other type of skeletal muscle, as opposed to
14     other types of skeletal muscles, the heart -- the
15     larger it becomes, the more inefficient it becomes, as
16     opposed, for example, your biceps, the larger they
17     are, the stronger you are. The heart works the
18     opposite way. Therefore, that is a finding she had.
19     Another finding she had during my
20     examination is she had an enlarged liver with passive
21     congestion. And she had nephrosclerosis. What that
22     says is she had that condition for a period of time.
23     That didn't arise within a week. This is a type of
24     patient that had a condition that I define as dilated
25     cardiomyopathy. I'm not a clinician. And when that



FRANCISCO DIAZ, M.D.
July 27, 2009

Page 17

1 happens, that leads to inefficiency or to cardiac
2 insufficiency. And the heart doesn't pump blood
3 effectively. Therefore, that's why you have the
4 congestion in the liver. Some of the blood is getting
5 stagnant in the liver, and the nephrosclerosis
6 indicates that this patient had increased pressure in
7 the kidneys due to the inefficiency of the heart.
8      Now in terms of what is the mechanism, what
9 happened that she died at that point, what happens is
10 that she had an episode of an electrical disturbance
11 of the heart, an arrhythmia, that is the mechanism,
12 that is the most common mechanism.
13 Q. So what we're getting at is, really there's one of two
14 things: Either -- well, strike that.
15     The cardiac insufficiency, that's
16 congestive heart failure?
17 A. It is.
18 Q. So we're talking about either a cardiac insufficiency,
19 where if she has that, she could languish for a period
20 of time, agreed?
21 A. She could.
22 Q. And if it's an arrhythmia that causes her passing, it
23 will be a much quicker death?
24 A. Well, again, I'm not a clinician, so I don't want to
25 overstep my boundaries. I can tell you what I found,

Page 18

1 and that is a significant finding. While she was
2 living, she could have -- and those findings are
3 suggestive of insufficiency, the size of the heart and
4 the congestion of the liver are indicative of
5 insufficiency. Was she having any symptoms prior to
6 that, I do not know that. What is the mechanism,
7 because the question you asked, what is the mechanism,
8 why a person with those findings would die, because
9 the heart will become inefficient and it will not pump
10 blood. And at the end, when that happens, when the
11 heart is not contracting the way it's supposed to, it
12 will lead to an arrhythmia. And let me make a
13 correction that you can verify with a clinician, with
14 an internist, for example. You may have an arrhythmia
15 and die instantaneously, it's possible, that is a
16 common mechanism. You can have an arrhythmia or you
17 can have several episodes of arrhythmias that don't
18 kill you instantaneously, that you may pass out as you
19 postulated or you are having multiple episodes of
20 that. For me as a pathologist, I cannot determine
21 which one. I can tell you the findings.
22 Q. Dilated cardiomyopathy is present when somebody passes
23 as a result of the congestive heart failure, correct?
24 A. It is.
25 Q. Same with pulmonary edema?

Page 19

1 A. Yes.
2 Q. Did you note any pulmonary edema in your examination
3 of Miss Turner?
4 A. Let me check the file. She had enlarged lungs as
5 well, the right lung was 425 grams and the left lung
6 was 375 grams. And they had, again, passive
7 congestion. That means there was fluid within the
8 spaces where air is supposed to be. Therefore, you
9 can say that she had pulmonary edema.
10 Q. And that's suggestive of congestive heart failure?
11 A. It is.
12 Q. And as opposed to somebody who dies, say, pretty much
13 immediately from the arrhythmia, they're not going to
14 have pulmonary edema, are they?
15 A. We are talking about different things. What is
16 striking in Mrs. Turner, in the type of decedents we
17 see here, a lady of this size, we usually see it in
18 morbidly obese people, 500, 600, 700 pound people. As
19 they become larger, the heart becomes larger and it
20 becomes inefficient. This is a very small framed
21 lady, five foot two inches in height and 132 pounds.
22 So she was not obese. She was slightly, slightly
23 overweight, you can say she was on the slim side as
24 compared to a lot of people that we see here.
25     In terms of an arrhythmia may kill you

Page 20

1 instantaneously, that depends on what is your
2 condition. You may have a congenital condition where
3 the electrical pump of the heart doesn't work properly
4 and it leads the wrong signal and that's it, you are
5 dead right immediately.
6     In the case of Mrs. Turner, she had
7 findings that I can tell you beyond a reasonable doubt
8 that she's had that condition for a period of time.
9 It takes time for nephrosclerosis to develop, it takes
10 time for congestion of the liver to develop.
11 Therefore, she had a previous medical condition.
12 Whether that was known to her or not, I do not know.
13 Therefore, I don't think she had an undiagnosed
14 arrhythmia, which is something that we see in people
15 with no findings, people who drop suddenly and the
16 autopsy shows nothing. In those cases you can say
17 that the person died of a previously undiagnosed
18 arrhythmia. In the case of Mrs. Turner, she had
19 findings.
20     What is the mechanism of her death, that
21 enlargement of the heart could lead for her to have
22 electrical disturbances of the heart and she could
23 develop arrhythmias. And again, as I said, a
24 clinician will answer that better. You can have
25 multiple episodes of arrhythmia. If you go to an ER



FRANCISCO DIAZ, M.D.
July 27, 2009

Page 21

1    right now, you'll have people with arrhythmia, that
2    doesn't mean they will die instantaneously. You can
3    have multiple episodes and the final one takes you
4    out. Or you can have one that takes you out
5    immediately. So it's difficult for a pathologist to
6    distinguish that. Her findings are of cardiac
7    insufficiency and those people eventually will develop
8    arrhythmias. Whether she died immediately or not is
9    difficult for me to discern.
10   Q.   So what you're saying is that the findings that you
11        saw upon examination and the documents that you
12        reviewed are suggestive of the cardiac insufficiency
13        which is the congestive heart failure?
14   A.   Right.
15   Q.   What is pulmonary edema?
16   A.   Pulmonary edema is accumulation of fluid in the
17        alveoli. Alveoli is the space where air is supposed
18        to get exchanged so you are not supposed to have any
19        type of fluid. When you have a condition such as the
20        one we've been talking about, because the blood
21        doesn't circulate the way it's supposed to circulate
22        due to inefficiency of the heart, blood accumulate in
23        certain places -- or not blood but fluid will leak out
24        of the blood vessels and go into the alveoli causing
25        pulmonary edema. Blood will get stagnant creating

Page 22

1    congestion in the liver and so forth.
2    Q.   This accumulation of fluid, the pulmonary edema, this
3         isn't a process that occurs postmortem, is it?
4    A.   No.
5    Q.   And so if an arrhythmia had killed Miss Turner
6         instantaneously, there would be no pulmonary edema, do
7         you agree?
8    A.   If a person has a pre-existing condition and the
9         condition that kills that person, the immediate cause
10        of death is an arrhythmia induced by specific
11        disturbance, electric disturbance of the heart. The
12        person will die instantaneously and they will have no
13        pulmonary edema. For the benefit of the jury, let me
14        put myself as an example. If I died of an arrhythmia
15        right now, chances are I will have no edema.
16   Q.   And as far as when Miss Turner actually died, would
17        you agree that that time frame would be much closer to
18        the 9:59 time frame of her pronouncement of death
19        rather than the first phone call that was made at 5:59
20        p.m.?
21   A.   You have a time frame basically of, as far as I know,
22        or it is documented of basically four hours, because I
23        have the official pronouncement at 9:59, and you say
24        that the first phone call is 5:59.
25   Q.   Correct.

Page 23

1    A.   So that's four hours. So in that time frame, what I
2         can tell you is beyond a reasonable degree of medical
3         certainty that when she died, her findings are the
4         ones we have discussed previously. What the
5         investigator from our office saw was she was still
6         warm and rigor mortis didn't set in at that point.
7         That is suggestive that she has not been dead for a
8         significant period of time. However, the time frame
9         is very small to reach a conclusion beyond a
10        reasonable degree of medical certainty, because if I
11        tell you one time, then you can postulate why that
12        time and not half an hour before or half an hour
13        later, what is the difference.
14             In terms of determining the time of death,
15        that is the difficulty. The investigator documented
16        what he saw and it is worth of note that Mrs. Turner
17        was not wearing any clothing when she was found.
18        Therefore, we know one part, which is she didn't have
19        layers of insulation on her that may have played a
20        role, and she was found inside a house. However, I
21        did not see the temperature of said house, at least
22        it's not documented, I don't know if you have that
23        temperature or not, because that also plays a role in
24        terms of accelerating or not accelerating the
25        findings. She was still warm when the investigator

Page 24

1    saw her.
2    Q.   And doctor, the fact that she was naked at
3         investigation by investigator Humes, that would lead
4         you to believe that somebody naked will have a faster
5         decrease in temperature than somebody who is clothed?
6    A.   Yes.
7    Q.   And do clothes act as some type of like insulation
8         that helps keep heat in?
9    A.   It does. For example, everybody that's here has
10        several layers of clothing or if you have a coat and
11        you die wearing a coat or while you are sleeping with
12        your comforter and linen and so forth, that will also
13        play a role because that will conserve the
14        temperature.
15   Q.   And you also earlier in your deposition mentioned
16        something about how rigor mortis after a certain
17        period of time will be gone?
18   A.   Yes.
19   Q.   And on a time frame on that, how far out would that be
20        after the person died? Would that be somewhere closer
21        to eight, ten, twelve hours?
22   A.   Yes. All depends on the environment plays a role and
23        I will give you again for the benefit of the jury, I
24        was born and raised in the Caribbean and if a person
25        dies at eight in the morning, by five p.m., on the



FRANCISCO DIAZ, M.D.
July 27, 2009

**Page 25**

1   outside, by five p.m. they have to be buried, no
2   exception because they will be decomposed because of
3   the high humidity and high temperature every single
4   day of the year.
5        So again, that's to emphasize how difficult
6   it is to pinpoint even with all the markers you have
7   suggest, rigidity, lividity and so forth and the
8   specific time of death.
9   Q.  You did review the EMS run sheet?
10  A.  Yes.
11  Q.  On the EMS run sheet you saw that it was noted that
12      there was some rigor mortis on face and extremities?
13  A.  Yes.
14  Q.  What did you make of that?
15  A.  What I make of that is rigor mortis happens in every
16      single muscle of the body at the same rate. You
17      notice them first in the small muscles and that is a
18      question we ask, for example, medical students here to
19      trick them, you can call it forensic humor. Because
20      you see decedents here with what is popularly called
21      goose flesh, and we ask them why do you think they
22      have that. If they are not very smart, they will say
23      because they are cold. How can they have that
24      reaction if they are dead. That is rigor mortis,
25      because every single hair that you have in your body

**Page 26**

1   has a muscle that contracts, gets rigid; therefore, at
2   the beginning of rigor mortis, you're going to have
3   that goose flesh, that's rigor mortis. The small
4   muscles you have in the face like in the cheek, you
5   will notice that first but rigor mortis is occurring
6   at the same rate on every single muscle. If the EMS
7   technician notice that, probably that's because of the
8   difficulty in trying to intubate the decedent and
9   that's why he noticed that on the face. Again, if we
10  take the rule of thumb that rigor mortis happens
11  within two hours, that is within two hours of her
12  death. Could have been within one hour depending on
13  the environment, which I don't know all the
14  circumstances of the environment where she was found
15  other than that she was without clothing.
16  Q.  In reviewing these documents, you agree that at the
17      time that investigator Humes did his investigation, no
18      rigor had set in, correct?
19  A.  Yes.
20  Q.  And that the body was warm to touch?
21  A.  Yes.
22       MR. HARRINGTON: I'll pass the witness at
23  this time.
24       MR. COPELAND: I don't have any questions.
25       MR. COTHORN: Neither do I.

**Page 27**

1        MR. COPELAND: I have one question.
2        EXAMINATION
3   BY MR. COPELAND:
4   Q.  Dr. Diaz, it is my understanding from your testimony
5       that in terms of the actual mechanism of death that
6       you would defer to a clinician?
7   A.  I would defer a clinician to explain it better, yes.
8        MR. COPELAND: Thank you.
9        RE-EXAMINATION
10  BY MR. HARRINGTON:
11  Q.  In your deferment, you would actually want to hear
12      what this clinician has to say, you're not giving a
13      blanket deferment without seeing what this clinician
14      says?
15  A.  Yes, that's correct.
16       MR. HARRINGTON: Thank you.
17       (The deposition was concluded at 11:02 a.m.
18       Signature of the witness was not requested
19       by counsel for the respective parties hereto.)
20
21
22
23
24
25

**Page 28**

1        CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN)
3                    ) SS
4   COUNTY OF MACOMB )
5
6        I, Carolyn Grittini, a Notary Public in
7   and for the above county and state, do hereby certify
8   that the above deposition was taken before me at the
9   time and place hereinbefore set forth; that the
10  witness was by me first duly sworn to testify to the
11  truth, and nothing but the truth; that the foregoing
12  questions asked and answers made by the witness were
13  duly recorded by me stenographically and reduced to
14  computer transcription; that this is a true, full and
15  correct transcript of my stenographic notes so taken;
16  and that I am not related to, nor of counsel to either
17  party nor interested in the event of this cause.
18
19
20  _____
21       CAROLYN GRITTINI, CSR-3381
22       Notary Public,
23       Macomb County, Michigan
24  My Commission expires: July 15, 2011



CERTIFICATE OF NOTARY

STATE OF MICHIGAN    )
                     ) SS
COUNTY OF MACOMB     )


I, CAROLYN GRITTINI, a Notary Public in
and for the above county and state, do hereby
certify that the above deposition was taken before
me at the time and place hereinbefore set forth;
that the witness was by me first duly sworn to
testify to the truth, and nothing but the truth;
that the foregoing questions asked and answers made
by the witness were duly recorded by me
stenographically and reduced to computer
transcription; that this is a true, full and correct
transcript of my stenographic notes so taken; and
that I am not related to, nor of counsel to either
party nor interested in the event of this cause.


CAROLYN GRITTINI, CSR-3381

Notary Public,

Macomb County, Michigan


My Commission expires: July 15, 2011

10b

1

```
 1                STATE OF MICHIGAN
 2      IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE
 3   DELAIHA PATTERSON,
     as Personal Representative
 4   of the Estate of SHERRILL
     TURNER, deceased, and ROBERT
 5   TURNER, a Minor, Individually,
     By His Next Friend, DELAIHA
 6   PATTERSON,
 7            Plaintiffs,
 8         -vs-             No. 08-111-034 NO
 9   SHERRY NICHOLS and TERRI SUTTON,
10            Defendants.
11   _____/
12        The deposition of WERNER SPITZ, M.D.,
13   taken before Reporter LaVerne M. Reinhardt, CSR-3305,
14   Notary Public in and for the County of Macomb, State of
15   Michigan, acting in the County of Macomb, at 23001
16   Greater Mack, St. Clair Shores, Michigan, on (Friday,
17   September 25, 2009, commencing at or about the hour of
18   10:45 a.m.
19   APPEARANCES:
20        JAMES J. HARRINGTON (P65351)
          FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, P.C.
21        19390 W. Ten Mile Road
          Southfield, Michigan 48075
22        (248) 355-5555
23            Appearing on behalf of Plaintiff
24
25
             RELIANCE COURT REPORTING
                 (313) 964-3611
```

2

```
 1   APPEARANCES:  (Continued)
 2        WILSON A. COPELAND II (P23837)
          GRIER, COPELAND & COPELAND, P.C.
 3        615 Griswold
          Suite 400
 4        Detroit, Michigan 48226
          (313) 961-3600
 5
 6            Appearing on behalf of Defendant
              Sherry Nichols
 7
 8        JOHN A. COTHORN (P32428)
          535 Griswold
 9        Suite 530
          Detroit, Michigan 48226
10        (313) 964-7600
11            Appearing on behalf of Defendant
              Terri Sutton
12
13
14
15
16
17
18
19
20
21
22
23
24
25
             RELIANCE COURT REPORTING
                 (313) 964-3611
```

9257
RECEIVED
OCT 16 2009
Fieger, Fieger, Kenney & Johnson, P.C.

3

```
 1               I N D E X
 2
 3                                    PAGE:
 4
 5
 6   Cross Examination by Mr. Copeland      4
 7   Cross Examination by Mr. Cothorn      35
 8   Recross Examination by Mr. Copeland   42
 9   Cross Examination by Mr. Harrington   47
10
11
12
13
14
15            E X H I B I T S
16
17   Defendant's Exhibit 1 - Dr. Spitz' file   40
18   (Not attached)
19
20
21
22
23
24
25
             RELIANCE COURT REPORTING
                 (313) 964-3611
```

4

```
 1                     St. Clair Shores, Michigan
 2                     Friday, September 25, 2009
 3                     10:45 p.m.
 4                 --- --- ---
 5             MR. COPELAND:  Let the record
 6       reflect that this is a deposition taken pursuant to
 7       Notice, to be used for those purposes guaranteed
 8       under the Michigan Court Rules or allowed under the
 9       Michigan Court Rules.
10             W E R N E R  S P I T Z, M.D.,
11       having first been duly sworn, to testify to the
12       truth, the whole truth and nothing but the truth,
13       was examined and testified on his oath as follows:
14                 CROSS-EXAMINATION
15   BY MR. COPELAND:
16   Q.  Dr. Spitz, how many times have you testified for
17       the Fieger firm?
18   A.  I don't know.  I've testified for the Fieger firm,
19       I've testified against the Fieger firm.
20   Q.  Understanding that, do you know how many times
21       you've testified for them on their behalf?  Can you
22       give me an estimate?
23   A.  No.  I think a fair enough number of times.
24   Q.  Okay.  Would that be over 15 times?
25   A.  Probably.
                 RELIANCE COURT REPORTING
                     (313) 964-3611
```



# Excerpts from Deposition Transcript of Werner Spitz, M.D.

## 25

1 rigor mortis in the lower jaw and she had -- when
2 they tried to intubate her they found it was rigid
3 or stiff and they say that she had rigor mortis in
4 her legs.
5 Well, legs don't become --
6 muscle doesn't become rigorous, the joints become
7 stiff so I'm at a bit of a quandary what that
8 means, but if the time is 5:59 or say for
9 convenience that the first call came at around six
10 and the second call came at nine it is quite
11 evident to me based on what all these people say,
12 the EMTs and the investigator, that there's every
13 chance in the world that makes it much more likely
14 than not that the death occurred at around the
15 second call and not around the first.
16 Therefore, I'm stating that she
17 died around 9:02 because rigor mortis and cooling
18 of the body and livor mortis which is not even a
19 factor here, begin to develop at death, when the
20 blood circulation stops, when the breathing stops
21 and the elimination of carbon dioxide stops and
22 acidity begins to develop and rigidity begins to
23 develop.
24 It does not all develop at one
25 time so it's a gradual process for rigidity to
RELIANCE COURT REPORTING
(313) 964-3611

## 26

1 develop and you begin to see it, to feel it, the
2 first manifestations of rigidity are somewhere
3 around 20 minutes later. Twenty minutes under room
4 temperature. Then you go to 30 minutes, you go to
5 one hour, you go to two, three, four hours and it
6 becomes rigid, real rigid when there's no question
7 that rigidity is rigidity because it ends up like a
8 board.
9 One investigator says that
10 there was rigidity in the legs which I don't know
11 how much that is. The other says there is no
12 rigor. The other says warmth, the first one says
13 cool.
14 I would have to conclude that
15 there is a beginning of rigor mortis that we're
16 talking about here because I don't want to say that
17 the EMT is wrong, I cannot say that the
18 investigator is wrong. I have to assume that there
19 is a fine line that we're dealing with here but if
20 there is a fine line then the fine line fits 9:02
21 and by no means fits 5:59 so consequently it is my
22 opinion that she died around 9 o'clock.
23 Q. If I understand you correctly, you are not
24 indicating that the EMS techs are wrong, you are
25 not indicating that the examiner is wrong, you are
RELIANCE COURT REPORTING
(313) 964-3611

## 27

1 acknowledging the fact that there's a disagreement?
2 A. I don't even know that there is a disagreement.
3 What I'm saying is, and the reason I'm saying this
4 is because I've seen it so many times where in the
5 early stages of the post-mortem period when rigor
6 mortis just begins that some will say there is
7 rigor mortis because it is impressive to feel a
8 joint and see it doesn't move as readily as it did
9 during life. And one will say there is less and
10 some will say there is more. Or some will say
11 there isn't any and some will say there's more.
12 I mean these may have different
13 explanations on top of it but when you take it all
14 together there's no escape from the fact that the
15 body would not be warm if it were dead at 5:59; the
16 body would be warm if the body -- if the person
17 died around 9 o'clock.
18 Q. Would you agree that if the person was dead at or
19 by 5:59 that rigor mortis would be present?
20 A. Rigor mortis would be markedly present. There
21 would be no discussion. There would be no
22 statement of no rigor and warm body.
23 Q. Would you agree that if the person were dead at or
24 by 5:59 that the body would be cool?
25 A. I would assume that it would be cooler than it was
RELIANCE COURT REPORTING
(313) 964-3611

## 28

1 at 9:02.
2 Q. And if the medical -- if the EMS individuals who
3 were there identified the presence of rigor and a
4 cool body and they have no question about the fact
5 that rigor was present or question about the fact
6 that the body was cool would you agree that based
7 on what they say that that would be consistent with
8 a body that reflected a death at or before 5:59?
9 A. Not necessarily.
10 Q. All right. What's the basis for saying that if
11 they are without question in their finding that it
12 doesn't support a finding of a death at 5:59?
13 A. Well, because they checked the joint -- sorry, the
14 jaw, the lower jaw and they checked the legs. I
15 don't really know what they mean by checking legs
16 because you don't check the legs, you check the
17 knee and you check the hip. And the legs you
18 really don't check because the muscle is of no
19 consequence. You want to know what the knee does
20 as being a major joint, you want to know what the
21 hip does being a major joint, you want to know
22 what the -- you notice that it becomes difficult to
23 intubate because of the stiffness of the lower jaw
24 and because of muscles of the throat making it
25 difficult to introduce a breathing tube.
RELIANCE COURT REPORTING
(313) 964-3611

# Excerpts from Deposition Transcript of Werner Spitz, M.D.

## 41

1  was that did the examination on behalf of the
2  medical examiner's office you have not spoken to
3  that person?
4  A.  No.
5  Q.  You indicated there were two people that would have
6  been there?
7  A.  Well, in my time when I was the medical examiner
8  there always were -- when a call came and it became
9  evident that the body needs to be brought in there
10  would be an attendant and an investigator sent.
11  Q.  So in our case you don't know whether there was one
12  person that responded or two?
13  A.  Well, I would almost be sure that there were two
14  because one cannot pick up a body. So the other
15  one may have remained in the truck and waited to be
16  notified by radio or by some fashion to come
17  upstairs and help remove the body.
18  Q.  You're not offering any opinions in this case that
19  had the EMS operator responded by calling -- or the
20  ESO operator responded by calling EMS at the
21  6 o'clock call that Ms. Turner would be alive or
22  could have been saved?
23  A.  I'm saying that she died much later, consequently
24  she was alive around six. I believe that had she
25  been removed emergently to the hospital she stood a

RELIANCE COURT REPORTING
(313) 964-3611

## 42

1  very good chance of survival.
2      Why am I saying that? Because
3  I believe she died of congestive heart failure and
4  not of an overwhelming haywire rhythm of the
5  heartbeat that would have dropped her and killed
6  her within seconds or even minutes. I believe that
7  this was a gradual process. Therefore, if she
8  would have been taken she stood a good chance of
9  survival.
10  Q.  And with respect to the second call you're not
11  testifying that she would have been saved had the
12  EMS responded to the second operator?
13  A.  Well, at the time it's mentioned, from six to nine,
14  I think the chances diminish as it goes.
15  Q.  Now listen to my question. Because we don't know
16  whether she died before 9:02 or after 9:02 we don't
17  know whether the second call would have made a
18  difference at all in terms of her survival?
19  A.  No, I didn't say that.
20  Q.  No, I'm asking a question.
21  A.  I'm saying that her chances of survival as they
22  came close to 9:02 might have been diminished as
23  compared to 6 o'clock or 5:59.
24  Q.  Okay, now listen to my question, Doctor. We've
25  already agreed that she might have died before

RELIANCE COURT REPORTING
(313) 964-3611

## 43

1  9:02, correct?
2  A.  We agreed that she might have died very shortly
3  before 9:02.
4  Q.  So therefore if she died very shortly before 9:02
5  the second call wouldn't have made any difference
6  one way or another because she was already dead?
7  A.  If it is shown that she died like at preceding the
8  9:02 call by a minute or two or two minutes or very
9  shortly before that then you're correct.
10  MR. COTHORN: I have no further
11  questions.
12  RECROSS EXAMINATION
13  BY MR. COPELAND:
14  Q.  Doctor, you indicated that she died from
15  non-ischemic cardiomyopathy earlier in the
16  deposition and just a moment ago you said that she
17  died from congestive heart failure. Now that leads
18  me to ask is there a difference between the two?
19  A.  No, there's no difference.
20  Q.  So you're saying that they're the same disease
21  process?
22  A.  No. The disease process is congestive heart
23  failure -- is dilated cardiomyopathy, the mechanism
24  of death is congestive heart failure.
25      The underlying disease is a

RELIANCE COURT REPORTING
(313) 964-3611

## 44

1  certain type of heart disease; what that heart
2  disease entails is a manifestation of failure of
3  the heart, and when the heart fails it may fail as
4  a result of a lot of things, one of them may be
5  dilated cardiomyopathy.
6      So, for example, if I am
7  involved in a traffic accident and a lot of
8  injuries are caused to me the cause of death may be
9  bleeding.
10  Q.  Well, you also indicated that she did not die from
11  some overwhelming haywire electrical rhythm
12  disorder.
13  A.  Yeah, rhythm disturbance. I believe that although
14  she might have had a terminal rhythm disturbance
15  because most people that die I think do have a
16  terminal rhythm disturbance but that is so terminal
17  that there's nothing you can do about that but she
18  went into congestive heart failure when her heart
19  began to fail acutely after her first collapse.
20  Q.  So, you think that the congestive heart failure
21  began after she was down?
22  A.  It may have been there before too but it may not
23  have been there to an intensity. People walk
24  around -- you often go to a supermarket and you see
25  people stand there, men or women, with big swollen

RELIANCE COURT REPORTING
(313) 964-3611

DEPOSITION OF WERNER SPITZ, M.D. - TAKEN 9-25-09

## 45

1  ankles and they go shopping and they do everything
2  that they have to do and they are in congestive
3  heart failure.
4  Q. Would they have symptoms?
5  A. They have symptoms.
6  Q. What would be the symptoms be?
7  A. They have symptoms, when they go up the steps they
8  get short of breath but they cope with it.
9  Q. Okay. So you do agree that if there was -- well,
10  no, never mind.
11  It is not this haywire rhythm
12  disturbance something where you said when that
13  happens there's nothing that can be done, is that
14  not an accepted or a known consequence of
15  cardiomyopathy?
16  MR. HARRINGTON: Form and
17  foundation. Go ahead.
18  THE WITNESS: It may be but then if
19  they develop such a haywire rhythm which I'm
20  suggesting to you may be ventricular fibrillation
21  then such a person will die in short order. This
22  person did not die in short order. This person
23  died not of ventricular fibrillation but died of
24  congestive heart failure which ultimately close to
25  9:02, and in my opinion probably after 9:02,

RELIANCE COURT REPORTING
(313) 964-3611

## 46

1  developed a haywire rhythm which could have been
2  solved.
3  BY MR. COPELAND:
4  Q. And the proof of congestive heart failure at
5  autopsy is where?
6  A. Congested organs, edema of the lungs, congested
7  other organs, I don't quite remember which but it's
8  evident that the death was not an acute death but a
9  protracted death.
10  Q. Do you have your slides?
11  A. I don't know if I have them here.
12  Q. But you did make slides?
13  A. I did make slides, yes. They are indicated in my
14  report. It says that I examined heart, lung and
15  kidneys.
16  MR. COPELAND: All right. May we
17  have access to those slides?
18  MR. HARRINGTON: I don't have a
19  problem with it. Doctor, is that okay?
20  THE WITNESS: Sure. They would have
21  to make recuts and we'll give it to them. And if
22  you talk to Diane on your way out from here when
23  you leave she will see to it that you get them.
24  MR. COPELAND: Okay, I will give her
25  a call back. Thank you, Doctor.

RELIANCE COURT REPORTING
(313) 964-3611

## 47

1  MR. HARRINGTON: I have a couple in
2  follow-up.
3  MR. COTHORN: Not at our deposition.
4  MR. HARRINGTON: That's fine. If
5  you don't have any objection to me supplementing by
6  affidavit that's fine but I figured I'd just take
7  care of it now. It's your guys call, I don't care.
8  MR. COTHORN: I'm talking about
9  paying. Go ahead.
10  MR. HARRINGTON: It will be real
11  quick.
12  CROSS EXAMINATION
13  BY MR. HARRINGTON:
14  Q. More likely than not, Doctor, had EMS response
15  arrived to Ms. Turner at 7 p.m. she would be alive
16  today?
17  A. I think so.
18  Q. More likely than not, Doctor, had EMS response
19  arrived to Ms. Turner at 8 p.m. she would be alive
20  today?
21  MR. COPELAND: Just a general
22  objection to his ability to provide opinions on
23  survivability.
24  BY MR. HARRINGTON:
25  Q. Go ahead, Doctor.

RELIANCE COURT REPORTING
(313) 964-3611

## 48

1  A. I believe so.
2  Q. And essentially, Doctor, had emergency medical --
3  MR. COTHORN: If I could have a
4  foundational objection if I could and I'll shut up.
5  MR. HARRINGTON: Fine.
6  MR. COPELAND: That was mine.
7  MR. HARRINGTON: Fine.
8  BY MR. HARRINGTON:
9  Q. More likely than not, Doctor, had EMS response
10  arrived and was there prior to Ms. Turner actually
11  expiring they could have saved her?
12  MR. COTHORN: From?
13  BY MR. HARRINGTON:
14  Q. Up until the time right before she died they could
15  have saved her?
16  A. Yes, they would have had to have taken her to the
17  hospital.
18  MR. HARRINGTON: That's all I have.
19  MR. COTHORN: Off the record.
20  (Discussion held off the
21  record.)
22  (Defendant's Exhibit 1 was
23  marked for identification.)
24  (Deposition concluded at
25  12:15 p.m.

RELIANCE COURT REPORTING
(313) 964-3611

```
1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN)
3                     ) SS
4    COUNTY OF WAYNE  )
5         I, LaVerne M. Reinhardt, CSR, Notary Public in
6    and for the above county and state, do hereby certify
7    that the deposition of WERNER SPITZ, M.D., was taken
8    before me at the time and place hereinbefore set forth,
9    that the witness was duly sworn to testify to the truth,
10   the whole truth and nothing but the truth, that
11   thereupon the foregoing questions were asked and
12   foregoing answers were made by the witness which were
13   duly recorded by me stenographically and later reduced
14   to computer transcription; and I certify that this is a
15   true and correct transcript of my stenographic notes so
16   taken.
17        I further certify that the signature was
18   waived by counsel for the respective parties hereto;
19   also, that I am not of counsel to either party nor
20   interested in the event of this cause.
21
22
23        LaVerne M. Reinhardt, CSR-2305
          Notary Public, Wayne County,
24        Michigan
          My Commission Expires:  01-02-15
25
             RELIANCE COURT REPORTING
                 (313) 964-3611
```


Ella M. Bully-Cummings, Chief of Police (Direct)

**subject:** INVESTIGATION AND REPORT REGARDING CHIEF ROUTE SLIP C06-508, REQUEST OF MR. STEVE WORTHING FOX 2 NEWS

**from:** Assistant Chief of Police Gary B. Christian, Administrative Portfolio

### ISSUE:

Should the Investigation and Report concerning allegations of misconduct completed by Communications, and the recommendations from Human Resource Director Lawana Ducker be accepted?

### DISCUSSION:

On Monday, February 27, 2006, the Office of the Chief of Police received a fax transmittal from Deputy Mayor Anthony Adams, regarding a Freedom of Information Act request from Fox 2 News Assignment Manager, Steve Worthing. The request involved a 9-1-1 call placed by five year old Robert Turner, on Monday, February 20, 2006. Writer has reviewed the investigation and report submitted by Deputy Chief Joyce Motley, Technical Services Bureau and the recommendations from Director Lawana Ducker. I find that Emergency Operators did not ascertain the actual circumstances of the caller and both operators concluded the call did not warrant service. 

- ESO Sharon Nichols is in direct violation of GENERAL ORDER 78-11, Section 21, Neglect of Duty (*Major 1 Offense*); and Section 8, Contact With Citizens, subsection 8.4, *All Possible Consideration* (*Minor Offense*); And, I agree with Director Ducker that under the charge of Contact With Citizens, subsection 8.9, *Professionalism and Objectivity* (Minor Offense) *Recommendation* (5-day suspension)

- ESO Terri Sutton is in direct violation of GENERAL ORDER 78-11, Section 8, Contact With Citizens, subsection 8.4, *All Possible Consideration (Minor Offense)*; And, subsection 8.9, *Professionalism and Objectivity (Minor Offense). Recommendation* (2-day suspension)

### RECOMMENDATION:

I concur with the recommended ranges (1-5 days suspension), submitted by Senior Emergency Services Operator Isaiah E. Hayes and endorsed by E.J. Reaves, Administrative Supervisor, Emergency Telephone Services.

16b



EXHIBIT
E

From:     Assistant Chief of Police Walter E. Shoulders, Operations Portfolio

And, I agree with Human Resource Director Lawana Ducker recommendations.

GARY B. CHRISTIAN
Assistant Chief
Administrative Portfolio

GBC/tp

Lawana Ducker, Director Human Resources

17b

ingarden - 911 Asst. Prosecutor's May 30, 2006 Internal Memorandum

Page 1

# INTERNAL MEMORANDUM

TO:       Kym Worthy, Wayne County Prosecutor
FROM:     Lora Weingarden, Assistant Prosecutor
DATE:     May 30, 2006
RE:       911 Operator Investigation of 2/20/06 call by Robert Turner

### Summary of Facts

On February 20, 2006 at 5:59 pm five year-old Robert Taylor dialed 911 to get help for his mother who had "passed out." Emergency Services Operator (ESO) Sharon Nichols took that first call, which is transcribed below:

ESO:   Emergency 911, what is the problem?
RT:    My mom has passed out
ESO:   You over on Spruce?
RT:    Huh?
ESO:   You on Spruce?
RT:    My mom....
ESO:   Where's Mrs. Turner at?
RT:    Right here.
ESO:   Let me speak to her.
RT:    She's not gonna talk.
ESO:   Okay, well I'm gonna send the police to your house and find out what's going on with you.
ESO:   1950 Spruce Apt. 3

This call was terminated after a mere 43 seconds. Even though ESO Nichols told Robert that she was sending the police did not dispatch a police unit to the Taylor residence, but rather logged the call as a prank call and closed the call record.

Three hours later at 9:02 pm, Robert Turner dialed 911 again. ESO Terri Sutton took this call, which is transcribed below:

ESO:   Emergency 911, where is the problem?
RT:    My mom has passed out.
ESO:   1950 Spruce. Is that the Robert Turner residence? What's the problem up there?
RT:    My mom...
ESO:   Let me speak to her. Let me speak to her before I send the police over there.
RT:    She's not gonna talk.
ESO:   Huh?
RT:    She's not gonna talk.
ESO:   Okay. Well, you know what? Then she's gonna talk to the police. Okay.

18b

RT:     She's gonna talk to the police because I'm sending them over there.
RT:     She's not gonna talk.
ESO:   I don't care. You shouldn't be playing on the phone. [pause] Now put her on the phone before I send the police out there to knock on the door and your gonna be in trouble.
RT:     MOM!!!!!!!!!!

This call lasted only 1 minute 16 seconds. However, ESO Sutton followed through on her words and dispatched a police unit to the Turner residence for investigation of a child "playing on 911 line." When police arrived at the Turner residence they discovered that Robert's mother was unresponsive. Twenty minutes later, at 9:40 pm, EMS arrived and declared Mrs. Turner dead at the scene.

An internal investigation concluded that both ESO operators, Nichols and Sutton, "did not ascertain the actual circumstances of the caller and ... concluded that the call did not warrant service." ESO Nichols received a 5 day suspension for violations of General Order 78-11, section 21 Neglect of Duty[1]; and section 8 Contact with Citizens subsections 8.4[2] and 8.9[3]. ESO Sutton received a 2 day suspension for violations of General Order 78-11, section 8 Contact with citizens subsections 8.4 and 8.9.

Training Bulletin 78-2 E9-1-1 "Interview Procedure" (Exhibit 1) set forth the 911 interview procedures that were in effect on the date Robert dialed 911. Neither ESO Nichols, nor ESO Sutton followed this procedure, which details the information that must be ascertained from a caller. Of note in this situation is that neither ESO listened to little Robert Turner's words to them. He clearly stated that his mom had "passed out" at the outset of both calls thereby relaying the "WHAT" information, which should have at least signaled to a ESO that this call could not be summarily dismissed as a prank call or child playing on the phone.

Training Bulletin 74-3-R-B "Telephone Deportment" (Exhibit 2) outlines "Telephone Manners" in section 3, which states, "Our purpose is to serve the public. Answer promptly – treat each call as an emergency." Again, neither ESO Nichols, nor ESO Sutton followed this clear, written procedure.

Training Bulletin 98-1 "Emergency Call-Taker Liability and Discretion" (Exhibit 3) conveys an express and clear duty upon ESOs to adhere to departmental procedures:

> Every call to our E9-1-1 Emergency center is different. Even the most similar calls may receive unusually different responses

---

[1] Neglect of Duty – Major 1 Offense: An employee shall not intentionally fail to take action as required by department rules, regulations, orders, or procedures which are applicable to his duties and responsibilities.
[2] 8.4 All Possible Consideration – Minor Offense: All employees shall give all possible consideration to citizens seeking information or assistance or desiring to make any report whether in person or by telephone.
[3] 8.9 Professionalism and Objectivity – Minor Offense: An employee shall, when questioning a citizen do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective to all persons.

depending upon which operator handles them. These facts place a burden of independent responsibility on each operator in the performance of their day to day duties and these facts are the reason why it is imperative that operator adhere to protocol (rules of conduct) and engage in critical thinking at all times.

Training Bulletin 98-1 also gives ESOs notice that they may be subject to liability for failure to follow established protocols:

> The ESO may not be protected by departmental or municipal immunity in the event or a charge of negligent or irresponsible job performance that results in court action. Protection from liability lies in strict and conscientious adherence to established guidelines (Training Bulletins, General Orders, Pre-arrival Instructions, etc.) which are accepted as standard operating procedures. We must not deviate from protocol by substituting terminology or procedures.

In addition to expressly conferring on ESOs a duty to follow protocol and giving them notice of the possible consequences for failure to follow protocol, Training Bulletin 98-1 goes a step further and lists "Liability Factor's" to warn ESOs of action or inaction that may give rise to liability. Three of these factors are highly relevant to the facts of Robert's call.

3. Not appreciating or understanding the impact of the words and expressions on callers. The caller relies on the operator.
4. Getting into the "routine" mode, where calls/callers are considered the same. Taking things for granted and assuming information.
5. Losing empathy. Failing to reflect upon, or consider the feelings, emotions, and situations of callers.

Summary of Applicable Law

MCL 750.478 states "When any duty is or shall be enjoined by law upon any public officer, or upon any person holding any public trust or employment, every willful neglect to perform such duty, where no special provision shall have been made for the punishment of such delinquency, constitutes a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $1,000.00."

The Court of Appeals decision in People v. Medlyn, 215 Mich App 338 (1996) is illustrative to determining whether a defendant had the requisite intent under MCL 750.478. In Medlyn, an inmate reported to a sheriff that other inmates had been sexually abused him, however the sheriff took no action and the inmate was attacked again. The Court found that the sheriff was guilty of neglect of duty under MCL 750.478, determining that willfulness requires that "some element of a bad purpose be present." The Court illustrated that actions were willful where a defendant voluntarily, consciously, and intentionally acted, but that merely careless or accidental actions were not willful.

20b