# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                        :
In re                                   :        Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :        Case No. 13-53846
                                        :
                        Debtor.         :        Hon. Thomas J. Tucker
                                        :
                                        :
-----------------------------------------------------x
```

## OBJECTION OF THE CITY OF DETROIT TO
## THE RETIRED DETROIT POLICE AND FIRE FIGHTERS
## ASSOCIATION'S MOTION FOR ENFORCEMENT OF
## SETTLEMENT AND EIGHTH AMENDED PLAN OF ADJUSTMENT

The City of Detroit ("City") hereby files this Objection to the *Retired Detroit Police and Fire Fighters Association's Motion for Enforcement of Settlement and Eighth Amended Plan of Adjustment* (Docket No. 9414) (the "Motion") filed by the Retired Detroit Police and Fire Fighters Association (the "RDPFFA").  In support of this Objection, the City respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The City's plan for the adjustment of its debts (Docket No. 8045) (the "Plan")[1] was confirmed by the Court in November 2014 with

---

[1]   Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

the support and agreement of all major stakeholders in this chapter 9 case –
including the RDPFFA.  See *Order Confirming the Eighth Amended Plan for
the Adjustment of Debts of the City of Detroit*, dated November 12, 2014 (Docket
No. 8272) at ¶ 15(a) (the "Confirmation Order").  The City's agreement with
RDPFFA initially was summarized in a term sheet dated April 25, 2015 (the "Term
Sheet"),[2] and the substance of that agreement then was incorporated into, and
superseded by, the Plan itself.  See *infra* at ¶¶ 24-26.

2.     The Plan and the Confirmation Order also recognized
the ongoing effectiveness of postpetition collective bargaining agreements entered
into by the City and certain of its unions.  See Plan § II.D.5; Exhibit II.D.5;
Confirmation Order ¶ 47.  In that regard, the RDPFFA is not a union and does not
engage in collective bargaining with the City on behalf of active or retired police
personnel or fire fighters.  There are three separate unions that represent the City's
police force and bargain on their behalf, and a different union that represents and
bargains on behalf of fire fighters.

3.     Four months after confirmation of the Plan, the RDPFFA has
now filed this Motion, seeking approximately $700,000 in cash to mirror, for
Detroit police retirees, a special disability benefit that a union representing Detroit
fire fighters – the Detroit Fire Fighters Association ("DFFA") – negotiated

---

[2]     The Term Sheet is attached as part of Exhibit 6 to the Motion.

exclusively for current and retired fire fighters.[3]  This special disability benefit for fire fighters is memorialized in the DFFA's postpetition collective bargaining agreement with the City (the "DFFA CBA").[4]  The police unions did not negotiate such a benefit for active police officers or retirees.

4.    RDPFFA attempts to justify this post-confirmation grab for additional retiree police benefits by claiming that paragraph 8 of the Term Sheet serves as a broad "most favored nations" or "me too" clause – i.e., a requirement that the City automatically provide to retired police officers any contractual benefits provided to retired fire fighters that are more favorable.

5.    The RDPFFA's position is palpably meritless.  As a bankruptcy law **and** contractual matter, RDPFFA is not entitled to obtain new benefits for retired police officers or any other retired police personnel.  First, reliance on the Term Sheet itself is inappropriate because the Plan superseded the Term Sheet, and the Term Sheet is not enforceable independently from the Plan.  By its own terms (see Term Sheet Preamble and ¶ 6), the provisions of the Term Sheet were to be incorporated into the Plan, with the Plan supplanting the Term Sheet.  Paragraph 8 of the Term Sheet, cited by the RDPFFA, relates to the treatment of

---

[3]    The $700,000 represents a $140,000 per year subsidy negotiated by DFFA on behalf of fire fighters for a five-year period.

[4]    The DFFA CBA is attached as part of Exhibit 6 to the Motion.

CHI-181960080

PFRS Pension Claims and OPEB Claims in Classes 10 and 12 under the Plan. The treatment of those Classes undeniably is governed *only* by the Plan.

6.     Second, as a contractual matter, the Term Sheet does ***not*** provide a "most favored nations" or "me too" provision.  It merely provides that if other agreements expressly made benefits available to certain police or fire fighter retirees relating to Classes 10 or 12 of the Plan, the Term Sheet could not be read to prohibit the receipt of such other negotiated benefits.  Although the DFFA negotiated an additional $700,000 in special disability benefits for its members and retirees, no such benefit was negotiated by any of the three police unions for either current or retired police personnel.

7.     In any event, and even if the Term Sheet somehow were construed as including a "most favored nations" clause (and it manifestly should not be), it still would not apply in the manner RDPFFA asserts.  The special disability benefit negotiated by DFFA is not part of the settlement or treatment of the Class 10 and 12 claims.  It is a new benefit, created postpetition, and independent of the resolution of Class 10 and 12 claims.  Because the relevant language of the Term Sheet relates only to resolution of Class 10 and 12 claims, the new disability benefit falls outside the Term Sheet.

8.     Moreover, the DFFA CBA that provides for the special disability benefit was the product of concessionary negotiations, in which current

CHI-181960080

Detroit fire fighters gave up other corresponding economic terms to receive this $700,000 benefit for their duty disabled brethren. Even under a "most favored nations" construction, and even were it applicable to these circumstances (which it is not), the Term Sheet at most grants the police unions only the right to obtain the same disability benefit in conjunction with cost neutral supporting concessions.

9.     Indeed, it would be unfair and unjust – and legally unsupportable  – for the RDPFFA to swoop in relying on a document that no longer has legal force, and that never applied to these circumstances, to cherry pick the benefits of the DFFA CBA without corresponding concessions as were provided to the City by its current fire fighters.

## BACKGROUND

**A.     The City's Mediation Agreement with the RDPFFA.**

10.     In the City's June 14, 2013 Proposal for Creditors (which is attached hereto as Exhibit A) (the "Proposal to Creditors"), the City noted that "there must be significant cuts in accrued, vested pension amounts for … currently retired persons." Proposal to Creditors at p. 109. On August 16, 2013, this Court issued its *First Order Referring Matters to Facilitative Mediation* (Docket No. 333) (the "Mediation Order"). The Mediation Order required the City and various creditors to engage in Court-supervised mediation regarding "[t]he treatment of the claims of the various creditor classes in a plan of

adjustment" and "[t]he negotiation and renegotiation of collective bargaining agreements." Id.

11.     Pursuant to the Mediation Order, the City entered into mediation with the RDPFFA, an organization acting as advocate for approximately 6,500 retired police and fire fighters.  Motion at ¶ 1.  This mediation addressed the treatment of those retirees' claims under the Plan, which involved retirees' prepetition right to pension and health benefits. [5]  As a result of mediation, on April 15, 2014, the City and the RDPFFA reached an agreement, which provided that RDPFFA retirees would receive no cut in their accrued prepetition pension benefits, with the only concession being a reduction of previously negotiated cost of living adjustments by 45%.  Term Sheet at ¶ 1.

12.     Of more relevance to this dispute, the Term Sheet contemplated that its provisions would be incorporated within and made a part of the Plan.  Term Sheet at p. 1.  Further, the Term Sheet made clear that it was not to operate to preclude other agreements that the City might enter into with respect to resolving claims for prepetition pension and OPEB benefits, i.e., Class 10 and 12 claims. Term Sheet at ¶ 8.  In other words, it left open the possibility that the City could

---

[5]     The Plan classifies (a) the police and fire fighters' claims relating to the City's promised pension benefits (including pension underfunding claims) as PFRS Pension Claims in Class 10 under the Plan and (b) their claims for the value of retiree health benefits as OPEB Claims in Class 12 under the Plan.

CHI-181960080

enter into other agreements with respect to the prepetition pension or OPEB claims of police or fire fighter retirees (or both). Id. Specifically, paragraph 8 of the Term Sheet provides that:

> Police and firefighter retirees are entitled to the benefits of any other agreement entered into by the City of Detroit *that covers such retired police and fire fighters* and which is more advantageous to them than the terms of this agreement *as it relates to Class 10 (PFRS Pensions) and 12 (OPEB)*.

Id. (emphasis added).

13.    Notably, this provision by it terms focuses only on agreements that apply to these groups and relate to the treatment of claims in Class 10 and Class 12. Paragraph 8 of the Term Sheet makes no reference to agreements, such as the DFFA CBA, impacting issues outside of these Plan classes and, in any event, simply provides that if any such other agreements were to provide an additional pension or retiree health benefit, "such retirees" as might be covered by those agreements would receive the additional benefit.

14.    In accordance with the preamble to the Term Sheet, the substantive terms of the agreement between the City and the RDPFFA were incorporated into the Plan as follows:

| Term Sheet Provision | Consistent Plan Provision |
|---|---|
| ¶ 1 | § II.B.3.q.ii.C |
| ¶ 2 | § II.B.3.q.ii.F |
| ¶ 3 | Exhibit II.B.3.q.ii.C |
| ¶ 4 | § II.B.3.s.ii.B |
| ¶ 9 | § I.A.180 (and subsequent references) |

15.    Paragraph 8 of the Term Sheet was not specifically incorporated into the Plan because it contained no substantive plan terms, but only contemplated the possibility that groups could negotiate enhanced plan treatment of Class 10 and 12 claims.  Consistent with the Term Sheet, any applicable enhancements to the treatment would have been incorporated into the Plan, which governs the treatment of claims in those classes.  Because there were no other agreements reached that related to the substantive treatment of Classes 10 and 12, paragraph 8 of the Term Sheet has no further relevance.

16.    Moreover, the RDPFFA supported every iteration of the Plan that the City put forth between April 2014 and October 2014 (when the final version was filed and submitted to the Court for confirmation).  The RDPFFA never suggested that any terms of the agreement described in the Term Sheet were missing from the Plan.  Now that the Plan is confirmed and consummated, the RDPFFA and its retirees are bound by the terms of the Plan and the Confirmation Order.

CHI-181960080

## B.   The City's Mediation Agreements with the Public Safety Unions.

17.     Even before the Court issued the Mediation Order, the City agreed to enter into discussions with each of the City's four public safety unions to determine whether the parties could reach an agreement on the terms of a collective bargaining agreement:  (a) the DFFA, representing City fire fighters; (b) the Detroit Police Officers Association (the "DPOA"), representing City police officers; (c) the Detroit Police Lieutenants and Sergeants Association (the "DPLSA"), representing City police lieutenants, sergeants and investigators; and (d) the Detroit Police Command Officers' Association ("DPCOA"), representing City police commanders and captains (collectively, the "Public Safety Unions").

18.     The City's mediation discussions with the Public Safety Unions covered all terms and conditions of employment, including benefits that active employees would receive upon retirement.  The City preferred to enter into five-year agreements that were cost-neutral relative to what the City reasonably could afford in future public safety labor costs.  With this objective in mind, the City's financial advisors (i.e., Ernst & Young) prepared multi-year budgets to project what the City might be able to afford in future labor costs for its public safety personnel, and these budgets set forth certain benefits and rules of employment, and the maximum amounts the City determined it could afford.

-9-

19.     As set forth in the DFFA CBA, the City and the DFFA reached agreement on a number of proposals to generate savings relative to the City's budget, including proposals to reduce the number of certain personnel at the Detroit Fire Department, the number of paid days off for certain employees and applicable holiday premiums.  All of these (and other) DFFA proposals provided greater concessions on these subjects than were set forth in the City's budgets. See generally DFFA CBA at § 24 (A)(4).  In turn, the City and the DFFA agreed to apply the bulk of the savings generated by these proposals toward additional wages for active DFFA bargaining unit members.  Id.

20.     Of most relevance, the City and the DFFA also agreed that a portion of the savings generated by their proposals be spent on a new "Disability Subsidy" for "employees who are Totally and Permanently Disabled."  Id. at § 24(B)(10)(b).  Specifically, the DFFA and the City agreed to allocate $140,000 annually for five years to a special disability subsidy to offset healthcare costs for "Employees who are Totally and Permanently Disabled due to an injury incurred in the line of duty."  Id. at § 24(B)(10) (the "Disability Subsidy").  This Disability Subsidy applies to former employees who were currently, or would in the future, become "Totally and Permanently Disabled," as defined by the collective bargaining agreement.  See id. at §§ 24(B)(10)(a), § 24(B)(10)(d).  Critical to maintaining the cost neutrality of the DFFA agreement, the relevant contractual

-10-

CHI-181960080

13-53846-tjt    Doc 9571    Filed 03/30/15    Entered 03/30/15 18:33:33    Page 10 of 21

provision expressly provided that the City's contribution toward the Disability Subsidy absolutely could not exceed $140,000 per year, for a total of $700,000 over the five-year term.  Id. at § 24(B)(10)(b)(i).

21.     Like the DFFA, the DPOA also reached agreement with the City on a number of concessionary provisions to save money against budget. See Section 26(I) of the collective bargaining agreement between the City and the DPOA, a copy of which is attached hereto as Exhibit B (the "DPOA CBA") (stating, with specificity, each contract concession the DPOA made to receive a larger first year general wage increase).  But, unlike the DFFA, the DPOA, on behalf of the Detroit police officers, elected to allocate 100% of the concessionary cost savings to the receipt of benefits *other than* a Disability Subsidy, such as an immediate 8% general wage increase for active DPOA members.  Id.

22.     Similarly, both the DPLSA and the DPCOA entered into collective bargaining agreements that did not provide for a Disability Subsidy for members of their respective bargaining units.  The DPLSA and DPCOA collective bargaining agreements are attached hereto as Exhibits C and D, respectively.

## ARGUMENT

23.     There is no merit to the RDPFFA's claim that existing police retirees should receive a free ride and obtain the Disability Subsidy that the DFFA negotiated and effectively paid for with other concessions in the DFFA CBA.

-11-

To the contrary, the RDPFFA's claim is inconsistent with well-established bankruptcy law precepts, the plain language of the Plan, the plain language of the Term Sheet, and the parties' collective bargaining agreements. And, on top of all that, the claim is violative of notions of fairness and equity.

**A. The Rights of RDPFFA Retirees Are Governed by the Plan and Confirmation Order, Not the Term Sheet.**

24.     The RDPFFA's purported reliance on the Term Sheet is misplaced. The Plan is a new and binding contract between the City and the RDPFFA covering these topics. The Term Sheet itself even recognizes that its substantive terms would be incorporated into the Plan. Term Sheet at p. 1. As a matter of law, the Term Sheet, as a stand-alone document, no longer binds the parties and is superseded by the Plan. See Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.), 456 F.3d 668, 676 (6th Cir. 2006), cert. denied, 549 U.S. 1317 (2007) ("In interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and creditors.").

25.     Notably, paragraph 8 of the Term Sheet – the only provision at issue here – specifically states that it relates to the treatment of claims in Classes 10 and 12 under the Plan. Plan treatment manifestly is governed only by the confirmed Plan, not by other documents extrinsic to – and whose substantive provisions are incorporated into – the Plan. In re A.P. Liquidating Co., 283 B.R.

-12-

456, 459 (Bankr. E.D. Mich. 2002) (Rhodes, J.) ("...the effect of plan confirmation is to bind all parties to the terms of a plan of reorganization."), citing Still v. Rossville (In re Chattanooga Wholesale Antiques, Inc.), 930 F.2d 458, 463 (6th Cir. 1991) ("Confirmation of a plan of reorganization by the bankruptcy court has the effect of a judgment by the district court and *res judicata* principles bar relitigation of any issues raised or that could have been raised in the confirmation proceedings."). Moreover, "[a]bsent ambiguity, the plan 'is to be enforced as written, regardless of whether it is in line with parties' prior obligations.'" In re Gainey Corp., 447 B.R. 807, 818 (Bankr. W.D. Mich. 2011), aff'd, 481 B.R. 264 (B.A.P. 6th Cir. 2012), citing Dow Corning, 456 F.3d at 676.

26.     As set forth above, the Plan incorporated all the applicable terms set out in the Term Sheet, and RDPFFA never objected to the omission of any terms from the Plan. As such, the Plan replaced the Term Sheet and relevant rights of RDPFFA retirees are governed by the Plan.[6]

---

[6]     The RDPFFA seeks to bolster its reliance on the Term Sheet by citing to paragraph 69 on page 114 of the Confirmation Order. Reliance on this provision is misplaced. The terms of that paragraph, among other things, confirms the ongoing validity of "all prior orders entered in the Chapter 9 Case [and] all documents and agreements executed by the City as authorized and directed *thereunder* [i.e., documents and agreements authorized and directed by Court order.]" Confirmation Order at p. 114 (emphasis added). Paragraph 69 of the Confirmation Order does not breathe life into the Term Sheet because it was not executed by the City *as authorized and directed by any order of this Court*. The introductory phrase of this provision also makes clear that any such agreements are "subject to the terms of the Plan

**B.    The RDPFFA's Interpretation of Paragraph 8 of
the Term Sheet as a Most Favored Nations Clause Is Untenable.**

27.     Moreover, the RDPFFA fundamentally misreads the Term

Sheet's plain language.  The RDPFFA attempts to cast paragraph 8 of the Term

Sheet as a broad "most favored nations" or "me too" clause that entitles its police

retiree members to the Disability Subsidy the DFFA negotiated exclusively for fire

fighters.  But paragraph 8 is not a "most favored nations" or "me too" clause at all.

It has a much simpler purpose:  it simply makes clear that the Term Sheet will not

limit the treatment of police and fire fighter retirees' claims under the Plan if more

favorable agreements are later negotiated.  This provision makes clear that the

Term Sheet should not be deemed to be an agreement of any RDPFFA retiree to

accept lesser Plan treatment than is otherwise afforded to *such* retiree.

28.     Indeed, paragraph 8 of the Term Sheet provides that "such

retired police and fire fighters" who are "covered" by "other agreement[s]" are

"entitled to the benefits" of those agreements if they are "more advantageous to

them," notwithstanding any benefits that those individuals will receive in

accordance with the Term Sheet.  The provision does not say that any benefits

negotiated by one subset of the RDPFFA retirees automatically apply to other

subsets, as would be the case if the contracting parties had intended to provide for

and this [Confirmation] Order," further indicating that the Plan and
the Confirmation Order govern over any potentially contrary provision in
the Term Sheet.

-14-

a "most favored nations" clause. This is apparent when the cited phrases are read in context of the entire provision:

> Police and firefighter retirees are entitled to the benefits of any other agreement entered into by the City of Detroit that *covers such retired police and fire fighters* and which is more *advantageous to them* than the terms of this agreement as it relates to Classes 10 (PFRS Pensions) and 12 (OPEB).

Term Sheet at ¶ 8 (emphasizing key phrases). In other words, if an outside agreement does not "cover" a police officer or fire fighter retiree, or if it is not more "advantageous to" that police officer or fire fighter retiree, paragraph 8 has no application. See id. The RDPFFA's overly broad interpretation, in contrast, would effectively read out of the agreement its limiting phrases – as well as the references limiting this provision to matters relating to Classes 10 and 12 of the Plan (see *infra*, at ¶¶ 31-32). The RDPFFA essentially would have this Court revise paragraph 8 of the Term Sheet to provide as follows:

> Police and firefighter retirees are entitled to the benefits of any other agreement entered into by the City of Detroit * * * which is more advantageous * * * than the terms of this agreement * * *.[7]

---

[7]    To be sure, the City knows how to draft a "most favored nations" clause when it agrees to such treatment. Indeed, the DPLSA's collective bargaining agreement contains a most favored nations clause with respect to wages, retirement benefits and medical benefits:

> In the event that the [Detroit Police] Department enters into a consensual collective bargaining agreement with any other labor organization

CHI-181960080

29.     "It is a time-honored principle of contract construction that contracts should be interpreted so as to give meaning to each and every word." Cotter v. DaimlerChrysler Corp., 87 F. Supp. 2d 746, 757 (E.D. Mich. 2000) (Rosen, J.); see also Rink v. C.I.R., 47 F.3d 168, 171 (6th Cir. 1995) ("An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless."); Intel Corp. v. Int'l Trade Comm'n, 946 F.2d 821, 826 (Fed. Cir. 1991) ("When interpreting a contract, we must, where possible give meaning and purpose to every term used in the contract."); Fin. Services, Inc. v. Ryan, 928 F.2d 994, 999-1000 (11th Cir. 1991); Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed. Cir. 1985).

30.     As such, under these circumstances, paragraph 8 of the Term Sheet cannot be read as the broad most favored nations clause desired by the RDPFFA.  For this independent reason, the Motion should be denied.

---

representing employees of the [Detroit Police] Department that provides union represented employees in the [Detroit Police] Department with general wage increases, coverage under City active or retiree medical plans, or retirement benefits that are more favorable than those provided to employees under this Agreement, the [Detroit Police] Department will promptly notify the Association of such terms and, upon request, increase the compensation or benefits provided . . . by this Agreement. .

See Ex. C at § 48(c).

**C.**   **Paragraph 8 Is Inapplicable to the Disability Subsidy.**

31.   Although paragraph 8 of the Term Sheet doubtlessly is not a "most favored nations" or "me too" clause, even were it to be so read, it still would not require the City to dig into its pockets to pay for a mirror Disability Subsidy for police retirees.  That is because paragraph 8 of the Term Sheet is expressly limited to the settlement of the value of claims for PFRS Pension and OPEB benefits. See Term Sheet at ¶ 8 (addressing agreements that are "more advantageous to them than the terms of this agreement as it relates to Classes 10 (PFRS Pensions) and 12 (OPEB)") (emphasis added).  But the Disability Subsidy is a brand *new* benefit that is distinct from retirees' claims against the City that arise from the City's prepetition pension and OPEB promises.

32.   Significantly, because it was negotiated between the City and the DFFA in the context of reaching a new collective bargaining agreement, the negotiation for a Disability Subsidy did not arise as part of of discussions regarding the settlement of claims for prepetition PFRS Pension benefits or OPEB benefits.  Instead, the Disability Subsidy was negotiated and paid for by active fire fighters to provide an additional benefit for those who are disabled in the line of duty.  It had nothing to do with the compromise of the retirees' Class 10 or Class 12 claims.  As such, the Disability Subsidy is outside the scope of, and is not covered by, paragraph 8 of the Term Sheet.

**D.  The RDPFFA's Position Would Result in a Windfall for Police Retirees.**

33.  Even if the Term Sheet's paragraph 8 were a "most favored nations" or "me too" provision, which it is not, and even if it applied to the Disability Subsidy, which it does not, the RDPFFA's claim still would fail. That conclusion is mandated by the central underlying fact:  the Disability Subsidy is a benefit that active Detroit fire fighters negotiated and effectively paid for with cost-neutral concessions.  Thus, if paragraph 8 of the Term Sheet were construed to provide police retirees with a similar "me too" right, the scope of that right would simply be for the three Public Safety Unions representing police officers to be given an opportunity to trade other economic terms to pay for a similar Disability Subsidy for police retirees:  nothing more.  See, e.g., Campbell Union Elementary Sch. Dist., 124 Lab. Arb. (BNA) 566 (2007)(Hoh, Arb.) (Noting, in interpreting the potential application of a most favored nations clause, that "items that other bargaining groups are trading in exchange for higher compensation" is a most favored nations clause feature).  A "me too" provision is not an invitation, in this context, for a party to cherry pick benefits without the corresponding burdens.

34.  As a result of the Mediation and other negotiations, the City entered into agreements allowing the Public Safety Unions to reallocate savings generated by concessions on a cost-neutral basis (i.e., in exchange for offsetting cost savings concessions from the relevant unions for the City's benefit).  As part

of this process, DPOA, DPLSA and DPCOA all entered into agreements in which they did **not** allocate any of their cost savings to a Disability Subsidy. See Exs. B, C and D. As evidenced by the DFFA CBA, the DFFA took a different path. The DPOA, DPLSA and DPCOA each had a similar right and made a different choice.

35.     Thus, to the extent that paragraph 8 of the Term Sheet could be read to extend a "most favored nations" right, those who could act on behalf of police retirees were granted that right and merely exercised it in a different fashion. To impose the $700,000 in additional costs on the City is wholly unjustified by the law and the facts, and would be inequitable to the City, as well as to the current City fire fighters who had to make concessions to achieve this benefit that the police retirees seek for free. The RDPFFA has no basis to demand this windfall for police retirees.

## **CONCLUSION**

WHEREFORE, the City respectfully requests that this Court (i) deny the Motion and (ii) grant such other and further relief to the City as the Court may deem proper.

Dated:  March 30, 2015        Respectfully submitted,


 /s/ Heather Lennox             
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
hlennox@jonesday.com


Charles N. Raimi (P29746)
Deputy Corporation Counsel
CITY OF DETROIT LAW DEPARTMENT
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan  48226
Telephone:  (313) 237-5037
Facsimile:  (313) 224-5505
raimic@detroitmi.gov

ATTORNEYS FOR THE CITY

# **CERTIFICATE OF SERVICE**

      I, Heather Lennox, hereby certify that the foregoing *Objection of the City of Detroit to the Retired Detroit Police and Fire Fighters Association's Motion for Enforcement of Settlement and Eighth Amended Plan of Adjustment* was filed and served via the Court's electronic case filing and noticing system on this 30th day of March, 2015.


                    /s/ Heather Lennox