The <u>Medlyn</u> court found that the sheriff willfully and deliberately did nothing. This omission to perform his enumerated duties resulted in serious harm to the inmate and therefore violated MCL 750.478.

<u>Theory of the case</u>

ESO Nichols willfully deviated from established protocol when she took Robert's 911 call lasting only 43 seconds. Nichols did not adhere to the pattern of questioning designed to evaluate a call and she did not treat the call as an emergency. She disregarded Robert's first statement in response to her question "what is the problem?" when Robert answered, "My mom has passed out." Finally Nichols did not listen to her caller or pay attention to the totality of the circumstances of the individual situation before her. Namely, a young child calling 911, saying his mom was passed out, and in response to ESO request to talk to mom, Robert's response was "she is not gonna talk." She assumed information and lost empathy for her caller.

Nichols is guilty of willful neglect of duty under MCL 7503.478 because she willfully and deliberately did nothing. She did not ask questions in compliance with Training Bulletin 78-2. She <u>did not treat the call as an emergency</u> in violation of the established protocol contained in Training Bulletin 74-3-R-B. She did not properly evaluate the call in accordance with Training Bulletin 98-1. Finally Nichols had notice that a conscious, intentional decision not to follow protocol could result in liability.

*[handwritten margin note: + failed to send a car which she said she was]*

ESO Sutton Wilfully deviated from established protocol when she took Robert's 911 call lasting only 1 minute 16 seconds. Sutton did not adhere to the pattern of questioning designed to evaluate a call and she did not treat the call as an emergency. Sutton disregarded Robert's first statement in response to her question, "where is the problem?" Robert answered, "My mom has passed out." Sutton did not listen to the answer or continue with questioning. She did not properly evaluate the call, disregarding the totality of the circumstances. She had on the line a young child calling 911, saying his mom was passed out, and in response to ESO repeated requests to talk to mom, Robert's response was "she is not gonna talk." Sutton labeled the call as a child playing on the phone and dispatched the police to discipline the child and to inform mom that the child was dialing 911 since Robert could not wake her to talk on the phone. Most disturbing in this instance is the fact that Sutton rebuked Robert for calling 911, never picking up on the fact that Robert even screamed "MOM!" in response to her repeated insistence to speak with his mother. Sutton is guilty of willful neglect of duty under MCL 7503.478 because she willfully and deliberately did nothing. She did not ask questions in compliance with Training Bulletin 78-2. She did not treat the call as an emergency in violation of the established protocol contained in Training Bulletin 74-3-R-B. She did not properly evaluate the call in accordance with Training Bulletin 98-1. Finally Sutton had notice that a conscious, intentional decision not to follow protocol could result in liability.

ESO Nichols was probably given a harsher punishment than Sutton b/c the results of her negligence were egregious. Robert waited 3 hours to try to call in again perhaps





## Detroit Police Department
## COMMUNICATIONS OPERATIONS SECTION

# TRAINING BULLETIN

Numbered Bulletins shall be retained
by all employees of the Section.

Number 98-1

July 13, 1998

## EMERGENCY CALL-TAKER LIABILITY AND DISCRETION

Decisions made by Emergency Services Operators (ESOs) are often based on discretion and judgment. ESOs must use this discretion and judgment to determine the need for police, fire, emergency medical and other urgent services. All of these decisions, along with hundreds of others, are based on "case by case" determinations. Every call to our E9-1-1 Emergency Center is different. Even the most similar of calls have differences, and in fact, the very "similar" calls may receive unusually different responses depending upon which operator handles them. These facts place a burden of independent responsibility on each operator in the performance of their day to day duties and these facts are the reason why it is imperative that operators adhere to protocol (rules of conduct) and engage in critical thinking at all times.

The burden of liability makes our day to day call-taking activity much more important in terms of personal, emotional and financial safety. The ESO may not be protected by departmental or municipal immunity in the event of a charge of negligent or irresponsible job performance that results in a court action. Protection from liability lies in strict and conscientious adherence to established guidelines (Training Bulletins, General Orders, Pre-arrival Instructions, etc.) which are accepted as standard operating procedures. We must not deviate from protocol by substituting terminology or procedures. This means that if guidelines/procedures appear to be faulty, outdated, or in error, we notify the proper authority but we do not make changes in how we perform our duties until we are instructed to do so. An ESO cannot be held personally liable for following formalized procedures--even faulty ones--while performing their duties, but an operator who fails to adhere to protocol can be made to answer for it personally.

23b

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-2-                                        TB 98-1

## LIABILITY FACTORS

1. Regularly performing activities that are outside the scope of responsibility". Performing functions that are not part of the job.

2. Not realizing that there are limitations to the role of call-taker. Trying to be all things to all people.

3. Not appreciating or understanding the impact of words and expressions on callers. The caller relies on the operator.

4. Getting into the "routine" mode, where calls/callers are considered the same. Taking things for granted and assuming information.

5. Losing empathy. Failing to reflect upon, or consider the feelings, emotions, and situations of callers.

6. Deviating from the use of proper terminology (the word "send" instead of "request").

7. Making unrealistic promises or statements to callers ("we'll be right there" instead of "a unit will be there as soon as possible").

8. In a no units available or backlog situation, failing to inform callers of an anticipated delay or that no units will be requested at all. (This deprives the caller of the right to make an informed choice.)

9. Not confirming critical data. Verify the Intelligent Control Module (ICM) data (which is used as a guide only).

10. Providing priority medical instructions that you are not trained or authorized to give.

11. Having training and authorization to give priority medical instructions, but electing not to follow established protocols.

12. Participating in unnecessarily long conversations with chronic callers; alcoholics or mentally unstable persons who frequently call but do not require the services provided.

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-3-

TB 98-1

13. Not using discretion on taped telephone lines. Forgetting that conversations are recorded.

14. Not screening, documenting or routing the critical and thorough details of a request for service.

## CASE OF ILLUSTRATION

Amalia Delong, her husband, and their three children lived in Erie County, New York, at 319 Victoria Boulevard in the village of Kenmore, outside the city of Buffalo. At approximately 9:30 in the morning of October 25, 1976, she dialed 9-1-1 from her home and was immediately connected to an emergency call-taker and requested emergency police assistance. The operator incorrectly recorded the address given by Mrs. Delong as "219 Victoria" instead of "319 Victoria". The call lasted 14 seconds, during which time the call-taker had failed to ascertain the caller's name or that the call was coming from the village of Kenmore. Because there was a Victoria Avenue in the city of Buffalo, the operator routed the call to the Buffalo police dispatcher. Had the call been correctly identified as "319 Victoria Boulevard", the operator would have directly contacted the village of Kenmore police department by pressing two buttons. At the time of Amalia Delong's call, there was a Kenmore patrol car less than one-half mile from her home. Had the call-taker properly identified the location of the call, officers from Kenmore could have been dispatched and were nearby.

Instead, at 9:31, the Buffalo police dispatcher radioed the call to the cars on duty in the Buffalo precinct where Victoria Avenue was located. Unable to locate "219 Victoria", one of the cars radioed back that the highest number on the avenue was "195". The dispatcher released the precinct cars at 9:34 and no further action was taken, contrary to operating procedures which called for a follow-up in this type of situation. The call was treated as "false".

At approximately 9:42, neighbors saw a naked and profusely bleeding Amalia Delong run from the front of her house and fall onto the sidewalk. The village of Kenmore police department responded to a call for assistance within a minute. At 9:53, Amalia Delong had no vital signs. A pathologist testified that she had died between 9:42 and 9:52, with the fatal blow having been inflicted at 9:38, approximately nine minutes after she had called for help.

13-53846-tjt    Doc 9573-3    Filed 03/31/15    Entered 03/31/15 09:15:42    Page 4 of 70

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-4-

TB 98-1

The operating procedures in effect on October 25, 1976, required, among other things, that all call-takers ask the name of the caller, the exact location of the call, and that the call-taker repeat this basic information back to the caller. The call-taker who received the Delong call failed to do so. Furthermore, the dispatcher of the Delong call ignored the required follow-up procedure in the event of not being able to locate an address.

In the case, "Delong vs. County of Erie", the New York Court of Appeals held that the plaintiff's reliance on the assurance that help was on its way, created a duty on the part of the city and county to respond to the plaintiff's plea for help in non-negligent fashion. The court held that the fact that after having called 9-1-1, Amalia Delong remained defenseless in her home, instead of running out the door to her neighbor's home, indisputably showed that the conduct of the municipality increased her risk of danger.

## ADDITIONAL CASES

### Koher v. Dial, 653 N.E.2d 524 (1995)

A little before 2:00 PM, on August 24, 1991, Neil Koher experienced chest pains while mowing his lawn. He took two nitroglycerin tablets but they did not relieve the pain. His wife sent for her sister who lived across the street. Shortly after 2:00 PM, they attempted to contact the Sheriff's department but were unsuccessful. The wife then tried calling 9-1-1, but there was no answer. On her second attempt she was able to get through. The call was received at 2:10 PM. The call-taker promised that an ambulance would be dispatched immediately.

Relying on the call-taker's promise, the family did not try to transport Mr. Koher by themselves or make additional attempts to seek an ambulance. An ambulance was not sent. At 2:17 PM, the sister telephoned the Fire Department directly and an ambulance was immediately sent. Because of the delay, Mr. Koher suffered permanent injuries.

It was later determined that the Sheriff's department was having their annual picnic and an officer unfamiliar with the dispatching system was call-taking. The court held that a special relationship had been created when the operator promised the Koher's that an ambulance would be dispatched and that there was a duty between the Sheriff's department and the Kohers.

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-5-                                              TB 98-1

## Noakes v. City of Seattle, 77 Wash App. 694 (1995)

Shortly before 1:00 AM, on March 18, 1990, Shirley and Marie Noakes, who were both developmentally disabled, were beaten and raped. Before and as the perpetrator broke into the house, Marie make three separate calls to the city's 9-1-1 system within a period of 9 - 11 minutes. Each time she called, she was told by the operator that the police would be sent. Because of her speaking difficulty, the operators would ask if she had been drinking. During the second call she was told that her call was a "waiting call", but that someone would be sent.

Approximately 30 minutes after the last call, a 9-1-1 call-taker called the Noakes residence to see if they still needed help. At this time the perpetrator had broken into the house and had already raped one of the women. He threatened them not to say anything, so Shirley told the operator that the prowler had gone.

Approximately 1 and 1/2 hours later, Marie was able to escape and run to a neighbor's house. This time the neighbor called 9-1-1 and police arrived shortly thereafter and the perpetrator was arrested.

The Court of Appeals held that the statements made by the operator to the caller, such as: "We'll send someone out" and "A unit will be sent", could have made Shirley and Marie rely on the assurances and stay in their home rather than search for another way of protection or escape.

27b

Asst. Prosecutor's May 30, 2006 Internal Memorandum

General Order 78-11(R)

6.  CHRONIC VIOLATORS - MAJOR I OFFENSE

An employee shall not be a chronic violator of the rules, regulations, orders or procedures of the department. An employee may be charged as a chronic violator if he has been disciplined on three (3) prior occasions for any offense within a sixteen (16) month period and commits a fourth or subsequent offense within the sixteen (16) month period.

7.  COMMUNICATIONS, WRITTEN - MINOR OFFENSE

An employee shall, upon receiving a written communication for transmission, forward such communication without unnecessary delay. An employee receiving the communication from a subordinate directed through official channels to a higher command shall approve, disapprove or make further recommendations before forwarding.

8.  CONTACT WITH CITIZENS

8.1  Meeting and Answering Questions - Minor Offense

An employee shall meet the public with consideration, answering questions civilly and courteously, and shall treat all citizens equally.

8.2  Addressing Citizens - Minor Offense

An employee shall, when on duty or acting in an official capacity, address citizens in a businesslike and courteous manner. In general, citizens should be addressed by their last names prefixed by Mr., Miss, Mrs., or Ms., whichever is appropriate. First names and other informal terms generally should not be used.

8.3  Ridicule - Minor Offense

An employee shall not use disrespectful, profane, abusive, racial, demeaning, belittling or insulting language or gestures to any citizen.

8.4  All Possible Consideration - Minor Offense

All employees shall give all possible consideration to citizens seeking information or assistance or desiring to make any report whether in person or by telephone.

28b

-4-

**8.5** <u>Name and Identification - Minor Offense</u>

An employee on duty or while engaged in a department matter shall, when requested, give his name and display his police identification card in a courteous manner.

**8.6** <u>Complying With Requests - Minor Offense</u>

An employee shall make every effort to fulfill reasonable requests made to him by a citizen.

**8.7** <u>Request to See Member or Employee - Minor Offense</u>

An employee shall give every consideration to a citizen requesting to see a particular member or employee of the department, unless compliance with the request would materially affect the integrity of an investigation.

**8.8** <u>Referrals - Minor Offense</u>

An employee shall not refer citizens to other commands of the department to make a report simply because the incident occurred in another location. It is the employee's duty to sincerely attempt to satisfy a citizen's request and to courteously refer him to other persons or commands only if necessary.

**8.9** <u>Professionalism and Objectivity - Minor Offense</u>

An employee shall, when questioning a citizen, do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective towards all persons.

**8.10** <u>Unduly Influenced - Minor Offense</u>

An employee shall not be influenced nor deterred in the performance of duty merely because a citizen has exercised his right to ask for the employee's identification card, or has indicated in any manner that he is going to report him to a supervisory officer.

**8.11** <u>Divulging Home Address or Telephone Number - Minor Offense</u>

An employee shall not divulge the home address or telephone number of a member or employee to a citizen without the expressed permission of the member or employee concerned.

#306
1-11-79

12.3 <u>Omissions - Purposeful - Major I Offense</u>

An employee shall not omit any matter or item from any department report, record or book for the purpose of making the report, record or book inaccurate or incomplete.

13. GAME PLAYING - MINOR OFFENSE

An employee shall not engage in games of chance for stakes in department buildings.

14. INCOMPETENCE - MAJOR I OFFENSE

An employee shall be competent in the performance of all duties proper to his classification.

15. INFORMATION - MINOR OFFENSE

An employee shall, when wishing to forward a written communication or information to a supervisory member or employee, forward such communication through the chain of command. An employee may bypass the chain of command when, in the employee's opinion, the information should be brought to the immediate personal attention of the Board of Police Commissioners, the Chief of Police, or other supervisor. However, justification for bypassing the chain of command may be required.

16. INSUBORDINATION - MAJOR I OFFENSE

An employee shall not refuse to obey a lawful order or reasonable direction given him by a supervisor. The order may be given verbally or in writing.

17. INTOXICATING BEVERAGES

17.1 <u>Odor of Intoxicants - Minor Offense</u>

An employee shall not report for regularly scheduled duty while intoxicated, nor shall an employee become intoxicated while on duty. The odor of intoxicants upon the breath of an employee shall be <u>prima facie</u> evidence that he is intoxicated.

17.2 <u>Drinking Intoxicants to Obtain Evidence - Minor Offense</u>

An employee shall not be ordered to drink intoxicating beverages for the purpose of obtaining evidence.

30b

17.3 Possession or Transportation of Unsealed Intoxicants - Minor Offense

An employee shall not bring any unsealed alcoholic beverages into any department vehicle or building, or store same in any department vehicle or building except when possessed in the performance of duty or authorized by proper authority.

18. KEYS - MINOR OFFENSE

An employee shall not possess or duplicate any key to any department building or facility without the authorization and knowledge of the supervisor of the section to which the employee is assigned.

19. KNOWLEDGE OF LAWS AND REGULATIONS

19.1 Working Knowledge - Major I Offense

An employee shall establish and maintain a working knowledge of the rules, regulations, orders, procedures and duties governing his assignment.

19.2 Interpretation - Minor Offense

An employee shall first seek assistance from his immediate supervisor in the interpretation of laws, ordinances, and rules, regulations, orders or procedures of the department. However, if directed by a supervisor, the employee may then contact the Legal Advisor Section or any other specialized sections to seek an interpretation.

19.3 Maintaining Current Information - Minor Offense

An employee shall make all directed changes and deletions, of which he is aware, in any manual, text, reference book or directive issued to him by the department.

20. LOAFING AND LOITERING ON DUTY - MINOR OFFENSE

An employee shall not loaf or loiter while on duty.

21. NEGLECT OF DUTY - MAJOR I OFFENSE

An employee shall not intentionally fail to take action as required by department rules, regulations, orders or procedures which are applicable to his duties and responsibilities.

22. OBSTRUCTING JUSTICE

22.1 Dissuading Member, Employee or Citizen - Major I Offense

An employee shall not advise, counsel, order or otherwise

31b



# Detroit Police Department
## COMMUNICATIONS OPERATIONS SECTION

## TRAINING BULLETIN

Numbered Bulletins shall be retained
by all members of the Section.



Number 74-3-R-B

Rev: April 11, 1974

EXHIBIT
Plaintiff's / Joint
Plaintiff's #5 B
Defendant's
Date 1-15-08
RUTH WHITOY, RMR
36th DISTRICT COURT

### TELEPHONE DEPORTMENT

The telephone is the most available and the most important means of communication the citizen has for obtaining the services of a law enforcement agency. It is imperative that the Emergency Services Operator (E.S.O.) handle the call courteously and efficiently.

The E.S.O. will only be as effective as his/her own initiative and sense of responsibility dictates. Neither the material covered in a class, nor that in any manual, can compensate for carelessness, lack of sincere effort, dishonesty, or disregard for established regulations and procedures.

By his or her choice, an E.S.O. can be respected and admired, or be a discredit to the department, Communications Operations Section, their supervisors, and themselves. One unprofessional E.S.O. will give the entire operation an undeserved reputation as inefficient and poorly run.

It is difficult, perhaps impossible, for a police department to perform its law enforcement tasks effectively without the cooperation, support, and concern of the community. We can help to develop public support and cooperation by treating all citizens with courtesy, consideration, and care. Because most citizens have relatively few dealings with the police, their initial contact with an E.S.O. can produce lasting impressions about police service. It is to the advantage of the E.S.O., the department, and the community that the initial contact be as favorable and friendly as possible.

The E.S.O.'s entire attention should be devoted to the caller. The information might be dull and uninteresting, however, it is very important to the caller. The E.S.O. should never convey a tone of sarcasm or impatience when speaking to any citizen.

1.  DISPOSITION OF CALLS

    A.  Courtesy and efficiency go together. When you handle a call from the start until its completion, courtesy and efficiency will prevail.

    B.  The disposition of the call will usually depend on the nature of the call. It might be necessary to ask several questions to determine the nature of the call. These should be pertinent and tactful questions.

*C99*

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-2-



2. VOICE TONE

A. An E.S.O.'s voice should give the distinct impression that he/she is alert and ready to serve.

   1. The replies must be immediate and decisive.
   2. Nothing imparts confidence as does an E.S.O. whose voice is clear—impersonal—instant—and completely ready to serve.
   3. Nothing destroys confidence as does a voice that reflects the "WHAT DO YOU WANT NOW" attitude.

B. Words or voice inflections can reflect irritation, disgust, and sarcasm. Courtesy can be expressed more aptly by the tone of the voice and manner of presentation than it can by words.

The E.S.O.'s voice may be:

   1. Emotional
   2. Too loud
   3. Too weak
   4. Show anger
   5. Show disgust
   6. Uncertain/indecisive
   7. Hesitant
   8. Voice trails off
   9. Heavy dialect
  10. Too fast
  11. Too slow
  12. Unable to understand (due to food, gum, etc.)
  13. Impatient

3. TELEPHONE MANNERS

Our purpose is to serve the public. Answer promptly—treat each call as an emergency.

   1. Place yourself in the caller's position—fear, panic
   2. Obtain all pertinent information
   3. Relay information to the proper agency
   4. Speak clearly
   5. Speak directly into the mouthpiece
   6. Do not waste time repeating unnecessary information
   7. Observe telephone courtesy
   8. Remain calm, competent; use a decisive voice
   9. Courtesy usually does not antagonize the caller
  10. Treat people as you would expect to be treated
  11. Explain transfers and holds; explain to the caller why he may be put on hold, or to whom he is being transferred
  12. Terminate calls positively and courteously

C/00

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-3-

4. PROFESSIONALISM

   To become professionals, we must fully accept E.S.O. responsibility and
   be aware of what is expected of us. For this reason, it is mandatory
   that a common operations procedure be established to promote more efficient
   communications thus resulting in the following benefits:

   1. Ease of understanding
   2. Elimination of errors
   3. Minimum communication time
   4. Development of a professional manner

   The Emergency Services Operator is the voice and partial reputation of the
   Police, Fire, and Emergency Medical Services of the city. The prerequisites of a
   good Emergency Services Operator are:

   1. Extreme level-headedness
   2. Common sense
   3. The ability to analyze statements and remember facts
   4. The ability to ask necessary questions pertinent to the
      request for emergency services
   5. The ability to exercise good judgement in emergency and
      routine situations
   6. The ability to learn the geography of the city
   7. The ability to speak clearly and distinctly
   8. The ability to work skillfully and accurately under stress
   9. The ability to establish and maintain effective relationships
      with others

   The E.S.O. should always bear in mind that he/she is part of a team; a team
   depends upon each of its parts—equipment, E.S.O. and dispatcher—to function
   smoothly and effectively. REMEMBER—a communications center is no better than its
   E.S.O. No matter what degree of technical perfection is achieved in police
   communications, the benefits derived can be unsatisfactory and inadequate if E.S.O.'s
   are not acquainted with, or fail to use efficiently, standardized operating procedure.

   When a citizen requests that an Emergency Services Operator give his/her name,
   the E.S.O.'s are not required to give citizens their names; however, the E.S.O.'s
   position number and/or badge number must be given. The possibility that a citizen
   may threaten to make a complaint against the E.S.O. will in no way affect the
   operator's response.

   Upon a request from a citizen to speak with the supervisor, the Emergency
   Services Operator will transfer the caller to the 9-1-1 Supervisor, or to the
   Sworn Supervisor, whichever is appropriate. If the 9-1-1 Supervisor is not
   available the E.S.O. will transfer the citizen to the Sworn Supervisor. At no time
   will the E.S.O. tell the citizen that there is no supervisor available, refuse to
   transfer the call, or have the citizen call another number.

*C/01*

34b

Asst. Prosecutor's May 30, 2006 Internal Memorandum

-4-

It is extremely important that E.S.O.'s extend a patient, professional, and totally positive level of assistance to callers. There is no question that the on-going process of the E.S.O. and the requirement of dealing with the distraught, confused, frightened citizens imposes a serious liability on both the nerves and the patience of on-line E.S.O.'s. The reality of this process requires the entire police force continually focus on the critical service delivery responsibility of the communications function.

Remember—you represent your police department. The Communications Center is the heart of this department...and the only contact a citizen may have with our department is with the Emergency Services Operator.

C/02



Detroit Police Department
COMMUNICATIONS OPERATIONS SECTION

## TRAINING BULLETIN

Numbered Bulletins shall be retained
by all members of the Section.



Number _78-2_

Revised: April 11, 1994

### E9-1-1 INTERVIEW PROCEDURE

The primary task of the E.S.O. is to receive telephonic requests for police, fire and medical services from the public; to analyze such information by separating emergency requests from non-emergency requests; to record said data in a manner which can be prioritized and acted upon based upon the <u>seriousness</u>, <u>urgency</u> and possible <u>growth rate</u>, with the existing available resources.

When the citizenry requests police or other emergency services, they generally are excitable and demanding. <u>It is encumbent upon the E.S.O. to gain control of the conversation and garner the factual information as to assist the citizen and the responding emergency unit(s)</u>. These requirements can be accomplished by adhering to the following sequential interviewing procedure:

EMERGENCY 9-1-1, <u>Where is the problem?</u>

1. <u>WHERE</u> - is the response unit(s) to go? This is the most important bit of information and should be the first controlling question, because if there is a disconnection, the responding unit(s) have a starting point. The Intelligent Display Module (IDM) a.k.a. Positron is to be used as a guide only. The area of response should be described as fully as possible such as:

   A. Address
   B. Closest major cross streets
   C. Type of dwelling
      1. single home
      2. flat
      3. apartment type complex
         a). unit or apartment number
         b). floor
      4. project
         a). building number
         b). apartment or unit number
         c). floor
         d). driveway number (if applicable)

36b

2. WHAT - will determine type of action you will take.

   A. Type of crime or incident
   B. Type of weapon used by perpetrator or carried by the caller.
   C. Type of responses needed (Determined by E.S.O.), for example, POLICE, FIRE, EMS, PLC, MICHCON GAS, EDISON, etc.

3. WHEN - reveals the urgency of the response.

   A. Is the incident ongoing or past?
   B. Time and date of incident?

4. WHO - identifies the actors in the situation.

   A. Are they known or unknown?
   B. Determine number of persons involved.
   C. Gain physical as well as clothing description.
   D. If caller is to be met on the street to point out someone, obtain caller's description and type of vehicle caller has.

5. HOW - identifies the possible growth rate.

   A. Identify the method of entry.
   B. Identify direction and method of escape (i.e., thru the rear upstairs window; fled south from scene in alley on foot, toward Woodward; or fled from scene south in alley in red vehicle, unknown make and model, partial plate, ABC-?12, toward Woodward).

REMEMBER: WHERE? WHAT? WHEN? WHO? HOW AND/OR EMS FOUR COMMANDMENTS: AGE, SEX, CONSCIOUS, BREATHING

# Misdemeanor Warrant

STATE OF MICHIGAN

2006614313

CASE NO: 2006614313

### 2ND AMENDED WARRANT MISDEMEANOR

**36TH DISTRICT COURT**
**3rd Judicial Circuit**

The People of the State of Michigan

vs

SHARON NICHOLS 82-06614313-01
TERRI SUTTON 82-06614313-02

**Offense Information**
Police Agency / Report No.
82DPIA IA C-06-508
Date of Offense
02/20/2006 wd
Place of Offense
13333 Lyndon, DETROIT
Complainant or Victim
CITY OF DETROIT
Complaining Witness
INFO & BELIEF

**STATE OF MICHIGAN, COUNTY OF WAYNE**
To any Peace Officer or Court Officer authorized to make arrest: The complaining witness has filed a sworn complaint in this Court stating that on the date and the location stated above, the Defendant(s), contrary to law,

**COUNT 1 DEFENDANT(S) (01):** PUBLIC EMPLOYEE, HOLDING THE PUBLIC TRUST- WILFULL NEGLECT OF DUTY
the defendant, who was employed by the City of Detroit Police Department as an emergency services operator, wilfully neglected to perform her duty, to wit: she purposely and knowingly deviated from the established protocol and disregarded the totality of the circumstances in evaluating the 911 call from Robert Turner. She misled Robert Turner into believing she was dispatching the police to his home; contrary to MCL 750.478. [750.478]
MISDEMEANOR: 1 Year and/or $1,000.00

**COUNT 2 DEFENDANT(S) (02):** PUBLIC EMPLOYEE, HOLDING THE PUBLIC TRUST- WILFULL NEGLECT OF DUTY
ie defendant, who was employed by the City of Detroit Police Department as an emergency services operator, wilfully neglected to perform her duty, to wit: she purposely and knowingly deviated from the established protocol and disregarded the totality of the circumstances in evaluating the 911 call from Robert Turner. She threatened Robert Turner that he would be in trouble for playing on the phone; contrary to MCL 750.478. [750.478]
MISDEMEANOR: 1 Year and/or $1,000.00

Upon examination of the complaining witness, there is probable cause to believe that the offense charge was committed and the Defendant committed the offense. Therefore, in the name of the People of the State of Michigan, I command you to arrest and bring the Defendant before the Court immediately.

_____     (SEAL)     _____
Date                                          District Judge/Magistrate

### RETURN

By virtue of this warrant, the Defendant has been taken into custody as commanded.

Date: _____     Peace Officer: _____

1b

EXHIBIT
6

STATE OF MICHIGAN

COURT OF APPEALS

Estate of SHERRILL TURNER v NICHOLS.

DELAINA PATTERSON, as Personal
Representative for the Estate of SHERRILL
TURNER, deceased, and ROBERT TURNER, a
minor, Individually, by his Next Friend,
DELAINA PATTERSON,

       Plaintiff-Appellee,

v

SHERRY NICHOLS,

       Defendant,
and

TERRI SUTTON,

       Defendant-Appellant.

UNPUBLISHED
December 7, 2010

Nos. 288375 and 291287
Wayne Circuit Court
LC No. 08-111034-NO

DELAINA PATTERSON, as Personal
Representative for the Estate of SHERRILL
TURNER, deceased, and ROBERT TURNER, a
minor, Individually, by his Next Friend,
DELAINA PATTERSON,

       Plaintiff-Appellee,

-1-

(4a)

EXHIBIT H

V

SHERRY NICHOLS a/k/a SHARON J.
NICHOLS,

          Defendant-Appellant,

and

TERRI SUTTON,

          Defendant.

No. 296198
Wayne Circuit Court
LC No. 08-111034-NO

---

Before: BORRELLO, C.J., and CAVANAGH and OWENS, JJ.

PER CURIAM.

In this consolidated appeal, defendants appeal as of right the denials of their motions for summary disposition. We affirm.

## I. FACTS

The facts in these cases are largely undisputed. On February 20, 2006, Robert Turner was at home with his mother, decedent Sherrill Turner. Just before six o'clock that evening, Robert noticed that his mother had fallen unconscious. Robert called 911, and Nichols answered. The following conversation occurred between Robert and Nichols:

    *Nichols.* Emergency 9-1-1, where is the problem?

    *Robert.* My mom has passed out.

    *Nichols.* You over on Spruce?

    *Robert.* Huh?

    *Nichols.* You on Spruce?

    *Robert.* My mom . . .

-2-

(5a)

*Nichols.* Where's Mrs. [or Mr.]¹ Turner at?

*Robert.* Right here.

*Nichols.* Let me speak to her [or him].

*Robert.* She's not gonna . . . she not gonna talk.

*Nichols.* Okay, well I'm gonna send the police to your house and find out what's going on with you. [Giving the address of the Turner residence.]

Nichols did not send the police, or any response. At about 9:00 p.m., Robert again dialed 911, and Sutton answered. The following conversation occurred between Robert and Sutton:

*Sutton.* Emergency 9-1-1, where is the problem?

*Robert.* My mom has passed out in her room.

*Sutton.* [Giving the Turners' address]. Is that the Robert Turner residence?

*Robert.* Yeah.

*Sutton.* Where the grown-up at?

*Robert.* In her room. My mom . . .

*Sutton.* Let me speak to her. Let me speak to her before I send the police over there.

*Robert.* (speaking over Sutton) She passed out.

*Robert.* (after Sutton) She's not gonna talk.

*Sutton.* Huh?

*Robert.* She's not gonna talk.

*Sutton.* Okay. Well, you know what then? She's gonna talk to the police. Okay. She's gonna talk to the police because I'm sending them over there.

---

¹ The parties disagree on certain details of the first call. The differences in the transcripts, while potentially relevant to the ultimate disposition of this case, are not relevant to the disposition of this appeal.

*Robert.* She's still not gonna talk.

*Sutton.* I don't care. You shouldn't be playing on the phone. (Pause.) Now put her on the phone before I send the police out there to knock on the door and you gonna be in trouble.

*Robert.* Argh!

Sutton dispatched a police officer, who arrived at the Turner home at about 9:30 p.m., responding to Sutton's report of "child playing on phone." The officer found Sherrill supine and unresponsive. The officer contacted emergency medical services, who arrived at about 9:40 p.m., and declared Sherrill dead at 9:59 p.m.

Plaintiffs sued defendants for wrongful death and for intentional infliction of emotional distress. Defendants moved for summary disposition based on governmental immunity. The trial court denied both defendants' motions on both counts.

## II. STANDARD OF REVIEW

The circuit court's determination of a motion for summary disposition is reviewed de novo. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 52; 684 NW2d 320 (2004). When reviewing a motion for summary disposition under MCR 2.116(C)(7), "the court may consider all affidavits, pleadings, and other documentary evidence, construing them in the light most favorable to the nonmoving party." *Alcona Co v Wolverine Environmental Production, Inc*, 233 Mich App 238, 246; 590 NW2d 586 (1998).

## III. WRONGFUL DEATH

Plaintiffs argue that the trial court erred in denying their motions for summary disposition of the wrongful death claim. We disagree.

MCL 691.1407(2) provides that governmental employees are immune from tort liability unless their conduct amounts to "gross negligence that is the proximate cause of the injury or damage." MCL 691.1497(2)(c). "Gross negligence" is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(7)(a).

In *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000), our Supreme Court held that "the proximate cause" means the "one most immediate, efficient, and direct cause of the injury or damage." This definition was first set forth in *Stoll v Laubengayer*, 174 Mich 701; 140 NW 532 (1913), and the *Robinson* Court relied on this case in support of its holding, stating that "the Legislature has nowhere abrogated this . . . ." *Robinson*, 462 Mich at 462. Thus, we turn to *Stoll* for guidance.

In *Stoll*, it appears that the defendant had allegedly parked his team of horses across a particular path in a negligent manner. *Stoll*, 174 Mich at 701. A five-year-old child who was sledding down a hill sledded "under defendant's wagon and against the heels of his horses" and was either run over by the wheel or the wagon or kicked by a horse. *Id.* She died from her injuries and the defendant was sued for negligence. After a judgment was rendered against

-4-
(7a)

defendant, he appealed arguing, in part, that his negligence was not the proximate cause of the child's death. *Id.* The Supreme Court agreed, holding that the defendant's alleged negligent act preceded the girl's decision to slide down the hill. The immediate cause of the injury was the child's act of "voluntarily starting her sleigh down the incline." *Id.* at 706. "But for this act of hers (subsequent to defendant's alleged negligent act, and therefore proximate to the injury) no accident could have occurred." *Id.* The *Stoll* Court concluded that, with regard to the girl's action, "[w]hether willful or accidental, it was still proximate—the immediate, efficient, direct cause preceding the injury." *Id.* at 706.

In *Robinson*, 462 Mich at 439, the plaintiffs, in relevant part, sued the police officers involved in police pursuits that eventually resulted in crashes and subsequent injuries to the plaintiffs. The individual officers claimed that they were not "the proximate cause" of the plaintiffs' injuries. The Supreme Court agreed, holding that—consistent with *Stoll*—the "one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles." *Id.* at 462. That is, but for the fleeing, no accident could have occurred.

In our cases, the claimed injury is the decedent's death. We conclude that there is a genuine issue of material fact whether the grossly negligent conduct of defendants was the proximate cause—the one most immediate, efficient, and direct cause—of the decedent's death. Although it is unclear at this point what caused the decedent's initial medical emergency, it appears to be cardiac-related. However, there is no evidence which indicates that the decedent's death was either immediate, i.e., that she was deceased at the time her son called 911, or was certain to occur. In fact, there is evidence to the contrary. According to records of the Wayne County Medical Examiner, when officers arrived—three hours after the initial call to 911—the decedent was "warm to the touch with no rigor present."

Thus, unlike in the cases of *Stoll* and *Robinson*, there is no other act or circumstance that could be the "one most immediate, efficient, and direct cause" of the decedent's death, other than the underlying medical event. But, a question of fact clearly exists regarding whether the underlying medical event or defendants' failure to provide the requested medical assistance was "the proximate cause," i.e., the one most immediate, efficient, and direct cause of decedent's death. In other words, there is no evidence that the underlying medical event would have certainly killed decedent, i.e., there was no chance of survival, or that the decedent would not have survived even with proper and timely medical assistance. Accordingly, there appears to be evidence from which a reasonable jury could conclude that defendants' gross negligence was the one most immediate, efficient, and direct cause of death.

Under the circumstances of our cases, the issue whether defendants' gross negligence was the proximate cause of the decedent's death cannot be determined as a matter of law according to the evidence before us. It appears that reasonable minds could differ regarding the proximate cause of decedent's death, and, as a result, the trial court did not err in denying defendants' motions for summary disposition on this count.

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants argue that they are also immune from liability for intentional infliction of emotional distress. They argue that, absent a specific intent to cause emotional distress, the GTLA shields them from liability because they were acting within the scope of their employment and performing discretionary, as opposed to ministerial, acts. They further argue that assuming they are not entitled to governmental immunity, the claims against them should nevertheless have been dismissed because plaintiffs cannot meet all of the elements of the tort. We disagree.

### A. GOVERNMENTAL IMMUNITY FOR INTENTIONAL TORTS

Subsection 7(2) of the GTLA only governs tort liability for negligence. Subsection 7(3) specifies that "[s]ubsection (2) does not alter the law of intentional torts as it existed before July 7, 1986." MCL 691.1407(3). Our Supreme Court has explained that the purpose of § 7(2) is to eliminate the distinction laid out in *Ross v Consumers Power Co*, 420 Mich 567; 363 NW2d 641 (1984) between discretionary and ministerial acts, as that distinction relates to immunity from tort liability. *Odom v Wayne Co*, 482 Mich 459, 470; 760 NW2d 217 (2008). The purpose of § 7(3) is to clarify that the *Ross* distinction was only being eliminated for negligent torts, and preserved for intentional torts. *Id.* at 470-471. The standard for governmental immunity from liability for intentional torts, then, remains governed by common law, specifically by *Ross* and *Odom*. *Id.* at 472-473.

Under the *Ross* test, there are three requirements for a lower-level[2] governmental employee to be immune from liability for intentional torts: the employee must be "1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." *Ross*, 420 Mich at 633-634. The parties agree that the first requirement was satisfied, but dispute the second and third requirements.

### 1. GOOD FAITH

In *Odom*, our Supreme Court discussed good and bad faith. And noted that bad faith includes "'malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of an intentional abuse of power.'" *Odom*, 482 Mich at 474, quoting Prosser, Torts (4th ed), § 132, p 989. According to *Odom*, "there is no immunity when the governmental employee acts *maliciously* or with a *wanton or reckless disregard of the rights of another*." *Id.* (emphasis in original). The Court stated "an 'action may lie only if the [defendant] has utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates of humanity.'" *Odom*, 482 Mich at 474, quoting *Dickey v Fluhart*, 146 Mich App 268, 276; 380 NW2d 76 (1985). Another cited case "described a lack of good faith as 'malicious intent, capricious action or corrupt conduct,'" *id.*, quoting *Veldman v Grand Rapids*, 275 Mich 100, 113; 265 NW 790

---

[2] Defendants are lower-level employees because they are not "judges, legislators, [or] the highest executive officials of [any level] of government." *Ross*, 420 Mich at 633.

-6-
(9a)

(1936), while another stated that "'willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does.'" *Id.* at 475, quoting *Burnett v Adrian*, 414 Mich 448, 455; 326 NW2d 810 (1982).

Thus, contrary to defendants' arguments, specific intent is *not* required to overcome immunity with respect to intentional torts. Rather, a lack of good faith may be shown by wanton or reckless conduct.

Recklessness may be shown by showing that "any reasonable person would know emotional distress would result" from a defendant's conduct. *Haverbush v Powelson*, 217 Mich App 228, 236-237; 551 NW2d 206 (1996). *Haverbush* held that such a showing is sufficient, not necessary, to show recklessness. *Id.* at 237. Black's Law Dictionary defines recklessness as "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk." Black's Law Dictionary (8th ed).

On the facts before this Court, a reasonable juror could find that defendants' conduct, failing to send assistance in response to a 911 call indicating a need for medical assistance, amounted to recklessness. Certainly a 911 operator is not infallible and must have some level of discretion in gauging the legitimacy of a report, the type of emergency, and the necessity and urgency of a response. But defendants arguably did not exercise such discretion. Rather it appears they ignored the information Robert was providing, including the fact that his mother could not come to the phone because she had passed out. A reasonable juror could find that treating a 911 call as a prank entails a risk of causing severe emotional distress to the caller, that defendants ignored this risk, and that their conduct therefore amounted to recklessness. Because reckless conduct, under *Odom*, is sufficient to demonstrate lack of good faith, defendants are not entitled to immunity from this claim.

## 2. DISCRETIONARY ACTS

Even if it were the case that defendants were acting in good faith, they are not entitled to immunity because their acts were ministerial, not discretionary. Defendants argue that, in fielding 911 calls, they are vested with the discretion to determine the priority of calls, and decide whether to send assistance and what kind of assistance to send. But this argument overlooks the gravamen of plaintiffs' complaint. Plaintiffs have alleged that Robert's emotional distress was caused by defendants' treatment of him on the phone. In other words, the allegedly tortious conduct was not defendants' failure to properly carry out the duties they describe as discretionary, but their interaction with Robert.

As plaintiffs point out, the treatment of a 911 caller is governed by a number of policies that strictly limit the discretion an operator has. Plaintiffs cite the Detroit Police Department's General Order 78-11 as a source of several of these policies, including subsections 8.1: "An employee shall meet the public with consideration, answering questions civilly and courteously"; 8.2: "An employee shall, when on duty or acting in an official capacity, address citizens in a businesslike and courteous manner"; 8.3: "An employee shall not use disrespectful . . . demeaning, belittling or insulting language . . . to any citizen"; and especially 8.4: "All employees shall give all possible consideration to citizens seeking information or assistance or

-7-

(10a)

desiring to make any report" and 8.9: "An employee shall, when questioning a citizen, do so in a polite and professional manner, taking into consideration all circumstances and remaining completely objective towards all persons." Following an internal investigation by the Detroit Police Department, both defendants were found to be in violation of subsections 8.4 and 8.9.

Even if Nichols were acting within her discretion in not sending assistance, and Sutton were acting within her discretion in sending a police officer instead of medical assistance, neither had the discretion to violate policies by interacting unprofessionally and inconsiderately with Robert. The mandatory language of the subsections quoted above governing defendants' performance of their duties makes clear that the conduct complained of was ministerial, not discretionary.

In addition to showing that they were acting within the course of their employment, defendants must, in order to claim governmental immunity, show that they were acting in good faith and that their acts were discretionary. Because a reasonable juror could find that, we affirm the trial court's decision to deny them governmental immunity.

## B. THE ELEMENTS OF THE TORT

The elements of intentional infliction of emotional distress are "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 597; 374 NW2d 905 (1985). Defendants argue that plaintiffs cannot, as a matter of law, establish the first two of these elements.

In *Roberts*, this Court described "the prevailing view of what constitutes 'extreme and outrageous' conduct," drawing from two paragraphs from the Second Restatement of Torts:

"The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an

-8-
(11a)

unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." [*Roberts*, 422 Mich at 602-603, quoting Restatement Torts, 2d, § 46, comment d, pp 72-73.]

Here, the circumstances surrounding defendants' conduct indicate that a reasonable juror could find the conduct to be extreme and outrageous. The mere words spoken, if spoken in another context or to another listener, might well be considered, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Given, however, defendants' positions as 911 operators, and the fact that their words were directed against a child, who they had been told was seeking emergency medical assistance for his unconscious mother (even if they did not believe it), this case may well be "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Because a reasonable juror might find that defendants' conduct was extreme and outrageous under this standard, the trial court was correct in holding that summary disposition is not appropriate on this element.

Additionally, as discussed, a reasonable juror could find that defendants acted recklessly. A reasonable juror could find that defendants were aware of the risk that their conduct would cause emotional distress to Robert, and acted in disregard of that risk. The trial court therefore did not err in finding that there was a triable issue of fact with respect to recklessness.

Triable issues of fact remain. A reasonable juror could find that the conduct of one or both defendants was extreme and outrageous, and that one or both defendants behaved recklessly. We find no error.

Affirmed.

/s/ Stephen L. Borrello
/s/ Mark J. Cavanagh
/s/ Donald S. Owens

-9-
(12a)

# Order

4/January 2012

142441

## ESTATE OF SHERRILL TURNER v NICHOLS

DELAINA PATTERSON, as Personal
Representative for the Estate of Sherrill Turner,
Deceased, and Robert Turner, a Minor, Individually,
by his Next Friend, DELAINA PATTERSON,
        Plaintiff-Appellee,

v

SHERRY NICHOLS, a/k/a SHARON J.
NICHOLS,
        Defendant-Appellant,
and

TERRI SUTTON,
        Defendant.

_____/

**Michigan Supreme Court**
**Lansing, Michigan**

Robert P. Young, Jr.,
*Chief Justice*

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
*Justices*

SC: 142441
COA: 296198
Wayne CC: 08-111034-NO

     On order of the Court, leave to appeal having been granted and the briefs and oral arguments of the parties having been considered by the Court, we VACATE our order of May 25, 2011. The application for leave to appeal the December 7, 2010 judgment of the Court of Appeals is DENIED, because we are no longer persuaded that the questions presented should be reviewed by this Court.



     I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 25, 2012
_____

_Corbin R. Davis_
Clerk

EXHIBIT
1

| STATE OF MICHIGAN 36TH JUDICIAL DISTRICT | 317 | ORDER OF PROBATION (Misdemeanor) | CASE NO. 06-61338 01 |
|---|---|---|---|

421 MADISON DETROIT, MI 48226
Court Address

(313) 965-3414
Court Telephone No.

| THE PEOPLE OF THE STATE OF MICHIGAN | V | Sharon Nichols |
|---|---|---|

4 Detroit, MI 48221

S.S.#

PHONE #: (3/3)

| 82 | CTN 066143130 1 | SID | D.O.B. 10/31/62 |
|---|---|---|---|

Offense: Offcl neglect                    Term: 1 yr nonreporting

☐ Judgment of guilt is deferred under:

__MCL 333.7411;MSA 14.15(7411)
*Controlled Substance Act*

__MCL 769.4a;MSA 28.1076
*Spouse Abuse Act*

R.D 3/11/09

__MCL 762.14; MSA 28.853(14)
*Youth Trainee Status*

**IT IS ORDERED** that the defendant be placed under the supervision of the Probation Department for the term indicated, and the defendant shall: (1) not violate any criminal law of any unit of government; (2) Not leave the state without the consent of this court; (3) Make a truthful report to the probation officer monthly, or as often as the probation officer may require, either in person or in writing; (4) Notify the probation officer immediately of any change of address; (5) Pay the following:

| | |
|---|---|
| Fine................................................$ | 200.00 |
| Costs...............................................$ | 200.00 |
| Restitution........................................$ | |
| Crime Victim ($50.00).............................$ | 50.00 |
| Supervision ($30.00 per month)....................$ | |
| DNA TEST ($60.00).................................$ | |
| Urinalysis Testing Fee ($10.00) per month.........$ | |
| TOTAL.............................................$ | #50.00 |

*Fines, costs, and fees not paid within 56 days of the date owed are subject to a 20% late penalty on the amount owed. If a cash bond/bail was personally posted by the defendant, payment toward the total is to be collected out of that bond/bail and allocated as specified under MCL 775.22.*

6. Other: (Use this space for conditions for the protection of 1 or more named persons-also complete the LEIN order on part 4 of 4 of this form)

( ) Attend and complete D.V.I.P
( ) Attend and complete Batterers Program (26 weeks)
( ) Attend and complete Anger Management (12) weeks
( ) Substance Abuse Evaluation
( ) No Assaultive Contact with Complainant
( ) No Contact with Complainant
( ) S.T.D. Testing
( ) H.I.V. Testing
( ) D.N.A. Testing
( ) Attend Morality/Vice Program
( ) Participate in Adult Education/GED Program
(X) Complete 15 day(s) of Community Service

( ) Attend Victim Impact Panel
( ) Attend Alcohol Anonymous
( ) Attend Narcotics Anonymous
( ) Attend and complete Alcohol Highway Safety Education
( ) Shall Not Use or Possess Any Illegal Substance
( ) Attend Outpatient/Inpatient Treatment
( ) Submit to Drug Urinalysis
( ) Shall not consume any alcohol beverage
( ) Pay all outstanding traffic tickets in full

OTHER _____

Failure to comply with this order may result in a revocation of probation and incarceration.

3-11-08
Date

_____ Judge        312 B
Bar No.

I have read or heard the above order of probation and have received a copy. I understand and agree to comply with this order.

3/11/08
Date

_____ Defendant Signature

*If the judgment of guilt is deferred as stated above, the clerk of the court shall send a photocopy of this order to the Michigan State Police Central Records Division to create a criminal history record as required under MCL 769.16a.*

MCL 600.8803; MSA 27A.4803; MCL 769.1a; MSA 28.1073; MCL 771.1 et.seq; MSA 28.1131 et. seq.MCL 775.22; MSA 28.1259; MCL 780.826; MSA 28.1287(826); MCR 6.445; MCL 780.905 (1)

36thDC 92-OP (5-02)

EXHIBIT J

COPY

# City of Detroit
## Notice of Discharge Form

| DATE: July 26, 2006 | |
|---|---|
| Department: Police | Division: Communications Operations |
| Employee Full Name: Sharon Nichols | Job Title: Emergency Services Operator |

Social Security No.: 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

You are hereby notified that you have been discharged from City of Detroit employment effective July 21, 2006.

For the following reason(s): Gross Negligence in the Performance of Duties on February 20, 2006 and Violation of General Order 78-11, Section 8.4 "All Possible Consideration" and Section 8 "Contact With Citizens.

_____

_____

_____

Discharge Issued by:_____ Title: _____
　　　　　　　　　　　　　(Department Head)

| Notice Served on Employee　　(7/26/06) | By (check one) |
|---|---|
| | ☐Personal Service XCertified Mail |

**RIGHT TO PROTEST** If you are in a union or association, you may consult with your appropriate representation. If you are a non-union represented employee, you may submit a written appeal within 10 days of the effective date of discharge in accordance with the Human Resources Department Grievance Procedure.



EXHIBIT
**K**
tabbies'

City of Detroit, copyright. All rights reserved.
pg. 2

FORM 9048
Rev 3

M.E. CASE NO.
06-01746
COUNTY OF DEATH
Wayne
TOWN OF DEATH
Detroit
DATE PRONOUNCED DEAD
20 Feb 2006

# OFFICE of the WAYNE COUNTY MEDICAL EXAMINER
## 1300 East Warren Avenue
### Detroit, Michigan 48207
## POSTMORTEM REPORT

THIS IS TO CERTIFY THAT
Francisco J. Diaz, M.D., Assistant Medical Examiner

PERFORMED A POSTMORTEM EXAMINATION ON THE BODY
Sherrill Turner

AT
Wayne County Medical Examiner's Office

BEGINNING AT
11:18am

ON
21 Feb 2006

IN THE PRESENCE OF

AND SAID POSTMORTEM REVEALED

## SUMMARY & OPINION

It is my opinion that death was due to dilated cardiomyopathy.
Autopsy disclosed an enlarged heart and nephrosclerosis.
Cardiomyopathy is known to induce irregular rhythm of the heart
and sudden death.
The post-mortem toxicology tests were essentially negative.
There was no external or internal evidence of trauma or injury.
The manner of death is classified as natural.

Francisco J. Diaz, M.D.
Assistant Medical Examiner
03/31/2006

FJD/ls

(report continues on next page)

Diaz

EXHIBIT NO. 4

7-27-09 (c)

EXHIBIT

OFFICE of the WAYNE COUNTY MEDICAL EXAMINER
1300 East Warren Avenue
Detroit, Michigan 48207
POSTMORTEM REPORT

M.E.CASE NO.
06-01746

NAME
Sherrill

Turner

Page  2

**CAUSE OF DEATH:**

    dilated cardiomyopathy
    **Other Significant Conditions:**
    nephrosclerosis
    amended 3-31-2006

**MANNER OF DEATH:** Pending

**FINAL MANNER OF DEATH:** NATURAL

<u>NARRATIVE SUMMARY:</u>

EXTERNAL EXAMINATION:

The body was that of a normally developed and normally nourished
black female appearing about the recorded age of 46 years.  The
body measured 5 feet 2 inches in length and weighed 132 pounds.
The body was cool, rigor mortis was waning, and liver mortis was
present posteriorly and fixed.  Clothing consisted of a white
tank top.  The head was normocephalic and the scalp hair was
black and short.  There was no facial hair.  The eyes had
white sclerae, pale conjunctivae, and brown irides.  The
dentition was natural.  No lesions of the oral mucosa were
identified.  There were no masses discernable in the neck and
the larynx was in the midline.  The thorax was symmetrical and
unremarkable.  The abdomen was flat.  The external genitalia
were those of a normal adult female.  The extremities and back
showed no significant deformities or other abnormalities.

INTERNAL EXAMINATION:

An autopsy was performed utilizing the normal thoraco-abdominal
and posterior coronal scalp incisions.

Head:
No abnormality was noted in the reflected scalp, calvarium,
dura, meninges or the base of the skull.  The 1050 gm brain had
symmetric cerebral and cerebellar hemispheres and was free of
neoplastic lesions.  The brainstem was symmetric and free of
lesions.  The cerebral vascular system was unremarkable.

Neck:
No abnormality was noted in the cervical muscles, hyoid bone,
laryngeal cartilages, trachea, or the cervical vertebral column.
               (report continues on next page)

OFFICE of the WAYNE COUNTY MEDICAL EXAMINER
1300 East Warren Avenue
Detroit, Michigan 48207
POSTMORTEM REPORT

06-01746
NAME
Sherrill

Turner

Page 3

## Narrative Summary of Postmortem Examination: (continued)

**Cardiovascular System:**
The 500 gm heart had a normal configuration and an unremarkable epicardial surface with a moderate amount of epicardial fat. The coronary arteries had no significant atherosclerotic disease. The myocardium was not hypertrophied. The papillary muscles and chordae tendineae were not thickened. The endocardium and heart valves were not fibrosed. The aorta had focal areas of significant atherosclerosis. The major arteries and great veins showed normal distribution.

**Respiratory System:**
The larynx and trachea were unremarkable. The right and left lungs weighed 425 gm and 375 gm, respectively. There was passive congestion in the parenchyma accentuated with dependent lividity. No pulmonary emboli were identified.

**Hepatobiliary System:**
The 1950 gm enlarged liver had a smooth serosal surface and a parenchyma that was dark reddish-purple from passive congestion. The gallbladder and biliary tracts were unremarkable.

**Hemolymphatics:**
The 125 gm spleen had smooth surfaces and dark purple firm pulp. There was no significant lymphadenopathy.

**Alimentary System:**
The tongue, esophagus, stomach, small bowel and colon were unremarkable. The lining of the stomach had an intact and unremarkable rugal pattern and the contents of the stomach consisted of approximately 20 ml of early digested food.

**Pancreas:**
The pancreas showed an unremarkable tan lobulated pattern.

**Endocrine System:**
The thyroid gland had a normal bilobed configuration. The adrenal glands were each unremarkable with golden-yellow cortices.

**Genitourinary System:**
The right and left kidneys weighed 200 gm and 200 gm,

(report continues on next page)

OFFICE of the WAYNE COUNTY MEDICAL EXAMINER
1300 East Warren Avenue
Detroit, Michigan 48207
POSTMORTEM REPORT

M.E.CASE NO.
06-01746

NAME
Sherrill

Turner

Page 4

Narrative Summary of Postmortem Examination: (continued)

respectively.    Each kidney had a granular cortical surfaces, and thinning of the cortico-medullary regions. The renal calyceal systems, pelves, ureters, and bladder were unremarkable.   The non-gravid uterus was of normal size and had a smooth, glistening, tannish-pink serosal surface and an unremarkable cervix and endometrium. The fallopian tubes and ovaries were unremarkable.

Musculoskeletal System:
All the muscles and axial skeleton are free of any significant abnormalities.

(End of Report)

                                          <06-0001746>[DIAZ]
:========================================================================

                    Toxicology Laboratory Report
            Office of the Wayne County Medical Examiner
              1300 East Warren Avenue Detroit Michigan 48207

:========================================================================
me: SHERRILL TURNER             FILE NUMBER  :06-0001746
A>                              SPECIMEN DATE> 02/21/2006
------------------------------------------------------------------------
PECIMEN(s) RECEIVED>Heart Blood(1) , Iliac Blood(2) , Bile(1) , Liv.(1) ,
tHu(1) , :
------------------------------------------------------------------------
        ALL RESULTS REPORTED IN mcg/mL UNLESS OTHERWISE INDICATED
------------------------------------------------------------------------

| ecimen==> | Blood-1 | Blood-2 | Bile-1 | Liv.-1 | VitHu-1 |
| te======> | C060221 | C060221 | C060221 | C060221 | C060221 |
| 1-Alcohol Screen | NEG | | | | |
| 5-Cyanide Screen | NEG | | | | |
| 6-Barbiturate Screen | NEG | | | | |
| 3-Stimulant Screen | NEG | | | | |
| 5-Benzodiazepine Screen | NEG | | | | |
| 6-Cocaine/Metab. Screen | NEG | | | | |
| 7-Bases - Qual. | | | POS | | |
| eta-Phenethylamine | | | POS | | |
| luconazole | | | POS | | |
| affeine | | | POS | | |
| 0-PCP Screen | NEG | | | | |
| 1-Opiate Screen | NEG | | | | |
| 2-Glucose Screen | | | | NEG | |
| 4-Salicylate Screen | NEG | | | | |
| 5-Acetaminophen Screen | NEG | | | | |
| 6-Ketone Screen | | | | | NEG |

>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>>COMMENTS<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
F LAB :
HER   :
========================================================================
G=Analyte(s) NOT detected  POS=Analyte(s) detected  NTDN=No Testing Done
S=Quantity Not Sufficient  UNS=Unsatisfactory Specimen

int Date ==> 03-04-2006 17:33:15  Toxicologist                MAR 0 4 2006
                    Director - Bradford R. Hepler Ph.D, DABFT

**Thomson Econometrics & Employment Research**
2350 Franklin Road, Suite 200
Bloomfield Hills, Michigan 48302

Phone (248) 292-0208
Fax (248) 292-0211

9257
RECEIVED

AUG - 8 2009

Fieger, Fieger, Kenney & Johnson, P.C.

Michael H. Thomson, Ph.D.
Nitin V. Paranjpe, Ph.D.
Martin M. Wing, Ph.D. (1958 – 2008)

August 6th, 2009

James J. Harrington, IV
Fieger, Fieger, Kenney, Johnson & Giroux
19390 West Ten Mile Road
Southfield, Michigan 48075-2463

<u>RE: Sherrill Turner.</u>

Dear Mr. Harrington:

Enclosed find my preliminary calculations in the above matter.

a. Chart 1 shows the costs of a 24 hour live-in aide using **$250/day** in 2007, adjusted for growth;
b. Chart 1A shows the costs of a 24 hour live-in aide using the **minimum wage**(currently $7.40/hour) prevailing in Michigan;
c. Chart 2 shows the loss in parental training and guidance, comparing college versus high school;
d. Chart 3 shows the present value of lifetime earnings from education for Robert in terms of less than high school to college.

**Charts 1 and 1A** are premised on an individual looking after Robert, till he turns 18; The nominal loss ranges from **$842,720** to **$1,208,091** which when discounted to present value ranges from **$730,037** to **$1,049,473.**

**Charts 2 and 3** show the value of education in terms of lifetime earnings to Robert that a jury can use to assess the loss of Sherrill Turner in terms of parental training and guidance to Robert. For example, if the jury were to find that Robert would not be able to graduate from college now, and would not get a high school degree (see Chart 2), then the loss on a year by year basis is shown, with a total nominal loss of **$5,421,565** or in present value terms, **$1,782,957.** OR, on average a loss of **$1,355,391** per year of schooling lost, or in present value terms, **$445,739** per year of schooling lost between college and high school. Chart 3 can likewise be used to compare the levels of education.

If there is any other information that you need, please do not hesitate to contact me at the above number. Thanks for using **Thomson Econometrics.**

Sincerely,

*Nitin Paranjpe*

Nitin V. Paranjpe, Ph.D.

EXHIBIT
M

# 1. A Preliminary Calculation of Loss in Services - Live-In Aide@$250/Day

## Re: Sherrill Turner, Deceased

## by: Nitin V. Paranjpe, Ph.D.

| Year | Sherrill's Age | Robert's Age | Projected Services | MCLA Factor | Present Value Services |
|------|------|------|------|------|------|
| 2006 | 46.8 | 5.8 | $76,214 | 1.00 | $76,214 |
| 2007 | 47.8 | 6.8 | 91,250 | 1.00 | 91,250 |
| 2008 | 48.8 | 7.8 | 91,500 | 1.00 | 91,500 |
| 2009 | 49.8 | 8.8 | 91,250 | 1.00 | 91,250 |
| 2010 | 50.8 | 9.8 | $93,988 | 1.05 | $89,512 |
| 2011 | 51.8 | 10.8 | 96,807 | 1.10 | 88,006 |
| 2012 | 52.8 | 11.8 | 99,985 | 1.15 | 86,943 |
| 2013 | 53.8 | 12.8 | 102,703 | 1.20 | 85,586 |
| 2014 | 54.8 | 13.8 | 105,784 | 1.25 | 84,627 |
| 2015 | 55.8 | 14.8 | 108,957 | 1.30 | 83,813 |
| 2016 | 56.8 | 15.8 | 112,533 | 1.35 | 83,358 |
| 2017 | 57.8 | 16.8 | 115,593 | 1.40 | 82,566 |
| 2018 | 59.0 | 18.0 | 21,529 | 1.45 | 14,847 |
| Past: | | | $350,214 | | $350,214 |
| Future: | | | $857,878 | | $699,259 |
| Total(s): | | | $1,208,091 | | $1,049,473 |

**Footnotes:**

| | |
|---|---|
| Date of Birth: | March 17, 1959 |
| Race: | Africa-American |
| Gender: | Female |
| Date of Death: | February 20, 2006 |
| Assumes 24 hours/day live-in aide until Robert turns 18 at daily rate in 2007 of: | $250 |
| Future increases of: | 3.00% |
| Past losses calculated from: | February 21, 2006 to December 31, 2009 |
| Future losses calculated from: | January 1, 2010 to age 18 for Robert |
| Years after 2009 are decreased for Present Value via MCLA 600.6306(2). | |

# 1A. A Preliminary Calculation of Loss in Services - Live-In Aide@ Minimum Wage

Re: Sherrill Turner, Deceased

by: Nitin V. Paranjpe, Ph.D.

| 1 Year | 2 Sherrill's Age | 3 Robert's Age | 4 Projected Services | 5 MCLA Factor | 6 Present Value Services |
|---|---|---|---|---|---|
| 2006 | 46.8 | 5.8 | $42,785 | 1.00 | $42,785 |
| 2007 | 47.8 | 6.8 | 61,765 | 1.00 | 61,765 |
| 2008 | 48.8 | 7.8 | 63,910 | 1.00 | 63,910 |
| 2009 | 49.8 | 8.8 | 64,824 | 1.00 | 64,824 |
| 2010 | 50.8 | 9.8 | $66,769 | 1.05 | $63,589 |
| 2011 | 51.8 | 10.8 | 68,772 | 1.10 | 62,520 |
| 2012 | 52.8 | 11.8 | 71,029 | 1.15 | 61,764 |
| 2013 | 53.8 | 12.8 | 72,960 | 1.20 | 60,800 |
| 2014 | 54.8 | 13.8 | 75,149 | 1.25 | 60,119 |
| 2015 | 55.8 | 14.8 | 77,403 | 1.30 | 59,541 |
| 2016 | 56.8 | 15.8 | 79,944 | 1.35 | 59,218 |
| 2017 | 57.8 | 16.8 | 82,117 | 1.40 | 58,655 |
| 2018 | 59.0 | 18.0 | 15,294 | 1.45 | 10,548 |
| Past: | | | $233,284 | | $233,284 |
| Future: | | | $609,436 | | $496,754 |
| Total(s): | | | $842,720 | | $730,037 |

## Footnotes:

| | | | |
|---|---|---|---|
| Date of Birth: | | | March 17, 1959 |
| Race: | | | African-American |
| Gender: | | | Female |
| Date of Death: | | | February 20, 2006 |
| Assumes 24 hours/day live-in aide until Robert turns 18 at minimum wage. | | | |
| Future Increases of: | | | |
| Past losses calculated from: | February 21, 2006 | to | December 31, 2009 |
| Future losses calculated from: | January 1, 2010 | to | age 18 for Robert |
| Years after 2009 are decreased for Present Value via MCLA 600.6306(2). | | | 3.00% |

Re: Robert Turner.

by: Nitin V. Paranjpe, Ph.D.

| Year | Age | Projected Compensation College | "Actual" Compensation High School | Loss Compensation | MCLA Factor | Present Value Loss |
|---|---|---|---|---|---|---|
| 2018 | 17.8 | $0 | $17,018 | ($17,018) | 1.45 | ($11,736) |
| 2019 | 18.8 | 0 | 23,598 | (23,598) | 1.50 | (15,732) |
| 2020 | 19.8 | 0 | 24,542 | (24,542) | 1.55 | (15,833) |
| 2021 | 20.8 | 0 | 25,523 | (25,523) | 1.60 | (15,952) |
| 2022 | 21.8 | 32,690 | 26,544 | 6,145 | 1.65 | 3,725 |
| 2023 | 22.8 | 45,330 | 27,606 | 17,724 | 1.70 | 10,426 |
| 2024 | 23.8 | 47,143 | 28,710 | 18,433 | 1.75 | 10,533 |
| 2025 | 24.8 | 77,388 | 46,316 | 31,072 | 1.80 | 17,262 |
| 2026 | 25.8 | 90,314 | 53,873 | 36,441 | 1.85 | 19,698 |
| 2027 | 26.8 | 93,927 | 56,028 | 37,899 | 1.90 | 19,947 |
| 2028 | 27.8 | 97,684 | 58,269 | 39,415 | 1.95 | 20,213 |
| 2029 | 28.8 | 101,591 | 60,600 | 40,991 | 2.00 | 20,496 |
| 2030 | 29.8 | 121,216 | 65,326 | 55,891 | 2.05 | 27,264 |
| 2031 | 30.8 | 131,460 | 68,736 | 62,723 | 2.10 | 29,868 |
| 2032 | 31.8 | 136,718 | 71,486 | 65,232 | 2.15 | 30,340 |
| 2033 | 32.8 | 142,187 | 74,345 | 67,841 | 2.20 | 30,837 |
| 2035 | 33.8 | 153,789 | 80,412 | 73,377 | 2.25 | 32,612 |
| 2036 | 34.8 | 175,289 | 95,799 | 79,490 | 2.30 | 34,561 |
| 2037 | 35.8 | 187,622 | 103,851 | 83,771 | 2.35 | 35,647 |
| 2038 | 36.8 | 195,127 | 108,005 | 87,122 | 2.40 | 36,301 |
| 2039 | 37.8 | 202,932 | 112,325 | 90,607 | 2.45 | 36,982 |
| 2040 | 38.8 | 211,049 | 116,818 | 94,231 | 2.50 | 37,693 |
| 2041 | 39.8 | 220,580 | 115,600 | 104,981 | 2.55 | 41,169 |
| 2042 | 40.8 | 229,781 | 118,181 | 111,600 | 2.60 | 42,923 |
| 2043 | 41.8 | 238,972 | 122,909 | 116,064 | 2.65 | 43,798 |
| 2044 | 42.8 | 248,531 | 127,825 | 120,706 | 2.70 | 44,706 |
| 2045 | 43.8 | 258,472 | 132,938 | 125,534 | 2.75 | 45,649 |
| 2046 | 44.8 | 274,742 | 146,873 | 127,868 | 2.80 | 45,667 |
| 2047 | 45.8 | 287,787 | 155,736 | 132,051 | 2.85 | 46,334 |
| 2048 | 46.8 | 299,299 | 161,965 | 137,333 | 2.90 | 47,356 |
| 2049 | 47.8 | 311,271 | 168,444 | 142,827 | 2.95 | 48,416 |
| 2050 | 48.8 | 323,721 | 175,182 | 148,540 | 3.00 | 49,513 |
| 2051 | 49.8 | 309,853 | 187,609 | 122,244 | 3.05 | 40,080 |
| 2052 | 50.8 | 312,950 | 196,993 | 115,958 | 3.10 | 37,406 |
| 2053 | 51.8 | 325,468 | 204,872 | 120,596 | 3.15 | 38,285 |
| 2054 | 52.8 | 338,487 | 213,067 | 125,420 | 3.20 | 39,194 |
| 2055 | 53.8 | 352,027 | 221,590 | 130,437 | 3.25 | 40,134 |
| 2056 | 54.8 | 401,308 | 226,909 | 174,399 | 3.30 | 52,848 |
| 2057 | 55.8 | 429,563 | 234,757 | 194,806 | 3.35 | 58,151 |
| 2058 | 56.8 | 446,746 | 244,147 | 202,598 | 3.40 | 59,588 |
| 2059 | 57.8 | 464,615 | 253,913 | 210,702 | 3.45 | 61,073 |
| 2060 | 58.8 | 483,200 | 264,069 | 219,131 | 3.50 | 62,609 |
| 2061 | 59.8 | 511,982 | 294,326 | 217,656 | 3.55 | 61,311 |
| 2062 | 60.8 | 535,738 | 312,926 | 222,812 | 3.60 | 61,892 |
| 2063 | 61.8 | 557,168 | 325,444 | 231,724 | 3.65 | 63,486 |
| 2064 | 62.8 | 579,455 | 338,461 | 240,993 | 3.70 | 65,133 |
| 2065 | 63.8 | 602,633 | 352,000 | 250,633 | 3.75 | 66,836 |
| 2066 | 64.8 | 516,459 | 301,665 | 214,794 | 3.80 | 56,525 |
| 2067 | 65.8 | 498,887 | 291,401 | 207,486 | 3.85 | 53,892 |
| 2068 | 67.0 | 129,711 | 75,764 | 53,946 | 3.90 | 13,832 |
| Future: | | $12,732,862 | $7,311,297 | $5,421,565 | | $1,782,957 |
| Loss/Year of Schooling: | | | | $1,355,391 | | $445,739 |

Footnotes:

Date of Birth: March 27, 2000

## 2. A Preliminary Calculation of Loss in Parental Training & Guidance

### Re: Robert Turner.

### by: Nitin V. Paranjpe, Ph.D.

| Year | Age | Projected Compensation College | "Actual" Compensation High School | Loss Compensation | MCLA Factor | Present Value Loss |
|------|-----|-------------------------------|-----------------------------------|-------------------|-------------|--------------------|
| Race | | | | African-American | | |
| Gender: | | | | Male | | |
| Projected Earnings assume a college degree and are adjusted for age, race, and gender. | | | | | | |
| Actual Earnings assume a high school degree and are adjusted for age, race, and gender. | | | | | | |
| Source: PINC-04. Educational Attainment. People 18 Years Old and Over, by Total Money Earnings in 2007, Race, Hispanic Origin, and Sex. | | | | | | |
| U.S. Census Bureau, Current Population Survey, 2008 Annual Social and Economic Supplement. | | | | | | |
| Future Increases of: | | | | | | |
| Assumes fringe benefits of: | | | | 4.00% | | |
| Earnings for college graduates are adjusted for worklife expectancy by: | | | | 15.00% | | |
| Earnings for high school graduates are adjusted for worklife expectancy by: | | | | -13.56% | | |
| Future losses calculated from: | | age 18 | to | -19.39% age 67 | | |

Page 2 of 2 page(s).



3. Present Value of Lifetime Earnings from Education:
RE: Robert Turner

Millions

$5.00
$4.00
$3.00
$2.00
$1.00
$0.00

$1.39 — Less than High School
$2.46 — High School
$2.55 — Associates
$4.24 — College

Note: Earnings are average earnings of african-american males, adjusted for age, and worklife expectancy.

# Gerald A. Shiener, M. D.

Fellow, American Psychiatric Association
251 East Merrill
Birmingham, Michigan 48009

(248) 645-5155
Telephone

(248) 645-2665
Telecopier

March 2, 2007

Geoffrey N. Fieger, Attorney at Law
Fieger, Fieger, Kenney & Johnson, P.C.
19390 W. 10 Mile Rd.
Southfield, Michigan 48075

RECEIVED

MAR - 5 2007

Fieger, Fieger, Kenney & Johnson, P.C.

Re:   Robert Turner

Dear Mr. Fieger:

In response to your request for information regarding my examination of Robert Turner, let me provide you the following. I had an opportunity to conduct a psychiatric examination on Robert Turner on April 14, 2006. He consulted me after his mother died under very conflicted circumstances. In addition to conducting a psychiatric examination, I took additional history from his older sister, Delaina Patterson. At the time of the evaluation I obtained the following history.

## History:

Robert Turner is a 6 year-old, African-American child who was attending the Owens School in Kindergarten when seen in April 2006. His birth date is March 27, 2000. Additional history was taken from Delaina Patterson, who is 31 years old, Robert's older sister. She is a homemaker and a student and does accounting for her husband's construction business.

By way of background, Robert Turner lived with his mother, Sherrill Turner, who was caring for Robert who was 5 years old at the time. On February 20, Mrs. Turner, who suffered from cardiovascular problems and respiratory problems, lost consciousness. Robert called 911 and told a female 911 operator that his mother had passed out. The operator demanded to speak to an adult and refused to send help. Robert became frustrated, hung up, and called back a short time later. The operator scolded him and told him he could get into trouble for making a prank call. Three hours later the police arrived. They found Robert in the home with his mother who was dead.

Robert states that he understands the consultation, "It's about my mom". He describes, "She passed out....I called 911....they didn't listen". He went on to state, "I called again....then they came". He describes that this occurred over the course of three hours. He states that it feels "okay" to talk about it, but then adds, "No...it makes me cry". He

volunteers that if he dreams about it he will still cry and he has had several dreams about the incident and about the time that he spent with his mother.

The patient describes poor sleep with troubling dreams. He has dreams where boys are "trying to get in and kill me". He does have dreams of his mother, but he states, "I only dream of her alive". Robert described that he lived with his mother. His father didn't stay with him, and his brothers and sisters were "gone".

He describes that his mother had been ill, and on the day of the incident he reports that his mother went back to her room to lay down. The patient describes that he went back to her room to ask her if he could have a snack. He saw her laying on the floor. She had on a shirt and was only partially dressed. When he saw her laying on the floor he tried to wake her up. He was shaking her and moving her. He then called 911. He states, "My mom taught me". She told the child that if she passed out to call 911 and "tell them to send an emergency truck right now". Robert reports that the operator told him to "stop playing on the phone". She told him this on the second call.

The patient gets sad and gets angry. He describes feelings of frustration. He states that he misses his mother. When he describes his relationship with her he states, "I love her". He describes a good relationship with her and states that she was a good and loving mother. When he did something wrong, he said that she would get "kind of mean" and that she would "whoop me". The patient described that when his mother was unconscious he kept saying "mom...mom". The patient describes that he and his mother would do things together. She would take him to school. She would play with him and they would play hide and seek, and he goes on to describe that he had "fun" with her.

He reports that because of being alone with her and his mother being sick he had to "grow up fast". The patient felt responsibility for his mother. When 911 came he describes, "They looked at her room". The Emergency Medical Technicians didn't say anything to him. They then called the patient's sister. They told his sister that he didn't know that she was dead. The patient reports that he knew that she was very sick and he was very scared, and he felt very bad about what happened. He said that deep down inside he was afraid that she had died. He saw her on the ground. He states, "I felt her tummy....I was afraid".

The patient has been crying. He describes his sleep as disturbed stating, "I just close my eyes....I dream". The patient describes that he has a good appetite. Additional history is taken from his sister, who describes that since the incident his behavior has been "up and down". He is able to enjoy himself and enjoy activities only when he is distracted and the family has to work to distract him. He is sad all the time. He talks about missing his mother. He doesn't cry as much as he did in the first few weeks after the incident, but he does cry at bedtime. He sleeps on the top bunk and Ms. Patterson's son, D.J., who is 8 years old, sleeps on the bottom bunk.

Ms. Patterson describes Robert's relationship with his mother stating, "She was his everything". Ms. Patterson has tried to establish a regular routine and provide structure for Robert. She called the library in his old neighborhood. They knew him. They spent a lot of time at the library (Mrs. Turner and Robert). They found orders for books and the staff knew Robert and his mom and asked about his well-being.

Robert has been more clingy since this incident. He is phobic and fearful and is afraid to go to bed. He is very clingy to Ms. Patterson and asks where she is going when she leaves. He has difficulty with separation and is very disturbed at this prospect and his behavior deteriorates at these times. She reports that his appetite is good and has "picked up" since the incident. He was eating poorly for the first several weeks after the incident. His energy levels are diminished. He has periods of just "laying around" and will not initiate any activities. He plays with other children well "for the most part", but he has problems sharing with other children. She reports that he has nightmares and will talk in his sleep.

## Personal History:

By way of personal history, Robert was born in Detroit. He is the product of a normal pregnancy and a vaginal delivery. There were no problems during the pregnancy. Robert developed normally and reached his milestones - walking at age 1, and talking at age 2.

The patient is the youngest of a sibship of 10. He has five older sisters - the oldest of whom is a homemaker, one of whom works as a paraprofessional for the Board of Education, three of whom are employed, and one of whom is a minor and is a Ward of the State because she ran away. She is 15 years old. She visits and spends weekends with Ms. Patterson. The patient has four older brothers - the oldest of whom does nothing, one of whom works as an upholsterer, one of whom lives in Battle Creek and is unemployed and incarcerated, and one of whom is 17 years old and lives with his father. None of his siblings suffer from any serious medical or psychiatric problems. One brother may have a substance abuse problem. They are somewhat close.

His mother was 46 years old and had cardiovascular and respiratory problems. She was a homemaker. She had worked for Sears. She was under the care of Dr. Obeid. The patient and his sister describe her as a good mother. They were quite close. She had no problems with substance abuse and took good care of herself. Robert's mother and father had never lived together. His biological father died in December. He was never really a father to them. Mother and the child's real father were together only for a brief period. There was a stepfather. He is 57 years old and in good health, although he suffered from diabetes. He worked as a mechanic. He was a fair father and the child was only somewhat close to him. They never really lived together.

## Past Medical History:

By way of past medical history, Robert was under the care of a pediatrician, but his sister does not know the name of that doctor. He has never been hospitalized. He takes no medicines. He does not smoke cigarettes, drink alcohol, or take street drugs. He has never been in counseling before, and he denies any drug allergies.

**MENTAL STATUS EXAMINATION:** On mental status examination, the patient presents the following picture:

**General Attitude and Behavior:** The patient is a well-developed, well-nourished, small child who appears his stated age. He is neatly and appropriately dressed and wears a hat. He keeps it on during the interview, but then takes it off and begins to play with it. He is cooperative, in good contact with his environment and not distracted by internal or external cues. He speaks softly and appears to be saddened. His speech becomes much more slowed and his eye contact deteriorates when he talks about his mother and the circumstances of her death. He begins to fidget in his chair. His eye contact deteriorates and he puts his fingers in his mouth and his hands to his face. The pitch of his voice changes and he becomes tearful.

**Stream of Mental Activity:** The patient is generally goal-directed. He responds to open-ended questions without becoming overly disorganized.

**Emotional State and Reactions:** The patient's affect is full and rich in depth. It is constricted in range. The mood is moderately to markedly depressed. This persistents throughout the course of the interview. Affect remains appropriate to thought content at all times.

**Mental Trend and Content of Thought:** The patient is preoccupied with the circumstances of his mother's death. He speaks of his frustration in calling 911 and the time that he spent alone with her. He describes difficulty with separation, social withdrawal, problems with sleep with nightmares and wish-fulfilling dreams of his mother being alive. He had a significantly, but transiently decreased appetite, and denies any bowel problems. Energy levels are diminished, and the patient is somewhat phobic of being alone. The patient drew pictures that are poorly expressed and articulated and somewhat disorganized. He has a picture of his mother and himself, and a picture of his mother lying on the ground. He draws a picture of a monster, and the figures display themes of threat, malevolence, and vulnerability. He denies any secondary psychotic symptoms and has not experienced any hallucinations, delusions, or pseudoperceptual events.

**Sensorium Mental Grasp and Capacity**: These are intact to gross testing in that the patient is alert and oriented to time, person, place, and situation. His ability to remember recent and remote events and calculate days and dates is intact. He is able to give very detailed history of his current circumstances. He does not show any signs of any cognitive disturbance.

## DIAGNOSTIC IMPRESSION:

Axis I:     Complicated bereavement; Post-traumatic Disorder.

Axis II:    No personality disorder is diagnosed.

Axis III:   No physical condition is diagnosed.

Axis IV:    Psychosocial Stressors - Severe. Mother's death under conflicted circumstances.

Axis V:     Highest level of functioning over the past year - Good and without impairment. Current level - Fair. (GAF: 50)

## DISCUSSION

Robert Turner presents for a psychiatric evaluation about two months after his mother died in his presence as a 5 year-old. He called 911 and attempted to get help "as I was taught", and had two frustrating encounters with 911 operators who refused to accept his call, asked to speak to an adult, and threatened him with punishment for making a prank call.

The patient spent a period of several hours alone in the house with his mother during her period of unconscious and death, and since that time has had difficulty separating. He has been depressed, withdrawn, having sleep disturbances - troubling dreams with a theme of threat or wish-fulfillment, decrease in appetite. The death of a parent under any circumstance is stressful. Under these circumstances of conflict with his powerlessness in helping his mother make the experience traumatic in a significant manner. The patient's reaction is determined by the intensity of this trauma.

Robert Turner is suffering from not only the loss of his mother and the bereavement that that entails, but his ability to overcome that loss and grieve it in a normal manner. It is complicated by the circumstances under which she died - specifically his attempts to get help and being frustrated in those attempts bring about feelings of guilt as evidence by his dreams of boys chasing him and trying to kill him, and in his naive child-like way he has

wish-fulfilling dreams of being reunited with his mother.

Wish-fulfilling dreams are much more primitive than dreams that speak to the frustration over the separation and loss, which would indicate an attempt to work through or overcome the experience of loss. Wish-fulfilling dreams are more common in small children and speak to the difficulty that small children have in overcoming the effects of trauma and work through their loss.

Robert Turner has been profoundly affected by his mother's death in a complicated way, and his reaction rises to the level of a psychiatric illness. This death will affect him for the rest of his life, and it will affect him more so than the death of his mother under more conventional or typical circumstances. The complication of him attempting to get her help and being frustrated in his attempts to do so have set him up for a lifelong impairment that will impair his ability to make attachments, trust adults, trust authority figures, and ask for help. He will be plagued by lifelong feelings of guilt.

He is in need of a long-term program of counseling, behavioral management, and family therapy. A careful review of his psychosocial history, and collateral history from his sister and the information that she gleaned from the community, indicates that before this incident Robert was quite well-adjusted and was functioning well and without impairment.

I would therefore conclude that the abnormalities in mental status and behavior and history are a direct result of his witnessing his mother's death under these circumstances with his inability to obtain help, and the treatment that he received from Emergency Medical Services made this event a significant trauma with which he will struggle for the rest of his life.

If you have any further questions regarding my evaluation, diagnosis, or recommendations, please feel free to contact me at my office address.

Very truly yours,

Gerald A. Shiener, M. D.
Diplomate of the American Board of Psychiatry and Neurology
Added qualifications in Addiction, Forensic and Geriatric Psychiatry

Chief, Consultation and Liaison Psychiatry
Sinai Grace Hospital of Detroit

Assistant Professor of Psychiatry

Purchase Order/Services Contract    CANTRELL FUNERAL HOME. INC.    February 23, 2006 2:10 PM

**BEAUTIFUL BODIES**    **10400 Mack Avenue**    **(313)-821-9040**

**BY CANTRELL**    **Detroit, Michigan**    **48214-2137**    **Fax: (313)-822-2835**

We agree to sell to you and you agree to purchase the funerals goods & services listed below.    rec2

# Funeral Arrangements For: SHERRILL TURNER

*Phone:*     248-345-9021    *Charged to:* TYRONE & DELAINA PATTERSON

*D.O.B.:*    *Address:* 23914 CHIPMUNK TRAIL

*S.S.#:*    *City/State:* NOVI, MI    48375

You have been shown a General, Casket, & Outer Burial Container Price List effective with this Contract.

| Description Statement of Packaged Funeral Goods & Services Selected: | | Costs: |
|---|---|---|
| 1. Casket . . . . . . . . . . . . . . | | N/A |
| 2. Cemetery/Crematory . . . .    LINCOLN MEM. PARK   *Single* | | $192.00 |
| 3. Vault/Cement Box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Rough* | | $138.00 |
| 4. Cremation Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | N/A |
| 5. Death Certificate . . . . .   Quantity =   2     Locale: **Detroit**  . . . . . . . . . | | $22.00 |
| 6. Printing of Obituaries: . . . .    *COLOR*    G. P.   & (1) Photo . . . . . . . . . . | | FTP |
| 7. Service Charge; . . . . . .Includes: removal of body, embalming, Family hr.   2DAY | | $1,541.00 |
| Viewing, Funeral, & personnel, our work & use of facilities & transportation | | |
| 8. Sedan  #    4    at $ 95.00@ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $190.00 |
| 9. Limousine #       at $210.00@ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| 10. Hearse . . . . . . . . . .   at $175.00 | | Included |
| 11. Register Book . . . . . . .   at $ 15.00 | | Included |
| 12. Acknowledgement Cards .@ $15. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Included |
| 13. Shipment . . . . . . . . . .   Airline:    . . . . . . . . . .   Flight #    . . . . . . . . . . . . . . | | N/A |
| 14. . . . . . . . . . . . . . . . . . .   Funeral Director   . . . . . . . . . . . . . . . . . . . . . . . | | $579.00 |
| 15. . . . . . . . . . . . . . . . . . .   Airtray | | N/A |
| 16. Clothing: Suit: $129.00    Dress: $99.00    Undies:$29.00 | | |
| 17. Misc. Chrg/Discount: . . . . .    . . . . . . . . . | | |
| 18.                                      *Sales Tax :* | | F.I.A |
| 19. Minister:   YES     Soloist:   YES     Organist:   YES | | Included |
| *PAYEE'S* | *TOTAL :* | $2,662.00 |
| F.I.A. Pays=   $909.00  Ins. I Pays: | | **Family Pays:** |
| VA / SSRF=     Ins. II Pays:     Ins.IV Pays: | | $1,753.00 |

**Payments must be in Cash, Money Order, or Cashier's Check; surcharge on all other payments!!**

I hereby authorize the above funeral, and I represent, that I have sufficient resources legally available to the CANTRELL FUNERAL HOME, INC. for payment of aforesaid sum, BEFORE the funeral service, or will guarantee by insurance proceeds. I will hold the CANTRELL FUNERAL HOME, HARMLESS IN THE ORDERING OF THE GRAVE. The CANTRELL FUNERAL HOME, Inc. make no warranties of fitness or merchantability, expressed nor implied, written or oral. The Only warranties available in connection with goods sold with this funeral are the expressed written warranties, if any, extended by the manufacturer thereof.

The Undersigned acknowledge the availability of said written warranties and their contents. This cash transaction is due in full by the funeral date, and in all events, is "PAST DUE & DELINQUENT" upon expiration of the due date. A penalty of 1.5% per month for UNANTICIPATED LATE PAYMENT be charged, effective 30 days after the due date and a service charge of $150.00 (US) shall be accrued to all accounts forwarded to a COLLECTION AGENCY. IN WITNESS Whereof. the PURCHASER(S) and FIRM have affixed their signatures on the date above. All guarantee's for Insurance or Cash (Currency) payments required 48 hours before Funeral. An additional 2% charge for all personal checks and credit cards (MC/Visa). Insurance claims paid within 72 hours, 5% charge.

Signed: _____    Signed: _____

Address:   23914 CHIPMUNK TRAIL

      NOVI, MI     0     48375 Witness:_____

| Cash Balance to be Paid BEFORE Funeral | | CHAPEL |
|---|---|---|
| FIRST | FAMILY | FUNERAL |

Embalming: required on Viewing Services; Immediate Cremation/Interment needs No Em

**EXHIBIT** [ ]

receipt

Thank you!

Thank you for shopping Costco.com. Your order processing is complete.
Your confirmation number is: 12462768

| Billing Address | | | Payment Method |
|---|---|---|---|
| Delaina Patterson | Member Number: | 111759414138 | MasterCard: ************2813 |
| 23914 CHIPMUNK TRL | | | |
| NOVI, MI 48375-3335 | | | |

Shipping

Delaina Patterson
Cantrell Funeral Home
10400 MACK
DETROIT, MI 48214

Your Order

| Qty | Description | Ship Method | Price | Item Total |
|---|---|---|---|---|
| 1 | The Mother Casket by Universal Standard Shipping Item # 810223 | Standard | $924.99 | $924.99 |
| | | Subtotal: | | $924.99 |
| | | Shipping & Handling: | | $0.00 |
| | | Tax: | | $55.50 |
| | | Order Total: | | $980.49 |



# Jay's Flower Shop, Showroom
## and Wholesale
10500 Mack Avenue
Detroit, Michigan 48214
(313) 822-1100 - (313) Fax 822-6830

**DELIVER TO** *Sherrill Turner*

| DATE ORDERED | DATE WANTED | A.M. | P.M. | ITEM | |
|---|---|---|---|---|---|
| | | | | | AMOUNT |
| | | | | Casket Spray | 80 |
| | | | | Red/White B/K Base | |

| CARD | | AMOUNT | 80 |
|---|---|---|---|
| *Love* | | SALES TAX | |
| *Family* | | DELIVERY CHARGE | |
| | | TRANSFER CHARGE | |
| | | TOTAL CHARGES | |
| | | PAID | CHARGE | C.O.D. |

| FUNERAL | CONVALESCENCE | BIRTH | BIRTHDAY | ANNIVERSARY | BUSINESS | HOLIDAY | OTHER |
|---|---|---|---|---|---|---|---|

CHARGE TO _____

ADDRESS _____ TEL. PHONE _____

CREDIT CARD NUMBER _____ EXP. DATE _____

# WAYNE COUNTY PROSECUTING ATTORNEY'S RECOMMENDATION

| IN CUSTODY | Dept. Precinct | Date: | ☐ Further Investigation Ordered |
|---|---|---|---|
| ☐ Yes   ☒ No | IAC-06-508 | | ☐ Further Investigation Completed |

| I ( ) DENY   ( ) RECOMMEND THE ISSUING OF A WARRANT | | MISDEMEANOR ( ) | FELONY ( ) |
|---|---|---|---|

| DEFENDANT NAME (Last, First, Middle) | FULL ADDRESS | AGE | SEX | RACE | D.O.B. | ST. & LOCAL I.D. |
|---|---|---|---|---|---|---|
| NICHOLS, SHARON | 13333 LYNDON, DETROIT, MI 48235 | 43 | F | B | 10/31/62 | NBN |
| SUTTON, TERRI | 13333 LYNDON, DETROIT, MI 48235 | 47 | F | B | 1/29/59 | NBN |
| | | | | | | |

Offense _Neglect of Duty - Def #1_          Defn. No. 1  2  3
    Attempted ( )
    MCLA _750.498_

Offense _Neglect of Duty - Def #2_          Defn. No. 1  2  3
    Attempted ( )
    MCLA _750.498_

Offense                                     Defn. No. 1  2  3
    Attempted ( )
    MCLA

Denial Reason:

Denial Code:
Defn. No. 1:          Defn. No. 2:          Defn. No. 3:

Instruction          _See attached sheet_

_6-7-06_
Date Completed

Signed: _Lora Weingarden P379_
Assistant Prosecuting Attorney & Bar No.

EXHIBIT

**5**

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DELAINA PATTERSON, as Personal Representative
for the Estate of SHERRILL TURNER, deceased, and
ROBERT TURNER, a minor, Individually, by his
Next Friend, DELAINA PATTERSON,

Plaintiffs,

Case No. 08-111034-NO
Hon. John A. Murphy

vs.

SHERRY NICHOLS,

Defendant.

---

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
Fieger, Fieger, Kenney, Giroux, Danzig
& Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

WILSON A. COPELAND, II (P23837)
Attorney for Defendant, Nichols
615 Griswold, Ste. 531
Detroit, MI 48226
(313) 961-2600

---

## AGREEMENT TO ARBITRATE

The parties, by their respective attorneys, agree to submit to the above-entitled case to arbitration on the following terms and conditions:

1.  The parties shall submit to arbitration all matters in controversy raised in the above-named lawsuit. The Wayne County Circuit Court shall have and retain jurisdiction to enforce any and all terms of the arbitration agreement.

2.  Arbitration shall be in accordance with the Michigan Rules of Evidence, except as may be by stipulation of the parties.

3.  Medical records, reports and bills and other records and documents, such as employment records, court records and other documents may be used at the hearing in lieu of the personal appearance or depositions of physicians, medical care providers or records custodians.

FIEGER, FIEGER, KENNEY, GIROUX, DANZIG & HARRINGTON · A PROFESSIONAL CORPORATION · ATTORNEYS AND COUNSELORS AT LAW · 19390 WEST TEN MILE ROAD · SOUTHFIELD, MICHIGAN 48075-2463 · TELEPHONE (248) 355-5555 · FAX (248) 355-5148

4.   The matter shall be arbitrated by a panel of three arbitrators, all of whom shall be practicing Michigan attorneys, or current or former judges. The Plaintiff's arbitrator shall be Kathleen Bogas, the Defendant's arbitrator shall be Laura McGifford, and the neutral, who has been selected jointly by Plaintiff and Defendant, shall be Pamela Harwood. Plaintiff shall pay all fees and costs associated with the arbitrator that he selects. Defendant shall pay all fees and costs associated with the arbitrator that he selects. All fees and costs of the neutral arbitrator shall be paid fifty percent (50%) by Plaintiff and fifty percent (50%) by Defendant.

   All other costs and fees, including attorney fees, shall be born by the party which incurs them.

5.   The arbitration shall take place on or before October 1, 2013. In the event that the neutral arbitrator is unavailable for hearing on the date set by the parties, the position shall be filled by agreement of the parties, or by agreement of the parties, the hearing date shall be adjourned to a reasonably prompt date. In the event that either party's arbitrator is unavailable for a hearing on the date set by the parties, the hearing date shall not be adjourned, but the party will be required to name and secure another arbitrator.

6.   Pre-hearing briefs shall be required of Plaintiff and Defendant and shall be submitted to the arbitration panel prior to commencement of the arbitration.

7.   The minimum amount of any award to the Plaintiff shall be in the amount of seventy-five thousand dollars ($75,000.00) and the maximum amount of any award to the Plaintiff shall be in the amount of one million eight hundred thousand dollars ($1,800,000.00). Any award less than $75,000.00 shall be deemed to be an award of $75,000.00, and any award in excess of $1,800,000.00 shall be deemed an award of $1,800,000.00.

8.   A decision of two of the three arbitrators shall be binding.

9.   The parties are submitting to arbitration all matters in controversy raised in the above-named lawsuit. Thus, Plaintiff may pursue all claims, including claims for pre-judgment interest, provided, however, there shall be no costs, fees or interest added to the award rendered by the arbitrators, and the award rendered by the arbitrators shall be deemed to include all claims for costs, fees, attorney fees and interest and sanctions of any kind.

10.  The award of the arbitrators shall represent a full and final resolution of any amounts due and owing to Plaintiff for any and all claims arising out of the incident, occurring on 02/20/2006, involving the two 911 telephone calls made by Robert Turner resulting in a claim of gross negligence and intentional inflection of emotional distress.

FEIGER, FEIGER, KENNEY, GIROUX, DANZIG & HARRINGTON • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

FIEGER, FIEGER, KENNEY, GIROUX, DANZIG & HARRINGTON • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

11. Neither the "high-low" amounts, nor the mediation award shall be disclosed to the arbitrators. Disclosure of the "high-low" amounts or the mediation award to the arbitrators shall render the arbitration award voidable by any non-disclosing party.

12. Each party shall have the opportunity to take depositions of any witness who the parties does not wish to bring in live to the arbitration without regard to witness availability.

13. The proceedings convened by the arbitrators need not be recorded. However, if any party wishes to have the proceedings recorded, then any costs incurred shall be born exclusively by said party.

14. In the event the parties will be calling any witnesses live at the time of the arbitration hearing, it is agreed that the parties will provide written notification to the opposing party of the individuals who will be called live. The written notification shall be provided to the opposing counsel 24-hours prior to the scheduled hearing. Any witness not disclosed within the above time frame precludes that witness from being called live unless otherwise agreed in writing by the parties.

15. The parties agree that they will faithfully observe the Agreement to Arbitrate and that they will abide by and promptly satisfy the award rendered by the arbitrators. In the event that any party refuses to abide by the arbitrators' decision, the other party may petition the Wayne County Circuit Court to confirm the award and enter judgment thereon.

16. The award of the arbitrators is a final binding award. The parties specifically waive any appeal of the award by the arbitrators to the Michigan Court of Appeals and/or the Michigan Supreme Court.

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
Fieger, Fieger, Kenney, Giroux, Danzig
& Harrington, P.C.
19390 West Ten Mile Road
Southfield, MI 48075
(248) 355-5555

WILSON A. COPELAND, II (P23837)
Attorney for Defendant, Nichols
615 Griswold, Ste. 531
Detroit, MI 48226
(313) 961-2600

FIEGER, FIEGER, KENNEY, GIROUX, DANZIG & HARRINGTON • A PROFESSIONAL CORPORATION • ATTORNEYS AND COUNSELORS AT LAW • 19390 WEST TEN MILE ROAD • SOUTHFIELD, MICHIGAN 48075-2463 • TELEPHONE (248) 355-5555 • FAX (248) 355-5148

_____

DELAINA PATTERSON, as Personal Representative
for the Estate of SHERRILL TURNER, deceased, and
ROBERT TURNER, a minor, Individually, by his
Next Friend, DELAINA PATTERSON

_____

Portia Roberson Corporation Counsel for City of Detroit

Subscribed and sworn to before me this
_____ day of _____, 2013

_____

Notary Public, Wayne County, MI
My Commission Expires:_____

6

## City of Detroit

**Charles Pugh**
*President*

**Gary Brown**
*President Pro Tem*

### CITY COUNCIL



### REGULAR SESSION
### AGENDA

Kenneth V. Cockrel, Jr.
Saunteel Jenkins
Brenda Jones
Kwame Kenyatta
Andre L. Spivey
James Tate
Jo Ann Watson

*Janice M. Winfrey*
*City Clerk*

### *REVISED*

TUESDAY, JUNE 4, 2013

*COUNCIL MEMBER JOANN WATSON WILL*
*PRESENT A SPIRIT OF DETROIT AWARD TO STEVEN ROSS*
*PRESIDENT & CEO OF SERMAN'S CLOTHES*

*COUNCIL MEMBER JAMES TATE HAS*
*ARRANGED FOR A PRESENTATION*
*TO BE GIVEN BY REPRESENTATIVES*
*FROM THE "WORLD CUP OF GARDENING"*

**APPROVAL OF JOURNAL OF LAST SESSION**

**RECONSIDERATIONS: None.**

**UNFINISHED BUSINESS**

**PRESIDENT'S REPORT ON STANDING COMMITTEE**
**REFERRALS AND OTHER MATTERS:**

**INTERNAL OPERATIONS STANDING COMMITTEE**
*THE FOLLOWING ITEM(S) ARE TO BE REFERRED TO THE INTERNAL*
*OPERATIONS STANDING COMMITTEE:*

**FINANCE DEPARTMENT/PURCHASING DIVISION**
Submitting the following **Finance Department/Purchasing Division Contracts:**

1.  Submitting reso. autho. **Contract No. 2878445** - 100% City Funding – To Provide
    Temporary Staffing Services – Company: Experis US Inc., Location: 1000 Town
    Center, Suite 1000, Southfield, MI 48075 – Contract Period: April 9, 2013 through
    May 31, 2015 – Contract Amount Not to Exceed: $750,000.00   **HUMAN**
    **RESOURCES**

**LAW DEPARTMENT**
2.  Submitting reso. autho. **Settlement** in lawsuit of Carmen Fulford v. City of Detroit,
    et. al.; Case No.: 12-001833-NF; File No.: A24000.000982 (FMEB); in the amount of

$7,500.00; by reason of alleged injuries sustained in an automobile accident involving a City of Detroit vehicle on or about June 11, 2011.

3.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Kevin White v. City of Detroit et. al.; United States District Court Case No.: 09-12911; File No.: A37000-006808 (MMM); in the amount of $68,000.00; by reason of events which occurred June 30, 2006 and July 1, 2006.

4.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Steven Wolak, as Personal Representative of the Estate of Christopher Wolak, deceased v. City of Detroit and Audrian Hardy; Case No.: 12-001060-NI; File No.: A20000-003328 (JLA); in the amount of $375,000.00; by reason of injuries sustained from a pedestrian/bus accident on or about December 24, 2011.

5.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Albert Jenkins v. R. Whitehead et. al.; Case Nos.: 12-005007-CB (SLdeJ); Matter No.: A37000.007765; in the amount of $90,000.00; by reason of an incident with the Detroit Police Department.

6.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Good Samaritan Comfort Transportation, LLC v. City of Detroit; Case No.: 12-116705-GC; File No.: A20000.003646 (PLC); in the amount of $5,000.00; by reason of alleged medical transportation costs incurred on or about September 27, 2011 and numerous additional dates.

7.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Eric Brown v. City of Detroit; Case No.: 12-005426NF; File No.: A20000.003381 (YRB); in the amount of $28,000.00; by reason of alleged physical and/or mental injuries sustained on or about October 18, 2011.

8.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Michael Lee v. City of Detroit; WCCC No.: 11-011855-CZ; in the amount of $49,500.00; by reason of alleged actions.

9.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Orlando Marion v. City of Detroit, et. al.; Case No.: 12-cv-12467 (SLdeJ); Matter No.: A37000.007825; in the amount of $21,500.00; by reason of alleged injuries sustained on or about July 25, 2011.

10. Submitting reso. autho. <u>Settlement</u> in lawsuit of Willie Swain v. City of Detroit; Case Nos.: 12-010967-NF (SLdeJ); Matter No.: A20000.003479; in the amount of $30,000.00; by reason of a bus accident.

11.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Shavrimn Lock v. City of Detroit; Case No.: 12-005111-NF; File No.: A20000.003375 (DJD); in the amount of $13,129.15; by reason of alleged bus-auto collision sustained on or about April 12, 2011.

12.  Submitting reso. autho. <u>Settlement</u> in lawsuit of Engineered Comfort Solutions, Inc. a Michigan Corporation v. City of Detroit; Case No.: 12-115629; File No.: A39000-000522 (PLC); in the amount of $8,750.00; by reason of alleged breach of contract sustained on or about July 12, 2012.

13.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Stephen Anjorin v. City of Detroit; United States District Court Case No.: 12-13393; for P.O. Steven Rata, P.O. Jason Murphy, Sgt. Lawrence Purifoy and Inv. Timothy Banks.

14.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Darnell Arvin V. Sgt. Spencer; Wayne County Circuit Court Case No.: 12-012075-NO; for Sgt. Tyrone Spencer.

15.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Lisa Fisher v. City of Detroit, Peter Padron, and Christopher Blahovec; United States District Court Case No.: 12-13040; for P.O. Christopher Blahovec and P.O. Peter Padron.

16.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Anthony Harmon v. Tracy Weinert, Jeremiah Orvelo, and Shawn Stellard; United States District Court Case No.: 12-14481; for P.O. Tracy Weinert and P.O. Jeremiah Orvelo.

17.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Martin Johnson and Carlton Johnson by his Next Friend Darlene Thomas v. City of Detroit, Ryan Connor, Robert Avery, Fitzgerald Harris and Jeffery Williams; Wayne County Circuit Court Case No.: 12-01414-NI; for Sgt. Robert Avery, P.O. Ryan Connor, P.O. Fitzgerald Harris and P.O. Jeffery Williams.

18.  Submitting reso. autho. <u>Legal Representation and Indemnification</u> in lawsuit of Lashure Montgomery and Chantil Donovan v. City of Detroit, Detroit Police Officers Bryan Brush #4245, Damon Kimbrough #449, and John Doe Police Officers #1-10; United States District Court Case No.: 12-14314; for P.O. Damon Kimbrough and Bryan Brush.

19. Submitting reso. autho. **Legal Representation and Indemnification** in lawsuit of Curtis Morris v. Officer J. Lewis and Officer Taylor; United States District Court Case No.: 12-15587; for P.O. Ned Gray and P.O. Joseph Lewis.

20. Submitting reso. autho. **Legal Representation and Indemnification** in lawsuit of Mickey Laron Perry v. the City of Detroit, Ralph Godbee, Lavon Howell, Dattahn Wade, Michael Dailey, Cynthia Davis, Joe Wright, Eric Jones, Sgt. Deschenes, Roslyn Banks, Tina Orr, and George N. Anthony, Secretary to the Board of Police Commissioners; Wayne County Circuit Court Case No.: 12-003288-NZ; for Sgt. Michael Dailey, Retired Chief of Police Ralph Godbee, Inspector Eric Jones and P.O. Lavon Howell.

21. Submitting reso. autho. **Legal Representation and Indemnification** in lawsuit of Jamel Cameron Turner and Tara Turner v. Detroit Police Officer John Doe, Robert Rowe, Unknown Members of the Detroit Police Department Special Response Team, the Detroit Police Department and the City of Detroit; United States District Court Case No.: 12-12913; Sgt. William Howitt, P.O. Larry Davis and P.O. Jonathan Bibbs.

22. Submitting reso. autho. **Order of Dismissal and to Enter into an Agreement to Arbitrate** in lawsuit of Delaina Patterson, as Personal Representative of the Estate of Sherrill Turner, Deceased, and Robert Turner, a Minor, Individually, by his Next Friend, Bobbie Turner v. Sherry Nichols; Case No.: 08-111034-NO; File No.: A24000.000654 (KAC); in an amount of not more than $1,800,000.00 for any and all claims arising out of the incident which occurred on or about February 20, 2006 at or near 1950 Spruce Street.

## NEIGHBORHOOD AND COMMUNITY SERVICES STANDING COMMITTEE

*THE FOLLOWING ITEM(S) ARE TO BE REFERRED TO THE NEIGHBORHOOD AND COMMUNITY SERVICES STANDING COMMITTEE:*

FINANCE DEPARTMENT/PURCHASING DIVISION
Submitting the following **Finance Department/Purchasing Division Contracts:**

23. Submitting reso. autho. **Contract No. 2879787** - 100% City Funding – To Provide Maintenance Services – RFQ #45152 –Company: Wright Way Services, Location: 645 Griswold, Suite 1379, Detroit, MI 48224 – Contract Period: April 1, 2013 through March 31, 2016 – Lowest Bid – Actual Cost: $196,237.00/ One (1) Year
RECREATION

## PLANNING AND ECONOMIC DEVELOPMENT STANDING COMMITTEE

*THE FOLLOWING ITEM(S) ARE TO BE REFERRED TO THE PLANNING AND ECONOMIC DEVELOPMENT STANDING COMMITTEE:*

### FINANCE DEPARTMENT/PURCHASING DIVISION

Submitting the following <u>Finance Department/Purchasing Division Contracts:</u>

24.   Submitting reso. autho. **Contract No. 2866332** - 100% Federal Funding – To Provide Public Service Activities to Senior Citizens who are Residents of the City of Detroit – Company: Adult Well Being Services, Location: 1423 Field, Detroit, MI 48214 – Contract Period: June 1, 2012 through May 31, 2013 – Contract Amount Not to Exceed: $75,000.00 **PLANNING & DEVELOPMENT**

Community Development Block Grant (CDBG) Contract

25.   Submitting reso. autho. **Contract No. 2874768** - 100% Federal Funding – To Provide Treatment Programs that Serve the Need of Children and Families – Company: Boysville/Holy Cross Children Services, Location: 8759 Clinton Macon Road, Clinton, MI 49236 – Contract Period: Upon City Council Approval through Eighteen (18) Months Thereafter – Contract Amount Not to Exceed: $60,000.00 **PLANNING & DEVELOPMENT**

Community Development Block Grant (CDBG) Contract

### PLANNING AND DEVELOPMENT DEPARTMENT

26.   Submitting reso. autho. **Surplus Property Sale** – 2272, 2264, 2252, and 2246 East Canfield, to Katherine Andresky, for the amount of $1,640.00. **(The purchaser proposes to rehabilitate the property for use as a "Single Family Residential Dwelling" and use the other three lots as accessory green space and for gardens.)**

27.   Submitting reso. autho. **Correction of Legal Entity** Former Detroit Fire Department Headquarters Building Development: 250 West Larned. **(Accordingly, the sale to 21 Century Holding L.L.C. should be amended to show 250 Larned L.L.C. as the actual buyer.)**

28.   Submitting reso. autho *Request for Public Hearing* to Establish a Commercial Rehabilitation District on behalf of DuCharme Place LLC., in the area of 1544-1556 E. Lafayette, Detroit, MI 48207 in accordance with Public Act 210 of 2005. **(Petition #2724) (The Planning and Development has reviewed the request of DuCharme**

Place LLC., and find that it satisfies the criteria set forth by Public Act 210 of 2005 and that it would be consistent with the development and economic goals of the Master Plan.)

## PUBLIC HEALTH AND SAFETY STANDING COMMITTEE

*THE FOLLOWING ITEM(S) ARE TO BE REFERRED TO THE PUBLIC HEALTH AND SAFETY STANDING COMMITTEE:*

### FINANCE DEPARTMENT/PURCHASING DIVISION

Submitting the following **Finance Department/Purchasing Division Contracts:**

29.     Submitting reso. autho. Contract No. 2838458 - 100% City Funding – To Provide Hydrofluorosilicic Acid – Company: Key Chemical Inc., Location: 9503 Dovewood Place, Waxhaw, NC 28173 – **Potential Savings: $260,755.00** – Contract Period: July 1, 2013 through June 30, 2014 – Estimated Cost: $2,249,884.00  **DWSD**

Renewal of Existing Contract - Original Contract Expires June 30, 2013

### LAW DEPARTMENT

30.     Submitting reso. autho. Emergency Ordinance to amend Chapter 33 of the 1984 Detroit City Code, *Minors*, Article III, *Regulation of Minors in Public Places and Adult Responsibility for Violation*, Division 2, *Curfew*, of the 1984 Detroit City Code by adding Sections 33-3-14 and 33-3-15 to provide for a superseding curfew for all minors on June 24, 2013, the scheduled date for the Detroit Annual Fireworks Display, or on any rescheduled date for this event, from 6:00 p.m. through 11:59 p.m., and on June 25, 2013, or on any following day where the event is rescheduled, 12:00 midnight through 6:00 a.m., with limited exceptions for any minor: 1) accompanied by his or her parent or legal guardian: 2) traveling to and from his or her place of employment: or 3) traveling to and from and education or training program or an organized sponsored recreational activity during the specified period. **(Due to the rapidly approaching date for the annual City of Detroit fireworks display, we request that in order to allow for timely publication, the proposed emergency ordinance be introduced and passed at the next Formal Session to be held by your Honorable Body.)**

### POLICE DEPARTMENT

31.     Submitting report relative to Petition of MACK ALIVE (#2758), request to host the "22nd Annual Parade and Rally" at Mack Ave at St. Jean marching to E. Grand Blvd. on August 17, 2013 from 8 am. to 5 p.m.  **(AWAITING REPORTS FROM**

MAYOR'S OFFICE, FIRE, PUBLIC WORKS, TRANSPORTATION, BUILDINGS SAFETY ENGINEERING & ENVIRONMENTAL AND HEALTH AND WELLNESS PROMOTION DEPARTMENTS.)

32. Submitting report relative to Petition of Woodbridge Pub (#2791), request permission to hold Woodbridge Merrick N Summer, June 29-30, 2013, from 12:00 p.m. to 1:00 a.m.; with temporary street closure on Merrick and Trumbull. (AWAITING REPORTS FROM MAYOR'S OFFICE, FIRE, PUBLIC WORKS, TRANSPORTATION, BUILDINGS SAFETY ENGINEERING & ENVIRONMENTAL AND HEALTH AND WELLNESS PROMOTION DEPARTMENTS.)

33. Submitting reso. autho. Request to Apply for A FY 2013 Community Policing Development (CPD) Microgrant from the United States Department of Justice's Office of Community Oriented Policing Services. (Community Policing Development (CPD) funds are used to advance the practice of community policing in law enforcement agencies through training and technical assistance, the development of innovative community policing strategies, applied research, guidebooks, and best practices.)

34. Submitting reso. autho. Request to Enter into an Intergovernmental Agreement with the Wayne County Prosecutor's Office to fund ITS Sexual Assault Team. (The Criminal Investigators Bureau (CIB) would like to continue this Project and provide funding through the 2012 JAG Grant to the WCPO for its Sexual Assault Team (SAT) for the continued vertical prosecution of sexual assault cases.)

## PUBLIC WORKS DEPARTMENT/ADMINISTRATION

35. Submitting reso. autho. Finance Director to transfer up to 50% of the Major Street Fund to the Local Street Fund; estimated amount of transfer is $8,129, 198.00. (Each year the City of Detroit receives a distribution of Michigan Transportation funds in accordance with Act 51, Public Act of 1951, as amended; Section 13 (6) of Act 51, P.A. 1951 as amended, however, allows a city to use on the local street system up to 50 percent per annum of funds returned the City for its major street system.)

## WATER DEPARTMENT

36. Submitting report relative to FY 2013-2014 Detroit Retail Water and Sewerage Rates and Changes, effective July 1, 2013 on all bills rendered on or after August 1, 2013 Response. (The Water Department has submitted a request to Council seeking authorization of the FY 2013-2014 proposed Detroit Retail Water and Sewerage

Rates and Changes. This correspondence is responsive to the questions asked by
Council Member James Tate on May 4, 2013.)

## VOTING ACTION MATTERS

## OTHER MATTERS:

## COMMUNICATIONS FROM MAYOR AND OTHER
## GOVERNMENTAL OFFICIALS AND AGENCIES:

### MAYOR'S OFFICE

37.  Submitting a **VETO** relative to Approval and/or Disapproval of City Council
     Amendments to Bing Administration's Proposed Fiscal Year 2013-14 Budget.
     (Receive and Place on File.)

## PUBLIC COMMENT

## STANDING COMMITTEE REPORTS:

## INTERNAL OPERATIONS STANDING COMMITTEE

### FINANCE DEPARTMENT/PURCHASING DIVISION

38.  Jones, reso. autho. **Contract No. 2877263** - 100% State Funding – Lease Agreement
     - Grace Ross Health Clinic – Company: Institute for Population Health, Inc.,
     Location: 14585 Greenfield St., Detroit, MI 48225 – Contract Period: October 1,
     2012 through June 1, 2013, may be extended upon mutual agreement of both parties
     for one (1) additional one (1) year term – Monthly Rental Amount: $576.25 per
     month (Payable to the City of Detroit on the first day of each month of the Term) -
     Contract Amount Not to Exceed: $4,610.00 (Eight (8) Months). **GENERAL
     SERVICES (PULLED FROM THE FORMAL SESSION ON 05-28-13)**

39.  Jones, reso. autho. **Contract No. 2877264** - 100% State Funding – Lease Agreement
     - Herman Kiefer – Company: Institute for Population Health, Inc., Location: 1151
     Taylor St., Detroit, MI 48202 – Contract Period: October 1, 2012 through September
     30, 2013, may be extended upon mutual agreement of both parties for one (1)
     additional one (1) year term – Monthly Rental Amount: $71,552.58 per month
     (Payable to the City of Detroit on the first day of each month of the Term) - Contract
     Amount Not to Exceed: $858,631.00 (One (1) Year). **GENERAL SERVICES
     (PULLED FROM THE FORMAL SESSION ON 05-28-13)**

40.    **Jones, reso. autho. Contract No. 2877265** - 100% State Funding – Lease Agreement - Northeast Health Clinic, 5400 E. Seven Mile – Company: Institute for Population Health, Inc., Location: 5400 E. Seven Mile Rd., Detroit MI 48234 – Contract Period: October 1, 2012 through September 30, 2014, may be extended upon mutual agreement of both parties for one (1) additional one (1) year term – Monthly Rental Amount: $730.00 per month (Shall be payable to the City of Detroit on the first day of each month of the Term) - Contract Amount Not to Exceed: $17,520.00 (Two (2) Years). **GENERAL SERVICES (PULLED FROM THE FORMAL SESSION ON 05-28-13)**

41.    **Jones, reso. autho. Contract No. 2836774** - 100% City Funding – To Provide Legal Services: Cable Commission Litigation against Comcast – PEG Fees – Company: Varnum Riddering Schmidt Howlett, LLP, Location: 333 Bridge Street N.W., Suite 1700, Grand Rapids, MI 49501 – Contract Period: January 1, 2010 through December 31, 2013 – Contract Increase: $100,000.00 – Contract Amount Not to Exceed: $500,000.00.    **LAW**    *(The Contract was last Approved for $400,000.00 on February 14, 2012.)*

42.    **Jones, reso. autho. Contract No. 2578900** - 100% City Funding – To Provide Oracle Financial System Maintenance Support – Company: Oracle Corporation, Location: 3290 W. Big Beaver Road, Suite #300, Troy, MI 48084 – Contract Period: March 26, 1997 through Termination of Services – Contract Increase: $1,700,000.00 – New Contract Amount Not to Exceed: $14,395,613.93.    **ITS**    *(Total Expended on Contract $12,695,613.93. Detailed Reason for Increase: Increase is needed to support application software updates for DRMS, HRMS, Police, Treasury and ITS.)*

**LAW DEPARTMENT**

43.    **Jones, reso. autho. <u>Settlement</u>** in lawsuit of Monisha Taylor v. City of Detroit; Case Nos.: 12-006430-NF (SLdeJ); Matter No.: A20000.003406; in the amount of $160,000.00; by reason of a bus accident.

44.    **Jones, reso. autho. <u>Settlement</u>** in lawsuit of Keys of Life Residential Care, Inc. v. City of Detroit; Case No.: 12-000982-NF; File No.: A20000.003308 (JDN); in the amount of $50,000.00; by reason of alleged payment due for medical services rendered to Dock Rembert.

45.    **Jones, reso. autho. <u>Settlement</u>** in lawsuit of Jacob Myers v. City of Detroit; Case No.: 12-007114-NO; File No.: A19000.004034 (DJD); in the amount of $18,000.00; by reason of alleged injuries sustained on or about May 28, 2011.

46. **Jones,** reso. autho. **Legal Representation and Indemnification** in lawsuit of Tangela McLemore v. Roadrick West, Michael David Mansfield, and City of Detroit; Wayne County Circuit Court Case No.: 12-013751-NI; for TEO Michael David Mansfield.

47. **Jones,** reso. autho. **Legal Representation and Indemnification** in lawsuit of Melvin Lyle Larson v. Gregory LaMont Cotton, and Detroit Department of Transportation; Wayne County Circuit Court Case No.: 13-001621-NI; for TEO Gregory LaMont Cotton.

**CITY CLERK'S OFFICE**

48. **Jones,** reso. autho. Petition of Freedom House (#2803) requesting resolution from your Honorable Body for a charitable gaming license. **(The City Clerk's Office recommends approval of this petition.)**

## NEIGHBORHOOD AND COMMUNITY SERVICES STANDING COMMITTEE

**LAW DEPARTMENT**

49. **Tate,** a Proposed ordinance amends Chapter 40 of the 1984 Detroit City Code, Parks and Recreation by amending Article II, Boats in Park Waters, by amending Sections 40-2-2, 40-2-3, 40-2-4, 40-2-9, and 40-2-10; by repealing Section 40-2-1 and adding substitute Section 40-2-1; and by adding new Section 40-2-11, to define 'park waters,' 'permit,' 'vessel,' and waters of the state', to clarify and revise certain provisions, and to authorize the Recreation Department to facilitate and regulate the mooring, storage, launching, and removal of vessels into park waters or waters of the state from City of Detroit property, commensurate with state law. **INTRODUCE**

50. **Tate,** reso. setting public hearing on **Monday, June 13, 2013 at 1:15 p.m.** on foregoing ordinance amendment.

## NEW BUSINESS

## CONSENT AGENDA

## MEMBER REPORTS

## ADOPTION WITHOUT COMMITTEE REFERENCE

## COMMUNICATIONS FROM THE CLERK

51.     Report on approved and disapproved proceedings from the Emergency Manager.

- **Contract No. 86348** – 100% City Funding – To Provide a License Mechanical Examiner – Leslie Owens, 3500 Oakman Blvd., Detroit MI 48204 – Contract Period: April 22, 2013 through April 21, 2014 - $28.85 per - $230.72 per diem – Contract Amount Not to Exceed: $30,000.00. *(Personal Service Contract)* **BUILDINGS SAFETY ENGINEERING AND ENVIRONMENTAL DEPARTMENT (APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 21, 2013)**

- **Contract No. 86351** – 100 Federal Funding – To Provide a Neighborhood Stabilization Program Specialist – Wilmem G. Griffin, 111 Cadillac Square, Apt. 19C, Detroit, MI 48226 – Contract Period: March 1, 2013 through March 10, 2014 - $32.44 per hour – Contract Amount Not to Exceed: $72,000.00. *(Personal Service Contract)* **PLANNING AND DEVELOPMENT DEPARTMENT (APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 21, 2013)**

- **Contract No. 2876968** – 100% City Funding – To Provide Animal Control and Care Facility – Company: Detroit Building Authority, Location: 65 Cadillac Square, Suite 2800, Detroit, MI 48226 – Contract Period: Upon City Council Approval through Three (3) Years Thereafter – Contract Amount No to Exceed: $4,000,000.00. *(This is a new Professional Service Contract to build a new Animal Care Control.)* **POLICE (APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 21, 2013)**

- **Contract No. 2848583** – RESTRUCTURING – 100% City Funding – Amendment of Contract to include analyzing the Financial Impacts and Strategic Alternatives related to the Public Lighting Department – Company: Ernst & Young LLP, Location: 777 Woodward Avenue, Detroit, MI 48226 – Contract Period: Upon Approval of the Emergency Manager through December 31, 2013 – Contract Amount: $225,000.00

Department is adding $225,000 to the existing E&Y contract which was initiated in May, 2011. The original contract was for Cash Flow Analysis. This

Amendment is to assist the City in evaluating the potential transfer of its Electric Transmission and Distribution Business to DTE Energy. This includes understanding current Revenue potentials, gathering and compiling data on assets for assessment purposes related to the Public Lighting Department. **(APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 23, 2013)**

- **Contract No. 2878871** – RESTRUCTURING – 100% City Funding – To Provide an Engineering Assessment at PLD – Company: Parsons Brinckerhoff, Location: 500 Griswold Street, Suite 2900, Detroit, MI 48226 - Contract Period: May 6, 2013 through June 24, 2013 – Contract Amount Not To Exceed: $100,000.00

  The Vendor will provide onsite surveys at PLD; perform electrical and structural engineering assessment support services. Vendor will also provide recommendations to bring substations and underground distribution systems up to standards. **(APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 23, 2013)**

- **Contract No. 2879081** – RESTRUCTURING – 100% City Funding – To Provide Evaluation of the City of Detroit's Distribution Systems – Company: Transmission Maintenance Construction, LLC, Location: 28175 Haggerty Road, Novi, MI 48377 – Contract Period: May 13, 2013 through June 24, 2013 – Contract Amount Not To Exceed: $80,000

  The Evaluation will consist of a limited sampling of the City of Detroit's Distribution system including the five interconnections with DTE at Public Lighting Department's Mistersky Plant and Switching Location, reviewing previously published documents of the systems condition, and an analysis of the maintenance and emergency maintenance performed on the system. **(APPROVAL BY THE EMERGENCY MANAGER FORWARDED TO THE CITY CLERK'S OFFICE ON MAY 23, 2013)**

- **Jones**, reso. autho. **Settlement** in lawsuit of Deborah Howell and Kennie Alonzo v. City of Detroit, Crystal Barmore, Tamera Tillerson, Karen Campbell, and Demetrus Pitts; Case No.: 12-003779-NO; File No.: A37000.0740 (CB); in the amount of $18,000.00; by reason of alleged arrest sustained on or about August 18, 2011. **(Approved by City Council on April 30, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 21, 2013)**

- **Jones**, reso. autho. <u>**Legal Representation and Indemnification**</u> in lawsuit of Vincent Cannon v. City of Detroit and Randolph Henry Skillman; Wayne County Circuit Court Case No.: 12-015093-NI; for TEO Randolph H. Skillman. **(Approved by City Council on April 30, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 21, 2013)**

- **Jones**, reso. autho. <u>**Legal Representation and Indemnification**</u> in lawsuit of James McCoy v. City of Detroit, P.O. Diandre Pitte, and P.O. Unika Patrick; Wayne County Circuit Court Case No.: 12-010206-CZ; for P.O. Diandre Pitts. **(Approved by City Council on April 30, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 21, 2013)**

- **Jones**, reso. autho. <u>**Legal Representation and Indemnification**</u> in lawsuit of Angelica Robinson v. Ralph Godbee and City of Detroit; Wayne County Circuit Court Case No.: 12-014438-CD, for Ralph Godbee, Retired Chief of Police. **(Approved by City Council on April 23, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 8, 2013)**

- **Jones**, reso. autho. <u>**Settlement**</u> in lawsuit of Darren Moore v. Lieutenant E. Jones, Police Officer Janoskey, Police Officer Colon, Police Officer S. Salisbury, City of Detroit Department, and City of Detroit; Case No.: 2:10-cv-11824; File No.: A37000.007040 (MRJ); in the amount of $100,000.00; by reason of alleged injuries sustained on or about October 10, 2008. **(Approved by City Council on May 14, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 28, 2013)**

- **Brown**, reso. autho. **Contract No. 86192** - 100% City Funding – To Provide a Technical Assistant for Community Outreach Support for the City of Detroit – Carl S. Taylor, Ph.D, 1305 Portage Path, E. Lansing, MI 48823 – Contract Period: Upon City Council Approval through Five (5) Months Thereafter – Contract Amount Not to Exceed: $100,000.00. **(Approved by City Council on May 14, 2013) (APPROVAL DENIED BY THE EMERGENCY MANAGER ON MAY 28, 2013)**

52.   Report on approval of proceedings by the Mayor.

## TESTIMONIAL RESOLUTIONS AND SPECIAL PRIVILEGE

53. **Cockrel, Jr.,** Testimonial Resolution for Reverend Marsha Foster Boyd, Ph.D- a Celebration of Service.