UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
2       SOUTHERN DIVISION

3 IN THE MATTER OF,     Case No. 13-53846
            Detroit, Michigan
4 CITY OF DETROIT, MI    May 6, 2015
_____/  1:39 p.m.
5

IN RE: TWELFTH OMNIBUS OBJECTION TO CERTAIN LATE FILED CLAIMS,
6 THIRTEENTH OMNIBUS OBJECTION TO CERTAIN NO BASIS CLAIMS AND
MOTION FOR ENFORCEMENT OF SETTLEMENT AND EIGHTH AMENDED PLAN
7         OF ADJUSTMENT
    BEFORE THE HONORABLE THOMAS J. TUCKER
8    TRANSCRIPT ORDERED BY: ROBIN WYSOCKI

9 APPEARANCES:

10 For the City of Detroit, MI: TAMAR DOLCOURT, ESQ. (P73425)
            LEAH IMBROGNO, ESQ.
11            Foley and Lardner
            500 Woodward Avenue
12            Suite 2700
            Detroit, MI 48226
13            313-234-7117

14            JEFFREY ELLMAN, ESQ.
            Jones, Day
15            1420 Peachtree Street NE
            Suite 800
16            Atlanta, GA 30309
            404-521-3939
17
 Retired Detroit Police and  RYAN PLECHA, ESQ. (P71957)
18 Firefighters Association:  O'Keefe, Gornbein
            370 East Maple Road
19            Third Floor
            Birmingham, MI 48009
20            248-646-8292

21 For Jackie's Transport, Inc.: WILLIAM BLASSES, ESQ. (P73945)
            Osipov, Bigelman
22            20700 Civic Center Drive
            Suite 420
23            Southfield, MI 48076
            248-663-1800
24

25

1  Court Recorder:            Jamie Laskaska

2  Transcriber:               Deborah L. Kremlick

3

4

   Proceedings recorded by electronic sound recording, transcript
5  produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Court in Session)

2           THE CLERK:  All rise.  This Court is now in session.

3   The Honorable Thomas J. Tucker is presiding.  You may be

4   seated.  The Court calls the case of the City of Detroit,

5   Michigan, case number 13-53846.

6           THE COURT:  All right.  Good afternoon to everyone.

7   Let's have appearances for the attorneys, please, starting

8   with the city.

9           MR. ELLMAN:  Your Honor, Jeffrey Ellman from Jones,

10  Day on behalf of the city.

11          MS. IMBROGNO:  Your Honor, Leah Imbrogno from Foley

12  and Lardner on behalf of the city.

13          MS. DOLCOURT:  Good afternoon, Your Honor.  Tamar

14  Dolcourt, Foley and Lardner on behalf of the city.

15          THE COURT:  All right.  Others.

16          MR. PLECHA:  Good afternoon, Your Honor.  Ryan

17  Plecha with O'Keefe, Gornbein on behalf of the Retired Detroit

18  Police and Firefighters Association.

19          THE COURT:  I'm sorry.  Just give me your last name

20  again, please.

21          MR. PLECHA:  Plecha, P-l-e-c-h-a.

22          THE COURT:  Plecha, okay.  I want to make sure I

23  pronounce it right.

24          MR. PLECHA:  Thank you, Your Honor.

25          MR. BLASSES:  William Blasses from Osipov, Bigelman

1  on behalf of Jackie's Transport, Inc.

2  THE COURT:  All right.  Good afternoon to everyone.

3  We have several matters scheduled for hearing today unless

4  counsel for the city has a different order of proceeding in

5  mind, I'd like to hear the claim objection matters and then

6  we'll hear the -- after that the hearing on the motion filed

7  by the Retired Detroit Police and Firefighters Association.

8  MS. IMBROGNO:  Good afternoon, Your Honor.  Again,

9  Leah Imbrogno from Foley and Lardner here on behalf of the

10  city.

11  We're here with regard to the 12th, 13th, and 14th omnibus

12  objections which the city filed on March 30th, 2015.  Notice of

13  these objections was also sent on March 30th with the help of

14  KCC, the city's noticing agent to the general service list,

15  ECF participants, and all of the claimants that were listed on

16  Exhibit 2 to those objections.

17  The notices included the claimant's response date of

18  April 29th as well as this hearing date of May 6th.  As the

19  Court is aware, we filed some certificates of no response

20  yesterday and the Court did enter orders sustaining these

21  objections except as to the claimants who filed responses.

22  So if it please the Court I will proceed to discuss those

23  responses.

24  THE COURT:  Well, before you do that, it -- it

25  appears to me that the -- with respect to the 14th omnibus

1  objection, there's nothing to be done today at this hearing on

2  that. That's been sustained to the extent it's stated in the

3  order filed yesterday and then I think there was one claim in

4  that that -- for which there was an order adjourning the

5  hearing to May 27. So there's nothing left for today on that

6  one, right?

7      MS. IMBROGNO: That's right, Your Honor.

8      THE COURT: Okay.

9      MS. IMBROGNO: It's -- claim number 852 has been

10 adjourned to the May 27th hearing.

11     THE COURT: Okay. So we're dealing then today with

12 the 12th and 13th omnibus objections, the -- what's unresolved

13 of those and -- unresolved and not adjourned. And so you want

14 to go on and talk about the 12th first?

15     MS. IMBROGNO: If it please the Court and if it's

16 all right with you, I was hoping we could start with the 13th.

17     THE COURT: Sure.

18     MS. IMBROGNO: Ms. Dolcourt --

19     THE COURT: Sure.

20     MS. IMBROGNO: -- from my office is going to be

21 discussing the 12th and I don't want to shuffle around too

22 much.

23     THE COURT: No problem.

24     MS. IMBROGNO: Okay, great. So regarding the 13th

25 omnibus objection, it -- it related to no basis claims. These

1 | are claims that the city does not believe there's any valid

2 | basis for liability on the part of the city.

3 |     Four responses were filed to these claims.  Two responses

4 | were filed by Mr. Richard Hall, this was as to claim numbers

5 | 1097 and 474.  Mr. Hall let us know that he could not attend

6 | the hearing today, so that the matter -- the responses -- I'm

7 | sorry, excuse me, the hearing as to those responses has been

8 | adjourned to the May 27th date as well.

9 |     The next response was filed by a Mr. Lue David Jackson.

10 | I do not have any -- any information as to whether Mr. Jackson

11 | was planning on attending the hearing today.  Mr. Jackson

12 | filed claim number --

13 |     THE COURT:  Well, let me find out.

14 |     MS. IMBROGNO:  Sure.

15 |     THE COURT:  For the record is Lue David Jackson

16 | here, is present?  I hear nothing.  But there are other people

17 | in the courtroom.  I just want to make sure he's not here for

18 | this party unless we hear from him, so go ahead.

19 |     MS. IMBROGNO:  Mr. Jackson filed claim number 1074

20 | on February 18th, ten -- or of 2014.  The claim was for the

21 | amount of $71,825.81.  And the stated basis was contingent and

22 | unsecured principal and interest charges.

23 |     Attached to Mr. Jackson's claim was a deed and what

24 | appeared to be some mortgage documents.  And then also

25 | mortgage bills from Bank of America.

1    Mr. Jackson did not provide any basis for why the city

2  would be liable for these mortgage payments.  The city is not

3  a party to this mortgage.  So based on that the city filed an

4  objection on the no basis omnibus.

5    Mr. Jackson filed a letter with the Court on April 6th,

6  2015.  Though it was unclear whether this was to be an

7  official response to the objection, he did actually attach a

8  copy of the proof of claim to that letter.  So in the

9  abundance of caution we decided to respond to that letter just

10  in further support of our objection.

11      THE COURT:  I have reviewed that letter and its

12  attachments and your reply regarding that that you filed on

13  May 1.  Go ahead.

14      MS. IMBROGNO:  We do not believe that Mr. Jackson's

15  letter gives any further basis for any liability on the part

16  of the city.  It does not state any reason why the city owes

17  him $71,825.81.  And for that reason we believe that the

18  objection to claim number 1074 should be sustained.

19      THE COURT:  I agree with you.  And my ruling on that

20  one is that the claim -- objection to claim as to this claim

21  by number 1074 filed by Lue David Jackson is sustained and the

22  claim is disallowed.

23    The claim -- the proof of claim itself and its

24  attachments as well as the letter from Mr. Jackson filed April

25  6, docket 9627 say nothing that provide any basis, even

1  colorable basis for the Court to determine that there is any

2  valid claim or debt owing by the city to Mr. Jackson on any

3  basis.  And so the -- the claim objection is sustained as to

4  his claim.  Go ahead.

5       MS. IMBROGNO:  Thank you, Your Honor.  The next

6  response that was filed also to the 13th omnibus objection was

7  a claim by Cheryl Ann Peyton.  Again, I -- I do not believe

8  that Ms. Peyton is present, but if the Court would like to

9  check.

10      THE COURT:  Sure.  Is Cheryl Ann Peyton present or

11 is there anyone here on behalf of Cheryl Ann Peyton?  All

12 right.  Go ahead, Ms. Imbrogno.

13      MS. IMBROGNO:  Ms. Peyton had filed claim number 779

14 on February 4th of 2014 in the amount of $80,000.  The stated

15 basis was tax auction not valid after July 25th, 2013.  There

16 is no further explanation of the meaning or any basis for

17 liability on that fact.

18     Attached to Ms. Peyton's claim was an assignment of

19 mortgage.  And also what appeared to be a mortgage billing

20 statement but again it wasn't clear what the attachments

21 actually were.

22     Ms. Peyton does not provide any basis for why the city

23 would be liable to her for $80,000.  So based on that the city

24 filed an objection claiming that the -- stating of the claim

25 had no basis for the city's liability.

1    Ms. Peyton's mother, Mary Jean Peyton, allegedly as an

2  agent for Ms. Cheryl Peyton, filed a response on Ms. Cheryl

3  Peyton's behalf on April 24th, 2015.  In that response Ms.

4  Peyton appears to state that the mortgage that was attached to

5  the proof of claim does not relate to the bankruptcy and is

6  not relevant.

7    But Ms. Peyton does not provide any alternative reason

8  for why the city would be liable to either her or her daughter

9  for $80,000.  So the city replied to this response on May 1st.

10  You know, based on all of these reasons we believe that the

11  objection to claim number 779 should be sustained as well.

12      THE COURT:  All right.  I have reviewed the reply

13  filed by the city on May 1 at docket 9782, the response, the

14  written response filed on April 24, 2015 by Mary Jean Peyton

15  as purported agent for the claimant Cheryl Peyton.  That was

16  the only response filed to the objection to claim or the claim

17  of Cheryl Peyton.

18    And neither the claim itself, proof of claim itself, nor

19  the written response to the claim objection in my view state

20  any basis for the -- for a valid claim of any amount to be --

21  to exist in favor of Cheryl Peyton or Mary Jean Peyton as her

22  agent against the city.

23    The claim objection then with regard to the Peyton claim

24  is sustained and the Peyton claim will be disallowed.  That's

25  claim number 779, I believe you said and that's right.  So

1 that then takes care of the unresolved claims on the 13th

2 omnibus objection except for the Hall ones that are adjourned,

3 right?

4          MS. IMBROGNO:  That's correct, Your Honor.

5          THE COURT:  All right.  I'll ask you to prepare an

6 order reflecting the rulings I've made regarding the Jackson

7 and Peyton claims.  I'll waive presentment of that order.  The

8 order should simply say, for the reasons stated by the Court

9 on the record today -- the hearing today, these claims are

10 disallowed.

11     You can use the -- the usual type language that you used

12 for example in the order that I entered yesterday regarding

13 the expungement of the claims and the claims agent can reflect

14 these on the records all those -- those sorts of bells and

15 whistles, that's fine.

16          MS. IMBROGNO:  Understood.

17          THE COURT:  Any questions on that?

18          MS. IMBROGNO:  No, we're good, Your Honor.

19          THE COURT:  All right. Thank you.

20          MS. IMBROGNO:  Finally as to the -- the 12th omnibus,

21 there's actually two responses that were filed, one by

22 Jackie's Transport which Mr. Osipov will discuss.  And another

23 by a Ms. Bridget Murriel.  Again I do not believe that Ms.

24 Murriel is present today in Court.

25          THE COURT:  One second.  For the record is Bridget

1    Murriel present or is anyone here on her behalf?  I hear

2    nothing.  Ms. Murriel has not appeared today.  Go ahead.

3           MS. IMBROGNO:  Okay.  Ms. Murriel filed claim

4    numbers 3798 and 3799 on December 3rd, 2014 which is more than

5    nine months after the bar date of February 21st, 2014.

6         Ms. Murriel was on notice of the bar date.  She was in

7    receipt of the bar date notice which was served upon her and

8    others by KCC on November 29th, 2013.  The bar date notice

9    specifically stated that the bar date was February 21st, 2014.

10        These claims are in an unliquidated amount and they

11   allege that Ms. Murriel has proof of corruption within the

12   City of Detroit Police Human Resources Department.  These

13   claims do not contain any reason or excuse for the extremely

14   late filing.

15        On this basis the city objected to Ms. Murriel's claims

16   as late filed.  Ms. Murriel filed a response on April 16th,

17   2015.  In the response Ms. Murriel claims that -- her claims

18   were late filed because of the substantial amount of documents

19   she was required to review related to the bankruptcy and

20   because she did not have an attorney.

21        She did not state any reason why it took, you know, over

22   a year to review the bar date notice that stated the February

23   21st bar date.  She also did not say why she was unable to

24   retain an attorney if she felt that one is needed.

25        So the city replied to Ms. Murriel's response on May 1st.

1 Because she does not provide any facts for the nine month

2 delay in filing her claims and because she does not provide

3 any valid excuse for the nine month delay, the city believes

4 that objections to claim numbers 3798 and 3799 should be

5 sustained.

6        THE COURT:  All right.  Thank you.  I have reviewed

7 the written response that Ms. Murriel filed to the claim

8 objection on April 16th, 2015.  That's at docket 9700.

9      I note that Ms. Murriel also filed a response on April 8,

10 2015 at docket number 9638 which was linked to the earlier

11 version of the 12th omnibus objection to claims that were

12 withdrawn.

13      I have reviewed both of her written responses however.

14 And of course the city's reply that was filed last Friday at

15 docket 9781.  And the claims of Ms. Murriel must be disallowed

16 and will be disallowed and the objection to her claim

17 sustained on the basis that Ms. Murriel's claims were not

18 timely filed, not even close.  And then for that reason and

19 based on the Court's November 21, 2013 bar date order

20 regarding claims, the claim filing deadline, docket 1782, her

21 claims will be -- Ms. Muriel's claims will be disallowed for

22 that reason.

23      So I will ask you to prepare and submit an order

24 reflecting this ruling.  And then I guess that leaves then the

25 Jackie's Transport matter.  And Ms. --

1          MS. IMBROGNO:  Thank you, Your Honor.

2          THE COURT:  -- Dolcourt is going to address that.

3   All right.  Thank you.

4          MS. DOLCOURT:  Good afternoon, Your Honor.  Tamar

5   Dolcourt, of Foley and Lardner on behalf of the city.

6          We're here on the final remaining response to the 12th

7   omnibus objection for late filed claims.  That is claim number

8   3497, filed by Jackie's Transport in the amount of $53,725.50.

9          And the claim is late filed.  It was received by KCC on

10  February 24th, three days after the bar date and it was

11  processed on that date.

12         In the response filed by Jackie's Transport the --

13  Jackie's counsel said that they mailed it on the 18th which

14  appears to be correct based on the postmark.  Unfortunately it

15  was not received until the 24th and pursuant to the bar date

16  order it needed to be received at KCC's California office by

17  February 21st on -- by 4:00 eastern time and it was not.

18         So the city believes this is a late filed claim.  I would

19  note in the response the -- Jackie's Transport hasn't ever

20  explained what happened.  What they really said is, we mailed

21  it and any delay in processing was the fault of KCC.

22         In the city's reply brief you will see the tracking

23  information from the United States Postal Service indicating

24  that the document was in fact received in El Segundo,

25  California on February 24th which is the date that KCC

1  processed it and the claim is stamped that date as of the

2  outside of the envelope.  So for those reasons the city

3  believes this claim was late filed and we believe it should be

4  disallowed.

5           THE COURT:  All right.  Thank you.  Mr. Blasses.

6           MR. BLASSES:  Your Honor, I -- I think many of the

7  facts are not in dispute here.  We did -- we did in fact mail

8  this on February 18th, 2014.  Both I and Mr. Osipov from my

9  office supervised the secretary in our office that was mailing

10  it, made sure that it was -- it was in fact sent out and we

11  can verify ourselves that it was sent out on that date.

12      For whatever reason --

13           THE COURT:  It appears as though you sent it

14  certified mail.

15           MR. BLASSES:  Yes, Your Honor.

16           THE COURT:  I think you said in your response first

17  class, but it was -- it was certified mail, right?

18           MR. BLASSES:  Yes, Your Honor.

19           THE COURT:  Okay, go ahead.

20           MR. BLASSES:  And based on -- we had -- we had

21  believed that there was significant time based the USPS's

22  representations, even on the web site that such mail would be

23  -- would be there within one to three business days.

24           THE COURT:  One to three business days?

25           MR. BLASSES:  Yes, Your Honor.  So in the worst case

1  scenario it should have been there that Friday of the bar

2  date.

3      Now what debtor is effectively arguing here and Your

4  Honor can note in their exhibit attached to docket number

5  9784-2, Page 2, is that not -- they didn't receive it on that

6  Friday the bar date -- well, their claims agent didn't receive

7  it that date, but rather they received it at 9:28 in the

8  morning the following business day.

9      Your Honor, there is a -- well, we tried to address --

10         THE COURT:  You mean instead of on Friday or by

11  Friday which was the deadline for filing a claim, it was

12  received the following Monday morning.

13         MR. BLASSES:  Yes, Your Honor.  It's what -- what we

14  can understand from the postal records and whatnot.  And we

15  don't dispute that that's what the postal records say.  We

16  looked it up ourselves, it says what it says.

17      Now, Your Honor --

18         THE COURT:  It also says, doesn't it that the -- the

19  claim -- proof of claim arrived at the postal service facility

20  in Los Angeles on Saturday, February 22nd.

21         MR. BLASSES:  Yes, Your Honor.  And that it went out

22  for delivery that day.

23         THE COURT:  And the part of their facility that --

24  early in the morning that day so from there to get to the

25  claims agent in El Segundo in California it took until Monday

1   morning the 24th, right?

2            MR. BLASSES:  Yes, Your Honor.

3            THE COURT:  Okay.  So anyway, go ahead.

4            MR. BLASSES:  The inference I -- I make from that --

5   from that record is that the claims agent simply wasn't open

6   for delivery of mail that day and because it was certified

7   mail they weren't able to sign for it and it was simply

8   delivered the following business day.

9            THE COURT:  But we don't know that, if that's the

10  case or not.

11           MR. BLASSES:  We don't know that, Your Honor.

12           THE COURT:  All right.

13           MR. BLASSES:  However, we have two legal arguments

14  that we are setting forth here for why this claim should be

15  allowed and why it's essentially first and foremost, let's say

16  that it's timely.

17       I think it's best illustrated by the reasoning set forth

18  in Graham v Hudson, 290 BR 424, that's a Northern District of

19  Georgia bankruptcy case from 2003.  And in that case they

20  pointed to Rule 9006(e) which provides that the service of

21  process and service of any other -- any paper other than

22  process or of notice by mail is complete on mailing.

23       One of the issues raised by debtor --

24           THE COURT:  What does that have to do with the issue

25  here?

1          MR. BLASSES:  Well, Your Honor, effectively under

2    that rule the --

3          THE COURT:  That means you -- you can say you served

4    the proof of claim on February 18 when you mailed it.

5          MR. BLASSES:  Yes, Your Honor.

6          THE COURT:  What does that have to do with the

7    claims bar date?

8          MR. BLASSES:  That it was effectively served upon

9    them prior to the claims bar date.

10          THE COURT:  Them being the claims agent?

11          MR. BLASSES:  Yes, the claims agent.

12          THE COURT:  Well, okay.  So go ahead.

13          MR. BLASSES:  And because of that it would be

14    therefore timely filed.  It avoids the concern expressed by

15    the debtor in this case about where do you draw the line.

16    They made a slippery slope argument in their reply brief that

17    where do you draw the line, three weeks, months, et cetera.

18          This was a case where the -- the claim was simply

19    received the following business day at 9:28 a.m.  Nothing

20    happened to impact the debtor and prevent the debtor from

21    proposing a plan.  They're not claiming that there was some

22    significant prejudice.  They're not identifying any sort of

23    issue.

24          And as a matter of policy we believe that that -- that

25    legal principle very much fits and should be adopted by this

1  Court.  However, if this Court does not agree with that --

2       THE COURT:  Well, wait a minute.  It sounds like

3  this first argument is not -- you're not yet making any -- any

4  sort of excusable neglect type argument under Federal

5  Bankruptcy Rule 9006(b)(1).  You're talking now about Rule

6  9006(e) and I assume this Hudson case that you've cited --

7       MR. BLASSES:  Yes, Your Honor.

8       THE COURT:  -- does it say any more than what

9  9006(e) says which is service is complete upon mailing.

10      MR. BLASSES:  Your Honor, and it's a relatively

11 lengthy decision in the context of a Chapter 13 case where

12 there is no excusable neglect flexibility here.

13     And in that -- in that case, the -- it considered the

14 mailbox presumption of -- of service of papers.  And that

15 attorneys should be able to rely on the U.S. Postal Service to

16 get the job done.  And to get -- and -- and to have -- have

17 this service done in a timely manner to effectuate what's

18 necessary under the rules, under the Code, and under

19 applicable procedures adopted by the Court.  And in the

20 context of this mailbox presumption, we don't see that

21 there's --

22      THE COURT:  And what was the holding of the case in

23 Hudson that has to do with this case?  Is it no more specific

24 than what you've just said?

25      MR. BLASSES:  Yes, Your Honor.  That the --

1        THE COURT:  So -- well, the mailbox rule has --

2   that's a rebuttable presumption that something that is mailed

3   is received by the addressee.

4        MR. BLASSES:  Yes, Your Honor.

5        THE COURT:  It really doesn't speak about when --

6   how quickly something is presumed to have been received by

7   mail by the addressee, does it?

8        MR. BLASSES:  No, Your Honor.

9        THE COURT:  Okay.  The issue here is well, of course

10  you're not -- you're not disputing when this claim -- proof of

11  claim was actually received by the claims agent.  But I guess

12  you seem to be arguing to me that if the postal service says

13  we'll get it there in one to three business days, you can rely

14  on that.

15        MR. BLASSES:  Yes, Your Honor.

16        THE COURT:  Even though the Court's claims bar date

17  order that was in effect from -- at the time we did this said

18  that the deadline meant that the claim -- proofs of claim had

19  to be actually received by the agent by 4:00 p.m. on -- on the

20  21st of February.

21        MR. BLASSES:  And, Your Honor, the -- in essence

22  here the debtor picked the language of that order.  We

23  interpreted Rule 9006 here to say that effectively based on

24  the language of 9006, that they did receive it for all intents

25  and purposes based on that -- the construction provided by

1  9006(e).

2          THE COURT:  They received it when?

3          MR. BLASSES:  That they received it upon mailing.

4          THE COURT:  The -- the provision in the claims bar

5  date order, docket 1782, I'm looking at Page 7 of that order,

6  it says proofs of claim will be deemed timely filed only if

7  actually received, and the words actually received is

8  underlined in the order, by the city's claims agent on or

9  before the applicable bar date.  That means only if the claims

10 are at least actually put in the mail by the claims bar date?

11 Or are you saying the words actually received by the claims

12 agent means put in the mail at the other end by you guys?

13         MR. BLASSES:  Yes, Your Honor.  We don't -- it's not

14 a defined term and we did see nothing in the order that seeks

15 to overrule the -- the plain language of 9006(e).

16         THE COURT:  Well, the date that you served the proof

17 of claim, however, is not the same as the date it was actually

18 received by the claims agent, is it?  Why not -- it's not

19 necessarily the same, right?

20         MR. BLASSES:  Your Honor, I mean in -- in plain

21 language outside -- outside the context yes, Your Honor.  But

22 we believe that Rule 9006(e) operates to create a legal

23 fiction that is routinely applied.  We don't understand why

24 there would be an exception to 9006(e) and -- unless there was

25 some sort of explicit label.

1          THE COURT:  All right.  What's -- what's the other

2     argument?  You said you had two legal arguments.

3          MR. BLASSES:  Yes, Your Honor.  In the alternative

4     we will argue excusable neglect.  The debtor has cited to In

5     Re: National Steel Corporation, a case which did sustain the

6     objection to claims.  And in that case you're talking about

7     the 16 month delay.

8          We think that the analysis if applied to this case would

9     come out in the exact opposite of -- in the exact opposite

10    manner.  In In Re:  National Steel Corp. they focused in on

11    the definition of neglect which is either circumstances beyond

12    the movant's control, which in this case would be the actions

13    of the U.S. -- U.S. Postal Service.  Or the movant's

14    inadvertence, mistake, or carelessness.  Which I'm sure the

15    debtor will argue that we should have picked a different mode

16    of service other than the U.S. Postal Service.

17         For the purpose of excusability you look at four factors.

18    The danger of prejudice to the debtor.  I'm not quite sure how

19    they were prejudiced by service the following business day at

20    9:28 a.m.  The length of delay which is minimal at best here.

21    The reason for delay.  Well, I believe the reasons for delay

22    here are completely understandable in this case, Your Honor.

23    And four, whether the movant acted in good faith.  There's

24    been no assertion that we were trying to game the system or

25    act in a bad faith in any manner here.

1    We tried to comply with the claims bar date.  Simply put

2   debtor is looking for the strictest possible interpretation of

3   the claims bar date in -- in an effort to just avoid paying.

4   There was no injustice, manifest injustice, that occurred as a

5   result.

6         THE COURT:  Well, these factors you're reciting,

7   these are the Pioneer Investment case factors, right?

8         MR. BLASSES:  Yeah -- yes, Your Honor.

9         THE COURT:  City's arguing for a bright line rule as

10  you know in their reply to what you filed in their objection.

11  Doesn't the -- the language from the claims bar date order

12  that I read to you from earlier, set a bright line rule?

13  A claim that says the claims have to actually be received

14  either by the city's claims agent or the Court, remember

15  another option allowed by the order was filing a proof of

16  claim with the clerk of our Court here in Detroit.

17    Either way the proof has to -- claim has to be actually

18  received by the claims agent or by the Court on or before the

19  bar date or according to the claims bar order, the claim is --

20  will be disallowed.  Isn't that among other things, isn't that

21  what it clearly says?

22        MR. BLASSES:  Yes, Your Honor.  But that's true for

23  every claims bar date.  I mean that's what the excusable

24  neglect standard is for.

25        THE COURT:  So under the Pioneer Investment factors,

1  the -- the factors -- the reason for the delay and whether the

2  delay was within the reasonable control of the movant, how do

3  those factors favor finding excusable neglect in this

4  instance?

5       MR. BLASSES: Well, Your Honor, our -- our -- our

6  position is that this would constitute circumstances beyond

7  the movant's -- movant's control, the delay by the U.S. Postal

8  Service. However, to the extent that the debtor is going to

9  argue that we should have picked a different carrier rather

10 than the U.S. Postal Service and not relied on the

11 representations made on their web site regarding the timing

12 for delivery, that would be the inadvertence, mistake, or

13 carelessness by -- by the movant here.

14      As far as excusability those four factors, the danger of

15 prejudice to the debtor, there's no prejudice to the debtor.

16 This didn't stop the debtor from being able to come out with

17 multiple amended plans. This didn't change the way debtor

18 approached -- preparing the plans. The length of delay was

19 minimal, it was the next business day, 9:28 a.m.

20      The reason for delay. The reason for delay simply put

21 was there was a delay in -- in the processing of the mailing.

22      And whether the movant acted in good faith, there is no

23 evidence here that movant acted in bad faith. The movant

24 tried to comply with the deadline. We believed we were

25 complying with the deadline.

1          THE COURT:  Well, but I -- I don't hear an

2   explanation of why the movant, and the movant was represented

3   by you.

4          MR. BLASSES:  Yes, Your Honor.

5          THE COURT:  And perhaps one of your colleagues at

6   your firm representative counsel.

7          MR. BLASSES:  Yes, Your Honor.

8          THE COURT:  And in fact you handled -- you and your

9   colleague at your firm as counsel for the moving party here --

10  or the claimant here rather, chose when and how to mail -- to

11  -- to send a claim form to the claims agent.

12         MR. BLASSES:  Yes, Your Honor.

13         THE COURT:  And -- and you were undoubtedly aware of

14  what the claims bar date order said.

15         MR. BLASSES:  Yes, Your Honor.

16         THE COURT:  Okay.  So you could have chosen a

17  shorter surer method of getting the claim form actually filed

18  with the -- either the Court or the claims agent by February

19  21 than -- than what you -- the method you chose.

20         MR. BLASSES:  Well, Your Honor --

21         THE COURT:  Is that right?

22         MR. BLASSES:  From that deadline we could have

23  sought overnight delivery, but we still could have been in the

24  same boat if there was some sort of an inexplicable delay with

25  Fed Ex or UPS.

1          THE COURT:  Well, if you -- excuse me.  If you chose

2   overnight delivery and you sent it that way on the 18th, you

3   could have determined on the 19th whether it had actually

4   gotten there and if it hadn't then you still had time to get

5   it there on time.

6          In the alternative the claims bar date order had allowed

7   you to file a proof of claim with the clerk of our Court which

8   means you could have sent somebody down here to hand deliver

9   it, file it with our clerk on the 18th, 19th, 20th, 21st.  You

10  didn't do that either.

11         So there were other means available for you to make

12  absolutely sure that the claim got filed on time and you

13  didn't choose to use those.

14         MR. BLASSES:  Your Honor, we had no reason to

15  believe that there would -- that there would -- could

16  potentially even be an issue.  From a practical standpoint,

17  for a next day delivery we're not going to know until the

18  following day after when the delivery is going to occur when

19  it pops up on the web site whether or not the delivery

20  occurred.  So we wouldn't have known until the 20th with --

21  with a next day delivery.

22         At that point yes, we could have had a courier out there,

23  but we were relying on, since the debtor cited it, I printed

24  out the USPS web site here.  And it -- it stands today

25  UPSP.com/shift/first-class-mail.htm will sit there and say one

1   to three business days.  We expected it to be there on

2   Thursday and Friday at the absolute worst case scenario.

3              THE COURT:  But it's not unheard of for there to be

4   delays in the postal service delivering the mail, right?

5              MR. BLASSES:  Your Honor --

6              THE COURT:  Isn't that common knowledge?

7              MR. BLASSES:  It's -- it's not unheard of, but we

8   can't --

9              THE COURT:  Isn't it common knowledge among lawyers?

10             MR. BLASSES:  Your Honor, I -- I can't -- when we've

11  sent something certified mail, I can't -- I can't say that

12  we've ever had a problem, even in the history of me working

13  for the firm with delivery timing from the USPS.  We've had

14  more problems with Fed Ex and with UPS.

15             THE COURT:  All right.  Well, what else did you want

16  to say?  Anything else then?

17             MR. BLASSES:  Your Honor, I think those -- we've set

18  forth our arguments.  We -- we believe -- we -- we don't

19  believe that this should be deemed as untimely filed, but even

20  if Your Honor disagrees with our legal argument there we

21  believe that excusability -- that it -- the circumstances

22  justify a finding of excusable neglect in this case and that

23  the claim should be allowed as it stands.  Thank you.

24             THE COURT:  All right.  Thank you.  Ms. Dolcourt,

25  what would you like to say?

1        MS. DOLCOURT:  Thank you, Your Honor.  First, I'd

2   just like to note that Jackie's Transport didn't raise any of

3   these issues of excusable neglect in their response.  What

4   they said instead was, we mailed it on time and any delay was

5   the fault of the debtor's claims agent.  And that's simply not

6   the case.

7        But now turning to the excusable neglect factors in

8   Pioneer, we believe that -- well, first of all, we want to say

9   we don't have any evidence or any reason to believe that there

10  was bad faith here.  We don't have any reason to not believe

11  Jackie's counsel when they say that they thought it would get

12  there in time.  And I think that's probably all true.

13       The problem is the factor which relates to who's it --

14  the reason for the delay and who was in control.  And Jackie's

15  Transport is exactly right.  I -- I will say that they could

16  have used a different delivery method.  They could have used

17  Fed Ex.

18       They could have hand delivered it to the Court in

19  Detroit.  Their offices are in Southfield, so it's not that

20  difficult to do that.

21       There were numerous other ways they could have insured

22  the process and they didn't.  And, you know, this -- this is

23  an admittedly short delay.  It is three days after the bar

24  date, one business day.

25       And, you know, the counsel for Jackie's doesn't want to

1  deal with the slippery slope argument.  And I -- and I

2  understand that.  But we have disallowed many claims in this

3  case because they were a few days late.  And --

4          THE COURT:  How -- how many?

5          MS. DOLCOURT:  I'm not certain.  I want to say at

6  least probably 50, somewhere in there.  But and a lot of them

7  were received within say the week after the bar date.  A lot

8  of those people were pro se claimants, Your Honor.  And they

9  got the bar date and they did the same sort of thing, they

10 mailed it.

11     In this case Jackie's was represented by counsel.  And

12 they don't dispute that they got a Court order, they read it,

13 the Court order said, it needs to be received.

14          THE COURT:  Wait a minute.  Are you telling me that

15 there have been some -- some 50, roughly 50 claims that

16 already in this case have been disallowed because they were

17 filed late and those claims were filed within a week or so

18 after the bar date?

19          MS. DOLCOURT:  Not all 50, Your Honor, no.  I'm

20 saying that there are certain claims which were filed late.

21          THE COURT:  How many?

22          MS. DOLCOURT:  Which have been -- I am not certain

23 of the exact number.

24          THE COURT:  Within a week after, how many?

25          MS. DOLCOURT:  I would say probably 10 to 20, but

1  there was an earlier late filed omnibus objection.  And in

2  those cases I think the reason that most of them were denied

3  was because the people did not appear and did not file a

4  response which of course they have in this case.  So --

5          THE COURT:  So where -- can you cite me the orders

6  that disallowed those claims?

7          MS. DOLCOURT:  I can't remember the omnibus

8  objection, but it was an earlier omnibus objection on late

9  filed claims.  And I'm sorry, it was back in I want to say

10 June or July of this year.  So I just -- of the prior year.

11         THE COURT:  Of 2014.

12         MS. DOLCOURT:  Of 2014, right.

13         THE COURT:  Okay.  So anyway go on, go on.

14         MS. DOLCOURT:  So really -- but there is a harm to

15 the process here.  Bar date orders are very common.  They need

16 to be abided by.  There -- there are many claimants who did

17 file -- thousands of claimants who did file timely including

18 many pro se claimants.

19     And so it's very important, especially for lawyers to

20 obey Court orders.  And we think that the bar date order was

21 very clear.  I -- I don't think Jackie's counsel has raised

22 any issue like in the Pioneer case that the bar date was not

23 clearly stated and emphasized with underlining.  And the city

24 believes that this claim should be disallowed because it was

25 late filed and because that delay was solely in Jackie's

1 counsel's control.  They could have used an alternate delivery

2 method and they chose not to.

3         THE COURT:  So are -- are you arguing that there's

4 any danger of prejudice to the city caused by this delay, this

5 three day delay filing the proof of claim by Jackie's

6 Transport three days after the bar date.

7         MS. DOLCOURT:  With this particular claim because of

8 its size, I -- I can't say that there is a prejudice to the

9 city on this particular claim.  But what I cay say is, the

10 city had a very clear bar date order that it expected many

11 many thousands of people to abide by including claimants

12 without counsel.

13    And it's important for the Court to uphold its orders.

14 And we've not really had cause here other than well, the

15 postal service's web site says it will get there in three

16 business days so we thought it would be timely.  And that's --

17 that's not -- that's not enough in our opinion.

18         THE COURT:  All right.  Anything else you'd like to

19 say?

20         MS. DOLCOURT:  No, Your Honor.  Thank you.

21         THE COURT:  All right.  Mr. Blasses, I'll -- I'll

22 give you an opportunity since you represent the creditor here

23 who is seeking a finding of excusable neglect.  I'll give you

24 an opportunity to reply briefly if you want to.

25         MR. BLASSES:  Your Honor, I'm -- I'm not -- I'm not

1 | quite sure where this delay came about.  When we filed our

2 | response we had -- we had been just given a vague reference

3 | from a different attorney representing the debtor that there

4 | were many claimants that had similar issues.

5 |  Given the uncharacteristic nature of the delay here and

6 | the length of the delay compared to what we would have

7 | expected, I've given the -- the manner of service of this

8 | claim.

9 |  When we filed our response we assumed that it had to have

10 | been on behalf of the claims manager.  We're not -- we still

11 | -- we still don't know what the basis for all this delay is.

12 | But we tried to get this out.  We tried to get this out in an

13 | expedited manner and we tried to get this out in a manner that

14 | would be cost effective.

15 |  THE COURT:  Is there really any way to find out why

16 | the postal service took so long to deliver the item?

17 |  MR. BLASSES:  Your Honor, I'm sure we can make a

18 | Freedom of Information Act request, but there is --

19 |  THE COURT:  You think that's going to do any good?

20 |  MR. BLASSES:  Those -- those take some time.

21 |  THE COURT:  There's really no way to find out

22 | anything more than what you already know, is there?

23 |  MR. BLASSES:  Not really, Your Honor.

24 |  THE COURT:  About that?  Okay, go ahead.

25 |  MR. BLASSES:  And essentially the circumstances here

1 are unfortunate.  However, at the end of the day the

2 overarching theme on the Pioneer standard is equitable and

3 looking into whether or not the -- the culpability of the

4 party attempting to comply with the order.

5      In this case here there really was no harm to any other

6 party.  There was no prejudice, there was no delay as a

7 result.  There was every attempt by the creditor in this case

8 to try to comply with their claims bar date order and things

9 happened.

10      And that's why we believe that even if Your Honor doesn't

11 agree our argument -- with our argument under Rule 9006(e), we

12 do believe excusable neglect is present here and that the

13 Court should allow the claim.

14           THE COURT:  All right.  Thank you all.  I'm going to

15 rule on this now.

16      The facts here are not disputed between the parties, the

17 relevant facts, material facts.  We have here a claim filed by

18 Jackie's Transport, the creditor here, that was filed on

19 Monday, February 24, 2014.  By filed I -- I should -- I should

20 say, it was actually received by the Court appointed claims

21 agent, Kurtzman Carson Consultants, LLC in California on that

22 day.

23      And undoubtedly then under the Court's claims bar date

24 order that was entered on November 21, 2013 at docket number

25 1782, particularly at Page 7 of that -- Pages 6 and 7 of that

1  order, the proof of claim was not timely filed and must be

2  deemed not timely filed.

3      That order says among other things in addition to

4  establishing the -- a deadline, a claim filing deadline of

5  February 21, 2014, the order provided that claims could be

6  filed -- proofs of claim could be filed either by sending them

7  to the claims -- city's claims agent, Kurtzman, and -- or by

8  filing them with the clerk of this Court here in Detroit.

9  That's Paragraph 7C of the order.

10      But in either case Paragraph 7C of the order says, that

11  proofs of claim will be deemed timely filed only if actually

12  received by the city's claims agent KCC, or the Court on or

13  before the applicable bar date.  That means on or before

14  February 21, 2014, the Friday before the Monday on which this

15  proof of claim of Jackie's Transport was actually received by

16  the city's claims agent Kurtzman Carson Consultants, LLC.

17      So the claim clearly was untimely -- not timely filed

18  under the Court's bar date order.  And the argument by

19  Jackie's -- the creditor Jackie's Transport based on Federal

20  Bankruptcy Rule 9007 -- 9006(e) is without merit.  That

21  argument is that the provision in that sub part of Rule 9006

22  which says that service of process and service -- service of

23  any paper other than process or of notice by mail is complete

24  on mailing has really nothing to do with the issue now before

25  the Court.

1    The date on which the proof of claim of Jackie's

2  Transport was served is entirely irrelevant even if we assume

3  based on this rule that the placing of the proof of claim in

4  the mail on February 18 as creditor's counsel here says they

5  did, was service of the proof of claim on February 18.

6    The date of service of the proof of claim on the claims

7  agent is irrelevant.  And it's not enough to file the claim

8  and to get the claim timely filed.  That's absolutely clear

9  from the bar date order.  The -- the concept of service of a

10  proof of claim is -- is really -- has no bearing whatsoever on

11  -- on this issue of whether or not the claim -- the proof of

12  claim is timely filed within the meaning of the bar date order

13  provisions that I have referred to here.

14    The second argument by the creditor is in the alternative

15  that the -- there is excusable neglect.  And presumably here

16  the creditor is relying upon the provisions of Rule 9006(b)(1)

17  of the Federal Bankruptcy Rules which say among other things

18  that "on motion made after the expiration of the specified

19  period, in fact the Court may 'permit the act to be done where

20  the failure to act was the result of excusable neglect'".

21    Now there's no motion made by the creditor here but I'll

22  still consider the argument on the merits.  The creditor's

23  argument on the merits is that there was excusable neglect --

24  the Court should find excusable neglect in the late filing of

25  the proof of claim by Jackie's Transport such that the Court

1  should excuse that late filing and refuse to disallow the

2  claim based on untimeliness in filing as the city argues the

3  Court should do.

4      The creditor relies upon the concept of excusable neglect

5  and the factors relevant to the issue of excusable neglect

6  that are set forth by the U.S. Supreme Court in its well known

7  decision of Pioneer Investment Services Company v Brunswick

8  Associates Limited Partnership, 507 US 380, a decision of the

9  U.S. Supreme Court from 1993.

10     The Court in that case said a couple of things that are

11  important here.  First of all, the Court made a point of -- of

12  holding and ruling that when we talk about excusable neglect

13  and whether a party's neglect is excusable or should be deemed

14  excusable, the Court must focus not only on whether the

15  debtor's -- or the -- or I'm sorry, the moving party

16  themselves, here the creditor Jackie's Transport's failure was

17  excusable.  But also on -- on whether the failure or neglect

18  of the attorney for Jackie's Transport was excusable.

19     As the Supreme Court put it, "the proper focus is upon

20  whether the neglect of the movants and their counsel was

21  excusable".  And the Court said that at 507 US at Page 396 to

22  97.

23     Essentially what the Supreme Court held was that a

24  neglect of a party's chosen attorney is attributable to and

25  visited upon the client, the party themselves and if the

1  attorney's neglect is deemed not excusable then even if the

2  client was personally not at fault, not guilty of any neglect,

3  the -- or in excusable neglect the Court still must find there

4  is no excusable neglect.

5      With respect to whether there was excusable neglect, I

6  will assume for purposes of ruling here that there was neglect

7  as that concept is used and defined by the Supreme Court in

8  the Pioneer Investment Services case in the failure to make

9  sure that the Jackie's Transport proof of claim was actually

10  received by either this Court here in Detroit, or the claim --

11  city's claims agent, KCC in California.

12      The question is whether that neglect which led to the

13  claim being untimely filed by not being actually received by

14  the claims bar date was excusable.  The Supreme Court in the

15  Pioneer case said that a determination of, "whether a party's

16  neglect of a deadline is excusable is at bottom and equitable

17  one taking account of all relevant circumstances surrounding

18  the party's omission, including the danger of prejudice to the

19  party opposing relief, the length of the delay and its

20  potential impact on judicial proceedings, the reason for the

21  delay, including whether it was within the reasonable control

22  of the movant, and whether the movant acted in good faith".

23      The movant here means in this context the creditor

24  Jackie's Transport who is seeking the benefit of a finding of

25  excusable neglect.

1       With respect to these factors, these Pioneer Investment

2   factors, it's -- there is no argument here that the creditor

3   Jackie's Transport or its counsel has not acted in good faith.

4   And so that factor under Pioneer does -- standing alone tends

5   to favor a finding of excusable neglect.

6       With respect to the factor the length of the delay and

7   its potential impact on judicial proceedings, the length of

8   the delay and its potential impact on the city's Chapter 9

9   bankruptcy case and the claims allowance process indicates as

10  well all was clearly minimal.  And there's really no serious

11  dispute about that.

12      The factor considering the danger of prejudice to the

13  city as the party opposing any finding of excusable neglect

14  here is also minimal.  The city has not identified any

15  prejudice that it suffered or will have suffered if the Court

16  finds excusable neglect here by allowing this claim that was

17  filed three days late.

18      The final factors which are related are the reason for

19  the delay including whether it was within the reasonable

20  control of the movant.  Meaning in this case the creditor

21  Jackie's Transport.

22      Again I emphasize that the conduct, acts, and omission,

23  neglect if any -- neglect of the creditor's attorney is

24  visited upon the creditor itself and the creditor is deemed to

25  be guilty of whatever delay and conduct, act, or omission that

1  caused the problem here in the first place even though it was

2  attributable to the party's attorney in this case.

3      So the reason for the delay and whether it was within the

4  reasonable control of the movant, the creditor Jackie's

5  Transport, clearly the delay here, the reason for the delay is

6  because Jackie's -- Jackie's Transport attorneys for reasons

7  that may or may not be at all attributable personally to

8  Jackie's Transport, but certainly is attributable to Jackie's

9  attorneys, at least to the extent it's not attributable

10  directly to Jackie's Transport, was -- the delay was well

11  within the reasonable control of the creditor and its

12  attorneys.

13      There's no dispute, no question that Jackie's Transport

14  and its attorneys knew well before the February 21 claims bar

15  date of that date and of the provisions of the Court's order

16  that had been entered back on November 21, 2013 at docket

17  number 1782 that set the claims bar date and said the claims

18  are -- are deemed filed -- timely filed only if actually

19  received by the Court or the city's claims agent by the bar

20  date.

21      The -- there is no reason or argument, facts presented by

22  Jackie's Transport suggesting that Jackie's -- Jackie or its

23  attorneys did not have complete control over whether or not

24  the proof of claim here would be actually received by the

25  city's claims agent or by the Court by the February 21, 2014

1 claims bar date.

2     The fact that it was not was in my view -- must be

3 considered to be entirely within the control and reasonable

4 control of Jackie's Transport and Jackie's attorneys.  And

5 this is notwithstanding the fact that Jackie's attorneys

6 placed some blame on the United States Postal Service for

7 being too slow to actually deliver to the claims agent the

8 proof of claim that was sent by certified mail by Jackie's

9 attorneys.

10     The reason for the delay in my view was simply, it was

11 entirely attributable for purposes of this excusable neglect

12 inquiry to Jackie's Transport via Jackie's attorneys.  Those

13 attorneys who are experienced and -- and highly competent and

14 capable attorneys, bankruptcy attorneys certainly knew how

15 they could make sure -- be sure that the Jackie's Transport

16 proof of claim was actually received by the bar date either by

17 the claims agent in California, or by the Court here in

18 Detroit, either which -- either of which method would have

19 resulted in a timely filing of the proof of claim if the claim

20 had been actually received on or before February 21 by either

21 -- in either place.

22     Jackie's attorneys are local here in Detroit.  They could

23 have hand delivered or caused to be hand delivered at any time

24 on or before February 21 the proof of claim to the clerk of

25 our Court and that would have been sufficient to get the claim

1  timely filed.  Or in the alternative they could have chosen an

2  overnight delivery service, guaranteed overnight delivery such

3  as offered by any number of -- of services, including Federal

4  Express and sent that in time so that they would have plenty

5  of time to confirm that the claims agent in California had

6  actually received the proof of claim.  And if it had not yet

7  actually received it, to take other steps to make sure the

8  proof of claim was actually received by February 21.

9      There is -- there is simply no good explanation or excuse

10  offered as to why the creditor here, or the creditor's

11  attorneys did not take steps, any of which -- any number of

12  which steps were available to it easily -- to easily get the

13  proof of claim timely filed and actually received by the Court

14  or by the claims agent here.

15      And so the factors, the reason for the delay including

16  whether it was within the reasonable control of the creditor

17  here, Jackie's Transport, weigh against a finding of excusable

18  neglect and -- and heavily so.

19      Now we have a mixed -- a mixed bag of factors here.  As

20  I've indicated, some of them favor a finding of excusable

21  neglect and some do not.  In my view the factors that I've

22  discussed weigh against finding excusable neglect carry the

23  day.  And -- and tney -- they do weigh more heavily in the

24  analysis in my view and properly so.

25      And under the circumstances, all relevant circumstances

1  presented, because those -- of those factors that weigh

2  against the findings of excusable neglect, the Court in its

3  discretion cannot find excusable neglect and must find rather

4  there was not excusable neglect here.  And so that argument

5  must be rejected as without merit by -- by the Court.

6      So what we have here then under the terms of the claims

7  bar date order, which is absolutely clear, we have a claim

8  that was not timely filed and that under the -- the terms of

9  the claims bar date order, must be disallowed for that reason.

10 And so the claim objection regarding the claim of Jackie's

11 Transport will be sustained and it will be disallowed as

12 untimely.

13     I'll ask counsel for the city to prepare an order that

14 reflects this ruling disallowing the claim for the reasons

15 stated by the Court on the record during today's hearing.  Ms.

16 Dolcourt or Ms. Imbrogno you can put that as a separate order,

17 or in the same order regarding the other claim that was

18 disallowed as untimely.  Either way I'll waive presentment of

19 the order.  Get it submitted and I'll review it and we'll get

20 it entered.  Thank you.

21         MR. BLASSES:  Thank you, Your Honor.

22         THE COURT:  That -- that completes the hearing on

23 the 12th omnibus objection, is that right?

24         MS. DOLCOURT:  Yes, it completes here.  We just have

25 one housekeeping matter.

1          THE COURT:  What's that?

2          MS. DOLCOURT:  We have one additional claims

3   objection hearing scheduled for May 27th, but there are no

4   hearing dates after that.  And so while we were here today we

5   just wanted to raise the issue with the Court as to

6   potentially scheduling some dates over the summer for omnibus

7   hearings.

8          THE COURT:  Hold on one second, please.

9          MS. DOLCOURT:  Of course.

10          THE COURT:  All right.  I see the list of available

11   claims objection hearing dates that have been posted to the

12   web site, the Court's web site end that the date of June 17th.

13   So you've got for June you've got already available June 3 and

14   June 17.  You want to -- you want to talk about dates after

15   that, I guess.

16          MS. DOLCOURT:  Yes, Your Honor.  Given the -- the

17   timing and the --

18          THE COURT:  Sure.

19          MS. DOLCOURT:  -- the deadlines.  We were looking at

20   a date in July of the 22nd which is also a Wednesday.

21          THE COURT:  That's fine.

22          MS. DOLCOURT:  Okay.  And then we also ahead for

23   August look at either the 19th or the 26th, both Wednesdays.

24          THE COURT:  Hold on.  Now I can give you more dates

25   than -- than what you've asked for in July.  You don't have to

1  be limited to one date per month.  If you want more dates --

2  hold on one second.  Let me just tell you what's available and

3  then you can tell me what you want on that.  Hold on.  We can

4  do July 8, July 15, July 22nd, July 29, any of those.

5          MS. DOLCOURT:  Okay.

6          THE COURT:  Now we don't have to make all of them

7  claim objection dates.

8          MS. DOLCOURT:  No, no.  I --

9          THE COURT:  Do you want -- if you want any more of

10  those -- any of those other than the July 22 date which is

11  fine, what do you want?

12          MS. DOLCOURT:  Well, I think one day a month is --

13  is -- is generally good for us.  It gives us one day to sort

14  of aim toward with all of our filing and service.  And that's

15  how we've been doing it, so I just wanted to --

16          THE COURT:  Okay.  July 22.  Now for August, what

17  did you say you wanted in August?

18          MS. DOLCOURT:  Either the 19th or the 26th, is what

19  would work for us, but really whatever is convenient to the

20  Court.

21          THE COURT:  19th is no good.  I won't be here.

22          MS. DOLCOURT:  Okay.

23          THE COURT:  The 26th I can do.

24          MS. DOLCOURT:  Okay.

25          THE COURT:  One second.  Yes, August 26th is fine.

1         MS. DOLCOURT:  Okay.

2         THE COURT:  Again these are all at 1:30 on

3  Wednesday.

4         MS. DOLCOURT:  1:30 on Wednesday.

5         THE COURT:  All right.

6         MS. DOLCOURT:  That's perfect.  Thank you so much,

7  Your Honor.  We appreciate that.

8         THE COURT:  Is that it for now?

9         MS. DOLCOURT:  That is it for now, thank you.

10        THE COURT:  All right.  I'll cause these dates to be

11  added to the Court's web site in terms of available hearing

12  dates for objections to claim in this case.

13        MS. DOLCOURT:  Thank you, Your Honor.

14        THE COURT:  Thank you.  Okay.  I think then we're

15  now to the hearing on the Retired Detroit Police and

16  Firefighter Association's motion.  So Mr. Plecha.

17        MR. PLECHA:  Yes.

18        THE COURT:  As counsel for the moving party I'll

19  hear from you first and you'll have an opportunity to reply in

20  support of your motion after we hear argument for the city.  I

21  have reviewed the papers filed by the parties relating to this

22  motion.  What would you like to say now about this?

23        MR. PLECHA:  Good afternoon, Your Honor.  If I may

24  I'd like to refer to the Retired Detroit Police and

25  Firefighters Association as the RDPFFA just for convenience if

1 that's appropriate with the Court.

2         THE COURT:  Sure.  RDPFFA.

3         MR. PLECHA:  Correct.

4         THE COURT:  I'll try to do the same.  Go ahead.

5         MR. PLECHA:  Thank you, Your Honor.  The motion

6 before the Court is the RDPFFA's motion to enforce the

7 settlement with the city as well as the eighth amended plan of

8 adjustment by the term sheet entered by the RDPFFA with the

9 city has a specific provision that reads as follows.

10     Police and firefighter retirees are entitled to the

11 benefits of any other agreement entered into by the City of

12 Detroit that covers such retired police and firefighters and

13 which is more advantageous to them, the terms of this

14 agreement as it relates to Classes 10, PFRS pensions, and 12,

15 OPEB.

16     The DFFA or the Detroit Firefighters Association entered

17 into a master agreement during the pendency of the bankruptcy

18 proceedings which provides a special disability benefit which

19 includes retired firefighters that meet the totally and

20 permanently disabled definition of the master agreement.  In

21 that provision the city is obligated to contribute $140,000

22 annually to fund medical benefits for totally and permanently

23 disabled firefighters that meet the definition set forth in --

24         THE COURT:  Is this a -- excuse me, is this a

25 benefit that did not exist before the collective bargaining

1  agreement was entered?

2          MR. PLECHA:  The city does argue that it's a new

3  agreement, Your Honor.  But our position is that it's merely a

4  way to subsidize the plan treatment and a way to --

5          THE COURT:  No, no, I'm not getting at that.  What

6  I'm trying to just understand is before that collective

7  bargaining agreement was entered into that you're referring

8  to, that was entered into when --

9          MR. PLECHA:  It was -- I believe it was signed on

10  November 7th.

11          THE COURT:  Of 2014.

12          MR. PLECHA:  Correct.

13          THE COURT:  All right.  Before that, that collective

14  bargaining agreement was entered into, what you just said made

15  it sound like this disability benefit, special disability

16  benefit was -- was something new in that agreement that had

17  not existed before.

18          MR. PLECHA:  I think that's correct, Your Honor.

19  But to the extent prior to that it wasn't necessary because

20  all retirees were receiving health care through the city as

21  promised in the prior CBA's.  So there wasn't a need for this

22  subsidy because they were being taken care of under other

23  provisions of the CBA.

24          THE COURT:  All right.  So a -- a totally

25  permanently disabled firefighter prior to this -- this new

1 | CBA, would receive health care but without even having to be

2 | totally and permanently disabled.

3 |          MR. PLECHA:  Correct.

4 |          THE COURT:  Just retired, is that right?

5 |          MR. PLECHA:  Correct.

6 |          THE COURT:  Okay.  So under the new CBA totally and

7 | permanently disabled members, firefighters would have this

8 | benefit whereas what other retirees would not?

9 |          MR. PLECHA:  Other similarly situated police

10 | personnel who were retired and permanently disabled under that

11 | same definition would not receive the same disability benefit

12 | which pursuant to the terms of the term sheet between the city

13 | and the RDPFFA, the police should be entitled to that enhanced

14 | benefit as it's an agreement that's more advantageous to the

15 | terms set forth in the agreement and/or the plan.

16 |     Essentially it's acting as a modification to the plan and

17 | that is providing an additional benefit solely for the benefit

18 | of retired firefighters who meet the permanently and totally

19 | disabled language set forth in the master agreement.

20 |          THE COURT:  All right.

21 |          MR. PLECHA:  Okay.  And I would like to note, Your

22 | Honor, that the term sheet did arise out of the Court ordered

23 | mediation process.

24 |     And this is important for two distinct reasons.  First,

25 | as a historical and contextual matter, the RDPFFA was the

1  first retiree representative body to come to an agreement with

2  the City of Detroit on pension and OPEB benefits.

3      This sentiment was said best in the statement of the

4  Detroit bankruptcy mediators and quote, "the agreement between

5  the RDPFFA is the first agreement with the city has reached

6  with a group of its retired workers and is particularly

7  significant as the RDPFFA is one of the city's oldest and

8  largest employee associations".

9      Further, the agreement, "recognizes the years of faithful

10  service and the important role police and firefighter retirees

11  have played in serving and protecting the city for so many

12  years.  This agreement was instrumental in setting forth the

13  dominos of settlements that followed -- following which led to

14  a primarily consensual plan".

15      Second, it's important that the term sheet was struck in

16  the mediation process because the plan is a patchwork of many

17  settlements which the Court stated at docket 8272.  Further,

18  in the confirmation order at Paragraph 69, the Court stated

19  that all documents and agreements executed by the city as

20  authorized and directed thereunder, shall be binding upon and

21  enure to the benefit of the city and any other parties

22  expressly thereto.

23      THE COURT:  Mr. Plecha, do you agree that -- or

24  acknowledge or agree that Paragraph 69 of the order confirming

25  the plan that you just cited to the Court from, docket 8272

1  is the only place, the only provision in the eighth amended

2  plan that was confirmed and the order confirming plan in those

3  combination documents or -- or any of the exhibits to the

4  confirmed plan that at least -- that even arguably adopt or

5  incorporate into the confirmed plan of adjustment, Paragraph 8

6  of the term sheet.

7      MR. PLECHA:  Based on our reading of all the

8  documents, I didn't find any others, but I'm not representing

9  that they're not there.  But that's the one that we found and

10  are relying on in this case, correct.

11      THE COURT:  I know there's a big volume here of

12  stuff, but the only one you're -- the only provision you're

13  aware of is Paragraph 69 of the -- of the order confirming the

14  plan.

15      MR. PLECHA:  That's correct, Your Honor.

16      THE COURT:  Okay.  All right, go ahead.

17      MR. PLECHA:  Further, Your Honor, the -- the RDPFFA

18  master --

19      THE COURT:  Perhaps now you want to address -- and

20  since we're -- I think we're at that point.  You want to

21  address the city's argument that the language in Paragraph 69

22  to our confirming plan doesn't, by its terms does not

23  incorporate into the plan Paragraph 8 of the term sheet.

24      MR. PLECHA:  And, Your Honor --

25      THE COURT:  I'm sure you saw their argument to that

1  effect.

2          MR. PLECHA:  Yes, we did, Your Honor.

3          THE COURT:  And I think one of the things they're

4  arguing, I think, is -- here is that the term sheet is not --

5  it's not a prior order entered -- entered in the Chapter 9

6  case, but it's -- it's also it's -- they're saying it's not a

7  document or agreement executed by the city as authorized and

8  directed under any orders entered in the Chapter 9 case.

9      I -- I -- I -- it seems to me you're arguing that yes,

10  they were -- it was because of -- of the mediation order.  The

11  order that referred the parties to mediation and then the

12  mediation process led to the term sheet.

13          MR. PLECHA:  Correct, Your Honor.  It's our

14  position --

15          THE COURT:  Is that the idea?  Okay.

16          MR. PLECHA:  -- position that that mediation order

17  authorizes and directed the city to make consensual agreements

18  with its various constituents which it in fact did with the

19  RDPFFA as reflected in the term sheet.

20          THE COURT:  There's no order of the Court in the

21  Chapter 9 case however that specifically approved the term

22  sheet itself as -- in some -- in some way, is there?

23          MR. PLECHA:  That's correct, Your Honor.  It was

24  just part of the patchwork of settlements that led into the

25  eighth amended plan which led to in turn the confirmation

1   order.

2         THE COURT:  I mean a number -- you agree a number of

3   the provisions of the term sheet were folded into the plan

4   expressly.

5         MR. PLECHA:  I do agree with that, Your Honor,

6   correct.

7         THE COURT:  Yeah, okay.  But not -- not Paragraph 8,

8   not expressly.

9         MR. PLECHA:  Correct, Your Honor.  Because at that

10  point the -- the plan was mostly consistent with the term

11  sheet.  So that we didn't see a need for it and also there was

12  a need to incorporate into the plan something that said that

13  the debtor was not going to make any further modifications

14  that would be, you know, in violation of the Bankruptcy Code.

15  Which is why the party or the RDPFFA did not request that that

16  be articulated expressly in the plan of adjustment.

17      Further, Your Honor, we believe that the DFFA master

18  agreement is an indirect modification of plan treatment that

19  does not comply with 11 USC 942 or 1123(a)(4).  The

20  requirement --

21        THE COURT:  Well, that depends really, doesn't it,

22  on whether the plan, the confirmed plan means what you say

23  rather than what the city says.

24        MR. PLECHA:  That's correct, Your Honor.

25        THE COURT:  I mean and if you're right about that

1  you -- you win anyway because the -- the plan at issue is

2  really -- I mean in other words the issue really is, what does

3  the plan, the confirmed plan mean and -- and say.  What does

4  it mean and include.

5          MR. PLECHA:  Correct.

6          THE COURT:  Isn't it?

7          MR. PLECHA:  Correct.

8          THE COURT:  Okay.  Go ahead.

9          MR. PLECHA:  And just to close, Your Honor, it's --

10 it's the RDPFFA's position that Paragraph 8 was integral to

11 the agreement that it struck with the city.  It should be

12 enforced and the city should be compelled to honor that and

13 treat the retired police officers in the same fashion that the

14 retired firefighters are being treated as it relates to

15 permanently and disabled retirees.  Thank you, Your Honor.

16         THE COURT:  Did you want to say anything else about

17 the arguments, the various arguments the city makes in their

18 written response to the motion?

19         MR. PLECHA:  I can answer any specific questions,

20 but I was going to hold some of that for rebuttal.  But if

21 Your Honor prefers, I can address those now.

22         THE COURT:  Well, I prefer you move more of your

23 planned rebuttal into your first argument so the city will

24 have the advantage of knowing what you're saying and have a

25 chance to respond.  You'll still have a rebuttal opportunity

1  though.

2       MR. PLECHA:  Okay.

3       THE COURT:  Or reply.  Go ahead.

4       MR. PLECHA:  I think we -- we had discussed some of

5  the city's opposition in our colloquy here so far.

6  Specifically whether it's a new benefit or -- or not.  It's

7  the RDPFFA's position that it's not a new benefit it's merely

8  a new name for a benefit that has existed for many years and

9  has been paid for many years for retired firefighters that

10  were either disabled or not disabled.  The OPEB benefits were

11  provided to all retirees.

12      The city also argues that Paragraph 8 does not in those

13  favored nations clause or need supervision.  Merely that it

14  prohibits the receipt of other negotiated benefits for RDPFFA

15  members as it relates to Class 12.  We don't think that's

16  accurate and even if it is, it seems to be a distinction

17  without a difference in that the benefits being provided to

18  the retired firefighters in this instance should also be

19  provided to the retired police personnel that are totally and

20  permanently disabled.

21      As to their argument as the cost concessions, the RDPFFA

22  is not a union as correctly indicated by the city.  The RDPFFA

23  does not have the ability to give cost concessions.  Those

24  cost concessions we are forced at this point to take on the

25  face value of the city's representations.  We don't have any

1  access to what occurred in the mediation partly based on the

2  confidentiality order that was entered by this Court.

3      And also we don't even know if -- if those concessions

4  were even limited to the DFFA or if those funds were -- were

5  taken from other pots throughout the city.  The city is the

6  one that has all of the cards and all the pieces to the puzzle

7  to know whether that in fact happened.  We're at a

8  disadvantage at that point to know that that in fact did

9  occur.

10      Also --

11      THE COURT:  Is there any significance in your view

12 to the fact that the facts argued -- these facts argued in the

13 city's response that the police unions also negotiated

14 collective bargaining agreements, but those did not include

15 this special disability benefit or subsidy that the DFFA's

16 collective bargaining agreement included.

17      MR. PLECHA:  I believe that's correct, Your Honor.

18 And had they done so, I wouldn't be before you today.

19 Unfortunately they chose not to.

20      THE COURT:  Well, is there any significance to that

21 fact or any -- does that -- does that --

22      MR. PLECHA:  In my opinion --

23      THE COURT:  -- tend to show that the parties had no

24 intention of -- of -- of giving the police the -- the -- this

25 disability, special disability benefit

1          MR. PLECHA:  I believe that the active unions

2   decided that they would not give that benefit to retirees and

3   even the actives that become permanently disabled as they

4   apparently took other benefits, whether it be wages or

5   whatnot, I -- I can't speak for -- for the active unions.  But

6   I believe that the term sheet does not exclude CBA's from

7   other agreements more beneficial to the retired police and

8   firefighters which in this case the DFFA --

9          THE COURT:  In effect you're arguing, aren't you,

10  that -- that the police collective bargaining agreements

11  didn't need to put this in, this benefit in, because they --

12  they already had it automatically by virtue of the fact that

13  the DFFA's collective bargaining agreement had it.

14         MR. PLECHA:  I don't believe --

15         THE COURT:  Because of Paragraph 8 of the term

16  sheet.

17         MR. PLECHA:  I believe that's not exactly true, Your

18  Honor.  The -- the RDPFFA is not a union in -- in any sense.

19  It's purely for retiree representation.  The police and the

20  DFFA and the other public safety unions represent the actives.

21  And this is one of the few instances in which the active

22  unions on the firefighters side had a benefit that they did

23  negotiate that had beneficial impact on the retirees whereas

24  the police officers chose not to do that for future

25  permanently disabled personnel as well as those police

1  personnel that were already permanently disabled.

2     So I think there's a bit of a -- a disconnect.  And I

3  don't think that the reason why the police unions didn't do it

4  is because the fire unions did.  I don't think that would --

5  would likely be accurate and I don't want to speak for the

6  unions because I don't represent them, but I think that's

7  probably not the case.

8          THE COURT:  All right.  Go on, go on, you were

9  saying.  What else did you want to say about the city's

10 arguments.

11          MR. PLECHA:  Just give me one moment, Your Honor.

12          THE COURT:  Sure, sure.

13          MR. PLECHA:  I think the other argument that the

14 city does raise like at the forefront of their papers and they

15 might agree whether it's at the forefront or not was the

16 difference between police and firefighters or firefighters and

17 police and the fact that it was not in the disjunctive and it

18 was an order that the agreements be for the benefit of retired

19 firefighters and police officers.

20    And I would just like to address that briefly that

21 retired police and firefighters have been used as a -- as a

22 group to represent the collective as retired police officers

23 and firefighters which is, you know, evidenced by the fact

24 that they had one pension system.  And colloquially they were

25 referred to as retired Detroit police and firefighters and

1  which is why it was reflected that way on the term sheet and

2  to the extent that there's any ambiguity in that language,

3  evidence may be necessary to address that issue of fact.

4      But I believe as it's stated in the term sheet it's used

5  as a broader more colloquial term to include police and

6  firefighters as a group as opposed to two separate bodies.

7  And with that, Your Honor, unless there's any questions, I

8  will --

9         THE COURT:  Well, I think what you're -- you've been

10  addressing just now is, I think one of the city's arguments in

11  effect is that when you look at the language of Paragraph 8 of

12  the term sheet, when it refers like, for example, the phrase

13  refers to -- it says police and firefighter retirees are

14  entitled to the benefits of any other agreements entered into

15  by the City of Detroit that covers such retired police and

16  firefighters.

17     You seem to be here addressing an argument that this

18  language means that in order for one of these other agreements

19  that has in it a benefit to be the subject of Paragraph 8 of

20  the term sheet it has to be an agreement that covers both

21  retired police and firefighters, not just --

22         MR. PLECHA:  Your Honor --

23         THE COURT:  -- not just for example as here,

24  firefighters.

25         MR. PLECHA:  Your Honor, I believe that's in part

1   the city's argument.

2           THE COURT:  Yeah.

3           MR. PLECHA:  And that's why I'm saying it's

4   generally referred to as the whole as opposed to one plus one.

5   I think it's a collective term that's generally used to refer

6   to retired police and firefighters.

7           THE COURT:  Well, Paragraph 8 as you know ends with

8   a phrase -- the phrase that -- the phrase, "which is more

9   advantageous to them than the terms of this agreement as it

10  relates to Classes 10 (PFRS pensions) and 12, (OPEB)".

11      Those references to Class 10 and Class 12 of the plan

12  refers to classes that contain claims of both - each class

13  contains claims of police and firefighters, right?

14          MR. PLECHA:  Correct.

15          THE COURT:  In other words police and firefighters

16  were sort of lumped together for purposes of Classes 10 and 12

17  of the plan and the treatment of claims in those classes,

18  right?

19          MR. PLECHA:  That's correct, Your Honor.

20          THE COURT:  Does that explain why this -- this

21  phrase is used in Paragraph 8 before that, police and

22  firefighter retirees, the phrase that covers such retired

23  police and firefighters, why those are lumped together that

24  way because--

25          MR. PLECHA:  I think --

THE COURT: Excuse me. Because as the city argues the reference here to in Paragraph 8 the benefits of any other agreements, et cetera, means with respect to the treatment of police and firefighters in Classes 10 and 12 of the plan only and nothing else. What do you make of that argument?

MR. PLECHA: Well, I think the -- the purpose of referencing Classes 10 and 12 in this situation was more of an identifier to the type of -- of benefits that they were discussing and which they'd be entitled any benefits that were greater down the road.

I don't think it was designed to limit it to just the plan treatment set forth there. The RDPFFA as I said was the first to reach an agreement. And this was primarily to protect both police and fire retirees from the very situation set forth today when -- when a group of retirees was getting better treatment arguably than another and covered by retired police and firefighters.

So I think in this situation it's the very situation that the RDPFFA was trying to protect its retired police and firefighters from. And that the benefits would go to both police and firefighters.

THE COURT: All right. Anything else you'd like to say?

MR. PLECHA: No, Your Honor.

THE COURT: All right. Well, thank you. I'll hear

1 from the city's counsel now. Mr. Ellman.

2        MR. ELLMAN: Good afternoon. For the record Jeffrey

3 Ellman from Jones, Day on behalf of the city.

4        Your Honor, we've obviously put our papers in. Our view

5 is that the RDPFFA is attempting to take what is -- what we

6 would refer to as a superseded plan term sheet and obtain a

7 windfall for certain of the police retirees that could cost

8 the city at least in the view of the movant up to $700,000.

9        This relates to a new benefit negotiated by the

10 firefighters union representing actives in exchange for other

11 concessions. It has nothing to do with the treatment of

12 claims in the plan which was the basis of the term sheet. It

13 has nothing to do with Class 10 or 12.

14        And as we note in our papers, we think the motion fails

15 for a number of reasons based on those principles. I guess

16 the place to start for me would be the fact that the term

17 sheet itself resolved mediation about the plan. I think

18 everyone agrees to that.

19        But it's a term sheet about the plan. It's a plan term

20 sheet about a settlement for the plan and it deals only with

21 the plan treatment of claims in Class 10 and 12. And it says

22 by its own terms it's incorporated into the plan, it has no

23 longer in light of its own.

24        We have a chart in our response that shows where all the

25 substantive pieces of that agreement ended up in the plan

1   itself and there's nothing left to rely upon the term sheet.

2   The term sheet is really no longer of -- of any particular use

3   of it for -- for -- for reliance of the parties.

4       This was an important agreement.  It was in early in the

5   process, but it's all been baked into the plan to the extent

6   there's any substance to it.  And the plan is now what

7   governs.  And that is the contract.  And ruling of the <u>Dow</u>

8   <u>Corning</u> case in the 6th Circuit and also other cases talk about

9   plans as binding contracts.  And that is the contract at this

10  point, really not the -- the term sheet.

11      And as the Court's already pointed out, Paragraph 8 which

12  is the paragraph we're focusing on, deals with by its terms

13  expressly the treatment in Classes 10 and 12.  That's what it

14  was about.  The movant is a representative of retirees.  All

15  they really had was historical claims dealt with by the plan

16  that we're trying to preserve the right to -- this was -- it

17  was our view anyway, this is certainly not an attempt, or an

18  effort, or an agreement to preserve future benefits under

19  collective bargaining arrangements.  That has nothing to do

20  with this agreement.  This is about the plan, it's about

21  Classes 10 and 12.

22          THE COURT:  Well, the distinction you're drawing

23  between Classes 10 and 12, I can just refer to them as

24  historical claims in what we just said.  One of the things I

25  wanted to ask you is, and this seems like a good place to do

1 | it, is --

2 | MR. ELLMAN: Sure.

3 | THE COURT: -- to -- to elaborate a little bit more

4 | on what -- why the city contends that Classes 10 and 12 have

5 | nothing to do with this new benefit that you -- as you've

6 | called it.

7 | MR. ELLMAN: Right.

8 | THE COURT: Under the collective bargaining

9 | agreement. Is it -- first of all, is it correct that health

10 | insurance which is what this new benefit concerns, would be

11 | the type of benefit that is covered under not necessarily the

12 | benefit, but the type of benefit that's included in -- in

13 | Class 12 other post employment benefits, OPEB.

14 | MR. ELLMAN: Class 12 includes retiree health care,

15 | that is what it covers.

16 | THE COURT: Okay.

17 | MR. ELLMAN: This -- this new agreement with the

18 | firefighters active union that is being discussed was a -- is

19 | a new benefit. It was not something that existed before.

20 | It's based on a stipend. It's intended to be used for health

21 | care unlike --

22 | THE COURT: Meaning the $140,000 a year of city

23 | contributions?

24 | MR. ELLMAN: Correct.

25 | THE COURT: Yeah.

1          MR. ELLMAN:  It's $140,000 a year for five years.

2   It's -- the city's only goal is to put the money in and it's

3   available to -- I mean this was negotiated with the active

4   union.  So it's for actives and in this case based on the way

5   the negotiations went, this also covers retirees.  But it's

6   not just for retirees, it's for the totally and permanently

7   disabled firefighters which would include actives and

8   retirees.  And in the past --

9          THE COURT:  There's not a requirement that somebody

10  be retired in order to get this benefit.

11         MR. ELLMAN:  No, no, no, no.  They have to be --

12         THE COURT:  Under the collective bargaining

13  agreement, I mean.

14         MR. ELLMAN:  Correct.  No, the --

15         THE COURT:  You don't have to be retired.

16         MR. ELLMAN:  -- the idea is that you have to be

17  totally and permanently disabled.  You could be retired,

18  that's really as part of a collective bargaining agreement,

19  the union representing really the actives.  And really it's

20  for the actives and it happens to also cover the retirees as

21  well for -- based on how the negotiations went.  So --

22         THE COURT:  Well, when you say it covers the

23  retirees.

24         MR. ELLMAN:  Correct.

25         THE COURT:  You're referring, I guess, to Paragraph

1 | 10D on Page 53.  Let me -- let me ask you about that while

2 | we're on it.

3 |           MR. ELLMAN:  Yeah.  I think it's -- it's a defined

4 | term.  Yes.  It's --

5 |           THE COURT:  Eligibility.  It's the eligibility

6 | paragraph.

7 |           MR. ELLMAN:  Yeah.  I think it's line -- no, no,

8 | maybe it's 10.  Hold on a second.  Yes, you're right, 10D is

9 | on Page 53.

10 |           THE COURT:  Okay.  So --

11 |           MR. ELLMAN:  And that's -- that's where it talks

12 | about totally and permanently disabled which is defined

13 | earlier.  And drawing a duty disability pension as of the

14 | effective date of this agreement or becomes disabled and draws

15 | a pension during the term of this agreement.  So it covers

16 | both people who are already in this situation which could

17 | include retirees or people in the future becoming the

18 | situation which could include actives.

19 |           THE COURT:  Well, how does this include -- possibly

20 | can include retirees?

21 |           MR. ELLMAN:  I was --

22 |           THE COURT:  If somebody is drawing a duty disability

23 | pension because they're totally and permanently disabled, are

24 | they considered a retiree?

25 |           MR. ELLMAN:  They could be a retiree.  If they had

1  retired and they already were drawing a pension at that point

2  in time then they would be a retiree subject to this section.

3          THE COURT:  Well, let me ask it a different way.

4  Under the collective bargaining agreement --

5          MR. ELLMAN:  Uh-huh.

6          THE COURT:  Someone who is in the bargaining unit,

7  firefighters bargaining unit that's covered by this agreement,

8  retires.  And then at some point after they retire they become

9  totally and permanently disabled.  Does that event make them

10  then eligible for this -- this medical benefits disability

11  subsidy?

12          MR. ELLMAN:  Well, my -- my understanding, and

13  hopefully this is correct, my understanding this is duty

14  disabled.  So you have to be disabled in the line of duty.

15  So --

16          THE COURT:  Oh, I see, okay.  So it wouldn't happen

17  to -- it wouldn't involve someone who retired and then became

18  disabled.

19          MR. ELLMAN:  This is -- my understanding is this is

20  to cover people who are duty disabled.  In other words you are

21  a firefighter, you go to a fire and you are injured while

22  performing your job duties.

23          THE COURT:  Okay.

24          MR. ELLMAN:  Not that you've retired and you get hit

25  by a car or something happens unfortunate to you.

1          THE COURT:  So it's an active firefighter, actively

2  employed firefighter, they suffer a duty related disability.

3          MR. ELLMAN:  Correct.

4          THE COURT:  Become permanently and totally disabled.

5  Then they're eligible for this.  Are they considered at that

6  point a retiree?  This refers to a duty pension.

7          MR. ELLMAN:  I -- I think this would kick in after

8  you retire.  So if you're active in the -- in the union at

9  this point and you retire, I think this would kick in.

10         THE COURT:  Retire on a disability basis?

11         MR. ELLMAN:  I'm not sure if that's the only reason,

12  but presumably --

13         THE COURT:  Well, what's the reference -- excuse me.

14         MR. ELLMAN:  -- presumably if you're -- if you're

15  duty disabled you would be retiring because you probably could

16  not perform the job duties at that point.  So I would expect

17  that yes, they would retire because they're no longer actively

18  able to do their job.

19         THE COURT:  Somebody who is drawing a duty

20  disability pension and they're a retiree?

21         MR. ELLMAN:  Correct.  The pension would be a

22  retiree.

23         THE COURT:  So it's another way of becoming eligible

24  -- eligible for retirement pension benefit and to be

25  considered retired even if the person -- because of the duty

1  disability, even if the person didn't otherwise qualify yet

2  for a retirement pension.

3          MR. ELLMAN:  That sounds -- you're asking some

4  questions, Your Honor, frankly that I'm -- I'm extrapolating

5  the answers to --

6          THE COURT:  All right.

7          MR. ELLMAN:  -- rather than knowing them for sure,

8  but --

9          THE COURT:  Well, let me -- let me circle back to --

10  to Class 12 of the plan.

11          MR. ELLMAN:  Yeah.  The --

12          THE COURT:  That's kind of where I was heading here

13  at least.  You know, I've -- I've read what I think are the

14  plan provisions regarding Class 12.

15          MR. ELLMAN:  Uh-huh.

16          THE COURT:  The claims --

17          MR. ELLMAN:  Correct.

18          THE COURT:  -- definition of Class 12 and the claims

19  and their treatment.

20          MR. ELLMAN:  Correct.

21          THE COURT:  And the Class 12 included both police

22  and firefighter retirees.

23          MR. ELLMAN:  It included all retirees.

24          THE COURT:  Well, okay.  So police, fire --

25          MR. ELLMAN:  Police, fire and everyone else.

1          THE COURT:  -- and general.

2          MR. ELLMAN:  Everyone.

3          THE COURT:  Everyone.

4          MR. ELLMAN:  Yes.  We had one -- we had one class --

5          THE COURT:  Class 10 is the police and fire only?

6          MR. ELLMAN:  Pension, yeah.  The pension you got two

7   different classes.

8          THE COURT:  I see.

9          MR. ELLMAN:  Eleven and -- 10 and 11.  And then for

10  12, that includes all retirees who had health OPEB claims.

11         THE COURT:  Police, fire, and general retirees.

12         MR. ELLMAN:  Exactly, all of them.

13         THE COURT:  Okay.  So let -- what I'm coming back to

14  is as you can imagine probably is the language in Paragraph 8

15  of the term sheet.  The reference in there to this -- this

16  phrase which is more advantageous to them than the terms of

17  this agreement as it relates to Classes 10 and 12.

18         MR. ELLMAN:  Correct.

19         THE COURT:  Focusing on the reference there to Class

20  12, you've argued as I understand it, that -- that that phrase

21  is one of the reasons why -- or one of the things that shows

22  that Paragraph 8 doesn't entitle the -- the retired police to

23  this event.  Even if -- even if Paragraph 8 were folded in --

24  had been folded in to the confirmed plan.

25         MR. ELLMAN:  That's correct.  That's correct.

1          THE COURT:  So would you elaborate on that a little

2   bit?

3          MR. ELLMAN:  Sure.  I'm happy to do that.  This plan

4   term sheet is -- is -- and this provision of it was I think a

5   counsel indicated, in -- in the document because this was one

6   of the first agreements we had.

7       And this paragraph was an acknowledgment that although

8   the retired police and firefighters through the RDPFFA were

9   agreed to certain settlement treatment in the plan.  They

10  weren't going to be limited to that treatment if the plan got

11  better.  If someone else negotiated better treatment or

12  enhancement to Class 12, or to Class 10, they would get that

13  too.  And that seemed fair and so that's what it says.

14      The plan by its nature includes the entirety of what the

15  treatment is for Class 12.  Everyone got the same treatment.

16  There was no change to it that would bring into play Paragraph

17  8.  Certainly the RDPFFA never objected.  They agreed to

18  support the plan and the plan is confirmed.

19      The collective bargaining agreements are separate.  They

20  were separately approving the plan in section I think it was

21  II(D)(5) maybe, I'm doing this from memory.  But they have --

22  there's a -- we cite this in our papers, and it's separately

23  approved in the plan.  They're separate and distinct from the

24  claim treatment.

25          THE COURT:  Where does the plan separately approve

1  this collective bargaining agreement?

2          MR. ELLMAN:  It's section --

3          THE COURT:  If that's in your papers, I missed it.

4          MR. ELLMAN:  Yeah, it's in the papers.  It's Section

5  II(D)(5).

6          THE COURT:  II?

7          MR. ELLMAN:  Yeah, II, capital D like dog and number

8  5.  And it's on exhibit, same number II(D)(5).

9      So the CBA's, the collective bargaining agreements are

10 separate and apart from the claim treatment.

11         THE COURT:  Okay.  I want to find this in the plan.

12         MR. ELLMAN:  Okay.  I can tell you a page number.

13         THE COURT:  Have you got a page number in the plan?

14         MR. ELLMAN:  I can find it, Your Honor.

15         THE COURT:  I mean I can -- maybe I can find this II

16 -- II(D).

17         MR. ELLMAN:  If you would give me one moment.

18         THE COURT:  Sure.

19         MR. ELLMAN:  It's II(D)(5).  It should be on Page 46

20 according to the table of contents.

21         THE COURT:  Okay.

22         MR. ELLMAN:  I don't -- I have --

23         THE COURT:  Oh, I think I see it, yes.

24         MR. ELLMAN:  And this is just -- it's a section

25 dealing with contracts and leases entered into after the

1  petition date which includes a lot of the collective

2  bargaining agreements, most of them.  And then if you look at

3  Exhibit II(D)(5), this is on the list of -- of the agreements

4  that was approved by the Court.

5            THE COURT:  This collective bargaining agreement?

6            MR. ELLMAN:  This -- the bargaining agreement with

7  the firefighters to be more precise, the DFFA, that created

8  the benefit that the movant would like to -- to apply to the

9  police officers.  That was approved by virtue of this Section

10  5 on Page 46 and the related exhibit that was incorporated

11  into the plan.

12            THE COURT:  Well, this says these post-petition

13  contracts will be performed by the city in the ordinary course

14  of business.  And accordingly they will survive and remain

15  unaffected by entry of the confirmation order.

16       The Court didn't in that language, didn't really approve

17  them as such, did it?  It just -- it merely recognized, made

18  clear that they survive confirmation of the plan.

19            MR. ELLMAN:  That's correct.  It approved that the

20  city would continue to perform them as written in there.  And

21  my point really is that these were separate and apart from the

22  claim treatment.

23       And, you know, we didn't really have a chance to respond

24  to this because it was in -- at least in writing because it

25  was in a reply.  But, you know, the movant tried to make an

1  argument under -- well, they cite to 1127(b) which I think

2  they've corrected now to be Section 942 about plan

3  modifications.  Because Section 1127(b) doesn't apply in

4  Chapter 9, but Section 942 and 1123(a)(4).

5      And that was the argument we heard here today that, you

6  know, somehow this collective bargaining agreement was a

7  modification to the plan, although we certainly don't think it

8  was.  And it creates some kind of disparate treatment for

9  Class 12 for a certain discreet group of retirees who happen

10  to be totally disabled.

11      To us it's not a plan treatment issue.  This was -- the

12  CBA was not intended to be plan treatment.  We never intended

13  to modify the plan treatment.  The provision of the CBA, the

14  collective bargaining agreement at issue is not on account of

15  the pre-petition claim of these retirees as a new stipend

16  program that did not exist.

17      It was negotiated as part of collective bargaining in

18  exchange for consideration.  It was paid for by virtue of the

19  union agreeing to concessions that allowed it to be paid for.

20  And the fact, and I think the main point is, the fact that

21  there is a new benefit that was created in collective

22  bargaining that benefits this small group of retirees who were

23  firefighters who were totally and permanently disabled.

24      That is not the same as disparate treatment.  And I think

25  the confusion which does come up from time to time, and the

1 cases talk about it, is confusing the treatment of claims

2 which 1123(a)(4) says you have to have equality treatment of

3 claims. That's one thing. And treatment of creditors which

4 is a different thing. Because creditors have various

5 different relationships with the city.

6     And you -- and you look at like the UNR Industries case

7 which is at 143 BR 506, it's a Northern District of Illinois

8 case in 1992. It has a good quote in there that talks about,

9 you know, creditors and claims are different things. And you

10 cannot really confuse them.

11     Disparate treatment in 1123(a)(4) sense means the claims

12 are treated the same. But creditors have often different

13 treatment and they have different rights.

14     Here the OPEB claims in Class 12, there's no doubt they

15 all got the same treatment. Everyone got the same stipend and

16 the VEBAs, that's what happened. The firefighters got the

17 same treatment like everyone else. It's consistent with the

18 term sheet. But the city also has this collective bargaining

19 arrangement with the union.

20          THE COURT: Well, let -- let me hold you on Class 12

21 for a minute.

22          MR. ELLMAN: Sure.

23          THE COURT: You referred to them as historical

24 claims. You've referred to them as pre-petition claims. What

25 -- what were the claims that were for Class 12?

1    MR. ELLMAN:  Well, they're the health care -- health

2    care claims.  The definition of OPEB claim includes -- it's in

3    the plan, I can cite you the page.  It's definition 260 on

4    Page 21.

5           THE COURT:  Yes.  I see that.

6           MR. ELLMAN:  Well, I guess actually you had to look

7    at 259 which is what OPEB benefits are.  It's a claim for OPEB

8    benefits which is post-retirement health, vision, dental,

9    life, and death benefits provided to a retired employee of the

10   city.

11          THE COURT:  So this is -- we're talking about health

12   benefits when we're talking about the issue before us --

13   before me today.  But these Paragraphs 259 and 260 of the

14   definitions there, it's a -- it includes any claim for

15   post-retirement health benefits held by a retiree who retired

16   on or before December 31, 2014, et cetera.

17          MR. ELLMAN:  Uh-huh.

18          THE COURT:  Right?  So you've -- you've called these

19      pre-petition claims.

20          MR. ELLMAN:  Correct.

21          THE COURT:  I guess by that you mean what exactly?

22          MR. ELLMAN:  Well, the claims that are addressed in

23   Class 12 are the pre-petition claims for promised health care

24   benefits that the city can no longer afford or pay to the same

25   extent that they had previously.

1    THE COURT:  In other words it's based on promises

2  made by the city before the petition date?

3    MR. ELLMAN:  That's absolutely correct.  And that --

4  that is what Class 12 addressed and it created these voluntary

5  employee benefit associations, these VEBAs which were funded

6  with B notes to allow some benefit to be provided on a going

7  forward basis to the retirees who otherwise would have

8  received different and more extensive benefits from the city.

9  And everyone now gets what's in the plan in Class 12 including

10  firefighters, including police retirees, and including every

11  other retiree.

12    THE COURT:  Now that's a VEBA plan but the city's

13  contribution to it is in the form of these new B notes?

14    MR. ELLMAN:  That's correct.  There are actually two

15  VEBAs to be -- to be more precise.  There is in this sense

16  Class 12 does have two pieces because although Class 12

17  includes all retirees, there is a police and fire VEBA and

18  there is a general VEBA.

19    But either way it's -- it's spelled out in the plan and

20  the B notes are funded into these vehicles to allow a benefit

21  to be paid in the future, no longer by the city but only by

22  these VEBAs.

23    THE COURT:  Now this concept that these OPEB claims,

24  Class 12 are pre-petition claims, claims based on promises

25  made by the city before the petition date.

1          MR. ELLMAN:  Correct.

2          THE COURT:  I see Paragraph 60, definition of 60 on

3   Page 6 of the plan defines claim means a claim is defined in

4   Section 101(5) of the Bankruptcy Code.

5          MR. ELLMAN:  Okay, correct.

6          THE COURT:  So that's -- that's the link in to

7   the --

8          MR. ELLMAN:  That's correct.

9          THE COURT:  -- this pre-petition promise concept.

10          MR. ELLMAN:  That's -- that's correct.

11          THE COURT:  Right?

12          MR. ELLMAN:  That's correct.  And then you know, to

13   complete the loop on what I was trying to articulate, the --

14   the city also has a relationship of actives going forward.

15   And they have a collective bargaining type arrangement and it

16   was critical for the city to be able to negotiate with a

17   number of other unions including the firefighters, a new

18   collective bargaining relationship and a productive and long

19   term relationship with the unions.

20       We discuss in our papers we wanted a five year

21   arrangement which we received.  And it was in the context of

22   that negotiation for those additional benefits of having a --

23   a collective bargaining arrangement that we could live with

24   what was appropriate costed and provided what we needed to

25   have as far as terms and conditions of employment, is in that

1 | context and with the active union, a new benefit was

2 | negotiated, paid for by concessions by the union to provide

3 | for a stipend that didn't exist before for these kinds of

4 | disabled individuals.

5 | And it does happen -- so happen that there's certain

6 | parties who are also in Class 12, these firefighter retirees

7 | who would benefit from the stipend, but this is not a payment

8 | on account of their claim, this is a new program and it is in

9 | consideration of getting the new collective bargaining

10 | arrangement.

11 | So it's independently justified and wouldn't make sense

12 | in the context of the give and take of that CBA.  It wouldn't

13 | have made sense to put it in the plan to provide it as plan

14 | treatment.  It wasn't proposed in that way.

15 | And in that sense it is very different and is justified.

16 | And there are a number of cases -- we've cited them before in

17 | briefing in confirmation.  And I can -- I can point them out

18 | here that talk about creditors who get something that other

19 | creditors don't get.  But it's not account of their claim.

20 | So the claims won't be the same, but they have a

21 | different relationship with the city and they get another

22 | benefit.  Again, the difference between a claim and a claim

23 | being treated equally with other claims and a creditor may be

24 | getting some other things that other creditors don't get.

25 | And so I would just point the Court to a few cases.

1  <u>Heron, Burchette</u>, which is B-u-r-c-h-e-t-t-e, <u>Ruckert and</u>

2  <u>Bothwell</u>.  It's at 148 BR 660, Bankruptcy District of Columbia

3  in 1992.  And that was a law firm bankruptcy where certain

4  partners got special releases and injunctions but the Court

5  found that that was in consideration of a settlement and not

6  their claim.  So the fact that it was different than other

7  creditors wasn't a problem.

8      You have <u>In Re: Aleris International</u> which is a case on

9  Westlaw, 210 Westlaw 3492664, a bankruptcy case in the

10  District of Delaware, May 13, 2010.  This is a -- a creditor

11  who also got some additional benefit that other creditors

12  didn't get, but again not on account of the claim.  They were

13  provided some additional backstop financing, again additional

14  consideration was fair and appropriate.

15      And then the last one I'll mention is <u>In Re:</u> -- <u>In Re:</u>

16  <u>Piece</u>, P-i-e-c-e <u>Goods shops Company</u>, 188 BR 778, a bankruptcy

17  case from the Middle District of North Carolina 1995.

18      And this is a case where the distribution in the plan was

19  stock to unsecured creditors.  One party who happened to be

20  the party that got the majority of the stock also got some

21  other benefits in the form of drag along rights and certain,

22  you know, potentially valuable rights that went with the

23  stock.

24      But -- but the Court found those were on account of

25  separately negotiated government's provisions for the entity.

1  It wasn't on account of the claim. They all got the same

2  stock.

3      Sort of like what we have here. Everyone gets the same

4  Class 12 treatment but to negotiate our CBA which is extremely

5  important for the city, there are creditors who get something

6  extra, but not on account of their claim. So and that's the

7  one point I think we really didn't get to make in our papers

8  given that this was really raised in the first in the reply

9  and I wanted to make sure the Court was aware of that and

10 hopefully that answers the Court's question on that point.

11     I also would say --

12         THE COURT: Well, let's -- let's go back to the

13 plan's --

14         MR. ELLMAN: Yes.

15         THE COURT: -- treatment of Class 12 claims.

16         MR. ELLMAN: Yeah.

17         THE COURT: I'm looking at section of the plan Page

18 42, that talks about that.

19         MR. ELLMAN: Yeah.

20         THE COURT: It talks about establishing general

21 Detroit -- Detroit general VEBA and Detroit police and fire

22 VEBA. And so I think that's the two VEBAs that you were

23 referring to.

24         MR. ELLMAN: That's correct, yes.

25         THE COURT: And the terms of those VEBAs is provided

1  by what?  In other words does the plan define what the terms

2  are of those VEBAs in terms of the benefits provided?  Or do

3  exhibits to the plan define that?  Or where is that defined if

4  anywhere in the plan?

5          MR. ELLMAN:  No, I think the VEBAs then are able to

6  through the provision of these B notes provide a stipend to

7  the individuals which I'm trying to see if there's anything --

8  give me one second here.

9          THE COURT:  No, I'm just -- I'm just -- the plans as

10  reference to establishment of these two VEBAs.

11          MR. ELLMAN:  Correct.

12          THE COURT:  These are -- the -- at least the

13  beginning in terms of these VEBAs are set forth in these

14  exhibits to the plan that are referred to.

15          MR. ELLMAN:  Yeah, that's what I was looking for.

16  There are exhibits --

17          THE COURT:  Okay.

18          MR. ELLMAN:  -- which I don't have with me, but they

19  are referenced here that talk about the terms of the VEBAs.

20          THE COURT:  And those have detailed terms which

21  would include what the benefits are, at least at the outset.

22          MR. ELLMAN:  Well, it includes -- includes

23  governance for the VEBAs.  Because what will happen is the

24  city will simply provide the consideration to the VEBAs and

25  fund the VEBAs.  And the city is then out of the health care

1 | business for these retirees.  So --

2 |          THE COURT:  Did your exhibits only deal with

3 | governance and then it was left to the governing bodies once

4 | the VEBAs are established to define and detail all the

5 | benefits?

6 |          MR. ELLMAN:  I believe that the VEBA governance

7 | provides substantial flexibility on how they utilize the money

8 | they had to provide the benefits.

9 |          THE COURT:  I -- I haven't looked at these exhibits.

10 |          MR. ELLMAN:  Yeah.

11 |          THE COURT:  So that's why I asked.

12 |          MR. ELLMAN:  I haven't looked at them in a long

13 | time, but I believe that's the case.

14 |          THE COURT:  All right.  So whatever terms these

15 | VEBAs had at the outset of the confirmation of the plan were

16 | governed by these -- what was in these exhibits.  And once

17 | they're established, the governing bodies take it from there,

18 | is that the idea?  Subject to the -- the city making their --

19 |          MR. ELLMAN:  The city's only obligation --

20 |          THE COURT:  -- contribution.

21 |          MR. ELLMAN:  Right, yes.  The city's only obligation

22 | is to fund them the one time with the B notes.  And then the

23 | benefit economically to the city obviously is that they no

24 | longer have this group of retirees on their -- on their roles

25 | for health care.

1      And it does say here --

2           THE COURT:  And the amount of -- excuse me, the --

3  I'm sorry, the amount of the --

4           MR. ELLMAN:  I was just going to say it does say in

5  here I think that looking at the Detroit and police fire VEBA

6  section on Page 23 it says, the board of trustees will be

7  responsible for among other things, management of property

8  held by the Detroit and police fire VEBA, administration of

9  the Detroit police and fire VEBA and determination of a level

10 and distribution of benefits to the beneficiaries.  And that's

11 in the second or third sentence in Section B on Page 23.

12          THE COURT:  Yes, okay, I see that.

13          MR. ELLMAN:  So I mean I think it really comes down

14 to what the trustees decide to do with those with the funding

15 they have.

16          THE COURT:  And then with respect to the Detroit

17 police and fire VEBAs specifically, there's this next

18 paragraph on Page 43 that says on the effective date, the city

19 shall distribute to that VEBA new B notes.

20          MR. ELLMAN:  Uh-huh, correct.

21          THE COURT:  In the aggregate principal amount of

22 232,000,000.  And then also it also refers to the additional

23 distribution set forth in the other section.  That's the

24 excess B notes.

25          MR. ELLMAN:  That's the excess B notes which were --

1              THE COURT:  Yeah.

2              MR. ELLMAN:  -- put aside for the COPS holders that

3    when the settlement of the COPS happened they were

4    re-distributed to other parties including in this case the

5    VEBAs.

6              THE COURT:  Okay.  So the city's obligation under

7    the confirmed plan with respect to the Detroit police and fire

8    VEBA was to distribute these new B notes at one time

9    distribution and that's it and they're done.

10        Their obligation to -- to make this $140,000 a year for

11   five year stipend referred to arises under the collective

12   bargaining agreement not under the plan.

13             MR. ELLMAN:  That's correct.

14             THE COURT:  And is a -- is a separate obligation

15   that the city undertook.

16             MR. ELLMAN:  Separate obligation the city undertook.

17             THE COURT:  Post-petition.

18             MR. ELLMAN:  Post-petition and only as a result of

19   concessions by the union that would allow it to be paid for.

20             THE COURT:  All right.  So thank you for that

21   information.  Go ahead, what else did you want to say?

22             MR. ELLMAN:  Well, the only thing I was going to say

23   really was that I've already mentioned the fact that this was

24   not something that we could have funded or included in Class

25   12.  This was something new that was only paid for by virtue

1 of the concessions and in exchange for having the collective

2 bargaining arrangement.

3     So that would lead to the next point which is if for some

4 reason although we would say it's wrong, the Court would

5 conclude that well, this actually is a benefit that is part of

6 Class 12, it's an additional benefit to this group that

7 they're getting better treatment on their claim although again

8 we think it's not.

9     The remedy in our view couldn't be to then pay everyone

10 else a single benefit.  We don't have the funding to do it for

11 one thing.  But I think the remedy would have to be they don't

12 get the benefit of this negotiated bargain.  We're not

13 advocating to do that.  We think that this is an appropriate

14 contract and appropriate on its own terms.

15     But I think the relief that is being requested -- first

16 of all, it's enforcement of a term sheet that is no longer

17 operative.  There is nothing to enforce.

18     The plan doesn't include this.  And we're not in a

19 position to modify the plan to include this if the Court were

20 to find that we should have included this in the plan.  I

21 think the only remedy you could really legitimately impose

22 would be to take this away from the firefighters who

23 negotiated it, which we don't think is appropriate either,

24 but, you know, I don't think there's really anything else you

25 could do.  So I wanted to make that point.

1          THE COURT:  Well, is the argument by the

2   association, RDPFFA.

3          MR. ELLMAN:  Right.

4          THE COURT:  Seems to be though, the primary argument

5   seems to be the confirmed plan requires what they're seeking.

6   The -- Paragraph 69 and what they say Paragraph 69 of your

7   confirmed plan means, and -- and that means includes an

8   incorporation of the terms in Paragraph 8 to the term sheet

9   which means what they have argued it means.

10         MR. ELLMAN:  Right.  It's kind of circular to me,

11  but yes.

12         THE COURT:  There's a number of steps in the

13  argument.  But they are really -- seems to be arguing is that

14  this benefit they are seeking recognition of is -- is part of

15  the confirmed plan.  And -- and they're merely trying to

16  enforce the confirmed plan.

17         MR. ELLMAN:  Yeah.  But that -- we would say --

18         THE COURT:  And you've -- I -- I understand you've

19  disagreed on a number of points with that, but --

20         MR. ELLMAN:  Well, Paragraph 69 is very circular.

21  Because this term sheet they're trying to enforce is a term

22  sheet for what's going to go into the plan.  So the fact that

23  we're even talking about it seems a little out of place.

24      Once you have a contract it supercedes the term sheet.

25  But putting that aside, that term sheet was entered into

1  voluntarily by the parties.  It wasn't authorized by the

2  Court.  We didn't ask the Court to authorize the term sheet.

3  We didn't -- certainly weren't directed to enter into a term

4  sheet.

5      We were directed to -- to talk to the parties which we

6  did.  But -- but Paragraph 69 is about agreements that the

7  Court approved.  Now there were settlements the Court

8  approved.

9      The Court approved the SWAP settlement.  That was in a

10  Court order.  This is the kind of thing that Paragraph 69 is

11  addressing.  It's not addressing a term sheet of the plan.

12  The plan now governs that.

13      So our view is that the whole Paragraph 69 matters is --

14  is kind of irrelevant.  I think we -- we relegated that to a

15  footnote in our response because it really is very circular in

16  a lot of ways.

17      And if a term sheet for what's going to be in the plan

18  now governs, I don't -- I guess in lieu of the plan.  That

19  doesn't -- that doesn't really work.  And Paragraph 69 is

20  about agreements approved by the Court --

21          THE COURT:  Well, I think part of your argument is

22  that if it's not part of the plan, the confirmed plan --

23          MR. ELLMAN:  Uh-huh.

24          THE COURT:  -- if the term sheet is not part of the

25  confirmed plan, then it's superceded by the plan.

1        MR. ELLMAN:  That is part of our argument, yes.

2   There's no doubt about that.  And the lead in to the term

3   sheet says we're going to incorporate this stuff into the

4   plan.  And -- and the materials that were relevant, there were

5   a few things that really weren't relevant to go in the plan.

6   Like they said, they would support the plan.  We don't have to

7   put that in the plan.

8       But the substantive terms that were relevant went into

9   the plan.  And -- and this one provision is not again from

10  Paragraph 69 which I think is on Page 114 of the confirmation

11  order, it's not -- it's -- it's not a prior order of the Court

12  and it's not a document or agreement the city executed because

13  it was authorized to do so or directed by the Court.  The

14  Court never authorized us to do it, so it didn't direct us to

15  sign it.

16      So it's talking about something else in that paragraph

17  and has nothing to do with this term sheet in our view.  And

18  that would be our -- our point of view.

19        THE COURT:  Is part of your argument that Paragraph

20  8 of the term sheet was not incorporated into the plan

21  expressly because there was no need to do so.

22        MR. ELLMAN: That's --

23        THE COURT:  Because of the treatment of claim --

24  Classes 10 and 12 never got better for anyone.

25        MR. ELLMAN:  That's true.  And -- and -- and even if

1  they did get better, we would just change the treatment and

2  make it apply to everyone.

3          THE COURT:  Well, for -- yeah, for example --

4          MR. ELLMAN:  Because for example I mean what --

5  what --

6          THE COURT:  The excess notes for example.

7          MR. ELLMAN:  Right.

8          THE COURT:  They got better because of that.

9          MR. ELLMAN:  They all got it.

10          THE COURT:  But that was applied to everyone.

11          MR. ELLMAN:  It was applied to everyone.  What --

12  what this is entitled to say, I believe, is we're first and

13  we're agreeing to this.  But don't take this to mean that if

14  something -- if Class 12 is going to get better in some way,

15  we don't get that too because we agreed to something less.

16  And that's -- that's how -- that's how it should be and that's

17  fair.

18          THE COURT:  In other words if they could -- they

19  could be deemed -- they didn't want to be deemed to agree to

20  disparate and less favorable treatment.

21          MR. ELLMAN:  Right.  Because 1123 --

22          THE COURT:  In Class 12 --

23          MR. ELLMAN:  Exactly.

24          THE COURT:  -- by consent --

25          MR. ELLMAN:  1123(a)(4)

1          THE COURT:  By virtue of this agreement to something

2    that -- that would end up being better for everyone else in

3    the class.

4          MR. ELLMAN:  Exactly.  That's 1123(a)(4) says you

5    can agree to lesser treatment.  This says, we're not agreeing

6    to take a lesser treatment, so don't bind us to lesser

7    treatment.  We get exactly what Class 12 and Class 10 get

8    which is what they got.

9          And as we said we talked about it before.  That would be

10   some creditors, a small number of creditors who happen to also

11   be in Class 12 who got something else, but not on account of

12   their Class 12 claims, it was about a CBA, a new benefit that

13   was negotiated and paid for by the union.  So that's a totally

14   separate thing.

15         I would probably only add maybe one more point unless the

16   Court has questions.  I have some other points, but they're

17   all kind of talked about in our papers.

18         But the one thing I would say, and I'm not saying this

19   because I want this to happen, but we -- we think -- I

20   probably should mention it though.  We think that the law and

21   the documents that are before the Court are sufficient to rule

22   in the city's favor.  We think we win.

23         We think it's -- from our perspective shouldn't be

24   hopefully a close case.  But as counsel for the movant

25   mentioned there are a number of facts that we could present

1  about the intent of the parties, and the nature of some of

2  these benefits and the like that would support our argument.

3  We don't think they're needed.

4      But if the Court felt that they were needed, the problem

5  we have is that they're all done in mediation.  So they're all

6  confidential.  So we did put them in our papers and if the

7  Court felt that it needed some factual grounding for some of

8  the statements beyond what is in the papers and what we've --

9  we've represented, we, I guess, would like an opportunity to

10 do that.

11     Again I'm not suggesting we think that's needed, but if

12 the Court thinks it's needed, we would have to find a way to

13 present it.  Because there are a number of things we did not

14 say in our papers because they happened in mediation as the

15 Court is aware and there's a mediation confidentiality order.

16     And so we tried to say as much as we felt like we could

17 without getting close to or crossing the line of things that

18 are confidential.  So I just wanted to put that out there in

19 case the Court feels like, you know, I wish I -- you know, I

20 wish I could have the answer to what the movants asked about

21 what happened in mediation.  Or I wish I knew more about this

22 or that.

23     But the genesis of the term sheet we're talking about in

24 Paragraph 8, I don't think it's unclear on its face but if

25 there's ambiguity and the Court wanted say parol evidence, we

1  would just have to figure out a mechanism because it's very

2  difficult.  I mean that confidentiality theoretically would

3  bind the Court as well.

4      So we couldn't even just hand you materials without some

5  protocol of the parties and the Court agreeing to it.  Again,

6  I'm not suggesting we need to do that, or that we wanted to do

7  that.  I just want to put that out there in case the Court,

8  Your Honor, feels like you would like some additional facts.

9  That's going to be a complicating factor if we end up going

10  there.

11         THE COURT:  All right.

12         MR. ELLMAN:  And that's all I have, Your Honor.

13         THE COURT:  All right.  Thank you.

14         MR. ELLMAN:  Thank you.

15         THE COURT:  Mr. Plecha, did you want to reply then?

16         MR. PLECHA:  Thank you, Your Honor.  Again, I'll --

17  I'll be brief.  The pointed questions of Your Honor basically

18  boiled this down to the -- to the essence.

19      I would like to say that in no way is this a request for

20  a windfall.  It's trying to protect disabled, permanently

21  disabled police retirees to get them closer to where they were

22  before based on Class 12 treatment.  Had there been no Class

23  12 treatment, there wouldn't have been a need for this new

24  alleged benefit.

25      If it was in the context of the bankruptcy and from my

1 knowledge the first time that the DFFA had actually bargained

2 for a benefit for retirees.  So this is an unprecedented

3 situation to my knowledge.

4     I think for the reasons stated in our papers the RDPFFA

5 motion should be granted.  The city should be required to

6 provide the same benefit to the retired police personnel that

7 are permanently and totally disabled.

8     One point of clarification as it relates to the VEBA.

9 There is one city trustee appointed to the police and fire

10 VEBA outside of just the B note.  But that is the other role

11 that the city plays in appointing one person to the VEBA

12 board.

13     Also it's my understanding that the DFFA was the last

14 public safety union to enter into its CBA.  As to where those

15 concessions came from and if it was purely from the projected

16 budget for DFFA.  Again, the city would know that.

17     And as brother counsel opined on, there may be a

18 mechanism to provide that information to the Court which would

19 -- we would be in favor of.  But for the reasons stated today

20 on the record and our papers, we agree that -- or we believe

21 that the Court should grant our motion.

22         THE COURT:  All right.  Well, thank you.

23         MR. PLECHA:  Thank you, Your Honor.

24         MR. ELLMAN:  If I could just say one thing, Your

25 Honor.  One of my words he mischaracterized.  I'm not

1   suggesting -- we were talking about a group of people in this

2   hearing were the, you know, the disabled retirees.  I'm not

3   suggesting they're getting a windfall like they're really

4   coming out of this great, that's not my point.

5       My point is that the -- the RDPFFA is asking for an

6   additional benefit.  At this point it's unfunded.  We've been

7   able to do this in the CBA negotiation with the firefighters

8   because there was a way to fund it through a concession and

9   there was a ongoing benefit which as I mentioned before was

10  the basis for doing it and their only justification for doing

11  it.

12      So I -- I just don't want it to sound like we're saying

13  gee, these retirees are coming out and getting a windfall.

14  That's not the point.  The point is it's in addition beyond

15  those that's been negotiated and paid for and we don't think

16  it's appropriate.  That's all.

17          THE COURT:  Well, characterization, your arguments

18  about windfall or no windfall really in my view in the end

19  probably aren't going to matter much because the issue here --

20  the issues here really turn primarily on what does the

21  confirmed plan mean.

22          MR. ELLMAN:  Right.

23          THE COURT:  And include and what does it not mean

24  and not include.  And it, you know, it -- if somebody is

25  entitled to a benefit under the confirmed plan, then -- then

1  they are.  If they aren't, they aren't.  So --

2            MR. ELLMAN:  Fair enough.

3            THE COURT:  That -- that's really the -- at least

4  the -- the starting place for me to look at -- at this motion,

5  the way I look at this motion and sort of proceed from there.

6  And so thank you both.

7            MR. ELLMAN:  Thank you.

8            THE COURT:  For the -- the oral argument.  It's

9  certainly helpful to have that in addition to what you've

10 argued in your papers.

11     I do want to take a bit more time to think about these

12 issues and arguments, both the written and the oral arguments

13 and the relevant documents in the record before ruling on this

14 motion.  So I'm not going to rule at this moment.

15     What I have in mind is, and this -- I may change my mind

16 about this and schedule this for a bench opinion, but as of

17 now my intention is to prepare and file a hopefully fairly

18 short written opinion and -- and related order as my ruling on

19 this motion rather than giving a bench opinion and issuing an

20 order.

21     And I expect to do that within 30 days of today.  I hope

22 sooner than that, but within 30 days.  And so for the time

23 being then this motion is taken under advisement.  Thank you

24 all.

25            MR. ELLMAN:  Thank you, Your Honor.

1          THE CLERK:  All rise.

2      (Court Adjourned at 3:44 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 5-30-15
    Jamie Laskaska

12

13

14

15

16

17

18

19

20

21

22

23

24

25