UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,      .      Docket No. 13-53846
          MICHIGAN,          .
                             .      Detroit, Michigan
                             .      May 27, 2015
              Debtor.        .      1:38 p.m.
. . . . . . . . . . . . . . .

HEARING RE. THIRTEENTH OMNIBUS OBJECTION TO CERTAIN CLAIMS,
      FIFTEENTH OMNIBUS OBJECTION TO CERTAIN CLAIMS,
      SIXTEENTH OMNIBUS OBJECTION TO CERTAIN CLAIMS,
         SEVENTEENTH OBJECTION TO CERTAIN CLAIMS,
STATUS CONFERENCE ON (DOCKET #4874) OBJECTION TO CLAIM OF
   COALITION OF DETROIT UNIONS, STATUS CONFERENCE ON
(DOCKET #4876) OBJECTION TO CLAIM OF MICHIGAN AFSCME
     COUNCIL 25 AND ITS AFFILIATED DETROIT LOCAL
        BEFORE THE HONORABLE THOMAS J. TUCKER
         UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Foley & Lardner, LLP
                      By:  TAMAR N. DOLCOURT
                           LEAH IMBROGNO
                      500 Woodward Avenue, Suite 2700
                      Detroit, MI  48226
                      (313) 234-7117

                      Miller, Canfield, Paddock & Stone, PLC
                      By:  MARC SWANSON
                           JOHN WILLEMS
                      150 West Jefferson, Suite 2500
                      Detroit, MI  48226
                      (313) 496-7591

                      City of Detroit
                      By:  CHARLES RAIMI
                      2 Woodward Avenue
                      CAYMAC, Suite 500
                      Detroit, MI  48226
                      (313) 237-5037

```
For Detroit Police    Erman, Teicher, Zucker & Freedman, PC
Lieutenants and       By:  BARBARA PATEK
Sergeants             400 Galleria Officentre, Suite 444
Association:          Southfield, MI  48034
                      (248) 827-4106

                      PETER P. SUDNICK, PC
                      By:  PETER SUDNICK
                      2555 Crooks Road, Suite 150
                      Troy, MI  48084
                      (248) 643-8533

For AFSCME:           Miller Cohen, PLC
                      By:  RICHARD MACK
                      600 West Lafayette Blvd., 4th Floor
                      Detroit, MI  48226
                      (313) 964-4454

Claimants:            DENNIS TAUBITZ
                      IRMA INDUSTRIUS
                      PAMELA BOOKER
                      MARIO ROSS
                      RICHARD HALL
                      GRETCHEN SMITH
                      DEBRA GILBEAUX
                      LAURENCE WHITE

Court Recorder:       Jamie Laskaska
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1     THE CLERK:  This Court is now in session.  The

2  Honorable Thomas J. Tucker is presiding.  You may be seated.

3  The Court calls the case of the City of Detroit, Michigan,

4  Case Number 13-53846.

5     THE COURT:  All right.  Good afternoon to everyone.

6  Let's have entries of appearance starting with those in the

7  courtroom and starting there with the debtor, city.

8     MR. IMBROGNO:  Your Honor, Leah Imbrogno from Foley

9  & Lardner for the City of Detroit.

10     MS. DOLCOURT:  Good afternoon, your Honor.  Tamar

11  Dolcourt of Foley & Lardner on behalf of the City of Detroit.

12     MR. SWANSON:  Good afternoon, your Honor.  Marc --

13     THE COURT:  You got to get to a microphone.  The

14  audio won't pick you up otherwise.

15     MR. SWANSON:  Good afternoon, your Honor.  Marc

16  Swanson on behalf of the City of Detroit.

17     MR. RAIMI:  Charles Raimi, deputy corporation

18  counsel, for the City of Detroit.

19     MS. PATEK:  Good afternoon, your Honor.  Barbara

20  Patek on behalf of the Detroit Police Lieutenants and

21  Sergeants Association.

22     MR. SUDNICK:  Good afternoon, your Honor.  Peter

23  Sudnick, co-counsel for Lieutenants and Sergeants

24  Association.

25     MR. WILLEMS:  Good afternoon, your Honor.  John

1    Willems on behalf of the City of Detroit.

2              MR. MACK:  Good afternoon, Judge.  Richard Mack with

3    Michigan AFSCME Council 25 and the Coalition of Detroit

4    Unions.

5              MS. GILBEAUX:  Good afternoon, your Honor.  I'm a

6    claimant.  My name is Debra Gilbeaux.  I work with the City

7    of Detroit Law Department.

8              THE COURT:  Have all attorneys that were in the

9    courtroom entered their appearance then?  All right.  And on

10   the telephone, for the record, we'll have entries of

11   appearance by -- we have at least one person who I'm told is

12   participating rather than simply listening today, and anyone

13   who is participating and on the phone I'd like to have you

14   identify yourself and enter your appearance, please.  Go

15   ahead.

16             MR. TAUBITZ:  Dennis Taubitz, a creditor.

17             MS. INDUSTRIUS:  Irma Industrius, a creditor.

18             THE COURT:  You're both breaking up very badly.  You

19   have to say it again, please.

20             MR. TAUBITZ:  Dennis Taubitz, a creditor.

21             MS. INDUSTRIUS:  And Irma Industrius, a creditor in

22   the case.

23             THE COURT:  All right.  Are either of you on a cell

24   phone?

25             MR. TAUBITZ:  Yes.

1          THE COURT:  That's not going to work well.  Can you

2    get to the land line?

3          MR. TAUBITZ:  No.  Unfortunately, we cannot.

4          THE COURT:  Well, we have -- we may have some

5    trouble with you hearing me or me hearing you.  We'll do the

6    best we can.  For future reference, don't phone in on a cell

7    phone.  All right?  Yes?  Did you hear me?

8          MR. TAUBITZ:  Yes.  Thank you.

9          THE COURT:  All right.  Anyone else on the

10   telephone?  All right.  Well, good afternoon to everyone.  We

11   have a number of matters scheduled for hearing today.  Unless

12   the city and the other parties have agreed on something

13   different, we'll just go through them in the order they

14   appear on the docket, so the first matter would be the city's

15   fifteenth omnibus objection to claims.  Ms. Imbrogno.

16         MR. IMBROGNO:  Yes, your Honor.  Again, Leah

17   Imbrogno here from Foley & Lardner, counsel for City of

18   Detroit, here with regard to the claims objections.  We will

19   begin with the fifteenth omnibus objection, which was as to

20   certain no basis claims.

21         Now, the first response that we received that I

22   would like to address was filed by a Ms. Constance Phillips.

23   That is Docket Number 9860.  And the reason why I'd like to

24   address this first is because Ms. Phillips -- we believe Ms.

25   Phillips is a pensioner with the city who filed Claim Number

1    3471.  Claim Number 3471 is not on omnibus objection fifteen,

2    nor is it on any of the omnibus objections, so that claim is

3    not affected by the omnibus objection.  As a result, the city

4    has not filed a response -- or excuse me -- a reply to that

5    response, and we believe that the granting of the omnibus

6    objections will not affect Ms. Phillips' claim.

7         THE COURT:  All right.  Just for the record, is

8    Constance Phillips present?  I hear nothing.  I did see that

9    Ms. Phillips filed a response to each of the omnibus claim

10   objections that are scheduled for hearing today, fifteen,

11   sixteen, and seventeen, the gist of which was she said

12   basically in case my claim is covered by this objection, this

13   claim objection, you know, I reiterate my claim basically.  I

14   agree.  From my review, I agree with you that none of

15   these -- none of these omnibus objections to claim that are

16   scheduled -- that are being heard today, fifteenth,

17   sixteenth, or seventeenth, object to any claim of Constance

18   Phillips, so her objection or response was unnecessary and is

19   not responsive, and so we'll move on.  Go on.

20        MR. IMBROGNO:  The second response that we received

21   was from Ms. Pamela Booker, and this was actually a response

22   that was hand-delivered to our offices at Foley, and -- but

23   we did notice it was never docketed with the Court, so we are

24   unsure whether it was filed, but we decided to file a reply

25   in further support of our objection in the abundance of

1   caution.

2         THE COURT:  Well, after I read that in your

3   response, your reply of May 21, I took a look, too, and I

4   didn't find any --

5         MR. IMBROGNO:  Okay.

6         THE COURT:  -- the filing of any response by Pamela

7   Booker to the city's fifteenth omnibus claim objection, so it

8   was not filed.

9         MS. BOOKER:  I have this, your Honor.  I'm Pamela

10   Booker.

11         THE COURT:  Would you come to the microphone --

12         MS. BOOKER:  Yes.

13         THE COURT:  -- right there?  You are who again?

14         MS. BOOKER:  Pamela Booker.

15         THE COURT:  Ms. Booker, why didn't you file anything

16   with the Court?

17         MS. BOOKER:  But I did, and I have it showing

18   received.

19         THE COURT:  Well, would you hand that up?  Let me

20   take a look.

21         MS. BOOKER:  Okay.

22         THE COURT:  Ms. Booker, I'm looking at what you've

23   handed up.  I'll say for the record it does appear to bear

24   the file stamp of our clerk of court here in the Bankruptcy

25   Court, and it shows a filing date of May 19, 2015, at 10:19

1    a.m.  There's no trace or indication that this was put on the

2    docket, as it should have been, so it appears you did file

3    your response --

4              MS. BOOKER:  Thank you.

5              THE COURT:  -- and it doesn't appear on the docket

6    for some reason.  Now, hold on one second here.  I'll take a

7    quick look at your response since I haven't seen it yet.

8              MS. BOOKER:  Okay.  Thank you.

9              THE COURT:  And, by the way, I'd like to have the

10   ability to copy this so that we can get this scanned into our

11   system and docketed as being filed on May 19.  I do want this

12   in the record since you did file it with the clerk.

13             MS. BOOKER:  Thank you, your Honor.

14             THE COURT:  Hold on.  All right.  Thank you.  I've

15   had a chance to review your response filed May 19.  Do you

16   need this back for the hearing?

17             MS. BOOKER:  Yes, my copy, um-hmm.

18             THE COURT:  Okay.  Let me hand this back to you.  Do

19   you have an extra copy of this with you?

20             MS. BOOKER:  No.

21             THE COURT:  All right.  Well --

22             MR. IMBROGNO:  Your Honor, I have a copy of what we

23   received during our hand-delivery, but --

24             THE COURT:  See if it's the same as the original

25   she's holding.

1          MR. IMBROGNO:  -- it does not have the file stamp.

2          THE COURT:  Do you have an extra you can give to Ms.

3   Booker to review --

4          MR. IMBROGNO:  Absolutely.

5          THE COURT:  -- and reference during the hearing?

6          MR. IMBROGNO:  May I approach?

7          THE COURT:  With?

8          MR. IMBROGNO:  It's a copy of Ms. Booker's response.

9          THE COURT:  Yes.  So is this an extra that we can

10  use to --

11         MR. IMBROGNO:  Yes.

12         THE COURT:  -- file stamp and file?

13         MR. IMBROGNO:  Yes, your Honor.

14         THE COURT:  All right.  Thank you.  All right.  Ms.

15  Imbrogno, go ahead.  What do you want to say about this?

16         MR. IMBROGNO:  Ms. Booker filed Claim Number 2177 on

17  February 20th of 2014.  She alleged property damage from a

18  fallen tree.  Ms. Booker's claim was placed onto the

19  fifteenth omnibus objection because the city did not see any

20  basis for liability on the face of the claim.  There were

21  some tax and mortgage documents attached, and there was no

22  explanation, and so the city thought that Ms. Booker was

23  requesting payment for taxes or mortgage-related issues,

24  which do not fall under the claims administration process.

25  On May 19th Ms. Booker filed her response and provided some

1   additional information about her claim where she alleged that

2   the city actually owns the property on which the tree that

3   allegedly damaged her home was located.  Even if Ms. Booker

4   is correct that a tree from city-owned property damaged her

5   own property, the city would be immune from liability on that

6   basis.  There's no exception to governmental immunity that

7   applies to property damage for a fallen tree, and Ms. Booker

8   has not claimed that any exception to governmental immunity

9   would apply in this instance, and, as such, we believed that

10  the fifteenth omnibus objection as to Ms. Booker's claim

11  should be sustained.

12          THE COURT:  So the authority that grants the

13  immunity to begin with is what?

14          MR. IMBROGNO:  MCL 691.1407.

15          THE COURT:  Okay.  So you said .1701 in your brief,

16  but it's 1407.

17          MR. IMBROGNO:  It is.  My apologies, your Honor, for

18  the typo.

19          THE COURT:  Okay.  Hold on a second.  You're

20  referring to 691.1407, sub 1, I guess; right?

21          MR. IMBROGNO:  That's correct, government's immunity

22  from tort liability.

23          THE COURT:  Government's immunity from tort

24  liability to governmental agencies engaged in the exercise of

25  discharge of a governmental function.  What does

1  "governmental function" mean in the context of this claim?

2          MR. IMBROGNO:  I think in the context of this claim,

3  it would actually be the alleged inaction in not removing the

4  tree.  Ms. Booker claims that the city was responsible for

5  removing the tree, and it did not do so.

6          THE COURT:  She says in her response filed May 19

7  that the city is the owner of the property where this tree

8  was located, I guess, next to hers.

9          MR. IMBROGNO:  That's correct.

10         THE COURT:  She says because it was forfeited to the

11  city for delinquent taxes.  Is all that correct?

12         MR. IMBROGNO:  Your Honor, I think that when we

13  filed our response, we thought that no matter what she had

14  alleged the city would be governmentally immune, so we didn't

15  actually research the substance of the claim, but we believe

16  that either way, whether the city does own the tree or does

17  not own the tree, it would not be liable to Ms. Booker for

18  the alleged property damage.

19         THE COURT:  Well, I did see -- I know you filed

20  several responses last Thursday to various claims where you

21  argue immunity.  Do any of the cases -- or do any of the

22  sections that you cited define what "governmental function"

23  means?

24         MR. IMBROGNO:  They do not, your Honor.

25         THE COURT:  So is there a distinction under Michigan

1  law between governmental functions and proprietary functions

2  exercised by a municipality?

3          MR. IMBROGNO:  Your Honor, I am not sure, but I'm

4  happy to brief that matter for you if that's something that

5  you would be interested in reading.

6          THE COURT:  Well, all right.  Anything else you'd

7  like to say then?

8          MR. IMBROGNO:  No, your Honor.

9          THE COURT:  Ms. Booker, what would you like to say

10  about this?

11          MS. BOOKER:  Just basically that I felt that the

12  city should pay for the damages to my property.  I don't know

13  what else to say.  I thought it was clear-cut that they owned

14  the property and that they would take care of it.

15          THE COURT:  What was the city doing with the

16  property?

17          MS. BOOKER:  It's just sitting there vacant and

18  open.

19          THE COURT:  Is this a residence, or what is this

20  property?

21          MS. BOOKER:  It's a residence.

22          THE COURT:  So it's a --

23          MS. BOOKER:  And they told me it was slated for

24  development.  That's all I know.

25          THE COURT:  But it was a vacant house?

1    MS. BOOKER:  Yes.

2    THE COURT:  Single-family house?

3    MS. BOOKER:  It's a vacant house.

4    THE COURT:  Tree was on the property that's next to

5  yours --

6    MS. BOOKER:  Yes.

7    THE COURT:  -- your property?  Tree fell onto your

8  property.

9    MS. BOOKER:  Yes, sir.

10    THE COURT:  Caused damage.  That's your claim

11  basically?

12    MS. BOOKER:  Yes.

13    THE COURT:  All right.  Anything else you'd like to

14  say, Ms. Booker?

15    MS. BOOKER:  No, your Honor.

16    THE COURT:  All right.  Well, the city filed a reply

17  in response to Ms. Booker's response to the claim objection

18  on May 21, Thursday of last week, in which they argued that

19  they have governmental immunity.  The statutory citation, as

20  provided in the hearing today, Michigan Compiled Laws,

21  Section 691.1407, sub 1, provides as a general rule that "a

22  governmental agency is immune from tort liability if the

23  governmental agency is engaged in the exercise or discharge

24  of a governmental function," unquote.  As counsel for the

25  city has acknowledged, however, none of the statutes, of

1  which there are several cited in the city's reply, nor the
2  cases apparently discuss what governmental function means and
3  how that phrase is -- applies or does not apply or may not
4  apply or does apply in the context that we have here with Ms.
5  Booker's claim.  The city also says it has not researched the
6  facts of the claim, but what we know is that the claim
7  asserts that the city owned a vacant property, a residential
8  property, and while the city owned that property, the --
9  allegedly a tree on the property fell and caused damage to
10 Ms. Booker's property.  The city may well be immune in this
11 instance, but I can't tell from the current record nor has
12 the city demonstrated, in my view, yet, at least, that
13 Section 694 -- 691.1407, sub 1, applies in this particular
14 situation.  I will give the city an opportunity to file a
15 brief as to whether -- why the city contends specifically the
16 governmental function concept of the immunity statute that
17 the city has cited applies in this situation that we have
18 with Ms. Booker's claim.  Ms. Imbrogno, how much time do you
19 want to file such a brief?
20       MR. IMBROGNO:  Your Honor, I think a week would be
21 sufficient.
22       THE COURT:  One week, you say?  All right.  So
23 that'll be June 3rd, 2015.  Ms. Booker, you don't have an
24 attorney representing you in this case, and that's fine.
25       MS. BOOKER:  No.

1          THE COURT:  You can represent yourself.  You have

2     every right to do that, but obviously as a pro se party, a

3     person not represented by an attorney, you have the same

4     rights and responsibilities as anyone who is represented by

5     an attorney in the case --

6          MS. BOOKER:  Um-hmm.

7          THE COURT:  -- and you're subject to the same law

8     and rules as everyone else.  I'm going to consider the city's

9     brief that they file but no later than June 3rd.  I will give

10    you a chance to file a written response to that brief if you

11    want to.  It's optional, but any response that you file will

12    need to be filed no later than two weeks after the city's

13    brief, so that's June 17.

14         MS. BOOKER:  Okay.

15         THE COURT:  You don't have to file a response, but

16    if you're going to file a written response to the city's

17    brief, you need to file it no later than June 17.

18         MS. BOOKER:  Okay.

19         THE COURT:  And we'll have a further hearing on this

20    claim of the fifteenth omnibus objection to claim in our July

21    objection to claim hearing date.  That's July -- is it 22,

22    Ms. Imbrogno?

23         MR. IMBROGNO:  That's correct, your Honor.

24         THE COURT:  Do you recall?  Yeah.  Hold on.  All

25    right.  We'll make it the further hearing then July 22 at

1    1:30.

2            MS. BOOKER:  Thank you, your Honor.

3            THE COURT:  So, Ms. Imbrogno, I forget.  Did you say

4    this is a copy we can use for filing purposes?

5            MR. IMBROGNO:  That's correct, your Honor.

6            THE COURT:  All right.  So, Ms. Booker, we'll take

7    the copy here of your response filed May 19.  We'll file it

8    in the case so it'll be in the record, and it'll have a file

9    date of May 19 on our Court's docket.

10           MS. BOOKER:  Okay.  So will I receive a copy of the

11   brief?

12           THE COURT:  Yes.  The City will --

13           MR. IMBROGNO:  Yes.

14           THE COURT:  -- mail you a copy of the brief --

15           MS. BOOKER:  Okay.

16           THE COURT:  -- that they file, so then you'll have

17   an opportunity to respond to it.

18           MS. BOOKER:  Um-hmm.

19           THE COURT:  All right.  Thank you --

20           MS. BOOKER:  Thank you.

21           THE COURT:  -- Ms. Booker.  So what else about the

22   fifteenth omnibus objection then, Ms. Imbrogno?

23           MR. IMBROGNO:  The next response that was filed was

24   by a Mr. Mario Ross, and that was with regard to Claim Number

25   3087 in the amount of $8,500 alleging a basis of sewerage

1    services performed. Mr. Ross did not attach any supporting

2    documentation or any -- or nor did he state any basis on

3    which the city was liable. Mr. Ross was added to the

4    fifteenth omnibus objection because he did not provide any

5    such basis for the city's liability.

6          On May 20th Mr. Ross filed a response where he

7    provided further information about his claim. Specifically,

8    he claims that his property was damaged by the Detroit Water

9    and Sewer Department. Mr. Ross did not provide any

10    supporting documentation with his response either, so, as a

11    result, we believe that Mr. Ross' claim should be disallowed

12    and expunged on two grounds. First, Mr. Ross did not provide

13    any supporting documentation, as is required by Rule 3001,

14    and, second, again, we believe the city is immune from

15    liability for any sewerage overflow or backup of a sewer

16    system unless it amounts to a sewer disposal system event.

17    This is basically where there's a known defect in the sewer

18    system. The city -- Mr. Ross has not provided the city with

19    any supporting documentation arguing that it is a sewer

20    disposal system event nor does he say there was any default

21    or defect in the sewer system. Further, Mr. Ross has not

22    complied with the notice requirements that are set forth in

23    MCL 691.1419. This requires the claimant to provide notice

24    to the city of any sewer damages within 45 days of those

25    damages, so for all of these reasons, we believe that Mr.

1  Ross' claim should be disallowed and expunged and that the
2  fifteenth omnibus as to his claim should be sustained.
3          THE COURT:  Mr. Ross -- for the record, is Mario
4  Ross present or is there anyone here on behalf of Mario Ross?
5  Mr. Ross, come forward, please, if you want to be heard.
6  While he's coming forward, Ms. Imbrogno, the immunity statute
7  you're citing here is a little different than for the last
8  claim.  It's Michigan Compiled Laws, Section 691.1417, sub 2,
9  I believe; right?
10         MR. IMBROGNO:  That's correct, your Honor.  It is a
11  different basis.
12         THE COURT:  Which deals specifically with
13  governmental immunity for tort liability for the overflow or
14  backup of a sewage disposal system with a specific exception
15  described in the statute that you've been discussing; right?
16         MR. IMBROGNO:  That's correct.
17         THE COURT:  All right.  So, Mr. Ross, what would you
18  like to say about your claim and the city's objection to your
19  claim and the city's arguments here?
20         MR. ROSS:  I believe I had documented it because I
21  had Roto-Rooter come out, you know, inspect my sewer system
22  and they told me, you know, that they can't do anything with
23  it, that it's the city's problem in some drain they have out
24  there.  I thought I had posted that report, but I don't know
25  what happened to it.  I don't have any --

1           THE COURT:  You got to speak up.  I can't hear you

2    very well.

3           MR. ROSS:  Well, I don't have documents with me, but

4    I thought I had posted their inspection with my claim, so --

5           THE COURT:  Well, you have not filed any

6    documentation supporting your claim --

7           MR. ROSS:  Okay.

8           THE COURT:  -- either with your proof of claim or

9    with your May 20th response to the city's objection.  What

10   else do you want to say about this claim?

11          MR. ROSS:  I'm just -- because I had got a lot of

12   property damage, I was just trying to get it repaired and

13   everything because their sewer even backs up all my

14   neighbor's stuff, and they're having complaints.

15          THE COURT:  You heard -- I hope you heard when you

16   were sitting in the back of the courtroom Ms. Imbrogno's

17   arguments here on behalf of the city today regarding

18   immunity.  Did you receive a copy of the city's reply to your

19   response that the city filed on May 21?

20          MR. ROSS:  Yes.

21          THE COURT:  So you read what that said about

22   immunity; right?

23          MR. ROSS:  About immunity?

24          THE COURT:  About the governmental immunity argument

25   the city is making.  You read what that said about that?

1          MR. ROSS:  Yes, I read.

2          THE COURT:  Do you want to respond any further to

3    that argument?

4          MR. ROSS:  Not really.  Not really, no, no.

5          THE COURT:  All right.  Anything else about your

6    claim you want to say, Mr. Ross?

7          MR. ROSS:  I don't have anything else to say.

8          THE COURT:  All right.  Well, thank you.  The city's

9    objection to the claim of Mr. Ross, which is part of the

10   fifteenth omnibus objection, must be sustained.  First, Mr.

11   Ross has not provided documentation in support of his claim

12   which is sufficient to establish that the -- or avoid the

13   immunity defense argued by the city under Michigan Compiled

14   Laws, Section 691.1417, and, therefore, has not properly

15   supported his claim either in the original proof of claim

16   that he filed in this case or in the response that he filed

17   on May 20, 2015, at Docket 9850 to the city's objection to

18   the claim.  The city has demonstrated that it has immunity

19   from liability for the claim asserted by Mr. Ross, which is

20   property damage caused by the City of Detroit sewerage

21   company, as he puts it, in his May 20th response.  Under

22   Michigan Compiled Laws, Section 691.1417, sub 2, the city

23   is -- as a governmental agency, is immune from liability --

24   tort liability, which is what we're talking about in this

25   claim, for the overflow or backup of a sewage disposal system

1 | unless certain specified requirements -- numerous
2 | requirements are met that are set forth in the later
3 | subsections of that statute.  Those requirements are not met
4 | nor does the proof of claim or other document filed by Mr.
5 | Ross allege that any of those requirements are met, including
6 | the notice requirement of Section 691.1417, subparts 3 and 4,
7 | and so the -- based on immunity under the statute, the claim
8 | must be disallowed, and the city's objection to the claim is
9 | sustained.
10 |        MR. ROSS:  Okay.
11 |        THE COURT:  All right.  So, Ms. Imbrogno, that's the
12 | fifteenth omnibus?
13 |        MR. IMBROGNO:  That's correct, your Honor.
14 |        THE COURT:  I did see there was a certificate of no
15 | response filed this morning --
16 |        MR. IMBROGNO:  Yes, your Honor.
17 |        THE COURT:  -- regarding this objection to claim.  I
18 | think there was one filed regarding the fifteenth, sixteenth,
19 | and seventeen.  They were all filed this morning.  I haven't
20 | had a chance to look at those or look at the proposed orders
21 | that you submitted this morning.  I was on the bench all
22 | morning -- or most of the morning, so, you know, when you
23 | wait until the morning of Wednesday, I'm usually on the
24 | bench, and I don't have time to -- I don't have the ability
25 | to look at anything that you submit that day, so I will

1    certainly be happy to look at the -- review the certificate

2    of no response and the proposed order.  The proposed order,

3    however, now needs to include disallowance of Mr. Ross'

4    claim, and I assume the order you submitted didn't do that.

5           MR. IMBROGNO:  That's correct.  We had it carved

6    out.

7           THE COURT:  All right.  Well, let's do this just for

8    simplicity.  I will take the order you submitted this

9    morning, and I will use that to -- for purposes of ruling on

10   the claims for which the no response was filed by the

11   creditors to the fifteenth objection.  I'll prepare and enter

12   an order in addition to that that disallows Mr. Ross' claim

13   and which sets out the further proceedings that we're going

14   to have on the claim of Pamela Booker as we discussed

15   earlier, so I'll prepare and enter that order.

16          MR. IMBROGNO:  Okay.

17          THE COURT:  All right.  That's the fifteenth omnibus

18   objection.  We're going to the sixteenth now?

19          MR. IMBROGNO:  Yes, your Honor.  The sixteenth

20   omnibus objection actually only has the one response filed,

21   and that was the Constance Phillips response that we

22   discussed earlier, so not only was that late filed but also

23   Ms. Phillips' claim is not affected by the sixteenth omnibus

24   objection, so, therefore, we believe that this claim -- or

25   I'm sorry -- the sixteenth omnibus objection should be

1   otherwise sustained.

2           THE COURT:  All right.  As I said earlier, I agree

3   that the sixteenth objection does not object to any claim

4   filed by Constance Phillips, so there has been no timely

5   response by anyone to that sixteenth omnibus objection.  I'll

6   review the certificate of no response you filed this morning

7   and the order and presumably will get that entered or perhaps

8   with revisions, nonsubstantive revisions.  All right.  Thank

9   you.

10          MR. IMBROGNO:  All right.  Your Honor, if it's okay

11  with you, I'm hoping that we can actually go to the

12  thirteenth omnibus objection at this time, and then I will

13  turn it over to Ms. Dolcourt on the seventeenth omnibus

14  objection.  It'll limit some shuffling.

15          THE COURT:  That's fine.

16          MR. IMBROGNO:  Okay.

17          THE COURT:  All right.  Now, there we're talking

18  about the only claim left, which is claims of Richard Hall;

19  right?

20          MR. IMBROGNO:  That's correct, your Honor.

21          THE COURT:  Two claims.  Two claims filed by Richard

22  Hall.

23          MR. IMBROGNO:  Yes.  And I believe Mr. Hall is here

24  today.

25          THE COURT:  Is Richard Hall present?  Mr. Hall, come

1    on up.  All right.  Just for the record, you are?

2           MR. HALL:  Richard Hall.

3           THE COURT:  All right.  Mr. Hall, you're the

4    creditor with respect to these claims, and we'll hear the

5    city's objections to your two claims now.  I did review the

6    debtor's reply.  They filed -- the city filed -- I'm sorry.

7    The city filed one reply with respect to each claim, so two

8    replies.  They were filed May 21.  I assume you got those in

9    the mail?

10          MR. HALL:  I didn't get them in the mail yet.

11          THE COURT:  You did not?

12          MR. IMBROGNO:  Your Honor, if I may, I actually

13   spoke to Mr. Hall yesterday morning on the telephone.  He

14   told me that he did not receive them in the mail, though they

15   were sent by FedEx, and I actually e-mailed them to him as

16   well tomorrow, and we agreed that that would be okay as well,

17   so --

18          THE COURT:  You e-mailed them what?  Yesterday?

19          MR. IMBROGNO:  Yesterday morning to him.

20          THE COURT:  Did you receive those by e-mail then?

21   Sorry.

22          MR. HALL:  Yes, I did.

23          THE COURT:  Oh, all right.  So you've had a chance

24   to review the city's response regarding your --

25          MR. HALL:  Yes.

1          THE COURT:  -- reply regarding your two claims;

2    right?

3          MR. HALL:  Yes; correct.

4          THE COURT:  Okay.  Ms. Imbrogno, I'll hear from you

5    first, and then we'll hear from Mr. Hall.

6          MR. IMBROGNO:  Thank you, your Honor.  With regard

7    to Mr. Hall's responses, they regard two different claims,

8    one Claim Number 474 and another Claim Number 1097.  They are

9    very similar arguments in that we believe that both are

10   barred by the statute of limitations, but I will take each in

11   turn.  Mr. Hall's Claim Number 474 was filed on January 3rd,

12   2014, in the amount of $100,000.  The stated basis for the

13   claim was "injured."  Mr. Hall attached documents to his

14   claim regarding an alleged highway defect.  Allegedly he was

15   burned on the leg by a steam grate, and this incident

16   occurred on June 28th, 2012.  Mr. Hall attached a notice of

17   intention to file suit.  That was actually filed with the

18   State of Michigan, Department of Transportation.  According

19   to the city's records, no notice of intention to file suit

20   was filed with the city, so the city filed its objection to

21   Mr. Hall's Claim 474 because to the extent that Mr. Hall had

22   a claim against the city, which we -- you know, for purposes

23   of this, we will argue that he may have, the statute of

24   limitations actually expired on that claim as of June 28th,

25   2014.

1        Further, Mr. Hall did not provide the necessary

2    statutory notice under MCL 691.1404 where any notice to the

3    city regarding a highway defect is required to be sent by

4    certified mail within 120 days of the alleged injury.

5        In addition, again, the statute of limitations

6    expired on June 28, 2014.  There's a two-year statute of

7    limitations regarding highway defect claims.  That's MCL

8    691.1411.  Mr. Hall has argued that the filing of his proof

9    of claim actually acted to toll his statute of limitations,

10   and the case law we believe is clear that the filing of a

11   proof of claim does not constitute commencement of an action

12   which is necessary to toll a statute.

13       Mr. Hall had two options.  He could have either

14   filed a motion to lift the automatic stay and then filed suit

15   against the city on his claim or, alternatively, he could

16   have utilized the 30-day grace period provided for in Section

17   108(c)(2) of the Bankruptcy Code whereby he could have filed

18   suit within 30 days after expiration of the bankruptcy stay.

19   Mr. Hall did not do either of those things, so given that

20   there is no possible liability on the underlying claim, we

21   believe that Mr. Hall's Claim Number 474 should be expunged

22   and that the thirteenth omnibus should be sustained as to

23   that claim.

24       THE COURT:  All right.  One second.  I want to -- I

25   want to come back to the two-year statute of limitations

1    perhaps in a minute.  I want to talk first further and have

2    Mr. -- give Mr. Hall a chance to respond regarding the

3    requirement in Michigan Compiled Laws, Section 691.1404, sub

4    1, that the city is relying on here that required Mr. Hall,

5    as the injured person, within 120 days from the time of

6    the -- when the injury occurred to serve a notice on the City

7    of Detroit of the occurrence of the injury and the defect to

8    contain certain specified information, as required by the

9    statute.  Mr. Hall, there's no documentation in the record,

10   at least at present that I can tell, that you served any

11   notice -- such notice on the City of Detroit.  Did you?

12           MR. HALL:  I did an intention to file the --

13   intention to file the suit because I was trying to see who

14   was liable.  Was it going to be the city or would it be

15   handled by the state?  And the city did respond to that

16   intention to file the claim right before the bankruptcy, so

17   part of that was maybe my intent was to maybe settle up

18   without going any further and also the tolling because of the

19   bankruptcy put the case in standstill, so I added up my days

20   from when the city went to bankrupt.  And what was that?

21   December or something like that?  So actually I'm thinking

22   the day that they added the days up from the day --

23           THE COURT:  Well, let's go back.  Let me go back to

24   the question --

25           MR. HALL:  -- filing the bankruptcy.

1    THE COURT:  -- excuse me -- the question that I

2   asked here.  I'm not focusing on the two-year statute of

3   limitations for filing a claim, filing a lawsuit at the

4   moment.  I'm talking only about the 120-day notice

5   requirement.  You seem to be saying --

6        MR. HALL:  Well, I thought --

7        THE COURT:  -- or implying that you served on the

8   City of Detroit a notice of this claim.

9        MR. HALL:  No.  I filed in the State of Michigan

10  Court of Claims, but the city responded to that intent to

11  file a lawsuit asking me -- they needed further information

12  to process my -- they was handling my case, and they were

13  processing -- I didn't send it to the city.  It was sent in

14  the Michigan state courts, and they responded.  The city

15  responded to that claim or whatever that lawsuit -- so,

16  therefore, I was dealing with the city at that time because

17  when I filed, I filed it in the State of Michigan Court of

18  Claims, but the City of Detroit responded to that before the

19  bankruptcy and all that stuff.  They responded.  I didn't

20  send anything to the city.  I guess I don't know how they got

21  ahold of the case anyway.  I don't know what happened, so I

22  was kind of confused.

23       THE COURT:  Well, the only thing I saw -- and, you

24  know, this -- you filed a lot of papers --

25       MR. HALL:  They got --

1          THE COURT:  -- a lot of paper in connection with

2    your claim and your response, but what I saw was in --

3          MR. HALL:  Why did they respond to it?

4          THE COURT:  Excuse me.  Don't interrupt me.

5          MR. HALL:  I'm sorry.

6          THE COURT:  Just a minute.  I'm talking now.  One

7    second.  Hold on.  Attached to your proof of claim is a

8    verified notice of intention to file claim that apparently

9    was filed in the Michigan Court of Claims --

10         MR. HALL:  Correct.

11         THE COURT:  -- by an attorney representing you --

12         MR. HALL:  Um-hmm.

13         THE COURT:  -- Ronald Weiner.

14         MR. HALL:  Correct.

15         THE COURT:  And his signature is dated September 28,

16   2012.  This was attached to your proof of claim, this

17   document, and that's a two-page document.  It's titled

18   "Verified Notice of Intention to File Claim," and it says the

19   claimant -- starts out saying, "Claimant, Richard Hall, by

20   his attorneys," et cetera.  Then it says, "hereby submits his

21   notice of intention to file claim against the State of

22   Michigan, Department of Transportation, and states the

23   following," and it doesn't say anything about an intention to

24   file claim against the City of Detroit.  And it is under a

25   case caption that says Richard Hall versus Michigan

1    Department of Transportation, nothing about the City of

2    Detroit.  I think the city's argument is that only shows that

3    you, at most, served a notice of intention to bring the claim

4    on the State of Michigan, Department of Transportation, and

5    doesn't show that you served such a notice on the City of

6    Detroit.  Is there any other particular document that you

7    have filed or that you can produce that is a copy of a notice

8    of intention to file claim against the City of Detroit?

9           MR. HALL:  No, sir.  My understanding is would the

10   city be liable?  Would you all be immune from that also?

11   Would it be toward the state because I got paperwork saying

12   that the city responded to that.  How would you all respond

13   to that?  I got papers saying you all responded, and you all

14   wanted to process the claim or whatever when I filed it, but

15   how did you all get ahold of that anyways when I sent it to

16   the Michigan -- the Court of Claims?  How did you all respond

17   to it?  That was the whole purpose of who was being liable,

18   and you all responded.  I didn't even send anything to the

19   city.  There's paperwork in my objection where you all

20   responded to that saying that you all needed further

21   information to process my claim.  I didn't ever send anything

22   to the city, so, therefore, I was confused over who was

23   liable for that.  Then the bankruptcy stuff popped up.  I

24   couldn't get any information, so I put in my claim.  And

25   because of your all bankruptcy, it's a standstill, so I still

1  have time to put my claim in.  The 120 days, the 30 days

2  modification, at first it was a stay modification.  You all

3  did not -- you all was not objecting to anything, anything

4  until now, so it wasn't up to me to file a lawsuit where it

5  could have been a settlement.  I didn't have to file a

6  lawsuit if you want to settle it.  That's what the intention

7  was if you wanted to settle it.  I didn't know anything about

8  the city or whatever, what they was going to do, so --

9        THE COURT:  Mr. Hall, is it correct that this injury

10  you suffered that we're talking about now, which is a subject

11  of this claim -- it's not the Section 1983 claim against the

12  city regarding actions of the police.  This is the other

13  claim.

14        MR. HALL:  Correct.

15        THE COURT:  The notice of intention to file a claim

16  that I just referred to says the claim arose on June 28,

17  2012.

18        MR. HALL:  Um-hmm.

19        THE COURT:  It gives a time and location.  It says

20  claimant walked over a steam grate and hot steam burned his

21  leg and goes on from there.  It's that injury we're talking

22  about.  Now, is that the correct date of the injury, June 28,

23  2012?

24        MR. HALL:  Correct.

25        THE COURT:  It is.  All right.  So all right.

1 Anything else you'd like to say about this 120-day notice
2 issue?

3       MR. HALL:  I don't know.  You all -- the city
4 responded January 2013, '14, something like that.  I don't
5 know.  You all responded in 2014 saying you all wanted to
6 process the -- you all was handling my case, whatever that
7 was, so what was I supposed to do?  Still go to the state and
8 you all would have sent me back -- it would have been the
9 city?  I could have claimed it or filed suit in the city?  I
10 didn't know.  That's why the intent was sent out in the state
11 just like you saying about the sewer.  The city, they're your
12 all governmental agency or whatever, so it was sent to the
13 state, so I was trying to find out who was liable, I guess.

14       THE COURT:  All right.  Ms. Imbrogno, did you want
15 to reply regarding this 120-day notice issue?

16       MR. IMBROGNO:  Your Honor, I can tell you that we
17 did look in the city's records to see if there was anything
18 with -- that would have been a notice of intent to file claim
19 on Mr. Hall's claim, and the only thing that the city had
20 regarding Mr. Hall was a FOIA request that we believe is
21 actually related to Claim Number 1097 and not this claim.

22       MR. HALL:  Well, I have paperwork saying you all --
23 you all responded to it.  You all responded with -- you all
24 received a notice of intent to file a claim.

25       THE COURT:  Excuse me, Mr. Hall.

1    MR. HALL:  How did it go to your --
2    THE COURT:  Is the papers -- are papers attached to
3  your proof of claim any -- in the 90 pages or so you attached
4  to your claim that is the city's response that you keep
5  referring to?
6    MR. HALL:  Yes, it is.  I have a copy of it.  I
7  should have a copy.
8    THE COURT:  Where is it?  You got 90 pages here.  I
9  don't see it.  Can you tell me about --
10    MR. HALL:  I have it in my --
11    THE COURT:  -- where it is in this?
12    MR. HALL:  I have it in my folder, a copy of it
13  where they responded to it and stuff like that saying we need
14  to file -- we are tolling this case, and we're going to
15  process your case.
16    THE COURT:  Is this attached to one of the documents
17  attached to your proof of claim?
18    MR. HALL:  Yes, it was.  Yes, it was.
19    THE COURT:  I don't see it, so you better go get it
20  if you have a copy there.  While he's looking for that, Ms.
21  Imbrogno, is there any such document, as far as you know,
22  attached to the proof of claim?
23    MR. HALL:  I'm looking, your Honor, and I believe
24  there is a document that's titled "Medicare Reporting
25  Affidavit and Indemnification of the City of Detroit by

1    Claimant Plaintiff."  I do not know the source of this

2    document, and the city did not have this document in its

3    records.  This also, you know, does not amount to a notice of

4    intention to file suit, as required to be filed under

5    691.1404.  That's on page 13 of 90 on Docket 9873-1.

6              THE COURT:  Mr. Hall --

7              MR. HALL:  Yes, sir.

8              THE COURT:  -- come on back, would you?  I think I

9    may have found this.  I'll ask you if this is the document.

10             MR. HALL:  So you found it?

11             THE COURT:  Attached to your proof of claim is a

12   one-page letter dated November 25, 2013, on what appears to

13   be City of Detroit letterhead addressed to Ronald Weiner,

14   your attorney, and it is signed by Monique Tyler, legal

15   investigator.  It says, "Dear Mr. Weiner:  Upon review of

16   your client's file, it was found that the City of Detroit has

17   attempted to process your claim, but due to lack of

18   sufficient documents -- information, we are unable to

19   proceed.  The City of Detroit Law Department Claims Division

20   requires that all claims contain specific information for

21   adequate processing," and then it goes on to request a

22   Medicare affidavit and health authorization.  That's the gist

23   of it.  Is that the letter you were referring to earlier?

24             MR. HALL:  Yes.

25             THE COURT:  Yes?  That letter, as I said, is dated

1  November 25, 2013.  It refers to you as the claimant, and it
2  says DOI -- I assume that means date of injury -- 6-28-12.

3        MR. IMBROGNO:  Your Honor, I can tell you that this
4  was not in the file that the city had, and I do not know what
5  the source of this claim is.

6        THE COURT:  Hold on.  Well, so, Ms. Imbrogno, you
7  don't know how the city may have gotten involved in dealing
8  with this claim.

9        MR. IMBROGNO:  I do not, unfortunately, and this
10  has, you know, come to my attention, but I think that
11  despite -- well, even if the city had been part of a notice
12  of intention to file claim, arguably, the two-year statute of
13  limitations would still prevent Mr. Hall's claim.

14        THE COURT:  Well, we're going to get to that if we
15  need to because that's a little more complex than I think the
16  city's argument makes it out to be.  At least I have some
17  questions about it.  All right.  Let's get to that then.  Ms.
18  Imbrogno, I read the arguments you made in your reply on
19  this, and you made a similar statute of limitations argument
20  about the 1983 claim of Mr. Hall, the other claim that we'll
21  talk about.  As I understand your argument, it is here that
22  there's a two-year statute of limitations for this injury
23  claim in Claim 474, so the two-year statute would have
24  expired June 28, 2014, under state law.  By that time, of
25  course, the city had filed several months earlier a Chapter 9

1   bankruptcy case, and the automatic stay took effect, and so
2   the automatic stay was in effect during the Chapter 9 case,
3   and Mr. Hall had the benefit of Section 108(c).  And you
4   referred to the Section 108(c)(2) 30-day window, which gives
5   a claimant whose -- as I understand it, the city agrees that
6   if a claimant has a claim against the city, the city files
7   bankruptcy before the statute of limitations expires, which
8   is true in this case with respect to the two-year statute,
9   108(c)(2) means that -- in effect, that the statute will not
10  be deemed to have expired on the claim until 30 days after
11  notice of the termination or expiration of the stay under
12  Section 362 -- one second -- or 922, so we've got an
13  automatic stay under both Section 362 and 922 that arose when
14  the city filed their Chapter 9 petition.  Under Section
15  108(c)(2) you're saying that the statute -- or the automatic
16  stay terminated.  At some point, debtor -- Mr. Hall got
17  notice of it, and 30 days passed, and he didn't file any
18  claim.
19          MR. IMBROGNO:  That's correct, your Honor.
20          THE COURT:  That's why this -- that's why his claim
21  is time-barred under the statute of limitations.
22          MR. IMBROGNO:  That's correct.
23          THE COURT:  Okay.  So walk me through the argument
24  in a bit more detail under Section 108(c)(2).  When and how
25  did the automatic stay terminate or expire?  You seem to be

```
1    implying in your argument that that happened on the effective
2    date of the confirmed Chapter 9 plan.  And when did Mr. --
3    and how did Mr. Hall get notice of the termination or
4    expiration of the stay so as to start the running of that 30-
5    day period?  Those are two questions.  And the third question
6    is how could Mr. Hall have filed a claim -- a lawsuit against
7    the city on this claim, this pre-petition claim, after the
8    effective date of the confirmed plan without violating a
9    discharge injunction under Section 524 and also the
10   injunction provisions in the confirmed plan?
11          MR. IMBROGNO:  Right.
12          THE COURT:  Wasn't this a discharged claim?
13          MR. IMBROGNO:  I think that those are definitely
14   considerations that the city should not take into account and
15   that we could, you know, also offer some supplemental
16   briefing on that as well.
17          THE COURT:  Well, these are questions that popped
18   into my head after I read your --
19          MR. IMBROGNO:  Um-hmm.
20          THE COURT:  -- argument because you didn't address
21   those, and, you know, it strikes me as a difficult
22   proposition to say that Mr. Hall would be barred from having
23   an allowed claim on a timely proof of claim that he filed in
24   the case because he didn't violate the discharge injunction
25   by filing a lawsuit.  You see the problem I'm having?
```

1          MR. IMBROGNO:  I do, and I still think it was a
2     possibility that Mr. Hall could, you know, file a motion to
3     lift the stay as to his claim and filed it within the statute
4     of limitations.

5          THE COURT:  Well, he could have -- he could have
6     filed a motion for relief from stay.  There's nothing in
7     Section 108(c) that would -- could be read as requiring him
8     to have done so, is there?

9          MR. IMBROGNO:  No, I do not believe that there is.

10          THE COURT:  He didn't have to do that.  There's
11     nothing -- no provision of the Bankruptcy Code required him
12     to do that; right?

13          MR. IMBROGNO:  Um-hmm.

14          THE COURT:  Did it?

15          MR. IMBROGNO:  No, it did not.

16          THE COURT:  Okay.  So these are questions I have
17     about your Section 108(c)(2) argument, and the same questions
18     I think -- same questions are going to apply with respect to
19     Mr. Hall's Section 1983 claim --

20          MR. IMBROGNO:  I agree.

21          THE COURT:  -- because that, too, is a discharge
22     claim under the plan, isn't it?

23          MR. IMBROGNO:  I would have to look into it before I
24     answer, yes.

25          THE COURT:  I think it is, so -- but there's really

1    three questions there.

2              MR. IMBROGNO:  Um-hmm.

3              THE COURT:  One, exactly how and when did the

4    automatic stay terminate or expire; number two, how and when

5    did Mr. Hall get notice of the termination or expiration of

6    the stay because it's 30 days from notice under 108(c)(2)

7    that is the deadline; and, three, how could Mr. Hall have

8    filed a lawsuit on a discharge claim after the effective date

9    of the claim without violating the discharge injunction under

10   Section 524, which applies in Chapter 9 cases under Section

11   901, and violating the injunctive provisions of the confirmed

12   plan?  And if he could not have, then what do we do with

13   that?  So, you know, I think the city might be right on the

14   first two questions that I've raised; that is, in implying

15   without really explaining or supporting it in your reply that

16   the automatic stay expired on the effective date of the plan.

17   You might be right about that, but as to the third question,

18   I've got a problem there.

19             MR. IMBROGNO:  Understood.

20             THE COURT:  First two questions, you know, I need --

21   just I need an explanation in more detail, more of a chapter

22   and verse-type thing, because this is -- it's not really such

23   a simple matter.  Now, the issue -- the first issue about --

24   Claim 474 here about Mr. Hall not having served a notice on

25   the City of Detroit as opposed to the State of Michigan

1    within 120 days of the injury in question is a little

2    different issue.  Now, as to that issue, Mr. Hall has said in

3    today's hearing that he didn't serve any notice directed to

4    specifically the City of Detroit.  We have the one that's

5    attached to his proof of claim only, which is directed only

6    to the State of Michigan, yet we have this November 25, 2013,

7    letter apparently, at least, from somebody at the City of

8    Detroit Law Department seemingly responding to this claim,

9    so, now, you did say you've already checked, and the city has

10   already checked, and they don't have it in their files or

11   records anywhere, any sort of notice of injury regarding this

12   June 28, 2012, injury; right?

13          MR. IMBROGNO:  That's correct, your Honor, and

14   that's -- once again, because it's not in the files doesn't

15   mean it wasn't once there, but we have checked, and there is

16   no notice in the city's files regarding Mr. Hall's personal

17   injury claim.

18          THE COURT:  You've looked at this November 25, 2013,

19   letter?

20          MR. IMBROGNO:  I saw it, but I did not make the

21   correlation that it was at all related to the notice of

22   intention to file a claim that was filed regarding the state.

23          THE COURT:  Well, on the current record, I'm really

24   not yet in a position to make a ruling as to whether or not

25   the city was not timely -- the City of Detroit was not timely

1    provided with a notice of injury required under Michigan

2    Compiled Laws, Section 691.1404, sub 1.  That's the 120-day

3    notice of the injury.

4            MR. IMBROGNO:  Um-hmm.

5            THE COURT:  Under the circumstances, the record is

6    not sufficiently clear and developed to enable the Court to

7    make a ruling on that.  That might be an independent basis

8    for disallowing Claim 474.  It wouldn't apply to Mr. Hall's

9    Section 1983 claim, which is the other claim we'll talk about

10   in a minute, but the current record doesn't permit me to

11   sustain the city's objection or overrule it, for that matter,

12   based on this 120-day notice requirement.

13           With respect to the two-year statute of limitations

14   and the Section 108(c)(2) argument, if the city wants to

15   pursue that argument and further brief it, I'll certainly

16   allow that.  Do you want to?

17           MR. IMBROGNO:  Yes, your Honor.  The city also

18   just -- we will make clear that we do preserve our rights to

19   object on substantive grounds to this claim to the extent

20   that the statute of limitations argument is not sustained.

21           THE COURT:  Right, yeah.  And you said that in your

22   papers.  I saw that.  All right.  You want the same sort of

23   schedule that we have with Ms. Booker's claim on the 15th

24   omnibus --

25           MR. IMBROGNO:  Your Honor, could we get --

1          THE COURT:  -- brief within a week, or do you want

2     longer?

3          MR. IMBROGNO:  Could we get two weeks on this one,

4     please?

5          THE COURT:  Yes.  So that'll be June 10th, 2015.

6     Mr. Hall, as I mentioned earlier with Ms. Booker on her

7     matter, the city is going to file a brief on these legal

8     issues that I've raised regarding Section 108(c)(2) and the

9     statute of limitations, and they're going to be -- they'll

10    send you a copy of that.  I'll give you an opportunity to

11    file a written response to that if you want to.  How much

12    time do you want after that?  Is two weeks plenty?

13         MR. HALL:  Plenty.

14         THE COURT:  Pardon me?

15         MR. HALL:  Yes.

16         THE COURT:  All right.

17         MR. HALL:  I have a question.

18         THE COURT:  Yes.

19         MR. HALL:  The bankruptcy -- the cure -- what is

20    the -- Michigan tolling on that is standstill.  The stay

21    modification was -- it was sustained.  I didn't get the -- I

22    got the letter.  What was it?  This year it said they were

23    going to stay, and then it came -- then it came with the

24    objections, so the stay modification was still there.  It

25    wasn't the 120-day.  It just came up maybe some months ago,

1   and our objection came, so what is the --

2          THE COURT:  I don't understand what you're saying or

3   asking, but this isn't the time for you to ask questions of

4   me on something in the case.

5          MR. HALL:  Well, can you add up the bankruptcy

6   tolling, the standstill?  How long is that where I can still

7   file?

8          THE COURT:  I don't understand what you're saying.

9          MR. HALL:  I'm just asking.  The bankruptcy

10  standstill, the tolling -- Michigan tolling, what is the

11  numbers on that?

12         THE COURT:  Nobody has said that there's any

13  Michigan tolling going on, Mr. Hall, so I'm not sure what

14  you're saying, but I'm not here to answer your questions.

15         MR. HALL:  Okay.

16         THE COURT:  I'm here to deal with these arguments

17  that you and the city are making on this claim objection,

18  and --

19         MR. HALL:  Okay.  I agree.

20         THE COURT:  -- that's what I'm in the process of

21  doing.

22         MR. HALL:  Okay.

23         THE COURT:  The city will file their brief on the

24  statute of limitations issues no later than June 10, 2015.

25  Mr. Hall, you may file a written response to that brief no

1  later than June 24, 2015, and we'll have a further hearing

2  with respect to Claim 474 on July 22 at 1:30 p.m.

3         Now, with respect to Mr. Hall's Section 1983 claim,

4  which is Claim Number 1097, which was also adjourned for

5  further hearing -- for hearing today, Ms. Imbrogno, you've

6  raised there the same type of statute of limitations

7  argument.  In this case, your argument is a three-year

8  statute of limitations for the 1983 claim, and then you're

9  arguing Section 108(c)(2); right?

10         MR. IMBROGNO:  That's correct, your Honor.  I think

11  it'll be the same three issues that we have previously

12  discussed.  If we can also be permitted to file a

13  supplemental brief as --

14         THE COURT:  Yes.

15         MR. IMBROGNO:  -- to those issues, the same two

16  weeks would be fine.

17         THE COURT:  Same schedule, same everything then,

18  what I just said about the other claims, so the city brief

19  June 10.  Mr. Hall, you may respond with a written response

20  by June 24.  We'll have a further hearing July 22 at 1:30

21  p.m.  All right.  That's it for today on -- regarding the

22  city's objection to the claims of Mr. Hall.  Thank you.  Now,

23  that was the only matter left regarding the thirteenth

24  omnibus claim objections, so --

25         MR. IMBROGNO:  Your Honor, Ms. Dolcourt will be

1    taking care of the seventeenth omnibus objections.

2            THE COURT:  Yes.

3            MR. IMBROGNO:  I believe those are next.

4            THE COURT:  All right.

5            MR. IMBROGNO:  Thank you.

6            MS. DOLCOURT:  Good afternoon, your Honor.  Tamar

7    Dolcourt from Foley & Lardner on behalf of the city regarding

8    the seventeenth omnibus objection to claims.

9            THE COURT:  Yes.  All right.  Good afternoon.  Go

10   ahead.  What would you like to say then?

11           MS. DOLCOURT:  Thank you.  Well, at the outset, we

12   want to clarify that the seventeenth omnibus objection seeks

13   only to reclassify claims which were marked on the proof of

14   claim as administrative claims.  It does not seek to disallow

15   any of these claims at this time.  The city has not

16   undertaken substantive reviews of each of the claims but will

17   do so in the future if it's determined to be appropriate.

18           And just at the outset, in a Chapter 11 case an

19   administrative claim is a claim that's necessary to preserve

20   the estate.  In a Chapter 9 case, there is no estate, and so

21   Section 541, which discusses the creation of a bankruptcy

22   estate, is actually not applicable in Chapter 9.  It's not

23   mentioned in Section 901.  Consequently, courts have limited

24   the definition of an administrative expense in Chapter 9 to a

25   very narrow slice of expenses directly related to the

administration of a bankruptcy case, and so to the extent
that parties filed responses to the claim objection, the city
believes that the claims that were filed are not
administrative expenses in a Chapter 9 context, and so I'd
like to go through each of the responses that we received in
order.

The first response we received was filed by Laurence
Woody White. I don't know if Mr. White is here today.

THE COURT: Is Laurence Woody White present, or is
there anyone here on his behalf? I hear nothing. Mr. White
has not attended today's hearing apparently. You don't know
why?

MS. DOLCOURT: I don't believe he resides in the
State of Michigan anymore. He's a retiree. It appears from
his claim that he's been retired for over 20 years from the
city. It appears to us that his claim is --

THE COURT: But you don't know specifically why
he --

MS. DOLCOURT: I don't know. He didn't contact me.

THE COURT: All right.

MS. DOLCOURT: We did mail him a copy of our reply
brief.

THE COURT: You did mail it?

MS. DOLCOURT: We did mail him a copy --

THE COURT: Yeah. All right.

1          MS. DOLCOURT:  -- of the reply brief, but he did not

2     contact me --

3          THE COURT:  Yeah.  Go ahead.

4          MS. DOLCOURT:  -- regarding the hearing.  In any

5     event, Mr. White's claim appears to be related to the pension

6     that he is getting from the City of Detroit, and, as such, it

7     is not an administrative claim.  His pension appeared to have

8     arisen in 1993 when he retired from the city, and he is still

9     getting his pension checks.  And the pension issues are

10    outside the claims administration process, in any event, so

11    even if we reclassify the claim from an administrative claim,

12    it still doesn't affect his entitlement to a pension, so we

13    believe that it is not an administrative expense and should

14    be reclassified to a pension claim, which is dealt with under

15    the plan separately from the claims administration process.

16         THE COURT:  Your objection to claim proposes to

17    simply reclassify it, though, to general unsecured.

18         MS. DOLCOURT:  It should be -- it should be, more

19    specifically, general unsecured or the other appropriate

20    claim under the plan because a pension claim is a

21    different -- it is not a Class 14 general unsecured.  There's

22    a different class, and I believe that Mr. White's claim, now

23    that we've determined it's a pension claim, should be

24    reclassified into that category.

25         THE COURT:  Which category?

1      MS. DOLCOURT:  I'm not entirely certain.  I believe

2  it's Class 12, but I would have to go look at the plan, but

3  it's a pension claim, so it's not really within the claims

4  administration process.  The pension claims have been handled

5  separately throughout the case.

6      THE COURT:  Well, Mr. White has no notice of your

7  request that you just made; right?  The notice he has of your

8  claim objection is to reclassify his claim as a general

9  unsecured claim.

10     MS. DOLCOURT:  Correct.  That's true.  However, a

11  pension claim under the plan is treated differently and I

12  would say likely more favorably than a general unsecured

13  claim, so I don't believe he's prejudiced by that.

14     THE COURT:  All right.  Hold on.  Can we tell -- can

15  you tell from the documentation whether Mr. White is a

16  retired police or fire person?

17     MS. DOLCOURT:  I don't believe that he is.  His

18  claim said building and safety.

19     THE COURT:  All right.  So you think he would be in

20  the GRS pension?

21     MS. DOLCOURT:  I believe he's in the general

22  retiree, yes.  His certificate, which he filed with his reply

23  brief -- it's pages 4 and 5 of his reply, which is Docket

24  9857 -- it shows his recognition of being in the building and

25  safety engineering department, and his certificate of

1    retirement says he's in the building division, and it's --

2           THE COURT:  All right.  So that would be, it looks

3    like -- I mean it appears that would be Class 11.

4           MS. DOLCOURT:  Class 11.  I apologize.

5           THE COURT:  Well, you're going to prepare an order,

6    and you can verify that you agree with me that it's Class 11,

7    but I'll go ahead and agree to your request to reclassify his

8    claim rather than as a general unsecured claim but as --

9    rather, as a general GRS pension claim, which appears is

10   Class 11.

11          MS. DOLCOURT:  Thank you.

12          THE COURT:  All right.  So go on.

13          MS. DOLCOURT:  The next response we received was

14   from Gretchen Smith, and Ms. Smith is here today.

15          THE COURT:  All right.  Ms. Smith, would you come

16   up, please?  Good afternoon.  You are?

17          MS. SMITH:  I'm Gretchen Rose Smith.

18          THE COURT:  All right.  Good afternoon, Ms. Smith.

19   Ms. Dolcourt, we'll hear from you, and then we'll hear from

20   Ms. -- anything Ms. Smith wants to say about the city's

21   objection or that it seeks to reclassify her claim as a

22   general unsecured claim.

23          MS. DOLCOURT:  Thank you, your Honor.  Ms. Smith

24   filed a proof of claim in the case for several different --

25   several different claims against the city on one proof of

1    claim form.  It appears that there was a -- and Ms. Smith

2    will certainly correct me if I'm wrong -- a bus accident in

3    2011.  Certain pieces of property which she may or may not

4    own -- she said she wasn't sure -- that are located within

5    the city and that another injury that occurred in November of

6    2013 -- and I believe she also states a retirement claim, but

7    that would be against Detroit Public Schools or involved with

8    Detroit Public Schools, not the City of Detroit.  With the

9    exception of the injury that occurred in late 2013, these

10   appear to be pre-petition claims, so they would not be

11   administrative under -- you know, in any event, but, however,

12   including the injury, none of them meet the definition of the

13   limited administrative expense allowance under a Chapter 9;

14   that is, an expense that is related directly to the

15   administration of the bankruptcy case.  So the city doesn't

16   seek to disallow Ms. Smith's claims.  The city only seeks to

17   reclassify them from administrative to general unsecured.

18           THE COURT:  All right.  Ms. Smith, what would you

19   like to say about this?

20           MS. SMITH:  So far what she said is correct;

21   however, I would like to give the Court some other factual

22   and then other information that I didn't get a chance to

23   share with her and I would like the Court to know about.  The

24   second claim is November 27, 2013, and I did file it with the

25   city.  The claim number is A27 -- or, yeah, A2750-005139,

1  and --

2       THE COURT:  That's not a claim number.  That's not a

3  claim number.

4       MS. SMITH:  Well, that's what they gave me, A32750-

5  005139.

6       MS. DOLCOURT:  Your Honor, if I may, that may be

7  the -- that may be a city law department claim number, not a

8  bankruptcy proof of claim number.

9       MS. SMITH:  Right.

10      THE COURT:  Yeah.  This objection, seventeenth

11  omnibus objection to claims that we're dealing with today,

12  Ms. Smith, insofar as your claims are concerned, concerns

13  only one of your claims that you filed as a proof of claim,

14  and that's Claim Number 2730.

15      MS. SMITH:  Excuse me.  I have audio deafness, so

16  could you speak just a little bit louder, and I can hear you

17  better?

18      THE COURT:  You have apparently filed several proofs

19  of claim.  There's only one of them that is the subject of

20  this claim objection that I'm hearing today.  That's Claim

21  Number 2730.  That's what I said.  Are you able to hear me

22  that way?  Okay.  All right.  I'll try to keep my voice up

23  for you there.

24      MS. SMITH:  Thank you.

25      THE COURT:  So that's the only claim that we're

1  talking about today, and the city wants to reclassify it

2  from -- you claimed it as an administrative priority claim,

3  and they're -- administrative expense claim, rather, and

4  they're -- the city is saying, no, it should be general

5  unsecured claim, so what do you want to say about that?

6        MS. SMITH:  I'm not sure which topic the 2730 refers

7  to.  Is that the bus accident or --

8        MS. DOLCOURT:  Yes.  This is the one where -- your

9  Honor, the basis for this claim says "Retirement DPS

10  property, bus accident, lawsuit for all appropriate benefits

11  and rights."

12        THE COURT:  Do you have a copy of the proof of claim

13  you can show her right there?

14        MS. DOLCOURT:  Yes.  Actually, I will give it to her

15  right now.

16        THE COURT:  It was attached to the city's reply

17  filed last Thursday.

18        MS. DOLCOURT:  Yes.  So this is the basis.

19        MS. SMITH:  Okay.

20        MS. DOLCOURT:  Do you see where you've written that?

21        MS. SMITH:  Okay.  Um-hmm.  I just wanted to clarify

22  that the retirement DPS is Detroit Public Schools, not

23  Department of Public Safety, and someplace in the paperwork

24  it stated Workmen's Comp.  Workmen's Comp and Medicare even

25  believes that, but this is not true.  I did not injure myself

1   at work at Detroit Public Schools.  My concern in the proof

2   of claim is about my retirement benefits.

3         And then also in the paperwork I got from -- while

4   the bankruptcy was going on and afterwards, the IRS wants me

5   to claim attorney fees that I received.  I didn't receive any

6   attorney fees nor am I an attorney, and I'm told by the IRS I

7   have to deal with the city with this, so there's a lot of,

8   you know, untrue information.

9         And then, further, the bus accident was July 1st,

10  2011, but the police report said June 31st, which we all know

11  there's no 31 days in June, at the top, and then at the

12  bottom of the police report of the bus accident it said July

13  1st, 2011, so that needed to be clarified.  And then the city

14  had May 10th, 2011, for this bus accident, so somehow a lot

15  of this didn't get processed right.  It got all pushed into

16  Medicare.  Medicare, as far as I know, is working on it, but

17  they're still confused because of all these, you know, false

18  factors, and I just felt I should make the Court aware of

19  them today.

20        And about the properties, I apologize.  I don't have

21  the addresses of the paperwork that was sent to me, but, as

22  far as I know, there's only two possibilities.  The reason I

23  don't know if they're mine or not is because they're

24  unfamiliar properties.  I called Orlans, the law firm that

25  sent the property information, and they would not give me any

1  information nor would they make an appointment with me to
2  look at the paperwork that I got.  And so my statement to
3  them was I don't know if this is my property.  My mother's
4  father had a lot of property in Detroit.  She might have put
5  some in my name and didn't tell me about them yet.  I don't
6  know.  The other possibility is that I was a severe victim of
7  identity theft and that it's possible that someone used my
8  name, my Social Security number, my financial profile, got a
9  mortgage, lived in the house, made the payments, and I knew
10 nothing about it.  I know my brother sent me some papers from
11 the IRS about one property that they said that they looked
12 into -- the IRS looked into and knew that I did not ever live
13 in it.  I said, "Well, how did you know?"  And they said, "We
14 need you to fill out this affidavit by a certain day and send
15 it back."  I did, and I don't know how my brother got the
16 paperwork sent to him, but he sent it to me, and then it
17 said -- or they said, "We know because there's no such
18 address," so it's not surprising to me that there are some
19 properties in my name that I don't know about.  A few months
20 ago I was told that my grandfather's 100-year property --
21 well, I call it a celebration because he asked me to tell the
22 story in 100 years, but he had several properties in Detroit
23 that he let people use to build their businesses, and I was
24 told in December when I turned 55 that I was to start
25 handling this, and then I remembered him walking me around.

1    Now, I've had to make a list of the property numbers and
2    streets, but I'm pretty sure it does not include the ones
3    that Orlans sent me, but Orlans does have a member of the St.
4    Thomas Armenian Orthodox Church that my grandparents did the
5    ground digging for. He's a lawyer there, and so it's
6    possible that they asked him to do the properties, some of
7    them, and put them in my name, so I don't know what to do
8    with all that. I just know that it was a part of the
9    bankruptcy paperwork that came to me when that process was
10   going on.

11         And then the last topic was just that there's some
12   missing care providing checks, about a quarter million
13   dollars, $6,000 a month by 42 months. I received one July
14   2nd, 2012, another one October 17, 2012, and then part of one
15   January of 2014 from Christopher Trainor's office, whom I
16   fired, not on the bus accident case any longer. So I don't
17   know what happened to the rest of them. I've made a police
18   report. As far as I know, it's still under investigation. I
19   tried to find out who cashed the checks from the city, but
20   the city redirected me to Freedom of Information. I filed
21   that. I got a name and number. Then they denied me answers
22   to those questions and wants me to appeal it. And I just
23   think this is all a lot of, you know, paperwork that could be
24   resolved, you know, very -- actually, if we met, you know,
25   went over all this, I think it could be -- we could all move

1   forward, you know, and that's what I'm looking to do, so

2   other than that, I guess I would like to just ask you what

3   you feel is appropriate.  I'm not a lawyer.

4           THE COURT:  All right.  Thank you. Ms . Dolcourt,

5   you can reply briefly if you wish to.

6           MS. SMITH:  Louder.  Who did you say?

7           THE COURT:  I said Ms. Dolcourt can reply briefly if

8   she wishes to to what you just said.

9           MS. DOLCOURT:  Your Honor, I think Ms. Smith raises

10  a host of issues that may need further investigation by the

11  city, but, in any event, none of the issues she raises appear

12  to be administrative expense claims within the definition of

13  an administrative expense claim in Chapter 9, and so today we

14  would merely ask the Court to reclassify her claim as a

15  general unsecured claim, and then, you know, to the extent

16  that further investigation is necessary, we will certainly do

17  that in the further process of the claims resolution.

18          THE COURT:  Well, all right.  Thank you.  The issue

19  before me today, properly before me today, is quite limited

20  with respect to the claim of Ms. Smith here.  It's limited to

21  the city's objection to Claim 2730 filed by Ms. Smith, a copy

22  of which claim is attached to the reply filed by the city

23  last Thursday at Docket 9868, and the only issue before me

24  today is whether that claim should be reclassified as a

25  general unsecured claim and no doubt subject to further

proceedings in the future within that classification because
it is not properly classified as it was filed as an
administrative expense -- an allowable administrative expense
or administrative claim.  I agree with the city's argument on
that.  Ms. Smith has a good deal to talk about with counsel
for the city or appropriate personnel at the city regarding
the ultimate resolution of her various claims filed in this
case, it appears, and she can certainly do that in the
future, and the city will have to consider further Ms.
Smith's claim as a general unsecured claim and what
objections, if any, need to be filed to the merits or
substance of those claims.  The issue for today, though, is
simply whether the claim needs to be reclassified because
it's not an appropriate administrative claim.  I agree with
the city that it's not.  Nothing in the claim or in what Ms.
Smith has said about her various claims in today's hearing
indicates otherwise, and I conclude that the claims of Ms.
Smith have no basis as an administrative expense.  They are
not claims for the actual and necessary costs or expenses
incurred in connection with the actual administration of the
Chapter 9 case.  I agree with the city's argument that there
is no estate under Section 541 in a Chapter 9 case, and
Chapter 9 -- in Chapter 9 cases, the scope of administrative
expenses is, therefore, narrow, narrower than it is in a
normal bankruptcy case.  The concept under Section

1  503(b)(1)(A) that allowed administrative expenses include the

2  actual and necessary costs and expenses of preserving the

3  estate does not apply, per se, as broadly in a Chapter 9 case

4  as it would in a different chapter bankruptcy case, and so

5  the claims of Ms. Smith do not meet the requirements to be an

6  allowed administrative expense for those reasons, so the

7  city's objection, which seeks reclassification of the claims

8  to general unsecured claims, are sustained, so, Ms. Dolcourt,

9  include that relief in your -- the order you're going to

10  prepare.

11          MS. DOLCOURT:  Yes, sir.

12          THE COURT:  Thank you, Ms. Smith.  Go on, Ms.

13  Dolcourt.

14          MS. DOLCOURT:  Okay.  The next response that we

15  received, your Honor, was a joint response filed by Dennis

16  Taubitz and Ms. -- Mr. Dennis Taubitz and Ms. Irma

17  Industrius.  I believe they're on the phone.

18          THE COURT:  Yes.  Mr. Taubitz and Ms. Industrius,

19  are you still there, and can you hear me?

20          MS. SMITH:  Thank you, your Honor.

21          MR. TAUBITZ:  Yes.

22          MS. INDUSTRIUS:  Yes, your Honor.  We're here.

23          THE COURT:  All right.  We're finally to your

24  claims, I think, now, so, Ms. Dolcourt, go on.  What would

25  you like to say about this?

1      MS. DOLCOURT:  Well, your Honor, as I've already

2  stated, these, again, are claims that the city is only

3  seeking at this time to reclassify, not to disallow, and so

4  with respect to Mr. Taubitz and Ms. Industrius' claims, the

5  city is investigating the claims that they make.  Mr. Taubitz

6  alleges that he's owed payments for wages for the entire

7  calendar year of 2013, and the city is looking into that

8  right now.  Ms. Industrius claims she is entitled to a bonus

9  for her employment.  We don't know from her pleadings when

10  that bonus entitlement supposedly arose, so the city is also

11  looking into that, but it's a little bit more difficult to

12  determine.  For example, we don't know if any of that claim

13  is a post-petition claim versus a pre-petition claim.  We

14  just have no information, so we're looking into it, but today

15  what we're looking to do is reclassify the claims from

16  administrative claims to general unsecured claims because,

17  again, the definition of administrative claims in the

18  bankruptcy is so narrow -- in a Chapter 9 is so narrow that

19  it's only those claims related to the actual administration

20  of the bankruptcy, and we do not believe that Mr. Taubitz and

21  Ms. Industrius' claims meet that standard.

22      In addition to that, the bar date notice did provide

23  a method for filing administrative claims, which was not

24  followed in this case, and Mr. Taubitz and Ms. Industrius

25  filed a surreply this morning stating that they never

1   received this bar date notice, which had the -- which had the

2   instructions for filing an administrative claim.  We hadn't

3   yet received from them any objection to service, but we did

4   go back and check our records this morning, and both of them

5   were served on November 29th, 2013, by the city's claims

6   agent, Kurtzman Carson.  The docket reference is 2337.  It is

7   the certificate of service for everybody who got a bar date

8   notice package.  It is approximately a 2,500-page document.

9   Mr. Taubitz' name appears on page 2,296 of that document, and

10  Ms. Industrius' name appears on page 488 of that document, so

11  they did receive the bar date notice.  And the claim form

12  that they mention in the surreply specifically states not to

13  use this claim form for an expense that arises after the

14  concurrence of -- commencement of the bankruptcy, so the city

15  seeks to reclassify it for two reasons:  first, that it was

16  not properly filed as an administrative expense claim if it

17  is one, and, second of all, we don't believe that it is one

18  under the more narrow definition of the Bankruptcy Code.

19          THE COURT:  Now, you're referring to the claims bar

20  date order in part here, Docket 1782, filed November 21,

21  2013.  You cited paragraph 5, I believe --

22          MS. DOLCOURT:  Yes, your Honor.

23          THE COURT:  -- of that order, which says, among

24  other things, that all administrative claims under Section

25  503(b) other than Section 503(b)(9) claims and the

1  administrative portion of rejection damages claims shall not

2  be deemed property if asserted by proof of claim; right?

3          MS. DOLCOURT:  Correct, your Honor.

4          THE COURT:  I don't have the bar date notice that

5  went out to -- by mail from the agent to everyone.  Did that

6  say these things as well?

7          MS. DOLCOURT:  Yes.  The order was included within

8  the notice as well as a proof of claim form.

9          THE COURT:  So a copy of the claim bar date order

10  was actually served with the notice?

11          MS. DOLCOURT:  I believe so.  I believe it was.  If

12  it was not, they did -- I believe KCC also did a summary of

13  the order because the order was lengthy explaining each type

14  of claim and the deadlines for each claim and the process.

15          THE COURT:  Do you have a docket number for the

16  bar -- the claim bar notice that was served on everyone?

17          MS. DOLCOURT:  You know, I don't, your Honor.  I'm

18  sorry.

19          THE COURT:  All right.  You didn't cite to that in

20  your papers.  I think you only cited the bar date -- claims

21  bar order, paragraph 5, so anything else you want to say?

22          MS. DOLCOURT:  Your Honor, I think that we've made

23  our arguments in the brief, and, as I mentioned before, you

24  know, we're still -- the city is still investigating these

25  claims specifically to determine, you know, what may have

1  happened and what -- and where they arise, but for today

2  we're really only seeking the reclassification of the claim.

3  We're not looking to argue the merits of the claim at this

4  point.

5         THE COURT:  Like how does Mr. Taubitz work for an

6  entire calendar year without getting paid anything?

7         MS. DOLCOURT:  That's certainly a question, your

8  Honor.

9         THE COURT:  All right.  Mr. Taubitz and Ms.

10  Industrius, we'll hear from you now, whichever of you wishes

11  to go first.

12         MR. TAUBITZ:  Yes.  I guess first is the -- all the

13  other employees got paid.  I'm assuming they were paid on the

14  basis it was an administrative expense, and, therefore, if I

15  wasn't paid, my claim should also be treated as an

16  administrative expense because it allowed the debtor to

17  function.

18         As to the bar due date, I guess we need to look at

19  this new information that now there is a docket number that

20  indicates service.  Our recollection is that we were not

21  served and, further, that the document itself that's provided

22  by the city, the proof of claim form, indicates an option of

23  an administrative priority expense.  It's a little

24  disingenuous to send a 500-page -- alleged 500-page document

25  that disallows that while you send a one-page document that

1  does allow that.

2          MS. INDUSTRIUS:  And, your Honor, if I may, Irma

3  Industrius.  And my position is that I understand -- I'm a

4  creditor of debtor.  I think it's stated that I didn't -- did

5  not include specific time frame for my proof of claim, and

6  I'm requesting leave of the Court and the Court's indulgence

7  for me to amend my proof of claim to indicate the specific

8  dates and also to correct the amount that's on there because

9  it indicates that it's 13,500, but upon further review of my

10 proof of claim, I believe that it's less than that.

11         THE COURT:  Ms. Industrius, you broke up quite a bit

12 there in what you just said, but I take it from what you said

13 I did hear you say that you request leave of Court to amend

14 your proof of claim.  You can file an amended proof of claim.

15 If the city objects to it, in part, on the ground that it

16 was -- it's not timely, we'll have a hearing on that, and the

17 parties can argue about whether or not the Court should deem

18 the amended claim to relate back to the date of the original

19 proof of claim that you filed -- that's one of the issues

20 that always comes up in that kind of situation -- or whether

21 the Court otherwise should deem the amended claim as

22 allowable notwithstanding the timing of its filing, so, you

23 know, you don't -- I'm not granting you specific leave.  You

24 don't need it.  You just file the amended claim, and then --

25 with the claims agent, and then if the city objects to it,

1    they object to it, and you respond, and we have a hearing.

2          Now, with respect to the -- is there anything else

3    you wanted to say, Ms. Industrius?

4          MS. INDUSTRIUS:  Your Honor, only that my position

5    is that the claim that I'm requesting is in relation to my

6    wages when I was an employee at the City of Detroit,

7    specifically bonuses, and I feel that that's part of the

8    administrative operation that's part of the Court while they

9    were in bankruptcy because I performed services for the city

10   and was entitled to those wages in the form of a bonus, and

11   that's all.

12         THE COURT:  All right.  Thank you.  Ms. Dolcourt,

13   did you want to reply briefly to these arguments?

14         MS. DOLCOURT:  Your Honor, just as a point of

15   clarification, Mr. Taubitz is correct that all the employees

16   were paid during the course of the bankruptcy; however, they

17   were not paid as an administrative expense.  The city merely

18   continued its payroll throughout the course of the case, and

19   all of those payments were made in the ordinary course of

20   business throughout the bankruptcy case, so to the extent

21   that Mr. Taubitz and Ms. Industrius may have a claim that

22   wasn't paid for some reason, you know, the city is

23   investigating that and will determine that further, but none

24   of the wage claims were treated as administrative expenses.

25   They were just paid in the ordinary course as the city kept

1   operating.

2           THE COURT:  Well, if someone worked and wasn't paid

3   a wage during the pendency of the case, what recourse do they

4   have against the city to get paid?  Do they have any

5   recourse?

6           MS. DOLCOURT:  Well, your Honor, I believe that if

7   it was a post-petition amount, it would be an ordinary course

8   expense under the plan.  There's a -- there was provision for

9   the city to keep paying its ordinary course expenses, and it

10  did so.  If there was a mistake, the city will investigate

11  that and determine the appropriate relief, but it's not

12  necessarily a claims administration issue.  It could well be

13  a payroll and, you know, wage department issue that's just

14  outside of this process, but because Ms. Industrius and

15  Mr. Taubitz filed claims as administrative claims and the

16  city doesn't believe them to be administrative claims, you

17  know, we've sought to reclassify it.

18          THE COURT:  All right.  Well, thank you.  While the

19  issue of what becomes of these claims ultimately and on a

20  final basis remains to be seen and isn't being decided today,

21  I am going to sustain the city's objection to these claims --

22  the limited objection that was stated, which is that the

23  claims should be reclassified out of the administrative claim

24  category and into the general unsecured claim category.  I

25  agree they're not properly classified as administrative

1    claims.  The argument of Mr. Taubitz and I think perhaps also

2    Ms. Industrius that the -- to the extent they worked as

3    employees of the city post-bankruptcy petition and were not

4    paid for that work or, in the case of Ms. Industrius, earned

5    a bonus, she says, for such work and wasn't paid, those are

6    not allowable as administrative expenses under Section

7    503(b), including 503(b)(1), because they are not expenses

8    incurred in connection with the actual administration of the

9    Chapter 9 case.  It is not sufficient in a Chapter 9 case to

10   obtain an allowed administrative expense merely to show and

11   argue that an employee worked for the municipality and

12   through their work was part of a workforce that allowed the

13   city to continue to function while it was in Chapter 9

14   bankruptcy, and so the city's objection in the seventeenth

15   omnibus objection is sustained as to both of these claims.

16   And, Ms. Dolcourt, I'll ask you to include that in the order

17   that you're going to prepare.

18           None of this, of course, is to say that neither --

19   or that either of these claimants, Mr. Taubitz or Ms.

20   Industrius, aren't necessarily entitled to be paid anything

21   by the city.  It simply concerns classifying their claims out

22   of the administrative claim category, and that's what the

23   ruling today does.  So does that complete the seventeenth

24   omnibus objection matter, Ms. Dolcourt?

25           MS. DOLCOURT:  Your Honor, just one more thing.  Ms.

1    Debra Gilbeaux filed a motion with the Court seeking

2    additional time to file a response on May 22nd, and the Court

3    subsequently denied that motion, but Ms. Gilbeaux is here

4    today, and I wanted to bring that to the Court's attention.

5          THE COURT:  Ms. Gilbeaux, you can come forward,

6    please.  No.

7          MS. GILBEAUX:  I'm Ms. Gilbeaux.

8          THE COURT:  Ms. Gilbeaux, Debra Gilbeaux.

9          MS. GILBEAUX:  I am Debra Gilbeaux.

10          THE COURT:  Come on up to the podium, please.

11          MS. GILBEAUX:  Okay.  Good afternoon.

12          THE COURT:  Good afternoon, Ms. Gilbeaux.  Perhaps

13    you didn't see it, but I denied the motion by an order filed

14    yesterday, your motion that you filed on Friday --

15          MS. GILBEAUX:  The 21st.

16          THE COURT:  -- last Friday in which you --

17          MS. GILBEAUX:  Yeah.

18          THE COURT:  -- asked for an additional five days to

19    file a response to the debtor's objection to the seventeenth

20    omnibus objection seeking to reclassify your claim, so you

21    did not file a timely response to the city's objection to

22    claim that seeks to reclassify your claim.

23          MS. GILBEAUX:  Correct.

24          THE COURT:  Now, you're here.  I'll let you talk.

25    What do you want to say?

1          MS. GILBEAUX:  I have a legitimate, I believe, claim

2     against the city.  I am still employed with them.  It is

3     about wages.  It started out with wages before the

4     bankruptcy.  They agreed that they owed me back pay wages,

5     and in my pursuit of the back pay wages that they -- the

6     city's employee in the human resource department, Renee

7     Laster, Benita Cheatom at that time, 2009, said that they

8     agreed that they owed me a difference between what I was

9     earning and what they actually had paid me, but -- and when I

10    talked to another employee that was in the finance

11    department, Maristella Lane, she said, "The city owes you

12    somewhere around $12,000, but I don't know when you'll see

13    it," is her response to me, and what I got from that $12,000

14    was $5,000.  And then I continued in pursuit of that money on

15    my own, and subsequently I was terminated in the pursuit of

16    what they owed me, which they stated in writing they owed me,

17    so it kept being this -- you know, in my pursuit, then they

18    terminated me on an unjust bogus charge of me bringing a

19    knife to work, and so then they start owing me more money

20    after the termination when they didn't pay what was a result

21    of the arbitration award, so I just -- and I'm still working

22    with them, so I'm still walking that delicate balance of

23    trying to work for my employer and give them a, you know,

24    honest day's work every day and do what they ask me to do and

25    still know that they owe me money, which they never

1  addressed, so it's -- that's where I am with them, and I

2  believe they're decent employees.  I find that, you know, I

3  get along with people pretty much.  I respect them.  I, you

4  know, hope they respect me, but they have not paid me what

5  they owed me.  And every time I've owed anyone anything, they

6  come after me, and they garnish or want to do whatever they

7  have to do to get their money, but, conversely, I can't get

8  mine, it seems, from people that claim that -- you know, that

9  they're honorable or they're lawyers or they take oaths to be

10 honorable, but they haven't been honorable with me.

11       THE COURT:  All right.  Ms. Dolcourt, did you want

12 to respond briefly?

13       MS. DOLCOURT:  Again, like Ms. Smith's claim,

14 Ms. Gilbeaux's claim has a lot of issues in it, which the

15 city, as part of the claims resolution process, is looking

16 at, and today we're only here to reclassify the claim from

17 the administrative expense category to the general unsecured

18 category, not to disallow the claim, so that's the only

19 relief that we're seeking at this time.  And we believe that

20 the issues raised by Ms. Gilbeaux in her proof of claim

21 involve pre-petition events with the city, and, therefore,

22 they don't -- they wouldn't be administrative expenses in any

23 event, but particularly in a Chapter 9 where they're not

24 directly related to the administration of the case.

25       THE COURT:  Well, first point that I'll make in

1   ruling here is Ms. Gilbeaux did not timely file a written

2   response to the claim objection.  The response -- written

3   responses were due Wednesday of last week, May 20.  Instead,

4   Ms. Gilbeaux filed two days after the deadline a motion --

5           MS. GILBEAUX:  Next day actually, sir.

6           THE COURT:  Ms. Gilbeaux, don't interrupt me.

7           MS. GILBEAUX:  I beg your pardon.

8           THE COURT:  You're done talking now.

9           MS. GILBEAUX:  Sorry.

10          THE COURT:  Ms. Gilbeaux filed a motion on Friday,

11  May 22, asking for -- two days after the deadline, asking for

12  an additional five days to file a response.  I denied that

13  motion with a text order that I entered yesterday promptly

14  after the motion came to my attention.  The text order is at

15  Docket 9880 dated May 26, 2015, and it states the reasons in

16  detail why the Court denied the motion, and so Ms. Gilbeaux

17  not having filed a timely response, written response to this

18  claim objection, the claim objection will be sustained by

19  default.  I would add, however, that I've not heard anything

20  in today's hearing in the oral statements by Ms. Gilbeaux

21  that would suggest that she has any claim that is properly

22  classified as an administrative claim in this Chapter 9

23  bankruptcy case as opposed to a general unsecured claim, and

24  so there is -- again, I would note that the only issue today

25  and the only relief being granted against Ms. Gilbeaux's

1  claim today is that it's being reclassified out of the
2  administrative claim category and into the general unsecured
3  claim category, so, Ms. Dolcourt, include that in your order.
4          MS. DOLCOURT:  Yes.  Thank you, your Honor.
5          THE COURT:  The city's objection is sustained.  Now,
6  I saw a gentleman raise his hand at the back there.
7  Apparently you want to say something.
8          MR. WHITE:  Yes, sir.
9          THE COURT:  You got to come up to a microphone.
10         MR. WHITE:  I've traveled here from West Virginia to
11 attend this court.
12         THE COURT:  You got to come up to a microphone, and
13 then tell me who you are and why you think you should be
14 speaking now.
15         MR. WHITE:  I'm Claimant 2252, Laurence White, from
16 West Virginia, and I arrived here last night.  And I was a
17 bit late getting here.  I came in at 1:35, I think, so if I
18 was to register with any of the ladies behind the counter
19 there, I missed out on that to get on the document here
20 today, but I'm having trouble understanding why I'm even on
21 this list.  I worked for 23 years and 7 months with the City
22 of Detroit, received a certificate of appreciation from the
23 city council and also from building and safety engineering as
24 well as the city engineering department because I worked 23
25 years and 7 months for the City of Detroit.  I've been having

1    trouble hearing most of the proceedings here, so I don't know
2    if you called --
3              MS. DOLCOURT:  We did call your name, Mr. White.
4              THE COURT:  All right.
5              MR. WHITE:  I didn't hear it then.
6              THE COURT:  All right.  Mr. White, we did call your
7    name, and I asked if you were here, and we heard nothing.
8              MR. WHITE:  I didn't hear that.
9              THE COURT:  And I ruled on the claim, the city's
10   objections to your claim in which they seek to reclassify
11   your claim actually as a Class 11 pension -- general retiree
12   pension claim under the confirmed plan instead of an
13   administrative claim -- an administrative expense claim.  And
14   I already ruled then that that was correct and proper and
15   that that would be done, so the only effect on your claim
16   today from this ruling is that it's going to be classified
17   into a different class under the confirmed plan, Class 11
18   general retiree pension claim class.
19             MR. WHITE:  Okay.
20             THE COURT:  It's not classified properly as an
21   administrative expense, so that's it.  Anything to add, Ms.
22   Dolcourt?
23             MS. DOLCOURT:  No, your Honor.  Just to be clear to
24   Mr. White, this doesn't affect your entitlement to a pension.
25   It's just the way the form was filled out.  We're just

1  reclassifying your claim as a pension claim.

2       MR. WHITE:  Okay.  So that was done in error or

3  misunderstanding or --

4       MS. DOLCOURT:  I think there might have been an

5  error in the way the form was filled out.

6       MR. WHITE:  Okay.

7       THE COURT:  All right.  Thank you.

8       MR. WHITE:  All right.  Thank you.

9       THE COURT:  Does that finish the seventeenth omnibus

10  claim objections?

11       MS. DOLCOURT:  It does, your Honor.

12       THE COURT:  All right.  So, Ms. Dolcourt, I'll ask

13  you to prepare and submit a proposed order reflecting the

14  rulings that I've made today.  I assume that, like the

15  other -- as with the other claim objections in which a

16  certificate of no response was filed this morning, this one

17  has a certificate of no response, and you already submitted a

18  proposed order which sustains the objections as to all of the

19  parties other than the ones who had filed responses.

20       MS. DOLCOURT:  Yes, exactly, your Honor.

21       THE COURT:  All right.  So submit this as an

22  additional order which deals with -- specifically with the

23  claims that were heard and ruled on today in this hearing.

24       MS. DOLCOURT:  Yes, your Honor.  Thank you.

25       THE COURT:  I'll waive presentment of that order,

1  and you submit it.  I'll review it, and we'll get it entered.

2           MS. DOLCOURT:  Thank you so much.  I appreciate it.

3           THE COURT:  Thank you.  Yep.  Thank you.  All right.

4  I believe that brings us to the status conference -- further

5  status conference.

6           MS. DOLCOURT:  Your Honor, I apologize.  I was just

7  informed that one of the other claimants on the seventeenth

8  omnibus objection is here but did not file a written

9  response, Ms. Deborah Zachary.

10          THE COURT:  Deborah who?

11          MS. DOLCOURT:  Ms. Deborah Zachary.  Her claim is

12  Number 1860.

13          THE COURT:  Well, she didn't file a written

14  response.  The claim objection is sustained.  That's it.

15          MS. DOLCOURT:  Thank you, your Honor.

16          THE COURT:  We're going to hear now the further

17  status conference regarding the city's objection to the

18  claims of the coalition of Detroit unions and AFSCME Council

19  25 and its affiliated Detroit local.  All right.  So good

20  afternoon.

21          MR. MACK:  Good afternoon.

22          MR. WILLEMS:  Good afternoon, your Honor.

23          THE COURT:  So we have Mr. Swanson, Mr. Mack, and --

24          MR. WILLEMS:  Mr. Willems.

25          THE COURT:  Willems.

1      MR. WILLEMS:  John Willems.  I'll be doing the

2  arguing today on behalf of the city.

3      THE COURT:  All right.  And you entered your

4  appearance earlier.

5      MR. WILLEMS:  Well, arguing.  The commentary.

6      THE COURT:  Okay.  So, Mr. Willems, I read the joint

7  status report that the parties filed last week, the 20th.

8  You don't seem to be really much farther than you were the

9  last time we had a status conference.

10     MR. WILLEMS:  Yeah, your Honor.  I'm sure we

11  disappointed you.  It's not as joint as you might have hoped.

12  You did ask us to discuss and get together with respect to a

13  plan for how to go forward on these claims.  The city has

14  made a proposal.  AFSCME has made its proposal.  They're kind

15  of distinct, but what I'd like to do is, if I may, make the

16  case for the city's approach, which is a mixed approach of

17  taking some of these issues to a threshold legal review and

18  mediating others.  And the city's approach is based on the

19  Court's order denying AFSCME's motion for abstention and the

20  joint statement of open issues that was filed by the parties

21  in the process -- in the abstention process, and it's really

22  a natural and logical evolution out of that -- out of that

23  process and out of the -- what the Court ordered and what the

24  parties agreed to.  So in the abstention order, the Court

25  noted that -- and this was based on the joint statement filed

1  by the parties in that process -- that some number of these

2  claims were susceptible to disposition on threshold legal

3  issues, and I'm citing to the abstention order, Docket 9047,

4  dated January 14th, 2015.  And the Court said expressly on

5  page 2, that statement, referring to the joint statement,

6  reflects that the claims on which abstention is sought may be

7  resolved through the Court's determination of certain

8  identified legal issues.  The Court concludes that the

9  interests of efficiency and economy would best be served by

10 deferring consideration of abstention until after it

11 determines those legal issues, so that sets the stage for

12 what the city is proposing here, so -- and notwithstanding

13 AFSCME's claims of inefficiency, that litigation and

14 mediating at the same time is counterproductive to the

15 mediation process, this Court certainly believes, as it

16 stated in that order, that deciding threshold legal issues

17 best serves the interests of efficiency and economy.

18             THE COURT:  Now, that order was entered by Judge

19 Rhodes.

20             MR. WILLEMS:  I'm sorry.

21             THE COURT:  That order was entered by Judge Rhodes,

22 as you know.

23             MR. WILLEMS:  Correct.

24             THE COURT:  And that was his view, and he didn't

25 specify in his order what parts of the claim, what legal

1    issues he was talking about.  You know, one could go back

2    perhaps and read the briefs of the parties on the abstention

3    motion and perhaps the joint statement and make educated

4    guesses about that, but you think -- the city thinks, at

5    least, that these issues that you've identified in your May

6    20 joint report, paragraph 13, these parts of the claims are

7    claims to which that reasoning applies.  There may be

8    threshold legal issues.

9         MR. WILLEMS:  Yes.  And, again, that's based on the

10   joint statement.  Our proposal is two-prong.  One is that

11   Claims 3, 4, 5, 6, 8, 9, 11, and 19 are those on which the

12   Court should decide threshold legal issues and that the other

13   two -- that there's another set, 10, 13, 14, 15, 16, 18, and

14   20, that really need no further involvement by the Court

15   because they've either been disposed of or they should be

16   mediated.  Now, of those in the joint statement, Claims 3, 5,

17   6, 8, and 11, if you look at the joint statement -- I have a

18   copy if you want to -- if you want it.

19        THE COURT:  No.  I have it.

20        MR. WILLEMS:  Okay.  So 3, 5, 6, 8, and 11 are

21   claims in which the parties agreed in one fashion or another

22   that the Court may decide preliminary legal issues and

23   dispose of the claims one way or the other in that regard.

24   We think that 4 is also susceptible to that process.  And

25   with respect to 9 and 19, our legal argument -- our legal

1 position on that is that the claims are insufficiently pled,

2 and we are certainly open to consideration of mediation if we

3 get more of -- a more definite statement as to the claims and

4 the underlying damages and liabilities. Excuse me. So

5 the -- what we're also proposing as part of the process is

6 that we take those that are subject to threshold review and

7 file a, quote, unquote, supplemental objection that brings

8 together all the arguments and exhibits that have been made

9 so far. When we took over this case, it took us awhile to

10 figure out where everything was at, and, you know, to -- in

11 the interest of efficiency and economy, I think it would aid

12 the Court to see all these claims argued in a single -- in a

13 single supplemental objection on each of these -- bringing

14 all of the -- because right now they're spread over replies,

15 objections. There's arguments in the motion for abstention,

16 and it's going to take a fair amount of effort on the Court

17 to sort of puzzle all that out.

18        In addition to that -- and I don't -- when I say

19 "supplemental," I don't mean that we're going to load in a

20 whole boatload of new arguments and exhibits and facts or any

21 of that, but I don't want the Court to be -- think it's being

22 misled. There are certainly some claims on which the city

23 feels that some of the legal arguments may need to be

24 refocused, some additional authority cited, and a few

25 additional exhibits presented. Now, that is also imbedded in

1  the joint statement.  In each of the -- in each of the claims

2  where the parties agreed -- excuse me -- agreed to a

3  threshold review, each party also left itself significant

4  reservation to add more information, perhaps agree on a set

5  of stipulated facts, but also perhaps, you know, undertake

6  evidentiary hearings, if necessary, so there's nothing here

7  that isn't already really part of the process, as was

8  envisioned earlier on, nothing new, nothing that should

9  surprise AFSCME, and it's our recommendation that we proceed

10  this way, that this will help the parties and the Court

11  focus -- the legal arguments focus on the facts and exhibits

12  that are relevant and material to those legal arguments.

13        THE COURT:  Well, what about stipulations?  I

14  thought from our discussion at the last conference that the

15  parties thought they could agree to some stipulated facts

16  that would streamline this process going forward.  There's no

17  stipulations filed yet.  Are we going to -- if they're going

18  to -- if there's a body or a group of facts that are relevant

19  or that at least one side or the other thinks is relevant to

20  these disputed matters that you want to brief now that the

21  parties agree on, why don't we --

22        MR. WILLEMS:  We're proposing that that --

23        THE COURT:  -- why don't we get stipulations filed

24  on that?

25        MR. WILLEMS:  We've had -- we've exchanged proposed

1   stipulations.  We've had one meeting to go over them.  It was

2   inconclusive, but we do have, I think, a number of material

3   facts that we can stipulate to, and I think that's a process

4   that needs to go forward and we should be able to conclude in

5   fairly short order.  I don't think that the stipulated --

6   that the facts that we end up stipulating to are going to be

7   all the facts that the parties want to present.  They're

8   going to be a portion, and they're going to be a significant

9   portion, you know, and a lot of them are going to include

10  exhibits that are -- you know, they're sort of self-

11  authenticating documents that are part of the progression of

12  the sequence of events that are at issue here, so I think

13  that's a viable process, and certainly our proposal, you

14  know, assumes that that's going to go forward.  I don't agree

15  with AFSCME's statement in the joint statement that the

16  intent was to have a threshold review only where all facts

17  are stipulated to.  If you look at the -- for example, what

18  the parties said in -- excuse me -- what the parties said on

19  Claim 3, for example, where there -- one of the claims where

20  there was agreement on a threshold review, and in one set of

21  words or language to that effect and in all the others where

22  there was agreement, the parties basically said the city and

23  AFSCME agree that the Court may first decide the threshold

24  legal issues provided that the parties will work in good

25  faith to present stipulated facts to aid in the determination

1 of the legal issues.  The parties believe that an evidentiary

2 hearing on the legal issues may be unnecessary, but each

3 party reserves the right to either, one, request an

4 evidentiary hearing if the parties cannot agree upon

5 stipulated facts or, two, contest such request or otherwise

6 argue that no additional disputed facts exist that would

7 prevent the Court's determination of the legal issues.  In

8 addition, the parties will provide the Court with any

9 additional information it may find necessary to render a

10 decision, so what's contemplated in the joint statement and I

11 think adopted by Judge Rhodes is that going forward there be

12 stipulated facts, no requirement that all the facts be

13 stipulated to and certainly no requirement that only

14 stipulated facts will support a threshold review.

15         THE COURT:  Well, let me ask you this.  How do

16 you -- how does the city want the filing of stipulations

17 and -- not only regarding facts but also regarding exhibits

18 that may be considered as admitted into evidence for purposes

19 of the Court ruling on these issues, how does that fit in

20 with the briefing schedule that you want me to set?

21         MR. WILLEMS:  Well, we've proposed, you know, kind

22 of a two-month period to present you with our proposed

23 supplemental objections and a similar period for AFSCME to

24 file a response, so, you know, if that's not a timeline the

25 Court is agreeable to, then obviously we will abide whatever

1    the Court sets, but we do see it as -- you know, we file the

2    objections.  They get to respond.  We get a short period to

3    reply.

4            THE COURT:  I know, but you talked about filing

5    exhibits, too.

6            MR. WILLEMS:  Yes.

7            THE COURT:  And there are going to be facts --

8            MR. WILLEMS:  Yes.

9            THE COURT:  -- that are relevant to the legal issues

10   and some of which are apparently undisputed and some of which

11   might be disputed.

12           MR. WILLEMS:  Correct.

13           THE COURT:  So how do we get those in, the

14   undisputed relevant facts or the undisputed facts that one

15   side or the other thinks is relevant and the exhibits?  The

16   easiest way is by stipulation.

17           MR. WILLEMS:  Sure.

18           THE COURT:  If you think that's just not going to

19   happen because the parties won't be able to agree on

20   anything, fine.

21           MR. WILLEMS:  Oh, no.  We absolutely will be able to

22   agree on some things.

23           THE COURT:  Well, if you will be able to agree, then

24   the question I asked is when does that stuff -- when do those

25   stipulations get filed in relation to the briefs?  What are

1    you proposing?

2          MR. WILLEMS:  Oh, well, along with the briefs.

3          THE COURT:  Well --

4          MR. WILLEMS:  I mean obviously we can do it

5    separately, but our -- you know, our plan is put it all

6    together in one package on each claim and submit it to you.

7    That way you don't have to go looking through any other

8    records.  Whatever the parties want to have you see is right

9    there in front of you in one package.

10         THE COURT:  Well, the city would go first under

11   paragraph 15 of your -- what you propose in the joint

12   statement here of last week --

13         MR. WILLEMS:  Correct.

14         THE COURT:  -- on or before July 31, you said.  A

15   separate brief regarding each of these eight issues?

16         MR. WILLEMS:  Well, yeah, a separate brief compiling

17   all the different briefs that have already been presented

18   that are already in the record, again, with probably some,

19   you know, modification or refocusing.

20         THE COURT:  By "eight issues," I meant these eight

21   numbered claims or subclaims.  You want to file a separate

22   brief not to exceed 15 pages regarding each of these subclaim

23   numbers?

24         MR. WILLEMS:  Yes.

25         THE COURT:  And what you're suggesting now is that

1    also the parties file any stipulations that they can agree to

2    regarding facts or exhibits at the same time the city files

3    its first set of briefs?

4             MR. WILLEMS:  Yes.

5             THE COURT:  And you're proposing July 31 to be that

6    deadline for those things?

7             MR. WILLEMS:  Yes, we are.

8             THE COURT:  And then I see what you said in

9    paragraph 13 about the other side responding and then reply

10   briefs and so forth.

11            MR. WILLEMS:  Correct.

12            THE COURT:  So before we hear from counsel for the

13   other side on these things, what about these remaining claims

14   that you refer to in paragraph 17 of the joint statement from

15   last week?  You mentioned earlier that they don't -- and you

16   said in the joint statement they don't need further court

17   involvement at this juncture.

18            MR. WILLEMS:  Well, there are at least three claims

19   that are -- that I don't think there's any dispute should be

20   mediated.  The others -- there is some, I guess, ambiguity

21   between the parties still as to whether or not they may have

22   been resolved by other processes.  We're still looking into

23   that.  If they are -- if they have not been, then the city is

24   agreeable to introduce those into the mediation as well.

25            THE COURT:  Well, do you want to be a little more

1    specific about mediation?

2         MR. WILLEMS:  Well, we've had some discussion about

3    what the mediation process is, but, frankly, it hasn't gotten

4    very far.  Obviously we need to come to a decision on a

5    mediator, some ground rules for the presentations to the

6    mediator, but I don't think either of us can stand here and

7    say that we've had a detailed discussion as to what that

8    process will be.

9         THE COURT:  So is it your view the parties are not

10   ready for the Court to enter any sort of mediation order at

11   this point?

12        MR. WILLEMS:  I would say that that's probably

13   correct, yes.  Unless it's an order that says the parties

14   shall mediate and says nothing more, we would not be ready.

15        THE COURT:  What good is that?

16        MR. WILLEMS:  Yes, exactly.

17        THE COURT:  All right.  Anything else you'd like to

18   say before we hear from the other side?

19        MR. WILLEMS:  I think I've pretty much said what I'm

20   going to say.  I'd like to reserve some rebuttal if --

21        THE COURT:  All right.  Mr. Mack.

22        MR. MACK:  Thank you, your Honor.  Your Honor, it

23   was 15 months ago when these proofs of claim were initially

24   filed, 12 months ago when the city filed its objections to

25   these claims.  I've got a great deal of respect for Mr.

1  Willems.  We've worked together in the past on other labor

2  cases.  I don't think either of us are very familiar with

3  this courtroom here, but I'm quite disturbed to hear that

4  there's a suggestion of additional briefing on claims that

5  are now 15 months old where the city has already filed, I

6  think, at least two on each of the claims, but beyond that,

7  your Honor, let me get to why we have been suggesting

8  mediation since when we first -- when we came before you back

9  in -- a month and a half ago now that we had raised the

10  prospect on April the 7th of mediation.  And I was, again,

11  pleasantly displeased -- or not pleasantly, but I was

12  displeased over the fact that the city is suggesting that

13  some of the claims should go to mediation and others go to

14  litigation.  Well, your Honor, we're dealing with one pot of

15  money within Class 14.  It's not going to get any bigger.

16  It's going to be the same amount that's got to be divvied up

17  by however many thousands of claimants.  Litigating hammer

18  and tong may get us a bit more here, a bit more there, but

19  after 15 months of having these claims outstanding, the

20  quickest easiest way is to make an effort to put everything

21  on the table to see what can be resolved.  The process of

22  mediation, Judge, in its essence, if both sides agreeing

23  we're going to --

24            THE COURT:  What do you mean by "everything"?

25            MR. MACK:  The claims we have, the claims we have on

1   appeal, the claims we -- we have two claims on appeal.

2           THE COURT:  Are you including in that the -- what

3   the city proposes in paragraph 13 of the last joint statement

4   to brief, Claims 3, 4, 5, 6, 8, 9, 11, and 19?

5           MR. MACK:  Yes.

6           THE COURT:  So it's everything.  Wasn't that already

7   done with Judge Roberts?

8           MR. MACK:  In a sense, yes, we did go through a

9   very -- the process was over a couple of very long days.

10  There was a hearing date set for two particular claims,

11  Claims 7 and 17, and the decision between the parties at that

12  point was let's make an effort to resolve everything before

13  we go to an adversarial hearing over Claims 7 and 17, so we

14  spent -- I think it was two or three very long days.  I

15  literally remember talking with one of the mediators at

16  midnight over the resolution of these claims.  And at the

17  very end, due to a misunderstanding of what the numbers were

18  worth, we were unable to settle, and it was -- by the way

19  that things were structured, Judge Rhodes was going to issue

20  a ruling and wanted things filed by -- I think it was three

21  o'clock that day, and at noon we were in the chambers of one

22  of the mediators, and we had this huge disagreement over what

23  the numbers we were talking about meant, and so the mediator

24  said, "Well, it's over.  You've got three hours to get what

25  you need to file," so, yes, there was an extensive mediation

process, but timewise, as far as the span of time, it was
abbreviated.  And as I mentioned, I've dealt with Mr. Willems
before in other cases, and so when I saw that he was counsel
for the city, I suggested mediation as a possible resolution.
The problem with mediation -- part of it, though, your Honor,
is if you think about it, mediation means, again, both sides
coming to the middle, and litigation means both sides
preserving that they want a hundred percent of what they're
asking for.  What the city is saying in its proposal is for
the claims we like, we want a hundred percent of what we're
asking for, but for the claims we don't like, we want you to
agree to come to the middle, so I've got to go to my client
and say, "Yeah, we're going to mediate some, but they're
going to preserve their right to get everything they want on
these others."  How much success am I going to have on
mediating the ones that we're asked to mediate for?  It's not
going to work if you get to cherry pick which claims you like
and don't like, Judge.  It's simply not.  You have to put
everything on the table and say -- now, you know, as much
as -- you know, much respect Mr. -- the city apparently has
for AFSCME's ability of persuading them to pay money on
claims they don't think they owe any money, you know, you're
dealing with round numbers.  You sit down, don't do it in a
couple of days, but you see what -- you know, what time you
take.  We set a schedule.  We get a mediator.  Matter of

1    fact, your Honor, in another case our firm had recently,

2    recommended -- and we had Judge Graves, and we get it done,

3    but it's not going to work if you piecemeal it.

4           As to the suggestion over the stipulated facts, I

5    think if you read the actual language of the joint statement

6    that was filed in January, it suggests their real intent.

7    With respect to Mr. Willems, again, I was there.  I put that

8    language together.  The intent was if we can agree -- I mean

9    your Honor is going to need facts to make a ruling on the law

10   for every one of the claims.  That's an absolute.  You're

11   either going to get the facts -- and I think the questions

12   you were asking are quite relevant.  You're either going to

13   get the facts by stipulation or by hearing or by affidavits

14   of some sort, and if we don't agree on what those facts are

15   and we file competing affidavits, the only way you're going

16   to have to determine which facts are true and not is by

17   having a hearing.  It's the only way it's going to get done.

18   What we were suggesting in the stipulated -- in the joint

19   statement filed in January was we're going to work to get to

20   the stipulated facts on those which we think we can.  In my

21   honest assessment, again, having been at this case since the

22   beginning, I think that there's a potential of getting with

23   some stipulated facts on maybe three of them, but as to the

24   others, there are factual disputes, Judge.  And we can

25   litigate and file four and five series of briefs on each

claim for the three issues that we may agree on stipulated
facts to, but then what are we going to do with the others?
So after we have that briefing for those, we've got to have
evidentiary hearings, and then even once you get beyond the
briefings on the merits say with number three and say that's
one of the ones I think may be stipulated facts there is a
possibility of us reaching agreement, so say if you make a
ruling and you rule in our favor that the claim has merit,
well, in that case you've still got to determine the damages.
So even for the claims which the city is saying should have a
threshold legal issue, there's still a need for either
mediation or an evidentiary hearing, and that claim, in
particular, involves about 80-some employees who were denied
overtime and holiday pay and so forth and so on, so either
we're going to agree on what the damages are -- and that's,
again, using their scheme of going through the threshold
legal issues first, stipulating facts, having four and five,
six years of briefs, you coming to a ruling, and by now we're
on what, October, November, maybe, 2016 sometime.  Then we've
got to still decide damages.  So, Judge, you know, I fear
that the city's process is going to take us -- not only is it
a cherry pick, in my opinion, but it's going to take us
months or years out having to deal with these claims, and I
think, again, that I would at least, before we do that -- I'm
not saying we won't have to do it.  Before we do it, I would,

1    I guess, ask your Honor to put us at one other effort in

2    mediation and with all of them, not just with some but with

3    all.

4         I don't know that I have much more to add, but I'd

5    be happy to -- on the -- as to -- the only -- there was a

6    comment made about the abstention order.  It's true that

7    he -- the judge said what he said.  You could read the order.

8    He did say that --

9         THE COURT:  I did read it.

10        MR. MACK:  -- yeah -- abstention wasn't appropriate

11   at this time.  There are a couple of the issues that are

12   unique to Michigan labor law, and what your Honor rules is

13   going to potentially have an impact on that, so the reason we

14   filed for the abstention is because, "A," we wanted to get to

15   quick resolution, maybe everything being dealt with at once,

16   and then, "B," with all respect to your Honor, I think that

17   some of those unique labor law issues, which some of them

18   haven't yet been ruled on by the courts because they're

19   dealing with statutes that are just three, four years old,

20   some two years old, ought to be first dealt with by the

21   tribunal that's in place for those as opposed to this

22   Honorable Court.

23        THE COURT:  Well, you're starting to reargue the

24   abstention motion.

25        MR. MACK:  No.

1    THE COURT:  Don't go there.  I'm not going to

2    revisit that.

3         MR. MACK:  Okay.

4         THE COURT:  I'm not going to revisit what Judge

5    Rhodes ruled on that.  He didn't say never to abstention.  He

6    said not now --

7         MR. MACK:  Yes.

8         THE COURT:  -- as I understand it, and, you know, I

9    agree with that now.  That's not to say that there may not

10   come a point where I see issues later on after this is

11   further developed and -- assuming no settlement and we're

12   litigating or I see issues where I agree with what you just

13   said, and so, yeah, I don't mean to say I'm closing the door

14   forever on abstention regarding anything.  I'm not saying

15   that.

16        MR. MACK:  No.  I appreciate that, Judge.

17        THE COURT:  We're not going to revisit that now,

18   though.

19        MR. MACK:  I appreciate that.

20        THE COURT:  All right.  Go on.

21        MR. MACK:  I appreciate it.  So that was, I think,

22   unless you have questions, our position.  Our request of this

23   Honorable Court would be to --

24        THE COURT:  Well, you wanted to file -- as I recall,

25   you were -- at the time of the January joint statement, you

1  were at a point where you wanted to file a surreply --

2        MR. MACK:  Yes, yes.

3        THE COURT:  -- to address some new issues that you

4  said the city raised in reply briefs.

5        MR. MACK:  Yes.

6        THE COURT:  So I assume you're still at that point.

7  If I don't agree with the city's proposed approach where we

8  have sort of a new round of briefing that pulls everything

9  together, you would still want a surreply; right?

10        MR. MACK:  Yes.  If your Honor does not agree that

11  mediation of everything is, you know, potentially a route we

12  should go, then, yes, we would still -- and the reason is

13  because the initial objection filed in May of 2014 was, you

14  know, very light on the facts and on the law, just basically

15  was a generic objection.  Our response to that objection was

16  much more meaty dealing with the specific legal issues on

17  each, and then the city's reply filed in -- you know, in

18  October made all sorts of new claims which really properly

19  should have been part of the original objection, so we've not

20  yet had an opportunity before you to respond to those.  To

21  suggest that there's going to be yet another layer of, you

22  know, not just cutting and pasting from the old objections

23  and saying this is all one document but maybe adding new law,

24  new argument, new theories, and then we -- I don't know when

25  this is going to end.  I just don't.  So, yes, I think --

1    THE COURT:  Well, if the city gets their way, it's
2  going to end with the next round.

3    MR. MACK:  Well, it would -- so then, as I
4  understand what the city is suggesting is they would file a
5  new supplemental brief.  We would file a supplemental
6  response.  They would file a supplemental reply.  And I think
7  I'm still at kind of the question you were asking, Judge, at
8  what point, assuming we do -- assuming we get the stipulated
9  facts, we can either file those along with the briefs or
10  separately.  At what point, if we get to claims where we
11  cannot -- like I think Claim 4, there's no way we're going to
12  have stipulated facts.  I just don't.  Again, having been
13  through this at the beginning, there's no way we're going to
14  stipulate to facts on Claim 4.  What do we do with Claim 4?
15  Do we have an evidentiary hearing at that point?  Do we hear
16  the legal arguments on Claim 3 and hold on the evidentiary
17  hearing for Claim 4?  I just -- I don't know that there's any
18  neat answer, and I think it complicates things greatly by
19  adding a whole 'nother series of briefings.

20    THE COURT:  One second.

21    MR. MACK:  Sure.

22    THE COURT:  All right.  Anything else, Mr. Mack,
23  before we hear a brief reply from Mr. Willems?

24    MR. MACK:  No.  I guess that I -- if your Honor is
25  entertaining some sort of -- well, I guess I reserve just to

1  hear whatever your Honor is entertaining.  Maybe I would have

2  some suggestions to whatever the particular schedule is, but

3  my initial request to you here is mediation for everything.

4      THE COURT:  Have you talked to opposing counsel

5  about that particular idea and they're not agreeable?

6      MR. MACK:  They're agreeable to some.  I mean

7  everyone agrees that --

8      THE COURT:  No, no.  You said on everything.

9      MR. MACK:  Yes.  Everyone agrees that some of the

10  claims ought to be mediated.  I think you can't cherry pick

11  some, but you ought to do all.  I've even suggested

12  bifurcating mediation.  If they want to deal with the ones

13  that everyone agrees ought to be mediated and then reserve

14  for a second round afterwards, I think, frankly, the momentum

15  built in the first round may cause cooler heads to prevail to

16  where we can just, you know, get some resolution on the

17  second round, but I haven't -- I think they're kind of

18  entertaining that idea as well.

19      THE COURT:  All right.  One moment.  All right.

20  Thank you.  Mr. Willems.

21      MR. WILLEMS:  I don't know where the idea of cherry

22  picking comes from.  I mean this is something we're simply

23  building on what was already agreed to in one form or

24  another, and I have to say if he's -- if Mr. Mack is going to

25  take credit for drafting the language, then I think we can

1  hold against him the fact that that language included all the
2  qualifications and the right to add evidence and all of that,
3  but that's not what we're talking about here.
4          THE COURT:  Why don't you start by talking about
5  mediation?
6          MR. WILLEMS:  Okay.
7          THE COURT:  You heard what he just said.  What's the
8  city's response?
9          MR. WILLEMS:  The city's response on mediating all
10  claims?
11         THE COURT:  Um-hmm.
12         MR. WILLEMS:  Our response is that we don't think
13  it's -- it doesn't work for us to simply take all these
14  claims, put them in a bag of money, shake it and see how much
15  falls out.  There are claims here that have no value, and I
16  think on some of these, if pressed, you know, even Mr. Mack
17  might concede that.  I mean Claim Number 3, for example,
18  that's a claim that not only, you know, is disposed of by the
19  very MERC decision they're challenging, but that issue was
20  litigated by the city, namely the issue of whether or not the
21  suspension of the duty to bargain extends to Act 312
22  proceedings, in other cases, and, you know, at the Circuit
23  Court level the judges all agreed with the city's position on
24  that.  There's simply no authority that I'm aware of -- and I
25  litigated these issues -- that they're going to be able to

1  bring to the table, so that's a claim that really needs to be
2  addressed on a legal basis and disposed of.  Claim Number 11
3  on longevity, there's a claim where the -- where they filed a
4  Department of Labor Claim, and the ALJ's found against them
5  in two separate decisions that were then enforced by the
6  Circuit Court.  Now, if you bring these kinds of claims to
7  mediation, you artificially invite inflating the total value
8  of all the claims, and that's a process that, from the city's
9  perspective, is not fair to the other creditors and certainly
10  doesn't make sense, so we're not cherry picking.  We're
11  looking at those claims where we --
12          THE COURT:  Well, are you, in part, saying that with
13  respect to those claims, those two claims you just mentioned,
14  3 and 11 --
15          MR. WILLEMS:  As examples, yeah.
16          THE COURT:  -- and perhaps others, that the city
17  views them as so without merit and value that the city is
18  just not willing to offer anything for them in a mediation?
19          MR. WILLEMS:  Right, but, you know --
20          THE COURT:  Is that what you're saying?  So the
21  mediation would be truly a waste of time?
22          MR. WILLEMS:  Mediation would be a waste of time.
23          THE COURT:  For sure.
24          MR. WILLEMS:  And not only that, but there's a risk.
25  You know, a mediator's job is to put a dollar value on

1   something.  They're not going to pay much attention to legal

2   arguments.  They're going to assume that the parties want to

3   come to the middle, as he said, even on claims where, you

4   know, we really should have our hundred percent because

5   there's no legal basis for the claim.  If this was, you

6   know -- well, I don't want to repeat myself.

7           THE COURT:  All right.  Go on.

8           MR. WILLEMS:  So, you know, on timing, well, you

9   know, even the claims objections deadline has been extended

10  to December 8th.  We proposed that this process be done by

11  then.  We think the threat of all this, you know, evidentiary

12  hearing and all of that is really kind of overstated --

13  extensively overstated because these are really large

14  broadscale kinds of legal issues.  You know, you can bring a

15  lot of facts to bear, but 90 percent of them or even 99

16  percent of them are not going to be material, and a dispute

17  over an immaterial fact really isn't going to make any

18  difference, you know, and I think the process that we've

19  proposed will pretty quickly suss out what material facts are

20  present or absent that allow you to make a decision.  And we

21  can, you know, bicker forever over this detail or that

22  detail, but, you know, most of the -- most of the critical

23  and material facts are going to be fairly easy to define and

24  present to the Court, and a lot of them are to be found in

25  the documents, you know.  There's really no -- not much in

1    the way of testimonial or affidavit evidence that we believe
2    is going to be required, and the documents are all self-
3    authenticating.  You know, we're not going to like all of
4    them.  Each party is going to have documents they don't like,
5    you know, and they'd rather not see, but they're not going to
6    be able to challenge them as inauthentic or anything like
7    that, so --
8              THE COURT:  Anything else?
9              MR. WILLEMS:  That's it.
10             THE COURT:  All right.
11             MR. WILLEMS:  Thank you, your Honor.
12             THE COURT:  All right.  Thank you.  I'm not going
13   to -- first of all, I'm not going to adopt at this point the
14   approach requested by Mr. Mack in today's hearing on behalf
15   of AFSCME and the coalition that the Court order mediation of
16   all parts of the claims that have not yet been resolved and
17   just put off any action toward moving this dispute closer
18   toward resolution via litigation.  Mediation is a great
19   thing, and I always encourage parties to mediate and to
20   consider and use other -- possibly other forms of alternate
21   dispute resolution.  I certainly would never discourage that,
22   but mediation was already tried with respect -- last fall
23   with respect to these claims and claim objections, and I
24   understand, I think, what Mr. Mack said about that in today's
25   hearing.  However, I'm not inclined to send everything back

1    to mediation and just hold off in moving this case -- these
2    matters forward on a litigation front in any part in the
3    meantime, so that's out.

4            Now, if the parties agree after -- some point after
5    today's hearing that they want to do that or something like
6    that or something approaching that, I certainly would
7    encourage you to make that known, file a stipulation, submit
8    a proposed order, tell me.  Let me know.  I'd be certainly
9    happy to consider that, but not as matters are currently
10   postured.

11           With respect to mediation and those subparts of the
12   claims which the parties can agree can and should be mediated
13   without delay and reach such an agreement, you know, either
14   very soon or down the road at any point, I would certainly
15   encourage the parties to discuss details regarding such
16   proposed mediation, see if you can agree on them, including
17   the mediator, procedures, issues to be mediated and the like,
18   and, to the extent you can agree, to -- I would encourage you
19   to file a stipulation, submit a proposed mediation order with
20   details, and I'd certainly be happy to consider that.  I
21   would encourage that.  In the meantime, we're going to tee
22   this thing up for -- at least with respect to these subparts
23   of the claim that the city has proposed in paragraph 13 of
24   last week's joint statement to move forward on briefing on.
25   The way I'm going to do this is I'm going to -- I'll prepare

1  and enter a scheduling order on this which says -- and I'm

2  going to apply to this, these further proceedings, Rule 56 of

3  the Federal Rules of Civil Procedure regarding summary

4  judgment motions.  That rule will apply, and what the parties

5  are to file will be motions for summary judgment.  Those

6  motions for summary judgment must be -- and this is regarding

7  subparts 3, 4, 5, 6, 8, 9, 11, and 19 of the AFSCME claim.

8           MR. MACK:  Could you say that again, Judge?  I

9  didn't write it all --

10          THE COURT:  The part numbers listed in paragraph 13

11  of last week's joint statement, 3, 4, 5, 6, 8, 9, 11, and 19.

12  The city must file a motion for summary judgment regarding --

13  with respect to each of those subparts of the claim, separate

14  motion, separate brief, briefs not to exceed 15 pages,

15  opening brief, and support the motion as appropriate and

16  permissible under Rule 56(c) of the Federal Rules of Civil

17  Procedure.  What that means, of course, is Rule 56(c)

18  materials may be used to establish the material facts that

19  the city deems relevant in support of its motions and may do

20  that by either the use of affidavits, deposition testimony,

21  if there is any in the record that -- or that can be put in

22  the record, exhibits which are properly authenticated by

23  affidavit, or by stipulation.  And stipulations -- I would

24  encourage the parties to try to agree on stipulations going

25  into this, stipulations of fact and also stipulations as to

1  authenticity and, to the extent the parties can agree,
2  admissibility for purposes of considering the material on
3  ruling on the motions and cover as much of that by
4  stipulation as the parties can with respect to each side's
5  motions because the creditors whose claims are subject to the
6  city's summary judgment motions may also file summary
7  judgment motions of their own if they wish to.  At the same
8  time, they must file a brief with respect to each subissue,
9  subclaim, responding to the city's summary judgment motion.
10 Briefs for the claimants are also not to exceed 15 pages per
11 motion, which means per subclaim.  And I'll set deadlines for
12 these filings in a minute.  And then the city, as moving
13 party, may file a reply in support of each motion for summary
14 judgment not to exceed five pages per brief.  And, you know,
15 I will say the Court strongly disfavors waiting until a reply
16 brief to put in a new argument.  That sort of sandbagging
17 will not be rewarded in this case, and I trust that the city
18 and the city's attorneys will not do that or even try to do
19 that.  And I mention that only because of what's been said
20 about AFSCME wanting an opportunity for a surreply and also
21 because it does happen on occasion that reply briefs have a
22 bunch of new arguments in them that really belong in the
23 opening briefs, so I'll -- I don't think I need to say
24 anything more on that subject here to these parties.
25         So I will -- I want to set deadlines for these

1  motions, response briefs, and reply briefs.  The response
2  briefs deadline for AFSCME and the coalition will be the same
3  date as the deadline for any summary judgment -- cross-motion
4  for summary judgment that they decide to file.  The city has
5  proposed July 31 in the joint statement filed last week for
6  filing supplemental objections.  I'll make July 31 the
7  deadline for filing the city's summary judgment motions.
8  That's a Friday.  Now, Mr. Mack, you wanted some input, I
9  think, into scheduling --
10         MR. MACK:  Yes.
11         THE COURT:  -- if I went down this path, so let me
12  give you that chance.
13         MR. MACK:  Thank you, Judge.
14         THE COURT:  Given July 31 as the date by which the
15  city will be filing its motions and briefs, what deadline do
16  you want for the creditors to have to file responses and any
17  cross-motions for summary judgment?
18         MR. MACK:  Yes, Judge.  What's proposed in paragraph
19  13 is the same amount of time -- I'm not -- let me find where
20  that's -- no -- sorry; Paragraph 15 -- forgive me -- with a
21  similar time frame for AFSCME to respond to each supplemental
22  objection.  I'm assuming that is a similar time from --
23         THE COURT:  Just tell me what you want.
24         MR. MACK:  I would suggest that.  I would also
25  suggest, your Honor, that in a Rule 56(c) motion practice,

1    typically there's been discovery which has happened

2    beforehand.  And as I read the rules, they provide us, as the

3    creditor, with the right to some form of discovery.  Now,

4    what's complicated about that is I don't know exactly -- I

5    have a sense, but I don't know exactly what their affidavit

6    is going to say, who they're going to use for affidavits or

7    what discovery may be necessary, but certainly the ability to

8    cross-examine affiants that they present would be something

9    important for us to have, and our joint statement filed in

10   January preserves all rights that may be allowable under the

11   rules and regulations with this Court, so we don't want to

12   foreclose our right to discovery.  I mean obviously if your

13   Honor doesn't think there's an issue of fact, that may impact

14   the right to an evidentiary hearing, but certainly the

15   ability to cross-examine affiants or test the authenticity of

16   documents that they may present is something that we'd like

17   to do depending on what's presented.

18          THE COURT:  Well, I acknowledge that just now was

19   the first mention anybody has made when I mentioned Rule 56,

20   subrule 56, but having said that, I'll also say I don't think

21   anybody has previously said anything about wanting leave to

22   conduct discovery in connection with these claim objections

23   and in particular --

24          MR. MACK:  It's in there.

25          THE COURT:  -- in particular with these threshold

1    issues, so-called threshold issues on these particular

2    subparts of the claim that I'm talking about here on these

3    motions, so I'm not going to grant leave to conduct discovery

4    at this point with respect to these claim objections.  That's

5    not to say I won't do that in the future if need be at some

6    point, and I do -- just would remind you that you have

7    available to you provisions of Rule 56(d) of Rule 56 if you

8    believe that it is important or essential to your ability to

9    respond to the city -- any of the city's summary judgment

10   motions to obtain specified discovery, so, anyway, having

11   said that, what -- how much time after July 31, Mr. Mack, do

12   you want for the creditors -- claiming creditors here to file

13   their responses to the city's motions and their briefs and

14   any cross-motions?

15            MR. MACK:  I'm getting my calendar out now.

16            THE COURT:  Sure.

17            MR. MACK:  I think the idea of the city's comment

18   was a similar time frame.  That's about a two-month time

19   frame, so I would suggest the same, I suppose.  I mean given

20   the fact that we've got to respond to --

21            THE COURT:  So you want till the end of September

22   basically?

23            MR. MACK:  Yes.

24            THE COURT: All right.  September 30, 2015.  The

25   city's reply briefs -- you said in paragraph 15 the joint

1    statement, 30 days.  What do you want, Mr. Willems?

2            MR. WILLEMS:  The reply brief?  Thirty days is

3    acceptable, your Honor.

4            THE COURT:  So end of October?

5            MR. WILLEMS:  Sounds good.

6            THE COURT:  October 30, 2015.  That's a Friday.

7    Now, when all this stuff is filed, we're going to need to

8    have a hearing.  I'm sure I'll want to have a hearing, and

9    we'll set a hearing, but I'm going to wait and see what gets

10   filed and have a chance to review it before I notice it for a

11   particular hearing date, so -- and I'll pick probably a

12   Wednesday afternoon where there's nothing else before me but

13   these motions to do this so that it's just you guys and

14   you've got hopefully plenty of time for the argument, and

15   that is an oral argument.  It's not an evidentiary hearing.

16   I would make known in advance before ever setting an

17   evidentiary hearing if something is going to be an

18   evidentiary hearing.  This is a -- I'm talking about an oral

19   argument basically hearing on these motions.  So the hearing

20   date is to be determined on these.

21           MR. MACK:  Judge, may I ask --

22           THE COURT:  Yeah.

23           MR. MACK:  Building into this schedule, as

24   indicated, we would be reserving our right to request

25   discovery as appropriate.  Would we build in a deadline for

1  the unions to move for discovery on particular issues?  I
2  mean at this juncture, as stated, I don't know exactly what
3  they're going to present.  We will know by July 31st, and --
4          THE COURT:  What sort of deadline do you want for
5  that?
6          MR. MACK:  I'm thinking -- well, it depends.
7          THE COURT:  Thirty days after the motions are filed?
8  Is that enough?
9          MR. MACK:  Sure.  But if it's 30 days for us to
10 request can we have discovery or 30 days to request
11 discovery, if you're indicating that there should be a basis
12 for us to, in fact, have it, then --
13         THE COURT:  Thirty days to request leave to conduct
14 discovery regarding specified issues to enable you to
15 properly fully respond to the motions.
16         MR. MACK:  I won't need 30 days to request leave.  I
17 can do that in two weeks.
18         THE COURT:  Okay.
19         MR. MACK:  So if -- once I get there --
20         THE COURT:  Sounds like you're already planning to
21 do it, but --
22         MR. MACK:  For some of them, I don't know.  I
23 mean --
24         THE COURT:  Yeah.
25         MR. MACK:  Based on our conversations, for some of

1  them, I do think we will.

2        THE COURT:  All right.  Two weeks after July 31 is

3  August 14, so August 14, 2015, will be -- I'll set that as a

4  deadline for the creditors to file either a request or a

5  stipulation if you can get agreement from the city granting

6  the creditors leave to conduct discovery regarding specified

7  matters relevant to the city's motions.  Does that work?

8        MR. WILLEMS:  I'm going to object to that, your

9  Honor.  It's going to take him two minutes to two days to

10  turn around and tell me he wants discovery.

11        THE COURT:  Your objection is overruled.  Does that

12  work for you, Mr. Mack?

13        MR. MACK:  It does.

14        THE COURT:  All right.  Anything else you want to

15  say, Mr. Mack?

16        MR. MACK:  Other than the fact that the reason

17  discovery wasn't addressed before is because of the way we

18  contemplated joint statement of facts, stipulated facts, is

19  that we wouldn't need discovery because we would agree on the

20  facts as presented, and so --

21        THE COURT:  I still am hoping you'll do that.

22        MR. MACK:  And we very well may.  Given the fact

23  that there's now a brief due, you know, maybe that will for

24  the three that I think are possible to do that in, we can

25  have that conversation, but that's why discovery hasn't been

1   mentioned heretofore because we had been --

2          THE COURT:  All right.  All right.

3          MR. MACK:  -- planning on stipulated facts.

4          THE COURT:  Okay.

5          MR. MACK:  Thank you, Judge.

6          THE COURT:  So I'm going to wrestle this order to

7   the ground and prepare it and enter it reflecting the further

8   proceedings that I just described, and we'll go from there.

9   That's it for today on these matters.  Thank you.

10         MR. MACK:  Thank you.

11         MR. WILLEMS:  Thank you, your Honor.

12         THE COURT:  Okay.  That leaves one motion yet to be

13  heard today, and that's the City of Detroit's motion

14  regarding the Detroit Police Lieutenants and Sergeants

15  Association state actions and related matters.  The motion

16  is -- the title of the motion is too long for me to read, but

17  it's Docket Number 9250 -- 9523, and we'll hear that now.

18         MR. RAIMI:  May I proceed, your Honor?

19         THE COURT:  Yes, please.

20         MR. RAIMI:  Thank you, your Honor.  May it please

21  the Court, my name is Charles Raimi.  I'm the deputy

22  corporation counsel for the City of Detroit.  The DPLSA in

23  state court filings seeks to compel the city to provide

24  healthcare to certain city retirees, specifically those

25  married to an active DPLSA member, and I'll refer to those

individuals as retiree spouses.  This is the city's motion
asking the Court to find that DPLSA's state court filings
violate the plan of adjustment and should be dismissed, and
we also seek an injunction against further violations.

As this Court is well-aware, the city exited
bankruptcy last December when the plan of adjustment became
effective.  The city's balance sheet has been greatly
improved, and Judge Rhodes found the plan of adjustment to be
feasible, but there's a huge gulf between feasible and
successful, and turning feasible into successful is going to
take hard work, diligence, and courage to protect the gains
achieved under the plan of adjustment and turn those into
tangible benefits for the citizens of the city.

Your Honor, under the plan of adjustment, the city
funded the retiree health VEBAs with $450 million in new B
notes.  Those VEBAs and the funding provided by the city is
specifically for the purpose of providing support and funding
for healthcare for city retirees, including the spouse
retirees that are at issue in this motion.  That's why the
city paid that money.  And that funding, your Honor, was made
on the express condition the city had no further
responsibility to any city retiree to provide retiree
healthcare.  DPLSA now seeks to upend those provisions of the
plan of adjustment.  They want to siphon dollars out of the
city's general fund, money that's desperately needed for

1   basic city services, and use that money for a special deal

2   for the retiree spouses married to DPLSA members.  These

3   sorts of special deals, your Honor, are exactly what led the

4   city into bankruptcy in the first place.  DPLSA argues

5   they're entitled or they seek a state forum to, quote,

6   interpret and enforce its collective bargaining agreement,

7   the CBA, but there's nothing in the CBA to interpret or

8   enforce.  There's nothing in the CBA that even addresses

9   retiree spouse healthcare let alone purports to compel the

10  city to provide it.  And, in fact, the CBA, your Honor,

11  really provides no details at all about the healthcare

12  available to DPLSA members.  There's nothing in the CBA about

13  the benefits or the specific coverages.  Instead, what the

14  CBA does, your Honor, is it incorporates by reference the

15  city medical plan document.  Your Honor, that document --

16  it's about 30 pages long.  At great expense, that medical

17  plan document was mailed out to each and every city employee

18  during open enrollment in the fall of 2014.  And, of course,

19  the purpose of that was to give city employees, including

20  DPLSA members, information -- basic information about

21  coverages and benefits available, so what's key here, your

22  Honor, is that the medical plan document prominently

23  emphasizes in crystal clear language the plan of adjustment's

24  prohibition on retiree spouses receiving city-provided

25  healthcare, and that's at page 6 of the medical plan document

1    that's been provided to the Court.

2            THE COURT:  This is Exhibit 6-B to the city's

3    motion; right?

4            MR. RAIMI:  Yes.  That's correct.  And it's on

5    page --

6            THE COURT:  Entitled "2014 City of Detroit Active

7    Employee Benefits"?

8            MR. RAIMI:  Yes.  On page 6, your Honor -- I believe

9    it's actually in two places on page 6 of that document

10   that --

11           THE COURT:  Page 6 is a table of contents.

12           MR. RAIMI:  No.

13           THE COURT:  Oh, I see.  I see.  Never mind.

14           MR. RAIMI:  Yeah.

15           THE COURT:  Yeah.  All right.  Hold on.

16           MR. RAIMI:  And in two places --

17           THE COURT:  Yeah, yeah.  Those are the provisions

18   you quoted in your brief.

19           MR. RAIMI:  That's correct, your Honor.

20           THE COURT:  Yeah.  Okay.  I see.

21           MR. RAIMI:  Your Honor, the city's position is that

22   even if there was no medical plan document, DPLSA's claim

23   would be barred by the plan of adjustment and its unambiguous

24   language saying that the city's contributions to funding the

25   VEBA were the only monies the city had to spend on retiree

1  healthcare, but the fact is --

2          THE COURT:  And that's based on this provision on

3  page 43 of the confirmed plan, I guess?  You quote that in

4  your pages 1 to 2 of your brief.

5          MR. RAIMI:  Yes.  It's actually page 43 of the

6  confirmed plan.  It refers to a funding for the Detroit

7  general VEBA of 218 million in new B notes and funding to the

8  police and fire VEBA of 232 million in new B notes, and then

9  there's a Section C that says no further responsibility,

10  which makes clear that the city has no further

11  responsibility.

12          THE COURT:  And the first sentence of C is -- I

13  think you're relying on that where it says, "From and after

14  the effective date, the city shall have no further

15  responsibility to provide retiree healthcare or any other

16  retiree welfare benefits."

17          MR. RAIMI:  Right.  That's correct.

18          THE COURT:  All right.  And so you're saying that's

19  conclusive?

20          MR. RAIMI:  I believe that's conclusive, but the

21  fact that this is also incorporated into the medical plan

22  document, that same prohibition, coupled with the fact that

23  the CBA expressly incorporates the medical plan document by

24  reference --

25          THE COURT:  How does it do that?

1        MR. RAIMI:  If the Court has the --

2        THE COURT:  I was a little unclear on the link

3   there.

4        MR. RAIMI:  If the Court has the CBA, the collective

5   bargaining agreement --

6        THE COURT:  It's Exhibit 6-A to your motion.  I do

7   have it in front of me.

8        MR. RAIMI:  Yes.  If the Court turns to page 48 --

9        THE COURT:  I see it.

10       MR. RAIMI:  -- and sub A, the first sentence, reads,

11  "During the term of this agreement, employees will be

12  eligible to participate in the group medical, prescription

13  drug, dental, and vision plans," quote, medical plans offered

14  by the cities, and those medical plans are what are embodied

15  in that medical plan document that I referenced earlier.  And

16  then if you turn then to sub E of 43 on page 51, the first

17  sentence in sub E says, "Except as provided in this article,"

18  and there is nothing to the contrary in the article, "the

19  extent of coverage under the city's medical plans will be

20  governed by the terms and conditions set forth in the

21  applicable medical plans offered by the city during the term

22  of this agreement."  So when the medical plan document was

23  mailed to each city employee at the time of open enrollment,

24  that allowed the employees to get a summary of the available

25  benefits.  There's two different providers.  There's HAP,

1  there's Blue Cross that you can choose from.  And that same

2  medical document, plan document, that described the benefits

3  also provides at page 6 no coverage for retiree spouses.

4          THE COURT:  Again, this is -- you're talking about

5  Exhibit 6-B to your motion?

6          MR. RAIMI:  Right, the medical --

7          THE COURT:  Yeah.

8          MR. RAIMI:  Yeah.

9          THE COURT:  I guess what I was asking is what

10  specifically in the collective bargaining agreement says that

11  that document, Exhibit 6-B, that document is the medical

12  plans or the document which states what the medical plans

13  are, in other words, that ties it in -- that ties that

14  document to the collective bargaining agreement's reference

15  to medical plans --

16          MR. RAIMI:  Well, I think that --

17          THE COURT:  -- the medical plans offered by the

18  city?

19          MR. RAIMI:  Well, that's the only document by which

20  the city's medical plans are offered.  That's the only

21  document.  And we have -- when the question was raised in

22  DPLSA's response, we did provide the Court with the affidavit

23  of Michael Hall to authenticate the fact that that medical

24  plan document is, in fact, a document that goes out to the

25  employees for open enrollment.  That is the document by which

1  employees are advised as to their choices of benefits and

2  medical providers.  It's that document.  There is no other

3  document, so when --

4          THE COURT:  Where is this affidavit of Michael Hall

5  in the record?

6          MR. RAIMI:  It's in the reply brief, your Honor.

7          THE COURT:  I didn't see your reply brief.  When did

8  you file that?

9          ATTORNEY:  Friday.  I can give you the docket

10  number.

11          MR. RAIMI:  It was filed last Thursday, wasn't it?

12          ATTORNEY:  Last Thursday, yeah.

13          MR. RAIMI:  It was filed last Thursday.

14          THE COURT:  Well, I'm sorry.  I missed it.  I was

15  looking for a reply brief and wondering why --

16          ATTORNEY:  98 --

17          THE COURT:  -- it wasn't there, and I didn't see it.

18          ATTORNEY:  9855.

19          MR. RAIMI:  Counsel says 98-55.

20          ATTORNEY:  9855.

21          MR. RAIMI:  98 -- Docket Number 98 --

22          ATTORNEY:  Docket number.

23          MR. RAIMI:  -- 9855.

24          THE COURT:  All right.  Hold on.  Hold on.

25          MR. RAIMI:  So we did --

1          THE COURT:  Just a minute.

2          MR. RAIMI:  I was actually quite surprised to see

3    DPLSA even question the medical plan document because, as I

4    said, it went out by the mail to every employee, but just to

5    cover that base in our reply brief, we included the

6    declaration of Mr. Hall, the city's labor relations director,

7    and he authenticated that as the medical plan document.

8          THE COURT:  I see the document, and I'm sorry I

9    missed it.  I was looking for it and didn't find it, and so I

10   have not read your reply brief or its exhibits.  I'll

11   certainly do that before I rule on this motion.  So I see the

12   declaration of Michael Hall you've just referred to of May 6,

13   2015, and it looks like you got another -- well, you got a

14   copy of the 2015 City of Detroit active employee benefits

15   document attached to that, which is what the next year's

16   version of what's your Exhibit 6-B to the motion, the 2014

17   one.

18         MR. RAIMI:  That's correct.  And actually it was

19   that 2015 document that went out in fall of 2014, but the

20   provisions on retiree spouse --

21         THE COURT:  Oh, it is.  Is that what Mr. Hall says?

22         MR. RAIMI:  Yes.

23         THE COURT:  All right.

24         MR. RAIMI:  The provisions on -- that prohibit

25   coverage of retiree spouses are the same in 2014 and 2015

1   documents, so the language on page 6 that we looked at

2   earlier is the same.

3           THE COURT:  Okay.  Thanks.  Go ahead.

4           MR. RAIMI:  So I hope I was clear in responding to

5   your Honor on the -- when the CBA, the collective bargaining

6   agreement, makes reference to the city medical plans, that

7   is, in fact, reference to that medical plan document, and

8   that is how that gets incorporated into the CBA.  But, again,

9   there's nothing in the CBA that in any way, shape, or form

10  purports to allow or require the city to provide coverage for

11  retiree spouses, and on that basis alone the DPLSA argument

12  fails.  It's barred by the plan of adjustment.

13          Your Honor, I'd just like to close on an issue of

14  the jurisdiction which was raised by the DPLSA, and, again,

15  they want a state court forum to what they say is to

16  interpret and enforce the CBA.  And, again, our position is

17  there's nothing in the CBA to interpret or enforce, and their

18  argument is barred by the plan of adjustment and the medical

19  plan document.  But on this issue of jurisdiction, this Court

20  faced a similar question just a few months ago, and that,

21  your Honor, was a dispute involving an Open Meetings Act

22  case.  This was when Judge Rhodes was still presiding over

23  this case.  And plaintiff in that case, your Honor, was

24  trying to get public disclosure of transcripts of closed city

25  council hearings, hearings that have been closed under

provisions of the Open Meeting Act.  The plaintiff challenged
the closure of these sessions and asked that the transcripts
be publicly disclosed.  The city removed the Open Meetings
Act case to this Court, and the plaintiff argued that this
Court should not hear the Open Meetings Act case, in fact,
didn't have jurisdiction.  Plaintiff said that the Open
Meetings Act case raised only questions of state law that
should be heard in state court.  The city argued, and this
Court agreed, that a state court judge unfamiliar with the
bankruptcy would not be in a position to appreciate the harm
that could result to the city's efforts to successfully exit
bankruptcy, and so it would be improper for a state court
judge to review those transcripts, and, rather, the
bankruptcy judge was the appropriate forum to do that.  This
Court agreed with that.  Your Honor, in this case, DPLSA
wants this dispute to be decided by --

THE COURT:  Was that decided before or after
confirmation?

MR. RAIMI:  Before.

THE COURT:  You must -- it looks like you cite that
in your reply brief.

MR. RAIMI:  Yes, we do.

THE COURT:  So I'll be able to find it from there.

MR. RAIMI:  Oh, yes.  There were also closed --
there were also sealed decisions.

1          THE COURT:  Before?  Did you say before

2   confirmation?

3          MR. RAIMI:  Yes.

4          THE COURT:  Okay.

5          MR. RAIMI:  Yeah.

6          THE COURT:  All right.

7          MR. RAIMI:  It was -- yeah.

8          THE COURT:  So it didn't deal with interpreting

9   these retention of jurisdiction provisions under the

10  confirmed plan?

11         MR. RAIMI:  It did not, but I think the reasoning --

12  obviously we think the retention of jurisdiction provisions

13  under the plan are actually stronger than what we were

14  dealing with at that time, but I think the logic is the same,

15  that these sorts of issues that attack the plan of adjustment

16  need to be decided by this Court, who is familiar with the

17  plan of adjustment and understands what an attack on the plan

18  of adjustment could do to the city's trying to successfully

19  exit from bankruptcy, so we think the logic is the same.  And

20  obviously we've cited the jurisdictional provisions in our

21  briefs, and we think those are more than adequate to cover

22  this situation, but we thought that the Open Meetings Act

23  case was at least instructive on this issue.

24         THE COURT:  Well, I assume part of your argument is

25  that if the Court finds and agrees with the city that the

1    state actions that were filed by the association, the DPLSA,

2    that are the subject of your motion, if they are enjoined by

3    the confirmed plan, they --

4           MR. RAIMI:  Yes.

5           THE COURT:  -- violate the injunction of the

6    confirmed plan and they seek relief that is barred by the

7    confirmed plan, as the city argues, then your view of the

8    retention of jurisdiction provisions in the confirmed plan is

9    that the Court -- this Court has -- is the Court that has

10   jurisdiction and authority to decide that issue on the merits

11   and, if it agrees with the city, to enjoin the actions.

12          MR. RAIMI:  Exactly.

13          THE COURT:  And if the Court, hypothetically

14   speaking, were to rule that what the state actions are

15   seeking is not barred by or inconsistent with the confirmed

16   plan but, rather, is seeking a -- enforcement of the

17   collective bargaining agreement and what the association says

18   that agreement means and what rights that provides, then is

19   it your view that this retention of jurisdiction provision

20   that the association relies heavily on does or does not

21   apply?  And that's the provision that says that the Court

22   retains jurisdiction.  It's B, to confirm the maturity date

23   and terms as written of the collective bargaining agreements,

24   et cetera, and then it says in parentheses it being

25   understood that the enforcement, interpretation, and

1    resolution of disputes of the terms of the contract shall

2    proceed under applicable state law.

3            MR. RAIMI:  Well, I have great difficulty even

4    understanding what provision of the CBA would invoke that.

5    Our position is there's nothing in the CBA to interpret or

6    enforce in this case.

7            THE COURT:  But isn't the -- aren't the state

8    actions based solely on the terms of the CBA and what the

9    association says that that document means?

10           MR. RAIMI:  Without citing anything in the CBA, yes,

11   they do cite the CBA, but they don't explain what in there

12   supports their position or let alone purports to overrule the

13   plan of adjustment language, but you are right.  I view that

14   language of retention of jurisdiction, your Honor, in this

15   way.  There are thousands or millions of labor disputes that

16   arise all the time, grievances over working conditions,

17   grievances over firings, and those sorts of things, your

18   Honor, are clearly under that jurisdictional provision not

19   for this Court.  They're for the state procedures, but that's

20   your typical -- you know, probably 99 percent of your labor

21   issues.

22           THE COURT:  Okay.  So you're going to tell me how

23   this dispute is different.

24           MR. RAIMI:  This dispute is different because it's a

25   direct attack on the plan of adjustment.

1          THE COURT:  Because -- at least the city says

2     because it's inconsistent with and barred by the plan.

3          MR. RAIMI:  Yes.

4          THE COURT:  Right?  Okay.

5          MR. RAIMI:  Yeah.

6          THE COURT:  All right.

7          MR. RAIMI:  So it's a completely different

8     situation.  If somebody has a grievance because their hours

9     were cut, that has nothing to do with the plan of adjustment.

10    Here they're saying despite the fact the city paid $450

11    million of new B notes to fund those health VEBAs and despite

12    the fact the plan of adjustment says you have no further

13    obligations, city, DPLSA says, "Oh, wait.  Thank you for

14    funding those VEBAs, but for these particular healthcare

15    retirees, we want the city to pay," directly contrary to the

16    plan of adjustment.  Unless the Court has anything further,

17    I'll reserve a brief rebuttal.

18         THE COURT:  I don't think so.  Thank you.  All

19    right.  Ms. Patek.

20         MS. PATEK:  Good afternoon, your Honor.  Again,

21    Barbara Patek on behalf of the Detroit Police --

22         THE COURT:  I'm sorry.  Patek.  Pardon me.

23         MS. PATEK:  Patek is probably the technically

24    correct pronunciation.

25         THE COURT:  I thought that's how you said it

1  earlier, so I was trying to --

2          MS. PATEK:  No.

3          THE COURT:  -- get that right.

4          MS. PATEK:  If I were the shortstop for the Kansas

5  City Royals, it would be the correct pronunciation of my last

6  name.

7          THE COURT:  Yeah.  That's what I remember, but -- so

8  what do you want me to call you?

9          MS. PATEK:  Patek is fine.

10         THE COURT:  Patek.  All right.  Thank you.  Go

11  ahead.

12         MS. PATEK:  The city's motion here has to be denied,

13  your Honor.  There is no violation of a plan injunction

14  because the benefit sought here is not a Class 12 OPEB

15  benefit but is a benefit that the DPLSA bargained for for its

16  members, and that is the right to have dependent spousal

17  coverage whether that member's spouse is disabled, has a

18  preexisting condition like cancer or diabetes or heart

19  disease, or happens to be married to a retired city employee.

20  The issues before the Court turn on basically two questions,

21  and I think the first one the Court raised some questions in

22  response to the city's argument, and that is what is the

23  meaning of the word "plan" here.  And there is, of course,

24  the plan of adjustment, there is the city medical plan, and

25  then there is this alleged city medical plan document, which

1   I will address in a moment.  And then the second is whether
2   the benefit being sought here is a retiree benefit or a
3   benefit to which an active member is entitled, and I want to
4   deal with that first question first.

5          Nothing in the treatment -- although the city cites
6   repeatedly to the treatment of the Class 12 claims -- there
7   is not a word in the plan that addresses the issue of a
8   retiree who happens to be married to an active employee who,
9   through his or her status as an active employee, has a right
10  to dependent healthcare coverage.  No further responsibility
11  has to do with the city's rights or obligations to that
12  retiree vis-a-vis his or her status as a retiree.  Section A
13  deals with the setup of the general VEBA, Section B deals
14  with the setup of the Detroit Police and Fire VEBA, and
15  Section C is the no further responsibility portion that I
16  just referred to.  The OPEB settlement --

17         THE COURT:  You're talking about page 43 of the
18  plan, I guess.

19         MS. PATEK:  Yes.  Correct, your Honor, 43 going on
20  to page 44, and the treatment actually begins on page 42
21  with, I think, the setup of the general VEBA.  The OPEB
22  settlement negotiated by the Retirees' Committee is Docket
23  Number 8045, and that appears at pages 695 through 708 of
24  that document.  There is not a word in that document about
25  what happens when a retiree spouse happens to be married to

1    an active employee who has certain rights pursuant to the

2    collective bargaining agreement that covers his or her

3    benefits.

4         The VEBA trust documents is another document that

5    would come into play.  That's Document 8045-1, and at pages

6    11 through 56 of that document it talks about how those two

7    trusts are going to be set up, who's going to sit on the

8    boards, again, not a word about what happens if a city

9    retiree also happens to be married and may have a separate --

10   or whose spouse has a separate right to healthcare benefits

11   vis-a-vis his or her status as an active employee.

12        Now, I want to diverge for a moment because I do

13   want to comment a little bit on the suggestion that the

14   DPLSA's pursuit of this issue is somehow a request for a

15   special deal, and I think -- and, again, I know this Court

16   post-effective date is handling these matters, and I'm sure

17   the Court has reviewed the pleadings that came before, but

18   nothing could be further from the truth.  The DPLSA together

19   with the three other Detroit public safety unions came into

20   court from day one in this bankruptcy, and while they were

21   challenging the city's eligibility, they supported the city's

22   request for a stay as to all proceedings.  They acknowledged

23   the city's service delivery insolvency, and they actively

24   sought to partner with the city in the bankruptcy proceedings

25   and to be a constructive force in those proceedings.

1          Through the order for mediation that Judge Rhodes

2    issued early in the case, which included negotiations between

3    the Detroit public safety unions, including the DPLSA and the

4    other public safety unions, the city was able to confirm a

5    plan of adjustment that allowed it to exit bankruptcy with

6    negotiated collective bargaining agreements with each of its

7    four public safety unions, and I can't tell you -- I don't

8    know the history enough, but you'd have to go back a lot of

9    years to find the last time that happened without the benefit

10   of an Act 312 arbitration or something like that, so this

11   collective bargaining agreement was highly negotiated.  The

12   language -- the city's counsel cited to the retention of

13   jurisdiction language.  Again, that was language -- we're in

14   Chapter 9.  The city has enormous control over how things are

15   going to be treated under the plan and what the Court -- you

16   know, in a Chapter 11, for example, an issue as to what the

17   collective bargaining agreement meant post-confirmation, that

18   would absolutely not be something that would ever come before

19   the Bankruptcy Court.  Here the city had control over that

20   issue, and it very deliberately chose language that expressly

21   limited this Court's jurisdiction over the DPLSA collective

22   bargaining agreement to confirming the maturity date and the

23   terms as written of the collective bargaining agreement.

24        Now, we walked the Court in our brief through the

25   different iterations of what's in the collective bargaining

agreement and what is in this document, but I do want to
address the city's reply brief and some of the issues raised
by that.  Again, to reiterate, this definition of retiree
spouse that shows up in the brief, it's a defined term in the
brief.  It is not a defined term anywhere in the plan of
adjustment.  What Mr. Hall actually said to, quote,
authenticate the 2015 City of Detroit active employee
benefits booklet was the following:  "I am familiar with the
document titled '2015 City of Detroit Active Employee
Benefits.'  That document is appended as Exhibit A and is
referred to in this declaration as the 2015 plan document."
Nowhere in his affidavit does Mr. Hall say that this is
actually the medical plan document, and the City of Detroit
active employee benefits booklet, which is an informational
booklet, it's true, that was mailed to city employees,
there's no question that these disclaimers -- and it may have
been what the city wanted, but it's not what it negotiated
about retiree eligibility for healthcare -- were included in
it, but that same document specifically and repeatedly
disclaims that it is a contract or that it is in any way
contractual.

          Now, with respect to what is -- what's actually in
the collective bargaining agreement with regard to
coverage --

          THE COURT:  Before you move into that --

1          MS. PATEK:  Sure.

2          THE COURT:  -- you read a minute ago -- you

3     obviously were reading from paragraph 3 of Michael Hall's

4     declaration --

5          MS. PATEK:  Yes.

6          THE COURT:  -- first sentence, and your point about

7     that was what?

8          MS. PATEK:  My point about that is the idea that

9     this is the -- that this document -- that is, the 2015 City

10    of Detroit active employee benefits informational booklet --

11    is a, quote, plan document is simply inaccurate.  I'm not

12    sure that's an issue for this Court because I think it's an

13    issue as to the interpretation of the collective bargaining

14    agreement and, frankly, something that would be decided if

15    this case were remanded to Administrative Jaw Judge Stern,

16    but I do want to address this idea that the collective

17    bargaining agreement is silent on the issue of spousal

18    retiree healthcare, and I think that is simply inaccurate.

19         If you look at Section 43 of the DPLSA collective

20    bargaining agreement, which is attached as -- I believe it's

21    Exhibit -- is it 6-B?

22         THE COURT:  6-A.

23         MS. PATEK:  6-A.

24         THE COURT:  Yeah.

25         MS. PATEK:  The first paragraph talks about medical,

1   prescription drug, dental, and vision plans, medical plans,

2   plural.  There is more than one medical plan, and, in fact,

3   there are two administered by the city and a third

4   independently administered by an entity called C.O.P.S.

5   Trust.  So it then goes on to talk about --

6           THE COURT:  Well, the phrase doesn't say medical

7   plans, plural.  It says medical, prescription drug, dental,

8   and vision plans, plural.

9           MS. PATEK:  Yeah.  And then in paren medical plans

10  it becomes a defined term.  And then unless the --

11          THE COURT:  Covering all of those things?

12          MS. PATEK:  Yes.

13          THE COURT:  Yeah.

14          MS. PATEK:  Okay.  So unless the parties mutually

15  agree otherwise, the city's 2014 medical plan designs, quote,

16  the medical plan designs, will remain in place during the

17  terms of this agreement, so what are the medical plan

18  designs?  The medical plan designs, in fact, appear at pages

19  35 and 36 of both the 2014 document attached to the city's

20  original brief and the 2015 document which we attached to our

21  brief and which is also appended to Mr. Hall's affidavit.

22  And that at pages 35 and 36 talks about employee medical plan

23  designs and consistent with the definition talks about

24  deductibles, co-insurance --

25          MR. RAIMI:  I'm sorry, counsel.  I'm not following

1  where you are in the plan.

2        MS. PATEK:  I'm sorry.  I am on page 35 and 36 of

3  the medical -- what the Hall affidavit refers to as the

4  medical plan design.

5        MR. RAIMI:  Yeah.  Oh, I see.

6        MS. PATEK:  And there is a reference in the medical

7  plan's design to single versus family coverage.  In page 35

8  and 36 there's no specific reference to any entitlement to

9  any kind of spousal coverage, but if you go back to the

10  actual collective bargaining agreement, you know, there is

11  the reference to the medical plan designs.  There is actually

12  a disclaimer under the -- with respect to the medical plan

13  designs that says these describe the essential features of

14  the above health plans, plural, in general terms.  It is not

15  intended to be a full description of coverage.  All efforts

16  have been made to correctly summarize the level of benefits.

17  If an error has been made in the summary description, the

18  certificate of coverage issued by the plan will supersede the

19  document.  Now --

20        THE COURT:  That's on page what?

21        MS. PATEK:  That's on page -- it's on page 35 of the

22  active employee benefits document that's appended to the Mr.

23  Hall affidavit to the city's reply brief, and I apologize.  I

24  don't have right at my hand here the actual -- let me see if

25  I can find the -- that would -- in terms of the docket, it's

1   going to be at pages 9656-2, pages 38 and 39, I believe, or

2   that may -- and that's as it was attached to our brief and as

3   attached -- no.  That's as attached to the -- yeah.  9855 --

4            THE COURT:  Well, hold on.  Hold on.

5            MS. PATEK:  Okay.  I'm going to --

6            THE COURT:  Hold on.  I'll look at your exhibit.

7   It's Exhibit -- your Exhibit B, your brief, Exhibit B, I

8   think?

9            MS. PATEK:  Yes.

10            THE COURT:  And that's page what?

11            MS. PATEK:  It's 9656-2, page 38 of the -- and 39.

12            THE COURT:  All right.  So these pages have this

13   chart entitled "Employee Medical Plan Design."

14            MS. PATEK:  Correct.

15            THE COURT:  And then you just read to me the

16   disclaimer of sorts that's in smaller print at the bottom of

17   that page 39.

18            MS. PATEK:  Yes.  And if these certificates of

19   coverage, in fact, disclaimed or disavowed retiree spousal

20   coverage, I assume that the city would have produced or

21   provided them to the Court, but I want to go back to the

22   collective bargaining agreement because it doesn't -- it

23   refers to the plans, but there's another important provision.

24   Again, sub E refers to the city medical plans as plural, and

25   the terms and conditions set forth in the applicable medical

1   plans, which is received from the summary document, are the

2   actual certificates of coverage.  Now, if you look at the

3   next page that's -- we're in the same section.  It's actually

4   the -- of the collective bargaining agreement, Section 43-I

5   of the -- and this is at -- let me give you the page here.

6          THE COURT:  Page 52?

7          MS. PATEK:  It is 43 -- 48, 49 -- yes, page --

8   actually, 52 of the collective bargaining agreement.

9          THE COURT:  I see that page.  Go ahead.

10         MS. PATEK:  Okay.  Surviving spouses and dependents.

11  This is the only place that I have been able to identify that

12  refers to actual spousal coverage.  Current and future

13  spouses and dependents of bargaining unit employees who are

14  killed in the line of duty will be eligible to continue to

15  participate in the city's hospitalization, medical insurance,

16  optical and dental care plans on the same terms and

17  conditions as active bargaining unit members.  Now, again,

18  this was a highly negotiated agreement over an extended

19  period of time, and if, in fact, retiree spouses were not

20  covered, it would have been very easy to say right there

21  "except if the spouse happens -- also happens to be a City of

22  Detroit retiree, in which case this provision does not

23  apply."  Similarly -- I mean the idea that the plan is silent

24  because it talks about family coverage, which we can, I

25  think, assume or interpret from Section 43-I includes spousal

1  coverage, the fact that there isn't a carveout, a contractual
2  carveout for retiree -- spouses of active employees who
3  happen to be retirees is, in and of itself, a very telling
4  fact.  At the end of the day -- and I want to step back from
5  the weeds for a moment because --
6          THE COURT:  Before you do that, where is the
7  certificate of coverage that you referred to earlier.
8  Neither side -- you don't have it?
9          MS. PATEK:  I don't have it.
10          THE COURT:  Well, okay.  The city can respond when
11  they get up --
12          MS. PATEK:  Yeah.
13          THE COURT:  -- about that.  You don't have the
14  certificates of coverage?
15          MS. PATEK:  I do not have the certificates of
16  coverage, and it's not been produced, and --
17          THE COURT:  So you don't know what they say?
18          MS. PATEK:  I don't know what they say.
19          THE COURT:  Okay.  So I interrupted you.  Go on.
20          MS. PATEK:  But I do want to step back from the
21  weeds because the first issue raised by the city is that
22  somehow the DPLSA has committed an assault on the plan of
23  adjustment, and, first of all, with respect to the way things
24  happened, I want to remind the Court that with respect --
25  there were two state actions.  The first went to MERC, and

1    Judge Stern said, "I'm not sure what to do because of the

2    bankruptcy."  And the second went to state court, and there

3    was an action for a preliminary injunction.  Upon -- you

4    know, I can represent to the Court -- it's of record -- the

5    injunction matter has been dismissed, and the DPLSA once --

6              THE COURT:  Removed adversary proceeding.

7              MS. PATEK:  It was the removed adversary proceeding,

8    and the reason it was dismissed was there was a real concern

9    when they first filed the MERC action as to what would be the

10   availability of other coverage to these spouses who were

11   being terminated from their city medical coverage.  And it

12   turns out to be really an issue of dollars and cents.  It's

13   costing them more money, but it's not at this moment in time

14   an irreparable harm issue, so that action has been dismissed.

15             THE COURT:  Does that mean it's costing them more

16   because they are getting coverage under the VEBAs, but it

17   costs them more?

18             MS. PATEK:  All the VEBA gets them -- there's no

19   coverage under the VEBA.  All the VEBA gives somebody who is

20   a retiree who used to get medical health coverage is a

21   stipend that helps them pay for whatever --

22             THE COURT:  So they go out and buy insurance?

23             MS. PATEK:  They have to go off and buy insurance on

24   their own, and --

25             THE COURT:  So they get a subsidy of their

1    insurance, but they got to pay the rest -- for the rest of

2    it?

3              MS. PATEK:  Correct; correct.  That's correct.

4              THE COURT:  All right.  And, again, coming back to

5    this idea that there is anything in the plan that addresses

6    what happens, this is not a benefit that is being sought by a

7    retiree.  This is somebody who just happens to also be a

8    retiree who might have a separate claim but who -- the

9    benefit doesn't come to them vis-a-vis their status as a

10   retiree, and, in fact, the benefit belongs to the active

11   employee, who is entitled to give his or her family medical

12   coverage under the city's medical plan.  So there is no

13   assault on the plan here.  The other question is whether or

14   not -- you know, is it an assault on the plan or is every

15   time there's going to be an issue of an interpretation of

16   this collective bargaining agreement, is that going to come

17   back before the Bankruptcy Court, or is this something that

18   should be business as usual as a matter of state labor law?

19   And I think I can say on behalf of the Lieutenants and

20   Sergeants Associations -- I think that they are, you know,

21   grateful for what came out of this Bankruptcy Court given

22   what we started with at the beginning of the process, but I

23   think it has to be said that this union together with other

24   unions in the city were an active and constructive part of

25   that process.  And I think it -- we pointed out in a footnote

1    in our brief where the city wanted to incorporate a term of

2    employment into the plan, its very able counsel knew how to

3    do it.  And that was done with pension, and all the unions

4    had to sign a memorandum of understanding because we've got

5    this ten-year injunction in the plan that says this is what's

6    going to happen with your pension.  And there were no holds

7    barred and no punches pulled, and it's right there for

8    everybody to see.  That pension for the next ten years is a

9    plan issue, and it's as plain as that.  Active employee

10   healthcare is not a plan issue.  And I think it has to be

11   understood that in order to -- or to suggest that there's

12   some asking for a special deal, the police officers,

13   lieutenants and sergeants, the command officers, the DPOA, I

14   mean they came into this Court -- and the records show it.  I

15   mean the chief of police came in and said terrible working

16   conditions, undermanned, underpaid, understaffed, and there

17   was -- I don't want to say it was a sea change, but a lot of

18   progress was made in the bankruptcy.  And everybody talks

19   about the grand bargain, and the grand bargain truly was

20   miraculous, but one thing people don't talk about too much is

21   that to mitigate those pension cuts and to help the city

22   control its pension obligations, the lieutenants and

23   sergeants, together with the other public safety unions, are

24   taking all of the risk of any pension underfunding for the

25   next ten years.  And I think this Court can't underestimate

1   the difficulty faced by both the city and these unions in

2   trying to negotiate an agreement.  This is part of the

3   collective bargaining agreement with the city.  I think we've

4   laid it out in our brief.  The retention of jurisdiction made

5   it very clear that, you know, this was the Court handing the

6   reins back to the city, not on everything, not for things

7   that are incorporated into the plan, but it's clearly stated

8   to the extent that they assumed or adopted or incorporated

9   these collective bargaining agreements that these would be

10  matters of state law to be determined under state law, and to

11  suggest that except for routine grievances that every time

12  there's an issue with respect to the collective bargaining

13  agreement that we're going to be back here before this Court,

14  I just don't think that was anybody's intention.  I don't

15  think that's what the plan says, and I certainly don't think

16  that's what Judge Rhodes intended.  And, in fact, I'd have to

17  go back and find the cite for the Court, but I -- he very

18  clearly -- that was one of the issues he had at one of his

19  early status conferences.  He actually asked the city to look

20  at the language in the plan because he wanted it clear that

21  this was not -- you know, these were state law issues; that

22  getting into what their collective bargaining rights were or

23  were not was not going to be an issue for this Court post-

24  confirmation, and everybody was going to have to stand on

25  their own two feet, so I think we've got a constituency here

1   who is sensitive to the costs issues, sensitive to how skinny

2   this plan is, doesn't want to upend it, but who have 12

3   members who, you know, based upon the contract the city

4   actually negotiated with them and everything we know about

5   what the plan documents actually say, are entitled to have

6   spousal coverage whether their spouse happens to be a retired

7   city employee or not, and, you know --

8           THE COURT:  Let me make sure I understand your

9   argument as to why you contend that the collective bargaining

10  agreement gives this right of retiree spouse health coverage

11  that you're after here.  You've cited paragraph 43-A, 43-I of

12  the collective bargaining agreement.

13          MS. PATEK:  Correct.

14          THE COURT:  I think you've also pointed to the

15  disclaimer --

16          MS. PATEK:  The disclaimer.

17          THE COURT:  -- in the plan booklet.

18          MS. PATEK:  And importantly, the medical plan

19  designs themselves -- there is -- I think the retiree -- the

20  word "retiree" is a bit of a red herring because if, in fact,

21  these plans or the collective bargaining agreement intended

22  to exclude certain spouses from being able to get dependent

23  healthcare coverage or being -- or actually exclude active

24  members from having their spouses covered, it ought to have

25  said it, and it didn't.  And the idea that we're just talk --

1   when you put the word "retiree" in there, it's --

2        THE COURT:  No.  I'm trying to get at what is it you

3   contend affirmatively supports the relief you're seeking in

4   the state actions in the collective bargaining agreement or

5   related documents?

6        MS. PATEK:  What is it?  Well, I've given the Court

7   some things.  It's a little bit beyond my pay grade because

8   I'm not a labor lawyer, but the issue is how would you

9   interpret this collective bargaining agreement?  What would

10   be the practice?  Is the city entitled --

11        THE COURT:  And the particular provisions are --

12        MS. PATEK:  The particular --

13        THE COURT:  -- 43-I you've cited.

14        MS. PATEK:  43-I, 43-A, the medical plan design

15   pages of the City of Detroit active employee benefits

16   information booklet, which was mailed and which was on line,

17   and that talks about single coverage.  It talks about family

18   coverage.  And I think --

19        THE COURT:  So what particular provision in there

20   are you relying on?

21        MS. PATEK:  Well, if you talk about --

22        THE COURT:  The reference to, for example --

23        MS. PATEK:  The availability of single and family

24   coverage.

25        THE COURT:  Just the reference to family?

1          MS. PATEK:  Yes.

2          THE COURT:  Family coverage.

3          MS. PATEK:  I think implicit in that is spousal

4    coverage, and I think if you're going to exclude somebody in

5    the family or who would be naturally considered a member of

6    the family from coverage, that would be -- that would be

7    something that you would want to indicate, and if you read

8    43-I together with the medical plan design and the rest of

9    the collective bargaining agreement, the idea that these 12

10   spouses -- or these 12 active lieutenants and sergeants don't

11   get the medical -- get the family medical coverage to which

12   their collective bargaining agreement and the city medical

13   plans entitle them because their spouses also happen to be

14   retired city employees is just a -- it's a false construct.

15         THE COURT:  Well, but this medical plan design

16   document, chart, which includes a reference to family

17   coverage, is in the same booklet that contains this language

18   on page 6 that the city has been citing.

19         MS. PATEK:  Well, the language on page 6 -- let me

20   make sure it's on page 6 in the two --

21         THE COURT:  So your response to that language is

22   what then?

23         MS. PATEK:  Our response to that language -- and I

24   just want to see if it's on page 6 in the -- no.  Okay.  Yes.

25   No duplicate medical.  That may be something that the city

1    wanted.  This made this way -- it made its way into this

2    document in 2013 when we were still under city employment

3    terms and where there were threats that if you don't reach

4    agreement with us, we're going to impose whatever terms that

5    we want on you.  The document that includes the no duplicate

6    medical coverage language specifically says -- and if the

7    Court looks at -- let me make sure it's paginated.  I think

8    it's actually the first page because the cover page -- to all

9    City of Detroit employees, and if you look at the last

10   paragraph -- it's the first full page -- the City of Detroit

11   employee healthcare plan options booklet is intended to be an

12   easy to read summary guide for city employees.  It is not a

13   contract.  The statement contained in this booklet regarding

14   eligibility for coverage applied generally to all city

15   employees; however, these statements are not intended to

16   replace or supersede any city code provisions, city council

17   resolutions, or language in labor agreements governing

18   healthcare or life insurance benefits, and if --

19        THE COURT:  I'm sorry.  You're on what page of the

20   booklet?

21        MS. PATEK:  The first page of the -- if you --

22   there's a cover sheet, and then the first page to all City of

23   Detroit employees.

24        THE COURT:  I see that, yes.

25        MS. PATEK:  Last paragraph.  And right in bold in

1  the middle, it is not a contract.

2          THE COURT:  I'm looking at a different document.

3  I'm looking at the 2014 document.

4          MS. PATEK:  It's not in the 2014 document because --

5  and I'm not sure --

6          THE COURT:  Okay.

7          MS. PATEK:  I'm not sure how that was pieced

8  together, but part of that document is retiree and part of it

9  is active, and that may have simply been the way it went out,

10  but --

11          THE COURT:  Okay.  So you're saying -- you're citing

12  to the 2015 document.

13          MS. PATEK:  Yes, which would be the operative --

14          THE COURT:  All right.

15          MS. PATEK:  -- document under the terms of the

16  current collective bargaining agreements which were ratified

17  in November of this year.

18          THE COURT:  Okay.  So anything else in the

19  collective bargaining agreement that supports the relief

20  you're seeking?

21          MS. PATEK:  Let me consult with my --

22          THE COURT:  All right.

23          MS. PATEK:  -- smarter half here.  Your Honor, it

24  may be quicker, with the Court's permission, if Mr. Sudnick

25  can answer this question because he -- as labor counsel, he

1   is far more conversant --

2           THE COURT:  You have to stick to the question --

3           MS. PATEK:  Yeah.

4           THE COURT:  -- that I asked.

5           MS. PATEK:  Yeah.

6           THE COURT:  I just want to know everything that your

7   side contends in the collective bargaining agreement supports

8   the --

9           MS. SUDNICK:  Good afternoon.

10          THE COURT:  -- relief you're seeking.

11          MR. SUDNICK:  Good afternoon, your Honor.  Peter

12  Sudnick.

13          THE COURT:  Excuse me.  Excuse me.

14          MR. SUDNICK:  Oh, I'm sorry.

15          THE COURT:  I wasn't finished talking.

16          MR. SUDNICK:  I'm sorry, your Honor.

17          THE COURT:  I'll say it again.  All I want to know

18  is I want a list -- make sure I've got a complete list of

19  everything that your side contends in the collective

20  bargaining agreement supports the relief you're seeking.

21  That's what I want to know, so go ahead.

22          MR. SUDNICK:  Okay.  Specifically, your Honor, first

23  thing I want to draw your attention to, on page 49 of the

24  collective bargaining agreement -- that's Article 43 -- the

25  hospitalization section, paragraph B --

1    THE COURT:  Hold it.  Page 43?

2    MR. SUDNICK:  49.  I'm sorry.

3    THE COURT:  I'm sorry.  49.  I see page 49.

4    MR. SUDNICK:  Paragraph B.

5    THE COURT:  Yes.

6    MR. SUDNICK:  And in there, that very first

7  sentence, it talks about the coverage tier selected by the

8  employee.  Coverage tier means this.  You can choose single

9  coverage.  You can choose two-person coverage, meaning the

10  coverage for your spouse, or you can choose family coverage.

11  Those are the three tiers.

12    THE COURT:  How do we know that?  How do we know

13  that?

14    MR. SUDNICK:  I've been doing this for 35 years.

15  These are the typical words we use in collective bargaining

16  agreements when we talk about tier coverage.  If you talk to

17  a representative from HAP, Blue Cross, or anywhere, tier

18  coverage means single, two-person, or family coverage.

19    THE COURT:  Tier is not defined expressly then in

20  there; is that right?

21    MR. SUDNICK:  Not other than by the word itself.

22    THE COURT:  Okay.  Go ahead.

23    MR. SUDNICK:  Okay.  And as a result of that -- and

24  I -- this particular benefit in the collective bargaining

25  agreement is not new, your Honor.  This has been in here for

1  decades, and the employee's spouse, whether retired from the

2  City of Detroit or not, has been covered for decades.

3          THE COURT:  I've asked you to focus on the language

4  of the CBA.

5          MR. SUDNICK:  I am.

6          THE COURT:  All right.

7          MR. SUDNICK:  And I --

8          THE COURT:  Continue.  What other language in the

9  CBA?

10          MR. SUDNICK:  Okay.  That's the tier coverage,

11  always been there.  Employees.  Okay.  The other language we

12  have an apparent dispute on where it says "medical plans."

13  The medical plans --

14          THE COURT:  And where are you referring to?

15          MR. SUDNICK:  That is in the first paragraph of

16  paragraph A.

17          THE COURT:  43-A on page 48?

18          MR. SUDNICK:  Yes.  City says medical plans means

19  this informational document.  It does not.  Medical plans

20  means the plan that is provided by the provider, whether it's

21  Blue Cross, whether it's HAP or whatever.  That is the

22  medical plan.  It is self-serving for them to use --

23          THE COURT:  How do we know that?

24          MR. SUDNICK:  Again, I was at the -- I was the one

25  who conducted these discussions and negotiations with the

1  city.  Medical plans --

2          THE COURT:  Well, I'm not asking for parol evidence.

3          MR. SUDNICK:  No.

4          THE COURT:  I'm asking for language in the CBA

5  itself.  How do we know that from the language of the CBA?

6  Do we know that from the language of the CBA?

7          MR. SUDNICK:  That medical plans refers to the

8  actual medical plans?

9          THE COURT:  Yeah.

10          MR. SUDNICK:  I guess that's a question of

11  interpretation, your Honor.

12          THE COURT:  All right.  What else in the CBA do you

13  want to point to?

14          MR. SUDNICK:  I think -- and the medical plan

15  designs, again, is something we rely on because --

16          THE COURT:  That's at 43-A also?

17          MR. SUDNICK:  That's already been referenced.

18          THE COURT:  Yeah.  Right.

19          MR. SUDNICK:  And I think those and --

20          THE COURT:  Okay.

21          MR. SUDNICK:  -- also the language in paragraph B-2,

22  small (a), small (b), where it talks about for the Health

23  Alliance Plan or the Blue Cross/Blue Shield plan, those are

24  the plans, not the informational document supplied by the

25  city, but what you see here in our collective bargaining

1    agreement, the HAP plan, the Blue Cross plan.

2              THE COURT:  All right.  Anything anywhere else?

3              MR. SUDNICK:  No.  That would cover --

4              THE COURT:  Okay.

5              MR. SUDNICK:  -- the collective bargaining

6    agreement, your Honor.

7              THE COURT:  All right.  Thank you.  All right.

8    Anything further before we hear a reply from the city, Ms.

9    Patek?

10             MS. PATEK:  Yeah.  And, your Honor, just to sort of

11   close the loop on that, this is absolutely consistent with

12   the active employee benefits, the last sentence under the

13   medical plan design.  The complete plans are described in the

14   certificate of coverage issued by each --

15             THE COURT:  Wait.  I'm sorry.  Start over.  Where

16   are you?

17             MS. PATEK:  It would be the medical plan design

18   page.  It's 35, I think, in the 2015 --

19             THE COURT:  So we're in the booklet?

20             MS. PATEK:  Yes.  If you want to know what the plans

21   are --

22             THE COURT:  Medical plan design page.  I see it.  Go

23   ahead.

24             MS. PATEK:  Last sentence at the bottom of the page,

25   "The complete plans are described in the certificate of

1  coverage issued by each plan and are available on request to

2  all interested persons."  Those are the operative documents

3  that define levels of coverage, tiers of coverage, all the

4  things that are referred to in the collective bargaining

5  agreement, and there is nothing anywhere either in the plan

6  of adjustment or in the collective bargaining -- well,

7  nothing in the plan of adjustment that eliminates the right

8  of an active employee to have his or her spouse covered if he

9  or she happens to be also a city retiree.  And in terms of

10 what the collective bargaining agreement itself says, again,

11 I would refer respectfully the Court to the retention of

12 jurisdiction issues.  There may be some things here that are

13 terms of art and would be more appropriately dealt with in

14 a -- the labor context, but -- and I would say, at minimum,

15 to complete this record, we ought to have before the Court --

16 and I apologize that it didn't occur to me to get, but we

17 ought to have those certificates of coverage in the record,

18 and then we could see what the actual plan documents say

19 about retiree healthcare or spousal coverage and whether

20 there is actually an exclusion if that spouse of an active

21 employee happens also to be a city retiree.

22         THE COURT:  All right.  Thank you.  Mr. Raimi.

23         MR. RAIMI:  Thank you, your Honor.  It's been a long

24 day, and I appreciate the Court's patience.  I'll try to be

25 brief and hit the main points here.

1        THE COURT:  I'm not hurrying you.

2        MR. RAIMI:  What's that?

3        THE COURT:  I'm not rushing you.  Go ahead.

4        MR. RAIMI:  Thank you.  Let me clear up one

5  preliminary issue in terms of what counsel was just talking

6  about on the page, page 35 of the medical plan document, that

7  has the chart.

8        THE COURT:  Well, I'm looking in the 2014 booklet.

9        MR. RAIMI:  Either one.  Either one that --

10       THE COURT:  Yeah.  I'm looking at Exhibit 6-B --

11       MR. RAIMI:  Yeah.  And it has the language.

12       THE COURT:  -- the 2014 one.  They're the same, I

13  think, in --

14       MR. RAIMI:  Yeah, I think they are.

15       THE COURT:  -- what you're going to say, so go on.

16       MR. RAIMI:  And it says -- the last sentence in that

17  small type says, "The complete plans are described in the

18  certificate of coverage issued by each plan and are available

19  on request to all interested parties," so what these are,

20  your Honor -- I mean if they want -- if DPLSA thought those

21  were important, any one of their members could have requested

22  them at any time.  They simply provide details as to the

23  benefits, so where the chart says "hospital care, number of

24  days of care," this is a general description of those

25  benefits.  The benefit certificates are hundreds of pages,

1  and they go into excruciating detail about the specific

2  benefits that are available under specific circumstances.

3  They address ambulance care.  They address chiropractic care.

4  They address all kinds of detailed things that you can't

5  address in a chart, so that's the answer to that.

6        THE COURT:  What do they address about spouse

7  coverage?

8        MR. RAIMI:  Well, I'm sure they don't address it at

9  all.

10        THE COURT:  They don't describe what family coverage

11  is?

12        MR. RAIMI:  Well, I don't -- they certainly don't

13  say that a retired spouse of the City of Detroit is entitled

14  to coverage under their active -- under their active employee

15  coverage.  They certainly don't say that.  I'm sure they --

16  what they --

17        THE COURT:  Do they say that -- just speak in

18  general terms of spouses being covered by family coverage?

19        MR. RAIMI:  I think --

20        THE COURT:  I would assume they would.

21        MR. RAIMI:  I think what they do is refer back to

22  the city documents for coverage issues.  Those are benefit

23  certificates.  They're not coverage documents.  And that's

24  why -- they're not coverage documents.  They refer back to

25  the city documents, and in this case that would mean starting

1   with the plan of adjustment, which, in my view, is the

2   overriding document here, the plan of adjustment.

3          THE COURT: Well, how many certificates of coverage

4   are there? Three?

5          MR. RAIMI: Oh, there's many. Blue Cross has

6   several, I believe. HAP probably has several.

7          THE COURT: Each hundreds of pages?

8          MR. RAIMI: I'm sure there are many pages, probably

9   over a hundred, yeah.

10          THE COURT: Well, should I allow the association

11   through Ms. Patek here to have access to these before I make

12   a ruling?

13          MR. RAIMI: Of course, that's up to the Court, but,

14   as I say, they could have --

15          THE COURT: Does the city have them handy?

16          MR. RAIMI: I can get them from Blue Cross just like

17   anybody could. They're available upon request. I mean if

18   DPLSA thought that they were of some importance, I suppose

19   they could have gotten them.

20          THE COURT: Well, it sounds like they now think they

21   might be important, so if need be you can get them fairly

22   promptly --

23          MR. RAIMI: Yeah. I'm sure --

24          THE COURT: -- make them available to Ms. Patek to

25   inspect and review and copy?

1          MR. RAIMI:  I'm sure I can.

2          THE COURT:  All right.  Go on.  What else did you

3    want to say?

4          MR. RAIMI:  Ms. Patek referred to the declaration of

5    Michael Hall, and I know the Court hasn't had an opportunity

6    to read it yet, but it specifically states that the 2015 plan

7    document, referring to the booklet, governs the determination

8    of which individuals are eligible for coverage under the

9    city's healthcare plan.

10         THE COURT:  That's paragraph 5?

11         MR. RAIMI:  Five.  The 2015 plan document also

12   provides a general summary of benefits and advises

13   participants that they can obtain a full description of the

14   applicable benefits from benefit certificates issued by Blue

15   Cross and HAP, which are available upon request.  So the

16   booklet is the coverage document, and that's consistent, your

17   Honor, with Section 43-E of the collective bargaining

18   agreement.  Except as provided in this article, and there is

19   nothing -- we all agree there's nothing addressing retiree

20   spouses -- the extent of coverage under the city's medical

21   plans will be governed by the terms and condition set forth

22   in the applicable medical plans.  Your Honor, I guess I've

23   learned by now that there is no contract, no document that

24   can ever be drafted that can't be subject to second-guessing

25   or attack, but when the only document given to employees, the

1    only document provided is this document that says consistent

2    with the plan of adjustment, retiree spouses are not eligible

3    for coverage under a city plan, I really don't know what more

4    you can do than that.  Evidently DPLSA's counsel would have

5    had the city address every conceivable possibility in the

6    plan of adjustment, but I think they're looking through the

7    wrong end of the telescope.  When you look at the plan of

8    adjustment, that key section -- and this is the -- this is

9    the key document, page 43-C.  From and after the effective

10   date, the city shall -- has no further -- shall have no

11   further responsibility to provide retiree healthcare.  It

12   doesn't say "except for a retiree who happens to be married

13   to an active employee."  It doesn't say that.  I don't know

14   how you could have made that clearer.  I just don't.  And

15   there was -- that was the consideration.  That was the

16   consideration for the city funding the VEBAs with $450

17   million in new B notes.  I just don't know how you can make

18   it clearer.  And then to have the document that goes out to

19   every employee say consistent with the plan of adjustment --

20   this is not just something that came out of the air, the page

21   6 language about retiree spouses not eligible.  That

22   didn't -- you know, the city didn't make that up out of the

23   air.  It implements the plan of adjustment.  I don't know how

24   human beings could do more than that to make this issue

25   clearer.

1           And one other point.  I want the Court to understand
2   the sequence of events here.  The 2014 document that was
3   attached as an exhibit to our original motion, that went
4   out -- that went out in the fall of 2013 for the open
5   enrollment for 2014.  The collective bargaining agreement is
6   dated November 6, 2014, so by the time this collective
7   bargaining agreement was signed, your Honor, they had both
8   the 2014 medical plan document and the 2015 medical plan
9   document, both of which implement the plan of adjustment
10  provision on no retiree healthcare, so I think when they say,
11  well, there's nothing in something, there should be something
12  more specific, they're just looking through the wrong end of
13  the telescope.  You have the plan of adjustment.  You have
14  that implemented by the document, this document, the medical
15  plan document.  You have nothing in the CBA to the contrary,
16  as we've now clearly established, nothing, absolutely nothing
17  in the CBA.  So, again, I go back to where I started.
18  There's nothing in the CBA to interpret or enforce.  This is
19  a naked attack on the plan of adjustment, and it's not just
20  these 12 DPLSA members.  There's hundreds of these retiree
21  spouses throughout the city, and it's a multi-million dollar
22  issue to the city.
23          THE COURT:  What do you make of paragraph 43-I of
24  the collective bargaining agreement, page 52, which Ms. Patek
25  cited and read from?  And I'll preface -- let me preface your

1   answer to that with a question.  I assume that everybody

2   agrees -- the city agrees that the plans -- the medical plans

3   that these active members of the DPLSA have under the

4   collective bargaining agreement as active members does

5   provide as an option family coverage, which would cover a

6   spouse of an active DPLSA employee in the city's view even as

7   long as that spouse is not a city retiree.

8           MR. RAIMI:  That's correct.

9           THE COURT:  Do you agree?

10          MR. RAIMI:  I agree with that.

11          THE COURT:  Okay.  So does 43-I -- is 43-I something

12  that needs just to be read with that in mind, or what do you

13  make of 43-I if something other than that?

14          MR. RAIMI:  I just don't see that it has any

15  relevance whatsoever.  It talks about -- it doesn't talk

16  about retiree spouses.  It doesn't address retiree spouses

17  whatsoever.  It addresses surviving spouses but not retiree

18  spouses.

19          THE COURT:  All right.  Anything else you'd like to

20  say?

21          MR. RAIMI:  No, your Honor.  Thank you.

22          THE COURT:  All right.  One second.  All right.

23  Thank you, all.  What I'm going to do here is -- as I

24  mentioned during the hearing, I did not read the city's reply

25  brief and its attachments before today's hearing.  I did

1  manage to read during the hearing as both sides' attorneys

2  pointed to provisions in the declaration of Michael Hall that

3  was attached to the reply, some provisions of that, but I

4  need to read that.  In fairness to the city, I need to read

5  their reply and its exhibit or exhibits.  And then I do want

6  to take a bit more time to think about the arguments made by

7  the parties here both in their writings and in the hearing

8  today and to think about this a bit more before I make a

9  ruling, so I'm going to take this motion under advisement at

10  this time.  My plan at the moment is to issue a hopefully

11  fairly brief written opinion ruling on -- and/or a ruling on

12  the motion rather than to do some sort of bench opinion at a

13  later date.  If I change my mind and decide to issue a bench

14  opinion, though, I'll give you notice of that.  We'll have a

15  notice date for that to occur.  So for the time being, the

16  motion is under advisement.  Thank you.

17          MR. RAIMI:  Thank you, your Honor.

18          THE COURT:  I believe that concludes today's

19  hearings on the City of Detroit case, so --

20          MR. RAIMI:  Thank you, your Honor.

21          THE COURT:  -- thank you, all.

22          MS. PATEK:  Your Honor, before we break, may I --

23  this issue of these certificates of coverage, given the

24  importance of this issue, since we all agree that those are

25  the actual plan documents, would the Court permit us to

1   enlarge the record by putting those into evidence?  We're not

2   going to ask you to read all, but we'll take responsibility

3   for going through and pointing out -- if retiree spousal

4   coverage isn't mentioned at all, I think that may mean one

5   thing to one side and one to the other, but I think those are

6   the plan documents, and --

7           THE COURT:  I didn't choose -- I heard you say that

8   at the end of your argument that you ought to have a chance

9   to get that.  I didn't choose to give you that, but I'll let

10  the city respond to your request and consider that anew

11  before I leave the bench today.  Mr. Raimi.

12          MR. RAIMI:  Your Honor, I guess my concern is that

13  after all this briefing, the document so clearly says that

14  these are available upon request, I just don't understand why

15  DPLSA -- if they thought they were relevant, why didn't they

16  get them?  Any one of their members can simply call up Blue

17  Cross and get that.

18          THE COURT:  I take that as opposing the request that

19  Ms. Patek has made, but I'm going to grant her request in

20  this way.  Ms. Patek is granted the limited right to

21  discovery with respect to the motion.  The right is limited

22  to obtaining from the city inspection and copying of the

23  certificates -- one second -- of coverage for the medical

24  plan and after doing so may file a supplement to the

25  association's objection to the motion with relevant -- or

1   with provisions of the certificates that the association

2   contends are relevant and in the supplement a list of the

3   specific provisions by section, page number, whatever it is

4   that would cite to the provision without a further brief,

5   without further argument, simply a list of citations to the

6   documents and attaching a copy of the documents.  The city

7   then will have the opportunity -- may -- is not required but

8   may file in response to that supplement a supplement to its

9   motion which simply cites and attaches copies of any parts of

10  the coverage certificates that the city contends are

11  relevant, if any, or which the city thinks the Court should

12  review, and this is in response to the provisions, if any,

13  that the association cites in its supplement.  Mr. Raimi, how

14  quickly can Ms. Patek get a copy of these -- inspection of a

15  copy of these certificates?

16          MR. RAIMI:  I'm just not sure how fast Blue Cross

17  moves on a request like this, so I'd like to have two weeks,

18  if I could.

19          THE COURT:  So, Ms. Patek, assuming that you'll have

20  these in two weeks, I'll give you three weeks from today to

21  file your supplement, June 17.  And the city wants how long

22  after June 17 to file any response to the supplement of the

23  type I have described?

24          MR. RAIMI:  A week should be sufficient, your Honor.

25          THE COURT:  June 24.  All right.  So I amend what I

1  said earlier.  The motions -- the motion will be deemed taken

2  under advisement on June 24 -- well, June 25 after the

3  supplements have been filed or the opportunity for doing so

4  has passed.  And so I'll reflect this in a short order that

5  I'll file -- procedural order that I'll file regarding these

6  motions.  Probably file it tomorrow, and I'll prepare it.

7  Thank you.

8           MR. RAIMI:  Your Honor, is there a --

9           MS. PATEK:  Thank you.

10          MR. RAIMI:  Are we talking about five pages for this

11  sort of little supplement?

12          THE COURT:  A list of citations, however many pages

13  it takes you.

14          MR. RAIMI:  Okay.

15          THE COURT:  You're just going to give me a list.

16  Nobody is going to brief anything.

17          MR. RAIMI:  Well --

18          THE COURT:  That's what I said, citations only with

19  attached copies.  That's it.  That's all these supplements

20  are.  Thank you.

21          THE CLERK:  All rise.  Court is adjourned.

22     (Proceedings concluded at 5:47 p.m.)

INDEX

<u>WITNESSES:</u>

None

<u>EXHIBITS:</u>

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    June 4, 2015
_____        _____
Lois Garrett