In re:                                               Case No. 13-53846

CITY OF DETROIT, MICHIGAN,                           Chapter 9

               Debtor.                       Judge Thomas J. Tucker
_____/

**OPINION REGARDING THE RETIRED DETROIT
POLICE AND FIRE FIGHTERS ASSOCIATION'S
"MOTION FOR ENFORCEMENT OF SETTLEMENT
AND EIGHTH AMENDED PLAN OF ADJUSTMENT"**

**I. Introduction**

      This case is before the Court on a motion filed by the Retired Detroit Police and Fire Fighters Association (the "RDPFFA"), entitled "Motion for Enforcement of Settlement and Eighth Amended Plan of Adjustment," (Docket # 9414, the "Motion"). The City of Detroit filed an objection to the Motion (Docket # 9571), and the RDPFFA filed a reply (Docket # 9765). The Court held a hearing on May 6, 2015, and took the Motion under advisement.

      The dispute concerns the meaning and interplay of certain provisions in the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (Docket # 8045, the "Plan"), the Court's November 11, 2014 Order confirming that Plan (Docket # 8272, the "Confirmation Order"), and a "Term Sheet for Settlement" signed on April 25, 2014 by the City and the RDPFFA (Docket # 9414, Ex. 6A, the "Term Sheet"). Based on its interpretation of these documents, the RDPFFA seeks an order requiring the City to contribute an additional $140,000 per year to fund health care benefits for retired police officers who have become permanently disabled in the line of duty.

The City objects to the Motion, arguing that it has no obligation to make such a contribution under the relevant documents.

For the reasons stated in this opinion, the Court agrees with the City, and will enter an order denying the Motion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this chapter 9 bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(O), because it is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship." This is also a core proceeding under 28 U.S.C. § 157(b)(1), because it falls within the definition of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Indus., Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009)(citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)). As a proceeding that purportedly seeks to enforce a confirmed Chapter 9 plan of adjustment, this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

This dispute is a type over which this Court retained jurisdiction under the confirmed Plan. Article VII, sections G, J, and O of the confirmed Plan state:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to,

2

the Chapter 9 Case and the Plan to the fullest extent permitted by
law, including, among other things, jurisdiction to:

. . . .

    G.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

. . . .

    J.    Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

. . . .

    O.    Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case . . . .

(Docket # 8045 at 69-70).

## III. Background and undisputed facts

### A. The pre-confirmation settlement between the City and the RDPFFA

The RDPFFA is not a labor union. It does, however, act "as an advocate for its approximately 6,500 retired Detroit police and firefighter members," and has done so for over fifty years. (Docket # 9414 at 1). Thus, when the City began mediation with its various creditors and creditor representatives to build a plan to resolve its chapter 9 case, the RDPFFA was included in negotiations. Those negotiations concerned prepetition claims for pensions and other post-employment benefits ("OPEB"), such as health insurance. On April 25, 2014, the RDPFFA and the City reached an agreement regarding the treatment of the pension and OPEB claims of

3

the RDPFFA's members. This was the City's first settlement in this bankruptcy case with a group representing retired City workers.

To memorialize the settlement, the parties signed the Term Sheet on April 25, 2014. Among other things, the Term Sheet provided for relatively modest pension reductions for members of the RDPFFA — no cuts to current pension amounts — but a 45% reduction in annual cost-of-living increases, with the possibility of having those "COLA" increases restored in the future under certain circumstances. But the Term Sheet provided for significant OPEB reductions, in which City-sponsored health care coverage is replaced with a monthly stipend for retirees to purchase their own policies on healthcare exchanges or elsewhere, through a structure known as a Voluntary Employee Benefits Association, or VEBA. The City's role in the VEBA structure is to issue certain bonds, called "New B Notes" and "Excess New B Notes" in the Plan, to the VEBA. The governing body of the VEBA is to manage and use the proceeds from these Notes to pay retirees the monthly stipend.[1]

In exchange for this treatment of its members' claims, the RDPFFA agreed to prepare a letter to its members advising them to vote in favor of the City's plan, so long as the plan's terms were consistent with the Term Sheet.[2]

The treatment of RDPFFA members' claims reflected in the Term Sheet was incorporated into the City's Second Amended Plan and all subsequent iterations of the plan,[3] as part of the

---

[1] The City also agreed that the RDPFFA would appoint member(s) to the governing body of the VEBA. (Docket # 9414, Ex. A at ¶ 4).

[2] At this time, the Eighth Amended Plan had not yet been proposed.

[3] *See* Docket # 4140 (Second Amended Plan, filed April 16, 2014); Docket # 4271 (Third Amended Plan, filed April 25, 2014); Docket # 4392 (Fourth Amended Plan, filed May 5, 2014); Docket # 6257 (Fifth Amended Plan, filed July 25, 2014); Docket # 6908 (Sixth Amended Plan, filed August 20,

treatment of claims in Class 10 (police and firefighter pension claims) and Class 12 (all retiree OPEB claims).[4] Ultimately, the treatment of Class 12 claims in the Eighth Amended Plan provided that the City will issue $232 million in New B Notes to the police and fire VEBA, plus an additional portion of $42.68 million in Excess New B Notes resulting from certain other settlements. (Plan at 37, 43 (article II, sections B.3.p.i.4. and B.3.s.ii.B., Docket #8045)).

The RDPFFA urged its members to support the City's plan, by writing and circulating the letter described in the Term Sheet, and "in other ways as agreed in the Term Sheet." (Docket # 9414 at 2). Ultimately, the plan was accepted by 82% of the Class 10 members voting, and by 88% of the Class 12 members voting. The RDPFFA did not object to the treatment of its members' claims in Classes 10 and 12 at any point during the confirmation proceedings.

Seven months after the City and the RDPFFA signed the Term Sheet, the Court confirmed the Eighth Amended Plan, by entry of the Confirmation Order on November 11, 2014. (Docket # 8272).

**B. The new collective bargaining agreement with the DFFA**

While the City worked toward confirmation of a plan of adjustment in this case, the City also worked on negotiating new collective bargaining agreements with labor unions who represent *active* City employees. Relevant to this Motion is the collective bargaining agreement ("CBA") the City reached with the Detroit Fire Fighters Association (the "DFFA"), which

---

2014); Docket # 7502 (Seventh Amended Plan, filed September 16, 2014); and Docket # 8045 (Eighth Amended Plan, filed October 22, 2014).

[4] Although all city retiree OPEB claims were included in Class 12, the Plan provides for two separate VEBAs, one for police and fire retirees, and one for general city retirees.

5

represents the City's active firefighters. The new DFFA CBA is attached as Exhibit C to the Motion. (Docket # 9414).

The City entered into the new DFFA CBA on November 6, 2014. (*See* Docket # 9414, Ex. 6C at 71). Among other things, that CBA provides for a "Disability Subsidy" for firefighters "who are Totally and Permanently Disabled due to an injury incurred in the line of duty." (*Id.* at 51).[5] The City agreed to contribute an additional $140,000 per year to the police and fire VEBA, which is to be separately accounted for, "to fund medical benefits for Totally and Permanently Disabled members in the DFFA bargaining unit." (*Id.* at 52).

The new DFFA CBA limits eligibility for these benefits as follows:

> In order to be eligible for benefits pursuant to this section, an employee must be either (i) Totally and Permanently Disabled and drawing a duty disability pension as of the Effective Date of this Agreement, or (ii) become Totally and Permanently Disabled and draw a duty disability pension during the term of this Agreement.

(*Id.* at 53).

According to statements made by counsel for the RDPFFA during the May 6 hearing, all City retirees received health care coverage prior to the City's chapter 9 case, meaning that before the bankruptcy any sort of special medical benefits for retired, permanently duty-disabled retirees would have been unnecessary. (Hrg. Tr. at 46-47, May 6, 2015, Docket # 9911).

---

[5] In the CBA, the term "Disability Subsidy" is defined as the City's annual $140,000 contribution. The phrase "Totally and Permanently Disabled" is defined as one of six types of injury, including "i. Total and permanent loss of sight in both eyes. ii. Loss of either leg or foot at/or above the ankle. iii. Loss of both arms or hands at/or above the wrist. iv. Loss of any two of the members or facilities enumerated in (i) or (iii) above. v. Permanent and complete paralysis of both legs or arms, or one leg and one arm. vi. Permanent and complete loss of facilities due to a persistent vegetative state." (Docket # 9414, Ex. 6C at 52).

6

It is undisputed that the DFFA specifically bargained for the Disability Subsidy in the new CBA by making economic concessions.[6] It is also undisputed that none of the labor unions representing police officers did so, at least not successfully,[7] nor did the RDPFFA successfully negotiate for any disability benefits in its mediation with the City. Finally, it is undisputed that the City's obligation under the Plan to provide $232 million in New B Notes (plus a portion of $42.68 million in Excess New B Notes) to the police and fire VEBA did not change with the execution of the new DFFA CBA. Nevertheless, in bringing the Motion, the RDPFFA asks that the City be required to provide an additional $140,000 per year to fund health care benefits for retired, permanently duty-disabled *police officers*.

---

[6] The record does not reflect exactly what concessions were given in exchange for the Disability Subsidy; however, article 24, section A.4 of the new DFFA CBA states:

> The DFFA acknowledges that, as an express quid pro quo for the receipt of a 7.5% wage increase . . . a one-time bonus on December 1, 2014 and July 1, 2015, and the 1% retiree medical subsidy [the Disability Subsidy], that the DFFA has agreed to: (a) elimination of any requirement that the Department maintain 135 Sergeant positions and creation of a Department right to reduce the number of Sergeants; (b) elimination of Super Duper Kelly Days; (c) elimination of the additional furlough day granted to members with over twenty-three (23) years of service; (d) reduction in the number of holidays and reduction in the holiday premium; (3) creation of the City's right to pay out annually accumulated sick time in excess of one thousand (1,000) hours at 85%; (f) elimination of mileage reimbursement; (g) elimination of the retention bonus based upon DFFA's portion of the public safety retention bonus; and (h) forego a 2% lump sum payment effective January 1, 2015 and a 1% lump sum payment effective July 1, 2015.

(Docket # 9414, Ex. 6C at 45).

[7] *See generally*, Docket # 9571, Ex. B, "Master Agreement between the City of Detroit and the Detroit Police Officers Association, 2014-2019;" Ex. C, "Master Agreement between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association, 2014-2019;" Ex. D, "Master Agreement between the City of Detroit and the Detroit Police Command Officers Association."

### C. The RDPFFA's argument, based on paragraph 8 of the Term Sheet and paragraph 69 of the Confirmation Order

The substantive basis for the RDPFFA's request is paragraph 8 of the April 25, 2014 Term Sheet, which states:

> Police and firefighter retirees are entitled to the benefits of any other agreement entered into by the City of Detroit that covers such retired police and firefighters and which is more advantageous to them than the terms of this agreement as it relates to Classes 10 (PFRS Pensions) and 12 (OPEB).

(Docket #9414, Ex. 6A).

The RDPFFA argues that this provision in the Term Sheet means that whatever benefits the City later (in November 2014) agreed to provide for duty-disabled *firefighter* retirees in the new DFFA CBA, the City now is also required to provide for duty-disabled *police* retirees. The RDPFFA contends that paragraph 8 of the Term Sheet was key to the settlement, because the RDPFFA "was adamant and demanded assurances that its members would not be prejudiced by being the first to agree to terms with the City." (Docket # 9765 at 2).

The RDPFFA acknowledges that the language of Paragraph 8 of the Term Sheet is not expressly included in the Plan, unlike the substantive claim treatment provisions of the Term Sheet,[8] and that the RDPFFA did not object to the Paragraph 8 provision being left out of the Plan during the confirmation process. Rather, to support its argument that paragraph 8 of the

---

[8] Paragraphs 1, 2, and 3 of the Term Sheet set forth the treatment of pension claims for RDPFFA members (including the COLA reduction, terms of a possible COLA restoration, and new governance structures for the Police and Fire Retirement System), and these terms are reflected in the Plan in article II, section B.3.q.ii (pages 38-39), and Plan Exhibit II.B.3.q.ii.C. (Docket # 8045). Paragraph 4 of the Term Sheet sets forth the treatment of OPEB claims for RDPFFA members, and it is reflected in the Plan in article II, section B.3.s.ii.B (pages 42-44).

Term Sheet remains binding on the City, the RDPFFA relies on paragraph 69 of the Confirmation Order, which states in pertinent part:

> Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 9 Case, **all documents and agreements executed by the City as authorized and directed thereunder** and all motions or requests for relief by the City pending before the Court as of the Effective Date **shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto.**

(Docket # 8272 at 114)(emphasis added). The RDPFFA contends that the Term Sheet is an "agreement executed by the City as authorized and directed [under Court order]," and thus remains binding on the City, even though the terms of ¶ 8 of the Term Sheet are not expressly included in the Plan. According to the RDPFFA, the Term Sheet was "authorized and directed" by this Court's First Order Referring Matters to Facilitative Mediation (Docket # 333). That Order referred to mediation, among other things, the treatment of claims and renegotiation of collective bargaining agreements.

**IV. Discussion**

The City disputes the RDPFFA's position, on a number of grounds. For the following reasons, the Court agrees with the City. The Court concludes that the City has no obligation to contribute an additional $140,000 per year to fund health care benefits for retired *police officers* who have become permanently disabled in the line of duty.

*First*, contrary to the RDPFFA's argument, the terms of ¶ 8 of the April 25, 2014 Term Sheet were *not* incorporated into or made a part of the Plan. Nor did the Term Sheet survive confirmation of the Plan.

9

The provisions of Term Sheet ¶ 8 are not expressly included anywhere in the Plan, or in the Confirmation Order. Nor does the Plan or the Confirmation Order incorporate those provisions by reference. In arguing otherwise, the RDPFFA relies only on ¶ 69 of the Confirmation Order, quoted above, but that reliance is misplaced. In pertinent part, ¶ 69 provides that "all prior orders entered in the Chapter 9 Case, [and all] documents and agreements executed by the City as authorized and directed thereunder . . . shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto." While the Term Sheet is an "agreement executed by the City" within the meaning of ¶ 69, that agreement was not "authorized and directed" under any "prior orders entered in the Chapter 9 Case" within the meaning of ¶ 69.

The RDPFFA does not identify any "prior order" entered in this case before entry of the Confirmation Order that either "authorized" or "directed" the City to execute the Term Sheet. Contrary to the RDPFFA's argument, the Court's August 16, 2013 mediation order is not such a "prior order." That mediation order, entitled "First Order Referring Matters to Facilitative Mediation" (Docket # 333), did nothing more than refer "to Chief District Judge Gerald Rosen for facilitative mediation" the "following matters": "1. [t]he treatment of the claims of the various creditor classes in a plan of adjustment;" and "2. [t]he negotiation and renegotiation of collective bargaining agreements." As such, that mediation order did not "authorize" or "direct" the City to execute *any* agreement, and in particular it did not authorize or direct the City to execute the Term Sheet. The mediation order and ¶ 69 of the Confirmation Order are unambiguous in this respect.

As discussed further below, the Term Sheet, and in particular ¶ 8 of the Term Sheet, solely concerned the treatment of the claims of retired police and retired firefighters in Classes 10 and 12 of the Plan. But because the terms of ¶ 8 of the Term Sheet, unambiguously, were not incorporated into or made part of the confirmed Plan, those terms did not survive the confirmation of the Plan. After the Court entered the Confirmation Order on November 11, 2014, and the confirmed Plan became effective on December 10, 2014, only the Plan, and not the Term Sheet, governed the treatment of Classes 10 and 12. As the Sixth Circuit has held,

> In interpreting a confirmed plan, courts use contract principles, since the plan **is effectively a new contract between the debtor and its creditors**. State law governs those interpretations, and under long-settled contract law principles, if a plan term is unambiguous, it is to be enforced as written, **regardless of whether it is in line with parties' prior obligations.**

*Official Comm. of Unsecured Creditors v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 676 (6th Cir. 2006)(emphasis added)(citations omitted).

*Second*, the Court concludes that even if it were part of the Plan, or somehow survived confirmation of the Plan, ¶ 8 of the Term Sheet would not entitle the RDPFFA to the relief it seeks in the Motion.

It is undisputed that the RDPFFA was the first group to reach an agreement with the City regarding the treatment of Class 10 and 12 claims. But not all retired police and retired firefighters were members of the RDPFFA.[9] And retired police and retired firefighters were not

---

[9] The RDPFFA previously has stated that "[a]pproximately 6,500 of an estimated 7,800 'uniformed' retirees of the City of Detroit (i.e., retirees who were employed as police officers or fire fighters) are members of the RDPFFA." (Decl. of Donald Taylor in Supp. of Consolidated Objection of the Retiree Association Parties to Eligibility at ¶ 3, Ex. B to Docket # 497).

11

the only creditors included in Classes 10 and 12.[10] If other individuals or groups later negotiated an agreement that would provide better treatment in the City's plan of retired police and retired firefighters Class 10 and Class 12 claims, the RDPFFA wanted assurance that its members also would receive the benefit of such enhanced plan treatment. In that event, the RDPFFA did not want its members to be bound by the Term Sheet to a less favorable treatment, just because the RDPFFA was the first group to reach agreement with the City.

That, and nothing more, is the only reasonable interpretation of ¶ 8 of the Term Sheet,[11] because ¶ 8 clearly is limited in its scope to the treatment of prepetition Class 10 and Class 12 claims in the City's plan. This is clear from the phrase at the end of ¶ 8, which unambiguously qualifies and limits the types of agreements covered by ¶ 8:

> Police and firefighter retirees are entitled to the benefits of any other agreement entered into by the City of Detroit that covers such retired police and firefighters and which is more advantageous to them than the terms of this agreement **as it relates to Classes 10 (PFRS Pensions) and 12 (OPEB)**.

---

[10] Retired police and retired firefighters are some of the creditors, but not the only creditors, with claims treated in Classes 10 and 12 of the City's plan. Class 10, named in the Plan as "PFRS Pension Claims," includes prepetition claims of "current or former employees of the City" and their heirs or beneficiaries, for pension or disability benefits under the Police and Fire Retirement System of the City of Detroit ("PFRS"). Class 12 of the Plan, entitled "OPEB Claims," includes prepetition claims of current and former employees for other post-employment benefits, such as health insurance, and the creditors in Class 12 include not only retired police and retired firefighters but also other retirees, including those with pension claims under the City's General Retirement System in Class 11 of the Plan. Thus, the prepetition claims of retired police and retired firefighters were part of, but not the entirety of, Classes 10 and 12 of the Plan.

[11] In discussing the interpretation of a confirmed Chapter 11 plan in *Dow Corning*, the Sixth Circuit held that "[a] term is deemed ambiguous when it is 'capable of more than one reasonable interpretation.'" 456 F.3d at 676 (quoting *Miller v. United States,* 363 F.3d 999, 1004 (9th Cir.2004)). But the court also held that "[a]lthough the interpretation of [a] plan of reorganization is analogous in many respects to the construction of a contract, we remain mindful that the law of this circuit requires that we review a bankruptcy court's interpretation of its own decisions with significant deference." *Id.* (citing *Terex Corp. v. Metro. Life Ins. Co.* (*In re Terex Corp.*), 984 F.2d 170, 172 (6th Cir. 1993)).

(Term Sheet ¶ 8)(emphasis added).

The new "Disability Subsidy," which the DFFA negotiated in its November 6, 2014 CBA with the City, is not part of the treatment of the prepetition claims in either Class 10 or Class 12 of the Plan. That CBA is in effect through June 30, 2019.[12] In that CBA, the DFFA, representing active firefighters, made a package of economic concessions in partial exchange for the City's agreement to contribute $140,000 per year to fund medical benefits only for *firefighters* who are "totally and permanently disabled due to an injury incurred in the line of duty." Unlike the DFFA, the City's police unions did not negotiate such a benefit for *police officers* in their CBAs with the City. It is undisputed that in this way, the economic give-and-take in the DFFA's new CBA was different from that in the City's new CBAs with the Detroit Police Officers Association ("DPOA"), the Detroit Police Lieutenants and Sergeants Association ("DPLSA"), and the Detroit Police Command Officers Association ("DPCOA").[13]

This new "Disability Subsidy" benefit in the DFFA's CBA is not part of the treatment of either Class 10 or Class 12 claims, which are prepetition claims, in the Plan.[14] The RDPFFA has cited nothing in the Plan, the Confirmation Order, or the DFFA CBA suggesting otherwise. This "Disability Subsidy" benefit in the CBA, therefore, clearly was not a benefit of the type described in ¶ 8 of the Term Sheet — the CBA did not provide anything "more advantageous" to police

---

[12] *See* DFFA CBA (Docket # 9414, Ex. 6C) at 61, ¶ 56.

[13] *See* the City's objection (Docket # 9571) at ¶¶ 21, 22, and the police unions' CBAs attached to the City's objection as Exhibits B, C, and D.

[14] Nor was the DFFA CBA incorporated into the confirmed Plan.

and firefighter retirees than the Term Sheet did "as it relates to Classes 10 (PFRS Pension) and 12 (OPEB)."

Other wording in ¶ 8 of the Term Sheet also shows that the DFFA CBA was not an agreement to which ¶ 8 applies. In order to apply to an "other" and "more advantageous" agreement, ¶ 8 requires such other agreement to be one "that covers such retired police and firefighters." This language means that the other more advantageous agreement must apply to *both* retired police and retired firefighters in order for ¶ 8 to apply. That makes sense with respect to the treatment of Classes 10 and 12 in the Plan, because the prepetition claims of *both* retired police and retired firefighters were included in Classes 10 and 12 of the Plan. But the CBA between the City and the DFFA, the union representing the active firefighters, is clearly not an agreement that "covers such retired police and firefighters" within the meaning of Term Sheet ¶ 8. The DFFA CBA did not provide the new "Disability Subsidy" to *both* retired police and retired firefighters, but only to firefighters.

This further confirms that the City's new CBA with the DFFA, with its new "Disability Subsidy" benefit for firefighters who are totally and permanently disabled in the line of duty, is not an "other agreement" of the type covered by ¶ 8 of the Term Sheet.

For all of these reasons, the Court agrees with the City's characterization of ¶ 8 of the Term Sheet, contained in the City's response to the RDPFFA's Motion:

> Paragraph 8 of the Term Sheet was not specifically incorporated into the Plan because it contained no substantive plan terms, but only contemplated the possibility that groups could negotiate enhanced plan treatment of Class 10 and 12 claims. Consistent with the Term Sheet, any applicable enhancements to the treatment would have been incorporated into the Plan, which governs the treatment of claims in those classes. Because there were no other

14

> agreements reached that related to the substantive treatment of
> Classes 10 and 12, paragraph 8 of the Term Sheet has no further
> relevance.

(Docket # 9571, at 8, ¶ 15).

Thus, even if ¶ 8 of the Term Sheet had survived confirmation of the Plan, it would not support the relief sought by the RDPFFA.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter an order denying the RDPFFA's Motion.

**Signed on June 26, 2015**  /s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**