## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S OBJECTION TO CORRECTED MOTION OF STEVEN WOLAK, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF CHRISTOPHER WOLAK, DECEASED, TO COMPEL PAYMENT BY DEBTOR PURSUANT TO SETTLEMENT CONTRACT, OR ALTERNATIVELY, VOID SETTLEMENT CONTRACT AND REINSTATE CASE

The City of Detroit, Michigan ("City") objects to Steven Wolak's ("Wolak") *Corrected Motion of Steven Wolak, as Personal Representative of the Estate of Christopher Wolak, Deceased, to Compel Payment by Debtor Pursuant to Settlement Contract, or Alternatively, Void Settlement Contract and Reinstate Case* ("Motion," Doc. No. 9967).[1] Wolak improperly seeks to elevate his unsecured claim above all others because the City voluntarily entered into a settlement agreement with him prepetition. This is no reason to grant such extraordinary relief, however. Further, the Court rejected these exact arguments the last time Wolak made them. This is now the law of the case; Wolak cannot relitigate the matter again here. For these reasons, Wolak's Motion should be denied.

## BACKGROUND

The facts Wolak alleges in his Motion and in the unsecured claim he filed in the City's case are straightforward. On December 24, 2011, Wolak's son, Christopher, had been drinking before and during a football game, after which he jogged into the street against a red light and was struck and killed by a City bus. Motion, p. 1; Claim Number 3232, Ex. 2, pp. 2-3. Wolak

---

[1] Note, this Motion was previously filed at Docket Number 9958; however, it was deemed deficient as filed. (Doc. No. 9959.) Wolak thus filed his corrected Motion.

promptly sued the City. Motion, p. 2. The parties settled the matter for $375,000 on May 12, 2013, subject to City Council approval. *Id.* The City Council approved the settlement on July 11, 2013. *Id.* A week later, the City filed its petition for bankruptcy relief. *Id.*

This Court's records supply the remaining facts. The City's Eighth Amended Plan for the Adjustment of Debts of the City of Detroit ("Plan," Doc. No. 8045) was confirmed by this Court's *Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit* ("Confirmation Order," Doc. No. 8272). On February 21, 2014, Claim Number 3232 (the "Claim"), asserting a $3,000,000[2] unsecured claim, was filed on Wolak's behalf. Under the Plan, the Claim is classified as a Class 14 "Other Unsecured Claim." Plan, Art I.262 (noting that "Other Unsecured Claims" are all unsecured claims other than a handful of specifically defined claims); Plan, Art II.B.3.u (providing treatment for Class 14 Other Unsecured Claims).

On March 3, 2015, the City filed a motion to reserve amounts for unsecured claims pending their resolution. ("Reserve Motion," Doc. No. 9351.) The Reserve Motion included a reserve for the Claim. Reserve Motion, p. 47 of 63. Wolak objected to the Reserve Motion, making the same arguments as in the Motion nearly word for word. ("Reserve Objection," Doc. No. 9493.) In his Reserve Objection, Wolak argued that (1) the City voluntarily settled with him; (2) the City acted in bad faith by filing for bankruptcy a week after the settlement was approved (implying that the City filed merely to escape its obligations to Wolak); (3) the Court should use its equitable powers to ensure that he is paid in full; and (4) since the City planned to reserve $3,000,000 for his Claim, paying him $375,000 would not prejudice the City. Reserve

---

[2] The Claim was filed by Michael Ratton of Fieger, Fieger, Kenny, Giroux & Harrington, acting as Wolak's agent. *See* Claim. It is supported by "Plaintiff's Facilitation Summary" ("Summary"), attached to the Claim. The $3,000,000 figure appears to be Wolak's evaluation of his claim's worth even though Wolak "concedes that some liability will be assessed against Christopher Wolak based upon his crossing against the signal and the presence of alcohol in his system." It is interesting that although Wolak admits he settled his suit for $375,000, his proof of claim filed in the City's case asserts he is owed $3,000,000. By signing the Claim, Ratton declared that this amount was correct under penalty of perjury. *See* Claim.

Objection, pp. 3-5. The Court overruled the Reserve Objection and numerous others, and granted the Reserve Motion. ("Reserve Order," Doc. No. 9701; *Id.* p. 6, listing Wolak objection among the responses received to the Reserve Motion).

Undeterred, Wolak now files his Motion, repeating the arguments that the Court overruled in the Reserve Objection. *Compare* Motion *with* Reserve Objection.

## ARGUMENT

As this Court previously recognized, the Motion contains no legally cognizable argument for raising the Claim above all other unsecured claims and paying it in full. Wolak starts with the unobjectionable comment that the Court has broad equitable powers, but does not explain why it is equitable for him to be paid in full while other unsecured creditors are not. *E.g.*, *In re Glenn*, 345 B.R. 831, 836 (Bankr. N.D. Ohio 2006) ("It is a basic facet of bankruptcy law that similarly situated creditors are entitled to be treated equally.")

From this point forward, he completely ignores bankruptcy law, asking the Court to enforce the settlement agreement as a contract, as if this were an action on the contract as opposed to a bankruptcy case with a confirmed plan. His assertion (by implication, anyway) that the City filed for bankruptcy protection shortly after approving the settlement to avoid paying him is baseless. This Court has repeatedly analyzed and discussed the City's reasons for filing. *E.g.*, Opinion Regarding Eligibility, Doc. No. 1945. Unsurprisingly, avoidance of a $375,000 settlement was not one of these reasons. Last, the idea that the City will not be prejudiced by paying out $375,000 because "Claimant's Proof of Claim amount of $3,000,000 has been reserved" also fails. Wolak freely admits he has a settlement for $375,000. Filing an inflated proof of claim to force the City to reserve an increased amount in no way imaginable supports the idea that "there will be no prejudice to any party, let alone Debtor."

Finally, <u>all</u> of Wolak's arguments were previously considered and rejected. *See* Reserve Motion, Reserve Objection, and Reserve Order. As such, this is now the law of this case. *See, e.g.,Brady-Morris v. Schilling (In re Kenneth Allen Knight Trust)*, 303 F.3d 671, 676-78 (6th Cir. 2002). While this Court is always free to revisit its reasoning, of course, "a court's power to reach a result inconsistent with a prior decision reached in the same case is "to be exercised very sparingly, and only under extraordinary conditions." *Id.* at 677. "To differ, we must find some cogent reason to show the prior ruling is no longer applicable, such as if our prior opinion was a clearly erroneous decision which would work a manifest injustice." *Id.* at 677-78. Wolak offers no such cogent reason here. In fact, he simply rehashes the same arguments virtually word for word. As such, there is no reason why the Court should revisit them again.

## CONCLUSION

For these reasons, the Motion should be denied.


June 29, 2015                    Respectfully submitted,

By: /s/ Marc N. Swanson
     Jonathan S. Green (P33140)
     Marc N. Swanson (P71149)
     Ronald A. Spinner (P73198)
     MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     green@millercanfield.com
     swansonm@millercanfield.com
     spinner@millercanfield.com

ATTORNEYS FOR THE CITY OF DETROIT

**EXHIBIT 1 – CERTIFICATE OF SERVICE**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 29, 2015, he served a copy of the foregoing *City of Detroit's Objection to Corrected Motion of Steven Wolak, as Personal Representative of the Estate of Christopher Wolak, Deceased, to Compel Payment by Debtor Pursuant to Settlement Contract, Or Alternatively, Void Settlement Contract and Reinstate Case* as listed below, via First Class United States Mail:

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.
David A. Dworetsky
19390 W. Ten Mile Road
Southfield, MI 48075

DATED: June 29, 2015

By: /s/ Marc N. Swanson
     Marc N. Swanson
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

## EXHIBIT 2 – PROOF OF CLAIM

B10 (Official Form 10) (04/13)

| UNITED STATES BANKRUPTCY COURT  EASTERN DISTRICT OF MICHIGAN | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>City of Detroit, Michigan<br>Audrian Hardy | Case Number:<br>13-53846 |
|---|---|

**FILED**

**FEB 2 1 2014**

US Bankruptcy Court
Eastern District of Michigan

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Steven Wolak, as Personal Representative of the Estate of Christopher Wolak, Deceased

Name and address where notices should be sent:
Fieger, Fieger, Kenney, Giroux & Harrington, P.C.
19390 West Ten Mile Road
Southfield, Michigan 48075

Telephone number:  (248) 355-5555   email:  m.ratton@fiegerlaw.com; b.craigo@fiegerlaw.com

❐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
(*If known*)

Filed on:_____

Name and address where payment should be sent (if different from above):

Telephone number:            email:

❐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**RECEIVED**

**FEB 2 4 2014**

KURTZMAN CARSON CONSULTANTS

**1. Amount of Claim as of Date Case Filed:**            $            3,000,000.00

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**  Personal Injury/Wrongful Death
   (See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as:<br><br>_____<br>(See instruction #3a) | 3b. Uniform Claim Identifier (optional):<br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _<br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❐Real Estate  ❐Motor Vehicle  ❐Other
**Describe:**

Value of Property: $_____

Annual Interest Rate_____% ❐Fixed  or  ❐Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

Basis for perfection: _____

Amount of Secured Claim:  $_____

Amount Unsecured:  $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

❐ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❐ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

❐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507 (a)(8).

❐ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(___).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of maki

13-53846-tjt   Doc 10002   Filed 06/29/15   Entered 06/29/15 15:12:22   Page 7 of 31

1353846140221000000000181

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**RECEIVED**

**FEB 2 4 2014**

**KURTZMAN CARSON CONSULTANTS**

---

**8. Signature:** (See instruction #8)

Check the appropriate box.

☐ I am the creditor.  ☑ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Michael T. Ratton
Title:  Attorney
Company:  Fieger, Fieger, Kenney, Giroux & Harrington
Address and telephone number (if different from notice address above):

_____
_____
_____

(Signature)      2/20/14      (Date)

Telephone number:            email:

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

---

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

**PROOF OF CLAIM**

**ADDENDUM**

TABLE OF CONTENTS

1. Wayne County Circuit Court First Amended Complaint, Case No. 12-001060-NI

2. Plaintiff's Facilitation Summary

3. Post Mortem Report



STEVEN WOLAK as Personal
Representative for the Estate of
CHRISTOPHER WOLAK, deceased,

   Plaintiff,

vs.

CITY OF DETROIT, a Municipal
Corporation, and AUDRIAN HARDY, jointly
And severely,

   Defendants.

WOLAK, STEVEN, Personal Rep. , et
Hon. Jeanne Stempien
01/25/2012

12-001060-NI

---

**LAW OFFICES OF RICHARD R. MANNAUSA**
BY:  **RICHARD R. MANNAUSA (P39747)**
Attorney for Plaintiff
2850 Dixie Highway
Waterford, MI 48328
(248) 674-0101

**CITY OF DETROIT LAW DEPARTMENT**
BY:  **JERRY L. ASHFORD (P47402)**
Attorney for Defendant City of Detroit
1650 First National Building
Detroit, MI 48226
(313) 237-3089

---

## FIRST AMENDED COMPLAINT AND RELIANCE UPON JURY DEMAND



**NOW COMES** Plaintiff, STEVEN WOLAK, as Personal Representative of the ESTATE OF CHRISTOPHER WOLAK, deceased, by and through his attorney, LAW OFFICES OF RICHARD R. MANNAUSA, PLC, and for his complaint against the above-named Defendants, states as follows:

## COUNT I

1.    Plaintiff, Christopher Wolak (hereinafter "Plaintiff-Decedent"), was a resident of the Township of Macomb, County of Macomb, State of Michigan.

2.    The Defendant, Audrian Hardy (hereinafter "Defendant Hardy"), was the operator of the subject City of Detroit bus at the time of this incident. Her residence is unknown.

3.    That Defendant, City of Detroit (hereinafter "Defendant City"), is a municipal corporation formed under the statutes of the State of Michigan and is located in the County of Wayne, State of Michigan.

4.    That, on or about December 24, 2011, Defendant Hardy was operating a bus owned and/or controlled by Defendant City on Woodward Avenue near the Montcalm intersection.

5.    That the amount in controversy herein exceeds Twenty-Five Thousand ($25,000.00) Dollars and is otherwise within the jurisdiction of this Court.

6.    That on said date, Plaintiff-Decedent was crossing Woodward Avenue in a well lit, clearly marked crosswalk and without reason or excuse Defendant Hardy struck and killed Plaintiff-Decedent.

7.    That on the date and time aforesaid, Defendant Hardy owed duties to Plaintiff-Decedent to operate said motor vehicle with reasonable care and caution and breached said duties in one or more of the following:

    a.    Operating said vehicle without having it under constant control;

    b.    Failed to make proper observation and failed to observe the presence of Plaintiff-Decedent and others in and near the roadway at the time said collision occurred;

    c.    Operated said vehicle in a careless and heedless manner, without due regard for the rights and safety of others, particularly Plaintiff-Decedent, and at a speed and in a manner so as to endanger or to be likely to endanger persons and property;

    d.    Operating said motor vehicle at a speed in excess of the legal limit posted;

2

e. Operating said motor vehicle under the influence of alcohol and/or drugs in violation of MCLA 257.625(a);

f. Failing to operate said motor vehicle with due care and caution in violation of MCLA 257.627;

g. Failing to heed a traffic control device;

h. Failing to operate said motor vehicle with due regard to traffic and surface conditions then existing in violation of MCLA 257.627;

i. Failing to exercise reasonable and ordinary care and keep a sharp lookout so as to avoid this collision;

j. Failing to maintain control of said vehicle at all times while on a highway;

k. Failing to make timely use of the braking system with which said vehicle was equipped;

l. Failing to adjust the speed of said vehicle so as to enable it to stop within an assured clear distance;

m. Driving said vehicle in willful and wanton disregard for the safety of persons or properties in violation of MCLA 257.626.

8. That Defendant Hardy's acts and omissions constitute gross negligence.

9. As a direct and proximate result of Defendant Hardy's negligence and gross negligence, Plaintiff-Decedent suffered serious and fatal injuries, including conscious pain and suffering, emotional and psychological injuries and mental anxiety.

10. As a further direct and proximate result of Defendant Hardy's negligence and gross negligence, survivors of Plaintiff-Decedent claim a loss of society and companionship, love, affection, services and financial support from Plaintiff-Decedent and all other damages allowed under the Statutes of the State of Michigan.

11. As a further direct and proximate result of Defendant Hardy's negligence and gross negligence, the survivors have been required to expend various sums of money and incur various financial obligations for doctors, medical services, hospitals, therapists and other services in an attempt to effectuate a cure or lessen the impact of this tragic death upon their lives.

3

12. As a further direct and proximate result of Defendant Hardy's negligence and gross negligence, the survivors have been unable to return to work and have sustained a loss of earnings and earning capacity now and into the future.

13. At the time of this collision, Plaintiff-Decedent was not negligent or comparatively negligent.

**WHEREFORE**, Plaintiff requests that this Court enter Judgment against the Defendants, jointly and severely, in an amount he is found to be entitled, together with costs, interest and attorney fees.

## COUNT II

14. Plaintiff hereby restates and realleges each and every allegation contained in the preceding paragraphs of this Complaint as though set forth in full herein.

15. At the time and date of said collision, Defendant Hardy was an employee, agent and/or servant of Defendant City.

16. At said time and place, Defendant Hardy was operating Defendant City's bus with its expressed or implied permission as its servant, employee and/or agent.

17. Defendant City is vicariously liable for Defendant Hardy's negligence, gross negligence and the resulting damages both under common law and under the Statutes of the State of Michigan.

18. **WHEREFORE**, Plaintiff requests that this Court enter Judgment against Defendants, jointly and severely, in an amount he is found to be entitled, together with costs, interest and attorney.

## COUNT III

19. Plaintiff hereby restates and realleges each and every allegation contained in the preceding paragraphs of this Complaint as though set forth in full herein.

4

20.     That Defendant City had an obligation to take reasonable care in the hiring, training and supervision of its bus drivers.

21.     That Defendant City breached its duty to act reasonably in the hiring, training and supervision of its bus driver, Audrian Hardy.

22.     That as a direct and proximate result of Defendant City's breaches in this matter, Plaintiff sustained the injuries and damages as hereinbefore narrated.

**WHEREFORE,** Plaintiff requests that this Court enter Judgment against Defendants, jointly and severely, in an amount he is found to be entitled, together with costs, interest and attorney.

## COUNT IV

23.     Plaintiff hereby restates and realleges each and every allegation contained in the preceding paragraphs of this Complaint as though set forth in full herein.

24.     That Defendant City and Defendant Hardy both had an obligation to inspect and maintain the subject bus in a safe and proper manner.

25.     That each Defendant failed to inspect, report and maintain said bus in a manner in which it was safe to the public.

26.     That as a direct and proximate result of both Defendants' breaches in this matter, Plaintiff sustained the injuries and damages as hereinbefore narrated.

**WHEREFORE,** Plaintiff requests that this Court enter Judgment against Defendants, jointly and severely, in an amount he is found to be entitled, together with costs, interest and attorney.

5

Respectfully submitted,

LAW OFFICES OF RICHARD R. MANNAUSA, PLC

Dated: 4-9-12

RICHARD R. MANNAUSA (P39747)
Attorney for Plaintiff
2850 Dixie Hwy.
Waterford, MI 48328
(248) 674-0101

## RELIANCE UPON JURY DEMAND

**NOW COMES** Plaintiff, STEVEN WOLAK, as Personal Representative of the ESTATE OF CHRISTOPHER WOLAK, deceased, by and through his attorney, LAW OFFICES OF RICHARD R. MANNAUSA, PLC, and hereby demands a trial by jury of the within cause.

Respectfully submitted,

LAW OFFICES OF RICHARD R. MANNAUSA, PLC

Dated: 4-9-12

RICHARD R. MANNAUSA (P39747)
Attorney for Plaintiff
2850 Dixie Hwy.
Waterford, MI 48328
(248) 674-0101

6



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

STEVEN WOLAK, as Personal Representative
of the Estate of CHRISTOPHER WOLAK,
Deceased,

            Plaintiff,                        Case No: 2012-001060-NI
                                               HON. Jeanne Stempien

-vs-

CITY OF DETROIT, a Municipal Corporation
and AUDRIAN HARDY,

            Defendants.

| | |
|---|---|
| GEOFFREY N. FIEGER (P30441) | JERRY ASHFORD (P47402) |
| MICHAEL T. RATTON (P42399) | Attorney for Defendants |
| Attorneys for Plaintiff | ***CITY OF DETROIT LAW DEPARTMENT*** |
| ***FIEGER, FIEGER, KENNEY, GIROUX*** | 2 Woodward Avenue Suite 500 |
| ***& DANZIG, P.C.*** | Coleman A. Young Municipal Center |
| 19390 W. 10 Mile Road | Detroit, MI 48226 |
| Southfield, MI 48075 | (313) 237-3089 |
| (248) 355-5555 | |

## PLAINTIFF'S FACILITATION SUMMARY

### FACILITATOR: PAMELA HARWOOD
### FACILITATION DATE AND TIME: 03/04/2013 - 9:30 A.M.

**PLAINTIFF**:      **Christopher Wolak** - 21 year old single man, no children, survived
                        by his parents Steven and Francine Wolak, sister, Samantha Wolak,
                        grandparents, aunts and uncles. (See photos - Exhibit 1)

**DEFENDANT**:    **Audrian Hardy** - City of Detroit Bus Driver was negligently
                        operating her DDOT Bus (hereinafter "Bus") killing Christopher.

                        **City of Detroit** - Owner of Bus responsible for Christopher's death

**DAMAGES**:       Death of 21 year old Christopher Wolak

**VALUE**:          $3,000,000

## **FACTUAL OVERVIEW**

On December 24, 2011, Christopher and a friend, Justin French, had attended the Lion's game. Upon attempting to return to his car, Christopher crossed against the traffic control device and was struck by a northbound Bus operated by Defendant. As a result, Christopher died a horrific death. Although negligence may be attributed to Christopher, it is clear from a review of the video, the analysis of the different statements provided by the Defendant and the witness testimony, that liability will most assuredly be assessed against the Defendants.

## **INCIDENT FACTS**

On December 24, 2011, the Detroit Lions were playing in a play off game against the San Diego Chargers. Christopher had secured tickets from a friend of his Uncle's. As such, Christopher asked his good friend, Justin French, to attend the game with him. Christopher picked up Justin just after noon on Christmas Eve. They then went down to the Elwood Bar where they had a couple of drinks prior to heading over to Ford Field. It was a 4:05 p.m. kick-off time. At the Elwood, both Christopher and Justin had a couple of drinks. Upon arriving at the game both purchased alcoholic beverages and went in to watch the game. They remained at the game up until half-time when the Lion's had established a significant lead. At that time, they decided to depart from the game and go to a Wolak family Christmas party. They left Ford Field at approximately 6:00 p.m. While at the game it is not clear exactly how many alcoholic beverages had been consumed, but both gentlemen did also eat.

Upon departing Ford Field, they took side streets until they got to East Montcalm Boulevard. They were proceeding on Montcalm in a westerly direction towards Northbound Woodward. Attached as Exhibit 2, please find a map depicting the area. As they arrived at the

-2-

Northeast corner of Montcalm and Woodward, Justin noted the light was red for them and stopped at the corner. Christopher jogged by his left shoulder, said "let's go" and started into northbound Woodward. Obviously Christopher did not see the northbound Bus. After crossing 2 northbound lanes , Christopher was struck by the northbound Bus. The Bus ran over Christopher and he became entangled in the undercarriage. The Defendant driver, Audrian Hardy, oblivious to what she had hit, indicates she brought her Bus to a stop after hearing a "thump". What is impossible to explain is how Ms. Hardy did not see Christopher as he ran into the road. He had already crossed 2 ½ lanes of travel prior to impact.

The UD-10 attached at Exhibit 3, shows a depiction of the location. Attached as Exhibit 4 please find a larger view of the area which shows the geographic layout of the area. It is the testimony of Ms. Hardy that it was her plan to proceed in a northerly direction past Montcalm, over 75 and make a left hand turn on the southbound 75 service drive (Exhibit 5).

## **LIABILITY**

There are 4 key pieces to the liability puzzle:
1.      Justin French, eye witness;

2.      Kedisha Williams, eye witness;

3.      Video Tape of occurrence taken from the Fox Theatre

4.      Audrian Hardy, Defendant.

When evaluating the liability aspects of this claim, it is evident that the Defendant, Audrian Hardy, was grossly negligent in her operation of the Bus.

### 1. JUSTIN FRENCH

As previously indicated, Justin French was the best friend of Christopher. Justin indicates as they came up Montcalm he stopped on the northeast corner of Montcalm and Woodward. He indicates that Christopher jogged by his left shoulder into the road indicating "let's go". Justin indicates all he was able to do was yell "no" and he saw Christopher impacted by the Bus. Justin indicates he saw Christopher turn towards the Bus and was certain Christopher was aware he was about to be hit. As the Bus proceeded past Justin, he indicates Christopher was no where to be seen. He saw his hat and shoe in the roadway. In shock, Justin never went to the Bus to see the gruesome sight involving his friend. Instead, he made telephone calls passing on the information of the horrendous accident.

At the time of his initial statement, Justin indicated that the Bus was in the far northbound (left hand) lane. At the time of his recent deposition, he indicates that he believes that the Bus was actually moving between the center lane and the left hand lane. This is consistent with the blood pattern on north Woodward Avenue. Specifically, Justin said the following:

> "A. "It was in the far northbound left lane.
> Q. Okay. Is that an accurate answer?
> A. At that point in time, I thought the bus was coming from there, but the more time I had to think about it, it was more towards the -- I think the bus was more into the middle lane than in the left lane."

(Exhibit 6- Deposition of Justin French, pg. 42 lines 1-6)

It is also significant that Justin did have the opportunity to view the Bus before it entered the intersection and stated the following with regard to speed:

> "Q. You saw the bus before it hit Christopher?

-4-

A. Yes.
Q. Could you estimate a speed for me?
A. I would say something between 30 and 40, 30 and 40 miles
per hour."
(Exhibit 6 - Deposition of Justin French, pg. 48 lines 8-12)

The testimony of Justin clearly places significant liability upon the negligent operation

of the Bus. The driver was speeding, crossing lanes as she proceeded through the intersection

and failing to look for pedestrian travel.

## 2.    KEDISHA WILLIAMS

Ms. Williams made the following statement to the Detroit Police Department the
following:

"Q: How fast do you think the bus was travelling?
A: About 35 mph.
Q: What lane of traffic were you in?
A: I believe the middle northbound lane of Woodward."
Q: The man that was with the pedestrian where was he?
A: They initially both were standing at the crosswalk. It looked like they were waiting
for the light. Then the pedestrian walked away and ran into the street."
(Exhibit 7 - Witness statement of Kedisha Williams 2 pages)

What is clear is Ms. Williams had the ability to see Justin French standing on the

northeast corner. Had Audrian Hardy been looking in the direction the Bus was travelling, she

would have seen Justin and Christopher.

## 3.    VIDEO TAPE (Exhibit 8)

The panel is encouraged to review the Video Tape (Exhibit 8) of this accident. Although

it is highly unusual, this is a case in which the actual accident has been captured via video. The

camera capturing the video is on the exterior of the Fox Theatre. The panel is asked to proceed

in the video up to approximately 2:15 seconds. By reference, the impact occurs at 2:18 seconds.

The following is clearly shown in the Video and depicted in the attached still photos:

-5-

1. 3 or 4 individuals are crossing Woodward Avenue prior to the time the Bus enters the intersection. Those individuals should have been readily visible to Ms. Hardy because they had yet to make it to the northwest corner of Montcalm and Woodward prior to the Bus entering the intersection. (Exhibit 9)

2. Christopher and Justin French are readily visible standing on the northeast corner of Woodward and Montcalm prior to the Bus entering the intersection. (Exhibit 10)

3. Christopher is readily visible at the northeast corner of Montcalm and Woodward prior to the Bus entering the intersection. (Exhibit 10)

4. That Christopher enters into the roadway a split second before the Bus actually enters the intersection. (Exhibit 10)

5. That Christopher has made it across one and one-half (1 ½) lanes of travel prior to the Bus entering the intersection. (Exhibit 10)

6. That impact occurs on the northern aspect of the crosswalk after Christopher has crossed 2 ½ lanes of northbound Woodward Avenue. (Exhibit 11)

It is difficult to explain how Ms. Hardy was unable to see Christopher.

## 4. AUDRIAN HARDY, INITIAL STATEMENT

Ms. Hardy has provided a variety of self-serving, yet inconsistent, statements since the time of the accident. Immediately following the accident, Audrian Hardy gave her first statement:

Following the accident, Ms. Hardy had a conversation with investigating Officer Scott Hall. At that time Ms. Hardy had described the following to Officer Hall:

> That she was just leaving from a slow roll past the last stop on
>
> Woodward just south on Montcalm and while she was going
>
> north changing lanes, she looked left and then back right
>
> changing from lane to lane. On second set of attempted lane

changes (into the left lane), Ms. Hardy stated she looked back to her right briefly and seen a white object run in front of her bus. She heard a loud bump and she immediately stopped the bus.

(Exhibit 12)

## AUDRIAN HARDY STATEMENT OF DECEMBER 25, 2011 AT 3:00 A.M.

A written statement was provided approximately 9 hours after the accident. That statement is attached as Exhibit 13 but has not been signed because it indicates that Ms. Hardy was <u>unable to read the statement without her glasses</u>. (Perhaps she should have been wearing them at the time of the accident?). The statement provided to the Officer at the time, states the following:

> "I did lane by lane, cleared myself looked to the left and went into middle lane. I looked back to right, then back left again to get into the far left lane. I briefly looked to right and saw something white dart in front of the bus. It appeared to be white male, unknown on clothing description. . . ." I said damn it looked like a white man, I seen image go past and heard the bump."

(Exhibit 13).

In the first statement, Ms. Hardy claims to have seen a "white object" then later acknowledges she saw a "white man".

Ms. Hardy provides additional information and changes the facts as she assists in the completion of the Department of Transportation Accident and Crime Report. As noted in attached Exhibit 14 she notes that the area was dark. Truth be told, the area is dark with street lights. There is no indication that the street was dark and that played a role in this accident. She does indicate at that time however that she was changing lanes at the time of the accident. This

-7-

is significant in that her training involving obtaining a CDL (Commercial Drivers License) clearly reflects that a bus driver should not change lanes when proceeding through an intersection. (Exhibit 15). Further, Ms. Hardy in an effort to alleviate herself from any blame indicates that the point of impact on the Bus was on the passenger side. This is clearly not true based upon the investigation. Ms. Hardy also indicates that the traffic was medium. However then at the time of her January 23, 2012 statement indicates that traffic was light. (Exhibit 16). Attached as Exhibit 17 please find a photograph taken following the accident. This clearly reflects the location of the Bus following impact. Further, the tissue left in the roadway supports the fact that Christopher was 2 ½ lanes cross Northbound Woodward prior to impact with the Bus. (Exhibit 18)

## HARDY DEPOSITION

It is still difficult to imagine once reviewing other witness statements and seeing the video why Ms. Hardy failed to see Christopher. According to her deposition testimony she had stopped at a Bus Stop on Woodward and Adams. She did not come to a complete stop again until after the accident. She indicates that she did a "slow roll" at the bus stop which is located across from the Fox Theater. This would place her some 50 feet south of the Montcalm intersection. Upon passing the bus stop in the curb lane, she attempted to move over 2 lanes of travel in the 50 foot span from the bus stop until impact with Christopher. The evidence clearly supports she had moved over approximately 1 ½ lanes at the time of impact. This is quite an abrupt lane change in a short time. In doing the lane change it appears as though her attention was drawn from her path of travel as she looked into her left hand mirror to navigate her lane change. This is supported by the fact that she claims to have not seen any other foot traffic in

-8-

the area. Specifically, Ms. Hardy stated the following:

> "Q.. Prior to something coming across in front of the bus did
> you note any pedestrians crossing Woodward in front of you at
> Montcalm?
> A. No, sir.
> Q. Did you know there was a Lions game that night?
> A. I don't know -- I knew there was some kind of activity at
> the park, yes

(Exhibit 19 Hardy deposition, pg. 64 lines 2-8).

By her own admission, Ms. Hardy knew there was some activity downtown and that foot traffic was a possibility. Yet that fails to explain why she did not see the pedestrians crossing northbound Woodward prior to the accident. A review of the video (Exhibit 8 and the still photographs Exhibit 9-11) show 3-4 pedestrians crossing Woodward prior to the impact. In fact, the pedestrians had crossed from northeast Montcalm to northwest Montcalm and had yet to make it to the west side of the street prior to the Bus entering the intersection. It is difficult to imagine that they were not visible to Ms. Hardy if she had been paying attention. In fact, the pedestrians have not reached the opposite side of Woodward prior to Christopher entering the roadway on the eastside of Woodward. (See video and still photographs).

Further, in an effort to excuse her grossly negligent conduct, Ms. Hardy now claims to have not seen anything prior to impact. When asked directly Ms. Hardy stated the following:

> "Q. Because you never saw a pedestrian prior to hearing this
> sound, correct?
> A. Exactly."

(Exhibit 19 - Hardy deposition, pg. 69 lines 17-19)

This is different testimony than that provided on the day of the accident and thereafter where Ms. Hardy claims to have seen a white male "dart" across the street.

-9-

## INJURIES TO CHRISTOPHER WOLAK

Graphic photographs depicting Christopher's injuries will not be provided to the panel unless requested. Evidence supports that the Bus actually ran over Christopher's head causing injuries which were fatal to Christopher at the scene.

## CONCLUSION

Christopher Wolak was a young man, 21 years of age. He graduated from Milford High School in 2008 and completed certification in Massage Therapy from Florida Health Academy in Naples, Florida. This occurred in January, 2009. He completed course work at Macomb Community College before enlisting in the United States Army in June, 2010. He received an honorable discharge from active duty in October 2010 due to difficulties associated with anxiety. At the time of his death he was employed at Insurance Restorations Services as a mover.

Christopher leaves behind a very close family which is devastated by this loss. Christopher's mother and father remain in counseling. His sister sought counseling for some time, however, at present is not actively participating in a counseling program. Christopher maintained close friendships in both Michigan and Florida. He had an ongoing loving relationship with his grandparents who he would visit frequently. Christopher's loss has devastated the entire family. His mother, Francine, has applied for disability due to her inability to remain in the workforce. Attached as Exhibit 20, please find an email recently received from the Wolak counselor.

## AWARD

Plaintiff concedes that same liability will be assessed against Christopher Wolak based

upon his crossing against the signal and the presence of alcohol in his system. However, it is difficult to explain why he was not seen by Ms. Hardy. Based upon the egregious, grossly negligent conduct of Ms. Hardy, a jury will have no difficulty awarding a 7 figure verdict in favor of the Wolak family.

Respectfully submitted:

**FIEGER, FIEGER, KENNEY, GIROUX & DANZIG, P.C.**

_____
MICHAEL T. RATTON (P42399)
Attorney for Plaintiff
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555

Dated: February 28, 2013

-11-





OFFICE of ~~e~~ WAYNE COUNTY MEDICAL E~~X~~ 'NER

1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

M.E. CASE NUMBER
11-13065
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
DETROIT
DATE PRONOUNCED DEAD
Dec 24, 2011

| THIS IS TO CERTIFY THAT | PERFORMED A POSTMORTEM EXAMINATION ON THE BODY |
|---|---|
| Carl Schmidt, M.D., Chief Medical Examiner | Wolak, Christopher |

| AT | ON |
|---|---|
| Wayne County Medical Examiner's Office | Dec 26, 2011 |

### SUMMARY & OPINION

It is my opinion that death was caused by blunt trauma to the head, apparently as a pedestrian struck by a motor vehicle. The deceased had a craniotomy due to extensive blunt trauma to the head. There were also multiple abrasions on the face and upper extremities. Tissue harvesting precluded any further evaluation of injury so the body was inspected.

The manner of death is accident.

printed by:cl

_Carl J. Schmidt_

Carl Schmidt, M.D., Chief Medical Examiner
January 5, 2012

(report continues on next page)



OFFICE of ᵗʰᵉ WAYNE COUNTY MEDICAL EXAMINER

1300 East Warren Avenue
Detroit, MI 48207

**POST MORTEM REPORT**

M.E. CASE NUMBER
11-13065
COUNTY OF DEATH
WAYNE
TOWN OF DEATH
DETROIT
DATE PRONOUNCED DEAD
Dec 24, 2011

**Cause of Death:**

MULTIPLE INJURIES

**Other Significant Conditions:**

**Manner of Death:**

Accident

## NARRATIVE SUMMARY

**EXTERNAL EXAMINATION:**

The body was that of a well developed white male appearing about the recorded age of 21 years. The body measured 5 feet 10 inches in length and weighed 176 pounds. The body was cool, rigor mortis was fully developed, and livor mortis was present posteriorly and fixed. There was no clothing. The head was normocephalic, with an extensive sutured fronto-temporal craniotomy, and the scalp hair was brown and straight. There was black stubble on the cheeks and chin. The eyes were removed prior to inspection. The dentition was natural. No lesions of the oral mucosa were identified. There were no masses discernable in the neck and the larynx was in the midline. The thorax was symmetrical and unremarkable, with a Y-shaped sture that originated in both shoulders,, converged in the xiphoid and extended into the epigastrium. The abdomen was flat, with sutured incision in both inguinal regions. The external genitalia were those of a normal adult male. The bones of the lower extremity were absent.

**EVIDENCE OF INJURY:**

The entire right side of the face was abraded. The right frontal bone was protruding at the superior orbit. There was a bony protrusion at the right cheek, inferior to the orbit. There was a contusion above the left eyebrow. There were abrasions on the left side of the face at the inferior orbit, cheek, and chin. There was an abrasion behind the left ear. The mandible was fractured. There were two abrasions on the anterior left shoulder. There was a 3 inch laceration at the left antecubital fossa. There was a bony protrusion lateral to the antecubital fossa. The entire left forearm was abraded posteriorly. There were abrasions on the posterior right forearm. There was an abrasion and indentation on the distal medial right forearm, posteriorly. There was a contusion on the distal lateral right forearm posteriorly. There were abrasions on the both thighs posteriorly. There was a 1.25 inch laceration in the left inguinal region.

**(End of Report)**