RECEIVED JUN 29 2015 CLERK U.S. BANKRUPTCY COURT EASTERN DISTRICT OF MICHIGAN

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

In re:

City of Detroit, Michigan,

    Debtor.

Bankruptcy Case No. 13-53846

Honorable Thomas J. Tucker

Chapter 9

---

## TANYA HUGHES' RESPONSE AND BRIEF OPPOSING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II) REQUIRING THE DISMISSAL OF THE STATE COURT ACTION FILED BY TANYA HUGHES

Tanya Hughes, by her undersigned counsel, files this Response and Brief opposing the City of Detroit's Motion for Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring the Dismissal of the State Court Action filed by Tanya Hughes (Docket #9970). In support of this Response, Sgt. Hughes respectfully states the following:

### I. Introduction

1. In May 1996, Sgt. Hughes was hired by the City of Detroit police department, eventually achieving the rank of sergeant. She was employed continuously until December 16, 2014, when the City discharged her from employment and halted her wages, fringe benefits, and pension service credit accrual. On February 27, 2015, Sgt. Hughes filed a state court action against the City of Detroit, alleging a cause of action that accrued to her on the date of her discharge, December 16, 2014.

2. Citing an incident that occurred October 5, 2012, the City sought to administer disciplinary action against Sgt. Hughes up to and including the possible penalty of dismissal. While the matter was pending, Sgt. Hughes remained on the payroll, collecting her routine wages, healthcare and other benefits, and accruing pension credit. During the period the matter

was pending with an arbitrator, the City filed its bankruptcy petition and obtained an order of automatic stay, which it served on the arbitrator, causing the arbitrator to cease deliberation on the City's claim against Sgt. Hughes. Only when the final order of adjustment was entered did the arbitrator resume deliberation, issuing an opinion and award on December 15, 2014 that ordered Sgt. Hughes dismissed from employment.

3. As an active employee throughout the City's bankruptcy proceeding, Sgt. Hughes continued to collect her routine wages, receive her healthcare and other employment benefits, and accrue pension service credit. Further, as an active employee during the bankruptcy proceeding, Hughes received notice of her right to file a claim. However, the notice expressly stated that "City employees and their beneficiaries are not required to file claims for pension or healthcare benefits, routine wages or other employment benefits." Because Sgt. Hughes remained actively employed, had no loss of employment, routine wages or other employment benefits, and was instructed that active employees such as herself were not required to file a proof of claim, she did not file a claim.

4. With her claim accruing to her when she was dismissed from employment on December 16, 2014, Sgt. Hughes is not bound by the injunction the City seeks to enforce against her because 1) her claim arose post-petition and was not fairly contemplated pre-petition; 2) the City is estopped from enforcing the injunction against Sgt. Hughes now because it notified her that she as an active employee was not required to file a proof of claim; 3) the City is further estopped from enforcing the injunction against Sgt. Hughes now because it instructed the arbitrator to cease deliberation on Sgt. Hughes' matter while the bankruptcy proceeding was pending, which had the effect of delaying resolution of the case until well after the claim bar date had passed; and 4) the City waived its right to enforce the injunction by failing to raise it as an

2

affirmative defense in the state court proceeding. For these reasons, the City's motion here should be denied.

## II. Background

5. Sgt. Hughes was nearly to full term with her pregnancy when, on October 5, 2012, she was ordered to submit to random drug testing by the Detroit Police Department. She suffered suffered pregnancy and disability discrimination when she was ordered unnecessarily to remove all of her clothes in order to void a urine specimen as part of the drug testing program. She offered to provide a specimen but declined to remove a medical garment before doing so because removing the garment was medically contraindicated to her health and that of her unborn child. Immediately following that event, Sgt. Hughes was placed on leave with pay; she suffered no loss of pay and therefore no adverse employment action as a result.

6. Subsequently, the Chief of Police petitioned the Board of Police Commissioners to convert the leave from "with pay" to "without pay." Had the Board concurred, Sgt. Hughes would have suffered pay loss and therefore adverse employment action. The Board did not concur, however, concluding to the contrary that Sgt. Hughes had not violated DPD policy or rules in the drug testing event. As the result of the Board's action, Sgt. Hughes remained on leave with pay and suffered no adverse employment action.

7. A police trial board subsequently sustained the Chief's determination concerning Sgt. Hughes, but the trial board did not alter her status of leave with pay. Accordingly, Sgt. Hughes suffered no adverse employment action as the result of the trial board determination or anything else that had occurred to that point.

8. The matter proceeded to arbitration before Umpire Linda Ashford on April 30 and May 6, 2013. Post-hearing briefs were filed June 18, 2013, with Sgt. Hughes still in a leave with pay status.

9. The City petitioned in bankruptcy on July 18, 2013. At that point, the Code's automatic stay became operative, a fact confirmed by order entered July 25, 2013. Docket #167. The automatic stay order was served on Umpire Ashford on July 26, 2013. She concluded it barred her from proceeding with the determination of the matter involving Sgt. Hughes, and she advised the City of this conclusion. Hearing nothing in reply, Umpire Ashford again on August 23, 2013 renewed her inquiry of the City for advice as to whether her conclusion was correct. The City did not respond. In the meantime, Sgt. Hughes remained on leave with pay, continuing to collect her bi-weekly paycheck and utilize her employment benefits, and Umpire Ashford took no further action while the stay was in place to decide Sgt. Hughes' case.

10. The Bankruptcy Court subsequently set a claim bar date of January 21, 2014. Docket #1782, p. 5.

11. The City sent a notice to creditors providing information about filing claims. Sgt. Hughes received the notice because she was an active employee of the City. The notice stated the following, in relevant part (Docket #1782, p. 20):

### INFORMATION ABOUT DEADLINES TO FILE CLAIMS

\*\*\*
- This document is a legal notice concerning the bankruptcy case of the City of Detroit, Michigan. This document is being sent to all parties that may be owed money by the City (known as "creditors").

\*\*\*
- In bankruptcy, creditors may be required to file claim forms stating the amount of money owed to them as of the day the bankruptcy was filed. This document explains how to file claims.
- **Many creditors in the City's bankruptcy case are not required to file a claim.** This document explains who is required to file a claim and who is not required to file a claim.

4

If you are not required to file a claim, then you do not need to take any action at this time to preserve your right to vote on or receive payments under a restructuring plan.
- **The following parties are not required to file a claim** …

  \*\*\*
    - **City employees and their beneficiaries** are not required to file claims for pension or healthcare benefits, routine wages or other employment benefits.

12. Sgt. Hughes did not file a claim for three reasons. First, per the express language of the notice the City sent her, there was no amount of money owed her "as of the day the bankruptcy was filed," July 18, 2013, because she had been paid her wages and other employment benefits in full through that date. Second, she was instructed by the notice the City sent her that, as a City employee receiving routine wages, healthcare benefits, other employment benefits, and pension service credit, she was not required to file a claim. Finally, she did not have an actionable discrimination case against the City arising from the October 5, 2012 incident because she had not suffered adverse employment action, without which she could not pursue a lawsuit.

13. On October 22, 2014, well more than a year after petitioning in bankruptcy, the City finally moved the Bankruptcy Court for an order permitting Umpire Ashford to consider the matter involving Sgt. Hughes. The Court entered the requested order on November 12, 2014 (Docket #8265), the same day it approved the Eighth Amended Plan of Adjustment that effectively ended the bankruptcy matter (Docket #8272). Sgt. Hughes remained on leave with pay through and after the Court's orders of that date.

14. With the automatic stay lifted with respect to Sgt. Hughes' matter, Umpire Ashford issued her opinion a month later on December 15, 2014, sustaining the Chief's determination and ordering Sgt. Hughes dismissed from the Detroit Police Department. The next day, Sgt. Hughes was removed from the payroll for the first time since she commenced employment, and her employment benefits were ended. Accordingly, December 16, 2014 was the first day Sgt. Hughes suffered adverse employment action, and it was the day her cause of action for

pregnancy and disability discrimination first accrued to her. This accrual date was one year and five months *after* the City petitioned in bankruptcy and ten months after the claim bar deadline set by the Bankruptcy Court. Sgt. Hughes filed her suit in Circuit Court on February 27, 2015.

### III. Sgt. Hughes' claim did not arise until December 16, 2014 and therefore is not barred by the bankruptcy injunction

15. The Bankruptcy Code defines "claim" as

> **(A)** right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> **(B)** right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.
> 11 USC §101(5).

The Code further defines "debt" as "liability on a claim." 11 USC §101(12).

16. Under the precedents of statutory discrimination law, an employee can establish a *prima facie* case of disparate treatment discrimination by establishing each of these four elements: (1) membership in a protected group, (2) qualification for the position, (3) adverse employment action, and (4) replacement by a nongroup member or proof that similarly situated persons not in the protected class were treated differently. *Lytle v. Malady*, 458 Mich. 153 (1998); *Matras v. Amoco Oil Co.*, 424 Mich. 675, 683 (1986); *Ewers v. Stroh Brewery Co.*, 178 Mich.App. 371 (1989); *Sisson v. Board of Regents of Univ of Michigan*, 174 Mich.App. 742 (1989).

17. "Adverse employment action" within this proofs matrix is action that is "materially adverse," *Wilcoxon v. 3M*, 235 Mich.App. 347, 364 (1999), in the form of an ultimate employment decision such as termination, suspension, or demotion that carries with it loss of pay and material loss of benefits.

18. Here, Sgt. Hughes lost no pay or benefits as the result of the action of the Chief of Police or the Trial Board. Instead, by action of the Board of Police Commissioners, Sgt. Hughes was maintained in a status of full pay and benefits while suspended. In similar circumstances, five federal Circuit Courts of Appeals have held that placement of an employee on administrative leave with pay does not constitute adverse employment action for purposes of statutory discrimination. *Peltier v. U.S.*, 388 F.3d 984, 986, 988 (6th Cir. 2004) (administrative leave with pay pending internal investigation and grand jury proceedings); *Singletary v. Mo. Dept of Corr.*, 423 F.3d 886, 889, 892 (8th Cir. 2005) (suspension with pay pending investigation); *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (administrative leave with pay pending investigation of complaint); *Breaux v. City of Garland*, 205 F.3d 150, 154-155, 158 (5th Cir. 2000) (administrative leave with pay pending Internal Affairs investigation); and *Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (administrative leave with pay during pendency of criminal case and for five months thereafter). These precedents establish that Sgt. Hughes, in full pay status, could not allege discrimination under Michigan's Elliott-Larsen Civil Rights Act or the Persons With Disabilities Civil Rights Act at any time prior to December 16, 2014, when she was for the first time removed from the payroll. Accordingly, she did not have a claim within the meaning of the Bankruptcy Code prior to the filing of the petition or the claim bar date or, indeed, December 16, 2014. For this reason, her present state court action claim is not implicated or barred by the injunction the City cites.

19. The subject of Sgt. Hughes' state court litigation does not constitute a pre-petition claim or contingent claim under the "fair contemplation" standard adopted by the court in *Signature Combs, Inc. v. United States*, 253 F.Supp.2d 1028 (W.D. Tenn. 2003), and followed by other courts within the Sixth Circuit (*see, e.g., In re Senczyszyn*, 426 B.R. 250 (Bkrtcy E.D. Mich.

2010), *aff'd on other grounds*, 444 B.R. 750 (E.D. Mich. 2011). The *Signature Combs* court addressed a claim under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) that defendant asserted had been discharged in a previous bankruptcy proceeding. The CERCLA permits a cause of action only if there has been a release of a hazardous substance *and* the plaintiff has incurred response costs. The court rejected the "underlying act" approach adopted by some courts in other circuits, by which the sole measuring point for determining whether a claim arose pre-petition was the date of the debtor's conduct (for CERCLA purposes, the underlying act would be the release of the hazardous substance), with no regard to whether that conduct caused actionable harm or caused the accrual of a claim under non-bankruptcy law (again for CERCLA purposes, the response costs). Instead, the *Signature Combs* court adopted the "fair contemplation" standard which, for purposes of discharging CERCLA claims in bankruptcy, held that "a CERCLA claim arises when the claimant can 'tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant *knows will lead to CERCLA response costs.*'" *Signature Combs,* 253 F.Supp.2d at 1037 (emphasis supplied).

20. Sgt. Hughes did not have a pre-petition claim under the "fair contemplation" standard. Analogizing the facts of *Signature Combs* to those at bar here, the October 5, 2012 event constitutes the "underlying act," but for the purpose of bankruptcy discharge, the claimant must *know that the act will lead to harm that can be remedied by statute*. Certainly, had Sgt. Hughes been discharged on October 5, 2012 and removed from employment status with loss of wages and employment benefits, there would be no question that her claim would be pre-petition. But when she was instead continued in an active employment status for more than two years that followed the October 2012 event, she did not *know*, as the *Signature Combs* court requires, that

8

she had a claim by which to challenge the treatment she experienced. At the time the City petitioned in bankruptcy, Sgt. Hughes' matter was pending in arbitration. The arbitrator had full authority to overrule the Chief of Police, just as the Board of Police Commissioners had done when the Chief asked that Sgt. Hughes be suspended without pay. Had the arbitrator ruled in Sgt. Hughes' favor, she would never had had a claim because she never would have suffered adverse employment action. Given the pendency of the arbitration proceeding, two possible outcomes could occur, one favoring Sgt. Hughes and one not. Under these circumstances, she did not know, at any time during the pendency of the bankruptcy proceeding, that a claim would accrue to her. In this way, Sgt. Hughes' circumstances differ from a plaintiff seeking contribution for response costs from a defendant in a CERCLA action. In the latter case, where the plaintiff knows of the underlying act, the plaintiff also knows that response costs will be inevitable, even if the plaintiff has not yet incurred them. By contrast, Sgt. Hughes did not know that she would suffer harm flowing from the October 2012 event, because the arbitrator might prevent the harm from occurring. For these reasons, Sgt. Hughes did not have a pre-petition or contingent claim under the "fair contemplation" standard, and the City's motion to enforce the injunction on that basis should be denied.

### IV. The City is equitably estopped from seeking to enforce the injunction

21. The City is equitably estopped from enforcing the injunction by virtue, first, of its representation that active employees were not required to file claims and, second, by its representations concerning the automatic stay of proceedings.

22. The instructions the City gave about filing claims expressly stated first that "creditors may be required to file claim forms stating the amount of money owed to them *as of the day the bankruptcy was filed.*" (Emphasis supplied.) The same notice declared that "City employees ...

9

are not required to file claims for pension or healthcare benefits, routine wages or other employment benefits." Despite the October 5, 2012 event, Sgt. Hughes as of July 18, 2013, was collecting and had collected 100% of her "routine wages" and had received all other employment benefits, healthcare, and pension service credit. Accordingly, the City owed her nothing more *as of the day the bankruptcy was filed*. Indeed, the City continued to pay her full wages through the entirety of the bankruptcy proceeding, until *after* the final plan of adjustment was approved. Further, even if the City had owed Sgt. Hughes additional compensation – which it did not – Sgt. Hughes fell squarely within the exception that declared that employees were not required to file claims for routine wages.

23. Further, counsel for the City served Umpire Ashford with the order of automatic stay on July 25, 2013. The umpire responded promptly with her conclusion that the automatic stay barred her from proceeding with deliberation and decision on Sgt. Hughes' matter. She followed up on that inquiry a short few weeks later. She received no reply, which caused her reasonably to conclude that her assessment of the order of automatic stay was correct. More than a year later, the City moved and the Bankruptcy Court ordered that the automatic stay did not apply to Sgt. Hughes' matter. The effect of the City's action in notifying Umpire Ashford of the stay, failing or refusing to advise her that the stay did not apply to Sgt. Hughes' matter, and then nineteen months later obtaining an order declaring that the automatic stay did not and never did apply to Sgt. Hughes' case was to delay the Umpire's decision on Sgt. Hughes's case to a point well beyond when Sgt. Hughes could have permissibly filed a claim against the bankruptcy estate, if indeed the Umpire's decision was adverse to Sgt. Hughes.

24. Equitable estoppel arises where a party, by representations, admissions, or silence, intentionally or negligently induces another party to believe facts, the other party justifiably

10

relies and acts on this belief, and prejudice results if the first party is permitted to deny the existence of those facts. *Southeastern Oakland Co. Incinerator Authority v. Dep't of Natural Resources*, 176 Mich.App. 434, 442-443 (1989).

25. The City here is equitably estopped to enforce the injunction against Sgt. Hughes first because of the notice it sent her and all other creditors stating that creditors "may be required to file claim forms stating the amount of money owed to them as of the day the bankruptcy was filed" and stating further that active employees were not required to file claims for routine wages. Where Sgt. Hughes was an active employee who had received all of her routine wages as of the day the bankruptcy was filed, she neither had a claim nor was required as an employee to file a claim. Now, despite those representations, the City faults Sgt. Hughes, arguing that she indeed had a claim at the time the bankruptcy was filed and was required to file it or lose her right to pursue it as part of the reorganization process. That the City misled Sgt. Hughes is patent. The doctrine of equitable estoppel should be applied to prevent the City from benefiting from its misrepresentation.

26. The City is further equitably estopped with respect to the automatic stay because (1) it engaged in words and conduct amounting to a misrepresentation or concealment of material facts – those being that the automatic stay applied to Sgt. Hughes' matter when it did not; (2) it knew or had reason to know at the time the representations were made that the representations were misleading or untrue – proof that came in the form of Umpire Ashford's communications stating that she considered herself bound by the automatic stay; (3) the lack of knowledge on Umpire Ashford's part, at the time the representations of the City were made concerning the automatic stay and at the time that they were acted upon, that the representations were untrue; (4) the City intended or reasonably expected that the representations would be acted upon; (5) Umpire

11

Ashford relied in good faith upon the representations to the detriment of Sgt. Hughes, especially given the City's failure even to respond to Umpire Ashford's inquiry about the automatic stay; and (6) prejudice to Sgt. Hughes resulted because of the City's representations in that she was denied the opportunity to file proof of claim. Had the City not misled Umpire Ashford with respect to the automatic stay, it is foreseeable that Umpire Ashford would have completed her deliberations and issued an opinion and award in 2013, which if adverse to Sgt. Hughes would have allowed her sufficient time to file a claim ahead of the February 2014 bar date. Instead, despite Umpire Ashford's statement of reliance on the automatic stay the City sent her, the City remained silent, allowing the bar date to pass and thereby deprive Sgt. Hughes of the basis – the loss of routine wages – that would give her a claim on which to file. That the City misled Umpire Ashford is obvious, and it bore consequences for Sgt. Hughes. The doctrine of equitable estoppel should be applied to prevent the City from benefiting from its misrepresentation.

### V. The City has waived its right to enforcement of the injunction by failing to raise it as a defense in the state court action

27. A final reason for denying the relief the City seeks here is its failure to assert the bankruptcy injunction as an affirmative defense in the state court action. Such an affirmative defense is governed by MCR 2.116(C)(7) – immunity granted by law – a defense that must be raised in the first responsive pleading or in a pre-answer motion. It was not raised in the answer and affirmative defenses filed March 23, 2015 and therefore has been forfeited. Forfeiture is the failure to timely assert a known right. *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 279 (2003).

### VI. Conclusion and Request for Relief

For all the reasons stated above, Sgt. Hughes respectfully requests that the City's motion be denied in its entirety.

Respectfully submitted,

Dated: June 29 2015

_____
Jeffrey J. Ellison (P35735)
Attorney for Sgt. Tanya Hughes
214 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 761-4300
(734) 528-4159 fax

**CERTIFICATE OF SERVICE**

**Jeffrey J. Ellison**, as an Officer of the Court, states that on June 29, 2015, he mailed a copy of the foregoing document to Marc N. Swanson, Miller Canfield, 150 W. Jefferson, Suite 2500, Detroit, MI 48226.

Dated: June 29 2015

_____
Jeffrey J. Ellison (P35735)
214 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 761-4300
(734) 528-4159 fax