# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CITY OF DETROIT'S BRIEF SUBMITTED PURSUANT TO COURT ORDER [D.E. 9969], AND IN SUPPORT OF MOTION SEEKING DETERMINATION THAT CLAIMANTS BRINGING PRE-PETITION NO-FAULT LAWSUITS CANNOT SEEK TO RECOVER INTEREST OR ATTORNEY FEES REGARDLESS OF WHETHER THE SERVICES WERE RENDERED PRE-PETITION OR POST-PETITION**

Marc N. Swanson (P71149)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
green@millercanfield.com
swansonm@millercanfield.com

Charles N. Raimi (P29746)
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan 48226
Telephone: (313) 237-5037
raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

July 6, 2015

# TABLE OF CONTENTS

RELEVANT FACTS AND PROCEEDINGS ........................................................................... 1

   A.   Explosion of no-fault litigation. .............................................................................. 1

   B.   450 pre-petition auto accident claims are filed in the City's bankruptcy. ........... 4

   C.   Relevant provisions of the no-fault act. ................................................................. 5

   D.   The Plan of Adjustment eliminates payment of interest or attorney fees on pre-petition no-fault claims. ........................................................................... 6

ARGUMENT:   ALL FIRST PARTY CLAIMS ARISING FROM PRE-PETITION MOTOR VEHICLE ACCIDENTS ARE PRE-PETITION CLAIMS, REGARDLESS OF THE DATE THE MEDICAL SERVICE WAS RENDERED, ACCORDINGLY, CLAIMANTS CANNOT RECOVER INTEREST OR ATTORNEY FEES UNDER THE PLAN OF ADJUSTMENT OR BANKRUPTCY LAW ........................................................................................... 8

   1.   The Plan of Adjustment unambiguously precludes recovery of interest or attorney fees on "pre-petition Claims." Under bankruptcy law, a no-fault claim is "pre-petition" if it arose from a pre-petition accident. .................... 8

   2.   The policies underlying bankruptcy – giving the debtor "breathing room" and a "fresh start" fully support the City's position. ................................ 14

CONCLUSION AND RELIEF ............................................................................................ 15

## RELEVANT FACTS AND PROCEEDINGS

This Court's June 15, 2015 Order directed the parties to brief the following issue: when a claimant was involved in a pre-petition motor vehicle accident, and the claimant seeks recovery for medical services that were provided post-petition, can the claimant seek (in addition to recovery for the medical service) recovery of interest and attorney fees under the confirmed Plan of Adjustment and federal bankruptcy law? The City's position is, in that fact pattern, claimant cannot recover interest or attorney fees on medical services provided post-petition from an accident that occurred before the filing of this bankruptcy case.

As discussed below, there has been an explosion of litigation under the no-fault act. As a result, the dispute before the Court has great significance to the City and its efforts to successfully exit from bankruptcy.

**A. Explosion of no-fault litigation.**

The no-fault act took effect in 1973. Its purpose is to ensure that individuals injured in automobile accidents obtain insurance benefits for medical expenses and wage loss without regard to whether the injured individual was at fault. To obtain such benefits, all automobile owners are required by law to purchase personal protection insurance (PPI or "first party" coverage). Under first party coverage, the injured party's own insurer pays benefits for medical services, wage loss and certain expenses.

It was believed that savings arising from eliminating costly litigation could allow for certainty of payment while maintaining affordable premium levels. *See*, *e.g. Shavers v Attorney General*, 402 Mich 554, 578 (1978); *Lewis v DAIIE*, 426 Mich 93, 101-102 (1986), ("One of the important reasons behind the enactment of the no-fault system was the reduction of auto accident litigation.").

Over the years the landscape has dramatically morphed. First party no-fault benefits (mostly medical bills and wage loss) still are paid to claimants by their insurers without regard to fault. But litigation surrounding no-fault claims has exploded. All the Court need do is look at the attorney ads on almost every city bus, freeway billboard, television and radio, etc., in which lawyers are soliciting no-fault claims.

The reason for these endless solicitations is simple: this business has become incredibly lucrative both for lawyers and medical providers. The underlying reason is that Michigan courts have construed the law to allow medical providers to collect their "billed charges" when treating auto accident victims. Payors other than no-fault insurers, including commercial insurers such as Blue Cross, and governmental insurers such as Medicare and Medicaid, pay providers much less than billed charges. Although no-fault insurers are allowed some latitude to contest the reasonableness of charges, no-fault insurers, including the city of Detroit, typically pay medical providers at rates 2 to 5 times more than providers are paid for the exact same service when the injury did not arise from an automobile accident.

This has been documented repeatedly over the years. Exhibit 1 is an October 2013 study by the Citizens Research Council of Michigan. Page 7 compares amounts collected by medical providers for several common services. It shows, for example, that for a 15 minute physical therapy session, providers on average collect $79.38 if the patient was injured in an auto accident and has no-fault insurance, versus $30.66 paid by Medicare for the same service. Other services have an even greater disparity – no-fault insurers on average pay $1,820.09 for a neck CT, versus $261.50 if Medicare is paying.

Attorneys routinely refer no-fault claimants to certain physicians and the attorney takes a fee from the provider's payment. The attorney fee often is one-third – which still leaves the

medical provider with a much higher recovery than would have been received from Blue Cross or Medicare for the same service.

Because the no-fault business is so lucrative, there are enormous incentives to over-treat no-fault patients. Exhibit 2 is an April 2011 no-fault study by the Michigan Chamber of Commerce. It notes that excessive costs often arise "from the deliberate overuse of benefits or from the filing of fraudulent or exaggerated claims." Ex. 2, p. 17. The study also points out that the rate of alleged brain injuries in auto accident victims is 8 times higher in Michigan than in other states. Ex. 2, pp. 19-20.

These are state-wide issues but the problem has become an unmitigated disaster for the City of Detroit. Detroiters – urged on by trial lawyers – file twice as many first party no-fault claims as suburbanites (12 per 1,000 exposures vs. 6 per 1,000 exposures). Ex. 3, excerpt of Pinnacle actuarial analysis, p. 6. Each first party claim in Detroit is, on average, roughly twice the cost as in the suburbs ($59,000 vs. $30,000). *Id.* On a per capita basis, no-fault lawsuits are filed 7.75 times more frequently in Wayne County than in Oakland County, and 5.2 times more frequently in Wayne County than in Macomb County. Ex. 4.

The City of Detroit suffers in two important ways from the explosion in no-fault claims and litigation. First, auto insurance rates in Detroit are the highest in the nation. More than 50% of Detroit drivers cannot afford insurance and, under the no-fault law, they become criminals when they drive without insurance. Exhibit 5, November 2014 Detroit Free Press Article. These unaffordable rates deter people from moving to, and deter growth and development in, the City.[1]

---

[1] The Michigan no-fault law mandates provision of unlimited medical benefits. It is the only state in the United States to do so – other no-fault states have much lower requirements. Massachusetts, for example, mandates only $8,000 of medical coverage. Mayor Michael Duggan has proposed a bill that would give Detroit drivers the option of buying lower cost no-fault insurance offering lower benefits. The bill is pending in the Michigan Senate. Exhibit 3 is an excerpt from an actuarial analysis of the proposed legislation.

Second, the City of Detroit owns and operates a large vehicle fleet including hundreds of buses and thousands of other vehicles. As discussed below, the City self-insures its vehicle fleet and receives hundreds of no-fault claims annually. Many are paid without litigation. However, when the City contests the necessity of certain treatment or the reasonableness of the charges, the City is sued at an alarming rate.

### B. 450 pre-petition auto accident claims are filed in the City's bankruptcy.

As the Court knows, this case represents the largest municipal bankruptcy case in history. More than 1,400 pre-petition litigation claims were ultimately filed against the City. Those 1,400 litigation claims do not include trade claims, administrative claims, contract rejection damage claims, and others.

By far the single largest category of litigation claims are those arising from motor vehicle accidents (MVAs). In total, 450 pre-petition MVA claims were filed. Of those, roughly 320 are first party no-fault claims – many of which arise from bus accidents.

The other category of MVA claims, other than first party no-fault claims, is "third party claims." Under the no-fault law, a person injured in a MVA must ordinarily look to her or his own insurer for payment of medical bills and wage loss. That is why those benefits are called "first party," they are paid by the claimant's own insurer. The no-fault act precludes an injured party from suing a third party for additional damages, such as pain and suffering, unless (i) the third party's negligence caused the accident and (ii) the injured party suffered severe bodily injured as defined in the no-fault law. In addition to the 320 first party no-fault claims, 130 third party MVA claims were filed. Third party claims are not at issue in the pending matter.

- 4 -

## C. Relevant provisions of the no-fault act.

The no-fault act requires motor vehicle owners to secure no-fault insurance. MCL 500.3101. No-fault insurance provides benefits, regardless of fault, for payment of medical expenses, work loss and certain replacement services. MCL 500.3105, 3107.

Each year, the City of Detroit receives hundreds of first party no-fault claims. Under the no-fault act, an individual's own insurer is normally responsible for paying "first party" no-fault benefits. However, the no-fault act's priority provisions dictate that for many bus passengers, the owner of the bus (City of Detroit) is the insurer and, hence, is responsible for paying first party no-fault benefits in the event the bus is involved in an accident – again, without regard to whether the bus driver was at fault. The City also is responsible for payment of first party no-fault benefits in other circumstances, such as if a City vehicle strikes a pedestrian and the pedestrian has no insurance coverage.

Michigan courts have determined that medical providers have independent standing to sue for no-fault benefits, i.e. to sue the responsible no-fault insurer to recover for medical services rendered to MVA victims. *Lakeland Neurocare v. State Farm*, 250 Mich. App. 35 (2002). Many of the 320 pre-petition first party claims are, in fact, brought by medical providers. In many cases the City is sued separately by the injured party and the medical provider that provided the service.

This Court's June 15, 2015 Order, in paragraph 7, cites the case of Sheila Williams. While Williams was the injured party, the state court lawsuit is brought directly by the Summit Medical Group – a frequent litigant against the city of Detroit. The City's supplemental filing [D.E. 9935] appended a summary disposition motion filed by Summit in its state court case. That copy also is appended as exhibit 6 to this brief.

MCL 500.3142 provides that PPI (first party) benefits are (i) payable as loss accrues, (ii) benefits normally are payable within 30 days after submission of a proper claim, and (iii) 12% interest is assessed on overdue payments:

> "Sec. 3142. **(1)** Personal protection insurance benefits are payable as loss accrues.
>
> **"(2)** Personal protection insurance benefits are overdue if not paid within 30 days after an insurer receives reasonable proof of the fact and of the amount of loss sustained. If reasonable proof is not supplied as to the entire claim, the amount supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. Any part of the remainder of the claim that is later supported by reasonable proof is overdue if not paid within 30 days after the proof is received by the insurer. For the purpose of calculating the extent to which benefits are overdue, payment shall be treated as made on the date a draft or other valid instrument was placed in the United States mail in a properly addressed, postpaid envelope, or, if not so posted, on the date of delivery.
>
> **"(3)** An overdue payment bears simple interest at the rate of 12% per annum."

MCL 500.3148 provides for assessment of attorney fees against a no-fault insurer "if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment:"

> "Sec. 3148. **(1)** An attorney is entitled to a reasonable fee for advising and representing a claimant in an action for personal or property protection insurance benefits which are overdue. The attorney's fee shall be a charge against the insurer in addition to the benefits recovered, if the court finds that the insurer unreasonably refused to pay the claim or unreasonably delayed in making proper payment."

### D. The Plan of Adjustment eliminates payment of interest or attorney fees on pre-petition no-fault claims.

As mentioned, 320 pre-petition first-party no-fault bankruptcy claims were filed in this case. At the outset of the bankruptcy proceedings, the City's legal counsel took the position that all pre- and post-petition services arising from pre-petition first party no-fault claims should be treated as all other unsecured claims in accordance with the Bankruptcy Code. In other words, the total claim would be determined by adding the pre-petition services to an estimated amount

- 6 -

for all post-petition services, and the total claim would be discharged in the same fashion as all other unsecured claims - at pennies on the dollar paid over 30 years.

The state of Michigan disagreed with that position as a matter of public policy (and not bankruptcy law). After extensive negotiations, the City and the State agreed on a Memorandum of Understanding which is appended as exhibit 7. The key provision of the MOU, section II (A) (3), was incorporated verbatim into the Plan of Adjustment (Art. IV (S)):

> "From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: **(1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL§ 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits;** (2) tort claims permitted by MCL§ 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131,shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law."

Emphasis added. The emphasized language makes clear that claimants pursuing pre-petition first party no-fault claims are entitled to recover the entire claim, to the extent valid, but not interest or attorney fees. In view of the fact that medical providers are

- 7 -

recovering 2-5 times more under the no-fault act than they would recover from other payors, recovery of their entire claim makes them exponentially better off than other similarly situated bankruptcy claimants.

**ARGUMENT: ALL FIRST PARTY CLAIMS ARISING FROM PRE-PETITION MOTOR VEHICLE ACCIDENTS ARE PRE-PETITION CLAIMS, REGARDLESS OF THE DATE THE MEDICAL SERVICE WAS RENDERED, ACCORDINGLY, CLAIMANTS CANNOT RECOVER INTEREST OR ATTORNEY FEES UNDER THE PLAN OF ADJUSTMENT OR BANKRUPTCY LAW**

1. **The Plan of Adjustment unambiguously precludes recovery of interest or attorney fees on "pre-petition Claims." Under bankruptcy law, a no-fault claim is "pre-petition" if it arose from a pre-petition accident.**

The issue before the Court is this: where a claimant was involved in a pre-petition motor vehicle accident, and the claimant seeks recovery for medical services that were provided post-petition, can the claimant seek (in addition to recovery for the medical service) recovery of interest and attorney fees under the Plan of Adjustment or federal bankruptcy law? The City expects that claimants will advance the following argument: Under MCL 500.3142(1), "personal protection insurance benefits are payable as loss accrues." Hence, for no-fault purposes, a claim accrues after the claimant incurs a medical bill – which in some cases may be well after the auto accident. In a bankruptcy case, it is irrelevant when the claim accrues under state law. It is well settled that federal bankruptcy law governs when a claim arises for treatment in a bankruptcy case. *See* 11 U.S.C. § 101(5)(A).

Although a no-fault claim may accrue, for no-fault purposes, after the petition date, the claim is valid only if the medical services are reasonably necessary to treat injuries arising from the **pre-petition** accident. *See* MCL 500.3107; *McKim v. Home Ins. Co.*, 133 Mich. App. 694 (1984). Because the post-petition medical services at issue here all relate back to a pre-petition

accident, under the Plan of Adjustment and settled bankruptcy law claims for post-petition medical services remain pre-petition claims.

The controlling provision of the Plan of Adjustment, as quoted above, is the following: "Claims for personal protection benefits as provided by MCL § 500.3107 and MCL§ 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on **prepetition Claims** for personal protection benefits * * *." Plan of Adjustment, Art. IV(S) (emphasis added). The fact that the "c" in "Claims" is capitalized means it is a defined term under the Plan of Adjustment.

Page 6 of the Plan of Adjustment states "'Claim' means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City." Section 101(5) of the Bankruptcy Code states:

> "(5) The term "claim" means—
>
> " (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> "(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

"Congress gave these terms the broadest possible definitions so as to enable a debtor to deal with all legal obligations in a bankruptcy case." *In re Lipa*, 433 B.R. 668, 669-70 (Bankr. E.D. Mich. 2010) (*citing Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558 (1990)). The Supreme Court has repeatedly reiterated that Congress intended to adopt the broadest available definition of "claim" and has declined all invitations to exclude rights to payment from the definition of claim. 2 COLLIER ON BANKRUPTCY ¶ 101.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (*citing FCC v. NextWave Personal Communications,*

*Inc. (In re NextWave Personal Communications, Inc.*), 537 U.S. 293 (2003); *Johnson v. Home State Bank*, 501 U.S. 78 (1991)).

"Courts have been careful to distinguish between when a right to payment arises for bankruptcy purposes, and when the cause of action accrues." *In re Dixon*, 295 B.R. 226, 229-30 (Bankr. E.D. Mich. 2003) (*citing Kilbarr Corp. v. G.S.A. (In re Remington Rand Corp.),* 836 F.2d 825, 830–31 (3d Cir.1988) ("recogniz[ing] that a party may have a bankruptcy claim and not possess a cause of action on that claim" and noting, for example, that "an indemnity or surety agreement creates a right to payment, albeit contingent, between the contracting parties immediately upon the signing of the agreement")). As such, it is "well settled that federal law governs *when* a claim arises." *In re Parks*, 281 B.R. 899, 902 (Bankr. E.D. Mich. 2002) (emphasis supplied).

Under federal bankruptcy law, a prepetition claim is not transformed into a post-petition claim "simply because it is contingent, unliquidated or unmatured when the debtor's petition is filed."[2] *Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987); *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Management, Inc.),* 4 F.3d 1329, 1335 n. 7 (5th Cir.1993) ("A claim is not rendered a post-petition claim simply by the fact that time for

---

[2] In fact, from a normative standpoint, bankruptcy law could work no other way. It cannot, and does not, protect the non-bankruptcy law entitlements of creditors (for example, the right to repossess and foreclose upon collateral security upon default or to exercise specific performance remedies under applicable law), but rather it *respects* and *values* those rights for treatment in a collective bankruptcy proceeding. The bankruptcy process is generally thought of as a collective debt-collection process designed to ameliorate a common pool problem, and thereby address and translate individual rights in and to the collective proceeding. To work, it must deal with assets and liabilities determined as of a particular moment in time. That is the purpose of the broad definition of "claim" in section 101(5) of the Bankruptcy Code, its statutory acceleration feature and other implementation provisions of the Bankruptcy Code. All creditors with claims against a debtor's assets, whether those claims are mature, unliquidated or contingent under state or other applicable non-bankruptcy law, must be accelerated (*i.e.* treated as "due and owing") and valued as of the petition date if those creditors are to have the right and, as importantly, the ability to share in a debtor's assets, or value of those assets, in the form of distributions in the bankruptcy process. Numerous other provisions in the Bankruptcy Code, such as the estimation procedures in section 502(c), are intended to facilitate that process. 11 U.S.C. § 502(c)(1) ("the fixing or liquidation of which . . . would unduly delay the administration of the case").

- 10 -
24759760.4\022765-00202
13-53846-tjt    Doc 10022    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 12 of 18

payment is triggered by an event that happens after the filing of the petition."); *United States through Agricultural Stabilization & Conservation Serv. v. Gerth,* 991 F.2d 1428, 1433 (8th Cir.1993) ("[D]ependency on a postpetition event does not prevent a debt from arising prepetition."); *In re Stewart Foods, Inc.*, 64 F.3d 141, 146 (4th Cir. 1995)("…the fact that the payments became due after the bankruptcy filing does not alter the conclusion that the payments are pre-petition obligations.").

Further, although the term "contingent" is not defined in the Bankruptcy Code, "courts have concluded that contingent claims are those in which a debtor will be required to pay only upon the occurrence of a future event triggering the debtor's liability. The inclusion of a contingent right to payment in the definition of a bankruptcy claim clarifies that a right to payment that is not yet enforceable under non-bankruptcy law at the time of the bankruptcy filing may still constitute a claim that is dischargeable in the bankruptcy case." *Lipa*, 433 B.R. at 670 (internal citations omitted). "Thus, a right to payment need not be currently enforceable in order to constitute a claim that is dischargeable in bankruptcy." *Parks*, 281 B.R. at 902 (*citing Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prod. Corp.),* 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998) ("Because contingent and unmatured rights of payment are 'claims' under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code."). Generally "[t]he classic example of a contingent debt is a guaranty because the guarantor has no liability unless and until the principal defaults." *In re Pennypacker,* 115 B.R. 504, 507 (Bankr. E.D. Pa. 1990)

In *In re Huffy Corp.,* 424 B.R. 295 (Bankr. S.D. Ohio 2010), the court explained

> That contingent claims are dischargeable in bankruptcy makes sense for reasons well-stated by the court in *Baldwin–United* noting that the combined effect of a broad definition of claim and a process for estimating certain remote claims is to:

> …bring all claims of whatever nature into the bankruptcy estate, and to give all claimants the same opportunity to share in any distribution from the estate. No longer will some creditors enjoy a windfall or effectively be denied any recovery based upon the provability or allowability of their claims and the financial status of the debtor after bankruptcy. Equally important, Congress has insured that the debtor will receive a complete discharge of his debts and a real fresh start, without the threat of lingering claims "riding through" the bankruptcy.
>
> *In re Baldwin–United Corp.,* 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985). In other words, a broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct.

*Lipa*, 433 B.R. at 670 (*quoting In re Huffy Corp.,* 424 B.R. at 301).

For bankruptcy purposes, there are two approaches for determining when a claim arises. *In re Spencer*, 457 B.R. 601, 606 (E.D. Mich. 2011); *Parks*, 281 B.R. at 902. Under the "debtor's conduct" approach, a claim arises when the conduct by the debtor occurs, even if the actual injury is not suffered until much later. *Spencer*, 457 B.R. at 606; *Parks*, 281 B.R. at 903. The other approach looks at whether there was a prepetition relationship between the debtor and the creditor such that a possible claim is within the fair contemplation of the creditor at the time the petition is filed. *Id.* This has been alternately termed the "fair contemplation," "foreseeability," "pre-petition relationship," or "narrow conduct" test. *Id.* Although the Court of Appeals for the Sixth Circuit has yet to address the various tests, the emerging consensus appears to adopt some version of the "fair contemplation" approach. *Spencer*, 457 B.R. at 606 (*citing In re Huffy Corp.,* 424 B.R. 295, 305 (Bankr. S.D. Ohio 2010)).

Here, under either approach, claims for post-petition medical services that arise from a pre-petition auto accident are clearly pre-petition claims for bankruptcy purposes.[3] Under the

---

[3] To further make this point, let us change one simple fact in this case. Let us assume that the temporal characterization of the claim (pre or post) arose not in the City's chapter 9 case, but in a chapter 7 case (a far more common and likely situation). If the post-petition medical expenses that arose from a pre-

- 12 -

"debtor's conduct" approach, the debtor's conduct is the City's vehicle's involvement in the pre-petition accident. Under the "fair contemplation" approach, it is always contemplated that a MVA victim's medical issues can continue well after the accident. Indeed, Michigan law expressly allows an insured and insurer to settle both past and future no-fault claims in one settlement, provided the release clearly covers future medical services. In *Lewis v. Aetna Casualty and Surety Company*, 109 Mich. App. 136 (1981), claimant, as part of a settlement agreement, signed a release in which she waived the right to recover for future medical services arising from the accident. Claimant argued that the release violated both the no-fault act and public policy. The court of appeals rejected both arguments and, as to the public policy claim, stated "We find the use of a release of future benefits in settlement of a reasonably disputed claim does not constitute a course of conduct which is cruel or shocking to the average man's conception of justice." *Id*., 109 Mich. App. 136, 140.

Accordingly, not only is the possibility of future medical services always contemplated following an auto accident, but Michigan law expressly allows settlement of those contemplated

---

petition accident were treated as a "separate claim" that arose only at the time the medical expenses were actually incurred and determined or fixed, and not at the time the accident giving rise to the need for medical services occurred, those claimants would be left with little, if any, recourse or remedy against a debtor or its estate and would receive little, if any, value or recovery on the basis of their claims, merely because of the timing of the accrual or incurrence of the claim for medical services under state law. In a chapter 7 case, a severely injured motorist requiring life time care would receive nothing or very little toward her life time care because (a) the assets of the chapter 7 debtor would have been promptly liquidated and the proceeds distributed to holders of accrued and mature claims; (b) the claim for future medical services would not have been incurred or accrued under state or other applicable non-bankruptcy law, thereby preventing the claimant from participating in distributions on the basis of that claim; and (c) the claimant would have no further or future recourse against a debtor that had been liquidated and is no longer in business generating cash flows. Furthermore, those with accrued claims under state or other non-bankruptcy law at the time of the commencement of the bankruptcy case would have been over compensated at the expense of the motor vehicle accident victim whose claim had not yet accrued or matured under state law. Characterizing the claim as a pre-petition claim regardless of the chapter of the bankruptcy proceeding solves this problem. Ironically, if the theory of the temporal nature of the claim for medical reimbursement and associated costs espoused by the claimants was correct, in order to maximize their recoveries, those claimants would be arguing that their claims were post-petition in a chapter 9 or 11 case and pre-petition in a chapter 7 case. The City's position and, more importantly, case law treat the claim the same regardless of the type of chapter proceeding.

future claims. In this case, had the state of Michigan not objected, all claims (including future claims) arising from all pre-petition auto accidents could have been compromised and discharged in this bankruptcy proceeding.

These legal principles are underscored by Summit Medical Group's state court motion. Ex. 6. The case involves a May 10, 2012 auto accident. The parties entered an ADR settlement of Summit's claims for medical services through the petition date of July 18, 2013.[4] In the attached motion, Summit seeks recovery for services from July 19, 2013 to present, plus interest and attorney fees. Because medical treatments for Ms. Williams were ongoing both before and after the petition date, it is crystal clear that future services were "contemplated" prior to the filing of the petition and, therefore, are pre-petition claims.

### 2. The policies underlying bankruptcy – giving the debtor "breathing room" and a "fresh start" fully support the City's position.

As mentioned above, Summit's medical services for Ms. Williams were ongoing before and after the City filed its bankruptcy petition on July 18, 2013. As also mentioned, the City's counsel initially took the position that all first party no-fault claims arising from pre-petition auto accidents should be discharged in bankruptcy. That would have entailed (1) adding up unpaid claims prior to the bankruptcy filing, and adding that amount to (2) an estimate of all future claims after the bankruptcy filing, and (3) the resulting total would have been a class 14 unsecured claim, treated as all other class 14 unsecured claims. Under that scenario, Summit's claim for both pre-petition and post-

---

[4] After the February 2014 bar date had passed, the City, under the Court's ADR Order, attempted to "liquidate," i.e. settle on an agreed number, for as many pre-petition claims as possible. However, the City could not and did not begin to pay out any such settlements until after the Plan of Adjustment became final. The City originally filed this motion because claimants were improperly seeking "enforcement" of such ADR settlements in state courts.

- 14 -

petition services would have been determined in that fashion, and Summit would then have received pennies on the dollar over 30 years – like other class 14 claimants.

The purpose of bankruptcy is, of course, to give the debtor a "real fresh start [] without the threat of lingering claims 'riding through' the bankruptcy." *See Lipa*, 433 B.R. at 470 (*quoting In re Huffy Corp.,* 424 B.R. at 301)). It is absurd for Summit to contend that the City was obligated to pay claims arising from pre-petition accidents, but for post-petition services, within 30 days of the filing of the claim, when the City reasonably believed it had no legal obligation to pay these claims and, rather, the claims might ultimately be discharged through bankruptcy.[5]

Until the Plan of Adjustment was approved in December 2014, the ultimate treatment of pre-petition first-party no fault claims was up in the air. The Plan of Adjustment, as approved, provides that such claims, to the extent valid, are to be paid in full, but without interest or attorney fees. This resolution, in a bankruptcy context, is extraordinarily favorable to no-fault claimants such as Summit.

## CONCLUSION AND RELIEF

The City respectfully asks that the Court enforce the Plan of Adjustment, and confirm that interest and attorney fees are not recoverable on post-petition no-fault claims arising from pre-petition motor vehicle accidents.

---

[5] Beginning in late 2013, the City, based on hardship considerations, began voluntarily paying some first-party claims arising from pre-petition accidents. Under Chapter 9, the City retained the right to make such voluntary payments.

Respectfully submitted,

By: /s/ Marc N. Swanson
    Jonathan S. Green (P33140)
    Marc N. Swanson (P71149)
    MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    green@millercanfield.com
    swansonm@millercanfield.com

    Charles N. Raimi (P29746)
    Deputy Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Coleman A. Young Municipal Center
    Detroit, Michigan 48226
    Telephone: (313) 237-5037
    Facsimile: (313) 224-5505
    raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

July 6, 2015

- 16 -
24759760.4\022765-00202
13-53846-tjt    Doc 10022    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 18 of 18