Ex. 1

# Citizens Research Council of Michigan



CRC

# Medical Costs of No-Fault Automobile Insurance

## October 2013

## Report 385 - Revised

Celebrating 97 Years of Independent, Nonpartisan Public Policy Research in Michigan

# BOARD OF DIRECTORS

Chair
**Jeffrey D. Bergeron**

Vice Chair
**Terence M. Donnelly**

Treasurer
**Aleksandra A. Miziolek**

**Jeffrey D. Bergeron**
Ernst & Young LLP
**Michael G. Bickers**
PNC Financial Services Group
**Beth Chappell**
Detroit Economic Club
**Terence M. Donnelly**
Dickinson Wright PLLC
**Randall W. Eberts**
W. E. Upjohn Institute
**Eugene A. Gargaro, Jr.**
Manoogian Foundation
**John J. Gasparovic**
BorgWarner Inc.
**Ingrid A. Gregg**
Earhart Foundation
**June Summers Haas**
Honigman Miller Schwartz and Cohn LLP

**Marybeth S. Howe**
Wells Fargo Bank
**Nick A. Khouri**
DTE Energy Company
**Daniel T. Lis**
Kelly Services, Inc.
**Kristen McDonald**
The Skillman Foundation
**Michael P. McGee**
Miller, Canfield, Paddock and
Stone PLC
**Aleksandra A. Miziolek**
Dykema Gossett PLLC
**Paul R. Obermeyer**
Comerica Bank
**Brian Peters**
Michigan Health & Hospital Association

**Kevin Prokop**
Rockbridge Growth Equity, LLC
**Jay Rising**
Detroit Medical Center
**Kelly Rossman-McKinney**
Truscott Rossman
**Jerry E. Rush**
Meritor, Inc.
**Candee Saferian**
PVS Chemicals, Inc.
**Terence A. Thomas, Sr.**
Thomas Group Consulting, Inc.
**Kent J. Vana**
Varnum
**Theodore J. Vogel**
CMS Energy Corporation

## ADVISORY DIRECTOR

**Louis Betanzos**

# BOARD OF TRUSTEES

Chair
**Eugene A. Gargaro, Jr.**

**Terence E. Adderley**
Kelly Services, Inc.
**Jeffrey D. Bergeron**
Ernst & Young LLP
**Stephanie W. Bergeron**
Walsh College
**Beth Chappell**
Detroit Economic Club
**Richard T. Cole**
Michigan State University
**Mary Sue Coleman**
University of Michigan
**Brian M. Connolly**
Oakwood Healthcare, Inc.
**Matthew P. Cullen**
Rock Ventures LLC
**Tarik Daoud**
Long Family Service Center
**Stephen R. D'Arcy**
Detroit Medical Center
**Richard DeVore**
PNC Bank
**Terence M. Donnelly**
Dickinson Wright PLLC
**John M. Dunn**
Western Michigan University
**David O. Egner**
Hudson-Webber Foundation
New Economy Initiative

**David L. Eisler**
Ferris State University
**David G. Frey**
Frey Foundation
**Mark T. Gaffney**
**Eugene A. Gargaro, Jr.**
Manoogian Foundation
**Ralph J. Gerson**
Guardian Industries Corporation
**Eric R. Gilbertson**
Saginaw Valley State University
**Allan D. Gilmour**
Wayne State University
**Alfred R. Glancy III**
Unico Investment Group LLC
**Thomas J. Haas**
Grand Valley State University
**David S. Haynes**
Northern Michigan University
**James S. Hilboldt**
The Connable Office, Inc.
**Paul C. Hillegonds**
DTE Energy Company
**Daniel J. Kelly**
Deloitte. Retired
**David B. Kennedy**
Earhart Foundation
**Mary Kramer**
Crain Communications, Inc.

**Gordon Krater**
Plante & Moran PLLC
**David Leitch**
Ford Motor Company
**Edward C. Levy, Jr.**
Edw. C. Levy Co.
**Daniel Little**
University of Michigan-Dearborn
**Alphonse S. Lucarelli**
Ernst & Young LLP, Retired
**Sarah L. McClelland**
JPMorgan Chase & Co.
**Aleksandra A. Miziolek**
Dykema
**Glenn D. Mroz**
Michigan Technological University
**Mark A. Murray**
Meijer Inc.
**James M. Nicholson**
PVS Chemicals
**Don R. Parfet**
Apjohn Group LLC
**Philip H. Power**
The Center for Michigan
**Keith A. Pretty**
Northwood University
**John Rakolta Jr.**
Walbridge

**Douglas B. Roberts**
IPPSR- Michigan State University
**Milt Rohwer**
**George E. Ross**
Central Michigan University
**Gary D. Russi**
**Nancy M. Schlichting**
Henry Ford Health System
**John M. Schreuder**
First National Bank of Michigan
**Lloyd A. Semple**
University of Detroit Mercy
School of Law
**Amanda Van Dusen**
Miller, Canfield, Paddock
and Stone PLC
**Kent J. Vana**
Varnum
**Theodore J. Vogel**
CMS Energy Corporation
**Gail L. Warden**
Henry Ford Health System,
Emeritus
**Jeffrey K. Willemain**
Deloitte.

*Citizens Research Council of Michigan is a tax deductible 501(c)(3) organization*


# MEDICAL COSTS OF NO-FAULT AUTOMOBILE INSURANCE

## OCTOBER 2013

## REPORT 385 – REVISED

Why is there a revised version of this CRC report?

After reviewing comments CRC received after the initial publication of this report, CRC made several changes in wording to enhance the accuracy and consistency of the report's language. The changes are to the wording only. The revisions do not impact other components of the report or other findings contained therein. Changes are denoted in red font.

CITIZENS RESEARCH COUNCIL OF MICHIGAN

MAIN OFFICE 38777 Six Mile Road, Suite 208 • Livonia, MI 48152-3974 • 734-542-8001 • Fax 734-542-8004
LANSING OFFICE 124 West Allegan, Suite 620 • Lansing, MI 48933-1738 • 517-485-9444 • Fax 517-485-0423
CRCMICH.ORG

# MEDICAL COSTS OF NO-FAULT AUTOMOBILE INSURANCE

Contents

**Summary** ........................................................................................................ iii

**Why High Health Care Expenditures are Problematic** ............................................... 1

**Summary of No-fault Automobile Insurance** ........................................................... 2

Variations of No-fault Insurance .............................................................................. 2

    Tort Thresholds .................................................................................................. 2

    Optional versus Mandatory PIP ............................................................................. 3

    Choice ............................................................................................................... 3

**Michigan's No-fault Automobile Insurance** ............................................................. 4

Personal Injury Protection ...................................................................................... 4

Bodily Injury ......................................................................................................... 4

Verbal Tort Threshold Definitions ............................................................................ 4

**Medical Expenditures Associated with Michigan's No-fault Insurance Claims** ......... 6

Prices for Medical Care .......................................................................................... 6

    Priority of Recovery ............................................................................................ 6

    Automobile Insurers Pay Higher Prices ................................................................. 6

Medical Service Use .............................................................................................. 9

Unlimited Lifetime Medical Benefits ....................................................................... 10

    Why are MCCA costs so high? ............................................................................ 11

Quality and Appropriateness of Medical Care.......................................................... 13

**Policy Options to Reduce Automobile Accident Medical Expenses** ......................... 15

    Cost-Shifting .................................................................................................... 16

    Incentive Structures ......................................................................................... 17

Reforms that Address Medical Pricing ..................................................................... 18

    Fee Schedules for Medical Services Covered by PIP Insurance................................ 18

    Increase Number of Health or Disability Insurers as Primary Payers for Claims .......... 19

    Automobile Insurers Pay Amount Customarily Received ......................................... 20

    Allow Automobile Insurers to Pay Health Insurance Prices ..................................... 20

Policy Options that Target Claiming Behavior............................................................ 21

    Implement a Tort-based System with Optional or Mandatory "Add-on"
    No-fault Insurance........................................................................................... 21

    Implement a Choice Insurance System ............................................................... 21

    Allow Consumer Choice in Coverage Levels ........................................................ 21

    Switching to a Dollar Tort Threshold .................................................................. 22

    Allow Automobile Insurers to Implement Cost Containment Measures ..................... 22

Reform Options that May Make the Largest Impact on Medical Costs ............................ 23

    Capping Medical Care Coverage........................................................................ 23

    Require all Automobile Accident Related Medical Costs
    to be Covered by Health Insurers ...................................................................... 24

    Repeal No-fault Insurance and Reinstitute a Tort-based Automobile Insurance .......... 24

Summary of Policy Options ................................................................................... 25

**Conclusion** ................................................................................................... 26

**Tables**

Table 1   Medical Fee Comparison, Detroit versus Medicare –
Detroit and Workers' Compensation .................................................................... 7

Table 2   Medical Fee Comparison, Lansing and Grand Rapids
versus Medicare and Workers' Compensation ........................................................ 8

Table 3   MCCA Payouts as Percent of Total Michigan Health Care Spending, 2009 ............... 11

Table 4   Claims Reported to the MCCA, Inception through June 30, 2012 ........................... 11

Table 5   Mix of Injuries for Claims Reported to the MCCA ................................................. 12


**Charts**

Chart 1   Number of New Claimants to the Michigan Catastrophic Claims Association,
1990 to 2012 .................................................................................................. 13


**Maps**

Map 1   Automobile Insurance Type, by State ................................................................... 3

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 6 of 36

# MEDICAL COSTS OF NO-FAULT AUTOMOBILE INSURANCE

## Summary

Many factors contribute to health care cost growth and recent research shows that Michigan's no-fault auto insurance policy is one such statewide driver. No-fault insurance means that an injured automobile accident victim receives compensation from his or her auto insurance company rather than having to show fault of the other driver in order to recover compensation from that driver's insurance company. Enacted in 1973, Michigan's mandatory no-fault auto insurance system was envisioned to reduce the number of disputes, fraudulent claims, and litigation associated with auto accidents. No-fault auto insurance has been successful at paying claims more quickly, which may allow auto accident victims to receive more timely and appropriate care to treat their injuries.

Michigan is one of 12 states with either mandatory or optional no-fault insurance. While successful in meeting some important policy goals, no-fault insurance premiums and associated medical costs have proven to be more expensive than those in all other types of auto insurance systems. Accounting for both higher prices and higher usage, medical claims in Michigan cost auto insurers 57 percent more than claims for similar crashes in other states; consequently, automobile insurance premiums are 17 percent higher on average. Driving higher costs under no-fault insurance is the practice that auto insurers are the primary payers for auto accident related medical care, whereas health insurers tend to be the primary payers in tort insurance states. This responsibility for payment becomes expensive if and when auto insurers are paying higher prices than health insurers for the same medical services. In Michigan, all payers are charged the same rate for services, but payers often do not pay the full amount charged. The actual amount paid by auto insurers is higher than the amount paid by most other payers.

Auto insurers pay higher rates because they have limited power to negotiate discounts on the rates they are charged. The Michigan Insurance Code states that providers "...may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance." This language has been held to mean that auto insurers must pay the amount customarily charged and not the amount customarily received. This provision in the Insurance Code may explain why providers' claims for reimbursement for medical care related to auto accidents are 24 percent higher in Michigan than in other states, when holding the amount of care constant.

Not only are medical prices associated with auto accidents higher in Michigan, but medical use is as well. Michigan's unique and relatively generous medical coverage, which includes "all reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation," has resulted in expansive and nearly unlimited coverage for those who need or want medical services. The result is a higher use of medical services in no-fault states compared to states with other insurance systems that rely on health insurers for auto accident related injury care. Patients may use more medical services in order to receive better, more comprehensive care, or in an attempt to gain access to the tort system. Auto insurers cannot contain use to prevent providers from ordering medical services that other insurers might have declined to cover.

Should policymakers consider changes to Michigan's no-fault auto insurance, many reform options would reduce the medical costs associated with the system, and consequently, auto insurance premium costs as well. Policymakers have available to them many reform options for Michigan's no-fault auto insurance that could reduce the associated medical costs. Several of these reforms may maintain the quality and comprehensiveness of current benefits, while others would alter the benefits of the current system to varying degrees, but may introduce ancillary impacts to accident victims or payers in other markets. For example, capping medical benefits for

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 7 of 36

those injured in automobile accidents may lead to reductions in health care spending and reductions in automobile insurance premiums, but caps may also negatively impact the comprehensiveness of care received by those catastrophically injured in automobile accidents. Fee schedules for auto insurers will reduce medical prices associated with auto accidents but may cause providers to shift costs to other payers to recoup lost revenue, and may cause other distortions in the healthcare market.

Policy options for consideration by state policymakers to address no-fault medical costs include:

- Introduce fee schedules for auto insurers, similar to that required for workers' compensation;
- Designate the health insurer as primary payer for auto accident related medical expenses and the auto insurer as the secondary payer;
- Allow auto insurers to pay the amount customarily received or allow auto insurers to pay the same prices as health insurers;
- Reform auto insurance to be a tort-system with added mandatory or optional no-fault;
- Allow customers to choose between a less expensive no-fault and a more expensive tort auto insurance;
- Allow customers to choose between several personal injury protection coverage amounts rather than require all customers to have unlimited coverage;
- Change the tort threshold from verbal to dollar, where verbal thresholds allow access to the tort system if injuries meet certain criteria and dollar thresholds allow access after a specified amount of economic damages has occurred;
- Allow auto insurers to implement cost containment measures similar to those allowed for health insurers;
- Cap medical benefits;
- Designate health insurers as payers for all auto accident related medical expenses;
- Repeal no-fault and revert back to a tort based system.

Michigan's no-fault insurance system provides Michigan drivers with a robust medical safety net. Michigan drivers may take comfort in knowing they have comprehensive medical coverage in the event they are injured in an auto accident. This coverage is likely more expansive than the coverage they would receive through private health insurance if they were injured in some other way. However, the trade-off for this more generous medical coverage is higher auto insurance premiums for Michigan drivers. Reducing the medical costs associated with no-fault auto insurance may reduce overall medical spending in the state while also reducing the cost of auto insurance premiums. However, Michigan drivers would have a less generous safety net, and some medical costs may be shifted to other payers such as private insurers.

# MEDICAL COSTS OF NO-FAULT AUTOMOBILE INSURANCE

Health care costs are a significant concern for individuals, families, and businesses, and there is no one source or factor that is single handedly driving prices, usage, and spending. A recent report by CRC (*Report 383: Health Care Costs in Michigan: Drivers and Policy Options*) found that no-fault insurance is a driver of health care costs in Michigan. These medical costs are raising automobile insurance premiums, disproportionately increasing overall health care spending, and likely causing some costs to be shifted from other health care payers to automobile insurers and drivers.

Original and current proponents of the state's no-fault automobile insurance system envisioned many benefits of no-fault automobile insurance including lower premium costs, more equitable payment of claims, fewer fraudulent claims, and faster claims processing. As a follow up to *Health Care Costs in Michigan: Drivers and Policy Options*, this paper looks specifically at how the no-fault automobile insurance system in Michigan contributes to higher health care spending in the state and provides a variety of policy options that may reduce the insurance system's medical costs.

## Why High Health Care Expenditures are Problematic

Health care costs have been growing as a percent of the state's economic output, as a percent of individual and household incomes, and as a percent of business and government revenues. Not only have costs grown, but they are growing at a rate that is faster than that of the economy as a whole. While on one hand this indicates a growing health care industry with increased employment and incomes, on the other hand, health outcomes are not growing commensurately with increases in health expenditures.[a] International and interregional comparisons show that after a certain level, spending is not correlated with health outcomes.[1]

In 2009, individuals, businesses, and governments in Michigan spent nearly $66 billion on health care services and products. This was equal to almost 19 percent of Michigan's gross state product. Nationally, households spent 6.2 percent of their incomes on health care. Private businesses spent an amount equal to 10.2 percent of wages and salaries; state and local governments spent 28 percent of revenues on health care.[2] As health care costs grow, businesses have fewer resources to reinvest in their own companies and to use for hiring, governments have fewer resources to spend on other public projects and priorities, and households must limit their spending in other sectors of the economy.

While the medical costs associated with auto accidents are just a portion of overall health care spending levels and growth, it is one of the areas that policymakers can meaningfully impact through state policy. Features of Michigan's no-fault insurance system contribute to higher overall health care spending when compared to other states and, while causation cannot be assigned, medical costs in no-fault insurance states are higher and are growing more quickly than in states without no-fault insurance.[b]

---

[a] In other words, if we are spending 20 percent more on medical costs, it is not clear that patients are 20 percent healthier as a result.

[b] This problem is compounded in the larger, verbal threshold (term defined below) no-fault insurance states, which include Michigan. In 2007, the relative cost of care for large, verbal threshold no-fault insurance states was 61 percent higher than in tort states and 4 percent higher than in small, monetary threshold (term defined below) states.

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 9 of 36

## Summary of No-fault Automobile Insurance

The distinguishing feature of no-fault auto insurance is that an injured auto accident victim receives compensation from his or her insurance company rather than having to show fault of the other driver in order to recover compensation from that driver's insurance company. This type of insurance is referred to as first-party insurance because an individual's own insurance company, rather than another person's insurance company, provides the reimbursement. It is similar to health insurance, which is also a first-party insurance, and is in contrast to tort-based auto insurance where auto accident victims must show fault of the other driver before recovering damages from the other party's insurance (a third-party).

The required first-party insurance is called *personal injury protection* (PIP) and is in contrast to *bodily injury* (BI) insurance that is required in states that have tort-based systems. While BI insurance covers a driver from a specified amount of damages that they may inflict on other drivers in an accident, PIP is paid out to the driver regardless of which driver is at fault.

PIP has many potential benefits. Because there is no need to show fault, there should be less auto accident litigation, which reduces overall expenses related to accidents and liability. Additionally, no-fault insurance advocates believe that victims are compensated more fairly and promptly under no-fault insurance than under tort-based insurance. No-fault insurance has delivered on many of these benefits, which were highly touted in the 1970s and 1980s as a reprieve from the problems existing in the tort-based system.

However, no-fault auto insurance premium prices have grown rapidly and are now higher than those paid by customers with tort-based auto insurance. In 1987, no-fault insurance injury costs were 12 percent higher than tort insurance injury costs and this gap grew to 73 percent by 2004. The rising cost of premiums has resulted in a great deal of backlash to no-fault insurance and a number of states have since repealed no-fault insurance in favor of the traditional tort-based insurance. The price of auto premiums has brought this argument to Michigan as well, where, since its enactment in 1973, Public Act 294 of 1972, which added the requirement of PIP insurance for registered motor vehicles, has endured many amendments and state policymakers are continuing to grapple with options for making the insurance system both timely and equitable as well as affordable.

> In 1987, no-fault insurance injury costs were 12 percent higher than tort insurance injury costs and this gap grew to 73 percent by 2004.

### Variations of No-fault Insurance

The 12 states that allow or require their residents to purchase no-fault auto insurance all have varying features. The main ways in which no-fault insurance varies are in access to the tort system and whether PIP is required or optional.

### Tort Thresholds

True no-fault insurance eliminates tort claims completely because it is neither necessary nor possible to sue. No system in the United States, however, operates in this manner. States with no-fault insurance have one of two types of thresholds that must be met for a tort claim to be pursued. *Verbal thresholds* allow for lawsuits only when damages meet certain criteria. In Michigan, lawsuits may only be pursued in cases involving serious impairment of body function, permanent disfigurement, or death. Florida and New York, the other two states with verbal thresholds, have similar criteria. The remaining no-fault insurance states have *dollar thresholds* that limit lawsuits to cases where economic damages exceed a certain dollar amount. The dollar cap that economic damages must exceed is typically set in statute but often adjusted upward to reflect inflation.

The type of tort threshold that best subdues costs is debatable. In theory, verbal thresholds would be more effective in reducing medical costs as well as the number of tort cases. When there is a dollar threshold, some victims may attempt to gain access to the tort system by running up medical costs. However, a study from RAND Institute for Civil Justice notes that

13-53846-tjt   Doc 10022-1   Filed 07/06/15   Entered 07/06/15 12:19:27   Page 10 of 36

counter-intuitively, victims are more likely to sue under no-fault insurance with verbal thresholds than under tort systems. As the victim uses more medical care, he or she begins to build a case for a more serious injury and is more likely to qualify for access to the tort system and thus recover noneconomic damages.[3] The higher the PIP coverage, the more medical care it is possible for the victim to use. Because Michigan has unlimited PIP coverage, there may be an incentive for Michigan auto accident victims to try to increase their use of medical services. Data show that states with dollar thresholds encourage claiming around the threshold and neither verbal nor dollar thresholds especially encourage claiming of hard to verify injuries (rather, incentives in the insurance system likely drive these claims).[4] Data specific to Michigan are not available.

Alternatively, no-fault insurance may see more lawsuits because in tort states, victims may be more likely to accept first settlement offers in order to pay necessary medical bills. Because first-party insurers pay in a timelier manner, victims may be more likely to counteroffer and land the case in court.

### Optional versus Mandatory PIP

Some states have systems referred to as *"add-on"* *insurance* because PIP coverage is added on to a conventional tort system. Some states require drivers to purchase PIP (mandatory add-on) and other states require only that insurers offer PIP (optional add-on). In other words, in these states there are no limitations in accessing the tort system, but consumers may or must have PIP coverage as well.

### Choice

Three states – Kentucky, New Jersey, and Pennsylvania – allow consumers to choose between traditional tort insurance and limited tort insurance. In an auto accident, consumers who elect traditional tort insurance (which is more expensive) may sue for damages incurred. Consumers who elect the less-expensive limited tort option may attempt to recover economic damages, but are limited in the right to recover non-economic damages such as pain and suffering.



Map 1
Automobile Insurance Type, by State

Tort  Optional Add-on  Mandatory Add-on  No-fault Monetary  No-fault Verbal  Choice

13-53846-tjt   Doc 10022-1   Filed 07/06/15   Entered 07/06/15 12:19:27   Page 11 of 36

## Michigan's No-fault Automobile Insurance

Chapter 31 of the Insurance Code of 1956, Public Act 218 of 1956, sets forth the laws and conditions related to auto insurance in Michigan. In 1973, the Insurance Code was amended to require that Michigan residents purchase PIP coverage. Michigan is one of 12 states with either optional or mandatory PIP coverage. Additionally, Michigan law requires drivers to carry property protection and coverage for property damage to other people's property.

> Chapter 31 of the Insurance Code of 1956, Public Act 218 of 1956, sets forth the laws and conditions related to auto insurance in Michigan.

### Personal Injury Protection

Michigan requires that all drivers buy PIP coverage. This coverage pays for unlimited medical costs of the driver in an accident, regardless of fault. Michigan's coverage also pays up to 85 percent of the income the driver would have earned had the driver not sustained an injury in the accident. Drivers may receive this income reimbursement for up to three years with a monthly limit that is revised annually.[c] Drivers are also entitled to up to $20 per day in replacement household services (such as housekeeping and yard work) if injured individuals are unable to perform these services themselves.

### Bodily Injury

If an insured driver is found legally responsible for an accident, and the injuries to the other driver meet the verbal thresholds, then the injured driver can sue the at-fault driver for damages. The at-fault driver's insurance will pay up to a certain amount, which at a minimum includes $20,000 for a person who is hurt or killed, $40,000 for each accident if several people are hurt or killed, and $10,000 for property damage in another state.

### Verbal Tort Threshold Definitions

Michigan statute limits tort liability for non-economic damages in auto accidents to cases where the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement. The question of whether the latter two conditions are met is deferred to the fact finder and ultimately the courts.[5]

### Catastrophic Claims Coverage

One of the most unique features of Michigan's no-fault insurance system compared to other no-fault insurance systems is that unlimited medical benefits are afforded to those injured in auto accidents. After Michigan, New York has the highest mandatory cap on benefits at $50,000.[d]

Michigan auto insurers are required to pay for the unlimited lifetime medical benefits of those injured in auto accidents. The private, non-profit, unincorporated Michigan Catastrophic Claims Association (MCCA) was created to reinsure auto insurers from the financial risk associated with these benefits.[6] The MCCA acts to reimburse auto insurers for no-fault insurance PIP claims that exceed a certain amount (called the retention level) over the lifetime of the claim. The retention level for July 2013 through June 2015 is $530,000; auto insurers will be reimbursed by the MCCA for medical costs that exceed $530,000

---

[c] Effective October 1, 2012, the reimbursement maximum is $5,189 per month.

[d] New Jersey previously had the second highest mandatory PIP coverage of $250,000. Recent changes to the auto insurance statute now allow policyholders to choose between several reduced coverage limits. The minimum coverage is now $15,000 per person per accident but allows for additional coverage up to $250,000 for specific catastrophic injuries- permanent brain damage, spinal cord injury, disfigurement, and other significant and permanent injuries.

per injured party.[e] In accordance with Public Act 3 of 2001, the retention level will increase every two years by the lesser of six percent or the increase in the consumer price index.

The MCCA assesses each auto insurance company a fixed premium per vehicle to fund the reimbursements. These assessments are typically passed on to consumers through auto insurance premiums. On July 1, 2013, the assessment rose $11 to $186 per vehicle. The assessment is calculated by independent actuaries and accounts for expected medical cost inflation, economic conditions, investment returns, the number of claims submitted to the MCCA, and fund surpluses or deficiencies from earlier assessments.

[e] The retention level is dependent upon the date the motor vehicle policy covering the loss was issued or renewed rather than the date the loss occurred or began or when the accident occurred. This means that the retention level may be lower if the motor vehicle accident policy was issued or renewed in a prior year.

# Medical Expenditures Associated with Michigan's No-fault Insurance Claims

Generally, medical expenditures per claim are higher in no-fault insurance states than in tort states. Many factors may contribute to higher medical spending: a higher number of claims, a higher number of fraudulent claims, higher reimbursement rates, fewer safety features in insured vehicles, and others. Data do not support claims that no-fault insurance itself leads to more accidents, more injuries, more severe injuries, or higher medical claiming rates. Many factors point to PIP coverage as being a lead cost driver, both because of higher prices for auto accident related medical services and because of higher use of medical services.[7]

### Prices for Medical Care

Higher prices related to auto injuries are contributing to higher total medical spending in Michigan. Prices paid by auto insurers are higher than those paid by other payers for the same services and Michigan's auto insurance statute ensures that auto insurers are more likely than other parties to pay for auto-related injuries.[8]

### Priority of Recovery

The first-party auto insurer is the first priority payer for PIP benefits. The order of priority for benefit payment to drivers and passengers is the following: 1) no-fault insurer of injured occupant; 2) no-fault insurer of injured occupant's Michigan relative; 3) no-fault insurer of the owner or registrant of the vehicle occupied at the time of the accident; 4) no-fault insurer of the driver of the vehicle occupied; and 5) if none of the above, claims go to the Michigan Assigned Claims Facility, which provides financial assistance to those injured in uninsured motor vehicle accidents. In cases where the policyholder has elected to coordinate their auto insurance benefits with their health or disability insurance (except Medicaid, Medicare, or a Medicare supplemental policy) the auto insurer is unlikely to be the primary payer and another insurer will act as the first-party insurer.

In contrast, in tort states, providers are more likely to seek reimbursement from health insurers.[9] As will be discussed below, because health insurers pay lower prices than auto insurers, spending per claim is lower.

### Automobile Insurers Pay Higher Prices

The same medical care costs more for individuals in auto accidents in no-fault insurance states than in tort states. Holding the amount of medical care consumed constant, in 2007, providers' claims for reimbursement for medical care related to auto accidents were 24 percent higher in Michigan than in other states.[10]

> When accounting for the price and amount of medical care, medical claims in Michigan cost 57 percent more than claims for similar crashes in other states.

This higher reimbursement rate is driving overall claim costs as well. When accounting for the price and amount of medical care, researchers calculated that the average auto injury claim in Michigan would be expected to cost $12,885, but instead the average claim cost $20,229; this is a 57 percent higher claim cost than for similar crashes in other states. This calculation was based on variables such as claimant demographics, accident circumstances, and reported injuries.[11] These researchers found that, "simple calculations suggest that a substantial fraction of the high cost of auto insurance in Michigan can be explained by these higher levels of reimbursement. If injury payments account for 30 percent of total premiums and injury payments are 57 percent higher in Michigan than in other states, other factors being equal, we would expect premiums in Michigan to be 17 percent higher than in other states."[12] Researchers indeed found that premiums in Michigan were 17 percent higher than the average of other states in 2007.

**Tables 1** and **2** provide a sample of medical services that are among the 15 most common medical charges related to auto accidents and the respective prices paid by various payers. **Table 1** compares the prices paid by no-fault auto insurers in Detroit, Medicare reimbursement rates in Detroit, and a statewide fee

charged for workers' compensation claims. **Table 2** compares the same services but looks at the prices paid by no-fault insurance in both Lansing and Grand Rapids compared to Medicare reimbursement in Michigan (excluding the rates in Detroit), and again to the workers' compensation fee schedule. Because these data are not comprehensive of all services or all payers, it may be premature to draw definite conclusions. However, it does corroborate other claims that prices paid by no-fault auto insurers are in fact higher, and in many cases much higher, than those paid by other payers in Michigan.

In general, Medicare pays lower prices than other payers, but typically higher than Medicaid. So it is not surprising that both workers' compensation fees and auto insurance prices are higher than Medicare in **Tables 1** and **2**. While this is just a snapshot of the data, there were no reimbursements in the available dataset paid by no-fault insurers that were less than either Medicare or workers' compensation for anywhere in the state for the top 15 services claimed in auto accidents. Parity is most closely achieved by reimbursement rates for a 25 minute office visit for an established patient when comparing the reimbursement rates for no-fault insurers in Grand Rapids to workers' compensation rates statewide; in this case, only a four percent premium was paid by no-fault insurers over that paid by workers' compensation insurers.

### Table 1
### Medical Fee Comparison, Detroit versus Medicare- Detroit and Workers' Compensation

| Service Description | Average Price Paid | | | Percent No-Fault Reimbursement Exceeds... | |
| | Detroit | | | | |
| | No-Fault Reimbursement | Medicare Reimbursement | Statewide Workers' Compensation | Medicare | Statewide Workers' Compensation |
|---|---|---|---|---|---|
| Physical therapy - therapeutic exercises for strength (15 min) | $79.38 | $30.66 | $41.57 | 159% | 91% |
| Chiropractic manipulative treatment, spinal, 3-4 regions | $72.60 | $36.43 | $48.67 | 99% | 49% |
| ER visit – moderate medical complexity | $297.04 | $65.70 | $90.75 | 352% | 227% |
| Physical therapy- ultrasound (15 min) | $66.26 | $12.50 | $16.73 | 430% | 296% |
| Office visit, established patient (25 min) | $151.30 | $107.90 | $133.85 | 40% | 13% |
| Neck CT scan | $1,820.09 | $261.50 | $418.78 | 596% | 335% |
| Low Back MRI | $3,278.55 | $484.31 | $765.57 | 577% | 328% |
| Shoulder surgery | $2,805.13 | $730.70 | $939.98 | 284% | 199% |

Source: Mitchell DecisionPoint® CRC calculations

Note: Source data contain prices only and not total expenditures. Of the 15 most common charges, the average difference between the prices paid by auto insurers in Detroit and Medicare in Detroit was 268 percent. Of the 15 most common charges, the average difference between the prices paid by auto insurers in Detroit and the statewide workers' compensation fees were 160 percent. These calculations use pricing data, are not weighed, and no standard deviation is available.

**Table 2**
**Medical Fee Comparison, Lansing and Grand Rapids versus Medicare and Workers' Compensation**

| Service Description | Average Price Paid | | | | Percent Lansing No-Fault Reimbursement Exceeds... | | Percent Grand Rapids No-Fault Reimbursement Exceeds... | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | No-fault Reimbursement | | Medicare Reimbursement (excluding Detroit) | Statewide Workers' Compensation | | | | |
| | Lansing | Grand Rapids | | | Workers' Compensation | Statewide Medicare | Statewide Workers' Compensation | Statewide Medicare |
| Physical therapy, therapeutic exercises for strength (15 min) | $56.17 | $57.97 | $29.03 | $41.57 | 35% | 93% | 39% | 100% |
| Chiropractic manipulative treatment, spinal, 3-4 regions | $60.67 | $57.05 | $34.22 | $48.67 | 25% | 77% | 17% | 67% |
| ER visit, moderate medical complexity | $282.98 | $255.01 | $60.92 | $90.75 | 212% | 365% | 181% | 319% |
| Physical therapy, ultrasound (15 min) | $49.80 | $43.82 | $11.74 | $16.73 | 198% | 324% | 162% | 273% |
| Office visit, established patient (25 min) | $142.85 | $138.85 | $100.61 | $133.85 | 7% | 42% | 4% | 38% |
| Neck CT scan | $1,142.25 | $1,176.14 | $244.59 | $418.78 | 173% | 367% | 181% | 381% |
| Low Back MRI | $2,057.55 | $2,118.60 | $452.56 | $765.57 | 169% | 355% | 177% | 368% |
| Shoulder surgery | $2,201.71 | $3,041.06 | $654.67 | $939.98 | 134% | 236% | 224% | 364% |

Source: Mitchell DecisionPoint®; CRC calculations

Note: Source data contain prices only and not total expenditures. Of the 15 most common charges, Lansing auto insurers paid 190 percent more on average and Grand Rapids auto insurers 193 percent more on average for the 15 top charges than Medicare. Of the 15 most common charges, Lansing and Grand Rapids auto insurers paid 93 percent and 95 percent more on average than workers' compensation insurance, respectively. These calculations use pricing data, are not weighed, and no standard deviation is available.

Notably absent from **Tables 1** and **2** are the prices paid by private health insurers – these data are difficult to come by as not every insurer pays the same amount and providers and insurers are not required to disclose the amounts they accept or receive. Since many of the policy options discussed later in the paper assume that health insurers pay lower prices than no-fault, it is important to estimate how much private health insurers pay for these same services. By comparing prices of each no-fault and private insurers to Medicare we are able to estimate how no-fault and private insurance prices differ.

The Center for Studying Health System Change, a health care policy research firm, used 2011 claims data from non-elderly privately insured autoworkers and dependants to calculate the price difference between Medicare and private insurance for various Michigan cities. For hospital inpatient services, Lansing prices were 46 percent higher than Medicare and Detroit prices were 42 percent higher than Medicare. For hospital outpatient services, Lansing private insurers paid 27 percent more than Medicare and Detroit private insurers paid 49 percent more than Medicare. In comparison, for the 15 most common charges related to auto accidents, the no-fault reimbursement in Detroit was 268 percent higher than Medicare. No-fault reimbursement in Lansing was 190 percent more and Grand Rapids was 193 percent more than Medicare. While this is not a direct comparison of the

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 16 of 36

same services, the data suggest that private insurers likely do in fact pay lower prices than no-fault auto insurers for the same services.

**Why Michigan Auto Insurers Pay Higher Prices.** Prices paid by auto insurers can be higher than those paid by other insurers and payers mainly because of the way the Insurance Code is written and how it has been interpreted by the courts. Section 3157 of the Insurance Code states,

> "A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, *may charge a reasonable amount* for the products, services and accommodations rendered. The charge shall not exceed *the amount the person or institution customarily charges* for like products, services and accommodations in cases not involving insurance" (emphasis added by CRC).

While providers typically *charge* all payers the same amount for each service, not all payers pay the amount charged or billed. Medicare and Medicaid, for example, typically do not negotiate prices and pay a specific amount for each type of service regardless of the amount they are charged. Other payers, such as private health insurers, can negotiate lower prices and therefore also pay amounts below what they are charged. Health insurers are able to negotiate discounts from the charged rate by including certain providers in their network; providers are willing to accept a lower rate because they may see a higher patient volume in exchange. Auto insurers have little market power to negotiate lower prices, in part because of the language of this statute, in part because they generate a lower volume, and in part because of other provisions in the Insurance Code that somewhat limit their ability to incentivize patients to visit certain "in-network" providers in exchange for reduced copayments and premiums.

Since this language was added in 1973, auto insurers have attempted to find ways to reduce the price they pay for medical services. One such strategy has been to simply pay the amount customarily paid (rather than the amount customarily charged). This may result in litigation and the most definitive opinion on the matter was submitted by the Michigan Court of Appeals in 1996 in *Munson Medical Center v Auto Club Insurance Association*. The Court of Appeals affirmed the trial court's decision that the amount a person or institution "customarily charges" means the standard amount a provider bills, regardless of whether the provider routinely accepts less than this amount.

> While providers typically *charge* all payers the same amount for each service, not all payers pay the amount charged or billed.

In this case, Auto Club Insurance Association (ACIA) was particularly concerned that providers were essentially shifting costs to the auto insurers and were protected by the law in doing so. The Court of Appeals noted that, "in its view ACIA had the 'high moral ground' with regard to its concerns about cost-shifting," however, because of government regulation in the insurance and health care industries, the court decided the plaintiff should expect to receive the amount that they billed for service.[13] In other words, in a free market economy, private businesses are allowed to set up discriminatory pricing schedules and many companies in industries other than health care utilize discriminatory pricing for a variety of economic and financial reasons.

### Medical Service Use

Higher rates of utilization also drive higher medical spending in no-fault insurance states. In 2007, victims in states with no-fault auto insurance were more likely to visit the emergency room, have an overnight hospital stay, and visit a chiropractor, physical therapist, dentist, or psychotherapist. They were less likely to go without medical treatment. The average number of claimed visits to a variety of provider types was also higher in no-fault insurance states.[14]

While the percent of Michigan claim-filing auto accident victims that receive medical treatment (92.8 percent) is not significantly different to those in other states (92.1 percent), the mix of services and the usage of each service claimed is substantially different.[15] Once adjusted for accident and injury characteristics and claimant demographics, Michigan auto accident victims are 19 percent more likely to visit a hospital and 25 percent more likely to visit an emergency room. Michigan auto accident victims claim more reimbursements for X-rays and CT scans, and are more likely to purchase durable medical equipment. Michigan claimants also are more likely to claim reimbursement for lost work. On the other hand, Michigan auto victims are less likely to submit claims for chiropractor care, anesthesiology, and alternative providers (such a massage therapy).[16]

> Michigan auto accident victims are 19 percent more likely to visit a hospital and 25 percent more likely to visit an emergency room.

Michigan's auto insurance structure may be contributing to higher medical service use among auto accident victims for several reasons. First, auto insurance companies are required to cover "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."[17] This provision in the Insurance Code provides for very few limitations in treatment scope and scale. This may lead to better health outcomes for those injured in auto accidents as treatment is not limited in the same way as many other health insurers.

Second, auto insurance companies have very limited ability to constrain service use especially when compared to health insurers. Health insurers often use cost sharing through copayments, coinsurance, and deductibles to make consumers price sensitive to certain services, which typically results in reduced utilization. Since auto accident victims in tort insurance states typically rely on their health insurer, they face much of these cost-sharing and other treatment limitations that would reduce overall medical use.

Third, the high threshold of allowable services means that injured auto accident victims can obtain more necessary services while also having access to additional services that might not be covered by other types of insurance. Auto insurers' weak ability to constrain service use means that providers are not prevented from, and may benefit in, ordering and charging for more services that may provide little, no, or even negative health value to the patient. This may be done to increase the level of care compared to what would be covered with private health insurance, and may also increase revenues for the provider. Patients too can utilize a greater multitude of services for a variety of reasons, including an attempt to establish a more serious injury and obtain access to the tort system. Under any of these scenarios, patients and providers have the means and incentive to utilize services beyond what would typically be covered under other types of insurance.

Finally, because Michigan provides catastrophic injury coverage, auto accident victims will be using a greater number of services over the course of their lifetime than in other states. However, long-term injuries tend to be treated through greater use of long-term care and rehabilitative therapies and it is unclear why unlimited lifetime services would result in relatively more emergency room and hospital visits considering they treat more acute injuries rather than chronic ones.

### Unlimited Lifetime Medical Benefits

A unique feature of Michigan's no-fault auto insurance is the lifetime medical care afforded to injured auto accident victims. The high cost of this program is a major criticism of Michigan's no-fault auto insurance. For the period between July 1, 2009 and June 30, 2010, the MCCA paid out $816.9 million in claims for 1,684 claims involving 2,174 claimants. In 2009, Michigan individuals, businesses, and governments spent $65.9 billion on total personal health care services and products. The annual amount paid in lifetime benefits through the MCCA represents 1.2 percent of this amount (See **Table 3**) and is roughly equivalent to the amount the state government appropriated for community health programs, excluding Medicaid, in Fiscal Year (FY) 2012. While this expenditure is small relative to total health care expenditures in Michigan, it does represent an expenditure of approximately $80 per capita.

**Table 3**
**MCCA Payouts as Percent of Total Michigan Health Care Spending, 2009**

| | |
|---|---|
| Michigan Health Care Expenditures, 2009* | $65,887,631,000 |
| Total MCCA Claims Payouts, June 2009-June 2010** | $816,909,758 |
| Catastrophic Claims Spending as a Percent of All Health Care Spending | 1.23% |

* The most recent and comprehensive data available that estimates total health care spending in Michigan.

** Older data are used to keep comparison years consistent. In FY2012, the MCCA paid out $931,689,712 in claims.

Note: Health Care Expenditures measure spending for all privately and publicly funded personal health care services and products (hospital care, physician services, nursing home care, prescription drugs, etc.). Hospital spending is included and reflects the total net revenue (gross charges less contractual adjustments, bad debts, and charity care). Costs such as insurance program administration, research, and construction expenses are not included in this total.

Sources: Centers for Medicare & Medicaid Services (2011). Health Expenditures by State of Residence. Michigan Catastrophic Claims Association Annual Report to the Commissioner, Fiscal Year Ended June 30, 2012. CRC Calculations.

While this is an expensive system, these health care costs need to be paid by someone – health insurers, Medicaid, or the victims themselves – or the treatment forgone. The unlimited lifetime benefits create a uniquely generous and high quality insurance product for Michigan consumers. In tort states without a catastrophic injury coverage option, auto accident victims would face treatment and usage limitations and potentially higher out-of-pocket expenses related to their insurance plan. In those states, accident victims covered by Medicaid face potential challenges associated with Medicaid's low reimbursement rates, such as difficulty accessing providers. In addition, they can be required to spend down their assets prior to qualifying for Medicaid coverage.

### Why are MCCA costs so high?

As of July 2013, auto accident related medical costs paid by auto insurers that exceed $530,000 are reimbursed by the MCCA. Many factors contribute to medical expenditures that exceed this retention level. First, claims covered by the MCCA are either very severe in nature or, because of lifetime benefits, are costly over a long period of time. From MCCA's inception through June 30, 2012 (excluding non-probable lifetime care claimants), 46.1 percent of claims involved injuries to the brain, 3.7 percent were for injuries resulting in quadriplegia, 3.1 percent were for injuries resulting in paraplegia, and 0.5 percent were claims from a burn injury (See **Table 4**).[18]

**Table 4**
**Claims Reported to the MCCA, Inception through June 30, 2012**

| Injury Type | Number of Claims | Percent of Total |
|---|---|---|
| Brain | 14,382 | 46.1% |
| Quadriplegia | 1,145 | 3.7% |
| Paraplegia | 952 | 3.1% |
| Burn | 154 | 0.5% |
| Miscellaneous | 14,537 | 46.6% |
| **Total** | **31,170** | **100.0%** |

Source: Michigan Catastrophic Claims Association, Injury Type Summary Inception to Date (as of June 30, 2012); CRC calculations.

Claiming data also indicate a shift in the mix of injuries being claimed to and paid by the MCCA over time. **Table 5** lists the percentage share of each injury claim reported to the MCCA for selected years beginning in 1992. Here, the miscellaneous category from **Table 4** is broken out to include amputation, back and neck, multiple fracture, and other injuries. In **Table 5,** brain injuries have been declining as a share of total injury claims and a higher number of back and neck and multiple fracture injuries have

**Table 5**
**Mix of Injuries for Claims Reported to the MCCA**

|  | 1992 | 1997 | 2002 | 2007 | 2012 |
|---|---|---|---|---|---|
| Brain | 59.5% | 51.6% | 40.4% | 43.9% | 29.3% |
| Burn | 0.7% | 0.3% | 0.4% | 0.2% | 0.6% |
| Amputation | 0.2% | 3.0% | 3.2% | 3.1% | 2.5% |
| Back & Neck | 4.8% | 7.3% | 14.2% | 13.1% | 34.1% |
| Multiple Fracture | 19.4% | 23.3% | 30.8% | 29.5% | 27.2% |
| Other – Misc. | 4.4% | 6.4% | 7.1% | 7.0% | 3.9% |
| Paraplegic | 3.9% | 3.3% | 2.1% | 1.5% | 1.0% |
| Quadriplegic | 4.1% | 4.7% | 1.9% | 1.7% | 1.4% |

Source: Michigan Catastrophic Claims Association; CRC calculations

been meeting the retention threshold. While fractures and injuries to the back and neck can be severe and long-lasting, injuries such as brain trauma, quadriplegia, paraplegia, and burns more often require intensive, lifelong care. In other words, the mix of injuries that are meeting the threshold for catastrophic coverage are perhaps not what was originally intended to be covered by catastrophic injury coverage.

Second, the MCCA pays the same prices as the auto insurers for medical services; in other words, the high prices paid by auto insurers are being paid for the lifetime of the injury. Because MCCA reimburses auto insurers for the claims, the organization does not have contact with providers directly. As part of their statutory responsibility, the MCCA tracks claims procedures and auto insurer practices to ensure that they are not out of line compared to other auto insurers, but otherwise has very limited ability to contain costs.

The inability of the MCCA to implement cost containment strategies and monitor for fraud and abuse is a concern. The statute creating the MCCA does not allow explicit use of these tools, but the MCCA's Plan of Operation sets up some parameters by which they monitor the procedures and practices of the auto insurance members. Because the MCCA reimburses the members there is little direct role they

can play in cost containment, however, they do have power to take action if they determine a member is not meeting the required procedures and practices. This role is limited in its ability to significantly reduce unnecessary medical costs.

> The inability of the MCCA to implement cost containment strategies and monitor for fraud and abuse is a concern.

The third driver of MCCA spending is attendant and facility care. For the period covering July 1, 2010 through June 20, 2012, roughly 57.8 percent of MCCA loss payments were for residential care and attendant care by an agency or family member. Providers of these services have the same legal right to receive the entire amount they bill, as stated in statute (MCL §500.3157) and clarified by *Munson Medical Center v Auto Club Insurance Association,* 1996. As such, prices for attendant and facility care vary widely. The statute only requires that charges be "reasonable."[19]

Between 2010 and 2012, 21.8 percent of MCCA payments went to family attendant care.[20] Several cases have been litigated regarding the rate that family members should receive for necessary services for an accident victim. In several recent cases, courts ruled that in determining a rate for family attendant care services (versus attendants hired through an agency), fact-finders should not use agency rates as comparables, but instead should use the rate received by the individual working for the agency.[21] This finding may lower costs to insurers.

However, the cost of attendant and facility care is still a cost driver for the MCCA. Auto insurance companies require that a doctor prescribe the amount and level of care needed; whether it be for "round the clock" care or just for certain functions and activities. For injury victims that require 24-hour care, costs for these services can add up quickly. While an average hourly rate is unavailable, a common rate would fall between $10 and $40 an hour (the lower rate may be more common for family attendants whereas the higher rate would be more common for agency attendants). Attendants providing care 24-hours per day at a rate of $10 per hour would receive annual payment equal to $87,760. Attendants charging $30 per hour for 24-hour care would receive $262,800 per year for their services. Twenty-four hour care is not the norm and is typically provided to patients in a permanent vegetative state, those with moderately severe brain injuries, quadriplegics, and those whose injuries require constant care or supervision.

Fourth, expenditures of the MCCA are increasing with increases in utilization of health care in general and not with changes in the severity of vehicle crashes, which has been declining over the last 20 years.[22] Despite evidence of lower incidences of auto accident fatalities and auto injuries both in Michigan and nationally, the number of new claimants being added to the MCCA is increasing, although the number of new claimants in 2012 was lower than that in 2010 (See **Chart 1**).[23] The mix of injuries of those claimants whose cases reach and exceed the retention level is also changing as was demonstrated in **Table 5**. The number of injuries to the brain and

resulting in quadriplegia or paraplegia has declined over time and a higher number of claims are being sent to MCCA that involve injuries such as severe fractures.

Finally, because benefits are provided for the life of the injured victim, there are more cases being opened each year than are being closed, so the overall costs of the MCCA are growing overtime. As of March 2013, the MCCA had an estimated $2 billion deficit related to existing claims. This is an amount equal to $300.17 per insured vehicle. The MCCA raised its assessment 6 percent for FY2014, in part to address the claims deficit.

## Quality and Appropriateness of Medical Care

A higher quality insurance product is another factor that may lead to higher auto insurance premium prices. Claims are paid out more quickly in no-fault insurance states, which provides injured accident victims more timely treatment. Victims in tort states may have to forgo some treatment until they receive a payout or may be tempted to accept a low initial payout offer in order to pay immediate medical needs. The payouts, however, may not be sufficient to treat



**Chart 1**
**Number of New Claimants to the Michigan Catastrophic Claims Association, 1990 to 2012**

Source: Michigan Catastrophic Claims Association; CRC calculations

the extent of their condition or for the duration necessary when compared to PIP coverage.

Between 1998 and 2002, 43.9 percent of first-party no-fault insurance claims were settled within three months, whereas only 20.3 percent of third-party claims in tort states were resolved in the same time period. One survey found that victims are slightly more satisfied with the amount and speed of their no-fault insurance reimbursement compared to tort systems.[24] Customer surveys however may be deceiving because customers likely have different expectations for the different systems and are not basing their satisfaction on what it could have been like under a different system.

A possible consequence of quick payments may be a rise in fraud and abuse. Because first-party auto insurers in Michigan must reimburse within 30 days after reasonable proof of the loss being incurred, there may be less oversight in preventing fraudulent claims or abuse of benefits through actions such as over-claiming. Insurers are penalized if they do not pay the claim in a timely manner.

The high medical service use rates related to auto accidents in Michigan and across no-fault insurance states may mean claimants are receiving more appropriate medical care compared to tort systems; this would support assertions that no-fault insurance provides a more equitable reimbursement structure. While the level of care may be more appropriate, this care may come with a disproportionately high relative cost; Michigan auto insurers are paying 57 percent more for medical claims but it is not clear that auto accident victims are improving their health outcomes by the same amount.

The extensive and generous coverage provided to those injured in auto accidents is also creating a higher quality auto insurance product. Auto insurance companies are required to cover "all reasonable charges incurred for reasonably necessary prod-

> The high medical service use rates related to auto accidents in Michigan and across no-fault insurance states may mean claimants are receiving more appropriate medical care compared to tort systems.

ucts, services and accommodations for an injured person's care, recovery, or rehabilitation."[25] These benefits tend to be more generous than would be provided by Medicare, Medicaid, or by private health insurers and are delivered at a low out-of-pocket financial cost to the victim (some auto insurance policies charge a deductible of $500).

Over 2,000 people sustain life-altering injuries from auto accidents each year in Michigan. For the 12 months ending June 30, 2012, 2,354 claimants received benefits through the MCCA. Without un-limited lifetime benefits, many of these accident victims may receive reimbursed care by their health insurance plans, including Medicaid and Medicare, but would face limitations in medical service scope, duration, and intensity, as well as age restrictions, injury severity and cause of injury restrictions, and paperwork burdens.[26]

Unfortunately, it is difficult to quantify whether or not the additional treatments and the quality of those treatments add value to Michigan auto accident victims' health. Data on treatment outcomes and long-term patient health and recovery are not available across states. Several Michigan-based studies argue that not only does the state's no-fault insurance accomplish what it seeks to do, but it is also a good value for the cost.[f]

---

[f] See *The Impact of Reducing PIP Coverage in Michigan*, August 2011, Prepared by Public Sector Consultants for the Michigan Brain Injury Provider Council and *Impact of Proposed "PIP Choice" Law in Michigan: The Potential Effects of Changes to Personal Injury Protection Liability Law*. 2011. Prepared by Erin Agemy and Alex Rosaen of Anderson Economic Group, LLC for the Coalition Protecting Auto No-Fault.

## Policy Options to Reduce Automobile Accident Medical Expenses

Many policy reform options for Michigan no-fault auto insurance could reduce the associated medical costs. Several of these reforms may maintain the quality and comprehensiveness of current benefits, while others would alter the benefits of the current system to varying degrees, but may introduce new benefits of their own. In reducing the medical costs associated with no-fault auto insurance, policymakers may impact the overall medical spending in the state and likely reduce the cost of auto insurance premiums.

### Summary of Policy Reform Options

A brief summary of the no-fault policy reform options discussed in this paper.

**Reforms that Address Medical Pricing**

Fee Schedules for Medical Services Covered by PIP

- Fee schedules for medical services are commonly set for a variety of payers. Michigan has a fee schedule for workers' compensation medical claims.
- Fee schedules can reduce prices paid by auto insurers but may also be financially burdensome to providers if rates do not cover the fixed and variable costs of service. If new fees do not cover costs, providers may shift costs to other payers.

Increase Number of Health or Disability Insurers as Primary Payers for Claims

- Auto insurers are secondary payers, paying for services that are not covered by the injured victim's health or disability insurer.
- In Colorado, reimbursement rates fell 40 percent when health insurers became primary payers.
- The potential benefit of this policy may be small because many auto insurance policies already coordinate benefits with the policyholder's health insurer and auto insurers would still pay for services not covered by health insurers.

Auto Insurers Pay Amount Customarily Received or the Amount Paid by Health Insurers

- Policymakers change the Insurance Code to allow auto insurers to pay the amount customarily received rather than customarily charged.
- Allows auto insurers to benefit from the negotiating power of health insurers in setting prices.

**Reforms that Target Claiming Behavior**

Implement a Tort-based System with Optional or Mandatory "Add-on" PIP

- States with mandatory or optional "add-on" no-fault insurance have lower medical costs associated with auto accidents than mandatory no-fault states. The savings are greater when no-fault is an optional add-on.
- Medical spending associated with auto accidents may be lower with this type of insurance because victims have access to the tort system at any time; they do not need to meet certain spending or categorical criteria to gain access and therefore may use fewer services.

Allow Customers to Choose between No-fault and Tort

- Customers choose between a more expensive tort insurance and a less expensive no-fault insurance option.
- Three states currently offer this option and the choice of insurance type may provide a better value for consumers who do not want access to the tort system.

### Allow Customer Choice in Level of PIP Coverage

- Policymakers allow auto insurers to offer policyholders several choices in PIP coverage. This may or may not include an unlimited benefits option.
- While studies suggest that policyholders would underinsure themselves, policymakers could set level options that are likely to cover the majority of claim costs; in 2007, roughly 94 percent of claims cost $50,000 or less.

### Implement a Dollar Tort Threshold

- Some research shows that absolute cost levels for bodily injury plus PIP are higher among no-fault states with verbal thresholds than among no-fault states with dollar thresholds.
- Since the sample size is small and there are many other differences between these two groups, more research should be conducted before any associated policy is enacted.

### Allow Auto Insurers to Implement Cost Containment Measures

- Most other medical insurers, except for auto insurers, are permitted to implement cost containment measures to reduce the use of marginally beneficial medical services. Examples include cost sharing and alternative payment options.

## Reforms that May Make the Largest Impact on Medical Costs

### Cap Medical Benefits

- Reduce costs associated with unlimited lifetime benefits by introducing a dollar cap on benefits. The majority of claims (99.995 percent) cost $400,000 or less in 2007 and in 2012, 3,345 (41 percent) of catastrophic claims paid by the MCCA exceeded $1 million.
- Those with claims that exceed the cap would rely on their health insurer for additional services or spend down assets to become eligible for Medicaid.

### Require all Automobile Accident Related Medical Costs to be Covered by Health Insurers

- Unlike auto insurers, health insurers are specialized in navigating the health care system. They have more experience and market power in negotiating prices and instituting cost containment measures.
- The payment priority of health insurers in tort insurance states is a major factor in lower medical spending.
- This reform would result in a noticeable reduction in the scope and scale of benefits to future auto accident victims as more health insurance policies have coverage and use limitations. This may result in higher health insurance premiums as health insurers now have added costs.

### Repeal No-fault and Reinstate a Tort System

- Repealing no-fault insurance and returning to a tort-based system would reduce medical spending associated with auto accidents but would compromise other benefits currently provided by the no-fault system.

Medical costs are just one aspect of auto insurance and should be treated as such. Reforms should consider all ramifications prior to implementation including changes to premiums, changes to the rate of uninsured drivers, treatment and service for those injured in auto accidents, and incentive structures that may encourage adverse actions (such as payment structures that may encourage false claims or systems where auto insurers may intentionally delay payments). This list of reforms focuses on ways to change incentives to reduce medical usage and inequitable pricing. Some reforms do this by shifting costs to other payers which may have ramifications outside the insurance industry.

## Cost-Shifting

Reforms that reduce the amount spent (either through price reductions or usage reductions) on medical services related to auto accidents may result in cost-shifting – the practice of charging some customers more in order to cover lower rates paid by other customers. Because providers accept different payment amounts from different payers for the same service, it is likely that they may be shifting the cost of their lower paying (or no-payment) customers to others in order to make up for the lost revenue. This practice is made possible because of varying degrees of willingness to pay and market power. Cost-shifting is a type of price discrimination that is practiced widely in many industries.

In the case of the health care industry, Medicare and Medicaid pay mostly non-negotiated prices that tend to be the lowest of any payer (excluding uncompensated care). Providers negotiate pricing and discounts with other insurers. In some cases, the state government sets the prices, such as is the case with Michigan's workers' compensation fee schedule.

Cost-shifting can occur for one or more reasons. First, because of uncompensated care and low reimbursement rates from Medicare and Medicaid, providers may need to charge other payers higher rates in order to generate enough revenue to cover their average costs, which includes fixed costs such as buildings and equipment as well as the marginal cost of providing each good or service. Second, providers are allowed to utilize their market power to price discriminate and payers can use their market power to negotiate discounts on those prices.

If it is the case that health care providers are shifting costs to auto insurers in order to generate sufficient revenue to maintain essential services, then reforms allowing auto insurers to pay lower prices will result in providers needing to either reduce their capacity or shift costs to other payers, likely private insurers. Alternatively, the reduced spending could materialize in other places such as the bottom line of health care providers.

## Incentive Structures

Another consideration is how new policies might change the incentive to consume health care related to auto accidents. A study by RAND Institute for Civil Justice on Colorado's change from no-fault insurance to tort-based auto insurance in 2003 found that the change caused provider reimbursements to drop roughly 40 percent, but procedures increased 5 to 10 percent and charges increased 5 percent, with no improvement to patient mortality.[27] If the goal of auto insurance reform is to decrease medical expenditures, it is important for policymakers to be aware of potential changes in medical practices that are wasteful and designed only to make up for lost revenue.

---

### Average versus Marginal Costs

Cost-shifting often occurs because providers need to recoup their average cost for providing goods and services. Average cost differs from the marginal cost in that it includes not only the variable costs associated with increased usage, but the fixed costs of delivering health care services, such as land, buildings, and equipment. Because of this, even if Medicare, Medicaid and other insurers pay the marginal cost of the service, typically disposable goods and labor, the cost of paying the fixed costs falls to the other payers. Providers would not be able to stay in business if every payer reimbursed for the marginal cost of the service or good provided.

For example, a robotic surgical device for minimally invasive procedures may cost only $800 per procedure, a price that covers the required operating supplies. This may be close to the rate that Medicare and Medicaid pay, however, it does not account for the $1 million purchase price nor the $100,000 cost of annual maintenance. A hospital with this equipment would have to charge other payers higher rates for the same service in order to make this equipment available.

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 25 of 36

### Reforms that Address Medical Pricing

#### Fee Schedules for Medical Services Covered by PIP Insurance

To address the higher prices that auto insurers often pay for services relative to those paid by other payers, several states with no-fault auto insurance have adopted fee schedules. By paying prices that are presumably lower than without the fee schedule, states may help to reduce excessive medical spending. Adopting a fee schedule protects auto insurers who do not negotiate prices or do not have enough market power to effectively negotiate prices.

Fee schedules are a common tool and are utilized to varying degrees by states for certain types of insurance. Maryland is the only state to have a hospital reimbursement rate schedule specific to health insurance. Many states, including Michigan, maintain fee schedules for workers' compensation insurance. New York, New Jersey, and Pennsylvania have reimbursement schedules for no-fault insurance where the costs on average are lower than those paid in Michigan and are closer to those set forth in the state's workers' compensation fee schedule. For example, an emergency department visit of moderate medical complexity costs $283 if paid by auto insurance, $90 if paid by Michigan's workers' compensation schedule, and around $200 in New Jersey's auto medical fee schedule. A 25 minute office visit for an established patient would cost $151 in Detroit if paid by an auto insurer, $134 if paid by Michigan's workers' compensation, and $126 if paid by New Jersey's auto medical fee schedule.[28]

A 2007 study of potential reforms to Michigan's auto insurance on behalf of the Insurance Institute of Michigan found that adoption of the workers' compensation fee schedule for auto accident related medical expenses would result in total PIP savings to insurers of 37.5 percent and total PIP premium savings of 34.1 percent. These savings assume similar treatment limitations included in workers' compensation (such as limitations for certain medical

services and limitations on attendant care to eight hours per day, seven days per week). As attendant care costs result in 38.7 percent of MCCA loss payments, the study predicted that savings for PIP claims over $400,000 (the retention level in 2007) would be 40.5 percent versus only 33.0 percent of claims costing $50,000 or less.[29] If the statutory definition and legal interpretation of auto insurance treatment criteria (all "reasonably necessary products") remain unchanged then the cost savings from this reform will not be as dramatic as this study suggests.

Introducing a fee schedule is unlikely to directly alter any of the distinguishing features of Michigan's auto insurance system (no medical benefit cap, generous medical coverage, verbal tort threshold, mandatory PIP), but secondary impacts may occur. A potential consequence of fee schedules is that it may raise the price of certain services for certain auto insurers who have negotiated lower prices. However, the Michigan auto insurance pricing data suggest that it is unlikely that any auto insurers are currently paying on average an amount that would be significantly lower than what could be achieved by a fee schedule similar to workers' compensation.

> Adopting a fee schedule protects auto insurers who do not negotiate prices or do not have enough market power to effectively negotiate prices.

Because long-term care expenses are such a large component of the medical expenditures related to auto insurers, it may also be an effective policy to set fee schedules for attendant care. Currently, attendants are being paid different amounts for their services; some are likely being underpaid while others may be overpaid, based on the actual services provided. The current average rate paid for attendant services is not available, and CRC does not have a suggestion for an appropriate rate. Therefore it is difficult to know if this reform will save money. However, a set rate may provide more equity and greater cost predictability. Rates would be more equitable if they were adjusted for cost of living differences across the state and the skills required to provide the services, and increased with inflation over time.

Fee schedules may be a powerful tool if they are implemented such that they do not negate the ben-

efits afforded when health or disability insurers are the primary payers. A fee schedule implemented such that the fees apply as a maximum payment (allowing auto insurers to potentially pay less than the scheduled rate) or as a payment schedule for auto insurers only (so as to not raise costs for other payers) would most effectively reduce medical prices. If the fee schedule dictates the price of all services related to auto accidents, then health and disability insurers may end up paying higher prices than they were before. This would not only raise some medical expenditures related to auto accidents, but could raise health insurance premiums as well. Because health insurers in particular have market power to negotiate prices, if the prices related to auto accidents rise compared to other services, then health insurers may decide to offer lower priced health care policies that exclude coverage for injuries related to auto accidents.

> Increasing the number of auto injury medical services paid for by health insurers has been shown to reduce prices.

Fee schedules can be burdensome to providers as they may prohibit them from charging and receiving the amounts necessary to cover the costs of procedures. Costs associated with medical services vary among providers, but fee schedules, perhaps with some basic adjustments for location, require set reimbursements for each service. If reimbursement rates from certain payers are too low, providers may shift costs to other payers or stop providing services to those patients altogether. Medicaid and Medicare provide an example of the latter case as patients covered by these programs are not accepted by some providers because of low reimbursements rates. In an extreme case, providers may close altogether – evidence of the impact of Michigan's low Medicaid reimbursement rates is the contiguous 16 county area of the upper part of the lower peninsula that is without obstetrical services (Medicaid and non-Medicaid).[30]

Finally, there is the question of whether government price intervention is warranted. In most other industries, businesses are permitted to charge prices at levels the market can bear. Fee schedules would be one of just a few pricing interventions by the government in private industry.

### Increase Number of Health or Disability Insurers as Primary Payers for Claims

Auto insurance consumers in Michigan can currently elect to coordinate benefits with their health or disability insurance policy (except for with Medicaid, Medicare, or a Medicare supplemental policy). In these cases, auto insurance pays for any reasonable expenses that are not covered by the health or disability policy.[31] Customers that elect another insurance as the primary payer may see discounts in their auto insurance premiums,[32] however, not all health or disability insurance policies will provide benefits for injuries related to auto accidents.[9]

Increasing the number of auto injury medical services paid for by health insurers has been shown to reduce prices. When Colorado lawmakers repealed no-fault insurance and reinstituted a tort-based auto insurance system in 2003, auto injury claims were shifted from the auto insurer to the health insurer. Consequently, provider reimbursement rates fell roughly 40 percent.[33]

At least three policy options can make this change: 1) make it simpler for auto insurance customers to elect their health insurer to be the primary payer; 2) require that health insurers assume payment for claims above or below a certain dollar amount (say, above a PIP cap or below the MCCA retention amount); or 3) require health insurers to assume payment for all claims (discussed below).

By 2014 when the federal Patient Protection and Affordable Care Act is fully implemented, health plans will no longer limit annual or lifetime benefits for essential services. If auto accident medical claims are paid entirely by the health insurer, then catastrophically injured auto accident victims will likely

---

[9] Some health insurance policies exclude or restrict medical coverage for injuries related to auto accidents if the injured person is also covered by an auto insurance policy. This exclusion is most common among self-insured employer health insurance plans.

13-53846-tjt    Doc 10022-1    Filed 07/06/15    Entered 07/06/15 12:19:27    Page 27 of 36

have access to covered medical benefits for the duration of their injuries. However, the benefits will likely not be as generous under health insurance as they would be under the current auto medical coverage. If auto insurers are always the secondary payers then benefits should remain intact.

Coordination of benefits may increase some administrative costs as auto insurers provide benefits that many health insurance plans may not. Residential and attendant care and rehabilitation benefits are typically limited under health insurance plans.

Whether this reform will provide significant cost savings is debatable, though positive savings should occur. Based on CRC interviews with auto insurers and health insurers, at least half of all current auto insurance policyholders have elected a health insurer as a primary payer. Additionally, if the remaining auto insurance plans designate a health insurer as a primary payer, then under the current statute auto insurers will still be required to cover "reasonable" expenses beyond what is covered by health insurers. Health insurers tend to have limitations on rehabilitation services and may not cover some alternative treatments such as massage therapy and acupuncture. Facility and attendant care coverage is also frequently limited to a discrete time period by health insurers; these costs make up nearly 60 percent of the MCCA loss payments and health insurers' contributions to this expense may not be significant in the long run.

Cost-shifting may occur under all reforms that shift auto accident coverage to health insurers. As health insurers absorb these new costs, they will likely build the expense into health insurance premiums. Health insurance premiums are paid for by the insured and often by their employers. For those that have employer sponsored health insurance, the cost increase will be disproportionately shifted to employers who, on average, pay 70 percent of employer sponsored health insurance premiums.[34] To compensate for these increased costs, employers may forgo expansion or reinvestment, reduce the benefits afforded

> Cost-shifting may occur under all reforms that shift auto accident coverage to health insurers. As health insurers absorb these new costs, they will likely build the expense into health insurance premiums.

to employees, or reduce current wages or future wage increases.

### Automobile Insurers Pay Amount Customarily Received

Section 3157 of the Insurance Code states that, "The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance." Because few payers other than auto insurers pay the amount they are charged, changing this sentence so payment focuses on the amount received rather than the amount charged will reduce costs for auto insurers as well as total health care spending. Many health insurers are able to negotiate prices using Medicare as a baseline; a similar strategy could be used to ensure that auto insurers are not paying significantly more than others for the same services.

### Allow Automobile Insurers to Pay Health Insurance Prices

In cases where the health insurer is the primary payer, providers may charge the health insurer less for a service for an individual patient than they would charge the auto insurer once the health insurer ceases coverage. For example, in a case where an auto accident victim requires physical therapy and has coordinated their benefits with their health insurer, the auto insurer may take over payments after 60 days. The amount charged to the auto insurer would be higher than what was charged to the health insurer even though it is the same patient with the same condition receiving the same service.

One policy option that would reduce medical spending would be to allow auto insurers to pay the same prices as the claimants' health insurance in cases where the health insurer is the primary payer. Providers would continue to bill services at the same rate but to a different payer once the health insurance benefits run out.

### Policy Options that Target Claiming Behavior

Michigan auto accident claimants use more medical services and the strategies that will be most effective in reducing medical spending will need to alter the behavior of those involved in reporting and treating claims. RAND researchers agree: "Unfortunately, many current reform proposals do little to alter the incentives faced by patients, physicians, and insurers who are considering the appropriate level of care for a given injury. Without changing incentives to consume care, it may be difficult to achieve long-term reductions in the cost of auto insurance in Michigan."[35] The following reforms attempt to address this claiming behavior.

### Implement a Tort-based System with Optional or Mandatory "Add-on" No-fault Insurance

If it is the case that an unsatisfactory portion of the medical spending is due to auto accident victims using unnecessary procedures in order to gain access to the tort system, then a system that is tort-based, but has PIP coverage, may be effective in reducing medical costs. This is a variation of no-fault insurance called "add-on" no-fault insurance (see page 3). In this case, there would be no barriers to accessing the tort system, but some of the major policy goals of no-fault insurance (other than limiting access to the tort system) may remain intact.

This system may be effective because victims have access to the tort system and can sue for noneconomic damages. With access to the tort system already established, some studies suggest that auto accident victims will be less likely to run up their medical use. PIP paid claims per vehicle in states with "add-on" PIP insurance are lower than those in no-fault insurance but higher than tort. Mandatory add-on PIP paid claims per vehicle are higher than those with the option to add-on no-fault insurance.[36]

### Implement a Choice Insurance System

Allowing drivers to decide which type of insurance they wish to purchase – no-fault insurance or tort –

has been successful in keeping costs low in the few states that offer choice. Kentucky, New Jersey, and Pennsylvania allow consumers to choose between less expensive limited tort insurance and more expensive full tort insurance. The latter allows accident victims full right to recover damages against third parties, whereas the former allows victims to recover damages in excess of their PIP coverage.

In Pennsylvania, which has a choice system, the no-fault insurance sector of auto insurance grew from 37 percent of drivers in 1993 to 53 percent of drivers in 2005. Rates for no-fault insurance in Pennsylvania have been at or below the regulatory guidelines. However, Pennsylvania requires only $5,000 in PIP coverage which would hardly cover the costs of catastrophic injuries and is likely responsible for keeping no-fault insurance costs down.[37]

> Allowing drivers to decide which type of insurance they wish to purchase – no-fault insurance or tort – has been successful in keeping costs low in the few states that offer choice.

### Allow Consumer Choice in Coverage Levels

Another option that would allow consumers more pricing and coverage options is to permit insurers to offer various levels of coverage. New Jersey offers this model for PIP insurance. Legislation sets up a basic policy offering $15,000 in PIP. Standard policies allow consumers to choose among various PIP limits: $250,000, $150,000, $75,000, $50,000, or $15,000. All policies provide coverage up to $250,000 for catastrophic injuries. While New Jersey does have auto insurance premiums that are some of the highest in the country, this may be related to factors other than health expenditures.

Providing customers choice in how much risk they would like to accept affords several advantages. RAND researchers point out that, "offering consumers broader choices rather than mandating generous but expensive coverage could allow more individuals to obtain affordable but less-comprehensive coverage while permitting those satisfied with the existing system to maintain their current coverage."[58] One study calculated that if Michigan policyholders were offered a range of coverage levels, policyholders that choose the $50,000 option (the minimum in

this example) would expect to save 11 to 13 percent and as much as 16 percent in premium costs compared to the unlimited coverage option.[39]

Several studies suggest that when faced with these decisions, consumers chronically underinsure themselves; in a few states that offer various coverage options, 95 percent of consumers purchase the minimum required PIP coverage.[40] One study estimates that between 75 percent and 90 percent of Michigan drivers would purchase less than lifetime PIP coverage if given a choice.[41] While this certainly decreases the coverage for a large number of drivers, data show that 94.4 percent of claims cost $50,000 or less.[42] An underinsured accident victim would use their health insurance or would pay out-of-pocket for medical expenses that exceed the auto insurance coverage.

### Switching to a Dollar Tort Threshold

Comparisons of total injury costs among no-fault insurance states with verbal versus dollar tort thresholds show that the former have significantly higher costs. This may be evidence that cost containment is more plausible under dollar thresholds. Researchers tracked trends in absolute cost levels for bodily injury plus PIP and found that they are higher among no-fault insurance states with verbal thresholds (Michigan, New York, and Florida, which are also larger) compared to states with dollar thresholds.[43] However, no-fault insurance states with a dollar threshold are also smaller and less densely populated which may lead to lower injury costs. More research would need to be done on the ease of containing costs among different types of tort thresholds.

### Allow Automobile Insurers to Implement Cost Containment Measures

If auto insurers are to remain the primary medical payers for auto injuries then allowing and encouraging auto insurers to implement cost containment measures can help address high costs and spending. A great deal of legislation addresses cost containment in the health care industry and policies require and incentivize health insurers and providers to reduce costs and improve health outcomes. The state continuously implements policies designed to reduce spending for Medicaid through various cost containment measures. Uniquely, Michigan's auto insurance does not contain cost containment measures related to medical spending and some provisions make it difficult or impossible for auto insurance to initiate such changes on their own.

> Uniquely, Michigan's auto insurance does not contain cost containment measures related to medical spending and some provisions make it difficult or impossible for auto insurance to initiate such changes on their own.

Health insurers have a multitude of cost containment options at their disposal, many of which could be effective in the auto insurance industry as well; some policies may have no negative effect on health outcomes and may even improve outcomes. Policies that encourage alternative payment systems (such as managed care or global payment), would reduce the prices paid for services as well as induce providers to only provide services that increase the wellness of the accident victim. Currently, auto insurers can provide policyholders with premium discounts by electing to participate in a managed care program or a preferred provider network, but auto insurers have no tools to require patients to abide by the requirements that make these options more affordable. Similarly, auto insurers have limited market power to switch from the costly fee-for-service payment model to a more cost effective one, such as global payments.

One study proposes that the incentives of Michigan's no-fault insurance increase claiming behavior by victims and medical providers. In this case, reforms that target this behavior would be most effective in driving down unnecessary medical costs associated with auto accidents.[44] Health insurers utilize many strategies to decrease usage among the insured with the hope that only high-value services are utilized. Patient cost-sharing has been shown to be effective in reducing health service use, however, there is debate regarding the effect on health outcomes. Specifically, unnecessary or low-value health services may be reduced by implementing health care deductibles, similar to those paid when there is prop-

erty damage, and introducing co-payments or co-insurance for all or just some types of treatments. Again, auto insurers are not permitted to charge deductibles or fees that are not approved by the insurance commissioner.[45]

CRC's recent paper *Health Care Costs in Michigan: Drivers and Policy Options* provides other policy options, such as developing and promoting evidence-based medical guidelines that in combination with auto insurance reform could play a major role in reducing excessive health care costs and improving health outcomes. However, many of the cost control options afforded to health insurers may not be appropriate for catastrophically injured patients.

> As of 2007, 99.995 percent of claims cost less than $400,000, the 2007 retention level; so only .005 percent of claims went to the MCCA.

### Reform Options that May Make the Largest Impact on Medical Costs

#### Capping Medical Care Coverage

Michigan is the only no-fault insurance state that provides unlimited medical benefits to victims of auto accidents. While injuries related to auto accidents may be severe and require treatment and care for the lifetime of the victim, few other insurance policies provide this same level of generous and unlimited medical coverage. Therefore, an option available to state policymakers is to cap medical benefits paid by auto insurers.

With the enactment of the federal Patient Protection and Affordable Care Act (ACA) in 2014, Michigan residents will be required to have health insurance. Federal health insurance premium subsidies and state-level expansion of Medicaid will help make health insurance more affordable for those younger than age 65. Additional provisions in the ACA do not allow health plans to limit annual or lifetime benefits for essential services. However, many health plans do not provide as many services as are typically provided by auto insurance coverage and the intensity and comprehensiveness of care, and potentially the health outcomes of those injured, could be negatively impacted.

If Michigan's insured drivers no longer pay for the catastrophically injured through the MCCA, at least some of those expenses will be shifted to the state's Medicaid program. As the catastrophically injured spend down their assets to pay for their care, they will begin to qualify for Medicaid; a study by Public Sector Consultants estimates that this may add as much as $30 million to the state's Medicaid costs annually.[46] Medicaid program enrollment growth would effectively distribute the costs to all Michigan taxpayers through higher taxes, or through a reduction in other state services as state resources are shifted to the Medicaid program. An increasing number of the catastrophically injured will also be eligible for and enroll in the federal Medicare and Social Security disability programs, having similar effects but at a national level.

While some no-fault insurance states offer optional PIP coverage, victims in the 11 other states with no-fault auto insurance can recover damages through tort according to their respective tort thresholds. However, after PIP and lawsuit options are eliminated or exhausted, victims apply for the same government assistance.

To reduce the exposure of auto accident victims to exorbitant medical costs related to catastrophic injuries, policymakers could enact a fairly high cap and one that captures the majority of claims. As of 2007, 99.995 percent of claims cost less than $400,000, the 2007 retention level; so only .005 percent of claims went to the MCCA.[47] That same year, 33.4 percent of claims paid by the MCCA exceeded $1.0 million. By 2012, 40.9 percent of claims paid by the MCCA exceeded $1.0 million.[48] These and similar data may help policymakers determine the most appropriate cap, if they should implement one.

Depending on the amount of the benefit limit, the MCCA may or may not be necessary. However, the debts of the current system, and the needs of the victims currently covered under auto insurance policies guaranteeing lifetime benefits would need to continue to be met.

## Require all Automobile Accident Related Medical Costs to be Covered by Health Insurers

A more extreme measure than having health insurers pay for some of the medical costs associated with auto accidents is to take auto insurers out of the business of providing medical coverage altogether. Doing this would leave health insurers as the primary and only payer for PIP coverage. This reform allows medical services to be monitored and paid for by insurers that specialize in this area and may significantly reduce health care costs and future growth.

While this will likely lower overall medical spending, this could lead to higher priced health insurance premiums. As health insurers' costs grow with the new expense of covering auto related medical expenses, health insurers will pass these costs on to consumers through health insurance premiums. Because a large proportion of health insurance plans are paid for by employers (through employer sponsored plans) and by Medicaid and Medicare, these groups could see their costs increase with this policy change. However, assuming that this policy change does not alter the number of injury claims associated with auto accidents, total health care spending should decline.

Of significance would be the resulting change in the generousness of the medical benefits offered to accident victims. Currently, any "reasonable" medical expenses are covered by auto insurers, but health insurers have many more coverage limitations that may impact recovery and health outcomes of accident victims.

> A more extreme measure than having health insurers pay for some of the medical costs associated with auto accidents is to take auto insurers out of the business of providing medical coverage altogether.

## Repeal No-fault Insurance and Reinstitute a Tort-based Automobile Insurance

Based on the available data, the medical costs of the no-fault insurance system are driven in large part because auto insurers are the primary payers. Tort-based systems do not meet the same policy goals as a no-fault insurance system, but they are less expensive because medical providers are more likely to bill health insurers, reducing medical costs as well as reducing auto insurance premiums.

Several states that once had a no-fault insurance system repealed those laws in favor of a tort-based system. Average liability premiums in Georgia, Connecticut, and Colorado, all of which repealed no-fault insurance, declined sharply following repeal. Whether or not premiums declined due to lower medical costs has not been verified. However, it is likely that with medical costs making up 30 percent of premiums there was some decline in medical costs that resulted in lower premium prices. Other data that show lower medical expenditures in tort-based states support the theory that premiums declined at least in part because of lower medical costs and use. Studying these states can help Michigan policymakers assess what outcomes may occur if they were to repeal, rather than reform, no-fault insurance.

## Summary of Policy Issue

Michigan auto insurers pay for higher medical costs related to auto accidents than do auto insurers in most other states. This analysis identified as root causes that:

1. Auto insurers pay higher prices for the same medical services than do private health insurers, workers' compensation, and Medicare;

2. Those injured in auto accidents in Michigan have higher rates of utilization of health care services than those injured in auto accidents in other states; and

3. Those injured in auto accidents are entitled to lifetime medical care.

CRC's analysis of the policy options suggest that it is possible to address these issues while maintaining the no-fault program and continuing to offer catastrophic coverage in the case of severe accidents. The ability to do so would provide for an opportunity to reign in at least one avenue of the escalating cost of medical care.

**Health Care Prices.** If state policymakers want to address the higher prices paid by auto insurers for medical services related to auto accidents they can change conditions in the Insurance Code requiring auto insurers to pay the full amount billed. The options for policymakers are to allow auto insurers to create fee schedules for medical services covered by PIP insurance; to increase the number of health or disability insurers as primary payers for claims; to allow automobile insurers to pay the amounts customarily received; or to allow automobile insurers to pay health insurance prices. Each of these would not alter the primary features (mandatory PIP, unlimited medical benefits, and a verbal tort threshold) of the program in a fundamental way, but would bring tools available to other payers of health insurance to the no-fault program. With the implemen-

tation of the Affordable Care Act in 2014 and its provisions forbidding health plans from limiting annual or lifetime benefits for essential services, there will be more options available to pay for catastrophic care going forward.

**Higher Rates of Utilization.** If state policymakers want to address the higher rates of health care utilization due to auto accidents, they have several options to bring utilization in line with that in other states. The options consist of implementation of a tort-based system with optional or mandatory "add-on" no-fault insurance; implementation of a choice insurance system; allowing consumers to choose coverage levels; switching the system to a dollar tort threshold; or allowing automobile insurers to implement cost containment measures. Some of these reform options would cause changes to the level of medical benefits and may alter the number of tort claims, but would bring tools available to other payers of health services to the no-fault program.

**Lifetime Medical Care.** State policymakers have options for addressing the high cost of lifetime medical care, including: capping medical care coverage; requiring all automobile accident related medical costs to be covered by health insurers; and repealing no-fault insurance and reinstituting a tort-based automobile insurance. Adoption of any of these options would fundamentally change the no-fault program.

It is possible that reform of the health care pricing and the rates of utilization will lessen the need for lifetime medical care and the costs associated with lifetime provision when it is necessary. Additionally, policymakers may want to further investigate the types of injuries currently covered by the MCCA. **Table 5** (on page 12) shows that brain injuries have been declining as a share of total injury claims and a higher number of back and neck and multiple fracture injuries have been meeting the retention threshold. The question policymakers might consider is how these types of injuries should be paid – by the catastrophic care funds or by other means.

## Conclusion

This paper provides an overview of the medical costs associated with no-fault auto insurance in Michigan and proposes a variety of policy options that may reduce medical spending associated with auto accidents, and consequently auto insurance premiums as well. Auto insurers' primary responsibility of payment and their statutorily limited market power to negotiate lower payments with providers and implement cost controls is principally responsible for the majority of excess health care spending related to auto accidents. However, other features of Michigan's no-fault structure may be causing higher medical spending including its verbal tort threshold and unlimited lifetime medical benefits for catastrophically injured accident victims.

Whether or not higher medical expenditures related to no-fault insurance claims are caused by over-claiming, higher prices, and a general lack of cost controls or because claimants are receiving a more appropriate level of care compared to tort-based systems is unclear. More research should examine this question and determine if there are greater incentives for fraud or to claim inappropriate care when auto insurers are the primary payers rather than health insurers. Regardless, medical spending is higher in no-fault insurance states, particularly those with verbal thresholds, and policymakers in Michigan must determine whether or not there is sufficient value in the current system to justify its price or if reforms should be made.

Ultimately, policymakers will need to select policies that best match their priorities related to auto insurance. This discussion did not focus on insurance premium costs, but rather the role of no-fault insurance in driving medical prices overall. Because auto insurers pay higher prices than other insurers for health care services and there are barriers to protecting against over- and unnecessary use of the medical services, no-fault auto insurance is playing a role, albeit small, in overall medical inflation in Michigan.

With the current structure of the auto insurance system, auto insurers, and consequently, Michigan drivers, are subsidizing the health care system by paying higher prices than other payers for identical services. In the same way that policymakers require and encourage health care providers and health insurers to decrease the costs of the health care system, policymakers should be using the same lens to scrutinize excessive spending in health care from auto accidents. Some actions would have no impact on the major features of no fault – unlimited, lifetime benefits; verbal tort threshold; and mandatory PIP – but could still reduce health care spending, and consequently, auto insurance premiums. Policymakers should consider reforms to Michigan's no-fault insurance that have little to no impact on accident victims but would potentially lead to significant reductions in health care spending related to auto accidents.

## Endnotes

[1] *Report 383: Health Care Costs in Michigan: Drivers and Policy Options.* Citizens Research Council of Michigan, May 2013. www.crcmich.org/PUBLICAT/2010s/2013/rpt383.html

[2] *National Health Expenditures 2010: Sponsor Highlights.* Centers for Medicare and Medicaid Services, Office of the Actuary, National Health Care Statistics, 2010.

[3] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[4] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[5] MCL §500.3135

[6] MCL §500.3104

[7] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with No-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[8] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010. And MCL §500.3101-500.3179.

[9] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[10] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[11] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[12] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[13] *Munson Medical v Auto Club Insurance Association* N.W.2d 49 (Mich.App. 1996)

[14] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with No-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[15] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[16] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[17] MCL §500.3107(1)(a)

[18] Michigan Catastrophic Claims Association, Injury Type Summary Inception to Date (as of June 30, 2012) http://michigancatastrophic.com/LinkClick.aspx?fileticket=b3E7fvqaXcU%3d&tabid=2943

[19] MCL §500.3107(1)(a)

[20] Michigan Catastrophic Claims Association, MCCA Loss Payment Summary by Category. http://michigancatastrophic.com/LinkClick.aspx?fileticket=0uMqjvZ%2fz2o%3d&tabid=2943

[21] *Bonkowski v Allstate Insurance Co.* and *Douglas v Allstate Insurance Co*, 492 Mich. 241 (2012)

[22] U.S. National Highway Traffic Safety Administration, Traffic Safety Facts, annual.

[23] U.S. National Highway Traffic Safety Administration, Traffic Safety Facts, annual.

[24] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010. pg. 66.

[25] MCL §500.3107(1)(a)

[26] Agemy, Erin and Alex Rosaen. *Impact of Proposed "PIP Choice" Law in Michigan: The Potential Effects of Changes to Personal Injury Protection Liability Law.* Prepared by of Anderson Economic Group, LLC for the Coalition Protecting Auto No-Fault. 2011.

[27] Heaton, Paul and Eric Helland. *Does Treatment Respond to Reimbursement Rates? Evidence from Trauma Care,* RAND Corporation, WR-648-ICJ, 2009.

[28] Mitchell DecisionPoint® and New Jersey Auto Medical Fee Schedule, Accessed August 8, 2013 www.state.nj.us/dobi/pipinfo/aicrapg.htm

[29] Miller, Michael J. *Private Passenger Automobile Analysis of No-Fault Legislative Reforms.* EPIC Consulting, LLC on behalf of the Insurance Institute of Michigan. June 2007.

[30] The West Branch Regional Medical Center in Ogemaw County closed its obstetric unit in 2010 citing underfunding of the Medicaid program as forcing, "many of the hospitals in Northern Michigan out of the [obstetric care] business and unless something is done, the trend will continue."West Branch Regional Medical Center Health Report. Summer 2010. www.wbrmc.org/DOCS/Health%20Report-Summer10.pdf

[31] *2008 Buyers' Guide to Auto Insurance.* Department of Labor and Economic Growth, Office of Financial and Insurance Regulation.

[32] MCL §500.3109a

[33] Heaton, Paul and Eric Helland. *Does Treatment Respond to Reimbursement Rates? Evidence from Trauma Care,* RAND Corporation, WR-648-ICJ, 2009.

[34] Centers for Medicare and Medicaid Services, Office of the Actuary, National Health Care Statistics, 2011.

[35] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[36] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with no-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[37] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with No-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[38] *Reducing Michigan Auto Insurance Rates.* RAND Corporation, 2010.

[39] Agemy, Erin and Alex Rosaen. *Impact of Proposed "PIP Choice" Law in Michigan: The Potential Effects of Changes to Personal Injury Protection Liability Law.* Prepared by Anderson Economic Group, LLC for the Coalition Protecting Auto No-Fault. 2011.

[40] Agemy, Erin and Alex Rosaen. *Impact of Proposed "PIP Choice" Law in Michigan: The Potential Effects of Changes to Personal Injury Protection Liability Law.* Prepared by of Anderson Economic Group, LLC for the Coalition Protecting Auto No-Fault. 2011.

[41] Agemy, Erin and Alex Rosaen. *Impact of Proposed "PIP Choice" Law in Michigan: The Potential Effects of Changes to Personal Injury Protection Liability Law.* Prepared by of Anderson Economic Group, LLC for the Coalition Protecting Auto No-Fault. 2011.

[42] Miller, Michael J. *Private Passenger Automobile Analysis of No-Fault Legislative Reforms.* EPIC Consulting, LLC on behalf of the Insurance Institute of Michigan. June 2007.

[43] Anderson, James M., Paul Heaton, and Stephen J. Carroll. *The U.S. Experience with No-Fault Automobile Insurance: A Retrospective.* RAND Institute for Civil Justice, Santa Monica, CA: 2010.

[44] Heaton, Paul. *Auto Insurance Reform in Michigan: What Can the Data Tell Us?*, RAND Corporation, 2010.

[45] MCL §500.3109(3)

[46] *The Impact of Reducing PIP Coverage in Michigan*, Prepared by Public Sector Consultants for the Michigan Brain Injury Provider Council. August 2011.

[47] Miller, Michael J. *Private Passenger Automobile Analysis of No-Fault Legislative Reforms.* EPIC Consulting, LLC on behalf of the Insurance Institute of Michigan. June 2007.

[48] House Fiscal Agency. Legislative Analysis. HB 4612, No-Fault Auto Insurance Amendments. Updated on May 30, 2013.

13-53846-tjt   Doc 10022-1   Filed 07/06/15   Entered 07/06/15 12:19:27   Page 36 of 36