



MICHIGAN
CHAMBER
of Commerce

The High Costs of Michigan's No-Fault Auto Insurance:

Causes and Implications for Reform

Prepared for the Michigan Chamber of Commerce

By

Sharon Tennyson, Ph.D.
Associate Professor
Department of Policy Analysis and Management
Cornell University
Ithaca, NY 14853
(607) 255-2619
sharon.tennyson@cornell.edu
(607) 255-2619

April 22, 2011

# Summary

Michigan has a strong tradition of no-fault insurance, and its no-fault system is often characterized as the best in the nation. Michigan no-fault provides generous life-long benefits to those who experience catastrophic automobile injuries, and accomplishes this by spreading the costs of these injuries across all drivers in the state. This assures that those injured receive adequate benefits, reduces delays and legal costs of obtaining benefits, and reduces worry and fear about experiencing such a loss. However, these features of no-fault also contain the seeds of spiraling cost growth: unlimited lifetime benefits burden the auto insurance system with the highest-cost cases, and socialized insurance costs diminish private incentives to hold down costs.

Recent and projected trends in claim costs and premiums suggest that Michigan's auto no-fault system is becoming too expensive to sustain. As seen in the chart, the average cost of a no-fault claim in Michigan has increased at a much higher rate than in other no-fault states so that by 2009 the per-claim cost in Michigan was nearly four times as much as in the average no-fault state. This upward cost spiral is creating a fiscally unsustainable situation that presents a real threat to the economic well being of the state, as the premium payments to cover the cost will become a greater percentage of consumer and business spending.



The primary cause of cost growth in Michigan auto no-fault is the accumulation of high-cost, long-term injury claims in the Michigan Catastrophic Claims Association (MCCA). Catastrophic claims account for only 1 to 2 percent of no-fault claims, but for over 45 percent of claim costs. Michigan drivers pay premium surcharges of nearly $1 billion each year to support these claims.

Major reforms are needed to prevent a cost crisis that will destroy Michigan's no-fault system. The most effective way to achieve auto no-fault cost reductions is to introduce limits to no-fault benefits and allow consumers to choose benefit amounts beyond some specified minimum. This will better match benefits to consumer needs and preferences, reduce moral hazard and fraud, and reduce uncertainty for insurers. This change will reduce the costs of future claims; it does not, however, reduce the costs of catastrophic claims already incurred. More effective claims management solutions are required to address this problem, including fee schedules and other cost controls for medical and long-term care services and coordinated responses to claims fraud. Monitoring and cost controls have been and will no-doubt continue to be controversial; but because catastrophic claims are shared by all Michigan drivers the government has a special responsibility to hold down costs and to control waste, fraud, and abuse.

# The High Costs of Michigan's No-Fault Auto Insurance: Causes and Implications for Reform

## Introduction

Michigan enacted a no-fault automobile insurance law in 1973, and is one of twelve states that continue to use the no-fault approach to compensating automobile accident injuries.[1] No-fault insurance has the goal of providing quick and certain payment for injuries, by avoiding expensive litigation over the causes of accidents as a way of determining who should pay. Due to these features, when it was first enacted no-fault insurance was widely viewed as a way to combat the high costs of automobile injury claims.

However, thirty years later the no-fault states are consistently among the highest-cost states for automobile insurance. Four states that enacted no-fault in the 1970s later repealed it due to high costs, and many feel that the promise of no-fault has never borne fruit. Indeed, the Rand Institute for Civil Justice recently published a retrospective study of no-fault insurance, with the objective to "help explain why no-fault was adopted, flourished, and then lost some of its political luster as a policy option."[2]

Michigan has a strong tradition of no-fault insurance, and its no-fault system is often characterized as the best in the nation. Yet the costs of auto no-fault are also growing in Michigan, and projections of future cost lead to the conclusion that the system will be unsustainable in the future. Michigan's no-fault is worth preserving, but major reforms are needed to prevent a cost crisis that will destroy the system.

---

[1] The others are Florida, Hawaii, Kansas, Kentucky, Massachusetts, Minnesota, New Jersey, New York, North Dakota, Pennsylvania and Utah.
[2] *The U.S. Experience with No-Fault Automobile Insurance: A Retrospective*, James M. Anderson, Paul Heaton, and Stephen J. Carroll, Rand Institute for Civil Justice, 2010.

[2]

## Michigan's Auto No-fault System

Under no-fault insurance, a person's own auto insurance company pays for their automobile-related injuries regardless of who was at fault in the accident. The portion of the automobile insurance policy in Michigan that covers these payments is called *personal injury protection* insurance or "PIP". All drivers in no-fault states are required to purchase some level of PIP insurance. Michigan's no-fault (PIP) benefits provide injured persons with unlimited lifetime medical benefits, including reasonable and necessary expenses for rehabilitation and long term care; loss-of-service benefits for up to three years to pay for help with tasks of everyday living such as laundry, cooking and cleaning;[3] replacement of 85 percent of wages for up to three years after the accident;[4] and survivor and funeral benefits.

Michigan is currently the only no-fault state to provide for unlimited medical benefits.[5] The next most generous states are New Jersey (which pays medical benefits up to $250,000) and Pennsylvania (which pays medical benefits up to $177,500), but drivers in those states may choose lower limits of coverage. Among the states in which no-fault benefits are mandatory, New York provides the most comprehensive benefits other than Michigan, and it provides for medical benefits only up to $50,000.[6]

To help ensure that auto injury claims settled through one's own insurance do not also lead to litigation, no-fault laws restrict the rights of those injured in accidents to sue their injurer for additional payments. The conditions that must be met in a state in order to bring a lawsuit for pain-and-suffering constitute what is known as the *tort threshold*. Michigan's tort threshold

---

[3] Loss-of-service benefits are subject to a daily maximum.
[4] Wage benefits are subject to a monthly maximum.
[5] Michigan is also unique among the states in providing for automobile accident property losses on a no-fault basis.
[6] Minnesota's maximum benefit is $40,000 and North Dakota's is $30,000. The remaining no-fault states provide maximum medical benefits ranging from $3,000 to $10,000. (Source: Rand Institute for Civil Justice).

[3]

limits lawsuits to those involving a serious impairment of body function, serious permanent disfigurement, or death. In these cases only, the injured person may bring a suit against the at-fault driver to seek compensation for losses such as pain-and-suffering.

Because it is defined in terms of a description of the circumstances which permit a lawsuit, Michigan's tort threshold is known as a *verbal* threshold. Florida and New York also have verbal thresholds. The other no-fault states have *monetary* tort thresholds which permit lawsuits when an injured person's medical expenses exceed a certain dollar amount. Monetary thresholds are less desirable because they can become ineffective over time due to medical cost inflation, and can create incentives to overstate medical expenses in order to meet the threshold.

## Successes and Failures of the System

Michigan's no-fault auto insurance system was designed with three public policy goals in mind: (1) to increase the benefits paid to injured persons, (2) to ensure prompt payment of benefits, and (3) to reduce the proportion of premium dollars paid out for administrative (i.e., legal) costs.[7] The system has been highly successful in meeting these goals. Due to the unlimited medical benefits, injured persons receive generous and certain compensation. And, due to the strong restrictions on lawsuits, Michigan sees a much smaller proportion of automobile injury claims settled through the liability system than in other states. In 2010, approximately 79 percent of automobile injury claims in Michigan were settled through PIP payments alone, with no involvement of the liability system. For the no-fault states as a whole, only around 40 percent of injury claims were settled with no involvement of the liability system.[8]

---

[7] *Michigan Insurance Workgroup Report*, 2006.
[8] Based on the author's calculations using Fast Track Monitoring System data. In the majority of states that do not have a no-fault system, 100 percent of automobile injury claims are settled through the liability system. The Fast Track System does not include data from every insurer in each state, and so these proportions and all other calculations using those data are based on the assumption that the claims experiences of omitted insurers are similar to those included in the database.

[4]

The main shortcoming of no-fault insurance is that reducing use of the liability system to compensate injury claims has not lowered automobile insurance costs in the way that was first envisioned. Michigan's policymakers have been concerned about the high costs of no-fault since soon after its inception, with calls for reforms coming as early as 1989.[9] But because the high costs have been thought to reflect the generous benefits that are provided, policymakers over the years have chosen to make only minor changes.

Unfortunately, this focus on maintaining benefits has led to cost problems that are now reaching a crisis level. Due to the accumulation of high-cost, long-term injury claims and the lack of adequate cost controls for other claims, spending to support Michigan's no-fault system has risen dramatically. More worrying, the *rate of increase* in costs has also grown with each passing year. This upward cost spiral is creating a fiscally unsustainable situation that presents a real threat to the economic well being of the state, as the premium payments to cover the cost will become a greater percentage of consumer and business spending.

Exhibit 1 provides a stark graphic representation of these trends. The figure compares the average cost of each no-fault (PIP) claim in Michigan to the average for all no-fault states combined, in each year from 1980 through 2009. Throughout much of this time period Michigan's cost per claim was only moderately higher than in other states, and it might be easy to attribute this difference to the higher benefits that Michigan offers. Beginning in the late 1990s, however, Michigan's cost per claim began to increase at a much higher rate than in other states. From 1997 to 2009 Michigan's average cost per no-fault claim rose by 252 percent. By 2009 the per-claim cost in Michigan was nearly four times as much as in the average no-fault state.

---

[9] See *Report on No-Fault Auto Insurance Reform in Michigan*, Senate Commerce and Technology Committee.

Exhibit 1



Source: Author's calculations using Fast Track Monitoring System.

Michigan's average cost per auto no-fault claim in 2010 was $35,446, an amount substantially greater than in any other no-fault state. Exhibit 2 shows that the second highest-cost no-fault state is New Jersey, where the average no-fault claim costs just over $16,000. All other no-fault states have average claim costs under $10,000, and about half of the no-fault states have claim costs averaging under $5,000. The state with the lowest average cost per no-fault claim is Massachusetts, at just over $1,800 per claim.

Exhibit 2



Source: Author's calculations using Fast Track Monitoring System.

The high and rising costs of no-fault injury claims in Michigan have proven to be a significant driver of auto insurance costs in the state. Exhibit 3 shows the trends in the average auto insurance loss costs per car in Michigan compared to the country as a whole, for the years 1997 through 2007. Because collision and comprehensive insurance are not required of drivers in most states, the graph compares losses excluding those costs. The comparison shows that while loss costs in the country as a whole were relatively stable over this time period, losses in Michigan increased substantially. In fact, average insured losses per car increased by 60 percent in Michigan during this ten year period, compared to an 8 percent increase countrywide.

**Exhibit 3**



Average Losses Per Car Excluding Collision and Comprehensive

Source: Author's calculations using data from NAIC.

Because the costs of claims are the major component of the cost of providing insurance, the high no-fault claim severity in Michigan increases the amounts that Michigan drivers must pay for insurance. Exhibit 4 provides comparisons of auto insurance premiums for Michigan and other states for the 1997 to 2007 time period. Insurance premiums in Michigan have increased more rapidly than those costs in other states, so that in recent years Michigan drivers are paying relatively more for automobile insurance than they did in the past. In 1997 the average annual

[7]

per car premium for automobile insurance in Michigan was $716, and Michigan had the 18th highest costs of automobile insurance in the nation. By 2007 the average premium in Michigan had risen to $934 per year, and the state had the 11th highest auto insurance costs in the country.[10] Between 1997 and 2007 average automobile insurance premiums increased by 13.7 percent nationwide. Premiums in Michigan rose by 30.5 percent over that same period, more than twice as fast as the national average. Nonetheless, average insurance premiums in Michigan grew only half as fast as average loss costs (shown in Exhibit 3), meaning that the premium increases are not due to higher insurer profit margins.

### Exhibit 4

| 1997 Average Premium | | | 2007 Average Premium | | | Percent Growth |
|---|---|---|---|---|---|---|
| Rank | State | Amount | Rank | State | Amount | |
| 1 | New Jersey | $1,127 | 1 | Louisiana | $1,119 | |
| 2 | Texas | $1,034 | 2 | New Jersey | $1,109 | |
| 3 | New York | $951 | 3 | Florida | $1,097 | |
| 4 | Florida | $919 | 4 | New York | $1,057 | |
| 18 | Michigan | $716 | 11 | Michigan | $934 | +30.5% |
| 47 | Maine | $473 | 47 | Nebraska | $558 | |
| 48 | Wyoming | $464 | 48 | South Dakota | $545 | |
| 49 | Iowa | $459 | 49 | North Dakota | $527 | |
| 50 | North Dakota | $432 | 50 | Iowa | $524 | |
| | US. Average | $679 | | U.S. Average | $772 | +13.7% |

Source: Author's calculations using data from NAIC.

Michigan drivers also pay much higher auto insurance premiums than drivers in other nearby states, as seen in Exhibit 5 on the next page. Compared to surrounding states, the next

---

[10] Michigan's auto insurance premiums were growing faster than the national average even before 1997. Michigan had the 22nd highest auto insurance premiums in the nation in 1987. Premiums in Michigan rose by 47.3 percent between 1987 and 1997, while the national average premium increase was only 32.1 percent during that period (based on the author's calculations using data from A.M. Best Co.). Previous analysis by Scott Harrington also finds that Michigan premiums grew more rapidly than the national average in the 1982 to 1987 time period ("Auto Insurance in Michigan: Regulation, No-fault, and Affordability," *Journal of Insurance Regulation*, 1991).

most expensive states are Illinois and Missouri, where premiums average about $735. This is nearly $200 (21 percent) per year less than premiums in Michigan. Premiums in other nearby states are even lower.

**Exhibit 5**



Source: Author's calculations using data from NAIC.

## Cost Growth in Michigan No-fault

What is causing the astronomical growth in Michigan auto no-fault costs? As in previous decades, healthcare cost inflation plays some role. Between 1997 and 2009 the medical care Consumer Price Index (CPI) increased by 60.1 percent, nearly twice as much as the 33.6 percent increase in the overall CPI. Nonetheless, by historical standards these rates of inflation are relatively low, and are nowhere near the 252 percent increase in no-fault claim severity seen in Michigan (Exhibit 1). Moreover, inflation cannot explain why Michigan's costs are growing faster than those in other states. Due to difficult economic conditions Michigan's wage rates and hospital expenditures have grown more slowly in recent years than the U.S. average. Michigan's traffic density has also grown more slowly, and the automobile fatality rate has fallen faster, than

[9]

the national average rates.[11] These trends should lead to lower relative growth in automobile injury costs in Michigan.

## Cost Growth in Catastrophic Claims

Much of Michigan's excessive no-fault cost growth is directly due to the costs of catastrophic injury claims. The provision of unlimited lifetime medical benefits for auto injuries means that some claims cost a very large amount and extend over a very long period of time. Catastrophic claims may involve injury to the brain and/or spinal cord, and result in serious and permanent disability. A person who is permanently disabled can require attendant or residential care for the remainder of their lifespan, in addition to medical care and rehabilitative services. The ultimate costs of such claims are difficult to predict and create a very risky exposure for insurers.

To help insurers reduce uncertainty associated with these claims, the Michigan Catastrophic Claims Association (MCCA) was created to act as a reinsurer for large no-fault claims. The MCCA is a private, nonprofit, unincorporated association created by the Michigan state legislature in 1978.[12] Every automobile insurer operating in the state is required to be a member. The MCCA reimburses insurers for the portion of each no-fault claim that exceeds a specified amount. Originally, insurers were required to pay the first $250,000 of every no-fault claim, and the MCCA reimbursed them for any additional payments. Beginning in 2002, the per-claim loss amount that insurers must retain has gradually increased. The current retention amount is $480,000, which means that insurers pay the first $480,000 of each claim and the MCCA

---

[11] Data on traffic density, wages, and hospital expenditures are from the U.S. Statistical Abstract, various years. Data on auto fatality rates is from the U.S. Department of Transportation Fatal Accident Reporting System (FARS).
[12] The MCCA was created by Public Act 136 of 1978, which added section 3104 to the Michigan Insurance Code. Its form and operations are governed by the enabling legislation Information. Information is taken from the MCCA 2010 *Annual Statement*, posted on the MCCA website http://www.michigancatastrophic.com.

reimburses them for payments above that amount. In July, 2011 insurers' retention limit will increase to $500,000, and will be raised every other year according to a pre-specified formula.[13]

The levels and time trends in MCCA reimbursements for 1981 to 2010 are shown in Exhibit 6. In 1991, the MCCA was paying about $100 million in reimbursements each year. The annual payment amounts doubled to $200 million per year by 1997, and doubled again within another five years. By 2010, annual reimbursements had grown eightfold and the MCCA now pays out around $800 million every year. Current MCCA projections suggest that reimbursements for catastrophic injuries will reach $1 billion *per year* by 2027.[14]

**Exhibit 6**



Source: Chart is taken directly from the MCCA website.

---

[13] Public Act 3 (2001) mandated the gradual increase in insurer retention limits beginning in 2002. By law, after 2011 insurers' retention limits will increase every two years by the lesser of six percent or the rate of increase in the Consumer Price Index.

[14] Data are reported on the MCCA website. The dramatic rise in MCCA claim payments over the last decade is reminiscent of the increasing severity of no-fault (PIP) injury claims seen in Exhibit 1. And, in fact, they are directly related. Of the PIP payments that insurers make to claimants each year, some are for accidents that occurred within the year but others are for accidents that occurred in previous years. For catastrophic injuries the payments extend over many years, and annual PIP payments by insurers increase each year as the numbers of long-term catastrophic injury claims accumulate. Although insurers must report all PIP payments made every year, they may report the occurrence of each PIP claim only one time, even if payments to the claimant extend over many years. Because the frequency of automobile accidents remains relatively stable over years, the number of new PIP claims received by insurers does not increase over time. As PIP claim payments increase each year due to the accumulation of old injury claims, this leads to the observed pattern of exponentially rising loss payments per PIP claim.

[11]

The rapid increase in payouts is due in part to medical cost inflation, but more importantly it is due to the accumulation of catastrophic losses. As noted above, claimants may receive benefits over a long span of years. By June, 2010, 25, 216 claims had been reported to the MCCA since its inception, and over one-half of these (12,801) remained open in 2010.[15] In addition, each year new claims are reported from accidents that occurred in prior years, as loss costs accumulate to reach the insurer's retention threshold. Of the 1,388 claims reported to the MCCA in 2010, less than one-third were for injuries from accidents that occurred in 2010; and nearly one-quarter were for injuries from accidents that occurred in 2005 or earlier.[16]

From its inception through June, 2010, the MCCA has paid out over $8 billion in reimbursements to insurers for losses to injured persons. This is a staggeringly high amount in relation to the number of claims it has received, suggesting an average cost per claim of nearly $320,000.[17] The size of the MCCA in relation to the total number and cost of no-fault losses in the state is also instructive. Throughout the state insurers receive upwards of 85,000 no-fault claims each year, amounting to around $2.5 billion in incurred losses. The MCCA receives only 1,100 to 1,300 claims each year, but incurs losses of over $1 billion per year. Comparing the MCCA to Michigan's auto insurance market as a whole thus reveals that catastrophic losses account for only for 1 to 2 percent of no-fault claims by number, but for over 45 percent of no-fault loss costs.[18]

---

[15] These figures are reported on the MCCA website.
[16] The exact figures are 29 percent from 2010 accidents and 24 percent from accidents in 2005 or prior. Data are based on the author's calculations from Schedule P of the MCCA 2010 *Annual Statement* to OFIR.
[17] The total payment amount is reported on the MCCA website. This amount is not adjusted for inflation. In current-year dollars total claim payouts and the average payout per claim would be even higher.
[18] MCCA claim and loss data are from the MCCA FY ending June 2008, reported in the MCCA's Annual Statement to OFIR. Total PIP losses for Michigan are from the NAIC 2007/2008 Auto Insurance Database Report. Total PIP claims for Michigan are estimated from 2007-2008 Fast Track data. Calendar year data for 2007 and 2008 are averaged to estimate fiscal year losses and claims.

Exhibit 7



Source: author's calculations from MCCA, NAIC and Fast Track data.

The costs of paying catastrophic claims contribute directly to higher auto insurance premiums for Michigan drivers. The MCCA is funded through assessments on automobile insurers, and these assessments are passed on to Michigan drivers as premium surcharges. Assessment amounts are determined annually by the MCCA based on actuarial estimates of claim costs, after taking into account inflation and investment returns and adding in administrative costs and amounts to recoup MCCA deficits or to refund MCCA surpluses.[19] In line with the growth in claim payments, annual assessments have grown over time.

Exhibit 8 displays the portion of the assessment attributable to loss costs, and the net amount assessed after taking into account MCCA deficits or surpluses, for the years 1979 through 2010.[20] In the early years MCCA assessment amounts were small -- under $20 per year per car. These grew rapidly to around $120 per car by the middle 1990s, and then declined due to rebates of MCCA surpluses to insurers. The MCCA currently runs a deficit, and to recoup the deficit the assessment amounts again exceed the amount needed for claim reimbursements.

---

[19] An audit of MCCA's financial statements is conducted annually by an independent public accounting firm. MCCA is required by statute to file an annual financial statement with OFIR.
[20] Net assessments are reported as charged, and the cost-based assessments are adjusted to a calendar year basis.

Exhibit 8



Source: author's calculations from data reported on MCCA website.

The MCCA assessment per car for fiscal year 2010-2011 is $143.09, and will rise to

$145.00 beginning July 1, 2011.[21] This amounts to nearly 20 percent of the average Michigan

auto insurance premium that is displayed in Exhibit 4,[22] and accounts for a substantial portion of

the difference between auto insurance premiums in Michigan and those in surrounding states.  It

also represents a substantial resource cost to the Michigan economy. With over six million cars

insured each year, MCCA assessments in total are over $850 million dollars for 2010-2011

alone. Exhibit 9 shows the per-car and total MCCA assessments for each of the last twelve years.

Assessment costs have grown substantially over time, and have exceeded $500 million per year

every year since 2004. Supporting the MCCA has added over $7.3 billion to Michigan auto

insurance premiums since 2000.

---

[21] MCCA Press Release, March 25, 2011. *www.michigancatastrophic.com*
[22] The FY 2007 MCCA assessment of $137.33 per car is 14.7 percent of the 2007 annual average premium
displayed in Figure 4.

**Exhibit 9**

| Fiscal Year | Per Car MCCA Assessment | Total Cost to Michigan Drivers |
|---|---|---|
| 2011[a] | $143.09 | $889,851,669 |
| 2010[a] | $124.89 | $776,669,054 |
| 2009[a] | $104.58 | $650,364,719 |
| 2008[a] | $123.15 | $765,848,299 |
| 2007 | $137.33 | $863,312,891 |
| 2006 | $141.70 | $898,004,691 |
| 2005 | $127.24 | $805,010,771 |
| 2004 | $100.20 | $639,415,128 |
| 2003 | $69.00 | $442,974,894 |
| 2002[b] | $78.36 | $505,703,327 |
| 2001[c] | $10.01 | $64,665,006 |
| 2000[d] | $5.60 | $35,915,975 |

Source: MCCA website.

*Cost Growth in Non-Catastrophic Claims*

Catastrophic claims are not the only cost drivers in Michigan auto no-fault. Certain non-catastrophic no-fault claims are also growing at an abnormally high rate. Michigan's Assigned Claims Facility (MACF) provides no-fault benefits to persons injured by an uninsured Michigan driver, if they have no insurance of their own.[23] Exhibit 10 shows that MACF expenditures of $157 million in 2010 – while small in comparison to those of the MCCA – are nearly 10 times what they were in 1991 ($16 million). MACF expenditures are also assessed to Michigan's insurers and can be passed on to insured drivers. Since 2000, the costs of supporting the MACF have added $1.1 billion to Michigan auto insurance premiums.

---

[23] The Michigan Assigned Claims Fund (MACF) is administered by the Michigan Secretary of State (SOS). Data and information on MACF are obtained from the SOS website http://www.michigan.gov/sos.

[15]

Exhibit 10



Source: MACF

*Excessive Claim Costs*

High benefit levels may not be the sole reason for the high insurance costs in Michigan. Cost levels may be higher than warranted due to incentive problems created by the no-fault system. Specifically, the combination of unlimited lifetime benefits for medical, rehabilitative, and long-term-care; generous wage-replacement benefits, few cost controls, and society-wide cost-sharing, provide strong inducements for spending and weak inducements for thrift.

Unlimited lifetime medical benefits mean that care-providers and care-recipients have no intrinsic motivation to hold down the costs of care. With no reason to consider costs in medical decisions, even small gains to a patient's health or wellbeing from more expensive tests, treatments, procedures, or facilities may lead to decisions in their favor. Generous wage replacement benefits may also make it more likely that injured persons take time off from work and take more days off from work. These kinds of incentive problems, known as *moral hazard*,

[16]

have been shown to be important in many different studies of insurance markets.[24] Moral hazard causes the costs of insurance claims to increase disproportionately in response to higher insurance benefits.

Excessive costs may also arise from the deliberate overuse of benefits or from the filing of fraudulent or exaggerated claims. Because no-fault claims do not face the scrutiny of the legal system, and because no-fault states have placed a priority on paying benefits quickly, exaggeration and fraud have become a problem in many no-fault states. In studies of no-fault states it has been found that typical patterns of fraud involve hard-to-verify injuries, and large numbers of visits to providers of alternative medical therapies.[25] In Michigan, the generosity of benefits for lifetime-care – including residential or custodial support – of persons with catastrophic injuries may provide an attractive target for fraudulent claims.

Catastrophic losses reinsured through the MCCA may be especially prone to excessive costs, because the costs of these claims are spread across Michigan's driving population. This weakens insurers' incentives to control the costs of claims that exceed their retention level or that are ultimately expected to exceed their retention level. The MCCA's role is to reinsure losses; claims management responsibility remains with individual insurers even though the financial responsibility for loss above a specified threshold is transferred to the MCCA.

Long-term care is an important driver of the costs of catastrophic claims in Michigan. Statistics reported by the MCCA show that fully 69 percent of its projected claim costs are associated with attendant and residential care of claimants (26 percent for residential care, 28

---

[24] See, e.g., G. Dionne and P. St-Michel (1991), Workers Compensation and Moral Hazard, *Review of Economics and Statistics* 73,236-244; J.D. Cummins and S. Tennyson (1996), Moral Hazard in Insurance Claiming: Evidence from Automobile Insurance, *Journal of Risk and Uncertainty* 12, 29-50.

[25] See e.g., S. Carroll and A. Abrahamse (2001), The Frequency of Excess Auto Personal Injury Claims, *American Law and Economics Review* 3, 228-249.

[17]

percent for attendant care by families, and 15 percent for attendant care by agencies).[26]  A large

proportion of these claims are for brain injuries. Exhibit 11 shows the distribution of MCCA

claims by injury category. Nearly 48 percent of claims reported to the facility are for brain

injuries; 7.1 percent of claims are for major paralysis (paraplegia or quadriplegia); 0.5 percent of

claims are for burns; and the remaining 44.5 percent are for other kinds of injuries.

### Exhibit 11



Source: MCCA website.

Traumatic brain injuries are a major public health problem, and automobile accidents are

an important cause of these injuries.[27] However, severity varies widely (ranging from concussion

to fatality) and impairment of brain function may be temporary or permanent.[28] Diagnosis is

challenging because symptoms are common to many other medical problems, and may occur

days or even months after the injury is sustained. The Centers for Disease Control (CDC) notes

---

[26] Data are reported on the MCCA website.

[27] Automobile accidents account for an estimated 17.3 percent of all such injuries. Statistics accessed at
http://www.cdc.gov/traumaticbraininjury/tbi_ed.html, based on M. Faul et al., (2010), *Traumatic Brain Injury in the
United States: Emergency Department Visits, Hospitalizations and Deaths 2002 – 2006*, Atlanta (GA): Centers for
Disease Control and Prevention, National Center for Injury Prevention and Control.

[28] The CDC estimates that 81 percent of these injuries require no hospitalization; 16 percent require hospitalization;
and 3 percent result in fatality.  See Centers for Disease Control and Prevention. *Heads up: Facts for Physicians
about Mild Traumatic Brain Injury (MTBI)*. http://www.cdc.gov/ncipc/pub-res/tbi_toolkit/physicians/mtbi/mtbi.pdf.

[18]

that there are currently no standards for treatment and management of these injuries.[29] These characteristics place brain injuries in the category of injuries that are hard for insurers to verify. Moreover, residential and assisted care is a major expense associated with brain injuries, and the extent and duration of needed care is difficult to verify.

Comparing the characteristics of automobile injury claims in Michigan to those in other states suggests that the number of brain injuries claimed in Michigan may be unusually high. Comparisons are made using the Insurance Research Council's (IRC) closed claim database from 2007, which contains a sample of 42,038 automobile injury claims from around the country (of which 634 are from Michigan).[30] In this database there are 10 claims for brain injuries in Michigan (occurring in 1.6 percent of claims) but only 80 such injuries in all other states combined (occurring in 0.2 percent of claims), which means that the relative rate of brain injuries reported in Michigan is *eight times* that in the rest of the country. In other states the prevalence of brain injuries is only about twice as prevalent as paralysis (0.1 percent), while in Michigan brain injuries are much more prevalent than paralysis (of which there are no occurrences).

Of course, the sample of IRC claims from Michigan is small which means that there is a greater chance that the claim patterns seen in this sample are not representative. Exhibit 12 provides a more complete comparison of the rates of serious injuries reported in Michigan versus other states in the IRC database. The exhibit shows that -- with the exception of paralysis and loss of a body part -- all categories of serious injuries are relatively more prevalent in Michigan than in other states. However, brain injuries stand out as by far the highest in relative terms.

---

[29] *Heads up: Facts for Physicians about Mild Traumatic Brain Injury (MTBI)*, http://www.cdc.gov/ncipc/pub-res/tbi_toolkit/physicians/mtbi/mtbi.pdf.
[30] A description of the database can be found at http://www.ircweb.org/IRCProducts/Databases.htm.

[19]

**Exhibit 12**

| Injury Rates in Auto Claims for 2007 | | | |
|---|---|---|---|
| Injury | Michigan | Other States | Michigan/ Other |
| Brain injury | 1.60% | 0.20% | 8.00 |
| Organ injury | 4.10% | 1.00% | 4.10 |
| Major fracture | 9.60% | 2.50% | 3.84 |
| Scarring | 3.30% | 1.10% | 3.00 |
| Concussion | 6.00% | 3.40% | 1.76 |
| Loss of body part | 0.05% | 0.16% | 0.31 |
| Paralysis | 0.00% | 0.10% | 0.00 |

Source: author's calculations from IRC closed claim database, 2007.

## Reducing the Cost of No-fault

Michigan's no-fault system socializes the costs of catastrophic auto-related injuries through the annual MCCA assessments to insurers who in turn incorporate these costs into the premiums charged to Michigan's drivers. This feature differs from the no-fault insurance systems in other states, which provide more limited no-fault benefits funded through private premium payments. Like other social insurance programs, Michigan auto no-fault is experiencing exceptionally high cost inflation. Cost growth reflects the accumulation of long-term injury claims and growth in the average cost per claim. Available data are not sufficiently detailed to determine whether the costs of these claims are warranted and whether the patterns of claiming reflect moral hazard or fraud.

Nonetheless it is well known that private incentives for cost control are inherently weak in socially provided insurance systems. This is because no one involved in care or payment decisions -- not the care beneficiary or care provider, nor the insurer or reinsurer of claims -- bears the full cost of the claims. In recognition of this problem most social insurance programs contain strict benefit limits and cost controls. Such limits and controls are not generally present in Michigan's auto no-fault. Although wage and service benefits are subject to maximum

[20]

reimbursement rates, medical and residential care expenses have no lifetime limits and medical reimbursement rates are uncapped. Fee schedules for medical services and reviews of service utilization are important components of cost controls in social insurance programs, and should be incorporated into Michigan no-fault.

Lack of private profit incentives may also lead to higher amounts of fraud in socialized insurance programs, and this means that strong fraud detection and enforcement processes are important for such programs. These fraud control systems are not present in Michigan auto no-fault. It would be extremely desirable to undertake rigorous analysis of claim patterns and claim costs, particularly of claims in the MCCA, to identify the extent (if any) of costs excesses. More generally, establishing a centralized and professionally staffed Insurance Fraud Bureau – as has been done in many other states – would help to detect, deter, and control the costs of fraud.

The simplest no-fault reform that would have the largest effect in reducing costs is establishment of a no-fault benefit limit. This would directly lower the costs of catastrophic claims, and may yield indirect cost-reduction benefits by reducing moral hazard. With some upper limit on benefits, care recipients and care providers will have incentives to limit expenditures to avoid exceeding the benefit maximum. Placing limits on benefits may also reduce incentives for fraudulent claiming.

Limited no-fault benefits will have little impact on the benefits received by the large majority of claimants. Catastrophic claims in the MCCA account for a disproportionate amount of the costs of no-fault and unlimited lifetime benefits burden the auto insurance system with the highest-cost cases. Over two-thirds of the projected costs of claims in the MCCA are for residential and attendant care. These costs are borne entirely by Michigan drivers. Opportunities

[21]

for cost-sharing with federal insurance programs such as Medicare and Medicaid could be leveraged if no-fault benefits were subject to a maximum limit.[31]

In addition to placing upper limits on no-fault benefits, a minimum required benefit level should be established and consumers should be allowed to choose whether to purchase benefits amounts beyond the minimum. Providing unlimited no-fault benefits to all drivers requires all drivers to purchase this level of benefits. This means that some drivers pay for benefits that they do not value, leading to higher insurance premiums and directing spending away from other goods and services in the economy. Mandating purchase of a finite, minimum no-fault benefit will redirect spending to more highly valued uses for some, while still allowing purchase of greater coverage amounts by those who desire them.

Despite the benefits of allowing consumer choice, the opportunity to purchase unlimited no-fault medical benefits should be eliminated. This would facilitate a more limited role for the MCCA reinsurance facility, and possibly its eventual elimination. As argued previously, reinsuring losses through the MCCA is an inefficient way to fund claims due to the weakened incentive to control the cost of claims that exceed, or are expected to exceed, the retention level. If insurers are forced to retain payment responsibility for claims, they will have stronger incentives to manage claim costs effectively. The MCCA was founded due to the difficulties insurers faced in obtaining private reinsurance for unlimited loss liabilities. Private reinsurance will be easier to obtain if a benefit limit is specified, even if that limit is extremely high.

## Conclusion

Michigan's no-fault auto system provides unlimited lifetime medical benefits for auto-related injuries, reducing financial distress due to injury and reducing worry and fear among all

---

[31] Nationwide, Medicare and Medicaid pay for nearly two-thirds of long-term care costs (T. Ng, C. Harrington, and M. Kichener (2010), Medicaid and Medicare in Long Term Care, *Health Affairs* 29, 21-28.)

[22]

citizens. But the central features of the system also contain the seeds of its spiraling cost growth: unlimited, lifetime benefits burden the auto insurance system with the highest-cost cases, and socialized insurance costs diminish private incentives to hold down costs.

The most effective way to achieve cost reductions in auto no-fault is to place upper limits on no-fault benefits, and allow consumers to choose the amount of benefits beyond a minimum requirement. This change would enhance economic efficiency by allowing consumer choice, reducing moral hazard and fraud, and reducing uncertainty for insurers. However, this change will reduce only the costs of future claims; it does not address the burgeoning costs of catastrophic claims already incurred. More effective claims management solutions are required to address this problem, and should include cost controls for medical and long-term care services, and coordinated responses to claims fraud. Important cost controls comprise medical fee schedules and monitoring of service utilization.

Monitoring and cost controls have been and will no-doubt continue to be controversial. However, when claim costs are socialized by being spread across the entire driving population, government has a special responsibility to hold down those costs and to control waste, fraud, and abuse. In other jurisdictions this has been accomplished efficiently through the use of strict benefit levels, cost controls, and coordinated fraud fighting efforts.

[23]