**<u>EXHIBIT 6F – WATERFRONT OFFER TO PURCHASE</u>**

## PURCHASE AGREEMENT

**BY AND BETWEEN**

**CITY OF DETROIT**

**and**

**WATERFRONT TERMINAL HOLDINGS II, LLC**

**(Waterfront Project)**

**Date: _____, 2015**

# TABLE OF CONTENTS

RECITALS ........................................................................................................... 1
ARTICLE 1. DEFINITIONS ............................................................................. 1
    1.01 - "Agreement" ....................................................................................... 1
    1.02 - "Associate" .......................................................................................... 2
    1.03 - "Closing" ............................................................................................. 2
    1.04 - "Deed" ................................................................................................. 2
    1.05 - "Effective Date" ................................................................................. 2
    1.06 - "Encumbrance" .................................................................................. 2
    1.07 - "Event of Default" and "Default" ..................................................... 2
    1.08 - "Property" ........................................................................................... 2
ARTICLE 2. SALE / COMPENSATION ........................................................ 2
    2.01 - Purchase Price ................................................................................... 2
ARTICLE 3. TITLE INSURANCE/DEED ...................................................... 2
    3.01 - Title Insurance/Survey ...................................................................... 2
    3.02 - Title/Deed .......................................................................................... 3
ARTICLE 4. TAXES AND ASSESSMENTS .................................................. 3
    4.01 - Property on Tax Rolls at Closing ...................................................... 3
    4.02 - Property Not on Tax Rolls at Closing ............................................... 3
ARTICLE 5. REPRESENTATION AND WARRANTIES ............................. 4
    5.01 - Inducement ......................................................................................... 4
    5.01 - Survival ............................................................................................... 5
ARTICLE 6. TESTS AND SURVEYANCE; CONDITION OF PROPERTY .... 5
    6.01 - Surveying and Testing ....................................................................... 5
    6.02 - Condition of Property; Inspection Period .......................................... 6
    6.03 - Release of City from Liability ........................................................... 6
    6.04 - Section 16 of NREPA ........................................................................ 7
ARTICLE 7. CLOSING .................................................................................... 7
    7.01 - Time and Place of Closing ................................................................. 7
    7.02 - Conditions to Closing ........................................................................ 7
    7.03 - Delivery of Deed and Possession ...................................................... 8
    7.04 - Payment of Expenses ........................................................................ 8
    7.05 - City's Failure to Convey ................................................................... 8
ARTICLE 8. DEFAULTS AND EVENTS OF DEFAULT ............................ 8
    8.01 - Default by Purchaser ......................................................................... 8
    8.02 - Failure to Cure Default ...................................................................... 9
    8.03 - Default by the City ............................................................................ 9
ARTICLE 9. REMEDIES ................................................................................. 9
    9.01 - Remedies Cumulative ....................................................................... 9
    9.02 - Reimbursement of Costs ................................................................... 9
ARTICLE 10. RESTRICTION UPON SPECULATION AND ASSIGNMENT .... 10
    10.01 - No Speculation ............................................................................... 10
    10.02 - Prior Approval of Assignment ....................................................... 10
    10.03 - Consideration for Assignment ........................................................ 10
ARTICLE 11. INDEMNITY ............................................................................ 10
    11.01 - Purchaser Indemnification .............................................................. 10
    11.02 - Defense of Claims .......................................................................... 10

i

11.03 - Non-Liability of the City ........................................................................... 10
11.04 - Hazardous Materials .................................................................................. 11
**ARTICLE 12. AMENDMENTS** ............................................................................ **12**
12.01 - Form.............................................................................................................. 12
12.02 - Binding Effect............................................................................................... 13
**ARTICLE 13. NOTICES** ........................................................................................ **13**
13.01 - Addresses ..................................................................................................... 13
13.02 - Date of Notice .............................................................................................. 13
**ARTICLE 14. SALE / COMPENSATION**............................................................. **14**
14.01 - Severability .................................................................................................. 14
14.02 - Entire Agreement ......................................................................................... 14
14.03 - Terminology ................................................................................................. 14
14.04 - Covenants and Conditions ........................................................................... 14
14.05 - Captions ....................................................................................................... 14
14.06 - Cumulative Remedies; Jurisdiction; Venue ................................................ 14
14.07 - Force Majeure .............................................................................................. 14
14.08 - Provisions Not Merged With Deed ............................................................. 15
14.09 - Counterparts................................................................................................. 15
14.10 - Singular and Plural, etc................................................................................ 15
14.11 - Time of the Essence ..................................................................................... 15
14.12 - Authority of City .......................................................................................... 15
**EXHIBIT A**............................................................................................................. **17**
**EXHIBIT B**............................................................................................................. **18**
**EXHIBIT C**............................................................................................................. **19**
**EXHIBIT D**............................................................................................................. **21**
**Schedule I**.............................................................................................................. **25**

ii

PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** ("Agreement") is entered into as of _____, 2015, by and between the **CITY OF DETROIT**, a Michigan public body corporate, acting by and through its Planning and Development Department, whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, referred to herein as the **"City"**, and **WATERFRONT TERMINAL HOLDINGS II, LLC**, a Michigan limited liability company, whose address is 5431 West Jefferson Avenue, Detroit, Michigan 48209, referred to herein as **"Purchaser."**

RECITALS:

A.      Purchaser has offered to purchase land located in the City of Detroit, the legal description of which is set forth on **Exhibit A** attached hereto and incorporated by reference, in accordance with the terms, covenants, and conditions of this Agreement.

B.      Purchaser's planned project for the Property includes the goals set forth on **Exhibit B** attached to this Agreement.

C.      The City believes that the sale of the Property pursuant to this Agreement and the fulfillment generally of this Agreement are in the best interests of the City and the health, safety and welfare of its residents.

In consideration of the foregoing recitals and the mutual obligations of the parties hereto, each of them does hereby covenant and agree with the other as follows:

## ARTICLE 1. DEFINITIONS

The following words and expressions shall, wherever they appear in this Agreement, be construed as follows:

1.01  **"Agreement"** shall mean this Agreement and the following Exhibits and Schedules attached hereto and expressly made a part hereof:

| | |
|---|---|
| Exhibit A | Description of Property |
| Exhibit B | Project Goals |
| Exhibit C | Quit Claim Deed |
| Exhibit D | Right of Entry Letter |
| Schedule I | Certificate of Authority for Waterfront Terminal Holdings II, LLC |

1.02 **"Associate"** shall mean any consultant, contractor, subcontractor, or any other party engaged by Purchaser and the agents and employees of said parties engaged by Purchaser to undertake any of the activities associated with this Agreement.

1.03 **"Closing"** shall mean a date agreed upon by the parties hereto for the transfer of title to the Property, but in no event shall said date be more than ninety (90) days from the Effective Date of this Agreement.

1.04 **"Deed"** shall mean the Quit Claim Deed conveying the Property to Purchaser by the City in substantially the form as attached hereto as **Exhibit C**.

1.05 **"Effective Date"** shall have the meaning set forth in Section 14.12 of this Agreement.

1.06 **"Encumbrance"** shall mean any covenant, license, right of way, easement, limitation, condition, reservation, restriction, right or option, mortgage, pledge, lien, construction lien, mechanic's lien, charge, conditional sale or other title retention agreement or arrangement, encumbrance, lease, sublease, security interest, or trust interest.

1.07 **"Event of Default"** and **"Default"** shall have the meanings as set forth in Article 8 of this Agreement.

1.08 **"Property"** shall mean that parcel of land identified by as a part of the Revere Copper and Brass Site and located in the City of Detroit, as more particularly described in Exhibit A attached hereto and made a part hereof.

## ARTICLE 2. SALE / COMPENSATION

2.01 <u>Purchase Price</u>. Subject to the terms, covenants, and conditions of this Agreement, Purchaser agrees to purchase, and the City agrees to convey, the Property for Seven Hundred Thirty-Five Thousand Dollars ($735,000.00) ("Purchase Price"), to be paid in immediately available funds by wire transfer, or certified or cashier's check simultaneously with the delivery of the Deed.

## ARTICLE 3. TITLE INSURANCE/DEED

3.01 <u>Title Insurance/Survey</u>.

a. <u>Commitment</u>. Within five (5) business days following the Effective Date, Purchaser shall order a commitment for an owner's title insurance policy for the Property showing all matters affecting record title to the Property, subject to the terms, covenants, and conditions of this Agreement and standard exceptions, together with copies of all instruments described in Schedule B thereof (the **"Title Commitment"**). The Title Commitment will be in the amount of the Purchase Price and will be issued by eTitle Agency, with offices at 1650 West Big Beaver Road, Troy, Michigan 48084. A copy of the Title Commitment will be provided to the City promptly upon Purchaser's receipt.

b. <u>Survey</u>.  Within thirty (30) days following the Effective Date, Purchaser shall obtain a current survey of the Property (the "Survey") from a registered land surveyor.  The legal description of the Property set forth in the Title Commitment shall conform exactly to the legal descriptions in the Survey and the Survey shall contain such detail from the ALTA/ASCM Schedule A Table as Purchaser deems required.  The Survey will be certified to the City, Purchaser, and others designated by Purchaser, and a copy will be provided to the City immediately upon Purchaser's receipt.

c. <u>Title Objections</u>.  Purchaser shall have the right, until ten (10) days following receipt of the Title Commitment and the Survey (the "Review Period"), to identify in writing those matters and/or title encumbrances identified in the Title Commitment or Survey that are unacceptable to it, in which event the City shall have reasonable opportunity (but not the obligation) to cure or remove such matters (if any) and to satisfy any other requirements set forth therein.  The items contained in the Commitment or the Survey to which Purchaser does not object during the Review Period shall be deemed permitted exceptions (the "Permitted Exceptions").  The City's failure or inability to, within twenty (20) days after receipt of notification of such objections (the "Cure Period"), cure such objections, or conscious decision not to do so, communicated in writing to Purchaser within the Cure Period, shall give Purchaser the right to terminate this Agreement and be relieved of all further obligation to perform hereunder upon notice to the City .

d. <u>Policy</u>.  The City **WILL NOT** order or pay the premium for an owner's policy of title insurance, nor will the City provide any estoppel or seller's certificate to the Purchaser or the title insurance company.  Any title insurance policy insuring Purchaser's title to the Property, whether an owner's or mortgage policy, with or without standard exceptions, will be at Purchaser's expense.

3.02   <u>Title/Deed</u>.

a. <u>Conveyance</u>.  At the Closing, if Purchaser has materially complied with all of those terms and conditions precedent to Closing as specified hereunder, the City will deliver the Deed to the Property to Purchaser.

b. <u>Title conveyed</u>.  Such conveyance and title shall fee simple, and shall, in addition to the conditions and covenants hereinafter provided for, be subject to existing easements and restrictions of record, all applicable zoning and building laws, and other encumbrances (if any) specifically referred to in <u>Exhibit A</u>.  Purchaser acknowledges that the City has not made, and by execution of this Agreement or any Deed does not make, any representations or warranties whatsoever with respect to title to the Property.

## ARTICLE 4. TAXES AND ASSESSMENTS

4.01   <u>Property on Tax Rolls at Closing</u>.  In the event that the Property is on the tax rolls at the date of Closing, all taxes and assessments which have become a lien upon the Property at the date of Closing shall be paid by the City provided that current City and County taxes shall be prorated and adjusted to the date of Closing on a due date basis.

4.02   <u>Property Not on Tax Rolls at Closing</u>.  In the event that the Property is not on the tax rolls at the date of Closing, Purchaser agrees to pay to the City at Closing an amount equal to the City of

Detroit ad valorem taxes (including debt service but not including any ad valorem taxes which would have been collected by the City on behalf of another governmental body, whether the State, County or any other body or for any other millage) which would have been levied had the Property been on the tax rolls, prorated from the date of Closing to the dates when the next tax bills are issued after the date the Property is placed back on the tax rolls, and the Property will be placed back on the tax rolls as of December 31 of the year in which the Closing takes place. For example, if the date of Closing is on or before December 31, 2015, the Property would be placed back on the tax rolls effective December 31, 2015, the next tax bills issued would be July 1, 2016 for the summer taxes and December 1, 2016 for the winter taxes and the payment for taxes would be pro-rated to June 30, 2016 and November 30, 2016, respectively. If the date of Closing takes place on or after January 1, 2016, the Property will not be placed on the tax rolls until December 31, 2016, and tax bills will not be issued until July 1 and December 1, 2017 and, in that case, the payment for taxes would be prorated to June 30 and November 30, 2017.

## ARTICLE 5. REPRESENTATION AND WARRANTIES

5.01 <u>Inducement</u>. In order to induce the City to enter into this Agreement, Purchaser represents and warrants to the City that:

     a. <u>Organization and Qualification</u>. It is a duly organized limited liability company, validly existing and in good standing under the laws of the State of Michigan, and has full power and authority to carry on its business as it is now being conducted.

     b. <u>Power to Make Agreement</u>. It has the power to make, deliver and perform this Agreement and finance the Improvements in accordance with the terms and conditions of this Agreement and has taken all necessary action to authorize the foregoing and to authorize the execution, delivery and performance of this Agreement.

     c. <u>Lack of Legal Impediments</u>. To the best of its knowledge, the execution, delivery and performance of this Agreement will not violate any provision of any existing law, regulation, order or decree of any court or governmental entity, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement, or any provision of Purchaser's organizational documents (*e.g.*, charter, articles of incorporation, articles of organization, partnership agreement, bylaws or operating agreement) and will not violate any provision of, or constitute a default under, any agreement or contract to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement. Purchaser has paid all income, personal and property taxes, and inspection or license fees heretofore due, payable, and owing to the City. Developer is not in default to the City

     d. <u>Legal Operation</u>. It is, to the best of its knowledge, in compliance with all existing laws and regulations applicable to it, the violation of which would or could materially adversely affect its ability to fulfill its obligations under this Agreement.

     e. <u>Litigation</u>. As of the date of this Agreement, no litigation or administrative proceeding of or before any court or administrative body is presently pending, nor, to its knowledge, is

any such litigation or proceeding presently threatened, against it or any of its property, that, if adversely determined, would or could materially affect its ability to fulfill its obligations under this Agreement.

f. Other Information. To the best of its knowledge, all other written information, reports, papers, and data given to the City by Purchaser with respect to Purchaser are accurate and correct in all material respects and substantially complete insofar as completeness may be necessary to give the City a true and accurate knowledge of the subject matter and all projections of future results are, in its opinion, reasonable.

g. Other Agreements. To the best of its knowledge, it is not a party to any agreement or instrument materially and adversely affecting its present or proposed business, properties or assets, operation or condition, financial or otherwise, not disclosed to the City in writing, the existence of which would or could materially affect its ability to fulfill its obligations under this Agreement; and it is not in default in the performance, observance, or fulfillment of any of the material obligations, covenants, or conditions set forth in any agreement or instrument to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement.

h. Brokerage and Finder's Fees and Commissions. Purchaser has not engaged any broker, finder or agent with respect to the transactions contemplated by this Agreement. Purchaser shall indemnify and hold the City harmless from and against claims for brokerage in connection with this transaction by any person or party claiming by, through or under Purchaser.

5.02 Survival. All of the representations and warranties contained in this Article 5 or pursuant hereto shall survive the delivery of the Deed and shall remain in full force and effect for a period of six (6) months following the date of Closing. Purchaser shall indemnify and hold the City harmless from and against, and shall be obligated to pay and reimburse the City for, any and all out-of-pocket expenses (including reasonable attorneys' fees, whether inside or outside counsel) which the City may sustain or incur as a result of any misrepresentation or breach of warranty on the part of Purchaser due to the City's reliance thereon. The "best of Purchaser's knowledge" is based on Purchaser's actual knowledge and is without any duty to investigate. Purchaser shall have no liability for a breach of any representation or warranty in the event that Purchaser gives written notice to the City prior to Closing that such representation or warranty was inaccurate or any document or report furnished to or obtained by the City, its agents, employees or contractors in connection with this Agreement shall have disclosed that such representation or warranty was inaccurate prior to Closing.

## ARTICLE 6. TESTS AND SURVEYANCE; CONDITION OF PROPERTY

6.01 Surveying and Testing. The City will, prior to the transfer of title, authorize Purchaser through and in accordance with a fully executed Right-of-Entry, to make soil boring and bearing tests and undertake such surveying and environmental and other due diligence activities as Purchaser deems appropriate, provided such does not interfere with the City's use, if any, and subject to the Purchaser's compliance with the requirements of this Article 6 and elsewhere in this Agreement. All such testing shall be done at Purchaser's risk and expense. Subject to the terms of the aforementioned Right of Entry, Purchaser shall give prior notice to the City to inspect and investigate the condition of the Property, including its environmental condition and shall conduct such inspection and investigation as Purchaser desires during normal business hours. Prior to entering onto the Property for such purposes,

Purchaser shall (i) request authorization from the Building, Safety, Engineering and Environmental Department and provide details of the intended activities and other documentation deemed necessary by the City, (ii) obtain a Right-of-Entry letter from City, (iii) execute said letter, and (iv) comply with all conditions and requirements stated therein. Purchaser shall use all reasonable efforts to minimize damage to the Property in connection with such entry and shall fully restore the Property to the condition existing prior to such entry. Purchaser shall indemnify, defend and hold the City harmless from and against, any and all loss, cost, liability and expense, including reasonable attorneys' fees and litigation costs, suffered or incurred by the City as a result of the Purchaser's activities in accordance with the Right-of-Entry. Purchaser shall submit to the City a copy of each survey or report generated as a result of such activities.

    6.02   <u>Condition of Property; Inspection Period.</u>

        a. Purchaser takes the Property as it finds it, **"AS IS"**, and the City makes no implied or express representations or warranties as to its fitness for absolutely any purpose whatsoever. By executing this Agreement, Purchaser acknowledges that it is satisfied with the condition of the Property, subject only to inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above. If, within ninety (90) days of the Effective Date, Purchaser fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based upon the results of such tests, investigations or surveys, or fails to deliver copies of any and all reports of such tests, investigations and/or surveys to the City, Purchaser shall be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

        b. In order to facilitate Purchaser's investigation of the Property, within ten (10) business days of the Effective Date hereof, the City shall deliver copies of any existing (i) environmental site assessments, reports, notices or correspondence from environmental regulatory authorities or citations, (ii) lease agreements, lease modifications, or third-party property/occupancy rights, if any (iii) notices or other correspondence that has been received from any governmental agency regarding the condition of the Property or pending government actions, (iv) land surveys, and (v) soil reports (collectively, the "Due Diligence Materials"), provided the same are in the City's possession or control.

        c. In the event Purchaser determines, based on its inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above that it does not wish to proceed with the purchase of the Property, Purchaser shall have the right for any reason whatsoever in its sole discretion, prior to the ninety-first (91st) day following the Effective Date, to terminate this Agreement by delivery of a written notice to the City (the "Notice of Termination"). Upon timely delivery by Purchaser of the Notice of Termination, this Agreement shall terminate without liability of Purchaser.

    6.03   <u>Release of City from Liability.</u> Purchaser hereby releases the City and its officials, employees, and agents (but not any third party) from any and all liability for any defects in or conditions of the Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, or conditions currently existing thereon, including but not limited to conditions described in Section 11.04, but subject to Section 11.04.

6.04    <u>Section 16 of NREPA</u>. Pursuant to the requirements of Section 16 of Part 201 of NREPA, MCL 324.20116, Purchaser agrees that the City has notified Purchaser that the Property is a "facility" as that term is defined in Part 201 of NREPA. The general nature and extent of any land or resource restrictions or any release at or from the facility that is known to the City is more fully described in certain reports, copies of which have been provided to Purchaser. By its execution of this Agreement, Purchaser acknowledges receipt of the following reports:

**Insert list of documents, if any, identified by DEA: NONE.**

## ARTICLE 7. CLOSING

7.01    <u>Time and Place of Closing</u>. The City will notify Purchaser of the prospective closing date not less than ten (10) calendar days prior to the Closing, unless otherwise agreed between the parties. The Closing shall occur within thirty (30) days after satisfaction of the conditions to closing as specified in Section 7.02 of this Agreement. The Closing shall take place at the office of the City's Planning & Development Department, or such other location in downtown Detroit designated by the City. If the conditions to closing specified in Section 7.02 of this Agreement have not been satisfied or waived by June 1, 2015, either party may, thereafter, terminate this Agreement without further liability.

7.02    <u>Conditions to Closing</u>.

a.    <u>City's Obligations to Close</u>. The obligation of the City to effect a Closing hereunder shall be subject to receipt of a resolution(s) by the Detroit City Council authorizing the transaction and fulfillment of all conditions contained therein, and fulfillment by Purchaser of each of the following conditions precedent:

(i)    <u>Accuracy of Representations and Warranties</u>. All representations and warranties of Purchaser set forth in Section 5.01 of this Agreement shall be true and correct as of the date of Closing as if made on that date.

(ii)    <u>Resolution of Purchaser's Authority</u>. Purchaser shall furnish to the City a certified copy of a resolution satisfactory to the City in form and substance, duly adopted by the Board of Directors or Members of Purchaser, or an authorized vote of the partners or joint venturers, authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder. Purchaser shall also furnish to the City an incumbency certificate, executed by the corporate secretary or proper manager of Purchaser, identifying the officers or managers of Purchaser.

(iii)    <u>Payment of Purchase Price and Closing Costs</u>. Purchaser shall have tendered payment of the Purchase Price and the closing costs payable by Purchaser.

(iv)    <u>No Default</u>. There shall be no existing Default by Purchaser under this Agreement.

b.    <u>Purchaser's Obligations to Close</u>. The obligation of Purchaser to effect a Closing hereunder shall be subject to the fulfillment by the City of each of the following conditions precedent:

(i) Title. Title to the Property shall be in the form required by this Agreement.

(ii) City Council and Other Approval. The City shall furnish to Purchaser a resolution(s) by the Detroit City Council authorizing the transaction and all conditions contained therein shall be fulfilled.

(iii) Acceptable Condition of Property. The physical and environmental condition of the Property and the results of Purchaser's other investigations shall be acceptable to Purchaser, pursuant to Article 6.

7.03    Delivery of Deed and Possession. The City will deliver the Deed to the Property and the possession thereof to Purchaser at the Closing provided that Purchaser has complied with all conditions precedent as specified herein. Purchaser shall be responsible for recording the Deed and paying all recording costs (including the cost of the documentary stamp tax on the Deed, if any).

7.04    Payment of Expenses. Purchaser shall pay all costs, fees, and out of pocket expenses of whatsoever kind or nature related to the procurement of services of Associates and contractors, etc. which have been incurred pursuant to the making of this Agreement and shall hold the City harmless with respect to the payment of same notwithstanding anything contained herein or elsewhere to the contrary.

7.05    City's Failure to Convey. In the event the City does not tender the conveyance of the Property in the manner provided in this Agreement, and any such failure shall not be cured within thirty (30) days after written demand by Purchaser, then, provided Purchaser is not in material Default under this Agreement, at the option of Purchaser, this Agreement shall be terminated, or, if all of the conditions set forth in Section 7.02a above have been satisfied, Purchaser shall be entitled to seek specific performance of this Agreement. In no event shall Purchaser seek or be entitled to money damages.

## ARTICLE 8. DEFAULTS AND EVENTS OF DEFAULT

8.01    Default by Purchaser. The occurrence of any one or more of the following events prior to Closing shall constitute a Default of this Agreement by Purchaser:

a.    Purchaser admits in writing its inability to pay its debts generally as they become due, or Purchaser ceases to conduct business in the normal course by reason of any of the following: (i) The making by Purchaser of any general arrangement or general assignment for the benefit of creditors; (ii) Purchaser becoming a "debtor" as defined in 11 USC § 101 or any successor statute thereto (unless, in the case of a petition filed against Purchaser, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where possession is not restored to Purchaser within sixty (60) days; (iv) the attachment, execution or other judicial seizure of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where such seizure is not discharged within sixty (60) days; or (v) its voluntary or involuntary dissolution. In the

event that any provision of this subsection is contrary to any applicable law, such provision shall be of no force or effect.

       b. Purchaser violates any of the terms and conditions of this Agreement, except as otherwise provided in this Section 8.01, and Purchaser fails to cure same within thirty (30) days after receipt of written notice by the City to cure said Default.

       c. Purchaser, not due to any breach of the City, does not acquire the Property pursuant to a Closing in accordance with this Agreement, unless such failure is due to the failure of a condition precedent to Purchaser's obligation to close as set forth in this Agreement.

    8.02   <u>Failure to Cure Default</u>. Any such Default on the part of Purchaser as set forth in Section 8.01 and the failure of Purchaser to cure such Default or within thirty (30) days after written demand by the City to cure said Default for Subsection 8.01b shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Purchaser's Default is such that more than the cure period provided is reasonably required for its cure, then Purchaser shall not be deemed to be in default if Purchaser commences such cure within said period and thereafter diligently pursues such cure to completion. Defaults pursuant to Subsections 8.01a are hereby deemed to be material, non-curable Events of Default without the necessity of any notice by the City to Purchaser thereof. The City may, in its sole discretion, waive in writing any Default or Event of Default by Purchaser.

    8.03   <u>Default by the City</u>. The City shall not be in default unless the City fails to perform obligations required of the City within a reasonable time, but in no event later than ninety (90) days, after written notice by Purchaser to the City, specifying wherein the City has failed to perform such obligation, provided, however, that if the nature of the City's obligation is such that more than ninety (90) days are reasonably required for performance then the City shall not be in default if the City commences performance within such ninety (90) day period and thereafter diligently pursues such performance to completion.

## ARTICLE 9. REMEDIES

    9.01   <u>Remedies Cumulative</u>. The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breach. No waiver made by the City shall apply to obligations beyond those expressly waived in writing.

    9.02   <u>Reimbursement of Costs</u>. Purchaser shall reimburse the City for its expenses, including reasonable attorney fees (whether inside or outside counsel), reasonably incurred by the City after an Event of Default in connection with the enforcement of or the preservation of any rights under this Agreement.

## ARTICLE 10. RESTRICTION UPON SPECULATION AND ASSIGNMENT

10.01 <u>No Speculation</u>. Purchaser represents that its purchase of the Property and its other undertakings pursuant to this Agreement are for the purpose of development of the Property for use in connection with Purchaser's adjacent facility and not for speculation.

10.02 <u>Prior Approval of Assignment</u>. Purchaser will not assign this Agreement, without the prior written approval of the City, except for an assignment to a parent, subsidiary or other company controlling, controlled by or in common control with Purchaser. Any proposed transferee shall, by instrument in writing, for itself and its successors and assigns, and expressly for the benefit of the City, assume all of the obligations of Purchaser under this Agreement and agree to be subject to all the conditions and restrictions to which Purchaser is subject. The consent of the City to an assignment or transfer in any one case shall not relieve Purchaser or the transferee of the obligation to obtain the consent of the City for any additional assignments or transfers.

10.03 <u>Consideration for Assignment</u>. Prior to the City's approval of any assignment pursuant to Section 10.02, Purchaser shall certify to the City that the consideration paid for the transfer of any of Purchaser's interest in this Agreement does not exceed an amount representing the actual cost (including carrying charges) incurred by Purchaser in connection with this Agreement; it being the intent of this Section to preclude assignment of this Agreement for profit. In the event Purchaser transfers any such interest at a profit, said profit shall belong to and forthwith be paid to the City.

## ARTICLE 11. INDEMNITY

11.01 <u>Purchaser Indemnification.</u> Purchaser agrees to and shall indemnify and save harmless the City, its agents and employees against and from any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including without limitation, reasonable fees and expenses of attorneys, whether inside or outside counsel, expert witnesses and other consultants) (collectively, "Damages") that may be imposed upon, incurred by or asserted against the City related to this purchase by reason of any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom, except to the extent such Damages are caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct. Purchaser also agrees to hold the City harmless from any and all injury to the person or damage to the property of an employee of the City which arises out of or pursuant to any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom except to the extent such loss or injury is caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct.

11.02 <u>Defense of Claims</u>. In the event any action or proceeding shall be brought against the City by reason of any claim covered hereunder, Purchaser, upon notice from the City, will at its sole cost and expense, resist and defend the same, using legal counsel reasonably acceptable to the City.

11.03 <u>Non-Liability of the City</u>. From and after the date of Closing, the City shall not be responsible or liable to Purchaser, and Purchaser hereby releases the City from liability, for any loss or

damage that may be occasioned by or through the acts or omissions of persons occupying any part of the Property. From or after the date of Closing, Purchaser shall be solely responsible for all injuries to persons and property resulting from any accident, explosion, leak or other cause arising in or about the use of the Property and its appurtenances, as hereinbefore stated. The City shall not be responsible for any loss or damage resulting to Purchaser or its property or to any other person or persons on their property which may be caused by the bursting, stopping, or leaking of water, gas, sewer or steam pipes or from overflow or backing up of any sewer or water main, unless caused by the City's gross negligence or willful misconduct.

11.04    Hazardous Materials.

    a.    Definitions.

        (i)    "**Relevant Environmental Laws,**" as referred to herein, shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations, and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, the present or the future, with respect to:

            (a)    the installation, existence, or removal of, or exposure to, Asbestos on the Property.

            (b)    the existence on, discharge from, or removal from the Property of Hazardous Materials.

            (c)    the effects on the environment of the Property or of any activity conducted on the Property.

        Relevant Environmental Laws shall include, but are not limited to, the following: (i) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC Sections 9601, *et seq.;* the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, *et seq.*; the National Environmental Policy Act, 42 USC Section 4321; the Safe Drinking Water Act, 42 USC Sections 300F, *et seq.*; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Federal Water Pollution Control Act, 33 USC Sections 1251, *et seq.*; the Clean Air Act, 42 USC Sections 7401, *et seq.*; and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including 29 CFR Sections 1910.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any state and local laws and regulations pertaining to Hazardous Materials and/or Asbestos.

        (ii)    "**Asbestos,**" as referred to herein, shall have the meanings provided under the Relevant Environmental Laws and shall include, but not be limited to, asbestos

fibers and friable asbestos as such terms are defined under the Relevant Environmental Laws.

(iii) **"Hazardous Materials,"** as referred to herein, shall mean any of the following as defined by the Relevant Environmental Laws: Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes, or contaminants (including, but not limited to, polychlorinated biphenyls (PCB's), paint containing lead, and urea formaldehyde foam insulation).

b. <u>Release and Indemnity</u>. The City shall give Purchaser the opportunity to inspect the Property and conduct such environmental assessments and testing as Purchaser has deemed appropriate. The City shall not be liable to Purchaser for, and Purchaser, for itself and its successors and assigns, hereby releases the City from, any and all liability for any violation or alleged violation of the Relevant Environmental Laws by Purchaser respecting the Property, whether such alleged violation occurred before or after Closing and the transfer of possession to Purchaser. The City shall not be liable for, and Purchaser shall immediately pay to the City when incurred and shall indemnify, defend and hold the City harmless from and against, all loss, cost, liability, damage and expense (including, but not limited to, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that the City may suffer or incur as a result of or in connection in any way with any violation of the Relevant Environmental Laws occurring after the Closing, any environmental assessment or study from time to time undertaken or requested by Purchaser, or breach of any covenant or undertaking by Purchaser in this Section; provided, however, Purchaser shall have no obligation to the City with respect to: (i) indemnified liabilities arising solely from the gross negligence or willful misconduct of the City; or (ii) conditions or Hazardous Materials existing at the time of Closing.

c. <u>Survival</u>. The provisions of this Section shall survive the termination of this Agreement.

d. <u>Breach</u>. Breach of any of the representations, warranties and/or covenants contained in this Article shall be a default under this Agreement; provided, however, that no breach shall be deemed to have occurred so long as, upon becoming aware of a possible breach, Purchaser proceeds to reasonably investigate and remedy in compliance with the Relevant Environmental Laws the matter giving rise to the possible breach.

e. <u>Assignment of Cause of Action</u>. The City shall, upon request of Purchaser, convey, assign and transfer to Purchaser any claim or cause of action the City may have against others in connection with any liability against which Purchaser has fully indemnified the City (including payment) under this Agreement.

## ARTICLE 12. AMENDMENTS

12.01 <u>Form</u>. Any change, addition, deletion, extension or modification of this Agreement (including assignments) that is mutually agreed upon by and between the City and Purchaser shall be incorporated in a written amendment (herein called **"Amendment"**) to this Agreement. Such Amendment shall not invalidate this Agreement nor relieve or release Purchaser of any of its obligations under this Agreement unless stated therein.

12.02 <u>Binding Effect</u>. No Amendment to this Agreement shall be effective and binding upon the parties unless it expressly makes reference to this Agreement, is in writing, is signed and acknowledged by duly authorized representatives of both parties. To be effective against the City, the Amendment must be authorized as set forth in Section 14.12 of this Agreement.

## ARTICLE 13. NOTICES

13.01 <u>Addresses</u>. Except as otherwise specified herein, all notices, consents, approvals, requests and other communications (herein collectively called **"Notices"**) required or permitted under this Agreement shall be given in writing and personally delivered with receipt obtained, or mailed by registered or certified first-class mail, return receipt requested, addressed as follows:

If to the City:
Director
City of Detroit
Planning & Development Department
2000 Cadillac Square
Detroit, Michigan 48226

with a copy to:

Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

If to Purchaser:
Harry C. Warner, President
Waterfront Terminal Holdings II, LLC
5431 West Jefferson Avenue
Detroit, Michigan 48209

with a copy to:

Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

13.02 <u>Date of Notice</u>. All notices shall be deemed given when hand-delivered or, if mailed, three (3) days after the day of mailing. Either party to this Agreement may change its address for the receipt of Notices at any time by giving notice thereof to the other as provided in Section 13.01. Any Notice given by a party hereunder must be signed by an authorized representative of such party.

## ARTICLE 14. MISCELLANEOUS

14.01 <u>Severability</u>. If any one or more provisions of this Agreement or in any instrument or other document delivered pursuant to this Agreement or the application thereof to any person or circumstance shall to any extent be declared or determined to be invalid or unenforceable, the validity, legality and enforceability of the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected or impaired thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.02 <u>Entire Agreement</u>. This instrument, including the exhibits listed in Section 1.01 which are attached hereto and which are made a part of this Agreement, contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Purchaser acknowledges that neither the City nor the City's agents have made any representations except those expressly set forth herein, and no rights or remedies are or shall be acquired by Purchaser by implication or otherwise unless expressly set forth herein.

14.03 <u>Terminology</u>. Unless the context otherwise expressly requires, the words "herein", "hereof", and "hereunder", and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision.

14.04 <u>Covenants and Conditions</u>. All the terms and provisions of this Agreement shall be deemed and construed to be "covenants" and "conditions" as though the words specifically expressing or imparting covenants and conditions were used in each separate term and provision.

14.05 <u>Captions</u>. The headings of the Articles, Sections and other subdivisions in this Agreement are for convenience only and shall not be used to construe or interpret the scope or intent of this Agreement or in any way affect the same.

14.06 <u>Cumulative Remedies; Jurisdiction; Venue</u>. The rights and remedies set forth herein are not exclusive and are in addition to any of the rights and remedies provided by law or equity; provided, however, that if the City breaches any of its obligations under this Agreement, then, after reasonable notice and opportunity to cure, Purchaser shall have the right solely to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement, and in no event shall Purchaser be entitled to monetary damages as a result of the City's breach of this Agreement. All actions arising under this Agreement shall be governed by, subject to, and construed according to the laws of the State of Michigan. Purchaser agrees, consents, and submits to the personal jurisdiction of any competent court in Wayne County, Michigan for any action brought against it arising out of this Agreement. Purchaser agrees that service of process at the address and in the manner specified in Article 13 will be sufficient to put Purchaser on notice. Purchaser also agrees that it will not commence any action against the City because of any matter whatsoever arising out of or relating to the validity, construction interpretation and enforcement of this Agreement, in any courts other than those in the County of Wayne, State of Michigan.

14.07 <u>Force Majeure</u>. In the event of enforced delay in the performance by either party of obligations under this Agreement due to unforeseeable causes beyond its control and without its fault or

negligence, including, but not restricted to, acts of God or of the public enemy, acts of the government, acts of the other party, fires, floods, epidemics, or severe weather, the time for performance of such obligations shall be extended for the period of the enforced delays; provided that the party seeking the benefit of the provisions of this Section shall within thirty (30) days after the beginning of such enforced delay, have first notified the other party in writing of the causes thereof and requested an extension for the period of the enforced delay.

14.08    Provisions Not Merged With Deed.  No provision of this Agreement is intended to or shall be merged by reason of any Deed transferring title to the Property from the City to Purchaser or any successor in interest, and any such Deed shall not be deemed to affect or impair the provisions and covenants of this Agreement.

14.09    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original document but together shall constitute one instrument.

14.10    Singular and Plural, etc..  As used herein, the singular include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

14.11    Time of the Essence.  Time is of the essence of this Agreement.

14.12    Authority of City.  Notwithstanding anything in this Agreement or otherwise to the contrary, the City shall not be authorized or obligated to sell the Property to Purchaser until the date that this Agreement has been fully executed by the duly authorized representative of the City pursuant to the resolution of the Detroit City Council or other governmental official or agent with jurisdiction over the matter and approved by the City of Detroit Law Department (the "Effective Date").  Any amendments or modifications must likewise be duly authorized by resolution and approval of all of the same parties.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

BH165139.3                              15

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

Print: *JAMES K DOWLING JR*

Print: _____

STATE OF MICHIGAN )
                  )ss.
COUNTY OF _____ )

**PURCHASER**

WATERFRONT TERMINAL HOLDINGS II, LLC

By: _____
Print:      Harry C. Warner
Its:      President

      The foregoing instrument was acknowledged before me on _____, 2015, by Harry C. Warner, the President of WATERFRONT TERMINAL HOLDINGS II, LLC, a Michigan limited liability company, on behalf of said entity.

Print: _____
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in the County of _____

WITNESSES:

Print: _____

Print: _____
STATE OF MICHIGAN )
                  )ss.
COUNTY OF WAYNE )

**CITY OF DETROIT,**
a Michigan public body corporate

By: _____
Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

      The foregoing instrument was acknowledged before me on _____, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

Print: _____
Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of Wayne

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

Print: _____

Print: _____

STATE OF MICHIGAN    )
                        )ss.
COUNTY OF _____  )

**PURCHASER**

WATERFRONT TERMINAL HOLDINGS II, LLC

By: _____
Print:      Harry C. Warner
Its:       President

The foregoing instrument was acknowledged before me on _____, 2015, by Harry C. Warner, the President of WATERFRONT TERMINAL HOLDINGS II, LLC, a Michigan limited liability company, on behalf of said entity.

_____
Print:
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in the County of _____

WITNESSES:

Print: _____

Print: _____
STATE OF MICHIGAN    )
                        )ss.
COUNTY OF WAYNE   )

**CITY OF DETROIT**,
a Michigan public body corporate

By: _____
Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

The foregoing instrument was acknowledged before me on *March 30*, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

Print: *Karen M. Beaver*
Notary Public, Wayne County, Michigan
My commission expires: *6/21/2018*
Acting in the County of Wayne

KAREN M. BEAVER
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 21 2018
ACTING IN COUNTY OF *Wayne*

BH165139.3

16

# EXHIBIT A
## LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS LOTS 1207 THROUGH 1214 BOTH INCLUSIVE, LOT 1215 EXCEPT THE EASTERLY 6.36 FEET THEREOF, ALL BEING TOGETHER WITH THE ADJACENT VACATED PUBLIC ALLEY (20 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO THE WESTERLY 213.64 FEET OF THE EASTERLY 574.00 FEET OF PRIVATE CLAIM NO. 39 LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE N.61°37'43"E. 213.64 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON AVENUE (80 FEET WIDE) TO A POINT BEING 6.36 FEET WESTERLY FROM THE NORTHEAST CORNER OF LOT 1215 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E. 1068.40 FEET ALONG A LINE 360.36 FEET WEST OF THE EASTERLY LINE OF SAID PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE; THENCE S.34°06'08"W. 241.60 FEET ALONG SAID DETROIT RIVER U.S. HARBOR LINE; THENCE N.28°03'35"W. 1180.06 FEET ALONG A LINE 574.00 FEET WEST OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF BEGINNING; SAID PARCEL CONTAINING 5.5137 ACRES, MORE OR LESS AND BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: _____ DATE:_____

Street Address[es]:

Property Tax Ward & Item numbers:

EXHIBIT B
PROJECT GOALS


1)    Construction contracts shall provide that at least fifty-one percent (51%) of the workforce must be Detroit residents, and Detroit residents shall perform fifty-one percent (51%) of the hours worked on the project.

2)    Waterfront Petroleum shall establish a goal of contracting with at least thirty percent (30%) of Detroit-based Businesses, Detroit-headquartered Businesses, and/or Detroit Emerging Businesses (gross receipts of $1 million or less) retained to provide services on the project. Of these categories, the City will give greater weight to Detroit-headquartered Businesses.

EXHIBIT C

## QUIT CLAIM DEED

      Subject to the following paragraph, the City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("**Grantor**"), quit claims to Waterfront Terminal Holdings II, LLC, a Michigan limited liability company whose address is 5431 West Jefferson Avenue, Detroit, MI 48209 ("**Grantee**"), the premises located in the City of Detroit, Wayne County, Michigan, described as:

(See attached Exhibit A)

A/K/A _____      Ward: _____Item(s): _____

(the "**Property**"), for the sum of _____($ _____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances and restrictions of record.

      This deed is dated as of _____.

WITNESSES:                        CITY OF DETROIT, a Michigan public body corporate

_____

Print: _____      By:_____
                                    Print: _____
_____      Its: _____

Print: _____

STATE OF MICHIGAN )
)ss.
COUNTY OF WAYNE )

The foregoing instrument was acknowledged before me on _____, 20___, by
_____, the _____ of the City of Detroit,
a Michigan public body corporate, on behalf of the City

_____

Print:

Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of _____

| | |
|---|---|
| Pursuant to § 18-5-4 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this instrument. | Approved by City Council on _____ JCC pp _____ or Detroit Legal News, _____, on file in my office. |

Approved by Mayor on _____

_____
Finance Director

Approved by Law Department pursuant to Sec.
7.5-206 of the Charter of the City of Detroit:

_____
City Clerk

_____
Corporation Counsel

This Instrument Drafted by:
Bruce N. Goldman
Property Section
City of Detroit Law Department
2 Woodward Avenue, Suite 550
Detroit, Michigan 48226

When recorded, return to:
Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

EXHIBIT D

Right of Entry Letter

**[DATE]**

_____, Project Manager
[Name of Environmental Consultant]
[Address]

**RE: Request for Right-of-Entry:**
**[Address/Location] (Ward #/Item #)**
**Detroit, Michigan**

Dear _____:

You have requested a right-of-entry to conduct **[general description of requested activities]** at the above-referenced address (hereinafter, the "Site").

Please be advised that the City of Detroit grants permission to **[Environmental Consultant]**, including its contractors, subcontractors, representatives, agents, and employees (collectively, "User") to enter the above-referenced Site for the sole purpose of conducting certain environmental activities, within the confines of the Scope of Work contained in **Exhibit A**.

This Right-of-Entry is subject in all respects to the following conditions:

1. Subject to satisfaction of the terms and conditions contained herein, this Right-of- Entry shall commence on **[start date]**, and shall automatically terminate upon the completion of the work described herein, or on **[end date]**, whichever occurs first.

2. User shall hold the City of Detroit harmless and shall defend and indemnify the City of Detroit from and against any and all damages, claims, obligations, penalties, costs, charges, losses, demands, liabilities, and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City of Detroit or its departments, officers, employees, or agents arising from and related to User and its contractors', subcontractors', representatives', agents', and employees' use of the Site and this Right-of-Entry (including but not limited to, any release or threatened release of hazardous and non-hazardous substances, contaminants, exacerbation, evacuation, on-site and/or off-site property damage, or bodily injury).

3. **[Environmental Consultant]** shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

  • Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence-based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

• Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

• Worker's Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

• Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificates of insurance, without limitation, for all preceding coverage, excluding workers' compensation and employers' liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies.

4. User shall not impair any part of the Site, except as customarily incident to the activities described in Exhibit A and in accordance with all applicable laws. User shall repair any damage caused to the Site and/or properties affected by the activities at the Site, and restore the Site and/or properties affected by the activities at the Site to its/their original condition. Initial access to the Site shall be coordinated through the Planning and Development Department, Property Management Section at (313) 224-1187.

5. User shall contact the Department of Public Works, City Engineering Division at (313) 224-3935 upon the discovery of any damage caused by User's activities to the curb, sidewalk, street, or any portion of the right of way and/or infrastructure in order to provide notice and obtain the proper City of Detroit permits for repair.

6. User will not bring any soils or other materials onto the Site, except in strict accordance with the Department of Public Works, City Engineering Division Standard Specifications for the above-referenced Site and only with prior written verification for compliance by the City of Detroit's Buildings, Safety Engineering, and Environmental Department –Environmental Affairs of the User's fill material analytical data. User shall be responsible for the removal of any and all materials, tools and equipment brought onto the Site required for the authorized activities, and User shall assume the risk of loss or damage to any materials, tools and equipment.

7. User is entering upon and using the Site at its own risk, and accepts the Site "As Is". The City of Detroit makes no representation or warranty as to the status of title or the physical or environmental condition of the Site, or its fitness for any particular use.

8. User shall take all reasonable measures and precautions to mitigate any noise, vibrations, dust, and odors emanating from the activities on the Site.

9. User shall immediately notify the City's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs at (313) 471-5108 upon the discovery of a suspected release of hazardous substances, hazardous materials, contaminants, or property damage as a result of User's activity at the Site.

10. User shall provide to the City of Detroit, without charge, copies of any and all draft and final work plans, reports, health and safety plans, and other environmental, analytical, or engineering documents relating in any way or arising out of its activities at the Site.

Upon the preparation of the documents, three copies of each document shall be provided to:

> Raymond A. Scott, General Manager
> City of Detroit
> Buildings, Safety Engineering, and Environmental Department
> 2 Woodward Avenue, Suite 401
> Detroit, Michigan 48226

11. This instrument and the rights granted hereunder may not be assigned by User.

12. User shall take all precautions necessary to make the Site safe for the authorized activities, including, where appropriate, preparation and adherence to a site-specific health and safety plan.

13. User shall be responsible for ensuring compliance with all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders. Any violation of the applicable laws, rules, regulations, standards, plans, and orders; or breach of the terms contained within this document may be considered grounds for termination of the Right-of-Entry.

14. This instrument constitutes the entire Right-of-Entry agreement between the City of Detroit and the User with respect to its subject matter. This agreement may not be modified, amended, changed, or altered in any respect unless done so in a writing acknowledged by both the City of Detroit and User.

15. No activities other than the activities authorized in Exhibit A may be performed on the Site.

This Right-of-Entry will be effective only upon execution of the acknowledgment and agreement noted herein by an authorized representative of User and upon delivery of same to Mr. Raymond Scott, Buildings, Safety Engineering, and Environmental Department, at the address listed above.

Sincerely,

_____

\*\*\* [Authorized City of Detroit Department Signature]

[Environmental Consultant], by its duly authorized representative, hereby acknowledges receipt of the original copy of this letter, and agrees to be bound by the terms and conditions stated therein.

[ENVIRONMENTAL CONSULTANT]
BY: _____
(Signature)

PRINT NAME: _____
ITS: _____
(Duly Authorized Representative)

DATE _____
TELEPHONE NUMBER: _____

EXHIBIT A TO SAMPLE ENVIRONMENTAL RIGHT-OF-ENTRY DOCUMENT

SCOPE OF WORK

The following is the Scope of Work that [Environmental Consultant], its contractors, subcontractors, representatives, agents and employees (collectively, "User"), is authorized to perform at the Site. User shall be responsible for ensuring compliance in all respects with the Scope of Work, and all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders.
User is only authorized to undertake the following activities at the Site:

[LIST OF AUTHORIZED ACTIVITIES]

Schedule I

## CERTIFICATE OF AUTHORITY FOR LIMITED LIABILITY COMPANY

I, _____, Manager of _____, a
_____limited liability company (the **"Company"**)

      DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

        ☐    the minutes of a meeting of the Members of the Company duly called and held on

        ☐    a consent in lieu of a meeting, with signed consents received from all of the Members of the Company on or before the date hereof.

and that the same is now in full force and effect:

      "RESOLVED, that any Manager of the Company, is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such Managers to be conclusive evidence of such approval."

      I FURTHER CERTIFY that the following persons are Managers:

      I FURTHER CERTIFY that any of the aforementioned Managers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

      IN WITNESS THEREOF, I have set my hand this _____ day of _____, 20___.

 

                                  _____
                                  Print:
                                  Manager

**EXHIBIT 6G – ESCROW AGREEMENT**

**ESCROW AGREEMENT**

**THIS ESCROW AGREEMENT** (the "Agreement") is made and entered into this _17_ day of July, 2015, by and among **Waterfront Terminal Holdings II, LLC**, a Michigan limited liability company also known as Waterfront Holdings II, LLC ("Purchaser"), **The City of Detroit**, a Michigan public body corporate, acting through its Planning and Development Department ("Seller"), and **eTitle Agency Inc.**, a Michigan corporation ("Escrow Agent"), and is based upon the following.

R E C I T A L S :

A.     Purchaser and Seller parties to a certain Purchase Agreement (the "Purchase Agreement"), dated February 17, 2015, whereby Seller agreed to sell to Purchaser certain real property as more particularly on Exhibit A attached hereto (the "Property").

B.     On July 1, 2015, B&C Land Development Corporation filed suit against Seller in the Circuit Court for the County of Wayne, Michigan (Case No. 15-008602-CH) claiming an interest in the Property (the "Suit").

C.     In anticipation of the dismissal of the Suit, Purchaser and Seller have agreed to close on the purchase and sale of the Property under the Purchase Agreement in escrow pursuant to the terms and conditions of this Agreement, and Escrow Agent has agreed to hold the original, fully executed Closing Documents (as defined below) and Closing Funds (as defined below) until such time as an appropriate order dismissing the Suit is issued by a court of competent jurisdiction and any lis pendens filed against the Property in connection with the Suit is ordered discharged or released.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties agree as follows:

1.     Escrow of Release Documents and First Amendment.  Promptly following the execution of this Agreement, (a) Seller shall deliver to Escrow Agent one original of:  (i) a fully executed and properly notarized quit claim deed in the form required by the Purchase Agreement conveying the Property to Purchaser (the "Deed"), and (ii) a closing statement in the form attached hereto as Exhibit B signed by Seller (the "Closing Statement"); and (b) Purchaser shall deliver to Escrow Agent, (x) the Purchase Price (as defined in the Purchase Agreement), plus or minus the credits and charges due to or from Purchaser pursuant to the Purchase Agreement as set forth in the Closing Statement (the "Closing Funds") and (y) the Closing Statement signed by Purchaser.  The Deed and the Closing Statement are sometimes referred to herein as the "Closing Documents."

2.     Disbursement of Closing Documents and Funds.  The Deed, the Closing Statement and the Closing Funds shall be delivered out of escrow by Escrow Agent as follows:  Upon either: A. receipt of (i) a copy of a duly entered order of dismissal of all counts, with prejudice, in the Suit, and (ii) a discharge of lis pendens duly executed by the counsel for the plaintiff in the Suit and in recordable form or an appropriate order issued by a court of competent jurisdiction discharging or releasing any lis pendens filed against the Property in connection with the Suit (the "Discharge") or B. Purchaser's written waiver of this condition, Escrow Agent shall immediately (i) record the Discharge, then (ii) release to Seller the Closing Funds due to Seller as set forth in the Closing Statement, then (iii) record the Deed, and (iv) release to the Escrow Agent the title insurance premium, closing costs and recording fees, as set forth in the Closing Statement, then (v) provide to Purchaser a copy of the recorded Deed and the original Closing Statement signed by Seller, and (iv) provide to Seller a copy of the recorded Deed and the original Closing Statement signed by Purchaser.

3. <u>Governing Law; Dispute</u>. This Agreement shall be governed by and construed in accordance with the laws and judicial decisions of the State of Michigan. The parties hereto expressly acknowledge and agree that all legal proceedings arising out of or relating to this Agreement shall be brought and maintained in the state and federal courts located in Wayne County and the Eastern District of Michigan. In the event of a dispute between Purchaser and Seller concerning the disposition of the Closing Documents or the Closing Funds, Escrow Agent may file an interpleader action and shall have the right to deliver the Closing Document and the Closing Funds, as applicable, into court. If the filing of an interpleader action does become necessary, the Purchaser and the Seller each agree to pay one-half of Escrow Agent's costs incurred in connection therewith, including reasonable attorney fees.

4. <u>Limitations on Liability</u>. After disbursing the Closing Documents and the Closing Funds in accordance with Section 2 above, Escrow Agent shall be released from any further liability under this Agreement, it being agreed that Escrow Agent's liability is limited by the terms and provisions set forth in this Agreement, and that by acceptance of this Agreement, the Escrow Agent is acting in the capacity of a depository, only. Escrow Agent will have no obligation under this Agreement except to exercise good faith and ordinary care. Escrow Agent may act upon receipt of any certificate or other written document, and will have no responsibility to determine or inquire into or otherwise corroborate the happening or occurrence of any event or condition described in such certificate or document.

5. <u>Notices</u>. Any notice required or permitted hereunder and all notices of change of address must be delivered to each of the parties to this Agreement and shall be deemed sufficient if either delivered personally or mailed by certified or registered mail, or delivered by recognized overnight courier service – next business day delivery, or hand-delivery addressed to the recipient at its address specified below. Notices provided by mail shall be conclusively deemed to have been received on the second business day after the date mailing. Notices provided by overnight delivery shall be conclusively deemed to have been received on the business day after the date of deposit with such courier. Notices provided by hand-delivery shall be conclusively deemed to have been delivered on the day of such hand-delivery. Notices to the parties shall be delivered to the address for such party, set forth below or such other address as such party may designate in writing in the manner set forth above:

If to Seller:         Director
City of Detroit
Planning & Development Department
2 Woodward Ave., Suite 808
Detroit, Michigan 48226

                      with a copy to:

                      Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

If to Purchaser:     Harry C. Warner
Waterfront Terminal Holdings II, LLC
5431 West Jefferson Avenue
Detroit, Michigan 48209

DET1539179

with a copy to:

Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

If to Escrow Agent:    Bryan Melvin, Esq.
eTitle Agency, Inc.
1650 West Big Beaver Road
Troy, Michigan 48084

6.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterpart copies (including facsimile and electronically transmitted signature pages), each of which shall constitute an original although not fully executed, but all of which when taken together shall constitute one and the same instrument binding on all parties hereto.

[signatures appear on following page]

DET1539179

**IN WITNESS WHEREOF**, the parties have caused this Escrow Agreement to be executed and delivered as of the date first set forth above.

WITNESSES:

                           **Waterfront Terminal Holdings II, LLC,**
a Michigan limited liability company also known as Waterfront Holdings II, LLC

_____

By: _____
          Harry C. Warner
Its:      Manager

**City of Detroit**, a Michigan public body corporate

_____

By: _____
          Maurice Cox
Its:      Director, Planning & Development Dept.

**eTitle Agency, Inc.**, a Michigan corporation

_____

By: _____
Name: _____
Its: _____

DET1539179

EXHIBIT A
LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING
DESCRIBED AS LOTS 1207 THROUGH 1214 BOTH INCLUSIVE, LOT 1215 EXCEPT
THE EASTERLY 6.36 FEET THEREOF, ALL BEING TOGETHER WITH THE ADJACENT
VACATED PUBLIC ALLEY (20 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF
THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED
IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO THE
WESTERLY 213.64 FEET OF THE EASTERLY 574.00 FEET OF PRIVATE CLAIM NO.
39 LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE
WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20,
PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND
ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT
SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO.
39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS;
THENCE N.61°37'43"E. 213.64 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON
AVENUE (80 FEET WIDE) TO A POINT BEING 6.36 FEET WESTERLY FROM THE
NORTHEAST CORNER OF LOT 1215 OF THE "SIXTH PLAT SUBDIVISION OF THE
PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN
LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E.
1068.40 FEET ALONG A LINE 360.36 FEET WEST OF THE EASTERLY LINE OF
SAID PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE;
THENCE S.34°06'08"W. 241.60 FEET ALONG SAID DETROIT RIVER U.S. HARBOR
LINE; THENCE N.28°03'35"W. 1180.06 FEET ALONG A LINE 574.00 FEET WEST
OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF
BEGINNING; SAID PARCEL CONTAINING 5.5137 ACRES, MORE OR LESS AND
BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: Basil Sarin DATE: 4/28/2015

Street Address[es]:

Property Tax Ward & Item numbers:

# Seller's Settlement Statement

eTitle Agency, Inc.
1650 W. Big Beaver
Troy, MI 48084
Phone: (248)502-3100    Fax: (248)502-3101

**Date:** 07/17/15    **Time:** 1:35:46PM    **Escrow no.:** 1530716
**Close of escrow:**    **Escrow officer:** Tamara Sadler
**Borrower:** Waterfront Terminal Holdings II, LLC, a Michigan limited liability company
**Seller:** City of Detroit, a Michigan public body corporate
**Property location:** 5701 W. Jefferson
Detroit, MI 48209

|  | Seller | |
|---|---|---|
|  | Debit | Credit |
| **Financial Consideration** | | |
| Contract sales price | | 735,000.00 |
| **Prorations/Adjustments** | | |
| Summer tax 350 days @ 30.108 | | 10,537.90 |
| **Recording Charges** | | |
| Record discharge of Lis Pendens to Wayne County Register of Deeds | 50.00 | |
| **Subtotals** | 50.00 | 745,537.90 |
| **Balance Due TO Seller** | 745,487.90 | |
| **TOTALS** | 745,537.90 | 745,537.90 |

Seller

City of Detroit, a Michigan public body corporate

BY:

eTitle Agency, Inc.
Settlement Agent

## EXHIBIT 6H – TRUE COPY CERTIFICATE OF RESOLUTION APPROVING REVERE DOCK OFFER TO PURCHASE

# TRUE COPY CERTIFICATE

STATE OF MICHIGAN ⎫ SS
City of Detroit ⎭

## CITY CLERK'S OFFICE, DETROIT

I, _____Janice M. Winfrey_____, City Clerk of the City of Detroit, in said State, do hereby certify

that the annexed paper is a TRUE COPY OF _____**RESOLUTION**_____

adopted (passed) by the City Council at session of _____June 30,_____ 20 15

and approved by Mayor _____July 7,_____ 20 15

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the

original, and the same is a correct transcript therefrom, and of the whole of such original.

**In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at**

Detroit, this **10th** day of **July** A.D. 20 **15**

CITY CLERK


**CITY OF DETROIT**
PLANNING AND DEVELOPMENT DEPARTMENT





COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 808
DETROIT, MICHIGAN 48226
PHONE 313•224•1339
WWW.DETROITMI.GOV

May 29, 2015

Detroit City Council
1340 Coleman A. Young Municipal Center
Detroit, MI 48226

Re:    Sale by Development Agreement - 5851 W. Jefferson Avenue, Detroit, MI 48209

Honorable City Council:

The City of Detroit Planning and Development Department has received an offer from Revere Dock, LLC, a Michigan limited liability company ("**Revere Dock**") to purchase from the City of Detroit (the "**City**") the approximately 17.1009 acres of vacant real property described on the attached Exhibit A, being part of what is commonly known as 5851 W. Jefferson Avenue, Detroit, MI 48209, (the "**Property**").

The terms of the offer are set forth in a Purchase Agreement dated February 17, 2015 (the "**Offer to Purchase**"). Under the terms of the Offer to Purchase, the Property would be conveyed to Revere Dock under a development agreement by quit claim deed (the "**Deed**"), for two million two hundred and eighty thousand and 00/100 Dollars (**$2,280,000.00**) (the "**Purchase Price**"). The Purchase Price is equal to the Property's current fair market value as determined by an independent appraisal obtained by the City. Under the terms of the development agreement, Revere Dock's construction contracts will provide that at least 51% of the workforce must be Detroit residents, Detroit residents will perform 51% of the hours worked on the project, and Revere Dock will establish the goal of contracting with at least 30% of Detroit-based Businesses, Detroit-headquartered Businesses, and/or Detroit Emerging Businesses.

Revere Dock, LLC is an affiliate of Erickson's Incorporated, a highly engineered marine and specialty services company with current contracts in Detroit and throughout the Great Lakes. Revere Dock's development of the property will bring new heavy lift marine and transport capacity to Detroit, supporting manufacturing and fabricating companies with project equipment of oversize dimension and weight, while providing on-site staging and storage of critical equipment. The proposed use is permitted as a matter of right in an M-4 (Intensive Industrial) zone.

We request that your Honorable Body adopt the attached resolution approving the sale of the Property by development agreement, and authorizing the Planning and Development Department Director to execute the Deed and such other documents as may be necessary or convenient in connection with the City's sale of the Property.

Respectfully submitted,

Maurice Cox, Director

MC:RC:kc

ENTERED JUN 1 8 2015

cc:    Aliyah Sabree, Mayor's Office
       Val Upshaw, H&RD Liaison

By Council Member _____  LELAND _____

    **WHEREAS,** the City of Detroit Planning and Development Department has received an offer from Revere Dock, LLC, a Michigan limited liability company, to purchase approximately 17.1009 acres of the vacant real property, commonly known as 5851 W. Jefferson Avenue, Detroit, MI 48209, (the "Property") described in <u>Exhibit A</u>; and

    **WHEREAS,** in accordance with Section 14-8-10 of the Detroit City Code, it is deemed in the best interests of the City that the Property be sold without public advertisement or the taking of bids.

    **NOW, THEREFORE, BE IT RESOLVED,** that the sale of Property by development agreement to **Revere Dock, LLC, a Michigan limited liability company,** for the Purchase Price of **two million two hundred eighty thousand dollars ($2,280,000.00),** and otherwise in accordance with the terms of the Offer to Purchase, is hereby approved; and be it further

    **RESOLVED,** that customary closing costs up to two hundred dollars ($200.00), and real estate brokerage commissions not to exceed five percent (5%) of the Purchase Price may be deducted from the Purchase Price and paid from the sale proceeds as "Property Transaction Costs" in accordance with the terms of the Property Management Agreement dated October 31, 2014, by and between the City and the City of Detroit Building Authority (the "Property Management Agreement"); and be it further

    **RESOLVED,** that a "Transaction Fee" may be deducted from the Purchase Price and be paid from the proceeds to the City of Detroit Building Authority in accordance with the terms of the Property Management Agreement; and be it further

    **RESOLVED,** that the sale of Property to Revere Dock, LLC, a Michigan limited liability company, without public advertisement or the taking of bids is hereby approved in accordance with Sec. 14-8-10 of the Detroit City Code; and be it further

    **RESOLVED,** that the Director of the Planning and Development Department, or his or her designee, is authorized to execute the Deed and such other documents as may be necessary or convenient for the consummation of the transaction pursuant to and in accordance with the Offer to Purchase; and be it further

    **RESOLVED,** that the Director of the Planning and Development Department, or his or her designee is authorized to execute any required instruments to make and incorporate technical amendments or changes to the Quit Claim Deed (including but not limited to corrections to or confirmations of legal descriptions, or timing of tender of possession of particular parcels) in the event that changes are required to correct minor inaccuracies or are required due to unforeseen circumstances or technical matters that may arise prior to the conveyance of the Property, provided that the changes do not materially alter the substance or terms of the transfer and sale; and be it finally

    **RESOLVED,** that the Deed will be considered confirmed when executed by the Director of the Planning and Development Department, or his or her designee and approved by the Corporation Counsel as to form.

EXHIBIT A
LEGAL DESCRIPTION


A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS LOTS 1187 THROUGH 1206 BOTH INCLUSIVE, ALL BEING TOGETHER WITH THE ADJACENT VACATED PUBLIC ALLEY (20 FEET WIDE) AND THE ADJACENT VACATED CAMPBELL AVENUE (66 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO PRIVATE CLAIM NO. 39 EXCEPT THE EASTERLY 574.00 FEET THEREOF LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE, EXCEPT A TRIANGULAR PORTION THEREOF DEFINED AS THE SOUTH 338.25 FEET ON THE WEST LINE OF PRIVATE CLAIM NO. 39 AND THE WEST 157.00 FEET ON THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1187 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE N.61°37'43"E. 578.36 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON AVENUE (80 FEET WIDE) TO A POINT BEING THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E. 1180.06 FEET ALONG A LINE 574.00 FEET WEST OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE; THENCE S.34°06'08"W. 494.78 FEET ALONG SAID DETROIT RIVER U.S. HARBOR LINE; THENCE N.55°47'32"W. 299.32 FEET TO A POINT ON THE WEST LINE OF PRIVATE CLAIM NO. 39; THENCE N.28°08'13"W. 1143.03 FEET ALONG SAID WEST LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF BEGINNING; SAID PARCEL CONTAINING 17.1009 ACRES, MORE OR LESS AND BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: _Basil Sam_ DATE: _4/28/2015_

Street Address[es]:

Property Tax Ward & Item numbers:



# ADOPTED AS FOLLOWS
# COUNCIL MEMBERS

| | YEAS | NAYS |
|---|---|---|
| Janee AYERS | ✓ | |
| Scott BENSON | ✓ | |
| Raquel CASTANEDA-LOPEZ | ✓ | |
| *George CUSHINGBERRY, JR. | ✓ | |
| Gabe LELAND | | ✓ |
| Mary SHEFFIELD | ✓ | |
| Andre SPIVEY | ✓ | |
| James TATE | ✓ | |
| Brenda PRESIDENT JONES | ✓ | |
| *PRESIDENT PRO TEM | | |
| | 8 | 1 |

## EXHIBIT 6I – REVERE DOCK OFFER TO PURCHASE

<u>PURCHASE AGREEMENT</u>

BY AND BETWEEN

CITY OF DETROIT

and

STEVEN W. ERICKSON, ON BEHALF OF AN ENTITY TO BE FORMED

(Erickson/Revere Copper Project)

Date: ___2/17___, 2015

# TABLE OF CONTENTS

RECITALS ........................................................................................................ 1
ARTICLE 1. DEFINITIONS ............................................................................ 1
   1.01 – "Agreement" .................................................................................. 1
   1.02 – "Associate" .................................................................................... 2
   1.03 – "Closing" ....................................................................................... 2
   1.04 – "Deed" ........................................................................................... 2
   1.05 – "Effective Date" ........................................................................... 2
   1.06 – "Encumbrance" ............................................................................ 2
   1.07 – "Event of Default" and "Default" ................................................ 2
   1.08 – "Property" ..................................................................................... 2
ARTICLE 2. SALE / COMPENSATION ........................................................ 2
   2.01 – Purchase Price ............................................................................. 2
ARTICLE 3. TITLE INSURANCE/DEED ...................................................... 2
   3.01 – Title Insurance/Survey ................................................................ 2
   3.02 – Title/Deed .................................................................................... 3
ARTICLE 4. TAXES AND ASSESSMENTS .................................................. 3
   4.01 – Property on Tax Rolls at Closing ................................................ 3
   4.02 – Property Not on Tax Rolls at Closing ......................................... 3
ARTICLE 5. REPRESENTATION AND WARRANTIES ............................. 4
   5.01 – Inducement ................................................................................. 4
   5.02 – Survival ....................................................................................... 5
ARTICLE 6. TESTS AND SURVEYANCE; CONDITION OF PROPERTY ... 5
   6.01 – Surveying and Testing ................................................................ 5
   6.02 – Condition of Property; Inspection Period ................................... 6
   6.03 – Release of City from Liability ..................................................... 6
   6.04 – Section 16 of NREPA ................................................................. 6
ARTICLE 7. CLOSING ................................................................................... 7
   7.01 – Time and Place of Closing ......................................................... 7
   7.02 – Conditions to Closing ................................................................. 7
   7.03 – Delivery of Deed and Possession ............................................... 8
   7.04 – Payment of Expenses ................................................................. 8
   7.05 – City's Failure to Convey ............................................................ 8
ARTICLE 8. DEFAULTS AND EVENTS OF DEFAULT ............................. 8
   8.01 – Default by Purchaser .................................................................. 8
   8.02 – Failure to Cure Default ............................................................... 9
   8.03 – Default by the City ...................................................................... 9
ARTICLE 9. REMEDIES ................................................................................ 9
   9.01 – Remedies Cumulative ................................................................ 9
   9.02 – Reimbursement of Costs ............................................................ 9
ARTICLE 10. RESTRICTION UPON SPECULATION AND ASSIGNMENT ... 10
   10.01 – No Speculation ......................................................................... 10
   10.02 – Prior Approval of Assignment .................................................. 10
   10.03 – Consideration for Assignment .................................................. 10
ARTICLE 11. INDEMNITY ............................................................................ 10
   11.01 – Purchaser Indemnification ........................................................ 10
   11.02 – Defense of Claims .................................................................... 10

i

11.03 - Non-Liability of the City .................................................... 10
11.04 - Hazardous Materials ......................................................... 11
ARTICLE 12.  AMENDMENTS .................................................. 12
12.01 - Form ................................................................................ 12
12.02 - Binding Effect .................................................................. 13
ARTICLE 13.  NOTICES ......................................................... 13
13.01 - Addresses ........................................................................ 13
13.02 - Date of Notice ................................................................ 13
ARTICLE 14.  SALE / COMPENSATION .................................. 14
14.01 - Severability ...................................................................... 14
14.02 - Entire Agreement ........................................................... 14
14.03 - Terminology .................................................................... 14
14.04 - Covenants and Conditions .............................................. 14
14.05 - Captions ........................................................................... 14
14.06 - Cumulative Remedies; Jurisdiction; Venue ..................... 14
14.07 - Force Majeure .................................................................. 14
14.08 - Provisions Not Merged With Deed .................................. 15
14.09 - Counterparts .................................................................... 15
14.10 - Singular and Plural, etc. .................................................. 15
14.11 - Time of the Essence ......................................................... 15
14.12 - Authority of City ............................................................. 15
EXHIBIT A ............................................................................. 17
EXHIBIT B ............................................................................. 19
EXHIBIT C ............................................................................. 20
EXHIBIT D ............................................................................. 22
Schedule I .............................................................................. 26

## PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** ("**Agreement**") is entered into as of _2/17_, 2015, by and between the **CITY OF DETROIT**, a Michigan public body corporate, acting by and through its Planning and Development Department, whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, referred to herein as the "**City**", and **STEVEN W. ERICKSON, ON BEHALF OF AN ENTITY TO BE FORMED,** whose address is 2217 Lake Avenue, North Muskegon, Michigan 49445, referred to herein as "**Purchaser.**"

### RECITALS:

A.     Purchaser has offered to purchase land located in the City of Detroit, the legal description of which is set forth on **Exhibit A** attached hereto and incorporated by reference, in accordance with the terms, covenants, and conditions of this Agreement.

B.     Purchaser's planned project for the Property includes the goals set forth on **Exhibit B** attached to this Agreement.

C.     The City believes that the sale of the Property pursuant to this Agreement and the fulfillment generally of this Agreement are in the best interests of the City and the health, safety and welfare of its residents.

In consideration of the foregoing recitals and the mutual obligations of the parties hereto, each of them does hereby covenant and agree with the other as follows:

### ARTICLE 1. DEFINITIONS

The following words and expressions shall, wherever they appear in this Agreement, be construed as follows:

1.01  "**Agreement**" shall mean this Agreement and the following Exhibits and Schedules attached hereto and expressly made a part hereof:

| Exhibit A | Description of Property |
|---|---|
| Exhibit B | Project Goals |
| Exhibit C | Quit Claim Deed |
| Exhibit D | Right of Entry Letter |
| Schedule I | Certificate of Authority for Purchaser |

BH 165144

1

1.02 **"Associate"** shall mean any consultant, contractor, subcontractor, or any other party engaged by Purchaser and the agents and employees of said parties engaged by Purchaser to undertake any of the activities associated with this Agreement.

1.03 **"Closing"** shall mean a date agreed upon by the parties hereto for the transfer of title to the Property, but in no event shall said date be more than ninety (90) days from the Effective Date of this Agreement.

1.04 **"Deed"** shall mean the Quit Claim Deed conveying the Property to Purchaser by the City in substantially the form as attached hereto as **Exhibit C**.

1.05 **"Effective Date"** shall have the meaning set forth in Section 14.12 of this Agreement.

1.06 **"Encumbrance"** shall mean any covenant, license, right of way, easement, limitation, condition, reservation, restriction, right or option, mortgage, pledge, lien, construction lien, mechanic's lien, charge, conditional sale or other title retention agreement or arrangement, encumbrance, lease, sublease, security interest, or trust interest.

1.07 **"Event of Default"** and **"Default"** shall have the meanings as set forth in Article 8 of this Agreement.

1.08 **"Property"** shall mean that parcel of land identified by as a part of the Revere Copper and Brass Site and located in the City of Detroit, as more particularly described in **Exhibit A** attached hereto and made a part hereof.

## ARTICLE 2. SALE / COMPENSATION

2.01 Purchase Price. Subject to the terms, covenants, and conditions of this Agreement, Purchaser agrees to purchase, and the City agrees to convey, the Property for Two Million Two Hundred Eighty Thousand Dollars ($2,280,000.00) ("Purchase Price"), to be paid in immediately available funds by wire transfer, or certified or cashier's check simultaneously with the delivery of the Deed.

## ARTICLE 3. TITLE INSURANCE/DEED

3.01 Title Insurance/Survey.

a. Commitment. Within five (5) business days following the Effective Date, Purchaser shall order a commitment for an owner's title insurance policy for the Property showing all matters affecting record title to the Property, subject to the terms, covenants, and conditions of this Agreement and standard exceptions, together with copies of all instruments described in Schedule B thereof (the "Title Commitment"). The Title Commitment will be in the amount of the Purchase Price and will be issued by eTitle Agency, with offices at 1650 West Big Beaver Road, Troy, Michigan 48084. A copy of the Title Commitment will be provided to the City promptly upon Purchaser's receipt.

b. Survey. Within thirty (30) days following the Effective Date, Purchaser shall obtain a current survey of the Property (the "Survey") from a registered land surveyor. The legal description of the Property set forth in the Title Commitment shall conform exactly to the legal descriptions in the Survey and the Survey shall contain such detail from the ALTA/ASCM Schedule A Table as Purchaser deems required. The Survey will be certified to the City, Purchaser, and others designated by Purchaser, and a copy will be provided to the City immediately upon Purchaser's receipt.

c. Title Objections. Purchaser shall have the right, until ten (10) days following receipt of the Title Commitment and the Survey (the "Review Period"), to identify in writing those matters and/or title encumbrances identified in the Title Commitment or Survey that are unacceptable to it, in which event the City shall have reasonable opportunity (but not the obligation) to cure or remove such matters (if any) and to satisfy any other requirements set forth therein. The items contained in the Commitment or the Survey to which Purchaser does not object during the Review Period shall be deemed permitted exceptions (the "Permitted Exceptions"). The City's failure or inability to, within twenty (20) days after receipt of notification of such objections (the "Cure Period"), cure such objections, or conscious decision not to do so, communicated in writing to Purchaser within the Cure Period, shall give Purchaser the right to terminate this Agreement and be relieved of all further obligation to perform hereunder upon notice to the City .

d. Policy. The City **WILL NOT** order or pay the premium for an owner's policy of title insurance, nor will the City provide any estoppel or seller's certificate to the Purchaser or the title insurance company. Any title insurance policy insuring Purchaser's title to the Property, whether an owner's or mortgage policy, with or without standard exceptions, will be at Purchaser's expense.

3.02   Title/Deed.

a. Conveyance. At the Closing, if Purchaser has materially complied with all of those terms and conditions precedent to Closing as specified hereunder, the City will deliver the Deed to the Property to Purchaser.

b. Title conveyed. Such conveyance and title shall fee simple, and shall, in addition to the conditions and covenants hereinafter provided for, be subject to existing easements and restrictions of record, all applicable zoning and building laws, and other encumbrances (if any) specifically referred to in Exhibit A. Purchaser acknowledges that the City has not made, and by execution of this Agreement or any Deed does not make, any representations or warranties whatsoever with respect to title to the Property.

## ARTICLE 4. TAXES AND ASSESSMENTS

4.01   Property on Tax Rolls at Closing. In the event that the Property is on the tax rolls at the date of Closing, all taxes and assessments which have become a lien upon the Property at the date of Closing shall be paid by the City provided that current City and County taxes shall be prorated and adjusted to the date of Closing on a due date basis.

4.02   Property Not on Tax Rolls at Closing. In the event that the Property is not on the tax rolls at the date of Closing, Purchaser agrees to pay to the City at Closing an amount equal to the City of

Detroit ad valorem taxes (including debt service but not including any ad valorem taxes which would have been collected by the City on behalf of another governmental body, whether the State, County or any other body or for any other millage) which would have been levied had the Property been on the tax rolls, prorated from the date of Closing to the dates when the next tax bills are issued after the date the Property is placed back on the tax rolls, and the Property will be placed back on the tax rolls as of December 31 of the year in which the Closing takes place. For example, if the date of Closing is on or before December 31, 2015, the Property would be placed back on the tax rolls effective December 31, 2015, the next tax bills issued would be July 1, 2016 for the summer taxes and December 1, 2016 for the winter taxes and the payment for taxes would be pro-rated to June 30, 2016 and November 30, 2016, respectively. If the date of Closing takes place on or after January 1, 2016, the Property will not be placed on the tax rolls until December 31, 2016, and tax bills will not be issued until July 1 and December 1, 2017 and, in that case, the payment for taxes would be prorated to June 30 and November 30, 2017.

## ARTICLE 5. REPRESENTATION AND WARRANTIES

5.01 Inducement. In order to induce the City to enter into this Agreement, Purchaser represents and warrants to the City that:

a. Organization and Qualification. Any permitted assignee of Purchaser shall be an entity validly existing and in good standing under the laws of the State of Michigan and with full power and authority to carry on its business as it is conducted at the time of the assignment of this Purchase Agreement.

b. Power to Make Agreement. It has the power to make, deliver and perform this Agreement and finance the Improvements in accordance with the terms and conditions of this Agreement and has taken all necessary action to authorize the foregoing and to authorize the execution, delivery and performance of this Agreement.

c. Lack of Legal Impediments. To the best of its knowledge, the execution, delivery and performance of this Agreement will not violate any provision of any existing law, regulation, order or decree of any court or governmental entity, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement, and will not violate any provision of, or constitute a default under, any agreement or contract to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement. Purchaser has paid all income, personal and property taxes, and inspection or license fees heretofore due, payable, and owing to the City. Purchaser is not in default to the City.

d. Legal Operation. It is, to the best of its knowledge, in compliance with all existing laws and regulations applicable to it, the violation of which would or could materially adversely affect its ability to fulfill its obligations under this Agreement.

e. Litigation. As of the date of this Agreement, no litigation or administrative proceeding of or before any court or administrative body is presently pending, nor, to its knowledge, is any such litigation or proceeding presently threatened, against it or any of its property, that, if adversely determined, would or could materially affect its ability to fulfill its obligations under this Agreement.

f. **Other Information**. To the best of its knowledge, all other written information, reports, papers, and data given to the City by Purchaser with respect to Purchaser are accurate and correct in all material respects and substantially complete insofar as completeness may be necessary to give the City a true and accurate knowledge of the subject matter and all projections of future results are, in its opinion, reasonable.

g. **Other Agreements**. To the best of its knowledge, it is not a party to any agreement or instrument materially and adversely affecting its present or proposed business, properties or assets, operation or condition, financial or otherwise, not disclosed to the City in writing, the existence of which would or could materially affect its ability to fulfill its obligations under this Agreement; and it is not in default in the performance, observance, or fulfillment of any of the material obligations, covenants, or conditions set forth in any agreement or instrument to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement.

h. **Brokerage and Finder's Fees and Commissions**. Purchaser has not engaged any broker, finder or agent with respect to the transactions contemplated by this Agreement. Purchaser shall indemnify and hold the City harmless from and against claims for brokerage in connection with this transaction by any person or party claiming by, through or under Purchaser.

5.02 **Survival**. All of the representations and warranties contained in this Article 5 or pursuant hereto shall survive the delivery of the Deed and shall remain in full force and effect for a period of six (6) months following the date of Closing. Purchaser shall indemnify and hold the City harmless from and against, and shall be obligated to pay and reimburse the City for, any and all out-of-pocket expenses (including reasonable attorneys' fees, whether inside or outside counsel) which the City may sustain or incur as a result of any misrepresentation or breach of warranty on the part of Purchaser due to the City's reliance thereon. The "best of Purchaser's knowledge" is based on Purchaser's actual knowledge and is without any duty to investigate. Purchaser shall have no liability for a breach of any representation or warranty in the event that Purchaser gives written notice to the City prior to Closing that such representation or warranty was inaccurate or any document or report furnished to or obtained by the City, its agents, employees or contractors in connection with this Agreement shall have disclosed that such representation or warranty was inaccurate prior to Closing.

# ARTICLE 6. TESTS AND SURVEYANCE; CONDITION OF PROPERTY

6.01 **Surveying and Testing**. The City will, prior to the transfer of title, authorize Purchaser through and in accordance with a fully executed Right-of-Entry, to make soil boring and bearing tests and undertake such surveying and environmental and other due diligence activities as Purchaser deems appropriate, provided such does not interfere with the City's use, if any, and subject to the Purchaser's compliance with the requirements of this Article 6 and elsewhere in this Agreement. All such testing shall be done at Purchaser's risk and expense. Subject to the terms of the aforementioned Right of Entry, Purchaser shall give prior notice to the City to inspect and investigate the condition of the Property, including its environmental condition and shall conduct such inspection and investigation as Purchaser desires during normal business hours. Prior to entering onto the Property for such purposes, Purchaser shall (i) request authorization from the Building, Safety, Engineering and Environmental Department and provide details of the intended activities and other documentation deemed necessary by

the City, (ii) obtain a Right-of-Entry letter from City, (iii) execute said letter, and (iv) comply with all conditions and requirements stated therein. Purchaser shall use all reasonable efforts to minimize damage to the Property in connection with such entry and shall fully restore the Property to the condition existing prior to such entry. Purchaser shall indemnify, defend and hold the City harmless from and against, any and all loss, cost, liability and expense, including reasonable attorneys' fees and litigation costs, suffered or incurred by the City as a result of the Purchaser's activities in accordance with the Right-of-Entry. Purchaser shall submit to the City a copy of each survey or report generated as a result of such activities.

6.02    Condition of Property; Inspection Period.

a.    Purchaser takes the Property as it finds it, "AS IS", and the City makes no implied or express representations or warranties as to its fitness for absolutely any purpose whatsoever. By executing this Agreement, Purchaser acknowledges that it is satisfied with the condition of the Property, subject only to inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above. If, within ninety (90) days of the Effective Date, Purchaser fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based upon the results of such tests, investigations or surveys, or fails to deliver copies of any and all reports of such tests, investigations and/or surveys to the City, Purchaser shall be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

b.    In order to facilitate Purchaser's investigation of the Property, within ten (10) business days of the Effective Date hereof, the City shall deliver copies of any existing (i) environmental site assessments, reports, notices or correspondence from environmental regulatory authorities or citations, (ii) lease agreements, lease modifications, or third-party property/occupancy rights, if any (iii) notices or other correspondence that has been received from any governmental agency regarding the condition of the Property or pending government actions, (iv) land surveys, and (v) soil reports (collectively, the "Due Diligence Materials"), provided the same are in the City's possession or control.

c.    In the event Purchaser determines, based on its inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above that it does not wish to proceed with the purchase of the Property, Purchaser shall have the right for any reason whatsoever in its sole discretion, prior to the ninety-first (91st) day following the Effective Date, to terminate this Agreement by delivery of a written notice to the City (the "Notice of Termination"). Upon timely delivery by Purchaser of the Notice of Termination, this Agreement shall terminate without liability of Purchaser.

6.03    Release of City from Liability. Purchaser hereby releases the City and its officials, employees, and agents (but not any third party) from any and all liability for any defects in or conditions of the Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, or conditions currently existing thereon, including but not limited to conditions described in Section 11.04, but subject to Section 11.04.

6.04    Section 16 of NREPA. Pursuant to the requirements of Section 16 of Part 201 of NREPA, MCL 324.20116, Purchaser agrees that the City has notified Purchaser that the Property is a

"facility" as that term is defined in Part 201 of NREPA. The general nature and extent of any land or resource restrictions or any release at or from the facility that is known to the City is more fully described in certain reports, copies of which have been provided to Purchaser. By its execution of this Agreement, Purchaser acknowledges receipt of the following reports:

Insert list of documents, if any, identified by DEA: None

## ARTICLE 7. CLOSING

7.01    <u>Time and Place of Closing.</u>  The City will notify Purchaser of the prospective closing date not less than ten (10) calendar days prior to the Closing, unless otherwise agreed between the parties. The Closing shall occur within thirty (30) days after satisfaction of the conditions to closing as specified in Section 7.02 of this Agreement. The Closing shall take place at the office of the City's Planning & Development Department, or such other location in downtown Detroit designated by the City. If the conditions to closing specified in Section 7.02 of this Agreement have not been satisfied or waived by June 1, 2015, either party may, thereafter, terminate this Agreement without further liability.

7.02    <u>Conditions to Closing.</u>

a.    <u>City's Obligations to Close.</u>  The obligation of the City to effect a Closing hereunder shall be subject to receipt of a resolution(s) by the Detroit City Council authorizing the transaction and fulfillment of all conditions contained therein, and fulfillment by Purchaser of each of the following conditions precedent:

(i)    <u>Accuracy of Representations and Warranties.</u>  All representations and warranties of Purchaser set forth in Section 5.01 of this Agreement shall be true and correct as of the date of Closing as if made on that date.

(ii)    <u>Resolution of Purchaser's Authority.</u>  Upon Purchaser's assignment of this Agreement in accordance with Section 10.02 of this Agreement, such assignee shall furnish to the City a certified copy of a resolution satisfactory to the City in form and substance, duly adopted by the Board of Directors or Members of Purchaser's assignee, or an authorized vote of the partners or joint venturers, authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder. Purchaser's assignee shall also furnish to the City an incumbency certificate, executed by the corporate secretary, general partner, or proper manager of Purchaser's assignee, identifying the officers, general partners, or managers of Purchaser's assignee.

(iii)    <u>Payment of Purchase Price and Closing Costs.</u>  Purchaser shall have tendered payment of the Purchase Price and the closing costs payable by Purchaser.

(iv)    <u>No Default.</u>  There shall be no existing Default by Purchaser under this Agreement.

(v)    <u>Development Agreement.</u>  Purchaser shall have executed and delivered to the City a development agreement for the Property in a form approved by the City.

b. Purchaser's Obligations to Close. The obligation of Purchaser to effect a Closing hereunder shall be subject to the fulfillment by the City of each of the following conditions precedent:

(i) Title. Title to the Property shall be in the form required by this Agreement.

(ii) City Council and Other Approval. The City shall furnish to Purchaser a resolution(s) by the Detroit City Council authorizing the transaction and all conditions contained therein shall be fulfilled.

(iii) Acceptable Condition of Property. The physical and environmental condition of the Property and the results of Purchaser's other investigations shall be acceptable to Purchaser, pursuant to Article 6.

7.03    Delivery of Deed and Possession. The City will deliver the Deed to the Property and the possession thereof to Purchaser at the Closing provided that Purchaser has complied with all conditions precedent as specified herein. Purchaser shall be responsible for recording the Deed and paying all recording costs (including the cost of the documentary stamp tax on the Deed, if any).

7.04    Payment of Expenses. Purchaser shall pay all costs, fees, and out of pocket expenses of whatsoever kind or nature related to the procurement of services of Associates and contractors, etc. which have been incurred pursuant to the making of this Agreement and shall hold the City harmless with respect to the payment of same notwithstanding anything contained herein or elsewhere to the contrary.

7.05    City's Failure to Convey. In the event the City does not tender the conveyance of the Property in the manner provided in this Agreement, and any such failure shall not be cured within thirty (30) days after written demand by Purchaser, then, provided Purchaser is not in material Default under this Agreement, at the option of Purchaser, this Agreement shall be terminated, or, if all of the conditions set forth in Section 7.02a above have been satisfied, Purchaser shall be entitled to seek specific performance of this Agreement. In no event shall Purchaser seek or be entitled to money damages.

## ARTICLE 8. DEFAULTS AND EVENTS OF DEFAULT

8.01    Default by Purchaser. The occurrence of any one or more of the following events prior to Closing shall constitute a Default of this Agreement by Purchaser:

a.    Purchaser admits in writing its inability to pay its debts generally as they become due, or Purchaser ceases to conduct business in the normal course by reason of any of the following: (i) The making by Purchaser of any general arrangement or general assignment for the benefit of creditors; (ii) Purchaser becoming a "debtor" as defined in 11 USC § 101 or any successor statute thereto (unless, in the case of a petition filed against Purchaser, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where possession is not restored to Purchaser within sixty (60) days; (iv) the attachment, execution or other judicial seizure of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where such

seizure is not discharged within sixty (60) days; or (v) its voluntary or involuntary dissolution. In the event that any provision of this subsection is contrary to any applicable law, such provision shall be of no force or effect.

  b.  Purchaser violates any of the terms and conditions of this Agreement, except as otherwise provided in this Section 8.01, and Purchaser fails to cure same within thirty (30) days after receipt of written notice by the City to cure said Default.

  c.  Purchaser, not due to any breach of the City, does not acquire the Property pursuant to a Closing in accordance with this Agreement, unless such failure is due to the failure of a condition precedent to Purchaser's obligation to close as set forth in this Agreement.

  8.02  Failure to Cure Default.  Any such Default on the part of Purchaser as set forth in Section 8.01 and the failure of Purchaser to cure such Default or within thirty (30) days after written demand by the City to cure said Default for Subsection 8.01b shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Purchaser's Default is such that more than the cure period provided is reasonably required for its cure, then Purchaser shall not be deemed to be in default if Purchaser commences such cure within said period and thereafter diligently pursues such cure to completion.  Defaults pursuant to Subsections 8.01a are hereby deemed to be material, non-curable Events of Default without the necessity of any notice by the City to Purchaser thereof. The City may, in its sole discretion, waive in writing any Default or Event of Default by Purchaser.

  8.03  Default by the City.  The City shall not be in default unless the City fails to perform obligations required of the City within a reasonable time, but in no event later than ninety (90) days, after written notice by Purchaser to the City, specifying wherein the City has failed to perform such obligation, provided, however, that if the nature of the City's obligation is such that more than ninety (90) days are reasonably required for performance then the City shall not be in default if the City commences performance within such ninety (90) day period and thereafter diligently pursues such performance to completion.

## ARTICLE 9. REMEDIES

  9.01  Remedies Cumulative.  The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breach.  No waiver made by the City shall apply to obligations beyond those expressly waived in writing.

  9.02  Reimbursement of Costs.  Purchaser shall reimburse the City for its expenses, including reasonable attorney fees (whether inside or outside counsel), reasonably incurred by the City after an Event of Default in connection with the enforcement of or the preservation of any rights under this Agreement.

## ARTICLE 10. RESTRICTION UPON SPECULATION AND ASSIGNMENT

10.01  No Speculation.  Purchaser represents that its purchase of the Property and its other undertakings pursuant to this Agreement are for the purpose of development of the Property for use in conjunction with Purchaser's transportation business and not for speculation.

10.02  Prior Approval of Assignment.  Purchaser will not assign this Agreement, without the prior written approval of the City, except for an assignment to an entity controlled by Purchaser. Any proposed transferee shall, by instrument in writing, for itself and its successors and assigns, and expressly for the benefit of the City, assume all of the obligations of Purchaser under this Agreement and agree to be subject to all the conditions and restrictions to which Purchaser is subject.  The consent of the City to an assignment or transfer in any one case shall not relieve Purchaser or the transferee of the obligation to obtain the consent of the City for any additional assignments or transfers.

10.03  Consideration for Assignment.  Prior to the City's approval of any assignment pursuant to Section 10.02, Purchaser shall certify to the City that the consideration paid for the transfer of any of Purchaser's interest in this Agreement does not exceed an amount representing the actual cost (including carrying charges) incurred by Purchaser in connection with this Agreement; it being the intent of this Section to preclude assignment of this Agreement for profit.  In the event Purchaser transfers any such interest at a profit, said profit shall belong to and forthwith be paid to the City.

## ARTICLE 11. INDEMNITY

11.01  Purchaser Indemnification.  Purchaser agrees to and shall indemnify and save harmless the City, its agents and employees against and from any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including without limitation, reasonable fees and expenses of attorneys, whether inside or outside counsel, expert witnesses and other consultants) (collectively, "Damages") that may be imposed upon, incurred by or asserted against the City related to this purchase by reason of any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom, except to the extent such Damages are caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct. Purchaser also agrees to hold the City harmless from any and all injury to the person or damage to the property of an employee of the City which arises out of or pursuant to any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom except to the extent such loss or injury is caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct.

11.02  Defense of Claims.  In the event any action or proceeding shall be brought against the City by reason of any claim covered hereunder, Purchaser, upon notice from the City, will at its sole cost and expense, resist and defend the same, using legal counsel reasonably acceptable to the City.

11.03  Non-Liability of the City.  From and after the date of Closing, the City shall not be responsible or liable to Purchaser, and Purchaser hereby releases the City from liability, for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying any part of the

Property. From or after the date of Closing, Purchaser shall be solely responsible for all injuries to persons and property resulting from any accident, explosion, leak or other cause arising in or about the use of the Property and its appurtenances, as hereinbefore stated. The City shall not be responsible for any loss or damage resulting to Purchaser or its property or to any other person or persons on their property which may be caused by the bursting, stopping, or leaking of water, gas, sewer or steam pipes or from overflow or backing up of any sewer or water main, unless caused by the City's gross negligence or willful misconduct.

11.04   Hazardous Materials.

    a.   Definitions.

        (i)   **"Relevant Environmental Laws,"** as referred to herein, shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations, and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, the present or the future, with respect to:

            (a)   the installation, existence, or removal of, or exposure to, Asbestos on the Property.

            (b)   the existence on, discharge from, or removal from the Property of Hazardous Materials.

            (c)   the effects on the environment of the Property or of any activity conducted on the Property.

Relevant Environmental Laws shall include, but are not limited to, the following: (i) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC Sections 9601, *et seq.*; the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, *et seq.*; the National Environmental Policy Act, 42 USC Section 4321; the Safe Drinking Water Act, 42 USC Sections 300F, *et seq.*; the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Federal Water Pollution Control Act, 33 USC Sections 1251, *et seq.*; the Clean Air Act, 42 USC Sections 7401, *et seq.*; and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including 29 CFR Sections 1910.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any state and local laws and regulations pertaining to Hazardous Materials and/or Asbestos.

        (ii)   **"Asbestos,"** as referred to herein, shall have the meanings provided under the Relevant Environmental Laws and shall include, but not be limited to, asbestos

fibers and friable asbestos as such terms are defined under the Relevant Environmental Laws.

(iii) **"Hazardous Materials,"** as referred to herein, shall mean any of the following as defined by the Relevant Environmental Laws: Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes, or contaminants (including, but not limited to, polychlorinated biphenyls (PCB's), paint containing lead, and urea formaldehyde foam insulation).

b. Release and Indemnity. The City shall give Purchaser the opportunity to inspect the Property and conduct such environmental assessments and testing as Purchaser has deemed appropriate. The City shall not be liable to Purchaser for, and Purchaser, for itself and its successors and assigns, hereby releases the City from, any and all liability for any violation or alleged violation of the Relevant Environmental Laws by Purchaser respecting the Property, whether such alleged violation occurred before or after Closing and the transfer of possession to Purchaser. The City shall not be liable for, and Purchaser shall immediately pay to the City when incurred and shall indemnify, defend and hold the City harmless from and against, all loss, cost, liability, damage and expense (including, but not limited to, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that the City may suffer or incur as a result of or in connection in any way with any violation of the Relevant Environmental Laws occurring after the Closing, any environmental assessment or study from time to time undertaken or requested by Purchaser, or breach of any covenant or undertaking by Purchaser in this Section; provided, however, Purchaser shall have no obligation to the City with respect to: (i) indemnified liabilities arising solely from the gross negligence or willful misconduct of the City; or (ii) conditions or Hazardous Materials existing at the time of Closing.

c. Survival. The provisions of this Section shall survive the termination of this Agreement.

d. Breach. Breach of any of the representations, warranties and/or covenants contained in this Article shall be a default under this Agreement; provided, however, that no breach shall be deemed to have occurred so long as, upon becoming aware of a possible breach, Purchaser proceeds to reasonably investigate and remedy in compliance with the Relevant Environmental Laws the matter giving rise to the possible breach.

e. Assignment of Cause of Action. The City shall, upon request of Purchaser, convey, assign and transfer to Purchaser any claim or cause of action the City may have against others in connection with any liability against which Purchaser has fully indemnified the City (including payment) under this Agreement.

## ARTICLE 12. AMENDMENTS

12.01 Form. Any change, addition, deletion, extension or modification of this Agreement (including assignments) that is mutually agreed upon by and between the City and Purchaser shall be incorporated in a written amendment (herein called **"Amendment"**) to this Agreement. Such Amendment shall not invalidate this Agreement nor relieve or release Purchaser of any of its obligations under this Agreement unless stated therein.

12.02  Binding Effect.  No Amendment to this Agreement shall be effective and binding upon the parties unless it expressly makes reference to this Agreement, is in writing, is signed and acknowledged by duly authorized representatives of both parties.  To be effective against the City, the Amendment must be authorized as set forth in Section 14.12 of this Agreement.

## ARTICLE 13. NOTICES

13.01  Addresses.  Except as otherwise specified herein, all notices, consents, approvals, requests and other communications (herein collectively called "Notices") required or permitted under this Agreement shall be given in writing and personally delivered with receipt obtained, or mailed by registered or certified first-class mail, return receipt requested, addressed as follows:

If to the City:
    Director
    City of Detroit
    Planning & Development Department
    2000 Cadillac Square
    Detroit, Michigan 48226

    with a copy to:

    Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Detroit, Michigan 48226

If to Purchaser:
    Steven W. Erickson, on behalf of an entity to be formed
    2217 Lake Avenue
    North Muskegon, Michigan 49445

    with a copy to:

    Beth S. Gotthelf, Attorney at Law
    Butzel Long
    Stoneridge West, 41000 Woodward Avenue
    Bloomfield Hills, Michigan 48304

13.02  Date of Notice.  All notices shall be deemed given when hand-delivered or, if mailed, three (3) days after the day of mailing.  Either party to this Agreement may change its address for the receipt of Notices at any time by giving notice thereof to the other as provided in Section 13.01.  Any Notice given by a party hereunder must be signed by an authorized representative of such party.

## ARTICLE 14. MISCELLANEOUS

14.01  Severability.  If any one or more provisions of this Agreement or in any instrument or other document delivered pursuant to this Agreement or the application thereof to any person or circumstance shall to any extent be declared or determined to be invalid or unenforceable, the validity, legality and enforceability of the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected or impaired thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.02  Entire Agreement.  This instrument, including the exhibits listed in Section 1.01 which are attached hereto and which are made a part of this Agreement, contains the entire agreement between the parties and all prior negotiations and agreements are merged herein.  Purchaser acknowledges that neither the City nor the City's agents have made any representations except those expressly set forth herein, and no rights or remedies are or shall be acquired by Purchaser by implication or otherwise unless expressly set forth herein.

14.03  Terminology.  Unless the context otherwise expressly requires, the words "herein", "hereof", and "hereunder", and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision.

14.04  Covenants and Conditions.  All the terms and provisions of this Agreement shall be deemed and construed to be "covenants" and "conditions" as though the words specifically expressing or imparting covenants and conditions were used in each separate term and provision.

14.05  Captions.  The headings of the Articles, Sections and other subdivisions in this Agreement are for convenience only and shall not be used to construe or interpret the scope or intent of this Agreement or in any way affect the same.

14.06  Cumulative Remedies; Jurisdiction; Venue. The rights and remedies set forth herein are not exclusive and are in addition to any of the rights and remedies provided by law or equity; provided, however, that if the City breaches any of its obligations under this Agreement, then, after reasonable notice and opportunity to cure, Purchaser shall have the right solely to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement, and in no event shall Purchaser be entitled to monetary damages as a result of the City's breach of this Agreement.  All actions arising under this Agreement shall be governed by, subject to, and construed according to the laws of the State of Michigan.  Purchaser agrees, consents and submits to the personal jurisdiction of any competent court in Wayne County, Michigan for any action brought against it arising out of this Agreement.  Purchaser agrees that service of process at the address and in the manner specified in Article 13 will be sufficient to put Purchaser on notice.  Purchaser also agrees that it will not commence any action against the City because of any matter whatsoever arising out of or relating to the validity, construction interpretation and enforcement of this Agreement, in any courts other than those in the County of Wayne, State of Michigan.

14.07  Force Majeure.  In the event of enforced delay in the performance by either party of obligations under this Agreement due to unforeseeable causes beyond its control and without its fault or

negligence, including, but not restricted to, acts of God or of the public enemy, acts of the government, acts of the other party, fires, floods, epidemics, or severe weather, the time for performance of such obligations shall be extended for the period of the enforced delays; provided that the party seeking the benefit of the provisions of this Section shall within thirty (30) days after the beginning of such enforced delay, have first notified the other party in writing of the causes thereof and requested an extension for the period of the enforced delay.

14.08  Provisions Not Merged With Deed.  No provision of this Agreement is intended to or shall be merged by reason of any Deed transferring title to the Property from the City to Purchaser or any successor in interest, and any such Deed shall not be deemed to affect or impair the provisions and covenants of this Agreement.

14.09  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original document but together shall constitute one instrument.

14.10  Singular and Plural, etc.  As used herein, the singular include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

14.11  Time of the Essence.  Time is of the essence of this Agreement.

14.12  Authority of City.  Notwithstanding anything in this Agreement or otherwise to the contrary, the City shall not be authorized or obligated to sell the Property to Purchaser until the date that this Agreement has been fully executed by the duly authorized representative of the City pursuant to the resolution of the Detroit City Council or other governmental official or agent with jurisdiction over the matter and approved by the City of Detroit Law Department (the "Effective Date").  Any amendments or modifications must likewise be duly authorized by resolution and approval of all of the same parties.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

BH 165144

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

_Brooke Erickson_
BROOKE ERICKSON
Print:

_Nancy Teichma_
Print: Nancy Teichma

STATE OF MICHIGAN )
)ss.
COUNTY OF Muskegon )

PURCHASER

STEVEN W. ERICKSON, ON BEHALF
OF AN ENTITY TO BE FORMED

By: _[signature]_
Print:          Steven W. Erickson

The foregoing instrument was acknowledged before me on February 17 , 2015, by Steven W. Erickson.

Kimberly Lynn Olsen
Notary Public, Muskegon County, MI
My commission expires June 30, 2018

_Kimberly Lynn Olsen_
Print:
Notary Public Muskegon County, Michigan
My commission expires: 6/30/2018
Acting in the County of Muskegon

WITNESSES:

_____
Print:

_____
Print:

STATE OF MICHIGAN )
)ss.
COUNTY OF WAYNE )

CITY OF DETROIT,
a Michigan public body corporate

By: _____
Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

The foregoing instrument was acknowledged before me on _____, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

_____
Print:
Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of Wayne

BH 165144

16

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

_____
Print:

_____
Print:

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF _____  )

    The foregoing instrument was acknowledged before me on _____, 2015, by Steven W. Erickson.

**PURCHASER**

STEVEN W. ERICKSON, ON BEHALF OF AN ENTITY TO BE FORMED

By: _____
Print:      Steven W. Erickson

_____
Print:
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in the County of _____

WITNESSES:

_____
Print:

_____
Print:

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF WAYNE      )

    The foregoing instrument was acknowledged before me on *March 30*, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

**CITY OF DETROIT,**
a Michigan public body corporate

By: _____
Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

Print: *Karen M. Beaver*
Notary Public, Wayne County, Michigan
My commission expires: *6/21/2018*
Acting in the County of Wayne

KAREN M. BEAVER
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 21 2018
ACTING IN COUNTY OF *Wayne*

BH 165144

16

# EXHIBIT A
## LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS LOTS 1187 THROUGH 1206 BOTH INCLUSIVE, ALL BEING TOGETHER WITH THE ADJACENT VACATED PUBLIC ALLEY (20 FEET WIDE) AND THE ADJACENT VACATED CAMPBELL AVENUE (66 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO PRIVATE CLAIM NO. 39 EXCEPT THE EASTERLY 574.00 FEET THEREOF LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE, EXCEPT A TRIANGULAR PORTION THEREOF DEFINED AS THE SOUTH 338.25 FEET ON THE WEST LINE OF PRIVATE CLAIM NO. 39 AND THE WEST 157.00 FEET ON THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1187 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE N.61°37'43"E. 578.36 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON AVENUE (80 FEET WIDE) TO A POINT BEING THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E. 1180.06 FEET ALONG A LINE 574.00 FEET WEST OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE; THENCE S.34°06'08"W. 494.78 FEET ALONG SAID DETROIT RIVER U.S. HARBOR LINE; THENCE N.55°47'32"W. 299.32 FEET TO A POINT ON THE WEST LINE OF PRIVATE CLAIM NO. 39; THENCE N.28°08'13"W. 1143.03 FEET ALONG SAID WEST LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF BEGINNING; SAID PARCEL CONTAINING 17.1009 ACRES, MORE OR LESS AND BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: _____ DATE: _____

Street Address[es]:

Property Tax Ward & Item numbers:

EXHIBIT B
PROJECT GOALS

1) Construction contracts shall provide that at least fifty-one percent (51%) of the workforce must be Detroit residents, and Detroit residents shall perform fifty-one percent (51%) of the hours worked on the project.

2) Purchaser shall establish a goal of contracting with at least thirty percent (30%) of Detroit-based Businesses, Detroit-headquartered Businesses, and/or Detroit Emerging Businesses (gross receipts of $1 million or less) retained to provide services on the project. Of these categories, the City will give greater weight to Detroit-headquartered Businesses.

# EXHIBIT C

## QUIT CLAIM DEED

Subject to the following paragraph, the City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("**Grantor**"), quit claims to quit claims to _____, whose address is 2217 Lake Avenue, North Muskegon, Michigan 49445 ("**Grantee**"), the premises located in the City of Detroit, Wayne County, Michigan, described as:

(See attached Exhibit A)

A/K/A _____     Ward: _____ Item(s):

(the "**Property**"), for the sum of _____ ($ _____ ), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances and restrictions of record.

This deed is dated as of _____.

WITNESSES:                              CITY OF DETROIT, a Michigan public body
                                        corporate

_____               By: _____
Print:                                  Print: _____
                                        Its: _____
_____
Print:


WITNESSES:                              CITY OF DETROIT, a Michigan public body
                                        corporate

_____               By: _____
Print:                                  Print: _____
                                        Its: _____
_____
Print:

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF WAYNE      )

The foregoing instrument was acknowledged before me on _____, 20___, by _____, the _____ of the City of Detroit, a Michigan public body corporate, on behalf of the City

_____
Print:

Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of _____

Pursuant to § 18-5-4 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this instrument.

Approved by City Council on _____
JCC pp _____ or Detroit Legal News, _____, on file in my office.

Approved by Mayor on _____

_____
Finance Director

Approved by Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit:

_____
City Clerk

_____
Corporation Counsel

This Instrument Drafted by:
Bruce N. Goldman
Property Section
City of Detroit Law Department
2 Woodward Avenue, Suite 550
Detroit, Michigan 48226

When recorded, return to:
Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

## EXHIBIT D

### Right of Entry Letter

**[DATE]**

_____, Project Manager
[Name of Environmental Consultant]
[Address]

**RE: Request for Right-of-Entry:**
**[Address/Location] (Ward #/Item #)**
**Detroit, Michigan**

Dear _____:

You have requested a right-of-entry to conduct [general description of requested activities] at the above-referenced address (hereinafter, the "Site").

Please be advised that the City of Detroit grants permission to **[Environmental Consultant]**, including its contractors, subcontractors, representatives, agents, and employees (collectively, "User") to enter the above-referenced Site for the sole purpose of conducting certain environmental activities, within the confines of the Scope of Work contained in **Exhibit A.**

This Right-of-Entry is subject in all respects to the following conditions:

1. Subject to satisfaction of the terms and conditions contained herein, this Right-of- Entry shall commence on **[start date]**, and shall automatically terminate upon the completion of the work described herein, or on **[end date]**, whichever occurs first.

2. User shall hold the City of Detroit harmless and shall defend and indemnify the City of Detroit from and against any and all damages, claims, obligations, penalties, costs, charges, losses, demands, liabilities, and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City of Detroit or its departments, officers, employees, or agents arising from and related to User and its contractors', subcontractors', representatives', agents', and employees' use of the Site and this Right-of-Entry (including but not limited to, any release or threatened release of hazardous and non-hazardous substances, contaminants, exacerbation, evacuation, on-site and/or off-site property damage, or bodily injury).

3. **[Environmental Consultant]** shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

   • Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence-based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

- Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

- Worker's Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

- Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificates of insurance, without limitation, for all preceding coverage, excluding workers' compensation and employers' liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies.

4. User shall not impair any part of the Site, except as customarily incident to the activities described in Exhibit A and in accordance with all applicable laws. User shall repair any damage caused to the Site and/or properties affected by the activities at the Site, and restore the Site and/or properties affected by the activities at the Site to its/their original condition. Initial access to the Site shall be coordinated through the Planning and Development Department, Property Management Section at (313) 224-1187.

5. User shall contact the Department of Public Works, City Engineering Division at (313) 224-3935 upon the discovery of any damage caused by User's activities to the curb, sidewalk, street, or any portion of the right of way and/or infrastructure in order to provide notice and obtain the proper City of Detroit permits for repair.

6. User will not bring any soils or other materials onto the Site, except in strict accordance with the Department of Public Works, City Engineering Division Standard Specifications for the above-referenced Site and only with prior written verification for compliance by the City of Detroit's Buildings, Safety Engineering, and Environmental Department –Environmental Affairs of the User's fill material analytical data. User shall be responsible for the removal of any and all materials, tools and equipment brought onto the Site required for the authorized activities, and User shall assume the risk of loss or damage to any materials, tools and equipment.

7. User is entering upon and using the Site at its own risk, and accepts the Site "As Is". The City of Detroit makes no representation or warranty as to the status of title or the physical or environmental condition of the Site, or its fitness for any particular use.

8. User shall take all reasonable measures and precautions to mitigate any noise, vibrations, dust, and odors emanating from the activities on the Site.

9. User shall immediately notify the City's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs at (313) 471-5108 upon the discovery of a suspected release of hazardous substances, hazardous materials, contaminants, or property damage as a result of User's activity at the Site.

10. User shall provide to the City of Detroit, without charge, copies of any and all draft and final work plans, reports, health and safety plans, and other environmental, analytical, or engineering documents relating in any way or arising out of its activities at the Site.

Upon the preparation of the documents, three copies of each document shall be provided to:

> Raymond A. Scott, General Manager
> City of Detroit
> Buildings, Safety Engineering, and Environmental Department
> 2 Woodward Avenue, Suite 401
> Detroit, Michigan 48226

11. This instrument and the rights granted hereunder may not be assigned by User.

12. User shall take all precautions necessary to make the Site safe for the authorized activities, including, where appropriate, preparation and adherence to a site-specific health and safety plan.

13. User shall be responsible for ensuring compliance with all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders. Any violation of the applicable laws, rules, regulations, standards, plans, and orders; or breach of the terms contained within this document may be considered grounds for termination of the Right-of-Entry.

14. This instrument constitutes the entire Right-of-Entry agreement between the City of Detroit and the User with respect to its subject matter. This agreement may not be modified, amended, changed, or altered in any respect unless done so in a writing acknowledged by both the City of Detroit and User.

15. No activities other than the activities authorized in Exhibit A may be performed on the Site.

This Right-of-Entry will be effective only upon execution of the acknowledgment and agreement noted herein by an authorized representative of User and upon delivery of same to Mr. Raymond Scott, Buildings, Safety Engineering, and Environmental Department, at the address listed above.

Sincerely,

---

\*\*\* [Authorized City of Detroit Department Signature]

[Environmental Consultant], by its duly authorized representative, hereby acknowledges receipt of the original copy of this letter, and agrees to be bound by the terms and conditions stated therein.

[ENVIRONMENTAL CONSULTANT]
BY: _____
(Signature)

PRINT NAME: _____
ITS: _____
(Duly Authorized Representative)

DATE _____
TELEPHONE NUMBER: _____

EXHIBIT A TO SAMPLE ENVIRONMENTAL RIGHT-OF-ENTRY DOCUMENT

SCOPE OF WORK

The following is the Scope of Work that [Environmental Consultant], its contractors, subcontractors, representatives, agents and employees (collectively, "User"), is authorized to perform at the Site. User shall be responsible for ensuring compliance in all respects with the Scope of Work, and all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders.
User is only authorized to undertake the following activities at the Site:

[LIST OF AUTHORIZED ACTIVITIES]

Schedule I

## CERTIFICATE OF AUTHORITY

I, _____, _____ of
, a _____, a Michigan _____ (the "Company")

DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

☐      the minutes of a meeting of the _____ of the Company duly called and held on _____

☐      a consent in lieu of a meeting, with signed consents received from the requisite number of _____ of the Company on or before the date hereof.

and that the same is now in full force and effect:

"RESOLVED, that any _____ of the Company, is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such _____ [Managers/Officers] to be conclusive evidence of such approval."

I FURTHER CERTIFY that the following persons are Officers:

I FURTHER CERTIFY that any of the aforementioned _____ [Managers/Officers] of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _____ day of _____, 20___.

_____
Print: _____