# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S SUPPLEMENT TO ITS MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II) REQUIRING THE DISMISSAL OF THE STATE COURT ACTION FILED BY TANYA HUGHES

The City of Detroit, Michigan ("City"), by its undersigned counsel, files this Supplement to its Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring the Dismissal of the State Court Action filed by Tanya Hughes (Docket # 9970) ("Motion") pursuant to this Court's Order Regarding Further Proceedings on the Motion (Docket # 10053) ("Order"). In support of this Supplement, the City states as follows:

1. On July 15, 2015, the Court held a hearing on the Motion and on July 16, 2015, this Court entered the Order.

2. In accordance with the Order, the City supplements its Motion with the following documents:

    a. The decision of the police trial board referred to in paragraph 19 of the Motion. *See* Exhibit 1.

    b. The Opinion and Award referred to in paragraph 21 of the Motion. *See* Exhibit 2.

    c. The provisions in the applicable collective bargaining agreement which describe the procedure, including the procedure on appeal(s), which applied to the City's effort(s) to terminate Tanya Hughes. *See* Exhibit 3.

WHEREFORE, the City respectfully requests that the Court enter the proposed order attached to the Motion.

July 29, 2015

Respectfully submitted,

By: /s/ Marc N. Swanson
    Jonathan S. Green (P33140)
    Marc N. Swanson (P71149)
    MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    green@millercanfield.com
    swansonm@millercanfield.com

    Charles N. Raimi (P29746)
    Deputy Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Coleman A. Young Municipal Center
    Detroit, Michigan 48226
    Telephone: (313) 237-5037
    Facsimile: (313) 224-5505
    raimic@detroitmi.gov

    ATTORNEYS FOR THE CITY OF DETROIT

2

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 29, 2015, he served a copy of the City of

Detroit's Supplement to its Motion for the Entry of an Order (I) Enforcing the Plan of

Adjustment Injunction and (II) Requiring the Dismissal of the State Court Action filed by Tanya

Hughes upon counsel as listed below, via first class mail and electronic mail:

Jeffrey J. Ellison, PLLC
Jeffrey J. Ellison
214 South Main Street, Suite 210
Ann Arbor, MI 48104-2122
ellisonesq@aol.com

DATED: July 29, 2015

By: /s/ Marc N. Swanson
      Marc N. Swanson
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

# EXHIBIT 1



To: Commanding Officer, Fourth Precinct (Direct)

**THE DECISION OF THE POLICE TRIAL BOARD IN THE MATTER OF SERGEANT TANYA HUGHES, BADGE #S-781, ASSIGNED TO THE FOURTH PRECINCT**
**DISCIPLINE FILE NO. 12-0506**

From: Sergeant Melinee Long-Thomason, Disciplinary Administration

Attached hereto is the recommendation of the Police Trial Board in the matter of Sergeant Tanya Hughes is...

### Dismissal from the Detroit Police Department

**The dismissal from the Department can only be implemented once the twenty (20) day appeal period has expired from the date of receipt.**

Please ensure that Sergeant Tanya Hughes is furnished with a copy of the Decision of the Police Trial Board and that the enclosed receipt is executed and distribution is made as indicated thereon. A copy of the Decision is to be placed in the member's file.

MELINEE LONG-THOMASON
Sergeant, S-728
Disciplinary Administration

**MLT**: kj

Attachment

Distribution:

Commander James White, Chairperson, Central District
Commander Dwayne Love, Co-Member, Western District
Inspector Marlon Wilson, Co-Member, Criminal Investigations
Lieutenant's and Sergeant's Association
Sergeant Tanya Hughes
Police Personnel
Police Payroll

CITY OF DETROIT
FINDINGS OF FACT

In the Matter of:

CITY OF DETROIT
(POLICE DEPARTMENT),

        Employer,              No. 12-0506

        -and-

DETROIT POLICE LIEUTENANTS AND
SERGEANTS ASSOCIATION
(SERGEANT TANYA HUGHES),

        Union.

_____/

                          Proceedings had in the above

matter before a Trial Board at 7310 Woodward Ave., 3rd

Floor, Detroit, Michigan, on Monday, December 3, 2012,

commencing at or about 5:02 p.m.

APPEARANCES:

                TRIAL BOARD

                COMMANDER JAMES WHITE, Chairperson
                COMMANDER DWAYNE LOVE, Co-Member
                INSPECTOR MARLON WILSON, Co-Member

INSPECTOR ROBBIN RIVERS, City Advocate
(Appearing on behalf of the Detroit Police Department)

MR. FRED WALKER, ESQUIRE
(Appearing on behalf of Sergeant Tanya Hughes)

REPORTED BY: MEGHAN J. O'CONNOR (CER-8253)

```
 1                        Detroit, Michigan

 2                        Monday, December 3, 2012

 3                        5:02 p.m.

 4                   P R O C E E D I N G S

 5                        COMMANDER WHITE:   On Monday,

 6      December 3, 2012, a Trial Board was convened to hear

 7      charges against Sergeant Tanya Hughes, badge S-781,

 8      assigned to the Fourth Precinct.

 9                        Present for the City was

10      Inspector Robbin Rivers and the officer in charge

11      Sergeant Richard Firsdon.

12                        Present for the officer was

13      Union Attorney Fred Walker and the officer.   Also

14      present was Union rep Sergeant Mark Young.

15                        The officer pled not guilty and

16      a Trial Board hearing was conducted.   The officer is

17      charged with Charge I, Refusal to Submit to or

18      Avoidance of Drug Screening Procedures, one

19      specification.

20                        Charge II, Willful Disobedience

21      of Rules or Orders.   There are a total of three

22      specifications for that charge.

23                        Charge III, Failure to Notify

24      the Commanding Officer of Any Circumstance that

25      Affects a Member's Ability to Perform Their Duties.
```

2

```
 1          There are two specifications with that charge.
 2                        After hearing the testimony and
 3          reviewing the evidence, the Board finds the
 4          following:
 5                        Guilty on all charges and
 6          specifications.
 7                        After the finding of guilt, the
 8          Board reviewed the officer's disciplinary record
 9          along with the disciplinary matrix to arrive at the
10          decision recommended.
11                        As it relates to the decision
12          of the Trial Board, I, Commander James White, as
13          chairperson, recommend a penalty of dismissal from
14          the Detroit Police Department.
15                        INSPECTOR WILSON:  I, Inspector
16          Marlon Wilson, concur with the majority.
17                        COMMANDER LOVE:  I, Commander
18          Dwayne Love, concur with the majority.
19                        COMMANDER WHITE:  Our
20          signatures will be attached to this transcript
21          showing our respective decisions.  That concludes
22          the Trial Board.
23                        (At 5:04 p.m., concluded)
```

3

# C E R T I F I C A T I O N

STATE OF MICHIGAN  )
                   )
COUNTY OF OAKLAND  )

       I certify that this transcript, consisting of 4 pages, is a complete, true and correct transcript of the Findings of Fact proceedings in this case on December 3, 2012.

Date _____          MEGHAN J. O'CONNOR (CER-8253)
                                2385 Jakewood Drive
                                West Bloomfield, Michigan 48324

sd

4



**detroit**
# police

## DISCIPLINARY ADMINISTRATION
## TRIAL BOARD FINDING OF FACT - SIGNATURE PAGE

Chester L. Logan.
Interim Chief of Police

### FILE #          12-0506
### Sergeant Tanya Hughes

### Signature page

Based on the trial board record, we enter the findings as detailed in the attached transcript.

_____          12-3-12
**Commander James White**                    Date
Chairperson

_____          12-3-12
**Commander Dwayne Love**                     Date
Board Member

_____          12-3-12
**Inspector Marlon Wilson**                   Date
Board Member

# EXHIBIT 2

# VOLUNTARY LABOR ARBITRATION TRIBUNAL
## CITY OF DETROIT AND DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION

In the Matter of the
Arbitration Between:

THE CITY OF DETROIT POLICE
DEPARTMENT

and

DETROIT POLICE LIEUTENANTS
AND SERGEANTS ASSOCIATION

_____ /

Grievance No. 12-0506

# OPINION AND AWARD

Appearances

*For the City of Detroit Police Department:*

Inspector Robbin Rivers, Labor Relations

Deputy Chief Eric Ewing

Commander John Serda

Lieutenant Kenneth Balinski, Southwest District

Lieutenant Mary A. Thomas, Medical Section

Lieutenant Whitney Walton, Internal Affairs

Sergeant Kimberly Bennett, Labor Relations

Sergeant Richard Firsdon, Officer-in-Charge, Internal Affairs

Sergeant Melissa Gardner, Labor Relations

Sergeant Steven Myles, Police Medical

Caias Cardozo, R.N., Henry Ford Health

Erica Felder, Henry Ford Health

*For Detroit Police Lieutenants and Sergeants Association:*

Fred B. Walker, Attorney at Law

Michael Young, President, Lieutenants and Sergeants Association

Bruce Rochefort, M.D.

Sergeant Tanya Hughes, Grievant

# OPINION

The Detroit Police Lieutenants and Sergeants Association ("LSA" or Association) appeals to arbitration the Chief of Police's adoption of the December 3, 2012-Trial Board decision recommending the dismissal of Sergeant Tanya Hughes based on its findings of guilt on the following Charges and Specifications:

## I. REFUSAL TO SUBMIT TO OR AVOIDANCE OF DRUG SCREENING PROCEDURES

Specification 1: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 11:39 a.m., at the Henry Ford Health Services, 3384 E. Jefferson, refuse to submit a urine specimen for the purposes of a Random Drug Screen, thus avoiding the drug screening procedures, such conduct which tends to bring the department into disrepute and reflects discredit upon the individual as an officer and contrary to the Law Enforcement Code of Ethics; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 --7.3, ALCOHOL/DRUG USE, COMMAND 10.

## II. WILLFUL DISOBEDIENCE OF RULES OR ORDERS

Specification 2: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 11:39 a.m., at the Henry Ford Health Services, 3384 E. Jefferson, willfully disobey an order of the Department by failing to comply with the directive pertaining to Drug Screening, such conduct which tends to bring the department into disrepute and reflects discredit upon the individual as an officer and contrary to the Law Enforcement Code of Ethics; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 -- 7.9, CONDUCT, UNPROFESSIONAL, COMMAND 8.

1

Specification 3: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 12:15 p.m., at the Henry Ford Health Services, 3384 E. Jefferson, willfully disobey a direct order given to her by Lieutenant Whitney Walton, Badge L-18, assigned to Internal Affairs, to complete the Drug Screening process; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3--7.9, CONDUCT, UNPROFESSIONAL, COMMAND 8.

Specification 4: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 12:15 p.m., at the Henry Ford Health Services, 3384 E. Jefferson, willfully disobey a direct order given to her by Lieutenant Mary Thomas, Badge L-234, assigned to Police Medical, to complete the Drug Screening process; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL. SERIES 100, DIRECTIVE 102.3--7.9, CONDUCT, UNPROFESSIONAL, COMMAND 8.

## III. FAILURE TO NOTIFY THE COMMANDING OFFICER OF ANY CIRCUMSTANCE THAT AFFECTS THE MEMBER'S ABILITY TO PERFORM THEIR DUTIES

Specification 5: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 10:15 a.m., at 4700 W. Fort Street (Fourth Precinct), fail to notify the Commanding Officer of the Fourth Precinct of a medical condition that made her unable to perform her duties as a department member; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3–7.14, JOB STANDARDS, COMMAND 1.

Specification 6: That she, SERGEANT TANYA HUGHES, badge S-781, currently assigned to the Fourth Precinct, while on duty, did on October 5, 2012 at approximately 12:15 p.m., at the Henry Ford Health Services, 3384 E. Jefferson, fail to notify the Commanding Officer of Police Medical of a medical condition that made her unable to perform her duties as a department member; THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3--7.14, JOB STANDARDS, COMMAND 1.

2

# OPINION

The Arbitration Hearing began on April 30, 2013 and was continued to May 6, 2013, over the Detroit Police Department's objection. With the concurrence of the parties, the Department gave an oral closing argument on a separate record, outside the presence of the Association. The Association elected instead to rest its case without oral argument through the submission of a post hearing brief.[1]

The following exhibits were admitted into evidence during the proceedings:

1.   **Joint Exhibit 1;** Master Agreement Between the City of Detroit and the Detroit Police Lieutenants and Sergeants Association 2009-2013

2.   **Joint Exhibit 2;** October 29, 2012-Charge Sheet re: DA# 12-0506

3.   **Joint Exhibit 3;** Disciplinary Chain

4.   **Joint Exhibit 4;** December 3, 2012-Trial Board Transcript and exhibits; **Department**: Exhibits **1 and 2**, 4th Precinct October 5, 2012-Desk Blotter Report pp. 2 and 3, respectively; Exhibit **3**, Sergeant Hughes' Operator's license and Detroit Police Department identification; Exhibit **4**, Sergeant Hughes' signed Detroit Police Department, Consent Form for Drug Screen Urinalysis dated October 5, 2012; Exhibit **5**, Henry Ford Health Systems, Detroit Police Department checklist; Exhibit **6**, October 9, 2012-*Garrity* Interview of Sergeant Tanya Hughes; Exhibit **7**, Detroit Police Department, *Drug Specimen Collection Procedures;* **Defendant**: Exhibit **1**, August 2, 2012-Physician's Prescription for JOBST compression hosiery; Exhibit **2**, Description of JOBST compression garments retrieved from the Internet; Exhibit **3**, October 5, 2012, Notice of Suspension issued to Sergeant Hughes

5.   **Joint Exhibit 5;** Disciplinary History of Sergeant Tanya Hughes

6.   **Joint Exhibit 6;** Disciplinary Matrix

---

[1]Before the completion of this Opinion and Award, the United States Bankruptcy Court issued a Stay of Arbitration proceedings.

7.   **Joint Exhibit 7;** Detroit Police Department Manual, Directive 403.5-1 to 403.5-6.3, *"Drug and Alcohol Abuse By Department Members"*

8.   **Joint Exhibit 8;** October 9, 2012-*Garrity* Interview of Sergeant Tanya Hughes

9.   **Joint Exhibit 9;** Opinion and Award, *P.O. Antoine Ingram,* Gr. No. 09-125 (Roumell, 2010)

10.  **Department Exhibit 10;** Opinion and Award, *P.O. Levia Davis,* Gr. No. 93-0085 (Knott, 1995)

11.  **Department Exhibit 11;** Detroit Police Department Manual, Directive 403.8-1 to 403.8-2.9, *"Pregnant Officers"*

12.  **Association Exhibit 2;** October 5, 2012-Oakwood Hospital Medical Report re: Tanya Hughes

## BACKGROUND FACTS

Grievant Tanya Hughes was working as an Administrative Sergeant at the Southwest District on October 5, 2012. She was in full duty status, wearing full uniform, at the time. Around 11:39 a.m., **Lieutenant Kenneth Balinski** received notification that she was ordered to report for drug screening. He testified, "When I notified her, she had made a comment about disrobing, and then I told her that she still had to go . . ."

When asked to elaborate, Lieutenant Balinski said, "I don't remember the exact comment, something about either being uncomfortable disrobing or not disrobing. I don't know the exact verbiage." The lieutenant said that neither he nor his Command was aware of "any restriction that would [exempt] her from complying with her status as a full-duty

4

officer."[2] Per the Desk Blotter, this random drug screening was to take place at Henry Ford Health Services Harbortown, 3384 E. Jefferson.[3]

**Sergeant Dave Keith Jemison** was the Fourth Precinct's union delegate for platoon two that day. He testified that Sergeant Hughes phoned him, advising that she was *en route* to a testing facility for a scheduled random drug screening. According to Sergeant Jemison, the grievant said "that she was not refusing to submit to a drug screening but that she had an issue." Sergeant Jemison met the grievant at the screening site shortly thereafter. Sergeant Hughes again told Sergeant Jemison that "she was not refusing to disrobe, but that she had issues because of her pregnancy."[4] Sergeant Jemison said, "I advised her that the Department had a protocol concerning drug screening. I was not versed on it, and so I called Sergeant Kennedy at the LSA.[5] Sergeant Kennedy told Sergeant Jemison to advise Sergeant Hughes "to submit to the drug screening."[6]

**Registered Nurse Caias Cardozo** was the Nurse Leader at Henry Ford Health System, Occupational Health Department, at the Harbortown Clinic on October 5, 2012.[7] Part of her duties entailed administering drug screens for female officers. She said that female

---

[2]December 3, 2012-Trial Board Transcript (hereinafter "TB"), pp. 14-15, 21.

[3]Joint Exhibit 4; 4th Precinct October 5, 2012-Desk Blotter Report.

[4]TB, p. 22.

[5]TB, p. 23.

[6]TB, p. 23.

[7]TB, pp. 33-34.

5

attendants always performed drug screens on female subjects "and males do males, no exceptions."[8]

Nurse Cardozo described the Detroit Police Department drug-screening protocol followed at her clinic. The testing subject presents the notification letter ordering them to undergo the drug screen, along with their departmental identification and drivers' license.[9] The testing subject then completes a form which requires him or her to list their medications and prescriptions of any kind.[10] (In this case, Sergeant Hughes indicated that she was taking "vitamins and a PNV select." She did not indicate that she had been prescribed compression hosiery, or that she had any medical impairment, problem or anything of that nature.[11])

The health center attendant would then escort the testing subject to a dressing room. The testing subject is directed to completely undress and to put on a gown and footies. Nurse Cardozo explained that while the testing subject disrobes in the room, in private, the health center attendant always stands immediately outside. "And then when they're undressed . . . we . . . proceed with the drug screening," she said.[12]

---

[8]TB, p. 34.

[9]TB, pp. 34-35.

[10]TB, p. 35; April 30, 2013- Arbitration Hearing Transcript (hereinafter "T1"), p. 37.

[11]T1, pp. 37-39.

[12]T1, p. 36.

6

Sergeant Hughes completed and signed the "Detroit Police Department's Consent Form for Drug Screen Urinalysis" on October 5, 2012. The Department's drug screening protocol was soon derailed,[13] however, because Sergeant Hughes:

> refused to remove her clothing. . . **She just stated that she was not comfortable with it, she did not feel it was necessary. She felt degraded and she did not want to remove her clothing.** She was not refusing to give the urine, but she was refusing to remove her clothes. [emphasis supplied].[14]

Nurse Cardozo said "at that point I informed her that. . . was part of the DPD policy that required of her to remove her clothing, put a gown on and footies in order to continue with the drug screen.[15]

Nurse Cardozo testified that Sergeant Hughes never entered the dressing room. "She did not remove any clothing." She also testified that nothing about Sergeant Hughes' appearance caused her to believe that she was encountering a pregnant woman. And at no time did Sergeant Hughes indicate that she was wearing compression hosiery, or that she needed assistance in removing such a garment. In fact, Nurse Cardozo said she learned of this assertion for the first time at the Police Trial Board.[16]

---

[13]T1, p. 58.

[14]T1, p. 39.

[15]T1, p. 39.

[16]T1, pp. 40, 52, 55-57, 59-60.

7

Had Sergeant Hughes advised her that she was wearing a compression garment, Nurse Cardozo said she would have been happy to help her remove it, or would have examined her with the garment on to ensure nothing was secreted within. The nurse said she would have also notified Police Medical of the situation.[17]

By way of illustration, Nurse Cardozo testified that she had recently conducted a drug screen on a testing subject who had undergone surgery for breast cancer. This testing subject informed Nurse Cardozo that she was wearing an upper compression garment for her arm and breast area.[18] After removing all of her clothing except for the compression device, the testing subject allowed a complete examination of the garment. Nurse Cardozo said "I examined it, I felt it, I felt all the way to her breast." The testing subject was then allowed to proceed with the drug screening protocol, and furnish her specimen.[19]

**Sergeant Steven Myles** testified he was the supervisor for drug screen and psychological services in the Police Medical Section.[20] His duties included notifying a Command when an officer had been selected to have a random drug screen, reviewing the drug screen test results and attending to problems arising during the drug screening testing

---

[17]T1, pp. 43, 48-49, 51.

[18]T1, pp. 40, 42.

[19]T1, p. 43.

[20]T1, p. 69.

8

procedure.[21]  Sergeant Myles testified that he received a phone call from Nurse Cardozo on October 5, 2012 informing him that Sergeant Hughes had "refused to follow the procedure of the drug screening process . . . she was refusing to do the disrobing portion of the testing . . . "[22]  He testified that:

> I did speak with Sergeant Hughes over the phone and I indicated then that she needed to follow the drug screen procedure. **She inquired was it in writing?** And I told her yes, and she said she wanted to see it and I printed a copy of the procedures before arriving at the testing site and I provided her with a copy which spelled out what the procedures were for the testing. [emphasis supplied].[23]

Sergeant Myles said he attempted to order Sergeant Hughes to submit to the testing, but she advised him that he could not because they were of equal rank.[24]  Sergeant Myles therefore gave notification to Lieutenant Mary A. Thomas, who was the officer in charge of Police Medical.  Sergeant Myles and Lieutenant Thomas spoke to Sergeant Hughes when they arrived at the Henry Ford Clinic testing site.  They presented the Department's entire Standard Operating Procedures regarding drug screening to Sergeant Hughes.  They also reviewed sections of the drug screen collection policy that specifically concerned the

---

[21]T1, p. 70.

[22]T1, pp. 70-71.

[23]T1, p. 71.

[24]TB, pp. 59-60. Sergeant Myles said he appealed to Sergeant Hughes to submit to the drug screening not only in his capacity as assigned personnel at Police Medical, but also as her friend. TB, pp. 66-67.

9

requirement that the testing subject must completely undress. Sergeant Myles pointed out for Sergeant Hughes' edification, Section V. 2-The Collection which states:

> 2. The collector asks the donor to completely disrobe and to leave briefcase, purse, book bag or other personal belongings he/she is carrying with the clothing. Weapons shall be locked in a locking gun box or a locker secured by the donor.[25]

Sergeant Myles also referred Sergeant Hughes to Section XI .9-Frequently Asked Questions and to Section IX-Refusals, that state:

> **9. The donor requests to keep his/her clothing on during the collections?**
>
> The donor may **not** keep his/her clothing on during the specimen collection process. All donors will be instructed to completely disrobe and will be supplied with a hospital examination gown and slippers. [emphasis and underscoring in original].[26]
>
> \*       \*       \*
>
> All members selected for drug screening shall be required to undergo a drug collection. **All drug collections are mandatory.** [emphasis in original].[27]

Following this exhaustive review of the policy, "[Sergeant Hughes] indicated that she read the policy and . . . **that she did not trust the document I had provided to her and the**

---

[25]T1, pp. 72-73; Joint Exhibit 4, *Drug Specimen Collection Procedures.*

[26]T1, p. 74; Joint Exhibit 4, *Drug Specimen Collection Procedures.*

[27]T1, p. 75; Joint Exhibit 4, *Drug Specimen Collection Procedures.*

10

**policy,"** Sergeant Myles said.[28]  He testified that throughout their discussion, Sergeant Hughes never indicated she was wearing compression hosiery, or that she needed assistance of any kind, or that she had any condition whatsoever that prevented her from following the Department's normal protocol for drug screening.[29]

Sergeant Myles further testified that officers have an affirmative obligation to report any condition that restricts or hinders their ability to adhere to Department policy. However, at the time of this incident, Sergeant Hughes had not reported to Police Medical "any condition or status that would preclude her from maintaining her full duty status and following the normal policies and protocols of the Department." Sergeant Hughes was therefore obligated to follow all of the policies and regulations like any other full duty officer.[30]

**Lieutenant Mary A. Thomas** testified that she and Sergeant Myles met with Sergeant Hughes and her union representative, Sergeant Jemison, for almost two hours. During this time Lieutenant Thomas said she was "begging and pleading" with Sergeant Hughes to submit to the drug screening. Lieutenant Thomas said this was first time she had ever allowed this, because:

---

[28]T1, p. 72; [emphasis supplied].

[29]T1, pp. 76-77. (Lieutenant Thomas offered similar testimony that Sergeant Hughes had not notified the Police Medical Section of any circumstances or conditions that impaired her ability to perform in full duty status.) T1, pp. 91, 93.

[30]T1, pp. 76-77.

11

I just didn't think that she realized the seriousness of her refusal, the consequences on her career, and for whatever reason I just didn't think she understood the full ramification of what the refusal would entail.[31]

*     *     *

Sergeant Myles even hugged her and she cried. And it appeared at first that she was going to agree and it's almost like her back stiffened and she just refused. She said it was **disrespectful**.[32] [emphasis supplied]

Lieutenant Thomas "told her even if she didn't want to take her clothes off, to go through with the test and, upon completing the test" make her objections known to the union.[33]

Further, Lieutenant Thomas testified that Sergeant Hughes never said throughout their lengthy discussion that she had any medical condition that precluded or restricted her from complying, or that she was wearing compression hosiery. Nor had Sergeant Hughes notified Police Medical "that day or prior that she was pregnant."[34] The Lieutenant said while Sergeant Hughes had offered to give blood or hair specimens, she did not offer a urine specimen in her presence.[35] Lieutenant Thomas said she advised the grievant that the protocol had to be adhered to and that her (Lieutenant Thomas') rank did not allow her to change Department policy.[36]

---

[31]T1, pp. 93-94.

[32]T1, p. 93.

[33]TB, pp. 77-78.

[34]T1, pp. 90, 92.

[35]T1, p. 102.

[36]T1, p. 103.

12

**Lieutenant Whitney Walton**, the lieutenant in charge of Internal Affairs, and Sergeant Firsdon, soon responded to the testing site where they joined, Lieutenant Thomas and Sergeants Hughes, Jemison and Myles. Lieutenant Walton explained that while she did not socialize outside of work with Sergeant Hughes, they had attended the police academy at the same time, but in different classes. On graduation, they were assigned to the same precinct where they maintained a friendly relationship. [37]

Apparently believing that she had some rapport with Sergeant Hughes, Lieutenant Walton asked to speak with her alone. However, the grievant asked to have her union steward present. Outside the presence of everyone save Sergeant Jemison, Lieutenant Walton testified that:

> *At first, I appealed to her as Whitney talking to Tanya. . . .* What's going on? Is there something that you're not telling us [what] is the reason you're not participating?[38]

> She seemed very emotional. Ultimately, I advised her of the consequences of ignoring the drug order, that it would be a suspension and, per policy, it would be moved towards termination from the Department.[39]

There came a point, however, when Lieutenant Walton said she spoke in her capacity as a lieutenant. Lieutenant Walton testified that she ordered Sergeant Hughes to submit to the drug screen process: "I advised her that she understood that this was a drug order, and I

---

[37]May 6, 2013- Arbitration Hearing Transcript (hereinafter "T2"), pp. 116-118.

[38]T2, p. 118; italics supplied.

[39]T2, pp. 118-119.

13

explained to her the consequences of not following the order." The meeting lasted between "an hour and an hour-and-a- half," Lieutenant Walton estimated. During all this time, Lieutenant Walton testified that Sergeant Hughes never said she needed assistance in removing her hosiery. However, at one point Sergeant Hughes said taking her clothing off was **demeaning**.[40]

Lieutenant Walton ultimately issued Sergeant Hughes a Notice of Suspension, with pay. The grievant wrote on the notice "I am willing to give blood and urine, just not disrobe."[41] The grievant had no history of discipline at the time of her suspension.[42]

**Deputy Chief Eric Ewing** testified he is the commanding officer of the Department's Administrative Services Bureau. In this capacity, he oversees the Planning and Accreditation Department "which prepares, writes, edits and changes" the policies of the Detroit Police Department.[43]

With regard to the drug screening directive promulgated in manual-section 403.5-5, Deputy Chief Ewing testified that adherence to the policy is most important to maintain the "integrity of the officers in the police department and for the process itself."[44] For these

---

[40]T2, pp. 119-120, 126, 133; emphasis supplied.

[41]T2, p. 122.

[42]T2, pp. 214-215.

[43]T2, pp. 153-154.

[44]T2, pp. 154-155.

14

reasons, the penalty of immediate suspension and the implementation of the dismissal procedure is imposed for the refusal or avoidance of the drug screen process.[45]

**Sergeant Tanya Hughes** was appointed to the Department in 1996 and promoted to the rank of sergeant in 2006. She testified that she attended a sergeant's professional assessment course at the time of her promotion and attends 40-hour training courses annually.[46] As of October 5, 2012, the grievant said she had personally had about five or six drug screens[47] in which she completely undressed and changed into a clinical gown. When asked whether she had ever submitted to a drug screen while on her menstrual cycle, Sergeant Hughes responded, "probably," but that was "no big deal."[48] She also said "I have read the manual directive over the years several times that pertains to drug screening" and that she had ordered subordinates to comply with the Department's drug screening procedures in her supervisory capacity. [49]

---

[45]T2, p. 155.

[46]T2, p. 254.

[47]T2, p. 220.

[48]T2, p. 275.

[49]Joint Exhibit 8; October 9, 2012-*Garrity* Interview of Sergeant Tanya Hughes, pp. 9, 17-19; T2, p. 255.

15

Sergeant Hughes testified that when Lieutenant Balinski advised her of the drug screen, "I indicated . . . that I would not be able to take off all of my clothes."[50] She said she called her union steward, Sergeant Jemison, because

> . . . I had never had an issue where I had to submit where I was wearing a prescription garment such as a JOBSt stocking. . . . I asked him to come along so that he could witness any type of conversation between the parties.[51]

Sergeant Hughes testified that after completing the drug screen notification form and furnishing her identification cards, a clinic worker called her to the back. The grievant thought the clinic workers at the Henry Ford Clinic were not trained: "I wouldn't want them touching me, she said."[52] Sergeant Hughes learned much later, however, that this "clinic worker" was in fact a nurse, *viz.,* Nurse Cardozo.[53] The grievant said she was handed a gown and directed to the dressing room. At that point, Sergeant Hughes said:

> I clearly told her that I'm 29-and-a-half weeks pregnant and that I wear TED[54] hose. . . . I'm not able to take off everything, my TED hose are my panties.[55]

Nurse Cardozo responded that she would have to call Sergeant Myles.

---

[50]T2, p. 218.

[51]T2, p. 219.

[52]Joint Exhibit 8; October 9, 2012-*Garrity* Interview of Sergeant Tanya Hughes, p. 19.

[53]TB, p. 160; T2, p. 233

[54]TED is an acronym for **T**hromboembolism **D**eterrent hose.

[55]T2, pp. 223-224.

16

Sergeant Hughes testified that she knew "for certain" that she spoke to Sergeant Myles precisely at 11:15 a.m. because "I looked at the clock." The following conversation ensued:

He told me that you have to complete this process.

I said, I am not refusing to give urine or blood or hair or whatever you may need, but **I can't take off all of my clothes**. So Sergeant Myles then said, your brother tried this, so you have to go ahead and do this.

I said, was my brother here today? He said, no, a couple of weeks ago your brother was here. So I said, well, **I can't take off all of my clothes**. He said, Tanya, please don't do this because I will have to call Internal Affairs, I said, well, **I can't take off all of my clothes**.[56] [emphasis supplied]

At the Arbitration hearing, the grievant testified that her TED pantyhose were so compressing that she "could not comfortably take them off in that particular room [Henry Ford Clinic's dressing room], but . . . once taking them off, I cannot get them back on."[57]

She explained that she only needed assistance in pulling the hosiery up to the knee, and that her husband assisted her in getting dressed in the mornings.[58] Sergeant Hughes also said she was too embarrassed to reveal that she was wearing a pad for urine seepage.[59]

As to why she did not tell Lieutenants Thomas and Walton of the difficulties associated with her compression hosiery during their lengthy discussions at the Henry Ford

---

[56]T2, pp. 224-225.

[57]T2, p. 226.

[58]T2, p. 228.

[59]T2, p. 256.

17

Clinic, the grievant said that after she had advised the nurse, she assumed everybody knew of her circumstance.[60] At another point in her testimony, Sergeant Hughes testified that:

> I did not fully disclose my problem because I was told that there was no accommodating, that I had to take off everything, no ifs, ands, buts whatsoever.[61]

Over the Department's repeated objections on multiple grounds, the Association was permitted to present, via the telephone, the testimony of **Bruce J. Rochefort, M.D.**[62] He maintains a practice on Michigan Avenue in Dearborn and is affiliated with both the Dearborn and Annapolis Oakwood Hospitals.[63] Dr. Rochefort testified that he specializes in obstetrics and gynecology and that he and his partner, Dr. Duane Kreil, treat patients together. Tanya Hughes has been a patient of theirs for a long time, he said.[64]

Early in his testimony, Dr. Rochefort said he was aware of Tanya Hughes' medical file, *"I have a copy with me."*[65] And according to the medical file, Dr. Kriel wrote Sergeant Hughes' August 2, 2012-prescription for compression hosiery. This was a valid prescription and was given to her because "she has severe varicosities, basically circulation issues,"

---

[60]T2, p. 265.

[61]T2, p. 262.

[62]T2, pp. 161-164, 188, 204.

[63]T2, p. 196.

[64]T2, pp. 189-190, 197.

[65]T2, pp. 189-190; italics supplied.

18

Dr. Rochefort testified. The hose "helps improve the circulation and the discomfort that arises from these issues."[66]

The Association moved for the admission of a medical report that related to Tanya Hughes' afternoon visit and drug screen at Oakwood Hospital on October 5, 2012. When Inspector Rivers asked Dr. Rochefort who had ordered Hughes' drug screen that day, the doctor then responded: *"I don't have my office chart with me."*[67]

The doctor testified that neither he nor Dr. Kriel treated Tanya Hughes on October 5, 2012. Further, he had no notes indicating that Oakwood Hospital had called his office that day, seeking directions or orders for the grievant's treatment. Therefore, he was unable to say what her presenting complaints were, or why she was given a drug screen, when she appeared at Oakwood Hospital on October 5.[68] However, he believed the sole reason for the drug screening was because Tanya Hughes had refused the drug test for the Detroit Police Department.[69] On cross-examination, Dr. Rochefort acknowledged that drug screens are not necessarily done on patients having Braxton Hicks, *i.e.,* sporadic contractions or cramping.[70]

---

[66]T2, p. 190.

[67]T2, p. 193.

[68]T2, pp. 197-198.

[69]T2, p. 203.

[70]T2, p. 200.

19

Dr. Rochefort said that in his practice he relied on the laboratory test results provided by Oakwood Health Care.[71] But concerning the matter of drug screening, he said he had no specific knowledge of Oakwood Hospital's specimen collection procedures, other than knowledge that:

> The patient is given the collection container, and then we have a single bathroom that they are allowed to use, and then they come right back to their triage bay to the nurse.[72]

Other facts will be addressed in the relevant discussion.

## DISCUSSION

This is a discharge case for which the Detroit Police Department bears the burden of proving by clear and convincing evidence just cause–not simply for imposing some discipline, but just cause for imposing the ultimate sanction of discharge. In *Kroger Co*, 25 LA 906, 908 (1955), Arbitrator Russell A. Smith commented:

> It seems reasonable and proper to hold that alleged misconduct of a kind which carries the stigma of general social disapproval as well as [the kiss of death in the grievant's profession] should be clearly and convincingly established by the evidence. Reasonable doubts raised by the proofs should be resolved in favor of the accused. This may mean that the Employer will at times be required, for want of sufficient proof, to withhold or rescind disciplinary action which in fact is fully deserved, but this kind of result is inherent in any civilized system of justice.

---

[71]T2, p. 194.

[72]T2, pp. 191-192.

20

Article 10.C.1. of the Collective Bargaining Agreement provides that "Arbitration is understood to include a full de novo review appeal pursuant to B (7)," meaning "a total review of guilt or innocence as well as severity of penalty and [the appeal] shall not be limited as to admission of evidence . . ." Therefore, both the testimonial and documentary evidence admitted in these proceedings will be reviewed without deference, or any presumption of correctness, to the Trial Board's findings and recommendation and the Chief of Police's decision below. *Indiana State Reformatory,* 91 LA 1068 (1988) (both questions of law and fact are reviewed anew).

## I.    Refusal to Submit to or Avoidance of Drug Screen Procedures

The Department argues that the grievant's refusal to complete the drug screening protocol, *i.e.,* her refusal to remove all of her clothing and change into a clinical gown and footies before supplying a urine specimen, constituted a refusal to submit to or an avoidance of the drug screening procedures. This fact establishes Sergeant Hughes' guilt as to Charge I, Specification 1, argues the Department.

The Association argues in response that "Sgt. Hughes did not refuse to participate in the drug screening procedure . . ." Rather, she was "wearing compression hose [due to her advanced pregnancy] which rendered her unable to perform her duty in this unusual, unanticipated particular instance."[73] According to the Association, these facts and circumstances lead to a not guilty finding on Charge I and Specification 1.

---

[73]Association's Post Hearing Brief, pp. 3, 9.

Article 58 of the parties' contract, entitled Drug Testing, provides, in part, that: "Members of the bargaining unit shall be subject to the drug testing program in accordance with the terms of the Act 312 award issued on June 25, 1990 (MERC Case No. B89 C-0622)." This award held that the Detroit Police Lieutenants and Sergeants Association would be covered by the Detroit Police Department's drug testing policy.

At the time of the Arbitration hearing, the police department's drug testing policy had been in effect for at least 17 years. Directive 403.5 of the Detroit Police Department Manual states in relevant part:

**403.5-2      Policy**
The Detroit Police Department has a paramount interest in protecting its employees and the public they serve by providing a safe and drug free working environment. The professional responsibilities and integrity of the department demand that employees refrain from illegal drug use, or the abuse of any drug or alcohol, and remain free of the negative consequences of that abuse. The department shall not and will not tolerate the use of illegal drugs by any of its members.

**403.5-4      Drug Screens**
*          *          *

All sworn and non-sworn members of this department are subject to drug screening, at any time, when authorized by the chief of police. **Refusal to submit to or avoidance of drug screening will result in immediate suspension and implementation of dismissal procedures.[74] [emphasis supplied].**

---

[74]Joint Exhibit 7; Detroit Police Department Manual, Directive 403.5, "Drug and Alcohol Abuse By Department Members"

Sergeant Hughes testified that while she could have taken her TED hose off at the Henry Ford Clinic, albeit not comfortably, "once taking them off, I cannot get them back on." She said she needed assistance pulling them up to the knee. In addition to this excuse, she claimed not to have undressed at the clinic "*because of the unsanitary condition of my hose touching the floor. . . . They could get contaminated or anything.*"[75]

After her suspension, Sergeant Hughes went to Oakwood Hospital. There, she claimed to have removed all of her clothing, including her TED pantyhose, without anyone's assistance and change into a hospital gown: "So I sat on the bed and took off what I had to take off." She said she was able to completely undress because she was familiar with the hospital, having delivered there before, **"it was *a more comfortable environment.* I trust its cleanliness."** When Sergeant Hughes finished her business at the hospital, she said she put her pants on without an undergarment and went directly home.[76]

The Association contends that because Sergeant Hughes could not put her TED pantyhose on without assistance she would have had to return to her Command after the departmental drug screen without wearing underwear. (Thus, by implication, because she could not put the hosiery back on by herself, she effectively could not take the garment off for the drug screen.)[77]

---

[75]T2, pp. 226-228. [italics supplied]

[76]T2, pp. 241-244.

[77]Association's Post Hearing Brief, p. 6.

The record demonstrates, however, that Sergeant Hughes had available to her a reasonable alternative. At the Arbitration hearing, the grievant readily agreed that she was contractually entitled to take sick time and get paid for the entire day after the drug screen.[78] The Association now insinuates that a request for sick time under these circumstances would have been dishonest.[79] However, this position clearly conflicts with the grievant's claims. Since her *Garrity* interview, Sergeant Hughes has maintained that she was prescribed compression hosiery to improve her circulation and to relieve the pain and discomfort resulting from her varicosities. Therefore, if she was unable to put the compression garment back on at the completion of the drug screen, she likely would not have felt well, thereby making a request for a sick day an honest one under the circumstances.

Sergeant Hughes has offered at various times myriad and conflicting excuses for failing to remove her TED pantyhose: She said she was not comfortable with it; that she did not feel it was necessary; that she felt degraded and demeaned; that she did not want to remove her clothing; that she did not trust or agree with the Department's specimen collection policies and procedures; that the process was disrespectful; that the Henry Ford Clinic was unsanitary and uncomfortable; that "I just can't take off everything"[80]; and on and on.

---

[78]T2, p. 276. This response was elicited on cross examination by Inspector Rivers.

[79]Association's Post Hearing Brief, p. 6.

[80]TB, p. 132.

24

However, regardless to her many excuses, Sergeant Hughes' own testimony clearly establishes that she was indeed able to remove her TED pantyhose, completely undress and change into a clinical gown in order to complete the Department's drug screen. Therefore, the evidence clearly and convincingly establishes that Sergeant Hughes refused to submit to the Department's random drug screening on October 5, 2012.

The Association argues in the face of this truism that, "The purpose of drug testing is to prevent the use of drugs, not simply to wring hands over the procedure itself." After all, "She gave a urine sample [later that afternoon at Oakwood Hospital] that tested negative for drugs."[81] But, this contention wholly ignores what distinguishes the collection of specimens for drug screening from those collected for other medical purposes: *the procedure itself*.

In any event, the authenticity of these test results is highly questionable due to the incompleteness of the record itself and the circumstances surrounding Sergeant Hughes' visit and specimen collections at the hospital. Sergeant Hughes said that after leaving her Command following her suspension, she went directly to Oakwood Hospital because she was having cramps, was concerned about her blood pressure and the condition of her unborn child. She testified at the Arbitration hearing that:

---

[81]Association's Post Hearing Brief, p. 6.

I had to pay to park to go over to Labor and Delivery. I got a receipt. **The time was *2:11* at that time, *2:11 p.m.***

I parked, I went up to the Labor and Delivery floor *as I would if I was in labor.*[82] [emphasis and italics supplied]

Thus, from the tenor of her testimony, the grievant did not delay, but instead rushed to the Labor and Delivery triage unit. Sergeant Hughes testified that the hospital staff then called her doctor, placed her on monitors and took specimens.[83]

The Association introduced Exhibit 2 which purports to be a health care record of treatment and laboratory testing for Sergeant Hughes at Oakwood Hospital on October 5, 2012. The document consists of computer screen pages. Of note, page 4 of 4 is missing from the purported treatment record. Page 1 of 4, on the other hand, is missing from the attached laboratory Interim Report. The record indicates that Sergeant Hughes was admitted at **14:53 (or 2:53 p.m.)** and discharged without restrictions an hour later at 15:53 (or 3:53 p.m.).

Even assuming that it took 10 minutes for Sergeant Hughes to reach the Labor and Delivery Triage after parking her vehicle at **2:11 p.m.**, by her time line, her admission was delayed for more than *30* minutes notwithstanding her complaints of cramping, blood pressure concerns and the well being of her unborn child. It is, of course, beyond the scope

---

[82]T2, p. 240.

[83]TB, p. 139.

of this record to ascertain what actually transpired during those missing 30 minutes or so. What is clear, given the emergency as the grievant has described, is that the long delay before the commencement of her "treatment" does not comport to reason.

Further, there is no reference in the record concerning the grievant's presenting complaints, vital signs, medical monitoring, orders for laboratory work, or identification or confirmation of the test subject. There likewise is no indication in the record that the hospital made any contact with the office of Sergeant Hughes' treating physicians', Dr. Rochefort or Dr. Kriel.

It must be recalled here that Dr. Rochefort testified that he had no notes indicating that Oakwood Hospital had called his office on October 5, 2012, seeking directions or orders for Sergeant Hughes' treatment. He also said he did not know why the grievant was given a drug screen that day. Thus, from the state of the record, it would appear that this reputable hospital administered expensive laboratory work without a physician's order, or a medical necessity, simply because the grievant asked for the tests. The questionable circumstances surrounding the grievant's visit to the hospital, the gaping holes in the purported medical record and the unknown involvement of hospital personnel, all cast serious doubt on the authenticity of Association Exhibit 2.

The questions circling Association Exhibit 2 demonstrate why officers are not allowed to circumvent the Department's established and vetted specimen collection procedure through the submission of independent test results of unknown origins and conditions.

27

To ensure the integrity of its drug screens, the Department has promulgated stringent testing policies and procedures with built-in redundancies–all of which the Association has bargained for and agreed to. Critical steps in the Department's specimen collection process include, but are not limited to, the following:

The first step of the specimen collection procedure is to identify the test subject properly as the employee for whom testing is to be done. This is accomplished by comparing the photo identification cards with the name on the drug screening authorization form.

Second, the test subject is required to change, in private, from street clothes to a clinical gown and footies, walk in the company of the collector, from the changing room to the restroom where the specimen is to be produced, and provide the specimen in a room where the test subject does not have access to his or her clothes and other possessions. These safeguards are in place to eliminate the possibility that the test subject could substitute a vial of another person's urine for his or her own.

Third, the toilet in the restroom where the specimen is provided contains a bluing agent. This eliminates the possibility that the test subject might substitute that water for his or her specimen, or use it to dilute the specimen. Further, the restroom has no soaps, disinfectants or tap water; thus, the test subject has no access to water that could adulterate or dilute the urine specimen.

28

Fourth, test subjects are instructed not to flush the toilet while in the restroom. Because the restroom has no wastebasket, the subject is thereby precluded from disposing a container that might contain a substituted urine specimen.

Fifth, the collector reads the temperature of the urine specimen within four minutes of collection, to ensure that it is within the range of 90 to 100 degrees Fahrenheit. Because the temperature of the human body is generally 98.6 degrees Fahrenheit, a temperature below or above the acceptable range raises suspicion that the specimen may have been adulterated or substituted.[84]

The affirmative record-evidence regarding the collection of the urine specimen at Oakwood Hospital shows that it is the antithesis of that required by the Detroit Police Department. Dr. Rochefort testified that the patient-test subject is given the specimen container at the hospital, then allowed to go to the restroom without an escort. The grievant gave a similar description of the hospital's specimen collection procedure:

> They gave me a collection cup, and I went over–there is a rest room right in that triage area. It's just a single one. I go in and get the collection cup, close it and give it to the nurse.[85]

The Arbitrator takes notice that ordinarily in such hospital restrooms the toilets are equipped with clear water, as opposed to bluing agents; the sink faucets emit running water and the restrooms are equipped with soap, sanitizers, and trash receptacles. Furthermore,

---

[84]Joint Exhibit 4, *Drug Specimen Collection Procedures*.
[85]T2, p. 242.

because there is no evidence that the temperature of Sergeant Hughes's urine specimen was read within four minutes of its collection, the hospital's procedure appears to have deviated from that of the Department's in yet another critical way.

Thus, no evidence demonstrates that Sergeant Hughes' specimen-collection at Oakwood Hospital was conducted using the same collection protocol that is required by the Detroit Police Department. This established and agreed upon protocol provides procedural safeguards both for the officer and the Department.

What is even more important, Sergeant Hughes did not have the option of furnishing her specimen at a time and location more to her liking and sensibilities. Indeed, if such decisions were within an officer's control, the whole notion of "random" testing would be turned on its head. Because these tests are conditions of employment and have such dire consequences depending on the results, by practical necessity, a dubious, independent laboratory report cannot take the place and stead of the Department-ordered drug screening.

The evidence clearly and convincingly establishes that Sergeant Hughes failed to submit to random drug screening as directed by the Detroit Police Department on October 5, 2012.

For the above reasons, the finding of guilt below on Charge I, Specification 1 will be affirmed.

30

## II.    Willful Disobedience of Rules or Orders

**Charge II, Specification 2.**   This specification charges Sergeant Hughes with willfully disobeying an order of the Department by failing to comply with the directive pertaining to Drug Screening.   The Association argues that:

> . . . the specific charges, Charge I, Specification 1 and Charge II, Specification 2 are the exact same thing stated two different ways without any meaningful distinction at all.  The Department should not be allowed to pile on with duplicative charges for the exact same alleged behavior done at the exact same time.[86]

The Arbitrator finds this argument meritorious.  It is generally held in discipline cases that once an employer has imposed a particular punishment for an offense, the employer cannot thereafter increase the penalty, *or impose another penalty for the same offense,* without subjecting the employee to double jeopardy.   As Arbitrator Henry B. Welch stated in *Gulf States Paper Corp.,* 97 LA 61, 62 (1991), double jeopardy "simply means that a person should not be penalized twice for the same offense."  The rule is based, not on the Constitution, but on "fundamental fairness." *United Int'l Investigative Serv.,* 114 LA 620, 626 (Maxwell, 2000).

Double jeopardy violations have been similarly found where an employer imposes multiple punishment for what amounts to the same act.  See *Crown Cork & Seal Co.,* 111 LA 83, 87 (Harris, 1998) (the employer relied on essentially the same evidence to prove the

------

[86]Association's Post Hearing Brief, p. 9.

employee's use of sabotage when its first attempt to discharge the employee for a verbal altercation with another employee was overturned.)

The proofs of the misconduct alleged in Specification 1 subsume all of the elements in Specification 2. Put another way, in refusing to submit a urine specimen for the purposes of a random drug screen, thereby avoiding the drug screening procedures, Sergeant Hughes willfully and necessarily disobeyed an order of the Department to comply with the drug screening directive. Therefore, imposing a separate guilty-finding on Count II, Specification 2 amounts to a violation of double jeopardy.

The finding of guilt below as to Charge II, Specification 2 will therefore be vacated. Sergeant Hughes' record is to be expunged of any report of misconduct relating to this charge.

**Charge II, Specifications 3 and 4.** These specifications respectively charge Sergeant Hughes with willfully disobeying the direct orders of Lieutenants Walton and Thomas to complete the drug screening procedure. The Association contends that:

> these charges too are duplicative. The Department should not be able to just have different people claim to have ordered her to do the exact same thing and then claim that not doing that one act results in multiple charges.[87]

To sustain a finding of guilt, the evidence must establish that an order or directive was actually given. While the language used need not always literally include the word "order;"

---

[87]Association's Post Hearing Brief, p. 9.

the totality of the circumstances and positions must indicate that an order was given. In other words, the meaning of the words used must be such that they could not reasonably be confused with a request, information, or mere conversation. Correspondingly, the evidence must establish that the employee reasonably understood or should have understood what was expected. In this regard, the fact that the words spoken took place within the context of a para military setting is a critical factor in reviewing the totality of the circumstances.

The record must further establish that the supervisor had the authority to give the lawful order or direction and was entitled to have it obeyed; that the subordinate had the capability to carry out the order and it was within her scope of duties; and that the subordinate was aware,[88] or should have been aware, of the consequences of refusing to conform to the directive or order. However, the supervisor need not give an admonition with each directive that disciplinary proceedings will be instituted for failure to obey. See *P.O. Levia Davis,* Gr. No. 93-0085 (Knott, 1995).

The double jeopardy challenge raised by the Association must be rejected because the record clearly establishes that both Lieutenant Walton and Lieutenant Thomas issued *distinct* orders to Sergeant Hughes to complete the drug screening procedure at the Henry Ford Clinic on October 5, 2012. The explicit meaning of the lieutenants' orders was that Sergeant

---

[88]The element of warning affords the employee an opportunity for reflection and correction. *See e.g., City of Gary Human Relations Commission and AFSCME Council 62, Local 4009,* 120 LA 244 (Deitsch, 2004).

33

Hughes was directed to remove all of her clothing and change into a clinical gown and footies before furnishing her urine specimen for drug screening.

The Association also questions whether either lieutenant issued an order to Sergeant Hughes:

> It is not clear from Lt. Walton's [testimony] that she ordered Sgt. Hughes to do anything. Did she issue a direct order? Was this when she was speaking to Sgt. Hughes as just "Whitney and Tanya" and not as Lt. Walton and Sgt. Hughes?
>
> *        *        *
>
> . . . there is literally no evidence that Lt. Thomas ever issued a direct order to Sgt. Hughes to complete the drug screen process.[89]

Recalling the testimony of Sergeant Myles, after receiving a phone call from the Henry Ford Clinic, he initially attempted to order Sergeant Hughes to complete the drug screening procedure. She then "checked" him, reminding him that he could not order her to do anything because they were of equal rank. While describing the circumstances as they unfolded at the clinic that day, Sergeant Hughes said she sat and waited at the clinic, then Lieutenant Thomas and Sergeant Myles showed up. Then Lieutenant Walton and Sergeant Firsdon appeared:

> At that point, **I was being told that–the lieutenant took command.** She is the commanding officer of the Medical Section, Lieutenant Thomas. . . . .
>
> I am assuming he [Sergeant Myles] talked to them because over the phone **he told me he can't order me, so he is calling the lieutenant, because we were equal rank.**

---

[89]Association's Post Hearing Brief, pp. 9-10.

34

So anyhow, once the lieutenant got there, **she basically told me you have to take off, remove all of your clothing to submit to this drug screen process.** You have done it for however many years. It's a process that's been in place for however many years. There was a whole spiel of that.[90]

Further evidence that both Lieutenant Walton and Lieutenant Thomas issued *distinct* orders to Sergeant Hughes came from the grievant herself. Sergeant Hughes testified in her *Garrity* interview that, "Both lieutenants . . . directed me to submit to that particular process, and **I just kept reiterating** . . . I'm not refusing to provide any type of sample . . . **I just don't want to take off all of my clothes.**"

Sergeant Firsdon of Internal Affairs asked the grievant more pointed questions on the topic in the course of the *Garrity* interview:

> Sergeant Firsdon: Okay. On this date of October 5th, did you receive a direct order from Lieutenant Thomas to submit to the policy set forth for drug screening?
>
> Sergeant Hughes: Yes. She advised that I need to disrobe and–the policy is to disrobe to submit to this process or I would be suspended, so I just removed my badge and my I.D. and placed it on the counter.
>
> Sergeant Firsdon: Also on this date, did you while at Henry Ford Health System, did you receive a direct order from Lieutenant Walton to submit to the drug screening procedures?
>
> Sergeant Hughes: Yes, and maybe I provided the badge and I.D. when she mentioned it . . .[91]

---

[90]T2, p. 230; emphasis supplied.

[91]October 9, 2012-*Garrity* Interview of Sergeant Tanya Hughes, pp. 15-16; emphasis supplied.

35

Hence, Sergeant Hughes' *Garrity*-testimony, and the context of the circumstances, establishes that the respective orders were indeed issued, were clear and were understood.

There similarly is no question that both lieutenants had the authority to give the orders. Because they held a higher rank than Sergeant Hughes they were empowered to issue orders to a subordinate member. Further, for the reasons previously discussed, their directives were legal orders that were entitled to be obeyed.

Also, for the reasons previously discussed, the evidence clearly establishes that Sergeant Hughes had both the capability of carrying out the orders and the duty to comply with the drug screening procedure, *i.e.,* removing all of her clothing and changing into a clinical gown and footies before furnishing her urine specimen for drug screening.

Based on the foregoing analyses, the evidence clearly and convincingly establishes that Sergeant Hughes willfully disobeyed the direct orders of Lieutenants Walton and Thomas to complete the drug screening procedure on October 5, 2012.

The findings of guilt below on Charge II, Specifications 3 and 4 will be affirmed.

## III.  Failure to Notify the Commanding Officer of Any Circumstance That Affects the Member's Ability to Perform Their Duties

**Charge III, Specifications 5 and 6.**  These Specifications respectively charge Sergeant Hughes with failing to notify the Commanding Officers of the Fourth Precinct and the Police Medical Section of a medical condition that made her unable to perform her duties as a department member on October 5, 2012.

36

The Association contends that "these specifications are directly at odds with the substantive thrust of the Department's entire case." It argues that findings of guilt on Specifications 5 and 6 necessarily mean that Sergeant Hughes *was unable* to perform her duty, and "would necessitate a finding of not guilty as to the first two charges and four specifications." Alternatively, the Association states:

> . . . if madam arbitrator finds [that Hughes "should have been able to overcome her embarrassment . . . at having to speak to other Department members beyond having told nurse Cardozo] . . . then Sgt. Hughes would be guilty of . . . Specification 5.
>
> . . . having informed nurse Cardozo that she was wearing the compression hose her failure to notify Lt. Thomas could be excused under the circumstances as she understood them at the time. If madam arbitrator finds that she should not be so excused then Sgt. Hughes would be guilty of Specification 6 also.[92]

The Department's policy relative to pregnant officers states, in part, that:

### PREGNANT OFFICERS

*　　　*　　　*

### 403.8-2　　POLICY

No officer or applicant will be subject to discrimination on the basis of a pregnancy or anticipated pregnancy.

This policy provides to pregnant officers who are unable to perform all of the essential functions of their current assignments, temporary alternative duty assignments. This policy is not intended to interfere with or diminish any rights or privileges to which an employee may be entitled under federal, state or local law, any other departmental policy or collective bargaining agreement.

---

[92]Association's Post Hearing Brief, p. 10.

37

### 403.8- 2.1    Disclosure of Pregnancy Status

**An officer shall notify her commanding officer** *when she believes that she cannot perform* **her current assignment due to pregnancy.**

No action shall be taken by the Department, or any supervisor or member of command, with respect to any pregnant officer's assignment at the time of the disclosure of her pregnancy unless the officer so requests in writing or presents a letter from her physician, which specifies restrictions or limitations on her ability to perform her current assignment.

**No officer,** defined as a sworn member of the Department, **shall be required to disclose her pregnancy. No officer shall be questioned as to her pregnancy status, nor shall any officer be sent to Police Medical for the purpose of testing or inquiry as to her pregnancy status.** Female officers shall not be subjected to special procedures to determine pregnancy status. [emphasis, underscoring and italics supplied].

Sergeant Hughes has maintained throughout these proceedings that she did not participate in the Department's random drug screening because she either could not take off her TED pantyhose or, at various times, that she could not pull them back on. She said she made a personal decision not to disclose her pregnancy to the Department. However, she also agreed that her duty entailed submitting to drug screening when ordered to do so by the Department.[93]

Directive 403.8- 2.1 states, in part, that "An officer shall notify her commanding officer *when she believes that she cannot perform* her current assignment due to pregnancy." In providing that the officer must give this notification *"when she believes that she cannot*

---

[93]T2, p. 269.

38

*perform,"* the directive turns, necessarily, on the officer's subjective perception of her abilities.

The Arbitrator has made a finding in this Opinion that Sergeant Hughes was, indeed, able to remove her TED pantyhose, completely undress and change into a clinical gown in order to complete the Department's drug screen. However, this finding of fact, *post hoc,* would not negate Sergeant Hughes' subjective perception of her ability on October 5, 2012 to perform an aspect of her duty as ordered by the Department.

Stated another way, regardless to the objective reality, Sergeant Hughes had the duty on October 5, 2012 to give the appropriate notifications to the Commanding Officers of the Fourth Precinct and the Police Medical Section because *she believed* that she could not completely undress herself in order to complete the required drug screen. Therefore, guilty-findings on Charge I, Specification 1 and Charge II, Specifications 3 and 4, do not preclude guilty-findings on Specifications 5 and 6.

Finally, the Association's argument that the failure to notify Lieutenant Thomas could be excused because Sergeant Hughes had informed Nurse Cardozo that she was wearing compression hose must be rejected because Directive 403.8-2.1 specifically provides that notice should be given to the officer's commanding officer.[94]

---

[94]In any event, the evidence is unpersuasive as to whether such information was ever imparted to Nurse Cardozo.

39

For the above reasons, the evidence clearly and convincingly supports findings of guilt on Charge III, Specifications 5 and 6.

The findings of guilt below on Charge III, Specifications 5 and 6 will be affirmed.

## CONCLUSION

In providing that the "Refusal to submit to or avoidance of drug screening will result in immediate suspension and implementation of dismissal procedures,"[95] Directive 403.5 uses language consistent with a no-fault policy. Still, under Article 5. D, discipline is to be imposed for "just cause." Therefore, dismissal under Directive 403.5 must be reviewed according to the same standard for discharge under the collective bargaining agreement.

"Just cause is a flexible concept, embodying notions of equity and fairness." *Arch of Illinois, Div of Apogee Coal Corp v District 12, United Mine Workers*, 85 F3d 1289, 1294 (7th Cir. 1996). However, properly understood,

> Where an employee has violated a rule or engaged in conduct meriting disciplinary action, it is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. . . The only circumstances under which a penalty imposed by management can be rightfully set aside by an arbitrator are those where discrimination, unfairness, or capricious and arbitrary action are proved–in other words, where there has been abuse of discretion.

*Stockham Pipe Fittings Co,* 1 LA 160, 162 (McCoy, 1945).

---

[95]Joint Exhibit 7; Detroit Police Department Manual, Directive 403.5, "Drug and Alcohol Abuse By Department Members"

40

Discipline is generally intended to be corrective and should follow a series of progressive steps to change the employee's unacceptable conduct or behavior. However, the severity of the misconduct may, in the appropriate circumstance, warrant an officer's dismissal on the first occasion of improper conduct, even without a history of prior discipline.

The misconduct here is of the utmost severity, given the public interest at stake and the parties' bargained for and agreed to drug screen policy. Sergeant Hughes seemingly embarked on a course to challenge the Department's longstanding drug policy and procedures from the moment she received the order from Lieutenant Balinski to report for a random drug screen on October 5, 2012. By that time she was most familiar with the Department's specimen collection procedures, having personally undergone approximately six drug screens in the past. And yet, she told her lieutenant, in effect, that she was not going to take off all of her clothes.

Sergeant Hughes phoned Sergeant Jemison, her union steward, *en route* to the clinic because she wanted him "to come along so that he could witness any type of conversation between the parties." Once briefed on her concerns, Sergeant Jemison conferred with another member of the union who was more knowledgeable of the Department's drug screen policy. The union's advice to Sergeant Hughes was that she should submit to the drug screen.

41

After 17 years on the job, six of which in supervision, training at a sergeant's professional assessment course, attending annual 40-hour training courses, reading the Department's drug directives several times, ordering her subordinates to comply with drug screen orders and approximately six personal drug screens under her belt, Sergeant Hughes questioned whether the Department's Specimen Collection Procedures even existed.

Then after Sergeant Myles and Lieutenant Thomas of the Police Medical Section presented her with the written directives, she regrettably said: "I do not trust the document and the policy."

Thereafter, for almost two hours, four of Sergeant Hughes' peers and supervisors ordered and/or appealed to her sense of reason, duty and responsibility to submit to the drug screening. Her peers and supervisors all the while made it clear what the impact of her refusal would have on her career. Thus, the grievant clearly had many, many opportunities to reverse her stance during these protracted discussions. But she steadfastly refused.

Sergeant Hughes also did not communicate to her Command the nature of her perceived difficulties in complying with the drug screen order--not even when Lieutenant Walton sought to discuss the matter with her in private. The grievant offered no meaningful response when Lieutenant Walton pointedly asked her, *Is there something that you're not telling us [what] is the reason you're not participating?"* Had Sergeant Hughes disclosed the nature of her claimed objections, reasonable accommodations would have been made to address her concerns, in all likelihood. Sergeant Hughes then would have been allowed to

42

proceed in accordance with the Department's established policy and thus provide a specimen for testing.

The Association tried this case with vigor and has advanced thoughtful and creative arguments in the grievant's defense. The stubborn facts nonetheless persist: the Sergeant's deliberate, disrespectful and woeful disobedience to the chain of command is antithetical to a para military organization like the Detroit Police Department. In recommending the penalty of dismissal, the Trial Board considered the nature of the misconduct, along with Sergeant Hughes' spotless disciplinary history. The Command structure ultimately concluded, however, that it could no longer entrust Tanya Hughes with performing the awesome responsibilities of a police sergeant. Considering the gravity of the charges, this Arbitrator cannot find that the Department violated concepts of just cause and reasonableness in reaching this determination.

For all of the above reasons, the following Award will issue:

The Department's finding of guilt below are affirmed with respect to: Charge I, Specification 1; Charge II, Specifications 3 and 4 and Charge III, Specifications 5 and 6. The Department's finding of guilt below with respect to Charge II, Specification 2 will be vacated. Sergeant Hughes' record is to be expunged of any report of misconduct relating to this charge. The dismissal of Sergeant Tanya Hughes from the Detroit Police Department will be affirmed.

43

## AWARD

The Department's finding of guilt below are affirmed with respect to: Charge I, Specification 1; Charge II, Specifications 3 and 4 and Charge III, Specifications 5 and 6.

The Department's finding of guilt below with respect to Charge II, Specification 2 is hereby vacated. Sergeant Hughes' record is to be expunged of any report of misconduct relating to this charge.

The dismissal of Sergeant Tanya Hughes from the Detroit Police Department is hereby affirmed.

LINDA D. ASHFORD
ARBITRATOR

Dated: December 15, 2014

44

# EXHIBIT 3

# MASTER AGREEMENT

BETWEEN THE

# CITY OF DETROIT

AND THE

# DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION

# 2009 – 2013

# 5. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.  The Association recognizes the prerogatives of the Department to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority and the terms and provisions of this Agreement.

B.  The Department has the right to schedule overtime work as required in a manner most advantageous to the Department and consistent with requirements of municipal employment and the public safety and consistent with the provisions of this Agreement.

C.  It is understood by the parties that every incidental duty connected with operations enumerated in job descriptions is not always specifically described.

D.  The Department reserves the right to discipline and discharge for just cause. The Department reserves the right to lay off personnel for lack of work or funds or for the occurrence of conditions beyond the control of the Department or when such continuation of work would be wasteful and unproductive. The Department shall have the right to determine schedules and hours of work and to establish the methods and processes by which such work is performed.

E.  The Police Department shall notify in advance, in writing, the Association President, or in his absence the next officer in line, when it anticipates exercising its right to make changes in working conditions. Conferences to discuss said anticipated changes shall be conducted at the request of either party. Such conferences shall not be construed as "formal" negotiations. Provided however, in no event shall the City make decisions which alter the relationship between the parties in regard to wages, hours, and the terms and conditions of employment. Any changes in that area require renegotiations of the contract.

F.  No Department official or agent of the City shall:

    1.  Interfere with, restrain, or coerce employees in the exercise of their right to join or refrain from joining a labor organization, except where permitted *by law* to avoid a conflict of interest; or

    2.  Initiate, create, dominate, contribute to or interfere with the formation, administration, internal affairs, elections, meetings, dues policies or officers, of the Association; or

    3.  Discriminate in regard to employment or conditions of employment in order to encourage or discourage membership in a labor organization; or

    4.  Discriminate against an employee because he has given testimony or taken part in any grievance procedures or other hearings, negotiations, or conferences as a part of the labor organization recognized under the terms of this Agreement; or

    5.  Refuse to meet, negotiate, or confer on proper matters with representatives of the Association as set forth in this Agreement.

G.  It is agreed that the City retains and reserves all rights, powers and authorities given to it under any national, state or local law unless otherwise negotiated in this Agreement.

H.   The Association recognizes the responsibilities of its members as a part of management and pledges full support for continuity of employment and supervision during normal or emergency working conditions.

I.   The Investigative staff of the Board of Police Commissioners shall have the right to interrogate and investigate members under the procedures in this Agreement to which any interrogating officer is subject and such right shall in no way abridge or change the rights of a member under this Agreement or under any Local, State, or Federal law or the Constitutions of the United States, or State of Michigan.

In no event shall any recommendations or actions resulting from such interrogation or investigation lead to any discipline outside or inconsistent with any discipline procedures or discipline matters maintained in this Agreement and currently utilized in this Department.

Further, no member after he has been once disciplined at a Commander's Hearing, Chief's Hearing or Trial Board shall be re-disciplined for any reason whatever for any matters arising out of the same set of facts and circumstances surrounding the first discipline.

# 6. ASSOCIATION RESPONSIBILITIES

A.   Recognizing the crucial role of law enforcement in the preservation of the public health, safety and welfare of a free society, the Association agrees that it will take all reasonable steps to cause the employees covered by this Agreement, individually and collectively, to perform all police duties, rendering loyal and efficient service to the very best of their abilities.

B.   The Association, therefore, agrees that there shall be no interruption of these services for any cause whatsoever by the employees it represents; nor shall there be any concerted failure by them to report for duty; nor shall they absent themselves from their work or abstain, in whole or in part, from the full, faithful, and proper performance of all the duties of their employment.

C.   The Association further agrees that it shall not encourage any strikes, sit-downs, stay-ins, slow-downs, stoppages of work, malingering, or any acts that interfere in any manner or to any degree with the continuity of the police services.

# 7. SPECIAL CONFERENCE

A.   A special conference shall be a meeting or session wherein both parties meet to discuss important matters.

B.   Special conferences on important matters shall be arranged between the Association President and the Chief of Police or his designated representative upon request of either party. Each party shall have at least two individuals present at said conference. Arrangements shall be made in writing five (5) calendar days in advance, whenever is possible. An agenda of the matters to be taken up shall be presented in writing at the time the conference is requested. Matters taken up at the Special Conference shall be confined to those matters listed on the agenda.

the grievance shall be held between the President or his designee, the grievance committee, and the Chief of Police or his designee within ten (10) calendar days after receipt of the grievance by the Chief of Police. A written decision shall be rendered within ten (10) calendar days of the meeting.

**Medical Grievance Procedure:**

All grievances involving medical issues shall be filed with the President of the Association. The employee's Commander shall be presented an informational copy of the grievance. After conducting an investigation, the President or his designee may submit the grievance to the Police Department Medical Officer, who shall be the designated representative of the Department. The Medical Officer shall make a complete investigation of the grievance, shall confer with a doctor, and shall answer the grievance within thirty (30) calendar days, attaching copies of all medical records pertaining to the injury or illness involved in the grievance.

E.  Notwithstanding any other provisions herein, individual members may present their own grievances to the Employer and have them adjusted without the intervention of the precinct or bureau delegate or Association officers, provided, however, that the Employer has given the delegate or Association officers notice and an opportunity to be present at such adjustment. In no event shall any such adjustment be contrary to or inconsistent with the terms of any agreement between the Employer and the Association.

F.  Grievances affecting a large number of employees may be treated as policy grievances and entered at the fourth step of the grievance procedure by the Association.

G.  Grievances shall be filed within thirty (30) days of the event, occurrence or knowledge of the facts giving rise to the grievance. Grievances not appealed in writing to the next step within ten (10) work days of receipt of the last decision shall be considered settled on the basis of the last decision. All time limits or steps of the grievance procedure may be shortened, extended or eliminated by mutual written agreement.

H.  In instances wherein the subject matter of the grievance lies within the jurisdiction of specific City agencies, e.g., payroll, etc., the grievance steps may be reduced in order to bring the grievance to the agency's immediate attention for a recommendation as to the action to be taken at Step 3.

# 9. ARBITRATION

A.  Any unresolved grievance relating only to the interpretation, application or enforcement of a specific article and section of this Agreement or any Supplementary Agreement, hereto having been processed fully through the last step of the grievance procedure may be submitted to arbitration by either party in strict accordance with the following:

1.  Arbitration shall be initiated by the President of the Association by written notice to the Chief of Police of an intention to arbitrate. **Such written notice of intent to arbitrate must be made within twenty (20) calendar days after receipt of the 4th step answer or Trial Board finding.** Upon receipt of notice to arbitrate, **the parties shall meet to select an ad hoc arbitrator. This will be done within ten (10) working days of such notice.**

**In the event an arbitrator cannot be agreed upon within ten (10) working days, the Association shall, within thirty (30) calendar days, request the Michigan Employment Relations Commission (MERC) to appoint an impartial arbitrator in accordance with its then applicable rules and regulations. Failure to adhere to these time limitations shall result in the matter being considered settled on the basis of the last decision.**

2. It shall be within the authority of the Arbitrator to make a decision binding upon the parties regarding the interpretation, application or enforcement of the Agreement.

3. The Arbitrator shall not consider any evidence submitted by either party, which was not produced in the grievance procedure unless such evidence was not then known to the party submitting the same.

4. The costs of the arbitration shall be shared equally by the parties, except each party shall make arrangements to pay its own Board member and witnesses.

5. The parties may request in writing of each other co-operation to have available at the arbitration proceedings any witnesses requested by the other party.

6. If the unresolved grievance pertains to a medical issue, the arbitration procedure specified in this article shall be in all respects the procedure for arbitration as defined herein.

B. When an employee is suspended pending disposition of charges against him in a court of law or a trial board proceeding, there shall be no offset of interim earnings provided he is exonerated and restored to duty.

C. If an employee's disciplinary penalty is simply modified or lessened to the extent that he has a claim for back wages during a period of suspension as the result of the modification or the lessening of the penalty, claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation for personal services he may have received from any source during the period in question, but excluding previously Department authorized income earned outside his regularly scheduled work period, and excluding documented overtime pay.

D. There shall be no appeal from the decision of a**n** Arbitrator if made in accordance with its jurisdiction and authority under this Agreement. It shall be final and binding on the Association, on all bargaining unit members, and on the City. The Association will actively discourage attempts by any bargaining unit employee to appeal a decision of the arbitrator to any Court or labor board, and will not aid or abet in any such attempt.

E. In the event a case is appealed to the **Arbitrator** and **he/she** finds that it has no power to rule on such case, the matter shall be referred back to the parties without decision or recommendation on the merits of the case.

F. The decision of an Arbitrator in any case shall not require a retroactive wage adjustment in any other case. Either party may, prior to the submission of a dispute to arbitration, state, and the opposite party is bound to agree, that the award not be binding precedent in like analogous situations pending at that time.

G. The **Arbitrator** shall limit **his/her** decision strictly to the interpretation, application or enforcement of the specific articles and sections of this Agreement, and it shall be without power or authority to make any decisions:

1. Contrary to, or inconsistent with or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law.

2. Involving the exercise of discretion by the City under the provisions of this Agreement, its Charter, or applicable law.

3. Limiting or interfering in any way with the powers, duties or responsibilities of the City under its Charter, applicable law, and rules and regulations having the force and effect of law.

4. Changing, altering, or modifying any practice, policy, or rule presently or in the future established by the City as long as such practice, policy, or rule does not conflict with this Agreement.

5. Implying any restriction or condition binding upon the City from this Agreement, it being understood that, except as such restrictions or conditions upon the City are specifically set forth herein, or are fairly inferable from the express language of any article or section hereof, the matter in question falls within the exercise of rights set forth in the Article of this Agreement entitled "Management Rights and Responsibilities".

6. Concerning the establishment of wage scales, rates on new or changed jobs, or change in any wage rate.

7. Providing agreement for the parties in those cases, where by their contract, they may have agreed that further negotiations should occur to cover the matters in dispute.

8. Granting any right or relief for any period of time whatsoever prior to the effective date of this Agreement or subsequent to the date upon which this Agreement shall terminate.

# 10. DISCIPLINE PROCEDURE

Subject to any disciplinary provisions contained in this Agreement and subject to the following disciplinary procedures the employer and the Association agree to maintain all disciplinary matters as presently existing within the Department.

A. ~~Original Hearings~~

1. **Superior's Written Reprimand** - The first form of discipline shall be at the level of a member's superior officer who shall be empowered to reprimand a member in writing for minor misconduct.

2. **Commander's Hearing** - This hearing is the second form of discipline. Upon a full investigation of allegations against an employee, a Commander shall be empowered by the Chief of Police to conduct a hearing and to render a disciplinary penalty.

It shall be the member's option whether to proceed with a Commander's Hearing or to proceed directly to a Chief's Hearing.

In no case shall the penalty rendered at a Commander's Hearing exceed three (3) days per charge with a maximum of two charges.

The member may elect to appeal any decision from a Commander's Hearing to a Chief's Hearing when a penalty of more than three days has been rendered.

Any penalty of three days or less will be considered final and binding with no right of appeal.

3. **Trial Board** - The third form of discipline is the Trial Board. When serious charges are made against an employee, the matter may be referred to a Trial Board. The Trial Board shall serve an investigatory role, it will not issue a penalty, but will make a penalty recommendation to the Chief of Police; and the discipline decision rendered in the Chief's hearing shall be the final ruling by Senior Management of the Department. The procedure for trial boards shall be maintained, as it presently exists.

   a.  All trial boards convened to consider charges against any member of the Association shall be made up of one command officer of the rank of Commander or higher, and two command officers of the rank of Inspector, who shall be chosen by lot.

   b.  The Disciplinary Unit or its successor within the Department shall maintain a current list of all command officers of the rank of Inspector and above who are employed in a duty status within the Department, with a number assigned to each such command officer.

   **c.**  When it shall be necessary to convene a trial board, the Disciplinary Unit, in the presence of a representative selected by the Association, shall cause numbers assigned to all such command officers to be placed in an opaque receptacle and the numbers corresponding to the names of the rank of Commander or higher drawn there from at random until the composition of the trial board is complete.

   d.  No command officer shall be selected for more than two (2) trial boards, for members of this bargaining unit, in a calendar month, and no command officer shall be selected for a trial board which is convened to consider charges conferred or approved by that command officer.

   e.  This provision shall not be construed as a waiver of the right of the Association to challenge before the trial board so convened, or in court, the seating on a trial board of any command officer who may have bias or prejudice or the appearance thereof in the matter involved or against the member charged in the trial board.

4. **Chief's Hearing** - This hearing is the fourth form of discipline. Subject to the provisions of this Agreement, the Chief of Police (or designee) shall be the final determinant of guilt or innocence and penalty. The Chief of Police shall review the findings of the Trial Board based upon the record made before the Trial Board or the Chief may conduct a de novo hearing and take testimony and consider any other evidence relevant to the case. The member or representative shall be afforded the opportunity to make a statement or offer any other evidence in support of his/her position. The Chief of Police may accept the findings of the Trial Board, modify the findings of the Trial Board, or may render an entirely new finding and penalty. The decision of the Chief of Police shall be the final Department Administrative remedy. The Chief of Police shall notify the employee in writing forthwith.

5. **Board of Police Commissioners** - Subject to the provisions of this Agreement, the Board of Police Commissioners shall be the final quasi-judicial determinants of guilt or innocence. Instead of hearing an appeal de novo from a Chief's Hearing itself, the Board of Police Commissioners shall review the judgment of the Chief's Hearing based upon the record made before the Chief's Hearing. No new testimony shall be received. However, prior to a final determination being made, the member or representative shall be afforded the opportunity to appear before the Commission with respect to the matter. If the Board of Police Commissioners decides that new evidence or testimony should be heard, they shall refer the case back to the Chief's Hearing. If the Board of Police Commissioners decides that the judgment was incorrect, they may modify the judgment accordingly. The Board of Police Commissioners shall notify the employee in writing. The Board's disposition of any disciplinary matter shall be final in the line of administrative remedies.

B. **Appeals**

1. Any employee not satisfied by a superior's written reprimand may appeal the decision to the Chief of Police, selected by the Chief of Police who shall consider the merits of the case and afford the member and/or his representative an opportunity to be heard. Such appeal must be in writing within ten (10) calendar days of the service of the written reprimand to the member. The decision of the Chief of Police to sustain or dismiss the written reprimand shall be final.

2. Any employee not satisfied with the decision rendered at a Commander's Hearing may proceed immediately by way of appeal to a Chief's Hearing. Such appeal must be made in writing at the unit level within ten (10) calendar days of the date the Commander's decision is made known to the member.

3. Any employee not satisfied with the decision rendered at a Chief's Hearing, whether the Chief's Hearing disposition was the result of an appeal described in Number 2 above, or whether the Chief's Hearing disposition was the result of an original hearing, has the option of proceeding to arbitration as outlined below or to the Board of Commissioners for a hearing as outlined in Number 5 above. In no event shall the employee proceed both to arbitration and to the Board of Commissioners with regards to the same matter. Appeals to the Board of Police Commissioners or to arbitration must be made within twenty (20) calendar days of receipt of the Chief's Hearing judgment.

4. In no event shall any penalty be increased from that rendered in the Chief's Hearing.

5. No penalty resulting from any disciplinary hearing will be implemented until the member has exhausted his administrative remedies in accordance with this Agreement.

6. Nothing in this Agreement shall abridge a member's rights after his final administrative remedy to proceed to the appropriate court under the remedy allowed by law.

7. Every appeal, except to the Board of Police Commissioners, shall be a total review of guilt or innocence as well as severity of penalty and shall not be limited as to admission of evidence (de novo hearing).

C. **Arbitration**

1. Arbitration is understood to include a full de novo review appeal pursuant to B (7).

2. Any matter brought to arbitration under this section shall be subject to the arbitration procedure of Section 9, insofar as it is applicable to discipline arbitration.

3. Any employee not satisfied with the decision rendered at a Chief's Hearing, whether the Chief's Hearing disposition was the result of an appeal described in Section A (2) or A(3) above, or whether the Chief's Hearing disposition was the result of an original hearing, may request the Association to appeal the Chief's Hearing decision to arbitration. If the Association elects to appeal the Chief's Hearing decision to arbitration, based upon the request of the employee, the employee may not process his appeal with regard to the same matter to the Board of Police Commissioners.

4. In the event arbitration is sought as an alternative, it is to be considered a final administrative remedy but no appeal to a court of law is permitted except in accordance with the provisions of Sections 9 and 10.

5. In arbitration hearings either party may introduce into evidence the Chief's Hearing record of witnesses who appeared in the original Chief's Hearing but are not available to testify at the arbitration hearing. The party wishing to use the Chief's Hearing record must prove its good faith efforts to produce the attendance of the witness at the arbitration hearing.

D. **Probationary Evaluation**

1. Probationary evaluation boards convened in accordance with Volume IV, Chapter 7, Section 4, (as amended 8/13/88) regarding newly promoted personnel, are authorized and limited to make recommendations to the Chief of Police which may require:

   a. Special training,
   b. Transfer, or
   c. Return to the member's former rank.

2. The implementation of a recommendation is not final and binding but subject to review by an arbitration panel under the grievance arbitration provisions of this Agreement.

# 11. MEMBER'S RIGHTS

Each member shall be guaranteed the following rights but this section shall not be construed as a section of limitation:

A.   Any member who is accused of violating any criminal law, City, State or Federal shall be entitled to his full rights under the State and Federal Constitutions without being disciplined for exercising such rights unless specifically excepted in this Agreement.

B.   The Department shall give a member at least five (5) working days notice with a copy to the Association of any disciplinary matter over and above Commander's Hearings scheduled to be heard. Such notice shall indicate the time and place of the hearing together with a list of all witnesses to be called.

C.   After a member is ordered to make any written statement in response to any alleged misconduct or possible misconduct on his part, he shall have at least thirty six (36) hours from the time of the order in which to comply.

   If any member is ordered to make an oral statement, he shall comply subject to the receipt of Miranda or Garrity warnings or both and shall be given a reasonable time to act in accordance with such rights.

D.   An Association officer, counsel or both shall have the right to be present at all disciplinary hearings at the request of the member and shall further have the right to be present during all administrative and investigatory proceedings when the investigated officer must be present.

E.   A member shall have the right to have counsel present at any disciplinary proceeding where testimony is given, to have counsel cross examine all witnesses against the member.

F.   Upon the conclusion of the presentation of evidence, the members of the Trial Board shall make a finding of fact and such finding shall be reduced to writing and a copy given to the member and to his counsel. No appellate time requirements shall begin to run until such time as counsel has been physically served with such written findings. Findings must be served within five (5) days of the conclusion of the hearing.

G.   Throughout all disciplinary hearings, each member shall be presumed innocent.

H.   No member shall be disciplined, discriminated against, or transferred because he exercises any of his constitutional rights before any grand jury, investigative body, court or law enforcement agency - federal, state and local as well as any investigative committee of any legislative body - federal, state and local.

I.   The matters in this section are proposed under the disciplinary procedure as presently existing within the Department and as projected under the present Charter for the City of Detroit. If such procedures are changed in such a way as to render any of the provisions of this section inapplicable or such changes as to require additional provisions in this section or such changes as were not contemplated by the parties hereto, the subject matter and provisions of this section shall be subject to renegotiation between the City and the Association.

J. No member shall be prohibited from engaging in political activity, either partisan or non-partisan, except when actually on duty, or while in uniform or while acting in official capacity as a police officer.

K. The Association President shall not be prohibited from speaking publicly through any form of communication.

L. Whenever a member is under investigation or subjected to interrogation by his Commanding Officer and/or the Department or by any of its units or bureaus, for any reason which could lead to disciplinary action, demotion, dismissal, transfer or criminal actions or charges, such investigation or interrogation shall be conducted under the following conditions:

1. The interrogation shall be conducted at a reasonable hour, preferably at a time when the member is on duty, unless the seriousness of the investigation is of such a degree that an immediate interrogation is required.

2. No interrogation shall begin until the member has been notified that he has a right to have counsel or an officer of the Association present.

3. The interrogation shall take place at the office of the interrogator or at the place of assignment of the employee being interrogated or at the place where the incident allegedly occurred as designated by the interrogator.

4. The employee under investigation shall be informed prior to such interrogation of the name of the person in charge of the investigation, the interrogators, and all persons present during the interrogation. If any of the interrogators are sworn police officers, at least one shall be present during the interrogation who is of a rank higher than that of the officer being interrogated.

5. Neither the home address nor the photograph of any member suspected of any wrongdoing shall be given to the press or the news media without the written consent of the member.

6. The complete interrogation of the member, including a notation of all recess periods, shall be recorded and there shall be no unrecorded questions or statements. At the request of the member, a copy of the interrogation shall be furnished to him.

M. The Department's practices in effect at the time of signing this Agreement relative to the taking of promotional examinations while suspended or discharged shall remain in effect.

N. Any member, who is suspended or discharged as the result of any indictment, shall be immediately restored to duty upon a dismissal of charges against him.

Should internal Department charges continue to be pursued against the restored member for a matter arising out of the same set of facts and circumstances as those surrounding the suspension, a Trial Board will be convened within forty-five (45) days from the date of restoration to duty. If the Department does not convene a Trial Board in the prescribed period of time, the member will be paid for back wages, which would have been earned during the period of suspension.

The parties by mutual agreement may waive or extend the prescribed period of time.

O.   When an employee is suspended pending disposition of charges against him in a court of law or a trial board proceeding, there shall be no offset of interim earnings provided he is exonerated and restored to duty.

P.   If an employee's disciplinary penalty is simply modified or lessened to the extent that he has a claim for partial back wages during a period of suspension as the result of the modification or the lessening of the penalty, claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation for personal services he may have received from any source during the period in question but excluding previously Department authorized income earned outside his regularly scheduled work period and excluding documented overtime pay.

Q.   The Investigative staff of the Board of Police Commissioners shall have the right to interrogate and investigate members under the procedures in this Agreement to which any interrogating officer is subject and such right shall in no way abridge or change the rights to a member under this Agreement or under any Local, State, or Federal law or the Constitution of the United States, or State of Michigan.

In no event shall any recommendations or actions resulting from such interrogation or investigation lead to any discipline outside or inconsistent with any discipline procedures or discipline matters maintained in this Agreement and currently utilized in this Department.

Further, no member after he has been once disciplined at a Commander's Hearing, Trial Board or Chief's Hearing shall be re-disciplined for any reason whatever for any matters arising out of the same set of facts and circumstances surrounding the first discipline.

## 12. DEPARTMENT FILES

A.   All personnel records which include home addresses, phone numbers and pictures of members shall be kept confidential and never released to any person other than officials of the Department or upon the written authorization of the member involved.

B.   A member shall have the right to inspect his official personnel record wherever kept, twice a year or more often for good cause shown.

Files maintained by the Internal Controls Division and the information contained therein are confidential and may not be disclosed to any member or department command or used for any purpose unless the investigation results in departmental or criminal charges and then the production and use of such documents will be governed by existing discovery procedure.

An arbitrator shall have the authority to make an appropriate award including a monetary award to a grievant if it is determined that the provisions have been knowingly and willfully violated by members of the Department. In addition, the Department agrees that an individual who violates this provision will be subject to disciplinary charges.

case of such investigators, if the investigator has less than two (2) years seniority in the rank of investigator by the date of the examination, the Department shall use the higher averaged rating of either of the following:

1.  The last two (2) performance evaluation ratings received by the investigator when that member was a police officer.

2.  The last two (2) performance evaluation ratings as an investigator.

After two (2) years in the rank of investigator, performance evaluations shall be used in accordance with normal practice.

C.  Appointments to the rank of inspector shall be made at the discretion of the Chief of Police in accordance with his authority under the City Charter.

The authority of the Chief of Police to make "charter" promotions to the rank of Lieutenant shall be limited in the following respect. No more than one "charter" promotion to Lieutenant shall be made for thirteen (13) promotions to that rank. For purposes of applying this provision, the permissible number of "charter" promotions will be based upon the cumulative number of promotions in that rank made after the effective date of this award (D98 F-0944).

D.  Effective July 1, 2003, promotions from the rank of Investigator to the rank of Sergeant, shall be made in accordance to the Act 312 Award issued June 2, 2003 (MERC Case No. D01 B-0202). Effective July 1, 2003, promotions to the rank of Lieutenant shall be made in accordance with Exhibit III, Page 77.

# 58.  DRUG TESTING

Members of the bargaining unit shall be subject to the drug testing program in accordance with the terms of the Act 312 award issued June 25, 1990, (MERC Case No. B89 C-0622).

Effective July 1, 2003, the penalty for testing positive for marijuana shall be dismissal. This includes those members testing positive for the first time.

# 59. CIVILIANIZATION (NEW)

**Effective April 1, 2011, the Department may, at its discretion, reassign bargaining unit members from the 36th District Court in order that they may be replaced with civilian staff or civilian security personnel. Such reassignment shall be made consistent with Article 18 and shall not reduce the force or erode the membership of the bargaining unit.**

# 60.  SAVINGS CLAUSE

A.  If any article or section of this Agreement or any supplement thereto, should be held invalid by