```
1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3  IN THE MATTER OF,           Case No. 13-53846
                               Detroit, Michigan
4  CITY OF DETROIT, MI         August 5, 2015
   _____/  2:13 p.m.
5
    IN RE: BENCH OPINION RE: (#9970) CITY OF DETROIT'S MOTION FOR
6     THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT
   INJUNCTION AND (II) REQUIRING THE DISMISSAL OF THE STATE COURT
7     ACTION FILED BY TANYA HUGHES, AND EXPEDITED HEARING RE:
      (#10087) CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER
8     (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II)
    REQUIRING B & C LAND DEVELOPMENT CORPORATION TO (A) DISMISS
9   WITH PREJUDICE ITS STATE COURT LAWSUIT AND (B) WITHDRAW ITS
                   NOTICE OF LIS PENDENS.
10           BEFORE THE HONORABLE THOMAS J. TUCKER
             TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
11
   APPEARANCES:
12
   For the City of Detroit, MI:  MARC SWANSON, ESQ. (P71149)
13                                JONATHAN GREEN, ESQ. (P33140)
                                  Miller, Canfield, Paddock &
14                                Stone
                                  150 West Jefferson
15                                Suite 2500
                                  Detroit, MI 48226
16                                313-496-7591

17  For Tanya Hughes:             JEFFREY ELLISON, ESQ. (P35735)
                                  214 S. Main Street
18                                Suite 210
                                  Ann Arbor, MI 48104
19                                734-761-4300
                                  734-528-4159
20
   For B & C Land Development     HORACE COTTON, ESQ. (P33268)
21  Corporation:                  P.O. Box 19520
                                  Detroit, MI 48226
22                                313-595-1517

23  Court Recorder:               Jamie Laskaska
   Transcriber:                   Deborah L. Kremlick
24
   Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.
```

1      (Court in Session)

2          THE COURT:  All right.  We'll we're ready to call

3  the City of Detroit case and the matters we have scheduled for

4  -- in that case today.

5          THE CLERK:  The Court calls the City of Detroit,

6  Michigan.  Case number 13-53846.

7          THE COURT:  All right.  Good afternoon.  Let's have

8  appearances, please.

9          MR. SWANSON:  Your Honor, it's Marc Swanson and

10  Jonathan Green on behalf of the debtor the City of Detroit.

11          MR. ELLISON:  Afternoon, Your Honor.  Jeffrey

12  Ellison for Tanya Hughes.

13          THE COURT:  All right.  We have two matters

14  scheduled for hearing today, one of which is the Tanya Hughes

15  matter.  So we will go ahead with that first.  And it's listed

16  as the first matter anyway on the Court's calendar.

17      So this is a -- originally after the July 15th hearing the

18  Court held in which the Court heard oral argument from counsel

19  for these parties regarding the City of Detroit's motion for

20  entry of an order enforcing the plan of adjustment and

21  injunction, et cetera concerning the State Court action filed

22  by Tanya Hughes.

23      The Court originally took the matter under advisement and

24  said the Court would issue a bench opinion -- actually it came

25  under advisement when the supplement filings that the Court

1  ordered on July 15 were -- were filed.  But the Court

2  scheduled today for a bench opinion hearing to rule on the

3  motion.

4       Since that time as the parties know, the parties filed a

5  stipulation asking the Court to enter an order permitting the

6  debtor and Ms. Hughes through counsel to present as they put

7  it, limited oral argument on the supplemental filings as

8  defined in the stipulation today and I -- I granted that and

9  entered the order granting that.

10       So we start at least with the -- some further oral

11  argument regarding the city's motion which the parties wish to

12  make in light of the supplemental filings that have been filed

13  since the July 15th hearing and that's fine, we'll hear that.

14  I'm not guaranteeing at this moment that I'm going to actually

15  issue a bench ruling when you get done with that argument

16  rather than doing it on another day, but we'll -- we'll see.

17  So go ahead.  We'll hear from the parties.  I guess unless the

18  parties have a different order in mind, we'll hear first from

19  the debtor, the moving party.

20       MR. SWANSON:  Thank you, Your Honor.  And at least

21  the city included the limited portion because it -- it -- it

22  intends to be brief.

23       The -- the supplemental filings were attached to the

24  city's supplement filed at docket number 10099 included the

25  police trial board decision which the Court requested, the

1 arbitration ruling, and then the relevant provisions of the

2 CBA.

3     Additionally attached as Exhibit A to the stipulation

4 filed at docket number 10109 was a proof of claim that was

5 filed by the DPLSA on behalf of certain individual members

6 including Ms. Hughes.

7     The city believes that these documents reinforce and

8 support the city's position that the claim arose pre-petition,

9 either under the debtor's conduct or the fair contemplation

10 approach.

11     First, this claim is consistent with and supports the

12 city's view that -- that this is a pre-petition claim.  The

13 claim shows that the claims arising from her termination were

14 within the fair contemplation of her union and should also

15 have been in the -- within her fair contemplation.  Filing of

16 the claim is exactly what should have happened and what in

17 fact did happen.

18     And that -- in this regard the claim states on Exhibit

19 1B, that it was her termination for -- that the grievant was

20 terminated for a refusal to submit to a drug screen.  And on

21 Exhibit 1 to the claim the -- it acknowledges that the claim

22 is filed as a protective measure, in event that any of the

23 claimants on the list attached hereto have monetary claims

24 against the city arising from the resolution of the

25 disciplinary action.

1     Footnote 1 to Exhibit 1 also states that resolution of a

2   disciplinary action may result in the DPLSA member having a

3   claim against the city.  That's exactly what is alleged here.

4   And -- and second, the city wanted to make clear that in light

5   of this claim it's not asking for Paragraphs 3 and 4 of the

6   relief requested in its original motion and has stipulated to

7   that fact.

8         THE COURT:  So basically what you're seeking now is

9   only the --

10        MR. SWANSON:  The --

11        THE COURT:  The order that -- the injunctive

12  provision regarding the State Court lawsuit.

13        MR. SWANSON:  Yes.  The only thing that we're

14  seeking here today, Your Honor -- I guess two things.  One,

15  we're seeking a determination that the claim as alleged in the

16  State Court lawsuit arose pre-petition.  And that claim is

17  enjoined or -- or Ms. Hughes to be exact, is enjoined from

18  pursuing that claim under the plan injunctive provisions.

19    And we would seek an order which requires Ms. Hughes to

20  dismiss her lawsuit against the city with prejudice and -- and

21  she has whatever rights she and the DPLSA have under this

22  proof of claim and -- and the city is not asking the Court to

23  obviously make any sort of determination, or ruling, or -- or

24  anything like that on -- on the claim.  And that's all the

25  city has, Your Honor.  Thank you.

1           THE COURT:  All right.  Mr. Ellison.

2           MR. ELLISON:  Yes.  Thanks very much, Your Honor.

3    Your Honor posed a question during oral argument when we were

4    last here as to whether this was a termination of Sergeant

5    Hughes that occurred in October or thereabouts of 2012, but a

6    termination that could not be fully implemented until the

7    arbitrator ruled, or was it instead an initiation of an effort

8    to remove Sergeant Hughes from the work force that did not

9    actually turn into a termination until the arbitrator ruled.

10          The distinction being that what -- what type of claim was

11   -- or what type of action against Sergeant Hughes was

12   initiated.  And I think the documents that have been presented

13   to Your Honor by stipulation bear on that question and

14   demonstrate the she was not fired by the Chief of Police

15   pre-petition.  She was not fired until December 16 of 2014

16   which was after the eighth amended adjustment plan was

17   approved by the Bankruptcy Court.

18          The -- the documents that bear this out, Your Honor, the

19   trial board decision which is in transcript form, and this is

20   docket number 10099 and it's Page 5 of the transcript.  It

21   says, quote -- it's a cover letter actually to the transcript.

22          It says, "attached hereto is the recommendation of the

23   police trial board in the matter of Tanya Hughes.  And the

24   recommendation is that she be -- be dismissed from the Detroit

25   Police Department".

1    Then the transcript itself says on Page 8 of the filing

2  beginning on Line 11, "as it relates to the decision of the

3  trial board, I, commander James White as chairperson,

4  recommend a penalty of dismissal from the Detroit Police

5  Department".

6    So the -- the trial board itself is making a

7  recommendation, they're not making a decision.  The

8  arbitrator's decision on Page 55 of the filing, Your Honor,

9  again this is docket 10099, Page 55, the arbitrator's decision

10  issued December 15, 2014, so nearly two years later following

11  the trial board decision says, "in recommending the penalty of

12  dismissal, the trial board considered the nature of the

13  misconduct along with Sergeant Hughes' spotless disciplinary

14  history".

15    And then the arbitrator went on to say, "considering the

16  gravity of the charges, this arbitrator cannot find that the

17  department violated concepts of just cause and reasonableness

18  in reaching this determination".

19    Again, the -- the recommendation.  So when did the

20  recommendation turn into an actual decision.  And I would

21  submit to Your Honor that that happened when the arbitrator

22  said that the recommendation was consistent with just cause.

23    If you take a look at the collective bargaining agreement

24  provisions, Page 59 of the filing says that Article 5, Section

25  D, "the department reserves the right to discipline and

1  discharge for just cause". That is the contractual language

2  that gives the department the right to fire.

3      Article 10, Section A --

4          THE COURT: Wait a minute. I'm looking at Page 59.

5          MR. ELLISON: Yeah.

6          THE COURT: Where is that?

7          MR. ELLISON: I -- I believe I have it right.

8          THE COURT: I'm sure it's there, but I just --

9          MR. ELLISON: It's Section D, Your Honor.

10          THE COURT: Oh, I see. The first sentence in D.

11          MR. ELLISON: The first sentence, yes. And then on

12  Page 59, Your Honor, in Article 10, Section A(3), it lays out

13  what the trial board's responsibility is.

14      It states, "the trial board shall serve an investigatory

15  role. It will not issue a penalty but will make a penalty

16  recommendation to the Chief of Police; and the discipline

17  decision rendered in the chief's hearing shall be the final

18  ruling by senior management of the department". That's on

19  Page 64 of the filing.

20      Now, there's nothing that's been submitted to Your Honor

21  that the chief actually made a decision. And I --

22          THE COURT: I was going to ask about that. I

23  noticed the provision in the collective bargaining agreement

24  on Page 65, talks about Section 4, a chief's hearing and ends

25  up by saying the decision of the Chief of Police should be the

1  final department administrative remedy.  The Chief of Police

2  shall notify the employee in writing forthwith.  There's no

3  such writing presented.

4          MR. ELLISON:  Correct.

5          THE COURT:  The parties don't have one?  There isn't

6  one?

7          MR. ELLISON:  I believe there is not one, Your

8  Honor.  I believe that the chief did not issue anything in

9  writing.  And I think that is consistent with the appeal to

10  arbitration which is at Article 9, Section A(1) which is on

11  Page 61 of the filing.

12      And that says, "such written notice of intent to

13  arbitrate must be made within 20 calendar days after receipt

14  of the fourth step answer or trial board finding".

15      So the time for proceeding to arbitration runs from when

16  the trial board makes its finding, not any appeal from a trial

17  board to a chief's hearing.  You note the language that you

18  found on Page 65 of the filing that gives the chief the right

19  to consider what the trial board has found, accept it in toto,

20  modify it, reject it, conduct a new de novo proceeding himself

21  if that's what the Chief of Police decides to do, yet the

22  appeal to arbitration language doesn't run from what the chief

23  does, it runs from what the trial board has done.

24      And so what we have in front of the Court is the trial

25  board recommendation and the arbitrator acknowledges that it's

1 a recommendation of the trial board and the arbitrator

2 determines based on that recommendation that the

3 recommendation is consistent with just cause.

4     And the timing here, Your Honor, is the most important

5 issue.  The timing coming when the arbitrator rules and the --

6 the following day, December 16 of 2014 is the day that

7 Sergeant Hughes for the first time suffers adverse employment

8 action.

9     And I would submit, Your Honor, that based on this

10 additional information that's been provided to the Court that

11 the underlying act then converts to the determination of the

12 arbitrator which is December 15 of 2014.

13         THE COURT:  Is there actually a termination at all

14 under the collective bargaining agreement terms before the

15 Chief of Police has issued a written decision?

16         MR. ELLISON:  I'm sorry, Your Honor.

17         THE COURT:  The Chief of Police makes the decision

18 whether or not to terminate subject to whatever appeal rights

19 there are.  Without such a decision is there actually even a

20 termination yet?

21         MR. ELLISON:  As -- as of today --

22         THE COURT:  Yeah.

23         MR. ELLISON:  -- Your Honor?  Yes, there is, Your

24 Honor.  When -- when the arbitrator issues the decision saying

25 that the recommendation of the trial board for dismissal is

1   consistent with just cause, the arbitrator says termination is

2   what happens.

3           THE COURT:  Is that what this arbitrator said?

4           MR. ELLISON:  Yeah.

5           THE COURT:  Where did the arbitrator say the

6   employee is terminated?

7           MR. ELLISON:  The arbitrator says --

8           THE COURT:  It says a dismissal of Sergeant Hughes,

9   et cetera, is hereby affirmed.

10          MR. ELLISON:  Correct.

11          THE COURT:  If you think that's the -- that award

12  language, Page 44 of the arbitrator's decision when that was

13  issued on December 15, 2014 that constitutes the moment in the

14  event of termination?

15          MR. ELLISON:  That's correct, Your Honor.  And prior

16  to that what we have under the language of the collective

17  bargaining agreement, again Article 10, Section A(3) on Page

18  64 is a referral to a trial board.

19      It indicates -- and I'll read the language rather than

20  attempt to recall it.  "When serious charges are made against

21  an employee, and again this is the second sentence of that

22  section, "when serious charges are made against an employee,

23  the matter may be referred to a trial board".

24      So that's without a determination being made.  It's just

25  a serious charge.  Disciplinary administration section,

1 perhaps the Chief of Police, whoever it is that determines

2 whether charges are serious within the meaning of that

3 language, it's clearly a department function.

4     But once it's referred to the trial board, then the trial

5 board language takes over and that gives the trial board the

6 right to investigate, but not issue a penalty.  They can make

7 a recommendation, but -- but can't issue the penalty.

8     So the determination of dismissal happens December 15 of

9 2014 when the arbitrator rules and the -- the decision that

10 the arbitrator issues on that date is implemented the next

11 day, December 16.  And that's the day that Sergeant Hughes is

12 removed from the payroll.

13     Now with respect to the claim that's filed by the DPLSA,

14 Your Honor may be aware of some of the background information

15 that gave rise to that claim.  There was a stipulation entered

16 into between the city and various public safety unions which

17 is docket number 2667 filed February 7 of 2014 concerning --

18 the principal concern there related to defense and

19 indemnification claims.

20     When an officer is accused of conduct giving rise to an

21 injury to a citizen known in common parlance as police

22 brutality for instance, the -- the citizen will sue the

23 officer and will also sue the city.  The officer of course is

24 not in bankruptcy.  The officer has a claim against the city

25 for defense and indemnification under the charter of the City

1 | of Detroit.

2 |     And the public safety unions were concerned that the

3 | officers who face potential claims would be left high and dry

4 | without defense and indemnification. And so this stipulation

5 | was reached through mediation and resulted in an order which

6 | is docket number 2678 which gave the public safety unions the

7 | right to file omnibus claims on behalf of any member of their

8 | associations that they could identify for a potential defense

9 | and indemnification. And again --

10 |     THE COURT: But that's not what the claim is that

11 | was filed by --

12 |     MR. ELLISON: I understand, Your Honor.

13 |     THE COURT: Excuse me, by the association on behalf

14 | of Tanya Hughes.

15 |     MR. ELLISON: Right. But --

16 |     THE COURT: It says nothing about indemnification.

17 |     MR. ELLISON: There -- there -- there is a -- there

18 | is a paragraph within the stipulation. Sub paragraph H on

19 | Page 4 of the stipulation. It's -- and again the stipulation

20 | is docket 2667.

21 |     That states, "there also are potential claims of public

22 | safety union members as a result of disciplinary action

23 | instituted against such member by the city". And the

24 | paragraph goes on, and the -- the stipulation thus gave --

25 | gave the public safety unions the right to file claims on

1 behalf of any person within their individual associations that

2 was facing potential disciplinary action.

3     And the claim that was filed by the DPLSA related to

4 disciplinary action. I believe Your Honor has as part of this

5 record, listing three individuals, Victor Jones, Tanya Hughes,

6 and Donald Johnson. Victor Jones, a discipline filed that

7 commenced in calendar 2010. Tanya Hughes, a discipline filed

8 that commenced in calendar 2012. And Donald Johnson, a

9 demotion filed.

10     Donald Johnson had been an inspector represented by the

11 Command Officer's Association. He had been demoted into the

12 DPLSA and there was a proceeding pending seeking to get him

13 re-promoted and get him the difference in the compensation

14 between the two ranks.

15     As far as I can tell, the -- what -- what the DPLSA put

16 in the claim with respect to Tanya Hughes, they asked for

17 reinstatement and back pay. She -- she didn't need

18 reinstatement at the time the claim was filed because she

19 hadn't been dismissed. And she had no back pay due and owing

20 to her because she was receiving full compensation in a

21 suspended with pay status.

22     So I -- I think that the claim that was filed by the

23 DPLSA does not go to the issue that's before Your Honor and

24 that is whether it was within the fair contemplation of

25 Sergeant Hughes that she had a claim under the Elliott-Larsen

1  Civil Rights Act for pregnancy discrimination or disability

2  discrimination arising from the order in October 2012 that she

3  completely disrobe before delivering a urine specimen at a

4  drug testing event.

5      Under the Signature Combs case as I've argued previously,

6  Your Honor, a claim for bankruptcy purposes arises if the

7  potential claimant knows that they have a claim and knowledge

8  of that is acknowledged to a certainty.  And here Sergeant

9  Hughes didn't know even if she was going to be fired as a

10  result of this let alone whether she would have a claim under

11  the Elliott-Larsen Civil Rights Act arising from such

12  dismissal.

13          THE COURT:  Well, Tanya Hughes did not sign this

14  proof of claim or file it?

15          MR. ELLISON:  Correct.  And in fact we did not know

16  about it.

17          THE COURT:  Is that correct?

18          MR. ELLISON:  That is correct, Your Honor.

19          THE COURT:  She didn't do it.

20          MR. ELLISON:  Sergeant Hughes didn't know about it.

21          THE COURT:  It was -- it was filed by the Detroit

22  Police Lieutenants and Sergeants Association.

23          MR. ELLISON:  Correct.

24          THE COURT:  Right?  Under -- under an order of this

25  Court that authorized that association to file claims like

1  this.

2        MR. ELLISON:  Correct.

3        THE COURT:  And the proof of claim says in Exhibit 1

4  it's without prejudice to claimant's ability -- I'm sorry,

5  there's something in the order or in the -- yeah, it says it's

6  -- it's without prejudice to the individual member to assert

7  claims on their own behalf.

8        MR. ELLISON:  Correct.

9        THE COURT:  All right.  Well, what else did you want

10  to say, anything?

11        MR. ELLISON:  That's all I have, Your Honor.  Thank

12  you.

13        THE COURT:  All right.  Thank you.  Mr. Swanson, as

14  usual as counsel for the moving party, I'll let you briefly

15  reply if you want to.  Anything further you'd like to say?

16        MR. SWANSON:  Thank you, Your Honor.  I think we

17  need to -- to go back to the definition of -- of claim under

18  the Bankruptcy Code.  And -- and realize that Congress broadly

19  defined claim and gave it the broadest possible definition.

20     When the termination was filed and when it occurred is --

21  is not all together relevant here.  We know that the conduct

22  occurred pre-petition, there were numerous proceedings

23  initiated pre-petition, and this claim was within Ms. Hughes'

24  fair contemplation before the filing of the case.  Thank you.

25        THE COURT:  All right.  Thank you both.

1    I'm -- I'm not going to issue a bench opinion at this

2    moment ruling on this motion or the -- the motion as it has

3    now been modified in terms of the relief the city is -- is

4    seeking.  Instead I'm going to schedule this for a bench

5    opinion to be given on the next day when I have City of

6    Detroit hearings which is August 26 at 1:30 p.m.

7    I've got a couple of matters in this case already

8    scheduled for that day.  I'm out of town much of the next two

9    weeks anyway.  So I couldn't really do it before then.

10    I do want to take a bit more time to think about the

11    arguments of the parties and the authorities the parties cite

12    and the issues here before ruling.  But I'll -- I'll do it on

13    August 26 at 1:30.  Now, does that date and time work on

14    counsels' calendars.  Mr. Swanson, Mr. Ellison.

15        MR. ELLISON:  Yes, Your Honor.  For Tanya Hughes it

16    does.

17        MR. SWANSON:  Your Honor, I -- I cannot make it here

18    that day but -- but Mr. Green will be here.

19        THE COURT:  Oh, okay.  So the city has no problem

20    with me doing it then as opposed to --

21        MR. SWANSON:  No problem.

22        THE COURT:  All right.  Okay, very good.  So that's

23    -- that's it for today on that matter.  The -- let's hear the

24    next matter which is the expedited hearing on the City of

25    Detroit's motion concerning B & C Land Development and its

1  lawsuit in State Court.

2      `All right.  This hearing on the city's motion is docket

3  number 10087.  The motion for entry of an order enforcing the

4  plan of adjustment injunction and requiring B & C Land

5  Development Corporation to dismiss with prejudice its State

6  Court lawsuit and withdraw its notice of lis pendens.

7      I -- I did review the papers filed by the parties

8  concerning this motion and their exhibits.  We'll start with

9  counsel for the moving party.  Mr. Swanson, you're going to

10  argue it?

11          MR. SWANSON:  Yes, Your Honor.

12          THE COURT:  All right.  Well, let's have

13  appearances.  You've already entered an appearance.  Counsel

14  for B & C.

15          MR. COTTON:  May it please the Court, Horace Cotton

16  appearing on behalf of B & C.

17          THE COURT:  All right.  Thank you.  Good afternoon

18  to everyone.  Go ahead then, Mr. Swanson.

19          MR. SWANSON:  Thank you, Your Honor.  The matters in

20  dispute here are one, does B & C Land have a contract with the

21  city.  Did it ever have a contract with the city.

22      And two, if this Court were to find that there was a

23  contract which the city does not believe is the case, is B & C

24  Land prohibited from suing on that contract because it's

25  barred by the Michigan statute of limitations

1    If this Court were to answer either of these questions in

2    the city's favor, the Court should enter the order requiring

3    the dismissal of the State Court lawsuit and the withdrawal of

4    the lis pendens.

5        THE COURT:  Was the lis pendens notice filed only in

6    the Circuit Court in the lawsuit, or was it filed separately

7    in the Register of Deeds office?  Do you know?

8        MR. SWANSON:  I don't know, Your Honor.  I would --

9        THE COURT:  Okay.  Well, go ahead.

10       MR. SWANSON:  Your Honor, I wanted to provide a

11   little background on -- on this piece of property and -- and

12   the facts at least as B & C has -- has alleged them to be.

13       First though, B & C alleges that there was a contract in

14   -- in 2006 between the city and B & C to sell real property.

15   B & C alleges that on May 21, 2008, the contract was breached

16   because that property which was subject to the alleged

17   contract was instead transferred to the Detroit Waterage or --

18   Detroit Water Sewerage Department, the DWSD.

19       Now in February of 2015, the city received two purchase

20   offers for this property and on June 30th, 2015, the Detroit

21   city council passed resolutions approving both of these

22   purchase offers -- offers.  And the Mayor has subsequently

23   approved them as well.

24       The city and the purchasers desired to complete the sale

25   of these properties as soon as possible and the day after the

1   city council approved these resolutions B & C filed a

2   complaint in Wayne County Circuit Court alleging that it had a

3   contract to purchase the same property that was approved by

4   city council and -- and sued for breach of contract.

5        Now, Your Honor, B & C does not have a contract and it

6   has never had a contract with the City of Detroit.  To support

7   its argument that there is a contract, B & C attached a cover

8   letter and a document entitled offer to purchase.  These

9   documents appear at docket number 10087 from Pages 35 to 43.

10       The cover letter to the offer to purchase is instructive

11  and -- and important.  Because it provides on Page 3, upon

12  receipt of the above, referring to the offer to purchase, we

13  shall review your proposed development package.  If

14  acceptable, we shall follow our standard procedure for sale of

15  surplus property by development agreement to obtain city

16  council authorization to execute an agreement to purchase and

17  develop the property.

18       Now this language was included on the cover letter, Your

19  Honor, because the city's charter provides in Section 4-112

20  that "except as otherwise provided by this charter, the city

21  may not sell or in any way dispose of any property without the

22  approval by resolution of city council".

23       And, Your Honor, city council never approved this offer

24  to purchase.  And B & C does not allege otherwise.  In fact,

25  Your Honor, what may be most telling is that in Paragraph 26

1  of B & C's own complaint, it says that the city breached the

2  purported contract by "failing and refusing to present the

3  development agreement to city council for final approval".

4      This -- this conclusion is also supported by the

5  declaration of Mr. James Noseda who filed a declaration in

6  support of the city's reply where he certified that he has

7  searched the city council records for resolutions on -- on

8  this piece of property and there has never been a resolution

9  approving any sale of property -- any sale of this property to

10  B & C or its President Mr. Carmack.

11      Your Honor, this is not the first time that B & C has --

12  has -- has alleged that they're -- alleged that they're a

13  party to a contract with the city.  And as we attached as an

14  Exhibit 6D to our original motion, the city has consistently

15  maintained over the years that there is not a contract and

16  that there has never been a contract.

17      In fact in May 2012, Robert A. Anderson, the director of

18  the city's planning and development department issued a public

19  statement to the Detroit city council.  Because Mr. Carmack

20  has repeatedly been in front of the city council alleging that

21  he had a contract.

22      When he explained that P & DD never took a deposit, the

23  planning and development department never took a deposit from

24  Mr. Carmack for the site, never entered into a purchase

25  agreement with Mr. Carmack for the site, and never entered

1 into a development agreement with Mr. Carmack for the site.

2   Planning and development department never requested that

3 this honorable body approve any sale of the site to Mr.

4 Carmack and your honorable body never passed a land sale

5 resolution or authorized the sale of the property to Mr.

6 Carmack.

7   Thus, Your Honor, the law provides that for the offer to

8 purchase to be a valid contract the city council had to

9 approve it.  The facts here are undisputed that the city

10 council never approved the contract thus the only conclusion

11 that this Court could reach is that there is no contract.

12   THE COURT:  And therefore you're saying there was no

13 executory contract to be assumed or rejected or otherwise

14 treated under the plan or otherwise.

15   MR. SWANSON:  Yes, Your Honor.

16   THE COURT:  I -- I gather from that also that you're

17 arguing that to the extent there is -- there are any claims

18 based on these pre-petition events other than a breach of

19 contract claim and that's -- I don't -- I'm not sure that's --

20 any such other claims are asserted in the complaint in State

21 Court, that those are clearly pre-petition claims that are

22 covered by the plan's discharge and injunction relief.

23   MR. SWANSON:  That's correct, Your Honor.

24   THE COURT:  Okay, go on.

25   MR. SWANSON:  And Your Honor, although the city

1  believes there's overwhelming evidence here that there is no

2  contract if -- if the Court were to find a contract again by

3  B & C's own admissions, the statute of limitations period to

4  enforce that contract has run.

5       As I stated in -- in -- in my introduction, B & C alleges

6  that on May 21, 2008, the city breached this alleged contract

7  by transferring the subject property to the DWSD.  And -- and

8  there are certainly allegations in the complaint which would

9  support a conclusion that -- that B & C is alleging that the

10 breach occurred at -- at an earlier date.

11      But even if we take the farthest possible date May 21,

12 2008 as alleged by B & C, if you apply a six year statute of

13 limitations which applies to contracts and contracts to

14 purchase real property, the statute would have run during the

15 city's bankruptcy case under 108(c) would have been extended

16 for a period of 30 days after the effective date.  Which means

17 the statute ran on January 9th, 2015.  Thus B & C is barred

18 from suing on this contract under the statute of limitations.

19      The city asks that the Court grant its motion and order

20 that B & C dismiss the State Court lawsuit and withdraw the

21 lis pendens.  Thank you, Your Honor.

22           THE COURT:  All right.  Thank you, Mr. Cotton.

23           MR. COTTON:  Your Honor, B & C maintains that the

24 offer to purchase which was accompanied by a $50,000 good

25 faith deposit, as well as full blown development plans

1 including feasibility studies, market studies, environmental

2 studies, architectural drawings, et cetera which were prepared

3 by B & C at great expense as required by the City of Detroit

4 that was and is a binding contract with the City of Detroit

5 even though it had been -- and we agree that it was never

6 presented to council by -- to -- to -- to obtain a resolution

7 for entry into a development agreement.

8 And it is also true that Mr. Carmack has tried repeatedly

9 over the years to convince council that he had a -- an offer

10 to purchase which should be considered by that body to pass a

11 resolution to enter into a development agreement.

12 The city argues that Mr. Anderson, I believe, appeared

13 before council and -- and made certain representations that

14 planning and development never took a deposit from Mr.

15 Carmack. Well, that was false. They had never entered into a

16 purchase agreement. That was false.

17 Part of the problem is that over the last few years given

18 Detroit's former Mayor and his administration being of course

19 embroiled in controversy and eventually convicted, over the

20 years there were a series of Mayors and -- and directors of

21 planning and development.

22 And under each administration they each told council

23 something different and contradictory. And the crux of the

24 matter is that Mr. Carmack who was accompanying me at the

25 counsel's table who is the President of B & C Land

1 Development, was solicited for a bribe and refused to

2 cooperate.  And it was then that his proposal was killed, or I

3 don't want to say killed, it was buried and was never

4 presented to council.  In the meantime he spent thousands of

5 dollars in preparation for the offer.

6      Now the city wants to argue that if there was a contract

7 that it was breached when the property was originally

8 transferred to the control or the authority of water and

9 sewerage.  Well, we disagree.  We disagree.  Because water and

10 sewerage never paid for the property and the property was

11 transferred back under the jurisdiction of planning and

12 development by resolution.

13      It is our position that this contract was not breached

14 until May 31st of 2015 when the city agreed to sell portions of

15 the property to water -- excuse me, Waterfront Terminal

16 Holdings and Revere Dock, two separate purchasers.

17      And mind you of course that they're only selling a

18 portion of the -- the total property.  The Court also asked a

19 question as to whether or not the lis pendens was filed with

20 the treasurer -- excuse me, Register of Deeds and it has been.

21           THE COURT:  Was that done at the same time you filed

22 the lawsuit?

23           MR. COTTON:  Yes.

24           THE COURT:  All right.  Thank you.

25           MR. COTTON:  So it's our position that this contract

1  was in fact executory.  It is not rejected by the city in the

2  plan of adjustment.  And we cited cases which indicates that

3  it -- because it is not rejected it continues in existence.

4  It was not breached until recently -- recently here

5  post-petition and therefore it does not violate the

6  injunction.  We therefore ask this Court to deny the city's

7  motion.

8          THE COURT:  You contend this contract that you say

9  existed was breached by the city post-petition only recently.

10 By that are you referring to the city's actions in moving

11 forward with sale of the property to the two other purchasers

12 recently?

13         MR. COTTON:  Yes.

14         THE COURT:  All right.  So Mr. Cotton, what --

15 what's your response to the city's argument that there is no

16 contract under applicable Michigan law because the city

17 charter required a resolution by the city council approving

18 the sale in order for there to be a valid contract.

19         MR. COTTON:  There is no -- there is no development

20 agreement.  There is not a -- a separate purchase agreement

21 which is a separate document.  But the offer to purchase

22 accepted by the city is a valid contract under common law.

23         THE COURT:  A contract to sell the property.

24         MR. COTTON:  Yes.

25         THE COURT:  So how is it a valid contract to sell

1  the property, this city owned property when there was no --

2  never a city council resolution approving that sale.

3      I'm looking at Section 4-112 of the city charter.  It

4  says except as otherwise provided by this charter, the city

5  may not sell or in any way dispose of any property without the

6  approval by resolution of the city council.

7      Now under that charter provision under the case law cited

8  by the city, doesn't that mean that the fact there was no city

9  council approval by resolution, doesn't that mean there was

10  never a -- a valid contract between the city and B & C for the

11  sale of this property?

12          MR. COTTON:  I am -- I am aware of the charter

13  provision as well as the case law.  As a matter of fact I'm a

14  former city employee.  However, the offer to purchase we

15  maintain is still a binding contract between B & C and the

16  City of Detroit that's separate and distinct from the -- if I

17  might take a second.  One second, please.

18      Attached to the city's motion itself is a copy of the

19  purchase agreement between Waterfront Terminal and the City of

20  Detroit.  Now that is an example of the formal purchase

21  agreement typically used by the City of Detroit to sell

22  surplus land.

23      It's the same type of agreement that was used for the

24  other purchaser, Revere.  The -- so that -- that's the formal

25  purchase agreement.  The process of selling surplus property

1 is that the -- the city first enters into a binding agreement

2 with the developer.

3 And that agreement is binding. Were it for the

4 bankruptcy and had this just arisen, it would go into State

5 Court if the city breached the offer to purchase and turned

6 around and sold it to another person. And the city at that

7 time would attempt to argue that it's not binding because it's

8 -- it hasn't gone before council. But the offer to purchase

9 is a binding legal document that gives B & C enforceable

10 rights separate from and before the issuance of a formal

11 purchase agreement authorized by the -- by council. Those are

12 two separate and distinct matters.

13 THE COURT: Well, but your theory is that the offer

14 to purchase when accepted you said that was accepted by city

15 personnel.

16 MR. COTTON: Yes.

17 THE COURT: Your theory is that is a binding

18 contract for the sale by the city to B & C of the real estate

19 which is the subject of the agreement.

20 MR. COTTON: Yes.

21 THE COURT: What I'm trying to understand is why you

22 -- why you are -- why you say that is so under Michigan law

23 given the city charter provisions and the case law to -- that

24 the city has cited here. And given the fact that is

25 undisputed that the city council --

1          MR. COTTON:  Excuse me.

2          THE COURT:  Detroit city council has never approved

3     the sale of any of this property to your client by a

4     resolution as required by the city charter.  Why doesn't that

5     mean that there -- there never was a valid or a binding

6     contract for the sale of any of this property between the city

7     and your client.

8          MR. COTTON:  I would -- I would pose the question

9     back to the city then what -- what is the purpose and effect

10    of -- of -- of executing an offer to purchase.  What it does

11    is it supposedly it ties up the land so that the -- the -- the

12    city will not negotiate with or -- or sell the property to any

13    other entity.  So it -- it -- it has legal effect as a

14    contract.  And the city is bound by it.  I think if -- that's

15    about all I have to say on that issue, Your Honor.

16         THE COURT:  All right.  Did you want to say anything

17    else then?

18         MR. COTTON:  No.  I think that's sufficient.

19         THE COURT:  All right.  Thank you.

20         MR. COTTON:  Thank you.

21         THE COURT:  Mr. Swanson, you may briefly reply as

22    counsel for the moving party if you want to.

23         MR. SWANSON:  Your Honor, what -- what we haven't

24    heard from B & C Land is that the contract was ever approved

25    by the city council or that it didn't need to be approved by

1   city council under the law.  That's because it -- it never was

2   approved by city council.  And -- and it had to be approved by

3   city council under the charter.

4        Second, Your Honor, B & C stated it -- it hasn't alleged

5   a -- a breach of contract on May 21, 2008.  If you look at

6   Paragraph 26 of the complaint it says, Detroit breached its

7   obligations under the purchase agreement by failing and

8   refusing to cooperate and negotiate in good faith.

9   Specifically Detroit has violated the purchase agreement by

10  number three, conveying the property to the Detroit Water and

11  Sewerage Department after the property was under contract to

12  B & C.  Paragraph 15 of the complaint states that that

13  conveyance occurred on May 21, 2008.  Thank you, Your Honor.

14        THE COURT:  All right.  Thank you all.  I'm going to

15  rule on this motion now.

16        The city's motion before me today seeks in the form of

17  the proposed order that's attached to the motion, an order of

18  this Court requiring B & C Land Development Corporation to

19  dismiss, or cause to be dismissed with prejudice, the specific

20  lawsuit that it recently filed in the Wayne County Circuit

21  Court against the city that's referred to in the motion.

22        And also to withdraw from the Wayne County Register of

23  Deeds the notice of lis pendens that the B & C Land

24  Development Corporation filed.  The city also seeks in its

25  order, an order from the Court barring and enjoining B & C

1  Land Development Corporation from asserting any claims

2  described in the State Court lawsuit, a copy of the complaint

3  in the State Court lawsuit filed in the Wayne County Circuit

4  Court is attached as an exhibit to the city's motion, or the

5  alleged conduct forming the basis of the State Court lawsuit

6  against the City of Detroit or its property in the State Court

7  lawsuit or in any other action or proceeding.

8      The city's proposed order also has the Court -- asks the

9  Court to order that if B & C Land Development Corporation

10  fails to timely withdraw the notice of lis pendens that I

11  referred to earlier, the city may file a copy of the Court's

12  order with the Register of Deeds which will operate as a

13  withdrawal of the lis pendens on the property.

14      I -- I have reviewed and considered carefully the

15  arguments of the parties with -- regarding this motion, both

16  the written papers and exhibits filed by the parties, and the

17  arguments made in today's expedited hearing on the motion.

18  And -- and my conclusion is that the motion must be granted in

19  its entirety and I will do so.

20      The -- the B & C Land Development Corporation's argument

21  in defense against the city's motion that it had as of the

22  filing of the City of Detroit's bankruptcy petition in this

23  Chapter 9 bankruptcy case, that is as of July 18, 2013, the

24  petition date in this case.  That -- that as of that time the

25  B & C Land Development had a valid and enforceable contract

1  with the City of Detroit for the purchase by B & C Land

2  Development from the city of the real estate which is the

3  subject of the city's motion and of the State Court lawsuit

4  filed by B & C.

5      That that contract was an executory contract within the

6  meaning of Section 365 of the Bankruptcy Code, 11 USC Section

7  365 which executory contract was never assumed or rejected by

8  the city during its bankruptcy case and therefore survives the

9  bankruptcy, the bankruptcy discharge, the bankruptcy plans,

10 and the order confirming plan's injunctive provisions.  And

11 therefore B & C is entitled and -- and permitted to pursue

12 their State Court lawsuit despite the city's confirmed Chapter

13 9 plan in this bankruptcy case.

14     The B & C's argument however is without merit based on

15 undisputed facts.  The undisputed facts include the fact that

16 the B & C -- while B & C alleges that it -- that the offer to

17 purchase document and perhaps other documents between itself

18 and the city regarding this property at issue were valid and

19 enforceable and binding contracts between B & C and the city,

20 that is simply not the case under Michigan law.

21     It's not the case because as the case law cited by the

22 city demonstrates, and the city charter provision cited by the

23 city demonstrates, there can be under Michigan law no valid

24 contract for the sale by the City of Detroit of any real

25 estate or any other property without the approval by

1  resolution of the city council of Detroit.

2      Section 4-112 of the city charter says, "that except as

3  otherwise provided by this charter, the city may not sell or

4  in any way dispose of any property without the approval by

5  resolution of the city council".

6      That B & C has not argued that there are any exceptions

7  in the city charter to this requirement that the city council

8  approve any sale of its property by resolution that would

9  apply to the property here.  B & C has not argued otherwise

10 and that argument by the city is supported by the affidavit

11 that the city filed -- a declaration rather under penalty of

12 perjury of the city's James Noseda, a member of this Detroit

13 law department.  That was attached as -- to the city's reply

14 brief, docket 10115.

15     And so it is undisputed that under the City of Detroit

16 charter a resolution by the Detroit city council approving the

17 sale of the property was necessary in order for there to be

18 the possibility of any existence of any valid binding,

19 enforceable contract of any kind regarding the sale of this

20 property at issue between the city and B & C Land Development.

21     It's also undisputed that there never was any such

22 approval by city council by resolution as required by the city

23 charter.  Under the cases cited by the city the result of this

24 is that there was -- there was and is -- there was never and

25 now is no contract, binding and enforceable contract between

1   the city and B & C Land Development.

2       The cases that support that proposition under Michigan

3   law include the case of <u>Johnson v City of Menominee</u>, 173 Mich

4   App 690, 434 NW 2d 211 and in particular at Pages 213 and 214,

5   a decision of the Michigan Court of Appeals from 1989.  And

6   also the decision of the United States Court of Appeals for

7   the 6th Circuit in applying Michigan law.

8       In the case of <u>Michigan Paytel Joint Venture v City of</u>

9   <u>Detroit</u>, 287 F 3d 527, particularly at Page –– Pages 539 to

10  540, a decision of the 6th Circuit from 2002.

11      So there is no valid and never was a valid contract or

12  any contract between –– enforceable contract between the city

13  and B & C Land Development Corporation therefore –– therefore

14  there could be no executory contract at any point and in

15  particular as of the petition date in the Chapter 9 bankruptcy

16  case within the meaning of Section 365 of the Bankruptcy Code.

17      So this –– so that B & C's argument that it has a –– an

18  executory contract that –– that was never rejected in the

19  bankruptcy and therefore survives the bankruptcy and the

20  bankruptcy discharge and injunction in the confirmed plan is

21  without merit.  And the Court must reject that argument.

22      If and to the extent B & C Land Development can be

23  construed as alleging in their State Court complaint that ––

24  or in their argument in responding to the city's motion here,

25  that certain acts or omissions by the city give B & C a claim

1 under some legal theory with respect -- relating to this

2 property under some legal theory other than breach of

3 contract, a contract based theory such as a tort theory or

4 some other type of theory other than contract or a theory that

5 -- other than the theory that depends upon the existence of an

6 enforceable and valid contract between the parties.

7      Those claims clearly are claims that arose before and --

8 and well before the city filed its bankruptcy petition in this

9 Chapter 9 case on July 18, 2013.  And such claims therefore

10 are discharged by the city's confirmed plan of adjustment and

11 the discharge injunction provisions of the confirmed plan and

12 of the Court's order confirming the plan bar B & C Land

13 Development from pursuing those claims, either in State Court,

14 or in the bankruptcy case, or anywhere else against the city

15 or the city's property.

16      Those provisions -- and such -- any such claims were

17 discharged under the confirmed plan.  The provisions in the

18 plan and the order confirming plan which the city has relied

19 on and which support these conclusions are the discharge

20 provision on Page 50 of the eighth amended plan which is on

21 file and is part of docket 8272.

22      The injunction provisions in that confirmed plan which

23 are on Pages 50 to 51 of the -- that same plan, docket 8272.

24 And the injunction provisions in the order confirming plan

25 that was filed in this case on November 12, 2014, docket

1  number 8272 beginning at Page -- Page 89 of the order

2  confirming plan.

3       For all these reasons then, B & C Land Development does

4  not have any claim against the City of Detroit arising from or

5  relating to any alleged agreement with the city regarding the

6  property at issue and does not have any claims under any legal

7  theory any that survive the bankruptcy case and the

8  confirmation of the plan of adjustment in this case against

9  the city and is subject to the injunction provisions enjoining

10 them from pursuing any such claims by litigation or otherwise

11 under the confirmed plan of adjustment.

12      Based on that the Court will grant the motion and will

13 order the relief that the city has requested in the motion.

14 Mr. Swanson, do you have the proposed order in front of you?

15           MR. SWANSON:  I do, Your Honor.

16           THE COURT:  That's attached to your motion?  I want

17 to -- I want to talk to you about it.  I want to talk about

18 some changes, minor changes in the order.

19      The order says in Paragraphs 2 and 3 it sets a deadline

20 for B & C to take certain action.  It says within five days of

21 the entry of this order.  I'm not concerned about that -- that

22 time frame, but instead of saying it that way in orders, I

23 like to whenever possible to set a specific calendar date as a

24 deadline.

25      So if you tell me that you're going to get this order --

1 | proposed order submitted to me yet today so that I can get it

2 | filed yet today, we'll make it five days -- no later than five

3 | days after today's date, so that would be five days -- that

4 | would be no later than next Monday, August 10th. I assume you

5 | can get me this order --

6 |       MR. SWANSON: Absolutely.

7 |       THE COURT: Submit this order today. I'm going to

8 | waive presentment of the revised order.

9 |       MR. SWANSON: Yes, Your Honor.

10 |       THE COURT: All right. So make the date August 10,

11 | no later than August 10, 2015, B & C Land Development

12 | Corporation must dismiss, et cetera in Paragraph 2. Paragraph

13 | 3, they must withdraw the notice of lis pendens. Paragraph 4,

14 | 5, and 6 are fine as is.

15 |     I'll ask you to submit that order as soon as possible.

16 | I'll waive presentment as I said. And I will make every

17 | effort to review the order and get it docketed as quickly as I

18 | can after you submit it.

19 |     The -- I may make some minor non-substantive changes to

20 | the order, but don't worry about those, I'll take care of

21 | that. And -- and as I said, they're -- they're entirely

22 | non-substantive type things.

23 |     So, submit the order and the motion will be granted on

24 | that basis. That concludes today's matters on the City of

25 | Detroit case. Thank you all.

1              THE CLERK:  All rise.

2              MR. SWANSON:  Thank you, Your Honor.

3              MR. ELLISON:  Thank you.

4         (Court Adjourned at 3:14 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872      Dated: 8-9-15
     Jamie Laskaska

12

13

14

15

16

17

18

19

20

21

22

23

24

25