legislature voting to raise taxes is remote. Even if the City could legally increase property tax rates, doing so would not increase the City's revenues because the City has reached its practical taxable limit, *i.e.*, tax saturation, meaning that any further tax increases on Detroit residents most likely would (a) exacerbate the City's already high tax collection delinquency rate, (b) continue the flight of residents and businesses from the City, (c) discourage inflow of prospective residents and businesses, (d) destabilize growth and (e) ultimately reduce the City's overall tax revenues. The loss of population in Detroit has compounded the City's financial difficulties and led to additional cutbacks in municipal services – which cutbacks, in turn, have led to continuing losses of population, industry and tax revenues. Increasing the tax burden on Detroit residents would only perpetuate this vicious cycle.

8. The effect of dismissal of the City's Chapter 9 Case would be the issuance of myriad judgment levies under State law.[39] In a dismissal scenario, the Revised Judicature Act would require the City to satisfy any judgments obtained by creditors either through bond issuances or property tax levies.[40] If the Chapter 9 Case were dismissed, the City's creditors would not realize greater recoveries than they would receive under the Plan because the City

---

[39] *See* M.C.L. § 600.6093.

[40] *See id.*

-35-

would lack the resources and ability to satisfy such judgment levies. In such a scenario, the City's pension obligations alone likely would quickly eradicate any meaningful recoveries for other unsecured creditors outside of chapter 9.

9. Dismissal of the Chapter 9 Case would deprive the City of the benefit of the Reinvestment Initiatives. Without such reinvestment, the City's ability to provide basic services would continue to decline below even today's inadequate levels. Without the ability to provide adequate levels of basic services, the City would be unable to reverse the exodus of residents and businesses from the City that has depleted the City's tax base, reduced land values and led to widespread abandonment and blight. In addition, the Plan offers financial benefits that would be unavailable to the City in the event of dismissal, including the $816 million that will be contributed to the Retirement Systems in connection with the Grand Bargain, the Exit Facility and the cost savings to be realized by the Reinvestment Initiatives and the Settlements under the Plan.

10. *Feasibility.* The Plan is feasible, within the meaning of section 943(b)(7) of the Bankruptcy Code. On and after the Effective Date, it is more likely than not that the City will be able to (a) make all payments contemplated by the Plan without a significant probability of default and

(b) sustainably provide adequate municipal services to its residents.[41]  The City has demonstrated a reasonable prospect that the City will successfully implement the Plan and the Reinvestment Initiatives.[42]

11.    The City's revenue and expense projections contained in (a) the ten-year summary of the Reinvestment Initiatives (the "10-Year Reinvestment Initiative Summary") introduced into evidence as City Exhibit 108 (July 2014); (b) the ten-year statement of projected cash flows (the "10-Year Forecast") introduced into evidence as City Exhibits 109 (July 2014), 733 (September 2014), 780 (October 2014), 781 (October 2014) and 782 (October 2014); (c) the forty-year statement of projected cash flows (the "40-Year Forecast") introduced into evidence as City Exhibits 111 (July 2014), 734 (September 2014), 779 (October 2014) and 793 (October 2014); and (d) the ten-year statement of projected cash flows of the City's water and sewage disposal funds introduced into evidence as part of City Exhibit 3 (collectively with the 10-Year Reinvestment Initiative Summary, the 10-Year Forecast and the 40-Year Forecast, the "Projections"), are reasonable, made in good faith, accurate,

---

[41]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[42]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 29, 164-65, 202-03; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

consistent with other financial projections made by the City and based upon assumptions that are reasonable when considered individually or collectively.[43]

12.  The City will have employees that have the necessary skill and commitment to implement, and perform according to the terms of, the Plan.  The City will also have adequate systems, controls and procedures (as modified, modernized and developed by the Reinvestment Initiatives) to (a) monitor the City's financial and operational performance and (b) minimize and eliminate fraud, abuse and waste (both in the City's day-to-day operations and in the implementation of the Reinvestment Initiatives).[44]

13.  The City is beginning to implement appropriate controls to reasonably ensure the City's ongoing compliance with the terms of the Plan.[45] These controls include, but are not limited to:  (a) the Michigan Financial Review Commission (the "Financial Review Commission") established pursuant to Public Act 181 of 2014, M.C.L. §§ 141.1631, *et seq.* ("PA 181" or the "Financial Review Commission Act"); (b) the requirements imposed by Public Act 182 of 2014,

---

[43]  *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 10, 200-01; Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4; Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 5-6.

[44]  *See* Court's Exhibit 12002 (Second Supplemental Expert Report of Martha E.M. Kopacz), at 29-30.

[45]  *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 175, 202.

-38-

13-53846-tjt   Doc 10181-10   Filed 09/21/15   Entered 09/21/15 13:01:21   Page 4 of 5
13-53846-swr   Doc 3074-5   Filed 09/26/15   Entered 10/24/15 15:00:52   Page 4 of 25   1312
314

M.C.L. § 117.4s-t ("PA 182" and, together with PA 181, the "Grand Bargain Legislation"), that the City (i) adopt a sound, multi-year financial plan, (ii) appoint a Chief Financial Officer and (iii) post its financial forecasts and contracts to the City's official website; and (c) the adoption of governance and financial oversight mechanisms for the Retirement Systems in connection with the State Contribution Agreement. The Financial Review Commission will have broad authority, under the Grand Bargain Legislation, to obtain and review the City's financial records on an ongoing basis, and to conduct financial audits of the City.[46]

14. The Reinvestment Initiatives provide for the reinvestment of approximately $1.7 billion in the City between the Effective Date and June 30, 2023. The Reinvestment Initiatives will allow the City to achieve approximately $483 million in additional revenue and $358 million in cost savings during that same period, resulting in net reinvestment in the City of approximately $877 million. The Reinvestment Initiatives are reasonably designed to, and more likely than not will, ensure that the City will be able to (a) remedy its service delivery insolvency and provide adequate municipal services to its residents, (b) meet its financial obligations on a prospective basis, (c) promote the stability of

---

[46] *See* M.C.L. § 141.1636.

-39-


13-53846-swr  Doc 8047-10  Filed 09/23/15  Entered 09/23/15 13:01:21  Page 5 of
314

the City's population and (d) provide a platform for the growth of both the City's resident and business populations.[47]

15. The costs associated with the Reinvestment Initiatives are reasonable. The goals of the Reinvestment Initiatives are achievable.[48] The City can arrest the reinforcing trends of population loss, declining property values and declining revenues if adequate services are restored, blight is remediated and the City becomes a more attractive place to live and work. The Reinvestment Initiatives will accelerate investment in the City by business, community and philanthropic organizations.

16. Absent the Reinvestment Initiatives, the City cannot provide a sustainable level of services to its residents. The Reinvestment Initiatives are necessary to (a) remedy the City's service delivery insolvency, (b) reduce blight and strengthen neighborhoods, (c) improve the efficiency of, and adequately fund, the City's operations (including, but not limited to, its administrative and support departments and the operations of the 36th District Court), (d) allow elected officials to more effectively manage the City, (e) enhance the City's revenues, (f) reduce the City's costs and (g) ensure the provision of

---

[47]     *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 202.

[48]     *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02.

adequate and significantly improved municipal and public safety services to City residents and businesses.[49]  The Mayor's office and the City Council have been consulted in connection with the City's restructuring and are committed to working in concert to implement the Plan and the Reinvestment Initiatives.[50]

17.    It is more likely than not that the Plan is sustainable over the long term.[51]  Based on the Projections, the City will have sufficient liquidity to sustain normal municipal operations, issue and perform under the New Securities, satisfy the Settlements and otherwise meet its financial obligations after the Effective Date.  The amount and terms of the Exit Facility are reasonable.  The City will have sufficient resources to service the Exit Facility.  The Plan and the Exit Facility will enable the City to resolve onerous debts related to the City's excessive prepetition borrowing.  The City's commitment, under the Plan, to use its best efforts to prepay the New LTGO Bonds on the Effective Date, or as soon as reasonably practicable thereafter, is both reasonable and feasible.  Credit markets

---

[49]    *See* Court's Exhibit 12000 (Expert Report of Martha E.M. Kopacz), at 201-02.

[50]    *See* Joint Notice of Transition Plan (Docket No. 7681), Exhibit A (Detroit City Council Resolution adopted Sept. 25, 2014), at 2-3 ("The City Council supports the confirmation and implementation of a Plan of Adjustment.… After, and assuming, confirmation of the Plan of Adjustment, the City Council will support the City's implementation of the confirmed Plan of Adjustment.").

[51]    *See* Court's Exhibit 12001 (Supplemental Expert Report of Martha E.M. Kopacz), at 3-4.

likely (a) will be receptive to the newly de-leveraged City and (b) would be closed

to the City absent the restructuring to be implemented pursuant to the Plan and the

Reinvestment Initiatives.  Although future economic risks cannot be predicted with

certainty, and some economic risk factors are outside of the City's control, under

the Plan, the City more likely than not will be able to adapt to unforeseen

circumstances as necessary to preserve its revitalization.

    18.  Under the Plan, the DWSD will have sufficient resources

to make the capital improvements necessary to enable the DWSD to continue to

provide an adequate level of water and sewer service to its customers, and the

DWSD's current capital improvement plans are reasonable for this purpose.  There

is no material risk of a system-wide failure that would prevent the DWSD from

providing adequate levels of service.  In addition, the DWSD Pension Funding

does not negatively impact the feasibility of the Plan with respect to other creditors

or the reinvestment initiatives.

## **EXECUTORY CONTRACTS**

    O.  Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy

Code (incorporated into this Chapter 9 Case by section 901 of the Bankruptcy

Code), upon the occurrence of the Effective Date, Section II.D of the Plan provides

for the assumption, assumption and assignment or rejection of certain Executory

Contracts and Unexpired Leases.  The City's determinations regarding the

assumption, assumption and assignment or rejection of Executory Contracts and

Unexpired Leases are based on and within the sound business judgment of the City,

are necessary to the implementation of the Plan and are in the best interests of the

City, holders of Claims and other parties in interest in the Chapter 9 Case.

The City has filed Exhibit II.D.6 to the Plan (as it may have been amended or

supplemented) and either has provided or will provide notice of the City's

determinations regarding the assumption, assumption and assignment or rejection

of Executory Contracts or Unexpired Leases and any related Cure Amount Claims

consistent with the procedures (collectively, the "Contract Procedures") set forth in

the Order, Pursuant to Sections 365, 901 and 1123 of the Bankruptcy Code,

(A) Establishing Procedures with Respect to the Proposed Assumption and

Rejection of Executory Contracts and Unexpired Leases and (B) Approving the

Form and Manner of Notice Thereof (Docket No. 6512), entered on

August 4, 2014 (the "Contract Procedures Order").

## **SETTLEMENTS AND RELEASES**

   P.  Pursuant to Bankruptcy Rule 9019(a) or otherwise, and in

consideration for the distributions and other benefits provided under the Plan, the

provisions of the Plan constitute a good faith compromise and settlement of all

Claims and controversies resolved pursuant to the Plan.

Q.     Based upon the representations and arguments of counsel to the City, the Retiree Committee, the Retirement Systems, Syncora, FGIC, the State, DIA Corp., the RDPFFA and the DRCEA, and all other testimony either actually given or proffered and other evidence introduced at the Confirmation Hearing and the full record of this Chapter 9 Case, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Court's approval of all Settlements provided for herein or in the Plan because, among other things, all aspects of such Settlements have been fully disclosed and such Settlements (and, as applicable, the agreements underlying such Settlements): (1) were negotiated and entered into in good faith and at arm's length; (2) comport with the policies and purposes of chapter 9 of the Bankruptcy Code; (3) reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation of the Chapter 9 Case; (4) fall well within the range of reasonableness for the resolution of complex litigation; (5) are fair, equitable and reasonable and in the best interests of the City, its creditors and other parties in interest; (6) represent appropriate exercises of the City's business judgment; (7) are essential to the successful implementation of the Plan; and (8) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.

R. <u>The DIA Settlement</u>. The DIA Settlement resolves a substantial dispute surrounding the extent of the City's property rights with respect to the DIA Assets. Under the DIA Settlement, as reflected in Section IV.E.2 of the Plan, the City will irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to hold in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.[52]

1. The City cannot be compelled to liquidate the DIA Collection.[53] Even if such a liquidation could be compelled, however, many works in the DIA Collection are subject to donor restrictions and, contrary to the City's position, the Michigan Attorney General and DIA Corp. assert that the entire DIA Collection is held in trust.[54] The City's likelihood of success in potential litigation over whether the City has sufficient interest in the DIA Assets (or in any of them) to permit it to sell any such assets and use the proceeds of sale for its own purposes, including payment of operating expenses or debt, is uncertain. Any such litigation would likely take substantial time and cause the City to incur substantial expense.

---

[52] *See* Plan, at Exhibit I.A.127 (DIA Settlement Documents).

[53] *See supra*, ¶ N.2; 11 U.S.C. § 904.

[54] *See* Michigan Attorney General Opinion No. 7272 (June 13, 2013).

2.      For the reasons set forth in the Confirmation Opinion, even if the City were to prevail in whole or in part in such litigation over the City's ability to sell the DIA Assets, it would not be in the City's best interests to liquidate the DIA Assets because (a) the City's ability to realize, on a timely basis, the full value of each of the DIA Assets it would be permitted to sell is uncertain and (b) a forced liquidation of the DIA Collection likely would yield only a fraction of the DIA Collection's true economic value.  A proposed sale or other deaccession of the DIA Assets would have been resisted, and likely would have provoked adverse action, including litigation, by (a) DIA Corp. and donors to DIA Corp. and to the DIA and (b) the international art community.  Preservation of the DIA Assets and the DIA is strongly in the interest of the City and its residents, is an important element in the revitalization of the City, critical to the feasibility of the Plan and to the City's future and therefore is in the interest of its creditors, who are receiving under the Plan payments over a period of time.

3.      The compromises and settlements embodied in the DIA Settlement (a) accurately reflect and effectively resolve a substantial dispute surrounding the extent of the property rights the City possesses with respect to the DIA Assets, (b) avoid objections to confirmation of the Plan regarding the Plan's treatment of Pension Claims, (c) resolve pending appeals regarding the Court's ability to impair pensions under chapter 9 of the Bankruptcy Code, and (d) are,

collectively, a key compromise upon which several provisions of the Plan rest. In the absence of the DIA Settlement, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses.

4.    The DIA Settlement has not been entered into fraudulently, nor with the intent to hinder, delay or defraud any entity to which the City is, or may become, indebted on or after the Effective Date.  The DIA Settlement is not a fraudulent transfer under state or federal law.

5.    The transfer of the DIA Assets to the DIA Corp. serves the public purpose of providing civic, artistic and cultural activities to the general public.  Such transfer is authorized by law, including by Section 4k of the Michigan Home Rule City Act, M.C.L. § 117.4k, and Section 1-102 of the Detroit City Charter.

6.    The DIA Settlement (a) eliminates the risk and expense of litigation regarding the DIA Assets and the Plan's treatment of Pension Claims and (b) leverages the DIA Assets for the benefit of the City's pensioners while also protecting the DIA Assets from the threat of liquidation and preserving the DIA Assets for the benefit of the City, its residents and surrounding communities. Based on the evidence of (a) the amount of the consideration to be provided under the DIA Settlement directly to the Retirement Systems, (b) DIA Corp.'s commitments to the City under the DIA Settlement, including the obligation to

-47-

13-53846-tjt   Doc 8272-10   Filed 11/07/14   Entered 11/07/14 23:20:54   Page 13 of
314

13-53846-swr   Doc 8045-15   Filed 10/22/14   Entered 10/22/14 12:36:01   Page 13 of 1321

maintain for the benefit of the public an encyclopedic art museum the permanent primary situs of which will be in the City, and (c) the settlement of litigation over the extent of the City's right, title or interest in the DIA Assets, the DIA Settlement and the transfer of the DIA Assets as provided in the DIA Settlement are for fair value and fair consideration and are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.

S.     The UTGO Settlement.  After sufficient notice and opportunity for all parties to be heard, and after due deliberation, based on the Court's thorough review and full consideration of the UTGO Settlement Agreement and good and sufficient cause appearing therefor, the Court makes the following findings of fact and conclusions of law with respect to the UTGO Settlement:

1.     The UTGO Settlement described in the Plan and the UTGO Settlement Agreement are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.  The UTGO Settlement Agreement is the result of extensive arm's length negotiations among the City and the Settling UTGO Bond Insurers – all of whom were represented by sophisticated counsel.  The compromises and settlements embodied in the UTGO Settlement (a) resolve all disputes with respect to claims classified in Class 8 under the Plan and the issues raised by the Settling UTGO Bond Insurers in the UTGO Litigation and (b) are, collectively, a key compromise upon which several provisions of the

-48-

13-53846-tjt    Doc 8035-10    Filed 09/23/15    Entered 09/23/15 15:43:31    Page 14 of
314
13-53846-tjt    Doc 10195-10    Filed 09/24/15    Entered 09/24/15 16:28:00    Page 14 of 1322

Plan rest. In the absence of such compromises and settlements, the City's emergence from chapter 9 would likely have been delayed by litigation and burdened with additional expenses.

2. The UTGO Settlement and the UTGO Settlement Agreement: (a) were negotiated and entered into in good faith; (b) comport with the policies and purposes of chapter 9; (c) are fair, equitable and reasonable; (d) are in the best interests of the City and its creditors and residents as they not only fully resolve the UTGO Litigation but also permit the City's assignees to receive value from the Assigned UTGO Bond Tax Proceeds as set forth in the Plan, which receipt fulfills a requirement of the State Contribution Agreement; (e) are within the range of reasonable results if the disputes resolved by the UTGO Settlement, including the UTGO Litigation, were instead litigated to a conclusion; (f) fall above the lowest point in the range of reasonableness; and (g) meet the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a) and other applicable law.

3. Without limiting any of the foregoing, the Court hereby finds that:

- The Plan incorporates the UTGO Settlement Agreement, and the effectiveness of the Plan is expressly conditioned upon: (a) the MFA board having approved the issuance of the Restructured UTGO Bonds and such bonds having been issued;

-49-

13-53846-tjt   Doc 8019-10   Filed 09/23/15   Entered 09/23/15 13:31:21   Page 15 of 1323
13-53846-tjt   Doc 8272-15   Filed 11/11/15   Entered 11/11/15 23:00:54   Page 15 of 314

and (b) the City having obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.[55]

- As of the Effective Date, the Plan represents a full, final and complete compromise, settlement, release and resolution of, among other matters, all disputes and pending or potential litigation (including any appeals), including, without limitation, the UTGO Litigation, regarding the allowability, amount, priority and treatment of the Unlimited Tax General Obligation Bond Claims. The treatment of Class 8 Unlimited Tax General Obligation Bond Claims under the Plan is a component of a settlement and compromise of the UTGO Litigation.[56]

- Good and valuable consideration has been provided for all releases and exculpations granted pursuant to the UTGO Settlement Agreement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement. Such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.[57]

- The Court confirms that, as of the Effective Date and pursuant to Emergency Manager Bond Order No. 4, the Municipal Obligation shall be secured, to the extent permitted by law, including, without limitation, Section 12(1)(x) of PA 436, by a lien granted by the City on the UTGO Bond Tax Levy

---

[55]     *See* Plan, at §§ III.A.9, III.A.10.

[56]     *See* Plan, at § II.B.3.o.ii, Exhibit I.A.360.

[57]     *See* Plan, at Exhibit I.A.360.

for so long as either the Municipal Obligation or the Stub UTGO Bonds are outstanding.[58]

- As of the Effective Date, the UTGO Bond Tax Levy shall constitute "special revenues," as defined in section 902 of the Bankruptcy Code, and "pledged special revenues," as that term is used in section 922(d) of the Bankruptcy Code.[59]

- As of the Effective Date, the MFA shall possess a valid and enforceable statutory fourth lien and trust on the shared revenue payments that the City is entitled to receive from the State under the Michigan Constitution and Michigan Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act, M.C.L. §§ 141.901, *et seq.*, as amended ("Distributable State Aid"), as provided in Section 15(2) of Michigan Public Act 227 of 1985, the Shared Credit Rating Act, M.C.L. §§ 141.1051, *et seq.*, or as otherwise provided under applicable law.[60]

- As of the Effective Date, Holders of the Restructured UTGO Bonds shall possess all of the MFA's rights and interest in the Municipal Obligation including all the rights and interest provided herein and under the UTGO Settlement Agreement, subject to the reservation by the MFA of rights to indemnification and to make all determinations and approvals and receive all notices accorded to it under the Municipal Obligation and related documents. Accordingly, the Restructured UTGO Bonds will be payable from and secured by (a) payments made by the City on the Municipal Obligation and to the extent

---

[58]   *See id.*

[59]   *See id.*; 11 U.S.C. §§ 902, 922(d).

[60]   *See* Plan, at Exhibit I.A.360.

permitted by law, including, without limitation, Section 12(1)(x) of PA 436, a lien on the portion of the UTGO Bond Tax Levy allocable to the Municipal Obligation, pledged by the City to secure the Municipal Obligation; and (b) a lien, made a statutory lien as provided by the Shared Credit Rating Act, on moneys in the funds and accounts established for the Restructured UTGO Bonds under the authorizing resolution for such bonds, including payments pledged by the City and received and held by the MFA or its trustee for the Restructured UTGO Bonds, which include, without limitation, all payments of (i) the proceeds of the UTGO Bond Tax Levy and (ii) Distributable State Aid.[61]

T.   <u>The LTGO Settlement</u>.  The LTGO Settlement Agreement and all Sections of the Plan pertaining to recoveries upon Limited Tax General Obligation Bond Claims, including Sections II.B.3.n and II.B.3.p.i.A of the Plan (such sections of the Plan, collectively with the LTGO Settlement Agreement, the "<u>LTGO Settlement</u>") are fair, equitable, reasonable and in the best interests of the City and its creditors and residents.  The LTGO Settlement is the result of extensive arm's length negotiations among the City, the LTGO Insurer and BlackRock Financial Management (on behalf of certain managed funds and accounts) ("<u>BlackRock</u>").  The compromises and settlements embodied in the LTGO Settlement (1) resolve all disputes with respect to (a) the Plan and any objections filed by the LTGO Insurer or BlackRock related to the Plan, (b) the

---

[61]     *See id.*

-52-

Claims classified in Class 7 under the Plan and (c) all issues relating to Limited Tax General Obligation Bonds raised in the adversary proceeding brought before the Bankruptcy Court, captioned as *Ambac Assurance Corp. v. City of Detroit, Michigan*, No. 13-5310 (Bankr. E.D. Mich.) (the "Ambac Action"); and (2) are, collectively, a key compromise upon which several provisions of the Plan rest.[62] In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

The treatment of Limited Tax General Obligation Bonds and related Limited Tax General Obligation Bond Claims under the Plan is part of the settlement of the Ambac Action, as such proceeding relates to such Bonds and Claims.

U. The OPEB Settlement. The OPEB Settlement is the result of extensive arm's length negotiations between the City and the Retiree Committee, which was represented by sophisticated counsel, and is an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retiree Committee. The compromises and settlements embodied in the OPEB Settlement (1) resolve all disputes with respect to the aggregate valuation of Claims classified in Class 12 under the Plan and the issues raised by the Retiree Committee in the Retiree Health Care Litigation; and

---

[62] *See* Plan, at Exhibit I.A.237 (LTGO Settlement Agreement).

(2) are, collectively, a key compromise upon which several provisions of the Plan rest. In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

      1.     The OPEB Settlement is in the best interests of the City and its creditors and residents as it fully resolves (a) the dispute between the City and the Retiree Committee regarding the aggregate valuation of OPEB Claims and the treatment of OPEB Claims under the Plan and (b) the Retiree Health Care Litigation. The OPEB Settlement is within the range of reasonable results if the disputes resolved by the OPEB Settlement, including the Retiree Health Care Litigation, were instead litigated to a conclusion.

      V.     <u>The 36th District Court Settlement</u>. The 36th District Court Settlement is the result of extensive arm's length negotiations among the City, the 36th District Court and the Settling 36th District Court Claimants. The compromises and settlements embodied in the 36th District Court Settlement resolve all disputes with respect to (1) the Plan and any objections filed by Settling 36th District Court Claimants related to the Plan and (2) the treatment of Indirect 36th District Court Claims under the Plan. In the absence of such compromises and settlements, the City's emergence from chapter 9 likely would have been

-54-

delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.

          1.     The 36th District Court Settlement is in the best interests of the City and its creditors and residents as it not only resolves the treatment of Indirect 36th District Court Claims under the Plan, but also provides for the payment of the Settling 36th District Court Claimants' Claims at a significant discount while enabling the City to avoid further litigation with the Settling 36th District Court Claimants regarding the City's power to impair Indirect 36th District Court Claims under the Plan. The 36th District Court Settlement is within the range of reasonable results if the disputes resolved by the 36th District Court Settlement were instead litigated to a conclusion.

          W.    <u>The Syncora Settlement</u>. The Syncora Settlement is the result of extensive arm's length negotiations among the City, Syncora and other interested parties impacted by the Syncora Settlement, including the Retiree Committee and the LTGO Insurer. The Syncora Settlement includes a long term commitment by Syncora to the revitalization of core areas of the City and a partnership between Syncora and the City focused on the City's growth. Without limiting the foregoing, the Court hereby finds as follows with respect to the Syncora Settlement:

<div align="center">-55-</div>

1.     The compromises and settlements embodied in the Syncora Settlement resolve all disputes between the City and Syncora with respect to (a) any Class 9 Claim or Class 14 Claim held by Syncora, (b) the Plan and all objections filed by Syncora related to the Plan (including any objection related to the UTGO Settlement) and (c) all issues arising in connection with the Dismissed Syncora Litigation, including, but not limited to, issues arising in connection with the COP Swap Settlement and the Tunnel Lease.  In the absence of the Syncora Settlement, the City's emergence from chapter 9 likely would have been delayed by additional litigation and burdened with additional expenses, with no assurance of a better result for the City.  The Syncora Settlement is (a) a reasonable exercise of the City's business judgment and (b) within the range of reasonable results if the disputes resolved by the Syncora Settlement were instead litigated to a conclusion.

2.     As part of the Syncora Settlement and to resolve all pending litigation involving the City and Syncora, the parties have agreed to enter into certain transactions (collectively, the "Syncora Redevelopment Transactions"), which include:  (a) the amendment, assumption and extension of the Tunnel Lease;[63] (b) the Syncora Development Agreement;[64] and (c) the agreement between the City and Pike Pointe Holdings, LLC (the "Developer"), a subsidiary of

---

[63]     *See* Plan, at Exhibit I.A.344.

[64]     *See* Plan, at Exhibit I.A.340.

Syncora, that provides the Developer, for a period of one year following the Effective Date, with the option to enter into a 30-year concession agreement to operate and maintain the Grand Circus Parking Garage. The Syncora Redevelopment Transactions will provide the City with benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership between the City and Syncora that promises to provide substantial investment in, and rehabilitation of, City assets on a mutually beneficial basis. In addition, pursuant to the Syncora Settlement, the City will pay Syncora the sum of $5 million (the "<u>Swap-Related Consideration</u>") in consideration for Syncora's (a) dismissal of Syncora's appeals of the COP Swap Settlement Approval Order (Docket No. 4094) and the Order Regarding Casino Revenues and Automatic Stay (Docket No. 670) and (b) withdrawal of Syncora's other litigation claims arising from the COP Swap Documents.[65] The Swap-Related Consideration, and any consideration provided by the City to Syncora in connection with the Syncora Redevelopment Transactions, is separate and distinct from, and constitutes no part of, the treatment under the Plan of Class 9 COP Claims. The Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth in the Plan for payment of COP Agent Fees). The Syncora

---

[65]     *See* Plan, at § IV.I.

13-53846-tjt   Doc 10295-10   Filed 09/23/15   Entered 09/23/15 13:31:31   Page 23 of
13-53846-tjt   Doc 8045-5   Filed 10/24/14   Entered 10/24/14 20:50:54   Page 23 of 1331
314

Settlement provides benefits to Classes 7, 12 and 14 under the Plan that would otherwise have been unavailable thereto.

X.     The FGIC/COP Settlement.  The FGIC/COP Settlement is the result of extensive good faith, arm's length negotiations among the City, FGIC, the FGIC COP Holders and the State.  The FGIC/COP Settlement is founded on a long term commitment by FGIC to the revitalization of core areas of the City and a partnership among FGIC, the City and the State focused on the City's growth. Without limiting the foregoing, the Court hereby finds as follows with respect to the FGIC/COP Settlement:

1.     The compromises and settlements embodied in the FGIC/COP Settlement resolve all disputes between the City, FGIC and the FGIC COP Holders with respect to (a) all Class 9 or Class 14 Claims held by FGIC and all Class 9 Claims held by the FGIC COP Holders, (b) the Plan and any objection filed by FGIC or the FGIC COP Holders related to the Plan and (c) all issues arising in connection with the Dismissed FGIC/COP Litigation.  In the absence of the FGIC/COP Settlement, the City's emergence from chapter 9 likely would have been delayed by litigation and burdened with additional expenses, with no assurance of a better result for the City.  The FGIC/COP Settlement is (a) a reasonable exercise of the City's business judgment and (b) within the range of

reasonable results if the disputes resolved by the FGIC/COP Settlement were instead litigated to a conclusion.

2. As part of the FGIC/COP Settlement and to resolve all pending litigation involving the City and FGIC, the City and FGIC have agreed to enter into the FGIC Development Agreement. The FGIC Development Agreement will provide the City with various benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership among the City, FGIC and the State that promises to provide substantial investment in, and rehabilitation of, City assets. Any consideration provided by the City to FGIC in connection with the FGIC Development Agreement is separate and distinct from, and constitutes no part of, the treatment under the Plan of Class 9 COP Claims. The FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth in the Plan for payment of COP Agent Fees).[66]

---

[66] In addition, pursuant to the FGIC/COP Settlement, in full satisfaction and discharge of FGIC's Claims against the City related to the COP Swap Documents, FGIC will receive an Allowed Class 14 Claim in the amount of $6.13 million and the Downtown Development Authority shall assign to FGIC all of the Downtown Development Authority's right, title and interest to its distribution of New B Notes under the Plan on account of its $33.6 million Class 13 Claim. This consideration is solely for FGIC's benefit.

The FGIC/COP Settlement provides benefits to Classes 7, 12 and 14 under the Plan that would otherwise have been unavailable thereto.

3.      The consideration to be paid by the City pursuant to the Syncora Settlement and the FGIC/COP Settlement is expected to be offset by certain newly-identified sources of revenue not incorporated into the City's July and September 2014 Projections (the "Prior Projections"), meaning that (a) the City's overall cash position set forth in the Prior Projections remains materially unchanged in the City's October 2014 Projections (incorporating the costs of the Syncora Settlement and the FGIC/COP Settlement) and (b) the City will have sufficient cash and revenues to satisfy its obligations under the Settlements and meet its operating expenses going forward.

Y.      ASF Recoupment.  ASF Recoupment, as set forth at Section II.B.3.r.ii.D of the Plan, is:  (1) an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retirement Systems and the Retiree Committee; and (2) is well within the range of possible reasonable settlements.

1.      During the period beginning in the mid-1980s until fiscal year 2012, Annuity Savings Fund accounts maintained on behalf of certain participants (who voluntarily contributed after tax dollars into the Annuity Savings Fund maintained by the GRS) often were credited with interest in excess of the

actual or market rate of return for assets in the GRS Traditional Pension Plan (such interest, the "ASF Excess Interest"). Because the assets credited to such Annuity Savings Fund accounts were coinvested with the assets of the GRS Traditional Pension Plan, assets of the GRS Traditional Pension Plan were allocated to the applicable Annuity Savings Fund accounts to fund such ASF Excess Interest. The City asserts that the aggregate total of such ASF Excess Interest credited during the period from 2003 through 2013 was approximately $387 million. The ASF Recoupment contemplated by the Plan would recover approximately $190 million in total ASF Excess Interest credited to Annuity Savings Fund accounts through reductions to retiree pension benefits and asset transfers from active GRS participants.

2.      The City has argued that the crediting of ASF Excess Interest to Annuity Savings Fund accounts constitutes a violation under Michigan Public Act 314 of 1965, the Public Employee Retirement System Investment Act, as well as the common law of trusts of the fiduciary duties owed to the GRS Traditional Pension Plan by the GRS Trustees and was an *ultra vires* act under the Detroit City Charter. Several GRS participants object, and assert a number of defenses to, the ASF Recoupment proposed by the City.

3.      The Court does not rule on the merits of the City's claim to recover ASF Recoupment or the merits of the GRS participants' defenses.

The Court reviews the parties' respective positions solely to determine whether the ASF Recoupment component of the City's broader pension-related settlement is reasonable. The Court finds substantial merit in the City's claim to recover ASF Excess Interest. The legal authority of the GRS Trustees to credit ASF Savings Fund Accounts with ASF Excess Interest was doubtful, and the prudence of the practice even more so. The Court further finds that the defenses to ASF Recoupment asserted by the objecting GRS participants likely have little merit. Accordingly, the Court finds that the City would have a reasonable likelihood of success (between 60% and 70%) on any claim to recover ASF Excess Interest. Nevertheless, the length, complexity and expense of any such litigation, and related issues of collectability, would be substantial.

4.     ASF participants received due process of law with respect to ASF Recoupment. In particular, ASF participants received (a) the Plain Language Supplement as part of their Solicitation Packages describing in detail the effect of ASF Recoupment (as well as subsequent communications from the City, the Retiree Committee, the Retirement Systems and certain retiree associations) and (b) sufficient opportunity to object to the Plan and ASF Recoupment, an opportunity exercised by many ASF participants.[67]

---

[67]     *See* Certificate of Service (Docket No. 6177), at ¶¶ 10, 14.

5.     ASF Recoupment will not cause the amounts recovered from ASF Distribution Recipients to exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap as such amounts are amortized over time using a 6.75% interest rate.  Subject to Section II.B.3.r of the Plan, GRS participants subject to ASF Recoupment have the option to pay the ASF Recoupment Amount in a lump sum.  The caps and other limitations on ASF Recoupment limit the hardship resulting to GRS participants therefrom.

Z.     Plan Releases.  Each non-Debtor party that will benefit from the releases, exculpations and related injunctions set forth in, among others, Sections III.D.5, III.D.6 and III.D.7 of the Plan (collectively, the "Plan Releases") either shares an identity of interest with the City, was instrumental to the successful prosecution of the Chapter 9 Case or provided substantial consideration, which value will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties.  The Plan Releases are, individually and collectively, integral to, and necessary for the successful implementation of, the Plan, essential to the City's restructuring and supported by reasonable consideration.  The City and all creditors that voted to accept the Plan have expressly consented to the Plan Releases.  Releases of non-Debtor parties pursuant to Section III.D.7 of the Plan were appropriately disclosed by the City in the Disclosure Statement, on each Ballot mailed to creditors and in the Plain

-63-

13-53846-tjt    Doc 8272-16  Filed 09/23/15  Entered 09/23/15 13:21:34  Page 29 of
314
13-53846-tjt    Doc 8045-16  Filed 09/24/15  Entered 09/24/15 23:00:54  Page 29 of  1337

Language Supplement.[68]  Accordingly, in light of all of the circumstances, the Plan

Releases are consonant with the prevailing law in this District and are fair to the

releasing parties.  Without limiting the foregoing, the Court hereby finds as follows

with respect to the Plan Releases:

1. The releases set forth in Section III.D.7.a of the Plan are

consensual releases that apply only to holders of Claims that voted to accept the

Plan.  The Plan's consensual release provisions are lawful and appropriate.

2. The exculpation provision contained in Section III.D.6 of

the Plan complies with applicable law and is appropriate.  Such provision contains

a carve-out for gross negligence and willful misconduct and is limited to claims

arising out of the City's restructuring efforts and the Chapter 9 Case.  In addition,

the Plan's exculpation provision extends only to certain parties who either have

settled with the City or have actively participated in the City's restructuring

activities.

3. The non-consensual third party releases and related

injunctions contained in the Plan (as such releases and injunctions may have been

modified herein with respect to claims asserted against officers and employees of

the City in their individual capacity pursuant to 42 U.S.C. § 1983 (*see* ¶¶ 22, 32

below)) are lawful and appropriate because unusual circumstances exist in the

---

[68]     *See*, *e.g.*, Disclosure Statement, at 16, 28-29, 37, 39, 50, 52, 60.

City's Chapter 9 Case that justify their application.  As far as this Court is aware, this is the first chapter 9 case wherein (a) the debtor has sought to compromise pension benefits for a municipality's active and retired workforce ***and*** (b) third parties under no obligation to contribute funds to creditors of a municipal debtor have volunteered to provide funding in addition to proposed recoveries under the debtor's plan of adjustment.

4.     As part of the Grand Bargain, the State has agreed to contribute $194.8 million to reduce the Retirement Systems' underfunding.[69] The settlements the City reached with representatives of its retirees and employees are conditioned upon the receipt of the State funding.[70]  The contributions to be made by the State pursuant to the State Contribution Agreement are made in exchange for the release of, among other things, (a) the constitutionally-based claims asserted by the Retirement Systems and holders of Pension Claims that such Claims may not be impaired and (b) certain litigation identified in the State Contribution Agreement.  The funding obligation of the State under the State Contribution Agreement is expressly conditioned upon the State and the State Related Entities obtaining the release set forth in Section III.D.7.b of the Plan.[71]

---

[69]     *See* Plan, at Exhibit I.A.332 (State Contribution Agreement).

[70]     *See* Plan, at Exhibits I.A.127, I.A.332.

[71]     *See* Plan, Exhibit I.A.332, at 5.

-65-

The funding obligation of the DIA Funders under the DIA Settlement Documents is expressly conditioned upon the State's provision of funding pursuant to the State Contribution Agreement.[72]  Because (a) the consummation of both the State Contribution Agreement and the DIA Settlement – and, thus, the State's and DIA Funders' respective contributions pursuant thereto – depends upon the approval of the releases set forth at Section III.D.7.b of the Plan; (b) the releases set forth at Section III.D.7.b of the Plan apply only with respect to holders of Class 10 and Class 11 Claims, *i.e.*, direct beneficiaries of both the State Contribution Agreement and the DIA Settlement; and (c) such provisions otherwise comply with applicable law, the Court hereby finds that the releases set forth at Section III.D.7.b of the Plan and any related injunctions are lawful and appropriate under the unusual circumstances of the City's Chapter 9 Case.

## **MISCELLANEOUS**

AA.   <u>Exit Facility</u>.  The terms and conditions of the Exit Facility and all of the transaction documents governing the Exit Facility, including, but not limited to, bond purchase agreements, indentures, bond forms, account control agreements and all other related documents and agreements (collectively, the "<u>Exit Facility Documents</u>") and the fees to be paid thereunder (1) are fair and reasonable, (2) reflect the City's exercise of prudent judgment, (3) are supported by reasonably

---

[72]    *See* Plan, Exhibit I.A.127, at 3.

equivalent value and fair consideration, (4) are proposed in good faith, (5) are critical to the success and feasibility of the Plan and (6) are in the best interests of the City. The Exit Facility and the fees to be paid thereunder are the result of a full and fair marketing process conducted by the City and its agents and advisors. The Exit Facility and the Exit Facility Documents and the fees to be paid thereunder were negotiated in good faith, without fraud or collusion and at arm's length among the parties, without the intent to hinder, delay or defraud any creditor of the City, and are supported by reasonably equivalent value and fair consideration. Credit extended under the Exit Facility and the Exit Facility Documents is extended in good faith for purposes and uses that are permitted by law, and not in violation of the Bankruptcy Code or of applicable nonbankruptcy law, and the Exit Facility (including the transactions contemplated by the Exit Facility Documents) is not prohibited by applicable bankruptcy or nonbankruptcy law. Each of (1) the MFA, (2) Barclays Capital Inc. (or such other qualifying affiliate as transferee), (3) the indenture trustee to be named under the Exit Facility Documents and (4) the holders of the bonds to be issued in connection with the Exit Facility (collectively, the "Exit Bonds"), therefore, shall not be affected by any reversal, modification, vacatur, amendment, reargument or reconsideration of this Order, any order finding jurisdiction, the Order for Relief or any other order.

BB.    Waiver of Stay of Confirmation Order.  To enable the City to

(1) consummate the DIA Settlement and the State Contribution Agreement

expeditiously, both of which settlements are conditioned upon the occurrence of

the Effective Date; (2) begin implementing, and making distributions to the City's

creditors pursuant to, the Plan; and (3) emerge from bankruptcy as expeditiously as

possible to minimize costs to all parties and remedy its service delivery insolvency,

good cause exists to support a waiver of the stay imposed by Bankruptcy

Rule 3020(e).

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED, AS FOLLOWS:

## A.    Confirmation of Plan

1.    The Plan and each of its provisions (whether or not specifically

approved herein) are CONFIRMED in each and every respect, pursuant to

section 943 of the Bankruptcy Code.  Failure specifically to include or reference

particular sections or provisions of the Plan or any related agreement in this Order

shall not diminish or impair the effectiveness of such sections or provisions, it

being the intent of the Court that the Plan be confirmed and such related

agreements be approved in their entirety.

2.    The Effective Date of the Plan shall occur on the date

determined by the City when the conditions set forth in Section III.A of the Plan

13-53846-tjt   Doc 8272-10   Filed 09/23/15   Entered 09/23/15 23:00:54   Page 34 of
314
13-53846-swr   Doc 8045-16   Filed 09/24/15   Entered 09/24/15 15:26:00   Page 84 of 1342

have been satisfied or, if applicable, have been waived in accordance with Section III.B of the Plan.

3.        Any objections or responses to Confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

## B.        Findings of Fact and Conclusions of Law

4.        Any finding of fact set forth in this Order constitutes a finding of fact even if it is stated as a conclusion of law, and any conclusion of law set forth in this Order constitutes a conclusion of law even if it is stated as a finding of fact.  All findings of fact and conclusions of law announced by the Court on the record in connection with confirmation of the Plan or otherwise at the Confirmation Hearing or in the Confirmation Opinion are incorporated herein by reference.[73]  The findings of fact and conclusions of law set forth herein, in the

---

[73]        The findings of fact and conclusions of law that are (a) set forth herein, (b) announced on the record during the Confirmation Hearing and (c) in the Confirmation Opinion shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided*, *however*, that if there is any direct conflict that cannot be reconciled, then, solely to the extent of such conflict, the provisions of the Confirmation Opinion shall govern and

Confirmation Opinion and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.

## C.    Approval of Settlements

5.    Consistent with the findings herein, the DIA Settlement, the State Contribution Agreement, the UTGO Settlement, the LTGO Settlement, the 36th District Court Settlement, the OPEB Settlement, the Syncora Settlement and the FGIC/COP Settlement (collectively, the "Settlements"), including, without limitation, any and all of the transactions contemplated, liens granted and protections created therein, are approved in all respects as good faith, fair, reasonable and equitable compromises and settlements of all disputes with respect to the subject matter thereof that are in the best interests of the City and its creditors and residents.

6.    The entry of this Order constitutes:  (a) approval of the each of the Settlements pursuant to, as applicable, (i) the Bankruptcy Rules, including Bankruptcy Rule 9019, (ii) the Bankruptcy Code, including section 1123 thereof

_____

(continued…)

shall control and take precedence over any findings of fact or conclusions of law announced on the record at the Confirmation Hearing or in the Confirmation Opinion.

and (iii) any and all applicable State law, including, but not limited to, (A) Act 279, Public Acts of Michigan, 1909, as amended, (B) PA 436, (C) Act 34, Public Acts of Michigan, 2001, as amended, and (D) Act 80, Public Acts of Michigan, 1981, as amended; and (b) authorization for the City to enter into each Settlement and take any and all actions necessary or appropriate to perform under or implement the terms of the applicable agreements.

7. The transfer under the Plan and the DIA Settlement of the DIA Assets, including without limitation (a) the real property located at 5200 Woodward Avenue, Detroit, Michigan, (b) the underground parking garage commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan, (c) the parking lot located at 5200 Woodward Avenue, Detroit, Michigan, (d) the parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan and (e) the art collection located in the DIA, shall be free and clear of all liens, claims and interests (as such terms are defined in the Bankruptcy Code) of the City and its creditors.

8. As provided in the Plan, on the Effective Date, the UTGO Settlement Agreement shall be binding on the City, Ambac, Assured and NPFG. All exculpations and releases granted pursuant to the UTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the UTGO Settlement Agreement, are hereby approved in their entirety.

-71-

13-53846-tjt   Doc 8272-10   Filed 09/23/15   Entered 09/23/15 13:31:21   Page 37 of
314
13-53846-tjt   Doc 10135-10   Filed 09/21/15   Entered 09/21/15 20:00:54   Page 872 of 1345

The Court approves such settlements and releases on the grounds that good and valuable consideration has been provided therefor, and that such provisions are fair, equitable, reasonable and integral elements of the UTGO Settlement Agreement.

9.      The proceeds of the UTGO Bond Tax Levy collected by the City shall be segregated and transmitted to the Debt Millage Escrow Trustee (as such term is defined at Section 2.4(a) of the UTGO Settlement Agreement) under the Debt Millage Escrow Agreement (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), and the Debt Millage Escrow Trustee shall segregate and transmit the proceeds allocable to the Municipal Obligation to the Master Trustee (as such term is defined at Section 1.2 of the UTGO Settlement Agreement) in accordance with Section 2.4(a) of the UTGO Settlement Agreement.

10.     Pursuant to the Section 2.7(b) of the UTGO Settlement Agreement, the City shall certify annually, not later than June 30 of each year, that it has imposed the debt millage levy as required by and in accordance with the terms of the UTGO Settlement Agreement.

11.     All exculpations and releases granted pursuant to the LTGO Settlement, including, without limitation, the releases and exculpations granted pursuant to Sections 6.1 and 6.2 of the LTGO Settlement Agreement, are hereby approved in their entirety.  The Court hereby approves such settlements and releases on the grounds that good and valuable consideration has been provided

therefor, and that such provisions are fair, equitable, reasonable and integral elements of the LTGO Settlement.

12.     All consent rights granted by the City to the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims, as reflected in the LTGO Settlement and specifically in Section II.B.3.p.i.A of the Plan, with respect to pre-Effective Date and post-Effective Date settlements of the COP Litigation are integral elements of the LTGO Settlement and supported by good and valuable consideration.

13.     In accordance with the LTGO Settlement, each month, the City shall segregate and deposit into a debt service fund monies for the payment of one-sixth of the next semi-annual debt service payable on the New LTGO Bonds, which monies shall not be used for any purpose other than paying debt service on the New LTGO Bonds so long as any New LTGO Bonds remain outstanding.

14.     The Syncora Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and Syncora, (b) the Syncora Development Agreement (including the garage option) and (c) the Tunnel Lease, and all transactions contemplated thereby, are hereby approved in all respects.  The Syncora Development Agreement shall be administered by, and consideration related thereto shall be distributed to, Syncora in a manner consistent with this Order and the Plan.

15.     Notwithstanding anything to the contrary in this Order or the

Plan (including, without limitation, Sections II.B.3.p.i.A, III.D.6 or IV.L of the

Plan, the FGIC/COP Settlement or the Syncora Settlement):  (a) none of the form,

method, mechanics or allocation of distributions in Section II.B.3.p.i.A of the Plan,

nor any findings or orders of the Bankruptcy Court related thereto, shall, or shall

be asserted or construed to, affect or prejudice any rights, claims or defenses

between the COP Swap Counterparties, on the one hand, and any Settling COP

Claimant (including Syncora, FGIC and the FGIC COP Holders) or COP Insurer,

on the other hand.  Subject to the proviso at the end of this paragraph, the

preceding sentence hereby amends and replaces in its entirety the fourth paragraph

of Section II.B.3.p.i.A of the Plan; (b) neither (i) any determinations, adjudications,

findings or rulings in the Plan or by the Bankruptcy Court regarding the

distributions or consideration provided to the COP Insurers or the Settling COP

Claimants under the Plan, including whether such distributions or consideration are

solely for the benefit of any particular parties nor (ii) any acceleration or deemed

acceleration of any COPs provided for in the Plan or by the Bankruptcy Court shall

in any way affect or prejudice any rights, claims or defenses of the COP Swap

Counterparties, including with respect to such distributions or consideration; and

(c) no release or agreement by any COP Agent provided for in the Plan (including,

without limitation any agreement not to sue any COP Holder or any COP Insurer

-74-

in Section II.B.3.p.i.A of the Plan) or by the Bankruptcy Court, shall in any way affect any liability of such COP Holder, COP Insurer or COP Agent to any COP Swap Counterparty (or to any COP Agent on behalf of such COP Swap Counterparty) or impair in any way the rights or obligations of any COP Swap Counterparty or COP Agent (on behalf of any COP Swap Counterparty) to sue any COP Holder, COP Insurer or COP Agent; *provided, however* that, notwithstanding anything in this paragraph to the contrary, the COP Swap Counterparties have agreed not to, and shall not, seek to enjoin, block, prevent, subject to any lien (other than a judgment lien) or otherwise interfere with (a) the distribution by the Debtor of the Class 9 Settlement Asset Pool and New B Notes to, as applicable, FGIC, the FGIC COP Holders, Syncora and the Settling COP Claimants under and as provided for in Section II.B.3.p.i.A of the Plan, (b) any performance, operation, administration of, sale of, transfer of, assignment of or other action with respect to the FGIC Development Agreement, the Syncora Development Agreement or the Tunnel Lease (it being understood that this clause (b) shall not impair any rights or claims of the COP Swap Counterparties to monetary damages related to such agreements or the value thereof), or (c) except as a defense, counterclaim or claim against and in response to a party asserting a counterclaim, in each case asserted by either of the COP Swap Counterparties, distributions to FGIC, the FGIC COP

Holders, Syncora and the Settling COP Claimants (as applicable) of the proceeds of any of the foregoing.

16.     The FGIC/COP Settlement Documents, including, but not limited to, (a) the Settlement Agreement between the City and FGIC, (b) the Stipulation Regarding FGIC Plan COP Settlement and FGIC COP Swap Settlement and (c) the FGIC Development Agreement, and all transactions contemplated thereby are hereby approved in all respects.  The FGIC Settlement Consideration and the FGIC Development Agreement shall be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent with this Order and the Plan.  The allocation of Plan distributions among FGIC and the FGIC COP Holders shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed with the Court on October 22, 2014, as the same was amended on October 27, 2014 and may be subsequently amended (with the written consent of the parties thereto) and more fully documented (the "FGIC/FGIC COP Holders Term Sheet").  Pursuant to the FGIC/COP Settlement, the Downtown Development Authority shall, as of the Effective Date, irrevocably assign to FGIC all of the New B Notes that the Downtown Development Authority is entitled to receive pursuant to its Class 13 Allowed Claim.

17. The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements (a) do not impose any additional obligations or liability on the COP Service Corporations and (b) are consistent with the allocation of Plan distributions among FGIC and the FGIC COP Holders agreed to by and among FGIC and the FGIC COP Holders pursuant to the FGIC/FGIC COP Holders Term Sheet.

18. Pursuant to and in accordance with the New C Notes Documents, revenues collected by the City related to (a) tickets issued for parking violations (including, but not limited to, meter collections, towing, storage fees and booting fees), other than revenues that would otherwise be paid to the 36th District Court, and (b) if the New C Notes are issued in a principal amount greater than $21,271,804, garage operations at the Parking Garages (collectively, the "City Parking Revenues") shall be directly remitted to a bank or banks or other financial institution which the Emergency Manager designates as a depository of the City (such institution, the "Depository Bank").  The Depository Bank shall deposit City Parking Revenues received by it into a special, separate and segregated fund (the "City Parking Revenue Fund") established at the Depository Bank.  Beginning on the date of delivery of the New C Notes and commencing on the first day of each fiscal year thereafter, each day, City Parking Revenues deposited into the City

Parking Revenue Fund shall be remitted by the Depository Bank to a special, separate and segregated account held for and on behalf of the City (the "<u>Debt Retirement Fund</u>") by the bond registrar, transfer agent and paying agent for the New C Notes until sufficient funds are on deposit in the Debt Retirement Fund to pay the principal and interest payable on the New C Notes on the last day of that Fiscal Year (such amount, the "<u>Annual Deposit Requirement</u>").  Once the Annual Deposit Requirement is satisfied for that fiscal year, any additional City Parking Revenues deposited in the City Parking Revenue Fund during that fiscal year may be remitted to the City for deposit into the General Fund and may be used by the City for any other purposes permitted by law.

**D.     Approval of Releases and Exculpation**

19.     The Plan Releases set forth in Section III.D.7 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party.

20.     Without limiting any other applicable provisions of, or releases contained in, the Plan, this Order or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under

the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is hereby deemed to forever release, waive and discharge all Liabilities in any way relating to: (a) the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436), *provided that*, for the avoidance of doubt, any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

(b) (i) Claims that are compromised, settled or discharged under or in connection with the Plan, (ii) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (iii) the Plan, (iv) the Exhibits, (v) the Disclosure Statement or

(vi) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; *provided*, *however*, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement.

21.    Nothing in paragraph 20 hereof shall (a) affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; or (b) release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties.

22.    For the avoidance of doubt, notwithstanding anything in the Plan or this Order (including paragraph 20) to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be released.

23.    If the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed forever to release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the

-80-

authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure

Statement, PA 436 and its predecessor or replacement statutes, and Article IX,

Section 24 of the Michigan Constitution that such party has, had or may have

against the State and any State Related Entities.  For the avoidance of doubt, the

foregoing sentence does not provide for a release, waiver or discharge of

obligations of the City that are established in the Plan or that arise from and after

the Effective Date with respect to (a) pensions as modified by the Plan or

(b) labor-related obligations, which post-Effective Date obligations shall be

enforceable against the City or its representatives by active or retired employees or

their collective bargaining representatives to the extent permitted by applicable

non-bankruptcy law or the Plan, or, with respect to pensions only, the GRS or the

PFRS.

        24.     As a condition to the State funding, the State and certain

parties, including Michigan Council 25, Sub-Chapter 98, Local 3308 and

Local 917 of AFSCME, entered into certain Support and Release Agreements and,

for the avoidance of doubt, in the event of an express conflict between any such

Support and Release Agreement, on the one hand, and the Plan, Plan Supplements

or this Order, on the other hand, as to the parties to these Support and Release

Agreements, their respective Support and Release Agreement shall govern.

-81-

13-53846-tjt   Doc 8272-1   Filed 11/12/14   Entered 11/12/14 18:28:00   Page 47 of
314
13-53846-swr   Doc 8035-18   Filed 09/23/15   Entered 09/23/15 13:31:54   Page 47 of 1355

25.    Notwithstanding Sections III.D.5 through III.D.7 and IV.L of the Plan, paragraph Z of the above findings (titled "Plan Releases") and paragraphs 19 through 21 and 29 through 33 hereof, except as set forth in the COP Swap Settlement, nothing in the Plan or this Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order.

26.    Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall be, and hereby is, to the fullest extent permitted under law, deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (a) the GRS, (b) the PFRS or (c) Related Entities of either the GRS or the PFRS.  At the direction of FGIC, which shall be, and hereby is, deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of

itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (a) Sections 6.5 and 9.1 of the Contract Administration Agreements, (b) Section 8.03 of the COP Service Contracts, (c) distributions made pursuant to or in connection with Section II.B.3.p.i.A of the Plan, (d) the FGIC/COP Settlement or (e) the Syncora Settlement. On the Effective Date, Syncora and FGIC shall be, and hereby are, to the fullest extent permitted under law, deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with Section II.B.3.p.i.A of the Plan, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

27. The exculpation provision set forth in Section III.D.6 of the Plan is approved in all respects, is incorporated herein in its entirety, is so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such exculpation or any other party. From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this paragraph, neither the City; its Related Entities (including the members of the City Council, the Mayor

and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City; the State; the State Related Entities; the Exculpated Parties; nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; *provided that* the foregoing provisions shall, and hereby do, apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the

Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; *provided*, *further*, that the foregoing provisions of this paragraph shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This paragraph shall not affect any liability of

(a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or the FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties. For the avoidance of doubt, notwithstanding anything in the Plan or this paragraph to the contrary, officers or employees of the City acting in their individual capacity shall not be exculpated from liability for claims asserted pursuant to 42 U.S.C. § 1983.

## E. Order Binding on All Parties

28. Subject to the provisions of Section III.A of the Plan, in accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of: (a) the City; (b) any and all holders of Claims (irrespective of whether (i) any such Claim is impaired under the Plan, (ii) proof of any such Claim has been filed or deemed filed under section 501 of the Bankruptcy Code, (iii) any such Claim is allowed under section 502 of the Bankruptcy Code or (iv) whether the holders of such Claims accepted, rejected or are deemed to have accepted or rejected the Plan); (c) the registered and beneficial holders of COPs; (d) any other person giving, acquiring or receiving property under the Plan; (e) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with the City; (f) any party to any Settlement; and (g) the respective heirs, executors, administrators, trustees,

affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing. All settlements (including, without limitation, the Settlements), compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations and injunctions set forth in the Plan shall be, and hereby are, operative, effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date. The compromises and settlements (including, without limitation, the Settlements) embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum.

## F.    Discharge of Claims

29.    The Plan discharge provisions set forth in Section III.D.4 of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court or any other party.

30.    In accordance with Section III.D.4 of the Plan, except as specifically provided otherwise in the Plan or this Order, as of the Effective Date, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, all

debts of the City shall be, and hereby are, discharged, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; *provided that*, in accordance with section 944(c)(1) of the Bankruptcy Code, such discharge shall not apply to (a) debts specifically exempted from discharge under the Plan, (b) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case, (c) claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 or (d) Claims of (i) T&T Management, Inc., (ii) HRT Enterprises and (iii) the John W. and Vivian M. Denis Trust related to condemnation or inverse condemnation actions against the City alleging that the City has taken private property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

## G. Release of Liens

31. The release and discharge of all Liens against the City's property set forth in Section IV.M of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court. As of the Effective Date, (a) the holders of such Liens are hereby authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such holder and to take such actions as

may be requested by the City to evidence the release of such Lien, including (i) the execution, delivery, filing or recording of appropriate releases and (ii) the taking of any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and (b) the City shall be authorized to execute and file on behalf of creditors such forms as may be necessary or appropriate to implement the provisions of Section IV.M of the Plan and this paragraph. All entities holding Claims against the City shall be, and hereby are, bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan. Upon the entry of this Order, all entities holding Claims against the City that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be, and hereby are, enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## H.    Injunction

32.    On the Effective Date, except as otherwise provided in the Plan or in this Order, all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, shall be, and hereby are, permanently enjoined from taking any of the following actions against or affecting the City or its

-89-

13-53846-tjt   Doc 8272-16   Filed 09/23/15   Entered 09/23/15 21:34:34   Page 55 of
314
13-53846-tjt   Doc 8045-1   Filed 06/26/14   Entered 06/26/14 22:00:52   Page 55 of 1363

property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from this Order): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (i) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (ii) Indirect 36th District Court Claims and (iii) Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity); (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Order, the Plan or the Settlements (to the extent such Settlements have been approved by the Court herein); and (f) taking any actions to interfere with the implementation or consummation of the Plan. For the avoidance of doubt, notwithstanding anything

in the Plan or this Order (including this paragraph) to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be enjoined. In addition, all individuals affected by the AFS Recoupment are enjoined from commencing any proceeding against the GRS and its trustees, officers, employees or professionals arising from GRS's compliance with the Plan or this Order.

33. All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan shall be, and hereby are, permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the

-91-

13-53846-tjt    Doc 8272-10    Filed 09/24/15    Entered 09/24/15 23:00:52    Page 57 of
314
13-53846-swr    Doc 8045-19    Filed 10/22/14    Entered 10/22/14 15:28:00    Page 57 of 1365

DRCEA, or a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or this Order. Notwithstanding the provisions of this paragraph and without limiting the injunctions in Section III.D.5.a of the Plan or paragraph 32 hereof, the holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

34. During the period that begins on the Effective Date and ends on June 30, 2023, the trustees of the PFRS, the trustees of the GRS or the trustees of any successor trust or pension plan to either the PFRS or the GRS shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS or the GRS (as applicable) that shall be 6.75%. Except as may be required to maintain the tax-qualified status of the PFRS or the GRS, or to comply with the terms of the Plan or this Order, the City, the trustees of the PFRS, the trustees of the GRS and all other persons or entities shall be, and hereby are, enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of either the PFRS, the GRS or any successor plan or trust to either the PFRS or the GRS, that govern the calculation of pension benefits (including, as applicable, the PFRS Adjusted

Pension Amount, the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the Prior GRS Pension Plan, the PFRS Restoration Payment, the GRS Restoration Payment, the New PFRS Active Pension Plan Formula, the New GRS Active Pension Plan Formula, the terms of the New PFRS Active Pension Plan and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumptions described in Section II.B.3.q.ii.B of the Plan (with respect to the PFRS) or Section II.B.3.r.ii.B of the Plan (with respect to the GRS), the contributions to the PFRS or the GRS, or the calculation or amount of PFRS pension benefits or GRS pension benefits (as the case may be), for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.

## I.    State Contribution Agreement

35.     The State Contribution Agreement is approved in all respects, and the City is hereby authorized to enter into, and take any action necessary to perform under or implement, the terms thereof.  The State shall file and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution (as set forth at

Section IV.D.3 of the Plan) have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

36.     In accordance with Section IV.D.2 of the Plan, the Income Stabilization Funds of the GRS and the PFRS shall receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State.

37.     In accordance with Section 4.f.ii of the State Contribution Agreement, filed as Exhibit I.A.332 to the Plan, the governing documents of the GRS and the governing documents of the PFRS shall be amended to include (a) the governance terms and conditions set forth in Paragraph 2, Exhibit A and Exhibit B of the State Contribution Agreement and (b) the Income Stabilization Payments and Income Stabilization Fund described in Paragraph 3 of the State Contribution Agreement.

## J.     DWSD Authority Transaction

38.     The Memorandum of Understanding Regarding the Formation of the Great Lakes Water Authority (the "Memorandum of Understanding"), filed as Exhibit A to the Notice of Execution of Framework for Creating a Water and Sewer Authority (Docket No. 7357), is approved in all respects.  The City is

hereby authorized to enter into, and take any action necessary to perform under or implement, the terms of the Memorandum of Understanding and any final agreement resulting therefrom creating a regional water and sewer/stormwater authority to be called the Great Lakes Water Authority (the "GLWA") in accordance with, and subject to all approvals and consents required under, State law, the DWSD Tender Order, all documents related to the 2014 DWSD Refinancing Obligations, all documents related to the 2014 Revenue Refinancing Bonds, all documents related to the 2014 Revenue and Revenue Refinancing Bonds and the DWSD Bond Documents. The GLWA transaction contemplated in the Memorandum of Understanding, if consummated, would constitute a Qualifying DWSD Transaction as such term is defined in the Plan.

## K.   ASF Recoupment

39.    ASF Recoupment is (a) an integral component of the City's global settlement of pension-related and other labor-related issues negotiated with, among others, the Retiree Committee, (b) is well within the range of possible reasonable settlements and (3) is approved in all respects. The City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date, calculate the Annuity Savings Fund Excess Amount for each ASF Current Participant, and the GRS, at the direction of the City, and solely as agent of the City and without any liability accruing to the GRS, shall deduct the Annuity

Savings Fund Excess Amount from each such participant's Annuity Savings Fund account, which deducted amounts shall be used to fund the accrued pension benefits of all GRS participants; *provided*, *however*, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap and the Current GRS Retiree Adjustment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

40. For each ASF Distribution Recipient who, after receipt of notice as required by the Plan and this Order, does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii of the Plan and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the City is hereby authorized to, and shall, on or as soon as reasonably practicable after the Effective Date: (a) calculate the Annuity Savings Fund Excess Amount; and (b) convert such amount into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate, and the GRS, pursuant to the Plan and at the direction of the Court, and

-96-

without any liability accruing to the GRS, shall deduct such monthly annuity amounts from the ASF Distribution Recipient's monthly pension check; *provided*, *however*, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap, if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

41. Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option. No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (a) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (b) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF

Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

42. The GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, the GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan and paragraph 40 hereof. The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

## L. Survival of Indemnities

43.     Notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the provisions hereof and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted.  Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan or this Order and shall be, and hereby are, discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this paragraph.

## M. Issuance of New Securities and Exemption From Securities Laws

44.     The issuance of the New Securities by the City on the Effective Date or on a subsequent Distribution Date (as applicable) is hereby approved and

authorized. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of New Securities pursuant to the Plan is, and shall be, exempt from Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Except as set forth in the Plan with respect to the Syncora Excess New B Notes, the New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are, and shall be, freely tradable and transferable by any initial recipient (including the Detroit General VEBA and the Detroit Police and Fire VEBA) thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code. It is hereby expressly found and determined that the Detroit General VEBA and the Detroit Police and Fire VEBA are not affiliates of the City within the meaning of Rule 144(a)(1) under the Securities Act.

## N. Executory Contracts and Unexpired Leases

45. The Executory Contract and Unexpired Lease provisions of Section II.D of the Plan are specifically approved in all respects, are incorporated herein in their entirety and are so ordered. The City is authorized to assume,

assume and assign, or reject Executory Contracts or Unexpired Leases in accordance with Section II.D of the Plan and the Contract Procedures Order.

46.     The assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the Effective Date is hereby approved, except for Executory Contracts or Unexpired Leases that:  (a) have been rejected pursuant to a Final Order of the Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph.  If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim filed in accordance with the Contract Procedures is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be, and hereby is, deemed effective as of the Effective Date.

47.     Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course

13-53846-tjt   Doc 8272-10   Filed 11/21/14   Entered 11/21/14 13:30:52   Page 67 of 295
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/24/14 13:00:52   Page 67 of 295 1375
314

of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of this Order.

48.     The rejection of each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan is hereby approved pursuant to section 365 of the Bankruptcy Code as of the later of (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Each contract or lease listed on Exhibit II.D.6 to the Plan shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  The City may, at any time on or prior to the Effective Date, amend Exhibit II.D.6 to the Plan to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1 of the Plan, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to Section II.D.6 of the Plan. The City will provide notice of any such amendments to Exhibit II.D.6 to the Plan in accordance with the terms of the Contract Procedures Order.  Listing a contract or lease on Exhibit II.D.6 to the Plan shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as

-102-

Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

## O. Plan Distributions

49. On and after the Effective Date, Distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to Section II.B and Article V of the Plan. The Distribution Record Date shall be 5:00 p.m., Eastern Time, on the date of entry of this Order.

## P. Retained Causes of Action

50. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City shall retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to, (a) any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets) and (b) the currently pending actions and claims brought by the City and identified on Exhibit III.D.2 to the Plan, to the extent not expressly released under the Plan or pursuant to any Final Order of the Court. The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 to the Plan shall not be

deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity.

## Q. Claims Bar Dates and Other Claims Matters

      51.   <u>General Administrative Claim Bar Date Provisions</u>.  Except as otherwise provided in Section II.A.2.b or Section II.A.2.c of the Plan or in a Bar Date Order or other order of the Court, unless previously filed, requests for payment of Administrative Claims must be filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be filed and served on the City and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the notice of entry of this Order and served on all parties in interest.

      52.   Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required

to file or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the holders of such Claims or further action or approval of the Court.

53. Holders of Administrative Claims that are Postpetition Financing Claims will not be required to file or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b of the Plan.

54. _Professional Fee Reserve_. On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds. The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively

submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3 of the Plan, as determined by the City in consultation with the Fee Examiner.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order or the process established under paragraph 87 hereof, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable by the Court shall be released to the General Fund or the DWSD's funds, as applicable.  If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable by the Court and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

      55.   <u>Bar Date for Rejection Damage Claims</u>.  Except as otherwise provided in a Final Order of the Court approving the rejection of an Executory

Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be filed with the Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

56. Notwithstanding anything to the contrary in the Plan or this Order, neither FGIC nor the COP Trustee shall be required to file any Claims arising out of the rejection of the COP Service Contracts pursuant to the Plan, which Claims are resolved and treated pursuant to the terms of the FGIC/COP Settlement Documents and the Plan.

57. <u>Workers' Compensation Claims</u>. From and after the Effective Date, (a) the City shall continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan or this Order shall discharge, release

or relieve the City from any current or future liability under applicable State workers' compensation law; *provided that* the City shall retain the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

58.    Claims Related to Operation of City Motor Vehicles.  From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to M.C.L. § 500.3101 in connection with the operation of the City's motor vehicles consistent with the terms of Section IV.S of the Plan.  Nothing in the Plan or this Order shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to M.C.L. § 500.3101 or Claims within the minimum coverage limits in M.C.L. § 500.3009(1); *provided that* the City shall retain the right to challenge the validity of any Claim subject to Section IV.S of the Plan or this paragraph, and nothing therein or herein shall be deemed to expand the City's obligations or any claimant's rights with respect to such Claims under State law.

59.    Payment of Tax Refund Claims.  From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax

-108-

13-53846-tjt   Doc 10135-10   Filed 09/23/15   Entered 09/24/15 13:31:21   Page 74 of 275
13-53846-swr   Doc 8045   Filed 10/22/14   Entered 10/24/14 15:00:52   Page 74 of 1382

refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures; *provided that* the City shall retain the right to challenge the validity of any claim for an income tax refund or property tax refund.

60.    Utility Deposits.  From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

61.    Pass-Through Obligations.  The City has certain Pass-Through Obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under the respective tax increment financing enabling statutes.  The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**R.    Plan Implementation**

62.    In accordance with section 1142 of the Bankruptcy Code, without further action by the Court, the City is authorized to:  (a) take any and all actions necessary or appropriate to implement, effectuate and consummate the Plan, this Order or the transactions contemplated thereby or hereby, including the

-109-

13-53846-tjt   Doc 8272   Filed 11/12/14   Entered 11/12/14 11:30:52   Page 75 of 314
13-53846-swr   Doc 2295-10   Filed 02/23/15   Entered 02/23/15 13:01:21   Page 75 of 251383

transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements (including the Settlements), releases (including the Plan Releases) and other agreements or documents entered into or delivered in connection with the Plan; and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases, agreements and documents necessary to implement, effectuate and consummate the Plan, including, without limitation, those contracts, instruments, releases, agreements and documents identified in Article IV of the Plan. All transactions effected by the City during the pendency of the Chapter 9 Case from the Petition Date through the Confirmation Date are approved and ratified.

63. Each federal, state, commonwealth, county, municipal, local, foreign or other governmental agency is hereby directed and authorized to accept any and all documents, mortgages and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

**S.      Cancellation of Existing Bonds,
Bond Documents, COPs and COP Documents**

64. Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as

specifically provided otherwise in the Plan or this Order (including any rejection of Executory Contracts pursuant to Section II.D of the Plan or paragraph 48 hereof), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; *provided*, *however*, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (a) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto; (b) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution; (c) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City; (d) as may be necessary to preserve any claim by (i) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (ii) a COPs Holder or COP Agent under a COP Insurance Policy or against any

-111-

13-53846-tjt   Doc 10195-10   Filed 09/23/15   Entered 09/24/15 13:31:21   Page 77 of 295
13-53846-tjt   Doc 10185   Filed 09/24/15   Entered 09/24/15 00:52:03   Page 77 of 1385
314

COP Insurer or (iii) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder; and (e) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. For the avoidance of doubt, this paragraph shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii of the Plan.

65.     As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be, and hereby are, deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to FGIC and the FGIC COP Holders. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each FGIC COP Holder to the receipt of proceeds of distributions under the Plan and not the rights of each such FGIC COP Holder against FGIC and shall not in any way modify payments currently required of FGIC under its existing insurance policies or the

-112-

First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013 (the "FGIC Rehabilitation Plan").

66. FGIC (irrespective of the terms of FGIC's COP Insurance Policies including, without limitation, the definition of "Due for Payment") may elect on or prior to the earlier to occur of (a) the Effective Date and (b) December 15, 2014, by filing a notice with the Court on or prior to such date, to treat all (but not less than all) of the outstanding principal owing on all (but not less than all) series of the FGIC-insured COPs as having been accelerated and currently "Due for Payment" (as such term is defined in the applicable FGIC COP Insurance Policy for purposes of such policy) as of the Effective Date, in which case, with respect to each FGIC COP Insurance Policy there shall be deemed a Permitted Policy Claim (as defined in the FGIC Rehabilitation Plan) in the amount of (a) the outstanding principal amount of the FGIC-Insured COPs in each CUSIP, as of the Effective Date, insured by such policy and (b) interest accrued and unpaid on such principal amount of such FGIC-Insured COPs through the Effective Date, in which case no interest shall accrue on or after the Effective Date. If FGIC does not elect to accelerate its COP Insurance Policies pursuant to the preceding sentence, FGIC's and the FGIC COP Holders' respective rights and obligations with respect to FGIC's COP Insurance Policies shall be governed by the FGIC/FGIC COP Holders Term Sheet.

67.     Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or the COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto.

68.     No provision of this Order or the Plan shall (a) enjoin any holder of a COP from enforcing its rights against any COP Insurer or (b) exculpate, release or affect any rights any holder of a COP may have with respect to any COP Insurance Policy.

## T.     Binding Effect of Prior Orders

69.     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 9 Case, all documents and agreements executed by the City as authorized and directed thereunder and all motions or requests for relief by the City pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto.  Nothing in the Plan or this Order shall in any respect modify the DWSD Tender Order, the rulings made and the rights granted

13-53846-tjt   Doc 10135-10   Filed 09/23/15   Entered 09/23/15 13:31:21   Page 60 of 205
13-53846-tjt   Doc 8045   Filed 11/24/15   Entered 11/24/15 19:00:52   Page 60 of 251388
314

therein or any of the documents approved, authorized or entered into pursuant thereto.

## U.  Final Order; Waiver of Stay

70.    This Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.  The stay of this Order otherwise imposed by Bankruptcy Rule 3020(e) is hereby waived as of the date hereof.

## V.  Reversal

71.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other federal appellate court with appropriate jurisdiction, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the City's receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

## W.   Notice of Confirmation of the Plan

72.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), on or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all creditors a notice (the "Confirmation Notice"), substantially in the form of Appendix II hereto, that informs such creditors of: (a) entry of this Order; (b) the occurrence of the Effective Date; (c) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline and procedures for the filing of Claims arising from any such rejection; (d) the deadline and procedures for the filing of Administrative Claims; and (e) such other matters as the City deems to be appropriate; *provided*, *however*, that the City shall be obligated to serve the Confirmation Notice only on the record holders of Claims as of the Confirmation Date.  The City is directed to publish the Confirmation Notice once in the national editions of *The Wall Street Journal* and *USA Today* and the daily edition of the *Detroit Free Press* no later than ten Business Days after the Effective Date.  As soon as practicable after the entry of this Order, the City shall make copies of this Order and the form Confirmation Notice available on (a) the City's official website at www.detroitmi.gov and (b) the Document Website at www.kccllc.net/Detroit.

## X.    Miscellaneous Provisions

73.    The City is hereby authorized to make non-material modifications or amendments to the Plan at any time prior to the substantial consummation of the Plan, without further order of the Court.  In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the City shall be, and hereby is, authorized and empowered to make non-material modifications to the documents filed with the Court, including Exhibits or documents forming part of the evidentiary record at the Confirmation Hearing, in its reasonable business judgment as may be necessary or appropriate.

74.    The City shall not, without FGIC's prior written consent, amend the Plan in a manner that (a) would have a materially adverse effect on Class 9 or (b) adversely affect FGIC; *provided, however*, that, notwithstanding anything to the contrary in this Order or the Plan, nothing in this Order or the Plan is intended to or shall be deemed to limit any rights of the FGIC COP Holders to object to any such Plan amendment.

75.    On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.  Notwithstanding the foregoing,

-117-

13-53846-tjt   Doc 8045  Filed 10/24/14  Entered 10/24/14 05:19:01   Page 83 of 1391

the Retiree Committee's professionals will have standing to participate in the post-Effective Date determination by the Court of the reasonableness of the fees and expenses incurred by the Retiree Committee and its professionals in connection with the City's Chapter 9 Case.

76.    Pursuant to the Order Resolving Corrected Motion of the Official Committee of Retirees for Entry of An Order Allowing an Administrative Expense Claim, entered on March 31, 2014 (Docket No. 3334), approving a stipulation and settlement agreement that requires the City to include a provision under the Barton doctrine first developed in Barton v. Barbour, 104 U.S. 126 (1881), and this Court having previously held that the Barton doctrine is applicable to members of the Retiree Committee, each and every member of the Retiree Committee is not only subject to protections under the release and injunction provisions of the Plan but is further protected by the provisions of the Barton doctrine and thus no action may be taken against any member of the Retiree Committee without separate relief granted by this Court.

77.    On the Effective Date or as soon thereafter as is practicable, all appeals of the Opinion Regarding Eligibility and the Order for Relief, subject to settlements by and among the appellants and the City, shall be withdrawn.

78.    The terms and conditions of the Exit Facility are fair and reasonable, and the Exit Facility has been negotiated in good faith and at arm's

-118-

13-53846-tjt   Doc 8045-10   Filed 10/21/14   Entered 10/21/14 13:00:52   Page 84 of 95
13-53846-swr   Doc 4295   Filed 04/25/14   Entered 04/25/14 13:00:52   Page 84 of 95   1392
314

length.  The City is hereby authorized to enter into, execute, deliver, file, record and issue the Exit Facility Documents and to incur the obligations under the Exit Facility, including the granting of liens thereunder, the payment of all fees, expenses, indemnities and other amounts provided for in each of the Exit Facility and the other instruments, agreements, guaranties and documents entered into in connection therewith, all of which are hereby approved.  The City is authorized and empowered to incur and to perform its obligations in accordance with, and subject to, the Exit Facility Documents and to perform all acts, and make, execute and deliver all instruments and documents which may be required for the performance by the City under the Exit Facility Documents and the creation and perfection of the liens described in and provided for by the Exit Facility Documents.  Subject to (a) the terms and conditions set forth in the Exit Facility Documents and (b) the City's compliance with the procedures for authorizing the borrowing of money under Sections 12(1) and 19 of PA 436 and the State Local Emergency Financial Assistance Loan Board's approval of the Exit Facility under Section 36a of Michigan Public Act 279 of 1909, the Home Rule City Act, M.C.L. §§ 117.1, *et seq.* (as amended), the City is hereby authorized to issue the Exit Bonds for purchase by the MFA in accordance with the terms and conditions set forth in the Exit Facility Documents.

79.     The Exit Facility Documents and the obligations of the City thereunder, including all related pledges and security agreements, shall, upon execution, constitute legal, valid, binding and authorized obligations of the City, enforceable in accordance with their terms.  The loans, advances and financial accommodations to be extended under the Exit Facility are being extended, and shall be, and hereby are, deemed to have been extended, in good faith, for legitimate purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent transfers or conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

80.     Notwithstanding any other provision of this Order or the Plan, as to the United States, its agencies, departments or agents, nothing in the Plan or this Order shall discharge, release or otherwise preclude:  (a) any liability of the City arising on or after the Effective Date; (b) any liability that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (c) any valid defense of setoff or recoupment with respect to a Claim; or (d) any liability of any entity under environmental laws arising, continuing or springing anew after the Effective Date that any entity would be subject to as a post-Effective Date owner or operator of property, *provided that*, for the avoidance of doubt and without

-120-

13-53846-tjt   Doc 8045-10   Filed 09/23/15   Entered 09/23/15 13:81:21   Page 86 of 295
13-53846-tjt   Doc 4735   Filed 04/24/15   Entered 04/24/15 00:52   Page 86 of 295   1394
314

limiting the liabilities previously described in sub-paragraph (d), any liability that is a dischargeable "claim" within the meaning of section 101(5) of the Bankruptcy Code and arose before the Effective Date, including any liabilities for costs expended or paid by the United States under environmental laws before the Effective Date or any penalties or fines owed to the United States for days of violation of environmental laws before the Effective Date, shall be treated as otherwise provided in the Plan.

81.     The Plan does not, and shall not be deemed to, modify, limit, release, discharge or enjoin any claims (a) related to the Retirement Systems that Bank of New York Mellon in its capacity as custodian under (i) the Global Custody Agreement with the Policemen and Firemen Retirement System of the City of Detroit, (ii) the Global Custody Agreement with the General Retirement System of the City of Detroit and (iii) the Global Custody Agreement with The Board of Trustees of The City of Detroit Employees' Benefit Plan (in such capacity, "BNY Mellon") may have against persons or entities other than the City or (b) against property of the Retirement Systems held by BNY Mellon in its capacity as custodian.

82.     Any document related to the Plan that refers to a plan of adjustment of the City other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of adjustment of

the City in such document shall mean the Plan confirmed by this Order, as appropriate.

83.    Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of a direct conflict between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (except as provided in paragraph 24 above, and unless otherwise expressly provided for in such agreement, instrument, or document).  In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

84.    In accordance with Section III.C of the Plan, if the Effective Date does not occur, then upon motion by the City, the Court may declare that: (a) the Plan is null and void in all respects, including with respect to (i) the discharge of Claims pursuant to section 944 of the Bankruptcy Code, (ii) the assumptions, assignments or rejections of Executory Contracts or Unexpired Leases pursuant to Section II.D of the Plan and (iii) the releases described in Section III.D.7 of the Plan; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the City or (ii) prejudice in any manner the rights of the City or any other party in interest.

-122-

85. To the extent that (a) the Court has held that any term or provision of the Plan is invalid, void or unenforceable and (b) with the consent of the City, the Court altered and interpreted such term or provision, consistent with Section VIII.D of the Plan, to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable: (a) such term or provision, as altered or interpreted, shall be (i) valid and enforceable pursuant to its terms, (ii) considered integral to the Plan and shall not be deleted or modified without the City's consent and (iii) non-severable and mutually dependent; and (b) notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

86. Pursuant to Section IV.N of the Plan and in accordance with the Fee Review Order, the Fee Examiner shall continue to review and assess all Fee Review Professional Fees for the period through, but not including, the Effective Date pursuant to the standard of section 943(b)(3) of the Bankruptcy Code. The Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses. All fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall

remain subject to review and approval of the Court pursuant to the terms of the Fee Review Order. Upon completing his review of all Fee Review Professional Fees and submitting all reports related thereto (as required by the Fee Review Order), the Fee Examiner shall have no further duties or obligations under the Fee Review Order other than obligations of confidentiality thereunder (which obligations, including, but not limited to, the confidentiality obligations set forth at paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date). Nothing in this paragraph prohibits the mediator from requesting or requiring the Fee Examiner to participate in mediation regarding Professional Fees at any time.

87. The Court, with the assistance of counsel, will establish an expeditious mediation and Court-review process to determine the reasonableness and disclosure of all fees and expenses, paid and unpaid, for which the City is obligated in connection with this case through the Effective Date, as required by 11 U.S.C. § 943(b)(3). The preceding sentence does not apply with respect to fees and expenses explicitly dealt with in settlements previously approved by orders of the Court.

88. The provisions in the Plan and in this Order regarding fees and expenses shall include the professional fees and expenses of (a) the GRS and the PFRS, to the extent that the City reimburses them; (b) the Fee Examiner and his

13-53846-tjt Doc 10185 Filed 09/23/15 Entered 09/24/15 13:31:21 Page 90 of 1398

professionals, and the Court-appointed feasibility expert and her counsel; and (c) the other Fee Review Professionals.

89.     Notwithstanding Section II.B.3.s.ii.A of the Plan, Charles Gayney shall serve as an initial member of the Detroit General VEBA board of trustees in place of Suzanne Daniels Paranjpe.

## Y.     No Diminution of State Power

90.     No provision of the Plan or this Order shall be construed:  (a) to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; or (b) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

## Z.     Post-Effective Date Governance

91.     The City shall promptly provide to the Court copies of any reports given to, or received from, the Financial Review Commission.  Nothing in the Plan or this Order shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

## AA.   Retention of Jurisdiction

92.     The Court shall, and hereby does, retain such jurisdiction over the City and the Chapter 9 Case as is consistent with section 1334 of title 28 and

-125-

title 11 of the United States Code until the Effective Date. Notwithstanding the entry of this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan, *provided, however*, that notwithstanding Article VII of the Plan, the Court shall not have jurisdiction over any dispute between or among FGIC and the FGIC COP Holders with respect to agreements between or among them that do not involve the City, the State or any Released Party (other than FGIC and the FGIC COP Holders) as a party.

93.    Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement. For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds and the Municipal Obligation. As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained

-126-

title 11 of the United States Code until the Effective Date. Notwithstanding the entry of this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan, *provided, however*, that notwithstanding Article VII of the Plan, the Court shall not have jurisdiction over any dispute between or among FGIC and the FGIC COP Holders with respect to agreements between or among them that do not involve the City, the State or any Released Party (other than FGIC and the FGIC COP Holders) as a party.

93.    Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement. For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds and the Municipal Obligation. As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained

-126-

title 11 of the United States Code until the Effective Date. Notwithstanding the entry of this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 9 Case to the fullest extent permitted by law, including, among other things, jurisdiction over those matters and issues described in Article VII of the Plan, *provided, however*, that notwithstanding Article VII of the Plan, the Court shall not have jurisdiction over any dispute between or among FGIC and the FGIC COP Holders with respect to agreements between or among them that do not involve the City, the State or any Released Party (other than FGIC and the FGIC COP Holders) as a party.

93.    Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the UTGO Settlement and the UTGO Settlement Agreement and any dispute arising from or related to the UTGO Settlement Agreement. For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the UTGO Settlement Agreement and all Settlement-Related Documents (as such term is defined at Section 1.2 of the UTGO Settlement Agreement), including, without limitation, all exhibits to the UTGO Settlement Agreement, the Restructured UTGO Bonds and the Municipal Obligation. As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained

-126-

13-53846-tjt    Doc 20095-10    Filed 09/23/15    Entered 09/23/15 13:01:21    Page 92 of
314

jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the Municipal Obligation, Stub UTGO Bonds or Restructured UTGO Bonds are outstanding.

94.    Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over the settlement of Limited Tax General Obligation Bond Claims and the LTGO Settlement and any dispute arising from or related to the LTGO Settlement.  For the avoidance of doubt and as the City has consented, the Court shall retain exclusive post-Confirmation authority and power to implement, interpret and enforce the LTGO Settlement and all Settlement-Related Documents, including, without limitation, all exhibits to the LTGO Settlement Agreement and the New LTGO Bonds.  As the City has consented, the Court reserves all powers as are necessary or appropriate to enforce or to give effect to the Court's retained jurisdiction under the Plan and this Order, including by way of injunction, as long as any of the New LTGO Bonds are outstanding.

95.    Pursuant to section 945(a) of the Bankruptcy Code, the Court shall, and hereby does, retain jurisdiction over any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement or the Syncora Development Agreement.

-127-

13-53846-tjt   Doc 10185-40   Filed 09/23/15   Entered 09/23/15 13:01:21   Page 93 of
314
13-53846-swr   Doc 8272   Filed 11/12/14   Entered 11/12/14 23:51:00   Page 93 of 1401

Signed on November 12, 2014

                                              /s/ Steven Rhodes
                                             Steven Rhodes
                                             United States Bankruptcy Judge

# APPENDIX I

# PLAN OF ADJUSTMENT

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

```
------------------------------------------------------------- x
                                          :
In re                                     :     Chapter 9
                                          :
CITY OF DETROIT, MICHIGAN,                :     Case No. 13-53846
                                          :
                 Debtor.                  :     Hon. Steven W. Rhodes
                                          :
                                          :
                                          :
------------------------------------------------------------- x
```

---

**EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT**
**(October 22, 2014)**

---

DAVID G. HEIMAN
HEATHER LENNOX
THOMAS A. WILSON
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

BRUCE BENNETT
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONATHAN S. GREEN
STEPHEN S. LAPLANTE
MILLER, CANFIELD,
    PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .................. 1

    A.     Defined Terms. ................................................................................................................... 1

    B.     Rules of Interpretation and Computation of Time. ....................................................... 30

          1.     Rules of Interpretation. ....................................................................................... 30

          2.     Computation of Time. .......................................................................................... 30

ARTICLE II CLASSIFICATION OF CLAIMS; CRAMDOWN;  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................................................................................... 30

    A.     Unclassified Claims. ...................................................................................................... 31

          1.     Payment of Administrative Claims. ................................................................... 31

          2.     Bar Dates for Administrative Claims. ................................................................ 31

    B.     Classified Claims. .......................................................................................................... 32

          1.     Designation of Classes. ...................................................................................... 32

          2.     Subordination; Reservation of Rights to Reclassify Claims. ............................ 33

          3.     Treatment of Claims. .......................................................................................... 33

    C.     Confirmation Without Acceptance by All Impaired Classes. ........................................ 45

    D.     Treatment of Executory Contracts and Unexpired Leases. ........................................... 45

          1.     Assumption. ........................................................................................................ 45

          2.     Assumption of Ancillary Agreements. ............................................................... 45

          3.     Approval of Assumptions and Assignments. ..................................................... 45

          4.     Payments Related to the Assumption of Executory Contracts and Unexpired Leases. ................................................................................................................. 46

          5.     Contracts and Leases Entered Into After the Petition Date. .............................. 46

          6.     Rejection of Executory Contracts and Unexpired Leases. ................................. 46

          7.     Rejection Damages Bar Date. ............................................................................. 46

          8.     Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases. .............................................................................................. 47

          9.     Insurance Policies. .............................................................................................. 47

ARTICLE III CONFIRMATION OF THE PLAN ........................................................................... 47

    A.     Conditions Precedent to the Effective Date. ................................................................. 47

    B.     Waiver of Conditions to the Effective Date. ................................................................. 48

    C.     Effect of Nonoccurrence of Conditions to the Effective Date. ..................................... 49

    D.     Effect of Confirmation of the Plan. ............................................................................... 49

          1.     Dissolution of Retiree Committee. ..................................................................... 49

          2.     Preservation of Rights of Action by the City. ................................................... 49

          3.     Comprehensive Settlement of Claims and Controversies. ................................ 49

          4.     Discharge of Claims. .......................................................................................... 50

13-53846-tjt   Doc 8045-10   Filed 10/22/14   Entered 10/22/14 13:01:21   Page 97 of
13-53846-swr   Doc 4295-5   Filed 04/23/15   Entered 04/23/15 19:01:52   Page 97 of 1405
314

|  | 5. | Injunction. | 50 |
|  | 6. | Exculpation. | 51 |
|  | 7. | Releases | 52 |
| E. | | No Diminution of State Power | 53 |
| F. | | Effectiveness of the Plan. | 53 |
| G. | | Binding Effect of Plan. | 53 |
| ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN | | | 54 |
| A. | | DWSD. | 54 |
|  | 1. | Rates and Revenues. | 54 |
|  | 2. | DWSD CBAs. | 54 |
|  | 3. | Potential DWSD Authority Transaction. | 54 |
| B. | | The New B Notes, New C Notes and New LTGO Bonds. | 55 |
| C. | | The UTGO Settlement. | 55 |
| D. | | The State Contribution Agreement. | 55 |
|  | 1. | State Contribution. | 55 |
|  | 2. | Income Stabilization Payments. | 55 |
|  | 3. | Conditions to State's Participation. | 56 |
|  | 4. | Release of Claims Against the State and State Related Entities. | 56 |
| E. | | The DIA Settlement. | 57 |
|  | 1. | Funding Contributions. | 57 |
|  | 2. | Transfer of DIA Assets. | 57 |
|  | 3. | Conditions to the DIA Funding Parties' Participation. | 57 |
| F. | | Contingent Payment Rights | 58 |
|  | 1. | Special Restoration | 58 |
|  | 2. | General Restoration | 58 |
| G. | | The OPEB Settlement. | 58 |
| H. | | The LTGO Settlement. | 59 |
| I. | | The Syncora Settlement | 59 |
| J. | | The FGIC/COP Settlement | 59 |
| K. | | Issuance of the New Securities. | 59 |
| L. | | Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents. | 60 |
| M. | | Release of Liens. | 60 |
| N. | | Professional Fees | 61 |
|  | 1. | Professional Fee Reserve | 61 |
|  | 2. | Fee Review Order | 61 |
|  | 3. | Dismissal of the Fee Examiner | 61 |
|  | 4. | Potential Review of Fees Not Subject to Fee Review Order | 61 |

|   |   |   |   |
|---|---|---|---|
| | 5. | Court-Appointed Expert | 62 |
| O. | | Assumption of Indemnification Obligations. | 62 |
| P. | | Incorporation of Retiree Health Care Settlement Agreement. | 62 |
| Q. | | Payment of Workers' Compensation Claims. | 62 |
| R. | | 36th District Court Settlement. | 62 |
| S. | | Payment of Certain Claims Relating to the Operation of City Motor Vehicles. | 62 |
| T. | | Payment of Tax Refund Claims. | 63 |
| U. | | Utility Deposits. | 63 |
| V. | | Pass-Through Obligations. | 63 |
| W. | | Exit Facility. | 63 |
| X. | | Post-Effective Date Governance. | 63 |

**ARTICLE V PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN** ......... 64

| A. | | Appointment of Disbursing Agent. | 64 |
|---|---|---|---|
| B. | | Distributions on Account of Allowed Claims. | 64 |
| C. | | Certain Claims to Be Expunged. | 64 |
| D. | | Record Date for Distributions; Exception for Bond Claims. | 64 |
| E. | | Means of Cash Payments. | 64 |
| F. | | Selection of Distribution Dates for Allowed Claims. | 65 |
| G. | | Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured. | 65 |
| H. | | City's Rights of Setoff Preserved. | 65 |
| I. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 65 |
| | 1. | Delivery of Distributions Generally. | 65 |
| | 2. | Delivery of Distributions on Account of Bond Claims. | 65 |
| | 3. | De Minimis Distributions / No Fractional New Securities. | 66 |
| | 4. | Undeliverable or Unclaimed Distributions. | 66 |
| | 5. | Time Bar to Cash Payment Rights. | 66 |
| J. | | Other Provisions Applicable to Distributions in All Classes. | 66 |
| | 1. | No Postpetition Interest. | 66 |
| | 2. | Compliance with Tax Requirements. | 66 |
| | 3. | Allocation of Distributions. | 67 |
| | 4. | Surrender of Instruments. | 67 |

**ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ......... 67

| A. | | Treatment of Disputed Claims. | 67 |
|---|---|---|---|
| | 1. | General. | 67 |
| | 2. | ADR Procedures. | 68 |
| | 3. | Tort Claims. | 68 |

|       | B. | Disputed Claims Reserve. | 68 |
|       | C. | Objections to Claims. | 69 |
|       |    | 1. Authority to Prosecute, Settle and Compromise. | 69 |
|       |    | 2. Expungement or Adjustment of Claims Without Objection. | 69 |
|       |    | 3. Extension of Claims Objection Bar Date. | 69 |
|       |    | 4. Authority to Amend List of Creditors. | 69 |

**ARTICLE VII RETENTION OF JURISDICTION** ........................................ 69

**ARTICLE VIII MISCELLANEOUS PROVISIONS** ..................................... 71

|       | A. | Plan Supplements. | 71 |
|       | B. | Modification of the Plan. | 71 |
|       | C. | Revocation of the Plan. | 71 |
|       | D. | Severability of Plan Provisions. | 71 |
|       | E. | Effectuating Documents and Transactions. | 71 |
|       | F. | Successors and Assigns. | 72 |
|       | G. | Plan Controls. | 72 |
|       | H. | Notice of the Effective Date. | 72 |
|       | I. | Governing Law. | 72 |
|       | J. | Request for Waiver of Automatic Stay of Confirmation Order. | 72 |
|       | K. | Term of Existing Injunctions and Stays. | 72 |
|       | L. | Service of Documents | 72 |
|       |    | 1. The City | 73 |
|       |    | 2. The Retiree Committee | 73 |

# TABLE OF EXHIBITS

| Exhibit I.A.9 | Principal Terms of 36th District Court Settlement |
|---|---|
| Exhibit I.A.66 | Schedule of Class 9 Eligible City Assets |
| Exhibit I.A.88 | Schedule of COP Swap Agreements |
| Exhibit I.A.108 | Form of Detroit General VEBA Trust Agreement |
| Exhibit I.A.112 | Form of Detroit Police and Fire VEBA Trust Agreement |
| Exhibit I.A.126 | Principal Terms of DIA Settlement |
| Exhibit I.A.127 | Form of DIA Settlement Documents |
| Exhibit I.A.132 | Dismissed FGIC/COP Litigation |
| Exhibit I.A.133 | Dismissed Syncora Litigation |
| Exhibit I.A.148 | Schedule of DWSD Bond Documents & Related DWSD Bonds |
| Exhibit I.A.156 | Schedule of DWSD Revolving Sewer Bond Documents & Related DWSD Revolving Sewer Bonds |
| Exhibit I.A.159 | Schedule of DWSD Revolving Water Bond Documents & Related DWSD Revolving Water Bonds |
| Exhibit I.A.183 | Principal Terms of Exit Facility |
| Exhibit I.A.197 | Form of FGIC/COP Settlement Documents |
| Exhibit I.A.198 | Form of FGIC Development Agreement |
| Exhibit I.A.216 | Schedule of HUD Installment Note Documents & Related HUD Installment Notes |
| Exhibit I.A.230 | Schedule of Limited Tax General Obligation Bond Documents & Related Limited Tax General Obligation Bonds |
| Exhibit I.A.237 | Form of LTGO Settlement Agreement |
| Exhibit I.A.246 | Principal Terms of New B Notes |
| Exhibit I.A.247 | Form of New B Notes Documents |
| Exhibit I.A.248 | Principal Terms of New C Notes |
| Exhibit I.A.249 | Form of New C Notes Documents |
| Exhibit I.A.250.a | Form of New GRS Active Pension Plan |
| Exhibit I.A.250.b | Principal Terms of New GRS Active Pension Plan |
| Exhibit I.A.254.a | Form of New PFRS Active Pension Plan |

| | |
|---|---|
| Exhibit I.A.254.b | Principal Terms of New PFRS Active Pension Plan |
| Exhibit I.A.280 | Prior GRS Pension Plan |
| Exhibit I.A.281 | Prior PFRS Pension Plan |
| Exhibit I.A.292 | Restoration Trust Agreement |
| Exhibit I.A.298 | Retiree Health Care Settlement Agreement |
| Exhibit I.A.305 | Schedule of Secured GO Bond Documents |
| Exhibit I.A.332 | State Contribution Agreement |
| Exhibit I.A.340 | Form of Syncora Development Agreement |
| Exhibit I.A.344 | Form of Syncora Settlement Documents |
| Exhibit I.A.354 | Schedule of Unlimited Tax General Obligation Bond Documents & Related Unlimited Tax General Obligation Bonds |
| Exhibit I.A.360 | Form of UTGO Settlement Agreement |
| Exhibit II.B.3.q.ii.A | Schedule of Payments and Sources of Payments for Modified PFRS Pension Benefits |
| Exhibit II.B.3.q.ii.C | Terms of PFRS Pension Restoration |
| Exhibit II.B.3.r.ii.A | Schedule of Payments and Sources of Payments for Modified GRS Pension Benefits |
| Exhibit II.B.3.r.ii.C | Terms of GRS Pension Restoration |
| Exhibit II.D.5 | Schedule of Postpetition Collective Bargaining Agreements |
| Exhibit II.D.6 | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit III.D.2 | Retained Causes of Action |

**INTRODUCTION**

The City of Detroit proposes the following plan for the adjustment of its debts pursuant to and in accordance with chapter 9 of the Bankruptcy Code.

A discussion of the City's organizational structure, operations, capital structure and events leading to the commencement of the City's Chapter 9 Case, as well as a summary and description of the Plan, risk factors and other related matters, is included in the Disclosure Statement. Retirees of the City will receive a supplement summarizing important information relevant to their entitlement to benefits (the "Retiree Supplement"). Other agreements and documents, which have been or will be Filed with the Bankruptcy Court, are referenced in the Plan or the Disclosure Statement and are available for review.

The City encourages all of its creditors to read the Plan, the Disclosure Statement and the other material that has been approved for use in soliciting votes on the Plan and encourages holders of claims for pensions and other post-employment benefits to read the Retiree Supplement and to consider the information included on the Ballot before casting a vote to accept or reject the Plan and before choosing among available treatment options.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME**

**A.    Defined Terms.**

Capitalized terms used in the Plan have the meanings set forth in this Section I.A. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.        "2005 COPs" means, collectively, the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%.

2.        "2005 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 2, 2005, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

3.        "2006 COPs" means, collectively, the (a) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (b) Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

4.        "2006 COPs Agreement" means the Trust Agreement by and between the COP Service Corporations and U.S. Bank National Association, as trustee, dated June 12, 2006, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

5.        "2014 DWSD Refinancing Obligations" means, collectively, the (i) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014D, (ii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Bonds, Series 2014E, (iii) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014F, (iv) City of Detroit, Michigan, Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Bonds, Series 2014G, (v) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014A, (vi) City of Detroit, Michigan, Detroit Water and Sewerage

Department Water Supply System Revenue Refunding Senior Lien Bonds, Series 2014B, (vii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014C, and (viii) City of Detroit, Michigan, Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Bonds, Series 2014D.

6.      "2014 Revenue and Revenue Refinancing Bonds" means, collectively, one or more series of Sewage Disposal System Revenue and Revenue Refunding Bonds and Water Supply System Revenue Refunding Bonds.

7.      "2014 Revenue Refinancing Bonds" means, collectively, the Michigan Finance Authority's (i) Local Government Loan Program Revenue Bonds, Series 2014C-4 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (ii) Local Government Loan Program Revenue Bonds, Series 2014C-5 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iii) Local Government Loan Program Revenue Bonds, Series 2014C-6 (Insured) (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (iv) Local Government Loan Program Revenue Bonds, Series 2014C-7 (Detroit Water and Sewerage Department Sewage Disposal System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (v) Local Government Loan Program Revenue Bonds, Series 2014D-1 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vi) Local Government Loan Program Revenue Bonds, Series 2014D-2 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Senior Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, (vii) Local Government Loan Program Revenue Bonds, Series 2014D-3 (Insured) (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds, and (viii) Local Government Loan Program Revenue Bonds, Series 2014D-4 (Detroit Water and Sewerage Department Water Supply System Revenue Refunding Second Lien Local Project Bonds), issued as the Type: Detroit Water and Sewerage Department Local Project Bonds.

8.      "36th District Court" means the district court for the thirty-sixth judicial district of the State.

9.      "36th District Court Settlement" means the settlement between the City and the Settling 36th District Court Claimants, substantially on the terms set forth on Exhibit I.A.9.

10.      "Active Employee" means an active employee of the City on and after the Confirmation Date.

11.      "Actual Return" means, for each Fiscal Year during the period beginning July 1, 2003 and ending June 30, 2013, the actual net return percentage on invested GRS assets for that Fiscal Year; provided that, if the actual net return percentage on invested GRS assets for any given Fiscal Year is greater than 7.9%, the Actual Return for that Fiscal Year shall be 7.9%, and if the actual net return percentage on invested GRS assets for any given Fiscal Year is less than 0.0%, the Actual Return for that Fiscal Year shall be 0.0%.

12.      "Ad Hoc Committee of DWSD Bondholders" means, collectively, Blackrock Financial Management, Inc., Eaton Vance Management, Fidelity Management & Research Company, Franklin Advisers, Inc. and Nuveen Asset Management.

13.      "Adjusted Pension Amount" means the GRS Adjusted Pension Amount or the PFRS Adjusted Pension Amount, as applicable.

14.      "Administrative Claim" means a Claim against the City arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to the Chapter 9 Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b) or 507(b)(2) of the Bankruptcy Code, including (a) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the City in the 20 days

-2-

13-53846-tjt   Doc 12191-2   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 104 of 265
13-53846-tjt   Doc 12015-1   Filed 02/16/15   Entered 09/21/15 18:05:12   Page 104 of 314

immediately prior to the Petition Date and sold to the City in the ordinary course of the City's operations and (b) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code or section 2-702 of the Uniform Commercial Code; provided that no claim for professional fees or any other costs or expenses incurred by any official or unofficial creditors' committee or any member thereof shall be considered an Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

15. "ADR Injunction" means the injunction set forth at Section I.B of the ADR Procedures.

16. "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Procedures Order, as such procedures may be modified by further order of the Bankruptcy Court.

17. "ADR Procedures Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (Docket No. 2302), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on December 24, 2013, as it may be subsequently amended, supplemented or otherwise modified.

18. "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

19. "Allowed Claim(s)" means: (a) a Claim, proof of which has been timely Filed by the applicable Bar Date (or for which Claim under express terms of the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court, a proof of Claim is not required to be Filed); (b) a Claim (i) that is listed in the List of Creditors, (ii) that is not identified on the List of Creditors as contingent, unliquidated or disputed and (iii) for which no proof of Claim has been timely Filed; (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; (d) a Claim designated as allowed in a stipulation or agreement between the City and the Holder of the Claim that is Filed; or (e) a Claim designated as allowed in a pleading entitled "Designation of Allowed Claims" (or a similar title of the same import) that is Filed; provided that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered allowed only if and to the extent that (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (y) if an objection is so interposed, the Claim shall have been allowed by a Final Order. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed to be an Allowed Claim unless and until such Entity pays in full the amount that it owes the City. "Allow" and "Allowing" shall have correlative meanings.

20. "Ambac" means Ambac Assurance Corporation.

21. "Annuity Savings Fund" means that sub-account and pension benefit arrangement that is part of the GRS and operated by the trustees of the GRS.

22. "Annuity Savings Fund Excess Amount" means the following: (a) for an ASF Current Participant who has not received any distributions from the Annuity Savings Fund, the difference between (i) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (ii) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return; (b) for an ASF Current Participant who has received any distribution from the Annuity Savings Fund other than a total distribution, the difference between (i) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 and (B) all distributions received by such participant from the Annuity Savings Fund during the ASF Recoupment Period and (ii) the sum of (A) the value of such participant's Annuity Savings Fund account as of June 30, 2013 calculated using the Actual Return and (B) the value of the participant's distribution calculated as of the date of distribution using the Actual Return through such date; and (c) for an ASF Distribution Recipient, the difference between (i) the value of such ASF Distribution Recipient's Annuity Savings Fund account as of the date of distribution from the Annuity Savings Fund, provided such date falls within the ASF Recoupment Period, and (ii) the value of such participant's Annuity Savings Fund account as of such date, calculated using the Actual Return. For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from his Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

23.     "ASF/GRS Reduction" means, with respect to a Holder of a GRS Pension Claim who is a retiree who is receiving a monthly pension as of June 30, 2014 or such retiree's later-surviving beneficiary, the 4.5% reduction in the Current Accrued Annual Pension amount described in Section I.A.211, plus the ASF Recoupment.

24.     "ASF Current Participant" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) is not an ASF Distribution Recipient.

25.     "ASF Distribution Recipient" means a person who (a) participates in the GRS, (b) participated in the Annuity Savings Fund at any time during the ASF Recoupment Period and (c) has received a total distribution from the Annuity Savings Fund.

26.     "ASF Election Date" means the date that is 35 days after the date on which the ASF Election Form is mailed.

27.     "ASF Election Form" means a form to be mailed to each ASF Distribution Recipient with the ASF Election Notice to allow such ASF Distribution Recipient to elect the ASF Recoupment Cash Option.

28.     "ASF Election Notice" means a notice to be mailed to each ASF Distribution Recipient notifying such ASF Distribution Recipient of the ASF Recoupment Cash Option and providing such recipient with an ASF Election Form.

29.     "ASF Final Cash Payment Date" means the later of (a) 90 days after the Effective Date or (b) 50 days after the date of mailing of an ASF Final Cash Payment Notice.

30.     "ASF Final Cash Payment Notice" means a notice to be provided by GRS to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option indicating the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.

31.     "ASF Recoupment" means the amount to be deducted from an ASF Current Participant's Annuity Savings Fund account or an ASF Distribution Recipient's monthly pension check, as applicable, pursuant to the formulae set forth in Section II.B.3.r.ii.D.

32.     "ASF Recoupment Cap" means, for both ASF Current Participants and ASF Distribution Recipients, 20% of the highest value of such participant's Annuity Savings Fund account during the ASF Recoupment Period plus an interest component of 6.75% if the amount recouped is amortized over time.  For purposes of this definition, the value of a participant's Annuity Savings Fund account as of any date will include the principal amount of any loans to the participant from such participant's Annuity Savings Fund account that are outstanding as of such date or that were defaulted during the ASF Recoupment Period.

33.     "ASF Recoupment Cash Option" means an election that may be exercised by an ASF Distribution Recipient to pay the total amount of such ASF Distribution Recipient's ASF Recoupment in a single lump sum.

34.     "ASF Recoupment Cash Payment" means the amount of the cash payment that an ASF Distribution Recipient who elects the ASF Recoupment Cash Option will be required to pay on account of such ASF Distribution Recipient's ASF Recoupment.

35.     "ASF Recoupment Period" means the period beginning July 1, 2003 and ending June 30, 2013.

36.     "Assigned UTGO Bond Tax Proceeds" means the rights to the proceeds of the UTGO Bond Tax Levy in an amount equal to the principal and interest payable on the Stub UTGO Bonds (but subject to the prior rights of the holders of the Municipal Obligation), which rights shall be assigned to a designee or designees of the City pursuant to the UTGO Settlement Agreement, substantially on the terms set forth on Exhibit I.A.360.

37.     "Assured" means, together, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance, Inc., and Assured Guaranty Corp.

38.     "Ballot" means the ballot upon which a Holder of an Impaired Claim entitled to vote shall cast its vote to accept or reject the Plan and make certain elections provided for in the Plan.

39.     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended.

40.     "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Michigan having jurisdiction over the Chapter 9 Case, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 or the General Order of the District Court pursuant to § 151 of title 28 of the United States Code, the District Court.

41.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the general, local and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 9 Case.

42.     "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

43.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 9 Case, including the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket No. 1782), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on November 21, 2013, as it may be amended, supplemented or otherwise modified.

44.     "Bond Agent" means a trustee, paying agent or similar Entity, as applicable, under the Bond Documents.

45.     "Bond Claims" means, collectively, the DWSD Bond Claims, the DWSD Revolving Bond Claims, the General Obligation Bond Claims, the HUD Installment Note Claims and the Secured GO Bond Claims.

46.     "Bond Documents" means, collectively, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the General Obligation Bond Documents, the HUD Installment Note Documents and the Secured GO Bond Documents.

47.     "Bond(s)" means, individually or collectively, the DWSD Bonds, the DWSD Revolving Bonds, the General Obligation Bonds, the HUD Installment Notes or the Secured GO Bonds.

48.     "Bondholder" means any beneficial or record holder of a Bond.

49.     "Bond Insurance Policies" means those policies, surety policies or other instruments insuring any Bond and obligations related thereto, including all ancillary and related documents that may obligate the City to pay any amount to a Bond Insurer for any reason.

50.     "Bond Insurance Policy Claim" means a Claim held by a Bond Insurer arising under or in connection with a Bond Insurance Policy.

51.     "Bond Insurer" means any party, other than the City, that has issued a Bond Insurance Policy.

52.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

53.     "Cash" means legal tender of the United States of America and equivalents thereof.

54.     "Causes of Action" means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether known or

-5-

13-53846-tjt    Doc 8045-2    Filed 09/21/15    Entered 09/21/15 18:51:21    Page 28 of 235
13-53846-swr    Doc 2015-1    Filed 02/21/15    Entered 02/21/15 18:00:51    Page 108 of 314
of 314

unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date, including without limitation (a) claims and causes of action under sections 502(d), 510, 544, 545, 547, 548, 549(a), 549(c), 549(d), 550, 551 and 553 of the Bankruptcy Code and (b) any other avoidance or similar claims or actions under the Bankruptcy Code or under similar or related state or federal statutes or common law, and, in the case of each Cause of Action, the proceeds thereof, whether received by judgment, settlement or otherwise.

55.     "CFSEM Supporting Organization" means the Foundation for Detroit's Future, a supporting organization of, and an Entity legally separate from, the Community Foundation for Southeast Michigan, solely in its capacity as a participant in the DIA Settlement.

56.     "Chapter 9 Case" means the bankruptcy case commenced by the City under chapter 9 of the Bankruptcy Code, captioned as *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.), and currently pending before the Bankruptcy Court.

57.     "City" means the City of Detroit, Michigan.

58.     "City Council" means the duly-elected City Council of the City.

59.     "City Parking Assets" means, collectively, the City's right, title and interest in (a) the Parking Garages, (b) operating revenue received by the City generated by the Parking Garages, (c) revenues collected from fines received by the City related to tickets issued for parking violations (other than any such revenue that would otherwise be paid to the 36th District Court), (d) revenue received by the City generated by parking meters owned by the City and (e) revenue received by the City generated by "boot and tow" operations conducted by the City.

60.     "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the City.

61.     "Claims and Balloting Agent" means Kurtzman Carson Consultants, LLC, in its capacity as Bankruptcy Court-appointed claims and balloting agent for the Chapter 9 Case.

62.     "Claims Objection Bar Date" means the deadline for objecting to a Claim, which shall be on the date that is the latest of (a) 180 days after the Effective Date, subject to extension by an order of the Bankruptcy Court, (b) 90 days after the Filing of a proof of Claim for such Claim and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court, which other period may be set without notice to Holders of Claims.

63.     "Claims Register" means the official register of Claims maintained by the Claims and Balloting Agent.

64.     "Class" means a class of Claims, as described in Section II.B.

65.     "Class 9 Settlement Asset Pool" means (a) either: (i) the New C Notes or (ii) in the event of a disposition or monetization of the City Parking Assets prior to distribution of the New C Notes, the proceeds from such disposition or monetization, in an amount not less than $80 million; and (b) the Class 9 Settlement Credits.

66.     "Class 9 Eligible City Asset" means those assets identified on Exhibit I.A.66.

67.     "Class 9 Settlement Credits" means assignable, transferable settlement credits in the aggregate amount of $25 million that may be applied to offset not more than 50% of the purchase price of a Class 9 Eligible City Asset; <u>provided</u> that, in all cases, to apply a Class 9 Settlement Credit, the owner thereof must (a) be the final party selected in a procurement process or auction conducted by the City and (b) otherwise satisfy all other elements of the procurement or auction process applicable to a particular Class 9 Eligible City Asset (in each of (a) and (b), without regard to such owner's offsetting any portion of the purchase price with such Class 9 Settlement Credit and irrespective of such owner's ability to apply any Class 9 Settlement Credit).

-6-

68. "COLAs" means the cost of living adjustments made to annual pension benefits pursuant to collective bargaining agreements, other contracts or ordinances (as applicable) to account for the effects of inflation, which adjustments sometimes are called "escalators" in such collective bargaining agreements, other contracts or ordinances.

69. "Confirmation" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 9 Case.

70. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 9 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

71. "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued.

72. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 943 of the Bankruptcy Code, as it may be subsequently amended, supplemented or otherwise modified.

73. "Contract Administration Agreement 2005" means the Contract Administration Agreement dated June 2, 2005, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2005, the COP Contact Administrator and the COP Swap Counterparties.

74. "Contract Administration Agreement 2006" means the Contract Administration Agreement dated June 12, 2006, by and among the COP Service Corporations, the Detroit Retirement Systems Funding Trust 2006, the COP Contact Administrator and the COP Swap Counterparties.

75. "Contract Administration Agreements" means, together, the Contract Administration Agreement 2005 and the Contract Administration Agreement 2006.

76. "Convenience Claim" means a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim; provided that, where any portion(s) of a single Claim has been transferred, (y) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (z) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

77. "COP Agent" means a contract administrator, trustee, paying agent or similar Entity, as applicable, under the COP Documents.

78. "COP Agent Fees" means reasonable, actual and documented fees payable to the COP Agent for services rendered or expenses incurred in accordance with and pursuant to the terms of the COPs Documents.

79. "COP Claim" means a Claim under or evidenced by the COP Service Contracts. For the avoidance of doubt, except as provided in any Final Order of the Bankruptcy Court, the definition of COP Claim shall include any Claim (other than a COP Swap Claim) on account of any act, omission or representation (however described) based upon, arising out of or relating to: (a) the issuance, offering, underwriting, purchase, sale, ownership or trading of any COPs (to the extent any such Claim is not a Subordinated Claim); (b) the COP Service Corporations; (c) any COP Service Contracts; (d) the 2005 COPs Agreement; (e) the 2006 COPs Agreement; (f) the Detroit Retirement Systems Funding Trust 2005; (g) the Detroit Retirement Systems Funding Trust 2006; (h) the Contract Administration Agreement 2005; (i) the Contract Administration Agreement 2006; (j) any allegations that have been made or could have been made by or against the City or any other person in the COP Litigation; or (k) any policy of insurance relating to the COPs.

80. "COP Contract Administrator" means Wilmington Trust, National Association, as successor to U.S. Bank, N.A.

-7-

81.     "COP Documents" means, collectively, the COP Service Contracts, the 2005 COPs Agreement, the 2006 COPs Agreement and the Contract Administration Agreements.

82.     "COP Insurance Policies" means those certain polices or other instruments insuring the 2005 COPs issued under the 2005 COPs Agreement and the 2006 COPs issued under the 2006 COPs Agreement, including all ancillary and related documents that may obligate the City to pay any amount to a COP Insurer for any reason.

83.     "COP Insurance Policies Claim" means a Claim held by a COP Insurer arising under or in connection with a COP Insurance Policy.

84.     "COP Insurer" means any party, other than the City, that has issued a COP Insurance Policy.

85.     "COP Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Service Corporation, Detroit Police and Fire Retirement System Service Corporation, Detroit Retirement Systems Funding Trust 2005 and Detroit Retirement Systems Funding Trust 2006*, Case No. 14-04112 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 31, 2014.

86.     "COP Service Contracts" means, collectively, the (a) the GRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit General Retirement System Service Corporation; (b) the PFRS Service Contract 2005, dated May 25, 2005, by and between the City and the Detroit Police and Fire Retirement System Service Corporation; (c) the GRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit General Retirement System Service Corporation; and (d) the PFRS Service Contract 2006, dated June 7, 2006, by and between the City and the Detroit Police and Fire Retirement System Service Corporation, as each of the foregoing may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments.

87.     "COP Service Corporations" means, collectively, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

88.     "COP Swap Agreements" means the 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) between the COP Service Corporations and the COP Swap Counterparties, as set forth on Exhibit I.A.88, together with all ancillary and related instruments and agreements, as the same may have been subsequently amended, restated, supplemented or otherwise modified.

89.     "COP Swap Claim" means a Claim by the COP Swap Counterparties arising under the COP Swap Documents.

90.     "COP Swap Collateral Agreement" means the Collateral Agreement among the City, the COP Service Corporations, the COP Swap Collateral Agreement Custodian and the COP Swap Counterparties, together with all ancillary and related instruments and agreements.

91.     "COP Swap Collateral Agreement Custodian" means U.S. Bank National Association as custodian under the COP Swap Collateral Agreement or any successor custodian.

92.     "COP Swap Counterparties" means UBS AG and Merrill Lynch Capital Services, Inc., as successor to SBS Financial Products Company LLC, under the COP Swap Documents.

93.     "COP Swap Documents" means the COP Swap Agreements and the COP Swap Collateral Agreement.

94.     "COP Swap Exculpated Parties" means the COP Swap Counterparties and their affiliates and each of their respective present and former (a) officers, (b) directors, (c) employees, (d) members, (e) managers, (f) partners and (g) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

-8-

95. "COP Swap Settlement" means that Settlement and Plan Support Agreement among the City and the COP Swap Counterparties filed with the Bankruptcy Court on the docket of the Chapter 9 Case on March 26, 2014 (Docket No. 3234), as the same may be subsequently amended, restated, supplemented or otherwise modified in accordance therewith.

96. "COP Swap Settlement Approval Order" means the order entered by the Bankruptcy Court approving the COP Swap Settlement (Docket No. 4094).

97. "COP Syncora Swap Insurance Policies" shall mean policy numbers CA03049E, CA03049D, CA3049C and CA03049B issued by XL Capital Assurance Inc.

98. "COPs" means, collectively, the 2005 COPs and the 2006 COPs.

99. "COP Trustee" means Wilmington Trust, National Association, as Successor Trustee for the Detroit Retirement Systems Funding Trust 2005 and the Detroit Retirement Systems Funding Trust 2006, or any successor thereto.

100. "Counties" means, collectively, Macomb County, Oakland County and Wayne County.

101. "Cure Amount Claim" means a Claim based upon the City's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the City under section 365 of the Bankruptcy Code to the extent such Claim is required to be cured by section 365 of the Bankruptcy Code.

102. "Current Accrued Annual Pension" means, with respect to any Holder of a Pension Claim, the amount of annual pension benefits that the applicable Retirement System (a) is obligated to pay to such Holder as of June 30, 2014 to the extent such Holder is retired or a surviving beneficiary and receiving, or terminated from City employment and eligible to receive, a monthly pension as of such date or (b) would be obligated to pay such Holder upon his or her future retirement to the extent such Holder is actively employed by the City on June 30, 2014, assuming such Holder's annual pension is frozen as of June 30, 2014, and such Holder is no longer able to accrue pension benefits after such date under the current terms and conditions of the applicable Retirement System, in either case as reflected on the books and records of the applicable Retirement System as of June 30, 2014.

103. "Current GRS Retiree Adjustment Cap" means, if the funding from the State Contribution Agreement and the DIA Settlement is received, an ASF/GRS Reduction in an amount not to exceed 20% of the Current Accrued Annual Pension (including an interest component of 6.75% on the ASF Recoupment portion of the ASF/GRS Reduction if the ASF Recoupment is amortized over time) of a person who was a current retiree as of June 30, 2014.

104. "CUSIP" means the nine-character identifier (consisting of letters and numbers) that uniquely identifies any particular issue of DWSD Bonds.

105. "Detroit General Retiree" means a retired employee or surviving beneficiary of a retired employee of a department of the City who (a) is not a Detroit Police and Fire Retiree, (b) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (c) is a Holder of an OPEB Claim.

106. "Detroit General VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit General VEBA Beneficiaries and certain of their dependents.

107. "Detroit General VEBA Beneficiary" means either (a) a Holder of an Allowed OPEB Claim who is a Detroit General Retiree or (b) a retired employee (or surviving beneficiary of a retired employee) of the Detroit Public Library or the Detroit Regional Convention Facility Authority who (i) retired (or is a surviving beneficiary of one who retired) on or before December 31, 2014 and (ii) holds a valid claim for OPEB Benefits against the Detroit Public Library or the Detroit Regional Convention Facility Authority.

108.    "Detroit General VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit General VEBA, in substantially the form attached hereto as Exhibit I.A.108.

109.    "Detroit Police and Fire Retiree" means a retired employee or surviving beneficiary of a retired employee of the Detroit Police Department or the Detroit Fire Department who (a) was not an employee of the Emergency Medical Services Division of the Detroit Fire Department, (b) is a Holder of an OPEB Claim and (c) retired (or was a surviving beneficiary of one who retired) on or before December 31, 2014.

110.    "Detroit Police and Fire VEBA" means a voluntary employees' beneficiary association established in accordance with section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and regulations thereunder that provides health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents.

111.    "Detroit Police and Fire VEBA Beneficiary" means a Holder of an Allowed OPEB Claim that is a Detroit Police and Fire Retiree.

112.    "Detroit Police and Fire VEBA Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Detroit Police and Fire VEBA, in substantially the form attached hereto as Exhibit I.A.112.

113.    "Detroit Retirement Systems Funding Trust 2005" means the funding trust established pursuant to the 2005 COPs Agreement.

114.    "Detroit Retirement Systems Funding Trust 2006" means the funding trust established pursuant to the 2006 COPs Agreement.

115.    "Developer" means FGIC or its designee(s) under the FGIC Development Agreement.

116.    "DDA" means the City of Detroit Downtown Development Authority.

117.    "DIA" means The Detroit Institute of Arts, a museum and cultural institution located at 5200 Woodward Avenue, Detroit, Michigan 48202.

118.    "DIA Assets" means the "Museum Assets" as defined in the DIA Settlement Documents.

119.    "DIA Corp." means The Detroit Institute of Arts, a Michigan non-profit corporation.

120.    "DIA Direct Funders" means DIA Corp. and those DIA Funders whose commitments to contribute monies in furtherance of the DIA Settlement are made directly to the CFSEM Supporting Organization.

121.    "DIA Funders" means those persons, businesses, business-affiliated foundations and other foundations from which DIA Corp. secures commitments, whether before or after the Effective Date, to contribute monies or otherwise secures contributions of monies in support of DIA Corp.'s payment obligations under the DIA Settlement, whether paid directly to the CFSEM Supporting Organization or to DIA Corp. for the purpose of supporting DIA Corp.'s payments to the CFSEM Supporting Organization.

122.    "DIA Funding Parties" means the Foundations and the DIA Direct Funders.

123.    "DIA Proceeds" means, collectively, the irrevocable funding commitments described in Section IV.E.1.

124.    "DIA Proceeds Default Amount" means a reduction in the Adjusted Pension Amount of a Holder of a Pension Claim (or a surviving beneficiary) by virtue of a DIA Proceeds Payment Default, as determined by the trustees of the GRS or the PFRS, the aggregate amount of which shall be commensurate with the pertinent DIA Proceeds Payment Default.

-10-

125. "DIA Proceeds Payment Default" means a default that has not been cured during any applicable grace period, as determined by the trustees of the GRS or the PFRS, by one or more DIA Funding Parties respecting material amounts scheduled to be paid to the City in accordance with the DIA Settlement that the City, in turn, is required to pay over to the GRS or the PFRS in accordance with the terms and conditions of the Plan.

126. "DIA Settlement" means the comprehensive settlement regarding the DIA Assets, as described at Section IV.E and as definitively set forth in the DIA Settlement Documents, the principal terms of which are attached hereto as Exhibit I.A.126.

127. "DIA Settlement Documents" means the definitive documentation to be executed in connection with the DIA Settlement, in substantially the form attached hereto as Exhibit I.A.127, which documents substantially conform to the term sheet attached hereto as Exhibit I.A.126.

128. "Disbursing Agent" means the disbursing agent(s) appointed pursuant to Section V.A.

129. "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the City and approved by the Bankruptcy Court in the Disclosure Statement Order, as the same may be amended, supplemented or otherwise modified.

130. "Disclosure Statement Order" means the Order Approving the Proposed Disclosure Statement (Docket No. 4401), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on May 5, 2014, approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, as it may have been subsequently amended, supplemented or otherwise modified.

131. "Discounted Value" means the net present value of all Net DWSD Transaction Proceeds to be received immediately or in the future utilizing a 6.75% discount rate.

132. "Dismissed FGIC/COP Litigation" means all litigation pending between the City and FGIC (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.132, which litigation shall be dismissed or withdrawn as set forth in the FGIC/COP Settlement Documents.

133. "Dismissed Syncora Litigation" means all litigation pending between the City and Syncora (including all appeals) arising out of or related to, and all motions or objections pending in, the Chapter 9 Case, including the litigation set forth on Exhibit I.A.133, which litigation shall be dismissed or withdrawn as set forth in the Syncora Settlement Documents.

134. "Disputed Claim" means any Claim that is not Allowed.

135. "Distribution" means any initial or subsequent payment or transfer made on account of an Allowed Claim under or in connection with the Plan.

136. "Distribution Amount" means the principal amount of $42,500,000 for each of the COP Swap Counterparties, plus interest, on and after October 15, 2014, on the unpaid Net Amount at the rate applicable to obligations under the Postpetition Financing Agreement, payable in cash in the manner set forth in the COP Swap Settlement Agreement.

137. "Distribution Date" means any date on which a Distribution is made.

138. "Distribution Record Date" means 5:00 p.m., Eastern Time, on the Confirmation Date.

139. "District Court" means the United States District Court for the Eastern District of Michigan.

140.     "Document Website" means the internet site address http://www.kccllc.net/Detroit, at which the Plan, the Disclosure Statement and all Filed Exhibits to the Plan shall be available to any party in interest and the public, free of charge.

141.     "Downtown Development Authority Claims" means Claims in respect of the Downtown Development Authority Loans.

142.     "Downtown Development Authority Loans" means loans made pursuant to that certain Loan Agreement, dated August 26, 1991, by and between the City and the DDA, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements.

143.     "DRCEA" means the Detroit Retired City Employees Association.

144.     "DWSD" means the Detroit Water and Sewerage Department, which is a department of the City.

145.     "DWSD Authority" means an authority that may be formed pursuant to a DWSD Authority Transaction to conduct many or all of the operations currently conducted by DWSD as described in Section IV.A.3.

146.     "DWSD Authority Transaction" means the potential formation (including the potential transfer of certain assets owned by DWSD) and operation of the DWSD Authority, as described in Section IV.A.3.

147.     "DWSD Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Bond Documents, including a Claim for principal and interest on the DWSD Bonds.

148.     "DWSD Bond Documents" means the ordinances passed, resolutions adopted, orders issued or indentures executed with respect to the DWSD Bonds, as set forth on Exhibit I.A.148, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

149.     "DWSD Bonds" means the secured bonds issued pursuant to the DWSD Bond Documents, as set forth on Exhibit I.A.148.

150.     "DWSD CVR" means a single series of contingent value right certificates representing the right to receive 50% of the Net DWSD Transaction Proceeds received by the General Fund on account of a Qualifying DWSD Transaction.

151.     "DWSD Exculpated Parties" means, collectively, the DWSD Settlement Parties and their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

152.     "DWSD Revolving Bond Claims" means, collectively, the DWSD Revolving Sewer Bond Claims and the DWSD Revolving Water Bond Claims.

153.     "DWSD Revolving Bond Documents" means, collectively, the DWSD Revolving Sewer Bond Documents and the DWSD Revolving Water Bond Documents.

154.     "DWSD Revolving Bonds" means, collectively, the DWSD Revolving Sewer Bonds and the DWSD Revolving Water Bonds.

155.     "DWSD Revolving Sewer Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Sewer Bond Documents, including a Claim for principal and interest on the DWSD Revolving Sewer Bonds.

156. "DWSD Revolving Sewer Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.156, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

157. "DWSD Revolving Sewer Bonds" means the secured bonds issued pursuant to the DWSD Revolving Sewer Bond Documents, as set forth on Exhibit I.A.156.

158. "DWSD Revolving Water Bond Claims" means any Claim against the City arising under or evidenced by the DWSD Revolving Water Bond Documents, including a Claim for principal and interest on the DWSD Revolving Water Bonds.

159. "DWSD Revolving Water Bond Documents" means the ordinances passed, resolutions adopted or indentures or agreements executed with respect to the DWSD Revolving Water Bonds, as set forth on Exhibit I.A.159, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

160. "DWSD Revolving Water Bonds" means the secured bonds issued pursuant to the DWSD Revolving Water Bond Documents, as set forth on Exhibit I.A.159.

161. "DWSD Series" means an individual issue of DWSD Revolving Bonds having the same lien priority, issue date and series designation.

162. "DWSD Settlement Date" means the date prior to the Effective Date upon which each of (i) consummation of the purchase of the DWSD Tendered Bonds, (ii) issuance of the 2014 DWSD Refinancing Obligations and (iii) issuance of the 2014 Revenue Refinancing Bonds occurs, which date is identified as September 4, 2014 in the DWSD Tender Invitations (subject to rescheduling to a date earlier or later than that date by the City in its sole discretion).

163. "DWSD Settlement Parties" means, collectively, Assured Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., Berkshire Hathaway Assurance Corp., FGIC (solely in its capacity as a DWSD Bond Insurer), NPFG, the Ad Hoc Committee of DWSD Bondholders and U.S. Bank National Association, as trustee for the DWSD Bonds.

164. "DWSD Tender" means the offers, subject to acceptance at the City's election and in its sole discretion, to purchase for cancellation some or all of the DWSD Bonds that have been tendered and accepted in connection with, and on the terms provided in, the DWSD Tender Invitations.

165. "DWSD Tendered Bonds" means the DWSD Bonds that have been tendered for purchase or cancellation pursuant to the DWSD Tender.

166. "DWSD Tender Invitations" means the invitations and accompanying disclosure statements sent by the City to holders of DWSD Bonds on August 7, 2014, in the form of those collectively attached as Exhibits 8A and 8B to the DWSD Tender Motion.

167. "DWSD Tender Motion" means the Motion of the Debtor for a Final Order Pursuant to (I) 11 U.S.C. §§105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 6644), Filed by the City on August 11, 2014.

168. "DWSD Tender Order" means the Order, Pursuant to (I) 11 U.S.C. §§ 105, 364(c), 364(d)(1), 364(e), 902, 904, 921, 922 and 928 (A) Approving Postpetition Financing and (B) Granting Liens and (II) Bankruptcy Rule 9019 Approving Settlement of Confirmation Objections (Docket No. 7028), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 25, 2014.

169.     "Effective Date" means the Business Day, as determined by the City, on which each applicable condition contained in Section III.A has been satisfied or waived.

170.     "Eligible Pensioner" means a Holder of a Pension Claim who is eligible to receive an Income Stabilization Payment because such Holder (a) is, as of the Effective Date, at least 60 years of age or is a minor child receiving survivor benefits from GRS or PFRS and (b) has an aggregate annual household income equal to or less than 140% of the Federal Poverty Level in 2013 (as determined by reference to their (or in the case of minor children, their legal guardian's) 2013 income tax returns or equivalent documentation); provided, that no new persons will be eligible to receive Income Stabilization Payments at any time in the future, and any minor child receiving survivor benefits shall cease to be an Eligible Pensioner after he or she turns 18 years of age.

171.     "Emergency Manager" means Kevyn D. Orr, in his capacity as emergency manager for the City serving in accordance with PA 436 or any successor emergency manager.

172.     "Employee Health and Life Insurance Benefit Plan" means the Employee Health and Life Insurance Benefit Plan, a welfare benefit plan sponsored and administered by the City, which provides health, dental, vision care and life insurance benefits to (a) all officers and employees of the City who were employed on the day preceding the effective date of the benefit plan, and who continue to be employed by the City on and after the Effective Date and (b) substantially all retired officers and employees of the City.

173.     "Employees Death Benefit Board of Trustees" means the governing board of the City of Detroit Employee Health and Life Insurance Benefit Plan, which operates and administers the Employees Death Benefit Plan.

174.     "Employees Death Benefit Plan" means the City of Detroit Employee Death Benefit Plan, a pre-funded defined benefit plan and trust administered by the Employees Death Benefit Board of Trustees that provides supplemental death benefits to active and retired officers and employees of the City.

175.     "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

176.     "Estimated Future Liability" means the Income Stabilization Payments anticipated to be made from GRS or PFRS, as applicable, in the future in order for the respective Retirement System to fulfill the obligation to make Income Stabilization Payments, as determined by the respective Retirement System's board of trustees in the year 2022, provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to the Retirement System at any time prior to 2022.

177.     "Excess Assets" means the amount by which, if at all, the Income Stabilization Fund of either GRS or PFRS is credited with assets in excess of its Estimated Future Liability.

178.     "Excess New B Notes" means, collectively:  (a) the Syncora Excess New B Notes and (b) New B Notes in the aggregate face amount of approximately $48.71 million, representing the difference between (i) the New B Notes that would have been distributed to FGIC or the FGIC COP Holders had their respective asserted COP Claims for principal and interest in Class 9 been Allowed in full and (ii) the New B Notes to be provided to FGIC and the FGIC COP Holders as partial consideration pursuant to the terms of the FGIC/COP Settlement.

179.     "Excluded Actions" means (a) any claims with respect to enforcement of the FGIC/COP Settlement Documents or the FGIC Development Agreement, (b) any claims with respect to the New B Notes, the New C Notes or the Class 9 Settlement Credits, (c) any claims held by FGIC against the (i) COP Swap Counterparties or (ii) Related Entities of any of the foregoing, or (d) any claims asserted against the City in the proofs of claim filed by FGIC and the COP Trustee; provided that, with respect to the claims described in clause (d), notwithstanding any other provision of the Plan, such claims shall be subject to the treatment, discharge and injunction provisions set forth herein.

180.     "Exculpated Parties" means, collectively and individually, (a) the RDPFFA and its board of trustees/directors, attorneys, advisors and professionals, (b) the DRCEA and its board of trustees/directors,

attorneys, advisors and professionals, (c) the postpetition officers of the Detroit Police Lieutenants and Sergeants Association, (d) the postpetition officers of the Detroit Police Command Officers Association, (e) GRS and its postpetition professional advisors, (f) PFRS and its postpetition professional advisors, (g) Gabriel, Roeder, Smith & Company, (h) the COP Swap Exculpated Parties, (i) the LTGO Exculpated Parties, (j) the UTGO Exculpated Parties, (k) the DWSD Exculpated Parties, (l) the RDPMA Exculpated Parties, (m) the Syncora Exculpated Parties, (n) the COP Agent and (o) the FGIC/COP Exculpated Parties. For the avoidance of doubt, Exculpated Parties shall not include the COP Service Corporations.

181. "Executory Contract" means a contract to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

182. "Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, all of which will be made available on the Document Website once they are Filed. The City reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

183. "Exit Facility" means a credit facility that will be entered into by the City, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.183.

184. "Exit Facility Agent" means the agent under the Exit Facility.

185. "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the List of Creditors, provided that such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the City in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by City, if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and such amount is not listed in the List of Creditors or is listed in List of Creditors as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

186. "Federal Poverty Level" means the poverty guidelines issued each year in the *Federal Register* by the United States Department of Health and Human Services.

187. "Fee Examiner" means Robert M. Fishman, in his capacity as the fee examiner appointed pursuant to the Fee Examiner Order.

188. "Fee Examiner Order" means the Order Appointing Fee Examiner (Docket No. 383), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on August 19, 2013, as it may have been amended, supplemented or otherwise modified.

189. "Fee Examiner Parties" means, collectively, (a) the Fee Examiner and (b) all counsel and other professionals advising the Fee Examiner whose fees and expenses are subject to the Fee Review Order.

190. "Fee Review Order" means the Fee Review Order (Docket No. 810), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on September 11, 2013, as it may have been amended, supplemented or otherwise modified, including pursuant to the Order Amending and Clarifying Fee Review Order of September 11, 2013 (Docket No. 5150), entered on May 29, 2014.

191. "Fee Review Professionals" means, collectively, (a) those professionals retained by the City and the Retiree Committee to render services in connection with the Chapter 9 Case who seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order and (b) those additional professionals retained by third parties to provide services in connection with

-15-

the Chapter 9 Case that seek reimbursement by or payment from the City or any of its departments and are, or are determined (by Bankruptcy Court order or otherwise) to be, subject to the Fee Review Order or the terms of this Plan. For the avoidance of doubt, any professionals retained by any official committee appointed in the Chapter 9 Case other than the Retiree Committee are not Fee Review Professionals.

192. "Fee Review Professional Fees" means, collectively, (a) the fees and expenses of the Fee Review Professionals incurred during the period beginning on the Petition Date and ending on the Effective Date and (b) the fees and expenses of the Fee Examiner Parties through the projected date of dismissal of the Fee Examiner pursuant to Section IV.N.3.

193. "FGIC" means Financial Guaranty Insurance Company.

194. "FGIC/COP Exculpated Parties" means (a) FGIC and its Related Entities, (b) the FGIC COP Holders and their respective Related Entities and (c) the COP Agent and its Related Entities, in each case solely in their respective capacities as holders of, insurer of or administrator, trustee, or paying agent with respect to COP Claims.

195. "FGIC COP Holders" means the registered and beneficial holders of COPs originally insured by FGIC.

196. "FGIC/COP Settlement" means the comprehensive settlement with FGIC and the FGIC COP Holders, as described at Section IV.J and as definitively set forth in the FGIC/COP Settlement Documents.

197. "FGIC/COP Settlement Documents" means the definitive documentation to be executed in connection with the FGIC/COP Settlement, in substantially the form attached hereto as Exhibit I.A.197, and in any case in form and substance reasonably acceptable to the City, FGIC and the FGIC COP Holders. Whenever the consent of the FGIC COP Holders is required hereunder, or any document is required to be reasonably satisfactory to the FGIC COP Holders, such consent shall be deemed given and such document shall be deemed reasonably satisfactory unless within the period of time specified for such consent or document (which shall be reasonable under the circumstances and in any event not less than 48 hours after the request for such consent or proposed document shall have been filed with the court) unless beneficial holders of a majority of the COPs originally insured by FGIC shall have objected in writing to the action or document.

198. "FGIC Development Agreement" means that certain development agreement to be entered into by the City and the Developer, in substantially the form attached hereto as Exhibit I.A.198.

199. "FGIC Settlement Consideration" means the share of the Class 9 Settlement Asset Pool and New B Notes to be distributed for the benefit of FGIC and the FGIC COP Holders pursuant to Section II.B.3.p.i.A in respect of COPs originally insured by FGIC.

200. "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or the Claims and Balloting Agent, as applicable, in the Chapter 9 Case.

201. "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 9 Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed shall not prevent such order from being a Final Order.

202.  "Financial Review Commission" means the financial review commission appointed under Section 4 of the Financial Review Commission Act.

203.  "Financial Review Commission Act" means Public Act 181 of 2014 of the State, also known as the Michigan Financial Review Commission Act, Michigan Compiled Laws §§ 141.1631, *et seq.*

204.  "Fiscal Year" means a fiscal year for the City, commencing on July 1 of a year and ending on June 30 of the following year.  A Fiscal Year is identified by the calendar year in which the Fiscal Year ends, such that, for example, the 2015 Fiscal Year is the Fiscal Year commencing on July 1, 2014, and ending on June 30, 2015.

205.  "Foundations" means those entities identified on Exhibit B to the summary of the material terms of the DIA Settlement, which is attached hereto as Exhibit I.A.126.

206.  "General Fund" means the primary governmental fund and the chief operating fund of the City, which fund accounts for several of the City's primary services, including police, fire, public works, community and youth services.

207.  "General Obligation Bond Claims" means, collectively, the Limited Tax General Obligation Bond Claims and the Unlimited Tax General Obligation Bond Claims.

208.  "General Obligation Bond Documents" means, collectively, the Limited Tax General Obligation Bond Documents and the Unlimited Tax General Obligation Bond Documents.

209.  "General Obligation Bonds" means, collectively, the Limited Tax General Obligation Bonds and the Unlimited Tax General Obligation Bonds.

210.  "GRS" means the General Retirement System of the City of Detroit.

211.  "GRS Adjusted Pension Amount" means, with respect to a Holder of a GRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a)  If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 4.5% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment, provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and

(b)  If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement:  for a Holder of a GRS Pension Claim who is (i) either retired and receiving a monthly pension or a surviving beneficiary or (ii) an Active Employee or a terminated employee with a right to receive a GRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus an additional 27% reduction in the Current Accrued Annual Pension amount, plus the ASF Recoupment; provided that ASF Recoupment shall not apply to a surviving beneficiary of a retiree who died prior to June 30, 2014; and provided further, that with respect to Holders who are Active Employees, in the event the unfunded liabilities of the GRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the GRS as of June 30, 2013, the monthly pension amount shall be decreased to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

212.  "GRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City or any participants in GRS, their heirs or beneficiaries or by the GRS or any trustee thereof or any other Entity acting on the GRS's behalf, against the City or any fund managed by the City (including,

-17-

but not limited to, the General Fund, the water fund, the sewage disposal fund, the Detroit General Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability or other post-retirement payment or distribution in respect of the employment of current or former employees or (b) the payment by the GRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the GRS.

213. "GRS Restoration Payment" means an addition to the pension benefits that comprise the GRS Adjusted Pension Amount as described in Exhibit II.B.3.r.ii.C.

214. "Holder" means an Entity holding a Claim. With respect to any COP originally insured by FGIC, "Holder" includes the beneficial holders of any such COP.

215. "HUD Installment Note Claims" means any Claim against the City arising under or evidenced by the HUD Installment Note Documents, including a Claim for principal and interest on the HUD Installment Notes.

216. "HUD Installment Note Documents" means the promissory notes executed with respect to the HUD Installment Notes, as set forth on Exhibit I.A.216, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

217. "HUD Installment Notes" means, collectively, the secured notes issued under the HUD Installment Note Documents, as set forth on Exhibit I.A.216.

218. "Impaired" means, with respect to a Class or a Claim, that such Class or Claim is impaired within the meaning of section 1124 of the Bankruptcy Code.

219. "Income Stabilization Benefit" means a supplemental pension benefit in an amount necessary to ensure that (a) each Eligible Pensioner's total household income is equal to 130% of the Federal Poverty Level in 2013 or (b) the annual pension benefit payment payable to each Eligible Pensioner equals 100% of the annual pension benefit payment actually received by the Eligible Pensioner in 2013, whichever amount is lower.

220. "Income Stabilization Benefit Plus" means a supplemental pension benefit in an amount necessary to ensure that (a) an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in a given calendar year is equal to 105% of the Federal Poverty Level for such year or (b) the annual pension benefit payment payable to an Eligible Pensioner equals 100% of the Eligible Pensioner's Current Accrued Annual Pension, plus COLAs, whichever amount is lower.

221. "Income Stabilization Payments" means the Income Stabilization Benefit and the Income Stabilization Benefit Plus, which will be paid from the Income Stabilization Fund in each of GRS and PFRS to Eligible Pensioners in accordance with the State Contribution Agreement.

222. "Income Stabilization Fund" means a separate recordkeeping sub-account that will be established in each of GRS and PFRS for the sole purpose of paying Income Stabilization Payments to Eligible Pensioners. The assets credited to these sub-accounts will be invested on a commingled basis with the GRS and PFRS assets, as applicable, and will be credited with a pro rata portion of the applicable Retirement System's earnings and losses.

223. "Indirect 36th District Court Claim" means any claim arising in connection with a Cause of Action against the 36th District Court, solely to the extent that (a) the 36th District Court is entitled to receive funding from the City to satisfy any such claim and (b) any Claim for such funding by the 36th District Court is resolved pursuant to the Plan and the 36th District Court Settlement.

224. "Indirect Employee Indemnity Claim" means any claim against an employee or former employee of the City with respect to which such employee has an Allowed Claim against the City for indemnification or

payment or advancement of defense costs based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law.

225.    "Insured LTGO Bonds" means those Limited Tax General Obligation Bonds that are insured by the LTGO Insurer.

226.    "Investment Committee" means, as applicable, the investment committee established by GRS or PFRS for the purpose of making recommendations to, and approving certain actions by, the respective Retirement System's board of trustees or making determinations and taking action under, and with respect to certain matters described in, the State Contribution Agreement.

227.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, derivative claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

228.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

229.    "Limited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Limited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Limited Tax General Obligation Bonds.

230.    "Limited Tax General Obligation Bond Documents" means the resolutions adopted and orders issued with respect to the Limited Tax General Obligation Bonds, as set forth on Exhibit I.A.230, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

231.    "Limited Tax General Obligation Bonds" means, collectively, the unsecured bonds issued under the Limited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.230.

232.    "Liquidity Event" shall be deemed to occur only if the City has at all times complied with its obligations under the COP Swap Settlement to use its best efforts to secure sufficient exit financing as set forth therein, but is nonetheless unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

233.    "List of Creditors" means the Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (together with the summaries and schedules attached thereto), attached as Exhibit A to the Notice of Filing of Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), Filed by the City on September 30, 2013, as such list, summaries or schedules may be amended, restated, supplemented or otherwise modified.

234.    "LTGO Distribution Agent" means U.S. Bank National Association, in its capacity as agent under a distribution agreement to be entered into in connection with the LTGO Settlement Agreement or such other entity as may be agreed to among the parties to the LTGO Settlement Agreement.

235.    "LTGO Exculpated Parties" means (a) the LTGO Insurer, (b) BlackRock Financial Management, solely in its capacity as a Holder of Limited Tax General Obligation Bonds, and (c) their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents, attorneys, advisors, accountants, consultants, financial advisors and investment bankers, solely in their capacity as such.

236.    "LTGO Insurer" means Ambac, solely in its capacity as insurer of certain of the City's obligations with respect to the Limited Tax General Obligation Bonds.

237.     "LTGO Settlement Agreement" means the comprehensive settlement regarding Limited Tax General Obligation Bond Claims and related Bond Insurance Policy Claims, substantially in the form attached hereto as Exhibit I.A.237.

238.     "LTGO Settlement Parties" means (a) the LTGO Insurer and (b) BlackRock Financial Management, on behalf of certain managed funds and accounts set forth in the LTGO Settlement Agreement.

239.     "Macomb County" means the County of Macomb, Michigan.

240.     "Mayor" means the duly-elected mayor of the City.

241.     "MFA" means the Michigan Finance Authority.

242.     "Municipal Obligation" means the local government municipal obligation to be delivered by the City to the MFA in accordance with the UTGO Settlement Agreement and applicable law.

243.     "NPFG" means National Public Finance Guarantee Corporation.

244.     "Net Amount" means the Distribution Amount less the sum of all quarterly payments received by the COP Swap Counterparties under the COP Swap Collateral Agreement in respect of amounts owed under the COP Swap Agreements since January 1, 2014.

245.     "Net DWSD Transaction Proceeds" means (a) the cash proceeds received by or for the benefit of, or for attribution to, the General Fund as a result of a Qualifying DWSD Transaction less (1) any cash payments made by or on behalf of the General Fund in connection with a Qualifying DWSD Transaction, (2) any cash payments previously anticipated or projected to be contributed to GRS by DWSD but for the Qualifying DWSD Transaction and (3) any cash payments previously anticipated or projected to be received by or on behalf of the General Fund but for the Qualifying DWSD Transaction; and (b) any other net payments, assumption of scheduled monetary liability or cancellation of indebtedness or other monetary obligations that inures to the direct benefit of the General Fund as a result of the Qualifying DWSD Transaction.  In applying this definition, the City and the Restoration Trust (or the Retiree Committee if prior to the Effective Date) will work to develop a schedule of Net DWSD Transaction Proceeds at the time of the Qualifying DWSD Transaction that will inform any Value Determination (if requested) and allow the parties to subsequently track actual results and adjust applicable pension restoration levels accordingly.

246.     "New B Notes" means the unsecured bonds to be issued by the City pursuant to the New B Notes Documents, substantially on the terms set forth on Exhibit I.A.246.

247.     "New B Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New B Notes, in substantially the form attached hereto as Exhibit I.A.247.

248.     "New C Notes" means the unsecured bonds to be issued by the City pursuant to the New C Notes Documents, substantially on the terms set forth on Exhibit I.A.248 and in any case in form and substance reasonably acceptable to the City and Syncora.

249.     "New C Notes Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New C Notes, in substantially the form attached hereto as Exhibit I.A.249 and in any case in form and substance reasonably acceptable to the City and Syncora.

250.     "New GRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active non-public safety employees of the City or another entity that participates in GRS in connection with employment service performed on and after July 1, 2014, in substantially the form attached hereto as Exhibit I.A.250.a and the material terms of which are attached hereto as Exhibit I.A.250.b.

251.     "New GRS Active Pension Plan Formula" means an accrual rate for active employee participants in the GRS for benefits earned for service on or after July 1, 2014 that equals the product of (a) 1.5% multiplied by (b) an employee's average base compensation over such employee's final 10 years of service, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will exclude overtime, longevity or other bonuses, and unused sick leave, and the New GRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

252.     "New LTGO Bond Documents" means the ordinances to be passed, resolutions to be adopted, orders to be issued or indentures to be executed with respect to the New LTGO Bonds, in substantially the form attached as an exhibit to the LTGO Settlement Agreement.

253.     "New LTGO Bonds" means the bonds to be issued by the City pursuant to the New LTGO Bond Documents, substantially on the terms set forth on Schedule 1 of the LTGO Settlement Agreement.

254.     "New PFRS Active Pension Plan" means the terms and conditions for future accrual and payment of pensions for active public safety employees of the City in connection with employment service performed on and after July 1, 2014, in substantially the form attached hereto as Exhibit I.A.254.a and the material terms of which are attached hereto as Exhibit I.A.254.b.

255.     "New PFRS Active Pension Plan Formula" means an accrual rate for active employee participants in the PFRS for benefits earned on or after July 1, 2014 that equals the product of (a) 2.0% multiplied by (b) an employee's average base compensation over the employee's final five years of service, as set forth on Exhibit I.A.254.b, multiplied by (c) such employee's years of service after July 1, 2014.  For purposes of this definition, base compensation will mean the employee's actual base compensation and will exclude overtime, longevity or other bonuses, and unused sick leave, and the New PFRS Active Pension Plan Formula will be part of a hybrid program that will contain rules to shift funding risk to participants in the event of underfunding of hybrid pensions, and mandate minimum retirement ages for unreduced pensions.

256.     "New Securities" means, collectively, the New B Notes, the New C Notes, the New LTGO Bonds and the Municipal Obligation.

257.     "Non-Settling UTGO Bond Insurer" means, together, Syncora Capital Assurance Inc. and Syncora Guarantee Inc., solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

258.     "Oakland County" means the County of Oakland, Michigan.

259.     "OPEB Benefits" means, collectively, post-retirement health, vision, dental, life and death benefits provided to retired employees of the City, the Detroit Public Library or the Detroit Regional Convention Facility Authority and their surviving beneficiaries pursuant to the Employee Health and Life Insurance Benefit Plan, the Employees Death Benefit Plan or any comparable plan, including the members of the certified class in the action captioned *Weiler et. al. v. City of Detroit*, Case No. 06-619737-CK (Wayne County Circuit Court), pursuant to the "Consent Judgment and Order of Dismissal" entered in that action on August 26, 2009.

260.     "OPEB Claim" means any Claim against the City for OPEB Benefits held by a retiree who retired on or before December 31, 2014 and is otherwise eligible for OPEB Benefits, and any eligible surviving beneficiaries of such retiree.

261.     "Other Secured Claim" means a Secured Claim, other than a COP Swap Claim, a DWSD Bond Claim, a DWSD Revolving Bond Claim, a HUD Installment Note Claim or a Secured GO Bond Claim.

262.     "Other Unsecured Claim" means any Claim that is not an Administrative Claim, a Convenience Claim, a COP Claim, a Downtown Development Authority Claim, a General Obligation Bond Claim, a GRS Pension Claim, an OPEB Claim, a PFRS Pension Claim, a Secured Claim, an Indirect 36th District Court Claim or a

-21-

Subordinated Claim. For the avoidance of doubt, Section 1983 Claims and Indirect Employee Indemnity Claims are included within the definition of Other Unsecured Claim.

263. "PA 436" means Public Act 436 of 2012 of the State, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575.

264. "Parking Garages" means, collectively, parking garages owned by the City other than (a) that certain underground parking garage, commonly known as the "Grand Circus Parking Garage," located at 1600-01 Woodward Avenue, Detroit, Michigan, (b) that certain underground parking garage, commonly known as the "Cultural Center Garage," located at 41 Farnsworth Street, Detroit, Michigan and (c) that certain multi-story parking structure near the Riverfront Arena with an address of 900 W. Jefferson Avenue, Detroit, Michigan having a capacity of approximately 3,200 car spaces commonly known as "Joe Louis Arena Garage." For the avoidance of doubt, (a) that certain parking lot located at 5200 Woodward Avenue, Detroit, Michigan and (b) that certain parking lot, commonly known as the "Frederick Lot," located at 318 Frederick Street, Detroit, Michigan, shall not be considered Parking Garages.

265. "Pass-Through Obligations" means the City's obligations to the Pass-Through Recipients with respect to which the City acts, or may in the future act, as a tax-collecting agent for tax increment revenues derived from property taxes of the City and certain other taxing jurisdictions and required to be transmitted by the Treasurer of the City to the Pass-Through Recipients under their respective tax increment financing enabling statutes.

266. "Pass-Through Recipients" means, collectively, the (a) DDA, (b) Local Development Finance Authority, (c) Detroit Brownfield Redevelopment Authority and (d) City of Detroit Eight Mile/Woodward Corridor Improvement Authority, each of which are separate legal entities from the City.

267. "Pension Claim" means a GRS Pension Claim or a PFRS Pension Claim.

268. "Petition Date" means July 18, 2013.

269. "PFRS" means the Police and Fire Retirement System of the City of Detroit.

270. "PFRS Adjusted Pension Amount" means, with respect to a Holder of a PFRS Pension Claim, the Current Accrued Annual Pension payable to such Holder as adjusted in accordance with the following formulas:

(a) If Classes 10 and 11 vote to accept the Plan, and funding is received from the DIA Settlement and the State Contribution Agreement: Holders of PFRS Pension Claims will continue to receive their Current Accrued Annual Pension, but COLAs from and after June 30, 2014 shall be 45% of the COLAs provided for in police and fire collective bargaining agreements, other contracts or ordinances; and

(b) If Classes 10 and 11 do **not** vote to accept the Plan or funding is **not** received from the DIA Settlement and the State Contribution Agreement: (i) for a Holder of a PFRS Pension Claim who is (A) either retired and receiving a monthly pension or a surviving beneficiary or (B) a terminated employee with a right to receive a PFRS pension in the future, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs; and (ii) for a Holder of a PFRS Pension Claim who is an Active Employee, elimination of the right to supplemental pension benefits to be paid after July 1, 2014 in respect of COLAs, plus elimination of the deferred retirement option plan feature of PFRS for certain Active Employees who have not already irrevocably elected to participate in the feature; provided that, with respect to Holders that are Active Employees, in the event the unfunded liabilities of the PFRS for the plan year ending June 30, 2014 are greater than the unfunded liabilities of the PFRS as of June 30, 2013, the monthly pension amount shall be reduced to the extent necessary to ensure that there is no change in the amount of the underfunding between Fiscal Years 2013 and 2014.

271. "PFRS Pension Claim" means any Claim (other than an OPEB Claim), whether asserted by current or former employees of the City, their heirs or beneficiaries or by the PFRS or any trustee thereof or any other Entity acting on the PFRS's behalf, against the City or any fund managed by the City (including, but not

limited to, the General Fund, the Police and Fire Retirement System Service Corporation fund or the pension funds) based upon, arising under or related to any agreement, commitment or other obligation, whether evidenced by contract, agreement, rule, regulation, ordinance, statute or law for (a) any pension, disability, or other post-retirement payment or distribution in respect of the employment of such current or former employees or (b) the payment by the PFRS to persons who at any time participated in, were beneficiaries of or accrued post-retirement pension or financial benefits under the PFRS.

272.    "PFRS Restoration Payment" means an addition to the pension benefits that comprise the PFRS Adjusted Pension Amount as described in Exhibit II.B.3.q.ii.C.

273.    "Plan" means this plan of adjustment and all Exhibits attached hereto or referenced herein, as the same may be amended, restated, supplemented or otherwise modified.

274.    "Plan COP Settlement" means the comprehensive settlement regarding COP Claims on terms and conditions described in Section II.B.3.p.i.A.

275.    "Plan Supplement" means any supplement to the Plan containing Exhibits that were not Filed as of the date of the entry of the Disclosure Statement Order.

276.    "Pledged Property" means the collateral pledged by the City under the COP Swap Collateral Agreement or Ordinance No. 05-09 of the City.

277.    "Postpetition Financing Agreement" means, collectively, (a) the Bond Purchase Agreement by and among the City and Barclays Capital, Inc., as purchaser, (b) the Financial Recovery Bond Trust Indenture by and among the City and UMB Bank, N.A., as trustee, and (c) all ancillary and related instruments and agreements approved by the Bankruptcy Court pursuant to the Postpetition Financing Order.

278.    "Postpetition Financing Order" means the Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (Docket No. 3067) entered by the Bankruptcy Court on the docket of the Chapter 9 Case on April 2, 2014, approving the Postpetition Financing Agreement.

279.    "Postpetition Financing Claims" means any Claim against the City under or evidenced by (a) the Postpetition Financing Agreement and (b) the Postpetition Financing Order.

280.    "Prior GRS Pension Plan" means the terms and conditions of the GRS in effect as of June 30, 2014 and applicable to benefits accrued by members of GRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.280.

281.    "Prior PFRS Pension Plan" means the terms and conditions of the PFRS in effect as of June 30, 2014 and applicable to benefits accrued by members of PFRS prior to July 1, 2014, the form documentation of which is attached hereto as Exhibit I.A.281.

282.    "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or other specified group of Claims, proportionately so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class or other specified group of Claims are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating a Pro Rata distribution of property to holders of Allowed Claims in such Class or group of Claims.

283.    "Professional Fee Reserve" means the reserve for Fee Review Professional Fees established pursuant to Section IV.N.1.

284. "Qualifying DWSD Transaction" means a potential transaction involving the transfer to a third party (including but not limited to a lease) of a majority of the assets of, or the right to operate and manage, the City's water or sewage disposal systems currently operated by the DWSD in one or a series of related transactions.

285. "RDPFFA" means the Retired Detroit Police and Fire Fighters Association.

286. "RDPMA" means the Retired Detroit Police Members Association.

287. "RDPMA Exculpated Parties" means the RDPMA and its board of trustees/directors, attorneys, advisors and professionals, solely in their capacity as such.

288. "Reinstated" means (a) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the Holder or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) the cure of any such default other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) the reinstatement of the maturity of such Claim as such maturity existed before such default; (iii) compensation of the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensation of the Holder of such Claim for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder. "Reinstate" and "Reinstatement" shall have correlative meanings.

289. "Related Entity" means, with respect to any Entity, such Entity's Affiliates, predecessors, successors and assigns (whether by operation of law or otherwise), and with respect to any of the foregoing their respective present and former Affiliates and each of their respective current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officials, officers, directors, employees, managers, advisors and professionals).

290. "Released Parties" means, collectively and individually, the Retiree Committee, the members of the Retiree Committee, the Retiree Committee Professionals, the Foundations, DIA Corp., the DIA Funders and their Related Entities and the CFSEM Supporting Organization and its Related Entities.

291. "Restoration Trust" means a trust to be established pursuant to the Restoration Trust Agreement to (a) hold the DWSD CVR and enforce rights related to its terms and (b) consult with the trustees and the Investment Committee of PFRS or GRS with respect to restoration rights affecting retirees of PFRS or GRS, respectively; provided, however, that the Restoration Trust shall not have any right to initiate enforcement proceedings against the trustees or Investment Committee of either PFRS or GRS with respect to Special Restoration or the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

292. "Restoration Trust Agreement" means the definitive documentation to be executed in connection with the formation of the Restoration Trust, in substantially the form attached hereto as Exhibit I.A.292.

293. "Restructured UTGO Bonds" means the bonds to be issued by the MFA to the current Holders of Unlimited Tax General Obligation Bond Claims, the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer in the amount of $287,560,790 pursuant to the UTGO Settlement Agreement, which bonds shall be limited obligations of the MFA and shall be secured as more particularly described in the UTGO Settlement Agreement.

294. "Retiree Classes" means Classes 10, 11 and 12, as set forth in Section II.B.

295.    "Retiree Committee" means the official committee of retired employees first appointed by the United States Trustee in the Chapter 9 Case on August 22, 2013 (Docket No. 566), as such committee may be reconstituted, solely in its capacity as such.

296.    "Retiree Committee Professionals" means those professionals retained by the Retiree Committee to render services in connection with the Chapter 9 Case that seek payment of compensation and reimbursement of expenses from the City for postpetition services pursuant to and in accordance with the Fee Review Order, solely in their capacity as such.

297.    "Retiree Health Care Litigation" means the adversary proceeding captioned as *Official Committee of Retirees of the City of Detroit, Michigan, et al. v. City of Detroit, Michigan, et al.*, Case No. 14-04015 (Bankr. E.D. Mich.), filed in the Chapter 9 Case on January 9, 2014.

298.    "Retiree Health Care Settlement Agreement" means the Settlement Agreement, effective February 14, 2014, between the parties to the Retiree Health Care Litigation, pursuant to which such parties agreed to certain modifications to the changes in retiree health care benefits that the City was otherwise to implement on March 1, 2014, a copy of which is attached hereto as Exhibit I.A.298.

299.    "Retirement System Indemnity Obligations" means any and all obligations of the City, as of the Petition Date, to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of any party in connection with any Causes of Action relating in any way to either GRS or PFRS or the management, oversight, administration or activities thereof, as such obligations may be as provided for in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements.

300.    "Retirement Systems" means, collectively, the GRS and the PFRS.

301.    "Section 115" means section 115 of the Internal Revenue Code of 1986, as amended.

302.    "Section 1983 Claim" means any Claim against the City, its employees or both arising under 42 U.S.C. § 1983 that has not been settled, compromised or otherwise resolved and with respect to which Claim a lawsuit was pending before the District Court on or prior to the Petition Date.

303.    "Secured Claim" means a Claim that is secured by a Lien on property in which the City has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the City's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 of the Bankruptcy Code.

304.    "Secured GO Bond Claims" means, collectively, the Secured GO Series 2010 Claims, the Secured GO Series 2010(A) Claims, the Secured GO Series 2012(A)(2) Claims, the Secured GO Series 2012(A2-B) Claims, the Secured GO Series 2012(B) Claims and the Secured GO Series 2012(B2) Claims.

305.    "Secured GO Bond Documents" means, collectively, the Secured GO Series 2010 Bond Documents, the Secured GO Series 2010(A) Bond Documents, the Secured GO Series 2012(A)(2) Bond Documents, the Secured GO Series 2012(A2-B) Bond Documents, the Secured GO Series 2012(B) Bond Documents and the Secured GO Series 2012(B2) Bond Documents.

306.    "Secured GO Bonds" means, collectively, the Secured GO Series 2010 Bonds, the Secured GO Series 2010(A) Bonds, the Secured GO Series 2012(A)(2) Bonds, the Secured GO Series 2012(A2-B) Bonds, the Secured GO Series 2012(B) Bonds and the Secured GO Series 2012(B2) Bonds.

307.    "Secured GO Series 2010 Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010 Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

308.     "Secured GO Series 2010 Bonds" means the secured $249,790,000 Distributable State Aid General Obligation (Limited Tax) Bonds, Series 2010, issued pursuant to the Secured GO Series 2010 Bond Documents.

309.     "Secured GO Series 2010 Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010 Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010 Bonds.

310.     "Secured GO Series 2010(A) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2010(A) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

311.     "Secured GO Series 2010(A) Bonds" means the secured $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds – Direct Payment), issued pursuant to the Secured GO Series 2010(A) Bond Documents.

312.     "Secured GO Series 2010(A) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2010(A) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A) Bonds.

313.     "Secured GO Series 2012(A)(2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A)(2) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

314.     "Secured GO Series 2012(A)(2) Bonds" means the secured $38,865,000 Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), issued pursuant to the Secured GO Series 2012(A)(2) Bond Documents.

315.     "Secured GO Series 2012(A)(2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A)(2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2010(A)(2) Bonds.

316.     "Secured GO Series 2012(A2-B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(A2-B) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

317.     "Secured GO Series 2012(A2-B) Bonds" means the secured $53,520,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(A2-B), issued pursuant to the Secured GO Series 2012(A2-B) Bond Documents.

318.     "Secured GO Series 2012(A2-B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(A2-B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(A2-B) Bonds.

319.     "Secured GO Series 2012(B) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

320.     "Secured GO Series 2012(B) Bonds" means the $6,405,000 General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B), issued pursuant to the Secured GO Series 2012(B) Bond Documents.

321.     "Secured GO Series 2012(B) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B) Bonds.

322.     "Secured GO Series 2012(B2) Bond Documents" means the resolutions adopted, orders issued and indentures executed with respect to the Secured GO Series 2012(B2) Bonds, as set forth on Exhibit I.A.305, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

323.     "Secured GO Series 2012(B2) Bonds" means the $30,730,000 Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), issued pursuant to the Secured GO Series 2012(B2) Bond Documents.

324.     "Secured GO Series 2012(B2) Claim" means any Claim against the City arising under or evidenced by the Secured GO Series 2012(B2) Bond Documents, including a Claim for principal and interest on the Secured GO Series 2012(B2) Bonds.

325.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

326.     "Settling 36th District Court Claimants" means (a) the 36th District Court, (b) Local 917 of the American Federation of State, County and Municipal Employees, (c) Local 3308 of the American Federation of State, County and Municipal Employees and (d) those individuals identified as "Individual Claimants" on the term sheet attached hereto as Exhibit I.A.9.

327.     "Settling COP Claimant" means (a) those holders of COP Claims that are the subject of the Syncora Settlement Documents or (b) those Holders of COP Claims that are the subject of the FGIC/COP Settlement Documents.

328.     "Settling UTGO Bond Insurers" means, collectively, Ambac, Assured and NPFG and each of their respective successors and assigns, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds.

329.     "Special Restoration" means the potential restoration or replacement of benefit reductions imposed by the Plan in connection with a Qualifying DWSD Transaction, as described in Section IV.F.

330.     "State" means the state of Michigan.

331.     "State Contribution" means payments to be made to GRS and PFRS by the State or the State's authorized agent for the purpose of funding Adjusted Pension Amounts in an aggregate amount equal to the net present value of $350 million payable over 20 years using a discount rate of 6.75%, pursuant to the terms of the State Contribution Agreement.

332.     "State Contribution Agreement" means the definitive documentation to be executed in connection with the comprehensive settlement regarding Pension Claims as described in Section IV.D, in substantially the form attached hereto as Exhibit I.A.332.

333.     "State Related Entities" means, collectively:  (a) all officers, legislators, employees, judges and justices of the State; (b) the Governor of the State; (c) the Treasurer of the State; (d) all members of the Local Emergency Financial Assistance Loan Board created under the Emergency Municipal Loan Act, Michigan Compiled Laws §§ 141.931-141.942; (e) each of the State's agencies and departments; and (f) the Related Entities of each of the foregoing.

334.     "Stay Extension Order" means the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and

Representatives of the Debtor (Docket No. 166), entered by the Bankruptcy Court on the docket of the Chapter 9 Case on July 25, 2013, as it may be amended, supplemented or otherwise modified.

335. "Stub UTGO Bonds" means Unlimited Tax General Obligation Bonds in the principal amount of $43,349,210 that, from and after the Effective Date, will (a) be reinstated, (b) remain outstanding and (c) be payable from the UTGO Bond Tax Levy, as more particularly described in the UTGO Settlement Agreement.

336. "Subordinated Claim" means a Claim of the kind described in sections 726(a)(3) or 726(a)(4) of the Bankruptcy Code or Claims subordinated under sections 510(b) or 510(c) of the Bankruptcy Code.

337. "Supplemental Trust Agreements" means, collectively, (a) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of FGIC and (b) one or more supplemental trust agreements between the COP Trustee and COP Service Corporations, entered into with the consent of Syncora, in each case to be executed prior to the Effective Date, which agreements shall, among other things, for purposes of distributions of trust assets explicitly supersede the 2005 COPs Agreement and the 2006 COPs Agreement, which incorporates by reference Sections 6.5 and 9.1 of each Contract Administration Agreement and Section 8.03 of each COP Service Contract.

338. "Swap Insurance Policies" means those policies or other instruments insuring the COP Swap Agreements and obligations related thereto.

339. "Syncora" means, collectively, Syncora Guarantee, Inc. and Syncora Capital Assurance Inc.

340. "Syncora Development Agreement" means that certain development agreement by and between the City and Pike Point Holdings, LLC, a wholly owned indirect subsidiary of Syncora, in substantially the form attached hereto as Exhibit I.A.340, including all exhibits thereto, and in any case in form and substance reasonably acceptable to the City and Syncora.

341. "Syncora Excess New B Notes" means New B Notes in the aggregate face amount of approximately $15.43 million, representing the difference between (a) the New B Notes that would have been distributed to Syncora had its asserted COP Claim for principal and interest in Class 9 been Allowed in full and (b) the New B Notes to be provided to Syncora as partial consideration pursuant to the terms of the Syncora Settlement.

342. "Syncora Exculpated Parties" means Syncora and their Related Entities, solely with respect to issues arising in connection with Syncora's capacity as holder or insurer of Unlimited Tax General Obligation Bond Claims and COP Claims.

343. "Syncora Settlement" means the comprehensive settlement with Syncora, as described at Section IV.I and as definitively set forth in the Syncora Settlement Documents.

344. "Syncora Settlement Documents" means the definitive documentation to be executed in connection with the Syncora Settlement, in substantially the form attached hereto as Exhibit I.A.344, and in any case in form and substance reasonably acceptable to the City and Syncora.

345. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margins, sales, use, stamp, real estate transfer, mortgage recording, ad valorem, value added, transfer, franchise, profits, license, property, payroll, employment, unemployment, occupation, disability, excise, severance, withholding, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a transferee or successor or a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Entity.

346.     "Top-Off Payments" means the payments to be made to the Settling UTGO Bond Insurers pursuant to the UTGO Settlement Agreement if a Trigger Event occurs in amounts equal to the product of:  (a) the amount by which the recovery received by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, under the Plan exceeds 69.5% of the aggregate amount of all such Allowed Claims in such Class, multiplied by (b) the quotient of (i) $100.5 million, divided by (ii) the sum of (x) 30.5% of the aggregate amount of all Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as the case may be, and (y) $100.5 million.

347.     "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that arises out of allegations of personal injury or wrongful death claims and is not a Section 1983 Claim.

348.     "Trigger Event" means the receipt by Holders of Allowed Limited Tax General Obligation Bond Claims or Allowed COP Claims, as applicable, of consideration pursuant to the Plan of 69.5% or more of the aggregate amount of all of the Allowed Claims in such Class.  For purposes of determining whether a Trigger Event has occurred, all actual recoveries for Holders of Allowed Limited Tax General Obligation Bond Claims and Allowed COP Claims shall be determined by discounting the payments made to such Classes using a 5% discount rate back to the date of Confirmation.

349.     "Tunnel Lease" means, collectively, (a) that certain Tube Lease, dated March 20, 1978, by and between the City, as landlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as tenant, and (b) that certain Sublease, dated March 20, 1978, by and between the City, as landlord, as successor-in-interest to Ford Motor Properties, Inc. as sublandlord, and Detroit Windsor Tunnel LLC, as successor-in-interest to Detroit & Canada Tunnel Corporation, as subtenant, each as may be amended, restated, supplemented or otherwise modified, in any case in form and substance reasonably acceptable to the City and Syncora.

350.     "Unexpired Lease" means a lease to which the City is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code.

351.     "Unimpaired" means, with respect to a Class or a Claim, that such Class or Claim is not Impaired.

352.     "United States Trustee" means the Office of the United States Trustee for the Eastern District of Michigan.

353.     "Unlimited Tax General Obligation Bond Claim" means any Claim against the City arising under or evidenced by the Unlimited Tax General Obligation Bond Documents, including a Claim for principal and interest on the Unlimited Tax General Obligation Bonds.

354.     "Unlimited Tax General Obligation Bond Documents" means the resolutions passed and orders issued with respect to the Unlimited Tax General Obligation Bonds, as set forth on Exhibit I.A.354, as the same may have been subsequently amended, restated, supplemented or otherwise modified, together with all ancillary and related instruments and agreements and all related Bond Insurance Policies.

355.     "Unlimited Tax General Obligation Bonds" means, collectively, the bonds issued under the Unlimited Tax General Obligation Bond Documents, as set forth on Exhibit I.A.354.

356.     "Unsecured Claim" means a Claim that is not a Secured Claim or an Administrative Claim.

357.     "UTGO Bond Tax Levy" means that portion of the proceeds of the ad valorem tax millage levies pledged to and on account of the Unlimited Tax General Obligation Bonds.

358.     "UTGO Exculpated Parties" means, collectively, Ambac, Assured and NPFG, solely in their capacity as insurers of certain of the City's obligations with respect to the Unlimited Tax General Obligation Bonds, and each of their respective parents, affiliates, shareholders, directors, officers, managers, employees, agents,

attorneys, advisors, accountants, consultants, restructuring consultants, financial advisors and investment bankers, solely in their capacity as such.

359.    "UTGO Litigation" means, together, the adversary proceedings filed in the Chapter 9 Case on November 8, 2013, captioned as *National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05309 (Bankr. E.D. Mich.), and *Ambac Assurance Corporation v. City of Detroit, Michigan, et al.*, Case No. 13-05310 (Bankr. E.D. Mich.), to the extent that such proceedings relate to the Unlimited Tax General Obligation Bonds.

360.    "UTGO Settlement Agreement" means that certain Settlement Agreement, dated as of July 18, 2014, among the City and the Settling UTGO Bond Insurers, substantially in the form attached hereto as Exhibit I.A.360.

361.    "Value Determination" means a valuation of the expected Net DWSD Transaction Proceeds.

362.    "Voting Deadline" means the deadline fixed by the Bankruptcy Court in the Disclosure Statement Order for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

363.    "Wayne County" means the Charter County of Wayne, Michigan.

**B.    Rules of Interpretation and Computation of Time.**

**1.    Rules of Interpretation.**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or Exhibit Filed or to be Filed shall mean such document or Exhibit, as it may have been or may be amended, restated, supplemented or otherwise modified pursuant to the Plan, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim includes that Entity's successors, assigns and Affiliates; (e) all references to Sections or Exhibits are references to Sections and Exhibits of or to the Plan; (f) the words "herein," "hereunder," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent with any other provision of this Section.

**2.    Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II
## CLASSIFICATION OF CLAIMS; CRAMDOWN;
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified under the Plan for all purposes, including voting, Confirmation and Distribution.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, as described in Section II.A, have not been classified and thus are excluded from the Classes described in Section II.B.1.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different

Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Notwithstanding the foregoing, in no event shall any Holder of an Allowed Claim be entitled to receive payments or Distributions under the Plan that, in the aggregate, exceed the Allowed amount of such Holder's Claim.

A.    **Unclassified Claims.**

    1.    **Payment of Administrative Claims.**

        a.    **Administrative Claims in General.**

        Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order.

        b.    **Claims Under the Postpetition Financing Agreement.**

        Unless otherwise agreed by Barclays Capital, Inc. pursuant to the Postpetition Financing Agreement, on or before the Effective Date, Postpetition Financing Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

    2.    **Bar Dates for Administrative Claims.**

        a.    **General Bar Date Provisions.**

        Except as otherwise provided in Section II.A.2.b, Section II.A.2.c or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.  The foregoing procedures shall be specified in the Confirmation Order and the notice of entry of the Confirmation Order and served on all parties in interest.

        b.    **Ordinary Course Claims**

        Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

c. **Claims Under the Postpetition Financing Agreement.**

Holders of Administrative Claims that are Postpetition Financing Claims will not be required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied pursuant to Section II.A.1.b.

d. **No Modification of Bar Date Order.**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

B. **Classified Claims.**

1. **Designation of Classes.**

The following table designates the Classes and specifies whether such Classes are Impaired or Unimpaired by the Plan.

| CLASS | NAME | IMPAIRMENT |
|---|---|---|
| | *Secured Claims* | |
| 1A | All Classes of DWSD Bond Claims (One Class for each CUSIP of DWSD Bonds, as set forth on Exhibit I.A.148) | Unimpaired |
| 1B | All Classes of DWSD Revolving Sewer Bond Claims (One Class for each DWSD Series of DWSD Revolving Sewer Bonds, as set forth on Exhibit I.A.156) | Unimpaired/Nonvoting |
| 1C | All Classes of DWSD Revolving Water Bond Claims (One Class for each DWSD Series of DWSD Revolving Water Bonds, as set forth on Exhibit I.A.159) | Unimpaired/Nonvoting |
| 2A | Secured GO Series 2010 Claims | Unimpaired/Nonvoting |
| 2B | Secured GO Series 2010(A) Claims | Unimpaired/Nonvoting |
| 2C | Secured GO Series 2012(A)(2) Claims | Unimpaired/Nonvoting |
| 2D | Secured GO Series 2012(A2-B) Claims | Unimpaired/Nonvoting |
| 2E | Secured GO Series 2012(B) Claims | Unimpaired/Nonvoting |
| 2F | Secured GO Series 2012(B2) Claims | Unimpaired/Nonvoting |
| 3 | Other Secured Claims | Unimpaired/Nonvoting |
| 4 | HUD Installment Notes Claims | Unimpaired/Nonvoting |
| 5 | COP Swap Claims | Impaired/Voting |
| 6 | Claims Previously Classified in Class 6 Paid in Full | N/A |
| | *Unsecured Claims* | |
| 7 | Limited Tax General Obligation Bond Claims | Impaired/Voting |
| 8 | Unlimited Tax General Obligation Bond Claims | Impaired/Voting |
| 9 | COP Claims | Impaired/Voting |

| CLASS | NAME | IMPAIRMENT |
|-------|------|------------|
| 10 | PFRS Pension Claims | Impaired/Voting |
| 11 | GRS Pension Claims | Impaired/Voting |
| 12 | OPEB Claims | Impaired/Voting |
| 13 | Downtown Development Authority Claims | Impaired/Voting |
| 14 | Other Unsecured Claims | Impaired/Voting |
| 15 | Convenience Claims | Impaired/Voting |
| 16 | Subordinated Claims | Impaired/Nonvoting |
| 17 | Indirect 36th District Court Claims | Impaired/Voting |

     **2.**       **Subordination; Reservation of Rights to Reclassify Claims.**

Except with respect to Bond Insurance Policy Claims, the allowance, classification and treatment of Allowed Claims and the respective Distributions and treatments specified in the Plan take into account the relative priority and rights of the Claims in each Class and all contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. Except as expressly set forth herein, consistent with section 510(a) of the Bankruptcy Code, nothing in the Plan shall, or shall be deemed to, modify, alter or otherwise affect any right of a Holder of a Claim to enforce a subordination agreement against any Entity other than the City to the same extent that such agreement is enforceable under applicable nonbankruptcy law. Pursuant to section 510 of the Bankruptcy Code, the City reserves the right to reclassify any Disputed Claim in accordance with any applicable contractual, legal or equitable subordination. For the avoidance of doubt, this Section II.B.2 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims, which are preserved for enforcement by the City or by the relevant Bond Insurer.

     **3.**       **Treatment of Claims.**

         **a.**       **Class 1A – DWSD Bond Claims.**

            **i.**       **Classification and Allowance.**

DWSD Bond Claims relating to each CUSIP of DWSD Bonds shall be separately classified, as reflected on Exhibit I.A.148, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.148.

            **ii.**       **Treatment.**

Each Holder of an Allowed DWSD Bond Claim shall have its Allowed DWSD Bond Claim Reinstated on the Effective Date, unless such Holder agrees to a different treatment of such Claim. All votes and elections previously delivered in Class 1A shall not be counted and shall be of no force and effect. Any Allowed Secured Claims for fees, costs and expenses under the DWSD Bond Documents arising in connection with such Allowed DWSD Bond Claims shall be paid in full in Cash once Allowed pursuant to the DWSD Tender Order, by agreement of the parties or by order of the Bankruptcy Court. In addition, all claims for fees, costs and expenses authorized pursuant to or in accordance with the DWSD Tender Order shall be paid as provided therein.

     b.     **Class 1B – DWSD Revolving Sewer Bond Claims.**

        i.     **Classification and Allowance.**

DWSD Revolving Sewer Bond Claims relating to each DWSD Series of DWSD Revolving Sewer Bonds shall be separately classified, as reflected on Exhibit I.A.156, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Sewer Bond Claims shall be deemed Allowed in the aggregate amounts set forth on Exhibit I.A.156.

        ii.     **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Sewer Bond Claim shall have its Allowed DWSD Revolving Sewer Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

     c.     **Class 1C – DWSD Revolving Water Bond Claims**

        i.     **Classification and Allowance.**

DWSD Revolving Water Bond Claims relating to each DWSD Series of DWSD Revolving Water Bonds shall be separately classified, as reflected on Exhibit I.A.159, with each Class receiving the treatment set forth below. On the Effective Date, the DWSD Revolving Water Bond Claims shall be deemed Allowed in the amounts set forth on Exhibit I.A.159.

        ii.     **Treatment.**

On the Effective Date, each Holder of an Allowed DWSD Revolving Water Bond Claim shall have its Allowed DWSD Revolving Water Bond Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

     d.     **Class 2A – Secured GO Series 2010 Claims.**

On the Effective Date, (i) the Secured GO Series 2010 Claims shall be deemed Allowed in the aggregate amount of $252,475,366 and (ii) each Holder of an Allowed Secured GO Series 2010 Claim shall have its Allowed Secured GO Series 2010 Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

     e.     **Class 2B – Secured GO Series 2010(A) Claims.**

On the Effective Date, (i) the Secured GO Series 2010(A) Claims shall be deemed Allowed in the aggregate amount of $101,707,848 and (ii) each Holder of an Allowed Secured GO Series 2010(A) Claim shall have its Allowed Secured GO Series 2010(A) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

     f.     **Class 2C – Secured GO Series 2012(A)(2) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A)(2) Claims shall be deemed Allowed in the aggregate amount of $39,254,171 and (ii) each Holder of an Allowed Secured GO Series 2012(A)(2) Claim shall have its Allowed Secured GO Series 2012(A)(2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

     g.     **Class 2D – Secured GO Series 2012(A2-B) Claims.**

On the Effective Date, (i) the Secured GO Series 2012(A2-B) Claims shall be deemed Allowed in the aggregate amount of $54,055,927 and (ii) each Holder of an Allowed Secured GO Series 2012(A2-B) Claim

shall have its Allowed Secured GO Series 2012(A2-B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### h.    Class 2E - Secured GO Series 2012(B) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B) Claims shall be deemed Allowed in the aggregate amount of $6,469,135 and (ii) each Holder of an Allowed Secured GO Series 2012(B) Claim shall have its Allowed Secured GO Series 2012(B) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### i.    Class 2F – Secured GO Series 2012(B2) Claims.

On the Effective Date, (i) the Secured GO Series 2012(B2) Claims shall be deemed Allowed in the aggregate amount of $31,037,724 and (ii) each Holder of an Allowed Secured GO Series 2012(B2) Claim shall have its Allowed Secured GO Series 2012(B2) Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### j.    Class 3 – Other Secured Claims.

On the Effective Date, each Holder of an Allowed Other Secured Claim shall have its Allowed Other Secured Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### k.    Class 4 – HUD Installment Note Claims.

On the Effective Date, (i) the HUD Installment Note Claims shall be deemed Allowed in the aggregate amount of $90,075,004 and (ii) each Holder of a HUD Installment Note Claim shall have its Allowed HUD Installment Note Claim Reinstated, unless such Holder agrees to a different treatment of such Claim.

### l.    Class 5 – COP Swap Claims.

#### i.    Allowance.

The COP Swap Claims shall be deemed Allowed as Secured Claims, which, solely for purposes of distributions from the City, will be equal to the Distribution Amount.

#### ii.    Treatment.

Each Holder of an Allowed COP Swap Claim, in full satisfaction of such Allowed Claim, shall receive, either:  (A) within thirty days following the Effective Date, the Net Amount in full in cash, provided that until paid in cash in full, such Secured Claims will remain secured by the Pledged Property; or (B) solely in the case of a Liquidity Event, the Net Amount in cash in full within 180 days following the Effective Date, provided that (1) other than with respect to net proceeds used to repay the Postpetition Financing Agreement, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (a) supported by the full faith and credit of the City or (b) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under the COP Swap Settlement and the COP Swap Settlement Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, such Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the rate applicable to obligations under the Postpetition Financing Agreement plus 1.5% with the interest obligation likewise being secured by the Pledged Property and (5) the COP Swap Counterparties will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them.

13-53846-tjt    Doc 10191-12   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 137 of 314
13-53846-tjt    Doc 12175-5   Filed 09/21/15   Entered 09/21/15 18:08:32   Page 137 of 205  1445
of 314

m.    **Class 6.**

[Claims previously classified in Class 6 paid in full – Paragraph intentionally left blank]

n.    **Class 7 – Limited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Limited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $163,544,770.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, (A) each Holder of an Allowed Limited Tax General Obligation Bond Claim that is not attributable to the Insured LTGO Bonds and (B) the LTGO Insurer with respect to those Allowed Limited Tax General Obligation Bond Claims attributable to the Insured LTGO Bonds, in full satisfaction of such Allowed Claim(s), shall receive, on or as soon as reasonably practicable after the Effective Date, (X) a Pro Rata share of, at the City's option, (1) $55,000,000 in Cash or (2) the New LTGO Bonds and (Y) distributions in accordance with Section II.B.3.p.i.A.

The City will use its best efforts to prepay the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter from the proceeds of the Exit Facility.  If the City cannot prepay all of the New LTGO Bonds on the Effective Date or as soon as reasonably practicable thereafter, the City will use its best efforts to prepay as much of the New LTGO Bonds as reasonably possible, and the LTGO Settlement Parties will accept such partial prepayment.  Upon a partial prepayment of the New LTGO Bonds, such New LTGO Bonds will be redeemed by lot.

iii.    **Impact of UTGO Settlement.**

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed Limited Tax General Obligation Bond Claims to recover more on a percentage basis on account of such Allowed Limited Tax General Obligation Bond Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

o.    **Class 8 – Unlimited Tax General Obligation Bond Claims.**

i.    **Allowance.**

On the Effective Date, the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000.

ii.    **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Unlimited Tax General Obligation Bond Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of Restructured UTGO Bonds as set forth in Schedules 1a and 1b to the UTGO Settlement Agreement.  Those Holders identified on Schedule 1a of the UTGO Settlement Agreement shall retain ownership of the Stub UTGO Bonds, subject to Sections I.A.36 and IV.C, which Stub UTGO Bonds shall be reinstated.

13-53846-tjt   Doc 8045-2   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 138 of 314

p.      **Class 9 – COP Claims.**

   i.      **Treatment.**

      A.      **Plan COP Settlement Option.**

On the Effective Date, the City shall deliver to the COP Trustee, solely for the benefit of, and for distribution to, the COP Insurers and the Settling COPs Claimants in accordance with (1) the Supplemental Trust Agreements and (2) the instructions of the applicable COP Insurer, (x) the Class 9 Settlement Asset Pool and (y) New B Notes in the face amount of $97,692,787, based upon each Settling COP Claimant's Pro Rata share calculated as an amount equal to the proportion that the unpaid principal amount plus accrued prepetition interest of COPs held by such Settling COP Claimant bears to the aggregate unpaid principal amount of all COPs plus all accrued prepetition interest thereon; provided, that the allocation of distributions among FGIC and the FGIC COP Holders shall be determined in accordance with agreements among FGIC and the FGIC COP Holders disclosed in a term sheet filed in court on October 22, 2014, as the same may be subsequently amended and more fully documented. For the avoidance of doubt, a Settling COP Claimant shall not be required to transfer (1) any claim against a COP Insurer or (2) the COPs it holds to the City pursuant to the Plan COP Settlement or otherwise pursuant to the Plan, the Syncora Settlement Documents or the FGIC/COP Settlement Documents. The COP Service Corporations shall enter into such Supplemental Trust Agreements as FGIC and Syncora may reasonably request with respect to their respective insured COPs as long as such Supplemental Trust Agreements do not impose any additional obligations or liability on the COP Service Corporations.

The City has granted the LTGO Settlement Parties, on behalf of the holders of Allowed Limited Tax General Obligation Bond Claims in Class 7, and the Retiree Committee consent rights regarding pre-Effective Date settlements of the COP Litigation if and as permitted under applicable non-bankruptcy law. The LTGO Settlement Parties have consented to the Syncora Settlement and FGIC/COP Settlement. On the Effective Date, on account of such consent rights, the Excess New B Notes shall be distributed as follows: (1) approximately $42.68 million to the Detroit General VEBA and the Detroit Police and Fire VEBA in proportion with the New B Notes allocated to each pursuant to Sections II.B.3.s.ii.A and II.B.3.s.ii.B; (2) approximately $17.34 million to be distributed Pro Rata among holders of Allowed Limited Tax General Obligation Bond Claims in Class 7; and (3) approximately $4.12 million to be distributed Pro Rata among holders of Allowed Other Unsecured Claims in Class 14. With respect to the distribution of the Syncora Excess New B Notes, on April 1, 2015, the City shall pay the interest then due on the Syncora Excess New B Notes and shall also prepay the October 1, 2015 interest payment on the Syncora Excess New B Notes (as a consequence of which, no interest payment shall be made on the Syncora Excess New B Notes on October 1, 2015). The VEBAs may not sell or otherwise transfer their right, title or interest in the Syncora Excess New B Notes prior to October 2, 2015.

As part of the Plan COP Settlement, on or as soon as reasonably practicable after the Effective Date, Syncora shall cause to be paid $500,126.94 in cash to the COP Agent on account of COP Agent Fees. As part of the Plan COP Settlement, FGIC shall cause to be paid to the COP Agent 75.945% of the reasonable COP Agent Fees in cash out of the first proceeds of the distributions to or for the benefit of the FGIC COP Holders.

Nothing in this Section II.B.3.p.i.A shall, or shall be asserted or construed to, affect or prejudice any rights, claims or defenses between the COP Swap Counterparties on the one hand and any Settling COP Claimant (including Syncora, FGIC and the FGIC COP Holders) on the other hand.

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each Settling COP Claimant shall, to the fullest extent permitted under law, be deemed to forever release, waive and discharge all Liabilities relating to COP Documents such Settling COP Claimant has, had or may have against the (1) GRS, (2) PFRS or (3) Related Entities of either GRS or PFRS. At the direction of FGIC, which shall be deemed given on the Effective Date, the COP Contract Administrator shall have irrevocably agreed (on behalf of itself, any successors and each FGIC COP Holder) to release and not to sue any COP Holder or any COP Insurer on behalf of any FGIC COP Holder, COP Insurer, the Detroit Retirement Systems Funding Trust 2005 or the Detroit Retirement

-37-

Systems Funding Trust 2006 in connection with any liability arising in connection with or related to (1) Sections 6.5 and 9.1 of the Contract Administration Agreements, (2) Section 8.03 of the COP Service Contracts, (3) distributions made pursuant to or in connection with this Section II.B.3.p.i.A, (4) the FGIC Settlement or (5) the Syncora Settlement. On the Effective Date, Syncora and FGIC shall, to the fullest extent permitted under law, be deemed to forever mutually release, waive and discharge all liabilities against each other relating to distributions made pursuant to or in connection with this Section II.B.3.p.i.A, Sections 6.5 and 9.1 of the Contract Administration Agreements or Section 8.03 of the COP Service Contracts.

### ii. Impact of UTGO Settlement.

Pursuant to the UTGO Settlement Agreement, the City has agreed that (a) the Plan shall not permit the Holders of Allowed COP Claims to recover more on a percentage basis on account of such Allowed COP Claims than the Holders of Allowed Unlimited Tax General Obligation Bond Claims recover on a percentage basis on account of such Allowed Unlimited Tax General Obligation Bond Claims, as such percentage recoveries are projected on the terms set forth in the UTGO Settlement Agreement at Confirmation; and (b) if a Trigger Event occurs, the Settling UTGO Bond Insurers shall receive Top-Off Payments (as set forth in Section IV.C).

### q. Class 10 – PFRS Pension Claims.

#### i. Allowance.

The PFRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,250,000,000.

#### ii. Treatment.

##### A. Contributions to PFRS.

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior PFRS Pension Plan only in the amounts identified on Exhibit II.B.3.q.ii.A. The exclusive source for such contributions shall be certain DIA Proceeds and a portion of the State Contribution. After June 30, 2023, (1) PFRS will receive certain additional DIA Proceeds and (2) the City will contribute sufficient funds required to pay each Holder of a PFRS Pension Claim his or her PFRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior PFRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of PFRS if such party chooses to do so.

##### B. Investment Return Assumption.

During the period that ends on June 30, 2023, the trustees of the PFRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the PFRS that shall be 6.75%.

##### C. Modification of Benefits for PFRS Participants.

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a PFRS Pension Claim shall be equal to the PFRS Adjusted Pension Amount for such Holder, provided that such PFRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any PFRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.q.ii.C. For purposes of calculating a PFRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.q.ii.A or any State contributions if the PFRS trustees fail to comply with the requirements described in

the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

### D. Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### E. Accrual of Future Benefits.

Each Holder of a PFRS Pension Claim who is an Active Employee shall receive, in addition to his or her PFRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014 consistent with the terms and conditions of the New PFRS Active Pension Plan Formula and the New PFRS Active Pension Plan.

### F. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established under PFRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date. The initial independent members of the Investment Committee established by PFRS shall be (1) Woodrow S. Tyler, (2) McCullough Williams III, (3) Robert C. Smith, (4) Joseph Bogdahn and (5) Rebecca Sorenson.

### G. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the PFRS or to comply with the terms of the Plan, the City, the trustees of the PFRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the PFRS, or any successor plan or trust, that govern the calculation of pension benefits (including the PFRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior PFRS Pension Plan, the PFRS Restoration Payment, the New PFRS Active Pension Plan Formula and the terms of the New PFRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.q.ii.B, the contribution to the PFRS or the calculation or amount of PFRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### H. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### r. Class 11 – GRS Pension Claims.

#### i. Allowance.

The GRS Pension Claims shall be allowed in an aggregate amount equal to the sum of approximately $1,879,000,000.

ii.     **Treatment.**

A.     **Contributions to GRS.**

During the Fiscal Years from the Effective Date through Fiscal Year 2023, annual contributions shall be made to fund benefits accrued under the Prior GRS Pension Plan only in the amounts identified on Exhibit II.B.3.r.ii.A. The exclusive sources for such contributions shall be certain pension related, administrative and restructuring payments received from the DWSD equal to approximately $428.5 million, a portion of the State Contribution, certain DIA Proceeds, a portion of the Assigned UTGO Bond Tax Proceeds and certain revenues from City departments, the Detroit Public Library and the Detroit Regional Convention Facility Authority. After June 30, 2023, (1) certain DIA Proceeds shall be contributed to the GRS and (2) the City will contribute such additional funds as are necessary to pay each Holder of a GRS Pension Claim his or her GRS Adjusted Pension Amount in accordance with and as modified by the terms and conditions contained in the Plan and the Prior GRS Pension Plan, in accordance with the State Contribution Agreement and exhibits thereto. Nothing in this Plan prevents any non-City third party from making additional contributions to or for the benefit of GRS if such party chooses to do so.

B.     **Investment Return Assumption.**

During the period that ends on June 30, 2023, the board of trustees of the GRS, or the trustees of any successor trust or pension plan, shall adopt and maintain an investment return assumption and discount rate for purposes of determining the assets and liabilities of the GRS that shall be 6.75%.

C.     **Modification of Benefits for GRS Participants.**

During the period that ends no earlier than June 30, 2023, the pension benefits payable to each Holder of a GRS Pension Claim shall be equal to the GRS Adjusted Pension Amount for such Holder, provided that such GRS Adjusted Pension Amount shall be (1) automatically reduced by the DIA Proceeds Default Amount in the event of a DIA Proceeds Payment Default and (2) increased by any GRS Restoration Payment.

Restoration of all or a portion of the modified pension benefits will be provided in accordance with the methodology set forth on Exhibit II.B.3.r.ii.C. For purposes of calculating a GRS Restoration Payment, market value of assets shall not include any City contributions through June 30, 2023, other than those listed on Exhibit II.B.3.r.ii.A or any State contributions if the GRS trustees fail to comply with the requirements described in the State Contribution Agreement. In the event that the Foundations and DIA Corp. accelerate all or a portion of their funding commitments described in Section IV.E.1 prior to June 30, 2023, the incremental portion of the acceleration will not count towards pension restoration.

D.     **Annuity Savings Fund Recoupment.**

1.     **ASF Current Participants.**

On or as soon as reasonably practicable after the Effective Date, the Annuity Savings Fund Excess Amount will be calculated for each ASF Current Participant and will be deducted from such participant's Annuity Savings Fund account and be used to fund the accrued pension benefits of all GRS participants; provided, however, that in no event shall the amount deducted from an ASF Current Participant's Annuity Savings Fund account exceed the ASF Recoupment Cap. In the event that the amount credited to an ASF Current Participant's Annuity Savings Fund account as of the Effective Date is less than such participant's Annuity Savings Fund Excess Amount, the ASF Current Participant will be treated as an ASF Distribution Recipient to the extent of the shortfall.

-40-

## 2.    ASF Distribution Recipients.

### i.    Monthly Deduction.

For each ASF Distribution Recipient who does not elect the ASF Recoupment Cash Option described in Section II.B.3.r.ii.D.2.ii and in the case of any ASF Distribution Recipient that elected the ASF Recoupment Cash Option but does not timely deliver the ASF Recoupment Cash Payment to the GRS, the Annuity Savings Fund Excess Amount will: (A) be calculated and converted into monthly annuity amounts based on common actuarial assumptions (such as the ASF Distribution Recipient's life expectancy, and, if not already retired, expected date of retirement) and amortized using a 6.75% interest rate; and (B) then be deducted from the ASF Distribution Recipient's monthly pension check; provided, however, that in no event shall the total amount deducted from an ASF Distribution Recipient's monthly pension check exceed the ASF Recoupment Cap or the Current GRS Retiree Adjustment Cap, if applicable. The total ASF Recoupment from the ASF Distribution Recipient's monthly pension checks over time shall not exceed the amount necessary to amortize the applicable Annuity Savings Fund Excess Amount at 6.75% interest.

### ii.    Single Lump Sum Payment.

Each ASF Distribution Recipient shall be afforded the ASF Recoupment Cash Option.

No later than seven days following the Effective Date, the City, through its Claims and Balloting Agent, shall send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Form shall explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (A) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (B) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.

An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date.

GRS shall mail the ASF Final Cash Payment Notice no later than 14 days after the ASF  Election Date.  ASF Distribution Recipients shall have until the ASF Final Cash Payment Date to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check.  If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i.  The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

### E.    Contingent Payment Rights.

The City will issue the DWSD CVR to the Restoration Trust for the benefit of Holders of Pension Claims, as described in Section IV.F.

### F.    Accrual of Future Benefits.

Each Holder of a GRS Pension Claim who is an Active Employee shall receive, in addition to his or her GRS Adjusted Pension Amount, as such amount may be modified herein, such additional pension benefit for service on or after July 1, 2014, consistent with the terms and conditions of the New GRS Active Pension Plan Formula and the New GRS Active Pension Plan.

### G. Governance.

On or as soon as reasonably practicable after the Effective Date, an Investment Committee shall be established by GRS in accordance with the State Contribution Agreement. The Investment Committee shall be vested with the authority and responsibilities set forth in the State Contribution Agreement for a period of 20 years following the Effective Date. The initial independent members of the Investment Committee established by GRS shall be (1) Kerrie VandenBosch, (2) Doris Ewing, (3) Robert Rietz, (4) David Sowerby and (5) Ken Whipple.

### H. No Changes in Terms for Ten Years.

**Except as may be required to maintain the tax-qualified status of the GRS or to comply with the terms of the Plan, the City, the trustees of the GRS and all other persons or entities shall be enjoined from and against the subsequent amendment of the terms, conditions and rules of operation of the GRS, or any successor plan or trust, that govern the calculation of pension benefits (including the GRS Adjusted Pension Amount, accrual of additional benefits, the DIA Proceeds Default Amount, the Prior GRS Pension Plan, the GRS Restoration Payment, the New GRS Active Pension Plan Formula and the terms of the New GRS Active Pension Plan) or against any action that governs the selection of the investment return assumption described in Section II.B.3.r.ii.B, the contribution to the GRS, or the calculation or amount of GRS pension benefits for the period ending June 30, 2023, notwithstanding whether that subsequent amendment or act is created or undertaken by contract, agreement (including collective bargaining agreement), statute, rule, regulation, ordinance, charter, resolution or otherwise by operation of law.**

### I. State Contribution Agreement.

The State Contribution Agreement, the effectiveness of which is contingent upon the acceptance of the Plan by Classes 10 and 11, shall include the following principal terms: (1) the State, or the State's authorized agent, will distribute the State Contribution for the benefit of Holders of Pension Claims; and (2) the Plan shall provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

### s. Class 12 – OPEB Claims.

#### i. Allowance.

As a result of a settlement between the City and the Retiree Committee, the OPEB Claims shall be allowed in an aggregate amount equal to $4,303,000,000.

#### ii. Treatment.

##### A. Detroit General VEBA.

Establishment of Detroit General VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit General VEBA to provide health benefits to Detroit General VEBA Beneficiaries and certain of their dependents. The Detroit General VEBA will be governed by a seven member board of trustees that will be responsible for, among other things, management of property held by the Detroit General VEBA, administration of the Detroit General VEBA and determination of the level of and distribution of benefits to Detroit General VEBA Beneficiaries. The Detroit General VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.108. With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the DRCEA and the Retiree Committee will each appoint three board members. The DRCEA will fill board member vacancies created by the departure of members initially appointed by the Retiree Committee or the DRCEA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor. The initial members of the Detroit General VEBA board of trustees shall be (1) Floyd Allen, (2) Roger Cheek, (3) Suzanne Daniels Paranjpe, (4) Doris Ewing,

(5) Barbara Wise-Johnson, (6) Shirley Lightsey and (7) Thomas Sheehan. Nothing in the Plan precludes either the Detroit General VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit General VEBA: On the Effective Date, the City shall distribute to the Detroit General VEBA New B Notes in the aggregate principal amount of $218,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit General VEBA Beneficiaries. The Detroit General VEBA shall also be entitled to additional distributions as set forth in Section II.B.3.p.i.A.

### B. Detroit Police and Fire VEBA.

Establishment of Detroit Police and Fire VEBA: On or as soon as practicable following the Effective Date, the City will establish the Detroit Police and Fire VEBA to provide health benefits to Detroit Police and Fire VEBA Beneficiaries and certain of their dependents. The Detroit Police and Fire VEBA will be governed by a seven member board of trustees and, for the first four years, one additional non-voting, ex-officio member. The board of trustees will be responsible for, among other things, management of property held by the Detroit Police and Fire VEBA, administration of the Detroit Police and Fire VEBA and determination of the level of and distribution of benefits to Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA Trust Agreement and related plan documentation will be substantially in the form set forth on Exhibit I.A.112. With respect to the initial appointment of the board of trustees, the Mayor will appoint one member, and the RDPFFA and the Retiree Committee will each appoint three board members. The RDPMA will appoint the non-voting, ex-officio member. The RDPFFA will fill board member vacancies created by the departure of voting members initially appointed by the Retiree Committee or the RDPFFA, and the Mayor will fill a board member vacancy created by the departure of the member appointed by the Mayor. The RDPMA will fill a non-voting, ex-officio board member vacancy created by the departure of the member initially appointed by the RDPMA, but such non-voting, ex-officio member position shall expire on December 31, 2018. The initial members of the Detroit Police and Fire VEBA board of trustees shall be (1) Floyd Allen, (2) Gregory Best, (3) John Clark, (4) Andrew Dillon, (5) Allan Grant, (6) Thomas Sheehan, (7) Greg Trozak and (8) Shirley Berger (*ex officio*). Nothing in the Plan precludes either the Detroit Police and Fire VEBA from being formed under Section 115 or the formation of a separate trust under Section 115, in each case with the City's consent, which consent will not be unreasonably withheld.

Distributions to Detroit Police and Fire VEBA: On the Effective Date, the City shall distribute to the Detroit Police and Fire VEBA New B Notes in the aggregate principal amount of $232,000,000, in satisfaction of the Allowed OPEB Claims held by Detroit Police and Fire VEBA Beneficiaries. The Detroit Police and Fire VEBA shall also be entitled to additional distributions as set forth in Section II.B.3.p.i.A.

### C. No Further Responsibility.

From and after the Effective Date, the City shall have no further responsibility to provide retiree healthcare or any other retiree welfare benefits. The City shall have no responsibility from and after the Effective Date to provide life insurance or death benefits to former employees. On the Effective Date, the Employees Death Benefit Plan will be frozen for former employees, and the City will no longer have an obligation to contribute to fund death benefits under the plan for any participant or beneficiary who is a former employee. Existing retirees who participate in the plan will be granted a one-time opportunity to receive a lump sum distribution of the present value of their actuarially determined death benefit to the extent of the plan funding. For the avoidance of doubt, the Employees Death Benefit Plan shall not be merged into or operated by either the Detroit General VEBA or the Detroit Police and Fire VEBA. The Employees Death Benefit Board of Trustees shall continue to manage the Employees Death Benefit Plan and employ the staff of the Retirement Systems to administer the disbursement of benefits thereunder, the costs of which administration shall be borne by the assets of the Employees Death Benefit Plan.

Retirees (and active employees that retire prior to December 31, 2014) of the Detroit Public Library and the Detroit Regional Convention Facility Authority are Detroit General VEBA Beneficiaries and will receive the treatment set forth above. However, the collective bargaining and other legal rights and obligations of the Detroit Public Library and the Detroit Regional Convention Facility Authority, on one hand, and their respective unions and former and current employees, on the other hand, are not affected by the Plan. These parties retain the

-43-

right to negotiate further or additional benefits; provided, however, that the City shall not be responsible for, or have any obligation with respect to, any such further or additional benefits or the administration thereof. In addition, in consideration of the eligible retirees of the Detroit Public Library and the Detroit Regional Convention Facility Authority participating in the Detroit General VEBA, the Detroit Public Library and the Detroit Regional Convention Facility Authority shall reimburse the City for their allocable share of the New B Note debt service related to the Detroit General VEBA.

      t.      **Class 13 – Downtown Development Authority Claims.**

      i.      **Allowance.**

On the Effective Date, the Downtown Development Authority Claims shall be deemed Allowed in the amount of $33,600,000.

      ii.      **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Downtown Development Authority Claim, in full satisfaction of such Allowed Claim, shall receive, on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of approximately $3.69 million in New B Notes.

      u.      **Class 14 – Other Unsecured Claims.**

      i.      **Treatment.**

Unless such Holder agrees to a different treatment of such Claim, each Holder of an Allowed Other Unsecured Claim, in full satisfaction of such Allowed Claim, shall receive (A) on or as soon as reasonably practicable after the Effective Date, a Pro Rata share of approximately $16.48 million in New B Notes and (B) distributions in accordance with Section II.B.3.p.i.A.

      v.      **Class 15 – Convenience Claims.**

      i.      **Treatment.**

Each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Claim, shall receive Cash equal to the amount of 25% of such Allowed Claim (as reduced, if applicable, pursuant to an election by such Holder in accordance with Section I.A.76) on or as soon as reasonably practicable after the Effective Date, unless such Holder agrees to a different treatment of such Claim.

      w.      **Class 16 – Subordinated Claims.**

      i.      **Treatment.**

On the Effective Date, all Subordinated Claims shall be disallowed, extinguished and discharged without Distribution under the Plan, and Holders of Subordinated Claims shall not receive or retain any property on account of such Claims. Pursuant to section 1126(g) of the Bankruptcy Code, Class 16 is deemed to have rejected the Plan and Holders of Subordinated Claims are not entitled to cast a Ballot in respect of such Claims.

      x.      **Class 17 – Indirect 36th District Court Claims.**

      i.      **Treatment.**

Unless such Holder agrees to a different treatment of its Claim, each Holder of an Allowed Indirect 36th District Court Claim, in full satisfaction of such Allowed Claim, shall receive: (A) if the Allowed amount of such Indirect 36th District Court Claim is less than $100,000.00, on or as soon as reasonably practicable after the Effective Date, Cash in an amount equal to 33% of the Allowed amount of such Allowed Indirect 36th

District Court Claim; or (B) if the Allowed amount of such Indirect 36th District Court Claim is equal to or more than $100,000.00, Cash equal to 33% of the Allowed amount of such Indirect 36th District Court Claim, plus simple interest on outstanding amounts at a rate of five percent per annum, payable in five equal annual installments, with the first installment to be paid on or as soon as reasonably practicable after the Effective Date and the remaining four installments to be paid on the date of the first four anniversaries of the Effective Date or, if any such date is not a Business Day, on the first Business Day thereafter.

### ii. Further Obligation of City, State and 36th District Court.

Subject to the terms of the 36th District Court Settlement, the treatment of Allowed Indirect 36th District Court Claims set forth in Section II.B.3.x.i shall fulfill any obligation of the City and the 36th District Court that may exist with respect to all Indirect 36th District Court Claims. Nothing in Section II.B.3.x.i prevents the Holder of an Indirect 36th District Court Claim from seeking further relief or payment from the State with respect to such Indirect 36th District Court Claim to the extent such Claim is not satisfied pursuant to the Plan.

## C. Confirmation Without Acceptance by All Impaired Classes.

The City requests Confirmation under section 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Plan shall constitute a motion for such relief.

## D. Treatment of Executory Contracts and Unexpired Leases.

### 1. Assumption.

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or entered into in a Final Order of the Bankruptcy Court, or as requested in any motion Filed by the City on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City will be deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged. For the avoidance of doubt, the City shall assume the Tunnel Lease pursuant to this Section II.D.1.

### 2. Assumption of Ancillary Agreements.

Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 or designated for rejection in accordance with Section II.D.3.

### 3. Approval of Assumptions and Assignments.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 (and any related assignment) as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 or (e) are designated for rejection in accordance with the last sentence of this paragraph. An order of the Bankruptcy Court (which may be the Confirmation Order) entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to

the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

4.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases.**

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

5.      **Contracts and Leases Entered Into After the Petition Date.**

Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

6.      **Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 shall be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The City reserves its right, at any time on or prior to the Effective Date, to amend Exhibit II.D.6 to delete any Executory Contract or Unexpired Lease therefrom, thus providing for its assumption pursuant to Section II.D.1, or add any Executory Contract or Unexpired Lease thereto, thus providing for its rejection pursuant to this Section II.D.6. The City will provide notice of any amendments to Exhibit II.D.6 to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Chapter 9 Case. Listing a contract or lease on Exhibit II.D.6 shall not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

7.      **Rejection Damages Bar Date.**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.

8.     **Preexisting Obligations to the City Under
Rejected Executory Contracts and Unexpired Leases.**

Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

9.     **Insurance Policies.**

From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date shall be reinstated and continue in full force and effect in accordance with its terms and, to the extent applicable, shall be deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1. Nothing contained herein shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in this Section II.D.9 shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

**ARTICLE III
CONFIRMATION OF THE PLAN**

A.     **Conditions Precedent to the Effective Date.**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the City has determined that all of following conditions have been satisfied or waived in accordance with Section III.B:

1.     The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the City.

2.     The Bankruptcy Court shall have entered an order (which may be included in the Confirmation Order) approving and authorizing the City to take all actions necessary or appropriate to implement the Plan, including the transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, settlements, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.     The Confirmation Order shall not be stayed in any respect.

4.     The Confirmation Order shall contain (a) a finding that the FGIC Settlement Consideration and the FGIC Development Agreement are solely for the benefit of FGIC and the FGIC COP Holders (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to FGIC and the FGIC COP Holders in a manner consistent therewith and with the Plan.

5.     The Confirmation Order shall contain (a) a finding that the Syncora Development Agreement is solely for the benefit of Syncora (subject to any provision set forth herein for payment of COP Agent Fees), and (b) an ordered provision that such consideration be administered and distributed to Syncora in a manner consistent therewith and with the Plan.

6.     All actions and all contracts, instruments, settlements, releases and other agreements or documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the City.

-47-

7.     All authorizations, consents and regulatory approvals, if any, required in connection with the consummation of the Plan have been obtained and not revoked, including all governmental and Emergency Manager consents and approvals required to carry out the terms of the LTGO Settlement Agreement.

8.     Any legislation that must be passed by the State legislature to effect any term of the Plan shall have been enacted.

9.     The MFA board shall have approved the issuance of the Restructured UTGO Bonds and the Restructured UTGO Bonds shall have been issued.

10.    The City shall have obtained all governmental and Emergency Manager consents and approvals required to carry out the terms of the UTGO Settlement Agreement.

11.    The Plan and all Exhibits shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section VIII.B.

12.    If Classes 10 and 11 have accepted the Plan, all conditions to the effectiveness of the State Contribution Agreement and the DIA Settlement Documents have been satisfied.

13.    The Syncora Settlement and the Syncora Settlement Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

14.    The Syncora Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and Syncora, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

15.    The FGIC/COP Settlement Documents and the FGIC Development Agreement shall have been approved by the Bankruptcy Court in form and substance reasonably acceptable to the City and FGIC, and such approval shall not have been vacated or otherwise modified, and the definitive documents contemplated thereby shall have been executed and delivered.

16.    The New York State Department of Financial Services shall have waived in writing the notice requirement under FGIC's plan of rehabilitation with respect to the settlement contemplated by the FGIC/COP Settlement Documents and the FGIC Development Agreement in form and substance reasonably acceptable to FGIC, and such waiver shall not have been vacated or otherwise modified.

17.    The Effective Date shall have occurred within 180 days of the entry of the Confirmation Order, unless the City requests an extension of such deadline and such deadline is extended by the Bankruptcy Court.

**B.     Waiver of Conditions to the Effective Date.**

The conditions to the Effective Date set forth in Section III.A may be waived in whole or part at any time by the City in its sole and absolute discretion, except for those conditions set forth in (1) Section III.A.9 and Section III.A.10, which conditions cannot be waived, (2) Sections III.A.5, III.A.13 and III.A.14, which may only be waived by the City with the prior written consent of Syncora, (3) Sections III.A.4 and III.A.15, which may only be waived by the City with the prior written consent of FGIC and (4) Section III.A.16, which may be waived by the City at any time on or after November 4, 2014 at 5:00 p.m. (Eastern Time) with the prior written consent of FGIC.

## C. Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied, or duly waived in accordance with Section III.B, then, before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the City may File a motion requesting that the Bankruptcy Court vacate the Confirmation Order; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section III.C:  (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims pursuant to section 944(b) of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.D and (c) the releases described in Section III.D.7; and (2) nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, will be or will be deemed to be (a) a waiver or release of any Claims by or against the City, (b) an admission of any sort by the City or any other party in interest or (c) prejudicial in any manner the rights of the City or any other party in interest.

## D. Effect of Confirmation of the Plan.

### 1. Dissolution of Retiree Committee.

On the Effective Date, the Retiree Committee, to the extent not previously dissolved or disbanded, will dissolve and disband, and the members of the Retiree Committee and their respective professionals will cease to have any role arising from or related to the Chapter 9 Case.

### 2. Preservation of Rights of Action by the City.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the City will retain and may enforce any claims, demands, rights, defenses and Causes of Action that it may hold against any Entity, including but not limited to any and all Causes of Action against any party relating to the past practices of the Retirement Systems (including any investment decisions related to, and the management of, the Retirement Systems' respective pension plans or assets), to the extent not expressly released under the Plan or pursuant to any Final Order of the Bankruptcy Court.  A nonexclusive schedule of currently pending actions and claims brought by the City is attached as Exhibit III.D.2.  The City's inclusion of, or failure to include, any right of action or claim on Exhibit III.D.2 shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that the City may hold against any Entity, and all Entities are hereby notified that the City intends to preserve all such claims, demands, rights or Causes of Action.

### 3. Comprehensive Settlement of Claims and Controversies.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are (a) in the best interests of the City, its property and Claim Holders and (b) fair, equitable and reasonable.  For the avoidance of doubt, this Section III.D.3 shall not affect or limit the application of section 509 of the Bankruptcy Code or any similar doctrine to Bond Insurance Policy Claims.

4.      **Discharge of Claims.**

a.      **Complete Satisfaction, Discharge and Release.**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan.

b.      **Discharge.**

In accordance with Section III.D.4.a, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge will void any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; <u>provided</u> that such discharge will not apply to (i) debts specifically exempted from discharge under the Plan; and (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case.

5.      **Injunction.**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

a.      **all Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims, along with their Related Entities, shall be permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):**

1.      **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims);**

2.      **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property;**

3.      **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the City or its property;**

4.      **asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property;**

5.      **proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and**

6. taking any actions to interfere with the implementation or consummation of the Plan.

b. All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan will be permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in Section III.D.5.a, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

6. **Exculpation.**

From and after the Effective Date, to the fullest extent permitted under applicable law and except as expressly set forth in this Section, neither the City, its Related Entities (including the members of the City Council, the Mayor and the Emergency Manager), to the extent a claim arises from actions taken by such Related Entity in its capacity as a Related Entity of the City, the State, the State Related Entities, the Exculpated Parties nor the Released Parties shall have or incur any liability to any person or Entity for any act or omission in connection with, relating to or arising out of the City's restructuring efforts and the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the formulation, preparation, negotiation, dissemination, consummation, implementation, confirmation or approval (as applicable) of the Plan, the property to be distributed under the Plan, the settlements implemented under the Plan, the Exhibits, the Disclosure Statement, any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan or the management or operation of the City; provided that the foregoing provisions shall apply to (a) the LTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the LTGO Settlement Agreement or the Plan (as it relates to the LTGO Settlement Agreement), (b) the UTGO Exculpated Parties solely in connection with acts or omissions taken in connection with the UTGO Settlement Agreement or the Plan (as it relates to the UTGO Settlement Agreement), (c) the DWSD Exculpated Parties solely in connection with acts or omissions taken in connection with the DWSD Tender, DWSD Tender Motion or DWSD Tender Order, (d) the Syncora Exculpated Parties solely in connection with acts or omissions taken in connection with the Syncora Settlement Documents and any actions or litigation positions taken by the Syncora Exculpated Parties in the Chapter 9 Case, (e) the FGIC/COP Exculpated Parties solely in connection with acts or omissions taken in connection with the FGIC/COP Settlement Documents and any actions or litigation positions taken by the FGIC/COP Exculpated Parties in the Chapter 9 Case, (f) the RDPMA Exculpated Parties and (g) the COP Agent, solely in its capacity as such and solely in connection with any Distributions made pursuant to the terms of the Plan; provided, further, that the foregoing provisions in this Section III.D.6 shall not affect the liability of the City, its Related Entities, the State, the State Related Entities, the Released Parties and the Exculpated Parties that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct or any act or omission occurring before the Petition Date. The City, its Related Entities (with respect to actions taken by such Related Entities in their capacities as Related Entities of the City), the State, the State Related Entities, the Released Parties and the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities under, or in connection with, the Chapter 9 Case, the administration thereof and the Plan. This Section III.D.6 shall not affect any liability of (a) any of the COP Swap Exculpated Parties to the Syncora Exculpated Parties or FGIC or (b) the Syncora Exculpated Parties or FGIC/COP Exculpated Parties to any of the COP Swap Exculpated Parties.

7.     **Releases.**

Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement):

a.     each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i.     all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii.     all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities shall be released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; and provided further, however, that if Classes 10 and 11 vote to accept the Plan, but any necessary conditions precedent to the receipt of the initial funding from the State (pursuant to the State Contribution Agreement) and the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing (pursuant to the DIA Settlement) that can be satisfied or waived by the applicable funding party prior to the Confirmation Hearing (including, but not limited to, adoption of relevant legislation and appropriations by the State and execution of necessary and irrevocable agreements for their funding commitments by each of the DIA Funding Parties that are such as of the commencement of the Confirmation Hearing, which conditions may not be waived) are not satisfied or waived by the applicable funding party prior to the Confirmation Hearing, then Holders of Claims in Classes 10 and 11 that voted to accept the Plan shall be deemed to have voted to reject the Plan, and the voluntary release set forth in the first sentence of this Section III.D.7.a shall not apply to Holders of Claims in Classes 10 and 11; provided, further, that nothing in this Section III.D.7.a shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties; and

-52-

b. if the State Contribution Agreement is consummated, each holder of a Pension Claim will be deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to this Section III.D.7 by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

**E.      No Diminution of State Power.**

No provision of this Plan shall be construed: (1) so as to limit or diminish the power of the State to control, by legislation or otherwise, the City in the exercise of the political or governmental powers of the City, including expenditures for such exercise; (2) so as to limit or diminish the power of the State to effect setoffs necessary to compensate the State or relieve the State of liability against funds (a) owing to the City from the State, (b) granted to the City by the State, or (c) administered by the State on behalf of the City or the federal government (including funds resulting from federal or state grants), for acts or omissions by the City (including but not limited to misappropriation or misuse of funds); and (3) as a waiver by the State of its rights as a sovereign or rights granted to it pursuant to the Tenth Amendment to the United States Constitution, or limit or diminish the State's exercise of such rights.

**F.      Effectiveness of the Plan.**

The Plan shall become effective on the Effective Date. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**G.      Binding Effect of Plan.**

Pursuant to section 944(a) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind all Holders of Claims, and their respective successors and assigns, whether or not the Claim of any such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan. The releases and settlements effected under the Plan will be operative, and subject to enforcement by the Bankruptcy Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the

-53-

compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to any collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (1) challenge such compromise and settlement prior to Confirmation of the Plan and (2) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing bankruptcy settlements under Bankruptcy Rule 9019 and other applicable law.

<div align="center">

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

</div>

A. **DWSD.**

1. **Rates and Revenues.**

DWSD will maintain Fiscal Year 2015 rate setting protocols for a minimum of five years, subject to certain changes necessary to stabilize water and sewer revenues. Rates will be determined by the Board of Water Commissioners or, if a DWSD Authority is formed and approved by the incorporating units' governing bodies, by the board of any such DWSD Authority. The City may seek to implement a rate stability program for City residents, which program may, among other things, (a) provide a source of funds to mitigate against rate increases, (b) enhance affordability and (c) provide a buffer against delinquent payments.

2. **DWSD CBAs.**

Collective bargaining agreements with respect to current DWSD employees that are in effect and not expired as of the Effective Date will be assumed by the City.

3. **Potential DWSD Authority Transaction.**

As a result of mediation or otherwise, it is possible that the City may enter into a DWSD Authority Transaction that includes the formation of the DWSD Authority to conduct many or all of the operations currently conducted by DWSD. Any such transaction would be subject to the approval of incorporating units and numerous other conditions. The timing of any such transaction, if it occurs at all, is not known. If any such transaction could occur, unless waived by the City in its sole discretion, the City will enter into such transaction only if Macomb County, Oakland County and Wayne County, and each of their municipal affiliates or related public corporations, withdraw with prejudice or shall have withdrawn with prejudice their objections to the Confirmation of the Plan. Any DWSD Authority Transaction shall be on terms that are consistent with all other provisions of the Plan, applicable law and orders of the Bankruptcy Court. The City shall not enter into any binding agreement with respect to or consummate any DWSD Authority Transaction prior to the Effective Date without first obtaining an order of the Bankruptcy Court approving and authorizing such DWSD Authority Transaction.

All terms and conditions in respect of any DWSD Authority Transaction set forth in (a) any DWSD Bond Document or (b) any transaction document in respect of such a DWSD Authority Transaction shall in any case include: (i) no material modifications to the source of payment and security for any DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (ii) an opinion of tax counsel that such transfer shall have no material adverse effect on the tax exempt status of the interest on the DWSD Bonds or 2014 Revenue and Revenue Refinancing Bonds; (iii) that the City could issue at least $1 of additional new money DWSD Bonds in compliance with the additional bonds test set forth in the applicable DWSD Bond Documents; and (iv) ratings confirmation of any rating agency then rating the DWSD Bonds and 2014 Revenue and Revenue Refinancing Bonds. A DWSD Authority Transaction shall not affect, impair, modify or otherwise alter the rights of any party under the DWSD Tender Order, the DWSD Bond Documents, the DWSD Revolving Bond Documents, the 2014 DWSD Refinancing Obligations, the 2014 Revenue and Revenue Refinancing Bonds or the 2014 Revenue Refinancing Bonds or any Bond Insurance Policy related to or issued in connection with any of the foregoing.

**B.      The New B Notes, New C Notes and New LTGO Bonds.**

On or before the Effective Date, the City shall (a) execute the New B Notes Documents, issue the New B Notes, substantially on the terms set forth on Exhibit I.A.246, and distribute the New B Notes as set forth in the Plan; (b) execute the New C Notes Documents, issue the New C Notes, substantially on the terms set forth on Exhibit I.A.248 (and in any case in form and substance reasonably acceptable to the City and Syncora), and distribute the New C Notes as set forth in the Plan; and (c) execute the New LTGO Bond Documents, issue the New LTGO Bonds, substantially on the terms set forth on Exhibit I.A.237, and distribute the New LTGO Bonds as set forth in the Plan.

**C.      The UTGO Settlement.**

On the Effective Date, the City and the Settling UTGO Bond Insurers shall consummate the UTGO Settlement Agreement, a copy of which is attached hereto as Exhibit I.A.360. The treatment of Unlimited Tax General Obligation Bond Claims under the Plan is provided for pursuant to the UTGO Settlement Agreement, which involves the settlement of, among other things, the UTGO Litigation and is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 9019. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the UTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

Pursuant to the UTGO Settlement Agreement, among other things: (1) the Unlimited Tax General Obligation Bond Claims shall be deemed Allowed in the amount of $388,000,000; (2) the City shall issue the Municipal Obligation to the MFA, which in turn will issue the Restructured UTGO Bonds; (3) Holders of Allowed Unlimited Tax General Obligation Bond Claims shall be entitled to receive their Pro Rata share of $279,618,950 of the Restructured UTGO Bonds as set forth in Schedule 1a of the UTGO Settlement Agreement; (4) the Settling UTGO Bond Insurers and the Non-Settling UTGO Bond Insurer shall be entitled to receive $7,941,840 of the Restructured UTGO Bonds as set forth in Schedule 1b to the UTGO Settlement Agreement; and (5) a designee or designees of the City shall have the right to receive the Assigned UTGO Bond Tax Proceeds, which Assigned UTGO Bond Tax Proceeds will be distributed over a 14-year period to the Income Stabilization Funds of GRS and PFRS for the payment of Income Stabilization Payments to Eligible Pensioners and to the Retirement Systems, in accordance with applicable agreements.

Each Settling UTGO Bond Insurer shall receive, as soon as reasonably practicable after the occurrence of a Trigger Event, its allocable share of the Top-Off Payments in accordance with the terms of the UTGO Settlement Agreement.

**D.      The State Contribution Agreement.**

Prior to or on the Effective Date, if Classes 10 and 11 vote to accept the Plan, the City, GRS, PFRS and the State will enter into the State Contribution Agreement, substantially on the terms set forth on Exhibit I.A.332.

**1.      State Contribution.**

The State or the State's authorized agent will contribute the net present value of $350 million payable over 20 years using a discount rate of 6.75% to GRS and PFRS for the benefit of the Holders of Pension Claims.

**2.      Income Stabilization Payments.**

The Income Stabilization Funds of GRS and PFRS will receive not less than an aggregate amount of $20 million over 14 years of the Assigned UTGO Bond Tax Proceeds in the form of annual installment payments pursuant to a payment schedule approved by the State. Following the Effective Date, on an annual basis, GRS and PFRS will distribute such portion of the funds held in their respective Income Stabilization Fund to Eligible Pensioners entitled to receive the Income Stabilization Benefit and the Income Stabilization Benefit Plus. The

-55-

Income Stabilization Benefit, which will be calculated in the first year following the Effective Date and will not increase thereafter, will be provided by the applicable Retirement System to each Eligible Pensioner.  In addition, to the extent that an Eligible Pensioner's estimated adjusted annual household income (as determined by the applicable Retirement System) in any calendar year after the first year of the income stabilization program is less than 105% of the Federal Poverty Level for such year, the applicable Retirement System will distribute the Income Stabilization Benefit Plus to such Eligible Pensioner.

In the event that, in 2022 (provided that the State has not issued a certificate of default under the State Contribution Agreement with respect to GRS or PFRS, as applicable, at any time prior to 2022), it is the opinion of at least 75% of the independent members of the Investment Committee of GRS or PFRS, as applicable, that the Income Stabilization Fund of the applicable Retirement System is credited with Excess Assets, the respective Investment Committee may recommend that the Excess Assets, in an amount not to exceed $35 million, be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.  In the event that any funds remain in the Income Stabilization Fund of each or either of GRS or PFRS on the date upon which no Eligible Pensioners under the applicable Retirement System are living, such funds shall be used to fund the Adjusted Pension Amounts payable by the applicable Retirement System.

3.    **Conditions to State's Participation.**

The payment of the State Contribution by the State or the State's authorized agent is conditioned upon satisfaction of the conditions precedent set forth in the State Contribution Agreement, including, among other things, the following:  (a) the Confirmation Order becoming a Final Order no later than December 31, 2014, which Confirmation Order must contain certain provisions as set forth in the State Contribution Agreement, including a requirement that the governing documents of GRS and PFRS be amended to include (i) the governance terms and conditions set forth in the State Contribution Agreement and (ii) the Income Stabilization Funds and Income Stabilization Payments; (b) the occurrence of the Effective Date no later than April 1, 2015; (c) acceptance of the Plan by Classes 10 and 11, which Plan must be in form and substance reasonably acceptable to the State and contain certain release provisions; (d) the Retiree Committee's endorsement of the Plan, including a letter from the Retiree Committee recommending that Classes 10 and 11 vote in favor of the Plan, or equivalent assurances from member organizations representing a majority of retirees in Classes 10 and 11; (e) active support of the Plan by, a release of and covenant not to sue the State from, and an agreement not to support in any way the litigation described in subsection (f) of this Section by, the City, the Retiree Committee, the Retirement Systems and certain unions and retiree associations, or equivalent assurances of litigation finality; (f) cessation of all litigation, or equivalent assurances of finality of such litigation, including the cessation of funding of any litigation initiated by any other party, as it relates to the City, (i) challenging PA 436 or any actions taken pursuant to PA 436 or (ii) seeking to enforce Article IX, Section 24 of the Michigan Constitution; (g) evidence satisfactory to the State of an irrevocable commitment by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents) to fund $366 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1; and (h) evidence satisfactory to the State of an irrevocable commitment by DIA Corp. to fund $100 million (or the net present value thereof) as part of the DIA Settlement, as provided in Section IV.E.1.

The State shall File and serve via the Court's electronic case filing and noticing system a notice that the conditions precedent to the State's payment of the State Contribution have been satisfied or otherwise addressed pursuant to the procedures outlined in the State Contribution Agreement no later than ten days after all such conditions have been satisfied or otherwise addressed.

4.    **Release of Claims Against the State and State Related Entities.**

The State Contribution Agreement requires that the Plan provide for the release of the State and the State Related Entities by each holder of a Pension Claim from all Liabilities arising from or related to the City, the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution, as more particularly described in the State Contribution Agreement and as set forth at Section III.D.7.b.

E.      **The DIA Settlement.**

On the Effective Date, the City and the DIA Corp. will enter into the DIA Settlement, pursuant to which (1) the DIA Funding Parties that are such as of the Effective Date have committed to assist in the funding of the City's restructured legacy pension obligations and (2) the City has agreed to enter into certain transactions that will cause the DIA to remain in the City in perpetuity, as described in and subject to the terms and conditions of the DIA Settlement Documents, and to otherwise make the DIA Assets available for the benefit of the residents of the City and the Counties and the citizens of the State. The DIA Settlement Documents attached hereto as Exhibit I.A.127 will qualify the description of the DIA Settlement in the Plan, Disclosure Statement and Exhibit I.A.126. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the DIA Settlement pursuant to Bankruptcy Rule 9019.

1.      **Funding Contributions.**

The DIA Settlement will be funded as follows: (a) irrevocable commitments in an aggregate amount of at least $366 million by the Foundations (excluding the Special Foundation Funders, as that term is defined in the DIA Settlement Documents); and (b) in addition to its continuing commitments outside of the DIA Settlement, irrevocable commitments in an aggregate amount of $100 million from the DIA Direct Funders (including the commitment of the Special Foundation Funders, as that term is defined in the DIA Settlement Documents, and subject to certain adjustments as set forth in the DIA Settlement Documents), the payment of which $100 million will be guaranteed by DIA Corp., subject to the terms of the DIA Settlement Documents. The foregoing commitments shall be funded over the course of the 20 year period immediately following the Effective Date (subject to the annual confirmation of the City's continuing compliance with the terms of the DIA Settlement) according to the "Agreed Required Minimum Schedule" and subject to the option at any time for the "Present Value Discount," as set forth in the DIA Settlement Documents. Amounts committed by the Foundations and the DIA Direct Funders will be paid to the CFSEM Supporting Organization, which will (a) transfer such amounts for the purpose of funding the Retirement Systems upon the City's satisfaction of certain conditions and (b) not be subject to claims of creditors of the Community Foundation for Southeast Michigan.

2.      **Transfer of DIA Assets.**

On the Effective Date, the City shall irrevocably transfer all of its right, title and interest in and to the DIA Assets to DIA Corp., as trustee, to be held in perpetual charitable trust, and within the City limits, for the primary benefit of the residents of the City and the Counties and the citizens of the State.

3.      **Conditions to the DIA Funding Parties' Participation.**

The DIA Funding Parties' participation in the DIA Settlement is conditioned upon, among other things, the following: (a) execution of the DIA Settlement Documents by each Foundation; (b) the irrevocable commitment from the DIA Corp. described in Section IV.E.1; (c) the acceptance of the Plan by Classes 10 and 11; (d) the irrevocable transfer by the City of the DIA Assets described in Section IV.E.2; (e) approval by the DIA's Board of Directors and the taking effect of the recommendation of the governance committee as described in Exhibit I.A.126; (f) the earmarking of all funds provided by the DIA Funding Parties towards the recoveries upon Pension Claims under the Plan for Holders of Claims in Classes 10 and 11; (g) the adoption of prospective governance and financial oversight mechanisms for the Retirement Systems that are reasonably satisfactory to the DIA Funding Parties; (h) the amendment by DIA Corp. and the art institute authority for each of Macomb County, Oakland County and Wayne County, Michigan of each art institute authority's respective service agreement so that the termination of the 1997 Operating Agreement between the City and DIA Corp. will not affect the art institute authorities' obligations under such agreements to pay millage proceeds to DIA Corp.; (i) the approval of the DIA Settlement by the Attorney General for the State; (j) the agreement of the State to provide the State Contribution; and (k) the City's agreement to indemnify and hold harmless the DIA Funding Parties and the CFSEM Supporting Organization and their Related Entities pursuant to, and in accordance with, the terms of the DIA Settlement Documents.

**F.     Contingent Payment Rights.**

On or as soon as reasonably practicable after the Confirmation Date, the City shall establish the Restoration Trust. The City shall issue the DWSD CVR to the Restoration Trust. If a Qualifying DWSD Transaction has not occurred before the seventh anniversary of the Effective Date, the DWSD CVR shall terminate and expire. The Restoration Trust shall distribute proceeds from the DWSD CVR in the following amounts and priorities: (1) first, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have their 4.5% pension reductions restored; (2) second, to GRS up to an amount sufficient for all three GRS waterfall classes identified on Exhibit II.B.3.r.ii.C to have 92% of their COLA benefits restored; and (3) third, 53% to GRS and 47% to PFRS. If the City makes any contributions to either GRS or PFRS out of its portion of the Net DWSD Transaction Proceeds, such contributions and earnings thereon shall not be taken into account for determining whether any pension restoration may be made. The DWSD CVR may not be transferred.

**1.     Special Restoration.**

Any proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated on or before the Effective Date, or fully executed and enforceable before the Effective Date but consummated after the Effective Date, shall be utilized for the purpose of funding the Special Restoration; provided that the City shall act in good faith so as not to unreasonably delay the execution of a Qualifying DWSD Transaction solely to avoid Special Restoration. In such case, the City will perform a Value Determination and arrive at the Discounted Value. The City will engage in good faith discussion as to the reasonableness of the Value Determination with the Retiree Committee or Restoration Trust, as applicable. In the event that the Retiree Committee or the Restoration Trust, as applicable, does not accept the Value Determination, the Retiree Committee or the Restoration Trust, as applicable, may seek to have the Bankruptcy Court determine the dispute, and the City consents to such jurisdiction.

Special Restoration shall follow the priorities of restoration of benefits set forth in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C. In order for benefits to be restored pursuant to the Special Restoration, such benefits must be fully funded by 50% of the Discounted Value for the full actuarially-determined lives of all participants for whom benefits are restored. In the event that actual Net DWSD Transaction Proceeds from the DWSD CVR do not equal 50% of the contemplated Net DWSD Transaction Proceeds as of the date of the Value Determination, the Investment Committees of the Retirement Systems will reduce or eliminate the Special Restoration benefits, as applicable, by the amount that 50% of the Discounted Value exceeds the actual Net DWSD Transaction Proceeds from the DWSD CVR received or projected to be received using a 6.75% discount rate. In the event that the Retiree Committee, the Restoration Trust or the City, as applicable, does not agree with the reduction in the Special Restoration benefits, the Retiree Committee or the Restoration Trust, as applicable, or the City may consult with the trustees and Investment Committees of PFRS or GRS with respect to any such reduction. Neither the Retiree Committee nor the Restoration Trust shall have any right to initiate any enforcement proceeding with respect to Special Restoration.

**2.     General Restoration.**

Any Net DWSD Transaction Proceeds from the DWSD CVR distributed by the Restoration Trust on account of a Qualifying DWSD Transaction consummated after the Effective Date, if such Qualifying Transaction was not fully executed and enforceable before the Effective Date, shall be utilized for the purpose of funding the pension trusts, and such cash contributions shall be included in any calculations allowing for the restoration of benefits in accordance with the general rules governing pension restoration as provided for in Exhibits II.B.3.q.ii.C and II.B.3.r.ii.C.

**G.     The OPEB Settlement.**

The City and the Retiree Committee have reached a settlement related to the allowance and calculation of the OPEB Claims in Class 12 and the treatment of such Allowed OPEB Claims, the terms of which settlement are reflected in the Plan. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

### H. The LTGO Settlement.

The City, the LTGO Insurer and BlackRock Financial Management have reached a settlement related to the treatment of Allowed Limited Tax General Obligation Bond Claims, the terms of which settlement are reflected in the Plan. Pursuant to the LTGO Settlement Agreement, Distributions attributable to the Insured LTGO Bonds shall be made to the LTGO Distribution Agent (as opposed to directly to the record owners of the Insured LTGO Bonds or to the LTGO Insurer) for the benefit of the record owners of the Insured LTGO Bonds in accordance with the LTGO Settlement Agreement. In the event that the City intends to redeem the principal amount of New LTGO Notes during any time that the Insured LTGO Bonds are outstanding, the City and the LTGO Distribution Agent shall be required to take certain actions as described in the LTGO Settlement Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, the LTGO Settlement Agreement pursuant to Bankruptcy Rule 9019.

### I. The Syncora Settlement.

The City and Syncora have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the Syncora Settlement Documents (the terms of which qualify and control over any description of the Syncora Settlement contained herein). Pursuant to the Syncora Settlement, and in accordance with the Plan, among other things: (1) the City shall, pursuant to Section II.D.1, assume the Tunnel Lease; (2) the parties shall enter into the Syncora Development Agreement; (3) the parties shall dismiss or withdraw the Dismissed Syncora Litigation as set forth in the Syncora Settlement Agreement; (4) any vote cast by Syncora to reject the Plan shall be deemed a vote to accept the Plan; (5) Syncora shall support Confirmation; and (6) on the Effective Date or as soon thereafter as practical, the City shall pay the sum of $5 million in full satisfaction of all of Claims filed or asserted against the City by Syncora relating to the COP Swap Agreements and any agreements related thereto, including the COP Syncora Swap Insurance Policies and the COP Swap Collateral Agreement. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the Syncora Settlement pursuant to Bankruptcy Rule 9019 and (2) the related Syncora Development Agreement (including the garage option) and the Tunnel Lease. The City shall not amend the Plan in any way that adversely affects Syncora without Syncora's prior written consent.

### J. The FGIC/COP Settlement.

The City and FGIC have reached a settlement effecting a global resolution of all matters and litigation between the parties related to the Chapter 9 Case, as set forth in the FGIC/COP Settlement Documents (the terms of which qualify and control over any description of the FGIC/COP Settlement contained herein). Pursuant to the FGIC/COP Settlement, and in accordance with the Plan, among other things: (1) the City and the Developer, for the benefit of FGIC and the FGIC COP Holders, shall enter into the FGIC Development Agreement; (2) FGIC shall, on behalf of the FGIC COP Holders, become a Settling COP Claimant with respect to all COPs and COP Claims associated with COPs originally insured by FGIC; (3) the parties shall dismiss or withdraw the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (4) except for Excluded Actions, FGIC shall waive any claims it may have against any other party related to the Dismissed FGIC/COP Litigation as set forth in the FGIC/COP Settlement Documents; (5) any vote cast by FGIC to reject the Plan shall be deemed a vote to accept the Plan; and (6) in full satisfaction and discharge of FGIC's claims against the City related to FGIC's Swap Insurance Policies, (a) FGIC shall receive an Allowed Class 14 Claim in the amount of $6.15 million, entitling FGIC to receive the Distributions provided pursuant to Section II.B.3.u.i and (b) the DDA shall assign to FGIC all of its right, title and interest to the New B Notes to be distributed to the DDA pursuant to Section II.B.3.t.ii. The Plan shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving and authorizing the parties to enter into, (1) the FGIC/COP Settlement pursuant to Bankruptcy Rule 9019 and (2) the related FGIC Development Agreement. The City shall not amend the Plan in any way that adversely affects FGIC without FGIC's prior written consent.

### K. Issuance of the New Securities.

The City shall issue the New Securities on the Effective Date or a subsequent Distribution Date, as applicable. To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-

bankruptcy law, the issuance of New Securities as contemplated by the Plan is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. The New Securities (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the City or applicable issuer as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

**L.     Cancellation of Existing Bonds, Bond Documents, COPs and COP Documents.**

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to Distribution under the Plan or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts pursuant to Section II.D), on the Effective Date, the Bonds, the Bond Documents, the COPs and the COP Documents will be deemed automatically cancelled, terminated and of no further force or effect against the City without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the parties to the City, as applicable, under the Bonds, the Bond Documents, the COPs and the COP Documents shall be discharged; provided, however, that the Bonds, the Bond Documents, the COPs and the COP Documents shall continue in effect solely (i) to allow the Disbursing Agent to make any Distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) for any trustee, agent, contract administrator or similar entity under the Bond Documents or COP Documents to have the benefit of all the rights and protections and other provisions of the Bond Documents or COP Documents, as applicable, and all other related agreements with respect to priority in payment and lien rights with respect to any Distribution, (iii) to set forth the terms and conditions applicable to parties to the Bond Documents and COP Documents other than the City, (iv) as may be necessary to preserve any claim by (1) a Bondholder or Bond Agent under a Bond Insurance Policy or against any Bond Insurer, (2) a COPs Holder or COP Agent under a COP Insurance Policy or against any COP Insurer or (3) a COP Swap Counterparty under a Swap Insurance Policy or against any insurer thereunder and (v) with respect to any obligation of any party (other than the City, except to the extent provided in the COP Swap Settlement or the COP Swap Settlement Approval Order) under any COP Document related to such party's obligations owed in respect of the COP Swap Documents or the COP Swap Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan (or the COP Swap Settlement or the COP Swap Settlement Approval Order), such Bonds, Bond Documents, COPs or COP Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City. Nothing in the Plan impairs, modifies, affects or otherwise alters the rights of (a) Bondholders or Bond Agents with respect to claims under applicable Bond Insurance Policies or against the Bond Insurers, (b) COPs Holders or COP Agent with respect to claims under COP Insurance Policies and obligations related thereto or (c) COP Swap Counterparties with respect to claims under Swap Insurance Policies and obligations related thereto. For the avoidance of doubt, except for the immediately preceding sentence, this Section IV.L shall not apply to any Bonds that are Reinstated pursuant to Section II.B.3.a.ii. As of the Effective Date, the principal amounts of the COPs originally insured by FGIC shall be deemed accelerated and due and payable, and no interest on the COPs originally insured by FGIC shall accrue thereafter, solely for the purposes of determining distributions from the COP Trustee to holders of COPs originally insured by FGIC. The foregoing acceleration of principal and cessation of interest shall affect only the rights of each holder of COPs originally insured by FGIC to the receipt of proceeds of distributions under the Plan and not the rights of each such COPs holder against FGIC or shall not in any way modify payments currently required of FGIC under its existing insurance policies or FGIC's Plan of Rehabilitation.

**M.     Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or where a Claim is Reinstated, on the Effective Date, all Liens against the City's property will be deemed fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will revert to the City. As of the Effective Date, (1) the holders of such Liens will be authorized and directed to release any collateral or other property of the City (including any cash collateral) held by such Holder and to take such actions as may be requested by the City to evidence the release of such Lien, including the execution, delivery, filing or recording of such releases as may be requested by the City, and (2) the City shall be authorized to execute and file on behalf of

-60-

creditors Form UCC-3 termination statements or such other forms as may be necessary or appropriate to implement the provisions of this Section IV.M.

**N.      Professional Fees.**

**1.      Professional Fee Reserve.**

On the Effective Date, the City shall establish and fund the Professional Fee Reserve from the General Fund or, where applicable, the DWSD's funds, in an amount determined by the City to be sufficient to pay the Fee Review Professional Fees that remain unpaid as of the Effective Date, solely to the extent that such amounts are payable from the General Fund or the DWSD's funds.  The initial amount of the Professional Fee Reserve shall be equal to the sum of (a) all invoices received from Fee Review Professionals and the Fee Examiner Parties as of the establishment and funding of the Professional Fee Reserve to the extent not yet paid (including holdbacks); (b) an estimate of the Fee Review Professionals' unbilled fees through the Effective Date as determined by the City in consultation with the Fee Review Professionals, which estimate shall be no lower than 125% of the aggregate amount of the highest monthly invoices respectively submitted by each Fee Review Professional pursuant to the Fee Review Order prior to the establishment and funding of the Professional Fee Reserve; and (c) an estimate of the Fee Examiner Parties' unbilled fees and expenses through the projected date of dismissal of the Fee Examiner under Section IV.N.3, as determined by the City in consultation with the Fee Examiner.  The funds held in the Professional Fee Reserve may not be used for any purpose other than the payment of Fee Review Professional Fees until any and all disputes regarding the Fee Review Professional Fees, including any disputes arising under the Fee Review Order, have been fully and finally resolved pursuant to a Final Order or a stipulation between the disputing parties.  Any amounts remaining in the Professional Fee Reserve after final resolution of all such disputes and the payment of all Fee Review Professional Fees determined to be reasonable in accordance with the Fee Review Order shall be released to the General Fund or the DWSD's funds, as applicable.  If the Professional Fee Reserve is insufficient to pay all Fee Review Professional Fees that are determined to be reasonable in accordance with the Fee Review Order and that are payable from the General Fund or the DWSD's funds, the City shall pay such additional amounts from the General Fund or the DWSD's funds, as applicable.

**2.      Fee Review Order.**

The Fee Examiner shall review all fees and expenses of the Fee Review Professionals for the period from the Petition Date and ending on the Effective Date in accordance with the terms of the Fee Review Order.  For the avoidance of doubt, the Fee Review Order shall not apply to any fees or expenses of the Fee Review Professionals for the period on and after the Effective Date, and the Fee Examiner shall not review any such fees or expenses; provided, however, that all fees and expenses of the Fee Examiner Parties, whether incurred before, on or after the Effective Date, shall remain subject to review and approval of the Bankruptcy Court pursuant to the terms of the Fee Review Order.

**3.      Dismissal of the Fee Examiner.**

Once the Fee Examiner completes his review of all Fee Review Professional Fees and submits or Files all reports related thereto as required by the Fee Review Order, the Fee Examiner shall be dismissed of all duties and obligations under the Fee Examiner Order and the Fee Review Order, other than any obligations of confidentiality thereunder.  The confidentiality obligations of the Fee Examiner and the other Fee Examiner Parties, including the confidentiality obligations set forth in paragraph 22 of the Fee Review Order, shall remain binding from and after the Effective Date.

**4.      Potential Review of Fees Not Subject to Fee Review Order.**

The City shall have the right to bring before the Bankruptcy Court a request to review and determine the reasonableness of the fees and expenses of any Fee Review Professional retained by the City or any of its departments to the extent that such fees and expenses have not been either (a) approved pursuant to or in accordance with the DWSD Tender Order, (b) subject to court review or (c) subject to a Bankruptcy Court-approved or agreed upon process for binding arbitration.

5.      **Court-Appointed Expert.**

The Court-appointed expert, Martha E. M. Kopacz of Phoenix Management Services, and her counsel shall be compensated for any reasonable fees and expenses incurred through the Confirmation Date in accordance with the terms of the Court's Order Appointing Expert Witness (Docket No. 4215), entered on April 22, 2014, as amended.

**O.      Assumption of Indemnification Obligations.**

Notwithstanding anything otherwise to the contrary in the Plan, nothing in the Plan shall discharge or impair the obligations of the City as provided in the City Charter of the City or other organizational documents, resolutions, employment contracts, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of officers and employees of the City (consistent with the injunction provisions of Section III.D.5 and including the members of the City Council, the Mayor and the Emergency Manager) and their Related Entities, in each case to the extent such Entities were acting in such capacity, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, foreseen or unforeseen, asserted or unasserted; <u>provided</u> that this Section IV.O shall be read in conjunction with the provisions for Indirect Employee Indemnity Claims set forth in Section III.D.5. Notwithstanding the foregoing, Retirement System Indemnity Obligations shall not be assumed under the Plan and shall be discharged.  For the avoidance of doubt, no indemnification provision in any loan document, bond document, Bond Insurance Policy or other agreement with a Bond Insurer is exempted from discharge by reason of this Section IV.O.

**P.      Incorporation of Retiree Health Care Settlement Agreement.**

The terms of the Retiree Health Care Settlement Agreement resolving the Retiree Health Care Litigation, which agreement is attached hereto as Exhibit I.A.298, are incorporated herein by reference and shall be binding upon the parties thereto.

**Q.      Payment of Workers' Compensation Claims.**

From and after the Effective Date, (a) the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for benefits and liabilities for which the City is responsible under applicable State workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the City's prepetition practices and procedures and governing State workers' compensation law, and (b) nothing in the Plan shall discharge, release or relieve the City from any current or future liability under applicable State workers' compensation law.  The City expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under applicable State workers' compensation law.

**R.      36th District Court Settlement.**

The City and the Settling 36th District Court Claimants have reached a settlement related to (1) the allowance of certain of the Settling 36th District Court Claimants' Claims and (2) the treatment of Allowed Indirect 36th District Court Claims under the Plan substantially on the terms attached hereto as Exhibit I.A.9.  The 36th District Court Settlement is incorporated into the Plan, which shall be construed as a motion for approval of, and the Confirmation Order shall constitute an order approving, such settlement pursuant to Bankruptcy Rule 9019.

**S.      Payment of Certain Claims Relating to the Operation of City Motor Vehicles.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows:  (1) Claims for personal protection benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142

-62-

or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

**T.     Payment of Tax Refund Claims.**

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay all valid claims for income tax refunds and property tax refunds for which the City is responsible under applicable law, regardless of when the applicable right to a refund arose, in accordance with the City's prepetition practices and procedures. The City expressly reserves the right to challenge the validity of any claim for an income tax refund or property tax refund.

**U.     Utility Deposits.**

From and after the Effective Date, the City will continue to administer utility deposits in accordance with the City's prepetition practices and procedures, including the payment of any undisputed, non-contingent, liquidated claims against the City for the refund of a utility deposit.

**V.     Pass-Through Obligations.**

The City shall continue to honor its Pass-Through Obligations to the Pass-Through Recipients.

**W.     Exit Facility.**

On the Effective Date, the City shall enter into the Exit Facility, as well as any ancillary notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of the liens securing the Exit Facility.

**X.     Post-Effective Date Governance.**

Prior to or on the Effective Date, the Financial Review Commission shall be established pursuant to and in accordance with the Financial Review Commission Act. The Financial Review Commission shall provide oversight as set forth in the Financial Review Commission Act, including to ensure that, post-Effective Date, the City adheres to the Plan and continues to implement financial and operational reforms that promote more efficient and effective delivery of services to City residents. The City shall promptly provide to the Bankruptcy Court copies of any reports given to, or received from, the Financial Review Commission. Nothing herein shall expand, limit or otherwise modify the role or powers of the Financial Review Commission.

# ARTICLE V
## PROVISIONS REGARDING DISTRIBUTIONS UNDER THE PLAN

**A.      Appointment of Disbursing Agent.**

The City may act as Disbursing Agent or may employ or contract with other Entities to act as the Disbursing Agent or to assist in or make the Distributions required by the Plan.  Any Disbursing Agent appointed by the City will serve without bond.  Other than as specifically set forth in the Plan, the Disbursing Agent shall make all Distributions required to be made under the Plan.

**B.      Distributions on Account of Allowed Claims.**

Except as otherwise provided in the Plan, on the Effective Date or as soon as practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive from the Disbursing Agent, the Bond Agent or the COP Agent, as applicable, the Distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Section VI.B.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim.

**C.      Certain Claims to Be Expunged.**

Any Claim that has been or is hereafter listed in the List of Creditors as contingent, unliquidated or disputed, and for which no proof of Claim is or has been timely Filed, is not considered to be an Allowed Claim and shall be expunged without further action by the City and without further notice to any party or any action, approval or order of the Bankruptcy Court.

**D.      Record Date for Distributions; Exception for Bond Claims.**

With the exception of Bond Claims, neither the City nor any Disbursing Agent will have any obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those Holders of Allowed Claims (including Holders of Claims that become Allowed after the Distribution Record Date) that are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  With the exception of the Bond Claims, the City and any Disbursing Agent shall instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims Register as of the close of business on the Distribution Record Date.  Unless otherwise set forth in the Confirmation Order, the City shall not establish a record date for Distributions to Holders of Bond Claims.

**E.      Means of Cash Payments.**

Except as otherwise specified herein, all Cash payments made pursuant to the Plan shall be in U.S. currency and made by check drawn on a domestic bank selected by the Disbursing Agent or, at the option of the Disbursing Agent, by wire transfer, electronic funds transfer or ACH from a domestic bank selected by the Disbursing Agent; provided, however, that Cash payments to foreign Holders of Allowed Claims may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### F. Selection of Distribution Dates for Allowed Claims.

Except where the Plan requires the making of a Distribution on account of a particular Allowed Claim within a particular time, the Disbursing Agent shall have the authority to select Distribution Dates that, in the judgment of the Disbursing Agent, provide Holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred in the distribution process. Upon the selection of a Distribution Date by the Disbursing Agent, the Disbursing Agent shall File a notice of such Distribution Date that provides information regarding the Distribution to be made.

### G. Limitations on Amounts to Be Distributed to Holders of Allowed Claims Otherwise Insured.

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the City's insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy; provided that, if the City believes a Holder of an Allowed Claim has recourse to an insurance policy and intends to direct the Disbursing Agent to withhold a Distribution pursuant to this Section V.G, the City shall provide written notice to such Holder regarding what the City believes to be the nature and scope of applicable insurance coverage. To the extent that one or more of the City's insurance carriers agrees to satisfy a Claim in full, then immediately upon such agreement such Claim may be expunged without a Claims objection having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court. Nothing in the Plan, including this Section V.G, shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities that any Entity may hold against any other Entity, including the City's insurance carriers and Bond Insurers, other than the City. For the avoidance of doubt, this Section shall not apply to Bond Insurance Policies or Swap Insurance Policies.

### H. City's Rights of Setoff Preserved.

Notwithstanding anything to the contrary in the Plan, pursuant to section 553 of the Bankruptcy Code or otherwise applicable non-bankruptcy law, the City may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim the claims, rights and Causes of Action of any nature that the City may assert against the Holder of such Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim pursuant to the terms of the Plan shall constitute a waiver or release by the City of any claims, rights and Causes of Action that the City may assert against such Holder, all of which are expressly preserved.

### I. Delivery of Distributions and Undeliverable or Unclaimed Distributions.

#### 1. Delivery of Distributions Generally.

Except as set forth in Section V.I.2, Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the City's records unless such addresses are superseded by proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001.

#### 2. Delivery of Distributions on Account of Bond Claims.

Distributions on account of the Bond Claims shall (a) be made by the Disbursing Agent to the Bond Agent under the applicable Bond Documents for the benefit of Holders of Bond Claims and (b) be deemed completed when made by the Disbursing Agent to the Bond Agent as if such Distributions were made directly to the Holders of such Claims. The applicable Bond Agent, in turn, shall make such distributions to the applicable Holders pursuant to the terms and conditions of the applicable Bond Documents and subject to the respective rights, claims and interests, if any, that the Bond Agent may have under the applicable Bond Documents or otherwise to the recovery or reimbursement of their fees, costs and expenses (including the fees, costs and expenses of counsel and financial advisors) from any distribution hereunder, whether such rights, claims or interests are in the nature of a charging lien or otherwise. The Bond Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to such Distributions.

13-53846-tjt Doc 10191-12 Filed 09/21/15 Entered 09/21/15 18:31:21 Page 167 of 205
13-53846-tjt Doc 10105-5 Filed 08/19/15 Entered 08/19/15 18:03:51 Page 167 of 314 1475
of 314

3.      **De Minimis Distributions / No Fractional New Securities.**

No distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the specific Holder of an Allowed Claim on the applicable Distribution Date has an economic value of less than $25.00. No fractional New Securities shall be distributed. Where a fractional portion of a New Security otherwise would be called for under the Plan, the actual issuance shall reflect a rounding down to the nearest whole New Security.

4.      **Undeliverable or Unclaimed Distributions.**

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest.

**Any Holder of an Allowed Claim that does not claim an undeliverable or unclaimed Distribution within six months after the Effective Date shall be deemed to have forfeited its claim to such Distribution and shall be forever barred and enjoined from asserting any such claim against the City or its property.** In such cases, any Cash held by the City on account of such undeliverable or unclaimed Distributions shall become the property of the City free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any New Securities held for distribution on account of such Claims shall be canceled and of no further force or effect. Nothing contained in the Plan shall require any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.      **Time Bar to Cash Payment Rights.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check originally was issued within 180 days after the date of the original check issuance. After such date, the Claim of any Holder to the amount represented by such voided check shall be released and forever barred from assertion against the City and its property.

J.      **Other Provisions Applicable to Distributions in All Classes.**

1.      **No Postpetition Interest.**

Except as otherwise specifically provided for in the Plan, or required by applicable bankruptcy law, the City shall have no obligation to pay any amount that constitutes or is attributable to interest on an Allowed Claim accrued after the Petition Date and no Holder of a Claim shall be entitled to be paid any amount that constitutes or is attributable to interest accruing on or after the Petition Date on any Claim without regard to the characterization of such amounts in any document or agreement or to whether such amount has accrued for federal income tax purposes. Any such amount that constitutes or is attributable to interest that has been accrued and has not been paid by the City shall be cancelled as of the Effective Date for federal income tax purposes.

2.      **Compliance with Tax Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the City and any Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions under the Plan shall be subject to such withholding and reporting requirements. All such amounts withheld and paid to the appropriate governmental unit shall be treated as if made directly to the Holder of an Allowed Claim. The City and the Disbursing Agent shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

-66-

Notwithstanding any other provision of the Plan, each Entity receiving or deemed to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Entity on account of such Distribution, including income, withholding and other Tax obligations. The City has the right, but not the obligation, to refuse, or to direct a Disbursing Agent to refuse, to make a Distribution until a Holder of an Allowed Claim has made arrangements satisfactory to the City and any Disbursing Agent for payment of any such Tax obligations. The City may require, as a condition to making a Distribution, that the Holder of an Allowed Claim provide the City or any Disbursing Agent with a completed Form W-8, W-9 or other Tax information, certifications and supporting documentation, as applicable.

If the City makes such a request and the Holder of an Allowed Claim fails to comply before the date that is 180 days after the initial request is made, the amount of such Distribution shall irrevocably revert to the City and any Claim in respect of such Distribution shall be released and forever barred from assertion against the City and its property.

**3.  Allocation of Distributions.**

All Distributions to Holders of Allowed Claims that have components of principal and interest shall be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such Distributions, if any, shall be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

**4.  Surrender of Instruments.**

As a condition to participation under this Plan, the Holder of a note, debenture or other evidence of indebtedness of the City that desires to receive the property to be distributed on account of an Allowed Claim based on such note, debenture or other evidence of indebtedness shall surrender such note, debenture or other evidence of indebtedness to the City or its designee (unless such Holder's Claim will not be Impaired by the Plan, in which case such surrender shall not be required), and shall execute and deliver such other documents as are necessary to effectuate the Plan; provided, however, that, if a claimant is a Holder of a note, debenture or other evidence of indebtedness for which no physical certificate was issued to the Holder but which instead is held in book-entry form pursuant to a global security held by the Depository Trust Company or other securities depository or custodian thereof, there shall be no requirement of surrender. In the City's sole discretion, if no surrender of a note, debenture or other evidence of indebtedness occurs and the Holder of Claim does not provide an affidavit and indemnification agreement, in form and substance reasonably satisfactory to the City, that such note, debenture or other evidence of indebtedness was lost, then no distribution may be made to such Holder in respect of the Claim based on such note, debenture or other evidence of indebtedness. For the avoidance of doubt, (a) no Bond, note, debenture or other evidence of indebtedness of the City shall be surrendered or deemed surrendered that is subject to any Bond Insurance Policy and (b) no COP shall be surrendered or deemed surrendered hereby to the extent necessary to make or preserve a claim under any applicable policies or other instruments insuring the COPs and obligations related thereto or against any party, other than the City, that insures the COPs. Notwithstanding the foregoing, such Bonds or Bond Documents as remain outstanding shall not form the basis for the assertion of any Claim against the City.

**ARTICLE VI**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.  Treatment of Disputed Claims.**

**1.  General.**

No Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) allowing such Claim. Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Without limiting the foregoing in any way, no partial payments and no partial Distributions will be made with respect to a disputed, contingent or

-67-

unliquidated Claim, or with respect to any Claim for which a proof of Claim has been Filed but not Allowed, until the resolution of such disputes or estimation or liquidation of such Claim by settlement or by Final Order.

## 2. ADR Procedures.

At the City's option, any Disputed Claim designated or eligible to be designated for resolution through the ADR Procedures may be submitted to the ADR Procedures in accordance with the terms thereof and the ADR Procedures Order. For the avoidance of doubt, the designation of a Disputed Claim for resolution through the ADR Procedures, either prior to or after the Effective Date, will not modify, and will not be deemed to have modified, the terms of the ADR Injunction imposed pursuant to the ADR Procedures Order. Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

## 3. Tort Claims.

At the City's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 9 Case) not resolved through the ADR Procedures or pursuant to a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date (subject to the City's right to seek removal or transfer of venue) or, if no action was pending on the Effective Date, in an administrative or judicial tribunal of appropriate jurisdiction that (a) has personal jurisdiction over the parties, (b) has subject matter jurisdiction over the Tort Claim and (c) is a proper venue. The City may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing such holder that the City has exercised such option (which notice shall be deemed to satisfy the notice requirements of Section I.B of the ADR Procedures). Upon the City's service of such notice, the automatic stay imposed pursuant to sections 362 and 922 of the Bankruptcy Code (along with any extension of such stay pursuant to the terms of the Stay Extension Order) or, after the Effective Date, the injunction set forth at Section III.D.5, will be deemed modified, without the necessity for further Bankruptcy Court approval or any further action by the City, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s); provided that nothing contained in this Section will modify, or will be deemed to have modified, the terms of the Stay Extension Order with respect to any Tort Claim prior to the City having served notice of its intent to determine and liquidate such Tort Claim pursuant to this Section. If the City does not serve such a notice upon a holder of a Tort Claim by the Claims Objection Bar Date, such holder may file a motion with the Bankruptcy Court no later than 30 days after the Claims Objection Bar Date seeking relief from the discharge injunction imposed pursuant to Section III.D.5 in order to liquidate and determine its Claim, which right and the deadline for exercising such right shall be set forth in the notice of entry of the Confirmation Order.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VI.A.3 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, provided that only the amount of such Allowed Tort Claim that is not satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim will be treated as an Allowed Claim for the purposes of distributions under the Plan and subject to the terms of the Plan. Distributions on account of any such Allowed Tort Claim shall be made in accordance with the Plan. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or Cause of Action that the City may have against any Entity in connection with or arising out of any Tort Claim, including any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the City may have against any Entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

## B. Disputed Claims Reserve.

On and after the Effective Date, until such time as all Disputed Claims have been compromised and settled or determined by Final Order and before making any Distributions, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, the City shall establish and maintain a reserve of property equal to (1) the Distributions to which Holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the Face Amount of such Disputed Claims or (2) such lesser amount as required by an order of the Bankruptcy Court. On the first Distribution Date that is at least 30 days (or such fewer days as may be agreed to by the City in its sole discretion) after the date on which a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall remit to the Holder of such Allowed Claim any Distributions such Holder would have been

entitled to under the Plan on account of such Allowed Claim had such Claim been Allowed as of the Effective Date. If a Disputed Claim is disallowed by Final Order, the property reserved on account shall become available for Distribution to the Holders of Allowed Claims within the Class(es) entitled to receive such property. Each Holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the assets held in the disputed claims reserve and not to any other assets held by the City, its property or any property previously distributed on account of any Allowed Claim.

## C. Objections to Claims.

### 1. Authority to Prosecute, Settle and Compromise.

The City's rights to object to, oppose and defend against all Claims on any basis are fully preserved. As of the Effective Date, only the City shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to the ADR Procedures or any similar procedures approved by the Bankruptcy Court. Any objections to Claims shall be Filed no later than the Claims Objection Bar Date. On and after the Effective Date, the City may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without any further notice or any action, order or approval of the Bankruptcy Court.

### 2. Expungement or Adjustment of Claims Without Objection.

Any Claim that has been paid, satisfied or superseded shall be expunged from the Claims Register by the Claims and Balloting Agent at the request of the City, and any Claim that has been amended by the Holder of such Claim shall be adjusted on the Claims Register by the Claims and Balloting Agent at the request of the City, without the Filing of an objection and without any further notice or any action, order or approval of the Bankruptcy Court.

### 3. Extension of Claims Objection Bar Date.

Upon motion by the City to the Bankruptcy Court, the City may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to specific Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a modification to the Plan under section 1127 of the Bankruptcy Code.

### 4. Authority to Amend List of Creditors.

The City will have the authority to amend the List of Creditors with respect to any Claim and to make Distributions based on such amended List of Creditors without approval of the Bankruptcy Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the City will provide the Holder of such Claim with notice of such amendment and such Holder will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the Disbursing Agent may proceed with Distributions based on such amended List of Creditors without approval of the Bankruptcy Court.

## ARTICLE VII
## RETENTION OF JURISDICTION

Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A. Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the amount, allowance, priority or classification of Claims;

B. Confirm the maturity date and the terms as written of the collective bargaining agreements identified on Exhibit II.D.5 of the Plan, which agreements are incorporated as part of the Plan (it being understood that the enforcement, interpretation and resolution of disputes of the terms of the contracts shall proceed under applicable state law);

C. Resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including claims for payment of any cure amount;

D. Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the City that may be pending on the Effective Date or brought thereafter;

F. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

G. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

H. Approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

I. Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J. Adjudicate, decide or resolve any matters relating to the City's compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

K. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or Distributions pursuant to the Plan are enjoined or stayed;

L. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

M. Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the FGIC Development Agreement;

N. Resolve any matters, cases, controversies, suits or disputes that may arise in connection with the Syncora Development Agreement;

O. Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 9 Case;

P.      Enter a final decree closing the Chapter 9 Case pursuant to section 945(b) of the Bankruptcy Code; and

Q.      Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules subject to any limits on the Bankruptcy Court's jurisdiction and powers under sections 903 and 904 of the Bankruptcy Code.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

**A.      Plan Supplements.**

All Plan Supplements not previously filed will be Filed no later than ten days before the Confirmation Hearing.

**B.      Modification of the Plan.**

Subject to section 942 and 1127(d) of the Bankruptcy Code, the City may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**C.      Revocation of the Plan.**

The City reserves the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the City revokes or withdraws the Plan, or if the Confirmation Date does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan, nor any action taken or not taken by the City with respect to the Plan, the Disclosure Statement or the Confirmation Order, shall be or shall be deemed to be:  (1) a waiver or release of any claims by or against the City; (2) an admission of any sort by the City or any other party in interest, or (3) prejudicial in any manner to the rights of the City or any other party in interest.

**D.      Severability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, in each case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the City's consent; and (3) non-severable and mutually dependent.

**E.      Effectuating Documents and Transactions.**

The City is authorized to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the City Council, the Emergency Manager, the Mayor or any employees or officers of the City.  On the Effective Date, the appropriate employees and officers of the City are authorized and directed to execute and deliver the agreements, documents and instruments contemplated

by the Plan, and to take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan, in the name and on behalf of the City.

**F.      Successors and Assigns.**

Except as expressly provided otherwise in the Plan, the rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Entity.

**G.      Plan Controls.**

In the event and to the extent that any provision of the Plan is inconsistent with the provisions of the Disclosure Statement, the provisions of the Plan shall control and take precedence.

**H.      Notice of the Effective Date.**

On or before ten Business Days after occurrence of the Effective Date, the City shall mail or cause to be mailed to all Holders of Claims a notice that informs such Holders of (1) entry of the Confirmation Order; (2) the occurrence of the Effective Date; (3) the assumption and rejection of Executory Contracts and Unexpired Leases pursuant to the Plan, as well as the deadline for the filing of Claims arising from such rejection; (4) the deadline for the filing of Administrative Claims; and (5) such other matters as the City deems to be appropriate.

**I.      Governing Law.**

Unless (1) a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or (2) otherwise specifically stated herein or in any contract, articles or certificates of incorporation, bylaws, codes of regulation, ordinance, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the laws of the State of Michigan, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan and any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan.

**J.      Request for Waiver of Automatic Stay of Confirmation Order.**

The Plan shall serve as a motion seeking a waiver of the automatic stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e).  Any objection to this request for waiver shall be Filed and served on the parties listed in Section VIII.L on or before the Voting Deadline.

**K.      Term of Existing Injunctions and Stays.**

**All injunctions or stays provided for in the Chapter 9 Case under sections 105, 362 or 922 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**L.      Service of Documents.**

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the City and (2) the Retiree Committee must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.      **The City**

        David G. Heiman, Esq.
        Heather Lennox, Esq.
        Thomas A. Wilson, Esq.
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio  44114
        Telephone:  (216) 586-3939
        Facsimile:  (216) 579-0212

        Bruce Bennett, Esq.
        JONES DAY
        555 South Flower Street
        Fiftieth Floor
        Los Angeles, California  90071
        Telephone:  (213) 243-2382
        Facsimile:  (213) 243-2539

        Jonathan S. Green, Esq.
        Stephen S. LaPlante, Esq.
        MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
        150 West Jefferson
        Suite 2500
        Detroit, Michigan  48226
        Telephone:  (313) 963-6420
        Facsimile:  (313) 496-7500

        (Counsel to the City)

2.      **The Retiree Committee**

        Claude Montgomery, Esq.
        Carole Neville, Esq.
        DENTONS US LLP
        1221 Avenue of the Americas
        New York, New York 10020
        Telephone:  (212) 768-6700
        Facsimile:  (212) 768-6800

        Sam J. Alberts, Esq.
        DENTONS US LLP
        1301 K Street NW, Suite 600, East Tower
        Washington, DC 20005-3364
        Telephone:  (202) 408-6400
        Facsimile:  (202) 408-6399

Matthew E. Wilkins, Esq.
Paula A. Hall, Esq.
BROOKS WILKINS SHARKEY & TURCO PLLC
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone:  (248) 971-1711
Facsimile:  (248) 971-1801

(Counsel to the Retiree Committee)

Dated:  October 22, 2014            Respectfully submitted,

The City of Detroit, Michigan

By:      /s/  Kevyn D. Orr
Name:   Kevyn D. Orr
Title:   Emergency Manager for the City of Detroit, Michigan

COUNSEL:


  /s/ David G. Heiman
David G. Heiman
Heather Lennox
Thomas A. Wilson
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500

ATTORNEYS FOR THE DEBTOR

# APPENDIX II

## CONFIRMATION NOTICE

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
------------------------------------------------------------ x
                                                             :
In re                                                        :           Chapter 9
                                                             :
CITY OF DETROIT, MICHIGAN,                                   :           Case No. 13-53846
                                                             :
                                    Debtor.                  :           Hon. Steven W. Rhodes
                                                             :
                                                             :
------------------------------------------------------------ x
```

## NOTICE OF (I) ENTRY OF ORDER CONFIRMING EIGHTH AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE CITY OF DETROIT AND (II) OCCURRENCE OF EFFECTIVE DATE

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

**1.     Confirmation of the Plan and Occurrence of the Effective Date.**

On _____, 2014, the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>") entered an order (Docket No. ____) (the "<u>Confirmation Order</u>") confirming the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (as it may have been amended, supplemented or modified, the "<u>Plan</u>"), in the above-captioned chapter 9 case of the City of Detroit, Michigan (the "<u>City</u>").  The Effective Date of the Plan occurred on _____, 201_.  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

**2.     Discharge of Claims.**

a.     Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, as of the Effective Date, the City is discharged from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt was Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt was allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt accepted the Plan.

b.     In accordance with the foregoing, except as expressly provided otherwise in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination, as of the Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b) of the Bankruptcy Code, and such discharge voids any judgment obtained against the City at any time, to the extent that such judgment relates to a discharged debt; <u>provided</u> that, in accordance with section

944(c)(1) of the Bankruptcy Code, such discharge does not apply to (i) debts specifically exempted from discharge under the Plan; (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case; (iii) claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983; or (iv) Claims of (A) T&T Management, Inc., (B) HRT Enterprises and (C) the John W. and Vivian M. Denis Trust related to condemnation or inverse condemnation actions against the City alleging that the City has taken private property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

### 3. Releases.

a. <u>General Releases by Holders of Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i. all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); <u>provided</u> <u>further</u>, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii. all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; <u>provided</u>, <u>however</u>, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities are released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

<u>provided</u>, <u>however</u>, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; <u>provided</u>, <u>further</u>, that nothing in Section III.D.7.a of the Plan shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be released.

b. <u>Release by Holders of Pension Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases,

agreements or documents entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), if the State Contribution Agreement is consummated, each holder of a Pension Claim is deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

4. **Injunctions.**

**On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order:**

**a. All Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, are permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity); (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly,**

-3-

13-53846-tjt   Doc 10191-12   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 181 of 314
13-53846-tjt   Doc 8045   Filed 10/22/14   Entered 10/22/14 16:50:52   Page 183 of 1489

any encumbrance of any kind against the City or its property; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 are not enjoined. In addition, all individuals affected by the AFS Recoupment are enjoined from commencing any proceeding against the GRS and its trustees, officers, employees or professionals arising from GRS's compliance with the Plan or this Order.

        **b.** **All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan are permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in sub-paragraph 4(a) above, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.**

        **5.** **Treatment of Executory Contracts and Unexpired Leases.**

        a. <u>Assumption</u>. Except for Executory Contracts and Unexpired Leases rejected in the Plan or by other court order, or as requested in any motion Filed by the City on or prior to the Effective Date, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City has been deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations have not been assumed under the Plan and have been discharged. For the avoidance of doubt, the City has assumed the Tunnel Lease pursuant to Section II.D.1 of the Plan.

        b. <u>Assumption of Ancillary Agreements</u>. Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan includes any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

        c. <u>Approval of Assumptions and Assignments</u>. The Confirmation Order constitutes an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the

-4-

13-53846-tjt   Doc 10191-12   Filed 09/21/15   Entered 09/21/15 18:31:21   Page of 225
13-53846-tjt   Doc 8272-5   Filed 11/09/14   Entered 11/09/14 15:51:05   Page 184 of 314   1490
of 314

Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph. The City has provided separate notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease are set forth in the Contract Procedures Order (Docket No. 6512). If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

> d.      **Payments Related to the Assumption of Executory Contracts and Unexpired Leases**. To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

> e.      **Contracts and Leases Entered Into After the Petition Date**. Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

> f.      **Rejection of Executory Contracts and Unexpired Leases**. Each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan was deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code. The Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan is rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on Exhibit II.D.6 to the Plan does not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

> g.      **Rejection Damages Bar Date**. **Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or**

**Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date, _i.e._, _____, 20__; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan. Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City. Proof of claim forms and instructions for filing claims can be found at the City's restructuring website, https://www.kccllc.net/detroit.**

        h.      <u>Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases</u>. Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection. Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

        i.      <u>Insurance Policies</u>. From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date are reinstated and continue in full force and effect in accordance with their terms and, to the extent applicable, are deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies. For the avoidance of doubt, nothing contained in Section II.D.9 of the Plan shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

        **6.**      **Payment of Administrative Claims.**

        a.      <u>Administrative Claims in General</u>. Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either: (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim. No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order and any additional fee process established by the Court.

        **7.**      **Bar Dates for Administrative Claims.**

        **a.**      <u>**General Bar Date Provisions.**</u> **Except as otherwise provided in subparagraphs 7(b) or 7(c) below or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date, _i.e._, _____, 20__. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will**

-6-

13-53846-tjt   Doc 8045-10   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 184 of 314
13-53846-tjt   Doc 8045-10   Filed 09/21/15   Entered 09/21/15 18:31:21   Page 184 of 314

be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, i.e., _____, 20__ , (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

   **b.**   <u>Ordinary Course Claims</u>.  Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations are not required to File or serve any request for payment or application for allowance of such Claims.  Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

   **c.**   <u>Claims Under the Postpetition Financing Agreement</u>.  Holders of Administrative Claims that are Postpetition Financing Claims are not required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied as set forth in subparagraph 7(b) above.

   **d.**   <u>No Modification of Bar Date Order</u>.  The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

   **8.**   **ASF Recoupment Cash Option.**

   a.   <u>ASF Recoupment Cash Option Election</u>.  No later than seven days following the Effective Date, i.e., _____, 20__, the City, through its Claims and Balloting Agent, will send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient.  The ASF Election Notice will notify ASF Distribution Recipients that each ASF Distribution Recipient may elect to pay the total amount of his or her ASF Recoupment in a single lump sum by timely returning a properly-completed ASF Election Form.  The ASF Election Form will explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (i) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (ii) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan.  *An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date, i.e., 35 days after the date on which the ASF Election Form is mailed.*

   b.   <u>ASF Recoupment Cash Payment</u>.  GRS will mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date.  The ASF Final Cash Payment Notice is a notice that will be sent to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option, and will indicate the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment.  *ASF Distribution Recipients shall have until the ASF Final Cash Payment Date – i.e., the later of (i) 90 days after the Effective Date,  i.e., _____, 20__ or (ii) 50 days after the date of mailing of an ASF Final Cash Payment Notice – to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and*

*ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan.* The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

9. **Copies of the Plan and Confirmation Order.** Copies of the Plan, Confirmation Order and all other documents Filed in the Chapter 9 Case may be obtained, free of charge, from the City's restructuring website at https://www.kccllc.net/detroit or from Kurtzman Carson Consultants LLC by calling (877) 298-6236 (toll-free).

BY ORDER OF THE COURT

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## **CERTIFICATE OF SERVICE**

I, Heather Lennox, hereby certify that the foregoing Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date was filed and served via the Court's electronic case filing and noticing system on this _____ day of _____, 201_.

/s/  Heather Lennox_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

### CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II) REQUIRING B&C LAND DEVELOPMENT CORPORATION TO (A) DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT AND (B) WITHDRAW ITS NOTICE OF LIS PENDENS

The City of Detroit, Michigan ("City"), by its undersigned counsel, files its Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring B&C Land Development Corporation to (A) Dismiss with Prejudice its State Court Lawsuit and (B) Withdraw its Notice of Lis Pendens ("Motion"). In support of this Motion, the City respectfully states as follows:

### I.  Introduction

1.      On July 1, 2015, B&C Land Development Corporation ("B&C") filed a state court lawsuit against the City seeking monetary damages, specific performance and injunctive relief on account of a pre-petition claim. The City informed B&C that the filing and prosecution of the state court lawsuit violates both the Bar Date Order (as defined in paragraph 5 below) and the injunction set forth in the confirmed Plan (as defined in paragraph 10 below). Despite the City's request, B&C refused to voluntarily dismiss the state court lawsuit. As a result, the City is left with no choice but to seek an order barring and permanently enjoining B&C from asserting and prosecuting the claims described in the state court lawsuit against the City or property of the City and requiring it to dismiss the state court lawsuit with prejudice.

II.    **Background**

    A.    **The City's Bankruptcy Case**

    2.    On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

    3.    On October 10, 2013, the City filed its Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Motion").  [Doc. No. 1146].

    4.    On November 21, 2013, this Court entered an order approving the Bar Date Motion ("Bar Date Order").  [Doc. No. 1782].  The Bar Date Order established February 21, 2014 ("General Bar Date") as the deadline for filing claims against the City.  Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this bankruptcy case and/or otherwise participate in the proceedings in this bankruptcy case associated with the confirmation of any chapter 9 plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

    5.    Paragraph 22 of the Bar Date Order also provided that:

> Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), **any entity that is required to file a proof of claim in this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or this Order with respect to a particular claim against the City, but that fails properly to do so by the applicable Bar Date, shall be forever barred, estopped and enjoined from: (a) asserting any claim against the City or property of the City** that (i) is in an amount that exceeds the amount, if any, that is identified in the List of Claims on behalf of such entity as undisputed, noncontingent and liquidated or (ii) is of a different nature or a different classification or priority than any Scheduled Claim identified in the List of Claims on behalf of such entity (any such claim under subparagraph (a) of this paragraph being referred to herein as an "Unscheduled Claim"); (b) voting upon, or receiving distributions under any Chapter 9 Plan in this case in respect of an Unscheduled Claim; or (c) with respect to any 503(b)(9) Claim or administrative priority claim component of any

Rejection Damages Claim, asserting any such priority claim against the City or property of the City.

Bar Date Order ¶ 22 (emphasis added).

6.     On October 22, 2014, the City filed its Eighth Amended Plan of the Adjustment

of Debts of the City of Detroit (October 22, 2014) ("Plan").  [Doc. No. 8045].

7.     On November 12, 2014, this Court entered an order confirming the Plan

("Confirmation Order").  [Doc. No. 8272].

8.     The discharge provision in the Plan provides

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.

Plan, Art. III.D.4.

9.     With certain exceptions not applicable here, the Plan does not afford any right to

distributions or payments to claimants that did not timely file proofs of claim.  Plan Art. I.A.19;

Art. I.A.134; Art. VI.A.1. Such claims are not Allowed Claims under the Plan and thus are not

entitled to distributions under the Plan.  *Id.*  ("Notwithstanding any other provision of the Plan,

no payments or Distributions shall be made on account of a Disputed Claim until such Claim

becomes an Allowed Claim.").

10.    The Plan injunction set forth in Article III.D.5 also provides in pertinent part:

**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

> a. all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…

> 1. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…

> 5. proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

> 6. taking any actions to interfere with the implementation or consummation of the Plan.

Plan, Article III.D.5 (emphasis supplied).

11. The Court also retained jurisdiction to enforce the Plan injunction and to resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan. Plan, Art. VII. F, G, I.

**B. B&C Files a Complaint in State Court in 2015 Based on an Alleged Real Estate Purchase Agreement Entered into in 2006**

12. On July 1, 2015, B&C filed a complaint ("Complaint") against the City in Wayne County Circuit Court, Michigan, case number 15-008602 ("State Court Lawsuit"). The Complaint is attached as Exhibit 6A. A notice of lis pendens ("Lis Pendens") was attached to the complaint.

13. Also, on July 1, 2015, the City wrote to B&C explaining that the filing of the Complaint violated the Plan and the Bar Date Order. The July 1 correspondence is attached as Exhibit 6B. In its July 1 correspondence, the City requested that B&C dismiss the State Court Lawsuit by July 8, 2015. B&C refused to dismiss the State Court Lawsuit. On July 21, 2015, the City filed its answer ("Answer") to the Complaint. *See* Ex. 6C.

14.     In the Complaint, B&C asserts that it submitted a proposal in 2004 to the City's Department of Planning and Development to develop approximately 29 acres of land located at 5601, 5815 and 5861 W. Jefferson Ave., commonly known as Revere Copper & Brass ("Property").  Complaint ¶ 5.  In connection with the proposal, B&C alleges that throughout 2004, its President, Mr. Robert Carmack, met with various City and Detroit Water and Sewerage Department ("DWSD") representatives.  *Id.* ¶¶ 6-9.  B&C further alleges that in 2005, Mr. Carmack was instructed by the City to conduct environmental studies on the Property, which B&C subsequently completed.  *Id.* ¶ 10.

15.     After conducting negotiations on the Property, B&C alleges that in March 2006 the City presented Mr. Carmack with an offer of sale for $500,000.  *Id.* ¶ 11.  B&C alleges that on April 14, 2006, Mr. Carmack signed the offer to purchase and gave a deposit of $50,000.00 by check to the City. *Id.*¶ 12.

16.     The sale and transfer of the Property was stalled, however, between April 2005 and May 2008, according to B&C.  *Id.* ¶ 13.  In May 2008, B&C alleges that the City presented a new document to City Council seeking approval of a sale of the Property from the City to DWSD.  *Id.* ¶ 15.  At that point, B&C alleges that "City Council, without benefit of the history of this property and pending sale to B&C approved the sale for $5,000,000.00 to DWSD with no appraisal or due diligence." *Id.*  As set forth in the Answer, on or about June 30, 2008, the Detroit City Council did authorize the transfer of the Property from the Planning and Development Department to the DWSD in exchange for reimbursement from the DWSD of $5 million.  Answer ¶ 15.

17. B&C continues to allege that at various points from 2010 through 2012, it was told that the DWSD needed the Property to build a combined sewer overflow facility but that there is not any evidence that the DWSD needed the Property for this purpose. *Id.* ¶¶ 16-19.

18. On May 10, 2012, Mr. Carmack did appear in front of the Detroit City Council raising many of the same allegations that are contained in the Complaint. *See* Ex. 6D.

19. In response to Mr. Carmack's comments to City Council, on May 15, 2012, Robert A. Anderson, the Director of the City's Planning and Development Department, submitted a public statement to City Council ("May 2012 Public Statement"). Ex. 6D.

20. In the May 2012 Public Statement, Mr. Anderson stated that on June 18, 2008, the Board of Water Commissions authorized the DWSD director to approve the acquisition of the approximately 28.66 acre "Revere Copper & Brass" site as the location for a combined sewer overflow facility. *Id.* He further explained that on June 30, 2008, the City Council authorized the transfer of the approximately 28.66 acre "Revere Copper & Brass" site from the City's Planning and Development Department to DWSD for a combined sewer overflow facility in exchange for reimbursement from DWSD of $5 million. *Id.*

21. Mr. Anderson emphasized:

P&DD never took a deposit from Mr. Carmack for this site, never entered into a purchase agreement with Mr. Carmack for this site, and never entered into a development agreement with Mr. Carmack for this site. P&DD never requested that this Honorable Body approve any sale of this site to Mr. Carmack, and Your Honorable Body never passed a land sale resolution or authorized the sale of the property to Mr. Carmack.

Since June of 2008, Your Honorable Body has requested P&DD report on the status of a sale of this site to Mr. Carmack no less than four times. The information each time has been recited above, with no change since the original report of June 25, 2008 other than the transfer to DWSD. We trust that this correspondence addresses with finality your concerns and inquiries to P&DD regarding the status of the former "Revere Coopper & Brass" property and the issues raised by Mr. Carmack.

*Id.*

22.     In the Complaint, B&C alleges that on February 5, 2013, the Detroit City Council then transferred jurisdiction over the property from the DWSD back to the Planning and Development Department because of a failure of consideration. *Id.* ¶ 20. In 2013, the City sold approximately 7 acres of the Property to Waterfront Terminal Holdings for a price of $1.16 million. Answer ¶ 21. *See also* Complaint ¶ 21. B&C also alleges that on June 30, 2031,[1] the City agreed to sell the remaining 21.665 acres to Waterfront Terminal Holdings II, LLC and Steven W. Erickson. Complaint ¶ 22.

23.     Based on these facts, the Complaint asserts causes of action for Breach of Contract (Count I), Injunctive Relief/Specific Performance (Count II), and Declaratory Relief (Count III). The Complaint is the first complaint filed by B&C against the City with respect to the alleged offer to purchase or the Property.

**C.     The Detroit City Council and Mayor Duggan Approve Two Purchase Agreements for Different Portions of the Property**

24.     In February, 2015, the City received two purchase offers for different portions of the Property. Waterfront Terminal Holdings II, LLC ("Waterfront") offered to purchase approximately 6 acres of the Property ("Waterfront Property") for $735,000. *See* Ex. 6E, True Copy Certificate of Resolution Approving Waterfront Offer to Purchase at 2. The terms of the Waterfront offer are set forth in a Purchase Agreement dated February 17, 2015 ("Waterfront Offer to Purchase"). *See* Ex. 6F. Waterfront wishes to acquire the Waterfront Property to expand its vital marine liquid and bulk distribution operations. Ex. 6E at 2. Upon acquisition, Waterfront will remediate the Waterfront Property, dredge the riverfront, and improve the seawall and dock in order to grow its large vessel refueling operations. *Id.*

---

[1] This is not a typographical error. The complaint uses the year "2031."

24838841.2\022765-00202                                   7
13-53846-tjt   Doc 10081-6   Filed 09/24/15   Entered 09/24/15 18:36:21   Page 194 of 314
13-53846-tjt   Doc 10081-10   Filed 09/24/15   Entered 09/24/15 18:36:21   Page 194 of 1502

25.    On June 30, 2015, the Detroit City Council passed a resolution approving the Waterfront Offer to Purchase and on July 7, 2015, Mayor Michael Duggan approved the resolution.  Ex. 6E.  Due to the filing of the State Court Lawsuit, on July 17, 2015, the sale closed in escrow.  *See* Ex. 6G, Escrow Agreement.

26.    A separate purchaser, Revere Dock, LLC ("Revere Dock"), offered to purchase approximately 17 acres of the Property ("Revere Dock Property") for $2,280,000.00.  *See* Ex. 6H, True Copy Certificate of Resolution Approving Revere Dock Offer to Purchase at 2. The terms of the Revere Dock offer are set forth in a Purchase Agreement dated February 17, 2015 ("Revere Dock Offer to Purchase").  *See* Ex. 6I.   Under the terms of the Revere Dock Offer to Purchase, the Revere Dock Property would be conveyed to Revere Dock under a development agreement by quit claim deed.  *See* Ex. 6H at 2.  Pursuant to the development agreement, Revere Dock's construction contracts will provide that Detroit residents must constitute at least 51% of the workforce and perform 51% of the hours worked on the project.  *Id.*   Revere Dock will also establish the goal of contracting with at least 30% of Detroit-based Businesses, Detroit-headquartered Businesses or Detroit Emerging Businesses.  *Id.*  Revere Dock's development of the Revere Dock Property will bring new heavy lift marine and transport capacity to Detroit, supporting manufacturing and fabricating companies with project equipment of oversize dimension and weight, while providing on-site staging and storage of critical equipment.  *Id.*

27.    On June 30, 2015, the Detroit City Council passed a resolution approving the Revere Dock Offer to Purchase and on July 7, 2015, Mayor Michael Duggan approved the resolution.  Ex. 6H.

28.    The City and the purchasers desire to complete the sale of these properties as soon as possible.  Consummating these transactions will immediately remove the properties from the

City's maintenance responsibilities, relieving the City of the commensurate costs. Because these properties are owned by the City, the properties are currently tax-exempt but will be returned to the tax rolls after the sales. The improvements to be made by the purchasers will create construction jobs, and the business operations will create permanent jobs.

29.     The purchasers have informed the City that they have forgone several contracts that they otherwise could have secured due to the closing delays caused by the filing of the State Court Lawsuit. Further, one of the purchasers informed the City that it needs to have closing occur immediately in order to perform on certain of its existing contractual obligations.

## III.   Argument

30.     B&C violated the Plan injunction and discharge provisions when it filed the State Court Lawsuit asserting claims against the City. And, it continues to violate it by continuing to prosecute, and refusing to voluntarily dismiss, the State Court Lawsuit. Pursuant to the Plan, B&C's claims against the City are discharged and it is enjoined from, among other things, commencing any action against the City with respect to those claims. Plan, Art. III.D.4; Plan, Art. III.D.5.

31.     Furthermore, B&C did not file a proof of claim by the General Bar Date and has at no time after the General Bar Date filed an untimely proof of claim or a motion for permission to file an untimely proof of claim on the basis of "excusable neglect" under *Pioneer Inv. Services Co v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380 (1993)("*Pioneer* Motion") and its

24838841.2\022765-00202
9
13-53846-tjt    Doc 10093-10    Filed 09/24/15    Entered 09/24/15 18:34:21    Page 196 of 314
13-53846-tjt    Doc 10086-6    Filed 09/23/15    Entered 09/23/15 18:08:52    Page 196 of 1504

progeny. Thus, B&C is also barred, estopped and enjoined from asserting any claim against the City or property of the City under the Bar Date Order. Bar Date Order ¶ 22.[2]

32.     However, even if B&C were now to file and have granted a *Pioneer* Motion (which it has not filed or sought), the relief to be afforded B&C would not include permitting B&C to proceed with its State Court Lawsuit.  At most, B&C would be permitted to file a proof of claim which, if B&C were to succeed on the merits of its proof of claim, would afford it an "Other Unsecured Claim" under Class 14 of the Plan, and the right to a Pro Rata share of New B Notes and certain other distributions to the holders of Class 14 Claims described in the Plan. Under no scenario would B&C be permitted to commence or continue to prosecute the State Court Lawsuit in connection with its claims against the City alleged in the Complaint.

## IV.   Conclusion

33.     The City respectfully requests that this Court enter an order in substantially the same form as the one attached as Exhibit 1,  (a) granting the Motion; (b) requiring B&C to dismiss, or cause to be dismissed, with prejudice the State Court Lawsuit; (c) requiring B&C to withdraw the Lis Pendens filed by it with respect to the Property; and (d) permanently barring, estopping and enjoining B&C from asserting any claims described in the State Court Lawsuit, or the alleged conduct forming the basis of the State Court Lawsuit, against the City or property of the City.  The City sought, but did not obtain, concurrence to the relief sought in the Motion.

---

[2] B&C's failure to timely file a proof of claim by the General Bar Date is an additional reason why B&C should be enjoined from continuing, and required to dismiss with prejudice, his claims against the City and its property.  However, it is not necessary for the Court to decide any bar date issues or address the Motion on that basis.  It is maintained as an alternative basis for granting the relief in the Motion.  As described in paragraph 32, even if B&C had filed a timely proof of claim and that proof of claim were Allowed under the Plan, B&C's sole right in connection with that claim would have been the right to receive distributions under the Plan on account of its Class 14 Claim (Other Unsecured Claim).  There is no set of circumstances under which B&C is or would have been permitted to commence and prosecute the State Court Lawsuit.

July 27, 2015                    Respectfully submitted,

                                 By: /s/ Marc N. Swanson
                                      Jonathan S. Green (P33140)
                                      Marc N. Swanson (P71149)
                                      MILLER, CANFIELD, PADDOCK AND
                                      STONE, P.L.C.
                                      150 West Jefferson, Suite 2500
                                      Detroit, Michigan 48226
                                      Telephone: (313) 496-7591
                                      Facsimile: (313) 496-8451
                                      green@millercanfield.com
                                      swansonm@millercanfield.com

                                      Charles N. Raimi (P29746)
                                      Deputy Corporation Counsel
                                      City of Detroit Law Department
                                      2 Woodward Avenue, Suite 500
                                      Coleman A. Young Municipal Center
                                      Detroit, Michigan  48226
                                      Telephone: (313) 237-5037
                                      Facsimile: (313) 224-5505
                                      raimic@detroitmi.gov


                                 ATTORNEYS FOR THE CITY OF DETROIT

## EXHIBIT LIST

Exhibit 1        Proposed Order

Exhibit 2        Notice

Exhibit 3        None

Exhibit 4        Certificate of Service

Exhibit 5        None

Exhibit 6A       Complaint

Exhibit 6B       July 1 Correspondence

Exhibit 6C       Answer

Exhibit 6D       May 2012 Public Statement

Exhibit 6E       True Copy Certificate of Resolution Approving Waterfront Offer to Purchase

Exhibit 6F       Waterfront Offer to Purchase

Exhibit 6G       Escrow Agreement

Exhibit 6H       True Copy Certificate of Resolution Approving Revere Dock Offer to Purchase

Exhibit 6I       Revere Dock Offer to Purchase

## EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>City of Detroit, Michigan,<br><br>Debtor. | Bankruptcy Case No. 13-53846<br><br>Honorable Thomas J. Tucker<br><br>Chapter 9 |

**[PROPOSED] ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II) REQUIRING B&C LAND DEVELOPMENT CORPORATION TO (A) DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT AND (B) WITHDRAW ITS NOTICE OF LIS PENDENS**

This matter, having come before the court on the City of Detroit's Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring B&C Land Development Corporation to (A) Dismiss with Prejudice its State Court Lawsuit and (B) Withdraw its Notice of Lis Pendens ("Motion"), upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.     The Motion is granted.

2.     Within five days of the entry of this Order, B&C Land Development Corporation shall dismiss, or cause to be dismissed, with prejudice, Case No 15-008602 filed with Wayne County Circuit Court, Michigan and captioned *B&C Land Development Corporation vs. The City of Detroit, A Municipal Corporation* ("State Court Lawsuit").

3.     Within five days of the entry of this Order, B&C Land Development Corporation shall withdraw from the Wayne County Register of Deeds the Notice of Lis Pendens filed by it with respect to the property described in paragraphs 7 and 8 of this Order.

4.      If B&C Land Development Corporation fails to timely withdraw the Notice of Lis Pendens as required by paragraph 3 of this Order, the City may file a copy of this Order with the Wayne County Register of Deeds which shall operate as a withdrawal of the Lis Pendens with respect to the property described in paragraphs 7 and 8 of this Order.

5.      B&C Land Development Corporation is permanently barred, estopped and enjoined from asserting any claims described in the State Court Lawsuit, or the alleged conduct forming the basis of the State Court Lawsuit, against the City of Detroit or property of the City of Detroit, in the State Court Lawsuit or in any other action or proceeding.

6.      The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

[continued on following page]

7.

## LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS LOTS 1187 THROUGH 1206 BOTH INCLUSIVE, ALL BEING TOGETHER WITH THE ADJACENT VACATED PUBLIC ALLEY (20 FEET WIDE) AND THE ADJACENT VACATED CAMPBELL AVENUE (66 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO PRIVATE CLAIM NO. 39 EXCEPT THE EASTERLY 574.00 FEET THEREOF LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE, EXCEPT A TRIANGULAR PORTION THEREOF DEFINED AS THE SOUTH 339.25 FEET ON THE WEST LINE OF PRIVATE CLAIM NO. 39 AND THE WEST 157.00 FEET ON THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1187 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE N.61°37'43"E. 578.36 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON AVENUE (80 FEET WIDE) TO A POINT BEING THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E. 1180.06 FEET ALONG A LINE 574.00 FEET WEST OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE; THENCE S.34°06'08"W. 494.78 FEET ALONG SAID DETROIT RIVER U.S. HARBOR LINE; THENCE N.55°47'32"W. 299.32 FEET TO A POINT ON THE WEST LINE OF PRIVATE CLAIM NO. 39; THENCE N.28°08'13"W. 1143.03 FEET ALONG SAID WEST LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF BEGINNING; SAID PARCEL CONTAINING 17.1009 ACRES, MORE OR LESS AND BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: _Basil Sari_ DATE: _4/28/2015_

Street Address[es]:

Property Tax Ward & Item numbers:

[continued on following page]

8.

## LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS LOTS 1207 THROUGH 1214 BOTH INCLUSIVE, LOT 1215 EXCEPT THE EASTERLY 6.36 FEET THEREOF, ALL BEING TOGETHER WITH THE ADJACENT VACATED PUBLIC ALLEY (20 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO THE WESTERLY 213.64 FEET OF THE EASTERLY 574.00 FEET OF PRIVATE CLAIM NO. 39 LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE N.61°37'43"E. 213.64 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON AVENUE (80 FEET WIDE) TO A POINT BEING 6.36 FEET WESTERLY FROM THE NORTHEAST CORNER OF LOT 1215 OF THE "SIXTH PLAT SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E. 1068.40 FEET ALONG A LINE 360.36 FEET WEST OF THE EASTERLY LINE OF SAID PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE; THENCE S.34°06'08"W. 241.60 FEET ALONG SAID DETROIT RIVER U.S. HARBOR LINE; THENCE N.28°03'35"W. 1180.06 FEET ALONG A LINE 574.00 FEET WEST OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF BEGINNING; SAID PARCEL CONTAINING 5.5137 ACRES, MORE OR LESS AND BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: Basil Sorin DATE: 4/28/2015

Street Address[es]:

Property Tax Ward & Item numbers:

## EXHIBIT 2 – NOTICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## NOTICE OF OPPORTUNITY TO RESPOND TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND (II) REQUIRING B&C LAND DEVELOPMENT CORPORATION TO (A) DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT AND (B) WITHDRAW ITS NOTICE OF LIS PENDENS

The City of Detroit has filed its Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring B&C Land Development Corporation to (A) Dismiss with Prejudice its State Court Lawsuit and (B) Withdraw its Notice of Lis Pendens.

**Your rights may be affected.** **You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the City of Detroit's Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring B&C Land Development Corporation to (A) Dismiss with Prejudice its State Court Lawsuit and (B) Withdraw its Notice of Lis Pendens, within 14 days, you or your attorney must:

1. File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above. You must also mail a copy to:

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
        Marc N. Swanson (P71149)
        150 West Jefferson, Suite 2500
        Detroit, Michigan 48226
        Telephone: (313) 496-7591
        Facsimile: (313) 496-8451
        swansonm@millercanfield.com

Dated:  July 27, 2015

## **EXHIBIT 3 – NONE**

**EXHIBIT 4 – CERTIFICATE OF SERVICE**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 27, 2015 the foregoing City of Detroit's Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring B&C Land Development Corporation to (A) Dismiss with Prejudice its State Court Lawsuit and (B) Withdraw its Notice of Lis Pendens was filed and served via the Court's electronic case filing and notice system and served upon counsel as listed below, via first class mail and electronic mail:

Horace D. Cotton
P.O. Box 19520
Detroit, MI 48219
hdcotton@yahoo.com

DATED: July 27, 2015

By: /s/ Marc N. Swanson
    Marc N. Swanson
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

**EXHIBIT 5 – NONE**

# EXHIBIT 6A – COMPLAINT

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS AND COMPLAINT | CASE NO.<br>15-008602-CH<br>Hon. Annette J. Berry |
|---|---|---|

2 Woodward Ave., Detroit MI 48226

Court Telephone No. 313-224-4679

| **Plaintiff**<br><br>B & C Land Development Corporation | v | **Defendant**<br><br>City of Detroit |
|---|---|---|
| **Plaintiff's Attorney**<br><br>Horace D. Cotton, P-33268<br>PO Box 19520<br>Detroit, MI 48219-0520 | | **Defendant's Attorney**<br><br>*H/p*<br>*GP* |

*[stamp: CITY OF DETROIT LAW 2015 JUN 31 PM 2: RECEIVED]*

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party or take other lawful action with the court (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C]).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>7/ 1/2015 | This summons expires<br>9/30/2015 | Court clerk<br>File & Serve Tyler |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**General Civil Cases**

☐ There is no other pending or resolved civil action arise out of the same transaction or occurrence as alleged in the complaint.

☐ An civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Place where action arose or business conducted | |

_____          _____
Date                                            Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (5/15) SUMMONS AND COMPLAINT MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a),(b), MCR 3.206(A)

STATE OF MICHIGAN
IN THE THIRD JUDICIAL CIRCUIT COURT

B&C Land Development Corporation,
A Michigan Corporation,

    Plaintiff,

-vs-

The City of Detroit, a Municipal Corporation,

    Defendant.

_____/

Case No. 15-008602-CH
FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/1/2015 7:53:55 AM
CATHY M. GARRETT

Horace D. Cotton (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

_____/

**VERIFIED COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff, B&C Land Development Corporation, by and
through its attorney, Horace D. Cotton, and for its Complaint states:

**PARTIES**

1. Plaintiff B&C Land Development Corporation, ("B&C") is a Michigan
   corporation with its principal place of business in Wayne County,
   Michigan.

1

2. Defendant City of Detroit is a municipal corporation duly organized under the laws of the State of Michigan and is located in Wayne County, State of Michigan.

3. The amount in controversy exceeds $25,000 and is otherwise within the jurisdiction of this Court.

4. The acts complained of in this Complaint occurred in Wayne County, Michigan.

### COUNT I
### BREACH OF CONTRACT

5. On or about February 27, 2004 B&C Land Development Corporation submitted a proposal to the City of Detroit Department Planning (Planning and Development.) to develop the 28.665 acre parcel of land located at 5601, 5815, and 5861 W. Jefferson Ave., commonly known as Revere Copper & Brass.

6. Mr. Robert Carmack, the President of B&C, was informed by Mr. Alan Hayner, Project Manager for the property with Detroit's Planning and Development Department , that he would have to go to the Detroit Water and Sewerage Department ("DWSD") to get their

2

approval because they intended to build a Combined Sewer Overflow (CSO) system on that location.

7. On March 10, 2004 Mr. Carmack met with Victor Mercado, Director of DWSD and was told he could move forward with the project and that DWSD had no problem and no objections to putting the anticipated CSO on a different piece of property.

8. On March 29, 2004: Mr. Carmack received a letter from Mr. Hayner at Planning and Development advising him to prepare a proposal which was to include drawings, footprints, elevations, costs, financing, development team, construction of seawall, environmental costs and additional hard and soft costs.

9. On April 14, 2004: Mr. Hayner advised Mr. Carmack to bring in all documents to Planning Development by June 18, 2004 and they would reserve the property and not accept any new offers.

10. On February 24, 2005 Mr. Carmack was instructed by Mr. Hayner to conduct a Phase I and Phase II environmental study on the property which he subsequently initiated and completed.

11. After conducting negotiations regarding the purchase of the property, on March 28, 2006 Mr. Carmack was presented with an

3

offer of sale for $500,000.00 by Mr. Christopher Raschke, the new Project Manager (replacing Alan Hayner) with the Planning and Development Department.

12.    April 14, 2006: Mr. Carmack signed the offer to purchase and gave a deposit of $50,000.00 by check to the Project Manager, Mr. Christopher Raschke, who signed the offer and accepted the deposit on behalf of the City of Detroit. (Exhibit 1)

13.    Between April 14, 2005 and May 21, 2008 the sale and transfer of property stalled as Detroit Mayor Kwame Kilpatrick and his administration became embroiled in scandal and controversy.

14.    During that period, Mr. Carmack was solicited to make a $50,000.00 bribe by a high ranking city official.  When he refused his development proposal was placed on the back burner and eventually killed altogether.

15.    On May 21, 2008 the Kilpatrick Administration presented a new document to City Council seeking approval of a sale of the property from the City of Detroit to DWSD. City Council, without benefit of the history of this property and pending sale to B&C

4

approved the sale for $5,000.000.00 to DWSD with no appraisal or due diligence.

16. When City Council approved the sale and contrary to previous statements and documentation, Mr. Carmack was informed that DWSD needed it for the CSO program and Right-of-Way. However there is no CSO either planned or actually being built on this property and the Right-of-Way has been in the possession of DWSD since 1936.

17. On January 2010: Mr. Carmack brought this issue to the attention of Mr. Al Fields, Executive Director in the new Bing Administration in Detroit.

18. On May 25, 2011: The new DWSD Director, Sue McCormick {replacing Victor Mercado), stated that they would be building a CSO on the property. There is no evidence to indicate this is a true statement. In fact, evidence points to the contrary.

19. On February 21, 2012 New Bing Administration Executive Director Karla Henderson (replacing Al Fields) initiated the transfer of the property to DWSD advising Mr. Carmack that a CSO was being built.

5

20. On February 5, 2013 the Detroit City Council by resolution
    transferred jurisdiction over the property from the Detroit Water
    and Sewerage Department back to the Planning and Development
    Department because of a failure of consideration.

21. On August 6, 2013 Detroit agreed to sell 7 acres of the property to
    Waterfront Terminal Holdings, II LLC.

22. On June 30, 2031 Detroit agreed to sell the remaining 21.665
    acres to Waterfront Terminal Holdings II, LLC and Steven W.
    Erickson.

## COUNT II
## INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE

23. By this action, B&C seeks declaratory and injunctive relief
    requiring Detroit to perform under the terms of the Purchase
    Agreement. Injunctive relief is appropriate.

24. Finally, B&C seeks specific performance of the Purchase
    Agreement requiring Detroit to convey the Revere Copper property
    to B&C. Detroit has impaired B&C's contractual rights by
    improperly agreeing to sell and convey the property to the Detroit

6

Water and Sewage Department, thereby destroying its own agreement.

25. Plaintiff adopts and incorporates by reference all prior paragraphs as though fully set forth herein.

26. Detroit breached its obligations under the Purchase Agreement by failing and refusing to cooperate and negotiate in good faith. Specifically, Detroit has violated the Purchase Agreement by, among other things: (1) failing and refusing to present B&C with a Development Agreement; (2) failing and refusing to present the development proposal to City Council for final approval; (3) conveying the property to the Detroit Water and Sewage Department after the property was under contract to B&C; (4) conveying and agreeing to convey the property to Waterfront Terminal Holdings II, LLC and Steven W. Erickson.

27. B&C fully cooperated with Detroit in pursuit of the Purchase Agreement by expended substantial resources and time in conducting due diligence and preparing a complete development proposal.

28. B&C is entitled to mandatory injunctive relief requiring Detroit to perform under the Purchase Agreement.

7

29. B&C is entitled to a mandatory injunction and/or specific performance of the Purchase Agreement.

## COUNT III
## DECLARATORY RELIEF

30. Detroit breached the terms of the Purchase Agreement B&C seeks specific performance of the Purchase Agreement, including, but not limited to, an order requiring Detroit to convey the property to B&C.

31. B&C repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

32. Detroit has prevented B&C's performance under the Purchase Agreement. B&C has satisfied all other conditions precedent to conveyance of the property except as excused by Detroit's breach.

33. An actual controversy has arisen and now exists between B&C and Defendants concerning their respective rights and duties.

34. B&C requests a judicial determination of the parties' rights and duties as set forth herein. A judicial declaration is necessary and

appropriate in order that the parties may ascertain their respective rights, duties and obligations.

35.     Specifically, B&C requests a declaration that Detroit breached the Purchase Agreement by conveying the property to DWSD and repudiating the Purchase Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, B&C Land Development Corporation respectfully request the following relief:

1. For specific performance and declaratory relief as specified below.

2. For a declaration that the vote to convey the property to DWSD was improper and unconstitutional; and that the vote be declared null and void and set aside.

3. For specific performance, including an order requiring Detroit to convey the property to B&C.

4. For declaratory relief, including a declaration that Detroit breached the Purchase Agreement.

5. For a declaration that the votes to convey the property to DWSD, Waterfront Terminal Holdings II, LLC And Steven W. Erickson were improper and unconstitutional; and that the votes be declared null and void and set aside.

6. For compensatory damages in an amount not less than $25,000 to be determined by the jury.

7. For attorneys' fees and costs of suit.

8. For such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, by and through undersigned counsel, and hereby requests that all issues in this Verified Complaint be tried by jury.

DATED: June 30, 2015

*/s/ Horace D. Cotton* (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

13-58846-tjt   Doc 10081-6   Filed 09/21/15   Entered 09/21/15 18:21:42   Page 221 of 314   1529

CITY OF DETROIT
PLANNING & DEVELOPMENT DEPARTMENT

2300 CADILLAC TOWER
DETROIT, MICHIGAN 48226
PHONE 313-224-6380
FAX 313-224-1629
WWW.CI.DETROIT.MI.US

March 28, 2006

Mr. Robert Carmack
B&C Land Development
8711 Michigan
Detroit, MI 48210

RE:     **Property For Sale By Development Agreement**
        **Development: 5601, 5815 & 5861 W. Jefferson**
                **(Former Revere Copper & Brass Site)**

Dear Mr. Carmack:

Your Offer to Purchase the above-captioned property has been reviewed and as a result a price adjustment has been determined. Accordingly, the established price for this property has been set at Five Hundred Thousand and 00/100 Dollars ($500,000.00). We hope that this adjustment in the sales price will allow you to go forward with your proposed development.

This offer supersedes any previous offer and this opportunity will expire if it is not executed on or before April 14, 2006. Please note that all city owned property is sold on an "AS IS" basis. However, if you desire to make an environmental survey of the site prior to title transfer, you may request a Right of Entry to do so.

Prospective purchasers are hereby notified that the Planning and Development Department has not investigated the environmental condition of any of the properties included in this Offer. Various federal, state or other City agencies may have information regarding the environmental condition of one or more of the properties on this list. Each purchaser is encouraged to conduct its own due diligence regarding the environmental condition of the property which that purchaser proposes to acquire and is notified that the property <u>may</u> be the subject of environmental contamination. The City of Detroit makes absolutely no warranty or representation regarding the environmental condition of any property offered for sale.

I.      **Pursuant to your request, we are enclosing the following items:**

    1.     A map of the area and legal description of the property.

    2.     Two copies of an Offer to Purchase. Please complete and sign both copies making certain that your telephone number is correct and that your name(s) appear(s) exactly as it should be shown on the Deed.

KWAME M. KILPATRICK, MAYOR



Mr. Robert Carmack
March 28, 2006
Page 2

3.   Two (2) copies of an Offeror's Statement of Qualifications which must be completed and included as part of formal purchase offer submittal.

4.   A copy of the Standard Procedure for the Purchase of Surplus Property under Development Agreement. This form explains what constitutes a formal purchase offer.

When property is sold for development purposes, standard City procedure requires that a formal Offer to Purchase be made before our Department can request authorization to proceed with a sale.

**II.**   **A formal offer to purchase and develop the captioned property must include all of the following information and _all_ of it must be submitted at the _same time_. If your response does not address each of the items listed below, your entire package will be returned to you.**

A.   A narrative statement describing the character and size of the development proposed along with preliminary site plans and/or elevation drawings at an appropriate scale to illustrate as clearly as possible the nature of the development.

B.   A statement of financial resources available to the developer for the proposed development. This should include the amount and source of developer's equity capital and other financing which provides sufficient financial information to establish the approximate net worth and/or liquid assets available to the developer for the proposed development.

Along with the following:

1.   A copy of the Developer's Articles of Incorporation, if applicable, so that the appropriate name will be used during the approval process and ultimately appear on the Deed at the Closing of the land sale.

2.   Two (2) completed copies of the Offer to Purchase.

3.   Three (3) copies of your **site plans, floor plans and elevation drawings**.

4.   Two (2) completed Offeror's Statement of Qualifications.

KWAME M. KILPATRICK, MAYOR



Mr. Robert Carmack
March 28, 2006
Page 3

15-008602-CH

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/1/2015 7:53:55 AM
CATHY M. GARRETT

5.    A cashier's or certified check payable to "Treasurer, City of Detroit" in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00) to serve as a "Good Faith" deposit. This deposit will be held by the City until the purchaser has completed the improvements as set forth in the site plan.

Upon receipt of the above, we shall review your proposed development package. If acceptable, we shall follow our Standard Procedure for sale of Surplus Property by Development Agreement to obtain City Council authorization to execute an Agreement to purchase and develop the property.

If you have any questions, please feel free to call **Christopher Raschke** at (313)224-6519 of the Development Division. **Your response to this Offer to Purchase should be mailed to:**

**Christopher Raschke**
**Planning & Development Dept.**
**65 Cadillac Square, Suite 2000**
**Detroit, MI 48226**

Sincerely,

Chidi Nyeche, Manager II
Planning & Development Department

CBN/CR/cdc

Enclosures

cc:    A. Bradby
      J. Marusich

KWAME M. KILPATRICK, MAYOR

## OFFER TO PURCHASE

(Expires if not executed on or before _____ April 14, 2006 _____ )

(I, We), **B & C Land Development Corporation**

_____ hereby offer to purchase the property

known as  5601, 5815 & 5861 W. Jefferson (Former Revere Copper & Brass Site)

_____ for the price of $ 500,000.00 , subject to the

Development Agreement for the aforementioned property.  (I, We)

plan to improve and use the property in the following manner:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Enclosed is a check or money order payable to "Treasurer, City

of Detroit", in the amount of $ 50,000.00 which represents a

"Good Faith" Deposit which will be held by the City until the

development has been satisfactorily completed.

_____4/14/06_____                    Signed _Christopher Ross_
Date

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Enclosed is a check or money order, payable to "Treasurer, City of Detroit" in the amount of $____50,000.00____ which represents a "Good Faith" Deposit which will be held by the City until the development has been satisfactorily completed.

____4__-__16____          Signed _____
      Date

                          Date _____

                          Telephone _____

____4/14/06____           Signed _____
      Date

                          Date _____

                          Telephone _____

STATE OF MICHIGAN
IN THE THIRD JUDICIAL CIRCUIT COURT

B&C Land Development Corporation,
A Michigan Corporation,

        Plaintiff,

-vs-                            15-008602CH
                                      Hon. Annette J. Berry

The City of Detroit, a Municipal Corporation,

        Defendant.

_____/

Horace D. Cotton (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

_____/

## **NOTICE OF LIS PENDENS**

      NOTICE IS HEREBY GIVEN that the above-entitled action concerning and

affecting real property as described herein was commenced on June 30, 2015 in the above-

named court by Plaintiff B & C Land Development Corporation against Defendant the City

of Detroit. The action is now pending in the above-named court.

1

The action affects the title of real property commonly known as:

5601, 5815 & 5851 W. Jefferson

War 16, Items 000006.001, 000006.002L &000008-9

And more particularly described as:

Land in the City of Detroit, County of Wayne and State of Michigan being part of Private Claim 39, also known as the Walter Crane Farm in the area formerly known as Springwells Township, and being more particularly described as follows:

All of that part of Private Claim 39 bounded on the North by the South line of West Jefferson Avenue, 80 feet wide; bounded on the West by the West line of Private Claim 39, which is common to the East line of Private Claim 39; and bounded on the South by the United States Harbor line as defined by the "Harbor Lines of Detroit and Vicinity Established by the Secretary of War, September 23, 1982:, as recorded in Liber 20, Pages 75 to 87, Wayne County Records, except for a triangular portion of said tract of land which is defined as being the South 338.25 feet on the West line of Private Claim 39 and the West 157 feet on the U.S. Harbor line of said tract of land.

This herein described tract of land is subject to a 30 feet Right of Way for a Sewer Easement that was granted to the City of Detroit on January 20, 1857 and recorded in Liber 289, Page 578 on February 9, 1883 and any other easements affecting the land. Said tract of land includes property formerly owned by the "Revere Copper Products Incorporated" which was deeded to the City of Detroit by Warranty Deed and recorded in Liber 23247, Pages 685 and 686, Wayne County Records, which was described as follows:

Parcel # 1:     Lots 1187 through 1200 inclusive and the Westerly 23 feet of Lot 1202 of the Sixth Plat of WALTER CRANE FARM, P.C. 39, together with the adjoining vacated alley located at the rear of said lots, according to the Plat thereof as recorded in Liber 20, Page 55 plats, Wayne County Records.

2

Parcel # 2:   Lots 1206 through 1215 inclusive of the Sixth Plat of WALTER CRANE FARM,, P.C. 39, together with the adjoining vacated alley located at the rear of said lots, according to the Plat thereof as recorded in Liber 20, Page 55 of plats, Wayne County Records, Campbell Avenue lying Southerly of the Southerly line of Jefferson Avenue West and Westerly of the above described premises also Lots 1 through 10, inclusive of Block 22, REEDER, JEROME AND DUFFIELDS SUBDIVISION, together with the adjoining vacated alley Southerly of said premises as recorded in Liber 7, Page 29 of plats, Wayne County Records, excepting that part of Lot 10 and the vacated alley deeded to the City of Detroit, Wayne County Records.

Parcel # 3:   The Westerly 385.36 feet in width of that part of Private Claim 39 South of Jefferson Avenue, excepting the Northerly 145 feet thereof as platted in the plat recorded in Liber 20, Page 55 of plats, Wayne County Register of Deeds records: together with accretions and additions thereof extending to the Detroit River and to the Harbor Line.

Parcel # 4:       Beginning at a point South 28° 8 minutes East 202.75 feet from a point in the Southerly line of said West Jefferson Avenue 97.52 feet distant on a course South 61° 52 minutes West from the intersection of the Southerly line of West Jefferson Avenue with the Westerly line of vacated, Campbell Avenue; running thence from said point of beginning North 61° 52 minutes East 71.40 feet to a point; thence North 27° 49 minutes West 57.75 feet to a point; thence 61 °52 minutes East 604.68 feet to a point; thence South 27 ° 50 minutes East 759. 52 feet to the United States harbor line, thence South 34 degrees 3 minutes West along said United States Harbor line 635.59 feet to a point in the Easterly line or Parcel # 3 above; thence North 55 degrees 57 minutes West 302.57 feet along the Easterly line of Parcel # 3 above to a point which is the apex of an angle formed by the change of the courses of the Westerly boundary of the premises herein described in an Easterly direction; thence continuing along said Easterly line of Parcel # 3 above North 28 degrees 3

3

minutes West 730.73 feet to a point; thence North 61 degrees 52 minutes East 29.64 feet to the point of beginning, including all vacated streets and alleys lying within the boundaries of said premises above described, and together with all riparian rights thereunto belonging.

Horace D. Cotton (P33286)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517

4

| STATE OF MICHIGAN THIRD JUDICIAL CIRCUIT WAYNE COUNTY | SUMMONS AND COMPLAINT | CASE NO. 15-008602-CH Hon. Annette J. Berry |
|---|---|---|

2 Woodward Ave., Detroit MI 48226

Court Telephone No. 313-224-4679

| Plaintiff B & C Land Development Corporation | v | Defendant City of Detroit |
|---|---|---|
| Plaintiff's Attorney Horace D. Cotton, P-33268 PO Box 19520 Detroit, MI 48219-0520 | | Defendant's Attorney |

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1.  You are being sued.
2.  **YOU HAVE 21 DAYS** after receiving this summons **to file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C]).
3.  If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued 7/ 1/2015 | This summons expires 9/30/2015 | Court clerk File & Serve Tyler |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☐ There is no other pending or resolved civil action arise out of the same transaction or occurrence as alleged in the complaint.

☐ An civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Place where action arose or business conducted | |

_____        _____

Date                                         Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.



MC 01 (5/15) SUMMONS AND COMPLAINT MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a)(b), MCR 3.206(A)

## EXHIBIT 6B – JULY 1 CORRESPONDENCE

**Swanson, Marc N.**

| | |
|---|---|
| **From:** | James Noseda <NoseJ@detroitmi.gov> |
| **Sent:** | Wednesday, July 1, 2015 4:21 PM |
| **To:** | HDCOTTON@YAHOO.COM |
| **Cc:** | Charles Raimi; Swanson, Marc N. |
| **Subject:** | B & C Land Development Corporation v City of Detroit, 15-008602-CH |
| **Attachments:** | B&C Land Develop..pdf; Bankruptcy.Notice.pdf |

Mr. Cotton:

You filed the attached lawsuit which seeks to enforce an alleged 2006 offer to purchase property from the City of Detroit.

The City Council never approved any such transaction, so no contract exists as a matter of law (and also by the very terms of the offer made by your client).

Also, the statute of limitations on a contract or any other claim has come and gone.

More importantly, your client did not file a claim in the City's bankruptcy. The deadline for filing a claim was February 24, 2014. Notice was given to all with known claims against the City, and to all others by means of multiple publications approved by the bankruptcy court.

The filing of the lawsuit, and any continuation of the lawsuit, violates the discharge injunction contained in the "Eight Amended Plan For the Adjustment of Debts of the City of Detroit" approved by the bankruptcy court on November 12, 2014 in Case No. 13-53846. See the attached Notice which contains a summary of the discharge and injunction.

Demand is made that you voluntarily dismiss the lawsuit by July 8, 2015, and send me a copy of the dismissal order.

In the event that the lawsuit is not dismissed, I have copied this e-mail to our bankruptcy counsel, Marc Swanson, and ask that he file a motion with the bankruptcy court to enforce the injunction and seek costs and sanctions as appropriate.


/s/ James D. Noseda
Supervising Assistant Corporation Counsel
City of Detroit Law Department
Coleman A. Young Municipal Building
2 Woodward Ave., 5th Floor
Detroit, Michigan 48226
Dir. Tel. 313-237-3057
Gen. Tel. 313-224-4550
Fax: 313-224-5505
nosej@detroitmi.gov

WARNING: This communication may include information protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or by other privilege. This communication is intended solely for the individual or entity to whom it is addressed. If you are not the intended recipient, use of the communication is neither allowed nor intended. If you received this e-mail in error, please securely delete it.

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS AND COMPLAINT | CASE NO.<br>15-008602-CH<br>Hon. Annette J. Berry |
|---|---|---|

2 Woodward Ave., Detroit MI 48226

Court Telephone No. 313-224-4679

| Plaintiff<br><br>B & C Land Development Corporation | v | Defendant<br><br>City of Detroit |
|---|---|---|
| Plaintiff's Attorney<br><br>Horace D. Cotton, P-33268<br>PO Box 19520<br>Detroit, MI 48219-0520 | | Defendant's Attorney |

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to file a written answer with the court and serve a copy on the other party or take other lawful action with the court (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C]).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued<br>7/1/2015 | This summons expires<br>9/30/2015 | Court clerk<br>File & Serve Tyler |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☐ There is no other pending or resolved civil action arise out of the same transaction or occurrence as alleged in the complaint.

☐ An civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint have been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Place where action arose or business conducted | |

_____        _____
Date                                             Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (5/15) SUMMONS AND COMPLAINT MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a),(b), MCR 3.206(A)

13-53846-tjt   Doc 10081-6   Filed 09/21/15   Entered 09/21/15 14:06:27   Page 234 of 314      1542

STATE OF MICHIGAN
IN THE THIRD JUDICIAL CIRCUIT COURT

B&C Land Development Corporation,
A Michigan Corporation,

        Plaintiff,

-vs-

Case No. 15-008602-CH
FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/1/2015 7:53:55 AM
CATHY M. GARRETT

The City of Detroit, a Municipal Corporation,

        Defendant.

_____/

Horace D. Cotton (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

_____/

**VERIFIED COMPLAINT AND JURY DEMAND**

    NOW COMES Plaintiff, B&C Land Development Corporation, by and

through its attorney, Horace D. Cotton, and for its Complaint states:

**PARTIES**

1. Plaintiff B&C Land Development Corporation, ("B&C") is a Michigan

    corporation with its principal place of business in Wayne County,

    Michigan.

1

2. Defendant City of Detroit is a municipal corporation duly organized under the laws of the State of Michigan and is located in Wayne County, State of Michigan.

3. The amount in controversy exceeds $25,000 and is otherwise within the jurisdiction of this Court.

4. The acts complained of in this Complaint occurred in Wayne County, Michigan.

<div align="center">

**COUNT I**
**BREACH OF CONTRACT**

</div>

5. On or about February 27, 2004  B&C Land Development Corporation submitted a proposal to the City of Detroit Department Planning (Planning and Development.) to develop the 28.665 acre parcel of land located at 5601, 5815, and 5861 W. Jefferson Ave., commonly known as Revere Copper & Brass.

6. Mr. Robert Carmack, the President of B&C, was informed by Mr. Alan Hayner, Project Manager for the property with Detroit's Planning and Development Department , that he would have to go to the Detroit Water and Sewerage Department ("DWSD") to get their

approval because they intended to build a Combined Sewer Overflow (CSO) system on that location.

7. On March 10, 2004 Mr. Carmack met with Victor Mercado, Director of DWSD and was told he could move forward with the project and that DWSD had no problem and no objections to putting the anticipated CSO on a different piece of property.

8. On March 29, 2004: Mr. Carmack received a letter from Mr. Hayner at Planning and Development advising him to prepare a proposal which was to include drawings, footprints, elevations, costs, financing, development team, construction of seawall, environmental costs and additional hard and soft costs.

9. On April 14, 2004: Mr. Hayner advised Mr. Carmack to bring in all documents to Planning Development by June 18, 2004 and they would reserve the property and not accept any new offers.

10. On February 24, 2005 Mr. Carmack was instructed by Mr. Hayner to conduct a Phase I and Phase II environmental study on the property which he subsequently initiated and completed.

11. After conducting negotiations regarding the purchase of the property, on March 28, 2006 Mr. Carmack was presented with an

3

offer of sale for $500,000.00 by Mr. Christopher Raschke, the new Project Manager (replacing Alan Hayner) with the Planning and Development Department.

12.    April 14, 2006: Mr. Carmack signed the offer to purchase and gave a deposit of $50,000.00 by check to the Project Manager, Mr. Christopher Raschke, who signed the offer and accepted the deposit on behalf of the City of Detroit. (Exhibit 1)

13.    Between April 14, 2005 and May 21, 2008 the sale and transfer of property stalled as Detroit Mayor Kwame Kilpatrick and his administration became embroiled in scandal and controversy.

14.    During that period, Mr. Carmack was solicited to make a $50,000.00 bribe by a high ranking city official.  When he refused his development proposal was placed on the back burner and eventually killed altogether.

15.    On May 21, 2008 the Kilpatrick Administration presented a new document to City Council seeking approval of a sale of the property from the City of Detroit to DWSD. City Council, without benefit of the history of this property and pending sale to B&C

approved the sale for $5,000.000.00 to DWSD with no appraisal or due diligence.

16. When City Council approved the sale and contrary to previous statements and documentation, Mr. Carmack was informed that DWSD needed it for the CSO program and Right-of-Way. However there is no CSO either planned or actually being built on this property and the Right-of-Way has been in the possession of DWSD since 1936.

17. On January 2010: Mr. Carmack brought this issue to the attention of Mr. Al Fields, Executive Director in the new Bing Administration in Detroit.

18. On May 25, 2011: The new DWSD Director, Sue McCormick {replacing Victor Mercado), stated that they would be building a CSO on the property. There is no evidence to indicate this is a true statement. In fact, evidence points to the contrary.

19. On February 21, 2012 New Bing Administration Executive Director Karla Henderson (replacing Al Fields) initiated the transfer of the property to DWSD advising Mr. Carmack that a CSO was being built.

5

20. On February 5, 2013 the Detroit City Council by resolution transferred jurisdiction over the property from the Detroit Water and Sewerage Department back to the Planning and Development Department because of a failure of consideration.

21. On August 6, 2013 Detroit agreed to sell 7 acres of the property to Waterfront Terminal Holdings, II LLC.

22. On June 30, 2031 Detroit agreed to sell the remaining 21.665 acres to Waterfront Terminal Holdings II, LLC and Steven W. Erickson.

## COUNT II
## INJUNCTIVE RELIEF/SPECIFIC PERFORMANCE

23. By this action, B&C seeks declaratory and injunctive relief requiring Detroit to perform under the terms of the Purchase Agreement. Injunctive relief is appropriate.

24. Finally, B&C seeks specific performance of the Purchase Agreement requiring Detroit to convey the Revere Copper property to B&C. Detroit has impaired B&C's contractual rights by improperly agreeing to sell and convey the property to the Detroit

6

Water and Sewage Department, thereby destroying its own agreement.

25.    Plaintiff adopts and incorporates by reference all prior paragraphs as though fully set forth herein.

26.    Detroit breached its obligations under the Purchase Agreement by failing and refusing to cooperate and negotiate in good faith. Specifically, Detroit has violated the Purchase Agreement by, among other things: (1) failing and refusing to present B&C with a Development Agreement; (2) failing and refusing to present the development proposal to City Council for final approval; (3) conveying the property to the Detroit Water and Sewage Department after the property was under contract to B&C; (4) conveying and agreeing to convey the property to Waterfront Terminal Holdings II, LLC and Steven W. Erickson.

27.    B&C fully cooperated with Detroit in pursuit of the Purchase Agreement by expended substantial resources and time in conducting due diligence and preparing a complete development proposal.

28.    B&C is entitled to mandatory injunctive relief requiring Detroit to perform under the Purchase Agreement.

7

29. B&C is entitled to a mandatory injunction and/or specific performance of the Purchase Agreement.

## COUNT III
## DECLARATORY RELIEF

30. Detroit breached the terms of the Purchase Agreement B&C seeks specific performance of the Purchase Agreement, including, but not limited to, an order requiring Detroit to convey the property to B&C.

31. B&C repeats and realleges each and every foregoing and subsequent allegation contained in the Complaint as though fully set forth herein.

32. Detroit has prevented B&C's performance under the Purchase Agreement. B&C has satisfied all other conditions precedent to conveyance of the property except as excused by Detroit's breach.

33. An actual controversy has arisen and now exists between B&C and Defendants concerning their respective rights and duties.

34. B&C requests a judicial determination of the parties' rights and duties as set forth herein. A judicial declaration is necessary and

8

appropriate in order that the parties may ascertain their respective rights, duties and obligations.

35.    Specifically, B&C requests a declaration that Detroit breached the Purchase Agreement by conveying the property to DWSD and repudiating the Purchase Agreement.

## PRAYER FOR RELIEF

WHEREFORE, B&C Land Development Corporation respectfully request the following relief:

1. For specific performance and declaratory relief as specified below.

2. For a declaration that the vote to convey the property to DWSD was improper and unconstitutional; and that the vote be declared null and void and set aside.

3. For specific performance, including an order requiring Detroit to convey the property to B&C.

4. For declaratory relief, including a declaration that Detroit breached the Purchase Agreement.

5. For a declaration that the votes to convey the property to DWSD, Waterfront Terminal Holdings II, LLC And Steven W. Erickson were improper and unconstitutional; and that the votes be declared null and void and set aside.

6. For compensatory damages in an amount not less than $25,000 to be determined by the jury.

7. For attorneys' fees and costs of suit.

8. For such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

NOW COMES Plaintiff, by and through undersigned counsel, and hereby requests that all issues in this Verified Complaint be tried by jury.

DATED: June 30, 2015

*/s/ Horace D. Cotton* (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

CITY OF DETROIT
PLANNING & DEVELOPMENT DEPARTMENT

March 28, 2006

Mr. Robert Carmack
B&C Land Development
8711 Michigan
Detroit, MI 48210

RE:     **Property For Sale By Development Agreement**
        **Development: 5601, 5815 & 5861 W. Jefferson**
              **(Former Revere Copper & Brass Site)**

Dear Mr. Carmack:

Your Offer to Purchase the above-captioned property has been reviewed and as a result a price adjustment has been determined. Accordingly, the established price for this property has been set at Five Hundred Thousand and 00/100 Dollars ($500,000.00). We hope that this adjustment in the sales price will allow you to go forward with your proposed development.

This offer supersedes any previous offer and this opportunity will expire if it is not executed on or before April 14, 2006. Please note that all city owned property is sold on an "AS IS" basis. However, if you desire to make an environmental survey of the site prior to title transfer, you may request a Right of Entry to do so.

Prospective purchasers are hereby notified that the Planning and Development Department has not investigated the environmental condition of any of the properties included in this Offer. Various federal, state or other City agencies may have information regarding the environmental condition of one or more of the properties on this list. Each purchaser is encouraged to conduct its own due diligence regarding the environmental condition of the property which that purchaser proposes to acquire and is notified that the property may be the subject of environmental contamination. The City of Detroit makes absolutely no warranty or representation regarding the environmental condition of any property offered for sale.

I.      **Pursuant to your request, we are enclosing the following items:**

1.  A map of the area and legal description of the property.

2.  Two copies of an Offer to Purchase. Please complete and sign both copies making certain that your telephone number is correct and that your name(s) appear(s) exactly as it should be shown on the Deed.

KWAME M. KILPATRICK, MAYOR



Mr. Robert Carmack
March 28, 2006
Page 2

3. Two (2) copies of an Offeror's Statement of Qualifications which must be completed and included as part of formal purchase offer submittal.

4. A copy of the Standard Procedure for the Purchase of Surplus Property under Development Agreement. This form explains what constitutes a formal purchase offer.

When property is sold for development purposes, standard City procedure requires that a formal Offer to Purchase be made before our Department can request authorization to proceed with a sale.

**II. A formal offer to purchase and develop the captioned property must include all of the following information and all of it must be submitted at the same time. If your response does not address each of the items listed below, your entire package will be returned to you.**

A. A narrative statement describing the character and size of the development proposed along with preliminary site plans and/or elevation drawings at an appropriate scale to illustrate as clearly as possible the nature of the development.

B. A statement of financial resources available to the developer for the proposed development. This should include the amount and source of developer's equity capital and other financing which provides sufficient financial information to establish the approximate net worth and/or liquid assets available to the developer for the proposed development.

Along with the following:

1. A copy of the Developer's Articles of Incorporation, if applicable, so that the appropriate name will be used during the approval process and ultimately appear on the Deed at the Closing of the land sale.

2. Two (2) completed copies of the Offer to Purchase.

3. Three (3) copies of your **site plans, floor plans and elevation drawings**.

4. Two (2) completed Offeror's Statement of Qualifications.

KWAME M. KILPATRICK, MAYOR



Mr. Robert Carmack
March 28, 2006
Page 3

5. A cashier's or certified check payable to "Treasurer, City of Detroit" in the amount of Fifty Thousand and 00/100 Dollars ($50,000.00) to serve as a "Good Faith" deposit. This deposit will be held by the City until the purchaser has completed the improvements as set forth in the site plan.

15-008602-CH
FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/1/2015 7:53:55 AM
CATHY M. GARRETT

Upon receipt of the above, we shall review your proposed development package. If acceptable, we shall follow our Standard Procedure for sale of Surplus Property by Development Agreement to obtain City Council authorization to execute an Agreement to purchase and develop the property.

If you have any questions, please feel free to call **Christopher Raschke** at (313)224-6519 of the Development Division. **Your response to this Offer to Purchase should be mailed to:**

**Christopher Raschke**
**Planning & Development Dept.**
**65 Cadillac Square, Suite 2000**
**Detroit, MI 48226**

Sincerely,

Chidi Nyeche, Manager II
Planning & Development Department

CBN/CR/cdc

Enclosures

cc:   A. Bradby
      J. Marusich

KWAME M. KILPATRICK, MAYOR



## OFFER TO PURCHASE

(Expires if not executed on or before _____April 14, 2006_____)

(I, We), **B & C Land Development Corporation**

_____ hereby offer to purchase the property

known as ___5601, 5815 & 5861 W. Jefferson (Former Revere Copper & Brass Site)___

_____ for the price of $ 500,000.00 , subject to the

Development Agreement for the aforementioned property. (I, We)

plan to improve and use the property in the following manner:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Enclosed is a check or money order, payable to "Treasurer, City

of Detroit", in the amount of $____50,000.00____ which represents a

"Good Faith" Deposit which will be held by the City until the

development has been satisfactorily completed.

___4/14/06___
Date

Signed _Christopher Ross_

Enclosed is a check or money order, payable to "Treasurer City of Detroit" in the amount of $ 50,000.00 which represents a "Good Faith" deposit which will be held by the City until the development has been satisfactorily completed.

4 - 06  
_Date_

Signed _____  
Date _____  
_____

4/14/06  
Date

Signed _____  
Date _____  
Telephone _____

STATE OF MICHIGAN
IN THE THIRD JUDICIAL CIRCUIT COURT

B&C Land Development Corporation,
A Michigan Corporation,

        Plaintiff,

-vs-
                                15-008602CH
                                Hon. Annette J. Berry

The City of Detroit, a Municipal Corporation,

        Defendant.

_____/

Horace D. Cotton (P33268)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517
hdcotton@yahoo.com

_____/

## **NOTICE OF LIS PENDENS**

      NOTICE IS HEREBY GIVEN that the above-entitled action concerning and

affecting real property as described herein was commenced on June 30, 2015 in the above-

named court by Plaintiff B & C Land Development Corporation against Defendant the City

of Detroit. The action is now pending in the above-named court.

1

The action affects the title of real property commonly known as:

5601, 5815 & 5851 W. Jefferson

War 16, Items 000006.001, 000006.002L &000008-9

And more particularly described as:

Land in the City of Detroit, County of Wayne and State of Michigan being part of Private Claim 39, also known as the Walter Crane Farm in the area formerly known as Springwells Township, and being more particularly described as follows:

All of that part of Private Claim 39 bounded on the North by the South line of West Jefferson Avenue, 80 feet wide; bounded on the West by the West line of Private Claim 39, which is common to the East line of Private Claim 39; and bounded on the South by the United States Harbor line as defined by the "Harbor Lines of Detroit and Vicinity Established by the Secretary of War, September 23, 1982:, as recorded in Liber 20, Pages 75 to 87, Wayne County Records, except for a triangular portion of said tract of land which is defined as being the South 338.25 feet on the West line of Private Claim 39 and the West 157 feet on the U.S. Harbor line of said tract of land.

This herein described tract of land is subject to a 30 feet Right of Way for a Sewer Easement that was granted to the City of Detroit on January 20, 1857 and recorded in Liber 289, Page 578 on February 9, 1883 and any other easements affecting the land. Said tract of land includes property formerly owned by the "Revere Copper Products Incorporated" which was deeded to the City of Detroit by Warranty Deed and recorded in Liber 23247, Pages 685 and 686, Wayne County Records, which was described as follows:

Parcel # 1:     Lots 1187 through 1200 inclusive and the Westerly 23 feet of Lot 1202 of the Sixth Plat of WALTER CRANE FARM, P.C. 39, together with the adjoining vacated alley located at the rear of said lots, according to the Plat thereof as recorded in Liber 20, Page 55 plats, Wayne County Records.

2

Parcel # 2:   Lots 1206 through 1215 inclusive of the Sixth Plat of WALTER CRANE FARM,, P.C. 39, together with the adjoining vacated alley located at the rear of said lots, according to the Plat thereof as recorded in Liber 20, Page 55 of plats, Wayne County Records, Campbell Avenue lying Southerly of the Southerly line of Jefferson Avenue West and Westerly of the above described premises also Lots 1 through 10, inclusive of Block 22, REEDER, JEROME AND DUFFIELDS SUBDIVISION, together with the adjoining vacated alley Southerly of said premises as recorded in Liber 7, Page 29 of plats, Wayne County Records, excepting that part of Lot 10 and the vacated alley deeded to the City of Detroit, Wayne County Records.

Parcel # 3:   The Westerly 385.36 feet in width of that part of Private Claim 39 South of Jefferson Avenue, excepting the Northerly 145 feet thereof as platted in the plat recorded in Liber 20, Page 55 of plats, Wayne County Register of Deeds records: together with accretions and additions thereof extending to the Detroit River and to the Harbor Line.

Parcel # 4:      Beginning at a point South 28° 8 minutes East 202.75 feet from a point in the Southerly line of said West Jefferson Avenue 97.52 feet distant on a course South 61° 52 minutes West from the intersection of the Southerly line of West Jefferson Avenue with the Westerly line of vacated, Campbell Avenue; running thence from said point of beginning North 61° 52 minutes East 71.40 feet to a point; thence North 27° 49 minutes West 57.75 feet to a point; thence 61 °52 minutes East 604.68 feet to a point; thence South 27 ° 50 minutes East 759. 52 feet to the United States harbor line, thence South 34 degrees 3 minutes West along said United States  Harbor line 635.59 feet to a point in the Easterly line or Parcel # 3 above; thence North 55 degrees 57 minutes West 302.57 feet along the Easterly line of Parcel # 3 above to a point which is the apex of an angle formed by the change of the courses of the Westerly boundary of the premises herein described in an Easterly direction; thence continuing along said Easterly line of Parcel # 3 above North 28 degrees 3

3

minutes West 730.73 feet to a point; thence North 61 degrees 52 minutes East 29.64 feet to the point of beginning, including all vacated streets and alleys lying within the boundaries of said premises above described, and together with all riparian rights thereunto belonging.

Horace D. Cotton (P33286)
Attorney for Plaintiff
P.O. Box 19520
Detroit, MI 48219
(313) 595-1517

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------- x
                                                         :
In re                                                    :     Chapter 9
                                                         :
CITY OF DETROIT, MICHIGAN,                               :     Case No. 13-53846
                                                         :
                              Debtor.                    :     Hon. Steven W. Rhodes
                                                         :
                                                         :
                                                         :
-------------------------------------------------------- x

**NOTICE OF (I) ENTRY OF ORDER CONFIRMING EIGHTH**
**AMENDED PLAN FOR THE ADJUSTMENT OF DEBTS OF THE**
**CITY OF DETROIT AND (II) OCCURRENCE OF EFFECTIVE DATE**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

    1.    **Confirmation of the Plan and Occurrence of the Effective Date.**

On November 12, 2014, the United States Bankruptcy Court for the Eastern
District of Michigan (the "Bankruptcy Court") entered an order (Docket No. 8272) (the "Confirmation
Order") confirming the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (as it
may have been amended, supplemented or modified, the "Plan"), in the above-captioned chapter 9 case of
the City of Detroit, Michigan (the "City"). The Effective Date of the Plan occurred on December 10,
2014. Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the
meanings given to them in the Plan and the Confirmation Order.

    2.    **Discharge of Claims.**

    a.    Except as provided in the Plan or in the Confirmation Order, the rights
afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete
satisfaction, discharge and release of all Claims arising on or before the Effective Date, including any
interest accrued on Claims from and after the Petition Date. Except as provided in the Plan or in the
Confirmation Order, as of the Effective Date, the City is discharged from all Claims or other debts that
arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or
502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt was Filed or
deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt was
allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt
accepted the Plan.

    b.    In accordance with the foregoing, except as expressly provided otherwise
in the Plan or the Confirmation Order, the Confirmation Order is a judicial determination, as of the
Effective Date, of a discharge of all debts of the City, pursuant to sections 524(a)(1), 524(a)(2) and 944(b)
of the Bankruptcy Code, and such discharge voids any judgment obtained against the City at any time, to
the extent that such judgment relates to a discharged debt; provided that, in accordance with section



944(c)(1) of the Bankruptcy Code, such discharge does not apply to (i) debts specifically exempted from discharge under the Plan; (ii) debts held by an Entity that, before the Confirmation Date, had neither notice nor actual knowledge of the Chapter 9 Case; (iii) claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983; or (iv) Claims of (A) T&T Management, Inc., (B) HRT Enterprises and (C) the John W. and Vivian M. Denis Trust related to condemnation or inverse condemnation actions against the City alleging that the City has taken private property without just compensation in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

3. **Releases.**

a. <u>General Releases by Holders of Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), each holder of a Claim that voted in favor of the Plan, to the fullest extent permissible under law, is deemed to forever release, waive and discharge (which release will be in addition to the release and discharge of Claims otherwise provided herein and under the Confirmation Order and the Bankruptcy Code):

i. all Liabilities in any way relating to the City, the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), the Plan, the Exhibits or the Disclosure Statement, in each case that such holder has, had or may have against the City or its current and former officials, officers, directors, employees, managers, attorneys, advisors and professionals, each acting in such capacity (and, in addition to and without limiting the foregoing, in the case of any Emergency Manager, in such Emergency Manager's capacity as an appointee under PA 436); provided further, for the avoidance of doubt, that any person or entity designated to manage the Chapter 9 Case for the City after the Emergency Manager's term is terminated, whether such person or entity acts as an employee, advisor or contractor to the City or acts as an employee, agent, contractor or appointee of the State under any applicable state law, shall be treated the same as an employee of the City hereunder; and

ii. all Liabilities in any way relating to (A) Claims that are compromised, settled or discharged under or in connection with the Plan, (B) the Chapter 9 Case (including the authorization given to file the Chapter 9 Case), (C) the Plan, (D) the Exhibits, (E) the Disclosure Statement or (F) the DIA Settlement, in each case that such holder has, had or may have against the City's Related Entities, the State, the State Related Entities and the Released Parties; provided, however, that any such Liability of the Foundations, the DIA Funders and the CFSEM Supporting Organization and their Related Entities are released only to the extent that such Liability, if any, arises from any such entity's participation in the DIA Settlement;

provided, however, that the foregoing provisions shall not affect the liability of the City, its Related Entities and the Released Parties that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that nothing in Section III.D.7.a of the Plan shall release (i) the City's obligations under the Plan or (ii) any defenses that any party may have against the City, its Related Entities, the State, the State Related Entities or the Released Parties. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 shall not be released.

b. <u>Release by Holders of Pension Claims</u>. Without limiting any other applicable provisions of, or releases contained in, the Plan or any contracts, instruments, releases,

agreements or documents entered into or delivered in connection with the Plan, as of the Effective Date, in consideration for the obligations of the City under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan (including the State Contribution Agreement), if the State Contribution Agreement is consummated, each holder of a Pension Claim is deemed to forever release, waive and discharge all Liabilities arising from or related to the City, the Chapter 9 Case, including the authorization given to file the Chapter 9 Case, the Plan, all Exhibits, the Disclosure Statement, PA 436 and its predecessor or replacement statutes, and Article IX, Section 24 of the Michigan Constitution that such party has, had or may have against the State and any State Related Entities. For the avoidance of doubt, the Plan does not release, waive or discharge obligations of the City that are established in the Plan or that arise from and after the Effective Date with respect to (i) pensions as modified by the Plan or (ii) labor-related obligations. Such post-Effective Date obligations shall be enforceable against the City or its representatives by active or retired employees or their collective bargaining representatives to the extent permitted by applicable non-bankruptcy law or the Plan, or, with respect to pensions only, GRS or PFRS.

Notwithstanding Sections III.D.5-7 and IV.L of the Plan, except as set forth in the COP Swap Settlement, nothing in the Plan or the Confirmation Order shall or shall be deemed to provide a release by the COP Swap Counterparties of any Liabilities related to the COPs, the COP Service Corporations, the Transaction Documents (as defined in the COP Swap Settlement), the COP Swap Settlement or the COP Swap Settlement Approval Order. For the avoidance of doubt, notwithstanding Section III.D.6 of the Plan, a vote of DWSD Bond Claims or DWSD Revolving Bond Claims in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such DWSD Bond Claims, a Holder of any such DWSD Revolving Bond Claims or the Bond Insurer insuring any such Claims of any Liabilities against the City or its Related Entities that do not arise in connection with the DWSD Bonds or the DWSD Revolving Bonds. For the further avoidance of doubt, notwithstanding anything in the Plan to the contrary, a vote of a Claim other than a DWSD Bond Claim or DWSD Revolving Bond Claim in favor of the Plan shall not, and shall not be deemed to, effect a release pursuant to Section III.D.7 of the Plan by a Holder of any such voted Claim or the Bond Insurer insuring such voted Claim of any Liabilities against the City or any other Entity arising in connection with the DWSD Bonds or DWSD Revolving Bonds.

    4.    **Injunctions.**

        **On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order:**

        a.    **All Entities that have been, are or may be holders of Claims against the City, Indirect 36th District Court Claims or Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity, along with their Related Entities, are permanently enjoined from taking any of the following actions against or affecting the City or its property, DIA Corp. or its property, the DIA Assets, the Released Parties or their respective property and the Related Entities of each of the foregoing, with respect to such claims (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the City or its property (including (A) all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice, (B) Indirect 36th District Court Claims and (C) Indirect Employee Indemnity Claims asserted against officers or employees of the City in their official capacity); (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against the City or its property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly,**

any encumbrance of any kind against the City or its property; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the City or its property; (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan. Notwithstanding anything in the Plan or the Confirmation Order to the contrary, claims against officers or employees of the City in their individual capacity under 42 U.S.C. § 1983 are not enjoined. In addition, all individuals affected by the ASF Recoupment are enjoined from commencing any proceeding against the GRS and its trustees, officers, employees or professionals arising from the GRS's compliance with the Plan or the Confirmation Order.

        b.    All Entities that have held, currently hold or may hold any Liabilities released pursuant to the Plan are permanently enjoined from taking any of the following actions against the State, the State Related Entities, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, and the Released Parties or any of their respective property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the State, a State Related Entity, the officers, board of trustees/directors, attorneys, advisors and professionals of the RDPFFA or the DRCEA, or a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan. Notwithstanding the foregoing and without limiting the injunctions in sub-paragraph 4(a) above, the Holders of Indirect 36th District Court Claims shall not be enjoined from taking any of the foregoing actions against the State or the State Related Entities with respect to Indirect 36th District Court Claims to the extent such Claims are not satisfied pursuant to the Plan.

        5.    Treatment of Executory Contracts and Unexpired Leases.

        a.    Assumption. Except for Executory Contracts and Unexpired Leases rejected in the Plan or by other court order, or as requested in any motion Filed by the City on or prior to the Effective Date, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, the City has been deemed to assume all Executory Contracts and Unexpired Leases to which it is a party. Notwithstanding the foregoing, Retirement System Indemnity Obligations have not been assumed under the Plan and have been discharged. For the avoidance of doubt, the City has assumed the Tunnel Lease pursuant to Section II.D.1 of the Plan.

        b.    Assumption of Ancillary Agreements. Each Executory Contract and Unexpired Lease assumed pursuant to Section II.D.1 of the Plan includes any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such Executory Contract or Unexpired Lease, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.D.6 of the Plan or designated for rejection in accordance with Section II.D.3 of the Plan.

        c.    Approval of Assumptions and Assignments. The Confirmation Order constitutes an order of the Bankruptcy Court approving the assumption of Executory Contracts and Unexpired Leases pursuant to Sections II.D.1 and II.D.2 of the Plan (and any related assignment) as of the

-4-

Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.D.6 of the Plan or (e) are designated for rejection in accordance with the last sentence of this paragraph. On November 21, 2014, in accordance with the Contract Procedures Order, the City filed with the Bankruptcy Court a non-exclusive list (Docket No. 8387) (the "Non-Exclusive Plan Assumption List") of Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan. On December 5, 2014, the City filed a notice of amendment to the Non-Exclusive Plan Assumption List (Docket No. 8573). The City has provided separate notice to each party whose Executory Contract or Unexpired Lease is identified on the Non-Exclusive Plan Assumption List of: (a) the Executory Contract or Unexpired Lease being assumed; (b) the Cure Amount Claim, if any, that the City believes it would be obligated to pay in connection with such assumption; (c) any assignment of an Executory Contract or Unexpired Lease; and (d) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease are set forth in the Contract Procedures Order (Docket No. 6512). **For Executory Contracts or Unexpired Leases assumed under the Plan but not identified in the Non-Exclusive Plan Assumption List, the counterparty to such an agreement must file any written objection, setting forth the basis for opposing assumption or assignment of the applicable agreement or the proposed Cure Amount Claim, no later than 20 days after the Effective Date of the Plan, i.e., December 30, 2014.** If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the City, the applicable Executory Contract or Unexpired Lease may be designated by the City for rejection, which shall be deemed effective as of the Effective Date.

        d.    <u>Payments Related to the Assumption of Executory Contracts and Unexpired Leases</u>. To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the City: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the City or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order resolving the dispute and approving the assumption.

        e.    <u>Contracts and Leases Entered Into After the Petition Date</u>. Contracts, leases and other agreements entered into after the Petition Date by the City, including (a) any Executory Contracts or Unexpired Leases assumed by the City and (b) the collective bargaining agreements identified on Exhibit II.D.5 to the Plan, will be performed by the City in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

        f.    <u>Rejection of Executory Contracts and Unexpired Leases</u>. Each Executory Contract and Unexpired Lease that is listed on Exhibit II.D.6 to the Plan was deemed rejected as of the Effective Date pursuant to section 365 of the Bankruptcy Code. The Confirmation Order constitutes an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease. Each contract or lease listed on Exhibit II.D.6 to the Plan is rejected only to the extent that any such contract or lease constitutes an

Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.D.6 to the Plan does not constitute an admission by the City that such contract or lease is an Executory Contract or Unexpired Lease or that the City has any liability thereunder.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be treated as Class 14 Claims (Other Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

**g.      Rejection Damages Bar Date.  Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court and served upon counsel to the City on or before the later of: (a) 45 days after the Effective Date, i.e., January 26, 2015; or (b) 45 days after such Executory Contract or Unexpired Lease is rejected pursuant to a Final Order or designated for rejection in accordance with Section II.D.3 of the Plan.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a Distribution from, and shall not be enforceable against, the City.  Proof of claim forms and instructions for filing claims can be found at the City's restructuring website, https://www.kccllc.net/detroit.**

**h.      Preexisting Obligations to the City Under Rejected Executory Contracts and Unexpired Leases.**  Pursuant to section 365(g) of the Bankruptcy Code, rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute a breach of such contract or lease and not a termination thereof, and all obligations owing to the City under such contract or lease as of the date of such breach shall remain owing to the City upon rejection.  Notwithstanding any applicable non-bankruptcy law to the contrary, the City expressly reserves and does not waive any right to receive, or any continuing obligation of a non-City party to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased, or services previously received, by the City from non-City parties to rejected Executory Contracts or Unexpired Leases, and any such rights shall remain vested in the City as of the Effective Date.

**i.      Insurance Policies.**  From and after the Effective Date, each of the City's insurance policies (other than welfare benefits insurance policies) in existence as of or prior to the Effective Date are reinstated and continue in full force and effect in accordance with their terms and, to the extent applicable, are deemed assumed by the City pursuant to section 365 of the Bankruptcy Code and Section II.D.1 of the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the City may hold against any Entity, including any insurer under any of the City's insurance policies.  For the avoidance of doubt, nothing contained in Section II.D.9 of the Plan shall apply to reinstate or continue any obligation of the City or any fund thereof to any Bond Insurer.

**6.      Payment of Administrative Claims.**

**a.      Administrative Claims in General.**  Except as specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the Holder of an Administrative Claim and the City, or ordered by the Bankruptcy Court, each Holder of an Allowed Administrative Claim will receive, in full satisfaction of such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim either:  (1) on the Effective Date or as soon as reasonably practicable thereafter; or (2) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Claim.  No Claim of any official or unofficial creditors' committee or any member thereof for professionals' fees or other costs and expenses incurred by such creditors' committee or by a member of such creditors' committee shall constitute an Allowed Administrative Claim, except that the Retiree Committee's members and the Retiree Committee Professionals shall be entitled to payment in accordance with the Fee Review Order and any additional fee process established by the Court.

7. **Bar Dates for Administrative Claims.**

a. **General Bar Date Provisions.** Except as otherwise provided in subparagraphs 7(b) or 7(c) below or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the City no later than 45 days after the Effective Date, i.e., January 26, 2015. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the City or its property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the City and the requesting party by the later of (i) 150 days after the Effective Date, i.e., May 11, 2015, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

b. **Ordinary Course Claims.** Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations are not required to File or serve any request for payment or application for allowance of such Claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the Holders of such Claims or further action or approval of the Bankruptcy Court.

c. **Claims Under the Postpetition Financing Agreement.** Holders of Administrative Claims that are Postpetition Financing Claims are not required to File or serve any request for payment or application for allowance of such Claims. Such Administrative Claims will be satisfied as set forth in subparagraph 7(b) above.

d. **No Modification of Bar Date Order.** The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

8. **ASF Recoupment Cash Option.**

a. **ASF Recoupment Cash Option Election.** No later than seven days following the Effective Date, i.e., December 17, 2014, the City, through its Claims and Balloting Agent, will send the ASF Election Notice and the ASF Election Form by first-class U.S. mail to each ASF Distribution Recipient. The ASF Election Notice will notify ASF Distribution Recipients that each ASF Distribution Recipient may elect to pay the total amount of his or her ASF Recoupment in a single lump sum by timely returning a properly-completed ASF Election Form. The ASF Election Form will explain that the amount of the ASF Recoupment Cash Payment shall be equal to the total amount of ASF Recoupment shown on the ASF Distribution Recipient's Ballot, unless the aggregate amount of ASF Recoupment for all ASF Distribution Recipients electing the ASF Recoupment Cash Option exceeds $30,000,000, in which case (i) the ASF Recoupment Cash Payment will be the ASF Distribution Recipient's Pro Rata portion of $30,000,000, and (ii) the remaining portion of the ASF Distribution Recipient's ASF Recoupment will be annuitized and deducted from the ASF Distribution Recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan. *An ASF Distribution Recipient must return his or her ASF Election Form to the Claims and Balloting Agent so that it is actually received by the Claims and Balloting Agent by the ASF Election Date, i.e., 35 days after the date on which the ASF Election Form is mailed.*

b. **ASF Recoupment Cash Payment.** GRS will mail the ASF Final Cash Payment Notice no later than 14 days after the ASF Election Date. The ASF Final Cash Payment Notice

is a notice that will be sent to each ASF Distribution Recipient who timely elects the ASF Recoupment Cash Option, and will indicate the amount of such ASF Distribution Recipient's ASF Recoupment Cash Payment. *ASF Distribution Recipients shall have until the ASF Final Cash Payment Date – i.e., the later of (i) 90 days after the Effective Date, i.e., March 10, 2015 or (ii) 50 days after the date of mailing of an ASF Final Cash Payment Notice – to make the ASF Recoupment Cash Payment, which payment must be made by cashier's check or wire transfer and may not be made by personal check. If an ASF Distribution Recipient's ASF Recoupment Cash Payment is not received by the ASF Final Cash Payment Date, GRS will notify the ASF Distribution Recipient of the failure to timely pay, and ASF Recoupment will be effected through diminution of such recipient's monthly pension check, as provided for in Section II.B.3.r.ii.D.2.i of the Plan.* The calculation of each electing ASF Distribution Recipient's ASF Recoupment Cash Payment shall not be adjusted under any circumstances, including as a result of default by any other electing ASF Distribution Recipient to remit his or her ASF Recoupment Cash Payment by the ASF Final Cash Payment Date.

         **9.**    **Copies of the Plan and Confirmation Order.** Copies of the Plan, Confirmation Order and all other documents Filed in the Chapter 9 Case may be obtained, free of charge, from the City's restructuring website at https://www.kccllc.net/detroit or from Kurtzman Carson Consultants LLC by calling (877) 298-6236 (toll-free).

<div align="center">

BY ORDER OF THE COURT

</div>

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
Thomas A. Wilson (OH 0077047)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
tawilson@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

<div align="center">

ATTORNEYS FOR THE CITY

</div>

## CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Notice of (I) Entry of Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit and (II) Occurrence of Effective Date was filed and served via the Court's electronic case filing and noticing system on this 10th day of December, 2014.

/s/  Heather Lennox

## EXHIBIT 6C – ANSWER

State of Michigan
Third Circuit Court

_____

B & C Land Development Corporation, ,

        Plaintiff,

v.                                        Case No. 15-008602-CH
                                        Judge Annette J. Berry

City of Detroit,

        Defendant.


_____

| | |
|---|---|
| James D. Noseda P-52563 | Horace D. Cotton P-33268 |
| Attorney for defendant | Attorney for plaintiff |
| City of Detroit Law Department | P.O. Box 19520 |
| Two Woodward Ave, Suite 500 | Detroit, MI 48219 |
| Coleman A. Young Municipal Center | 313-595-1517 |
| Detroit, MI 48226 | hdcotton@yahoo.com |
| 313-237-3057 | |
| nosej@detroitmi.gov | |

_____

**City Of Detroit's Answer And Affirmative Defenses**

      The City of Detroit ("City") answers the complaint as follows.

1.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

2.     Admit.

1

3.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

4.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

5.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

6.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

7.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

8.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

9.     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

10.    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

11.    Denied as false.

12.    Defendant refers to Exhibit 1 for its true meaning and effect.  Denied that Exhibit 1 is a contract with the City of Detroit.  The City did not accept payment of a deposit as alleged. Plaintiff's principal, Robert Carmack, has admitted both in writing and recorded televised comments that the check for the deposit was returned to him uncashed.  Except as stated herein, The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

13.    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

14.    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

15.     On June 30, 2008, Detroit City Council authorized the transfer of the

property known as the "Revere Copper & Brass" site from the Planning and

Development Department to the Water & Sewerage Department in exchange for

reimbursement from the Water & Sewerage Department of $5 million.  Except as

stated herein, denied as false.

16.      Denied that there was sale of the subject parcel approved by City Council.

Otherwise, the City lacks knowledge or information sufficient to form a belief as to

the truth of the allegations of the corresponding paragraph of the complaint, which

has the effect of a denial.

17.     The City lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of the corresponding paragraph of the complaint, which has

the effect of a denial.

18.     The City lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of the corresponding paragraph of the complaint, which has

the effect of a denial.

19.     The City lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of the corresponding paragraph of the complaint, which has

the effect of a denial.

20.      Sometime after May of 2012, the subject property was returned to the

surplus inventory of Planning & Development Department.  Except as stated

herein, the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

21.    In 2013, the City sold approximately 7 acres of the "Revere Copper & Brass" site to Waterfront Terminal Holdings for a price of $1.16 million.

22.    Denied as false.  On June 30, 2015, Detroit City Council approved a contract of sale for 5.5137acres of of the Revere Copper & Brass Site to Waterfront Holdings II, LLC, and the sale of 17.1009 acres of the site to Revere Dock, LLC, for a total aggregate price of $3 million.

23.    Denied as false that plaintiff is entitle to any relief in this action, injunctive or otherwise.  Except as stated herein, The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the corresponding paragraph of the complaint, which has the effect of a denial.

24.    Denied as false.  At no time did a contract exist between the City of Detroit and plaintiff with respect to the sale of any portion of the Revere Copper & Brass site.

25.    The City restates it answers to the preceding paragraphs of the complaint for its answer to the corresponding paragraph of the complaint.

26. Denied as false. No purchase agreement or contract of any kind with respect to the Revere Copper & Brass site was ever formed between the City of Detroit and either plaintiff or Robert Carmack.

27. Denied as false.

28. Denied as false.

29. Denied as false.

30. Denied as false.

31. The City restates it answers to the preceding paragraphs of the complaint for its answer to the corresponding paragraph of the complaint.

32. Denied as false.

33. Denied as false.

34. Denied as false.

35. Denied as false.

Wherefore, the City of Detroit prays that the Court dismiss this unfounded action and assess attorney fees and costs against plaintiff and its counsel under applicable statute and court rule for the filing and pursuit of this action which is not well founded in fact or in law.

### Affirmative Defenses

1. Plaintiff has failed to state a claim upon which relief can be granted.

2.     No purchase agreement or other contract with plaintiff ever was formed

between the City of Detroit and plaintiff because no resolution authorizing or

approving any such contract was adopted by the Detroit City Council as required

by law to form a contract with the City of Detroit.

3.     To the extent that plaintiff alleges a claim or seeks a monetary award against

the City of Detroit that sounds in tort, it is barred by governmental immunity.

4.     All claims made in this action are barred by the applicable statute of

limitations.

5.     Plaintiff's claims are barred by laches, undue delay and unclean hands.

6.     Plaintiff did not file a claim in *In re City of Detroit*, United States

Bankruptcy Court, Eastern District of Michigan, Case No. 13-53846.  The filing of

this action violated the federal injunction contained in the "Eight Amended Plan

for the Adjustment of Debts of the City of Detroit" ("the Plan") approved by the

bankruptcy court on November 12, 2014.  Any action taken in pursuit of this action

is a continuing violation of the Plan and injunction.

7.     The Lis Pendens filed in this action is void ab initio and violates the Plan

and injunction.  Any recording of the Lis Pendens violates the Plan and injunction,

and also is a slander of title.

8.     Any contract claim is barred by a lack of consideration.

9.     Any contract claim is barred by a failure of consideration.

10. Plaintiff never submitted a formal offer to purchase the property that was approved by officials in the Executive Branch of the City or approved by the Detroit City Council, as is required by the Detroit City Charter and Detroit City Code.

11. Plaintiff's claims are barred by impossibility.

12. Plaintiff's claims are barred by the Statute of Frauds.

## DEMAND FOR REPLY

Under MCR 2.110(B)(5), Defendant demands a reply to its answers.

**City of Detroit**


By: /s/ James D. Noseda
     James D. Noseda P-52563
     City of Detroit Law Department

### Certificate of Service

The undersigned certifies that on July 21, 2015, he served the foregoing paper upon counsel of record by e-mail. I declare that the foregoing is true to the best of my knowledge, information, and belief.

/s/ James D. Noseda

**EXHIBIT 6D – MAY 2012 PUBLIC STATEMENT**



CITY OF DETROIT
PLANNING & DEVELOPMENT DEPARTMENT

2300 CADILLAC TOWER
DETROIT, MICHIGAN 48226
PHONE: 313·224·6380
FAX: 313·224·1639
WWW.DETROITMI.GOV

May 15, 2012

Detroit City Council
200 Coleman A. Young Municipal Center
Detroit, Michigan 48226

RE: **May 10, 2012 Public Comment – "Mr. Bob Carmack Offer to Purchase Property in Southwest Detroit of 27 acres on water (Revere Copper & Brass)"**

Honorable City Council:

In response to the above public comment, the Planning & Development Department (P&DD) no longer has jurisdictional control over the subject property:

- On June 18, 2008, The Honorable Board of Water Commissioners, City of Detroit, Michigan authorized the then Detroit Water & Sewerage Department (DWSD) Director, Victor Mercado, to approve the acquisition of the approximately 28.66 acre "Revere Copper & Brass" site as the location for a CSO Control Facility (see attached Agenda of June 18, 2012),

- On June 30, 2008, Your Honorable Body authorized the transfer of the approximately 28.66 acre "Revere Copper & Brass" site from P&DD to DWSD for a CSO facility in exchange for reimbursement from DWSD of $5 million dollars (see attached from Detroit Legal News),

P&DD never took a deposit from Mr. Carmack for this site, never entered into a purchase agreement with Mr. Carmack for this site, and never entered into a development agreement with Mr. Carmack for this site. P&DD never requested this Honorable Body approve any sale of this site to Mr. Carmack, and Your Honorable Body never passed a land sale resolution or authorized the sale of the property to Mr. Carmack.

Since June of 2008, Your Honorable Body has requested P&DD report on the status of a sale of this site to Mr. Carmack no less than four times. The information each time has been as recited above, with no change since the original report of June 25, 2008 other than the transfer to DWSD. We trust that this correspondence addresses with finality your concerns and inquiries to P&DD regarding the status of the former "Revere Copper & Brass" property and the issues raised by Mr. Carmack.

Sincerely,

Robert A. Anderson
Director

RAA/JM/jm

Cc: Denise Gardener, Mayor's Office

## EXHIBIT 6E – TRUE COPY CERTIFICATE OF RESOLUTION APPROVING WATERFRONT OFFER TO PURCHASE

# TRUE COPY CERTIFICATE

STATE OF MICHIGAN }
City of Detroit } ss

## CITY CLERK'S OFFICE, DETROIT

I, __Janice M. Winfrey__, City Clerk of the City of Detroit, in said State, do hereby certify

that the annexed paper is a TRUE COPY OF __RESOLUTION__

adopted (passed) by the City Council at session of __June 30,__ 20__15__

and approved by Mayor __July 7,__ 20__15__

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the

original, and the same is a correct transcript therefrom, and of the whole of such original.

**In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at**

Detroit, this __10th__ day of __July__ A.D. 20__15__

_____
CITY CLERK






**CITY OF DETROIT**
PLANNING AND DEVELOPMENT DEPARTMENT

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 808
DETROIT, MICHIGAN 48226
PHONE 313•224•1339
WWW.DETROITMI.GOV

May 29, 2015

Detroit City Council
1340 Coleman A. Young Municipal Center
Detroit, MI 48226

**Re:** Real Property at 5851 W. Jefferson Avenue, Detroit, MI 48209

Honorable City Council:

The City of Detroit Planning and Development Department has received an offer from Waterfront Holdings II, LLC, a Michigan limited liability company ("**Waterfront**") to purchase from the City the approximately 5.5137 acres of vacant real property described on the attached Exhibit A, being part of what is commonly known as 5851 W. Jefferson Avenue, Detroit, MI 48209, (the "**Property**").

The terms of the offer are set forth in a Purchase Agreement dated March 20, 2015 (the "**Offer to Purchase**"). Under the terms of the Offer to Purchase, the Property would be conveyed to Waterfront by Quit Claim Deed (the "**Deed**") for seven hundred thirty-five thousand and 00/100 Dollars (**$735,000.00**) (the "**Purchase Price**"). The Purchase Price is equal to the Property's current fair market value as determined by an independent appraisal obtained by the City.

Waterfront, an affiliate of the Detroit-based bulk fuel supply company Waterfront Petroleum Terminal Company, in 2007 purchased from the City the idled 11-acre fuel storage facility at the Mistersky Electric Generation Station, and in 2013 purchased from the City an additional adjacent 7 acres. Waterfront wishes to acquire the Property to expand the company's vital marine liquid and bulk distribution operations. Upon acquisition, Waterfront will remediate the Property, dredge the riverfront, and improve the seawall and dock in order to grow its large vessel refueling operations. The proposed use is permitted as a matter of right in an M-4 (Intensive Industrial) zone.

We request that your Honorable Body adopt the attached resolution approving the sale of the Property, and authorizing the Planning and Development Department Director to execute the Deed and such other documents as may be necessary or convenient in connection with the City's sale of the Property.

Respectfully submitted,

Maurice Cox, Director

MC:JB:kc

Cc: Aliyah Sabree, Mayor's Office
Val Upshaw, H&RD Liaison

By Council Member  LELAND

**WHEREAS,** the City of Detroit Planning and Development Department has received an offer from Waterfront Holdings II, LLC, a Michigan limited liability company, to purchase approximately 5.5137 acres of vacant real property described in the attached <u>Exhibit A</u>, part of what is commonly known as 5851 W. Jefferson Avenue, Detroit, MI 48209, (the "**Property**"); and

**WHEREAS,** in accordance with Section 14-8-10 of the Detroit City Code, it is deemed in the best interests of the City that the Property be sold without public advertisement or the taking of bids.

**NOW, THEREFORE, BE IT RESOLVED,** that the sale of Property to **Waterfront Holdings II, LLC, a Michigan limited liability company,** for the Purchase Price of **seven hundred thirty-five thousand dollars ($735,000.00),** and otherwise in accordance with the terms of the Offer to Purchase is hereby approved; and be it further

**RESOLVED,** that customary closing costs up to two hundred dollars ($200.00), and real estate brokerage commissions not to exceed five percent (5%) of the Purchase Price may be deducted from the Purchase Price and paid from the sale proceeds as "Property Transaction Costs" in accordance with the terms of the Property Management Agreement dated October 31, 2014, by and between the City and the City of Detroit Building Authority (the "Property Management Agreement"); and be it further

**RESOLVED,** that a "Transaction Fee" may be deducted from the Purchase Price and be paid from the proceeds to the City of Detroit Building Authority in accordance with the terms of the Property Management Agreement; and be it further

**RESOLVED,** that the sale of Property to Waterfront Holdings II, LLC, a Michigan limited liability company, without public advertisement or the taking of bids is hereby approved in accordance with Sec. 14-8-10 of the Detroit City Code; and be it further

**RESOLVED,** that the Director of the Planning and Development Department, or his or her designee, is authorized to execute the Deed and such other documents as may be necessary or convenient for the consummation of the transaction pursuant to and in accordance with the Offer to Purchase; and be it further

**RESOLVED,** that the Director of the Planning and Development Department, or his or her designee, is authorized to execute any required instruments to make and incorporate technical amendments and changes to the Quit Claim Deed (including but not limited to corrections to or confirmations of legal descriptions, or timing of tender of possession of particular parcels) in the event that changes are required to correct minor inaccuracies or are required due to unforeseen circumstances or technical matters that may arise prior to the conveyance of the Property, provided that the changes do not materially alter the substance or terms of the transfer and sale; and be it finally

**RESOLVED,** that the Deed will be considered confirmed when executed by the Director of the Planning and Development Department, or his or her designee, and approved by the Corporation Counsel as to form.

EXHIBIT A
LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING
DESCRIBED AS LOTS 1207 THROUGH 1214 BOTH INCLUSIVE, LOT 1215 EXCEPT
THE EASTERLY 6.36 FEET THEREOF, ALL BEING TOGETHER WITH THE ADJACENT
VACATED PUBLIC ALLEY (20 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF
THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED
IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO THE
WESTERLY 213.64 FEET OF THE EASTERLY 574.00 FEET OF PRIVATE CLAIM NO.
39 LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE
WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20,
PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND
ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT
SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO.
39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS;
THENCE N.61°37'43"E. 213.64 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON
AVENUE (80 FEET WIDE) TO A POINT BEING 6.36 FEET WESTERLY FROM THE
NORTHEAST CORNER OF LOT 1215 OF THE "SIXTH PLAT SUBDIVISION OF THE
PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN
LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E.
1068.40 FEET ALONG A LINE 360.36 FEET WEST OF THE EASTERLY LINE OF
SAID PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE;
THENCE S.34°06'08"W. 241.60 FEET ALONG SAID DETROIT RIVER U.S. HARBOR
LINE; THENCE N.28°03'35"W. 1180.06 FEET ALONG A LINE 574.00 FEET WEST
OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF
BEGINNING; SAID PARCEL CONTAINING 5.5137 ACRES, MORE OR LESS AND
BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: Basil Sarin DATE: 4/28/2015

Street Address[es]:

Property Tax Ward & Item numbers:



# ADOPTED AS FOLLOWS
# COUNCIL MEMBERS

| | YEAS | NAYS |
|---|---|---|
| Janee **AYERS** | ✓ | |
| Scott **BENSON** | ✓ | |
| Raquel **CASTANEDA-LOPEZ** | ✓ | |
| *George **CUSHINGBERRY, JR.** | ✓ | |
| Gabe **LELAND** | | ✓ |
| Mary **SHEFFIELD** | ✓ | |
| Andre **SPIVEY** | ✓ | |
| James **TATE** | ✓ | |
| Brenda **PRESIDENT JONES** | ✓ | |
| *PRESIDENT PRO TEM | | |
| | 8 | 1 |

**EXHIBIT 6F – WATERFRONT OFFER TO PURCHASE**

<u>PURCHASE AGREEMENT</u>

BY AND BETWEEN

CITY OF DETROIT

and

WATERFRONT TERMINAL HOLDINGS II, LLC

(Waterfront Project)

Date: _____, 2015

# TABLE OF CONTENTS

RECITALS ................................................................................................. 1
ARTICLE 1. DEFINITIONS ................................................................... 1
    1.01 - "Agreement" ............................................................................. 1
    1.02 - "Associate" ............................................................................... 2
    1.03 - "Closing" .................................................................................. 2
    1.04 - "Deed" ..................................................................................... 2
    1.05 - "Effective Date" ...................................................................... 2
    1.06 - "Encumbrance" ........................................................................ 2
    1.07 - "Event of Default" and "Default" ........................................... 2
    1.08 - "Property" ............................................................................... 2
ARTICLE 2.  SALE / COMPENSATION ............................................... 2
    2.01 - Purchase Price .......................................................................... 2
ARTICLE 3.  TITLE INSURANCE/DEED ............................................ 2
    3.01 - Title Insurance/Survey .............................................................. 2
    3.02 - Title/Deed .................................................................................. 3
ARTICLE 4. TAXES AND ASSESSMENTS .......................................... 3
    4.01 - Property on Tax Rolls at Closing ............................................. 3
    4.02 - Property Not on Tax Rolls at Closing ...................................... 3
ARTICLE 5.  REPRESENTATION AND WARRANTIES ................... 4
    5.01 - Inducement .............................................................................. 4
    5.01 - Survival .................................................................................... 5
ARTICLE 6.  TESTS AND SURVEYANCE; CONDITION OF PROPERTY ... 5
    6.01 - Surveying and Testing ............................................................. 5
    6.02 - Condition of Property; Inspection Period ................................ 6
    6.03 - Release of City from Liability .................................................. 6
    6.04 - Section 16 of NREPA ............................................................... 7
ARTICLE 7.  CLOSING .......................................................................... 7
    7.01 - Time and Place of Closing ........................................................ 7
    7.02 - Conditions to Closing .............................................................. 7
    7.03 - Delivery of Deed and Possession ............................................ 8
    7.04 - Payment of Expenses ............................................................... 8
    7.05 - City's Failure to Convey ......................................................... 8
ARTICLE 8.  DEFAULTS AND EVENTS OF DEFAULT .................... 8
    8.01 - Default by Purchaser ............................................................... 8
    8.02 - Failure to Cure Default ............................................................ 9
    8.03 - Default by the City ................................................................... 9
ARTICLE 9.  REMEDIES ........................................................................ 9
    9.01 - Remedies Cumulative .............................................................. 9
    9.02 - Reimbursement of Costs .......................................................... 9
ARTICLE 10.  RESTRICTION UPON SPECULATION AND ASSIGNMENT ... 10
    10.01 - No Speculation ...................................................................... 10
    10.02 - Prior Approval of Assignment .............................................. 10
    10.03 - Consideration for Assignment ............................................... 10
ARTICLE 11.  INDEMNITY .................................................................... 10
    11.01 - Purchaser Indemnification .................................................... 10
    11.02 - Defense of Claims ................................................................. 10

i

11.03 - Non-Liability of the City .......................................................................... 10

11.04 - Hazardous Materials .............................................................................. 11

**ARTICLE 12.  AMENDMENTS** ...................................................................... **12**

12.01 - Form ....................................................................................................... 12

12.02 - Binding Effect ........................................................................................ 13

**ARTICLE 13.  NOTICES** ................................................................................... **13**

13.01 - Addresses ............................................................................................... 13

13.02 - Date of Notice ........................................................................................ 13

**ARTICLE 14.  SALE / COMPENSATION** ....................................................... **14**

14.01 - Severability ............................................................................................ 14

14.02 - Entire Agreement ................................................................................... 14

14.03 - Terminology ........................................................................................... 14

14.04 - Covenants and Conditions ..................................................................... 14

14.05 - Captions ................................................................................................. 14

14.06 - Cumulative Remedies; Jurisdiction; Venue .......................................... 14

14.07 - Force Majeure ........................................................................................ 14

14.08 - Provisions Not Merged With Deed ........................................................ 15

14.09 - Counterparts ........................................................................................... 15

14.10 - Singular and Plural, etc. ......................................................................... 15

14.11 - Time of the Essence ............................................................................... 15

14.12 - Authority of City .................................................................................... 15

**EXHIBIT A** ........................................................................................................ **17**

**EXHIBIT B** ......................................................................................................... **18**

**EXHIBIT C** ......................................................................................................... **19**

**EXHIBIT D** ........................................................................................................ **21**

**Schedule I** ........................................................................................................... **25**

ii

# PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT** ("**Agreement**") is entered into as of _____, 2015, by and between the **CITY OF DETROIT**, a Michigan public body corporate, acting by and through its Planning and Development Department, whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, referred to herein as the "**City**", and **WATERFRONT TERMINAL HOLDINGS II, LLC**, a Michigan limited liability company, whose address is 5431 West Jefferson Avenue, Detroit, Michigan 48209, referred to herein as "**Purchaser.**"

## RECITALS:

A.      Purchaser has offered to purchase land located in the City of Detroit, the legal description of which is set forth on **Exhibit A** attached hereto and incorporated by reference, in accordance with the terms, covenants, and conditions of this Agreement.

B.      Purchaser's planned project for the Property includes the goals set forth on **Exhibit B** attached to this Agreement.

C.      The City believes that the sale of the Property pursuant to this Agreement and the fulfillment generally of this Agreement are in the best interests of the City and the health, safety and welfare of its residents.

In consideration of the foregoing recitals and the mutual obligations of the parties hereto, each of them does hereby covenant and agree with the other as follows:

## ARTICLE 1. DEFINITIONS

The following words and expressions shall, wherever they appear in this Agreement, be construed as follows:

1.01 "**Agreement**" shall mean this Agreement and the following Exhibits and Schedules attached hereto and expressly made a part hereof:

| | |
|---|---|
| Exhibit A | Description of Property |
| Exhibit B | Project Goals |
| Exhibit C | Quit Claim Deed |
| Exhibit D | Right of Entry Letter |
| Schedule I | Certificate of Authority for Waterfront Terminal Holdings II, LLC |

BH165139.3

1

1.02 **"Associate"** shall mean any consultant, contractor, subcontractor, or any other party engaged by Purchaser and the agents and employees of said parties engaged by Purchaser to undertake any of the activities associated with this Agreement.

1.03 **"Closing"** shall mean a date agreed upon by the parties hereto for the transfer of title to the Property, but in no event shall said date be more than ninety (90) days from the Effective Date of this Agreement.

1.04 **"Deed"** shall mean the Quit Claim Deed conveying the Property to Purchaser by the City in substantially the form as attached hereto as **Exhibit C**.

1.05 **"Effective Date"** shall have the meaning set forth in Section 14.12 of this Agreement.

1.06 **"Encumbrance"** shall mean any covenant, license, right of way, easement, limitation, condition, reservation, restriction, right or option, mortgage, pledge, lien, construction lien, mechanic's lien, charge, conditional sale or other title retention agreement or arrangement, encumbrance, lease, sublease, security interest, or trust interest.

1.07 **"Event of Default"** and **"Default"** shall have the meanings as set forth in Article 8 of this Agreement.

1.08 **"Property"** shall mean that parcel of land identified by as a part of the Revere Copper and Brass Site and located in the City of Detroit, as more particularly described in Exhibit A attached hereto and made a part hereof.

## ARTICLE 2. SALE / COMPENSATION

2.01 Purchase Price.   Subject to the terms, covenants, and conditions of this Agreement, Purchaser agrees to purchase, and the City agrees to convey, the Property for Seven Hundred Thirty-Five Thousand Dollars ($735,000.00) ("Purchase Price"), to be paid in immediately available funds by wire transfer, or certified or cashier's check simultaneously with the delivery of the Deed.

## ARTICLE 3. TITLE INSURANCE/DEED

3.01 Title Insurance/Survey.

a. Commitment.   Within five (5) business days following the Effective Date, Purchaser shall order a commitment for an owner's title insurance policy for the Property showing all matters affecting record title to the Property, subject to the terms, covenants, and conditions of this Agreement and standard exceptions, together with copies of all instruments described in Schedule B thereof (the **"Title Commitment"**).  The Title Commitment will be in the amount of the Purchase Price and will be issued by eTitle Agency, with offices at 1650 West Big Beaver Road, Troy, Michigan 48084.  A copy of the Title Commitment will be provided to the City promptly upon Purchaser's receipt.

b. <u>Survey</u>. Within thirty (30) days following the Effective Date, Purchaser shall obtain a current survey of the Property (the "Survey") from a registered land surveyor. The legal description of the Property set forth in the Title Commitment shall conform exactly to the legal descriptions in the Survey and the Survey shall contain such detail from the ALTA/ASCM Schedule A Table as Purchaser deems required. The Survey will be certified to the City, Purchaser, and others designated by Purchaser, and a copy will be provided to the City immediately upon Purchaser's receipt.

c. <u>Title Objections</u>. Purchaser shall have the right, until ten (10) days following receipt of the Title Commitment and the Survey (the "Review Period"), to identify in writing those matters and/or title encumbrances identified in the Title Commitment or Survey that are unacceptable to it, in which event the City shall have reasonable opportunity (but not the obligation) to cure or remove such matters (if any) and to satisfy any other requirements set forth therein. The items contained in the Commitment or the Survey to which Purchaser does not object during the Review Period shall be deemed permitted exceptions (the "Permitted Exceptions"). The City's failure or inability to, within twenty (20) days after receipt of notification of such objections (the "Cure Period"), cure such objections, or conscious decision not to do so, communicated in writing to Purchaser within the Cure Period, shall give Purchaser the right to terminate this Agreement and be relieved of all further obligation to perform hereunder upon notice to the City .

d. <u>Policy</u>. The City **WILL NOT** order or pay the premium for an owner's policy of title insurance, nor will the City provide any estoppel or seller's certificate to the Purchaser or the title insurance company. Any title insurance policy insuring Purchaser's title to the Property, whether an owner's or mortgage policy, with or without standard exceptions, will be at Purchaser's expense.

3.02   <u>Title/Deed</u>.

a. <u>Conveyance</u>. At the Closing, if Purchaser has materially complied with all of those terms and conditions precedent to Closing as specified hereunder, the City will deliver the Deed to the Property to Purchaser.

b. <u>Title conveyed</u>. Such conveyance and title shall fee simple, and shall, in addition to the conditions and covenants hereinafter provided for, be subject to existing easements and restrictions of record, all applicable zoning and building laws, and other encumbrances (if any) specifically referred to in <u>Exhibit A</u>. Purchaser acknowledges that the City has not made, and by execution of this Agreement or any Deed does not make, any representations or warranties whatsoever with respect to title to the Property.

## ARTICLE 4. TAXES AND ASSESSMENTS

4.01   <u>Property on Tax Rolls at Closing</u>. In the event that the Property is on the tax rolls at the date of Closing, all taxes and assessments which have become a lien upon the Property at the date of Closing shall be paid by the City provided that current City and County taxes shall be prorated and adjusted to the date of Closing on a due date basis.

4.02   <u>Property Not on Tax Rolls at Closing</u>. In the event that the Property is not on the tax rolls at the date of Closing, Purchaser agrees to pay to the City at Closing an amount equal to the City of

Detroit ad valorem taxes (including debt service but not including any ad valorem taxes which would have been collected by the City on behalf of another governmental body, whether the State, County or any other body or for any other millage) which would have been levied had the Property been on the tax rolls, prorated from the date of Closing to the dates when the next tax bills are issued after the date the Property is placed back on the tax rolls, and the Property will be placed back on the tax rolls as of December 31 of the year in which the Closing takes place. For example, if the date of Closing is on or before December 31, 2015, the Property would be placed back on the tax rolls effective December 31, 2015, the next tax bills issued would be July 1, 2016 for the summer taxes and December 1, 2016 for the winter taxes and the payment for taxes would be pro-rated to June 30, 2016 and November 30, 2016, respectively. If the date of Closing takes place on or after January 1, 2016, the Property will not be placed on the tax rolls until December 31, 2016, and tax bills will not be issued until July 1 and December 1, 2017 and, in that case, the payment for taxes would be prorated to June 30 and November 30, 2017.

## ARTICLE 5. REPRESENTATION AND WARRANTIES

5.01 <u>Inducement</u>. In order to induce the City to enter into this Agreement, Purchaser represents and warrants to the City that:

a. <u>Organization and Qualification</u>. It is a duly organized limited liability company, validly existing and in good standing under the laws of the State of Michigan, and has full power and authority to carry on its business as it is now being conducted.

b. <u>Power to Make Agreement</u>. It has the power to make, deliver and perform this Agreement and finance the Improvements in accordance with the terms and conditions of this Agreement and has taken all necessary action to authorize the foregoing and to authorize the execution, delivery and performance of this Agreement.

c. <u>Lack of Legal Impediments</u>. To the best of its knowledge, the execution, delivery and performance of this Agreement will not violate any provision of any existing law, regulation, order or decree of any court or governmental entity, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement, or any provision of Purchaser's organizational documents (*e.g.*, charter, articles of incorporation, articles of organization, partnership agreement, bylaws or operating agreement) and will not violate any provision of, or constitute a default under, any agreement or contract to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement. Purchaser has paid all income, personal and property taxes, and inspection or license fees heretofore due, payable, and owing to the City. Developer is not in default to the City

d. <u>Legal Operation</u>. It is, to the best of its knowledge, in compliance with all existing laws and regulations applicable to it, the violation of which would or could materially adversely affect its ability to fulfill its obligations under this Agreement.

e. <u>Litigation</u>. As of the date of this Agreement, no litigation or administrative proceeding of or before any court or administrative body is presently pending, nor, to its knowledge, is

any such litigation or proceeding presently threatened, against it or any of its property, that, if adversely determined, would or could materially affect its ability to fulfill its obligations under this Agreement.

f. Other Information. To the best of its knowledge, all other written information, reports, papers, and data given to the City by Purchaser with respect to Purchaser are accurate and correct in all material respects and substantially complete insofar as completeness may be necessary to give the City a true and accurate knowledge of the subject matter and all projections of future results are, in its opinion, reasonable.

g. Other Agreements. To the best of its knowledge, it is not a party to any agreement or instrument materially and adversely affecting its present or proposed business, properties or assets, operation or condition, financial or otherwise, not disclosed to the City in writing, the existence of which would or could materially affect its ability to fulfill its obligations under this Agreement; and it is not in default in the performance, observance, or fulfillment of any of the material obligations, covenants, or conditions set forth in any agreement or instrument to which it is a party, the violation of which would or could materially affect its ability to fulfill its obligations under this Agreement.

h. Brokerage and Finder's Fees and Commissions. Purchaser has not engaged any broker, finder or agent with respect to the transactions contemplated by this Agreement. Purchaser shall indemnify and hold the City harmless from and against claims for brokerage in connection with this transaction by any person or party claiming by, through or under Purchaser.

5.02 Survival. All of the representations and warranties contained in this Article 5 or pursuant hereto shall survive the delivery of the Deed and shall remain in full force and effect for a period of six (6) months following the date of Closing. Purchaser shall indemnify and hold the City harmless from and against, and shall be obligated to pay and reimburse the City for, any and all out-of-pocket expenses (including reasonable attorneys' fees, whether inside or outside counsel) which the City may sustain or incur as a result of any misrepresentation or breach of warranty on the part of Purchaser due to the City's reliance thereon. The "best of Purchaser's knowledge" is based on Purchaser's actual knowledge and is without any duty to investigate. Purchaser shall have no liability for a breach of any representation or warranty in the event that Purchaser gives written notice to the City prior to Closing that such representation or warranty was inaccurate or any document or report furnished to or obtained by the City, its agents, employees or contractors in connection with this Agreement shall have disclosed that such representation or warranty was inaccurate prior to Closing.

## ARTICLE 6. TESTS AND SURVEYANCE; CONDITION OF PROPERTY

6.01 Surveying and Testing. The City will, prior to the transfer of title, authorize Purchaser through and in accordance with a fully executed Right-of-Entry, to make soil boring and bearing tests and undertake such surveying and environmental and other due diligence activities as Purchaser deems appropriate, provided such does not interfere with the City's use, if any, and subject to the Purchaser's compliance with the requirements of this Article 6 and elsewhere in this Agreement. All such testing shall be done at Purchaser's risk and expense. Subject to the terms of the aforementioned Right of Entry, Purchaser shall give prior notice to the City to inspect and investigate the condition of the Property, including its environmental condition and shall conduct such inspection and investigation as Purchaser desires during normal business hours. Prior to entering onto the Property for such purposes,

Purchaser shall (i) request authorization from the Building, Safety, Engineering and Environmental Department and provide details of the intended activities and other documentation deemed necessary by the City, (ii) obtain a Right-of-Entry letter from City, (iii) execute said letter, and (iv) comply with all conditions and requirements stated therein. Purchaser shall use all reasonable efforts to minimize damage to the Property in connection with such entry and shall fully restore the Property to the condition existing prior to such entry. Purchaser shall indemnify, defend and hold the City harmless from and against, any and all loss, cost, liability and expense, including reasonable attorneys' fees and litigation costs, suffered or incurred by the City as a result of the Purchaser's activities in accordance with the Right-of-Entry. Purchaser shall submit to the City a copy of each survey or report generated as a result of such activities.

6.02    Condition of Property; Inspection Period.

a.    Purchaser takes the Property as it finds it, **"AS IS"**, and the City makes no implied or express representations or warranties as to its fitness for absolutely any purpose whatsoever. By executing this Agreement, Purchaser acknowledges that it is satisfied with the condition of the Property, subject only to inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above. If, within ninety (90) days of the Effective Date, Purchaser fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based upon the results of such tests, investigations or surveys, or fails to deliver copies of any and all reports of such tests, investigations and/or surveys to the City, Purchaser shall be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith.

b.    In order to facilitate Purchaser's investigation of the Property, within ten (10) business days of the Effective Date hereof, the City shall deliver copies of any existing (i) environmental site assessments, reports, notices or correspondence from environmental regulatory authorities or citations, (ii) lease agreements, lease modifications, or third-party property/occupancy rights, if any (iii) notices or other correspondence that has been received from any governmental agency regarding the condition of the Property or pending government actions, (iv) land surveys, and (v) soil reports (collectively, the "Due Diligence Materials"), provided the same are in the City's possession or control.

c.    In the event Purchaser determines, based on its inspection of the Property, review of title, and the results of the tests, investigations, and surveys permitted under Section 6.01, above that it does not wish to proceed with the purchase of the Property, Purchaser shall have the right for any reason whatsoever in its sole discretion, prior to the ninety-first (91st) day following the Effective Date, to terminate this Agreement by delivery of a written notice to the City (the "Notice of Termination"). Upon timely delivery by Purchaser of the Notice of Termination, this Agreement shall terminate without liability of Purchaser.

6.03    Release of City from Liability. Purchaser hereby releases the City and its officials, employees, and agents (but not any third party) from any and all liability for any defects in or conditions of the Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party, or conditions currently existing thereon, including but not limited to conditions described in Section 11.04, but subject to Section 11.04.

6.04    Section 16 of NREPA. Pursuant to the requirements of Section 16 of Part 201 of NREPA, MCL 324.20116, Purchaser agrees that the City has notified Purchaser that the Property is a "facility" as that term is defined in Part 201 of NREPA. The general nature and extent of any land or resource restrictions or any release at or from the facility that is known to the City is more fully described in certain reports, copies of which have been provided to Purchaser. By its execution of this Agreement, Purchaser acknowledges receipt of the following reports:

**Insert list of documents, if any, identified by DEA:  NONE.**

## ARTICLE 7. CLOSING

7.01    Time and Place of Closing. The City will notify Purchaser of the prospective closing date not less than ten (10) calendar days prior to the Closing, unless otherwise agreed between the parties. The Closing shall occur within thirty (30) days after satisfaction of the conditions to closing as specified in Section 7.02 of this Agreement. The Closing shall take place at the office of the City's Planning & Development Department, or such other location in downtown Detroit designated by the City. If the conditions to closing specified in Section 7.02 of this Agreement have not been satisfied or waived by June 1, 2015, either party may, thereafter, terminate this Agreement without further liability.

7.02    Conditions to Closing.

a.    City's Obligations to Close. The obligation of the City to effect a Closing hereunder shall be subject to receipt of a resolution(s) by the Detroit City Council authorizing the transaction and fulfillment of all conditions contained therein, and fulfillment by Purchaser of each of the following conditions precedent:

(i)    Accuracy of Representations and Warranties. All representations and warranties of Purchaser set forth in Section 5.01 of this Agreement shall be true and correct as of the date of Closing as if made on that date.

(ii)    Resolution of Purchaser's Authority. Purchaser shall furnish to the City a certified copy of a resolution satisfactory to the City in form and substance, duly adopted by the Board of Directors or Members of Purchaser, or an authorized vote of the partners or joint venturers, authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder. Purchaser shall also furnish to the City an incumbency certificate, executed by the corporate secretary or proper manager of Purchaser, identifying the officers or managers of Purchaser.

(iii)    Payment of Purchase Price and Closing Costs. Purchaser shall have tendered payment of the Purchase Price and the closing costs payable by Purchaser.

(iv)    No Default. There shall be no existing Default by Purchaser under this Agreement.

b.    Purchaser's Obligations to Close. The obligation of Purchaser to effect a Closing hereunder shall be subject to the fulfillment by the City of each of the following conditions precedent:

(i) <u>Title</u>. Title to the Property shall be in the form required by this Agreement.

(ii) <u>City Council and Other Approval</u>. The City shall furnish to Purchaser a resolution(s) by the Detroit City Council authorizing the transaction and all conditions contained therein shall be fulfilled.

(iii) <u>Acceptable Condition of Property</u>. The physical and environmental condition of the Property and the results of Purchaser's other investigations shall be acceptable to Purchaser, pursuant to Article 6.

7.03   <u>Delivery of Deed and Possession</u>. The City will deliver the Deed to the Property and the possession thereof to Purchaser at the Closing provided that Purchaser has complied with all conditions precedent as specified herein. Purchaser shall be responsible for recording the Deed and paying all recording costs (including the cost of the documentary stamp tax on the Deed, if any).

7.04   <u>Payment of Expenses</u>. Purchaser shall pay all costs, fees, and out of pocket expenses of whatsoever kind or nature related to the procurement of services of Associates and contractors, etc. which have been incurred pursuant to the making of this Agreement and shall hold the City harmless with respect to the payment of same notwithstanding anything contained herein or elsewhere to the contrary.

7.05   <u>City's Failure to Convey</u>. In the event the City does not tender the conveyance of the Property in the manner provided in this Agreement, and any such failure shall not be cured within thirty (30) days after written demand by Purchaser, then, provided Purchaser is not in material Default under this Agreement, at the option of Purchaser, this Agreement shall be terminated, or, if all of the conditions set forth in Section 7.02a above have been satisfied, Purchaser shall be entitled to seek specific performance of this Agreement. In no event shall Purchaser seek or be entitled to money damages.

## ARTICLE 8. DEFAULTS AND EVENTS OF DEFAULT

8.01   <u>Default by Purchaser</u>. The occurrence of any one or more of the following events prior to Closing shall constitute a Default of this Agreement by Purchaser:

a.   Purchaser admits in writing its inability to pay its debts generally as they become due, or Purchaser ceases to conduct business in the normal course by reason of any of the following: (i) The making by Purchaser of any general arrangement or general assignment for the benefit of creditors; (ii) Purchaser becoming a "debtor" as defined in 11 USC § 101 or any successor statute thereto (unless, in the case of a petition filed against Purchaser, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where possession is not restored to Purchaser within sixty (60) days; (iv) the attachment, execution or other judicial seizure of substantially all of Purchaser's assets located at the Property or of Purchaser's interest in this Agreement, where such seizure is not discharged within sixty (60) days; or (v) its voluntary or involuntary dissolution. In the

event that any provision of this subsection is contrary to any applicable law, such provision shall be of no force or effect.

b. Purchaser violates any of the terms and conditions of this Agreement, except as otherwise provided in this Section 8.01, and Purchaser fails to cure same within thirty (30) days after receipt of written notice by the City to cure said Default.

c. Purchaser, not due to any breach of the City, does not acquire the Property pursuant to a Closing in accordance with this Agreement, unless such failure is due to the failure of a condition precedent to Purchaser's obligation to close as set forth in this Agreement.

8.02   Failure to Cure Default.  Any such Default on the part of Purchaser as set forth in Section 8.01 and the failure of Purchaser to cure such Default or within thirty (30) days after written demand by the City to cure said Default for Subsection 8.01b shall be deemed to constitute an **Event of Default**, provided, however, that if the nature of Purchaser's Default is such that more than the cure period provided is reasonably required for its cure, then Purchaser shall not be deemed to be in default if Purchaser commences such cure within said period and thereafter diligently pursues such cure to completion.  Defaults pursuant to Subsections 8.01a are hereby deemed to be material, non-curable Events of Default without the necessity of any notice by the City to Purchaser thereof.  The City may, in its sole discretion, waive in writing any Default or Event of Default by Purchaser.

8.03   Default by the City.  The City shall not be in default unless the City fails to perform obligations required of the City within a reasonable time, but in no event later than ninety (90) days, after written notice by Purchaser to the City, specifying wherein the City has failed to perform such obligation, provided, however, that if the nature of the City's obligation is such that more than ninety (90) days are reasonably required for performance then the City shall not be in default if the City commences performance within such ninety (90) day period and thereafter diligently pursues such performance to completion.

## ARTICLE 9. REMEDIES

9.01   Remedies Cumulative.  The rights and remedies of the City, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breach.  No waiver made by the City shall apply to obligations beyond those expressly waived in writing.

9.02   Reimbursement of Costs.  Purchaser shall reimburse the City for its expenses, including reasonable attorney fees (whether inside or outside counsel), reasonably incurred by the City after an Event of Default in connection with the enforcement of or the preservation of any rights under this Agreement.

## ARTICLE 10. RESTRICTION UPON SPECULATION AND ASSIGNMENT

10.01 <u>No Speculation</u>. Purchaser represents that its purchase of the Property and its other undertakings pursuant to this Agreement are for the purpose of development of the Property for use in connection with Purchaser's adjacent facility and not for speculation.

10.02 <u>Prior Approval of Assignment</u>. Purchaser will not assign this Agreement, without the prior written approval of the City, except for an assignment to a parent, subsidiary or other company controlling, controlled by or in common control with Purchaser. Any proposed transferee shall, by instrument in writing, for itself and its successors and assigns, and expressly for the benefit of the City, assume all of the obligations of Purchaser under this Agreement and agree to be subject to all the conditions and restrictions to which Purchaser is subject. The consent of the City to an assignment or transfer in any one case shall not relieve Purchaser or the transferee of the obligation to obtain the consent of the City for any additional assignments or transfers.

10.03 <u>Consideration for Assignment</u>. Prior to the City's approval of any assignment pursuant to Section 10.02, Purchaser shall certify to the City that the consideration paid for the transfer of any of Purchaser's interest in this Agreement does not exceed an amount representing the actual cost (including carrying charges) incurred by Purchaser in connection with this Agreement; it being the intent of this Section to preclude assignment of this Agreement for profit. In the event Purchaser transfers any such interest at a profit, said profit shall belong to and forthwith be paid to the City.

## ARTICLE 11. INDEMNITY

11.01 <u>Purchaser Indemnification.</u> Purchaser agrees to and shall indemnify and save harmless the City, its agents and employees against and from any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including without limitation, reasonable fees and expenses of attorneys, whether inside or outside counsel, expert witnesses and other consultants) (collectively, "Damages") that may be imposed upon, incurred by or asserted against the City related to this purchase by reason of any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom, except to the extent such Damages are caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct. Purchaser also agrees to hold the City harmless from any and all injury to the person or damage to the property of an employee of the City which arises out of or pursuant to any negligent or tortious act or omission of Purchaser or its Associates resulting in personal injury, bodily injury, sickness, disease or death, or injury to or destruction of tangible property including the loss of use therefrom except to the extent such loss or injury is caused by the City's or its, employees', contractors' or agents' gross negligence or willful misconduct.

11.02 <u>Defense of Claims</u>. In the event any action or proceeding shall be brought against the City by reason of any claim covered hereunder, Purchaser, upon notice from the City, will at its sole cost and expense, resist and defend the same, using legal counsel reasonably acceptable to the City.

11.03 <u>Non-Liability of the City</u>. From and after the date of Closing, the City shall not be responsible or liable to Purchaser, and Purchaser hereby releases the City from liability, for any loss or

damage that may be occasioned by or through the acts or omissions of persons occupying any part of the Property. From or after the date of Closing, Purchaser shall be solely responsible for all injuries to persons and property resulting from any accident, explosion, leak or other cause arising in or about the use of the Property and its appurtenances, as hereinbefore stated. The City shall not be responsible for any loss or damage resulting to Purchaser or its property or to any other person or persons on their property which may be caused by the bursting, stopping, or leaking of water, gas, sewer or steam pipes or from overflow or backing up of any sewer or water main, unless caused by the City's gross negligence or willful misconduct.

11.04   Hazardous Materials.

a.   Definitions.

(i)   "**Relevant Environmental Laws,**" as referred to herein, shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations, and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, whether in the past, the present or the future, with respect to:

(a)   the installation, existence, or removal of, or exposure to, Asbestos on the Property.

(b)   the existence on, discharge from, or removal from the Property of Hazardous Materials.

(c)   the effects on the environment of the Property or of any activity conducted on the Property.

Relevant Environmental Laws shall include, but are not limited to, the following: (i) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC Sections 9601, *et seq.;* the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, *et seq.;* the National Environmental Policy Act, 42 USC Section 4321; the Safe Drinking Water Act, 42 USC Sections 300F, *et seq.;* the Toxic Substances Control Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Federal Water Pollution Control Act, 33 USC Sections 1251, *et seq.;* the Clean Air Act, 42 USC Sections 7401, *et seq.;* and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including 29 CFR Sections 1910.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any state and local laws and regulations pertaining to Hazardous Materials and/or Asbestos.

(ii)   "**Asbestos,**" as referred to herein, shall have the meanings provided under the Relevant Environmental Laws and shall include, but not be limited to, asbestos

fibers and friable asbestos as such terms are defined under the Relevant Environmental Laws.

(iii) **"Hazardous Materials,"** as referred to herein, shall mean any of the following as defined by the Relevant Environmental Laws: Asbestos; hazardous wastes; solid wastes; toxic or hazardous substances, wastes, or contaminants (including, but not limited to, polychlorinated biphenyls (PCB's), paint containing lead, and urea formaldehyde foam insulation).

b. <u>Release and Indemnity</u>. The City shall give Purchaser the opportunity to inspect the Property and conduct such environmental assessments and testing as Purchaser has deemed appropriate. The City shall not be liable to Purchaser for, and Purchaser, for itself and its successors and assigns, hereby releases the City from, any and all liability for any violation or alleged violation of the Relevant Environmental Laws by Purchaser respecting the Property, whether such alleged violation occurred before or after Closing and the transfer of possession to Purchaser. The City shall not be liable for, and Purchaser shall immediately pay to the City when incurred and shall indemnify, defend and hold the City harmless from and against, all loss, cost, liability, damage and expense (including, but not limited to, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that the City may suffer or incur as a result of or in connection in any way with any violation of the Relevant Environmental Laws occurring after the Closing, any environmental assessment or study from time to time undertaken or requested by Purchaser, or breach of any covenant or undertaking by Purchaser in this Section; provided, however, Purchaser shall have no obligation to the City with respect to: (i) indemnified liabilities arising solely from the gross negligence or willful misconduct of the City; or (ii) conditions or Hazardous Materials existing at the time of Closing.

c. <u>Survival</u>. The provisions of this Section shall survive the termination of this Agreement.

d. <u>Breach</u>. Breach of any of the representations, warranties and/or covenants contained in this Article shall be a default under this Agreement; provided, however, that no breach shall be deemed to have occurred so long as, upon becoming aware of a possible breach, Purchaser proceeds to reasonably investigate and remedy in compliance with the Relevant Environmental Laws the matter giving rise to the possible breach.

e. <u>Assignment of Cause of Action</u>. The City shall, upon request of Purchaser, convey, assign and transfer to Purchaser any claim or cause of action the City may have against others in connection with any liability against which Purchaser has fully indemnified the City (including payment) under this Agreement.

## ARTICLE 12. AMENDMENTS

12.01 <u>Form</u>. Any change, addition, deletion, extension or modification of this Agreement (including assignments) that is mutually agreed upon by and between the City and Purchaser shall be incorporated in a written amendment (herein called **"Amendment"**) to this Agreement. Such Amendment shall not invalidate this Agreement nor relieve or release Purchaser of any of its obligations under this Agreement unless stated therein.

12.02   _Binding Effect_.  No Amendment to this Agreement shall be effective and binding upon the parties unless it expressly makes reference to this Agreement, is in writing, is signed and acknowledged by duly authorized representatives of both parties.  To be effective against the City, the Amendment must be authorized as set forth in Section 14.12 of this Agreement.

## ARTICLE 13. NOTICES

13.01   _Addresses_.  Except as otherwise specified herein, all notices, consents, approvals, requests and other communications (herein collectively called **"Notices"**) required or permitted under this Agreement shall be given in writing and personally delivered with receipt obtained, or mailed by registered or certified first-class mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to the City: | Director<br>City of Detroit<br>Planning & Development Department<br>2000 Cadillac Square<br>Detroit, Michigan  48226 |
|  | with a copy to: |
|  | Corporation Counsel<br>City of Detroit Law Department<br>2 Woodward Avenue, Suite 500<br>Detroit, Michigan 48226 |
| If to Purchaser: | Harry C. Warner, President<br>Waterfront Terminal Holdings II, LLC<br>5431 West Jefferson Avenue<br>Detroit, Michigan  48209 |
|  | with a copy to: |
|  | Beth S. Gotthelf, Attorney at Law<br>Butzel Long<br>Stoneridge West, 41000 Woodward Avenue<br>Bloomfield Hills, Michigan 48304 |

13.02   _Date of Notice_.  All notices shall be deemed given when hand-delivered or, if mailed, three (3) days after the day of mailing.  Either party to this Agreement may change its address for the receipt of Notices at any time by giving notice thereof to the other as provided in Section 13.01.  Any Notice given by a party hereunder must be signed by an authorized representative of such party.

## ARTICLE 14. MISCELLANEOUS

14.01 <u>Severability</u>. If any one or more provisions of this Agreement or in any instrument or other document delivered pursuant to this Agreement or the application thereof to any person or circumstance shall to any extent be declared or determined to be invalid or unenforceable, the validity, legality and enforceability of the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected or impaired thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.02 <u>Entire Agreement</u>. This instrument, including the exhibits listed in Section 1.01 which are attached hereto and which are made a part of this Agreement, contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Purchaser acknowledges that neither the City nor the City's agents have made any representations except those expressly set forth herein, and no rights or remedies are or shall be acquired by Purchaser by implication or otherwise unless expressly set forth herein.

14.03 <u>Terminology</u>. Unless the context otherwise expressly requires, the words "herein", "hereof", and "hereunder", and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other subdivision.

14.04 <u>Covenants and Conditions</u>. All the terms and provisions of this Agreement shall be deemed and construed to be "covenants" and "conditions" as though the words specifically expressing or imparting covenants and conditions were used in each separate term and provision.

14.05 <u>Captions</u>. The headings of the Articles, Sections and other subdivisions in this Agreement are for convenience only and shall not be used to construe or interpret the scope or intent of this Agreement or in any way affect the same.

14.06 <u>Cumulative Remedies; Jurisdiction; Venue</u>. The rights and remedies set forth herein are not exclusive and are in addition to any of the rights and remedies provided by law or equity; provided, however, that if the City breaches any of its obligations under this Agreement, then, after reasonable notice and opportunity to cure, Purchaser shall have the right solely to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement, and in no event shall Purchaser be entitled to monetary damages as a result of the City's breach of this Agreement. All actions arising under this Agreement shall be governed by, subject to, and construed according to the laws of the State of Michigan. Purchaser agrees, consents, and submits to the personal jurisdiction of any competent court in Wayne County, Michigan for any action brought against it arising out of this Agreement. Purchaser agrees that service of process at the address and in the manner specified in Article 13 will be sufficient to put Purchaser on notice. Purchaser also agrees that it will not commence any action against the City because of any matter whatsoever arising out of or relating to the validity, construction interpretation and enforcement of this Agreement, in any courts other than those in the County of Wayne, State of Michigan.

14.07 <u>Force Majeure</u>. In the event of enforced delay in the performance by either party of obligations under this Agreement due to unforeseeable causes beyond its control and without its fault or

negligence, including, but not restricted to, acts of God or of the public enemy, acts of the government, acts of the other party, fires, floods, epidemics, or severe weather, the time for performance of such obligations shall be extended for the period of the enforced delays; provided that the party seeking the benefit of the provisions of this Section shall within thirty (30) days after the beginning of such enforced delay, have first notified the other party in writing of the causes thereof and requested an extension for the period of the enforced delay.

14.08   Provisions Not Merged With Deed.   No provision of this Agreement is intended to or shall be merged by reason of any Deed transferring title to the Property from the City to Purchaser or any successor in interest, and any such Deed shall not be deemed to affect or impair the provisions and covenants of this Agreement.

14.09   Counterparts.   This Agreement may be executed in counterparts, each of which shall be deemed to be an original document but together shall constitute one instrument.

14.10   Singular and Plural, etc..   As used herein, the singular include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

14.11   Time of the Essence.   Time is of the essence of this Agreement.

14.12   Authority of City.   Notwithstanding anything in this Agreement or otherwise to the contrary, the City shall not be authorized or obligated to sell the Property to Purchaser until the date that this Agreement has been fully executed by the duly authorized representative of the City pursuant to the resolution of the Detroit City Council or other governmental official or agent with jurisdiction over the matter and approved by the City of Detroit Law Department (the "Effective Date").   Any amendments or modifications must likewise be duly authorized by resolution and approval of all of the same parties.

<div align="center">REMAINDER OF PAGE INTENTIONALLY LEFT BLANK</div>

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

Print: _James K Dowling Jr_

Print: _JAMES K DOWLING JR_

Print: _____

STATE OF MICHIGAN )
                  )ss.
COUNTY OF _____ )

PURCHASER

WATERFRONT TERMINAL HOLDINGS II, LLC

By: _____
Print: Harry C. Warner
Its: President

    The foregoing instrument was acknowledged before me on _____, 2015, by Harry C. Warner, the President of WATERFRONT TERMINAL HOLDINGS II, LLC, a Michigan limited liability company, on behalf of said entity.

 

Print: _____
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in the County of _____

WITNESSES:

_____
Print: _____

_____
Print: _____
STATE OF MICHIGAN )
                  )ss.
COUNTY OF WAYNE  )

**CITY OF DETROIT,**
a Michigan public body corporate

By: _____
  Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

    The foregoing instrument was acknowledged before me on _____, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

 

Print: _____
Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of Wayne

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

WITNESSES:

_____
Print:

_____
Print:

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF _____  )

    The foregoing instrument was acknowledged before me on _____, 2015, by Harry C. Warner, the President of WATERFRONT TERMINAL HOLDINGS II, LLC, a Michigan limited liability company, on behalf of said entity.

**PURCHASER**

WATERFRONT TERMINAL HOLDINGS II, LLC

By: _____
Print:    Harry C. Warner
Its:      President

_____
Print:
Notary Public, _____ County, Michigan
My commission expires: _____
Acting in the County of _____

WITNESSES:

_____
Print:

_____
Print:

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF WAYNE      )

**CITY OF DETROIT,**
a Michigan public body corporate

By: _____
 Arthur Jemison, Mayor's Designee
Pursuant to EM Order No. 38, ¶13

    The foregoing instrument was acknowledged before me on *March 30*, 2015 by Arthur Jemison, Mayor's Designee Pursuant to EM Order No. 38, ¶13.

KAREN M. BEAVER
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Jun 21 2018
ACTING IN COUNTY OF *Wayne*

Print: *Karen M. Beaver*
Notary Public, Wayne County, Michigan
My commission expires: *6/21/2018*
Acting in the County of Wayne

EXHIBIT A
LEGAL DESCRIPTION

A PARCEL OF LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING
DESCRIBED AS LOTS 1207 THROUGH 1214 BOTH INCLUSIVE, LOT 1215 EXCEPT
THE EASTERLY 6.36 FEET THEREOF, ALL BEING TOGETHER WITH THE ADJACENT
VACATED PUBLIC ALLEY (20 FEET WIDE) OF THE "SIXTH PLAT SUBDIVISION OF
THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED
IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; ALSO THE
WESTERLY 213.64 FEET OF THE EASTERLY 574.00 FEET OF PRIVATE CLAIM NO.
39 LYING SOUTH OF THE "SIXTH PLAT SUBDIVISION OF THE PARTS OF THE
WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN LIBER 20,
PAGE 55 OF PLATS, WAYNE COUNTY RECORDS AND LYING NORTH OF AND
ADJACENT TO THE DETROIT RIVER U.S. HARBOR LINE; SAID PARCEL BEING
MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF LOT 1207 OF THE "SIXTH PLAT
SUBDIVISION OF THE PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO.
39" AS RECORDED IN LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS;
THENCE N.61°37'43"E. 213.64 FEET ALONG THE SOUTHERLY LINE OF JEFFERSON
AVENUE (80 FEET WIDE) TO A POINT BEING 6.36 FEET WESTERLY FROM THE
NORTHEAST CORNER OF LOT 1215 OF THE "SIXTH PLAT SUBDIVISION OF THE
PART OF THE WALTER CRANE FARM OF PRIVATE CLAIM NO. 39" AS RECORDED IN
LIBER 20, PAGE 55 OF PLATS, WAYNE COUNTY RECORDS; THENCE S.28°03'35"E.
1068.40 FEET ALONG A LINE 360.36 FEET WEST OF THE EASTERLY LINE OF
SAID PRIVATE CLAIM NO. 39 TO THE DETROIT RIVER U.S. HARBOR LINE;
THENCE S.34°06'08"W. 241.60 FEET ALONG SAID DETROIT RIVER U.S. HARBOR
LINE; THENCE N.28°03'35"W. 1180.06 FEET ALONG A LINE 574.00 FEET WEST
OF THE EASTERLY LINE OF PRIVATE CLAIM NO. 39 TO THE POINT OF
BEGINNING; SAID PARCEL CONTAINING 5.5137 ACRES, MORE OR LESS AND
BEING SUBJECT TO ANY EASEMENTS OF RECORD.

Description CORRECT

ENGINEER OF SURVEYS

BY: _____ DATE:_____

Street Address[es]:

Property Tax Ward & Item numbers:

## EXHIBIT B
## PROJECT GOALS

1)     Construction contracts shall provide that at least fifty-one percent (51%) of the workforce must be Detroit residents, and Detroit residents shall perform fifty-one percent (51%) of the hours worked on the project.

2)     Waterfront Petroleum shall establish a goal of contracting with at least thirty percent (30%) of Detroit-based Businesses, Detroit-headquartered Businesses, and/or Detroit Emerging Businesses (gross receipts of $1 million or less) retained to provide services on the project. Of these categories, the City will give greater weight to Detroit-headquartered Businesses.

EXHIBIT C

## QUIT CLAIM DEED

Subject to the following paragraph, the City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("**Grantor**"), quit claims to Waterfront Terminal Holdings II, LLC, a Michigan limited liability company whose address is 5431 West Jefferson Avenue, Detroit, MI 48209 ("**Grantee**"), the premises located in the City of Detroit, Wayne County, Michigan, described as:

(See attached Exhibit A)

A/K/A _____          Ward: _____ Item(s): _____

(the "**Property**"), for the sum of _____($ _____ ), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances and restrictions of record.

This deed is dated as of _____.

WITNESSES:                          CITY OF DETROIT, a Michigan public body
                                    corporate

_____
Print: _____          By:_____
                                    Print: _____
                                    Its: _____
_____
Print: _____

STATE OF MICHIGAN        )
                         )ss.
COUNTY OF WAYNE          )

      The foregoing instrument was acknowledged before me on _____, 20___, by
_____, the _____ of the City of Detroit,
a Michigan public body corporate, on behalf of the City

_____

Print:

Notary Public, Wayne County, Michigan
My commission expires: _____
Acting in the County of _____

Pursuant to § 18-5-4 of the Detroit City Code,
I hereby certify that proper and fair consideration
has been received by the City pursuant to this
instrument.

_____
             Finance Director

Approved by Law Department pursuant to Sec.
7.5-206 of the Charter of the City of Detroit:

_____
          Corporation Counsel

This Instrument Drafted by:
Bruce N. Goldman
Property Section
City of Detroit Law Department
2 Woodward Avenue, Suite 550
Detroit, Michigan 48226

When recorded, return to:
Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

Approved by City Council on _____
JCC pp _____ or Detroit Legal News,
_____, on file in my office.

Approved by Mayor on _____

_____
             City Clerk

EXHIBIT D

Right of Entry Letter

**[DATE]**

_____, Project Manager
[Name of Environmental Consultant]
[Address]

**RE: Request for Right-of-Entry:**
**[Address/Location] (Ward #/Item #)**
**Detroit, Michigan**

Dear _____:

You have requested a right-of-entry to conduct **[general description of requested activities]** at the above-referenced address (hereinafter, the "Site").

Please be advised that the City of Detroit grants permission to **[Environmental Consultant]**, including its contractors, subcontractors, representatives, agents, and employees (collectively, "User") to enter the above-referenced Site for the sole purpose of conducting certain environmental activities, within the confines of the Scope of Work contained in **Exhibit A**.

This Right-of-Entry is subject in all respects to the following conditions:

1. Subject to satisfaction of the terms and conditions contained herein, this Right-of- Entry shall commence on **[start date]**, and shall automatically terminate upon the completion of the work described herein, or on **[end date]**, whichever occurs first.

2. User shall hold the City of Detroit harmless and shall defend and indemnify the City of Detroit from and against any and all damages, claims, obligations, penalties, costs, charges, losses, demands, liabilities, and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City of Detroit or its departments, officers, employees, or agents arising from and related to User and its contractors', subcontractors', representatives', agents', and employees' use of the Site and this Right-of-Entry (including but not limited to, any release or threatened release of hazardous and non-hazardous substances, contaminants, exacerbation, evacuation, on-site and/or off-site property damage, or bodily injury).

3. **[Environmental Consultant]** shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

• Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence-based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

• Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

• Worker's Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

• Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificates of insurance, without limitation, for all preceding coverage, excluding workers' compensation and employers' liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies.

4. User shall not impair any part of the Site, except as customarily incident to the activities described in Exhibit A and in accordance with all applicable laws. User shall repair any damage caused to the Site and/or properties affected by the activities at the Site, and restore the Site and/or properties affected by the activities at the Site to its/their original condition. Initial access to the Site shall be coordinated through the Planning and Development Department, Property Management Section at (313) 224-1187.

5. User shall contact the Department of Public Works, City Engineering Division at (313) 224-3935 upon the discovery of any damage caused by User's activities to the curb, sidewalk, street, or any portion of the right of way and/or infrastructure in order to provide notice and obtain the proper City of Detroit permits for repair.

6. User will not bring any soils or other materials onto the Site, except in strict accordance with the Department of Public Works, City Engineering Division Standard Specifications for the above-referenced Site and only with prior written verification for compliance by the City of Detroit's Buildings, Safety Engineering, and Environmental Department –Environmental Affairs of the User's fill material analytical data. User shall be responsible for the removal of any and all materials, tools and equipment brought onto the Site required for the authorized activities, and User shall assume the risk of loss or damage to any materials, tools and equipment.

7. User is entering upon and using the Site at its own risk, and accepts the Site "As Is". The City of Detroit makes no representation or warranty as to the status of title or the physical or environmental condition of the Site, or its fitness for any particular use.

8. User shall take all reasonable measures and precautions to mitigate any noise, vibrations, dust, and odors emanating from the activities on the Site.

9. User shall immediately notify the City's Buildings, Safety Engineering, and Environmental Department –Environmental Affairs at (313) 471-5108 upon the discovery of a suspected release of hazardous substances, hazardous materials, contaminants, or property damage as a result of User's activity at the Site.

10. User shall provide to the City of Detroit, without charge, copies of any and all draft and final work plans, reports, health and safety plans, and other environmental, analytical, or engineering documents relating in any way or arising out of its activities at the Site.

Upon the preparation of the documents, three copies of each document shall be provided to:

Raymond A. Scott, General Manager
City of Detroit
Buildings, Safety Engineering, and Environmental Department
2 Woodward Avenue, Suite 401
Detroit, Michigan 48226

11. This instrument and the rights granted hereunder may not be assigned by User.

12. User shall take all precautions necessary to make the Site safe for the authorized activities, including, where appropriate, preparation and adherence to a site-specific health and safety plan.

13. User shall be responsible for ensuring compliance with all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders. Any violation of the applicable laws, rules, regulations, standards, plans, and orders; or breach of the terms contained within this document may be considered grounds for termination of the Right-of-Entry.

14. This instrument constitutes the entire Right-of-Entry agreement between the City of Detroit and the User with respect to its subject matter. This agreement may not be modified, amended, changed, or altered in any respect unless done so in a writing acknowledged by both the City of Detroit and User.

15. No activities other than the activities authorized in Exhibit A may be performed on the Site.

This Right-of-Entry will be effective only upon execution of the acknowledgment and agreement noted herein by an authorized representative of User and upon delivery of same to Mr. Raymond Scott, Buildings, Safety Engineering, and Environmental Department, at the address listed above.

Sincerely,

_____

**\*\*\* [Authorized City of Detroit Department Signature]**

[**Environmental Consultant**], by its duly authorized representative, hereby acknowledges receipt of the original copy of this letter, and agrees to be bound by the terms and conditions stated therein.

[**ENVIRONMENTAL CONSULTANT**]
BY: _____
(Signature)

PRINT NAME: _____
ITS: _____
(Duly Authorized Representative)

DATE _____
TELEPHONE NUMBER: _____

EXHIBIT A TO SAMPLE ENVIRONMENTAL RIGHT-OF-ENTRY DOCUMENT

SCOPE OF WORK

The following is the Scope of Work that [Environmental Consultant], its contractors, subcontractors, representatives, agents and employees (collectively, "User"), is authorized to perform at the Site. User shall be responsible for ensuring compliance in all respects with the Scope of Work, and all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders.
User is only authorized to undertake the following activities at the Site:

[LIST OF AUTHORIZED ACTIVITIES]

Schedule I

## CERTIFICATE OF AUTHORITY FOR LIMITED LIABILITY COMPANY

I, _____, Manager of _____, a
_____limited liability company (the **"Company"**)

DO HEREBY CERTIFY that the following is a true and correct excerpt from *[check appropriate box]*

☐ the minutes of a meeting of the Members of the Company duly called and held on

☐ a consent in lieu of a meeting, with signed consents received from all of the Members of the Company on or before the date hereof.

and that the same is now in full force and effect:

"RESOLVED, that any Manager of the Company, is hereby authorized to execute and deliver, in the name and on behalf of the Company, any agreement or other instrument or document in connection with any matter or transaction with the City of Detroit that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such Managers to be conclusive evidence of such approval."

I FURTHER CERTIFY that the following persons are Managers:

I FURTHER CERTIFY that any of the aforementioned Managers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in the attached Agreement, and that all necessary approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _____ day of _____, 20___.

_____
Print:
Manager

# EXHIBIT 6G – ESCROW AGREEMENT

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (the "Agreement") is made and entered into this _17_ day of July, 2015, by and among **Waterfront Terminal Holdings II, LLC**, a Michigan limited liability company also known as Waterfront Holdings II, LLC ("Purchaser"), **The City of Detroit**, a Michigan public body corporate, acting through its Planning and Development Department ("Seller"), and **eTitle Agency Inc.**, a Michigan corporation ("Escrow Agent"), and is based upon the following.

## R E C I T A L S:

A.     Purchaser and Seller parties to a certain Purchase Agreement (the "Purchase Agreement"), dated February 17, 2015, whereby Seller agreed to sell to Purchaser certain real property as more particularly on Exhibit A attached hereto (the "Property").

B.     On July 1, 2015, B&C Land Development Corporation filed suit against Seller in the Circuit Court for the County of Wayne, Michigan (Case No. 15-008602-CH) claiming an interest in the Property (the "Suit").

C.     In anticipation of the dismissal of the Suit, Purchaser and Seller have agreed to close on the purchase and sale of the Property under the Purchase Agreement in escrow pursuant to the terms and conditions of this Agreement, and Escrow Agent has agreed to hold the original, fully executed Closing Documents (as defined below) and Closing Funds (as defined below) until such time as an appropriate order dismissing the Suit is issued by a court of competent jurisdiction and any lis pendens filed against the Property in connection with the Suit is ordered discharged or released.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the parties agree as follows:

1.     <u>Escrow of Release Documents and First Amendment</u>.  Promptly following the execution of this Agreement, (a) Seller shall deliver to Escrow Agent one original of:  (i) a fully executed and properly notarized quit claim deed in the form required by the Purchase Agreement conveying the Property to Purchaser (the "Deed"), and (ii) a closing statement in the form attached hereto as Exhibit B signed by Seller (the "Closing Statement"); and (b) Purchaser shall deliver to Escrow Agent, (x) the Purchase Price (as defined in the Purchase Agreement), plus or minus the credits and charges due to or from Purchaser pursuant to the Purchase Agreement as set forth in the Closing Statement (the "Closing Funds") and (y) the Closing Statement signed by Purchaser.  The Deed and the Closing Statement are sometimes referred to herein as the "Closing Documents."

2.     <u>Disbursement of Closing Documents and Funds</u>.  The Deed, the Closing Statement and the Closing Funds shall be delivered out of escrow by Escrow Agent as follows:  Upon either: A. receipt of (i) a copy of a duly entered order of dismissal of all counts, with prejudice, in the Suit, and (ii) a discharge of lis pendens duly executed by the counsel for the plaintiff in the Suit and in recordable form or an appropriate order issued by a court of competent jurisdiction discharging or releasing any lis pendens filed against the Property in connection with the Suit (the "Discharge") or B. Purchaser's written waiver of this condition, Escrow Agent shall immediately (i) record the Discharge, then (ii) release to Seller the Closing Funds due to Seller as set forth in the Closing Statement, then (iii) record the Deed, and (iv) release to the Escrow Agent the title insurance premium, closing costs and recording fees, as set forth in the Closing Statement, then (v) provide to Purchaser a copy of the recorded Deed and the original Closing Statement signed by Seller, and (iv) provide to Seller a copy of the recorded Deed and the original Closing Statement signed by Purchaser.

3.     Governing Law; Dispute.  This Agreement shall be governed by and construed in accordance with the laws and judicial decisions of the State of Michigan.  The parties hereto expressly acknowledge and agree that all legal proceedings arising out of or relating to this Agreement shall be brought and maintained in the state and federal courts located in Wayne County and the Eastern District of Michigan.  In the event of a dispute between Purchaser and Seller concerning the disposition of the Closing Documents or the Closing Funds, Escrow Agent may file an interpleader action and shall have the right to deliver the Closing Document and the Closing Funds, as applicable, into court.  If the filing of an interpleader action does become necessary, the Purchaser and the Seller each agree to pay one-half of Escrow Agent's costs incurred in connection therewith, including reasonable attorney fees.

4.     Limitations on Liability.  After disbursing the Closing Documents and the Closing Funds in accordance with Section 2 above, Escrow Agent shall be released from any further liability under this Agreement, it being agreed that Escrow Agent's liability is limited by the terms and provisions set forth in this Agreement, and that by acceptance of this Agreement, the Escrow Agent is acting in the capacity of a depository, only.  Escrow Agent will have no obligation under this Agreement except to exercise good faith and ordinary care.  Escrow Agent may act upon receipt of any certificate or other written document, and will have no responsibility to determine or inquire into or otherwise corroborate the happening or occurrence of any event or condition described in such certificate or document.

5.     Notices.  Any notice required or permitted hereunder and all notices of change of address must be delivered to each of the parties to this Agreement and shall be deemed sufficient if either delivered personally or mailed by certified or registered mail, or delivered by recognized overnight courier service – next business day delivery, or hand-delivery addressed to the recipient at its address specified below.  Notices provided by mail shall be conclusively deemed to have been received on the second business day after the date mailing.  Notices provided by overnight delivery shall be conclusively deemed to have been received on the business day after the date of deposit with such courier.  Notices provided by hand-delivery shall be conclusively deemed to have been delivered on the day of such hand-delivery.  Notices to the parties shall be delivered to the address for such party, set forth below or such other address as such party may designate in writing in the manner set forth above:

If to Seller:            Director
                         City of Detroit
                         Planning & Development Department
                         2 Woodward Ave., Suite 808
                         Detroit, Michigan  48226

                         with a copy to:

                         Corporation Counsel
                         City of Detroit Law Department
                         2 Woodward Avenue, Suite 500
                         Detroit, Michigan 48226

If to Purchaser:         Harry C. Warner
                         Waterfront Terminal Holdings II, LLC
                         5431 West Jefferson Avenue
                         Detroit, Michigan  48209

with a copy to:

Beth S. Gotthelf, Attorney at Law
Butzel Long
Stoneridge West, 41000 Woodward Avenue
Bloomfield Hills, Michigan 48304

If to Escrow Agent:     Bryan Melvin, Esq.
eTitle Agency, Inc.
1650 West Big Beaver Road
Troy, Michigan 48084

    6.     <u>Counterparts</u>.   This Agreement may be executed in one or more counterpart copies (including facsimile and electronically transmitted signature pages), each of which shall constitute an original although not fully executed, but all of which when taken together shall constitute one and the same instrument binding on all parties hereto.

[signatures appear on following page]

DET1539179

**IN WITNESS WHEREOF**, the parties have caused this Escrow Agreement to be executed and delivered as of the date first set forth above.

WITNESSES:

                **Waterfront Terminal Holdings II, LLC,**
                a Michigan limited liability company also known as
                Waterfront Holdings II, LLC

_____    By:_____
                       Harry C. Warner
                Its:     Manager


                **City of Detroit**, a Michigan public body corporate

_____    By:_____
                       Maurice Cox
                Its:     Director, Planning & Development Dept.


                **eTitle Agency, Inc.**, a Michigan corporation

_____    By: _____
                      Name: _____
                Its: _____

DET1539179