UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

                Debtor.

_____/

Bankr. No. 13-53846
Chapter 9
HON. STEVEN W. RHODES

WILLIAM M. DAVIS,

                Appellant,

vs.

CITY OF DETROIT, MICHIGAN, et al.,

                Appellees.

_____/

Case No. 14-cv-14920

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER GRANTING APPELLEE'S MOTION TO DISMISS APPEAL AS EQUITABLY AND CONSTITUTIONALLY MOOT PURSUANT TO FED. R. CIV. P. 12(b)(1)

This matter is presently before the Court on the "Corrected Motion of Appellee the City of Detroit, Michigan for an order Pursuant to Fed. R. Civ. P. 12(b)(1) Dismissing Appeal as Equitably and Constitutionally Moot" [docket entry 33].  Appellant, William M. Davis, has filed a brief in opposition and appellee, the City of Detroit, Michigan ("the City"), has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

## I.  Background

After experiencing decades of financial decline, the City filed the above-captioned Chapter 9 case ("Chapter 9 Case") on July 18, 2013, in the United States Bankruptcy Court for the Eastern District of Michigan ("the Bankruptcy Court").  This Chapter 9 Case is the largest and most complex municipal bankruptcy in U.S. history.  *See In re City of Detroit*, 504 B.R. 191, 281 (Bankr. E.D. Mich. 2013) (finding that, as of July 18, 2013, the City had over $18 billion in escalating debt,

over 100,000 creditors, and hundreds of millions of dollars of negative cash flow).  The importance of this Chapter 9 Case cannot be overstated.  The Bankruptcy Court found that there existed a "service delivery insolvency" such that the City did not have "the resources to provide its residents with the basic police, fire and emergency medical services that its residents need for their basic health and safety." *Id.* at 193.

Over the course of 16 months, the City engaged in negotiations and mediation with representatives of the vast majority of its creditors, which resulted in a series of intricate and carefully woven settlements with nearly all of the City's stakeholder constituencies.  These carefully woven settlements were encompassed in the City's Eighth Amended Plan for the Adjustment of Debts of the City of Detroit ("the Plan"), which the Bankruptcy Court confirmed on November 12, 2014, in its Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit ("Confirmation Order") after conducting a 24-day evidentiary hearing.  Appellant appeals the Bankruptcy Court's Confirmation Order, arguing that various aspects of the treatment of pension claims under the Plan violate the Bankruptcy Code.

***The "Grand Bargain" and the Global Retiree Settlement***

At the heart of the confirmed Plan is the "Grand Bargain"–a carefully interlaced settlement agreement that made it possible for the City, which cannot fully fund its future pension obligations, to avoid drastic cuts to pensions.  The Grand Bargain includes agreements by and between the City, the State of Michigan, certain philanthropic foundations, and the Detroit Institute of Arts ("DIA") to provide a total of $816 million in funding ("the Outside Funding") to the City to finance its pension  obligations (as adjusted by the Plan).  In securing the Grand Bargain, the City entered into a comprehensive settlement ("the Global Retiree Settlement") of pension, healthcare,

2

and other labor-related issues with employee and retiree representatives, including the official committee of retirees appointed in the Chapter 9 Case; critical unions and retiree associations; and the City's two retirement systems, the General Retirement System ("GRS") and the Police and Fire Retirement System (collectively, the "Retirement Systems").

The Retirement Systems are fiduciary trusts and legal entities separate from the City. On behalf of the City, they administer the retirement programs established by the City for City employees, retirees, and their beneficiaries. The GRS Board of Trustees administers a defined benefit pension plan ("GRS Defined Benefit Pension Plan") and a defined contribution annuity program ("the Annuity Savings Fund"). The City is the sole sponsor of each Retirement System's defined benefit pension plan and is therefore ultimately responsible for any deficiency in funding those plans. The City, however, is not responsible for funding the GRS Annuity Savings Fund.

***Treatment of GRS Pension Claims Under the Plan***

The Plan classifies the pension claims of members of the GRS ("GRS Pension Claims") in Class 11 of the Plan's claims.[1]  Even with the $816 million in Outside Funding negotiated through the Grand Bargain, the City did not have the resources to fully fund GRS Pension Claims over time. The Plan therefore adjusts GRS Pension Claims by providing for payment over time for approximately 60% of the $1.879 billion underfunded portion of the GRS Defined Benefit Pension Plan (hereafter the "underfunded claims"), assuming that $816 million is received from Outside Funding. Because the City cannot fully satisfy the underfunded claims, the Plan adjusts the future benefits of GRS members by eliminating annual cost of living increases in benefits

_____

[1]  Other pension claims are classified in Class 10.  The Plan's treatment of retiree healthcare claims (which fall under "OPEB Claims") are classified in Class 12.

3

("COLAs") and imposes an across-the-board 4.5% reduction in earned pensions of GRS members. These adjustments were conditioned in part upon acceptance of the Plan by the holders of GRS Pension Claims, who were notified that if they rejected the Plan, the Outside Funding would not be available and the City would be required to reduce each GRS retiree's pension by 27% instead of by 4.5%. Holders of Class 11 GRS Pension Claims voted 73% in favor of accepting the Plan.

*ASF Recoupment*

In addition to the GRS Defined Benefit Pension Plan, since 1973 the GRS has sponsored the Annuity Savings Fund ("ASF"), a supplemental retirement program that allows current City employees to invest up to seven percent of their after-tax salaries in a defined contribution retirement account. Although ASF funds are not used to fund pensions earned under the GRS Defined Benefit Pension Plan, these funds are nonetheless held in the GRS trust and are invested with the assets that the City contributed to fund the GRS Defined Benefit Pension Plan. The ASF accounts operate like a 401(k) account–employees earn interest on their contributions based on the returns from ASF account investments, which the GRS Board of Trustees determines and then credits to those ASF accounts annually. But these ASF accounts were unlike any other 401(k) account because they were treated essentially as guaranteed investment contracts. From the mid-1980s until fiscal year 2012, the GRS Trustees would credit each ASF account holder with no less than a 7.9% annual return, regardless of the actual annual return on GRS Trust Assets.

The practice of crediting ASF account holders with a guaranteed 7.9% annual return[2] was financed by diverting nearly $387 million contributed by the City to the GRS Defined Benefit Pension Plan to the ASF participants' individual defined contribution accounts. Not surprisingly,

---

[2] The City describes the illegality of this practice at length at pages 13-17 of its brief.

this diversion process contributed to the City's inability to fully fund GRS Pension Claims. Thus, in negotiating the underfunded GRS Pension Claims, the City made known to the Retiree Representatives that the City possessed various causes of action against the GRS and the GRS Trustees, under which it could, and had an obligation to, recoup those diverted payments. After months of negotiations, the City and GRS agreed to settle those causes of action as part of the Global Retiree Settlement. The parties agreed that it would be unfair to address the underfunded portion of the GRS Defined Benefit Pension Plan by reducing the pensions of all GRS participants regardless of whether and how much they participated in the ASF program. Instead, to minimize global reductions and to recover a reasonable amount of improperly diverted GRS Defined Benefit Pension Plan funds, the parties agreed as part of the Global Retiree Settlement to recapture diverted funds through an intricate ASF Recoupment program set forth in the Plan.

The ASF Recoupment program allows the City to recover approximately $190 million of the roughly $387 million in GRS Defined Benefit Pension Plan funds that were improperly diverted from July 1, 2003, to June 30, 2013 ("ASF Recoupment Period"). Annual recoupment is determined by the difference between the amounts earned on ASF accounts and the amounts that would have been earned had the accounts been credited with actual returns, but capped at 7.9% and with a floor against investment loss (0%). The ASF Recoupment program then recoups from each recipient of excess interest, subject to two independent caps. In each case, the total amount to be recovered is capped at 20% of the highest value of the recipient's ASF account balance during the ASF Recoupment Period. Further, the total pension benefit of ASF participants who retired as of June 30, 2014, cannot be reduced by more than a total of 20% of their annual pension benefit, including the reduction from both ASF Recoupment and the 4.5% across-the-board

5

reduction of all GRS pensions.  The parties agreed that the process to recover the ASF Recoupment amounts would proceed as follows: (a) for current City employees who continued to maintain ASF accounts, by debiting their ASF accounts in the amount of ASF Recoupment; and (b) for those who already received a full distribution of their ASF accounts, by having their monthly pension further reduced.

The ASF Recoupment program therefore struck a balance between two opposite objectives: (1) avoiding the imposition of even greater pension cuts for those who either did not participate or participated minimally in the ASF program; and (2) minimizing, to the extent reasonable given the City's financial insolvency and inability to fully fund GRS Pension Claims, the effect of recoupment on the pensions and income of those who had participated in the ASF program.  As noted by the Bankruptcy Court, ASF Recoupment is an "integral component of the City's [Global Retiree Settlement]" and is projected to recover about $190 million, without which, the Bankruptcy Court further noted, the Plan would be required to impose a 13% across-the-board reduction in GRS pensions, rather than the confirmed 4.5% reduction.  Confirmation Order at 61, 95.

***Impact of the Plan***

Overall, the Plan (1) eliminates approximately $7 billion in City liabilities; (2) frees approximately $1.7 billion in revenue over a nine-year period for reinvestment into the City's services, including directing funds to public safety services, blight remediation, and improvements to information technology and public transportation; and (3) provides for $483 million in additional revenue and $358 million in cost savings over the same time period.

Since the Plan became effective on December 10, 2014, the City has taken several

6

steps to implement it.  For example, the City (1) issued $287.5 million in bonds under the Exit

Facility; (2) issued $632 million and $88 million in New B and C Notes, respectively; (3)

irrevocably transferred all DIA assets to a perpetual charitable trust; (4) debited excess interest from

all but five current ASF account holders subject to the ASF Recoupment program; (5) transferred

interests of property pursuant to the Syncora Settlement and the FGIC/COP Settlement; and (6)

implemented a two-year City budget.  These actions provide only a brief glimpse into the numerous

transactions that have occurred since the Plan's effective date.

***The Instant Appeal***

        Appellant appeals the Bankruptcy Court's Confirmation Order, arguing that various

aspects of the treatment of pension claims under the Plan violate the Bankruptcy Code.  Appellant

objects to the Plan's reduction of GRS Pension Claims as violative of the Michigan Constitution.

Appellant's Br. at 2.  Further, appellant objects to ASF Recoupment, arguing that members who

participated in the ASF program are treated less favorably[3] under the Plan.[4]  *Id.*  For relief, appellant

asks the Court to "reverse the Confirmation of the Plan of Adjustment insofar as it violates Chapter

9 and the Michigan constitution" and to restore full pension benefits.  *See id.* at 31.

## II.  Legal Standard

        This Court has jurisdiction to hear appeals from "final judgments, orders, and

---

   [3]   In addition to the 4.5% across-the-board pension reduction, GRS members who
participated in the ASF program face a 14.5% further reduction to their pensions, whereas those who
did not participate in the ASF program are not affected by a further reduction.

   [4]   Appellant notes in his brief, however, that "[i]n the interest of judicial economy, Mr. Davis
relies and incorporates the arguments of fellow appellants in opposition to the annuity claw-back
recoupment."  Appellant's brief therefore focuses primarily on the issue of pension adjustments.
The Court will likewise focus on this issue.

decrees" of the Bankruptcy Court.  28 U.S.C. § 158(a)(1).  The City has moved to dismiss this appeal as equitably and constitutionally moot pursuant to Fed. R. Civ. P. 12(b)(1).  *See Alexander v. Barnwell Cnty. Hosp.*, 498 B.R. 550, 557 (D.S.C. 2013) (finding that a motion to dismiss an appeal of an order confirming a bankruptcy plan as equitably or constitutionally moot is properly brought pursuant to Fed. R. Civ. P. 12(b)(1)).

## III.  Argument

### A.  The Doctrine of Equitable Mootness

The doctrine of equitable mootness applies "in appeals from bankruptcy confirmations in order to protect parties relying upon the successful confirmation of a bankruptcy plan from a drastic change after appeal."  *In re United Producers, Inc.*, 526 F.3d 942, 947 (6th Cir. 2008).  The doctrine promotes fairness and protects "parties' settled expectations and the ability of a debtor to emerge from bankruptcy."  *Id.* (citing *In re Ormet Corp.*, No. 2:04-CV-1151, 2005 WL 2000704, at *4 (S.D. Ohio Aug. 19, 2005)).  Equitable mootness operates on the premise that a bankruptcy plan "once implemented, should be disturbed only for compelling reasons," *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1225 (6th Cir. 1995) (internal quotation marks and citation omitted), and is "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable," *In re United Producers, Inc.*, 526 F.3d at 947 (quoting *MAC Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002) (internal quotation marks omitted)).  The equitable mootness doctrine therefore prevents a creditor, or any party for that matter, from overturning an order of the Bankruptcy Court–most often a confirmation order–if the requested relief would unravel complex and interwoven restructuring agreements or would require

8

the undoing of transactions that are "extremely difficult to retract." *In re Ormet Corp.*, 355 B.R. 37, 41 (S.D. Ohio 2006).

Appellant correctly notes that the doctrine of equitable mootness has been applied to a Chapter 9 bankruptcy appeal in only two cases–neither of which originated from courts within the Sixth Circuit. *See In re City of Vallejo, CA*, 551 F. App'x 339, 339 (9th Cir. 2013) (affirming the Bankruptcy Appellate Panel's order dismissing Chapter 9 appeals as equitably moot); *Barnwell Cnty. Hosp.*, 498 B.R. 550, 559 (D.S.C. 2013) (dismissing Chapter 9 appeal as equitably and constitutionally moot). While it is true that "[e]quitable mootness is most commonly applied to avoid disturbing [Chapter 11] plans of reorganization," *In re Fontainebleau Las Vegas Holdings, LLC*, 434 B.R. 716, 742 (S.D. Fla. 2010), this doctrine has been applied in other contexts, such as in Chapter 7 appeals, s*ee, e.g.*, *In re McDonald*, 471 B.R. 194, 196-97 (E.D. Mich. 2012) (applying an equitable mootness analysis to a Chapter 7 appeal),[5] and in Chapter 11 liquidation proceedings, *see, e.g.*, *In re BGI, Inc.*, 772 F.3d 102, 108-09 (2d Cir. 2014) (finding "no principled reason" why the doctrine of equitable mootness should not also apply in Chapter 11 liquidation proceedings where "substantial interests may counsel in favor of preventing tardy disruption of a duly developed, confirmed, and substantially consummated plan").[6]

_____

[5] *See also In re Shawnee Hills, Inc.*, 125 F. App'x 466, 469-70 (4th Cir. 2005) (applying equitable mootness doctrine to a Chapter 7 appeal); *In re Health Co. Int'l*, 136 F.3d 45, 48-49 (1st Cir. 1998) (same); *In re Fitzgerald*, 428 B.R. 872, 881-82 (B.A.P. 9th Cir. 2010) (same); *In re Carr*, 321 B.R. 702, 706-07 (E.D. Va. 2005) (noting that the equitable mootness doctrine applies with equal force to a Chapter 7 liquidation of a bankruptcy estate as it does to a Chapter 11 reorganization).

[6] *See also In re President Casinos, Inc.*, 409 F. App'x 31, 31-32 (8th Cir. 2010) (affirming district court's decision that Chapter 11 liquidation appeal was equitably moot); *In re Centrix Fin. LLC*, 355 F. App'x 199, 201-02 (10th Cir. 2009) (remanding Chapter 11 liquidation appeal to district court with instructions to apply equitable mootness analysis); *In re Superior Offshore Int'l, Inc.*, 591

A survey of the case law discussing and applying the doctrine underscores the notion that equitable mootness "is not limited to appeals of orders confirming [Chapter 11] reorganization plans,"[7] has "been applied in a variety of [bankruptcy chapter] contexts,"[8] and should be "accorded broad reach."[9]  As the case law illustrates, the doctrine is not concerned with the specific chapter under which the debtor's case was brought.  Rather, what matters is whether hearing the bankruptcy appeal could unravel the debtor's plan and disturb the reliance interests created by it.  Because the underlying equitable considerations of promoting finality and good faith reliance on a judgment applies with equal force to a Chapter 9 bankruptcy appeal, the Court sees no reason why the doctrine should not be applied to avoid disturbing a Chapter 9 plan of adjustment.

In urging the Court to hold otherwise, appellant relies heavily on the decision in *Bennett v. Jefferson Cnty.*, 518 B.R. 613 (N.D. Ala. 2014), where the court held that the doctrine of equitable mootness is inapplicable to appeals of orders confirming Chapter 9 plans of adjustment. The Court will not adopt the holding or rationale in *Jefferson County*, as it finds the discussion regarding the differences between the underlying policy objectives of Chapter 9 and Chapter 11 bankruptcies to be particularly problematic.

In deciding to exempt Chapter 9 bankruptcies from the equitable mootness doctrine, the *Jefferson County* court found that the underlying policy objectives of a Chapter 9 bankruptcy

---

F.3d 350, 353-54 (5th Cir. 2009) (conducting an equitable mootness analysis in a Chapter 11 liquidation appeal).

[7] *In re PC Liquidation Corp.*, No. CV-06-1935(SJF), 2008 WL 199457, at *5 (E.D.N.Y. Jan. 17, 2008).

[8] *In re Arcapita Bank B.S.C. (c)*, Nos. 13 Civ 5755 (SAS) & 13 Civ. 5756(SAS), 2014 WL 46552, at *2 (S.D.N.Y. Jan. 6, 2014).

[9] *In re BGI, Inc.*, 772 F.3d at 109.

do not align as closely with the purpose of the equitable mootness doctrine as that of a Chapter 11 bankruptcy.  That court found that a Chapter 11 corporate reorganization is concerned with efficiency and "preserving going concerns and maximizing property available to satisfy creditors," *id.* at 635, whereas a Chapter 9 bankruptcy is concerned not with future profit, but with "continued provision of public services."  *Id.* at 636.  The court went on to conclude that "[t]hese major differences in the purposes of Chapter 9 and Chapter 11 reorganizations alter analysis of whether equitable considerations should factor into this court's decision to hear the [Chapter 9] appeal" because although the doctrine "requires a weighing of finality and good faith reliance against competing interests that underlie the right of a party to seek review of a bankruptcy court order . . . , [i]n the case of a Chapter 9 reorganization plan–finality and reliance may be required to yield to the Constitution and interest of the public in the provision of governmental services."  *Id.* (internal citations and quotation marks omitted).

The Court agrees with appellee that the interests of the City, its over 100,000 creditors, and its nearly 700,000 residents in relying on a final judgment cannot be marginalized and dismissed in the broad brush manner adopted by the *Jefferson County* court.  If the interests of finality and reliance are paramount to a Chapter 11 private business entity with investors, shareholders, and employees, then these interests surely apply with greater force to the City's Chapter 9 Plan, which affects thousands of creditors and residents.  The Court will therefore apply an equitable mootness analysis to the instant appeal.

**B.  Application**

The Sixth Circuit applies the equitable mootness doctrine using a three-part test: "(1) whether a stay has been obtained; (2) whether the plan has been 'substantially consummated';

and (3) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *In re United Producers*, 536 F.3d at 947-48 (internal citation omitted).

**1.  Existence of a Stay**

"When an appellant does not obtain a stay of the implementation of a confirmation plan, the debtor will normally implement the plan and reliance interests will be created." *In re United Producers, Inc.*, 526 F.3d at 948.  The failure to obtain a stay will therefore "count against the appellant in determining whether an appeal should be denied on equitable mootness grounds," *id.* (citing *In re Manges*, 29 F.3d at 1040), but is "not necessarily fatal to the appellant's ability to proceed," *City of Covington*, 71 F.3d at 1225-26.

The Bankruptcy Court declined to issue a stay in this matter, reasoning that a stay would jeopardize and bring "to a halt" "the City's efforts to pull itself out of its service delivery insolvency and to revitalize itself." *See* Order Denying Motions for Stay Pending Appeal (Bankr. Docket Entry 8533).  Because "[a] stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization," *United Producers, Inc.*, 526 F.3d at 948, the fact that appellant concurred in a motion that unsuccessfully sought a partial stay in this matter is of no consequence and does not weigh in favor of appellant's position.  Accordingly, appellant's failure to obtain a stay weighs in favor of granting the City's motion to dismiss.

**2.  Substantial Consummation**

The Bankruptcy Code defines "substantial consummation" as:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (c) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  Although the definition of "substantial consummation" is ordinarily used as a statutory measure "to determine whether a bankruptcy court may modify or amend a [Chapter 11] reorganization plan, *In re United Producers*, 526 F.3d at 948 (citing § 1127), "[t]he standard has been adopted in the equitable mootness analysis to determine the extent to which the plan has progressed," *Id.* (citing *In re Manges*, 29 F.3d at 1040-41).  "If a plan has been substantially consummated there is a greater likelihood that overturning the confirmation plan will have adverse effects on the success of the plan and on third parties." *Id.*  This Chapter 11 standard therefore serves as a "yardstick . . . as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal." *In re Manges*, 29 F.3d at 1040-41.

Appellant does not provide any argument in his response or brief as to whether the Plan has been substantially consummated.  Instead, appellant argues that "a finding of substantial consummation is not dispositive and, in the context of this case, not very relevant."  Appellant's Resp. at 23.  In contrast, the City argues that the Plan has been substantially consummated and notes numerous major transfers and transactions that have been effectuated pursuant to the Plan, including (1) the State of Michigan's disbursement of $194.8 million to the City's Retirement Systems; (2) the DIA's and other philanthropic organizations' disbursement of $23 million to the Retirement Systems; (3) the City's issuance of $287.5 million in Financial Recovery Bonds, $632 million in New B Notes, and $88 million in New C Notes; (4) the City's irrevocable transfer of its right, title, and interest in DIA assets to a perpetual charitable trust; (5) the Retirement Systems' implementation of pension plan modifications, including pension and COLA reductions and ASF

Recoupment; and (6) the substantial completion[10] of ASF Recoupment of current account holders, which has resulted in $58.5 million in recaptured funds. *See* Appellee's Mot. at 28-31. The City and other entities have also resumed or initiated management of substantially all of the property dealt with by the Plan, as demonstrated by (1) Kevyn D. Orr's resignation as Emergency Manager, which restored day-to-day management of the City to the Mayor and City Council; (2) Governor Richard D. Snyder's decision to remove the City from financial emergency status and end receivership; (3) the City's implementation of $1.7 billion in Reinvestment Initiatives, of which $8.4 million went to the Detroit Police Department, $3.8 million to the Detroit Fire Department, $3.5 million for blight remediation, and $1.9 million to the City's Income Tax Division to upgrade information technology; (4) the establishment of the Great Lakes Water Authority and two VEBAs to provide healthcare benefits to City retirees; and (5) appointment of the Michigan Financial Review Commission to review the City's finances. *See id.* at 31-33. Finally, the City notes that it has substantially completed numerous payments and distributions under the Plan, including (1) $55 million in cash to holders of allowed Class 7 claims; (2) $17 million in New B Notes for distribution to holders of allowed Limited Tax General Obligation Bond Claims; (3) $280 million in Restructured UTGO Bonds to holders of allowed Class 8 Claims; (4) $88 million in New C Notes to the COP Trustee for the benefit of settling claims with Class 9 claimants; and (5) $493 million in New B Notes to the VEBAs to satisfy Class 12 claims. *See id.* 34-35.

As these many transfers, transactions, and actions demonstrate, implementation of the Plan has been set into motion and has been substantially consummated, especially as it relates

---

[10] On January 2, 2015, ASF excess amounts were debited from 5,278 of 5,283 current ASF account holders. Appellee's Mot. at 30 n.17. The City notes in its motion that debits from the remaining five accounts failed for technical reasons and will be re-attempted. *Id.*

14

to GRS Pension Claims.  Since the effective date, pensions have been reduced, COLAs have been eliminated, ASF Recoupment has recaptured nearly all diverted funds from current ASF account holders, and ASF Recoupment for non-current ASF account holders has taken effect by further adjusting GRS pensions.  Thus, this factor weighs in favor of granting the City's motion to dismiss.

### 3. Rights of Third Parties and Success of the Plan

"Even when a plan has been substantially consummated, it is 'not necessarily . . . impossible or inequitable for an appellate court to grant effective relief.'" *In re United Producers, Inc.*, 526 F.3d at 949 (quoting *In re Manges*, 29 F.3d at 1042-43).  This is because the "most important factor [a] court must consider is 'whether the relief requested would affect either the rights of parties not before the court or the success of the plan.'" *Id.* (quoting *In re Am. HomePatient, Inc.*, 420 F.3d 559, 564 (6th Cir. 2005)).  This question "'require[s] a case-by-case judgment regarding[] the feasibility or futility of effective relief should a litigant prevail.'" *Id.* (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147-48 (D.C. Cir. 1986)).  In assessing the feasibility of granting relief, the court must "consider[] the nature of the relief requested and whether it amounts to a piecemeal revision of the plan or a wholesale rewriting of it." *Id.* (citing *In re Manges*, 29 F.3d at 1042) ("We must evaluate [actions taken pursuant to the Plan], many of which appear irreversible, against the backdrop of the relief sought–nothing less than a wholesale annihilation of the Plan.").  Essentially, the Court must decide whether appellant presents a "plausible argument that the implementation of [his] suggested changes to the confirmation plan would not require any of the actions undertaken pursuant to the plan to be reversed." *In re United Producers, Inc.*, 526 F.3d at 950.

In his brief and response, appellant asks the Court to reverse the Plan such that

pensions are restored in full.[11]   Appellant argues that although "[t]he City of Detroit may have to find some alternative funds to make up the difference in the funding necessary to restore pensions to their full payments[,] . . . that funding will be relatively small and can be provided without disturbing the plan of adjustment."  Appellant's Resp. at 27.  Appellant suggests that the City could avoid disturbing the Plan by making up for the funding deficit by applying for federal funds for blight remediation and "go[ing] after major banks, whose predatory lending policies led to the destruction of neighborhoods throughout Detroit."  *Id.*

The Court disagrees with appellant's suggestion that requiring the City to unimpair approximately $1.9 billion in GRS Pension Claims would not "produce a 'perverse' outcome–'chaos in the bankruptcy court' from a plan in tatters and/or significant 'injury to third parties.'"  *In re Semcrude, L.P.*, 728 F.3d 314, 320 (3d Cir. 2013) (quoting *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012)).  The relief appellant requests–sending the City back to square one to keep pensions intact–would require "nothing less than a wholesale annihilation of the Plan."  *In re Manges*, 29 F.3d at 1043.  Any argument to the contrary simply cannot be credited.

---

[11]   In his response to the motion to dismiss, appellant suggests that if the Court does not grant his request to restore full pension benefits, he seeks "(1) [an] order that an amended plan of adjustment be adopted removing any language providing for further reduction of pension payments; [and] (2) [an] order that any future amended plan of adjustments not contain any language impairing or diminishing pension payments."  Appellant's Resp. at 30.  Appellant's concern stems from a condition in the Plan that states that in the event the DIA defaults on making its payments, pensions shall be automatically reduced by the defaulted amount.  *Id.* at 13.  Such relief was never requested in his opening brief and appellant cannot request such relief in response to the City's motion to dismiss.  However, even if such relief had been initially requested in appellant's brief, appellant's suggestion that the Plan would not be unraveled by adding his conditions post-confirmation cannot be credited.  The ability to further reduce pensions based on the DIA defaulting provides assurance that the City will not become liable in the event of a default.  By removing these conditions, bargaining positions would change, requiring all stakeholders to return to the table to negotiate a new Plan.

16

As the City notes in its motion, the Global Retiree Settlement sought to ensure that payment of GRS Pension Claims would be made at a specified level and that to achieve this level, the State and the DIA Funding Parties would need to contribute $816 million to the City. This Grand Bargain was contingent on the confirmation of the Plan and the implementation of the Global Retiree Settlement, which relies on ASF Recoupment. Exempting pensions from the Plan would therefore unravel the Grand Bargain, which could cause (1) the State to commence measures to recover the State Contribution and (2) the DIA Funding Parties to withhold hundreds of millions of dollars in funding not yet disbursed to the City. Appellee's Reply at 4. Further, appellant's requested relief would disrupt ASF Recoupment by removing $190 million in necessary cost savings. By losing $190 million in ASF Recoupment proceeds and $816 million in Outside Funding, the City would be rendered incapable of (1) satisfying its obligations to creditors under the Plan and (2) implementing $1.7 billion in Reinvestment Initiatives. In a Plan described by Martha E.M. Kopacz, the court-appointed independent feasibility expert, as having "little space remaining on the continuum of reasonableness," where "[i]t is not realistic or prudent to believe that the City could take on any additional plan obligations and remain within the continuum . . . necessary to establish feasibility," it is simply unrealistic to credit appellant's claim that his requested relief would not hinder the success of the Plan. Tr. of 11/7/2014 Hr'g at 54:13-14. Simply put, unimpairing GRS Pension Claims would not only threaten the success of the Plan, it would cast the City into a renewed financial emergency.

Further, reversing the Plan would negatively affect countless third parties who have justifiably relied on the Plan. Equitable mootness has particular force when "[r]eversal of the Confirmation Order . . . would require the invalidation of thousands of good-faith transfers made

pursuant to the Plan," *In re Eagle-Picher Indus., Inc.*, 172 F.3d 48 (6th Cir. 1998), and "unraveling the plan 'would work incalculable inequity to many thousands of innocent third parties who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation,'" *In re United Producers, Inc.*, 526 F.3d at 951 (quoting *In re Public Serv. Co.*, 963 F.2d 469, 475 (1st Cir. 1992)).  This reliance interest is heightened when, as here, the plan "reflects a highly integrated settlement among various constituencies."  *HNRC Dissolution, Co.*, No. Civ.A.04-158 HRW, 2005 WL 1972592, at *9 (E.D. Ky. Aug. 16, 2005).

The record from the Bankruptcy Court reveals that appellant's requested relief would negatively affect the success of the Plan and harm innocent third parties.  Although appellant makes light of these consequences, the record before the Court, as described above, establishes that various parties have come to rely upon the Plan such that unraveling it would throw the City into financial chaos.  Thus, the third factor of the equitable mootness analysis weighs in favor of granting the City's motion to dismiss.

**IV.  Conclusion**

All three factors of the equitable mootness analysis weigh in favor of dismissing appellant's appeal as moot:  appellant did not obtain a stay; the confirmed Plan has been substantially consummated; and reversal of the Plan would adversely impact third parties and the success of the Plan.  Having concluded that this appeal is equitably moot, the Court finds it unnecessary to address the City's secondary argument that the appeal is also constitutionally moot.  Accordingly,

IT IS ORDERED that the "Corrected Motion of Appellee the City of Detroit, Michigan for an order Pursuant to Fed. R. Civ. P. 12(b)(1) Dismissing Appeal as Equitably and Constitutionally Moot" [docket entry 33] is granted.  This appeal is dismissed as equitably moot.


S/ Bernard A. Friedman_____
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2015
       Detroit, Michigan