In re:

CITY OF DETROIT, MICHIGAN,

Debtor

Bankruptcy Case No. 13-53846

Honorable Thomas J. Tucker

Chapter 9

## BRIEF ON BEHALF OF THE SENIOR ACCOUNTANTS, ANALYSTS AND APPRAISERS' ASSOCIATION (SAAA) IN OPPOSITION TO THE CITY OF DETROIT'S APPLICATION TO REQUIRE THE <u>WITHDRAWAL OF A GRIEVANCE IT FILED FOR ITS MEMBER</u>

The Senior Accountants, Analysts and Appraisers' Association (SAAA), a labor organization in the City of Detroit, opposes the City's attempt to compel it to withdraw a grievance the SAAA filed on behalf of one of its members challenging the post-petition suspension and discharge of Cedric Cook, a member of the SAAA bargaining unit.

## STATEMENT OF RELEVANT FACTS

Prior to filing the Petition in this case, the Emergency Manager for the City of Detroit promulgated the City Employment Terms (CET) (Relevant sections affixed as Ex. 1) which provided for the terms and conditions of employment for employees represented by the SAAA. The CET prohibited discipline and

1

discharges without just cause and provided for a grievance procedure culminating in binding arbitration for grievances arising under its terms (CET, Ex. 1, at 8-10).

The CET remained in effect after the filing of the Petition in this case and ended only when the Emergency Manager signed a new contract with the SAAA in July 2014. In his final Executive Order No. 44, the Emergency Manager proclaimed that in addition to the collective bargaining contracts specifically recognized in the Plan and the Confirmation Order, he would continue to recognize any claims that arose in the ordinary course of business under the any CET that he had promulgated or that the City had promulgated prior to the EM's tenure:

> All Collective Bargaining Agreements ("CBAs")...are hereby adopted, approved and ratified in all respects. In addition to the foregoing, all City Employment Terms ("CETs")...are hereby adopted, ratified and approved in all respects including, without limitation, the CETs and other agreements identified on the attached Exhibit C. The EM also ratifies and approves the CETS that were implemented prior to the EM Tenure and that remain in effect as of the date of this Order, including the CETs identified on the attached Exhibit C.

> (Ex. 2, EM Exec. Order No. 44, at 7).

The SAAA's August 2, 2013 grievance clearly arose after the Petition had been filed on July 18, 2013. The City suspended Cook on July 26, 2013 (Ex. 3) and discharged him on August 22, 2013 (Ex. 4) and, under the established past practice, the SAAA's July 26, 2013 grievance (Ex. 5) challenges both the suspension and the discharge.

The SAAA appealed its grievance on behalf of Cook to arbitration under the CET, and, acting under that procedure, the SAAA and the City agreed that Attorney Thomas Barnes would serve as the arbitrator for this grievance.

Arbitrator Barnes set June 24, 2015 as the hearing date. On June 12, 2015, however, the City for the first time advised the SAAA that it claimed that the SAAA's grievance was barred by the bankruptcy proceedings. The SAAA did not agree with this assertion, but in order to avoid the needless expenditure of resources, it agreed to adjourn the arbitration until the City filed and the Court decided the City's motion asserting that the arbitration was barred by the bankruptcy proceedings.

The City finally filed its motion on September 15, 2015 (R. 10183). Having reviewed the motion, the SAAA urges this Court to reject it because the grievance at issue is a post-petition claim asserting a violation of an executory contract affirmed by the City Detroit and, as such, it is a claim that arose in the ordinary course of the City's business and is therefore not barred by either the Plan or this Court's Order approving the Plan.

# ARGUMENT

## I

## THE SAAA'S GRIEVANCE ON BEHALF OF COOK IS A POST-PETITION CLAIM.

The City spends considerable time in its motion on discipline that it claims to have levied on Cook before the petition and the alleged misconduct that it alleges justifies the suspension of July 26 and the discharge of August 22 (R. 10183, City Motion, at 1-5).

The City's motion also spends much time on what Cook allegedly did (R. 10183, City Motion at 4-5)—assertions which the SAAA sharply disputes and which were to be settled by the arbitration to which the parties had agreed.

But having spent time on those issues, the City's motion utterly fails to come to grips with the crucial issue of when the SAAA's grievance actually arose. The reason is obvious: the SAAA's claim arose when the City suspended and discharged Cook on, respectively, July 26 and August 22, 2013. Until the City suspended and discharged Cook, neither the SAAA nor Cook had cause to file a grievance. Until the suspension and discharge, the events of July 18—whichever version of those events is believed—were simply another day of work. The breach of the contract—if indeed it was a breach—only occurred if the City suspended and then discharged Cook without just cause which occurred, respectively, on July 26 and August 22, 2013.

4

The City spends much time on Cook's prior discipline as if that was relevant in any way to when the grievance over his July 26 suspension and August 22 discharge actually arose. Under well-established law, however, Arbitrator Barnes is charged with determining whether the City had just cause for the July 26 suspension or the August 22 discharge. If it did not, he then must order an appropriate remedy for the breach of the contract. If the City utterly lacked cause, he may order reinstatement and full back pay. But under the doctrine of double jeopardy, he may not under those circumstances impose any penalty on Cook for his prior discipline.

The discipline imposed on Cook before July 18, 2013 is relevant in the arbitration in only one way. If the arbitrator finds that the City had just cause for some discipline on July 26 and August 22, he may consider Cook's prior record to determine the severity of the penalty that the City may impose for the misconduct that the Arbitrator found had actually occurred. As in criminal law, the arbitrator may consider the accused's prior record when determining his sentence—but he may not penalize the accused simply because he has a prior record.

There is no question that the SAAA's grievance arose when the City suspended and discharged Cook. In the leading case of *McSherry v Trans World Airlines, Inc.*, 81 F 3d 739, 741 (8th Cir. 1996), the court, citing its own prior precedents, held that "...the "occurrence" in unlawful termination suits is the

termination itself...." The SAAA knows of no cases that contradict that principle—and none has been cited.

Contrary to the City's claim, a grievance filed over discipline that allegedly breaches a contract is <u>not</u> like a future stream of payments due in a contract signed before a petition. It is a claim for a post-petition breach of a contract that the City had assumed in the ordinary course of its business.

In fact, this Court has so held in this case. In particular, the Court held that the automatic stay provisions did not prevent the City from disciplining employees or prevent the employees from filing grievances under the normal procedures that the parties had established:

> 2. The City is authorized to continue to prosecute Disciplinary Proceedings, including the Pending Arbitration, that have been initiated by the City against City employees. Similarly, the applicable defendants [the unions] are permitted to defend against such Disciplinary Proceedings; provided that any counterclaims that may be asserted by the defendants against the City are subject to the Automatic Stay.

> R. 8256, Order Confirming that the Automatic Stay does not Apply to Disciplinary Proceedings, at 2.

The Order may well apply to pre-petition claims. In this case, where the SAAA's grievance is a post petition claim, there is no basis whatever for blocking the arbitration that the City contractually agreed to use in resolving disputes over the discipline of employees which clearly arise in the normal course of its business.

**NEITHER THE PLAN OF ADJUSTMENT NOR THE ORDER CONFIRMING THAT PLAN BAR THE SAAA FROM PURSUING ITS CLAIM IN THE CONTRACTUALLY-AGREED UPON ARBITRATION PROCEEDINGS.**

The City claims that Cook either released his claim by voting to confirm the plan or is, in any event, barred from asserting it under the Plan of Adjustment or by the Order confirming that Plan (R. 8045; R. 8272)

Preliminarily, the SAAA's grievance is just that: a grievance filed by and on behalf of the union on behalf of one of its members. Cook could not release that claim even if he wanted to, which he does not.

More fundamentally, however, the City has simply ignored the relevant language of the Plan and the Order which make clear that the SAAA's claim for Cook is not released or barred by the Plan or the Order confirming it. The release provisions of the Plan provide in relevant part as follows:

> *Except as provided in the Plan or the Confirmation Order*, the rights afforded under the Plan and the treatment of claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date.

Plan, R. 8045, III.D.4 (emphasis added).

Shortly before that, the Plan spells out an exception that is controlling here. With exceptions not here relevant, the City is "…deemed to have assumed all Executory Contracts… to which it is a party…" (Plan, R. 8045, II.D.1, 3). The

7

confirmation Order generally confirms that the City has assumed all such contracts (Plan, R. 8045, II.D.1, 3) and specifically provides that claims for violations of such contracts are not released and may be prosecuted without filing a claim in this Court and without seeking the approval of this Court:

> Holders of Claims based on Liabilities incurred by the City after the Petition Date in the ordinary course of its operations will not be required to file or serve any request for payment or application for allowance of such claims. Such Claims will be paid by the City, pursuant to the terms and conditions of the particular transaction giving rise to such Claims, without further action by the holders of such claims or further action or approval of the Court.

> Conf. Order, R. 8272, Q.52.

For the same reason, the City may not seek injunctive relief against the arbitration because the Court's Confirmation Order in providing for such relief makes clear that such relief is *not* available for claims that the Confirmation Order has provided may be prosecuted without leave of this Court:

> ...*[E]xcept as otherwise provided herein or in the Confirmation Order,,,,*all Entities that have been or made be holders of claims against the City are enjoined from commencing, conducting or continuing ...any suit...or...other proceeding of any kind against or affecting the City...

> Plan, R. 8045, III.D.5 (emphasis added).

## CONCLUSION

For the reasons stated, the SAAA asks this Court to deny the City's motion for an order to block the arbitration scheduled on the SAAA's grievance alleging

that its member Cedric Cook was discharged in violation of the City Employment

Terms.

By the SAAA's Attorneys,
SCHEFF & WASHINGTON, P.C.

BY: _____
George B. Washington (P-26201)
615 Griswold, Suite 910
Detroit, Michigan 48226
(313) 963-1921

Dated: September 29, 2015

## ATTACHED EXHIBITS

1. City of Detroit Terms for All Non-Uniform Employees (pages 1-11)

2. Emergency Manager Order No. 44

3. July 26, 2013 Suspension of Cedric Cook

4. August 21, 2013 Discharge of Cedric Cook

5. August 2, 2013 SAAA Grievance for Cedric Cook

## CERTIFICATE OF SERVICE

George B. Washington certifies that he served a copy of the foregoing Brief on Behalf of the Senior Accountants, Analysts and Appraisers' Association in response to the City's request for an injunction to block an arbitration proceeding by hand delivering it to counsel for the City of Detroit at the following address:

> Mark N. Swanson
> Miller, Canfield, Paddock and Stone, PLLC
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226

George B. Washington (P-26201)

Dated: September 29, 2015

# CITY EMPLOYMENT TERMS FOR ALL NON-UNIFORM EMPLOYEES

## PREAMBLE

Pursuant to the Financial Stability Agreement ("FSA") entered into between the City of Detroit and the State of Michigan on April 4, 2012, these City Employment Terms ("CET") sets forth the terms and conditions of employment of certain employees and the terms of representation by the Union of those employees. Any provisions in the most recently expired Collective Bargaining Agreements, memorandums of understandings, practices, and/or supplemental agreements that are not expressly referenced in this CET or any addendum and are inconsistent with the terms in this CET or any addendum are null and void as of the effective date of this CET. Arbitration awards or other dispositions relating to such inoperative provisions shall be deemed not binding or precedential with respect to the terms of this CET. The relevant provisions of the FSA, and all modifications thereof, are incorporated herein.

NOTE: The headings used in this CET and Exhibits neither add to nor subtract from the meanings but are for reference only.

## 1. PURPOSE AND INTENT

A. The purpose of this CET is to set forth wages, hours, terms and conditions of employment for the duration of this CET and to promote orderly and peaceful employment relations in the interest of serving the citizens of the City of Detroit.

B. To effectuate this purpose, this CET serves to establish employment relations and workplace processes and functions that serve the interest of the community and achieve the goal of customer service excellence for citizens, businesses and visitors of Detroit and achieve financial stability for the government of the City of Detroit and provide effective community policing, safe and stimulating programs for young people, and improving the environment in neighborhoods to instill civic pride and encourage new development.

C. The City is legally and morally obligated to provide equality of opportunity, consideration, and treatment of all employees of the City and, accordingly, to establish policies, practices and rules that insure such equality of opportunity, consideration and treatment of all persons employed in all phases of the employment process, without regard to race, color, creed, national origin, age, political orientation, sex, sexual orientation, marital status, or disability in accordance with applicable State and Federal laws. The City shall continue to comply with all other applicable state federal and laws and regulations.

## 2. UNION RECOGNITION

A.    The Employer recognizes the bargaining unit as the representative, for the purposes set out in this CET, of the employees who hold the classified positions covered by the bargaining unit.

B.    The classified positions are subject to change in title, duties, responsibilities and qualifications pursuant to the Employer's rights under the Management Rights provision of this CET. The positions may also be added to or eliminated. The Employer will give the Union reasonable notice and the opportunity to discuss and provide input with respect to proposed permanent changes prior to implementation. Positions covered shall be realigned consistent with current practice.

## 3. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.    The City has the right and obligation to operate and manage its affairs in all respects in accordance with its responsibilities and powers of authority in accordance with applicable law and the FSA.

B.    Every incidental duty connected with operations enumerated in job descriptions is not always specifically described.

C.    The City shall have the right and obligation to determine and establish the policies, goals and scope of its operations. Consistent with this right the City has the right to determine and implement work schedules/shifts, vacation schedules, and flex time and to establish the goals, methods and processes by which such work is performed and the qualifications of employees assigned to do the work. These rights and obligations include, but are not limited to:

1.    Implement changes in the structure of Department operations, including establishment or consolidation of service areas and work locations within the Department;

2.    Cease or outsource functions or operations;

3.    Initiate new functions or operations;

4.    Achieve uniformity of employment terms across the Department;

5.    Provide appropriate training, education, performance evaluation and job assignments for employees;

6.    Establish wage and benefits for new and existing employees that achieve the goal of financial stability in City Government;

7.    Establish qualifications and methods for hire, transfer, assignment, position retention and promotion in employment;

8.    Revise, create, combine, and/or eliminate classifications, duties and/or positions;

9. Determine classification, status and tenure of employees;

10. Initiate promotions and disciplinary actions;

11. Determine personnel hiring and reductions;

12. Discipline and discharge employees for just cause;

13. Recruit, assign, transfer employees to positions within the Department;

14. Suspend, demote, discharge or take other disciplinary action against employees for just cause;

15. Establish rules and policies; adopt and enforce work rules and policies applicable to this unit and/or all employees, including but not limited to, the Universal Work Rules promulgated by the City;

16. Determine the requirements and payments related to an employee's job functions including, but not limited to, equipment, tools, clothing and uniforms;

17. Suspend past practice;

18. Enforce state and local licensing and other requirements;

19. Assign employees to any function or duties in the Department involving direct supervision of other bargaining unit members;

20. Assign employees to any function or duties in the Department not involving direct supervision of other bargaining unit members without payment of "out-of-class" compensation;

21. Relieve employees from duties because of lack of work, lack of funds or for disciplinary reasons;

22. Determine methods, means and employees necessary for departmental operations;

23. Control the departmental budget;

24. Determine and implement such other actions deemed appropriate to achieve the City's goals and objectives.

D. The City reserves the right to amend or modify this CET and any addendums, supplements, MOUs, letters of agreement, and all other writings and practices. The City, where practical, shall provide reasonable notice and an opportunity to discuss changes with the Union.

## 4. UNION RIGHTS AND OBLIGATIONS

A. Any member shall have the right to discussion or services of Union Representative. When such a request is made to the supervisor, permission for services or discussion shall be granted without undue delay unless such request adversely impacts operations. Permission shall not be unreasonably withheld. This right shall not be abused. If the employee's requested Union Representative is unavailable, the Union will promptly substitute another union representatives in the represented unit, if on duty and available.

B. The Union shall have the right and obligation to assist and cooperate with the City in effectuating the provisions of this CET and to encourage its members to do the same.

C. The Union shall have the right and obligation to educate its members regarding the intent of this CET and the terms contained herein.

D. The Union shall have the right to grieve the interpretation and application of the terms herein and to exercise such other rights as are set forth in this CET.

E. Activities involving internal management of the Union such may be conducted during non-working hours. These activities shall not interfere with normal work operations of any department or work area of the City.

F. Requests for meetings by Union officials other than Special Conferences shall be scheduled at a mutually agreeable time.

G. When a union representative goes into a City operation for the purpose of conducting Union business, the Division Head must be notified of his/her presence and the nature of their business, prior to arrival, and obtain permission from the Division Head. If it is necessary for a Steward or Union President to speak to an employee about a grievance, management will notify the employee's immediate supervisor and arrangement will be made to accommodate the meeting with due regard for Departmental operations.

## 5. AGENCY SHOP

A. All employees in the bargaining unit shall be required, as a condition of employment, to pay the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership in the Union for the duration of this Agreement. Such requirement shall be in effect 31 days after the effective date of the Agreement, and for new full-time employees, 31 days after they commence full-time employment.

B. An employee shall be deemed to be in compliance within the meaning of this section, if they are not more than sixty (60) days in arrears in payment of membership dues.

C. Once the Employer receives written notice of the Union's intent to seek the discharge of an employee for failure to meet his/her financial obligations to the Union, the employee shall have a ten (10) day grace period to meet their financial obligations or the Union's demand shall be honored.

D.   The Union agrees that, in the event of litigation against the City, its agents or employees arising out of this provision, it will co-defend, indemnify, and hold harmless the City, its agents or employees from any monetary award arising out of such litigation.

## 6.   DUES CHECK-OFF

A.   The Employer agrees to deduct from the wages of any employee who is a member of this Union, all union membership dues and initiation fees uniformly required, if any, as provided in a written authorization executed by the employee. The written authorization for union dues deduction shall remain in full force and effect during the period of this contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B.   Dues and initiation fees will be authorized, levied and certified in accordance with the constitution and By-Laws of the local union. Each employee and the Union hereby authorize the City to rely upon and to honor certifications by the Secretary-Treasurer of the local union, regarding the amounts to be deducted and the legality of the adopting action specifying such amounts of union dues and/or initiation fees.

C.   The Employer shall continue the dues check-off except that the union shall reimburse the City an amount equal to 2% for all union dues amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D.   The Dues Deduction Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the dues deduction is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member resubmit a Dues Deduction Check-Off Card on each occasion that the employee returns to the payroll.

E.   The Employer agrees to deduct from the wages of any employee who authorizes a deduction for a Union Political Action Committee as provided for in a written authorization in accordance with the standard form used by the Employer, provided that the said form shall be executed by the employee. This deduction may be revoked by the employee at any time by giving written notice to both the Finance Department and to the Union. Article 4-E, F and G shall apply to this section.

## 7.   SERVICE FEE CHECK-OFF

A.   The Employer agrees to deduct from the wages of any employee who is not a member of the Union, all Union service fees as provided in a written authorization executed by the employee. The written authorization for service fee deduction shall remain in full force and effect during the period of this Contract and may be revoked only by written notice given during the period thirty (30) days immediately prior to expiration of this CTE. The termination notice must be given both to the Employer and to the Union.

B.   The amount of such fees will be as provided and determined by Article 4 and 5 of this CTE.

C.   The Employer shall continue the existing service fee check-off structure except that the union shall reimburse the City an amount equal to 2% for all service fee amounts remitted to the Union. If the Union fails to reimburse the City within 45 days of the dues remittance by the City to the Union, the City shall have no further obligation to continue dues check-off.

D.   The Service Fee Check-Off Card shall be presented to the bargaining unit member within thirty (30) days of his or her arrival in the employing department. If the service fee check-off is stopped during the term of this CET because the employee left the payroll, the employing department shall have the bargaining unit member re-submit a Service Fee Check-Off Card on each occasion the employee returns to the payroll.

## 8.   UNION REPRESENTATION

A.   It is mutually recognized that the principle of proportionate representation is a sound and sensible basis for determining the number of Union representatives.

B.   In each Department, district, building, work location, unit, area, site, division or floor ("Work Unit"), the employees on each shift shall be represented by one Union representative who shall be a regular employee working in that work unit on that shift. Work Units shall be defined by the Employer. Where such work unit is permanently or temporarily discontinued in its current form, union representation shall be adjusted consistent with this paragraph. In the absence of the union representative, an alternate Union representative shall represent the employees in that work unit. The Union shall promptly notify each employing department with copy to the Human Resources Department of the names and locations of representatives selected. At the request of the Union, the Labor Relations Division may agree to exceptions to this provision.

In the absence of a Union representative and his alternate, the Union will notify the department of a designated representative and shall promptly confirm such designation in writing.

C.   The number of Union representatives and districts shall be that number negotiated between the Union and the City's representatives for each department. Absent agreement between the parties, the City shall designate the number of Union representatives and districts.

D.   The Union shall reimburse the Employer for all full-time and part-time paid Union officials, including any additional compensation arrangements (including un-worked overtime) paid to employees holding union positions. If the Union fails to reimburse the City within 45 days of the end of a calendar month the City shall have no further obligation to pay such officials for union time thereafter until all reimbursement obligations and arrears are satisfied. Union representatives may elect to use vacation or compensatory time for attendance at Union meetings, conferences, conventions and other time on union activities, or take unpaid time off.

6 of 42

E.   Working Stewards and Chief Stewards shall request time off for Weingarten representation duties or grievance processing from their supervisor and the supervisor shall grant or deny such requests in writing.

## 9.   GRIEVANCE AND ARBITRATION PROCEDURES

A.   Should any dispute arise between the City and the Union concerning the application or interpretation of this CET, an earnest effort shall be made to settle such dispute promptly in accordance with the following Grievance Procedure:

Step 1.   Employee, Supervisor and Steward

Any employee having a grievance may report the same to his Supervisor and an endeavor shall be made to adjust the grievance between the employee and the Supervisor. If a satisfactory adjustment is not obtained, the employee may request a Steward, and the three will attempt to resolve the matter. Where the matter involves imposition of disciplinary suspension or above, Step 1 does not apply and grievances shall be filed at Step 2.

Step 2.   Department Head Level

If a satisfactory adjustment is not obtained under Step 1, the grievance shall be reduced to writing on a standard grievance form setting forth all facts believed to be relevant to the dispute, and the grievance shall be signed by the employee or employees involved. The written grievance must then be submitted to the Department Head. A meeting shall be held at a mutually convenient date and time to discuss the grievance. Up to two (2) Union Representatives, other than the Grievant, may attend the Step 2 meeting. Any resolution reached at this meeting shall be reduced to writing. The Department Head shall endeavor to furnish the Union with his/her written decision within fifteen (15) working days of the Step 2 meeting, excluding Saturdays, Sundays and holidays.

Step 3.   Labor Relations Division Level

If a satisfactory adjustment is not obtained under Step 2, the Union may request a Step 3 meeting with the Labor Relations Director. Such appeal and request for a Step 3 meeting must be submitted in writing to the Labor Relations Director within five (5) working days from the receipt of the Department Head's Step 2 answer. Not more than two (2) Union Representatives may attend the Step 3 meeting, and the Labor Relations Director may designate members of his staff to represent the City. Any resolution reached at this meeting shall be reduced to writing. The Labor Relations Director or his or her designee shall endeavor to furnish the Union with his/her decision within thirty (30) working days of the Step 3 meeting.

**Step 4.**     **Arbitration**

    a.    If a grievance is not settled after it has gone through Step 3 of the Grievance Procedure, the Union must file a written notice with the Labor Relations Director of appeal and intent to submit the dispute to arbitration. The Notice of Intent to Arbitrate must be filed within fourteen (14) calendar days of its receipt of the Labor Relation Director's Step 3 answer. If the Union fails to request arbitration in writing within this time limit, the grievance shall be deemed settled on the basis of the Step 3 answer and not eligible to go to arbitration.

    b.    Arbitrations shall generally be heard by a member of a permanent umpire panel consisting of individuals mutually agreed-to by the City and the Union. Arbitrators will hear cases on a rotating basis. In non-disciplinary contract interpretation cases, however, the City may, at its election, choose to have the dispute arbitrated pursuant to the Labor Arbitration Rules of the American Arbitration Association. The Arbitration's fees and expenses shall be borne equally by the parties, and all other expenses shall be borne by the party incurring them. The Grievant, one (1) witness, and one (1) Union Representative shall not lose pay for time off the job while attending the arbitration proceeding.

    c.    The decision of the Arbitrator shall be final and binding on the Union and its members, the employees involved and the City. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms of this CET, and shall have due regard for the rights and responsibilities of the Employer set forth in Article 2 of the CET "Management Rights." The Arbitrator shall have no power to grant any wage increases or decreases, and shall not uphold any grievance against the City on the basis of past practice. The Authority of the Arbitrator is limited to interpretation and application of the provisions of this CET. The Arbitrator shall have no authority to apply or interpret the provisions of the expired collective bargaining agreement between the Union and the City, unless the grievance at issue was submitted during the term of that agreement, or grant any right or relief for any alleged grievance under the terms of the expired collective bargaining agreement between the Union and the City, unless the grievance at issue was submitted during the term of that agreement.

B.    A grievance shall be deemed untimely, settled and withdrawn unless a written Step 2 grievance is filed with the Department Head within five (5) working days (excluding Saturdays, Sundays and holidays) after the Grievant first knew, or should have known, of the facts giving rise to the grievance. Grievances concerning a continuing practice or continuing act of the Employer must be grieved within ten (10) working days of the date the Grievant first knew, or should have known, of the act or practice. Any extensions of these time limits must be agreed to by the City in writing.

C. In the event the Employer fails to respond to a grievance or schedule a meeting within the time periods provided in any steps of the Grievance Procedure, said grievance shall be denied and the Union may make a written request that the grievance be referred to the next step.

D. Any agreement reached between the Employer and the Union under the Grievance Procedure shall be binding upon the Employer, the Union and the employees concerned and cannot be changed by any individual. No settlement at any stage of the grievance procedure, except an arbitration decision, shall be a precedent in any arbitration and shall not be admissible in evidence in any future arbitration proceeding.

E. The City shall not be required to pay back wages more than five working days prior to the date a written grievance is filed.

F. All claims for back wages shall be limited to the amount of wages that the employee would have earned, less any compensation received for temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Department of Health and Human Services, City-Funded Long-Term Disability Insurance, Sickness and Accident Insurance or Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein.

G. In the case of a pay shortage in which the employee would not have been aware before receiving his pay, any adjustment made shall be retroactive to the beginning of the pay period covered by such pay, if a grievance is filed within the twenty (20) working days within receipt of such paycheck.

H. Exchanging, pertinent information regarding a grievance is beneficial to both parties in attempting to resolve the grievance.

The Union shall be advised of the factors considered in the imposition of discipline and shall have the right to request copies of available written documents or statements pertaining thereto. If the Union requests information regarding a grievance from an employee's personnel file, the Union must present written authorization from the employee to release the information. Management shall be advised of the basis of the grievance and have the right to request copies of available written information or statements pertaining thereto and which the Union proposes to present in support of the grievance.

It is agreed that any information requested in accordance with the above provisions which is not made available to the other party shall not be admissible as evidence in any arbitration hearing provided that a written request has been made to the appropriate Local Union President or Departmental Representative.

I. The grievance procedure contained in this CET shall be the exclusive grievance procedure and remedy for all members of the bargaining unit claiming a violation of this CET.

## 10. DISCIPLINARY PROCEDURE

A. The City retains the right to promulgate, amend and modify disciplinary rules, procedures and penalties.

B. All disciplinary action taken against an employee shall be for just cause and subscribe to the general philosophy that the primary purpose of disciplinary action is to correct employee behavior or conduct. The City will make an effort to utilize a progressive discipline process; however, the City reserves the right to invoke more severe discipline, up to and including, termination. The issuance of disciplinary action shall take place in a timely manner with due regard for the Employer's right to conduct workplace investigations of employee misconduct. Any dispute regarding the timeliness of the discipline shall be resolved through the grievance procedure.

C. **NOTIFICATION REQUIREMENTS:** Notification shall be given to the appropriate union representative of any disciplinary action taken against any member which may result in any official entries being added to the employee's personnel file. Both employee and the Union representative shall be given a copy of such official entry.

In all cases when a supervisor contemplates issuance of disciplinary action, the supervisor shall inform the employee and allow the employee the opportunity to have union representation. If the employee's requested representative is unavailable, the Union shall promptly substitute other union representatives in the represented unit, if on duty and available. If the employee declines union representation, he/she shall indicate so in writing and a copy shall be given to the Union.

When the department has decided to issue discipline, the employee will be allowed adequate time and an available area to discuss the discipline with his/her steward, or in the absence of a steward an appropriate union representative. In the case of a suspension or discharge, where Union representation is available, this discussion will take place prior to the employee leaving City property. Upon request the management representative who is present and issuing the action will discuss the disciplinary action with the employee and his/her steward. Exceptions to this procedure would be in situations where the suspended or discharged employee is absent without leave, or the parties agree that such discussion would not be beneficial at this time.

In the case of an oral reprimand, a notation by date and subject only shall be placed in the employee's personnel file.

D. All disciplinary actions shall be subject to the grievance procedure. It shall be the responsibility of the grievant to keep the Union and City informed of his/her mailing address and telephone number(s) at which he/she may be reached for purposes of notification. Certified mail to the address of record shall constitute proper notification to the grievant.

E. During investigation, an employee shall have the right to request to have his/her steward present if the employee reasonably believes that his/her statements may lead to

disciplinary action. Before an employee is required to make any statements pertaining to his/her possible misconduct, the employee shall have the opportunity to discuss the matter first with his/her steward.

F.  PERSONNEL RECORDS: All employees within the bargaining unit shall have the right to review his/her personnel records pursuant to applicable law.

G.  USE OF PAST RECORD: In imposing any discipline on a current charge or in evaluating an employee for promotion or transfer, management will not take into account any prior infractions or disciplinary action taken which occurred more than three years previously.

H.  GUIDELINES FOR ADMINISTRATION OF A CORRECTIVE DISCIPLINE PROGRAM:

1.  Disciplinary action should be appropriate and take into account both the offense and the employee.

Factors which should be considered in imposing discipline in each case are:

a.  The seriousness and circumstances of the particular offense.
b.  The employment history of the employee involved including length of service.
c.  The recency and nature of prior disciplinary action taken with respect to the employee.
d.  Prior departmental action in comparable stipulations.

2.  Any published departmental standards or rules governing employee conduct or expected work performance should be fairly and consistently applied.

## 11.  SPECIAL CONFERENCE

Special Conferences for important matters including problems of health and safety and periodic discussions of substantial issues which are of concern to Union members may be arranged upon mutual agreement between the Union President and the Department Head or his/her designated representative upon the request of either party. Such meeting shall be between representatives of the department, and no more than three (3) and at least two (2) representatives of the Union.

## 12.  HEALTH AND SAFETY

A.  The City recognizes its responsibility to provide safe and healthful working conditions, and the Union recognizes it's their obligation to cooperate in the maintenance and improvement of those conditions.

B.  All existing safety practices and provisions in expired agreements shall remain in effect until such time as amended by the City.

# EMERGENCY MANAGER
## CITY OF DETROIT

## ORDER No. 44

## FINAL EMERGENCY MANAGER ORDER

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all of the authority, powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the City's Mayor (the "Mayor") and the Detroit City Council (the "Council"); and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Section 10(1) of PA 436 provides, in part, that "[a]n emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely implementation of a financial and operating plan..., or to take actions or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan;" and

1

The EM has developed and implemented a written financial and operating plan for the City consistent with the requirements of Section 11 of PA 436, the objective of which has been to enable City officials to provide, or cause to be provided, governmental services essential to the public health, safety and welfare of residents of the City, and assure the fiscal accountability of the City; and

Section 12 of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to exercise certain rights and powers, along with the other rights, duties and powers set forth in PA 436; and

Section 21 of PA 436 states, "[b]efore the termination of receivership and the completion of the emergency manager's term, or if a transition advisory board is appointed under section 23, then before the transition advisory board is appointed, the emergency manager shall adopt and implement a 2-year budget, including all contractual and employment agreements, for the local government commencing with the termination of receivership;" and

On July 18, 2013, consistent with the authorization of the Governor of the State of Michigan (the "Governor") provided under Section 18(1) of PA 436, the City filed a petition for relief pursuant to chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"); and

By an order dated December 5, 2013 (Docket No. 1945) (the "Eligibility Order"), the Bankruptcy Court determined that the City is eligible for relief under chapter 9 of the Bankruptcy Code; and

On October 22, 2014, the City filed the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit in the Bankruptcy Court (Docket No. 8045) (as it may be further amended, modified or supplemented, the "Plan of Adjustment");[1] and

By an order dated November 12, 2014 (the "Confirmation Order") (Docket No. 8272), the Bankruptcy Court confirmed the Plan of Adjustment pursuant to the Bankruptcy Code; and

In connection with the Plan of Adjustment, the City, Title Source, Inc. (the "Title Company"), The Detroit Institute of Arts (the "DIA") and the Foundation for Detroit's Future ("FDF") have entered into that certain Deposit Escrow Agreement dated September 19, 2014 (the "Deposit Escrow Agreement"), whereby the parties thereto have agreed to deposit certain agreements relating to the conveyance of the assets of the Detroit Institute of Arts to the DIA to be held in perpetual charitable trust, including, but not limited to, the Omnibus Transaction Agreement by and among the City, the DIA and the FDF (the "Omnibus Agreement"); the Settlement Conveyance and Charitable Trust Agreement by and between the City and the DIA (the "Conveyance Agreement"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the cultural center garage (the "Garage Deed"); the Quit Claim Deed from the City to the DIA granting the DIA the City's interest in the real property of the Detroit

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Plan of Adjustment.

2

Institute of Arts (the "DIA Deed"); the Bill of Sale by and between the City and the DIA (the "Bill of Sale"); and the Intellectual Property Transfer Agreement by and between the City and the DIA (together with the Omnibus Agreement, the Conveyance Agreement, the Garage Deed, the DIA Deed, the Bill of Sale and any other document referenced in Schedule 1 of the Deposit Escrow Agreement, the "DIA Transfer Documents"); and

The City also is entering into various settlement agreements and other resolutions as set forth in the Plan of Adjustment and the exhibits thereto (collectively, the "Plan Settlements"), which will be effective upon effective date of the Plan of Adjustment (the "Effective Date"), including, without limitation, the following (as further defined or described in the Plan of Adjustment): (a) the UTGO Settlement Agreement, in substantially the form as Exhibit I.A.360 to the Plan of Adjustment, (b) the LTGO Settlement Agreement, in substantially the form as Exhibit I.A.237 of the Plan of Adjustment, (c) the 36th District Court Settlement, as outlined in Exhibit I.A.9 to the Plan of Adjustment; (d) the settlement of OPEB Benefits, as set forth in Section IV.G of the Plan of Adjustment and the Retiree Health Care Settlement Agreement attached as Exhibit I.A.298 to the Plan of Adjustment; (e) the DIA Settlement, as outlined in Exhibit I.A.126 of the Plan of Adjustment and pursuant to the DIA Settlement Documents substantially in the form as Exhibit I.A.127 of the Plan of Adjustment; (f) the State Contribution Agreement in substantially the form as Exhibit I.A.332 of the Plan of Adjustment (the "State Contribution Agreement"); (g) matters relating to the DWSD Authority; (h) the Syncora Settlement, including the Syncora Development Agreement in substantially the form as Exhibit I.A.340 of the Plan of Adjustment and the other Syncora Settlement Documents in substantially the forms as Exhibit I.A.344 of the Plan of Adjustment; (i) the FGIC/COP Settlement, including the FGIC Development Agreement in substantially the form as Exhibit I.A.198 to the Plan of Adjustment and the other FGIC/COP Settlement Documents in substantially the forms as Exhibit I.A.197; and (j) all other compromises and settlements included in, incorporated into or related to the Plan of Adjustment; and

On September 25, 2014, in accordance with Section 9(6)(c) of PA 436, the Council voted unanimously to remove the EM as of the Effective Date (the period from the appointment of the EM through such removal, the "EM Tenure"). By a letter to the Governor, the Mayor approved of the Council's vote on the same day; and

On September 25, 2014, in connection with the vote of Council to, and the Mayor's approval of, the removal of the EM as of the Effective Date, the EM adopted and issued his Order No. 42. By Order No. 42, the EM, among other things, (a) restored the authority of the Mayor and the Council over day-to-day operations and activities effective immediately as permitted by PA 436, (b) agreed not to exercise his powers under PA 436 to interfere with the powers restored to the Mayor and the Council and (c) agreed that he will exercise his powers through the conclusion of the EM Tenure only with respect to any action (or the prevention of any action) that is necessary or convenient for (i) the management of the case captioned *In re City of Detroit, Michigan,* Case No 1353846" (the "Bankruptcy Case") and related bankruptcy proceedings and (ii) the implementation of the Plan of Adjustment; and

3

The EM has concluded that, as of and conditioned on the occurrence of the Effective Date, the financial conditions of the City will have been corrected in a sustainable fashion consistent with the requirements of Section 9(7) of PA 436; and

Section 22(1) of PA 436 provides that "[i]f an emergency manager determines that the financial emergency that he or she was appointed to manage has been rectified, the emergency manager shall inform the governor and the state treasurer;" and

By letter dated December 8, 2014, the EM will notify the Governor and the Treasurer of the State of Michigan (the "State Treasurer") of the EM's determination that the financial emergency he was appointed to manage within the City will have been rectified as of, and conditioned on the occurrence of, the Effective Date; and

As the EM Tenure approaches its conclusion and in anticipation of the Effective Date, the EM has determined that this Order is appropriate to: (a) promote the successful conclusion of the City's restructuring efforts and its capacity to provide or cause to be provided necessary governmental services essential to the public health, safety and welfare; and (b) otherwise fulfill the intents and purposes of PA 436 and chapter 9 of the Bankruptcy Code; and

As part of this Order, the EM has determined, among other things, that the terms hereof are appropriate to provide for a smooth transition at the conclusion of the EM Tenure and to promote the long-term financial recovery of the City and the health, safety and welfare of the public; and

Pursuant to Order No. 42, the EM has consulted with the Mayor and the Council regarding the terms of this Order.

**It is hereby ordered that:**

*Restoration of City Governance*

1. To the extent not already restored pursuant to the EM's Order No. 42, and except as provided by this Order or other or applicable Michigan or Federal statute, the powers and authority of the Mayor and the Council previously exercised by the EM shall be restored as of, and conditioned upon the occurrence of, the Effective Date.

*Cooperation and Compliance by City Officials*

2. The Mayor, Council members, department heads and other employees, agents and contractors of the City shall promptly and fully do all of the following:

   a. Cooperate with the EM through the end of the EM Tenure to the extent necessary to effectuate the implementation of a Plan of Adjustment, the Confirmation Order or other orders entered or that may be entered in connection therewith by

4

the Bankruptcy Court in the Bankruptcy Case or in any related proceeding or appeal from any order entered or that may be entered by the Bankruptcy Court.

b. Comply with requests from the Michigan Financial Review Commission (the "Commission") created by Michigan Public Act 181 of 2014 ("PA 181"), known as the Michigan Financial Review Commission Act, to the extent necessary or appropriate to effectuate the purposes of PA 181. Such compliance shall include, at a minimum and without limitation, all of the following:

   i. Providing to the Commission any documents, records or other information requested of City officials by the Commission or its staff, including any documents, records or other information specifically required by PA 181.

   ii. Appearing before the Commission to provide testimony, documents, records or other information as and when requested by the Commission or its staff.

   iii. Providing to the Commission upon its request verification of compliance by the City with all of the following consistent with the requirements of Section 6(3) of PA 181:

      A. Section 8 of Michigan Public Act 152 of 2011, the Publicly Funded Health Insurance Contribution Act;

      B. Sections 4i, 4p, 4s and 4t of Michigan Public Act 279 of 1909, the Home Rule City Act;

      C. Michigan Public Act 34 of 2001, the Revised Municipal Finance Act; and

      D. Michigan Public Act 2 of 1968, the Uniform Budgeting and Accounting Act;

   *provided that* nothing herein shall limit, modify or excuse the City's obligation to comply with the applicable law, whether or not listed herein.

*Plan of Adjustment Matters*

3. Without limiting the terms of paragraph 2 above, the Mayor, the Council and all City officers, department heads and other employees, agents and contractors shall take such steps as are necessary or appropriate from and after the Effective Date to pursue the prompt implementation of the Plan of Adjustment, the Confirmation Order and all agreements necessary thereto, including the Plan Settlements. For the avoidance of doubt, such steps include, without limitation, the following:

a. The City shall defend any appeals of the Confirmation Order and any appeals of the Eligibility Order or other orders of the Bankruptcy Court necessary for the success of the Plan of Adjustment.

b. On or promptly after the Effective Date and provided that the conditions set forth in the Deposit Escrow Agreement and the DIA Transfer Documents have been otherwise satisfied, the City shall provide the certification described in Schedule 2 of the Deposit Escrow Agreement to the Title Company, and, upon release of the DIA Transfer Documents in accordance with the Deposit Escrow Agreement, the City shall cause the transfer of the assets of the Detroit Institute of Art described in the DIA Transfer Documents and the governance thereof to The Detroit Institute of Arts in accordance with the DIA Transfer Documents.

c. The City shall comply with all covenants set forth in Sections 5.2 and 5.3 of the Omnibus Agreement.

d. Without limiting any other provision hereof, the City shall make such distributions and take such actions as are contemplated in the Plan of Adjustment for the establishment of and distribution to the Detroit General VEBA and Detroit Police and Fire VEBA (as such terms are defined in the Plan of Adjustment), in substantially the form provided in the Plan of Adjustment, and consistent with the measures set forth in the letter agreement filed at Docket No. 8183, all of which are hereby specifically adopted, approved and ratified in all respects.

e. Upon the negotiation of documentation mutually acceptable to the parties, the City shall be authorized and is directed to take such actions and sign such documents as are necessary or appropriate to establish the DWSD Authority (*i.e.*, the Great Lakes Water Authority) and implement the DWSD Authority Transaction consistent with the Memorandum of Understanding (as defined in the Confirmation Order).

f. The City is authorized to enter into and implement, and the EM hereby approves, the *Memorandum of Understanding Between the City of Detroit and Wayne County Community College* in the form approved by the Council on December 8, 2014.

4. All Plan Settlements and related agreements (including, without limitation, the DIA Transfer Documents), to the extent not previously approved by an order of the EM, are hereby expressly adopted, approved and ratified in all respects.

*Restructuring Advisors*

5. The Mayor or his designee may determine whether to retain the restructuring advisors listed on the attached Exhibit A (collectively, the "Restructuring Advisors") for such period as is necessary or appropriate to complete their work to implement the Plan of Adjustment and defend the appeals thereof (the "Restructuring Period"), subject to the terms of the Restructuring Advisors' contracts with the City, *provided that* the Mayor shall consult with the Commission with respect to any decision not to retain a Restructuring Advisor through the conclusion of the Restructuring Period.

6

6. The Emergency Manager, on behalf of the City, hereby restates and ratifies his approval of all fees and expenses for the City's restructuring professionals that have been subject to the Fee Examiner review process in the City's bankruptcy case (including the Restructuring Advisors) for services rendered through the Effective Date, subject to the Bankruptcy Court's independent review of reasonableness. The City is directed to continue to process and pay invoices of the City's restructuring professionals (including the Restructuring Advisors) for their work through the Effective Date based on the invoices presented, subject only to the Bankruptcy Court's independent review of reasonableness. For the avoidance of doubt, the City also shall pay any creditor advisors or court-appointed professionals and experts consistent with orders of the Bankruptcy Court. The City's Chief Financial Officer ("CFO") shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

7. Consistent with the foregoing, the City shall: (a) set aside a reserve account solely for the payment of restructuring fees consistent with full funding of the amounts identified for "Restructuring Professional Fees" in the City of Detroit Ten-Year Financial Projections; and (b) otherwise implement the fee provisions of the Plan of Adjustment, the Confirmation Order and any further orders of the Bankruptcy Court. The CFO shall be responsible for the foregoing on behalf of the City, under the supervision of the Mayor.

*Two-Year Budget*

8. Attached hereto as Exhibit B is the City's two-year budget consistent with the requirements of Section 21(1) of PA 436 (the "Two-Year Budget").

9. Consistent with the requirements of Section 21(2) of PA 436, the City shall not amend the Two-Year Budget without the written approval of the State Treasurer. In addition to approval by the State Treasurer, an amendment by the City to the Two-Year Budget shall not take effect unless approved by the Commission consistent with Section 7(c) of PA 181.

*Labor Matters*

10. All Collective Bargaining Agreements ("CBAs") set forth on Exhibit II.D.5 of the Plan of Adjustment and all CBAs identified on the attached Exhibit C (including CBAs relating to the Detroit Water and Sewerage Department), and any addenda, exhibits, schedules, appendices, supplements or related agreements though the date of this Order, are hereby adopted, approved and ratified in all respects. In addition to the foregoing, all City Employment Terms ("CETs") and other labor-related agreements approved or authorized by the EM are hereby adopted, ratified and approved in all respects, including, without limitation, the CETs and other agreements identified on the attached Exhibit C. The EM also ratifies and approves the CETs that were implemented prior to the EM Tenure and that remain in effect as of the date of this Order, including the CETs identified on the attached Exhibit C.

7

11. For the avoidance of doubt, and without limiting anything herein, the EM hereby expressly reaffirms his Order Nos. 25, 26, 29, 30 and 43 with respect to the changes to the City's pension plans and related ordinances, subject to the additional provisions below.

12. Pursuant to Section 16.4 of Component I of the Combined Plan for the General Retirement System of the City of Detroit, Michigan (the "Combined GRS Plan"), the EM, on behalf of the City, adopts the Combined GRS Plan, as amended and restated, in the form attached hereto as Exhibit D, which document (a) conforms the Combined GRS Plan to the terms of the confirmed Plan of Adjustment and (b) makes other clarifying modifications.

13. Pursuant to Section 17.5 of Component I of the Combined Plan for the Police and Fire Retirement System of the City of Detroit, Michigan (the "Combined PFRS Plan"), the EM, on behalf of the City, adopts the Combined PFRS Plan, as amended and restated, in the form attached hereto as Exhibit E, which document: (a) reflects changes in the terms and conditions of retirement benefits as provided in the CBAs and memoranda of understanding negotiated with certain of the employee representatives; (b) conforms the Combined PFRS Plan to the terms of the confirmed Plan of Adjustment; and (c) makes other clarifying modifications.

14. Copies of the Combined GRS Plan, as amended and restated, and the Combined PFRS Plan, as amended and restated, will be kept in the Office of the City Clerk for the City of Detroit and shall be available for public inspection.

15. The appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the General Retirement System of the City of Detroit ("GRS") and the Police and Fire Retirement System of the City of Detroit ("PFRS") to timely file or cause to be filed on behalf of GRS and PFRS applications for Favorable Determination Letters with the Internal Revenue Service pursuant to Revenue Procedure 2014-6 (or any successor procedure) to obtain rulings that the Combined GRS Plan and the Combined PFRS Plan satisfy the requirements for favorable tax treatment under Sections 401(a) and 501(a) of the Internal Revenue Code. City officers, department heads and other employees, agents and contractors shall cooperate with and provide such information as the Boards of Trustees and their legal counsel may require in connection with such Favorable Determination Letter applications.

16. The Mayor, Council members and appropriate City officers, department heads and other employees shall cause the Boards of Trustees of the GRS and the PFRS to: (a) comply with the governance requirements set forth in Section 2 of the State Contribution Agreement (including, with respect to the GRS, the requirements of Exhibit A and, with respect to the PFRS, the requirements of Exhibit B) at all times during the 20-year period

8

following the disbursement to the GRS and the PFRS of the State Contribution (as defined in the State Contribution Agreement); and (b) establish and implement an income stabilization program that complies in all respects with Section 3 of the State Contribution Agreement.

## Other EM Orders and Bond Orders

17. All prior Orders of the EM, to the extent that they are not otherwise inconsistent with this Order and have not previously been modified or rescinded (the "Prior Orders"), shall be incorporated by reference into this Order.

18. The reaffirmation herein of specific Orders of the EM shall not render the Orders not explicitly mentioned herein revoked, rescinded or altered in any way unless such Orders are otherwise inconsistent with this Order.

19. The bond orders issued by the EM, including the bond orders identified on the attached Exhibit F (collectively, the "Bond Orders"), are hereby ratified and affirmed.

## Administrative Matters

20. The City shall maintain access to the EM page via the City's website for a period of at least one year following the end of the EM Tenure.

21. Nothing in this Order shall be construed as contrary to applicable law.

22. Nothing in this Order shall be construed to restrict or impair the authority of the Governor, in the Governor's sole discretion, to determine that the financial conditions of the City have not been corrected in a sustainable fashion as required by Section 9(7) of PA 436 and appoint a new emergency manager pursuant to Section 24 of PA 436.

23. If any provision of this Order is declared by a court of competent jurisdiction to be illegal, unenforceable or ineffective, such provision shall be deemed severable to the extent necessary so that all other provisions contained in this Order shall remain valid, enforceable and effective.

24. The City shall, and is directed to, maintain all insurance called for by Article 8 of the EM's Contract for Emergency Manager Services dated March 27, 2013 between Mr. Orr and the State of Michigan (the "EM Contract"), including, without limitation, any general liability, professional liability or errors and omissions policy under Sections 8.1 and 8.3 of the EM Contract, and any tail coverage for such insurance.

25. The City shall, and is directed to, fulfill its obligations under Section 8.2 of the EM Contract after the end of the EM Tenure, including, without limitation, by paying the costs of any judgment, settlement or attorneys' fees relating to any uninsured claim,

9

demand or lawsuit against the EM or any employee, agent, appointee or contractor of the EM for actions taken during the EM Tenure. If Mr. Orr is sued personally for any action performed within the scope of his official capacity as the EM, Mr. Orr shall have the right to direct the defense of any such action, and the Mayor, the Council, the Corporation Counsel and the other employees, officers, department heads and agents of the City shall not take any action contrary to, or to interfere with, Mr. Orr's right to direct such defense.

26. Prior to the Effective Date, and pursuant to Section 5.1 of the Financial Stability Agreement, as Amended and Restated on November 7, 2013 (the "FSA"), the EM hereby consents, with the mutual consent of the State Treasurer, to amend Section 6.1(c) of the FSA for the purpose of terminating the FSA as of the Effective Date. To that end, the *Addendum to the Financial Stability Agreement* in the form attached hereto as Exhibit G (the "FSA Amendment") is approved and ratified in all respects. For the avoidance of doubt, the mutual execution of the FSA Amendment by the EM and the State Treasurer shall not preclude the Council from voting to ratify execution of the FSA Amendment prior to the Effective Date.

27. This Order shall be distributed to the Governor, the State Treasurer, the Mayor, Council members, the CFO and all department heads.

28. This Order is effective immediately.


*Modification of This Order and Prior EM Orders*

29. Prior to the Effective Date, the EM may modify, amend, rescind, replace, supplement or otherwise revise this Order at any time. Further, nothing herein shall preclude the EM from issuing any other appropriate Orders, consistent with EM Order No. 42, prior to the Effective Date.

30. Pursuant to Section 21(2) of PA 436, the Council shall not revise this Order or any other Orders or ordinances implemented by the EM during his term, and that remain in effect, prior to one year after the termination of receivership. In addition, after the Effective Date, this Order, or any other Order issued by the EM that remains in effect, may be amended, modified or rescinded only by the following methods:

    a. By a subsequent Order issued by an emergency manager appointed by the Governor under Section 9 of PA 436, including:

        i. After a selection by the Council pursuant to Section 7(1)(b) of PA 436; or

        ii. Pursuant to Section 24 of PA 436; or

    b. By the City by resolution of the Council, approved by the Mayor and ratified by the Commission pursuant to Section 7(n) or 7(o) of PA 181.

10

Dated: December 8, 2014

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc: Governor of the State of Michigan
    State Treasurer
    Mayor Michael Duggan
    Members of Detroit City Council
    Chief Financial Officer
    City Department Heads

3

# City of Detroit
## Notice of Suspension

Date Issued: <u>07/26/2013</u>

Seniority Date: <u>9/17/1980</u>

Department: <u>ITS</u>

Division: <u>Applications</u>

Employee Name: <u>Cedric Cook</u>

SSN: <u>xxx-xx-4865</u>

Classified Title: <u>Sr. D.P. Programmer/Analyst</u>

You are hereby notified that you have been suspended from City of Detroit employment for a period of <u>twenty-nine(29)</u> CALENDAR DAYS/ _____ ( ___ ) WORK DAYS for the
<sub>(Words and figures)</sub>         <sub>(Words and figures)</sub>
following reason(s): <u>Group IV Offense – Neglect of Duty. Wanton & willful neglect in the performance of assigned duties or in the care, use or custody of any City property. Abuse, or deliberate destruction in any manner of City property, tools, equipment or the property of employees.</u>

The first day of your suspension period is effective on <u>07/26/2013</u>. You are to report back to work on your regular shift on _____ unless otherwise notified to report on any other date.

**Check One**    ☒ Your suspension is with a recommendation for DISCHARGE/PROBATIONARY SEPARATION

             ☐ Your suspension is **not** with a recommendation for DISCHARGE

Date Notice Served on Employee: _____ By:

☒ Personal Service   ☐ Certified Mail   ☐ Other _____
<sub>Specify one</sub>

SUSPENSION ISSUED BY: <u>Cynthia Humphries</u>     TITLE: <u>Pr. D.P. Programmer/Analyst</u>

REVIEWED BY: <u>Lori Cetlinski</u>             TITLE: <u>General Manager</u>

HR Representative: <u>Tamara Tarrance</u>      TITLE: <u>HR Analyst II</u>

                                          Date Reviewed: <u>07/26/2013</u>

**Human Resources must be notified the next business day when a suspension is issued.**

CC:     Supervisor
       Employee Services Specialist (at Employee Services)
       Records Specialist (at HR Records)
       Labor Association Representative (if applicable)

**4**

# City of Detroit
## Notice of Discharge Form

DATE: 08/21/2013

| | |
|---|---|
| Department: Information Technology Services | Division: Applications |
| Employee Full Name: Cedric Cook | Job Title: Sr. Data Processing Programmer Analyst |

Social Security No.: XXX-XX-4865  Oracle: 4259

You are hereby notified that you have been discharged from City of Detroit employment effective August 24, 2013 (date),

For the following reason(s):  Group IV Offense – Neglect of Duty: Wanton & willful neglect in the performance of assigned duties or in the care, use or custody of any City property.  Abuse, or deliberate destruction in any manner of City property, tools, equipment or the property of employees.

Discharge Issued by: _~~(signature)~~_  (Department Head )    Title: Director

| Notice Served on Employee    08/22/2013 | By (check one)  ☐ Personal Service  ☒ Certified Mail |
|---|---|

**RIGHT TO PROTEST** If you are in a union or association, you may consult with your appropriate representation. If you are a non-union represented employee, you may submit a written appeal within 10 days of the effective date of discharge in accordance with the Human Resources Department Grievance Procedure.

Notice of Discharge          City of Detroit, copyright.  All rights reserved.          FORM 9048
Effective 12/02/02                              pg. 1                                    Rev 3

13-53846-tjt   Doc 10183   Filed 09/15/15   Entered 09/15/15 13:12:31   Page 65 of 70
13-53846-tjt   Doc 10215-1   Filed 09/29/15   Entered 09/30/15 15:35:45   Page 39 of 42

**5**

# Senior Accountants, Analysts, and Appraisers Association

65 Cadillac Square
2905 Cadillac Tower Building
Detroit, Michigan 48226
Telephone: (313) 961-3701          Facsimile: (313) 961-7908

---

| Susan R Glaser | Audrey Bellamy | Sharon Jordan | Lenetta Walker | Audrey Bellamy | Lenetta Walker |
|---|---|---|---|---|---|
| President | Vice President I | Vice President II | Secretary | Treasurer | Administrative Representative |

DATE:          August 2, 2013

Association Grievance Number:          07-2013-ITS-08-02

Step Level of Grievance:          1:
                                                  2:  X
                                                  3:
                                                  4:
                                                  5:

Employee's Name:               Cedric Cook
Classification:                      Senior D.P Programmer/Analyst
Department:                         Information Technology System
Division:                              Application
Location:                             801 CAYMC

Date Incident Occurred Causing Grievance:  July 18, 2013

Description of Grievance:
There are unfounded violations based on the CET and Departmental Policy and Procedures', and undocumented support provided for accusation related to the Group I, II, and, VI, offenses citing the ITS work rules.  The first offense showed total calls with no support that the calls were unanswered.  The second offense provided statements which are based on the facts presented.  The last offense Group IV failed to utilize the ITS work rules.  Under the working conditions provided the process for mandating the HELP DESK without any additional support of resources restricts the optimal performance demonstrated in the claims substantiated by the reprimanding parties listed Cynthia Humphries, Lori Cetlinski, and Human Resources Representative Tamara Tarrance.  Also, overlooking the Grievant processes utilized for work completed throughout the day.

Violations:
Under Protest CET 1- Purpose and Intent A, B & C; 3-Management and Responsibilities- C-1,3,4,5,10,12,14,15,16; 4-Union Rights and Obligations B,D, and F; 10.Disciplinary Procedure-A,B,D,G and H.  Guidelines for Administration of a Corrective Discipline Program-1 and 2; and E 25. Equal Employment Opportunity and Affirmative Action Statement.

Remedies:
Restore Grievant to work immediately based on the actual facts presented and delineated with factual support of the HELP DESK by the immediate Supervisor.   Remove the Offenses I and IV that were contributory to the actual processes of the HELP DESK.  Remove Offense II based on facts presented and supported in the meeting on July 26, 2013.  Restore Grievant pay and make whole.

Employee Signature:  _____

Filed By:  Lenetta Walker, Administrative Representative

cc:  Ex. Bd., G. Washington, Robert Anderson, Valeria Miller, Files/LSW

I need an explanation on your where abouts.

Chuck Dodd, Director
City of Detroit - I.T.S Department
1212 Coleman A. Young Municipal Ctr.
Two Woodward Avenue
Detroit, Michigan  48226
313-224-1774 office
313-224-2158 fax
Email - cdodd@detroitmi.gov

Dave Bing, Mayor

file:///C:\Documents and Settings\loric\Local Settings\Temp\XPgrpwise\51E00D38Finance...    7/22/2013