# EXHIBIT 6A

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT   EASTERN DISTRICT of MICHIGAN | CHAPTER 9 PROOF OF CLAIM |
|---|---|

Name of Debtor: **City of Detroit, Michigan**    Case Number: **13-53846**

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Detroit Police Lieutenants and Sergeants Association ("DPLSA")**

Name and address where notices should be sent:
Julie Beth Teicher
Erman, Teicher, Zucker & Freedman, P.C.
400 Galleria Officentre, Suite 444
Southfield, MI 48034
Telephone number: 248/827-4100 email: jteicher@ermanteicher.com

Name and address where payment should be sent (if different from above):
Peter P. Sudnick
Peter P. Sudnick, PC
2555 Crooks Rd., Ste. 150, Troy, MI 48084
Telephone number: 248/643-8533 email: psudnick@sudnicklaw.com

**FILED**

FEB 2 0 2014

COURT USE ONLY

RECEIVED
FEB 2 4 2014
KURTZMAN CARSON CONSULTANTS

☐ Check this box if this claim amends a previously filed claim.

US Bankruptcy Court
MI Eastern District

Court Claim Number: _____
(If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed: $ **Amount of claim is presently unliquidated.**

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: **Pending grievances of DPLSA members - see attached Exhibits.**
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor: _____    3a. Debtor may have scheduled account as: _____
(See instruction #3a)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $_____
Annual Interest Rate (when case was filed) _____% ☐ Fixed or ☐ Variable

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim: $_____
Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).
$_____

5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. § _____.
$_____

6. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

7. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. **The underlying documents relative to this claim are in the City's possession.**
If the documents are not available, please explain:

8. Signature: (See instruction #8)
Check the appropriate box.

☐ I am the creditor. ☒ I am the creditor's authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.) ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Julie Beth Teicher
Title: Attorney and Authorized Agent
Company: Erman, Teicher, et al
Address and telephone number (if different from notice address above):

*(Signature)* Julie Beth Teicher   Date: 2-20-14

Telephone number: _____ email: _____

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment*

13-53846-tjt  Doc 10247-2  Filed 11/03/15  Entered 11/03/15  Page 2 of 40

13538461402200000000000376

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT      EASTERN DISTRICT of MICHIGAN | CHAPTER 9<br>**FILED** |
|---|---|

| Name of Debtor: City of Detroit, Michigan | Case Number: 13-53846 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Detroit Police Lieutenants and Sergeants Association ("DPLSA")**

Name and address where notices should be sent:
Julie Beth Teicher
Erman, Teicher, Zucker & Freedman, P.C.
400 Galleria Officentre, Suite 444
Southfield, MI  48034
Telephone number: 248/827-4100  email: jteicher@ermanteicher.com

☐ Check this box if this claim amends a previously filed claim.

US Bankruptcy Court
MI Eastern District

Court Claim Number:_____
(If known)

Filed on:_____

Name and address where payment should be sent (if different from above):
Peter P. Sudnick
Peter P. Sudnick, PC
2555 Crooks Rd., Ste. 150, Troy, MI 48084
Telephone number:248/643-8533  email:psudnick@sudnicklaw.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed:      $ __Amount of claim is presently unliquidated.__

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: __Pending grievances of DPLSA members - see attached Exhibits.__
(See instruction #2)

3. Last four digits of any number by which creditor identifies debtor: _____ | 3a. Debtor may have scheduled account as:_____
(See instruction #3a)

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $_____
Annual Interest Rate (when case was filed)_____% ☐Fixed or ☐Variable

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim:     $_____
Amount Unsecured:            $_____

5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).      $_____

5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. § _____.      $_____

6. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

7. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. __The underlying documents relative to this__
If the documents are not available, please explain: __claim are in the City's possession.__

8. Signature: (See instruction # 8)
Check the appropriate box.

☐ I am the creditor. ☒ I am the creditor's authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.) ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Julie Beth Teicher
Title:  Attorney and Authorized Agent
Company:  Erman, Teicher, et al
Address and telephone number (if different from notice address above):
_____
_____

*Julie Beth Teicher*  2-20-14
(Signature)          (Date)

Telephone number _____

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

A-1851

## DPLSA PROOF OF CLAIM ATTACHMENT

Pursuant to the Order, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [Doc. No. 1782] (the "Bar Date Order"), the DPLSA is authorized to file this Proof of Claim on behalf of its members. The DPLSA and its members are referred to hereinafter as "Claimants" or any individual as a "Claimant".

This Proof of Claim and Attachment are filed to preserve the rights of Claimants. The filing of this Proof of claim is not intended to be, and should not be construed as:

1) An election of remedies;

2) A waiver of any past, present or future defaults by the City or any third party;

3) A waiver of Claimants' claims against any other parties liable to Claimants;

4) A waiver or limitation of any rights, claims or defenses of Claimants, including, but not limited to, the right to challenge the Court's jurisdiction to hear disputes arising out of the claims set forth in this Proof of Claim or to make any motion to have such dispute resolved in a forum other that the Court;

5) A waiver of Claimants' rights to amend this Proof of Claim for any purpose;

6) A limitation on the number or type of claims filed by Claimants.

The filing of this Proof of Claim is not intended to and should not be construed to be a consent to or submission to the jurisdiction of the Court for any reason. Claimant has challenged the City's eligibility for relief under chapter 9 of the Bankruptcy Code. Claimant has appealed the Court's Opinion Regarding Eligibility dated December 5, 2013 [Doc. No. 1945] (the "Eligibility Opinion") and the Order for Relief dated December 5, 2013 [Doc. No. 1946] and moved for certification for direct appeal to the United States Court of Appeals for the Sixth Circuit pursuant to 29 U.S.C. §158(d)(2) and Fed. R. Bankr. Pro. 8001(f). The filing of this Proof of Claim is not a waiver of Claimants' continuing challenge to the eligibility of the City.

Pursuant to the Bar Date Order, individual members of the DPLSA have the right to file a Proof of Claim on their own behalf.

## EXHIBIT 1 TO DPLSA PROOF OF CLAIM

## GRIEVANCE CLAIMS

Attached hereto is a list of pending Grievances as of the Chapter 9 petition date, which cover the time period of 2005 to July 18, 2013. Claimant has made a diligent search of available information to compile the list attached hereto. Claimant reserves the right to amend this Proof of Claim in the event additional pre-petition Grievances are discovered or brought to its attention. In accordance with the Claims Bar Date Order, the filing of this Proof of Claim is without prejudice to the rights of individual DPLSA members to assert claims on their own behalf.

This Proof of Claim is filed without prejudice to Claimants' ability to resolve any of the Grievances listed in the attachments in the ordinary course of the City's affairs.

**Exhibit 1A**—Alphabetical list of Claimants and Policy Grievances

**Exhibit 1B**—List of Claimants by Grievance Number and Summary of Grievance

**Exhibit 1C**—List of DPLSA members who have claims under DPLSA Grievance Nos. 10-032 and 12-051 (Banked Time Payouts Under Deferred Retirement Option Plan ("DROP"))

**Exhibit 1D**—Arbitration award for DPLSA Grievance Nos. 10-032 and 12-051

# EXHIBIT 1A TO DPLSA PROOF OF CLAIM

## GRIEVANCE CLAIMS

| Member | Grievance No. | Type of Grievance |
|---|---|---|
| Carter, Marlon | 13-026 | Job Assignment |
| Corsetti, Rocco | 13-015 | Medical |
| Day, Angela | 13-018 | Denial of Weapon |
| Herbert, Terry | 13-025 | Lump Sum |
| Kuykendall, Nancy | 13-013 | Lump Sum |
| Love, Myron | 13-005 | Medical |
| Mayfield, Roscoe | 13-022 | Lump Sum |
| Miller, Kevin | 05-029 | Injury |
| Miller, Kevin | 10-024 | Harrassement |
| Miller, Kevin | 12-010 | Wages |
| Plieth, Steven | 13-024 | Lump Sum |
| Stanley, Sherell | 13-004 | Wages |
| Turner, Robert | 13-010 | Medical |
| Wicker, Lurline | 12-045 | Medical |
| LSA Policy | 13-006 | Overtime Wages |
| LSA Policy | 10-032/12-051 | Lump Sum |

**GRIEVANCE CLAIMS**

DETROIT POLICE
LIEUTENANTS & SERGEANTS ASSOCIATION

OUTSTANDING GRIEVANCES/DISCIPLINARY CASES

In Re: City of Detroit
United States Bankruptcy Court, Eastern District of Michigan, Southern Division
Chapter 9 Case No. 13-53846
Hon. Steven W. Rhodes

| Member | Grievance No. | Type of Grievance |
|---|---|---|
| Sgt. Kevin Miller | 10-024 | The Grievant claims that he has been harassed and forced to work in a hostile and intimidating work environment in violation of Articles 5, 11, 33, and 53 of the collective bargaining agreement. Relief: The Grievant seeks a non-monetary cease and desist remedy. |
| Sgt. Kevin Miller | 12-010 | The Grievant protests the Department's refusal to allow him to work New Year's Day. The Department refused to put the Grievant on the holiday rotation schedule because he was on restricted duty. The Grievant alleges a violation of Articles 11,37 & 53. Relief: monetary. |
| Cherell Stanley | 13-004 | The Grievant protests the refusal of the Department to pay her overtime for a report she was directed to complete at the end of her tour of duty. The Grievant alleges a violation of Articles 25 & 53. Relief: monetary. |
| LSA Policy | 13-006 | This is a policy grievance protesting the failure of the Department to factor in the employee's annual longevity amount in the current overtime calculation. The Association alleges a violation of Articles 25 & 53. Relief: monetary. |

| Member | Grievance No. | Type of Grievance |
|---|---|---|
| Nancy Kuykendall | 13-013 | This matter protests the Department's failure to pay the Grievant lump sum pay outs upon retirement in violation of Articles 17 & 53. Relief: monetary. |
| Angela Day | 13-018 | The Grievant was denied her service weapon upon retirement in violation of Articles 34 & 53 of the collective bargaining agreement. The Grievant requests to be given her service weapon. Relief: non-monetary. |
| Roscoe Mayfield | 13-022 | The Grievant protests the Department's refusal to pay him lump sum pay outs upon retirement in violation of Articles 17 & 53 of the collective bargaining agreement. Relief: monetary. |
| Steven Plieth | 13-024 | The Grievant protests the Department's refusal to pay lump sum payments upon retirement in violation of Articles 17 & 53 of the collective bargaining agreement. Relief: monetary. |
| Terry Herbert | 13-025 | The Grievant protests the Department's failure to pay lump sum pay outs upon retirement in violation of Articles 17 & 53 of the collective bargaining agreement. Relief: monetary. |
| Marlon Carter | 13-026 | The Grievant protests his involuntary transfer to the Northeastern District in violation of Articles 22 & 53 of the collective bargaining agreement. Relief: non-monetary. |

| Member | Grievance No. | Type of Grievance |
|---|---|---|
| LSA Policy Grievances | 10-032/12-051 | The grievances protest the Department's failure to pay lump sum pay outs for banked time within 30 days from separation of employment in violation of Articles 17 & 53 of the collective bargaining agreement. There are approximately 35 individuals who did not receive contractual lump sum payments. Relief: monetary NOTE: This case did proceed to arbitration before Arbitrator E.R. Scales. The Arbitrator issued a decision directing that members of the DPLSA eligible to elect the DROP Plan are entitled to pay out of all accumulated banked time, including sick time, at the time they elected to participate in the DROP Plan. The Arbitrator also awarded interest on unpaid lump sums. The City refused to implement the award. Consequently the DPLSA filed a complaint with the Wayne County Circuit Court, Case No. 13-009468 seeking enforcement of the award. This matter has been stayed by the Bankruptcy Court. |

## MEDICAL GRIEVANCES

| Member | Case No. | Type of Grievance |
|---|---|---|
| Sgt. Kevin Miller | 05-029 | The Grievant claims to suffer from duty related injuries. The Department deems the injuries to be non-compensable. The Grievant claims the injuries are compensable and the City's refusal to treat them as such is a violation of Articles 32 & 53 of the collective bargaining agreement. Relief: monetary. |
| Lurline Wicker | 12-045 | The Grievant protests the City's decision to treat as non-compensable the Grievant's hand/wrist injury. Relief: monetary |
| Myron Love | 13-005 | The Grievant protests the City's decision to treat as non-compensable the Grievant's knee injury. Relief: monetary. |
| Robert Turner | 13-010 | The Grievant protests the City's decision to treat as non-compensable the Grievant's hand/wrist injury. Relief: monetary. |
| Rocco Corsetti | 13-015 | The Grievant protests the City's decision to treat as non-compensable the Grievant's hearing injury. Relief: monetary. |

DETROIT POLICE

# LIEUTENANTS AND SERGEANTS

## ASSOCIATION



Sergeant Mark Young
President

Lieutenant Rodney N. Sizemore
Vice President

Lieutenant Brian E. Harris
Secretary - Treasurer

Sergeant John F. Kennedy
Sergeant-at-Arms

28 W. Adams, Suite 700
Detroit, Michigan 48226-1685
Phone: (313) 961-5699
Fax: (313) 961-0923

February 19, 2014

Below is a compiled listing of members currently in the Deferred Retirement Option Plan (DROP) that have requested their lump sum payouts/ eligible for lump sum payout option, as awarded through Arbitration Award Tribunal #10-032 and #12-051:

Outstanding DROP Participants

| Member | Date of DROP Lump Sum Request | Pension# |
| --- | --- | --- |
| Dwight Snodgrass | 11/21/11 | 231172 |
| Kenneth Gardner | 12/08/11 | 231072 |
| Shawn Wesley | 01/05/12 | 231174 |
| Mark Thornton | 01/06/12 | 231048 |
| Steven Crutchfield | 01/18/12 | 231155 |
| Steven Myles | 01/18/12 | 231328 |
| Kevin Robinson | 01/26/12 | 200613 |
| Lester Mathews | 02/08/12 | 231405 |
| Darrell Patterson | 02/09/12 | 231297 |
| Gordon Moore | 02/21/12 | 231295 |
| Roderick Glover | 03/01/12 | 231510 |
| Michael Jamison | 03/05/12 | 207877 |
| Michael Nied | 03/16/12 | 231116 |
| Anthony Potts | 03/21/12 | 208531 |
| Pride Henry | 03/27/12 | 231461 |
| Rodney Fresh | 04/23/12 | 231509 |
| Durelle Cooper | 05/04/12 | 231456 |
| Alan Quinn | 05/15/12 | 231487 |
| Benito Mendoza | 08/17/12 | 231211 |
| Kristy Cross | 08/21/12 | 231382 |
| Kyra Hope | 09/17/12 | 207119 |

## Entered the DROP Program After November 30, 2012

| | | |
|---|---|---|
| James Cashion | 01/24/13 | 231230* |
| Erick Douglas | 02/01/13 | 231502* |
| Donald Olsen | 02/16/13 | 212243* |
| David Wright | 02/20/13 | 231559* |
| William Anderson | 04/12/13 | 231533* |
| Larry Meinke | 04/19/13 | 231580* |
| Mark Young | 05/23/13 | 231604* |

*Denotes participant did not have payout option effective 11/30/12

# VOLUNTARY LABOR ARBITRATION

In the Matter Between:

**CITY OF DETROIT (POLICE DEPARTMENT)**
City,

- and -

**DETROIT POLICE LIEUTENANTS & SERGEANTS ASSOCIATION (DPLSA)**
Association,

|  |  |
|---|---|
| Grievances: | Banked Time Payouts Under DROP |
|  | (DPLSA Grievances No., 10-032 & 12-051) |
| Arbitrator: | E. R. Scales |
| Hearing: | April 9, 2013 |
| Award: | June 28, 2013 |

## OPINION & AWARD

Appearances

For the City:    June Adams, Attorney, City of Detroit Law Department

For the Association:    Richard Mack, Attorney, Miller Cohen, PLC

Brought by the City:

Anita Berry    Labor Relations Manager, City of Detroit

In Attendance – But Not Testifying

Robbin C. Rivers    Commanding Officer, Legal Affairs, Detroit Police Department
Kimberly Bennett    Sergeant, Labor Relations, Detroit Police Department

Brought by the Association:

Mark Young    President, DPLSA
Junetta Wynn    Sergeant, Past President, DPLSA
John Kennedy    Sergeant-at-Arms, DPLSA
Kenneth Gardner    Sergeant, Homicide Division, Detroit Police Department

In Attendance – But Not Testifying

Rodney Sizemore    Vice President, DPLSA
Mark Thornton    Sergeant, Crime Analysis, Detroit Police Department

1

# INTRODUCTION

This matter was brought to arbitration pursuant to the terms of the Collective Bargaining Agreement (hereinafter CBA or Contract), effective, July 1, 2009 through June 30, 2013(which remains in effect through the time of this Opinion & Award), between the City of Detroit, a Michigan Municipal Corporation (hereinafter, the "City") and the Detroit Police Lieutenants & Sergeants Association, Inc., (hereinafter, the "Association"). A formal hearing was conducted on two grievances, Tuesday, April 9, 2013, at Detroit Police Department Headquarters, 1300 Beaubien, in Detroit, Michigan.

Each party was given ample opportunity to support its respective positions with opening statements; examination and cross-examination of witnesses; the presentation of evidence; and closing arguments. The Association presented four witnesses. The City presented one witness. A total of fourteen (18) exhibits were entered into the record at the hearing.

Post-hearing briefs from the parties were due and received by electronic mail on May 31, 2012. The arbitration decision and award, based on the case presented, follow:

## THE GRIEVANCES & EACH ANSWER, SHOWING EACH PARTY'S POSITION AT THE TIME THE GRIEVANCE WERE FILED

### Grievance 10-032 (J-2), filed April 28, 2010, reads:

As of this date, the City of Detroit has failed to pay lieutenants, sergeants and investigators pension retired members and designee participates [sic] of the Deferred Retirement Option Program (DROP) participants lump sum payouts in accordance to the City of Detroit documentation issued May 23, 2010, court ordered decisions and the current contractual master agreement of this association.

The city's failure to follow the above obligations have caused over eighty members to lose interest on wages, accumulated bonus vacation time, opportunities to use earned benefits, errors in bank time calculations for pending separations and pension calculations as well as suffer personal loses.

This association has made several attempts over the pass [sic] several months to have these violations corrected by meeting with the directors of city labor relations, department of finance, and police payroll to no avail.

This association finds the City of Detroit continuous [sic] operating in an unfair labor practice along with violating the current contractual agreement articles 17, 35, 37, and 52[1] among others.

### Desired Settlement of Grievance 10-032, as written at the end of the grievance:

1. The City of Detroit and the Detroit Police Department abide by the court orders, contractual agreement, city documentation and ruling of additional court action.

2. The City of Detroit and the Detroit Police Department pay members their lump sum payments at the current contractual rate of eighty-five percent (85%) for sick time payment and all other compensatory, furlough, court time and other time at one hundred percent (100%).

---

[1] Article 52 of the CBA (J-1) between the parties speaks to "Adoption by Reference of Relevant Charter Provisions, Ordinances and Resolutions."

2

3. The City of Detroit and the Detroit Police Department audit all association members' payroll banks and restore all missing time.

4. The City of Detroit and the Detroit Police Department deposit bonus vacation time in member's payroll banks from the payroll period of July 2009 – June 30 without regard of drop date or retirement date due to the City's failure to pay prior July 1, 2010 date.

5. The City of Detroit and the Detroit Police Department pay the current Michigan judgment interest rate to all lump sums (pensions and drop plans) exceeding the thirty-day notification made by the member.

6. The City of Detroit and the Detroit Police Department make all members whole.

7. The City of Detroit and the Detroit Police Department pay all legal and attorney fees associated with this grievance.

**The City of Detroit Response to Grievance 10-032, as signed by Assistant Chief Chester L. Logan, dated February 16, 2011 (See, J-2):[2]**

Representatives of the Association headed by yourself, and Sergeant –at-Arms John F. Kennedy, and representatives of the Department led by myself, discussed the matter.

This grievance states that the City of Detroit has failed to pay Lieutenants, Sergeants and Investigators pension retired members and designee participants of the Deferred Retirement Option Program (DROP), lump sum payouts in accordance to City of Detroit documentation issued May 23, 2010, court ordered decisions and the current contractual master agreement of this Association.

The grievance further states, the city's failure to follow the above obligations have caused over eighty (80) members to lose interest on wages, accumulated bonus vacation time, opportunities to use earned benefits, errors in bank time calculations for pending separations and pension calculations as well as suffer personal loses. The association has made several attempts over the pass [sic] several months to have these violations corrected by meeting with the directors of city labor relations, department of finance, and police payroll to no avail. This association finds the City of Detroit continuous operating in an unfair labor practice.

The allegations are said to describe a violation of Contract Articles 17, 35, 37, and 52, along with others.

The desired settlement is that the Department abides by the court orders, contractual agreement, city documentation and ruling of additional court action. The City of Detroit and the Detroit Police Department pay members their lump sum payments at the current contractual rate of eighty-five percent (85%) for sick time payment and all other compensatory, furlough, court time and other time at one hundred percent (100%). The City of Detroit and the Detroit Police Department audit all association members' payroll banks and restore all missing time. The City of Detroit and the Detroit Police

---

[2] After having read the grievance response several times this arbitrator finds that the response contained in assistant Chief Logan's February 16, 2011 response is, in fact, no response at all, other than the clear statement that he denies the grievance. It is more along the lines of a *non sequitur*.

After repeating what the Association put in its grievance, he writes, beginning at the sixth paragraph, with "[i]t is the Department's position…" he does not give the Departments position, but merely ends the sentence with a statement about part of what is contained in "Article 17 H." The final paragraph of his response only makes a statement about "a decision to cash out" possibly affecting eligibility for Contract benefits," and then he states "if a member cashed all of their accumulated sick leave, they will not be eligible for bonus vacation days until they accumulate the minimum number sick days required under the" CBA. He provides no reason for why the grievance is denied. Thus, the arbitrator is deprived of the assistance of the grievance response to help explain the City's rationale for denying the grievance. A reasoned response at the original stage of the grievance might have helped the City's position in this grievance. But there was none.

3

Department deposit bonus vacation time in member's payroll banks from the payroll period of July 2009 – June 30 without regard of drop date or retirement date due to the City's failure to pay prior July 1, 2010 date. The City of Detroit and the Detroit Police Department pay the current Michigan judgment interest rate to all lump sums (pensions and drop plans) exceeding the thirty-day notification made by the member. The City of Detroit and the Detroit Police Department make all members whole.

It is the Department's position that according to Article 17 H, which states in part: late lump sum payments (greater than thirty days) will include interest at the State of Michigan judgment interest rate as described in MCL 600.6013 (6). It should also be noted, that if a member elects to cash out their accumulated sick leave banks, further accumulation shall begin anew, as of their date of DROP.

In addition, a decision to cash out may affect the eligibility for contractual benefits. In accordance with the Contract, if a member cashed out all of their accumulated sick leave, they will not be eligible for bonus vacation days until they have accumulated the minimum number of sick days required under the Collective Bargaining Agreement.

Therefore this grievance is denied.

**Grievance 12-051 (J-3), dated November 30, 2012:**

On November 23, 2012, the Detroit Police Lieutenants and Sergeants Association received via U.S. mail a letter indicating that the City of Detroit Labor Relations director was removing current benefit conditions relative to members DROP selections effective November 30, 2012.

The Association attempted to resolve this matter to no avail [sic] Therefore the Union charges that the Employer is violating various sections of the DPLSA bargaining agreement. The City changed the form and is denying the union members who elect to DROP the right to their lump sum payment, for all banked time at the time of DROP. The City's actions violate the following Articles: 5, 17, 26, 35, 51, 52, 53, 56, and 59 among others.

**Desired Settlement of Grievance 12-051 (J-3), as written at the end of the grievance:**

1. The Department abides by the Contract and written agreements.

2. The Union seeks all allowable under Contract law.

3. The Association request back pay and benefits for members

4. The Department makes all affected members whole, and order to enjoin the City from continuing this practice, and all other relief allowable.

5. The City pay all legal and attorney fees cost associated with this matter.

**The City of Detroit Response to Grievance 12-051, as signed by Commanding Officer of Legal Affairs Robbin Rivers, dated January 31, 2013 (See, J-3):**

In accordance with the legal agreement, a Step 4 grievance meeting was scheduled on January 8, 2013, however the parties have agreed that a written response will be provide:

Grievance No. 12-051

Grievant: DPLSA Policy

Issue: Change in Working Conditions (DROP PLAN)

On November 23, 2012, the Detroit Police Lieutenant and Sergeants Association received a letter from Lamont Satchel, Director of Labor Relations for the City of Detroit,

4

changing working conditions. The letter indicated that members who elect to DROP will no longer have the right to their lump sum payments for earned bank time.

The Association's allegations are said to describe a violation of Articles 5, 17, 26, 35, 51, 52, 53, 56, and 59 along with others of the collective bargaining agreement (CBA).

The desired settlement is that the Department abides by the Contract and written agreements and the Association seeks all allowable under the Contract. Also, the Association request back pay and benefits for members. In addition, the Association requests that the Department makes all affected members whole, an order to enjoin the City from continuing this practice, and all other relief allowable.

According to Director Lamont Satchel, City of Detroit Labor Relations Division, a letter was sent to you're a\Association on November 16, 2012. This letter advised that pursuant to your collective bargaining agreement, lump sum payments for banked time, other than sick time, are paid out within thirty (30) calendar days of separation. In addition, a new form for the DROP program has been forwarded to pension for use by your members.

Accordingly, this grievance is being denied.

## BACKGROUND AND RELEVANT FACTS[3]

The parties have a provision in the CBA between them, in Article 51, PENSIONS, which allows eligible members of the bargaining unit to participate in a "Deferred Retirement Option Plan" (hereinafter, DROP). The DROP plan originally came into being in the 1998-2001 CBA between the City and another police personnel bargaining unit, the Detroit Police Officers Association (hereinafter, DPOA), as the result of an Act 312 Arbitration Award issued by a panel chaired by Donald F. Sugerman. That Award was issued on July 21, 2000. This same DROP plan was placed into the CBA between the City and the DPLSA (Association). The current CBA reads, in pertinent part, in Article 51, Section O, "[e]ffective July 1, 2003, a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option..." Both the City and the Association affirmed that the language in the DROP in the CBA between them is in all germane aspects, for the purposes of this arbitration, essentially the same as that in the CBA between the City and the DPOA.

---

[3] This background is excerpted and paraphrased, in part, from Umpire George T. Roumell, Jr.'s November 12, 2009 through decision in Grievance No. 09-057. I have read that decision carefully and have determined that for all practical purposes it appears to be the initial and quintessential decision regarding interpretation of the DROP Plan and how it was and is to work between the City of Detroit and the DPOA.

5

When Chairman Sugerman wrote the original approval of the DROP plan, at pages 25-26, of the July 21, 2000 Award, he stated that "[u]nder a DROP, a member who is eligible to retire makes an irrevocable commitment to participate. The pension allowance is then established. However, the officer continues to work and the pension benefit, reduced to a percentage is 'dropped' into an account and invested. When the officer retires, s/he collects the money accumulated in the DROP account, his/her retirement allowance is restored to its full amount (including annual escalator amounts) that would have been added but for the member's DROP participation."[4]

## PERTINENT PROVISIONS OF THE COLLECTIVE BARGAINING AGREEMENT

### ARTICLE 17 MISCELLANEOUS ITEMS

H. **Lump Sum for Banked Time:** Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of the separation. This includes, but is not limited to separation with a deferred vested pension or under a disability. Late lump sum payments (greater than thirty days) will include interest at the Michigan Judgment Interest Rate as described in MCL 600.6013(6).

### ARTICLE 35 SICK LEAVE

L. **Retirement and Death Sick Leave Payment:** Immediately preceding the effective date of a member's retirement, exclusive of duty and non-duty disability retirement, or at the time of a member's death, he or his estate shall be entitled to pay for his unused accumulated sick banks as follows:

A member shall receive full pay for 50% of the unused accumulated sick bank amounts.

Effective July 1, 2003, a member shall receive full pay for 70% of the unused accumulated sick bank amounts.

If a member is granted a duty or non-duty disability retirement, he shall be entitled to a reimbursement of unused sick time according to the preceding formula, upon attaining his normal full duty retirement date and petitioning the Chief of Police for such reimbursement.

Note: This Section was amended on May 13, 2008 by a Memorandum of Understanding between the parties that was attached to the DPLSA CBA, and was admitted into evidence in the current arbitration case as J-1(a).[5] The MOU reads as follows:

---

[4] J-7, at page 6.
[5] This exact same MOU was executed between the City of Detroit and (2) the DPOA; (3) the DPCOA – Unit 1; (4) DFFA – I.A.F.F. Local 344. The only difference between them is that each MOU was modified to reflect the specific CBA Article where the language was to be placed for each of these bargaining units. See, the attachments to J-1(a).

## MEMORANDUM OF UNDERSTANDING
### BETWEEN THE
## CITY OF DETROIT
### AND
## DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION

RE: Adding Unused Sick Leave to Average Final Compensation

This Memorandum of Understanding hereby modifies the existing language in the labor agreement (Article 35, Subsection L — Retirement and Death Sick Leave Payment) to provide the following option:

1) Effective July 1, 2008, a member shall receive full pay for eighty-five percent (85%) of the unused accumulated sick bank amounts, or

2) choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provide 1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in 1) above.

All other provisions of Article 35, Subsection L shall remain the same.

Dated this 13th day of May, 2008.

*Eugene Goode*
Eugene Goode, President
Detroit Police Lieutenants and
Sergeants Association

*Barbara Wise-Johnson*
Barbara Wise-Johnson, Director
Labor Relations

## ARTICLE 51 PENSIONS

O. **DROP Plan**. Effective July 1, 2003, a Deferred Retirement Option Program (DROP) plan option shall be made available as a retirement option with the following features:

1. To participate in the program a member must have at least twenty-five (25) years of active service with the City as a member of the Policemen and Firemen Retirement System.

2. There will be no limit on the number of years a member may participate in the program.

3. If a member is injured to the point that the member is disabled and placed off on a duty disability per the Retirement System, the member will revert to his/her regular pension.

4. A DROP accumulation account will be established with an outside investment company chosen by the Union.

7

5. The amount paid into the DROP accumulation account shall be 75% of the member's regular retirement allowance plus the annual escalator of 2.25% x the full regular retirement allowance x 75%).

6. Once a member has chosen to place his/her DROP proceeds into the DROP accumulation account, the member shall not be allowed to remove those funds until the member permanently retires.

7. Upon permanent retirement, the member shall be given the right to remove funds from the DROP accumulation account.

8. When the member permanently retires, the member will receive a regular retirement allowance calculated as if the member retired on the day the DROP account started. The member's retirement allowance shall include all annual escalator amounts (2.25%) that would have been added while the member was participating in the DROP plan.

9. This program will not be put into effect unless it is certified by the IRS that it will not affect the tax exempt status of the Retirement System under the Internal Revenue Code.

10. This program shall be effective only for as long as it is cost-neutral to the City, provided however, that the DROP Plan shall continue during the pendency of proceedings, described below, designed to restore the Plan to cost neutrality.

11. If the City contends that the program is costing it money, including, but not limited to, making the City's annual contribution to the P&F Retirement System higher than it would be if the DROP Plan was not in effect, the parties, along with the Retirement Plan's actuary and actuary appointed by the City, shall meet and confer in good faith regarding the cost. If the parties are unable to reach an understanding, the matter shall be submitted to a third, independent, actuary, chosen or agreed upon by the Retirement Plan's actuary and the City's actuary, who will be an associate or a fellow of the Society of Actuaries and a member of the American Academy of Actuaries. This actuary, when rendering a decision, will be limited to ordering the implementation of changes necessary to make the program cost neutral. Upon the implementation of changes necessary to make the program cost neutral, participants shall have thirty days to elect (a) retiring from active duty, or (b) withdraw from the DROP Plan, continuing active employment and resuming participation in the regular retirement plan. The Board shall notify the participants of these changes prior to implementation. Those resuming participation in the regular retirement plan shall not accumulate service credit for any time that they were participating in the DROP Plan. Those not making either election shall remain participants in the DROP Plan.

12. In the event the DROP Plan cannot be changed to restore cost neutrality, it shall be discontinued and participants shall have the option of either (I) retiring, or (b) continuing active employment and resuming participation in the regular retirement plan.

8

# ARTICLE 53 MAINTENANCE OF CONDITIONS

A. Wages, hours and conditions of employment legally in effect at the execution of this Agreement shall, except as improved herein, be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

B. Relation to Regulations, etc.: This Agreement shall supersede any rules, regulations, ordinances, or resolutions inconsistent herewith.

## ISSUES:

ARE THE MEMBERS OF THE DPLSA BARGAINING UNIT WHO ARE ELIGIBLE WHO ELECT TO PARTICIPATE IN THE DROP PLAN ENTITLED TO RECEIVE CASH PAYOUTS OF THEIR ACCUMULATED BANKED TIME, INCLUDING SICK TIME, AT THE TIME THAT THEY ELECT TO PARTICPATE IN THE DROP PLAN OR ARE THEY ENTITLED TO SUCH PAYOUTS ONLY AT THE TIME THAT THEY SEPARTE FROM EMPLOYMENT?

DOES THE EMPLOYER HAVE THE RIGHT UNDER THE COLLECTIVE BARGAINING AGREEMENT TO A MAKE SUBSTANTIVE REPLACEMENT OF THE DROP ELECTION FORM THAT WAS CREATED TO COMPLY WITH UMPIRE GEORGE T. ROUMELL'S AWARD IN THE ARBITRATION OF GRIEVANCE NO: 09-057 R-288 IN THE CASE BETWEEN THE CITY OF DETROIT AND THE DPOA IN THE FORM TO BE USED BY MEMBERS OF THE DPLSA BARGAINING UNIT?

## DISCUSSION

This arbitrator was jointly selected by the parties on March 14, 2013. After some lengthy discussions back and forth the parties finally settled on a hearing date and this arbitrator heard the case on April 9, 2013. Under the terms of Article 9 of the CBA between the parties this arbitrator was given the authority to make a binding decision on the parties as to the the issues raised in this arbitration.

The issues in the case before me center, first, on when eligible members of the DPLSA bargaining unit who have elected to participate in the DROP Plan are entitled to receive payouts of their accumulated banked time, including sick time, and, second, on whether the change in form used to make an election concerning how the banked and accumulated time would be handled for DPLSA bargaining unit members, initiated on or about November 23, 2012 by City of Detroit Labor Relations Director Lamont Satchel violates the DROP Plan and the Agreement between the parties. Essentially the first of these issues is whether eligible members of the

9

DPLSA bargaining unit who have elected to participate in the DROP Plan are entitled to receive lump sum payout of accumulated banked time, such as sick time and other banked time, at the time they elect to participate in the DROP Plan or must wait to receive it until the time that they permanently separate (retire) from service with the City. The answer to the first issue will be, in large measure, determinative of the resolution of the second issue.

The employer has taken the position that these employees are only entitled to these payouts at the time that they permanently separate (retire) from employment and not at the time that they elect to participate in the DROP Plan. The Association, on the other hand, asserts that eligible members of the bargaining unit are entitled to elect to take the payouts at the time they elect to participate in DROP or may defer the payouts until they permanently separate from service.

Grievances were filed by the Association, No. 10-032, regarding Failure to Pay Lump Sum Payments, on 9/28/2010, and No. 12-051, regarding a Substantive Change in and the Replacement of the Form to be Used by officers to Make an Election of what to do concerning banked and accumulated time at the time an officer elects to participate in the DROP Plan, on November 30, 2012. No timeliness issues or other threshold issues or objections were raised by the City as to either of these grievances. Thus each grievance is deemed to be appropriately before this arbitrator for decision and award.

What makes the cases before this arbitrator the more intriguing is that following the introduction of the DROP Plan the City and the DPOA (a "fellow" union to DPLSA) had a number of disputes over the application of the DROP Plan that were placed before a tribunal under the City of Detroit – Detroit Police Officers Association Umpire System, before Umpire George T. Roumell, Jr., which were settled in three decisions authored by Umpire Roumell as described variously within the body of this Opinion and Award.

Albeit for grievances involving the City of Detroit and the DPOA, the issues involved

10

were similar to those before this arbitrator and involved CBA language that is virtually indistinguishable from that in the DPLSA CBA with the City of Detroit. Those disputes involved language that is almost identical to the language at issue in the CBA between the City and DPLSA, and in the disputes at issue herein.[6] Mr. Roumell wrote two decisions and issued a supplemental award to clarify the award in the first decision. The discussion and resolution of those cases sets the backdrop and possibly the basis for resolution of the present disputes for the City and the DPLSA.

Additionally, DPLSA has raised the claim that the doctrine of *collateral estoppel* prevents the arbitration of the issue regarding the time of payout of the banked time, as well as whether the City is obligated to pay out interest for late pay out of banked time owed to officers. According to the DPLSA, those issues have already been decided in the Roumell decisions and issue preclusion should attach.

The City of Detroit made one statement regarding the issue of applying *collateral estoppel* to this set of grievances. At page 7 of its post-hearing brief it stated that "collateral estoppel and CBA support City's position that payout of banked time occurs at separation from employment.

While this arbitrator appreciates both party's attempt to dispose of this case using that legal doctrine, the arbitrator must point out that the parties remained at odds following the filing of the grievances and not resolving the "settled issues" short of having to go through this arbitration.

Let me remind the parties that *collateral estoppel* is a legal doctrine that is most often applied in court cases. This arbitrator does not subscribe to the position that the mere

---

[6] As there was no claim by the City in the cases before me, Gr. No. 10-032 and Gr. No. 12-051, that the language in the DPOA CBA and the DPLSA CBA with the City was and is different, the discussion regarding the "Roumell Decisions" in the DPOA cases will be treated as applying directly to the DPLA cases before me. Note that while I have made this statement here the statement does not in any way mean that I have made a decision yet regarding the Association's request that the doctrine of *collateral estoppel* be applied to the cases herein.

announcement of such a doctrine in arbitration will adequately resolve the case.

Let me also remind the parties that the use of legal terminology does not usually speed up the process in arbitration. As an example lets briefly review the of *stare decisis*, which generally means "to abide by, or adhere to, decided cases."[7] Generally, under this doctrine a lower or inferior court is obligated to follow the prior decision of a superior court, i.e., a court of higher jurisdiction, on the same subject matter. Of course, if a CBA requires it, an arbitrator will be bound to follow the precedential value of a prior award. The CBA between the parties to this arbitration does not contain a provision that would require an arbitrator to follow prior awards between the parties or between one of the parties and another party with whom the party who was not involved in that award is in *privy*. This might sound like a bold statement, and it is, there is no *stare decisis* in most labor arbitration because every arbitrator stands on equal footing with every other arbitrator, there is no higher and lower ranking.[8] And, almost every case comes to arbitration *de novo*. In most every instance every arbitrator is free to consider prior decisions and may choose to apply them in some fashion to the case that the arbitrator is deciding if the arbitrator determines that doing so would be valuable.

*Collateral estoppel* can be valuable in litigation and it is best left to use in a judicial forum where the parties can engage in legal maneuvering about its use. In the arbitration arena this arbitrator prefers to follow the arbitrator's right to examine prior arbitration awards or rulings on issues in other awards and determine whether in his or her opinion as an arbitrator that they are valuable enough or even controlling enough to be incorporated into the case at hand.

Here the Association raises the Roumell Awards as being determinative of the issues before this arbitrator. The employer, on the other hand, points to the Roumell Awards, particularly in J-7, and its supplement, J-8, as having provided the requirement that it issue the

---

[7] *Black's Law Dictionary*, at 1261 (West Publishing Co., 5th Ed, 1979).

[8] Where my statement most often might not apply is in an industry with a system or hierarchy of arbitration levels or levels of arbitral review, such as in the postal service or in the coal industry.

form identified in J-14. It also appears that the City believed that the Roumell Award supported its decision to issue the November 16, 2012 letter that stated "lump sum payments for banked time, other than sick time, are paid out within thirty days of separation" and that"[p]ursuant to Article 35(L): Retirement and Death Leave Payment – sick leave payments are paid out immediately preceding the effective date of retirement,"[9] which decision prompted the SPLSA to file Grievance 12-051. This alone is enough to bring the substance of those three Roumell Opinions and Awards into this case for review.

**The Roumell Decisions and Their Application to this Arbitration**

> **The First Roumell Award: J-7 (Gr. No. 09-057, DROP Eligibility/Banked Time Payout R-288) Dated November 12, 2009**
> In the first of the three Awards authored by Umpire George T. Roumell, Jr., Gr. No. 09-057, dated November 12, 2009, which was received as Joint Exhibit 7 (hereinafter, J-7),[10] in the cases before me, Umpire Roumell considered two issues concerning the DROP Plan. The first of these issues centered on whether members of the bargaining unit would be eligible to be included in DROP if they had 20 years of service with the City or 25 years of service. Umpire Roumell determined and awarded that "[t]he grievance…is denied…the 2004-2009 Agreement will not be reformed to reduce the DROP plan eligibility to 20 years from 25 years."[11]

The second issue in J-7 involved the rate at which an officer[12] would be paid accumulated sick time if the officer chose to wait to be paid accumulated sick time at the time that the officer actually retires. Umpire Roumell, stated, and I quote his language directly from page 4 of the

---

[9] See Mr. Satchels letter in J-13, which is accompanied by the City's Labor Relations form that is headed, "Unused accumulated Sick Leave and All Other Accumulated Banked time Declaration for DROP Retirement.

[10] All exhibits taken as part of this case were numbered consecutively from 1-18, and designated as J, for joint, E, for employer (here, the City of Detroit), and U, for union (here, the DPLSA). Sub-exhibits were identified using he exhibit number and a consecutive letter of the alphabet, as in J-1(a), an addendum to the Contract, Re: Adding Unused Sick Leave to Average Final Compensation.

[11] See, J-7, the first sentence following the heading, "AWARD," at 35.

[12] Hereinafter, the words or phrases "member/members of the bargaining unit," "officer/officers" and "employee/employees" shall refer to those persons who are part of the DPLSA bargaining unit, unless the references is specifically to the DPOA, as part of the history of DROP and the awards issued by Umpire Roumell.

13

Opinion and Award, "the payout rate for the accumulated sick time when an officer elects not to receive payment for their [sic] accumulated sick time at the time of selecting the DROP Plan, but waits until the officer's actual retirement to receive the payout of accumulated time including sick time."

In reading through the decision I note that while Umpire Roumell's statement at page 4 specifically spoke to "accumulated sick time." He later clarified the issue in the discussion phase of his award at bottom of page 33 and on page 34, and then, finally, in the actual Award itself, at page 35. On pages 33-34, Umpire Roumell stated that:

> The issue addresses the rate that should be applied to banked time not cashed out upon selection of the DROP plan, but which is ultimately cashed out by an officer upon actual retirement. President Bandemer testified that the practice for rate of accumulated time has been the prevailing rate at the time of separation – meaning the officer's rate at the time of actual retirement. This included payment of all banked time, including sick time. The City provided no evidence to disprove this practice.
>
> This was the practice under Article 40.H,[13] which reads:
>
>> Lump Sum for Banked Time. Whenever an employee leaves employment with the City, such employee will be paid for all banked time, other than sick time, in a lump sum payment within thirty (30) calendar days of the separation, at the prevailing rate of pay in effect at the time of separation. This includes, but is not limited to separation with a deferred vested pension or under a disability.
>
> There is no evidence that the parties bargained or changed this language. There is no evidence that this language, as adopted, was a mistake. Rather, this language was continued against a past practice of paying all banked time, including sick time, at the rate that the officer was making at the time of retirement.
>
> This Umpire is persuaded that it has been practice for the City to pay accumulated time the prevailing rate at the time of the officer's separation from the City –meaning the time of retirement, not the time of selecting the DR"O plan.
>
> &ast; &ast; &ast; &ast;

---

[13] This language is identical to the language regarding Lump Sum for Banked Time, in Article 17, Section H, of the CBA between the City and the DPLSA, except that there is an additional sentence in the DPLSA version, which reads, pertinently, "*Late lump sum payments (greater than thirty days) will include interest at the Michigan Judgment Interest Rate as described in MCL 600.6013 (6).*" (Emphasis added)

14

For this reason, this Umpire is persuaded that the proper rate of pay for all accumulate (including available sick) time for an office that selects the DROP plan but dies not cash out the accumulated time at the time of selecting the DROP plan and instead banks the accumulated time until actual retirement is his/her prevailing rate of pay at the time of actual retirement, not the rate at the time of selecting DROP.

Umpire Roumell then granted that portion of the grievance. He determined and awarded that, and again I quote him directly from the "AWARD," at page 35, "the rate of payout of all accumulated banked time including available sick time that is not cashed out or used to calculate final average compensation at the time of DROP selection but cashed out upon the officer's actual retirement shall be paid at the officer's prevailing rate of pay at the time of the officer's actual retirement, and not the officer's rate at the time of the DROP selection."

In that arbitration Umpire Roumell had been charged with determining the payout rate for the accumulated sick time when an officer elects not to receive payment for accumulated sick time at the time of selecting the DROP Plan, but waited until the officer's actual retirement to receive the payout of accumulated time including sick time.

The issue was what was to be the payout rate to be at the time that an officer actually retired, (a) the rate at the time the officer elected to participate in the DROP Plan or (b) the rate that was in effect at the time the officer actually retired? Umpire Roumell's award was that it was to be the rate of pay that was in effect at the time that the officer "actually retired."

This is very important to the case before me because when one reads the .award one must be careful to understand that Umpire Roumell ruled that the rate of payout, (1) if the officer did not choose to receive payment for the accumulated sick time (2) at the time the officer selected the DPOP Plan (3) but chooses to wait until (4) the time of the officer's actual retirement (5) the rate of pay would be at the rate that was in effect at the time the officer actually retired.

He did not rule that the officer could only receive payout for accumulated banked time, sick or other time, at the time of retirement

15

In his Award Umpire Roumell very specifically addressed the issue of lumping sick time together with other banked time, crediting the testimony of then DPOA President Bandemer, as cited above. He also stated clearly in the Award in Grievance 09-057 (J-7, for our purposes) that all accumulated banked time including sick time can be paid out at the time the officer elects to participate in DROP. This is done at the officer's choosing. See the actual Award language, at page 35, "the rate of payout of **all accumulated banked time including available sick time that is not cashed out or used to calculate final average compensation at the time of DROP selection** but cashed out upon the officer's actual retirement shall be paid at the officer's prevailing rate of pay at the time of the officer's actual retirement, and not the officer's rate at the time of the DROP selection." (Emphasis added)

In accordance with Umpire Roumell's Opinion and Awards, in particular his Award in J-7, and based on the practice[14] identified in that Opinion and Award this arbitrator finds that members of the DPLSA bargaining unit who are eligible to elect the DROP Plan are entitled to payout of all accumulated banked time, including sick time, at the time the officers elect to participate in the DROP Plan if the officers so choose.

### The Second Roumell Award: The Supplemental Award, J-8 (Gr. No. 09-057, DROP Eligibility/Banked Time Payout R-292) Dated April 20, 2010

After his award was issued in Gr. No. 09-057, the DPOA contacted Umpire Roumell, by letter on November 20, 2009, and asked him to clarify an issue that it stated "was discussed but not contested in the above captioned case [Grievance No. 09-057] but the Association believes the best interests of the parties would be served through the issuance of a clarifying Supplemental Award that would eliminate any potential misunderstandings."[15]

---

[14] See the quoted language from Umpire Roumell's Opinion and Award in J-7, regarding established past practice at page 14, *supra*. And see footnote 13, above.

[15] See J-8, at 2.

16

The letter went on to describe the issue thusly:

> In your decision you correctly observed, at pages 9 and 10, that an officer's options at the time of an election to participate in the DROP included either 'cash[ing] out 100% of their accumulated time at their current rate' or applying 25% of their accumulated time toward computation of their 'average final compensation used to compute the officer's service pension of his/her retirement allowance' and cashing out the remaining 75% at the time of the DROP election. The third option is to keep accumulated time banked and cash it out upon actual retirement; the later issue was disputed and you resolved that issue.

> As a consequence of the uncertainty concerning what you identified as the third (and contested) option, when officers began to elect to participate in the DROP beginning last summer, they were not in a position to make an election decision and most did not. As a result of your ruling, officers are now able to make a fully-informed decision and to the extent they did not do so when they elected to participate in the DROP over the last several months they should now be given that opportunity. Accordingly the Association believes a Supplementary Award is necessary to make it clear that officers who elected to DROP prior to the issuance of your November 12, 2009 ruling must be given the opportunity to exercise their right to cash out (with or without applying the 25% to the computation of AFC) retroactive to the time of their DR"OP election.

Following Umpire Roumell's receipt of the letter described above the parties engaged in some back and forth activities that eventually led to Umpire Roumell setting up a hearing on February 24, 2010, in which he "permitted the City to present evidence on what apparently was the merits on the issue of the rate of payout for accumulated time when an officer actually separates from the Department who previously participated in the DROP plan." For the record, Umpire Roumell stated in his supplemental award that the "Opinion [in J-8] should not be considered precedent because the parties [were] entitled to insist and have applied the principles announced by Owen Fairweather in Chapter XIX, 'Post Hearing Procedures,' Practice and Procedure in Labor Arbitration, 557-563 (2nd Ed. 1983).[16]

Umpire Roumell recounted some of the history that lead up to the creation of the DROP plan, including what occurred in the various Act 312 cases, chaired by Messrs. Sugerman, Long

---

[16] See, J-8, at 5.

13-53846-tjt    Doc 10247-2    Filed 11/03/15    Entered 11/03/15 11:05:20    Page 28 of 40

and Block, noting that "[a]t the time of the Long and Block awards that the Drop Plan had not been implemented because of the pendency of the IRS approval."[17] Umpire Roumell was careful to point out that the parties, i.e., the City and the DPOA had entered into a Memorandum of Understanding on May 13, 2008, which was signed by Marty Bandemer, then President of the DPOA, and Barbara Wise-Johnson, who was the City's Director of Labor relations, in which they agreed as follows:

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
CITY OF DETROIT
AND
DETROIT POLICE OFFICERS ASSOCIATION

RE: Adding Unused Sick Leave to Average Final Compensation

This Memorandum of Understanding hereby modifies the existing language in the labor agreement (Article 35, Subsection J[18] –Retirement and Death Sick Leave Payment) to provide the following option:

1) Effective July 1, 2008, a member shall receive full pay for one hundred percent (100%) of the unused accumulated sick bank, or

2) Choose to receive the 3-year average of twenty-five percent (25%) of the unused accrued sick leave bank as provided in 1) above, and have that sum included in the average final compensation used to compute the member's service pension of their retirement allowance. For any member choosing to exercise this option, the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in 1) above.

All other provisions of Article 35, Subsection J shall remain the same

Dated this 13th day of May, 2008.

*Marty Bandemer*
Marty Bandemer, President
Detroit Police Officers Association

*Barbara Wise-Johnson*
Barbara Wise-Johnson, Director
Labor Relations

I note for the record, that this language is identical to language that was placed into a Memorandum of Agreement (MOU), between the City and the DPLSA also signed on May 13,

---

[17] Id, at 6.

[18] Umpire Roumell pointed out that the reference to Subsection J of Article 35 (DPOA CBA), in the document was incorrect, that the correct reference should have been to Subsection M, stating that Subsection J addresses "return to duty," and addresses "retirement and Death Sick Leave Payments." See, J-3, at 7.

18

2008, by then DPLSA President Eugene Goode, and Barbara Wise Johnson, Director of Labor Relations for the City. That MOU is in the record for this arbitration as J-1(a).

Umpire Roumell made a point of stating that the MOU between the City and the DPOA was signed 14 months after the Act 312 Panel, Chaired Richard Block had rejected a proposal to allow the use of up to 25% of accumulated sick tome to increase average final compensation in the officers' pension plan. Umpire Roumell also pointed out that the MOU mirrored the language that was in the signed 2004-2009 Agreement, which was signed on February 2, 2009 Umpire Roumell stated that there was an argument about whether the signing of the Agreement was voluntary, and wrote that "[a]ll the Umpire can conclude is that there is no evidence that it was ordered by an Act 312 Arbitration Panel which-h would seem [he said] to make the Agreement part of the give and take of negotiations between the parties. This [he stated] is the only interpretation that can be given to the facts as outlined above."[19] In dealing with the City's attempt to reopen the merits of the case decided in J-7, he stated that one of the two issues that the City raised at the rehearing (the Supplemental Award hearing, on February 24, 2010) seemed "to be that if the officer elects to participate in the DROP Plan and contributes at the time 25% of his/her sick bank accumulation toward the average final compensation then the remaining accumulation, when the officer leaves Department employment, should be paid at the rate of pay in effect at the time of the DROP rather than at the prevailing rate at the time the officer actually leaves Department employment." (See, J-8, at page 9)

After a lengthy discussion of the City's position and analysis of a report provided by Gabriel, Roeder, Smith & Company, and a reference to the transcript from the Block Panel hearing during testimony of DPOA Vice President Paul Stewart, as discussed at pages 9-14, of J-8, Umpire Roumell concluded that "[t]here is no evidence on this record that the parties intended anything other than what has been their practice, namely, the value of the payout of sick leave is

---

[19] Id, at 9.

the prevailing rate at the time of the officer's actual permanent retirement from employment."[20]

Umpire Roumell then went on, at page 15 of J-8, to reaffirm his November 12, 2009 Award, wherein he wrote, at page 33, "[t]his Umpire is persuaded that it has been the practice of the City to pay accumulated time [at] the prevailing rate at the time of the officers separation from the City – meaning the time of retirement, not the time of selecting the DROP plan."[21]

Umpire Roumell then spent quite some time explaining why the payout of banked time at the time an officer retires must be paid at the prevailing rate at the time the office actually retires as opposed being paid at the rate that was prevailing at the time the officer elected to participate in DROP.

That, after all, was the second issue that was put before him in the original grievance, Gr. No. 09-057 DROP Eligibility/Banked Time Payout R-288. See that Award, herein, J-7, at page 33, where Umpire Roumell wrote that "[t]he second issue addresses the rate that should be applied to banked time not cashed out upon selection of the DROP plan, but which is ultimately cashed out by an officer upon actual retirement."

Umpire Roumell ended his discussion with the following sentence:

> For this reason, this Umpire is persuaded that the proper rate of pay for all accumulated (including available sick) time for an officer that selects the DROP plan but does not cash out the accumulated time at the time of selecting the DROP plan and instead banks the accumulated time until actual retirement is his/her prevailing rate of pay at the time of actual retirement, not the rate at the time of selecting DROP

Returning to the Supplemental Award, J-8 (Gr. No. 09-057 DROP Eligibility/Banked Time Payout R-292), Umpire Roumell wrote a telling clarification at page 17. He wrote and this

---

[20] Ibid, at 14-15.

[21] I read this statement as answering the question posed by the parties about whether the banked time should be paid out at the time of separation at the rate that was prevailing at the time of electing to participate in DROP or at the rate that prevailed at the time or permanent separation, retirement. To the extent that the City might be attempting to rely on that quoted language to say that the Umpire intended that any payout of banked time could not be paid out until an employee who had elected to participate in Drop retires, such a reading is improper, and may explain why the City has taken that position. If that is the basis for its position it is an erroneous position,

20

is important for our purposes in the current grievances, 10-032 and 12-051:

> [T]he Umpire will reaffirm his Award issued on November 12, 2009. But in doing so, the Umpire notes the City, although this Umpire does not agree, suggested that the following sentence in the initial Award was unclear:
>
>> ... However, the rate of payout of all accumulated banked time including available sick time that is not cashed out or used to calculate final average compensation at the time of DROP selection but cashed out upon the officer's actual retirement shall be paid at the officer's prevailing rate of pay at the time of the officer's actual retirement, and not the officer's rate at the time of the DROP selection.
>
> It was only a descriptive sentence explaining the effect of the option's concerning accumulated time/leave banks including sick leave when an officer selects to participate in the DROP Plan.
>
> Nevertheless, this Umpire will add as part of the Supplemental Award the following sentence following the "However" sentence in his original Award: "This sentence is intended to mean that for an office who elects not to cash out his/her accumulated time/leave banks or contribute sick leave toward final average compensation at the time of electing to participate in the DROP Plan but rather cashes out at the time the officer actually retires, the cash out value will be at the officer's rate of pay at the time of actual or permanent retirement." This is the only proposition that the sentence in the initial Award beginning with "However" stands for.

Umpire Roumell then gave an explanation of why he issued the Supplemental Award. This explanation makes it clear why the City was instructed to grant a one-time opportunity to those officers who had previously begun to elect to participate in the DROP Plan. Beginning at page 17, and extending into page 18, he wrote that the "issue of a rehearing or a conference with the Umpire initially arose when the Association asked the Umpire to issue a statement stating that the Award was retroactive. The reason for this is that the Award came on November 12, 2009, whereas the DROP Plan [had been implemented after the IRS approval came in and] was implemented in either June or July 2009 [note that the footnote that was placed here regarding his belief that it was July has intentionally been omitted as being irrelevant to the current arbitration case discussion]. Officers at the time began electing to participate in the DROP Plan

21

but, because there was no decision on the rate to be assigned for accumulated sick leave at the time of permanent retirement or actual retirement, whatever one wishes to call it, **officers did not know whether to elect to cash out accumulated sick time at the time of selecting the DROP Plan** or in some cases even whether to make a 25% contribution toward the average final compensation. In fairness to the officers, the officers should have that opportunity at this time, retroactively, to make a decision concerning their sick time. The Supplemental Award that follows will so provide." (Emphasis added)

Umpire Roumell then set out in rather detailed fashion what was to be done comply with his award, which stated that "all accumulated banked time including available sick time that is not cashed out or used to calculate final average compensation at the time of DROP selection but cashed out upon the officer's actual retirement shall be paid at the officer's prevailing rate of pay at the time of the officer's actual retirement, and not the officer's rate at the time of the DROP selection." (See, J-8, at page 18)

My reading of this Award - especially in light of the words this arbitrator has bolded for emphasis, which, again for clarity's sake reads, "officers did not know whether to elect to cash out accumulated sick time at the time of selecting the DROP Plan," and the repeating of his original Award, coupled with the newly added sentence at the end of the first section, 1., of the Supplemental Award following the repeat of the statement from his original Award,"[t]his sentence is intended to mean that for an officer **who elects not to cash out his/her accumulated time/leave banks** or contribute sick leave toward final average compensation **at the time of electing to participate in the DROP Plan** but rather cashes out at the time the officer actually retires, the cash out value will be at the officer's rate of pay at the time of actual permanent retirement" (emphasis added) - leads me to the inevitable conclusion that members of the DPOA and by extension, given the fact that both have the same DROP Plan and given the parallels between relevant language in their two Contracts and practices, the members of the DPLSA

22

bargaining unit are entitled to cash out their accumulated banked time, including sick time, at the time that they elect to participate in the DROP Plan, rather than having to wait until the time that they actually retire before they can do so.

The question now shifts to whether this was a "one time opportunity" only for those officers who had elected to participate in the DROP Plan prior to November 12, 2009, as the City of Detroit maintains, or whether the opportunity was and is not limited to that select group of officers, and extends to any eligible officer in the DPLSA bargaining unit who elected or elects to participate in the DROP Plan since that time and going forward.

Umpire Roumell's April 10, 2010 Award (J-8) was issued to provide a retroactive opportunity to those officers who, prior to his April 20, 2010 clarifying Award, did not know whether to (1) elect to cash out accumulated sick time at the time of selecting the DROP Plan or (2) in some cases even whether to make a 25% contribution toward the average final compensation. He concluded, at page 18, that "in fairness to the officers, the officers should have that opportunity at this time, retroactively, to make a decision concerning their sick time."

Several of the DPLSA witnesses testified to the fact that

DPLSA Witness Wynn, former President testified without contradiction that she and then vice president, Mark Young were called to a meeting with Mr. Martinico to discuss the letter and the form that are in J-14 the day before he published the letter and the form. She and Mr. Young were asked to review the letter and the form. She also testified that Mr. Martinico insisted that the City would be able to pay officers within thirty days. She stated that because of complaints from the members of the bargaining unit about not receiving their lump sum payments she was in the Departments building often, weekly. She stated that she had spoken with many persons up the "chain of command," including Kirk Lewis, Pat Aquart and even spoke with Mayor Bing about the matter. Her uncontroverted testimony was that none of them ever contended that members of the DPLSA bargaining unit were not entitled to receive their lump sum payments

23

until Mr. Satchel sent his November 2012 letter.

Finally, DPLSA Witness Wynn testified that she had completed two forms (J-15) regarding the declaration about sick time relative to the DROP Plan. The first form was the one originally issued with the launching of the DROP Plan, and was headed "Unused Sick Leave Declaration form and contained two options from which an officer could choose, the first, which she signed on August 24, 2009, included allowing the officer to have the value of 25% of the officer's unused sick leave on retirement benefit included in the average final compensation calculation or the officer could have the applicable percentage of the officer's unused sick leave on retirement paid to the officer "in the usual manner,", and stated that eh officer understood that that selection would result in the officer not having the value of 25% of unused sick leave on retirement benefit included in the average final compensation calculation. This is the form that was in contention in Umpire Roumell's Opinion and Award in J-7. Following Umpire Roumell's Award in J-7, this form was replaced with the "Martinico form, which Ms. Wynn signed on July 23, 2010. It contained the language from Umpire Roumell's Award and provided the officer with four choices, one of which specified that an officer could have all of the unused accumulated sick leave and all other accumulated banked time paid (this word was in all capital letters) to the officer now (also in all capital letters) in the "usual manner at the current rate and rank. This reflected the clarification that the DPOA had sought in it grievance that resulted in the issuance of J-8, the supplement to J-7.

Based on the foregoing this arbitrator concludes that when Mr. Martinico published the "Unused Accumulated Sick Leave and All Other Accumulated Banked Time Declaration for DROP Retirement" form he was in fact carrying out the directions in Umpire Roumell's Awards in J-7 and J-8 by offering those officers a "one time opportunity," i.e., a retroactive opportunity to make a fully informed choice concerning the DROP Plan. Mr. Martinico's cover letter, dated May 24, 2010, could have made things clearer and, perhaps, could have prevented Mr. Satchel

24

from writing his November 2012 letter and from developing/approving the form that caused the DPLSA to file Grievance 12-051, if Mr. Martinico had stated in the letter that this one time opportunity was for those who had elected to participate in the DROP Plan prior to the issuance of Mr. Martinico's letter.

It is possible that if one only read Mr. Martinico's letter, or read lightly over Umpire Roumell's Opinion and Award in J-7 (Grievance No. 09-057 R-288) and in J-8 (Grievance 09-057 R-292) one might come away with impression that officers are only entitled to cash out accumulated banked time at the time they actually retire (permanently separate from service with the City).

This arbitrator believes that what is written in this paragraph is made more possible, though not plausible, by a passage Umpire Roumell wrote in J-8, at page 34, wherein he stated - in reference to the language that is specifically written in Article 40, Section H, of the DPOA Contract, which language is mirrored in Article 17, Section H, of the DPLSA Contract – "[t]here is no evidence that the parties bargained to change this language. There is no evidence that this language, as adopted, was a mistake. Rather, this language was continued against a past practice of paying all banked time, including sick time, at the rate that the officer was making at the time of retirement. This Umpire is persuaded that it has been the practice for the City to pay accumulated time the prevailing rate at the time of the officer's separation from the City – meaning at the time of retirement, not the time of selecting the DROP Plan. [To fully understand this passage one has to remember here that Umpire Roumell is answering the question – What rate of pay should be used to pay an officer at the time that s/he actually retires from the City. And, one must also carefully read and digest the quote from Umpire Harry Shulman from the landmark decision in *Ford Motor Co.,* 19 LA 237 (1952), referenced in that same passage, regarding the nature of past practice, a portion of which this arbitrator will restate here, from page 34 of J-8:

25

A practice, whether or not fully stated in writing, may be the result of an agreement or mutual understanding. And, in some industries there are contractual provisions requiring the continuance of unnamed practices in existence as the execution of the collective agreement. (There are no such practices in the Ford Agreement or in those of the automobile industry generally.) A practice thus based on mutual agreement may be subject to change only by mutual agreement. Its binding quality is due, however, not to the fact that it is past practice but rather to the agreement in which it is based.

Returning to the discussion about the meaning of Umpire Roumell's Award in J-8, based upon the discussion, two paragraphs above, this arbitrator determines that the answer to the question of:

> whether this was a "one time opportunity" only for those officers who had elected to participate in the DROP Plan prior to November 12, 2009, as the City of Detroit maintains, or whether the opportunity was and is not limited to that select group of officers, and extends to any eligible officer in the DPLSA bargaining unit who elected or elects to participate in the DROP Plan since that time and going forward.

is that while this was only a retroactive opportunity for those officers who had not had the benefit of the clarification given in Umpire Roumell's April 20, 2010 Award, to conclusively let them know what rate they would receive if they cashed out their accumulated banked time, including sick time, or used it to calculate final average compensation at the time of DROP selection, this did not and does not prevent or deprive other officers in the DPLSA bargaining unit of the opportunity of cashing out their accumulated available banked time, including sick time, at the time they elect to participate in the DROP Plan or using that accumulated time to calculate final average compensation at the time of DROP selection.

So that there is no question about the meaning of this determination let me repeat it, in a different way. That is to say that in accordance with the Awards issued by Umpire Roumell in J-7 (Grievance No. 09-057 R-288) and in J-8 (Grievance 09-057 R-292), an eligible member of the DPLSA bargaining unit who elects to participate in the DROP Plan may elect to cash out his or her accumulated banked time, including sick time at the time s/he elects to participate in the DROP Plan.

26

The remaining issue to be resolved is the issue raised by the DPLSA in Grievance No. 12-051, wherein it challenges the fact that in late November 2012 the City issued a different form for officers to use to when they elect to participate in the DROP Plan, identified in Mr. Satchel's November 16, 2012 letter (J-13) to the DPLSA as "a Declaration for DROP Retirement form."

DPLSA Witness Wynn, former DPLSA President, testified without contradiction that former director of Labor relations told her that the form he had sent out with his letter (J-14) was to be the form that DPLSA bargaining unit members were to use "going forward" to elect how their banked time, including leave time, was to be handled. It would be appropriate for the City to reinstate that form, with barcode in place, if that is what the pension office requires, for members of the DPLSA bargaining unit to use to make their selection as regards their accumulated banked time, including sick time.

In keeping with Umpire Roumell's Opinion and Awards, in particular his Award in J-8, and given the fact that this arbitrator has ruled that eligible members of the DPLSA bargaining unit may elect to cash out accumulated banked time, including sick time, at the time that they elect to participate in the DROP Plan, the City cannot continue to use a form that only allows eligible members of the DPLSA bargaining unit who elect to participate in the DROP Plan to receive payments of their accumulated banked time at the time that they actually retire from employment. This makes moot the issue of whether the City could alter the DROP form that had been in use since Umpire Roumell's Award in J-8, at any time during the term of the Contract. The City will need to withdraw the November 2012 replacement form and provide a form that will be in keeping with the ruling made above.

**The Third Roumell Award: J-9 (Gr. No. 10-082, Failure to Payout Accumulated Sick and Banked Time With Interest R-304) Dated April 29, 2011**

The third and final Roumell decision that has been placed before this Arbitrator for

27

banked time, including sick time at the rate stated in CBA Article 17, Section H?

Pursuant to Umpire Roumell's Opinion and Awards, in particular his Award in J-9, and based on the foregoing discussion it is clear that the City has, at least in the past, recognized its obligation to pay lump sum payments in accordance with the DROP Plan on time and has recognized its responsibility to pay interest if it does not pay within the time specified within the CBA. Therefore, it is clear that a late payment would be any payment that is not made within thirty (30) calendar days of separation and the City is obligated under the terms of the CBA to pay such interest.

## AWARD

Consistent with the findings and conclusions cited in the discussion above, the three Opinions and Awards authored by Umpire George T. Roumell, Jr., headed, Gr. No. 09-057 DROP Eligibility/Banked Time Payout R-288 (J-7, herein); Gr. No. 09-057 DROP Eligibility/Banked Time Payout R-292 (J-8, herein); and Gr. No. 10-082 R-304 (J-8, herein) are incorporated into and followed in this Opinion and Award.

The grievance is granted as follows, and is only granted in relation to members of the DPLSA bargaining unit who are participating in or who are eligible to participate in the DROP Plan. It does not address any other bargaining unit issues or members:

1. Members of the DPLSA bargaining unit who are eligible to elect the DROP Plan are entitled to payout of all accumulated banked time, including sick time, at the time the officers elect to participate in the DROP Plan, if the officers so choose.

2. The City or the Police Department shall:

    (a) Immediately withdraw from use the form authorized and/or authored by Labor Relations Director Satchel, in November 2012, which is J-13, herein, and replace it with the form (attached to J-14 of this arbitration) that had been sent to members of the DPLSA bargaining unit under the direction of former Labor Relations Director Martinico (sent on or after the date of Mr. Martinico's May 24, 2010 letter). This form shall be referred to hereinafter as the "new" form, so as to distinguish it from the November 2012 form and any other form that might have been generated before the new (Marinico) form, and shall include the language set out in Sections 2-4(c)(ii) in Umpire Roumell's April 20, 2010 Award (J-8). The terms on that form shall not be inconsistent with the provisions specified in Umpire Roumell's decision and shall be in keeping with the terms of this Award.

    (b) The "new" form specified in 2(a) above is "not" "a-one-time-only form" and shall be sent to all eligible members of the bargaining unit who did not apply on the original Martinico form, including those who made elections using the form put out in November 2012. It is the responsibility of the parties to be sure of

34

who the eligible bargaining unit members are. To that end the parties are to meet within the next sixteen (16) calendar days to satisfy one another who is an eligible bargaining unit member

(c) The new form shall be sent to those identified in 2(b) above as soon as practicable and in no event later than thirty-five (35) days from the date of this award

(d) The "new" form shall also be used with each newly eligible bargaining unit member, going forward.

(e) All eligible bargaining unit members who made elections on the form generated in November 2012 shall be notified within thirty-five (35) days of the date of this award that they will be given a "one time" opportunity to make a new election using the "new" form and shall be notified that they will have sixty calendar days from his or her receipt of the form and the notice to do so.

3. All members of the DPLSA bargaining unit who were in fact eligible at the time they completed the original Martinico form, who have not yet been sent their lump sum payouts of all their accumulated banked time, including sick time, are to be paid as soon as possible, and in no event, later than sixty (60) calendar days from the date of this decision. The City and the DPLSA will meet at the conclusion of the sixty (60) calendar day period to verify that all payments have been made, if they do not make verifications between them as the payments go out.

4. Per the provisions of Article 17, Section H, all eligible members of the DPLSA bargaining unit who have not received their lump sum payment for all accumulated banked time, including sick time, in accordance with the drop Plan, or who did not receive it in accordance with terms of Article 17, Section H, are entitled to collect interest on unpaid lump sum money due them. This arbitrator, however, recognizes that he has no authority to enforce the provision in Article 17, Section h, that requires that "late lump sum payments (greater than thirty days) will include interest at the Michigan Judgment Interest Rate as described in MCL 600.6013 (6)."

5. The arbitrator shall retain limited jurisdiction for a period of thirty (30) calendar days for the purpose of clarifying the terms of this award.

_E R Scales_
E. R. Scales, Esq., Arbitrator

Dated: June 28, 2013
Place: Southfield, Michigan
Case: <u>City of Detroit & DPLSA</u>
(Gr. No. 10-032, April 28, 2010 &
No. 12-051, November 30, 2012)