# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In Re:

CITY OF DETROIT, MICHIGAN,

      Debtor,



RECEIVED DEC 0 5 2015 CLERK U.S. BANKRUPTCY COURT EASTERN DISTRICT OF MICHIGAN

Chapter 9

Case #: 13-53846

Hon. Thomas J. Tucker

_____/

## PETITIONER SHAWN CABOT'S *EX PARTE* MOTION TO FILE BY TRADITIONAL PAPER FILING

Petitioner, Shawn C. Cabot, submits his *Ex Parte* Motion to File by Traditional Paper Filing in accordance with ECF Procedure 3(b), and states as follows:

1. Petitioner, Shawn C. Cabot, is an attorney licensed in Michigan and the federal court for the Eastern District of Michigan

2. Petitioner, Shawn C. Cabot, is not registered with, has never practiced in the Bankruptcy Court system, and has not taken the seminar for ECF relative to electronic filings for the Bankruptcy Court.

3. Petitioner represents an individual who had a civil rights case (which was filed pre-petition) that was part of the instant Bankruptcy action involving the City of Detroit.

4. Petitioner filed a Proof of Claim on the matter with the Bankruptcy Court.

5. On November 20, 2015, the City of Detroit filed a "Motion to Enforce Settlement Agreement and Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims Against Gregory Phillips and/or Dominique McCartha as Personal Representative for the Estate of Gregory Phillips, Deceased," which was sent via regular United States mail to the undersigned.

6. Petitioner now desires to file a Response to the aforementioned Motion in the traditional paper filing manner.

7. Petitioner does not currently anticipate the need to file additional pleadings in this matter.

8. The Response that Plaintiff desires to file in the traditional manner is attached herein.

## CONCLUSION

For these reasons, this Court should grant Petitioner's *Ex Parte* Motion to File, by Traditional Paper Filing, the attached above-referenced Response.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES

SHAWN C. CABOT (P64021)
Attorneys for Plaintiff
9750 Highland Road
White Lake, Michigan 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

Dated: December 4, 2015
SCC/

## PROOF OF SERVICE

The undersigned certified that on the 4th Day of December, 2015, a copy of the foregoing document was served upon the Bankruptcy Court at its stated business address via hand delivery. I declare under penalty of perjury that the foregoing statement is true to the best of my information, knowledge, and belief.

SHAWN C. CABOT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:

CITY OF DETROIT, MICHIGAN,

        Debtor,

Chapter 9

Case #: 13-53846

Hon. Thomas J. Tucker

_____/

## RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT AND ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS AGAINST GREGORY PHILLIPS AND/OR DOMINIQUE MCCARTHA AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS, DECEASED [D/E #10272]

NOW COMES DOMONIQUE McCARTHA, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS, by and through her attorneys, CHRISTOPHER TRAINOR & ASSOCIATES, and for her Response to the instant Motion states as follows:

1.    Denied. The Responded filed a 42 U.S.C. § 1983 lawsuit against the City of Detroit and individual police officer, Ian Severy, in his <u>individual and official capacities.</u> (Case Number 11-14419—Judge Avern Cohn). Admitted that Plaintiff filed a Proof of Claim which was limited only to the City of Detroit. **(Exhibit A).** While a Settlement Agreement was signed, it should not be enforced for the reasons set forth herein.

With respect to the "settlement agreement" that was purportedly signed, it should be noted that the language of the Release makes it appear that any claims potentially being resolved would be for the City of Detroit only, since it was only the City of Detroit, who was a Defendant in the federal court 42 U.S.C. § civil rights lawsuit case, that was in bankruptcy. The individually-named

1

Defendant, Ian Severy, was not involved in the bankruptcy to the knowledge of the undersigned. Thus, a reasonable reading of the Release is that any civil action would still proceed against the individually-named Defendant in this case, at a minimum.

Secondly, there must be a meeting of the minds on all material terms of a settlement agreement before it can be enforced. *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983). There was no meeting of the minds on all material terms because Respondent did not know when the proceeds would be paid and/or how much exactly would be paid for the "unsecured claim." During the court-mandated mediation, straight answers to the timing of payments or exactly how much may or may not be paid could not be answered by the City of Detroit. When specific questions were asked, the response by the City of Detroit of "we don't know this is all new" was repeatedly conveyed. As such, there was no meeting of the minds in this case as to the material terms.

Moreover, at the time of the court-ordered mediation, the City of Detroit was well aware of the possibility that lawsuits filed under 42 U.S.C. § 1983 would not even be subject to the bankruptcy proceedings. This was NEVER conveyed to Respondent, but instead was concealed in a fraudulent attempt to get Respondent to resolve her federal civil rights lawsuit because of the uncertainty "scare tactics" used by the City of Detroit. In fact, on November 7, 2014, **Bankruptcy Court Judge Steven Rhodes opined that "section 1983 claims against individuals in their personal capacity are not claims against the City. Accordingly, the bankruptcy code does not permit a chapter 9 plan to treat those claims, nor does it provide for their discharge."** (Exhibit B, Oral Opinion on the Record, Judge Steven Rhodes, p. 36). Therefore, it is readily apparent given the timing of Judge Rhodes' opinion, that there was a dispute as to whether any claims brought under 42 U.S.C. § 1983 would even be subject to the bankruptcy. However, the

2

City of Detroit, nor its agents and representatives, ever advised Respondent or her Counsel of any of this, thereby precluding informed decisions to be made.

Consequently, the district court retains inherent jurisdiction and equitable power to rescind any arguable settlement that may have been entered into. *Id.* Furthermore, the Sixth Circuit in *Therma-Scan, Inc., v. Thermoscan, Inc.*, 217 F.3d 414, 419-420 (6th Cir. 2000), reversed the district court's enforcement of the parties' purported settlement agreement because it found that the parties did not reach a "meeting of the minds" on a material term.

Thirdly, a settlement agreement can be set aside for fraud or mutual mistake of fact. *Guy v. Lexington-Fayette Urban County Gov't*, 57 Fed. Appx. 217, 224 (6th Cir. 2003). Fraud can be actual or constructive. *Id.* There certainly was fraud involved in the arguable settlement of this matter. It is readily apparent from the Opinion and Order attached as **Exhibit B** herein that the issue of whether Section 1983 cases were dischargeable in bankruptcy had been a topic of discussion in the bankruptcy proceedings at the time of the mediations. That issue did not appear in the Opinion and Order by chance; but obviously came about because there had to have been discussion about the possibility that Section 1983 cases were not dischargeable. Instead of Defendant City of Detroit being candid and explaining this possibility, the City of Detroit opted to engage in a campaign of scare tactics and cover-ups. The City of Detroit threatened that if minimal settlements were not taken, the claimants may not ever get anything or it may take decades to get small percentages of the monetary claims asserted. During the court-ordered mediation, the fact that Section 1983 cases, which this case is, may not even be subject to bankruptcy, was never disclosed. This was concealed from Respondent and her Counsel, and thereby was fraudulent. Therefore, the settlement, to the extent the Court believes there is even one, must be set aside.

2.    Denied. This is not a situation of the settlement being "second-guessed." This is a situation where the City of Detroit committed fraud and actively concealed the fact that there was the very real possibility that Section 1983 claims would not even be subject to the bankruptcy proceedings. The City of Detroit never once even hinted at such a possibility. Instead, the City of Detroit ran a campaign of fear and non-disclosure.

3.    Admitted. In addition, however, Respondent's Complaint was brought pursuant to 42 U.S.C. § 1983, because it alleged violations of the Fourth Amendment to the United States Constitution. Furthermore, the claims against the police officer were brought in both his official and individual capacities.

4.    No response required. The docket for Respondent's federal civil rights lawsuit speaks for itself. However, in its Motion, the City of Detroit admits that it was going to indemnify Defendant Ian Severy, which means in both his individual and official capacity. At a bare minimum, if the court believes there was a valid settlement agreement, which there was not, it certainly did not include any claims brought against Defendant Severy in his individual capacity.

5.    Admitted. Furthermore, the size and magnitude of this bankruptcy was virtually unprecedented; whereby numerous issues involved have never been addressed or decided.

6.    No response required. The Bankruptcy Court's docket speaks for itself. Respondent leaves the City of Detroit to its strict proofs.

7.    No response required. The Court Order speaks for itself. Respondent leaves the City of Detroit to its strict proofs.

8.    No response required. The record speaks for itself. Respondent leaves the City of Detroit to its strict proofs.

9.      No response required. The record speaks for itself. Respondent leaves the City of Detroit to its strict proofs.

10.     No response required. The referenced document speaks for itself. Respondent leaves the City of Detroit to its strict proofs. Furthermore, even if such language is applicable, it is not a defense to the fraudulent concealment and "non meeting of the minds" as set forth above.

11.     No response required. The referenced document speaks for itself. Respondent leaves the City of Detroit to its strict proofs. Furthermore, however, it is Respondent's position that this court lacks jurisdiction to hear this dispute, because the dispute is not about the ADR process per se, but whether there is an enforceable settlement based upon the actions and/or inactions by the City of Detroit as referenced herein.

12.     Admitted that the Proof of Claim as to the City of Detroit only was filed. **(Exhibit A).**

13.     No response required. The record speaks for itself. Respondent leaves the City of Detroit to its strict proofs.

14.     Neither admitted or denied. Respondent leaves the City of Detroit to its strict proofs.

15.     Admitted only that the Respondent-Plaintiff signed a settlement agreement. However, in view of the reasons set forth herein, the settlement is not enforceable and should not be enforced given the circumstances involved.

16.     Denied.

17.     Neither admitted or denied. Respondent leaves the City of Detroit to its strict proofs. However, it is interesting that now, the City of Detroit cannot even locate its referenced Exhibit B.

18.     Neither admitted or denied. The document says what it says. Respondent leaves the City of Detroit to its strict proofs.

19.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

20.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

21.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

22.     Admitted.

23.     Denied.  Contrary to the position of the City of Detroit, given the vague language of the various plan and settlement documents, combined with the fact that there was not a meeting of the minds, compounded by the active concealment of pertinent information by the City of Detroit as set forth herein, Plaintiff should not have to dismiss the federal civil rights lawsuit, and it should be deemed that the alleged settlement agreement is null and void.

24.     Denied.  Ian Severy was also sued in his individual capacity, which would not be protected; and any claims in his individual capacity must still go forward.

25.     Denied.  Minimally, the claims against Defendant Severy in his individual capacity still go forward.  However, Respondent nonetheless maintain her position that has not been a settlement in the first place.

26.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

27.     Denied.  Respondent's claims have not been settled.  Furthermore, to the extent that there is even a settlement agreement, it must be set aside for the reasons set forth herein.

**WHEREFORE,** Respondent respectfully requests that this Honorable Court DENY the instant Motion in its entirety and requests oral argument on the matter.

Dated: December 4, 2015

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES

BY: _____
SHAWN C. CABOT (P64021)
Attorney for Respondent
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

7

## INDEX OF EXHIBITS

A  Proof of Claim

B  Court Order

# EXHIBIT A

Andrew E. Barrett
Shawn C. Cabot
Amy J. DeRouin
Ryan A. Ford
Timothy M. Hartner
Thomas F. Norton
Christopher J. Trainor

Of Counsel:
Shawn J. Coppins
Vincent M. Farougi



LAW OFFICES OF
# CHRISTOPHER TRAINOR
## & ASSOCIATES



9750 Highland Road
White Lake, Michigan 48386

Tel (248) 886-8650
Toll Free (800) 961-8477
Fax (248) 698-3321
MichiganLegalCenter.com

February 18, 2014
**Via Hand Delivery**

Office of the Clerk of Court
United States Bankruptcy Court
For the Eastern District of Michigan
211 West Fort Street
Suite 1700
Detroit, MI 48226

Re:   Dominique McCartha as Per. Rep. for Estate of Gregory Phillips v. City of Detroit, et al
        United States District Court—E.D. Michigan Case No: 11-14419

Dear Sir/Madam:

In reference to the above-referenced matter, enclosed please find the creditor's B10 form and supporting documentation.

At the time of the bankruptcy, a police misconduct case was pending in the United States District Court—Eastern District of Michigan. Mr. Phillips, who was unarmed, was shot and killed by a City of Detroit police officer for no legal or justifiable reason whatsoever.

Attached are copies of the filed Court Complaint and a Facilitation Summary (without exhibits) which support the claimant's position.

If any questions or concerns arise, please feel free to contact our office.

Very Truly Yours,
CHRISTOPHER TRAINOR & ASSOCIATES

Shawn C. Cabot, Esq.

SCC/
Enclosures

cc:    City of Detroit Claims Processing Center
        c/o Kurtzman Carson Consultants, LLC
        2335 Alaska Avenue
        El Segundo, CA 90245

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT | EASTERN DISTRICT of MICHIGAN | **FILED** ~~CHAPTER 9~~ |
| --- | --- | --- |

Name of Debtor: City of Detroit, Michigan

Case Number: 13-53846

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

FEB 18 2014

US Bankruptcy Court
MI Eastern District

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Dominique McCartha

Name and address where notices should be sent:
Dominique McCartha for Estate of Gregory Phillips
Christopher Trainer + Assoc.
Christopher J. Trainer + Shawn C. Cabot
9750 Highland Road
White Lake, MI 48386

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Telephone number: 248-886-8650 email: shawn.cabot@cjtrainor.com

Filed on: _____

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number: _____ email: _____

**1. Amount of Claim as of Date Case Filed:** $4,500,000.00

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Personal Injury / Civil Rights / Police Misconduct
(See instruction #2)

**3.** Last four digits of any number by which creditor identifies debtor: _____ | **3a.** Debtor may have scheduled account as: _____ (See instruction #3a)

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $_____

Annual Interest Rate (when case was filed) _____% ☐ Fixed or ☐ Variable

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim: $_____

Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).**

**5b. Amount of Claim Otherwise Entitled to Priority.** Specify Applicable Section of 11 U.S.C. § _____.
$_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**8. Signature:** (See instruction # 8)
Check the appropriate box.

☐ I am the creditor. ☑ I am the creditor's authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.) ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Shawn C. Cabot
Title: Attorney
Company: Christopher Trainer + Assoc.
Address and telephone number (if different from notice address above):
9750 Highland Road
White Lake, MI 48386

(Signature)

2-16-14
(Date)

Telephone number: 248-886-8650 email: shawn.cabot@cjtrainor.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIQUE McCARTHA, as Personal Representative for
the ESTATE OF GREGORY PHILLIPS, deceased and
GREGORY PHILLIPS,

     Plaintiff,

v.

                                            CASE NO: 11-14419
                                            HONORABLE:
CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity,                        Avern Cohn

     Defendants.

_____/

CHRISTOPHER TRAINOR & ASSOCIATES
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

_____/

## COMPLAINT AND JURY DEMAND

    **NOW COMES** Plaintiff, by and through her attorneys, CHRISTOPHER TRAINOR &

ASSOCIATES, and for her Complaint against the above-named Defendants, states as follows:

1.    Dominique McCartha is the appointed, qualified, and acting Personal Representative

       of the Estate of Gregory Phillips and currently resides in the City of Detroit, County

       of Wayne, State of Michigan.

2.    Defendant City of Detroit is a municipal corporation and governmental subdivision

       which is organized and existing under the laws of the State of Michigan.

1

3.    Defendant Ian Severy is and/or was a police officer employed by the Detroit Police Department and was acting under color of law, in his individual and official capacity, and in the course and scope of his employment at all times mentioned herein.

4.    All events giving rise to this lawsuit occurred in the City of Detroit, County of Wayne, State of Michigan.

5.    This lawsuit arises out of Defendants' violations of Plaintiff's federal constitutional rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution and consequently, Plaintiff has a viable claim for damages under 42 U.S.C. § 1983. Plaintiff also has viable state law claims.

6.    Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331 [federal question] and 28 U.S.C. § 1343 [civil rights].

7.    That the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), not including interest, costs, and attorney fees.

## FACTS

8.    Plaintiff alleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

9.    On or about October 9, 2008, Gregory Phillips was shot and killed by Defendant Ian Severy in the area of 5333 McDougall, in the City of Detroit.

10.   On October 9, 2008, Gregory Phillips left his home to meet an acquaintance to buy a cell phone.

11.   Gregory Phillips met the seller of the cell phone and Detroit police officers approached them in an unmarked car and in plain clothes.

12.   The officers never once identified themselves as police officers.

2

13.     Because they did not know they were police officers, Gregory Phillips and his friend fled the scene on foot.

14.     As Gregory fled on foot, Defendant Severy fired multiple shots at Gregory Phillips and then told him to "Get his fucking hands up."

15.     Gregory Phillips was shot in the left chest and left flank.

16.     After Gregory Phillips had been shot, Defendant Severy repeatedly asked Gregory Phillips where the gun was at; however Gregory Phillips told the officer that he did not have a gun.

17.     The dying Gregory Phillips repeatedly asked for help, but Defendant Severy refused to render any aid to him, but instead handcuffed him.

18.     No weapons were found on Gregory Phillips or by him.

19.     At no time during the killing did Defendant Severy have a justifiable reason to use the deadly force that he employed.

20.     Defendants are not entitled to immunity protection.

21.     As a result of Defendants' unlawful actions, Plaintiff suffered injuries and damages.

### COUNT I
### VIOLATION OF THE FOURTH AMENDMENT
### 42 U.S.C. § 1983 EXCESSIVE FORCE

22.     Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

23.     That Defendant Severy was at all times acting under color of law, within the course and scope of his employment, and in his individual and official capacities.

3

24.   Defendants violated Gregory Phillips' right to be free from punishment and deprivation of life and liberty without due process of law under the Fourteenth Amendment to the United States Constitution.

25.   That Defendants violated Gregory Phillips' clearly established and federally protected rights as set forth under the United States Constitution and the Amendments thereto, including, but not limited to, the Fourth Amendment of the United States Constitution to be free from unreasonable searches and seizures mainly to be free from excessive use of force, when they employed unnecessary and unreasonable excessive and deadly force which resulted in Gregory Phillips' untimely death.

26.   Defendants' acts were at all times objectively unreasonable in violation of Gregory Phillips' clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution which proximately resulted in Gregory Phillips' untimely demise.

27.   As a proximate result of Defendants' violation and/or deprivation of Gregory Phillips' constitutional rights, Gregory Phillips and/or his estate have a viable claim for compensatory and punitive damages pursuant to 42 U.S.C. § 1983 together with costs, interest and attorney fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an award in her favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and attorney fees as well as an award of punitive damages.

## COUNT II
## GROSS NEGLIGENCE

4

28.   Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

29.   The governmental agency that employed Defendant Severy was engaged in the exercise or discharge of a governmental function.

30.   Defendant's conduct amounted to gross negligence that was the proximate cause of Gregory Phillips' injuries and damages.

31.   Defendant Severy was working for the Detroit Police Department at the time of the incident complained of herein and had a duty to perform his employment activities so as not to endanger or cause harm to Gregory Phillips.

32.   Notwithstanding these duties, Defendant Severy breached his duty with deliberate indifference and gross negligence and without regard to Gregory Phillips' rights and welfare, which caused serious injuries and damages to Gregory Phillips.

33.   Defendant Severy knew or should have known that by breaching these duties, harm would come to Gregory Phillips.

34.   That according to MCL 691.1407(2), the breach of Defendants' duty to exercise reasonable care was reckless and amounts to gross negligence.

35.   That as a direct and proximate result of Defendants' indifferent/grossly negligent acts and/or omissions, Gregory Phillips suffered damages and injuries.

36.   Defendants' actions were so egregious and so outrageous that Gregory Phillips' damages were heightened and made more severe, thus Plaintiff is entitled to exemplary damages.

5

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an award in Plaintiff's favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs, interest, and attorney fees.

## COUNT III
## CITY OF DETROIT'S CONSTITUTIONAL VIOLATIONS

37.    Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

38.    Defendant City of Detroit acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs and/or policies and/or practices that resulted in constitutional violations to Gregory Phillips.

39.    That these customs and/or policies and/or practices included, but were not limited to:

a.    Failing to adequately train and/or supervise its police officers so as to prevent violations of citizen's constitutional rights;

b.    Failing to adequately train and/or supervise police officers regarding the proper use of force;

c.    Failing to supervise, review, and/or discipline police officers whom Defendant City of Detroit knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its police officers to engage in such conduct; and

d.    Failing to adequately train and/or supervise its police officers in the proper policies and procedures for establishing probable cause to arrest and the proper policies and procedures for effectuating an arrest without the use of excessive and/or deadly force.

6

40.   Defendants' conduct demonstrated a substantial lack of concern for whether an injury resulted.

41.   Defendants' acts and/or indifference and/or omissions were the direct and proximate cause of Gregory Phillips' injuries.

42.   The facts as set forth in the preceding paragraphs constitute a violation of Plaintiff's Fourth and Fourteenth Amendment rights and pursuant to 42 U.S.C. § 1983, Plaintiff has a viable claim for compensatory and punitive damages plus interest, costs, and attorney fees as set forth in 42 U.S.C. §1988.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an award in Plaintiff's favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs, interest, and attorney fees.

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES

s/ Shawn C. Cabot
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorney for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

Dated: October 7, 2011
SCC/rrw

7

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DOMINIQUE McCARTHA, as Personal Representative for
the ESTATE OF GREGORY PHILLIPS, deceased and
GREGORY PHILLIPS,

      Plaintiff,

v.

                                              CASE NO:
                                              HONORABLE:

CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity,

      Defendants.

_____/

CHRISTOPHER TRAINOR & ASSOCIATES
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

_____/

### DEMAND FOR TRIAL BY JURY

8

NOW COMES Plaintiff, by and through the attorneys, CHRISTOPHER TRAINOR & ASSOCIATES, and hereby makes a Demand for Trial by Jury.

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES

s/ Shawn C. Cabot
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorney for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

Dated: October 7, 2011
SCC/rrw

9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY PHILLIPS and/or DOMINIQUE
McCARTHA as Personal Representative for
the Estate of GREGORY PHILLIPS, deceased,

    Plaintiff,

v.

                                  CASE NO:   11-14419
                                  HONORABLE:  AVERN COHN

CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity,

    Defendants.

| CHRISTOPHER TRAINOR & ASSOCIATES | CITY OF DETROIT LAW DEPARTMENT |
|---|---|
| CHRISTOPHER J. TRAINOR (P42449) | JERRY L. ASHFORD (P47402) |
| AMY J. DEROUIN (P70514) | Attorneys for Defendants |
| Attorneys for Plaintiff | 660 Woodward Avenue, Suite 1800 |
| 9750 Highland Road | Detroit, Michigan 48226 |
| White Lake, MI 48386 | (313) 237-3062 |
| (248) 886-8650 | ashfj@detroitmi.gov |
| (248) 698-3321 | |
| amy.derouin@cjtrainor.com | |

## PLAINTIFF'S FACILITATION SUMMARY

           Date:        June 27, 2013
           Time:        2:00 p.m.
           Facilitator:  Allan Charlton

I.    OVERVIEW:

This case involves the unjustified and indefensible killing of Mr. Gregory Phillips by a

Defendant City of Detroit police officer. Defendant Ian Severy murdered Mr. Phillips, after he

cornered him in a dark alley. While the officers allege that Plaintiff was posing a threat to them

by waving around a gun, tales of this phantom gun have been greatly exaggerated and there is

zero evidence to substantiate said allegations. As a matter of fact, the physical evidence does not

1

support that Mr. Phillips even had any weapon on his person at the time that he was fatally shot, let alone a gun. As a result of Defendants' unlawful actions, Plaintiff will not settle for less than $4,500,000.00.

## II.    STATEMENT OF FACTS:

This case involves the murder of Gregory Phillips, in violation of his rights as secured by the Fourth Amendment of the United States Constitution and state law. On October 9, 2008, Mr. Phillips was visiting with his friends before returning home with his five-year-old son. As Mr. Phillips stood near his vehicle, an unmarked Detroit Police Department patrol car stopped near him and out sprung three plainclothes police officers, which included Defendant Severy. Officers Brian Laperrierre, John Mitchell, and Defendant Ian Severy began chasing Mr. Phillips and his friends as Officer David Pomeroy pursued them in the police vehicle. According to the testimony of Defendant Severy and Officer Mitchell, who chased Mr. Phillips, at some point during the foot chase Mr. Phillips pulled a gun from inside his coat, ran with the gun in his hand until he reached a gate, then turned and pointed the gun at Defendant Severy. However, their suspicious testimony is completely unsubstantiated by any physical evidence.

Specifically, all photographic evidence from the scene show Mr. Phillips' body, covered in blood, sprawled on the ground within a few feet of a small black object. (**See Crime Scene Photos, attached as Exhibit F.**) That object, as reflected in photographs taken at the scene of the homicide, was a cell phone. Moreover, none of the photographic evidence reflects that Mr. Phillips had a gun.

Defendant Severy, who fired the shots that killed Mr. Phillips, testified that the alleged gun that Mr. Phillips aimed at him was removed from the scene to ensure the safety of the police

2

officers. (See Deposition Transcript of Defendant Ian Severy attached as Exhibit A, p. 26). However, Defendant Severy also testified that he knew that Mr. Phillips was dead the moment he approached the body. (Exhibit A, p. 27). Defendant Severy's partner, Office Mitchell, was the next officer to arrive on the scene. In his deposition, Officer Mitchell's testimony is wildly different from that of Defendant Severy. Officer Mitchell testified that Mr. Phillips was still breathing immediately after the shooting, and he was alive until the moment before EMS arrived on the scene. (See Deposition Transcript of John Mitchell attached as Exhibit B, pp. 30-31). Although Mr. Phillips was still alive, according to Officer Mitchell, Officer Mitchell took no action to save Mr. Phillips' life and instead spent those precious few minutes securing the alleged gun and handcuffing Mr. Phillips. (Exhibit B, pp. 30-31). Officer Mitchell testified that he took pains to preserve any fingerprints on this gun, and picked it up carefully with his thumb and forefinger to avoid compromising the evidence. (Exhibit B, p. 27). Shockingly, Officer Mitchell's next action taken with this evidence, that he was so concerned with preserving, was to stick the gun into his pocket! (Exhibit B, p. 28). As it turned out, Officer Mitchell did not need to be concerned at all with preserving fingerprints on the gun, because Defendant City of Detroit never ordered, and *to this very day* had not ordered, any fingerprint analysis of the alleged gun carried by Mr. Phillips submitted into evidence.

Although Officer Pomeroy, who was Officer Mitchell's supervisor, testified that it was Officer Mitchell's responsibility to inform the evidence tech, Thomas Smith, of any gun recovered from the scene Officer Mitchell shirked that responsibility and passed it along to the other officers. (Exhibit B, p. 33; See Deposition Transcript of David Pomeroy attached as Exhibit C, pp. 28-29, 31). While who retains ultimate responsibility remains a mystery, the fact

3

is that none of the responding officers reported to Mr. Smith where the alleged gun was found – that's because Mr. Phillips did not have a gun.

Notably, Officer Pomeroy testified that he never saw the gun while it was on the ground. (Exhibit C, p. 22). Defendant Severy then testified that Officer Mitchell took the gun to the trunk of the scout car. (Exhibit A, p. 25). However, and as previously mentioned, Officer Mitchell testified that he put the gun in his pocket. (Exhibit B, p. 28). Mr. Smith's report reflects, and his deposition testimony details, that the item that was found at the scene and marked with evidence tag number three was a cell phone. (See Deposition Transcript of Thomas Smith attached as Exhibit D, p. 19). Mr. Smith, a retired evidence technician without an interest in this case, acknowledged that he could not make a representation of the location of the gun because he never saw the weapon and Officer Mitchell never provided this information to him. (Exhibit D, pp. 8-10, 19). Officer Laperrierre, who arrived on the scene within minutes after the shooting, never even saw the gun allegedly dropped by Mr. Phillips, nor did he ever see Mr. Phillips pull a weapon at all. (See Deposition Transcript of Brian Laperrierre attached as Exhibit E, pp. 18, 24). This mystery gun, with its unclear and problematic journey through the chain of custody and nonexistent relationship to Mr. Phillips, is the crux of any defense to this unjustified homicide. Unfortunately for the Defendants, no photographic or forensic evidence support the allegation that Mr. Phillips had a gun. Instead, the same such evidence lends its credence to the most apparent answer which is that Mr. Phillips was gunned down in a dark alley on a dark night for no justification whatsoever. As stated above, Mr. Smith, the evidence technician who conducted a thorough and complete accounting of the scene of the homicide shortly after it occurred, testified that he *never* saw a gun that was alleged to have been the

4

property of Mr. Phillips. The only personal effect of Mr. Phillips that was on the ground near his fallen body was his cell phone. (Exhibit D. pp. 20, 24).

Mr. Phillips, father of two small children who were dependent upon him, is survived by those children. Mr. Phillips was an employee of Two Men and a Truck prior to his murder. Consequently, Plaintiff filed the instant lawsuit against Defendants City of Detroit and Ian Severy alleging the following claims: (1) excessive use of force in violation of the Fourth Amendment under 42 U.S.C. § 1983; (2) assault and battery; (3) gross negligence; and (4) a *Monell* claim against the City of Detroit.

## III.  CORROBORATING FACTS:

### A.  DEPOSITION TRANSCRIPT OF DEFENDANT IAN SEVERY (EXHIBIT A):

- Officer Mitchell moved the gun out of concern for the safety of the officers after the shooting. (p. 26)
- Immediately after the shooting, he was aware that Mr. Phillips was dead. (p. 27)
- After Officer Mitchell picked up the gun, Officer Mitchell put it in the trunk of the patrol car. (p. 25)

### B.  DEPOSITION TRANSCRIPT OF JOHN MITCHELL (EXHIBIT B):

- Mr. Phillips was alive immediately following the shooting and until just before EMS arrived. (pp. 30-31)
- He secured the gun and handcuffed Mr. Phillips before EMS arrived. (p. 30-31)
- He picked up the gun with his thumb and forefinger. (p. 27)
- He put the gun in his pocket. (p. 28)

### C.  DEPOSITION TRANSCRIPT OF DAVID POMEROY (EXHIBIT C):

- Officer Mitchell was responsible for reporting the gun to the evidence tech. (pp. 28-31)
- He never saw the alleged gun on the ground. (p. 22)

### D.  DEPOSITION TRANSCRIPT OF THOMAS SMITH (EXHIBIT D):

- He marked the cell phone found on the ground as Exhibit 3. (p. 19)
- As the officer recovering evidence, it was Officer Mitchell's responsibility to report any removed evidence to him in preparation of his report of the scene. (pp. 8-10)
- Mr. Phillips' cell phone was on the ground near his body when Mr. Smith arrived at the scene. (p. 20)

5

- He never saw the gun. (p. 24)

E.   DEPOSITION TRANSCRIPT OF BRIAN LAPERRIERRE (EXHIBIT E):

- He never saw the gun on the ground. (p. 18)
- He never saw Mr. Phillips pull a gun from inside his coat. (p. 24)

F.   CRIME SCENE PHOTOS (EXHIBIT F):

V.   LEGAL ARGUMENT:

A.       DEFENDANTS ARE LIABLE FOR ASSAULTING AND BATTERING MR. PHILLIPS.

Under Michigan law, an assault is an intentional and unlawful threat of offensive physical contact to another person which under the circumstances creates in the victim a well-founded fear of imminent physical contact coupled with the ability of the assailant to accomplish the contact. *VanVorous v. Burmeister*, 262 Mich. App. 467 (2004). *See also Espinoza v. Thomas*, 189 Mich. App. 110, 119 (1991). A battery is defined as "a willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." A police officer may use force when making an arrest, **but only that level of necessary force** that an ordinary person would have deemed necessary given the knowledge of the arresting officer and the situation in which the arrest occurred. *Brewer v. Perrin*, 132 Mich. App. 520, 528 (1984). To find that a government actor is liable for the aforementioned torts, a Court must determine that "the officers' actions were not justified because they were not objectively reasonable under the circumstances." *Id.*

In the present case, Defendant Severy's actions against Mr. Phillips were absolutely unjustifiable, unreasonable, and absolutely malicious. As a result of Defendant Severy's intentional and unlawful actions, Mr. Phillips lost his life. Therefore, Defendant Severy is unmistakably liable for assaulting and battering Mr. Phillips.

6

B.    DEFENDANT SEVERY'S CONDUCT WAS GROSSLY NEGLIGENT AND GOVERNMENTAL IMMUNITY DOES NOT APPLY.

In Michigan, governmental employees acting within the scope of their employment are immune from tort liability <u>unless</u> their conduct amounts to gross negligence. MCL 691.1407(2); *Poppen v. Tovey*, 256 Mich. App. 351, 356 (2003). Gross negligence is statutorily defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCLA 691.1407(a); *Oliver v. Smith*, 269 Mich. App. 560, 565 (2006). Moreover, the definition of gross negligence "suggests almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea v. Crabtree*, 263 Mich. App. 80, 87 (2004).

The senseless and unlawful actions taken by Defendant Severy illustrate a wanton disregard for Mr. Phillips' welfare and safety. As such, Defendant Severy is clearly liable for gross negligence because his unlawful and disturbing actions clearly demonstrate a substantial lack of concern for whether an injury or death resulted to Mr. Phillips, and he is certainly not entitled to governmental immunity.

C.    DEFENDANT SEVERY'S USE OF FORCE AGAINST MR. PHILLIPS WAS EXCESSIVE IN VIOLATION OF THE FOURTH AMENDMENT AND DEFENDANT SEVERY IS NOT ENTITLED TO QUALIFIED IMMUNITY

The Fourth Amendment to the United States Constitution guarantees that "the right of the people to be secure in their person…against unreasonable searches and seizures, shall not be violated…." U.S. CONST. AMEND. IV. The reasonableness of a seizure "depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original) (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Thus, pursuant to 42

7

U.S.C. § 1983, a cause of action exists for the excessive use of force during an arrest. As will be explained below, Defendant Severy violated Plaintiff's Fourth Amendment rights by use of excessive force and he is not entitled to qualified immunity for his actions.

The Fourth Amendment's prohibition of unreasonable seizures strictly limits the amount of force a police officer may use. *Graham* at 394. Specifically, a police officer may only use that degree of force necessary to complete the arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) (emphasis added). When reviewing a police officer's use of force, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345-347 (6th Cir. 1992); see also *Graham* at 396. A court must consider the facts and circumstances surrounding the arrest or seizure, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the citizen is actively resisting arrest or attempting to evade arrest by flight." *Graham* at 396-97. An objective standard must be used to determine the reasonableness of the particular force used in light of the facts and circumstances confronting a reasonable officer on the scene. *Graham* at 396-97. Applying this standard to the facts of this case leaves only one conclusion: Defendants used excessive force against Plaintiff.

Cases within the Sixth Circuit "clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence...." *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). In the instant case, even though Mr. Phillips was completely compliant and posed no threat whatsoever to any of the officers, he was fatally shot. Clearly, Defendant Severy's actions were certainly unreasonable and excessive and he is not entitled to qualified immunity.

8

D.    PLAINTIFF HAS VALID CLAIMS AGAINST DEFENDANT CITY OF DETROIT

In *Monell v. Dept. of Social Services of the City of New York*, 436 US 658, 690-691(1978), the United States Supreme Court held that local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." While a municipality cannot be held liable solely because it employs a tortfeasor, liability can be imposed when an employee adheres to an official policy which causes another's constitutional rights to be violated.

A municipality will be held liable for inadequately training its officers when it "evidences a 'deliberate indifference' to the rights of its inhabitants...such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 US 378, 389 (1989). Defendant City of Detroit has clearly failed to train and supervise its police officers as to the proper use of force to employ while arresting a citizen. This failure to train and supervise the police officers regarding the use of force makes Defendant City of Detroit liable for Mr. Phillips' death and damages.

9

## VI. Conclusion

In light of the evidence and caselaw set forth above, Plaintiff will not settle for less than $4,500,000.00.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES

BY: _____

CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650

Dated: June 25, 2013
AJD/gcj

## PROOF OF SERVICE

The undersigned certified that on the 26th day of June, 2013
a copy of the foregoing document was served upon the attorney (s)
of record by e-mailing a copy of same to said attorney(s) only.
I declare under the penalty of perjury that the foregoing statement is
true to the best of my information, knowledge and belief.

_____

DANIELLE NOWICKI

10

# EXHIBIT B

*For Release and Posting Following the*
*Conclusion of the Oral Opinion*

ORAL OPINION ON THE RECORD

In re City of Detroit
Bankruptcy Judge Steven Rhodes

November 7, 2014

## Table of Contents

Introduction ........................................................................................ 1

The Plan ............................................................................................. 2

The Grand Bargain ............................................................................. 3

The Pension Settlement ...................................................................... 4

The Annuity Savings Fund Recoupment Settlement ......................... 8

The State Contribution Agreement .................................................... 10

The DIA Settlement ........................................................................... 12

The OPEB Settlement ........................................................................ 14

The 36th District Court Settlement .................................................... 15

The UTGO Settlement ....................................................................... 15

The LTGO Settlement ........................................................................ 16

The COPS Settlement ........................................................................ 17

The Syncora Settlement ..................................................................... 18

The FGIC Settlement ......................................................................... 19

Good Faith .......................................................................................... 20

Best Interests of Creditors ................................................................. 22

Fees .................................................................................................... 25

Unfair Discrimination ........................................................................ 28

Fair and Equitable ............................................................................. 33

The Constitutional Claims Against the City ..................................... 35

The Exit Financing ............................................................................ 37

Feasibility .......................................................................................... 38

Conclusion ......................................................................................... 44

# INTRODUCTION

In chapter 9 of the bankruptcy code, the federal government offers help to the states in solving a problem that, under our constitutional structure, the states cannot solve by themselves. That problem is the adjustment of the debts of an insolvent municipality. Today, this federal bankruptcy court grants that help to the State of Michigan and the City of Detroit.

The Court concludes that the City's eighth amended plan of adjustment meets the legal requirements for confirmation. Accordingly, the Court confirms that plan.

The Court also concludes that the settlements incorporated into the plan of adjustment are reasonable, fair and equitable. Accordingly, the Court approves those settlements.

The Court also concludes that the City's proposed exit-financing meets the requirements of the bankruptcy code. Therefore, the Court approves the exit financing.

This oral opinion will first address the settlements. There are no outstanding objections to the settlements, except for the ASF recoupment portion of the pension settlement. Nevertheless, the City requested the Court to determine that they are reasonable, fair and equitable.

The Court will then review the major issues relating to confirmation. These are good faith, best interests of creditors, professional fees, unfair discrimination, fair and equitable, and the treatment of the constitutional claims against the City. The Court will then briefly review the City's request for approval of the exit financing. The Court will then address feasibility and conclude. The Court will soon issue a supplemental opinion that will more fully address all of the issues.

1

# THE PLAN

Nearly every creditor group filed litigation against the City seeking the full protection of its claims, as well as objections to confirmation. The plan is largely comprised of the settlements of those claims and objections. With only one exception, every group of creditors represented by counsel has settled with the City. That exception is a small group of creditors with constitutional claims against the City.

The Court previously approved the settlement with the swap counterparties. Here are the settlements that Court approves today at the City's request:

- The Grand Bargain settlement, which includes the pension settlement, the State Contribution agreement and the DIA settlement.
- The OPEB settlement.
- The 36th District Court settlement.
- The UTGO settlement.
- The LTGO settlement.
- The Syncora settlement.
- The FGIC settlement.

Several factors are relevant to the reasonableness of each settlement and are common to all of them. These include the following:

All of the creditors in these settlements had filed and vigorously pursued objections to the plan.

All of the creditors were highly motivated to pursue those objections and had the resources to do so. This would include the appellate process if necessary.

2

Many of the objections raised issues that were novel, complex legally and factually, and potentially significant beyond this case.

All of the parties were well represented and well prepared for litigation.

For the City, litigating with creditors was incompatible with its goal of a prompt and efficient exit from bankruptcy and start to its revitalization.

For the City, the stakes in any of the creditor litigation were high. Even a single loss to any major creditor would seriously compromise its goals in this case.

Each settlement was at arms' length, hard-fought. Each required perseverance, creativity and compromise by all involved.

Each of those considerations played a role in each of these settlements.

## THE GRAND BARGAIN

The cornerstone of the plan is the Grand Bargain. It is a collection of settlements among a number of parties with an interest in the City's two pension plans and in protecting the City's art. These parties include:

- The official committee of retirees.

- The General Retirement System, GRS.

- The Police and Fire Retirement System, PFRS.

- The American Federation of State, County and Municipal Employees, AFSCME.

- The United Auto Workers Union.

- The Detroit Retired City Employees Association.

- The Retired Detroit Police Members Association.

- The Retired Detroit Police & Fire Fighters Association.

3

- The Detroit Police Lieutenants and Sergeants Association.

- The Detroit Police Command Officers Association.

- The Detroit Police Officers Association.

- The Detroit Fire Fighters Association.

- The State of Michigan.

- A number of charitable foundations.

- The Detroit Institute of Arts.

The settlements represented in the Grand Bargain are the pension settlement, the state contribution agreement, and the DIA settlement. The plan of adjustment reflects the Grand Bargain in its treatment of class 10, which consists of the PFRS claims, and class 11, which consists of the GRS claims. The State of Michigan, a number of charitable foundations, the Detroit Institute of Arts and a number of individuals will contribute to the City's two pension plans a total value of $816 million over 20 years.

## THE PENSION SETTLEMENT

The key points of the pension settlement are:

• The allowed claim amount of Unfunded Accrued Actuarial Liability, the UAAL, will be $1.25 billion for PFRS and $1.879 billion for GRS.

• Through June 30, 2023, the pension plans will use a 6.75% discount rate to value the liabilities and a 6.75% assumed investment return rate to estimate the future growth of their assets.

• The pension plans will be frozen as of July 1, 2014.

4

- Active employees continuing to work for the City after July 1, 2014, will have benefits under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the present plans.

- Each pension claimant will receive the Adjusted Pension Amount. For PFRS retirees, this means no reduction in the accrued pension benefit amount but a 45% reduction in the cost of living adjustment, COLA. For GRS retirees, the Adjusted Pension Amount is a 4.5% reduction in accrued pension benefit amount and elimination of COLA.

- Some GRS retirees will be subject to an annuity savings fund recoupment. Because some parties have objected to this ASF recoupment, the Court will address this separately later.

- There are provisions for restoration of pension benefit payments in certain circumstances.

- For 2023, the funding targets are 70% for GRS and 78% for PFRS. For 2053, in 40 years, the targets are 100% for each.

- PFRS and GRS will each have an investment committee that will make recommendations to, and in certain situations approve the actions of, their boards of trustees.

- Until June 30, 2023, the parties may not amend the terms, conditions and rules of the GRS and PFRS relating to the calculation of pension benefits, the investment return assumptions, or the contributions to the pension systems.

The pension classes voted to accept the plan by 82% in class 10, PFRS, and 73% in class 11, GRS.

Despite these strong votes in favor of the plan, the treatment of pension claims in the City's plan of adjustment has been a significant issue in the case. In the Court's eligibility opinion, it held that the federal bankruptcy power could impair pension right in a municipal case, even if the state constitution protects. The Court stands by that decision.

5

Now, at the confirmation stage, the Court must determine whether the plan's treatment of pension claims meets the legal requirements for plan confirmation and settlement approval. The plan confirmation issues include good faith, best interests of creditors, feasibility and others. The Court will address these questions later. It will now address whether the pension settlement is a reasonable settlement.

Despite the acceptance of the plan by the pension classes, many pension claimants still strongly oppose the impairment of their pension rights in this bankruptcy. They believe that under the Michigan constitution, their pension rights are not subject to impairment. They credibly state that they worked hard for the City, that they did nothing wrong, and that these impairments will cause them real hardship. Some also argue that the pension impairments in the plan of adjustment are unnecessary because the pension plans are in fact fully funded. They further argue that if the pension plans are underfunded, the City should sell the art at the Detroit Institute of Arts or other City assets. Many of these objecting parties took the time to come to court to give a strong, sincere and personal voice to their objections.

The Court finds that the pension settlement is a reasonable settlement and overrules those objections to confirmation and to the pension settlement.

The several representatives of the pension classes appealed this Court's eligibility decision to the Court of Appeals. The City of course took the position that the eligibility decision was correct and should be affirmed. To determine the reasonableness of the settlement, it is incumbent upon this Court to estimate the parties' likelihood of the success of the appeal. That is challenging here. On balance, the Court estimates that the pension creditors' chances of success on appeal were in the range of 25%.

6

The next step would be to determine each side's best-case scenario. For the City, that would plainly be to prevail on appeal and to continue in this chapter 9.

For the pension claimants, however, the best-case scenario is much less clear. The City would still have no ability to pay the claim even if those claimants were to prevail on appeal.

These considerations suggest that it is a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. The plan's proposal is only possible because of the pension settlement and the Grand Bargain. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

At the same time, the Court must acknowledge that these pension reductions will cause real hardship. In some cases, it is severe.

This bankruptcy, however, like most, is all about the shared sacrifice that is necessary because the City is insolvent and desperately needs to fix its future. All of the City's unsecured creditors are making sacrifices. Others sacrifice too, including the City's residents and visitors, and even the State of Michigan and its residents. Even the City's professionals are now contributing to this process and to the City's future.

As noted, substantial majorities of the two pension classes accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

The Court finds that the pension settlement is reasonable and approves it.

7

## The Annuity Savings Fund Recoupment Settlement

The Court will now address the Annuity Savings Fund recoupment part of the pension settlement. In the City's long-standing ASF program, GRS employees could voluntarily contribute a percentage of their gross pay to a separate pension account. The GRS then invested these contributions with the other GRS assets. Each participant's ASF account increased in value based on the participant's contributions and the interest credited to that account.

For many years, the GRS credited interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less than that. The City claims that this diversion of assets increased the GRS unfunded liability. It claims that it is therefore entitled to recoupment of the excess interest credits from the participants to offset that increased unfunded liability. This in turn would reduce the pension cuts to the GRS retirees. The City calculates that the total of this claim is approximately $387 million. The GRS and the ASF participants assert that there is no basis for recoupment.

The parties have settled this dispute. The key points are:

• The ASF Recoupment amount for each ASF participant will be the amount of excess interest that GRS credited to the participant between July 1, 2003 and June 30, 2013.

• The GRS will amortize each ASF participant's recoupment amount over the participant's life expectancy with interest at 6.75%, to be deducted from the participant's monthly pension check or ASF account.

• The plan of adjustment caps the ASF recoupment at 20% of the highest value of each participant's ASF account between July 1, 2003 and June 30, 2013. An additional cap limits the combined pension reduction and ASF recoupment to 20% of such participant's annual pension.

- Each participant that is subject to the ASF Recoupment will have the option to pay the ASF Recoupment amount in a single lump sum cash payment.

- The settlement will net approximately $190 million for the GRS, which is about 49% of the City's calculation of its claim here.

Several participants object to the ASF recoupment in the plan of adjustment. They argue:

1. The ASF recoupment violates the applicable statute of limitations.

2. Under state law, the City's recoupment claim has no merit.

3. They did nothing that justifies imposing this liability on them.

4. The GRS board did nothing wrong.

5. The City has no standing to assert the claim.

6. They do not consent to the lesser treatment of their pension claim in class 11 that results from the recoupment.

7. The treatment of the City's recoupment claim in the plan violates their right to be heard on the merits.

8. The City did not properly disclose the 6.75% interest rate.

9. The interest rate is illegal, usurious and unfair.

10. The Court should carve the ASF settlement out of the plan and then approve the plan.

The Court overrules those objections.

The ASF recoupment settlement is a part of the pension settlement and therefore a part of the Grand Bargain. It is also a part of the City's plan of adjustment. The Court, therefore, has only two issues to consider. The first is whether the settlement is reasonable. The second is whether the plan provisions that incorporate the ASF settlement violate the bankruptcy code.

9

It is not for the Court to rule on the merits of the City's ASF recoupment claim or the merits of the participants' defenses. The Court only to reviews the parties' positions to determine whether the settlement is reasonable.

The Court finds substantial merit in the City's recoupment claim. The legal authority of the GRS board to credit interest in excess of the actual rate of return was doubtful. The prudence of the practice was even more doubtful. The Court also considers that the asserted defenses have less merit.

On balance, it appears that the City's recoupment claim would have a reasonable likelihood of success, 60-70%. However, the length, complexity and expense of litigation on the claim would be substantial. Should the City prevail, issues of collectability against ASF participants could also be substantial, depending upon the structure of the final judgment.

The Court also considers that this settlement is a part of the much larger settlement of all pension-related issues. The class of claims affected by the settlement, class 11, accepted the settlement by a vote of 73%. Finally, the Court notes that the caps and other limitations on the recoupment amount that the parties negotiated should reduce the hardship of it.

Fairly weighing these factors suggests that the ASF recoupment settlement is well within the range of possible reasonable settlements. The Court approves it.

## THE STATE CONTRIBUTION AGREEMENT

The Court will now address the state contribution agreement.

This agreement settles the state's potential liability for the underfunding of the GRS and the PFRS under the pension non-impairment provision of the Michigan constitution, Article IX, section 24. It also supports the City's plan of adjustment. The key points of this agreement are:

10

- The state of Michigan will immediately contribute $194.8 million.

- The City, GRS and PFRS will establish an income stabilization program established to ensure that pension reductions do not cause any retirees to fall into poverty. This income stabilization program will receive a portion of the payments on the Stub UTGO Bonds, which the Court will describe later.

- The pension claimants will release the state and its related entities from liability and cease litigation related the chapter 9 case, PA 436, or the pension provisions of the Michigan constitution.

The claim settled here would not be a frivolous claim. The language of article IX, section 24, of the Michigan constitution can be read to support the claim. The non-impairment language is absolute and the state is in a much better position than retirees to monitor and enforce the non-impairment of municipal pensions.

There is nonetheless no precedent for such a claim. Any litigation of it would be long, complex and expensive. If the state loses, it would be responsible for the Detroit pension underfunding of $3 billion. It might also then be responsible for the entire unfunded liability of every municipality in the state. That would be disastrous for the state.

The question then is whether the state's contribution is a fair settlement to obtain a release of any liability that it might have on this claim. As noted, the contribution is $195 million.

The novelty and the lack of precedent make judging its likelihood of success challenging. The litigation would, however, be high-risk for all concerned.

The parties have settled, with the help of the DIA and the charitable foundations. The many skilled and capable representatives of the pension claimants have concluded that the state contribution agreement is fair. They recommended it to their pension claimants, who, in turn, voted strongly to support it and to release their potential litigation claims.

11

In the circumstances, the Court finds that it is reasonable, although perhaps at the lowest end of the range of reasonable settlements. The Court approves it. For reasons that the Court will explain in its written opinion, the Court also approves the release of the state and the state related entities.

## THE DIA SETTLEMENT

The Court will now address the DIA settlement.

This settlement resolves all of the disputes relating to the rights of all parties with respect to the DIA and the art. The key points of this settlement are:

- The DIA will secure and guaranty commitments for contributions to the GRS and the PFS of $100 million over twenty years.

- Various local and national charitable foundations will contribute $366 million to the GRS and PFRS over 20 years.

- The City will transfer the art to the DIA Corp., which will hold the art in a perpetual charitable trust for the benefit of the people of the City and the State.

Two issues arise here. The first is whether the DIA settlement is a fair settlement. The Court will address this issue now. The second is whether the settlement is consistent with the best interests of creditors test. The Court will address that issue later.

Addressing the fairness of the settlement, the Court will first examine the relative strengths of the parties' positions. Both the Michigan Attorney General and the DIA itself take the position that the DIA art is subject to a trust that prohibits the City from selling it to pay debts and places it beyond the creditors' reach. The DIA also asserts that the donors of many of the pieces of art had imposed specific transfer restrictions on them.

12

The evidence supports these assertions. The Court was especially impressed with the testimony of Ms. Erickson on these points, and with the historical documentary evidence that the DIA cited in its brief and that was admitted in evidence.

The evidence further establishes that nationally accepted standards for museums prohibit the de-acquisition of art to pay debt. The creditors also admitted, perhaps grudgingly, that no creditor had ever considered the value of the art as a possible source of repayment when it decided to lend money to the City or to acquire City debt.

On the other hand, the creditors did submit substantial evidence and legal grounds supporting the contrary view that the City can legally sell or monetize the DIA art.

On balance, the Court concludes that in any potential litigation concerning the City's right to sell the DIA art, or concerning the creditors' right to access the art to satisfy its claims, the position of the Attorney General and the DIA almost certainly would prevail.

However, evidence also established that any such result in litigation might well have taken years to achieve and would have been costly to pursue. It also would have been difficult for the City to endure the delay and expense while at the same time attempting to revitalize itself. The DIA and the attorney general state with credibility that they would vigorous contest any attempt to sell any art. Credible evidence also establishes that an attempt by the City to sell its art might result in a cancellation of the county millage taxes that support the DIA's operations and constitute almost 70% of the DIA's budget.

The Court concludes that the DIA settlement was a most reasonable and favorable settlement for the City and its pension creditors. The Court readily approves it. Accordingly, the Court approves all aspects of the grand bargain.

13

## The OPEB Settlement

The Court will now review the OPEB settlement.

The City is currently obligated to its retirees for other post-employment benefits, OPEB. This includes health care and life insurance benefits. The City claimed the OPEB liability is $3.8 billion. The retiree committee asserts that it is $5 billion. The difference largely results from differences in certain actuarial assumptions and discount rates. They also disagreed about how to account for postpetition OPEB payments. Either value would make the OPEB liability the City's largest single liability.

The parties settled. The key points of this settlement are:

• The allowed amount of OPEB Claims is $4.3 billion. Of that, $2.2 billion is for PFRS retirees and $2.1 billion is for GRS retirees.

• The City will establish two voluntary employees' beneficiary associations, known as VEBAs, to provide post-employment benefits to retirees and certain of their beneficiaries and dependents.

• The City will distribute New B Notes and other assets to fund the VEBAs.

• Various sources will fund the start-up costs for the VEBAs.

• The City will have no further responsibility to provide other post-employment benefits.

The plan treats the OPEB claim in class 12. The estimated recovery for Class 12 OPEB claims is 10%. Class 12 accepted the plan.

The retiree committee's OPEB litigation sought to prohibit the City from terminating OBEP benefits. It asserted largely equitable grounds relating to the hardship that terminating these benefits would naturally cause to retirees. There did not appear to be any substantial legal grounds for the requested relief. The City's likelihood of success was very high. The OPEB claim is an

14

unsecured claim. Unlike the retirees' pension claims, their OPEB claims had no arguable constitutional protection.

The 10% recovery for class 12, the OPEB class, is approximately the recovery of other unsecured creditors. The class voted to accept it by over 88%. The Court finds that the OPEB settlement is reasonable. The Court approves it.

## THE 36TH DISTRICT COURT SETTLEMENT

The Court will now discuss the 36th District Court settlement.

When the City filed bankruptcy, the 36th District Court was defending several employment-related claims. Because the City is legally required to fund the 36th District Court, it would ultimately be responsible for any judgments against the 36th District Court in those proceedings. The parties in the litigation settled with the City. The aggregate liquidated allowed amount of the claims is $6 million.

These claims are in class 17. Their recovery is 33%. They accepted the plan by a vote of 100%. The Court finds that this settlement is reasonable. The Court approves it.

## THE UTGO SETTLEMENT

The Court will now address the UTGO bond settlement.

Postpetition, the City defaulted on its obligation to make payments on these Unlimited Tax General Obligation bonds. The bond insurers paid claims on the defaulted payments.

In the resulting litigation, the UTGO bond creditors claimed that portions of the City's property taxes could only be used to pay their claims and that they had a lien on that stream of revenues. They also asserted that this revenue was "special revenue" in chapter 9, entitled to special protections.

15

The City opposed the litigation, contending that the UTGO claims were unsecured claims. The City and the bond insurers settled. The key points of this settlement are:

• The allowed claim on the UTGO Bonds will be $388 million.

• Just under $288 million of the UTGO Bonds will be restructured and reallocated among the holders of the bonds.

• Approximately $43 million the UTGO bonds, which parties have called the Stub UTGO bonds, will be reinstated to existing holders. However, those holders' rights to payment on those Stub UTGO bonds will be dedicated to the income stabilization program that is part of the State Contribution Agreement, which the Court mentioned earlier.

The plan classifies the UTGO Bond Claims in Class 8. The recovery is 74%. The class accepted the plan by a vote of 87%.

The UTGO settlement, 74%, is the highest settlement percentage that the City agreed to for unsecured creditors. The City's chance of success on the merits of the litigation was a coin-toss. On the other hand, the consequence to the City of losing on this issue could have been dire. It would have lost access to the portion of its property tax revenue that the UTGO bondholders claimed.

The Court concludes, therefore, that the UTGO settlement is within the range of possible reasonable settlements, although perhaps at the upper end of that range. The Court concludes that these circumstances do warrant the premium that the settlement reflects. The Court therefore approves it.

## THE LTGO SETTLEMENT

The Court will now discuss the LTGO settlement.

16

The City has almost $164 million in outstanding limited tax general obligation bonds, called LTGO bonds. Postpetition, the City defaulted on its obligation to make interest payments on the LTGO Bonds. On both occasions, Ambac Assurance Corporation, insurer of two-thirds of the LTGO bonds, paid claims on the defaulted payments. In the resulting litigation, the LTGO claimants argues that their claims were entitled to secured treatment and that state law requires the City to pay the LTGO bonds as a first budget obligation. The City asserted that the LTGO claims were unsecured claims.

The parties settled their disputes. The key points of this settlement are:

• The City may either issue new LTGO Bonds in the amount of $55 million or pay $55 million in cash using exit financing. The City has elected to make the $55 million cash payment from the exit financing.

• The City will also distribute $17.3 million in Excess New B Notes to the holders of LTGO bond claims.

The plan classifies the LTGO bonds claims in Class 7. The recovery for class 7 is 41%. The class accepted the plan.

The Court's judgment is that the City had a substantial likelihood of prevailing in the LTGO litigation, perhaps a 75% chance. The 41% LTGO settlement is within the range of reasonable settlements. The Court approves it.


## THE COPS SETTLEMENT

The Court will now address the Syncora settlement and the FGIC and COPs settlement. Both of these are, in part, addressed in class 9 of the plan. Each Class 9 Claim holder will receive its pro rata share of almost $98 million in New B Notes, $88 million in New C Notes and $25

17

million in Settlement Credits. The settlement credits may be used to offset up to 50% of the purchase price of certain eligible City assets.

## THE SYNCORA SETTLEMENT

Syncora and the City have settled their many disputes. The key points of this settlement are:

- As a settling Class 9 claim holder, Syncora will receive $23.5 million in New B Notes, $21.5 million in New C Notes, and $6.25 million in Class 9 Settlement Credits.

- The City will make an additional $5 million cash payment to Syncora.

- Syncora and the City will enter into a development agreement, under which a subsidiary of Syncora will be granted a five-year option to acquire and develop certain properties owned by the City.

- The development agreement will also include a one-year option for another subsidiary of Syncora to enter into a thirty-year concession at the Grand Circus Park parking garage. This agreement includes specified financial and capital expenditure requirements.

- The City will assume the Detroit Windsor Tunnel lease with a Syncora subsidiary and extend it to December 2040. This lease will be amended to include certain provisions and requirements for capital expenditures, and operating and financial reporting.

The settlement resolves Syncora's objections to confirmation as well as several appeals that Syncora had pursued relating to eligibility, the quality of life loan, mediation, and the casino revenue. The Syncora settlement also frees up $162 million in B notes for the LTGO, OPEB and general unsecured creditors.

The development agreement is a substantial benefit to the City. James Doak, an expert from the Miller Buckfire firm that the City retained, testified that in his opinion, the business aspects of the Syncora settlement are a reasonable exercise of the City's business judgment and the Court credits that testimony.

Syncora's recovery is about 13% and is about the same as FGIC's settlement recovery, to be discussed next. The recovery for other unsecured creditors in class 14 is also similar. Accordingly, the Court readily finds that this settlement is reasonable and approves it.

## THE FGIC SETTLEMENT

The City, FGIC, which is the insurer of the COPs, and the COPs holders have also entered into a settlement agreement. The key points of this settlement are:

- FGIC will opt into the class 9 settlement and receive $74.2 million in New B Notes, $67.2 million in New C Notes, and $19.75 million in Class 9 Settlement Credits. FGIC and the COPs holders will divide the consideration provided under the Class 9 Settlement Option.

- FGIC and the City will also enter into a development agreement for the Joe Louis Arena site.

- To settle FGIC's claims against the City relating to the Swap Agreements, FGIC will have an Allowed Class 14 Claim of $6.11 million. In addition, the Downtown Development Authority will assign to FGIC its rights to its distribution of New B Notes under the plan of adjustment for its $33.6 million Class 13 claim. The City estimates that FGIC will receive approximately $4.5 million in New B Notes in settlement of its swap related claims.

This settlement resolves the objections to confirmation that FGIC and the COPs holders filed. These objections were substantial and were zealously litigated. It also resolves the COPs

19

invalidity litigation in which the City sought to invalidate its obligation to the COPs holders in the approximate amount of $1.5 billion dollars.

FGIC's recovery is 13%. The development agreement is of incalculable value to the City. The Court readily finds that this settlement is reasonable and approves it.

That concludes the Court's discussion of its approval of the settlements in the City's plan.

The Court will now address some of the other confirmation requirements that the plan must meet, including good faith, the best interests of creditors, and the reasonableness of attorney fees. The Court will then address the requirements that apply because two classes of creditors, classes 14 and 15 rejected the plan. These are whether the plan unfairly discriminates and whether the plan is fair and equitable. The Court will also briefly address the objections of certain creditors holding constitutional claims against the City. The Court will conclude with the feasibility requirement. .

## GOOD FAITH

Section 1129(a)(3) requires the City to establish that it proposed its plan of adjustment in good faith. When the Court decided that the City was eligible to be in bankruptcy, the Court found that the City acted in good faith in seeking the relief that this Court can provide. The good faith inquiry at this stage is largely an extension of that inquiry. The Court again finds that the City has acted in good faith in proposing its plan of adjustment.

Specifically, the Court finds:

First, the City crafted and proposed the plan to achieve the objectives and purposes of chapter 9, that is, to adjust the City's debt to enable the City to provide adequate municipal services.

20

Second, the City filed its plan with honesty, good intentions, and the reasonable expectation that the plan is feasible.

Third, the process the City undertook to seek confirmation of the Plan was fundamentally fair to the City's creditors.

On the first and second points, the record demonstrates that the City has worked honestly, diligently, and tirelessly to accomplish precisely the remedy that the bankruptcy code establishes for municipalities—the necessary adjustment of the City's debt. The record also demonstrates that the City is committed to maintaining its debt at a level that it can manage in the long-term.

The testimony of several City representatives directly supports these findings. These include Emergency Manager Kevyn Orr, Mayor Mike Duggan, City Council President Brenda Jones, the City's Chief Financial Officer John Hill, the City's Chief Information Officer Beth Niblock, Police Chief James Craig, and Executive Fire Commissioner Edsel Jenkins.

Ron Bloom's testimony, however, was particularly compelling on this point, not only for what he said, but also because he testified as a representative of the retiree committee. He testified:

> But I think one of the things the City persuaded us over the course of the case was [that] they were sincere . . . we didn't like what they had to say often, but we felt that their commitment to revitalization was sincere. And when we saw evidence of that . . . for instance how they were treating the active workers, that was a positive sign that our long-term interest was going to be served and the revised promises we got would eventually be honored.

On the third point, the court finds that the strongest evidence that the City treated its creditors in a fundamentally fair way is the high level of creditor consensus supporting the plan.

The City's good faith in proposing this plan shines with the greatest brilliance in the grand bargain and in the settlements with Syncora, FGIC and the COPs holders. Those settlements are more than just creditor claim settlements. They create new ventures and relationships that enable

21

all of the stakeholders in the case to achieve their long-term missions and goals. This is an extraordinary accomplishment in bankruptcy and an ideal model for future municipal debt restructurings.

The City has proven that upon confirmation, it intends to implement its plan of adjustment. The City has also proven its commitment and ability to begin the challenging process of revitalization.

The Court finds that the City proposed its plan of adjustment in good faith.

## BEST INTERESTS OF CREDITORS

Section 943(b)(7) requires that the plan be in the best interests of creditors. The cases generally hold that in chapter 9, this means that the creditors will receive all that they can reasonably expect under the circumstances. The only legal alternative to plan confirmation is dismissal, because no other party can file a plan of adjustment and the liquidation of a municipality's assets is not permitted in chapter 9. Accordingly, the Court will also consider whether the plan is a better alternative for creditors than dismissal.

Under the plain language of section 943(b)(7), the issue is the best interests of creditors as a whole, not any particular creditor or class of creditors.

The Court finds that the plan is in the best interests of creditors.

Some creditors have argued that the City could pay more to creditors by raising taxes and by monetizing assets, specifically the art at the DIA.

No provision of law allows the creditors to access the DIA art to satisfy their claims, whether in bankruptcy or outside of bankruptcy. The market value of the art, therefore, is irrelevant in this case. A judgment creditor's sole remedy is a court-ordered property tax

22

assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

Some creditors argue that the best interest test in chapter 9 requires this Court's full consideration of all of the City's assets, including the art, even if the assets would not be accessible to unsecured creditors outside of bankruptcy.

The Court also rejects the argument. The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy. Neither the bankruptcy code nor the case law suggests otherwise.

As noted, the City determined not to sell or monetize the DIA art in the art market. Under section 904, that decision is off-limits to this Court.

However, even if the law did give the Court some authority here, the Court would not have interfered with the City's decision. The City made the only appropriate decision. Maintaining the art at the DIA is critical to the feasibility of the City's plan of adjustment and to the City's future. The Court toured parts of the DIA and saw the art there, as well as how its many visitors were experiencing the art. It also accepts the testimony of Ms. Erickson on the priceless value that the DIA and the art creates for the City, the region and the state.

The evidence unequivocally establishes that the DIA stands at the center of the City as an invaluable beacon of culture, education for both children and adults, personal journey, creative outlet, family experience, worldwide visitor attraction, civic pride and energy, neighborhood and community cohesion, regional cooperation, social service, and economic development. Every great City in the world actively pursues these values. They are the values that Detroit must pursue to uplift, inspire and enrich its residents and its visitors. They are also the values that Detroit must pursue to compete in the national and global economy to attract new residents, visitors and

23

businesses. To sell the DIA art would only deepen Detroit's fiscal, economic and social problems. To sell the DIA art would be to forfeit Detroit's future. The City made the right decision.

The City also rejected the concept of using the art as a collateral for a loan to pay creditors, for two reasons. First, that proposal would just substitute debt for debt and would not help the City. Second, if the City defaulted, it might lose the art. The City made the right decision here too.

Beyond that, the record reflects that the City has made reasonable efforts to monetize other assets, including the Detroit Windsor Tunnel, certain real estate properties, certain parking properties, the Joe Louis arena property and certain other property that it no longer needs. It also entered into the Great Lakes Water Authority memorandum of understanding with Wayne, Oakland and Macomb Counties, which benefits all creditors. The Court finds that the City has made reasonable efforts to monetize its assets to satisfy the best interests of creditors test.

The evidence also establishes that raising taxes is not a viable option for the City. In the eligibility opinion, the Court found that the City cannot legally increase its tax rates. Mayor Duggan testified that the likelihood of the people of Detroit or the state legislature voting to raise taxes is remote.

Further, a property tax increase would produce very little additional revenue. The Mayor testified that taxes in Detroit are among the highest relative to surrounding communities and the city services are comparatively low. Kevyn Orr credibly testified that the City is at tax saturation and raising taxes would likely add to the population decline.

The evidence also establishes that the plan is a better, indeed much better, alternative for creditors than dismissal. Significant City obligations would become immediately due. As mentioned earlier, in that scenario, the creditors' only remedy is the property tax assessment

24

remedy under the Revised Judicature Act. It is easy to foresee that a great number of creditors would race for that relief and the result would be chaos and an administrative nightmare for all involved. The City's reinvestment and revitalization initiatives would stall. The pension UAAL and OPEB claims in the billions of dollars would go unresolved.

There is no more money available for creditors in the City's already tight budget projections. The Court's feasibility expert so testified, as the Court will review here shortly. Every dollar is accounted for in providing necessary services, in implementing the City's necessary RRIs, and in repaying plan obligations. All of those cash uses are essential to the City's future.

Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is in their best interests.

## FEES

The Court will now discuss the issue of fees. As a condition of confirmation, section 943(b)(3) requires that "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."

On August 19, 2013, with the City's consent, the Court entered an order appointing a fee examiner and requiring him to act "to assure the Court, the City, the creditors, and the public that the City's Professional Fee Expenses are fully disclosed and are reasonable, as required by section 943(b)(3)." The fee examiner has filed quarterly reports that have fully disclosed the City's Professional Fee Expenses through June 2014.

Under the plan of adjustment, the process will continue as necessary to address fees incurred through the effective date of the plan.

Two issues are raised here:

25

(1) Does section 943(b)(3) require that all of the City's professional fees in the case be disclosed and reasonable or only fees that are unpaid as of confirmation?

(2) Should the Court accept, without further review, the fee examiner's findings that the fees have been reasonable?

The Court concludes that section 943(b)(3) does require that all of the City's professional fees in connection with the case be disclosed and reasonable. The Court further concludes that it is not appropriate to accept without further judicial review the fee examiner's findings that the fees have been reasonable.

The plain language of section 943(b)(3) requires only that fees "to be paid" must be reasonable. Yet, the Court cannot find any rational basis to distinguish between paid and unpaid fees in applying section 943(b)(3). It is an arbitrary line and may be subject to manipulation.

The Supreme Court's decision in *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.* is highly instructive on this question. In that case, the Court discussed at length the legal and equitable necessity for the bankruptcy court to review a municipality's professional fees. It is a lengthy passage but worth quoting, because it is powerful and will also be relevant to the discussion on the fair and equitable issue later. The Court will omit the case citations.

> A bankruptcy court is a court of equity and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act. * * * A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest.' These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto.
>
> * * *
>
> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special

26

benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. . . . That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy. The necessity for its exercise is based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle.

In *City of Avon Park*, all of the professional fees at issue were unpaid upon confirmation. Nevertheless, the Supreme Court's mandate to review professional fees in a municipal case was not so spineless as to permit an exception for paid fees. Rather, the Supreme Court's mandate is imperative. This Court must abide it with the greatest consideration and care. This is particularly so in this case, because it appears that the fees will exceed $100 million.

Accordingly, the Court concludes that it has the obligation, as a condition of confirming the City's plan, to determine that the professional fees for which the City is obligated in connection with the case, whether paid or unpaid, are disclosed and reasonable.

The *City of Avon Park* case linked the bankruptcy court's obligation to review fees to its obligation to determine whether the plan is fair and equitable. Accordingly, the Court cannot outsource this responsibility to the fee examiner. It must make an independent determination that section 943(b)(3) is met.

The next question is how to review the fees in this case. In *In re Corcoran Hospital District*, the court found that the debtor could satisfy section 943(b)(3) through a post-confirmation process to review fees for reasonableness. This makes good sense in this case because the fees will continue to accrue post-confirmation.

27

Accordingly, to expedite confirmation, the Court will defer this issue. The Court will later request the assistance of counsel in establishing a mediation and litigation process for determining the disclosure and reasonableness of the fees for which the City is obligated.

There is another issue here that will have to be addressed. As noted, reasonableness of fees is a requirement for confirmation in chapter 9. This is unlike chapter 11 where objections to fees are not confirmation objections. The general deadline to object to the City's plan was May 12, 2014, and for bondholders and retirees it was July 11, 2014. As far as the Court can determine, only one party, David Sole, asserted an objection to the reasonableness of fees in this case.

So the issue becomes whether everyone else in the case has waived the issue. Within the next few days, the Court will establish a process to review fees, which it will do with the help of counsel. As part of that process, the Court will invite briefing on this waiver issue. In the meantime, until this process is established and the Court orders otherwise, the Court's order of October 31, 2014, prohibiting filing papers relating to the fee issue remains in effect.

Regardless however, the Court reaffirms that even if there has been such a waiver, the Court intends to fulfill its independent obligation to review the reasonableness and disclosure of fees.

## UNFAIR DISCRIMINATION

As noted, two classes of claims voted to reject the plan, class 14, the other unsecured claims, and class 15, the convenience claims under $25,000. Section 1129(b) allows the Court to confirm the plan despite those dissenting class votes with respect to those dissenting classes, "if the plan does not discriminate unfairly, and is fair and equitable." The Court will now address the unfair discrimination test and then the fair and equitable test next.

28

To analyze the unfair discrimination issue, the first step is to determine the recoveries for each unsecured class in the plan. The second step is to determine whether there is any discrimination against any of the rejecting classes. If so, the final step is to determine whether that discrimination is unfair.

Here, the recoveries for the rejecting classes are 13% for class 14, and 25% for class 15.

The next step is to identify any discrimination by identifying the classes of unsecured claims that have a higher recovery than the recoveries of the rejecting classes. It is readily apparent that the plan does discriminate in favor of class 7, the LTGO claims with a 41% recovery, class 8, the UTGO claims with a 74% recovery, and class 17, the 36th District Court claims with 33% recovery.

Calculating a percentage recovery for pension claims in classes 10 and 11 is complex.

The City's disclosure statement, which the Court approved, stated that the recoveries are 59% for PFRS and 60% for GRS. Based on a number of complex arguments, the City now asserts that the true recovery percentages are much lower and that there is no discrimination in favor of the pension class 10 and 11.

Fortunately, the Court does not need to resolve the difficult issues raised here. The Court concludes that even if the pension classes' recoveries are what the disclosure statement declares, the resulting discrimination against the unsecured and convenience classes is not unfair.

In connection with this final step, the Court must determine the meaning of the phrase unfair discrimination in section 1129(b).

The Court concludes that fairness and unfairness are matters of conscience and that determining fairness is a matter of relying upon the judgment of conscience. Whether

29

discrimination in a plan of adjustment is unfair is a question that requires a court to focus on the judgment of its conscience regarding that discrimination.

Several factors naturally inform this judgment. These factors include the circumstances in the case that bear upon the fairness of the discrimination in light of the purpose of chapter 9, which is to adjust an insolvent municipality's debt so that it can provide adequate municipal services. These factors also naturally include the Court's experience, education and sense of morality.

That is what this Court meant in its eligibility opinion when it addressed the potential for the impairment of pension rights in the City's plan. It stated that when considering any such impairment, the bankruptcy code demands "this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan."

The Court concludes that Congress intended this approach to unfair discrimination. Congress certainly could have established in section 1129(b) a more specific standard to determine unfair discrimination, including any of the more specific standards adopted in the case law. The sole statutory test, however, is whether the discrimination is unfair.

The Court will first address the fairness of the discrimination in the plan in favor of the pension classes. Then it will discuss the fairness of the discrimination in favor of the UTGO, LTGO and 36th District Court classes.

The Court finds that the City has demonstrated a substantial mission-related justification to propose a higher recovery to its pension claimants. The City is a municipal service enterprise. Viewed broadly, its mission is to provide municipal services to its residents and visitors to promote their health, welfare and safety. Its employees and retirees are and were the backbone of the structures by which the City fulfills its mission. The City, therefore, has a strong interest in

30

preserving its relationships with its employees and in enhancing their motivation, consistent with its financial resources. The City has reasonably and properly concluded that its discrimination in favor of the pension claims in its plan is necessary to its mission.

In contrast, the City has no similar mission-related investment in its relationships with its other unsecured creditors in classes 14 and 15.

Second, the City is an agency of the State of Michigan. Its existence, its mission, and its means of fulfilling that mission are all subject to the provisions of the constitution and laws of the State of Michigan. Among these provisions is article 9, section 24 of the Michigan constitution, which singles out municipal pension claims for special protection:

In the Court's eligibility opinion, it held that because of the Supremacy Clause of the United States constitution, this specific protection of the state constitution is not entitled to vindication in a federal bankruptcy proceeding. Nevertheless, that provision of the Michigan constitution does express the considered judgment of the people of the State of Michigan. The Court concludes that in determining the fairness of the discrimination against unsecured claims proposed in the City's plan, this judgment of the people of the State of Michigan is entitled to substantial deference.

Another consideration that appeals to the Court's conscience is the reasonable expectation of the parties. Generally, unsecured creditors reasonably expect similar treatment in bankruptcy. The difference here, however, is that the Michigan constitution gives notice to all of the unsecured creditors of a municipality that the rights of pension creditors are distinct, even if their pension claims are unsecured. That constitutional notice reasonably justifies the enhanced expectations of the pension creditors in this case. At the same time, that notice should also lower the reasonable expectations of the other unsecured creditors in the case.

31

A final consideration also suggests that this discrimination is not unfair. The Court has already observed here that the City's plan is largely a collection of interconnected settlements. Mr. Montgomery, counsel for the retiree committee, astutely argued that if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair.

The Court agrees. The factors that inform the reasonableness of each individual settlement are the same factors that inform the Court's judgment about whether the resulting discrimination is fair.

Here, the classes that did not settle instead rejected the plan are two classes of general unsecured claims. There is, however, nothing about those claims that warrants any favorable consideration in the Court's unfair discrimination analysis.

In the Court's judgment, therefore, the discrimination in the City's plan of adjustment in favor of the pension creditors is not unfair.

The Court comes to the same conclusion about the discrimination in the plan in favor of the UTGO, LTGO and 36th District Court classes. The Court has already found that these settlements are reasonable settlements. They fairly and reasonably reflect the strengths and weakness of the creditors' claims and the City's defenses, the complexity and expense of possible litigation, and collectability issues. These considerations also justify discriminating in their favor and against the other unsecured claims and the convenience claims.

The Court only adds that the City also has a mission related reason to favor the 36th District Court claim due to its continuing legal and funding relationship with that court.

Accordingly, the Court finds that the City's plan does not unfairly discriminate against the two rejecting unsecured classes, 14 and 15.

32

## FAIR AND EQUITABLE

The Court will now discuss whether the plan is fair and equitable to dissenting classes 14 and 15.

To properly determine the meaning of this test, it is important to understand its effect. In practical consequence, the law allows the judge, who has no stake in the outcome of the plan, to substitute his or her judgment about the fairness and equity of the plan for the judgment of the creditors, who have every stake in the outcome. Ultimately, the issue is whether the Court should force a debt adjustment on unwilling creditors. We colloquially call this cramdown. That is the power that the City requests this Court to exercise here.

The language fair and equitable suggests the same kind of process of adjudication that the Court just discussed for the unfair discrimination test. Indeed, the words of these two requirements overlap somewhat, but the fair and equitable test has a broader focus, as the Court will discuss in a moment.

In *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.*, which the Court discussed earlier, the Supreme Court reviewed at length the bankruptcy court's role in determining whether a chapter 9 plan is fair and equitable.

The Court concludes that under *City of Avon Park*, the City's plan is fair and equitable as to dissenting classes 14 and 15. That case first mandates this Court to investigate whether there is evidence of any misconduct that would require the court's remedy as a condition of confirmation, or whether the City or any class of creditors has committed any overreaching. The Court readily finds that there is no such evidence in this case.

33

But under the *City of Avon Park* case, overriding the dissenting creditors' judgment about a plan of adjustment requires more than just the absence of misconduct. It must also mean something more than what all of the other confirmation requirement mean.

The Court concludes that the fair and equitable requirement asks this question: Are there circumstances in the case that suggest to the Court's conscience that it is fair and equitable to impose the plan on the dissenting creditors against their stated will?

The Court finds that that there are such circumstances in this case.

First, it is appropriate to look at exactly how this class reacted to this plan. Very few of the creditors in classes 14 and 15 filed objections to the plan. Although the classes did vote to reject the plan, the margins were small. In class 14, the margin was slim—51% rejecting, 49% accepting. In class 15, it was a bit more significant—58% rejecting, 42% accepting.

The numbers behind those percentages tell a story here too. The actual vote in class 14 was 97 rejecting, 93 accepting. This means that if 3 rejecting votes had gone the other way, the necessary majority in number would have been achieved. The actual vote in class 15 was 189 rejecting and 153 accepting. That means that if 19 rejecting creditors in this class had accepted, the necessary majority would have been reached.

These circumstances raise this question: Is it fair and equitable to confirm this plan over the dissent of literally a handful of unsecured creditors, most of whom have claims under $25,000, when thousands of creditors with claims in the billions of dollars support the plan? To the Court's conscience, this is fair and equitable and the Court so finds.

The Court accepts the likelihood that the dividend to the creditors in classes 14 and 15 will cause those creditors real hardship. But the Court must analyze and balance the hardship on the other side too.

34

A large number of people in this City are suffering hardship because of what we have antiseptically called service delivery insolvency. What this means is that the City is unable to provide basic municipal services such as police, fire and EMS services to protect the health and safety of the people here. Detroit's inability to provide adequate municipal services runs deep and has for years. It is inhumane and intolerable, and it must be fixed. This plan can fix these problems and the City is committed to it. So if to fix this problem, the Court must require these few creditors that rejected the plan to nevertheless share in the sacrifice that the other creditors have agreed to endure, then so be it.

There is really no choice here. There are no viable alternatives to this plan that will solve the City's problems and at the same time pay more to classes 14 and 15 to get their support.

To revitalize itself for the good of all, the City and its people desperately need the shared sacrifice that this plan will impose on all of its creditors, even these few rejecting creditors, and the City and its people need it now.

Accordingly, the Court concludes that it should exercise its power under the bankruptcy code to impose the plan of adjustment on classes 14 and 15 despite their dissenting votes. The Court finds that the plan is fair and equitable as to them.

## THE CONSTITUTIONAL CLAIMS AGAINST THE CITY

The Court will now state its resolution of the objections that creditors with constitutional claims against the City filed. The written opinion will explain in depth the Court's reasons for these conclusions.

The Court first concludes that the Fourteenth Amendment does not provide a constitutional right to damages for a constitutional violation. Accordingly, the Court overrules the claimants' objection that chapter 9 cannot provide for the discharge of a claim under 42 U.S.C section 1983.

The Court further concludes that section 1983 claims against individuals in their personal capacity are not claims against the City. Accordingly, the bankruptcy code does not permit a chapter 9 plan to treat those claims, nor does it provide for their discharge.

If a collective bargaining agreement or other contract obligates the City to defend and indemnify its officers on these claims in their personal capacity and that contract is assumed in this bankruptcy, then that contractual obligation survives the discharge and remains fully enforceable post-confirmation. Otherwise, the City's contractual indemnification obligation is discharged in this bankruptcy.

To the extent that the City seeks to release its officers from liability under the standards in the *Dow Corning* case, the Court denies that. The City certainly has a strong interest in the efficient and effective functioning of the police department. The Court accepts that protecting its officers from personal liability for section 1983 claims is necessary to that mission. However, the record is barren of any evidence suggesting that the contractual indemnity obligations that the City is assuming are inadequate to accomplish that purpose. A third party release would deny injured parties their just relief. There is no evidence that the protection of a third party release for these officers, in addition to their indemnity, is also necessary for the proper functioning of the police department.

Finally, the Court concludes that the Fifth Amendment does establish a right to just compensation when a municipality takes private property for public use. Chapter 9 would violate

36

the Fifth Amendment if its application in this case would result in less than just compensation to these objecting claimants. There is, however, a ready solution.

Section 944(c)(1) gives the Court the discretion to exempt debts from discharge in the confirmation order. At the suggestion of the Attorney General, to avoid any issue as to the constitutionality of chapter 9 in this respect, the Court will use its authority under section 944(c)(1) to order that the objecting parties' Takings Clause claims are exempt from discharge. This ruling eliminates any constitutional grounds to deny confirmation of the City's plan of adjustment.

These rulings will be reflected in the order confirming the plan.

## THE EXIT FINANCING

The Court will now address the City's request for approval of its exit financing. No party has objected to the exit financing.

The City requests the authority to borrow up to $325 million as part of its exit from bankruptcy. The City has recently stated, however, the intent to borrow only $275 million. The loan agreement requires an escrow reserve of $27.5 million. Barclays Capital, the issuer, will hold the notes, but they will be sold or refinanced in the municipal bond market within 150 days. The notes are secured by the City's revenue from its income tax, which reduces its interest cost slightly. This security interest may, however, impair the City's ability to access the municipal bond market, should the need arise.

From these loan proceeds, the City will use $120 million for the postpetition loan, $45 million for the outstanding SWAPs settlement obligation, and $55 million of the outstanding LTGO obligation. The balance will be used to begin to fund the restructuring and reinvestment

37

initiatives. As the Court will address in a moment. These RRIs are critically important to the feasibility of the plan and to the City's future.

The borrowing was approved by City Council, the Michigan Finance Authority and the Local Emergency Financial Assistance Loan Board.

The Court finds that both the terms of the financing and the uses of the loan proceeds are reasonable. The lender is acting in good faith. Accordingly, the financing meets the requirements of the bankruptcy code. The Court approves it.

## FEASIBILITY

The Court will now address feasibility.

The Court appointed an expert, Martha E.M. Kopacz, on the issue of feasibility. Ms. Kopacz submitted a report and two supplements. She also testified regarding her observations, conclusions and recommendations.

The GRS filed two related motion to exclude portions of Ms. Kopacz's testimony and to preclude her evidence relating to alleged historical mismanagement and misconduct by the GRS and the PFRS. For reasons that the Court will explain in its written opinion, both motions are denied.

The Court finds that Ms. Kopacz's reports and testimony are fully credible and it accepts and adopts her findings, with the minor exception of her conclusion about the Court's pacing of this case.

Ms. Kopacz adopted this test for feasibility in this case:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations

38

contemplated in the Plan without the significant probability of a default?

The Court concludes that this standard is the appropriate standard for determining feasibility under section 943(b)(7). Accordingly, the Court adopts it.

Her opinion is that the City's plan is feasible, as required by section 943(b)(7), and that the assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable.

In Ms. Kopacz's initial report, she concludes:

> The POA and the projections that support the POA are designed to allow the City to continue to improve its level of service to the citizens of Detroit. I believe that the RRIs are reasonable and well considered. If executed, they will allow the City to deliver essential services. It is my opinion that the City is beginning to emerge from the service delivery insolvency referenced in Judge Rhodes' opinion concerning eligibility.

In her second supplemental report, she concludes:

> My opinion, based on the information provided to me and my team and certain testimony during the Confirmation Trial, is the current projections are within the range of reasonableness and the Plan of Adjustment remains feasible.

Ms. Kopacz did add this caution in her second supplemental report:

> I want to emphasize, however, that there is little space remaining on the continuum of reasonableness. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern. While my opinion is the Plan of Adjustment remains feasible and there is not yet a significant probability of default as described in the Standard, there is no denying the possibility of default has increased.

39

It is not realistic or prudent to believe that the City could take on any additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility.

Ms. Kopacz's testimony was to the same effect.

Her conclusions regarding the feasibility of the plan were corroborated by the testimony from Gaurav Malhotra, Robert Cline, Caroline Sallee, John Hill, Charles Moore, Kevyn Orr, Council President Jones, and Mayor Duggan.

In this case, the evidence establishes that there are three components to the feasibility of the plan and to the ultimate success of the City of Detroit. They are (1) a workable long-term financial plan, (2) the human and capital resources to execute the plan, and (3) the commitment to implement the plan.

The emergency manager and his team, working in conjunction with the Mayor and his team, have created a workable plan for this City. It will be for the City Council, the Mayor and his administration to implement the plan. The Mayor testified that he and his team are fully committed to implementing the plan and Council President Jones testified that the plan has the support of the City Council. The Court fully credits that testimony.

The Court finds further support for the feasibility of the plan in the establishment of the Financial Review Commission under PA 181 of 2014. The Act gives the Commission the responsibility to insure that the City complies with the plan of adjustment. It also gives the Commission a broad array of responsibilities and tools to oversee the City's fiscal integrity. For example, the Commission has the authority to review and approve the City's 4-year financial plans, contracts over $750,000, and all collective bargaining agreements. It also appears to give oversight responsibility for the City's pension funding obligations.

40

13-53846-tjt   Doc 10683   Filed 12/04/15   Entered 12/04/15 15:51:43   Page 75 of 83

It cannot be emphasized enough that the long-term feasibility of the plan of adjustment will depend on the effectiveness of the Financial Review Commission. This is a matter of extraordinary weight and responsibility. It will certainly require substantial budget resources and skilled staffing. The Court is satisfied that the state will provide the Commission with adequate resources to meet its responsibilities.

In conclusion, therefore, the Court finds that it is likely that the City of Detroit, after the confirmation of the plan of adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default. Accordingly, the Court finds that the City's plan of adjustment is feasible.

It appears that Ms. Kopacz's greatest concern for the feasibility of this plan and for the future of the City arises from the risks that the City retains relating to pension funding.

Ms. Kopacz states in her report, "The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations."

The Court shares that concern. What happened in Detroit must never happen again. The hardship and anxiety that its employees and retirees, and their families, have endured and will continue to endure must never happen again. This must never be repeated anywhere in this state.

Therefore, the Court's confirmation of this plan comes with three further appeals.

The first is to the City's labor unions and retiree associations. In his closing argument, Mr. Bennett, the City's attorney, perceptively asserted that the goal of protecting municipal pensions, and in this country, requires municipal labor to enhance its vigilance of municipal pension funding. He also implored labor to use its relationships with the municipal leadership to achieve that goal.

41

The Court agrees. It would only additionally ask labor to consider whether this goal of protecting municipal pensions in this City, and indeed the broader goal of revitalizing the City, suggests that it should take a much longer and broader view of the best interests of its members and retirees.

The second appeal is to the State of Michigan. The Revised Municipal Finance Act unequivocally states that the Michigan Department of Treasury is "directed to protect the credit of this state and its municipalities." Michigan Compiled Laws 141.2201. The argument is powerful that this provision of state law, together with the constitutional prohibition on impairing municipal pensions and the constitutional mandate on pension funding, requires the state to take full responsibility to vigorously supervise and regulate its municipalities to assure adequate pension funding. The Michigan constitution does not single out the obligations of municipal bonds for protection in the same way it protects pension rights. Bond obligations can no longer be the only first-budget municipal obligations.

Moreover, the constitutional protection for municipal pensions can only be realized through honest, complete and realistic accounting and actuarial disclosures. Ms. Kopacz made several specific and worthy recommendations that the City, the pension plans, the Financial Review Commission and the state should seriously consider adopting and implementing.

The municipal employees and retirees of this state need and deserve the state's robust commitment to that obligation. The Court found here today that the state's contribution of $195 million in exchange for a release of liability on the pensioner's constitutional claim is a reasonable settlement. History will judge the correctness of this finding, and it will judge that this finding was correct only if what happened to Detroit never happens again. The State of Michigan can sustain that finding in history only by fulfilling its constitutional, legal and moral obligation to

42

assure that the municipalities in this state adequately fund their pension obligation. If the state fails, history will judge that this Court's approval of that settlement was a massive mistake.

The third appeal is directly to the governor. It relates to the composition of the Financial Review Commission. The Court has found that the responsibilities that PA 181 imposes on the Commission will contribute to the feasibility of the plan.

But the law by itself is not enough. The effectiveness of the Commission in ensuring the long-term feasibility of the plan and the City's fiscal health will require that its members have the skills, standing, experience, expertise, independence, and commitment that are the most outstanding that can be found, and beyond question. This would be so under any circumstances, but one particular circumstance makes this concern even more compelling.

In Public Act 181, the Michigan legislature chose to include on the nine-member commission two elected City of Detroit officeholders. At the commission level, therefore, the mayor and the council president will advocate the City's position, not provide oversight of it. That means that realistically, only seven of its nine members are truly independent. It also means that only the seven independent members of the commission will carry out the oversight function that the legislation contemplates.

This is a major problem. Because the commission acts by majority vote, it will take a super-majority vote of the independent members, 5 of the 7, to disapprove or reject any action that the City proposes for approval by the commission under the law. It is a plain conflict of interest for the mayor and the council president to have a vote. It both skews the commission's voting and risks undermining the commission's effectiveness in ensuring the implementation of the plan and the City's fiscal health and integrity. Equally importantly, it also risks undermining the public's perception of the legitimacy and independence of the commission.

43

The Court believes that this problem requires that the governor appoint members of the commission who are fully willing and able to exercise the independent, skilled and experienced judgment that PA 181 contemplates. The Court therefore appeals to the governor to appoint commission members with these qualities.

That concludes the Court's decision confirming the City's plan.


## CONCLUSION

This comes with thanks to many people.

First, deeply felt thanks also to Chief Judge Rosen for his work as the mediator in the case. Deeply felt thanks also to each of the mediators on his team—Judge Roberts, Judge Cox, Judge Lawson, Judge Daniels, Judge Perris, Eugene Driker, and David Coar. These words of thanks cannot begin to express the depth of gratitude that I, and all of the parties and attorneys, feel about what Chief Judge Rosen and his mediation team put into this case—the work, the time, the creativity, the commitment, the nights, the weekends, and the holidays.

Thanks also to Prof. Gina Torielli. She enthusiastically served as the mediators' consultant on municipal bond issues. Her assistance was invaluable.

The settlements that the mediators assembled in this case are extraordinary and unprecedented. Never before have bankruptcy mediators proactively sought to marshal the community's financial resources to solve a community problem. Most importantly, they knew that their work was not simply about resolving a bankruptcy case. It was about fixing a broken city. Where would this case be without them?

44

I have said publicly and repeat now that the smartest thing I did in this case was to ask Judge Rosen to be the mediator. I don't know if he agrees with that. I do think that he would agree that the smartest thing he did as the mediator was to assemble his team.

One of the unforeseen but fortuitous consequences of this case has been the development of a true partnership between the bankruptcy court and the district court. This partnership was essential to the efficient and expeditious resolution of this case and, arguably, to the very future of the City of Detroit. Thanks to the Chief for having the wisdom, foresight and willingness to engage in it with us. I hope this partnership endures.

Thanks also to Judge Rosen, to the entire district court, and to Dave Weaver and his staff for their amazing and gracious hospitality.

Thanks also to Katherine Gullo, the bankruptcy clerk, and to her staff for their wonderful support in this case.

On behalf of the parties in the case, thanks also must go to the foundations and to the DIA for their generous and unprecedented charitable commitments in this case. It is unimaginable what the resolution of this case would have looked like without them.

Profound thanks to the attorneys and the other professionals in the case. You conducted yourselves with the highest degree of civility, respect, and professionalism, both to each other and to the Court. At the same time, you also demonstrated zealous advocacy as well as loyalty to your oaths and to your clients. Your work in this case is a model of the public service role that lawyers and the legal profession perform in our society. It has made me proud to be a part of the judicial process and of legal profession, and you should each share in that pride.

Also, on a more personal level, you made my job manageable. Even fun sometimes. Thanks for that.

45

Here I want to single out Kevyn Orr for special recognition and appreciation. His task was perhaps the most challenging of all of us. Yet he met that challenge with skill, determination and commitment, and at great personal sacrifice. I hope that someday soon, this City will recognize the singular contribution that he made to its fresh start and give him the credit that he truly deserves.

Thanks also to Dick Ravitch, my consultant on feasibility. His commitment, knowledge, wisdom, expertise, and spirit of public service were remarkable and helped me to more fully understand this case. I hope a way is found for him to contribute to fiscal health and revitalization of this City. He would be a valuable resource in any capacity.

Thanks to Marti Kopacz and her team. Under extraordinary time pressure, she and they performed remarkable service for me with grace and professionalism.

Thanks to Bob Fishman, my fee examiner, and his staff, for their skilled assistance on the delicate responsibility that they took on and embraced.

Finally, this case proves that it takes a team. So I want to thank and gush about my team— Caroline Fayz, Kelli Dexter, Chris Sikula, Ryan Hamstead, Cindy Person and Alesia Dobbins. You are simply the best. Thank you.

We have talked a lot in this case about how a chapter 9 case is so different from all the other types of bankruptcy cases. It is, but only around the edges. In fundament ways, the Detroit bankruptcy case is just like every one of the other 30,609 bankruptcy cases that were filed in our court in 2013. In every case, we have a debtor who needs help, who made mistakes, who took unwarranted risks, who accepted bad advice, who exercised bad judgment, who was too long in denial, or who had just plain bad luck. But no matter, our society holds dear the value of a fresh start and of second chances. That value is manifested with brilliant clarity in our bankruptcy laws.

46

And that value is manifested the same in this $18 billion case as it was in the no asset chapter 7 cases that were filed just before and just after this case on July 18, 2013.

To the current leadership of the City, you are about to get your City back from us in the bankruptcy world. We give it back to you with the fresh start that this City needs and deserves under our federal bankruptcy laws. We hope we helped. It is now on you to implement this plan. I have found that you will do that. Please make me right. It is in the City's best interest. The City's true and full fresh start depends on it.

Before I conclude, I want to address the people of the City of Detroit, whose passion for this City is remarkable in its breadth, in its expression, and in its unwavering endurance. I just said that your leaders are about to get the City back. Actually of course, it is you who are about to get your City back. It is your City.

A large number of you told me that you were angry that your City was taken away from you and put into bankruptcy. You told me in your court papers. You told me in your statements in court. You told me in your blogs, letters, and protests. I heard you.

I urge you now not to forget your anger. Your enduring and collective memory of what happened here, and your memory of your anger about it, will be exactly what will prevent this from ever happening again. It must never happen again.

When Fredia Butler testified during the confirmation hearing, she quoted the great wisdom of Marian Wright Edelman, who said, "Democracy is not a spectator sport." And so I ask you, for the good of the City's fresh start, to move past your anger. Move past it and join in the work that is necessary to fix this City. Help your City leaders do that. It is your City.

47

This leads to my final thought. We have used the phrase, the grand bargain, to describe the group of agreements that will fix the City's pension problem. That description is entirely fitting.

In our nation, we join together in the promise and in the ideal of a much grander bargain. It is the bargain by which we interact with each other and with our government, all for the common good. That grander bargain, enshrined in our constitution, is democracy.

It is now time to restore democracy to the people of the City of Detroit.

I urge you to participate in it. And I hope that you will soon realize its full potential.