UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
IN RE:  CITY OF DETROIT,      .        Docket No. 13-53846
        MICHIGAN,             .
                              .        Detroit, Michigan
                              .        December 2, 2015
                   Debtor.    .        1:37 p.m.
. . . . . . . . . . . . . . . . .
```

HEARING RE. MOTION FOR ENTRY OF AN ORDER (I) ENFORCING
THE PLAN OF ADJUSTMENT AND (II) REQUIRING THE WITHDRAWAL
WITH PREJUDICE OF THE AUGUST 2, 2013, GRIEVANCE FILED BY
THE SENIOR ACCOUNTANTS, ANALYSTS AND APPRAISERS ASSOCIATION
ON BEHALF OF CEDRIC COOK FILED BY DEBTOR IN POSSESSION
CITY OF DETROIT, MICHIGAN (DOCKET #10183)
BEFORE THE HONORABLE THOMAS J. TUCKER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the City of      Miller, Canfield, Paddock & Stone
Detroit:             By:  MARC SWANSON
                     150 West Jefferson
                     Detroit, MI  48226
                     (313) 496-7591


For the Senior       Scheff & Washington, PC
Accountants,         By:  GEORGE B. WASHINGTON
Analysts and         615 Griswold, Suite 910
Appraisers'          Detroit, MI  48226
Association:         (313) 963-1921


Court Recorder:      Jamie Laskaska
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068


Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1       THE CLERK:  All rise.  This court is now in session.

2   The Honorable Thomas J. Tucker is presiding.  You may be

3   seated.  The court calls the case of the City of Detroit,

4   Michigan, Case Number 13-53846.

5       THE COURT:  All right.  Good afternoon.  Let's have

6   appearances for the record starting with the city.

7       MR. SWANSON:  Thank you, your Honor.  Marc Swanson

8   on behalf of the city.

9       MR. WASHINGTON:  And, your Honor, my name is George

10  Washington on behalf of the Senior Accountants Association.

11      THE COURT:  All right.  Good afternoon.  This is a

12  hearing, as you know, on the city's motion for entry of an

13  order enforcing plan of adjustment, et cetera.  I did review

14  the city's motion brief, the response brief filed on behalf

15  of the Senior Accountants, Analysts and Appraisers

16  Association, and the City of Detroit's reply brief filed, the

17  most recent filing being last Wednesday, November 25.  So,

18  Mr. Swanson, let's hear from you first, and then we'll hear

19  from Mr. Washington.

20      MR. SWANSON:  Thank you, your Honor.  The city

21  requests an order prohibiting Cook from pursuing a grievance

22  that was filed against the city for two reasons.  First, your

23  Honor, Cook voted to accept the city's bankruptcy plan.  The

24  ballot was attached as Exhibit 6-N to the city's motion.  By

25  voting to accept the city's bankruptcy plan, Cook released

1   all claims against the city as of the effective date.

2          The SAAA, the union, raised two arguments in

3   response:  first, said that Cook could not release his

4   claims.  Your Honor, we don't believe that argument is

5   correct for several reasons.  First, the grievance was filed

6   on behalf of Cook.  It was signed by Mr. Cook.  It's premised

7   entirely on Cook's alleged claims against the city, and it

8   requests that the city restore Cook's pay, make him whole,

9   and provide other remedies directly to Cook.  In short, your

10  Honor, the claims alleged in the grievance and the relief

11  requested both fall within the scope of the release provision

12  in the plan and the definition of liabilities upon which that

13  release provision is based.

14         Second, your Honor, the union argues that the

15  contract was assumed and, as a result of that assumption,

16  Cook did not release his claims.  Your Honor, that argument

17  fails immediately because the contract was not assumed.  It

18  was not in effect, as the union stated in its brief, as of

19  the date of confirmation of the city's plan, and, thus, it

20  was not an executory contract and not assumed.  Your Honor,

21  both of the arguments --

22         THE COURT:  And it was not in effect because what?

23  It was superseded by a collective bargaining agreement?

24         MR. SWANSON:  That's correct, your Honor, in July

25  2014.  The plan was not confirmed for several months after

1    that.

2            THE COURT:  Okay.  Go ahead.

3            MR. SWANSON:  Thanks.  In short, your Honor, both of

4    the arguments fail.  The Court should find that Cook released

5    the claims asserted in the grievance and any right to receive

6    anything from the city based on these claims.  So we have one

7    argument based on the ballot and the release provision in the

8    plan, your Honor, and the second argument is a separate --

9            THE COURT:  We have a rather unusual situation, I

10   suppose.  Mr. Cook was sent a ballot, and he signed and sent

11   it in voting to accept the plan at a time when he had not

12   filed a proof of claim, and he never has filed a proof of

13   claim; right?

14           MR. SWANSON:  That's correct, your Honor.

15           THE COURT:  So was he even eligible to vote on the

16   plan?

17           MR. SWANSON:  He held a pension claim, your Honor,

18   so he was eligible to vote on the plan.

19           THE COURT:  Oh, I see.  Pension.  So was that the

20   idea of the ballot was a -- sent to the class of the pension

21   claim holders?

22           MR. SWANSON:  I think it was Class 11, your Honor.

23   The top of the ballot states, "The undersigned, a retiree --

24   a retired GRS pension claim holder in Class 11, as of March

25   1, 2014, against the City of Detroit."  So Mr. Cook had a

1    claim against the city, voted to accept the plan.  The
2    release provision in the plan was not limited in any way to
3    any claims arising or relating to the pension.  It was very
4    broad.  It said all liabilities relating to the city, which
5    clearly would encompass these alleged liabilities.

6         Now, your Honor, the second argument that the city
7    made is that the claims were discharged under the discharge
8    provision of the plan.

9         THE COURT:  Excuse me one second.  I'm just going to
10   pull up on the screen here the ballot.

11        MR. SWANSON:  Sure.

12        THE COURT:  That's exhibit what of your motion?

13        MR. SWANSON:  It's Exhibit 6-N, your Honor.

14        THE COURT:  N.  Okay.  Hold on.

15        MR. SWANSON:  Page 69 of 70 and 70 of 70 of the
16   motion.

17        THE COURT:  All right.  Thank you.

18        MR. SWANSON:  Thank you.  Your Honor, the second
19   argument that the city is making is that the claims were
20   discharged because they arose prior to the city's bankruptcy
21   filing date.  Now, your Honor, the SAAA spent most of its
22   brief discussing when the claim accrued under state law.  As
23   the city has consistently maintained before this Court, that
24   approach, called by -- or referred to by many courts as the
25   accrual approach, is not the proper approach for determining

1  when a claim arises in a bankruptcy case. The proper

2  approach for determining when a claim arises in a bankruptcy

3  case is the fair contemplation test, your Honor, and under

4  the fair contemplation test Cook's claim arose prior to the

5  petition date. The city --

6          THE COURT: Well, you've argued that that doesn't

7  even matter because it clearly arose before the effective

8  date, and that's all the --

9          MR. SWANSON: Oh, on the discharge?

10         THE COURT: Yeah.

11         MR. SWANSON: Yeah.

12         THE COURT: Is that right?

13         MR. SWANSON: I believe that's right, yes. I think

14  the city is not going to pursue the argument that if it arose

15  after the petition date but before the effective date the

16  claim was discharged. The city just would request that the

17  Court focus on whether the claim arose prior to the petition

18  date, not whether it arose -- if it arose after the effective

19  date, then, you know, the city would not maintain that it was

20  discharged. The city would still maintain that the claim was

21  released under the release provision but not under the

22  discharge provision.

23         THE COURT: Okay. So then back to your argument

24  about why you contend it was a claim that arose before the

25  petition date. I think you were going to argue about the

1  fair contemplation test and how it applies here.

2          MR. SWANSON:  Yes, your Honor.  The city went into

3  great detail in its motion about the policies the city had in

4  place and Cook's troubled work history.  Cook was an employee

5  that habitually was disciplined and disciplined in writing.

6  The city acted pursuant to its written policy and provided

7  Cook with written notice each time he violated that policy.

8  Your Honor, in effect, we had a three strikes and you're out

9  policy here.  Cook was provided notice when he violated it

10  the first time.  He was provided notice -- written notice

11  when he violated it the second time, and Cook violated it the

12  third time on the petition date but prior to the time the

13  city filed for bankruptcy.

14          THE COURT:  It was the conduct -- the last conduct

15  that he engaged in that was the basis for -- the suspension

16  and discharge that officially became effective later occurred

17  before the petition was filed?

18          MR. SWANSON:  That's correct, your Honor.

19          THE COURT:  That same day but earlier in the day

20  before, so it's a pre-petition conduct that gave rise to the

21  post-petition suspension and discharge.

22          MR. SWANSON:  That's exactly correct, your Honor.

23          THE COURT:  And under your view of the law, that's

24  sufficient to bring it within the realm of a pre-petition

25  claim under the fair contemplation test?

1    MR. SWANSON:  Yes, yes.  The city maintains that it
2  was within Cook's fair contemplation that if he violated the
3  written policy that had been provided to him for the third
4  time that he would be suspended or discharged, and that
5  claim, thus, arose prior to the petition date.  Consequently,
6  your Honor, the city asks that this Court order that the
7  grievance proceeding be dismissed with prejudice, the first
8  reason being that the claim, whether it arose before or after
9  the petition date, was encompassed within the release
10  provision of the plan when Cook voted to accept the plan, the
11  second argument being that the claim arose prior to the
12  petition date and was discharged under the discharge
13  provision of the plan.  Thank you.
14    THE COURT:  Well, what about -- I just want to get
15  your response to the argument made in the brief filed by the
16  SAAA -- I think it's page 8 of their brief, Docket 10217 --
17  where they rely upon this provision in the order confirming
18  plan that they say is an exception that saves Mr. Cook's
19  claim, the exception to discharge and release provisions of
20  the plan.  I think, if I've got it right, that's at pages 104
21  to 105 of the confirmation order, Docket Number 8272.  Using
22  the page numbers that are in the middle at the bottom of the
23  page, not the PDF page numbers, 104, 105, paragraph Q52
24  there.  I think, if I understand correctly, SAAA is arguing,
25  among other things, that Cook's claim falls within this

1  language of paragraph 52 as a claim based on a liability
2  incurred by the city after the petition date in the ordinary
3  course of its operations and says that because it falls
4  within that definition, as paragraph 52 goes on to say, such
5  claims will be paid by the city --
6          MR. SWANSON:  Sure.
7          THE COURT:  -- without further action by the holders
8  of the claims, et cetera.  What's your response?  What's the
9  city's response to that argument?
10          MR. SWANSON:  Well, one, your Honor, the brief
11  says -- it uses that provision, but the argument is premised
12  on the city having assumed the contract.  The brief says the
13  confirmation order generally confirms that the city has
14  assumed all such contracts, and it specifically provides that
15  claims for violations of such contracts, those being the
16  assumed contracts, are not released and may be prosecuted
17  without filing a claim in this court and without seeking the
18  approval of this Court, so how I interpreted that argument
19  was that based on the assumption that the contract was
20  assumed, this provision comes into play.  If we knock out the
21  faulty assumption that the contract was not assumed, then I
22  didn't see that the SAA was arguing that this provision would
23  have any impact on that, and further --
24          THE COURT:  Well, putting aside the issue of --
25  let's assume you're right, there was no -- the CET was not

1  assumed by the city in the plan -- the confirmed plan or

2  otherwise.  Using that assumption, does this paragraph, Q52,

3  in the order confirming plan that's quoted at page 8 of the

4  SAAA's brief apply to Cook's claim?

5       MR. SWANSON:  Sure.  Well, I guess first we get to

6  the assumption that the claim arose -- this provision only

7  would become operative assuming that Cook's claim arose post-

8  petition, so this provision could only affect the city's --

9       THE COURT:  Well, but it says claims based on

10  liabilities incurred by the city after the petition date.  Is

11  that something different, incurred by the city -- liability

12  incurred by the city, is that something different than when a

13  claim arose, or you think it's the equivalent and should use

14  the same test?  You see what I mean?  See what I'm asking?

15       MR. SWANSON:  Yeah.  I'd not considered the

16  difference between that language.

17       THE COURT:  Do you think that language -- that that

18  provision was intended to refer only to claims that arose

19  post-petition?

20       MR. SWANSON:  Yeah.  "Incurred" seems to me has a

21  more definite meaning than "arose."  We talk about when an

22  obligation was incurred, when an obligation became mature,

23  when, you know, the claim was potentially actionable under

24  nonbankruptcy law, but this provision certainly would not

25  come into play if the claim arose prior to the bankruptcy

1  filing.  And I don't read anything in the release provision
2  which would somehow allow this provision to override the
3  release that Cook provided to the city when he voted to
4  accept the plan.
5          THE COURT:  In other words, the release has no --
6  the release provisions in the confirmed plan, they have no
7  exception language.  Is that what you're saying?
8          MR. SWANSON:  Yes.  Let me read it.
9          THE COURT:  Yeah.
10         MR. SWANSON:  I guess the only exception language,
11  if you -- I'm looking at the plan, page 52
12         THE COURT:  Yes.
13         MR. SWANSON:  If you go down to the absolute bottom,
14  provided further that nothing in this section III.D.7.A shall
15  release the city's obligations under the plan --
16         THE COURT:  I'm sorry.  Where are you in there?
17         MR. SWANSON:  I'm at the absolute bottom of page 52
18  of the plan.
19         THE COURT:  Yes.
20         MR. SWANSON:  Provided further that nothing in this
21  section III.D.7.A shall release, one, the city's obligations
22  under the plan, or, two, any defenses that any party may have
23  against the city, et cetera.
24         THE COURT:  Oh, I see.  So if the paragraph Q52 at
25  pages 104 to 105 of the order confirming plan did apply to

1   give Cook a right to payment under this language, liability

2   incurred after the petition date in the ordinary course of

3   the city's operations, then this language you just read from

4   in the release paragraph on page 52 of the plan would mean

5   that the release would not apply to that.

6           MR. SWANSON: I wouldn't go that far. I mean if

7   we're talking about a, you know, litigation, you know, the

8   release provision here was meant to address litigation claims

9   just like this. I think that reading, if we included all

10   litigation claims as an obligation under the city under the

11   plan, then that would really gut the entire release that --

12           THE COURT: Well, maybe what -- let me see if I

13   understand what you just said.

14           MR. SWANSON: Yeah.

15           THE COURT: It sounds like what you're saying just

16   now is Q52 of the order confirming plan does not apply to a

17   claim like Cook's, which is a litigation claim, I guess in

18   part because you're saying it arose pre-petition.

19           MR. SWANSON: Yes.

20           THE COURT: But had it arisen post-petition, would

21   Q52 apply to it even though it's a litigation claim, or does

22   that not fall within this phrase "incurred in the ordinary

23   course of the city's operations"? Is it in the ordinary

24   course of the city's operations when they -- if they incur a

25   liability because they wrongfully terminate an employee, for

1  example?

2          MR. SWANSON:  Yeah.  Well --

3          THE COURT:  I assume this phrase, "ordinary course

4  of operation," is not defined anywhere in the plan.

5          MR. SWANSON:  I don't believe it's defined anywhere.

6          THE COURT:  Yeah.  Okay.  Go ahead.

7          MR. SWANSON:  Okay.  That's all I have, your Honor.

8          THE COURT:  All right.  So then, if I understand it,

9  the city's arguments now are twofold, one -- mainly twofold.

10  One, by signing a ballot and submitting a ballot accepting

11  the plan, Mr. Cook released his -- any claims, including

12  those claims being pursued under this -- in this grievance,

13  whether or not it's a claim that arose pre-petition; right?

14  Now, the second argument is it's a pre-petition claim.  It's

15  a claim that arose pre-petition under this fair contemplation

16  test, and, therefore, it's discharged --

17          MR. SWANSON:  Correct.

18          THE COURT:  -- by the confirmed plan in its

19  discharge language.  And this Q52 order confirming plan

20  language, liabilities incurred by the city after the petition

21  date in the ordinary course of its operations, doesn't apply

22  because this claim is a pre-petition claim.  It's a claim

23  that arose pre-petition, not after the petition date.

24          MR. SWANSON:  Yes.

25          THE COURT:  Is that right?

1    MR. SWANSON:  That is right.

2    THE COURT:  Okay.  I think I understand these

3    arguments.  Anything else you want to say then?

4    MR. SWANSON:  Nothing further, your Honor.

5    THE COURT:  Okay.  Mr. Washington, what would you

6    like to say?

7    MR. WASHINGTON:  Good afternoon, to start.  Your

8    Honor, first of all, I'd like to put this in some context.

9    We're here for one union and one individual, but I don't

10   think it takes a great stretch of the imagination to

11   recognize the city has 10,000 or so employees, and from July

12   of 2013 till now those employees have filed I would imagine

13   10,000 grievances about somebody who didn't get vacation or

14   somebody who didn't get their overtime or was passed over,

15   and all of those -- a lot of those depend on what seniority

16   rights that they had accrued over many, many years.  And I

17   think there would be an awful lot of people who would be

18   terribly surprised if they were told that, hey, you voted for

19   the plan, and, therefore, you gave up your claim to get your

20   holidays or your overtime or your whatever, and the city put

21   in place these CETs and collective bargaining contracts, but

22   actually once you voted for it, you've given them a license

23   to violate that whenever they want to because they can come

24   to Bankruptcy Court and say, "Hey, you don't have any way to

25   enforce this."

1          And just a couple of points on the waiver argument.

2    And I was actually surprised by the reply brief, and I

3    suppose it's because I do labor law, not bankruptcy, but it's

4    a bedrock principle that a grievance filed by the union is a

5    claim by the union even if it's on behalf of an employee, and

6    I'd cite Vaca v. Sipes, 386 U.S. 171. We can settle that

7    claim. We can pursue it. We, the union, can do that. Mr.

8    Cook can't waive it because we represent everybody, and we

9    can't have people fired or taken out of seniority or

10   anything. It's a union claim, and so --

11          THE COURT: Does Vaca versus Sipes say that, say

12   that --

13          MR. WASHINGTON: Yes, it does.

14          THE COURT: -- an employee cannot waive a grievance

15   that a --

16          MR. WASHINGTON: Yes, it does.

17          THE COURT: -- union files on his behalf?

18          MR. WASHINGTON: It says the grievance belongs to

19   the union, and the union has to represent the person fairly,

20   but it's up to us. I mean we represent --

21          THE COURT: No, no. That wasn't my question. Does

22   Vaca versus Sipes actually talk about the inability of the

23   employee on whose behalf a grievance is filed to waive the

24   grievance?

25          MR. WASHINGTON: Actually, I think it cites earlier

1    cases from like the 1930s which hold that, and I'm going to

2    blank on the name of those cases, but right after the Wagner

3    Act was passed, the Supreme Court held, no, an individual

4    can't waive a union right under a union contract because it

5    affects everybody else.  But I also -- the second argument we

6    would make on waiver is that the ballot language says in

7    accord with the plan.  The plan makes an exception for

8    grievances or for things that arise in the ordinary course,

9    and we would say that any fair contemplation of this, there's

10   no way those 10,000 people when they voted on this thought

11   they were giving up every grievance they ever filed about

12   holidays or overtime or promotions or whatever else or

13   discipline.  And I think, you know, it seems to us that the

14   plan itself, which says claims in the ordinary course will be

15   honored, essentially says to people, okay, we're not talking

16   about that.  We're talking about, you know, your claim to get

17   your pension as it used to be or your claim to get your wages

18   as they were before this or those kind -- or any back claims

19   you had before July of 2013.  I don't think anybody on either

20   side ever thought that every employee in the city was giving

21   up any claim they had about anything, and, in fact, if you

22   look at this case, we were about ready to sit down with the

23   arbitrator before the city even raised this claim.  This case

24   had been pending for a couple years.  Nobody interpreted that

25   ballot that way until somebody in an office came up with that

1    argument.  And so, anyway, the waiver claim, it seems to us,
2    just doesn't make sense.  Logically it doesn't make sense
3    with what the plan says, and it certainly isn't fair, and
4    beyond that, we didn't waive it.

5            Second point I'd make is the city -- on the question
6    of whether we have a contract claim, whether we have a -- you
7    know, whether we're entitled to it, we cited on our brief in
8    page 2 the last executive order that the emergency financial
9    manager or the emergency manager issued, Executive Order 44,
10   and it's quoted, says, "We assume every CET we've ever
11   issued," because Mr. Orr realized that, you know, we've still
12   got grievances coming under these contracts and under these
13   CETs that are in the pipeline somewhere or another.  They
14   assumed it, and it's certainly in the ordinary course of
15   business.  And I'd say among the provisions in the CET and
16   the later contract, the most important or one of the most
17   important is that you won't get discharged except for just
18   cause, I mean, because otherwise you got nothing.  If you can
19   get fired for no reason at all, then you have no job
20   protection.  And just by the by, I don't think anybody
21   thought they were voting to waive that to say if I cast a
22   vote for this plan, then you can fire me anytime you want,
23   and I don't have any remedy.  Nobody thought that.  But I
24   think on the question of -- so I think Mr. Orr definitely
25   assumed the CET, and the grievance was filed by the union on

1    union stationery signed by the union under the CET.  And I
2    think the question -- the really key question it seems to us
3    is is it a pre-petition or a post-petition claim, and on that
4    I'm somewhat surprised again that Mr. Swanson said, "Well,
5    you only cited one case, McSherry, out of the Eighth
6    Circuit," and I thought, well, okay.  I mean this is --
7    termination claims have come up in many bankruptcies.  If you
8    think it's different, really cite some other case, and there
9    is no -- there's nothing that contradicts the principle that
10   a grievance or a claim about a termination accrues when it
11   happens.  And I went back after getting his brief and looked
12   and, you know, I guess you call it key cited now the
13   McSherry.  There is also a Ninth Circuit decision which holds
14   to the same effect at 229 F.3d 871, and it basically says
15   exactly -- in fact, it's a very interesting case because it
16   involves the County of Orange.

17           THE COURT:  What's the name of the case?

18           MR. WASHINGTON:  The case is O'Loghlin versus County
19   of Orange, 229 F.2d -- F.3d -- I'm sorry -- 871, and
20   basically says if you've -- in that case, it was an employee
21   who had had a physical disability which arose pre-petition,
22   and then after the petition she said, "Look, I need some kind
23   of accommodation for my job because I can't do it as I used
24   to."  And they said -- the county in that case said, "Well,
25   but you hurt yourself a couple years ago.  You had discipline

1  a couple years" -- whatever, and they said, "Well, no, it's

2  when the accommodation request comes up is the date of the

3  claim.  And in that particular case, they found, well, okay,

4  there are two of the three things that were at issue which

5  were before the confirmation date, one afterwards, and so the

6  Ninth Circuit said you can go on one-third of your case but

7  not on the other part.

8          In this case, if you applied those principles here,

9  the discharge occurred, if I recall correctly -- suspension

10  July 26, discharge 8-22.  That's when the city took action,

11  and it's what our grievance is filed against.  And, you know,

12  the claim arose on those two dates, both of which are after

13  the petition.  And if they hadn't done that, we had no

14  grievance because whatever happened or didn't happen on July

15  13th -- and actually I think some of the events supposedly

16  happened before the actual firing and some after.  There's a

17  kind of straddle on the events.  But I don't think that's

18  relevant.  It seems to us that -- and this is what both

19  County of Orange and McSherry say, and I think rightly, is

20  that it arises at the time of the termination.  And it seems

21  to us these are different than the cases -- the Grossman's

22  line of cases where it's -- you know, where an asbestos

23  company does something, causes somebody injury, and then they

24  find out about it many years later and bring a lawsuit, and

25  they say, "Well, no, it goes back, you know, under the

1    claim," because the statutory definition of "claim" -- and

2    I'm not a bankruptcy person, as you know, but the statutory

3    is an unsecured liability or an unliquidated claim. Well,

4    the truth is before July 13th -- before July 26 we had no

5    claim. There was no claim at all because there's nothing --

6    until they suspend and terminate him, there's nothing to

7    fight about, nothing to sue about, nothing to do anything.

8    And so before and on July 13th there was no claim within the

9    meaning of the federal bankruptcy petition as well as within

10   the meaning of state law and federal law, too, so that --

11            THE COURT: I assume that part of your argument

12   would be that even though the conduct -- the last conduct by

13   Mr. Cook that gave rise to or --

14            MR. WASHINGTON: Right.

15            THE COURT: -- upon which his suspension and

16   discharge were based, even though that conduct occurred

17   before the petition was filed --

18            MR. WASHINGTON: Right.

19            THE COURT: -- it was -- the city didn't have to

20   discipline him --

21            MR. WASHINGTON: Exactly.

22            THE COURT: -- didn't have to suspend him or

23   discharge him. It could have chosen not to do that.

24            MR. WASHINGTON: That's true.

25            THE COURT: And I think the city's argument is,

1    well, you know, Mr. Cook knew what was going to happen.  As
2    soon as he engaged in this conduct for this third time or
3    whatever it was, he knew what was going to happen, but your
4    point -- counterpoint is you don't know till it actually
5    happens because --
6              MR. WASHINGTON:  True.
7              THE COURT:  -- the city didn't have to do that.
8              MR. WASHINGTON:  I think that's exactly right, and,
9    of course, it all assumes that he did it, which is why we
10   have an arbitration to begin with is did he actually do what
11   they said he did, which we would --
12             THE COURT:  Right.  We're assuming that for purposes
13   of this -- discussing this issue at this point.
14             MR. WASHINGTON:  Yeah, although I'm not sure we can
15   because in some sense the question is did anything happen,
16   and that seems to us what an arbitrator has to decide.  I
17   mean there may be that nothing happened on the 13th.  The
18   only thing we know here for sure is that on the 26th they
19   suspended him, and on the -- what is it?  The 26th they
20   suspended him, and August 22nd they discharged him.  That's
21   when under the bankruptcy definition a claim arose because
22   before that nothing had happened that gave Mr. Cook, the
23   Senior Accountants, or anybody else a claim.  And so on both
24   reasons, it seems to me we really should let Mr. Barnes, the
25   arbitrator, sort this all out and do whatever -- he can find

1  out whether Mr. Cook is the bad guy they said he is or the

2  good guy we say he is, so I mean that's kind of the way we

3  see it.  I'd be happy to answer any questions that you might

4  have.

5          THE COURT:  Is there any other authority you want to

6  cite to me for this proposition that the employee, Mr. Cook,

7  could not waive the grievance filed by his union?

8          MR. WASHINGTON:  And if I could remember the name of

9  the case, I would.  I'd be happy to give you that cite, but

10  to be truthful, your Honor, from a labor law point of view,

11  it's such a bedrock principle that it's like almost the first

12  commandment to us.  But I can certainly provide a cite.

13          THE COURT:  Yeah.  I mean have lawyers -- and this

14  isn't you, but --

15          MR. WASHINGTON:  Yeah.

16          THE COURT:  -- I have lawyers that come in here and

17  say, "I've been practicing law for 30 years, and everybody

18  knows such-and-so" --

19          MR. WASHINGTON:  I understand that.

20          THE COURT:  -- some principle of bankruptcy law

21  that -- well, what's the authority?  There isn't any.  You

22  can try to find it.  There isn't any.  It's just wrong.  I

23  mean this has happened to me.

24          MR. WASHINGTON:  I understand that.

25          THE COURT:  And I'm not accusing you.

1          MR. WASHINGTON:  Yeah.  I understand.

2          THE COURT:  I'm just saying, you know, I got to have

3     something to go on here.  I'll certainly review Vaca versus

4     Sipes, but if there's anything else you want to cite to me on

5     that, I'd like to know it.

6          MR. WASHINGTON:  And I would be happy to do that.

7     Can I send a letter or a supplemental, something like that?

8     I'd have to do it by paper as we --

9          THE COURT:  Just file a supplemental brief.  You're

10    still filing by paper?

11         MR. WASHINGTON:  Yeah.

12         THE COURT:  I'll allow you to do that.  We'll come

13    back to a deadline for that because I want to give the city

14    an opportunity also to brief that if they want to.

15         MR. WASHINGTON:  Okay.  Fine.  That would be fine.

16         THE COURT:  Anything else you want to say?

17         MR. WASHINGTON:  No.  I think we've said what it is.

18    I do think there'd be an awful lot of people surprised if

19    they found out that they had -- their vote suddenly meant

20    they didn't get -- their grievance on Thanksgiving holiday

21    was gone or whatever.

22         THE COURT:  All right.

23         MR. WASHINGTON:  Thank you very much.

24         THE COURT:  Thank you.  Mr. Swanson, as counsel for

25    the moving party, I'll give you an opportunity to reply

1   briefly if you want to.

2          MR. SWANSON:  Sure, your Honor.  Just two points

3   here.  First, Mr. Washington referred to this emergency

4   manager order that was attached as an exhibit to his brief.

5   That emergency manager order is dated December 8th, 2014.

6   Mr. Washington claims it stands -- some of the language in

7   there caused the city to assume the CET.  The language I'd

8   like to point the Court to is cited in the brief.  "The EM

9   also ratifies and approves the CETs that were implemented

10  prior to the EM tenure and that remain in effect as of the

11  date of this order."  The union stated in its brief that the

12  CET was not in effect as of December 8th, 2014, so I don't --

13  I think it's legally wrong that the order --

14         THE COURT:  This is the quotation now that you have

15  on page 2 of your reply brief it looks like; right?

16         MR. SWANSON:  Yes, yes, yeah, yeah, yeah.

17         THE COURT:  Oh, wait.

18         MR. SWANSON:  Well --

19         THE COURT:  No.  The emergency manager order, you

20  don't quote that in your brief?

21         MR. SWANSON:  I don't quote that.

22         THE COURT:  I see.  Okay.

23         MR. SWANSON:  The union quotes it on page 2 of its

24  brief.

25         THE COURT:  Oh, I see.  Hold on a minute.  Where

1  does the CET that's involved in this case fall in this

2  quotation?

3        MR. SWANSON:  It's not encompassed within that

4  quotation because it was not in effect at the time of the

5  order.  The order was dated December 8, 2014.  The CET was

6  not in effect in July of -- after July of 2014.

7        THE COURT:  Well, it says -- second sentence of the

8  quotation in the brief of the union, at least, says, "All

9  city employment terms, CETs, are hereby adopted, ratified,

10 and approved in all respects," et cetera.  You think that

11 refers only to CETs that were then in effect?

12       MR. SWANSON:  Yes, your Honor.

13       THE COURT:  And I assume they're not -- that this

14 one is not listed on the attached Exhibit C to that order.  I

15 didn't look to see, but --

16       MR. SWANSON:  There was no Exhibit C attached to the

17 order that was included within the movant's brief.  I didn't

18 independently look to see if there was an Exhibit C, but I

19 assume if it had been listed there, the union would have

20 included it.

21       THE COURT:  All right.  Go on.  What else did you

22 want to say?

23       MR. SWANSON:  Just I wanted to touch briefly again

24 on when this claim arose.  The union cites to McSherry.  The

25 city does not believe that McSherry is applicable because the

1  quoted portion about when the claim arose was in response to
2  the _Frenville_ approach.  This was another case which was
3  discussing the accrual approach.  When the claim became
4  actionable under state law is not the test for bankruptcy.
5  If the claim didn't become actionable until July 26th or
6  whatever other date the union alleges, that's not the test.
7  The test that this Court needs to focus on is whether the
8  claim was within Cook's fair contemplation as of the petition
9  date, and that is an entirely separate question from when the
10 claim became actionable under state law.  Thank you.
11        THE COURT:  Was there anything else?
12        MR. SWANSON:  No, your Honor.
13        THE COURT:  All right.  Thank you both.  Mr.
14 Washington, as we said, I'll give you an opportunity to file
15 a brief -- a short supplemental brief regarding this issue
16 that I raised or asked further about regarding the -- what
17 you say is the legal inability of an employee to waive a
18 claim that a union has brought as a grievance on his behalf.
19 How much time do you want?  Is seven days enough time for you
20 to file it?
21        MR. WASHINGTON:  That would be fine, your Honor,
22 yeah.
23        THE COURT:  I don't want a big long brief.  I want
24 a --
25        MR. WASHINGTON:  Oh, and it won't be.

1          THE COURT:  Two pages enough?

2          MR. WASHINGTON:  Two pages is fine.

3          THE COURT:  All right.  Two pages, seven days, and

4    I'll enter a short order that permits that, sets a deadline,

5    and which says right in the order that you are permitted to

6    file that in paper form.

7          MR. WASHINGTON:  Thank you.

8          THE COURT:  You still -- you're not -- you're still

9    not filing electronically?

10          MR. WASHINGTON:  No, because I'm --

11          THE COURT:  Okay.

12          MR. WASHINGTON:  -- not a bankruptcy -- I don't tend

13    to do much bankruptcy, frankly.

14          THE COURT:  All right.  Mr. Swanson, I'll give you

15    an optional opportunity to file a response to that.  Unless

16    you want to waive that now, I'll give you that option and set

17    a deadline.  What do you want to do?

18          MR. SWANSON:  No, your Honor.  We would like that

19    option.

20          THE COURT:  Okay.  Seven days after the union's

21    brief is enough time, I assume?

22          MR. SWANSON:  Yes, your Honor.

23          THE COURT:  Okay.  So the union's deadline will be

24    December 9, one week from today, City's response will be

25    December 16, each brief not to exceed two pages.  When that

1  December 16 date has passed, I will consider this motion to

2  be taken under advisement at that point. I'll certainly

3  review that. I do want to take some additional time, in any

4  event, to think some more about the issues and the arguments

5  made in both the writings and in the oral argument and will

6  consider the supplemental briefs. I anticipate issuing a

7  written decision on this, hopefully not a very long one,

8  sometime before the end of December, this month.

9          Mr. Washington, you may be aware -- I don't know if

10  you are or not, but I'll just, just so you're aware of this,

11  let you know that I have a couple of other matters -- motion

12  matters that I have heard previously in the City of Detroit

13  case that concern in part this issue of when did a claim

14  arise, did it arise pre-petition or post-petition, that I

15  have to decide, and I'm going to issue a written opinion on

16  that -- on those matters, probably one opinion for both of

17  those matters, and I'll probably do that very close to the

18  same time that I issue the decision in this matter, maybe

19  sooner since this one has to wait until the parties file

20  their supplemental briefs. So this is not the first time

21  that issue has come up, although I haven't ruled on it yet in

22  any of these matters, so you'll see that, you know, if you

23  care to see it, the opinion that comes out on that on these

24  other matters as well, so all right. So anything else today

25  then?

1          MR. WASHINGTON:  Nothing, your Honor.  Thank you.

2          MR. SWANSON:  Nothing, your Honor.

3          THE COURT:  All right.  Thank you both, and thank

4    you for your efforts and for your oral argument.

5          THE CLERK:  All rise.  Court is adjourned.

6       (Proceedings concluded at 2:20 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            December 9, 2015
_____       _____
Lois Garrett