Carmelita Brown Bullock
27900 Independence # 201F
Farmington Hills, MI 48336
carmtrav90@gmail.com
(313) 828 7878

FILED (I)

2016 MAR 22 P 12: 53

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

Marc N. swanson
MILLER, Canfield, Paddock, and Stone,PLC
150 WEST Jefferson, Suite 2500
Detroit,MI 48226

**3/17/2016**

**RE: Bankruptcy Case No. 12-53846 & Claim # 1654**

Dear Mr. Swanson,

*[28+L Omnibus] CB*

    The purpose of this correspondence is to respond to the City of Detroit's objection to my claim due to **Insufficient Documentation(Claim # 1654)**. I worked for the Department of Human Services and I held the title Sr. Senior Child Development Compliance Assistant. I was laid off by the City of Detroit on August 1 2012. At that time, I was a member in good standing in the SAAA union. Between January 2009 and July 31, 2012, the City of Detroit caused me to lose wages when they changed their policies mid-stream without bargaining. I humbly request that my claim not be dismissed, as it has validity. I have already submitted a signed copy of my last union contract and an itemized accounting of my claim. I am resubmitting an itemized accounting of my claim and SAAA contract. If you should require additional documentation, please contact me. I will respond promptly. Thank you for your time and consideration.

Sincerely,

Carmelita Brown Bullock

*Name Carmelita Brown Bullock*
*Title: Sr. Child Development Compliance Assistance*
*City of Detroit: Department of Human Services/Head Start*

*Non negotiated reductions in wages and Election Holidays taken away. Also elimination of longevity payout and swing holidays vacation days added.*

*Forced 10% reduction in pay for 31 months ($47,200 annual)...................... $11,750.00*

*Elimination of longevity 2yr@ $150.00/yr and 1yr@ $175.00 .......................$475.00*

*Swing Holiday hrs taken 56hrs@ $22.59/hr................................................$1265.00*

*Election Day worked 16hrs worked @ $33.89/hr..........................................$542.24*

*Hour lunch eliminated 245hr@ $22.56/....................................................$5534.55*

*Total claim..........................................................................................$19,566.79*

# MASTER AGREEMENT

BETWEEN THE

# CITY OF DETROIT

AND

# SENIOR ACCOUNTANTS, ANALYSTS AND APPRAISERS ASSOCIATION

# 2008-2012

**2008-2012 MASTER AGREEMENT BETWEEN THE CITY OF DETROIT AND THE SENIOR ACCOUNTANTS, ANALYSTS, AND APPRAISERS ASSOCIATION**

# TABLE OF CONTENTS

| ARTICLE NUMBER | | PAGE NUMBER |
|---|---|---|
| | Agreement | 1 |
| | Purpose And Intent | 1 |
| 1. | Recognition Of Association | 1 |
| 2. | Management Rights And Responsibilities | 2 |
| 3. | Equal Employment Opportunity | 2 |
| 4. | Rights Of Employees Represented By The Association | 2 |
| 5. | Association Security | 3 |
| 6. | Association Representatives | 5 |
| 7. | Grievance Procedure | 5 |
| 8. | Time Limit On Grievances | 9 |
| 9. | Time Limit On Monetary Claims | 9 |
| 10. | Special Conferences | 10 |
| 11. | Interference With Work | 10 |
| 12. | Discharge And Suspension | 11 |
| 13. | Seniority | 11 |
| 14. | Seniority For Association Representatives | 12 |
| 15. | Sub-Contracting | 13 |
| 16. | Reduction In Force | 13 |
| 17. | Promotions | 18 |
| 18. | Probation Periods | 18 |
| 19. | Inter-Departmental Transfers | 18 |
| 20. | Veterans Preference | 19 |
| 21. | Maintenance Of Conditions | 19 |
| 22. | Refreshment Breaks | 19 |
| 23. | Other Conditions Of Employment | 19 |
| 24. | Wages | 20 |
| 25. | Overtime | 21 |
| 26. | Shift Premium, Show Up Time | 22 |
| 27. | Out-Of-Class Work Assignments | 22 |
| 28. | Jury Duty | 23 |
| 29. | Workers' Compensation | 24 |
| 30. | Vacations | 26 |
| 31. | Unused Sick Leave On Retirement | 29 |
| 32. | Holidays And Excused Time Off | 29 |
| 33. | Miscellaneous | 31 |
| 34. | Sick Leave | 33 |
| 36. | Leaves Of Absence | 34 |
| 37. | Funeral Leave | 35 |
| 38. | Death Benefits And Life Insurance | 36 |

## 2008-2012 MASTER AGREEMENT BETWEEN THE CITY OF DETROIT AND THE SENIOR ACCOUNTANTS, ANALYSTS, AND APPRAISERS ASSOCIATION

# TABLE OF CONTENTS

| ARTICLE NUMBER | | PAGE NUMBER |
|---|---|---|
| 39. | Hospitalization, Medical Insurance, Dental Insurance And Optical Care | 39 |
| 40. | Unemployment Compensation – Supplemental Unemployment Benefits | 45 |
| 41. | Retirement Provisions | 47 |
| 43. | Cooperation In Validation Studies | 53 |
| 44. | Safety | 53 |
| 45. | Flex-Time | 53 |
| 46. | State Licensing Examinations | 54 |
| 47. | Tuition Refund | 54 |
| 48. | Rates For New Positions | 55 |
| 49. | Successor Clause | 55 |
| 50. | Content | 55 |
| 51. | Savings Clause | 56 |
| 52. | Modification And Termination | 57 |
| | Signature Page | 57 |

**MEMORANDUMS OF UNDERSTANDING:**

| | | |
|---|---|---|
| Re: | Service Improvement Process (SIP) For Bargaining Unit Members | 58 |
| Re: | Medical Technologists In The Health Department | 61 |
| Re: | Association Business Time For Association Grievance Executive | 63 |
| Re: | Association Business Time | 64 |
| Re: | Americans With Disabilities Act | 66 |
| Re: | Labor/Management Committees | 67 |
| Re: | Budget Analyst Positions | 69 |
| Re: | Drafting Technicians I, II, And III | 70 |
| Re: | Classification And Out-Of-Class | 71 |
| Re: | Substance Abuse Program | 72 |
| Re: | Temporary Placement Of Employees Into Other Duties/Departments | 74 |
| Re: | Association Jurisdiction – Schedule B | 75 |
| Re: | City Alternative Health Care Proposal | 76 |
| Re: | HR / Payroll Systems | 79 |
| Re: | Defined Contribution Retirement Plan | 80 |
| Re: | Family Medical Leave | 81 |
| | Schedule A | 87 |
| | Schedule B | 90 |
| | Schedule C | 92 |

DRAFT 4/26/2008
ii

# AGREEMENT

This Agreement is entered into between the City of Detroit, a Michigan Municipal Corporation (hereinafter referred to as the "EMPLOYER" or the "CITY") and The Senior Accountants, Analysts, and Appraisers Association, a labor organization existing under the laws of the State of Michigan (hereinafter referred to as the "ASSOCIATION").

**NOTE:** The headings used in this Agreement and Exhibits neither add to nor subtract from the meaning but are for reference <u>only</u>.

# PURPOSE AND INTENT

A. The general purpose of this Agreement is to set forth terms and conditions of employment and to promote orderly and peaceful labor relations for the mutual interest of the City of Detroit in its capacity as an Employer, the Employees, the Association and the citizens of the City of Detroit.

B. The parties agree that both management and employees should work toward improving the quality of life in Detroit. Accordingly, we recognize that the interest of the community and the job security of City employees depend upon the Employer's success in establishing a proper service to the community. Therefore, the parties will be working together toward achieving the goal of customer service excellence for citizens, businesses and visitors of Detroit; and accomplishing the Employer's initiatives of effective community policing, safe and stimulating programs for young people, and improving the environment in neighborhoods to instill civic pride and encourage new development.

C. To these ends, the Employer and the Association encourage to the fullest degree friendly and cooperative relations between the respective representatives at all levels and among all employees.

D. Basic rights and equities of employees are established through the City Charter, Executive Orders of the Mayor, Ordinances and Resolutions of the City Council, rules of the Civil Service Commission, and the terms of this Agreement.

# 1. RECOGNITION OF ASSOCIATION

A. Pursuant to and in accordance with all applicable provisions of the Public Acts of 1947, as amended, the Employer does hereby recognize the Association as the exclusive representative for all employees holding the classifications listed in Schedule A, for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment for the term of this Agreement.

B. The City shall not promote any labor group or organization which purports to engage in collective bargaining or make any agreement with any labor group or organization which would violate any rights of the Association under this Agreement.

DRAFT 4/26/2011

## 2. MANAGEMENT RIGHTS AND RESPONSIBILITIES

A.   The Association recognizes the prerogative of the City to operate and manage its affairs, in all respects in accordance with its responsibilities and powers of authority as set forth in State Law, the Charter and Home Rule Act.

B.   The City reserves the right to discipline and discharge for just cause. The City reserves the right to lay off for lack of work or funds; or the occurrence of conditions beyond the control of the City; or where such continuation of work would be wasteful and unproductive. The City shall have the right to determine reasonable schedules of work, including overtime, and to establish the methods and processes by which such work is performed. The employee shall have the right to grieve upon the interpretation and application of these provisions.

C.   It is understood by the parties that every incidental duty connected with operations enumerated in classification specifications is not always specifically described.

D.   The City has the right to establish reasonable practices, policies or rules, provided the same do not conflict with the express terms of this Agreement and are applied equally to all employees in the bargaining unit.

## 3. EQUAL EMPLOYMENT OPPORTUNITY

A.   The City and the Association agree that the City is legally and morally obligated to provide equality of opportunity, treatment and consideration for all City employees and applicants for employment, and to establish policies and practices which will insure such equality of opportunity, treatment and consideration for all persons in all phases of the employment process without regard to race, color, creed, religion, national origin, age, political orientation, association affiliation, sex, sexual orientation, marital status, or disability.

B.   In recognition of the provision of the City Charter which mandates the City's Human Resources Department to take affirmative action to assure that all levels of the classified service are reasonably representative of the ethnic and sex composition of the City, the City agrees to make available representatives of the Human Resources Department to meet with representatives of the Association to discuss any aspects of affirmative action activities which may involve the Association or members of the bargaining unit.

## 4. RIGHTS OF EMPLOYEES REPRESENTED BY THE ASSOCIATION

A.   Nothing in this Agreement shall abridge any right or privilege that any employee has under the Constitution and Laws of the State of Michigan, nor under the Charter or Ordinances of the City of Detroit or resolutions of the Detroit City Council unless otherwise provided in this Agreement.

B. The Association may request the Classification and Compensation Division of the Human Resources Department to conduct a classification survey of any position in which an individual represented by the Association is the incumbent. The Human Resources Department will endeavor to complete such survey within ninety (90) calendar days after receipt of the incumbent's completed classification questionnaire. If for some reason a delay of more than ninety (90) calendar days is caused, the Association will be advised as to the reasons and cause of the delay.

C. No employee represented by the Association who holds permanent status in a class shall be status changed to another classification without the employee's concurrence unless such status change was made for disciplinary reasons including demonstrated unsatisfactory work performance in the employee's current classification.

D. **Personnel Records:** All employees within the bargaining unit shall have the right to review his/her personnel record every six (6) months if requested by the employee in writing. Such requests shall be granted within five (5) working days of receipt of the written request and shall be scheduled during regular business hours. This review may be with the presence of the employee's representative if requested by the employee.

E. Employees shall be entitled to copies of materials in their personnel file, and to submit written statements explaining the employee's position if there is disagreement with any material in the file in accordance with applicable State law.

F. No employee represented by the Association shall be assigned on a permanent basis to supervise or be responsible for the work of any other bargaining unit member who is at the classification level equal to or greater than that of the employee. Excluded from this provision are situations where the employee is assigned to work out-of-class, a promotion is pending or his/her position is undergoing classification survey. Also excluded are situations where the employee is a lead person of a work team or task force.

# 5. ASSOCIATION SECURITY

A. Employees are free to join or not to join the Association. Employees who are members of the recognized bargaining unit but who are not members of the Association may join the Association by initiating their Association application form and dues deduction authorization form.

The employing department shall promptly notify the district representative and the Association President when new members are hired or promoted into the Association bargaining unit.

B. The City agrees to deduct from the wages of an employee, who is a member of the Association, all Association membership dues uniformly required, as provided in a written authorization in accordance with the standard form used by the City provided that the said form shall be executed by the employee. The written authorization for Association dues deduction shall remain in full force and effect during the period of this Agreement unless revoked by written notice. The revocation notice must be given to both the Finance Department and to the Association.

C. All persons certified and employed with the City on or after October 11, 1947, and who are covered by this Agreement and who are not Association members, shall, as a condition of employment, pay the Association a service fee as a contribution towards the administration of this Agreement, in an amount determined by the Association in accordance with applicable Law. Employees who fail to comply with this requirement shall be discharged within thirty (30) calendar days after receipt of written notice by the Department from the Association, unless otherwise notified by the Association, in writing, within said thirty (30) calendar days and provided, that the Association shall release the Department from fulfilling the obligation to discharge if during such thirty (30) calendar day period the employee pays the membership dues or service fee retroactive to the due date and confirms his/her intention to pay the required membership dues or service fee in accordance with this Agreement.

D. The City agrees to deduct from the wages of any employee covered by this Agreement, who is not a member of the Association, all Association service fees uniformly required as provided in a written authorization in accordance with the standard form used by the City, provided that the said form shall be executed by the employee. The written authorization for Association service fee deduction shall remain in full force and effect during the period of this Agreement unless revoked by written notice. The revocation notice must be given to both the Finance Department and to the Association.

E. All Association membership dues and service fees will be authorized, levied, and certified in accordance with the by-laws of the Association. Each employee and the Association hereby authorizes the City to rely upon and to honor certifications by the Treasurer of the Association regarding the amounts to be deducted and the legality of the adopting action specifying such amounts of Association dues and service fees, which dues and service fees shall be sent to the Treasurer of the Association. The Treasurer of the Association shall not request the City to change the amounts so deducted more often than four times each City fiscal year.

F. The Association shall have no right or interest whatsoever in any money authorized withheld until such money is actually paid over to them. The City or any of its officers and employees shall not be liable for any delay in carrying out such deductions; and upon forwarding a check in payment of such deductions by mail to the Association, the City and its officers and employees shall be released from all liability to the employee-assignors, and to the Association under such assignments. (Chapter 13, Article 4, Section 4 of the Municipal Code of the City of Detroit.)

G. The Association shall refund to employees, dues and service fees erroneously deducted by the City and paid to the Association. The City may offset any amount erroneously or improperly deducted and paid to the Association from any subsequent remittance to the Association.

H. The Association agrees to save and hold harmless the City from any damages or other financial loss which the City may be required to pay or suffer as a consequence of enforcing the above provisions.

# 6. ASSOCIATION REPRESENTATIVES

A. The Association shall appoint district representatives for members of the bargaining unit. Employee representatives shall be members of the bargaining unit. These representatives and the particular departments and offices which they serve as indicated in Schedule B shall be made known to the departments within thirty (30) calendar days of the effective date of this Agreement. The Association will promptly provide an updated list of any subsequent changes of association representatives to the department and the City.

B. The representatives, during working hours and without loss of time or pay, may investigate and present grievances to the Employer. Arrangements shall be made with the immediate supervisor for their release. This privilege shall not be abused.

C. In the absence or unavailability of a district representative or alternate, bargaining unit members can be represented by the Association President, designated Grievance Executive or Administrative Representative.

# 7. GRIEVANCE PROCEDURE

Should differences arise between the City and the Association during the term of the Agreement, an earnest effort shall be made to resolve such differences promptly.

An employee grievance is a difference between the Employer and the employee concerning the interpretation or application of any provision of the Agreement.

An Association policy grievance is a difference between the Employer and the Association concerning the interpretation or application of any provision of the Agreement affecting members of the bargaining unit in two (2) or more City departments or many members within a department and may be processed to Step 4 of the grievance procedure.

All grievances involving suspension, discharge or separation of an employee shall be initiated at Step 3 (department head level) of the grievance procedure.

The grievance procedure contained in this Article shall be the exclusive grievance procedure available to members of the bargaining unit and shall be as follows:

**STEP 1:** An employee who believes he/she has been dealt with unjustly because any provision of this Agreement has not been properly applied or interpreted, may discuss his/her complaint with his/her supervisor, with or without his/her district representative (in accordance with Schedule B); both parties shall discuss the complaint in a friendly manner and will make every effort to reach a satisfactory settlement.

**STEP 2: NOTE:** Step 2 of the Grievance Procedure will only be applicable to the Finance, Health and Water and Sewerage Departments. For all other departments, the written grievance shall be directly forwarded to the department head (see Step 3). If the Department representative at Step 1 is also the Department representative at Step 2, the written grievance shall be directly forwarded to Step 3.

If the matter is not satisfactorily settled, a grievance may be submitted in written form by the Association President, designated Grievance Executive or Administrative Representative to the immediate supervisor, who will stamp the date received and forward the grievance to the division head or his/her designated representative.

The written grievance shall set forth the nature of the grievance, the date it occurred, identify the employee or employees involved by name, the provisions of this Agreement that the Association claims the City has violated, and specific remedies the Association desires.

In cases where the District Representative is involved, he/she shall be allowed time off the job without loss of time or pay to investigate and process grievances that may arise under this Agreement. This privilege shall not be abused. An aggrieved employee desiring the services of his/her district representative shall request permission from his/her supervisor, and permission shall be granted without undue delay.

A meeting will be held within five (5) working days of the date the written grievance is received by the division head. The meeting shall involve no more than three (3) City representatives of which one shall be the division head or his/her designated representative and no more than three (3) Association representatives, which shall include:

1. The grievant
2. Designated Association Representative
3. The Association President or his/her designated representative.

The division head or his/her designated representative shall submit his/her written answer to the Association President within five (5) working days after the meeting concerning the grievance.

If the answer of the division head or his/her designated representative is not acceptable to the Association, the Association may appeal in writing to the department head within five (5) working days of receipt of the written answer from the division head or his/her designated representative.

**STEP 3: NOTE:** If Step 2 of the Grievance Procedure is not applicable, the written statement of the grievance as described above shall be directly forwarded to Step 3 (department head level). If the Department representative at Step 2 is also the Department representative at Step 3, the written grievance shall be directly forwarded to Step 4.

Within five (5) working days from the receipt of the written grievance or appeal from the Second Step, the department head will arrange a meeting. The meeting shall involve no more than three (3) City representatives, and no more than three (3) Association representatives, which shall include the appropriate Association Representative and the Association President or his/her designated representative, and may include the grievant.

The department head or his/her designated representative shall submit his/her written answer to the Association President within ten (10) working days after the meeting concerning the grievance. Management's written answer after the Third Step meeting shall briefly state the factors considered by management in its decision regarding the grievance.

If the department head's or their designated representative's answer is not acceptable to the Association, the Association may appeal in writing to the Labor Relations Director within ten (10) working days of receipt of the written answer from the department head or their designated representative.

**STEP 4:** The Association's written appeal to the Fourth Step shall briefly state the facts in dispute and/or reasons for dissatisfaction with management's Third Step answer. Within ten (10) working days from the receipt of the written appeal from the third step, the Labor Relations Division will arrange a meeting. The meeting shall involve no more than three (3) City representatives, and no more than three (3) Association representatives, which shall include the appropriate District Representative and the Association President.

The Labor Relations Director will answer the grievance in writing within ten (10) working days from the date of the meeting at which the grievance was discussed. The Labor Relations Director's answer will be sent to the Association President.

In the event the dispute is not settled, it may be referred to arbitration within ninety (90) calendar days of receipt by the Association of the Labor Relations Director's answer.

**STEP 5 – ARBITRATION:** Any unresolved grievances which relate to the interpretation, application or enforcement of any specific article and section of this Agreement which have been fully processed through the Fourth Step of the grievance procedure, may be submitted to arbitration in strict accordance with the following:

1. Arbitration shall be invoked by written notice to the other party of the intent to arbitrate. When the matter is referred to arbitration, it shall be assigned in rotation to a member of the mutually selected panel of arbitrators. Panel arbitrators shall be selected with, and shall continue to serve subject to, the consent of both parties. If the parties are unable to agree upon the panel of arbitrators, the party desiring arbitration shall refer the matter to the Federal Mediation and Conciliation Service (FMCS). Once a list of arbitrators is secured, the parties will then meet to mutually agree upon an arbitrator from the list. If the party desiring arbitration fails to refer the matter to either the Panel Arbitrators or the Federal Mediation and Conciliation Service within a reasonable time, not to exceed ninety (90) working days of the notice of intent to arbitrate the matter shall be considered settled on the basis of the last answer to the grievance.

2. The arbitrator shall limit his/her decision strictly to the interpretation, application or enforcement of this Agreement and he/she shall be without power and authority to make any decision:

   a. Contrary to, or inconsistent with, or modifying or varying in any way the terms of this Agreement.
   b. Concerning the discipline or discharge of employees for engaging in a strike, slowdown or stoppage of work who exercise their right under Section 6 of Act 336, as amended.
   c. Concerning grievances appealed to the Mayor pursuant to applicable State Veteran laws.
   d. Granting any wage increases or decreases, or altering contractual wage rates.
   e. Granting any right or relief for any period of time whatsoever prior to the execution date of this Agreement.

7

f.   Contrary to the City's right to establish, adopt, and amend, promulgate and enforce uniform work rules for its departments.

g.   Relative to position classification whether permanent or temporary. The parties recognize this is within the sole jurisdiction of the Human Resources Department.

h.   In a discipline case involving alleged misconduct, directing that the grievant be transferred to another department or agency.

3.   The arbitrator shall be without authority to require the City to delegate, alienate or relinquish any powers, duties, responsibilities, obligations or discretion's which by state law or City Charter the City cannot delegate, alienate or relinquish.

4.   No settlement at any stage of the grievance procedure, except an arbitration decision, shall be a precedent in any arbitration and shall not be admissible in evidence in any future arbitration proceeding.

5.   All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any compensation received for temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Family Independence Agency, and City-funded Long Term Disability Insurance, Sickness and Accident Insurance and Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employees equity therein.

6.   The decision of the arbitrator in a case shall not require a retroactive wage adjustment in another case except by express agreement of the parties.

7.   There shall be no appeal from the arbitrator's decision, if made in accordance with his/her jurisdiction and authority under this Agreement. The Arbitrator's decision shall be final and binding on the City, on the employee or employees and on the Association.

8.   In the event a case is appealed to an arbitrator and he/she finds that he/she has no power to rule on such case, the matter shall be referred back to the parties without decision or recommendations on the merits of the case.

9.   The expenses of the arbitrator shall be shared equally by the parties. The aggrieved and his/her local representative shall not lose pay for time off the job while attending the arbitration proceedings.

10.   Except as provided herein by letter or agreement between the parties, the parties understand and agree that in making this contract they have resolved for its term all bargaining issues which were or which could have been the subject of discussion. The arbitral forum here established is intended to resolve disputes between the parties only over the interpretation or application of the matters which are specifically covered in this contract and which are not excluded from arbitration.

# 8. TIME LIMIT ON GRIEVANCES

A. Any grievance settlement shall be made in accordance with the terms and spirit of this Agreement. Further, Labor Relations is authorized to make settlements on behalf of the City regarding any unresolved grievance properly appealed to Step 4 or Step 5 of the grievance procedure.

B. Any grievance under this Agreement which is not filed in writing within fifteen (15) working days after the grievance arises shall not be considered a grievance.

C. The time limits in the first two (2) steps of the grievance procedure can be shortened or extended or steps may be eliminated by mutual agreement; any grievance to which an answer is not made by the City within the time limits prescribed, or any extension which may have been agreed to, may be referred to the next step in the grievance procedure, the time limit to run from the expiration date of the City's time limits.

D. Any grievance not appealed in writing from a decision at the previous step to the next step within the specified time periods shall be considered settled.

E. The Association may withdraw any grievance without prejudice at the first or second step. However, the grievance withdrawn may not be reinstated.

F. The period of "optional holiday closing" (established under the Holiday Article of this Agreement) will be excluded from the grievance procedure time limits.

# 9. TIME LIMIT ON MONETARY CLAIMS

A. The City shall not be required to pay back wages for any period longer than two (2) working days prior to the date on which a written grievance is filed.

B. All claims for back wages shall be limited to the amount of wages that the employee otherwise would have earned less any direct monetary compensation received for temporary employment obtained subsequent to his/her removal from the City payroll, and payments from Unemployment Insurance, Social Security Disability, Welfare, Family Independence Agency, and City funded programs such as Long Term Disability Insurance, Sickness and Accident Insurance and Automobile Accident Income Replacement Insurance. Where appropriate, the City shall reimburse those agencies and insurance funds so as to not affect the employee's equity therein. (**NOTE**: It is the understanding of the parties that deductions from back wages excludes all forms of income existing at the time the employee was suspended or discharged and which were not the direct result of the loss of employment).

C. In the case of a pay shortage in which the employee would not have been aware before receiving his/her pay, any adjustment shall be retroactive to the beginning of the pay period covered by such pay if a grievance is filed within ten (10) working days within receipt of such paycheck.

D. In cases where a pay shortage or an overpayment has occurred due to an error and the amount that should have been paid is not a matter of dispute no time limits on recovery shall apply.

# 10. SPECIAL CONFERENCES

A. Special Conferences shall be arranged between the Association and the department head or his/her designated representative upon the request of either party within ten (10) working days of such request. Such meetings shall be between no more than three (3) representatives of the department and no more than three (3) representatives of the Association one of whom shall be the Association President. Arrangements for such Special Conferences shall be made in advance and an agenda of the matters to be taken up at the meeting shall be presented at the time the Conference is requested. A copy of the request and agenda shall be sent to the Labor Relations Division for informational purposes.

B. Matters taken up in Special Conferences shall be confined to those included in the agenda. Conferences shall be held between the hours of 9:00 a.m. and 4:00 a.m. The representatives of the Association shall not lose time nor pay for time spent in Special Conferences.

C. On certain matters that concern employees of more than one department, Conferences shall be arranged between the Association representatives and the City's Labor Relations Division, in which case Association representation limitations shall be mutually agreed upon between the parties.

D. The Association may meet at a place designated by the City on the City's property for not more than one-half (1/2) hour immediately preceding a meeting with the representatives of the City for which a written request has been made.

# 11. INTERFERENCE WITH WORK

A. The Association agrees to refrain from engaging in any strike, work stoppage, slowdown or interference of any kind with the operations of the City during the term of this Agreement. Should a strike, work stoppage, slowdown, or similar interference with work occur, the City and the Association will take every affirmative step necessary to immediately end such activity.

B. The City will not lock out any employee during the term of this Agreement. However, if any employee is unable to work because equipment or facilities are not available due to a strike, work stoppage, slowdown or other interference by other employees, such inability to work shall not be deemed a lock out under the provisions of this Section.

C. It shall not be a violation of this Agreement, and it shall not be a cause for discharge or disciplinary action if any employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of the Association, except that the City shall not be required to pay the wages of employees who shall refuse to report for and be willing to work. Provided, however,

that such refusal shall in no way be detrimental to the public health or safety. However, the employee cannot be ordered to cross a picket line if such action could result in adverse effect on the personal safety of the employee, nor shall employees be required to do work normally done by striking members of other Associations.

# 12. DISCHARGE AND SUSPENSION

A.  When a City department believes that a discharge or suspension is warranted, such action must be initiated within fifteen (15) working days of the occurrence of the incident or condition giving rise to the department's action, or within fifteen (15) working days of the date it is reasonable to assume management became fully aware of the incident or condition. On a case by case basis, the department may take additional time for investigation of such disciplinary action upon notification to the Association.

B.  The Employer agrees upon the discharge or suspension of an employee, to allow Association Representation during issuance of the discharge or suspension.

C.  Upon request, the Employer or his/her designated representative will discuss the discharge or suspension with the employee and the Association representative. Exceptions to this procedure would be in situations where the suspended or discharged employee is absent without leave, has committed acts of violence on the worksite, or the parties agree that such discussion would not be beneficial.

D.  In imposing any discipline on a current charge, the City shall not take into account any prior infractions which occurred more than fourteen (14) months previously. However, this period shall be extended to twenty-four (24) months where the current charge is a repetition of prior infractions involving workplace violence, sexual harassment, theft or willful destruction of City property.

**NOTE:** It shall be the responsibility of the grievant to keep the Association and City informed of his/her mailing address and telephone number(s) at which he/she may be reached for purposes of notification. Certified mail to the address of record shall constitute proper notification to the grievant.

# 13. SENIORITY

A.  **SENIORITY** is hereby defined as the length of continuous service beginning on the date of legal certification to a position in the classified service of the City of Detroit, or the date of induction into such classified service as provided by law. Effective July 1, 1978, employees who are certified for employment but not hired within thirty days of such certification, shall have their date of hire recorded as their date of seniority and certification.

Seniority, as defined above and in accordance with the rules of the Human Resources Department incorporated herein by reference is established primarily to serve as a basis for

**DRAFT 4/26/2011**

determining the order of demotion or layoff in the event of a reduction in force and the re-employment rights of employees.

B. Within ninety (90) calendar days of the signing of this Agreement the City will furnish to the Association, a seniority list showing each employee's name, address, department, classification, pension number, and total City seniority date. This information will be organized in a format mutually agreeable to the Association and the City. The City also agrees to provide the Association with an up-to-date seniority list every three (3) months upon request. When the City has the capability, such lists will be provided to the Association on compact disks (CDs).

C. **LOSS OF SENIORITY:** An employee shall lose his/her seniority for the following reasons only:

1. The employee resigns or quits.
2. The employee retires on regular service retirement.
3. The employee is discharged or permanently removed from the payroll and the separation is not reversed through the grievance procedure.
4. The employee does not return at the expiration of a leave of absence.
5. The employee does not return to work when recalled from layoff as set forth in the recall procedure.

D. **SUSPENSION OF SENIORITY CREDIT:** An employee shall not lose his/her accrued seniority but shall not accumulate additional seniority credit during the following periods:

1. Layoffs resulting from reduction in force which exceed four (4) years.
2. Leaves of absence which exceed one (1) year.
3. Non-duty disability retirements which exceed one (1) year.
4. Voluntary layoffs.

E. When employees of this bargaining unit receive a status change to a different classification within the bargaining unit, they will be able to exercise total City seniority in the new classification upon satisfactory completion of their probation periods.

F. Any employee who is absent from duty for three (3) consecutive work days without specific leave from his/her department and who fails to notify the employer within those three days (except in cases of proven enabling emergency), shall be deemed to have quit his/her employment from City service and to have vacated his/her position. Any such absence shall be without pay unless otherwise approved by a subsequent action by the employer.

# 14. SENIORITY FOR ASSOCIATION REPRESENTATIVES

A. Notwithstanding their standing on the seniority list, in the event of a reduction in force, the Officers of the Association (the Association President, Vice President I, Vice President II, the Secretary, the Treasurer, the designated Grievance Executive, the Administrative Representative) and all permanent Association Representatives, who have been properly

identified and serve pursuant to Article 6 (Association Representatives), shall be continued in their employment in their employing department providing any of the following conditions exist and in the following order:

1. There continues to be a position in their current classification.
2. There is a position in any lower classification in their occupational series.
3. There is a position in a formerly-held classification which is in the bargaining unit.

B. If any of the above-indicated Association officers or Association Representatives are laid off by their department, they shall have priority in recall to available vacant positions in the classification in which they were laid off, any lower classification in their occupational series or any formerly-held classification which is in the bargaining unit.

C. The order of layoff, demotion, and recall resulting from the operation of the provisions of this Article shall apply provided no employee outside the bargaining unit is affected.

D. The provisions of this Article shall apply as long as the Officers of the Association and Association Representative, as defined in paragraph A above, continue to hold their respective offices.

Should the Association officers or Association Representatives lose their office, the former Association Officers or Association Representatives shall be subject to displacement by employees with greater seniority and who have been laid off or demoted as a result of reduction in force made prior to the loss of office.

Upon written notice from the Association President in office to the Human Resources Department that such loss of office has occurred, the City shall have thirty (30) days to investigate and make any required displacement.

## 15. SUB-CONTRACTING

The right of contracting or sub-contracting is vested in the City. The right to contract or sub-contract shall not be used for the purpose or intention of undermining the Association nor to discriminate against any of its members nor shall any seniority employee be laid off or demoted as a direct and immediate result of letting a contract.

The City agrees that the Association will be notified prior to any such action to enter into new contracts or to renew existing contracts which will directly affect the membership. Association representatives will be advised of the nature, scope and the approximate period of work to be performed and the reasons why the City is contemplating contracting out the work.

## 16. REDUCTION IN FORCE

In the event of a reduction in force affecting members of the bargaining unit, the procedure shall be as follows:

## SECTION 1 - REDUCTION IN FORCE TERMS DEFINED:

A.  A reduction in force is a reduction in the number of employees in a given class in a department of the City for lack of work, lack of funds, or reasons other than the acts or delinquencies of employees.

The expiration of a limited-term certification or change of status shall not be considered a reduction in force.

B.  A layoff due to reduction in force is the removal of an employee from a position in a department and from the classified service of the City of Detroit, subject to the recall rights provided under this Rule.

C.  A demotion due to reduction in force is the removal of an employee from a position in a class in a department by change of status to a position in a lower class.

D.  A transfer due to reduction in force is the removal of an employee from a position in a class in a department by change of status to a position in another class which is at the same level.

E.  A voluntary layoff is a removal of an employee from the classified service of the City of Detroit which is made at the request of and for the convenience of the employee.

F.  Unless otherwise indicated, seniority shall mean total City seniority as determined in accordance with Human Resources Department Rules.

1.  An employee acquires status in the classified service by certification in accordance with Section 6-510 of the City Charter and Human Resources Department Rules III and IV.

2.  An employee who is certified, promoted, transferred, or demoted to a position in a class on a regular permanent basis or permanent-subject to continuing availability of program funding, acquires permanent status in the class, provided he/she has satisfied all qualification requirements of the class including completion of any required probation period. An employee can have permanent status in only one class at a time.

3.  An employee who is certified, promoted, transferred or demoted to a position in a class only for a specified term or conditional event, or where the certification or status change states that such employment is limited to assignment on a particular project, acquires limited-term status in the class.

## SECTION 2 - ORDER AND MANNER OF REDUCTION

Reduction in force shall be by class in a department and shall be made from among all employees in the same class in that department.

A.  Within the department, the following categories of employees shall be removed first:

1.  Provisional employees shall be separated by terminating their services; provided, however, that employees provisionally employed in the class who hold permanent status

in some other class shall revert to the class in the department from which they were provisionally promoted or transferred.

2. Employees who have not completed their initial probationary period shall be laid off in accordance with their seniority, the least senior employee being laid off first.

3. Employees hired on a limited-term basis shall be laid off in accordance with their seniority, the least senior employee being laid off first.

4. In the event it is necessary to reduce the number of permanent status employees in the class, the order of removal shall be as follows:

5. Employees in the class on a limited-term basis and employees in the class on a permanent basis who have not completed the required probationary period, but who hold permanent status in some other class, shall revert to the class in the department from which they were promoted or transferred. Removal shall be in accordance with their total City seniority, the least senior employee to be removed first.

6. Employees in the class on a permanent basis shall be removed in accordance with their total City seniority, the least senior employee to be removed first. Such employees shall be laid off subject to the following demotion or transfer rights within the department:

   (a) **Demotion in Series**
   If the employee is in a class in an occupational series, the employee shall have the right to be demoted to a position in a lower class in the series, provided there are one or more employees in the lower class in the department having less total City seniority. (The least senior employee displaced as a result shall be subject to demotion, transfer or layoff in accordance with applicable provisions of this Rule.)

   An employee who waives his/her right to demotion to the next lower class in series and is laid off, shall lose all rights to city-wide displacement as provided for in Section 3 and restoration rights as provided for in Paragraph A of Section 4.

   (b) **Demotion or Transfer to a Formerly-Held Class**
   If the employee has previously held permanent status in another class not in series which is at the same or lower level, the employee may elect demotion or transfer to such class, provided there are one or more employees in the class in the department having less total City seniority. (The least senior employee displaced as a result shall be subject to demotion, transfer or layoff in accordance with applicable provisions of this Rule.)

   An election to accept a demotion or transfer to a formerly-held class is optional for employees who also have a right to a demotion in series.

   (c) **Change of Status to Vacant Positions in Other Classes**
   If the employee has exhausted his/her rights to demotion or transfer under (a) and (b) above, the department may, in so far as the interests of the service permit,

DRAFT 4/20/2011

propose transfer or demotion of the employee to an available vacant position in any other class in the department for which the department believes the employee is qualified. Such proposed change of status shall be subject to the approval of the Human Resources Director.

## SECTION 3 - CITY-WIDE DISPLACEMENT

Employees with permanent status who have been laid off in a class from a City department shall displace employees of the same classification in those categories listed in Paragraph A of Section 2 on a City-wide basis. In addition, laid off permanent employees who have one or more years of classified service shall displace other permanent employees in the same classification of lesser seniority on a City-wide basis; and if there are no lesser seniority employees in the same classification, shall have the right to displace lesser seniority employees in a lower class in the same occupational series. Employees who fail to exhaust their eligibility for demotion to the next lower class in series in their department shall lose their eligibility for City-wide displacement. (Least senior employees displaced under this section shall be subject to demotion, transfer or layoff in accordance with applicable provisions of this Rule.)

Employees with permanent status who have been demoted to a lower classification due to reduction in force shall displace employees in the class from which they were demoted in those categories listed in Paragraph A of Section 2 on a City-wide basis. (In addition, such demoted permanent employees who have one or more years of classified service shall displace other permanent employees in the class from which they were demoted of lesser seniority on a City-wide basis.)

Displacement of lesser seniority employees across departmental lines shall be accomplished by layoff and displacement certification and shall coincide with the effective date of the layoff, if possible, but in any event within sixty (60) days of the effective date of layoff of employees having displacement rights.

## SECTION 4 - RE-EMPLOYMENT PROCEDURES

A.  Employees with permanent status in the class who were laid off, demoted, transferred, or laid off and certified to a lower class as a result of a reduction in force shall have their names maintained in order of their total City seniority on a special register ("blocking list") in the Human Resources Department. Such employees shall be entitled to re-certification, promotion or transfer from the register to any vacancy in the class from which they were demoted, transferred or laid off, or any lower class in the same series in any City department, before any such vacancy can be filled by certification, promotion, or transfer. An employee's name shall remain on the special register until he/she is restored to the classification (or equivalent level) from which he/she was demoted, transferred or laid off, or waives an offer of such restoration.

B.  Laid off employees who elect layoff in lieu of demotion in series shall be placed on the preferred eligible list for the class in which they were laid off and shall be re-certified to available vacancies in this class in the order of their total City seniority from the list.

C.  Laid off employees shall be placed on preferred eligible lists for all other classes in which they have held permanent status and shall be offered certification to available vacancies in these

classes in the order of their total City seniority from such lists, provided that employees who were laid off in such classes have been first recalled.

Should a laid off employee on a preferred eligible list waive an offer of employment to a position in the class, his/her right to remain on that list shall terminate.

D.  In the absence of a preferred eligible list for a class, laid off employees shall be certified to requisitions for positions in such class from higher, equivalent or allied lists which have been determined to be appropriate by the Human Resources Director.

E.  Re-employment provisions in this Section do not apply to persons laid off and separated from City employment for a period of four (4) years.

## SECTION 5 - EFFECT OF JURISDICTIONAL LINES

The order of layoff, demotion and re-employment shall not be altered by bargaining unit jurisdictional lines and employees shall carry their total City seniority across jurisdictional lines for reduction in force purposes.

## SECTION 6 - EMPLOYEES HOLDING MULTIPLE TITLES

In determining an employee's rights under this Rule, an employee can have permanent status in only one class at a time. An employee who carries a multiple title shall have permanent status in the lowest class of his/her multiple title or the class in which he/she last held permanent status on a single title basis, unless there is a contractual agreement which otherwise identifies the class in which the employee has permanent status, or official action is taken designating such class based upon the nature and history of the employment. Such agreement or official action must be completed at least ninety (90) days prior to the announcement of the reduction in force.

## SECTION 7 - CONDITIONAL WAIVER OF EMPLOYEE RIGHTS

Where the City anticipates that a reduction in force will not exceed thirty (30) days, an employee in a class subject to reduction in force and his/her employing department may agree to a conditional waiver of the employee's seniority rights for a specified period not to exceed thirty (30) days. This conditional waiver must be in writing and be approved by the Human Resources Director. It is recognized that an out-of-seniority layoff resulting from such waiver is for the benefit of the City and the employee retains the right to exercise all rights to restoration, demotion, transfer and displacement at the end of the specified period.

## SECTION 8 - PREEMPTIVE LAYOFF REQUESTS

If a reduction in force in a department is imminent or taking place over an extended period of time, any employee who has been identified as being subject to layoff, may request in writing that he/she be laid off prior to the date when he/she would be reached for such layoff. Such request is subject to approval of the employing department and the Human Resources Director.

Employees who are granted an effective date of layoff earlier than the scheduled layoff date shall retain the same rights which they would have had had they been laid off as scheduled.

**SECTION 9 - STATUS CHANGES IN ANTICIPATION OF LAY OFFS**

Where the Human Resources Department shall find that any status change were made either to avoid the layoff of or to cause the layoff of any employee, upon finding by the Human Resources Director that such status change was made for reasons other than the good of the service such status change shall be set aside and proper layoff made; provided, however, this section shall not apply to status changes of more than six month's standing.

# 17. PROMOTIONS

Promotions of Association members to classifications within the bargaining unit shall be made on the basis of merit, ability, and seniority in accordance with applicable provisions of the City Charter and Human Resources Department Rules.

# 18. PROBATION PERIODS

A. Probation periods are recognized as "working test" periods used to supplement other evaluations to determine whether the employee fully meets the qualifications of the class. Probation periods are required in all cases of initially certified new hires, employees transferred or promoted, employees re-certified to a new title, reinstated employees and other cases as provided in Human Resources Department Rules.

B. The length of the probation period for all employees hired, promoted, transferred or placed into classifications represented by this Association shall be six (6) months.

C. In the case of new employees hired by the City and others initially placed in the bargaining unit, the Association shall represent probationary employees during the probation period for the purpose of the collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment except for separation from City service or reversion to the formerly held title for reasons other than Association activities. Provided that, employees serving a probation as a condition of a status change shall be entitled to Association representation in cases of suspension and discharge for just cause.

D. During an employee's initial hire probation period, the employing department may, in accordance with Human Resources Department Rules, extend the probation period or take action to separate the employee as a probationary employee. In the case of an unsatisfactory employee who has classified status, the employing department may extend the probation period or take action reverting the employee to his/her former classification. The department shall notify the Association of the reasons for any extension of probation.

# 19. INTER-DEPARTMENTAL TRANSFERS

A. An employee desiring a transfer to another City department may file a request for transfer with the Certification Division of the Human Resources Department. The employee shall receive

notification of any requested transfer opportunity in accordance with Human Resources Department referral practices. To receive such consideration, the request for transfer must be on file at least thirty (30) calendar days prior to receipt of a requisition indicating an opening.

Requests for transfer shall remain on file for the duration of the Contract.

B. The City agrees that a department head shall not arbitrarily refuse to allow an employee a transfer to another City department which has requested the employee's transfer. Such transfers shall be effectuated no later than thirty (30) calendar days from the effective date approved by the Human Resources Department unless the transfer at such time would cause a serious adverse effect on departmental operations.

## 20. VETERANS PREFERENCE

Nothing in this Agreement shall abridge the rights and preferences of veterans as provided by federal, state, and local laws.

## 21. MAINTENANCE OF CONDITIONS

Wages, hours and conditions of employment legally in effect at the execution of this Agreement, except as improved herein, shall be maintained during the term of this Agreement. No employee shall suffer a reduction in such benefits as a consequence of the execution of this Agreement.

## 22. REFRESHMENT BREAKS

Employees covered by this Agreement shall be granted two (2) fifteen (15) minute breaks; one prior to the lunch break and one after the lunch break. Such refreshment breaks shall not be used to extend the lunch period or change the starting or ending time of the work day.

## 23. OTHER CONDITIONS OF EMPLOYMENT

Fringe benefits and working conditions, except as otherwise expressly provided herein, shall be in accordance with the City Charter, Ordinances, Rules, Resolutions, Executive Orders of the Mayor and the Human Resources Department Rules in effect on the execution date of this Agreement.

# 24. WAGES

## A. GENERAL WAGE INCREASES:

| | | |
|---|---|---|
| a. | Effective July 1, 2008 | 0% |
| b. | Effective July 1, 2009 | 0% |
| c. | Effective July 1, 2010 | 0% |
| d. | Effective July 1, 2011 | 0% |

Members of the bargaining unit will be required to take twenty-six (26) mandatory budget required furlough (BRF) days without pay for three (3) consecutive 12-month periods. To achieve uniformity among its various bargaining units and equitable treatment of employees, the City has the right to determine the date that the BRF three (3) consecutive 12-month periods will commence. It is understood by the parties that the completion of the three (3) consecutive 12-month periods will exceed the contract period of the Master Agreement.

If for any reason an employee is required to work on any mandatory budget furlough day, a substitute furlough day without pay must be scheduled by the Department and taken by the employee to ensure that the twenty-six (26) mandatory budget furlough days without pay requirement will be met during each twelve month period.

## OVERTIME
If an employee is scheduled to work less than 40 hours in a work week due to mandatory budget furlough time off, overtime for that work week shall not be payable until the employee works 40 hours in that work week.

## RETIREMENT
The period of reduced regular wages due to mandatory budget furlough time off shall not be recognized for pension computation purposes and appropriate calculations will be made to have any pension benefits equal the same amount the member would have earned had his or her regular pay not been reduced.

Employees who retire during this period shall continue to have their vacation, swing holiday and compensatory time banks run-out in forty (40) hour per week increments.

## VACATIONS
Qualifications for earning time are proportionally reduced, and other appropriate modifications are agreed to as necessary to comport with the mandatory budget furlough 10% hours reduction.

## SICK LEAVE
Qualifications for earning time are proportionally reduced, and other appropriate modifications are agreed to as necessary to comport with the mandatory budget furlough 10% hours reduction.

## WORKERS' COMPENSATION
Employees who are working a 10% reduced work period at the time that they go off on Workers' Compensation shall have their formula for supplementation out of their sick leave banks calculated upon 100% of their take-home pay under the mandatory budget furlough schedule.

**DRAFT 4/26/2011**                    20

B. Each employee covered by the Agreement who is paid at either the minimum or maximum rate and said rate is over $20,000 per year, shall, if these rates fall between even hundred dollar levels after an increase is granted, shall have their rate adjusted to the next higher hundred dollar level.

C. **RECRUITMENT AND PLACEMENT AT ADVANCED STEP LEVELS:** The City shall have the flexibility to hire new employees or promote employees to classifications in the bargaining unit at advanced step levels within the pay range based upon an evaluation of their academic and practical training.

These bargaining unit classifications shall be designated as Step Code "R" in the Official Compensation Schedule and employees shall progress through the range in accordance with Step Code "A", except where specific agreement exists to establish a different step code. The employer may take action to deny an employee's step increment for failure to meet work expectations.

# 25. OVERTIME

A. The City has the right to schedule overtime work as required by the City in a reasonable manner. Such overtime shall not be scheduled so as to reduce the work force.

B. **Time and One-Half Overtime**

Salary rated employees time and one-half shall be credited or paid to salary employees as follows:

1. Cash payment for all hours worked over forty (40) in one (1) service week except if such time is worked on a seventh day or a holiday.

2. Cash payment or credit for all hours worked on the sixth day, provided the employee has worked his/her assigned forty (40) hours in the work week.

C. **Double Time Overtime**

Double Time (two-hundred percent [200%] of the basic or hourly rate) will be paid to hourly-rated and salary rated employees for work on the seventh day of the work week schedules as defined by Chapter 13, Article 2, Section 12 of the Municipal Code of the City of Detroit.

Double time (two hundred percent [200%] of the basic or hourly rate) shall be paid for all time worked in excess of sixteen (16) hours from the employee's assigned starting time.

D. Premium payments shall not be duplicated for the same hours worked.

E. When an employee works overtime, meal periods and coffee breaks are unpaid time. For employees working in twenty-four (24) hour operations compensation will be in accordance with past practice.

F. Except as herein provided, the provisions regarding overtime shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit and the State Minimum Wage Law.

G. All overtime under this contract shall be computed solely on the basis of time actually worked by the employee.

H. Notwithstanding the above paragraph, vacations and holidays shall be counted as time worked for the purpose of computing overtime.

# 26. SHIFT PREMIUM, SHOW UP TIME

A. **Shift Premium**

**Afternoon and Night Shifts:**
Employees who work regularly scheduled afternoon and night shifts shall receive, in addition to their regular pay, a premium of seventy cents (70¢) per hour for the afternoon shift and a premium of seventy-five cents (75¢) per hour for the night shift according to Chapter 13, Article 2, Section 12 of the Municipal Code of the City of Detroit.

B. **Shift Premium Times**

1. The afternoon shift shall be any full-time shift commencing at the hour of 11:00 a.m. or between the hours of 11:00 a.m., and 6:59 p.m.

2. The night shift shall be any full-time shift commencing at the hour of 7:00 p.m., or between the hours of 7:00 p.m., and 3:59 a.m. in accordance with Chapter 13, Article 2, Section 12, of the Municipal Code of the City of Detroit.

C. When an employee is called to work, he/she shall be guaranteed no less than four (4) hours of pay for "show up" time at the straight time rate.

All of the provisions of this section shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit.

# 27. OUT-OF-CLASS WORK ASSIGNMENTS

A. Employees are to be assigned job duties and responsibilities which are appropriate to their classification. An employee shall not be assigned to perform work which falls outside of his/her classification except for short-term training purposes, short-term exigencies and in cases of emergency or other situations resulting from factors beyond the control of management which cannot be anticipated or planned for in the normal courses of departmental operations and where such assignment is necessary to effectively carry out departmental operations.

DRAFT 4/26/2011

B. When an employee is assigned to perform work clearly outside of his/her classification which involves special higher-level skills or is assigned and given responsibility to perform the preponderance of duties regularly performed by employees in a higher class for a period in excess of fifteen (15) consecutive work days, the department shall take steps to see that the employee so assigned shall be compensated at the appropriate rate for the work performed. Questions concerning out-of-class work claims shall be determined by the Classification and Compensation Division of the Human Resources Department. The qualifying period to determine eligibility for out-of-class compensation shall be inclusive of absences, not exceeding two (2) days, by the employee so assigned.

C. Performing the duties of an employee in the next higher classification in series during short-term absences and normal vacation periods not in excess of fifteen (15) consecutive working days, shall not be construed as being out-of-class work assignments.

D. If an employee believes that his/her regularly assigned set of duties and responsibilities are not properly allocated to his/her current title, the employee or the Association may request the Classification and Compensation Division of the Human Resources Department to conduct a classification survey of the employee's job as provided in Human Resources Department Rules.

# 28. JURY DUTY

A. An employee who serves on jury duty will be paid the difference between his/her pay for jury duty and his/her regular pay for all days he/she is required to serve on jury duty.

B. In the event that an employee reports for jury duty but does not actually serve on a jury, he/she will be paid the difference between the jury pay received and his/her regular days pay and be excused for the day.

C. In order to receive payment for jury duty supplementation, an employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one (l) year of seniority.

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this Agreement.

E. Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. However, the employee must notify the department of his/her desire to

exercise this option prior to the first date of jury service.

F.    An employee on jury duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the City will deduct the amount received or due from such jury duty, less any mileage allowance paid for the jury service.

# 29. WORKERS' COMPENSATION

A.    All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided, also; that where the employee has a off-time banks and receives income under the Workers' Compensation Act, such income shall be supplemented by the City from his/her off time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B.    Employees who are unable to supplement their Workers' Compensation benefit from their off-time benefits because the amount of overtime worked causes the benefit to meet or exceed ninety-five percent (95%) of weekly take-home pay, shall be treated like employees who are able to supplement for the purposes of hospitalization, life insurance and current sick leave. This provision does not apply to those employees who are unable to supplement because they have no time available in their off-time banks.

C.    Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Workers' Compensation benefits.

D.    The City agrees to continue hospitalization and life insurance benefits for employees with one (1) or more years of seniority who have been approved for Workers' Compensation benefits for a period of nine (9) months after they go off the payroll. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

E.    When an employee receives sick leave pay from the City for a time period for which he/she subsequently receives Workers' Compensation benefits, the resulting overpayment shall be immediately recoverable by the City notwithstanding any limitations set forth elsewhere in this Agreement pertaining to the recovery of overpayments which are due to payroll error.

**NOTE:** In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by this Agreement. Those deductions

will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

F. Consistent with the Workers' Compensation Act and current City practices:

(1) The City shall continue its program of returning workers who suffered job injuries back to active employment to perform work tasks which are compatible with their current physical capabilities. To the maximum extent possible, employees will be returned to their former job classification in their former department, or if no such position is available, in another City department if they are presently able to perform the essential duties with or without reasonable accommodations.

(2) If the employee is presently able to perform some but not all of the essential duties, but there is competent medical documentation that he/she will be able to perform all such duties within ninety (90) days, he/she may be placed conditionally in an available position in the classification subject to review at the end of this period. Work tasks assigned will be those compatible with present work restrictions.

(3) If the employee cannot presently be returned to his/her former job classification, he/she will be placed in an appropriate available position in another classification on a temporary basis until such time as the employee is able to return to his/her former job classification or acquires permanent status in the alternate classification by action of the Human Resources Department. The duration of the temporary status shall be in accordance with the Workers' Compensation Act. During the temporary period, efforts will be made to place the employee in available positions consistent with his/her training and experience and current physical capabilities.

(4) While employed in the alternate job classification, whether temporary or permanent, the employee shall be represented by the local union having jurisdiction over employees in that classification and at that location. However, residual seniority rights to the employee's former classification shall remain with his/her former local or other union. An employee in an alternate classification on a permanent basis continues to have a right to return to his former job classification in his former department when physically able to do so.

(5) Employees returned to work under these provisions shall not be charged with absences for disciplinary purposes where there is medical documentation that such absences were caused and necessitated by the former job injury.

(6) Employees will be eligible for wage increases granted to their alternate job classification.

(7) Should a medical dispute arise between the employee's physician and the Employer's physician, a third physician will be mutually selected by the doctors and the third doctor's opinion shall be final and binding on the City and Union.

# 30. VACATIONS

A. **ELIGIBILITY:** Employees inducted during the course of the fiscal year shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1,000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for at least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. Once employees have earned at least sixteen hundred (1600) hours of paid time, exclusive of overtime, and have attained status as employees for at least twelve (12) months, they are entitled to five (5) additional vacation days. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of ten (10) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis.

B. Employees hired on or after effective date of approval by City Council, shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for at least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of five (5) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis.

The maximum vacation days to be earned in a fiscal year for an employee hired on or after effective date of approval by City Council with fifteen (15) or more years of service shall be (15).

C. The vacation schedule for employees hired prior to effective date of approval by City Council shall be as follows:

| | |
|---|---|
| 0-6 months | No vacation |
| 6 months | 5 days |
| 1 year | Additional 5 days |
| 2 through 5 years | 10 days |
| 6 years | 11 days |
| 7 years | 12 days |
| 8 years | 13 days |
| 9 years | 14 days |
| 10 through 12 years | 17 days |
| 13 years | 18 days |
| 14 years | 19 days |
| 15 years or more | 20 days |

**VACATION SCHEDULE:** The vacation schedule for employees hired on or after effective date of approval by City Council shall be as follows:

| | |
|---|---|
| 0-6 months | No vacation |
| 6 months through 5 years | 5 days |
| 6 years | 6 days |
| 7 years | 7 days |
| 8 years | 8 days |
| 9 years | 9 days |
| 10 years through 12 years | 12 days |
| 13 years | 13 days |
| 14 years | 14 days |
| 15 years or more | 15 days |

D. **VACATION PERIOD:**

1. Vacations will, insofar as possible, be granted at a time most desired by employees according to their seniority and in accordance with department practices.

2. When an official holiday occurs during a scheduled vacation, the employee shall be entitled to an additional vacation day.

3. If an employee becomes ill while on his vacation, or prior to, his vacation shall be re-scheduled after proof of such illness.

4. Employees who are on extended sick leave of one (1) month or more on any October 1 date, shall, upon prior written application to the department head and the Finance Director be entitled to a lump-sum payment in lieu of time off for all vacation leave earned during the preceding fiscal year.

   An employee's vacation bank may not exceed more than forty (40) days, or 320 hours, on any October 1.

E. **VACATION PRORATION:** Employees who fail to accumulate the required sixteen hundred (1600) straight time regular payroll hours, those who die and those who are separated from the service, either temporarily or permanently, so that it is apparent at the time of separation that they will not accumulate sixteen hundred (1600) hours of straight time pay, shall be entitled to vacation leave before such separation computed as follows: 8.3 percent of the vacation credit of the previous July 1 multiplied by the number of calendar months in which employees have been paid for not less than one hundred and sixty (160) straight time regular payroll hours, and rounded to the nearest whole number. After sixteen hundred (1600) straight time hours are worked in a fiscal year, employees will be entitled to one hundred percent (100%) of their next July 1 vacation. Employees who have attained status for at least twelve (12) months but have not yet been placed on a fiscal year basis and who are separated from the service, shall be entitled to prorated vacation leave computed by multiplying the number of months worked from the one year anniversary date to the date of separation by 8.3 percent of ten (10) days and rounding the product to the nearest whole day. Current rules governing vacation shall

otherwise continue to apply. This paragraph does not apply to part-time, seasonal or temporary employees.

New employees hired on or after effective date of approval by City Council who have attained status for at least twelve (12) months but have not yet been placed on a fiscal year basis, and who are separated from the service, shall be entitled to prorated vacation leave, computed by multiplying the number of months worked from the one year anniversary date to the date of separation by 8.3 percent of five (5) days and rounding the product to the nearest whole day. Current rules governing vacation shall otherwise continue to apply. This paragraph does not apply to part-time, seasonal or temporary employees.

F. **CREDITING VACATION:** One hundred percent (100%) of anticipated annual vacation leave (rounded down to the nearest half-day [1/2] day) will be posted to an employee's bank after he/she has accumulated sixteen hundred (1600) straight time hours in a fiscal year. In the event an employee has been credited with more time than he/she has earned, on the succeeding July 1, or date of separation, whichever comes first, the employee will have any vacation time credited but not earned charged first against his/her existing vacation bank, then to his/her swing holiday bank, or failing sufficient time in those two banks, he/she will be docked for the time.

G. **VACATION PRORATION - LAYOFFS:** An employee who is laid off for an extended period of time beyond sixty (60) calendar days, will receive a lump-sum bonus payment in lieu of any unused vacation credit including that accrued in the current fiscal year on a pro-rata basis according to Section 30-D.

A recalled employee who received a lump-sum bonus credit at the time of layoff for the current fiscal year will have such credit deducted from the total vacation earned in the fiscal year in which he/she is laid off.

An employee who is laid off for sixty (60) days or less shall have the option of receiving a lump-sum bonus payment in lieu of vacation or leaving his/her vacation intact.

H. **RATE DURING VACATION:** Employees will be paid their current base rate while on vacation. Employees with multiple classifications shall be paid an average current rate of pay computed from the ratio of time worked in each classification over the fiscal year immediately preceding such vacation.

I. If a regular pay day falls during an employee's vacation of one (1) week or more, he/she may request his/her check in advance before going on vacation and such request shall be granted.

J. Employees will have two (2) vacation days converted into "Prior C Time" to be posted by July 1 of each year.

Note: The two-tier system for new hires as referenced in this Article will be implemented when the City's Payroll System has the capability. (See Memorandum of Understanding – RE: HR/Payroll Systems.)

# 31. UNUSED SICK LEAVE ON RETIREMENT

A.   Employees shall be entitled to payment for unused sick leave on retirement as follows:

Upon retirement, or death with twenty (20) years of service, an employee shall be entitled to payment of one-half (1/2) of their unused sick leave. Effective July 1, 2003, the payment shall be increased to sixty percent (60%) of the employee's unused sick leave.*

B.   The payments will be made as part of the Employee's Pension Program, or the Employee's Benefit Plan, or through the Finance Department.

C.   At the employee's option, he/she can elect to have up to the amount permitted by law of his/her unused sick leave payment deposited in his/her deferred compensation account with the balance paid to the employee.

**Note:** * This increase to 60% of the unused sick leave on retirement payment (previously was one-half (1/2) of an employee's unused sick leave banks, does not increase the one-quarter 1/4) amount that can be included in the average final compensation used to compute the service pension portion of a retirement allowance. (See Article 41. Retirement Provisions, paragraph J.)

# 32. HOLIDAYS AND EXCUSED TIME OFF

A.   Employees shall be entitled to the following seven (7) holidays: New Year's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

Employees hired prior to effective date of approval by City Council shall be entitled to three (3) swing holidays in each fiscal year. Employee hired on and after effective date of approval by City Council shall not be entitled to swing holidays.

B.   Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Where a holiday is concurrent with the employee's sixth or seventh work day, the department head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the department head.

C.   An employee shall be eligible for Holiday Pay or excused time day pay provided he/she shall have received at least eight (8) hours of pay exclusive of overtime and sick leave pay the day before and the day after the holiday or excused time day; provided the employee continues on the payroll through the holiday or excused time day in question and would otherwise be qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, is on a formal leave of absence granted by the Human Resources Department (generally over thirty [30] days), is on workers' compensation, or is laid off. An employee's

payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D.   If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

E.   Double time will be paid for all hours worked on a holiday in addition to the straight time holiday pay due for a holiday as such.

F.   Premium payments shall not be duplicated for the same hours worked.

G.   Employees shall be granted eight (8) hours of excused time on Good Friday effective in the year 2004 and thereafter or the last eight (8) hours on the last scheduled paid day prior to Good Friday, and eight (8) hours of excused time on the last scheduled paid day before Christmas Day and before New Year's Day and for Veteran's Day, and the day after Thanksgiving, and Election Day as designated by the City Council. For employees hired prior to effective date of approval by City Council, an additional Swing Holiday shall be granted in the event there is no designated Election Day, provided they are on the payroll through the excused time day in question. Employees required to work any portion of the excused time on these days will receive either equal time off for hours worked or additional pay at straight time for such hours at the option of the department head. No holiday premium will be paid for work on these days. When an employee is absent without good cause for the non-excused portion of the day, he/she shall forfeit this excused time for the day.

H.   For the purpose of this Article, an employee shall be considered off the payroll if he/she engages in a work stoppage which extends through a holiday or excused time day. All benefits under this Article will be forfeited for the holiday or excused time in question.

I.   If a holiday or excused time day falls on Saturday it shall be observed on the preceding Friday, and if a holiday or excused time day falls on Sunday it shall be observed on the following Monday for all employees except those assigned to six and seven day operations. Should two (2) consecutive holidays or excused time days occur on a Friday and Saturday, or on a Sunday and Monday, Friday and Monday, respectively, shall be designated as the official holidays.

J.   If an employee engaged in six or seven day operations works either the actual calendar holiday or the substitute holiday, he/she shall receive the holiday premium, but he/she will not be allowed to pyramid holiday premium for working both days.

     1.   An employee assigned to a six or seven day operation may be scheduled off for the holiday on either the calendar holiday or the substitute holiday.

     2.   When an employee works both the calendar holiday and the substitute holiday, the day selected as a holiday for pay purposes shall be the day which allows the employee the maximum pay credit for working both days.

     3.   If an employee works either the calendar holiday or the substitute holiday, but not both,

he/she shall be paid holiday premium for the day worked.

4.  If an employee is off sick on the calendar holiday, or the substitute holiday, or both, he/she shall receive sick pay. If he/she works either of the two days he/she shall receive holiday premium.

5.  If an employee is AWOL on the actual calendar holiday, but works the substitute holiday, he/she shall not be entitled to holiday pay or holiday premium.

K.  The City shall have the option to close all or part of its facilities for the Christmas and New Year's holiday season consistent with operating needs and the public service. Employees shall have the option of using vacation, swing holidays, compensatory time or no-pay for any days off during this period. If an employee has none of the above listed accrued time, departmental leave may be used if available. If an employee has no paid time accrued, and wishes to work, the City will make every attempt to place an employee in his/her department on a job assignment consistent with their job classification and ability to perform the work.

In the event a department requires additional personnel during the period, the Human Resources Department will be so advised. Employees who are without accrued time and are desirous of working during this period will contact their department Human Resources Consultant for available placement in another department.

The optional holiday season closing dates during the period of this Agreement shall be:

**December 26, 29, 30, 2008**
**December 21, 22, 23, 28, 29, 30, 2009**
**December 21, 22, 23, 28, 29, 30, 2010**
**December 19, 20, 21, 22, 27, 28, 2011**

Any scheduled time off or uses of department leave days during these periods shall not be counted against the employees' attendance records nor (except for bonus vacation) adversely affect their benefits.

The City reserves the right to use mandatory budget required furlough days for any of the dates during the optional holiday closing season.

L.  The Holiday Schedule during the term of this Agreement is set forth in Schedule C.

Note: **The two-tier system for new hires as referenced in this Article will be implemented when the City's Payroll System has the capability. (See Memorandum of Understanding – RE: HR/Payroll Systems.)**

# 33. MISCELLANEOUS

A.  All salaried employees will have their hourly rates computed by dividing their annual salary by two thousand eighty (2080) hours.

DRAFT 4/26/2011

B. Deferred Compensation Plan: Employees shall be eligible for a Deferred Compensation Plan made available by the City. Participation in the plan shall be optional with each employee.

C. The basic step increment schedule for salary classifications shall be five percent (5%) of the employee's salary as of the date the increment is normally paid, not to exceed the maximum rate for the classification. Beginning January 1, 2004, and thereafter, an employee may be denied his/her annual step increment for failure to receive a rating of at least "Meets Expectations" on the most recent evaluation on the Service Improvement Process (SIP) program administered by the Human Resources Department.

D. Effective July 1, 1980, employee benefits for those employees sixty-five (65) years of age and older may be modified as permitted by law but shall not result in any additional cost to the employee, (e.g. coordination of Medicare/Medicaid coverage with City hospitalization coverage.)

E. Where by payroll error an employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an employee in writing fourteen (14) days prior to making any overpayment recovery.

The correction of the underpayment shall be made within 60 days after notification to the department Human Resources officer.

For overpayment recoveries the City is authorized to deduct up to fifty dollars ($50) weekly or one hundred dollars ($100) bi-weekly. If the employee separates from City service, the entire unpaid balance shall be recoverable immediately.

If the amount owed by the employee is over $2,600, the City reserves the right to seek immediate recovery through the appropriate legal proceedings.

F. In order to be eligible for some economic benefits under this Agreement, employees must be on the payroll as of a certain date. For the purposes of this Agreement, "on the payroll" shall mean that the employee was receiving regular pay in a classification covered by this Agreement as of the qualifying date. Employees are on the payroll when absences are charged against sick leave, jury duty, funeral leave, vacation, C-time, holidays and other absences which are paid for under this Agreement. Employees are considered "off the payroll" if they have resigned, are discharged, are laid off, are on workers' compensation without supplementation, are suspended for more than thirty days, or are on an unpaid absence from work from which they do not return within thirty (30) days. Such unpaid absences include leaves of absence, AWOL, etc. Being returned to the payroll for the sole purpose of receiving a lump-sum payment for vacation, C-time, retroactive pay adjustments, etc. shall not constitute being "on the payroll."

The definition set forth above shall generally apply absent specific provisions to the contrary for particular benefits.

# Carmelita Bullock

27901 APT#F201
Farmington Hills, MI 48336

313.828.7878
carmtrav90@gmail.com

## SUMMARY OF QUALIFICATIONS

- Program Monitoring/Field Investigation
- Computer Literate
- Customer Service
- Demonstrated ability to work with detailed information
- Ability to perform a variety of tasks in a timely manner

## PROFESSIONAL EXPERIENCE

**Program Coordinator (part-time)**                                    September 2012 to Present
Bailey Park Project, Detroit, MI

- Develops program plans
- Engaging Customers in person and by phone
- utilize computer information system
- Recruits/supervises program participants
- Assists in preparation of proposal for funding
- Facilitates educational interventions
- Coordinates activities of program

**Senior Program Monitor**                                    August 2000 to August 2012
City of Detroit Head Start, Detroit, MI

- Investigated preschool/childcare facilities to insure compliance with all federal, state, and local rules and regulations
- Performed moderately complex investigational research relating to the development, implementation, and evaluation of a federally sponsored child development program
- Prepared comprehensive reports/findings
- Project Leader for Annual Staff Credential Verification Audit
- Managed Peer Review teams for annual citywide peer review process
- Acted as liaison to delegate program administration to insure an expeditious monitoring process
- Collected, analyzed, and evaluated training data to identify systemic trends and formulate/improve future program services
- Planed and organized the provisioning of ongoing training and technical assistance
- Represented Grantee at Community Events(Health Fairs, Parent Orientations, Recruitment Events, City-Wide Trainings)
- Designed and facilitated educational interventions/workshops (Delegate Pre-Service Presenter)
  **Accomplishments:**
- As a delegate liaison, I helped delegate agencies prepare for triennial reviews which led to multiyear grant funding
- Named Team Leader of the Year (Grantee Peer Review), 2010
- Named Team MVP (Grantee Peer Review), 2009
- Played a pivotal role in developing the first Grantee Annual report which led to increased community support (In-Kind) for the program.

- Played a pivotal role in developing an Enrollment and Recruitment Plan which led to 100% funded enrollment.

## EDUCATION

**Spring Arbor College, 1995**
Dearborn, MI
- **Bachelor of Arts : Family Life Education**

**Highland Park Community College,** 1993
Highland Park, MI
- **Associate of Arts: Liberal Arts**

## MILITARY SERVICE
US Army, Walter Reed Army Medical Center, Washington, D.C.,
-worked in clinic setting
-processed patient admissions
-managed medical records
- Honorable discharge

## AWARDS
- Graduated Magna Cum Laude (Spring Arbor University), 1995
- Awarded Army Achievement Medal(U.S. Army, 1988)

# 34. SICK LEAVE

A.  All employees hired prior to the effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked eighty percent (80%) of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Those employees hired on or after effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed ten (10) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971, may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

The service month shall be in accordance with City payroll practices. All employees must be on the payroll for the entire month to be eligible for sick leave.

B.  Reserve sick leave of five (5) service days shall be granted on July 1 to each employee hired prior to effective date of approval by City Council who was on the payroll the preceding July 1 and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank. Those employees hired on or after effective date of approval by City Council shall not be eligible for reserve sick leave.

C.  Sick leave may not be granted in anticipation of future service.

D.  Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E.  **QUALIFIERS FOR BONUS VACATION DAYS:**

1.  **Fifty Day Qualifier:** Employees hired prior to effective date of approval by City Council who have accumulated a total of fifty (50) or more days on July 1 shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
|---|---|
| 0 | 6 |
| ½ to 1 day | 5 ½ |
| 1 ½ to 2 | 5 |
| 2 ½ or 3 | 4 ½ |
| 3 ½ or 4 | 4 |
| 4 ½ or 5 | 3 ½ |
| 5 ½ or 6 | 3 |
| 6 ½ or 7 | 2 ½ |
| 7 ½ or 8 | 2 |
| 8 ½ or 9 | 1 ½ |

| | |
|---|---|
| 9 ½ or 10 | 1 |
| 10 ½ or 11 | ½ |
| 11 ½ or more | 0 |

2. **Twenty-five Day Qualifier:** Employees hired prior to effective date of approval by City Council who have accumulated a total of at least twenty-five (25) but less than fifty (50) or more unused sick days on July 1 shall receive up to three (3) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Total Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
|---|---|
| 0 to 2 days | 3 |
| 2 ½ or 3 | 2 ½ |
| 3 ½ or 4 | 2 |
| 4 ½ or 5 | 1 ½ |
| 5 ½ or 6 | 1 |
| More than 6 | 0 |

Those employees hired on or after effective date of approval by City Council shall not be eligible for bonus vacation days.

This Section shall otherwise be in accordance with Chapter 13-5-1 of the Municipal Code.

F. Employees will have access to Departmental Leave Days in accordance with the Municipal Code and the Manual of Standard Personnel Practices. Permission will not be unreasonably withheld.

G. The above shall be in accordance with Chapter 13, Article 5, Section 2, of the Municipal Code of the City of Detroit except as modified by this Article.

**Note:** The two-tier for new hires referenced in this Article will be implemented when the City's Payroll System has the capability. (See Memorandum of Understanding – RE: HR/Payroll Systems.)

# 36. LEAVES OF ABSENCE

A. Leave of absence without pay may be granted for reasonable periods for the following purposes:

1. Temporary physical or mental incapacity.
2. Training related to an employee's regular duties in an approved educational institution.
3. Military service.
4. Parenting Leave.

B. Leaves of absence may be granted for other reasons than those listed above where in the

judgment of the City such leaves are deemed beneficial to the City.

C.    To be eligible for a leave of absence, the employee must have completed one (1) year of continuous classified service immediately prior to the leave. This requirement shall not apply to leaves for military service.

D.    Leaves of absence (excluding military) may be extended for periods up to two (2) years. After two (2) years, the person's name may be placed on the preferred eligible list for an additional two (2) years. Seniority of persons on leave of absence shall be governed by the Seniority article of this Agreement.

E.    Unless otherwise provided for, the procedure for the administration of this Article shall be in accordance with Human Resources Department Rules.

F.    A member of the Association elected or appointed to a position in the Association which would take him from his/her employment with the City, may request a leave for a period of not less than sixty (60) calendar days nor more than two (2) years or termination of his/her Association position whichever occurs first. Such request shall be granted unless in the discretion of the department director such leave would cause a serious adverse effect on departmental operations.

G.    Parenting Leaves: A parent of a new-born or newly-adopted infant who is eligible for a leave of absence may request a personal leave without pay for purposes of providing parental care or making child care arrangements. Such absence from work shall not exceed a maximum period of six (6) months including any optional use of accrued vacation or other earned time. Granting of such leave shall be at the discretion of the department director based upon the operating needs of the department.

In the case of employees who have been off work on sick leave or health leave of absence due to maternity, the optional leave for parenting purposes shall not begin until after the employee has been adjudged physically able to return to work.

## 37. FUNERAL LEAVE

A.    If a death occurs among members of the employee's immediate family or household, the employee, provided he/she attends the funeral or memorial service and submits documentation of such upon return to work, will be granted three (3) days leave not to be charged to sick leave; provided that such leave will be extended to five (5) days if the funeral or memorial service which the employee attends is more than 300 miles from the City of Detroit. When an employee is entitled to three (3) days leave under this provision, and the funeral or memorial service is within 300 miles of Detroit, he/she shall be granted two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

B.    **Definition of Immediate Family:** The immediate family is defined as wife, husband, son, daughter, brother, sister, father, mother, step-father, step-mother, step-son and step-daughter, grandmother, and grandfather.

C.    If a death occurs among the relatives of the employee, the employee will be granted one (1) day leave, not to be charged to sick leave provided he/she attends the funeral and submits documentation of such upon return to work. If the funeral which the employee attends is more than 300 miles from the City of Detroit, the employee may extend the leave by two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

D.    **Definition of Relatives:** Relatives are defined as grandson, granddaughter, brother-in-law, sister-in-law, uncle, aunt, mother-in-law, and father-in-law.

E.    The Association President or his/her designated representative, with proper notification to the department head, shall be allowed one (1) funeral day, not to be charged to sick leave, in order to attend the funeral of a City employee who was a member of his/her Association on the day prior to his/her death, provided he/she attends the funeral and submits documentation of such upon return to work.

Note: Employees hired on or after effective date of approval by City Council are not eligible to receive reserve sick leave.

The two-tier system for new hires referenced in this Note will be implemented when the City's Payroll System has the capability. (See Memorandum of Understanding RE: HR/Payroll Systems.)

## 38. DEATH BENEFITS AND LIFE INSURANCE

A.    **DEATH BENEFITS:**

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $10,000.

   1.    **MEMBERSHIP:**
         Mandatory for regular employees.

   2.    **CONTRIBUTIONS:**
         By the City - $13.30 per year per employee.
         By the employee 20¢ per week or $10.40 per year.

If during the term of this Agreement, the Governing Board of Employee Benefits approves an increase in the death benefit eligible for payment to members of the plan, the parties agree that this increased benefit will be applicable to employees covered by this Agreement.

B.    **PAYMENT FOR EMPLOYEES KILLED OR PERMANENTLY DISABLED IN LINE OF DUTY:**

   1.    A lump-sum duty death benefit of $10,000 will be paid to the beneficiaries or estate of employees who are killed or who die as a direct result of injuries sustained in the actual performance of their duties.

2. A lump-sum payment of $10,000 will be made to any employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of their duties. "Totally and permanently disabled" shall be defined exclusively as follows:

   a. Total and permanent loss of sight of both eyes.
   b. Loss of both legs or both feet at/or above the ankle.
   c. Loss of both arms or both hands at/or above the wrist.
   d. Loss of any two of the members or facilities enumerated in (a), (b), (c).
   e. Permanent and complete paralysis of both legs or both arms or one leg and one arm.
   f. Incurable insanity or imbecility.

   A claimant to benefits under this paragraph shall have the right to present any written information in support of the claim which shall become part of the records reviewed by the physician appointed by the Finance Director and the Medical Board of Inquiry, should a Board of Inquiry be formed.

   The Finance Director shall appoint a physician who shall examine the medical records and findings and with respect to rights of claimants the physician may also personally examine the claimant. Said physician shall within sixty (60) days of appointment file a written report regarding his medical findings which report shall include a recommendation as to whether or not the claimant is entitled to the benefits.

   Should either the claimant or the Finance Director disagree with the medical findings of the physician so appointed and the claim for benefits is denied, the claimant or the Finance Director must so indicate to the other in writing the demand for a Medical Board of Inquiry.

   The Medical Board of Inquiry shall consist of three (3) physicians or surgeons appointed by the Wayne County Medical Society. The Medical Board of Inquiry shall examine all medical findings and within sixty (60) days of its formation shall file with Finance Director written report of its findings, which as to the benefits provided herein shall be final and binding as to the medical finding. The Finance Director shall pay the fees of the physician named by him/her and the fees of any Medical Board of Inquiry formed.

3. Employees who receive a permanent disability payment under this Article shall be ineligible for the $10,000 Duty Death Benefit described in Section B-1 above.

C. **GROUP LIFE INSURANCE:**

A group life insurance program for the employee and his/her family is available for all members of the Employees Benefit Plan on an optional basis, under the provisions of the City Code, Chapter 13, Article 9.

1. **Membership** - Optional for members of the Employees Benefit Plan.

2. **Contributions** - The City shall pay approximately sixty percent (60%) of the premium for insurance up to and including $12,500. The employee shall pay forty percent (40%) of the premium for insurance up to and including $12,500. The employee shall pay the full cost of any insurance in excess of $12,500.

3. **Benefits - Employees:**

| Yearly Pay | Amount of Insurance |
|---|---|
| Under $5,000 | $ 3,750 |
| $5,000 to $7,500 | $ 6,250 |
| $7,500 to $10,000 | $ 9,375 |
| Over $10,000 | $12,500 |

4. **Benefits - Dependents:**

| Cost of Employee | Amount of Insurance |
|---|---|
| 70¢ per week | $5,000 each dependent |

## D. ADDITIONAL INSURANCE:

1. Employees will be able to purchase insurance which is approximately equal to their annual salary or they may choose to purchase insurance which is approximately equal to two (2) times their annual salaries in accordance with the following:

| Yearly Pay | Amount of Insurance Option 1 | Amount of Insurance Option 2 |
|---|---|---|
| $12,500 to $15,000 | $15,000 | $30,000 |
| $15,000 to $17,500 | $17,500 | $35,000 |
| $17,500 to $20,000 | $20,000 | $40,000 |
| $20,000 to $22,500 | $22,500 | $45,000 |
| $22,500 to $25,000 | $25,000 | $50,000 |
| $25,000 to $27,500 | $27,500 | $55,000 |
| $27,500 to $30,000 | $30,000 | $60,000 |
| $30,000 to $32,500 | $32,500 | $65,000 |
| $32,500 to $35,000 | $35,000 | $70,000 |
| And so forth in $2,500 increments | And so forth in $2,500 increments | And so forth in $2,500 increments |

2. Subject to the agreement of and conditions determined by the current life insurance carrier, retirees shall have the option of converting all or part of their group life insurance to a life insurance policy at their own expense. Also, subject to the above conditions, employees who resign may continue their current coverage at their own expense. For retirees who elect to retain this coverage, the City shall deduct the premiums from their retirement checks on a monthly basis.

Changes to Article 39 are reflected in the Memorandum of Understanding RE: Alternative Health Care Plan.

# 39. HOSPITALIZATION, MEDICAL INSURANCE, DENTAL INSURANCE AND OPTICAL CARE

A.  The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87), known as the two-dollar ($2), deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, duty death beneficiaries and their legal dependents as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit. Effective July 1, 2006, the co-pay for the Prescription Drug benefit was increased to $5 for generic drugs and $15 for brand name drugs.

(Note: The $2 deductible Drug Rider (Certificate #87 referenced above) reflects the benefit at the time the premium sharing arrangement was instituted.)

Hospital/Medical insurance coverage for employees hired/re-instated prior to effective date of approval by City Council shall begin on the first day of the first full pay period, and end on the last day of the month that employment ends.

Hospital/Medical insurance coverage for employees hired/re-instated on or after effective date of approval by City Council shall begin on the first day of the month following three (3) months of service, and end on the last day of the month that employment ends. For the first five (5) years of employment hospital/medical insurance enrollment opportunity shall be limited to Community Blue PPO and HMO plan options available under the City Medical Design Plan II (formerly known as the "Mercer Design Plan"). The Blue Cross Traditional Plan is not an available plan option. Eligibility to apply for enrollment in the Alternative Health Care option design plans will begin at the open enrollment period following the end of the five (5) years of service with an effective date of July 1st of that year.

B.  The City will pay up to the following amounts per month for Blue Cross/Blue Shield Traditional Plan hospitalization/medial coverage:

| | |
|---|---|
| Single person | $100.06 |
| Two persons | $238.29 |
| Family | $253.54 |

Fifty percent (50%) of any premium charges that exceed the above amounts shall be paid by the employees and fifty percent (50%) shall be paid by the employer.

C.  Effective upon approval of City Council, the City will no longer provide employees the option to insure sponsored dependents.

D.  The City will provide regular retirees and their spouses who are enrolled in the Blue

Cross/Blue Shield Traditional Plan hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87) known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 77-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City. For employees who retire (except for vested retirees) on or after July 1, 2006, the co-pay for the Prescription Drug benefit was increased to five dollars ($5) for generic and fifteen dollars ($15.00) for brand name. For persons who retire (except for vested retirees and non-duty disability retirees) on or after July 1, 1986, the City will pay up to the following amounts per month for Blue Cross Cross/Blue Shield Traditional Plan hospitalization and medical insurance:

| | |
|---|---|
| **Single person** | **$100.06** |
| **Two persons** | **$238.29** |

Fifty percent (50%) of any increase over these amounts shall be paid by the retiree and fifty percent (50%) shall be paid by the City. The City will pay this premium for regular retirees and their spouses at the time of retirement only for as long as they receive a pension from the City.

E.  The City Blue Cross/Blue Shield Traditional hospitalization plan for active employees and their dependents and retirees and their spouses shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a one hundred seventy five dollars ($175.00) per person annual deductible three hundred fifty dollars ($350) for two or more in a family).

F.  Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from plans or programs made available by the City. The City's contribution to the alternative plans or programs shall be limited to the following:

Alternative Health Care Design Plans (AHCD) – Blue Cross Community Blue PPO 90% of the monthly premium; all HMO plans 80% of the monthly premium.

City Medical Design (CMD) Plan II options (formerly known as the "Mercer Plan") – Blue Cross Community Blue PPO and all HMO plans 80% of the monthly premium.

The employee's contribution toward the component premiums (i.e., one person, two persons, family) for Blue Cross Community Blue PPO (AHCD) plan shall be capped at 10% of the monthly premium; and for Blue Cross Community Blue PPO (CMD Plan II) and all HMO plans shall be capped at 20% of the monthly premium.

If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll fifty (50) employees city wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

G.  The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a Dental Plan which shall be equivalent to the Blue Cross/Blue Shield program which provides Class I benefit on a 25% co-pay basis and Class II and III benefits on a fifty percent (50%) co-pay basis. Class I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a fifty percent (50%) co-pay basis with a $1,000 lifetime maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City will make available cost-effective alternative dental plans.

Coverage for new hires shall begin on the first of the month following the employee completing six months of service. Coverage ends on the last day of the month that employment ends.

H.  The City will provide Optical Care Insurance through the Employee Benefit Board, such benefit will include case hardened lenses.

Effective July 1, 2006, the City will contribute $6.42 per month for employees covered by CO/OP Optical and $6.27 per month for employees covered by Heritage Optical. Optical care enrollments will occur at two (2) year intervals.

Optical coverage for employees hired/re-instated prior to effective date of approval by City Council shall begin on the first day of the month following the employee completing 60 days of service. Coverage ends on the last day of the month that employment ends.

Optical coverage for employees hired/re-instated on or after effective date of approval by City Council shall begin on the first day of the month following the employee completing six (6) months of service. Coverage ends on the last day of the month that employment ends.

I.  If, during the term of this Agreement, a Federal Health Care Law is enacted, the parties shall enter into immediate collective bargaining negotiations over the impact of such a law on the existing arrangement for funding and providing health care benefits.

J.  No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits. All carriers will be required to provide group specific utilization and cost data as a condition of doing business with the City. Copies of all information will be provided to Association and City representatives as directed.

K.  The City reserves the right to implement Health Care Cost Containment Programs during the term of the Agreement. Said Cost Containment Program shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits.

L. The Association and the City are in agreement on the escalating costs of health care in the health care industry. In recognition of the above and in an attempt to take positive steps to control costs and improve delivery systems the City agrees to form a multi-union Health Care Committee comprised of not more than five (5) representatives from the Unions and five (5) from the City. The Senior Accountants, Analysts, and Appraisers Association shall be one of the unions selected to participate on the committee.

Connected with the above, the Association strongly approves of the design and implementation of a flexible benefits package.

M. Employees on the active payroll who are covered by a health care plan offered by an employer other than the City, and can furnish proof of such coverage, may elect to take an annual $950 cash payment (opt-out stipend), payable quarterly at the end of each three month period, , in lieu of the hospitalization-medical coverage offered by the City. Effective with the implementation of the new HR/payroll system this opt-out stipend will be paid equally during each applicable pay cycle. This opt-out election shall take place annually during the open enrollment period.

Once an employee elects the cash payment, the employee will not receive hospitalization-medical coverage until the next year's enrollment period. If the employee loses his eligibility for the alternate coverage, the employee, upon submitting appropriate proof of loss of coverage, will be able to resume the City's hospitalization-medical coverage the month following completion of the applicable enrollment forms. The cash payments will cease upon the employee resuming the City's hospitalization-medical coverage.

The City shall have the sole discretion to offer this opt-out provision to current and future retirees who are eligible for the City's hospitalization-medical coverage. This discretion shall extend to the determination of the amount of the cash payment, the method of payment, the eligibility requirements, and the continuance of the opt-out plan itself.

N. A spouse who is or becomes divorced from an employee or a retiree (divorced spouse) is not entitled to healthcare coverage under this Agreement under any circumstances.

If a retiree marries or remarries after retirement, the new spouse is not entitled to healthcare coverage under this Agreement under any circumstances.

The child, of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent healthcare coverage under this Agreement.

O. When the City's payroll system has the capability of allowing employees to *pay their medical contribution* through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

P. Mandatory Generic Drugs: Prescription drug coverage under all City of Detroit health care plans shall require the use of generic drugs, unless determined that a brand name drug is

medically required or a generic equivalent is not available. If the brand name drug is requested, but is not medically required or a generic drug is available, the employee, retiree or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and the brand name drug. This requirement applies even if the prescribing physician has indicated "dispense as written" or "DAW" on the prescription. This mandatory generic drug requirement shall be administered by BCBSM for BCBSM-administered or insured plans, and for other City carriers by their medical insurer or administrator. Final resolution to any appeal will be handled by the medical insurance carrier or administrator.

Q.   Enrollment for medical coverage for retirees who are Medicare-eligible shall be limited to the Medicare Advantage option plans offered by the City. In the event, such Medicare Advantage plans are no longer offered or cost effective, enrollment in alternate plans will be permitted as determined by the City.

R.   Effective with the coverage plan year that begins on or after July 1, 2006, in order to be eligible for coverage under all City of Detroit health care plans, all active employees and their dependents who are eligible for Medicare, due to certain medical conditions defined by Medicare that permits the employer to be a secondary payee for insurance, must enroll in Medicare Parts A and B. Such enrollment in Medicare shall not result in any reduction in benefits or additional cost to the employee, in that the employee shall be reimbursed the amount paid for Medicare after submission of required proof of enrollment and payment. This reimbursement for the cost of Medicare provision only applies to employees and their eligible dependents, while the employee is on the active payroll. This benefit does not apply to retirees or dependents covered under the City retiree's health care contract.

Currently, all retirees and their dependents that are eligible for Medicare regardless of age must enroll in Medicare Parts A and B at their own expense to be eligible for continued coverage, and this provision shall remain unchanged and applicable to all persons who retire in the future.

Accordingly, any person who is eligible for hospital/medical coverage under this agreement and who is Medicare-eligible shall furnish the City's Benefits Administration Office a copy of his/her Medicare card which confirms that he/she has obtained Medicare Parts A and B or documentation from the Social Security Administration that verifies ineligibility in order to continue to receive any hospital/medical coverage under this Agreement. Failure to enroll in Medicare, provide required Medicare documentation or maintain Medicare Parts A and B coverage will result in coverage termination. If coverage is terminated, re-enrollment will not be permitted until the next scheduled open enrollment period. Required documentation, i.e., proof of Medicare coverage, must be presented with the enrollment application. If reenrollment is approved, the coverage shall be reinstated prospectively only. (Generally, open enrollment occurs in the spring of the year, with a July 1st coverage effective date).

Consistent with current practice, all employees, retirees, and their dependents, who receive healthcare coverage under this Agreement, must disclose to the City the existence of any other source of healthcare benefits. In all such cases, full coordination of benefits will apply at all times.

Effective July 1, 2010, if an employee/retiree's spouse has hospitalization-medical coverage available to him/her under a plan offered by his/her employer (other than the City of Detroit), said spouse must enroll in that employer's hospitalization/medical plan for employees or retirees in order for the spouse to be eligible for medical coverage through the City of Detroit. In such cases, if the spouse of the employee or retiree is also enrolled in the City's hospitalization-medical plan, the City will be the secondary insurer/payer. This provision does not apply in those instances where the employee/retiree and spouse are both employed by the City of Detroit. (See Paragraph W as referenced above)

S. Consistent with current practice, if an employee retires with 25 years of credited service but less than 30 and receives an actuarially reduced pension, (referred to as the Actuarially Reduced 25 Year Option of the Retirement Plan) he/she may participate in the City's group retiree hospital-medical plans at full cost for the coverage. The City shall make no contribution to the monthly premiums for this hospital-medical coverage until such time as this retiree reaches what would have been his/her 30th year anniversary which would have qualified him/her for a regular service retirement. Upon reaching his/her 30th year, the City will contribute to the cost of the retiree and spouse's health care based on the contribution formula and rules in effect at time of qualification for regular retirement at the 30th year.

T. Employees hired on or after effective date of approval by City Council, hospital/medical and prescription benefits shall cease for retirees and their spouses after the retiree (or medical contract holder) becomes Medicare eligible by age; the current Medicare eligible age requirement is 65.

U. Effective upon approval of City Council, employees who retire after the effective date of this Agreement, and who are qualified to receive the City's hospitalization-medical insurance as a retiree shall at any time the retiree is receiving said coverage, be entitled to the same coverage opportunities then available to the active employees (plus, Medicare advantage plans as specified in P above) and utilizing the same co-premium calculation formula to determine amounts payable by retirees for the retiree and his/her spouse.

V. **Health Habits and Reproductive Prescription Drugs:** Effective upon approval of City Council, all health habits, reproductive (fertility), and lifestyle prescription drugs will no longer be covered under the City's prescription drug program.

W. Effective with the Family Continuation Verification Period for the coverage plan year beginning July 1, 2006, in addition to the existing family continuation requirements, employees insuring family continuation dependents (19 – 25 year old dependent children) must also provide proof that the dependent is enrolled in an accredited school as a full-time student (carrying 12 credit hours each Fall and Winter term) in order for that dependent to be eligible for continued coverage. Effective with the coverage year that begins on July 1, 2010, the age requirement for family continuation dependents shall be changed from age 19 through 25 to age 19 through 22.

X. There shall be no duplicate hospitalization-medical insurance coverage or payments in lieu thereof provided employees or future retirees of the City. If the City employs more than one

member of a family, or the family unit includes a retiree of the City, all of whom could be eligible for coverage under one hospital-medical insurance policy or plan as a spouse or eligible dependent, the spouses or eligible dependents of that family shall be covered by only one spouse or the other. It is the responsibility of the family to select a single hospitalization carrier. Under no circumstances shall the City be obligated to provide more than one hospitalization-medical policy or plan.

Y. **Coalition Bargaining**: In addition to the above noted provisions, the parties agree to continue to bargain and to work collaboratively toward establishing cost saving measures for Healthcare benefits as well as resolve issues that may arise with the implementation of the new HR/Payroll and Benefit System. If the parties agree to further changes during the course of this Agreement, such changes shall be implemented upon ratification of the bargaining unit and approval by City Council, and thereafter, incorporated into this Master Agreement. Examples of Continued Cost Saving Measures for medical, dental, optical and life insurance plans include, but are not limited to:

Post-Retirement Employment (City is Not Responsible for Retiree Healthcare if Employee is Eligible for Healthcare Through His/Her Post Retirement Employer, that is Substantially the Same as the City's Plan, During the Period of Other Employment)

Auto-Related Accidents Coverage (Primary Insurer—Automobile Insurance Plan; Secondary Insurer—City Medical Plan)

The two-tier system for new hires referenced in this Note will be implemented when the City's Payroll System has the capability. (See Memorandum of Understanding – RE: HR/Payroll Systems.)

# 40. UNEMPLOYMENT COMPENSATION - SUPPLEMENTAL UNEMPLOYMENT BENEFITS

A. **UNEMPLOYMENT COMPENSATION:**

Employees covered by this Agreement shall receive unemployment benefits in accordance with the unemployment insurance plan administered by the Michigan Employment Security Commission under the Michigan Employment Security Act.

B. **SUPPLEMENTAL UNEMPLOYMENT PLAN:**

Subject to all of the following rules and qualifications, employees shall be entitled to Supplemental Unemployment Benefits.

**SECTION 1. Application for Supplemental Unemployment Benefits:**
No employee shall be eligible for S.U.B. unless and until he/she shall have made due application therefore in accordance with the procedure established by the City and shall have met the eligibility requirements of Section 2 of this article. Such an employee shall be considered as an applicant.

**SECTION 2.** An applicant shall be eligible for S.U.B. only if he/she is on layoff from the City with respect to the week for which application is made, and he/she did not work for another employer during such week, and if

a)   such layoff:
    1)   was from the Bargaining Unit;
    2)   occurred in a reduction in force;
    3)   was not for disciplinary reasons and was not a consequence of (i) any strike, slowdown, work stoppage, picketing (whether by his/her bargaining unit or any other), or concerted action, or any dispute of any kind involving City employees, or (ii) any fault attributable to the applicant, or (iii) any war or hostile act of a foreign power (but not government controls or regulation connected therewith), or (iv) sabotage or insurrection, or (v) any act of God and
    4)   was not self elected.

b)   with respect to such week, the applicant:
    1)   had sufficient seniority to be eligible for one week's benefit;
    2)   has registered at and has reported to an employment office of the Michigan Employment Security Commission as required by the MESC;
    3)   has received unemployment compensation from MESC not currently under protest;
    4)   has not refused to accept work when recalled pursuant to the Collective Bargaining Agreement and has not refused an offer by the City of other available work which the applicant has no option to refuse under the Collective Bargaining Agreement;
    5)   has not failed to report for interview within five (5) working days after notice of recall from the City;
    6)   has not failed through any fault of his/her own to report for hire at the employing department within five (5) working days after certification;
    7)   was not eligible for and was not claiming any accident or sickness or other disability benefit (other than a disability benefit which would be payable to the applicant whether he/she was working full time or not or a survivor's allowance under Workers' Compensation laws), whether publicly or privately financed, or a pension or retirement benefit financed in whole or in part by the City;
    8)   was not in military service;
    9)   did not receive any unemployment benefit from, or under any contract, plan or arrangement of, any other employer, and he/she was not eligible for such a benefit from, or under any contract, plan or arrangement of, any employer with whom he/she has greater seniority than with the City;
    10)   must have been on continuous layoff from the City for a period of thirty (30) consecutive calendar days; whereupon he/she will be eligible retroactively for benefits commencing after the second week of layoff;
    11)   must not be on layoff from a classification designated as special service, limited term, part-time, provisional, contractual, limited status, or for which the duration of employment is listed as seasonal;
    12)   must have at least eighteen (18) months total City seniority.

c)   an employee shall forfeit permanently all eligibility for S.U.B. if he/she shall misrepresent any material fact in connection with an application by him/her for any S.U.B. or other

46

DRAFT 4/28/2011

unemployment compensation. Furthermore, he/she shall be subject to disciplinary action upon his/her return to active status.

## SECTION 3. Powers and Authority to the City

The City shall have such powers and authority as are necessary and appropriate in order to carry out its duties under this Article, including without limitation the following:

a) to obtain from employees, persons filing applications for benefits, eligible persons and elsewhere such information as the City shall deem necessary in order to carry out its duties under this article;

b) to investigate the correctness and validity of information furnished by any person who applies for a benefit;

c) to make appropriate determinations pursuant to this article;

d) to require an applicant to exhibit his/her MESC Unemployment Benefit check for the week with respect to which application for S.U.B. is made, or to submit evidence satisfactory to the City of receipt or entitlement to receive a MESC unemployment benefit.

## SECTION 4. Amount of Weekly Supplemental Benefit

An applicant who meets all the eligibility requirements of this article shall be entitled to a weekly Supplemental Unemployment Benefit in the amount of forty five ($45) dollars.

## SECTION 5. Duration of Supplemental Benefit

An eligible applicant shall be entitled to one week of S.U.B. for every month of total City seniority, not to exceed in any case a maximum of twenty-six (26) weeks duration for any continuous layoff.

## SECTION 6. All compensation received under this Article shall be offset against any claim for back wages.

# 41. RETIREMENT PROVISIONS

A. Eligibility for Service Retirement Allowance - Any employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service or ten (10) years of service and attained age sixty (60) or eight (8) years and attained age sixty-five (65) may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired. On the date so specified for his/her retirement, he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service. Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code. Employees may retire on or after July 1, 1992, with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall be known as the 25-year Early Service Retirement (actuarially reduced) Option of the Retirement Plan. Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

The above paragraph notwithstanding, employees hired after January 1, 1998, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This age requirement shall apply to both the Regular Service Retirement with thirty (30) years of service and the Early Service Retirement (actuarially reduced) with twenty-five (25) or more years of service.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.

After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than ninety (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992, may convert to this option anytime after they have had twenty-five (25) years of service with the City.

B.   Retirement benefits shall be modified to include an optional coordination of benefits between regular retirement benefits and Social Security benefits for those employees who retire from the City with a regular retirement or the Actuarially Reduced 25 Year Option prior to becoming eligible for Social Security payments. Such coordination of benefits shall cause an approximate leveling of total monthly benefits derived from both the City's retirement system and Social Security without creating any additional actuarial costs. This provision shall include all employees who retire on or after July 1, 1974, and shall be retroactive to that date.

C.   For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirement.

D.   For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1988, shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.

In the event that any law, state or federal is passed during the term of this Agreement which permits employees to vest their pension prior to meeting the vesting requirements set forth in this Contract, any employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday.

E.   Employees in this bargaining unit, or of any other bargaining unit which has this provision and become members of this bargaining unit subsequent thereto shall continue the vesting practice whereby employees who leave City employment after being vested but before

reaching eligibility for a service retirement, shall receive their retirement benefits the same day they would have been entitled to receive same had they continued in City service.

Beginning July 1, 1988, employees in this bargaining unit, shall pay the equivalent of .64 of one percent (.0064) of their wages which count towards Average Final Compensation to the City as consideration for continuation of the vesting provisions set forth in the preceding paragraph. This provision will remain portable for all July 1, 1988, bargaining unit members for as long as they are City employees and elect to pay for the benefit individually. Bargaining unit members who are eligible for a regular service retirement (30 years of service or age 60 with ten years of service or age 65 with 8 years of service), or the Early Service Retirement (actuarially reduced) with 25 or more years of service will not have the .64% deduction taken from their wages. Employees who came into the bargaining unit after July 1, 1988, are not eligible for the "old" vesting provision and will not have the .64% deduction taken from their wages.

F. Employees, who become eligible for a pension under the vesting provisions of the plan, shall be ineligible for any of the hospital, medical, optical or dental benefits provided for other retirees, spouses, dependents, or beneficiaries.

G. Employee contributions to the general retirement annuity fund shall be made optional. Balances in the fund standing to the individual credit of employees discontinuing contribution shall be maintained with accumulated interest to be paid out to the employee upon separation from the City. Employees qualified under the pension vesting provision of the general retirement system may withdraw their annuity with accumulated interest upon separation. Upon attainment of twenty-five (25) years of service, or at age sixty (60) with ten (10) years of service, an employee shall be eligible to withdraw, one time only prior to retirement, all or part of his/her annuity savings.

Non-Duty and Duty Disability Retirees shall be eligible to withdraw, one time only, all or part of their annuity savings.

H. At the time of retirement, members of the general City pension system may elect an option which shall entitle them to change their pension option from either option 2 or option 3 to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. This shall be known as the Pop-Up Option. The actuarial cost of the change in benefit shall be borne by the member who selects this change in his/her option election.

I. Employees who retire on or after July 1, 1998, shall have their pensions computed according to the following formula. Using the highest paid 36 consecutive months out of the last 120, including longevity payments, as Average Final Compensation; 1.6% of Average Final Compensation for each year of service for the first 10 years; 1.8% of Average Final Compensation for each year of service greater than 10 years up to 20 years, 2.0% of Average Final Compensation for each year of service greater than 20 years up to 25 years; and 2.2% of Average Final Compensation for each year of service greater than 25 years; plus $12 for each year of City service not to exceed $120. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation except in the case where

a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992.

J. Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the option to 1) select the Unused Sick Leave On Retirement payment benefit provided for elsewhere in Article 31 of this labor agreement or 2) chose to receive payment of one-quarter (1/4) of their unused sick time and have that sum included in the average final compensation used to compute the membership service pension portion of their retirement allowance.

K. Effective upon approval of City Council, any employee covered by this agreement, who is seeking a duty disability retirement, shall have an examination conducted by an independent medical examiner (IME). If the IME concludes that the employee's physical or medical condition does not relate to his/her employment with the City of Detroit, the employee shall not be eligible for the duty disability retirement.

L. Effective January 1, 1999, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.

The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased to $9,000 per annum.

M. Effective January 1, 1999, minor dependents under age 19 or permanently mentally or physically impaired dependent children who become impaired prior to age 19 of employees who die with 20 years of service without a surviving spouse shall receive a payment of $9,000 per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age 19 or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.

N. In addition to in-service death pension benefits which already exist for employees with 20 or more years of service, effective January 1, 1999, if a bargaining unit member dies after having attained 15 or more but less than 20 years of creditable service at any age below 60, the surviving spouse will be paid a 50% joint and survivor election. Dependent children, if there is no eligible surviving spouse, are to be paid a total of $6,000 which shall be divided equally amongst all eligible dependents until the youngest child reaches age 19, or for life if a child is permanently physically or mentally impaired.

O. The annual post retirement escalator factor shall increase from 2.0% to 2.25% of original base pension effective July 1, 1992.

P. Employees shall have the option of selecting from two additional surviving beneficiary options of 25% and 75%.

Q. Annuity Contribution Amounts: The City will offer to employees who choose to contribute to the annuity plan the option of 3% up to the Social Security maximum salary which would then be increased to 5%, a straight 5%, or a straight 7%.