Attorney for Plaintiff
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
Miller, Canfield, Paddock and Stone, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420


United States Bankruptcy Court
Eastern District of Michigan
Southern Division

<u>City of Detroit, Michigan</u>          Bankruptcy Case No. 13-53846
Debtor

                                         Written response to objection
vs.

<u>Lenetta Walker - creditor</u>
2898 Claim

PO Box 2714
Detroit, Michigan 48202
(313) 467-2624

Date:  April 5, 2016          Respectfully submitted,

                              *Lenetta Walker* (signature)
                              Lenetta Walker

FILED
2016 APR -6 P 1:51
U.S. BANKRUPTCY
E.D. MICHIGAN-DETROIT

United States Bankruptcy Court
Eastern District of Michigan
Southern Division

City of Detroit, Michigan          Bankruptcy Case No. 13-53846
Debtor

_____

April 5, 2016

The claim to dismiss due to a review of this matter is disputed. The claim of these funds were provided by a Federal Grant. These funds were never disallowed, or returned to the City. Therefore payment should be paid immediately without reduction due to bankruptcy. My wages and retirement were paid from Federal grant funds.

The Debtor, the City of Detroit (City) claims that this will benefit and make the City in a better position to operate and the documentation was insufficient that was reviewed by a selected team of employees from personnel specifically familiar with the operations and liabilities of the City.

Respectfully,

Lenetta Walker

Bankruptcy Case No. 13-53846
Lenetta Walker - creditor
2898 Claim

**Lenetta Walker**
**Claims Form**

| Year | Rate | Hours | Forced 10% Cut |
|------|------|-------|----------------|
| 2009 | 23.23 | 208 | $ 4,832 |
| 2010 | 22.37 | 208 | 4,653 |
| 2011 | 22.37 | 208 | 4,653 |
| 2012 | 22.37 | 152 | 3,400 |
| | | 776 | 17,538 |
| | | | **Bonus Vacation** |
| 2012 | 22.37 | 40 | $ 895 |
| | | | **Longevity** |
| 2012 | | | $ 450 |
| | | | **Reserve sick** |
| 2012 | 22.37 | 40 | $ 895 |
| | | | **Lunch** |
| 2012 | 22.37 | 195 | $ 4,362 |
| | | **Grand Total** | $ 24,140 |

2014bankruptcyclaim2/20/2014

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

IN RE:

City of DETROIT

**Debtor.**

_____/

CASE NO: 13-53846

CHAPTER: 9

## CERTIFICATE OF SERVICE

I hereby certify that on ___4/6/16___ (date of mailing), I served copies as follows:

1. Document(s) served:

   Written Response to objection
   → support - STATEMENT of FACTS

2. Served upon [name and address of each person served]:

   MARC N. Swanson (P71149
   Miller, Canfield, Paddock and Stone, PLC
   150 West Jefferson, Suite 2500
   Detroit, Michigan 48226

3. By First Class Mail.

Dated: ___4/6/16___

_____
(Signature)

Print Name: ___Lenetta Walkov___

In the matter of a fact finding between

SENIOR ACCOUNTANTS, ANALYSTS
AND APPRAISERS ASSOCIATION (SAAA),                    George Roumell

      Union,                                                       Fact Finder

      -- and --

CITY OF DETROIT,

      Employer.

_____/

## BRIEF ON BEHALF OF THE SENIOR ACCOUNTANTS, ANALYSTS AND APPRAISERS ASSOCIATION (SAAA)

### STATEMENT OF FACTS

The Senior Accountants, Analysts and Appraisers Association (SAAA) represents approximately 300 accountants, analysts, appraisers, information technicians, and similar professional and technical employees of the City of Detroit. Many of these employees, whose job titles are listed in the 2006-2008 contract that the City imposed on the SAAA (Ex 1, at 80-83), are required to have college degrees and professional licenses.

The Union begins with a brief statement of the events leading to this fact finding, of the issues that the parties have agreed to submit to fact finding, and of the criteria that fact finders have traditionally used. In the argument that follows, the Union addresses the City's core claim that it needs massive financial concessions due to its budget crisis. Following that discussion, the Union addresses the substantive merits of its proposals on each of the specific issues in dispute.

## A. <u>The events leading to this fact finding.</u>

The last true collective bargaining agreement between the City and the SAAA expired on June 30, 2005. In July 2006, the City imposed the 2005-2008 contracts on the SAAA and other City unions. The manner in which the City did that to the SAAA is subject to a pending unfair labor practice charge.

Even though unfair labor practice had not been decided, the SAAA began negotiations with the City for a new contract in a negotiation meeting on July 20, 2009. After a number of such meetings, the parties were not able to reach agreement and the SAAA requested mediation under the PERA. In November and December 2009, the SAAA and the City of Detroit met on six occasions with the assistance of that mediator. Still without an agreement, the SAAA requested fact-finding pursuant to MCL 423.25 in a petition dated January 11, 2010 (Ex 2).

On March 22, 2010, the MERC appointed Professor Donald Burkholder of the University of Detroit as the fact finder (Ex 3). The SAAA did not press for immediate hearings on the fact finding petition because it, like many other unions, was awaiting the report of the fact finder on the AFSCME Council 25—City of Detroit proceedings. Nor did the City press for immediate hearings, presumably for the same reason.

After the AFSCME-City of Detroit report was issued, the City and the SAAA met for several sessions in an attempt to narrow the differences. That resulted in some progress, but disputes still remained. The SAAA thus asked Professor Burkholder for dates and a meeting was scheduled for October 5, 2010.

At that meeting, the parties and Professor Burkholder discussed the issues in dispute and he set hearing dates for October 29 and November 9, 2010. The parties

2

agreed to continue negotiating on October 5 after Professor Burkholder left. In the evening of October 5, 2010, negotiators for the City of Detroit and the SAAA reached a tentative agreement to present to the SAAA membership (Ex 4).

On October 25, 2010, the membership of the SAAA duly debated and voted on the contract. By an overwhelming majority, the membership of the SAAA rejected the tentative agreement. The SAAA contacted the City and the fact finder and made clear that the Union was prepared to resume fact finding and negotiations.

On November 1, 2010, however, the Director of Labor Relations for the City of Detroit sent the SAAA declaring that on November 12, 2010, the City was unilaterally implementing its collective bargaining proposal, including a ten percent reduction in work hours and the elimination of the longevity pay that was due to be paid in early December 2010 (Ex 4). By letter of November 4, 2010, the SAAA advised the City that this action was unlawful, that it was ready to resume both negotiations and fact finding, and that it was filing an unfair labor practice charge with MERC over the proposed unilateral changes (Ex 5). On November 4, 2010, the SAAA also filed an unfair labor practice charge with the MERC (Ex 6).

The fact finder announced that he was prepared to hold a fact-finding hearing on November 9. The City of Detroit declared, however, that it was not willing to participate in that hearing.

On December 2, 2010, the SAAA and the City appeared for a hearing before MERC on the SAAA's charge. Before the hearing began, the City proposed a settlement of the unfair labor practice charge. After some negotiations, the SAAA agreed to a

3

modification of the City proposal. As reflected in the attached transcript (Ex 7), the City and the Union agreed as follows:

1. They would proceed to expedited fact finding before George Roumell, Jr.

2. Only briefs would be submitted.

3. The parties would request an award by January 10, 2011.

4. The Union would waive the 60-day cooling-off period with the proviso that there would be no unilateral changes before February 1, 2011.

5. The City, if it unilaterally implemented any changes on or after February 1, would implement the terms contained in the tentative agreement the parties reached on October 5, 2010.

6. The Union would withdraw its unfair labor practice charge.

B.  The issues to be submitted to fact finding.

Subsequent to the hearing before MERC, the City and the Union agreed that they would submit the following issues for a proposed resolution by the fact finder:

1. Budgeted furlough days, especially for grant and enterprise funded areas;

2. The 35 hour workweek;

3. Longevity pay;

4. Tuition reimbursement;

5. A 3-step grievance procedure;

6. A me-too clause.

4

C. The criteria for fact finding.

The Labor Mediation Act provides no explicit criteria for evaluating the City's claimed inability to pay and its bargaining proposals generally. But as this fact finder knows, fact finders frequently refer to the criteria specified by statute in the police and fire arbitration statute as guidelines for the voluntary awards for other public employees. Those criteria are as follows:

(a)   The lawful authority of the employer.

(b)   Stipulations of the parties.

(c)   The interests and welfare of the public and the financial ability of the unit of government to meet those costs.

(d)   Comparison of the wages, hours and conditions of employment of the employees involved in the arbitration proceeding with the wages, hours and conditions of employment of other employees performing similar services and with other employees generally:

> (*i*) In public employment in comparable communities.

> (*ii*) In private employment in comparable communities.

(e)   The average consumer prices for goods and services, commonly known as the cost of living.

(f)   The overall compensation presently received by the employees, including direct wage compensation, vacations, holidays and other excused time, insurance and pensions, medical and hospitalization benefits, the continuity and stability of employment, and all other benefits received.

(g)   Changes in any of the foregoing circumstances during the pendency of the arbitration proceedings.

(h)   Such other factors, not confined to the foregoing, which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment through voluntary collective bargaining, mediation, fact-finding, arbitration or otherwise between the parties, in the public service or in private employment.

MCL 423.239.

5

The SAAA has addressed those factors as appropriate below. The City and the Union have agreed that the Fact Finder may refer to those aspects of the transcript of the AFSCME-City of Detroit fact finding proceeding as may be relevant.

## ARGUMENT

### A. THE CITY'S FINANCIAL CRISIS AND ITS SIGNIFICANCE FOR THIS FACT FINDING.

The Union begins with the overarching issue in these proceedings—the City's financial crisis and its demand that employees help solve that crisis by agreeing to yet another round of concessions.

To begin with the obvious, by any conventional measure, there is no question that the City has a large deficit in its general fund. The facts of that deficit are set forth in the fact finders' reports for AFSCME and for the building trades. Those reports also set forth the decline in the City's population, its economic base, and its tax revenues—and in the funds the City general fund has received from the state and federal governments. Borrowing at one time lessened the deficit—but in recent years, repayment obligations increased the general fund deficit.

The general fund deficit is, of course, only part of the immediate financial story. Many areas of City government administer national or state programs that are not paid for out of the general fund. Other areas of the City, including, in particular, the Water Department, provide services to entire region and are financed by payments for the services provided. For those programs—which represent a considerable portion of the SAAA's membership—the general fund deficit is irrelevant. More concessions by City employees in those areas will not decrease the general fund deficit at all.

6

But even in the areas covered by the general fund, the new and draconian wage and benefit concessions demanded by the City will not reduce the deficit in any long-term sense. For many years, the City and, behind it, the state and federal governments and the bondholders, have demanded and won concessions from City employees and cuts in City services as the supposed means for resolving the general fund deficit. But it has not worked.

In July 2006, the City imposed a three-year contract on the SAAA and on other City employees. That agreement imposed a ten percent cut in the 2006-2007 contract year, cut health benefits substantially for all three years, and provided for only a four percent wage increase for the entire period from July 1, 2005 through June 30, 2008 (Ex 1). From July 1, 2008, forward, wages have been frozen. Even assuming that the All Urban Consumers price index (as opposed to the Urban Wage Earner and Clerical index) is the appropriate standard for the professional and technical employees at issue here, prices have increased 12.6 percent during the period from June 2005 through November 2010 (BLS Statistics, available on line).[1] With nominal wages having only increased only four percent during this period--the SAAA' employees' real, base-wage rate has dropped by 8.6 percent in four years. With the health concessions and the ten percent reduction for 2006-2007 included, the SAAA's members' loss in real wages is already well 15 percent in the last four years.

The City's core proposal is for a *further* 10 percent cut in weekly wages, accomplished by means of 26 forced days off (budgeted furlough days) for each of the next three years. *Plus* the City demands more cuts in health care. *Plus* it demands

---

[1] The all urban consumer index stood at 194.4 in June 2005. In November 2010, it was 218.8, which is a 12.6 percent increase.

7

lengthening the standard work week from 35, where it has been for a half century, to 40 hours per week. Even assuming that prices are stable over the next three years—which may actually occur—over two contracts, the City demands that employees work 14 percent more every day for real wages that have dropped over 20 percent and real total compensation that has dropped by close to 30 percent.

These enormous cuts have not solved the budget crisis. Indeed, by lowering living standards for City employees, by cutting services, and by ensuring that Detroit's youth will have no jobs in the City, these cuts have contributed to a downward spiral in which the decline in the residents' incomes leads to less tax revenues, more flight (and thus even less revenues), and then to demands for further cuts.

In addition to destroying the economic base of the City, these cuts have destroyed its social fabric as well. At the same time that the former administration demanded sacrifices from employees for the "common good," it looted the City in what the federal government has now called a criminal enterprise. The current administration has apparently ended many aspects of the criminal enterprise, but it has continued and proposed increases in doling out huge contracts for City construction and for City services (including information technology) to private companies. And the tax breaks given to every major corporation located in the City have, of course, continued.

The City is, of course, not alone in its one-sided demands. At the state level, the single business tax has been cut and will now apparently be eliminated—at the same time that aid to Detroit declines. At the federal level, major banks, financial institutions and corporations, including the auto companies and their suppliers, have received hundreds of billions from the federal government and trillions from the Federal Reserve—and the

8

wealthiest Americans are now set to receive two more years of tax cuts, at the same time that they demand that City and other public workers sacrifice for the "common good."

Under the criteria in the compulsory arbitration statute that are quoted above, the fact finder must consider more than the raw numbers of the City's general fund deficit. He must consider past concessions, the "interests and welfare of the public," and "other factors …which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment…" MCL 423.239(h). Equality of sacrifice is and has always been a factor in determining wages—and imposing a 20 and 30 percent real reduction in living standards at the same time that contracts, tax cuts, and direct payments to the wealthiest citizens of the country and of the State continue is the exact opposite of equality of sacrifice.

Under extreme pressure, a few unions have ratified contracts containing the City's proposals. But most have not because the members see the City's proposals as blatant inequality and as leading not to saving the City but to its further degradation. Nowhere is the social fabric more vulnerable than in Detroit; nowhere is the demand for equality more important; and nowhere are those factors more relevant in wage decisions than here.

The SAAA asks this fact finder to consider those realities in assessing both the areas outside the general fund and those inside the general fund. If that is done, the City's proposals cannot be sustained.

B. THE SPECIFIC ISSUES AT STAKE.

1. Budgeted furlough days.

The City has proposed requiring each employee represented by the SAAA to accept 26 days off without pay over each of the next three years. Because employees

9

cannot obtain replacement jobs for single days every other week, the City's proposal amounts to a demand for a 10 percent pay cut. Moreover, given the companion demand for an increase in the work week from 35 to 40 hours—which will affect every member of the SAAA—employees will, on balance, work the same number of hours for 10-percent less money. For those reasons, the SAAA objects to this proposal in general and to its application in the grant and enterprise funded areas in particular.

On a general basis, the SAAA objects for the reasons set forth above. The employees have already suffered huge real pay cuts—with no discernible reduction in the City budget deficit. Moreover, unlike some City employees, who work in 7-day, 24-hour operations, the members of the SAAA work almost entirely in positions that work a more normal work schedule. They thus will in fact suffer a ten percent reduction in wages with little benefit or relief in sight.

On a specific basis, the SAAA has a large number of employees who work in the Water Department, Neighborhood Services and other areas that are 100 percent federally funded or 100 percent funded by enterprise operations. In those areas, the concessions will force the employees to suffer a huge decrease in real living standards—with no benefit at all to the City general fund deficit.

In some areas, the cuts in compensation for grant funded employees violate the relevant federal statutes or contracts. In the Head Start program, for example, the City receives two million dollars in federal funds for wages and another $1.6 million for fringe benefits (Ex 8). By statute, these funds must be used for personnel purposes and will be returned to the federal government if not so used. Indeed, in the case of Head Start, there is a specific federal mandate that the funds be used for improving (or maintaining)

10

the wages and benefits of the employees receiving them *even if there are not funds for*

*increasing other employees' salaries:*

> Any agency that receives financial assistance under this subchapter to improve the compensation of staff who provide services under this subchapter shall use the financial assistance to improve the compensation of such staff, regardless of whether the agency has the ability to improve the compensation of staff employed by the agency who do not provide Head Start services.

42 USC 9835(j).

The City receives substantial funds from the federal Department of Housing and Urban Development (HUD) for community service block grants, weatherization and other programs. The City has not yet provided the grants and contracts for these funds. But the funds are 100 percent federal—and in those areas, as well as in enterprise-funded areas, it makes no sense to impose a reduction in the workweek where it will not aid the City deficit at all.

Traditionally, the City (and sometimes the unions) has asserted that it did not want to pay different wages based on the source of the funds. But as applied to the budgeted furloughs, that assertion is irrelevant. Base wage rates are not affected—only hours are affected. And as the City has already reserved the right to exempt certain employees from the budgeted furlough days for operational needs, it makes no sense to say that it cannot exempt employees from the furloughs where there would be no savings to the City and the only result would be a return of funds to the federal government or to enterprise operations.

2.      Imposition of a 40 Hour Work Week.

As the Arbitrator knows, when what was once called the City County Building was first constructed in the 1950s, those City employees who were in that building

11

received a paid lunch hour (and thus a 35 hour work week) to match the County employees who worked in the same building. The 35 hour work week has remained for 50 years—and has been applied not only to the City employees stationed in that building but also to those who had once been stationed there and had since been transferred to some other location.

The City now proposes ending this benefit. Ostensibly, it is for three years. In reality, it is likely to be for far longer than that. The City demand amounts to a 14 percent increase in work time with no additional increase in compensation. And of course, it amounts to a 14 percent increase at the same time that managers and officials continue to set their own schedules—thus avoiding any increase in work time if they so choose.

The SAAA asks this Fact Finder to recommend that the above increase be rejected.

3.      Longevity pay.

The City has for over a half century paid longevity pay to all City employees based on their years of service under the following schedule:

| | |
|---|---|
| Five—ten years | $150 |
| Eleven—fifteen years | 300 |
| Sixteen—twenty years | 450 |
| Twenty-one—twenty-five years | 600 |
| Twenty-six years and above | 750 |

(Ex 1, at 31).

12

The City paid this amount to SAAA employees in 2010. It also signed contracts with the Teamsters, the Amalgamated Transit Union (ATU), and the Principal Clerks agreeing to pay these amounts to current employees for 2011 and 2012 (Ex's 9, 10, 11). The City position is that it wants to punish the SAAA, AFSCME, and the unions that did not accept its overall contract demands by fall 2009.

The City cannot have it both ways. It cannot say that it wants equal wages and benefits—except where the City wants to make a point by punishing those who have not agreed with it.

4.    Tuition reimbursement.

The City has, for many years, paid employees up to $2000 in a fiscal year to reimburse them for course work towards an undergraduate or graduate degree (Ex 1, 50). For the employees in the SAAA, that has been a particularly important benefit. For the City as well—especially in information technology and computer operations—it has been extremely important.

The SAAA today faces many claims by the City that it must subcontract work in those areas because the City employees supposedly lack the requisite skills. It pays premium prices to outside vendors. But it makes no sense to say that City employees lack the requisite skills—and then deny them the ability to acquire those skills.

The SAAA requests that the fact finder sustain the SAAA position on this issue.

5.    A 3-step grievance procedure.

The imposed contract has three-steps in the grievance procedure prior to arbitration in every department except Finance, Health, and Water and Sewerage (Ex 1, at

13

5-8). In those departments, the imposed contract has an intermediate Step 2 with an official lower than the department director or his designee.

The SAAA formerly did not have this step in its contract. It was included at City request in order to make the SAAA procedure the same as the AFSCME procedure. But it has been a complete waste of time, resulting in grievances piling up before officials who never do anything to resolve those cases.

The overwhelming majority of the grievances filed by the SAAA involve claims of discipline without just cause. The Step 2 meetings are almost always with the officials who approved the discipline in the first place—and those officials never change their minds. The meetings are a waste of time—and simply delay the time when the grievances can be addressed by the department head or by labor relations, who sometimes do grant relief.

Given that the division head or his representative decide on or approve the discipline, the SAAA asks that the procedure be the same in all departments—three steps before arbitration, with the first step being with the department head or his designee on discipline case. The proposed procedure is faster, more efficient, and can provide at least some help in ending the backlog that is of no assistance to either party or to the affected employees.

The City has offered no reason for rejecting this proposal. If cooperation is not to be a one-way street, it should be adopted.

6.    Me-too clause.

The Union has, in the past, had a clause in its contract providing that if any other union obtained a more favorable settlement, the SAAA would receive the benefits of that

14

settlement. That clause has been an incentive for unions to settle even when there was uncertainty as to what other unions would receive.

The City proposed it to the SAAA, but when the SAAA refused to accept it at the time, the City withdrew the proposal. Apart from an attempt at retroactively vindicating its negotiating position, the City has offered no reason for not following the traditional pattern bargaining on this. The SAAA would accordingly request that a "me-too" clause be included in the final agreement recommended by the fact finder.

## CONCLUSION

For the reasons stated, the SAAA requests that the fact finder sustain its position on the issues listed above.

By the SAAA's attorneys,

SCHEFF, WASHINGTON & DRIVER, PC

By:     George B. Washington
        645 Griswold--Suite 1817
        Detroit, MI 48226
        313-963-1921

Dated:

15

The definition set forth above shall generally apply absent specific provisions to the contrary for particular benefits.

## 35.    LONGEVITY PAY

A.    Employees shall qualify for longevity pay as follows:

   1.    Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

   2.    Employees may qualify for the second step of longevity pay, inclusive of the first step provided, they have served as City employees for an accumulated period of eleven (11) years.

   3.    Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

   4.    Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (21) years.

   5.    Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

   6.    The first step of longevity increment shall be one hundred fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three-hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four-hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven hundred and fifty dollars ($750).

B.    Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1,800) hours of straight time Regular Payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1st.

33

# 34. SICK LEAVE

A.  All employees hired prior to the effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked eighty percent (80%) of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Those employees hired on or after effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed ten (10) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971, may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

The service month shall be in accordance with City payroll practices. All employees must be on the payroll for the entire month to be eligible for sick leave.

B.  Reserve sick leave of five (5) service days shall be granted on July 1 to each employee hired prior to effective date of approval by City Council who was on the payroll the preceding July 1 and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank. Those employees hired on or after effective date of approval by City Council shall not be eligible for reserve sick leave.

C.  Sick leave may not be granted in anticipation of future service.

D.  Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E.  **QUALIFIERS FOR BONUS VACATION DAYS:**

1.  **Fifty Day Qualifier:** Employees hired prior to effective date of approval by City Council who have accumulated a total of fifty (50) or more days on July 1 shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
|---|---|
| 0 | 6 |
| ½ to 1 day | 5 ½ |
| 1 ½ to 2 | 5 |
| 2 ½ or 3 | 4 ½ |
| 3 ½ or 4 | 4 |
| 4 ½ or 5 | 3 ½ |
| 5 ½ or 6 | 3 |
| 6 ½ or 7 | 2 ½ |
| 7 ½ or 8 | 2 |
| 8 ½ or 9 | 1 ½ |