UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 13-53846

CITY OF DETROIT, MICHIGAN,                                Chapter 9

            Debtor.                                       Judge Thomas J. Tucker
_____/

**OPINION REGARDING MOTIONS FILED BY THE CITY OF DETROIT:
1) FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT
INJUNCTION AND (II) REQUIRING THE DISMISSAL OF THE STATE COURT
ACTION FILED BY TANYA HUGHES (DOCKET # 9970);
2) FOR (I) DETERMINATION THAT THE GOODMAN ACKER AND HAAS &
GOLDSTEIN LAW FIRMS HAVE VIOLATED THE PLAN OF ADJUSTMENT BY (A)
REFUSING TO HONOR AN ADR SETTLEMENT AND/OR (B) SEEKING RELIEF ON
A PRE-PETITION CLAIM BEYOND THAT ALLOWED BY THE PLAN OF
ADJUSTMENT AND
(II) ORDER ENJOINING FURTHER VIOLATIONS (DOCKET # 9893);
AND 3) FOR ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT
AND (II) REQUIRING THE WITHDRAWAL WITH PREJUDICE OF THE AUGUST 2,
2013, GRIEVANCE FILED BY THE SENIOR ACCOUNTANTS, ANALYSTS, AND
APPRAISERS ASSOCIATION ON BEHALF OF CEDRIC COOK (DOCKET # 10183)**

**I. Introduction**

        This case is before the Court on three motions filed by the City of Detroit, seeking

enforcement of the City's confirmed Chapter 9 plan, entitled the Eighth Amended Plan for the

Adjustment of Debts, which was confirmed on November 12, 2014.[1]  The only unresolved

question in each motion is whether certain claims arose, for bankruptcy purposes, before the City

filed for protection under chapter 9 of the Bankruptcy Code on July 18, 2013.  The question is

important because the City's liability on pre-petition claims was discharged when the Plan was

confirmed on November 12, 2014, and became effective on December 10, 2014.  Claimants

_____

        [1] Docket ## 8045, 8272.  The Eighth Amended Plan, as modified by the order confirming the
Plan, is referred to as the "Plan" in this opinion.

holding pre-petition claims are enjoined from pursuing a recovery beyond what is provided for in the Plan. *See* 11 U.S.C. §§ 524(a)(2), 901(a), 944.[2] Claimants holding post-petition claims, however, may be entitled to pursue other remedies, as the claimants involved in each of these motions are attempting to do.

### A. Tanya Hughes

The first motion involves a state court lawsuit filed by Tanya Hughes. The motion is entitled "City of Detroit's Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and (II) Requiring the Dismissal of the State Court Action Filed by Tanya Hughes (the "Tanya Hughes Motion").[3] The motion concerns a discrimination suit filed by Ms. Hughes in February 2015 in the Wayne County Circuit Court, concerning her termination from the Detroit Police Department.

The Court held its first hearing on the matter on July 15, 2015. Following the hearing, the Court ordered the parties to file additional documents[4] concerning Ms. Hughes's termination, and granted the parties' request to present additional argument related to the documents at a second hearing.[5] In the interim, the parties resolved some of the issues raised in the motion, but not the issue of whether the claim arose pre-petition. After holding the second hearing on August 5, 2015, the Court took the matter under advisement.

---

[2] *See also* Plan, article III, section D.3-5 at 49-50 (Docket # 8045).

[3] Docket # 9970.

[4] These documents can be found at Docket # 10099. The parties stipulated to their authenticity. *See* Stipulation By and Between the City of Detroit and Tanya Hughes (Docket # 10109).

[5] *See* Order Regarding Further Proceedings (Docket # 10053); Order Approving Stipulation (Docket # 10112).

**B. No-Fault Insurance Act payments**

The second motion is the "City of Detroit's Motion for (I) Determination that the Goodman Acker and Haas & Goldstein Law Firms have Violated the Plan of Adjustment by (A) Refusing to Honor an ADR Settlement and/or (B) Seeking Relief on a Pre-Petition Claim Beyond that Allowed by the Plan of Adjustment and (II) Order Enjoining Further Violations" (the NFA Motion").[6]  This motion concerns payments for claims against the City arising under the Michigan No-Fault Insurance Act, Mich. Comp. Laws §§ 500.3101, .3107, .3108, .3142, .3148, in which claimants were injured pre-petition but require post-petition medical treatment. The City filed the NFA Motion in response to actions filed in the Wayne County Circuit Court by healthcare providers who have given post-petition medical treatment to these claimants.

The Court held a hearing on the NFA Motion on June 10, 2015.  Following the hearing, the Court entered an order resolving a number of issues and scheduling a further hearing for September 16, 2015, specifically on the issue of whether the claims for post-petition medical treatment constitute pre-petition claims.[7]  In advance of the September 16 hearing, the City filed a brief in support of the NFA Motion.[8]  Haas & Goldstein, P.C., one of the law firms named in the NFA Motion which represents healthcare providers in state court, filed a response[9] and the City filed a reply brief.[10]  Following the September 16, 2015 hearing, the Court took the matter

---

[6] Docket # 9893.

[7] Docket # 9969.

[8] Docket # 10022.

[9] Docket # 10116.

[10] Docket # 10134.

under advisement.

### C. Cedric Cook grievance

The third motion concerns a grievance filed on behalf of Cedric Cook. The motion is entitled "City of Detroit's Motion for Entry of an Order (I) Enforcing the Plan of Adjustment and (II) Requiring the Withdrawal with Prejudice of the August 2, 2013, Grievance Filed by the Senior Accountants, Analysts, and Appraisers Association [the "SAAA"] on Behalf of Cedric Cook" (the "Cedric Cook Motion").[11] The SAAA, the labor union which represents Cedric Cook, filed the grievance against the City after Mr. Cook was discharged from his employment as a Programmer Analyst with the City's Information Technology Services Department. The grievance alleges that the Mr. Cook's discharge was wrongful. The Court held a hearing on the Cedric Cook Motion on December 2, 2015. The Court permitted the parties to file supplemental briefs following the hearing, and then took the matter under advisement.[12]

For the reasons stated below, the Court concludes that (1) the claims at issue in the Tanya Hughes Motion and in the NFA Motion constitute pre-petition claims covered by the Plan; but (2) the Court finds the grievance at issue in the Cedric Cook Motion is a post-petition claim, not covered by the Plan.

## II. Jurisdiction

This Court has subject matter jurisdiction over this chapter 9 bankruptcy case and these contested matters under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)

---

[11] Docket # 10183.

[12] *See* Order Regarding Further Proceedings (Docket # 10648); Supplemental Brs. (Docket ## 10693 & 10711).

(E.D. Mich.). These are core proceedings under 28 U.S.C. § 157(b)(2)(O), because they are proceedings "affecting . . . the adjustment of the debtor-creditor . . . relationship." These are also core proceedings "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within this category are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans-Indus., Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)). As proceedings that seek to enforce a confirmed chapter 9 plan of adjustment, these are proceedings "arising in" a case under title 11, because they are proceedings that "by [their] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

These disputes are a type over which this Court retained jurisdiction under the confirmed Plan. Article VII, sections G and I of the confirmed Plan state:

> Pursuant to sections 105(c), 945 and 1142(b) of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 9 Case and the Plan to the fullest extent permitted by law, including, among other things jurisdiction to:
>
> . . . .
>
> G.      Resolve any cases, controversies, suites or disputes that may arise in connection with the consummation, interpretation or enforcement of hte Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;
>
> . . . .
>
> I.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary

5

or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order . . . .[13]

## III. Background

### A. Tanya Hughes Motion

Tanya Hughes began working as an officer for the Detroit Police Department (the "DPD") in May 1996. After ten years of service, she was promoted to the rank of sergeant. Until the events described below, Ms. Hughes never had any disciplinary problems.[14]

On October 5, 2012, Ms. Hughes was ordered to submit to a random drug screening, in the form of a urine test. DPD policy requires all "donors," or employees selected for screening, to disrobe completely before providing the urine sample. At the time, Ms. Hughes was seven months pregnant and was wearing compression hosiery that was prescribed by her doctor. There is a factual dispute regarding whether Ms. Hughes notified the nurse on duty, or anyone at DPD, about her pregnancy or the compression garment. In any event, Ms. Hughes refused to completely disrobe to give the urine sample. After several unsuccessful attempts by her commanding officer and others to convince Ms. Hughes to disrobe and take the test, Ms. Hughes was issued a "Notice of Suspension, with pay."[15] She was suspended from active duty but continued to collect her pay and receive her other employment benefits.

At some point, the Chief of Police petitioned the Board of Police Commissioners to stop

---

[13] Docket # 8045 at 69-70.

[14] *See* Voluntary Labor Arbitration Tribunal Opinion and Award at 15, 43 (Docket # 10099, Ex. 2, the "Arbitration Decision").

[15] Arbitration Decision at 13-18 (Docket # 10099, Ex. 2).

paying Ms. Hughes or allowing her to receive benefits while she was suspended, but the Board of Police Commissioners declined to do so.[16]

A police trial board convened on December 3, 2012, to hear the charges against Ms. Hughes related to the drug-screen incident. The charges were 1. "Refusal to Submit to or Avoidance of Drug Screening Procedures," 2. "Willful Disobedience of Rules or Orders," and 3. "Failure to Notify the Commanding Officer of Any Circumstance that Affects a Member's Ability to Perform Their Duties."[17] The trial board found Ms. Hughes guilty on all charges and recommended that she be dismissed from the DPD.[18] The Trial Board Decision, along with a memorandum from the DPD Disciplinary Administration, was forwarded to Ms. Hughes on December 19, 2012. The memorandum stated:

> Attached hereto is the recommendation of the Police Trial Board in the matter of Sergeant Tanya Hughes is [sic] . . .
>
> **Dismissal from the Detroit Police Department**
>
> **The dismissal from the Department can only be implemented once the twenty (20) day appeal period has expired from the date of receipt.**[19]

Ms. Hughes appealed the decision to a civilian arbitrator, who possessed the authority to

---

[16] *See* Tanya Hughes' Resp. and Br. Opposing City of Detroit's Mot. at 3, ¶ 6 (Docket # 10005).

[17] *See* Decision of the Police Trial Board at 2-3 (Docket # 10099, Ex. 1, the "Trial Board Decision").

[18] Trial Board Decision at 3 (Docket # 10099, Ex. 1). Under the collective bargaining agreement in effect at the time between the City and the Detroit Police Lieutenants and Sergeants Association (the "DPLSA"), the trial board lacked the authority to actually impose a penalty; its role was simply to make a recommendation regarding discipline to the Chief of Police. Master Agreement between the City of Detroit and the DPLSA at 12 (Docket # 10099, Ex. 3, the "DPLSA CBA").

[19] Inter-office Memorandum (bold in original) (Docket # 10099, Ex. 1).

7

conduct a fresh review of all the evidence and testimony and issue a final, binding decision regarding whether there was just cause under the CBA for the recommended penalty.[20]

The arbitration hearing took place on April 30 and May 6, 2013. But before the arbitrator issued a decision, the City filed its bankruptcy petition, on July 18, 2013. The arbitrator asked the City whether the proceedings were subject to the automatic stay but the City never responded, so the arbitration was stayed for over a year. Finally, on October 22, 2014, the City filed a motion asking this Court to confirm that the stay does not apply to disciplinary proceedings initiated by the City against its employees.[21] The Court entered an order granting the motion on November 12, 2014,[22] the same day the Court confirmed the City's Plan.

The arbitrator issued her decision on December 15, 2014. She affirmed the majority of the police trial board's findings of guilt, and affirmed the trial board's recommendation that Ms. Hughes be dismissed from the DPD.[23] Ms. Hughes stopped receiving pay or benefits the next day, December 16, 2014.

On February 27, 2015, Ms. Hughes filed a complaint against the City in the Wayne County Circuit Court.[24] Ms. Hughes alleges that the City violated the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2202(1), and the Persons with Disabilities Civil Rights Act, Mich. Comp. Laws §§ 37.1103 (d)(i)(A), 37.1202(1)(b), by requiring her to completely disrobe to take

---

[20] DPLSA CBA at 6 (section 5(D)); 9-10 (section 9(A)); 14 (section 10(C)) (Docket # 10099).

[21] *See* Docket # 8060.

[22] Docket # 8256.

[23] Arbitration Decision at 43-44 (Docket # 10099, Ex. 2).

[24] *See* Complaint and Jury Demand (Docket # 9970, Ex. 6A, the "Tanya Hughes Complaint").

8

the drug screen and by terminating her for refusing to do so. She seeks a declaratory judgment that the City violated these laws, and seeks damages for mental and emotional suffering, "restoration to full duty status and work assignment, reimbursement for lost past and future wages, overtime, and benefits," and attorney fees and interest.[25]

In the Tanya Hughes Motion, the City contends that the claims Ms. Hughes asserts in her state court case are pre-petition claims. The City asks the Court to order Ms. Hughes to dismiss her state court action, with prejudice.[26]

Ms. Hughes contends that her state court claims only arose when the arbitrator confirmed the decision of the police trial board and her termination was actually implemented, such that she lost pay and benefits. This is because, she argues, a loss of material benefits of employment is a required element in each of her state court claims against the City.

**B. NFA Motion**

A brief review of the relevant provisions of the Michigan No-Fault Insurance Act and the

---

[25] Tanya Hughes Complaint at 6-7 (Docket # 9970, Ex. 6A).

[26] Initially, the City also asked the Court to bar Ms. Hughes from filing a claim in the City's bankruptcy case or allowing her to share in any distribution under the Plan, on its belief that Ms. Hughes failed to timely file a proof of claim. *See* Proposed Order (Docket # 9970, Ex. 1). Later, the parties discovered that the DPLSA did file a timely proof of claim on Ms. Hughes's behalf, Claim # 1878, with permission from the Court. The City therefore withdrew its request for this additional relief, while reserving its right to object to the proof of claim filed by the DPLSA. *See* Stipulation By and Between the City of Detroit and Tanya Hughes (Docket # 10109).

Ms. Hughes did not sign the DPLSA proof of claim. Moreover, the DPLSA proof of claim explicitly states that, "[p]ursuant to the Bar Date Order, individual members of the DPLSA have the right to file a Proof of Claim on their own behalf." Claim # 1878 (Docket # 10109, Ex. A).

As set forth below, the Court will permit Ms. Hughes to file her own separate proof of claim, subject to the City's right to object to the claim. But in no event will Ms. Hughes be permitted to recover for both the DPLSA proof of claim and her own separate proof of claim.

9

settlement in the confirmed Plan regarding no-fault claims against the City is necessary to understand the issues raised by the NFA Motion.

<u>The Michigan No-Fault Insurance Act</u>

The act requires owners of motor vehicles to maintain insurance to provide benefits for reasonable medical expenses and lost wages in the event of a motor vehicle accident, regardless of fault. Mich. Comp. Laws §§ 500.3101; .3105; .3107–3108. These benefits are referred to as "personal protection benefits." *See, e.g.,* Mich. Comp. Laws §§ 500.3107–3108. Under normal circumstances, a person must look to his or her own insurance provider for personal protection benefits even if the person is, for example, a passenger in someone else's motor vehicle. In the event the person does not have no-fault insurance, for example if they do not own a vehicle, the statute lists the next potentially responsible party to whom the person must look for benefits, and the person simply goes down the list until a party with no-fault insurance can be identified. *See* Mich. Comp. Laws § 500.3114–.3115.

When a person's own insurer pays the benefits, they are known as "first party benefits."[27] With certain exceptions, the No-Fault Act prohibits suits against third parties who may be at fault, and thus limits claimants' ability to recover damages beyond personal protection benefits. Mich. Comp. Laws § 500.3135.

The City is self-insured for its fleet of vehicles and public buses. Thus, when a person is injured while riding a City bus, and that person cannot look to a higher priority responsible party, the City must pay personal protection benefits to that person. Mich. Comp. Laws § 500.3114(2). The same is true when a City-owned vehicle strikes a pedestrian. Mich. Comp. Laws

---

[27] *See* City of Detroit's Br. in Supp. of NFA Motion at 4 (Docket # 10022).

10

§ 500.3115. These are also referred to as "first party benefits."[28]

The No-Fault Act provides for penalties if a responsible insurer does not pay personal protection benefits within 30 days after receiving "proof of the fact and of the amount of loss sustained." Mich. Comp. Laws § 500.3142(2). Overdue payments bear interest at a rate of 12% per year. *Id.* at .3142(3). The act further provides for reasonable attorney fees "for advising and representing a claimant in an action for personal . . . protection benefits which are overdue." Mich. Comp. Laws § 500.3148(1).

<u>Treatment of No-Fault Claims under the Plan</u>

Over 300 first party no-fault claims for personal protection benefits were filed against the City in this bankruptcy case, relating to accidents that occurred prior to the July 18, 2013 petition date. After negotiating with the State of Michigan over how to treat these claims while maintaining the ability to self-insure its vehicles, the City agreed to pay 100% of the personal protection benefits for "valid prepetition Claims," but the State agreed to allow the City to forego payment of interest or attorney fees for any overdue payments on these claims normally required by Mich. Comp. Laws §§ 500.3142 and 500.3148. The settlement was incorporated into the City's confirmed Plan. The provision of the Plan incorporating the settlement provides:

**S.     Payment of Certain Claims Relating to the Operation of City Motor Vehicles**

> From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection

---

[28] *See* City of Detroit's Br. in Supp. of NFA Motion at 5 (Docket # 10022).

11

benefits as provided by MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits. . . . Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 . . . . The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.[29]

The City reports that, since the Plan was confirmed and became effective in late 2014, the City has settled over 100 claims for personal protection benefits incurred pre-petition.[30]

### State Court Lawsuits

There was some delay on the part of the City in paying the settlements as well as claims for treatment provided post-petition to the claimants, including the accident victims and healthcare providers who treated the accident victims. Many of these unhappy claimants filed lawsuits against the City in state court, which prompted the City to file the NFA Motion.

Several of these state court cases settled or were resolved by order entered by this Court on June 15, 2015, following the first hearing on the NFA Motion.[31] The order provides a timeline for the City to pay any settlements it reaches regarding these claims:

The City must submit settlements of Pre-Petition MVA [motor vehicle accidents] claims to City Council for approval within thirty (30) days after the City's receipt of all fully executed settlement documents including, where applicable, Medicare

---

[29] Plan, article IV, section S at 62-63 (Docket # 8045).

[30] NFA Motion at 7-8 (Docket # 9893).

[31] *See* Order on Stipulation at ¶¶ 2-6 (Docket # 9969).

12

affidavits. City Council must act within 21 days of receipt of the
documents. Upon approval by City Council, the City must issue
the settlement check within sixty (60) days after City Council
approval. Provided, however, if settlement papers have been
provided to the City prior to the date of this Order, the thirty (30)
days for submission to City Council will begin to run on the date of
entry of this Order. H&G and Goodman Acker must, within ten
(10) days after entry of this Order, submit to the City law
department duplicate copies of any previously submitted settlement
documents. In the event a settlement has been approved by City
Council prior to entry of this Order, the 60 days for issuing
payment will begin to run on entry of this Order.[32]

The only remaining state court case relevant to the NFA Motion is the case filed against

the City by Summit Medical Group, PLLC and Summit Physicians Group, PLLC ("Summit"),

which is represented by attorney Justin Haas of the law firm Haas & Goldstein, P.C. ("Haas").[33]

That case concerns payment for medical treatment given by Summit to Ms. Sheila Williams, who

sustained injuries in a motor vehicle accident involving a vehicle for which the City is self-

insured, where the City was determined to be the responsible insurer.[34] The accident occurred

pre-petition, and Ms. Williams began receiving medical treatment from Summit for her injuries

pre-petition. The City settled Summit's claim for these costs, and that settlement is now subject

to the timeline set forth in the Court's Order from June 15, quoted above. The parties agree that

---

[32] Order on Stipulation at ¶ 5 (Docket # 9969).

[33] The Court notes, however, that during the June 10, 2015 expedited hearing on the NFA
Motion, Haas indicated there may be many other claimants with similar claims, who simply have not
filed yet. June 10, 2015 Hrg. Tr. at 7-8 (Docket # 9971). Haas therefore is participating in the
proceedings on the NFA Motion as an interested party, representing itself. Although the bankruptcy
claim belongs to Summit, Haas is an interested party because Summit seeks attorney fees and because the
City's NFA Motion seeks relief against Haas.

[34] At the second hearing on the NFA Motion on September 16, 2015, counsel for Summit stated
that "his recollection" was that Ms. Williams was injured while riding on a City bus. Audio recording of
oral argument at 20:06-20:35 (*available at* Docket # 10186).

the Plan prohibits interest and attorney fees relating to the payments covered by that settlement.

The parties further agree that the City is required to pay 100% of the cost of medical treatment arising from the pre-petition accident but provided to Ms. Williams after July 18, 2013. The dispute concerns only whether Summit and Haas are entitled to interest and attorney fees for any unreasonable delay on the part of the City in paying these costs for treatment provided post-petition. That question turns on when Summit's claim for these costs arose for bankruptcy purposes. If the claim arose pre-petition, then the Plan controls and Haas and Summit are not entitled to interest or attorney fees under the motor vehicle claimants' settlement; if the claim arose post-petition, then the No-Fault Act governs and Haas and Summit may be entitled to pursue interest and attorney fees in state court under Mich. Comp. Laws §§ 500.3142 and 500.3148.

The City argues that because the claim arises from a pre-petition motor vehicle accident, it constitutes a pre-petition claim regardless of when the medical care is provided. Haas argues that the claim arises post-petition because neither Ms. Williams nor Summit can demand payment from the City for medical care until the care is actually given.

### C. Cedric Cook Motion

Cedric Cook was a Senior Programmer Analyst with the City's Information Technology Services Department (hereafter, "ITSD"), where his primary duty was to staff the ITSD help desk. At the time he was discharged from employment, he had worked for the City for over 32 years.

According to his supervisor, the disciplinary problems which eventually led to Mr. Cook's discharge began in May 2011. His main problem was that he was often away from his

14

desk during work hours.  After several unsatisfactory performance reviews, Mr. Cook was given

a copy of the ITSD rules of conduct, which set forth the department's disciplinary procedures and

"suggested disciplinary actions."[35]  The rules of conduct classify employee misconduct by

groups.  Relevant to the Cook Motion are Group II offenses, which include leaving a work area

and failure to report absences to a supervisor, and Group IV offenses, which include "wanton or

willful neglect in the performance of assigned duties . . . ."  For Group II offenses, the suggested

discipline is a written reprimand for a first offense, a "substantial suspension" for a second

offense, and discharge for a third offense.  For Group IV offenses, the suggested discipline for a

first offense is discharge.[36]

In September 2012, Mr. Cook failed to report to work, and then called in mid-day to

request a vacation day, a Group II violation.  Because this was his first Group II offense, he

received a written reprimand, on September 18, 2012.  The reprimand states, "[u]nless you

improve your behavior, this Department **will take action to suspend you from your duties."**[37]

On November 16, 2012, Mr. Cook again failed to appear for work or to report his absence

to a supervisor.  Because this was his second Group II offense, Mr. Cook was suspended from

work for five days.

The third major incident took place on July 18, 2013, the same day the City filed

bankruptcy.  The parties dispute what happened that day, but the City alleges Mr. Cook again

failed to appear for work or timely report his absence.  Attached to the Cook Motion are two

---

[35] *See* Declaration of Cynthia Humphries Pearson (Docket # 10183, Ex. 6A).

[36] *Id.*

[37] City of Detroit Written Reprimand Form (bold in original) (Docket # 10183, Ex. 6D).

emails to Mr. Cook from Chuck Dodd, the director of the City's IT department at that time, asking about Mr. Cook's whereabouts because no one had seen him at his desk. Mr. Dodd sent the first email at 1:14 pm, and the second email at 2:22 pm.[38] The City filed bankruptcy at 4:06 pm.

Mr. Cook did not respond to the emails until the following day, when he wrote to Mr. Dodd, "[y]ou must come at times when I'm either at lunch or break but I'm always around. I take calls all day including at 7:30 when I first arrive. You can check the tickets and calls."[39]

On July 25, 2013, the City created a Disciplinary Action Sheet relating to the July 18 incident with Mr. Cook.[40] The document states:

> On July 18, 2013, Cedric Cook violated the following ITS work rules:
>
> 1) Work Performance (Group I offense) - Failed to answer in-coming help desk calls.
>
> 2) Leaving the Work Area (Group II offense) - Failed to obtain permission to leave work area for extended period.
>
> 3) Neglect of Duty (Group IV offense) - Neglected to perform his assigned duty of answering incoming help desk calls.
>
> As Mr. Cook received a written reprimand on September 18, 2012 and a suspension on November 30, 2012 for violation of ITSD's rules of conduct this violation is a third occurrence and warrants a 30 day suspension pending discharge.

The following day, the City issued a Notice of Suspension to Mr. Cook.[41] The notice

---

[38] Docket # 10183, Ex. 6G.

[39] *Id.*

[40] Docket # 10183, Ex. 6I.

[41] Docket # 10183, Ex. 6J.

states that the suspension "is with a recommendation for DISCHARGE/PROBATIONARY SEPARATION." The reason listed is "Group IV Offense - Neglect of Duty: Wanton & willful neglect in the performance of assigned duties or in the care, use or custody of any City property. . . ."[42]

Mr. Cook's labor union, the Senior Accountants, Analysts, and Appraisers Association (the "SAAA"), filed a grievance against the City on Mr. Cook's behalf on August 2, 2013 (the "Grievance") .[43] The Grievance alleges that in deciding to suspend and discharge Mr. Cook following the July 18, 2013 incident, the City violated the City Employment Terms then in effect for all non-uniform City employees.[44] The Grievance requests that Mr. Cook be allowed to return to work and be "ma[de] whole." Following a hearing on August 22, 2013, the City denied the Grievance and shortly thereafter served Mr. Cook with a Notice of Discharge Form, which stated that Mr. Cook's discharge would become effective on August 24, 2013. The reason listed for his discharge is, again, the Group IV Offense - "Neglect of Duty: Wanton & willful neglect in the performance of assigned duties . . . ."[45]

Mr. Cook appealed the denial of the Grievance to arbitration. The arbitrator set a hearing

---

[42] *Id.*

[43] Docket # 10183, Ex. 6K. The City and the SAAA dispute whether the claims asserted in the Grievance belong to Mr. Cook or the SAAA. Because the Court finds the claims arose post-petition, it is unnecessary to resolve this issue. For clarity and simplicity's sake, the Court will refer to the claims as belonging to Mr. Cook in this opinion, but this language should not be interpreted as the Court's finding or conclusion on the issue.

[44] City Employment Terms are similar to a collective bargaining agreement in that they govern the terms and conditions of employment for City employees and set forth procedures for employee discipline. The City Employment Terms in effect from April 2012 through July 2014 are attached as Exhibit 1 to the SAAA's brief filed in response to the Cook Motion (Docket # 10217).

[45] *See* City of Detroit Notice of Discharge Form (Docket # 10183, Ex. 6L).

date for June 25, 2015. However, on June 12, 2015, the City advised Mr. Cook that it believed the arbitration was barred by the bankruptcy proceedings and the City's confirmed Plan. The parties therefore agreed to adjourn the arbitration so the City could file the Cedric Cook Motion and this Court could rule on the issue.

The City argues that Mr. Cook's claims arose pre-petition because he had been previously disciplined and was aware that a third Group II violation of the ITSD's rules of conduct would result in his suspension and discharge. As a result, the City says, the claims were discharged by the Plan, and the arbitration proceeding violates the injunction provisions set forth in the Plan. Furthermore, the City argues that because Mr. Cook had a pension claim against the City and voted to accept the Plan, including its release provisions,[46] he waived the right to pursue any pre-petition claims against the City, including any claims asserted by the SAAA on his behalf.[47]

---

[46] The City relies on language in Mr. Cook's ballot which states:

> **If you accept the Plan, you are voting to approve a release of any claims that you have against the State, the City, and other entities in connection with the loss of part of your pension.**
>
> **If you vote to accept the Plan, you are also voting to approve certain other . . . injunction and release provisions contained in the Plan. . . . Specifically, this release would release all claims and liabilities arising from or related to the City . . . .**

(Bold in original)(Docket # 10183, Ex. 6N). The Plan's release language states, "each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge . . . all Liabilities in any way relating to the City . . . ." Plan, article III, section D.7 at 52 (Docket # 8045).

[47] The City initially took the position that the claims were discharged and waived as long as they arose pre-*confirmation*. However, the City withdrew these arguments, and now only argues that the claims are discharged or waived if they arose pre-*petition*. *See* City of Detroit's Supplemental Br. Regarding Its Mot. to Enforce Against Cedric Cook at 2 (Docket # 10711) ("[A]t the hearing, the City withdrew its argument that [the] claim was discharged even if it arose after the commencement of the City's bankruptcy case. The City now withdraws its argument that the claim was released if it arose after the commencement of the City's bankruptcy case. Thus, the City's remaining argument is that the

18

Finally, the City argues Mr. Cook should not be allowed to file a late proof of claim relating to the Grievance, as he made no attempt to do so during the pendency of the City's bankruptcy case or the Cook Motion.

## IV. Applicable law

The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5). "Congress intended by this language to adopt the broadest available definition of 'claim,'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (citations omitted), which includes "'all legal obligations of the debtor, no matter how remote or contingent.'" *In re Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010) (quoting *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198, 200 (4th Cir. 1988)). This broad definition serves the two primary goals of bankruptcy: to ensure that all creditors are treated equitably and to secure a fresh start for the debtor. As the *Huffy* court put it, "a broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct." 424 B.R. at 301.

Ms. Hughes and Haas (on behalf of Summit) both argue that their claims arose post-petition because they had no pre-petition "right to payment": Ms. Hughes, because she had not lost any material work benefits, an essential element of her state law employment discrimination

---

grievance claim was discharged or released under the confirmed Plan of Adjustment if it arose prior to the commencement of the City's bankruptcy case.").

claims, and Haas/Summit, because neither accident victims nor healthcare providers are entitled

to payment for medical care under the Michigan No-Fault Act until they actually receive or

administer the care. Similarly, Mr. Cook argues that his claim arose post-petition because there

was no cause to file the Grievance under the City Employment Terms until he was actually

suspended and discharged.

Haas/Summit, Ms. Hughes, and Mr. Cook may be correct that their claims were not yet

actionable under state law or the City Employment Terms as of the petition date. But the

question of when a claim arises under the Bankruptcy Code is governed by federal law. *In re*

*Parks*, 281 B.R. 899, 902 (Bankr. E.D. Mich. 2002) (citations omitted). And, as the above

quoted definition of "claim" in section 101(5) of the Bankruptcy Code indicates, pre-petition

claims that are "contingent" or "unmatured," and thus not presently actionable, may be

discharged. *In re Dixon*, 295 B.R. 226, 229-30 (Bankr. E.D. Mich. 2003) (citing *In re Kilbarr*

*Corp. v. G.S.A.* (*In re Remington Rand Corp.*), 836 F.2d 825, 830-31 (3rd Cir. 1988)) (other

citations omitted) ("Courts have been careful to distinguish when a right to payment arises for

bankruptcy purposes, and when the cause of action accrues.").

In *Parks*, the court explained the meaning of a "contingent" debt, as that term is used in

section 101(5):

> A "contingent debt is 'one which the debtor will be called
> upon to pay only upon the occurrence or happening of an extrinsic
> event which will trigger the liability of the debtor to the alleged
> creditor.'" Thus, a right to payment need not be concurrently
> enforceable in order to constitute a claim that is dischargeable in
> bankruptcy. *See Riverwood Int'l Corp. v. Olin Corp.* (*In re*
> *Manville Forest Prods. Corp.*), 225 B.R. 862, 866 (Bankr.
> S.D.N.Y. 1998) ("Because contingent and unmatured rights of
> payment are 'claims' under the Code, it is possible that a right to
> payment that is not yet enforceable at the time of the filing of the

20

petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code."). *See also Kilbarr Corp. v. G.S.A.* (*In re Remington Rand Corp.*), 836 F.2d 825, 832 (3rd Cir. 1988) ("[A] party may have a bankruptcy claim and not possess a cause of action on that claim.").

*In re Parks*, 281 B.R. at 901-02 (other citations omitted).

By contrast, "it is well-settled that 'a debt is *noncontingent* if all events giving rise to liability occurred prior to the filing of the bankruptcy petition.'" *In re Redburn*, 193 B.R. 249, 259 (Bankr. W.D. Mich. 1996) (emphasis added) (quoting *Nicholes v. Johnny Appleseed of Wash.* (*In re Nicholes*), 184 B.R. 82, 88 (B.A.P. 9th Cir. 1995)).

A "matured claim" is one that is "'unconditionally due and owing,'" while an "unmatured claim," is "one which is not yet due and owing." *In re Cleveland*, 349 B.R. 522, 532 (Bankr. E.D. Tenn. 2006) (citation omitted).

There are limits to how remote or contingent a claim can be, consistent with creditors' rights to due process. Courts have therefore developed several different tests to decide when a contingent or unmatured claim arises for bankruptcy purposes.

First, the "right to payment" test provides that a claim arises for bankruptcy purposes only after each element of the claim has been established. This test has been widely rejected since it was adopted by the Third Circuit in *Avellino & Bienes v. M. Frenvile Co., Inc. (In re Frenville Co., Inc.),* 744 F.2d 332 (3rd Cir. 1984), and the Third Circuit itself later rejected this test. *See Jeld-Wen, Inc. v. Van Brunt* (*In re Grossman's, Inc.*), 607 F.3d 114, 120 (3rd Cir. 2010) (citations omitted) (overruling the "right to payment" test, and noting that "[t]he courts of appeals that have considered *Frenville* have uniformly declined to follow it").

Under the second test, the "debtor's conduct" test, "a claim arises when the conduct by

the debtor occurs, even if the actual injury is not suffered until much later." *In re Parks*, 281 B.R. at 902 (citations omitted). This approach has been criticized, in certain contexts, "as patently unfair to creditors," particularly where the creditor had no significant pre-petition relationship with the debtor. *Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028, 1035 (W.D. Tenn. 2003)).

Third and finally, as explained in *In re Senczyszyn*, 426 B.R. 250 (Bankr. E.D. Mich. 2010), *aff'd,* 440 B.R. 750 (E.D. Mich. 2011):

> The most widely adopted test, followed by *Parks* and *Dixon*, has been alternately termed the "fair contemplation," "foreseeability," "pre-petition relationship," or "narrow conduct" test. It looks at whether there was a pre-petition relationship between the debtor and the creditor, "such as contract, exposure, impact or privity," such that a possible claim is within the fair contemplation of the creditor at the time the petition is filed.

*Id.* at 257 (quoting *Dixon*, 295 B.R. at 230) (other citations omitted). Under this test, a claim is considered to have arisen pre-petition if the creditor "could have ascertained through the exercise of reasonable due diligence that it had a claim" at the time the petition is filed. *Signature Combs*, 253 F. Supp. 2d at 1037 (quotation & citations omitted). This test, which the Court will refer to as the "fair contemplation test," has the advantage of allowing the Court to examine all of the circumstances surrounding a particular claim — the debtor's conduct, the parties' pre-petition relationship, the parties' knowledge, the elements of the underlying claim — and use its best judgment to determine what is fair to the parties, in context. As the *Huffy* court points out, "one approach may not fit all circumstances." 424 B.R. 295, 303 (Bankr. S.D. Ohio 2010).

The Court will follow and apply the "fair contemplation test" here, because the Court concludes that it is the correct approach.

For the reasons that follow, the Court concludes that Ms. Hughes and Summit were each involved in a pre-petition relationship with the City, such that their claims were within their fair contemplation prior to the date the City filed bankruptcy. As for Mr. Cook, the Court concludes that while he may have been involved in a pre-petition relationship with the City, the claims asserted in the Grievance were not within his fair contemplation prior to the date and time the City filed bankruptcy.

## V. Discussion

### A. NFA claimants

Haas argues that because the City need not act in order to incur liability for first party benefits under the No-Fault Act, the only conduct relevant to the Court's "fair contemplation" analysis is Ms. Williams' decision to seek medical treatment and Summit's decision to render the treatment to Ms. Williams. In effect, Haas argues that any claim for post-petition benefits was not within the parties' fair contemplation prior to the filing of the petition, because Ms. Williams could have decided not to seek the reasonably necessary medical treatment.[48]

The Court disagrees. It is true that the No-Fault Act assigns liability differently than ordinary principles of fault-based tort law. It is nevertheless clear that a significant pre-petition relationship between Ms. Williams and the City arose simply by operation of the No-Fault Act when the bus accident occurred, Ms. Williams was injured, and there were no higher priority no-fault insurers responsible for Ms. Williams' first party benefits. Ms. Williams was thereafter entitled to payment from the City for first party benefits, including reasonably necessary medical

---

[48] *See* Haas Resp. to City of Detroit's Br. at 6-7 (Docket # 10116). Haas/Summit does not argue that Ms. Williams's *need* for post-petition medical treatment was not foreseeable.

care.  Of course, the City did not actually owe money until Ms. Williams sought out and received

the medical care.  But that does not mean Ms. Williams' claim did not arise for bankruptcy

purposes until the moment she received the care.  Rather, her claim arose when the accident

occurred that gave rise to her pre-petition relationship with the City, although the claim was

contingent on Ms. Williams receiving the medical care (and the care being reasonably necessary,

*see* Mich. Comp. Laws § 500.3107).  The arrangement is similar to a contractual agreement for

indemnification executed pre-petition, which "courts . . . have almost universally held . . . is a

prepetition contingent claim."  *In re Huffy Corp.*, 424 B.R. 295, 305 (Bankr. S.D. Ohio 2010).

The Court's analysis does not change when Summit, the healthcare provider, is

substituted for Ms. Williams, the accident victim.  For one thing, Haas explicitly takes the

position that there should be no difference.[49]

Additionally, under Michigan law, healthcare providers have no greater rights under the

No-Fault Act than do accident victims.  In *TBCI, P.C. v. State Farm Mutual Insurance Company*,

795 N.W.2d 229 (Mich. Ct. App. 2010), TBCI, a healthcare provider, gave medical treatment to

Eric Afful following an automobile accident.  Mr. Afful's no-fault insurer, State Farm, denied

coverage to Mr. Afful on the grounds that the claims he submitted were fraudulent.  *Id.* at 230.

Mr. Afful unsuccessfully sued for wrongful denial of coverage in separate litigation.  *Id.*  In that

litigation, State Farm prevailed in establishing its fraud claim.  TBCI then sued State Farm,

arguing that it had an "'independent cause of action' involving a claim of services that 'was not

adjudicated in the Wayne County action.'" *Id.*  In affirming the trial court's dismissal of TCBI's

claim on res judicata grounds, the Michigan Court of Appeals held that:

---

[49] *See* audio recording of oral argument at 21:45-23:45 (*available at* Docket # 10186).

> Plaintiff, by seeking coverage under the policy, is now essentially
> standing in the shoes of Afful. Being in such a position, there is
> also no question that plaintiff, although not a party to the first case,
> was a "privy" of Afful. "A privy of a party includes a person so
> identified in interest with another that he represents the same legal
> right. . . ."

*Id.* at 232 (quoting *Begin v. Mich. Bell Tel. Co.*, 773 N.W.2d 271, 283 (Mich. Ct. App. 2009));

*see also Garden City Rehab, LLC v. State Farm Mut. Auto. Ins. Co.*, No. 320543, 2015 WL

3796373, at *4 (Mich. Ct. App. June 18, 2015) (where no-fault claimant/patient lost claim for

coverage in previous lawsuit, plaintiff healthcare provider "was in privity with [no-fault

claimant/patient] because plaintiff was required to 'stand in his shoes' in order to recover no-

fault benefits from defendant.").

     *Wyoming Chiropractic Health Clinic, PC v. Auto-Owners Insurance Company*, 864

N.W.2d 598 (Mich. Ct. App. 2014), does not involve any res judicata or collateral estoppel

issues. In that case the Michigan Court of Appeals held that healthcare providers have standing

under the No-Fault Act to bring direct claims against no-fault insurers for recovery of benefits

and for interest and attorney fees. *Id.* at 603. However, the court emphasized language in the

No-Fault Act which provides that "personal protection insurance benefits are payable to *or for

the benefit of* an injured person." *Id.* at 601 (emphasis added) (citing Mich. Comp. Laws

§ 500.3112). Thus, while the providers may bring a direct action, they are only entitled to

recover whatever the accident victims themselves are entitled to recover. *See also, e.g., Moody v.

Home Owners Ins. Co.*, 849 N.W. 2d 31, 46-48 (Mich. Ct. App. 2014) (holding that "the

providers' claims are dependent on establishing [the accident victim's] claim," and further noting

that if an accident victim "waives" a claim for personal injury benefits, "a service provider's

remedy is to seek payment from the injured person"); *Aetna Cas. & Sur. v. Starkey*, 323 N.W.2d

325, 329 (Mich. Ct. App. 1982) ("Under the [No-Fault] statute, Aetna could have paid the medical providers for the medical bills incurred by the defendant's son so long as it was not notified of another claim.") (abrogated in part on other grounds by *Wyoming Chiropractic*, 864 N.W.2d at 604; *Garcia v. Butterworth Hosp.*, 573 N.W.2d 627 (Mich. Ct. App. 1997)).

Finally, Summit presumably was in a position to determine whether the City, as Ms. Williams's no-fault insurer, was in bankruptcy before Summit provided any post-petition care to Ms. Williams. Haas does not argue that either Summit or Haas did not have notice of the City's well-publicized bankruptcy. Summit thus voluntarily associated itself with Ms. Williams's pre-petition relationship with the City. *See In re Pan American Hosp. Corp.*, 364 B.R. 839, 848 (Bankr. S.D. Fla. 2007) ("Even assuming for sake of argument that [a representative of a decedent's estate] is considered a new claimant under state law, the chain of events or 'relationship' that gave rise to her claim—which is the focus of *bankruptcy* law—unquestionably began with the Hospital's pre-petition negligent treatment of [the decedent].").

Under these circumstances, and for the reasons stated above, the Court concludes that Summit's claim for payment relating to post-petition medical treatment of Ms. Sheila Williams, whether already provided or to be provided, constitutes a pre-petition claim.

**B. Tanya Hughes**

Ms. Hughes argues that her sex and disability discrimination claim was not within her fair contemplation when the City filed bankruptcy on July 18, 2013; she contends that the fair contemplation test requires that a creditor *know* they will have a claim against a debtor before the debtor files bankruptcy. In other words, if a contingent claim is dependent on the occurrence of an extrinsic event, Ms. Hughes's position is that the parties must be certain the event will occur

before the contingent claim can be within the creditor's fair contemplation.

Applied to her claim, she argues that as of the petition date, she had no way of knowing whether the arbitrator would affirm the recommendation of dismissal by the police trial board and, had the arbitrator concluded the recommendation to terminate her was without just cause, the City would have been bound by that determination and she would have no claim. Thus, she argues, her claim cannot be said to have been within her fair contemplation as of the petition date, and is therefore a post-petition claim.

For her interpretation of the fair contemplation test, Ms. Hughes relies heavily on a quotation from *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 974 F.2d 775, 786 (7th Cir. 1992), contained in *Signature Combs*, 253 F. Supp. 2d at 1037. In a string cite of cases applying the fair contemplation test to CERCLA[50] environmental liability claims, the *Signature Combs* court characterizes the *In re Chicago, Milwaukee* case as "holding, for discharge purposes, that a CERCLA claim arises when the claimant can 'tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs.'" *Signature Combs*, 253 F. Supp. 2d at 1037 (quoting *Chicago, Milwaukee*, 974 F.2d at 786). But Ms. Hughes overstates the holding of the *Chicago, Milwaukee* case by limiting her reading of the case to the short quotation contained in *Signature Combs*.

*Chicago, Milwaukee* is a CERCLA liability case decided under Section 77 of the Bankruptcy Act of 1898. 974 F.2d at 777. Ms. Hughes characterizes the court's holding as setting forth a general rule that the earliest point at which a creditor can have a contingent claim

---

[50] CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

is when the creditor *knows* all elements of the creditor's claim will eventually come to fruition. This is incorrect for several reasons. First, the court in *Chicago, Milwaukee* declined to adopt any rule at all; its holding is limited to the facts of that case. *Id.* at 786 ("rather than adopting such a rule, *or any rule*, we explain below that . . ." (emphasis added)). Second, to the extent the court offers an "explanation" of its holding, rather than a rule, it is clear the court applies a broader definition of contingent claim than Ms. Hughes argues:

> Just as it was unnecessary for the *Union Scrap* court to derive such a rule that would make the ability to discharge CERCLA claims in the bankruptcy context forever dependent on whether a party first incurs response costs, we find that it is unnecessary to set forth such a rule in this case. For this reason, rather than adopting such a rule, or any rule, we explain below that when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, *then this potential claimant has, at least, a contingent CERCLA claim for purposes of Section 77.*

*Id.* at 786 (emphasis added) (footnote omitted).

Finally, the *Chicago, Milwaukee* court rejects the argument that the creditor had no claim until it received final results of post-plan consummation soil tests; instead the court finds that the contingent claim could have arisen even before the creditor performed the soil tests — as early as when the creditor was first notified that a pre-petition spill had taken place. *Id.* at 787.

When the fair contemplation test is applied properly, it is clear that Ms. Hughes's claims arose pre-petition. Ms. Hughes does not dispute that the City's relevant conduct, what Ms. Hughes calls the "underlying act," occurred when the DPD refused to make an exception

regarding its drug testing policy, on October 5, 2012.[51]  It is undisputed that the police trial board

recommended she be dismissed from the DPD on December 3, 2012, and that Ms. Hughes was

mailed a written notice of the trial board's recommendation on December 19, 2012.  Ms. Hughes

was thus aware of the City's conduct underlying her employment discrimination claim (its refusal

to deviate from its drug testing procedures) and aware that the police trial board recommended

dismissal (for her refusal to follow the drug testing procedures) well in advance of the petition

date of July 18, 2013.

      The Court need not decide precisely when Ms. Hughes's employment discrimination

claim arose for bankruptcy purposes; it is clear that her claim was within her fair contemplation

prior to July 18, 2013, although it may have been contingent on whether the arbitrator affirmed

the recommendation of the police trial board, the event that would cause Ms. Hughes to sustain

material damages.[52]  Ms. Hughes may not have *known for certain* that she would have an

actionable claim against the City, but certainty is not the standard.  The standard is whether the

contingent claim was within Ms. Hughes's fair contemplation.  Because the "underlying act"

occurred pre-petition, the City indicated its intent to dismiss Ms. Hughes pre-petition, and Ms.

Hughes was involved in disciplinary proceedings to determine whether the City had just cause to

dismiss Ms. Hughes pre-petition, the Court concludes that a bankruptcy claim was within Ms.

Hughes's fair contemplation.

## C. Cedric Cook Motion

---

[51] *See* Tanya Hughes' Resp. and Br. Opposing City of Detroit's Mot. (Docket # 10005) at 8, ¶ 20.

[52] For the purpose of this analysis, the Court assumes, but does not rule, that Ms. Hughes' pre-petition suspension with pay does not constitute the adverse employment action required for a claim to accrue under the Elliott-Larsen Civil Rights Act or the Persons with Disabilities Civil Rights Act.  The parties dispute this issue, but the Court finds it unnecessary to resolve it.

The circumstances of Mr. Cook's employment-related claim differ significantly from those of Ms. Hughes's claims. Mr. Cook's claim against the City is based on the City's decision to discharge Mr. Cook from employment. Mr. Cook first received notice of the City's decision to suspend and discharge him on July 26, 2013, more than a week after the City filed bankruptcy. By contrast, Ms. Hughes was first formally notified of the police trial board's decision to recommend her discharge from employment in December 2012.

The City's position is that Mr. Cook could have fairly contemplated a claim against the City for wrongful termination or discharge when he allegedly failed to report to work on the morning of July 18, 2013. This is because, the City argues, Mr. Cook had been given a copy of the ITSD rules of conduct, and was therefore aware that a third Group II violation (leaving the work area and failing to report absence) would result in his discharge.

The City's argument fails. First, Mr. Cook disputes that he committed a third Group II offense by not reporting to work on July 18, 2013.[53] (If he did, in fact, report to work that morning, he could not have contemplated a claim against the City for wrongful termination based on a third violation of the rules of conduct, because he would not have committed a third violation.) This factual issue would be addressed in arbitration on the Grievance.

Second, even assuming Mr. Cook *did* commit a third Group II violation, the disciplinary actions listed in the ITSD rules of conduct are not mandatory, they are "suggested disciplinary actions."[54] There is no proof in the record that Mr. Cook was informed that he would in fact be

---

[53] This is another difference between Mr. Cook's claim and Ms. Hughes's claim. There is no doubt that Ms. Hughes refused to take the drug test, nor could there be. Her dispute concerns the appropriateness of the DPD policy of requiring that officers disrobe and the City's alleged failure to accommodate her pregnancy.

[54] *See* ITSD Rules of Conduct (Docket # 10183, Ex. 6A).

fired if he committed a third Group II offense.[55]  Nor is there proof that the City was *required* by the ITSD rules of conduct (or any other rules) to discharge Mr. Cook.  It is not even clear from the record that the City had actually decided to discharge Mr. Cook before the petition was filed.  Put simply, the City could have chosen not to discipline Mr. Cook, or it could have chosen to suspend him instead of discharging him.

Unlike in Ms. Hughes's case, the City neither notified Mr. Cook that he would be discharged nor initiated disciplinary proceedings against Mr. Cook for the July 18, 2013 incident until after the bankruptcy petition was filed.

The City points out that the SAAA Grievance states that the "Date Incident Occurred Causing Grievance" is July 18, 2013.  The Court has considered this fact, but does not find it controlling in applying the fair contemplation test, in light of the other circumstances discussed above.

The SAAA argues, in part, that Mr. Cook's claim did not arise until he was terminated on August 21, 2013.[56]  The Court's holding today does not go that far.  As with the Tanya Hughes Motion, it is unnecessary to determine when precisely Mr. Cook's claim arose.  It is sufficient to find that the claim was not within his fair contemplation prior to the City filing its bankruptcy petition.  The Court finds that the two cases cited by the SAAA on this point are not persuasive, when applied to Mr. Cook's claim.

---

[55] The Court also notes that both the July 26, 2013 Notice of Suspension and the August 21, 2013 Notice of Discharge indicate Mr. Cook was terminated for committing a Group IV offense ("wanton & willful neglect in the performance of assigned duties") (Docket # 10183, Ex. 6J, 6L).  The "suggested disciplinary action" for a *first* Group IV offense is discharge.  The only document related to the July 18, 2013 incident that mentions his disciplinary history is the July 25, 2013, Disciplinary Action Fact Sheet.

[56] *See* SAAA Br. at 5 (Docket # 10217).

31

In *McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 739 (8th Cir. 1996), the court considered whether an employee's claim of "discriminatory termination under the Americans with Disabilities Act (ADA)" arose pre- or post-confirmation.[57] The employee was terminated before the chapter 11 plan was confirmed, but did not receive a "right to sue letter" from the United States Department of Labor, a jurisdictional requirement under the ADA, until after the plan was confirmed. *Id.* at 739-40. The court found the employee's claim was a pre-confirmation claim, reasoning that "[b]oth the allegedly unlawful actions and the harm occurred on the date of termination." *Id.* at 740. The court did note that "the 'occurrence' in unlawful termination suits is the *termination itself*," but that was in the context of discussing when an employee can file a "charge" with the Department of Labor under the ADA. *Id.* at 740-41 (emphasis added). More importantly, the court found that the claim had *accrued* when the employee was terminated; the court did not hold that the claim could not have *arisen*, for purposes of the fair contemplation test, earlier than the termination date. *Id.* at 740 (stating that even the *Frenville* test would not "help" the employee "because under [the ADA] his claim accrued at the time of termination, not at the time he received his right to sue letter"). The question of whether the claim was within the employee's fair contemplation prior to confirmation of the chapter 11 plan was simply not before the court, because the court found the claim had already accrued by that time.

*O'Loghlin v. County of Orange*, 229 F.3d 871 (9th Cir. 2000), the other case cited by the

_____

[57] Under 11 U.S.C. § 1141(d), with certain exceptions, a chapter 11 plan discharges a debtor of all debts arising pre-confirmation. By contrast, in this case, the City has asked the Court to consider only whether the claims are discharged because they arose pre-*petition*. *See* discussion in footnote 47 of this opinion.

32

SAAA, also involves claims under the ADA. An employee alleged that the County failed to reasonably accommodate her disability on three different occasions — twice prior to confirmation of the County's chapter 9 plan,[58] and once after the plan was confirmed. *Id.* at 873. Citing *McSherry*, the court held that the two claims based on the pre-confirmation incidents were discharged, regardless of when the employee received her "right to sue" letter from the department of labor. *Id.* at 874. The court held that the claim based on the third incident was not discharged, reasoning, "[a] suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws." *Id.* at 875. The majority of the court's analysis is dedicated to a discussion and rejection of the "continuing violation doctrine" to ADA claims based on post-petition debtor conduct, and to the question of whether the employee should be required to obtain a second "right to sue letter." *Id.* at 874-77. The court did not consider the fair contemplation test.

Finally, the SAAA and the City dispute whether the City Employment Terms were assumed as an executory contract during the Plan confirmation stage of the City's bankruptcy. This dispute relates to whether Mr. Cook released his wrongful termination claim by voting to accept the Plan's treatment of his pension claim, and whether the Plan's injunction provisions apply to his wrongful termination claim. The SAAA argues that the order confirming the Plan[59] and the Plan itself both include express exceptions from the waiver and injunction provisions of

---

[58] Applying 11 U.S.C. § 944(b), the court in *O'Loghlin* held that all pre-confirmation debts are discharged. Again, the City asks this Court to only consider whether pre-petition debts are discharged. *See* discussion in footnote 47 of this opinion.

[59] Docket # 8272.

the Plan, for claims arising from the breach of executory contracts.[60]  The City argues that

regardless of whether the SAAA's interpretation of the Plan and Confirmation Order is correct,

its argument fails because the City did not assume the City Employment Terms during the

bankruptcy.  Rather, by the time the Plan was confirmed, the City Employment Terms had been

replaced by a new collective bargaining agreement.[61]

The Court finds it is unnecessary to rule on this issue, and declines to do so.  The City has

limited its waiver and injunction arguments to pre-petition claims.  *See* discussion in footnote 47

of this opinion.  Because the Court has concluded that Mr. Cook's wrongful termination claim

arose post-petition for bankruptcy purposes, whether the City Employment Terms were assumed

by the City is not important for resolution of the Cedric Cook Motion.

## V. Conclusion

For the reasons stated in this opinion, the Court finds the claims addressed in the NFA

Motion and the Tanya Hughes Motion arose pre-petition.  The Court will enter separate orders

granting these two motions in part, as follows:

Haas will be ordered to dismiss, or cause to be dismissed, the currently pending state

court lawsuit in which Haas represents Summit regarding care Summit provided to Ms. Sheila

Williams (*Summit Med. Grp. (Sheila Williams) v. City of Detroit*, Wayne County Circuit Court

No. 14-010025-NF).  The dismissal of the Summit case will be deemed to be without prejudice

to Summit's right to be paid in accordance with Article IV, Section 5 of the Plan, to the extent

Summit has not already been paid.  In no event are Haas and Summit permitted to pursue any

---

[60] *See* SAAA Br. at 7-8 (Docket # 10217).

[61] City's Reply Br. to SAAA at 2 (Docket # 10285).

34

action to recover attorney fees or interest for any delay in the City's payments.

Ms. Hughes will be ordered to dismiss, or cause to be dismissed, her currently pending state court action concerning her dismissal from the Detroit Police Department (*Hughes v. City of Detroit*, Wayne County Circuit Court No. 15-002536-CD) and will be enjoined from pursuing her claim in any other forum. The injunction and dismissal are without prejudice to Ms. Hughes's right to file a proof of claim in the City's bankruptcy case. For the sake of clarity, the City retains its right to object to Ms. Hughes's proof of claim on any grounds, including untimeliness.

Finally, the Court concludes that the claim addressed in the Cedric Cook Motion constitutes a post-petition claim. The Court will enter an order denying the Cedric Cook Motion.

**Signed on April 15, 2016**                    **/s/ Thomas J. Tucker**
                                                 **Thomas J. Tucker**
                                                 **United States Bankruptcy Judge**