

P.O. BOX 30754
LANSING, MICHIGAN 48909

**BILL SCHUETTE**
ATTORNEY GENERAL

March 5, 2013

Clerk of the Court
Court of Claims
313 W. Kalamazoo St.
P.O. Box 40771
Lansing, MI 48901

      Re:   *Detroit Police Officers Assoc v City of Detroit*
             Court of Claims Case no. 12-80-MK

Dear Clerk:

    Enclosed for filing is the PROOF OF SERVICE that a true copy of the Final Order Denying Declaratory Judgment and Granting Dismissal for Defendants was served on counsel of record.

                      Sincerely,

                      Michael F. Murphy

                      Michael F. Murphy
                      Assistant Attorney General
                      State Operations Division
                      (517) 373-1162

MFM:bb
Enc.
cc:    Fillipe S. Iorio      w/true copy of Order and Proof of Service
       Jason McFarlane   w/true copy of Order and Proof of Service
       John H. Willems  /w/true copy of Order and Proof of Service

DETROIT POLICE OFFICERS
ASSOCIATION,

No. 12-80-MK

HON. JAMES S. JAMO

     Plaintiff,

v

CITY OF DETROIT, a Municipal Corporation;
DAVID BING, Mayor of City of Detroit; KIRK
J. LEWIS, Deputy Mayor (Acting as Mayor) of
City of Detroit; City Council, City of Detroit;
ANDY DILLON, State Treasurer; THE
FINANCIAL REVIEW TEAM FOR THE CITY
OF DETROIT; STATE OF MICHIGAN; RICK
SNYDER, Governor; RALPH L. GODBEE,
Chief of Police; City of Detroit;

**FINAL ORDER DENYING
DECLARATORY JUDGMENT
AND GRANTING JUDGMENT
OF DISMISSAL FOR
DEFENDANTS**

     Defendants.

| | |
|---|---|
| Donato Iorio (P57423)<br>Attorney for Plaintiffs<br>Kalniz, Iorio & Feldstein, Co., L.P.A.<br>P.O. Box 352170, 5550 W. Central Ave.<br>Toledo, OH 43635-2170<br>Ph: (419) 537-4825  Fax: (419) 535-7732 | Fillipe S. Iorio (P58741)<br>Attorney for Plaintiffs<br>Kalniz, Iorio & Feldstein<br>4981 Cascade Rd. S.E.<br>Grand Rapids, MI 49546<br>Ph: (616) 940-1911 Fax: (616) 940-1942 |
| Michael F. Murphy (P29213)<br>Attorney for Defendants State of MI,<br>Dillon, Snyder, Review Team<br>MI Department of Attorney General<br>State Operations Division<br>P.O. Box 30754<br>Lansing, MI 48909<br>Ph: (517) 373-1162  Fax: (517) 373-2060 | Margaret A. Nelson (P30342)<br>Attorney for Defendants State of MI,<br>Dillon, Snyder, Review Team<br>MI Department of Attorney General<br>Public Employment, Elections & Tort<br>P.O. Box 30736<br>Lansing MI 48909<br>Ph: (517) 373-6434 |
| Jason McFarlane (P73105)<br>Attorney for Defendant City of Detroit<br>City of Detroit Law Department<br>Labor & Employment Law Division<br>660 Woodward Ave., Suite 1650<br>Detroit, MI 48226<br>Ph: (313) 237-5038  Fax: (313) 224-5505 | John H. Willems (P31861)<br>Attorney for Defendants Bing, Lewis<br>and Godbee<br>Miller Canfield Paddock & Stone PLC<br>150 W. Jefferson Ave., Suite 2500<br>Detroit, MI 48226<br>Ph: (313) 963-6420  Fax: (313) 496-8453 |

/

At a session of the
Court of Claims, held

_____ FEB 28 2013

PRESENT: HON. JUDGE JAMES S. JAMO

This matter having come before the Court for hearing February 20, 2013 on

Plaintiff's motion for entry of a Declaratory Judgment; the Court having considered

the pleadings, briefs, and argument of counsel; and, the Court being otherwise fully

advised;

IT IS HEREBY ORDERED that Plaintiff's motion for entry of Declaratory

Judgment is denied for the reasons stated on the record.

IT IS FURTHER ORDERED that a judgment of dismissal is entered for

Defendants on all claims pursuant to MCR 2.116(I)(2) for the reasons stated on the

record.

This Order disposes of all claims and parties and closes the case.

JUDGE JAMES S. JAMO
_____
COURT OF CLAIMS JUDGE

Approved for entry as to form only:

/s/Fillipe S. Iorio w/perm. 2/26/13
Fillipe S. Iorio (P58741)
Attorney for Plaintiff

/s/John Willems      w/perm. 2/27/13
John Willems (P39318)
Attorney for Defs. Bing, Lewis and Godbee

/s/Jason McFarlane w/perm. 2/21/13
Jason McFarlane (P73105)
City of Detroit Law Department
Attorney for Defs. City of Detroit
and City Council

M Murphy (JJ) w/
permission
P67126

Michael F. Murphy (29213)
Assistant Attorney General
Attorney for Defs. State of Michigan,
Dillon, Snyder and Review Team

2012-0016050-A\Detroit Police Officers Assoc v City of Detroit\Final Order

2

STATE OF MICHIGAN
COURT OF CLAIMS

DETROIT POLICE OFFICERS
ASSOCIATION,

No. 12-80-MK

HON. JAMES S. JAMO

Plaintiff,

v

CITY OF DETROIT, a Municipal Corporation;
DAVID BING, Mayor of City of Detroit; KIRK
J. LEWIS, Deputy Mayor (Acting as Mayor) of
City of Detroit; City Council, City of Detroit;
ANDY DILLON, State Treasurer; THE
FINANCIAL REVIEW TEAM FOR THE CITY
OF DETROIT; STATE OF MICHIGAN; RICK
SNYDER, Governor; RALPH L. GODBEE,
Chief of Police, City of Detroit;

**PROOF OF SERVICE**

Defendants.

| Donato Iorio (P57423) | Fillipe S. Iorio (P58741) |
|---|---|
| Attorney for Plaintiffs | Attorney for Plaintiffs |
| Kalniz, Iorio & Feldstein, Co., L.P.A. | Kalniz, Iorio & Feldstein |
| P.O. Box 352170, 5550 W. Central Ave. | 4981 Cascade Rd. S.E. |
| Toledo, OH 43635-2170 | Grand Rapids, MI 49546 |
| Ph: (419) 537-4825  Fax: (419) 535-7732 | Ph: (616) 940-1911 Fax: (616) 940-1942 |
| Michael F. Murphy (P29213) | Margaret A. Nelson (P30342) |
| Attorney for Defendants State of MI, | Attorney for Defendants State of MI, |
| Dillon, Snyder, Review Team | Dillon, Snyder, Review Team |
| MI Department of Attorney General | MI Department of Attorney General |
| State Operations Division | Public Employment, Elections & Tort |
| P.O. Box 30754 | P.O. Box 30736 |
| Lansing, MI 48909 | Lansing MI 48909 |
| Ph: (517) 373-1162  Fax: (517) 373-2060 | Ph: (517) 373-6434 |
| Jason McFarlane (P73105) | John H. Willems (P31861) |
| Attorney for Defendant City of Detroit | Attorney for Defendants Bing, Lewis |
| City of Detroit Law Department | and Godbee |
| Labor & Employment Law Division | Miller Canfield Paddock & Stone PLC |
| 660 Woodward Ave., Suite 1650 | 150 W. Jefferson Ave., Suite 2500 |
| Detroit, MI  48226 | Detroit, MI  48226 |
| Ph: (313) 237-5038  Fax: (313) 224-5505 | Ph: (313) 963-6420  Fax: (313) 496-8453 |

/

## PROOF OF SERVICE

The undersigned certifies that on March 5, 2013, a true copy of the FINAL ORDER DENYING DECLARATORY JUDGMENT AND GRANTING JUDGMENT OF DISMISSAL FOR DEFENDANTS, dated February 28, 2013, was served on the attorneys of record in the above-captioned case by mailing the same to them at their respective addresses, with first class postage fully prepaid.

| | |
|---|---|
| Fillipe S. Iorio<br>Kalniz, Iorio & Feldstein<br>4981 Cascade Rd. S.E.<br>Grand Rapids, MI 49546 | Jason McFarlane<br>City of Detroit Law Department<br>Labor & Employment Law Division<br>660 Woodward Ave., Suite 1650<br>Detroit, MI 48226 |
| John H. Willems<br>Miller Canfield Paddock & Stone PLC<br>150 W. Jefferson Ave., Suite 2500<br>Detroit, MI 48226 | |

*Bobbi Ballinger*

Bobbi Ballinger
Legal Secretary to Michael F. Murphy

2012-0016050-A\ Detroit Police Officers Assoc v City of Detroit\POS 3-5-13

```
 1              STATE OF MICHIGAN

 2      IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

 3
      DETROIT POLICE OFFICERS ASSOCIATION,
 4
             Plaintiff,        Case No. 12-010859-CL
 5      vs.

 6      CITY OF DETROIT,

 7             Defendant.
      --------------------------/
 8

 9             Proceedings taken in the above-entitled

10      matter before HONORABLE KATHLEEN MACDONALD, Third

11      Judicial Circuit Court Judge, Detroit, Michigan, on

12      Thursday, August 30, 2012.

13
      APPEARANCES:
14

15      FOR PLAINTIFF:          MR. DONATO IORIO

16

17      FOR CITY OF DETROIT:    MR. ANDREW JARVIS

18

19      FOR MAYOR DAVE BING:    MR. RICHARD SERYAK

20

21      FOR ATTORNEY GENERAL
        & STATE TREASURER:      MR. MICHAEL MURPHY
22                              MR. MICHAEL McGEE

23

24
      Shelee Beard
25      Official Court Reporter
```

1                          **I   N   D   E   X**

2

3       <ins>WITNESS</ins>                                          <ins>Page</ins>

        N/A
4

5                         <ins>E X H I B I T S</ins>

6
            <ins>NUMBER</ins>         <ins>MARKED</ins>        <ins>ADMITTED</ins>
7
              N/A
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           Detroit, Michigan

2                           Thursday, August 30, 2012

3                                - - -

4                     THE CLERK:  Calling case number

5       12-010859, Detroit Police Officer Association

6       versus City of Detroit.

7                     MR. IORIO:  Donato Iorio on behalf of

8       the Plaintiff Detroit Police Officer Association.

9                     MR. JARVIS:  Andrew Jarvis on behalf

10      of the Defendant City of Detroit.

11                    MR. SERYAK:  Richard Seryak on behalf

12      of Mayor Dave Bing.

13                    MR. McGEE:  Michael McGee on behalf

14      of Mayor Bing.

15                    MR. MURPHY:  Michael Murphy on behalf

16      of the attorney general and state treasurer.

17                    THE COURT:  Before we begin, when you

18      address the Court, please restate your name and

19      who you represent for purposes of the record so

20      we keep everything straight.  Procedurally, the

21      first thing we need to address is the request to

22      intervene that has been filed by Mayor Bing as

23      well as the attorney general and state treasurer.

24                    MR. SERYAK:  Richard Seryak appearing

25      on behalf of Mayor Bing.  We have filed the

1    motion to intervene in this case, both as a

2    matter of right and as a matter of interest.  The

3    mayor was a party to the financial stability

4    agreement.  The mayor has worked acidulously and

5    desperately to avoid financial crisis.  We

6    believe he should be a party to this proceeding

7    just as he was in an almost copycat case filed in

8    front of the court of claims and Judge

9    Manderfield.  For the reasons set forth in our

10    motion we'd ask that the Court grant the

11    intervention.

12             I don't know if counsel for the

13    plaintiff has an objection; we've did not receive

14    any.  I'll let counsel address their position on

15    the motion, but we urge the Court to grant it.

16             MR. JARVIS:  If I may, Judge.  I know

17    the Court is probably familiar with some of the

18    issues between Corp Counsel and the Mayor's

19    Office regarding the representation and the

20    charter.  At this point we have no objection to

21    the mayor intervening in the suit, because for

22    all practical purposes the Corp Counsel and the

23    Mayor's Office are on the same side on this.

24             THE COURT:  And then the state.

25             MR. MURPHY:  Yes, your Honor.

1      Michael Murphy appearing on behalf of the

2      attorney general and the state treasurer.  I

3      think my motion sufficiently outlines our reasons

4      for being here and that we are entitled to be

5      here, especially the attorney general under the

6      statute.  We ask that the Court allow us to

7      intervene as a party defendant.

8           MR. IORIO:  Thank you, your Honor.

9      Donato Iorio on behalf the DPOA.  The DPOA has

10     filed a formal motion in opposition to proposed

11     intervenor state for the reason articulated in

12     the responsive opposition brief.  Specifically

13     because this is an entirely different case than

14     what was filed before the court of claims.  I

15     know we'll get into the merits on that when we

16     move on.  In addition, the DPOA, while it hasn't

17     filed a formal written objection to proposed

18     intervenor Bing, we believe that there's no

19     necessity in terms of granting the city dual

20     representation.  The City of Detroit particular

21     has corporation counsel pursuant to its charter,

22     an authorized representative, and has adequately

23     represented the City of Detroit.

24           DPOA believes that allowing the city

25     of Detroit's corporation counsel, as well as

1     proposed intervener Bing to argue both provides

2     dual advantage.

3          THE COURT:  I'm going to allow it

4     under the court rules it's going to be a

5     permissive intervention.  They have timely

6     requested the intervention and have alleged in

7     their motion that their interests are different

8     and the opposing or differing parties cannot

9     protect their interest properly.  So their

10    motions to intervene are granted.

11         Then we get to what we're really here

12    for today.  Proceed, counsel.

13         MR. IORIO:  Your Honor, as indicated,

14    my name is Donato Iorio.  I'm appearing on behalf

15    of the Plaintiff Detroit Police Officer

16    Association.  Plaintiff Detroit Police Office

17    Association is a labor organization that

18    represent roughly 2,000 police officers who are

19    assigned to frontline tasks of responding to the

20    city's war on crime.  Plaintiff DPOA has filed a

21    two count complaint seeking both declaratory and

22    injunctive relief to stop the City from acting

23    pursuant to an Act, Public Act 4 that no longer

24    is in effect and has been suspended and has been

25    rendered inoperative as opined by the attorney

1     general in its August 6th opinion.  And more
2     importantly, as determined by article 2 section 9
3     of the Constitution.  Despite this fact the City
4     of Detroit has indicated and expressed its
5     intention to proceed with the plan to
6     unilaterally change Detroit Police Officer wages,
7     hours and terms of conditions of employment.  And
8     its plan to do so is pursuant to and arises out
9     of Public Act 4.  That is the legal foundation
10    that serves as the City's anchor for imposing
11    CET.
12            The DPOA submits that the dispositive
13    legal question in this case is what, if any,
14    legal authority exist that justifies the city in
15    continuing to operate pursuant to an act that
16    doesn't exist.  In the DPOA submits that not only
17    does Article 2 section 9 answer that
18    overwhelmingly but the legal framework that
19    currently exist today is MCL section 423.243.
20    The law expressly prohibits the city of Detroit
21    from unilaterally changing, altering or modifying
22    whatsoever the existing wages and hours and terms
23    and conditions of employment of Detroit Police
24    Officers.  And specifically the wages, hours, and
25    terms and conditions of employment that existed

1        for Detroit Police Officers on a date they invoke

2        Act 312, which was June 22nd.  The Act 312 has

3        been marked as verified complaint Exhibit B. And

4        so the DPOA has filed its verified complaint, its

5        brief, reply brief which attached a number of

6        evidentiary pieces that we think provide a

7        detailed and comprehensive recitation of the

8        facts that lead of to you doorstep, your Honor.

9        I'm not going to focus on each and every fact,

10       but simply the more salient facts that DPOA

11       believes justifies its entitlement to preliminary

12       a declaratory relief.  That takes us back 40

13       years to Act 312 which was passed more than 40

14       years by a legislation that recognized

15       governments exist to protect people and property.

16       That's their sole function and responsibility.

17       They're able to protect people and property by

18       and through largely police officers and

19       firefighters.  So critical are the services that

20       police officers and firefighters provide and the

21       legislature recognize, they need to be carved out

22       from all other public employees and given

23       preferential treatment for resolving disputes

24       concerning successor collective bargaining

25       agreements.  That procedure was Act 312 which is

1    really a two-legged stool.  It provided

2    compulsory binding arbitration during the

3    pendency of which all wages, hours, terms and

4    conditions of employment must be maintained.

5         The legislature recognized the strong

6    nexus between maintaining morale and performance

7    and efficiency of the department, that where

8    morale is upheld, which Act 312 accomplishes,

9    then performance and the efficiency of that

10    department are accomplished.  Conversely, where

11    morale is attacked or officers are demoralized,

12    that adversely impacts the efficiencies of the

13    department, that compromises public safety.

14         On March 16, 2011, Governor Synder

15    signed into law Public Act 4 which replaced its

16    predecessor Public Act 72.  Public Act 4

17    established the process for local units of

18    government, of which the city of Detroit is one,

19    to deal with, respond to and address a situation

20    of financial distress.  It established and either

21    or process.  Either the governor could appoint

22    what's termed an emergency financial manager.  Or

23    if that was not palpable then the city and the

24    state could negotiate a consent agreement.  One

25    significant legal distinction separated the EFM

1    from the consent agreement situation; that being

2    the EFM and only the EFM was conferred with

3    statutory and powerful tool in dealing with

4    public employees wages, hours and terms and

5    conditions.  A powerful tool, a tool being that

6    the EFM would have the authority to rewrite

7    collective bargaining agreements to impose

8    whatever wages and hours and terms and conditions

9    of employment that the EFM deemed appropriate.

10        In my view it was a tool that was not

11   assigned or exist in the realm of a consent

12   decree.  Shortly after PA4 was passed in March of

13   11, the City of Detroit approached the DPOA in

14   December of 2011 and asked it to reopen its

15   contract which was due to expire on June 30, 2012

16   indicating that it needed additional concessions

17   to help alleviate its fiscal situation.  The DPOA

18   was reluctant for not only the obvious reasons,

19   but importantly for the reason that it believed

20   any additional concession would compromise pubic

21   safety.  Its rationale behind that was very

22   simple; for the past 10 years the Detroit Police

23   Department has been experiencing withering

24   attrition, internal, a thousand fewer officers

25   today than 10 years ago.  It come with -- the

1     problem attrition has not been a reduction in

2     crime.  In fact, it's been a spike and a

3     continued surge in crime, which means officers

4     who have been left behind are continually worked

5     at an incredibly high rate.  Their work load is

6     overwhelming and they're doing so under extremely

7     stressful and dangerous conditions which only

8     perpetuates the turnover problem.  On top of this

9     the city was reluctant -- the City of Detroit for

10    the past 15 or 20 years has been very successful

11    in its unrelenting attack on police officer pay

12    checks.  Mind you, it was done by and through

13    largely Act 312.  But it has been successful in

14    compressing DPOA compensation to the point that

15    Detroit Police Officers' compensation pales in

16    comparison to officers in surrounding and

17    national departments.  And we've provided the

18    evidence to support that proposition verified

19    complaint Exhibit O and verified complaint

20    Exhibit P1.

21          Just to highlight that example, your

22    Honor, we provided a chart that shows the top 50

23    largest salaries; the salaries for the top 50

24    largest department.  And Detroit, if the CETs are

25    permitted to proceed, would reduce the maximum

1       pay for an officer to $47,900.  By contrast, of

2       all the top 50 largest departments, there's not a

3       single one that pays its officers below $52,000.

4               The city has succeeded in composing a

5       compensation package that is simply

6       non-competitive.  The reason that compromises

7       public safety is because officers like everyone

8       else have to make ends meet, have to provide for

9       their family.  They're professionals and they

10      have portable skills.  And they can take those

11      skills and leave the department, which they've

12      done for the last 10 years and which the CETs are

13      going to accelerate because as we've indicated in

14      our verified complaint and as attested to by DPOA

15      president, Joe Dunkin, 63 officers have left

16      since June 1 which is incredible acceleration in

17      turnover.  Quite frankly, public safety does not

18      exist where there aren't police officers to

19      respond to calls.  And that's the situation that

20      the city of Detroit finds itself in this moment.

21      It is deteriorating; the police department is

22      dissolving before our eyes.

23              The final reason the DPOA was

24      reluctant to sit down with the city is because

25      less than six months earlier, July of 2011, the

1        city and DPOA negotiated what the current mayor

2        Bing determined historic concessionary agreement.

3        They were able to collective bargain an agreement

4        that the mayor quantified as producing more than

5        $100 million in savings to the city of Detroit.

6        It was all done on the backs of police officers.

7        It included and extended to wage freeze another

8        three years.  It resulted in a radical

9        restructuring of pension benefits.  Just to put

10       those pension benefits in context, the DPOA and

11       the city agreed the first major department in the

12       country to do away with the defined benefit

13       pension plan and replace it with a defined

14       contribution plan, reduced the -- eliminated the

15       pension annual escalator for pensioners.  It

16       reduced pension multiplier 2.5 percent to 2.1

17       percent.  And just to kind of flush that with

18       some context, your Honor, when Governor Snyder

19       articulated his best standards, best practices

20       for public employees on pension, he said police

21       officer multiplier should be 2.2 percent.  We

22       provided comparative data as well that shows, for

23       example Wayne County Sheriff, their pension

24       multiplier is 2.5 percent.  For a state trooper

25       it's 2.4 percent.  All of this collectively

1    continues to feeds the turnover churn which in

2    turn impairs public safety.

3            With that caveat the DPOA expressed

4    its willingness to sit down with the city.  The

5    city agreed.  The major recognized Detroit Police

6    Officers were underpaid and took pay cuts off the

7    table.  And in that context the DPOA and the city

8    over the next three months collectively bargained

9    a tentative agreement which was reached on

10   February 9, 2012 and was to produce nearly $26

11   million in additional savings to the city.  That

12   included an additional three-year wage freeze

13   which would have meant the Detroit Police

14   Officers would have gone more than seven years

15   without a pay increase.  In the law enforcement

16   world it's unheard of to go more than one or two

17   years.

18           It also included other radical

19   restructure of work rule changes.  As soon as

20   that tentative agreement was reached, the city

21   essentially cut off all communication with the

22   DPOA.  They refused to ratify the agreement, and

23   it turned its attention to the state where it was

24   able to negotiate a consent agreement pursuant to

25   PA4.  The consent agreement was termed financial

1          stability agreement which I think is marked as

2          verified complaint exhibit A.  The critical point

3          in the financial stability agreement is section 4

4          which deals with the duty to bargain.  In

5          essence, the City and the State contracted the

6          DPOA out of it's right to bargain and its Act 312

7          rights.  That was all done pursuant to and

8          authorized by Public Act 4.

9                  Despite this fact the DPOA proceeded

10         with its statutory Act 312 rights.  It submitted

11         the issue to mediation in May.  It attended

12         mediation in June, which was unsuccessful.

13         Because mediation was unsuccessful it filed its

14         Act 312 petition on June 22nd.  The invocation of

15         Act 312 carries with it significant legal

16         consequences.  It triggers the coverage and

17         protection of MCL 423.243, which the Michigan

18         Supreme Court, I believe it's an '85 case Ottawa

19         County held once you invoke Act 312 there can be.

20         No further changes to wages and hours and terms

21         and conditions of employment as of that date.

22                 As of June 22nd, 2012, there were no

23         10 percent pay cuts.  There were no fringe

24         benefit cuts.  There were no 12 hour shifts.

25         There were none of the any other multitude of

1    changes that are enumerated in the CET.  That

2    large is because CET didn't exist at that point

3    in time.  Notwithstanding that fact, the city

4    advised the DPOA that it was going to exercise

5    its rights under FSA Section 4 pursuant to Public

6    Act 4 to terminate the contract on June 30th and

7    thereafter at some point in the future to impose

8    unannounced and unknown wages, hours, and terms

9    and conditions of employment, unannounced and

10   unilaterally created non-negotiated wages, hours,

11   terms and conditions.

12        That required that the DPOA take

13   immediate legal action.  The legal action it took

14   was to file a six count complaint before the

15   court of claims.  That was on or about June 25th,

16   your Honor.  There's a couple of critically

17   important facts and legal questions that

18   distinguish that case from the case that's before

19   you.  The six count claim was filed because the

20   city said pursuant to Public Act 4 we're

21   exercising our FSA Section 4 rights which allow

22   us to terminate the duty to bargain.  And we

23   interpret that to mean you no longer have Act 312

24   rights because PA4 does away with ACT 312 right.

25   And the state treasurer pursuant to 4.4 has made

1    the determination we no longer have a duty to

2    bargain.  So there was state action by and

3    through concerted action between the city and the

4    state to deprive the DPOA of its Act 312 right.

5    It was undertaken by and through a contract in

6    which the state was a party to, and PA4 served as

7    the legal foundation.  That triggered the court

8    of claims exclusive jurisdiction because the

9    legal question in that case unlike this case was

10   what impact does PA4 have on Act 312.  What

11   impact, if any; does it impact the applicability,

12   the enforceability, its meaning.  What is the

13   interplay between Public Act 4 and Act 312?

14        The DPOA argued and maintained its

15   position that PA4 has no legal effect, but it was

16   unsuccessful in making that argument because as

17   the city argued --

18        THE COURT:  I that part of your

19   argument also was Act PA4 was unconstitutional.

20        MR. IORIO:  We did.  That was one of

21   the counts.  That count has not yet been --

22        THE COURT:  And she denied your

23   relief on both issue.

24        MR. IORIO:  I don't believe we asked

25   for injunctive relief on the constitutional

1    claim.

2              THE COURT:  Well, she couldn't give

3    you that.

4              MR. IORIO:  She hasn't ruled on that

5    as far as we know, your Honor.

6              THE COURT:  Okay.

7              MR. IORIO:  She only ruled on the

8    preliminary injunction which came on July 9th.

9    She denied the DPOA's preliminary injunction on

10   the basis that PA4 by and through the FSA

11   eliminates section 4 because by and through

12   section 4, since section 4 eliminates the duty to

13   bargain and the state treasurer determined there

14   is no duty to bargain, then no Act 312 injunction

15   can issue.

16             Three days later, the city of Detroit

17   on July 12th presented the financial advisory

18   board which is a PA4 creature.  What it

19   unilaterally prepared and crafted is city

20   employment terms.  These were unknown to the DPOA

21   and certainly hadn't been negotiated.  The

22   financial advisory board at that time approved

23   the CET.  The DPOA learned that city council was

24   scheduled to vote on the same on or about July

25   16th and immediately presented city council

1        briefing paper that explained that neither the

2        city nor police officers could afford the cuts

3        for the reasons I've articulated, largely because

4        it jeopardizes public safety.  It appeared before

5        city council on July 16th where DPOA president,

6        Joe Dunkin made the same presentation and city

7        council agreed.  It rejected the CETs.

8              Nonetheless on that same day, your

9        Honor, the mayor issued a two-page order imposing

10       the CET.  And we've attached that order as

11       verified complaint Exhibit G.  That order states

12       that it implements the CETs.  But more

13       importantly it provides the expressed legal

14       authority that the city believe it had in order

15       to change wages, hours and terms and conditions

16       of employment from those that existed on June

17       22nd.  The authority was Public Act 4.  On August

18       3rd came the transformative moment in this

19       particular case.  That's when the Michigan

20       Supreme Court in stand up for democracy granted

21       plaintiff's writ for mandamus compelling state

22       board of canvassers to certify PA4 as referendum

23       petition.  In so doing, that triggered the

24       application of Article 2 section 9, which I'll

25       get to when I get to my legal analysis.

1          Within a business day, on August 6th

2     the attorney general issued his opinion letter

3     discussing the legal impact of certification on

4     PA4 and correctly concluded in unmistakably clear

5     language that PA4 is suspended and is rendered

6     inoperative.

7          On August 8th, the state board of

8     canvassers certified PA4, which triggered the

9     application of Article 2 section 9, the effect of

10    which PA4 is no longer in operation.  As a

11    result, the DPOA sought confirmation that the

12    city would comply.  The city indicated that it

13    would not, that it intended to proceed to operate

14    pursuant to PA4, as it has not been suspended by

15    and through the implementation of its condition

16    of the employment, by and through the changes to

17    DPOA wages, hours, term and conditions of

18    employment.  That has lead us to your doorstep,

19    your Honor, by and through its two count

20    complaint.  It's seeks declaratory and injunctive

21    relief.  And I'll turn to the four traditional

22    elements of injunctive relief and apply those at

23    this point to count one.

24          Count one asks this Court to stop the

25    city from continuing to operate pursuant to PA4

1   because of Article 2 Section 9.  Turning first to

2   the injunctive element likelihood of success, the

3   DPOA has likelihood of success because it's legal

4   condition and theory is anchored to the

5   Constitution, and it's anchored to the

6   controlling case authority.  The controlling case

7   authority being the 1971 supreme court decision

8   is Kuhn v. Department of Treasury, as well as

9   2000 court of appeals decision, Reynolds v. State

10   Bureau of Lottery.

11    Turning first to the constitution, I

12   would quote Article 2, Section 9 which is really

13   the foundation for DPOA's count one argument.  It

14   states and I quote.  "No law as to which the

15   power of referendum properly has been invoked

16   shall be effective thereafter unless approved by

17   a majority of the electors."

18    It's interesting to note that Article

19   2 Section 9 is so clear that none of defendants,

20   proposed intervenors or corporation counsel

21   disagree that PA4 is suspended by virtue of

22   Article 2 Section 9.  Yet, the city attempts to

23   request an alternative interpretation to Article

24   2 Section 9 ordinary meaning.  Essentially that

25   interpretation is that it be permitted to

1        continued to operate pursuant to PA4 despite the

2        fact it is no longer in effect.  The Michigan

3        Supreme Court in the Adar case, which I believe

4        is one of the cases cited by intervenor Bing in

5        its motion in opposition to the DPOA, has stated

6        that the constitution is of the people and by the

7        people.  It goes on to state that when

8        interpreting and applying the constitution the

9        guiding force, the interpretive construction

10       that's to be signed is what is the ordinary

11       meaning, what would reasonable minds agree as it

12       relates to the text data used.

13           I think in this case the focal point

14       of the dispute is what does effective thereafter

15       mean.  The ordinary meaning of effect, according

16       to Black's Law Dictionary Sixth Edition is to do,

17       to produce, to make, to bring to pass, to

18       execute, enforce, accomplish the operation of the

19       law, going into operation.  When PA4 is in effect

20       arguably that means that it's able to do what

21       it's not able to do today.  By that I mean it

22       would be able to use PA4 as an instrument to

23       effectuate the change it seeks to impose upon

24       DPOA officers by and through the CETs.  It was be

25       able to put into effect the CETs.  That's what

1    effect means according to its ordinary term.  So

2    when PA4 is no longer in effect, then the

3    converse is true; that the city can no longer

4    continue to do what it's attempting to do because

5    its legal authority no longer exists.

6         THE COURT:  You have no case law to

7    support that the actions taken under PA4 are void

8    ab initio.

9         MR. IORIO:  I believe Article 2

10   Section 9 reach that conclusion, as I believe

11   Reynolds v. Bureau of State Lottery which cited

12   approvingly and adopt the holding from the 1927

13   Arizona Supreme Court case which said,

14   essentially, a properly invoked referendum

15   petition nullifies the targeted measure.  There

16   can be no other reasonable interpretation other

17   than PA4 in not in effect.  We're simply asking

18   that the Constitution be enforced and applied as

19   written.

20        We also indicate, your Honor, the

21   city has not cited any authority whatsoever to

22   suggest that it gets to continued to operate

23   pursuant to PA4.

24        THE COURT:  I don't think they're

25   arguing that.  I think they're arguing that what

1   they have done is still valid.

2          MR. IORIO:  Right.  Which in essence

3   would lead to the conclusion that it is allowed

4   to continue to operate as if PA4 allows them to

5   do so.

6          THE COURT:  No they're not allowed to

7   continue under it because there are a lot of

8   other measures they could have taken and could

9   take under PA4, and they have chosen not to do

10  that.

11         My question to you is, you want to go

12  back to the status quo; why is the status quo not

13  the CETs that were entered into by the city --

14  well, enacted by the city based on their

15  financial need?

16         MR. IORIO:  I think that's a great

17  question.  The answer to that is multifaceted.

18  First, it's not the status quo because Michigan

19  Supreme Court says it's not.  Ottawa County v.

20  Kalinski (ph) says, the status quo is that which

21  existed at the time Act 312 was invoked.  At the

22  time Act 312 was invoked there were no ten

23  percent pay cuts.  There were no fringe benefits

24  cuts.  There were no 12 hour shifts.  Kalinski

25  has been followed in a number of cases that

1      clearly holds that where Act 312 has been

2      invoked, and there's no dispute Act 312 has been

3      invoked.  It was invoked on June 22nd that that's

4      the status quo.

5            Secondarily, we believe June 18th is

6      not the status quo because that would require

7      Article 2 Section 9 to be sides aside.  The only

8      way July 18th could be the status quo is if PA4

9      is in effect; it is not.  It also would require

10     the complete rejection of Act 312 as it currently

11     exist today.  The legal context that exist today

12     is Act 312 stands alone and has absolutely no

13     impact whatsoever by virtue of PA4 because of

14     August 8th, 2012 and the certification if the

15     referendum.

16           Thirdly, we submit July 18th is not

17     the appropriate status quo because it's not the

18     legal status quo.  The legal status quo

19     contemplates what was the last mutually agreed to

20     wages, hours and terms and conditions of

21     employment that were in existence.  The CETs are

22     nothing more than the city's unilaterally

23     prepared wish list of what it hopes to achieve,

24     what it would like to achieve, all in the absence

25     of collectively bargaining.  And that is in

1          complete defiance of the Michigan Supreme Court

2          case DPOA v. City of Detroit 391 Mich 44 (1974)

3          the Michigan Supreme Court held that on mandatory

4          subjects of bargaining, and that's clearly what

5          we're dealing with, wages, hour and terms and dig

6          conditions of employment, the employer is

7          required to bargain in good faith.  And absent

8          impasse in negotiations there can be no

9          unilateral changes.  With that, a holding which

10         was reaffirmed in the unpublished case, Clinton

11         Professional Firefighters v. City of Flint where

12         the court of appeals stated and I quote, where

13         the collective bargaining agreement has expired,

14         all parties have a duty not to unilaterally

15         change its status quo.

16              THE COURT:  Counsel, I've issued

17         injunctions under those conditions.  Those are

18         not the conditions here.  Of course, an employer

19         cannot impose conditions once Act 312 has been

20         invoked.  I've issued those injunctions, but

21         that's not what we're talking about here.

22              MR. IORIO:  We respectfully disagree.

23         I believe implicit within that comment is that --

24         that there's some legal basis that allows the

25         city to do that; that legal basis is PA4 and PA4

1      is no longer effective.  It no longer gives

2      operation.  We've also indicate that it's not the

3      appropriate status quo.  Particularly, intervenor

4      Bing in its brief, pages 6 through 8 attempts to

5      make the analogy that this is really analogous to

6      a situation where a statute has been repealed or

7      where a statute has been amended.  It went all

8      the way to Nebraska to try to find a case to

9      support it's position, which, in fact, it was

10     completely misrepresented.  It doesn't stand for

11     the proposition --

12              THE COURT:  Actually, they only had

13     to go to Lansing and upstairs to Judge Murphy's

14     courtroom.

15              MR. IORIO:  I'm going to get to Judge

16     Murphy.  I don't believe that's controlling, and

17     I don't believe that applies either.  Well, they

18     chose to go to Nebraska.

19              THE COURT:  It's not controlling, but

20     he's my colleague who I have a great deal of

21     respect for.  I read the transcript, and I

22     thought he did a fine analysis.

23              MR. IORIO:  I'll get go Judge Murphy

24     after I hit this point.  As it relates to the

25     Haskel case, that actually supports the DPOA's

1    position.  In Haskel --

2              THE COURT:  Okay.  Those are the

3    legal mattes.  I need you to get to the harm to

4    the public interest if this injunction is issued.

5    This is a significant issue.

6              MR. IORIO:  Can I first get to the

7    Judge Murphy real quickly.

8              THE COURT:  Sure.

9              MR. IORIO:  We understand Judge

10   Murphy is a colleague.  Judge Kustis (ph) as well

11   is a colleague.  And last year she issued a TRO

12   under identical circumstances.  The Judge Murphy

13   situation --

14             THE COURT:  When Act 4 wasn't even

15   law?

16             MR. IORIO:  PA4 was law.  We've

17   attached that order.  I think it's verified

18   complaint exhibit -- give me one second, your

19   Honor.  Verified complaint Exhibit Z.

20             Turning back to Judge Murphy, we

21   believe the transcript doesn't tell the full

22   legal context in which that case exist.  We

23   provided the complaint.  I think the complaint

24   indicates -- really the legal question in that

25   case is whether PA72 is revived by virtue of PA4

1    being suspended.  We don't disagree with that.

2    Quite frankly, if PA727 is revived it bolsters

3    the DPOA's position because PA72 did not allow

4    the city to impose the CET that it's attempting

5    to do at this point in time.  Nor is the

6    transcript a final and appealable order at this

7    point in time, so we don't know what Judge Murphy

8    is ultimately going to order.

9         More importantly it's distinguishable

10   because it doesn't deal with police officers.

11   Police officers, whether we like it or not, enjoy

12   special statutory treatment under Act 312.  That

13   was not an Act 312 case; this is.

14        Turning -- if I could finalize my

15   argument as is relates to the status quo.

16        THE COURT:  Sure.

17        MR. IORIO:  I think the city's

18   argument crumbles under its own logic.  I think

19   it was best exemplified by intervenor State's

20   argument when it stated even if PA4 rejected by

21   the voters, it's still going to proceed as if PA4

22   exist.  And it's still going to proceed pursuant

23   to the FSA.

24        THE COURT:  I think that opens up a

25   whole new legal quagmire if it's approved it

1   should be repealed, then we get into whether the
2   action taken under PA4 are valid and binding.
3   But we're not to that point yet.
4           MR. IORIO:  We respectfully believe
5   we are in the same legal posture.  I think it
6   provides a window into what the city and the
7   state are thinking, which is we can disregard the
8   constitution and we can contract our way to a
9   veto of the people's power.  And can simply
10  ignore Article 2 Section 9 which again says
11  because PA4 is not in effect you can't do these
12  things.
13          Finally, on the status quo, your
14  Honor, if we're going to look at what the status
15  quo is, why wouldn't we look to August 8th, which
16  is the date of the certification.  August 8th
17  what were the wages, hours and terms and
18  conditions of employment?  They were no 10
19  percent pay cut.  They were no 12 hour shifts.
20  They were none of the other fringe benefits.
21  They were none of the CETs.  The CETs were not
22  impose, I think according to the city's own
23  document which we've attached as verified
24  complaint Exhibit Y page 2.  The fourth column
25  lays out all of the implementation dates.  For

1       example, a 10 percent pay cut didn't come into

2       fruition until August 24th for hours worked after

3       August 8th.  So the status quo  -- if the Court

4       is inclined to suggest that June 22nd is not the

5       status quo, we would submit the most appropriate

6       status quo would be what were the wages, hours

7       and terms and conditions of employment that

8       existed as of August 8th.  And they were not 10

9       percent pay cut, fringe cuts, or the 12 hours

10      shifts.

11              I believe you wanted me to address

12      the irreparable harm issue, which is where I'm

13      going, your Honor.  Irreparable harm in this

14      case, and I will restrict myself to count one, or

15      do you want me to do both counts?

16              THE COURT:  Do both, please.

17              MR. IORIO:  Okay.  The irreparable

18      harm in this case, your Honor, first as it

19      relates to count one is multifaceted.  We're

20      dealing with irreparable harm, the constitution.

21      The constitution Article 2 Section 9 in plain and

22      unambiguous text says PA4 is no longer in effect.

23      Accordingly, it can no longer be used to allow it

24      to implement the acts that were exclusively

25      allowed under PA4, and that is the CETs.  The

1       constitution says that the people get the final

2       say as to whether or not PA4 gets to remain in

3       operation.  There's no purer form of democracy

4       than a properly invoked petition, as in this

5       case, where more than 200,000 Michiganders have

6       spoken and said we want the opportunity to be

7       able to speak on a particularly divisive piece of

8       legislation.  And the Constitution recognizes

9       that right.  And The Michigan Supreme Court in

10      Kuhn says we need to do what's necessary to

11      effectuate and facilitate the will of the people,

12      not hamper and destruct.  And what will

13      facilitate the will of the people is to let them

14      speak on November 6th.  And in the interim

15      period, PA4 to remain -- is not to remain in

16      effect.  It's to be suspended.  And as the

17      attorney general said, it's no longer in

18      operation.

19              So the first injury is to the

20      Constitution's democracy to the will of the

21      people.  The second irreparable harm with respect

22      to count one, and it has some overlap on count

23      two, so I'll address this harm collectively.

24      There's irreparable harm to public safety.  A

25      government exists to protect its people and its

1    property.  That's done in Detroit largely on the

2    backs of Detroit Police Officers who do so by the

3    performance of their duties, who do so with

4    having a sufficient numbers of officers available

5    to respond to the citizens calling for

6    assistance.

7         In this case today, your Honor, the

8    Detroit Police Department is seriously broken.

9    It's broken because its officers are broken.

10   They're demoralized.  They're demoralized because

11   for the past 10 years, and it's only recently

12   we've seen an uptake in this, turn over has

13   exploded.  And those vacancies have not been

14   replaced.  When turnover exists and those

15   vacancies are not filled and crime continues to

16   spiral out of control, the officers left behind

17   have a greater workload, continue to work in far

18   more dangerous working conditions.  And that only

19   feeds burnout which only feeds the turnover

20   problem.

21        When you add to that layer what exist

22   in Detroit, which is paying it's police officer

23   an uncompetitive rate, then you have a recipe for

24   disaster because officers are expressing their

25   displeasure and the fact they're demoralized with

1   their feet.  They're leaving.  Sixty-three

2   officers since June 1st have left.  More are on

3   the way.  More than 500 have signed petition

4   we've provided in verified complaint making it

5   very clear that they're barely making ends meet

6   before the 20 cut, that they're professionals and

7   have portable skills and they will have to leave.

8            I think the city fails to recognize

9   it cannot provide public safety without its

10  Detroit Police Officers.  They're an

11  indispensable ingredient in that formula and yet

12  they're completely being ignored and disregarded.

13  The problem that we see with respect to

14  irreparable harm is because officers are fleeing.

15  The public which is already -- whose safety is

16  already jeopardized shouldn't be compromised any

17  further.  So there's irreparable harm to public

18  safety which the CETs will only accelerate

19  because it's going to force officers to flee the

20  department.

21            For example, we attached president

22  Dunkin's supplemental affidavit.  He received

23  word from the Toledo Police Department they're

24  hiring 75 officers and they want Detroit's

25  finest.  And they want them because of the

1   experience and because they recognize that

2   Detroit Police Officers are to the point where

3   they've been pushed beyond the brink and they're

4   going to leave and continue to leave.  So there's

5   irreparable harm to public safety.  There's

6   irreparable harm to the individual officers as

7   well.  We recognize that traditional forms of

8   financial injury typically don't constitute

9   irreparable harm.  However, there are cases which

10  say where you're dealing with impending fiscal

11  ruin or financial ruin, it may constitute

12  irreparable harm.  I'm talking about the State

13  Employees v. Department of Health (1985) case.

14          In particular, the Michigan Supreme

15  Court in that case quoting from the U.S. Supreme

16  Court case says, and I quote, "the availability

17  of a backpay award several years after dismissal

18  scant justice for a government employee who may

19  have long since been evicted from his home and

20  found himself forced to resort to public

21  assistance in order to support his family.  It's

22  little solace to those who are so injured to be

23  told their plight is normal."  It goes on to

24  state -- The supreme Court goes on to state, we

25  do not hold that the absence of usable resources

1      and attainable alternative sources of income with

2      which to support oneself and one's dependents

3      coupled with the prospect of destitution, serious

4      physical harm, or loss of irreplaceable treasured

5      possessions can never support of finding of

6      irreparable injury in an appropriate case.

7              The DPOA submits that this is the

8      appropriate case.  We've submitted affidavits of

9      officers who are foregoing medical treatment

10     because they can't afford it.  I direct your

11     attention to verified complaint Exhibit Q-1 where

12     officer Ewing has stated and I quote, "just to

13     make ends meet I've been forced on occasion to

14     collect pop bottles for cash fund.  I've lived

15     off payday advance loans for years, and I've

16     changed my employment status to 1099 to defer

17     paying taxes on my income.  Due to my financial

18     hardship I've been forced to sell portions of my

19     vacation time.  Even with all these drastic

20     measures I only had $26 left over from my last

21     paycheck after paying monthly bills.  My wife is

22     currently on ten medications and I cannot afford

23     to get some of her medications filled.  There is

24     no worse feeling than not being able to care for

25     your wife and family."

1           We direct your attention to verified

2     complaint Exhibit Q-2, officer Iceman (ph) who,

3     as you stated, was recently forced to file for

4     bankruptcy, was forced to sell our family

5     vehicles, and he lives only on the bare basics.

6     And in order to clothe his children he has to go

7     to the thrift shop.

8           We direct your attention to verified

9     complained Exhibit Q-3, officer Stephan, who says

10    he and his wife lives in an apartment because

11    they left their house due to short sale.  He goes

12    on to say in the event I am sick or injured I

13    avoid going to the hospital or doctor's office so

14    I do not incur further medical costs that I

15    cannot afford.  I anticipate that my credit

16    rating will also suffer as a result because I

17    will not be able to make certain payments and

18    will be forced to increase my credit card debt.

19    I will be forced -- I've already been forced to

20    prioritize my bills and decide which I will pay

21    and which I will not.

22          We offer the affidavit of Lisa Ray

23    who says, I've already been forced not to fill

24    her daughter's prescriptions on certain

25    occasions.  When I cannot afford her prescripts

1       it's only going to get worse.  I pay

2       approximately $75 per month in prescription drug

3       costs, and I anticipate those cost will more than

4       double under the city's changes.

5               That's the type of injury that awaits

6       Detroit Police Officers.  They were barely making

7       ends meet.  More than 500 have indicated they

8       were barely making ends meet before.  And they've

9       exercised their right to leave as attested to by

10      Officer Pitt, a 17 year veteran who moved to

11      Atlanta.  He didn't even have a job lined up, but

12      he knew that staying in Detroit and policing in

13      Detroit was going to kill his family because he

14      couldn't provide for them.

15              Officer Estrada, an 18 year veteran

16      who left the department, took this training that

17      the city invested in and went to the Chrysler

18      Executive Protection Unit because he had to make

19      ends meet for his family and couldn't do so under

20      the CET, couldn't do so under $47,000 when he

21      knows every surrounding and local department pays

22      more.  And they have better working condition,

23      greater chance that officers will be able to

24      return home at the end of their shift.

25              So the irreparable harm, your Honor,

1    as it relates to count one; constitution,

2    compromising the public's safety, as well as the

3    individual police officers.  Count two deals with

4    the individual injury to Act 312.

5         We cited I believe in our reply brief

6    a court of appeals decision Attorney General v.

7    Power Pick Players Club of Michigan where quoting

8    from a supreme court case, the court of appeals

9    held, "at common law acts in violation of law

10   constitute a public nuisance.  Harm to the public

11   is presumed to flow from the violation of the

12   valid statute enacted to preserve public health,

13   safety and welfare."

14        Act 312 is the quintessential example

15   of a statute that was enacted to protect and

16   preserve public health, safety and welfare.  We

17   know that because the legislature has embedded

18   its strong public policy right into the statute.

19   423.321 clearly and unambiguously states that it

20   is the public policy of the state that in public

21   police and fire departments where the right of

22   employees to strike by law is prohibited it is

23   requisite to the high morale of such employee.

24   And efficient operation of such department to

25   afford an alternate expeditious, effective and

1    binding procedure for the resolution of such

2    disputes.  And to that end the provisions of this

3    act providing for compulsory arbitration shall be

4    literally construed.

5         So the public policy in this case,

6    Act 312, will be irreparably harm.  Again, it's a

7    two-legged stool, one of which is compulsory

8    arbitration.  The other leg is maintaining the

9    wages, hours and terms and condition of

10   employment.  The city seeks to do away at this

11   point in time with the status quo injunction.

12   However, that is going to bring and has already

13   brought to bear dire consequences the Michigan

14   Supreme Court in Dearborn Firefighters, a 1975

15   case, warn about would occur if police officers

16   and firefighters would no longer have the

17   protection of Act 312.

18        The dire consequences in this case

19   are already being experienced in the streets of

20   Detroit because officers are leaving.  The police

21   department is disintegrating, and the public

22   safety is being compromised.  So the irreparable

23   harm exists as it relates to Act 312, as well,

24   your Honor.

25        423, as you've indicated, you've

1    issued 423 for injunction.  You're well versed

2    with that, and you understand that.

3              THE COURT:  It's usually under

4    conditions that if I don't issue an injunction,

5    the union would effectively be dissolved.  There

6    would be no union.

7              MR. IORIO:  That's the situation

8    we're talking about right now.

9              THE COURT:  No.

10             MR. IORIO:  Absolutely, because we

11   believe --

12             THE COURT:  So you believe all of the

13   officers from the city of Detroit are going to

14   leave, and there won't be a union?  That's not

15   the city's position.  In fact, they have retained

16   90 percent of your bargaining rights.  Other than

17   wages and hours, those are the only two things.

18             MR. IORIO:  And terms and conditions,

19   which is everything.

20             THE COURT:  But you still have your

21   grievance procedure, the arbitration.

22             MR. IORIO:  After the city gets the

23   CET, it's whether or not it follows it.

24             THE COURT:  I read that CET; that is

25   not what it says.

1          MR. IORIO:  There's countless

2     documents and public statements where the city

3     has made it clear they reserve the power to do

4     what ever it wants.

5          THE COURT:  They have it written;

6     it's written that you retain all those.

7          MR. IORIO:  So they say.  We

8     obviously disagree with that.  We believe first

9     and foremost there's injury to the police

10     department.  There's not going to be a police

11     department left, your Honor, if the city is

12     permitted to get away with disregarding the

13     constitution, as well as Act 312.  There is --

14          THE COURT:  Okay.  I'm going to save

15     you some rebuttal time.  I'd like to hear from

16     opposing counsel.

17          MR. JARVIS:  Years and years ago when

18     I started working for the City of Detroit, they

19     said it was an easy job.  Public Service is not

20     easy.  That's why you sit on the bench and have

21     to make decisions that are hard.  People who are

22     elected to public office have to make decisions

23     that are hard that affect residents of the city

24     of Detroit.  But over all, they have to look at

25     the survivability and the viability of the city

1    of Detroit.

2             On a personal note, 2009, Judge, I

3    received a 10 percent wage reduction like a lot

4    of other city employees.  It goes as today with a

5    10 percent wage reduction for myself.

6             The police officers and firefighters

7    of the city are the last people who are going to

8    receive the 10 percent wage reduction, Judge.

9    And that's because the City did everything it

10   could to save them from that reduction.  But the

11   time has come where that has had to occur, Judge.

12   It's not an easy decision, but looking at the

13   overall viability of the city of Detroit, it's a

14   decision that had the be made.  I'm sorry that it

15   did because I have friends in this room who may

16   not be my friends anymore, but I have to argue on

17   behalf of the city that it was a necessary move.

18            Judge, the CETs were imposed on the

19   18th of July when Public Act 4 was still viable;

20   it's currently suspended.  The CETs are the

21   status quo.  There's been some argument today

22   that somehow the 10 percent wage cuts only took

23   effect -- only became effective with the August

24   8th payroll.  We have a PPS system in the city of

25   Detroit, Judge, that dates back from the

```
 1          seventies.  It took two payroll cycles to

 2          implement the reduction for the police

 3          department.  After the 18 of July, the first

 4          meeting with respect to the payroll reduction for

 5          the police department, took place on July 23rd.

 6          They have to figure out how to do it.  They had

 7          to input all those changes, had to run through

 8          two payroll cycles running tests programs.  And

 9          finally on the 24th of August that's when the 10

10          percent took effect, Judge.  When Public Act 4

11          was in place, not suspended, the CETs were

12          properly imposed; that's the status quo, Judge.

13                  Harm to the public, I guess I'd like

14          to address that first because it's something I

15          think we all can be concerned about.  This TRO

16          should not issue, Judge, based on mere

17          speculation.  The City of Detroit Police

18          Department has always had an attrition rate of

19          about 25 to 50 officers per month depending on

20          the time of year.  It's unfortunate when a police

21          officer gets to their 20 or 25 years anniversary

22          and decide to move on to do something else.  I

23          wish we could do something else, but we don't

24          have the finances available to bring even a new

25          class at this time.
```

1          What's the harm to the public?  If

2     this package, the CETs are not put in place,

3     Judge, we're going to face a catastrophic failure

4     of the city's finances; that's what's going to

5     happen.  It's there for a reason.  There's nobody

6     in this building or anywhere in the executive

7     offices around this city who's got it in for the

8     Detroit Police Department.  These are changes and

9     things that had to be done.

10          Every executive at the Detroit Police

11     Officer started off as a PO and they had to work

12     their way up.  They have friends who are still

13     POs in the lower ranks.  They understand the

14     stresses of the job.  They understand demands.

15     But overall, Judge, the harm to the public if

16     this TRO issues will be catastrophic for the

17     city.

18          With respect to irreparable harm,

19     Judge, they can't show irreparable harm with a 10

20     percent wage cut.  Simply put, it's fear,

21     apprehension, speculation that there's going to

22     be a mass exodus from the police department.

23     They can't show that.  The CETs were properly put

24     in place under Public Act 4.  I don't see or

25     haven't heard anything here much different than

1      what was argued in front of Judge Manderfield in

2      Ingham County.  Many of the same arguments made

3      today with respect to Act 312 were made there,

4      and Judge Manderfield addressed those.

5            With respect to 312 it certainly

6      supplement para and the duty to bargain.  And

7      that was suspended under Public Action 4.  The

8      CETs were properly imposed.  I'm sorry that it

9      had to come to that, but that's just the

10     realities of the way we're working today, Judge.

11     The City has done everything it can to prevent

12     these 10 percent reductions for the police

13     department.  They're the last detail that had to

14     be done with the city.

15           I covered a lot of issues in my

16     brief.  If you have any questions, I'd be happy

17     to answer them.

18           THE COURT:  No.  Thank you.  Counsel.

19           MR. SERYAK:  Richard Seryak appearing

20     on behalf of the mayor.  Your Honor, I believe

21     this is the basis for Judge Murphy's ruling.  It

22     goes to probabilities, success on the merit, the

23     plaintiff's burden.  If they cannot meet that,

24     the election code section 168.477 specifies what

25     thereafter mean in the constitution.  Counsel

1    kind of schlepped over the word thereafter.  If

2    you ignore the word thereafter, you can try to

3    make an argument that suspension means more than

4    just suspension.  Suspension is not

5    nullification.  Section 2 in the school code says

6    that the law that is the subject of the

7    referendum continues to be effective and the

8    referendum  --  continues to be effective until

9    the referendum is properly invoked, which occurs

10   when the board of state canvassers make official

11   declaration of the sufficiency of the referendum

12   petition.  That was done on August 8th.  So state

13   statute makes it clear that actions taken prior

14   to August 8th, an imposition of the employment

15   terms, the city employment terms.  And that order

16   of imposition was issued July 17th our 18th, but

17   that's when it was imposed.

18        Those conditions were lawful then, by

19   virtue of the election code.  They were lawfully

20   imposed.  They were valid.  They're binding, and

21   they survived.  And actions taken pursuant to the

22   financial stability agreement in the order of

23   imposition, the employment terms.  Even though

24   they may be implemented; it may take weeks to

25   implement, those are still lawful terms.  And

1    they are enforceable and binding.  And that's the

2    status quo that must be honored as of today.  We

3    recognize and we don't dispute that as of August

4    8th we now have a duty to bargain.  And there

5    will be arbitration proceedings.  But the key is

6    what's the baseline that the arbitrator or the

7    parties will look at for purposes of

8    negotiations.  It's the terms and conditions of

9    employment imposed by the city on July 18th;

10   that's the status quo.  Those are the terms.

11        Plaintiff wants to go back to a

12   contract that expired the end of last year and

13   argues that's the status quo.  That can't be the

14   status quo.  It his to be the terms that were

15   lawfully imposed in July.  Those are the terms

16   that were in existence as of August 8th.  They're

17   not nullified.  The statute says they're

18   effective.  And, therefore, we submit the

19   plaintiff cannot show likelihood of success on

20   the merits.  That was the basis for Judge

21   Murphy's decision in the Detroit Public School

22   case.

23        He did not undue actions taken by the

24   emergency manager under Act 4 because those

25   actions were lawfully undertaken.  And the mere

1    fact that now the law is suspended right now does

2    not vesicate the actions taken in July or prior

3    to August 8th.  The plaintiff is arguing those

4    actions are somehow void ab initio.  That is not

5    the law.  That is not what the election code

6    says.  The plaintiff cites this section in their

7    complaint.  It's right in -- they refer to it in

8    the supreme court decision.  It's in paragraph

9    16.  This is the reference to the stand up for

10   democracy.  The supreme court in its decision

11   refers to the section with the election code;

12   168.477 section 2.  Therefore, we submit the city

13   employment terms are valid.  They do survive.

14   They would be the terms that would be the

15   conditions of employment tnat any arbitrator

16   would look at.

17        Act 312, the argument is this was

18   addressed, presented before the court of claims.

19   And the court of claims made it very clear that

20   Act 312 doesn't have special exalted status after

21   PA4.  PA4 made it clear that there is no duty to

22   bargain.  If there's no duty to bargain, there's

23   no right for the employee to sit down with the

24   employer and negotiate a collective bargaining

25   agreement.  If there's no right to a collective

1   bargaining agreement, there's no right to have an

2   arbitrator to come in and impose a collective

3   bargaining agreement. That's what Judge

4   Manderfield recognized and made it very clear in

5   her opinion. In fact, it was the response to

6   repeated questions from counsel. He wanted her

7   to add to her ruling. She was just going to deny

8   the restraining order, and he pressed her for

9   more. She said I'm going to rule. I'm making a

10   finding that the city can impose terms and

11   conditions of employment. And within a couple of

12   weeks of that decision, the city did so. Those

13   were lawful acts. And those were the baselines

14   that must guide any arbitrator going forward.

15     Your Honor, as to the balance of the

16   equities, we urge the Court to follow what the

17   court of claims decided. That it is a public

18   interest. We have the state's major city. This

19   issue affects the entire state not just Detroit.

20   It's so important the city is still running.

21   They're still in a deficit position. They're in

22   a deficit position even with these cost savings

23   that we're talking about that were imposed in

24   July. Those are part of the fiscal year budget

25   for 2013. That budget assumes these cost savings

1    will be realized.  If that is disturbed, the

2    situation is even more vicarious than it is right

3    now.

4            So the public interest, both for the

5    citizens of Detroit and the state require that

6    this injunction be denied categorically because

7    the plaintiff cannot show success on the merit.

8    They simply can't based on the election code.

9    And they cannot show the interest tilt in favor

10   of the plaintiff.  We urge the Court to deny it

11   by the request.  Thank you.

12           THE COURT:  Counsel.

13           MR. MURPHY:  Good morning, your

14   Honor, Michael Murphy appearing on behalf of the

15   attorney general.

16           As a practical matter, I think the

17   whole case is governed by MCR 2.116(C)(6).  We

18   have a case.  It's pending.  It's sitting in the

19   court of claims.  What no one is also mentioning

20   is plaintiff filed an emergency appeal from that

21   decision, which the court of appeals declined to

22   hear.  That case is still open, active.

23           THE COURT:  There's a stay.  At least

24   a request for a stay.

25           MR. MURPHY:  No.  There is a request

1    by the plaintiff to stay the action which is up

2    in September.  And they want to stay the entire

3    action pending the referendum.  So in the interim

4    PA4 was suspended, and then we had this case

5    filed which the only difference between the two

6    is the suspension of PA4 by referendum.  That

7    could have easily been brought in an amendment in

8    that case because it's still open.  She hasn't

9    issued a final ruling.  And then we'd go back and

10   argue that due to change in circumstances or the

11   change in the law, require the Court to give the

12   relief plaintiff is asking you to give them

13   today.  I believe this is just a duplication of

14   that case.

15        The third thing is that I agree with

16   counsel's representation that PA4, even though

17   suspended any acts done under it are not void.

18   They're valid when they were passed.  There's no

19   retroactivity to the suspension.  Therefore,

20   anything that was implemented while PA4 was in

21   effect, as Judge Murphy has indicated the same in

22   his opinion I'd like to point out because what we

23   hear a lot and I heard it in a lot of these cases

24   is democracy and the will of the people.

25        I don't dispute that we operate under

1      democracy and the will of the people, but we also

2      act.  And we have a republican form of

3      government, a representative form of government.

4      And to say the people have willed PA4 out of

5      existence is not accurate.  What we had is a

6      minority has suspended the will of the majority,

7      as expressed by the legislature, to suspend PA4.

8      We're in the middle of no man's land, limbo land

9      right now until the election in November when the

10     actual majority, when the will of the people will

11     be expressed.  If has not been expressed through

12     the petition and the referendum.

13           I believe because that, and, in fact,

14     this is September 1st this weekend.  We have

15     September, October and the election after that.

16     So we have two months or less until the election

17     when we know whether PA4 will be resurrected, so

18     to speak; that since the plaintiff has already

19     asked for a stay of everything in the court of

20     claims until that process is completed, this

21     Court should also stay everything until that

22     process is completed.  Why turn everything over

23     and right now and then in two months we go back

24     to PA4, and then we're back in here with all the

25     machinations of what would happen there.

1          I think it's best that this Court let

2     the CET stand as it should because it was valid

3     under PA4.  That's the status quo.  Maintain that

4     status quo until the election.  And then we'll

5     deal with the constitutionality of PA4 should the

6     voters approve it.  I think the biggest thing

7     here, and I've looked at all of this because I

8     had to deal with ment DPOA in the court of

9     claims.  All the claims are similar.  All the

10    harms claimed by the DPOA are the same today as

11    they were in the court of claims.

12         I personally sympathize with their

13    position.  I know to a certain extent what

14    they're going through.  I had wage freeze,

15    furlough days, cut pay.  It's a sign of the time.

16    We're in trouble times.  Not just the city of

17    Detroit, but the city of Flint, city of Inkster,

18    Detroit Public Schools, Muskegon Public Schools,

19    Highland Park Public Schools.  Allen Park is now

20    on the verge of financial abyss.  Your Honor s

21    probably aware they wanted the eliminate most of

22    the fire department in Allen Park.

23         This isn't a problem that's unique to

24    the city of Detroit although I will say it's

25    unique in the sense the city of Detroit is the

1    state of Michigan to a great extent.  Without it

2    if you go out of state, they know Detroit.  They

3    don't know Allen Park.  They don't know Lansing

4    to a certain extent.  You mention Detroit and

5    they know where you're coming from.  The

6    viability of the city to the state is critical.

7    I think the public interest would be very, very

8    much annihilated if we enter an injunction that

9    would give the DPOA what it wants and end up in

10   the long run destroying the city.  We're not

11   dealing with just DPOA.  We're dealing with 40

12   some unions in the city all Detroit all facing

13   the same terms and conditions.  Who's going to

14   flip the coin and say DPOA is more important than

15   the firefighter.  Or DPOA is more important the

16   people who pick up the garbage or drive the bus?

17   They are, because you can't do those functions

18   without them.  But at the same time this is a

19   cohesive unit.  This is a city that provide more

20   than one service, more than one thing for public

21   safety.  If you don't pick up the garbage, you

22   have a health problem; that's public safety.  But

23   you have --

24              (Outbursts from unidentified speakers

25   in the courtroom.)

1          THE COURT:  I'm going to clear this

2      courtroom if that keeps up.  You certainly have a

3      right to be here, but you do not have a right to

4      be disruptive.  Continue, counsel.

5          MR. MURPHY:  I think the public

6      interest is best served by the denial of the

7      injunction because the city of Detroit must

8      survive.  And it won't survive if we have to go

9      back to the way things were.  We have to remember

10     that the CBA expired the end of June.  There was

11     no contract in place when the CET was

12     implemented.  That is the status quo that we're

13     operating under now.  The public would be

14     disserved by entering this injunction.  I think

15     that's a critical factor for the Court to look

16     at.

17          THE COURT:  Counsel, briefly.

18          MR. IORIO:  Thank you.

19          THE COURT:  I think you need to

20     answer his question.

21          MR. IORIO:  And I will when --

22          THE COURT:  No, the question is why

23     shouldn't all of this be stayed until after the

24     election in November?

25          MR. IORIO:  Because of the

1    irreparable harm.  Act 312 says it should not --

2            THE COURT:  You couldn't get to an

3    Act 312 before November.

4            MR. IORIO:  We're there.  The

5    arbitrator has been appointed.  We're willing to

6    accelerate.  Act 312 doesn't say we have to get

7    there.  It simply says we have to invoke it.

8            I'd like to address the claim.  The

9    city whether it be intervenor city or Bing or

10   whomever, they all make the argument the

11   viability of the city depends on this action.  We

12   agree.  The city is not going to be viable if it

13   doesn't have a police department.  Public safety

14   begins and end with police, and that's these

15   officers in this courtroom, these officers who

16   are overwhelmed, overwork and out gunned.  And to

17   talk about irreparable harm, while we can

18   commensurate with Mr. Jarvis, he doesn't have the

19   protection of Act 312.  He doesn't put his life

20   on the line like officers do.

21           To answer Mr. Murphy's question who's

22   going to say who's more important that the other?

23   The legislature has already made that

24   determination.  They decided police officers and

25   firefighters get preferential treatment.  They

1     said they get Act 312 protection and that the

2     city cannot change their status quo during the

3     pendency of Act 312 regardless of whether there's

4     any kind of ability to pay.  Act 312 is designed

5     to answer the inability to pay argument.

6     Arbitrator George Romel is an empowered and

7     experienced arbitrator who has the authority to

8     be able to resolve that question, so that the

9     DPOA can test and examine the voracity of the

10    city's position, which quite frankly we believe

11    in a $1.2 billion budget the fact that the city

12    hasn't properly prioritized and allocated its

13    resource appropriately, that's the issue as it

14    relates to ability to pay.  That's the reason

15    Mayor Bing wanted to do away with the law

16    department because we have duplicative services.

17    We wouldn't need to have multi law firms here,

18    outside expenses.  Those are the types of wasted

19    dollars that are incurring on the backs of police

20    officers.

21         You talk about the viability of the

22    city, your Honor.  We agree; we stand with Mr.

23    Murphy on that.  The problem is that the city's

24    structural problem which exists and it's been

25    ongoing for 15 or 20 years, it's not police

1     officers wages, terms and condition of

2     employment.  The city has already succeeded in

3     compressing their compensation to the bottom of

4     the barrel.  They've conceded.  With that success

5     comes consequences.  And the consequences that

6     the city is reeking is a deteriorating police

7     department.  Officers are fleeing the door.  The

8     city is telling them you better leave because you

9     won't be able to provide, and we don't care if

10    you can't provide for your family.  That's been

11    the city's M.O., whether it be this

12    administration or prior administrations for the

13    past 20 years.  We've experienced the result.

14    Detroit has experienced the result of that page

15    from that book which is crime continues to

16    explode.  If prosperous people leave a once

17    vibrant city of near two million is now down to

18    700,000.  Why is that?  Because people are

19    afraid, and they're not going to live where they

20    believe the police department cannot protect and

21    serve.  And when they leave, they take their tax

22    dollars with them.

23         To think to continue the follow the

24    same tried and unsuccessful policy and double

25    down on it is going to produce different result,

1         that it's going to stop the homicide for which

2         there's 240 as of today. It's going stop the

3         carjacking, stop the violence and lead people

4         back into the city? It's the very definition of

5         insanity. So the DPOA submits that this Court

6         has the ability and it should exercise its

7         authority to grant the injunctive relief to

8         uphold public safety and insure citizens are

9         protected. If that were to occur, exactly what

10        happened less a year ago when the parties sat

11        down and negotiated because Judge Kustis issued

12        an injunction. And it forced the city to the

13        bargaining table which resulted in nearly $100

14        million in savings. The same thing would occur

15        in this situation.

16             The DPOA and its police officers are

17        entitled to their statutory rights. We'd simply

18        ask they be enforced as written. Thank you.

19             THE COURT: Your right, counsel,

20        sometimes decisions are very difficult. This is

21        a very difficult one for me because I understand

22        that police officers work hard. They put

23        themselves in harms way to protect the public.

24        And they deserve every dollar they earn.

25        However, I'm limited by the law here. The motion

1    presented to me is pursuant to 3.3110 and 2.605.

2    The plaintiff requesting injunctive and

3    declaratory relief compelling defendant to

4    maintain the status quo required by section 13 of

5    Act 12 and MCL 423.243 and to cease and desist

6    from imposing terms and conditions of employment

7    pursuant to Public Act No. 4 of 2011 on or after

8    August 8, 2012 suspension of said act due to

9    Board of State Canvassers certifying the

10   referendum.

11          The standards for such extraordinary

12   relief, and it is extraordinary relief are: The

13   likelihood the party seeking the injunction will

14   prevail on the merits; The danger that the party

15   seeking the injunction will suffer irreparable

16   harm if the injunction is not issued; the risk

17   that the part seeking the injunction would be

18   harmed more by the absence of an injunction that

19   the opposing party would be by granting of the

20   relief; and fourth, the harm to the public

21   interest if the injunction is issued.

22          A party requesting such extraordinary

23   relieve must prevail on all four of these

24   factors.  Here, I've decided the injunction must

25   be denied based on two basis.  First of all, the

1       harm to the public interest if an injunction is

2       issued.  Here, given the city --

3               The first is harm to the public

4       interest if the injunction is issued.  Here,

5       given the city's dire financial condition and the

6       consequences of returning to the expired

7       collective bargaining agreement threatens the

8       city's overall financial stability.

9               If the DPOA members are not subject

10      to the cuts, then those cuts would have to be

11      made to other public safety operations and other

12      critical service areas endangering the city and

13      the public as a whole.  But the stronger reason

14      to me is that DPOA cannot prevail on the merits

15      of their claim.  At issue here are actions taken

16      under Public Act 4 Section 14a subsection 10 and

17      section 15a of PERA.  Essentially these laws

18      state that when an employer enters into a PA4

19      consent agreement, there's no duty to bargain

20      once existing union contracts expire.  Once

21      existing contract expire the employer has a

22      legally unrestricted right to make changes in

23      wages, hours and terms and conditions of

24      employment.

25              Here, between the city and the

1       plaintiff the CBA has expired as was terminated

2       on June 30th, 2012.  On July 18th, 2012, the CET

3       was imposed on plaintiff, and other city

4       employees have been subject to same kinds of

5       changes in employment.

6               Plaintiff's theory that anything done

7       under Public Act 4 that it's necessarily void now

8       that it has suspended is not legally supportable.

9       Article 2 section 9 of our Michigan Constitution

10      provides no law as to which the power of

11      referendum properly has been invoked shall be

12      effective thereafter unless approved by the

13      majority of the electorates voting thereupon at

14      the next general election.  This same article is

15      codified in MCL 168.477 subsection 2 which

16      states, a law that is the subject of a referendum

17      continues to be effective until the referendum is

18      properly invoked which occurs when the State

19      Board of Canvassers makes its official

20      declaration of the sufficiency of the referendum

21      petitions.  Thus, the actions taken under PA4

22      prior to the suspension are valid and are the

23      status quo as of August 8th, 2012.

24              I believe that my colleague, Judge

25      Murphy, and my colleague in Lansing have reached

1       the same result.  To change the status quo at

2       this point would be catastrophic to the city as

3       well as to the union.

4              Your motion for declaratory relief

5       and injunction is denied, counsel.

6              MR. SERYAK:  Thank you, your Honor.

7       Is your Honor dissolving the temporary

8       restraining order?

9              THE COURT:  Yes.

10             MR. JARVIS:  Is the Court also

11      dismissing the complaint, Judge?

12            THE COURT:  Yes.  So you have a final

13      order that you can appeal at least from this

14      Court.

15            MR. IORIO:  Thank you.

16           (Whereupon proceedings concluded.)

17          -   -   -

18

19

20

21

22

23

24

25

1    STATE OF MICHIGAN )

2                      )  SS

3    COUNTY OF WAYNE   )

4

5

6            R E P O R T E R ' S   C E R T I F I C A T E

7

8            I, Shelee Beard, CSR-5493, do hereby

9    certify that I have recorded the proceedings had and

10   testimony taken in the above-entitled matter at the

11   time and place hereinbefore set forth and that the

12   foregoing is a full, true and correct transcript of

13   proceedings had in the above-entitled matter; and I do

14   further certify that the foregoing transcript has been

15   prepared by me or under my direction.

16

17

18

19   _____
     Shelee D. Beard, CSR-5493
20   1107 Coleman A. Young Municipal Center
     Detroit, MI  48226
21   (313) 224-5225

22

23

24

25

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DETROIT POLICE OFFICERS ASSOCIATION,

      Plaintiff,

                        Case No.: 12-010859-CL

v.

                        Hon. Kathleen MacDonald

CITY OF DETROIT, a Municipal Corporation,

      Defendant

MAYOR DAVID BING,

      Proposed Intervenor-Defendant

ATTORNEY GENERAL BILL SCHUETTE
and STATE TREASURER ANDY DILLON

      Proposed Intervenor-Defendants

12-010859-CL

FILED IN MY OFFICE
WAYNE COUNTY CLERK
9/19/2012 3:44:23 PM
CATHY M. GARRETT
K. Davis

| | |
|---|---|
| Donato Iorio | Andrew R. Jarvis (P59191) |
| Fillipe S. Iorio | City of Detroit Law Department |
| Kalniz, Iorio & Feldstein, Co. L.P.A. | 660 Woodward Avenue, Suite 1650 |
| 4981 Cascade Rd., SE | Detroit, MI 48226 |
| Grand Rapids, MI 49546 | Phone: 313 237 5038 |
| (616) 940-1911 | Attorneys for City of Detroit |
| Attorneys for Plaintiff | |
| | |
| Michael F. Murphy (P-29213) | John Willems  (P-39318) |
| Attorney for Defendants Attorney General Bill | Michael McGee (P-36541) |
| Schuette and Treasurer Andy Dillon | Miller, Canfield, Paddock And Stone, P.L.C. |
| Department of Attorney General | Attorneys for Defendant Mayor David Bing |
| State Operations Division | 150 West Jefferson, Suite 2500 |
| P.O. Box 30754 | Detroit, Michigan  48226 |
| Lansing, MI 48909 | (313) 963-6420 |
| (517) 373-1162 | willems@millercanfield.com |
| | mcgee@millercanfield.com |

## ORDER DENYING PLAINTIFF'S MOTION FOR A STAY OF PROCEEDINGS/INJUNCTION PENDING APPEAL

At a session of said Court held in the City of Detroit,
County of Wayne and State of Michigan

ON: _____September 19, 2012_____

PRESENT: HON. _____Kathleen Macdonald_____

CIRCUIT COURT JUDGE

This matter having come for hearing before this Court on September 18, 2012 on Plaintiff Detroit

Police Officer's "Motion for a Stay of Proceedings/Injunction Pending Appeal" pursuant to MCR

2.614(C), and the Court having read and considered the pleadings, briefs, and affidavits filed by the

parties, and the Court having heard oral argument from counsel for Plaintiff, the City of Detroit, Mayor

Bing, and the Attorney General and State Treasurer in open Court; and the Court being otherwise fully

advised in the premises;

IT IS HEREBY ORDERED AND ADJUDGED that for the reasons stated by the Court on the

record at the September 18, 2012 hearing, Plaintiff's Motion for a Stay of Proceedings/Injunction Pending

Appeal pursuant to MCR 2.614(C) shall be and hereby is **DENIED**.

**PURSUANT TO MCR 2.602(A)(3), THIS IS A FINAL ORDER THAT RESOLVES**

**THE LAST PENDING CLAIM AND CLOSES THE CASE.**

/s/ Kathleen Macdonald

CIRCUIT COURT JUDGE

Stipulated as to form only:

Donato Iorio
Fillipe S. Iorio
Kalniz, Iorio & Feldstein, Co., L.P.A.
Attorneys for Plaintiff

Michael F. Murphy (P-29213)
Attorney for Defendants Attorney General Bill
Schuette and Treasurer Andy Dillon
Department of Attorney General
State Operations Division

Andrew R. Jarvis (P59191)
City of Detroit Law Department
Attorneys for City of Detroit

John Willems (P-39318)
Michael McGee (P-36541)
Miller, Canfield, Paddock And Stone, P.L.C.
Attorneys for Proposed Intervenor-Defendant Mayor
David Bing

-2-

# Court of Appeals, State of Michigan

## ORDER

Detroit Police Officers Association v City of Detroit

Docket No. 311317

LC No. 12-000080-MK

William B. Murphy, C.J.
Presiding Judge

David H. Sawyer

Joel P. Hoekstra
Judges

The motion for immediate consideration of the application for leave to appeal is GRANTED.

The Court orders that the application for leave to appeal is DENIED for lack of merit in the grounds presented.

The motion for immediate consideration of the motion for stay and/or injunction pending appeal is GRANTED.

The motion for stay and/or injunction pending appeal is DENIED.



A true copy entered and certified by Larry S. Royster, Chief Clerk, on

JUL 2 5 2012
Date

Chief Clerk

STATE OF MICHIGAN



Dept of Attorney General

OCT 1 0 2012

State Operations Division
RECEIVED

THIRTIETH JUDICIAL CIRCUIT
*Veterans Memorial Courthouse*

October 8, 2012

Mr. Andrew A. Paterson
Paterson Law Office
46350 Grand River Ave., Ste. C
Novi, MI 48374

Ms. Kathleen Cavanaugh
Mr. Joshua O. Booth
Assistant Attorneys General
P.O. Box 30754
Lansing, MI 48909

Mr. John Willems
Mr. Michael J. Hodge
Mr. Michael McGee
Miller, Canfield, Paddock & Stone, PLC
150 W. Jefferson Ave., Ste. 2500
Detroit, MI 48226

Mr. James D. Noseda
City of Detroit Law Dept.
660 Woodward Ave., Ste. 1650
Detroit, MI 48226

Re: *Citizens United Against Corrupt Government, et al. v City of Detroit Financial Review Team, et al.*
Ingham County Case No.: 12-698-CZ

Dear Counsel:

    Enclosed please find an Opinion and Order.

    Sincerely,

*Jean M Smydra*

Jean M. Smydra
Judicial Assistant to Judge Manderfield

Enclosure

313 West Kalamazoo Street   P.O. Box 40771   Lansing, MI 48901-7971   (517) 483-6426   Fax: (517) 483-6536   pmanderfield@ingham.org
13-53846-tjt   Doc 11102-7   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 75 of
120

STATE OF MICHIGAN

IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM

GENERAL TRIAL DIVISION

**CITIZENS UNITED AGAINST
CORRUPT GOVERNMENT and
AFSCME COUNCIL 25,**

**OPINION AND ORDER**

          Plaintiffs,

Case No.: 12-698-CZ

v

Hon. Paula J.M. Manderfield

**CITY OF DETROIT FINANCIAL
REVIEW TEAM, DETROIT CITY
COUNCIL, and ANDY DILLON,**

          Defendants,

and

**MAYOR DAVE BING,**

          Intervenor Defendant.

_____/

      This case arises from a challenge to the validity of the Financial Stability

Agreement entered into between the City of Detroit and the State of Michigan under

Public Act 4 ("PA 4"). Defendants City of Detroit Financial Review Team ("the

Financial Review Team") and Andy Dillon ("Dillon") seek dismissal under MCR

2.116(C)(8). Mayor Dave Bing ("the Mayor") seeks dismissal under MCR 2.116(C)(8)

and (C)(10).

      For the reasons set forth below the Court grants Defendants' motions.

13-53846-tjt   Doc 11102-7   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 76 of
120

## BACKGROUND

Plaintiff Citizens United Against Corrupt Government ("Citizens") was previously dismissed for lack of standing. Prior to that dismissal Citizens filed a First Amended Complaint adding AFSCME Council 25 ("AFSCME"). AFSCME is a local trade union. Defendant Dillon is both the State Treasurer and a member of the Financial Review Team. As the State Treasurer, he is the State Financial Authority for purposes of this case.

This case concerns actions taken pursuant to PA 4 (the Local Government and School District Fiscal Accountability Act, also referred to as the Emergency Financial Manager Act).[1] Under the act, Dillon is vested with the authority to conduct a preliminary review of the finances of any local unit of government that he deems necessary.[2] In December 2011, Dillon undertook a review of the City of Detroit's finances in order to determine whether or not a financial emergency existed in the City's finances.

After Dillon's review of the City's finances, he reported to the Governor and advised that he found "probable financial stress," and requested the Governor to appoint a Financial Review Team under PA 4. As required by PA 4, Dillon was appointed as one of the ten members of the Team.[3]

The Financial Review Team was tasked with examining the City's finances to determine whether or not a financial emergency existed that would warrant the appointment of an emergency manager or some other less severe remedy. Under PA 4 the Financial Review Team had the authority to negotiate and sign a consent agreement

---

[1] MCL 141.1501, *et seq.*
[2] MCL 141.1512(1).
[3] MCL 141.1512(4).

2

with the City's Chief Administrative Officer (the Mayor).[4]  After review, the Financial

Review Team was required to issue a report to the Governor reaching one of the

following four conclusions:

> 1. The local government is not in financial stress or is in a condition of mild financial stress;
>
> 2. The local government is in a condition of severe financial stress, but a consent agreement containing a plan to resolve the problem has been adopted;
>
> 3. The local government is in a condition of severe financial stress, and a consent agreement has not been adopted; or
>
> 4. A financial emergency exists and no satisfactory plan exists to resolve the emergency.[5]

The Financial Review Team concluded that the City of Detroit was in severe financial

stress and that a consent agreement had not been adopted in its report to the Governor.

Dillon acting in his capacity as the State Financial Authority had the authority to

approve and execute a consent agreement negotiated by the Financial Review Team.

Under PA 4, the Detroit City Council had the authority to approve by resolution or

disapprove any consent agreement negotiated by the Financial Review Team.

On April 4, 2012, the Financial Review Team convened a public meeting.  At that

meeting Dillon advised the Team of the various meetings he had held with the City and

with City Council staff.  Dillon explicitly stated that at those meetings he was not acting

in his capacity as a member of the Team, but rather in his capacity as the State Treasurer.

Following Dillon's report, the Financial Review Team voted to approve a consent

agreement with the City of Detroit (the Financial Stability Agreement, referred to here as

---

[4] MCL 141. 1513(1)(c).
[5] MCL 141.1513(4).

the FSA). That same day the City Council voted by resolution to approve the FSA, and Dillon, acting in his capacity as the State Financial Authority, approved and executed the FSA.

The Governor signed the FSA after determining that the City was in severe financial stress and the consent agreement contained a plan to resolve the financial stress under PA 4.

In the First Amended Complaint, four counts are stated:

> Count I: The FSA is void because it was not properly negotiated;
>
> Count II: Sections 1.1 and 1.3 of the FSA violate the Michigan Constitution;
>
> Count III: Section 4 of the FSA violates PA 4; and
>
> Count IV: Plaintiff is entitled to costs and attorney's fees.

The Financial Review Team, Dillon, and the Mayor move for summary disposition as to all four counts.

## ANAYLSIS

### Standard of Review

The standard of review has been accurately stated in the parties' briefs and will not be repeated here.

### Discussion

#### Standing:

The Financial Review Team and Dillon assert that AFSCME lacks standing to bring this action for declaratory relief because an actual controversy must exist, and here there is no such actual controversy. The Court agrees.

4

The Michigan Supreme Court set forth the general rule regarding standing as follows:

> A litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.[6]

Relying on the first sentence of the above, AFSCME directs the Court to MCL 600.2041(3) and MCR 2.201(B)(4)(a). Each of these provides that an action to prevent the illegal expenditure of state funds or to test the constitutionality of a statute related thereto may be brought in the name of a domestic nonprofit corporation organized for civic, protective, or improvement purposes. AFSCME asserts that it is hereby attempting to prevent the illegal expenditure of state funds to implement the FSA, and therefore it has standing.

AFSCME has overlooked or ignored the fact that this action is an action for declaratory judgment. In order to have standing to seek declaratory relief, an "actual controversy" must exist.[7] An actual controversy exists "when a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve legal rights."[8] It does not exist when issues are merely hypothetical.[9] As the Michigan Court of Appeals has stated:

---

[6] *Lansing Schools Education Ass'n v Lansing School District Bd of Educ*, 487 Mich 349, 372; 792 NW2d 686 (2010).

[7] MCR 2.605(A)(1); *Int'l Union, United Auto, Aerospace, & Agriculture Implement Workers of America v Central Michigan Univ Trustees*, 295 Mich App 486, 494-495; 815 NW2d 132 (2012).

[8] *Id.*, at 495.

[9] *Id.*

5

> The essential requirement of an actual controversy under the rule is that the plaintiff pleads and proves facts that demonstrate an adverse interest necessitating the sharpening of the issues raised.

*Id.*

Here, AFSCME is not a party to the FSA, and therefore has no interest in the manner the FSA was negotiated, whether the FSA violates the Constitution, or whether it violates PA 4. As a result, there is no need for the Court to guide AFSCME's conduct or sharpen any issues for the future. Since there is no "actual controversy," AFSCME lacks standing to bring Counts this case.

The Court notes that AFSCME has argued that it has standing because:

> [I]t has been adversely affected differently from the citizens at large considering its members have been adversely affected with the unilaterally [sic] implementation of new work rules and collective bargaining agreements without having the opportunity to bargain in accordance with PERA.[10]

However, any injury to AFSCME's right to bargain under PERA is the result of the operation of PA 4 and the FSA, and not the result of the manner in which the FSA was negotiated. Likewise, any such injury to AFSCME also is not the result of certain sections of the FSA being unconstitutional or in violation of PA 4. Thus, there is no factual or legal link between the manner in which the FSA was negotiated, its constitutionality, or its legality in relation to PA 4, and any adverse affect on AFSCME's right to bargain under PERA. Accordingly, this argument is unavailing.

Although this Court does not believe Plaintiff has standing, the Court elects address the remaining arguments.

---

[10] AFSCME's complaint, Paragraph 36.

## Count I – FSA Improperly Negotiated:

Defendants argue that Count I should be dismissed because nothing in PA 4 either requires the Financial Review Team as a whole to negotiate a consent agreement, or bars the Financial Review Team from delegating the power to negotiate a consent agreement to a single member of the Team. The Court agrees.

MCL 141.1513(c) states in relevant part as follows:

> The review team shall have full power in its review to perform all of the following functions:
>
> * * *
>
> (c) Negotiate and sign a consent agreement with the chief administrative officer of the local government.

AFSCME asserts that this statute gives the Financial Review Team the exclusive authority to negotiate a consent agreement. AFSCME then notes that Dillon negotiated the terms of the FSA acting in his role as State Treasurer, and therefore asserts that the FSA was improperly negotiated and must be deemed void.

However, such an interpretation is contrary to the terms of the statute itself. The plain language merely grants the Financial Review Team the power to negotiate a consent agreement. It does not restrict that power exclusively to the Financial Review Team as a whole.

Moreover, a review of PA 4 as a whole confirms the Court's interpretation. PA 4 explicitly provides that the State Treasurer, as the State Financial Authority, has the authority to insist that certain terms be included in a consent judgment.[11] Nothing in PA

---

[11] MCL 141.1415a.

4 bars or prohibits the State Treasurer from negotiating or participating in the negotiation of a consent judgment, and nothing in the Act bars the Financial Review Team from delegating its authority to negotiate, in part or in whole, to one of its team members.

Likewise, there is nothing in the Michigan Court of Appeals' decision in *Davis v City of Detroit Financial Review Team*,[12] referenced and relied upon by Plaintiff, that says the Financial Review Team has exclusive authority to negotiate the terms of a consent judgment, or that PA 4 bars the Team from delegating its negotiating authority to one of its team members.

Moreover, although Dillon conducted meetings with various City officials and discussed terms of a consent agreement while acting as State Treasurer, ultimately the entire Financial Review Team met at a public meeting and reviewed the consent agreement, provision by provision, and approved or amended the consent agreement before taking a final vote to approve the FSA. Therefore this Court finds that the FSA was negotiated in compliance with PA 4, and Plaintiff has failed to state a claim as to Count I.

### Count II – Sections 1.1 and 1.3 of FSA Violate Constitution:

In Count II Plaintiff asserts that the FSA violates Article 9, Section 17 and Article 4, Section 30 of the Michigan Constitution, because the FSA requires the State to pay money out of the treasury for a local purpose without any appropriation for that expenditure having been made.

---

[12] *Davis v Financial Review Team*, ___ Mich App ___; ___ NW2d ___ (2012)

The Court previously ruled in this case that Citizens had failed to state a claim in Count II, because the obligations agreed to by the State in the FSA were for a State purpose and there was an appropriation passed by a two-thirds vote of the Legislature for these expenditures.[13] Because AFSCME's arguments are identical, that ruling controls and Count II must be dismissed.

### Count III – Sections 4.1 and 4.3 of FSA Violate PA 4:

Defendants assert that Count III must be dismissed because Sections 4.1 and 4.3 do not grant the Mayor any power that was expressly reserved to an emergency manager under PA 4. Again the Court agrees.

### Section 4.1:

The Financial Review Team and Dillon note that Section 4.1 of the FSA explicitly provides that the authority granted in that Section in regard to rejecting, modifying, or terminating collective bargaining agreements only exists to the "extent authorized by law."[14] By its very terms the powers granted in Section 4.1 are only granted to the extent that they are allowed by PA 4. The Mayor makes the same argument, and buttresses this argument with an affidavit from the City Labor Relations Director, Lamont Satchel, which states that the Mayor does not interpret his powers under Section 4.1 to include the powers enumerated under MCL 141.1519(1)(k), and has not and will not exercise such power.[15]

---

[13] Transcript of hearing on MSD, pp 30-32.
[14] FSA, Section 4.1.
[15] Affidavit of Lamont Satchel, attached to the Mayor's brief directly before Exhibit 1, p 3.

**Section 4.3**:

The Financial Review Team and Dillon note that MCL 141.1519(1)(k) grants emergency managers the exclusive power to reject, modify, or terminate one or more terms and conditions of an **existing** collective bargaining agreement. Only actions relating to **existing** collective bargaining agreements cannot be granted to the mayor pursuant to MCL 141.1514a(9). Section 4.3 of the FSA provides a procedure to follow when a collective bargaining agreement **has expired** and new employment terms must be established. Accordingly, Section 4.3 of the FSA does not grant the Mayor the exclusive powers granted to emergency managers in MCL 141.1519(1)(k), and therefore does not violate MCL 141.1514a(9).

The Mayor notes that while MCL 141.1514a(9) bars the grant to the Mayor of the powers set forth in MCL 141.1519(1)(k), that same statute provides for the grant to the Mayor of any of the other powers prescribed for emergency managers in MCL 141.1519. The Mayor further notes that Section 4.3 explicitly provides that the powers granted therein are granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(DD)(i), or other applicable law. Nowhere does Section 4.3 indicate that it includes a grant of the powers set forth in MCL 141.1519(1)(k). Moreover, AFSCME cannot point to any instance where the Mayor rejected, modified, or terminated one or more terms and conditions of an **existing** collective bargaining agreement. The fact that no such action has been taken itself suggests that Section 4.3 does not grant such authority.

**The Court's Analysis**:

PA 4 allows a consent agreement to include a grant to the chief administrative officer (Mayor Bing) of one or more of the powers prescribed for emergency managers.[16] It also provides that this grant of powers may not include powers prescribed for emergency managers in MCL 141.1519(1)(k) of PA 4.[17] MCL 141.1519(1)(k) grants an emergency manager the power to:

> After meeting and conferring with the appropriate bargaining representative and, if in the emergency manager's sole discretion and judgment, a prompt and satisfactory resolution is unlikely to be obtained, reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement.

Section 4.1 of the FSA provides as follows:

> The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

Section 4.3 of the FSA provides as follows:

> The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director. Upon the prior approval of the Financial Advisory Board following consultation with the Program management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g)

---

[16] MCL 141.1514a(9).
[17] *Id.*

and 141.1519(DD)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3

AFSCME asserts that the powers granted to the Mayor in these sections falls within those powers exclusively granted to the emergency manager in MCL 141.1519(1)(k) and barred to the chief administrative officer of the local government in MCL 141.1514a(9), and therefore asserts that Section 4.1 and 4.3 violate PA 4.

The Court finds Defendants' arguments to be the more persuasive, and for those reasons finds that Sections 4.1 and 4.3 of the FSA do not violate the terms of PA 4. Therefore Plaintiff has failed to state a claim in Count III.. To the extent that this Court previously ruled Sections 4.1 and 4.3 of the FSA invalid, the Court hereby reconsiders and reverses that ruling.

## Count IV – Costs and Attorney's Fees:

Based on the above rulings, Count IV for costs and attorney's fees is moot.

Finally, the Court notes that AFSCME has argued that because PA 4 has been suspended, the FSA also should be suspended. This argument was raised for the first time in AFSCME's response brief, and therefore is not properly before this Court and will not be considered.

## ORDER

**IT IS HEREBY ORDERED** that Defendants' Motions for Summary Disposition are **GRANTED** pursuant to MCR 2.116(C)(8) as to all counts.

This order resolves the last pending claim and closes this case.

October 8th, 2012

Hon. Paula J.M. Manderfield (P-34319)
Circuit Court Judge

# PROOF OF SERVICE

I hereby certify that I served a copy of the Opinion and Order upon the attorneys of record by placing said document in an envelope addressed to each attorney and placing same for mailing with the United States Mail at Lansing, Michigan, on October 8, 2012.


*Jean M Smydra*

Jean M. Smydra
Judicial Assistant to Judge Manderfield


cc:    Andrew A. Paterson
Paterson Law Office
46350 Grand River Ave., Ste. C
Novi, MI 48374

Kathleen Cavanaugh
Joshua O. Booth
Assistant Attorneys General
P.O. Box 30754
Lansing, MI 48909

John Willems
Michael J. Hodge
Michael McGee
Miller, Canfield, Paddock & Stone, PLC
150 W. Jefferson Ave., Ste. 2500
Detroit, MI 48226

James D. Noseda
City of Detroit Law Dept.
660 Woodward Ave., Ste. 1650
Detroit, MI 48226

STATE OF MICHIGAN
COURT OF CLAIMS

DETROIT POLICE OFFICERS
ASSOCIATION,

     Plaintiff,

v

CITY OF DETROIT, a Municipal Corporation;
DAVID BING, Mayor of City of Detroit; KIRK
J. LEWIS, Deputy Mayor (Acting as Mayor) of
City of Detroit; CITY COUNCIL, City of
Detroit; ANDY DILLON, State Treasurer;
THE FINANCIAL REVIEW TEAM FOR THE
CITY OF DETROIT; STATE OF MICHIGAN;
RICK SNYDER, Governor; RALPH L.
GODBEE, Chief of Police, City of Detroit;

     Defendants.

No. 12-80-MK

HON. PAULA J.M.
MANDERFIELD

**ORDER DENYING**
**PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

---

Donato Iorio (P57423)
Attorney for Plaintiffs
Kalniz, Iorio & Feldstein, Co., L.P.A.
P.O. Box 352170, 5550 W. Central Ave.
Toledo, OH 43635-2170
419-537-4825  Fax: 419-535-7732

Fillipe S. Iorio (P58741)
Attorney for Plaintiffs
Kalniz, Iorio & Feldstein
4981 Cascade Rd. S.E.
Grand Rapids, MI 49546
616-940-1911  Fax: 616-940-1942

---

Michael F. Murphy (P29213)
Attorney for Defendants State of MI,
Dillon, Snyder, Review Team
Michigan Department of Attorney General
State Operations Division
P.O. Box 30754
Lansing, MI 48909
517-373-1162  Fax: 517-373-2060

Margaret A. Nelson (P30342)
Attorney for Defendants State of MI,
Dillon, Snyder, Review Team
MI Department of Attorney General
Public Employment, Elections & Tort
P.O. Box 30736
Lansing MI 48909
517-373-6434

---

John H. Willems (P31861)
Miller Canfield Paddock & Stone PLC
Attorney for Mayor Bing, Deputy Mayor
Lewis, and Chief of Police Godbee
150 W Jefferson Ave., Ste. 2500
Detroit, MI 48226
(313) 963-6420  Fax: (313) 496-8453

Andrew R. Jarvis (P59191)
City of Detroit Law Department
Attorney for City of Detroit and City
Council
660 Woodward Ave Ste 1650
Detroit, MI  48226
(313) 237-5038  Fax: (313) 224-5505

_____/

At a session of said Court held in the
Court of Claims, City of Lansing,
County of Ingham, State of Michigan,

on _____7/9/12_____

PRESENT:  HON. _____

This matter having come before the Court on Plaintiff's Motion for a

Preliminary Injunction; the Court having considered the pleadings, briefs, and

argument of counsel; and the Court being otherwise fully advised in the premises;

IT IS HEREBY ORDERED that Plaintiff's Motion for a Preliminary

Injunction is DENIED as to the ~~State~~ *ALL* Defendants for the reasons stated from the

bench on July 9, 2012 and incorporated herein.

_____
COURT OF CLAIMS JUDGE

2012-0016050-A\Detroit Police Officers Assoc v City of Detroit\ Order Denying PI

2

INGHAM COUNTY CIRCUIT COURT
PO BOX 40771
LANSING, MI 48901

CLERKS' NOTICE
FILE NUMBER: 12-000698-CZ-C30
JUDGE PAULA J. M. MANDERFIELD

DAVE BING  c/o  MEGAN P. NORRIS
150 W JEFFERSON #2500
DETROIT, MI 48226

## Official Circuit Court Notice        October 9, 2012

CITIZENS UNITED AGAINST CORRUPT GOVERNMENT VS CITY OF DETROIT FINANCIAL REVIEW TEAM et al

NOTICE IS HEREBY GIVEN PURSUANT TO COURT RULE OF THE FILING OF THE FOLLOWING IN THIS CASE

OPINION / ORDER THAT DFS` MOTIONS FOR SUMMARY DISPOSITION ARE GRANTED AS TO ALL COUNTS - THIS ORDER RESOLVES THE LAST PENDING CLAIM AND CLOSES THE CASE (SIGNED BY JUDGE MANDERFIELD ON 10/8/12)

K KIRK,
DEPUTY CLERK OF THE COURT





1    STATE OF MICHIGAN
              COURT OF CLAIMS
2


3
      DETROIT POLICE OFFICERS
4     ASSOCIATION,

5                      Plaintiff,

6     v                                    Case No. 12-80-MK
                                 Hon. Paula J.M. Manderfield
7     CITY OF DETROIT, et al.,

8                      Defendants.
      _____/
9
                  MOTION FOR PRELIMINARY INJUNCTION
10                      MOTION FOR STAY

11        BEFORE THE HON. PAULA J.M. MANDERFIELD, CIRCUIT JUDGE

12           Ingham County, Michigan - Monday, July 9, 2012


13
      APPEARANCES:
14    For the Plaintiff:   FILLIPE S. IORIO (P58741)
                           Kalniz, Iorio & Feldstein
15                         4981 Cascade Rd., SE
                           Grand Rapids, MI 49546
16
                           DONATO IORIO (P57423)
17                         Kalniz, Iorio & Feldstein, Co., LPA
                           P.O. Box 352170
18                         Toledo, OH  43635-2170

19    For Defendants State of MI, Dillon, Snyder, Financial
      Review Team:         MICHAEL F. MURPHY (P29213)
20                         Assistant Attorney General
                           State Operations Division
21                         P.O. Box 30754
                           Lansing, MI 48909
22
      For Defendant City of Detroit:
23                         ANDREW R. JARVIS (P59191)
                           City of Detroit Law Department
24                         660 Woodward Avenue
                           Suite 1650
25                         Detroit, MI 48226

1

```
 1          For Defendants Bing, Lewis, and Godbee:
                               MICHAEL J. HODGE (P25146)
 2                             JOHN WILLEMS (P39318)
                               Miller, Canfield, Paddock & Stone, PLC
 3                             One Michigan Avenue
                               Suite 900
 4                             Lansing, MI 48933-1609

 5

 6          REPORTED BY:       Melinda I. Dexter, RPR, CSR-4629
                               Official Court Reporter
 7                             313 W. Kalamazoo
                               Post Office Box 40771
 8                             Lansing, MI  48901-7971

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2

<pre>
 1                    T A B L E   O F   C O N T E N T S

 2

 3

 4

 5        WITNESSES:

 6             None

 7

 8

 9

10

11        EXHIBITS:

12             None

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

3

Ingham County, Michigan
Monday, July 9 2012 - 2:27 p.m.
THE COURT: Please be seated. Okay. This is the Detroit Police Officers Association versus the City of Detroit, et al., Docket 12-80-MK. This is the time set for a hearing on the TRO.
And who's here on behalf of the Plaintiff?
MR. FILLIPE IORIO: Your Honor, Fill Iorio on behalf of the DPOA.
THE COURT: Okay.
MR. DONATO IORIO: Your Honor, Donato Iorio on behalf of the DPOA.
THE COURT: Okay. And who's here on behalf of the Defendants?
MR. JARVIS: Good afternoon, your Honor. Andrew Jarvis, assistant corporation counsel with the City of Detroit, for the City of Detroit.
THE COURT: Okay.
MR. WILLEMS: Your Honor, John Willems on behalf of Mayor David Bing, Deputy Mayor Kirk Lewis, and Chief of Police Ralph Godbee.
THE COURT: Okay. And you're Mr. Givens? Are you Mr. Givens?
MR. WILLEMS: Mr. Givens is not here.
THE COURT: Okay. And what is your name again?

4

MR. WILLEMS: John Willems, W-i-l-l-e-m-s.
THE COURT: Yes, and you're here for the Mayor?
MR. WILLEMS: Mayor, Chief of Police, and Deputy Police.
THE COURT: Okay.
MR. HODGE: Michael Hodge, your Honor, with Mr. Willems.
THE COURT: Okay.
MR. MURPHY: Michael Murphy, your Honor, on behalf of the Governor, State Treasurer, and the Detroit Financial Review Team.
THE COURT: Okay.
And, Mr. Iorio, go ahead, please.
MR. FILLIPE IORIO: Thank you, your Honor.
THE COURT: Would you mind coming up to the podium, please.
MR. FILLIPE IORIO: Good afternoon. Fill Iorio appearing on behalf of the Plaintiff, Detroit Police Officers Association, which I'll refer to as the DPOA. The DPOA represents approximately 2,130 police officers who serve the residents of the city of Detroit and are charged with providing public safety in perhaps the most dangerous, violent city in the United States.
The DPOA and the City are parties to a labor agreement that expired on June 30, 2012. This labor

5

agreement contains provisions relating to wages, fringe benefits, and other terms and conditions of work.
In anticipation of the expiration of this agreement, the DPOA representatives and the City met in the winter of 2011 and 2012 and agreed to a tentative agreement whereby the DPOA agreed to additional economic concessions. However, the City failed to put that tentative agreement into place, compelling the DPOA to initiate what are called Act 312 proceedings. Those proceedings were initiated in April of 2012.
THE COURT: So that was before this -- the current collective bargaining agreement expired.
MR. FILLIPE IORIO: Correct.
THE COURT: There were concessions agreed to between the parties back in the winter of --
MR. FILLIPE IORIO: February of 2012.
THE COURT: Okay.
MR. FILLIPE IORIO: A tentative agreement had been reached, but no action was taken on that. The DPOA then filed for Act 312 arbitration starting the process in April of 2012. The City has stated that it is not subject to Act 312, will not enter into a successor agreement, and has refused to participate in state-mandated mediation.
The Defendants in this case include the State

6

and the City, and the DPOA presents that they have precipitated a labor crisis by entering into a financial stability agreement, which I'll refer to as the FSA. The FSA is premised upon 2011 PA 4, commonly known as the emergency manager law. The State and the City are using this FSA as an excuse to refuse to engage in state-mandated mediation, to refuse to be subject to Act 312, and to refuse to enter into a successor agreement.
Instead, the Defendants have said they've terminated the agreement, they will not agree to a successor agreement, and they will decide which, if any, terms and provisions in the collective bargaining agreement they will follow going forward. The Defendants have put the parties at the very precipice of the very type of labor strife that Act 312 was designed to avoid.
The Plaintiffs have filed a six-count complaint against Defendants in order to preserve their right to Act 312 binding arbitration, to prevent the wholesale dismantling of the DPOA collective bargaining agreement, and their rights to collective bargaining.
Your Honor, I think it's important to note what the Plaintiff is not asking this Court to do. The Plaintiff is not asking this Court to invalidate the entire FSA. The Plaintiff is not asking this Court to overrule the entirety of PA 4. Instead, Plaintiff is

7

**Page 8**

1  requesting that this Court declare through declaratory
2  judgment and to also issue an injunction that makes it
3  very clear that the Defendants cannot prevent, obstruct,
4  or otherwise deny the application of Act 312 and/or deny
5  the Plaintiff rights to a collective bargaining
6  agreement.
7  　　　　The complaint can be summarized as follows:
8  Counts I, II, and IV are declaratory judgment actions
9  against the State and City, essentially asking that the
10  Court declare that the City is subject to Act 312,
11  notwithstanding the Defendants' alleged obligations under
12  the FSA and PA 4.
13  　　　　Count III is a count seeking injunctive relief
14  seeking to enjoin any changes to existing wages, hours,
15  and other conditions of employment during the pendency of
16  Act 312 proceedings.
17  　　　　Counts V and VI are counts just against the
18  State alleging tortious interference with contract and
19  tortious interference with a business relationship.
20  　　　　Your Honor, we have presented not only a
21  verified complaint and an affidavit, we've also filed
22  today a supplemental affidavit. There is the affidavit
23  of Joseph Duncan, who is the president of the DPOA, the
24  supplemental affidavit of Joseph Duncan; and the exhibits
25  attached thereto. I'd like to at least go through some

**Page 9**

1  of the facts to frame the issues in this case.
2  　　　　The DPOA and the City have engaged in
3  collective bargaining going back decades. The parties'
4  most recent contract is attached as Exhibit B to
5  Joseph Duncan's first affidavit. In fact, we've attached
6  the two most recent contracts. The first is the
7  2004-2009 agreement, and then at the end you can see that
8  that agreement was modified and extended through June 30,
9  2012.
10  　　　　It is undisputed, and you can see in
11  Mr. Duncan's affidavits, that in the most recent
12  collective bargaining agreement that just expired, the
13  DPOA agreed to major economic concessions, no wage
14  increases since 2008, reduction in pension benefits,
15  including elimination of the annual pension escalator,
16  reducing the pension multiplier from 2.5 to 2.1, agreeing
17  to defined distribution plan for new hires, changes in
18  working conditions; all concessions that the DPOA agreed
19  to through the last Act 312 process.
20  　　　　As I've mentioned and is noted in Duncan's
21  affidavit, February of 2012, in anticipation of the
22  current collective agreement expiring, the DPOA agreed to
23  further economic concessions that are spelled out in
24  Duncan's affidavit. However, the City did not act on
25  that tentative agreement which compelled the DPOA to

**Page 10**

1  initiate Act 312 proceedings. And I point your
2  attention, your Honor, to Exhibit C, to Duncan's
3  affidavit, to the initial affidavit, which is the filing
4  that starts the Act 312 process, and that was April 27,
5  2012.
6  　　　　The actions of the Defendants that have
7  precipitated this labor crisis I don't believe are in
8  dispute. First, the Defendants, the State Defendants,
9  namely through the Office of the Governor and the State
10  Treasurer, initiated proceedings under the Emergency
11  Manager Act by undertaking a review of the city of
12  Detroit's financial condition. After initiating the
13  proceedings, the State negotiated and implemented what is
14  called the financial stability agreement in April of
15  2012. We've attached that as Exhibit A to the first
16  Duncan affidavit.
17  　　　　Second, the State is directing that the City
18  violate the City's legal obligations to engage in
19  mandated mediation, binding arbitration under Act 312,
20  and to bargain in good faith under PERA. They are doing
21  this through the FSA, which is a contract between the
22  State and the City. The FSA purports to address
23  collective bargaining agreements, and perhaps the section
24  that is most relevant to this dispute, and I'm pointing
25  to section 4, which is found on page 32 and in which

**Page 11**

1  continues through page 33, the FSA purports to grant to
2  various Defendants, including the Mayor and the State
3  Treasurer, expansive powers. These powers include the
4  following:
5  　　　　Page 32 of the FSA, which is Exhibit A, the
6  authority of the Mayor to modify, reject, or terminate
7  collective bargaining agreements.
8  　　　　In section 4.2, identifying what has to be in
9  collective bargaining agreements by referencing an
10  Annex D.
11  　　　　Section 4.3, requiring certain steps that must
12  be taken before a contract is agreed upon.
13  　　　　And section 4.4, duty to bargain, and I'll read
14  it:
15  　　　　　　It is the State Treasurer's
16  　　　　　　determination pursuant to
17  　　　　　　MCL 141.1514a(10) that beginning
18  　　　　　　30 days after the effective date
19  　　　　　　of this agreement, the City is
20  　　　　　　not subject to section 15 of PERA
21  　　　　　　for the remaining term of this
22  　　　　　　agreement.
23  　　　　These are significant powers that are allegedly
24  being bestowed upon not only the City Defendants but the
25  State Defendants. The powers also have implications, and

1  those implications are that there is an enforcement
2  mechanism in this FSA. The enforcement mechanism is
3  found in section 6. If the City fails to comply --
4       THE COURT: What page are you on?
5       MR. FILLIPE IORIO: I am on Exhibit A, 35,
6  Defaults and Remedies. Section 6 defines what are
7  material breaches in section 6.2 on page 36. It is a
8  material breach, for instance, if the City fails to
9  comply with the labor agreement section 4.2. And if a
10  material breach occurs, the State is granted ultimate
11  power in section 6.3. It's what I would refer to as the
12  nuclear option for any municipality; that being, the
13  State Treasurer has the ability to place the City in
14  receivership under the Emergency Manager Act. Page 38,
15  the very top:
16          The placement by the State
17          Treasurer of the City in
18          receivership as provided in --
19       And then it gives the cite to the Emergency
20  Manager Act. That is the nuclear option that is present
21  in this FSA. That option would allow the divesting of
22  the democratically elected City Council of their
23  authority, divest even the Mayor of any authority,
24  appointing to a third party -- outside third party the
25  authority to conduct all business of the City.

1  Mr. Duncan's original affidavit --
2       THE COURT: Okay.
3       MR. FILLIPE IORIO: -- Exhibit D.
4  Unfortunately, both affidavits have lettered exhibits, so
5  I will refer to the initial affidavit first.
6       THE COURT: Exhibit D, did you say, or --
7       MR. FILLIPE IORIO: Exhibit D, the letter from
8  Mr. Satchel --
9       THE COURT: Okay.
10       MR. FILLIPE IORIO: -- to Mr. Duncan indicating
11  that they had no duty to bargain. I would direct your
12  attention to Exhibit E, which is a -- I'm sorry, Exhibit
13  F, which is another letter from the City of Detroit Labor
14  Relations Director to the labor mediator appointed by the
15  Michigan Employment Relations Commission. That's the
16  executive body charged with dealing with certain labor
17  relation matters. In that case, again, the City makes
18  clear that it is not going to be subject to mediation or
19  Act 312 because of the FSA.
20       The City repeats this claim in Exhibit G,
21  another June 12th letter to my client, where the City
22  indicates that it will be presenting changes to be made
23  to the terms of the contract to comply with the FSA.
24  That's the last paragraph in the first page of Exhibit G.
25       Exhibit I, again the City Director of Labor

1       It's not surprising then because of this
2  tremendous penalty that is built into this agreement that
3  the City is taking the position that they're taking in
4  this case justifying their position that they do not have
5  to engage and are not subject to Act 312 binding
6  arbitration and that they will not even consider a
7  successor agreement with the DPOA, and they have not been
8  bashful about explaining that position. Again, we've
9  attached to Mr. Duncan's affidavit, his initial
10  affidavit, the City's position that's spelled out in
11  correspondence. The first is Exhibit D, which is a May
12  11th, 2012, letter, from Lamont Satchel, who is the
13  Director of Labor Relations to my client, Joseph Duncan.
14  And in that letter, he reminds Mr. Duncan that pursuant
15  to the financial stability agreement entered into between
16  the City and the State, the City's duty to bargain is
17  eliminated.
18       THE COURT: You're looking at the exhibits that
19  were attached to this affidavit that was supplied today?
20       MR. FILLIPE IORIO: This would be the original
21  affidavit that was supplied when we filed the complaint.
22  The affidavit that was filed today is a supplemental
23  affidavit, so I'm not referring to those exhibits --
24       THE COURT: Okay.
25       MR. FILLIPE IORIO: -- yet. It would be

1  Relations, again in a letter to my client, indicates that
2  it is terminating the agreement and will decide on a
3  case-by-case basis which types of rights it will -- in
4  the contract it will continue and which it will not
5  continue.
6       The DPOA submitted its petition for Act 312,
7  and that's attached as Exhibit J. I would note that the
8  State has acted upon the petition for Act 312. The body
9  charged with appointing the Act 312 arbitrators, MERC,
10  issued an initial panel of arbitrators this past week,
11  and the DPOA is committed to going forward with that
12  process, both mediation and Act 312. The State appointed
13  a mediator to have mediation on Friday, June 22. The
14  DPOA was prepared and ready to mediate. The DPOA and
15  their representatives showed up. The City did not
16  attend. The DPOA remains willing to mediate, and that is
17  identified in Joseph Duncan's supplemental affidavit.
18       The DPOA was compelled to file this action to
19  seek both declaratory judgment and injunctive relief to
20  uphold the State's mandated Act 312 process and to
21  prevent the Defendants from gutting the labor agreement,
22  which would eliminate the DPOA's primary purpose as an
23  organization to negotiate and enforce a contract. The
24  impact of the City's actions in stating it's not subject
25  to Act 312 will have a devastating impact on officer

1   morale, the very type of thing that Act 312 is designed
2   to avoid.
3       Your Honor, I would like to address some of the
4   legal arguments that have been advanced. We have
5   submitted an initial brief and two reply briefs. I did
6   receive this afternoon a brief from the City, which I
7   only had a chance to look at this afternoon. We've not
8   had an opportunity to respond to the arguments raised in
9   the City's brief in writing, in any event.
10      The DPOA's legal argument is premised on
11   numerous cases and statutes, but the primary statute
12   that's involved here, your Honor, is Act 312. As this
13   Court is aware, Act 312 only applies to public safety
14   unions, including the police officers in this case. Act
15   312 sets forth substantive rights.
16      Three of the most relevant substantive rights
17   in this proceeding are: Number one, binding compulsory
18   arbitration under MCL 423.233. Number two, maintaining
19   the status quo; in other words, during the pendency of
20   Act 312, existing wages, hours, terms and conditions of
21   employment must be maintained. That means the Defendant
22   cannot unilaterally make changes to those terms. And,
23   three, the public policy, which is spelled out in MCL
24   423.231, stating that the Act is to be liberally
25   construed.

16

1      The state-declared public policy in MCL 423.231
2   is clear, but the Michigan Supreme Court has continually
3   stated and restated that policy, and I'm quoting from the
4   *Detroit Firefighters* case, *City of Detroit*, 482 Mich 18,
5   page 29, and this Supreme Court is quoting a prior
6   Supreme Court, and I'm paraphrasing: When policemen
7   engage in a strike, the community becomes immediately in
8   danger by the withdrawal of services. Thus, under Act
9   312, if the public employer and the police officers'
10   bargaining unit have not reached an agreement concerning
11   a mandatory subject of bargaining and mediation proves
12   unsuccessful, either party may initiate binding
13   arbitration in order to avert a strike.
14      If it's anywhere in this state important to
15   preserve and protect Act 312, it's in the city of
16   Detroit, the largest city in the state with the most
17   significant crime problem. There is no dispute, and you
18   can see this from Duncan's supplemental affidavit, that
19   public safety is the number one priority in the city of
20   Detroit. DPO officers, police officers are on the front
21   line. They are the ones who are charged with maintaining
22   safety. They are the first responders. They are the
23   ones charged with enforcing the criminal code and the
24   other codes. You cannot have qualities that you think of
25   in a first class city unless you have public safety. You

17

1   cannot have liveable neighborhoods. You can't have a
2   vibrant business environment.
3      The rationale for Act 312, the tradeoff,
4   prohibiting police officers from striking while framing
5   binding arbitration to settle contracts, is necessary to
6   ensure labor peace and public safety.
7      Another general point that should be noted, and
8   this is a very important point, Act 312 was recently
9   amended. It was amended by 2011 PA 116, which was
10   effective July 20, 2011. The amendments are significant
11   because they confirm that Act 312 is to take place even
12   where PA 4 consent agreements or even emergency managers
13   are in place.
14      Act 3 -- er, Act 16 [sic], which amended Act
15   312, does a couple things. First, it compresses the time
16   for the hearing. It speeds up the hearing process. As
17   I've already mentioned and as is indicated in Duncan's
18   supplemental affidavit, the DPOA has already received
19   from the State, as has the City, a list of Act 312
20   arbitrators. The DPOA is prepared to select from that
21   panel and get on with the hearing.
22      Act 312 also, though, is amended stating that
23   the most significant factor that the panel is to consider
24   is the municipality's ability to pay and to meet the
25   economic demands. And one of the factors in looking at

18

1   the ability to pay is to address whether there are any
2   directives under PA 4. So, very clearly, the legislature
3   understood that Act 312 would continue even after a city
4   was put in a consent agreement --
5      THE COURT: Where does it --
6      MR. FILLIPE IORIO: -- scenario.
7      THE COURT: -- say that?
8      MR. FILLIPE IORIO: The cite for that, if
9   you'll give me a moment, please, I have it in the brief.
10   I -- if you'll give me a moment --
11      THE COURT: Sure.
12      MR. FILLIPE IORIO: -- I'll get the statute. I
13   believe it's section 9 of the Act. I'm referring to MCL
14   423.239.
15      THE COURT: 432 --
16      MR. FILLIPE IORIO: I'm sorry, 423.239, section
17   (1)(a).
18      THE COURT: And that's of Public Act 312?
19      MR. FILLIPE IORIO: Correct. And subparagraph
20   four -- well, I'll read from 9(1)(a):
21      The financial ability of the unit
22      of government to pay. All of the
23      following shall apply to the
24      arbitration panel's determination
25      of the ability of the unit of

19

government to pay.

And one of the four factors is:

Any law of this State or any
directive issued under the local
government and school district
financial accountability act --

And then it cites the Emergency Manager Act.

-- that places limitations on a
unit of government's expenditures
or revenue collection.

And so the amendment to Act 312 clearly contemplated Act 312 continuing even after imposition of a consent agreement or even an emergency manager.

The -- as I've indicated, there are six counts in Plaintiff's complaint. The first count I will address is the count for injunctive relief. And I don't believe there is any dispute with respect to the standard for injunctive relief. We've cited it in our brief. I think the Defendants have agreed that we've correctly cited the standard.

I'll address the four factors, the first factor being the likelihood of prevailing on the merits. I would respectfully submit that the DPOA is likely to prevail on the merits of its claim. The first -- on separate independent grounds. The first ground would be

---

PA 4 does not amend Act 312. Act 312 is a statute that is separate and apart and survives in its entirety, notwithstanding the financial stability agreement and notwithstanding PA 4.

Act 312 is also a statute separate from the Public Employment Relations Act, which I'll refer to as PERA. In looking at the briefs, it appears that some of the Defendants, and perhaps all of the Defendants, are arguing that because the Public Employment Relations Act, PERA, was amended by PA 4, that means that Act 312 by implication was amended. That is not the case.

Act 312 is a statute separate from PERA, and there are substantive rights in Act 312 that are not present in PERA. Those substantive rights as I've mentioned before are the right to binding compulsory arbitration, the right to maintain the status quo, and the public policy which provides that Act 312 is to be liberally construed. The fact that section 15 of PERA has been suspended, allegedly, by PA 4 does not operate to suspend Act 312 rights. That would require a leap of logic that is not justified by the plain terms of the statute.

First, PA 4 by its express terms amends PERA. PERA has an entirely different statutory framework for resolving disputes concerning public employees who are

---

not firefighters or police officers. That's called fact finding. It's a non-binding process that results in the appointment of a fact finder who makes recommendations. The PA 4 specifically stated that it was amending PERA, and the cite to PA 4 amending PERA is MCL 141.1514a(10).

PERA was also specifically amended to reflect that it had been changed by PA 4. And the cite there is MCL 423.215(9). The legislature, when it enacted PA 4, did not touch Act 312. PA 4 doesn't mention Act 312. Act 312 does not mention PA 4 other than what I've identified as a factor for the arbitration panel to consider when rendering their decision and conducting their hearings.

The omission of any amending language to Act 312 must be considered intentional. It is a well-known principle that the legislature is presumed to be aware and, thus, to have considered the effect of all existing statutes when existing [sic] new laws. Defendants are asking this Court to write into Act 312 something that is not there. There is nothing nowhere in Act 312 that says it is limited by PA 4 or that it could be limited by some sort of consent agreement. If that was the legislature's intent, they would have put it in the statute, and they didn't.

---

Second, Act 312 was amended after PA 4, and I've mentioned this previously. The amendment was effective to -- the Act 312 amendment PA 116 was effective on July 20th, 2011. As I mentioned also, the amendment to Act 312 reaffirmed the importance of Act 312 to resolve contract disputes. The panel is expected to consider the municipality's ability to pay and to consider the limitations on government's expenditures or revenues on directives issued under PA 4, and that again is cited at MCL 423.239.

The legislature clearly anticipates Act 312 occurring under PA 4. There absolutely is no legislation anywhere that says that a public employer is not subject to Act 312 if there is a consent agreement. This Court should not legislate that into the language.

The third reason that confirms that the DPOA is likely to succeed on this count is that this Court is bound to follow the Court of Appeals' decision in *Metropolitan Council v City of Center Line*, which is cited at 78 Mich App 281. This is controlling law. In this *Center Line* case, the City, the city of Center Line, made unilateral changes to wages by changing shift differentials and uniform allowances and other unilateral changes to working conditions while the parties were engaged in Act 312. The trial court enjoined the City

13-53846-tjt Doc 11102-7 Filed 04/21/16 Entered 04/21/16 12:24:19 Page 101 of 120

**Page 24**

from making these changes, and the Court of Appeals
upheld it finding that Act 312 is separate and distinct
from PERA and that the court has jurisdiction to enforce
the Act 312 status quo provision.

The Michigan Supreme Court in 2008 had a chance
to review this holding and, in fact, commented on it and
asked the parties to brief the issue of whether *Center
Line* should be reconsidered. The Supreme Court case is
the *Detroit Firefighters* case, 482 Mich 18, page 28,
footnote 12. If you look at that footnote, very clearly
the Michigan Supreme Court decided not to overturn or
take any action on *Center Line*. *Center Line* remains good
law and is controlling on this Court, and it provides the
basis and other bases for finding that the DPOA is likely
to succeed on the merits.

Finally, we've stated that even if this Court
were to accept the argument that PA 4 amends Act 312,
even though it doesn't say so anywhere on its face, the
alleged amendment is constitutionally defective, and
we've cited argument on the Michigan Constitution and the
violation of the separation of powers and due process.

We've cited basic law. The legislature must
promulgate not abrogate. That means if the legislature
delegates certain authority to another person or
legislative -- er, executive body, it must provide

---

**Page 25**

standards that are reasonably precise to ensure against
excessive delegation and misuse of delegated power. And
we've cited the *Blue Cross Blue Shield*, Michigan Supreme
Court case. In that case, the legislature enacted a wide
ranging health care law. And one of the aspects was
establishing a panel of actuaries who would have the
power to engage in risk assessment analysis, thereby
impacting costs. And the Supreme Court struck that down
finding that there was absolutely no standards that would
be employed by these actuaries in making this
determination, finding that the power was open ended,
there was no clarity, and they were immune from
challenge.

If you look at the emergency manager provision
that both the City Defendants and State Defendants are
relying upon to suspend collective bargaining, the very
same outcome would result. And the section I'm referring
to is under PERA, section 14a(10). If you'll just give
me a moment, I'll grab that section.

THE COURT: That's of PA 4?

MR. FILLIPE IORIO: That is the PERA. I'm
actually referring to the PERA provision.

THE COURT: Oh, right.

MR. FILLIPE IORIO: MCL --

THE COURT: Okay.

---

**Page 26**

MR. FILLIPE IORIO: Let me get there.

THE COURT: I have 312.

MR. FILLIPE IORIO: 423.

THE COURT: .215?

MR. FILLIPE IORIO: .215, I believe.

THE COURT: Actually, I don't know if that's
215. It's probably --

MR. FILLIPE IORIO: I'm sorry, I was referring
to -- first I would refer to PA 4. We've cited it in our
brief, and it's MCL 141.1514a(10):

> Unless the State Treasurer
> determines otherwise, beginning
> 30 days after the date a local
> government enters into a consent
> agreement under this Act, the
> local government is not subject
> to section 15.1 of PERA for the
> remaining term of the consent
> agreement.

There are no standards whatsoever that the
State Treasurer is set to apply under that provision.
And the Defendants have contended that there are other
standards elsewhere in the statute, but the other
standards do not apply to the State Treasurer's specific
authority granted in this section. This is significant

---

**Page 27**

authority, authority to say whether or not section 15
collective bargaining will apply. And the fact that it's
kind of a reverse veto doesn't change the analysis. At
the end of the day, this provision purports to allow the
State Treasurer to determine whether section 15 of PERA
will apply. And that is, by definition, an improper
unconstitutional delegation of power.

If you look at the emergency manager law and
other provisions, for instance when an emergency manager
is actually appointed, there are specific standards that
apply that guide the emergency manager in the exercise of
his authority. And I would point the Court, which we've
cited in our brief, MCL 141.1519, which spells out the
authority of an emergency manager.

Now, obviously there is no emergency manager
appointed in Detroit. However, an emergency manager, if
there was one, would have the authority to terminate,
reject, modify collective bargaining agreements under
subparagraph (k). However, there are four factors that
the emergency manager would have to follow before taking
such a drastic step. And those are spelled out, again,
under subparagraph (k)(i), (ii), (iii), and (iv).

That is obviously missing from the State
Treasurer's authority to suspend Act 15, and that is a
constitutional defect that is not cured anywhere else in

13-53846-tjt   Doc 11102-7   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 102 of 120

**Page 28**

1   the statute.
2   The fact that there are provisions that have to
3   be applied in determining whether a consent agreement
4   will be in place in the first place doesn't have any
5   impact on whether or not the State Treasurer will or will
6   not exercise his authority to suspend section 15 rights.
7   And I think if you just think about it, let's
8   say a municipality in Wayne County was under a consent
9   agreement other than Detroit and in that municipality the
10   State Treasurer said, "I'm not -- I'm going to revive
11   section 15 rights." On what basis would the public
12   understand why in Detroit he didn't revive section 15
13   rights but in a neighboring municipality he did? It's
14   absent. It's missing. That's a constitutional defect
15   that is not cured. The legislature simply lost sight of
16   its constitutional obligations in passing that aspect of
17   PA 4.
18   That is a separate argument for overruling that
19   somehow PA 4 amends Act 312 separate and apart from the
20   other arguments that I've already raised.
21   THE COURT: Well, when you're referring to
22   section 19(k) --
23   MR. FILLIPE IORIO: Yes.
24   THE COURT: -- which specifically does not
25   apply to a -- to this kind of an agreement, it only

**Page 29**

1   applies to emergency financial managers that are
2   appointed --
3   MR. FILLIPE IORIO: Correct.
4   THE COURT: -- under section 9. But in that
5   language in (k), it -- it repeats the word existing
6   collective bargaining agreements.
7   MR. FILLIPE IORIO: It does.
8   THE COURT: So how do you interpret that -- how
9   do you interpret that in this situation because it's
10   apparent that the collective bargaining agreement in this
11   case terminated June 30th of '12?
12   MR. FILLIPE IORIO: Well, I was merely pointing
13   out the fact that the legislature in (k), which clearly
14   doesn't apply here because there isn't an emergency
15   manager, had the foresight to put standards in, the
16   standards being (i), (ii), (iii), (iv). Before an
17   emergency manager could terminate a contract, an existing
18   contract, they'd have to follow these four steps.
19   THE COURT: Right. So they could -- so the
20   financial emergency -- er, emergency financial manager
21   could terminate an existing contract.
22   MR. FILLIPE IORIO: Yes.
23   THE COURT: Whereas the way it's set up with
24   this -- let's see, with the consent agreement, they don't
25   have that authority to terminate an existing contract.

**Page 30**

1   MR. FILLIPE IORIO: Well, we would submit that
2   they don't. I don't think the City and the State would
3   state that. If you look at the actual terms of the
4   consent agreement, the financial stability agreement in
5   section 4.1, it does say the Mayor, in accordance with
6   the law, has the right to terminate or modify contracts.
7   THE COURT: Right. And that is in section --
8   that's stated right above section (k) in (j). The Mayor
9   can reject, modify, or terminate one or more terms and
10   conditions of an existing contract.
11   MR. FILLIPE IORIO: Yes. The -- we're not
12   contending that somehow the emergency manager powers
13   should be exercised by the City in this case. We're only
14   pointing out, for purposes of contrasting, the State
15   Treasurer's purported authority to suspend collective
16   bargaining rights. There are no standards under which to
17   evaluate how he's exercising those rights to suspend or
18   revive collective bargaining. And that would just be
19   comparing and contrasting (k), which you have with --
20   THE COURT: But under section 9, it
21   specifically says that a consent agreement may include a
22   grant to the chief administrative officer or the chief
23   financial officer, etcetera --
24   MR. FILLIPE IORIO: Right.
25   THE COURT: -- one or more of the powers

**Page 31**

1   prescribed for emergency managers in section 19. Okay.
2   So they basically can have all the powers listed under
3   section 19 (a) through (j) if it's included in their
4   agreement. Do you agree with that?
5   MR. FILLIPE IORIO: No, I don't. The last
6   sentence of subsection 9 says they don't have --
7   THE COURT: Right, except for (k).
8   MR. FILLIPE IORIO: Except for (k), correct.
9   THE COURT: I said (a) through (j) --
10   MR. FILLIPE IORIO: Oh, right, I'm sorry.
11   THE COURT: They can have (a) through (j),
12   which includes reject, modify, or terminate one or more
13   terms and conditions of an existing contract.
14   MR. FILLIPE IORIO: I don't believe that (j)
15   applies to labor agreements because (k) is a specific
16   provision that would apply in the context of a labor
17   agreement. I think (j) --
18   THE COURT: Okay.
19   MR. FILLIPE IORIO: -- would apply to other --
20   other contracts.
21   THE COURT: Other contracts.
22   MR. FILLIPE IORIO: Otherwise, there would be
23   no reason to have a (k). (K) is specifically -- specific
24   application to labor agreement, and (j) would apply to
25   existing contracts that the municipality may have with,

**Page 32**

1  you know, non-labor contracts.
2  THE COURT: Okay.
3  MR. FILLIPE IORIO: So I would not agree that
4  the -- under a consent agreement that -- that they would
5  have the authority to simply terminate contracts and
6  modify them as they see fit.
7  THE COURT: Right. Only the emergency managers
8  can do that.
9  MR. FILLIPE IORIO: Yes, yes.
10  THE COURT: Existing contracts. But do we have
11  an existing contract here anymore?
12  MR. FILLIPE IORIO: Well, it's existing to the
13  extent that Act 312 provides that during the pendency of
14  an Act 312 process, the existing wages, terms, and
15  working --
16  THE COURT: Can't be changed.
17  MR. FILLIPE IORIO: -- conditions can't be
18  changed.
19  THE COURT: Okay.
20  MR. FILLIPE IORIO: And they continue, so.
21  THE COURT: So you're saying that after the
22  consent agreement was entered into --
23  Or was it before the consent agreement was
24  entered?
25  MR. FILLIPE IORIO: The consent agreement was
32

**Page 33**

1  entered into -- and I don't have the exact date. It was
2  April in 2012. So it was before the contract expired.
3  It was in April of 2012, and the parties signed it at
4  different times, and the State Clerk had to certify it.
5  I think it was April 15th, 2012, when that occurred.
6  That occurred, though, well before the contract expired.
7  And the City was taking the position well before the
8  contract expired that it would not engage in Act 312
9  arbitration; that it would not engage in state-mandated
10  mediation, and that it would not entertain entering into
11  a successor agreement.
12  And the DPOA's position is, and I think it's
13  consistent with the law, is the City is subject to Act
14  312 notwithstanding what PA 4 says and notwithstanding
15  what the FSA says.
16  THE COURT: But the request for Act 312
17  arbitration wasn't filed until June 22nd of 2012.
18  MR. FILLIPE IORIO: No. The mediation -- the
19  Act 312 process started -- Exhibit C, which is the
20  initial step in the Act 312 process, and Exhibit C is
21  the --
22  THE COURT: April 27th --
23  MR. FILLIPE IORIO: Correct.
24  THE COURT: -- 2012.
25  MR. FILLIPE IORIO: And, again, the history is
33

**Page 34**

1  that the City the DPOA actually reached a tentative
2  agreement in February of 2012 where the DPOA agreed to
3  additional concessions. So the DPOA was hopeful that an
4  agreement could be reached, you know, without having to
5  go through the Act 312 process. That didn't actually
6  occur.
7  THE COURT: It wasn't reduced to writing, or
8  what?
9  MR. FILLIPE IORIO: It is reduced to writing,
10  yes. The City Council didn't take action on it. They
11  didn't take it up, and they didn't ratify it. And so it
12  is in writing, and the general terms are spelled out in
13  Joe Duncan's supplemental affidavit, which we did provide
14  today, as least the concessionary terms.
15  THE COURT: Okay. Thank you.
16  MR. FILLIPE IORIO: Okay. If I might just
17  continue looking -- again, this is related, but we also
18  have a count that provides that the FSA section 4.1 is
19  contrary to law and should be stricken on its face. That
20  provision purports to give the Mayor --
21  The Mayor shall have the
22  authority to negotiate,
23  renegotiate, execute --
24  And I am looking at, I'm sorry, page 32 of
25  Exhibit A:
34

**Page 35**

1  The Mayor shall have the
2  authority to negotiate,
3  renegotiate, execute, amend,
4  modify, reject, or terminate
5  collective bargaining agreements
6  to the fullest extent authorized
7  by law and subject to the terms
8  of this agreement.
9  We just walked through PA 4, which plainly says
10  that a consent -- under a consent agreement, there is no
11  authority to terminate and modify. So what I hear the
12  Defendants saying is that because it's the fullest extent
13  authorized by law and it is not authorized by law, this
14  provision has no real force and effect, and if that's the
15  case, then they shouldn't be objecting to having it
16  stricken, and we don't object to having it stricken.
17  We've asked that it be stricken. There is a severability
18  clause in the FSA, and I think that's a perfect
19  opportunity to strike section 4.1 along with the other
20  section 4 provisions.
21  The second factor in the issue of injunctive
22  relief is irreparable harm. And the DPOA, through Joe
23  Duncan's initial affidavit and in his supplemental
24  affidavit, has clearly identified that there will be
25  particularized harm that can't be remedied with money
35

damages. We don't dispute that injunctive relief is an
extraordinary relief, but it has been issued in labor
cases, and we've cited a number in our brief. One is the
*Van Buren* case, which is a school case, a bus
subcontracting case which was decided before the law was
changed allowing a school district to subcontract school
bus services. But before the law was changed, the court
in *Van Buren* found that injunctive relief was necessary
because the subcontracting of the school bus drivers
would effectively terminate the union. There would be no
other purpose to have a union, and it would be difficult
to reconstitute its function if at some later point the
subcontracting was overturned.

We also have attached an *AFSCME* case and a *City
of Detroit* case, again where labor injunctions were
issued to preserve union bargaining rights. We also
attached a Wayne County Circuit Court TRO from last year
where the DPOA got a TRO to prevent the City from
implementing changes to health insurance during the
pendency of Act 312, a matter that is very similar to
what we have here aside from the fact that a year ago,
there wasn't an FSA and a year ago the State wasn't
directing that the City to take these actions under
threat of being put in receivership.

The irreparable harm in this case is more

pronounced than any of the cases we've cited, including
the one from a year ago. The City and the State are
permitted to unilaterally impose concessions. It renders
Act 312 a mere formality. It will make it non-effective.
It will create dissension and lower the morale of the
membership. It makes the union look powerless. It
violates public policy. There is no adequate remedy at
law to address those particularized harms.

There is, I think, a requirement that we look
at the fact that we're looking at the largest city in the
state of Michigan where it's unquestioned that public
safety is the top priority, and that in order to avoid
labor strife, it is crucial that we preserve the Act 312
and collective bargaining rights.

The irreparable harm also goes to the violation
of state policy. As I've indicated, state policy on Act
312 is written into the statute, MCL 423.231. Again, it
recognizes the tradeoff. Police officers cannot strike.
They are, therefore, provided this Act 312 mechanism to
ensure labor peace and to prevent harm to the public if
labor peace does not continue. I think it's very clear
that irreparable harm has been demonstrated. The City
and the State can simply terminate the contract, not just
terminate it but decide which, if any, provisions they'll
apply and which provisions they will continue or not

continue and steadfastly refuse to even entertain
entering into a successor agreement. There can be no
other monetary remedy to address that other than to say
what the law provides, and that is the City is subject to
Act 312, and the DPOA is entitled to its Act 312 process.

THE COURT: So you're saying that if they can't
keep the binding arbitration, then they should be able to
strike?

MR. FILLIPE IORIO: Well, the law prohibits
them from striking. So we're not saying that they're
going to strike. The law prohibits striking. The
rationale for Act 312 is that there is a prohibition on
striking. No one disputes that. And the tradeoff is
that there is this process in place to ensure a fair
hearing process where experienced, appointed officials
will hear the dispute on the successor contract. The
City is refusing to be subject to that. They wouldn't
even participate in state-mandated mediation. That can't
be remedied with money damages. That is a damage that is
irreparable, and if not enjoined could very well lead to
the type of low morale that Act 312 is designed to avoid.
And we've cited numerous Michigan Supreme Court cases
that cite this. This is not a novel theory that we've
come up with. This is the public policy of the State of
Michigan.

As to the third factor, the DPOA also would
suffer more harm than the Defendant Cities. We're simply
asking -- Defendant City and State. We're simply asking
that the status quo as it relates to wages, hours, and
terms and conditions of work, as set forth in Act 312, be
continued during the pendency of Act 312.

The City has filed an affidavit from
Jack Martin, the CFO, where he mentions economic and
financial issues that the City is suffering, and that
they need to generate savings. And I think they've cited
30 to 35 million in savings they want to extract from the
DPOA members by reducing wages and benefits even further
than what has been agreed and what had been agreed in the
prior contract. That isn't for this Court. That is for
the Act 312 arbitration panel.

The City should be making the arguments that
they presented in the four page or five page Jack Martin
affidavit before the Act 312 panel. Act 312 says that
the arbitration panel must give the most significance to
the ability of the City to pay. I think that the Martin
affidavit, one, I don't think it's relevant as far as the
finances to any of the issues in this Court. It's only
relevant to point out that those are arguments that
should be made to the Act 312 panel. Not here.

We have attached an affidavit, the supplemental

**40**

1  affidavit, of Joseph Duncan.  I want to make sure our
2  position is clear.  Our position is this whole issue of
3  the financial condition of the City is not relevant to
4  the issues before you today.  But we have attached an
5  affidavit of Joseph Duncan, a supplemental affidavit,
6  where we have cited and attached numerous exhibits from
7  the business records of the City that lay out the City's
8  red book.  The red book is the budget, and identified
9  numerous areas where the City has appropriated monies for
10  the 2012-2013 fiscal year that clearly don't have the
11  same type of priority that public safety does.
12        We're not introducing those to say that somehow
13  this Court should entertain a discussion about whether
14  the priority should be funding the African-American
15  History Museum or Detroit police officers or funding
16  recreation in the city of Detroit or funding Detroit
17  police officers.  That truly should be arguments that are
18  made to the Act 312 arbitration panel, but we've
19  presented that affidavit as a counter to the affidavit of
20  Jack Martin.
21        I'd also note that the 30 to 35 million in
22  savings is a mere pittance in relation to the entirety of
23  the City's budget.  The City's general budget is
24  1.1 billion.  The total budget is almost $3 billion.  And
25  we've just pointed out well over $30 million in cuts that

**41**

1  could be made before you impose further cuts on the
2  wages, salaries, and benefits of the Detroit police
3  officers.
4        Finally, factor number four, injunctive relief
5  promoting the public interest.  I think it's very clear
6  that the public interest in this case is as stated in Act
7  312, the public policy:  Maintaining labor peace,
8  avoiding the public harm that could ensue if morale of
9  police officers is lessened.  I think that's especially
10  true in the city of Detroit, again where violent crime is
11  a real problem.  And we've cited from the City's website
12  in Joe Duncan's initial affidavit just some recent crime
13  statistics, and those are Exhibits L and Exhibits K.
14  Again, those are taken directly from the City's website.
15  Those are business records that --
16        THE COURT:  Now is this the exhibits attached
17  to the supplemental affidavit of Duncan?
18        MR. FILLIPE IORIO:  I'm sorry, those are
19  exhibits attached to the original affidavit.
20        THE COURT:  Okay.
21        MR. FILLIPE IORIO:  The DPOA is also seeking
22  declaratory relief.  They have filed several counts, as
23  I've mentioned, that ask that this Court issue a
24  declaratory judgment essentially finding that Act 312 is
25  not affected by either PA 4 or the financial stability

**42**

1  act and that the City is subject to Act 312 and that all
2  of Act 312's substantive provisions apply; the binding
3  compulsory arbitration, the maintenance of the status
4  quo, and the liberal construction.
5        We would submit under MCR 2.605 that there
6  clearly is an actual controversy present here.  Under the
7  declaratory relief counts, this Court does not have to
8  find irreparable harm, and so we are also asking that the
9  Court declare, as we've stated in our briefs and in our
10  complaint, that the City is subject to Act 312, must
11  comply with Act 312, and the State cannot compel the City
12  to make changes to the collective bargaining agreement
13  that fall outside the status quo mandate of Act 312.
14        The State has raised a couple arguments that
15  I'd like to address just briefly in their brief.  First,
16  the State appears to argue that they are not a proper
17  party.  We've submitted a reply brief.
18        The State is an indispensable party in this
19  case.  The FSA is the basis for each and every one of the
20  six counts.  The State is inextricably intertwined with
21  the City, and, again, I'd point to the financial
22  stability agreement, section 4 and section 6.  Section 4
23  purports to define what the City must do with regards to
24  its labor contracts with the DPOA, and section 6 provides
25  the enforcement mechanism.  If the City doesn't comply,

**43**

1  it could be placed in receivership.  And so to say
2  somehow that the State is not a proper party or the State
3  is not involved in this is, with all due respect,
4  disingenuous and doesn't really take into account the
5  undisputed facts here, which are the State initiated the
6  financial review, the State negotiated and then
7  implemented the financial stability agreement, in which
8  it is directing the City to do certain things.  The
9  things that the DPOA is concerned about are the things
10  that are taking away its rights under Act 312.
11        The City, through its counsel from the Mayor's
12  Office and the Deputy Mayor and the Police Chief, argue
13  in their brief that Act 312 is somehow just a procedure
14  and that it relies upon PERA, the Public Employment
15  Relations Act, implying that somehow if PERA is
16  suspended, by implication then Act 312 must be suspended.
17  And I've addressed that already, but there is no repeal
18  by implication, and we've cited cases to that effect.
19  The legislature knows how to repeal or amend a statute.
20  You don't say that because PERA was amended, then by
21  implication Act 312 is amended.
22        Beyond that, Act 312 has real substantive
23  rights over and above what non-public safety employees
24  have.  And I've discussed those at length, but I won't do
25  that again.

The City is also essentially asking you to overlook but really wants you to overrule the *Center Line* case, the Michigan Court of Appeals case, which I've cited, from 1977, 78 Mich App 281, and, again, that is controlling law. Even if this Court were to say they don't agree with the *Center Line* holding, it does control.

The City Council for the Mayor and the Deputy Mayor and the Police Chief also argue about the finances and the financial condition of the City. We would, again, present that that's not relevant to the matter before this Court. The issue of the financial status of the City is something that should rightly be addressed by Act 312 panel. The DPOA has addressed that. They've addressed it in their last contract where they agreed to concessions, and they addressed it again in February of 2012 where they agreed to concessions. That's not really a factor for this Court.

The Act 312 panel will be -- will have the special expertise to deal with the claims that the City simply doesn't have the ability to meet the financial demands of the DPOA, and we would submit that it's not relevant, clearly not relevant on the declaratory judgment counts and also not relevant as to the injunctive standards because it cannot outweigh the

44

public policy of Act 312.

As I mentioned, your Honor, I just received the City of Detroit's brief from Mr. Andrew Jarvis this afternoon. And in that brief he raises an argument that was not raised by the other Defendants, and that is jurisdiction. We have not briefed the jurisdiction issue. We would be willing to; not that we want to write anything additional. I know we've provided the Court with a number of documents, but to the extent the Court is going to entertain the jurisdictional issue, we are willing to brief that.

The City appears to claim that the -- through the corporate counsel, that the Court lacks jurisdiction over the City. And we would just say the following with respect to that: Number one, the Court of Claims has jurisdiction under MCL 600.6419(1)(a) all claims ex contractu, and that would be any claims arising from a contract.

The *Parkwood* Supreme Court case is particularly relevant in analyzing that aspect of the Court of Claims jurisdiction. In *Parkwood*, the court said it's the nature of the claim that determines whether the Court of Claims has jurisdiction. The nature of each and every one of Plaintiffs counts is premised on the FSA because that is the only basis that the City is giving for

45

refusing to be subject to Act 312, for refusing to engage in mediation, and for refusing to agree upon a successor agreement.

The claims against the State and City are intertwined. There is not a true, separate count against the City. All are dependent, all six counts are dependent upon an analysis of the FSA contract. We would submit that the DPOA is a third party victim of this contract that was entered into between the City Defendants and the State Defendants.

The DPOA is seeking to invalidate terms and provisions of the FSA that the City and State maintaining would restrict the DPOA's rights under Act 312. As such, we submit that jurisdiction is proper in this Court as to all six claims even those claims that have the first four counts where the City is listed as a Defendant as arising from a contract pursuant to the clear statute in *Parkwood*.

As an alternate argument, we would present that the Court has jurisdiction, concurrent jurisdiction under MCL 600.6419(a), and that is claims that are ancillary to a claim filed in the Court of Claims. And that provision provides that in addition to the powers and jurisdiction conferred upon the Court of Claims by section 6419, the Court of Claims has concurrent jurisdiction of any demand

46

for equitable relief and any demand for a declaratory judgment when ancillary to a claim filed pursuant to section 6419.

And we would submit that the -- every one of the counts, Counts I through IV involving both the State and the City, to the extent we've listed the City, there -- there is ancillary jurisdiction. Now, that phrase is not defined in the Court of Claims. They don't define ancillary jurisdiction, but there are other cases that do. And under the other cases that look at ancillary claims, again we have haven't briefed this because we didn't recognize that that argument would be raised by any of the Defendants, but in *WPW Acquisition v City of Troy*, 254 Mich App 6, at page 9, a 2002 Michigan Court of Appeals case, the court outlined the standard for ancillary jurisdiction stating it should attach where:

The matter arises from the same
transaction that was the basis of
the main proceeding, or arises
during the course of the main
matter, or is an integral part of
the main matter.

(2) the matter can be determined
without a substantial new

47

fact-finding process.
        (3) determination of the
        ancillary matter through an
        ancillary order would not deprive
        a party of a substantial
        procedural or substantive right.
        (4) the ancillary matter must be
        settled to protect the integrity
        of the main proceeding or to
        insure that the disposition in
        the main proceeding would not be
        frustrated.
    So we would submit as an alternative the Court
would have jurisdiction under 600.6419(1)(a). It's
difficult to contemplate how we could have a proceeding
in this Court and a proceeding in another court where
both courts would be charged with looking at the FSA and
determining whether certain provisions should be deemed
unenforceable or stricken as it relates to the DPOA.
    I would also just comment on Justice Young's
concurrence in *Parkwood* where he commented that the
jurisdictional provisions set forth in the Court of
Claims Act are, quoting:
        Unquestionably less than clear.
    Unquote. We would say that the jurisdiction of

this Court is clear, though. All of these claims are
arising out of the FSA, which is undoubtedly a contract
and, therefore, jurisdiction does rest with this Court.
    Your Honor, in closing -- oh, one more argument
that the City appeared to raise in their brief that I'd
like to just mention. The City had an argument somehow
that the -- they raised layoffs on page 13 of their brief
under a heading, "The City had the contractual right
under Article 6 of the now expired CBA to lay off and
restructure its police department," somehow contending
that the injunction would harm that right.
    The DPOA is not contending that somehow the
City is enjoined or should be enjoined from taking
actions that they're otherwise entitled to do. For
instance, if the contract allows them to lay off in the
manner in which they've cited in their brief, then the
injunction wouldn't prevent them from doing that. The
injunction only prevents them from changing existing
wages, hours, and terms and conditions of employment. So
if one of those existing conditions of employment was the
right to lay off, as they claim in their brief, then that
would -- that would be an existing working condition that
would have to be continued. So I don't understand their
argument.
        THE COURT: So you're saying that if I

continued the injunction, the City would be prohibited
from laying off in lieu of altering other conditions of
employment.
        MR. FILLIPE IORIO: Not exactly. I'm saying
that if -- they've cited Article 6 of the labor
agreement. If that article of the labor agreement as
they say allows them to lay off, then that would have
been an existing term that would have to have been
continued.
        THE COURT: So they could lay off.
        MR. FILLIPE IORIO: Yeah. I don't have the
full Article 6 in front of me. Like I said, I just
looked at it today. But if, as they say, Article 6
allowed them to lay off, you know, when the contract was
in effect, then that would be an existing term that would
have continue. Again, I don't have Article 6 here. I
haven't had a chance to kind of look at that.
        THE COURT: Okay. I think it's attached to
something.
        MR. FILLIPE IORIO: It is. In closing, I think
it's important to note, again, and reaffirm what the DPOA
is asking here. We're not asking for the Court to throw
out the FSA in its entirety. We're not asking that the
Court overrule and find unconstitutional the PA 4.
That's not what we're here for.

    We're here for the very specific reason that
applies primarily to my client, and that is they have a
right under state law to Act 312 arbitration. That right
has not been affected by either PA 4 or the FSA. The
fact that the State is directing the City through the FSA
to take certain actions against my client through the
labor agreement process does not and cannot be used to
obstruct or prevent my client from their right to Act 312
arbitration. My client has from the beginning been
reasonable and willing to negotiate, to mediate, and to
go through the Act 312 process. We ask that this Court
allow that process to continue and to not do anything
that would obstruct it.
    And I would say, again, that the MERC has
already appointed a suggested panel of arbitrators, and
the DPOA will be taking action to ensure that the time
frames are complied with so that can be conducted in an
efficient and timely manner. Unless the Court has any
other questions, I'd reserve any, I guess, time to
respond to any of the Defendants' arguments.
        THE COURT: Okay. Thank you, very much.
    Okay. Who wants to go first?
    Okay. And you're Mr. Javis?
        MR. JARVIS: Jarvis.
        THE COURT: Jarvis.

1    MR. JARVIS: Judge, I know there's been a lot
2  raised by the Plaintiffs in this case, but I do want to
3  bring back the argument that I raised in the City's brief
4  with respect to the Court's jurisdiction. This matter at
5  its heart is a labor dispute between the DPOA and the
6  City of Detroit, Judge. And I think the appropriate way
7  to resolve these is in MERC.
8    One of the points that I'd also like to make is
9  the fact that the labor contract is currently expired,
10  Judge. With that in mind, this duty to bargain that the
11  Plaintiffs keep bringing up, I don't believe it exists
12  anymore. This matter was certainly thrown in the Court
13  at the last minute. And I'd like to indicate too that
14  Public Act 4 and the FSA are valid.
15    I don't -- I think I briefed --
16    THE COURT: Have there been any holdings on
17  that issue? I know there's been litigation involving PA
18  4, but have there been any definitive rulings on PA 4's
19  constitutionality?
20    MR. JARVIS: None that I know of, Judge.
21    THE COURT: Or upheld on any other basis?
22    MR. JARVIS: None that I know of, Judge.
23    THE COURT: Okay.
24    MR. JARVIS: And one of the things that I think
25  is important for the Court to note is, is that there

52

1  seems to be this misunderstanding of what Public Act 312
2  is all about. Public Act 312 is to assist -- is to
3  assist parties in collective bargaining when they can't
4  reach an agreement. That's intertwined with the duty to
5  collectively bargain. When that duty no longer exists,
6  Act 312 no longer is applicable. And I think there's
7  been a number of case that talked about that some and
8  I've cited in my brief.
9    Judge, one of the things that the Plaintiffs
10  fail to recognize is the fact that the legislature
11  enacted this legislation. They understood what it was.
12  And Public Act 4 clearly gives the ability of the City of
13  Detroit, after the expirations of the contracts, to do
14  what they did. Do you have any further questions?
15    THE COURT: So your brief is -- it looks like a
16  brief attached to a brief. Okay. That's not it. Okay.
17  I've read it. I don't believe I have any other
18  questions.
19    MR. JARVIS: Thank you, Judge.
20    THE COURT: You're welcome.
21    Mr. Murphy, or Mr. -- who wants to go next?
22    MR. MURPHY: I guess it's my turn. Good
23  afternoon, your Honor. Michael Murphy appearing on
24  behalf of the Defendant Governor, the Defendant State
25  Treasurer, and the Defendants Detroit Fiscal Review Team

53

1    The -- the beginning of Plaintiff's arguments
2  intrigued me because he talked about the public safety,
3  the safety of the citizens of the city of Detroit, the
4  safety of visitors to the city of Detroit, the
5  difficulties faced by the Detroit police officers. Their
6  brief was replete with instances of how they're
7  underpaid.
8    The affidavit, at least supplied to me today,
9  was pretty clear to me an Act 312 submission to
10  your Honor. That was well put together if your Honor was
11  going to impose a contract on the City of Detroit, which,
12  of course, is not the position you find yourself in.
13    I know personally city of Detroit police
14  officers. I was born and raised with -- in the city of
15  Detroit, and some of my friends I went to Detroit public
16  schools with became Detroit police officers. The safety
17  in the City is of critical importance. So is the fiscal
18  integrity of the City, the fiscal stability of the City,
19  the ability of the City to pay its bills. It's not just
20  its police force. It's its existence that was at stake.
21    And this didn't happen overnight. And it
22  didn't happen because of the DPOA alone. It didn't
23  happen because of the Detroit firefighters alone or any
24  of the unions alone or decades of financial mismanagement
25  or the State closing its eyes to what was going on, but

54

1  we found ourselves in this position, and something had to
2  be done, and something was done in an attempt to keep the
3  fiscal stability of the system intact.
4    I may not agree with the decisions made, you
5  may not agree with the decisions made, the DPOA may not
6  agree with the decisions that were made, but those aren't
7  our decisions to make. It's for the legislature to make.
8    We talk about improper delegation of
9  legislative authority, and I'm going to quote from
10  Mr. Iorio's well written brief on page 11 and 12:
11      PA 4 purports to give the
12      Treasurer unfettered discretion,
13      with absolutely no limits, in
14      determining whether section 15(1)
15      will be applied or not.
16    I think it's a well written sentence.
17  Absolutely wrong, though, because if you read the statute
18  that he quotes up above it: Unless the State Treasurer
19  determines otherwise, beginning 30 days after the date
20  the agreement's signed with the local government, that
21  local government is not subject to section 15(1).
22    So the Treasurer is not taking away the right
23  to bargain. The legislature is. The Treasurer can
24  restore it, but he can't take it away. It's gone.
25  30 days. That's not any discretion on his part. It's

55

gone unless he determines otherwise.  That's not a delegation of legislative authority that Mr. Iorio has presented throughout all his briefs.  That's the legislature saying, "It's gone.  Now, Treasurer, if you make some determination throughout the course of the agreement that some of those things should be restored, you can do so, but, otherwise, it's gone."

You have to look at PA 4 as a whole and not just to the action and the practical necessities that flow from it.  One of the things in legislative delegation is, you must look -- presume first that the Act is constitutional and as well as look at the Act as a whole.  What is the whole scheme of PA 4, not just what does section 1514a(10) do, but what is the entire purpose and scope of the Act before you can make any determination that the legislature has improperly delegated its authority.  I think my brief is fairly clear on that issue; that there has been no improper delegation of authority.

Well, that's the first two counts of their complaint; that the State somehow improperly delegated its authority to the State Treasurer, to the Detroit Fiscal Review Team.  I still haven't, in reading the complaint four or five times, I still haven't seen any allegations about the Fiscal Review Team other than they

56

are charged under PA 4 with negotiating and signing the agreement.  But once the agreement is signed, that's an agreement between the parties, the City of Detroit and the State of Michigan.

Now, I looked at it from another aspect:  Why am I here?  If this Court were to enjoin the Governor and the State Treasurer and the Detroit Financial Review Team from, what, from entering the Fiscal Stability Agreement?  Too late.  It's all been signed.  So what are you preventing us from doing?  Act 312?  PERA is pretty clear, and so is Act 312.  That procedure is between the public employer, City of Detroit, and the union, DPOA.  Not us.  So if you enjoined us but didn't enjoin the City, would Act 312 go forward?  No.  Nothing would happen.  Nothing would change.  So I keep asking myself, why am I here under an injunction preventing me from doing what?

THE COURT:  Well --

MR. MURPHY:  Is it preventing me from --

THE COURT:  -- look at the injunction.

MR. MURPHY:  I looked at it, and I read it a couple times.  It still doesn't seem to prevent me from doing anything or telling me to do anything.  It does tell the City -- it uses Defendants plural a few times so I fall into that category, so I'm obeying it to the best

57

of my abilities.

THE COURT:  Well, it's just -- I mean, you want me to -- I mean, you asked a question, and I can answer it.  I mean, I can read what it says in the last three paragraphs of the TRO.

MR. MURPHY:  I know what it says in the last three paragraphs, but I don't have anything to do with those procedures so I don't know whether I'm violating or not.  I'm trying not to, that's for sure.  I haven't done anything or directed my clients not to do anything to interfere with the Act 312 procedure.

In fact, I think you heard Mr. Iorio state today that MERC has already issued names of mediators.

Is that what your statement was?  I don't want to misquote you.

THE COURT:  I believe he said --

MR. FILLIPE IORIO:  Yes.

THE COURT:  -- that they've issued a panel of arbitrators and --

MR. MURPHY:  So if you took my control over my clients to its extreme, I suppose we could have called MERC and told them not to send out mediators, but we didn't do that.  The mediator names went out, so obviously MERC is doing what it's supposed to do.  And they aren't a defendant here, only the State Treasurer

58

and the Governor.  So I don't know what I can do in relation to Act 312.

I'd like to point out that I've heard over and over again, "We're not attacking the entire FSA agreement.  We're not attacking PA 4 as a whole.  We're only concerned because it attacks our little fiefdom of the DPOA of Act 312, and that's what we want to protect."  Yet, they go on to argue that the range of options under the FSA, such as what they call their nuclear options or remedies in the FSA, emergency managers, receiverships, state control over the approval of cities into the capital markets, withholding discretionary state revenue payments, not those that are mandatory under the constitution, elimination of democratic representatives, all of those things are required under the agreement or under PA 4 to save the City.

And if we go to 312 and we get -- and the City were to get something that it could not live with and came to us and it looked like it was a breach of the FSA, then that's what's going to happen.  That's what's --

THE COURT:  Can the --

MR. MURPHY:  -- being asked for.

THE COURT:  Can the consent agreement be converted to the -- to having an emergency --

MR. MURPHY:  Emergency manager?  Yes, it can.

59

60

                THE COURT:  Okay.

                MR. MURPHY:  If the consent agreement is
materially breached or, for example, the City enters an
operation plan, say "We're going to do A, B, and C to get
to a certain level financially," and they do not follow
that plan, the State Treasurer can go to the Governor and
say, "You have to declare them in receivership," and an EM
would be appointed, and everything that the DPOA has
worked for and the City of Detroit has worked for is
gone.  And now we'll have an emergency manager, and we'd
probably be back here but not for long and under
different circumstances.

                This has been going on for years and years and
years.  We have to understand too that the DPOA is close
to 3,000 members of an 11, 12,000-person workforce with
48 units -- unions, which means they are the big boys.
They run the show in the City even over the firefighters.

                I'm surprised they're not here with you.

                We know what -- so the DPOA goes, so goes every
union in the City.  It's a practicality.  It's realty.
We deal with it, and so they're the ones here.  Only the
firefighters, though, and the DPOA are allowed 312
arbitration.  There's been an argument that because the
legislature amended 312 subsequent to PA 4, that somehow
that magically just makes 312 always operational under a

                    61

consent agreement.  I don't think so, and I would take
issue with that.  I think it could be operational under a
consent agreement if the Treasurer were to restore the
PERA bargaining rights under the consent agreement, which
the Treasurer has the discretion to do.

                We've heard over and over again how the
Treasurer takes them away.  No, the Treasurer doesn't.
The legislature takes them away.  The Treasurer can give
it back.  And if the Treasurer were to give it back under
circumstances that the City felt was necessary, then Act
312 could come back into play at some point for the
firefighters and/or police officers, and then the
provision of 312 amended, that would have to be taken
into consideration by an arbitration panel would come
into play.

                It may have come into play -- I'm not going to
tell the Court it has -- for other emergency managers who
are still actively bargaining with unions, entering
contracts; in other words, not imposing them, and 312
could come up, and it could go to arbitration even for an
emergency manager who wants to bargain.  So that
amendment is very obviously needed for situations where
bargaining is still taking place.

                As far as the standards for injunctive relief,
I can make as strong an argument that the public interest

                    62

demands this injunction be lifted as the DPOA has made
that the injunction should stand.  And if I can make that
argument from the point of view of the Governor, the
Treasurer, and, in essence, the People of the State who
have spoken through this legislation, then they haven't
carried that portion of the injunctive relief because the
public interest here is that the city of Detroit survive.
It's unfortunate, but it's not in the best public
interest necessarily that the DPOA survive, as harsh as
that may sound, but it is in the public interest that the
city of Detroit survive.  And that's what this stability
agreement is about.

                If your Honor only knew what I personally have
gone through regarding this fiscal stability agreement
and how important it is to so many people, even though I
personally may disagree with a lot of its terms, it isn't
for me to decide.  I've argued this in court over and
over again; it isn't for me to decide.  This is a policy
decision that was made by the People's representatives,
their elected Governor, and for the Citizens of Detroit,
their elected City Officials because unfortunately for
decades nobody has decided to make any decisions, and
this is what it's come down to.  That's the public
interest.  That's what public interest is defined as,
that type of thing, and that clearly the DPOA hasn't

                    63

carried.

                They haven't carried likelihood of success on
the merits at least as to the State Defendants because
there is nothing we can do.  We don't sit at the Act 312
table.  Only the City does.  They -- they can force us to
come in, but there is nothing we can do.  They're
employed by the City of Detroit unless, of course, they
want to take the last vestige of independence from the
city officials and say that the State of Michigan is now
the City of Detroit; then we don't need the Mayor, we
don't need the City Council, and we don't need this
fiscal stability agreement, and we'll just appoint an
emergency manager.  This is what's been desperately
trying to be avoided by all of the parties involved
because they don't feel it's in the best interest of the
People.  Yet, if the DPOA is successful, that's what
they're going to get, and I can't control that.

                Now, the Court of Claims Act that Mr. Iorio
discussed, I've been involved with that for quite awhile.
As your Honor is well aware, when the Court of Claims Act
was passed, although it was many, many years ago, this
Court was set up as the Court of Claims, but it's a
separate, distinct statutory court.  Circuit Court is a
court of general jurisdiction constitutionally provided
for.  Court of Claims is statutory specific:  Contract

**64**

```
1   actions, criminal fine actions against the State, its
2   boards, commissions, etcetera.
3           The ancillary jurisdiction talked about by
4   Mr. Iorio is there, but it's not for all of the People.
5   It's for claims.  In other words, before when the Court
6   of Claims Act was first passed, you could file a breach
7   of action -- contract action against the State for money
8   damages, but you couldn't file injunction, dec. actions,
9   equitable actions against the State in the Court of
10  Claims.  There was no jurisdiction.  That had to be filed
11  in circuit court, Ingham Circuit Court.
12          Later the statute was amended.  The Court of
13  Claims Act was amended so you could bring ancillary
14  claims against the State within the Court of Claims,
15  action for injunction, for equitable relief, but there is
16  no jurisdiction in this Court against any party other
17  than the State of Michigan, which means any order you
18  enter against the City of Detroit and/or its leadership
19  is void Latin ab initio, no effect or force because you
20  have no jurisdiction over them.
21          Any order you enter against me, the Governor,
22  and the State in their -- and our State Treasurer acting
23  in their official capacity or the Detroit Financial
24  Review Team as a state board, you have both equitable and
25  legal jurisdiction because this does involve a contract.
```

**66**

```
1   law.  I think 312 is a supplement to PERA.  I think it
2   works hand in hand with PERA.  I think logically it
3   follows 15(1) of PERA gives you the duty to bargain.  If
4   that's gone, no bargaining, no impasse, no 312.  In other
5   words, if the -- there is no bargaining, you can never
6   get to 312.
7           THE COURT:  So 15(1) basically applies to all
8   labor unions.
9           MR. MURPHY:  All labor unions, not just DPOA.
10  All of them.  There is no duty to bargain.  I don't know
11  -- I won't be so presumptuous to say what agreements are
12  expiring with the City of Detroit.  I know the police
13  officers are.  I don't know about the others.  But as I
14  said before, as DPOA goes, so goes the others.
15          THE COURT:  Okay.  Thank you, very much.
16          Okay.  Who wants to go next?  You're
17  Mr. Willems.
18          MR. WILLEMS:  Good afternoon, your Honor.  I'll
19  try not to wear you out any more than I'm sure you
20  already are.  But I would like to take the opportunity to
21  make, perhaps, a few points about the issue of Act 312
22  and its relationship to PERA.  And you can start by
23  looking at the two statutes, perhaps almost side by side,
24  and what their purpose and intent is.  And you can see
25  that PERA is -- it's both rights and obligations, okay.
```

**65**

```
1           So if you order the City of -- er, the State
2   and the Governor to do something under 312, we can't do
3   it because we're not the public employer.  And if you
4   order the City of Detroit, they don't have to do it
5   because you have no jurisdiction over them.  So that's
6   where we stand, and that's where we are today for the
7   practicality.
8           THE COURT:  So why do I get these cases in the
9   Court of Appeals involving Wayne County?
10          MR. MURPHY:  I have no idea unless it's --
11          THE COURT:  When Wayne County is a Defendant.
12          MR. MURPHY:  Social services?  Wayne County --
13  well, that's a --
14          THE COURT:  Property tax cases.
15          MR. MURPHY:  Property tax cases, I don't have
16  -- unless it's turned over to the State Treasurer for
17  collection and then the State Treasurer becomes the
18  nominal Defendant.  But in this case, it's just us.  I'll
19  entertain any questions you may have.
20          THE COURT:  I don't know if you want to address
21  it about Act 312, that that's separate and distinct from
22  PERA and the fact that the amendment -- well, I'll just
23  strike that comment.
24          MR. MURPHY:  Okay.  I think I briefed some of
25  that in my brief, not a lot, but there is, I think, case
```

**67**

```
1           First, it establishes the right of public
2   employees to designate representatives to collectively
3   bargain with the employer.  On the other side, it
4   establishes the obligation of the public employer to
5   bargain with the representatives, with the duly
6   designated representatives, the unions.  So in its
7   preamble it states that it is an Act, among other things,
8   to declare and protect the rights and privileges of
9   public employees.  Okay.  So that's why we call it a
10  substantive statute.  It defines what the public
11  employees' rights are:  To bargain collectively, to join
12  in unions, to present demands for bargaining to the
13  employer, and the employer then is obliged under section
14  15(1) to respond to those demands and engage in that
15  bargaining.
16          Now, what's developed under section 15(1) is a
17  whole body of law that talks about what are you required
18  to bargain about, and there are three kinds of subjects.
19  There are mandatory subjects of bargaining.  Those are
20  the ones that under section 15(1) you must bargain about
21  if the union makes a demand with respect to that.  And,
22  conversely, the union must bargain with the employer if
23  the employer makes a demand in this arena.  And usually
24  we think of things like hours, wages, layoff procedures,
25  things of that nature.
```

And then there are permissive subjects of bargaining. These are things that a union or employer might propose but which it cannot bargain to impasse on, and I'll touch on impasse in a minute more. And then finally there are illegal subjects of bargaining. So you have got these three categories. There is only one category that the employee is required to bargain about; those are the mandatory subjects.

Tacking over to Act 312, there is a whole body of law, and, again, I'll read the preamble to show you what the differences and the intent of these acts and why we call this a process act. This is an Act to provide for arbitration -- compulsory arbitration of labor disputes in municipal police and fire departments, to define such departments, to provide for the selection of members of arbitration panels, to proscribe procedures and authority thereof, and to provide for the enforcement and review of awards thereof.

So you take what are the mandatory subjects of bargaining under PERA, what you're required to bargain about on both sides, and if you do not reach a collective bargaining agreement in a municipal police or fire department, the City can't reach a contract with its fire unions or police unions, then they are -- have a right to go to Act 312 and take that dispute, that dispute over

68

mandatory subjects of bargaining, and present it to an arbitrator. And we have cited a number of cases, and the law is well established, and counsel for the union knows this inside out, I'm sure, that an Act 312 arbitrator only has authority over mandatory subjects of bargaining. You cannot bring permissive subjects before an Act 312 arbitrator. You cannot force an Act 312 arbitrator to consider them. Same with, well, illegal subjects. I mean, that's a whole other category.

So the duty to bargain applies to mandatory subjects of bargaining under PERA and case law interpreting it. And, as I said, there is an impasse aspect to this. Under PERA, you're required to bargain, but you're not necessarily required to agree. And that's in section 15 as well, the same -- at the same point where the statute gives the employer or requires the employer to bargain, it also says, "You have to bargain in good faith, but that doesn't mean you have to agree to something you don't want to agree to."

Ultimately, an employer can impose if impasse is reached between it and non-public safety unions, and there is a whole process and procedure for that. It involves mediation, fact finding. Imposition is not simple. It's not easy. It can take a long time. It can take months, it can take years before you actually get to

69

that point, and you're required to bargain all throughout.

For police and fire, there is this other process: Act 312 arbitration. It is simply another form of bargaining, bargaining over subjects that are defined in PERA. And one of the aspects of Act 312 that illustrates and underscores that is section 423.237a, which authorizes the Act 312 arbitrator to remand a dispute for further collective bargaining. And it states:

At any time before the rendering of an award, the chairman of the arbitration panel, if he is of the opinion that it would be useful or beneficial to do so, may remand the dispute to the parties for further collective bargaining for a period not to exceed three weeks.

Now, as a practical matter, I've been personally involved in Act 312 proceedings for probably as long as I've been a lawyer. And I'm sure that counsel for Plaintiffs have the same experience. Very often the parties continue to bargain while they're in Act 312. They present a number of proposals. They bargain over

70

some. They settle some. They leave some with the arbitrator. And at the end, what have you got? You have got a collective bargaining agreement. You have an Act 312 award. You have got portions you've agreed to or tentatively agreed to that are not in dispute. And at the end of that, you tie all of that up in a collective bargaining agreement.

So although Act 312 is a statute that appends to PERA, it is not PERA itself. It is, by its own terms, supplementary to PERA and provides a process by which public safety employees can overcome impasse and the employer as well in their collective bargaining over mandatory subjects of bargaining. So that's the critical piece that's left out of the Plaintiff's argument here.

The DPOA wants to convince this Court that Act 312 somehow defines the subjects of bargaining, which is not the case. Those are defined in PERA. Act 312 is ancillary to it. It's another form of bargaining, and that's what the cases say.

And so if under Act 4 the duty to bargain is suspended, then there are no more subjects that are mandatory that can be submitted to an Act 312 arbitrator. There is no need to amend or repeal Act 312 in order to accomplish that. The suspension of the duty to bargain under PERA by itself does that. And it does that only

71

**Page 72**

1  for those public employers who operate under a consent
2  agreement.  And as counsel for the State made clear, and
3  I think it's clear from the statute from Act 4, there --
4  that is by operation of statute; it's not by operation of
5  the Treasurer.
6        In fact, that was -- we argued in our brief
7  that the DPOA really lacks standing to bring the argument
8  about unconstitutional delegation with respect to the
9  Treasurer because, in fact, the Treasurer cannot harm the
10  DPOA.  The statute itself does that.  The statute takes
11  away the duty to bargain.  If anything, all the Treasurer
12  can do is benefit them by suspending the suspension, so
13  to speak, or exempting the exemption.  So on those
14  grounds alone, they lack standing to even make that
15  argument.
16        Now, the DPOA also argues that Act 312 was
17  amended, and, indeed, it was as part of Act 4, and that
18  those amendments confirm that Act 312 is not affected by
19  the amendment to PERA and -- er, the suspension of the
20  duty to bargain.  But, again, that rests on a fundamental
21  misconstruction of the statute.  Because the Treasurer
22  also has the authority under a consent agreement to
23  reinstate the duty to bargain, obviously there has to be
24  a mechanism for that -- for the provisions under any
25  consent agreement to also be considered in Act 312.

72

**Page 73**

1  That's why it was amended.  It was amended in two parts,
2  section 9, subparagraph (8) and subparagraph (9).  (8)
3  provides for what happens if you have an emergency
4  manager and the emergency manager agrees to enter into
5  Act 312 or doesn't eviscerate the Act 312 rights.  And
6  section (9) provides for what happens if there is a
7  consent agreement.
8        And one of the -- one of the reasons this is
9  done is section 9 sets out the standards by which an
10  arbitrator is supposed to review the proposals and
11  evidence of the parties and fashion an award, and there
12  has been a long debate about those prov -- the -- those
13  provisions of section 9; whether they are effective
14  enough; what is the weight to be given to each of them,
15  and there is a lot of argument between the unions and
16  public employers and in the case law about that.
17        However -- and so the legislature at the same
18  time that it was amending those -- those provisions
19  looked at the ability-to-pay section.  Prior to these
20  amendments, ability to pay was only one factor for an Act
21  312 arbitrator to look at.  Given the exigencies of the
22  last decade, if not longer, and given that Act 4 is a
23  statute, it's actually a successor statute to Act 72 and
24  to a prior act, that Act 4 is legislation intending to
25  address communities in financial distress and provide for

73

**Page 74**

1  a means for them to stabilize financially.  Any
2  provisions including operating plans, financial stability
3  agreements, things of that nature need to be taken into
4  account if there is an Act 312 proceeding.
5        So by amending the ability-to-pay portion of
6  Act 312 of the -- of section 9 of the standards that an
7  arbitrator is supposed to apply, the legislature took
8  into account anything that might happen under Act 4,
9  anything that might happen under a consent agreement, or
10  anything that might be devised if an emergency manager is
11  put in place.
12        Does that help you with respect to the
13  relationship between Act 312 --
14        THE COURT:  Yes.
15        MR. WILLEMS:  -- and PERA?
16        THE COURT:  Thank you.
17        MR. WILLEMS:  Is there any questions on that?
18        THE COURT:  No.
19        MR. WILLEMS:  Okay.  There's a couple other
20  points I want to make.  One is, there is an agreement
21  being made here that all of this is completely
22  destructive of the union.  I think the term "dismantling
23  the DPOA" was used in oral argument, and that is
24  absolutely not the case.  The -- as I indicated before,
25  there are both rights and obligations under PERA.  The

74

**Page 75**

1  right to join in unions, the right to have designated
2  union representatives, none of those are being abrogated.
3  Only section 15(1), the obligation to bargain, is
4  suspended.
5        And as are the affidavit of Jack Martin
6  attests, and as I can stand here and tell you, it is not
7  the City's intent, nor does it have the authority under
8  the FSA or under Act 4, to dismantle the DPOA, to refuse
9  to recognize it, and, in fact, the City intends to
10  continue many of the -- the procedures and policies, so
11  to speak, that are effectuated under a collective
12  bargaining agreement.  Grievance procedures, arbitration
13  procedures, trial boards for this particular group, those
14  are going to continue.  Union representation is going to
15  continue.  In most cases, they're not going to notice the
16  difference.
17        The dues checkoff, service fee checkoff, all of
18  those kinds of things that make for a collective
19  bargaining type of relationship where the union
20  interfaces with the employer in order to resolve problems
21  that arise in that relationship, all of that is going to
22  continue.
23        If, indeed, the City wanted to dismantle the
24  DPOA, the first thing it would do would be to eliminate
25  dues checkoff and cut off the financial pipeline for the

75

1  membership to the union.  That has been done but not in
2  this case.  That is not the intent at this point.  The
3  intent is to keep the DPOA, and that is because this is
4  not a permanent state.  This is not a repeal of Act 312.
5  This is not a doing away with Act 312.  This is a duty to
6  -- the suspension of the duty to bargain is coextensive
7  with the financial stability agreement.
8        At some point, presumably, collective
9  bargaining will return and the DPOA will once again be
10  entering into negotiations and Act 312 proceedings.  This
11  is not neither an act nor an intent to do what the DPOA
12  is claiming the City can or will do.  And that
13  particularly speaks to the provision of the FSA that
14  addresses the Mayor's authority.  As you rightly noted,
15  the authority even for an emergency manager is --
16  although the provision in the FSA mimics that language,
17  it says -- it qualifies it.  The Mayor is only entitled
18  to do what he is able to do under the law.  Under the
19  law, all he can do is not bargain or suspend bargaining
20  on -- on expired contracts.  He has no authority, nor is
21  he exercising any authority to terminate existing
22  collective bargaining agreements.
23        Indeed, there are two other collective
24  bargaining agreements in the City of Detroit Police
25  Department.  There is the Detroit Police Lieutenants and

76

1  Sergeants Association, whose contract expires in a year,
2  the DPCOA, the Detroit Police Command Officers
3  Association, whose contract also expired on June 30th and
4  on whom -- er, with respect to whom the same terms and
5  conditions of employment are being imposed.  They are not
6  here.  They're not demanding Act 312.  They have the same
7  rights as DPOA.  They're not here saying that the world
8  is going to end and that the City will be a wash in
9  crime.
10        In fact, many of those horror scenarios that
11  have been painted for you here are just as likely to
12  happen if the City runs out of money, which it has done
13  and which it continues to do and has to lay people off,
14  particularly police officers and fire officers.
15        So for those reasons we respectfully request
16  that you deny their motion for a temporary restraining
17  order, dismiss the complaint in its entirety and with
18  prejudice, and allow the City to effectuate its rights
19  under Act 4 and the benefit of Act 4 that has been passed
20  through the consent agreement to suspend the duty to
21  bargain and engage in the process of achieving financial
22  stability over the next three to five years, a daunting
23  task at best.
24        Finally, if the Court is not going to rule
25  today, we request that you stay the MERC proceedings

77

1  relating to Act 31 while your decision is pending.  If
2  the Court does not stay those proceedings, then the Act
3  312 process and machinery will proceed, and the City is
4  at risk of having its concerns placed before a third-
5  party arbitrator, and the result of that is
6  unpredictable.
7        We -- you know, the DPOA has said, "Oh, what
8  we've got is a drop in the bucket."  It's $33 million.
9  That's not a drop in the bucket.  Yes, the budget is
10  1.2 million if you discount the enterprise areas of the
11  City, but when you're looking at 150,000, 180,000
12  deficits coming up in the next two years and --
13        THE COURT:  You mean $157 million.
14        MR. WILLEMS:  I'm sorry, million, yes.  I
15  misspoke.  When you're looking at that size of a deficit,
16  every dollar counts, and $33 million is just a piece of
17  the puzzle.  As counsel for the State pointed out, there
18  are 48 collective bargaining units, 48 agreements, 30
19  supplementals.  There is a lot at stake here.  This is
20  one piece of it.  It's as critical a piece as any other
21  piece.  The City has to have these savings, and it has to
22  have them now.  The City spends over $1 million a day on
23  its operations.  We can't afford to do that without
24  putting the FSA in place in its entirety, and that
25  includes the DPOA.

78

1        THE COURT:  Okay.  Thank you.
2        MR. WILLEMS:  Thank you.
3        THE COURT:  Mr. Hodge?
4        MR. HODGE:  I defer to my colleague,
5  Mr. Willems.  Thank you, your Honor.
6        THE COURT:  Okay.
7        Brief rebuttal?
8        MR. FILLIPE IORIO:  Thank you.  I will be
9  brief.  Your Honor, as to Mr. Jarvis's comment about the
10  contract terminating, the reality in the labor scenario,
11  especially in Act 312, is it doesn't technically
12  terminate where there is pending Act 31 proceedings.
13  Under
14  MCL 243.243, the existing wages, hours, terms and
15  conditions continue.  So it's not, I think, a fair
16  statement to say somehow the contract terminates.  In the
17  labor realm, especially Act 312 pendency, existing terms
18  continue.
19        Mr. Murphy made much comment on the fiscal
20  integrity of the City and their very existence being at
21  stake.  Those are all arguments that do not belong in
22  this Court.  They belong before the Act 312 panel.  The
23  legislature saw fit to make clear that the arbitration
24  panel must give the financial ability to pay as the most
25  significant factor in analyzing the DPOA's demands.

79

That's where that belongs, not before this Court.

He also talked about the constitutional claim, and I want to make sure that this Court understands you don't have to make a constitutional finding to rule in favor of the DPOA, and that is because this PA 4 did not amend Act 312. PERA, despite Mr. Willems' statements and arguments, does not control Act 312. Act 312 is a separate, independent statute. I point again to the *Center Line* case, the Court of Appeals case, which is good law which states that. And also point again to the substantive rights that are set forth in Act 312.

So you don't have to make any constitutional finding to find that the DPOA is entitled to Act 312 rights. We have made a constitutional claim just to point out that the Treasurer, where he claims to have suspended section 15 rights under PERA -- I'm sorry not the Treasurer claims he suspended, but the Treasurer having the right to revive section 15 rights, that is an unconstitutional delegation because there are no, absolutely no standards. But you don't have to make that finding to determine that the DPOA is entitled to Act 312.

He also mentioned, I think, there were close to 3,000 DPOA police officers. That number is, as stated in Joseph Duncan's affidavit, 2,130. He mentioned the

80

firefighters not being here and the LSA not being here. The LSA is lieutenants and sergeants. The firefighters' contract is still in effect. It's got another year in effect. And the City has taken no action to terminate, modify, amend, or change that. There is no reason for the firefighters to be here because the City isn't extracting any sort of concessions on the firefighters.

The same thing with the LSA, lieutenants and sergeants. The contract is still in effect. The City hasn't taken any action to extract any sort of concessions that it claims it needs in order to function on a day-to-day basis. There is no reason for either of those two groups to be here.

The -- Mr. Murphy also commented on the Court of Claims. Again, we would be willing to brief that as it wasn't raised at least in the State's brief and the Defendant City Mayor brief and other Deputy briefs. We maintain that there is jurisdiction in this Court.

Again the whole of the lawsuit is based upon the FSA. I cannot envision this being split up in a circuit court in Wayne County and the State claim being addressed by this Court. It would be not only inefficient, but how could you have a scenario where two different courts are looking at the same FSA and making determinations as to its applicability or

81

non-applicability?

Mr. Murphy also made comment, what is the State being directed to do or prevented from doing? You know, I pointed out the FSA and the mechanism in the FSA, the enforcement mechanisms. The State is directing the City to do certain things. They are directing the City to take actions against the DPOA. There is also a major penalty that the City will be imposed upon if they do not take those actions, the ultimate penalty being having a receivership declared. So to somehow claim the State is not doing anything would require a -- blinders, to put on blinders and to not take into account the true meaning of the FSA.

Mr. Murphy also made comment that he believes the Act 312 is separate -- er, is not separate and distinct. I would point your Honor to -- we filed a reply brief to the City's brief. In that brief we attached as Appendix A an amicus brief that the State Attorney General filed in a separate case, a Detroit Firefighters' case in the Supreme Court. They filed it November 2, 2007, where the State Attorney General was arguing exactly what the DPOA is arguing here: Act 312 is separate and distinct from PERA, and that the circuit courts have the authority not only to enforce it but the obligation to enforce it if, indeed, the status quo is

82

not being maintained during the pendency of arbitration.

We would ask that you take consideration of the State's position in an admittedly different case that involved different parties. Well, I guess it didn't involve totally different parties. The City of Detroit was a defendant in that case as well.

As to Mr. Willems' argument in the Act 312 and its relation to PERA, they are clearly two different statutes. And to make the argument that somehow Act 312 is procedural but PERA is substantive would require this Court to write something into the Act 312 statute that is not there. Act 312 is a substantive provision. It contains real rights.

Again, I would direct the Court to look at section 423.231, and I'm reading:

It is the public policy of this state that in public police and fire departments where the right of employees to strike by law is prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternate, expeditious, effective, and binding procedure

83

**[Page 84]**

1    for the resolution of disputes,
2    and to that end the provisions of
3    this act, providing for
4    compulsory arbitration, shall be
5    liberally construed.
6        That is not a procedure. That is a right.
7    That is something that the legislature saw fit to enact
8    that goes above and beyond anything that's contained in
9    PERA. That is a right that no public employee has other
10   than police and fire employees.
11       The Court should take notice and in its
12   consideration of the interplay of PA 4 and Act 312 the
13   fact that PA 4 was enacted March 16, 2011, and Act 312
14   was amended and effective July 20, 2011. Again, the
15   legislature's presumed to know the law on its books. If
16   it wanted to invalidate Act 312 proceedings when a
17   consent agreement is in place, it would have done so, and
18   it did not do so.
19       Mr. Willems mentioned the affidavit of
20   Jack Martin. Our understanding is Jack Martin is the CFO
21   who's been recently appointed through the terms of the
22   FSA. So he's not been on the job long, at least in terms
23   of calendar months. And, you know, his affidavit that at
24   this time or at this point they're not going to be making
25   changes to policies and procedures is entirely

84

**[Page 85]**

1    inconsistent with what the Director of Labor Relations is
2    telling my client, and you have those letters in
3    evidence. Exhibit A to the -- I'm sorry, Exhibit I to
4    the first Duncan affidavit and the other exhibits clearly
5    state that the City through its labor relations
6    department will be determining on a case-by-case basis
7    what provisions of the now expired collective bargaining
8    agreement will be continued.
9        And there is nothing, nowhere, and even the
10   Mayor's counsel mentioned "at this time." So although
11   they are collecting dues at this time, that does not mean
12   under the City's theory that tomorrow they couldn't
13   decide to stop, and that is the irreparable harm. At
14   this point the City because of pressure from the State is
15   saying, "We have 'terminated the contract'. We will not
16   be subject to 312. We will not be subject to mediation,
17   and we are willing to sit down with you and tell you what
18   your new employment terms will be."
19       And if you look at the supplemental affidavit
20   of Joe Duncan, Exhibit A, that's essentially what the
21   City says in -- from its labor relations director.
22   Again, Mr. Willems mentioned the LSA contract. They're
23   not here. That contract has expired. And as far as we
24   know and we understand, they have not -- the City or the
25   State hasn't taken any action to extract concessions from

85

**[Page 86]**

1    the LSA. He mentioned the DPCLA. That's the command
2    officers. I think there's less than 40 command officers,
3    and what their position is really has no relevance or
4    bearing on the legal issues that are before you today.
5        The -- Mr. Willems mentioned that somehow
6    giving this to a third-party arbitrator in Act 312 would
7    not be -- would not be appropriate. The City sure didn't
8    seem to think it was inappropriate to enter into an
9    agreement where if they violate that agreement, they will
10   have an emergency manager appointed who will divest the
11   democratically elected City Council and Mayor from having
12   any authority.
13       The DPOA maintains that it is entitled not only
14   to injunctive relief but to a declaratory judgment. The
15   DPOA is asking that this Court recognize that Act 312 is
16   a separate statute that prevails, that the City is
17   subject to Act 312, and that the State be prohibited from
18   taking any action to obstruct, prevent the Act 312
19   process from continuing.
20       We also object to the City's request that the
21   MERC proceedings be stayed. And unless you have any
22   further questions, I don't have anything in addition.
23       THE COURT: Nope. That's it.
24       MR. FILLIPE IORIO: Oh, your Honor, just one
25   more point if I could. The -- you had asked about the

86

**[Page 87]**

1    tentative agreement and was it in writing. It is
2    attached as part of our exhibit to the initial Duncan
3    affidavit. Exhibit C, the first page is the actual
4    initiation of the Act 312 proceedings. The next 12 pages
5    were the tentative agreement that was reduced to writing
6    in February of 2012.
7        THE COURT: I'm sorry, what exhibit was that?
8        MR. FILLIPE IORIO: That is Exhibit C to the
9    initial Duncan affidavit, not the exhibits that we gave
10   you today but the exhibits that were filed with the
11   verified complaint. The first page is the notice of
12   status of negotiations. The next page and continuing is
13   the tentative agreement that was reduced to writing.
14   Thank you.
15       THE COURT: You're welcome. Okay. The Court
16   has read the briefs filed by the parties. The issue
17   today is whether or not the Court should grant a
18   preliminary injunction. There was an ex parte TRO that
19   was signed. I was on vacation at the time, and it was
20   signed by Judge Aquilina enjoining the Defendants from
21   taking any action to implement Public Act 4, section 14a
22   (10), FSA sections 4.1 and/or 4.4. And they were also
23   enjoined from taking any action to implement any other
24   provisions of PA 4 or the FSA that purports to suspend or
25   restrict Act 312 and/or the collective bargaining against

87

Plaintiff DPOA. And they were also enjoined from failing
and/or refusing to maintain the status quo in compliance
with section 13 of Act 312 with respect to terms and
conditions of employment pending operation of Act 312
compulsory arbitration proceedings.

The City contends that -- not the City, excuse
me, the Detroit Police Officers Association, also called
the DPOA, contends that the City of Detroit is obliged to
engage in compulsory Act 312 labor arbitration regarding
a successor labor agreement because the legislature did
not expressly amend or repeal Act 312 when it exempted
the local governments from the duty to bargain under
section 15 of the Public Employment Relations Act, also
called P-E-R-A or PERA when they enacted Public Act 4.

And the City claims that the Act 312 is
separate and distinct from PERA and that when the
amendment was -- when the amendment was enacted to PERA,
specifically under section 15(9):

A unit of local government that
enters into a consent agreement
under the local government and
school district fiscal
accountability act --
Which is Public Act 4.
-- is not subject to subsection

88

(1) for the term of the consent
agreement as provided in the
local government and school
district fiscal accountability
act.
And subsection (1) provides that:
A public employer shall bargain
collectively with the
representatives of its employees
as described in section 11 and
may make and enter into
collective bargaining agreements
with those representatives.
And it also defines what it means:
To bargain collectively is to
perform the mutual obligation of
the employer and the
representative of the employees
to meet at reasonable times and
confer in good faith with respect
to wages, hours, and other terms
and conditions of employment, or
to negotiate an agreement and to
execute a written contract.
So under section 15(9), if there is a consent

89

agreement entered, the local government is not subject to
subsection (1), which is their duty to bargain,
basically.

And the Defendants claim that there is no duty
to bargain or to enter into binding arbitration under Act
312, and, therefore, the injunction should not be
granted.

Now, the Court, in looking at whether or not to
grant an injunction, a party moving for one must meet the
four standard requirements that are briefed by the
parties, and they're stated in the *Thermatool* --
*Thermacool* case, I believe, but they are:

Number one, the probability that the Plaintiff
will succeed on the merits.

Number two, the degree of irreparable harm that
the Plaintiff will suffer if injunctive relief is not
granted.

Number three, the balance between the harm the
Plaintiff will suffer if leave is not granted and the
harm the Defendant will suffer if it is granted.

And the fourth requirement is whether or not
the injunction will promote the public interest.

Here, I believe the -- well, first of all, all
four factors must be -- er, Plaintiff must prevail on all
four factors. And the -- really the deciding factor for

90

this Court is whether the -- whether or not the
injunction will promote the public interest. It's common
to anyone to read in the newspapers about the dire
financial conditions that the City of -- City of Detroit
is experiencing. So when I look -- when I view that and
I've read the affidavits of the parties, and I would just
say that I think, you know, police officers deserve
every, you know, dollar that they earn, but I don't
believe that the public interest would be served by
granting an injunction, and for that reason there would
be greater harm to the Defendant if the injunction is
granted than to the Plaintiffs if the injunction is not
granted.

And the Court notes that based on Mr. Murphy's
comments, this would not be permanent. Hopefully that in
a few years the City will recover, and you can go back to
your Act 312 arbitration. But the Court is denying the
motion for the preliminary injunction.

Mr. Willems, if you'd submit an order, please.
MR. WILLEMS: I have orders prepared,
your Honor.
THE COURT: And I believe that that would
probably resolve the case.
MR. FILIBERIO: Well, could I ask for some
clarification, your Honor?

91

THE COURT: Go ahead.

MR. FILLIPE IORIO: We have asked for declaratory judgment as well, and that would require a determination of the merits of the case.

THE COURT: Well, then, it would not resolve the entire case --

MR. FILLIPE IORIO: Well --

THE COURT: -- because this was just for the TRO today. I'm not going to make constitutionality rulings as to Public Act 4 today.

MR. FILLIPE IORIO: All right. Our counts on declaratory judgment don't all include declar -- er, don't all involve constitutional claims, but we would submit that the four factors for injunctive relief aren't something to be weighed when you're looking at a declaratory judgment action. In that sense, you'd be looking at the merits of the claims raised by the DPOA. And we would note that, you know, this is an important case to my client. As far as guidance from you in proceeding further, do you see additional hearings?

THE COURT: If you want the Court to make additional rulings, I would do so. But in regard to the Act 312, I'll make some additional findings right now. Perhaps that would be helpful. But I've considered your argument that Act 312 is totally separate, and the fact that there was only an amendment to PERA does not -- does not -- does not change the Court's ruling because looking at the case law, I believe that PERA is the umbrella statute. And Act 312 simply is specific, and it provides a further mediation process to public safety employees, firefighters, police officers.

But the initial collective bargaining is done under the Public Employees Relations Act. And the fact that that statute was amended also affects Act 312 in that you're prohibited from going ahead with mandatory arbitration.

If I'm going to issue an opinion in regard to other issues raised, then I would like the jurisdiction issue addressed.

MR. FILLIPE IORIO: I don't know how we bring closure to this case if we don't address the other counts. And it just -- looking at the case, I'm not sure what other proceedings need to be done from our end. I mean, do you envision hearings?

THE COURT: Well, in your closing, in your closing rebuttal, you ask that the Court grant an injunction and that I make a declaration that Act 312 is a separate statute, and of course it's a separate statute. And you wanted Defendants enjoined from taking no further action against changing any working condition which I denied.

Now, the Defendants ask that I dismiss the lawsuit in its entirety. Because the issue is moot, I'm not going to stay the MERC proceedings as requested by Defendants. I know you have other -- you have six counts in the complaint.

You also made the argument in Count I that the PA 4 is unconstitutional because of the separation of powers clause. I'm not prepared to rule on that today. But you have to meet all four prongs for an injunction, and I'm ruling against you on the public interest prong. So it's really moot whether or not I found for you or not in regard to PA 4's constitutionality.

MR. FILLIPE IORIO: But it's not moot as to our other counts that request declaratory judgment. We've asked the Court to declare that, for instance, the DPOA is entitled to Act 312 proceedings, and that PA 4 and the FSA do not restrict or limit, in any way, the DPOA's right to -- to participate in the Act 312 process.

And I just wanted clarity as far as your -- we're asking for a ruling on the merits as well and --

THE COURT: Well, then I'll need to write an opinion, but today the injunction is denied.

MR. FILLIPE IORIO: All right.

MR. MURPHY: Your Honor, I've prepared an order just denying the injunction as to the State Defendants that I would ask the Court to at least look at and enter. It doesn't have any other rulings on the merits.

THE COURT: Show it to counsel.

MR. MURPHY: I've showed it to my Co-Defendant counsel, but --

MR. HODGE: Just write in "All Defendants."

MR. MURPHY: Your Honor, I can change it to All Defendants instead of State Defendants if --

I've shown it to him, and I've changed State to All, and it only denies the injunction.

Is that correct in my statement, Mr. Iorio?

MR. FILLIPE IORIO: Yes.

THE COURT: That's all for the record.

(At 4:50 p.m., recessed;
reconvened at 4:51 p.m.)

THE COURT: Go back on the record.

MR. FILLIPE IORIO: Thank you.

THE COURT: You have five minutes.

MR. FILLIPE IORIO: Well, we would move to stay operation of this order denying the preliminary injunction pursuant to MCR 2.119 --

THE COURT: 2.119.

MR. FILLIPE IORIO: Yes.

THE COURT: What is the number? 2.119?

```
1          MR. FILLIPE IORIO:  Is that what it is?
2          THE COURT:  I think so.  I get them from time
3   to time.
4          MR. FILLIPE IORIO:  If you'll just give me a
5   moment, I'll look.
6          THE COURT:  You're moving for reconsideration.
7          MR. FILLIPE IORIO:  I'm sorry, we're moving for
8   a stay injunction pending appeal, 2.614(C).  Obviously we
9   don't have a final order, but we would ask this Court
10  stay the order denying the injunction, to keep in place,
11  essentially, the status quo.
12         THE COURT:  Well, it would be by application
13  for leave, but, you know, you do have to ask the trial
14  court for a stay prior to asking the Court of Appeals.
15         So the motion for a stay is denied.  And if
16  you'd submit an order on that effect, then you can file
17  your application for leave to appeal.
18         MR. FILLIPE IORIO:  And on that, just -- and I
19  understand the Court is busy and we foisted this upon you
20  without a lot of notice, but as far as your opinion and
21  order, is that something that you would envision being
22  issued in the near future?
23         THE COURT:  You know, probably within 60 days
24  or less.
25         MR. FILLIPE IORIO:  Okay.  Okay.
```

```
1          THE COURT:  So I'll try to get it out as soon
2   as I can, but I wanted to rule on the injunction today.
3          MR. FILLIPE IORIO:  All right.  Thank you.
4          THE COURT:  You're welcome.  Thank you.
5          MR. MURPHY:  Thank you, your Honor.
6          THE COURT:  You're welcome.
7               (At 4:54 p.m., the matter is
8               concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1       STATE OF MICHIGAN)
                         ) SS.
2        COUNTY OF INGHAM)

3

4                    CERTIFICATE OF REPORTER

5

6                I, Melinda I. Dexter, Certified Shorthand

7       Reporter, do hereby certify that the foregoing

8       97 pages comprise an accurate, true, and complete

9       transcript of the proceedings and testimony taken in the

10      case of Detroit Police Officers Association versus City

11      of Detroit, et al., Case No. 12-80-MK, on Monday, July 9,

12      2012.

13               I further certify that this transcript of the

14      record of the proceedings and testimony truly and

15      correctly reflects the exhibits, if any, offered by the

16      respective parties.  WITNESS my hand this the eleventh

17      day of July, 2012.

18

19

20

21

22      _____
                 Melinda I. Dexter, RPR, CSR-4629
23               Official Court Reporter
                 313 West Kalamazoo
24               Post Office Box 40771
                 Lansing, Michigan  48901-7971
25
```

98