2010 WL 1924868
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Robert ADAIR, Plaintiff-Appellee,
v.
UTICA COMMUNITY SCHOOLS, Defendant,
and
Utica Skilled Trades Association,
Defendant-Appellant.

Docket No. 288286.
|
May 13, 2010.

West KeySummary

1   **Labor and Employment**
    Union's breach of duty

Trial court's denial of union's motion for summary disposition in carpenter's breach of duty of fair representation claim, based on union's claim that carpenter failed to exhaust contractual remedies as to underlying grievances, was not error. Carpenter's first grievance, based on an issue regarding his seniority, was simply ignored by the union. During the process for the second grievance, by which time the carpenter had filed suit, the union again refused to budge from its previous position and refused to represent him at the formal stage of the process. Thus, the union's hostility towards the carpenter was clear and an exception to the exhaustion requirement was applicable.

Cases that cite this headnote

Macomb Circuit Court; LC No. 07-003776-CK.

Before: MURPHY, C.J., and JANSEN and ZAHRA, JJ.

**Opinion**

PER CURIAM.

*1 Defendant Utica Skilled Trades Association (USTA or union) appeals as of right a judgment entered on a jury verdict in favor of plaintiff Robert Adair on his claim of breach of the duty of fair representation. The jury awarded plaintiff a grand total of $288,053 in damages with respect to the claim, which included $225,000 in exemplary damages and $10,000 in emotional distress damages. We affirm the verdict with respect to liability and the award of damages, except that we vacate the award of emotional distress damages.

I. OVERVIEW

This case stems from the USTA's failure to adequately and properly represent plaintiff relative to a grievance lodged by plaintiff against defendant Utica Community Schools (UCS) after the UCS laid him off from his job as a journeyman carpenter during a fiscal crisis. Although plaintiff had the least actual seniority amongst school carpenters, he was a union steward on the afternoon shift for the USTA, and he claimed that he was thus protected from being laid off under the principle of superseniority. Superseniority is a concept encompassed by the UCS's and USTA's collective bargaining agreement, whereby union representatives, for purposes of layoffs and layoff protection, are effectively treated as if they have greater seniority than more senior union employees within their job classification. On the basis of an opinion issued by the Michigan Employment Relations Commission (MERC) in *Warren Consolidated Schools v. AFSCME,* 19 MPER 37 (2006), and the advice of counsel for the Michigan Education Association (MEA), officials of the USTA, as well as the UCS, essentially came to the conclusion that plaintiff did not qualify for protection based on superseniority status. This conclusion led to the UCS giving short shrift to plaintiff's grievance, which was denied at the informal stage under the grievance procedures outlined in the collective bargaining agreement,[1] and it led to the USTA's lackadaisical and inadequate handling of the grievance on behalf of plaintiff; there was no effort by the union to process the grievance and proceed to step 1 of the formal stage of the grievance procedures. We note that the jury ultimately found that the UCS had indeed breached the collective bargaining agreement by laying plaintiff off and not giving him supperseniority protection. We agree with the jury's assessment, as the union's interpretation and application

of the *Warren* ruling, and cases cited therein, strained reason to say the least, where plaintiff engaged in steward and thus steward-like duties.

Plaintiff filed a second grievance on the matter after nothing came of the first grievance. At this point, plaintiff was not working as the layoff had taken effect. The second grievance could be deemed untimely under the collective bargaining agreement. Shortly after filing the second grievance, plaintiff commenced this lawsuit in the trial court against the USTA and the UCS. The USTA subsequently filed two motions for summary disposition during the litigation, arguing that the court lacked subject-matter jurisdiction because plaintiff failed to exhaust his remedies under the collective bargaining agreement's grievance procedures, which included arbitration at the final level (step 4) of the formal stage of the process. Both summary disposition motions were denied by the trial court, and this Court twice denied the USTA's applications for leave challenging the trial court's rulings. *Adair v. Utica Community Schools,* unpublished order of the Court of Appeals, entered June 10, 2008 (Docket No. 283542); *Adair v. Utica Community Schools,* unpublished order of the Court of Appeals, entered August 11, 2008 (Docket No. 285987).

**\*2** During the litigation, the trial court refused to halt ongoing grievance proceedings relative to the second grievance; therefore, there were parallel proceedings, one in the trial court and one under the provisions of the collective bargaining agreement. The second grievance went through the informal stage and three levels of the formal stage, but did not ultimately result in arbitration. Plaintiff's grievance was rejected at every level, and there was testimony that the union refused to assist or represent plaintiff in the grievance proceedings, forcing plaintiff to represent himself and to struggle with what was, primarily, a legal argument. At one of the court hearings, counsel for the USTA stated that the union would not argue at any grievance meeting that plaintiff was entitled to superseniority protection. While union officials testified at trial about a planned arbitration and that it would be possible for the union to advocate on plaintiff's behalf at an arbitration, the trial court thereafter entered an order granting summary disposition in favor of the UCS in a separate declaratory judgment action commenced by the USTA, in which the USTA had sought an order forcing arbitration. The UCS and plaintiff had accepted a case evaluation award in the instant suit, and plaintiff's claims against the UCS were therefore dismissed. There essentially was nothing left for the UCS and plaintiff to arbitrate, even though the trial court, consistent with the caselaw, required plaintiff to prove at trial,

as part of the fair representation claim and as a prerequisite to the recovery of damages, that the UCS had breached the collective bargaining agreement. The jury was directed to determine whether plaintiff was entitled to superseniority protection against the layoff.

Throughout the litigation in the trial court, the USTA, while filing motions for summary disposition and applications for leave, never filed an answer to the complaint. Before trial, the court granted plaintiff's motion in limine that sought to exclude any evidence proffered by the USTA denying liability with respect to the claim of breach of the duty of fair representation. The basis for the motion and ruling was that the USTA never filed an answer to the complaint, thereby admitting the allegations contained in the complaint. The jury was instructed that the USTA admitted that it breached the duty of fair representation. The trial court, however, allowed the jury to resolve the issue of whether plaintiff had to exhaust his contractual grievance remedies, where the jurors were directed to make the determination whether plaintiff was excused, under the facts presented, from exhausting his remedies under three exceptions to the exhaustion requirement.

The jury returned a verdict, finding that the UCS had breached the collective bargaining agreement, which meant that the jury had concluded that plaintiff had superseniority status. The jury also found that plaintiff was excused from processing his grievance all the way through arbitration prior to filing the lawsuit, that the USTA actively participated in the UCS's breach of the collective bargaining agreement, that the USTA breached its duty of fair representation as to plaintiff, which had been admitted, and that the USTA acted with recklessness, malice, or deceit. The jury further found that causation was established and that the USTA was jointly and severally liable for plaintiff's damages resulting from the UCS's breach of the agreement. The jury concluded that plaintiff's damages directly attributable to the UCS's breach of the agreement amounted to $33,053, that plaintiff's damages directly attributable to the USTA's breach of the duty of fair representation up to May 1, 2008 (approximate date of UCS's stipulated dismissal connected to case evaluation acceptance), amounted to $20,000, plus an additional $10,000 for emotional distress damages,[2] and that the USTA must pay plaintiff exemplary damages in the amount of $225,000.

**\*3** Following the trial, plaintiff was awarded case evaluation sanctions, and the trial court denied the USTA's motion for

judgment notwithstanding the verdict (JNOV), or for new trial, or for remittitur. The USTA appeals as of right.

## II. ANALYSIS

### A. BREACH OF THE DUTY OF FAIR REPRESENTATION

We begin with a brief overview of a cause of action for breach of the duty of fair representation. In *Goolsby v. Detroit,* 419 Mich. 651, 655, 358 N.W.2d 856 (1984), our Supreme Court exhaustively examined the legal underpinnings of a claim that "a union's unexplained failure to process a member's grievance constitutes a breach of the union's duty of fair representation." The Supreme Court reached the following conclusions:

> [W]e hold that: (1) PERA [Public Employment Relations Act, MCL 423.201 *et seq.*] impliedly imposes on labor organizations representing public sector employees a duty of fair representation; (2) bad-faith conduct is not always required to make out a breach of that duty; (3) the conduct prohibited by the duty of fair representation includes (a) impulsive, irrational or unreasoned conduct, (b) inept conduct undertaken with little care or with indifference to the interests of those affected, (c) the failure to exercise discretion, and (d) extreme recklessness or gross negligence; (4) absent a reasoned, good-faith, nondiscriminatory decision not to process a grievance, the failure of a labor organization to comply with collectively bargained grievance procedure time limits constitutes a breach of the duty of fair representation; and (5) in this case, the union's inexplicable failure to comply with the grievance procedure time limits indicates inept conduct undertaken with little care or with indifference to the interests of plaintiffs, which could have reasonably been expected to foreclose plaintiffs from pursuing their grievance further. As a result, the union breached its duty of fair representation to plaintiffs. [*Goolsby,* 419 Mich. at 681-682, 358 N.W.2d 856.]

"The duty of fair representation by a labor organization is an implied duty that requires the labor organization to fairly and impartially represent *all* members of the bargaining unit." *Martin v. East Lansing School Dist.,* 193 Mich.App. 166, 180-181, 483 N.W.2d 656 (1992) (emphasis in original). "To prevail on a claim of unfair representation, the employee must establish not only a breach of the duty of fair representation but also a breach of the collective bargaining agreement." *Id.* at 181, 483 N.W.2d 656. The MERC and state circuit courts have concurrent jurisdiction over fair representation claims brought under the PERA. *Demings v. City of Ecorse,* 423 Mich. 49, 53, 377 N.W.2d 275 (1985).

### B. SUMMARY DISPOSITION-EXHAUSTION OF CONTRACTUAL GRIEVANCE REMEDIES

The USTA first argues that the trial court erred in denying its motions for summary disposition, where the court lacked subject-matter jurisdiction given plaintiff's failure to exhaust his contractual remedies under the grievance procedures outlined in the collective bargaining agreement, including arbitration. The USTA argues that the first and second grievances were identical and, as a result, plaintiff lost nothing, either procedurally or substantively, when the first grievance lapsed by inaction. Thus, plaintiff was required to fully exhaust the available contractual grievance procedures and remedies in connection with the second grievance, and no one, but plaintiff himself, claimed that the second grievance was untimely. According to the USTA, there could be no cause of action predicated solely on the first grievance considering the circumstances. The second grievance process concluded short of arbitration when the UCS and plaintiff agreed to accept the case evaluation award. The USTA therefore argues that, with respect to the second grievance, the only possible claim for breach of the duty of fair representation would have concerned the manner in which it was processed. The only potential argument would be that the USTA took too long to process the second grievance, but this could not form the basis of a claim, where any delay did not result in denial of the grievance.

***4** We initially note that any arguments that touch on whether the USTA breached the duty of fair representation fail because the paragraphs in the complaint alleging a breach were deemed admitted for purposes of trial where the USTA never filed an answer to the complaint. For the reasons discussed below, we find that there was no error in the court's ruling that precluded the USTA from presenting evidence denying liability for breach of the duty of fair representation.

While the USTA frames the present argument as one that concerns subject-matter jurisdiction, the caselaw does not so indicate. In *Sankar v. Detroit Bd. of Ed.,* 160 Mich.App. 470, 473 n. 1, 409 N.W.2d 213 (1987), this Court indicated that failure to exhaust grievance and arbitration procedures found in a collective bargaining agreement is an affirmative defense, which, for purposes of summary disposition, is to be raised under MCR 2.116(C)(7). See also *Mollett v. City of Taylor,* 197 Mich.App. 328, 332, 494 N.W.2d 832 (1992). Summary disposition for lack of subject-matter jurisdiction is based on MCR 2.116(C)(4).

There is a strong presumption favoring the use of negotiated grievance procedures for resolving disputes over the interpretation or application of a collective bargaining agreement. *AFSCME, AFL-CIO, Michigan Council 25 & Local 146 v. Highland Park Bd. of Ed.,* 457 Mich. 74, 84, 577 N.W.2d 79 (1998). "It is well established in Michigan that until internal union remedies have been exhausted, there is no access to the courts for disputes involving contractual rights." *Merdler v. Detroit Bd. of Ed.,* 77 Mich.App. 740, 747, 259 N.W.2d 211 (1977). However, exceptions to the exhaustion requirement have been acknowledged, and in *Murad v. Professional & Administrative Union Local 1979,* 239 Mich.App. 538, 542-544, 609 N.W.2d 588 (2000), this Court held:

> The Supreme Court's decision in *Clayton v. Int'l Union, UAW,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981), a case arising pursuant to § 301(a) of the Labor Management Relations Act, 29 USC 185(a), provides the appropriate test for resolving the precise question with which we are now faced. As set forth in *Clayton,* the question is
>
> "whether, and in what circumstances, an employee alleging that his union breached its duty of fair representation in processing his grievance, and that his employer breached the collective-bargaining agreement, must also attempt to exhaust the internal union appeals procedures established by his union's constitution before he may maintain his suit under § 301." [*Id.* at 682, 609 N.W.2d 588.]

The [*Clayton*] Court described the test as follows:

> "[C]ourts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim. If any of these factors are found to exist, the court may properly excuse the employee's failure to exhaust." [*Id.* at 689, 609 N.W.2d 588.]

**\*5** The test outlined in *Clayton* has frequently been utilized by the Court of Appeals for the Sixth Circuit in analyzing so-called "hybrid § 301/fair representation" claims. That court has also applied *Clayton* to a PERA claim arising as part of a diversity action. Until today, however, *Clayton* has never been explicitly adopted by Michigan courts in the context of a PERA action. [Citations omitted.]

We recognize that *Murad* discussed exhaustion in the context of exhausting internal union procedures and remedies and not exhausting procedures and remedies in a collective bargaining agreement. *Murad,* 239 Mich.App. at 540, 544 n. 2, 609 N.W.2d 588. But exceptions to the exhaustion requirement have also been recognized with respect to grievance procedures in collective bargaining agreements. In *Pompey v. Gen. Motors Corp.,* 385 Mich. 537, 560-561, 189 N.W.2d 243 (1971), our Supreme Court stated:

> It is well settled, as a matter of Federal labor law, that an employee may not maintain an action against his employer for an alleged breach of a collective bargaining agreement where the employee has not first exhausted the grievance and arbitration procedures established under the collective bargaining agreement upon which he bases his suit. This rule has been uniformly followed by the Michigan courts. But exceptions have been engrafted onto the rule, on the theory that since "these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or

unworkable to the individual grievant." In the instant case, it is beyond dispute that resort to the higher stages of grievance procedure under the contract is exclusively vested in the union. [Citations omitted.]

In *AFSCME, AFL-CIO, Michigan Council 25 & Local 146 v. Highland Park Bd. of Ed.,* 214 Mich.App. 182, 191, 542 N.W.2d 333 (1995), aff'd 457 Mich. 74, 577 N.W.2d 79 (1998), this Court stated:

> In conclusion, we hold that, where a collective bargaining agreement mandates that internal remedies be pursued to resolve disputes, a party must exhaust those remedies before filing a court action. An exception exists where the remedies have become futile.

The exhaustion requirement can be waived or excused when a union employee shows that the conduct of an employer amounted to a repudiation of contractual procedures or when the union has prevented exhaustion by its wrongful refusal to process a grievance or by its demonstrated refusal to do so in the past. *Vaca v. Sipes,* 386 U.S. 171, 185-186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); see also *Bowen v. United States Postal Service,* 459 U.S. 212, 221-222, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). In *DelCostello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 163-164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), the United States Supreme Court observed:

> It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement. Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. Subject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement. In *Vaca* ..., however, we recognized that this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding. [Citations omitted.]

**\*6** The union places emphasis on *Highland Park,* 457 Mich. 74, 577 N.W.2d 79, in which a majority of the Justices ruled that mandatory grievance procedures contained in a collective bargaining agreement, as opposed to internal union policies or procedures, must be exhausted before filing suit in circuit court for breach of the collective bargaining agreement. But the case did not entail a fair representation claim, as pointed out by Justice Boyle in a concurring opinion, and the case focused on the narrow issue of whether the statute of limitations was tolled while grievance procedures were being pursued. The Court was not concerned with whether a union employee bringing a fair representation claim in circuit court against the union could be excused under certain circumstances from exhausting grievance procedures and remedies contained in a collective bargaining agreement. Thus, the case is distinguishable. And on a very practical level there must be a distinction. If a union does not act on a grievance in violation of its duty of fair representation, the grievance procedures and remedies outlined in a collective bargaining agreement will not have been exhausted because of the inaction. And it would lack sense and reason to allow the union to then claim that the aggrieved employee could not access the courts based on the exhaustion requirement, where the union itself shut the door to the grievance process and prevented application of grievance remedies.

With respect to plaintiff's first grievance, the grievance procedures in the collective bargaining agreement were not exhausted prior to suit, but there was evidence showing that the first grievance went nowhere after the informal stage (or first step of the formal stage) because the union was adamant in its position that plaintiff was not entitled to superseniority protection and because the union never followed up on the administrative denial of the grievance. There was evidence that the union simply ignored the grievance and that plaintiff's attempts to get answers and action from the union were to no avail. The evidence and reasonable inferences arising from the evidence supported a conclusion that the union prevented exhaustion by refusing to process the grievance. The hostility of union officials directed towards plaintiff and his grievance was clear and blatant. We note that, at the time

of the first grievance, plaintiff was not yet laid off and had lost nothing in terms of wages and benefits. By the time of the second grievance, which plaintiff was forced to pursue because of the union's inaction in regard to the first grievance, plaintiff was out of a job and had been unemployed for nearly two months. Proper and sound union representation in addressing the first grievance may have precluded any lost time and wages, and we thus reject the USTA's stance that nothing was lost by the inadequate representation relative to the first grievance. Exhaustion of grievance procedures and remedies in connection with the first grievance was made futile and indeed impossible by the union's own recalcitrance. The USTA essentially concedes this point by placing its focus on the second grievance. Additionally, because the first grievance was mishandled and a fair representation claim arose, plaintiff had to act quickly in filing suit, where the applicable statute of limitations was only six months. *Ann Arbor v. AFSCME & Affiliated Local 369,* 284 Mich.App. 126, 135, 771 N.W.2d 843 (2009).

 *\*7* When the lawsuit was commenced and when the two motions for summary disposition were filed and heard, as well as at the time of trial, plaintiff had not fully exhausted the contractual grievance procedures with respect to the second grievance, which included the arbitration remedy. However, throughout the grievance process relative to the second grievance, the USTA did not budge from its position that plaintiff was not entitled to superseniority protection. The union refused to assist plaintiff and represent him at the meetings related to steps 2, 3, and 4 at the formal stage of the grievance process, making him handle the meetings entirely on his own. Plaintiff was forced to represent himself. The union's hostility towards plaintiff was glaring and readily evident. Even then, the trial court allowed the issue of whether an exception to the exhaustion requirement existed to be decided at trial by the jury. The trial court patterned the jury instructions regarding exhaustion of remedies and the exceptions on federal jury instructions addressing the issue.

The USTA appears to be of the opinion that there are no exceptions whatsoever to the exhaustion requirement, but that is contrary to the law cited above. We also find that the procedural posture of this case was unusual, where plaintiff was attempting, on order of the court, to exhaust his contractual grievance remedies with respect to the second grievance during the litigation, but the union, while pushing the grievance through the various steps and meetings, effectively provided no support to plaintiff; the process was an exercise in futility from plaintiff's point of view, lacking substance and meaning.

In conclusion, we hold, on de novo review, *Kreiner v. Fischer,* 471 Mich. 109, 129, 683 N.W.2d 611 (2004), that the trial court did not err in denying the USTA's motions for summary disposition in relation to the affirmative defense of failure to exhaust contractual grievance remedies, where there were exceptions to the exhaustion requirement upon which factual issues existed or, even if they did not exist, favored plaintiff not the USTA.

### C. ADMISSION OF LIABILITY ON BREACH OF THE DUTY OF FAIR REPRESENTATION

The USTA next argues that the trial court erred in granting plaintiff's motion in limine that sought to exclude any evidence proffered by the USTA denying liability with respect to breach of the duty of fair representation.

The USTA asserts that the motion for reconsideration following the court's ruling on the first motion for summary disposition and the two interlocutory appeals tolled the time to file an answer to the complaint. The USTA also argues that, given the unique procedural chronology of the case, the trial court should have overlooked any failure to answer as excusable neglect under MCR 2.108(E). Minimally, the trial court should have allowed the USTA the opportunity to file an answer.

"A defendant must serve and file an answer or take other action permitted by law or these rules within 21 days after being served with the summons and a copy of the complaint[.]" MCR 2.108(A)(1). Under MCR 2.108(B), a "motion raising a defense ... must be served and filed within the time for filing the responsive pleading[.]" MCR 2.108(C)(1) provides:

> *\*8* If a motion under MCR 2.116 made before filing a responsive pleading is denied, the moving party must serve and file a responsive pleading within 21 days after notice of the denial. However, if the moving party, within 21 days, files an application for leave to appeal from the order, the time is extended until 21 days after the denial of the

6

application unless the appellate court orders otherwise.

Here, no answer was ever filed by the USTA. The USTA did not file an answer within 21 days after notice of the denial of the first motion for summary disposition, nor was an interlocutory appeal pursued within that timeframe, although the USTA did file a motion for reconsideration within that time period. MCR 2.108 does not address or acknowledge motions for reconsideration, and the plain language of MCR 2.108(C)(1) required the filing of an answer or an appeal within 21 days after notice of the denial of the summary disposition motion, which did not occur. Accordingly, there was a failure to comply with MCR 2.108; however, we shall examine the issue a little bit further. The order denying the motion for reconsideration was entered on January 18, 2008. But the USTA filed an application for leave to appeal with this Court on February 7, 2008, which application was denied on June 10, 2008. This would give the USTA 21 days from June 10, 2008, to file an answer, but it failed to do so. Confusing matters is the fact that the USTA filed a second motion for summary disposition on March 31, 2008, which was technically not within 21 days after the application for leave was denied on the first appeal, as that denial order from this Court had yet to issue. The second summary disposition motion was denied by the trial court on May 23, 2008. Within 21 days of May 23, and two days after this Court denied the first application, the USTA filed a new application for leave to appeal relative to the second motion for summary disposition. This Court denied that application on August 11, 2008, and the trial started two days later. Other than making the conclusory statement that tolling occurred, the USTA fails to provide any analysis under the court rules to explain how the convoluted procedural history permitted it to proceed to trial without filing an answer. As our Supreme Court so eloquently stated in *Mudge v. Macomb Co.,* 458 Mich. 87, 105, 580 N.W.2d 845 (1998):

> "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." [Citation omitted.]

In sum, and considering the extent of the union's arguments, we hold that the USTA did not file an answer as required by MCR 2.108.

As a result of this failure to answer, plaintiff did not seek a default or default judgment under MCR 2.603, but he did successfully obtain an order under MCR 2.111(E)(1), pursuant to which the allegations in plaintiff's complaint were deemed admitted. MCR 2.111(E)(1) provides that "[a]llegations in a pleading that requires a responsive pleading, other than allegations of the amount of damage or the nature of the relief demanded, are admitted if not denied in the responsive pleading." There were no denials as there was no responsive pleading. We can find no error with the trial court's ruling.

**\*9** The USTA's reliance on MCR 2.108(E) does not salvage its position. MCR 2.108(E) provides:

> A court may, with notice to the other parties who have appeared, extend the time for serving and filing a pleading or motion ..., if the request is made before the expiration of the period originally prescribed. After the expiration of the original period, the court may, on motion, permit a party to act if the failure to act was the result of excusable neglect....

The USTA never made a request for an extension of time to file an answer before the expiration of the period of time in which to file an answer. And there is no record support for the proposition that the failure to file an answer was the result of excusable neglect. The trial court noted that the USTA had "not actually stated what constitute[d] excusable neglect in this case other than the ... unusual procedural history." The trial court declined to exercise its discretion under MCR 2.108(E) and refused to allow the late filing of an answer. Even though the procedural history of this case was complicated, the USTA should have filed an answer sometime during the year the case was being litigated. We note that the UCS, which also filed or joined in on two summary disposition motions, filed its answer less than a month after the complaint was filed. The court did not err in its ruling; reversal is unwarranted.

### D. WAIVER OF CLAIM AFTER VOLUNTARY DISMISSAL OF ACTION AGAINST THE UCS

The USTA next argues that plaintiff effectively waived further prosecution of his action against the USTA when it dismissed the UCS from the case pursuant to acceptance of the case evaluation award. The USTA contends that acceptance of the case evaluation award disposed of all claims in the entire action. The USTA maintains that, in order to succeed on a claim of breach of the duty of fair representation, a plaintiff must not only prove a breach of said duty, but also a breach of the collective bargaining agreement. And the issue concerning breach of the collective bargaining agreement was settled when plaintiff's action against the UCS was dismissed pursuant to case evaluation.

This argument is wholly lacking in merit. Plaintiff did not waive his claim of breach of the duty of fair representation by dismissing the action against the UCS pursuant to case evaluation. It is true that plaintiff had to prove that there was a breach of the collective bargaining agreement in order to establish his fair representation claim. *Martin,* 193 Mich.App. at 181, 483 N.W.2d 656. But this does not mean that plaintiff acquiesced to a finding that there was no breach of the collective bargaining agreement when he resolved and settled the dispute with the UCS. The issue of whether the collective bargaining agreement was breached went to the jury, and it was counsel for the USTA who demanded that the jury answer said question and that the jury be instructed on the issue.

MCR 2.403(M)(1) does provide that a judgment or dismissal entered pursuant to case evaluation "shall be deemed to dispose of all claims in the action [.]" However, MCR 2.403(M)(2) provides that "[i]n a case involving multiple parties, judgment or dismissal as provided in subrule (1), shall be entered as to those opposing parties who have accepted the portions of the evaluation that apply to them." This language clearly reflects that a judgment or dismissal based on acceptance of case evaluation disposes of the claims as between the parties agreeing to accept a case evaluation award, not other parties in the action. The USTA's argument is nonsensical, otherwise, for example, in a case involving multiple defendants in which a plaintiff makes overlapping claims or identical elements need to be established as to each defendant, e.g., vicarious liability and joint and several liability situations, the dismissal of one defendant pursuant to acceptance of a case evaluation award would necessarily result in dismissal of a non-accepting defendant. Reversal is unwarranted.

### E. DENIAL OF MOTION FOR JNOV, NEW TRIAL, OR REMITTITUR

**\*10** Finally, the USTA argues that the trial court erred in denying its motion for JNOV, or new trial, or remittitur.

The USTA first contends that the jury verdict was excessive, where it was contrary to law, where it arose from the misconduct of plaintiff's counsel, and where plaintiff's actual damages were capped at $33,053. As part of the USTA's argument that the verdict was excessive because it was contrary to law, the USTA repeats its jurisdictional and exhaustion arguments, which we have already addressed and rejected above. On the argument of counsel misconduct, the USTA maintains that plaintiff's counsel, when discussing final jury instructions, represented that plaintiff would not be seeking emotional distress damages and thus no instructions on the issue were proposed. However, during closing arguments, plaintiff asked for emotional distress damages and, after an objection based on the prior agreement, the court allowed plaintiff to pursue emotional distress damages when plaintiff's counsel indicated a change of heart on the issue. The union contends that this was improper.

Further, the USTA argues that the jury awarded plaintiff actual economic damages in the amount of $33,053 attributable to the UCS's breach of the collective bargaining agreement, thereby setting a cap on actual economic damages of $33,053, yet an additional $20,000 was awarded to plaintiff, which amount was attributable to the USTA. According to the USTA, any damages over the $33,053 amount was excessive with respect to actual economic damages.

Next, the USTA contends that the court erred in regard to exemplary damages. It argues that, although the court ordered that plaintiff's actual damages were to be limited to those accruing before May 1, 2008, the court improperly refused to do the same with respect to exemplary damages. The USTA also maintains that any award of exemplary damages was improper because caselaw bars such damages in relation to a claim that a union breached the duty of fair representation. In connection with this argument, the USTA contends that plaintiff's counsel engaged in misconduct in arguing in favor of exemplary damages on the basis of money collected by the union in dues and total union membership even though there was no evidence in the record supporting the argument. Moreover, the dollar amount argued by plaintiff's counsel

actually pertained to the MEA, which was not a party to the action, as opposed to the USTA, an affiliate of the MEA. Despite the USTA's sustained objection to the argument, the jury nonetheless had heard the argument and the damage was done; the USTA was prejudiced, especially given the verdict on exemplary damages that dwarfed the amount of actual damages by ten times. The USTA concludes that the awarding of $225,000 in exemplary damages violated due process and was clearly excessive.

With respect to the arguments concerning attorney misconduct, this Court in *Hilgendorf v. St. John Hosp. & Medical Ctr. Corp.,* 245 Mich.App. 670, 682-683, 630 N.W.2d 356 (2001), stated:

> **\*11** MCR 2.611(A)(1)(b) permits a trial court to grant a motion for a new trial if the prevailing party committed "misconduct," affecting the moving party's substantial rights. In *Reetz v. Kinsman Marine Transit Co.,* [416 Mich. 97, 102-103, 330 N.W.2d 638 (1982),] the Michigan Supreme Court articulated the analysis that must be used to determine whether attorney misconduct warrants a new trial:
>
> "When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action."

In regard to alleged attorney misconduct by plaintiff's counsel when she argued, in the context of requesting exemplary damages, that the union had 130,000 members and collected millions of dollars in union dues, the USTA is correct that there was an absence of evidence supporting such assertions and the argument was therefore improper. The reference to the MEA was likewise improper. However, the court sustained the union's objection and instructed the jury that the arguments of counsel were not evidence and that the jurors must disregard any arguments not supported by the evidence. Jurors are presumed to understand and follow the court's instructions. *Bordeaux v. Celotex Corp.,* 203 Mich.App. 158, 164, 511 N.W.2d 899 (1993). Any assumed misconduct did not result in an unfair trial.

With respect to the USTA's claim that there could be no more than $33,053 in actual economic damages and therefore the additional $20,000 that the jury awarded plaintiff was improper, we find that the argument lacks merit. Plaintiff specifically asked the jury during closing arguments to award him, in part, $33,053, which represented the total amount of lost wages through May 1, 2008, and the jury awarded said amount to plaintiff as part of its finding that plaintiff incurred such a loss attributable directly to the UCS's breach of the collective bargaining agreement, for which the USTA was found jointly liable. But plaintiff also asked the jury to award him actual damages for lost fringe benefits, which could explain the additional award of $20,000 in damages that the jury found plaintiff was entitled to as a loss directly attributable to the USTA's breach of the duty of fair representation. We also note that the trial court instructed the jury that it could award damages for breach of the duty of fair representation, covering such items as the added expenses involved in collecting from the UCS for breach of the collective bargaining agreement. Reversal is unwarranted.

**\*12** With respect to the USTA's argument that the court should have placed a May 1, 2008, limit on exemplary damages, like it did with wage-loss damages, the court was never actually confronted with this issue or argument, yet it is true that no such limit was specifically placed on exemplary damages. The court did expressly address emotional distress damages and an argument that they should be limited to those incurred before May 1, 2008. The argument was rejected, and while we ultimately vacate the award of emotional distress damages on other grounds, we agree with the court's reasoning that the emotional impact of the events on plaintiff's life could certainly have lasted well beyond May 1, 2008. For that very reason, we find no error with the absence of a date limitation in connection with exemplary damages given the types of losses that such damages are intended to encompass, which we explore below, and which are comparable to emotional distress damages. Accordingly, there was no error.

We next address the issue of whether the law supported the exemplary damages awarded in this fair representation suit and whether the award truly constituted exemplary damages, as opposed to punitive damages.

In *Casey v. Auto-Owners Ins. Co.,* 273 Mich.App. 388, 400, 729 N.W.2d 277 (2006), this Court stated that "[p]unitive damages, which are designed to punish a party for misconduct, are generally not recoverable in Michigan." There is an exception where punitive damages are authorized by statute, *id.,* but there is no claim here that punitive damages are authorized by statute relative to a fair representation suit.

In *Int'l Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 52, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the United States Supreme Court held:

> Because general labor policy disfavors punishment, and the adverse consequences of punitive damages awards could be substantial, we hold that such damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance. Accordingly, we reverse the judgment below insofar as it upheld the award of punitive damages.

The *Foust* Court provided the following reasoning in support of its decision to deny punitive damages in a fair representation action against a union:

Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." In respondent's view, this extraordinary sanction is necessary to vindicate an employee's right to fair representation. Because actual damages caused by a union's failure to pursue grievances may be *de minimis,* respondent contends that a strong legal remedy is essential to encourage unfair representation suits and thereby inhibit union misconduct.

We do not doubt that the prospect of lucrative monetary recoveries unrelated to actual injury would be a powerful incentive to bring unfair representation actions. Similarly, the threat of large punitive sanctions would likely affect unions' willingness to pursue individual complaints. However, offsetting these potential benefits is the possibility that punitive awards could impair the financial stability of unions and unsettle the careful balance of individual and collective interests which this Court has previously articulated in the unfair representation area.

**\*13** The fundamental purpose of unfair representation suits is to compensate for injuries caused by violations of employees' rights. In approving "resort to the *usual* judicial remedies of injunction and award of damages when appropriate," the Court emphasized that relief in each case should be fashioned to make the injured employee whole. [Emphasis in original; citations omitted.]

Plaintiff relies on federal appellate opinions that simply indicate that district courts did not abuse their discretion in excluding evidence concerning punitive damages, which plaintiff asserts establishes that the issue is discretionary. This is reading more into the cases than intended, and it is contrary to *Foust* and Michigan caselaw on punitive damages. Accordingly, we conclude that punitive damages were not recoverable in the instant suit; however, the nomenclature used below was "exemplary" damages, and there is a distinction between punitive and exemplary damages under Michigan law. In *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 419, 295 N.W.2d 50 (1980), our Supreme Court explained:

> In Michigan, exemplary damages are recoverable as compensation to the plaintiff, not as punishment of the defendant. Our review of the precedent indicates that those cases which permit recovery of exemplary damages as an element of damages involve tortious conduct on the part of the defendant. An award of exemplary damages is considered proper if it compensates a plaintiff for the "humiliation, sense of outrage, and indignity" resulting from injuries "maliciously, wilfully and wantonly" inflicted by the defendant. The theory of these cases is that the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done the plaintiff's feelings. [Citations omitted.]

Additionally, in *McPeak v. McPeak,* 233 Mich.App. 483, 490, 593 N.W.2d 180 (1999), this Court observed:

> Exemplary damages are recoverable as compensation to the plaintiff and not as punishment of the defendant. An award of exemplary damages is proper if it compensates a plaintiff for the humiliation, sense of outrage, and indignity resulting from injustices maliciously, wilfully, and wantonly inflicted by the defendant. It is not

essential to present direct evidence of an injury to the plaintiff's feelings. Rather, the question is whether the injury to feelings and mental suffering are natural and proximate in view of the nature of the defendant's conduct. [Citations omitted.]

The union does not cite any authority that supports the proposition that exemplary damages, as defined above in *Kewin* and *McPeak,* are unavailable in fair representation suits. Indeed, the union did not contend that emotional distress damages were not recoverable in a fair representation suit, and such damages mirror exemplary damages to a great extent.

When discussing proposed jury instructions, defense counsel merely indicated that he was unaware of any authority allowing exemplary damages. Plaintiff's counsel then cited federal authority to the trial court, which we find was not relevant or persuasive, but defense counsel never responded with contrary argument or authority. Defense counsel never framed an argument or objection specifically in terms of punitive damages. It does appear that to some degree the terms "exemplary" and "punitive" were treated as interchangeable. Even on appeal, the union argues that, on the basis of *Foust,* exemplary damages should not have been awarded, but that case actually spoke in terms of "punitive" damages and not damages described in *Kewin* as being exemplary. Also, we observe that the USTA's appellate argument on this issue is extremely cursory regarding the facts and law and is analytically inadequate, lacking even a discussion of the nuances between exemplary and punitive damages under Michigan law. See *Mudge,* 458 Mich. at 105, 580 N.W.2d 845.

**\*14** When plaintiff's counsel argued that the jury needed to send a message to the union and essentially punish the union, defense counsel raised no objection that punitive damages were not recoverable. [3] It also does not appear that defense counsel ever sought an instruction under the authorities cited above warning the jury that it could not impose punitive damages. Furthermore, it is likely that the jury actually contemplated losses consistent with the nature of exemplary damages as defined in *Kewin* when awarding plaintiff $225,000 in exemplary damages. The reasons for this conclusion are: (1) the jury was not given a specific instruction talking about or describing emotional distress damages, which are comparable in character to exemplary damages; (2) the jury did not initially have a verdict form that addressed emotional distress damages before returning a verdict on exemplary damages; (3) the court did not describe the nature of exemplary damages to the jury; [4] and, (4) plaintiff's counsel spent time discussing emotional distress damages and asked the jury to award emotional distress damages, which the jury likely blended in with the award of exemplary damages, not yet being directed to award emotional distress damages. Recall, the foreperson asked the trial court, before being returned to the jury room to consider emotional distress damages, whether the findings already made were null and void, and the court said "no." The jury re-deliberated and returned to the courtroom in 10 minutes with the $10,000 award for emotional distress damages, suggesting that the jurors had already thought about emotional distress when awarding exemplary damages.

In sum, because of the absence of a definitive objection and the failure to properly preserve the issue, *Booth Newspapers, Inc. v. Univ. of Michigan Bd. of Regents,* 444 Mich. 211, 234, 507 N.W.2d 422 (1993), the lack of sufficient analysis in the union's appellate brief regarding the law and factual events that transpired at trial leading up to the instructions and verdict, *Mudge,* 458 Mich. at 105, 580 N.W.2d 845, and because of the likelihood that the jury contemplated exemplary-like damages when making the $225,000 award, we affirm the award of exemplary damages. The USTA's due process argument and claim that the award was clearly excessive are rejected. We note that plaintiff had requested $700,000 in exemplary damages, receiving less than half that amount.

Because emotional distress damages are essentially subsumed by or fit within the category of exemplary damages, and because we affirm the award of exemplary damages, which the jury awarded to plaintiff without knowledge that it would later be called upon to separately address emotional distress damages, we vacate the award of emotional distress damages, as they would be duplicative of the exemplary damages already awarded. See *Peterman v. Dep't of Natural Resources,* 446 Mich. 177, 207 n. 48, 521 N.W.2d 499 (1994) ("Of course, plaintiff may not receive duplicative damages."). [5]

### III. CONCLUSION

**\*15** We affirm the trial court's rulings that denied the union's two motions for summary disposition on the issue of exhaustion of contractual grievance procedures and

remedies. There was evidence, sufficient to survive summary disposition, showing that exhaustion was excusable or that an exception to the exhaustion requirement existed. Also, under the circumstances, plaintiff did go as far as possible in the grievance process, where arbitration was effectively made impossible.

Given the union's failure to answer the complaint, we also affirm the trial court's ruling that the allegations in plaintiff's complaint were deemed admitted and that the union was precluded from submitting evidence denying liability on the fair representation claim.

We further reject the union's argument that plaintiff waived his fair representation claim brought against the USTA when he accepted, along with the UCS, the case evaluation award and dismissed the suit against the UCS. The court rule on case evaluation, MCR 2.403, provides no support for this argument and requires different treatment of participants in case evaluation who do not accept an evaluation.

Finally, we reject the arguments concerning denial of the motion for JNOV, new trial, or remittitur, except that we vacate the award of emotional distress damages.

Affirmed in part and vacated in part.

ZAHRA J., (concurring in part and dissenting in part).
I concur in the majority opinion as it relates to all the liability issues. I also concur in the majority opinion to the extent that affirms the economic damages awarded by the jury. However, I respectfully dissent from the majority's conclusion that the $225,000 award for exemplary damages should be affirmed. I would vacate this award and reinstate the $10,000 award for emotional damages.

I conclude that counsel for USTA sufficiently voiced objection to the notion of exemplary and punitive damages. Prior to closing arguments and the giving of jury instructions, the trial court and counsel discussed proposed instructions on the record. When they reached the issue of instructing on exemplary damages, the USTA's attorney argued, "I'm not aware of any authority that would allow exemplary damages in a case like this." Plaintiff counsel proceeded to cite *Schoonover v. Consolidated Freightways Corp. of Delware,* 147 F.3d 492 (C.A.6, 1998), in support of exemplary damages. Plaintiff counsel stated that *Schoonover* was a federal case in which the term "punitive" was still being used. Plaintiff counsel then stated, "We don't have punitives. It's exemplary in Michigan." Plaintiff counsel argued that *Schoonover* reflected that the court had the discretion to allow the awarding of exemplary damages. The trial court then ruled:

> Well, I'm going to allow [plaintiff] to argue it, but the standard is pretty stringent. I mean you've got to show malice, recklessness or deceit. If you think you can convince this jury of it, I'm going to let you present that argument. I'm going to read that instruction.

\*16 The record does not reveal on what authority the court concluded that exemplary damages are recoverable where malice, recklessness, or deceit are established; it appears that the language or principle was simply contained in the proposed instruction on exemplary damages provided to the trial court by plaintiff:

> Exemplary damages are damages awarded in addition to actual damages when the Defendant acted with recklessness, malice or deceit. In the event you find that the union acted toward Plaintiff Adair in a manner that was reckless with malice or with deceit, you may award Plaintiff Adair exemplary damages in an amount that you determine the union owes.

This instruction is erroneous for several reasons. The most obvious error is the instruction does not identify the basis for an award of exemplary damages. While mentioning that plaintiff must establish that defendant acted "maliciously, wilfully and wantonly" toward plaintiff, there is absolutely no mention that exemplary damages are to compensate a plaintiff for any "humiliation, sense of outrage, and indignity." *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 419, 295 N.W.2d 50 (1980). Here, the jury was improperly instructed to award exemplary damages for no other reason than defendant acted with recklessness, malice or deceit regardless of any injury actually suffered by plaintiff.

Further, the instruction allows for the jury to punish defendant. "Punitive damages, which are designed to punish a party for misconduct, are generally not recoverable in Michigan." In *Casey v. Auto-Owners Ins. Co.,* 273 Mich.App.

388, 400, 729 N.W.2d 277 (2006). There is an exception where punitive damages are authorized by statute, *id.,* but there is no claim here that punitive damages are authorized by statute relative to a fair representation suit. Moreover, persuasive case law forbids punitive damages in a fair representation suit. In *Int'l Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 52, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979), the United States Supreme Court held:

> Because general labor policy disfavors punishment, and the adverse consequences of punitive damages awards could be substantial, we hold that such damages may not be assessed against a union that breaches its duty of fair representation by failing properly to pursue a grievance. Accordingly, we reverse the judgment below insofar as it upheld the award of punitive damages.

The *Foust* Court provided the following reasoning in support of its decision to deny punitive damages in a fair representation action against a union:

Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." In respondent's view, this extraordinary sanction is necessary to vindicate an employee's right to fair representation. Because actual damages caused by a union's failure to pursue grievances may be *de minimis,* respondent contends that a strong legal remedy is essential to encourage unfair representation suits and thereby inhibit union misconduct.

 ***17** We do not doubt that the prospect of lucrative monetary recoveries unrelated to actual injury would be a powerful incentive to bring unfair representation actions. Similarly, the threat of large punitive sanctions would likely affect unions' willingness to pursue individual complaints. However, offsetting these potential benefits is the possibility that punitive awards could impair the financial stability of unions and unsettle the careful balance of individual and collective interests which this Court has previously articulated in the unfair representation area.

The fundamental purpose of unfair representation suits is to compensate for injuries caused by violations of employees' rights. In approving "resort to the *usual* judicial remedies of injunction and award of damages when appropriate," the Court emphasized that relief in each case should be fashioned to make the injured employee whole. [*Foust,* 442 U.S. at 48-49 (emphasis in original).]

The jury instruction improperly permitted the notion of punitive damages to be injected into the instant case.[1]

Further, there is a strong likelihood, given remarks made by plaintiff counsel during closing argument, that the jury in fact awarded plaintiff punitive damages. Plaintiff counsel first argued to the jury that plaintiff was entitled to "[e]motional distress damages," which, for all intents and purposes, are exemplary damages." Plaintiff counsel argued:

> Emotional distress damages, let's talk about that a little bit. And that's not on your chart. That's something that I don't have a figure to ask you for. And the reason I don't have a figure is because I asked that you, as jurors, have to within yourselves determine what it was worth. What was it worth for Mr. Adair to be a union steward and believe in his union, file a grievance and then find out that they weren't going to help him because of an agreement that they entered into with the school. What-what is that worth? What is it worth for him to constantly keep asking questions and feel he's not getting an answer? What-what is that worth? What is it worth to file a grievance and now be laid off and never hear anything about the grievance? Never heard from the union, didn't know what happened to it. They don't know what happened to it. What is that worth? What is it worth to show up at your step two meeting, have your chief steward there and he not speak on your behalf? What is that worth? To actually have to argue your own grievances, what is that worth? So you show up at the-the third step hearing, you figure they didn't represent me at the first one, surely they won't represent me at this one either, but you didn't know that they were going to tell the people,

> say everything to him directly. They have nothing to do with you. It's as if you're not even a member. What is that worth? ...

Here, plaintiff's argument at least marginally relates to emotional damages. However, soon afterwards, in discussing so-called "exemplary damages," plaintiff counsel shifts focus:

> **\*18** Here's where we get to the exemplary damages issues and what we're asking for. Mr. Adair paid, along with every other member of the [union], about seven dollars a month in union dues. It comes up to somewhere around, I believe ... eight-hundred-forty dollars a year he was paying in union dues. That doesn't seem like a lot for one person. But when you take a look at the MEA's Website, you'll see that they represented in 2007 upwards of [130,000] members.... If you do the math, ... this union brought in over ... [$66 million] in membership-[2]

Thus, immediately after discussing plaintiff's "emotional damages," plaintiff counsel's discussion of "exemplary damages" focuses on the union's finances, and then cites to the estimated income of the MEA; a non-party in this case.

Further, if there were any doubt that plaintiff counsel was suggesting that the jury punish defendant, plaintiff counsel then stated:

> Okay. So what I stand before you to say is whether I give you an amount or not, that this union brings in, what is enough to make this union recognize that what it did was wrong? What is enough to hurt this union where it hurts most, in their pocket? Whatever the revenue this union receives, they receive it because they are supposed to represent the members. If they don't represent the members, then they shouldn't be paid at all. And certainly, that happened in this case. Eight years he paid union dues to get to a point where they failed to represent him at all.

Plaintiff's counsel then spoke of how the union's actions were reckless, were done with malice, and were deceitful. Counsel asked for $700,000 in exemplary damages, and then told the jury, "[t]his is not a mom and pop shop. This is a conglomerate with over one-hundred-thirty-thousand members in 2007. How do you, as jurors, send a message that you are there to protect the rights of your members? How do you send that message?"

In discussing exemplary damages, plaintiff counsel only argued that defendant should be punished. How can any other conclusion be reached when plaintiff counsel states, "[w]hat is enough to hurt this union where it hurts most, in their pocket," and "[h]ow do you send that message." Indeed, that plaintiff counsel suggested $700,000 in exemplary damages contradicts her earlier statements that emotional damages cannot definitively be ascertained. Rather, plaintiff counsel apparently proposed the $700,000 in exemplary damages based on defendant's theoretical income; something not at all related to the proper measure exemplary damages. Even on appeal, at oral argument, plaintiff counsel continues to assert, erroneously, that the closing argument was proper because there is "no other way to get to this union besides a monetary penalty" and that her argument was intended to "make the union aware that they cannot behave this way," or that "they could not treat one of its own members this way." These statements clearly reflect an intent to punish defendant, not compensate plaintiff for injury.

**\*19** While the majority concludes this inappropriate conduct can be overlooked because of an "absence of a definitive objection and the failure to properly preserve the issue," I would conclude the defendant sufficiently preserved the question for appellate review. Defendant's objection to the applicability of exemplary damages certainly preserves a challenge to an award entered for exemplary damages, particularly if the damages were actually punitive in nature. Requiring that defendant also request a curative instruction in regard to exemplary damages unduly elevates form over substance.

Moreover, this Court may review an issue if failure to consider it would result in manifest injustice. *Polkton Twp. v. Pellegrom,* 265 Mich.App. 88, 95-96, 693 N.W.2d 170 (2005). Manifest injustice results if the defect constitutes plain error requiring a new trial or pertains to a basic

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 14

and controlling issue. *Internat'l Union, UAW v. Dorsey,* 268 Mich.App. 313, 324, 708 N.W.2d 717 (2005), rev'd in part on other grounds 474 Mich. 1097, 711 N.W.2d 79 (2006). In my view, the trial court committed plain error by improperly instructing the jury to award exemplary damages for no other reason than defendant acted with recklessness, malice or deceit, regardless of any injury actually suffered by plaintiff. The instruction erroneously allows for the jury to punish defendant for acting with recklessness, malice or deceit. And given that plaintiff counsel expressly requested that the jury punish defendant, I can only conclude that the jury's award of exemplary damages was actually an award of punitive damages. I am clearly convinced that the jury's award of exemplary damages is actually an award of punitive damages. Further, as plaintiff counsel admits, emotional distress damages are exemplary damages. Thus, I would vacate the exemplary damage award and reinstate the $10,000 award for emotional damages.

**All Citations**

Not Reported in N.W.2d, 2010 WL 1924868

Footnotes

1    The nature of plaintiff's actions in connection with the first grievance could also be viewed as falling under the first step of the formal stage of the grievance process.

2    The trial court did not place a similar limit of the May 1, 2008, date as to the claims for emotional distress and exemplary damages.

3    Plaintiff's attorney did overstep her bounds when her argument on exemplary damages at times crossed into punitive damages territory.

4    The union's attorney never objected to the specific wording of the instruction on exemplary damages.

5    The union contends that plaintiff's counsel engaged in misconduct when she argued in favor of emotional distress damages during closing argument, despite previously agreeing not to request such damages. We have vacated the award of emotional distress damages, but to the extent that the misconduct argument could be carried over to exemplary damages considering their consistency with emotional distress damages, we find that the union was not denied a fair trial and was not prejudiced. The union went through the entire trial with the understanding that emotional distress damages were being sought, and it even prepared a proposed jury instruction addressing emotional distress damages. While plaintiff's counsel, during discussions of jury instructions and shortly before closing arguments were presented, agreed to remove an instruction on emotional distress damages, she later changed her mind when the court decided to limit the wage-loss damages to those incurred up to May 1, 2008, eliminating future wage-loss damages. Although counsel should have sought permission from the court before launching into an argument in favor of emotional distress damages, the court agreed that such damages were recoverable, the union never argued that such damages were not recoverable, and the union expected to defend against a claim for emotional distress damages. Reversal is unwarranted.

1    Indeed, the only standard jury instruction providing for exemplary damages, M Civ JI 118.21, "Libel-Exemplary Damages," makes a clear distinction between punitive and exemplary damages:

> The damages on which I have already instructed you are called actual damages. If you find that plaintiff is entitled to actual damages, you may then consider an award of exemplary damages. *Exemplary damages may not be awarded to punish or to make an example of the defendant, but may only be awarded to compensate the plaintif for any incremental or increased injury to plaintiff's feelings that you find were caused by defendant's bad faith or ill will.* However, you may not award exemplary damages for any injury to feelings which you include in your award of actual damages. [ (emphasis added).]

Thus, consistent with *Foust,* 442 U.S. 52, the standard civil jury instructions recognize that punitive damages are precluded.

2    At this point USTA objected, arguing that there was no evidence presented at trial in regard to the number of union members and total dues collected by the union. The trial court sustained the objection, except that plaintiff could argue with regard to how much he personally paid in dues, as there was record evidence on the matter.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.