**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S REPLY TO OBJECTION OF CHERYL MINNIEFIELD

The City of Detroit ("City"), by its undersigned counsel, files this reply to the Objection of Cheryl Minniefield [Doc. No. 11096] ("Objection") stating as follows:

1. Minniefield was an employee of the Detroit Water and Sewerage Department ("DWSD"). *See* Ex. 1, Findings of Fact, Conclusions of Law and Recommendations ("Recommendation") at 3. Minniefield was suspended effective April 6, 2011, from the DWSD. Recommendation at 6. The revised notice of suspension issued on May 2, 2011, provided that Minniefield was suspended for "Gross Misconduct by a City of Detroit Employee: falsification of time records; theft of time; misuse of City property for the employee's own gain or benefit." *Id.* The notice of discharge was effective May 6, 2011. *Id.* at 6-7.

2. Minniefield filed an Employee Grievance for Classified Non-Union Employees on April 7, 2011, requesting "the removal of the suspension, reinstatement, expungement of her record and to be made whole." *Id.* at 7.

- 1 -

3.     On various dates during the time period from November 2011 through March 2012, a fourth step hearing of grievance was conducted. *Id.* at 1-2. The hearing officer issued the Recommendation on May 6, 2013. The Recommendation concluded that

> The action by Ms. Minniefield involved a clear violation of The City's disciplinary guidelines and he is a dischargeable offense under paragraph 9, specifically "… deliberately falsifying timecards or hours worked."
>
> The Hearing Officer's recommendation is to uphold the City's Disciplinary Action.

*Id.* at 63.

4.     The Civil Service Commission upheld the Recommendation.

5.     Approximately ten months later, Minniefield filed a complaint with the City of Detroit ombudsman asserting that she did not receive payment for her accumulated vacation bank. Objection at 4. Minniefield also filed claim number 3292 in this bankruptcy case asserting "unpaid time bank i.e. vacation/swing holiday" without any supporting documentation. *See* Reply in Support of Debtor's Thirty-Sixth Omnibus Objection to Certain Claims at 5. [Doc. No. 11062].

6.     On March 10, 2016, the City filed its Thirty-Sixth Omnibus Objection. [Doc. No. 10811]. As set forth on Exhibit 2 to the Thirty-Sixth Omnibus Objection, the City objected to claim number 3292 of Cheryl

26564723.1\022765-00213

Minniefield.   On April 6, 2016, Minniefield filed her corrected response.[1]   [Doc. No. 11040].

7.     On April 13, 2016, the Court conducted a hearing on the Thirty-Sixth Omnibus Objection.   Minniefield appeared at the hearing and requested additional time to supplement her corrected response.   The Court granted this request, allowing Minniefiled until April 20, 2016, to supplement her correct response. Order Sustaining Debtor's Thirty-Sixth Omnibus Objection to Certain Claims ¶ 3. [Doc. No. 11082].

8.     Minniefield was discharged from employment at the DWSD because she deliberately falsified timecards or hours worked.   Minniefield's grievance, including her request to "be made whole," was denied.   Yet, Minniefield still seeks accumulated vacation/holiday time.   Pursuant to the City's Manual of Standard Personnel Practice in effect at the time of the discharge, "At the discretion of the department head, an employee discharged for cause may be denied payment for any accrued vacation time."   *See* Ex. 2, Manual of Standard Personnel Practice ("Manual") at Section IX, Page No: 4.   Minniefield's request for payment of any accrued vacation time was denied pursuant to the authority provided in the Manual. Consequently, claim number 3292 should be disallowed and expunged.

---

[1] Minniefield's first response was filed on April 1, 2016, at docket number 11005.

26564723.1\022765-00213

Dated: April 22, 2016

By: /s/ Marc N. Swanson
    Jonathan S. Green (P33140)
    Marc N. Swanson (P71149)
    MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    green@millercanfield.com
    swansonm@millercanfield.com

    -and-

    Charles N. Raimi (P29746)
    Deputy Corporation Counsel
    City of Detroit Law Department
    2 Woodward Avenue, Suite 500
    Coleman A. Young Municipal Center
    Detroit, Michigan 48226
    Telephone: (313) 237-5037
    Facsimile: (313) 224-5505
    raimic@detroitmi.gov

ATTORNEYS FOR THE CITY OF DETROIT

City of Detroit

Civil Service Commission

Grievance Hearing

City of Detroit,

     Employer

                          City Case No. 2011-5

and                          Hearing Officer: Jerome F. Rock

Cheryl Minniefield,

     Grievant

---

## Findings of Fact, Conclusions of Law and Recommendations

This is the Fourth Step Hearing of Grievance No. 2011-5. The grievant, Cheryl Minniefield, is appealing her 29-day suspension/discharge issued by the Water and Sewerage Department.

Jerome F. Rock was selected as the Hearing Officer in accordance with Section 6-513 of the City of Detroit Charter and pursuant to the Human Resources Department Rule 17, "Employee Grievances." The Hearings were conducted under the Rule 18, the City of Detroit Human Resources Department.

1

Appearances:

For the Employer:

Andrew R. Jarvis, Esq.

Patricia Watkins, Principal Clerk at the Hearings and Policies Development Division

Brenda Bracefield, Hearings and Policies Development Division


For the Grievant:

Cheryl Minniefield

John R. Runyan, Esq.

Hearing Dates:

November 2, 2011    January 10, 2012
January 11, 2012     February 9, 2012
February 20, 2012    March 5, 2012

Witnesses Presented:

Dimitric Fresh, Retired, DWSD Investigator

Arnold Shaw, Retired, DWSD Sewage Plant Supervisor (SPS)

Saulius Simoliunas, PhD, DWSD Systems Chemist

Lori Cetlinski, City of Detroit, Project Manager for WorkBrain system

William M. Davis, DWSD Sewage Plant Supervisor (SPS)

Reginald Burgess, DWSD Sewage Plant Operator (SPO)

Jared Richards, former DWSD Plant Manager

Samuel Smalley, DWSD Assistant Director of Wastewater Operations Group

Richard Harvin, DWSD Head Sewage Plant Operator (HSPO)

Darryl McCollins, Retired, DWSD Sewage Plant Supervisor (SPS)

Joseph Ramsey, PhD, IT Manager, DWSD

Maria Young, City of Detroit, Human Recourse Analyst at DWSD

Kerry Rudolph, DWSD Sewage Plant Supervisor (SPS)

Cheryl Minniefield, Grievant

2

I.     Ms. Minniefield's Employment History:

The Grievant, Cheryl Minniefield was employed by the City of Detroit Water and Sewerage Department on December 9, 1981 (although for reasons not fully explored during this hearing, Ms. Minniefield had a break in service and her City Seniority date is recorded as October 24, 1977). She held positions as Sewage Plant Operator Apprentice, Sewage Plant Operator, Senior Sewage Plant Operator and supervisory positions as Assistant Head Sewage Plant Operator and finally, since 2006, as Head Sewage Plant Operator, the position she held at the time of this disciplinary action.

Ms. Minniefield's Prior Disciplinary Action:

According to Ms. Minniefield, in 2009 she was subjected to Disciplinary Action for leaving the plant for 3 hours without clocking in/or out, and as a result, she was of paid for a full shift of 8 hours. Ms. Minniefield received a 3 day suspension, and appealed the disciplinary action through the Step 4 Grievance process. The Civil Service Commission apparently upheld the discipline, but reduced the number of days off. (p. 831).

II.     Disciplinary Action - Suspension and Discharge:

Mr. Jared Richards, the Waste Water Treatment Plant Manager contacted Ms. Minniefield, and scheduled a meeting for April 5, 2011. Mr. Richards testified that he advised Ms. Minniefield that there were anomalies in her timekeeping and that disciplinary action was contemplated. He advised her that she could bring a representative to the meeting. At the April 5th meeting, Ms. Minniefield invited Dr. Saulius Simoliunas, a WWTP chemist. Jared Richards, Sam Smalley, Assistant Director WWOG, Paulette Brown, HR Manager and Mr. Dimitric Fresh, the investigator from the Detroit Water & Sewage Department Security Section attended the meeting for the City. Prior to the start of the meeting, Ms. Minniefield's invited representative, Dr. Saulius Simoliunas asked that Mr. Fresh be excluded from the meeting.

A Disciplinary Action Fact Sheet dated April 7, 2011 prepared by Jared Richards, the Waste Water Treatment Plant Manager, summarized the meeting of April 5, 2011 (Exhibit 5 and 21). Mr. Richards testified that although he did not personally review the payroll and gate

3

records that were the basis of the disciplinary action, he reviewed the summary of the materials and the manner of investigation with Mr. Smalley, the Assistant Director of Wastewater Operations Group, and Mr. Dimitric Fresh, the investigator with the DWSD Dept who undertook much of the investigation. The disciplinary action fact sheet includes the following Statement of Facts:

> While investigating a discrepancy between gate swipe information and Workbrain clock times for Mr. Kristopher Jackson it became apparent that there was a great number of time entries that resulted in Mr. Jackson being paid for time that he was not on site. Further investigation let to the discovery that Ms. Cheryl Minniefield was the supervisor that was adjusting the employees times inappropriately. It was also discovered that Ms. Minniefield was using an retired employees Workbrain proxy to adjust her own clock times to allow payment for time that when she was not on site. The record of gate swipes and Workbrain clock swipes are in the custody of DWSD Security.

> When asked if she had adjusted the time for Mr. Jackson, Ms. Minniefield indicated that she adjusted a lot of people's time in WorkBrain and she needed particular information to answer correctly. She stated that she had to do out punches and in punches because employee's cards did not work on the clocks. Her practice was to call the employees on the job and ask them when they arrived to provide in punches when they were missing. Ms. Minniefield had no explanation as to why an out punch would have to be adjusted if the card worked on the in punch.

> When asked about adjusting her own times she stated that this was done only with the knowledge of the supervisor. I asked if she told the supervisor when she was late and she said I stop by and tell them that I'm here". This is not nearly the same as I was late.

4

At no time did Ms. Minniefield deny adjusting the employees time or her own. She did state that she did not have Mr. Keith McWilliams password but only his proxy.

Given the computer records of gate passes and Workbrain punch modifications, the management group concluded that Ms. Minniefield had been over-riding payroll entries in Workbrain for herself and Mr. Kristopher Jackson and therefore was guilty of gross misconduct by a city of Detroit employee by manipulating time keeping records. The discipline issued as a 29 day suspension with recommendation for discharge.

Mr. Smalley, the Assistant Director of Wastewater Operations Group prepared his own summary of the disciplinary meeting (included in Exhibit 5). The Statement of Facts by Mr. Smalley are dated the day after the disciplinary hearing, April 6, 2011:

> During a disciplinary meeting conducted on April 5, 2011, Ms. Minniefield admitted that she had in fact adjusted her late times in Workbrain. First she state it was "six minutes or so", and then she later stated it was "ten minutes or so", and later she indicated "it couldn't have been more that 15 minutes". Writer understood this to mean that she admitted she had been adjusting her time in Workbrain to eliminate her late arrivals. She further stated that she could not have done this on her own without approval from the Sewage Plant Supervisor on shift. She also stated that she has to enter times for a number of people because the swipes don't work at all the clocks. When reminded that we have gate swipes, she said she couldn't have done this on her own.
>
> She asked if she would be provided with copies of the relevant data or information that were were basing our decision on and she was informed that she would be receiving this information but not at the meeting.

She also asked if this was in retaliation for her going to Council to complain about things at the WWTP. I told her that while I was aware that the delivered a letter to Council at the recent rate hearings, I have not see the letter nor am I aware of the contents of the letter. I informed her that this was in no way retaliation for anything, but was based solely on the preponderance of data that shows she has been over-riding payroll entries in Workbrain for herself and Mr. Kristopher Jackson.

After leaving the room to discuss the situation, Paulette Brown, Jared Richards, and I all agreed that issuing the 29-day suspension with a recommendation for discharge was still the appropriate course of action based on the data and information received at the meeting.

Ms. Minniefield brought Mr. Saulius Simoliunas as a witness or representative during eh t disciplinary meeting. At the onset the meeting, Saulius objected to having Mr. Dimitric Fresh and a security guard attend the meeting. Mr. Fresh and the security guard obliged by stepping out of the room.

The City introduced the Notice of Suspension dated April 5 2011 (included in Exhibit 5). The Notice was issued by Jared Richard, Waste Water Treatment Plant Manager, and reviewed by Same Smalley, Assistant Director Waste Water OG.

Ms. Minniefield was suspended effective April 6, 2011. The reason stated for the suspension was: "Gross Misconduct by a City of Detroit Employee. Embezzlement of Department funds by fraudulently manipulating time keeping records". A revised Notice of Suspension was issued on May 2, 2011, which altered the stated reasons for the suspension to read: "Gross Misconduct by a City of Detroit Employee: falsification of time records; theft of time; misuse of City property for the employee's own gain or benefit." The Notice of

6

Discharge was effective May 6, 2011. (The notice of suspension, revised notice of suspension and notice of discharge where entered as Exhibits 11, 13 and 14 respectively).

Ms Minniefield filed an Employee Grievance for Classified Non-Union Employees on April 7, 2011 requesting the removal of the suspension, reinstatement, expungement of her record and to be made whole.

III.    City's Policies and Procedures applicable to this Grievance:

The Disciplinary Guidelines of the Human Resources Department [Exhibit 12 of the proceedings] provide notice to employees of the conduct that may be subject to disciplinary action. The Disciplinary Guidelines Provide:

> The primary purpose of disciplinary action is to correct employee behavior or employee conduct with procedures that are progressive and consistent. All disciplinary action taken shall be for just cause and the selection of disciplinary action in any specific case should be appropriate based on the circumstances of the offense and the employee. Again, discipline is intended to be corrective. [Emphasis provided].
>
> Attached are disciplinary guidelines governing employee misconduct. Supervisors and employees are being notified in advance that committing these offenses will result in disciplinary action. These actions are intended to improve the general working conditions and the well-being of all DWSD employees.
>
> DWSD guidelines are examples of unacceptable misconduct. However, it is not feasible to indentify every possible form of misconduct in advance. Misconduct of a like seriousness will receive disciplinary action in a like manner. When a supervisor contemplates issuance of disciplinary action, the offense shall be investigated full in all cases before taking action and discussed with the employee prior to issuance.

7

Dischargeable Offenses:

9. Embezzlement or mishandling of funds. Falsification claims of scheduled-contractual provided absence, e.g. claim of funeral leave with no one dies or a funeral not attended, or claimed attendance at related training sessions, deliberately falsifying timecards or hours worked.

Waste Water Treatment Plant Rules and Regulations Employee Handbook

"Policy on Tardiness."( Exhibit 36):

"Operations. Working Hours. In order to provide continuous service, it is mandatory that treatment operations units be staffed continuously. To achieve this goal, all shift operations employees, except shift laboratory employees, work eight-hour shifts, exclusive of half-hour unpaid lunch. The total time spent on the Plant is eight-and-a-half hours. The effect of this arrangement is that the oncoming crew arrives a half hour before the outgoing crew leaves. The shift overlap time enables operators ending their shift to exchange important information with their counterparts beginning their shifts."

"This information exchange at shift overlap is to minimize potential problems associated with the change of crews and provide essential information for a follow through of routine and non-routine assignments begun on the prior shift."

"Employees are required to be punctual in reporting at or before the start time of their shifts."

8

IV.    The Standard for Review.

The Disciplinary Guidelines of the Human Resources Department [Exhibit 12 of the proceedings] provide notice to employees of the conduct that may be subject to disciplinary action. The Disciplinary Guidelines are referenced above.

Although not specifically referenced in the Rule 18, Conduct of Administrative Hearings, the Disciplinary Guidelines adopt the commonly accepted just cause standard for review in discharge cases, which usually centers on such things as the factual determination of whether the grievance did the acts which they are charged, the quantum of proof which is required, the significance of the failure to follow customary procedures, and whether the punishment imposed is commensurate with the seriousness of the offense. Further, it must be demonstrated that the City conducted a fair and objective investigation prior to any discipline being imposed, preferably through an official unconnected with the events in question in the arbitration, where  substantial and compelling evidence of guilt is obtained. This is important because every accused employee has the right to due process of law and the right to be heard before discipline is administered. The Hearing Officer is fully mindful of the City's need for careful, safe and efficient performance of its employees, but before the City can discipline employee for failure to meet these requirements, the City must take pains to establish such failure.

Ms. Minniefield's Attorney presents several arguments:

1. The City failed to carry the burden of proving the misconduct for which Minniefield was first suspended and later discharged – namely, "Gross Misconduct by a City of Detroit Employee:  Falsification of time records; theft of time; misuse off City property for he employee's own gain and benefit."

2. Even had the City carried the burden of proving the misconduct for which Ms. Minniefield was suspended, which did not, the decision to discharge her violate the disciplinary guidelines contained in the  DWSD Employee Handbook because the offense was not a dischargeable offense but a Group II offense requiring progressive discipline prior to discharge.

9

3. The evidence at hearing showed that the City's stated reasons for suspending and terminating Minniefield's employment are pretextual – the real reason for the City's adverse actions was Minniefield's protected First Amendment activity.

Counsel for Ms. Minniefield also noted that many of the documents relied upon by the City were unavailable to him or Ms. Minniefield prior to the date the hearing. Specifically, Mr. Runyan stated that he had not received the summaries of the Lenel gate entry and exit reports prepared by Mr. Fresh as part of his investigation (transcript page 35). Mr. Jarvis, counsel for the city responded that he had not received any request for documents from Mr. Runyan prior to the receipt of subpoenas pursuant to this hearing. It is clear from the record that Jared Richardson advised Ms. Minniefield that the documents used to substantiate the disciplinary action against her would be provided. Ms. Minniefield apparently made a request for the City's documents directly to Mr. Jarvis, the city's attorney. Mr. Jarvis said he advised Ms. Minniefield that since she had retained counsel, any communication or exchange of documents would have to be through Ms. Minniefield's legal counsel. The Disciplinary Action Fact Sheet prepared by the City noted that Ms. Minniefield's representative did not want the City's Security Department investigator present at the hearing. He would likely have had the type of documents requested by Ms. Minniefield.  In order to assure Ms. Minniefield the right to be heard on all issues, the hearing officer therefore provided Ms. Minniefield and her counsel with adjournments and opportunity to review, cross-examine and present exhibits that Ms. Minniefield considered responsive to the City's Exhibits during this Step 4 of the grievance proceedings.

V.      Background on the Investigation leading to the Disciplinary Charges:

The event that  precipitated the investigation into Ms. Minniefield's conduct began in March, 2011, when Arnold Shaw a Sewage Plant Supervisor (SPS) at the Detroit Wastewater Treatment Plant could not locate a certain employee,  Sewage Plant Assistant (SPA) Kristopher Jackson. Mr. Shaw initiated a request to the Detroit Water and Sewage Department Security section. Mr. Dimitric Fresh a Security Specialist, conducted the inquiry and testified about his investigation. His Security Section Incident Report was entered as Exhibit 1 to the proceedings.

10

Mr. Fresh testified that he checked the records for Mr. Jackson for the City of Detroit employee timekeeping program for payroll, referred to as the "Workbrain" system, and the gate entry and exit records from the turnstiles, referred to as the Lenel System. Mr. Fresh explained that all employees must swipe their ID cards when they go through a turnstile or gate entry when they enter or leave the plant, and these entry and exit times are recorded and stored in a program maintained by the Security staff (the Lenel System). Mr. Fresh also explained that once in the plant, the employee was expected to again swipe the same ID card at a clock terminal to record their start and quit times in the City's timekeeping program for payroll referred to as the Workbrain System.

Mr. Fresh observed that there were "quite a few Overrides on Mr. Jackson's records, which indicates someone at a level higher than Mr. Jackson went in and manually entered his time[in the Workbrain timekeeping system], but those times did not match up to what I was seeing from the Lenel system." Mr. Jackson's Workbrain payroll records showed he was working, but he was not recorded as entering or exiting the plant on the Lenel records. Mr. Fresh noted that Cheryl Minniefield was the person who was entering the Overrides to Mr. Jackson's time in the Workbrain system. When Mr. Fresh then compared the Lenel gate entry and exit records with the Workbrain records for Ms. Minniefield, he noted that there were numerous instances where the two sets of records did not coincide.

Mr. Fresh also wrote in his report that on" March 4, 2011, Mr. Jackson complained to a supervisor that his check was 8 hours short, and that Ms. Minniefield told Mr. Jackson that she would take care of the problem the following week and put 8 hours into the Workbrain payroll system for Mr. Jackson with the comment that it was pay owed for the last pay period." Mr. Jackson noted that "Ms. Minniefield knows that if there is a problem with your check, it will be corrected by the payroll department; you do not put someone in for 8 hours and they did not work that day".

VI.    The Evidence of the Investigation by the City:

A.    The Lenel Gate Swipes.        Mr. Fresh, the DWSD security specialist, testified that the Lenel gate entry system requires that each employee swipe their ID card in order

to gain access to the plant grounds. The Lenel records are maintained by the security department and cannot be altered. Mr. Fresh identified Exhibit 2 as the summary of Lenel gate entry records identifying the times Ms. Minniefield swiped to the plant through either the Jefferson gate or the Copland gate, the only two points of access for supervisory employees. . Mr. Fresh presented a list of dates or incidents from the Lenel Gate records from October, 2010 through March, 2011 that he claimed showed Ms. Minniefield entered the plant after her shift starting time, or before her shift ending time, with variances from as little as 1 minute to as much as 2 hours.

B.    The Report of Overrides.        Mr. Fresh explained a document presented by the City (Exhibit 4) listing the "Overrides" performed on employee time records in the Workbrain system from January through April, 2011. Comparing the records for Ms. Minniefield from the Lenel gate entry system and the Workbrain records for the period January 1, 2011 to March 26, 2011, Mr. Fresh noted 38 times where the records did not coincide. The City introduced Exhibit 5 summarizing the Lenel entrance and exit gate records and the Workbrain records for Ms. Minniefield.

Mr. Fresh testified that during the course of his investigation, he talked to Ms. Minniefield's supervisor on shift 4, Arnold Shaw, as well as sewage plant supervisor William Davis. Each of them told Mr. Fresh that they had not given permission to Ms. Minniefield to alter her own time. Mr. Fresh said that Mr. Darryl McCollins, a Sewage Plant Supervisor on what was referred to as the A/C shift, the relief shift working three afternoons and two midnights on the weekend. Mr. Fresh said Mr. McCollins refused to talk to him, and then he retired. Messrs. Shaw, Davis and Mc Collins all testified at the hearing.

C.    ' Evidence on Robert Graham.        Mr. Dimitric Fresh, the investigator for the DWSD also investigated the gate access and Workbrain time records of Mr. Robert Graham (Exhibits 8,9,4). Mr. Fresh noted that Ms. Minniefield entered Overrides to the shift start times for Mr. Graham while working on her shift approximately 17 times from January through March 2011; each of these instances were recorded as Ms. Minniefield using Mac Williams proxy.

12

D.    Evidence on Kristopher Jackson.         Mr. Fresh noted in his investigation report that he spoke with Ms. Minniefield about the failure to use a payroll inquiry form , or "PIF", for Christopher Jackson concerning his complaint that he was short in his paycheck for the week of March 4, 2011. Ms. Minniefield entered Overrides to Mr. Jackson's Workbrain record, authorizing payment for eight hours on March 7, 2011. Exhibits 19 and 20 presented at the hearing demonstrate that Christopher Jackson never entered or exited the plant through the Lenel system on March 7, 2011.

Mr. Fresh testified about the incident during examination by the City's Attorney, Mr. Jarvis

Q (Jarvis) And then let's look at 3/7/2011. We've got a number of columns. Usually we've got a gate swipe in of--there is no gate swipe in. Is that correct?

A (Fresh) Correct.

Q And we've got a Workbrain in of 7:00 a.m.?

A Correct.

Q And then a Workbrain out of 3:30 p.m., and no gate swipe out?

A Correct.

Q It says, "Employee never reported." Why does that appear in that column, "Employee never reported"?

A The employee never came to work that day. There was a comment on Workbrain that this supposedly was pay owed from the last pay period, but in order to make a payroll correction, you submit a PIF form. You don't arbitrarily give someone eight hours.

You don't make that correction. That is done by Payroll, not by the supervisor.

Q So did you check and see if there was a PIF form?

A No, there wasn't.

Q There was no PIF form?

A No.

Q And who was the proxy user and actual user on that date?

A Proxy, MacWilliams. Actual user, Minniefield.

13

## VII. Explanation of the Workbrain System

The City presented Ms. Lori Cetlinski, project manager for Workbrain implementation and a manager for the functional support of the departments that use the Workbrain. Ms. Cetlinski explained that since 2009, the Workbrain system is the computerized time and attendance system and payroll system for the City of Detroit, including the WWTP. The Workbrain system operates in practice much like a conventional punch card and time clock, but automates the timekeeping process. Each employee has an ID badge or card with a magnetic stripe that is used to electronically enter their time on a device that is referred to as a proximity clock. The employee passes the ID card near the device at the beginning and end of shift, and the swipe-in and swipe-out times are stored in the Workbrain system electronically. The proximity clocks are located inside the plant at various locations. Any employee can log into their own Workbrain account on computers throughout the plant at any time and observe their own time records in Workbrain, but cannot make any changes to these records.

Ms. Cetlinski explained that Exhibit 4 was a report from the Workbrain database listing all of the "Overrides" performed on employee time records from the January – April 2011 timeframe. Ms. Minniefield as a supervisor had limited authority to adjust Workbrain records. Every time a Workbrain record was changed or adjusted, a record was made of the "Override".

Ms. Cetlinski explained that the Workbrain program assigns different levels of authorization to employees operating within the system. For example, all employees have the ability to access their own records on Workbrain, they can view any vacation, sick time accrual, or daily time entries including swipe Ian swipe out records, but they cannot make any changes to their own records.

As a Head Sewage Plant Operator (HSPO), Ms. Minniefield could enter "Overrides" for her own time records within Workbrain, so long as the changes did exceed her "scheduled" work times. These Overrides did not require any further approval. For example, if Ms. Minniefield was scheduled to work the on the day shift, from 7:00 am to 3:30 pm, the Workbrain system would permit her to enter an "Override" to her actual swipe-in or swipe-

14

out times in order to avoid a "tardy", but would not permit her to enter any records that would approve her for payment for any other shifts, or for overtime.

Ms. Minniefield, as a Head Sewage Plant Operator had the responsibility to manage the Workbrain time records for payroll for the 25 or so employees that worked under her on Shift 4- Liquids. Because of retirements within the supervisory ranks at the WWTP, Ms. Minniefield was also given responsibility for the Workbrain timekeeping records of employees who did not work for her directly, such as the employees on Shift 4-Solids. Sometimes employees normally assigned to her crews worked overtime on other shifts, and Ms. Minniefield would also be responsible to manage and process the Workbrain time records for these situations, often involving overtime assignments where Ms. Minniefield would not be physically present during the shift.

Ms. Minniefield, as a Head Sewage Plant Operator, could use her authority to view records of employees under her supervision, on her crews, and could make certain entries, or Overrides to those time records, but could not change an employee's work schedule. Higher-level supervisors, such as the Sewage Plant Supervisor (SPS) were issued higher levels of authority and would be able to view records of all employees and could authorize Overrides that adjusted times, as well as work schedules. Because Ms. Minniefield had responsibility to maintain the Workbrain timekeeping records for employees working on other shifts, she was issued the "proxy" of a sewage plant supervisor, now retired SPS Darryl MacWilliams. Using Darryl MacWilliams proxy and using her own "username", she could access Workbrain records and make Overrides to time schedules.

Changing the shifts or schedules or for overtime for an employee had to be authorized by the Sewage Plant Supervisor.

A.    The Workbrain "Overrides"

There was testimony that there were several accepted protocols or explanations for manually entering adjustments (or Overrides) to an employee's Workbrain records by supervisory personnel that have proper authorization.

15

1. Swipe –in / Swipe-out. The first of these protocols is based on the situation where an employee's ID badge does not properly register on the Workbrain proximity clock and therefore the employee cannot use their ID card to make a Swipe-in or Swipe-out on the Workbrain system. After appropriate verification, a supervisor could manually enters the start time or quit time as an Override, adjusting employee's time in the timekeeping system to accurately reflect the actual time worked. The Hearing Officer received testimony from Ms. Minniefield's direct supervisor Mr. Arnold Shaw, (a Sewage Plant Supervisor or SPS) that if the employee did not have a Swipe-in recorded in the Workbrain system, the best method to verify start times or quit times was to check with the gate swipe records maintained by the security staff. Checking with the security staff was generally the responsibility of a SPS position, and Ms. Minniefield, as a HSPO would have to make the gate swipe inquiry through a SPS. Although Ms. Minniefield had obtained gate swipe records from the security department in the past and had used these records to discipline employees for tardiness, Ms. Minniefield testified that she did not request gate swipe records through a SPS for any of the Overrides that she made to the Workbrain records for Mr. Kristopher Jackson or Robert Graham.

Ms. Cetlinski testified that the non functionality of the employee badge and the proximity clock was generally not intermittent. In other words, if the ID badge swipe was not recorded at the start of the shift, it would not thereafter work for the end of shift swipe. If the ID card was rejected by the Workbrain system it would have to be reset by her Department. Ms. Cetlinski manages the administrative staff responsible for processing requests for ID cards that did not work. She testified the card would be reprogrammed the next day and generally request to reset nonfunctioning cards would be addressed promptly. Ms. Cetlinski also testified that the number of requests to reprogram nonfunctioning ID cards was not significant, stating that except for requests for new employee cards, the number of nonfunctioning ID cards was no more than a handful. According to Ms. Cetlinski, if an employee's ID did not properly register with the Workbrain proximity clock, they would notify their supervisor, and the supervisor would verity the time the employee started or ended the shift by checking the gate swipe records, and make the appropriate entry to the Workbrain system as an Override.

16

The following exchange between Ms. Minniefield's immediate supervisor, Mr. Arnold Shaw, and Ms. Minnefield's attorney, Mr. John Runyan explored the problem of the non functioning ID cards. Although the complaints were many, in Mr. Shaw's opinion, the problem was more employee compliance, not with faulty ID cards. Mr. Shaw testified as to his understanding of proper procedures to address the problems and enter the Overrides:

Q (Runyan) Now I think Mr. Jarvis asked you if you ever had an employee complain to you that they tried to swipe in and it didn't take, or something like that?

A (Shaw) Yes.

Q And you said that that has happened so many times you couldn't even count them?

A Yes. It happens a lot.

Q And is that another situation where you have to make a judgment? You have to enter an Override in order to get that employee?

A If you verify that what they are saying is true, yes. If you cannot verify that what they are saying is true--because there were people who thought they were slick.

They would come in through the gate, not swipe at all because they were late, and then they would tell you, "Well, I got here on time." Well, no, you didn't, because I'm going to check.

I'm going to check, and I'm going to know that you did or it is not going to be done, and then you have to deal with the consequences of that.

Q And tell me how you are supposed to check. How are you--

A You go through the chain of command and contact Mr. Fresh or Security.

Q Is there any other way you can check? Do you ever call the supervisor--

A Oh, there are--

17

Q  I mean, did you ever call Ms. Minniefield and say, "Mr. Graham just told me that he was here all the time," and--do you ever call the supervisor and see if the employee--

A  No.

Q  Other than calling Security, is there any other way you double check to make sure that the information you were given is accurate?

A  No.

Q  Did you ever call the Security system and they would be reluctant to give you information?

A  Yes.

Q  Tell me about that. What happened?

A  As you just stated, there were persons that you could call, and they wouldn't tell you.

Q  So some people that you would call in Security, they would be reluctant to give you the information from the Lenel system so you could--that would happen?

A  Yes.

Q  And so you kind of had to know who you could call and who not to call? Is that what you are saying?

A  I'm saying if you could call and verify that what they said is true through Security, then you would input it.

   If you couldn't, then you didn't, and you would just make it up the next week with a correction of some sort, but you didn't just arbitrarily put in a number because somebody told you, no.

Q  But would it happen almost every week that somebody would--you would have to do an Override for somebody because somebody didn't have a swipe in that recorded correctly?

A  We did it constantly, yes. It was an ongoing thing at times.

Q  And was that part of the supervisor's responsibility for the employees under their supervision, to try to make sure that the Workbrain system had manual entries if necessary?

18

A   Yes. We would in a lot of cases collectively near a week's end or the beginning of the very next week, we would have an awful lot of people spending an awful lot of time on Workbrain, but the fact of the matter is this.

If it could not be verified through Security, you did not input it until you could verify it, and only then would they be compensated.

There were people who actually at times didn't get a check. It's unfortunate, but that is just the way the system was or is. It shouldn't be, but you didn't just arbitrarily write in something somebody told you right then.

Q   And did that continue from the onset of Workbrain in June of 2008 [sic] right up until the time that you retired?

A   Yes.

Mr. Shaw was adamant that if the ID card did not swipe in or out with an actual time, the proper procedure for verifying the actual time that an employee arrived at work involved checking the gate swipes with security. But another SPS on Shift 2, Mr. William Davis acknowledged that although checking the gate swipes was the normal protocol, there were times when the verification of a supervisor who had actually seen the worker arrive on time would be sufficient to enter an Override in Workbrain with a starting time.

The testimony concerning ID cards that would not register at the Workbrain proximity clocks was also presented by Mr. McCollins, a retired SPS who appeared at the hearing at the request of Ms. Minniefield, who said that "I ran across that with one employee for sure".

Mr. Shaw's testimony above, reflects the frustration with what he viewed as the problem being exaggerated by employees that intentionally bypassed the system to avoid penalties associated with tardiness. Ms. Cetlinski's testimony clearly places this problem with Workbrain as a relatively small problem with no more than a" handful" of ID cards being rejected at the proximity clock and requiring action by her assistant to reset the ID card, and only several e-mails per week from the security department for issuance of new cards.

19

So the ability of the ID card to swipe-in and swipe-out appears from the great weigh of the testimony to be a problem, but not in my estimation the major cause for operational problems with the Workbrain system.

Notwithstanding the need for Overrides to the Workbrain system, there was testimony by several supervisors that the "Override" of the Workbrain system was not intended to alter or change actual work times or swipe-in or swipe-out times of employees. It is critical to understand this policy because the City's disciplinary action against Ms. Minniefield is based on the City's proposition that Ms. Minniefield has improperly adjusted her own time records, and the time records of her nephew, Kristopher Jackson and another employee Robert Graham. Ms. Minniefield maintained that she only made Overrides to the Workbrain timekeeping system with approval of the SPS.

Arnold Shaw was the Sewage Plant Supervisor for Shift 4 at the time of Ms. Minniefield's discharge. Ms. Minniefield reported to Mr. Shaw and worked as the Head Sewage Plant Operator. Shift 4 had a normal shift starting time of 7:00 am and a shift end time of 3:30 pm. The following exchange explained Mr. Shaw's position:

> (Q: Jarvis) Had you ever told her to change anybody's time?
>
> A (Shaw)    No, sir.
>
> Q    Did you ever tell her to change Mr. Robert Graham's time?
>
> A    No, sir.
>
> Q    Mr. Jackson's time?
>
> A    No, sir.
>
> Q    Did she have authority to change anybody's time?
>
> A    Absolutely not.
>
> Q    And why is that?
>
> A    Her title didn't--itself does not have the authority, period. No one has the authority to manipulate someone's time contrary to when they were actually there or not there. You know, you are there when you are there, and when you are not, you are not.

20

Mr. William Davis, another Sewage Plant Supervisor on Shift 2, the "off shift" working afternoons and weekends testified about changing time in Workbrain. Ms. Minniefield worked under SPS Davis when she worked overtime shifts, generally starting 3:00 pm to 11:30 pm:

> Q: (Jarvis)   All right.  Now at any time did you give Ms. Minniefield
> permission to go into the Workbrain system and change anybody's
> time?
>
> A   (Davis) No.
>
> ...
>
> Q   Is it appropriate to pay employees when they are not at the
> Sewage Plant working?
>
> A   No.
>
> Q   Why is that?
>
> A   You are only supposed to pay employees when they are actually
> on the clock performing a service.
>
> Q   When they show up and start work.  Is that correct?
>
> A   Yes.

2.    Overtime.     The second reason for a manual Override to the Workbrain system is based on one of the acknowledged deficiencies of the Workbrain computer program logic. The Workbrain program does not always properly deal with shifts that extend over two calendar days. Ms. Cetlinski said that employees who work a midnight shift will have the clock time assigned to the wrong date. She explained that if an employee swiped- in for an 11:00 PM shift start for the midnight shift, the time would not be applied to the following day. The supervisor can enter an Override to Workbrain records to properly reflect the appropriate calendar day for the employee's time within the current payroll period.  This problem was emphasized by Ms. Minniefield, and referenced by published newspaper articles that she introduced as Exhibits during the hearing.  During Ms. Minniefield's testimony, many transactions that were recorded as Workbrain Overrides where she was the User under proxy of a supervisor dealt with this condition or deficiency with the

21

Workbrain system. This condition also appeared to contribute to a problem of under recording hours worked for employees, where they would end up with a shortage on their paycheck.

Mr. Arnold Shaw, Ms. Minniefield's direct supervisor and Mr. Davis and Mr. McCollins, Sewage Plant Supervisors on other shifts also described the necessity of an Override in Workbrain for this type of situation and that this adjustment often required a great deal of effort at the end of the pay period to make all the necessary Overrides in the Workbrain system. Mr. McCollins provided the best description of the complexity of the 24/7 nature of the business, with an overlay of union negotiated pay differentials to create substantial problems for the WWTP staff responsible for administering the Workbrain system. This description also sheds light on the many opportunities for payroll check mistakes, and the expected frustration of the employees that were required to resolve the payroll mistakes through the Payroll Inquiry Form (PIF). Mr. McCollins is responding to questions by Mr. Runyan:

> Q  (Runyan) Tell me what your experience with Workbrain is. Has Workbrain, the implementation of Workbrain gone smoothly in your opinion since 2009?
>
> A  (McCollins) No, not even close, just the opposite.
>
> Q  Why?
>
> A  It was something that was dumped on the City without any beta testing. I mean, I think it works ideal for Monday through Friday employees, but I don't think they did any beta testing on the 24/7 operation, because I detected many flaws in the system.
>
> Like people that worked six days, it paid them straight time for the sixth day, didn't pay employees holiday pay on the actual holiday, only the substitute holiday.
>
> For example, if Fourth of July fell on a Sunday and the holiday was on Monday, the 5th, it would only pay you on the 5th and not the 4th.

22

There is a clause--well, a union clause where, you know, if we are a 24/7 operation, you pay for either/or, or whichever one that nets you the most hours, but Workbrain wasn't set up that way.

Also it actually looked at the midnight shift as third shift for the day instead of first shift of the next day, so it's a bunch of flaws in it.

Q  And was there--did you ever become familiar with problems, employees having problems getting their swipes to take when they were trying to enter Workbrain?

A  Yeah. I ran across that with one employee for sure.

3.  Regular Shifts Pre-Programmed in Workbrain.  The Workbrain system Incorporated a regular schedule or shift for each employee. In Ms. Minniefield's situation, she was regularly scheduled for a day shift starting at 7 AM and ending at 3:30 PM, working in Liquids, but also would work additional shifts on overtime during the week. Authorizing overtime, or adding a shift or changing a shift for an employee that was different from the employees regular schedule required the authorization of the Workbrain Override by a sewage plant supervisor (SPS).

4.  Adjustments to type of Work.  Overrides in the Workbrain system are also appropriate when an employee does not show up for work, but the employee may be entitled to payment for that day, for example using vacation time, sick time, FMLA time, etc.  An Override would also be required if an employee performed work that differed from the scheduled assignment, for example an employee would be attending training, as opposed to his or her regularly scheduled work position. The employee might still be eligible for payment, but an Override would be required acknowledging that the employee was not performing their expected or scheduled job.

5.  Proxies.  During the course of the hearing a great deal of testimony was presented concerning the use of proxies by employees such as Ms. Minniefield to access payroll records in the Workbrain payroll system. I am convinced that the controls over the issuance or use of proxies, or the use of proxies of retired supervisors were not universally

23

known or followed, and there appear to be other instances where other employees were using proxies in ways similar to Ms. Minniefield. . Ms. Minniefield testified that although she used a proxy of retired supervisor Keith McWilliams, she never she never made any Workbrain entries using his password or the password of any other supervisor, and therefore each Workbrain record was recorded as user " Minniefield" (transcript volume 3 page 456 – 457). Ms. Minniefield's use of Mr. MacWilliams proxy prior to his retirement was for the proper purpose of obtaining access to the Crew 4 Solids under HSPO Greg Davis who was off on extended medical leave. That Ms. Minniefield continued to use the McWilliams proxy after his retirement appears to be a practice necessitated by staff shortages, and accepted, notwithstanding the loss of management control over the Workbrain payroll system. This a similar situation that existed for SPS Darryl McCollins, who was responsible for Crew 3, but used the proxy of Darryl Ivory after he retired so he could look at the Workbrain records of employees on other crews.

B.    Payroll Mistakes – Payroll Inquiry Form.

Ms. Cetlinski , Mr. Rudolph and Mr. McCollins testified that In the event an employee did not receive the correct accounting for time worked or overtime rate in their payroll check, the department policy was to submit a Payroll Inquiry Form, or PIF to the payroll department. There was frustration by employees and supervisors because of the length of time for the payroll department to respond to the PIF's. There was however, a clear and unmistakable understanding of the necessity to follow the procedure using the Payroll Inquiry Form for all situations involving questions about the accuracy of paychecks. Non-Conformance with this procedure is one of the reasons presented by the City supporting the discipline to Ms. Minniefield.


C.    Attendance Control and "Tardies"

Punctuality is important for DWWTP operations because there is a 30 minute overlap for each shift where the status of operations is reviewed by the ending shift for the benefit of the starting shift.  Testimony was presented that from the time the employee passed

24

through the plant gate and registered on the Lenel system, there would be anywhere from 5 to 10 minutes before they would be able to swipe-in at the Workbrain terminal inside the plant.

If an employee swipes-in late by even one minute, they may be subjected to Attendance Control, resulting in potential disciplinary action. Tardiness is also one of the factors used by the HR Department in assessing the promotion of an employee.

The WWTP also has a specific policy on tardiness.

"Policy on Tardiness."( Exhibit 36):

> "Operations. Working Hours. In order to provide continuous service, it is mandatory that treatment operations units be staffed continuously. To achieve this goal, all shift operations employees, except shift laboratory employees, work eight-hour shifts, exclusive of half-hour unpaid lunch. The total time spent on the Plant is eight-and-a-half hours. The effect of this arrangement is that the oncoming crew arrives a half hour before the outgoing crew leaves. The shift overlap time enables operators ending their shift to exchange important information with their counterparts beginning their shifts."

> "This information exchange at shift overlap is to minimize potential problems associated with the change of crews and provide essential information for a follow through of routine and non-routine assignments begun on the prior shift."

> "Employees are required to be punctual in reporting at or before the start time of their shifts."

Ms. Minniefield acknowledged that attendance is important and accepts that tardy is one aspect for HR to consider for promotion. She also accepts that it is the supervisor's

25

responsibility to be accurate and that putting 8 hours for a shift on a Carryover Report would not show a tardy and undermine attendance control. Ms Minniefield acknowledged that qualifying questionnaires for promotions administered by human resources reviews attendance records and if you have too many tardies or absences that you may not become considered for the position. (Transcript volume 4 page 715-16):

Q (Jarvis) Ms. Minniefield, is it your understanding that when you fill out qualifying questionnaires for promotions that Human Resources reviews your time record to see if you have any tardies, and if you have too many tardies or absences that you will not be considered for the position that you are applying to?

A (Minniefield) I believe there is a criteria or protocol there. Your attendance should be a certain--in a certain state of, you know, acceptance.

Q So having a perfect time record would be beneficial to an employee trying to advance. Is that correct?

A Yes.

. . .

Q (Jarvis) Right, and would you say as a supervisor that it is your responsibility to make sure that people are at their work location on time?

A (Minniefield) Yes, it is.

Q Okay, and would you say it is also part of your responsibility as a supervisor to make sure that people's time is properly recorded so that those who have good attendance records and those that don't, that is reflected in their time, so that when it comes time for Human Resources to review somebody's time records to see if they are eligible for promotion, that that is fairly applied?

A Yes.

Q So theoretically, Ms. Minniefield, if you just went to the crew carryovers and gave somebody eight hours pay--everybody, even the

ones who were tardy--they would get an unfair advantage over those
who are on time every single day. Correct?

A   If that happened, yeah.

...

Q   And when you were changing your times, you say according to the
     SPS telling you to do it, you were giving yourself a perfect
     attendance record, weren't you?

A   Depending on what times you are talking about, because when you
     come in for overtime you are never--that is not considered a
     tardy.

Q   Well, how about prescheduled overtime?

A   It doesn't matter. When it's overtime it's not a tardy.

The city contends that Ms. Minniefield by routinely adjusting Workbrain records to match
the Carryover Reports is violating WWTP policy, giving herself and others perfect
attendance, unfairly and deceptively improving their opportunities for promotion,
avoiding the penalties associated with Attendance Control, and undermining the integrity
and effectiveness of the Human Resource function.

D.           Overtime Practices – Call-In

The practice of paying workers from the beginning of the shift when they were "called in"
to work overtime shifts, regardless of the time the employee actually arrived at the jobsite
has existed at the wastewater treatment plant from at least 1979 according to the
testimony of retired SPS Darryl McCollins.

The City presented Jared Richards the Wastewater Treatment Plant Manager from 2009-
2011 to describe the policy on payment of call in time for overtime shift assignments:

27

Q (Jarvis) Now during your time down there, did it ever come to your attention that there was a policy to pay people who were called in for overtime for their call-in time?

A  There was a policy in Operations whereby the Sewage Plant Supervisors were approved to pay reasonable call-in time, or if people were called in for overtime to pay them before they actually showed up.

Q  What was "reasonable," if you know?

A  When I did it as a Sewage Plant Supervisor many years ago, it was usually no more than an hour. You know, if you had to call somebody on midnights and they have to get up and get dressed and get there.

Q  Okay, but that is when they weren't working a shift. Correct?

A  They were called in.

Q  When they were called in.

A  Right.

Q  When they were actually at home--

A  They were not scheduled to be there.

Q  Okay. Now did there come a time where that policy was stopped?

A  Yes.

Q  Do you know when that was?

A  I don't recall the exact time, but it was early in 2011. Mr. Smalley issued a directive that that was no longer going to be practiced.

Q  Now you indicated in your testimony that it was only--who could approve that call-in time?

A  To the best of my knowledge it was SPSs only, Sewage Plant Supervisors.

Mr. Smalley however, could not recall that he issued a memorandum on this subject.

Mr. Davis testified that the practice was stopped because some of the people that were working on regular shifts earlier that day could have been and should have been starting on time for the overtime shift. Mr. Davis said it was just a bad practice that was

discontinued (p. 234). Mr. Davis also testified that the practice was unauthorized although he acknowledged that as late as 2011 the abuse continued with some crews.

Mr. Fresh and several other witnesses on behalf of the City testified that the practice of paying a "full 8" for "call in" for overtime shifts was intended to extend a reasonable amount of time for the employee to arrive the job site after they were called in for a nonscheduled shift. A reasonable amount of time having been defined as 30 – 45 minutes up to an hour by some estimates.

Mr. Fresh testified that a scheduled over time was not eligible for the "call in" allowance. Ms. Minniefield testified that she could not recall if any of the Overrides that she made on the Graham or Jackson records involved scheduled overtime assignments. Although this testimony was not credible, there was not sufficient testimony presented to conclusively determine that Ms. Minniefield or Mr. Jackson or Mr. Graham was scheduled for overtime shifts for the dates at issue.

Ms. Minniefield herself was often scheduled for overtime on Tuesdays and Wednesdays according to Mr. Jarvis, the city's attorney, but Ms. Minniefield steadfastly refused to acknowledge that any of the over time assignments were scheduled and maintained that she was entitled to the "full 8" notwithstanding Lenel gate records at variance with scheduled shift starting times.

VIII.        The Crew Carryover Report

Extensive testimony was presented concerning the Crew Carryover Reports. The definition and use of the Carryover Reports is critical to this hearing because of Ms. Minniefield's reliance on the accuracy of the reports, and the authorization or authority of the Reports as

rationale for the many Overrides that she performed in the Workbrain system, for Messrs. Jackson and Graham, and for herself. Ms. Minniefield maintained that entries on the crew carryover reports could be entered directly into the Workbrain timekeeping system as Overrides. She considered the initial on a Crew Carryover report as the "approval of the SPS" authorizing her to enter the Workbrain Override verbatim.

A.    Carryover Report - Purpose and Use

Mr. Jared Richards, then the Plant Manager for the WWTP was asked for his understanding of the Carryover Reports:

> (Q: Jarvis)   Would you tell the Hearing Officer what your understanding of the carryover records are and what they are used for?
>
> A   (Richards) Carryover record is a software program that keeps track of people's time. It's based on a management by exception rule, in that the schedules are programmed into there. The people on the crew and on the schedule are programmed into there, and it's assuming that you are going to work that day and it awards you eight hours of work. The Head Operators go into the software and change the entry to reflect anything that is not the norm, whether it is vacation, sick leave, funeral leave, overtime, whatever it is.
>
> Q   So they have to take affirmative steps to audit that system to make sure it's correct. Is that correct?
>
> A   That is correct.
>
> Q   Is this system connected to Workbrain?
>
> A   No.
>
> Q   So, for instance, if somebody wanted to verify whether somebody had swiped in or not, they would have to look at the Workbrain system. Is that correct?
>
> A   That is correct.

30

SPS William Davis, the Sewage Plant Supervisor for Shift 2 provided his understanding of the Carryover Reports that are consistent with those of Mr. Richards, the Plant Manager. The Carryover Reports were used to schedule staff, and then verify that they showed up, and make adjustments for things that could not be anticipated, such as sick call in, vacations, etc.

> Q: (Runyan) Are you familiar with what is known as carryover reports?
>
> A Yes.
>
> Q Tell me what--how a carryover report, what is the purpose of that?
>
> A A carryover report is a system we have available that we document who was there or not there and what time they may have not been using--you know, like whether or not somebody worked--somebody was--whether or not they were sick or on vacation or on FMLA or what-have-you, and how many hours they worked, and how many hours they used comp time or whatever.
>
> Q And as the SPS, the Sewage Plant Supervisor, is it your responsibility to approve and sign off on a carryover report each day?
>
> A Yes, if they are available.
>
> Q And is it--so if there is a carryover report that is prepared each--for a day, and there is--that shows how many hours each of the 70 employees under your supervision is going to be authorized to be paid for? Is that correct?
>
> A It should.
>
> Q And you have to go through and initial that carryover report, is that correct, each day?
>
> A Yes.
>
> Q And if you see any people on the carryover report that you think shouldn't be paid, you have to look into it and make sure that you are not authorizing somebody to be paid that should not be paid?
>
> A Yes, if you have time.

31

Q  And you do that on a daily basis. Correct?

A  Yes.


Mr. Samuel Smalley was the assistant director of Wastewater Operations Group, responsible for the operations and maintenance of the wastewater treatment plant. Mr. Runyan asked Mr. Smalley to explain the carryover reports:

Q (Runyan) Tell me what you know about the purpose of the carryover reports.

A (Smalley) it is my understanding that the carryover reports are an outdated process that we have continued to maintain and will inform the oncoming shift about those individuals that are bearing being carried over from the previous shift.

Q  When you say "outdated", that was-- the carryover reports were something that had existed prior to when Workbrain came on the scene in 2009. Right?

A  Maybe "outdated" isn't the appropriate word. What I would say is that Workbrain is the system that we use. The carryover reports are parallel system that we have still maintained.


Kerry Rudolph is a sewage plant supervisor for Crew 5. At one time he worked on Ms. Minniefield's crew as an assistant head sewage plant operator when Ms. Minniefield was the head sewage plant operator. Mr. Jarvis asked Kerry Rudolph to explain the use of carryover reports and the role of the Head Sewage Plant Operator in maintaining the accuracy of the Reports before they were submitted to the Sewage Plant Supervisor:

Q  (Jarvis) Now crew carryovers, are you familiar with those?

A  (Rudolph) Yes.

Q  What are they used for?

32

A   It is just used as a roster, just to--that person is here. It's not for like--say if that person came in at three minutes late. That person was late, but that person was still here.

So Assistant Heads and Heads, when Workbrain came along, got lazy with that, and if that person was two minutes late, they would still say he was here eight hours, but Workbrain will show that that person wasn't here eight hours.

So the carryover is just to make, "Okay. That person here is in their area. They--we saw them, or somebody has seen them, and they are in their area." It doesn't necessarily mean that they were in, that they swiped in on time, but you did see them in their area.

Q   So if you wanted to check and see if somebody was scheduled to work, what would you refer to?

A   For overtime?

Q   Well, any, straight time or overtime, if they were scheduled to work, what would you use to see if they were scheduled to work?

A   Well, that sheet would let you know that they are scheduled to work.

Q   By "that sheet," you mean what?

A   The carryover sheet.

Q   Crew carryover, okay, but the crew carryover, is it an accurate recording of the person's time?

A   No.

Q   When a Head signs off on the crew carryover, do you know why he would sign that?

A   An SPS signs it, but the Heads--the Assistant Heads are filling it out, and the Heads are making sure that it's as accurate as it can be.

33

Then when the SPS gets it, after the Head gives it to
them, the SPS is assuming that you have done your due
diligence and you have checked and made sure that everybody
that is on that sheet, whether they are vacation or sick or comp
time, or late, that you did your due diligence and, you know,
these people are here, or if they are absent there is a reason
why.

Q   Right, right. Would it ever be appropriate to use the crew
carryovers to input somebody's time into Workbrain?

A   No.

Q   Why is that?

A   Because it's not accurate.

Ms. Minniefield contacted Mr. Rudolph and requested that he testify at this
proceeding, specifically to support her position and interpretation of the
Carryover reports. Mr. Rudolph testified that he told Ms. Minniefield that he
did not believe the carryover report could be used for tracking time in
Workbrain (pp.1200 – 1202):

Q   (Jarvis) Well, let me ask you this question. Prior to your
testimony here today, did you have any contact with Ms.
Minniefield?

A   Yes.

Q   What did she ask you or say to you when she contacted
you?

A   She wanted me to come here and tell what I thought was
the City's policy on things, asking me questions about, "Well,
Kerry, you know, we normally did this on Workbrain," or "We
normally did this on a carryover," stuff like that, "Would
you agree to that, yes or no?"

Q   Okay, and what did you indicate to her with respect to the work--to the crew carryovers?  Did you indicate you would testify the way she wanted you to?

A   I just said that if I was subpoenaed or whatever, that I would be here and I would tell the truth, but--and that I wasn't particularly--whoever asks me whatever, **I'm going to tell the truth.**

Q   Okay.

A   It's just that.

Q   Did she ask you anything specific about the crew carryovers that you recall?

A   **Was it used to--for specific--you know, for the time.**

Q   All right.  Tracking time?

A   Tracking time.

Q   And what if anything did you indicate to her?

A   **I told her no, it wasn't used for tracking time.**

Q   Okay, and what did she say to that?

A   Well, **she was telling me how her case boiled down to what it boiled down to, the carryover,** and just did I agree with what she was saying, and I didn't agree with everything that she was saying.

Darryl McCollins was also a SPS . He testified that  the carryover reports were basically like a record of "roll call".  According to Mr. McCollins the report identifies who is at work, who is not at work who is there on overtime, what time what kind of time they are getting paid, either time and a half, double time, was on vacation, who called in sick who is off for FMLA and so forth.

35

B.        History of the Carryover Report.

Sewage Plant Supervisor William Davis testified that prior to the introduction of the Workbrain payroll system in 2009, the carryover reports were in use along with a conventional time card used to record the actual time worked for each employee. An administrative staff person, referred to as a payroll clerk, would validate the employee time records against the carryover report to ensure that the employee was in fact authorized to work on that shift and in that position as specified in the carryover report. The Carryover Report would be manually adjusted for absences, vacation, sick and late time etc. From the testimony presented, the hearing officer believes the payroll clerk would take the information from the time cards, and incorporate the actual hours worked, vacation, sick pay, etc. and present the Carryover Reports to the SPS for approval and then submitted to the payroll department for processing. The introduction of the Workbrain system eliminated the staff position of payroll clerk and automated the manual time card system with the ID card that the employee would swipe near a "proximity clock" or computer device that would automatically record the employees' shift punch in, and punch out times.   Responsibility to coordinate the Workbrain time entries with the carryover reports was delegated to the Head Sewage Plant Operator (HSPO), the position held by Ms. Minniefield.


C.    Role of the Head Sewage Plant Operator.

The Head Sewage Plant Operator (HSPO) is the person generating the carryover report. The beginning point for a Carryover Report is the staffing and schedules for the employees that management has assigned to work on the shift, and the locations or job assignments for each of those employees. This is entered in the program and the Carryover Report is produced.. The first version of the Carryover Report could be printed and showed "defaults" that everyone came to work, and everyone would be shown as eligible for 8 hours. The work of the Head Sewage Plant Operator is to make sure the Carryover Report is managed and updated accurately.  During the course of the day, some people may call in

sick, some will have vacation time, some will request FMLA time, and some employees may not show up for work on time, or may leave before the end of their shift. This is the "roll call" or management by exception reference made by Mr. Richards Theses are the exceptions that must be managed by the HSPO so that the information is accurate for payroll purposes. These exceptions are the majority of the "Overrides" that are entered into the Workbrain timekeeping system. The smooth functioning of the Workbrain program is based on the automated ID cards that produce the swipe in and swipe out time for accurate reporting of employee start time and quit times.

Mr. Runyan asked Mr. Richards how a Head Sewage Plant Operator would check on the time of one of her regularly assigned employee that was working on a different shift. This is the inquiry relating to the Workbrain Overrides entered by Ms. Minniefield on the time records of Mr. Jackson and Mr. Graham when these individuals worked additional overtime on shifts other than Ms. Minniefield's shift 4. Mr. Richards testified that this had nothing to do with Carryovers. Mr. Richard's direct response was that the swipe in and swipe out records would be the definitive answer. If Workbrain swipe in and swipe out records were available, there would be no need for Ms. Minniefield to be entering the Overrides in the Workbrain system. If the Workbrain swipe in and swipe out records were missing, a responsible Head Sewage Plant Operator would recognize the need for diligent inquiry. This inquiry could include making inquiry of the Lenel gate swipe records, or perhaps checking with other supervisory personnel working that particular shift:

> Q (Runyan)   And if she had an employee who was on her crew who was working, let's say, another shift for overtime on a midnight shift, on Crew 2, how would she determine how much that employee should be paid?
>
> A (Richards)   You are stating that the employee worked the previous shift and was staying over on days?
>
> Q   Well, I mean, whether they worked on the previous shift or not, if they were working for a different crew on a different shift, how is the Head Sewage Plant Operator--what do they look at to determine what

that employee on their crew is supposed to be paid in terms of overtime?

A The Workbrain swipes will indicate the employee has swiped in and out and when they swiped in and out. Overtime is for time worked. Overtime is for over eight hours on scheduled shift, or on your sixth day.

A Head Operator would know all those rules and make that determination.

Retired SPS Darryl McCollins, a witness called by Ms. Minniefield, acknowledge that it was the responsibility of the Head sewage plant operator (SPS) to double check the crew carryover over reports to make sure they were accurate:

Q: (Jarvis) so to blindly follow the crew carryover report without checking to see if that person is there or if they swiped into Workbrain would be a mistake would you agree?

A: (McCollins) well, everybody, they check the people in. They don't just turn it in. I mean, the carryover has a list of everybody that is supposed to be there, but the first line supervisor verifies that all the people are there then there it is adjusted accordingly. (p. 591).

Additionally, sewage plant supervisor William Davis made it clear that the head sewage plant operator is responsible to prepare the carryover reports and he was unsure I sure their accuracy when they are submitted to the sewage plant supervisor. When the carryover report is submitted to the SPS, Mr. Davis replied that it identified that he had seen the report, but the head sewage plant operator was responsible for collecting the data and the accuracy of the data that went into the carryover report. (Transcript page 206 – 207). The testimony of Mr. Shaw is emphatic that Workbrain records are to reflect actual time at the jobsite. Reference in a carryover report that an employee is expected to work a full shift should not be used to Override Workbrain and Lenel Gate swipe records indicating the employee was not actually present at the jobsite.

38

IX.    Relationship between Crew Carryover Reports and Workbrain

Jared Richards, the wastewater treatment plant manager testified that the carryover report was not used for payroll purposes . Mr. Runyon continued cross-examination of Mr. Richards focusing on the crew carryover reports ( pp. 316 – 320):

Q   (Runyan) We appreciate your promptness. As I understand your testimony, you said that the carryover report system has a default where people are--this is an assumption in the system, that people are going to be there and be paid eight hours time. Right?

A   (Richards) That is correct.

Q   And so the Head Sewage Plant Operators have to go into that system and make adjustments if they find for some reason that somebody is not there for eight hours, or if they called in sick. Correct?

A   That is correct.

Q   Are there any--that you know of, is there any written policy or directives that you have issued or anybody else has issued, the Head Sewage Plant Operators, to tell them what they should do in that situation, what information they should check, that they should--

Is there a checklist that says, "Well, first of all you should call the Assistant Sewage Plant Operator to see if the person is there, and then you should check the Workbrain system, and then you should check the Lenel system"?

Is there any written policy that you know of that tells the Head Sewage Plant Operator how they are supposed to make those adjustments to the system, to the carryover system?

A   Okay. Which question--is there a written policy on--

Q   Is there a written policy or directives that you have ever seen?

A   No policy that I am aware of.

39

Q   (By Mr. Runyan)  You have never seen any policy like that?

A   There is material on how to use the software, I mean, you know, the carryover software.

Q   And so it would tell somebody, "If you need to make a deduction for four hours, here is how you do it." Right?

But you have never seen any policy in the Wastewater Treatment Plant that tells Head Sewage Plant Operators, you know, "Before you approve eight hours time for somebody, you should check the Workbrain system. You should check the Lenel system. You should check with the Assistant Sewage Plant Operator to make sure that the person is actually on the job"?

You have never seen that written?

A   I don't believe there is any written policy that directs that.

Q   And you understand that before anybody gets paid one dime, the SPS on a daily basis approves the carryover reports?

A   Not since Workbrain.

Q   Pardon?

A   Not since Workbrain.

Q   Not since Workbrain.  So if we can show you a bunch of carryover reports since Workbrain, some as recently as 2011, where the Sewage Plant--where the SPS actually signed and approved--

A   Since the implementation of Workbrain, that is the official payroll document.  The carryover is just an internal document.

Q   You don't believe the carryover is used to pay people?

A   It's not used to pay people.

Q   So the carryover report that the Head Sewage Plant Operators go in and adjust isn't used at all to determine what payroll is?

A   No, not since Workbrain.

Q   So prior to Workbrain, you are saying the carryover reports were used to pay people, but since Workbrain they have not been?

40

A  It was used as a check. **If you had a time card, you punched in and out, and that is what was recorded.** The carryover gives additional information about where you worked, what area of the plant and in what position.

Mr. Richards was direct in his response to questions about how Ms. Minniefield should have relied on the swipe in or swipe out records in order to verify the actual time worked, and Ms. Minniefield's reliance on the carryover report as sufficient to enter an Override and Workbrain was misplaced (pp 326 – 328):

Q  (Runyan) Okay. You understand that Ms. Minniefield was supervising, I think, Liquids as a part of Crew 4. Is that correct? That is on the day shift?

A  She was on the day shift, yes.

Q  And if she had an employee who was on her crew who was working, let's say, another shift for overtime on a midnight shift, on Crew 2, how would she determine how much that employee should be paid?

A  You are stating that the employee worked the previous shift and was staying over on days?

Q  Well, I mean, whether they worked on the previous shift or not, if they were working for a different crew on a different shift, how is the Head Sewage Plant Operator--what do they look at to determine what that employee on their crew is supposed to be paid in terms of overtime?

A  **The Workbrain swipes will indicate the employee has swiped in and out and when they swiped in and out. Overtime is for time worked. Overtime is for over eight hours on scheduled shift, or on your sixth day. A Head Operator would know all those rules and make that determination.**

41

Sewage plant supervisor Kerry Rudolph viewed the accuracy of the carryover reports in a similar manner:

Q   Crew carryover, okay, but the crew carryover, is it an accurate recording of the person's time?

A   No.

Q   When a Head signs off on the crew carryover, do you know why he would sign that?

A   An SPS signs it, but the Heads--the Assistant Heads are filling it out, and the Heads are making sure that it's as accurate as it can be.

Then when the SPS gets it, after the Head gives it to them, the SPS is assuming that you have done your due diligence and you have checked and made sure that everybody that is on that sheet, whether they are vacation or sick or comp time, or late, that you did your due diligence and, you know, these people are here, or if they are absent there is a reason why.

Q   Right, right. Would it ever be appropriate to use the crew carryovers to input somebody's time into Workbrain?

A   No.

Q   Why is that?

A   **Because it's not accurate.**

Mr. Runyan asked additional questions about the carryover reports during cross examination of Dimitric Fresh (pp.377 – 378). Although Mr. fresh was not involved in preparing carryover reports, his investigation led him to review carryover reports and his opinion as to the use of carryover reports is consistent with testimony from other city Detroit managers. The carryover reports based on this testimony were not intended to be used for purpose of computing employee start times or end times for payrolls and were not

42

a substitute for the ID card swipe-in or swipe-out. . Mr. Runyan's cross examination of Mr. Fresh follows:

Q (Runyan)   Well, what if there was a discrepancy between the crew carryover reports and the Workbrain records? Wouldn't that have been significant?

A (Fresh)   That could very well be, but you have to understand a lot of those crew carryover reports were handwritten, and I found out during the course of my investigation there were times that supervisors would go back and back-date the information instead of putting it in as it actually occurred.

Q   Well, wouldn't--don't you think--the crew carryover reports that were testified to yesterday was a parallel system. That's what Mr. Smalley testified to?

A   Allegedly, yes.

Q   He said that that was a parallel system of timekeeping, along with the Workbrain records?

A   And I cannot dispute that, but as I said, when I looked into it, there were a lot of them missing. A lot of them were incorrect, so I wouldn't put a whole lot of faith in those crew carryover reports myself.

Ms. Minniefield asserts that the Overrides to the Workbrain database that she made, were all made based on the information contained in Crew Carryover Reports. (Exhibit 5 is the list prepared by Mr. Fresh listing the changes to the Workbrain database by Ms. Minniefield for various dates from October 2010 through March, 2011). (pp. 478 – 480).

Q   ( Runyan) Where did you get these documents?

A   (Minniefield) These documents are documents that I used to enter data, information into Workbrain.

Q   How did you happen to have these particular documents?

A   Okay. What happened is, I always use copies at Workbrain of carryovers to enter information into Workbrain so I can be accurate, because this is the only accurate record of time.

43

At work in the office that I share, I share a common office that is a 24/7 operation with several other people, and we have no place to keep things, you know, that is not going to be messed with.

I use these on a regular basis every day, so you know, I would just--this would--I would stick it in my work bag, you know, out of my way, out of other people's way, so when I come back to it it will be there.

So, you know, that's how I wound up having things like this in my possession.

Q   And this isn't a complete set. This is just ones that you happened to have for 2010, the dates listed on Exhibit 5. Correct?

A   Right. I just happened--yeah, these are things that I just happened to have that happened to correspond to some information that is on here.

Sewage plant supervisor Arnold Shaw was Ms. Minniefield's direct supervisor for Crew 4 and he clear in the distinction between Workbrain used for payroll records and the role of the carryover report. The following testimony was elicited by Mr. Runyan on cross-examination:

Q   (Runyan)And you understand that before anybody gets paid one dime, the SPS on a daily basis approves the carryover reports?

A   (Shaw) **Not since Workbrain.**

Q   Pardon?

A   **Not since Workbrain.**

Q   Not since Workbrain. So if we can show you a bunch of carryover reports since Workbrain, some as recently as 2011, where the Sewage Plant--**where the SPS actually signed and approved--**

44

A   Since the implementation of Workbrain, that is the official payroll document. **The carryover is just an internal document.**

Q   You don't believe the carryover is used to pay people?

A   It's not used to pay people.

Q   So the carryover report that the Head Sewage Plant Operators go in and adjust isn't used at all to determine what payroll is?

A   **No, not since Workbrain.**

Q   So prior to Workbrain, you are saying the carryover reports were used to pay people, but since Workbrain they have not been?

A   It was used as a check. **If you had a time card, you punched in and out, and that is what was recorded.** The carryover gives additional information about where you worked, what area of the plant and in what position.


The city asserts that Ms. Minniefield in her capacity as head sewage plant operator is responsible to accurately prepare the crew carryover report (and specifically with respect to this disciplinary action, the accuracy of the employee stat time and quit times). Ms. Minniefield is responsible to prepare the Crew Carryover Report and later relies on the accuracy of the crew carryover report in supporting her Overrides to the Workbrain time entries. (Transcript Page 667):

Q   (By Mr. Jarvis) So let me ask you this. The crew carryover reports that you are relying on to say that you worked those times, Ms. Minniefield, for the 4th and 5th are documents that have not been introduced yet. Is that correct?

. . .

45

Q  No, ma'am. The ones that you are relying on for the 4th and 5th of January, 2011. **Who created those**, and who audited them?

A  They were **created by the Head Sewage Plant Operator** at the time on that particular--of that particular day.

Q  And **who was that**?

A  Well, **on this day I was the Head Operator** that created the one for the 5th.

Q  So you are saying that the crew carryover report that you relied upon to establish the fact that you were working on the 5th is a document you created yourself?

A  That was part of my job, to create that document.

. . .

Q  (By Mr. Jarvis) **So that document, you approved your own time** on the 5th. Is that correct?

A  **I didn't approve my time.**

Q  **Well, who created the document on the 5th?**

A  **I inputted the data, and the original is signed by the SPS.** I submitted it to the SPS for the SPS's approval.

The Hearing Officer is persuaded that the carryover report is a type of staffing schedule that assigns employees to various jobs on predetermined work shifts. On any given day, this report will show who is supposed to be at work. The Workbrain ID cards are used to swipe in and swipe out of the workbrain system, validating that the employee in fact was working on that day. The additional adjustments to the Carryover report are based on events that occur that day, such as sick call-ins, FMLA excused absences, vacation, etc. The history of carryover reports prior to 2009 involved the use of punch cards and a time clock. Workbrain replaced the manual punch card process with an ID card that automatically entered the start time and end time electronically, and therefore the payroll clerk's job could be re-engineered. For the purpose of swipe in and swipe out, the carryover report is not a document to be used as a payroll record to determine employee start times or end

46

times. I am persuaded that the Workbrain database is to be used for purposes of computing actual hours worked for purposes of payroll, and over rides must be based on ID swipe in or swipe out data, or be diligently verified by the Head Sewage Plant Operator before submission of the Crew Carryover report to the Sewage Plant Supervisor, and before making an Override in the employee's record.

XI.　　　　Approval of Ms. Minniefield's Overrides by SPS

In response to the city's charges against her that she improperly entered Overrides into the Workbrain system, Ms. Minniefield maintained that at all her actions were approved by the SPS. This position relies on: a) the SPS approval of the carryover reports; or b) the SPS authorization of Ms. Minniefield's Overrides in the Workbrain system.

A.　　　　Carryover Reports.　　The previous discussion about the carryover reports explained Ms. Minniefield's rationale that the initials of the SPS on the carryover report authorize Ms. Minniefield to enter Overrides in the Workbrain system to employee starting and quitting times reflecting that the employees worked a full eight hours on that shift.

The Hearing Officer concludes that Ms. Minniefield's assertion is without merit and that the City has presented overwhelming testimony to discredit Ms. Minniefield's assertion.

B.　　　　Workbrain Authorization by SPS.　　Ms. Minniefield additionally asserts that although she entered Overrides in the Workbrain system, on each date referenced by the City's Exhibits (Exhibits 5, 8,19 - The lists of dates of Lenel Gate swipes compared to the Workbrain records), a sewage plant supervisor also made entries in the Workbrain system. Ms. Minniefield presented a table (Exhibits 30, 33,34) identifying the sewage plant supervisor that also entered authorization in Workbrain on most of the dates referenced.

In response to each date at issue on in Exhibit 5, using the information she compiled in Exhibit 34, Ms. Minniefield responded in similar fashion to the following example provided

47

below where Ms. Minniefield is answering questions presented by her attorney Mr. Runyan:

Q (Runyan)   Now the first entry on the second page of Exhibit 5 deals with the date of January 5, 2011, and the document which is Exhibit 5 suggests that you were late 14 minutes on January 5, 2011, or that there was a discrepancy between the gate swipe and the Workbrain entry of 14 minutes.

Now can you see if you can find on Exhibit 4 whether or not the entry that was made in the Workbrain records was authorized by anybody other than yourself?

A (Minniefield)   Yes.

Q   And what page of Exhibit 4 can we find that information?

A   Page 138.

Q   138?

A   Uh-huh.

Q   And tell me which entry on page 138 shows that the over-ride that was made in the Workbrain was authorized by someone other than yourself.

A   Okay.  Look at the date, January 5, '11.  There is three of them.  I've challenged that, looking at these other over-rides too that discerned them, but the third January 5, '11, the over-ride says, "Works authorized," and if you go over to "Proxy" and "Actual User" it says, "Richards, proxy.  McCollins, the actual user."

So McCollins authorized my time on January 5th.

Q   So Mr. McCollins was in the classification of Sewage Plant Supervisor?

A   Sewage Plant Supervisor.

Q   And he was a superior of yours?

A   Yes.

Q  So your understanding of the entry for January 5, 2011, was that
the over-ride which authorized that 14 minutes time on January 5,
2011, had been approved by Mr. McCollins. Is that correct?

A  Yes.

The Workbrain Overrides for all of these transactions are based on the "approved"
carryover reports prepared by Ms. Minniefield. The SPS authorization in the Workbrain
records are the result of misplaced reliance on the work product of Ms. Minniefield in
preparing and submitting the carryover report, or perhaps her failure to diligently perform
her duties as Head Sewage Plant Operator to investigate the reason for missing swipe- in or
swipe-out information. The testimony was received from Messrs. Davis, Shaw, Rudolph, Mc
Collins and others laid the foundation that Workbrain entries were for actual time only
while working and therefore processing the Workbrain payroll with an authorization is not
a validation of Overrides predicated on inadequate carryover reports.

XII.         Ms. Minniefield's Contention that the Disciplinary Guidelines do not justify
             discharge.

Ms. Minniefield contends that  even had the City carried the burden of proving the
misconduct for which Ms. Minniefield was suspended,  the decision to discharge her
violates the disciplinary guidelines contained in the  DWSD Employee Handbook because
the offense was not a dischargeable offense but a Group III offense requiring progressive
discipline prior to discharge.

    Group 3 offenses (exhibit number 6, pages 3 – 2)
    "Falsification of records of performance
    or of other work records."

Maria Young, the City's Human Resource Analyst stated that the notice of suspension and
discharge is consistent with the provisions of the Disciplinary Guides resulting in discharge
because Ms. Minniefield falsified her time records for her own personal gain. In addition,
Ms. Minniefield falsified other people's time records. (p. 154).

The Hearing Officer agrees with Ms. Young's interpretation of the disciplinary guidelines. Paragraph 9 under Dischargeable Offenses list very specific actions including "deliberately falsifying timecards or hours worked".

XIII.     The City's Discipline and Ms. Minniefield's Letter to City Council.

Ms. Minniefield presented Exhibit 15, which is a statement that was prepared by her, delivered to a rate hearing conducted by the Detroit city Council by Dr. Simolinuas and read into the record by Councilwoman Diane Watson on March 10, 2011. Ms. Minniefield notes that her discharge occurred in April 2011. Mr. Runyan suggested that Ms. Minniefield's exercise of her First Amendment rights where the actual cause for her discharge.

Dr. Saulius Simoliunas testified that he introduced statement to be read by Councilwoman Watson and that Mr. Sam Smalley was present at the hearing. The city's investigation that led to the charges against Ms. Minniefield began on March 28, 2011 based on a request from sewer plant supervisor Arnold Shaw. There are no facts or testimony presented that suggest any basis for the charges brought against Ms. Minniefield other than as presented by the City during this hearing. The hearing officer finds no merit in this assertion.

XIV.    Discussion and Recommendation of Hearing Officer

A.        Crew Carryover Reports- Workbrain Overrides

Ms. Minniefield's characterization of the accuracy of the crew carryover reports for the purpose of entering employee time in the Workbrain payroll system is inconsistent with the testimony presented by numerous other witnesses. There seems to be a type of circular reasoning employed by Ms. Minniefield. The Assistant Head Sewage Plant Operator and the Head Sewage Plant Operator are responsible to prepare the carryover report. The Assistant and the Head Sewage Plant Operator are expected to maintain accurate time records that are subjected to a certain level of "audit" or diligence through review of Workbrain swipe in swipe out records, or if not available, through personal observation, and if necessary request the Lenel gate swipe records through the SPS.

50

The Head Sewage Plant Operator submits the carryover report that they prepared to the Sewage Plant Supervisor on a daily basis, with the implication that they performed their job diligently; whereupon the SPS initials the carryover report. But what is critical to this case is Ms. Minniefield's reliance on the SPS "approved" Carryover Report that is used to establish a start time or a quit time that does not have an ID swipe-in or swipe-out (or if there was an ID card swipe-in or swipe-out, it was overridden). Ms. Minniefield's own work product (which she knows, or should know to be deficient) is held out as the verification or authority to make Workbrain Override time adjustment.

The following example is taken from the testimony of Ms. Minniefield and illustrates what the Hearing Officer considers to an improper application of the role of the carryover reports used to Override the actual starts and ending times (p. 688):

> Q  (Jarvis) Okay. So why did you feel the need to change your time?
>
> A  (Minniefield)  Change my time where?
>
> Q  On the records of the 26th and the 25th?  Why did you change your time?
>
> A  I put in Workbrain what was authorized by the SPS.
>
> Q  Off the crew carryovers?
>
> A  Off the crew carryover.

There is ample testimony that the Workbrain system had recognized shortcomings and deficiencies that placed additional burdens on management and undoubtedly caused hardship to employees who did not receive proper compensation in their payroll checks. However, Ms. Minniefield's interpretation and use of the carryover report is inconsistent with the overwhelming weight of testimony. Ms. Minniefield's actions undermine the entire Workbrain system reducing the swipe in swipe out time controls as unnecessary, or even worse, arbitrary.  Ms. Minniefield criticizes the Workbrain timekeeping system and perhaps suggests a return to the old timekeeping system at the WWTP using timecards and "discretion" of the supervisor. The following summary is from Ms. Minniefield's testimony:

> Q  (Runyan) Tell me what your understanding is of the purpose of
>
> the crew carryover report and the purpose of having the SPS sign
>
> them at the bottom.

51

A   (Minniefield) Well, my understanding of the purpose of the and use of the crew carryover is by way of the signature of the--when the SPS signs off on the carryover, he
is--for lack of a better word, I mean, he is authorizing, accepting that these individuals will be paid the amount of time that is indicated on the carryover that he signed.

Q   And what is your understanding based upon? What led you to have that understanding of the purpose of the crew carryover reports?

A   Because this crew--this carryover is being used in this manner that I'm stating for, I guess, 40 years or better. It's created. The time is put on the carryover.

When we had time cards, even way back when we had time cards, we would put the time on these. The individual, the employee would come to work.

He would punch a time card, and whatever time is on the time card **together with discretion of the supervisor**, this carryover will reflect what the amount of hours, amount of time that an individual will be paid that day based on, as I stated, what is on his time--well, the discretion of the supervisor.

This carryover, I don't know if it has been--well, we've heard it said that they automatically give everybody eight hours. Okay?

So we refer to this as in respect--sometimes like as an absence report, because you are assumed to be paid eight hours every day unless you are absent in some manner.

So therefore if an employee is off sick, have FMLA, on vacation, which means if he is not--whatever length of time that he is off, if he is off sick for four hours or eight hours, on vacation for four hours or eight hours, FMLA, whatever part increment of FMLA he is off, we are to indicate that time that that employee is absent in that manner on this carryover, which would take away from the eight hours that is

52

initially assumed that that employee will be paid, resulting in that employee being paid the amount of time that is reflected in this carryover.

Q  Let me ask you this. Have you ever docked an employee because they came in late, you know, an hour and a half or ten minutes or whatever it is? Have you ever docked an employee on this crew carryover report?

A  Oh, sure, a lot. I mean, that happens routinely.

Q  So you don't just give people eight hours regardless of the time they work. It depends whether they're there and what time they get there. Right?

A  What time, right, right, based on--yes.

Q  Let me finish this. Then I have another--I think we were up to December--look at December 18, 2010. Do you see according to Exhibit 5 you were again two minutes late?

That is apparently the discrepancy between the Workbrain and the gate swipe is two minutes. Was your time on that date approved by Mr. Davis?

A  On the carryover of 12/18/2010, my time was indicated as eight hours for me to be paid. That was--and it's initialed by William Davis, SPS.

Q  And I think the last one that we have is for December 24, 2010. You were a minute late again according to the Workbrain records that we don't have and the gate swipe.

Can you tell me whether your time was--whether your time, eight hours time for that day was approved by the SPS?

A  On--

Q  December 24th?

A  December 24th. Let me get that.

Q  Christmas Eve?

53

A    Let me get that. December 24th, okay. Yes, December 24th, the
carryover for December 24, 2010, my hours are eight hours. I have
eight hours down for that day, and it's initialed by Arnold Shaw.

Ms. Minniefield remains the only witness the testified that the Workbrain shift start times
were subject to some discretion by supervisors. All other testimony clearly states that on
the job, at work is the only information that goes into Workbrain for payroll purposes.
Exercising the discretion about adjusting for shift start times seems to be a privilege
reserved to Ms. Minniefield for her own account and for the benefit of selected employees
when completing her crew carryover reports that are submitted to the Sewage Plant
Supervisor for approval. This practice to the extent it exists, would undermine the
fundamental ability of management to control the workplace and clearly hinder the HR
department in administering the attendance control policies.

1.       The hearing officer concludes that the testimony presented by the City dealing with
Ms. Minniefield's Overrides to the **arrival time for the normal shift 4Liquids** with a
schedule 7 AM to 3:30 PM with respect to Ms. Minniefield, Mr. Jackson and Mr. Graham is
sufficient to sustain the City's disciplinary action against Ms. Minniefield. This action by Ms.
Minniefield involved a clear violation of The City's disciplinary guidelines and he is a
dischargeable offense under paragraph 9, specifically "... deliberately falsifying timecards
or hours worked".

The Hearing Officer's recommendation is to uphold the City's Disciplinary Action.

2.       With respect to the Overrides entered by Ms. Minniefield relating to **early
departures from the scheduled overtime shift** for Mr. Jackson and Mr. Graham only, the
Hearing Officer has not received sufficient testimony to sustain the city's burden of proof
with respect to disciplinary action for this set of Workbrain Overrides performed by Ms.
Minniefield.

3,       With respect to Overrides entered by Ms. Minniefield regarding the **afternoon/over
time shift start times** for herself, Mr. Jackson and Mr. Graham, the Hearing Officer is
troubled by the conflicting testimony regarding procedures for payment for call -ins

54

discussed at some length earlier. The city has failed to present convincing testimony that the change to the practice of paying call-in time from the start of the shift was conveyed to supervisors. I am therefore unable to resolve these issues with respect to those Overrides entered by Ms. Minniefield that involve starting times for afternoon/over time shifts.

B.   Incident of March 17, 2011

Exhibit 5 of the proceedings includes a reference to the transactions on March 17, 2011. Ms. Minniefield is recorded to have a Lenel gate swipe four minutes after her shift start time of 7:00 am, but the Workbrain timekeeping system indicated a normal shift in-time. On the same day, Ms. Minniefield worked an overtime shift that ended at 11:30 pm, although the Lenel gate swipe shows that she exited the plant 34 minutes early, and later entered an Override in her Workbrain records to reflect that she worked the entire 8 hour shift.

The Hearing Officer focuses on the early departure by Ms. Minniefield on March 17, 2011. The hearing officer reviews the testimony of William Davis to lay a foundation for assessing the propriety of this early departure and Override for 34 minutes. Mr. Davis was the sewage plant supervisor for this shift on the day in question and he was the SPS that "authorized" the Override by Ms. Minniefield and was the SPS that "approved" the Carryover Report.


1.   Workbrain.   In explaining the Workbrain system, Mr. Davis provided the following responses to Mr. Jarvis's questions ( p. 184):

Q (Jarvis) would you explain to the hearing officer what the Workbrain system is and how it works?
A (Davis) The Workbrain system is a system that we bought supposedly to make it easier to look at and do -- process payroll issues related to make sure people get paid, make sure you keep a running track of that, hours, the hours worked, look at their vacation time, their sick time. So you could supposedly **have accurate records** for it

55

so you know where people stand, so you know if they need discipline for sick time or tardiness or know how much vacation time they got.

Q is it appropriate to pay employees when they are not at the sewage plant working?

A No

Q why is that?

A you are **only supposed to pay employees when they are actually on the clock** performing a service.

Q all right. Now at any time did you give Ms. Minniefield permission to go into the Workbrain system and change anybody's time?

A No

2. Carryover Reports. Mr. Davis responded to the following questions regarding carryover reports ( p. 188):

Q (Jarvis) Tell me what--how a carryover report, what is the purpose of that?

A (Davis ) A carryover report is a system we have available that we document who was there or not there and what time they may have not been using--you know, like whether or not somebody worked-- somebody was--whether or not they were sick or on vacation or on FMLA or what-have-you, and how many hours they worked, and how many hours they used comp time or whatever.

Q And as the SPS, the Sewage Plant Supervisor, **is it your responsibility to approve and sign off on a carryover report each day?**

A **Yes, if they are available.**

Q And is it--so if there is a carryover report that is prepared each-- for a day, and there is--that shows how many hours each of the 70 employees under your supervision is going to be authorized to be paid for? Is that correct?

56

A   It should.

Q   And you have to go through and initial that carryover report, is that correct, each day?

A   Yes.

Q   And if you see any people on the carryover report that you think shouldn't be paid, you have to look into it and make sure that you are not authorizing somebody to be paid that should not be paid?

A   Yes, if you have time.

Q   And you do that on a daily basis. Correct?

A   Yes.

Q   (By Mr. Runyan) Isn't there a packet of documents that get put together when you approve the carryover report?

A   Yeah. There is carryovers and sick calls, vacation requests.

Q   Now how does that happen on a daily basis? Who puts those together, and when do they give those to you?

A   Usually the Head Operators put those together, and normally like the Solids Head comes and gives their pack to the Liquids Head, and the **Liquids Head presents a consolidated pack to the SPS for the SPS to initial.**

. . .

Q   Are you supposed to review those documents before you initial or sign them?

A   Ideally, if you have the time.

Q   But is that--do you understand that that is you are supposed to be responsible--when you put your signature, your initials on there, that signifies that you have reviewed those documents and you are approving that?

A   It identifies that I have seen them, yes.

. . .

Q   (By Mr. Jarvis) Would it be the responsibility of a Head Sewage Plant Operator to make sure that his subordinates or her subordinates

were doing their job with respect to checking that employees were at work?

A  Yes.

Q  So ultimately the responsibility would fall on the Head Sewage Plant Operator?

A  Yes.

. . .

Q  So you **would rely upon the person putting that report together to make sure it was accurate. Is that correct?**

. . .

THE WITNESS: **Yes.**

Q  (By Mr. Jarvis)  Okay, and if they were not correct, how would you go and determine that?

A  It would be difficult, because, as I say, there is a lot of stuff going on, just part of many jobs that you are doing. So basically you take it on faith that the information you are given is correct.

Q  Did it ever come to your attention that the information that Ms. Minniefield was supplying in those reports was incorrect?

A  As it relates to when she worked for me, or—

Q  Yes.

A  No.

In the opinion of the Hearing Officer, considering the testimony of Mr. Davis along with the documents in exhibits submitted by the City, it is not likely that Mr. Davis would have approved or authorized any Workbrain Overrides for Ms. Minniefield had she been aware that the Override was used to obscure her early departure from the plant by 34 minutes on that shift on March 17, 2011. Mr. Davis explained the importance of maintaining the accuracy of the Workbrain records and was direct when he responded that " you are only supposed to pay employees when they are actually on the clock performing a service".

Mr. Davis testified that his initials or approval on the crew carryover report are based on his good-faith reliance on the materials submitted to him by the head sewage plant operator. There is no independent verification of the information in the Carryover Report by the Sewage Plant Supervisor. Their approval of the report acknowledges that the materials have been presented to them in proper form. As previously discussed, Ms. Minniefield's reliance on the "approved" crew carryover report as justification for an Override to a Workbrain time is misplaced. Ms. Minniefield was the author of the misleading crew carryover report submitted to Mr. Davis and she cannot relying on his approval as a way of somehow validating her early departure from the plant. I find it improbable that Mr. Davis would knowingly approve the early departure by Ms. Minniefield and yet permit her to enter information into the Workbrain system giving her credit for the entire shift. Even if Ms. Minniefield did not prepare the crew carryover report for that afternoon shift on March 17, 2011, she knew that she checked out early and she knew that if the carryover report gave her a full eight hours for that shift, it was inaccurate.

Ms. Minniefield has been previously disciplined for leaving the plant in 2009. The events of September 17, 2011 are of a similar character and nature inasmuch as Ms. Minniefield left the plant without authorization, but remained on the payroll for the entire shift. But for a supervisor looking for Ms. Minniefield in 2009, she would have received full pay for the shift. In this situation the investigation initiated by Mr. Fresh has disclosed the gate swipe information that is conclusive proof that Ms. Minniefield left her shift early. I do not find Ms. Minniefield's explanation credible.

This action by Ms. Minniefield involved a clear violation of The City's disciplinary guidelines and he is a dischargeable offense under paragraph 9, specifically "... deliberately falsifying timecards or hours worked". The Hearing Officer's recommendation is to uphold the City's Disciplinary Action.

C.    Override for Payment of 8 hours to Mr. Jackson on March 7, 2011

The investigation that led to these disciplinary charges was initiated because of a request by Sewage Plant Supervisor Arnold Shaw. Mr. Shaw was looking for Sewer Plant Assistant Kristopher Jackson who could not be found. Mr. Fresh's investigation (Exhibit 1) resulted

in the isolation of the Override performed by Ms. Minniefield on Mr. Jackson's Workbrain record on March 7, 2001. There are no gate swipes in or out for Mr. Jackson that day however Ms. Minniefield entered time for a full shift of eight hours, for which Mr. Jackson was apparently paid. Ms. Minniefield entered this Override using a proxy of Mr. Mac Williams, using her own username. Ms. Minniefield's explanation was based on her desire to payroll miscalculation in an expedited manner and to avoid the long delay associated with processing a payroll inquiry form. Ms. Minniefield entered a note in the Workbrain program referencing that the eight hour time entry was to remedy the reported shortage to Mr. Jackson's previous payroll check.

The Hearing Officer received testimony from other sewage plant supervisors concerning the shortcomings of the Workbrain timekeeping program and their frustrations in administering the system. I referred to the testimony of sewage plant supervisor Darryl Mc Collins (page 553) to explain what I believe to be the proper procedure for addressing Mr. Jackson's payroll shortage. Mr. McCollins offered an insightful analysis of the Workbrain shortcomings with a level of detail that made the frustrations of plant personnel perfectly understandable. Corrections to the Workbrain shortcomings would be excruciatingly slow, remaining unresolved four months. Mr. McCollins testified that his own payroll was often miscalculated, and it one instance, it took eight months to get issue straightened out. Notwithstanding his frustrations, Mr. McCollins testified that he initiated all of these mistakes to his payroll checks with a payroll inquiry form (PIF) .

> Q (By Mr. Runyan) When employees claim that they have not been paid correctly under Workbrain, is there a document that is known as a PIF, Payment Inquiry Form?
>
> A Yeah.
>
> Q What is your experience with the PIF forms?
>
> A Well, you know, when the employees say that they haven't been paid correctly, you know, we put them in and submit them down to Payroll, but a lot of times the following weeks and weeks go by, and they still say they haven't been paid in a timely fashion.
>
> They eventually get their money, but it's not very timely.

Q   What is your experience?  What do you mean, "not timely"?  How long does it take for an employee to get paid through the PIF system?

A   Well, some people get paid within a couple of weeks, and some people still are quibbling about their money.

Q   Did you ever have to put in a request for yourself to be paid?

A   Yes, I have.

Q   How long did you have to wait for your money?

A   Well, there was a number of times, but I can recall one during the first year, I had a back-up of about six to eight months of time that I had to get processed.

Q   And how long did you have to wait for it?  Six to eight months?

A   Yeah, yeah.  It was about eight months before I finally got paid.

Sewage plant supervisor Kerry Carey Rudolph also testified about the procedure to be followed to correct paycheck errors. (Although the Hearing Officer did not sense any bias in Mr. Rudolph's testimony, he disclosed that he had previously worked as an assistant head sewage plant operator under Ms. Minniefield, and their relationship was at times contentious, to the point that Mr. Rudolph offered that Ms. Minniefield had attempted to have him fired from DWWD. Prior to these hearings, Ms. Minniefield contacted Mr. Rudolph to discuss matters that would come before this hearing). Mr. Rudolph's testimony response to the hypothetical question of a worker who worked a full 40 hour shift, but only received 32 hours of pay in their paycheck. (Page 1194).

Q  ( By Mr. Jarvis)  Well, if they worked 40 in that week--

A   Oh, okay.

Q   But got paid 32, and that person wanted to give them that extra eight hours time they didn't get paid--

A   Okay.

Q   The correct procedure--

    MR. JARVIS:  I will withdraw the former--

Q   (By Mr. Jarvis)  The correct procedure would be to do what?

61

A   Fill out a PIF form.

Q   And what do you do when you fill out a PIF form?

A   You get the check stub. You see that they only got paid for 32 hours. You go back into the Workbrain and verify that they worked--

You have to verify that they worked the 40 hours, make copies of that and copies of their check stub, fill out the PIF. SPS got to sign it, and then you send it to H.R.

Q   Let's say you went into Workbrain, and you only could confirm through Workbrain that they worked 32 hours based on the swipes, but they said they worked 40. What would you do next?

. . .

Q   (By Mr. Jarvis) Going back to my example to you that I just gave a few minutes ago, somebody comes to you and says, "I worked 40 hours in this particular week," right, "but I only got paid for 32, but I did work that time."

What would you do to confirm that they should get paid for that extra eight hours of straight time?

A   I would have the SPS pull their swipes for that day, pull the gate swipes and see what they were, what the gate swipes were.

Q   Okay.

A   And I would also kind of look at the area sheet, as far as the crew sheet, as in--say they worked incineration. I would look at the incinerator, incineration log, to see whose name is on the incineration log.

I would see in the crew area, comment area, if their names had been written down there or what-have-you.

The above testimony of two sewage plant supervisors to presents what I believe to be the proper policy and procedure for addressing paycheck shortages, each stating that the payroll inquiry form (PIF) is the proper and appropriate method to address these problems. These statements stand in contrast to the testimony of Ms. Minniefield that her

coworkers actually do the same thing that she did to put time in Workbrain when they were not actually at the plant. No testimony was presented by Ms. Minniefield supporting her contention. I am therefore comfortable in accepting that Ms. Minniefield knew of the appropriate procedures under the payroll inquiry form, but elected a shortcut by falsely entering time in the Workbrain timekeeping system for an employee that was not physically at the plant for the eight hours Ms. Minniefield entered in his Workbrain record.

This action by Ms. Minniefield involved a clear violation of The City's disciplinary guidelines and he is a dischargeable offense under paragraph 9, specifically "... deliberately falsifying timecards or hours worked".

The Hearing Officer's recommendation is to uphold the City's Disciplinary Action.

Respectfully Submitted,

_____

Jerome F. Rock

Hearing Officer

Date: May 6, 2013

63

## TABLE OF CONTENTS

I. INTRODUCTION
    A. Purpose of Manual
    B. Organization of Manual
    C. Departments to Which Manual Applies
    D. Civil Service System in Detroit

II. RECRUITMENT AND SELECTION OF EMPLOYEES
    A. Manner of Recruitment
    B. Application for Examination
    C. Requirements for Eligibility
    D. Types of Examinations
    E. Test Development and Validation
    F. Affirmative Action Program

III. HIRING PROCEDURES
    A. Eligible Registers
    B. Requisitions
    C. Certification
    D. Provisional Hires
    E. Extra Service Employment

IV. COMPENSATION AND BENEFITS
    A. Determination of Pay Rates
    B. Compensation Schedule
    C. Step Increments
    D. Work Schedule and Supplemental Benefits
    E. Overtime Compensation
    F. Holiday Payments
    G. Other Payments
    H. Payroll Procedures
    I. Paydates
    J. Payroll Deductions
    K. Employee Benefit Plan
    L. Deferred Compensation
    M. Worker's Compensation
    N. Income Protection Plan
    O. Duty Death Benefit
    P. Unemployment Compensation

V. JOB ANALYSIS AND CLASSIFICATION
    A. Nature of Classification Plan
    B. Purposes of Classification Plan
    C. Classification Terms
    D. Administration of Classification Plan
    E. Procedures for Processing Requisitions, Status Changes
        and Other Personnel Transactions
    F. Miscellaneous

TABLE OF CONTENTS (Cont'd)

VI.   CONDITIONS OF EMPLOYMENT
      A.  Work Periods
      B.  Holidays and Excused Time Off
      C.  Vacation
      D.  Sick Leave
      E.  Attendance Control Program
      F.  Funeral Leave
      G.  Jury Leave
      H.  Leave of Absence
      I.  Military Leave
      J.  Employee's Rights and Restrictions

VII.  EMPLOYMENT STANDARDS
      A.  Probation
      B.  Status Change
      C.  Discipline

VIII. EMPLOYEE RELATIONS
      A.  Introduction
      B.  Intra-departmental Relations
      C.  Employee Grievance Procedure
      D.  Civil Service Commission Hearings
      E.  Employee Organization
      F.  Public Employment Relations Act

IX.   SEPARATION FROM SERVICE
      A.  Separation Types
      B.  Resignation
      C.  Discharge
      D.  Layoff
      E.  General Retirement
      F.  Other Types of Separations

X.    SPECIAL PROVISIONS
      A.  Seniority
      B.  Veteran's Preference
      C.  Conventions and Conferences
      D.  Witness Fees
      E.  Supervision by Relatives

XI.   PERSONNEL SUPPORT SERVICES
      A.  Employee Assistance Center
      B.  Employee Training

1. **INTRODUCTION**

A. **PURPOSE OF THIS MANUAL:**

1. **Summarize Personnel Practices:** To bring together the personnel policies and practices permitted by the various laws, rules, and regulations under which the City of Detroit operates.

2. **Standardize Personnel Practices:** To secure uniform personnel practices among all City departments.

3. **Improve Personnel Practices:** To provide a book which will act as a guide in making changes in personnel policies and which will encourage improvement in personnel practices.

B. **ORGANIZATION OF MANUAL:**

The contents of this Manual are arranged in simple outline form so that all, or most, of the information about any particular personnel function is found in one section.

1. **Revision of the Manual:** The outline form and the use of a loose-leaf binder makes it possible to expand or contract the Manual without much disturbance. For example, if any provision was altered in any way, the page containing this item would be re-issued and all holders of the Manual would replace the old page with the new version. In the upper right hand corner of the new page the date of the change will be noted.

2. **Reference sources:**

a. THE JOURNAL OF THE CITY COUNCIL:
This is a record of the various questions, proposals, communications and other items of business which are introduced at its meetings and the action taken by the City Council. It is published weekly and also issued annually in bound volumes.

b. THE OPINIONS OF THE CORPORATION COUNSEL:
This is a record of the interpretations by the City's law department of the various legal provisions under which the City of Detroit operates. They are published in numbered volumes beginning with III in 1920.

c. PERSONNEL DEPARTMENT RULES:
The rules are adopted by the Civil Service Commission to govern its activities. They are published and available in the Personnel Department offices.

d. ORDINANCES OF THE CITY OF DETROIT:
Ordinances are laws passed by the City Council affecting only the City of Detroit. They are published in the <u>Municipal Code</u> which covers all municipal legislation through 1954. Since 1954 all ordinances and amendments are published in looseleaf form, numbered from F-1 upwards.

e. THE CHARTER OF THE CITY OF DETROIT:
The Charter as revised and adopted November 6, 1973, and effective July 1, 1974, is the basic law under which the City government is organized and operates. It is published in book form.

f. PERSONNEL DIRECTIVES:
Personnel Directives are issued periodically by the Personnel Director to set forth guidelines and procedures for implementation of Personnel Department programs and policies.

3. <u>Index</u>: An alphabetic index is found at the end of the Manual. The Index contains a thorough cross-reference of the subjects and names used. Finding any item should be easily accomplished by consulting either the Table of Contents at the front of the Manual or the detailed Index at the back.

C. <u>DEPARTMENTS TO WHICH PERSONNEL MANUAL APPLIES</u>:

1. The policies and procedures described in the Manual apply to all departments, boards, and commissions of the City of Detroit, except the following:

> Board of Education
> Library Commission
> Recorder's Court Jury Commission and Psychiatric Division
> Recorder's Court Traffic Division and Criminal Division

2. <u>Variations in Policies and Procedures</u>: This Manual presents general procedures and policies for the majority of the City departments. There is some variation among the departments in carrying out these procedures and policies.*

3. <u>Non-Classified Personnel</u>: Charter provisions for non-classified employees and officers, who are not covered in this Manual, are divided into three general groups:

> (a) Elected officials
> (b) Appointed employees and officials
> (c) Contractual and certain other employees specifically exempted by the Charter and/or Statute

---

*Some provisions on vacation, sick leave, compensation schedule, hours of work and similar matters are not covered in this Manual for the Fire and Police Departments because special provisions are made by State Law, ordinances and City Charter for these agencies: Chap. XV, Sec. 13 for Fire Dept.; Chap. XXI, Sec. 15 for the Police Department.

D. THE CIVIL SERVICE SYSTEM IN DETROIT:

1. <u>Authority</u>: The Detroit Civil Service Commission, now the Personnel Department, was established by Charter Amendment on May 3, 1913.

   Chapter 5 of the new Detroit Charter, adopted on November 6, 1973, now governs the work of the Personnel Department.

2. <u>Functions</u>: The Personnel Department is the central employment agency of the City government and is in charge of the recruitment, examination, appointment, and classification of city employees. In addition, the Labor Relations Division conducts labor negotiation on economic issues, negotiates and administers all collective bargaining contracts for the city, and represents the city at arbitrati hearings. A five-member Civil Service Commission is appointed by th Mayor, who in turn appoints a Personnel Director. The commission ma hold hearings, subpoena witnesses, administer oaths, take testimony, and require the production of evidence.

3. <u>Structure of the Personnel Department</u>: The following is a list of the divisions of the Personnel Department:

   1. Recruitment and Selection
   2. Technical Services
         a. Classification and Job Analysis
         b. Test Development
         c. Test Validation
   3. Certification and Placement
         a. Unemployment Benefits
         b. Residence Investigation
   4. Administrative Services
         a. Hearings
         b. Payroll Audit
         c. Employee records
   5. Training/Employee Counseling
   6. Labor Relations
   7. Urban Corps

5. **General Retirement System:** If the employee is a member of the General Retirement System, he/she loses credit for service prior to the resignation unless he/she returns within 6 years. The employee may opt to redeposit a sum equal to the amount of the accumulated contribution paid at the time of resignation.

C. **DISCHARGES:** A discharge is the involuntary separation of an employee from the payroll by action of the employing department. While discharges are primarily given for disciplinary reasons, they can also be given for other reasons, such as lack of ability to do the work, but never for any other consideration than the good of the service. (See Section VII, Paragraph C, Disciplinary Action and Personnel Department Rule IX.)

1. **Procedure:** The department head or other authorized person must file two (2) copies of a Notice of Discharge (Form 148-NO) with the Personnel Department stating the reasons for this action. (Normally, but not necessarily, the action to discharge is preceded by a suspension, pending discharge). One copy of the payroll separation form (PPS 1500) must accompany the discharge notice to the Personnel Department. The employee must also receive a copy of this notice either delivered in person or mailed to the last address on record with his department.

   a. **Documentation:** The department should prepare and maintain adequate documentation in the event of a grievance and possible litigation.

   b. **Unemployment Compensation Notice to Employee:** MESC Form 1711 must be given to the employee at the time of separation.

   c. **Separation from Payroll:** A discharged employee should be separated from the payroll following the last day worked.

2. **Signature on Discharge:** All discharges must be signed by the department head, or in his absence, the deputy. If the appointing authority is a Board or Commission, the discharge should be authorized at a meeting of the Commission and the Notice of Discharge signed by a person authorized by the Commission or Board.

3. **Payment of Accumulated Vacation Time:** At the discretion of the department head, an employee discharged for cause may be denied payment for any accrued vacation time. (Chapter 16, Article 7, Paragraph 1-c, Municipal Code)

4. **Right of Protest:** The employee has the right to file a grievance in conformance with the appropriate union procedure or the Personnel Department's Employee Grievance Procedure (See Section VIII, Employee Relations, Paragraph C).