But even in the areas covered by the general fund, the new and draconian wage and benefit concessions demanded by the City will not reduce the deficit in any long-term sense. For many years, the City and, behind it, the state and federal governments and the bondholders, have demanded and won concessions from City employees and cuts in City services as the supposed means for resolving the general fund deficit. But it has not worked.

In July 2006, the City imposed a three-year contract on the SAAA and on other City employees. That agreement imposed a ten percent cut in the 2006-2007 contract year, cut health benefits substantially for all three years, and provided for only a four percent wage increase for the entire period from July 1, 2005 through June 30, 2008 (Ex 1). From July 1, 2008, forward, wages have been frozen. Even assuming that the All Urban Consumers price index (as opposed to the Urban Wage Earner and Clerical index) is the appropriate standard for the professional and technical employees at issue here, prices have increased 12.6 percent during the period from June 2005 through November 2010 (BLS Statistics, available on line).[1] With nominal wages having only increased only four percent during this period--the SAAA' employees' real, base-wage rate has dropped by 8.6 percent in four years. With the health concessions and the ten percent reduction for 2006-2007 included, the SAAA's members' loss in real wages is already well 15 percent in the last four years.

The City's core proposal is for a *further* 10 percent cut in weekly wages, accomplished by means of 26 forced days off (budgeted furlough days) for each of the next three years. *Plus* the City demands more cuts in health care. *Plus* it demands

---

[1] The all urban consumer index stood at 194.4 in June 2005. In November 2010, it was 218.8, which is a 12.6 percent increase.

lengthening the standard work week from 35, where it has been for a half century, to 40 hours per week. Even assuming that prices are stable over the next three years—which may actually occur—over two contracts, the City demands that employees work 14 percent more every day for real wages that have dropped over 20 percent and real total compensation that has dropped by close to 30 percent.

These enormous cuts have not solved the budget crisis. Indeed, by lowering living standards for City employees, by cutting services, and by ensuring that Detroit's youth will have no jobs in the City, these cuts have contributed to a downward spiral in which the decline in the residents' incomes leads to less tax revenues, more flight (and thus even less revenues), and then to demands for further cuts.

In addition to destroying the economic base of the City, these cuts have destroyed its social fabric as well. At the same time that the former administration demanded sacrifices from employees for the "common good," it looted the City in what the federal government has now called a criminal enterprise. The current administration has apparently ended many aspects of the criminal enterprise, but it has continued and proposed increases in doling out huge contracts for City construction and for City services (including information technology) to private companies. And the tax breaks given to every major corporation located in the City have, of course, continued.

The City is, of course, not alone in its one-sided demands. At the state level, the single business tax has been cut and will now apparently be eliminated—at the same time that aid to Detroit declines. At the federal level, major banks, financial institutions and corporations, including the auto companies and their suppliers, have received hundreds of billions from the federal government and trillions from the Federal Reserve—and the

8

wealthiest Americans are now set to receive two more years of tax cuts, at the same time that they demand that City and other public workers sacrifice for the "common good."

Under the criteria in the compulsory arbitration statute that are quoted above, the fact finder must consider more than the raw numbers of the City's general fund deficit. He must consider past concessions, the "interests and welfare of the public," and "other factors …which are normally or traditionally taken into consideration in the determination of wages, hours and conditions of employment…" MCL 423.239(h). Equality of sacrifice is and has always been a factor in determining wages—and imposing a 20 and 30 percent real reduction in living standards at the same time that contracts, tax cuts, and direct payments to the wealthiest citizens of the country and of the State continue is the exact opposite of equality of sacrifice.

Under extreme pressure, a few unions have ratified contracts containing the City's proposals. But most have not because the members see the City's proposals as blatant inequality and as leading not to saving the City but to its further degradation. Nowhere is the social fabric more vulnerable than in Detroit; nowhere is the demand for equality more important; and nowhere are those factors more relevant in wage decisions than here.

The SAAA asks this fact finder to consider those realities in assessing both the areas outside the general fund and those inside the general fund. If that is done, the City's proposals cannot be sustained.

B. THE SPECIFIC ISSUES AT STAKE.

1. Budgeted furlough days.

The City has proposed requiring each employee represented by the SAAA to accept 26 days off without pay over each of the next three years. Because employees

9

cannot obtain replacement jobs for single days every other week, the City's proposal amounts to a demand for a 10 percent pay cut. Moreover, given the companion demand for an increase in the work week from 35 to 40 hours—which will affect every member of the SAAA—employees will, on balance, work the same number of hours for 10-percent less money. For those reasons, the SAAA objects to this proposal in general and to its application in the grant and enterprise funded areas in particular.

On a general basis, the SAAA objects for the reasons set forth above. The employees have already suffered huge real pay cuts—with no discernible reduction in the City budget deficit. Moreover, unlike some City employees, who work in 7-day, 24-hour operations, the members of the SAAA work almost entirely in positions that work a more normal work schedule. They thus will in fact suffer a ten percent reduction in wages with little benefit or relief in sight.

On a specific basis, the SAAA has a large number of employees who work in the Water Department, Neighborhood Services and other areas that are 100 percent federally funded or 100 percent funded by enterprise operations. In those areas, the concessions will force the employees to suffer a huge decrease in real living standards—with no benefit at all to the City general fund deficit.

In some areas, the cuts in compensation for grant funded employees violate the relevant federal statutes or contracts. In the Head Start program, for example, the City receives two million dollars in federal funds for wages and another $1.6 million for fringe benefits (Ex 8). By statute, these funds must be used for personnel purposes and will be returned to the federal government if not so used. Indeed, in the case of Head Start, there is a specific federal mandate that the funds be used for improving (or maintaining)

10

the wages and benefits of the employees receiving them *even if there are not funds for increasing other employees' salaries:*

> Any agency that receives financial assistance under this subchapter to improve the compensation of staff who provide services under this subchapter shall use the financial assistance to improve the compensation of such staff, regardless of whether the agency has the ability to improve the compensation of staff employed by the agency who do not provide Head Start services.

42 USC 9835(j).

The City receives substantial funds from the federal Department of Housing and Urban Development (HUD) for community service block grants, weatherization and other programs. The City has not yet provided the grants and contracts for these funds. But the funds are 100 percent federal—and in those areas, as well as in enterprise-funded areas, it makes no sense to impose a reduction in the workweek where it will not aid the City deficit at all.

Traditionally, the City (and sometimes the unions) has asserted that it did not want to pay different wages based on the source of the funds. But as applied to the budgeted furloughs, that assertion is irrelevant. Base wage rates are not affected—only hours are affected. And as the City has already reserved the right to exempt certain employees from the budgeted furlough days for operational needs, it makes no sense to say that it cannot exempt employees from the furloughs where there would be no savings to the City and the only result would be a return of funds to the federal government or to enterprise operations.

2.    Imposition of a 40 Hour Work Week.

As the Arbitrator knows, when what was once called the City County Building was first constructed in the 1950s, those City employees who were in that building

11

received a paid lunch hour (and thus a 35 hour work week) to match the County employees who worked in the same building. The 35 hour work week has remained for 50 years—and has been applied not only to the City employees stationed in that building but also to those who had once been stationed there and had since been transferred to some other location.

The City now proposes ending this benefit. Ostensibly, it is for three years. In reality, it is likely to be for far longer than that. The City demand amounts to a 14 percent increase in work time with no additional increase in compensation. And of course, it amounts to a 14 percent increase at the same time that managers and officials continue to set their own schedules—thus avoiding any increase in work time if they so choose.

The SAAA asks this Fact Finder to recommend that the above increase be rejected.

3.    Longevity pay.

The City has for over a half century paid longevity pay to all City employees based on their years of service under the following schedule:

| Five—ten years | $150 |
| Eleven—fifteen years | 300 |
| Sixteen—twenty years | 450 |
| Twenty-one—twenty-five years | 600 |
| Twenty-six years and above | 750 |

(Ex 1, at 31).

12

The City paid this amount to SAAA employees in 2010. It also signed contracts with the Teamsters, the Amalgamated Transit Union (ATU), and the Principal Clerks agreeing to pay these amounts to current employees for 2011 and 2012 (Ex's 9, 10, 11). The City position is that it wants to punish the SAAA, AFSCME, and the unions that did not accept its overall contract demands by fall 2009.

The City cannot have it both ways. It cannot say that it wants equal wages and benefits—except where the City wants to make a point by punishing those who have not agreed with it.

4.     <u>Tuition reimbursement.</u>

The City has, for many years, paid employees up to $2000 in a fiscal year to reimburse them for course work towards an undergraduate or graduate degree (Ex 1, 50). For the employees in the SAAA, that has been a particularly important benefit. For the City as well—especially in information technology and computer operations—it has been extremely important.

The SAAA today faces many claims by the City that it must subcontract work in those areas because the City employees supposedly lack the requisite skills. It pays premium prices to outside vendors. But it makes no sense to say that City employees lack the requisite skills—and then deny them the ability to acquire those skills.

The SAAA requests that the fact finder sustain the SAAA position on this issue.

5.     <u>A 3-step grievance procedure.</u>

The imposed contract has three-steps in the grievance procedure prior to arbitration in every department except Finance, Health, and Water and Sewerage (Ex 1, at

13

5-8). In those departments, the imposed contract has an intermediate Step 2 with an official lower than the department director or his designee.

The SAAA formerly did not have this step in its contract. It was included at City request in order to make the SAAA procedure the same as the AFSCME procedure. But it has been a complete waste of time, resulting in grievances piling up before officials who never do anything to resolve those cases.

The overwhelming majority of the grievances filed by the SAAA involve claims of discipline without just cause. The Step 2 meetings are almost always with the officials who approved the discipline in the first place—and those officials never change their minds. The meetings are a waste of time—and simply delay the time when the grievances can be addressed by the department head or by labor relations, who sometimes do grant relief.

Given that the division head or his representative decide on or approve the discipline, the SAAA asks that the procedure be the same in all departments—three steps before arbitration, with the first step being with the department head or his designee on discipline case. The proposed procedure is faster, more efficient, and can provide at least some help in ending the backlog that is of no assistance to either party or to the affected employees.

The City has offered no reason for rejecting this proposal. If cooperation is not to be a one-way street, it should be adopted.

6. <u>Me-too clause.</u>

The Union has, in the past, had a clause in its contract providing that if any other union obtained a more favorable settlement, the SAAA would receive the benefits of that

14

settlement. That clause has been an incentive for unions to settle even when there was uncertainty as to what other unions would receive.

The City proposed it to the SAAA, but when the SAAA refused to accept it at the time, the City withdrew the proposal. Apart from an attempt at retroactively vindicating its negotiating position, the City has offered no reason for not following the traditional pattern bargaining on this. The SAAA would accordingly request that a "me-too" clause be included in the final agreement recommended by the fact finder.

## CONCLUSION

For the reasons stated, the SAAA requests that the fact finder sustain its position on the issues listed above.

By the SAAA's attorneys,

SCHEFF, WASHINGTON & DRIVER, PC

By:   George B. Washington
645 Griswold--Suite 1817
Detroit, MI 48226
313-963-1921

Dated:

15

The definition set forth above shall generally apply absent specific provisions to the contrary for particular benefits.

## 35. LONGEVITY PAY

A. Employees shall qualify for longevity pay as follows:

1. Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

2. Employees may qualify for the second step of longevity pay, inclusive of the first step provided, they have served as City employees for an accumulated period of eleven (11) years.

3. Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

4. Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (21) years.

5. Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

6. The first step of longevity increment shall be one hundred fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three-hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four-hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven hundred and fifty dollars ($750).

B. Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1,800) hours of straight time Regular Payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1st.

33

# 34. SICK LEAVE

A.     All employees hired prior to the effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked eighty percent (80%) of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Those employees hired on or after effective date of approval by City Council who shall have completed three (3) months of continuous service shall be granted one (1) sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed ten (10) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971, may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

    The service month shall be in accordance with City payroll practices. All employees must be on the payroll for the entire month to be eligible for sick leave.

B.     Reserve sick leave of five (5) service days shall be granted on July 1 to each employee hired prior to effective date of approval by City Council who was on the payroll the preceding July 1 and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank. Those employees hired on or after effective date of approval by City Council shall not be eligible for reserve sick leave.

C.     Sick leave may not be granted in anticipation of future service.

D.     Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E.     **QUALIFIERS FOR BONUS VACATION DAYS:**

  1.   **Fifty Day Qualifier:** Employees hired prior to effective date of approval by City Council who have accumulated a total of fifty (50) or more days on July 1 shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
|---|---|
| 0 | 6 |
| ½ to 1 day | 5 ½ |
| 1 ½ to 2 | 5 |
| 2 ½ or 3 | 4 ½ |
| 3 ½ or 4 | 4 |
| 4 ½ or 5 | 3 ½ |
| 5 ½ or 6 | 3 |
| 6 ½ or 7 | 2 ½ |
| 7 ½ or 8 | 2 |
| 8 ½ or 9 | 1 ½ |

13-53846-tjt    Doc 11102-2    Filed 04/21/16    Entered 04/21/16 12:24:19    Page 26 of
13-53846-tjt    Doc 11230-1    Filed 06/06/16    Entered 06/06/16 13:34:30    Page 11 of
636   33
40

The service month shall be in accordance with City payroll practices. All employees must be on the payroll for the entire month to be eligible for sick leave.

B. Reserve sick leave of five (5) service days shall be granted on July 1 to each employee who was on the payroll the preceding July 1 and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank.

C. Sick leave may not be granted in anticipation of future service.

D. Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E. QUALIFIERS FOR BONUS VACATION DAYS:

1. **Fifty Day Qualifier.** Employees who have accumulated a total of fifty (50) or more days on July 1 shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
| --- | --- |
| 0 | 6 |
| ½ to 1 day | 5 ½ |
| 1 ½ to 2 | 5 |
| 2 ½ or 3 | 4 ½ |
| 3 ½ or 4 | 4 |
| 4 ½ or 5 | 3 ½ |
| 5 ½ or 6 | 3 |
| 6 ½ or 7 | 2 ½ |
| 7 ½ or 8 | 2 |
| 8 ½ or 9 | 1 ½ |
| 9 ½ or 10 | 1 |
| 10 ½ or 11 | ½ |
| 11 ½ or more | 0 |

2. **Twenty-five Day Qualifier.** Employees who have accumulated a total of at least twenty-five (25) but less than fifty (50) or more unused sick days on July 1 shall receive up to three (3) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Total Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
| --- | --- |
| 0 to 2 days | 3 |
| 2 ½ or 3 | 2 ½ |
| 3 ½ or 4 | 2 |
| 4 ½ or 5 | 1 ½ |
| 5 ½ or 6 | 1 |
| More than 6 | 0 |

---

5. Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

6. The first step of longevity increment shall be one hundred fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three-hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four-hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven hundred and fifty dollars ($750).

B. Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1800) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1.

No employee will be denied a full longevity payment on December 1 because of a temporary unpaid absence of twenty (20) continuous days or less extending through the December 1 date in question.

C. Employees who first qualify for longevity pay increments in any month other any December 1 date shall be paid such increments on a pro-rata basis upon attaining such qualification in the amount of full increment less one-twelfth (1/12) thereof for each calendar month or fraction thereof from the previous December 1 date to date of such qualification.

D. Promoted employees may be made between December 1 dates to qualified employees and officers who were separate or take leave from City service, excluding those who are discharged, those who resign and those who resign with a vested pension. Such promoted longevity increment shall be paid for time served on a full calendar month basis since the date of their last longevity payment; provided, that each month shall contain at least one use hundred sixty (160) straight time regular payroll hours of service.

E. All of the above provisions except as modified herein shall be in accordance with Chapter 13, Article 7 of the Municipal Code of the City of Detroit.

## 35. SICK LEAVE

A. All employees who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked eighty percent (80%) of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971, may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

days off during this period. If an employee has none of the above listed accrued time, departmental leave may be used if available. If an employee has no paid time accrued, and wishes to work, the City will make every attempt to place an employee in his/her department on a job assignment consistent with their job classification and ability to perform the work.

In the event a department requires additional personnel during the period, the Human Resources Department will be so advised. Employees who are without accrued time and are desirous of working during this period will contact their department Human Resources Officer for available placement in another department.

The optional holiday season closing dates during the period of this Agreement shall be:

**December 23, 24, 27, 30, 2002**
**December 24, 26, 30, 2003, and January 2, 2004**
**December 24, 28, 30, 2004**

Any scheduled time off or uses of department leave days during these periods shall not be counted against the employees' attendance records nor (except for bonus vacation) adversely affect their benefits.

L. The Holiday Schedule during the term of this Agreement is set forth in Schedule C.

## 33. MISCELLANEOUS

A. All salaried employees will have their hourly rates computed by dividing their annual salary by two thousand eighty (2080) hours.

B. Deferred Compensation Plan. Employees shall be eligible for a Deferred Compensation Plan made available by the City. Participation in the plan shall be optional with each employee.

C. The basic step increment schedule for salary classifications shall be five percent (5%) of the employee's salary as of the date the increment is normally paid, not to exceed the maximum rate for the classification. Beginning January 1, 2004, and thereafter, an employee may be denied his/her annual step increment for failure to receive a rating of at least "Meets Expectations" on the most recent evaluation on the Service Improvement Process (SIP) program administered by the Human Resources Department.

D. Effective July 1, 1980, employee benefits for those employees sixty-five (65) years of age and older may be modified as permitted by law but shall not result in any additional cost to the employee, (e.g. coordination of Medicare/Medicaid coverage with City hospitalization coverage).

E. Where by payroll error an employee is underpaid or overpaid, the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an employee in writing fourteen (14) days prior to making any overpayment recovery.

29

The correction of the underpayment shall be made within 60 days after notification to the department Human Resources officer.

For overpayment recoveries the City is authorized to deduct up to fifty dollars ($50) weekly or one hundred dollars ($100) bi-weekly. If the employee separates from City service, the entire unpaid balance shall be recoverable immediately.

If the amount owed by the employee is over $2,600, the City reserves the right to seek immediate recovery through the appropriate legal proceedings.

F. In order to be eligible for some economic benefits under this Agreement, employees must be on the payroll as of a certain date. For the purposes of this Agreement, "on the payroll" shall mean that the employee was receiving regular pay in a classification covered by this Agreement as of the qualifying date. Employees are on the payroll when absences are charged against sick leave, jury duty, funeral leave, vacation, C-time, holidays and other absences which are paid for under this Agreement. Employees are considered "off the payroll" if they have resigned, are discharged, are laid off, are on workers' compensation supplementation, are suspended for more than thirty days, or are on an unpaid absence from leaves of absence, AWOL, etc. Being returned to the payroll for the sole purpose of receiving a lump-sum payment for vacation, C-time, retroactive pay adjustments, etc. shall not constitute being "on the payroll."

The definitions set forth above shall generally apply absent specific provisions to the contrary for particular benefits.

## 34. LONGEVITY PAY

A. Employees shall qualify for longevity pay as follows:

1. Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

2. Employees may qualify for the second step of longevity pay, inclusive of the first step provided, they have served as City employees for an accumulated period of eleven (11) years.

3. Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

4. Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (21) years.

30

B. The payments will be made as part of the Employee's Pension Program, or the Employer's Benefit Plan, or through the Finance Department.

C. At the employee's option, he/she can elect to have up to the amount permitted by law of his/her unused sick leave payments deposited in his/her deferred compensation account with the balance paid to the employee.

~~Note:~~ * This increase to 60% of the unused sick leave on retirement payment (previously was one-half (½) of an employee's unused sick leave banks, does not increase the one-quarter (¼) amount that can be included in the average final compensation used to compute the service pension portion of a retirement allowance. (See Article 41. Retirement Provisions, paragraph I.)

## 32. HOLIDAYS AND EXCUSED TIME OFF

A. Employees shall be entitled to the following seven (7) holidays: New Year's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

Employees shall be entitled to three (3) swing holidays in each fiscal year. New employees shall be entitled to the first swing holiday after ninety (90) calendar days and the second swing holiday after one hundred eighty (180) calendar days and the third swing holiday after two hundred seventy (270) calendar days.

B. Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Where a holiday is concurrent with the employee's sixth or seventh work day, the department head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the department head.

C. An employee shall be eligible for Holiday Pay or excused time day pay provided he/she shall have received at least eight (8) hours of pay exclusive of overtime in the calendar week prior to, during or after the holiday or excused time day; provided the employee continues on the payroll through the holiday or excused time day in question and would otherwise be qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, is on a formal leave of absence granted by the Human Resources Department (generally over thirty [30] days), is on workers' compensation, or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D. If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

E. Double time will be paid for all hours worked on a holiday in addition to the straight time holiday pay due for a holiday as such.

F. Premium payments shall not be duplicated for the same hours worked.

G. Employees shall be granted eight (8) hours of excused time on Good Friday effective in the year 2004 and thereafter or the last eight (8) hours on the last scheduled paid day prior to Good Friday, and eight (8) hours of excused time on the last scheduled paid day before Christmas Day and before New Year's Day and for Veteran's Day, and the day after Thanksgiving and Election Day as designated by the City Council, or an additional Swing Holiday in the event there is no designated Election Day, provided they are on the payroll through the excused time day in question. Employees required to work any portion of the excused time on these days will receive either equal time off for hours worked or additional pay at straight time for such hours at the option of the department head. No holiday premium will be paid for work on these days. When an employee is absent without good cause for the non-excused portion of the day, he/she shall forfeit this excused time for the day.

H. For the purpose of this Article, an employee shall be considered off the payroll if he/she engages in a work stoppage which extends through a holiday or excused time day. All benefits under this Article will be forfeited for the holiday or excused time in question.

I. If a holiday or excused time day falls on Saturday it shall be observed on the preceding Friday, and if a holiday or excused time day falls on Sunday it shall be observed on the following Monday for all employees except those assigned to six and seven day operations. Should two (2) consecutive holidays or excused time days occur on a Friday and Saturday, or on a Sunday and Monday, Friday and Monday, respectively, shall be designated as the official holidays.

J. If an employee engaged in six or seven day operations works either the actual calendar holiday or the substitute holiday, he/she shall receive the holiday premium, but he/she will not be allowed to pyramid holiday premium for working both days.

1. An employee assigned to a six or seven day operation may be scheduled off for the holiday on either the calendar holiday or the substitute holiday.

2. When an employee works both the calendar holiday and the substitute holiday, the day selected as a holiday for pay purposes shall be the day which allows the employee the maximum pay credit for working both days.

3. If an employee works either the calendar holiday or the substitute holiday, but not both, he/she shall be paid holiday premium for the day worked.

4. If an employee is off sick on the calendar holiday, or the substitute holiday, or both, he/she shall receive holiday pay in lieu of sick pay on one of the two days. If he/she works either of the two days he/she shall receive holiday premium.

5. If an employee is AWOL on the actual calendar holiday, but works the substitute holiday, he/she shall not be entitled to holiday pay or holiday premium.

K. The City shall have the option to close all or part of its facilities for the Christmas and New Year's holiday season consistent with operating needs and the public service. Employees shall have the option of using vacation, swing holidays, compensatory time or no-pay for any

## 28. HOLIDAYS AND EXCUSED TIME OFF

A. Employees shall be entitled to the following seven (7) holidays: New Years's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

Employees shall be entitled to three (3) swing holidays in each fiscal year. New employees shall be entitled to the first swing holiday after ninety (90) calendar days and the second swing holiday after one hundred eighty (180) calendar days and the third swing holiday after two hundred and seventy (270) calendar days.

B. Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Were a holiday is concurrent with the employee's sixth or seventh work day, the Department Head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the Department Head.

C. An employee shall be eligible for Holiday Pay or Excused Time Day Pay provided he/she shall have received at least eight (8) hours of pay exclusive of overtime in the calendar week prior to, during or after the holiday or excused time day; provided the employee continues on the payroll through the holiday or excused time day in question and would otherwise be qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, is on a formal leave of absence granted by the Personnel Department (generally over 30 days) or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D. If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

66

Class Title: **Admin Asst Gd II City Elect Exmpt**

Bargaining Unit: **Association of Professional & Technical Employees**

Class Code: **012242**

Salary:

Description: ...

# City Employees Benefits Summary

### EMPLOYMENT BENEFITS

The City of Detroit offers a competitive and comprehensive employee benefit package. We pride ourselves on the longevity of our employees. Part of the reason for the low turnover rate is the exceptional benefit package listed below. Benefits include, but are not limited to the following:

**Medical**
Eligible for hospital, surgical, and prescription drug benefits at the time of employment. Employees may select from several medical plans, currently two (2) Blue Cross/Blue Shields Plans and three (3) HMO plans.

**Dental**
Eligible for dental care after sixth (6) months of employment. Employees may select from three dental plans; Blue Cross Blue Shield "Traditional Plus Plan", DENCAP Network-Based Plan and Golden Dental Network-Based Dental Plan.

**Vision**
Eligible for eye care after two-months of employment. Employees may select from two vision plans; Cohop Optical and Heritage Optical.

**Life Insurance**
Optional group insurance available to employee and their family. The City pays 60% of premium for first $12,500 of employee life insurance. Employee may purchase, at own expense, life insurance for spouse and each dependent.

**Long-Term Disability Insurance (Income Protection Plan)**
The City offers disability insurance through payroll deductions for persons who become disabled and who are not yet eligible for a service retirement.

### VACATION and LEAVE

**Holidays**
New Year's Day
Martin Luther King's Birthday
Good Friday
Memorial Day
Independence Day
Labor Day
Election Day
Veterans Day
Thanksgiving Day
Day after Thanksgiving
Christmas Eve
Christmas Day
New Year's Eve
Swing Holiday

**Sick Leave**
City employees accrue sick leave based on the number of regular hours worked. Full time employees earn ninety-six (96) hours of sick leave per year. You may carry over your unused sick leave, there is no maximum accumulation. Employees receive an additional forty (40) hours "Reserve Bank" days after one thousand & six hundred & six hundred ... during the previous year.

**Other Leave Policies**
The City also has the following paid and unpaid leaves: funeral leave, Family and Medical Leave, jury duty, military duty leave ... ... ...

## RETIREMENT BENEFITS

**City Employees Retirement System**
As a regular City employee you automatically become a member of the General Retirement System. This entitles you to a retirement allowance on:

- Completion of thirty (30) years of service.

or

- At age sixty (60) if you have at least ten (10) years of service.

or

- At age sixty-five (65) with eight (8) years of service. (In the event of disability, other eligibility rules apply).

- An early, actuarially reduced, retirement is offered after you have attained at least twenty-five (25) years of service.

- Employees are vested after ten (10) years of service, regardless of age.

**Defined Contribution Plan (Annuity Savings Fund)**
The Plan is an optional program which permits you to contribute toward an annuity, which can be used to enhance your retirement. As a City employee you have the option of contributing 0%, 3%, 5% or 7% of your gross earnings to your account in the Annuity Savings Fund. At retirement, your annuity fund may be transferred into monthly annuity payments or withdrawn in the form of a lump sum payment at the time you

**13-53846-tjt   Doc 11102-2   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 34 of**
**13-53846-tjt   Doc 11230-1   Filed 06/06/16   Entered 06/06/16 13:34:30   Page 17 of**
636
40

retire, or leave City employment before reaching retirement age

**1998 Defined Contribution Plan**
This Plan is a self-directed 401-a plan with the City contributing 6% of gross pay and matching the first 3% of the employee's contributions. The employee will be able to contribute [...] City's contributions will be fully vested (100%) after two years of service and one hundred percent (100%) after four years of service.

**CAREER OPPORTUNITIES**

**Advancement Opportunities**
Employees have many opportunities for growth and career advancement throughout all City departments and divisions.

*Have a successful career with the City of Detroit. Always remember that you are a part of a team with a common Vision of delivering excellent service to the citizens of the City of Detroit.*

## 28. HOLIDAYS AND EXCUSED TIME OFF

A.  Employees shall be entitled to the following seven (7) holidays: New Years's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

Employees shall be entitled to three (3) swing holidays in each fiscal year. New employees shall be entitled to the first swing holiday after ninety (90) calendar days and the second swing holiday after one hundred eighty (180) calendar days and the third swing holiday after two hundred and seventy (270) calendar days.

B.  Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Were a holiday is concurrent with the employee's sixth or seventh work day, the Department Head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the Department Head.

C.  An employee shall be eligible for Holiday Pay or Excused Time Day Pay provided he/she shall have received at least eight (8) hours of pay exclusive of overtime in the calendar week prior to, during or after the holiday or excused time day; provided the employee continues on the payroll through the holiday or excused time day in question and would otherwise be qualified for the holiday or excused time day.

For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, is on a formal leave of absence granted by the Personnel Department (generally over 30 days) or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D.  If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

66

Detroit, Michigan, Code of Ordinances >> **Part III - CITY CODE** >> **Chapter 13 - CIVIL SERVICE AND PERSONNEL REGULATIONS** >> **ARTICLE VII. - LONGEVITY PAY** >>

# ARTICLE VII. - LONGEVITY PAY

Sec. 13-7-1. - Definitions.
Sec. 13-7-2. - Qualifications of employees; amounts.
Sec. 13-7-3. - List of eligible employees to be furnished finance director annually.
Sec. 13-7-4. - Prorated payments.
Sec. 13-7-5. - Service not required to be consecutive.
Sec. 13-7-6. - Requests for and payment of increments when employee does not qualify.

## Sec. 13-7-1. - Definitions.

For the purposes of this article, the following words and phrases shall have the meanings respectively ascribed to them by this section:

*City employees and officers* shall include all city employees and officers, except contractual part-time employees, elected officers, members of part-time boards and commissions, consultants and, unless otherwise provided by resolution of the following authorities, employees and officers of the public library commission and the recorder's court of the city, except those employees of the traffic court division thereof who are under the classified service of the city.

*Longevity pay* shall mean such pay, within the meaning of this article, is not a part of and shall not become a part of an employee's base pay. It is a reward based on length of service.

*Part-time employees* shall include those who are hired for periods of either less than forty (40) hours per week or less than one year.

*Service* shall be construed to mean payroll time, exclusive of overtime or premium time. It shall include time spent on duty disability pension only for the purpose of computing the years of service for qualifying, and not for the purpose of continuing annual longevity payments. It shall include all time spent on military leave but shall not include absence due to layoff or leaves of absence requiring approval of the civil service commission, nor time served prior to any resignation or discharge. For the purpose of this article, service while under the status of special service or part-time employment may be credited and accumulated only if and when an employee or officer shall have become a permanent employee.

(Code 1964, § 16-11-1)

*Cross reference— Definitions and rules of construction generally, § 1-1-2*

## Sec. 13-7-2. - Qualifications of employees; amounts.

(a) All employees and officers may qualify for the first step of longevity pay, provided they have served for an accumulated period of eleven (11) years, and for the second step of longevity pay inclusive of the first step, provided they have served for an accumulated period of sixteen (16) years. All employees and officers, except noncivilian employees of the police and fire departments and members of collective bargaining units, unless included by contract, shall be eligible for the third step of longevity pay inclusive of the first and second steps, effective December 1, 1973, provided they have served for an accumulated period of twenty-one (21) years.

(b) The first step of longevity increment shall be one hundred fifty dollars ($150.00). The second step of longevity increment, inclusive of the first step, shall be three hundred dollars ($300.00). The third step of longevity increment, inclusive of the first and second step, shall be four hundred and fifty dollars ($450.00).

(c) Employees who have qualified for longevity pay and have accumulated at least two hundred sixteen (216) days of paid time (two hundred ninety-two (292) calendar days for fire fighters) exclusive of overtime or premium time during the year immediately preceding any December first date or any other date of qualification; except, that for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December first.

(d)    No employee will be denied a full longevity payment on December first because of a temporary unpaid absence of thirty (30) continuous days or less extending through the December first date in question.

*(Code 1964 § 16-11-2)*

## Sec. 13-7-3. - List of eligible employees to be furnished finance director annually.

All department heads and commissions, on November fifteenth of each year, shall furnish the finance director a list of employees who will have become eligible for longevity increment pay on December first of each year. He shall indicate, in the manner prescribed by the finance director the amount of longevity pay due each such employee, and the finance director may then authorize payment as of December first of each year.

*(Code 1964, § 16-11-3)*

## Sec. 13-7-4. - Prorated payments.

(a)    Employees who first qualify for longevity pay increments in any month after any December first date shall be paid such increment on a prorata basis upon attaining such qualification, in the amount of a full increment less one-twelfth thereof for each calendar month or fraction thereof from the previous December first date to the date of such qualification.

(b)    Prorated longevity payments may be made between December first dates to qualified employees and officers who separate or take leave from city service, excluding those who are discharged, those who resign and those who resign with a vested pension. Such prorated longevity increment shall be paid for time served on a full calendar month basis since the date of their last longevity payment; provided, that each month shall contain at least eighteen (18) days of service (twenty-four (24) calendar days for fire fighters).

(c)    In the case of employees who have otherwise qualified for longevity pay, according to the provisions of this article, but who fail to retain status by reason of death, a prorated longevity payment shall be made to their beneficiaries.

*(Code 1964, § 16-11-4)*

## Sec. 13-7-5. - Service not required to be consecutive.

The years of required service, as provided in section 13-7-2, need not be consecutive or uninterrupted. Service, for the purpose of qualifying for longevity pay, may be accumulated in terms of years equivalent to three hundred sixty-five (365) calendar days, according to the best city records available; provided, that during such years of required service, there shall have been accumulated an average of two hundred sixteen (216) days per year of paid time (two hundred ninety-two (292) calendar days for fire fighters), exclusive of overtime and premium time.

*(Code 1964, § 16-11-5)*

## Sec. 13-7-6. - Requests for and payment of increments when employee does not qualify.

When an interpretation of the provisions of this article would, in the opinion of the department head, violate the general intent thereof, a longevity increment may yet be requested by the department head or commission and paid upon the approval of the city council; provided, that the proposed recipient of such increment must comply with the basic definition of the term "service," as indicated in this article, and all other sections of this chapter.

*(Code 1964, § 16-11-6)*

## 25. LONGEVITY PAY

A. Employees shall qualify for longevity pay as follows:

   1. Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

   2. Employees may qualify for the second step of longevity pay, inclusive of the first step provided they have served as City employees for an accumulated period of eleven (11) years.

   3. Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

   4. Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (21) years.

   5. Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

   6. The first step of longevity increment shall be one hundred and fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven hundred and fifty dollars ($750).

B. Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1800) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1st.

   No employee will be denied a full longevity payment on December 1st because of a temporary unpaid absence of twenty (20) continuous days or less extending through the December 1st date in question.

C. Employees who first qualify for longevity pay increments in any month after any December 1st date shall be paid such increment on a pro-rata basis upon attaining such qualification in the amount of a full increment less one-twelfth (1/12) thereof for each calendar month or fraction thereof from the previous December 1st date to date of such qualification.

D. Prorated longevity payments may be made between December 1 dates to qualified employees and officers who separate or take leave from City service, excluding those who are discharged, those who resign and those who resign with a vested pension. Such prorated longevity increment shall be paid for time served on a full calendar month basis since the date of their last longevity payment; provided, that each month shall contain at least 160 straight time regular payroll hours of service.

E. All of the above provisions except as modified herein shall be in accordance with Chapter 13, Article 7 of the Municipal Code of the City of Detroit.

## Addendum to the Proof of Claim of
## The Coalition of Detroit Unions

This proof of claim (the "Claim") is for all claims due to the Coalition of Detroit Unions

and the unions within and their members and former members/retirees (or future retirees with

pension or other post-employment benefit obligations vested prior to the City of Detroit's (the

"City") bankruptcy filing). The membership of the Detroit Coalition of Unions includes:

> Michigan AFSCME Council 25 and its affiliated Detroit local unions
> Association of Professional and Technical Employees
> Detroit Police Detention Officers Association
> Senior Accountants, Analysts and Appraisers Association
> Teamsters, Local 214
> Association of Municipal Inspectors
> Michigan Building Trades Council and its affiliated unions
> International Union of Operating Engineers, Local 324
> UAW PAA Local 2211
> Association of City of Detroit Supervisors
> Detroit Income Tax Investigators Association
> SEIU Local 517M

The chief claim of the Coalition of Detroit Unions ("Claimant" or "Coalition") is rooted

in the City's failure to sign the Coalition Tentative Agreement in March 2012 which would have

established a 3 year contract through to March 2015, followed by the failure to bargain and

unilateral imposition of employment terms. In July 2012, the City unilaterally imposed its own

Employment Terms ("CET") in place of the Tentative Agreement. **The calculated aggregate**

**amount owed pursuant to this claim amounts to not less than $242,586,116.50.** The not less

than **$242,586,116.50** amount asserted in this Claim consists of several separate changes which

were implemented or failed to be implemented as a result of the overall claim.[1] (See attachment)

---

[1] The amounts set forth in this Claim are estimates based on data provided to Claimant by the City, Collective Bargaining Agreements, the City's General Retirement System or other third parties. Claimant reserves the right to amend this Claim to include updated data, any appropriate changes in applicable actuarial assumptions which serve as the basis for the calculations of the amounts set forth herein, and any appropriate updates for Claimant's members or former

28579/2
02/20/2014 28725506.1
13-53846-tjt    Doc 11102-3    Filed 04/21/16    Entered 04/21/16 12:24:19    Page 3 of 7
13-53846-tjt    Doc 11230-1    Filed 06/06/16    Entered 06/06/16 13:34:30    Page 23 of
40

On November 21, 2013, the Court entered its order establishing bar dates For filing proofs of claim and approving the form and manner of notice thereof [Docket No. 1782] (the "Bar Date Order") establishing February 21, 2014 at 4:00 p.m. Eastern Time as the general claims bar date for filing poofs of claim in this case. Notably, while individuals or entities holding claims for, *inter alia*, Pension Obligations and OPEB Obligations were not required to file proofs of claim pursuant to the Bar Date Order, as the City has not (to date) determined how the claims for Pension Obligations and/or OPEB Obligations will be asserted and/or allowed, Claimant has filed portions of this Claim as a protective measure.

As the documents supporting this Claim – including without limitation the relevant statutes, charter and ordinances, grievances, unfair labor practice charges, collective bargaining agreements, Coalition Tentative Agreement, City Employment Terms, the books and records of the City's General Retirement System, and the City's communications with its employees and retirees – are voluminous, they are not attached to this Claim. Copies of the relevant documents supporting this Claim are or should be, upon information and belief, in the possession of the City.

Claimant expressly reserves the right to amend this Claim to re-characterize or further characterize all or any portion of these claims as administrative expenses or priority claims or to include such modifications, deletions or additions as may be just and proper.

Pursuant to the Bar Date Order, individual members of AFSCME Council 25, its affiliated Locals and the members of the Coalition have a right to file a proof of claim on their own behalf. Thus, Claimant reserves the right for other units or individual members to file proof

---

Claimant members who have or may become eligible in the future for pension benefits but whose data was not included in the herein calculations.

-2-

On November 21, 2013, the Court entered its order establishing bar dates For filing proofs of claim and approving the form and manner of notice thereof [Docket No. 1782] (the "Bar Date Order") establishing February 21, 2014 at 4:00 p.m. Eastern Time as the general claims bar date for filing poofs of claim in this case. Notably, while individuals or entities holding claims for, *inter alia*, Pension Obligations and OPEB Obligations were not required to file proofs of claim pursuant to the Bar Date Order, as the City has not (to date) determined how the claims for Pension Obligations and/or OPEB Obligations will be asserted and/or allowed, Claimant has filed portions of this Claim as a protective measure.

As the documents supporting this Claim – including without limitation the relevant statutes, charter and ordinances, grievances, unfair labor practice charges, collective bargaining agreements, Coalition Tentative Agreement, City Employment Terms, the books and records of the City's General Retirement System, and the City's communications with its employees and retirees – are voluminous, they are not attached to this Claim. Copies of the relevant documents supporting this Claim are or should be, upon information and belief, in the possession of the City.

Claimant expressly reserves the right to amend this Claim to re-characterize or further characterize all or any portion of these claims as administrative expenses or priority claims or to include such modifications, deletions or additions as may be just and proper.

Pursuant to the Bar Date Order, individual members of AFSCME Council 25, its affiliated Locals and the members of the Coalition have a right to file a proof of claim on their own behalf. Thus, Claimant reserves the right for other units or individual members to file proof

Claimant members who have or may become eligible in the future for pension benefits but whose data was not included in the herein calculations.

2

of claims in addition to this claim. Notably, the Coalition is filing an aggregate proof of claim for all outstanding claims—including those made by its affiliated unions. Claimant has put forth a good faith effort to provide an exhaustive list of all outstanding claims while avoiding duplicative filings; any unnecessary duplication is not intentional and will be resolved.

The filing of this Proof of Claim is not intended to and should not be construed to be a consent or submission to the jurisdiction of this Court for any reason.

The filing of this Claim is not and should not be deemed a waiver of any Claimants' challenge to the legal validity of this bankruptcy or any legal claims relating to the bankruptcy and/or Detroit's assets. Furthermore, this Claim shall not be deemed or construed to be a waiver of the rights of the Claimant (1) to have final orders with respect to non-core matters entered only after *de novo* review by the United States District Court, (2) to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases, (3) to have the United States District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (4) to assert any other rights, claims, actions, setoff or recoupments to which the Claimant is or may be entitled in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupment the Claimant expressly reserves, and (5) to assert any and all rights or claims against others jointly or severally liable for the sums claimed herein.

-3-

13-53846-tjt   Doc 11102-3   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 5 of 7
13-53846-tjt   Doc 11230-1   Filed 06/06/16   Entered 06/06/16 13:34:30   Page 26 of
40

## EXHIBIT 1 FOR COALITION OF DETROIT UNIONS PROOF OF CLAIM

| ISSUE NAME | DESCRIPTION |
|---|---|
| Financial losses due to imposition | In July 2012, The City unilaterally imposed the City Employment Terms. Because of the implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members suffered significant losses due to the imposition of wage and benefit concessions. These loses are from at least as early as 2012 and continue into the future for present employees and employees who have/will retire. Additionally, Coalition members and their unions have suffered losses due to the breaches of collective bargaining agreements, CET terms and orders or actions of the Emergency Manager. |
| Agency Shop | Had the Coalition TA been executed as a contract, employee union security clauses in Coalition contracts would have been continued through the end of the CBA term. Thus, any loss of dues compensation to the union due to the absence of this contract is a claim. |
| Dues Check off without charge | The July 2012 City Employment Terms provided that the City charge a 2% fee for the collection of all dues. This fee would not have been present had the City signed the Coalition TA, or bargained in good faith. |
| Grievance / Discipline | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, employee past records used for the determination of discipline went from 14 months to 3 years. Thus, any employee disciplined/fired due to past record between 14 months and 3 years old is a claimant. The union lost dues for any such separated employee as well. |
| Seniority | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the employee probationary period expanded from 3 months to 6 months. Any probationary employee discharged within the 3 – 6 month window is a claimant. The union lost potential dues for any such separated employee. |
| Outsourcing | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, unions and employees lost the contractual protections in place when the City sought to privatize union work. Under protections in the Coalition TA, employees could not lose overtime or their position as a result of their work being outsourced the Coalition lost dues from the separated employee as well. |
| Maintenance of conditions | Under the Coalition union contracts, the Employer agreed to maintain the employment conditions which were in place at the time the contract was signed, even if not specified in the union contract. Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the employees lost various benefits which would have been protected under the maintenance of conditions clauses. |
| Successor clause | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the City eliminated the "successor clause" in Coalition union contracts. This clause required any third parties which were assigned City operations to take the obligations of the union contract, as well as the employees. |
| "Me Too" language | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition union contracts lost the economic disadvantage provision ("me too") – where any union employee compensation enhancements offered elsewhere in the City would have also been given to Coalition union members. |

Ex 1, Coalition Proof of Claim – Pg 1

13-53846-tjt    Doc 11102-3    Filed 04/21/16    Entered 04/21/16 12:24:19    Page 6 of 7
13-53846-tjt    Doc 11230-1    Filed 06/06/16    Entered 06/06/16 13:34:30    Page 27 of
40

| | |
|---|---|
| Sick Leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, all employees and anyone who retired after July 18, 2012 lost any sick time accrued from that point forward, for potential payout (even though the Coalition TA placed a limit on the use of sick time for Final Average Compensation). |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost accrual of sick leave beyond a cap of 300 hours.   Sick leave is accumulated at 1 sick day (8 hours) per month. Coalition members have lost sick time for every hour they would have accrued beyond 300 hours in the future. |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost reserve sick time.  Employees with at least 1600 hours on payroll through the year earn five Reserve Sick Days. The benefit is awarded each year on July 1st. |
| Sick leave | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition members lost bonus vacation days. Coalition union contracts awarded 1-6 bonus vacation days for unused sick days. The benefit is awarded each year on July 1st. |
| Shift Premium | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition members lost shift premium.  The afternoon shift went from $.70 to $.25 and night shift from $.75 to $.50, per hour. |
| Overtime | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost double-time both for work on Sundays and work beyond 16 hours in one shift. |
| Holidays | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost three annual swing days and a fourth election (or excused time) day. |
| Vacation | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost prorated accrual of vacation for employees with less than 20, or less than 15, years of service.  A new vacation schedule was established, which resulted in a significant reduction of vacation hour accruals. |
| Health care | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, the Coalition employees had significant losses in health insurance coverage and increased cost-sharing. |
| Workers Compensation | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost certain policy provisions surrounding City workers compensation coverage. |
| Death and Life Benefits | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost certain policy provisions surrounding City death and life benefit coverage. |
| Clothing Allowance | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, Coalition members lost annual clothing and uniform allowance, to having it paid bi-annually. |
| 2013 furloughs | Because of the City's implementation of the CET, failure to bargain, and failure to execute the Coalition TA, a number of the Coalition members were forced to work at less than a full 40 hour week, beginning in February 2013, and for the bulk of the year 2013. |
| **TOTAL CLAIM AMOUNT** | **Not less than $255,496,436.50 (estimate)** |

Ex 1, Coalition Proof of Claim – Pg 2

13-53846-tjt   Doc 11102-3   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 7 of 7
13-53846-tjt   Doc 11230-1   Filed 06/06/16   Entered 06/06/16 13:34:30   Page 28 of 40

This proof of claim (the "Claim") is for all claims due to Michigan AFSCME Council 25 and its affiliated Locals within the City of Detroit (the "Claimant"), and its members, and former members/retirees (or future retirees with pension or other post-employment benefit obligations vested prior to the City of Detroit's (the "City") bankruptcy filing), relating to:

(i) unfunded or underfunded pension obligations (including annuity savings fund obligations) owed with respect to the City's General Retirement System (the "Pension Obligations"),

(ii) other unfunded or underfunded post-employment benefit obligations (the "OPEB Obligations", including obligations owed with respect to the City's Health and Life Insurance Benefit Plan and/or the Supplemental Death Benefit Plan and/or other non-pension post-employment welfare benefits, including unfunded actuarially accrued liabilities),

(iii) grievances and other disputes under the various union contracts; the City Employment Terms or other contractual obligations,

(iv) monies owed for violations of local, state or federal law, unfair labor practice charges,

(v) monies owed due to uncompensated services performed,

(vi) any other claims which arose before July 18, 2013.

**The calculated aggregate amount owed pursuant to these claims amount to not less than $8,718,697,854.82.** The not less than $8,718,697,854.82 amount asserted in this Claim consists of several separate claims.[1] (See attachment)

---

[1] The amount set forth in this Claim are estimates based on data provided to Claimant by the City, Collective Bargaining Agreements, the City's General Retirement System and other third

28579/2
02/20/2014 28725506.1

On November 21, 2013, the Court entered its order establishing bar dates for filing proofs of claim and approving the form and manner of notice thereof [Docket No. 1782] (the "Bar Date Order") establishing February 21, 2014 at 4:00 p.m. Eastern Time as the general claims bar date for filing poofs of claim in this case. While individuals or entities holding claims for, *inter alia*, Pension Obligations and OPEB Obligations were not required to file proofs of claim pursuant to the Bar Date Order, as the City has not (to date) determined how the claims for Pension Obligations and/or OPEB Obligations will be asserted and/or allowed, portions of this claim are in reference to Pension Obligations and OPEB Obligations as a protective measure.

As the documents supporting this Claim – including without limitation the relevant statutes, charter and ordinances, collective bargaining agreements, City Employment Terms, grievances, arbitration awards, unfair labor practice charges, the books and records of the City and its General Retirement System, and the City's communications with its employees and retirees – are voluminous, they are not attached to this Claim. Copies of the relevant documents supporting this Claim are or should be, upon information and belief, in the possession of the City.

Claimant expressly reserves the right to amend this Claim to re-characterize or further characterize all or any portion of these claims as administrative expenses or priority claims or to include such modifications, deletions or additions as may be just and proper.

Pursuant to the Bar Date Order, individual members of AFSCME Council 25, its affiliated Locals, and the Coalition of Unions have a right to file a proof of claim on their own

---

parties. Claimant reserves the right to amend this Claim to include updated data, any appropriate changes in applicable actuarial assumptions which serve as the basis for the calculations of the amounts set forth herein, and any appropriate updates for Claimant's members or former Claimant members who have or may become eligible in the future for pension benefits but whose data was not included in the herein calculations.

-2-

behalf. Thus, Claimant reserves the right for other units or individual members to file proof of claims in addition to this claim. Claimant has put forth a good faith effort to provide an exhaustive list of all outstanding claims while avoiding duplicative filings; any unnecessary duplication is not intentional and will be resolved.

The filing of this Proof of Claim is not and should not be deemed a waiver of any Claimant's challenge to the legal validity of this bankruptcy or any legal claims relating to the bankruptcy and/or Detroit's assets. Furthermore, this Claim shall not be deemed or construed to be a waiver of the rights of the Claimant (1) to have final orders with respect to non-core matters entered only after *de novo* review by the United States District Court, (2) to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases, (3) to have the United States District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, (4) to assert any other rights, claims, actions, setoff or recoupments to which the Claimant is or may be entitled in law or in equity, all of which rights, claims, actions, defenses, setoffs, and recoupment the Claimant expressly reserves, and (5) to assert any and all rights or claims against others jointly or severally liable for the sums claimed herein.

-3-

EXHIBIT 1 TO MICHIGAN AFSCME COUNCIL 25 PROOF OF CLAIM

| ISSUE NAME | DESCRIPTION |
|---|---|
| Underfunded pension and post employment benefit obligations | Based upon data from the City and elsewhere, it is projected that the pension and health care obligations of the City's active employees and retirees amounts, in total, to no less than $8.1 billion dollars. |
| Violations of local, state or federal law | Claimant asserts any and all claims arising from or related to every City breach of local, state or federal law, the orders of the Emergency Manager, or any other failure of the City or its agents to fulfill such legal obligations, to Claimant or its present or former members. This applies to legal violations impacting present or former union members for injury which has been, is presently or will be realized in the future. This applies whether or not such violations are identified herein. |
| Refusal to bargain AFSCME Local 1023: MERC Case Number D13 C-0331 | AFSCME Local 1023 is a public safety local, and therefore its bargaining disputes must be resolved with binding arbitration pursuant to state law, if so requested by a negotiating party. The state labor board, in another case, ruled that 2012 Public Act 436 denied binding arbitration to public safety locals. AFSCME Local 1023 was not a party to that case and filed its own request for negotiation assistance with the state labor board. Local 1023 maintains a claim for the City's unilateral imposition of employment conditions, prior to binding arbitration, and contends that the state labor board interpreted Public Act 436 in error (by, for instance, not properly accounting for the other state law which requires binding arbitration). |
| Local 207, 2394 and 2920 DWSD refusal to bargain / Case Number C13 D-069 | AFSCME water department locals were refused the opportunity to bargain a new contract, and incurred illegal changes in employment conditions. |
| Imposition of furloughs days in February 2013 | In February 2013, the City unilaterally imposed furlough days, in violation of its obligation to bargain with its unions. The City required employees to take unpaid days off work at least twice per month. These furlough days were realized through the bulk of the 2013 calendar year, causing significant losses in wages and benefits that would have been earned or accrued during the lost time. |
| Detroit refusal to bargain concerning Transportation Locals: Case Number C12 H-157 | The City has committed to bargain with AFSCME Locals 214 and 312. The members of these Locals work in the Detroit Department of Transportation. These locals, however, are part of a city-wide bargaining unit, as determined by Michigan courts. By refusing to bargain with the entire bargaining unit, but only select portions of the bargaining unit, the City is violating state labor law. Any changes in employment conditions realized by the entire unit – due to the City's failure to bargain – represent a claim. |

| | |
|---|---|
| AFSCME Council 25 (13th check ULP). MERC Case No. C12-E-092 | On about November 30, 2011, the City passed an ordinance which curtailed payments into employee annuity accounts and stopped "13th checks" being paid to retirees. By applying this change to union-negotiated benefits, the City violated state labor laws, by ignoring its bargaining obligation and repudiating its contractual obligations. An administrative law judge recommended a finding in favor of the Unions and estimated the award to be as high as $174,000,000. |
| City of Detroit 2012 negotiations and implementation with Coalition: MERC Case No. C12 D-065, C12 F-125, C13 G-129 | Following the negotiation of a Coalition tentative agreement in February 2012, the City violated state labor laws by refusing to execute that contract but illegally imposing other terms and conditions of employment. This includes wage and benefit concessions for all AFSCME members, which remain in existence today. The reader is referred to the Coalition of Detroit Unions Proof Of Claim, addressing the losses discussed therein. AFSCME's share of the Coalition proof of claim amount is in the range of 60% - 70%. |
| Violation of Privatization Ordinance | The City has repeatedly violated the City's Privatization Ordinance, prior to letting contracts to vendors to perform work normally performed by unionized employees. These claims are held by individual members of the Unions, as opposed to the union itself. Nonetheless, the claims seek all relief available to the employees under the law. |
| City of Detroit/DFFA/MERC: MERC Case No. C11 K-201 | The union filed an unfair labor practice charge concerning removal of work from the applicable bargaining unit. This change impacted the employees who had previously performed the work. |
| City of Detroit longevity claim for AFSCME employees: Claim number 12-000522 and 12-000523; Wayne County Circuit Court Number 13-003430-AA | Under the 2005-2008 AFSCME union contract, employees had received a yearly payment, in December, based upon the number of hours they worked since the previous December, receiving the full longevity payment for hitting 1600 hours. Effective October 2010, the City imposed new contract terms on AFSCME employees, which removed the longevity pay. However, many AFSCME members had already worked the 1600 hours since the December 2009, entitling them to full longevity pay. Further, for members who had worked less than the 1600 hour threshold, they were entitled to prorated longevity payments for hours worked in each month during that year. The City refused any AFSCME members longevity pay, despite the clear contractual obligation. AFSCME members filed claims with the state for this payment, and the City challenged the payments. The claims were initially denied by the administrative law judge, and placed on appeal before Wayne County Circuit Court. |

Ex 1 AFSCME Proof Of Claim – Pg 2

| | |
|---|---|
| Negotiation of Local 542 supplemental agreement: MERC Case Number C07 L-033 | MERC ruled that the City was obligated to negotiate a supplemental bargaining agreement with Local 542. Failure of the City to do so caused financial harm to members of this bargaining unit. |
| Detroit & SEMHA: MERC Case No. C05 H-194 | The charge was filed to protest the layoff of four individuals from the Detroit Health Department and rehiring of them by a Detroit contractor, to perform the same work. The charge alleged a violation of state labor law. In the process of the hearing (despite repeated appeals, ancillary litigation and cancelations), the Union learned of other positions for which this occurred. The charge sought back pay and benefits for those impacted employees. The Union lost dues for those laid off members as well. |
| **Grievance Claims** | |
| Breach of contract claims | Claimant asserts any and all claims arising from or related to every City breach of the Council 25 Master Agreement, local supplemental agreements, Council or local memoranda or letters of understanding, the imposed City Employment Terms, the orders of the Emergency Manager, or any other failure of the City or its agents to perform any contractual obligation to the Claimant or its present or former members. This applies to breaches impacting present or former union members for injury which has been, is presently or will be realized in the future. This applies to all such breaches, whether or not listed specifically herein. |
| Exhibit 2 Listing of Specific Grievances | Exhibit 2, attached to this Proof Of Claim, contains a listing of a number of specific grievances filed by AFSCME Council 25 local unions. While this is intended to be a list of all active grievances currently in existence, derived after diligent search, Claimant reserves the right to add to or otherwise modify the list of grievances, or the description of any grievance listed therein. |
| City of Detroit/Human Services department: Grievance No. 25-01-12 / COA: 12-0077708-CL | In July and October, 2012, approximately 174 AFSCME Locals 1642 and 457 members, working at the Detroit Health Department and Workforce Development Department, were permanently laid off and replaced with employees from third party companies. The arbitrator found the City's actions to be in violation of the union contract, and awarded back pay and benefits to the members. The arbitrator's decision, confirmed by Circuit Court, is now on appeal. |
| City of Detroit Retirees Health Care: Grievance No. C10 A-025 | In 2006, the City changed retiree health care benefits, requiring retirees to incur greater cost for health care. AFSCME filed a grievance on behalf of all AFSCME retirees (approximately 6,000), because the changes violated specific provisions of the union contracts under which the employees retired. |
| Payroll disputes | Repeatedly, the City of Detroit payroll system will not issue correct amounts of pay or benefits on payroll checks of AFSCME members. This problem has escalated over the years, resulting in significant losses of money and benefits for AFSCME members. |

Ex 1 AFSCME Proof Of Claim – Pg 3

13-53846-tjt    Doc 11102-4    Filed 04/21/16    Entered 04/21/16 12:24:19    Page 8 of 25
13-53846-tjt    Doc 11230-1    Filed 06/06/16    Entered 06/06/16 13:34:30    Page 34 of 40

| | |
|---|---|
| Detroit Service and Maintenance Outsourcing in Downtown Detroit: Grievance Number C09-078 | In 2009, the City reduced the overtime of AFSCME members, due to work performed by private contractors, in the downtown Detroit area. This violation of Article 19 of the AFSCME Master Agreement continued for years after the fact. The violations impacted 40-60 employees throughout the period. |
| Tree Artisan failure to secure license: Grievance Number 727May08 | Tree artisan employees in the AFSCME bargaining unit were discharged. The grievance was granted in that the City was required to pay for training and restore seniority to some employees. To the extent these benefits were not awarded, those employees have claims. |
| **TOTAL CLAIM AMOUNT** | **Not less than $8,718,697,854.82 (estimated)** |

Ex 1 AFSCME Proof Of Claim – Pg 4

13-53846-tjt   Doc 11102-4   Filed 04/21/16   Entered 04/21/16 12:24:19   Page 9 of 25
13-53846-tjt   Doc 11230-1   Filed 06/06/16   Entered 06/06/16 13:34:30   Page 35 of 40



**EMERGENCY MANAGER
CITY OF DETROIT**

**ORDER No. 21**

**ORDER APPROVING PENSION FREEZE FOR CITY
EMPLOYEES**

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas,* on March 28, 2013, Michigan Public Act 436 of 2012 (PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

1

Further, Section 9(2) of PA 436 prohibits, during the pendency of receivership, the Detroit Mayor and City Council from exercising "any powers of those offices except as may be specifically authorized in writing by the [EM] or as otherwise provided by [PA 436] and are subject to any conditions required by the [EM];" and

Pursuant to Section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 12(1)(a) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]nalyze factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition;" and

Section 12(1)(b) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(d) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[r]equire and approve or disapprove, or amend or revise, a plan for paying all outstanding obligations of the local government;" and

Section 12(1)(dd) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[e]xercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" as provided in the Michigan Home Rule City Act, Act 279 of 1909, Michigan Compiled Laws ("M.C.L.") §§ 117.1 to 117.38 (the "Home Rule Act"); and

Section 12(1)(ee) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities;" and

Pursuant to Section 12(2) of PA 436, "during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the [EM])."

At the current time, pursuant to Section 12 of PA 436, the Emergency Manager has determined that implementing the following changes to terms and conditions of employment for employees currently participating in the General Retirement System is consistent with the

2

Further, Section 9(2) of PA 436 prohibits, during the pendency of receivership, the Detroit Mayor and City Council from exercising "any powers of those offices except as may be specifically authorized in writing by the [EM] or as otherwise provided by [PA 436] and are subject to any conditions required by the [EM];" and

Pursuant to Section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 12(1)(a) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]nalyze factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition;" and

Section 12(1)(b) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(d) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[r]equire and approve or disapprove, or amend or revise, a plan for paying all outstanding obligations of the local government;" and

Section 12(1)(dd) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[e]xercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" as provided in the Michigan Home Rule City Act, Act 279 of 1909, Michigan Compiled Laws ("M.C.L.") §§ 117.1 to 117.38 (the "Home Rule Act"); and

Section 12(1)(ee) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities;" and

Pursuant to Section 12(2) of PA 436, "during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the [EM])."

At the current time, pursuant to Section 12 of PA 436, the Emergency Manager has determined that implementing the following changes to terms and conditions of employment for employees currently participating in the General Retirement System is consistent with the

2

13-53846-tjt    Doc 109.02-6 Filed 03/03/16  Entered 03/03/16 15:36:49  Page 38 of 45
13-53846-tjt    Doc 11230-1    Filed 06/06/16    Entered 06/06/16 13:34:30    Page 38 of 40

purposes of PA 436 and will enhance the City's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare in addition to rectifying the City's financial emergency.

**It is hereby ordered that:**

1. Effective as of December 31, 2013 (the "Freeze Date"), no employees hired or rehired by the City of Detroit will be eligible to participate in the General Retirement System of the City of Detroit ("GRS"), and the GRS will be closed to all new employees.

2. Effective as of the Freeze Date, benefit accruals for GRS members will be frozen based on the years of credited service and Average Final Compensation as of such Freeze Date.

3. Effective as of the Freeze Date, the City's 1998 Defined Contribution Plan will be closed to all employees hired or rehired by the City of Detroit and no future contributions will be made to or accepted by such plan after the last payroll date that occurs in 2013.

4. Effective as of the Freeze Date, the Annuity Savings Fund is closed to new employees and rehired employees. The Annuity Savings Fund will stop accepting future contributions as soon as administratively practicable after the Freeze Date but no later than the last applicable payroll dates that occur in January 2014.

5. Members who are not vested in a pension under Article II of Chapter 47 of the Detroit Code of Ordinances or in an Employer Contribution Account under Article III of Chapter 47 of the Detroit Code of Ordinances as of the Freeze Date shall not be entitled to such benefits under the GRS.

6. Effective as of the Freeze Date, the pension improvement factor (escalator) is eliminated and no future cost of living adjustments shall be made with respect to any accrued benefits paid or payable to any GRS member.

7. Effective as of January 1, 2014, the City will establish a new qualified defined contribution plan that is intended to meet the requirements of Section 401(a) of the Internal Revenue Code (the "Code") (the "401(a) Plan").

8. Unions representing affected employees either have received or will receive a letter informing them of the substance of this Order.

9. Nothing in this Order shall be interpreted as contrary to Federal law.

10. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

11. This Order is effective immediately upon the date of execution below.

3

12. The EM may modify, amend, rescind, replace, supplement, or otherwise revise this Order at any time.

13. This Order shall be distributed to the Mayor, Mayor-elect, City Council members, City Council members-elect, all department heads, and the State of Michigan Department of Treasury.


Dated: December 31, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit


cc:   State of Michigan Department of Treasury
Dave Bing, Mayor
Michael Duggan, Mayor-elect
Members of Detroit City Council
Members of Detroit City Council-elect