June 8, 2016

TO:   Clerk of the Court
      United States Bankruptcy Court
      211 W. Fort Street, Suite 2100
      Detroit, Michigan 48226

RE:   Bankruptcy Case No. 13-53846          *Response To: Forty-Fourth*
      Honorable Thomas J. Tucker               *Omnibus Objection*
      Chapter 9

This letter is to oppose the City of Detroit objection for the following claims number 1823
for Gladys M. Cannon (City Employee).  I, Gladys M. Cannon, do oppose to the City's objection
in the ~~Thirty-Second~~ *Forty-Fourth* Omnibus Objection.  The prior sick leave, longevity pay and ten (10%)
percent pay cut should be restored.  These provisions were contractually bargained for and are
essential to maintaining city employee morale.  Also, these benefits are in the City's Charter.

Please see enclosed documentation to support my claim.  EXHIBIT - PROOF OF CLAIMS FOR
GLADYS M. CANNON, CITY EMPLOYMENT TERMS. 24. SICK LEAVE, 25. LONGEVITY PAY and the
City Charter.

Sincerely,

*Gladys M. Cannon*
Gladys M. Cannon

**EXHIBIT – PROOF OF CLAIM FOR GLADYS M. CANNON**

| ISSUE NAME | DESCRIPTION |
|---|---|
| Financial losses due to imposition | In July 2012, The City of Detroit unilaterally imposed the City Employment Terms (CET). I suffered significant losses due to the imposition of wage and benefit concessions. |
| Sick Leave | Because of the implementation of the CET, I lost reserve sick time. Employees with at least 1600 hours on payroll through the year earn five Reserve Sick Days. The benefit is awarded each year on July 1st. |
| Holidays | Because of the implementation of the CET, I lost three annual swing holidays and election day (or excused time) day. |
| Health care | Because of the implementation of the CET, I had significant losses in health insurance coverage and increased cost-sharing. |
| Longevity Pay | Because of the implementation of the CET, I had significant losses of longevity pay. Longevity pay is received by employees based on years of service. |
| Total Claim Amount | Not less than $27,481.72 |



COLEMAN A. YOUNG
MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 332
DETROIT, MICHIGAN 48226
PHONE 313-224-3860
FAX 313-224-0738
WWW.DETROITMI.GOV

CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

## INTER-DEPARTMENTAL COMMUNICATION

July 27, 2012

To:     City of Detroit Employee

From:   Lamont D. Satchel, Esq.
        Director of Labor Relations

RE:     City Employment Terms

As you know, the City of Detroit has implemented employment terms ("City Employment Terms" or "CET") for employees in certain unions. Employees are encouraged to contact their respective unions for questions regarding the applicability of the City Employment Terms to them. We understand that there are a number of questions employees have regarding the actual implementation of various City Employment Terms as they affect wages, vacation, sick banks, healthcare and other areas of importance to employees. Below are a number of items covered by the City Employment Terms, accompanied by the City's approach to implementation.

It should be kept in mind that it is the City's intent to implement the economic and non-economic provision of the City Employment Terms in a reasonable manner so as to avoid or minimize personal and operational disruption.

Implementation of the item below for non-union employees will be communicated at a later date.

*10% Wage Reduction and Cessation of Furlough* – A 10% wage reduction will be reflected in employee's paychecks on August 24 or August 31, 2012, depending on the employee's pay cycle. Budgeted Required Furlough ("BRF") days will be discontinued and coincide with replacement by the 10% wage reduction. The last Budgeted Required Furlough day will be July 30, 2012. For employees who do not have BRF days the 10% wage reduction shall be effective July 17, 2012.

*Merit and Step Increases* – All merit and step increases have been eliminated effective July 17, 2012.

*Shift Premium* – Shift premiums will be $.25 for the afternoon shift and $.50 for the night shift, effective August 12, 2012.

*Vacation Accrual Cap* – Currently vacation hours are capped at 320 hours and accrual over this amount must be used before September 30, 2012. Going forward the cap on accrual of vacation hours will be reduced to 160 hours. However, this year employees will be allowed to carry over up to 320 hours on October 1, 2012. This cap will be implemented pursuant to the Human Resource Vacation Policy.

1

*Elimination of Swing Holidays and Election Day as Holiday* – Swing holidays received this July 1, 2012 will be honored. However, there will be no future receipt of swing holidays after July 1, 2012. Effective July 17, 2012, proration of swing holidays for new hires has ceased. Effective July 17, 2012, Election Days formerly treated as holidays will be considered work days.

*Sick Time Banks* – Award of Reserve and Seniority Sick Banks will be discontinued. No more accruals to these banks will be made after July 1, 2012, but they will be available for use. Current Sick Banks will be capped at 300 hours. Employees will be notified prior to the effective date of the cap.

*Jury Duty* – Supplemental jury duty pay will be eliminated. However, employees will be allowed to use available paid leave time while off on jury duty. Employees will be notified prior to implementation of this change in the city's jury duty policy.

*Private Car Mileage Reimbursement* - Effective September 2012, City of Detroit employees who qualify for mileage reimbursement will no longer receive the $3.00/day reimbursement for use of their vehicle on city business. Such employees will, however, continue to receive actual mileage reimbursement. Also, supplemental accident payments are eliminated effective September 2012.

*Health Care* – The City has made changes to the plan design of its health care benefits including BCBSM PPO, Health Alliance Plan & Total Health Care. The City is eliminating BCBSM Traditional and Comprehensive Major Medical as plan options for all active employees subject to the CBT. Open Enrollment is expected to occur October 1 – October 31, 2012 and the 80/20 employee healthcare contribution is expected to be implemented in October 2012.

*Health Care Plan Changes*

- Deductibles increase to $250 per person/$500 per family for all plans
- Coinsurance increase to 80/20 for all plans
- Coinsurance maximum increase to $1,500 per person/$3,000 per family
- Office Visit Copay increase to $25 per visit
- Urgent Care Copay increase to $25 per visit
- Emergency Room Copay increase to $100 per visit
- New Hospital Admission Copay of $100 per admission
- Prescription drug Copay increase to $10 generic/$35 preferred brand/$50 non-preferred brand.
- Mandatory generic
- Mandatory step therapy
- Mandatory prior authorization

2

- Mandatory mail order for maintenance medications
- Exclusion of lifestyle drugs except Weight Management, Smoking Cessation and Birth Control medications
- Self Funded prescription drug administration changed to new vendor. All fully insured prescription drugs will continue to be administered by the respective HMO provider i.e. HAP, BCN, THC.
- Medical, Dental and Vision employee premium cost sharing is changed to 80/20.

*Death Benefit & Life Insurance* -- The City will continue to provide death benefits and life insurance as previously outlined in the most recently expired collective bargaining agreements. The life insurance benefits will be contained in city policy.

*Retirement* -- The multiplier has been reduced to 1.5 and the escalator eliminated. The expected implementation date for these changes is November 2012.

*Supplemental Unemployment Benefit* -- The City will no longer provide the supplemental unemployment benefit to employees who become eligible for the benefits after July 17, 2012. Employees currently receiving this benefit will receive their last payment on August 10 or August 17, 2012, depending on their pay cycle.

*Overtime* -- All changes reflected in the overtime provision of the CET, including the reduction of overtime to 1 ½ and elimination of daily overtime will be implemented prior to the end of the calendar year for relevant employees. Advance notification of implementation will be provided.

*Unused Sick Leave on Retirement* -- Any sick leave accumulated after July 17, 2012 and remaining unused at retirement will not be paid out.

*Holiday* -- The holiday premium rate is reduced from double time to 1 ½. This change will be implemented November 1, 2012.

*Funeral Leave* -- Effective August 1, 2012, employees may take up to two days off, with pay, for funeral leave for immediate family members. Up to an additional three (3) days may be taken and charged to an employee's sick leave bank.

*Clothing & Uniform Allowance* -- Where applicable, clothing and uniform allowances will now be paid every two (2) years, instead of every year. Eligible employees will receive such allowance this fiscal year.

3

*Tuition Refund* – The Tuition Refund program is eliminated effective July 17, 2012. Employees taking eligible classes and receiving tuition refunds as of the effective date will receive refunds for that semester only.

*Longevity* – Effective October 1, 2012 there will be no annual longevity payment and no proration upon separation of employment.

*125k Plan* – The City will be implementing a 125K Flexible Spending Account Plan. Employees will receive prior notification of the implementation date and details regarding participation.

*Out-of-Class Pay* – Employees working out of classification will receive out-of-class payment after 30 consecutive days of working out of classification. This practice will become effective September 1, 2012.

*Bonus Vacation Days* – Bonus Vacation Days received this July 1, 2012 will be honored. However, there will be no future receipt of Bonus Vacation Days after July 1, 2012.

*Sick Time Inclusion in Final Average Compensation* – The inclusion of sick time in an employee's Final Average Compensation will be discontinued. The expected implementation date is November 15, 2012

4

# 24. SICK LEAVE

A.  All employees who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971, may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

All employees must be on the payroll for the entire month to be credited with sick leave.

B.  Reserve sick leave of five (5) service days shall be granted on July 1 to each employee who was on the payroll the preceding July 1 and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank.

C.  Sick leave may not be granted in anticipation of future service.

D.  Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E.  1.  Employees who have accumulated a total of fifty (50) or more unused sick days on July 1, shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1 |
|---|---|
| 0 | 6 |
| ½ to 1 day | 5 ½ |
| 1 ½ to 2 | 5 |
| 2 ½ or 3 | 4 ½ |
| 3 ½ or 4 | 4 |
| 4 ½ or 5 | 3 ½ |
| 5 ½ or 6 | 3 |
| 6 ½ or 7 | 2 ½ |
| 7 ½ or 8 | 2 |
| 8 ½ or 9 | 1 ½ |
| 9 ½ or 10 | 1 |
| 10 ½ or 11 | ½ |
| 11 ½ or more | 0 |

2.  Employees who have accumulated a total of at least twenty-five (25) but less than fifty (50) or more unused sick days on July 1 shall receive up to three (3) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

39

| Total Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days. To Be Credited on July 1 |
|---|---|
| 0 to 2 days | 3 |
| 2 ½ or 3 | 2½ |
| 3 ½ or 4 | 2 |
| 4 ½ or 5 | 1½ |
| 5 ½ or 6 | 1 |
| More than 6 | 0 |

This section shall otherwise be in accordance with Chapter 13-5-1 of the Municipal Code.

A. <u>Reserve Sick Leave Usage.</u>

1. Reserve sick leave is not available for usage as Departmental Leave Days or to cover short periods of non-chronic illness. Reserve sick leave can only be used for absences which (a) are the result of a period of hospitalization or, (b) cover a period of sickness resulting from a well-documented history of chronic recurring illness.

2. If an employee is denied use of his/her reserve sick leave, the employee shall be notified of the denial as soon as possible after that determination has been made, but prior to the issuance of the affected pay check, whenever possible.

3. If an employee has requested the use of his or her reserve sick leave and his or her Department Director denies such use because it is deemed not to comport with the reserve sick leave usage rules set forth in the preceding paragraph, the denied employee shall be entitled to appeal the matter to the Labor/Management Reserve Sick Leave Review Board (RSLRB). The RSLRB shall consists of a Council 25 Staffrepresentative, the employee's Local Union President, or his or her designee in his or her absence, a representative from the employee's department, and a Labor Relations Division staff member. The Board will consider the appeal of the denied employee and shall have the power to overturn a negative decision of a Department Director. The decision shall be through anonymous voting, with a simple majority deciding the question and with the results being certified as accurate by the initialing by all members of the RSLRB. In the event the board deadlocks "two-to-two" (2-2), the employee's appeal shall be immediately reviewed through the Labor Agreement's Umpire System.

4. The RSLRB shall meet weekly in conjunction with the Appeal and Review Board. The agenda for the RSLRB shall be comprised of the appeals from the previous week.

Employees will have access to Departmental Leave Days in accordance with the Municipal Code and the Manual of Standard Personnel Practices. Permission will not be unreasonably withheld.

H. The above shall be in accordance with Chapter 13, Article 5, Section 2 of the Municipal Code of the City of Detroit except as modified by this article.

I. The City shall provide upon request monthly reports on sick leave usage by department.

40

# 25. LONGEVITY PAY

A. Employees shall qualify for longevity pay as follows:

    1. Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

    2. Employees may qualify for the second step of longevity pay, inclusive of the first step provided they have served as City employees for an accumulated period of eleven (11) years.

    3. Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

    4. Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (2 1) years.

    5. Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

    6. The first step of longevity increment shall be one-hundred and fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three-hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four-hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six-hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven-hundred and fifty dollars ($750).

B. Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1800) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1.

No employee will be denied a full longevity payment on December 1 because of a temporary unpaid absence of twenty (20) continuous days or less extending through the December 1 date in question.

C. Employees who first qualify for longevity pay increments in any month after any December 1 date shall be paid such increment on a pro-rata basis upon attaining such qualification in the amount of a full increment less one-twelfth (1/12) thereof for each calendar month or fraction thereof from the previous December 1 date to date of such qualification.

41

Detroit, Michigan, Code of Ordinances · Part III - CITY CODE · Chapter 13 - CIVIL SERVICE AND PERSONNEL REGULATIONS · ARTICLE VII. - LONGEVITY PAY

## ARTICLE VII. - LONGEVITY PAY

Sec. 13-7-1. - Definitions.
Sec. 13-7-2. - Qualifications of employees; amounts.
Sec. 13-7-3. - List of eligible employees to be furnished finance director annually.
Sec. 13-7-4. - Prorated payments.
Sec. 13-7-5. - Service not required to be consecutive.
Sec. 13-7-6. - Requests for and payment of increments when employee does not qualify.

### Sec. 13-7-1. - Definitions.

For the purposes of this article, the following words and phrases shall have the meanings respectively ascribed to them by this section:

*City employees and officers* shall include all city employees and officers, except contractual part-time employees, elected officers, members of part-time boards and commissions, consultants and, unless otherwise provided by resolution of the following authorities, employees and officers of the public library commission and the recorder's court of the city, except those employees of the traffic court division thereof who are under the classified service of the city.

*Longevity pay* shall mean such pay, within the meaning of this article, is not a part of and shall not become a part of an employee's base pay. It is a reward based on length of service.

*Part-time employees* shall include those who are hired for periods of either less than forty (40) hours per week or less than one year.

*Service* shall be construed to mean payroll time, exclusive of overtime or premium time. It shall include time spent on duty disability pension only for the purpose of computing the years of service for qualifying, and not for the purpose of continuing annual longevity payments. It shall include all time spent on military leave but shall not include absence due to layoff or leaves of absence requiring approval of the civil service commission, nor time served prior to any resignation or discharge. For the purpose of this article, service while under the status of special service or part-time employment may be credited and accumulated only if and when an employee or officer shall have become a permanent employee.

*(Code 1964, § 16-11-1)*

Cross reference— Definitions and rules of construction generally, § 1-1-2.

### Sec. 13-7-2. - Qualifications of employees; amounts.

(a)   All employees and officers may qualify for the first step of longevity pay, provided they have served for an accumulated period of eleven (11) years, and for the second step of longevity pay inclusive of the first step, provided they have served for an accumulated period of sixteen (16) years. All employees and officers, except noncivilian employees of the police and fire departments and members of collective bargaining units, unless included by contract, shall be eligible for the third step of longevity pay inclusive of the first and second steps, effective December 1, 1973, provided they have served for an accumulated period of twenty-one (21) years.

(b)   The first step of longevity increment shall be one hundred fifty dollars ($150.00). The second step of longevity increment, inclusive of the first step, shall be three hundred dollars ($300.00). The third step of longevity increment, inclusive of the first and second step, shall be four hundred and fifty dollars ($450.00).

(c)   Employees who have qualified for longevity pay and have accumulated at least two hundred sixteen (216) days of paid time (two hundred ninety-two (292) calendar days for fire fighters) exclusive of overtime or premium time during the year immediately preceding any December first date or any other date of qualification; except, that for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December first.

(d)     No employee will be denied a full longevity payment on December first because of a temporary unpaid absence of thirty (30) continuous days or less extending through the December first date in question.

*(Code 1964. § 16-11-2)*

## Sec. 13-7-3. - List of eligible employees to be furnished finance director annually.

All department heads and commissions, on November fifteenth of each year, shall furnish the finance director a list of employees who will have become eligible for longevity increment pay on December first of each year. He shall indicate, in the manner prescribed by the finance director the amount of longevity pay due each such employee, and the finance director may then authorize payment as of December first of each year.

*(Code 1964 § 16-11-3)*

## Sec. 13-7-4. - Prorated payments.

(a)     Employees who first qualify for longevity pay increments in any month after any December first date shall be paid such increment on a prorata basis upon attaining such qualification, in the amount of a full increment less one-twelfth thereof for each calendar month or fraction thereof from the previous December first date to the date of such qualification.

(b)     Prorated longevity payments may be made between December first dates to qualified employees and officers who separate or take leave from city service, excluding those who are discharged, those who resign and those who resign with a vested pension. Such prorated longevity increment shall be paid for time served on a full calendar month basis since the date of their last longevity payment; provided, that each month shall contain at least eighteen (18) days of service (twenty-four (24) calendar days for fire fighters).

(c)     In the case of employees who have otherwise qualified for longevity pay, according to the provisions of this article, but who fail to retain status by reason of death, a prorated longevity payment shall be made to their beneficiaries.

*(Code 1964. § 16-11-4)*

## Sec. 13-7-5. - Service not required to be consecutive.

The years of required service, as provided in section 13-7-2, need not be consecutive or uninterrupted. Service, for the purpose of qualifying for longevity pay, may be accumulated in terms of years equivalent to three hundred sixty-five (365) calendar days, according to the best city records available; provided, that during such years of required service, there shall have been accumulated an average of two hundred sixteen (216) days per year of paid time (two hundred ninety-two (292) calendar days for fire fighters), exclusive of overtime and premium time.

*(Code 1964. § 16-11-5)*

## Sec. 13-7-6. - Requests for and payment of increments when employee does not qualify.

When an interpretation of the provisions of this article would, in the opinion of the department head, violate the general intent thereof, a longevity increment may yet be requested by the department head or commission and paid upon the approval of the city council; provided, that the proposed recipient of such increment must comply with the basic definition of the term "service," as indicated in this article, and all other sections of this chapter.

*(Code 1964. § 16-11-6)*

## Re: City of Detroit -- Active Employee Health Benefits Restructuring Meeting (Non-Uniform)

Tue Jul 30 2013 6:59

From : ayoung586@comcast.net
Subject : Re: City of Detroit -- Active Employee Health Benefits Restructuring Meeting (Non-Uniform)
To : Samantha Woo <swoo@JonesDay.com>
Cc : susan glazer <replythehstor@aol.com>, Sharon Jordan <jordan3@dwsd.org>, nycheese <nycheese@netzero.com>

The Board of the Senior Accountants, Analysts, and Appraisers Association, (SAAA) would like to confirm our plans to attend the August 2nd meeting. Please reserve space for the following:
Audrey Bellamy, President, (313) 224-3081
Sharon Jordan, Vice-President II, (313) 964-9557
Loretta Walker, Vice-President I, (313) 457-2624
Thank You,
Audrey Bellamy

From: "Samantha Woo" <swoo@JonesDay.com>
Cc: "Eben Miller" <emiller@JonesDay.com>, "Brian Easley" <beasley@JonesDay.com>, "Heather Lennox" <hlennox@JonesDay.com>, "David G. Heiman" <dgheiman@JonesDay.com>, "David Birnbaum" <dbirnbaum@JonesDay.com>
Sent: Friday, July 26, 2013 6:41:01 PM
Subject: City of Detroit -- Active Employee Health Benefits Restructuring Meeting (Non-Uniform)

We would like to have a meeting with the City of Detroit's non-uniform unions to discuss the restructuring plan for active employee health benefits developed by Emergency Manager Kevyn Orr. We also want to continue our discussions with respect to the Emergency Manager's restructuring plan for retiree health benefits, as they relate to currently active employees. This meeting will be held on Friday, August 2, 2013, at 9:30 a.m. at the Coleman A. Young Municipal Center, 2 Woodward Ave., Detroit, Michigan 48226. The room number will be provided in advance of the meeting.

Due to space limitations, we are requesting that no more than three representatives from each union attend the meeting. Please confirm in writing (including names, contact information, and affiliation) the representatives of your union who will be attending the meeting no later than Tuesday, July 30, 2013. To the extent that any of your representatives will need to be released from work to attend the meeting, please note this in your response and we will coordinate with the City's labor and employee relations department to ensure such employees are excused from work to attend the meeting.

We appreciate the willingness of your union to participate in these discussions and look forward to your input with respect to these important issues.

Regards,
Samantha

Samantha Woo · Associate
77 W. Wacker Dr., Suite 3500, Chicago, IL 60601
Direct: 312.269.4074 · Fax: 312.782.6585 · Email: swoo@jonesday.com

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying and notify sender by reply e-mail, so that our records can be corrected.

# *MEMO*

**To:** Detroit Water and Sewerage Department Employees

**From:** Terri T. Conerway, Manager

**Date:** October 30, 2013

**Subject:** Election Day Excused Time Off Eligibility – Tuesday, November 5, 2013

---

This communication is to update you on the status of DWSD employee eligibility for the upcoming Election Day, Tuesday, November 5, 2013.

**Non-Union Employees**
Employees are eligible for Election Day Excused Time Off

**Employees represented by the following Unions or Associations:**
**Building Trades Council, IUOE Local 324, UWA 488, 504, 531, APCI, AFSCME Local 2920**
Employees are eligible for Excused Time Off

**Employees represented by the following Unions or Associations:**
**AFSCME Local 207, and 2394, ADE, AME, APTE, SAAA, SCATA, UAW 2200, SWSCA, Teamsters**
Employees are not eligible for the Election Day Excused Time Off.

DWSD facilities will be staffed according to operational needs. If you have any questions regarding your work assignment for Election Day, contact your supervisor directly.

The Eastside payment center will be closed.



RETIREMENT SYSTEM
OF THE
CITY OF DETROIT



2 WOODWARD AVE. STE. 908
DETROIT, MICHIGAN 48226
PHONE 313·224·3362
FAX 313·224·3522

July 25, 2012

Honorable Dave Bing, Mayor
City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226

Re:     Purported changes in composition of the Board of Trustees of the
        General Retirement System which should be removed from the CET

Dear Mr. Mayor:

We respectfully request you to withdraw and recommend to the appropriate parties the withdrawal of purported changes to the composition of the Board of Trustees. The purported changes would directly or indirectly provide your office with control of seven seats on the Board of Trustees; in effect, giving complete control of the trust fund and its approximately $2.2 billion dollars to your office, thus to the employer, City of Detroit.

The idea of eliminating a (1) balance (of power) and (2) diversification of influence of the ten member Board of Board of Trustees is a BAD IDEA. We request that you reconsider this bad idea and arrange for the withdrawal of this one purported change of the CET for the following reasons:

1.      It has no basis in the law. It will lead to time consuming litigation and it will not survive court scrutiny. It will harm all parties involved (as set forth below).

2.      A change in the composition of the Board of Trustees is unnecessary. The interests of the City of Detroit are well represented on the Board of Trustees. The record shows that the full Board of Trustees is sensitive to financial problems of the City and has made decisions, while limited by its fiduciary responsibility to the trust fund, its members and beneficiaries with a cooperative attitude regarding the concerns of the employee.

3.      It is seen as a usurpation of the trust fund ("power grab") and will reflect on your office.

4.      It exposes the Retirement System to risk of loss of its qualified plan status under the Internal Revenue Code with disastrous economic harm (because of tax consequences) to the General Retirement System, members, retirees and beneficiaries and the employer City of Detroit.

8325218.1

5.    The idea, upon serious reflection, in light of the foregoing, is against common sense. It ignores the concept of a trust fund.

Attached are copies of our letter to you dated July 18, 2012 and GRS Resolution of July 18, 2012 which indicates our determination to prevent the GRS purported change in the composition of the Board of Trustees.

Please work for the withdrawal of the purported change to the composition of the Board of Trustees of the General Retirement System. You can avoid the litigation regarding these matters. Thank you.

Very truly yours,

Board of Trustees
of the General Retirement System

By _Susan R Glaser_

Enclosures

cc:    City Council (each council person)
      William C. Andrews, Program Management Director
      Sandra Pierce, Chair, Financial Advisory Board
      Jack Martin, Chief Financial Officer

8325218.1



RETIREMENT SYSTEM
OF THE
CITY OF DETROIT

2 WOODWARD AVE. STE. 908
DETROIT, MICHIGAN 48226
PHONE 313*224*3362
FAX 313*224*3522

July 25, 2012

Sandra Pierce, Chair
Financial Advisory Board
c/o Mayor, City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1126
Detroit, Michigan 48226

Re:   Purported changes in composition of the Board of Trustees of the
      General Retirement System which should be removed from the CBT

Dear Ms. Peirce:

We look forward to meeting with you (as well as all applicable parties) if you are interested in doing so.

We urge you to note the various correspondence we have sent to the Mayor, City Council, Program Management Director and Chief Financial Officer regarding our protest to the purported change in the composition of the Board of Trustees of the General Retirement System and the inclusion of the purported change in the CBT.

We urge you to support our position regarding this matter. Thank you.

Very truly yours,

Board of Trustees
of the General Retirement System

By _____
     Thomas Sheehan, Chairman

cc:   Hon. Dave Bing, Mayor
      City Council (each council person)
      William C. Andrews, Program Management Director
      Sandra Pierce, Chair, Financial Advisory Board
      Jack Martin, Chief Financial Officer

8327143.1

GENERAL RETIREMENT SYSTEM
OF THE
CITY OF DETROIT

2 WOODWARD AVE. STE. 908
DETROIT, MICHIGAN 48226
PHONE 313•224•3362
TOLL FREE 800•339•8344
FAX 313•224•3522

July 18, 2012

The Honorable Dave Bing
Mayor, City of Detroit
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 1124
Detroit, Michigan 48226

Dear Mayor Bing,

The Board of Trustees of the General Retirement System of the City of Detroit is totally opposed to the Bing Administration's attempt to change the composition of the Board of Trustees as proposed in the "City Employment Terms for all Non-Uniform Employees" agreement recently issued to the civilian employee unions of the City of Detroit.

Not only is the change unnecessary, its strips away one of the fundamental principles that governs this Board of Trustees – accountability. Currently, there are five active elected employee trustees and one elected retirant trustee who answer *directly* to those whose money they have a fiduciary duty to protect.

In the proposed change, the number of elected trustees would be reduced in half to only three. This shift in the balance of power, to a structure where a political administration would have the majority rule (a total of 7 out of 11 seats) sets up an environment that is not only ripe for undue influence and corruption (as witnessed by experience with a recent administration with pay-to-play, bribery, indictments and favoritism), but flies in the face of the will of the people who created the pension system as an independent trust and is likely a violation of the requirements set forth in Public Act 314.

This Board of Trustees sees nothing wrong with change and has embraced the concept when it has been done for the right reason - to benefit the members, beneficiaries and retirees of the fund. Recent examples of this include the changing our smoothing period from five to seven years (at this Administration's request), as well as the adoption of stringent new and updated governing policies covering ethics, education and travel and due diligence.

However, we can see no real rationale for this proposed change and believe that ultimately it would serve to undermine the entire system. We therefore cannot and will not support it. In fact, we will do everything within our power to fight against it.

We will fight because as trustees we have taken an oath to act in the best interest of the plan, its members and beneficiaries. All of our actions are tied directly back to this oath. And, as can be witnessed by the fact that the General Retirement

July 18, 2012
The Honorable Dave Bing
Page 2


System is 87% funded, we are fulfilling our fiduciary duty, especially during these turbulent financial times when other public pension funds in Michigan and throughout the county are dangerously underfunded.

Further, given the current financial state of the City of Detroit – which is being led by many of those who would be appointed by the Mayor to serve on the Board of Trustees – we cannot fathom how anyone could believe that the system would be better off. We would not be fulfilling our oath if we were to stand by and let the fund be led down the same disastrous financial path as the City.

Sincerely,

Thomas Sheehan

Thomas R. Sheehan
Chairman
General Retirement System of the City of Detroit


cc: Detroit City Council
    City Clerk
    General Retirement System Board of Trustees
    City of Detroit Civilian Unions

*Tuition Refund* – The Tuition Refund program is eliminated effective July 17, 2012. Employees taking eligible classes and receiving tuition refunds as of the effective date will receive refunds for that semester only.

*Longevity* – Effective October 1, 2012 there will be no annual longevity payment and no proration upon separation of employment.

*125k Plan* – The City will be implementing a 125K Flexible Spending Account Plan. Employees will receive prior notification of the implementation date and details regarding participation.

*Out-of-Class Pay* – Employees working out of classification will receive out-of-class payment after 30 consecutive days of working out of classification. This practice will become effective September 1, 2012.

*Bonus Vacation Days* – Bonus Vacation Days received this July 1, 2012 will be honored. However, there will be no future receipt of Bonus Vacation Days after July 1, 2012.

*Sick Time Inclusion in Final Average Compensation* – The inclusion of sick time in an employee's Final Average Compensation will be discontinued. The expected implementation date is November 15, 2012

4

**RE:   COMPOSITION OF THE BOARD OF TRUSTEES/ATTEMPT SOLE
CONTROL OF THE TRUST FUND BY THE MAYOR**

**BY:   TRUSTEE GLASER – SUPPORTED BY TRUSTEE HATTY**

**WHEREAS**, the composition of the Board of Trustees consists of ten (10) trustees, including five elected employees, an elected retiree trustee, a citizen trustee and three ex-officio trustees (Mayor, Treasurer, City Councilperson) which represents a balance of power and checks and balances and distribution of influences but subject to the fiduciary obligation of each trustee; **and**

**WHEREAS**, the Board of Trustees notes that the Mayor seeks to dramatically change the composition of the Board of Trustees to result in virtually complete control of the $2.2 billion trust fund directly or indirectly by the Mayor (by controlling seven seats on the Board of Trustees); **and**

**WHEREAS**, the Board of Trustees notes that the proposed revised composition of the Board of Trustees (giving control to the Mayor) (1) is not consistent with the financial concerns of the City per Stability Agreement dated on or about April 12, 2012, (2) violates a history of the checks and balances within the composition of the Board of Trustees since inception in 1938, (3) exposes the Retirement System to loss of its qualified plan status with serious financial harm to the Retirement System, the members and retirees of the Retirement System, and the employer, City of Detroit; **and**

**WHEREAS**, the Board notes independent harm to the (1) General Retirement System, an entity itself, (2) to the members, retirees and beneficiaries of the System, and (3) the Board of Trustees of the General Retirement System as a separate entity; **and**

**WHEREAS**, the (1) Retirement System having assets in excess of $2.2 billion, (2) the city being in dire need of financial improvement, and (3) the proposal by the Mayor to be able to control the $2.2 billion trust fund leads to questions of the legality and propriety of the Mayor's apparent intentions; **and**

**WHEREAS**, the Board of Trustees is mindful of each trustee's fiduciary obligations to assure the "exclusive benefit rule" under the Internal Revenue Code and applicable trust fund law being followed; **and THEREFORE BE IT**

## Continued:      Composition of the Board

**RESOLVED,** that the General Retirement System and the Board of Trustees of the General Retirement System take legal action with respect to the proposed revised composition of the Board of Trustees to obtain declaratory, injunctive and/or any other relief to protect the members and beneficiaries of the Retirement System, **and be it further**

**RESOLVED,** that Clark Hill PLC and Joseph Turner are appointed as Special Legal Counsel with the assistance of the Retirement System's General Counsel to file an appropriate lawsuit to protect the interests of the Retirement System members and beneficiaries and prevent what appears to be a usurpation of control over the Retirement System's assets in excess of $2.2 billion, **and be it further**

**RESOLVED,** that a copy of this resolution be forward to Joseph Turner at Clark Hill PLC and a copy maintained in the Retirement System records.

**YEAS:**      **Trustees Anthony, Cook, Glaser, Hatty, Jenkins, Riehl and Chairperson Sheehan – 7**

**NAYS:**    None



CITY OF DETROIT
HUMAN RESOURCES DEPARTMENT
LABOR RELATIONS DIVISION

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 33
DETROIT, MICHIGAN 48226
PHONE 313-224-3860
FAX 313-224-0738
WWW.DETROITMI.GOV

*Sent via email and first class mail*

June 20, 2012

Susan Glazer, President
Senior Accountants, Analysts & Appraisers Asso.
65 Cadillac Square, Ste. 2905
Detroit, MI 48226

RE:     Termination of 2008-2012 Collective Bargaining Agreement

Dear President Glazer:

This letter serves as notification that in accordance with our collective bargaining agreement, the City hereby provides ten (10) days written notice of its intent to terminate the collective bargaining agreement as of July 1, 2012.

Please be advised that the City will continue its practice, where required, of disciplining and discharging non-probationary unit employees under a just cause standard notwithstanding the contract termination. The City also agrees to maintain the grievance and arbitration procedures with regards to all discipline and discharge cases. With regard to non-discipline or discharge cases, the City's position, in accordance with Michigan law, is that the termination of the agreement ends the contractual arbitration procedures for any dispute based upon facts arising after the termination date of the agreement, or not involving rights accrued or vested under the agreement. Accordingly, the City will determine its arbitration obligations on a case-by-case basis, and will act in accordance with its rights and obligations under Michigan law. The City of Detroit reserves all rights pursuant to applicable legal authority.

Sincerely,

Lamont Satchel, Esq.
Director, Labor Relations

cc:    Jack Martin
       Kirk Lewis
       Chris Brown
       Patrick Aquart
       Robert Warfield
       Labor Relation Staff



EMERGENCY MANAGER
CITY OF DETROIT

ORDER No. 21

**ORDER APPROVING PENSION FREEZE FOR CITY
EMPLOYEES**

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas,* on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager ("EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to Section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

1

Further, Section 9(2) of PA 436 prohibits, during the pendency of receivership, the Detroit Mayor and City Council from exercising "any powers of those offices except as may be specifically authorized in writing by the [EM] or as otherwise provided by [PA 436] and are subject to any conditions required by the [EM];" and

Pursuant to Section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 12(1)(a) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]nalyze factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition;" and

Section 12(1)(b) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[a]mend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended;" and

Section 12(1)(d) of PA 436 authorizes the EM "notwithstanding any charter provision to the contrary," to "[r]equire and approve or disapprove, or amend or revise, a plan for paying all outstanding obligations of the local government;" and

Section 12(l)(dd) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[e]xercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government" as provided in the Michigan Home Rule City Act, Act 279 of 1909, Michigan Compiled Laws ("M.C.L.") §§ 117.1 to 117.38 (the "Home Rule Act"); and

Section 12(1)(ee) of PA 436 authorizes the EM, "notwithstanding any charter provision to the contrary," to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the [EM] shall be superior to and supersede the power of any of the foregoing officers or entities;" and

Pursuant to Section 12(2) of PA 436, "during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the local government under law, charter, and ordinance shall be suspended and vested in the [EM])."

At the current time, pursuant to Section 12 of PA 436, the Emergency Manager has determined that implementing the following changes to terms and conditions of employment for employees currently participating in the General Retirement System is consistent with the

2

purposes of PA 436 and will enhance the City's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare in addition to rectifying the City's financial emergency.

**It is hereby ordered that:**

1. Effective as of December 31, 2013 (the "Freeze Date"), no employees hired or rehired by the City of Detroit will be eligible to participate in the General Retirement System of the City of Detroit ("GRS"), and the GRS will be closed to all new employees.

2. Effective as of the Freeze Date, benefit accruals for GRS members will be frozen based on the years of credited service and Average Final Compensation as of such Freeze Date.

3. Effective as of the Freeze Date, the City's 1998 Defined Contribution Plan will be closed to all employees hired or rehired by the City of Detroit and no future contributions will be made to or accepted by such plan after the last payroll date that occurs in 2013.

4. Effective as of the Freeze Date, the Annuity Savings Fund is closed to new employees and rehired employees. The Annuity Savings Fund will stop accepting future contributions as soon as administratively practicable after the Freeze Date but no later than the last applicable payroll dates that occur in January 2014.

5. Members who are not vested in a pension under Article II of Chapter 47 of the Detroit Code of Ordinances or in an Employer Contribution Account under Article III of Chapter 47 of the Detroit Code of Ordinances as of the Freeze Date shall not be entitled to such benefits under the GRS.

6. Effective as of the Freeze Date, the pension improvement factor (escalator) is eliminated and no future cost of living adjustments shall be made with respect to any accrued benefits paid or payable to any GRS member.

7. Effective as of January 1, 2014, the City will establish a new qualified defined contribution plan that is intended to meet the requirements of Section 401(a) of the Internal Revenue Code (the "Code") (the "401(a) Plan").

8. Unions representing affected employees either have received or will receive a letter informing them of the substance of this Order.

9. Nothing in this Order shall be interpreted as contrary to Federal law.

10. If any component of this Order is declared illegal, unenforceable, or ineffective by a court of competent jurisdiction, such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

11. This Order is effective immediately upon the date of execution below.

3

12. The EM may modify, amend, rescind, replace, supplement, or otherwise revise this Order at any time.

13. This Order shall be distributed to the Mayor, Mayor-elect, City Council members, City Council members-elect, all department heads, and the State of Michigan Department of Treasury.


Dated: December 3/th, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit


cc:     State of Michigan Department of Treasury
        Dave Bing, Mayor
        Michael Duggan, Mayor-elect
        Members of Detroit City Council
        Members of Detroit City Council-elect

4

# ARTICLE 11.
# RETIREMENT PLANS

### Sec. 11-101. City's Duties.

1.     The City shall provide, by ordinance, for the establishment and maintenance of retirement plan coverage for city employees.

2.     Financial benefits arising on account of service rendered in each fiscal year shall be funded during that year and that funding shall not be used for financing unfunded accrued liabilities.

3.     The accrued financial benefits of active and retired city employees, being contractual obligations of the city, shall in no event be diminished or impaired.

### Sec. 11-102. Continuation of Existing Plans.

The retirement plans of the city existing when this Charter takes effect, including the existing governing bodies for administering those plans, the benefit schedules for those plans and the terms for accruing rights to and receiving benefits under those plans shall, in all respects, continue in existence exactly as before unless changed by this Charter or an ordinance adopted in accordance with this article.

### Sec. 11-103. Principles Applicable in Administering Plans.

Not more than two (2) governing bodies for administering the city's retirement plans may be established, whose membership is set forth in this section, subject to applicable law.

    1.  The Board of Trustees of the General Retirement System shall consist of:

        a. The Mayor;
        b. A City Council member selected by that body;
        c. The City Treasurer;
        d. Five (5) members of the retirement system, to be elected by the members of the retirement system under rules and regulations as may be adopted by the Board; except that not more than one (1) trustee shall be elected from any department;

        e. A citizen of the City who is neither an employee of the city nor eligible to receive benefits under the retirement system, appointed by the Mayor, subject to approval of the Board; and
        f. One (1) retirant, receiving benefits under the retirement system and elected by retired city employees under procedures established by ordinance.

    2.  The Board of Trustees of the police and fire retirement system shall consist of:

        a. The Mayor or in the absence of the Mayor, a designee;
        b. A City Council member selected by that body;
        c. The City Treasurer;
        d. The Chief of Police;
        e. The Fire Commissioner;
        f. Three (3) firefighters who are members of the retirement system elected by the firefighter members under the rules and regulations as may be adopted by the Board. Trustees shall be:
           (1) Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks.

(2) One (1) to be elected by and from members holding a rank above lieutenant (or equivalent);

g. Three (3) police officers who are members of the retirement system elected by police officer members under the rules and regulations as may be adopted by the board. Trustees shall be:

(1) Two (2) to be elected by and from members holding the rank of lieutenant (or equivalent) and lower ranks.

(2) One (1) to be elected by and from members holding a rank above lieutenant (or equivalent); and

h. Two retirants, receiving benefits under the retirement system, who shall be residents of the city, one elected by retired firefighters and one elected by retired police officers under procedures established by ordinance.

Staff services required by a governing body shall be provided as determined by the Finance Director.

---

**COMMENTARY:** *The 1997 Charter allows one (1) retirant on the board of the Police and Firefighters Retirement System. This section has been revised to allow for two (2) retirants board members, one selected by retired police officers and the other by retired firefighters.*

*The section has been further revised to clarify that membership on the retirement boards is subject state law.*

---

### Sec. 11-104. Information Required Before Benefit Increase.

Before final action on any proposed change in future retirement benefits is taken, the City Council shall obtain a report as to the immediate and long-term costs of the change from an independent actuary of its choosing and may not take final action until at least three (3) months after the report of the actuary is made public at a meeting of the City Council.

### Sec. 11-105. Audits.

The Board of Trustees for the city retirement plans shall contract for annual independent audits.

# ARTICLE 12.
# INITIATIVE and REFERENDUM

## Sec. 12-101. Initiative and Referendum.

The voters of the city reserve the power to enact city ordinances, call the "initiative", and the power to nullify ordinances, enacted by the city, called the "referendum". However, these powers do not extend to the budget or any ordinance for the appropriation of money; the referendum power does not extend to any emergency ordinance.

The initiative and the referendum may be invoked by petition as provided in this chapter.

## Sec. 12-102. Petitions.

Initiative and referendum petitions must be signed by voters of the City, not less in number than three percent (3%) of all votes cast for the office of Mayor at the preceding regular city general election.

Petitions shall set forth in full, the measure to be initiated or referred, as well as a brief statement of its substance. If the measure is submitted to the voters, that brief statement shall appear on the official ballot.

Signers of the petitions shall be voters of the City. Each signer shall sign his or her name indelibly and shall indicate his or her residence and the date of signing. Each petition paper shall contain a sworn affidavit of the circulator stating the number of signers on each petition paper; that each signature is, to the knowledge of the circulator, the genuine signature of the person whose name it purports to be; and that it was affixed in the presence of the circulator.

## Sec. 12-103. Time of Filing.

An initiative petition must be filed with the City Clerk not less than one hundred and forty (140) days before the election at which it is to be voted on.

A referendum petition must be filed with the City Clerk before the ordinance on which the referendum is sought, takes effect or, where the ordinance is given immediate effect, within thirty (30) days after its effective date.

## Sec. 12-104. Filing and Canvass of Petitions.

Petitions to adopt or rescind an ordinance shall be filed with the Office of the City Clerk. The City Clerk shall verify the number of petitions that were filed and transmit petitions to the Department of Elections for a canvass of the petitions. Within ten (10) days of receipt, the Department of Elections shall canvass the signatures thereon to determine their sufficiency and make a report of the result to the City Council. Any signature on an initiative petition obtained more than six (6) months before the filing of the petition with the Office of the City Clerk shall not be counted.

*COMMENTARY: In addition to being renamed, several grammatical changes have been made to this section. Additionally, it has been substantively changed as it now reflects the current practice for the filing and canvassing of petitions needed to adopt (an initiative) or rescind (a referendum) ordinances. This includes the City Clerk verifying the number of petitions filed and forwarding them to the Department of*

*Elections to be canvassed. The Department of Elections is required to canvass the signatures within 10 days of receipt and report their results to City Council. The 1997 Charter assigned all of these duties to the City Clerk.*

*Lastly, the title to this section has been revised to better reflect its contents.*

### Sec. 12-105. Insufficient Petitions.

If the Clerk's canvass discloses that the number of signatures on petitions for any initiative or referendum is insufficient, additional petitions may be filed within fifteen (15) days after the Clerk's determination. When this fifteen (15) day period has expired, the Clerk shall again canvass the signatures on the petitions filed to determine their sufficiency and make a report of the result.

### Sec. 12-106. Suspension of Ordinance.

Where a referendum on an ordinance has been invoked under section 12-103, the effect of the ordinance shall be delayed or suspended until the City Clerk has made a final report that the referendum petitions are insufficient or, if the referendum petitions are sufficient, until the voters of the City have expressed their support for the ordinance in the referendum election.

### Sec. 12-107. Time Limit for Enactment or Repeal of Ordinance.

Upon the report of the Department of Elections that the initiative or referendum petitions are sufficient, and filed within the time limits provided by this Charter, the City may within sixty (60) days:

1. In the case of an initiative petition, enact the ordinance, which is proposed by the petition, in accordance with Section 4-115, 4-117, 4-118 of this Charter; or.

2. In the case of referendum petition, repeal the ordinance, which is set out in the petition, in accordance with Section 4-115, 4-117, 4-118 of this Charter.

*COMMENTARY: This section has been renamed to accurately reflect the subjects covered by this section. Additionally, it has been revised to reflect the current procedure for enacting or repealing ordinances pursuant to initiative or referendum, respectively. The Department of Elections and not the City Clerk as stated in the 1997 Charter, currently reports to City Council on the sufficiency of initiative and referendum petitions and their timely filing. This section has been amended accordingly. Also, the timeline within which City Council is required to enact or repeal the ordinance that is the subject of the initiative or referendum has been increased from thirty (30) to sixty (60) days. Thirty (30) days has proven to be a difficult time frame within which to enact or repeal an ordinance as a result of City Council's adoption of a Committee structure for handling its business. The committee structure was not in existence at the time of the original adoption of this section. Rather the City Council disposed of its business under a Committee of the Whole structure, which was amenable to the thirty (30) day time frame. With the evolution of city government, the thirty (30) day period for enacting or repealing ordinance under this section has become unworkable. A sixty (60) day time period is both practical and non-prejudicial, in light of the current practice.*

*Language has also been added to clarify that sections 4-115 (Ordinance Procedure), 4-117 (Procedure for Approval or Veto by Mayor and City Council's Override of Veto) and 4-118 (Publication of Ordinances and Effective Date) apply to enactment or repeal of ordinances under 12-107, which is the present practice. Lastly, the language requiring the measure to be submitted to voters where the City fails to enact*

13-53846-tjt   Doc 11242   Filed 06/08/16   Entered 06/08/16 10:12:34   Page 30 of 36

*or repeal the measure sought in the initiative or referendum petition has been retained but moved to section 12-108.*

*Lastly, the title to this section has been revised to better reflect its contents.*

### Sec. 12-108. Submission to Election Commission and Voters.

If the City fails to enact or repeal the ordinance in accordance with Section 12-107 of this Charter, the City Council shall forward the proposed initiative or referendum petition to the Election Commission. The Election Commission shall make a determination as to whether the question can lawfully be placed on the ballot and report their conclusions to the City Council. If there is no legal impediment to placing the measure on the ballot, the Election Commission shall place the question on the ballot and submit the measure to the voters in accordance with the applicable requirements of Michigan Election Law, MCL 168.1, et seq.

If a measure must be submitted to the voters, it shall be submitted:

1. In the case of an initiative or referendum, at the next election in the city, or, in the discretion of the City Council, at a special election, subject to applicable provisions of the Michigan Election Law, MCL 168.1, et seq.

Except as otherwise required by law, the result of any initiative or referendum election shall be determined by a majority of the voters voting on the question.

*COMMENTARY: This section has been revised to add language removed from section 12-107 regarding submission of measures to voters when the City fails to adopt or repeal an ordinance pursuant to the initiative and referendum procedure in the Charter, and spells out the procedure for doing so. Although it is the Election Commission's current practice, language has been added that the Election Commission is charged with determining the legality of the measure to be adopted or repealed. This revision recognizes that certain ordinances are required by law and cannot be repealed, while certain other proposed new ordinances may be expressly prohibited by law and thus are incapable of adoption.*

*Language has been added to the duties of the Election Commission requiring that, as a formality, it report its conclusion to the City Council as to the legality of the proposed initiative or referendum question. The reference to seventy (70) days was removed from numbered paragraph two (2) of the 1997 Charter in favor of reference to the Michigan Election Law, which regulates the time frame in which local questions can be placed on the ballot (Michigan Election Law, MCL 681.646a(2)) and paragraph two (2) has been merged with numbered paragraph one (1).*

*Lastly, the title to this section has been revised to better reflect its contents.*

### Sec. 12-109. Amendment, Repeal and Re-Enactment.

An ordinance adopted by the voters through initiative proceedings may not be amended or repealed by the city for a period of twelve (12) months after the date of the election at which it was adopted, and an ordinance nullified by the voters through referendum proceedings may not be re-enacted by the city for a period of twelve (12) months after the election at which it was defeated.

**Sec. 12-110. Submission by Council.**

The City Council may, on its own motion, submit any proposed ordinance or any proposal for the repeal or amendment of any ordinance to the voters in the manner and with the effect provided in this chapter for submission of proposals initiated by petition.

**Sec. 12-111. Similar or Conflicting Measures.**

If two (2) or more initiative or referendum measures submitted to the voters of the City shall have conflicting provisions, or attempt to accomplish the same object, and more than one (1) of these measures is approved by the voters, the measure receiving the highest number of affirmative votes shall prevail to the extent of their inconsistency.

**Sec. 12-112. Repeal or Amendment of Ordinance in Effect.**

The voters of the City may invoke the initiative power to repeal or amend an existing ordinance.

# ARTICLE 13
# SCHEDULE

### Sec. 13-101. Effect on Existing City Legislation.

All ordinances and resolutions of the City and all orders, rules and regulations made by any officer or agency of the City which are not inconsistent with this Charter shall remain in effect, until changed by action taken under this Charter.

The Corporation Counsel shall, within six (6) months after the effective date of this Charter, recommend to the City Council such changes as may be necessary to make the provisions of the 1997 Charter which have been continued in force as well as existing ordinances, resolutions, orders, rules, and regulations consistent with this Charter.

---

**COMMENTARY:** *The year stated in this section has been changed from 1974 to 1997.*

---

### Sec. 13-102. Continuation of Public and Private Rights.

All writs, actions, suits, proceedings, civil or criminal liabilities, prosecutions, judgments, sentences, orders, decrees, appeals, causes of action, contracts, claims, demands, titles and rights existing when this Charter takes effect shall continue unaffected except as modified in accordance with this Charter.

### Sec. 13-103. Rights of Officers and Employees.

No provision of this Charter shall affect or impair the rights or privileges of city officers or employees existing when this Charter takes effect with respect to appointment, ranks, grades, tenure of office, promotion, removal, pension and retirement rights, or the civil rights or privileges of city officers or employees.

Any person who, at the time this Charter takes effect, holds a position in city government from which he or she could have been removed only for cause or under the rules of the Civil Service Commission, may not be removed under this Charter unless:

1.      Cause for the removal is established in proceedings before the Civil Service Commission;

2.      The person is transferred to another position in city government and is assured of salary and benefits at least as favorable as would have been earned by service in the position from which transferred until mandatory retirement age is reached; or

3.      A mutually agreeable settlement is made by the City with the person discharging all rights against the City which the person may assert.

### Sec. 13-104. Effective Date.

Except as otherwise provided, this Charter shall become effective on January 1, 2012.

COMMENTARY: The effective date for this revised Charter has been set as January 1, 2012.

### Sec. 13-105. Employees Benefit Plan.

The governing provisions of the City of Detroit employees benefit plan may be changed by ordinance. However, the benefits provided by the City of Detroit employees benefit plan may be amended by resolution of the Detroit City Council.

The governing body of the employees benefit plan shall be the General Retirement System Board of Trustees, except the civilian member.

### Sec. 13-106. Condemnation.

The procedures for the exercise of the City's power of eminent domain existing when this Charter takes effect shall remain in effect until changed by ordinance.

### Sec. 13-107. Fire and Police Pension Committees.

The provisions of the 1974 Charter relating to the Fire Department Pension Committee and the Police Department Pension Committee, existing when this Charter takes effect, shall in all respects continue in existence exactly as before until changed by ordinance.

### Sec. 13-108. Police Fund.

The Police Commissioner's power under the 1974 Charter shall in all respects continue in existence exactly as before until changed by ordinance.

COMMENTARY: This section was revised to include a non-substantive grammatical change.

### Sec. 13-109. Initial Appointments.

Notwithstanding any provision of this Charter, the first appointments after the effective date of this Charter to the vacant positions on any multi-member body may be for varying terms less than the length prescribed by this Charter in order that thereafter not more than the specified number of terms will expire in any year.

The term of a member serving a fixed term of office on any multi-member body when this Charter takes effect shall expire at the end of the fixed term, unless otherwise indicated in this Charter. Appointments to vacancies arising on the multi-member bodies shall then be made in accordance with the provisions in this Charter.

COMMENTARY: This section has been revised to recognize that the term of a member of a multi-member body may expire earlier than the fixed term, where stated in the Charter.

144 | P a g e

### Sec. 13-110. General Provision.

If any question concerning transition from the 1997 Charter to this Charter (for which this Charter has not provided) arises, the City may provide for a resolution of the question by ordinance.

> **COMMENTARY:** *This section seemingly allows for City Council to effectuate and implement this revised Charter by ordinance, where necessary. Accordingly, this section has been revised to reference the 1997 Charter and remove reference to the 1974 Charter.*

### Sec. 13-111. Submission of the Charter.

This Charter shall be submitted for adoption at the general election to be held November 8, 2011, in the manner and with the effect prescribed by state law as follows:

Proposal C - Proposal to Adopt a New City Charter.

Shall the City of Detroit Home Rule Charter proposed by the Detroit Charter Revision Commission be adopted?

> Yes
> No

> **COMMENTARY:** *This section was amended to add the appropriate ballot question and submission date of the revised Charter.*

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

IN RE:

CASE NO: _13-53846_
CHAPTER: _9_

City of Detroit
Debtor.

## CERTIFICATE OF SERVICE

I hereby certify that on _June 8, 2016_ (date of mailing) served copies as follows:

1. Document(s) served:

   Objection to the ~~Thirty-Second~~ Forty-Fourth Omnibus Objection

2. Served upon [name and address of each person served]:

   Marc N Swanson
   Miller, Canfield, Paddock and Stone, PLC
   150 West First Street, Suite 2500
   Detroit, MI 48226

3. By First Class Mail.

Dated: _6/8/16_

(Signature)

Print Name: _Gary M. Cannon_