June 21, 2016

863 Venoy
Madison Heights, MI 48071

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT
2016 JUN 21 P 2: 59
FILED

Clerk of the Court
United States Bankruptcy Court
211 W. Fort St., Ste. 2100
Detroit, MI 48226

Re: bankruptcy case #13-53846
Honorable Thomas J. Tucker
Additional documents supporting Claimants response to Debtor's 44th Omnibus Objection
to Certain Claims

Dear Court:

Attached are additional materials supporting my claims, which I attempted to present at the hearing on June 15. Perhaps the court will accept them at the clerk's office. For clarity I again present my letter to the court dated June 6, 2016 which these documents support. My basis for my claim stated "non negotiated reduction …". I believe that this is a valid argument because the emergency manager law ("emergency dictator law") will be appealed in court in August 2016 by the Sugar Law Center. With the disaster in Flint the lawsuit's chances of success should be greater. The $920 million* shorted to the City of Detroit by the State of Michigan has played a large role in the City's poor financial situation. If the State's actions weren't illegal they should have been.

Thank you for your attention.

Sincerely,

*Jim Capizzo*

James Capizzo

* My original letter stated $820 million but the attached documents put it at $920 million

June 6, 2016

863 Venoy
Madison Heights, MI 48071

Clerk of the Court
United States Bankruptcy Court
211 W. Fort St., Ste. 2100
Detroit, MI 48226

*Case no 13-53846*

*Claimant's Response to Debtor's*

*44th Omnibus Objection to*

*Certain Claims*

Dear Court:

I continue my claim since nothing has been decided regarding the union's case against the city (non negotiated reduction in wages). The Detroit bankruptcy ruling the reduction of pensions is also being appealed in federal court in Cincinnati, Ohio.

My claim is for $13,482.36 and a full pension (that is a pension without the 4.5% reduction and having a cost of living adjustment). It might be noted that the State of Michigan owes the City of Detroit at least $820 million ($220 million that Dennis Archer negotiated in return for a lower city income tax and $600 million in reduced revenue sharing from the state to cities) and the unions offered the Bing administration concessions that would have put Detroit in the black in 2012 but Rick Snyder had Bing refuse the union's offer (!!). Plus the fact that Rick Snyder violated the State Constitution to protect public employee pensions by throwing the city into federal bankruptcy court.

Enclosed is a copy of my claim, which includes a basis for the claim. Also enclosed is a copy of the first page of what I received recently which has prompted this letter.

Thank you for your attention.

Sincerely,

*James Capizzo*

James Capizzo

FILED (1)
2016 JUN -7 P 2: 30
U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT | EASTERN DISTRICT of MICHIGAN | CHAPTER 9 PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: City of Detroit, Michigan | Case Number: 13-53846 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

*James F. Capizzo*

Name and address where notices should be sent:

*Jim Capizzo*
*863 Venoy*
*Madison Heights, MI 48071*
Telephone number: *248-303-9852* email:

Name and address where payment should be sent (if different from above):

Telephone number:         email:

**COURT USE ONLY**

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ ~~6972.00~~ *+ full pension*
*13,482.36*

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** *Non negotiated reduction in wages, election holidays, paid lunch,*
(See instruction #2) *swing holidays, and longevity; member of SAAA union*

**3. Last four digits of any number by which creditor identifies debtor:** _____ | **3a. Debtor may have scheduled account as:** _____ (See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach redacted documents, and provide the requested information.

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $_____

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Basis for perfection: _____

Value of Property: $_____

Amount of Secured Claim: $_____

Annual Interest Rate (when case was filed)_____% ☐ Fixed or ☐ Variable

Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).** | $_____

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____ | $_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**8. Signature: (See instruction # 8)**
Check the appropriate box.

☒ I am the creditor. ☐ I am the creditor's authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.) ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: *James F. Capizzo*
Title: *Senior Data Processing Programmer Analyst*
Company: *City of Detroit*     (Signature) *James Capizzo*     (Date) *2/20/14*
Address and telephone number (if different from notice address above):

_____

Telephone number:         email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

*248-303-9852*

Sign Up

Email or Pho

☐ Keep me

I read

# PRESS RELEASE: City Of Detroit Can Collect $800 Million Owed By Businesses

February 26, 2013 at 12:08pm



**PRESS RELEASE**

**Committee to Elect Krystal A. Crittendon**

**February 25, 2013**

**FOR IMMEDIATE RELEASE**
**CONTACT: Phillip Brown, 313 717 5077**

**Statement of Krystal Crittendon Regarding Financial Advisory Board Report**
**City can collect $800 million owed by businesses, says Crittendon**

Detroit Mayoral Candidate Krystal Crittendon released this statement today in response to the Governor-appointed Financial Advisory Board's release of findings after its 30-day review:

"The Financial Advisory Board's findings in their report concerning the City of Detroit's financial status should come as no surprise to anyone. The bottom line: the Report provides no justification for the appointment of an emergency financial manager, especially when it makes no mention of $800 million in accounts receivable owed to the City as confirmed by State Treasurer Andy Dillon.

"The FAB had already found the City to be in severe financial distress in 2012. The specific findings contained in the report regarding whether the City was in 'severe financial distress,' whether the City 'had a plan in place to address the financial distress,' and whether the City had a likelihood of fixing its financial problems, are findings which are required to be made and contained in a financial report to the Governor by a FAB empaneled under PA 72. No one reading the report should be shocked that these findings are included.

"The FAB criticizes the City's Charter as containing 'restrictions and structural details that make it extremely difficult for City officials to restructure the City's operations in any meaningful manner.' It must be noted that the City's Charter was required to be, and was, actually, approved by the State of Michigan before it was placed on the ballot to be voted on by Detroit voters. It is unclear as to whether this state-appointed advisory board is aware that the State signed off on the Charter before it was adopted by the residents of Detroit.

"The report also criticizes the fact that the 36th District Court has allegedly failed to collect




# Michigan's $6.2B 'raid' on revenue sharing? See how much local communities have lost since 2003

**Jonathan Oosting | joosting@mlive.com By Jonathan Oosting | joosting@mlive.com**
**Follow on Twitter**
on March 18, 2014 at 1:34 PM, updated March 18, 2014 at 4:31 PM

LANSING, MI -- Michigan communities have missed out on some $6.2 billion in statutory revenue sharing payments over the past decade as lawmakers and governors diverted funds to fill holes in the state budget, according to a new report from the Michigan Municipal League highlighting losses by community.

Detroit, the state's largest city, lost out on $732 million in revenue sharing between 2003 and 2013, according to the report. Twenty two other cities -- from Grand Rapids to Wyandotte -- saw the state divert at least $10 million in sales tax revenue



Downtown Detroit

Jonathan Oosting | MLive.com

that local leaders believe they should have been entitled to.

That's money that would have helped local governments provide essential services -- including police and fire, water systems, road maintenance, parks, libraries -- and may have allowed some of them to avoid financial emergencies requiring state intervention.

"It is sad. It is wrong," Utica Mayor Jacqueline Noonan said Tuesday at a media roundtable. "The institutional memory in the state (Legislature) is non-existent. They don't care what happens to local governments. I'm furious."

The Michigan Constitution requires requires a portion of the state sales tax be distributed to local communities. Lawmakers cannot revise that formula.

However, local leaders say the state has not honored a statutory provision (see: law) that requires it to appropriate additional sales tax dollars to communities based on a standard formula. Over the course of the past decade, those "raids" have added up.

"You can look at pretty much any Michigan community and see where they might be today if the statutory revenue sharing had been fully funded," Samantha Harkins of the Municipal League said in a statement.

"For example, look at Flint, which is now under an emergency manager. Flint will have lost $54.9 million dollars by the end of 2014. The deficit in its 2012 financial statements is $19.2 million. Flint could eliminate the deficit and pay off all $30 million of bonded indebtedness and still have over $5 million in surplus. In Detroit, a city facing the largest municipal bankruptcy in history, the state took over $700 million to balance the state's books."

Michigan Gov. Rick Snyder, who pushed to replace the traditional statutory revenue sharing with the Economic Vitality Incentive Program, has proposed increasing funding by 15 percent next year. Lawmakers are considering various changes to the program.

Snyder's proposed 2015 year funding is a good start, according to the Municipal League, but it won't undo years of reductions. See what those cuts have meant for some of the state's largest cities using the database below. Leave the drop down on "all cities" to see the full list.

*Jonathan Oosting is a Capitol reporter for MLive Media Group. **Email him**, find him on **Google+** or follow him on **Twitter**.*

© 2015 MLive.com. All rights reserved.


 **(/)**


**Give Now (https://www.callswithoutwalls.com/pledgecart/?projectId=137&clear)**

◯　　The Diane Rehm Show　LOADING...

# How did we get here? A look back at Michigan's emergency manager law

By JOSH HAKALA (/PEOPLE/JOSH-HAKALA) • FEB 3, 2016

**Twitter (http://twitter.com/intent/tweet?url=http%3A%2F%2Fwww.i.mp%2F1nHUkdO&text=How%20did%20we%20get%20here%3F%20**

Support for Michigan Radio comes from





(http://mediad.publicbroadcasting.net
/p/michigan/files/styles/x_large/public/201310
/earleyambrose101813_004.JPG)

CREDIT STEVE CARMODY/MICHIGAN RADIO

Station promotion



Support for Michigan Radio comes from



The state of Michigan's emergency manager law has received considerable criticism in the wake of the Flint water crisis. The concept of the state moving in to take power away from local officials to fix a financial crisis is not new. In fact, Public Act 72 (https://www.michigan.gov/documents/treasury/FiscalEmerg_271926_7.pdf), known as the Local Government Fiscal Responsibility Act, was passed in 1990.

But how did we get from the Local Government Fiscal Responsibility Act, passed when Democratic Gov. James Blanchard was in office, to the latest edition of the Gov. Rick Snyder emergency manager law?

Michigan State University economist Eric Scorsone, who is the founding director of the MSU Extension Center for Local Government Finance and Policy, joined *Stateside* to take a look back at Michigan's history of the emergency manager law.

According to Scorsone, the origin of this law comes from the legal precedent that local government is a branch of Michigan's state government. So, in a way, an emergency manager is just acting to solve a problem area within the state government.

According to Scorsone, Public Act 72 was rarely used in the approximately 20 years it was in effect through the administrations of Gov. John Engler and Gov. Jennifer Granholm. When Snyder took office, one of the first bills that he signed in 2011 was Public Act 4, which Scorsone says was a "beefed-up" emergency manager law.

Michigan voters rejected that law by referendum in 2012, only to see a new bill passed, PA 436 (http://michiganradio.org/post/michigans-governor-signs-revised-emergency-manager-law#stream/0), a month later. The new version made some changes to the original version (http://michiganradio.org/post/comparing-new-emergency-manager-law-one-repealed-voters#stream/0), including requiring the state to pay the salary of the EM, rather than the cash-strapped local government they were appointed to rescue, and giving the local government the power to vote out the EM after 18 months. The most controversial change made to PA 436 was that it stipulated that the public could not repeal it.

Another feature that was added to the current bill is that local governments are now given four choices of how they want to proceed once the governor has declared them an "emergency" situation. The communities can choose between a consent agreement, which keeps local officials in charge but with constraints, neutral evaluation which is like a pre-bankruptcy process, filing for bankruptcy directly, and having an emergency manager appointed.

"The thought behind it is 'we need some policy, we had a lot of financial distress,' and so the idea was to give these communities a choice of which of the options they wanted to use," said Scorsone. "That maybe was felt to be different than the Public Act 4 that was rejected. I can understand the critique of that."

However, while the local governments are given the power to choose, Scorsone says it's a not a true choice.

"The choice is a little constrained, to be truthful about it," said Scorsone. "If you really carefully read PA 436, what you actually find is that a local government can choose consent agreement, for example, but actually the state treasurer has to agree that that is the right approach. If they don't agree, they can force them to go back to one of the other options. So it is a choice, but perhaps a bit of a constrained choice."

The liability of the emergency managers and the decisions they make will be a major issue as the Flint water crisis continues to be investigated. How responsible can they be held for making the wrong calls and what happens when a lawsuit is brought forth?

"The law is pretty clear that the emergency manager is acting in a way that does provide some governmental immunity," said Scorsone. "The emergency manager, if there's a claim against them, has to be defended by the Attorney General. That was fairly new to these new emergency manager laws. The city actually has to pay the legal bills of what the Attorney General incurs and it's certainly true that there is a degree of immunity provided to that emergency manager, and I suppose the rationale would be that they want some kind of protection because they are making these difficult decisions. But I think this issue is going to be tested in the Flint case to see how that really plays out."

There has been plenty of media coverage of Michigan's emergency manager law, but out of everything he has seen, Scorsone was asked what he feels are the biggest flaws of the EM system.

"The theory is that the state can do it better," said Scorsone. "The state can take over the local government and run it better and provide the expertise, and that clearly didn't work in the Flint case. The situation is epically wrong, perhaps, but this is clearly a case of where we have to ask the question why did it go wrong, and I think it's a complex answer, but one of the things that needs to be done ... we need a better relationship between state and local government."

Listen to the full interview to hear more about the process and whether Scorsone believes the EM law should be repealed or if it just needs to be reevaluated.

Listen
13:40

*Listen to an interview with Michigan State University economist Eric Scorsone.*

RELATED PROGRAM:   STATESIDE (/PROGRAMS/STATESIDE)

TAGS:   EMERGENCY MANAGER (/TERM/EMERGENCY-MANAGER)    ERIC SCORSONE (/TERM/ERIC-SCORSONE)

FLINT WATER CRISIS (/TERM/FLINT-WATER-CRISIS)    DPS (/TERM/DPS)

EMERGENCY MANAGER LAW (/TERM/EMERGENCY-MANAGER-LAW)

## Related Content

(/post/next-steps-flints-transition-back-local-control)
(/post/next-steps-flints-transition-back-local-control)          4 months ago
(/post/next-steps-flints-transition-back-local-control)



**Progressive News and Commentary**

Contact Us (tips, comments, etc.)    Comment Policy    Privacy policy    Email notification subscribe/unsubscribe

Flint Water Crisis  |  Emergency Managers  |  EAA  |  Detroit  |  Interviews  |  #TransStories  |

Emergency Manager Law, Emergency Managers — November 20, 2014

# Constitutionality of Michigan's anti-democratic Emergency Manager law headed to federal court

by Eclectablog

Like ⟨ 151 ⟩    Tweet    G+1 ⟨ 1 ⟩    22



*The indispensable M. The essential Michiga*

*Great blog* -Diane R:

*An indispensable blog on the Michig*
-Jonathan Mahler, New

Search ....

**Help support n blogging at Ecl**

**With YOUR suppor contributors at Ecl their work. If you v check to avoid fee it to: Chris Savage 48130. Otherwise, Paypal form:**



Act No. 436
Public Acts of 2012
Approved by the Governor
December 26, 2012
Filed with the Secretary of State
December 27, 2012
EFFECTIVE DATE: March 28, 2013

**ENROLLED SENATE BILL No. 865**

Introduced by Senator

STATE OF MICHIGAN

96TH LEGISLATURE

REGULAR SESSION OF 2012

Federal District Court Judge George Caram Steeh has found that a lawsuit challenging Michigan's

anti-democratic Emergency Manager law, Public Act 436, can move forward based on its disparate

impact on African Americans in Michigan.

The suit alleges that PA 436 is unconstitutional based on nine specific causes:

1. Denial of "substantive due process" by violating the right to vote of Michigan citizens living

in municipalities controlled by Emergency Managers

2. Violation of the Guarantee Clause which guarantees " to every State in this Union a

Republican Form of Government"



**Flint Wate**

Basic supporter - ;

**Other Amount:**

**Want to make a re**

**donation?** Enter th

pay each month

$

*Sign up for*

Michigan Goverr
known about th
drinking water v
time, ZERO le
been removed t
his administratior

LOLGOP on Tw

3. Violation of the Equal Protection Clause by the denial of the "fundamental right to vote [which] has been denied, abridged, and/or diluted by PA 436 because governing authority is stripped from local elected officials and transferred to one unelected EM with no accountability to local citizens"

4. Violation of the Equal Protection Clause by discrimination based on race

5. Violation of the Equal Protection Clause by discrimination based on wealth

6. Violation of the Voting Rights Act

7. Violation of the First Amendment by:

   1. Viewpoint discrimination which violates the First Amendment when it regulates speech based on substantive content

   2. Denial of Freedom of Speech

   3. Denial of the right to petition the government

8. Violation of the Thirteenth Amendment prohibiting slavery

9. Discrimination against localities with Emergency Manager appointed under previous laws

Every one of these was found to be invalid except for #4, the violation of the Equal Protection Clause by discrimination based on race.

Judge Steeh's commentary on this is lengthy but well worth a read (full decision is **HERE**):

### *Discrimination Based on Race (Count 4)*

*Plaintiffs assert that the disproportionate impact the appointment of emergency managers has had on African Americans establishes an equal protection claim. By plaintiffs' calculations, over 52% of Michigan's African Americans are under emergency manager*

authority pursuant to the enactment of PA 436, compared to two percent of Michigan's Caucasian citizens. Plaintiffs argue that as applied, PA 436 invidiously discriminates between similarly situated groups in the exercise of their fundamental rights, and should thus be subject to strict scrutiny. Defendants, on the other hand, argue that rational basis is the appropriate standard because the law is facially neutral, and plaintiffs have not alleged facts raising a plausible inference of discriminatory intent. They also argue that PA 436 and its application pass rational basis scrutiny, so plaintiffs have failed to state an equal protection claim for racial discrimination.

The Constitution's equal protection requirement does not invalidate a facially-neutral law "simply because it may affect a greater proportion of one race than of another." Washington v. Davis, 426 U.S. 229, 242 (1976). Disparate impact "is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977). However, a facially neutral law with a legitimate purpose can still violate the Equal Protection Clause if that law "had a discriminatory effect . . . and was motivated by discriminatory purpose." Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 533-34 (6th Cir. 2002) (citing Wayte v. United States, 470 U.S. 598, 608 (1985)).

Invidious discriminatory intent is an impermissible justification for state action, which triggers strict scrutiny. See Arlington Heights, 429 U.S. at 265-66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [judicial] deference is no longer justified."); Yick Wo, 118 U.S. at 373 ("Though the law itself be fair on its face . . . if it is applied and administered by public authority . . . so as practically to make

## Tweets by @LOL



**LOLGOP**
**@LOLGOP**

Terribly unpopular thing than

1. Scabies
2. Immortal yeast infec
3. Trump last week

nationalmemo.com/tru



**LOLGOP**
**@LOLGOP**

Sad. But Trump's Musl hotel in Branson. twitte

LOLGOP Retweete

**Amy Hunter**
**@amy10506**

If you are queer or tran yourself an ally, read th villagevoice.com/news/

Embed

## Subscribe to e

6/15/2016 10:33 AM

unjust and illegal discriminations between persons in similar circumstances . . . the denial of equal justice is still within the prohibition of the Constitution."). A plaintiff need not demonstrate racial discrimination was dominant in the reasoning for state action to trigger strict scrutiny, but only that it was a motivating factor. *United States v. City of Birmingham, 727 F.2d 560, 565 (1984).*

Since it is inherently difficult to prove discriminatory intent, as legislators rarely admit to it, claimants may use a number of objective factors to determine the existence of such intent. *Id.* (citing *Arlington Heights, 429 U.S. at 266-68).* For example, proof of discriminatory impact may demonstrate unconstitutionality in "circumstances [in which] the discrimination is very difficult to explain on nonracial grounds." *Batson v. Kentucky, 476 U.S. 79, 93 (1986).* The legislative or factual history may also be relevant, as well as any procedural or substantive departures from the state's usual course of action. *Arlington Heights, 429 U.S. at 266-68.* Additionally, and most important to this case, claimants may also use statistics to demonstrate the absence of a rational, nonracial purpose for a certain policy. *Farm Labor Org. Comm., 308 F.3d at 534* (citations omitted).

At the motion to dismiss stage, plaintiffs need only state a plausible claim for relief. *Iqbal, 556 U.S. at 678.* Since statistical evidence can be used to demonstrate unconstitutional discriminatory action, plaintiffs at this stage must plead some facts that demonstrate the plausibility that emergency managers have been appointed in an intentionally discriminatory manner. The First Amended Complaint states that 52% of Michigan's African American population resides in cities with an EM, a consent agreement, or a transition advisory board. At the same time, only about 2% of Michigan's white citizens live in

Subscribe to or uns
notifications when
Your email:

Enter email addre:



## Subscribe to a

Click **HERE** to rece
around 5 p.m. ET v
Eclectablog posts

Follow @Eclectat

Eclectablog v
Washington Pos
**progressive polit**







**Blog Authors**

communities governed by an EM. PA 436 has been applied to multiple municipalities of different sizes and jurisdictions, and almost all of them are predominantly black.

Additionally, the Michigan Department of Treasury maintains a scoring system to determine the financial health of the state's cities and townships. The latest information available from the state is for fiscal year 2009. Fiscal indicator scores between 5 and 7 place a municipality on a fiscal watch list, while scores between 8 and 10 result in the community receiving consideration for review. However, six out of seven communities (85%) with a majority population of racial and ethnic minorities received EMs when they had scores of 7. At the same time, none of the twelve communities (0%) with a majority white population received an EM despite having scores of 7 or higher. Defendants argue that these statistics are old and of no application to PA 436, but the history of state intervention makes it reasonable to assume that similar statistics are available in discovery to support plaintiffs' claims regarding the pattern of decision making.

There are twelve factors that may be considered by state authorities in assessing whether a local government is eligible for appointment of an EM, yet only one factor is necessary to serve as the basis for state intervention. This confers enormous discretion to state decision makers and creates a significant potential for discriminatory decisions. This court is satisfied that at this juncture plaintiffs have pleaded a plausible equal protection claim based on the racial impact of PA 436's implementation. Defendants' motion to dismiss Count 4 is denied.

Basically what Judge Steeh is saying here is that the Governor Snyder and those involved in making decisions about which communities will be put under Emergency Management use 12

factors outlined in PA 436 in making their decision. Because of this, they have an enormous amount of discretion. Because a municipalities' financial situation is based on a score, we have an objective measure by which we can determine if they abused that discretion. And, indeed, they seem to have abused it. As Judge Steehs points out, 85% of the communities with scores of 7 or higher and a majority population of racial and ethnic minorities were put under an Emergency Manager while NONE of those with a score of 7 or higher and with a majority white population was.

I have mixed feelings about the fact that I was the **first to report the disparate impact of Public Act 4 on African Americans in Michigan** in December of 2011. While I'm proud of having crunched the numbers (with a BIG hat tip to Marcy Wheeler for putting me onto that path), I am ashamed of my state government for what they have done.

This is going to be interesting to watch. The attorneys for the plaintiffs are the Sugar Law Center and AFSCME and they plan to appeal the eight dismissed counts.

I wish them well in their fight. Other states are now looking into using Emergency Managers to take over struggling communities. The most recent is New Jersey where Republican Governor Chris Christie, who was apparently **making fact-finding missions to Michigan** last year to set the stage for putting Atlantic City under an Emergency Manager with **"extraordinary supervisory powers"**. So what happens here could impact how widespread this becomes nationally.

**Tags** AFSCME    Emergency Manager Law    Emergency Managers    PA436    Sugar Law Center

"FALSE" - *Politifac:*
**Buy LOLGOP's boc**



Arr
Am
wri
cor
stra

alswrite.com or or

To
Tor
of t
pro
Pet

He is the author of
been part of the pi
landscape for 20+
Twitter @tonytrup

Ani
Ani
pro
pht
cor

**Author: Eclectablog**

**Chris Savage is the owner and publisher of Eclectablog,** your one-stop shop for progressive state & national political news & commentary.

## Homeowners Who Haven't Missed A Payment in 3 Yrs - Read This

Banks Outraged by Federal Home Payoff Stimulus Package...

Learn More

Sponsored by Comparisons.org

Em
Em
str
Em
LLC

@DC_Emma.

Ju
Juc
act
soc
ma

Bra
Chi
("Bi
Ecl
pro
occasional contrib

Jol
Jol
the
blo
He

# A $220M Question: Why doesn't Detroit sue for the revenue sharing money it says it's owed?



**By Jeff T. Wattrick | jwattric@mlive.com**
**Follow on Twitter**
on March 21, 2012 at 6:50 AM

Some Detroit politicians, including **Mayor Dave Bing** and City Councilwoman **Joann Watson**, have argued the state owes the city $220 million in unpaid revenue sharing money. They also argue that money would go a long way toward righting the city's fiscal ship.

Whether or not, the money is actually owed is a tricky question.

Back in 1997, then-Governor John Engler and then-Mayor Dennis Archer struck a deal to ensure Detroit received guaranteed fixed revenue sharing payments. In exchange, the city agreed to gradually lower its income tax from 3% to 2% over ten years.

Halfway through the decade-long tax cut plan, **Detroit stopped its incremental tax rate reductions** in 2004. **Then-Governor Jennifer Granholm cut revenue sharing payments across the board** to balance the state budget the year before, including the promised payment to Detroit.

In the end, Detroit residents were left with a 2.5% income tax rate and lower-than-anticipated annual revenue sharing payments.

However, does any of that mean the state still owes Detroit revenue sharing money from years past?

That depends who you ask. In situations where two parties disagree on the terms of an agreement, there is a place where such disputes can be remedied: a court of law. If the city officials really believe Detroit is owed \$220 million, why not sue the state?

Lawyer/Fox 2 legal analyst/WYXT morning host **Charlie Langton** is wondering the same thing.

"I've said they should at least explore it," said Langton. "Now there are some—I could argue both sides of this—but I think you've got to call into question the fact that there is a possibility of a lawsuit, but there doesn't appear to me anyone is going to take up the charge."

The Bing Administration did not respond to requests to inquiries about what, if any, legal remedies it is pursuing to obtain those dollars.

One reason the city may be avoiding legal action is politics. Arguably, a lawsuit against the state might poison the well as Bing and Snyder work toward (haggle over?) some kind of mutual arrangement to solve Detroit's fiscal woes.

It's also possible, Langton says, that Detroit waited too long to sue for this pot of money.

"A problem may very well be the statute of limitations issue," he said. "I mean this was from Engler...this was in 1997. That was last century. However, I would then argue this was an agreement that continued year after year after year, so therefore you don't go back to the agreement in '97, you say you can now sue because of the damage today."

So, does the state of Michigan owe the city of Detroit \$220 million? Absent a court case, it may be a question without an answer.

Registration on or use of this site constitutes acceptance of our User Agreement and Privacy Policy

13-53846-tjt    Doc 11303    Filed 06/21/16    Entered 06/21/16 15:17:08    Page 20 of 22

© 2016 MLive Media Group. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of MLive Media Group.

**Community Rules** apply to all content you upload or otherwise submit to this site. **Contact interactivity management.**

▷ **Ad Choices**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

IN RE: City of Detroit

CASE NO: 13-53846
CHAPTER: 9

_____ Debtor. _____ /

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2016 (date of mailing), I served

copies as follows:

1. Document(s) served:

Supplemental exhibits to Claimants Response to Debtor's 44th Omnibus Objection to Certain Claims

2. Served upon [name and address of each person served]:

Marc N. Swanson
150 W. Jefferson, Suite 2500
Detroit, MI 48226

3. By First Class Mail.

Dated: 6/21/16

_____
(Signature) Jim Capizzo

Print Name: James Capizzo

FILED
2016 JUN 21 P 2 59
U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT