# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S
## SUPPLEMENTAL BRIEF IN SUPPORT OF ITS OBJECTION TO THE CLAIM OF JAJUAN MOORE

The City of Detroit ("City"), pursuant to this Court's June 16, 2016, Order Regarding the City's Unresolved Objections [Doc. No. 11293], which directed the City to file a supplemental brief regarding the Claim of Juan Moore and this Court's June 29, 2016, Order extending the City's deadline for filing that supplemental brief [Doc. No. 11335], submits its supplemental brief in support of its objection to the claim of JaJuan Moore.

## I. INTRODUCTION

On March 10, 2016, the City filed its Thirty-Sixth Omnibus Objection to Certain Claims, including the claim of City employee JaJuan Moore. [Doc. No. 10811]. Mr. Moore filed a response to the objection. [Doc. No. 11016]. On April 7, 2016, the City filed its *Ex Parte Motion* for an Order (I) Adjourning Hearing on Certain Responses Filed to the City's Thirty-Sixth and Thirty-Seventh Omnibus Objections to Claims, and (II) Assigning Them to Be Heard and Resolved Under

27102175.2\022765-00213

the Established Process for Hearing and Resolving Employee Obligation Claims [Doc. No. 11050] ("Process Motion"). Mr. Moore's claim was included in the Process Motion. On April 7, 2016, the Court entered an Order granting the Process Motion, adjourning the hearing on Mr. Moore's claim to June 15, 2016, at 1:30 p.m [Doc. No. 11054] ("Process Order").[1] The Process Order also required the City to serve a supplemental brief on Mr. Moore and other claimants by April 21, 2016. Process Order ¶ 4.

On April 21, 2016, the City filed its Supplemental Brief in Support of Expungement or Disallowance of Claims of "Employee Obligation Claimants" addressing the legal issues common to all claimants [Doc. No. 11050] ("Supplemental Brief"). The substance of the City's arguments with respect to all Employee Obligation Claimants was that these claims involved imposition of the City Employment Terms ("CETs") and other actions lawfully taken by the City while under a consent agreement or in receivership under Acts 4 or 436. Some of these claims also involved allegations against terms in the Plan of Adjustment as opposed to being actual prepetition Class 14 claims.

---

[1] On April 14, 2016, this Court entered its Order Sustaining Debtor's Thirty-Sixth Omnibus Objection to Certain Claims [Doc. No. 11082] ("36th Claims Order"). Paragraph two of the 36th Claims Order provided that the City's objections to claim number 2098 of JaJuan Moore was adjourned for further hearing to be held on June 15, 2016. 36th Claims Order ¶ 2.

27102175.2\022765-00213

On June 15, 2016, the Court conducted the hearing at which Mr. Moore addressed the Court. Mr. Moore's written Response and statements at the hearing indicated that some portion of his claims may fall outside of legal issues that were addressed in the Supplemental Brief. The City requested an opportunity to investigate those portions of Mr. Moore's claim and was initially granted until June 29, 2016, to file a supplemental response.[2] Upon the City's *ex parte* Motion, that deadline was adjourned to July 15, 2015.[3]

## ARGUMENT

## I.   ALLEGATIONS IN JAJUAN MOORE'S CLAIM AND RESPONSE

Mr. Moore's Claim was filed February 20, 2014. *See* Ex 2, JuJuan Moore, POC No. 2098. The Claim alleged that Mr. Moore: suffered a ten percent (10%) reduction in pay as of August 2012; was denied step increases, shift premiums, holiday pay, hazard pay and COLA increases. Mr. Moore's Claim also alludes to "pension and annuity" issues. (Ex 2, at Attachment). In his response to the City's Supplemental Brief, Mr. Moore reiterated the litany of losses alleged in his claim, conceding that most of the losses in his original claim were due to the imposition

---

[2] *See* Order Regarding the City of Detroit's Unresolved Objections to Claims Contained in the City's Twentieth, Twenty-Third, Twenty-Fifth, Twenty-Eighth, Twenty-Ninth, Thirtieth, Thirty-First, Thirty-Second, Thirty-Third, Thirty-Fourth, Thirty-Sixth, and Thirty-Seventh Omnibus Objection to Certain Claims ¶ 1 [Doc. No. 11293] ("Order Regarding Unresolved Objections").

[3] *See,* Doc Nos. 11331 and 11335.

27102175.2\022765-00213

of the CETs, but also added that:  the City payroll system "will not issue correct amounts of pay or benefits, on payroll checks;" and that the City failed to pay him "turn-around" pay in February 2014.  (Ex 3).

Mr. Moore included with his response certain documents that he presumably believes support his claims, including:

(a) an email dated July 21, 2014, regarding statements made by a DWSD attorney and a request for a legal opinion, which has no discernable bearing on his claim or allegations;

(b) a copy of a page from a document purporting to be the City's Manual of Standard Personnel Practices;[4]

(c) an email dated August 21, 2009, addressed to a large distribution list regarding "New Workbrain Time Code – Turnaround" the text of which is illegible;

(d) a page from an April 17, 2013, "draft" document that is otherwise unidentified and whose highlighted text is also nearly illegible; and (e) a decision by the Michigan Employment Relations Commission ("MERC") in its Case No UC15 L-024, dated March 3, 2016, pertaining to a matter filed by Mr. Moore's

---

[4] Terms of Employment for union employees such as step increases are governed by collective bargaining agreements and/or, in this case, the CETs, not the Manual Of Personnel Practices.  It is not clear whether the specific Manual page attached to the Response was even in effect in the time frame pertaining to Mr. Moore's claims.

27102175.2\022765-00213

Union on December 17, 2015, involving a jurisdictional dispute over certain positions to be staffed at the newly formed Great Lakes Water Authority ("GLWA") between the Union and the City and the GLWA. There is nothing in this Decision that references or pertains to any of Mr. Moore's Claims, and given the date of the filing of the action and the fact that it involves the GWLA, which was formed subsequent to approval of the Plan of Adjustment, this MERC Decision is evidence that, if and however it may apply to Mr. Moore, it does not involve a pre-petition claim.

## II. JAJUAN MOORE'S CLAIM SHOULD BE EXPUNGED OR DISALLOWED IN ITS ENTIRETY

With respect to Mr. Moore's claims based on the CETs and his pension and annuities claims, the City refers the Court to, and relies on, its Supplemental Brief and argument made at the June 16, 2016, hearing. These would include his alleged losses with respect to wages, step increases, shift premiums, holiday pay, hazard pay, all of which were occasioned by the lawful imposition of the CETs.

Similarly, Mr. Moore's claims with respect to COLA and "pensions and annuities" should be disallowed because these were addressed under the Plan of Adjustment and, at best for Mr. Moore, constitute objections to the Plan but do not constitute cognizable Class 14 claims. Moreover, Mr. Moore's COLA claim was not contained in his original Proof of Claim and should therefore be disallowed in any case. It first appeared in his 2016 Response and is therefore untimely.

27102175.2\022765-00213

Mr. Moore's allegations regarding being denied turn-around pay are also untimely and first mentioned only in his Response. In addition, the notes in his Response indicate that this occurred in February 2014 and cannot be the basis for a pre-petition claim. The turn-around pay claim should therefore be disallowed.

Finally, Mr. Moore' complaints about the City payroll system are simply too vague to be justiciable, and he does not allege that he actually lost wages or benefits as a result of problems with the system. At counsel's request, City representatives reviewed Mr. Moore's claim and researched City employee complaint and grievance records. Mr. Moore does not claim, and the City has no records of, any actual dispute or registered complaints by Mr. Moore regarding this or any other allegation in his claim. Mr. Moore also does not claim, and the City has no records of, any grievances filed by the Union on Mr. Moore's behalf regarding the payroll system, his "turn-around" pay claim or any of the other allegations in his claim. Mr. Moore alleges that he is an officer of the Union, and as such must be imputed with knowledge of, and the ability to proceed with, the grievance and arbitration mechanisms available under the collective bargaining agreements or CETs in effect at the time his various claims arose. It is well settled that exhaustion of grievance and arbitration procedures is a necessary predicate for bringing any claims regarding violation of terms and conditions of employment before a court; *see*, *e.g., Sankar v. Detroit Bd. of Educ.,* 160 Mich. App. 470, 480-

- 6 -

81, 409 N.W.2d 213, 218 (1987); *Sankar v. Detroit Bd of Ed,* 160 Mich.App 470, 474; 409 NW2d 213, 215 (1987); *Grosse Pointe Farms Police Officers Ass'n v. MERC Chairman,* 53 Mich.App 173, 178; 218 NW2d 801 (1974); *see also Mollet v. City of Taylor,* 197 Mich.App 328, 337; 494 NW2d 832 (1992). For these and the other reasons cited, Mr. Moore's claim should be expunged or disallowed.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, the City respectfully requests that the Court expunge or disallow the Claim of Jajuan Moore in its entirety and grant such further relief as the Court deems appropriate.

Dated: July 15, 2016          By: /s/ Marc N. Swanson

Marc N. Swanson (P71149)
John H. Willems (P31861)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com
willems@millercanfield.com

Charles N. Raimi (P29746)
Deputy Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Coleman A. Young Municipal Center
Detroit, Michigan  48226
Telephone: (313) 237-0470
Facsimile: (313) 224-5505
raimic@detroitmi.gov
Attorneys For The City Of Detroit

- 7 -

## SUMMARY OF ATTACHMENTS

The following documents are attached to this Supplementary Brief.

Exhibit 1    Certificate of Service

Exhibit 2    Claim of JaJuan Moore (Claim No. 2098)

Exhibit 3    Response of JaJuan Moore [Doc. No. 11016]

**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 15, 2016, he caused a copy of the *CITY OF DETROIT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS OBJECTION TO THE CLAIM OF JAJUAN MOORE* to be served upon the persons listed below, via first class mail:

JaJuan Moore
3873 Rohns
Detroit, MI 48214

Anthony Greene
Greene Law Group
2232 S. Main, Suite 438
Ann Arbor, MI 48103

DATED: July 15, 2016

By: /s/ Marc N. Swanson
    Marc N. Swanson
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT | EASTERN DISTRICT of MICHIGAN | CHAPTER 9 |
|---|---|---|

**PROOF OF CLAIM**

**FILED**

| Name of Debtor: City of Detroit, Michigan | Case Number: 13-53846 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

**FEB 2 0 2014**

Name of Creditor (the person or other entity to whom the debtor owes money or property):

JAJUAN MOORE

COURT USE ONLY

Name and address where notices should be sent:

JAJUAN MOORE
3873 ROHNS. 48214
Detroit MI
(313) 424-0087
email: KnightDon31@ yahoo.Con

☐ Check this box if this claim amends a previously filed claim.

US Bankruptcy Court
MI Eastern District
Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):




Telephone number:     email:

☑ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**RECEIVED**

**1. Amount of Claim as of Date Case Filed:** $ 50,000

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a state

**FEB 2 4 2014**

KURTZMAN CARSON CONSULTANTS

**2. Basis for Claim:** See Attachment
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** _____
(See instruction #3a)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Amount of arrearage and other charges, as of the time case was filed,** included in secured claim, if any:

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

**Basis for perfection:** _____

Value of Property: $_____

**Amount of Secured Claim:** $_____

Annual Interest Rate (when case was filed)____% ☐ Fixed or ☐ Variable

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).** $_____

**5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. §** _____ $_____

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature: (See instruction # 8)**
Check the appropriate box.

☑ I am the creditor.  ☐ I am the creditor's authorized agent.  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: JAJUAN MOORE
Title: CPA
Company: City of Detroit MI
Address and telephone number (if different from notice address above):
3873 Rohns Detroit MI 48214
313-424-0087 KnightDon31@ yahoo.com
Telephone number:     email:

(Signature) JaJuan Moon   (Date) 2-19-2014

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

My Basis of Claim is Breech of Contract with the City of Detroit.

1.) The unjust 10% paycut since August 6, 2012

2.) My step Increases that I was supost to get when I first start with the city.

3.) Shift Premiums

4.) Holiday Pay

5.) Hazzard Pay

6. Cola Pay.

7.) Penigan And Annunitys

8) Mental stress

# United States Bankruptcy Court

EASTERN _____ District Of MICHIGAN

FILED (I)

In re City of Detorit _____
Debtor

2016 APR -4 P 2: 36

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT

Case No. 13-53846 _____

Chapter 9 _____

RESPONSE to DeBtors THiRTy Six
OMNiBus OBJECTION

# 1

PROOF of CLAIM City of Detroit,

IN February 2014, I JAJuan Moore
sent in A Proof of Claim Form, About
Money the city of Detroit owed Me. Here is A
List AND DESCRIPTION:

1.) Payroll disputes: Repeatedly, the city of Detroit
payroll system AKA (Work Brain) will Not issue
correct Amounts of pay or benefits, on payroll
checks.

2.) Breach of contract: See Council 25 Master
Agreement, DWSD imposed the (C.E.t) City
Employment term, on Water Department works, And it
was unjust. 10% wage cut And loss of
Benefits, and health care.

3.) Never got My Step And Merit increases
from 2011,-2014, in page 70 in Master Argeem

4.) DWSD took 4hrs turn Around Pay from Me
I supposed to get for Not having 2 off Day
Consecutive. The city took that Pay from Me
FeB -2014 in which per the
Master Agreement in Employment terms, IM
supposed to Be Convosated For. ON PAGE 45

5.) Pain And suffing for the lost of wages
and for Payment of My lawyer fees.

6.) MERC Case NO. C17 K-201
under funded Anntey and Post employent

#2

(CONT)

8.) DPSD Refused the opportunity to bargin
And new contract with My union, And By
Doing So Frozen My Pay At A lower
Rate than My pers. Equal pay for Equal
work, see Docket No. 14-009883- MERC

9) Basis of the claim is for Services performed
15-003430    MERC

10) I Am the vice pres of Local 207 filed
grievances And submitted In February 2014 As
part of proof of claim.

DATE  3-23-2016

JaJuan Nook
3873 Rohns
Detroit Mi 48214



UNION ST...   Search        Search Mail    Search Web    Home    Juan

Compose

Archive   Move   Delete   Spam   More

Local 207 Contract Talks

AFSCME LOCAL 20 Public Utility Emplo <afscme207@sbcglobal.net>        07/21/14 at 9:07 AM
To CATHERINE PHILLIPS
CC ADEDAYO OGUNNUPE, Susan Ryan, lekita.thomas207@gmail.com, Juan Moore,
    Michael Mulholland, Tanya Glover

Hi Cathy,

Steve Swartz, DWSD's lawyer,  keeps telling us that a state law says that if DWSD is converted to an independent authority, that any labor contract would only stay in effect for 6 months unless replaced by another contract. I believe we need counsel to provide us with an independent legal opinion on this matter. Could you get Council 25 to provide us with that?

Thanks,

Michael Mulholland

Reply, Reply All or Forward | More

Click to Reply, Reply All or Forward

Send

Inbox (15)
Drafts (27)
Sent
Archive
Spam (315)
Trash (483)
Smart Views
Important
Unread
Starred
People
Social
Shopping
Travel
Finance
Folders (559)
My Stuff!!!!!! (25)
UNION STUFF
wow (534)
Recent

Sponsored

TransUnion

Protect your Credit
Protect your Identity
Protect your Future
Get your Score.
Get your Report.

SheIn

FREE SHIPPING
no minimum
40% OFF
* 1st Order *

SHOP NOW >

stevedocwra on flickr

g. Special Service Employees: Jobs and assignments designated as special service may be part-time or temporary in nature (less than forty hours per week or 52 weeks per year), may constitute assignments to special projects which are not expected to be permanent city functions or may be assignments to training programs which will not necessarily lead to placement in regular city classes.

## C. STEP INCREMENTS:

Most classifications for employees in the classified service have pay ranges.

1. Salary Classes: Generally, employees begin work at the minimum rate of the pay range and receive periodic raises or step increases until they reach the maximum rate. For salary positions in job classes listed on an annual rate basis, increases are determined by the salary step increment schedule included in the "Official Compensation Schedule". Generally, the salary step increment equals five percent (5%) of the employee's salary as of the date the increment is normally paid.

2. Hourly Classes: Employees in classes listed on an hourly basis in the official compensation schedule receive a 10-cents per hour increase semi-annually until they reach the maximum of their pay range.

3. Apprentice Classes: An increment schedule for 21 classes of apprentices provides specified hourly rates of pay for each succeeding 6 months of apprenticeship.

4. Procedures for Granting Step Increases: Every quarter, each department is notified of employees who are eligible for a step increase based on their class date and the step formula indicated in the Official Compensation Schedule. The first step increment for a new employee is based on the appointment date (first day worked). The step will be automatically awarded unless the department denies it prior to its award.

a. Eligibility for Step Increase: For an annual step increase, an employee must complete at least 216 days of payroll time in one grade of the same classification or in equivalent grades of similar classifications within a 12 month period, exclusive of overtime including sixth and seventh days. For 6-month increments, an employee must have completed 108 days of service within a 6-month period.

1. Part-time Employees: When employees are regularly scheduled to work part days or part weeks, they may be granted a step on the full rate for the title, provided they have served 80% of their regular yearly schedule during a 12 month period.



O Z Outlook    Type here to search   Entire Mailbox ▼ 🔍  Privacy  🎴  ☰ Options  ❓  Sign out

**Mail**

📅 Calendar

👤 Contacts

Deleted Items
Drafts [23]
Inbox (32514)
Junk Email [41]
Sent Items (1)

Click to view all folders ⋎

📁 Clutter (1287)

📁 Manage Folders...

📧 Reply  📧 Reply All  📧 Forward  🖨 ✕  🚫 Junk  Close

# New Workbrain Time Code Turnaround
HRMS Communications [HRMS_communications@detroitmi.gov]

Sent: Friday, August 21, 2009 11:30 AM

To: Sarah Snow [snows@detroitmi.gov]; craig2@dwasd.org; jetter@dwsd.org; Carlo Magno;
reid@dwsd.org; abelen@dwsd.org; abrou@dwsd.org; Andrea Callen; Andreia Johnson; Adrian
Taylor; ahall@dwsd.org; ahmed@dwsd.org; aibrahim@dwsd.org; ajohn@dwsd.org;
aknight@dwsd.org; alix@dwsd.org; alston@dwsd.org; anderso1@dwsd.org;
andrews@dwsd.org; angelcox@dwsd.org; apatel@dwsd.org; Annie Philip; aridgell@dwsd.org;
Allen Wilson; Andre' Batie; beden@dwsd.org; Barbara Belcher; Jose Belen; Frank Benedict;
Kimberly Bennett; berger@dwsd.org; binge@dwsd.org; Barry Jennings; blackmon@dwsd.org;
Lemont Boyd; boyd1@dwsd.org; David Bradwell; brown2@dwsd.org; bryson@dwsd.org;
buchanan@dwsd.org; bullock@dwsd.org; burnett@dwsd.org; Gerald Burrell; bush@dwsd.org;
bwalker@dwsd.org; bwelch@dwsd.org; byes@dwsd.org; cadams@dwsd.org;
campbell1@dwsd.org; campbell5@dwsd.org; canady@dwsd.org; canderson@dwsd.org;
carroll@dwsd.org; cathompson@dwsd.org; catron@dwsd.org; cdodds@dwsd.org;
cgeorge@dwsd.org; cgrant@dwsd.org; Pamela Chapman; charris@dwsd.org;
chatterjee@dwsd.org; choice@dwsd.org; christia@dwsd.org; Dennis Church; clegg@dwsd.org;
cnelson@dwsd.org; collins@dwsd.org; Carlotta L Collins; colvin@dwsd.org; coxx@dwsd.org;
Chauncey Philson; Cheryl Porter; Terry Craig; craig1@dwsd.org; Martin Craig;
crizzo@dwsd.org; Kimberly Crowell; crum@dwsd.org; cscott2@dwsd.org;
cshackelfor@dwsd.org; Chandan Sood; cstanley@dwsd.org; cuthbert@dwsd.org;
cwalker@dwsd.org; Constance Williams-Levye; dada@dwsd.org; Daniel Edwards;
dagee@dwsd.org; Carl Daggs; Danise Allen; daniel@dwsd.org; Darryl Turner;
davis1@dwsd.org; davis4@dwsd.org; Derek Bennett; Derrick Carter; dew@dwsd.org;
dhunter@dwsd.org; dingle@dwsd.org; djones@dwsd.org; dleonard@dwsd.org;
dlowe@dwsd.org; dmoore@dwsd.org; Denise Donelson-Williams; doshi@dwsd.org; Darryl
Roberts; drose@dwsd.org; Debra Singleton; dsood@dwsd.org; Derek Stones;
dthomas@dwsd.org; Arlene Wells; duncan@dwsd.org; Donovan Walton; dwright@dwsd.org;
Thomas Eapen; eaustin@dwsd.org; ebrannon@dwsd.org; eedwards@dwsd.org;
ellenwood@dwsd.org; elmore1@dwsd.org; esmith@dwsd.org; estes@dwsd.org; Mohamad
Farhat; Louis Fischione; Lavaughnda Flowers; Francine Duncan-Martin; ford2@dwsd.org;
frank@dwsd.org; franklin@dwsd.org; freeman@dwsd.org; fudge@dwsd.org; fujita@dwsd.org;
galhotra@dwsd.org; garbarino@dwsd.org; gawthrop@dwsd.org; gbillingsley@dwsd.org;
gdavis@dwsd.org; ggray@dwsd.org; gibbs@dwsd.org; glanton@dwsd.org; Gerald Moore;
gopalswami@dwsd.org; goshea@dwsd.org; gosmith@dwsd.org; green@dwsd.org;
grewal@dwsd.org; Loraine Griffin; griffith@dwsd.org; grimes@dwsd.org; griswel@dwsd.org;
Gary Watkins; habib2@dwsd.org; hansbury@dwsd.org; Donna Harris-Morris; Alma Harris;
harrison@dwsd.org; harvin@dwsd.org; hayes@dwsd.org; henderso@dwsd.org;
hensley@dwsd.org; Sidney High; hlewis@dwsd.org; holloway@dwsd.org;
humphrey@dwsd.org; hunter@dwsd.org; hurd@dwsd.org; huston@dwsd.org;
hutton@dwsd.org; ibrahim@dwsd.org; James Irving; ivers@dwsd.org; ivory@dwsd.org;
jackson1@dwsd.org; Parvez Jafri; jallen@dwsd.org; jamison@dwsd.org; Zahid Jawadi;
jcrook@dwsd.org; jdockery@dwsd.org; jdunlap@dwsd.org; Jetaun Coleman; Jesia Mitchell;
jetke@dwsd.org; jetter@dwsd.org; jhclark@dwsd.org; Janine MacCallum; jmoore@dwsd.org;
john@dwsd.org; jolee@dwsd.org; jomartin@dwsd.org; jordan1@dwsd.org; joshi@dwsd.org;
jrobinson@dwsd.org; Michael Jurban; jweathers@dwsd.org; Jane Wilson; Jeanetta Brown;
Pawan Kapila; kapur@dwsd.org; kazda@dwsd.org; Knyiesha Scott; kciers@dwsd.org;
kdjohnson@dwsd.org; Keith Duncan; Kimberly Crowell; keintz@dwsd.org; khurana@dwsd.org;
kilpatrick@dwsd.org; kittle@dwsd.org; klong@dwsd.org; knight@dwsd.org; Yvonne Knowlton;
Stephen Kosanke; krishnan@dwsd.org; Stephen Kuplicki; kyoung@dwsd.org; Evelyn Larkins;
larringto@dwsd.org; Darryl Latimer; Latanya McTaw; lbrown@dwsd.org; Lenore Canady;
lcarson@dwsd.org; leonard@dwsd.org; Michael Lewis; linsday@dwsd.org; livi@dwsd.org; John
Lokosis; lorenc@dwsd.org; lowe@dwsd.org; loyd3@dwsd.org; Linda Philson; Leonard Russ;
Leon Wheeler; lwilliams@dwsd.org; lwjones@dwsd.org; lyons@dwsd.org; lyons1@dwsd.org;
machiiet@dwsd.org; macwill@dwsd.org; mahajan@dwsd.org; Marilyn King; Tarek Malek;
Aruna Mandava; Mathew Mangatt; Michael Mannion; Rao Manyam; maxwell@dwsd.org; Adino
May; Maria Young; mccarty@dwsd.org; mccean@dwsd.org; mccollins@dwsd.org;
mccoy@dwsd.org; mccuean@dwsd.org; mcgrail@dwsd.org; mckeller@dwsd.org;
mcmeekins@dwsd.org; mdixon@dwsd.org; mehta@dwsd.org; meredith@dwsd.org;
metz@dwsd.org; Michelle Wright-Bailey; Milewski@dwsd.org; milliner@dwsd.org;
minniefi@dwsd.org; Majid Khan; mldavis@dwsd.org; Melvin Murphy; moreland@dwsd.org;
Mildred Morris; moultrie@dwsd.org; msawyer@dwsd.org; msmith@dwsd.org;

mtardy@dwsd.org; Sanjeev Mungarwadi; Richard Muntz; Michelle Washington-Williams; mwatkins@dwsd.org; Calvin Norfleet; norman@dwsd.org; nowak@dwsd.org; nparker@dwsd.org; ohunter@dwsd.org; onwuneme@dwsd.org; Otis Patterson; Yolanda OQuinn; orozco@dwsd.org; oziem@dwsd.org; pallegar@dwsd.org; patton@dwsd.org; pavlicek@dwsd.org; paylor@dwsd.org; pbrown@dwsd.org; pdixon@dwsd.org; Joseph Peindl; perry1@dwsd.org; pmoore@dwsd.org; polchlopek@dwsd.org; poole@dwsd.org; powell@dwsd.org; Prakashkumar Patel; pturner@dwsd.org; pwells@dwsd.org; quiggle@dwsd.org; qussar@dwsd.org; rabbaig@dwsd.org; radtke@dwsd.org; Asm Rahman; ramachandran@dwsd.org; ramchar@dwsd.org; Edward Ramey; ramsey@dwsd.org; rasch@dwsd.org; rbrown@dwsd.org; rcampbell@dwsd.org; reaves@dwsd.org; Theresa Redden; redmon@dwsd.org; redmond@dwsd.org; reid@dwsd.org; reineri@dwsd.org; rford@dwsd.org; Roderick French; Ronald Hayes; richards@dwsd.org; rjohnson@dwsd.org; rjoseph@dwsd.org; rlbrown@dwsd.org; rmarshall@dwsd.org; rodney@dwsd.org; rose@dwsd.org; roy@dwsd.org; royster@dwsd.org; rpernal@dwsd.org; rpritchett@dwsd.org; rshaya@dwsd.org; rshukla@dwsd.org; rudolph@dwsd.org; rwillis@dwsd.org; ryan@dwsd.org; sadler@dwsd.org; Samuel Gibson; Syed Ali; sallador@dwsd.org; sammoore@dwsd.org; Biren Saparia; sarnacki@dwsd.org; sbailey@dwsd.org; scales@dwsd.org; scooper@dwsd.org; segatti@dwsd.org; Balvinder Sehgal; Sekena Jones; Mary Lynn Semegen; sevakis@dwsd.org; sgant@dwsd.org; shackleford@dwsd.org; shajahan@dwsd.org; shaw@dwsd.org; ITSIO-IT-Hardware Managers; Glen Sherman; shovein@dwsd.org; sjamison@dwsd.org; smalley@dwsd.org; smedes@dwsd.org; Mark Smoot; song@dwsd.org; sood@dwsd.org; spatel@dwsd.org; spencer1@dwsd.org; stackhouse@dwsd.org; stanley2@dwsd.org; Walter Starnes Jr; stenzel@dwsd.org; stillwel@dwsd.org; stokes@dwsd.org; strychar@dwsd.org; Stephen Turner; summers@dwsd.org; swift@dwsd.org; Samuel Wilson; sywillia@dwsd.org; Tiffany Alexander; Anthony Troy; taylor@dwsd.org; TAYLOR2@dwsd.org; Tonya Bell; Terri Conerway; Terrance Coombs; Terry Daniel; tdavis@dwsd.org; Thomas Dotson; tecoleman@dwsd.org; tennille@dwsd.org; thomas1@dwsd.org; Dana Samuel; tiwari@dwsd.org; tmitch@dwsd.org; tmoore@dwsd.org; toaster@dwsd.org; tolentino@dwsd.org; tpeters@dwsd.org; Jacqueline Trimble; Tracey Simmons; ttarrance@dwsd.org; turnbow@dwsd.org; Patti Turner; Clement Udeozor; ulman@dwsd.org; urbanik@dwsd.org; Muhammad Ussabur; valentine@dwsd.org; valera@dwsd.org; vanhorn@dwsd.org; vanlander@dwsd.org; Christopher Vanpoppelen; vazquez@dwsd.org; vethomas@dwsd.org; Annette Vines; vkidappr@dwsd.org; vmuntz@dwsd.org; vnavilys@dwsd.org; Venus Simpson-Patton; Vallorie Parks-Turner; Victoria Williams; wadehra@dwsd.org; walker1@dwsd.org; walker3@dwsd.org; walls@dwsd.org; wanogho@dwsd.org; wbrown@dwsd.org; weathing@dwsd.org; weaver@dwsd.org; Damian Welborne; welbourne@dwsd.org; welch@dwsd.org; whill@dwsd.org; white1@dwsd.org; whitwort@dwsd.org; Terrence Wilcox; Patrick Williford; Larry Witt; wmccarty@dwsd.org; wruffin@dwsd.org; Carlton Wyatt; Yvette Hayes-Johnson; zapinski@dwsd.org; Zanetta Stewart

**Cc:** Lori Cetlinski [LoriC@detroitmi.gov]



**Regarding**



Please share this information with the appropriate Supervisors in your agency.

This message has been scanned for malware by SurfControl plc.
www.surfcontrol.com

# 25. WORK WEEK, WORK DAY, SHIFT PREMIUM

## A. STANDARD SERVICE WEEK:

✱ 1. ~~DWSD shall have the discretion to schedule the length of the workday with ten (10) work days notice to the Union and affected employees. DWSD shall hold a special conference with the Union at least ten (10) work days prior to assigning employees to a twelve (12) hour shift. The standard payroll work week shall begin at 12:01 a.m. Monday, and end at 12:00 p.m. Sunday. It shall consist of five (5) regularly scheduled eight (8) hour work periods or four (4) regularly scheduled ten (10) hour work periods or another work period configuration exclusive of the lunch break. The two (2) or more remaining days in the payroll work week shall be known as "off days."~~

~~2. Off days in the work week shall be scheduled consecutively unless such scheduling shall adversely affect or add cost to operations of the department.~~

✱ 3. ~~The DWSD and the Union will review departmental work schedules which currently do not provide for consecutive off days. If the parties can agree that scheduling changes which allow for consecutive off days are feasible, such changes will be implemented, provided that such changes do not result in increased costs or loss of productivity.~~

4. The DWSD and the Union will also review those departmental operations which currently require rotating shifts. If the parties can agree that a more productive schedule can be established without an increase in cost, DWSD will take the steps necessary to implement such schedules.

5. Employees will be allowed to submit shift preferences within locations for any new work schedules established pursuant to reviews made in accordance with Section A-3 and A-4.

## B. SERVICE DAY AND WORK DAY:

1. The regular full working day may consist of eight (8) or more hours of work in the service day exclusive of the lunch break. It shall begin at 12:01 a.m., and extend to 12:00 p.m.

2. Two (2) coffee breaks of not less than fifteen (15) minutes per shift shall be permitted.

3. The normal lunch period for all day shift employees not working twenty-four (24) hour shift operations covered by this Agreement will be scheduled between the hours of 11:00 a.m. and 1:00 p.m.

4. An adequate wash-up time will be allowed all employees covered by this Agreement before lunch and at quitting time.

5. When an employee is called to work, he/she shall be guaranteed no less than four (4) hours of pay for "show up" time at the appropriate rate.

**DRAFT 4/17/2013**

#6

**TRUE COPY**

STATE OF MICHIGAN
EMPLOYMENT RELATIONS COMMISSION
LABOR RELATIONS DIVISION

In the Matter of:

CITY OF DETROIT AND DETROIT WATER AND SEWERAGE DEPT,
    Public Employer,

                                    Case No. UC15 L-024
    -and-                          Docket No. 15-063232-MERC

GREAT LAKES WATER AUTHORITY,
    Public Employer,

    -and-

AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES
COUNCIL 25 AND ITS AFFILIATED LOCALS 207 AND 2920, (AFSCME),
    Labor Organization-Petitioner,

    -and-

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 324,
    Labor Organization-Intervenor
_____/

<u>APPEARANCES</u>:

The Allen Law Group PC, by Floyd Allen, for the City of Detroit

Steven H. Schwartz & Associates, PLC, by Steven H. Schwartz and Catherine Heitchue Reed; and
William Wolfson, for the Detroit Water and Sewerage Department

Miller Cohen PLC, by Richard G. Mack and Adam Taub, for Petitioner AFSCME

Sachs Waldman PC, by Mami Kato, for Intervenor International Union of Operating Engineers,
Local 324.

<u>DECISION AND ORDER</u>
<u>ON PETITION FOR UNIT CLARIFICATION</u>

    On December 17, 2015, AFSCME Council 25 and its affiliated Locals 207 and 2920
(AFSCME) filed this petition for unit clarification with the Michigan Employment Relations
Commission (the Commission) pursuant to § 13 of the Public Employment Relations Act (PERA),
1965 PA 379, as amended, MCL 423.213. A hearing was conducted for the Commission on this

petition on eleven days between January 14 and February 4, 2016, by Julia C. Stern, an Administrative Law Judge (ALJ) for the Michigan Administrative Hearing System. Based on the entire record, including post-hearing briefs filed by the City of Detroit Department of Water and Sewerage (DWSD), AFSCME, and the International Union of Operating Engineers, Local 324 (Local 324) on February 9, and February 12, 2016, the Commission finds as follows.

## I. The Petition:

AFSCME's petition seeks clarification of its bargaining unit consisting of employees of the City of Detroit/DWSD and Great Lakes Water Authority (GLWA) to include the classifications of Plant Technician and Office Support Specialist. Plant Technicians are employed at the Wastewater Treatment Plant formerly operated by the City of Detroit/DWSD. As of January 1, 2016, the Plant Technicians are employed by the GLWA. The Office Support Specialist is a general clerical classification. Some Office Support Specialists support functions now performed by the GLWA, and these Office Support Specialists are employed by the GLWA. Others support functions that continue to be performed by the City of Detroit/DWSD and are employed by the City of Detroit/DWSD.[1]

Sometime between December 2013 and February 2014, the City of Detroit/DWSD, which was then the employer of all these employees, assigned the Plant Technician and Office Support Specialist positions to be represented by Local 324 as part of an overall reorganization that included, as discussed below, the elimination of all its previous job titles and the creation of new ones. Since February 2014, Local 324 has been recognized by the City of Detroit/DWSD, and now the GLWA, as the bargaining representative of a bargaining unit consisting of these two classifications. In early 2014, AFSCME filed an unfair labor practice charge, Case No. C14 E-60, and a unit clarification petition, Case No. UC14 F-010, over the removal of positions and of work performed by these and other positions from its bargaining units and their reassignment to other unions.

AFSCME was ordered to file the petition before us today by United States District Court Judge Victoria Roberts in orders issued by her on December 8, December 10, and December 15, 2015. Beginning in October 2015, Roberts, under the auspices of the United States Bankruptcy Court for the Eastern District of Michigan, successfully mediated disputes among the City of Detroit/DWSD and its various labor organizations, including disputes over the bargaining unit placement of certain positions, in order to facilitate the January 1, 2016 transfer of functions from the City of Detroit/DWSD to the GLWA. Judge Roberts ordered AFSCME to file the instant petition, and ordered certain other parties to participate in the Commission proceeding, after the dispute over the placement of the Plant Technician and Office Support Specialist positions could not be resolved by agreement. Roberts' orders stated that a Commission decision must issue on the appropriate unit placement of the Plant Technician position no later than March 4, 2016, and

---

[1] The term Employer is used in this decision to refer to the City of Detroit/DWSD and the GLWA collectively. Since some of the Office Support Specialists are employed by the City of Detroit/DWSD and some are employed by the GLWA, any bargaining unit which includes this position must be considered a multi-employer bargaining unit. The Commission will recognize a multi-employer bargaining unit only when all the employers involved have expressly consented to this arrangement. See *Public Safety Academy*, 20 MPER 12 (2007). In this case, the GLWA and the City of Detroit/DWSD have consented to recognize and bargain with units consisting of both their employees.

2

that a Commission decision on the unit placement of the Office Support Specialist position must issue no later than March 18, 2016.

## II. Removal of the Senior Water Systems Chemists Association and Sanitary Chemists and Technicians Association as Parties

Judge Roberts' December 8, 2015 order directed the Senior Water Systems Chemists Association (SWSCA) and the Sanitary Chemists and Technicians Association (SCATA) to participate in the proceeding to determine the appropriate unit placement of the Plant Technician position because she believed that employees formerly classified as Senior Water Chemists and represented by SWSCA, and employees formerly classified as Water Chemists and represented by SCATA, had been reclassified as Plant Technicians. On December 18, 2015, the ALJ scheduled a pre-trial conference in this matter for January 6, 2016, and served the parties with an order that, among other things, informed them that the failure of a union party to appear at this conference would be taken as an indication that this party had no further interest in representing the Plant Technician or Office Support Specialist classifications or any employee currently so classified. No SWSCA representative appeared at the conference. Several SCATA representatives attended. However, discussion among the parties disclosed that while work formerly performed by Water Chemists was reassigned to Plant Technicians over SCATA's objection, no employee who held either a SWSCA or SCATA title was reclassified as a Plant Technician. SCATA representatives also confirmed that SCATA had no interest in representing either the Plant Technician or the Office Support Specialist position. Accordingly, on January 8, 2016, the ALJ issued an order removing these two labor organizations as parties to the proceeding.

## III. Addition of GLWA as Party Employer

The GLWA was not fully operational until January 1, 2016, and was not a party to the mediation conducted by Judge Roberts. However, at the January 6, 2016 conference, the ALJ raised the issue of whether the GLWA should be made a party to the unit clarification with William Wolfson, who attended the conference as a representative of the DWSD; Wolfson is also the General Counsel for the GLWA. The parties agreed at the conference that as of January 1, 2016, the GLWA, and not the DWSD, was the employer under PERA of all the Plant Technicians and some of the Office Support Specialists. The ALJ told Wolfson that she believed GLWA should be made a party to the unit clarification proceeding and asked him to contact the GLWA Board.

On the first day of hearing, Wolfson presented a letter from the GLWA stating that it was its position that the bargaining unit assignment decisions made by the City of Detroit/DWSD were appropriate under the circumstances, that it was confident that the attorneys appearing on behalf of the City and DWSD would develop a complete factual record; and that the GLWA did not have additional factual information to present. The letter stated that the GLWA was aware that it would be impacted by the unit clarification decision because its lease agreements with the DWSD provided that it would be the successor employer for employees who transferred their employment to the GLWA and also required it to assume the DWSD's collective bargaining agreements with respect to such employees. However, it "declined the invitation to become a participant in the unit clarification proceeding." The ALJ ruled that because the GLWA had admitted that it was the employer of at least some of the employees, and the Commission decision, therefore, would impact

3

its future bargaining obligations, the GLWA should be added as a party employer whether or not it chose to present evidence or otherwise participate in the proceeding.[2]

IV. <u>AFSCME's Motion to Consolidate Case No. UC15 L-024 and Case No. C14 E-060</u>

At the January 6, 2016 pre-hearing conference, AFSCME made an oral request to the ALJ that the instant petition be consolidated with the unfair labor practice charge in Case No. C14 E-060. After the ALJ denied that request, AFSCME, on January 20, 2016, filed a motion to consolidate, as well as a third amended charge in the unfair labor practice case. AFSCME argued that the matters should be consolidated under Rule 164 of the Commission's General Rules, R 423.164, because they arose out of the same circumstances, and consolidation would promote judicial economy and expeditious determination of the issues. It also argued that consolidation was necessary for a just determination of the issues because the matters did not involve mutually exclusive relief, and there could be conflicting rulings or issues regarding issue preclusion if the cases remained separate. Finally, it argued that deciding the unfair labor practice issues separately would require duplicative testimony.

Local 324 and the DWSD both filed statements in opposition to the motion. On January 26, 2016, the ALJ denied the motion on the record at the hearing. She noted that were the petition to be consolidated with the unfair labor practice case, the Commission could not comply with Judge Robert's directive to issue an order by March 2016, because under § 16(b) of PERA, if an ALJ hears the testimony in an unfair labor practice case he or she must issue a decision and recommended order and the parties then have a right to file exceptions to the decision with the Commission. She held that as she had been directed by the Commission to comply with Judge Robert's order, a final order on the unit clarification issue should be issued as expeditiously as possible even if, under other circumstances, the charge and petition might have been consolidated for hearing and decision. She also held that consolidation was not necessary for a complete and just determination of all the issues in the two cases. She noted that AFSCME's primary allegation in the unfair labor practice case was that the DWSD had acted improperly by removing positions from their existing AFSCME-represented bargaining units without either a substantial change in their job duties or AFSCME's agreement, and that this was also AFSCME's claim in the instant proceeding. The ALJ noted that the Commission applies the same principles to this type of claim whether it is raised in an unfair labor practice charge or in the context of a petition for unit clarification. She held, therefore, that AFSCME's primary claim would be fully addressed and decided by the Commission in its decision on the petition. The ALJ held that while the charge included other allegations of bad faith bargaining, including whether the City of Detroit/DWSD violated PERA by failing to bargain over the impact of the reclassification, these allegations could be decided in a separate proceeding after the unit clarification decision was issued. With respect to the allegation in the amended charge that the assignment of the Plant Technician and Office Support Specialist classifications violated § 10(1)(c) of PERA, the ALJ noted that she had already permitted AFSCME to present testimony during the hearing that the DWSD acted in bad faith and had a discriminatory motive when it assigned the positions to Local 324.

---

[2] Wolfson, who as indicated above is GLWA's General Counsel, was present as a representative of the DWSD on every day of the hearing.

## V. Positions of the Parties

### A. AFSCME

AFSCME argues that the City of Detroit/DWSD could not lawfully remove the positions it "mapped" (consolidated) into the Plant Technician and Office Support Specialist titles from their existing AFSCME bargaining unit without AFSCME's agreement because the creation of the new titles was not accompanied by any substantial change in the job duties performed by existing positions. It asserts that under Commission case law, therefore, the Plant Technician and Office Support Specialist positions were not "new" positions and the City of Detroit/DWSD was not entitled to alter their bargaining unit placement. It notes that under Commission case law, it is well established that an employer cannot lawfully remove a position from its existing unit simply by changing its title. *Detroit Pub Sch*, 23 MPER 61 (2010); *City of Detroit (Fire Dep't)*, 20 MPER 79 (2007). As AFSCME notes, an employer's decision to eliminate unit positions and redistribute their work among positions outside the bargaining unit may be either a mandatory subject of bargaining or a matter of managerial prerogative, depending on a number of factors. None of these factors are considered relevant, however, when an employer takes an existing unit position and, without changing its duties, transfers it to another unit; it is unlawful for an employer to do this without the agreement of the position's bargaining agent. *City of Grand Rapids*, 29 MPER 69 (2006). When an employer creates what it claims is a new position and gives it a new title, but the position has the same or substantially similar duties to an eliminated position, the employer cannot lawfully remove the position from its existing bargaining unit without the union's agreement. *Lenawee Co*, 25 MPER 1 (2011). AFSCME maintains that the record establishes that the duties of none of the former AFSCME positions "mapped" into the Plant Technician title or the Office Support Specialist title underwent a substantial change when the new titles were created, and the Plant Technician and Office Support Specialist titles, therefore, were not new positions.

AFSCME also argues that even if the Plant Technician and Office Support Specialist titles are considered new positions, the City of Detroit/DWSD could not lawfully assign them to be represented by Local 324. AFSCME acknowledges that when a new position is created and placed by the employer into one of two competing bargaining units, the Commission usually defers to the employer's unit placement decision. However, it cites *Detroit Pub Sch*, for the proposition that the Commission defers to the employer's decision only when the evidence establishes that the position shares a community of interest with the unit in which it has been placed and the employer's unit placement decision is reasonable and made in good faith.

AFSCME argues that in cases in which the Commission has deferred to an employer's decision to place a new position in one of two competing bargaining units, the first question has always been whether the new position shares a community of interest with an existing bargaining unit in which the employer has placed it. It points out that Local 324 does not represent any titles within the Employer other than the Plant Technician and Office Support Specialist. Therefore, according to AFSCME, there are no other titles with whom the Plant Technicians or Office Support Specialists can be compared for purposes of determining community of interest. AFSCME also points to the two reasons given by the DWSD for assigning the Plant Technicians and Office Support Specialists to Local 324: that Local 324 previously represented the employees with the highest skill levels in both new classifications and the fact that Local 324 apparently offered to provide the DWSD with training at discounted rates in exchange for new members. AFSCME

5

notes that the aforementioned reasons are not factors that have been or should be considered in determining community of interest.

However, according to AFSCME, the Plant Technician clearly shares a community of interest with other new titles currently represented by AFSCME, including Water Technician, Systems Technician, Maintenance Technician, Electronics and Instrument Control Technician (EICT), and Field Service Technician. According to AFSCME, these positions and the Office Support Specialist position, together form a unit appropriate for collective bargaining.

AFSCME also asserts that in determining whether the DWSD's decision was reasonable, the Commission should look to precedent under the National Labor Relations Act dealing with situations when bargaining units represented by different labor organizations are combined, for example when one company acquires another. AFSCME, citing *USW Communications, Inc,* 310 NLRB 854 (1993) and *Metro Teletronics Corp,* 279 NLRB 957 (1986), aff'd 819 F2d 1130 (CA 2, 1987) asserts that when the National Labor Relations Board (NLRB) determines that an acquisition or consolidation has eliminated the separate identity of the bargaining units, it looks to which of the original bargaining units was the largest and accretes the smaller groups into the largest one.

Finally, AFSCME asserts that the DWSD's decision to assign the Plant Technicians and Office Support Specialists to be represented by Local 324 was made in bad faith. AFSCME contends that the DWSD's decision was based on the reputation of the AFSCME Locals representing their predecessor titles for "militancy," while Local 324 had been more compliant and easier to deal with in collective bargaining than AFSCME.

B. The DWSD

The DWSD vehemently disagrees with AFSCME that the Plant Technician and Office Support Specialist positions should not be considered new positions. It points out that, as discussed in the facts below, the DWSD was ordered by the U.S. District Court on November 4, 2011, to "perform a review of the current employee classifications at DWSD and reduce the number of DWSD classifications to increase workforce flexibility." After a comprehensive study, the DWSD eliminated all of its 257 existing classifications and consolidated them into 57 new positions that had to be assigned to bargaining units. The new Plant Technician position combined parts of eleven existing jobs with narrowly defined job duties, and the employees who had held those jobs were represented by three different labor organizations. The new Plant Technician position, as set out in its job description, provides for complete cross-training in the various operations of the Sewage Plant and increased flexibility in assigning employees within these operations. Thus, the Plant Technician is not just a new title, but also a new job. Likewise, the new Office Support Specialist position combined parts of seventeen different jobs, including positions previously represented by two different labor organizations and positions that had been unrepresented.

According to the DWSD, AFSCME appears to be arguing that this is not a question of the placement of new positions, but rather a matter of bargaining unit work being removed from its unit. The DWSD argues that even if this were the case, traditional Commission law cannot apply in this situation. Here, the DWSD did not simply shift the work of a few positions from one unit to another. Rather, the case involves a comprehensive overhaul and reorganization of every

6

position within the DWSD and the realignment of 20 bargaining units with approximately 1,900 employees, as well as two complicated federal lawsuits, an emergency financial manager, and the creation of a new water authority, the GLWA.

The DWSD relies on a long line of Commission cases, including *City of Lansing, Bd of Water & Light*, 2001 MERC Lab Op 13; *Lansing Sch Dist*, 22 MPER 96 (2009); *Henry Ford Cmty Coll*, 1996 MERC Lab Op 374, 380; and *Saginaw Valley State Coll*, 1988 MERC Lab Op 533, 538. These decisions hold that when there is a newly created position the Commission will defer to the employer's decision to place the new position in one of several existing units as long as a community of interest exists between the new position and employees in the unit in which the position is placed and the employer's decision was made in good faith. It cites *Lansing Sch Dist*, 22 MPER 96 (2009), for the principle that rather than determining relative degrees of community of interest or attempting to find the "optimum" unit, the Commission will defer to an employer's reasonable decision to place the position in one bargaining unit rather than another. Citing *Univ of Michigan*, 29 MPER 23 (2015); *City of Zeeland*, 1995 MERC Lab Op 652; and *City of Lansing*, 2000 MERC Lab Op 380, the DWSD maintains that the Commission determines only whether the resulting unit is "a unit appropriate for collective bargaining based on the facts of each case," and that "in matters where a position shares a community of interest with more than one bargaining unit and conflicting claims are made regarding it, [the Commission] will defer to the employer's good faith decision as to unit placement."

The DWSD maintains that under established MERC case law as set out above, deference should be given to its employer's judgment and the unit placement of the two positions should not be disturbed because the Plant Technicians share a community of interest with other Plant Technicians and with Office Support Specialists within Local 324's unit. The DWSD also asserts that the Office Support Specialists and Plant Technicians share a community of interest with each other for the following reasons. Some of the Office Support Specialists also work at the Wastewater Treatment Plant and report to the same plant director and operations manager as the Plant Technicians. All employees at the Wastewater Plant share the same locker rooms, parking lots, and break room facilities and the Plant Technicians and Office Support Specialists who work at the plant punch in using the same time clock. The Plant Technicians and Office Support Specialists report to the same upper-level management team. The fringe benefits for the Plant Technicians and Office Support Specialists, whether they are employed by the City of Detroit/DWSD or the GLWA, are identical, and they are all paid an hourly wage and earn overtime according to the same formula. All Office Support Specialists and Plant Technicians, like other City of Detroit/DWSD and GLWA employees, are subject to the same work rules, entitled "The Way We Work." Office Support Specialists generally work the same work hours as the Plant Technicians who are on the day shift. Both Office Support Specialists and Plant Technicians need at least a high school diploma or GED to be hired, and neither position requires a college degree at any level. Both Plant Technicians and Office Support Specialists operate computers to perform their jobs.

According to the DWSD, under the Commission policy of deferring to an employer's good faith decision on unit placement, it is irrelevant whether the Plant Technicians and Office Support Specialists also share a community of interest with the unit now represented by AFSCME.

The DWSD asserts that after the Plant Technician and Office Support Specialist positions were created, the DWSD took a logical and good faith approach to determining which unit should represent the new positions. It determined which feeder classification had the highest skill/licensure requirements, and then looked to see which union was most familiar with that particular group. In the case of both the Plant Technician and Office Support Specialist positions, it was Local 324. Local 324 had represented boiler operators at the Sewage Plant for at least twenty years. It also could provide the necessary training opportunities for employees to reach the highest level of their respective classifications. The DWSD maintains that its decision to assign these new positions to Local 324 based on these factors was reasonable in these circumstances.

The DWSD also asserts that in order to show that the employer's decision was made in bad faith, the union must present evidence of the alleged bad faith. For this it cites two unfair labor practice cases, *City of Inkster*, 27 MPER 30 (2013) and *Detroit Pub Sch*, 25 MPER 84 (2012) (no exceptions). While AFSCME provided evidence that it had, in essence, been difficult to deal with in the past, according to the DWSD, there is absolutely no evidence to support AFSCME's claim that this motivated the DWSD's assignment of the Plant Technician or Office Support Specialist classifications to Local 324.

### C. Local 324

Local 324 emphasizes the atypical nature of this unit clarification petition. This includes the origin of the dispute in federal litigation, as discussed below, and the fact that the City of Detroit/DWSD eliminated 257 job titles and replaced them with 57 new titles mainly by consolidating multiple job titles into a single classification. Like the DWSD, however, it argues that we should apply our case law holding that when two unions claim a new position, the Commission will defer to an employer's reasonable decision to place the position in one of their units if the evidence indicates that the position shares a community of interest with this unit or with both units rather than determining relative degrees of community of interest. *Detroit Pub Sch*, 21 MPER 52 (2008); *Swartz Creek Cmty Sch*, 2001 MERC Lab Op 372, 375; *City of Saginaw*, 1984 MERC Lab Op 915, 919. Local 324 agrees with the DWSD that under this well-established principle, the City of Detroit/DWSD's decision to assign the Plant Technician and Office Support Specialist titles to Local 324 should not be disturbed so long as the new titles share a community of interest. It also agrees with the DWSD that the Plant Technician and Office Support Specialist titles are new positions. Local 324 points out that the Plant Technician title combines the duties of 12 "feeder classifications," and that under the job description, Plant Technicians are or will be in the future required to perform all the duties that have been consolidated into the new title, while the Office Support Specialist title combines the duties of seventeen "feeder classifications."

Local 324, however, notes that this case diverges from typical unit clarification cases in that none of the classification titles that had been in either Local 324's or AFSCME's previous bargaining units survived the reclassification process, and that the process completely changed the composition of both bargaining units. However, Local 324 takes issue with AFSCME's attempt to compare the Plant Technician and Office Support Specialist positions with other new positions assigned to be represented by it. Local 324 argues that, because none of the previous bargaining units survived the reclassification process, the community of interest analysis should be based on commonalities between the new classifications of Plant Technician and Office Support Specialist and the bargaining units as they existed prior to the reclassification, because this was the situation

8

at the time the DWSD made its bargaining unit assignments. It then argues that the Plant Technician shares a community of interest with Local 324's pre-reclassification bargaining unit, which included the classifications of Plant Equipment Operation Mechanic (PEOM)/Boiler Operator. Local 324 contends that because the Plant Technician subsumed the duties of the PEOMs, along with 11 other "feeder classifications," the new Plant Technician position shares a community of interest with the old PEOM title. In addition, as indicated by the Plant Technician job description, the new position is required to demonstrate abilities to perform duties formerly performed by the PEOM's, including assisting with "non-hazardous plumbing/piping, Heating, Ventilation and Air Conditioning (HVAC) General Maintenance." Moreover, in order to reach the top pay level of the classification, a Plant Technician must acquire a Third Class Steam Stationary Engineer License, Certificate of Completion of Training in Basic Refrigeration, and EPA Refrigeration Universal Handling Certification, all qualifications possessed by and required of the PEOMs. Similarly, the Office Support Specialist shares a community of interest with Local 324's pre-classification bargaining unit because this unit included the Local 324-represented classifications of Principal Clerk and Office Management Assistant, and the Office Support Specialist position subsumed the duties of these former titles.

Because there is a community of interest between the new Plant Technician and Office Support Specialist titles and Local 324's pre-classification bargaining unit, Local 324 argues that the City/DWSD's decision to assign the titles to Local 324 should not be disturbed so long as the Commission finds that it was reasonable and based on objective criteria. Here, the record established that the DWSD's Transition Team considered the licensure and certification requirements of feeder classifications in making the decision to assign the Plant Technician title to Local 324. Local 324 argues that, especially in light of the Commission's reluctance to leave positions unrepresented, it was reasonable for the DWSD to assign the Plant Technician title to Local 324 because the PEOM title represented by Local 324 was the only one with certification requirements. Local 324 also asserts that it was reasonable for the Transition Team to consider Local 324's extensive training program in making the assignment, since Local 324 had actively promoted Local 324's training program and since, of the three unions that represented the "feeder classifications," only Local 324 had an extensive training program that was immediately available to the DWSD. Because the DWSD was already making contributions to Local 324's Educational Fund under the parties' collective bargaining agreement, Local 324's training program was a valuable investment to which the DWSD was already committed.

Similarly, Local 324 argues that the record shows that the DWSD's Transition Team made a reasonable decision to assign the Office Support Specialist position to Local 324. Although the highest skilled positions whose duties were consolidated into the Office Support Specialist position were unrepresented, the Transition Team made the decision not to leave the new title unrepresented. This was reasonable, especially in light of the Commission's policy to avoid leaving isolated positions unrepresented whenever possible. *Jackson Pub Sch*, 23 MPER 97 (2010). The Transition Team then had to find an objective and reasonable basis upon which to make the bargaining unit assignment for the Office Support Specialist title. The Transition Team's decision to assign the position to Local 324, based on the fact that the Principal Clerks represented by Local 324 were the highest-skilled union-represented employees in the new classification, was both reasonable and based on an objective fact.

9

## VI. Findings of Fact

### A. Federal District Judge Cox's Orders

This dispute has its origins with a lawsuit filed against the City of Detroit and DWSD for violations of the Clean Water Act, 33 USC §1251 et seq. In 1977, the Environmental Protection Agency initiated the action in the United States District Court for the Eastern District of Michigan. The action remained pending in 2011 because the City/DWSD had repeatedly agreed to remedial plans to which it had not been able to adhere. After the retirement of Federal District Judge John Feikens, who had been assigned to the case, the matter was reassigned to Federal District Judge Sean Cox. At Cox's direction, a "Root Cause Committee" was formed in September 2011 and charged with identifying the causes of the DWSD's repeated compliance failures and with proposing solutions. On November 4, 2011, Judge Cox issued an order directing the City of Detroit/DWSD to take a series of actions. Some of these actions were proposed by the Root Cause Committee, but some were ordered by Judge Cox because, as he said in his order, he felt the Committee's recommendation did not go far enough.

In 2011, the DWSD had 257 separate job classifications and its employees were members of 20 different collective bargaining units, each of which had its own collective bargaining agreement. Many of these units included both DWSD employees and employees within other City departments. While the job descriptions for these job classifications had been developed and revised over the years by the City's human resources department, many job descriptions had not been revised since the 1990s or earlier.

Judge Cox's November 2011 order required the City/DWSD to take a number of actions that affected the terms and conditions of employment of union-represented DWSD employees. These included requiring the DWSD and the City to have separate collective bargaining agreements covering DWSD employees and enjoining the enforcement of certain terms of existing collective bargaining agreements. The order also included these provisions:

Paragraph 1. The Director of the DWSD, with the input and advice of union leadership, shall develop a DWSD employee training program, a DWSD employee assessment program, and a DWSD apprenticeship training program.

Paragraph 8. The Director of the DWSD shall perform a review of the current employee classifications at the DWSD and reduce the number of DWSD employee classifications to increase workforce flexibility. Future DWSD CBA's shall include these revised employee classifications.

Paragraph 10. Past practices on operational issues shall not limit operational changes initiated by management with respect to DWSD CBAs.

Paragraph 13. The Court enjoins the Wayne County Circuit Court and the Michigan Employment Relations Commission from exercising jurisdiction over disputes arising from the changes ordered by this Court. The Court also enjoins the unions from filing any grievances, unfair fair labor practices or arbitration demands over disputes arising from the changes ordered by this Court.

10

Judge Cox did not explain in his order why he felt that workforce flexibility was a problem. However, managers testified at the hearing in this case that there was a problem with employees doing only the tasks that were listed in their job descriptions. One result was that employees sometimes waited until an employee with a different title became available to perform a necessary task. The Plant Technicians who testified regarding this point denied observing this type of conduct.

After Judge Cox issued his November 4, 2011 order, several unions, as discussed in more detail below, filed motions to intervene. The City of Detroit and the DWSD, as well as the State of Michigan on behalf of the Commission, filed a series of motions requesting clarification of the November 4, 2011 order. In a January 30, 2013 order addressing one of these motions, Cox stated:

> This Court only intended to enjoin MERC and the Wayne County Circuit Court from: (1) ruling that the various items of specific relief relating to CBAs that were ordered by this Court constitute unfair labor practices; (2) exercising jurisdiction over any grievances, unfair labor practice charges, or arbitration demands that are based upon the specific relief ordered by this Court.

On December 14, 2015, Cox issued a "Stipulated Order Regarding Labor Matters" signed by the City, DWSD and AFSCME. The order included a list of thirteen "2015 Labor Mandates" including:

> Paragraph 1: DWSD, with the input and advice of any or all involved/affected unions, must establish training or apprenticeship programs.

> Paragraph 8: DWSD retains the ability to reduce employee classifications in order to increase workforce flexibility, based on operational needs.

> Paragraph 13:

> (a) Except as provided in this Order, labor claims filed or later filed that challenge actions of DWSD which were ordered or specifically permitted by the Labor Orders are permanently enjoined unless dismissed with prejudice by the parties.

> (b) Upon execution of this Order, the injunction previously issued is modified to return jurisdiction to Wayne County Circuit Court, MERC and grievance arbitrators for those claims challenging DWSD actions which were neither ordered nor specifically permitted by Labor Orders. These labor claims may proceed whether filed before or after this Order's date.

> (c) There are also certain pending claims where the parties disagree as to whether or not DWSD's actions, which were challenged with such claims, were ordered or specifically permitted to be taken by the Labor Orders. For such claims, the tribunal where the matter is pending will decide whether DWSD's actions were ordered by Labor Orders. This shall occur also for claims yet to be filed.

11

(d) The following labor claims are enjoined or dismissed:

    (i)    UC14 F-010/C14 E-060 Unit clarification petition and related ULP. AFSCME will amend its Charge and Unit Clarification Petition to dismiss all challenges and issues except for the placement of the positions of Plant Technician and Office Support Specialist.

The December 14, 2015 order also explicitly noted that "the union representation issue of the positions of Plant Technician and Office Support Specialist has not been resolved. AFSCME and IUOE are disputing over the proper union representation for these two positions." It stated that this dispute was the subject of orders issued by Judge Roberts, and that he was adopting her orders as the orders of the Court.

Judge Cox issued his second and final order on December 15, 2015. This order included the same list of thirteen "Labor Mandates" included in the stipulated order of the previous day, but made them applicable "prospectively to the City/DWSD and any labor unions that were not a party to the December 14, 2015 Stipulated Order Regarding Labor Matters." Local 324 was not a party to the stipulated order. The December 15, 2015 order stated that the Labor Mandates and rulings contained in the order "are the entire sum and substance of all labor or union employment rulings which will govern DWSD henceforth, as orders from this Court," and that these Labor Mandates replaced the Court's November 4, 2011 order.

## B. The Wastewater Treatment Plant

The Wastewater Treatment Plant consists of a series of buildings on one property located at 9300 W. Jefferson Ave. in Detroit. There are also several combined sewage overflow (CSO) basins that are part of wastewater operations. The CSO basins hold overflow from the sewage system until it can be treated at the plant. As David McNeeley, the GLWA's Interim Chief of Wastewater Operations described it, the product that the Wastewater Treatment Plant produces is clean water. In the process, debris is removed from contaminated water, solids are removed from the water and turned into sludge, the water proceeds though several stages of treatment, is chlorinated and then de-chlorinated, and then is discharged into the Detroit River. The sludge is further dried, treated with lime and turned into pellets that can be safely used as fertilizer, or incinerated and the ashes trucked away to landfills. There are five major operational areas at the plant: primary treatment, secondary treatment, dewatering, incineration (residuals) and chlorination/dechlorination. The Michigan Department of Environmental Quality (MDEQ), which has an office at the plant, monitors the plant's operations and the content of the effluent it releases into the Detroit River.

## C. The City/DWSD's Actions to Comply with Paragraph 8 of Cox's order

After Judge Cox's November 4, 2011 order, DWSD committed itself to improving efficiency and saving money across its whole organization in a process the DWSD calls "optimization." Issues relating to the City's financial problems and bankruptcy and the creation of the GLWA have intruded, and the process has proceeded slowly. However, according to Majid

12

Kahn, currently the GLWA's Manager of Operations, by 2015 the Wastewater Plant's water quality results, as confirmed by the MDEQ, had begun showing improvement.

In early 2012, the DWSD hired an independent consulting firm specializing in utilities, EMA,[3] to conduct a ninety day review of DWSD's operations. This included interviews with employees throughout the department. EMA identified six major organization-wide operations deficiencies: "siloed" organization (see below); inflexible job descriptions; multiple reporting levels; lack of training; seasonal work issues; ineffective deployment and use of technology; and disconnected business processes. EMA recommended that the 257 job classifications be reduced to 31, including five management classifications, with each classification having between three and five "skill levels." The new classifications EMA proposed included Plant Technician, Industrial Waste Technician, Field Service Technician, Electrical Instrumentation Technician, and Shift Plant Technician, with Plant Technicians, Shift Technicians, Maintenance Technicians and Electrical Instrument Technicians assigned to work at both the Wastewater Plant and the five facilities where water is treated before being distributed through the system. EMA, after its initial study, also proposed the creation of an Administration Support Classification. EMA suggested in its report that the DWSD could reduce its number of management and supervisory positions by 86% and its total staff by 80%.

In October 2012, the City/DWSD entered into a contract with EMA to conduct a more detailed study and prepare a more detailed restructuring plan. EMA formed five "design teams" made up of employee volunteers and EMA facilitators to discuss and review work processes in different areas. The five design teams were: Water, Wastewater, Field Services, Administration and Finance, and Tech Support. Sometime in the late spring or early summer of 2013, each design team, along with EMA, submitted reports for implementing an optimization plan in its area. The minimum time frame for completing these plans was to be five years. The design teams' recommendations included what existing job classifications within their areas could be combined so that work could be more efficiently performed from start to finish. The Wastewater design team recommended the creation of ten new titles to replace existing ones: Plant Technician, Maintenance Technician, Electrical Instrumentation Control Technician (EICT), Team Leader, Engineer, Inspector, Storekeeper/CMMS Clerk, Chemist, and Manager. It also specified which old titles it believed should be consolidated into the new titles. It recommended that twelve existing titles be consolidated into the Plant Technician title. These included two supervisory titles and ten titles represented by AFSCME. It also included Boiler Operator/Plant Equipment Operations Mechanic (PEOM), a title represented by Local 324. Consistent with EMA's earlier recommendation, the design teams recommended "skill-based pay" whereby employees would advance within the title by obtaining licenses and certifications in their fields of work and/or demonstrating specific skills and abilities. The Wastewater design team recommended that the Plant Technician title have four skill/pay levels.

The Administrative and Finance design team recommended the creation of an Office Support Specialist title. As with the other titles, the pay was to be skill-based, with employees advancing within the title based, in this case, on demonstrating specific skills. The design team

---

[3] The documents in the record from this firm use only the initials EMA to identify it.

recommended that the Office Support Specialist title have three skill/pay levels. It also identified eleven existing job classifications that it believed should be consolidated into the new title.

DWSD management adopted most of what EMA65 recommended, including the new job titles EMA had suggested. As EMA had proposed, DWSD decided that all existing titles in the department would be abolished and replaced by the new classifications. The old titles consolidated into the new titles were referred to as "feeder titles" for the new positions. By the end of December 2013, the DWSD had produced a list of 56 job titles (a 57th was later added) to replace the 257 they had in 2011, and had drafted new job descriptions for each new title. The DWSD submitted its list of new titles to Kevyn Orr, then the City's emergency financial manager, and he approved them on December 30, 2013.

Under the former system, many job titles, including clerical titles and those held by operators at the Wastewater Treatment plant were "siloed," i.e., a number of job titles, each with specific job duties, were arranged in a series. Formally, at least, employees were responsible for performing only the tasks within their specific job title. As they gained experience, employees applied for promotion to the next title in their series and, upon promotion, gained new job responsibilities as well as more pay. To be promoted, employees had to wait for the position above them to become vacant. For example, operators in the Wastewater Plant typically began as Sewage Plant Attendant, moved to Sewage Plant Operator when there was a vacancy, and then to Senior Sewage Plant Operator if they had the experience and desire to do so. Above Senior Sewage Plant Operator in the series were two supervisory titles, Assistant Head Sewage Plant Operator and Head Operator. Clerical titles were similarly "siloed." Employees began as Office Assistants Is, Messengers, or Junior Clerks, were promoted to Office Assistant II and then III, Clerk, Senior Clerk and then Principal Clerk, and from there could be promoted to Head Clerk, an unrepresented position. Clerical employees with these titles worked in different locations and different areas throughout the DWSD. Employees with different job titles worked together in the same areas, with tasks requiring more skill, experience, or judgment assigned to the employees with higher level titles, supposedly in accord with their job descriptions, and employees with higher level titles directing the work of those below. However, the job descriptions for many of these clerical titles were seriously out of date and included tasks that clericals had not performed for years because of changes in office technology.

The Wastewater operator jobs described above, and other titles in the Wastewater Treatment plant, have now been collapsed into the Plant Technician title. The Plant Technicians in each area now work as a team, with all Plant Technicians responsible for performing all operator duties of which they are capable based on their experience and training. The Plant Technician title has four levels, each with its own pay scale and top and bottom salary. As described in more detail below, Plant Technicians can advance to the next level when they meet both the certification and "skills demonstrated" requirements for that level. That is, they do not have to wait for a position above them to become vacant. However, in order to move up to the next level, Plant Technicians must demonstrate some specific skills that they may not be able to acquire unless they are assigned by the Employer to work in several different areas of the Wastewater Plant. In addition, the Plant Technician title, unlike all the previous nonsupervisory and lower-level supervisory Wastewater plant operator titles, requires employees to obtain at least a Class D and then a Class C State Wastewater Treatment certification. In order to even take the exams for these certifications, employees must satisfy certain experience requirements established by the MDEQ. The Employer

14

eventually plans to implement a system under which Plant Technicians are systematically rotated to Plant Technician assignments in different areas within the plant. However, this system is not close to fruition.

All the other new job titles, including the Office Support Specialist, are similarly structured. The intent is that an Office Support Specialist should be able to handle an entire process in his or her area, so that employees within that area can fill in for and assist each other to speed the work flow. In the case of the Office Support Specialist, employees advance to level two, and then may advance to level three, by demonstrating the abilities and skills specifically set out in the Office Support Specialist job description.

For the Office Support Specialist, duties of seventeen "feeder titles" were combined into one new title. Three of the seventeen feeder titles were unrepresented, two were represented by Local 324, eleven were represented by AFSCME, and one was an obsolete title at the time of the reclassification. Twelve "feeder titles" were combined or "mapped" to the new Plant Technician title. Two of the twelve were supervisory titles. One was an unrepresented position. Another, Assistant Head Sewage Plant Operator, was part of a supervisory unit represented by the UAW.[4] The Boiler Operator/PEOM title, actually one title but listed as two in DWSD documents, was represented by Local 324. The other eight titles mapped to the Plant Technician were represented by AFSCME.

In December 2013, the DWSD's management Transition Team held a meeting with their labor counsel to discuss whether the employees within each new title shared a community of interest as the Commission defines it. They also discussed to which existing union, if any, each new title should be assigned. At this meeting, the Transition Team was given by their counsel a list of eighteen factors traditionally relied upon by the Commission to determine community of interest. Because of attorney-client privilege, nothing substantive about the discussions that took place at this meeting was admitted into the record. However, Terri Connerway, now the Organizational Development Director for the GLWA and formerly the Human Resources Director for DWSD, testified that either at this meeting or thereafter she recalled discussing the fact that the former Boiler Operator/PEOM title required a certification in the context of the decision to assign the Plant Technician title to Local 324. She testified that the Transition Team decided to assign the Plant Technician title to the union that represented the feeder classification with the highest license and/or certification level requirement. The feeder classification for Plant Technician with the highest certification requirement was Head Operator, but this was an unrepresented position and the Transition Team did not want to designate the Plant Technician classification as non-union. Of the remaining feeder classifications for the Plant Technician position, the Boiler Operators/PEOM's had the highest certification requirement, and since they were represented by Local 324, the Transition Team decided to assign the Plant Technician to Local 324. According to Connerway, the Transition Team also looked at the feeder positions for the new Office Support Specialist title and decided that, of the feeder positions that had been represented by unions, the Principal Clerk position, a position represented by Local 324, was the highest skilled. Before the reclassification, some, but not all, Principal Clerks had been supervisory positions. According to Connerway, it was primarily for this reason that the Transition

---

[4] The UAW indicated, before the instant petition was filed, that it had no interest in representing the new Plant Technician position.

15

Team decided to assign the Office Support Specialist position to Local 324. The team at some point also discussed the type of training that the DWSD would be required to provide in the future and the fact that, as discussed below, Local 324 already provided some of the training that the DWSD would need.

In February 2014, Local 324 learned that it had been assigned the new Plant Technician and Office Support Specialist positions when the DWSD reopened their collective bargaining agreement and presented Local 324 with a proposal that included salary ranges and other terms and conditions of employment for these two positions. In March 2014, the DWSD held a meeting with all of its unions to inform them of the new classifications and the union to which each had been assigned. Job descriptions for each of the new classifications were distributed to the unions at this same meeting. At this meeting, AFSCME learned that it had been assigned a number of new classifications, including Water Technician and Systems Technician. Water Technicians operate and maintain equipment at the Employer's five water (as opposed to wastewater) treatment plants. Systems Technicians monitor the transmission mains and pressure flow of fresh water from the water plants and the pumping stations to ensure that water pressure stays within certain parameters. System Technicians also monitor the flow of wastewater from the CSO holding basins to the Wastewater Plant to ensure that the right volume of wastewater is flowing into the Wastewater Plant from the CSO basins. Systems Technicians regularly communicate with Water Technicians. They also communicate with Plant Technicians at both the Wastewater Plant and CSO basins twice per shift on a regular basis, and more often during storms.

AFSCME was also assigned the new Customer Service Specialist title. Customer Service Specialists take orders from the public for new service and deal with billing issues. They share software with and communicate several times per day with Office Support Specialists in the meter operations office who are responsible for sending Field Service Technicians out to connect water meters and verify that the correct equipment is at the correct property so that accounts can be billed properly. All of these titles are now in a single bargaining unit represented by AFSCME.

Either in 2014 or as a result of the federal court mediation in 2015, AFSCME was also assigned most employees with the title Maintenance Technician.[5] Maintenance Technicians do equipment repair and maintenance at both the Water and Wastewater Plants. If Plant Technicians cannot fix a problem with their equipment, they put in a work order for a Maintenance Technician. Maintenance Technicians and Plant Technicians frequently work together to determine the source of an equipment malfunction. AFSCME was also assigned some of the employees within the EICT classification. EICTs deal with hydraulic pressure and electrical control systems, and both Plant and Water Technicians contact EICTs when they have problems with these systems. EICTs who are electricians or electrical apprentices are now represented by the Michigan Building Trades Council, while all other EICTs are represented by AFSCME. Finally, AFSCME currently

---

[5] The DWSD contends that, because this mediation was confidential, no reference can be made in this proceeding to the agreements reached regarding unit placement as part of this mediation. We do not agree. The matters discussed during mediation and the reasons for the agreements during mediation are not our concern. However, by agreeing to place positions in one unit or another, whether as part of mediation or otherwise, the DWSD agreed, on behalf of itself and the GLWA, to recognize and bargain with certain unions for certain groups of employees in the future. We conclude that the determination of the proper unit placement of the two disputed positions cannot be made without considering the scope of the units currently represented by AFSCME and by Local 324.

16

represents Field Service Technicians at level one of this classification, while Field Service Technicians at level two are represented by the Teamsters.

The Plant Technician title was assigned by the DWSD to Local 324. The Office Support Specialist title was also assigned to Local 324.

As noted above, in May 2015, AFSCME filed an unfair labor practice charge, Case No. C14 E-060 over the removal of bargaining unit work from its unit. In June 2014, it filed a unit clarification petition challenging the reassignment of positions represented by it to new bargaining units. Per the settlement reached in mediation, except for the Plant Technician and Office Support Specialist positions, the bargaining unit assignment of the positions covered by the June 2014 unit clarification petition is no longer in dispute.

The DWSD also created a "catch-all" classification, Special Projects Technician, for employees that were not selected through the assessment process (see below) to fill one of the other new titles. The Special Projects Technicians will hold this title until their retirements or separations, and are assigned to do any type of work they can do in any area of the Wastewater Plant. It is not clear from the record whether there are also Special Projects Technicians in the water plants. The Special Projects Technicians in the Wastewater Plant were assigned to AFSCME.

Sometime after the EMA design teams made their recommendations, the DWSD developed pilot teams for each of the five major areas of the Wastewater Treatment Plant. Managers were assigned to head each team, and employees volunteered or were requested to participate. The pilot teams were set up to test the feasibility of the new organizational plan; employees who worked on the pilot teams performed the duties of the new titles Plant Technician, Maintenance Technician, Electrical Instrument Control Technician, etc., while retaining their old titles.

In early 2014, employees were provided a list of the new classifications and were told that their old titles were being abolished and that they needed to apply for a new classification. To do so, they completed a skills assessment form. The forms were reviewed by the employees' supervisors who evaluated their knowledge, skills, and abilities. The assessments were then reviewed by DWSD's Human Resources Staff who considered the assessments and the employees' prior work history in assigning them to a new job classification and to a level within that classification. Some employees who were not assigned a new job classification were laid off or retired.

D. Plant Technician and Office Support Specialist Duties

Of the approximately 125 employees who are now classified as Plant Technician, five were formerly classified as Assistant Head Sewage Plant Operator. As indicated above, this was a supervisory title which was part of a supervisory unit represented by the UAW. Another six were classified Boiler Operators/PEOMs and represented by Local 324. The other 114 were in job titles represented by AFSCME.

Around 40 employees now have the Office Support Specialist title. One of these 40 employees had the former title Head Clerk, which was unrepresented. Eleven Office Support

Specialists were classified as Principal Clerks, and three were classified as Office Management Assistants and were part of a unit represented by Local 324. Some of the Principal Clerks had been supervisors; as Office Support Specialists they continue to direct the work of others but have no supervisory responsibilities as the Commission defines them. The other 25 or so Office Support Specialists were in clerical classifications represented by AFSCME.

The new job description for Plant Technician describes the "Essential Job Functions" of the position as follows:

> Operate basic wastewater treatment plant equipment and processes to continually monitor plant-wide operations. Take equipment and process readings at various locations throughout the plant. Load and unload chemicals, polymers, and other materials manually and using motorized equipment. Collect and perform tests on water and sludge samples. Perform maintenance and troubleshoot equipment on wastewater treatment equipment. Maintain various records and prepare reports. Perform shift work which includes all day, afternoon, night, weekend and holiday assignments. A valid Michigan Driver's License and the ability to drive a motor vehicle on all terrain. Wear personal protective equipment (PPE). Follow security and safety policies and procedures in carrying out work duties. Perform on the job training.

The only mention in the job description of boiler or HVAC equipment-related duties is the list of abilities that a Plant Technician is required to demonstrate to advance to Level 2. These include:

> Assist with routine carpentry, non-hazardous plumbing/piping, Heating, Ventilation and Air Conditioning (HVAC) maintenance and repair, painting and general maintenance work on building, grounds and related structures.

However, Connerway testified that the operation and maintenance of these systems, particularly the former, is essential not only for the comfort and safety of employees working in the Wastewater Plant, but to other processes in the Plant. For example, a certain temperature range must be maintained for certain biological and chemical processes to take place. Connerway explained that the Employer considers the Plant Technicians who maintain and operate the boiler and HVAC systems to be "operating basic wastewater treatment plant equipment and processes." In addition, McNeeley, who is a former boiler operator as well as an expert in wastewater treatment processes, testified that the type of calculations necessary to operate a boiler system are the same or similar to those required in the wastewater process.

The Plant Technician title has four different levels. The requirements for advancing to the next level within this title are discussed in detail in the section below entitled "Employer's Training Goals and Plans."

The new job description for the Office Support Specialist describes its "essential functions" as follows:

Perform clerical work. Maintain records. Complete recordkeeping, typing, transcription and similar work. Reconcile petty cash. Design and utilize filing systems. Classify items for entry into bookkeeping records. Check arithmetic computation and balance figures. Operate standard office equipment such as personal computers, printers, copiers, scanners, fax, etc. Maintain calendars for departmental staff. Schedule hours, training and meetings. Perform routine correspondence in response to inquiries and complaints and handle routine contacts with other divisions or sections of the organization. Possess a valid Michigan Driver's License and the ability to drive a motor vehicle on all terrain. Follow security and safety policies and procedures in carrying out work duties. Provide on the job training.

The Office Support Specialist position has three levels. An employee is required to advance from level one to level two within two years; there is no requirement to advance to level three. None of the three levels requires more education than a high school diploma or GED, although an associate's degree is recommended for advancement to level three. Advancement from one level to another is achieved by demonstrating the abilities set out in the job description for the next level.

As DWSD witnesses repeatedly testified, the chief goals of the "optimization" process encompass encouraging all employees in a particular area to work as a team. The goals include eliminating "not within my job classification" arguments and ensuring that if there is work that needs doing and employees are capable of doing it, the work gets done as fast as possible. Another goal is promoting on-the-job training of less experienced employees (e.g., giving Sewage Plant Attendants, who were assigned the lowest skill jobs of cleaning up, the opportunity to learn to operate machines so they can step in to do so when necessary). The job descriptions for the new Office Support Specialist and Plant Technician titles describe the duties of the new positions in somewhat broader language than the job descriptions for the old titles. As AFSCME pointed out at the hearing, however, most of the job descriptions for the old titles included "catch-all" language that, at least theoretically, could have been used to force employees in lower paid classifications to do a range of duties normally performed by higher paid employees.

Only a handful of the approximately 165 employees in these two classifications were called to testify at the hearing about their current or former job duties. It appears that most employees who applied for and received a Plant Technician or Office Support Specialist position are assigned to the same jobs in the same areas as before their reclassifications. Two Office Support Specialists testified that they received some additional duties after their reclassification. One Plant Technician testified that Plant Technicians were trained to perform lab analysis that chemists in another bargaining unit formerly performed, and that after the reclassification, Plant Technicians were assigned to perform this work. The same Plant Technician testified that he monitors tanks and retrieves samples, and that since the reclassification he had been given more tanks to monitor although his actual work had not changed. The three other Plant Technicians who were called as witnesses by AFSCME testified that their duties and the duties of the employees who work with them are exactly the same as they were before they received their new titles. One, who was formerly a Sewage Plant Attendant, testified that although there is no longer a Senior Sewage Plant Attendant classification, in his area whoever is working that day and has the most seniority is designated the senior for that day. He also testified that while he operates equipment in his area,

if there is cleanup work that needs to be done in his area while he is operating equipment, a more senior Plant Technician will take over the equipment while he takes care of the cleanup. Likewise, Susan Ryan, who before the reclassification was a Senior Sewage Plant Operator, and is currently president of AFSCME Local 207, testified that as she moves about the plant performing her regular and union duties, the Plant Technicians formerly classified as Sewage Plant Operators seem to be doing the duties formerly done by Sewage Plant Operators, and that other Plant Technicians also seemed to be doing exactly the same duties they did under their old titles.

Zanetta Stewart, who supervised the employees who operated and maintained the boiler and HVAC systems when they were classified as PEOMs and who now supervises them as Plant Technicians, testified that only one minor new assignment – checking steam traps – has been added to their job duties since they were reclassified as Plant Technicians. This task was actually included in the PEOM job description. Moreover, the boiler and HVAC work continues to be performed exclusively by employees who were formerly classified as PEOMs; no other Plant Technicians have as yet been assigned to boiler or HVAC duties to be trained in this work. The Plant Technician witnesses who are not former PEOMs confirmed that they have not yet been assigned to work in the boiler room and denied being told that they would eventually be assigned to or trained to work in the boiler room.

E.  The Employer's Training Goals and Plans

As part of the optimization process, the Employer plans to increase the amount of formal training it provides and also increase on-the-job training and cross-training. For its Wastewater Operations alone, it budgeted $300,000 for training for the 2015-2016 fiscal year and has budgeted $250,000 for the 2016-2017 fiscal year. The Employer has an ambitious plan that includes not only training in the employee's particular work area, but cross-training in all other jobs within his or her classification, and, eventually, cross-training certain employees in the job duties of other classifications with which they work. For example, Plant Technicians now do simple repairs on equipment in the Sewage Plant, while more complicated repairs or problems that a Plant Technician cannot fix, are done by a Maintenance Technician. The Employer eventually plans to train Plant Technicians not only to do all the duties done by Plant Technicians within the sewage plant, but some duties now performed by Maintenance Technicians, so that the Plant Technicians can perform more of this work without putting in a work order for a Maintenance Technician. In addition, its long-term goal (this might take between five and ten years to accomplish) is to provide Plant Technicians with training in the chemistry of the processes with which they work, so that they will be better able to understand why problems arise and what should be done about them.

Sewage Plant operators with long careers at the Wastewater Plant have typically worked in more than one of the five areas. However, for some areas it may take as long as three months of on-the-job experience for a Plant Technician, to be fully trained in an area in which he or she has not worked before; in other areas, it may take longer than six months, depending on the Plant Technician. If there is a vacancy or a need for more Plant Technicians in a particular area, a Plant Technician, of course, will be reassigned to that area. If the Plant Technician has not worked in that area before, he or she will be trained. The record indicates that at least at one time there was a training program in place that required new operators to cycle through jobs in every major area of the plant over the course of several months to become familiar with all processes before they received their first permanent assignment. Plant Technician Susan Ryan, who was hired in 1998,

20

testified that a training program like this was in place when she was first hired. However, the training Ryan received during this program was not full training, and this type of program has apparently not been in place since at least 2011. With the possible exception of the process control center area, the Employer has not yet systematically begun rotating Plant Technicians among areas solely for the purpose of training them in unfamiliar processes.

The Employer has begun cross-training some Plant Technicians to do jobs outside of their title without reassigning them. As noted above, it trained some Plant Technicians to do lab analysis work that was formerly performed by SCATA members. It has also trained Plant Technicians to do some additional light maintenance work on machines, in addition to encouraging them to assist Maintenance Technicians in doing minor repairs.

None of the old nonsupervisory Sewage Plant operator positions required a certification or license. Among other problems, this resulted in a shortage of individuals qualified to fill the higher-level management positions in the Sewage Plant for which State or Federal regulations require a Class B or A Wastewater Treatment certification. The Plant Technician job description now requires employees at Level 1 to obtain a State Wastewater Treatment D license within two years. It is not clear from the job description what the consequences would be if the Employer enforced this requirement. Once a Plant Technician obtains a Class D license and meets the "demonstrated abilities" for Level 2, he or she advances to Level 2. According to the job description, a Level 2 Plant Technician must then obtain a Class C license and advance to Level 3 within three years. Again, it not clear what is to happen if the Plant Technician does not meet this deadline. In order for the Plant Technician to advance to Level 4, he or she has to obtain both a Class B license and the other licenses and certifications discussed below. There is no requirement for a Plant Technician, to advance to Level 4.

The State Department of Environmental Quality requires an individual to have work experience in at least one of five specified areas of wastewater treatment – preliminary/primary treatment, secondary/advanced treatment, residuals processing and disposal, laboratory analysis, or maintenance – in order to be eligible to take the Class D Wastewater license exam. All Plant Technicians will meet this requirement if they remain employed. However, as the Employer admits, most if not all Plant Technicians will need specific training geared to the test, and a refresher math course, in order to pass the Class D exam. In order to be eligible to take the Class C exam, a Plant Technician must have hands-on experience or immediate supervision in three of the five specified areas, including at least 160 hours in secondary treatment. As discussed above, there is no system yet in place to ensure that Plant Technicians are rotated among areas so they can gain the experience they need to take the Class C exam. There is also no formal training program yet in place for Plant Technicians geared to either the Class D or Class C exams. The Employer was not able to provide an estimate of when it would be able to offer the Plant Technicians training that would prepare them to take the Class D or C exams, or when it would be able to ensure that Plant Technicians who obtain Class D licenses will be able to obtain the experience necessary to take the Class C test. It admits, therefore, that it will not be able to enforce the certification requirements in the Plant Technician job description for some time in the future, and that it has not yet set a deadline for when it will begin enforcing these requirements.

In order to reach Level 4 within the classification, a Plant Technician must have both a Class C Wastewater Treatment certification, a Third Class Steam Stationary Engineer License,

21

Certification of Completion of Training in Basic Refrigeration, and EPA Refrigeration Universal Handling Certification. Except for the Wastewater Treatment certification, these are all qualifications possessed by the Boiler Operators/PEOMs who were represented by Local 324 prior to the reclassification and who have now been reclassified as Plant Technicians. A City of Detroit ordinance requires that one employee with a Third Class Steam Stationary License be in the Sewage Plant's boiler room at all times when the plant's boilers are in operation. Local 324 has a training program that qualifies employees for this license and all the current Plant Technicians assigned to the boiler room have it; as well as the refrigeration certifications listed above. When reclassified as Plant Technicians, however, the former PEOMs were placed at Level 1 because they don't have the skills, experience, or Class D Wastewater certification required for higher levels. As of the date of the hearing, there were no Level 4 Plant Technicians, since none of the Plant Technicians had both a stationary engineer license and a wastewater license.

The Employer agrees that no Plant Technician who was formerly classified as a Boiler Operator/PEOM has as yet been assigned to any duties that were not within the scope of his or her old classification. The Employer testified that it eventually plans to rotate the boiler operators to other operator jobs in the Sewage Plant, and to rotate other operators into the boiler room. This is all in the future and there is as yet no timetable for implementing this plan.

Some Office Support Specialists work in the Wastewater Plant, others work at Water Plants, and others work in administrative offices at different locations. The Employer plans eventually to rotate Office Support Specialists among different assignments for cross-training purposes, but has not yet formulated a specific plan to do so. The Employer also plans to provide more Office Support Specialists with formal training in the use of personal computers and in Microsoft Office for those Office Support Specialists whose day-to-day job duties do not require computers and to those who need more training on in Word, Excel, Access, and/or PowerPoint. Terry Daniel, the Employer's Water Operations Director, testified that he has recently sent some Office Support Specialists who work under him to Microsoft Office Training. However, he began doing this before the reclassification, and the Office Support Specialists have received their training from a private vendor also used by the City of Detroit. As noted below, Local 324 added Microsoft Office courses to its training curriculum specifically in anticipation of the Employer's training needs, but no DWSD or GLWA employee has as yet attended any of these courses.

F. The IUOE's Role, and Prospective Role, in Training

IUOE Local 324 has two established training programs, one originally designed for stationary engineers (boiler operators) and another for construction employees. It is licensed by the State of Michigan as a proprietary school, and its apprenticeship program is certified by the United States Department of Labor. A City of Detroit ordinance governs the license and certification requirements for stationary engineers within the City. The City recognizes Local 324's high pressure boiler operator's license training program as a sufficient substitute for the requirement in the City ordinance that any individual must complete a year of on-the-job experience to be eligible for a high pressure boiler operator's license, which is itself a requirement for the Stationary Engineer's license.

22

The Local 324 training programs are open equally to Local 324 members and to members of the public, including individuals not employed in the trade. However, per course rates are lower for Local 324 members.

Local 324's collective bargaining agreements with the City of Detroit have long included a $.05 per-member per-hours worked contribution to the Local 324 Stationary Engineers Educational and Apprenticeship Fund. The contract between Local 324 and the DWSD, a one-year agreement entered into in December 2012, did not include a contribution to the Educational Fund. However, in 2013, when Local 324 and the DWSD agreed to a new collective bargaining agreement through 2022, they agreed to a contribution of $.40 per hour worked. Under the arrangement between the DWSD and Local 324, IUOE members can take up to four classes in Local 324's training program per year at no additional cost to either the Employer or the individual member. The cost of these classes, which Local 324 calculates at the discounted rate offered to Local 324 members, is covered by the Employer's contributions to the Educational Fund.

There are certain training classes that state or federal regulations require wastewater treatment operators to have periodically and which the DWSD has long provided. These include: HAZMAT training, First Aid/CPR, Confined Space Awareness (working safely in confined spaces), "Hot Works," and "Lockout/Tagout." In 2015, Local 324 and the DWSD agreed that Local 324's trainers would begin providing these training classes, as well as a Math Refresher class, at the Wastewater plant. The cost of this training is covered by the Educational Fund. Local 324's training curriculum also includes other classes that could be useful to a wastewater treatment operator, including pump performance and maintenance, and basic electrical troubleshooting. These classes are held at Local 324's training center. At the time of the hearing, employees of the Employer had to submit a request and have their request be approved by their supervisor in order to enroll in a Local 324 class at its training center. The Employer has not yet begun assigning or directing Plant Technicians to enroll in classes at the training center, although this is something the Employer envisions doing in the future. As of the date of the hearing, Local 324 had not yet put together a course specifically for wastewater treatment operators or designed to help them pass a wastewater certification test. Again, this is something the DWSD and Local 324 envision will occur in the future.

After Local 324 became the bargaining representative for the Office Support Specialists, it added classes in Basic Computers and Microsoft Office specifically with the Office Support Specialists in mind. These classes are currently being conducted, and Local 324 members are attending. However, the Employer has not yet assigned or directed any Office Support Specialists to attend these classes.

AFSCME does not have a training program operating in Michigan, although the AFSCME International does have a training curriculum and AFSCME does provide training to its members in some localities. AFSCME argued at the hearing that AFSCME and the Employer could agree to establish a training fund like the IUOE has, which is funded by Employer contributions and, perhaps, use that fund to pay for training by the IUOE. It also appears, from the numerous DWSD documents discussing the training entered into the record, that a Michigan-based non-profit, the Michigan Water Environment Association (MWEA), currently offers training courses which it advertises as preparation for the MDEQ's wastewater license exams.

### G. History of "Militancy" Among Members of AFSCME Locals at the DWSD

One of AFSCME's arguments in this case is that the Employer's decision to assign the Plant Maintenance and Office Support Specialist positions to Local 324 was not made in good faith because it was based solely or primarily on the fact that the AFSCME Local Unions that represented DWSD, and Local 207 in particular, had a history of "militancy." This included a history of filing frequent grievances, opposition to the changes implemented by the DWSD after Cox's November 4, 2011 order, opposition to the pension cuts imposed on City employees as part of the City's bankruptcy, and opposition to appointment of an emergency manager for the City. AFSCME also offered evidence that the AFSCME Locals, unlike some other unions including Local 324, did not reach collective bargaining agreements with the DWSD after Cox's November 4, 2011 order. According to AFSCME, this was because the AFSCME Locals were not willing to accept terms that other unions agreed to. Last but not least, while AFSCME Council 25, AFSCME Local 207, Local 324 and other unions filed motions to intervene in the federal litigation after Cox issued his November 4, 2011, order, Local 324 agreed during contract negotiations with the DWSD not to appeal Cox's denial of its motion.

Immediately after Judge Cox's November 4, 2011, order, a number of unions filed motions to intervene in the federal court action. These included AFSCME Council 25 on behalf of itself and its affiliated Locals, UAW Region I and its Local 2200, and Local 324. On or about November 28, 2011, after Judge Cox had denied these motions, Local 207, along with the Senior Accountants and Analysts Association (SAAA), filed its own motion to intervene, along with a motion asking Judge Cox to disqualify himself from ruling on further matters related to his November 4, 2011, order. Local 207's motions were denied by Judge Cox on December 13, 2011, after which Local 207 joined AFSCME Council 25 in appealing the denial of their motions to intervene to the Sixth Circuit Court of Appeals. The other unions, including Local 324 and AFSCME Local 2920, either decided not to appeal or appealed and then withdrew the appeal. On April 13, 2013, the Sixth Circuit granted AFSCME Council 25, AFSCME Local 207, and the SAAA intervenor status.

Prior to Cox's November 4, 2011 order, all AFSCME-represented DWSD employees were covered by the City of Detroit Master Agreement between the City and AFSCME. At some point before the issuance of the November 4, 2011 order, Local 207 and Local 2920, two AFSCME locals assigned to represent different groups of DWSD employees, negotiated separate supplemental agreements with the City of Detroit covering the employees under their jurisdiction. However, no one at the hearing could recall the last time Local 207 and the City reached a supplemental agreement.

Cox's November 4, 2011 order, as noted above, directed the DWSD and City to have separate collective bargaining agreements covering DWSD employees. The parties agree that all AFSCME-represented employees at the DWSD are now part of a single bargaining unit. As discussed below, the DWSD and Local 2920 have a collective bargaining agreement which does not expire until 2018. There is no agreement between the DWSD and Local 207. What, if any, role AFSCME intends to assign to Local 207 in representing employees of the DWSD or GLWA is unclear from the record.

Local 207, and specifically its members in the Wastewater Plant, has a long history of "militancy," in the sense of taking public positions on issues relating to the operation of the DWSD and holding rallies and public demonstrations in support of these positions. According to testimony, Local 207 has consistently opposed proposals made over the last fifteen years to turn DWSD operations over to a regional water authority such as the GLWA. Local 207 warned its members, in the months before Cox issued his November 4, 2011 order, that Cox was likely to order some combination of a regional authority takeover and privatization of DWSD functions. After Cox issued his November order, Local 207 expressed outrage at its provisions in its official newsletter.

In 2012, the City entered into a consent agreement with the State of Michigan under the Local Government and School District Fiscal Accountability Act, 2011 PA 4. In accord with the terms of this statute, the City was not subject to the duty to bargain under §15 of PERA for the duration of the consent agreement. In June 2012, the City imposed a concessionary "contract" on its unit of nonsupervisory employees represented by AFSCME which was titled "City Employment Terms (CET)." On June 27, 2012, the Detroit Board of Water Commissioners, which oversees the DWSD, passed a resolution applying the terms of the CET to all bargaining units whose agreements with the City had expired and that had not reached separate collective bargaining agreements with the DWSD. This included the AFSCME-represented unit of DWSD employees.

Although the DWSD took the position that these negotiations were not "bargaining" because the City's duty to bargain had been suspended, AFSCME and the DWSD commenced negotiations for a new contract around July 2012. Negotiations did not go well. On July 24, 2012, AFSCME Local 207 held an informational picket at the Wastewater Plant which was covered by local media. In September 2012, both AFSCME Local 2920 and AFSCME Local 207 members, voting separately, voted to authorize a strike, although neither Local actually called a strike. On September 30, 2012, Local 207 conducted a picket of the Wastewater Plant that lasted five days. This picket was accompanied by a walkout of approximately 150 employees at the plant led by Local 207 officers Michael Mulholland and Susan Ryan. The employees who participated in this walkout were suspended but, per an agreement between AFSCME and the DWSD, were allowed to return to work after signing last chance agreements.

In October 2012, the DWSD imposed another set of terms on its AFSCME-represented employees. AFSCME Local 207 held a rally at the Federal Courthouse in Detroit in October 2012. In November, 2012, it urged its members to appear before City Council to oppose approval of the contract with EMA.

In November 2012, 2011 PA 4 was repealed by referendum of the voters. In March 2013, the DWSD asked AFSCME Local 207 to take the DWSD's contract offer to its membership. The DWSD's offer included a demand that Local 207 withdraw its request to intervene in the federal court proceeding. Local 207's membership decisively rejected the offer. However, on March 26, 2013, the DWSD and AFSCME Local 2920 entered into a collective bargaining agreement covering the term 2012-2018.[6] As part of this agreement, Local 2920 withdrew as a party from

---

[6] According to AFSCME's post-hearing brief, this contract, at least at the time it was executed, covered only the clerical titles then under AFSCME Local 2920's jurisdiction. After the reclassification, AFSCME had only one

AFSCME Council 25's appeal to the Sixth Circuit of Cox's denial of its motion to intervene in the federal court litigation.

On March 28, 2013, a new statute, the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1543 et seq., took effect. This statute was the third Michigan statute to allow for the appointment of an emergency financial manager for a municipality and, like its immediate predecessor, stated that a municipality's duty to bargain under § 15 of PERA was suspended when it was placed "in receivership," i.e. when an emergency manager was appointed. On March 15, 2013, Governor Rick Snyder appointed Kevyn Orr as the City's emergency manager and on March 26, 2013, confirmed his status under the new statute. At the beginning of July 2013, the City filed a petition for bankruptcy.

In July 2013, AFSCME Local 207 conducted a rally and picket line to protest the appointment of an emergency manager, the proposal to cut pensions and annuities as part of the City bankruptcy, and regionalization of the DWSD. The purpose of the rally, according to Local 207's newsletter was "to Get EMA out of DWSD – Stop Job Cuts, Job Combination, Pilot Programs and Resource Pool."

The 2012-2018 contract between the DWSD and AFSCME Local 2920 provided that either party could reopen the contract on economic issues at any time after ratification. It also stated that the parties would negotiate for thirty calendar days on any economic issue raised in the reopener, and that after that, the DWSD had the right to implement its last offer. The DWSD reopened the contract in 2014. In the late summer of 2014, AFSCME refused to take what the DWSD labeled its "last offer" to its membership for a vote. The DWSD reopened the contract again in 2015, and again the parties were unable to reach mutual agreement on terms.

On December 14, 2014, Governor Snyder declared that the City was no longer in a state of financial emergency, and the City returned to local control.

As evidence that Local 207 filed frequent grievances, AFSCME offered a document submitted in February 2014 as part of its proof of claim in the City bankruptcy case. According to that document, Local 207 had 764 pending grievances on that date; it also filed 150 grievances later in 2014, 80 in 2015 and 17 in 2016.

AFSCME also presented the testimony of Tracy Reynolds, current president of AFSCME Local 2920 and, since the reclassification, a Customer Service Specialist. At the time the DWSD hired EMA to help review its job classifications, Reynolds was Local 2920's vice-president. She testified that Local 2920 complained to DWSD management about EMA's intrusiveness. Reynolds also testified that Local 2920 opposed the hiring of EMA because "we were afraid they were going to consult us out of our jobs." She also testified that she advised other employees in her area not to answer the consultants' questions, although she was never disciplined for this.

---

clerical title, Customer Service Specialist. However, according to the document entered into the record, this contract covered a much broader unit, including water and sewage plant operator titles. As indicated above, AFSCME agrees that there is now only one AFSCME-represented bargaining unit of DWSD/GLWA employees. It is not clear from the record whether the other new titles assigned to AFSCME in or after the reclassification are covered by the 2012-2018 agreement between AFSCME Local 2920 and the DWSD.

According to Reynolds, after the consultants found that employees in her area were unwilling to cooperate, they left the area.

AFSCME contrasts the history of contentious negotiations between AFSCME and the DWSD with what it alleges was the compliant position taken by Local 324 in contract negotiations. In December 2012, Local 324 entered into a one-year collective bargaining agreement with the DWSD that covered Local 324's unit of principal clerks, office management assistants, and PEOMs and another IUOE-represented unit of park management employees. This agreement, which was to expire in June 2013, included both a broad management rights clause and a memorandum of understanding stating that "any position that is created during the term of this agreement in which one or more IUOE 324 members are in place[sic] will be considered the jurisdiction of the Operating Engineers Local 324." At the time this contract was reached, the contractor EMA had just begun its efforts to survey work processes. Local 324 Business Representative William Miller testified without contradiction that he proposed this MOU to protect the jobs of his members in return for accepting the broad management rights language proposed by the DWSD. The 2012-2013 contract did not require the DWSD to make a contribution to Local 324's Educational Fund.

In March 2013, the DWSD and Local 324 agreed to an extension of their collective bargaining agreement through June 30, 2022. It included the same economic reopener language as the AFSCME agreement discussed above. This new agreement omitted the MOU discussed above, but added these two provisions:

> Article 44. Training Fund
> DWSD agrees to contribute $0.40 per member, per hours worked, capped at 2080 hours per member, to Operating Engineers Local 324 Stationary Engineers Educational and Apprenticeship Fund for training purposes.

> Article 45. Apprenticeship
> DWSD will accept the Operating Engineers Local 324 Stationary Engineers Educational and Apprenticeship Fund. The Apprenticeship will be mutually agreed upon between both parties through a Memorandum of Understanding (MOU). The program may be revisited by either party each contract year between April 1 and June.

The 2012-2022 agreement was reopened in 2014. The DWSD's proposal to Local 324 on February 11, 2014, stated that the new job classifications of Office Support Specialist and Plant Technician had been assigned to Local 324 and proposed salary minimums and maximums for these positions, as well as some other changes to the economic provisions in the contract. The parties reached tentative agreement on new provisions on March 12, 2014, and these new provisions were later ratified by both parties. No change was made to the DWSD's contribution to the Training Fund.

The DWSD reopened the agreement again in 2015. On December 4, 2015, Local 324 and the DWSD reached tentative agreement on another set of changes to the economic

provisions of their contract, and these changes were later ratified by both parties. No change was made to the DWSD's contribution to the Training Fund.

Local 324 Representative Miller testified that Local 324 had no pending grievances when the City filed for bankruptcy, and that it might have filed two or three grievances, but no more, after it began representing Plant Technicians in 2015.

## VII. Discussion and Conclusions of Law:

### A. The Commission's Authority to Determine the Appropriate Unit and Unit Clarification Principles

The Commission's authority to determine units appropriate for collective bargaining under PERA is established by §13 of the Act, which states:

> The commission shall decide in each case, to insure public employees of the full benefit of their right to self-organization, to collective bargaining and otherwise to effectuate the policies of this act, the unit appropriate for purposes of collective bargaining as provided in section 93 of Act No. 176 of the Public Acts of 1939, as amended, being section 423.93 of the Michigan Compiled Laws. . .

Unit placement is a permissive, not a mandatory, subject of collective bargaining. *Detroit Fire Fighters Ass'n, Local 344, IAFF v City of Detroit,* 96 Mich App 543, 546, (1980); *Ishpeming Supervisory Employees, Local 128, AFSCME v Ishpening,* 155 Mich App 501, 515 (1986); *Michigan Educational Support Personnel Ass'n v Southfield Public Schools,* 148 Mich App 714, 716 (1985).

When the parties cannot agree, unit placement and the scope of the bargaining unit are matters to be decided by the Commission under § 13. *City of Warren,* 1994 MERC Lab Op 1019, 1023; *Livonia Pub Sch,* 1996 MERC Lab Op 479, 481. The reclassification and removal of positions from a bargaining unit without a substantial change in job duties is not a question of the employer's authority to assign work and, therefore, is not within the scope of a public employer's management prerogative. Instead, it is a question of unit placement that, absent the agreement of the parties, must be resolved by the Commission. *City of Ann Arbor,* 16 MPER 17 (2003) (no exceptions); *Michigan State Univ,* 1992 MERC Lab Op 120, 123.

In exercising our authority to determine the scope of the appropriate unit, however, we defer to the parties' past agreements, both explicit and implicit, regarding bargaining unit placement. This principle is reflected in our unit clarification petition case law, which we recently summarized, in *Univ of Michigan,* 29 MPER 23 (2015), as follows:

> The Commission Rules and its case law regarding unit clarification petitions are both well-settled. We have long followed the holding of the National Labor Relations Board in *Union Electric Co,* 217 NLRB 666, 667 (1975), which we adopted in *Genesee Co,* 1978 MERC Lab Op 552, 556, and more recently restated in *City of Detroit & AFSCME Council 25,* 23 MPER 102 (2010), and *Jackson Pub Sch,* 1997 MERC Lab Op 290, 298-299:

28

Unit clarification, as the term itself implies, is appropriate for resolving ambiguities concerning the unit placement of individuals who, for example, come within *a newly established classification of disputed unit placement or, within an existing classification which has undergone recent, substantial changes in the duties and responsibilities of the employees in it so as to create a real doubt as to whether the individuals in such classification continue to fall within the category -- excluded or included -- that they occupied in the past.* Clarification is not appropriate, however, for upsetting an agreement of a union and employer or an established practice of such parties concerning the unit placement of various individuals, even if the agreement was entered into by one of the parties for what it claims to be mistaken reasons or the practice has become established by acquiescence and not by express consent. [Emphasis added]

A position is not "newly established" if it has the same job duties as an abolished position and has merely been given a new title. *City of St Clair Shores*, 1988 MERC Lab Op 485. An employer does not have the right to reclassify or retitle a position and unilaterally remove it from its bargaining unit without a change in its job duties, and this principle applies whether the issue is raised in the context of the unfair labor practice charge or in a unit clarification proceeding. *Ingham Co*, 1993 MERC Lab Op 808, 812.

Moreover, in order to justify a change in the position's unit placement, the change in the position's job duties must be "substantial."[7] Contrast, for example, *Hart Pub Sch*, 1982 MERC Lab Op 178, (in which we concluded that a school aide's job duties were not substantially changed when she was reassigned from working with students to record-keeping duties); and *Bay Co*, 1996 MERC Lab Op 240, (where we concluded that the removal of professional duties from the positions of staff accountant and senior staff accountant justified clarifying an existing unit of clerical, technical, and paraprofessional employees to add these two positions).

In addition, in making unit placement decisions, we generally consider only changes in job duties that have been implemented as of the day of the hearing, and do not base our unit placement determinations on an employer's testimony that it plans to change the job's duties in the future since these changes may never occur. *Branch Co Sheriff*, 1989 MERC Lab Op 768; *Lansing Sch Dist*, 20 MPER 3 (2007). But see, *MEA v Clare-Gladwin ISD*, 153 Mich App 792 (1986), aff'g 1985 MERC Lab Op 915, in which we held that the employer's testimony that a position had received new supervisory authority constituted a substantial change in the position's job duties, even though the employee had not yet had occasion to exercise the new authority.

As we stated in *City of Detroit (Fire Dep't)*, 20 MPER 79 (2007), when an employer reclassifies an existing position, generally the only issue is whether there have been changes in job duties that have affected the community of interest between the position and the bargaining unit so that placement of the position in its original unit is no longer appropriate. If the changes have not affected the community of interest, the employer has an obligation to bargain over terms and

---

[7] A position need not have received all new duties, but the change in duties must be substantial.

conditions of employment of the reclassified position. *Ingham Co,* 1993 MERC Lab Op 808, 812-813. See also *Northern Michigan Univ,* 1989 MERC Lab Op 139 (employer violated its duty to bargain when it eliminated unit positions, created new positions with different titles doing the same work, and recognized a second union as the bargaining representative for the "new" positions).

As discussed above, our policy is not to alter an established bargaining unit or unit configuration even if it is not one that we would have found appropriate if asked to determine the appropriate unit when the union(s) first sought to represent the employees. However, when a position is genuinely new, unions representing different bargaining units claim the position, and the employer places it in one of these bargaining units, we defer to the employer's good faith decision as long as it is reasonable and the position shares a community of interest with the unit in which it is placed. In addition to the cases cited by the parties for this proposition, see *Royal Oak Pub Sch,* 1984 MERC Lab Op 922; *Lakeview Sch,* 1988 MERC Lab Op 424. We do not determine relative degrees of community of interest or attempt to find the "optimum" or "most" appropriate unit. *Lansing Sch Dist,* 22 MPER 96 (2009); *City of Lansing, Bd of Water & Light,* 2001 MERC Lab Op 13, 16; *Henry Ford Cmty Coll,* 1996 MERC Lab Op 374, 379-380.

## B. Application of these Principles in the Instant Case

We find, first, that the positions Plant Technician and Office Support Specialist do not meet our definition of "new" positions, because the evidence does not demonstrate that the job duties of the positions which were consolidated into these two new titles underwent changes substantial enough to justify changing their bargaining unit placement. Twelve positions were consolidated into the new Plant Technician title, and seventeen into the Office Support Specialist title. Altogether, approximately 165 employees were affected. These included employees who previously had supervisory authority, but lost it in the reclassification. Clearly, these employees no longer belong in supervisory units, if they ever did. Some Plant Technicians were assigned to lab analysis work that was formerly done by chemists, but there is no indication in the record that this work is so markedly different in nature from other duties previously performed by operators in the Wastewater Plant. Of course, only a small sampling of the 165 employees who are now classified either as Plant Technicians or Office Support Specialists testified at the hearing. However, from this testimony and the testimony of management personnel, we conclude that while some employees in both of these classifications have been given somewhat more responsibility, others, in both classifications, have experienced no change in their job duties.

The Employer plans eventually to cross-train Plant Technicians to do every task described in the Plant Technician job description, as well as duties normally done by other titles, such as Maintenance Technician. Not only have these plans not yet been implemented, but, more importantly, even if and when the Employer fully realizes its plans to train the Plant Technicians, they will not be performing work that is fundamentally different from that performed by positions in their previous bargaining units before the reclassification. That is, they will be better, more skilled, more versatile, more efficient, and more knowledgeable Wastewater plant operators and boiler operators/HVAC technicians, but they will still be plant operators and boiler operators/HVAC technicians. Likewise, after the Office Support Specialists are cross-trained to work in other areas and receive more formal training in office skills as the Employer anticipates, the Employer will have more efficient and capable clerical support employees who can be more easily transferred within the organization. However, they will still be clerical support employees.

30

We conclude that the reclassification has not resulted in a substantial change in the job duties performed by either the Plant Technicians or Office Support Specialists that would normally justify altering the bargaining unit placement of the employees in these positions. Therefore, we would normally order the Employer to recognize and bargain with Local 324 for the Plant Technicians who formerly performed boiler/HVAC duties in the Wastewater Plant and for the employees who were formerly classified as Principal Clerks and Office Management Assistants, and order it to recognize and bargain with AFSCME for the remaining employees in both the Plant Technician and Office Support Specialist classifications. This would not, of course, require the Employer to revive job titles within the AFSCME or Local 324 bargaining units which it has eliminated, or to return to its previous system of "siloed" jobs, but would simply require the Employer to recognize and bargain with AFSCME or Local 324 over any new title resulting from the consolidation of positions within their respective bargaining units. Any assignment of work across bargaining unit lines that the Employer wished to implement, or the cross-training needed for such assignment, would be matters to be negotiated with the two unions involved.

We recognize, however, that this is an atypical unit clarification proceeding because the Employer's reclassification and removal of positions from their existing bargaining unit resulted from its attempts to comply with the U.S. District Court's November 4, 2011 order. That order directed the DWSD to review its existing classifications and reduce their number to increase workforce flexibility. The same order enjoined us from exercising jurisdiction over "disputes arising from the changes ordered by this Court." As AFSCME points out, paragraph 8 of Judge Cox's November 4, 2011 order requiring the DWSD to reduce the number of its existing classifications (257 at the time of that order), says nothing about bargaining units. Nor did Judge Cox tell the DWSD to reduce the number of classifications by 80%, or eliminate all of its existing classifications and replace them with new ones. However, we find that since Cox's order included an injunction on our exercise of jurisdiction, that he intended to give the DWSD the authority to reduce job classifications without necessarily respecting existing bargaining unit configurations, as we would have ordered it to do. We also agree with the DWSD that in ordering the DWSD to reduce the number of its classifications to "increase flexibility," Cox contemplated that the DWSD would assign at least some of its employees to new classifications without substantially changing their job duties.

We note that under Judge Cox's December 14 and December 15, 2015 orders we are no longer enjoined from adjudicating "claims challenging DWSD actions which were neither ordered nor specifically permitted by Labor Orders." However, somewhat oddly, we are apparently tasked with determining what actions were "specifically permitted," by those orders if the parties do not agree. We construe this as giving us the ability to interpret Judge Cox's November 4, 2011 order to determine his original intent, which we have done above. We conclude, therefore, that the Plant Technician and Office Support Specialist classifications should be analyzed as new positions even though, as discussed above, they do not meet our normal definition of that term.

The DWSD and Local 324, however, not only ask us to apply a different definition of a new position, but argue that we should defer to the DWSD's decision to assign the new positions to Local 324. As discussed above, when a position is genuinely new, and claimed by more than one existing bargaining unit, we defer to the employer's good faith decision to place the position

in one of these units as long as the decision is reasonable and the position shares a community of interest with the unit in which it is placed.

These parties assert that because the two new classifications, Plant Technician and Office Support Specialist, share a community of interest with each other, and the DWSD's decision to assign them to be represented by Local 324 was reasonable – although not based on any factor normally considered by us in determining community of interest – we should defer to the DWSD's decision even though the two positions might also share a community of interest with AFSCME's bargaining unit.

However, all cases in which we have deferred to an employer's decision to place a new position in one unit over another involved a small number of new positions and two or more existing bargaining units claiming them. In some of those cases, the new positions appeared to share a community of interest with more than one of the competing units and/or the units would together have formed an appropriate unit if combined into a larger unit. However, consistent with our policies of not disturbing existing bargaining units or determining relative degrees of community of interest, we deferred to the employer's decision to place the new position(s) in one of the competing units.

As Local 324 recognizes in its brief, this situation is different. In this case, the DWSD abolished all of its existing positions and created new ones. By assigning each position to be represented by one (or more) of the unions that had represented the abolished classifications, DWSD essentially created new bargaining units. AFSCME asserts that the Plant Technician and Office Support Specialist positions share a community of interest with the bargaining unit which the DWSD created and assigned to AFSCME, and that we should place the positions in that unit. The Employer and Local 324 argue that we should defer to the DWSD's decision to create a separate bargaining unit consisting of the new Plant Technician and Office Support Specialist positions.

The most important criteria in determining appropriate units is whether the employees within the unit share a community of interest. The touchstone of an appropriate bargaining unit is the finding that all of its members have a common interest in the terms and conditions of employment to warrant their inclusion in a single unit. *Eastern Michigan Univ Regents v Eastern Michigan Univ Professors*, 46 Mich App 534, 208 (1973). Community of interest is determined by examining a number of factors, including: similarities in duties, skills, and working conditions; similarities in wages and employee benefits; amount of interchange or transfer between groups of employees; centralization of the employer's administrative and managerial functions; degree of central control of labor relations; common promotion ladders; and common supervision. See e.g., *Macomb Co*, 17 MPER 35 (2004); *Dearborn Pub Sch*, 2002 MERC Lab Op 287; *Grosse Pointe Pub Library*, 1999 MERC Lab Op 151; *Covert Pub Sch*, 1997 MERC Lab Op 594, 601. The fact that employees have different job duties or functions does not necessarily mean that they lack a community of interest. *Covert*, at 602.

The DWSD asserts that the Office Support Specialists and Plant Technicians share a community of interest with each other for the following reasons. Some of the Office Support Specialists also work at the Wastewater Treatment Plant and report to the same plant director and operations manager as the Plant Technicians. All employees at the Wastewater Plant share the

32

same locker rooms, parking lots, and break room facilities and the Plant Technicians and Office Support Specialists who work at the plant punch in using the same time clock. The Plant Technicians and Office Support Specialists report to the same upper-level management team. The fringe benefits for the Plant Technicians and Office Support Specialists, whether they are employed by the City of Detroit/DWSD or the GLWA, are identical, and they are all paid an hourly wage and earn overtime according to the same formula. All Office Support Specialists and Plant Technicians, like other City of Detroit/DWSD and GLWA employees, are subject to the same work rules, entitled The Way We Work. Office Support Specialists generally work the same work hours as the Plant Technicians who are on the day shift. Both Office Support Specialists and Plant Technicians need at least a high school diploma or GSD to be hired, and neither position requires a college degree at any level. Both Plant Technicians and Office Support Specialists operate computers to perform their jobs.

All these factors, however, also support a finding that the Office Support Specialist and Plant Technicians share a community of interest with the AFSCME bargaining unit. Maintenance Technicians represented by AFSCME work at the Wastewater Treatment Plant and report to the same plant director and operations manager as the Plant Technicians and Office Support Specialists working there. They all share the same locker rooms, parking lots, and break room facilities, punch the same time clock, and report to the same upper level-management team. In addition, some Maintenance Technicians and Plant Technicians also report to the same lower-level supervisor. All City of Detroit/DWSD and GLWA employees, including the Plant Technicians, Office Support Specialists and all the employees in the AFSCME bargaining unit, are subject to the same work rules. While the Plant Technicians who perform boiler and HVAC duties work slightly different shifts from the other Plant Technicians and the Maintenance Technicians who work at the Wastewater Plant, all other Plant Technicians and the Maintenance Technicians work the same shifts. The Office Support Specialists, who work only the day shift, work the same hours as the Maintenance Technicians at the plant who work the day shift. The Office Support Specialists, the Plant Technicians, and the Water and Maintenance Technicians in AFSCME's unit all need at least a high school diploma or GED to be hired, although the Water Technician position requires an associate's degree to reach the highest level within the classification. Although the record does not indicate whether Water or Maintenance Technicians operate computers, the Systems Technician, another position in the AFSCME bargaining unit, does.

Local 324 argues that because none of the previous bargaining units survived the reclassification process, the community of interest comparison should be between the new classifications, in this case the Plant Technician and Office Support Specialist classifications, and the bargaining units as they existed prior to the reclassification. It asserts that in December 2013, when the DWSD's Transition Team made the decision to assign new positions to unions, there were no other bargaining units on which to base a comparison and that, therefore, the Transition Team acted properly in comparing the new positions to the old. It also maintains that the Plant Technician and Office Support Specialist classifications share a community of interest with Local 324's pre-reclassification bargaining unit which included the "feeder classifications" of PEOM/Boiler Operator and Principal Clerk. We do not agree, however, that the determination of whether the Plant Technician and Office Support Specialist positions should be placed in Local 324's current bargaining unit or the bargaining unit currently represented by AFSCME should be based on whether these positions share a community of interest with bargaining units that no longer exist.

33

We also note that there is no evidence in this record that the DWSD considered any of the factors we traditionally use to determine community of interest in its decisions to assign the Plant Technician or Office Support Specialist positions to Local 324. It appears that the DWSD, did not consider similarities or differences in duties, skills, or educational qualifications between the Plant Technician or Office Support Specialist positions and other new positions. Instead it looked at the "feeder classifications" for these two new positions, picked out those classifications that had been represented by a union, identified the classifications in this group which it deemed to require the highest level of skill, and assigned the new position to Local 324 because it had represented that feeder classification. The fact that Local 324 had a training program in place and was able and willing to expand its program to offer the training the DWSD expected to need in the future, at discounted rates for Local 324 members, also seemed to have been a factor in the decision to assign the classifications to that union. The end result of this decision, however, the creation of a new bargaining unit primarily made up of feeder classifications and employees previously represented by AFSCME but, after reclassification, represented by IUOE Local 324.

We conclude that the DWSD has not demonstrated that its decision to creating a separate bargaining unit consisting only of the Plant Technician and Office Support Specialist classifications was reasonable. The DWSD appears to assert that, as long as there was a community of interest between these two classifications, it was entitled to make the decision to assign the two new positions to Local 324 based on "operational" considerations. Presumably this included the training benefits the Employer would derive from having its employees represented by Local 324. It is not clear, and the DWSD did not explain, what benefits either the Employer or the employees derived from the assignment of the new positions to the union that represented the most highly skilled of the feeder classifications into which the new positions were consolidated.[8] In any case, we do not rely on either of these factors in determining the appropriate unit placement of these positions.

In *Hotel Olds v State Labor Mediation Bd*, 333 Mich 382, 387 (1952), the Supreme Court stated:

> In designating bargaining units as appropriate, a primary objective of the commission is to constitute the largest unit which, in the circumstances of the particular case, is most compatible with the effectuation of the purposes of the law and to include in a single unit all common interests.

As discussed above, we generally defer to bargaining history and the parties' agreement as to the appropriate unit. However, when there is neither bargaining history nor agreement on the appropriate unit, our policy is to avoid unnecessary multiplication or fractionalization of bargaining units. The importance of this policy has been reaffirmed by the Courts. See *Michigan Coaches Ass'n, Warren Consolidated School Dist, Local No 1 v Warren Consolidated Schools Bd of Ed*, 119 Mich App 85, 89 (1982), lv. den. 417 Mich 1020 (1983); *Michigan Ass'n of Pub Employees v AFSCME Council 125*, 172 Mich App 761, 765 (1988). Unless there are countervailing considerations such as bargaining history, craft identification, common

---

[8] The IUOE is the union which traditionally represents stationary engineers. However, there was no indication in the record that the Plant Technicians were assigned to Local 324 so that the former PEOMs in that classification could continue to be represented by the union which traditionally represents their craft.

34

professional standards, or law enforcement responsibilities, we favor broad units, including county-wide units over departmental or single location units. *Wayne Co*, 1988 MERC Lab Op 232, 243.

Because the Plant Technician and Office Support Specialist positions are being treated as though they are new positions, there is no bargaining history to consider, and the parties did not reach agreement on their unit placement. We conclude that, in accord with the policy of *Hotel Olds*, the appropriate unit in this case is the largest unit of employees of the Employer who share a community of interest. Since we find, as discussed above, that the Plant Technicians and Office Support Specialist positions share a community of interest with the larger unit of Water Technicians, some Maintenance Technicians, some Electrical and Instrument Technicians, Systems Technicians, some Field Service Technicians, and Customer Service Specialists employed by the Employers, we will clarify that unit to add the Plant Technician and Office Support Specialist positions.

## ORDER

The request of Petitioner AFSCME Council 25 and its affiliated Locals 207 and 2920 to clarify its bargaining unit of employees of the City of Detroit/Detroit Water and Sewerage Department and the Great Lakes Water Authority to include the positions of Plant Technician and Office Support Specialist is granted.

MICHIGAN EMPLOYMENT RELATIONS COMMISSION

Edward D. Callaghan, Commission Chair

Robert S. LaBrant, Commission Member

Natalie P. Yaw, Commission Member

Dated: MAR - 3 2016

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

IN RE:

CASE NO: 13-53846

CHAPTER: 9

Debtor.

City of Detroit Michigan /

### CERTIFICATE OF SERVICE

I hereby certify that on 4-4-2016 _____ (date of mailing), I served

copies as follows:

1. Document(s) served: 6 Documents, one Letter, 2 E MAIL About DWSDs Lawyer Steve Swarts, MANUAL of STANDARD PRactices, E-MAIL called workbrain TuRNaRouND, AND Copy of MERC CASE # u©15 L-024 Docket NO 15-063232-MeRC

2. Served upon [name and address of each person served]:
   MARC N. SWANSON
   MilleR, CANfield, PAddock ANd stone, PLC
   150 West Jefferson, Suite 2500
   Detroit, Mi 48226

3. By First Class Mail.

Dated: 4-4-2016 _____

(Signature)

Print Name: JAJuAN MOORE