# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND THE BAR DATE ORDER AND (III) REQUIRING A.B.E. ASSOCIATES, INC. TO DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT

The City of Detroit, Michigan ("City"), by its undersigned counsel, files its Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and the Bar Date Order and (II) Requiring A.B.E Associates, Inc. to Dismiss with Prejudice its State Court Lawsuit ("Motion").  In support of this Motion the City respectfully states as follows:

## I.      Introduction

1.      On April 26, 2016, A.B.E Associates, Inc., as Assignee of IOCAD Engineering Services, Inc. ("ABE") filed a state court lawsuit against the City seeking monetary damages on account of a claim which ABE asserts arose in June, 2012.  The filing of the state court lawsuit violates the injunction and discharge provisions in the City's confirmed plan and the Bar Date Order (as defined below) entered in this case because ABE did not file a proof of claim. Consequently, the

- 1 -

City requests that this Court enter an order requiring ABE to dismiss its state court lawsuit with prejudice.

## II.    Background

### A.    The City's Bankruptcy Case

2.    On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

3.    On October 10, 2013, the City filed its Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Motion"). [Doc. No. 1146].

4.    On November 21, 2013, this Court entered an order approving the Bar Date Motion ("Bar Date Order"). [Doc. No. 1782]. The Bar Date Order established February 21, 2014 ("General Bar Date") as the deadline for filing claims against the City. Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this bankruptcy case and/or otherwise participate in the proceedings in this bankruptcy case associated with the confirmation of any chapter 9 plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

5.    Paragraph 22 of the Bar Date Order also provided that:

27303709.1\022765-00213

Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), **any entity that is required to file a proof of claim in this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or this Order with respect to a particular claim against the City, but that fails properly to do so by the applicable Bar Date, shall be forever barred, estopped and enjoined from: (a) asserting any claim against the City or property of the City** that (i) is in an amount that exceeds the amount, if any, that is identified in the List of Claims on behalf of such entity as undisputed, noncontingent and liquidated or (ii) is of a different nature or a different classification or priority than any Scheduled Claim identified in the List of Claims on behalf of such entity (any such claim under subparagraph (a) of this paragraph being referred to herein as an "Unscheduled Claim"); (b) voting upon, or receiving distributions under any Chapter 9 Plan in this case in respect of an Unscheduled Claim; or (c) with respect to any 503(b)(9) Claim or administrative priority claim component of any Rejection Damages Claim, asserting any such priority claim against the City or property of the City.

Bar Date Order ¶ 22 (emphasis added).

6. On October 22, 2014, the City filed its Eighth Amended Plan of the Adjustment of Debts of the City of Detroit (October 22, 2014) ("Plan"). [Doc. No. 8045].

7. On November 12, 2014, this Court entered an order confirming the Plan ("Confirmation Order"). [Doc. No. 8272].

8. The discharge provision in the Plan provides

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of

the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.

Plan, Art. III.D.4, p. 50.

9. With certain exceptions not applicable here, the Plan does not afford any right to distributions or payments to claimants that did not timely file proofs of claim. Plan Art. I.A.19, p. 3; Art. I.A.134, p. 11; Art. VI.A.1, pp. 67-68. Such claims are not Allowed Claims under the Plan and thus are not entitled to distributions under the Plan. *Id.* ("Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.").

10. The Plan injunction set forth in Article III.D.5 also provides in pertinent part:

**Injunction**

**On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**

**a. all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**

**1. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**

- 4 -

27303709.1\022765-00213

**5.** proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6.** taking any actions to interfere with the implementation or consummation of the Plan.

Plan, Article III.D.5, pp. 50-51. (emphasis supplied).

11.     The Court retained jurisdiction to enforce the Plan injunction and to resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan. Plan, Art. VII. F, G, I, pp. 69-70.

### B.     ABE Files a Complaint in State Court in 2016 Based on an Alleged Claim for Breach of Contract that Arose in 2012

12.     On April 26, 2016, ABE filed a complaint ("Complaint") against the City in Wayne County Circuit Court, Michigan, case number 16-005285-CB ("State Court Lawsuit"). The Complaint is attached as Exhibit 6.

13.     In the Complaint, ABE asserts that IOCAD Engineering Services, Inc. ("IOCAD") entered into a contract with the City on June 2, 2004 under which the City would pay IOCAD to render technical and professional services to the City (the "Contract") and that in April, 2008, IOCAD assigned the Contract to ABE. Complaint ¶¶ 5-8. ABE also alleges that in 2009, the City agreed to the assignment of the Contract rights to ABE and authorized ABE to commence the work subject to the Contract in May, 2009. *Id.* ¶¶ 9-10

- 5 -

14.     ABE alleges that the City terminated the contract without cause in May 2012. *Id.* ¶¶ 13-14. ABE further alleges that in June 2012, it corrected the errors identified by the City but the City refused to pay ABE's invoices in violation of the contract. *Id.* ¶¶ 22-27.  ABE asserts that its "invoice payment is now more than 1400 days overdue." *Id.* ¶ 29.

15.     The Complaint asserts a claim for breach of contract and requests the court enter judgment in favor of ABE and against the City in the amount of $1,576,018.80. *Id.* ¶¶ 31-32.

## III.   <u>Argument</u>

16.     ABE violated the Plan injunction and discharge provisions when it filed the State Court Lawsuit asserting claims against the City.  And, it continues to violate it by continuing to prosecute the State Court Lawsuit.  Pursuant to the Plan, ABE claims against the City are discharged and it is enjoined from, among other things, commencing any action against the City with respect to those claims. Plan, Art. III.D.4, p. 50; Plan, Art. III.D.5, pp. 50-51.

17.     Furthermore, ABE did not file a proof of claim by the General Bar Date.  Consequently, ABE is also barred, estopped and enjoined from asserting any

- 6 -

claim against the City or property of the City under the Bar Date Order. Bar Date Order ¶ 22.[1]

## IV. Conclusion

18. The City respectfully requests that this Court enter an order in substantially the same form as the one attached as Exhibit 1, (a) granting the Motion; (b) requiring ABE to dismiss, or cause to be dismissed, with prejudice the State Court Lawsuit; and (c) permanently barring, estopping and enjoining ABE from asserting any claims described in the State Court Lawsuit, or the alleged conduct forming the basis of the State Court Lawsuit, against the City or property of the City. The City sought, but did not obtain, concurrence to the relief sought in the Motion.

---

[1] ABE's failure to timely file a proof of claim by the General Bar Date is an additional reason why ABE should be enjoined from continuing, and required to dismiss with prejudice, its claims against the City and its property. However, it is not necessary for the Court to decide any bar date issues or address the Motion on that basis. It is maintained as an alternative basis for granting the relief in the Motion. Even if ABE had filed a timely proof of claim and that proof of claim were Allowed under the Plan, ABE's sole right in connection with that claim would have been the right to receive distributions under the Plan on account of its Class 14 Claim (Other Unsecured Claim). There is no set of circumstances under which ABE is or would have been permitted to commence and prosecute the State Court Lawsuit.

27303709.1\022765-00213

August 17, 2016              Respectfully submitted,

                            By: /s/ Marc N. Swanson
                                Jonathan S. Green (P33140)
                                Marc N. Swanson (P71149)
                                MILLER, CANFIELD, PADDOCK AND
                                STONE, P.L.C.
                                150 West Jefferson, Suite 2500
                                Detroit, Michigan 48226
                                Telephone: (313) 496-7591
                                Facsimile: (313) 496-8451
                                green@millercanfield.com
                                swansonm@millercanfield.com


                            ATTORNEYS FOR THE CITY OF DETROIT

## EXHIBIT LIST

Exhibit 1    Proposed Order

Exhibit 2    Notice

Exhibit 3    None

Exhibit 4    Certificate of Service

Exhibit 5    None

Exhibit 6    Complaint

## EXHIBIT 1 – PROPOSED ORDER

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## [PROPOSED] ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND BAR DATE ORDER AND (II) REQUIRING A.B.E. ASSOCIATES, INC. TO DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT

This matter, having come before the court on the City of Detroit's Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and Bar Date Order and (II) Requiring A.B.E Associates, Inc. to Dismiss with Prejudice its State Court Lawsuit, ("Motion"), upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.     The Motion is granted.

2.     Within five days of the entry of this Order, A.B.E. Associates, Inc. shall dismiss, or cause to be dismissed, with prejudice, Case No 16-005285-CB filed with Wayne County Circuit Court, Michigan and captioned *A.B.E. Associates, Inc., as Assignee of IOCAD Engineering Services, Inc. vs. City of Detroit, a*

*Michigan Municipal Corporation, acting by and through its Board of Water Commissioners* ("State Court Lawsuit").

3.      A.B.E. Associates, Inc. is permanently barred, estopped and enjoined from asserting any claims described in the State Court Lawsuit, or the alleged conduct forming the basis of the State Court Lawsuit, against the City of Detroit or property of the City of Detroit, in the State Court Lawsuit or in any other action or proceeding.

4.      The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

## EXHIBIT 2 – NOTICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO RESPOND TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER (I) ENFORCING THE PLAN OF ADJUSTMENT INJUNCTION AND BAR DATE ORDER AND (II) REQUIRING A.B.E. ASSOCIATES, INC. TO DISMISS WITH PREJUDICE ITS STATE COURT LAWSUIT**

The City of Detroit has filed its Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and Bar Date Order and (II) Requiring A.B.E Associates, Inc. to Dismiss with Prejudice its State Court Lawsuit.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order (I) Enforcing the Plan of Adjustment Injunction and Bar Date Order and (II) Requiring A.B.E Associates, Inc. to Dismiss with Prejudice its State Court Lawsuit, within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.   If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1]  Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated: August 17, 2016

# EXHIBIT 3 – NONE

27303709.1\022765-00213

## EXHIBIT 4 – CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 17, 2016 the foregoing Motion for the Entry of an Order (I) Enforcing the Plan of Adjustment Injunction and Bar Date Order and (II) Requiring A.B.E Associates, Inc. to Dismiss with Prejudice its State Court Lawsuit was filed and served via the Court's electronic case filing and notice system and served upon counsel as listed below, via first class mail and electronic mail:

David Jonathan Cross
Simpson, Morton & Cross, PLLC
535 Griswold, Suite 111-129
Detroit, MI 48226
Email: davidjonathancross@gmail.com

DATED: August 17, 2016

By: /s/ Marc N. Swanson
Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

## EXHIBIT 5 – NONE

# EXHIBIT 6 – COMPLAINT

<table>
<tr><td colspan="2">**STATE OF MICHIGAN<br>3rd JUDICIAL CIRCUIT<br>COUNTY OF WAYNE**</td><td>**VERIFICATION OF<br>BUSINESS COURT ELIGIBILITY<br>AND NOTICE OF ASSIGNMENT**</td><td>**CASE NO.**</td></tr>
</table>

Court address: 2 Woodward Ave., Detroit, MI 48226

| Plaintiff(s) | | Defendant(s) |
|---|---|---|
| A.B.E. Associates, Inc., as Assignee of<br>IOCAD ENGINEERING SERVICES, INC | v | CITY OF DETROIT, a Michigan Municipal<br>Corporation, acting by and through its<br>Board of Water Commissioners |

I am the attorney for the [check one] ☑ plaintiff ☐ defendant and per *MCR 2.114(B)(2) and MCR 2.114(D)* declare to 16-005285-CB the best of my information, knowledge, and belief that this case meets the statutory requirements to be assigned to the business court, *MCR 2.112(O),MCL 600.8031 et seq.*, and request assignment to the Business Court for the following reasons:

**[*Both Sections 1 and 2 must be completed to be accepted by the Court (check all that apply)*]**

1. **Parties.** This is a qualifying business or commercial dispute as defined by *MCL 600.8031(1)(c)* because,

☑ all of the parties are business enterprises

☐ one or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members, directors, officers, agents, employees, suppliers, or competitors, and the claims arise out of those relationships

☐ one of the parties is a non-profit organization, and the claims arise out of that party's organizational structure, governance, or finances

☐ It is an action involving the sale, merger, purchase, combination, dissolution, liquidation, organizational structure, governance, or finances of a business enterprise.

**AND**

2. **Actions.** This business or commercial action as defined by *MCL 600.8031(2)* involves,

FILED IN MY OFFICE<br>WAYNE COUNTY CLERK<br>4/26/2016 1:07:40 PM<br>CATHY M. GARRETT

☐ information technology, software, or website development, maintenance, or hosting

☐ the internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers

☑ contractual agreements or other business dealings, including licensing, trade secret, intellectual property, antitrust, securities, noncompete, nonsolicitation, and confidentiality agreements if all available administrative remedies are completely exhausted, including but not limited to, alternative dispute resolution processes prescribed in the agreements

☐ commercial transaction, including commercial bank transactions

☐ business or commercial insurance policies

☐ commercial real property

☐ other type of business or commercial dispute (explain)

4/26/2016

Date

Signature

David Jonathan Cross                          P42683

Name (type or print)                          Bar no.

| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | SUMMONS AND COMPLAINT | CASE NO.<br>16-005285-CB<br>Hon. Lita Masini Popke |
|---|---|---|

2 Woodward Ave., Detroit MI 48226                              Court Telephone No. 313-224-2953

| Plaintiff | | Defendant |
|---|---|---|
| A.B.E. Associates, Inc. as Assignee of IOCAD Engineering Servi | v | City of Detroit, acting by and through it Board of Water Commiss |

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| David J. Cross, P-42683<br>535 Griswold St Ste 111-129<br>Detroit, MI 48226-3604 | RECEIVED<br>MAY 05 2016<br>CITY OF DETROIT<br>LAW DEPARTMENT |

**SUMMONS** **NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state). (MCR 2.111[C])
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued | This summons expires | Court clerk |
|---|---|---|
| 4/26/2016 | 7/26/2016 | File & Serve Tyler |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**COMPLAINT** *Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.*

[X] This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

**Family Division Cases**

☐ There is no other pending or resolved action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties.

☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**General Civil Cases**

☐ There is no other pending or resolved civil action arise out of the same transaction or occurrence as alleged in the complaint.

☐ An civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.

The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|
| | | |

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Place where action arose or business conducted | |

4/26/16
Date

Signature of attorney/plaintiff

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (5/15) SUMMONS AND COMPLAINT MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a),(b), MCR 3.206(A)



| STATE OF MICHIGAN<br>THIRD JUDICIAL CIRCUIT<br>WAYNE COUNTY | **PROOF OF SERVICE** | CASE NO.<br>16-005285-CB |
|---|---|---|

**TO PROCESS SERVER:** You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

☐ **OFFICER CERTIFICATE**     OR     ☐ **AFFIDAVIT OF PROCESS SERVER**

I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:   (notarization not required)

Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that:   (notarization required)

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with

_____
List all documents served with the Summons and Complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare that the statements above are true to the best of me information, knowledge and belief.

| Service fee<br>$ | Miles traveled<br>$ | Mileage fee<br>$ | Total fee<br>$ | Signature |
|---|---|---|---|---|

Name (type or print)

Title

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                              Date

My commission expires: _____ Signature: _____
                Date                          Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____

_____
                               Attachments

_____ on _____
                               Day, date, time

_____ on behalf of _____
Signature

# STATE OF MICHIGAN

## IN THE WAYNE COUNTY CIRCUIT COURT

A.B.E ASSOCIATES, INC., as Assignee of               CB
IOCAD ENGINEERING SERVICES, INC.,

           Plaintiff,

                             CASE NO.
                             JUDGE:

   -v-

CITY OF DETROIT MICHIGAN, a Michigan Municipal Corporation,
acting by and through its BOARD OF WATER COMMISSIONERS,

           Defendants.

_____ /

**SIMPSON, MORTON & CROSS, PLLC**
David Jonathan Cross (P42683)
Attorney for Plaintiff
535 Griswold, Suite 111-129
Detroit, MI 48226
313-729-6288

_____ /

**There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint. Plaintiff verifies that this case meets the statutory requirements to be assigned to the business court.**

## COMPLAINT

     Plaintiff, by counsel, and in support of its claim against Defendant alleges the following:

   1. Plaintiff is a Michigan corporation with principle place of business located in Detroit, Wayne County, Michigan.

1

SIMPSON, MORTON & CROSS, PLLC
535 GRISWOLD, SUITE 111-129 | DETROIT, MICHIGAN 48226 | 313-729-6288

2. Plaintiff is also a vendor within the meaning of Ordinance No. 42-98 entitled "Prompt Payment of Vendors," being Sections 18-5-71 through 18-5-79 of the 1984 Detroit City Code.

3. Defendant is a municipal corporation located in Wayne County, Michigan.

4. The amount in controversy exceeds $25,000.00 and jurisdiction in the Wayne County Circuit court is proper.

5. Defendant entered into a contract with IOCAD Engineering Services, Inc. on June 2, 2004, to render certain technical and/or professional services in connection with the creation of an electronic as-built documentation system. A copy of the contract CS-1333, is attached as **Exhibit A.**

6. Defendant agreed to pay IOCAD for professional services rendered on a per work order, fixed price basis, and the completion of tasks as outlined in the contract.

7. On April 28, 2008, IOCAD assigned the contract to Plaintiff for good and valuable consideration. **Exhibit B.**

8. April 21, 2008, IOCAD and Plaintiff entered into a Novation and Sale Agreement with respect to the IOCAD/DWSD Contract CS-1333. **Exhibit C.**

9. On March 9, 2009, Defendant, IOCAD and Plaintiff entered into a Novation Agreement effecting a novation of the IOCAD/City of Detroit Contract and assigning the rights to the contract to Plaintiff. **Exhibit D.**

10. On or about May 4, 2009, Defendant authorized Plaintiff to commence the work of the CS-1333 contract and Plaintiff began work on May 4, 2009.

11. Plaintiff provided the following professional services and deliverables to Defendant pursuant to the authorization to commence work and the contract:

2

SIMPSON, MORTON & CROSS, PLLC
535 GRISWOLD, SUITE 111-129  DETROIT, MICHIGAN 48226 | 313-729-4288

a. CADD Standards
b. As-built and O&M Standards
c. Drawing standards
d. As-built drawings
e. Development of a Facilities As-Built Documentation System with network storage capabilities,
f. System maintenance services and
g. Operations Manuals.

12. Plaintiff performed satisfactorily under the contract until the contract was terminated without cause.

13. On April 18, 2012, Defendant by letter to Plaintiff terminated the subject contract without cause, effective May 11, 2012. **Exhibit E.**

14. Thereafter, on May 7, 2012, Plaintiff submitted an invoice to Defendant for services performed up to May 7, 2012. . **Exhibit F.**

15. On June 8, 2012, Defendant wrote Plaintiff a letter indicating that all but $1,459,181.73 of the invoice was being "disallowed" and with the explanation that the disallowance was due to the lack of providing status report updates. **Exhibit G.**

16. The contract provided only that payment for the services performed under the contract was contingent upon the receipt of a Scheduling and Monitoring Reporting, approval by Defendant of the Report as well as an invoice for payment and subsequent approval by Defendant.

17. In addition, payment for Plaintiff's services is governed by the terms of Ordinance No. 42-98 entitled "Prompt Payment of Vendors," being Sections 18-5-71 through 18-5-79 of the 1984 Detroit City Code.

SIMPSON, MORTON & CROSS, PLLC
535 GRISWOLD, SUITE 111-129 | DETROIT, MICHIGAN 48226 | 313-724-6288

3

18. The Prompt Payment of Vendors ordinance provides that within forty-five (45) business days after the vendor's delivery to the responsible person of an invoice or other written request for payment issued pursuant to the terms of a contract or purchase order.

19. The ordinance also provides that where a vendor's invoice contains a defect, an error, or otherwise does not comply with the terms of the contract or purchase order, the responsible person shall notify the vendor of the defect within ten (10) business days after receiving the invoice.

20. There are no provisions in the Prompt Payment to Vendors Ordinance that permits, or authorizes, Defendant to "disallow" an invoice payment, in whole or in part, to a vendor.

21. The Prompt Payment Ordinance also provides for the payment of interest on overdue payments. See §18-5-76.

22. Defendant violated the Prompt Payment Ordinance and did not notify Plaintiff of any defects, errors in the invoice, or other non-compliance for more than 40 days after Plaintiff submitted its May 7, 2012 invoice.

23. The responsible person for this contract was Ms. Miriam L. Dixon, the Contracts and Grants Manager for the City of Detroit Water and Sewerage Department.

24. On June 8, 2012, Miriam Dixon notified Plaintiff, in writing, that it was disallowing $1,459, 181.73 of Plaintiff's $1, 467, 613.23 invoice due to the absence of six (6) months of status reports. **Exhibit G.**

25. In violation of the prompt payment ordinance, the subject contract included a provisions that gave vendors the opportunity to document the applicability of the disallowed amount by submitting additional documentation, corrected invoice amounts, written explanations, etc., prior to submitting its next invoice.

4

SIMPSON, MORTON & CROSS, PLLC
535 GRISWOLD, SUITE 111-1297 | DETROIT, MICHIGAN 48226 | 313-731-6288

26. The subject contract does not permit a permanent "disallowance" of any amounts billed by a vendor.

27. On June 19, 2012, Plaintiff corrected the errors, Plaintiff corrected the errors cited by Defendant in its notification of the disallowance and submitted the missing status reports to Defendant on June 19, 2012, but Defendant has refused, and continues to refuse to pay Plaintiff's invoice in violation of the contract and in violation of the City of Detroit's prompt payment ordinance.

28. Defendant has not provided any reason or justification for failing to pay Plaintiff's invoice in violation of the subject contract and the Prompt Payment Ordinance.

29. Plaintiff's invoice payment is now more than1400 days overdue.

30. Plaintiff has fully or substantially performed according to the terms of the subject contract and is entitled to full payment of its invoice from Defendant.

31. Defendant's conduct as described in this complaint constituted a breach of the contract between the parties.

32. Plaintiff has been damaged by Defendant's breach in the amount of $1,459, 181.73, which represents the unpaid balance of Plaintiff's invoice submitted to Defendant.

PLAINTIFF REQUESTS that this court enter judgment in Plaintiff's favor and against Defendant in the amount of $1,576,018.80, plus interest at the statutory rate from the time of Defendant's breach, and that the court grant her such other and different relief as the court deems warranted.

SIMPSON, MORTON & CROSS, PLLC

/s/ David Jonathan Cross

David Jonathan Cross (P42683)

SIMPSON, MORTON & CROSS, PLLC
535 GRISWOLD, SUITE 111-129  DETROIT, MICHIGAN 48226  313-729-6288

5

Attorney for Plaintiff
535 Griswold, Suite 111-129
Detroit, MI 48226
313-729-6288

Date: April 26, 2016

SIMPSON, MORTON & CROSS, PLLC
535 Griswold, Suite 111-129 | Detroit, Michigan 48226 | 313-729-6288

6

# EXHIBIT A

16-005285-CB

FILED IN MY OFFICE
WAYNE COUNTY CLERK
4/26/2016 1:07:40 PM
CATHY M. GARRETT

KWAME M. KILPATRICK, MAYOR

CITY OF DETROIT

CONTRACT FOR CONSULTANT SERVICES

BETWEEN

CITY OF DETROIT, MICHIGAN

BOARD OF WATER COMMISSIONERS

AND

IOCAD ENGINEERING SERVICES, INC.

CONTRACT NO. CS-1333
CONTRACT PURCHASE ORDER NUMBER _____

RECITATIONS

This CONTRACT is made this _____ day of _____, 2004, by and between the City of Detroit, a Municipal Corporation of the State of Michigan, acting by and through its Board of Water Commissioners of the Water and Sewerage Department, hereinafter referred to as the "CITY", or "DWSD", party of the first part, and IOCAD ENGINEERING SERVICES, INC., with offices located at 3011 West Grand Boulevard, Suite 401, Detroit, Michigan 48202, hereinafter referred to as the "CONSULTANT", party of the second part.

03/18

WHEREAS, the CITY desires to engage the CONSULTANT to render certain technical and/or professional services (herein called the "Services"), in connection with the creation of an electronic as-built documentation system; and

WHEREAS, the CONSULTANT represents that it is authorized and able to provide professional personnel that are qualified to perform the Services in a manner which is responsive to the CITY'S needs in all respects; and

WHEREAS, the objectives of this Contract are the development of a Facilities As-Built Documentation System with network storage capabilities, system maintenance services, and Operations and Maintenance Manuals; and

WHEREAS, other related services may be provided in support of the Services;

NOW THEREFORE, in consideration of the promises, the mutual undertakings and benefits to accrue to the parties and to the public, the parties hereto agree as follows:

## ARTICLE 1

### EMPLOYMENT OF CONSULTANT

1.01 The DWSD hereby engages the CONSULTANT and the CONSULTANT hereby agrees to faithfully and diligently perform the Services hereinafter set forth in Article 2 "SCOPE OF SERVICES" in accordance with the terms and conditions contained in this Contract.

## ARTICLE 2

### SCOPE OF SERVICES

03/18

2.01   The CONSULTANT shall perform in a satisfactory and proper manner, as determined within the sole and reasonable discretion of the DWSD, the Services as described below and in Exhibit A "WORK PLAN". In the event that there shall be any dispute between the parties with regard to the extent and character of the Services to be performed, or the quality of performance under the Contract, the interpretation and determination of the DWSD shall govern.

2.01a   Task Order. The Contracting Officer will issue a Task Order to the CONSULTANT describing the services required by DWSD on an as-needed basis. For each Task Order, the CONSULTANT will submit a Work Plan and Costing summary to complete the Task Order. DWSD will review the CONSULTANT's Work Plan and Costing Plan and, if acceptable, the Contracting Officer will issue a written Notice to Start Work for the Task Order.

Once the Notice to Start on a Task Order is issued, such Task Order may be revised only upon written approval by the Contracting Officer. A separate Notice to Start Work is required for each Task Order.

2.01b   For each task as tabulated in Exhibit A "WORK PLAN", develop, implement, operate, maintain, modify, revise as appropriate, and deliver in a timely fashion and on a regular schedule a cost-loaded Scheduling and Monitoring Report or other presentation such as a Gantt Chart meeting the approved standards of DWSD. The Report

03/18

shall include detailed tasks, schedules, payment milestones with associated deliverables, decision points, and subcontractor participation, and shall indicate scheduled personnel requirements. No payments shall be authorized until the Report is accepted and approved in writing by DWSD. This report will be the basis for payment in accordance with Article 8.01.

2.01c     Coordinate the work of this Contract with the work of the DWSD and the work of other contractors whose work may affect the design and/or construction of this project.

2.01d     Prepare preliminary plans and specifications for those improvements and additions requested by DWSD. Submit the preliminary plans and specifications to DWSD for review and approval.

2.01e     Prepare Operation and Maintenance Manuals as required.

2.01f     Provide training for the project as designed and subsequently as installed.

2.01g     All as-built contract drawings and specifications shall be in conformance with DWSD and other public, County, State and Federal agencies.

03/18

2.01h    Throughout the course of the Contract, provide professional advice and consultation to the Director, the Contracting Officer, and/or their authorized representatives.

2.01i    Prepare and submit invoices for services rendered in accordance with Article 8 "METHOD OF PAYMENT".

2.01j    Prepare and submit Scheduling and Monitoring Reports in accordance with Article 6.07 "CONSULTANT'S PERSONNEL AND ADMINISTRATION".

2.02    The Services include all conferences and consultations deemed necessary by the DWSD to properly and fully perform the Services.

2.03    The Services shall be performed at the addresses specified in Article 18 "NOTICES" herein, or at such other locations as are deemed appropriate by the DWSD to the proper performance of the Services.

2.04    All reports, notes, drawings, photographs and any other technical data prepared by or for the CONSULTANT in connection with this Contract shall become the property of the DWSD. The DWSD shall have full and unrestricted use of these documents for the purpose of the work or otherwise for the sole use by DWSD when and where the DWSD may designate without any claim by the CONSULTANT for additional compensation.

Notwithstanding the foregoing, any reuse of such reports, notes, drawings, photographs or any other technical data prepared by the CONSULTANT, for anything other than its intended purpose, and without adaptation or revision by the

03/18

CONSULTANT therefore shall be DWSD's sole risk and without liability or legal exposure to the CONSULTANT.

## ARTICLE 3
## SPECIAL SERVICES

3.01  The CONSULTANT is to utilize other firms and/or individuals as deemed necessary to properly perform the services specified in this Contract. All subcontracts for Special Services between the CONSULTANT and other firms and individuals for performance of services under this Contract shall receive the prior approval of the Director of the DWSD or a designated representative.

The CITY will not be a party to any such subcontracts for Special Services.

3.02  (Reserved)

## ARTICLE 4
## TIME OF PERFORMANCE

4.01  The CONSULTANT shall commence work on this Contract and the rendering of the Services required hereunder upon the DWSD posting a written notice to proceed (herein called a "Notice to Start Work") to the CONSULTANT to the address and in the manner specified in Article 18 "NOTICES" herein.

All services shall be completed within sixty (60) months after Notice to Start Work. Final completion shall mean completion of all Services as specified in the contract documents and that such Services have been accepted, in writing, by the DWSD Contracting Officer.

03/18

4.02    The CONSULTANT will have no authority to start work, and no payments will be authorized by the Finance Department, prior to the award of this Contract by resolution of the City Council, and approvals by all appropriate City agencies.

4.03    The initial contract duration is sixty (60) months. In no event shall the time period stated herein be extended, except in accordance with the provisions of Article 16 "AMENDMENTS".

4.04    This Article 4 is subject to the provisions of Article 11 "TERMINATION".

## ARTICLE 5

### OBLIGATIONS OF THE DWSD

5.01    Copies of all information, data, reports, drawings, records, control surveys, etc., as are existing, available, and deemed necessary by the DWSD for completing the Services shall be furnished to the CONSULTANT without charge by the DWSD upon the CONSULTANT'S request.

The CONSULTANT shall be permitted to visit CITY offices and key facilities as approved by the DWSD during regular business hours to obtain the necessary data. Appropriate conferences shall be scheduled at convenient times with key administrative personnel of the CITY for the purpose of gathering such data.

5.02    The DWSD shall furnish at its own expense the following services to the CONSULTANT:

5.02a    Competent DWSD personnel, including professionals such as Engineers, shall promptly review, comment on and approve all preliminary and final design reports; preliminary and final

03/18

specifications; preliminary and final construction plans; all Change Orders; and any other work products required by this Contract.

5.02b    Coordinate the work of this Contract with the work of DWSD Engineering and the appropriate DWSD Operations and Maintenance Sections, and/or the work of other contractors.

5.02c    Furnish all DWSD standard forms and materials for the preparation of construction contract documents.

## ARTICLE 6

### CONSULTANT'S PERSONNEL AND ADMINISTRATION

6.01    To insure proper performance of the Services, the CONSULTANT warrants that all personnel assigned to perform the Services (herein called the "Employees"), and all Subconsultants/Contractors engaged by the CONSULTANT to perform the Special Services, are fully qualified and authorized to perform such Services under the state and local laws and governing professional association rules (if any) where such Employee or Subconsultant/Contractor is employed. Upon the DWSD's request, the CONSULTANT shall supply a resume of each Employee and Subconsultant/Contractor it proposes be assigned to this Contract, as well as a summary of the Employee's or Subconsultant's/Contractor's professional activities and accomplishments.

6.02    The DWSD shall have the right to interview and approve the CONSULTANT's supervisory staff assigned to this Contract. Each Employee and Subconsultant/Contractor, if any, employed by the CONSULTANT in the performance of the Services shall devote such time, attention, skill, knowledge and professional ability

03/18

as is necessary to most effectively and efficiently perform the Services in conformity with the highest professional practices in the industry.

The DWSD may, in its sole discretion, assign qualified DWSD employees to work with the CONSULTANT in completing the Services when it deems it reasonable to do so and not inconsistent with the terms of this Contract. It is expressly understood and agreed by the parties hereto that the CONSULTANT shall be. primarily and ultimately responsible to the CITY for the proper and expedient completion of the Services and assumes all liability and holds the CITY harmless for such performances by CITY personnel, when such performance is pursuant to the request of the CONSULTANT.

6.03   The relationship of the CONSULTANT to the CITY is and shall continue to be that of an independent contractor, and no liability or benefits (such as worker's compensation, pension rights or liabilities, insurance rights or liabilities) arising out of or related to a contract for hire or employer/employee relationship, shall arise or accrue to either party's agent or employee with respect to the CITY as a result of the performance of this Contract. No relationship other than that of independent contractor shall be implied   between   the   parties   or   either   party's   agent,   Employee   or Subconsultant/Contractor, and the CONSULTANT hereby agrees to hold the CITY harmless from any such claim and any costs or expenses related thereto.

6.04   The CONSULTANT hereby waives any claim against the CITY and agrees not to hold the CITY liable for any personal injury or property damage incurred by its Employees, Subconsultants/Contractors or Associates on this Contract which is not held in a court of competent jurisdiction to be attributable to the gross negligence of an employee of the CITY acting within the scope of their employment and hereby agrees to hold the CITY harmless from any such claim by the CONSULTANT'S Employees, Subconsultants/Contractors or Associates.

03/18

6.05   The CONSULTANT agrees not to remove an Employee who is acceptable to the DWSD from work hereunder until this Contract is terminated, in the absence of circumstances beyond its control. Immediately upon receipt of written notification, the CONSULTANT shall replace any Employee, including the Project Manager, who, in the DWSD's sole opinion, unsatisfactorily performs the Services hereunder, or who is unsatisfactory for the performance of the Services hereunder, irrespective of any prior DWSD approval.

6.06   In all cases in which an Employee or a Subconsultant/Contractor must be replaced for any reason, the CONSULTANT shall supply an acceptable replacement as soon as possible, and agrees not to substitute a lower classified Employee or less qualified Subconsultant/Contractor to perform the Services without obtaining prior DWSD approval in writing. The CONSULTANT will furnish such replacement on a no-charge basis for that period of time necessary for any retraining or job orientation.

6.07   The CONSULTANT shall designate a Project Manager, acceptable to DWSD, to be responsible for all aspects of the Services. The duties of the Project Manager shall be:

6.07a      The Project Manager will coordinate the Employees' and Subconsultant's/Contractor's work schedules and the Project Manager will monitor performance goals. The Project Manager will supervise the day-to-day activities of the Employees. All Employees and Subconsultants/Contractors will report directly to the Project Manager concerning all matters related to this Contract.

6.07b      The Project Manager will act as liaison between the CONSULTANT and the DWSD. Day-to-day services to be performed by the

03/18

CONSULTANT will be done in cooperation with the designated DWSD representative.

6.07c The Project Manager shall submit a written Report monthly describing progress on the work of the Contract by updating the Scheduling and Monitoring Report described in Article 2.01a. The Report shall indicate which activities were performed by the CONSULTANT and which were performed by Subconsultant/ Contractors.

As part of the Scheduling and Monitoring Report, the Project Manager shall inform the DWSD as soon as the following types of conditions become known: (a) probable delays or adverse conditions which materially affect the ability to attain objectives or prevent meeting the time schedules, accompanied by a statement of any remedial actions taken or contemplated by the CONSULTANT; and (b) favorable developments or events which enable attaining objectives or meeting time schedules sooner than anticipated.

At regular intervals, the CONSULTANT'S supervisors, higher than the Project Manager (if any), will make checks and verifications on the Reports.

6.07d The person designated as Project Manager may be changed by the CONSULTANT upon written notice of such change being sent to the DWSD and upon the DWSD's approval thereof.

03/18

6.08   The CONSULTANT warrants and represents that all Employees assigned to the performance of this Contract shall be full-time employees of the CONSULTANT and, if assigned to perform back-up or related services on a continuous basis, shall be assigned to the Contract on a full-time basis, unless otherwise authorized by the DWSD. Similar terms and conditions apply to all Employees of all Subconsultant/Contractors.

6.09   The CONSULTANT shall maintain full and complete books, ledgers, journals, accounts, or records (herein collectively called "Records") in which are kept all entries reflecting its operation pursuant to this Contract. The Records shall be kept in accordance with generally accepted accounting practices.

The CONSULTANT shall include a similar covenant for maintenance of full and complete financial records in all Subcontracts for services which will be charged to the City of Detroit.

6.10   The CONSULTANT agrees to allow representatives of the CITY to make periodic inspections/visits for the purpose of ascertaining that the CONSULTANT is properly performing the Services set forth in Article 2 "SCOPE OF SERVICES". Such inspections/visits may be made at any time during normal business hours of the CONSULTANT. If, in the course of such inspections/visits, the representatives of the CITY should note any deficiencies in the performance of the Services, such deficiencies shall be reported promptly to the CONSULTANT, in writing. The CONSULTANT agrees to promptly remedy and correct any such reported deficiencies within fifteen (15) calendar days of notification by the DWSD.

### ARTICLE 7

### COMPENSATION

03/18

7.01   The CITY agrees to pay the CONSULTANT for professional services rendered in accordance with Exhibit B "COSTING SUMMARY" and on a per work order fixed price basis, based upon the completion of each Task Order requested in accordance with Article 2.01a. The DWSD's determination of the percentage completion of each Task Order shall control the amount of payment. The cost of the initial tasks I and II are as follows and as detailed in Exhibit B "Costing Summary".

| Task No. | Task Title | | Cost |
|---|---|---|---|
| I | Wick Station | $ | 394,639.00 |
| II | EDMS Configuration and Deployment | $ | 382,539.00 |
| III | As-Needed Reimbursable Services Allowance | $ | 400,000.00 |
| IV | As-Needed Task Orders | $ | 3,822,822.00 |
| | TOTAL CONTRACT PRICE | $ | 5,000,000.00 |

7.01a   At DWSD's discretion, certain items in a Task Order price may be paid for on a reimbursable basis at a negotiated unit price or at the prices quoted by the CONSULTANT in Exhibit B "COSTING SUMMARY".

7.01b   In the event a mutually acceptable price for a task cannot be reached, DWSD may direct the Consultant to proceed on a cost reimbursable basis utilizing the direct labor rates, labor burdens, overhead, profit and other pricing information quoted by the CONSULTANT and detailed in Exhibit B "COSTING SUMMARY".

7.01c   The Total Contract Amount shall not exceed $5,000,000.00 except by amendment to this Contract.

03/18

If the cost of authorized services is less than the limit of the total contract amount, the difference will be deducted from the total contract price.

7.02   Reserved)

7.03   The CITY agrees to reimburse the CONSULTANT for approved travel expenses only in accordance with the Finance Directive 01-2 "Employee Travel Procedure" or the most current issue of the Travel Procedures.

7.04   The CITY shall have the right at any time and without notice to examine and audit all Records relating to performance under this Contract. Pursuant thereto, the CONSULTANT shall make all Records available for examination during normal business hours. The CITY may delay payment to the CONSULTANT pending the results of any such audit without penalty or interest.

The CONSULTANT shall include a similar covenant allowing for CITY audit of any Subcontract for Special Services which will be charged directly or indirectly to the City of Detroit.

## ARTICLE 8

## METHOD OF PAYMENT

8.01   Payment for the proper performance of the Services shall be proportionate to the scheduled progress of the Work Plan as evidenced by the timely receipt of the Scheduling and Monitoring Report described in Article 2.01a. Payment shall be contingent upon receipt and approval by the DWSD of the Report and an invoice for payment (hereinafter called an "Invoice") and approval by DWSD thereof.

03/18

8.02   Each Invoice shall clearly indicate the time period covered by the Invoice; the budgeted amount for each line item; billings to date; amount billed for the current Invoice period, including actual payments to each Subconsultant/ Contractor; and funds remaining. The Invoice period shall be the same as the Scheduling and Monitoring Report period.

8.03   Between the first and tenth day of each month, the CONSULTANT shall submit three copies of the Invoice to DWSD, plus three copies of such other support data which may be required for evaluation of applicability and eligibility for payment under this Contract. The Invoice must be received by the DWSD not more than thirty (30) calendar days after the close of each calendar month, and be signed by the Project Manager or an authorized officer or designate of the CONSULTANT.

8.04   Invoices shall be directed as specified in Article 18 "NOTICES".

8.05   The DWSD shall pay the CONSULTANT monthly for approved Services rendered and invoiced. Such monthly payments shall be paid in accordance with the Prompt Payment of Vendors Ordinances, attached as Exhibit D.

8.06   If the DWSD disallows any amount billed by the CONSULTANT on any Invoice, a letter shall be sent to the CONSULTANT explaining the reason for the disallowance. The uncontested amounts will be approved for payment in accordance with Article 8.05. The CONSULTANT shall document the applicability and eligibility of the disallowed amount in a satisfactory manner (i.e. additional documentation, corrected Invoice amount, written explanation, etc.) prior to the submittal of the next Invoice. If, in DWSD's judgment, the documentation is sufficient, the disallowed amount will be released and included in the next scheduled payment.

03/18

8.07   Upon Final Completion of all the Contract work, the CONSULTANT shall request Final Payment. Upon written acceptance of Final Completion by the Department, the Final Payment shall be made. Acceptance of the Final Payment by the CONSULTANT shall constitute an accord and satisfaction of all claims against the CITY of whatsoever kind or nature under this Contract.

## ARTICLE 9

## INDEMNITY

9.01   The CONSULTANT agrees to save the CITY harmless from and against any and all liabilities, obligations, damages, penalties, claims, costs, charges, losses and expenses (including without limitation, fees and expenses of attorneys, expert witnesses and other consultants) which may be imposed upon, incurred by or asserted against the CITY by reason of any of the following occurring during the term of this Contract:

a.   any negligent or tortious act, error or omission of the CONSULTANT, or any of its Associates for whose acts any of them might be liable;

b.   any failure by the CONSULTANT or any of its Associates to perform its obligations either implied or expressed under this Contract;

c.   any and all injury to the person or damage to the property of, or any loss or expense incurred by, an employee of the CITY which arises out of or pursuant to the CONSULTANT'S performance or that of its Associates under this Contract.

03/18

9.02   The CONSULTANT undertakes and assumes all risk of dangerous conditions, if any, in and about any CITY premises and agrees to make an examination of all places where it will be performing the Services, in order to determine whether such places are safe for the performance of the Services. The CONSULTANT also agrees to waive and release any claim or liability against the CITY for personal injury or property damage sustained by it or its Associates for personal injury or property damage while performing under this Contract on premises which are not owned by the CITY.

9.03        In the event any action or proceeding shall be brought against the CITY by reason of any claim covered hereunder, the CONSULTANT, upon notice from the CITY, will at its sole cost and expense, resist and defend the same.

9.04   The CONSULTANT agrees that it is its responsibility and not the responsibility of the CITY to safeguard the property and materials that it or any of its Associates use or have in their possession while performing under this Contract. Further the CONSULTANT agrees to hold the CITY harmless for any loss of such property and materials used by any such persons pursuant to the CONSULTANT'S performance under this Contract or which is in their possession.

9.05   The indemnification obligation under this Article shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the CONSULTANT under worker's compensation acts or other employee benefit acts. In addition, the CONSULTANT agrees to hold the CITY harmless from the payment of any deductible on any insurance policy providing coverage to the CONSULTANT.

## ARTICLE 10

### INSURANCE

03/18

<u>10.01</u>   The CONSULTANT shall maintain at its expense during the term of this Contract the following types and amounts of insurance. With the exception of Worker's Compensation, Employers' Liability, Professional Liability, and Comprehensive Automobile Liability such insurances shall name as an Additional Insured the City of Detroit, a municipal corporation of the State of Michigan, and all other associated, affiliated, allied and subsidiary entities now existing or hereafter created as their respective interests may appear.

| TYPE OF INSURANCE | MINIMUM AMOUNT |
|---|---|
| **WORKER'S COMPENSATION** | Statutory |
| EMPLOYER'S LIABILITY | |
| Each Accident | $     500,000 |
| Each Disease | $     500,000 |
| Each Disease per Employee | $     500,000 |
| PROFESSIONAL LIABILITY | |
| (Errors and Omissions) | $  1,000,000 |
| COMMERCIAL GENERAL LIABILITY | |
| Bodily Injury – Each Occurrence | $  1,000,000 |
| Body Injury – Aggregate | $  2,000,000 |
| (Completed Operations) | |
| Property Damage – Each Occurrence | $  1,000,000 |
| Property Damage – Aggregate | $  2,000,000 |
| or | |
| Combined Single Limit | $  2,000,000 |
| COMPREHENSIVE AUTOMOBILE LIABILITY | |
| Bodily Injury | $     500,000 |
| Property Damage | $     250,000 |
| or | |
| Combined Single Limit | $  1,000,000 |
| **UMBRELLA OR EXCESS LIABILITY** | $  2,000,000 |

<u>10.01a</u>   Worker's Compensation insurance for Employees which meets Michigan's statutory requirements and Employers' Liability insurance which meets the minimum limits stated above. The

03/18

CONSULTANT agrees that it will obtain a similar covenant with respect to Worker's Compensation insurance from any Subconsultant.

10.01b    Professional Liability (Errors and Omissions) insurance with minimum limits stated above.

10.01c    Commercial General Liability insurance which conforms to the minimum limits stated above.

10.01d    Automobile Liability insurance covering all owned, non-owned, or hired automobiles with minimum limits as stated above. Such insurance shall comply with the provisions of the Michigan No Fault Insurance Act and shall provide coverage for Personal Protection insurance, Property Protection insurance and Residential Liability insurance.

10.01e    Excess Liability (Umbrella) insurance with minimum limits as stated above.

10.02    All such insurance shall be affected as the CONSULTANT'S expense, under valid and enforceable policies, issued by insurers of recognized responsibility which are licensed by the State of Michigan Insurance Bureau and are acceptable to the DWSD.

10.03    Said policies shall name the CONSULTANT as the insured, and shall contain an agreement that such policies shall not be canceled or materially changed without at least thirty (30) calendar days prior written notice to the CITY. Certificates of insurance evidencing such coverage shall be submitted to the DWSD prior to the time

03/18

the CONSULTANT executes the Contract, and again at least fifteen (15) calendar days prior to the expiration dates of such policies.

10.04   In addition to the above requirements, the CONSULTANT shall require each Subconsultant/Contractor to effect Commercial General Liability insurance in which the City of Detroit is named as an Additional Insured as well as the CONSULTANT. The amounts of such insurance, if not in the same amounts as fixed for the CONSULTANT, shall be determined by the DWSD based on the nature and potential hazards of the activities of the various subconsultants, and shall not necessarily be based on the amount of the subcontract. In no case, however, shall the amount of such coverage for Bodily Injury be less than $100,000 for each occurrence and $300,000 aggregate, nor shall the amount for Property Damage be less than $100,000 for each occurrence and $300,000 aggregate, and may be fixed up to and including the maximum amounts previously stated in Article 10.01 of this Contract.

The Subconsultant's/Contractor's coverage need only be maintained during the period the Subconsultant/Contractor is performing Services as specified in the Work Plan.

10.05   If, during the term of this Contract, changed conditions or other pertinent factors should, in the reasonable judgment of the DWSD, render inadequate the insurance limits specified above, the CONSULTANT will furnish on demand, and DWSD will reimburse the CONSULTANT for, such additional coverage as may reasonably be required under the circumstances.

10.06   The parties acknowledge and understand that the availability of certain insurance coverages at reasonable prices is subject to market conditions prevalent at the time such coverage is being sought. In that regard, the parties agree that the aforestated specific requirements for types and amounts of insurance are subject to the market availability at reasonable prices. In the event certain such types or amounts of

03/18

insurance become unavailable at reasonable prices, as determined by the Contracting Officer, the aforestated specific requirements for insurance coverages will continue in effect until the CONSULTANT and the CITY can, by mutual good faith negotiations, arrive at mutually agreeable specific requirements for insurance coverages. This change in insurance requirements will take place only upon written authorization of the Director of DWSD.

## ARTICLE 11

### TERMINATION

    11.01   The DWSD may terminate this Contract for cause upon giving written "Notice of Termination" to the CONSULTANT at least twenty-four (24) hours before the effective date of the termination, should the CONSULTANT: (1) fail to fulfill in a timely and proper manner its obligations under this Contract; (2) violate any of the covenants, agreements or stipulations of this Contract; (3) cease conducting business in the normal course; or (4) admit in writing its inability to pay its debts generally as they become due. The CONSULTANT shall be liable to the CITY for any damages it sustains by virtue of the CONSULTANT'S breach or any reasonable costs the CITY might incur enforcing or attempting to enforce this Contract, including reasonable attorney's fees. The CITY may withhold any payment(s) to the CONSULTANT for the purpose of set-off until such time as the exact amount of damages due to the CITY from the CONSULTANT is determined. It is expressly understood that the CONSULTANT will remain liable for any damages the CITY sustains in excess of any set-off. If the Contract is so terminated, the CITY may take over the Services, and prosecute the same to completion by contract with another party or otherwise, and the CONSULTANT shall be liable to the CITY for any costs occasioned to the CITY thereby.

    11.02   The CITY may terminate this Contract without cause at any time, without incurring any further liability whatsoever, other than as stated in this Article 11, by issuing a Notice of Termination to the CONSULTANT specifying the effective date

03/18

thereof, at least fifteen (15) calendar days prior to the effective date of such termination. If the Contract is terminated, the CITY will pay the CONSULTANT only for the Services rendered prior to termination. The amount of the payment shall be computed by the CITY on the basis of the Services rendered, and such other means which, in the judgment of the CITY, represents a fair value of the Services provided, less the amount of any previous payments made. The CONSULTANT agrees that acceptance of the Final Payment constitutes full and complete payment and an accord and satisfaction of any and all claims of whatsoever kind or nature under this Contract.

a)  Should the CITY or the CITY'S designee undertake any part of the Services which are to be performed by the CONSULTANT, to the extent such Services which are to be performed by the CITY or its designee the CONSULTANT shall not be entitled to any compensation for the Services so performed. The parties expressly agree that no payments under this Article shall exceed the maximum sum payable provision in Article 7.01 "COMPENSATION".

11.03    After receipt of a Notice of Termination and except as otherwise directed by the CITY, the CONSULTANT shall:

a)  Stop work under the Contract on the date and to the extent specified in the Notice of Termination;

b)  Obligate no additional Contract funds for payroll costs and other costs beyond such date as the CITY shall specify, and place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under this Contract as is not terminated;

03/18

c) Terminate all purchase orders and Subcontracts to the extent that they relate to the portion of work so terminated;

d) As of the date the termination is effective, preserve all Records and submit to the CITY such Records and Reports as the CITY shall specify, and furnish to the CITY an inventory of all furnishings, equipment, and other property purchased for the Contract (if any) and all pertinent keys to files, buildings, and property and carry out such directives as the CITY may issue concerning the safeguarding or disposition of files and property; and

e) Submit within thirty (30) calendar days a final Report of receipts and expenditures of funds relating to this Contract, and a listing of all creditors, Subconsultant/Contractors, lessors, and/or other parties with which the CONSULTANT has incurred financial obligations pursuant to this Contract (if any).

<u>11.04</u>  Upon completion or other termination of this Contract, all finished or unfinished original documents or copies (when originals are unavailable), data, studies, surveys, drawings, maps, models, photographs, files, intermediate materials, supplies, notes, reports or other materials (hereinafter collectively referred to as the "Work Product") prepared by the CONSULTANT under this Contract or in anticipation of this Contract shall, at the option of the CITY, become its exclusive property, whether or not in the CONSULTANT'S possession, free from any claim or retention of rights thereto on the part of the CONSULTANT, except as herein specifically provided, and shall promptly be delivered to the CITY upon the City's request and the CITY shall return all CONSULTANT'S properties to it.

03/18

The CONSULTANT acknowledges that any intentional failure or delay on its part to deliver the Work Product to the CITY will cause irreparable injury to the CITY not adequately compensable in damages and for which the CITY has no adequate remedy at law. The CONSULTANT accordingly agrees that the CITY may in such event seek and obtain injunctive relief in a court of competent jurisdiction and compel delivery of the Work Product, to which the CONSULTANT hereby consents.

The CITY shall have full and unrestricted use of the Work Product for the purpose of completing the Contract.

11.05    Access to the Work Product prior to delivery shall be restricted to trusted and duly authorized representatives of the CITY and the CONSULTANT. The CONSULTANT shall have no right to disclose or use any information gathered in the course of its work without the explicit concurrence of the CITY. All such information shall be marked "Confidential" and be handled at all times in such a manner as to preserve confidentiality. The CONSULTANT acknowledges that such Work Products are proprietary to the CITY having been developed for the CITY for its own and sole use, unless such work products have been previously developed by the CONSULTANT outside of this Contract.

11.06    Each party will assist the other party in the orderly termination of this Contract and the transfer of all aspects hereof, tangible or intangible, as may be necessary for the orderly, non-disrupted business continuance of each party.

11.07    Special Conditions for Termination may apply in event of termination under terms and conditions of Article 17 "FAIR EMPLOYMENT PRACTICES".

## ARTICLE 12

### ASSIGNMENT AND SUBCONTRACTING

03/18

12.01    The CONSULTANT shall not assign or encumber directly or indirectly any interest whatsoever in this Contract, and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the DWSD thereto. Any such consent given in any one instance shall not relieve the CONSULTANT of its obligation to obtain the prior written consent of the DWSD to any further assignment.

Within fifteen (15) calendar days of receipt of a fully executed copy of the Contract, the Consultant shall deliver to DWSD an executed copy of any Subcontract(s) entered into for Special Services under this Contract. In the event that a Subconsultant/Contractor has not been identified at the time of execution of this Contract, the CONSULTANT shall deliver an executed copy of any future Subcontract to DWSD within fifteen (15) calendar days of its execution. No payment shall be issued for any subcontracted services unless DWSD has a fully executed Subconsultant/Contractor agreement on file covering the performance of same.

12.02    None of the Services included by this Contract shall be subcontracted without the prior written approval of the DWSD. Such covenant shall not constitute a basis for privity between the DWSD and the Subconsultant/Contractor. The CONSULTANT agrees to indemnify and hold the CITY harmless from any such claims initiated pursuant to any subcontracts it enters into in performance of this Contract in accordance with Article 2, Section 2-106 "Standards of Conduct" of the Charter of the City of Detroit.

12.03    The CONSULTANT shall make a good faith effort to comply with the goals of Executive Order No. 2003-4, attached as Exhibit E.

03/18

12.04   The CONSULTANT agrees to make every reasonable effort to utilize the subconsultants listed in Exhibits A and B to the extent designated therein.

## ARTICLE 13

## CONFLICT OF INTEREST

13.01   The CONSULTANT covenants that it presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of the Services under this Contract. The CONSULTANT further covenants that, in the performance of this Contract, no person having any such interest shall be employed.

The CONSULTANT further covenants that no officer, member or employee of the CITY and no other public official who exercises any functions or responsibilities in the review or approval of the undertaking or carrying out of this Contract has any personal or financial interest, direct or indirect, in this Contract or in the proceeds thereof in accordance with Article 2, Section 2-106 "Standards of Conduct" of the Charter of the City of Detroit.

13.02   The CONSULTANT also hereby warrants that it has not and will not employ any person to solicit or secure this Contract upon any agreement or arrangement for payment of a commission, percentage, brokerage, or contingent fee, either directly or indirectly. The CONSULTANT further agrees that if this warranty is breached, the CITY may, at its option, terminate this Contract without penalty, liability or obligation, or may at its election, deduct from any amounts owed to the CONSULTANT hereunder any amounts of such commission, percentage, brokerage, or contingent fee.

13.03   The CONSULTANT agrees that neither it nor its Employees will endeavor to influence the CITY'S employees to seek employment with the CONSULTANT within the duration of this Contract and shall not for a period of one (1)

03/18

year thereafter employ any of the CITY'S employees without prior written approval from the CITY. Proof of such activity as determined by DWSD may cause immediate termination of this Contract.

13.04    The CONSULTANT shall include the provisions of this Article in any subcontract it enters into pursuant to this Contract.

## ARTICLE 14

### CONFIDENTIAL INFORMATION

14.01    In order that the CONSULTANT may effectively fulfill its covenants and obligations under this Contract, it may be necessary or desirable for the DWSD to disclose confidential and proprietary information to the Employees pertaining to the CITY'S past, present and future activities. Since it is difficult to separate confidential and proprietary information from that which is not, the CONSULTANT shall instruct its Associates to regard all information gained by each such person as a result of the Services to be performed hereunder as information which is proprietary to the DWSD and not to be disclosed to any organization or individual without the prior consent of the DWSD.

14.02    The CONSULTANT agrees to take appropriate action with respect to its Associates to insure that the obligations of non-use and non-disclosure of confidential information of this Contract can be fully satisfied.

03/18

## ARTICLE 15

## COMPLIANCE WITH LAWS AND SECURITY REGULATIONS

15.01    The CONSULTANT shall comply with and shall require its Associates to comply with (a) all applicable Federal, state and local laws, ordinances, code(s), regulations and policies, including, but not limited to, all security regulations in effect from time to time on the CITY'S premises; and (b) all applicable codes and regulations for materials, belonging to the CITY or developed in relationship to this Contract.

The CONSULTANT shall hold the CITY harmless with respect to any damages arising from any violations of the same by it or its Associates. The CONSULTANT shall commit no trespass on any public or private property in performing any of the Services encompassed by this Contract. The CONSULTANT shall require, as part of any subcontract that Subconsultants/Contractors comply with all such laws and regulations.

## ARTICLE 16

## AMENDMENTS

16.01    The CITY may from time to time consider it in its best interest to change, modify or extend a term, condition or covenant of this Contract or require changes in the scope of the Services to be performed by the CONSULTANT, or require the CONSULTANT to perform Additional Services. Any such change, addition, deletion, extension or modification, including any increase or decrease in the amount of the CONSULTANT'S compensation, which are mutually agreed upon by and between the CITY and the CONSULTANT shall be incorporated in written amendments to this Contract. Such Amendments shall not invalidate this Contract nor relieve or release the CONSULTANT of any of its obligations under this Contract unless so stated in the Amendment.

03/18

16.02    No Amendment to this Contract shall be effective and binding upon the parties unless it expressly makes reference to this Contract, is in writing and is signed and acknowledged by duly authorized representatives of both parties, and is approved by the Detroit City Council and other appropriate CITY agencies.

## ARTICLE 17

### FAIR EMPLOYMENT PRACTICES

17.01    In accordance with the United States Constitution and all federal legislation and regulations governing fair employment practices and equal employment opportunity including, but not limited to, Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), and in accordance with the Michigan constitution and all state laws and regulations governing fair employment practices and equal employment opportunity, including, but not limited to, the Michigan Civil Rights Act (P.A. 1976 No. 453) and the Michigan Handicappers Civil Rights Act (P.A. 1976 No. 220), the CONSULTANT agrees that it will not discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions or privileges of employment because of religion, race, color, national origin, age, sex, height, weight, marital status, or handicap that is unrelated to the individual's ability to perform the duties of a particular assignment or position. The CONSULTANT hereby recognizes the right of the United States, the State of Michigan and the City of Detroit to seek judicial enforcement of the foregoing covenants against discrimination, against itself or its Subconsultant/Contractors connected directly or indirectly with the performance of this Contract.

17.02    The CONSULTANT agrees that it will notify any Subconsultant/ Contractor(s) of the obligations relative to non-discrimination under this Contract when soliciting same, and will include the provisions of this Article 17 in any subcontract.

03/18

17.03    Breach of the terms and conditions of this Article may be regarded as a material breach of this Contract.

### ARTICLE 18

### NOTICES

18.01    Except as otherwise specified herein, all notices, consents, approvals, requests and other communications (herein collectively called "Notices") required or permitted under this Contract shall be given in writing and mailed by first class mail, addressed as follows:

If to the DWSD on behalf of the CITY:

> Victor M. Mercado, Director
> Detroit Water & Sewerage Department
> 735 Randolph
> Detroit, Michigan 48226
> Attention: Darryl A. Latimer

If to the CONSULTANT:

> William Pyant, Jr.
> IOCAD Engineering Services, Inc.
> 3011 West Grand Boulevard, Suite 425
> Detroit, Michigan 48202

18.02    All Notices shall be deemed given on the day of post-marked mailing. Any Notice given by a party hereunder must be signed by an authorized representative of such party.

18.03    Notwithstanding the requirement above as to the use of first-class mail, change of address notices, termination notices, and other Notices of a legal nature, shall be sent by certified first-class mail, postage prepaid, return receipt requested.

03/18

## ARTICLE 19

### PROPRIETARY RIGHTS AND PATENT INDEMNITY

19.01    The parties acknowledge that should the performance of this Contract result in the development of new proprietary and secret concepts, methods, techniques, processes, adaptions, discoveries, improvements and ideas, same shall be promptly reported to the CITY, belong solely and exclusively to the CITY, without further consideration and without regard to the origin thereof, and the CONSULTANT will not, other than in the performance of this Contract, make use of or disclose same to anyone. At the CITY'S request the CONSULTANT shall execute all documents and papers and shall furnish all reasonable assistance requested in order to establish in the CITY all right, title and interest in such inventions, discoveries and improvements or to enable the CITY to apply for United States patents thereon, if the CITY elects to do so.

19.02    The CONSULTANT hereby grants to the CITY a permanent, irrevocable, non-exclusive, paid-up license under any and all copyrights or copyright applications owned, controlled, or under which the CONSULTANT has the right to grant such license, which license shall permit the CITY to reproduce each and every copyrighted work of authorship fixed in any tangible means of expression (including without limitation, drawings, prints, manuals and specifications) furnished to the CITY in the course of performance hereunder, to prepare derivative works based thereon, to distribute copies of the copyrighted work to the public and to display the copyrighted work publicly.

19.03    The CONSULTANT warrants that any products sold or processes used in the performance of this Contract do not infringe upon or violate any patent, copyright, trademark, trade secret or any other proprietary rights of any third party. In the event of any claim by any third party against the CITY, the CITY shall promptly notify the CONSULTANT and the CONSULTANT shall defend such claims in the CITY'S name,

03/18

but at the CONSULTANT'S expense and shall indemnify the CITY against any loss, cost, expense or liability arising out of such claim, whether or not such claim is successful.

## ARTICLE 20

### MISCELLANEOUS

20.01 No failure by the CITY to insist upon the strict performance of any covenant, agreement, term or condition of this Contract or to exercise any right, term or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or such covenant, agreement, term and condition. No waiver of any breach shall affect or alter this Contract, but each and every covenant, agreement, term and condition of this Contract shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

20.02 If any provision of this Contract or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Contract or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

20.03 This instrument (including Exhibits A, B, C, D and E) contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Neither the CITY nor the CITY'S Agents have made any representations except those expressly set forth herein, and no rights or remedies are or shall be acquired by the CONSULTANT by implication or otherwise unless expressly set forth herein.

03/18

In the event that the language, terms and/or conditions as stated in the Contract itself differs from that in any of the Exhibits, the language terms and conditions of the Contract shall govern: All such determinations will be made by the DWSD.

20.04    Unless the context otherwise expressly requires, the words "herein", "hereof", and "hereunder" and other words of similar import refer to this Contract as a whole and not to any particular Article, Section or other subdivision.

20.05    All the terms and provisions of this Contract shall be deemed and construed to be "covenants" and "conditions" as though the words specifically expressing or imparting covenants and conditions were used in each separate term and provision.

20.06    The headings of the Articles in this Contract are for convenience only and shall not be used to construe or interpret the scope or intent of this Contract or in any way affect the same.

20.07    The rights and remedies set forth herein are not exclusive and are in addition to any of the rights and remedies provided by law or equity. This Contract and all actions arising hereunder shall be governed by, subject to, and construed according to the laws of the State of Michigan. The CONSULTANT agrees, consents and submits to the personal jurisdiction of any competent court in Wayne County, Michigan, for any action arising out of this Contract. The CONSULTANT agrees that service of process at the address and in the manner specified in Article 18 "NOTICES" will be sufficient to put the CONSULTANT on notice and hereby waives any and all claims relative to such Notice. The CONSULTANT also agrees that it will not commence any action against the CITY because of any matter whatsoever arising out of or relating to the validity, construction, interpretation and enforcement of this Contract, in any courts other than those in the County of Wayne, State of Michigan, unless original jurisdiction can be had

03/18

in the United States District Court, Eastern District, Southern Division, the Michigan Court of Appeals or the Michigan Supreme Court.

20.08  If any Affiliate of the CONSULTANT shall take any action which, if done by a party, would constitute a breach of this Contract, the same shall be deemed a breach by the CONSULTANT with right legal effect.

20.09  It is understood that this is not an exclusive service contract and that, during the term of this Contract, the CITY may contract with other consulting firms. It is also understood that the CONSULTANT is free to render the same or similar services to other clients, provided however, that the CONSULTANT'S obligations to the CITY contained in this Contract will not be affected in any manner.

20.10  Neither party shall be responsible for force majeure events. In the event of a dispute between the parties with regard to what constitutes a force majeure event, the determination of DWSD shall be controlling.

20.11  The CONSULTANT warrants that all of the prices, terms, warranties and benefits granted to the CITY are comparable to or better than the equivalent terms presently being offered by the CONSULTANT to any other customer for the performance of like Services.

20.12  For purposes of the hold harmless and indemnity provision contained in this Contract, the term "CITY" shall be deemed to include the City of Detroit, and all other associated, affiliated, allied or subsidiary entities or commissions, their officers, agents and representatives now existing or hereafter created, their agents and employees.

03/18

<u>20.13</u>   The CONSULTANT covenants that it is not, and will not become in arrears to the CITY upon any contract, debt, or other obligations to the CITY, including real property, personal property and income taxes. The CONSULTANT agrees to include this provision in any Subcontracts for Special Services.

<u>20.14</u>   This Contract may be executed in any number of counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Promptly after the execution thereof as set forth in Article 4.02 "TIME OF PERFORMANCE", the CITY shall submit to the CONSULTANT a confirmed copy of this Contract.

<u>20.15</u>   As used herein, the singular shall include the plural, and the plural singular.

<u>20.16</u>   For purposes of this Contract, the terms below will be defined as noted:

<u>20.16a</u>   "Additional Services" shall mean any Services in addition to those set out in Exhibit A which are related to fulfilling the objectives herein stated, are not contained in the original Services as designated in this Contract or any Exhibit thereto and are agreed upon by the parties by written amendment.

<u>20.16b</u>   "Affiliate" shall be defined as a "parent", subsidiary or other company controlling, controlled by or in common control with the CONSULTANT.

03/18

20.16c     "Associates" shall be defined as the CONSULTANT'S personnel, employees, consultants or Subconsultant/Contractors, agents or any associated entities, their agents and employees.

20.16d     "Contracting Officer" shall be defined as an employee of DWSD to be designated in the Notice to Start Work to be the representative of DWSD.

20.16e     "Director" shall be defined as the Director of DWSD.

20.16f     "Project Manager" shall be defined as the employee of the CONSULTANT designated to be responsible for management of all aspects of the Services.

20.16g     "Services" shall be defined as the technical and/or professional services to be rendered by the CONSULTANT.

20.16h     "Subconsultant/Contractor" shall be defined as a subconsultant or subcontractor of the CONSULTANT.

20.16i     "Work Product" shall be defined as all finished or unfinished original documents or copies (when originals are unavailable), data, studies, surveys, drawings, maps, models, photographs, files, intermediate materials, supplies, notes, reports or other materials prepared by the CONSULTANT under this Contract or in anticipation of this Contract.

03/18

20.17    The CONSULTANT shall comply with the Detroit Living Wage Ordinance and execute Exhibit C, attached hereto.


20.18    This Contract shall not be construed to create any rights in any third party.


## ARTICLE 21

### LITIGATION


This Contract does not cover any professional services in connection with or arising out of litigation between the parties hereto.


## ARTICLE 22

### CONTINUITY


This Contract shall inure to the benefit of and be binding upon the respective parties hereto, their successors and assigns; however, the CONSULTANT shall not assign, transfer, convey, or otherwise dispose of this Contract without prior written approval of the DWSD.


## ARTICLE 23

### PROMPT PAYMENT OF VENDORS ORDINANCE


Payment for services provided under this Contract is governed by the terms of Ordinance No. 42-98 entitled "Prompt Payment of Vendors," being Sections 18-5-71 through 18-5-79 of the 1984 Detroit City Code, which is attached as Exhibit D.


03/18

IN WITNESS WHEREOF, the City and the Consultant by and through their duly authorized officers and representatives have executed this Contract as of the day and year first above written.

WITNESS: (Consultant)

(Signature)

_____
(Print or Type)

(Signature)

_____
(Print or Type)

WITNESS: (Director)

(Signature)

_____
(Print or Type)

(Signature)

_____
(Print or Type)

THIS CONTRACT WAS APPROVED BY THE CITY COUNCIL ON _____
                                            Date

_____
Purchasing Director          Date

___IOCAD Engineering Services, Inc.___
CONSULTANT

BY _____
        (Authorized Signature)

TITLE _____

                    3011 W. Grand Boulevard
                              Suite 425
ADDRESS      Detroit, Michigan 48202

TELEPHONE NO. (313) 873-2310

Social Security No. or Federal Identification No.    38-3084945

CITY OF DETROIT
BY
BOARD OF WATER
COMMISSIONERS

BY _____

TITLE  Victor M. Mercado, Director

APPROVED BY LAW DEPARTMENT PURSUANT TO §6-406 OF THE CHARTER OF THE CITY OF DETROIT

_____
Corporation Counsel          Date

03/18

## CITY ACKNOWLEDGMENT

STATE OF MICHIGAN     )
                             )  SS.

COUNTY OF WAYNE     )

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, the _____, of the Water and Sewerage Department of the City of Detroit, Michigan a municipal corporation.


_____
Notary Public, Wayne County, Michigan
My Commission Expires:

If a corporation, please complete the following:

## RESOLUTION OF CORPORATE AUTHORITY

I, _____ , Corporate

Officer of           (Print or Type)

_____ , a

_____

Corporation (the "Company") DO HEREBY CERTIFY that the following is a true and correct excerpt from the minutes of the meeting of the Board of Directors duly called and held on _____ and that the same is now in full force and effect:

> "RESOLVED, that the Chairman, the President, each Vice President, the Treasurer and the Secretary and each of them, hereby is authorized to execute and deliver, in the name and on behalf of the Company and under its corporate seal or otherwise, any agreement or other instrument or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement; document, or other instrument, or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such officers to be conclusive evidence of such approval. "

I FURTHER CERTIFY that _____ is Chairman of the Board, and _____ is President, _____ is Treasurer, _____ is Secretary.

I FURTHER CERTIFY that any of the aforementioned officers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in _____ and that all necessary corporate approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _____ day of _____, 20___.

CORPORATE SEAL

_____
Corporate Officer's Signature

_____

03/18

## CORPORATE ACKNOWLEDGMENT

STATE OF MICHIGAN   )
                          ) SS.
COUNTY OF WAYNE   )

      The foregoing instrument was acknowledged before me this _____
day    of     _____,    20__,    by     _____,    the
_____of        _____,     a
_____ Corporation on behalf of the Corporation.

                           _____
                           Notary Public, Wayne County, Michigan
                           My Commission Expires:

03/18

# EXHIBIT A

available. Team members will then be able to view and comment on all information. Designated team members will also provide QA/QC review. Regularly scheduled review workshops will provide a collaborative forum to gather feedback and suggestions regarding the content and presentation. In addition to the review workshops, our O&M team will make several trips to the facility with DWSD staff to gather "hands-on" feedback about how the facilities are best operated in order to create the most accurate O&M related documents.

Once all information has been created, converted and published, draft hard-copy deliverables will be produced and distributed for review and comment. We propose two designated workshops to review the hard copy materials – one devoted to the O&M manual and one devoted to the other O&M related documents (SEMP's, SOP's, PMAS's, PMAP's and PSEM's). All comments received at the workshops will be summarized and distributed. The IAS will then be updated to address the comments and a final draft of all the hard copy documents produced for distribution. A final workshop will be held to assure consensus on the documents. Any final updates will be completed. Any revised hard copies will be printed. All final electronic information will then be published to Documentum.

We have worked directly with Documentum to develop preliminary specifications for their Documentum 4i Content Management System, including:

- Functional design and needs definition
- Detailed solution design

- Development
- Deployment
- Integration assistance
- Training
- Licensing

We also worked directly with Documentum to develop preliminary costs for server hardware, both application and Oracle database, and for Oracle licensing. All details are presented in the appendices.

## 2.g.     On-Going Maintenance

We propose to keep all O&M information current during the course of this project by conducting quarterly review sessions with DWSD staff to identify new projects at facilities, which have already been completed. We will then review the scope of the completed improvement including any drawings, specifications, shop drawings and O&M related information. We will then prepare a letter report summarizing our recommendations for updating the as-builts, O&M manuals and related documents. We will complete the updates as authorized by DWSD. As an alternate to a new Documentum deployment, DWSD may wish to expend the current deployment being performed at the wastewater treatment plant and may realize significant cost and time savings from this approach at the plant.



## 2.h. EDMS Deployment and Integration

Integration of the final, approved as-built drawings and O&M information must be coordinated with the Documentum implementation currently underway at DWSD. The Documentum eDMS will then become the permanent repository for management of all as-built and O&M related information. Our work plan and Wick Station Model Plan include all of the elements necessary to efficiently integrate all final information into Documentum as follows:

- **Defining the document object types.** The as-built and O&M standards define all the document object types for as-built drawings and related documents. The XML templates developed within the information access system define the document object types for the eDMS

- **Defining the workflow.** The workflow associated with each document object for creation, review, approval, access and maintenance is identified as part of the work process enhancements

- The final task at the conclusion of the Wick Pump Station assignment will be to integrate the as-built and O&M document types into the eDMS and establish the approved workflow

Prior to each successive assignment, the kick-off workshop will identify if there are any unique document objects or workflow associated with the particular facility. If so, we will update the eDMS as required.

All as-built and O&M document object types along with their associated workflow will be defined within the Documentum eDMS. All final, approved as-built and O&M related information will be published to the eDMS.

### Task 2: Deliverables
#### As-Built Deliverables:
- Five copies of preliminary "as-built" drawings (95% complete)
- One mylar reproducible of final "as-built" drawings
- Twenty copies of final "as-built" drawings
- Five copies of preliminary electrical coordination study report
- Ten copies of final electrical coordination study report
- Electronic, uncompressed files of the preliminary and final study reports in latest Microsoft Word format and AutoCAD on optical disk reader (CDR) media
- Ten copies of media disks containing digital photos of each site and system equipment

#### O&M Deliverables:
- Systematic procedures for both normal and emergency operation of individual pieces of equipment and systems.
- Start-up and shut-down procedures.
- System troubleshooting guidelines.
- Descriptive information including: schematics, flow diagrams, drawings and photos.
- Digital video where necessary to fully describe system operation and maintenance.
- Fully updated vendor and manufacturer's literature for: removal, disassembly, repair, preventative maintenance
- Component drawings with all designations and parts lists
- On-hand spare parts recommendations
- Required tool lists
- Safety procedures
- Vendor lists and contacts and phone numbers
- Emergency contacts and phone numbers
- On-going maintenance of O&M information (as authorized by DWSD)
- All required hardware and software
- Documentum eDMS including development, deployment, integration, and training

All O&M information will be available via the information access system, provided in hard-copy format and on CD. Five draft hard copies will be provided followed by ten final copies (the PSEM's will have 75 final copies).



## QUALITY MANAGEMENT

Our quality management approach implements effective project controls to assure:

- Optimum involvement by DWSD throughout the project process

- Collaborative and successful project meetings and work shops

- Achievement of project schedule and budget goals

- Proper management of subconsultant team members

- Highest quality project deliverables

Our approach to management is straightforward, direct, and based upon careful and thoughtful planning. We make it a practice to evaluate and thoroughly understand both the technical and non-technical requirements associated with each specific project. We then employ a highly collaborative project planning process to clearly define performance objectives, operational constraints, and existing conditions. This process drives the creation of a collaborative *Project Plan*, which becomes the "road map" for how the IOCAD Team will proceed. The Project Plan consists of:

*Our Team's Management Approach provides:*

- *Organizational control*
- *Close & effective communication*
- *Effective QA/QC*

- Organizational Plan
- Communication Plan
- Quality Plan

## Organizational Plan

This will establish the:

- Team organization and roles and responsibilities

- Budget and Schedule Control

- Responsibilities and management of subconsultants

- Administrative elements such as billing, document control

Our approach to budget control is designed to define the level of completion needed for each discipline as the design proceeds, in terms of what work should be completed and budget expended. Budget expenditures over time will be established at the onset of the project along with a clear definition of the tasks needed to achieve interim completions. Our Budget Management System consists of two major computing environments:

- Project Management Toolbox (PMT), a PC-based system providing project information directly to

 



project staff. PMT provides our managers with weekly updates, on-line and accessible, of project expenditures

- Business Management Toolbox (BMT), a minicomputer-based system supporting accounting and master database functions, used primarily by our corporate support and billing staff

## Communication Plan

The critical nature of the site selection process, quantity of field work involved and potential interaction with the public and regulatory agencies make effective project communications critical to success. The methods of communication among team members, DWSD staff, vendors, public and regulatory agencies will be delineated in our communication plan. Formats for the monthly progress reports and schedule updates will be discussed and agreed upon with DWSD.

*Our project team of experts will be in constant communication with DWSD. This will enable us to provide responsive and efficient service on this project.*

## Quality Plan

Our Quality Plan will assure the highest level of technical quality for DWSD and meet our commitment to continuous improvement. Included in this section of the Project Plan are all standards to be used in the technical performance of the work, such as specifications, CADD standards, and Quality Assurance/Quality Control (QA/QC).

Quality on each project is best achieved by assigning the most qualified individuals to tasks where they are most expert, operating within a well-managed group, and providing the technical checks necessary to every project.

QA/QC Plans have often been described in detail and then seldom used. Our team's emphasis in preparing a QA/QC Plan is that the simpler the plan, the better it is. Simple means that all members of the as-built team will understand, use and follow it; that quality checks occur at the time that they are most needed; and QA/QC will not require a special effort outside of normal operations, but will be an integral part of the as-built process. We will develop our QA/QC plan to:

- Identify the most appropriate and expert QC reviewers for checking each task, discipline and subject
- Schedule QC reviews at the most appropriate time
- Schedule QC reviews of our subconsultant's work with particular emphasis on allowing sufficient time for timely completion
- Require direct response from the as-built specialists to the QC reviews
- Check that changes resulting from the review are incorporated in the as-builts






- Document that all reviews, checks, responses and other QC measures are in place and maintained as a complete QA document

## Subcontractor Management

Our approach to managing the efforts of our sub-consultants is based on a higher level of understanding developed via a partnering process. Nonetheless, we understand the need as prime consultant to maintain vigilance over the efforts of our subconsultants, whether on technical or business-related matters. We are ultimately responsible to our clients and will use all means to assure proper performance of the work by all of our team members. The multiple project controls to be instituted, as discussed throughout this document, are in part designed to provide the necessary level of management of our subconsultants. Our Project Manager and Deputy Project Manager will receive information weekly regarding subcontractor progress and status.

 
13-53846-tjt    Doc 11439    Filed 08/17/16    Entered 08/17/16 16:44:49    Page 75 of 129

# TASK ORDER NO. I

## WICK STATION



Our model plan follows the approach presented in our Work Plan. The work items are organized to coordinate with the five main tasks from the Cost Information Sheets in Exhibit B.

- Preparation
- Digitizing
- Publishing
- eDMS
- Prints

Flow charts and an overall schedule are also provided to fully explain our approach to completing O&M information and as-builts for the Wick Road Pump Station.

Prior to beginning the first assignment, we propose to hold a series of workshops with DWSD to enhance work processes and facilitate the development of standard requirements for both O&M and as-built information. These workshops are discussed in detail in our overall work plan. The first task in each assignment would then be to review these standards and identify any unique requirements for a particular facility.

We intend to deploy the Documentum eDMS (*Documentum 4i Content Management System*) in parallel with the first as-built assignment. Our web-based information access system (IAS) will allow for as-built and O&M content development and collaboration to proceed while the final eDMS is being deployed. DWSD will be able to immediately pilot test and prototype information standards and work flow processes using our IAS, which can then be configured into the eDMS.

| Task | Description | Resources | Anticipated Duration |
|------|-------------|-----------|----------------------|
| **Preparation** | | | |
| Assignment Kick-Off Meeting | Review detailed requirements for the particular assignment. Identify any unique information requirements in addition to the standard requirements. Develop a draft assignment schedule | Project manager, deputy project manager, O&M specialist, as-built specialist | 1 day meeting |
| Review Existing O&M Information | Review all existing hard copy and electronic O&M information to determine its suitability for use and any conversion requirements. | Deputy project manager and an O&M specialist | 10 days |
| Initial Site Investigation | Determine the level of effort required to complete the as-built work | Deputy project manager, surveyor, electrician, as-built specialist | 3 days |
| Field Investigation Work Plan | Summarize the results of the O&M information review and the initial site investigation. Provide a detailed plan and schedule to complete all the field activities. Identify any coordination required with on-going DWSD projects | Project manager, deputy project manager | |

 
13-53846-tjt   Doc 11439   Filed 08/17/16   Entered 08/17/16 16:44:49   Page 77 of 129



| Task | Description | Resources | Anticipated Duration |
|---|---|---|---|
| | at the assigned facility. | | |
| Detailed Site Investigation | Scan all existing drawings into raster format. Field-verify and complete all as-builts including detailed equipment/systems inventory, electrical, site survey and buried utility location. | Deputy project manager, as-built specialists, electrician crew, surveying crew | |
| **Field Investigations Report** | | | |
| Complete O&M Information | Conduct workshops with DWSD to develop any missing O&M information. Convert all existing relevant information to digital format. Obtain updated vendor information for all equipment and systems. | Deputy project manager, O&M specialists | |
| **Digitizing** | | | |
| Produce Digital As-Builts | Digitize all scanned drawings into AutoCAD dwg format, enter all field corrections and create all additional drawings as required to produce digital as-builts. Conduct QA/QC and hold review workshops with DWSD. Gather all feedback and produce final as-builts. | Project manager, as-built specialists, CAD technicians | |
| **Publishing** | | | |
| Load all O&M information into the web-based information access system (IAS) | The web-based IAS will be used throughout the assignment to facilitate the organization of information and overall team collaboration. We will publish all O&M information to the IAS as it is collected. We will conduct concurrent QA/QC reviews and collaborative review workshops with DWSD. We will revise and finalize O&M information as comments are accepted. All O&M information will be available to authorized users for viewing, commenting and downloading from the IAS. | Information management specialist, O&M specialists | |
| Load all as-built drawings into the web-based information access system (IAS). | As with the O&M information, the web-based IAS will be used throughout the assignment to facilitate the organization of as-built drawings and overall team collaboration. We will publish all as-built drawings to the IAS as they are completed. We will conduct QA/QC and collaborative review workshops with DWSD. We will re- | Information management specialist, as-built specialist, CAD technicians | |

A003701 / COL

Detroit Water & Sewerage Department
Facilities As-Built Documentation Development and Maintenance Services







**Model Plan D**

| Task | Description | Resources | Anticipated Duration |
|---|---|---|---|
| | vise and finalize as-built drawings as comments are accepted. All as-built drawings will be available to authorized users for viewing, commenting and downloading from the IAS. | | |
| On-Going Maintenance of Information | For the duration of the project, in accordance with quarterly reviews and as authorized by DWSD, update all relevant information for new or on-going projects at facilities where as-built and O&M work has been completed. | Variable depending upon type of updates (O&M versus as-built) required. The deputy project manager will supervise the overall process | Variable depending upon assignment |
| **Electronic Document Management System** | | | |
| Install web-based information access system (IAS) and provide training to DWSD | The web-based IAS will be installed on DWSD's network on dedicated hardware and software procured for this project. The IAS is discussed in detail in our overall work plan. In summary, the IAS will provide: content management, intranet publishing, automated workflow, QA/QC and team collaboration | Information management specialists | |
| Custom templates for DWSD | Customized XML templates will be created to define the documents required for O&M documents. The templates will be loaded into the IAS and made available for inputting information as it becomes available | Deputy project manager, information management specialist, O&M specialists | |
| Export final as-built and O&M information to Documentum | Incorporate all final, approved as-built and O&M information into DWSD's enterprise electronic document management system (eDMS), Documentum. The migration of the final information will be coordinated with the on-going Documentum deployment at DWSD. | | |
| **Prints** | | | |
| Print hard-copy as-built drawings | Draft prints will be produced for final comments. A review session will be held, revisions made and final prints produced. | As-built specialist, CAD technicians | |
| Print hard-copy O&M manuals and related documents | Draft documents will be produced for final comments. A review session will be held, revisions made and final documents produced | O&M specialists | |





Gantt chart: CWFSD CO-1.523 FastSite As-Built Documentation, Development and Maintenance Services, Model Plan Draft Schedule

# TASK ORDER NO. II

# EDMS CONFIGURATION AND DEPLOYMENT

# DWSD EDMS Implementation

## Current Proposed Scope of Services

IOCAD will provide Detroit Water & Sewerage Department (DWSD) with assistance in procuring and implementing an Electronic Document Management System (EDMS) based on DWSD's current standard (Documentum) in conjunction with the "CS-1333 As-Built Documentation" project. Our current proposed scope of services includes the following:

## I. Prepare Specifications and Implementation Plan

The purpose of this phase of work is to prepare DWSD for the procurement of the EDMS. We understand that in conjunction with the Wick Road Pump Station Model Plan, DWSD wishes to implement an EDMS based on DWSD's current Documentum standard.

### Task 1 – Prepare Technical Specifications

In this task, IOCAD will prepare Technical Specifications for the procurement of the EDMS.

At a minimum, the specifications will include requirements for:

- Technical platform and architecture
- Specific Hardware (subject to revision by vendor)
- Software General Functions and Support for Data and Document Types
- Software Work Process Support
- Software Security
- Software Reporting
- Software-Hardware Interfacing
- Integration with Other DWSD Systems
- Software Configuration and Upgrading
- Implementation Services
- Data Conversion
- System Testing
- Training
- Licensing, Software Maintenance and Support
- Ongoing Support Services

**Deliverables:** Technical Specifications Outline, Technical Specifications
**Milestones:** Meeting to Discuss Options and Specifications Outline
**Duration:** Approx. 3 months (partial overlapping with Task 2 below)

## Task 2 – Prepare Implementation Plan

IOCAD will prepare a draft Implementation Plan for the implementation of the EDMS. Based on our experience with application integrators, we believe it is prudent to strike a balance when specifying how the integrator is to conduct the implementation.

Most system integrators have a specific methodology that has been tested with the particular software they handle. A tightly specified implementation plan would likely put the system integrator in an unfamiliar position, which would constitute a substantial project risk. We recommend placing constraints on the system integrator to which they must conform, but otherwise allowing them to exercise their methodology.

With that approach in mind, we will prepare an implementation plan that includes·
- Project schedule, with unambiguous "go live" date
- Delineation of responsibilities, limiting what will be provided by DWSD or its agents such as IOCAD
- Suggested sequence for implementation, highlighting the need for adequate time for data input, testing and training
- Communications protocol and issues management process to be used

**Deliverables:** Draft Implementation Plan
**Milestones:** Implementation Plan Review Meeting
**Duration:** Approx. 3 months (partial overlapping with Task 1 above)

## II. Contract Negotiations

In this phase, IOCAD will negotiate with vendors to secure an agreement for software licenses and services required to implement the EDMS. IOCAD will coordinate with DWSD in completing the contract documents for the software and services contract with the vendor. For this contract, we recommend DWSD seek a single point of responsibility for all elements (even though some software vendors will attempt to separate the software contract from the services contract).

We also recommend that DWSD consider if negotiations are permitted with the selected vendor under the procurement approach being taken for the EDMS. In our experience, a single negotiation session, performed in a classical face-to-face manner with the software vendor and integrator decision-makers, can yield substantial (20 to 40 percent) cost savings, most commonly with license fee concessions by the software vendor, and labor rate concessions by the system integrator. If these negotiations are permitted, IOCAD will prepare negotiating strategies and conduct of the session.

**Deliverables:** Reviewed and Finalized Contract Documents, Licensing Agreements, Draft Implementation Plan
**Milestones:** Contract Execution
**Duration:** Approx. 3 weeks

# General Specifications for Documentum System to support CS-1333

Develop Software, Hardware and Integration Services Estimate of Cost to Implement Documentum-based EDS.

## EDMS Support For

- Document As-Built and O&M Manuals capture
- Intranet document publishing
- Electronic information distribution
- Archival and retrieval services
- Data warehousing in native format (such as CAD format and MS-Word format)
- Process improvement
- Work process automation
- Export and transfer of eContent in CD or other electronic media

## Application Architecture

The application will be available predominantly as an "Extranet" application, with the largest number of users accessing the application via an Internet connection. The application should be tightly integrated with desktop applications such as AutoCAD/Microstation, Micosoft Word, etc.

The eDMS database should be Oracle, in order to maintain compliance with DWSD standards as well as facilitate the transition of data contained within the eDMS to DWSD's Enterprise Documentum eDMS in the future.

## Users

We estimate there will be approximately one hundred project participants who may access the EDMS at some time during the project and should be defined within the eDMS; concurrent use is estimated at forty users.

## Number of Managed Document Objects.

We estimate there will be approximately 25 document objects that will need to be defined in the document management system. This includes discrete electronic data files such as engineering drawings, digital photos, word processing documents, digital animations, scanned TIFF and PDF files. Certain types of documents in the system may be best represented (and managed) via XML.

The series of standard documents that may be represented via XML pertain to the "Operations & Maintenance" portion of the project. These documents are:

- Standard Equipment Maintenance Procedures (SEMPs)
- Standard Operating Procedures (SOPs)

- Preventative Maintenance Activity Sheets (PMASes)
- Preventative Maintenance Activity Procedures (PAMPs)
- Pocket Size Equipment Manuals (PSEMs)

## *Other Issues Related to EDMS:*

### Production Level Scanning

Support for scanning existing vendor & OEM documents; integration with XES 8225 scanner/plotter.

### Integration with Hand-Held Devices

Data forms for XML-based data entry and synchronization for PMAPs and PMASes; XML or other native digital format for representation on hand-held devices, for purposes of field redline/markup.

### Redline/Markup

Tools for managing document redlining shall also be included in the system, including the use of Autodesk Voloview for view/markup of AutoCAD drawings.

### Preparation of Standard Documents

Prepare O&M manuals for each facility, to include a roll-up of all As-built engineering and O&M (SEMPs, SOPs, PMASes and PMAPs) data related to the facility; to emulate the current standard for printed O&M materials.

### Digital Replication

Prepare user-requested information and data to write to CD-ROM or DVD data format

## III. Implement Electronic Document Management System

The purpose of this phase of work is the implementation of the new EDMS. Its main features will be management of the vendor contract and significant communication and coordination with DWSD and the vendor.

### Task 1 – Coordinate Vendor Configuration and Documentation

This task consists of a mix of activities required to ensure the implementation process is progressing smoothly and that each party is living up to their obligations. We envision the following activities:

- Vendor preparation of requirements documents and a configuration plan that are a precursor to system installation and configuration.
- IOCAD and DWSD review and comment on the Vendor's documents.
- Vendor installation of the software on servers and workstations. We recommend the vendor supply the main database and application servers and take total hardware/software responsibility. IOCAD inspection of installed systems.
- Vendor configuration of testing, training and production instances of the software, including development or modification of user defined fields, document types, workflow, screens, security profiles, report options and data integration modules.
- Bi-Weekly status meetings to review schedule, progress, and issues, with IOCAD organizing and facilitating the meetings, and maintaining the issues list.

**Deliverables:** Reviewed Vendor Documents, bi-weekly meeting materials, Final Implementation Plan, completed EDMS configuration and integration (empty)
**Milestones:** Various milestones as part of vendor implementation schedule
**Duration:** Approx. 6 months

### Task 2 – Information Population

IOCAD will be responsible for data migration and content loading of all Wick Station pilot information to the new EDMS as outlined in the EDMS Task Summary Sheet.

**Deliverables:** Data Migration Plan, complete loading of EDMS
**Milestones:** Data Migration Completed
**Duration:** Approx. 3 weeks (partial overlapping with Task 3 below)

### Task 3 – Coordinate System Rollout

System testing is the most important activity that takes place prior to rollout. We will require the vendor to prepare a Unit and System Test Plan. IOCAD will review and comment on the plan. This task can be performed concurrently with Task 2 above to test the operability of the new EDMS. Partially loading the EDMS will allow more detailed testing of the effectiveness of the defined work flow processes and the EDMS' object handling capabilities. Adjustments can be implemented and coordinated for the continued population of the EDMS

IOCAD will jointly work with DWSD during the user acceptance aspect of system testing. We recommend that DWSD staff concentrate on testing real use scenarios. while

IOCAD will focus on various "torture tests" (for example, multi-user loading to assess performance under anticipated loads).

System Rollout is typically an "all hands" activity that takes place in a relatively short time period. IOCAD will provide a continuous presence to assist as required to expedite the rollout process.

We recommend the "all hands" approach be extended beyond the actual "go live" date, to assure resources are readily available in the first full week of operation at minimum.

**Deliverables:** Reviewed System Test Plan, technical experts during "crunch time"
**Milestones:** User Acceptance Testing Completed
**Duration:** Approx. 3 months (overlapping with Task 2 above)

## Task 4 – Coordinate Training

IOCAD will participate in the vendor supplied training. We envision participating in training provided for users as well as system administrator training provided for the IT staff. We will also review and comment on a Training Plan.

**Deliverables:** Reviewed Training Plan
**Milestones:** Training Sessions
**Duration:** Approx. 3 months (partial overlapping with Task 3 above)

**Complete EDMS Deployment Duration:** Approx. 12 months

**EXHIBIT B**

**COSTING SUMMARY**

Cost Information Sheets
Proposal for DWSD Contract No. CS-1333

## SUMMARY PAGE

### I. WICK STATION TASK ORDER

| Task | Cost Sheet | Wick Station Model Plan | |
| --- | --- | --- | --- |
| | | Estimated Hours | Estimated Costs |
| Preparation | A | 2,148 | $ 211,710 |
| Digitizing | B | 935 | $ 54,962 |
| Publishing | C | 924 | $ 67,679 |
| eDMS | D | 114 | $ 26,243 |
| Prints | E | 258 | $ 34,045 |
| **Sub-Totals** | | 4,379 | $ 394,639 |

### II. EDMS CONFIGURATION AND DEPLOYMENT TASK ORDER

| | Cost Sheet | Estimated Hours | Estimated Costs |
| --- | --- | --- | --- |
| EDMS Configuration, deployment, loading, testing, & training | F | 2,544 ** | $ 382,539 |

### III. AS-NEEDED CASH REIMBURSIBLES

| Description | Cost Sheet | Estimated Costs | Reimbursement Estimate |
| --- | --- | --- | --- |
| Maintenance* | G, H | $ 160,522 | $ 175,000 |
| Software | 2 | $ 131,404 | $ 150,000 |
| Hardware | 2 | $ 65,391 | $ 75,000 |

(*) - Maintenance costs include As-built document maintenance (i.e., re-visiting the site to update content as needed, reviewing records, field changes, etc.) and eDMS maintenance (sheet H) for the duration of the project.

(**) - Does not include estimated man-hours for integration services (Westin)

## WICK STATION TASK ORDER

### COST SHEET A : Preparation

**TOTAL DIRECT LABOR**

| Classification/Title | Hourly Rate | Hours | | Labor Cost |
|---|---|---|---|---|
| 1. Principle | $50.00 | 8 | | $400 |
| 2. Project Manager | $45.00 | 120 | | $5.400 |
| 3. System Analyst III | $30.00 | 100 | | $3.000 |
| 4. Clerical | $14.00 | 80 | | $1.120 |
| | | Subtotal Direct Hours: 308 | Subtotal Direct Labor: | $9.920 |

**INDIRECT COSTS**

| Overhead | 1.35% | Subtotal Indirect Labor | $13.392 |
|---|---|---|---|

**OTHER DIRECT COSTS**

| Computers | $600 |
|---|---|
| Reproduction | $3,477 |
| Mail and Courier | $75 |
| Travel and Subsistence | $250 |
| Subtotal ODC: | $4.402 |

**SUBCONSULTANTS**

| | Hours | Dir. Labor | Ind. Labor | ODC | Profit | Subtotal |
|---|---|---|---|---|---|---|
| 1. MPI | 768 | $29,230.00 | $46,768.00 | $2,841.60 | $8,593.62 | $87,433.22 |
| 2. MMI | 560 | $15,377.60 | $24,804.16 | $1,000.00 | $4,521.00 | $45.502.76 |
| 3. NTH | 104 | $2,063.84 | $3,302.14 | $679.00 | $606.77 | $6.651.75 |
| 4. METCO | 240 | $7,360.80 | $11,335.63 | $250.00 | $2,124.32 | $21,070.75 |
| 5. LES | 80 | $1,316.37 | $1,961.38 | $150.00 | $334.49 | $3,762.24 |
| 6. ACE | 88 | $4,160.00 | $3,702.40 | $85.00 | $712.19 | $8,659.59 |
| | | | | | Subtotal Subconsultants: | $173,080 |

**CONTRACT MARKUP FOR SERVICES**

| Direct Labor (12%) | $1,190 |
|---|---|
| Indirect Labor (8%) | $1,071 |
| Subconsultant Services (5%) | $8,654 |
| Subtotal: | $10,916 |

| TOTAL ESTIMATED COST FOR PREPARATION | $211,710 |
|---|---|

# EXHIBIT B

**TRANSFER AGREEMENT BETWEEN ABE ASSOCIATES, INC. AND IOCAD
FOR DETROIT WATER AND SEWER DEPARTMENT (DWSD) CONTRACT CS-1333**

This AGREEMENT is made as of Apr 21 2008, between ABE Associates, Inc.,
a Michigan Corporation (ABE), and IOCAD, 20109 West 8 Mile Road, Detroit, MI 48219,
a Michigan Corporation (IOCAD).

### Article 1 Contract

DWSD Contract CS-1333 will be transferred to ABE from IOCAD this will allow IOCAD to
remain in good standing with DWSD. ABE will manage all activities relative to contract
upon execution of the contract transfer agreement. This is a confidential agreement
between ABE, William Pyant, Sr. and William Pyant, Jr.

### Article 2 Existing Work

1. ABE will be added as a sub contractor to IOCAD until contract is transferred to ABE
by the City.

2. ABE manage and provide assistance to complete existing work.

3. ABE will hire IOCAD employees and be responsible for pay roll of three employees
from IOCAD.

4 IOCAD will close its business after the City of Detroit transfers the Contract to ABE
and has be authority to issue checks to ABE for work completed for the contract.

5. ABE will issue all payments to subcontractors for work completed on the Contract.

6. ABE will provide funds to pay IOCAD creditors as outlined in Article 4.3. Checks to
IOCAD creditors will be issued with IOCAD checks. ABE will provide funds to pay
IOCAD creditors for 30 days after the contract has been transferred from IOCAD to ABE
by the City.

7. Expenses to complete existing tasks will be paid by ABE

8. Invoice submitted in name of ABE and IOCAD

9. IOCAD to change mailing to ABE's address

10. IOCAD to complete work on Task 1 and Task 3 to provide ABE with 100% complete
as-builts drawings that includes all comments from DWSD at no charge to ABE. IOCAD
will be responsible for getting final approval and signoff on 100% complete drawings
from DWSD.

11. ABE will be responsible for the completion of the deliverable items for Task 1 and
Task 3.

12. ABE will be responsible for the completion of the new work scope added to the
existing tasks to incorporate the PC-713 changes into the drawings for Task 3 and 4.

Page 1

**Article 3 New Work**

1. ABE will manage, coordinate and assign work tasks to subcontractors for all new work assigned to the contract.

2. ABE will determine the level of involvement by each sub contractor

3. ABE will rewrite subcontract agreements to enter into subcontract agreements with each subcontractor that was a subcontractor to IOCAD on this Contract.

**Article 4  Payment to IOCAD Creditors**

1.   ABE will give Iocad a cashiers check to the each company listed below to pay IOCAD Creditors. This will stop IOCAD creditors from garnishing IOCAD payments from DWSD.

2. ABE will pay IOCAD creditors as stipulated in item 1 above for 1 month if required after the City has transferred the Contract into ABE's name. ABE will not be responsible to pay IOCAD after this period.

3. ABE agrees to deliver the following monthly payments to IOCAD. These payments to IOCAD will be made out in the form of cashiers checks to the following IOCAD creditors

      LMS    $2000.00
      BOA    $500.00
      <u>Capital $ 500.00</u>

      Total   $3000.00


**Article 5 Lawyers Compensation**

1. IOCAD will be responsible for its own lawyer fees.

2. IOCAD will meet with lawyers to ensure IOCAD debts are not transferable to ABE.

3. ABE will be welcome to attend meetings with IOCAD lawyers.

4. ABE will be responsible for its own lawyer's fees.

**Article 6 Hiring of IOCAD Employees**

1. ABE will hire IOCAD employees at their current pay rates at the completion of Task 1 and Task 3. IOCAD responsible for there payroll up to point where Task 1 and Task 3 as-builts are complete.  If IOCAD wants ABE to pick up the responsibility for pay roll of IOCAD staff ABE will deduct the amount of the payroll required to complete the as-built of Task 1 and Task 3 from the profit sharing due to IOCAD.  Which are;

William C. Pyant Jr.
Diane Ferguson

Page 2

Carmen Jones

2. ABE will evaluate the level of experience of the IOCAD employees hired to determine if they are performing to the level of compensation they are being paid. If it is determined that an employee hired from IOCAD is not performing to the level of compensation being paid ABE will adjust the amount being paid to that employee to an amount equal to their skill level.

3. ABE will make all effort to retain employees hired from IOCAD but if it is determined that the employees hired are not performing at an acceptable level, ABE retains the rights to terminate that employee.

**Article 7 Compensation**

1. ABE will pay William Pyant, Sr. an initial payment of $5000.00 which is due at the time the Transfer Agreement is signed between ABE and IOCAD. The initial payment will be billed against the profits payments due to IOCADD in accordance with this agreement. Profit payments will not begin until the $14,000.00 initial payment has been fulfilled.

2. ABE will make another lump sum payment to William Pyant, Sr. 6 months into the contract in the amount of $5000.00. This second payment will be billed against the profits payments due to IOCAD in accordance with this agreement. In the event that the profit sharing is available earlier than stipulated in item 7.2 and 7.3, ABE will pay the total initial payment balance of $9,000.00 to William Pyant, Sr., otherwise 7.2 and 7.3 will remain in effect.

3. ABE will make a third lump sum payment to William Pyant, Sr. 1 year from the date that the Transfer Agreement is signed in the amount of $4000.00. This third payment will be billed against the profits payments due to IOCAD in accordance with this agreement.

4. Profit sharing between ABE and IOCAD will be as follows:

ABE (60%)
IOCAD (40%)

5. Profit sharing will be paid to IOCAD based on the percentages stipulated above for all invoices submitted to DWSD for work performed by ABE for the duration of the contract which includes any extensions and additions.

6. When and if IOCAD is closed the profit sharing will be distributed to William Pyant, Sr. and William Pyant, Jr..

**Article 8 Vacation**

1. William C. Pyant Jr Three weeks or ABE's current policy which every is greater.

2. IOCAD employees hired by IOCAD will receive vacation time in accordance with ABE's company policy.

**Article 9 IOCAD Debts**

Page 3

1. All existing debts of IOCAD are the responsibilities of IOCAD for payment of the debts. It is understood that none of IOCAD debts will be transferred to ABE as a part of none payment by IOCAD to their creditor.
2. ABE will only make payments to IOCAD as outlined in Article 2 of this agreement.

ABE Associates, Inc
(PURCHASER),

BY: _Andew Brooks_
Andrew Brooks
TITLE: _President_

DATE: _4 | 21 | 08_

WITNESS: _____

IOCAD
(SELLER)

BY: _William Clyaz_
William C Pyatt
TITLE: _President_

DATE: _7/21/08_

WITNESS: _William C. Pyet Sr._
william c. Pyatt Sr

Page 4

# EXHIBIT C

with the same force and effect as if the actions had been taken by the Assignee.

6. The Assignee is recognized as the Assignor's successor in interest in and to the Contracts. The Assignee by this Novation Agreement becomes entitles to all rights, titles, and interest of the assignor in and to the Contracts as if the Assignee were the original party to the Contracts.

7. Except as expressly provided in this Novation Agreement, nothing in it be construed as a waiver of any rights of the City against the Assignor.

8. All payments previously made by the City to the Assignor, and all other previous actions taken by the City under the Contracts, shall be considered to have discharged those of the City's obligations under the contracts.

9. All terms, conditions, and covenants of the Contracts shall remain in full force and effect, and the Assignee shall fulfill all such terms, conditions and covenants.

10. This Novation Agreement and all actions arising under it shall be by the laws of the State of Michigan.

11. This Novation Agreement may be executed and delivered in counter parts, including by facsimile transmission, each of which will be deemed an original.

IN WITNESS WHEREOF, the
by their duly authorized officers and representatives, have executed this Novation Agreement as of the dates of their respective signatures:

Signed under seal this _____ day of September 2008
Signed in the presences of:

Witnesses:                                    IOCAD Engineering Services, Inc.:

1. _____            By: _William C. Ryan_ 4/21/08
      Name                                        Signature          Date

2. _____            By: _William C. Ryan TD_
      Name                                        Name Printed

                                               Its: _President_
                                                    Title

Witnesses:                                    ABE Associates, Inc.:

1. _____            By: _Andre Brown_ 4/21/08
      Name                                        Signature       Date

2. _____            By: _ANDRE BROOKS_
      Name                                        Name Printed

                                               Its: _President_
                                                    Title

State of Michigan

County of *Macomb*

On *September 3, 2008* before me, appeared *William Pymt and Andre Brooks* personally known to me (or proved to me on the on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed within and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

CYNTHIA D. FORD
Notary Public, State of Michigan
County of Macomb
My Commission Expires Dec. 15, 2008
Acting in the County of *Macomb*

# NOVATION AND SALE AGREEMENT
## BETWEEN
## IOCAD ENGINEERING SERVICES, INC
## AND
## ABE ASSOCIATES, INC.
## FOR
## DWSD CONTRACT CS-1333
## JULY 2008

### NOVATION AGREEMENT

THIS NOVATION AGREEMENT is entered into by and between IOCAD Engineering Services, Inc., a Michigan Corporation, with its principal place of business located at 20109 West Eight Mile Road, Detroit, Michigan 48219 and ABE Associates, Inc., a Michigan Corporation, with its principal place of business located at 155 West Congress, Suite 450, Detroit, Michigan 48226 ("Assignee")

### RECITALS

WHEREAS, as the Assignor intends to assign to the Assignee the Assignor's rights under the Contract and delegate to the Assignee the Assignor's duties under the Contract and the Assignee intends to accept the same; and

WHEREAS, the Assignee is in a position to fully all obligations that may exist under the Contracts: and

WHEREAS, the parties intend to effect a Novation of the Contract by the substitution of the Assignee for the Assignor with respect to all rights, duties and obligations under the Contracts;

### ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

1. The Assignee shall be assigned the Assignor's rights and shall be delegated the Assignor's duties under the Contracts as of the date this instrument is signed.

2. The parties hereby agree that the rights, duties and obligations of the Assignor under the Contracts shall be and are hereby extinguished as of the date stated in paragraph 1 above.

3. The Assignor confirms the assignment of all rights, duties and obligations under the Contracts to the Assignee, and waives any claim and rights against the city that it now has or may have in the future in connection with the Contracts.

4. The Assignee agrees to be bound by and to perform the Contracts in accordance with the conditions contained in the Contracts. The Assignee also assumes all obligations and liabilities of, and all claims against, the Assignor under the Contracts as if the Assignee were the party to the Contracts. The Assignee ratifies all previous actions taken by the Assignor with respect to the Contracts, with the same force and effect as if the actions had been taken by the Assignee.

5. The assignee ratifies all previous actions taken by the assignor with respect to the Contract,

# EXHIBIT D

CITY OF DETROIT
WATER AND SEWERAGE DEPARTMENT
GENERAL ADMINISTRATION

735 RANDOLPH STREET
DETROIT, MICHIGAN 48226-2830
PHONE: 313-224-4800/224-4801
FAX: 313-224-6067
WWW.DWSD.ORG

March 9, 2009

Mr. William Pyant, Sr.
ABE Associates, Inc./Iocad
Engineering Services, Inc.
155 West Congress, Suite 450
Detroit, Michigan 48202

Dear Mr. Pyant:

**Regarding:** **Novation Agreement
DWSD Contract No. CS-1333
"Facilities As-Built Documentation
Development and Maintenance Services"**

Transmitted herewith is one signed original of the Novation Agreement between IOCAD
Engineering Services, Inc. & ABE Associates, Inc. and City of Detroit Water and Sewerage
Department. If you have any questions or require assistance, please contact me at (313) 964-
9465.

Sincerely,

Miriam L. Dixon
Manager
Consultant Contracts Section

MLD/SKJ

Enclosure

Kenneth V. Cockrel, Jr., MAYOR

# NOVATION AGREEMENT

**THIS NOVATION AGREEMENT** is entered into by and between IOCAD Enginering Services, Inc., a Michigan Corporation, with its principal place of business located at 20109 West Eight Mile Road, Detroit, Michigan 48219 ("Assignor"), and ABE Associates, Inc., a Michigan Corporation, with its principal place of business located at 155 West Congress, Suite 450, Detroit, Michigan 48226 ("Assignee"), and the City of Detroit, A Michigan municipal corporation, acting through its Water and Sewerage Department ("City").

## RECITALS

**WHERAS,** the City and the Assignor entered into a contract dated June 2, 2004, identified as Contract No. CS-1333 is hereby incorporated by reference; and

**WHEREAS,** as the Assignor intends to assign to the Assignee the Assignor's rights under the Contract and delegate to the Assignee the Assignor's duties under the Contract and the Assignee intends to accept the same; and

**WHEREAS,** the Assignee is in a position to fully perform all obligations that may exist under the Contracts; and

**WHEREAS,** the parties intend to effect a novation of the Contracts by the substitution of the Assignee for the Assignor with respect to all rights, duties and obligations under the Contracts;

### ACCORDINGLY, THE PARTIES AGREE AS FOLLOWS:

1. The Assignee shall be assigned the Assignor's rights and shall be delegated the Assignor's duties under the Contracts as of August 1, 2008.

2. The parties hereby agree that the rights, duties and obligations of the Assignor under the Contracts shall be and are hereby extinguished as of the date stated in paragraph 1 above.

3. The Assignor confirms the assignment of all rights, duties and obligations under the Contracts to the Assignee, and waives any claim and rights against the city that it now has or may have in the future in connection with the Contracts.

4. The Assignee agrees to be bound by and to perform the Contracts in accordance with the conditions contained in the Contracts. The Assignee also assumes all obligations and liabilities of, and all claims against, the Assignor under the Contracts as if the Assignee were the original party to the Contracts.

5. The Assignee ratifies all previous actions taken by the Assignor with respect to the Contracts, with the same force and effect as if the actions had been taken by the Assignee.

6. The City recognizes the Assignee as the Assignor's successor in interest in and to the Contracts. The Assignee by this Novation Agreement becomes entitles to all rights, titles, and interest of the assignor in and to the Contracts as if the Assignee were the original party to the Contracts.

7. Except as expressly provided in this Novation Agreement, nothing in it shall be construed as a waiver of any rights of the City against the Assignor.

8. All payments previously made by the City to the Assignor, and all other previous actions taken by the City under the Contracts, shall be considered to have discharged those parts of the City's obligations under the contracts.

9. All terms, conditions, and covenants of the Contracts shall remain in full force and effect, and the Assignee shall fulfill all such terms, conditions and covenants.

10. This Novation Agreement and all actions arising under it shall be governed by the laws of the State of Michigan.

11. This Novation Agreement may be executed and delivered in counter parts, including by facsimile transmission, each of which will be deemed an original.

**IN WITNESS WHEREOF,** the parties, by their duly authorized officers and representatives, have executed this Novation Agreement as of the dates of their respective signatures:

Witnesses:

1. _Colanita Jones_
   Name

2. _[signature]_
   Name

**IOCAD Engineering Services, Inc:**

By: _Walter Eligee_    7/14/08
    Name                 Date

Its: _President_
     Title

Witnesses:

1. _L. Moore_
   Name

2. _Travis C. Jones_
   Name

**ABE Associates, Inc.:**

By: _Audre Brooks_    7/14/08
    Name               Date

Its: _PRESIDENT_
     Title

Witnesses:

1. _[signature]_
   Name  DEBRA L. RAGLAND

2. _[signature]_
   Name  Robert C. Walter

**City of Detroit, Water and Sewerage Department:**

By: _[signature]_
                        Date

Its: Director

**THIS AGREEMENT WAS APPROVED BY THE CITY COUNCIL ON:**

OCT 2 1 2008

_[signature]_    1/26/08
Purchasing Director    Date

**APPROVED BY LAW DEPARTMENT PURSUANT TO SECTION 6-406 OF THE CHARTER OF THE CITY OF DETROIT:**

_[signature]_    9-7-08
Corporation Counsel    Date

**THIS AGREEMENT IS NOT VALID OR AUTHORIZED UNTIL APPROVED BY RESOLUTION OF THE CITY COUNCIL AND SIGNED BY THE PURCHASING DIRECTOR.**

## CORPORATE ACKNOWLEDGMENT
## FOR ASSIGNOR CORPORATION


STATE OF MICHIGAN )
                  ) SS
COUNTY OF WAYNE   )


The foregoing Novation Agreement was acknowledged before me the _14_ day of

_July_ , 200_8_ , by _William C. Pyatt Jr. President_
                        (title of person who signed the Novation Agreement)

the _William C. Pyatt Jr. President_ ,
    (title of person who signed the contract as it appears on the Novation Agreement)

of _I O CAD Engineering Services_ ,
   (complete name of the corporation)

on behalf of the Assignor.


_____
Notary Public, County of Wayne
State of Michigan

My commission expires: _1/26/2013_

## CORPORATE ACKNOWLEDGMENT
## FOR ASSIGNEE CORPORATION

STATE OF MICHIGAN )
                 ) SS
COUNTY OF WAYNE )

The foregoing Novation Agreement was acknowledged before me the __14__ day of
__July__, 200_8_ by __ANDRE BROOKS PRESIDENT__, the
(title of person who signed the Novation Agreement)

__ANDRE BROOKS PRESIDENT__,
(title of person who signed the contract as it appears on the Novation Agreement)

of __ABE ASSOCIATES, INC.__,
(complete name of the corporation)

on behalf of the Assignee.

Notary Public, County of Wayne
State of Michigan

My commission expires: __1/26/2013__

# CITY ACKNOWLEDGMENT

STATE OF MICHIGAN )
                ) SS
COUNTY OF WAYNE )

The foregoing Novation Agreement was acknowledged before me on the _21st_ day of
_July_ 200_8_, by _Anthony Adams_
            (name of person who signed the Novation Agreement)

the _Interim Director_
    (title of person who signed the contract as it appears on the Novation Agreement)

of _Detroit Water And Sewerage Department_,
    (complete name of the corporation)

on behalf of the City.

_Debra L. Ragland_

Notary Public, County of Wayne
State of Michigan

My commission expires: _3/2/2012_

DEBRA L RAGLAND
Notary Public - Michigan
Wayne County
My Commission Expires May 2, 2012
Acting in the County of _Wayne_

## RESOLUTION OF CORPORATE AUTHORITY
## FOR ASSIGNOR CORPORATION

I, _William C Pyent_ _____, Corporate Officer of
   (Print or Type)

_FOCAD Engineering Services Inc,_ , a _Michigan_
Corporation (the "Company") DO HEREBY CERTIFY that the following is a true and correct
excerpt from the minutes of the meeting of the Board of Directors duly called and held on
_3/10/08_ and that the same is now in full force and effect:

     "RESOLVED, that the Chairman, the President, each Vice President, the
Treasurer and the Secretary and each of them, hereby is authorized to execute and
deliver, in the name and on behalf of the Company and under its corporate seal or
otherwise, any agreement or other instrument or document in connection with any
matter or transaction that shall have been duly approved; the execution and
delivery of any agreement; document, or other instrument, or document in
connection with any matter or transaction that shall have been duly approved; the
execution and delivery of any agreement, document, or other instrument by any of
such officers to be conclusive evidence of such approval. "

    I FURTHER CERTIFY that _William C Pyent_ is Chairman of the Board, and
_William C Pyent Jr._ is President, _William C Pyent_ is Treasurer,
_William C Pyent Jr._ is Secretary.

    I FURTHER CERTIFY that any of the aforementioned officers of the Company are
authorized to execute or guarantee and commit the Company to the conditions, obligations,
stipulations and undertakings contained in _Novation Agreement_ and that all necessary
corporate approvals have been obtained in relationship thereto.

    IN WITNESS THEREOF, I have set my hand this _14_ day of
_July_ , 20_08_.

CORPORATE SEAL

              _William C Pyent_
              Corporate Officer's Signature

              _William C Pyent Jr_

## RESOLUTION OF CORPORATE AUTHORITY
## FOR ASSIGNEE CORPORATION

I, _Andre Brooks_ , Corporate Officer of
(Print or Type)

_ABE Associates, Inc._ , a _Michigan_
Corporation (the "Company") DO HEREBY CERTIFY that the following is a true and correct excerpt from the minutes of the meeting of the Board of Directors duly called and held on _8/12/08_ and that the same is now in full force and effect:

"RESOLVED, that the Chairman, the President, each Vice President, the Treasurer and the Secretary and each of them, hereby is authorized to execute and deliver, in the name and on behalf of the Company and under its corporate seal or otherwise, any agreement or other instrument or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement; document, or other instrument, or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such officers to be conclusive evidence of such approval. "

I FURTHER CERTIFY that _Andre Brooks_ is Chairman of the Board, and _Andre Brooks_ is President, _Andre Brooks_ is Treasurer, _Andre Brooks_ is Secretary.

I FURTHER CERTIFY that any of the aforementioned officers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in _Novation Agreement_ and that all necessary corporate approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _14_ day of _July_ , 20_08_.

CORPORATE SEAL

_Andre Brooks_
Corporate Officer's Signature

_Andre Brooks_

## RESOLUTION OF CORPORATE AUTHORITY
## FOR ASSIGNEE CORPORATION

I, _Andre Brooks_, Corporate Officer of
_(Print or Type)_

_ABE Associates, Inc._, a _MICHIGAN_
Corporation (the "Company") DO HEREBY CERTIFY that the following is a true and correct except from the minutes of the meeting of the Board of Directors duly called and held on _8/12/08_ and that the same is now in full force and effect:

"RESOLVED, that the Chairman, the President, each Vice President, the Treasurer and the Secretary and each of them, hereby is authorized to execute and deliver, in the name and on behalf of the Company and under its corporate seal or otherwise, any agreement or other instrument or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement; document, or other instrument, or document in connection with any matter or transaction that shall have been duly approved; the execution and delivery of any agreement, document, or other instrument by any of such officers to be conclusive evidence of such approval. "

I FURTHER CERTIFY that _Andre Brooks_ is Chairman of the Board, and _Andre Brooks_ is President, _Andre Brooks_ is Treasurer, _Andre Brooks_ is Secretary.

I FURTHER CERTIFY that any of the aforementioned officers of the Company are authorized to execute or guarantee and commit the Company to the conditions, obligations, stipulations and undertakings contained in _Novation Agreemen_ and that all necessary corporate approvals have been obtained in relationship thereto.

IN WITNESS THEREOF, I have set my hand this _14_ day of _July_, 2008.

CORPORATE SEAL

_Andre Brooks_
Corporate Officer's Signature

_Andre Brooks_

## INCOME TAX STATEMENT

IOCAD Engineering Services, Inc. 155 West Congress Street, Suite 450, Detroit, Michigan 48226, (formerly 20121 W. 8 Mile Road, Detroit, Michigan 48202) has sold its interest in DWSD Contract CS-1333 to ABE Associates, Inc.. IOCAD is in the process of obtaining copies of records to obtain the Income Tax Clearance. In the meantime this issue was discussed with the City of Detroit Purchasing (Kennith Troupe, Jr.) and Law Departments (Robert Walters) to keep the execution of the contract moving ABE Associates, Inc, would assume all City of Detroit Income Tax Liabilities for IOCAD Engineering Services, Inc.. Any Income Tax that IOCAD owes to the City will be paid by ABE Associates, Inc. if any payment is due.

TO ALL PERSONS, be it known, that I, Andre Brooks, President of ABE Associates, Inc., 155 West Congress Street, Suite 450, Detroit, Michigan 48226, do hereby confirm that ABE will assume all Income Tax payments that are due to the City of Detroit in by IOCAD Engineering Services, Inc. for DWSD Contract CS-1333 and all City contracts that Income Taxes are owed to the City by IOCAD Engineering Services, Inc.

Signed under seal this _____ day of September, 2008
Signed in the presences of:

Abd' Abdillah,

Witness _____

_____
Witness

_____
Grantor      Andre Brooks, PE

ANDRE   Brooks
Print Name

_____
Witness

_____
Witness

State of **Michigan**
County of WAYNE                    }
On 9/22/2008          before me,
appeared _____
personally known to me (or proved to me on the on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed within and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____

**THOMAS MAY JR.**
Notary Public, State of Michigan
County of Wayne
My Commission Exp. March 22, 2015
Acting in the County of WAYNE

Z:\IOCAD\Income Tax Statement.doc

# EXHIBIT E

CITY OF DETROIT
WATER AND SEWERAGE DEPARTMENT
OFFICE OF ADMINISTRATION

735 RANDOLPH STREET
DETROIT, MICHIGAN 48226
WWW.DETROITMI.GOV

April 18, 2012

ABE Associates, Inc.
155 West Congress, Ste. 450
Detroit, Michigan 48226

Attention:    Mr. Andre Brooks, P.E.

Gentlemen:

Regarding:    **Notice of Termination**
              **DWSD Contract No. CS-1333**
              **Facilities As-Built Documentation Development**
              **And Maintenance Services**

In accordance with Article 11.02, DWSD is terminating the CS-1333 contract. The effective termination date is May 11, 2012. You are directed to suspend all contract work and performance, and submit within thirty (30) days a final invoice to DWSD. You are to incur no new obligations or costs on this contract without the written approval of the contracting officer.

Subsequently, in accordance to Article 11.04, ABE shall submit all the documents (i.e. drawings, manuals, reports cds, etc.) complete or incomplete within 30 days from the receipt of this notice.

Should you have any questions, please contact Parvez Jafri, of my staff, at (313) 297-0200.

Sincerely,

Darryl A. Latimer
Deputy Director

DAL/PJ/jw

Attachment (copy of the subject articles)

Dave Bing, Mayor

10.05 If, during the term of this Contract, changed conditions or other pertinent factors should, in the reasonable judgment of the DWSD, render inadequate the insurance limits specified above, the CONSULTANT will furnish on demand, and DWSD will reimburse the CONSULTANT for, such additional coverage as may reasonably be required under the circumstances.

10.06 The parties acknowledge and understand that the availability of certain insurance coverages at reasonable prices is subject to market conditions prevalent at the time such coverage is being sought. In that regard, the parties agree that the aforestated specific requirements for types and amounts of insurance are subject to the market availability at reasonable prices. In the event certain such types or amounts of insurance become unavailable at reasonable prices, as determined by the Contracting Officer, the aforestated specific requirements for insurance coverages will continue in effect until the CONSULTANT and the CITY can, by mutual good faith negotiations, arrive at mutually agreeable specific requirements for insurance coverages. This change in insurance requirements will take place only upon written authorization of the Director of DWSD.

## ARTICLE 11

### TERMINATION

11.01 The DWSD may terminate this Contract for cause upon giving written "Notice of Termination" to the CONSULTANT at least twenty-four (24) hours before the effective date of the termination, should the CONSULTANT: (1) fail to fulfill in a timely and proper manner its obligations under this Contract; (2) violate any of the covenants, agreements or stipulations of this Contract; (3) cease conducting business in the normal course; or (4) admit in writing its inability to pay

03/18

its debts generally as they become due. The CONSULTANT shall be liable to the CITY for any damages it sustains by virtue of the CONSULTANT'S breach or any reasonable costs the CITY might incur enforcing or attempting to enforce this Contract, including reasonable attorney's fees. The CITY may withhold any payment(s) to the CONSULTANT for the purpose of set-off until such time as the exact amount of damages due to the CITY from the CONSULTANT is determined. It is expressly understood that the CONSULTANT will remain liable for any damages the CITY sustains in excess of any set-off. If the Contract is so terminated, the CITY may take over the Services, and prosecute the same to completion by contract with another party or otherwise, and the CONSULTANT shall be liable to the CITY for any costs occasioned to the CITY thereby.

    11.02 The CITY may terminate this Contract without cause at any time, without incurring any further liability whatsoever, other than as stated in this Article 11, by issuing a Notice of Termination to the CONSULTANT specifying the effective date thereof, at least fifteen (15) calendar days prior to the effective date of such termination. If the Contract is terminated, the CITY will pay the CONSULTANT only for the Services rendered prior to termination. The amount of the payment shall be computed by the CITY on the basis of the Services rendered, and such other means which, in the judgment of the CITY, represents a fair value of the Services provided, less the amount of any previous payments made. The CONSULTANT agrees that acceptance of the Final Payment constitutes full and complete payment and an accord and satisfaction of any and all claims of whatsoever kind or nature under this Contract.

    a)    Should the CITY or the CITY'S designee undertake any part of the Services which are to be performed by the CONSULTANT, to the extent such Services which are to be performed by the CITY or its

03/18

designee the CONSULTANT shall not be entitled to any compensation for the Services so performed. The parties expressly agree that no payments under this Article shall exceed the maximum sum payable provision in Article 7.01 "COMPENSATION".

11.03 After receipt of a Notice of Termination and except as otherwise directed by the CITY, the CONSULTANT shall:

a) Stop work under the Contract on the date and to the extent specified in the Notice of Termination;

b) Obligate no additional Contract funds for payroll costs and other costs beyond such date as the CITY shall specify, and place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work under this Contract as is not terminated;

c) Terminate all purchase orders and Subcontracts to the extent that they relate to the portion of work so terminated;

d) As of the date the termination is effective, preserve all Records and submit to the CITY such Records and Reports as the CITY shall specify, and furnish to the CITY an inventory of all furnishings, equipment, and other property purchased for the Contract (if any) and all pertinent keys to files, buildings, and property and carry out such

03/18

directives as the CITY may issue concerning the safeguarding or disposition of files and property; and

e)   Submit within thirty (30) calendar days a final Report of receipts and expenditures of funds relating to this Contract, and a listing of all creditors, Subconsultant/Contractors, lessors, and/or other parties with which the CONSULTANT has incurred financial obligations pursuant to this Contract (if any).

11.04   Upon completion or other termination of this Contract, all finished or unfinished original documents or copies (when originals are unavailable), data, studies, surveys, drawings, maps, models, photographs, files, intermediate materials, supplies, notes, reports or other materials (hereinafter collectively referred to as the "Work Product") prepared by the CONSULTANT under this Contract or in anticipation of this Contract shall, at the option of the CITY, become its exclusive property, whether or not in the CONSULTANT'S possession, free from any claim or retention of rights thereto on the part of the CONSULTANT, except as herein specifically provided, and shall promptly be delivered to the CITY upon the City's request and the CITY shall return all CONSULTANT'S properties to it.

The CONSULTANT acknowledges that any intentional failure or delay on its part to deliver the Work Product to the CITY will cause irreparable injury to the CITY not adequately compensable in damages and for which the CITY has no adequate remedy at law. The CONSULTANT accordingly agrees that the CITY may in such event seek and obtain injunctive relief in a court of competent jurisdiction and compel delivery of the Work Product, to which the CONSULTANT hereby consents.

03/18

The CITY shall have full and unrestricted use of the Work Product for the purpose of completing the Contract.

11.05   Access to the Work Product prior to delivery shall be restricted to trusted and duly authorized representatives of the CITY and the CONSULTANT. The CONSULTANT shall have no right to disclose or use any information gathered in the course of its work without the explicit concurrence of the CITY. All such information shall be marked "Confidential" and be handled at all times in such a manner as to preserve confidentiality. The CONSULTANT acknowledges that such Work Products are proprietary to the CITY having been developed for the CITY for its own and sole use, unless such work products have been previously developed by the CONSULTANT outside of this Contract.

11.06   Each party will assist the other party in the orderly termination of this Contract and the transfer of all aspects hereof, tangible or intangible, as may be necessary for the orderly, non-disrupted business continuance of each party.

11.07   Special Conditions for Termination may apply in event of termination under terms and conditions of Article 17 "FAIR EMPLOYMENT PRACTICES".

## ARTICLE 12

### ASSIGNMENT AND SUBCONTRACTING

12.01   The CONSULTANT shall not assign or encumber directly or indirectly any interest whatsoever in this Contract, and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the

03/18

# EXHIBIT F



**ABE**

Associates, Inc.

Engineering • Surveying • Architecture

May 7, 2012

Ms. Miriam Dixon
Manager of Contracts & Grants
Detroit Water and Sewage Department
735 Randolph
Detroit, Michigan 48226

Re: Invoice No.36  CS-1333
    Services through April 18, 2012
    Billing amount: $1,400,809.14

Dear Ms. Dixon,

Please find enclosed for your review and processing a copy of   Invoice No.  36  for work performed on Contract No. CS-1333.  The billing format reflects the percentage of work completed for each task assigned to ABE Associates, Inc. and to our subcontractors.

Please note that included in this submittal is a status report describing the activities performed under each task up to the end of August, along with the DBE/SBE Fact Sheet supporting documents and a breakdown of additional services tasks as requested.

Sincerely,

Andre Brooks, P.E.
President

Enclosed



**Associates, Inc.**

Engineering • Surveying • Architecture

## Invoice No. 36

May 7, 2012

Ms. Miriam Dixon
Manager of Contracts & Grants
Detroit Water and Sewage Department
735 Randolph
Detroit, Michigan 48226

Re: Contract CS-1333

Services through April 18, 2012

| Company | Total Invoice Invoice Amt. | 5% Mark Up | Total |
|---|---|---|---|
| **Task Order 1: Wick Pumping Station** | | | |
| ABE Associates, Inc | $ 1,049.05 | | $ 1,049.05 |
| ACE | $ - | $ - | $ - |
| MMI | $ - | $ - | $ - |
| Malcolm Pirnie | $ 4,505.00 | $ 1,853.50 | $ 6,358.50 |
| METCO | $ - | $ - | $ - |
| NTH Consultants | $ 884.00 | $ - | $ 884.00 |
| Subtotal | $ 6,438.05 | $ 1,853.50 | $ 8,291.55 |
| **Task Order 2: Electronic Document Management System (EDMS)** | | | |
| ABE Associates, Inc | $ - | | $ - |
| Malcolm Pirnie | $ - | $ 2,599.53 | $ 2,599.53 |
| Westin | | $ - | $ - |
| Subtotal | $ - | $ 2,599.53 | $ 2,599.53 |
| **Task Order 2: Hardware/Software/Training*** | | | |
| AutoCAD MEP Training | $ - | | $ - |
| Hardware | $ - | | $ - |
| Software | $ 7,665.00 | | $ 7,665.00 |
| Training | | | |
| Westin | $ - | | |
| Maintenance | | | |
| Equipment Software markup 10% | $ 766.50 | | $ 766.50 |
| Subtotal | $ 8,431.50 | | $ 8,431.50 |
| **Task Order 3 Northeast Sewer Lift Station** | | | |

I:\CS-1333\Billing\Invoice 36\ABE201205Invoice36_corrected Invoice
155 W. Congress, Detroit, Mi 48226 Ph: (313) 961-5170 Fax: (313 961-5172



Associates, Inc.
Engineering • Surveying • Architecture

## Invoice No. 36

| | | | | | |
|---|---|---|---|---|---|
| ABE Associates, Inc | $ | 9,331.15 | | $ | 9,331.15 |
| ACE | $ | - | $ | - | $ | - |
| MMI | $ | - | $ | - | $ | - |
| Malcolm Pirnie | $ | - | $ | 513.92 | $ | 513.92 |
| METCO | $ | - | $ | - | $ | - |
| NTH Consultants | $ | - | $ | - | $ | - |
| Subtotal | $ | 9,331.15 | $ | 513.92 | $ | 9,845.07 |
| **Task Order 4: Joy Road Pumping Station** | | | | | |
| ABE Associates, Inc | $ | 16,614.48 | | $ | 16,614.48 |
| ACE | $ | - | $ | - | $ | - |
| LES | $ | - | $ | - | $ | - |
| MMI | $ | 3,098.80 | $ | 154.94 | $ | 3,253.74 |
| Malcolm Pirnie | $ | 21,085.00 | $ | 1,054.25 | $ | 22,139.25 |
| METCO | $ | 1,125.00 | $ | 56.25 | $ | 1,181.25 |
| NTH Consultants | $ | 630.00 | $ | 31.50 | $ | 661.50 |
| Subtotal | $ | 42,553.28 | $ | 1,296.94 | $ | 43,850.22 |
| **Task Order 5: Southwest Water Plant** | | | | | |
| ABE Associates, Inc | $ | 285,631.50 | | $ | 285,631.50 |
| ACE | $ | 6,996.69 | $ | 349.83 | $ | 7,346.52 |
| MMI | $ | 23,710.34 | $ | 1,185.52 | $ | 24,895.85 |
| Malcolm Pirnie | $ | 49,101.81 | $ | 2,455.09 | $ | 51,556.91 |
| METCO | $ | 2,750.01 | $ | 137.50 | $ | 2,887.51 |
| NTH Consultants | $ | 1,906.78 | $ | 95.34 | $ | 2,002.12 |
| Subtotal | $ | 370,097.13 | $ | 4,223.28 | $ | 374,320.41 |
| **Task Order 6: Ypsilanti Pump Station** | | | | | |
| ABE Associates, Inc | $ | 15,040.40 | | $ | 15,040.40 |
| ACE | $ | 649.46 | $ | 32.47 | $ | 681.93 |
| MMI | $ | 2,048.92 | $ | 102.45 | $ | 2,151.37 |
| METCO | $ | 31,108.00 | $ | 1,555.40 | $ | 32,663.40 |
| NTH Consultants | $ | 465.25 | $ | 23.26 | $ | 488.51 |
| Subtotal | $ | 49,312.03 | $ | 1,713.58 | $ | 51,025.61 |
| **Additional Services/ Change Order** | | | | | |
| ABE Associates, Inc | $ | 914,646.00 | | $ | 914,646.00 |

| **Total Invoice** | | | | | |
|---|---|---|---|---|---|
| Total | $ 1,400,809.14 | $ | 12,200.75 | $ | 498,363.89 |

I:\CS-1333\Billing\Invoice 36\ABE201205Invoice36_corrected Invoice
155 W. Congress, Detroit, Mi 48226 Ph: (313) 961-5170 Fax: (313 961-5172



**ABE** Associates, Inc.
Engineering · Surveying · Architecture

Services through April 18, 2012
## Status Sheet

May 7, 2012

| Task Order 1: Wick Pumping Station | | | | | | |
|---|---|---|---|---|---|---|
| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
| Total | $ 394,639.00 | $ 386,347.45 | $ 8,291.55 | $ 394,639.00 | $ - | 100% |
| Advanced Consulting Engineering Inc. | $ 8,660.00 | $ 8,660.00 | $ - | $ 8,660.00 | $ - | 100% |
| ABE Associates, Inc | $ 179,495.05 | $ 178,446.00 | $ 1,049.05 | $ 179,495.05 | $ - | 100% |
| Lakeshore Engineering | $ - | $ - | $ - | $ - | $ - | 0% |
| Madison Madison International | $ 47,007.00 | $ 47,007.00 | $ - | $ 47,007.00 | $ - | 100% |
| Malcolm Pirnie | $ 125,142.00 | $ 120,637.00 | $ 4,505.00 | $ 125,142.00 | $ - | 100% |
| METCO | $ 15,250.00 | $ 15,250.00 | $ - | $ 15,250.00 | $ - | 100% |
| NTH Consultants | $ 8,840.00 | $ 7,956.00 | $ 884.00 | $ 8,840.00 | $ - | 100% |
| Markup 5% (prime only) | $ 10,244.95 | $ 8,391.45 | $ 1,853.50 | $ 10,244.95 | $ - | 100% |

| Task Order 2: EDMS | | | | | | |
|---|---|---|---|---|---|---|
| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
| Total | $ 382,538.55 | $ 359,081.26 | $ 2,599.53 | $ 361,680.79 | $ 20,857.76 | 95% |
| Advanced Consulting Engineering Inc. | $ - | $ - | $ - | $ - | $ - | 0% |
| ABE Associates, Inc | $ 135,454.65 | $ 134,602.16 | $ - | $ 134,602.16 | $ 852.49 | 99% |
| Lakeshore Engineering | $ - | $ - | $ - | $ - | $ - | 0% |
| Madison Madison | $ - | $ - | $ - | $ - | $ - | 0% |
| Malcolm Pirnie | $ 235,318.00 | $ 216,254.00 | $ - | $ 216,254.00 | $ 19,064.00 | 92% |
| METCO | $ - | $ - | $ - | $ - | $ - | 0% |
| NTH Consultants | $ - | $ - | $ - | $ - | $ - | 0% |
| Markup 5% (prime only) | $ 11,765.90 | $ 8,225.10 | $ 2,599.53 | $ 10,824.63 | $ 941.27 | 92% |

| Task Order 2: Reimbursibles | | | | | | |
|---|---|---|---|---|---|---|
| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
| Total | $ 267,742.74 | $ 254,320.26 | $ 8,431.50 | $ 262,751.76 | $ 4,990.98 | 98% |
| Hardware | $ 18,356.00 | $ 18,087.00 | | $ 18,087.00 | $ 269.00 | 99% |
| Software | $ 155,013.24 | $ 147,348.24 | $ 7,665.00 | $ 155,013.24 | $ - | 100% |
| Training | $ 14,000.00 | $ 13,020.00 | $ - | $ 13,020.00 | $ 980.00 | 93% |
| Westin | $ 56,033.25 | $ 56,033.25 | $ - | $ 56,033.25 | $ - | 100% |
| Maintenance | $ - | $ - | $ - | $ - | $ - | 0% |
| Markup 10% | $ 24,340.25 | $ 19,831.77 | $ 766.50 | $ 20,598.27 | $ 3,741.98 | 85% |



Engineering • Surveying • Architecture

Services through April 18, 2012

## Status Sheet

May 7, 2012

### Task Order 3: Northeast Sewer Lift Station

| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
|---|---|---|---|---|---|---|
| Total | $ 379,386.69 | $ 369,241.74 | $ 9,331.15 | $ 378,572.89 | $ 813.80 | 100% |
| Advanced Consulting Engineering Inc. | $ 8,659.59 | $ 8,659.59 | $ - | $ 8,659.59 | $ - | 100% |
| ABE Associates, Inc | $ 177,446.00 | $ 168,114.85 | $ 9,331.15 | $ 177,446.00 | $ - | 100% |
| Lakeshore Engineering | $ - | $ - | $ - | $ - | $ - | 0% |
| Madison Madison International | $ 45,450.00 | $ 45,450.00 | $ - | $ 45,450.00 | $ - | 100% |
| Malcolm Pirnie | $ 119,674.88 | $ 119,375.00 | $ - | $ 119,375.00 | $ 299.88 | 100% |
| METCO | $ 8,740.00 | $ 8,740.00 | $ - | $ 8,740.00 | $ - | 100% |
| NTH Consultants | $ 9,800.00 | $ 9,800.00 | $ - | $ 9,800.00 | $ - | 100% |
| Markup 5% (prime only) | $ 9,616.22 | $ 9,102.30 | $ 513.92 | $ 9,616.22 | $ - | 100% |

### Task Order 4: Joy Road Pumping Station

| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
|---|---|---|---|---|---|---|
| otal | $ 405,906.48 | $ 357,430.17 | $ 48,476.31 | $ 405,906.48 | $ - | 100% |
| Advanced Consulting Engineering Inc. | $ 11,352.50 | $ 10,784.97 | $ 567.53 | $ 11,352.50 | $ - | 100% |
| ABE Associates, Inc. | $ 166,144.75 | $ 149,530.27 | $ 16,614.48 | $ 166,144.75 | $ - | 100% |
| Lakeshore Engineering | $ 3,600.00 | $ 3,600.00 | $ - | $ 3,600.00 | $ - | 100% |
| Madison Madison International | $ 61,976.00 | $ 58,877.20 | $ 3,098.80 | $ 61,976.00 | $ - | 100% |
| Malcolm Pirnie | $ 116,411.00 | $ 95,326.00 | $ 21,085.00 | $ 116,411.00 | $ - | 100% |
| METCO | $ 22,500.00 | $ 21,375.00 | $ 1,125.00 | $ 22,500.00 | $ - | 100% |
| NTH Consultants | $ 12,505.00 | $ 11,875.00 | $ 630.00 | $ 12,505.00 | $ - | 100% |
| Markup 5% (prime only) | $ 11,417.23 | $ 6,061.73 | $ 5,355.50 | $ 11,417.23 | $ - | 100% |

### Task Order 5: Southwest Water Plant

| | Scheduled | Previous Amt. | Amount Billed | Total Amount | Remaining | Percent Of Task |
|---|---|---|---|---|---|---|
| Total | $ 1,502,285.65 | $ 1,034,178.67 | $ 468,106.98 | $ 1,502,285.65 | $ - | 100% |
| Advanced Consulting Engineering Inc. | $ 35,000.59 | $ 28,003.90 | $ 6,996.69 | $ 35,000.59 | $ - | 100% |
| ABE Associates, Inc. | $ 911,135.82 | $ 625,504.32 | $ 285,631.50 | $ 911,135.82 | $ - | 100% |
| Madison Madison International | $ 60,347.82 | $ 36,637.48 | $ 23,710.34 | $ 60,347.82 | $ - | 100% |
| Malcolm Pirnie | $ 286,603.81 | $ 237,502.00 | $ 49,101.81 | $ 286,603.81 | $ - | 100% |
| METCO | $ 55,000.01 | $ 52,250.00 | $ 2,750.01 | $ 55,000.01 | $ - | 100% |
| NTH Consultants | $ 36,727.07 | $ 34,820.29 | $ 1,906.78 | $ 36,727.07 | $ - | 100% |
| Prints | $ 93,786.57 | | $ 93,786.57 | $ 93,786.57 | $ - | 100% |
| .dditional Services | $ - | | | | | |
| Markup 5% (prime only) | $ 23,683.96 | $ 19,460.68 | $ 4,223.28 | $ 23,683.96 | $ - | 100% |



Associates, Inc.

Engineering • Surveying • Architecture

Services through April 18, 2012

**Status Sheet**

May 7, 2012

| Task Order 6: Ypsilanti Pump Station | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Scheduled | | Previous Amt. | | Amount Billed | | Total Amount | | Remaining | Percent Of Task |
| Total | $ | 497,391.00 | $ | 357,345.76 | $ | 72,484.63 | $ | 429,830.39 | $ | 67,560.61 | 86% |
| Advanced Consulting Engineering Inc. | $ | 12,989.30 | $ | 12,339.84 | $ | 649.46 | $ | 12,989.30 | $ | - | 100% |
| ABE Associates, Inc | $ | 225,202.02 | $ | 210,161.62 | $ | 15,040.40 | $ | 225,202.02 | $ | - | 100% |
| Madison Madison International | $ | 20,491.46 | $ | 18,442.54 | $ | 2,048.92 | $ | 20,491.46 | $ | - | 100% |
| METCO | $ | 196,004.74 | $ | 164,896.74 | $ | 31,108.00 | $ | 196,004.74 | $ | - | 100% |
| NTH Consultants | $ | 9,304.94 | $ | 8,839.69 | $ | 465.25 | $ | 9,304.94 | $ | - | 100% |
| Prints | $ | 21,459.02 | $ | - | $ | 21,459.02 | $ | 21,459.02 | $ | - | 100% |
| Markup 5% (prime only)* | $ | 11,939.52 | $ | 10,225.94 | $ | 1,713.58 | $ | 11,939.52 | $ | - | 100% |

\* 5% markup not included in amount approved for task, budget shift requested to cover 5% markup.

I:\CS-1333\Billing\Invoice 36\ABE201205Invoice36_corrected Invoice
155 W. Congress, Detroit, Mi 48226 Ph: (313) 961-5170 Fax: (313) 961-5172



Engineering · Surveying · Architecture

Services through April 18, 2012

**Status Sheet**

May 7, 2012

| | | Scheduled | | Previous Amt. | | Amount Billed | | Total Amount | | Remaining | | Percent Of Task |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Additional Services/ Change Order** | | | | | | | | |
| | Total | $ | 1,047,628.00 | $ | - | $ | 914,646.00 | $ | 914,646.00 | $ | 132,982.00 | 87% |
| A | Cad Standards | $ | 328,475.00 | $ | - | $ | 289,058.00 | $ | 289,058.00 | $ | 39,417.00 | 88% |
| B | Cover Sheet Design | $ | 7,304.00 | $ | - | $ | 7,304.00 | $ | 7,304.00 | $ | - | 100% |
| C | Title Block Design | $ | 24,760.00 | $ | - | $ | 24,760.00 | $ | 24,760.00 | $ | - | 100% |
| D | Reattach Title Block | $ | 163,170.00 | $ | - | $ | 163,170.00 | $ | 163,170.00 | $ | - | 100% |
| E | Bubbles/Tags Design Redesign | $ | 30,600.00 | $ | - | $ | 30,600.00 | $ | 30,600.00 | $ | - | 100% |
| E1 | Reattach Bubbles and Tags | $ | 122,602.00 | $ | - | $ | 122,602.00 | $ | 122,602.00 | $ | - | 100% |
| F | Pen Table Design | $ | 41,855.00 | $ | - | $ | 41,855.00 | $ | 41,855.00 | $ | - | 100% |
| G | Layering Scheme/Line Weight | $ | 27,903.00 | $ | - | $ | 27,903.00 | $ | 27,903.00 | $ | - | 100% |
| H | Request for Copies of Drawings | $ | 16,000.00 | $ | - | $ | 16,000.00 | $ | 16,000.00 | $ | - | 100% |
| I | PC-713 Drawings, Wick, NE, Joy, SW & Yps- 686 Sheets Total | $ | 90,794.00 | $ | - | $ | 90,794.00 | $ | 90,794.00 | $ | - | 100% |
| J | CADD Additional 217 Sheets, Southwest | $ | - | $ | - | $ | - | $ | - | $ | - | 10% |
| K | Print Additional 217 Sheets, Soutwest | $ | - | $ | - | $ | - | $ | - | $ | - | 0% |
| L | CADD Split Sheets Southwest | $ | 145,000.00 | $ | - | $ | 87,000.00 | $ | 87,000.00 | $ | 58,000.00 | 60% |
| M | Print Split Sheets Southwest | $ | 35,565.00 | $ | - | $ | - | $ | - | $ | 35,565.00 | 0% |
| N | N/A | $ | - | $ | - | $ | - | $ | - | $ | - | 0% |
| O | CADD Standards Binder | $ | 13,600.00 | $ | - | $ | 13,600.00 | $ | 13,600.00 | $ | - | 100% |
| | TOTAL | $ | 1,047,628.00 | $ | - | $ | 914,646.00 | $ | 914,646.00 | $ | 132,982.00 | 100% |

I:\CS-1333\Billing\Invoice 36\ABE201205Invoice36_corrected Invoice
155 W. Congress, Detroit, Mi 48226 Ph: (313) 961-5170 Fax: (313) 961-5172

13-53846-tjt    Doc 11439    Filed 08/17/16    Entered 08/17/16 16:44:49    Page 126 of 129



## Fact Sheet

Services through April 18, 2012

| 5/7/2012 | | | | | |
|---|---|---|---|---|---|
| Firm | Percent of Contract | DBB | MBE | SBE | WBE |
| Advanced Consulting Engineering Inc. | 3% | | | | |
| ABE Associates, Inc | 40% | X | X | X | |
| Lakeshore Engineering | 3% | X | X | | |
| Madison Madison International | 10% | X | X | | X |
| Malcolm Pirnie | 34% | X | | | |
| METCO | 7% | X | X | | |
| NTH Consultants | 3% | X | | | |
| Westin | | | | | |
| Total | 100% | | | | |

| Currrent Status | | | | | |
|---|---|---|---|---|---|
| Firm | Total Contract Value | Previously Billed | Amount Due This Invoice | Total Amount Billed | Remaining Contract Amount |
| Advanced Consulting Engineering Inc. | $ 76,094.45 | $ 68,448.30 | $ 7,646.15 | $ 76,094.45 | $ - |
| ABE Associates, Inc | $ 3,393,150.70 | $ 1,517,600.48 | $ 1,746,508.45 | $ 3,264,108.93 | $ 129,041.77 |
| Lakeshore Engineering | $ 3,600.00 | $ 3,600.00 | $ - | $ 3,600.00 | $ - |
| Madison Madison International | $ 235,272.28 | $ 206,414.22 | $ 28,858.06 | $ 235,272.28 | $ - |
| Malcolm Pirnie | $ 863,785.81 | $ 789,094.00 | $ 74,691.81 | $ 863,785.81 | $ - |
| METCO | $ 297,494.75 | $ 262,511.74 | $ 34,983.01 | $ 297,494.75 | $ - |
| NTH Consultants | $ 77,177.01 | $ 73,290.98 | $ 3,886.03 | $ 77,177.01 | $ - |
| Westin | $ 53,425.00 | $ 53,425.00 | $ - | $ 53,425.00 | $ - |
| Total | $ 5,000,000.00 | $ 2,974,384.72 | $ 1,896,573.50 | $ 4,870,958.23 | $ 129,041.77 |

I:\CS-1333\Billing\Invoice 36\ABE201205Invoice36_corrected Invoice
155 W. Congress, Detroit, Mi 48226 Ph: (313) 961-5170 Fax: (313 961-5172

13-53846-tjt    Doc 11439    Filed 08/17/16    Entered 08/17/16 16:44:49    Page 127 of 129

# EXHIBIT G

CITY OF DETROIT
WATER AND SEWERAGE DEPARTMENT
GENERAL ADMINISTRATION

735 RANDOLPH STREET
DETROIT, MICHIGAN 48226
WWW.DETROITMI.GOV

June 8, 2012

Mr. Andre Brooks, President
ABE Associates, Inc.
155 West Congress, Suite 450
Detroit, Michigan 48236

Dear Mr. Brooks:

**Regarding:** **DWSD Contract No. CS-1333, Invoice No. 36**
**"Facilities As-Built Documentation**
**Development and Maintenance Services"**

The Wastewater Design Group has found it necessary to disallow $1,459,181.73 of the requested $1,467,613.23 for Invoice No. 36 of Detroit Water and Sewerage Department (DWSD) Contract No. CS-1333. The amount approved for payment is $8,431.50. The reason for the disallowance is the status report for the last six (6) months has not been submitted.

If you should have any questions or wish additional information, please contact Parvez Jafri at (313) 297-0200.

Sincerely,

Miriam L. Dixon
Contracts and Grants Manager

MLD/SKJ

cc: P. Jafri
    J. Williams