**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**



In Re:

CITY OF DETROIT, MICHIGAN,

        Debtor,

Chapter 9

Case #: 13-53846

Hon. Thomas J. Tucker

_____/

## RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT AND ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS AGAINST GREGORY PHILLIPS AND/OR DOMINIQUE MCCARTHA AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS, DECEASED [D/E #10272]

**NOW COMES DOMONIQUE McCARTHA, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS,** by and through her attorneys, CHRISTOPHER TRAINOR & ASSOCIATES, and for her Response to the instant Motion states as follows:

1.    Denied. The Responded filed a 42 U.S.C. § 1983 lawsuit against the City of Detroit and individual police officer, Ian Severy, in his <u>individual and official capacities.</u> (Case Number 11-14419—Judge Avern Cohn). Admitted that Plaintiff filed a Proof of Claim which was limited only to the City of Detroit. **(Exhibit A).** While a Settlement Agreement was signed, it should not be enforced for the reasons set forth herein.

      With respect to the "settlement agreement" that was purportedly signed, it should be noted that the language of the Release makes it appear that any claims potentially being resolved would be for the City of Detroit only, since it was only the City of Detroit, who was a Defendant in the federal court 42 U.S.C. § civil rights lawsuit case, that was in bankruptcy. The individually-named

1

Defendant, Ian Severy, was not involved in the bankruptcy to the knowledge of the undersigned. Thus, a reasonable reading of the Release is that any civil action would still proceed against the individually-named Defendant in this case, at a minimum.

Secondly, there must be a meeting of the minds on all material terms of a settlement agreement before it can be enforced. *Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983). There was no meeting of the minds on all material terms because Respondent did not know when the proceeds would be paid and/or how much exactly would be paid for the "unsecured claim." During the court-mandated mediation, straight answers to the timing of payments or exactly how much may or may not be paid could not be answered by the City of Detroit. When specific questions were asked, the response by the City of Detroit of "we don't know this is all new" was repeatedly conveyed. As such, there was no meeting of the minds in this case as to the material terms.

Moreover, at the time of the court-ordered mediation, the City of Detroit was well aware of the possibility that lawsuits filed under 42 U.S.C. § 1983 would not even be subject to the bankruptcy proceedings. This was NEVER conveyed to Respondent, but instead was concealed in a fraudulent attempt to get Respondent to resolve her federal civil rights lawsuit because of the uncertainty "scare tactics" used by the City of Detroit. In fact, on November 7, 2014, **Bankruptcy Court Judge Steven Rhodes opined that "section 1983 claims against individuals in their personal capacity are not claims against the City. Accordingly, the bankruptcy code does not permit a chapter 9 plan to treat those claims, nor does it provide for their discharge." (Exhibit B, Oral Opinion on the Record, Judge Steven Rhodes, p. 36).** Therefore, it is readily apparent given the timing of Judge Rhodes' opinion, that there was a dispute as to whether any claims brought under 42 U.S.C. § 1983 would even be subject to the bankruptcy. However, the

City of Detroit, nor its agents and representatives, ever advised Respondent or her Counsel of any of this, thereby precluding informed decisions to be made.

Consequently, the district court retains inherent jurisdiction and equitable power to rescind any arguable settlement that may have been entered into. *Id.* Furthermore, the Sixth Circuit in *Therma-Scan, Inc., v. Thermoscan, Inc.*, 217 F.3d 414, 419-420 (6th Cir. 2000), reversed the district court's enforcement of the parties' purported settlement agreement because it found that the parties did not reach a "meeting of the minds" on a material term.

Thirdly, a settlement agreement can be set aside for fraud or mutual mistake of fact. *Guy v. Lexington-Fayette Urban County Gov't*, 57 Fed. Appx. 217, 224 (6th Cir. 2003). Fraud can be actual or constructive. *Id.* There certainly was fraud involved in the arguable settlement of this matter. It is readily apparent from the Opinion and Order attached as **Exhibit B** herein that the issue of whether Section 1983 cases were dischargeable in bankruptcy had been a topic of discussion in the bankruptcy proceedings at the time of the mediations. That issue did not appear in the Opinion and Order by chance; but obviously came about because there had to have been discussion about the possibility that Section 1983 cases were not dischargeable. Instead of Defendant City of Detroit being candid and explaining this possibility, the City of Detroit opted to engage in a campaign of scare tactics and cover-ups. The City of Detroit threatened that if minimal settlements were not taken, the claimants may not ever get anything or it may take decades to get small percentages of the monetary claims asserted. During the court-ordered mediation, the fact that Section 1983 cases, which this case is, may not even be subject to bankruptcy, was never disclosed. This was concealed from Respondent and her Counsel, and thereby was fraudulent. Therefore, the settlement, to the extent the Court believes there is even one, must be set aside.

2.      Denied.  This is not a situation of the settlement being "second-guessed."  This is a situation where the City of Detroit committed fraud and actively concealed the fact that there was the very real possibility that Section 1983 claims would not even be subject to the bankruptcy proceedings. The City of Detroit never once even hinted at such a possibility.  Instead, the City of Detroit ran a campaign of fear and non-disclosure.

3.      Admitted.  In addition, however, Respondent's Complaint was brought pursuant to 42 U.S.C. § 1983, because it alleged violations of the Fourth Amendment to the United States Constitution.  Furthermore, the claims against the police officer were brought in both his official and individual capacities.

4.      No response required.  The docket for Respondent's federal civil rights lawsuit speaks for itself.  However, in its Motion, the City of Detroit admits that it was going to indemnify Defendant Ian Severy, which means in both his individual and official capacity.  At a bare minimum, if the court believes there was a valid settlement agreement, which there was not, it certainly did not include any claims brought against Defendant Severy in his individual capacity.

5.      Admitted.   Furthermore, the size and magnitude of this bankruptcy was virtually unprecedented; whereby numerous issues involved have never been addressed or decided.

6.      No response required.  The Bankruptcy Court's docket speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.

7.      No response required.  The Court Order speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.

8.      No response required.  The record speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.

4

13-53846-tjt    Doc 10685-1    Filed 12/04/15    Entered 12/04/15 16:40:26    Page 4 of 92
13-53846-tjt    Doc 10461-1    Filed 08/19/16    Entered 08/19/16 12:25:13    Page 4 of 92

215

263

9.    No response required.  The record speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.

10.    No response required.  The referenced document speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.  Furthermore, even if such language is applicable, it is not a defense to the fraudulent concealment and "non meeting of the minds" as set forth above.

11.    No response required.  The referenced document speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.  Furthermore, however, it is Respondent's position that this court lacks jurisdiction to hear this dispute, because the dispute is not about the ADR process per se, but whether there is an enforceable settlement based upon the actions and/or inactions by the City of Detroit as referenced herein.

12.    Admitted that the Proof of Claim as to the City of Detroit only was filed.  **(Exhibit A).**

13.    No response required.  The record speaks for itself.  Respondent leaves the City of Detroit to its strict proofs.

14.    Neither admitted or denied.  Respondent leaves the City of Detroit to its strict proofs.

15.    Admitted only that the Respondent-Plaintiff signed a settlement agreement.  However, in view of the reasons set forth herein, the settlement is not enforceable and should not be enforced given the circumstances involved.

16.    Denied.

17.    Neither admitted or denied.  Respondent leaves the City of Detroit to its strict proofs.  However, it is interesting that now, the City of Detroit cannot even locate its referenced Exhibit B.

18.    Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

19.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

20.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

21.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

22.     Admitted.

23.     Denied.  Contrary to the position of the City of Detroit, given the vague language of the various plan and settlement documents, combined with the fact that there was not a meeting of the minds, compounded by the active concealment of pertinent information by the City of Detroit as set forth herein, Plaintiff should not have to dismiss the federal civil rights lawsuit, and it should be deemed that the alleged settlement agreement is null and void.

24.     Denied.  Ian Severy was also sued in his individual capacity, which would not be protected; and any claims in his individual capacity must still go forward.

25.     Denied.  Minimally, the claims against Defendant Severy in his individual capacity still go forward.  However, Respondent nonetheless maintain her position that has not been a settlement in the first place.

26.     Neither admitted or denied.  The document says what it says.  Respondent leaves the City of Detroit to its strict proofs.

27.     Denied.  Respondent's claims have not been settled.  Furthermore, to the extent that there is even a settlement agreement, it must be set aside for the reasons set forth herein.

**WHEREFORE,** Respondent respectfully requests that this Honorable Court DENY the instant Motion in its entirety and requests oral argument on the matter.

Dated: December 4, 2015

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES

BY: _____
SHAWN C. CABOT (P64021)
Attorney for Respondent
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

7

13-53846-tjt Doc 10685-1 Filed 12/04/15 Entered 12/04/15 16:40:06 Page 7 of 92
13-53846-tjt Doc 10744-1 Filed 02/19/16 Entered 02/19/16 12:25:13 Page 7 of 266
215

## INDEX OF EXHIBITS

A      Proof of Claim

B      Court Order

13-53846-tjt   Doc 10485-1   Filed 08/19/16   Entered 08/19/16 12:25:13   Page 8 of 92
13-53846-tjt   Doc 10685   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 9 of 92
215
267

# EXHIBIT A

13-58846-tjt   Doc 10464-1   Filed 08/19/16   Entered 08/19/16 12:25:13   Page 9 of 92
13-58846-tjt   Doc 10659   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 9 of 215
268

Andrew E. Barrett
Shawn C. Cabot
Amy J. DeRouin
Ryan A. Ford
Timothy M. Hartner
Thomas F. Norton
Christopher J. Trainor

Of Counsel:
Shawn J. Coppins
Vincent M. Farougi



LAW OFFICES OF
# CHRISTOPHER TRAINOR
## & ASSOCIATES



9750 Highland Road
White Lake, Michigan 48386

Tel (248) 886-8650
Toll Free (800) 961-8477
Fax (248) 698-3321
MichiganLegalCenter.com

February 18, 2014
**\*\*Via Hand Delivery\*\***

Office of the Clerk of Court
United States Bankruptcy Court
For the Eastern District of Michigan
211 West Fort Street
Suite 1700
Detroit, MI 48226

Re:   Dominique McCartha as Per. Rep. for Estate of Gregory Phillips v. City of Detroit, et al
      United States District Court—E.D. Michigan Case No: 11-14419

Dear Sir/Madam:

In reference to the above-referenced matter, enclosed please find the creditor's B10 form and supporting documentation.

At the time of the bankruptcy, a police misconduct case was pending in the United States District Court—Eastern District of Michigan. Mr. Phillips, who was unarmed, was shot and killed by a City of Detroit police officer for no legal or justifiable reason whatsoever.

Attached are copies of the filed Court Complaint and a Facilitation Summary (without exhibits) which support the claimant's position.

If any questions or concerns arise, please feel free to contact our office.

Very Truly Yours,
CHRISTOPHER TRAINOR & ASSOCIATES

Shawn C. Cabot, Esq.

SCC/
Enclosures

cc:   City of Detroit Claims Processing Center
      c/o Kurtzman Carson Consultants, LLC
      2335 Alaska Avenue
      El Segundo, CA 90245

13-53846-tjt   Doc 10664-1   Filed 12/04/19   Entered 12/04/19 16:10:25   Page 10 of   269
13-53846-tjt   Doc 10665-1   Filed 12/04/19   Entered 12/04/19 16:12:13   Page 10 of 92
215

B10 (Official Form 10) (04/13) (Modified)

| UNITED STATES BANKRUPTCY COURT | EASTERN DISTRICT of MICHIGAN | CHAPTER 9<br>FILED |
|---|---|---|

| Name of Debtor: City of Detroit, Michigan | Case Number: 13-53846 |
|---|---|

FEB 18 2014

US Bankruptcy Court
Eastern District MI

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Dominique McCartha

Name and address where notices should be sent:
Dominique McCartha for Estate of Gregory Phillips
Christopher Trainor & Assoc.
Christopher J. Trainor & Shawn C. Cabot
9750 Highland Road
White Lake, MI 48386
Telephone number: 248-886-8650 email: shawn.cabot@cjtrainor.com

☐ Check this box if this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number: _____ email: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. Amount of Claim as of Date Case Filed: $4,500,000.00

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Personal Injury / Civil Rights / Police Misconduct
*(See instruction #2)*

3. Last four digits of any number by which creditor identifies debtor: _____   3a. Debtor may have scheduled account as: _____
*(See instruction #3a)*

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property: $_____

Annual Interest Rate (when case was filed) _____% ☐ Fixed or ☐ Variable

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:
$_____

Basis for perfection: _____

Amount of Secured Claim: $_____

Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority as an Administrative Expense under 11 U.S.C. §§ 503(b)(9) and 507(a)(2).   $_____

5b. Amount of Claim Otherwise Entitled to Priority. Specify Applicable Section of 11 U.S.C. § _____   $_____

6. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

7. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #7, and the definition of "redacted".)* DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

8. Signature: (See instruction # 8)
Check the appropriate box.

☐ I am the creditor.   ☑ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)   ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Shawn C. Cabot
Title: Attorney
Company: Christopher Trainor & Assoc.
Address and telephone number (if different from notice address above):
9750 Highland Road
White Lake, MI 48386

(Signature)   2-16-14   (Date)

Telephone number: 248-886-8650 email: shawn.cabot@cjtrainor.com

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIQUE McCARTHA, as Personal Representative for
the ESTATE OF GREGORY PHILLIPS, deceased and
GREGORY PHILLIPS,

       Plaintiff,

v.

                                    CASE NO: 11-14419
                                    HONORABLE:
                                          Avern Cohn

CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity,

       Defendants.

_____/

CHRISTOPHER TRAINOR & ASSOCIATES
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI  48386
(248) 886-8650
shawn.cabot@cjtrainor.com

_____/

## COMPLAINT AND JURY DEMAND

    **NOW COMES** Plaintiff, by and through her attorneys, CHRISTOPHER TRAINOR &

ASSOCIATES, and for her Complaint against the above-named Defendants, states as follows:

1.    Dominique McCartha is the appointed, qualified, and acting Personal Representative

      of the Estate of Gregory Phillips and currently resides in the City of Detroit, County

      of Wayne, State of Michigan.

2.    Defendant City of Detroit is a municipal corporation and governmental subdivision

      which is organized and existing under the laws of the State of Michigan.

1

3.  Defendant Ian Severy is and/or was a police officer employed by the Detroit Police Department and was acting under color of law, in his individual and official capacity, and in the course and scope of his employment at all times mentioned herein.

4.  All events giving rise to this lawsuit occurred in the City of Detroit, County of Wayne, State of Michigan.

5.  This lawsuit arises out of Defendants' violations of Plaintiff's federal constitutional rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution and consequently, Plaintiff has a viable claim for damages under 42 U.S.C. § 1983. Plaintiff also has viable state law claims.

6.  Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331 [federal question] and 28 U.S.C. § 1343 [civil rights].

7.  That the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), not including interest, costs, and attorney fees.

## FACTS

8.  Plaintiff alleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

9.  On or about October 9, 2008, Gregory Phillips was shot and killed by Defendant Ian Severy in the area of 5333 McDougall, in the City of Detroit.

10. On October 9, 2008, Gregory Phillips left his home to meet an acquaintance to buy a cell phone.

11. Gregory Phillips met the seller of the cell phone and Detroit police officers approached them in an unmarked car and in plain clothes.

12. The officers never once identified themselves as police officers.

2

13. Because they did not know they were police officers, Gregory Phillips and his friend fled the scene on foot.

14. As Gregory fled on foot, Defendant Severy fired multiple shots at Gregory Phillips and then told him to "Get his fucking hands up."

15. Gregory Phillips was shot in the left chest and left flank.

16. After Gregory Phillips had been shot, Defendant Severy repeatedly asked Gregory Phillips where the gun was at; however Gregory Phillips told the officer that he did not have a gun.

17. The dying Gregory Phillips repeatedly asked for help, but Defendant Severy refused to render any aid to him, but instead handcuffed him.

18. No weapons were found on Gregory Phillips or by him.

19. At no time during the killing did Defendant Severy have a justifiable reason to use the deadly force that he employed.

20. Defendants are not entitled to immunity protection.

21. As a result of Defendants' unlawful actions, Plaintiff suffered injuries and damages.

## COUNT I
### VIOLATION OF THE FOURTH AMENDMENT
### 42 U.S.C. § 1983 EXCESSIVE FORCE

22. Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

23. That Defendant Severy was at all times acting under color of law, within the course and scope of his employment, and in his individual and official capacities.

3

24. Defendants violated Gregory Phillips' right to be free from punishment and deprivation of life and liberty without due process of law under the Fourteenth Amendment to the United States Constitution.

25. That Defendants violated Gregory Phillips' clearly established and federally protected rights as set forth under the United States Constitution and the Amendments thereto, including, but not limited to, the Fourth Amendment of the United States Constitution to be free from unreasonable searches and seizures mainly to be free from excessive use of force, when they employed unnecessary and unreasonable excessive and deadly force which resulted in Gregory Phillips' untimely death.

26. Defendants' acts were at all times objectively unreasonable in violation of Gregory Phillips' clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution which proximately resulted in Gregory Phillips' untimely demise.

27. As a proximate result of Defendants' violation and/or deprivation of Gregory Phillips' constitutional rights, Gregory Phillips and/or his estate have a viable claim for compensatory and punitive damages pursuant to 42 U.S.C. § 1983 together with costs, interest and attorney fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an award in her favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and attorney fees as well as an award of punitive damages.

## COUNT II
## GROSS NEGLIGENCE

28. Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

29. The governmental agency that employed Defendant Severy was engaged in the exercise or discharge of a governmental function.

30. Defendant's conduct amounted to gross negligence that was the proximate cause of Gregory Phillips' injuries and damages.

31. Defendant Severy was working for the Detroit Police Department at the time of the incident complained of herein and had a duty to perform his employment activities so as not to endanger or cause harm to Gregory Phillips.

32. Notwithstanding these duties, Defendant Severy breached his duty with deliberate indifference and gross negligence and without regard to Gregory Phillips' rights and welfare, which caused serious injuries and damages to Gregory Phillips.

33. Defendant Severy knew or should have known that by breaching these duties, harm would come to Gregory Phillips.

34. That according to MCL 691.1407(2), the breach of Defendants' duty to exercise reasonable care was reckless and amounts to gross negligence.

35. That as a direct and proximate result of Defendants' indifferent/grossly negligent acts and/or omissions, Gregory Phillips suffered damages and injuries.

36. Defendants' actions were so egregious and so outrageous that Gregory Phillips' damages were heightened and made more severe, thus Plaintiff is entitled to exemplary damages.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an award in Plaintiff's favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs, interest, and attorney fees.

## COUNT III
## CITY OF DETROIT'S CONSTITUTIONAL VIOLATIONS

37. Plaintiff realleges and incorporates by reference each and every paragraph of this Complaint as though fully set forth herein.

38. Defendant City of Detroit acted recklessly and/or with deliberate indifference when it practiced and/or permitted customs and/or policies and/or practices that resulted in constitutional violations to Gregory Phillips.

39. That these customs and/or policies and/or practices included, but were not limited to:

   a. Failing to adequately train and/or supervise its police officers so as to prevent violations of citizen's constitutional rights;

   b. Failing to adequately train and/or supervise police officers regarding the proper use of force;

   c. Failing to supervise, review, and/or discipline police officers whom Defendant City of Detroit knew or should have known were violating or were prone to violate citizens' constitutional rights, thereby permitting and/or encouraging its police officers to engage in such conduct; and

   d. Failing to adequately train and/or supervise its police officers in the proper policies and procedures for establishing probable cause to arrest and the proper policies and procedures for effectuating an arrest without the use of excessive and/or deadly force.

6

40.   Defendants' conduct demonstrated a substantial lack of concern for whether an injury resulted.

41.   Defendants' acts and/or indifference and/or omissions were the direct and proximate cause of Gregory Phillips' injuries.

42.   The facts as set forth in the preceding paragraphs constitute a violation of Plaintiff's Fourth and Fourteenth Amendment rights and pursuant to 42 U.S.C. § 1983, Plaintiff has a viable claim for compensatory and punitive damages plus interest, costs, and attorney fees as set forth in 42 U.S.C. §1988.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an award in Plaintiff's favor and against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs, interest, and attorney fees.

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES

s/ Shawn C. Cabot
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorney for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

Dated: October 7, 2011
SCC/rrw

7

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DOMINIQUE McCARTHA, as Personal Representative for
the ESTATE OF GREGORY PHILLIPS, deceased and
GREGORY PHILLIPS,

      Plaintiff,

v.

                                               CASE NO:
                                               HONORABLE:

CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity,

      Defendants.

_____/

CHRISTOPHER TRAINOR & ASSOCIATES
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI  48386
(248) 886-8650
shawn.cabot@cjtrainor.com
_____/


## DEMAND FOR TRIAL BY JURY

8

NOW COMES Plaintiff, by and through the attorneys, CHRISTOPHER TRAINOR &

ASSOCIATES, and hereby makes a Demand for Trial by Jury.

Respectfully Submitted,

CHRISTOPHER TRAINOR & ASSOCIATES


s/ Shawn C. Cabot
CHRISTOPHER J. TRAINOR (P42449)
SHAWN C. CABOT (P64021)
Attorney for Plaintiff
9750 Highland Road
White Lake, MI  48386
(248) 886-8650
shawn.cabot@cjtrainor.com

Dated:  October 7, 2011
SCC/rrw

9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY PHILLIPS and or DOMINIQUE
McCARTHA as Personal Representative for
the Estate of GREGORY PHILLIPS, deceased.

      Plaintiff.

v.

                               CASE NO:   11-14419
                               HONORABLE: AVERN COHN

CITY OF DETROIT and IAN SEVERY,
in his individual and official capacity.

      Defendants.

| CHRISTOPHER TRAINOR & ASSOCIATES | CITY OF DETROIT LAW DEPARTMENT |
|---|---|
| CHRISTOPHER J. TRAINOR (P42449) | JERRY L. ASHFORD (P47402) |
| AMY J. DEROUIN (P70514) | Attorneys for Defendants |
| Attorneys for Plaintiff | 660 Woodward Avenue, Suite 1800 |
| 9750 Highland Road | Detroit, Michigan 48226 |
| White Lake, MI 48386 | (313) 237-3062 |
| (248) 886-8650 | ashfj@detroitmi.gov |
| (248) 698-3321 | |
| amy.derouin@cjtrainor.com | |

## PLAINTIFF'S FACILITATION SUMMARY

               Date:       June 27, 2013
               Time:      2:00 p.m.
               Facilitator:  Allan Charlton

I.     **OVERVIEW:**

This case involves the unjustified and indefensible killing of Mr. Gregory Phillips by a

Defendant City of Detroit police officer. Defendant Ian Severy murdered Mr. Phillips, after he

cornered him in a dark alley. While the officers allege that Plaintiff was posing a threat to them

by waving around a gun, tales of this phantom gun have been greatly exaggerated and there is

zero evidence to substantiate said allegations. As a matter of fact, the physical evidence does not

1

13-53846-tjt  Doc 10644-1  Filed 12/04/15  Entered 12/04/15 16:12:25  Page 21 of 92
13-53846-tjt  Doc 10665-1  Filed 12/04/15  Entered 12/04/15 16:12:46  Page 21 of 92  280
215

support that Mr. Phillips even had any weapon on his person at the time that he was fatally shot, let alone a gun. As a result of Defendants' unlawful actions, Plaintiff will not settle for less than $4,500,000.00.

## II.     STATEMENT OF FACTS:

This case involves the murder of Gregory Phillips, in violation of his rights as secured by the Fourth Amendment of the United States Constitution and state law. On October 9, 2008, Mr. Phillips was visiting with his friends before returning home with his five-year-old son. As Mr. Phillips stood near his vehicle, an unmarked Detroit Police Department patrol car stopped near him and out sprung three plainclothes police officers, which included Defendant Severy. Officers Brian Laperriere, John Mitchell, and Defendant Ian Severy began chasing Mr. Phillips and his friends as Officer David Pomeroy pursued them in the police vehicle. According to the testimony of Defendant Severy and Officer Mitchell, who chased Mr. Phillips, at some point during the foot chase Mr. Phillips pulled a gun from inside his coat, ran with the gun in his hand until he reached a gate, then turned and pointed the gun at Defendant Severy. However, their suspicious testimony is completely unsubstantiated by any physical evidence.

Specifically, all photographic evidence from the scene show Mr. Phillips' body, covered in blood, sprawled on the ground within a few feet of a small black object. (See Crime Scene Photos, attached as Exhibit F.) That object, as reflected in photographs taken at the scene of the homicide, was a cell phone. Moreover, none of the photographic evidence reflects that Mr. Phillips had a gun.

Defendant Severy, who fired the shots that killed Mr. Phillips, testified that the alleged gun that Mr. Phillips aimed at him was removed from the scene to ensure the safety of the police

officers. (See Deposition Transcript of Defendant Ian Severy attached as Exhibit A. p. 26). However. Defendant Severy also testified that he knew that Mr. Phillips was dead the moment he approached the body. (Exhibit A, p. 27). Defendant Severy's partner. Office Mitchell, was the next officer to arrive on the scene. In his deposition. Officer Mitchell's testimony is wildly different from that of Defendant Severy. Officer Mitchell testified that Mr. Phillips was still breathing immediately after the shooting. and he was alive until the moment before EMS arrived on the scene. (See Deposition Transcript of John Mitchell attached as Exhibit B, pp. 30-31). Although Mr. Phillips was still alive, according to Officer Mitchell, Officer Mitchell took no action to save Mr. Phillips' life and instead spent those precious few minutes securing the alleged gun and handcuffing Mr. Phillips. (Exhibit B, pp. 30-31). Officer Mitchell testified that he took pains to preserve any fingerprints on this gun. and picked it up carefully with his thumb and forefinger to avoid compromising the evidence. (Exhibit B, p. 27). Shockingly. Officer Mitchell's next action taken with this evidence. that he was so concerned with preserving, was to stick the gun into his pocket! (Exhibit B, p. 28). As it turned out, Officer Mitchell did not need to be concerned at all with preserving fingerprints on the gun. because Defendant City of Detroit never ordered, and *to this very day* had not ordered, any fingerprint analysis of the alleged gun carried by Mr. Phillips submitted into evidence.

Although Officer Pomeroy, who was Officer Mitchell's supervisor. testified that it was Officer Mitchell's responsibility to inform the evidence tech, Thomas Smith. of any gun recovered from the scene Officer Mitchell shirked that responsibility and passed it along to the other officers. (Exhibit B, p. 33; See Deposition Transcript of David Pomeroy attached as Exhibit C, pp. 28-29, 31). While who retains ultimate responsibility remains a mystery, the fact

is that none of the responding officers reported to Mr. Smith where the alleged gun was found – that's because Mr. Phillips did not have a gun.

Notably, Officer Pomeroy testified that he never saw the gun while it was on the ground. (Exhibit C, p. 22). Defendant Severy then testified that Officer Mitchell took the gun to the trunk of the scout car. (Exhibit A, p. 25). However, and as previously mentioned, Officer Mitchell testified that he put the gun in his pocket. (Exhibit B, p. 28). Mr. Smith's report reflects, and his deposition testimony details, that the item that was found at the scene and marked with evidence tag number three was a cell phone. (See Deposition Transcript of Thomas Smith attached as Exhibit D, p. 19). Mr. Smith, a retired evidence technician without an interest in this case, acknowledged that he could not make a representation of the location of the gun because he never saw the weapon and Officer Mitchell never provided this information to him. (Exhibit D, pp. 8-10, 19). Officer Laperrierre, who arrived on the scene within minutes after the shooting, never even saw the gun allegedly dropped by Mr. Phillips, nor did he ever see Mr. Phillips pull a weapon at all. (See Deposition Transcript of Brian Laperrierre attached as Exhibit E, pp. 18, 24). This mystery gun, with its unclear and problematic journey through the chain of custody and nonexistent relationship to Mr. Phillips, is the crux of any defense to this unjustified homicide. Unfortunately for the Defendants, no photographic or forensic evidence support the allegation that Mr. Phillips had a gun. Instead, the same such evidence lends its credence to the most apparent answer which is that Mr. Phillips was gunned down in a dark alley on a dark night for no justification whatsoever. As stated above, Mr. Smith, the evidence technician who conducted a thorough and complete accounting of the scene of the homicide shortly after it occurred, testified that he *never* saw a gun that was alleged to have been the

4

13-58846-tjt    Doc 10665-1  Filed 02/04/19  Entered 02/04/19 16:12:25  Page 24 of 92
13-53846-tjt    Doc 10665-1  Filed 02/04/19  Entered 02/04/19 16:10:25  Page 24 of 92    283
215

property of Mr. Phillips. The only personal effect of Mr. Phillips that was on the ground near his fallen body was his cell phone. (Exhibit D, pp. 20, 24).

Mr. Phillips, father of two small children who were dependent upon him, is survived by those children. Mr. Phillips was an employee of Two Men and a Truck prior to his murder. Consequently, Plaintiff filed the instant lawsuit against Defendants City of Detroit and Ian Severy alleging the following claims: (1) excessive use of force in violation of the Fourth Amendment under 42 U.S.C. § 1983; (2) assault and battery; (3) gross negligence; and (4) a *Monell* claim against the City of Detroit.

## III.  CORROBORATING FACTS:

### A.  DEPOSITION TRANSCRIPT OF DEFENDANT IAN SEVERY (EXHIBIT A):

- Officer Mitchell moved the gun out of concern for the safety of the officers after the shooting. (p. 26)
- Immediately after the shooting, he was aware that Mr. Phillips was dead. (p. 27)
- After Officer Mitchell picked up the gun, Officer Mitchell put it in the trunk of the patrol car. (p. 25)

### B.  DEPOSITION TRANSCRIPT OF JOHN MITCHELL (EXHIBIT B):

- Mr. Phillips was alive immediately following the shooting and until just before EMS arrived. (pp. 30-31)
- He secured the gun and handcuffed Mr. Phillips before EMS arrived. (p. 30-31)
- He picked up the gun with his thumb and forefinger. (p. 27)
- He put the gun in his pocket. (p. 28)

### C.  DEPOSITION TRANSCRIPT OF DAVID POMEROY (EXHIBIT C):

- Officer Mitchell was responsible for reporting the gun to the evidence tech. (pp. 28-31)
- He never saw the alleged gun on the ground. (p. 22)

### D.  DEPOSITION TRANSCRIPT OF THOMAS SMITH (EXHIBIT D):

- He marked the cell phone found on the ground as Exhibit 3. (p. 19)
- As the officer recovering evidence, it was Officer Mitchell's responsibility to report any removed evidence to him in preparation of his report of the scene. (pp. 8-10)
- Mr. Phillips' cell phone was on the ground near his body when Mr. Smith arrived at the scene. (p. 20)

5

- He never saw the gun. **(p. 24)**

E.   **DEPOSITION TRANSCRIPT OF BRIAN LAPERRIERRE (EXHIBIT E):**

- He never saw the gun on the ground. (p. 18)
- He never saw Mr. Phillips pull a gun from inside his coat. **(p. 24)**

F.   **CRIME SCENE PHOTOS (EXHIBIT F):**

V.   **LEGAL ARGUMENT:**

A.   **DEFENDANTS ARE LIABLE FOR ASSAULTING AND BATTERING MR. PHILLIPS.**

Under Michigan law, an assault is an intentional and unlawful threat of offensive physical contact to another person which under the circumstances creates in the victim a well-founded fear of imminent physical contact coupled with the ability of the assailant to accomplish the contact. *VanVorous v. Burmeister*, 262 Mich. App. 467 (2004). *See also Espinoza v. Thomas*, 189 Mich. App. 110, 119 (1991). A battery is defined as "a willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." A police officer may use force when making an arrest, **but only that level of necessary force** that an ordinary person would have deemed necessary given the knowledge of the arresting officer and the situation in which the arrest occurred. *Brewer v. Perrin*, 132 Mich. App. 520, 528 (1984). To find that a government actor is liable for the aforementioned torts, a Court must determine that "the officers' actions were not justified because they were not objectively reasonable under the circumstances." *Id.*

In the present case, Defendant Severy's actions against Mr. Phillips were absolutely unjustifiable, unreasonable, and absolutely malicious. As a result of Defendant Severy's intentional and unlawful actions, Mr. Phillips lost his life. Therefore, Defendant Severy is unmistakably liable for assaulting and battering Mr. Phillips.

6

B.   DEFENDANT SEVERY'S CONDUCT WAS GROSSLY NEGLIGENT AND GOVERNMENTAL IMMUNITY DOES NOT APPLY.

In Michigan, governmental employees acting within the scope of their employment are immune from tort liability **unless** their conduct amounts to gross negligence. MCL 691.1407(2); *Poppen v. Tovey*, 256 Mich. App. 351, 356 (2003). Gross negligence is statutorily defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCLA 691.1407(a); *Oliver v. Smith*, 269 Mich. App. 560, 565 (2006). Moreover, the definition of gross negligence "suggests almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks. It is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare of those in his charge." *Tarlea v. Crabtree*, 263 Mich. App. 80, 87 (2004).

The senseless and unlawful actions taken by Defendant Severy illustrate a wanton disregard for Mr. Phillips' welfare and safety. As such, Defendant Severy is clearly liable for gross negligence because his unlawful and disturbing actions clearly demonstrate a substantial lack of concern for whether an injury or death resulted to Mr. Phillips, and he is certainly not entitled to governmental immunity.

C.   DEFENDANT SEVERY'S USE OF FORCE AGAINST MR. PHILLIPS WAS EXCESSIVE IN VIOLATION OF THE FOURTH AMENDMENT AND DEFENDANT SEVERY IS NOT ENTITLED TO QUALIFIED IMMUNITY

The Fourth Amendment to the United States Constitution guarantees that "the right of the people to be secure in their person…against unreasonable searches and seizures, shall not be violated…." U.S. CONST. AMEND. IV. The reasonableness of a seizure "depends not only on *when* it is made, but also on *how* it is carried out." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original) (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Thus, pursuant to 42

7

U.S.C. § 1983, a cause of action exists for the excessive use of force during an arrest. As will be explained below, Defendant Severy violated Plaintiff's Fourth Amendment rights by use of excessive force and he is not entitled to qualified immunity for his actions.

The Fourth Amendment's prohibition of unreasonable seizures strictly limits the amount of force a police officer may use. *Graham* at 394. Specifically, a police officer may only use that degree of force necessary to complete the arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997) (emphasis added). When reviewing a police officer's use of force, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345-347 (6th Cir. 1992); see also *Graham* at 396. A court must consider the facts and circumstances surrounding the arrest or seizure, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the citizen is actively resisting arrest or attempting to evade arrest by flight." *Graham* at 396-97. An objective standard must be used to determine the reasonableness of the particular force used in light of the facts and circumstances confronting a reasonable officer on the scene. *Graham* at 396-97. Applying this standard to the facts of this case leaves only one conclusion: Defendants used excessive force against Plaintiff.

Cases within the Sixth Circuit "clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence...." *Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006). In the instant case, even though Mr. Phillips was completely compliant and posed no threat whatsoever to any of the officers, he was fatally shot. Clearly, Defendant Severy's actions were certainly unreasonable and excessive and he is not entitled to qualified immunity.

8

## D. PLAINTIFF HAS VALID CLAIMS AGAINST DEFENDANT CITY OF DETROIT

In *Monell v Dept. of Social Services of the City of New York*, 436 US 658, 690-691(1978), the United States Supreme Court held that local governments "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." While a municipality cannot be held liable solely because it employs a tortfeasor, liability can be imposed when an employee adheres to an official policy which causes another's constitutional rights to be violated.

A municipality will be held liable for inadequately training its officers when it "evidences a 'deliberate indifference' to the rights of its inhabitants...such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 US 378, 389 (1989). Defendant City of Detroit has clearly failed to train and supervise its police officers as to the proper use of force to employ while arresting a citizen. This failure to train and supervise the police officers regarding the use of force makes Defendant City of Detroit liable for Mr. Phillips' death and damages.

9

## VI.   Conclusion

In light of the evidence and caselaw set forth above, Plaintiff will not settle for less than $4,500,000.00.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES

BY: _____
CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI  48386
(248) 886-8650

Dated:  June 25, 2013
AJD/gcj

## PROOF OF SERVICE

The undersigned certified that on the 26th day of June, 2013
a copy of the foregoing document was served upon the attorney (s)
of record by e-mailing a copy of same to said attorney(s) only.
I declare under the penalty of perjury that the foregoing statement is
true to the best of my information, knowledge and belief.

_____
DANIELLE NOWICKI

10

# EXHIBIT B

13-53846-tjt   Doc 10664-1   Filed 02/09/16   Entered 02/09/16 12:25:13   Page 31 of 92
13-53846-tjt   Doc 10665   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 31 of 92
215
290

*For Release and Posting Following the*
*Conclusion of the Oral Opinion*

ORAL OPINION ON THE RECORD

In re City of Detroit

Bankruptcy Judge Steven Rhodes

November 7, 2014

# Table of Contents

Introduction..................................................................................1

The Plan .....................................................................................2

The Grand Bargain........................................................................3

The Pension Settlement...................................................................4

The Annuity Savings Fund Recoupment Settlement.......................8

The State Contribution Agreement ...............................................10

The DIA Settlement ....................................................................12

The OPEB Settlement ..................................................................14

The 36th District Court Settlement................................................15

The UTGO Settlement .................................................................15

The LTGO Settlement..................................................................16

The COPS Settlement ..................................................................17

The Syncora Settlement ...............................................................18

The FGIC Settlement...................................................................19

Good Faith .................................................................................20

Best Interests of Creditors............................................................22

Fees ..........................................................................................25

Unfair Discrimination ..................................................................28

Fair and Equitable ......................................................................33

The Constitutional Claims Against the City ...................................35

The Exit Financing.......................................................................37

Feasibility...................................................................................38

Conclusion .................................................................................44

13-53846-tjt    Doc 10644-1  Filed 02/04/19  Entered 02/04/19 16:12:25  Page 33 of 92
13-53846-tjt    Doc 10655-1  Filed 12/04/19  Entered 12/04/19 16:40:46  Page 33 of 92    292
215

# INTRODUCTION

In chapter 9 of the bankruptcy code, the federal government offers help to the states in solving a problem that, under our constitutional structure, the states cannot solve by themselves. That problem is the adjustment of the debts of an insolvent municipality. Today, this federal bankruptcy court grants that help to the State of Michigan and the City of Detroit.

The Court concludes that the City's eighth amended plan of adjustment meets the legal requirements for confirmation. Accordingly, the Court confirms that plan.

The Court also concludes that the settlements incorporated into the plan of adjustment are reasonable, fair and equitable. Accordingly, the Court approves those settlements.

The Court also concludes that the City's proposed exit-financing meets the requirements of the bankruptcy code. Therefore, the Court approves the exit financing.

This oral opinion will first address the settlements. There are no outstanding objections to the settlements, except for the ASF recoupment portion of the pension settlement. Nevertheless, the City requested the Court to determine that they are reasonable, fair and equitable.

The Court will then review the major issues relating to confirmation. These are good faith, best interests of creditors, professional fees, unfair discrimination, fair and equitable, and the treatment of the constitutional claims against the City. The Court will then briefly review the City's request for approval of the exit financing. The Court will then address feasibility and conclude. The Court will soon issue a supplemental opinion that will more fully address all of the issues.

1

13-53846-tjt   Doc 10644-1  Filed 02/04/16   Entered 02/04/16 16:12:25   Page 34 of 92
13-53846-tjt   Doc 10685   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 34 of 91
215
293

## THE PLAN

Nearly every creditor group filed litigation against the City seeking the full protection of its claims, as well as objections to confirmation. The plan is largely comprised of the settlements of those claims and objections. With only one exception, every group of creditors represented by counsel has settled with the City. That exception is a small group of creditors with constitutional claims against the City.

The Court previously approved the settlement with the swap counterparties. Here are the settlements that Court approves today at the City's request:

- The Grand Bargain settlement, which includes the pension settlement, the State Contribution agreement and the DIA settlement.

- The OPEB settlement.

- The 36th District Court settlement.

- The UTGO settlement.

- The LTGO settlement.

- The Syncora settlement.

- The FGIC settlement.

Several factors are relevant to the reasonableness of each settlement and are common to all of them. These include the following:

All of the creditors in these settlements had filed and vigorously pursued objections to the plan.

All of the creditors were highly motivated to pursue those objections and had the resources to do so. This would include the appellate process if necessary.

Many of the objections raised issues that were novel, complex legally and factually, and potentially significant beyond this case.

All of the parties were well represented and well prepared for litigation.

For the City, litigating with creditors was incompatible with its goal of a prompt and efficient exit from bankruptcy and start to its revitalization.

For the City, the stakes in any of the creditor litigation were high. Even a single loss to any major creditor would seriously compromise its goals in this case.

Each settlement was at arms' length, hard-fought. Each required perseverance, creativity and compromise by all involved.

Each of those considerations played a role in each of these settlements.


## THE GRAND BARGAIN

The cornerstone of the plan is the Grand Bargain. It is a collection of settlements among a number of parties with an interest in the City's two pension plans and in protecting the City's art. These parties include:

- The official committee of retirees.

- The General Retirement System, GRS.

- The Police and Fire Retirement System, PFRS.

- The American Federation of State, County and Municipal Employees, AFSCME.

- The United Auto Workers Union.

- The Detroit Retired City Employees Association.

- The Retired Detroit Police Members Association.

- The Retired Detroit Police & Fire Fighters Association.

3

13-53846-tjt   Doc 10664-1   Filed 02/04/16   Entered 02/04/16 16:10:26   Page 36 of 92
13-53846-tjt   Doc 10665-1   Filed 12/04/15   Entered 12/04/15 16:12:05   Page 36 of 91   295
215

- The Detroit Police Lieutenants and Sergeants Association.

- The Detroit Police Command Officers Association.

- The Detroit Police Officers Association.

- The Detroit Fire Fighters Association.

- The State of Michigan.

- A number of charitable foundations.

- The Detroit Institute of Arts.

The settlements represented in the Grand Bargain are the pension settlement, the state contribution agreement, and the DIA settlement. The plan of adjustment reflects the Grand Bargain in its treatment of class 10, which consists of the PFRS claims, and class 11, which consists of the GRS claims. The State of Michigan, a number of charitable foundations, the Detroit Institute of Arts and a number of individuals will contribute to the City's two pension plans a total value of $816 million over 20 years.

### THE PENSION SETTLEMENT

The key points of the pension settlement are:

• The allowed claim amount of Unfunded Accrued Actuarial Liability, the UAAL, will be $1.25 billion for PFRS and $1.879 billion for GRS.

• Through June 30, 2023, the pension plans will use a 6.75% discount rate to value the liabilities and a 6.75% assumed investment return rate to estimate the future growth of their assets.

• The pension plans will be frozen as of July 1, 2014.

4

• Active employees continuing to work for the City after July 1, 2014, will have benefits under new hybrid pension plans. The pension formulas contained in the new hybrid plans are less generous than those in the present plans.

• Each pension claimant will receive the Adjusted Pension Amount. For PFRS retirees, this means no reduction in the accrued pension benefit amount but a 45% reduction in the cost of living adjustment, COLA. For GRS retirees, the Adjusted Pension Amount is a 4.5% reduction in accrued pension benefit amount and elimination of COLA.

• Some GRS retirees will be subject to an annuity savings fund recoupment. Because some parties have objected to this ASF recoupment, the Court will address this separately later.

• There are provisions for restoration of pension benefit payments in certain circumstances.

• For 2023, the funding targets are 70% for GRS and 78% for PFRS. For 2053, in 40 years, the targets are 100% for each.

• PFRS and GRS will each have an investment committee that will make recommendations to, and in certain situations approve the actions of, their boards of trustees.

• Until June 30, 2023, the parties may not amend the terms, conditions and rules of the GRS and PFRS relating to the calculation of pension benefits, the investment return assumptions, or the contributions to the pension systems.

The pension classes voted to accept the plan by 82% in class 10, PFRS, and 73% in class 11, GRS.

Despite these strong votes in favor of the plan, the treatment of pension claims in the City's plan of adjustment has been a significant issue in the case. In the Court's eligibility opinion, it held that the federal bankruptcy power could impair pension right in a municipal case, even if the state constitution protects. The Court stands by that decision.

5

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 38 of 92
13-53846-tjt   Doc 10605-1   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 38 of 91
215
297

Now, at the confirmation stage, the Court must determine whether the plan's treatment of pension claims meets the legal requirements for plan confirmation and settlement approval. The plan confirmation issues include good faith, best interests of creditors, feasibility and others. The Court will address these questions later. It will now address whether the pension settlement is a reasonable settlement.

Despite the acceptance of the plan by the pension classes, many pension claimants still strongly oppose the impairment of their pension rights in this bankruptcy. They believe that under the Michigan constitution, their pension rights are not subject to impairment. They credibly state that they worked hard for the City, that they did nothing wrong, and that these impairments will cause them real hardship. Some also argue that the pension impairments in the plan of adjustment are unnecessary because the pension plans are in fact fully funded. They further argue that if the pension plans are underfunded, the City should sell the art at the Detroit Institute of Arts or other City assets. Many of these objecting parties took the time to come to court to give a strong, sincere and personal voice to their objections.

The Court finds that the pension settlement is a reasonable settlement and overrules those objections to confirmation and to the pension settlement.

The several representatives of the pension classes appealed this Court's eligibility decision to the Court of Appeals. The City of course took the position that the eligibility decision was correct and should be affirmed. To determine the reasonableness of the settlement, it is incumbent upon this Court to estimate the parties' likelihood of the success of the appeal. That is challenging here. On balance, the Court estimates that the pension creditors' chances of success on appeal were in the range of 25%.

6

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 39 of 92
13-53846-tjt   Doc 10685-1   Filed 12/04/15   Entered 12/04/15 16:10:06   Page 39 of 91   298
215

The next step would be to determine each side's best-case scenario. For the City, that would plainly be to prevail on appeal and to continue in this chapter 9.

For the pension claimants, however, the best-case scenario is much less clear. The City would still have no ability to pay the claim even if those claimants were to prevail on appeal.

These considerations suggest that it is a vast understatement to say that the pension settlement is reasonable. It borders on the miraculous. No one could have foreseen this result for the pension creditors when the City filed this case. The plan's proposal is only possible because of the pension settlement and the Grand Bargain. The pension reductions in the pension settlement are minor compared to any reasonably foreseeable outcome for these creditors without the pension settlement and the Grand Bargain.

At the same time, the Court must acknowledge that these pension reductions will cause real hardship. In some cases, it is severe.

This bankruptcy, however, like most, is all about the shared sacrifice that is necessary because the City is insolvent and desperately needs to fix its future. All of the City's unsecured creditors are making sacrifices. Others sacrifice too, including the City's residents and visitors, and even the State of Michigan and its residents. Even the City's professionals are now contributing to this process and to the City's future.

As noted, substantial majorities of the two pension classes accepted the necessity of shared sacrifice for the common good of the City. That collective judgment is entitled to substantial consideration here.

The Court finds that the pension settlement is reasonable and approves it.

## THE ANNUITY SAVINGS FUND RECOUPMENT SETTLEMENT

The Court will now address the Annuity Savings Fund recoupment part of the pension settlement. In the City's long-standing ASF program, GRS employees could voluntarily contribute a percentage of their gross pay to a separate pension account. The GRS then invested these contributions with the other GRS assets. Each participant's ASF account increased in value based on the participant's contributions and the interest credited to that account.

For many years, the GRS credited interest in each participant's ASF account at the assumed rate of return even when the actual rate of return was less than that. The City claims that this diversion of assets increased the GRS unfunded liability. It claims that it is therefore entitled to recoupment of the excess interest credits from the participants to offset that increased unfunded liability. This in turn would reduce the pension cuts to the GRS retirees. The City calculates that the total of this claim is approximately $387 million. The GRS and the ASF participants assert that there is no basis for recoupment.

The parties have settled this dispute. The key points are:

• The ASF Recoupment amount for each ASF participant will be the amount of excess interest that GRS credited to the participant between July 1, 2003 and June 30, 2013.

• The GRS will amortize each ASF participant's recoupment amount over the participant's life expectancy with interest at 6.75%, to be deducted from the participant's monthly pension check or ASF account.

• The plan of adjustment caps the ASF recoupment at 20% of the highest value of each participant's ASF account between July 1, 2003 and June 30, 2013. An additional cap limits the combined pension reduction and ASF recoupment to 20% of such participant's annual pension.

8

13-53846-tjt    Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 41 of 92
13-53846-tjt    Doc 10665   Filed 12/04/15   Entered 12/04/15 16:10:36   Page 14 of 91   300
215

• Each participant that is subject to the ASF Recoupment will have the option to pay the ASF Recoupment amount in a single lump sum cash payment.

• The settlement will net approximately $190 million for the GRS, which is about 49% of the City's calculation of its claim here.

Several participants object to the ASF recoupment in the plan of adjustment. They argue:

1. The ASF recoupment violates the applicable statute of limitations.

2. Under state law, the City's recoupment claim has no merit.

3. They did nothing that justifies imposing this liability on them.

4. The GRS board did nothing wrong.

5. The City has no standing to assert the claim.

6. They do not consent to the lesser treatment of their pension claim in class 11 that results from the recoupment.

7. The treatment of the City's recoupment claim in the plan violates their right to be heard on the merits.

8. The City did not properly disclose the 6.75% interest rate.

9. The interest rate is illegal, usurious and unfair.

10. The Court should carve the ASF settlement out of the plan and then approve the plan.

The Court overrules those objections.

The ASF recoupment settlement is a part of the pension settlement and therefore a part of the Grand Bargain. It is also a part of the City's plan of adjustment. The Court, therefore, has only two issues to consider. The first is whether the settlement is reasonable. The second is whether the plan provisions that incorporate the ASF settlement violate the bankruptcy code.

9

13-53846-tjt   Doc 10644-1  Filed 02/04/19  Entered 02/04/19 16:12:25  Page 42 of 92
13-53846-tjt   Doc 10655-1  Filed 02/04/19  Entered 02/04/19 16:10:06  Page 43 of 91   301
215

It is not for the Court to rule on the merits of the City's ASF recoupment claim or the merits of the participants' defenses. The Court only to reviews the parties' positions to determine whether the settlement is reasonable.

The Court finds substantial merit in the City's recoupment claim. The legal authority of the GRS board to credit interest in excess of the actual rate of return was doubtful. The prudence of the practice was even more doubtful. The Court also considers that the asserted defenses have less merit.

On balance, it appears that the City's recoupment claim would have a reasonable likelihood of success, 60-70%. However, the length, complexity and expense of litigation on the claim would be substantial. Should the City prevail, issues of collectability against ASF participants could also be substantial, depending upon the structure of the final judgment.

The Court also considers that this settlement is a part of the much larger settlement of all pension-related issues. The class of claims affected by the settlement, class 11, accepted the settlement by a vote of 73%. Finally, the Court notes that the caps and other limitations on the recoupment amount that the parties negotiated should reduce the hardship of it.

Fairly weighing these factors suggests that the ASF recoupment settlement is well within the range of possible reasonable settlements. The Court approves it.

## THE STATE CONTRIBUTION AGREEMENT

The Court will now address the state contribution agreement.

This agreement settles the state's potential liability for the underfunding of the GRS and the PFRS under the pension non-impairment provision of the Michigan constitution, Article IX, section 24. It also supports the City's plan of adjustment. The key points of this agreement are:

10

• The state of Michigan will immediately contribute $194.8 million.

• The City, GRS and PFRS will establish an income stabilization program established to ensure that pension reductions do not cause any retirees to fall into poverty. This income stabilization program will receive a portion of the payments on the Stub UTGO Bonds, which the Court will describe later.

• The pension claimants will release the state and its related entities from liability and cease litigation related the chapter 9 case, PA 436, or the pension provisions of the Michigan constitution.

The claim settled here would not be a frivolous claim. The language of article IX, section 24, of the Michigan constitution can be read to support the claim. The non-impairment language is absolute and the state is in a much better position than retirees to monitor and enforce the non-impairment of municipal pensions.

There is nonetheless no precedent for such a claim. Any litigation of it would be long, complex and expensive. If the state loses, it would be responsible for the Detroit pension underfunding of $3 billion. It might also then be responsible for the entire unfunded liability of every municipality in the state. That would be disastrous for the state.

The question then is whether the state's contribution is a fair settlement to obtain a release of any liability that it might have on this claim. As noted, the contribution is $195 million.

The novelty and the lack of precedent make judging its likelihood of success challenging. The litigation would, however, be high-risk for all concerned.

The parties have settled, with the help of the DIA and the charitable foundations. The many skilled and capable representatives of the pension claimants have concluded that the state contribution agreement is fair. They recommended it to their pension claimants, who, in turn, voted strongly to support it and to release their potential litigation claims.

11

13-53846-tjt    Doc 10644-1  Filed 02/04/16  Entered 02/04/16 16:12:25  Page 44 of 92
13-53846-tjt   Doc 10685-1 Filed 12/04/15 Entered 12/04/15 16:10:46 Page 44 of 91   303
215

In the circumstances, the Court finds that it is reasonable, although perhaps at the lowest end of the range of reasonable settlements. The Court approves it. For reasons that the Court will explain in its written opinion, the Court also approves the release of the state and the state related entities.

## THE DIA SETTLEMENT

The Court will now address the DIA settlement.

This settlement resolves all of the disputes relating to the rights of all parties with respect to the DIA and the art. The key points of this settlement are:

• The DIA will secure and guaranty commitments for contributions to the GRS and the PFS of $100 million over twenty years.

• Various local and national charitable foundations will contribute $366 million to the GRS and PFRS over 20 years.

• The City will transfer the art to the DIA Corp., which will hold the art in a perpetual charitable trust for the benefit of the people of the City and the State.

Two issues arise here. The first is whether the DIA settlement is a fair settlement. The Court will address this issue now. The second is whether the settlement is consistent with the best interests of creditors test. The Court will address that issue later.

Addressing the fairness of the settlement, the Court will first examine the relative strengths of the parties' positions. Both the Michigan Attorney General and the DIA itself take the position that the DIA art is subject to a trust that prohibits the City from selling it to pay debts and places it beyond the creditors' reach. The DIA also asserts that the donors of many of the pieces of art had imposed specific transfer restrictions on them.

12

13-53846-tjt   Doc 10644-1   Filed 02/04/19   Entered 02/04/19 16:12:25   Page 45 of 91
13-53846-tjt   Doc 10685-1   Filed 12/04/19   Entered 12/04/19 16:10:06   Page 45 of 91
215
304

The evidence supports these assertions. The Court was especially impressed with the testimony of Ms. Erickson on these points, and with the historical documentary evidence that the DIA cited in its brief and that was admitted in evidence.

The evidence further establishes that nationally accepted standards for museums prohibit the de-acquisition of art to pay debt. The creditors also admitted, perhaps grudgingly, that no creditor had ever considered the value of the art as a possible source of repayment when it decided to lend money to the City or to acquire City debt.

On the other hand, the creditors did submit substantial evidence and legal grounds supporting the contrary view that the City can legally sell or monetize the DIA art.

On balance, the Court concludes that in any potential litigation concerning the City's right to sell the DIA art, or concerning the creditors' right to access the art to satisfy its claims, the position of the Attorney General and the DIA almost certainly would prevail.

However, evidence also established that any such result in litigation might well have taken years to achieve and would have been costly to pursue. It also would have been difficult for the City to endure the delay and expense while at the same time attempting to revitalize itself. The DIA and the attorney general state with credibility that they would vigorous contest any attempt to sell any art. Credible evidence also establishes that an attempt by the City to sell its art might result in a cancellation of the county millage taxes that support the DIA's operations and constitute almost 70% of the DIA's budget.

The Court concludes that the DIA settlement was a most reasonable and favorable settlement for the City and its pension creditors. The Court readily approves it. Accordingly, the Court approves all aspects of the grand bargain.

13

# THE OPEB SETTLEMENT

The Court will now review the OPEB settlement.

The City is currently obligated to its retirees for other post-employment benefits, OPEB. This includes health care and life insurance benefits. The City claimed the OPEB liability is $3.8 billion. The retiree committee asserts that it is $5 billion. The difference largely results from differences in certain actuarial assumptions and discount rates. They also disagreed about how to account for postpetition OPEB payments. Either value would make the OPEB liability the City's largest single liability.

The parties settled. The key points of this settlement are:

• The allowed amount of OPEB Claims is $4.3 billion. Of that, $2.2 billion is for PFRS retirees and $2.1 billion is for GRS retirees.

• The City will establish two voluntary employees' beneficiary associations, known as VEBAs, to provide post-employment benefits to retirees and certain of their beneficiaries and dependents.

• The City will distribute New B Notes and other assets to fund the VEBAs.

• Various sources will fund the start-up costs for the VEBAs.

• The City will have no further responsibility to provide other post-employment benefits.

The plan treats the OPEB claim in class 12. The estimated recovery for Class 12 OPEB claims is 10%. Class 12 accepted the plan.

The retiree committee's OPEB litigation sought to prohibit the City from terminating OBEP benefits. It asserted largely equitable grounds relating to the hardship that terminating these benefits would naturally cause to retirees. There did not appear to be any substantial legal grounds for the requested relief. The City's likelihood of success was very high. The OPEB claim is an

14

13-53846-tjt   Doc 10664-1  Filed 02/04/19  Entered 02/04/19 16:12:25  Page 47 of 92
13-53846-tjt   Doc 10665-1  Filed 12/04/18  Entered 12/04/18 16:10:06  Page 47 of 91   306
215

unsecured claim. Unlike the retirees' pension claims, their OPEB claims had no arguable constitutional protection.

The 10% recovery for class 12, the OPEB class, is approximately the recovery of other unsecured creditors. The class voted to accept it by over 88%. The Court finds that the OPEB settlement is reasonable. The Court approves it.

## THE 36TH DISTRICT COURT SETTLEMENT

The Court will now discuss the 36th District Court settlement.

When the City filed bankruptcy, the 36th District Court was defending several employment-related claims. Because the City is legally required to fund the 36th District Court, it would ultimately be responsible for any judgments against the 36th District Court in those proceedings. The parties in the litigation settled with the City. The aggregate liquidated allowed amount of the claims is $6 million.

These claims are in class 17. Their recovery is 33%. They accepted the plan by a vote of 100%. The Court finds that this settlement is reasonable. The Court approves it.

## THE UTGO SETTLEMENT

The Court will now address the UTGO bond settlement.

Postpetition, the City defaulted on its obligation to make payments on these Unlimited Tax General Obligation bonds. The bond insurers paid claims on the defaulted payments.

In the resulting litigation, the UTGO bond creditors claimed that portions of the City's property taxes could only be used to pay their claims and that they had a lien on that stream of revenues. They also asserted that this revenue was "special revenue" in chapter 9, entitled to special protections.

15

13-53846-tjt    Doc 10644-1    Filed 02/04/16    Entered 02/04/16 16:10:25    Page 48 of 92
13-53846-tjt    Doc 10605    Filed 12/04/15    Entered 12/04/15 16:10:56    Page 48 of 92    307
215

The City opposed the litigation, contending that the UTGO claims were unsecured claims. The City and the bond insurers settled. The key points of this settlement are:

• The allowed claim on the UTGO Bonds will be $388 million.

• Just under $288 million of the UTGO Bonds will be restructured and reallocated among the holders of the bonds.

• Approximately $43 million the UTGO bonds, which parties have called the Stub UTGO bonds, will be reinstated to existing holders. However, those holders' rights to payment on those Stub UTGO bonds will be dedicated to the income stabilization program that is part of the State Contribution Agreement, which the Court mentioned earlier.

The plan classifies the UTGO Bond Claims in Class 8. The recovery is 74%. The class accepted the plan by a vote of 87%.

The UTGO settlement, 74%, is the highest settlement percentage that the City agreed to for unsecured creditors. The City's chance of success on the merits of the litigation was a coin-toss. On the other hand, the consequence to the City of losing on this issue could have been dire. It would have lost access to the portion of its property tax revenue that the UTGO bondholders claimed.

The Court concludes, therefore, that the UTGO settlement is within the range of possible reasonable settlements, although perhaps at the upper end of that range. The Court concludes that these circumstances do warrant the premium that the settlement reflects. The Court therefore approves it.


THE LTGO SETTLEMENT

The Court will now discuss the LTGO settlement.

16

The City has almost $164 million in outstanding limited tax general obligation bonds, called LTGO bonds. Postpetition, the City defaulted on its obligation to make interest payments on the LTGO Bonds. On both occasions, Ambac Assurance Corporation, insurer of two-thirds of the LTGO bonds, paid claims on the defaulted payments. In the resulting litigation, the LTGO claimants argues that their claims were entitled to secured treatment and that state law requires the City to pay the LTGO bonds as a first budget obligation. The City asserted that the LTGO claims were unsecured claims.

The parties settled their disputes. The key points of this settlement are:

• The City may either issue new LTGO Bonds in the amount of $55 million or pay $55 million in cash using exit financing. The City has elected to make the $55 million cash payment from the exit financing.

• The City will also distribute $17.3 million in Excess New B Notes to the holders of LTGO bond claims.

The plan classifies the LTGO bonds claims in Class 7. The recovery for class 7 is 41%. The class accepted the plan.

The Court's judgment is that the City had a substantial likelihood of prevailing in the LTGO litigation, perhaps a 75% chance. The 41% LTGO settlement is within the range of reasonable settlements. The Court approves it.

## THE COPS SETTLEMENT

The Court will now address the Syncora settlement and the FGIC and COPs settlement. Both of these are, in part, addressed in class 9 of the plan. Each Class 9 Claim holder will receive its pro rata share of almost $98 million in New B Notes, $88 million in New C Notes and $25

17

13-53846-tjt   Doc 10684-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 50 of 92
13-53846-tjt   Doc 10685   Filed 02/04/16   Entered 02/04/16 16:10:46   Page 50 of 92   309
215

million in Settlement Credits. The settlement credits may be used to offset up to 50% of the purchase price of certain eligible City assets.

## THE SYNCORA SETTLEMENT

Syncora and the City have settled their many disputes. The key points of this settlement are:

• As a settling Class 9 claim holder, Syncora will receive $23.5 million in New B Notes, $21.3 million in New C Notes, and $6.25 million in Class 9 Settlement Credits.

• The City will make an additional $5 million cash payment to Syncora.

• Syncora and the City will enter into a development agreement, under which a subsidiary of Syncora will be granted a five-year option to acquire and develop certain properties owned by the City.

• The development agreement will also include a one-year option for another subsidiary of Syncora to enter into a thirty-year concession at the Grand Circus Park parking garage. This agreement includes specified financial and capital expenditure requirements.

• The City will assume the Detroit Windsor Tunnel lease with a Syncora subsidiary and extend it to December 2040. This lease will be amended to include certain provisions and requirements for capital expenditures, and operating and financial reporting.

The settlement resolves Syncora's objections to confirmation as well as several appeals that Syncora had pursued relating to eligibility, the quality of life loan, mediation, and the casino revenue. The Syncora settlement also frees up $162 million in B notes for the LTGO, OPEB and general unsecured creditors.

18

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 51 of 92
13-53846-tjt   Doc 10665-1   Filed 12/04/15   Entered 12/04/15 16:40:46   Page 51 of 92   310
215

The development agreement is a substantial benefit to the City. James Doak, an expert from the Miller Buckfire firm that the City retained, testified that in his opinion, the business aspects of the Syncora settlement are a reasonable exercise of the City's business judgment and the Court credits that testimony.

Syncora's recovery is about 13% and is about the same as FGIC's settlement recovery, to be discussed next. The recovery for other unsecured creditors in class 14 is also similar. Accordingly, the Court readily finds that this settlement is reasonable and approves it.


## THE FGIC SETTLEMENT

The City, FGIC, which is the insurer of the COPs, and the COPs holders have also entered into a settlement agreement. The key points of this settlement are:

• FGIC will opt into the class 9 settlement and receive $74.2 million in New B Notes, $67.2 million in New C Notes, and $19.75 million in Class 9 Settlement Credits. FGIC and the COPs holders will divide the consideration provided under the Class 9 Settlement Option.

• FGIC and the City will also enter into a development agreement for the Joe Louis Arena site.

• To settle FGIC's claims against the City relating to the Swap Agreements, FGIC will have an Allowed Class 14 Claim of $6.11 million. In addition, the Downtown Development Authority will assign to FGIC its rights to its distribution of New B Notes under the plan of adjustment for its $33.6 million Class 13 claim. The City estimates that FGIC will receive approximately $4.5 million in New B Notes in settlement of its swap related claims.

This settlement resolves the objections to confirmation that FGIC and the COPs holders filed. These objections were substantial and were zealously litigated. It also resolves the COPs

19

invalidity litigation in which the City sought to invalidate its obligation to the COPs holders in the approximate amount of $1.5 billion dollars.

FGIC's recovery is 13%. The development agreement is of incalculable value to the City. The Court readily finds that this settlement is reasonable and approves it.

That concludes the Court's discussion of its approval of the settlements in the City's plan.

The Court will now address some of the other confirmation requirements that the plan must meet, including good faith, the best interests of creditors, and the reasonableness of attorney fees. The Court will then address the requirements that apply because two classes of creditors, classes 14 and 15 rejected the plan. These are whether the plan unfairly discriminates and whether the plan is fair and equitable. The Court will also briefly address the objections of certain creditors holding constitutional claims against the City. The Court will conclude with the feasibility requirement.

### GOOD FAITH

Section 1129(a)(3) requires the City to establish that it proposed its plan of adjustment in good faith. When the Court decided that the City was eligible to be in bankruptcy, the Court found that the City acted in good faith in seeking the relief that this Court can provide. The good faith inquiry at this stage is largely an extension of that inquiry. The Court again finds that the City has acted in good faith in proposing its plan of adjustment.

Specifically, the Court finds:

First, the City crafted and proposed the plan to achieve the objectives and purposes of chapter 9, that is, to adjust the City's debt to enable the City to provide adequate municipal services.

Second, the City filed its plan with honesty, good intentions, and the reasonable expectation that the plan is feasible.

Third, the process the City undertook to seek confirmation of the Plan was fundamentally fair to the City's creditors.

On the first and second points, the record demonstrates that the City has worked honestly, diligently, and tirelessly to accomplish precisely the remedy that the bankruptcy code establishes for municipalities—the necessary adjustment of the City's debt. The record also demonstrates that the City is committed to maintaining its debt at a level that it can manage in the long-term.

The testimony of several City representatives directly supports these findings. These include Emergency Manager Kevyn Orr, Mayor Mike Duggan, City Council President Brenda Jones, the City's Chief Financial Officer John Hill, the City's Chief Information Officer Beth Niblock, Police Chief James Craig, and Executive Fire Commissioner Edsel Jenkins.

Ron Bloom's testimony, however, was particularly compelling on this point, not only for what he said, but also because he testified as a representative of the retiree committee. He testified:

> But I think one of the things the City persuaded us over the course of the case was [that] they were sincere . . . we didn't like what they had to say often, but we felt that their commitment to revitalization was sincere. And when we saw evidence of that . . . for instance how they were treating the active workers, that was a positive sign that our long-term interest was going to be served and the revised promises we got would eventually be honored.

On the third point, the court finds that the strongest evidence that the City treated its creditors in a fundamentally fair way is the high level of creditor consensus supporting the plan.

The City's good faith in proposing this plan shines with the greatest brilliance in the grand bargain and in the settlements with Syncora, FGIC and the COPs holders. Those settlements are more than just creditor claim settlements. They create new ventures and relationships that enable

21

all of the stakeholders in the case to achieve their long-term missions and goals. This is an extraordinary accomplishment in bankruptcy and an ideal model for future municipal debt restructurings.

The City has proven that upon confirmation, it intends to implement its plan of adjustment. The City has also proven its commitment and ability to begin the challenging process of revitalization.

The Court finds that the City proposed its plan of adjustment in good faith.


## BEST INTERESTS OF CREDITORS

Section 943(b)(7) requires that the plan be in the best interests of creditors. The cases generally hold that in chapter 9, this means that the creditors will receive all that they can reasonably expect under the circumstances. The only legal alternative to plan confirmation is dismissal, because no other party can file a plan of adjustment and the liquidation of a municipality's assets is not permitted in chapter 9. Accordingly, the Court will also consider whether the plan is a better alternative for creditors than dismissal.

Under the plain language of section 943(b)(7), the issue is the best interests of creditors as a whole, not any particular creditor or class of creditors.

The Court finds that the plan is in the best interests of creditors.

Some creditors have argued that the City could pay more to creditors by raising taxes and by monetizing assets, specifically the art at the DIA.

No provision of law allows the creditors to access the DIA art to satisfy their claims, whether in bankruptcy or outside of bankruptcy. The market value of the art, therefore, is irrelevant in this case. A judgment creditor's sole remedy is a court-ordered property tax

22

assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

Some creditors argue that the best interest test in chapter 9 requires this Court's full consideration of all of the City's assets, including the art, even if the assets would not be accessible to unsecured creditors outside of bankruptcy.

The Court also rejects the argument. The legal limitations on the collection of judgments that apply outside of bankruptcy also constrain the best interests of creditors test in bankruptcy. Neither the bankruptcy code nor the case law suggests otherwise.

As noted, the City determined not to sell or monetize the DIA art in the art market. Under section 904, that decision is off-limits to this Court.

However, even if the law did give the Court some authority here, the Court would not have interfered with the City's decision. The City made the only appropriate decision. Maintaining the art at the DIA is critical to the feasibility of the City's plan of adjustment and to the City's future. The Court toured parts of the DIA and saw the art there, as well as how its many visitors were experiencing the art. It also accepts the testimony of Ms. Erickson on the priceless value that the DIA and the art creates for the City, the region and the state.

The evidence unequivocally establishes that the DIA stands at the center of the City as an invaluable beacon of culture, education for both children and adults, personal journey, creative outlet, family experience, worldwide visitor attraction, civic pride and energy, neighborhood and community cohesion, regional cooperation, social service, and economic development. Every great City in the world actively pursues these values. They are the values that Detroit must pursue to uplift, inspire and enrich its residents and its visitors. They are also the values that Detroit must pursue to compete in the national and global economy to attract new residents, visitors and

23

businesses. To sell the DIA art would only deepen Detroit's fiscal, economic and social problems. To sell the DIA art would be to forfeit Detroit's future. The City made the right decision.

The City also rejected the concept of using the art as a collateral for a loan to pay creditors, for two reasons. First, that proposal would just substitute debt for debt and would not help the City. Second, if the City defaulted, it might lose the art. The City made the right decision here too.

Beyond that, the record reflects that the City has made reasonable efforts to monetize other assets, including the Detroit Windsor Tunnel, certain real estate properties, certain parking properties, the Joe Louis arena property and certain other property that it no longer needs. It also entered into the Great Lakes Water Authority memorandum of understanding with Wayne, Oakland and Macomb Counties, which benefits all creditors. The Court finds that the City has made reasonable efforts to monetize its assets to satisfy the best interests of creditors test.

The evidence also establishes that raising taxes is not a viable option for the City. In the eligibility opinion, the Court found that the City cannot legally increase its tax rates. Mayor Duggan testified that the likelihood of the people of Detroit or the state legislature voting to raise taxes is remote.

Further, a property tax increase would produce very little additional revenue. The Mayor testified that taxes in Detroit are among the highest relative to surrounding communities and the city services are comparatively low. Kevyn Orr credibly testified that the City is at tax saturation and raising taxes would likely add to the population decline.

The evidence also establishes that the plan is a better, indeed much better, alternative for creditors than dismissal. Significant City obligations would become immediately due. As mentioned earlier, in that scenario, the creditors' only remedy is the property tax assessment

24

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 57 of 92
13-53846-tjt   Doc 10665-1   Filed 12/04/15   Entered 12/04/15 16:10:56   Page 57 of 316
215

remedy under the Revised Judicature Act. It is easy to foresee that a great number of creditors would race for that relief and the result would be chaos and an administrative nightmare for all involved. The City's reinvestment and revitalization initiatives would stall. The pension UAAL and OPEB claims in the billions of dollars would go unresolved.

There is no more money available for creditors in the City's already tight budget projections. The Court's feasibility expert so testified, as the Court will review here shortly. Every dollar is accounted for in providing necessary services, in implementing the City's necessary RRIs, and in repaying plan obligations. All of those cash uses are essential to the City's future.

Accordingly, the Court finds that the plan will provide creditors all that they can reasonably expect under the circumstances and that it is in their best interests.

## FEES

The Court will now discuss the issue of fees. As a condition of confirmation, section 943(b)(3) requires that "all amounts to be paid by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable."

On August 19, 2013, with the City's consent, the Court entered an order appointing a fee examiner and requiring him to act "to assure the Court, the City, the creditors, and the public that the City's Professional Fee Expenses are fully disclosed and are reasonable, as required by section 943(b)(3)." The fee examiner has filed quarterly reports that have fully disclosed the City's Professional Fee Expenses through June 2014.

Under the plan of adjustment, the process will continue as necessary to address fees incurred through the effective date of the plan.

Two issues are raised here:

13-53846-tjt    Doc 10644-1    Filed 02/04/16    Entered 02/04/16 16:12:25    Page 58 of 92
13-53846-tjt    Doc 10695    Filed 12/04/15    Entered 12/04/15 16:40:46    Page 58 of 92    317
215

(1) Does section 943(b)(3) require that all of the City's professional fees in the case be disclosed and reasonable or only fees that are unpaid as of confirmation?

(2) Should the Court accept, without further review, the fee examiner's findings that the fees have been reasonable?

The Court concludes that section 943(b)(3) does require that all of the City's professional fees in connection with the case be disclosed and reasonable. The Court further concludes that it is not appropriate to accept without further judicial review the fee examiner's findings that the fees have been reasonable.

The plain language of section 943(b)(3) requires only that fees "to be paid" must be reasonable. Yet, the Court cannot find any rational basis to distinguish between paid and unpaid fees in applying section 943(b)(3). It is an arbitrary line and may be subject to manipulation.

The Supreme Court's decision in *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.* is highly instructive on this question. In that case, the Court discussed at length the legal and equitable necessity for the bankruptcy court to review a municipality's professional fees. It is a lengthy passage but worth quoting, because it is powerful and will also be relevant to the discussion on the fair and equitable issue later. The Court will omit the case citations.

> A bankruptcy court is a court of equity and is guided by equitable doctrines and principles except in so far as they are inconsistent with the Act. * * * A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest.' These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization, and the obtaining of assents thereto.
>
> * * *
>
> Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special

26

benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. . . . That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy. The necessity for its exercise is based on the responsibility of the court before entering an order of confirmation to be satisfied that the plan in its practical incidence embodies a fair and equitable bargain openly arrived at and devoid of overreaching, however subtle.

In *City of Avon Park*, all of the professional fees at issue were unpaid upon confirmation. Nevertheless, the Supreme Court's mandate to review professional fees in a municipal case was not so spineless as to permit an exception for paid fees. Rather, the Supreme Court's mandate is imperative. This Court must abide it with the greatest consideration and care. This is particularly so in this case, because it appears that the fees will exceed $100 million.

Accordingly, the Court concludes that it has the obligation, as a condition of confirming the City's plan, to determine that the professional fees for which the City is obligated in connection with the case, whether paid or unpaid, are disclosed and reasonable.

The *City of Avon Park* case linked the bankruptcy court's obligation to review fees to its obligation to determine whether the plan is fair and equitable. Accordingly, the Court cannot outsource this responsibility to the fee examiner. It must make an independent determination that section 943(b)(3) is met.

The next question is how to review the fees in this case. In *In re Corcoran Hospital District*, the court found that the debtor could satisfy section 943(b)(3) through a post-confirmation process to review fees for reasonableness. This makes good sense in this case because the fees will continue to accrue post-confirmation.

27

Accordingly, to expedite confirmation, the Court will defer this issue. The Court will later request the assistance of counsel in establishing a mediation and litigation process for determining the disclosure and reasonableness of the fees for which the City is obligated.

There is another issue here that will have to be addressed. As noted, reasonableness of fees is a requirement for confirmation in chapter 9. This is unlike chapter 11 where objections to fees are not confirmation objections. The general deadline to object to the City's plan was May 12, 2014, and for bondholders and retirees it was July 11, 2014. As far as the Court can determine, only one party, David Sole, asserted an objection to the reasonableness of fees in this case.

So the issue becomes whether everyone else in the case has waived the issue. Within the next few days, the Court will establish a process to review fees, which it will do with the help of counsel. As part of that process, the Court will invite briefing on this waiver issue. In the meantime, until this process is established and the Court orders otherwise, the Court's order of October 31, 2014, prohibiting filing papers relating to the fee issue remains in effect.

Regardless however, the Court reaffirms that even if there has been such a waiver, the Court intends to fulfill its independent obligation to review the reasonableness and disclosure of fees.

### UNFAIR DISCRIMINATION

As noted, two classes of claims voted to reject the plan, class 14, the other unsecured claims, and class 15, the convenience claims under $25,000. Section 1129(b) allows the Court to confirm the plan despite those dissenting class votes with respect to those dissenting classes, "if the plan does not discriminate unfairly, and is fair and equitable." The Court will now address the unfair discrimination test and then the fair and equitable test next.

28

13-53846-tjt  Doc 10644-1  Filed 02/04/16  Entered 02/04/16 16:12:35  Page 61 of 92
13-53846-tjt  Doc 10605-1  Filed 12/04/15  Entered 12/04/15 16:40:46  Page 61 of 92
215
320

To analyze the unfair discrimination issue, the first step is to determine the recoveries for each unsecured class in the plan. The second step is to determine whether there is any discrimination against any of the rejecting classes. If so, the final step is to determine whether that discrimination is unfair.

Here, the recoveries for the rejecting classes are 13% for class 14, and 25% for class 15.

The next step is to identify any discrimination by identifying the classes of unsecured claims that have a higher recovery than the recoveries of the rejecting classes. It is readily apparent that the plan does discriminate in favor of class 7, the LTGO claims with a 41% recovery, class 8, the UTGO claims with a 74% recovery, and class 17, the 36th District Court claims with 33% recovery.

Calculating a percentage recovery for pension claims in classes 10 and 11 is complex.

The City's disclosure statement, which the Court approved, stated that the recoveries are 59% for PFRS and 60% for GRS. Based on a number of complex arguments, the City now asserts that the true recovery percentages are much lower and that there is no discrimination in favor of the pension class 10 and 11.

Fortunately, the Court does not need to resolve the difficult issues raised here. The Court concludes that even if the pension classes' recoveries are what the disclosure statement declares, the resulting discrimination against the unsecured and convenience classes is not unfair.

In connection with this final step, the Court must determine the meaning of the phrase unfair discrimination in section 1129(b).

The Court concludes that fairness and unfairness are matters of conscience and that determining fairness is a matter of relying upon the judgment of conscience. Whether

discrimination in a plan of adjustment is unfair is a question that requires a court to focus on the judgment of its conscience regarding that discrimination.

Several factors naturally inform this judgment. These factors include the circumstances in the case that bear upon the fairness of the discrimination in light of the purpose of chapter 9, which is to adjust an insolvent municipality's debt so that it can provide adequate municipal services. These factors also naturally include the Court's experience, education and sense of morality.

That is what this Court meant in its eligibility opinion when it addressed the potential for the impairment of pension rights in the City's plan. It stated that when considering any such impairment, the bankruptcy code demands "this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan."

The Court concludes that Congress intended this approach to unfair discrimination. Congress certainly could have established in section 1129(b) a more specific standard to determine unfair discrimination, including any of the more specific standards adopted in the case law. The sole statutory test, however, is whether the discrimination is unfair.

The Court will first address the fairness of the discrimination in the plan in favor of the pension classes. Then it will discuss the fairness of the discrimination in favor of the UTGO, LTGO and 36th District Court classes.

The Court finds that the City has demonstrated a substantial mission-related justification to propose a higher recovery to its pension claimants. The City is a municipal service enterprise. Viewed broadly, its mission is to provide municipal services to its residents and visitors to promote their health, welfare and safety. Its employees and retirees are and were the backbone of the structures by which the City fulfills its mission. The City, therefore, has a strong interest in

30

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:10:25   Page 63 of 92
13-53846-tjt   Doc 10695   Filed 12/04/15   Entered 12/04/15 16:42:06   Page 63 of 91   322
215

preserving its relationships with its employees and in enhancing their motivation, consistent with its financial resources. The City has reasonably and properly concluded that its discrimination in favor of the pension claims in its plan is necessary to its mission.

In contrast, the City has no similar mission-related investment in its relationships with its other unsecured creditors in classes 14 and 15.

Second, the City is an agency of the State of Michigan. Its existence, its mission, and its means of fulfilling that mission are all subject to the provisions of the constitution and laws of the State of Michigan. Among these provisions is article 9, section 24 of the Michigan constitution, which singles out municipal pension claims for special protection:

In the Court's eligibility opinion, it held that because of the Supremacy Clause of the United States constitution, this specific protection of the state constitution is not entitled to vindication in a federal bankruptcy proceeding. Nevertheless, that provision of the Michigan constitution does express the considered judgment of the people of the State of Michigan. The Court concludes that in determining the fairness of the discrimination against unsecured claims proposed in the City's plan, this judgment of the people of the State of Michigan is entitled to substantial deference.

Another consideration that appeals to the Court's conscience is the reasonable expectation of the parties. Generally, unsecured creditors reasonably expect similar treatment in bankruptcy. The difference here, however, is that the Michigan constitution gives notice to all of the unsecured creditors of a municipality that the rights of pension creditors are distinct, even if their pension claims are unsecured. That constitutional notice reasonably justifies the enhanced expectations of the pension creditors in this case. At the same time, that notice should also lower the reasonable expectations of the other unsecured creditors in the case.

31

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 64 of 92
13-53846-tjt   Doc 10665-1   Filed 12/04/15   Entered 12/04/15 16:40:46   Page 64 of 92   323
215

A final consideration also suggests that this discrimination is not unfair. The Court has already observed here that the City's plan is largely a collection of interconnected settlements. Mr. Montgomery, counsel for the retiree committee, astutely argued that if each of the settlements in the plan is reasonable, then the resulting discrimination in the plan must be fair.

The Court agrees. The factors that inform the reasonableness of each individual settlement are the same factors that inform the Court's judgment about whether the resulting discrimination is fair.

Here, the classes that did not settle instead rejected the plan are two classes of general unsecured claims. There is, however, nothing about those claims that warrants any favorable consideration in the Court's unfair discrimination analysis.

In the Court's judgment, therefore, the discrimination in the City's plan of adjustment in favor of the pension creditors is not unfair.

The Court comes to the same conclusion about the discrimination in the plan in favor of the UTGO, LTGO and 36th District Court classes. The Court has already found that these settlements are reasonable settlements. They fairly and reasonably reflect the strengths and weakness of the creditors' claims and the City's defenses, the complexity and expense of possible litigation, and collectability issues. These considerations also justify discriminating in their favor and against the other unsecured claims and the convenience claims.

The Court only adds that the City also has a mission related reason to favor the 36th District Court claim due to its continuing legal and funding relationship with that court.

Accordingly, the Court finds that the City's plan does not unfairly discriminate against the two rejecting unsecured classes, 14 and 15.

32

13-53846-tjt   Doc 10645-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 65 of 92
13-53846-tjt   Doc 10644-1   Filed 12/04/15   Entered 12/04/15 16:40:46   Page 65 of 92   324
215

## FAIR AND EQUITABLE

The Court will now discuss whether the plan is fair and equitable to dissenting classes 14 and 15.

To properly determine the meaning of this test, it is important to understand its effect. In practical consequence, the law allows the judge, who has no stake in the outcome of the plan, to substitute his or her judgment about the fairness and equity of the plan for the judgment of the creditors, who have every stake in the outcome. Ultimately, the issue is whether the Court should force a debt adjustment on unwilling creditors. We colloquially call this cramdown. That is the power that the City requests this Court to exercise here.

The language fair and equitable suggests the same kind of process of adjudication that the Court just discussed for the unfair discrimination test. Indeed, the words of these two requirements overlap somewhat, but the fair and equitable test has a broader focus, as the Court will discuss in a moment.

In *American United Mutual Life Insurance Co. v. City of Avon Park, Fla.*, which the Court discussed earlier, the Supreme Court reviewed at length the bankruptcy court's role in determining whether a chapter 9 plan is fair and equitable.

The Court concludes that under *City of Avon Park*, the City's plan is fair and equitable as to dissenting classes 14 and 15. That case first mandates this Court to investigate whether there is evidence of any misconduct that would require the court's remedy as a condition of confirmation, or whether the City or any class of creditors has committed any overreaching. The Court readily finds that there is no such evidence in this case.

33

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:10:25   Page 66 of 92
13-53846-tjt   Doc 10685-1   Filed 12/04/15   Entered 12/04/15 16:40:56   Page 66 of 91   325
215

But under the *City of Avon Park* case, overriding the dissenting creditors' judgment about a plan of adjustment requires more than just the absence of misconduct. It must also mean something more than what all of the other confirmation requirement mean.

The Court concludes that the fair and equitable requirement asks this question: Are there circumstances in the case that suggest to the Court's conscience that it is fair and equitable to impose the plan on the dissenting creditors against their stated will?

The Court finds that that there are such circumstances in this case.

First, it is appropriate to look at exactly how this class reacted to this plan. Very few of the creditors in classes 14 and 15 filed objections to the plan. Although the classes did vote to reject the plan, the margins were small. In class 14, the margin was slim—51% rejecting, 49% accepting. In class 15, it was a bit more significant—58% rejecting, 42% accepting.

The numbers behind those percentages tell a story here too. The actual vote in class 14 was 97 rejecting, 93 accepting. This means that if 3 rejecting votes had gone the other way, the necessary majority in number would have been achieved. The actual vote in class 15 was 189 rejecting and 153 accepting. That means that if 19 rejecting creditors in this class had accepted, the necessary majority would have been reached.

These circumstances raise this question: Is it fair and equitable to confirm this plan over the dissent of literally a handful of unsecured creditors, most of whom have claims under $25,000, when thousands of creditors with claims in the billions of dollars support the plan? To the Court's conscience, this is fair and equitable and the Court so finds.

The Court accepts the likelihood that the dividend to the creditors in classes 14 and 15 will cause those creditors real hardship. But the Court must analyze and balance the hardship on the other side too.

34

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 67 of 92
13-53846-tjt   Doc 10655   Filed 12/04/15   Entered 12/04/15 16:40:36   Page 67 of 91   326
215

A large number of people in this City are suffering hardship because of what we have antiseptically called service delivery insolvency. What this means is that the City is unable to provide basic municipal services such as police, fire and EMS services to protect the health and safety of the people here. Detroit's inability to provide adequate municipal services runs deep and has for years. It is inhumane and intolerable, and it must be fixed. This plan can fix these problems and the City is committed to it. So if to fix this problem, the Court must require these few creditors that rejected the plan to nevertheless share in the sacrifice that the other creditors have agreed to endure, then so be it.

There is really no choice here. There are no viable alternatives to this plan that will solve the City's problems and at the same time pay more to classes 14 and 15 to get their support.

To revitalize itself for the good of all, the City and its people desperately need the shared sacrifice that this plan will impose on all of its creditors, even these few rejecting creditors, and the City and its people need it now.

Accordingly, the Court concludes that it should exercise its power under the bankruptcy code to impose the plan of adjustment on classes 14 and 15 despite their dissenting votes. The Court finds that the plan is fair and equitable as to them.

## THE CONSTITUTIONAL CLAIMS AGAINST THE CITY

The Court will now state its resolution of the objections that creditors with constitutional claims against the City filed. The written opinion will explain in depth the Court's reasons for these conclusions.

The Court first concludes that the Fourteenth Amendment does not provide a constitutional right to damages for a constitutional violation. Accordingly, the Court overrules the claimants' objection that chapter 9 cannot provide for the discharge of a claim under 42 U.S.C section 1983.

The Court further concludes that section 1983 claims against individuals in their personal capacity are not claims against the City. Accordingly, the bankruptcy code does not permit a chapter 9 plan to treat those claims, nor does it provide for their discharge.

If a collective bargaining agreement or other contract obligates the City to defend and indemnify its officers on these claims in their personal capacity and that contract is assumed in this bankruptcy, then that contractual obligation survives the discharge and remains fully enforceable post-confirmation. Otherwise, the City's contractual indemnification obligation is discharged in this bankruptcy.

To the extent that the City seeks to release its officers from liability under the standards in the *Dow Corning* case, the Court denies that. The City certainly has a strong interest in the efficient and effective functioning of the police department. The Court accepts that protecting its officers from personal liability for section 1983 claims is necessary to that mission. However, the record is barren of any evidence suggesting that the contractual indemnity obligations that the City is assuming are inadequate to accomplish that purpose. A third party release would deny injured parties their just relief. There is no evidence that the protection of a third party release for these officers, in addition to their indemnity, is also necessary for the proper functioning of the police department.

Finally, the Court concludes that the Fifth Amendment does establish a right to just compensation when a municipality takes private property for public use. Chapter 9 would violate

36

13-53846-tjt    Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 69 of 92
215
13-53846-tjt    Doc 10685-1   Filed 12/04/15   Entered 12/04/15 16:12:25   Page 69 of 92    328

the Fifth Amendment if its application in this case would result in less than just compensation to these objecting claimants. There is, however, a ready solution.

Section 944(c)(1) gives the Court the discretion to exempt debts from discharge in the confirmation order. At the suggestion of the Attorney General, to avoid any issue as to the constitutionality of chapter 9 in this respect, the Court will use its authority under section 944(c)(1) to order that the objecting parties' Takings Clause claims are exempt from discharge. This ruling eliminates any constitutional grounds to deny confirmation of the City's plan of adjustment.

These rulings will be reflected in the order confirming the plan.

## THE EXIT FINANCING

The Court will now address the City's request for approval of its exit financing. No party has objected to the exit financing.

The City requests the authority to borrow up to $325 million as part of its exit from bankruptcy. The City has recently stated, however, the intent to borrow only $275 million. The loan agreement requires an escrow reserve of $27.5 million. Barclays Capital, the issuer, will hold the notes, but they will be sold or refinanced in the municipal bond market within 150 days. The notes are secured by the City's revenue from its income tax, which reduces its interest cost slightly. This security interest may, however, impair the City's ability to access the municipal bond market, should the need arise.

From these loan proceeds, the City will use $120 million for the postpetition loan, $45 million for the outstanding SWAPs settlement obligation, and $55 million of the outstanding LTGO obligation. The balance will be used to begin to fund the restructuring and reinvestment

37

13-53846-tjt   Doc 10644-1   Filed 02/04/16   Entered 02/04/16 16:12:25   Page 70 of 92
13-53846-tjt   Doc 10695-1   Filed 12/04/15   Entered 12/04/15 16:10:46   Page 70 of 92   329
215

initiatives. As the Court will address in a moment, These RRIs are critically important to the feasibility of the plan and to the City's future.

The borrowing was approved by City Council, the Michigan Finance Authority and the Local Emergency Financial Assistance Loan Board.

The Court finds that both the terms of the financing and the uses of the loan proceeds are reasonable. The lender is acting in good faith. Accordingly, the financing meets the requirements of the bankruptcy code. The Court approves it.

<h3 style="text-align:center">FEASIBILITY</h3>

The Court will now address feasibility.

The Court appointed an expert, Martha E.M. Kopacz, on the issue of feasibility. Ms. Kopacz submitted a report and two supplements. She also testified regarding her observations, conclusions and recommendations.

The GRS filed two related motion to exclude portions of Ms. Kopacz's testimony and to preclude her evidence relating to alleged historical mismanagement and misconduct by the GRS and the PFRS. For reasons that the Court will explain in its written opinion, both motions are denied.

The Court finds that Ms. Kopacz's reports and testimony are fully credible and it accepts and adopts her findings, with the minor exception of her conclusion about the Court's pacing of this case.

Ms. Kopacz adopted this test for feasibility in this case:

> Is it likely that the City of Detroit, after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations

38

13-53846-tjt   Doc 10644-1  Filed 02/04/16   Entered 02/04/16 16:12:25   Page 71 of 92
13-53846-tjt   Doc 10685   Filed 12/04/15   Entered 12/04/15 16:40:46   Page 71 of 92   330
215

contemplated in the Plan without the significant probability of a default?

The Court concludes that this standard is the appropriate standard for determining feasibility under section 943(b)(7). Accordingly, the Court adopts it.

Her opinion is that the City's plan is feasible, as required by section 943(b)(7), and that the assumptions that underlie the City's plan of adjustment projections regarding its revenues, expenses and plan payments are reasonable.

In Ms. Kopacz's initial report, she concludes:

> The POA and the projections that support the POA are designed to allow the City to continue to improve its level of service to the citizens of Detroit. I believe that the RRIs are reasonable and well considered. If executed, they will allow the City to deliver essential services. It is my opinion that the City is beginning to emerge from the service delivery insolvency referenced in Judge Rhodes' opinion concerning eligibility.

In her second supplemental report, she concludes:

> My opinion, based on the information provided to me and my team and certain testimony during the Confirmation Trial, is the current projections are within the range of reasonableness and the Plan of Adjustment remains feasible.

Ms. Kopacz did add this caution in her second supplemental report:

> I want to emphasize, however, that there is little space remaining on the continuum of reasonableness. The recent settlements and corresponding amendments to the Plan of Adjustment have served the laudable goals of efficiently resolving disputes and garnering additional support for the Plan of Adjustment. Conversely, they have imposed additional financial obligations on the City. I have already expressed concerns regarding the level of contingency provided for in the Plan of Adjustment. The financial obligations associated with the recent settlements only intensify this concern. While my opinion is the Plan of Adjustment remains feasible and there is not yet a significant probability of default as described in the Standard, there is no denying the possibility of default has increased.

39

It is not realistic or prudent to believe that the City could take on any additional Plan obligations and remain within the continuum of reasonableness necessary to establish feasibility.

Ms. Kopacz's testimony was to the same effect.

Her conclusions regarding the feasibility of the plan were corroborated by the testimony from Gaurav Malhotra, Robert Cline, Caroline Sallee, John Hill, Charles Moore, Kevyn Orr, Council President Jones, and Mayor Duggan.

In this case, the evidence establishes that there are three components to the feasibility of the plan and to the ultimate success of the City of Detroit. They are (1) a workable long-term financial plan, (2) the human and capital resources to execute the plan, and (3) the commitment to implement the plan.

The emergency manager and his team, working in conjunction with the Mayor and his team, have created a workable plan for this City. It will be for the City Council, the Mayor and his administration to implement the plan. The Mayor testified that he and his team are fully committed to implementing the plan and Council President Jones testified that the plan has the support of the City Council. The Court fully credits that testimony.

The Court finds further support for the feasibility of the plan in the establishment of the Financial Review Commission under PA 181 of 2014. The Act gives the Commission the responsibility to insure that the City complies with the plan of adjustment. It also gives the Commission a broad array of responsibilities and tools to oversee the City's fiscal integrity. For example, the Commission has the authority to review and approve the City's 4-year financial plans, contracts over $750,000, and all collective bargaining agreements. It also appears to give oversight responsibility for the City's pension funding obligations.

40

It cannot be emphasized enough that the long-term feasibility of the plan of adjustment will depend on the effectiveness of the Financial Review Commission. This is a matter of extraordinary weight and responsibility. It will certainly require substantial budget resources and skilled staffing. The Court is satisfied that the state will provide the Commission with adequate resources to meet its responsibilities.

In conclusion, therefore, the Court finds that it is likely that the City of Detroit, after the confirmation of the plan of adjustment, will be able to sustainably provide basic municipal services to the citizens of Detroit and to meet the obligations contemplated in the Plan without the significant probability of a default. Accordingly, the Court finds that the City's plan of adjustment is feasible.

It appears that Ms. Kopacz's greatest concern for the feasibility of this plan and for the future of the City arises from the risks that the City retains relating to pension funding.

Ms. Kopacz states in her report, "The City must be continually mindful that a root cause of the financial troubles it now experiences is the failure to properly address future pension obligations."

The Court shares that concern. What happened in Detroit must never happen again. The hardship and anxiety that its employees and retirees, and their families, have endured and will continue to endure must never happen again. This must never be repeated anywhere in this state.

Therefore, the Court's confirmation of this plan comes with three further appeals.

The first is to the City's labor unions and retiree associations. In his closing argument, Mr. Bennett, the City's attorney, perceptively asserted that the goal of protecting municipal pensions, and in this country, requires municipal labor to enhance its vigilance of municipal pension funding. He also implored labor to use its relationships with the municipal leadership to achieve that goal.

41

The Court agrees. It would only additionally ask labor to consider whether this goal of protecting municipal pensions in this City, and indeed the broader goal of revitalizing the City, suggests that it should take a much longer and broader view of the best interests of its members and retirees.

The second appeal is to the State of Michigan. The Revised Municipal Finance Act unequivocally states that the Michigan Department of Treasury is "directed to protect the credit of this state and its municipalities." Michigan Compiled Laws 141.2201. The argument is powerful that this provision of state law, together with the constitutional prohibition on impairing municipal pensions and the constitutional mandate on pension funding, requires the state to take full responsibility to vigorously supervise and regulate its municipalities to assure adequate pension funding. The Michigan constitution does not single out the obligations of municipal bonds for protection in the same way it protects pension rights. Bond obligations can no longer be the only first-budget municipal obligations.

Moreover, the constitutional protection for municipal pensions can only be realized through honest, complete and realistic accounting and actuarial disclosures. Ms. Kopacz made several specific and worthy recommendations that the City, the pension plans, the Financial Review Commission and the state should seriously consider adopting and implementing.

The municipal employees and retirees of this state need and deserve the state's robust commitment to that obligation. The Court found here today that the state's contribution of $195 million in exchange for a release of liability on the pensioner's constitutional claim is a reasonable settlement. History will judge the correctness of this finding, and it will judge that this finding was correct only if what happened to Detroit never happens again. The State of Michigan can sustain that finding in history only by fulfilling its constitutional, legal and moral obligation to

42

assure that the municipalities in this state adequately fund their pension obligation. If the state fails, history will judge that this Court's approval of that settlement was a massive mistake.

The third appeal is directly to the governor. It relates to the composition of the Financial Review Commission. The Court has found that the responsibilities that PA 181 imposes on the Commission will contribute to the feasibility of the plan.

But the law by itself is not enough. The effectiveness of the Commission in ensuring the long-term feasibility of the plan and the City's fiscal health will require that its members have the skills, standing, experience, expertise, independence, and commitment that are the most outstanding that can be found, and beyond question. This would be so under any circumstances, but one particular circumstance makes this concern even more compelling.

In Public Act 181, the Michigan legislature chose to include on the nine-member commission two elected City of Detroit officeholders. At the commission level, therefore, the mayor and the council president will advocate the City's position, not provide oversight of it. That means that realistically, only seven of its nine members are truly independent. It also means that only the seven independent members of the commission will carry out the oversight function that the legislation contemplates.

This is a major problem. Because the commission acts by majority vote, it will take a super-majority vote of the independent members, 5 of the 7, to disapprove or reject any action that the City proposes for approval by the commission under the law. It is a plain conflict of interest for the mayor and the council president to have a vote. It both skews the commission's voting and risks undermining the commission's effectiveness in ensuring the implementation of the plan and the City's fiscal health and integrity. Equally importantly, it also risks undermining the public's perception of the legitimacy and independence of the commission.

43

13-53846-tjt  Doc 10644-1  Filed 02/04/16  Entered 02/04/16 16:12:25  Page 76 of 92
13-53846-tjt  Doc 10665-1  Filed 12/04/15  Entered 12/04/15 16:40:06  Page 76 of 92   335
215

The Court believes that this problem requires that the governor appoint members of the commission who are fully willing and able to exercise the independent, skilled and experienced judgment that PA 181 contemplates. The Court therefore appeals to the governor to appoint commission members with these qualities.

That concludes the Court's decision confirming the City's plan.


## CONCLUSION

This comes with thanks to many people.

First, deeply felt thanks also to Chief Judge Rosen for his work as the mediator in the case. Deeply felt thanks also to each of the mediators on his team—Judge Roberts, Judge Cox, Judge Lawson, Judge Daniels, Judge Perris, Eugene Driker, and David Coar. These words of thanks cannot begin to express the depth of gratitude that I, and all of the parties and attorneys, feel about what Chief Judge Rosen and his mediation team put into this case—the work, the time, the creativity, the commitment, the nights, the weekends, and the holidays.

Thanks also to Prof. Gina Torielli. She enthusiastically served as the mediators' consultant on municipal bond issues. Her assistance was invaluable.

The settlements that the mediators assembled in this case are extraordinary and unprecedented. Never before have bankruptcy mediators proactively sought to marshal the community's financial resources to solve a community problem. Most importantly, they knew that their work was not simply about resolving a bankruptcy case. It was about fixing a broken city. Where would this case be without them?

44

I have said publicly and repeat now that the smartest thing I did in this case was to ask Judge Rosen to be the mediator. I don't know if he agrees with that. I do think that he would agree that the smartest thing he did as the mediator was to assemble his team.

One of the unforeseen but fortuitous consequences of this case has been the development of a true partnership between the bankruptcy court and the district court. This partnership was essential to the efficient and expeditious resolution of this case and, arguably, to the very future of the City of Detroit. Thanks to the Chief for having the wisdom, foresight and willingness to engage in it with us. I hope this partnership endures.

Thanks also to Judge Rosen, to the entire district court, and to Dave Weaver and his staff for their amazing and gracious hospitality.

Thanks also to Katherine Gullo, the bankruptcy clerk, and to her staff for their wonderful support in this case.

On behalf of the parties in the case, thanks also must go to the foundations and to the DIA for their generous and unprecedented charitable commitments in this case. It is unimaginable what the resolution of this case would have looked like without them.

Profound thanks to the attorneys and the other professionals in the case. You conducted yourselves with the highest degree of civility, respect, and professionalism, both to each other and to the Court. At the same time, you also demonstrated zealous advocacy as well as loyalty to your oaths and to your clients. Your work in this case is a model of the public service role that lawyers and the legal profession perform in our society. It has made me proud to be a part of the judicial process and of legal profession, and you should each share in that pride.

Also, on a more personal level, you made my job manageable. Even fun sometimes. Thanks for that.

45

13-53846-tjt    Doc 10644-1  Filed 02/04/16   Entered 02/04/16 16:12:25   Page 78 of 91
13-53846-tjt    Doc 10685-1  Filed 12/04/18   Entered 12/04/18 16:10:06   Page 78 of 92    337
215

Here I want to single out Kevyn Orr for special recognition and appreciation. His task was perhaps the most challenging of all of us. Yet he met that challenge with skill, determination and commitment, and at great personal sacrifice. I hope that someday soon, this City will recognize the singular contribution that he made to its fresh start and give him the credit that he truly deserves.

Thanks also to Dick Ravitch, my consultant on feasibility. His commitment, knowledge, wisdom, expertise, and spirit of public service were remarkable and helped me to more fully understand this case. I hope a way is found for him to contribute to fiscal health and revitalization of this City. He would be a valuable resource in any capacity.

Thanks to Marti Kopacz and her team. Under extraordinary time pressure, she and they performed remarkable service for me with grace and professionalism.

Thanks to Bob Fishman, my fee examiner, and his staff, for their skilled assistance on the delicate responsibility that they took on and embraced.

Finally, this case proves that it takes a team. So I want to thank and gush about my team— Caroline Fayz, Kelli Dexter, Chris Sikula, Ryan Hamstead, Cindy Person and Alesia Dobbins. You are simply the best. Thank you.

We have talked a lot in this case about how a chapter 9 case is so different from all the other types of bankruptcy cases. It is, but only around the edges. In fundament ways, the Detroit bankruptcy case is just like every one of the other 30,609 bankruptcy cases that were filed in our court in 2013. In every case, we have a debtor who needs help, who made mistakes, who took unwarranted risks, who accepted bad advice, who exercised bad judgment, who was too long in denial, or who had just plain bad luck. But no matter, our society holds dear the value of a fresh start and of second chances. That value is manifested with brilliant clarity in our bankruptcy laws.

And that value is manifested the same in this $18 billion case as it was in the no asset chapter 7 cases that were filed just before and just after this case on July 18, 2013.

To the current leadership of the City, you are about to get your City back from us in the bankruptcy world. We give it back to you with the fresh start that this City needs and deserves under our federal bankruptcy laws. We hope we helped. It is now on you to implement this plan. I have found that you will do that. Please make me right. It is in the City's best interest. The City's true and full fresh start depends on it.

Before I conclude, I want to address the people of the City of Detroit, whose passion for this City is remarkable in its breadth, in its expression, and in its unwavering endurance. I just said that your leaders are about to get the City back. Actually of course, it is you who are about to get your City back. It is your City.

A large number of you told me that you were angry that your City was taken away from you and put into bankruptcy. You told me in your court papers. You told me in your statements in court. You told me in your blogs, letters, and protests. I heard you.

I urge you now not to forget your anger. Your enduring and collective memory of what happened here, and your memory of your anger about it, will be exactly what will prevent this from ever happening again. It must never happen again.

When Fredia Butler testified during the confirmation hearing, she quoted the great wisdom of Marian Wright Edelman, who said, "Democracy is not a spectator sport." And so I ask you, for the good of the City's fresh start, to move past your anger. Move past it and join in the work that is necessary to fix this City. Help your City leaders do that. It is your City.

This leads to my final thought. We have used the phrase, the grand bargain, to describe the group of agreements that will fix the City's pension problem. That description is entirely fitting.

In our nation, we join together in the promise and in the ideal of a much grander bargain. It is the bargain by which we interact with each other and with our government, all for the common good. That grander bargain, enshrined in our constitution, is democracy.

It is now time to restore democracy to the people of the City of Detroit.

I urge you to participate in it. And I hope that you will soon realize its full potential.

13-53846-tjt   Doc 10664-1   Filed 02/19/16   Entered 02/19/16 12:25:13   Page 81 of 92
13-53846-tjt   Doc 10665   Filed 12/04/15   Entered 12/04/15 16:40:46   Page 81 of 92
215
340

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In Re:

CITY OF DETROIT, MICHIGAN,

      Debtor,

Chapter 9

Case #: 13-53846

Hon. Thomas J. Tucker

_____/

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 4, 2015, he caused a copy of the foregoing: **RESPONSE TO CITY OF DETROIT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT AND ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS AGAINST GREGORY PHILLIPS AND/OR DOMINIQUE MCCARTHA AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS, DECEASED [D/E #10272]** to be served upon counsel via first class United States Mail as follows:

Marc N. Swanson
Miller, Canfield, Paddock & Stone, PLC
150 W. Jefferson, Suite 2500
Detroit, MI 48226

Dated: December 4, 2015

BY: _____
SHAWN C. CABOT (P64021)
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
shawn.cabot@cjtrainor.com

FILED

2015 DEC -4 P 3 40

U.S. BANKRUPTCY
E.D. MICHIGAN-DETROIT

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S REPLY TO THE RESPONSE OF DOMINIQUE McCARTHA, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS [DOC NO. 10685]

<table>
<tr><td>

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

</td><td>

CITY OF DETROIT LAW DEPARTMENT

Charles N. Raimi (P29746)
James Noseda (P52563)
Jerry L. Ashford (P47402)
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
Phone - (313) 237-5037/
Email - raimic@detroitmi.gov

</td></tr>
</table>

The chronology of events is important. Plaintiff appends papers for a facilitation that took place in **June 2013** – **prior to** the City's bankruptcy filing. [Doc. No. 10685 at pages 21-30 of 82]. The parties next discussed settlement in **April 2014**, after this Court had issued its ADR order designed to facilitate prompt settlement of claims. [Doc. No. 2302]. At that time, the current versions of the plan contained language enjoining 42 U.S.C. § 1983 claims against police officers. [Doc. Nos. 3380 & 4140].[1] Claimants did not file any objections attempting to contest this injunction until approximately June 2014. Thus, the City did not, and could not possibly have, provided information about such objections because they had not yet been filed.

The case did not settle at the April 2014 facilitation, but the City gave Plaintiff's counsel the proposed ADR settlement agreement providing for a $25,000 convenience claim. There were no further discussions; rather, in September 2014, some 6 months later, Plaintiff's counsel sent back the executed ADR agreement. Obviously, the City played no part in Plaintiff's decision to execute the settlement papers.[2]

## I.    Plaintiff Released His Claims Against Defendant Ian Severy

Plaintiff first argues that the "Release makes it appear that any claims potentially being resolved would be for the City of Detroit only, since it was only the City of Detroit, who was a Defendant in the federal court 42 U.S.C. § civil rights lawsuit case, that was in bankruptcy." This argument is directly contradicted by the Settlement Agreement's release provision which states that "As used in this Agreement, the Claimant and the City include each of their respective

---

[1] Holders of Indirect Employee Indemnity Claims were enjoined from pursuing such claims pursuant to the Injunction provision in the Amended Plan and the Second Amended Plan. [Doc. No. 3380 at page 46 of 235; Doc. No. 4140 at page 46 of 301].
[2] At the April 2014 facilitation, Plaintiff's counsel was advised that the Detroit Police Department had located the gun that Mr. Phillips claimed in his lawsuit not to have. That fact made Plaintiff's claim largely worthless.

- 1 -

25767416.4\022765-00213
13-53846-tjt   Doc 11472-1   Filed 08/19/16   Entered 08/19/16 12:25:13   Page 84 of
13-53846-tjt   Doc 10723   Filed 02/03/16   Entered 02/03/16 18:41:31   Page 2 of
215
343

servants, agents, contractors, attorneys, **employees,** representatives..." Settlement Agreement ¶ 8

(emphasis added). [Doc. No. 10272 at p. 58]. Plaintiff clearly released his claims against Severy.

## II. The Settlement Agreement Should be Enforced

### A. Courts Favor Compromises of Disputes

Courts "favor compromises of disputes, and where a settlement is once shown, every

presumption is indulged in favor of its fairness, correctness and validity generally, and the

burden of proving a basis for avoidance thereof is on the party seeking such avoidance." *General*

*Discount Corp. v. Schram*, 47 F. Supp. 845, 849 (E.D. Mich. 1942). *See also Aro Corp. v. Allied*

*Wittan Co.*, 531 F.2d 1368, 1371-72 (6th Cir. 1976) (holding that the lower court "had not only

the inherent power but, when required in the interests of justice, the duty to enforce the

agreement which had settled the dispute pending before it.").

### B. Plaintiff Has Not Provided Any Basis to Avoid the Settlement Agreement

#### 1. Timing and Amount of Payment Prescribed by Plan

Plaintiff argues against enforcement of the Settlement Agreement because she did not

know "when the proceeds would be paid and/or how much exactly would be paid for the

'unsecured claim.'" Response at 2. Again, the plain language of the Settlement Agreement

refutes Plaintiff's argument: "The Parties agree that any Settled Claim is a general unsecured,

nonpriority claim, subject to the treatment provided for such claims under any chapter 9 plan for

the adjustment of debts confirmed by the Bankruptcy Court (a "Plan")." Settlement Agreement ¶

5. Plaintiff thus recognized and agreed that the timing and the amount of the payment would be

prescribed by any confirmed chapter 9 plan.

Further, ten days before the Plaintiff signed the Settlement Agreement, the City filed its

Seventh Amended Plan for the Adjustment of Debts of the City of Detroit (September 16, 2014)

[Doc. No. 7502] ("Seventh Amended Plan"). The Seventh Amended Plan and the confirmed

- 2 -

Eighth Amended Plan treat Convenience Claims[3] (such as Plaintiff's) exactly the same -- cash in the amount of $6,250.00 to be paid on or as soon as reasonably practicable after the Effective Date.[4]  The Seventh Amended Plan was a public record, available free of charge to Plaintiff, that specified the timing and amount of payment to Plaintiff and such treatment is identical under the confirmed Eighth Amended Plan.

**2.      The dispute over the ultimate treatment of 42 U.S.C § 1983 claims was a matter of public record when Plaintiff signed the settlement – the City had no better knowledge how such claims would ultimately be treated than did anyone else.  Accordingly, Plaintiff cannot avoid the settlement by arguing "no meeting of the minds" or "fraud."**

Plaintiff argues that there was no meeting of the minds because the "City of Detroit was well aware of the possibility that lawsuits filed under 42 U.S.C. § 1983 would not even be subject to the bankruptcy proceedings. This was NEVER conveyed to Respondent, but instead was concealed ...." Response at 2.  Those allegations are false.  In April 2014, the City did not, and could not possibly have, advised Plaintiff  because there was nothing to tell, and there were no further discussions.

 However, at the time Plaintiff signed the settlement in September 2014, the public record contained (1) the most recent proposed plan of adjustment, under which 42 U.S.C. § 1983 claims against police officers were enjoined, and (2) voluminous filings by plaintiffs' lawyers arguing that 42 U.S.C. § 1983 claims against police officers should be able to proceed notwithstanding

---

[3] The term "Convenience Claim" is defined to mean "a Claim that would otherwise be an Other Unsecured Claim that is (a) an Allowed Claim in an amount less than or equal to $25,000.00; or (b) in an amount that has been reduced to $25,000.00 pursuant to an election made by the Holder of such Claim…" Seventh Amended Plan, Article I.A.76, page 14 of 82; Eighth Amended Plan, Article I.A.76, page 14 of 82 at docket number 8045.

[4] On October 22, 2014, the City filed a redline of the Seventh Amended Plan against the Eighth Amended Plan  [Doc. No. 8046, Ex. A] ("Redline").  As set forth in the Redline, neither the definition of "Convenience Claim" nor the treatment of Convenience Claims under Class 15 changed.   Redline, Article I.A.76, page 22 of 725; Article II.B.3.v.i., page 64 of 725.

- 3 -
25767416.4\022765-00213
13-53846-tjt   Doc 10744-1   Filed 08/12/16   Entered 08/12/16 12:25:13   Page 86 of
215
13-53846-tjt   Doc 10723   Filed 02/03/16   Entered 02/03/16 18:11:32   Page 48 of   345

the bankruptcy.[5]  Seventh Amended Plan, Article III.D.5, p. 56 of 82 (enjoining holders of Indirect Employee Indemnity Claims from pursuing actions).[6]

In short, Plaintiff had available all relevant information. The City did not advise Plaintiff on the §1983 issue, nor did the City have a crystal ball to foresee how the Court ultimately would rule on the issue.  Parties routinely settle cases not knowing how various issues might later be decided.  If this were enough to overturn a settlement, no settlement would be safe from attack.

Plaintiff makes a related argument, alleging that the settlement should be set aside because of "fraud."  Response at 3.  A plaintiff "cannot claim to have been defrauded where he had information available to him that he chose to ignore." *Nieves v. Bell Industries, Inc.*, 204 Mich.App. 459, 465 (1994).   Plaintiff was represented by experienced counsel who had been personally served in March 2014 with a notice providing that the Plan and all related documents are "available on the internet, free of charge, at http://www.kccllc.net/Detroit ..."  Doc. No. 2823-14 at page 3 & 4 of 5 (Notice); Doc. No. 2823-2 at page 52 of 171 (Certificate of Service).

---

[5] *See e.g.* (a) *Supplemental Brief of Ryan, Swift, Mendoza and Cuppetelli, Interested Parties, in Support of Their Objections Previously Filed [Dkts. # 4099, #4228, #4608] Insofar as §II.B.3.U.I of the Proposed Plan Violates the Fourteenth Amendment, Impairing the Relief Available to Victims of Constitutional Violations Under 42 U.S.C. § 1983*, filed on June 30, 2014 at docket number 5690; (b) *Brief in Concurrence of Creditors Dwayne Provience, Richard Mack, and Gerald and Alecia Wilcox, Interested Parties, to Deborah Ryan, Walter Swift, Cristobal Mendoza and Annica Cuppetelli, Interested Parties, Supplement Brief [Dkt. #5690] In Support of the Instant Creditors Previously Filed Objections [Dkts. #4224 and #4618] to Debtor, City of Detroit's Plan for the Adjustment of Debts of the City of Detroit, and Certificate of Service*, filed on June 30, 2014 at docket number 5693; (c) *Second Supplemental Brief of Ryan, Swift, Mendoza, and Cuppetelli, Interested Parties/§1983 Plaintiffs, in Support of Their Objections Previously Filed [Dkts. #4099, #4228, #4608, #5690] On the Constitutionality of Allowing the Diminishment of the Fundamental Right to Damages Remedy For the Violation of Constitutional Rights*, filed on August 15, 2014, at docket number 6764; and (d) *§ 1983 Plaintiff's Concurrence of Interested Parties Ryan, Swift, Mendoza, and Cuppetelli, Second Supplemental Brief in Support of Their Objections Previously Filed [Dkts. #4099, #4288, #4608, #5690] On the Constitutionality of Allowing the Diminishment of the Fundamental Right to a Damages Remedy for the Violation of Constitutional Rights*, filed on August 21, 2014, at docket number 6911.
[6] *See also* Consolidated (A) Pretrial Brief in Support of Confirmation of Sixth Amended Plan for the Adjustment of Debts of the City of Detroit and (B) Response to (I) Certain Objections Filed by Individual Bondholders and Individual Retirees and (II) Supplemental Objection at pp. 218-225 of 292.  [Doc. No. 7143].

Plaintiff's counsel apparent failure to review the freely available bankruptcy filings does not allow Plaintiff to set aside the settlement for "fraud."

C.    **Plaintiff's reliance on the *Ozyagcilar* and *Therma-Scan* decisions is misplaced**

Neither *Ozyagcilar* nor the *Therma-Scan* case involved an executed settlement agreement.  In *Ozyagcilar,* the parties signed an outline of a settlement agreement and read that outline into the record.  *Ozyagcilar v. Davis*, 701 F.2d 306 (4th Cir. 1983). While reading the outline into the record, the district court asked, and the parties agreed, that it could resolve any disputes over the interpretation of the outline. *Id.* at 306-07.   The district court subsequently decided a dispute over a term.  *Id.*  On appeal, the Fourth Circuit held that a district court only "retains the power to enforce *complete* settlement agreements" and it was unclear whether the outline agreement was complete.  *Id*. at 307-08 (emphasis supplied).

Similarly, in *Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414 (6th Cir. 2000), the parties had not executed a settlement agreement.   Instead, the district court attempted to summarize the key terms of a settlement reached during an oral argument and then directed the parties to draft a written agreement.  *Id.* at 416-417. The parties could not agree on a written agreement and the district court ordered them to sign an agreement prepared by one of the parties.  *Id.* at 418. The Sixth Circuit held that the district court erred when it ordered the parties to sign the settlement agreement because its finding that the parties had entered into a complete settlement was clearly erroneous. *Id.* at 419-20.  Here, the parties executed the written Settlement Agreement, which states (¶ 10) that it is "the entire agreement between the Parties…"

Dated: January 8, 2016

By:/s/ Marc N. Swanson (P71149)
150 W. Jefferson, Suite 2500
Detroit, Michigan 48226
T: 313.496.7591/ F: 313.496.8451
swansonm@millercanfield.com
Miller, Canfield, Paddock and Stone, PLC

- 5 -

## CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Honorable Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 8, 2016, he caused a copy of the foregoing *CITY OF DETROIT'S RESPONSE IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT AND ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS AGAINST GREGORY PHILLIPS AND/OR DOMINIQUE MCCARTHA AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF GREGORY PHILLIPS, DECEASED* to be served upon counsel via electronic mail and first class mail as follows:

Shawn C. Cabot
Christopher Trainor & Associates
9750 Highland Road
White Lake, MI 48386

shawn.cabot@cjtrainor.com

Dated: January 8, 2016

By: /s/ Marc N. Swanson
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

1

2

3  IN THE MATTER OF,          Case No. 13-53846
                             Detroit, Michigan
4  CITY OF DETROIT, MICHIGAN   June 15, 2016
   _____/   1:35 p.m.

5

        IN RE:  FORTY-FOURTH OMNIBUS OBJECTION TO CERTAIN CLAIMS,
6      FORTY-FIFTH OMNIBUS OBJECTION TO CERTAIN CLAIM, MOTION TO
   ENFORCE MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE PLAN OF
7  ADJUSTMENT INJUNCTION AND BAR DATE ORDER AGAINST RODRICK SINER
        FILED BY DEBTOR IN POSSESSION CITY OF DETROIT, MICHIGAN,
8  MICHAEL MCKAY'S MOTION TO ENFORCE AGREEMENT RESOLVING CLAIM OF
       MICHAEL MCKAY, TWENTY-THIRD OMNIBUS OBJECTION TO CERTAIN
9  CLAIMS(PENSION CLAIMS THAT HAVE BEEN CLASSIFIED AND ALLOWED BY
       THE CITY'S PLAN), TWENTY-FIFTH OMNIBUS OBJECTION TO CERTAIN
10  CLAIMS (PENSION CLAIMS THAT HAVE BEEN CLASSIFIED AND ALLOWED
        BY THE CITY'S PLAN), TWENTIETH OMNIBUS OBJECTION TO CERTAIN
11       CLAIMS (FAILURE TO SPECIFY ASSERTED CLAIM AMOUNT AND
     INSUFFICIENT DOCUMENTATION), TWENTY-EIGHTH OMNIBUS OBJECTION
12  TO CERTAIN CLAIMS (INSUFFICIENT DOCUMENTATION), TWENTY-NINTH
           OMNIBUS OBJECTION TO CERTAIN CLAIMS (INSUFFICIENT
13  DOCUMENTATION), THIRTIETH OMNIBUS OBJECTION TO CERTAIN CLAIMS
     (INSUFFICIENT DOCUMENTATION), THIRTY-FIRST OMNIBUS OBJECTION
14  TO CERTAIN CLAIMS (INSUFFICIENT DOCUMENTATION), THIRTY-SECOND
           OMNIBUS OBJECTION TO CERTAIN CLAIMS (INSUFFICIENT
15   DOCUMENTATION), THIRTY-THIRD OMNIBUS OBJECTION TO CERTAIN
      CLAIMS (INSUFFICIENT DOCUMENTATION), THIRTY-FOURTH OMNIBUS
16          OBJECTION TO CERTAIN CLAIMS (INSUFFICIENT
     DOCUMENTATION), THIRTY-SIXTH OMNIBUS OBJECTION TO CERTAIN
17   CLAIMS (INSUFFICIENT DOCUMENTATION), THIRTY-SEVENTH OMNIBUS
           OBJECTION TO CERTAIN CLAIMS (INSUFFICIENT
18                        DOCUMENTATION)
           BEFORE THE HONORABLE THOMAS J. TUCKER
19            TRANSCRIPT ORDERED BY: ROBIN WYSOCKI

20  APPEARANCES:

21  For the City of Detroit, MI:   RONALD SPINNER, ESQ. (P73198)
                                   JOHN WILLEMS, ESQ. (P31861)
22                                 Miller, Canfield, Paddock &
                                   Stone
23                                 150 West Jefferson
                                   Suite 2500
24                                 Detroit, MI 48226
                                   313-496-7829
25

```
 1  For Michael McKay:          ERIC STEMPIEN, ESQ. (P58703)
                                Romano Law, PLLC
 2                              23880 Woodward Avenue
                                Pleasant Ridge, MI 48069
 3                              616-355-6673

 4  For Da'Nean M. Brooks and   ANTHONY GREENE, ESQ. (P47715)
    JaJuan Moore:               Greene Law Group
 5                              2232 S. Main
                                Suite 438
 6                              Ann Arbor, MI 48103
                                313-410-3390
 7
    Claimants:                  JULIUS R. COLLINS
 8                              CRAIG STEELE
                                HENRY WOLFE
 9                              VENTONIA DORCH
                                GLADYS M. CANNON
10                              SARAH MCCRARY
                                JAMES CAPIZZO
11                              WANDA BECKOM-WHITE

12  Court Recorder:             Jamie Laskaska

13  Transcriber:                Deborah L. Kremlick

14

15  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
16

17

18

19

20

21

22

23

24

25
```

1    (Court in Session)

2    THE CLERK:  All rise.  This Court is now in session.

3  The Honorable Thomas J. Tucker is presiding.  You may be

4  seated.  The Court calls the case of the City of Detroit,

5  Michigan, case number 13-53846.

6    THE COURT:  All right.  Good afternoon to everyone.

7  We have a number of matters scheduled for hearing -- or

8  further hearing today.  I have in mind at least somewhat the

9  order in which I prefer to hear matters, but if counsel for

10  the city thinks there's a particular reason to do it in a

11  different order than I impose, that's fine.

12    Before we get much further into this though, let's have

13  entries of appearance by any and all attorneys in the

14  courtroom who wish to enter their appearance for the hearings

15  today starting with the city.

16    MR. SPINNER:  Thank you, Your Honor.  Ron Spinner

17  from Miller, Canfield and John Willems from Miller, Canfield

18  on behalf of the city.

19    THE COURT:  All right.

20    MR. STEMPIEN:  Your Honor, I'm Eric Stempien.  I'm

21  here on behalf of claimant Michael McKay.

22    THE COURT:  All right.  Good afternoon to the

23  attorneys and to everyone else here in the courtroom.  Mr.

24  Stempien, I'm glad you're at counsel table.  I had in mind

25  calling the matter involving your client first.

1          MR. STEMPIEN:  Oh.

2          THE COURT:  Mr. Stempien, yes.

3          MR. STEMPIEN:  Yes.

4          THE COURT:  The matter involving the motion brought

5  by the claimant Michael McKay.  I wanted to hear that first.

6  So unless there's any -- the city has any particular reason to

7  do -- to do -- otherwise, I'll hear that case first.

8          MR. SPINNER:  Oh, no, that's fine, Your Honor.

9          THE COURT:  All right.  So this matter then is the

10  motion by claimant Michael McKay to enforce agreement

11  resolving claim of Michael McKay, it's entitled.  It's docket

12  number 11157 filed May 11, 2016.

13      The city filed an objection to that motion on May 20,

14  2016.  I have reviewed the papers filed by the parties

15  relating to this motion and we'll hear argument now.  Mr.

16  Stempien, we'll start with you.

17          MR. STEMPIEN:  Good afternoon, Your Honor, and thank

18  you.  The first thing I'd like to make sure is clear is

19  exactly what it is we're -- we're requesting the Court to do.

20  Because I don't think it's perfectly clear from the -- the

21  objection that I received from the city that -- that really

22  came across completely.

23      We're not challenging the fact that there was a

24  settlement of a bankruptcy claim.  We're not challenging that

25  the individual officers' claims were included within that

1 | settlement.  And I bring that up because attached to the

2 | objection that the city filed, they attached a transcript from

3 | a prior hearing of this Court where that was the issue before

4 | the Court, whether there was a settlement, whether it applied

5 | to the individual officers.  That is not what our claim is

6 | here.  That's not the -- the requested relief that we have

7 | here.

8 |     What we're saying, Your Honor, is that we want

9 | confirmation that the settlement agreement that was reached

10 | with regard to the bankruptcy claim requires a payment of the

11 | full $42,500 to claimant Michael McKay.  In the objection the

12 | city simply says that this is a Class 14 claim.  They provide

13 | no specific support for that.  They don't say why it's a Class

14 | 14, it's just something that they designated on their own.

15 |     However, when we look at everything that has made part of

16 | this matter with Mr. McKay which would be the settlement

17 | agreement, the eighth amended plan, Judge Rhodes' oral opinion

18 | on the record with regard to his approval of the eighth

19 | amended -- amended plan, it makes it clear that the settlement

20 | requires a full payment of $42,500.

21 |     First, with regard to the agreement itself, the paragraph

22 | that -- the operative paragraphs are Paragraph 2 and 5.

23 | Basically what it is, is it says that he agrees to settle this

24 | claim for $42,500, that it would be a -- a unsecured

25 | non-priority claim.

1    Paragraph 5 then says that it will be treated as such

2   under the plan that was at that time not yet approved by the

3   Court.  So it was not clear what the level of treatment was

4   going to be at the time that the settlement agreement was

5   reached.

6        So when the settlement agreement -- or excuse me, when

7   the plan is actually then approved, the question becomes what

8   is this claim.  So I think we need to start kind of the

9   underlying lawsuit.  The underlying lawsuit was a -- a 42 USC

10  1983 claim.  It was brought in State Court and litigated

11  within State Court.  It was against three individual officers.

12  There was never a claim made against the city itself.  The

13  only defendants were the three individual police officers.  It

14  was resolved through a binding arbitration process.

15       THE COURT:  Well, wait a minute.  You say in the

16  State Court litigation it was not -- the case was not brought

17  against the city itself, rather only against the individual

18  officers.

19       MR. STEMPIEN:  Correct.

20       THE COURT:  That may be, but your client Mr. McKay

21  filed a proof of claim in the City of Detroit bankruptcy case,

22  a claim against the City of Detroit by its nature.  And that's

23  -- that was part of what was -- at least part of what was

24  settled by this settlement agreement at issue, isn't it?

25       MR. STEMPIEN:  Correct.

1          THE COURT:  Okay.  And you said you're not

2  contesting that that settlement also include a settlement of

3  the -- Mr. McKay's claims against the individual officers.

4          MR. STEMPIEN:  Correct.

5          THE COURT:  Okay.  So it's everybody.

6          MR. STEMPIEN:  It is everybody.

7          THE COURT:  All right.  So the -- what Mr. McKay got

8  in exchange for his release of his claims against the City of

9  Detroit and the officers according to the settlement

10 agreement, is the treatment provided in Paragraph 2 of the

11 settlement agreement, isn't it?

12         MR. STEMPIEN:  I would say it's actually Paragraph 5

13 is the operative paragraph, Your Honor.

14         THE COURT:  Okay.  Well, let's say 2 plus 5.

15         MR. STEMPIEN:  Right.  I think it's both right, Your

16 Honor, yeah.

17         THE COURT:  Yeah, okay.  So and that was -- there

18 would be an allowed claim of $42,500 to be treated as a Class

19 5 as a general unsecured non-priority claim subject to the

20 treatment provided for such claims under any Chapter 9 plan

21 confirmed by the Court.

22         MR. STEMPIEN:  Correct.

23         THE COURT:  That's the gist of it.  Okay.  And

24 that's all Mr. McKay got.

25         MR. STEMPIEN:  Correct.

1              THE COURT:  Right?

2              MR. STEMPIEN:  Right.

3              THE COURT:  Okay.  So the plan that was confirmed in

4  the case, it was later but the plan that was confirmed in the

5  case treated general unsecured non-priority claims and it

6  treated them in Class 14 of the plan, didn't it?

7              MR. STEMPIEN:  Well, I don't believe so, Your Honor.

8  Now I think 1983 claims and indemnification claims were given

9  their own treatment separately.

10              THE COURT:  What class are they in in the plan in

11  your view?

12              MR. STEMPIEN:  Your Honor --

13              THE COURT:  If not 14, what class of the plan,

14  confirmed plan?

15              MR. STEMPIEN:  Well, my read of the -- the plan says

16  that they have to pay it in full, Your Honor.  I mean whether

17  -- whether it's under Class 14 --

18              THE COURT:  Well, where is that in the plan?

19              MR. STEMPIEN:  Okay.  So where I would point the

20  Court to would be, it's under Article 4 because, you know, you

21  have the class and you have -- you have the plan that's going

22  to be put into place and then Article 4 of the plan says

23  here's how we're going to implement it.

24        These are the means for implementation of the plan.  It's

25  Article 4, Section O, subsection O.  It talks about assumption

1   of indemnification, I believe.

2           THE COURT: Hold on. If you're not going to give me

3   the page number, I'm going to have to dig it out.

4           MR. STEMPIEN: Oh, I'm sorry, 62 -- 62.

5           THE COURT: Hold on. Sixty-two of the confirmed

6   plan, is that right?

7           MR. STEMPIEN: That is correct.

8           THE COURT: And for the record, the confirmed plan,

9   when I'm looking at the confirmed plan, I'm looking at docket

10   number 8272, the eighth amended -- eighth amended plan filed

11   on -- I'm sorry, 8272 is the order confirming the eighth

12   amended plan.

13           MR. STEMPIEN: Correct.

14           THE COURT: And it has attached to it a copy of the

15   eighth amended plan that was confirmed. And in there you're

16   looking at Page 62 of the plan, right?

17           MR. STEMPIEN: Correct.

18           THE COURT: And I'm -- I'm on that page. Now what

19   -- what -- what language are you pointing to?

20           MR. STEMPIEN: So the language that I believe

21   requires full payment in this is under Section O, it says

22   assumption of indemnification obligations. Notwithstanding

23   anything otherwise to the contrary in the plan, nothing in the

24   plan shall discharge or impair the obligations of the city as

25   provided in the charter or other organizational documents of

1  such nature from the city to then indemnify, defend,

2  reimburse, escrow pay, advanced fees and expenses, or limit

3  the liability of officers, employees of the city.

4      So and this is consistent with Judge Rhodes' oral opinion

5  that he gave when he said I'm going to confirm the plan which

6  we attached as well to our motion and quoted within the brief

7  itself where Judge Rhodes says, 1983 claims are not affected

8  by this.  And why this is important is because if you --

9          THE COURT:  Well, just a minute.

10         MR. STEMPIEN:  Okay.

11         THE COURT:  Hold on.  You cited Judge Rhodes' oral

12 opinion regarding confirmation of the plan.  That was later

13 put into the order confirming plan.

14         MR. STEMPIEN:  Correct.

15         THE COURT:  And then later there was a written

16 opinion which went into more detail, but it was consistent, I

17 think, with the oral opinion about confirming the plan.  In

18 all of these documents it appears to me that what that meant

19 and what was done with that is, that the Court sustained an

20 objection to confirmation that had been made in part by -- by

21 ruling that basically Section 1983 claims against individual

22 officers and employees of the city were not being discharged

23 by the plan, although such claims as against the City of

24 Detroit and therefore also against city employees in their

25 official capacities which is essentially the equivalent of

1  being against the City of Detroit were being treated and

2  discharged in the plan.  Now do you -- do you disagree or

3  agree with that reading?

4        MR. STEMPIEN:  I agree that our claim is subject to

5  the plan in the sense that -- in the sense that even if it

6  wasn't within what Judge Rhodes said or put in the final plan,

7  we agreed to that within the agreement.  I mean I think that

8  -- however the plan treats these 1983 claims is -- is going to

9  be binding upon us based on what we said.  But I guess what

10 I'm --

11       THE COURT:  Well, you're not answering my question.

12       MR. STEMPIEN:  Okay.  Maybe I misunderstood.

13       THE COURT:  I want to be clear about -- if possible,

14 I want to be clear about what the plan did and did not

15 discharge with respect to 1983 claims.

16     The plan, the confirmed plan did not discharge 1983

17 claims brought against officers or employees of the City of

18 Detroit in their individual capacities, do you agree?

19       MR. STEMPIEN:  Correct, yes.

20       THE COURT:  But it did discharge 1983 claims brought

21 against the City of Detroit or -- and/or -- and claims brought

22 against employees or officers of the City of Detroit in their

23 official capacities.  Do you agree with that?

24       MR. STEMPIEN:  I'm not able to answer that, I

25 apologize, Your Honor.  I did not -- I know those with regard

1 to the city.  With regard to the actions of within their

2 official capacity, my -- my understanding of it, and I may be

3 mistaken, is that it -- it's -- it's part of the

4 indemnification requirements because that's exactly what the

5 indemnification provisions are for.

6        THE COURT:  Well, we're going to talk about the

7 indemnification provisions in a minute.  But before we get to

8 that, I just want to be clear.  We're talking about this sort

9 of the same basic groundwork here.

10     I'm looking at the order confirming plan, docket 8272, at

11 Pages 87 to 88, first of all.  That's -- that's the order that

12 confirmed the plan filed November 12, 2014.  Docket 8272,

13 Pages 87 to 88.

14     It's in a section called F, discharge of claims.

15 Paragraph 30 which carries over on to Page 88 says, this --

16 claims that are discharged and it says such discharge will not

17 apply to among other things, "claims against officers who are

18 employees of the city in their individual capacities --

19 capacity under 42 USC Section 1983."  That's the exception to

20 the discharge for claims against employees in their individual

21 capacity that we just talked about, right?  Right?

22        MR. STEMPIEN:  Correct, yeah.

23        THE COURT:  Okay.  Now if you see something here in

24 the order confirming plan or in the plan for that matter that

25 indicates that the -- that 1983 claims against the city and

1  officers, employees in their official capacity were not

2  discharged were also exceptions to the discharge on this

3  confirmed plan.  I need you to tell me where that is because I

4  don't know where that is.  I don't think that's the case.

5         MR. STEMPIEN:  I don't -- I would not be able to

6  point that out to the Court.

7         THE COURT:  All right.  Okay.  So now you were

8  focusing here on Page 62 of the eighth amended plan that was

9  confirmed in this Paragraph O on Page 62 about the provision

10  regarding -- essentially meaning that the city's obligations

11  to essentially to indemnify its employees -- officers and

12  employees of the city was not being -- pardon me, discharged

13  or impaired by the confirmed plan, right?

14         MR. STEMPIEN:  Correct.

15         THE COURT:  Okay.  So from that concept and that

16  provision in the confirmed plan you argue what?

17         MR. STEMPIEN:  Well, I argued --

18         THE COURT:  What's the consequence of that?

19         MR. STEMPIEN:  My argument is that when they say the

20  word nothing -- nothing in the plan shall discharge or impair

21  their obligations to indemnify, I think the plain language of

22  the plan itself is nothing before this that we put in here

23  shall discharge that.  And so my consequences --

24         THE COURT:  Excuse me though.  This is -- this

25  language refers to indemnifying et cetera officers and

 1  employees of the city, right?

 2          MR. STEMPIEN:  Correct.

 3          THE COURT:  It -- it doesn't refer to any sort of

 4  duty to indemnify third party claimants.

 5          MR. STEMPIEN:  Correct.

 6          THE COURT:  Like your claim.

 7          MR. STEMPIEN:  Correct.

 8          THE COURT:  Right?

 9          MR. STEMPIEN:  Right.  And that's not my position.

10  I'm not saying they indemnify me.  My -- my -- here's the

11  argument, Your Honor.

12          THE COURT:  Sure.

13          MR. STEMPIEN:  We -- we sued these individual

14  officers.  We didn't sue the City of Detroit.  Our judgment

15  which as an arbitration award we never turned into a judgment,

16  but our arbitration award is as to these three individuals.

17      The only obligation that the City of Detroit could

18  possibly have to pay that award/judgment is as an indemnitor

19  for those three individual officers.  That's the only

20  obligation the city could possibly have.

21      And that would be an obligation found within their

22  collective bargaining agreement.  So this is not a direct

23  action against the city.  We did not sue the city.  That's why

24  I opened up with that because we didn't sue them.

25      Their -- only time they could ever have an obligation to

1 | pay, let's say we never had the bankruptcy if -- if you just

2 | went through the litigation and the City of Detroit paid the

3 | arbitration award on a City of Detroit check and the City of

4 | Detroit account, it would have only been as an indemnitor for

5 | those three officers. That would be the only way they could

6 | have been obligated in any manner.

7 | Therefore because it's clear that they're indemnitors,

8 | and it's clear that the plan says nothing in the plan shall

9 | discharge per their obligations, they're obligated to

10 | indemnify these individual officers as to that full amount,

11 | it's not changed.

12 | THE COURT: This duty to indemnify the officers that

13 | you're pointing to is not a duty that runs to your client, to

14 | an injured third party. It runs only to the officers, doesn't

15 | it?

16 | MR. STEMPIEN: Correct.

17 | THE COURT: So your clients couldn't possibly have a

18 | claim against the City of Detroit based upon the City of

19 | Detroit's duty to indemnify its officers, is that right?

20 | MR. STEMPIEN: My position on that is usually we

21 | would have standing if they tried to challenge it to -- to

22 | argue on that. But I don't think we could bring an

23 | independent cause to enforce an -- or I mean an

24 | indemnification provision.

25 | THE COURT: The indemnity rights are rights that

1  belong to the officers.

2          MR. STEMPIEN:  That is correct.

3          THE COURT:  You agree, okay.

4          THE COURT:  All right.

5          MR. STEMPIEN:  Yes.  Now, this settlement agreement

6  it looks like the arbitration award was made by the three

7  arbitrators.  It's looks like the written arbitration award

8  was May 16, 2013 it looks like the date.  And I think that's

9  part of Exhibit A attached to docket 11181, the city's

10 response and probably elsewhere in the record, but -- so it

11 was after that arbitration award that Mr. McKay and the city

12 made this settlement agreement that's at issue, right?

13         MR. STEMPIEN:  That's correct.

14         THE COURT:  The -- the agreement doesn't seem to

15 state, you know, a date, official date of this agreement, but

16 it looks like it was signed by the city on December 16, 2015

17 signed by Mr. McKay it looks like June 23, 2014.

18         MR. STEMPIEN:  Correct.

19         THE COURT:  I'm just looking at the signature --

20         MR. STEMPIEN:  That's right.  And it -- it --

21         THE COURT:  -- signature on the last page.

22         MR. STEMPIEN:  -- was never signed by the attorneys

23 for Mr. McKay.

24         THE COURT:  Right.  It was signed by Mr. McKay and

25 by the city.  And -- and that all happened after the

1  arbitration award had been entered against the individual

2  officers.

3         MR. STEMPIEN: Yes.

4         THE COURT: Right? Okay. So and you've said that

5  the settlement agreement settled Mr. McKay's claims against

6  the individual officers.

7         MR. STEMPIEN: Correct.

8         THE COURT: As well as the city, everybody.

9         MR. STEMPIEN: Yes.

10         THE COURT: Okay. So the agreement -- the

11  settlement agreement itself does not say the city would agree

12  to be obligated to indemnify Mr. McKay for anything based on

13  the arbitration award against the officers. Expressly what it

14  did was it gave Mr. McKay an allowed claim of $42,500 that

15  would be classified and treated in the Chapter 9 plan as a

16  general unsecured non-priority claim right, you would agree to

17  that?

18         MR. STEMPIEN: Yes. But --

19         THE COURT: Yeah, okay.

20         MR. STEMPIEN: Well, you say they didn't promise to

21  indemnify but they did promise to make a payment based on the

22  provisions of the plan that was to be later adopted. So I

23  mean whether you call it indemnification or not, but they made

24  a promise to pay.

25         THE COURT: Well, I don't think it says they'll make

1  a payment.  It said that -- and then it said, it's Paragraph

2  5, it would -- in Paragraph 2 and 5 they give -- they give an

3  allowed general unsecured non-priority claim and say it's

4  going to be subject to the treatment of such -- for such

5  claims in any Chapter 9 plan.

6          MR. STEMPIEN:  Correct.

7          THE COURT:  All right.  All right.  So the -- the

8  provision regarding indemnification that you cited on Page 62

9  of the confirmed plan, it doesn't say anything about how

10 general unsecured non-priority claims are to be treated.

11     And it's limited for purposes of your motion, I think

12 you'll agree, to the city's obligation to indemnify, defend,

13 et cetera, its own employees.

14         MR. STEMPIEN:  Yeah.  The -- their obligation is to

15 the employee, yes.

16         THE COURT:  So -- so how -- how does that -- how

17 does that -- I'm having trouble seeing the link that you're

18 trying to make there between that provision in the confirmed

19 plan and your ultimate conclusion that the city under this

20 settlement agreement has to pay the full 42,500 of the claim.

21         MR. STEMPIEN:  Because I think the operative words

22 in Paragraph 5 are, subject to the treatment provided for such

23 claims under any Chapter 9 plan.  So the question has to

24 become how does the plan treat this particular claim.  The

25 city --

1    THE COURT:  Well, wait a minute. Look at Paragraph

2  5.  The treatment provided for such claims under any Chapter 9

3  plan, the language you just pointed to.  The reference to such

4  claims there is a reference, isn't it, to the -- the phrase

5  general unsecured non-priority claim?

6    MR. STEMPIEN:  Yes.

7    THE COURT:  It appears earlier in the sentence.

8    MR. STEMPIEN:  Yes.

9    THE COURT:  So when it says such claims you can

10  translate that to mean -- to say and mean that the claim, Mr.

11  McKay's claim, settled claim here, would be subject to the

12  treatment provided for general unsecured non-priority claims

13  under the Chapter 9 plan, is that right?

14    MR. STEMPIEN:  Yes.  And I would argue that 1983

15  claims are unsecured non-priority claims.  I -- there's no --

16  there's no security created by our 1983 claim.  There's no

17  priority.  And I apologize if there is, because I -- I don't

18  practice bankruptcy at all.  But my understanding is that

19  priority claims are things like wages and -- and things of

20  that nature.

21    This is -- my observance it's not a priority claim, it's

22  not a secured claim.  It is a -- it is an unsecured

23  non-priority claim.  But the plan treats 1983 claims --

24    THE COURT:  Okay.

25    MR. STEMPIEN:  -- differently than it does other

1  non-priority unsecured claims.

2          THE COURT:  Maybe I'm -- I'm understanding your

3  argument a little better now, but let me see if I've got it.

4          MR. STEMPIEN:  Okay.

5          THE COURT:  If I understand it.  Seems -- seems to

6  be what you're saying now is that this Paragraph O on Page 62

7  of the confirmed plan is one place, not the only place

8  necessarily, one place in which the plan, confirmed plan,

9  treats general unsecured non-priority claims.

10         MR. STEMPIEN:  Correct.

11         THE COURT:  In the form of claims that are claims by

12 employees of the city for indemnification, is that right?

13         MR. STEMPIEN:  Well, it --

14         THE COURT:  Isn't that what Paragraph O talks about?

15         MR. STEMPIEN:  Yes.  That is correct, yes, yes.

16         THE COURT:  Okay.

17         MR. STEMPIEN:  But the general unsecured claim that

18 I have is a 1983 claim which I think is treated differently

19 under this.  So my obligation -- my claim -- my settlement as

20 to the city and their officers was to be treated as that type

21 of a claim under the plan which I think provides for $42,500

22 full payment.

23     Now does that mean I can go to the officers and say the

24 officers have to pay me 42,500?  Well, the Court's already

25 ruled no, I can't.  I saw that in the prior ruling.

1    So then it's the city who is obligated to pay it under

2  this.  And the only way they can be obligated to pay is under

3  the indemnification provision.  And then if it's under the

4  indemnification provision, I think it's -- that is not

5  impaired or discharged in any manner.

6    THE COURT:  Well, the city's obligated to pay

7  something because they agreed to a settlement agreement that

8  gave your client a general unsecured non-priority claim in the

9  bankruptcy under the plan.  Whether they had before agreeing

10 to that, it was the city had any sort of legal obligation to

11 pay your client anything I suppose is -- is a different issue.

12   But the settlement agreement gave your client a right to

13 treatment, whatever treatment was -- what Paragraph 5 means

14 under any confirmed plan by the city, right?

15   MR. STEMPIEN:  Right.

16   THE COURT:  Right.

17   MR. STEMPIEN:  But it would be in conjunction I

18 think with the nineteen eight -- we sued these individual

19 police officers, not the city.  We didn't bring a custom and

20 policy claim against the city, we sued these individual

21 officers.

22   My understanding then is that they're obligated as the

23 full amount of the money.  And if I had not -- my client had

24 not signed this agreement I could go after these officers for

25 the full -- full 42,500 which is, you know, I think everybody

1  agrees that's true.  We signed this agreement so now we have

2  the city coming in.

3      So under one provision we get the full -- full 42,500,

4  but when the city has to come in and pay it they get to pay it

5  as a Class 14 under the notes.  And I -- I think that that

6  would be -- I think that would be reading the -- the

7  provisions inconsistently.  Because I think 1983 claims have

8  gotten their own treatment.  These are individual officers

9  sued not -- not with the city, but as individuals.

10     And it was arbitrated.  A decision was made.  They had a

11 judgment or could enter a judgment against them if we hadn't

12 pursued the -- the agreement.  And therefore if the city is

13 going to pay it, they can do it as an indemnitor and therefore

14 they're -- they're -- they can't impair that ability there to

15 do so.

16         THE COURT:  Well, look at, if you have it front of

17 you there, Page 44 of the plan.  It talks about the treatment

18 of Class 14.

19         MR. STEMPIEN:  I believe I do have that one with me,

20 yes.

21         THE COURT:  Other unsecured -- all right.  The

22 treatment of Class 14.  Do you have it there?

23         MR. STEMPIEN:  I'm looking at it.

24         THE COURT:  Page 44 of the plan, docket 8272

25 attached to the order confirming the plan at treatment.  It

1  says, "unless such holder agrees to a different treatment of

2  such claim, each holder of an allowed other unsecured claim in

3  full satisfaction such allowed claim shall receive," and then

4  it goes on to talk about the -- the -- the notes, et cetera.

5  The Class 14 treatment there.

6      Now the -- the phrase allowed other unsecured claim,

7  allowed means the claim is allowed, but other unsecured claims

8  defined at Page 21 of the plan, Paragraph 262 in the -- number

9  262 of the definitions to mean any claim that is not an

10  administrative claim, a convenience claim, a COP claim, a

11  downtown development authority claim, a general obligation

12  bond claim, a GRS pension claim, an LBB claim, a BFRS pension

13  claim, a secured claim, indirect 36th District Court claim, or

14  subordinate claim.

15      Then it says where the avoidance of doubt, Section 1983

16  claims and indirect employee indemnity claims are included

17  within the definition of other unsecured claim.

18      So doesn't that claim which made clear when combined with

19  the language of the treatment of Class 14, that 1983 claims,

20  including indirect employee indemnity claims are within the

21  definition of -- of allowed other unsecured claim in Class 14

22  of the plan.

23          MR. STEMPIEN:  Again, the direct -- there was no

24  direct 1983 claim, so it doesn't meet that because we didn't

25  -- we didn't sue the city for a 1983 claim.  We sued

1 individual officers for violation of the 42 USC 1983. That

2 provision if it's read in the way that I believe the Court

3 just indicated, I think would conflict with the -- the -- the

4 subsequent provision that says that the 1983 claims against

5 individual officers are not impaired. I don't remember the

6 language, I apologize, but to that effect.

7     Again can the -- can the -- would the officers then have

8 a different -- would they be in a different position to in

9 their indemnity claim against the city if we went after them

10 for the 42,500. It sounds like it would apply to that.

11     But then that -- that provision, that definition also

12 conflicts with Article 4, subsection O which says there's no

13 -- you know, there's no impairment of -- of an indemnity

14 claim.

15     I would ask -- I would ask the Court to apply that, you

16 know, sort of statutory construction rules that we would have

17 or the more specific provisions and would rule over the

18 general provisions. And I think when you read in conjunction

19 the specific 1983 section about individual officers and the

20 indemnification provisions it makes clear that I've still got

21 my full claim against the officers because that -- when I

22 signed this agreement and the -- and the officers -- or when

23 my client signed this agreement and -- and said we're waiving

24 our claim against the officers for 42,500 under the plan,

25 they're still obligated to 42,500.

1    And then -- then the city's got to indemnify it because

2  they're indemnified under their collective bargaining

3  agreement.  And Article 4, Section O we'd say they have to do

4  it without impairment.

5         THE COURT:  One of things I was going to get to and

6  ask you about the language in the plan about the treatment of

7  Class 14 on Page 44 in addition to what we've just already

8  talked about is, the opening phrase of the -- of the paragraph

9  that I just read to you, it says unless such holder agrees to

10  a different treatment of such claim.

11    I thought you were going to argue that partly in response

12  to my last question that well, yeah, the -- the claim that was

13  settled and the claim which is allowed in the case is maybe a

14  general unsecured non-priority claim.  It is because that's

15  what -- what the settlement agreement says in Paragraph 2 and

16  5.  And -- and it may be a -- an allowed other unsecured claim

17  within the meaning of Class 14, but here the holder, your

18  client of the claim, agreed to a different treatment of the

19  claim.  That is treatment different than what Class 14

20  provides for.

21         MR. STEMPIEN:  Right.

22         THE COURT:  In the plan.  And that, you're arguing

23  is based on the settlement agreement, the full $42,500

24  payment.

25         MR. STEMPIEN:  Correct.

1          THE COURT:  Is that part of what you're arguing?

2          MR. STEMPIEN:  Yes, yeah, yeah.

3          THE COURT:  All right.  You -- on the subject of

4   your claim against the individual officers, I noticed that in

5   March of this year apparently in the State Court action you

6   obtained an order of that Court ordering the individual

7   employees to pay the full amount of the arbitration award

8   within 60 days, is that right?

9          MR. STEMPIEN:  That is correct.

10         THE COURT:  That's the order that is entitled order

11  enforcing arbitration award in March 14, 2016, Circuit Court.

12  This is -- a copy of this is -- it looks Exhibit 6 to your

13  motion.

14         MR. STEMPIEN:  Okay.

15         THE COURT:  Refers to the arbitration award issued

16  on May 16, 2013, order defendants, meaning the individual

17  defendants being Meyer and Watkins and John -- Officer John

18  Doe, so we're talking about Meyer and Watkins, I guess, to pay

19  that award within 60 days.

20         MR. STEMPIEN:  Correct.

21         THE COURT:  Was the city involved in the litigation

22  that led to this particular order in the State Court?

23         MR. STEMPIEN:  Yes, they did.

24         THE COURT:  They were?

25         MR. STEMPIEN:  Yeah, they appeared at the hearing.

1          THE COURT:  And did they argue against this?

2          MR. STEMPIEN:  No.

3          THE COURT:  Did they raise the issue of the

4  settlement?

5          MR. STEMPIEN:  No.

6          THE COURT:  And did they oppose this entry of this

7  order in any way?

8          MR. STEMPIEN:  No.

9          THE COURT:  During the hearing did they say anything

10  about their indemnification obligation to Officer Watkins?

11          MR. STEMPIEN:  No.

12          THE COURT:  Did you bring up any of these things

13  during that hearing?

14          MR. STEMPIEN:  I did not.

15          THE COURT:  All right.  Well, what else do you want

16  to say about your motion then, Mr. Stempien?

17          MR. STEMPIEN:  No, I believe we've covered

18  everything, Your Honor.  I think the Court has a good sense of

19  what my argument is.  Thank you.

20          THE COURT:  All right.  Well, thank you.  We'll hear

21  from the city now.  Mr. Spinner.

22          MR. SPINNER:  Yes, good afternoon, Your Honor.  I

23  think you have actually covered most of what I would say.  You

24  know, now I understand exactly what he's -- brother counsel is

25  going after.

1    I think the -- the only issue I might raise, and it's

2    probably a lot simpler than it -- than it would appear in the

3    surface.  To me the one doctrine that's being overlooked all

4    over here is merger and the ability to settle claims.  Two

5    doctrines, I suppose.

6    First of all the parties can sell anything they wish for

7    the most part.  And they did so here and signed an agreement

8    to that effect.

9    At the time the settlement took place, merger takes

10   place.  The original claim merges into the settlement.  The

11   settlement requires that this claim, this -- this suit in

12   which the order was -- from the Court which issued the order,

13   that suit was supposed to have been dismissed.

14   The claims against the individual police officers were

15   obviously  released as they were to the city.  Claimant

16   bargained for a $42,500 unsecured claim, that's what he has,

17   that's what he's gotten.

18   And beyond that I don't think I could add much to what

19   Your Honor's already asked.  Unless you have questions for me,

20   Your Honor.

21       THE COURT:  Well, what do you say about this

22   Paragraph O on Page 62 of the confirmed plan and the argument

23   made by Mr. Stempien here?

24       MR. SPINNER:  Indemnification?  The -- well, two

25   things.  First of all, there's no indemnification required

1  anymore, Your Honor, he's released the officers and said, I

2  will take an unsecured claim against the city for payment.  So

3  there's no -- no ability or requirement for indemnification

4  because there's no further charges against the officers.

5  That's part of the settlement agreement that's been executed.

6  And as to that --

7          THE COURT:  So it is your view that the reference in

8  the settlement agreement in Paragraphs 2 and 5 to the -- to

9  Mr. McKay having a general unsecured non-priority claim

10 subject to the treatment provided for such claims under any

11 Chapter 9 plan, does not -- it means the treatment provided in

12 Class 14 of the confirmed plan, not the -- not anything that's

13 provided in Paragraph O on Page 62 of the plan relating to the

14 indemnification of city employees.

15         MR. SPINNER:  Oh, absolutely, Your Honor.  As a

16 matter of fact, you know, if we really want to get to be

17 esoteric about this, most of the arbitration award was

18 entered.  In theory the 1983 claims merged with that and you

19 have an arbitration dollar award.  What is now against the

20 individual officers is a dollar --

21         THE COURT:  That was a binding arbitration, I

22 assume, by agreement.

23         MR. SPINNER:  I believe so.

24         THE COURT:  Yeah.

25         MR. SPINNER:  And then -- and that was exchanged and

1 merged into a settlement agreement and in the settlement

2 agreement the plaintiff unambiguously agreed to release the

3 city, its employees, and then -- and dismiss this case and in

4 exchange for that would receive a Class 14 unsecured claim.

5     The reasons for the entering into the agreement, I'm not

6 going to speculate.  I'm not allowed to speculate because it's

7 unambiguous.  There's no parol evidence really to speculate

8 upon.  It's -- this is -- it is what it is.  He was

9 represented by counsel.  It was executed and then -- and now

10 he's gone off and gotten an award or an order from the Court.

11 I would say that theoretically is in violation of the

12 injunction.  But I think this motion would probably take care

13 of that.

14     In effect, Your Honor, what we're looking for is the same

15 thing Mr. McKay is.  We're looking to have the settlement

16 enforced.  I think we just have different interpretations of

17 what that means.

18         THE COURT:  The entry of this order on March --

19 dated March 14, 2016 by the State Circuit Court, order

20 enforcing arbitration award that I -- I referred to a little

21 bit ago with Mr. Stempien, Exhibit 6 to the -- Mr. McKay's

22 motion.

23     That order seems inconsistent with your argument about

24 the settlement agreement having released any claims by Mr.

25 McKay against the individual officers.

1        MR. SPINNER:  Certainly would be my position, Your

2   Honor.

3        THE COURT:  So is there -- is there a problem

4   however in the fact that there is a State Court judgment or in

5   fact the order which I assume is a final order, that's

6   inconsistent with the city's position?

7        MR. SPINNER:  Insofar as that the order exists, Your

8   Honor, if it's entered in violation of the Bankruptcy Court

9   injunction that was entered with the plan, we could move to

10  have it set aside.  I mean technically speaking yes, the order

11  stands until it's set aside and probably needs to be set

12  aside.

13      I -- to be perfectly honest, I am not entirely familiar

14  with the circumstances of how the order was extracted from the

15  State Court.  But if --

16      THE COURT:  Well, how -- how would the order be in

17  violation of any sort of injunction, discharge order, or

18  injunction under the confirmed plan?

19      MR. SPINNER:  Well, and to the extent -- just at a

20  beginning without speculating on how many different ways.

21  Just going after the fact the city's officers were sued in

22  their official capacities, this order does not, I don't

23  believe distinguish between that.

24      Certainly it's not limiting itself in any way.  It's just

25  simply the defendants shall pay within 60 days.  So at a

1  minimum it should be corrected.

2       But I mean I would also say that regarding the

3  settlement, the settlement said I will dismiss this case.  And

4  he did not dismiss this case.  So I think the city would then

5  have a claim against him theoretically for damages.

6       I don't want to speculate on how far this goes.  I think

7  this can be resolved a lot more simply than all.  But if we're

8  following hypotheticals, that's where I would take it.

9            THE COURT:  The obligation to dismiss the city case

10  or the civil case in State Court, that's Paragraph 9 of the

11  settlement agreement.

12            MR. SPINNER:  Yes, I believe so, Your Honor.

13            THE COURT:  That says stipulation of dismissal with

14  prejudice.  And the form attached hereto is Exhibit B.  I

15  don't see any Exhibit B in the record.  What is Exhibit B?

16            MR. SPINNER:  You know, Your Honor, we have not

17  found Exhibit B either.  However, I believe when the Court

18  last looked at this there was that similar -- this was exactly

19  on all fours with the Phillips decision, Exhibit B was not

20  found.  But there was definitely an intent expressed within

21  the agreement that the underlying litigation that led to the

22  filing of the proof of claim was to be dismissed and the city

23  takes the position that that same intent is expressed here,

24  it's the same language exactly.

25            THE COURT:  All right.  Anything else you'd like to

1 | say then, Mr. Spinner?

2 |      MR. SPINNER: No, sir. Thank you.

3 |      THE COURT: All right. Mr. Stempien, as counsel for

4 | the moving party you can briefly reply if you want to.

5 |      MR. STEMPIEN: Your Honor -- I'll get to the

6 | lectern. The only thing I'd like to point out is that there

7 | has been no indication that they were sued only in their

8 | official capacities. And there's nothing in the arbitration

9 | award that tells us how it was awarded against them.

10 |     They were sued as individuals. We did not sue the City

11 | of Detroit. We did not bring them in and say they are -- you

12 | know, this is the city's problem. We sued individual officers

13 | which is actually in the 1983, that's generally how it's done.

14 |     So to -- to -- I think it's just -- I don't think that

15 | there's been an establishment. I think that the fact of the

16 | matter is we have an arbitration award that could have been a

17 | judgment entered against three individuals with no indication

18 | that it was in any -- in official capacity. So I believe it

19 | still falls within that one provision of the plan that we

20 | talked about earlier.

21 |      THE COURT: Entered against three individuals?

22 |      MR. STEMPIEN: Correct.

23 |      THE COURT: Who were those other than Meyer and

24 | Watkins?

25 |      MR. STEMPIEN: If I could, Your Honor. It was

1  originally filed against Mr. Watkins, and then the lawsuit was

2  amended and we added three -- two other individual police

3  officers and the award was Officer Myron Watkins, Frederick

4  Persing, and Kevin Clark.

5           THE COURT:  Oh, I see.  They're named in the --

6           MR. STEMPIEN:  It's Exhibit 5 of my --

7           THE COURT:  They're named in the arbitration award.

8           MR. STEMPIEN:  Right.

9           THE COURT:  Yeah, okay, I got you.  All right.

10          MR. STEMPIEN:  Okay.

11          THE COURT:  Go on.

12          MR. STEMPIEN:  That's it.  That's all.

13          THE COURT:  All right.  Thank you all.  I'm going to

14  rule on this motion now.

15     Based on the argument presented in -- in the hearing

16  today and if this was not 100% clear in the papers filed by

17  the moving party and by the city before today's hearing, but

18  in the hearing it's now clear, that the moving party Mr.

19  McKay's theory here to entitlement from the City of Detroit of

20  full payment, the $42,500, the full amount of the -- what is

21  called the settled claim amount in Paragraph 2 of the

22  settlement agreement, must be paid at 100% rather than paid at

23  some -- with some lesser -- consideration of some lesser value

24  because of the terms of the confirmed Chapter 9 plan.

25     That that argument is -- that argument is the sum -- the

1   total amount of relief and really the only theory of relief

2   that ultimately is -- is argued here by the moving party, Mr.

3   McKay.  And that means as -- as stated by Mr. Stempien,

4   counsel for Mr. McKay during the hearing made clear today, the

5   -- Mr. McKay agrees and acknowledges that the settlement

6   agreement provided for settlement of and release by him of the

7   -- his 1983 claims, or his -- his claims -- civil rights and

8   1983 claims against not only the City of Detroit whatever

9   claims there may be, but also against the individual officers

10  who were the subject of the arbitration award at issue.

11       And that's clear -- as the city argues, that's clear from

12  Paragraph 8 of the settlement agreement which by the way is in

13  the record as an exhibit to both parties' papers.  I'm looking

14  at docket 11187 as my copy here, it's Exhibit B at that point.

15  It's also Exhibit 7 to the motion, docket 11157.  That's the

16  settlement agreement.

17       The -- the settlement agreement is clear in Paragraphs 2

18  and 5 that what Mr. McKay was receiving as the sum total of

19  consideration running in his direction in exchange for

20  releasing his claims against the individual officers and the

21  city in Paragraph 8, is -- provides -- that provided in

22  Paragraphs 2 and 5 of the settlement agreement.  That is in

23  the form of Mr. McKay being given -- a provision stating that

24  the claim Mr. McKay had filed in the City of Detroit's case

25  would be amended, modified, and allowed as a general unsecured

1  non-priority claim.  That's Paragraph 2.  In the amount of

2  $42,500.

3      The priority of the claim then is general unsecured

4  non-priority.  Paragraph 5 confirms that of the settlement

5  agreement, confirms that as well.  And says, "the parties

6  agree that any settled claim is a general unsecured

7  non-priority claim subject to the treatment provided for such

8  claims under any Chapter 9 plan for the adjustment of debts

9  confirmed by the Bankruptcy Court."

10     The -- Mr. McKay then is entitled to what he's entitled

11 to from the city as the sum total of what the city is

12 obligated to -- to provide to Mr. McKay under this based on

13 this settlement agreement, is whatever treatment the confirmed

14 Chapter 9 plan in this case provided for general unsecured

15 non-priority claims.

16     And that treatment in my view clearly is the treatment

17 provided in -- to Class 14 in the confirmed plan.  The

18 treatment of Class 14 is stated in the confirmed plan.  At

19 Page 44 of the confirmed plan, a copy of the confirmed plan is

20 attached to the order confirming plan, docket number 8272 on

21 file in this case.  And that treatment is certainly quite

22 different from full payment in cash of the full amount of the

23 allowed claim as argued by Mr. McKay.  It's the treatment that

24 provides for a pro rata share of certain amount of new B notes

25 and other distributions referred to in Class 14, but it is

1  definitely not full payment in cash and it is far -- far less

2  than that of the allowed claim.

3       Now Mr. -- that's clear in my view from the words used in

4  the provision, the stated -- the treatment of Class 4 claims

5  which are defined as allowed other unsecured claims, that's a

6  defined term on Page 44 of the confirmed plan.

7       It allowed -- there's no dispute that there's an allowed

8  claim here.  The -- the question is whether this claim of Mr.

9  McKay under the settlement agreement is a "Other Unsecured

10 Claim" within the meaning of the statement of treatment under

11 Class 14 on Page 44 of the plan.

12      In my view clearly it is.  The definition of -- of other

13 unsecured claim in the definitions of the confirmed plan on

14 Page 21 to 22, Paragraph 262 in my view, although you have to

15 parse through it, it's -- it's -- it's clear and unambiguous

16 that that includes the general unsecured non-priority claim of

17 the type which Mr. McKay was given as an allowed claim in this

18 Chapter 9 bankruptcy case under the confirmed Chapter 9 plan

19 by this settlement agreement, Paragraphs 2 and 5.

20      Mr. McKay has relied upon a provision in the confirmed

21 plan on Page 62 of the confirmed plan.  Again it's docket

22 8272.  The Paragraph O on that page which says for purposes

23 irrelevant to this motion, in -- in essence says that the

24 plan, the confirmed plan does not discharge or impair the

25 allegations of the city that the city otherwise has to

1  indemnify, defend, reimburse, exculpate, advanced fees and

2  expenses to or limit the liability of officers and employees

3  of the city.

4      As the movant's counsel acknowledged I think in today's

5  hearing, it is clear that the city's obligation to indemnify,

6  defend, reimburse, et cetera its employees, that was not

7  discharged given the language in Paragraph O on Page 62 of the

8  confirmed plan and otherwise, is an obligation that runs of

9  the city to its employees and not an obligation the city has

10  or that runs to any third party claimants who make claims

11  against employees and officers of the city like Mr. McKay.

12      And so the settlement agreement in my view and its

13  reference -- its language in Paragraphs 2 and 5 of the

14  settlement agreement, is clear and unambiguous given the clear

15  and unambiguous language of the confirmed Chapter 9 plan, that

16  the treatment of the allowed $42,500 claim that Mr. McKay has

17  under the settlement agreement or under the Chapter 9 plan, is

18  the treatment provided by in -- to holders of Class 14 claims

19  under the confirmed plan that I've already referred to and

20  nothing else and nothing more.

21      The city has no other obligation in my view under this

22  settlement agreement and under the confirmed plan than that to

23  Mr. McKay.  The -- and so Mr. McKay's motion which seeks an

24  order requiring the city to pay the full $42,500 allowed

25  amount of his claim is relief that cannot be granted, it would

1  be inconsistent with the confirmed plan.

2     And the Court must reject Mr. McKay's motion and

3  arguments to the contrary.  So for that -- those reasons Mr.

4  McKay's motion will be denied.  I will prepare and enter an

5  order reflecting this ruling and denying the motion.  Thank

6  you.

7          MR. STEMPIEN:  Thank you, Your Honor.

8          THE COURT:  The next motion then that I want to hear

9  that's on our agenda is the -- the motion filed by the city

10 seeking relief against Rodrick Siner.

11    For the record this motion was filed by the city on May

12 12, 2016.  It is at docket number 11159.  It's entitled City

13 of Detroit's motion for the entry of an order enforcing the

14 plan of adjustment injunction and the bar date order against

15 Rodrick Siner.

16    Now Mr. Spinner, you're on your feet.  You're

17 representing the city today in this hearing on this motion.

18 For the record I will ask, I think I know the answer, but I

19 will ask whether Rodrick Siner is present or if there's anyone

20 here on behalf of Mr. Siner.  I hear nothing.  Mr. Siner has

21 failed to appear at this hearing either in person or through

22 any attorney.

23    And the Court and the city counsel may well know why that

24 is or have good reason to suspect why that is, namely that Mr.

25 Siner is in prison in Alabama at the moment and did not try to

1  make any arrangements to participate in this hearing by

2  telephone as far as I know and has not hired counsel as far as

3  I know to represent him in this -- in this matter.

4      He did file a written response to the city's motion.  For

5  the record that appears at docket 11175.  It was filed on May

6  17, 2016.  The city filed a reply to that response on June 10,

7  2016 at docket 11261.

8      I have considered all of those documents.  I also have

9  reviewed and considered the document filed by Mr. Siner in

10 this Court two days ago, June 13th at docket 11279 entitled

11 motion to reschedule hearing.

12     I have not yet acted on that motion to reschedule

13 hearing.  For one thing a notice of deficiency had to be

14 issued with respect to that motion it was deficient in several

15 ways as identified in the deficiency notice that was filed

16 yesterday at docket 11281.

17     Mr. Spinner, let me ask you as counsel for the moving

18 party, the city, whether the city has a position regarding

19 whether the Court should grant or deny Mr. Siner's motion to

20 reschedule hearing filed two days ago.

21        MR. SPINNER:  Your Honor, we do not believe it is --

22 could be taken in good -- we suggest that the Court deny it.

23 The -- if I -- if I read Mr. Siner's motion correctly, he

24 would like it adjourned until he is either appointed counsel,

25 or he can appear in person which I believe he says would

1 happen approximately April of 2017.

2     That would mean that the -- if the -- if the Court were

3 to entertain it and adjourn it that long that would mean that

4 Mr. Siner's suit in the District Court could continue which

5 apparently he is able to manage from -- from prison for many

6 months before we would be able to adjudicate on whether or not

7 that is an illegal suit based on the plan injunction. So we

8 don't think that's a -- that's particularly well taken.

9     THE COURT: All right. Well, the short answer is

10 the city opposes Mr. Siner's motion to reschedule. I might

11 have considered ruling otherwise if the city had agreed to the

12 motion to reschedule in some way, but they -- they have not

13 and I'm going to deny Mr. Siner's motion to reschedule today's

14 hearing and I'll prepare and enter an order reflecting this

15 ruling.

16     I'm denying it for the following reasons. First, the

17 motion is untimely. It is filed much too late in time and

18 much too close to the date of the scheduled hearing in my

19 view.

20     Mr. Siner was mailed a notice of today's hearing on the

21 city's motion on May 19, 2016, just one day short of four

22 weeks before today's hearing date. And so shortly after that

23 Mr. Siner knew of the June 15 hearing date on this motion and

24 he waited until June 13 to file a motion to reschedule the

25 hearing. That's untimely in my view and it's denied for that

1  reason.

2       Second, Mr. Siner as -- as Mr. Spinner mentioned, Mr.

3  Siner asks in his motion to reschedule that the Court

4  reschedule the hearing until a later date that will allow him

5  to be present and present argument on his behalf, or in the

6  alternative, appoint counsel to represent him.  The Court

7  cannot appoint counsel to represent Mr. Siner in this matter,

8  there's simply no basis in law or under this Court's rules or

9  procedures, or the Bankruptcy Code to permit that.

10      This Court does have a pro bono counsel, volunteer

11 counsel program in which volunteer attorneys represent certain

12 debtors and sometimes certain creditors in certain bankruptcy

13 -- types of bankruptcy cases regarding certain issues.  But

14 they all have to do with issues of whether or not an

15 individual debtor is to obtain a discharge in a Chapter 7

16 case, or have a given -- certain types of debts excepted from

17 discharge in a Chapter 7 case.

18      The Court's pro bono program does not extend to a motion

19 of this type in this case.  And so this Court does not have

20 any ability to appoint counsel to represent Mr. Siner in this

21 matter or otherwise.

22      And as Mr. Spinner pointed out, Mr. Siner's motion to

23 reschedule this hearing indicates that he is incarcerated

24 until -- is not scheduled to be released from his

25 incarceration in Alabama until April 2017.  That is under the

1   circumstances far too long for this Court to wait to have --

2   to merely have a hearing on the city's motion under all the

3   circumstances.

4       And so for those reasons I'm -- I'm denying Mr. Siner's

5   very late filed motion to reschedule today's hearing and we're

6   going to go forward with today's hearing.  And as I said, I'll

7   prepare and enter an order reflecting that ruling.

8       That brings us then to the city's motion.  And while I

9   have denied and am denying Mr. Siner's motion to adjourn or

10  reschedule today's hearing on the motion, I am not defaulting

11  Mr. Siner for his failure to appear at the hearing today.

12      That is I'm not going to rule against him in any part or

13  in any way because of his failure to appear at today's

14  hearing.  If I rule against him it will be based upon the

15  merits of this dispute rather than any sort of default by Mr.

16  Siner's failure to appear today.

17      And I do -- I do that because in this case it's obvious

18  and -- and well known to the Court, Mr. Siner's made known to

19  the Court that he -- that it is physically impossible for him

20  to appear at today's hearing and argue his -- his position.

21      I have considered, however, the position and argument he

22  made and facts he alleged in his written response to the

23  city's motion that I referred to earlier as well as of course

24  the city's arguments.  Now I will give counsel for the city an

25  opportunity to argue the motion since they have appeared at

1  today's hearing.

2      So Mr. Spinner, I'll do that now.  What do you want to

3  say about your motion?

4      MR. SPINNER:  Thank you, Your Honor.  Well,

5  obviously you've been considering it.  Also I will keep it

6  extremely brief.

7      In short, Mr. Siner filed suit against the city in the

8  District Court on October 8th, 2015, commenced the case

9  15-13532 against the city and several John Doe police officers

10 which he sued in their official and individual capacities --

11 capacities asserting various violations of constitutional

12 rights.

13     And the city for protection has appeared and answered.

14 The short answer is that Mr. Siner is not allowed to do this.

15 He's filed -- the filed bar date order at docket 1782,

16 Paragraph 22 bars people from asserting pre-petition claims

17 against the city after February 21st, 2014.

18     The plan at docket 8045 which Your Honor has cited the

19 confirmation order confirming said plan contains a similar

20 injunction in Article 3(d)(5).  Siner -- Mr. Siner responds

21 that the discharge could not cover future events and he cites

22 the revocation of his Alabama parole on October 13th, 2015

23 which he says he could not have foreseen to -- to which the

24 city responds that first in his complaint he says he was

25 warned about this by his parole officer when the warrant for

1   his arrest and his subsequent arrest took place sometime

2   between 2010 and 2012 which clearly means he must have been

3   aware of it since his parole officer -- he alleges himself, he

4   admits his parole officer told him this would be the outcome.

5       And also as an aside technically though he clearly saw

6   how the hearing was going to go because he filed -- he mailed

7   the complaint to the Court September 29th, two weeks before the

8   parole hearing alleging that his parole had been denied, so

9   either he has a crystal ball or pretty good idea what was

10  going on.

11      The Court has already considered how to decide whether a

12  claim arises pre or post-petition.  For the record the issued

13  opinion is at docket 11089.  And so the Court settled on the

14  fair contemplation test to make the determination.  And the

15  simple question is with reasonable due diligence could the

16  claimant here Siner, assert ascertaining they had a claim

17  pre-petition and as we've just stated yes, he admits that his

18  parole officer warned him.  So he did not even need to

19  exercise due diligence, he was informed that this could very

20  well be the outcome.

21      So he knew this -- this could have happened.  This was

22  all pre-petition conduct and therefore it's all subject to the

23  bar date and the injunction and the claims against the city

24  and their officers at least in their official capacity, are

25  barred.

1      And I think that's pretty much the majority.  The only

2  comment I would mention is that he did mention, and since

3  we're dealing with Mr. Siner in full fairness, he mentions he

4  did not get notice of the bar date.  He raised that in his

5  motion to adjourn, although it's not technically up for the

6  Court.

7      It's also not relevant for this particular question.  If

8  he feels he needs to file a motion to file a late filed claim

9  he can -- he can do so.  We can deal with it at a future time.

10  But I wanted to respond fully to all of his -- his comments.

11  Other than that if Your Honor has any questions, happy to

12  address them.  But I think you've -- you've covered it.

13          THE COURT:  I don't have questions, thank you.  I'm

14  going to rule on this motion now as well.

15      This motion by the city will be granted.  It's clear and

16  -- it is clear from the facts and the circumstances presented

17  here that in filing this action that he filed in U.S. District

18  Court on or about October 8, 2015, Mr. Siner filed a lawsuit

19  against the City of Detroit based on a pre-petition claim.

20  That is a claim that he has against the City of Detroit that

21  arose well before the city filed its bankruptcy petition in

22  this Chapter 9 case on July 18, 2013.  That was the bankruptcy

23  petition date.

24      Mr. Siner's complaint and -- and his claim are claims

25  against the city whatever validity or merit they may have or

1  may have had are based on actions and arise from actions,

2  wrongful actions allegedly taken by one or more officers of

3  the -- police officers of the city back in 2010.  On or about

4  April 13, 2010.

5      The complaint is based upon an alleged violation of Mr.

6  Siner's constitutional rights that occurred he says and

7  alleges when an arrest warrant was issued by the Detroit

8  Police Department on April 13, 2010 against him on criminal

9  charges.  His complaint is based entirely on that as the

10  wrongful action by the city and city officers that form the

11  basis of his claim or claims against the city.

12      That is clearly a pre-petition claim in the sense that it

13  arose well before the city filed its Chapter 9 bankruptcy

14  petition in July 2013.  The -- while Mr. Siner argues in his

15  written response that he only suffered the most serious

16  damages that he complains about, that is the revocation of his

17  parole in Alabama that led to his incarceration that he still

18  suffers from in Alabama according to his response, while that

19  occurred after the filing of the bankruptcy petition, that is

20  not dispositive of the issue in my view of when the claim or

21  claims by Mr. Siner against the city arose for bankruptcy

22  purposes.

23      As the city points out in their response, the Court

24  recently issued an opinion discussing at length the law

25  concerning when a claim against a bankrupt debtor is deemed to

1  arise for bankruptcy purposes.  And when -- and whether it is

2  deemed to arise before or after the filing of a bankruptcy

3  petition.

4      I want to reiterate and incorporate by reference

5  everything I said in -- in my recent opinion filed in this

6  case on that subject.  For the record the opinion was filed by

7  me as -- as an amended opinion.  It was filed on April 19,

8  2016 and it is reported at 548 B.R. 748, a decision again from

9  April 19, 2016.

10      In that opinion, that lengthy opinion and in particular

11  at Pages 761 to 763 of the Court's opinion in that case, the

12  Court discusses the fair contemplation test as the proper test

13  for determining whether a claim arose pre-petition or

14  post-petition for bankruptcy purposes and then apply that test

15  to three different sets of claims that had been brought

16  against the city and ruled as to whether they were pre or

17  post-petition.

18      The claim of Mr. Siner, or claims of Mr. Siner clearly

19  arose pre-petition.  The alleged wrongful conduct by the city

20  arose and Mr. Siner was well aware of the wrongful conduct,

21  far and long before the bankruptcy petition date.

22      The fact that Mr. Siner suffered damage or additional

23  damage from that alleged wrongful conduct by the city that he

24  was aware of well before the bankruptcy petition date after

25  the petition date and continues to suffer some adverse affects

1  after the petition date from such pre-petition conduct does

2  not make the claim arise after the filing of the bankruptcy

3  case for bankruptcy purposes.

4      Rather clearly this claim arose before the filing of the

5  bankruptcy petition.  The consequences of that conclusion is,

6  that the filing and prosecution of that lawsuit in District --

7  U.S. District Court that's at issue in this motion by Mr.

8  Siner was a violation of the discharge injunction in the

9  confirmed Chapter 9 plan and the claim -- the so-called bar

10 date order, both of which are cited and discussed in detail in

11 the city's motion.

12     I agree entirely with the city on their arguments that

13 the -- Mr. Siner's actions in filing and prosecuting that

14 lawsuit in U.S. District Court was barred, is barred and

15 prohibited by the discharge injunction and the bar date order

16 in this bankruptcy case.

17     And so the city is entitled to the relief they request.

18 The -- Mr. Spinner, I'll ask you to submit the proposed order

19 that was attached to the motion.  I will ask you to make one

20 change in the order.

21     In Paragraph 2 of the order it requires Mr. Siner to

22 dismiss or cause to be dismissed with prejudice his claims in

23 the city -- or the U.S. District Court case within five days

24 after the entry of this order.  That -- that is perhaps a bit

25 too soon of a deadline for Mr. Siner given that he's in -- in

1  prison in Alabama.

2      And so I'm going to make it 14 days.  So I'll say no

3  later than, and so I'll just say no later than and then put in

4  the specific date that is 14 days after today which is June

5  29.  So, no later than June 29, 2016, Frederick Siner shall

6  dismiss or cause to be dismissed, et cetera as it -- as it

7  reads there.

8      And then I -- I'll ask you to submit the order as

9  revised.  I will modify probably in some non-substantive ways

10  the first paragraph text of the order to recite the Court

11  having held a hearing today and -- and -- and so forth.  But

12  other than that the order is fine and I'll ask you to submit

13  that and I'll waive presentment of the revised order.  Any

14  questions about what's needed there, Mr. Spinner?

15          MR. SPINNER:  Crystal clear, Your Honor.

16          THE COURT:  All right.  Thank you.  As I said, I'll

17  prepare and enter the order regarding denying the motion to

18  reschedule the hearing.

19      All right.  That next brings us to the remainder of the

20  agenda for today which is the city's forty-fourth omnibus

21  objection to certain claims.  The city's forty-fifth omnibus

22  objection to certain claims.  And then an adjourned hearing

23  regarding numerous claims that were the subject of several

24  previous omnibus objections to claims heard earlier dates

25  which were adjourned for purposes of being treated together

1  and argued at today's adjourned hearing.

2       I think all of these matters concern basically the same

3  issues.  And so I think we'll consider them all together and

4  those -- we'll hear first from counsel for the city regarding

5  these omnibus objections to claim.  And then anyone who is in

6  the Court who wants to be heard regarding these, any of these

7  matters insofar as it concerns a claim of theirs.  Or if

8  you're an attorney, a claim of your client's in this case will

9  have an opportunity to be heard today in this hearing.  So,

10 Mr. Spinner.

11        MR. SPINNER:  Well, Your Honor.  Thank you.  You've

12 taken pretty much most of the words out of my mouth here

13 today.  Pretty much I was going to suggest we do them all

14 together so that's -- that's absolutely appropriate.

15      What we were going to propose is that I would review the

16 procedure of how we got here and the docket entries and then

17 Mr. Willems would argue the brief.  But Your Honor has been

18 doing a fabulous job keeping the docket up to date so if you

19 don't need me at all, I could just turn it over to Mr. Willems

20 to argue his brief, or I can go through the procedure,

21 whatever suits the Court.

22        THE COURT:  I think you should briefly describe the

23 procedure and the background a bit here as to the claims --

24 objections other than the forty-fourth and forty-fifth omnibus

25 objections for the benefit of those who are present who don't

1  have counsel and -- and may benefit from hearing a bit about

2  the background on this.

3        MR. SPINNER:  Happy to do so.  On July 9th, 2014 the

4  Court entered the order pursuant to 11 USC Section 105(a) and

5  Federal Rule of Bankruptcy Procedure 3007 approving claims

6  objection procedures.  That's at docket 5872 of the claims

7  procedures order.

8        And at two on that order it allows the city to file

9  omnibus objections with respect to claims that do not identify

10  a valid basis for any liability of the city.  On February 26,

11  2016, the city filed omnibus claim objection twenty through

12  thirty-four and that's docket numbers 10776 through 10790.

13       Fifty-three Detroit employees filed responses that were

14  not stricken that raised similar issues with respect to terms

15  of employment and the imposition in large part on city

16  employment terms.

17       On March 24th, fifth, and April 7th of 2016, the city filed

18  ex parte motions to establish an orderly process for hearing

19  and determining these claims.  And those were at docket

20  numbers 10931 and 11050.

21       On March 10th, we also filed two more omnibus objections

22  which related omnibus number thirty-six and thirty-seven at

23  docket numbers 10811 and 10812.

24       The city ordered -- entered orders granting our ex parte

25  motions.  Those were entered at docket numbers 10941, 11035,

1   and 11054.  And they were served upon the various claimants

2   and the certificates of service are at docket numbers 10966,

3   10987, 11070, and 11071.

4       Taken collectively these orders allowed the city the

5   opportunity to explain collectively why employee obligation

6   claims fail as a matter of law and thus on April 21st the city

7   filed its supplemental brief in support of expungement or

8   disallowance of claims of employee obligation claimants at

9   document number 11 -- 11102.  No responses were filed now so

10  the employee obligation claims from those omnibus objections

11  are up for hearing today.

12      On May 12th, subsequent to that the city filed its

13  forty-fourth and forty-fifth omnibus objections for claimants

14  who asserted claims that the city believed were in the same

15  vein as those subject to the -- of the legal arguments in the

16  supplemental brief.  And those were filed, those omnibus

17  objections were filed at docket numbers 11162 and 11163.

18      There were a number of timely responses to the

19  forty-fourth and forty-fifth omnibus objections and a number

20  of parties asserted that they were in positions funded by

21  grants provided outside the city and thus for various reasons

22  the city employment terms should not apply to them.

23      The city does not wish to rush to judgment on those.  It

24  wishes to afford additional time to investigate and resolve

25  them as to the extent possible.  So I filed an ex parte motion

1  to adjourn the hearing for these particular claimants at

2  docket number 11255 and the Court granted that at document

3  11265.

4      The city served all the parties affected by this by

5  overnight service this past Friday at document number 11267 so

6  the affected parties should have got notice of that.  None of

7  them have been returned, so they should all know they do not

8  need to show up today.

9      Of course some responses have subsequently been stricken

10 for various deficiencies.  If the Court wishes, I can read in

11 the list of claimants who were scheduled to be heard today but

12 which were adjourned, or I can skip that.

13          THE COURT:  One second.

14          MR. SPINNER:  Certainly.  There were 20 in all I

15 think.  Fourteen for the forty-fourth and six for the

16 forty-fifth.  And the reason for the size discrepancy, the

17 forty-fourth was the first 100 and the remaining I think 40 or

18 so were in the forty-fifth.

19          THE COURT:  Just a minute, please.

20          MR. SPINNER:  Sorry.

21          THE COURT:  I -- I think, yes.  I will ask you to

22 read the names of those who were -- whose claims were the

23 subject of the forty-fourth and forty-fifth omnibus claim

24 objections which are being heard for the first time today.

25          MR. SPINNER:  Well, first time today are the ones

1  who are being adjourned.  I don't have --

2        THE COURT:  Just let me finish.

3        MR. SPINNER:  I'm sorry.

4        THE COURT:  Those omnibus claims objections are

5  being heard today except as to those individuals whose claims

6  -- the objection to claim has been adjourned by the Court's

7  order that was entered on June 10th that you referred to.  So

8  as to those individuals whose -- for whom the hearing on the

9  claim objections have been adjourned to August 31 at 1:30

10 p.m., I would like you to read those names.

11        MR. SPINNER:  Sure.

12        THE COURT:  For the record and for the benefit of

13 anyone who has come to the hearing today, if your name is read

14 now, understand that you -- your claim is not scheduled for

15 hearing today, it's been adjourned for a hearing on August 31

16 at 1:30.  You're not required to be here and there's nothing

17 to argue -- for you to argue today about your claim, but of

18 course everyone who is here is welcome to be here.

19    This Court is open to the public.  And anyone whether

20 they have a claim or not in the city case is -- is --

21 certainly may attend and listen to the hearing.  So with that

22 said, Mr. Spinner, would you read the names of those who are

23 -- whose claim -- the objection to whose claims are not being

24 heard today but rather have been adjourned to August 31 at

25 1:30 p.m.

1          MR. SPINNER:  Absolutely.  Would you like just the

2    name or the name and the docket number of their response?

3          THE COURT:  Just read the names and speak up so

4    everybody will hear you.

5          MR. SPINNER:  Yes, sir.  Michelle Duff, Anthony

6    Derrick Smith, Hope Strange, Dinah L. Bolton, Jacqueline M.

7    Jackson, Fern Clement --

8          THE COURT:  Hold it, Mr. Spinner -- Mr. Spinner,

9    let's do it this way.  I'm following along.  I want you to

10   read it in the order that it appears in the order adjourning.

11   Do you have that there?

12         MR. SPINNER:  I do.  And for further clarification,

13   I believe -- I recognize some of these names have been

14   recently stricken.  Their responses have been stricken for

15   various deficiencies.  If the Court will indulge me just a

16   moment.

17         THE COURT:  Just read the names that are in the box

18   on Page 2 of the June 10 order 11265.  That's what I want you

19   to do.

20         MR. SPINNER:  Yes, Your Honor.  I had to get the

21   order in front of me.

22         THE COURT:  All right.  If you have that order in

23   front of you, go ahead and again speak up.

24         MR. SPINNER:  I will.  Dinah L. Bolton, Gueelma

25   Brown, Fern Clement, Stephanie Crews, Brenda L. Davis,

1 | Michelle Duff, Warren T. Duncan, Gerhard Eady, Jacqueline M.

2 | Jackson, George A. Kaw, Kim McCoy, Sandra O'Neal, Diane L.

3 | Onuigbo, Diana Lynn Patillo, Marlene Y. Robinson, Anthony

4 | Derrick Smith, Hope Strange, Randall Thomas, Ranna K. Trivedi,

5 | and Darrell S. Carrington.

6 | THE COURT: All right. Thank you. Again those are

7 | the names of individuals whose claims are not being discussed

8 | in today's hearing. The city's objection to your claim if

9 | you're on that list that was just read is -- has been

10 | adjourned to August 31 at 1:30 p.m. You need to be here then

11 | for that if you want to appear and be heard about it.

12 | Now, that concerns the individuals whose claims were part

13 | of the city's forty-fourth and forty-fifth omnibus objections

14 | to claim. There is a list of it looks like about 49 people

15 | whose claims were the subject of earlier objections to claim

16 | but which the hearing of which has been adjourned to today.

17 | MR. SPINNER: Yes.

18 | THE COURT: Under the procedures you described,

19 | including the city's filing of its brief on April 21 talking

20 | about the -- the city employment terms and the employee

21 | obligation claims.

22 | So is -- unless there's any further background that you

23 | wish to give then, Mr. Spinner, we'll -- we'll hear argument

24 | from the city on the merits of the -- these arguments.

25 | MR. SPINNER: Only that there's six remaining from

1  the forty-fourth and forty-fifth.  And I believe Mr. Wolfe's

2  was just stricken by the Court prior to this hearing for a

3  deficiency.  So that leaves James Capizzo, Carla Smith, Gladys

4  Cannon, and Gerald Moore from the forty-fourth going forward

5  today and Renee Tollman for the forty-fifth.  And that ends my

6  portion and I will turn it over to my colleague.

7         THE COURT:  Well, wait, Mr. -- excuse me, if Mr.

8  Wolfe is present, I will allow him to be heard today in the

9  hearing.  I'll allow him to speak if he's here and he wants to

10 speak about the names that you just went through.

11        But the names you just went through are the names of

12 individuals who filed responses, written responses as they

13 were required to do to the city's forty-fourth and forty-fifth

14 omnibus claim objections and there are other names of

15 individuals who were subject to those objections who are not

16 being adjourned or who did not file a written response.  And

17 as to those, I -- I assume the city is seeking an order

18 granting the -- sustaining the objection to claim and

19 disallowing the claims.

20        MR. SPINNER:  Yes, Your Honor.

21        THE COURT:  All right.  So if the city is ready to

22 argue the merits, go ahead.

23        MR. WOLFE:  Your Honor, you wanted to hear from Mr.

24 Wolfe.  I wanted to --

25        THE COURT:  Are you Mr. Wolfe?

1          MR. WOLFE:  Yes.

2          THE COURT:  Well -- well, as I said, I'll give you

3    an opportunity to speak, Mr. Wolfe after we hear from the

4    attorney for the city.

5          MR. WOLFE:  Okay.  Thank you.

6          THE COURT:  As I will give the others who are --

7    whose claims are up today, I'll give everyone else a chance to

8    speak.  Go ahead, Mr. Williams is it?

9          MR. WILLEMS:  Willems, Your Honor.

10         THE COURT:  All right.  Go ahead, Mr. Willems.

11         MR. WILLEMS:  It's E-m-s at the end.

12         THE COURT:  Go ahead.

13         MR. WILLEMS:  Thank you, Your Honor.  The -- what

14   I'm going to do is just address briefly the general principles

15   about which we are asking the Court to expunge with -- with

16   all these -- these claims or disallow these claims.

17         THE COURT:  Mr. Willems, let me ask you to speak up.

18         MR. WILLEMS:  Yes, okay.

19         THE COURT:  Apparently there are some folks in the

20   back of the courtroom that are having trouble hearing.  I want

21   to make sure they hear.  So I'm trying to speak up, hopefully

22   I'm not yelling.

23         MR. WILLEMS:  I'll move the mike a little closer.

24         THE COURT:  Yeah, please do.

25         MR. WILLEMS:  How is that?

1          THE COURT: All right. Go ahead.

2          MR. WILLEMS: Okay. So we have essentially three

3     arguments, two of which apply to all of the claims and one of

4     which applies to a certain subsection.

5          As we reviewed these claims, we noticed that all of them

6     seem to have at least to a great degree or exclusively claims

7     based on the reductions in pay and benefits that took place

8     under what are known as the CET's, the city employment terms.

9     The city employment terms were imposed on city employees both

10    union and non-union in July of 2012 after the city entered

11    into a consent agreement or a financial stability agreement

12    with the state under what was then Act 4 which was in effect

13    at the time. That's PA-4 of 2011.

14         The -- under -- under that -- under Act 4 and under the

15    consent agreement, the city's duty to bargain with its unions

16    was suspended for the period of the consent agreement. And

17    that means that under -- under the Public Employment Relations

18    Act normally the city is required as a public employer to

19    bargain with the duly elected representatives of its

20    employees, in this case the unions ASFCME, SAAA, et cetera.

21         Under -- under the consent agreement under Act 4 that

22    duty was suspended for a period of time and so the city was

23    legally allowed to impose terms and conditions of employment

24    on its employees. And that was true whether it was a union

25    employee or not because basically unless you had a collective

1  bargaining agreement you were an at will negotiable employee

2  in any case.

3      So as part of the requirements under the consent

4  agreement, certain financial efficiencies had to be instituted

5  and a lot of those ended up being labor costs that were

6  addressed in the CET's.  And what -- what we see in these

7  claims are pretty much the -- the same -- the same sort of

8  claims of reductions in pay and benefits that -- that you see

9  that were imposed in the CET's, the 10% wage loss, the

10  reduction in -- in various holidays, bonuses, longevity,

11  elimination, and loss of vacation days, swing, and election

12  holidays, holiday pay, paid lunch hours, increased health care

13  costs, changes in welfare benefits, freezing of reserved sick

14  banks, all those kinds of things.

15      And to practically every claim with one or two exceptions

16  I think, had some component of those reductions in them as

17  their claim.  In some cases the CET's were specifically

18  referenced, in other cases they were not, but in any case the

19  -- the specifics of the claims comported precisely with the

20  reductions in -- in the -- in the pay and benefits that were

21  imposed under the CET's.

22      Our argument on -- on this process is that there's really

23  no valid underlying legal claim here.  The CET's were lawfully

24  imposed under Act 4.  To the extent that there were any

25  challenges they were rebuffed by -- by the Courts.  In fact

1  there were really only three legal challenges, two of which

2  we've cited in our brief.  The Detroit Police Officers

3  Association brought two separate cases attempting to argue

4  primarily because they're a public safety union that they had

5  still retained rights to negotiate the terms and conditions of

6  employment despite the fact that there was -- that there were

7  CET's in place and that there was a -- a consent agreement in

8  place.

9      The Courts rejected those and as you may know

10 historically Act 4 was suspended pending a referendum and at

11 that point the Detroit Police Officers Association went back

12 into Court and tried to get the CET's overturned and the

13 Courts rejected that.  Those cases were all up on appeal when

14 the -- when the city was placed in receivership and ultimately

15 the appeals were withdrawn.

16     So the -- the first reason for disallowing or expunging

17 these claims is that there's no valid underlying legal claim.

18 The city was within its rights to impose the CET's.  There is

19 no -- no challenge that -- that undermines that argument and

20 the -- the claims should be disallowed for that reason.

21     The second reason for disallowing some of these claims is

22 that they appear to be based on the actions of the emergency

23 manager.  As you -- as you know, in -- in March of 2013, the

24 city was placed in receivership and it was placed under the

25 guidance of -- of an emergency manager.  This time under Act

1  436 which is the -- the successor statute to Act 4 and

2  contains a lot of the same provisions.

3      But in effect under receivership the emergency manager

4  also has no duty to bargain collectively under the Public

5  Employment Relations Act.  And so there were further terms

6  imposed by the -- by the emergency manager and specifically

7  the claims, some of these claims, and I think we've identified

8  them in our brief, allege that in addition to the CET

9  reductions the emergency manager also imposed an annuity and

10  pension freeze under emergency manager order number 21.

11      And those claims should be expunged or disallowed for the

12  same reasons that these were lawful actions taken by the

13  emergency manager.  There is no underlying legal claim that --

14  that can be brought for any -- any reductions in pension or

15  annuities.

16      Finally, all of these -- well, all but I think two of the

17  claimants are union members and they belong to various unions.

18  The -- the bulk of them are AFSCME, American Federation of

19  State County and Municipal Employees which has a number of

20  locals throughout the city and various departments.

21      There are also members of several other unions which

22  we've identified in our brief.  And all of these unions

23  themselves are members of what is called a coalition of

24  Detroit unions.  The coalition and AFSCME both have their own

25  proof of claim pending which is -- covers all of the claims

1  relating to the CET's that are brought here by the individual

2  claimants.

3      So in essence these claims are duplicative of the omnibus

4  union claims.  The -- the Court is probably aware of both the

5  AFSCME claim and the coalition claim.  And we have attached

6  those to our brief to demonstrate that the -- the claims

7  brought by the unions are in fact the same kinds of claims

8  that are brought by the individuals.

9      And being duplicative the individuals obviously the

10  question for the Court is, if I have duplicate claims which

11  one do I honor, which one prevails.  And it's pretty clear

12  under Michigan law that it would be the union claims that

13  prevail.

14      The CET's as you recall were imposed under -- under an

15  amendment to PARA that was made as a result of Act 4.  They --

16  they are -- are part of collective bargaining law in this

17  state or they were at that time.

18      And the -- they supplanted the collective bargaining

19  agreements.  But they did not, although there was no duty to

20  bargain with the unions, the unions still continued to be the

21  duly elected representatives of the unions.  And the CET's

22  recognize that.  They continued to have a grievance process.

23  They continued to have, you know, the whole relationship and

24  infrastructure between employer and union was still in place

25  under the CET's.

1     And it's -- it's kind of a basic principle of -- of labor

2   law where you have a union in place that the employer has to

3   deal with the union.  It's got to negotiate with the union it

4   cannot deal with employees individually, cannot negotiate with

5   employees individually, it's their elected representative that

6   manages the entire employment relationship.

7     If there's a problem there, the recourse is against the

8   union as we pointed out in our brief and a duty of fair

9   representation claim against the union.  But in -- but the

10  basic terms and conditions and relationships with the employer

11  are in the hands of the union and that's by law, that's under

12  PARA.

13     In fact if we were to attempt to settle any of these

14  claims with the individuals we would probably hear from the

15  unions fairly quickly because we would be in fact violating

16  PARA on an attempt to do so.  Remember each one of these

17  claims is not an individual claim, it's a claim about a policy

18  that affected all employees.  The -- the policy being

19  expressed in the CET's.  So we have those three reasons why

20  these claims should be disallowed or expunged.

21          THE COURT:  Well, with respect to your argument

22  about duplicate claims --

23          MR. WILLEMS:  Yeah.

24          THE COURT:  This -- this last argument you've

25  referred to.  What is the current status of the proceedings

1    and the city's objections to the claims of AFSCME and the

2    coalition of unions.  You -- I -- you know, we -- we -- the

3    Court has entered orders, several orders over the last few

4    months extending deadlines.

5               MR. WILLEMS:  Yes.

6               THE COURT:  That the Court set a year or so ago

7    originally for the filing of summary judgment motions, and

8    briefs, and hearings.  The -- the latest order if -- if I read

9    it correctly sets as the first deadline for summary judgment

10   motions to be filed, it's now June 28th this month.

11              MR. WILLEMS:  Correct.

12              THE COURT:  But I -- I thought I recalled seeing in

13   some of the papers, including stipulations for recent

14   extension orders, some indications that at least in principle

15   the dispute between the city and these -- the AFSCME and the

16   coalition regarding these claims has been settled, at least in

17   principle.

18              MR. WILLEMS:  The claims have -- in principle.  And

19   in fact we've -- we've --

20              THE COURT:  So what is the status there?

21              MR. WILLEMS:  Okay.  We've gone a step beyond that.

22   We have a document now that has been agreed to by council and

23   it is now going through the ratification process in the city.

24   As you know all agreements have to be ultimately ratified by

25   city council and that's the process that we're in now.  So we

1  have -- we have a -- a complete settlement of both claims

2  subject to ratification.

3           THE COURT:  And that would include --

4           MR. WILLEMS:  As far -- my understanding is, it's

5  been ratified on the union side.

6           THE COURT:  It has been?

7           MR. WILLEMS:  Yes.

8           THE COURT:  The -- if the settlement is approved by

9  city council then the -- the settlement would settle any

10 claims, any and all claims of these claimants AFSCME and the

11 coalition of unions that you say are duplicates of claims some

12 of these individuals have brought, is that right?

13          MR. WILLEMS:  They would, they would.

14          THE COURT:  And is it the city's position that --

15 that whatever the -- the Court may rule on the city's

16 arguments made today that all of these claims that have to do

17 with the individuals' claims that have to do with the city

18 employment terms, imposition of city employment terms, the

19 employee obligation claims, the merits of those claims.  That

20 is the city's argument that there are no valid claims, no

21 legal -- valid legal claims for those things.  Whatever the

22 Court rules on that, that's not going to be binding on AFSCME

23 and the coalition of unions for purposes of their claims?

24          MR. WILLEMS:  Well, it depends on what you -- how

25 you rule, Your Honor.

1          THE COURT:  In other words part -- part of your

2    argument, I think --

3          MR. WILLEMS:  Yeah.

4          THE COURT:  Part of your argument is the same

5    argument that had you not settled but gone to litigation on

6    the AFSCME and coalition claims you would be making there.

7    And you would be asking the Court to rule on there.

8          That is the argument I assume is in there that -- the

9    city's argument that you're making now which is that the

10   imposition of the city employment terms, both before and after

11   the emergency manager was appointed under the Act 436, the

12   ones under Act 4 and Act 436, were lawfully done and cannot

13   give rise to any valid claim by anyone.

14         That's -- that's an argument that you -- the city was

15   maintaining against AFSCME and the coalition of the unions on

16   -- on that part of their claim that had to do with that,

17   right?

18         MR. WILLEMS:  On that part, yes.  They also had

19   other claims but yeah.

20         THE COURT:  Yeah.  And that was in there.  And so

21   that as to the AFSCME and the coalition union claims, that's

22   in the process of -- of being settled, assuming the city

23   council ratifies it, it's -- it's settled and isn't going to

24   be litigated.  But, you know, if something happens and city

25   council doesn't ratify and there is no settlement and the

1  matter has to be litigated, if I rule today on the merits of

2  these arguments you're making now in connection with these

3  individual claims is it your view that's going to bind the

4  AFSCME and the coalition of the unions or not?

5       MR. WILLEMS:  Well, I suppose there would be parts

6  of it that might end up being law of the case, yes.

7       THE COURT:  Well, except --

8       MR. WILLEMS:  I mean obviously the --

9       THE COURT:  Except AFSCME -- except your -- your

10  position is that AFSCME and the coalition of unions are the

11  prima parties to bring those claims if anyone and they're not

12  here, right?

13       They weren't given an opportunity to respond to the

14  city's April 21 brief and they're not participating in these

15  objection to claims in the individual claims.  And your

16  objections are not stated as -- the ones before me today are

17  not stated as objections to the AFSCME and the -- and the

18  coalition union claims.

19       So I'm wondering how they're going to be -- they're not

20  going to be bound by what I rule today, but on the other hand,

21  you know, if I rule on the merits today, you know, you're

22  going to -- you'll probably be -- be thinking well, the Judge

23  isn't going to rule inconsistently with that later on.

24       So I -- I have this question about whether as a legal

25  matter AFSCME and the coalition of unions would be bound by

1   any ruling that I make on the merits of your argument that

2   you're making today with respect to these many individual

3   claims.  And I guess similar -- a similar concern that -- or

4   question about -- about what -- whether the Court should wait

5   to rule on the merits of all the -- of these arguments until

6   we see whether the settlement is actually going to go through

7   with the AFSCME and the coalition.  Or -- or in the

8   alternative result in litigation, a litigated result.

9              MR. WILLEMS:  I'm sorry, or --

10             THE COURT:  A litigated result.

11             MR. WILLEMS:  Oh, oh, yeah, right, right.

12             THE COURT:  Do you see the concern I have?

13             MR. WILLEMS:  No, I -- I understand.  So I guess

14  here's my response to that.  As I was sitting here, you know,

15  prior to coming up to argue, I was thinking really the -- the

16  -- the real issue here is the duplication issue.

17      And -- and that almost by itself kind of swallows the

18  rest of the -- the -- the arguments here because really these

19  claims under the CET's should and can only be brought by the

20  unions.  And to the extent there are duplicate -- there's

21  duplication here, they, you know, they should be subsumed in

22  the -- in the union claims and withdrawn or expunged or

23  whatever as individual claims.  Because that's -- that's

24  either going to settle or litigate all these issues.  And

25  whatever the results of that will be will affect these

1   claimants.

2          THE COURT:  I would have thought that is the more

3   difficult issue.  That's how it struck me.  That's a more

4   difficult issue you know, when you get into issues about

5   whether the individuals have right to bring their own claims

6   here or not.  That doesn't strike me as a -- as a simple

7   issue, a simple matter.

8      If you're right about the merits, however, that is fairly

9   clean and simple issue to deal with one way or the other.  If

10  you're right or you're wrong.  But I had this concern about

11  the impact if any on the pending settlement.

12         MR. WILLEMS:  I understand, yeah.  We were -- got a

13  little bit of a crossfire going here that we need to be

14  sensitive to.  Is the Court suggesting that we adjourn pending

15  what happens with the AFSCME cases?

16         THE COURT:  Well, I, you know, I'm not wild about

17  that idea.  We've got everybody here and --

18         MR. WILLEMS:  Right.

19         THE COURT:  Today is the day for the hearing on

20  this.  And you've made -- you've made arguments about the

21  merits here.

22         MR. WILLEMS:  Right.

23         THE COURT:  Not just this duplication argument.  How

24  soon will we know do you think whether or not city council has

25  -- has ratified this settlement with the -- the unions?

1          MR. WILLEMS:  At this point, I think we may need one

2   more adjournment to finish it off.  But that would be the end

3   of it.  We should be able to have word from city council in at

4   least a month and a half to two months.

5          THE COURT:  All right.  Well, let's assume we're not

6   -- I'm not adjourning, we're going to have this hearing today

7   and -- and if I can rule, I'm going to rule one way or the

8   other on -- on the arguments.  Is there anything else you'd

9   like to say before we hear from the -- any individuals that

10  want to be heard?

11         MR. WILLEMS:  Can I take a moment to consult with

12  counsel?

13         THE COURT:  Sure.

14         MR. WILLEMS:  I don't know if I --

15         THE COURT:  Again, speak up, please.  Go ahead.

16         MR. WILLEMS:  Yeah.  I don't know if I have anything

17  very helpful to add.  If we're going to proceed today then

18  obviously you're going to decide on the merits.  The -- the

19  concern --

20         THE COURT:  Well, I may decide today or I may decide

21  to put it off.

22         MR. WILLEMS:  Or you may decide to put it off, I

23  understand.

24         THE COURT:  But we're going to have the hearing

25  today, we're all here.  We're all here

1              MR. WILLEMS:  Okay.

2              THE COURT:  We're going to do it at least with that

3    in mind.

4              MR. WILLEMS:  Absolutely.

5              THE COURT:  I had hoped -- I had hoped to be able to

6    rule today from the bench as I try to do in many of these

7    matters, but we'll see.

8              MR. WILLEMS:  We -- we have not received any

9    responses to our legal arguments, so we might hear some today,

10   I -- I don't know.  But the, I guess, other than that, you

11   know, the concern you raised about the AFSCME and the

12   coalition not being present in this sector of the arguments, I

13   mean, you know, the  -- the -- their claims are not being

14   presented here.

15      If there's a -- if there's a issue in terms of who is

16   bound or what's bound, I suppose we could discuss the -- the

17   question of law of the case.  But that would probably be

18   something that they would have to bring up in terms of whether

19   or not this ends up being that.

20             THE COURT:  All right.  Anything else you want to

21   say before we hear from others?

22             MR. WILLEMS:  I do not have anything else.

23             THE COURT:  All right.  So, I want to give anyone

24   else who wants to be heard on this, whose claim is concerned

25   in this, an opportunity to be heard.  The gentleman here,

1  you're an attorney, sir?

2         MR. GREENE:  I am, sir.

3         THE COURT:  Would you come up?

4         MR. GREENE:  Yes.

5         THE COURT:  If you want to be heard.

6         MR. GREENE:  Yeah.  Anthony Greene, I'm appearing on

7  behalf of Da'Nean Brooks.  And I want to first say that I did

8  not submit her proof of claim for her, however, in her proof

9  of claim she indicated that she was objecting to the taking of

10 interest that she had gained on her annuity.

11     And I am arguing today, Your Honor, that the -- in

12 January 16, 2015, the City of Detroit -- she gained exactly

13 $15,424.41 in interest on her annuity.  The city took $8,690

14 of -- of those funds.

15     They accordingly recouped those funds on the basis of the

16 eighth amended plan for adjustment of debts.  And we object on

17 the basis that we -- even though it was done according to an

18 agreement, it certainly wasn't an agreement that she was

19 subject to and we consider those monies to belong to her and

20 not to the city, it was part of her annuity.  And we argue

21 that they were unlawfully taken.  And --

22         THE COURT:  Mr. -- Mr. Greene, let me ask you --

23         MR. GREENE:  Yes.

24         THE COURT:  Just one second.  I want to -- in my

25 papers here I want to find Ms. -- the paper -- the information

1   I have regarding Ms. Brooks' claim.

2           MR. GREENE:  Yes.

3           THE COURT:  Do you -- do you have -- which -- which

4   omnibus objection to claim was her claim subject to?  Do you

5   have it there?

6           MR. GREENE:  Hold on.

7           MR. WILLEMS:  Your Honor, if I may, it's

8   twenty-eight.

9           MR. GREENE:  Yeah.

10          THE COURT:  Twenty-eight?  All right.  One second,

11  hold on.

12          MR. WILLEMS:  And -- and it -- it would be Item 6 on

13  our --

14          MR. GREENE:  Yeah.

15          MR. WILLEMS:  I'm sorry, Item 53 on -- on our

16  Exhibit 1.

17          THE COURT:  All right, hold on.  Thank you.  Exhibit

18  1.

19          MR. WILLEMS:  Exhibit 1 has a list of the --

20          THE COURT:  Yeah, I know.

21          MR. WILLEMS:  Okay.

22          THE COURT:  It's the -- it's the chart, Exhibit 1 to

23  the --

24          MR. GREEN:  Yes.

25          THE COURT:  -- to the April 21 brief.

1          MR. WILLEMS:  Yes.

2          THE COURT:  All right.  I'm looking on there.  It's

3   number fifty what?

4          MR. WILLEMS:  Fifty-three.

5          THE COURT:  All right.  Hold on.  All right.  Mr.

6   Greene, I have found the information I was looking for in

7   this.

8          MR. GREENE:  Yes.

9          THE COURT:  Why don't you continue?  You're saying

10  that the claim is -- is based on --

11         MR. GREENE:  The taking of 800 -- $8,690.31 that was

12  -- it's called a recoupment.  It was taken in January of 2016

13  -- 2015 as a result of the bankruptcy.

14         THE COURT:  As a result of the confirmed plan,

15  right?

16         MR. GREENE:  That is true, Your Honor.

17         THE COURT:  All right.  Just hold on, hold on.

18         MR. GREENE:  Yeah, I'm sorry.

19         THE COURT:  Hold on.  So when was this proof of

20  claim filed?

21         MR. GREENE:  This proof of claim was filed, I think

22  I do have that.  That was filed on -- bear with me for a

23  second.  I got it.  That's the original proof of claim.  That

24  was filed on February 21st, 2014.

25         And she -- and she -- in the proof of claim she does

1  mention that she was filing it to save part of her annuity

2  which belonged to her at the time.  Well --

3          THE COURT:  So the claim could not possibly have

4  included when -- when it was filed, anything about this

5  recoupment that occurred January 16 of 2015.  It concerned

6  rather the -- the imposition of the city employment terms and

7  -- and orders affect on pensions and annuities by the

8  emergency manager order 21, both of which occurred pre --

9  pre-bankruptcy, is that right?

10         MR. GREENE:  That is true.  But she did on March

11  22nd, 2016, file an amended proof of claim.

12         THE COURT:  All right.  And that included then this

13  -- as part of the claim, a claim based on this recoupment of

14  8,690 on January 16 of 2015.

15         MR. GREENE:  It is not mentioned in that -- in that

16  amendment.  But if you put both together, the original proof

17  of claim and this proof of claim it is mentioned.  But you're

18  right, it -- she does not reference that recoupment in this

19  particular second amended proof of claim, that's true.

20         THE COURT:  All right.  So to the extent the --

21  perhaps we have two pieces here.  You're arguing -- we've got

22  the pre-petition claim which is --

23         MR. GREENE:  Yeah, that's true, that's correct.

24         THE COURT:  Which is based on the imposition of the

25  city employment terms and --

1              MR. GREENE:  Sure.

2              THE COURT:  And the emergency manager order 21,

3    possibly also as well.  And then this -- this other component

4    has to do with this recoupment that occurred under the terms

5    of the confirmed plan.

6              MR. GREENE:  Sure.

7              THE COURT:  That occurred in January 2015.

8              MR. GREENE:  Yes, that's true.

9              THE COURT:  And -- and so as to that latter, that

10   is, if I understand what you're saying correctly, Ms. -- Ms.

11   Brooks is complaining there about the terms of the confirmed

12   plan.

13             MR. GREENE:  She is.

14             THE COURT:  So how is that a valid claim?

15             MR. GREENE:  Well -- well, I imagine it's a -- it's

16   a it's a constitutional claim I guess that will go along with

17   the claims of the actual AFSCME union which -- and that's

18   another concern that I had that her claim really has a lot to

19   do with the current claims of AFSCME union and I would ask the

20   Court to withhold an opinion regarding her claim until that

21   particular issue is resolved.  Because they're arguing that,

22   the AFSCME union that she's a part of.

23             THE COURT:  The AFSCME union claim includes a claim

24   based on the recoupment that occurred in January 2015?

25             MR. GREENE:  Well, it -- it -- it challenges the

1   taking of the money from the annuity and the pension.

2           THE COURT:  But it doesn't directly challenge the

3   confirmed plan, does it?

4           MR. GREENE:  I'll be honest with you, Your Honor, I

5   have not reviewed their entire claim.  And I -- and I -- I

6   can't speak to that.  I apologize for that.

7           THE COURT:  Well, what do you want to say about the

8   merits of the -- of these -- of Ms. Brooks' positions here?

9           MR. GREENE:  Well, we're claiming that

10  constitutionally that -- it constitutes a taking.  Because

11  those funds belong to Ms. Brooks.  And I know it was a part of

12  the -- the plan but certainly she wasn't individually a part

13  of that plan and it was taking money that belonged directly to

14  her.

15          THE COURT:  Now are you talking about the

16  recoupment?

17          MR. GREENE:  Yes.

18          THE COURT:  Under the plan?

19          MR. GREENE:  Yes.

20          THE COURT:  All right.  Go ahead.  You were -- you

21  were saying.

22          MR. GREENE:  Yeah, yeah.  So -- so we believe that

23  even though that amount was under the plan, we believe it was

24  still unlawfully taken because it wasn't the city's money to

25  take.

1      And -- and of course that's a, I guess a due process

2  argument or a constitutional argument that they should never

3  have taken those monies, even if it was a part of the plan.

4  So that's my argument, Your Honor.

5           THE COURT:  All right.  Thank you.  I'll allow the

6  city to respond now to this argument by Mr. Greene and then

7  we'll hear -- continue hearing from others who want to speak.

8           MR. GREENE:  Thank you.

9           THE COURT:  City?

10          MR. WILLEMS:  Well, Your Honor, it appears that we

11  have an objection to the confirmation of the plan rather than

12  a claim.  And it should be brought that way.  So as -- as a

13  claim it should still be expunged.

14          THE COURT:  Well, Mr. Greene just left the courtroom

15  but, you know, I'll say this.  And, you know, I guess he'll

16  have to get it from the recording of the hearing.  He's not

17  here, he just walked out.

18      The -- to the extent Ms. Brooks is making a claim that is

19  based upon the -- this -- what's characterized by Mr. Greene

20  in the hearing today as a recoupment of $8,690 in January of

21  2015 based on the terms of the confirmed plan, that claim is

22  -- that claim is without merit because it is inconsistent with

23  the terms of the confirmed Chapter 9 plan.  Admittedly so by

24  -- as admitted by counsel for Ms. Brooks which plan, confirmed

25  plan, is binding on all creditors and the city and is not --

1  is a final order that's long since been a final order and it's

2  not subject to debate.

3      Now, you know, that's -- that's the end of that piece of

4  the argument.  The other -- to the extent Ms. Brooks' claim,

5  it appears that the claim she filed originally anyway, and

6  perhaps even the amended claim she filed in March 2016 is

7  based upon the imposition of the city employment terms and --

8  and the emergency manager's order 31 its affect on pensions

9  and annuities then that is part of the category of claims that

10  the city has called employee obligation claims and which the

11  city has argued are without merit as well as being duplicates

12  of claims brought -- properly brought by the unions.

13      So I -- I'm not ruling at this moment on that aspect of

14  the argument.

15          MR. WILLEMS:  I understand.

16          THE COURT:  And I'm going to hold off.  I want to

17  hear from others and then we'll come back to that.

18      But certainly to the extent of Ms. Brooks' claim is based

19  upon essentially an objection to the confirmed plan, it's --

20  it's overruled, the claim is -- the objection to that claim is

21  sustained.

22      So anyway, who wants to be heard from next, anyone?

23  Anyone who is represented by an attorney, I'll let you go

24  next.  Are there any other attorneys here in the courtroom

25  that want to be heard on behalf of a client?  No?  All right,

1  Who's -- sir, you're -- you're next if you want to --

2          MR. COLLINS:  Julius Collins.

3          THE COURT:  Come on up.  Your name is what again?

4          MR. COLLINS:  Julius Collins.

5          THE COURT:  All right.  One moment, sir.  I want to

6  find you in the -- in my list here.  Oh, I see.  Mr. Collins,

7  it looks like the city objected to your claim as part of their

8  twentieth omnibus objection to claim.  What do you want to

9  say, Mr. Collins?

10         MR. COLLINS:  Good afternoon, Your Honor.  Thank you

11 and good afternoon.

12     My claims, I just ask the -- the city attorney was

13 stating that my claim is still against the city for the

14 actions taken against me and I worked for the City of Detroit

15 for 12 years and not only we took pay cuts in 2014, but before

16 then I don't have a accurate date, but of those cuts, that's

17 what I'm asking.  I'm claiming for those actions taken.

18     And while I worked for the City of Detroit those years, I

19 -- we was forced to take pay cuts, and vacation cuts, and

20 longevity and -- and all those.  Holidays was -- was -- was

21 cut and a lot of different actions were taken against us.

22     According to the CET and the consent agreement which I --

23 which I believe was unfair for the City of -- of Detroit.  My

24 claim amount was -- was for 30,000 -- $30,000 in recoupment.

25 And I -- I would -- my -- my claims that I was forced

1 | reduction in -- in -- in wages and elimination of my benefits.

2 |     And while I retired from the City of Detroit in 2012.

3 | And I had a great -- great reduction in my retirement

4 | benefits.  And also I'm paying a retirement recoupment to the

5 | City of Detroit to bail out the City of Detroit which is every

6 | time I receive a -- a paycheck from the City of Detroit, I'm

7 | still paying -- paying $61.00 to the City of Detroit according

8 | to the bail out -- the bankruptcy plan.

9 |     So I -- and also I have to pay my own insurance because

10 | certain -- certain period of time, I think it's July of 2013.

11 | They eliminated -- they -- they forced us to -- to pay our own

12 | medical benefits.  We were -- we were given a stipend, but

13 | then they turned around and eliminated the stipend so we have

14 | to pay -- pay directly from -- from what my benefit is.

15 |     I had a $125.00 stipend coming out of my -- coming to me,

16 | but after sometime in July, they reduced -- they eliminated

17 | that and directly coming out of my retirement today is -- is

18 | that amount, the $125.00 I have to pay for insurance.

19 |     So my -- my thing and my issue today is that I am

20 | entitled to some type of financial restitution because the --

21 | the attorney spoke up, the union, AFSCME union was reacting on

22 | my behalf.  The AFSCME union is not on my behalf today.  I'm

23 | here individually.  I can't afford a lawyer, so that's why I'm

24 | here, I'm here personally because of my benefit and -- and my

25 | cost of living.  I can't afford a lawyer.

1    And -- and -- and I -- that's why I -- I -- I believe

2  through my -- through my years working for the City of Detroit

3  that I am entitled to some -- some financial restitution for

4  -- for my work and for the unfairness.  Say -- it was saying

5  -- only said that the city had probably breached an employment

6  obligation.  My thing is that the city wrongfully handled our

7  -- our employment obligation because we had no bargaining even

8  though I was a member of the City of Detroit, I had -- I had

9  nothing to say about what the city -- the CET, the city

10  employment term.

11    I had no -- individually I had nothing to -- nothing to

12  say about it, you know.  I had -- I had no -- no offense so I

13  had no defense, you know, for the CET, for the consent

14  agreement.  But I had -- as an employee of the City of

15  Detroit, I had nothing -- nothing to say about it, you know.

16        THE COURT:  All right.  Mr. Collins, you need to --

17  you need to wrap it up.

18        MR. COLLINS:  Oh, I'm sorry.

19        THE COURT:  I've got to give others a chance to

20  talk, so --

21        MR. COLLINS:  Okay, okay.  I'm sorry, sir, you know.

22        THE COURT:  That's all right.  It's okay.

23        MR. COLLINS:  Yes.

24        THE COURT:  You -- you know, we have to --

25        MR. COLLINS:  Okay.

1          THE COURT:  -- have a reasonable limit on how long

2   everybody can talk or we won't get done today.

3          MR. COLLINS:  Okay, I'm -- I'm sorry, Your Honor.

4          THE COURT:  So go ahead.  Go ahead and finish.

5   Finish up, please.

6          MR. COLLINS:  But, okay.  So -- so finally that's --

7   that's I -- I -- I believe that I am entitled to -- and -- and

8   we all are entitled to some financial obligation.  And to me

9   if we can't -- if we -- I'm speaking for myself, if I -- if I

10  can't -- can't receive -- receive all of my claimant, I am --

11  I am willing to settle for, you know, for a settle amount.  So

12  thank you, Your Honor.

13         THE COURT:  All right.  Thank you, Mr. Collins.  Mr.

14  Willems, you can have a seat.  I think instead of calling on

15  you after each person speaks now for the rest of the hearing

16  I'll -- I'll give you a chance to speak when everyone else is

17  done on the -- on the claimant's side.

18         MR. WILLEMS:  Okay, that's fine.

19         THE COURT:  So if you would hold any thoughts you

20  were going to just express and we can hear those when everyone

21  else has spoken.  So you don't have to stand up.  You can if

22  you want, but you don't have to.

23         MR. WILLEMS:  Thank you.

24         THE COURT:  All right.  So who would like to speak

25  next of the creditors?  Sir, come on up.

1          MR. STEELE:  Good afternoon, Your Honor.

2          THE COURT:  Come on up to the microphone and speak

3  loud, please, so everyone can hear you.  What's your name,

4  sir?

5          MR. STEELE:  My name is Craig Steele.  Good

6  afternoon, Your Honor.

7          THE COURT:  Craig what?

8          MR. STEELE:  Craig Steele.

9          THE COURT:  S-t what?

10         MR. STEELE:  S-t-e-e-l-e.

11         THE COURT:  Mr. Steele --

12         MR. STEELE:  Yes.

13         THE COURT:  -- let me find your claim on the list

14  here.  One second.  Mr. Willems, if you know where that -- he

15  is in the list, let me know.

16         MR. WILLEMS:  It's number -- it's Item 20.

17         THE COURT:  All right.  One second.  Number 20 on

18  the chart which is the city's Exhibit 1 to the April 21 brief.

19         MR. WILLEMS:  Correct.

20         THE COURT:  That's what we're talking about.  So

21  this is part of the city's twentieth omnibus -- twenty-ninth

22  omnibus --

23         MR. WILLEMS:  Twenty-ninth, yes.

24         THE COURT:  Twenty-ninth omnibus objection.  All

25  right.  Go ahead, Mr. Steele.  What would you like to say?

1          MR. STEELE:  Well, Your Honor, I've been sitting in

2    this Court all day and you are doing a wonderful job looking

3    at all the back door moves that I consider very crafty and

4    creative.

5          My only contention is that I took -- I took -- I paid

6    attention to what you said about notion that if you rule today

7    and what that -- as the -- as the city's counsel said that

8    they have negotiations and they're almost in the process of

9    ratifying certain claims which we didn't know, I didn't know.

10   If you -- if you make a decision today that we don't have this

11   kind of -- well, you made a decision with that then and now we

12   want you to be consistent and make a decision in the same

13   manner then.

14        Or -- or, you know, when that comes down.  And like you

15   said, you brought up a good question.  What if the city

16   doesn't ratify.  What if we lose on both end.  You sign with

17   the city today and then the city council doesn't ratify.

18        So to me I think the Court shows a lot of wisdom and a

19   lot of patience by saying maybe we should adjourn it until we

20   see what that proceeding goes like.

21          THE COURT:  And by the way, Mr. Steele and anyone

22   else, in case it's not clear to anyone, I -- I don't know what

23   the terms of this proposed settlement are, I have no idea.

24   And I don't really need to know --

25          MR. STEELE:  Right.

1          THE COURT: -- at this stage of the case --

2          MR. STEELE: Right.

3          THE COURT: -- as the Bankruptcy Judge.

4          MR. STEELE: Right.

5          THE COURT: I don't know. Because if the settlement

6    does not happen --

7          MR. STEELE: And that was -- that was my contention

8    -- I'm sorry, go ahead.

9          THE COURT: Excuse me. If the settlement does not

10   happen and, you know, it's just a -- a dead letter, then the

11   parties are going to litigate --

12         MR. STEELE: Right.

13         THE COURT: -- in front of me and I'm going to have

14   to make decisions on the merits of the parties' arguments

15   about the claim of the unions. And I don't really want to

16   know what the parties talked about or agreed to tentatively

17   with respect to settlement.

18         MR. STEELE: Right.

19         THE COURT: If I'm going to be doing that. And so I

20   don't know what the terms are and I don't want to know. Just

21   so everybody's clear, I have no idea what --

22         MR. STEELE: Right.

23         THE COURT: -- what the proposed settlement is --

24         MR. STEELE: Right.

25         THE COURT: -- or what it may or may not provide for

1  any of the creditors involved in this hearing today.  I have

2  no idea.

3        So just understand that and I want to make sure everyone

4  understands that.  So Mr. Steele, go on.  What else did you

5  want to say, anything?

6            MR. STEELE:  Yes.  And I -- and I appreciate you

7  bringing out that point, Your Honor.  And it's no way for you

8  to even have that information.

9        But what I'm concerned like I said before is, that if you

10  rule in their favor and then like I said I just learned about

11  that information when city council said that they are in

12  negotiations and close to ratifying.  And then when you asked

13  them how long would it be before they wrap up those

14  negotiations, he said maybe a month, half, two months.

15        Well, maybe we should wait and adjourn until we see as I

16  said, how that goes down.  So we won't lose twice.  That's --

17  that is my concern.  Because he doesn't want us -- he said

18  that we cannot represent -- or AFSCME cannot represent, we

19  represent our own case he said that's duplicates.  Okay, I

20  understand that.

21        Well, then if that is closer or not closer, but if that

22  is -- he says that he has to go with what the union -- he

23  can't even negotiate with us as individuals and if you can

24  only negotiate with AFSCME's and the other unions and those

25  proceedings have not concluded, my contention is and then we

1  should wait till it does conclude.

2          THE COURT:  All right.  Mr. Steele, we need to wrap

3  it up.  Anything else you want to say?

4          MR. STEELE:  No, that is -- that is it, sir.  Thank

5  you for your time.

6          THE COURT:  All right.  Thank you, Mr. Steele.  Who

7  would like to speak next?  Come on up, sir.  Your name, sir?

8          MR. WOLFE:  Henry Wolfe.

9          THE COURT:  All right.  One second.  All right.

10  Good afternoon, Mr. Wolfe.

11          MR. WOLFE:  Good afternoon.

12          THE COURT:  Your claim is the subject of the city's

13  forty-fourth omnibus objection to claims.

14          MR. WOLFE:  Correct, correct.

15          THE COURT:  And that's docket 11162.  I did see the

16  written response that you filed with the Court to that claim

17  objection on June 7 at docket -- it's at docket number 11232.

18  You -- one second.

19      I said earlier I would allow you to speak today, but I --

20  I want to make sure you know and it will be mailed -- it's

21  mailing -- being mailed to you today butt there is an order

22  entered today, earlier today striking your response to the

23  objection to claim because you did not comply with the Court's

24  notice of deficiency regarding your claim.  You did not make

25  the deficiency.

1    And the problem was that you didn't file a proof of

2  service regarding -- or certificate of service regarding

3  service so they may respond on the city.  And you had seven

4  days to fix that and you didn't do that within seven days and

5  so the Court as it typically always does in that kind of

6  situation, entered an order striking your response.

7    Now having said that, I will give you an opportunity to

8  speak today and I want you to go ahead.  What do you want to

9  say about this?

10      MR. WOLFE:  Okay.  In regards to the -- I believe it

11 was the -- the deficiency was proof of service.  I'm saying --

12 the justification for striking my response.

13      THE COURT:  Well, what do you want to say?

14      MR. WOLFE:  Well, I want to say that I received that

15 notification this past Thursday, so it has not been seven

16 days.  I thought it said eight days, but I hasn't been seven

17 days.  And if the --

18      THE COURT:  You mean Thursday of last week you

19 received it.

20      MR. WOLFE:  Of the last week I received it in the

21 mail, correct.

22      THE COURT: The notice required that you correct the

23 problem within seven days of the date of the notice, however,

24 which was June 7, so that meant -- that meant June 14,

25 yesterday.  Anyway, go on.

1           MR. WOLFE:  Okay.  Well, that's the reason why you

2   hadn't received it.

3           My issue and response dealt with around the time of the

4   bankruptcy I filed two proofs of claim.  One was in regards to

5   out of class payment and one was -- was in regards to

6   longevity pay.

7           When I received the notice from the Court, I was not

8   aware that it was in regards longevity pay so the response

9   dealt more so with the -- with the issue about the out of

10  class.  That's why there was somewhat of some confusion there.

11          My contention about the -- I am still contesting about

12  the longevity pay because the city's argument for dismissal is

13  that the CET agreement nullified longevity pay, however the --

14  that issue was issued in October of 2012 and my longevity pay

15  I stopped receiving it in two thousand, I believe nine, two --

16  two years had passed before the CET agreement had went into

17  place and I did not receive longevity pay.

18          The out of class issue is a whole nother issue, but it

19  was filed as a proof of claim with this Court.  But that was

20  not on the --

21          THE COURT:  I don't see that that claim has been

22  objected to yet at least.  At least it's not in the -- it's

23  not in the list.  I don't -- it doesn't look like it's in the

24  list for -- of claims that were objected to on the city's

25  forty-fourth.  The list says -- lists only one of your claims

1 | and that, I think, and that is claim number 2258 for $2,800.

2 |         MR. WOLFE:  Correct.

3 |         THE COURT:  Now if Mr. Willems can correct me if I'm

4 | -- if he thinks I'm wrong about this, if the city has objected

5 | to your -- what you refer to as your out of class pay claim,

6 | he can tell me that and we'll -- we'll deal with that.  But

7 | I'm assuming for the time being that's not part of this claim

8 | objection.

9 |         MR. WOLFE:  You know unless you want it to be, but

10 | no.

11 |         THE COURT:  I'm not starting disputes that no party

12 | has raised.  I've got enough disputes that parties have raised

13 | to deal with.  So, anyway anything else you want to say then

14 | for today?

15 |         MR. WOLFE:  No, that's it.  The deficiency if it's

16 | in regards to -- it says something about proof of service.

17 | Could I maybe be made aware of what that is?

18 |         THE COURT:  Sure.  When you file anything with the

19 | Court, in this Bankruptcy Court and case, you have to serve a

20 | copy of it on opposing parties and opposing attorneys, or if

21 | the party is represented by an attorney as here on the -- on

22 | the opposing attorney by -- and then file a certificate that

23 | says that you have served your response on that -- on that

24 | attorney, in this case attorney for the city and you didn't do

25 | that and that's what the deficiency was about.

1        Now anything else you want to say about the merits of

2   this issue about longevity pay before we let some other folks

3   talk, please?

4            MR. WOLFE:  No.

5            THE COURT:  All right.  Thank you.

6            MR. WOLFE:  You're welcome.

7            THE COURT:  Who wants to speak next?  Good

8   afternoon.

9            MR. DORCH:  Good afternoon.  My name is Ventonia

10  Dorch.

11           THE COURT:  One second.  How do you spell your last

12  name?

13           MR. DORCH:  D-o-r-c-h.

14           THE COURT:  All right.  Which claim objection are

15  you responding to, do you know?

16           MR. DORCH:  I think it was on proof of -- what was

17  it, documentation, proof of what I was claiming, the money

18  that they took from me.

19           THE COURT:  All right, just a minute.  Mr. Willems,

20  do you know?

21           MR. WILLEMS:  Is it Dorch, Ventonia?

22           MR. DORCH:  Yeah.

23           MR. WILLEMS:  Okay.  That would be Item 10.  It's

24  omnibus thirty-three.

25           THE COURT:  All right, one second.  All right.  I

1  see that.  Go ahead, Mr. Dorch, what would you like to say?

2          MR. DORCH:  Yes.  In regards to they say the CET was

3  in effect in 2012.  I started having the 10% taken from me in

4  2011.  So it's way before the CET in late -- October 2011, I

5  think it was.

6          THE COURT:  Anything else you want to say?

7          MR. DORCH:  That's pretty much it.

8          THE COURT:  All right.  Thank you.  Who would like

9  to speak next?

10          MR. GREENE:  Your Honor, I just spoke with -- this

11  is JaJuan Moore, JaJuan Moore.

12          THE COURT:  Well, just a minute.  Mr. Greene

13  attorney for who now?

14          MR. GREENE:  Anthony Greene, Your Honor, appearing

15  on behalf of JaJuan Moore.  And he is on --

16          MR. WILLEMS:  It's -- it's objection number

17  thirty-six, Item 18 in Exhibit 1.

18          THE COURT:  All right.  One second.

19          MR. GREENE:  Yeah.

20          THE COURT:  Just a minute.  So you're representing

21  Mr. Moore then, correct?

22          MR. GREENE:  Yes, I am.

23          THE COURT:  All right.  Go ahead, what do you want

24  to say?

25          MR. GREENE:  I was just retained, so I was given his

1  -- his summary of -- of what he believes he's entitled to from

2  the city.

3       He has what are called payroll disputes.  The city not

4  providing him with the correct pay from June 11th, 2011 to

5  January 1st of 2016.  So it's pre-petition and post-petition,

6  the city failing to provide him the correct amount.  I believe

7  in his --

8            THE COURT:  What do you mean failing to provide the

9  correct amount?

10           MR. GREENE:  Well, he -- he was supposed to make -

11  how much money?

12           MR. MOORE:  15.35.

13           MR. GREENE:  But they paid him --

14           MR. MOORE:  $12.38.

15           MR. GREENE:  Right.  So they were actually paying

16  him $3.00 less each pay period.  And they did that until

17  January of 2016.  And he added that amount up to $3,000.  And

18  -- and that he failed to receive from the city as a result of

19  them shorting his pay by $3.00 an hour.

20           THE COURT:  When you say shorting his pay, is -- is

21  that because of the imposition of city employment terms?

22           MR. MOORE:  That was -- if I may speak, Your Honor.

23  That was because of the work brain system we had.  That it was

24  a payroll system.  It also messed up our vacation time pay and

25  our sick time pay.  It could jumble it up and it wouldn't get

1  it on your paycheck.

2       The paycheck said something different from the computer.

3  And Human Resources going to look at what's on your paycheck

4  versus the computer.  So it was always a issue.  And then it

5  always took a long time for them to pay you back and then

6  since we changed over to Great Lakes Authority, we still

7  haven't received compensation for that.

8            MR. GREENE:  And there's also a question, Your

9  Honor, of what's called four hours turnaround pay which he

10 should have received and he can explain what turnaround pay

11 is.

12           THE COURT:  Well, look -- look, we don't need in

13 this hearing an explanation in detail of what the claim is.

14           MR. GREENE:  Okay.

15           THE COURT:  What I -- what I need to know really,

16 the key things I need to know is, are the -- is the claim --

17 to what extent is the claim based upon city employment terms

18 that were imposed --

19           MR. GREENE:  Got it.

20           THE COURT:  Excuse me.  That were imposed before the

21 city -- or the emergency manager was appointed or based on

22 cuts or freezes that were imposed by the emergency manager

23 before the bankruptcy case was filed.

24       To what extent are the claims based on that as opposed to

25 something else.  And if it's something else, what is the

1  something else.  That's the -- the key thing I want to know.

2  And then I would appreciate it if -- if you want -- any

3  argument you want to make about the merits of the city's

4  arguments regarding the first of those types of claims.  That

5  is the city imposed city employment terms and the emergency

6  manager cuts previously.  So go ahead, Mr. Greene.

7          MR. GREENE:  Yeah, okay.  With regards to the CET,

8  we argue again that the cutting his income or taking out 10%

9  of his wages which was also done as a result of the CET.  The

10  CET actually cut his wages by 10%.

11      He is also claiming that that was unlawfully taken as

12  well.  His arguments are -- are consistent with the AFSCME

13  arguments in the pending litigation.  And there's also the --

14  the reason why we -- we request that the Court withhold

15  judgment until that issue is resolved.

16      So what he's saying is, as a result of the CET, 10% of

17  his wages were cut.  And he believes that that was unlawful or

18  should not have occurred.

19          THE COURT:  Now what's -- what about the first part

20  of my question which is to what extent if any does Mr. Moore

21  argue his claim is based on something other than the cuts and

22  adverse effects of the city imposed -- city employment terms

23  that were imposed.

24          MR. GREENE:  Okay, other than.

25          THE COURT:  Other things.

1           MR. GREENE:  Okay, right.

2           THE COURT:  Pre-petition claim based on other

3   things --

4           MR. GREENE:  Pre-petition.

5           THE COURT:  -- if any -- if anything.

6           MR. GREENE:  Okay, right.  Well, in terms of

7   pre-petition the city for whatever reason was miscalculating

8   his appropriate income and not paying him what they should

9   have paid him pursuant to his employment agreement with them.

10  And so that's a breach of contract, a breach of a contract

11  claim, Your Honor.

12          THE COURT:  You mean quite apart from any 10% cut

13  or --

14          MR. GREENE:  That's exactly right.  Yeah, that's a

15  totally separate issue.

16          THE COURT:  Basically you're saying -- you're saying

17  the city was making a mistake.

18          MR. GREENE:  Yes.  The city --

19          THE COURT:  And paying him less than they even

20  intended to pay him.

21          MR. GREENE:  Yes, Your Honor.

22          THE COURT:  Is that what you're saying?

23          MR. GREENE:  Absolutely.

24          THE COURT:  All right.  So that's part of the claim.

25          MR. GREENE:  That's part of the claim.

```
 1           THE COURT:  All right.  Anything else that's not a

 2  CET type part of the claim?

 3           MR. GREENE:  I think that's it unless you have

 4  something else.

 5           MR. MOORE:  I would like to just add to that, part

 6  of that 2012 there was a collective bargaining extension

 7  agreement with the IOU.  All of the people that was at the

 8  DSWD was placed into that union where it was no concessions

 9  involved or the CET.

10       The CET was new per that contract.  So there was no

11  concessions.  And I have right here the contract 2012 to 2022

12  per Sue McCormick acting on her own with DSWD away from the

13  city.  We was all placed up under this contract but we was all

14  supposed to get our 10% back, wage concessions, and any issues

15  with the payroll clocks handled with the new ceridian that has

16  not been handled yet.

17           THE COURT:  All right.  Anything else then, Mr.

18  Greene?

19           MR. GREENE:  No, no, no, that's it.

20           THE COURT:  All right.  Thank you.  Who would like

21  to speak next?  Ma'am, come on up, please.

22           MS. CANNON:  I just want to mention prior to the --

23           THE COURT:  No, no, what's your name, please?

24           MS. CANNON:  Oh, I'm sorry.  Gladys Cannon,

25  forty-fourth.
```

1           THE COURT:  Hold on.

2           MS. CANNON:  Okay.

3           MR. WILLEMS:  I'm sorry, I didn't get the name.

4           MS. CANNON:  Gladys Cannon.

5           MR. WILLEMS:  Cannon?

6           MS. CANNON:  Yes, C-a-n-n-o-n.

7           MR. WILLEMS:  Okay.

8           THE COURT:  All right.  Ms. Cannon, as you've just

9    referred to, your claim objected to as part of the city's

10   forty-fourth omnibus objection.

11          MS. CANNON:  Right.

12          THE COURT:  To claims.  And you filed a written

13   response to that objection.  What would you like to say?

14          MS. CANNON:  What I would like to say is prior to

15   the implementation of the CET, they did deny us longevity in

16   2010 as well as 2011.  I did file paperwork with the state

17   Wage and Labor Commission regarding that.

18       And when I contacted them about it, they said it would be

19   handled with the city, but we're talking a two year delay from

20   the time that I originally filed the paperwork till the time

21   that the CET was implemented.

22          THE COURT:  All right.  Thank you.

23          MS. CANNON:  You're welcome.

24          THE COURT:  Who would like to be heard next?

25          MS. MCCRARY:  Good afternoon.

```
1            THE COURT:  Good afternoon.  Speak close and into

2    the microphone, please, so we can all hear you.  Your name,

3    please?

4            MS. MCCRARY:  Sarah McCrary.

5            THE COURT:  And which claim objection, do you know?

6            MS. MCCRARY:  Excuse me?

7            THE COURT:  Which claim objection?

8            MR. WILLEMS:  It's number thirty-seven.

9            THE COURT:  Pardon?

10           MR. WILLEMS:  Number thirty-seven, Your Honor.

11           THE COURT:  All right.  Hold on.  Where in the

12   chart?

13           MR. WILLEMS:  Item 40.

14           THE COURT:  Thirty-seventh omnibus objection.  All

15   right.  Thank you.  I see that in the chart.  Ms. McCrary, go

16   ahead.  What would you like to say?

17           MS. MCCRARY:  I'd just like to say that I've been

18   working for the city for 20 years.  And even prior to the CET

19   and all the other things that are going on, we made a genuine

20   effort to keep the -- the city going.  I work for the ITS

21   department.

22      We have saved the city hundreds of thousands of dollars

23   in things contract reviews and disposal of equipment and --

24   and other things.  And also before this CET and the BRF's and

25   all these things, we have already been taking do op days,
```

1  That was back during the do op days.  Whatever it took to --

2  to keep the city going, is what we had to do.

3      And during the CET not only were we taking a 10%

4  reduction in pay, but we were also doing the BRF days which

5  was a 20% reduction in pay for some months which is more than

6  I think was fair for the City of Detroit workers.  I just --

7  and I am not part of the union and I was not part of the

8  union, so my claim is separate from everything else.

9          THE COURT:  All right.  Thank you.

10         MS. MCCRARY:  Thank you.

11         THE COURT:  Who would like to speak next?  Sir, you

12  came up earlier.  Come on up.

13         MR. CAPIZZO:  Good afternoon.  My name is Jim

14  Capizzo.  I'm in the forty-fourth objection.

15         THE COURT:  All right.  One second, please.

16         MR. WILLEMS:  I'm sorry, I didn't catch the name.

17         MR. CAPIZZO:  The -- James Capizzo.

18         MR. WILLEMS:  James Capizzo, forty-fourth, okay.

19         THE COURT:  All right.  Mr. Capizzo, I see the --

20  where you -- where your claim is listed and under the

21  forty-fourth omnibus objection to claim.  And I see the

22  written response.  And I did review the written response that

23  you filed to that claim objection.  You filed it on June 7th,

24  it's docket number 11239.  What would you like to say?

25         MR. CAPIZZO:  Just one major thing and a few minor

1 things. I'm just confused about this whole thing. I received

2 this thing a couple weeks ago in the mail and it said I should

3 be here or I might lose my claim on the one hand. And on the

4 other hand it says if you're a member of a union you're

5 duplicate filing and that sort of implies you shouldn't be

6 here. So that's -- that's just been confusing to me.

7    Now there's minor things. A young lady back there said

8 something. Not all the people received their notices so that

9 maybe she could address that, I don't know.

10    The -- the city says I don't have a valid basis. My

11 basis is it was the CET was non-negotiated. Now I also put

12 for my thing --

13         THE COURT: And your part of what union, sir?

14         MR. CAPIZZO: SAAA.

15         THE COURT: All right. Thank you. Go ahead.

16         MR. CAPIZZO: SAAA calculated for me some $13,000 in

17 claim and I put -- and I also added plus for pension, so

18 somebody put unliquidated so it's -- it's the thirteen

19 thousand some dollars and -- and full pension. And our

20 pension is being -- pension cuts are being on appeal today in

21 the Court in Cincinnati. I think that Court is probably over

22 by now.

23    So also the emergency manager law was appealed and I

24 think that might be coming up in August. The emergency

25 manager dictated to -- used that to dictate to us rather than

1  -- than negotiate under democracy.

2      So that's my points.  Thank you.  I have some -- some

3  documents for the Court.

4              THE COURT:  No.

5              MR. CAPIZZO:  No.

6              THE COURT:  If you want the Court to consider

7  documents, you need to file them with the clerk's office in

8  the case rather than hand them up at -- at a hearing.

9              MR. CAPIZZO:  Okay.  Thank you.

10             THE COURT:  All right.  Thank you.  Who would like

11 to speak next?  Anyone?  All right.  No other creditors have

12 asked to speak next in the hearing here now.  Mr. Willems, I

13 will give you a chance to reply and to speak further if you

14 would like to for the city.

15             MS. BECKOM-WHITE:  Excuse me.

16             THE COURT:  I can't hear what you're saying, but

17 Ma'am, do you want to speak?

18             MS. BECKOM-WHITE:  How are you doing?  My name is

19 Wanda Beckon-White.  I'm on part case thirty-three.

20             THE COURT:  Spell your last name, please.

21             MS. BECKOM-WHITE:  B as in boy, E as in Edward, C as

22 in cat, K as in -- and O as in Mary, and the color White.

23             THE COURT:  Ms. Beckom-White?

24             MS. BECKOM-WHITE:  Yes.

25             THE COURT:  Is that how you say it?  All right.  And

1    you're part of the forty --

2              MS. BECKOM-WHITE:  Thirty-three.

3              THE COURT:  I'm sorry?

4              MS. BECKOM-WHITE:  Thirty-three.

5              THE COURT:  All right.  Just a minute.  Where is

6    that in the chart, Mr. Willems?

7              MR. WILLEMS:  I'm looking.  I think it's towards the

8    back.  Hang on.  I'm sorry, is it White or Beckom?

9              MS. BECKOM-WHITE:  It is both.  But it's under

10   Beckom-White.

11             MR. WILLEMS:  Oh, okay.

12             MS. BECKOM-WHITE:  The omnibus thirty-three omnibus.

13             MR. WILLEMS:  Oh, I'm sorry.  Okay.  It's

14   thirty-three is the objection, you're correct.  And it's

15   twenty-three on the chart.

16             THE COURT:  All right.  One second.  All right.

17   Thank you.  Go ahead, Ms. -- what's -- the chart says White,

18   Wanda Beckom.  What is your name again, Wanda Beckom-White?

19             MS. BECKOM-WHITE:  Wanda -- Wanda Beckom-White.

20             THE COURT:  Is Beckom-White one word, is it

21   hyphenated or what is it?

22             MS. BECKOM-WHITE:  It's hyphenated with White.

23             THE COURT:  Okay.  I -- I got you.  All right.  Ms.

24   Beckom-White, go ahead.

25             MS. BECKOM-WHITE:  Okay.  Thank you for giving us

1  the opportunity to come to Court and -- and support the fact

2  that 10% have been taken away from our -- our -- our wages

3  along with longevity, some of our shift premium.

4      And I came here to say thank you for giving us the

5  opportunity to come.  Some of the people that was on -- that

6  was in the case did not receive a packet to be able to

7  represent themselves.  And I wanted to see if there is any way

8  possible that they was going to be included in this City of

9  Detroit under AFSCME.

10      When you say that city council is looking into

11  negotiating with AFSCME.  I was trying to see the people that

12  did --

13          THE COURT:  Ms. Beckom-White -- Ms. Beckom-White.

14          MS. BECKOM-WHITE:  Uh-huh.

15          THE COURT:  This isn't the time for you to ask

16  questions of the attorney for the city.

17          MS. BECKOM-WHITE:  Okay, okay.

18          THE COURT:  You can do that after the hearing.

19          MS. BECKOM-WHITE:  Okay.

20          THE COURT:  -- but not -- not during the hearing.

21  This is your chance --

22          MS. BECKOM-WHITE:  No, was trying to --

23          THE COURT:  Hold it, hold it.

24          MS. BECKOM-WHITE:  Okay.

25          THE COURT:  This is your chance to speak to the

1  Court.

2           MS. BECKOM-WHITE:  Okay.

3           THE COURT:  And say whatever you want to say, but

4  don't -- you know, do it briefly and go ahead.

5           MS. BECKOM-WHITE:  Okay.  I just wanted the people

6  that wasn't able to get a packet from the Court, to be able to

7  -- be able to be looked, you know, for them to look over it.

8  And how can I put it?  So they can be able to be known that

9  they also have lost their 10%, they annuity, and they

10  longevity.

11          THE COURT:  Well, I don't know who you're referring

12  to Ms. --

13          MS. BECKOM-WHITE:  And they assist --

14          THE COURT: Excuse me.

15          MS. BECKOM-WHITE:  Uh-huh.

16          THE COURT:  I don't know who you're referring to

17  there --

18          MS. BECKOM-WHITE:  Uh-huh.

19          THE COURT:  -- but you're free to -- certainly to

20  bring to the attention of the attorneys for the city --

21          MS. BECKOM-WHITE:  Uh-huh.

22          THE COURT:  -- the names of any persons who you

23  think had a claim objected to by the city at any time and then

24  did not get proper notice of that objection to the claim --

25          MS. BECKOM-WHITE:  Uh-huh.

1          THE COURT:  -- and of the hearing date.  So if -- if

2    you think there are such people, I would encourage you to let

3    the city's attorneys know about that.

4          MS. BECKOM-WHITE:  Uh-huh.

5          THE COURT:  And if any of those people want to seek

6    relief from the Court by way of a motion from any adverse

7    orders that may have been entered regarding their claim on the

8    ground that they didn't receive proper notice, they can do

9    that on their own behalf, but that's -- that's for them to do.

10   Anyway, go ahead.  Anything else?

11         MS. BECKOM-WHITE:  But that was my concern.

12         THE COURT:  Anything else?

13         MS. BECKOM-WHITE:  That was it.

14         THE COURT:  All right.  Thank you.  Now, I'll ask

15   again, anyone else among the creditors who want to speak in

16   the hearing today before we turn -- let the city counsel speak

17   and then conclude the hearing.  All right, I hear nothing.

18   Mr. Willems, did you want to reply?

19         MR. WILLEMS:  Well, Your Honor, as to the

20   individuals who have made a presentation to the Court --

21         THE COURT:  Remember, please speak up so everybody

22   can hear you back there.  Thank you.

23         MR. WILLEMS:  Your Honor, as to the individuals who

24   have made a presentation to the Court, I first pointed out

25   that we haven't heard anything that undermines the city's

1  legal arguments or its arguments on the merits.

2      With respect to Mr. Collins, I'd note that his response,

3  the city did request that it be stricken because it was filed

4  late.  I had the document that we filed in my hand just a

5  second ago, but it's gotten swallowed up in the paper mess

6  over there.  But he doesn't -- he doesn't add anything to his

7  claim.  It appears that he's still -- it's basically a CET

8  claim.

9      With respect to Mr. Wolfe --

10          THE COURT:  Wait, hold on one second, please.

11          MR. WILLEMS:  Yeah.

12          THE COURT:  All right.  Thank you.  Go ahead.

13          MR. WILLEMS:  In fact his original claim, Mr.

14  Collins' original claim didn't even state an amount, it just

15  said compensation earned without any specificity.  So his

16  claim is deficient for that reason.

17      With respect to Mr. Wolfe, I -- I wasn't sure if the

18  Court said that it had not seen our reply in support of

19  forty-fourth -- the city's forty-fourth omnibus objection.

20          THE COURT:  I have seen it, I read it.

21          MR. WILLEMS:  Oh, okay.  All right.  All right.

22          THE COURT:  That was filed last Friday, right?

23          MR. WILLEMS:  Yes.  Yeah, it's --

24          THE COURT:  Yeah, I saw that, I read it.

25          MR. WILLEMS:  Okay.  All right.  As -- as -- as we

1  indicate in that response, or reply, first of all his -- his

2  response should be overruled. He's -- he's actually bringing

3  in a new claim after the bar date. He's bringing in now an

4  out of class claim as opposed to the longevity claim that he

5  previously pleaded.

6      So -- and in addition the -- the new claim is -- has been

7  settled as part of a -- an entire group of grievances that --

8  that the city settled as part of the -- the overall labor

9  settlement in -- under the -- under the bankruptcy

10 proceedings. And Tab 9 behind our -- behind the reply, Tab A9

11 I should say, addresses that.

12         THE COURT: What is Mr. Wolfe getting as a result of

13 the settlement of his claim regarding out of class pay?

14         MR. WILLEMS: I don't know what the specifics are.

15 There's a -- there's an omnibus settlement agreement that's --

16 that's at that tab which settles all of the grievances that

17 were filed as part of the AFSCME proof of claim.

18     As you may recall the AFSCME proof of claim had two

19 parts. It had the -- the first part was a general recitation

20 of a number of broad collective bargaining claims and then as

21 Exhibit 2 it had several -- well, 50 or more pages of

22 individual grievances that were pending at the time of the

23 bankruptcy proceeding.

24     And those were all settled. I don't have the specifics

25 of how each one was settled. But Mr. Wolfe's claim is at Page

```
 1   56 of -- of that attachment.  And it -- it -- it specifies

 2   that it was a grievance based on out of class payments and the

 3   amount is the precisely same amount that -- that he has in his

 4   claim here.  So that -- that --

 5              THE COURT:  He said that he filed two claims, is

 6   that correct?

 7              MR. WILLEMS:  His initial claim was based on the --

 8   on the elimination of longevity.

 9              THE COURT:  Right.

10              MR. WILLEMS:  The second claim, the untimely one was

11   the out of class pay.

12              THE COURT:  Well, you say untimely.  Was it filed

13   actually as a proof of claim, or merely a response to your

14   claim objection?

15              MR. WILLEMS:  Well, it was -- it was filed as a

16   response but it added an entirely new claim.

17              THE COURT:  All right.  So it wasn't as if he filed

18   two proofs of claim in the case.

19              MR. WILLEMS:  He did not file two proofs of claim,

20   no.

21              THE COURT:  Okay.

22              MR. SPINNER:  Your Honor --

23              THE COURT:  Go on, Mr. Willems.

24              MR. SPINNER:  Your Honor, Ron Spinner.  I'm sorry to

25   interrupt.  I'm not entirely certain that there are a second
```

1  proof of claim.  We just know that at the time what the city

2  has said were to be objected were on the list.  I do not have

3  a collapsed list that says everything by claimant.  So it's

4  possible pending a search there could be a second additional

5  proof of claim and I just don't want to go on the record

6  unless Mr. Willems is certain of that fact.

7      Based on the knowledge we have today there's no second

8  original pre-petition proof of claim.  But I cannot stand

9  before you today for the city and say that for sure.

10         MR. WILLEMS:  I appreciate that correction.

11         THE COURT:  Well, if there is -- if there is, and

12  the city -- I mean eventually the city will object to it if

13  the city has an objection to it, I presume based on it being

14  settled or whatever else there may be for argument.

15         MR. SPINNER:  That's right.  For this purpose here

16  to the extent that Mr. Wolfe is suggesting that his first

17  claim, the one we were checking to longevity is an out of

18  class claim, we're explaining why it won't work as far as an

19  amendment goes.  He can't -- untimely, amendment, all that

20  good stuff.  But his original other claim as filed will remain

21  as it is until -- assuming that there is such a claim, it

22  remains there until we file an objection of course.

23         THE COURT:  All right.  Back to you, Mr. Willems.

24         MR. WILLEMS:  Moving on to Mr. Dorch.  He's claiming

25  a -- a reduction in 2011.  I -- I don't have any information

1  to -- to address that at this moment.

2      It could well be that there's some confusion about the

3  timing.  The -- the -- there were prior to the imposition of

4  the CET's under prior imposed collective bargaining

5  agreements, some reductions.  But if that's what he's talking

6  about, then the argument would be the same.  Those were --

7  those were lawfully imposed in the context of collective

8  bargaining.

9      And then they were -- they were not the CET's, but just

10  by way of quick historical background, the 2008, 2012

11  collective bargaining agreement between the city and AFSCME

12  was initially an imposed, and eventually an agreed to

13  collective bargaining agreement.

14      And under that 2008, 2012 collective bargaining

15  agreement, there were also some reductions that -- including

16  longevity and -- and there may have been some what they call

17  BFR days or 10% cuts, or something along that line.

18      And Mr. Moore, and I haven't had a chance to look this

19  up.  Obviously he's got, as we now understand it, an

20  additional claim on failure to pay checks.  I looked back in

21  his claim and -- and I think that -- that there's probably

22  some language in there that -- that would validate that --

23  that it's part of the original claim.  But that's the -- the

24  -- the failure to properly pay step increases.

25      Distinguishing that from the CET claim, I think that's

1 one where -- I guess I can't imagine that there wouldn't have

2 been a grievance filed or something along that line.  That

3 that wouldn't have been addressed in some way.

4     And what -- what I'd like to do with that one is propose

5 that -- that I take that information back to the city and we

6 look at it and see whether there's a -- there's an issue

7 there.  Obviously with the rest of his claim which is a CET --

8 which is a standard CET claim, all our arguments would still

9 be in play on that one.

10    Ms. Cannon, she hasn't brought anything forth to

11 distinguish her from the other CET claimants and therefore our

12 arguments would hold there.  The same with Ms. McCrary.  Same

13 with Mr. Capizzo, although it looks like he may have also have

14 some claims that would fall under the -- either the confirmed

15 plan, or the emergency manager order 21, but it wasn't clear

16 from his recitation.

17    And I guess the same thing would apply to Ms.

18 Beckom-White.  She didn't present any information to change

19 the nature or the -- the affect of our arguments on her claim.

20 And that's all I have.

21        THE COURT:  All right, just a moment.  All right.

22 Mr. Willems or Mr. Spinner, whoever wants to answer this.  Am

23 I correct in assuming that when the Detroit city council

24 decides whether or not to ratify the proposed settlement of

25 the AFSCME claim and the union -- coalition of unions claim,

1  that the -- that some sort of agreed order will be stipulated

2  to and submitted to the Court for entry if the settlement is

3  approved?  Is that correct or is that not correct?

4          MR. WILLEMS:  That's a correct assumption, Your

5  Honor.

6          THE COURT:  So if it's approved, I will -- the Court

7  will learn about it that way if not some other way.  That is

8  there will be a -- I'll see a stipulation and a proposed order

9  that indicates that it has been -- the settlement has been

10  approved and the city's objections to the claims of those

11  unions are fully settled, is that right?

12          MR. WILLEMS:  That's -- that's correct.

13          THE COURT:  What if the city council does not

14  ratify, decides not to ratify the settlement.  How will the

15  Court know that?  Will it -- will there be something filed

16  relating to the litigation deadlines order that will tell me

17  that or what?

18          MR. WILLEMS:  I mentioned that we would then apprise

19  the Court of the fact that that particular settlement hasn't

20  been approved and there will either be a plan B attempt to

21  settle in some other way, or we may at that point decide that

22  -- or the parties may decide that they should come back to the

23  Court and litigate the issues.

24          THE COURT:  Now currently as you know as I mentioned

25  earlier, the -- the first -- current first deadline in the

1  litigation schedule for the filing of certain summary judgment

2  motions regarding these claims is -- is currently now an

3  extended date of -- I think it was June 28th.

4      So if the city council hasn't acted before then, the

5  parties, I -- I assume were going to come back to the Court

6  and seek another extension order, right?

7          MR. WILLEMS:  We will be, Your Honor.

8          THE COURT:  And when you -- when you do that you

9  will -- I hope you will put something in there to indicate

10  what the status is of the proposed settlement.

11          MR. WILLEMS:  I think we've done that each time and

12  we will certainly do that again.

13          THE COURT:  Yeah.  The last time there was just --

14  the dispute had been settled entirely in principle subject to

15  documentation.  So you'll give me an update of that kind about

16  the status if it has not yet been fully approved you'll tell

17  me what's -- what the status is of the settlements, right?

18          MR. WILLEMS:  We will do that.

19          THE COURT:  Yeah.  All right.  So then I'll -- I'll

20  know one way or the other then in the not too distant future

21  what's going on with the settlements.

22          MR. WILLEMS:  You will indeed.

23          THE COURT:  All right.  All right.  Thank you.

24      With respect to the matters that the Court has just been

25  hearing today, the -- the objection to claim matters the Court

1  has been hearing that the forty-fourth omnibus, the

2  forty-fifth omnibus objections to claim, and the adjourned

3  hearing today on all of the claims that were subject to the --

4  to earlier omnibus objections to claim but which the Court

5  adjourned for hearing to today to give the city and the

6  parties a chance to file briefs, all of which have to do with

7  the city's arguments that these are employee -- so-called

8  employee obligation claims and the arguments that the city

9  makes in its brief that was filed April 21 at docket 11102 and

10  -- and argued further about today.

11      As to those, I'm not going to make a ruling today.  And

12  I'm not going to make any ruling until I -- I see what happens

13  with the proposed settlement between the -- regarding the

14  city's objection to the claims of AFSCME and the coalition of

15  unions that we've talked about today.

16      If the city council of Detroit approves the -- or

17  ratifies the settlement from what's been told -- what I've

18  been told in this hearing, the -- the result of that will be

19  an order that -- that fully resolves the city's objection to

20  the claims of those unions.  And the Court will have no

21  further concern about what impact a ruling on the merits of

22  the arguments presented today and in the April 21 brief may

23  have on the city's objection to the claims against AFSCME and

24  the coalition of unions since those matters will be settled

25  and will not be litigated.

1    And I think it's appropriate for the Court to wait and

2  see if this settlement is approved.  And if the settlement is

3  not approved and it's going to be litigated, and then the

4  dispute is going to be litigated including the issues

5  regarding the imposition of -- of -- of city employment terms

6  and the emergency manager 21 and its affects on employees in

7  the -- and whether or not those adverse actions can give rise

8  to any valid legal claim by anyone in the city's bankruptcy

9  case.

10    I think those issues are issues that would be part of the

11  litigation between the city on the one hand and the AFSCME and

12  coalition of unions on the other regarding their claims.  And

13  I would want the -- before I rule on the merits of those

14  arguments, I would want in that instance the city -- or rather

15  the coalition of unions and the AFSCME to have an opportunity

16  to be heard, to brief and to be heard on those -- the city's

17  arguments that are made in the April 21 brief about that.

18    However that will not be necessary if in fact in the next

19  month to month and a half as -- as the timing is predicted by

20  city's counsel -- city's counsel today in the hearing, the

21  claims -- the objections to claims against the claim of AFSCME

22  and the coalition of unions is settled through a final

23  settlement ratified by Detroit city council.

24    So I'm going to wait to see what happens with this

25  settlement.  That's the short of it before I make any further

1 ruling on these objections to claim that we've talked about

2 today, except Mr. Willems, correct me if I'm wrong, I -- I

3 believe with respect to the forty-fourth and forty-fifth

4 omnibus objections to claim, there have been some creditors

5 who did not file a response to those objections and did not

6 appear today, is that correct?

7           MR. WILLEMS:  That appears to be the case, yes.

8           MR. SPINNER:  Yes, Your Honor.

9           THE COURT:  Does the city want the Court essentially

10 by default to enter an order sustaining the objections as to

11 those creditors and those claims?

12          MR. SPINNER:  I believe that has been the past

13 practice, Your Honor.  And we would -- yes, we would like

14 that.

15          THE COURT:  And the past practice has been -- yes,

16 it has been that.  And -- and, you know, it's up to you, you

17 can tell me.  I'm willing to do that much, that's not really a

18 ruling on the merits.  Basically those claimants are having

19 their claims -- the objection to their claim sustained by

20 default.

21     And so I'll ask the counsel for the city to submit a

22 proposed order, one for each, the forty-fourth, one for the

23 forty-fifth sustaining the objection to claims as to all the

24 claims which no written response was -- neither a written

25 response was filed, nor the creditor -- nor did the creditor

1    appear at today's hearing both.

2        So if the creditor for a particular claim did not file a

3    written response, stricken or not, did not file any written

4    response and did not appear at today's hearing and speak at

5    today's hearing, either one, then I'll sustain the objection

6    as to those -- their claim.  Otherwise not.

7        And so that should be the -- the list of claims and

8    creditors on the list in the orders that -- proposed order

9    that you're going to submit.  Do you -- do you -- do you see

10   what's needed here?

11            MR. SPINNER:  I do.  The only question I have, it

12   sounds like you're suggesting so that we do not include in

13   that Mr. Wolfe because he did appear today.

14            THE COURT:  No, do not include Mr. Wolfe for -- for

15   the time being I'm going to leave him out there as part of the

16   other group and for ruling at a later time.

17            MR. SPINNER:  That's fine, Your Honor.

18            THE COURT:  So Mr. Spinner or Mr. Willems, one of

19   you will submit that order.  I'll waive presentment of these

20   orders, each of them.  Ask you to submit those.  And how

21   quickly can you get those to me?  Tomorrow?

22            MR. SPINNER:  I believe so.  I certainly can work to

23   have that arranged.  I'm traveling to the ABI conference

24   tomorrow, but our paralegal who takes care of this is well

25   versed in this by now and I think we can get through that

1          THE COURT:  All right.  Well, you know, as soon as

2  you can.  Now with respect to the claims that are not going to

3  be sustained, the objection to claims it's not going to be

4  sustained yet at least on the forty-fourth and forty-fifth,

5  plus all the other claims that were adjourned for hearing

6  today.

7      As I said, I'm going to hold off ruling on those.  And so

8  with respect to those, what I'll do is deem them -- deem the

9  objections to those claims submitted for a decision, but the

10  Court's decision will await a determination of whether the

11  objections to claims of the AFSCME claim and the coalition of

12  union claims are -- are settled or not.  And so I'll prepare

13  and enter an order reflecting that. So the exact terms of that

14  will be -- will be known.

15      Now, Mr. Willems or Mr. Spinner, one or the other, I

16  think there was at least one claim that was discussed during

17  today's hearing in which Mr. Willems says -- indicated he

18  wanted to go back to the city and find out more about it.

19      And I think the issue had to do with whether or not the

20  claim was -- involved any aspect or any -- any basis other

21  than the imposition of city employment terms, or the emergency

22  manager order 21.  Or -- or for that matter, a claim that is

23  basically at war with the confirmed plan.  Some other

24  pre-petition claim.

25      I think there was at least one that Mr. Willems indicated

1  he wanted to check on.  I think that was the claim of Mr.

2  Moore.

3           MR. WILLEMS:  It was Mr. Moore.  And -- and he -- he

4  had asserted that there was a failure to pay step increases

5  and so he was underpaid for --

6           THE COURT:  Does the city want an opportunity to

7  file a supplement to its claim objection regarding Mr. Moore's

8  claim?

9           MR. WILLEMS:  We -- I -- I -- that would be --

10          THE COURT:  Pardon?

11          MR. WILLEMS:  Yes, I would propose that.

12          THE COURT:  Any of the other ones heard today that

13  you want to -- the opportunity to supplement regarding?

14          MR. WILLEMS:  You know, offhand I -- I -- and none

15  of the others jump out at me as something that we need to

16  supplement.

17          THE COURT:  All right.  All right.  So what sort of

18  deadline would you like me to set for any such optional

19  supplement by the city to be filed?  One week enough?

20          MR. WILLEMS:  One week may not be enough because in

21  trying to track down this -- this issue it may take longer

22  than that.  So --

23          THE COURT:  How much time do you want?

24          MR. WILLEMS:  I would ask for at least two weeks.

25          THE COURT:  All right.  That's June 29.  I'll put

1  that in the order.

2        MR. COLLINS:  And, Your Honor --

3        THE COURT:  And as I said, I'll prepare and enter an

4  order reflecting what I've said here and we'll go from there.

5  So I think that concludes matters for today.  Sir, why do you

6  raise your hand?

7        MR. COLLINS:  Your Honor, the attorney --

8        THE COURT:  If you want to -- if you want to speak,

9  come up to the microphone.  But this hearing is basically

10  finished.  So what is it?  You're Mr. Collins?

11        MR. COLLINS:  Yes.

12        THE COURT:  You spoke earlier.

13        MR. COLLINS:  Okay.  Yes, yes, it is.

14        THE COURT:  What is it, sir?

15        MR. COLLINS:  What's that?  The -- the attorney for

16  the city said that I did not submit any -- you know, anything.

17        THE COURT:  Mr. Collins, this is not an opportunity

18  for you to reply to his -- the reply of the city.  They speak

19  last because they're the party objecting.  We're done.

20        MR. COLLINS:  Okay.  Sir, I -- I did submit my

21  claims to the Court and to the clerk.  And I did submit them

22  out for, you know --

23        THE COURT:  Mr. Collins, I just said we're done.

24  Thank you.  All right.  Thank you all and we'll see you next

25  time.

1          MR. COLLINS:  Thank you, Your Honor.

2          THE CLERK:  All rise.  Court is adjourned.

3      (Court Adjourned at 4:31 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7    We certify that the foregoing is a correct transcript from the

8    electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11   /s/Deborah L. Kremlick, CER-4872          Dated: 7-5-16
     Jamie Laskaska
12

13

14

15

16

17

18

19

20

21

22

23

24

25