UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

Debtor.

_____/

Chapter 9

Case No. 13-53846

Hon. Thomas J. Tucker

## RESPONSE TO CITY OF DETROIT'S MOTION TO DETERMINE RIGHTS TO CLAIM NUMBER 201

## I. Preface

Mr. Beydoun disputes the lien claimed by Kajy in the amount of $168,017.21 as Mr. Beydoun does not owe any money to Kajy Development L. L. C.. (Ex. 11). Mr. Beydoun was never provided the Kajy garnishment request submitted to this Court until it was filed as an attachment to the recent Motion filed by the City of Detroit, Doc. # 11624. (Ex. 11).

In response to paragraph 13 of Detroit's present Motion, the $25,000.00 in attorney fees as cited by the City of Detroit, and 1/3 of the remaining monies ($2,098,003.91 as cited at paragraph 13, equating to $699,334.63 are to be paid to Raymond Guzall III P. C., and the remaining $1,398,669.28 paid to Mr. Beydoun) (that remaining amount should however equate to $2,266,021.12 if the Kajy claim is disallowed, equating to $755,340.37 paid to Raymond Guzall III P. C and the remaining $1,510,680.75 paid to Mr. Beydoun). (See Exhibit 6 and Exhibit 11 attached hereto). Because David Warren failed to produce the documentation requested by the City of Detroit, the documentation is being produced herein.

As stated at paragraph 5 within the City of Detroit's Motion, "[t]he City contacted David Warren who represented Seifman and the Seifman Law firm in this dispute and requested documentation showing that this lien still exists, but received no documentation." There exists no lien by Mr. Seifman in this case.

1

## II. There exists no lien by Mr. Seifman in this case

Upon leaving the law Firm of Seifman & Guzall, P. C., Seifman filed a lawsuit against Guzall seeking all damages, including the attorney fees in the Michael Beydoun lawsuit versus the City of Detroit. (Exhibit 1- lawsuit, and see also the Stipulated Mutual Order of March 12, 2012 attached by Detroit to it's present Motion). Guzall then filed a counter-lawsuit against Seifman. (Exhibit 2). Those cases were settled at case evaluation and an order was entered returning all monies placed into escrow back to the Party which paid the money into escrow, and a subsequent order was entered listing the specific amounts to be paid to each Party. (Exhibit 3). As an example, the Cassandra Parks case, a case originating at Seifman & Guzall P. C., as listed at paragraph 1, letter q of the March 22, 2012 order, resulted in an attorney fee of $16,666.66. Raymond Guzall III P. C. received those monies after the lawsuits between Guzall and Seifman commenced, and deposited that $16,666.66 into the court escrow account. (Exhibit 4). Guzall was then paid back that $16,666.66 after the Guzall and Seifman lawsuits were settled. (Exhibit 3).

Also as a result of the Seifman and Guzall lawsuits, Seifman paid Guzall in accord with the case evaluation in favor of Guzall, resolving the dispute. (Exhibit 5). Therefore, pursuant to the accord and satisfaction, Seifman maintains no

2

further interest in this matter. Other applicable defenses include, but are not limited to, estoppel and res judicata.

Attorney Raymond Guzall III litigated and tried the Beydoun v City of Detroit lawsuit in Wayne County Circuit Court and represented Mr. Beydoun throughout the appellate court process and before this Court in the bankruptcy proceedings. See attached creditor filing with this Court as to Michael Beydoun and attorney Raymond Guzall III "as to attorney fees and costs". (Exhibit 6-1 of the City of Detroit's present Motion). See also attached attorney/client agreement between Mr. Beydoun and Raymond Guzall III P. C.. (Exhibit 6). Mr. Seifman has not produced such an agreement. Without such an agreement, Mr. Seifman's claim of lien is not valid. Further, to date, it is not indicated that Seifman has made any claim with this Court, and Raymond Guzall III is not aware of any such claim.

## A.    The application of res-judicata

Should this Court need to look further, res judicata also applies in this case, barring Seifman from maintaining a claim in this Court. "Michigan law defines res judicata broadly to bar litigation in the second action not only of those claims actually litigated in the first action, but also claims arising out of the same transaction that the parties, exercising reasonable diligence, could have litigated

3

but did not." *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 11, 672 N.W.2d 351, 358 (2003). The law further holds:

> "...the Supreme Court outlined the general principles governing res judicata:
> Res judicata bars a subsequent action between the same parties when
> the evidence or essential facts are identical. *Eaton Co. Bd. of Co. Rd.
> Comm'rs v. Schultz,* 205 Mich.App. 371, 375, 521 N.W.2d 847
> (1994). A second action is barred when (1) the first action was
> decided on the merits, (2) the matter contested in the second action
> was or could have been resolved in the first, and (3) both actions
> involve the same parties or their privies. *Id.* at 375–376, 521 N.W.2d 847."
> *Verbrugghe v. Select Specialty Hosp. Macomb Cty., Inc.,* 279 Mich.
> App. 741, 744, 760 N.W.2d 583, 585 (2008).

Because Seifman litigated and accepted the Case Evaluation Award in favor of Guzall regarding the attorney fees he sought within the named cases (Beydoun v City of Detroit included), as illustrated with the City of Detroit's Exhibit labeled "STIPULATED MUTUAL ORDER", dated March 22, 2012, Seifman is barred from maintaining the same claim in this Court.

The Michigan Supreme Court examined the principles governing interpretation of the court rules and the definitions of the terms "claim" and "action" before ruling as follows:

> "*The language of MCR 2.403(M)(1) could not be more clear that
> accepting a case evaluation means that all claims in the action, even
> those summarily disposed, are dismissed*. Thus, allowing bifurcation
> of the claims within such actions, as plaintiff suggests, would be
> directly contrary to the language of the rule. We, therefore, reject
> plaintiff's position because it is contrary to the court rule's

4

unambiguous language that upon the parties' acceptance of a case evaluation all claims in the action be disposed.

* * *

These [Court of Appeals decisions holding to the contrary] improperly allow a party to make a showing that "less than all issues were submitted" to case evaluation. Allowing the parties involved in the case evaluation process to make such a showing has no basis in the court rule. . . . As we have explained, this unambiguous language [of MCR 2.403(M)(1)] evidences our desire to avoid bifurcation of civil actions submitted to case evaluation. To the extent that *Reddam* [*v Consumer Mortgage Corp*, 182 Mich App 754; 452 NW2d 908 (1990)] and its progeny have been read to suggest that parties may except claims from case evaluation under the current rule, these cases are overruled. *If all parties accept the panel's evaluation, the case is over*." *Magdich & Assocs, supra*, at 278-279, emphasis added.

Thus, the mutual acceptance of a case evaluation in Michigan *means that all claims in the action, even those summarily disposed, are dismissed. Id.*, at 278. "Accordingly, plaintiff's acceptance of the mediation award settled all claims, including those which had been dismissed by partial summary disposition." *CAM Const. v. Lake Edgewood Condo. Ass'n*, 465 Mich. 549, 556; 640 N.W.2d 256, 259 (2002).

When res judicata is applied, "[i]t is not necessary for the Court to consider Defendant's alternate argument that the claims are also barred by collateral estoppel." *ADF Int'l, Inc. v. Steelcon, Inc.*, 409 F. Supp. 2d 836, 841 (E.D. Mich. 2005). Should this Court not apply res judicata, collateral estoppel applies:

5

**B.    The application of collateral estoppel**

"Collateral estoppel, or issue preclusion, precludes relitigation of an issue in a subsequent, different cause of action between the same parties or their privies when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in the prior proceeding." *ADF Int'l, Inc. v. Steelcon, Inc.,* 409 F. Supp. 2d 836, 841–42 (E.D. Mich. 2005). Collateral estoppel prevents Seifman from relitigating the issue of him being paid any attorney fees in the Beydoun v City of Detroit case as Seifman accepted the Case Evaluation Award against him where he sought the attorney fees in the Beydoun v City of Detroit case prior. (Ex. 1, 3, 5 and the City of Detroit's Exhibit labeled "STIPULATED MUTUAL ORDER", dated March 22, 2012).

**III.    Should Mr. Seifman argue to this Court that he is entitled to a portion of the attorney fees in this case, because of the illegal and/or improper acts of Seifman, relief cannot be granted in his favor**

The law holds, "An attorney may lose his right to fees for unprofessional conduct or abandonment of his client's case." *Rippey v Wilson*, 280 Mich 233, 245, 273 NW 552 (1937), citations omitted. For the *quantum meruit* rule to apply the discharged attorney **must not** have: engaged in misconduct that is subject to discipline; that is prejudicial to the client's case or conduct; or that is contrary to public policy (such would disqualify the equitable *quantum meruit* award).

6

*Reynolds v Polen*, 222 Mich App 20, 564 NW2d 467 (1997); *Ecclestone, Moffett & Humphrey, PC v Ogne, Jinks, Alberts & Stuart, PC*, 177 Mich App 74, 441 NW2d 7 (1989).

## A. Barry A. Seifman knowingly violated MRPC 1.15(a)(3), MRPC 1.15 (f) and MRPC 8.4 (a), (b), and (c).

The Michigan Rules of Professional Conduct state as follows:

"(3) "IOLTA account" refers to an interest- or dividend-bearing account, as defined by the Michigan State Bar Foundation, at an eligible institution from which funds may be withdrawn upon request as soon as permitted by law. An IOLTA account shall include only client or third person funds that cannot earn income for the client or third person in excess of the costs incurred to secure such income while the funds are held." MI R MRPC 1.15(a)(3).

"**(f)** A lawyer may deposit the lawyer's own funds in a client trust account only in an amount reasonably necessary to pay financial institution service charges or fees or to obtain a waiver of service charges or fees." MI R MRPC 1.15 (f).

"It is professional misconduct for a lawyer to:

**(a)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

**(b)** engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

**(c)** engage in conduct that is prejudicial to the administration of justice;..." *MRPC 8.4 (a), (b), (c).*

7

###### i. **Barry A. Seifman used the IOLTA account of the Law Firm Seifman & Guzall, P. C., to avoid paying income taxes for _at least 6 years_.**

Barry Seifman improperly held 'his' money in the Firm's IOLTA account for years, per his own testimony attached hereto at Exhibits 7 and 8. An attorney cannot commingle his own funds with client funds in an IOLTA account for 6 years, nor move money from the firm's checking account into the IOLTA account at year end to avoid showing a profit and avoid paying income taxes, or keep earned funds in an IOLTA account to avoid paying income taxes. Mr. Seifman did all of this, as his testimony illustrates.

Seifman's <u>own testimony</u> in April of 2012 illustrates that **he in fact did co-mingle his funds with Client funds over a period of 6 years:**

```
20  Q.  Do you interpret Exhibit 42 that all of that was
21       money which you were entitled to?
22  A.  I was entitled to it but I didn't take it.
```
(Exhibit 7, deposition of Barry Seifman, p. 225, emphasis added)

```
                227
7   Q.  So even though paragraph 2 says "all funds" you
8       believe only $30,000.00 of those funds is what you
9       were entitled to?
10  A.  Relevant to the checking.
11  Q.  Relative to the checking, okay.
12          Let's go to the IOLTA.  Paragraph 2 of
13       Exhibit 42 say "All funds in the IOLTA trust
14       account," okay, "shall be the sole property of Barry
15       Seifman."
```

8

16         I'm showing you page 402 of the documents
17     that you've produced and as of July 13, 2006 there
18     appears to be **$211,882.08**.  That's what this
19     document, page 402 says.  Can we agree on that?
20  A.   All right.  Well, I don't know.  I'm sorry.

228

5  A.   Approximately 211 thousand.
6  Q.   $211,000.00.
7         Can you tell me **how much of that 211**
8    **thousand that was in the IOLTA trust account as of**
9    **that date was money that *clients were entitled to*** as
10    opposed to money that could be distributed to the
11    firm or to you?
12  A.   **I don't know**.

24  Q.   And am I correct that at no time did you ever, even
25    up to today, you've never totaled that up, is that
        229
1    correct?
2  A.   **At sometime I probably did** to have an idea of what
3    the heck was in there.
4  Q.   Okay.
5  A.   But I don't remember.
(Exhibit 7, deposition of Barry Seifman, p. 227-229, emphasis added)

    Mr. Seifman also testified:

5  Q.   Okay.  Did you tell him how much was in the IOLTA
6    account?
7  A.   **I think I did.**
8  Q.   Okay.  I asked if you -- do you know how much was in
9    the IOLTA account at the time?
10  A.   **I'm not sure.**

15  Q.   So according to this document, **whatever was in the**
16    **firm checking account became your money pursuant to**

9

17    this stockholder agreement, correct?
18 A.  **Right.**
19 Q.  Okay.  And so that became your money.  **Did you record**
20    **it on your income tax return as income?**
21 A.  **I don't** -- I give my information to my CPA and they
22    do what they're supposed to do.

25 Q.  You produced personal income **tax returns for yourself**
                   145
1    and your wife but not for the **year 2006.**  Do you have
2    them, sir?
3 A.  **We couldn't find them.**

7        **The money that became yours that was in the**
8    **corporate checking account** pursuant to Exhibit 42,
9    **did you withdraw it?**
10 A.  **Did I withdraw it?**
11 Q.  Yeah, from the corporate checking.
12 A.  **Do you mean for personal use?**
13 Q.  Yes.
14 A.  **No.**
15 Q.  Okay.  Therefore, **you commingled that personal money**
16    **of yours with the firm's money, correct?**
17 A.  **Only as you interpret it, not the way I interpret**
18    **it.**

24 Q.  And it was your money, not the firm's money at that
25    point, correct?
                   146
1 A.  **I was entitled to that money.  I did not take it**
2    **out.**
3 Q.  Therefore, **you commingled it with the firm's funds,**
4    **correct?**
5 A.  No, I think at that time that was the only funds in
6    that account.
7 Q.  Therefore, all the money in that account was your
8    funds, Barry A. Seifman individually, right?

10

9  A.  **I don't know.**  You're asking me tax questions and I
10     don't do tax.
11  Q.   I'm not asking you a tax question.
12  A.   Well, **commingled to me is versus the firm, versus me,**
13     **versus when I take it in is a tax question so I'm**
14     **sorry.**
15  Q.   So you **as an attorney can't answer my question**
16     **whether you commingled your personal funds with the**
17     **firm's funds?  You can't answer that, is that**
18     **correct?**
19  A.   **Not the way it's phrased.**
25          **Why did you leave money that became yours**
                    147
1      **in the firm's IOLTA account after July 18, 2006?**
2  A.   **I'm sorry, I must have faded out.**  Can you please say
3      that again?

16  Q.   So that was the firm's IOLTA account, correct?
17  A.   **There's only been <u>one IOLTA account</u>.**
18  Q.   And that is the firm's IOLTA account, correct?
19  A.   It's in the firm's name.
20  Q.   Okay.  **And did you continue to deposit money in the**
21     **firm's IOLTA account after July 18 of '06?**
22  A.   **Yes.**
23  Q.   **Did you continue to deposit money in the firm's IOLTA**
24     **account after July 18, '06 *while your money was still***
25     ***in that IOLTA account*?**
                    148
1  A.   **Yes.**
2  Q.   Okay.  **Therefore, you commingled your money with the**
3      **firm's money in the IOLTA account?**
4  A.   **I don't think so.  I kept separate records.**
(Exhibit 7, deposition of Barry Seifman, pp. 144-148, emphasis added).

Keeping separate records has no bearing upon the fact the Mr. Seifman

commingled his funds with client funds for at least 6 years in violation of the

11

previously cited Michigan Rules of Professional Conduct. Yet, Mr. Seifman also

testified that he paid his wife *out of the law Firm's IOLTA account,* over

$88,000.00.

> ## ii. Barry Seifman testified that he paid his wife Marsha Seifman out of the Firm's IOLTA account, yet she performed no work for the Firm

12  Q.  There's a date here of July 8, '06.
13  A.  Oh, I know what it is, yeah.
14  Q.  What is that?
15  A.  That's **$1,880.00 paying for in July Marsha Seifman's**
16      **wages.**
17  Q.  $1,880.00?
18  A.  Oh, it's a gross number, yeah.
19  Q.  There's no -- how do you know it's Marsha Seifman's
20      wages?
21  A.  I know the dollar amount.
22  Q.  Okay.
23  A.  Say it again?
24  Q.  Okay. **That was paid from the IOLTA account?**
25  A.  **Yep.**

(Exhibit 7, deposition of Barry Seifman, pp. 154, emphasis added)

Seifman testified he retained earnings (over $200,000.00) in the IOLTA

account over the tax year. (Ex. 7, p. 228).

13  Q.  **Do you keep <u>retained earnings</u> of the IOLTA account**
14      **<u>over the tax year</u> from December 31st to January 1st?**
15  A.  **<u>I have.</u>**

10  A.  **I have retained funds beyond a tax year where <u>some</u>**
11      **<u>may be available</u> and some may not be available within**
12      **that tax year to be disbursed.**

12

(Ex. 7, Seifman dep, pp. 110 lines 13-15 to p. 111 lines 10-12, emphasis added).

The Michigan Attorney Greivance Board has previously stated:

"[w]e can perceive of no excuse for an attorney's failure to be aware of the requirement under Rule 1.15 of the Michigan Rules of Professional Conduct [formerly DR 9.102(a) that <u>client funds be **held separately** from the lawyer's own money</u>. *There are no exceptions in either the former or present rule which allow an attorney to commingle client funds in a business or personal account for reasons of convenience or expedience...*" *Grievance Administrator v Brent S. Hunt,* December 28, 2012 Opinion, Case No. 12-10-GA, at p. 8, citing to *Grievance Administrator v Cummings,* (Ex. 9).

### iii.    Barry Seifman violated MRPC 8.4

"It is professional misconduct for a lawyer to:

**(a)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

**(b)** engage in conduct involving dishonesty, fraud, deceit, misrepresentation, or violation of the criminal law, where such conduct reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer;

**(c)** engage in conduct that is prejudicial to the administration of justice;..." *MRPC 8.4.*

Seifman engaged in conduct involving dishonesty, fraud, deceit, and/or

misrepresentation as well as conduct that is prejudicial to the administration of

justice. In December of 2014, Mr. Seifman testified that he still had **not**

determined how much of his money he had commingled with client funds in the

13

Firm IOLTA account:

5  Q.  This question has been asked and answered and both
6      times in the past I believe your answer was "I don't
7      know" so I'm going to ask you, since the last time you
8      were deposed, have you had a chance to review the
9      **$211,000 that were in your IOLTA in 2006 to determine**
10     **how much of that was firm money to be distributed** or
11     **dispersed to the firm and how much of that was**
12     **client's money?**
22  Q.  So at this point **you still don't know how much of that**
23     **was firm money and how much of that was client money**?
24  A.  **Correct.**
(Ex. 8, Dec. 23, 2014 dep. of Seifman, p. 275, emph. added, attorney banter
omitted).

7  A.  I'm -- I don't do tax.  What they label as trust, I
8      don't know if that's synonymous to IOLTA.
9  Q.  So you would have **no way of knowing** how much of that
10     money was **client money** and how much of that money was
11     **your money?  Firm money?**
16  A.  **I don't know.**
(Ex. 8, p. 287, emph. added, attorney banter omitted).

> **B.    Barry Seifman engaged in conduct involving dishonesty,
>         fraud, deceit, misrepresentation, and in violation of the
>         criminal law, by paying his wife, Marcia Seifman who did
>         not earn the salary he paid her, only to bump up her social
>         security in violation of Federal and State law.  Barry
>         Seifman has violated MRPC 8.4, and MCR 9.104 (1), (2),
>         (3), (4), (5), (6).**

1.    Barry A. Seifman engaged in the illegal act of fraud against the United

      States Government in violation of 18 U.S.C.A. § 371 and 26 USCA 7201,

      by paying his wife Marcia Seifman a salary of <u>over $88,000.00</u> over the

                                    14

years 2008 through the year 2011, yet she did not work to earn those monies, and Barry Seifman told attorney Raymond Guzall in late August or early September of the year 2011 that Barry only paid his wife to bump up her social security. (Ex. 10). Payments made to Marcia Seifman are:

| Year | Salary | Profit Sharing | Yearly Total |
| --- | --- | --- | --- |
| 2008 | $10,000.00 | | $10,000.00 |
| 2009 | $20,000.00 | $1,000.00 | $21,000.00 |
| 2010 | $20,000.00 | $20,000.00 | $40,000.00 |
| 2011 | $17,253.00 | | $17,253.00 |
| GRAND TOTAL | | | $88,253.00 |

2. The law states, "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution." *26 USCA 7201.*

3. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or

15

imprisoned not more than five years, or both." *18 USCA 371.*

4.  Barry A. Seifman conspired with his wife, Marcia Seifman, to defraud the
    United States or agency thereof to avoid paying State of Michigan and U. S.
    Federal taxes and illegally bump up Marcia Seifman's social security
    payments for the benefit of both Barry A. Seifman and Marcia Seifman.

5.  Barry A. Seifman also violated MCL 205.27 as the facts herein show.

6.  MCL 205.27 states in part, "A person who violates a provision of this
    section with intent to defraud or to evade or assist in defrauding or evading
    the payment of a tax, or a part of a tax, is guilty of a felony, punishable by a
    fine of not more than $5,000.00, or imprisonment for not more than 5 years,
    or both." *MCL 205.27.*

7.  Barry Seifman's wife Marcia Seifman did not earn the salary that Barry
    Seifman paid her. (Exhibit 12, p. 87 line 9 - p. 93 line 4; Ex. 13, p. 50-52
    and 92; Ex. 10).

8.  Seifman "lowered his wife's pay" at a later date because he and his wife
    were being penalized by the IRS because his wife was now showing that she
    made <u>too much</u> income. (Ex. 12, Seifman dep., p. 98 lines 1-14).

9.  During the time that Raymond Guzall III was a partner with Barry A.
    Seifman, doing business as Seifman & Guzall P. C., Seifman was engaging

16

in the illegal act of fraud against the U. S. Government and against the State of Michigan by maintaining law firm monies and his own money in the law firm's IOLTA account from one tax year over into another tax year in order to avoid paying taxes on those monies earned. He then claims to have used those funds to pay his wife. (Ex. 12, p. 93 line 8 - p. 96 line 13).

10. During the time that Raymond Guzall III was a partner with Barry A. Seifman, doing business as Seifman & Guzall P. C., Barry A. Seifman also was engaging in the illegal act of fraud against the United States Government and against the State of Michigan by paying for his home telephone bill with monies and/or funds of the law firm and of Guzall, and was stealing from Guzall. (Exhibit 14).

10. During the time that Raymond Guzall III was a partner with Barry A. Seifman, doing business as Seifman & Guzall P. C., Barry A. Seifman also was engaging in the illegal act of fraud against the United States Government and against the State of Michigan by paying for his home cable television bill, home newspaper, his wife's dental bills and her gym membership with monies and/or funds of the law firm and of Guzall, and was stealing from Guzall. (Exhibit 14).

11. A percentage of all monies paid to Marcia Seifman in the form of salary and

17

profit sharing at the direction of Barry A. Seifman, in accord with Guzall's percentage of interest in the Firm at the end of each fiscal year, belonged to Guzall and was improperly/illegally converted by Seifman for his and his wife-Marcia Seifman's use. (Exhibit 1, paragraph 12 and Ex. 10).

12. Guzall possessed title to 25% of the Firms assets in the year 2011 and 2012, pursuant to the last Agreement between Seifman and Guzall, and other percentages since the year 2006. (Exhibit 1, paragraphs 9-12).

13. Seifman improperly/illegally converted Guzall's money in the year 2011 when Seifman paid his home telephone bill, home television cable bill, and other personal bills as stated herein with Law Firm money of Seifman & Guzall, P. C., as Guzall's portion of all Firm money in the year 2011 was 25%, and Guzall was entitled to that money as Seifman took his full salary that year, and took his full salary all other previous years that he was a partner and shareholder with Guzall. (Ex. 1, 2, 15).

14. As to the money Seifman used to pay his personal bills, his wife's personal bills and his wife a salary and profit sharing in the years 2006 through 2012, Guzall owned title to his Shareholder percentage of those funds illegally expended by Seifman. (Ex. 1, 2, 15).

15. At one point in the year 2007, Raymond Guzall III was listed as a director

18

of the firm Seifman & Guzall, P. C.

16. As a Director and Shareholder of Seifman & Guzall, P. C., Guzall held title to his share of all monies illegally or legally expended by Seifman when Seifman paid his personal bills, his wife's personal bills and his wife a salary and profit sharing in the years 2006 through 2012, as the Shareholder's percentages to Guzall over the years was his rightful claim and title to those monies.

17. Barry Seifman violated MCL 600.2919a, entitled: Stealing, embezzling, or converting property or buying, receiving, possessing, concealing, or aiding in concealment of stolen, embezzled, or converted property; recovery of treble damages, costs, and attorney fees; other rights or remedies. (Ex. 2 and Ex. 10)

18. Barry Seifman received and/or aided in the acquisition and/or concealment of Guzall's converted property. (Exhibits 1, 2 , 7, 10, 12, 14, 16, 17).

19. Barry Seifman wrongfully concealed information, regarding or concerning the status of Guzall's property. (Exhibits 1, 2 , 7, 10, 12, 14, 16, 17).

20. Barry Seifman did wrongfully exert dominion and control over Guzall's money/property by paying Seifman's wife a salary she did not earn with some of Guzall's money, and by paying Seifman's personal bills with some

19

of Guzall's money. (Ex. 16, Law Firm Profit Sharing and Ex. 17, Payroll of Seifman & Guzall, PC). (Ex. 12, Seifman's dep. of Oct. 16, 2012, p. 171 line 16 - p. 173 line 8).

21. Seifman hid from his partner Guzall, the fact that Seifman was paying his wife a salary for many years. Andrea McAnally, the Law Firm's Office Manager, and secretary to both Seifman and Guzall, testified to those facts. (Ex. 13, Deposition of Andrea McAnally, pp. 49 line 7 - p. 51 line 13). See also Ex. 12, p. 103 and p. 107, Seifman's testimony.

22. The application of facts here is as follows:

"[W]e find nothing in the current ABA Standards which suggests that conversion of funds held in trust for another lawyer is somehow less egregious than conversion of funds held on behalf of a client. As succinctly argued by the Grievance Administrator, it is untenable to give the respondent a "break" simply because he stole money belonging to another lawyer rather than belonging to a client." *Grievance Administrator v Brent S. Hunt, supra,* December 28, 2012 Opinion, citing to *Grievance Administrator v Rodney Watts.* (Ex. 27).

The law holds that the court <u>must</u> consider the alleged misconduct of Seifman. *Barth v Fieger*, No. 306078, 2013 WL 238532 (Mich Ct App January 22, 2013), an unpublished opinion <u>on point</u>, attached at Ex. 18. Proofs of Seifman's misconduct are also relevant to show that he comes to court with unclean hands. A party cannot benefit when it comes to court with unclean hands,

20

*Morris v Clawson Tank Co*, 459 Mich 256, 275; 587 NW2d 253, 262 (1998).

**IV.** **Aside from determining Seifman is not entitled to any attorney fees in this matter based upon the above evidence, Seifman would only be entitled to the value of his hourly services**

Should the court fail to apply the law and facts as cited above, by law,

Seifman's best argument would be that he his entitled to the reasonable <u>value of his services</u>:

> "An attorney **retained on the contingent fee agreement** who withdraws from a case for good cause is entitled to compensation for the **reasonable value of _his services_** based **upon quantum meruit, and not the contingent fee contract**. *Medbury v General Motors Corp*, 119 Mich App 351, 358; 326 NW2d 139 (1982). Therefore, it was proper to compensate defendant pursuant to the principles of quantum meruit." *Ecclestone, supra, at* 76, emphasis added.

By law, if this Court finds any validity to Seifman's claim of a lien, he

would **not** be entitled to a portion of the contingency fee agreement (should he

produce such an agreement), but <u>only</u> quantum meruit for the time he worked on

the case, (for which no amount of time has been supplied by Seifman). A lien of

an attorney may only exist, "...upon the judgment or fund <u>resulting from</u> **his**

**services**". *Ambrose v. Detroit Edison Co,* 65 Mich. App. 484, 487–488; 237

NW2d 520 (1975), emphasis added.

WHEREFORE, it is requested that this Honorable Court Alter or Amend the

Proposed Order of the City of Detroit to conform to the following;

21

1. Order that Kajy Development, L. L. C. be eliminated from claiming any proceeds of the remaining $2,266,021.12 to be paid to Mr. Beydoun and his attorney Raymond Guzall III P. C.,

2. That the $25,000.00 attorney fee cited at paragraph 13 of the City of Detroit Motion be paid to Raymond Guzall III P. C.,

3. That $755,340.37 be paid to Raymond Guzall III P. C. and the remaining $1,510,680.75 be paid to Michael Beydoun as illustrated herein,

4. That should this Court find that Kajy Development, L. L. C. does possess a valid garnishment as stated in the amount of $168,017.21, that the court then order $699,334.63 is to be paid to Raymond Guzall III P. C., and the remaining $1,398,669.28 is to be paid to Michael Beydoun.

5. Creditor Beydoun and Raymond Guzall III P. C. also request that all other relief this Court deems appropriate in their favor be provided to them.

Respectfully submitted,
Raymond Guzall III, P.C.
/s/ Raymond Guzall III
Raymond Guzall III  (P60980)
Attorney for Creditor Michael Beydoun
and on behalf of Raymond Guzall III, P. C.
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, Michigan 48334
Phone:      (248) 702-6122
Fax:         (248) 702-6124
Rayguzall@attorneyguzall.com

22

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2016, I electronically filed this pleading, **RESPONSE TO CITY OF DETROIT'S MOTION TO DETERMINE RIGHTS TO CLAIM NUMBER 201** and all exhibits with the Clerk of the Court using the Court Authorized electronic filing system which will send electronic notification of such filing to the attorneys of record and I hereby certify that I know of no manual recipients on the Notice List who require service other than the following listed below who were served via U. S. First Class Mail:

David W. Warren
Joelson Rosenberg, PLC
30665 Northwestern Hwy, #200
Farmington Hills, MI 38334

Barry A. Seifman
Barry A. Seifman P.C.
30445 Northwestern Hwy, #301
Farmington Hills, MI 38334

Kajy Development, L. L. C.
c/o David W. Yaldo
4036 Telegraph Road, Suite 204
Bloomfield Hills, MI 48302

/s/ Raymond Guzall III
Raymond Guzall III  (P60980)
Attorney for Creditor Michael Beydoun
and on behalf of Raymond Guzall III, P. C.
31555 W. Fourteen Mile Rd., Suite 320
Farmington Hills, Michigan 48334
Phone:      (248) 702-6122
Fax:          (248) 702-6124
Rayguzall@attorneyguzall.com

23