# EXHIBIT 6

**LAW OFFICES**

**RAYMOND GUZALL III, P.C.**

Page 1

**LAW OFFICES**

**RAYMOND GUZALL III, P.C.**

## CONTINGENT FEE AGREEMENT

Michael Beydoun, herein called Client, retains the law firm of RAYMOND GUZALL III, P.C., herein called Attorney, to investigate, and/or settle a claim for damages arising out of the following only: Lawsuit against City of Detroit, and appeal of judgment at trial);

Any further representation is within Attorney's sole discretion and must be the subject of a separate written agreement. The attorney client relationship is limited to this damages claim. The attorney is not responsible for any other matters except as agreed in writing.

Client agrees to provide all necessary documentation and names and contract information for witnesses and otherwise cooperate fully with attorney in the investigation / attempt to settle the claim set forth above.

## I. BASIC TORT CONTINGENCY FEE

It is understood and agreed that as compensation for services rendered by Attorney, Client will pay a fee contingent on any net recovery as follows:

> a One-third (1/3) contingency fee computed after deduction of costs.

In computing the fee, costs as taxed, any interest included in or upon the amount of judgment by the Court shall be deemed part of the amount recovered. Attorney fees that are awarded must and will be paid to attorneys, as such cannot be split or paid to others besides attorneys and are part of compensation above and beyond any other fees.

If a structured settlement fee is obtained, the Attorney shall have the option to elect payment in full based on the present value of the structure, or periodic payment over the life of the structure.

Should Attorney advance any costs, Attorney shall then be entitled to

1

reimbursement of the actual costs and expenses which may have been advanced on behalf of Client. These include, but are not limited to, costs in ordering medical records, reporter services, filing fees, motion fees, expert witness fees, long distance telephone charges, all postage, and excess copying charges (i.e., more than 250 pages). A five percent (5%) charge will be added to cover interest and other miscellaneous costs.

The contingency fee and/or hourly fee pays for all Attorney services related to the damages claim only. All other incidental services, including but not limited to probate work, shall be subject to a separate fee.

## II. APPEALS

Raymond Guzall III has already filed his notice with the Michigan Court of Appeals that he represents Michael Beydoun in this matter and on the appeal, and he will continue to do so as Raymond Guzall III, P. C..

## III. WITHDRAWAL

It is further understood and agreed that the Attorney may withdraw from the case prior to filing suit if upon the exercise of its sole discretion, the Attorney determines that the potential recovery does not warrant the further expenditure of time and energy. Regular mail shall be deemed sufficient to give notice to such decision to withdraw. After filing suit, the Attorney reserves the right to withdraw from the case if upon exercise of its sole discretion, the Attorney determines that the potential recovery does not warrant the further expenditure of time and energy, and as permitted by the applicable Court Rules.

## IV. MISCELLANEOUS DISCLAIMERS

Client agrees that Attorney has given no guarantee regarding the successful termination of the client's claim or cause of action; and that all expressions by the Attorney relevant to the Client's claim are only matters of his/her opinion given in good faith.

2

## V. DISPUTE WITH ATTORNEY/STATUTE OF LIMITATIONS

Any dispute with the attorneys of Raymond Guzall III, P.C. as to fees, costs and/or how a matter was handled and/or outcome of your case shall solely go to binding arbitration, wherein the firm shall select an arbitrator, client shall select an arbitrator, and the two arbitrators will then select a neutral arbitrator. Costs of the neutral shall be borne one-half by each party. The award may be memorialized by a Judgment in the Circuit Court of Oakland County. Only Oakland County, Michigan shall have venue over such matters. Any claim must be brought no later than one year from the time of incurring any claim, or it will be forever barred against Law Firm.

## VI. WORK ASSIGNMENTS

**Raymond Guzall III, P.C.** reserves the option of assigning attorneys and other staff to work on the file at attorney's discretion, and referring the matter to other attorneys for their participation.

## VII. LIENS

The Attorney shall have all general, possessory, or retaining liens, and all special or charging liens known to the common law, in addition to any statutory lien, upon Client's cause Of action, claim or counterclaim. Such lien shall attach to any recovery in the Client's favor, and to the proceeds thereof into whomsoever's hands they may come. Attorney shall not be, in any way, obligated to waive his Attorney's lien until his/her Attorney's fees and any and all disbursements made upon Client's behalf, have been fully paid. Attorney shall not be liable to the Client in any way whatsoever for any loss Client may incur or suffer because of Attorney exercising his/her Attorney's lien in order to secure full payment of his/her legal fees and proper costs, expenses and disbursements under this Agreement.

## VIII. EXPERTS

Attorney in his/her discretion may employ medical experts to examine persons involved in the subject matter hereof, or whose examination might further the prosecution of the client's claim, and other technical experts to examine and report to him/her the facts of the within case. Attorney may also, in his/her discretion, employ expert investigators to investigate the facts surrounding the subject action. All such experts shall report exclusively to Attorney, and any fees for such experts may be advanced by Attorney and charged against any recovery on the claim as advance costs.

3

Client also authorizes Attorney to furnish Experts with all medical and other information that the Attorney deems necessary without seeking independent or advance authorization from Client. Client further authorizes the Attorney to disseminate medical information to insurance carriers and other Defendants if, in the Attorney's discretion, dissemination would facilitate procurement of damages or benefits.

## IX. BINDING ON SUCCESSORS

This agreement shall be binding upon all successors in interest to the parties, including heirs, personal representative, guardians, conservator, and assigns.

## X. OTHER FEE ARRANGEMENTS

Client hereby acknowledges that Attorney may be employed under other fee arrangements whereby Attorney is compensated for the reasonable value of his/her services, such as an hourly basis or per diem basis but Client elects to employ Attorney on a contingent fee basis rather than under any other form of Attorney compensation.

## XI. RECORDS

All Client records are confidential. Records will not be released without the Client's written permission or as otherwise permitted or provided by law. Attorney work product belongs to the attorney and may be retained or destroyed at attorney's discretion. The firm reserves the right to destroy a client file upon completion of all work thereon.

## XII. MAINTAINING CONTACT

You must ALWAYS keep us informed of your current address and phone number. If you do not fully cooperate with us, or if we decide, for any reason, we can no longer effectively assist you, we may discontinue our representation, and you owe us nothing. If we do, you agree a) that we may notify you by regular mail at the last address you furnished us; b) that such notice terminates the attorney-client relationship; and c) that we need take no further steps to locate you.

## XIII. CHANGING LAWS

The law in Michigan with regard to personal injury cases, and in particular cases arising from automobile accidents, premises accidents, slip and fall accidents, is changing, sometimes rapidly. This could mean that the law in effect at the time of your injury and/or

4

accident may not be the same law in effect as your case progresses toward resolution. If the laws affecting your case should change, or if facts pertaining to either your medical condition or the circumstances of your accident should change, our office reserves the right to discontinue our representation in your case, and will not be required to take your case to trial.

## XIV. DESTRUCTION OF FILES

Pursuant to MR PC 51 R-5 you are hereby advised that we will maintain your file for a period of two (2) years from the date of closing. Because of storage restrictions, it is our policy to maintain files in storage for a period of two years. If at any time during that period you wish to obtain something contained in your file, you must notify us in writing. THERE WILL BE NO FURTHER NOTIFICATION TO YOU BY OUR OFFICE PRIOR TO DISPOSAL OF YOUR FILE.

RAYMOND GUZALL III, P.C.

By: Raymond Guzall III

CLIENT:

Michael Beydoun

DATED: 2-10-2012

# EXHIBIT 7

1                STATE OF MICHIGAN

2    IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

3

4    BARRY A. SEIFMAN PC, a Mich Professional Corp.,

5    f/k/a SEIFMAN & GUZALL PC, SEIFMAN & ASSOCIATES PC

6    and THE LAW ADVOCATE, and BARRY A. SEIFMAN,,

7                     Plaintiffs/Counter Defendants,

8        vs.                    Civil Action

9                               No. 12-125053-CZ

10                              Hon. James M. Alexander

11   RAYMOND GUZALL, III, and individual and

12   THE LAW OFFICES OF RAYMOND GUZALL II PC, a Mich

13   Professional Corp., jointly and severally,

14                     Defendants/Counter Plaintiffs.

15   _____/

16   PAGE 1 TO 255

17

18

19       Videotape Deposition of BARRY A. SEIFMAN, ESQ.,

20       Taken at 30665 Northwestern Highway, Suite 200,

21       Farmington Hills, Michigan,

22       Commencing at 10:04:58 a.m.,

23       Tuesday, April 17, 2012,

24       Before F. Albert Teodori, CSR 0071.

25

1    Farmington Hills, Michigan

2    Tuesday, April 17, 20112

3    About 10:04:58 a.m.

4              MR. McKINLEY:  We are now on the record.

5         This is the Videotape Deposition of Barry

6    Seifman being taken in Farmington Hills, Michigan.

7    Today is April 17th, 2012.  The time is 10:04:58

8    seconds a.m.

9              Will the attorneys introduce themselves and

10   the court reporter please swear in the witness.

11             MR. LANDRY:  My name is David Landry.  I

12   represent the defendant/counter-plaintiff.

13             MR. WARREN:  My name is David Warren.  I

14   represent the plaintiff and counter defendants.

15             THE COURT REPORTERS:  Would you raise your

16   right hand, please.

17             Do you solemnly swear that the testimony

18   you are about to give will be the truth, the whole

19   truth, and nothing but the truth?

20             THE WITNESS:  Yes, I do.

21             MR. LANDRY:  Let the record reflect this is

22   the Deposition of Mr. Barry Seifman.  It is being

23   taken pursuant to notice and it is to be used for all

24   purposes allowed under the Michigan Court Rules.

25   BARRY A. SEIFMAN, ESQ.,

1   Q.   What do you mean when you say retained earnings?

2   A.   Just what I said. I think they've been earned and

3        they're retained to be disbursed.

4   Q.   Okay. Do you keep funds that are earned by the firm

5        and are available for disbursement, do you keep in

6        the IOLTA account between December 31st to January

7        1st of any given year?

8   A.   I have problems with your statement of available.

9   Q.   What's your problem with it?

10  A.   My problem is by that to me you better have some

11       retention or you're not going to be practicing very

12       long.

13  Q.   Do you keep retained earnings of the IOLTA account

14       over the tax year from December 31st to January 1st?

15  A.   I have.

16  Q.   So that would be money that the firm has earned that

17       is available to be disbursed on December 31st but you

18       have chosen at times to keep that in the IOLTA

19       account over a tax year, one tax year to another from

20       December 31st to January 1st, correct?

21  A.   I still have problems with your word available. To

22       me it's not available if you need operating funds.

23  Q.   Let me define the term available. The term available

24       in my definition is the client has received their

25       money and that money is at that time eligible to be

1       disbursed to the law firm as a receipt. Do you

2       understand that?

3   A.  I understand what you just said.

4   Q.  Okay. In that sense of the term available, have you

5       kept funds in the IOLTA account over a tax year from

6       December 31st to January 1st and chosen not to

7       disburse it to the firm?

8   A.  It's already in the firm. There's no --

9   Q.  For disbursement to attorneys.

10  A.  I have retained funds beyond a tax year where some

11      may be available and some may not be available within

12      that tax year to be disbursed.

13  Q.  Okay. Why have you kept in the IOLTA account funds

14      that are available to be disbursed, why have you kept

15      those over a tax year?

16  A.  To pay for profit sharing and to cover emergencies

17      and operating costs.

18  Q.  Okay. In the following tax year, that's why you kept

19      it from one tax year to another to pay for emergency

20      expenses to start up the next year, is that correct?

21  A.  Yes.

22          MR. WARREN: Let's take a break.

23  A.  Good idea.

24          MR. LANDRY: Okay.

25          MR. McKINLEY: Going off the record. The

HANSON RENAISSANCE
Transcript & Video
313-567-8100
COURT REPORTERS & VIDEO

1  Q.  Let's go back and clear it up.

2            The checking account, did you tell Ray on

3      July 18 of 2006 how much was in the checking account?

4  A.  Yes.

5  Q.  Okay.  Did you tell him how much was in the IOLTA

6      account?

7  A.  I think I did.

8  Q.  Okay.  I asked if you -- do you know how much was in

9      the IOLTA account at the time?

10  A.  I'm not sure.

11  Q.  And you don't know how much was in the checking

12      account?

13  A.  I think $30,000.00.  Now I may have transferred to

14      make it 30 but I thought there was 30.

15  Q.  So according to this document, whatever was in the

16      firm checking account became your money pursuant to

17      this stockholder agreement, correct?

18  A.  Right.

19  Q.  Okay.  And so that became your money.  Did you record

20      it on your income tax return as income?

21  A.  I don't -- I give my information to my CPA and they

22      do what they're supposed to do.

23  Q.  Did you sign the return?

24  A.  Yes.

25  Q.  You produced personal income tax returns for yourself

hansonreporting.com

1    and your wife but not for the year 2006.  Do you have

2    them, sir?

3    A.    We couldn't find them.

4    Q.    Who did your 2000 income tax return in 2006?

5    A.    Candice Rich.

6    Q.    We'll subpoena them then.

7          The money that became yours that was in the

8    corporate checking account pursuant to Exhibit 42,

9    did you withdraw it?

10   A.    Did I withdraw it?

11   Q.    Yeah, from the corporate checking.

12   A.    Do you mean for personal use?

13   Q.    Yes.

14   A.    No.

15   Q.    Okay.  Therefore, you commingled that personal money

16   of yours with the firm's money, correct?

17   A.    Only as you interpret it, not the way I interpret

18   it.

19   Q.    According to this document, once Ray signed this

20   document that roughly $30,000.00 became your 30, you,

21   Barry A. Seifman individually, correct?  That's what

22   this document says, it becomes your money?

23   A.    I was entitled to this money.

24   Q.    And it was your money, not the firm's money at that

25   point, correct?

HANSON RENAISSANCE   hansonreporting.com

1    A.    I was entitled to that money.  I did not take it

2          out.

3    Q.    Therefore, you commingled it with the firm's funds,

4          correct?

5    A.    No, I think at that time that was the only funds in

6          that account.

7    Q.    Therefore, all the money in that account was your

8          funds, Barry A. Seifman individually, right?

9    A.    I don't know.  You're asking me tax questions and I

10         don't do tax.

11   Q.    I'm not asking you a tax question.

12   A.    Well, commingled to me is versus the firm, versus me,

13         versus when I take it in is a tax question so I'm

14         sorry.

15   Q.    So you as an attorney can't answer my question

16         whether you commingled your personal funds with the

17         firm's funds?  You can't answer that, is that

18         correct?

19   A.    Not the way it's phrased.

20   Q.    Okay.

21   A.    I can only answer it the best I can.

22   Q.    Okay, fine.

23               Why did you leave your personal funds --

24         strike that.

25               Why did you leave money that became yours

1    in the firm's IOLTA account after July 18, 2006?

2  A.  I'm sorry, I must have faded out.  Can you please say

3    that again?

4  Q.  Pursuant to Exhibit 42, the money that was in the

5    IOLTA account --

6  A.  Right.

7  Q.  -- as of the time Ray signed this document --

8  A.  Right.

9  Q.  -- that money became your money --

10  A.  Okay.

11  Q.  -- but you left it in the IOLTA account after Ray

12    signed this document, right?

13  A.  Right.

14  Q.  Why did you do that?

15  A.  In case there was an emergency.

16  Q.  So that was the firm's IOLTA account, correct?

17  A.  There's only been one IOLTA account.

18  Q.  And that is the firm's IOLTA account, correct?

19  A.  It's in the firm's name.

20  Q.  Okay.  And did you continue to deposit money in the

21    firm's IOLTA account after July 18 of '06?

22  A.  Yes.

23  Q.  Did you continue to deposit money in the firm's IOLTA

24    account after July 18, '06 while your money was still

25    in that IOLTA account?

1  A.  Yes.

2  Q.  Okay. Therefore, you commingled your money with the

3      firm's money in the IOLTA account?

4  A.  I don't think so. I kept separate records.

5  Q.  What records did you keep?

6  A.  I provided those. It shows a new and it shows an old

7      as to what was in the trust accounts.

8  Q.  The IOLTA trust records?

9  A.  Yes.

10  Q.  Showed -- what was in there?

11  A.  I showed, I gave a copy of my handwritten notes as to

12      everything that was in the IOLTA before Mr. Guzall

13      had any ownership interest and after.

14  Q.  Okay, I'd like you to show me those records because I

15      haven't seen them and I'll give you everything you

16      provided to me. They're in these 3-ring binders here

17      and I'll let you go through these and please find

18      that document because I couldn't find those.

19  A.  It isn't a document.

20  Q.  And I've got these Bates stamped on the binders

21      here. I'll let you take a moment and you find that.

22          MR. WARREN: Well, it may take more than

23      moment. Why don't we go off the record.

24          MR. McKINLEY: We're going off the record

25      at 1:54:02 p.m.

1  Q.    What's this number right there, 3868.5 something.

2  A.    $3,868.04.

3  Q.    Was that on the date of the Smith case?

4  A.    Yep.

5  Q.    Okay.  Under Madrigal can you explain those entries

6        there?

7  A.    There's 60,000 and there's 16 taken out and then

8        various other distributions.

9  Q.    Were they all made at the same time, the

10       distributions?

11  A.    I don't think so.

12  Q.    There's a date here of July 8, '06.

13  A.    Oh, I know what it is, yeah.

14  Q.    What is that?

15  A.    That's $1,880.00 paying for in July Marsha Seifman's

16       wages.

17  Q.    $1,880.00?

18  A.    Oh, it's a gross number, yeah.

19  Q.    There's no -- how do you know it's Marsha Seifman's

20       wages?

21  A.    I know the dollar amount.

22  Q.    Okay.

23  A.    Say it again?

24  Q.    Okay.  That was paid from the IOLTA account?

25  A.    Yep.

1   A.   The same thing as reflected in the check registers.

2   Q.   Whatever -- oh, your personal expenses or business

3        expenses? Which ones?

4   A.   Whichever ones were paid.

5   Q.   Including your personal expenses?

6   A.   I'm not agreeing whether they're personal or not. It

7        depends on the subject matter but whatever was paid I

8        was entitled.

9   Q.   Was the firm as of July 2006 paying any of your

10       personal expenses that were not firm related?

11  A.   I have trouble understanding what isn't firm

12       related.

13                  MR. WARREN:  So please rephrase your

14       question.

15                  MR. LANDRY:  No.

16       BY MR. LANDRY:

17  Q.   Can you answer that question?

18  A.   Not the way it's phrased.

19  Q.   So you don't understand what the phrase firm related

20       means, correct?

21  A.   Firm related?

22  Q.   Correct.

23  A.   You said versus personal expenses?

24  Q.   Correct.

25  A.   Those are particular words that have different

1    meaning depending on their application and I'm

2    uncomfortable with it.

3    Q.   Okay.  You can't answer that, we'll just leave it at

4         that.

5              The last paragraph says "In the event there

6         appears in the judgment of Barry A. Seifman a

7         situation wherein it appears the owners cannot get

8         along or Raymond Guzall, III seeks to separate from

9         the company, he should be paid the sum of $5.00 for

10        his stock ownership and all files shall remain the

11        property of the company."

12             Did I read that correctly?

13   A.   I think so.

14   Q.   Okay.  Did you intend this to mean when you drafted

15        this that you could at any time tell Ray in my

16        opinion, Ray, we don't get along, here's a $5.00

17        bill, this firm owes you nothing for your stock in

18        excess of that?

19   A.   Yes.

20   Q.   Okay.  Do you think that's fair?

21   A.   Yes.

22   Q.   Why?

23   A.   Why?  Because he didn't pay anything for it in the

24        first place.  It was a -- I was gifting it and as far

25        as I was concerned it was fair.

| | | |
|---|---|---|
| 1 | Q. | Excuse me. As an officer, director and shareholder, |
| 2 | | Raymond Guzall in January of 2012 had a right to look |
| 3 | | at firm records, didn't he? |
| 4 | A. | I answered that. |
| 5 | Q. | No, you didn't. You said as a common courtesy you |
| 6 | | didn't think it was proper. |
| 7 | A. | No, no, you're parsing out. I said he had a right to |
| 8 | | look at records. |
| 9 | Q. | Okay. Isn't it true that Ray Guzall asked you what |
| 10 | | your benefits were and you told him you wouldn't tell |
| 11 | | him? |
| 12 | A. | No. |
| 13 | Q. | So as of July 18, 2006 after Ray signed this document |
| 14 | | he was a five percent shareholder in the firm Barry |
| 15 | | A. Seifman, P.C., is that right? |
| 16 | A. | I'm trying to remember if it's effective. No, it's |
| 17 | | as of August 1st. |
| 18 | Q. | Did you ever tell Ray Guzall at any time that you |
| 19 | | would not tell him what your expenses were that were |
| 20 | | being paid by the firm? |
| 21 | A. | Not that I recall. |
| 22 | Q. | Okay. |
| 23 | | MR. WARREN: And on that note, let's take a |
| 24 | | five-minute break. |
| 25 | | MR. LANDRY: Okay. |

HANSON RENAISSANCE   hansonreporting.com

1   A.   Well, the answer is no and yes.

2        BY MR. LANDRY:

3   Q.   Okay, let's break it down.

4   A.   Depends which would --

5   Q.   Okay.

6   A.   And you said minus the liabilities and that's not

7        so.  It was, as I indicated earlier, either there was

8        $30,000.00 in the checking or I transferred it from

9        accrued earnings.  This lends me to believe that

10       there was more than $30,000.00 in the checking.  We

11       were on a go-forward basis.  Whatever cases there

12       were and continuing expenses started on that day.

13  Q.   Let me ask you this.  This is about -- let's just use

14       a round number, $36,000.00 in the checking account as

15       of January 17th.

16            MR. WARREN:  The general account?

17            MR. LANDRY:  The general checking, about

18       $36,000.00.

19       BY MR. LANDRY:

20  Q.   Do you interpret Exhibit 42 that all of that was

21       money which you were entitled to?

22  A.   I was entitled to it but I didn't take it.

23  Q.   Okay.  What about, sir, if there were expenses of the

24       firm that were incurred but not paid prior to July

25       18, is it your position that those expenses incurred

1     but not actually paid were to be paid by the new firm

2     so to speak?

3  A.  Yep.

4  Q.  And you've already said you get the whole 36, okay.

5  A.  No, 30.

6        MR. WARREN: Well, he just said --

7    BY MR. LANDRY:

8  Q.  This is out of the checking account.

9  A.  Yes.

10  Q.  Exhibit 42 says in it, "All funds held presently in

11    the corporate checking."

12  A.  Um-hum.

13  Q.  So that would be, according to this document, roughly

14    $36,000.00 from the checking account.

15  A.  Okay.

16  Q.  Okay. And the new firm you just testified would have

17    to pay whatever liabilities that had been previously

18    incurred?

19  A.  I think if you read here -- what paragraph? One,

20    two, three, four, five, fifth paragraph it has

21    $30,000.00. Okay? That's out of that checking.

22  Q.  Oh, so you have to read, in your opinion you're

23    reading paragraph one, two, three, four, five in

24    conjunction with paragraph 2?

25  A.  Right.

HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   913-567-8100

1   Q.   So the obligation created in paragraph 2 --

2   A.   Obligation.

3   Q.   -- the obligation that the money in the checking

4        account becomes your money is defined further in this

5        later paragraph which says the amount is $30,000.00?

6   A.   Correct.

7   Q.   So even though paragraph 2 says "all funds" you

8        believe only $30,000.00 of those funds is what you

9        were entitled to?

10  A.   Relevant to the checking.

11  Q.   Relative to the checking, okay.

12            Let's go to the IOLTA.  Paragraph 2 of

13       Exhibit 42 say "All funds in the IOLTA trust

14       account," okay, "shall be the sole property of Barry

15       Seifman."

16            I'm showing you page 402 of the documents

17       that you've produced and as of July 13, 2006 there

18       appears to be $211,882.08.  That's what this

19       document, page 402 says.  Can we agree on that?

20  A.   All right.  Well, I don't know.  I'm sorry.

21  Q.   I'll start with the question.

22            MR. WARREN:  So give me the number again.

23       211?

24       BY MR. LANDRY:

25  Q.   Yeah, can you read it?

HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   /913-567-8100

1   A.   Is that what you're talking about?

2   Q.   As of July 13.

3   A.   Right here?

4   Q.   I think it's --

5   A.   Approximately 211 thousand.

6   Q.   $211,000.00.

7         Can you tell me how much of that 211

8      thousand that was in the IOLTA trust account as of

9      that date was money that clients were entitled to as

10     opposed to money that could be distributed to the

11     firm or to you?

12  A.   I don't know.

13  Q.   Okay.  Is that number written anywhere?

14  A.   Well, you've got the IOLTA sheets of the old so that

15     it could be created out of that there.

16  Q.   Okay, that's where we would have -- but other than

17     that you don't have any way to deal with it?

18  A.   I only have one IOLTA account.

19  Q.   Okay.  But my only question is we would have to go

20     and add all those numbers up from the old ledgers

21     that we marked today in order to find out how much of

22     that you believe you are entitled to?

23  A.   Yep.

24  Q.   And am I correct that at no time did you ever, even

25     up to today, you've never totaled that up, is that

1    correct?

2  A.    At sometime I probably did to have an idea of what

3        the heck was in there.

4  Q.    Okay.

5  A.    But I don't remember.

6  Q.    And you never wrote it down?

7  A.    On the date of? No, because I still have those

8        isolated sheets. They are what they are.

9  Q.    Okay. So we'll have to make that computation at some

10        point going forward, okay.

11                DEPOSITION EXHIBIT 53

12                minutes July 18, 2006

13                WAS MARKED BY THE REPORTER

14                FOR IDENTIFICATION.

15  Q.    Exhibit 53 --

16  A.    Are you done with 42?

17  Q.    Yes, I'm done with 42.

18                This page 746 of the Bates stamped

19        documents looks like minutes from Barry A. Seifman,

20        P.C. from July 18, '06. Did you prepare these

21        minutes, sir?

22  A.    I think so.

23  Q.    That's your signature on page 2? 747 actually.

24                MR. WARREN: The second page of the

25        exhibit.

HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313-567-8100

## CERTIFICATE OF NOTARY

1

2

3    STATE OF MICHIGAN          )

4                              ) SS

5    COUNTY OF WAYNE           )

6        I, F. Albert Teodori, Certified Shorthand

7    Reporter, a Notary Public in and for the above county

8    and state, do hereby certify that the above

9    deposition was taken before me at the time and place

10   hereinbefore set forth; that the witness was by me

11   first duly sworn to testify to the truth, and nothing

12   but the truth; that the foregoing questions asked and

13   answers made by the witness were duly recorded by me

14   stenographically and reduced to computer

15   transcription; that this is a true, full and correct

16   transcript of my stenographic notes so taken; and

17   that I am not related to, nor of counsel to either

18   party nor interested in the event of this cause.

19

20

21

22       F. Albert Teodori

23       CSR 0071 Notary Public,

24       Wayne County, Michigan

25   My Commission expires: May 2, 2017.

# EXHIBIT 8

```
 1                          STATE OF MICHIGAN

 2          IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

 3

 4    BARRY A. SEIFMAN, P.C., a Michigan

 5    Professional Corporation, F/K/A

 6    SEIFMAN & GUZALL, P.C., SEIFMAN &

 7    ASSOCIATES, P.C., and THE LAW ADVOCATE,

 8    and BARRY A. SEIFMAN,

 9                    Plaintiffs,

10          vs.                        Case No. 2012-125053-CZ

11                                     Hon. James M. Alexander

12    RAYMOND GUZALL, III, an individual

13    and THE LAW OFFICES OF RAYMOND GUZALL

14    III, P.C., a Michigan Professional

15    Corporation, jointly and severally,

16                    Defendants.

17

18

19          The Deposition of BARRY A. SEIFMAN, VOLUME II,

20          Taken at 30665 Northwestern Highway, Suite 200,

21          Farmington Hills, Michigan,

22          Commencing at 10:02 a.m.,

23          Tuesday, December 23rd, 2014,

24          Before Joanne Smith, CSR-3099.

25
```

TIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

```
 1        go ahead.  Go to your next question, please.
 2                    MR. CAMARGO:  Thank you, David.  I
 3            appreciate the commentary.
 4    BY MR. CAMARGO:
 5    Q.    This question has been asked and answered and both
 6          times in the past I believe your answer was "I don't
 7          know" so I'm going to ask you, since the last time you
 8          were deposed, have you had a chance to review the
 9          $211,000 that were in your IOLTA in 2006 to determine
10          how much of that was firm money to be distributed or
11          dispersed to the firm and how much of that was
12          client's money?
13                    MR. WARREN:  I'll object.  Your question was
14            since his last deposition; right?
15    BY MR. CAMARGO:
16    Q.    Have you had a chance to look?
17                    MR. WARREN:  That question has not been
18            asked and answered.
19                    MR. CAMARGO:  Thank you, David.
20    A.    I have not looked to determine that.
21    BY MR. CAMARGO:
22    Q.    So at this point you still don't know how much of that
23          was firm money and how much of that was client money?
24    A.    Correct.
25    Q.    Is there a reason that you haven't provided your
```

```
 1         343,000 and end of tax year $303,000 approximately; is

 2         that correct?

 3   A.    That's what it says.

 4   Q.    Is that funds related to IOLTA trust?

 5   A.    I don't know.

 6   Q.    What other types of funds could it be?

 7   A.    I'm -- I don't do tax.  What they label as trust, I

 8         don't know if that's synonymous to IOLTA.

 9   Q.    So you would have no way of knowing how much of that

10         money was client money and how much of that money was

11         your money?  Firm money?

12              MR. WARREN:  Talking relative to the entry

13         funds held in trust on the document you've marked as

14         Exhibit I?

15              MR. CAMARGO:  Yes.

16   A.    I don't know.

17   BY MR. CAMARGO:

18   Q.    Okay.

19   A.    Are we done with this?

20   Q.    Yes.

21   Q.    Have you ever been represented by Joelson Rosenberg in

22         the past?

23              MR. WARREN:  Do you mean prior to today?

24   BY MR. CAMARGO:

25   Q.    Prior to this case.
```

HENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.hienenstock.com

# EXHIBIT 9

FILED
ATTORNEY DISCIPLINE BOARD
DECEMBER 28, 2012



STATE OF MICHIGAN

# Attorney Discipline Board

Grievance Administrator,

Petitioner/Appellant-Cross Appellee,

v

Brent S. Hunt, P 30711,

Respondent/Appellee-Cross Appellant,

Case No 12-10-GA.

Decided: December 28, 2012

*Appearances:*
Todd A. McConaghy, for the Grievance Administrator
Brent S. Hunt, Respondent, In Pro Per

## BOARD OPINION

Respondent admitted to a hearing panel that from 2003 to 2009 he commingled and misappropriated the sum of $7,423.00 which he was holding pending distribution to the conservator of the estate of a legally impaired person. Respondent acknowledged to the panel that he placed the funds in his business account and, for approximately six years, used the money to pay general law office expenses. The Grievance Administrator petitioned for review of the hearing panel's order entered June 20, 2012, imposing a reprimand, with educational and supervisory conditions, on the grounds that the hearing panel erred in not imposing greater discipline. The respondent filed a cross-petition for review on the narrow ground that the Grievance Administrator's original petition for review filed July 3, 2012, did not state reasons and grounds for the petition and therefore did not meet the minimum requirements of MCR 9.118(A)(1). The Attorney Discipline Board has conducted review proceedings in accordance with MCR 9.118. For the reasons discussed below, discipline in this matter is increased to disbarment.

## Proceedings Before the Hearing Panel

The Grievance Administrator's formal complaint in this matter was filed February 6, 2012. Respondent, Brent S. Hunt, did not file a timely answer and his default was filed by the Grievance Administrator on March 6, 2012. Respondent filed an answer to the formal complaint three days later, on March 9, 2012. However, respondent did not file a motion to set aside the default.

At the hearing conducted on April 2, 2012, respondent appeared before the panel and stated that he was contesting the default, although he had not presented a motion to set aside the default or an affidavit of facts showing a meritorious defense, as required under MCR 2.603(D)(1). The panel nevertheless allowed respondent to present his oral motion to set aside the default.

Following its deliberation, the panel announced that it would not grant respondent's request to set aside the default. The panel noted that, apart from the technical deficiencies of his oral motion, respondent had "willingly and without any nudging by any third party," admitted that he had commingled the funds. The panel further noted that the Grievance Administrator had presented a transcript of respondent's sworn statement, taken September 23, 2011 (Petitioner's Exhibit 4), in which respondent admitted under oath that he had used the funds in question to pay general office expenses such as rent, utilities, telephone, automobile expenses and filing fees. The panel found that, based on respondent's default, together with his admissions, the charges of misconduct in the formal complaint were established and the panel moved to the separate sanction hearing to determine the appropriate discipline which is required by MCR 9.115(J)(2).

In his testimony to the panel, respondent described his conduct as resulting from misunderstandings or carelessness on his part and he explained that although the funds in question were, admittedly, not in his IOLTA account, he always considered those funds to have been "available." Respondent did not present an argument to the panel in support of a specific level of discipline. The Grievance Administrator's counsel argued for the entry of an order of disbarment, citing the American Bar Association Standards for Imposing Lawyer Sanctions, as well as prior opinions of the Attorney Discipline Board.

Following a recess, the hearing panel announced to the parties that it had concluded its deliberations and would enter an order of reprimand, coupled with conditions relative to the established misconduct as provided in MCR 9.106(3), including respondent's attendance at a

seminar on law practice management and an audit of his law office practices and procedures by the State Bar's Practice Management Resource Center (PMRC). The hearing panel's Order of Reprimand With Conditions was issued June 20, 2012. The Grievance Administrator's petition for review was filed July 6, 2012.

## Factual Background

The evidence presented to the hearing panel, including respondent's own testimony, provides the factual background to the charges of misconduct in this case. In 2003, respondent was asked to assist in the sale of a house in Ecorse, Michigan owned by sisters Mary Jane Bicsak and Julia Rush. Their parents, who had died some years before, had quit claimed the house to the sisters but had reserved a life estate in the house for a third sibling, Donald Peters. In accordance with that life estate, Donald Peters had lived in the house, but by 2003 he was suffering from several physical infirmities and was living in a convalescent home where, according to respondent, he was receiving SSI benefits and Medicaid and was, in essence, a ward of the state.

Ms. Bicsak and Ms. Rush both resided outside of Michigan and they agreed to pay respondent $1,000.00 for his assistance in selling the house as well as an additional $1,500.00 to handle the necessary probate proceedings in Wayne County Probate Court in light of their bother's interest in the property. Respondent succeeded in having Ms. Bicsak appointed conservator of her brother's estate and he obtained approval from the probate court for the sale of the house. The house was sold in November 2003 and shortly thereafter the net proceeds from the sale were distributed to the siblings: $20,031.75 was distributed to Ms. Bicsak; $20,031.75 was distributed to Ms. Rush; and $7,423.16 was to be distributed to Mr. Peters (because Mr. Peters had lived in the house before moving to a convalescent home, certain charges for taxes and other expenses were deducted from his portion of the proceeds).

At a sworn statement at the Attorney Grievance Commission on September 23, 2011 (Petitioner's Exhibit 4), respondent explained that he did not distribute any funds directly to Mr. Peters after the closing because "he was a ward of the state and he was in a group home, and I was waiting for - I didn't know who to make the check to, because it wouldn't go to him." (Petitioner's Exhibit 4, p 21.) Respondent further explained that although he was not an expert in such matters, he assumed that if he gave the money to Mr. Peters, either the State of Michigan would take it or,

worst case, Mr. Peters would become ineligible for his federal benefits. He explained that it was his intention that "when they [Peters' caregivers] asked me for the money, I would pay them, and that is basically what I did." According to respondent, nobody asked him for the money for six years.

In June 2009, Ms. Bicsak, who now lives in Florida, filed a request for investigation (Petitioner's Exhibit 8) with the Attorney Grievance Commission. She complained that she had not received any cooperation from respondent since 2004. When she wrote to the Grievance Commission, she was under the impression that she was still the appointed conservator of her brother's estate. (In fact, the probate court had closed the estate for failure to file an accounting several years earlier.) Ms. Bicsak included a copy of her 2009 letter to respondent requesting, in her capacity as conservator, the balance of $7,423.36 held on behalf of her brother Donald Peters. She closed her request for investigation by saying,

> *My concern covers three things:*
>
> 1. *I want the information to answer to the State of Michigan as required.*
> 2. *Funeral arrangements were made by me to carry out my bother's [sic] wishes for his remains and I would like to see the money used to carry out his last request.*
> 3. *Since he is bed ridden, I would like to see some of the money used to replace the TV he has in the Eastwood Convalescent Home.*
>
> *If this is not possible and the money needs to go to the State, then that is fine. I just want to make sure that the money due my brother is spent on his behalf for him, and not misappropriated or mishandled in a questionable manner.* [Petitioner's Exhibit 8.]

Respondent filed his answer to the request for investigation on August 13, 2009 (Petitioner's Exhibit 5). He stated in that answer,

> I am holding $9,412.99 [sic] and I am willing to waive the attorney fee of $1,500.00 and pay the $9,412.99 to the appropriate party. [Petitioner's Exhibit 5.]

On November 5, 2009, Guardian Care Inc. sent a written request to respondent for delivery of all funds held on behalf of Donald Peters. On December 15, 2009, respondent wrote a check to Donald Peters, drawn on his IOLTA account at Charter One Bank, in the amount of $7,432.16 (Petitioner's Exhibit 9).

At his sworn statement in September 2011, respondent failed to bring the bank records specified in the Grievance Administrator's subpoena and he was somewhat vague as to whether or not the money to be distributed to Mr. Peters was originally deposited in his general account or into a trust account, but he did acknowledge that the money ultimately ended up in his business account (Petitioner's Exhibit 4, p 27). In fact, the Administrator had obtained the records for respondent's IOLTA account, which established that either (1) the money held for Donald Peters was not deposited into the IOLTA account in November 2003 or (2) if the funds had been placed in an IOLTA account after the sale of the house in November 2003, those funds were depleted by May 1, 2004.

At the hearing before the panel on April 2, 2012, respondent testified:

> I didn't have an escrow agreement with anyone in this file, and I guess I misunderstood or obviously was careless with the idea of my obligation in terms of trust for that $7,400. In my mind, it was money that was, that really was owed to the State. Again, I mean, I benefitted from it, bills were paid from it, but I never intended to take that money, and it was my intention to pay that money as soon as a proper request was made.
>
>                     . . .
>
> I didn't want to just send the money to Guardian Care because I didn't know what was going to happen with it and I didn't want to compound things. I did have conversations with Ms. Biesak. I mean, I -- the money went into my account and there's, and there's no answer to that, other than I made a mistake with that. But I tried to communicate to Ms. Bicsak the fact that this isn't a situation where the money was going to Donald Peters, it was going to go to the State of Michigan. And even when I spoke with Mr. Borowski, who was the attorney for Guardian Care in the summer of 2009, I mean, he basically admitted to me he was going to be disqualified, they agreed they weren't going to boot him out of a convalescent home, but that's ultimately what happened, he didn't get the money, the money didn't go to him. And this is not a situation where -- I mean, Ms. Bicsak knew that I had the money the whole time and I never, I never misrepresented to her that the money was there, okay, it wasn't in a trust account, and I'll admit that, but the money ultimately was paid. [Tr, pp 44-46.]

As noted above, respondent wrote a check on his IOLTA account in the amount of $7,432.16 to Donald Peters on December 15, 2009. Donald Peters died in June 2010. The Grievance

Administrator's investigation continued, including the taking of respondent's sworn statement in September 2011 and formal proceedings were commenced with the Attorney Discipline Board on February 6, 2012.

## Discussion

In its report issued January 20, 2012, the hearing panel acknowledged its obligation under *Grievance Administrator v Lopatin*, 462 NW 235; 612 NW2d 120 (2000), to employ the American Bar Association Standards for Imposing Lawyer Sanctions and the panel acknowledged that it had considered the Grievance Administrator's argument that disbarment would be appropriate in this case under at least three of those Standards: Standard 4.11, which states that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client; Standard 4.61, which states that disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potential serious injury to a client; or Standard 5.11, which states that disbarment is generally appropriate when a lawyer engages in serious criminal conduct, a necessary element of which includes misappropriation or when a lawyer engages in other intentional conduct involving dishonesty that seriously adversely reflects on the lawyer's fitness to practice.

The panel concluded, however, that

> The Administrator has very ably argued for a strict interpretation and enforcement of the ABA Standards and interpretative case[s] following. Strict constructionism has its place but it must on occasion yield to a more nuanced view of the intent of the rule and the nature of the offense by the specific person on trial. Such is the case before the panel.
>
> There is no material dispute about the fact or with respect to this panel's judgment after its thoughtful interrogation of the respondent, review of evidence, and careful observation of the respondent throughout the proceedings. The panel is convinced, by respondent's ready acknowledgment of a mistake in judgment, that his resultant misconduct was but a "one-off" event. Mr. Hunt's error in judgment resulted from the unusual circumstance that Mr. Peters was a ward of the state and could not directly receive monetary proceeds without the potential harm of losing government benefits. In other words, respondent's error was due to unique circumstances that were most unlikely to reoccur. It is important to note that Mr. Hunt has served

> the public for 32 years and amassed a nearly spotless record. (One
> prior misstep occurred in 1991 for which he received a reprimand.)
> [Hearing Panel Report, June 20, 2012, p 5.]

The standard of review for the Attorney Discipline Board's review of a hearing panel's
decision recognizes that while the Board is to determine whether or not there is evidentiary support
for a panel's findings, the Board has greater discretion in its review of the panel's final result, in this
case, the appropriate level of discipline. *Grievance Administrator v August*, 438 Mich 296, 304; 475
NW2d 256 (1991). This greater discretion to review and, if necessary, modify a hearing panel's
decision as to the level of discipline, is based, in part, upon a recognition of the Board's overview
function and its responsibility to ensure a level of uniformity and continuity. *Matter of Daggs*, 411
Mich 304; 307 NW2d 66 (1981).

While we agree with the hearing panel's view that the ABA Standards are neither absolutely
rigid nor immune from reasoned interpretation, the Board has been straightforward in its instructions
to hearing panels when it comes to applying the Standards to cases involving a lawyer's intentional
conversion of funds.

The case of *Grievance Administrator v Frederick A. Petz*, 99-102-GA; 99-130-FA (ADB
2001) was the first such case considered by the Board following the Supreme Court's explicit
instruction in *Grievance Administrator v Lopatin, supra*, to employ the ABA Standards in
determining the appropriate level of discipline. Following the methodology provided in ABA
Standard 3.0, the Board concluded that the intentional conversion of funds in *Petz* fell under ABA
Standard 4.11, which states:

> Disbarment is generally appropriate when a lawyer knowingly
> converts client property and causes injury or potential injury to a
> client.

The Board noted in *Petz* that during its then more than 20 years of existence, the Board had regularly
declared that willful misappropriation, absent compelling mitigation, had generally resulted in
discipline ranging from a suspension of three years to disbarment. The Board also noted that in
many of those cases the Board had been inclined to grant substantial deference to a hearing panel's
imposition of discipline if the discipline fell within that presumptive range. However, the Board
continued in *Petz*,

> With our opinion today, we serve notice that hearing panels presented
> with facts similar to those in the instant case, that is intentional
> conversion of client funds for the lawyer's personal or business use
> coupled with the absence of compelling mitigation, are, until further
> order of the Attorney Discipline Board or the Supreme Court, to
> apply the American Bar Association Standards for Imposing Lawyer
> Sanctions and, if appropriate, to explain why the presumptive
> sanction of disbarment under Standard 4.11 should not be applied.

The Attorney Discipline Board has consistently held that misappropriation of funds is a *per
se* offense that does not involve the element of intent. *Grievance Administrator v Robert R.
Cummins*, 159-88 (ADB 1988); *Matter of Steven J. Lupiloff*, DP 34/85 (ADB 1988), citing *In Re E.
David Harrison*, 461 A2d 1034 (1983). The Board has also held that a lawyer's duty to hold money
belonging to someone else separate from their own is so fundamental that there can rarely be an
excuse. As we stated 25 years ago in *Grievance Administrator v Cummins, supra*:

> There should be no question as to the nature of the misconduct in this
> case. We can perceive of no excuse for an attorney's failure to be
> aware of the requirement under Rule 1.15 of the Michigan Rules of
> Professional Conduct [formerly DR 9.102(a)] that client funds be
> held separately from the lawyer's own money. *There are no
> exceptions in either the former or present rule which allow an
> attorney to commingle client funds in a business or personal account
> for reasons of convenience or expedience . . . [Cummins, supra* at p
> 2.] (Emphasis added.)

Regardless of whether or not anyone asked respondent for Mr. Peters' money for over six years,
respondent has offered no justification for why *he* was entitled to use that money to pay his own
office and personal expenses, without any supervision and without accounting for the funds to Mr.
Peters, his conservator or caregivers, his sisters or a court.

We recognize that an argument could be made in this case that the funds in question were
not, in fact, "client funds" but were funds held on behalf of a third person, Donald Peters. The ABA
Standards, in the commentary to Standard 4.11, notes that "lawyers who convert the property of third
persons other than their clients are covered by Standard 5.11." That Standard, in turn, directs that
disbarment is generally appropriate when a lawyer engages in intentional conduct involving
dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness
to practice.

In *Grievance Administrator v Rodney Watts*, 05-151-GA (ADB 2007), the Board noted this lack of clarity in the ABA Standards with regard to a lawyer's misuse of funds held on behalf of someone·other than a client, but held,

> [W]e find nothing in the current ABA Standards which suggests that conversion of funds held in trust for another lawyer is somehow less egregious than conversion of funds held on behalf of a client. As succinctly argued by the Grievance Administrator, it is untenable to give this respondent a "break" simply because he stole money belonging to another lawyer rather than money belonging to a client. [*Watts, supra* at p.7.]

In this review proceeding, the Grievance Administrator has cited the Board's prior decision in another case involving a lawyer's improper handling of funds from the sale of a house before eventually remitting the proceeds to the client. In *Grievance Administrator v Patricia Dockery*, 00-72-GA; 00-91-FA (ADB 2001), the Board increased discipline from a suspension of 180 days to a suspension of three years, concluding that it should not disturb the hearing panel's reasoned conclusion that a suspension under ABA Standard 4.12 was appropriate under the circumstances of that case. In this case, *Dockery* is aptly cited for the Board's rejection of the notion that a lawyer's misappropriation of funds is mitigated in any significant way because the lawyer did not intend to permanently withhold the funds from the rightful owner. The Board's opinion in *Dockery* includes this citation:

> The passage of almost·30 years has not dimmed the relevance of a case often cited by the Board, *In Re Wilson*, 81 NJ 451; 409 A2nd 1153 (1979), which had this to say about the lawyer's intent in a case involving, among other things, the lawyer's failure to turn over the proceeds from the sale of a house until after an ethics complaint was filed:
>
> > When restitution is used to support the contention that the lawyer intended to 'borrow' rather than steal, it simply cloaks. the mistaken premises that the unauthorized use of clients' funds is excusable when accompanied by an intent to return them . . . lawyers who 'borrow' may, it is true, be less culpable than those who had no intent to repay, but the difference is negligible in this connection. Banks do not rehire tellers who 'borrow' depositors' funds. Our professional standards, if anything, should be higher.

> Lawyers are more than fiduciaries: they are
> representatives of a profession and officers of this
> court. [*Wilson*, 409 A2nd at 156].

In the instant case, respondent had a number of opportunities during the six years that he held the funds belonging to Donald Peters to turn that money over to the court-appointed conservator or to Mr. Peters' caregivers or to seek instructions from the court. We cannot agree that his use of those funds for six years allows the misconduct in this case to be described as a "one off" event. Nor can we find in the record sufficient evidence of compelling mitigation of the type envisioned in *Grievance Administrator v Petz, supra*, and subsequent opinions dealing with the knowing misuse of funds belonging to another. There are, however, significant aggravating circumstances to be considered in this case, including respondent's selfish motive [Standard 9.22(b)]; an obstruction of the Grievance Administrator's investigation by failing to comply with requests to produce trust account records [Standard 9.22(e)]; a refusal to acknowledge the wrongful nature of his conduct [Standard 9.22(g)]; and the vulnerability of the victim of that conduct [Standard 9.22(h)].

Without doubt, the aggravating effect of the victim's vulnerability should be given weight in this case. When his parents' house was sold in 2003, Donald Peters was 66 years old and living in a convalescent home. He was described in the guardian ad litem's report (Petitioner's Exhibit 6) as "oriented and coherent," but "completely bedridden" and in need of 24 hour care. Despite respondent's professed assumption that any funds distributed to Mr. Peters would be taken by the state, respondent was admittedly "no expert" on the subject and there is no evidence in the record that he made any effort to research the issue between the time he took possession of Mr. Peters' share of the sale proceeds in November 2003 and his delivery of a check to Mr. Peters in December 2009. Perhaps Mr. Peters would not have benefitted from those funds if the money had been released to him. On the other hand, it is possible that the conservator or guardian could have found a way to use a small portion of that money to fulfill Ms. Bicsak's desire to replace her brother's television at Eastwood Convalescent Home. Unfortunately, Donald Peters was not in a position to assert a claim for that money.

## Conclusion

On the issue presented in the respondent's cross-petition for review, that is, whether or not the Grievance Administrator's petition for review filed July 3, 2012, met the criteria of MCR

9.118(A)(1) by including a statement as to the grounds and reasons upon which the Grievance Administrator sought review, that issue is rendered moot by the filing of the Grievance Administrator's supplemental petition on July 16, 2012, clarifying his position that review was sought on the grounds that the hearing panel erred in not imposing greater discipline. That is consistent with the admonition in MCR 9.102(A) that subchapter 9.100 is to be liberally construed for the protection of the public, the courts and the legal profession and the instruction in MCR 9.107(A) that a proceeding may not be held invalid because of a non-prejudicial irregularity or an error not resulting in a miscarriage of justice.

On the issue presented in the Grievance Administrator's petition for review, we are unable to reconcile the discipline system's paramount duty of public protection with the imposition of a sanction less than disbarment under the facts and circumstances of this case. We therefore vacate the hearing panel Order of Reprimand With Conditions issued June 20, 2012, and increase discipline in this case to disbarment.

Board members James M. Cameron, Jr., Rosalind E. Griffin, M.D., Andrea L. Solak, Carl E. Ver Beek, Sylvia P. Whitmer, Ph. D., Lawrence G. Campbell, and Dulce M. Fuller concur in this decision.

Board Chairperson Thomas G. Kienbaum and Board Member Craig H. Lubben were absent and did not participate.

# EXHIBIT 10

## AFFIDAVIT OF RAYMOND GUZALL III

I, Raymond Guzall III, being first duly sworn, state the following is accurate and true:

1.    Upon leaving the Firm of Seifman & Guzall, PC, a determination had to be made as to how to protect each Client who I was directly involved with. Barry Seifman advised me sometime in late August/early September of 2011 that he was paying his wife a salary only to "bump up her social security". After that statement by Seifman, I looked through all Firm records that I could find at that point, and discovered that Barry Seifman was in fact paying his wife a salary from Firm funds to bump up her social security, unbeknownst to me. At that point, I knew there was no way I could stay at this Firm. My name was on the door. I was not going to be liable for the illegal acts of Barry Seifman.

2.    I also realized in late August/early September of 2011 upon looking through records at the Firm, that Barry Seifman was paying his home cable bill, home telephone bill, his home newspaper, his own credit card bills, his and/or his wife's gym membership bills, store bills and his wife's dental bills with Firm money. Our Firm did not have dental coverage. His wife did no work for the Firm. I realized Barry was cheating and stealing from me, and what looked to be like from the federal government. Many of those records were obtained in files that were located within Barry Seifman's credenza and desk in his office.

3.    So a place that I called home for over a decade became a nightmare. I was taken to the hospital by ambulance after I passed out and then smacked my head into a wall, on the way to the ground, thinking I was having a heart attack.

It was stress induced. My wife called 911 and I spent two days in the hospital on or about November 3, 2012.

4.   I did not solicit any Clients. I told each Client that I had to leave my Firm. I told each that they could stay with the Firm, or that I could represent them if they wanted. Each Client chose me as their attorney to represent them at Seifman & Guzall, P. C., and upon leaving that Firm.

5.   Client interest was paramount. I knew that Barry Seifman, now a proven crook and liar, could not be trusted to provide to me the Client files upon my departure, and some of those files, like John Hankins and Michael Beydoun among others were needed immediately in order to properly represent those Clients under the time constraints of the courts. After being requested in writing, it took Barry Seifman approximately two months after I left the Firm of Seifman & Guzall to provide those Clients like John Hankins, Greg Eusani and Cassandra Parks a cost breakdown and return of monies owed to each Client. Barry Seifman co-mingled his funds with those of the Firm Clients for years. He has been nothing but dishonest with me throughout our partnership. He has continued his dishonesty throughout the litigation process, wherein he filed a frivolous lawsuit against me. I placed in writing to Barry Seifman and his attorneys that I was willing to work out our differences in an informal manner, yet he filed his lawsuit against me just over 10 days after my departure from the Firm of Seifman & Guzall, P. C.

6.   Barry Seifman served me with his lawsuit one day before I was to try the *John Hankins v City of Inkster* case. That act by Siefman was no accident. His

lawsuit against me was pure vengeance. He has no valid lawsuit against me, and through discovery, it is clear from the proofs in this case that he has violated the law by cheating the U. S. Government, having them pay his wife a greater amount in social security, yet she does not deserve that money. It is clear from the proofs in this case that he has violated the trust of the Firms Clients and violated the Michigan Rules of Professional Conduct by co-mingling his money with Client money for over 6 years. It is also clear from the proofs in this case that Barry Seifman has violated the law by holding monies that should have been paid to the Firm in one year, over to the next year to avoid paying taxes. Barry Seifman was not a partner. He was nothing more than a common thief and a liar.

7: I was the minority shareholder, not Seifman. Seifman would not tell me what he spent on his costs. I asked him, he would not tell me, let alone show me. And even before I asked him in the year 2011, he told me, "I will not tell you what my costs are". Barry Seifman breached the original agreement between him and I the day after our agreement was signed, and continued to breach that agreement and other agreements that were entered into by us, while engaging in conduct that not only threatened my livelihood, it threatened the proper representation of each and every client at Seifman & Guzall, P. C., and their best interests. Barry Seifman never once showed me where any financial records could be located in the office. When Barry Seifman went on vacation, he had Andrea McAnally write checks on behalf of the Firm.

8. After I crafted the Marcos Madrigal lawsuit, taking every deposition, handling

every hearing, drafting every question for trial, and obtained a verdict of over $4 million, Barry Seifman then decided to make me a partner. There was no "gift", as Barry would have this Court believe. I provided him his largest monetary payout ever, and he wanted to keep me around. I did not realize at what cost until he told me that he had to lower his wife's pay, and he was only paying her to bump up her social security.

9. It is clear now, and the facts show, that the only reason Barry Seifman paid his wife was to bump up her social security, as, he would have to pay the same amount in taxes if he paid himself that $40,000.00 in one year, or he paid it to his wife. The only true benefit to pay his wife who did not work for the Firm a salary would be to bump up her social security. Seifman has yet to explain why he told me at that time in late August-early September of 2011. From the evidence in this case thus far, it is concluded that he told me in whole or in part to intentionally inflict emotional distress upon me. It worked, and I ended up in the hospital. I was going to the gym on average ever other day and bench pressed and squatted over 300 pounds. I was in very good physical condition. I ended up losing 10 to 15 pounds due to that stress all because my ex-partner, Barry Seifman is a crook, and decided to tell me about it.

10. In addition to that stress, the City of Romulus account presented several problems. My wife, Marianna Guzall informed Barry Seifman of several things occurring in the City of Romulus that seemed improper and/or illegal. Barry Seifman did nothing to cure those problems. My wife then informed me. I then informed Barry Seifman. All of this occurred sometime between March of 2011

and July of 2011. Barry Seifman still did nothing. The Seifman & Guzall Firm represented the City of Romulus. The fact that Seifman did nothing to address the improper and/or illegal acts in Romulus contributed to the daily stress at work, and worry about how the Firm might withstand an investigation by a governmental agency, as the City of Romulus was already being investigated by the Michigan State Police, with 5 or 6 Police Officers charged with felonies ranging up to 20 years each, including the Chief of Police in Romulus.

11. Barry Seifman lied to me about where the money was coming from to pay his wife for computer back up training in the year 2008 or 2009. Barry Seifman lied to me about how long he would pay his wife. Barry Seifman lied to me about the fact that his wife would actually learn the back up work. Barry Seifman's expenses as stated in the first agreement in 2006, were understood to be expenses attributed to the operation of the Lawfirm, not his home cable bill, home phone bill, his wife's dental bills (yet no one in the Firm was given dental benefits), not his or his wife's gym membership, and not for pay to his wife who did no work for the Firm, just to bump up her social security.

12. If Barry Seifman would have disclosed to me that he was paying expenses improperly, at least I would have had the opportunity to voice my shares in an informed manner. I was never given that opportunity. Seifman saddled me with his improper and illegal conduct unbeknownst to me until late August/early September of 2011. Seifman sat and still claims to sit on the attorney grievance commission and has practiced law for approximately 40 years. It is beyond outrageous that an attorney (Barry Seifman) who sits in judgment of other

attorneys would commit improper and/or illegal acts and subject me to those acts.

13. I began working with Barry Seifman around July 28, 2000. Every year around that date, we entered into a new contract. The last agreement or contract that I signed with Barry Seifman was on July 18, 2010. Barry Seifman agreed that he made a typographical error, and that the March 1, 2011 date was not accurate in that Agreement, and acknowledged that my shareholder increase would occur on August 1, 2010. Therefore, in front of Barry Seifman, I crossed out the March 1, 2011 date as agreed, and wrote in Aug 1, 2010. Barry Seifman then made me a copy of that Agreement. That Agreement in 2010 was the last agreement that I signed with Barry Seifman. That July 18, 2010 Agreement did not ratify any prior agreements.

14. During this lawsuit, Barry Seifman's continued deposition was scheduled on several different occasions, yet was not completed prior to my Response to Seifman's Motion to Dismiss being due. On one scheduled deposition date, Seifman's attorney, David Warren showed up over ½ hour late, and then ½ hour after Mr. Warren appeared, at his own office, he stated to us that Barry Seifman could not be deposed that day. Barry Seifman has continually dodged his continued deposition. Barry Seifman also failed to provide a copy of his 2006 taxes, and failed to sign a subpoena for those records, and therefore, they were not obtained prior to having to respond to Seifman frivolous motion to dismiss the Counter-Complaint.

15. Barry Seifman made several material representations to me. He represented to

me that the costs that the Firm would pay as listed in our agreements/contracts were to be costs such as the Firm copy machine or Firm phones, not his home cable bill or his home telephone bill. Seifman's representations were false. Seifman also told me that the Firm did not pay for dental. Yet, Seifman paid for his wife's dental bills with Firm money. Seifman never told me he was paying his wife with Firm money, equating to silent fraud. Seifman knew that he was making false statements to me. Seifman purposely concealed the fact that he was paying for his car with Firm money, even when I asked about the Firm paying for our vehicles. Seifman made these and other statements to me so that I would continue to work with him and make him a lot of money, in particular since I obtained the largest verdict in 2004 involving an employment discrimination claim. I continually told Seifman that the Madrigal case was a million dollar case, yet he wanted to pull out of that case at one point when the client fell behind in costs. In reliance on Seifman's oral and written statement, I stayed with the Firm of Seifman & Guzall, P. C. to my detriment. Seifman stole from the Firm, stole from me, and subjected me and Firm Clients to potential liability and damage as to his illegal acts. I ultimately ended up in the hospital due to Seifman's greed, dishonesty, betrayal and utter disregard for the proper operation of the Law Firm, the Clients, employees, and me, his partner.

16. Barry Seifman knew that my wife had been laid off. Seifman also knew of the amount in health insurance I would have to pay if I left the Firm, and how much my car payment totaled. Seifman telling me that he was paying his wife to bump up her social security was his attempt to cover his back in regards to the

agreement/contract between the two of us, as he was supposed to advise me of all economic decisions involving the Firm, and an attempt to have me acquiesce to his own improper and/or criminal acts. Seifman knew that I could not economically survive without my job, as my wife was laid off. Seifman acted like he had me over a barrel, and I told him on three separate occasions before I left the Firm that I was miserable, and he did not show an ounce of care, and said nothing. On two of those occasions he simply walked away from my office. On the third occasion I walked away from his office, as he did not address my statement.

17. The hand writing upon the documents attached at Exhibit 9 of DEFENDANT/COUNTER-PLAINTIFF'S RAYMOND GUZALL III's RESPONSE TOPLAINTIFFS/COUNTER-DEFENDANT'S MOTION FOR SUMMARY DISPOSITION AS TO DEFENDANT/COUNTER-PLAINTIFF'S COUNTER-CLAIMS is the handwriting of Barry Seifman, showing that he paid each bill with Firm money, matching the check ledger provided in discovery. The signature on the Seifman & Guzall, P. C. check paying for Barry's wife's dental bill is Barry Seifman's signature. All documents at Exhibit 9 show proof of Seifman paying his and his wife's personal bills with Law Firm money of Seifman & Guzall, P. C.

18. Barry Seifman's pleadings claiming that I stole the most profitable clients of the Firm is false and an attempt to mislead and improperly shock the conscious of the Court. The City of Romulus client account generated over $200,000.00 per year, and remains with Barry Seifman. In direct contrast, the Cassandra Parks case generated just $16,666.66 in attorney fees. Seifman's pleadings are

documented false statements by Seifman and his attorneys, and are <u>known</u> <u>false statement to them.</u>

19. In addition, Seifman and his attorneys know that the *Lumetta* case and the *Gholston & Moore* case have <u>not generated any fee</u>, and <u>may never</u>, as they were dismissed and are on appeal. Further, they know that the *Eusani* case generated less than a <u>few thousand dollars</u>, as Seifman returned money to Mr. Eusani. They also know that the *Francart* case and *Greg Morgan (GM Refrigerated)* cases generated less than $10,000.00, and that the Terrell James case settled recently, generating <u>$5,833.33</u> in attorney fees which were <u>placed into *this court's* escrow account (Oakland County Circuit) by me, so Seifman and his attorneys absolutely know that their statements to this court are false</u>, yet still attempt to mislead Judge Alexander.

Raymond Guzall III

Subscribed and sworn to before me
this _28th_ day of _August_ , 2012.

Notary Public _OAKLAND_ County, MI
My commission expires: NOVEMBER 1, 2017

HELEN NIETO
Notary Public - Michigan
Oakland County
My Commission Expires Nov 1, 2017
Acting in the County of _OAKLAND_

# AFFIDAVIT OF RAYMOND GUZALL III

I, Raymond Guzall III, being first duly sworn, state the following is accurate and true:

1. Just prior to me leaving the Firm of Seifman & Guzall, P. C., there existed over $240,000.00 in the Firm's accounts, equating to monies to be split between Raymond Guzall III and Barry A. Seifman, as shown in the bank records produced by Barry Seifman in the lawsuit, case # 12-125053-CZ. That $240,000.00 plus was the property of Barry A. Seifman and Raymond Guzall III as shareholders in the Firm Seifman & Guzall, P. C.

2. In 2011, Barry A. Seifman wrongfully exerted dominion and control over my money and other property when Barry A. Seifman paid his home telephone bill, home television cable bill, and other personal bills with Law Firm money of Seifman & Guzall, P. C. My portion of all Firm money in the year 2011 was 25%. Beginning in 2006, Barry A. Seifman wrongfully exerted dominion and control over my money and other property when I became a shareholder, until my departure from the Firm in 2012, by paying his home telephone bill, home television cable bill, and other personal bills with Law Firm money of Seifman & Guzall, P. C.

3. A percentage of all monies paid to Marcia Seifman in the form of salary and profit sharing at the direction of Barry A. Seifman, in accord with my percentage of interest in the Firm at the end of each fiscal year, belonged to me and was converted by Seifman for his and his wife-Marcia Seifman's own use.

4. I had no reason <u>not</u> to believe Barry Seifman when Seifman told me that he was

paying his wife OUT OF A SEPARATE FUND/ACCOUNT (Barry Seifman's money), not Law Firm money of which a portion was my money, to learn the back up on the computer systems/software at the Firm. I had no way to reasonably discover anything improper as to Seifman's actions at that time. If Seifman wanted to pay his wife a salary with his own money, it was of no bad consequence to me. In fact, I thought it was a good idea that another person would know some of the software in the Firm, because Seifman told me that if someone became sick or went on a long vacation, his wife could then come in and work, which would help us out.

5. Barry Seifman wrongfully exerted dominion and control over my money when Barry A. Seifman in the year 2006 and forward, was paying for his car with Law Firm money, which a portion was my property, and lied about it to me when I asked questions about paying for our cars with Law Firm money. Seifman told me he did not want the Firm to own his car, so he did not like the idea.

6. The first time I knew that Seifman lied to me, or reasonably could have discovered wrongdoing on the part of Seifman was in the summer of 2010 when I realized that Seifman lied about paying for his car with Law Firm money, (a portion of which belonged to me).

7. Barry Seifman controlled the Corporation doing business as Seifman & Guzall, P. C., of which only Seifman and myself were Shareholders. I was the minority shareholder.

8. Seifman's actions as described herein, in my Verified Complaint (Original and Amended) were not in good faith, nor with the care an ordinarily prudent person

in a like position would exercise under similar circumstances, nor in a manner he reasonably believed to be in the best interests of the corporation. Seifman is a scam artist who conned me into believing that he would act in good faith and in the best interest of the Firm with my name on it, and in my best interests as a shareholder, officer and director. He lied to me and cheated me as described herein, in my Verified Complaint (Original and Amended).

9. Barry Seifman told me that the Firm/Corporation did not pay for dental coverage or dental bills. However, Seifman paid his wife's dental bills with Firm funds, belonging to me and the Corporation/Firm, completely lying to me, not acting in good faith, and defrauding me, all while profiting himself.

10. I engaged and relied upon my previous Counsel, David Landry to file a lawsuit as to my claims, which was sufficient upon it's face, so as to survive a Motion to Dismiss based upon MCR 2.116(C)(8) or other applicable law. David Landry, and/or another attorney from his Firm was supposed to respond to Plaintiff/Counter-Defendant (Seifman's) Motion for Summary Disposition, however, they did not file or aid in the Response.

Raymond Guzall III

Subscribed and sworn to before me
this _9_ day of _October_, 2012.

Notary Public _____ County, MI
My commission expires _Acting in the county of Oakland_
12/30/2012

# EXHIBIT 11

# AFFIDAVIT OF MICHAEL BEYDOUN

I, Michael Beydoun, make the following statements and general affidavit upon oath and affirmation of belief and personal knowledge that the following matters, facts and things set forth are true and correct to the best of my knowledge:

1.  I am over the age of 18 and I am a resident of the State of Michigan. I have personal knowledge of the facts herein and if called as a witness at trial, could and will testify competently as to these facts.

2.  I met with David W. Yaldo in his office in the year 2007 to discuss a contract that my Company National Specialty Installation Incorporated had with Kajy Development to build a Family Dollar in Pontiac. Mr. Yaldo represented both Kajy and my Company National Specialty Installation Incorporated and Mr. Yaldo was involved in drafting the contract between the two companies. Mr. Yaldo called me on the phone and told me that the project was not going to move forward anymore. I told him that was a breach of contract with my Company. He said to me that he would then look into it. My Company had already performed a great deal of the work. Mr. Yaldo then filed a lawsuit against my Company. I met again with Mr. Yaldo and he told me that I did not need to hire an attorney and that he would have me sign a release against Kajy Development and that they would sign that same release as against my Company. After that occurred, I never heard anything back from Mr. Yaldo. I was never given a copy of any garnishment or any other judgment regarding Kajy. The judgment against me by Kajy is fraudulent, and also, any judgment related to the issues claimed by Kajy would and could only be against my Company National Specialty Installation

Incorporated and not me personally.

Michael Beydoun

Subscribed and sworn to before me
this _26_ day of _OcToBeR_ , 2016.

Raymond Guzall III

Notary Public _Oakland_ County, MI
My commission expires: _2 - 6 - 2021_

# EXHIBIT 12

# BARRY A. SEIFMAN, P.C., ET AL v. GUZALL, III, ET AL

## BARRY A. SEIFMAN

October 16, 2012

*Prepared for you by*



### BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

1    Farmington Hills, Michigan

2    Tuesday, October 16th, 2012

3    9:50 a.m.

4

5                    BARRY A. SEIFMAN,

6         was thereupon called as a witness herein, and after

7         having first been duly sworn to testify to the truth,

8         the whole truth and nothing but the truth, was

9         examined and testified as follows:

10                        EXAMINATION

11   BY MR. CAMARGO:

12   Q.   Can you, for purposes of the record, state your name?

13   A.   Barry Allen Seifman.

14   Q.   And Mr. Seifman, my name is Nicolas Camargo.  By now

15        I'm sure you're aware that I will be representing Mr.

16        Guzall for the future proceedings in this matter.

17        When I'm discussing this matter, I'm referring to the

18        case that was filed in Oakland County Circuit Court,

19        Case Number 2012-125053-CZ, and obviously for today's

20        purposes, I will be the one asking you questions.  If

21        there's any questions that I ask that you don't

22        understand, please let me know and I'll try to answer

23        or ask it in a different manner; okay?

24   A.   Sure.

25   Q.   And for purposes of the record, let me note for the

## Page 85

BY MR. CAMARGO:

1
2 Q. Have you ever had any financial disagreements with
3 Andrea McAnally?
4 A. Yeah.
5 Q. Have you had, more specifically, financial
6 disagreements with her about expenses of the firm?
7 A. No.
8 Q. Have you had financial --
9 A. Wait. Wait. It depends how you define expenses.
10 Q. Well, the day-to-day operation costs and, of the
11 firm. Let's begin with that.
12 A. She may want to order something, office supplies, that
13 I say we don't need.
14 Q. Have you ever had financial disagreements with her
15 with respect to her own pay?
16 A. Yes.
17 Q. And what's the nature of those?
18 A. She wants an increase, I don't want to give an
19 increase. Health care participation.
20 Q. How often has that occurred, if at all?
21 A. I don't keep track of something like that. It's not
22 that often.
23 Q. Not that often. Have there been any disputes
24 regarding bonuses at the end of the year?
25 A. I -- Yes.

## Page 86

1 Q. I noticed you paused for a second. Are there specific
2 instances you can recall?
3 A. I used to give Christmas bonuses.
4 Q. Okay.
5 A. It would mess me up because you don't want to have a
6 lot of money in the checking account. Therefore, you
7 had to have enough for bonuses, so I announced a year
8 plus in advance I wasn't going to give any Christmas
9 bonuses. I'd rather increase salaries than do a
10 Christmas bonus.
11 Q. So there were years you did not give a Christmas bonus
12 because of that reason?
13 A. Right.
14 Q. Is that something that's been consistent from a
15 certain point going forward?
16 A. I don't know when the point started.
17 Q. It wasn't sporadic, one year you would, one year you
18 wouldn't?
19 A. No.
20 Q. You came to a point at some point where you decided,
21 "From this point forward, I'm going to give salary
22 increases instead of Christmas bonuses"?
23 A. If we could afford it.
24 Q. If you could afford it. Okay.
25 MR. CAMARGO: Can we go off the record for a

## Page 87

1 second?
2 (Off the record at 11:55 a.m.)
3 (Back on the record at 11:56 a.m.)
4 BY MR. CAMARGO:
5 Q. One of the -- Are you aware that one of the concerns
6 of Mr. Guzall by virtue of his counter-complaint has
7 been payments made to your wife as part of a salary?
8 A. Yes.
9 Q. Has your wife directly received compensation from
10 Barry A. Seifman, PC?
11 A. She receives corporate payroll checks. Actually, the
12 checks come through Paychex.
13 Q. She receives checks from the company through Paychex?
14 A. On my prior pre-accrued earnings.
15 Q. Is she listed as a W-2 employee?
16 A. Yes.
17 Q. Does she perform any work at the company?
18 A. She is co-trustee on the profitsharing and assistant
19 secretary of the corporation and I believe she has
20 check writing authority. In case something happened
21 to me.
22 Q. Any other duties?
23 A. At times I would, I would say, without saying names, I
24 would get her input on cases and situations. Pretty
25 regularly, actually.

## Page 88

1 Q. Bounce ideas off her?
2 A. No question. Plus we had meetings with the financial
3 advisors, past, present.
4 Q. Let's talk about the two primary ones aside from
5 discussions about clients, financial planning and
6 check writing authority. The first two you mentioned
7 were co-trustee and assistant secretary; is that
8 correct?
9 A. Corporate secretary.
10 Q. Assistant corporate secretary?
11 A. Yeah.
12 Q. Talk to me about what the co-trustee entails.
13 MR. WARREN: On the profitsharing?
14 BY MR. CAMARGO:
15 Q. On the profitsharing.
16 A. Have fiduciary obligations. We have to have bonds for
17 it. You cannot have one person acting as it. As I
18 understand, it requires two. So she agreed to take
19 that responsibility. We get monthly statements as to
20 what's earning, not earning. Originally we were with
21 Morgan Stanley. We moved out of Morgan Stanley, out
22 of profitsharing, and moved over to Merrill Lynch --
23 Well, Merrill Lynch with Fidelity in between.
24 Actually I had Fidelity at one time combined.
25 Q. How long has she served in that capacity?

13-53846-tjt   Doc 11642-2   Filed 10/26/16   Entered 10/26/16 15:41:45   Page 62 of

Page 89

1  A.  Since its inception. I don't know when the
2      profitsharing started. Since its inception.
3  Q.  That was my question. Since its inception, meaning
4      since the inception of the profitsharing?
5  A.  Correct.
6  Q.  And what specific — Obviously, you've indicated that
7      there's, by your view of it, there's a need for a
8      co-trustee. What specific actions or duties has she
9      undertaken as co-trustee?
10 A.  We discuss it and meet at times with financial
11     advisors at the institutions, besides just discussions
12     between us.
13 Q.  How often do you do that?
14 A.  Depends on the need. Morgan Stanley screwed us up
15     when the market was going down. She met personally
16     with a financial advisor before we were going out of
17     town. 'Cause she had some ill at ease 'cause we were
18     going overseas, and they said hold the fort. When we
19     came back, they held the fort and watched the fort
20     tumble.
21 Q.  And what year was that?
22 A.  I'd be guessing.
23     MR. WARREN: Well, as long as you tell us
24     that you're guessing, I guess --
25 A.  I'm guessing latter '90s. I'm going to say '98, '99,

Page 90

1      when we went to Italy.
2  Q.  That would have been right around the time that Barry
3      A, that you left your prior firm and started doing --
4      I don't want to get into this mess, but that would
5      have been right around the time you left your prior
6      firm; correct?
7  A.  No, it had to be 2008. I said '98.
8  Q.  You said '98.
9  A.  It was 2008.
10 Q.  Thank you.
11     MR. WARREN: And that's why we don't want
12     you guessing.
13 A.  I had the eight right.
14 BY MR. CAMARGO:
15 Q.  Okay. Let's talk about the assistant corporate
16     secretary. What did that entail?
17 A.  If anything has to be executed like bank documents,
18     with corporations, they require two documents, so she
19     would have to be a signatory on it and hold a
20     position. Being the practice of law, I had
21     reservations as to whether she could be corporate
22     secretary, so that's why she's assistant secretary.
23 Q.  Who was the corporate secretary?
24 A.  Me.
25 Q.  Did she ever perform any other administrative duties

Page 91

1      within the firm?
2  A.  The problem is that that's awful broad based. I have
3      discussed with her raises at times for secretarial as
4      to what her input would be in that reaction. Is that
5      administrative, I don't know.
6  Q.  No, and it is a broad question so let me make it a
7      little more specific. Did she ever perform day-to-day
8      administrative assistant type duties such as answering
9      phones, mailing out documents, et cetera, et cetera?
10 A.  No.
11 Q.  How many hours -- Well, let me go back. Did she spend
12     regular hours at the firm?
13 A.  No.
14 Q.  How many hours a week, if any, did she spend at the
15     firm?
16 A.  Don't know.
17 Q.  Did it vary.
18 A.  It varied, most of it was -- Most was not with the
19     firm. She was on a salary. She wasn't on an hourly
20     wage.
21 Q.  And that salary was compensation for what?
22 A.  I already said.
23 Q.  I don't know that we asked that specific question, so
24     I don't want to put words in your mouth. Is it your
25     testimony that salary was as compensation for her

Page 92

1      being a co-trustee, assistant corporate secretary, and
2      all of the other check writing, et cetera, authority?
3  A.  And anything else I bounced off of her, anything I
4      asked as to input. I don't remember her ever saying
5      no.
6  Q.  Real quick, moving back to Andrea McAnally. She, as
7      we sort of described earlier, has done a little bit of
8      everything administratively in the firm; is that
9      correct?
10 A.  Correct.
11 Q.  Did she ever work hand-in-hand with your wife on any
12     of those projects such as inputting of financial
13     information?
14 A.  At one time we were talking about doing that, but I
15     don't think it ever happened.
16 Q.  Did she ever train her to do any of that?
17 A.  I think that would have been the same answer I just
18     said.
19 Q.  I know you talked about it. Did it get --
20 A.  No, I finished the sentence by saying I don't think
21     that ever came about.
22 Q.  So the answer would be no, she never trained her?
23 A.  I don't think so.
24 Q.  How much did you pay your wife?
25 A.  Look at the Paychex records.

BIENENSTOCK
WORLDWIDE COURT REPORTERS
www.bienenstock.com

23 (Pages 89 to 92)

Page 93

1   Q.  Do you --
2   A.  We supplied those.
3   Q.  Do you know offhand?
4   A.  Right now I think it's 1,140 gross per month.
5       MR. WARREN: You're talking about for 2012?
6   A.  Yeah.
7   BY MR. CAMARGO:
8   Q.  Has it been consistently 1,140 gross since 1999?
9   A.  No.
10   Q.  When do you make a determination as to what she's
11     going to be paid?
12   A.  Right now she's penalized on Social Security if she
13     makes too much.
14   Q.  So you reduced her amount in order to avoid those
15     penalties?
16   A.  No. We got it anyhow.
17   Q.  You attempted to reduce her amount to avoid the
18     penalties?
19   A.  We got penalized. If you're taking security before a
20     certain age, you're get penalized.
21   Q.  Sure.
22   A.  According to how much you make.
23   Q.  You said that you paid her on a salary basis. Was
24     that per hour or not?
25   A.  If it was per hour, it wouldn't be salary.

Page 94

1   Q.  Sure. So regardless of how many hours she worked, you
2     paid her, for example in 2012, you would pay her that
3     1,140 per month?
4   A.  Yes. That's a responsibility.
5   Q.  Did you and your wife file your taxes jointly or
6     separately?
7   A.  We provided our tax returns jointly.
8   Q.  Jointly? Have you always done that?
9   A.  As long as I can remember.
10   Q.  Insofar her income, if it was joint, then for
11     purposes of tax, there was joint income that the
12     federal and state governments would look at; correct?
13       MR. WARREN: I'm going to let him answer.
14   You have not established a foundation for this witness
15   to answer really any questions regarding the tax.
16   He's told you in fact that he's not a tax attorney.
17   So I'm assuming you're not asking him as an expert but
18   merely his understanding of what took place.
19   BY MR. CAMARGO:
20   Q.  I'm asking you your understanding of what took place.
21       MR. WARREN: You asked him if the income
22   that he and his wife reported --
23   A.  What's the question?
24       MR. WARREN: -- was reported as joint
25   income?

Page 95

1   BY MR. CAMARGO:
2   Q.  Let me ask you it this way: You filed taxes jointly;
3     correct?
4   A.  It's a joint return.
5   Q.  What is your understanding of a joint return insofar
6     as how you are taxed on your income?
7   A.  It's the combination of all income.
8   Q.  So if your income is 150 and her income is 20, the
9     government, both state and federal, will look at it as
10     170; correct?
11   A.  As far as the gross number goes.
12   Q.  And that doesn't matter with whether it's 150 and 20,
13     or 165 and 5 or 170 and 0, it's all gross of 170?
14   A.  According to your scenario, yes. As long as the total
15     gross adds up to 170.
16   Q.  Then what was the purpose of paying her rather than
17     just simply paying yourself that money?
18   A.  Well, one, I thought she was entitled to it because
19     she was taking responsibilities, was the main reason.
20   Q.  Okay.
21   A.  Two, I wanted to keep separate the funds that were
22     pre-accrued so we wouldn't have an issue like
23     somebody's raising in this lawsuit.
24   Q.  And what is that?
25   A.  Trying to say that I'm wrongfully paying her. I'm

Page 96

1   paying her out of dollars that had nothing to do with
2   Mr. Guzall.
3   Q.  Why do you say that?
4   A.  Because they were pre-accrued, and per the shareholder
5     agreement, they were pre-accrued dollars.
6   Q.  So we're both clear on what pre-accrued dollars were,
7     what does that mean?
8   A.  That means funds in the IOLTA prior to Mr. Guzall
9     becoming a shareholder, he was not entitled to.
10     That's waht the shareholder agreement says.
11   Q.  That would have been funds prior to 2006 when he
12     wasn't a shareholder of five percent?
13   A.  Correct.
14       (Off the record at 12:10 p.m.)
15       (Back on the record at 12:12 p.m.)
16   BY MR. CAMARGO:
17   Q.  Back on the record. Okay. One of the distinctions
18     you made when we were just on the record is a
19     distinction between pre-accrued money and money that
20     was accrued or earned after 2006 when Mr. Guzall was
21     made a shareholder; correct?
22   A.  Yes.
23   Q.  How much pre-accrued money was there prior to Mr.
24     Guzall becoming a shareholder?
25   A.  I will repeat what I've been asked before. It's in my

## Page 97

1   deposition before. I never sat down. Defense counsel
2   presented a Bates number. It's said 211,000.
3   Q.  That would have been what was in the IOLTA?
4   A.  That's what defense counsel presented.
5   Q.  Okay.
6   A.  I only remember that was in the transcript. And
7   we didn't know how much was clients' or not.
8   Q.  You didn't know how much was clients' or not?
9   A.  Because I never -- I just knew it was there. It was
10  retained earnings. As far as I was concerned. And
11  you're starting a new venture. Who knows how much
12  you're going to need?
13  Q.  Sure. I want to get back to that question, though.
14  What do you mean you don't know how much was clients'
15  or not?
16  A.  It's an IOLTA. I don't know how much was still due
17  clients plus I don't know what your experiences are
18  but there are times when you make all disbursements
19  and a bill comes in afterwards, client raises an
20  issue. It depends on the situation. There could be a
21  contingency, it could be hourly retainer. All of the
22  above have happened.
23  Q.  Would there be a way to determine how much of that was
24  clients'?
25  A.  Only in a looking after the fact.

## Page 98

1   Q.  Okay. If -- How much was your wife paid from 2006 on,
2   If you know?
3   MR. WARREN: Not only was that question
4   asked, I believe at the previous deposition, you just
5   asked that question moments ago. So it has been asked
6   and answered, but go ahead, Barry, take another run at
7   it.
8   A.  I don't remember. There's Paychex records.
9   BY MR. CAMARGO:
10  Q.  Okay. Was it approximately a thousand dollars per
11  month every year? You said that in 2012 you think it
12  was 1,140 per month; correct?
13  A.  Yep. It used to be more. Then we got penalized, then
14  it got less. Was it day and night difference? No.
15  MR. WARREN: Please wait for him to ask you
16  a question.
17  BY MR. CAMARGO:
18  Q.  How were you able to identify the monies that were
19  being used for her payment as pre-accrued funds?
20  A.  That was asked before also. We went through sheets
21  where I'd point out oh, look, here's a check, here's
22  a withdrawal for, I think it was 1,140. That's
23  Marcia. I took -- You want a full explanation again?
24  Q.  Sure.
25  A.  On or about, when Mr. Guzall became a shareholder, I

## Page 99

1   took the existing IOLTA account books -- they're
2   yellow pages, okay -- and I created an old and a new,
3   and I took, extrapolated what was in the old from this
4   combination, and have a binder behind my desk that's
5   always been there since this occurred, old, and then
6   next to it is a binder called new.
7   Q.  How long did you plan on paying your wife? In other
8   words, was there a cease date for payments to your
9   wife?
10  A.  Nope.
11  Q.  Would you agree that at some point all pre-accrued
12  funds would be exhausted?
13  A.  Some point.
14  Q.  Do you know when that point might be or if it's
15  already passed?
16  A.  It has not passed.
17  Q.  How do you know it has not passed?
18  A.  'Cause I've looked since this litigation.
19  Q.  Do you have an idea of when that point might be?
20  A.  No, my wife, God forbid, is not in good health.
21  Q.  And I don't want to push in those areas, obviously,
22  and I can only extend my sympathy, but I have to ask
23  the question, were she to be in good health, do you
24  know approximately when that would cease?
25  A.  No.

## Page 100

1   Q.  Do you need to check --
2   A.  Okay. Thank you.
3   Q.  You're welcome. Did you set up a separate account for
4   your wife to pay her money out?
5   MR. WARREN: You mean a separate --
6   BY MR. CAMARGO:
7   Q.  Bank account.
8   A.  No.
9   Q.  So at no time did you try to separate these
10  pre-accrued funds into a separate account where you
11  would be able to manage exactly how many funds were
12  there and when that was going to be exhausted?
13  A.  I didn't know if that would be a triggering event. I
14  was also still there for purposes of if there was an
15  emergency, and I had isolated each client into the
16  separate books plus the continuation of the master
17  book.
18  Q.  Did you ever tell Mr. Guzall that you were paying your
19  wife?
20  A.  Yeah.
21  Q.  Did you ever tell him how much you were paying your
22  wife?
23  A.  No.
24  Q.  Did you ever tell him --
25  A.  He wasn't interested.



**Page 101**

```
 1   Q.  All right. Did you ever tell him whether you were
 2       paying her weekly or hourly? Or on a salary basis?
 3   A.  What? That's the same question just broken into
 4       subparts.
 5   Q.  So the answer is probably easy for you?
 6   A.  I told him I was paying her under pre-accrued
 7       earnings. He didn't ask as to how much or whatever.
 8       At one time there was a discussion of her learning
 9       backup stuff.
10   Q.  What do you mean by her learning backup stuff?
11   A.  QuickBooks.
12   Q.  That was that same discussion with Andrea McAnally
13       where she was possibly going to train her to learn
14       that stuff?
15   A.  Correct.
16   Q.  And that never took place?
17   A.  I don't think so. Partially because the paralegal who
18       came in knew how to do it.
19   Q.  Okay.
20   A.  And then I wanted -- She was also using a different
21       system. Then I wanted Andrea learning the different
22       system that she was using. For probate matters.
23   Q.  Did you tell Mr. Guzall whenever you would change your
24       wife's pay?
25   A.  I doubt it. Because I didn't think it involved him
```

**Page 102**

```
 1       and he wasn't interested in anything dealing with
 2       management anyhow.
 3   Q.  Is it true that by paying your wife a salary, you were
 4       able to have her pay into Social Security?
 5   A.  That's how we got penalized.
 6   Q.  How's that?
 7   A.  If you are receiving Social Security, you make more
 8       than so much money, you're penalized, unless you reach
 9       a certain age bracket.
10   Q.  When did she start receiving Social Security?
11   A.  More than a year ago. My recollection.
12   Q.  Prior to that, would you agree with me that when she
13       was not receiving Social Security, she would have been
14       paying into Social Security?
15   A.  That's confusing.
16   Q.  All right. Are you familiar with how Social Security
17       works?
18   A.  To a certain degree. I don't do Social Security
19       disability.
20   Q.  So you have a basic rudimentary knowledge of Social
21       Security; correct?
22   A.  You get a paycheck out of it. So much is allocated to
23       pay Social Security, Medicare, I believe, health
24       benefits.
25   Q.  At some point, as you progress through life, you
```

**Page 103**

```
 1       become entitled to withdraw from or receive benefits
 2       from Social Security; correct?
 3   A.  Correct.
 4   Q.  That's contingent; correct?
 5   A.  Contingent correct what?
 6   Q.  It's not automatic that you're entitled to those
 7       benefits?
 8   A.  You have got to have paid into the system.
 9   Q.  Correct.
10   A.  And she had been paying into the system.
11   Q.  By virtue of the salary that you were giving her?
12   A.  No. She worked for 20 years.
13   Q.  Okay. Where did she work?
14   A.  Dermatology Associates.
15   Q.  So you didn't pay her solely to bump up her Social
16       Security?
17   A.  No, that's bull. Excuse me. That's ridiculous.
18   Q.  You never told Ray Guzall that?
19   A.  No, that's his imagination. That's right, Ray.
20           MR. WARREN:  Okay. I know -- Answer the
21       question, no arguing.
22   A.  Can the record show that your client is, was trying to
23       stare me down?
24           MR. GUZALL:  I'm looking at you 'cause
25       you're lying.
```

**Page 104**

```
 1           MR. WARREN:  Ray.
 2           MR. CAMARGO:  Enough.
 3           MR. WARREN:  Ray, if you keep up with that,
 4       we'll walk.
 5   A.  I'll ask my attorney to get an order of extrapolation.
 6           MR. WARREN:  Call him another name, Ray, and
 7       we're walking.
 8           MR. GUZALL:  That's the truth.
 9           MR. WARREN:  Nick, what do you want to do?
10           MR. CAMARGO:  Let's keep going and I think
11       we can all behave a little better, so let's just keep
12       moving on forward.
13   BY MR. CAMARGO:
14   Q.  Have you -- Obviously Andrea McAnally is familiar with
15       this litigation; is that correct?
16   A.  I don't know what you mean by familiar. She knows the
17       litigation going on. My staff is not handling the
18       paperwork.
19   Q.  Because it's being handled by another firm?
20   A.  Correct. So it's not the same which she would
21       normally know.
22   Q.  But she knows that there is litigation between you,
23       the firm and Mr. Guzall and his new firm?
24   A.  Yes.
25   Q.  Have you had a chance to discuss that with her, and I
```



Page 105

1    should take that back because I think earlier you held
2    me to the fire for that. Have you discussed that with
3    her?
4         MR. WARREN: Discussed the —
5    BY MR. CAMARGO:
6    Q.   The litigation.
7    A.   There may be a time I commented.
8    Q.   And what did you comment about?
9    A.   I don't know. I don't keep track of that.
10   Q.   Did you ever have a discussion with her about training
11       your wife?
12   A.   I don't remember.
13   Q.   You don't recall her ever indicating that she did in
14       fact train your wife and in fact it took X number of
15       hours to train her?
16   A.   No.
17   Q.   Earlier I asked you approximately how many hours your
18       wife spent at the law firm office doing work, and I
19       believe you said most or the majority of her work was
20       done outside of the office; is that correct?
21            MR. WARREN: His answer was whatever his
22       answer was.
23   BY MR. CAMARGO:
24   Q.   Earlier you said that. Let's go to 2006. How much of
25       the time did she spend in the office to do actual

Page 106

1        work?
2    A.   I don't know.
3    Q.   How about 2007?
4    A.   It would be the same thing for each year.
5    Q.   Including this year?
6    A.   Including this year, when she's not in the hospital.
7    Q.   You don't know how many hours she's come into the
8        office?
9    A.   I don't keep track of that. It's not important to me.
10   Q.   And the same would be true for 2011?
11   A.   Correct.
12   Q.   And you said you don't keep track of it because that's
13       not important so you don't have any way of keeping
14       track of how much time she puts in at the office?
15            MR. WARREN: I'm sorry, you mischaracterized
16       his testimony. He said he did not keep track.
17            MR. CAMARGO: Right.
18   BY MR. CAMARGO:
19   Q.   So you don't keep any track of how much time she puts
20       in at the office?
21            MR. WARREN: That has been asked and
22       answered.
23   A.   Yes.
24   BY MR. CAMARGO:
25   Q.   Did you keep track or did your wife keep track — Let

Page 107

1        me ask this singularly. Did you keep track of how
2        much work she did outside of the office?
3    A.   No. I just -- I just know, as I said before, most of
4        this, significantly, was outside of the office.
5    Q.   Did your wife keep track of how much work she did
6        outside of the office?
7    A.   To my knowledge? No.
8    Q.   Did anyone, to your knowledge, keep track of how much
9        work she did outside of the office?
10   A.   That's — I don't know who that other person would be.
11   Q.   Well — Let me ask you the question —
12   A.   I believe in the man upstairs. Maybe he does.
13   Q.   Seeing as though I don't think we're going to be able
14       to depose him or call him in as a witness, let me ask
15       you again, did anyone, other than you or your wife,
16       keep track of your time? Yes, no or I don't know?
17            MR. WARREN: He's already told you he
18       doesn't know of anyone who would have done that.
19   BY MR. CAMARGO:
20   Q.   So the answer is I don't know?
21   A.   The answer is I don't know.
22   Q.   Thank you.
23   A.   You're welcome.
24   Q.   Would the answer be the same for each of the years
25       we've discussed, going back to 2006?

Page 108

1    A.   Correct.
2    Q.   So, and bear with me because I'm a little slow and
3        clearly a little bit repetitive here, so just to make
4        sure that it's clear, for each of those years, no one
5        kept track, or that you're aware of, of her time in or
6        out of the office, from 2006 on?
7    A.   Your self-demeaning I find inapplicable, but it's
8        appreciated, but the answer to the question, as far as
9        I know, it's no different than what I've already
10       answered.
11   Q.   Thank you. That will fix some time here. Again, with
12       self-deprecation in mind, for each of those years 2006
13       through 2011, if I thought it out better I probably
14       would have asked it at the time, is it your testimony
15       that the work you said she had done previously, i.e.,
16       serving as co-trustee and serving as assistant
17       corporate secretary, that was the work that she did
18       for the most part during those years, 2006, 2007,
19       2008, 2009?
20            MR. WARREN: The question really has been
21       asked and answered, Nick. But go ahead.
22   A.   It's been three times.
23            MR. WARREN: I know.
24   A.   Three times --
25   BY MR. CAMARGO:

## Page 169

1     talking about things that Mr. Seifman heard about
2     employees of a client involving those employees taking
3     illegal actions?
4         MR. CAMARGO: Correct, and I believe his
5     answer was, "I learned about it after they were
6     prosecuted."
7         MR. WARREN: So now your question is, did
8     Mr. Seifman learn about these unknown events after Mr.
9     Guzall left?
10        MR. CAMARGO: No. The question was --
11 BY MR. CAMARGO:
12   Q.  Correct me if I'm wrong. Mr. Seifman, you did at some
13     point learn that there had been some specifically
14     illegal acts for which people were being prosecuted;
15     correct?
16   A.  Yes.
17   Q.  You don't know whether those coincided with what Mr.
18     Guzall had alluded to or not?
19   A.  If I had -- My impression is they didn't.
20   Q.  Did his discussion or mention to you about possible
21     illegal acts predate or postdate the prosecution of
22     these individuals?
23   A.  I'd be guessing and I believe it's pre.
24   Q.  And did the prosecution predate or postdate Mr.
25     Guzall's decision to leave the firm?

## Page 170

1         MR. WARREN: We don't know -- I'm sorry,
2     that assumes facts not in evidence. We know when it
3     is that Mr. Guzall communicated to Mr. Seifman he was
4     leaving the firm. When he made his decision --
5         MR. CAMARGO: Okay.
6 BY MR. CAMARGO:
7   Q.  For clarity sake, does it predate or postdate February
8     6th?
9   A.  Does what?
10   Q.  The prosecution of these individuals. Does it predate
11     or postdate February 6th, 2012?
12   A.  I can't say as to the prosecution. I can say that I
13     believe the suspensions of the police officers
14     involved predate.
15   Q.  Predate. These documents were provided to you by way
16     of discovery. Can you briefly go through those?
17     They're B through I, I believe, and tell me if you,
18     after you have had a chance to review them, tell me if
19     you recognize them.
20   A.  Are we going to go one by one or what?
21   Q.  Let's do them one by one. That might be easier.
22   A.  I'm looking at what's labeled B.
23   Q.  Okay.
24   A.  That's a check for this particular root canal.
25   Q.  That would have been a --

## Page 171

1   A.  For Marcia Seifman and it's dated April 5th, 2010,
2         MR. WARREN: Well, wait. There's a couple
3     of different things on this.
4         MR. CAMARGO: Sure.
5         MR. WARREN: There's a statement. There's a
6     --
7 BY MR. CAMARGO:
8   Q.  Let me ask you a couple questions regarding it.
9     You've in basic terms described it. In looking at
10     that document, which speaks for itself, is it fair to
11     say that there's a receipt, then a computer or what
12     would be called charge card receipt that appears to
13     have been stapled, and then at the bottom a check on
14     that, all on that one document?
15   A.  Yep.
16   Q.  Okay. That check, there is a Pay to the Order for the
17     payee being Capital One; is that correct?
18   A.  Correct.
19   Q.  And the memo line has what appears to be some
20     writing. Is that your writing?
21   A.  Yes.
22   Q.  Can you decipher what that says?
23   A.  Yes.
24   Q.  And what does it say?
25   A.  M. Seifman dentist.

## Page 172

1   Q.  And the signature, can you identify that signature?
2   A.  On the check you mean?
3   Q.  Yes.
4   A.  Yes.
5   Q.  Is that your signature?
6   A.  Yes.
7   Q.  Did you notify Mr. Guzall that you were paying this
8     with a corporate check?
9   A.  No.
10   Q.  Move on to Exhibit C. Can you look at that and
11     identify that?
12   A.  Okay.
13         MR. WARREN: Well, the question is, can you
14     identify it?
15   A.  Can I identify it as a copy of a check that has my
16     handwriting, printing on it?
17   Q.  And that's exactly what I was going to ask you,
18     Exhibit C, is that in fact your notations on there in
19     handwritten form?
20   A.  As I said, yes.
21   Q.  Does it indicate a date?
22   A.  January 10th, 2008.
23   Q.  Does this also appear to be costs associated with
24     dental work?
25   A.  Yes.

Page 173

```
 1   Q.   And when you indicate, in those notations, PD.CK7913,
 2        what does that signify to you?
 3   A.   Paycheck number 7913.
 4   Q.   And paid check 7913, would that be a corporate check
 5        or a personal check?
 6   A.   Corporate.
 7   Q.   Did you tell Mr. Guzall about that expense?
 8   A.   Don't think so.
 9   Q.   Moving on to — I apologize I may have them out of
10        order. What do you have as the next one, if you can
11        identify that?
12   A.   D as in dog.
13   Q.   Okay. And what is that?
14   A.   It's a Citi card.
15   Q.   Okay.
16   A.   And there are two charges on here.
17   Q.   What are those charges?
18   A.   One to Planet Fitness.
19   Q.   When is that Citi card from?
20   A.   I'm sorry? What do you mean when is it from?
21   Q.   Is it a statement, a monthly statement?
22   A.   Do you see a month on here?
23             MR. WARREN: Well, I see a bunch of dates
24        but I'm not answering the question either, so —
25   A.   I don't know.
```

Page 174

```
 1   BY MR. CAMARGO:
 2   Q.   Well, let me take a look at it real quick, if you
 3        don't mind, just to make sure that I have — Okay.
 4        That is again D; correct?
 5   A.   Yes.
 6   Q.   All right. There is an account activity date at the
 7        sort of middle of, the top left of the document, if
 8        you're holding it.
 9   A.   Okay. June 16th to July 15th.
10   Q.   Correct. And that would be June 16th to July 15th of
11        2011? Would you agree?
12   A.   That's what it says.
13   Q.   And there are — Well, let me ask you this: Citibank
14        Platinum Select, do you recall whether that was a
15        personal charge card or a charge card in your personal
16        name for corporate or business expenses?
17   A.   There was a time that I used a different charge card
18        than I'm using now and that may have been the prior
19        card.
20   Q.   Okay. That may have been the prior card that you had
21        designated for corporate expenses?
22   A.   Correct.
23   Q.   And there is a Planet Fitness charge on there; would
24        you agree?
25   A.   Yep.
```

Page 175

```
 1   Q.   What would that have been for?
 2   A.   That's one of these workout places.
 3   Q.   All right. Would that have been for you or your wife
 4        personally?
 5   A.   Personally? It would have been for me and my wife's
 6        use.
 7   Q.   Okay. How about the next charge on there?
 8   A.   That's an eye place.
 9   Q.   Would that have been for —
10   A.   One of us.
11   Q.   One of you, vision; correct?
12   A.   Correct.
13   Q.   There is a notation at the top. It says CK 10107;
14        correct?
15   A.   Correct.
16   Q.   What is — Is that your handwriting?
17   A.   Yes.
18   Q.   What does that notation mean to you, if anything?
19   A.   Check number and date.
20   Q.   Would that indicate to you whatever this, whatever
21        this payment or whatever this amount was, was paid by
22        you?
23             MR. WARREN: Paid by you?
24   BY MR. CAMARGO:
25   Q.   Excuse me. Written out of a corporate account?
```

Page 176

```
 1   A.   I believe so.
 2   Q.   So look at the next one.
 3             MR. WARREN: That would be E.
 4   BY MR. CAMARGO:
 5   Q.   That would be E. In the same area for the account
 6        activity, do you see date there?
 7   A.   As to period of time?
 8   Q.   Correct.
 9   A.   Yes.
10   Q.   And that period of time would be March 16th through
11        April 15th, 2011?
12   A.   Correct.
13   Q.   Over on the right are several charges. Do you agree
14        with me the first one again is another Planet Fitness
15        charge?
16   A.   Yeah.
17   Q.   Was that a recurring charge that happened monthly, if
18        you know?
19   A.   I thought so.
20   Q.   All right.
21   A.   But — I thought it was changed out of that charge.
22   Q.   Do you know when it would have been changed out of
23        that charge?
24   A.   No.
25   Q.   Do you know how long there was a membership at Planet
```

## Page 225

1  jeopardized potentially the account?
2  A.  It could have.
3  Q.  Was the Romulus account one of the bigger accounts you
4  have as a firm?
5  A.  On an hourly basis?
6  Q.  Yes.
7  A.  Yes.
8  Q.  Okay.  And not the most revenue producing because any
9  contingency in any given year could exceed that but
10  from a year-to-year basis, is it the biggest account
11  you have on an hourly basis?
12  A.  Yes.
13  Q.  Okay.  And you'd obviously like to keep that account
14  since it's a good source of steady income for the
15  firm; correct?
16  A.  Yes.
17  Q.  You -- You try and do whatever you can to try to save
18  that account as opposed to jeopardizing it; right?
19     MR. WARREN:  Object to the use of the term
20  whatever.
21  A.  Well, whatever you can --
22  BY MR. CAMARGO:
23  Q.  Okay.
24  A.  -- I can't agree with that language.
25  Q.  All right.  Is it true that you have given to Mayor

## Page 226

1  Lambert's campaign?
2  A.  Absolutely.
3  Q.  Has your wife given money to Mayor Lambert's campaign?
4  A.  She may have.
5  Q.  Do you have specific knowledge as to that?
6  A.  No.  No.  I don't keep track of all that.
7  Q.  Okay.  How often have you given money?
8  A.  At least twice a year.
9  Q.  Have you ever told your -- Have you ever told Ray
10  Guzall to give money to the campaign?
11  A.  Prior to Marianna being terminated?
12  Q.  Yeah.
13  A.  I said I think you should.
14  Q.  How about after Marianna being terminated?
15  A.  If he got -- What happens is that the tickets go to
16  the individual, so I don't know -- I'm presuming he
17  got tickets.  I think historically he didn't pay for
18  the tickets because he literally would be there at the
19  event with Marianna doing work.
20  Q.  Okay.  Did you --
21  A.  The tickets didn't come to me to give to them.
22  Q.  Did you ask Kevin Watts to give money to the mayor's
23  campaign?
24  A.  Same way.  Tickets would come straight to him.
25  Q.  Did you know whether Marianna Guzall was going to be

## Page 227

1  laid off before it actually occurred?
2  A.  I didn't -- You mean before it actually happened to
3  her?  No.
4  Q.  Did you know that there were going to be layoffs?
5  A.  Yes.
6  Q.  Did you ever tell Ray Guzall that information?
7  A.  I think it was common knowledge as far as those in the
8  city.
9  Q.  But you're saying you had no specific knowledge that
10  Marianna herself was going to be laid off?
11  A.  Not until she was laid off.
12  Q.  Prior to that?
13  A.  Right.  There was talk -- there was talk about her
14  floating between two different departments and the
15  likes of this.
16  Q.  Marianna?
17  A.  But I didn't take part in the decision as to who
18  doesn't get laid off.
19  Q.  One of the things you had testified to very early on
20  in our deposition is Marianna, in your opinion, had
21  caused some issues in the city that were again
22  negatively affecting your account with the city; is
23  that right?
24  A.  Yes.
25  Q.  Would that have been prior to or after she was laid

## Page 228

1  off?
2  A.  After.
3  Q.  Prior to her being laid off, did Marianna ever confide
4  with you about concerns she had about some of the
5  things going on in the city?
6     MR. WARREN:  This is while she was still an
7  employee of the city?
8  BY MR. CAMARGO:
9  Q.  While she was still an employee.
10     MR. WARREN:  I don't think he can answer
11  that question.  An employee of a client comes and
12  confides something.  I think that Mr. Guzall raise the
13  privilege.  I think that may in fact be protected by
14  attorney-client privilege.
15     MR. CAMARGO:  And my understanding is when
16  that privilege was raised, that in fact you argued
17  against it being privileged in front of Judge
18  Alexander.
19     MR. WARREN:  Not with regard to statements
20  being made by employees of the city to Mr. Guzall or
21  any other member of the firm, no.
22  BY MR. CAMARGO:
23  Q.  Well, I'm going ask it again.  Did you -- Did Marianna
24  Guzall confide in you that she had some concerns about
25  some of the activities going on within the city?

Page 229

```
1          MR. WARREN: I am --
2  BY MR. CAMARGO:
3  Q.  I won't even ask you the specifics. It's a simple yes
4      or no question.
5          MR. WARREN: I'm not sure if he can respond
6      in any way without violating the privilege.
7      Conceptually, Nick, I'm not necessarily --
8  A.  Can we confer?
9          MR. CAMARGO: Please.
10         MR. WARREN: Give us a minute.
11         (Off the record at 5:13 p.m.)
12         (Back on the record at 5:15 p.m.)
13         MR. WARREN: There's a question pending.
14         MR. GUZALL: We're going to have to talk
15     first.
16         (Off the record at 5:15 p.m.)
17         (Back on the record at 5:16 p.m.)
18         MR. WARREN: Counsel, I've spoken with Mr.
19     Seifman and there were times when Marianna Guzall
20     spoke with Mr. Seifman in her role as an employee of
21     the city, and there were other times when she spoke
22     with Mr. Seifman because she was Ray's spouse, so if
23     you can limit your question to those occasions when
24     Marianna Guzall was speaking to Mr. Seifman in her
25     role as Mr. Guzall's wife, I think he can answer the
```

Page 230

```
1      question.
2          MR. CAMARGO: Okay.
3  BY MR. CAMARGO:
4  Q.  My question was, did Marianna Guzall ever confide with
5      you or in you concerns she had about some of the
6      activities going on within the city offices?
7          MR. CAMARGO: And I don't know that that
8      meets your qualifier, so if you want to place your
9      objection.
10         MR. WARREN: To the extent that, that I do
11     not want Mr. Seifman's response to be construed in any
12     way as a waiver of the attorney-client privilege.
13         MR. CAMARGO: I certainly won't.
14         MR. WARREN: So we're not going to hear
15     later that because Mr. Seifman responded to this
16     question, that there's been a general waiver of the
17     privilege vis-a-vis the city.
18         MR. CAMARGO: I will agree with that for
19     this question, absolutely.
20         MR. WARREN: Okay. Go ahead.
21 A.  There was nothing reported to me that any activities
22     that were taking place in the city, the city could be
23     found guilty of some type of criminal conduct.
24 BY MR. CAMARGO:
25 Q.  Okay.
```

Page 231

```
1  A.  Does that meet what your question is?
2  Q.  That's the answer that you've given me. More
3      specifically, did she ever confide with you that she
4      had concerns about the campaign finance records
5      regarding the Mayor?
6          MR. WARREN: Okay. And, again, to the
7      extent that there's an implication of an
8      attorney-client privilege, I don't want his response
9      to be construed as a general waiver, a limited waiver
10     of the privilege, so --
11         MR. CAMARGO: Accepted.
12 A.  No.
13 BY MR. CAMARGO:
14 Q.  She never said to you anything about any concerns
15     regarding campaign finance records there at --
16         MR. WARREN: Campaign finance records.
17 BY MR. CAMARGO:
18 Q.  Records related to --
19 A.  Regarding records under the Campaign Finance Act, I've
20     --
21 Q.  Correct.
22 A.  I've never seen them. I've never had discussion with
23     her about that.
24 Q.  Okay.
25 A.  She oftentimes would tell Ray things and Ray would
```

Page 232

```
1      say, "Marianna told me some stuff, but you don't need
2      to know."
3  Q.  Which is what you said earlier. But your testimony
4      today is she never specifically confided with you
5      about concerns regarding campaign finance reporting
6      records for Mayor Lambert?
7          MR. WARREN: Well, that's a different
8      question. It's a different question.
9  BY MR. CAMARGO:
10 Q.  To the extent it's a different question --
11         MR. WARREN: To the extent again that this
12     may have an implication with the attorney-client
13     privilege, again I will object. I will allow the
14     witness to respond, but only to the extent that this
15     does not imply a waiver of the privilege. Go ahead,
16     Barry.
17         MR. CAMARGO: Thank you.
18 A.  I don't understand the difference of this question and
19     the previous --
20         MR. WARREN: The question has to do with
21     mayor campaign finance.
22 A.  That's what this --
23 BY MR. CAMARGO:
24 Q.  Would the answer be no?
25         MR. WARREN: He doesn't remember the
```

Page 233

```
 1    question now.
 2  A. If the question is did Marianna Guzall discuss with me
 3     some irregularities in the mayor's financial reporting
 4     under the Campaign Finance Act, I have no memory of
 5     that.
 6  BY MR. CAMARGO:
 7  Q. Perfect. Did she -- Excuse me. Did she discuss with
 8     you any concerns about any employees and potential
 9     drug use of employees, keeping in mind we'll note it
10     doesn't constitute a waiver of the attorney-client
11     privilege?
12          MR. WARREN: You can answer. Again, it is
13     not construed as a waiver of the attorney-client
14     privilege.
15  A. She told me somebody, an employee, was taking more
16     drugs than they should.
17  BY MR. CAMARGO:
18  Q. Okay.
19  A. But I had nothing to verify that.
20  Q. Do you recall that person's name?
21  A. I'm uncomfortable laying that out in public.
22  Q. Well, if you did nothing wrong, there shouldn't be any
23     discomfort.
24          MR. WARREN: Who did something wrong?
25  A. Not me. It's the person's name.
```

Page 234

```
 1  BY MR. CAMARGO:
 2  Q. Well, I'm going ask you then, was it Betsy Krampitz?
 3          MR. WARREN: Look, now we have a problem
 4     having to do with the defamation privilege. I don't
 5     know anything --
 6          MR. CAMARGO: I don't know of a defamation
 7     privilege. There's an issue with Miss Krampitz and
 8     Mr. Seifman.
 9          MR. WARREN: It isn't a question between Mr.
10     Seifman and whoever this other person is. The
11     question is in responding to your question. The issue
12     is Mr. Seifman may be defaming that person under
13     circumstances where he doesn't have a privilege.
14          MR. CAMARGO: Are you instructing --
15          MR. WARREN: I'm not going to let him
16     answer.
17          MR. CAMARGO: I'm going to simply ask -- We
18     talked about first year of law school. Defamation
19     requires statement put forth by the individual. I'm
20     not asking did he confirm this, did he do anything,
21     did he find it to be true, did he do it.
22  BY MR. CAMARGO:
23  Q. What I'm asking is, did Marianna Guzall specifically
24     discuss with you that an individual by the name of
25     Betsy Krampitz may have some drug issues?
```

Page 235

```
 1          MR. WARREN: And, again, by answering your
 2     question, Mr. Seifman may be publishing a defamation,
 3     a libel, and I don't know if he has a privilege, so I
 4     can't --
 5          MR. CAMARGO: Can we go off the record?
 6          (Off the record at 5:22 p.m.)
 7          (Back on the record at 5:22 p.m.)
 8          MR. WARREN: I will instruct him not answer.
 9          MR. CAMARGO: Perfect.
10          MR. WARREN: I'm instructing the witness not
11     to answer. He can't identify whoever this person is
12     without necessarily walking himself into a defamation
13     claim. I'm sorry.
14          MR. CAMARGO: Okay, that's it. Thank you.
15     We'll deal with that. We've got another motion. We
16     have to be there anyway on another matter. Perfect.
17  BY MR. CAMARGO:
18  Q. What was the last written agreement between you and
19     Mr. Guzall?
20  A. Shareholder agreement or minutes.
21  Q. What was the last agreement between you?
22  A. Define agreement. That's why I asked you. Are you
23     talking about the shareholder agreement? To me that's
24     the shareholder agreement.
25  Q. All right. Did you, in fact, sign --
```

Page 236

```
 1          (Off the record at 5:23 p.m.)
 2          (Back on the record at 5:24 p.m.)
 3  A. What's the question?
 4  BY MR. CAMARGO:
 5  Q. I'm referring you to your Complaint which under
 6     Exhibit B you attached or your firm attached.
 7  A. My attorneys.
 8  Q. Your attorneys attached minutes. Excuse me. I
 9     apologize. Minutes of meeting of shareholders and
10     directors of Barry A. Seifman a/k/a Seifman & Guzall,
11     P.C., held July 18th, 2010. Keep flipping. This is
12     part of Exhibit 1. Or A. Excuse me. Is that it? I
13     believe that's it.
14          MR. WARREN: Don't know. Yeah.
15          MR. CAMARGO: Okay.
16  BY MR. CAMARGO:
17  Q. This is a document that purports to be the minutes of
18     a meeting between shareholders; correct?
19  A. Yes, sir.
20  Q. This document is signed by yourself as a director;
21     correct?
22  A. Yep.
23  Q. This document is signed by yourself as a shareholder;
24     correct?
25  A. Yes.
```

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN    )

3                         ) SS

4    COUNTY OF WAYNE      )

5

6                 I, JOANNE SMITH, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20

21            *Joanne Smith*

22            JOANNE SMITH, CSR-3099,

23            Notary Public,

24            Wayne County, Michigan

25   My Commission expires: 1-24-17