# EXHIBIT 13

# SEIFMAN, P.C., ET AL v. GUZALL, III, ET AL

## ANDREA MCANALLY

October 17, 2012

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

Page 1

```
 1              STATE OF MICHIGAN
 2      IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
 3
 4   BARRY A. SEIFMAN, P.C., a Michigan
 5   Professional Corporation F/K/A
 6   SEIFMAN & GUZALL, P.C., SEIFMAN &
 7   ASSOCIATES, P.C. and The Law Advocate,
 8   and BARRY A. SEIFMAN,
 9            Plaintiffs,
10   vs.              Case No. 2012-125053-CZ
11                    Hon. James M. Alexander
12   RAYMOND GUZALL, III, an individual,
13   and THE LAW OFFICES OF RAYMOND GUZALL,
14   III, P.C., a Michigan Professional
15   Corporation, jointly and severally,
16            Defendants.
17
18
19        The Deposition of ANDREA McANALLY,
20     Taken at 30665 Northwestern Highway, Suite 200,
21     Farmington Hills, Michigan,
22     Commencing at 1:11 p.m.,
23     Wednesday, October 17th, 2012,
24     Before Joanne Smith, CSR-3099.
25
```

Page 2

```
 1   APPEARANCES:
 2   DAVID W. WARREN
 3   Joelson Rosenberg Moss Cohen Warren & Drasnin, PLC
 4   30665 Northwestern Highway, Suite 200
 5   Farmington Hills, Michigan 48334
 6   248.855.2233
 7       Appearing on behalf of the Plaintiffs/
 8       Counter-Defendants.
 9
10   NICOLAS CAMARGO
11   Fedor Camargo & Weston, PLC
12   401 S. Old Woodward Avenue, Suite 410
13   Birmingham, Michigan 48009
14   248.822.7160
15       Appearing on behalf of the Defendants/
16       Counter-Plaintiffs.
17
18   RAYMOND GUZALL, III
19   Law Offices of Raymond Guzall III, PC
20   31555 W. Fourteen Mile Road, Suite 320
21   Farmington Hills, Michigan 48334
22   248.702.6122
23       Appearing on behalf of the Defendants/
24       Counter-Plaintiffs.
25
```

Page 3

```
 1                TABLE OF CONTENTS
 2
 3   Witness                              Page
 4   ANDREA McANALLY
 5
 6   EXAMINATION
 7   BY MR. CAMARGO:........................... 5
 8   EXAMINATION
 9   BY MR. WARREN:........................... 89
10   EXAMINATION
11   BY MR. CAMARGO:.......................... 91
12   EXAMINATION
13   BY MR. WARREN:........................... 94
14
15                  EXHIBITS
16   EXHIBIT                              Page
17   (Exhibits Attached to Transcript.)
18
19   DEPOSITION EXHIBIT 1...................... 39
20   DEPOSITION EXHIBIT 2...................... 39
21   DEPOSITION EXHIBIT 3...................... 39
22   DEPOSITION EXHIBIT 4...................... 39
23   DEPOSITION EXHIBIT 5...................... 39
24   DEPOSITION EXHIBIT 6...................... 39
25   DEPOSITION EXHIBIT 7...................... 39
```

Page 4

```
 1   DEPOSITION EXHIBIT 8...................... 39
 2   DEPOSITION EXHIBIT 9...................... 39
 3   DEPOSITION EXHIBIT 10..................... 39
 4   DEPOSITION EXHIBIT 11..................... 39
 5
```

Page 5

1  Farmington Hills, Michigan
2  Wednesday, October 17th, 2012
3  1:11 p.m.
4
5           ANDREA McANALLY,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10           EXAMINATION
11 BY MR. CAMARGO:
12  Q.  Would you please state your name for the record?
13  A.  Andrea McAnally.
14  Q.  Miss McAnally, are you currently employed?
15  A.  I am.
16  Q.  Where are you employed?
17  A.  Law Offices of Barry A. Seifman.
18  Q.  How long have you been there?
19  A.  Eleven years.
20  Q.  What's your current position?
21  A.  Legal assistant, office manager.
22  Q.  You do a little bit of everything there?
23  A.  What I'm told.
24  Q.  Okay. How long have you known Barry Seifman?
25  A.  For maybe 15 years. He knows my mother.

Page 6

1  Q.  Okay. And is that how you came to know him?
2  A.  Yes.
3  Q.  How did you come to — Well, let me ask you this
4     first: How long have you been employed with Mr.
5     Seifman's firm?
6  A.  Eleven years.
7  Q.  How did you come to become employed with the firm?
8  A.  I was working at a firm, then gave my notice, and he
9     was looking for somebody and I interviewed and got the
10    job.
11 Q.  Did you give your notice with the understanding that
12    you were going to take the position with Mr. Seifman
13    or had you already given your notice and this just
14    came up?
15 A.  I have to think how that happened. I didn't give my
16    notice until I had secured the position with Mr.
17    Seifman.
18 Q.  And you said that you were introduced to him by way of
19    your mother; is that correct?
20 A.  That's correct.
21 Q.  Your mother's name is?
22 A.  Beverly McAnally.
23 Q.  She at the time was serving in an official capacity
24    for the City of Romulus; am I correct?
25 A.  Yes.

Page 7

1  Q.  What was that capacity?
2  A.  Mayor.
3  Q.  Do you know how long she was mayor?
4  A.  Six years.
5  Q.  Were those the only six years that she was mayor?
6  A.  Yes.
7  Q.  I mean — Okay. I guess I should have specified which
8     of those six years. Do you remember approximately
9     when those six years were?
10 A.  No. I wasn't in the state for much of it.
11 Q.  Where were you living?
12 A.  California.
13 Q.  Whereabouts?
14 A.  Los Angeles for a while and Orange County for a while.
15 Q.  Okay. We talked very briefly about your duties and
16    you kind of said you do whatever you're asked. Do you
17    have any specific duties that you do there?
18 A.  I manage the firm checking account, I order supplies,
19    I share responsibilities for the phones. I
20    transcribe.
21 Q.  When you say type, transcribe —
22 A.  Dictation.
23 Q.  Pleadings, dictation, letters, et cetera?
24 A.  Yes. E-filings.
25 Q.  You weren't kidding when you said a little bit of

Page 8

1  everything; right?
2  A.  Pretty much.
3  Q.  When you say that you do the phones, is that answering
4     the phones?
5  A.  Yes.
6  Q.  Do you also have contact with clients regarding any
7     questions they may have?
8  A.  Sometimes, but I defer to Mr. Seifman.
9  Q.  How about with respect to supplies? I know you said
10    you manage the supplies. What does that entail?
11 A.  Well, paper, office supplies. Paper clips, staples,
12    the like.
13 Q.  And so that I understand, your firm or Mr. Seifman's
14    firm, I should say, the firm that you work at, it's
15    actually in this building; is that right?
16 A.  Yes.
17 Q.  The actual address is?
18 A.  Suite 255, 30665 Northwestern Highway.
19 Q.  Great. And in that office, is it solely Mr. Seifman
20    and people associated with his firm that occupy the
21    office?
22 A.  Yes.
23 Q.  So — and the reason I say —
24 A.  There are two attorneys in of counsel capacity.
25 Q.  Perfect. Thank you so much. There are no other

Page 37

1   please scan in the exhibits for both of the deps and
2   if you can e-mail them to me?
3       MR. CAMARGO: I'll be happy to. We'll do
4   that today.
5   BY MR. CAMARGO:
6   Q.  You said one of the things you saw, for example, was
7   prescriptions. Is that right?
8   A.  Yes.
9   Q.  Can you describe that a little more?
10  A.  Well, he would just write prescription, RX is what he
11      did, and write the amounts, but not specifics.
12  Q.  And then you would enter that into QuickBooks?
13  A.  Yes.
14  Q.  Under an expense or expenditure?
15  A.  Under prescriptions. Personal.
16  Q.  Prescriptions personal?
17  A.  Yeah.
18  Q.  Is that what the category --
19  A.  It's under medical insurance prescriptions, yes.
20  Q.  Okay. Were you aware that he also paid some, that he
21      paid medical bills of his in addition to
22      prescriptions?
23  A.  I don't remember seeing anything set out as medical
24      bills.
25  Q.  Were you aware that he paid dental bills of himself or

Page 38

1   his wife?
2   A.  Yes.
3   Q.  How would you come to have that knowledge?
4   A.  Only when a check to the dentist would cross my desk.
5       Which it sometimes did and sometimes didn't.
6   Q.  What do you mean by sometimes did, sometimes didn't?
7   A.  Well, sometimes he mails out his own bills.
8   Q.  Okay. So sometimes he would give it to you and say,
9       "Hey, I need this mailed out"?
10  A.  Uh-huh.
11  Q.  And sometimes you just wouldn't even see it other than
12      the notation telling you how to mark it as an expense?
13  A.  But I don't believe I ever saw a dentist bill coming
14      out of the firm's checking account.
15  Q.  How long had you had the management duties over
16      managing the checking account?
17  A.  Oh, goodness. After Foster and Paliti moved out, it
18      fell to me.
19  Q.  Why don't you tell us when that would have been?
20  A.  That was in 2002 or -- Yeah, 2002.
21  Q.  So, since 2002, you had been balancing and managing
22      the checking account?
23  A.  Yes.
24  Q.  When you say Foster and Paliti in your answer just two
25      answers ago, you were referring to the accounting firm

Page 39

1   that you earlier referred to?
2   A.  Yes.
3       MR. WARREN: Can we take a two-minute
4   break?
5       MR. CAMARGO: Yes.
6       (Off the record at 1:50 p.m.)
7       MARKED FOR IDENTIFICATION:
8       DEPOSITION EXHIBITS 1-11
9       1:53 p.m.
10      (Back on the record at 1:53 p.m.)
11  BY MR. CAMARGO:
12  Q.  All right, ma'am. I am showing you what's been marked
13      as Exhibit 1. I'm giving you what's been marked as
14      Exhibit 1. It's two separate documents. Do you
15      recognize either of those documents?
16  A.  No.
17  Q.  Okay. I'm going to mark the second one, if I can, as
18      -- actually I'll just do 2. Take it easy. It will
19      be fine. Do you recognize those documents at all?
20  A.  No. I don't.
21  Q.  If those were -- Well, let me ask you, on Exhibit 1,
22      Exhibit 1 has what appears to be a receipt, then a
23      computer little credit card or charge card receipt,
24      and then at the bottom a check; is that correct?
25  A.  Yes.

Page 40

1   Q.  Focusing your attention on the check down at the
2       bottom, do you recognize not that specific check but
3       the type of check that that was drawn on or written
4       on?
5   A.  It would help to see the account number at the bottom
6       of the check, but it looks like it's one of ours.
7   Q.  If a check like that was used to pay dental bills or
8       any other types of bills, again, your testimony today
9       is you would not necessarily see it come across your
10      desk?
11  A.  Correct.
12  Q.  It might get sent out by Mr. Selfman directly; is that
13      correct?
14  A.  Yes.
15  Q.  Would you always receive, to the best of your
16      knowledge, however, some sort of indication that it
17      was paid out?
18  A.  Not for something like this, no.
19  Q.  So how would you be able to balance the checking
20      account, the checking account if you were completely
21      unaware that, for example, a check in the amount of
22      $88 was issued?
23  A.  I would have it noted as payee is Capital One and the
24      check number and the date.
25  Q.  Okay.

Page 41

1   A.   But --
2   Q.   How would you know that payee was Capital One, again
3        if it didn't come across your desk? I'm sorry if I
4        made that confusing. Maybe we can start over. If it
5        came across your desk to mail out, then you would have
6        access to the check; correct?
7   A.   Yes.
8   Q.   If it didn't come across your desk, which you
9        testified happens from time to time, your testimony
10       was generally you would receive something from Mr.
11       Selfman, telling you that a check had been paid out;
12       correct?
13  A.   Most of the time, yes, for something like this.
14  Q.   If you didn't receive or have any knowledge of it, how
15       would you have been able to balance the checking
16       account?
17  A.   I would have to look at the bank statement and check
18       the checks by number and amounts against what I had in
19       QuickBooks.
20  Q.   When you said you would have to check the checks,
21       would you, would you -- How would you go about
22       checking the checks?
23  A.   From the bank statement. It has the check numbers and
24       the amount. It doesn't necessarily have the payees.
25  Q.   Correct. Would you then cross-verify that with a copy

Page 42

1        of the check?
2   A.   If I had one, yes.
3   Q.   If you didn't have one, how would you know how to
4        attribute it or characterize it or categorize it in
5        QuickBooks?
6   A.   I would ask Barry or get the register.
7   Q.   So, hypothetically, let's say Barry doesn't give you
8        any information about a check that's been paid out and
9        you notice, hey, we're off by $88. Oh, is it check
10       9289? You would go ask Barry, "What's this for? I
11       can't figure it out"?
12  A.   Yes. Or I'd check the register.
13  Q.   So with respect to 1, you've never seen that before
14       then?
15  A.   I don't recall seeing that.
16  Q.   You don't have any specific recollection at this time?
17  A.   I don't.
18  Q.   How about with respect to Exhibit 2?
19            MR. WARREN: She's already answered. Go
20       ahead.
21  A.   No.
22  BY MR. CAMARGO:
23  Q.   With respect to both -- actually, with respect to
24       Exhibit 2, there's handwriting on that. Do you
25       recognize that handwriting at all?

Page 43

1   A.   Oh, yes.
2   Q.   How do you recognize that?
3   A.   That's Barry's handwriting.
4   Q.   Are you familiar with that handwriting?
5   A.   Very.
6   Q.   Appears to say PD, then CK, then the number 7913,
7        something scratched and then 1-10-08. Do you make --
8        Does that signify anything to you?
9   A.   That's the check number he paid and when he paid it.
10  Q.   Would something like this come across your desk so
11       that you would know what he paid?
12  A.   No, I would have to get that off the register.
13  Q.   Okay. I'm going to show you what's a two-page
14       document that I've marked as Exhibit 3. Do you have
15       any specific recollection of that document or can you
16       recognize it in any way, shape or form?
17  A.   I do.
18  Q.   Okay. Tell me about it. What is it?
19  A.   It is a cable/internet bill.
20  Q.   Okay. Is that something that regularly came across
21       your desk?
22  A.   It -- Yes.
23            MR. WARREN: You mean something like that,
24       not that particular document; right?
25  BY MR. CAMARGO:

Page 44

1   Q.   Did cable/internet bills regularly come across your
2        desk such as the one that you have before you?
3   A.   Yes.
4   Q.   How did they come across your desk?
5   A.   He, Barry, would have a checked attached to the bill
6        and an envelope for me to mail out.
7   Q.   Did that happen every month?
8   A.   Most.
9   Q.   In the months that it didn't happen, did you ever ask
10       him whether he needed to pay or anything?
11  A.   No.
12  Q.   Were there times where it didn't happen; in other
13       words, you didn't receive a check to mail out and yet
14       you would notice it on the account?
15  A.   Yeah.
16  Q.   How often did you notice it on the corporation's
17       checking account?
18  A.   It was monthly.
19  Q.   Okay. One last question regarding Exhibit 3. That
20       internet slash cable bill was not for the firm's
21       internet or cable; correct?
22  A.   No.
23  Q.   Was there a separate internet or cable bill that the
24       firm had?
25  A.   Yes.

Page 45

1  Q.  What was your understanding of what those bills were
2     for?
3  A.  Exhibit 3?
4  Q.  Yes.
5  A.  That was his home.
6  Q.  So it would have been -- Your understanding would be
7     it was his home internet and/or cable bill?
8  A.  Yes.
9  Q.  Thank you. I'm showing you what's been marked as
10    Exhibit 4. Do you recognize that document?
11 A.  Not that particular one, but I've seen documents like
12    it.
13 Q.  So you don't have any specific recollection as to the
14    monthly statement for April 29th through May 28th,
15    2011 as indicated in Exhibit 4; correct?
16 A.  That's right.
17 Q.  But you have seen monthly statements that are similar
18    to this; is that correct?
19 A.  Yes.
20 Q.  How would you come about seeing those?
21 A.  Well, usually these he would mail out but I would have
22    them on the check register.
23 Q.  When you say that you would have them on the check
24    register, in other words, you would find out about
25    them when you were reviewing the monthly account

Page 46

1     statement?
2  A.  Well, I have to input the checks into a facsimile
3     check in QuickBooks and so if I find myself off in the
4     sequence, I would have to go get the register, and say
5     okay, when did he pay that, and that's how I would get
6     the information.
7  Q.  That makes sense. So there might be a time where
8     let's say you paid out checks number one and two for
9     the IT guy and for something else; correct? Barry
10    gives you a check for number three for something he
11    paid, correct, and then the next check you have is
12    number five so you're wondering where did number four
13    go; correct?
14 A.  Yes.
15 Q.  And then you would check the check register?
16 A.  Correct.
17 Q.  And you had seen checks for AT & T in the check
18    register?
19 A.  Yes.
20 Q.  What would you enter those checks in under in
21    QuickBooks?
22 A.  Well, there's a category for telephones.
23 Q.  Did you enter those under the category for telephones?
24 A.  Yes.
25 Q.  How about going back to internet and cable, where did

Page 47

1     you enter those?
2  A.  That was -- Let's see. What is that? I'm trying to
3     remember. I think there's a category for cable/
4     internet service.
5  Q.  Okay. Again, there's some handwriting on there. Do
6     you recognize that to be Barry's again?
7  A.  Yes.
8  Q.  And it means the same thing to you that the last one
9     did, that a check was paid on that date?
10 A.  Correct.
11 Q.  You can flip that one over. I'm going to show you
12    what's marked as Exhibit Number 5. Have you ever seen
13    that document specifically or any document like that?
14 A.  I have not.
15 Q.  On the right corner there is again some writing. Is
16    that again Barry's writing?
17 A.  Yes, it is.
18 Q.  Reviewing this document -- I know you've never seen it
19    before or don't have any specific recollection of
20    that. Would you agree with me it appears to be a bill
21    for the Detroit Jewish News?
22 A.  Yes.
23 Q.  Directly at the office, did the office ever receive
24    the Detroit Jewish News?
25 A.  No.

Page 48

1  Q.  Did you ever see entries for news publications such as
2     the Detroit Jewish News when going through the check
3     register or balancing the account?
4  A.  Sometimes.
5  Q.  How would you classify or characterize those in
6     QuickBooks?
7  A.  Those would be dues and subscriptions, is the
8     category.
9  Q.  How often did you see those come across?
10 A.  Not very often.
11 Q.  Do you recall specifically the Detroit Jewish News,
12    not this particular bill, but that coming across?
13 A.  No.
14 Q.  What publications, if any, do you recall specifically?
15 A.  Lawyers Weekly, and once or twice the Free Press.
16 Q.  Thank you.
17       MR. WARREN: Done.
18 BY MR. CAMARGO:
19 Q.  Flip that one over. I'm showing you what's been marked
20    as Exhibit 6. Have you ever seen that document
21    before?
22 A.  No.
23 Q.  Do you recognize the handwriting on that document at
24    all?
25 A.  Yes.

13-53846-tjt   Doc 11642-3   Filed 10/26/16   Entered 10/26/16 15:41:45   Page 7 of 44

Page 49

1   Q.  Does the document, any part of it, make any sense to
2       you?
3           MR. WARREN: I'll object to the form of the
4       question. Do you want to rephrase it?
5           MR. CAMARGO: Okay.
6   BY MR. CAMARGO:
7   Q.  Do you specifically see the name Marcia Selfman on
8       that document?
9   A.  Yes.
10   Q.  Do you also specifically see a 2010 wages column?
11   A.  Yes.
12   Q.  Do you see where it says $20,000 in wages for Marcia
13       Selfman?
14   A.  Yes.
15   Q.  Did you know that Marcia Selfman was receiving wages
16       from the firm?
17   A.  Yes.
18   Q.  Did you write the checks or authorize a payroll
19       company to write checks for her?
20   A.  I did not.
21   Q.  Okay. How did you know that she was being paid then?
22   A.  Well, the payroll company calls to get the payroll and
23       one time, you know, they asked me employee by employee
24       what the payroll is. Now, with regard to Barry, I
25       would just say what he usually gets, and with Ray,

Page 50

1       when he was here, I would say what Ray usually gets.
2       I was not privy to nor authorized to give out specific
3       amounts there.
4   Q.  Okay.
5   A.  So one time she asked and Marcia, and --
6   Q.  Were you surprised when she asked and Marcia?
7   A.  I was.
8   Q.  Why were you surprised?
9   A.  It was the first time she included Marcia in the
10       payroll.
11   Q.  Do you know how long Marcia had been paid?
12   A.  It's been a couple years. I think it was probably --
13       I don't recall the exact time, but --
14   Q.  Okay. Do you know today -- and if the answer is no, I
15       don't know, that's fine -- do you know today whether
16       or not Marcia was paid every year that you were there?
17   A.  No, she was not paid every year that I was there.
18   Q.  So you do know that she was not paid every year that
19       you were there?
20   A.  That's correct.
21   Q.  How do you know that?
22   A.  Well, when I was -- When I was handling the payroll,
23       it was -- She was not included in it. They wouldn't
24       call and ask me what Marcia was going to get paid.
25   Q.  When did you start handling the payroll?

Page 51

1   A.  Well, that happened -- When did that start? About --
2       I want to say six years ago, but I'm not certain.
3   Q.  Okay. When did you stop doing the payroll?
4   A.  I haven't.
5   Q.  All right. So --
6   A.  Paychex calls me and I just give them --
7   Q.  What years do you recall Paychex requesting or
8       identifying a salary for Marcia Selfman?
9   A.  Less than five years. I don't know exactly.
10   Q.  Would it be less than five continuous years?
11   A.  Yes.
12   Q.  Is that still the case today?
13   A.  Yes.
14           MR. WARREN: Is -- I'm sorry.
15           MR. CAMARGO: I'll rephrase the question.
16           MR. WARREN: Thank you.
17           MR. CAMARGO: To make it a little more
18       clear.
19           MR. WARREN: This is just between us. Go
20       ahead.
21   BY MR. CAMARGO:
22   Q.  Is that still the case, and by that I mean, are there
23       still -- Is there still a salary being paid to Marcia
24       Selfman as of today?
25   A.  Yes.

Page 52

1   Q.  So it would, to the best of your recollection or idea,
2       she has been paid a salary for somewhere less than the
3       last five continuous years?
4   A.  Yes.
5   Q.  And that's an approximation?
6   A.  Yes.
7   Q.  Okay. The first time you learned she had been paid a
8       salary was that first time you received one of those
9       phone calls?
10   A.  Yes.
11   Q.  And that's when you would have been surprised;
12       correct?
13   A.  Well, I told them she's not -- This is the first I've
14       heard she's working.
15   Q.  In fact, it would have been surprising to you because
16       you didn't really see her around the office; correct?
17   A.  No.
18   Q.  Well, why would it have been surprising?
19   A.  No, it would not --
20   Q.  I'm sorry. It may have been a poorly asked question.
21       Part of the reason it was surprising to you was
22       because you didn't see her on a day-to-day basis
23       working in the office?
24   A.  Correct.
25   Q.  Did you think there was anything wrong with that or

## Page 89

1  BY MR. CAMARGO:
2  Q.  Did you have any knowledge that Miss Krampitz was
3      abusing prescription drugs?
4  A.  No.
5      MR. CAMARGO:  I have nothing else then from
6      a question standpoint today.
7          EXAMINATION
8  BY MR. WARREN:
9  Q.  Andrea, did you know that Ray became a shareholder of
10     the Seifman firm?
11 A.  Yes.
12 Q.  Okay.  Do you know when he became a shareholder?
13 A.  Here it goes to times.
14 Q.  If you don't remember, it's okay.
15 A.  No, I don't.
16 Q.  During the entire time that Ray worked at your office,
17     did he ever ask you to see the QuickBooks records?
18 A.  No.
19 Q.  Did he ever ask you to print them out?
20 A.  No.
21 Q.  Did he ever ask you to give him a copy or to look at
22     Excel spreadsheets?
23 A.  No.  Only where it applied to his specific client when
24     we're settling a case.
25 Q.  But did he ever express any interest to you about the

## Page 90

1      financial dealings of the law firm?
2  A.  No.
3  Q.  You told us that there's a file, you kept a file I
4      think you said with credit card statements in a filing
5      cabinet?
6  A.  Yes.
7  Q.  Where's the credit — filing cabinet?  Where's the
8      filing cabinet?
9  A.  It's in the office.  It's in the room where the copier
10     is.
11 Q.  All right.  Was that credit card file in that filing
12     cabinet when Mr. Guzall was still at the firm?
13 A.  Yes.
14 Q.  Is that filing cabinet locked up?
15 A.  No.
16 Q.  Do you know where Mr. Seifman keeps the check
17     registers for the accounts?
18 A.  Yes.
19 Q.  Where does he keep them?
20 A.  At his desk.
21 Q.  Do you know if they're locked up?
22 A.  No, they're not.
23 Q.  In your presence, did you ever see Mr. Guzall or
24     observe Mr. Guzall make any request of anybody at the
25     Seifman firm to review any of the financial records of

## Page 91

1      the firm?
2  A.  No.
3      MR. CAMARGO:  Do you have anything else?
4      MR. WARREN:  I need to take a minute.
5      MR. CAMARGO:  Okay.
6      MR. WARREN:  No.  Thank you.
7          EXAMINATION
8  BY MR. CAMARGO:
9  Q.  All right.  Just a couple questions.  You said you
10     knew, there came a point where you knew that Marcia
11     Seifman was being paid a salary?
12 A.  Yes.
13 Q.  And you just testified that you knew there came a
14     point where Ray Guzall was made a shareholder?
15 A.  Yes.
16 Q.  Did you know the intricacies of his becoming a
17     shareholder, how much of an interest he had in the
18     company or anything like that?
19 A.  No.
20 Q.  Do you know whether he was an equal partner or just a
21     partial partner or a member, or shareholder, I should
22     say?
23 A.  I think he had percentage interest, but I don't know
24     for sure.  This was between him and Barry.
25 Q.  So you wouldn't know what percentage that interest

## Page 92

1      would be?
2  A.  No.
3  Q.  When you discovered that Mrs. Seifman was receiving a
4      salary, did you tell Ray Guzall about that?
5  A.  No.
6  Q.  Why not?
7  A.  Not my call.  Why would I?
8  Q.  Well, I'm asking you, other than not your call, is
9      that your answer?
10 A.  Well, it just wasn't about him.
11 Q.  Okay.  Did you tell Ray Guzall about any of the
12     personal items such as cable or internet —
13 A.  No.
14 Q.  — that were being paid?
15     MR. WARREN:  You have to let him finish the
16     question.
17 A.  I'm sorry.  No.
18 BY MR. CAMARGO:
19 Q.  Did you ever pay with corporate checks for Mr.
20     Guzall's internet or cable?
21 A.  No.
22 Q.  Did you ever pay for his phone bill?
23 A.  No.
24     MR. WARREN:  Wait.  I'm sorry.  You realize
25     you are assuming a fact that is not in evidence.  She

Page 93

1  never paid anything. The testimony is that the checks
2  were written by Mr. Selfman, so perhaps you'd like to
3  correct your question.
4  MR. CAMARGO: Sure.
5  BY MR. CAMARGO:
6  Q. Did you ever receive any checks from Mr. Selfman or
7  see any corporate checks that were used to pay for Mr.
8  Guzall's internet or cable?
9  A. No.
10 Q. Did you ever see, have knowledge of or review any
11 corporate checks that were used to pay for his phone
12 bill?
13 A. No.
14 Q. How about dental bills?
15 A. No.
16 Q. Prescriptions for Mr. Guzall?
17 A. No.
18 Q. Did you ever see car payments for Mr. Guzall?
19 A. Yes.
20 Q. At a certain point there come a time when some car
21 payments were being made for Mr. Guzall; correct?
22 A. Yes.
23 Q. How about for Mr. Selfman?
24 A. At any point in time?
25 Q. There were times when there was; is that correct?

Page 94

1  A. Yes.
2  Q. And there were times when there weren't car payments?
3  A. Yes.
4  Q. Did you see any gym memberships paid for Mr. Guzall?
5  A. No.
6  Q. Did you see any of these items we've gone through paid
7  for Mr. Guzall?
8  A. No.
9  MR. CAMARGO: I don't have anything else.
10 EXAMINATION
11 BY MR. WARREN:
12 Q. Before Mr. -- I'm sorry. When you started maintaining
13 -- You know what, never mind. Thank you very much.
14 A. Okay.
15 MR. CAMARGO: Thank you.
16 MR. GUZALL: Thank you, Andrea.
17 (The deposition was concluded at 3:04 p.m.
18 Signature of the witness was not requested by
19 counsel for the respective parties hereto.)
20
21
22
23
24
25

Page 95

1  CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3  ) SS
4  COUNTY OF WAYNE )
5
6  I, JOANNE SMITH, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing questions
9  and answers were recorded by me stenographically and
10 reduced to computer transcription; that this is a
11 true, full and correct transcript of my stenographic
12 notes so taken; and that I am not related to, nor of
13 counsel to, either party nor interested in the event
14 of this cause.
15
16
17
18
19
20
21
22 JOANNE SMITH, CSR-3099,
23 Notary Public,
24 Wayne County, Michigan
25 My Commission expires: 1-24-17

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

# EXHIBIT 14

5133130
ROOT CANAL SPECIALIST
31620 SCHOOLCRAFT
LIVONIA, MI 48150
734-261-7800

TERMINAL ID:                    881

MASTERCARD
************4284
SALE
BATCH: 000009    INV: 000010
DATE: Mar 29, 10    TIME: 11:47

AUTH:09095Z

TOTAL            $88.00

THANK YOU FOR
YOUR BUSINESS!

CUSTOMER COPY

# RECEIPT

Page 1 of 1

Root Canal Specialty Assoc
31620 Schoolcraft Rd.
Livonia, MI 48150-8150
(734) 261-7800

nt #: L058324)

| Patient Information | | Account Balance: | $28.00 | |
|---|---|---|---|---|
| Home: (248) 661- | | Patient: | $0.00 | Estimated |
| Business: (245) 217- | | Insurance: | $28.00 | Balance |

Next Recall: None Scheduled
Next Appt: None

Guarantor: Marcia Seifman

| | | | Visit Detail | | | | | Estimated | |
|---|---|---|---|---|---|---|---|---|---|
| Date | Code | Service | Th | Quad | Surfaces | Charges | Credits | Patient | Insurance |
| 03/29/2010 | D0140 | LIMITED ORAL EVALUATION E | | | | $88.00 | $88.00 | $0.00 | $0.00 |
| 03/29/2010 | D0220 | PERIAPICAL SINGLE FILM | 14 | | | $28.00 | $0.00 | $0.00 | $28.00 |
| | | | | | | $116.00 | $88.00 | $0.00 | $28.00 |

| | | | Summary | |
|---|---|---|---|---|
| Previous Balance | $0.00 | by: Master Card | | |
| Charges | $116.00 | Notes | | Credit/Debit Sale Information |
| Payments | $88.00 | Your insurance carrier has paid less than | Merchant #: | Date: |
| Adjustments | $0.00 | we anticipated due to what they consider Usual Customary, therefore, the balance | Term. #:: | Time: |
| Current Balance | $28.00 | remaining is your resposibility. | Card #: | |
| Personal Balance | $0.00 | | Trans. #: | |
| | | | Auth. #: | |
| | | | Name: | |

SEIFMAN & GUZALL, P.C.
PH: 248-538-0711
30665 NORTHWESTERN HWY., SUITE 255
FARMINGTON HILLS, MI 48334

9280

DATE

PAY
TO THE
ORDER OF

DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
Detroit, Michigan 48226
www.Chase.com

| DATE | DESCRIPTION | PATIENT'S NAME | CHARGES | CREDITS |
|---|---|---|---|---|
| | Balance Forward | | 77.20 | |
| 11/07/2007 | | | | |
| 11/08/2007 | Crown-full cast high noble mtl | MARCIA | 849.00 | |
| 12/13/2007 | Dental Ins Pmt-(11/29/2007)-GUARDIAN | MARCIA | | -412.00 |
| 11/12/2007 | Payment by Mail-Thank You Ch.# 7798 | MARCIA | | -77.20 |
| 11/29/2007 | SEAT CROWN | MARCIA | 0.00 | |

\* Indicates that Dental Insurance has been billed.

Regular monthly payments are necessary to keep your account current.

| PRIOR BALANCE | CURRENT CREDITS | CURRENT CHARGES | NEW BALANCE |
|---|---|---|---|
| 77.20 | -489.20 | 849.00 | 437.00 |

HAPPY NEW YEAR! PLEASE PAY BY JANUARY 21, 2008.   THANK YOU.

PLEASE PAY
THIS AMOUNT

| 437.00 |
|---|

©DENTRIX 1987-2005     DLSTM 4

Mack Family Dentistry - 27855 Plymouth Rd
Livonia, MI 48150 (734)261-5100

Citi® Platinum Select® / AAdvantage® Account

**Account Activity**
Jun 16 - Jul 15, 2011

New Balance:
**$40.00**

Minimum Payment Due:
**$20.00**

Payment Due Date:
**08/13/2011**

Payment must be received by 5:00 PM local time on the payment due date.

Late Payment Warning: If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35 and your APRs may be increased up to the variable Penalty APR of 29.99%.

For information about credit counseling services, call 1-877-337-9197.

You get the great rate with these checks!
No matter how you use them.

You can use the checks on the last page of this statement to pay other creditors, or make a check payable to yourself to use the money any way you choose.

You can also pay other creditors online at balancetransfer.citicards.com or by calling us at 1-866-765-4186.

CITI

©2011 Citibank (South Dakota), N.A. Citi and Citi with Arc Design are registered service marks of Citigroup, Inc.

www.citicards.com
Account Member
BARRY A SELFMAN
Member Since 2001

Account Number
4965

| Summary of Account Activity | |
|---|---|
| Previous Balance | $229.68 |
| Payments | $229.68 |
| Other Credits | $0.00 |
| Purchases | +$40.00 |
| Cash Advances | +$0.00 |
| Fees Charged | +$0.00 |
| Interest Charged | +$0.00 |
| New Balance | $40.00 |
| Past Due Amount | $0.00 |
| Amt Over Rev Cr LL | $0.00 |
| Revolving Credit Limit | $36,300 |
| Avail. Revolving Credit | $36,260 |
| Cash Advance Limit | $21,800 |
| Available Cash Limit | $21,800 |
| Statement/Closing Date | 07/15/2011 |
| Days in Billing Cycle | 30 |

How To Reach Us
www.aa.com
1-888-766-CITI (2484)

Customer Service
BOX 6500
SIOUX FALLS, SD
57117

American Airlines AAdvantage® Miles

EARN 2 AAADVANTAGE MILES FOR EACH ELIGIBLE $1 YOU SPEND. 40
See The American Airlines AAdvantage Miles Update Section in this statement.

**Payments, Credits and Adjustments**

| Sale | Post | Description | Amount |
|---|---|---|---|
| | 06/29 | PAYMENT THANK YOU | -229.68 |

**Standard Purchases**

| Sale | Post | Description | Amount |
|---|---|---|---|
| 06/07 | 06/07 | PLANET FITNESS 248-9874800 MI | 0.00 |
| 07/03 | 07/04 | CLAVENNA VISION BIRMINGHAM MI | 30.00 |

**Fees**

| Sale | Post | Description | Amount |
|---|---|---|---|
| | | TOTAL FEES FOR THIS PERIOD | 0.00 |

**Interest Charged**

| Sale | Post | Description | Amount |
|---|---|---|---|
| | | TOTAL INTEREST FOR THIS PERIOD | 0.00 |

| 2011 Totals Year-to-Date | |
|---|---|
| Total Fees charged in 2011 | $0.00 |
| Total Interest charged in 2011 | $0.00 |

American Airlines, AAdvantage, AAdvantage with Scissor Eagle Design and Scissor Eagle Design are marks of American Airlines, Inc.

NNNN-NNNN-NNNN-NYYY

## Citi® Platinum Select® / AAdvantage® Account

**Account Activity**
Mar 16–Apr 15, 2011

Account Number
1 4966

New Balance:
$147,756

Minimum Payment Due:
$29.00

Payment Due Date:
05/13/2011

**Late Payment Warning:** If we do not receive your minimum payment by the date listed above, you may have to pay a late fee of up to $35 and your APRs may be increased up to the variable Penalty APR of 29.99%.

For information about credit counseling services, call 1-877-337-8187.

### Summary of Account Activity

Previous Balance ... $243.32
Payments ... $243.32
Other Credits ... $0.00
Purchases ... $147.56
Cash Advances ... $0.00
Fees Charged ... $0.00
Interest Charged ... $0.00
New Balance ... $147.56
Past Due Amount ... $0.00
Credit Limit ... $17,500
Available Credit ... $17,352
Amount Over Credit Limit ... $0.00

OK 9935
4/21/11

### Your card comes with built-in benefits which provide you extra value and security.

- **Citi Identity Theft Solutions:** If you suspect identity theft, Citi is there to help you reclaim your identity and reestablish your credit - even if it's not your Citi account that was affected.
- **$0 Liability for Unauthorized Charges:** With Citi's $0 liability policy, you won't pay for any unauthorized charges on your account.
- **Car Rental Insurance:** You're automatically covered when you reserve and rent a covered vehicle with your Citi Card, so you can save money by declining the car rental company's collision, loss/damage waiver.

©2010 Citibank (South Dakota), N.A. Citi and Citi with Arc Design are registered service marks of Citigroup Inc.

citi

BGR00g01D

1 of 4

---

citi

How To Reach Us
1-888-766-CITI(2484)

Customer Service
BOX 6500
SIOUX FALLS, SD
57117

Account Member
BARRY A SEIFMAN

Member Since 2001

### American Airlines AAdvantage® Miles

www.aa.com

### Payments, Credits and Adjustments

| Sale | Post | Description | Amount |
|------|------|-------------|--------|
| | 03/27 | PAYMENT THANK YOU | -243.32 |

### Standard Purchases

| Sale | Post | Description | | Amount |
|------|------|-------------|--|--------|
| 03/17 | 03/17 | PLANET FITNESS | 248-9874800 MI | 10.00 |
| 03/23 | 03/23 | CVS PHARMACY #8044 003 FARMINGTON HI MI | | 15.58 |
| 03/28 | 03/28 | CAFE RENDEZVOUS - OPS FARMINGTON HI MI | | 23.15 |
| 04/01 | 04/01 | CANCER CENTER PHARMACY ANN ARBOR MI | | 30.00 |
| 04/02 | 04/02 | OUTPATIENT PHARMACY #1 ANN ARBOR MI | | 47.53 |
| 04/09 | 04/09 | CVS PHARMACY #8044 003 FARMINGTON HI MI | | 21.30 |

### Fees

| Sale | Post | Description | Amount |
|------|------|-------------|--------|
| | | TOTAL FEES FOR THIS PERIOD | 0.00 |

### Interest Charged

| Sale | Post | Description | Amount |
|------|------|-------------|--------|
| | | TOTAL INTEREST FOR THIS PERIOD | 0.00 |

**2011 Totals Year-to-Date**

| Total fees charged in 2011 | $0.00 |
|----------------------------|-------|
| Total interest charged in 2011 | $0.00 |

AmericanAirlines, AAdvantage, AAdvantage with Scissor Eagle Design and Scissor Eagle Design are marks of American Airlines, Inc.



**bright house**
NETWORKS

#0000480
BRIGHT HOUSE NETWORKS'
14525 FARMINGTON RD LIVONIA MICH 48154-5405
8981 9900 BH RP '11 03122009 YNNNNY.

MARCIA SEIFMAN
30069 HIGH VALLEY RD
FARMINGTON HILLS MI 48331-2144

# Statement of Account

How To Reach Us...
248/553-7300 M-TH8:30-7 FRI 8:30-6
SAT 9-2. 24HR SERVICE 248/553-7307
24HR INTERNET SERVICE 1-866-233-7233

*ck $610
3/7/09*

## Account Summary

PAYMENTS RECEIVED after 03/11/09 are not included on this statement

| | |
|---|---|
| Previous Statement Balance | $ 149.94 |
| Payment(s) | -149.94 |
| Current Monthly Service(s) | -144.65 |
| Other Charge(s), Taxes & Fee(s) | -6.67 |
| Balance Due | $ 151.32 |
| Payment Due Date | 03/31/09 |

Please see reverse side for account details.

## For Your Information

BRIGHT HOUSE NETWORKS MAKES THE DIGITAL TV TRANSITION EASY: As long as
you're a Bright House Networks customer and all of your household TV's are plugged in our
cable lines, you are ready for the transition to digital TV in June 2009. So sit back, relax, and
enjoy your favorite programming brought to you by Bright House Networks!



On Time Performance is hard to find. At Bright House Networks it is guaranteed! If we fail to arrive for a scheduled
appointment on time, you will receive a $20.00 credit.



MARCIA SEIFMAN
Statement Date:
Account Number:

Page 2 of 3
March 11, 2009
_117757

## Account Detail

This statement is for services from 03/22/09 through 04/21/09.

| | | |
|---|---|---|
| Previous Statement Balance | | $149.94 |

**Payment(s)**

| | | |
|---|---|---|
| 03/02 | Payment - Thank You | -149.94 |
| | Subtotal | -149.94 |

**Current Monthly Service(s)**

| | | |
|---|---|---|
| 03/22 - 04/21 | High Definition/DVR | 13.90 |
| | Your Package Includes: High Definition Tier And Digital Video Recorder | |
| 03/22 - 04/21 | Digital HBO | 12.00 |
| 03/22 - 04/21 | Dig Add'l Eqpt/serv | 9.00 |
| | Your Services Include: Tier, Interactive Guide, Digital Equipment $6.95 | |
| 03/22 - 04/21 | Digital Equipment | 6.95 |
| 03/22 - 04/21 | Cable Card | 2.95 |
| 03/22 - 04/21 | Cable Card | 2.95 |
| 03/22 - 04/21 | Digital Add'l Tier | .00 |
| 03/22 - 04/21 | Digital Add'l Tier | .00 |
| 03/22 - 04/21 | Digital Combo | 95.90 |
| | Your Package Includes: Basic Channels 2-84, Tier, Interactive Guide And High Speed Internet | |
| | Subtotal | 144.65 |

**Other Charge(s), Taxes & Fee(s)**

| | | |
|---|---|---|
| 03/11 | Franchise Fee | 5.57 |
| 03/11 | FCC User Fee | .07 |
| 03/11 | PEG Fee | 1.03 |
| | Subtotal | 6.67 |

| | | |
|---|---|---|
| Balance Due | | $151.32 |

Your Franchising Authority is Swccc 22900 Nine Mile Road, Farmington, MI 48336 248/473-2800. The Swccc Office Is Not Responsible For Billing OR Service Questions. Please Direct All Inquiries To Bright House Networks At The Phone Numbers On The Statement.

BARRY A SEIFMAN.
30069 HIGH VALLEY RD
FARMINGTN HLS, MI 48331-2144

Page 1 of 3
Account Number 248 661
Billing Date May 28, 2011

Web Site att.com



# Monthly Statement
### Apr 29 - May 28, 2011

## Bill-At-A-Glance

| | |
|---|---|
| Previous Bill | 71.93 |
| Payment Received 5-11 - Thank You! | 71.93CR |
| Adjustments | .00 |
| Balance | .00 |
| Current Charges | 71.97 |
| **Total Amount Due** | **$71.97** |
| Amount Due in Full by | Jun 18, 2011 |

## Billing Summary

Billing Questions? Visit att.com/billing

| | |
|---|---|
| Plans and Services<br>1-800-288-2020 | 65.88 |
| Other AT&T Long Distance<br>1-800-288-2020 | 6.09 |
| **Total of Current Charges** | **71.97** |

## AT&T Benefits

· Thank you for being an AT&T customer, featuring savings from:
 · AT&T Michigan  · AT&T Long Distance

## Plans and Services

| Monthly Service - May 28 thru Jun 27 | |
|---|---|
| Combined Communications Svcs | 52.00 |
| ALL DISTANCE® | |
| by AT&T Michigan | |
| Call Plan Unlimited | |
| Caller Identification | |
| Calling Name Display | |
| Three-Way Calling | |
| Automatic Callback | |
| Call Forwarding | |
| Selective Call Screening | |
| Call Waiting | |
| Privacy Manager | |
| Speed Calling | |
| Call Waiting ID | |
| LINE-BACKER® | |
| Unltd Nationwd Clg Advantage 1 | |
| by AT&T Long Distance | |
| Federal Access Charge | 5.34 |
| Total Monthly Service | 57.34 |

| Surcharges and Other Fees | |
|---|---|
| 9-1-1 Emergency System | |
| Billing for more than one city/counties | .29 |
| Emergency 9-1-1 Operational Assessment | |
| Billing for more than one city/counties | .23 |
| Michigan State E911 | .19 |
| Federal Universal Service Fee | 2.43 |
| Carrier Cost Recovery Fee (Long Dist) | 1.99 |
| Total Surcharges and Other Fees | 5.13 |

| Taxes | |
|---|---|
| State at 6% | 3.41 |
| Total Plans and Services | 65.88 |

## News You Can Use Summary

- PREVENT DISCONNECT
- PAYMENT OPTIONS
- ELECTRONIC PAYMENTS
- WIN A DREAM VACATION
- PHONE WITH USABILITY
- CARRIER INFO
- MI STATE ACCESS FUND
- SERVICE INFORMATION
- CUSTOMER SUPPORT
- CALL BEFORE YOU DIG!

See "News You Can Use" for additional information.



BARRY A SEIFMAN
30069 HIGH VALLEY RD
FARMINGTN HLS, MI 48331-2144

Page 2 of 3
Account Number 248 661-
Billing Date May 28, 2011

Total Other AT&T Long Distance 6.09

## AT&T Long Distance

Thank you for subscribing to ALL DISTANCE® service with unlimited domestic long distance provided by AT&T Long Distance ($18.00 of the total ALL DISTANCE® service package price is Unltd Nationwd Clg Advantage 1, the domestic direct dial long distance service, not including taxes and surcharges). ALL DISTANCE® service call detail and any other AT&T Long Distance charges will be listed below. Any usage not previously billed may appear within the details below.

Message Regarding Terms & Conditions:
To view your Terms & Conditions for AT&T Long Distance, access www.att.com/servicepublications or call 1-888-225-5550 to have a copy mailed.

Invoice Summary
(as of May      13, 2011)

Current Charges
Service Charges                        5.00
Credits and Adjustments                 .00
Call Charges                            .00
Surcharges and Other Fees               .75
Taxes                                   .34
Total Invoice Summary                  6.09

Service Charges

Monthly Service Charges

| Type of Service | Period | Qty | |
|---|---|---|---|
| 1. Unlimited Call Ad 1 | 05/11-06/10 | 1 | .00 |
| 2. Worldwide Value Call | 05/11-06/10 | 1 | 5.00 |
| Total Monthly Service Charges | | | 5.00 |

Total Service Charges                  5.00

Call Charges - Apr 11th thru May 10th
Domestic Usage Summary                Amount
Calls for 248-661-2752
Domestic Minutes Used          160
Number of Calls                 46
Total Domestic Direct Dial Charges     .00
To obtain a copy of previous call detail for up to 24 months at no charge, contact AT&T Long Distance customer service at the number listed in the Billing Summary section on page 1.

Surcharges and Other Fees
3. Fed Universal Service Fund          .75
Total Surcharges and Other Fees        .75

Taxes
4. Federal                             .00
5. State                               .34
6. Municipal                           .00
7. Non Bona State                      .00
Total Taxes                            .34

Total Invoice Charges                  6.09

## News You Can Use

PREVENT DISCONNECT
Thank you for being a valued customer. It is important to inform you that all charges must be paid each month to keep your account current and prevent collection activities. In addition, please be aware that we are required to inform you of certain charges that MUST be paid in order to prevent interruption of basic local service. These charges are already included in the Total Amount Due and are $20.00.

CARRIER INFO
AT&T Long Distance, or a company that resells their service, is your long distance and local toll carrier.

PAYMENT OPTIONS
Visit att.com to pay your AT&T bills online FREE of charge. Additional payment options can also be viewed online. Self-service is available anytime day or night by calling 1.800.288.2020 - just say "Pay My Bill". Payments made with an AT&T representative may be subject to a $5.00 payment convenience fee.

MI STATE ACCESS FUND
Effective 7/1/2011, AT&T will begin to assess the Michigan (MI) State Access Fund surcharge on intrastate charges to recover AT&T's required contribution to this fund. The charge will appear as MI State Access Fund under the Surcharges and Other Fees section of your bill. For more information please contact us at 1.800.288.2020.

ELECTRONIC PAYMENTS
When making a secure electronic bill payment from your bank account over the phone, you will need to provide sufficient information to authenticate yourself as the account owner. By providing this information, you are authorizing AT&T and your financial institution to process a one-time debit from your bank account for payment of your bill. Other bill payment options are available at www.att.com.

SERVICE INFORMATION
Your local services are provided by AT&T Michigan (Michigan Bell Telephone Company). Your AT&T long distance services, if any, are provided by one or more of the following AT&T Inc. subsidiaries: AT&T Long Distance (SBC Long Distance, LLC), AT&T Communications of Michigan, Inc., and/or AT&T Corp. You can find the name of your long distance service provider in the long distance section of your bill. To view your provider's service publications, including Guidebooks, Service Guides and/or Tariffs, go to att.com/servicepublications.

WIN A DREAM VACATION
Save time with AT&T Paperless Billing and get 100 bonus entries for your chance to win a $15,000 vacation or cash! No purchase necessary. Contest ends 6/30/2011. Visit att.com/wintrip for official contest rules.

```
BILLING DATE:      06/09/2008
ACCOUNT NUMBER:    0017473
RENEWAL FOR:
```

MARCIA SEIFMAN
30069 HIGH VALLEY RD
FARMINGTON, MI  48331-2144

AMOUNT PAID: $140.00

CHECK NUMBER: _____

CREDIT CARD: _____

Your subscription is up for renewal. As you can see
we have many price discounts available.

Please take a moment to renew your subscription
today. The Detroit Jewish News thanks you for your
loyalty and we look forward to continuing to serve you
52 weeks a year.

*pd ck.*
*f.20V*

KEEP THIS PORTION FOR YOUR RECORDS

JEWISH RENAISSANCE MEDIA

# Premium Due Notice

**ABE**
AMERICAN BAR ENDOWMENT

If payment is not received within 31 days of due date, coverage will lapse.

P.O. Box 6160
Carol Stream, IL 60197-6160
1-800-621-8981· www.abendowment.org

CERTIFICATE HOLDER ID:   00928516

BARRY A. SEIFMAN
30069 HIGH VALLEY
FARMINGTON HILLS MI 48331

BUS. PH. NO: (248)538-0711
DUE DATE: August 01, 2008
INSURED: BARRY A. SEIFMAN

### IMPORTANT MESSAGE

DEAR INSURED MEMBER:
THANK YOU FOR YOUR SUPPORT AND
PARTICIPATION IN THE ABE INSURANCE PLAN(S)
DESCRIBED BELOW.  IT IS ONLY BECAUSE OF
MEMBERS SUCH AS YOU THAT THE ENDOWMENT IS
ABLE TO PROVIDE FUNDING FOR HUNDREDS OF
RESEARCH AND EDUCATIONAL PROJECTS IN THE
FIELD OF LAW.  IN ORDER TO MAINTAIN THIS
IMPORTANT INSURANCE COVERAGE,  PLEASE PAY
THIS BILL BY THE DUE DATE.
RENEE Z. LESKIW, EXECUTIVE DIRECTOR

| Program | Coverage | Mode* | Premium Payment Period | Premium |
|---|---|---|---|---|
| DISABILITY  MEMBER | $5,980 | Q | 08/01/2008 - 10/31/2008 | $316.11 |

* A=Annual  S=Semiannual  Q=Quarterly

| | |
|---|---|
| Total | $316.11 |
| Credit/Debit | $0.00 |
| Amount Due | $316.11 |

00928516

QUESTIONS? CALL YOUR PERSONAL ENDOWMENT REPRESENTATIVE
TOLL FREE: 1-800-621-8981

Please see reverse side for important dividend information.

# Premium Due Notice

If payment is not received within 31 days of due date, coverage will lapse.

 

P.O. Box 6160
Carol Stream, IL 60197-6160
1-800-621-8981• www.abendowment.org

---

CERTIFICATE HOLDER ID:  00928516

BARRY A. SEIFMAN
30069 HIGH VALLEY
FARMINGTON HILLS MI 48331

BILL NO: 9996677747
BUS. PH. NO: (248) 538-0711
DUE DATE:  August 01, 2011

INSURED:  BARRY A. SEIFMAN

## IMPORTANT MESSAGE

DEAR INSURED MEMBER:
THANK YOU FOR YOUR SUPPORT AND
PARTICIPATION IN THE ABE INSURANCE
PLAN(S) DESCRIBED BELOW.  IT IS ONLY
BECAUSE OF MEMBERS SUCH AS YOU THAT THE
ENDOWMENT IS ABLE TO PROVIDE FUNDING FOR
HUNDREDS OF RESEARCH AND EDUCATIONAL
PROJECTS IN THE FIELD OF LAW.  IN ORDER
TO MAINTAIN THIS IMPORTANT INSURANCE
COVERAGE,  PLEASE PAY THIS BILL BY THE
DUE DATE.
RENEE Z. LESKIW, EXECUTIVE DIRECTOR

---

| | Program | | Coverage | Mode* | Premium Payment Period | Premium |
|---|---|---|---|---|---|---|
| DISABILITY | MEMBER | 90 DAY | $5,000 /MO | Q | 08/01/2011 - 10/31/2011 | $316.11 |

C̶ 100.77
7/6/11

*A=Annual  S=Semiannual  Q=Quarterly

| | |
|---|---|
| Total | $316.11 |
| Credit/Debit | $0.00 |
| Amount Due | $316.11 |

00928516

QUESTIONS? CALL YOUR PERSONAL ENDOWMENT REPRESENTATIVE
TOLL FREE:  1-800-621-8981

Please see reverse side for
important dividend information.

# BILLING STATEMENT

 

For customer service, please call Toyota Financial Services at (800) 874-8822, or visit us online at www.toyotafinancial.com.

Uf 925 19
3/17/10

## Thank you for the opportunity to serve your financing needs.

| | |
|---|---|
| Statement Date | 3/12/2010 |
| Account Number | 030 6087710 |

You are near the end of your finance contract with Toyota Financial Services. We hope your experience with us has been satisfying. When shopping for your next Toyota, ask your dealer about return customer benefits for TFS customers.

### SUMMARY OF CHARGES

| | |
|---|---|
| Past Due Payment Amount | $0.00 |
| Unpaid Late Charges | $0.00 |
| Miscellaneous Charges | $0.00 |
| Current Payment Due | $628.10 |
| | |
| Total Amount Due | $628.10 |
| Payment Due Date | 3/29/2010 |

### ACCOUNT INFORMATION

| | |
|---|---|
| Regular Payment Amount | $628.10 |
| Last Transaction Amount | $628.10 |
| Date of Last Transaction | 2/24/2010 |
| Monthly Payments Made | 44 |
| Maturity Date | 6/29/2010 |
| Outstanding Balance* | $2,424.50 |

*Outstanding Balance is not your payoff amount. To obtain your payoff amount and payoff instructions, please visit us online at www.toyotafinancial.com or contact Toyota Financial Services at (800) 874-8822.

Please refer to the back of this statement for important information on negative credit reporting, check processing and the specially designated address when sending any communication regarding disputed payoffs.



IMPORTANT: To ensure timely delivery, please detach this portion and mail in the enclosed envelope with your payment.
Make check or money order payable to Toyota Financial Services. Include your account number and name on the front of your check or money order.



# BILLING STATEMENT



For customer service, please call Toyota Financial Services at (800) 874-8822, or visit us online at www.toyotafinancial.com.



*C R 8952*
*9/19/09*

## CAMRY

Commonly chosen.
Uncommonly engineered.

**32 MPG**
Highway Est.*

| | |
|---|---|
| Statement Date | 9/11/2009 |
| Account Number | 030 6087710 |

### SUMMARY OF CHARGES

| | |
|---|---|
| Past Due Payment Amount | $0.00 |
| Unpaid Late Charges | $0.00 |
| Miscellaneous Charges | $0.00 |
| Current Payment Due | $628.10 |
| | |
| Total Amount Due | $628.10 |
| Payment Due Date | 9/29/2009 |

### ACCOUNT INFORMATION

| | |
|---|---|
| Regular Payment Amount | $628.10 |
| Last Transaction Amount | $628.10 |
| Date of Last Transaction | 8/22/2009 |
| Monthly Payments Made | 38 |
| Maturity Date | 6/29/2010 |
| Outstanding Balance* | $6,015.47 |

*Outstanding Balance is not your payoff amount. To obtain your payoff amount and payoff instructions, please visit us online at www.toyotafinancial.com or contact Toyota Financial Services at (800) 874-8822.

Please refer to the back of this statement for important information on negative credit reporting, check processing and the specially designated address when sending any communication regarding disputed payoffs.



Hybrid models available.
Vehicle shown with options.
*2009 EPA estimates. 4 cylinder models. Actual mileage will vary.

VISIT YOUR
LOCAL TOYOTA
DEALER FOR A TEST DRIVE.

buyatoyota.com

TOYOTA
moving forward

IMPORTANT: To ensure timely delivery, please detach this portion and mail in the enclosed envelope with your payment.
Make check or money order payable to Toyota Financial Services. Include your account number and name on the front of your check or money order.



| VISIT | DESCRIPTION | BEGIN-DATE | END-DATE | CHG/PMT/ADJ | INS PENDING | PATIENT AMT |
|---|---|---|---|---|---|---|
| | HOSPITAL MONTHLY STATEMENT OF ACTIVITY | | | | | |
| 1049 | OUTPT HOSP SERVICES   02/18/11 | | | | 4552.30 | 0.00 |
| | WE HAVE BILLED THE FOLLOWING INSURANCE(S) | | | | | |
| | BLUE PREFERRED | 02/18/11 - 02/18/11 | | | | |
| | | | VISIT TOTAL | | 4552.30 | 0.00 |
| 1367 | INPT HOSP SERVICES   01/29/11 | | 01/31/11 | | 14068.65 | 0.00 |
| | 02/15/11 BLUE CROSS MISC INS PAYMENT | | | 8353.20- | | |
| | BLUE PREFERRED | | SERVICE ON 01/29/11 | | | |
| | 02/15/11 BLUE CROSS CONTR INS ADJ | | | 5420.49- | | |
| | BLUE PREFERRED | | SERVICE ON 01/29/11 | | | |
| | | | VISIT TOTAL | | 0.00 | 294.96 |

CK 9879
3/18/11

FOR QUESTIONS REGARDING YOUR BALANCE CALL 800-992-9475
M-F, FROM 8:30AM-4:15PM; OR 888-843-8037 M-F,
FROM 4:15PM-8PM, AND 9:00AM-6PM ON SATURDAY.

PLEASE PAY BALANCE IN FULL
UPON RECEIPT OF THIS STATEMENT

| | |
|---|---|
| BALANCE LAST STATEMENT | 30952.13 |
| NEW CHARGES/ADJMTS | 0.00 |
| PATIENT PYMTS/ADJMTS | 523.01- |
| INSURANCE PYMTS/ADJMTS | 22971.44- |
| BALANCE THIS STATEMENT | 7457.68 |
| INSURANCE PENDING | 7077.30 |
| PLEASE PAY THIS AMOUNT | 380.38 |



| PATIENT NAME | CPI NO. | STMT DATE | PAGE | UNIVERSITY OF MICHIGAN HOSPITALS & HEALTH CENTERS |
|---|---|---|---|---|
| SEIFMAN, MARCIA S | 0408847 | 02/11/11 | 01 | 1500 E MEDICAL CENTER DRIVE  ANN ARBOR MI 48109-0060 |

| VISIT | DESCRIPTION | BEGIN-DATE | END-DATE | CHG/PMT/ADJ | INS PENDING | PATIENT AMT |
|---|---|---|---|---|---|---|
| | HOSPITAL MONTHLY STATEMENT OF ACTIVITY | | | | | |
| 0367 | INPT HOSP SERVICES | 12/15/10 | 12/28/10 | | 76398.86 | 0.00 |
| | 01/18/11 BLUE CROSS MISC INS PAYMENT | | | 19792.17- | | |
| | BLUE PREFERRED | SERVICE ON 12/15/10 | | | | |
| | 01/18/11 BLUE CROSS CONTR INS ADJ | | | 56606.69- | | |
| | BLUE PREFERRED | SERVICE ON 12/15/10 | | | | |
| | 01/25/11 BLUE CROSS MISC INS PAYMENT | | | 0.00 | | |
| | BLUE PREFERRED | SERVICE ON 12/15/10 | | | | |
| | 01/25/11 BLUE CROSS LATE CHG INS ADJUST | | | 129.00- | | |
| | BLUE PREFERRED | SERVICE ON 12/15/10 | | | | |
| | NEW CHARGES SINCE LAST STATEMENT | | | 129.00 | | |
| | | VISIT TOTAL | | | 0.00 | 0.00 |
| 1005 | OUTPT HOSP SERVICES | 01/07/11 | | | 3803.60 | 0.00 |
| | 02/01/11 BLUE CROSS MISC INS PAYMENT | | | 1408.70- | | |
| | BLUE PREFERRED | SERVICE ON 01/07/11 | | | | |
| | 02/01/11 BLUE CROSS CONTR INS ADJ | | | 2042.73- | | |
| | BLUE PREFERRED | SERVICE ON 01/07/11 | | | | |
| | | VISIT TOTAL | | | 0.00 | 352.17 |
| 1011 | OUTPT HOSP SERVICES | 01/11/11 | | | 909.00 | 0.00 |
| | 02/08/11 BLUE CROSS MISC INS PAYMENT | | | 341.68- | | |
| | BLUE PREFERRED | SERVICE ON 01/11/11 | | | | |
| | 02/08/11 BLUE CROSS CONTR INS ADJ | | | 481.90- | | |
| | BLUE PREFERRED | SERVICE ON 01/11/11 | | | | |
| | | VISIT TOTAL | | | 0.00 | 85.42 |
| 1013 | OUTPT HOSP SERVICES | 01/13/11 | | | 909.00 | 0.00 |
| | 02/08/11 BLUE CROSS MISC INS PAYMENT | | | 341.68- | | |
| | BLUE PREFERRED | SERVICE ON 01/13/11 | | | | |
| | 02/08/11 BLUE CROSS CONTR INS ADJ | | | 481.90- | | |
| | BLUE PREFERRED | SERVICE ON 01/13/11 | | | | |
| | | VISIT TOTAL | | | 0.00 | 85.42 |

FEDERAL TAX I.D. 386006309W         SEE REVERSE SIDE FOR IMPORTANT INFORMATION

00804  REV 4/03

FOR QUESTIONS REGARDING YOUR BALANCE CALL 800-992-9475
M-F, FROM 8:30AM-4:15PM; OR 888-843-8037 M-F,
FROM 4:15PM-8PM, AND 9:00AM-6PM ON SATURDAY.

PLEASE PAY BALANCE IN FULL
UPON RECEIPT OF THIS STATEMENT

| | |
|---|---|
| BALANCE LAST STATEMENT | 96869.11 |
| NEW CHARGES/ADJMTS | 258.00- |
| PATIENT PYMTS/ADJMTS | 0.00 |
| INSURANCE PYMTS/ADJMTS | 81626.45 |
| BALANCE THIS STATEMENT | 15500.66 |
| INSURANCE PENDING | 14977.65 |
| PLEASE PAY THIS AMOUNT | 523 |

| DATE | PATIENT | DESCRIPTION | ACCOUNT ACTIVITY | |
|------|---------|-------------|------------------|---|
| | | | INSURANCE | PATIENT |
| 08/03/10 | MARIA | PREVIOUS BALANCE | | 0.00 |
| 08/05/10 | MARIA | TRANSFER INS BALANCE TO PATIENT | | 40.00 |
| | | 02/19/2010 99202 OFF VISIT, I - $40.00 Co-payment | | |
| 08/05/10 | MARIA | TRANSFER INS BALANCE TO PATIENT | | 40.00 |
| | | 02/26/2010 99212 OFF VISIT, S - $40.00 Co-payment | | |
| 09/23/10 | MARIA | TRANSFER INS BALANCE TO PATIENT | | 40.00 |
| | | 03/26/2010 99213 OFF VISIT, S - $40.00 Co-payment | | |
| 10/20/10 | MARIA | TRANSFER INS BALANCE TO PATIENT | | 40.00 |
| | | 05/05/2010 99212 OFF VISIT, S - $40.00 Co-payment | | |

#9671
11/3/10

BALANCE 160.00

DRS. GROSS & FOREMAN. QUESTIONS? CALL 248-646-6882

| 0-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91-120 DAYS | 120+ DAYS |
|-----------|------------|------------|-------------|-----------|
| 40.00 | 40.00 | 80.00 | 0.00 | 0.00 |

MAKE CHECKS
PAYABLE TO:

ARNOLD S. GROSS, DPM, P.C.

REORDER: Genius Solutions 586-751-9080 GS100-LN1P

| IT/ DESCRIPTION | BEGIN-DATE | END-DATE | CHG/PMT/ADJ | INS PENDING | PATIENT AMT |
|---|---|---|---|---|---|

### HOSPITAL MONTHLY STATEMENT OF ACTIVITY

| | | | | |
|---|---|---|---|---|
| 57 INPT HOSP SERVICES 12/15/10 12/28/10 | | 76398.86 | 0.00 |
| 01/18/11 BLUE CROSS MISC INS PAYMENT | 19792.17- | | |
| BLUE PREFERRED SERVICE ON 12/15/10 | | | |
| 01/18/11 BLUE CROSS CONTR INS ADJ | 56606.69- | | |
| BLUE PREFERRED SERVICE ON 12/15/10 | | | |
| 01/25/11 BLUE CROSS MISC INS PAYMENT | 0.00 | | |
| BLUE PREFERRED SERVICE ON 12/15/10 | | | |
| 01/25/11 BLUE CROSS LATE CHG INS ADJUST | 129.00- | | |
| BLUE PREFERRED SERVICE ON 12/15/10 | | | |
| NEW CHARGES SINCE LAST STATEMENT | 129.00 | | |
| VISIT TOTAL | | 0.00 | 0.00 |
| | | | |
| 05 OUTPT HOSP SERVICES 01/07/11 | | 3803.60 | 0.00 |
| 02/01/11 BLUE CROSS MISC INS PAYMENT | 1408.70- | | |
| BLUE PREFERRED SERVICE ON 01/07/11 | | | |
| 02/01/11 BLUE CROSS CONTR INS ADJ | 2042.73- | | |
| BLUE PREFERRED SERVICE ON 01/07/11 | | | |
| VISIT TOTAL | | 0.00 | 352.17 |
| | | | |
| 11 OUTPT HOSP SERVICES 01/11/11 | | 909.00 | 0.00 |
| 02/08/11 BLUE CROSS MISC INS PAYMENT | 341.68- | | |
| BLUE PREFERRED SERVICE ON 01/11/11 | | | |
| 02/08/11 BLUE CROSS CONTR INS ADJ | 481.90- | | |
| BLUE PREFERRED SERVICE ON 01/11/11 | | | |
| VISIT TOTAL | | 0.00 | 85.42 |
| | | | |
| 13 OUTPT HOSP SERVICES 01/13/11 | | 909.00 | 0.00 |
| 02/08/11 BLUE CROSS MISC INS PAYMENT | 341.68- | | |
| BLUE PREFERRED SERVICE ON 01/13/11 | | | |
| 02/08/11 BLUE CROSS CONTR INS ADJ | 481.90- | | |
| BLUE PREFERRED SERVICE ON 01/13/11 | | | |
| VISIT TOTAL | | 0.00 | 85.42 |

4 REV. 4/03    FEDERAL TAX I.D. 386006309W    SEE REVERSE SIDE FOR IMPORTANT INFORMATION

OR QUESTIONS REGARDING YOUR BALANCE CALL 800-992-9475
F FROM 8:30AM-4:15PM; OR 888-843-8037 M-F,
OM 4:15PM-8PM; AND 9:00AM-6PM ON SATURDAY.

EAS E PAY BALANCE IN FULL
ON RECEIPT OF THIS STATEMENT

| | |
|---|---|
| BALANCE LAST STATEMENT | 96869.11 |
| NEW CHARGES/ADJMTS | 258.00 |
| PATIENT PYMTS/ADJMTS | 0.00 |
| INSURANCE PYMTS/ADJMTS | 81626.45 |
| BALANCE THIS STATEMENT | 15500.66 |
| INSURANCE PENDING | 14977.65 |

PLEASE PAY THIS AMOUNT    523.01

13-53846-tjt   Doc 11642-3   Filed 10/26/16   Entered 10/26/16 15:41:45   Page 28 of 44

# EXHIBIT 15

## MINUTES OF MEETING OF SHAREHOLDERS
## AND DIRECTORS OF BARRY A. SEIFMAN, P.C.
## AKA SEIFMAN & GUZALL, P.C. HELD JANUARY 25, 2008

This matter having come before the Board, historically a one-man corporation, and it being recognized that the Minutes have been taking place orally for many years, but having gotten behind in memorializing them in writing.

Upon motion duly made, waiver of any and all notices that occur for the meeting was ratified.

Upon motion duly made, seconded and carried, all actions taken by Barry A. Seifman historically prior to date are ratified, and he shall be indemnified for any and all acts taken by him where it appears he was performing such acts in his judgment for the betterment of the Corporation.

It was further discussed that there was a stockholder transaction that took place. Such stockholder agreement allows for Raymond Guzall III to be a member of the Corporation, in recognition of his history of good faith service to the Corporation. Such shareholder agreement is hereby duly moved, seconded, ratified and incorporated herein as an attachment, and to be effective August 1, 2006.

It was further seconded and carried that the Board of Directors shall continue to be Barry A. Seifman.

It was further moved, seconded and carried that the officers of the Corporation shall be the various roles of Barry A. Seifman filling where necessary the roles of President, Vice President, Treasurer and Secretary and Marcia Seifman serving as Assistant Secretary in the event of emergencies.

It was further moved, seconded and carried, that Barry A. Seifman shall continue to make all economic decisions for the Corporation, including salaries, and shall keep Raymond Guzall III informed.

It was further, moved, seconded and carried that Barry A. Seifman shall use his discretion in opening up new bank accounts for the continued Corporation in its new d/b/a of Seifman & Guzall, P.C., to sign appropriate

bank documents as he deems the signatory should be.

There being no further business to come before the Board of Directors and Shareholders, the meeting was adjourned.

Date: January 25, 2008

_____
Barry A. Seifman, Director

_____
Barry A. Seifman, Shareholder

_____
Raymond Guzall III, Shareholder

# EXHIBIT 16

2010 PROFIT SHARING PLAN

BARRY A. SEIFMAN P.C.

AGE WEIGHTED PLAN

Prepared By

Approved By

National Brand 45-813 Eye-Ease
J5-313 2 - Pack

| | | 2010 WAGES | PROFIT SHARING 5% | EARNINGS 2010 | 2009 Totals | 2010 Totals |
|---|---|---|---|---|---|---|
| 1 | (2) ✷ ANDREA McANALLY | 42061 00 | 2100 00 | 359 31 | 1477575 | 1721306 |
| 2 | (2) ✷ RAYMOND GUZALL III | 105105 00 | 6150 00 | 866 61 | 5747245 | 4445666 |
| 3 | (2) ✷ SUSAN SMITH | 15315 00 | 766 00 | 6 85 | 264100 | 166783 |
| ✷ | (2) + MARCIE SEIFMAN (SPOUSE) | 40606 00 | 20060 00 | 2256 | 100000 | 2102256 |
| 5 | (1) BARRY A. SEIFMAN | 245000 00 | 50 3568 | 777855 | 33936757 | 33712100 |
| | | | 79191 68 | 90 24 51 | 39943157 | 48105543 |
| 6 | | | | | | |
| 7 | ✷ Each Employee IN Class #2 | | | | | |
| 8 | Receives 5% of Wages | | | | | |
| 9 | Class #1 Receives Balance | | | | | |
| 10 | of Contribution Max 25% | | | | | |
| 11 | | | | | | |
| 12 | ✷ ≠ (Spouse Receives 100% | | | | | |
| 13 | For Profit Sharing) | | | | | |
| 14 | | | | | Earnings | |
| 15 | INVESTMENTS 2010 | | | | | |
| 16 | Class Original Investment | 7500000 | | | | |
| 17 | INT Earned 2010 | 148774 | | | | |
| 18 | Less Accrued Int. | (123002) | | | | |
| 19 | INT. 2% 4½/day 56 days | | | | | |
| 20 | 10-16-10 To 10-12-11 Approx Accrued Int | 23002 | | 148774 | | |
| 21 | | 7648974 | | | | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | FIDELITY 272-887201 | | | | | |
| 25 | Beg. bal 1-01-10 | 2705803 | | | | |
| 26 | Earning 2010 | 4039 | | | | |
| 27 | Contributions 2009 (bal.) | 375517 | | | | |
| 28 | Contrib. 2010 Qualified | 5111 7595 | | | | |
| 29 | ✷ Distributions | (110217 27) | | | | |
| 30 | | 11679052 | | | 40 39 | |
| 31 | | | | | | |

# MONROE AND ASSOCIATES, INC.

Actuarial and Employee Benefit Plan Consultants

25901 West Ten Mile Road, Suite 200
Southfield, Michigan 48033-2857
(248) 354-6220  Fax (248) 354-6287.

February 18, 2011

Mr. Barry Seifman
30665 Northwestern Hwy.
Suite 255
Farmington Hills, MI 48334.

Re:  Profit Sharing Plan Allocations For 2010

Dear Mr. Seifman:

The following allocations pass the general test and related gateway under IRC 401(a)(4) and is fully deductible under IRC 404. Other allocations are possible. This one maximizes you and your wife and minimizes all others.

Allocations are as follows:

|              | Age | Compensation | Allocation 1 |
|--------------|-----|--------------|--------------|
|              |     |              | 90,175.68    |
|              |     |              | ~~$45,000~~  |
| B. Seifman   | 64  | $245,000     |              |
| M. Seifman   | 63  | 20,000       | 20,000       |
| R. Guzall    | 42  | 123,000      | 6,150        |
| A. McInally  | 58  | 42,001       | 2,100        |
| S. Smith     | 26  | 15,313       | 766          |

~~$78,016.~~
79,192.68

Please call if you have any questions.

Sincerely,

Joel K. Letvin, E.A., M.A.A.A.

JKL/lam

cc:  John Selesko

...t any Employees during the plan year not covered by the plan:

| Name | Sex | Date of Birth | Date of Hire | Spouse Date of Birth | Compensation * | Hrs if <1000 |
|---|---|---|---|---|---|---|
| Marcia Seifman | F | 7/3/49 | 1-1-06 | 10-14-46 | $20,016.00 | less than 1000 |

Employees who terminated, retired, died, or became disabled during plan year:

| Name | Date of Termination | Date of Birth | Date of Hire | Spouse Date of Birth | Compensation * | Hrs if <1000 |
|---|---|---|---|---|---|---|
| Deborah Beatty | 8-11-08 | 1-20-62 | 1-30-01 | N/A | N/A | N/A |

Also indicate any change in address, attorney, or accountant:

* Show compensation as amount includable in IRS Form W-2 box (1) paid in the Plan Year.

After Completion Please return to:
Judith Murray
Monroe & Associates, Inc.
25901 West Ten Mile Road, Suite 200
Southfield, Michigan 48033
(248) 354-6220

Completed by (please sign and date)
Phone Number    248 538 0711

2017

Day 49ᵗ

Maria   17253.44
        $863.

Susan Smith  6856.
             $343.

Ray
    ~~120,000~~
     86,000.

Avidan  42012.0ᶠ
        2101.

    ─────────
      58307
     - 9000
    ─────────
     (49307)

fo

2% profit sharing + uk

9.21. → Anders

Ray p~9o

SAS 50,000

401 E 17000

401 K → 55500

Match on $o

Maria on 5000

401 K 5000

Justin

Monroe

<u>CERTIFICATE OF PARTICIPATION</u>

<u>BARRY A. SEIFMAN, P.C. PROFIT SHARING PLAN</u>

TO: MARCIA SEIFMAN

| | |
|---|---|
| Beginning Balance on 01-01-09 | $ 0.00 |
| Contributions for 2009 | 1000.00 |
| Plan earnings for 2007 | 0.00 |
| Balance as of 12-31-09 | $ 1000.00 |
| Non-Forfeitable Percentage | 0% |
| Vested Amount | $ 0.00 |

> In the event of your death, your beneficiary would receive the total accrued benefit at the time of your death without any forfeiture due to vesting.

# EXHIBIT 17

Payrolls by Paychex, Inc.

# PAYROLL JOURNAL

| EMPLOYEE NAME / ID | HOURS, EARNINGS, REIMBURSEMENTS & OTHER PAYMENTS | | | | | WITHHOLDINGS | | DEDUCTIONS | NET PAY, ALLOCATIONS |
|---|---|---|---|---|---|---|---|---|---|
| | DESCRIPTION | RATE | HOURS | EARNINGS | REIMB. & OTHER PAYMENTS | | | | |
| **\* \* 100 STAFF** | | | | | | | | | |
| Guzall III, Raymond 2 | Regular | | | 3,956.34 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 166.25<br>57.39<br>683.92<br>195.40 | | Direct Deposit # 10212   0.00<br>Check Amt<br>Chkg 1503    2,806.20<br>2,806.20 |
| | EMPLOYEE TOTAL | | | 3,956.34 | | | 1,072.14 | | |
| McNally, Andrea 4 | Regular | | | 1,856.45 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 77.22<br>20.90<br>291.80<br>89.97 | Medical  10.00 | Net Pay<br>Direct Deposit #    5    0.00<br>Check Amt<br>Chkg 8400    1,352.80<br>1,352.80 |
| Sellman, Marcia 4 | Regular | | | 1,856.45<br>400.00 | | | 479.89 | | |
| | EMPLOYEE TOTAL | | | 400.00 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 20.16<br>6.96<br>142.21<br>20.08 | | 10.00 Net Pay<br>Readychex #<br>Check Amt  1,352.80<br>600.00<br>417.75 |
| | EMPLOYEE TOTAL | | | 400.00 | | | 62.25 | | |
| **\* \* 200 STAFF** | | | | | | | | | |
| Hampton, Angela S | Regular | 14.0000 | 51.50 | 721.00 | | | | | Net Pay     -417.75 |
| | EMPLOYEE TOTAL | | 51.50 | 721.00 | | Social Security<br>Medicare<br>MI Income Tax | 30.20<br>10.45<br>11.24 | | Direct Deposit # 10214   0.00<br>Check Amt<br>Chkg 6840     669.03<br>669.03 |
| Michaud, Ann M | Regular | 14.0000 | 65.00 | 721.00<br>910.00 | | | 51.97 | | |
| | EMPLOYEE TOTAL | | 65.00 | 910.00 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 38.22<br>13.19<br>57.25<br>39.59 | | Net Pay     669.03<br>Direct Deposit # 10215   0.00<br>Check Amt<br>Chkg 9272     761.75<br>761.75 |
| Sellman, Barry A | Regular | | | 11,000.00 | | | 148.25 | | |
| | EMPLOYEE TOTAL | | | 11,000.00 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 462.00<br>159.50<br>2,556.40<br>478.50 | | Net Pay     761.75<br>Readychex #<br>Check Amt   500.00<br>7,343.00 |
| | COMPANY TOTAL | | 116.50 | 11,000.00 | | | 3,656.40 | | |
| | Regular | | 116.50 | 18,925.79 | | Social Security<br>Medicare<br>Fed Income Tax<br>MI Income Tax | 794.13<br>274.15<br>3,602.72<br>805.66 | Medical  10.00 | Net Pay     7,343.00 |
| | | | 116.50 | 18,925.79 | | | 5,476.66 | 10.00 | Check Amt<br>Dir Dep   7,761.35<br>5,669.70 |

Period Start – End Date   01/16/12 – 01/31/12
Check Date   01/31/12

Net Pay     13,431.13

Payroll Journal
Page 1 of
PYRJRN

# EXHIBIT 18

Barth v. Fieger
Court of Appeals of Michigan. January 22, 2013. Not Reported in N.W.2d (Approx. 4 pages)
2013 WL 238532
Only the Westlaw citation is currently available.

Representing A...

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Georgeanna BARTH and Paul Broschay, Plaintiffs–Appellants,

v.

Geoffrey N. FIEGER, Defendant–Appellee.

and

Northlander Corp., Defendant.

Docket No. 306078.    Jan. 22, 2013.

Oakland Circuit Court; LC No. 10–108864–NO.

Before: STEPHENS, P.J., and OWENS and MURRAY, JJ.

## Opinion

PER CURIAM.

\*1 In this attorney fee lien case, plaintiffs appeal the trial court's award of 90% of the disputed attorney fees to defendant Geoffrey Fieger and 10% to plaintiff Paul Broschay. We reverse and remand.

In February 2010, plaintiff Georgeana Barth was a resident of a hotel owned by defendant Northlander Corporation. There, she was subjected to a brutal sexual assault by an individual who gained access to her room with the help of his friend who worked at the front desk. In March 2010, Barth retained the Fieger firm to represent her claims against Northlander. During the time that plaintiff was represented by the Fieger firm, her case was handled exclusively by defendant Broschay. While employed with the Fieger firm, Broschay claims to have spent approximately 50 hours of time working on plaintiff's file. In May 2011, Broschay left the Fieger firm. Barth discharged the Fieger firm and retained Broschay independently to continue representing her on a contingency fee basis. Plaintiffs claim that Fieger began a "campaign of harassment" of Barth, demanding money and misrepresenting the degree of his personal involvement in her case.

In July 2011, on the eve of trial, Broschay successfully obtained a settlement on Barth's behalf in the underlying lawsuit against Northlander. The trial court entered an order dismissing the matter pursuant to the parties' settlement agreement. Broschay claims to have spent approximately 50 hours of time on Barth's case after the discharge of the Fieger firm. After costs, the attorney fee in this matter was approximately $221,000.

On August 11, 2011, Fieger, as lienholder, filed a motion requesting an award of attorney fees. Fieger asserted that the Fieger firm "substantially performed the entire contingency undertaken in the retention agreement, and on a quantum meruit percentage basis is entitled to an award of a substantial portion (if not all) of the $221,415.82 fee." After hearing arguments, the trial court awarded the Fieger law firm 90% and Broschay 10% of the $221,000 attorney fee. The trial court entered an order consistent with its ruling, and Broschay timely filed this appeal.

We review the decision whether to enforce a lien such as this for an abuse of discretion. *Reynolds v. Polen,* 222 Mich.App 20, 24, 27; 564 NW2d 467 (1997). Plaintiffs first argue that the trial court abused its discretion in failing to consider whether Fieger's alleged misconduct resulted in a forfeiture of the Fieger firm's lien interest. We agree. The trial court failed to address this issue. When counsel brought up the issue at the hearing, the trial court stated, "I'm not going to hold an evidentiary hearing on this ."

"[T]he law creates a lien of an attorney upon the judgment or fund resulting from his services." *Ambrose v. Detroit Edison Co,* 65 Mich.App 484, 487–488; 237 NW2d 520 (1975). If an attorney's employment is prematurely terminated before completing services contracted for

under a contingency fee agreement, the contingency fee agreement no longer operates to determine the attorney's fee and the attorney is entitled to compensation for the reasonable value of his services on the basis of quantum meruit, provided that his discharge was wrongful or his withdrawal was for good cause. *Reynolds,* 222 Mich.App at 27; see also *Plunkett & Cooney, PC v. Capitol Bancorp Ltd,* 212 Mich.App 325, 329–30; 536 NW2d 886 (1995); *Morris v. Detroit,* 189 Mich.App 271, 278; 472 NW2d 43 (1991); *Ecclestone, Moffett & Humphrey, PC v. Ogne, Jinks, Alberts & Stuart, PC,* 177 Mich.App 74, 76; 441 NW2d 7 (1989); *Ambrose,* 65 Mich.App at 488–492. "[A]s long as a discharged attorney does not engage in disciplinable misconduct prejudicial to the client's case or conduct contrary to public policy that would disqualify any quantum meruit award, a trial court should take into consideration the nature of the services rendered by an attorney before his discharge and award attorney fees on a quantum meruit basis." *Reynolds,* 222 Mich.App at 27. However, "quantum meruit recovery of attorney fees is barred when an attorney engages in misconduct that results in representation that falls below the standard required of an attorney (e.g., disciplinable misconduct under the Michigan Rules of Professional Conduct) or when such recovery would otherwise be contrary to public policy." *Id.* at 26.

*2 In their responsive pleadings[1], plaintiffs alleged that Fieger engaged in interference with a known contractual relationship, in direct solicitation, and in misconduct. Additionally, plaintiffs contend that Fieger engaged in ex-parte communication with the client of another attorney (violations of MRPC 4.2 and 7.3(b)(1)-(2)). We conclude that the trial court erred in failing to consider these allegations, which, if proven, could result in a forfeiture of any right to Fieger's lien. On remand, the trial court is instructed to hold a hearing on the issue of whether Fieger's behavior constituted misconduct.

Next, plaintiffs contend that the trial court erred by failing to apply quantum meruit, and by refusing to consider plaintiffs' pleadings, affidavits, and other record evidence in calculating the division of the attorney fee. We agree.

If the trial court concludes that Fieger committed unethical and professional misconduct that resulted in a forfeiture of his firm's lien interest, then the trial court need not engage in a quantum meruit analysis. However, if the trial court does not conclude that Fieger's conduct rose to the level of unethical and professional misconduct, then the court must consider the pleadings, affidavits, and other record evidence in order to apply quantum meruit to the division of the attorney fees.

The phrase "quantum meruit" means " 'as much as deserved.' " *Keywell & Rosenfeld v. Bithell,* 254 Mich.App 300, 359; 657 NW2d 759 (2002) (quoting Black's Law Dictionary (6th ed, 1990), p. 1243). It is "an equitable principle that measures recovery under an implied contract to pay compensation as reasonable value of services rendered." *Id.* at 358 (quotation marks omitted). Black's Law Dictionary defines "quantum meruit" as follows:

[Latin "as much as he has deserved"] (17c) 1. The reasonable value of services; damages awarded in an amount considered reasonable to compensate a person who has rendered services in a quasi-contractual relationship. 2. A claim or right of action for the reasonable value of services rendered. 3. At common law, a count in an assumpsit action to recover payment for services rendered to another person. Quantum meruit is still used today as an equitable remedy to provide restitution for unjust enrichment. It is often pleaded as an alternative claim in a breach-of-contract case so that the plaintiff can recover even if the contract is unenforceable.... [BLACK'S LAW DICTIONARY (6th ed 1990).]

The method by which quantum meruit recovery of attorney fees is determined in Michigan where there exists a contingency fee agreement and the attorney was wrongfully discharged[2] or rightfully withdrew was outlined in *Morris,* 189 Mich.App at 278–279:

We recognize that there is no precise formula for assessing the reasonableness of an attorney's fee. Nevertheless, in *Crawley v. Schick,* 48 Mich.App 728, 737; 211 NW2d 217 (1973), this Court enumerated several nonexclusive factors appropriately considered for such a determination, including:

*3 (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client.

While the trial court should consider these factors, its decision need not be limited to these guidelines. *Wood v. DAIIE,* 413 Mich. 573, 588; 321 NW2d 653 (1992)[, mod by *Smith v. Khouri,* 481 Mich. 519, 522; 751 NW2d 472 (2008) ]; *Smolen v. Dahlmann Apartments, Ltd,* 186 Mich.App 292, 296; 463 NW2d 261 (1990), is believed to be relevant.

also properly consider that the attorney originally agreed to render services on a contingency basis. Such a consideration would allow the court to consider the degree of risk undertaken by an attorney who was prematurely discharged. Accordingly, it would be appropriate for the court to award the attorney a larger fee, provided that the fee was not in excess of that permitted under MCR 8.121.

A trial court may also consider the factors listed in MRPC 1.5(e), which overlap the *Crawley* factors. *Smith,* 481 Mich. at 529. In *Reynolds,* 222 Mich.App at 30, this Court added:

> We believe that a trial court is in the best position to assess an attorney's contribution to a case because trial courts are aware of the strengths and weaknesses of cases before them, the time and effort expended by the attorneys, and changes in the parties' leverage resulting from changes in counsel (e.g., due to attorneys' skill or reputation). We believe that the *Morris* approach to quantum meruit-one compensates an attorney for completed work on the basis of evaluating as closely as possible the actual deal struck between the client and the attorney rather than an assessment of reasonable compensation in the abstract-is also the proper means of evaluating quantum meruit in cases such as the instant one.

Similarly, Michigan Courts have identified the following nonexhaustive list of factors to be considered in determining the reasonable value of fees on the basis of quantum meruit, which are virtually identical to those referenced in *Paolillo:*

> (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [*Morris v. City of Detroit,* 189 Mich.App 271, 279; 472 NW2d 43 (1991) (citing *Crawley v. Schick,* 48 Mich.App 728, 737; 211 NW2d 217 (1973)).]

In reviewing the transcript of the hearing, it is clear that the trial court could not have performed a proper assessment of the quantum meruit in this case when it acknowledged that it had not even read plaintiffs' responsive pleadings. It is unclear from the record exactly how the trial court arrived at its 90/10 award. The court ignored the evidence presented, eschewing plaintiffs' responsive pleadings, and instead relied on its own personal experience:

> *4 Okay. You know, I've done, not Plaintiff's work, but I've done this kind of work and I would imagine it's even more so on the Plaintiff's part. The lion's share of the work is done at the beginning of the file. All the research, all the pleadings, you know, I would think that takes the most in any kind of file really.

This was not a proper analysis, given the availability of actual documentation about the amount of time Broschay spent on this case before and after leaving the Fieger firm. Therefore, should a quantum meruit analysis be necessary, we instruct the trial court to review the documentary evidence provided by the parties and to reach a conclusion based on this evidence.

We reverse and remand for proceedings consistent with this opinion. We do not retain jurisdiction.

---

### Footnotes

1    We note that Fieger contends that Broschay failed to file any responsive pleadings with the trial court. The record shows that Broschay did file a timely response on August 19, 2011.

2    Or the attorney was discharged with some justification, just not enough to be wrongful.

---

End of Document      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Preferences    My Contacts  |  Offers  |  Getting Started  |  Help  |  Live Chat  |  Sign Off

WestlawNext. © 2013 Thomson Reuters - Privacy Statement | Accessibility | Contact Us   1-800-REF-ATTY (1-800-733-2889) | Improve WestlawNext

 THOMSON REUTERS