# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND THE PLAN OF ADJUSTMENT INJUNCTION AND DISCHARGE PROVISIONS AGAINST WALTER HICKS AND SPIRLIN MOORE

The City of Detroit, Michigan ("City"), by its counsel, Miller, Canfield, Paddock and Stone, P.L.C., files this Motion for the Entry of an Order Enforcing the Bar Date Order and the Plan of Adjustment Injunction and Discharge Provisions against Walter Hicks and Spirlin Moore ("Motion"). In support of this Motion, the City respectfully states as follows:

## I.     Introduction

1.     On July 13, 2016, a group of plaintiffs, including individual plaintiffs Walter Hicks and Spirlin Moore, filed a state court lawsuit against the City seeking declaratory and injunctive relief on account of, in part, a pre-petition claim. Hicks and Moore both assert claims for denial of due process related to the City's alleged failure to provide them with due process of law in connection with poverty exemption applications in 2013, which allegedly resulted in wrongful denial of a poverty exemption for 2013. As explained below, Hicks and Moore's claims were

27801908.5\022765-00213

within their respective fair contemplation prior to the City's bankruptcy case and they were thus required to file proofs of claim if they wanted to preserve and assert their due process claims in connection with the 2013 exemption. Neither did, however. Consequently, Hicks and Moore's claims were discharged pursuant to the City's plan of adjustment and the filing of the state court lawsuit violated the Plan injunction. The City requests that this Court enter an order requiring Hicks and Moore to dismiss with prejudice their claims for denial of due process with respect to the 2013 poverty exemption.

## II.    Factual Background

### A.    The City's Bankruptcy Case

2.      On July 18, 2013, the City commenced its chapter 9 bankruptcy case ("Petition Date").

3.      On October 10, 2013, the City filed its Motion Pursuant to Section 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof ("Bar Date Motion"). [Doc. No. 1146].

4.      On November 21, 2013, this Court entered an order approving the Bar Date Motion ("Bar Date Order"). [Doc. No. 1782]. The Bar Date Order

27801908.5\022765-00213

established February 21, 2014 ("General Bar Date") as the deadline for filing

claims against the City.  Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar
> Date…any entity: (i) whose prepetition claim against the City is not
> listed in the List of Claims or is listed as disputed, contingent or
> unliquidated; and (ii) that desires to share in any distribution in this
> bankruptcy case and/or otherwise participate in the proceedings in this
> bankruptcy case associated with the confirmation of any chapter 9
> plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

5.      Paragraph 22 of the Bar Date Order also provided that:

> Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy
> Rule 3003(c)(2), any entity that is required to file a proof of claim in
> this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or
> this Order with respect to a particular claim against the City, but that
> fails properly to do so by the applicable Bar Date, shall be forever
> barred, estopped and enjoined from: (a) asserting any claim against
> the City or property of the City that (i) is in an amount that exceeds
> the amount, if any, that is identified in the List of Claims on behalf of
> such entity as undisputed, noncontingent and liquidated or (ii) is of a
> different nature or a different classification or priority than any
> Scheduled Claim identified in the List of Claims on behalf of such
> entity (any such claim under subparagraph (a) of this paragraph being
> referred to herein as an "Unscheduled Claim"); (b) voting upon, or
> receiving distributions under any Chapter 9 Plan in this case in respect
> of an Unscheduled Claim; or (c) with respect to any 503(b)(9) Claim
> or administrative priority claim component of any Rejection Damages
> Claim, asserting any such priority claim against the City or property
> of the City.

Bar Date Order ¶ 22.

6.      On November 12, 2014, this Court entered an Order Confirming

Eighth Amended Plan for the Adjustment of Debts of the City of Detroit

("Confirmation Order").  [Doc. No. 8272].  The Eighth Amended Plan was attached as Appendix 1 to the Confirmation Order ("Plan").

7.  The discharge provision in the Plan provides

> Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims arising on or before the Effective Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date, discharge the City from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (ii) the Holder of a Claim based on such debt has accepted the Plan.

Plan, Art. III.D.4, p. 50.

8.  The Plan injunction set forth in Article III.D.5 also provides in pertinent part:

> **Injunction**
>
> **On the Effective Date, except as otherwise provided herein or in the Confirmation Order,**
>
> **a.    all Entities that have been, are or may be holders of Claims against the City…shall be permanently enjoined from taking any of the following actions against or affecting the City or its property…**
>
> **1.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affect the City of its property…**

27801908.5\022765-00213

**5.** proceeding in any manner in any place whatsoever that does not conform or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan; and

**6.** taking any actions to interfere with the implementation or consummation of the Plan.

Plan, Article III.D.5, pp. 50-51. (emphasis supplied).

9. The Court retained jurisdiction to enforce the Plan injunction and to, among other things, resolve any suits that may arise in connection with the consummation, interpretation or enforcement of the Plan. Plan, Art. VII. F, G, I, pp. 69-70.

**B. The Complaint**

10. On July 13, 2016, four Wayne County neighborhood associations and eight individuals plaintiffs filed a Complaint against the City, the Detroit Citizens Board of Review, Wayne County and the Wayne County Treasurer in Wayne County Circuit Court ("State Court Lawsuit"). The Complaint is attached as Exhibit 6A.

11. The Complaint contains two counts and requests class certification of each. Complaint ¶ 10. No class has been certified.

12. In Count I, the neighborhood associations and five Wayne County homeowners allege that Wayne County and the Wayne County Treasurer violated the Fair Housing Act by foreclosing on "homes in the county with tax debts that

were based on an illegal over-assessment of property values…" Complaint ¶¶ 3-6, 252-259. The City does not seek any relief in this Motion with respect to Count I because it is not a named defendant in Count I.

13. In Count II, the neighborhood associations and four Detroit homeowners allege that the City and the Detroit Citizens Board of Review's (collectively, the "Detroit Defendants") violated the due process clause of the United States and Michigan Constitutions. Specifically, the plaintiffs allege that

> The Detroit Defendants unduly burdensome process for receiving a poverty tax exemption and general misadministration of the poverty exemption application process have resulted in denials of the poverty exemption to which Plaintiffs and members of the Poverty Exemption Class were entitled, in violation of their constitutional right to due process. The Detroit Defendants have failed to provide members of the Poverty Exemption Class with notice and a meaningful opportunity to be heard prior to denying their requests for a poverty exemption, in violation of the Michigan Constitution and the United States Constitution. U.S. Const, Am XIV; Const 1963, art 1, § 17.

*Id.* ¶ 264.[1]

14. Two of the individual plaintiffs assert claims related to the 2013 poverty exemption.

15. Individual plaintiff Walter Hicks alleges that in 2012 he applied for a poverty exemption from the Detroit Defendants but he never received a letter of approval or denial. Complaint ¶ 195. As a result, Hicks alleges that he had to

---

[1] The "Poverty Exemption Class" is the defined term used by the plaintiffs for the proposed class in Count II. Complaint ¶ 10.

27801908.5\022765-00213

physically travel to the Coleman A. Young Municipal Center and that this trip was difficult because he did not own a car. *Id.* ¶ 196. Due to his "frustration from his 2012 application, Hicks did not apply for a poverty exemption in 2013." *Id.* ¶ 197. But, as of January 1, 2013, he certainly knew of the existence of the exemption, as well as the City's alleged "unduly burdensome process for receiving a poverty tax exemption and general misadministration of the poverty exemption application process." Complaint ¶ 264.

16.    Individual plaintiff Spirlin Moore alleges that in 2011 his caregiver, Trece Andrews, drove him to the Coleman A. Young Municipal Center to request a poverty exemption.  Complaint ¶ 212. He further alleges that he received his application only a few days before the deadline but submitted it with extensive supporting documentation before the deadline.  *Id.* ¶ 213.  He then allegedly received a letter denying his application as incomplete and was not given the opportunity to supplement. *Id.* ¶ 213.

17.    Moore's caregiver allegedly assisted him in obtaining a poverty exemption application in 2012, 2013, and 2014 by traveling downtown.  Complaint ¶ 214.  Mr. Moore alleges that "[e]ach year the application would be mailed only days before the deadline, leaving Mr. Moore and Ms. Andrews inadequate time to gather the numerous required documents." *Id.* ¶ 214.

18. Moore further alleges that he applied for poverty exemptions in 2012, 2013, and 2014, but he was unable to collect all the required documents due to the late arrival of the application. Complaint ¶ 215. Again, as of January 1, 2013, Moore certainly knew of the existence of the exemption, as well as the City's alleged "unduly burdensome process for receiving a poverty tax exemption and general misadministration of the poverty exemption application process." Complaint ¶ 264.

19. On Count II, the plaintiffs request that the court enter a judgment requiring, among other things, the "Detroit Defendants to allow Plaintiffs and members of the Poverty Exemption Class to apply retroactively for poverty exemptions for the 2013, 2014, 2015 and 2016 tax years." Complaint, p. 49.

20. In Circuit Court, the City moved for summary disposition of the Count II claims on the grounds that the claims were within the exclusive jurisdiction of the Michigan Tax Tribunal. In plaintiffs' opposition brief, plaintiffs alleged that the relief sought is two-fold: first, to obtain a ruling that the City's process for 2013 (and later years) resulted in a denial of due process, and, second, after the City has revised its process, to allow the plaintiffs to reapply for the (2013) exemption. Exhibit 6B, Plaintiffs' Opposition to Detroit Defendants' Motion for Summary Disposition ("Plaintiffs' Opposition"), p. 3. The City's motion was denied.

## III. Argument

21.     Hicks and Moore's claim that they were denied due process with respect to the 2013 poverty exemption arose prior to the Petition Date and was discharged by the Plan.  Hicks and Moore also violated the Plan injunction by filing the State Court Lawsuit and their claims with respect to the 2013 poverty exemption should be dismissed with prejudice.

22.     This Court recently issued an opinion on when a claim arises under the Bankruptcy Code.  *See In re City of Detroit, Michigan*, 548 B.R. 748 (Bankr. E.D. Mich. 2016).  In that decision, the Court explained that:

> The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5). "Congress intended by this language to adopt the broadest available definition of 'claim,' " *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (citations omitted), which includes " 'all legal obligations of the debtor, no matter how remote or contingent.' " *In re Huffy Corp.,* 424 B.R. 295, 301 (Bankr.S.D.Ohio 2010) (quoting *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 200 (4th Cir.1988)). This broad definition serves the two primary goals of bankruptcy: to ensure that all creditors are treated equitably and to secure a fresh start for the debtor. As the *Huffy* court put it, "a broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct." 424 B.R. at 301.

*Id.* at 761.

23.    This Court further held that "the question of when a claim arises under the Bankruptcy Code is governed by federal law. And, as the above quoted definition of 'claim' in Section 101(5) of the Bankruptcy Code indicates, pre-petition claims that are 'contingent' or 'unmatured,' and thus not presently actionable, may be discharged." *Id.* at 762 (internal citations omitted).

24.    This Court explained that courts have developed several different tests to decide when a contingent or unmatured claim arises for bankruptcy purposes. *Id.* at 762. The Court rejected the "right to payment" test and the "debtor's conduct" test while adopting the "fair contemplation" test. *Id.* at 762-63. Under the fair contemplation test

> a claim is considered to have arisen pre-petition if the creditor "could have ascertained through the exercise of reasonable due diligence that it had a claim" at the time the petition is filed. *Signature Combs,* 253 F.Supp.2d at 1037 (quotation & citations omitted). This test, which the Court will refer to as the "fair contemplation test," has the advantage of allowing the Court to examine all of the circumstances surrounding a particular claim—the debtor's conduct, the parties' pre-petition relationship, the parties' knowledge, the elements of the underlying claim—and use its best judgment to determine what is fair to the parties, in context.

*Id.* at 763.

25.    Here, Hicks and Moore's denial of due process claims for the 2013 poverty exemption were within their fair contemplation prior to the Petition Date.

26.    As Hicks admits, he did not apply for the 2013 poverty exemption due to his "frustration from his 2012 application." Complaint ¶ 197. As such, Hicks

knew of the City's allegedly "unduly burdensome process for receiving a poverty exemption and general misadministration of the poverty exemption application process" in 2012 and well prior to the Petition Date. *Id.* ¶ 264.

27.    Similarly, Moore's due process claim for the 2013 poverty exemption was within his fair contemplation prior to the Petition Date because he was aware of the City's process and administration of the poverty exemption no later than 2011.  Complaint ¶¶ 212-13.  Moore alleges that the process in 2013 was identical to the process in 2011 and 2012.  *Id.* ¶¶ 213-15.  In 2011, 2012, and 2013, Moore was required to travel downtown, wait to complete a request for the poverty exemption application and his application was mailed only days before the deadline leaving inadequate time to gather the numerous required documents.  *Id.* ¶¶ 212-14.  Each year Moore's application was denied based on inadequate supporting documentation and he was not given the opportunity to supplement his applications.  *Id.* ¶ 213, 215.  Consequently, Moore's claim for denial of due process with respect to the 2013 poverty exemption was within his fair contemplation prior to the Petition Date.

28.    Moore and Hicks both held pre-petition claims for the 2013 poverty exemption but neither filed proofs of claim in the City's bankruptcy case. These claims are subject to the discharge provision in the Plan because they are claims as defined by section 101(5) of the Bankruptcy Code.  Plan, p. 6, ¶ 60.  As set forth

on page 49 of the Complaint, Moore and Hicks seek a judgment requiring the Detroit Defendants to allow the Plaintiffs and members of the Poverty Exemption Class to apply retroactively for poverty exemptions for the 2013 tax year. Complaint, p. 49; *see also* Plaintiffs' Opposition, p. 7 ("Plaintiffs seek only the opportunity to have their requests for a poverty exemption considered under a constitutionally valid process."). This relief can, of course, be satisfied by the payment of money and, as such, gives rise to a claim in favor of the Moore and Hicks under Bankruptcy Code § 101(5). *Ohio v. Kovacs*, 469 U.S. 274, 279-80 (1985) (holding that defendant's obligation under an injunction is a "debt" or "liability on a claim" subject to discharge under the Bankruptcy Code). Moore and Hicks' claims are thus subject to the discharge provision in the Plan.

29.    Consequently, pursuant to the Plan and the Bar Date Order, Moore and Hicks' respective claims were discharged and expunged. Moore and Hicks should be required to dismiss with prejudice their respective claims for denial of due process with respect to the 2013 poverty exemption because the filing and prosecution of these claims in the State Court Lawsuit violates the Plan injunction.

## IV.    Conclusion

30.    The City thus respectfully requests that this Court enter an order, in substantially the same form as the one attached as Exhibit 1, requiring Moore and Hicks to dismiss with prejudice their respective claims for denial of due process

with respect to the 2013 poverty exemption.  The City sought, but did not obtain, concurrence to the relief requested in this Motion.

Dated: November 23, 2016      MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

- and -

CITY OF DETROIT LAW DEPARTMENT

Charles N. Raimi (P29746)
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
Phone: (313) 237-5037
Email: raimic@detroitmi.gov

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## EXHIBIT LIST

Exhibit 1          Proposed Order

Exhibit 2          Notice of Opportunity to Object

Exhibit 3          None

Exhibit 4          Certificate of Service

Exhibit 5          None

Exhibit 6A         Complaint

Exhibit 6B         Plaintiffs' Opposition

**EXHIBIT 1 – PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**ORDER GRANTING CITY OF DETROIT'S MOTION FOR THE ENTRY
OF AN ORDER ENFORCING THE BAR DATE ORDER AND THE PLAN
OF ADJUSTMENT INJUNCTION AND DISCHARGE PROVISIONS
AGAINST WALTER HICKS AND SPIRLIN MOORE**

This matter, having come before the Court on the Motion for the Entry of an Order Enforcing the Bar Date Order and the Plan of Adjustment Injunction and Discharge Provisions against Walter Hicks and Spirlin Moore ("Motion")[2], upon proper notice and a hearing, the Court being fully advised in the premises, and there being good cause to grant the relief requested,

**THE COURT ORDERS THAT:**

1.      The Motion is granted.

2.      Within five days of the entry of this Order, Walter Hicks and Spirlin Moore shall dismiss, or cause to be dismissed, with prejudice, their respective claims for denial of due process with respect to the 2013 poverty exemption in case

---

[2] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to them in the Motion.

number 16-008807, pending in the Wayne County Circuit Court, State of Michigan.

3. The Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

<u>**EXHIBIT 2 – NOTICE**</u>

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**NOTICE OF OPPORTUNITY TO OBJECT TO CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND THE PLAN OF ADJUSTMENT INJUNCTION AND DISCHARGE PROVISIONS AGAINST WALTER HICKS AND SPIRLIN MOORE**

The City of Detroit has filed Motion for the Entry of an Order Enforcing the Bar Date Order and the Plan of Adjustment Injunction and Discharge Provisions against Walter Hicks and Spirlin Moore.

**<u>Your rights may be affected.</u>  You should read these papers carefully and discuss them with your attorney.**

If you do not want the Court to enter an Order granting the Motion for the Entry of an Order Enforcing the Bar Date Order and the Plan of Adjustment Injunction and Discharge Provisions against Walter Hicks and Spirlin Moore, within 14 days, you or your attorney must:

1.    File with the court a written response or an answer, explaining your position at:[1]

United States Bankruptcy Court
211 W. Fort St., Suite 1900
Detroit, Michigan 48226

If you mail your response to the court for filing, you must mail it early enough so that the court will **receive** it on or before the date stated above.  You must also mail a copy to:

Miller, Canfield, Paddock & Stone, PLC
Attn: Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

2.    If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time, and location of that hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, Michigan 48226
      Telephone: (313) 496-7591
      Facsimile: (313) 496-8451
      swansonm@millercanfield.com

Dated: November 23, 2016

## EXHIBIT 3 – NONE

<u>**EXHIBIT 4 – CERTIFICATE OF SERVICE**</u>

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 23, 2016, he served a copy of the foregoing **CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND THE PLAN OF ADJUSTMENT INJUNCTION AND DISCHARGE PROVISIONS AGAINST WALTER HICKS AND SPIRLIN MOORE** upon the person listed below via first class mail and email:


Michael J. Steinberg
American Civil Liberties Union Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
msteinberg@aclumich.org

Joshua Rosenthal
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
jrosenthal@naacpldf.org

Shankar Duraiswamy
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4656
sduraiswamy@cov.com

Coty Montag
NAACP Legal Defense and Educational Fund, Inc.
1444 I Street, NW, 10th Floor
Washington, DC 20005
cmontag@naacpldf.org

DATED: November 23, 2016

By: /s/ Marc N. Swanson
     Marc N. Swanson (P71149)
     150 West Jefferson, Suite 2500
     Detroit, Michigan 48226
     Telephone: (313) 496-7591
     Facsimile: (313) 496-8451
     swansonm@millercanfield.com

# EXHIBIT 5 – NONE

# EXHIBIT 6A – COMPLAINT

## STATE OF MICHIGAN
## WAYNE COUNTY CIRCUIT COURT

| | |
|---|---|
| MORNINGSIDE COMMUNITY ORGANIZATION, a Michigan non-profit corporation; HISTORIC RUSSELL WOODS-SULLIVAN AREA ASSOCIATION, a Michigan non-profit corporation; OAKMAN BOULEVARD COMMUNITY ASSOCIATION, a Michigan non-profit corporation; NEIGHBORS BUILDING BRIGHTMOOR, a Michigan non-profit corporation; WALTER HICKS; SPIRLIN MOORE; DEWHANNEA FOX; DEAUNNA BLACK; ROBERT LEWIS; JULIA AIKENS; and EDWARD KNAPP, on behalf of themselves and all those similarly situated, | 16-008807-CH<br><br>FILED IN MY OFFICE<br>WAYNE COUNTY CLERK<br>7/13/2016 10:28:57 AM<br>CATHY M. GARRETT |
|       Plaintiffs, | 16-_____-CH<br>Hon. _____ |
| v. | |
| ERIC SABREE, in his official capacity as Wayne County Treasurer; WAYNE COUNTY, a municipal corporation; THE CITY OF DETROIT, a municipal corporation; and THE DETROIT CITIZENS BOARD OF REVIEW, a municipal entity, | **COMPLAINT** |
|       Defendants. | |

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Mark P. Fancher (P56223)
Kimberly Buddin (P79126)
AMERICAN CIVIL LIBERTIES UNION FUND
  OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org

Sherrilyn Ifill
  Director-Counsel
Janai Nelson
Christina Swarns*
Joshua Rosenthal*
NAACP LEGAL DEFENSE AND EDUCATIONAL
  FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
cswarns@naacpldf.org
jrosenthal@naacpldf.org

Shankar Duraiswamy[*]
Sarah E. Tremont (P73809)
Amia L. Trigg[*]
Jason R. Grimes[*]
Wesley W. Wintermyer[*]
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4656
(202) 662-6000
sduraiswamy@cov.com
stremont@cov.com
atrigg@cov.com
jgrimes@cov.com
wwintermyer@cov.com

Coty Montag[*]
Ajmel Quereshi[*]
NAACP LEGAL DEFENSE AND EDUCATIONAL
     FUND, INC.
1444 I Street, NW, 10th Floor
Washington, DC 20005
cmontag@naacpldf.org
aquereshi@naacpldf.org

* Pro hac vice motions to be filed.

Attorneys for Plaintiffs

---

## COMPLAINT

There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in this complaint.

### Introduction

1.      African-American homeowners in Wayne County are enduring a tax foreclosure

crisis of a magnitude not experienced by homeowners in Michigan since the Great Depression.

Wayne County and Eric Sabree, acting in his capacity as the Wayne County Treasurer (the

"Wayne County Defendants") are preparing to seize the homes of thousands of county

homeowners — the overwhelming majority of whom are African-American — due to their

inability to pay property taxes that are magnitudes higher than the taxes that can legally be

assessed under Michigan law.  The Wayne County Defendants' actions have an unjustified

disparate impact on African-American homeowners in Wayne County in violation of the Fair

2

Housing Act of 1968. 42 USC 3601-3619. Five Wayne County homeowners at risk of foreclosure — joined by four Wayne County neighborhood associations — bring this housing discrimination class action on behalf of themselves and all similarly situated homeowners who are at risk of losing their homes as a result of unlawfully imposed, excessive taxes. Plaintiffs seek a preliminary and final order halting the foreclosures and sales of all owner-occupied homes that have been improperly over-assessed.

2.      Additionally, thousands of Detroit homeowners who qualify for a poverty exemption excusing them from paying property taxes have been unlawfully prevented from obtaining that exemption due to needlessly complex and impenetrable application procedures improperly administered by the City of Detroit and the Detroit Citizens Board of Review (the "Detroit Defendants"). Four Detroit homeowners illegally precluded from receiving the poverty exemption — joined by four Wayne County neighborhood associations — bring this challenge under 42 USC 1983 on behalf of themselves and all similarly situated homeowners. They seek a preliminary and final order finding that their constitutional right to due process was violated by the misadministration of the poverty exemption application process; requiring the Detroit Defendants to allow members of the class to apply retroactively for poverty exemptions for each tax year from 2013 to 2016; and requiring the Detroit Defendants both to remove unduly burdensome documentary requirements from the application process and to ensure that adequate procedural due process is extended to all poverty exemption applicants going forward.

3.      Under Michigan law, a homeowner's property taxes must be based on the "True Cash Value" of their home. Michigan law requires that each municipality conduct annual assessments to determine the True Cash Value of all homes. If a homeowner does not pay property taxes based on these assessments within three years, the county will foreclose upon the

3

home and sell it in a foreclosure sale, resulting in the eviction of the homeowner or any other occupants living in the home.

4.      The City of Detroit has failed to conduct properly the legally mandated property assessments for at least two decades.  Further, after the values of homes began to drop precipitously in 2008, the City of Detroit failed to reduce the assessed values of the homes to match the actual True Cash Values, a fact which city officials have acknowledged.  As a result, homeowners, including Plaintiffs, were taxed as if their homes were worth many times their actual True Cash Value.

5.      The inability to pay these excessive taxes results in tax foreclosure by the Wayne County Defendants.  Indeed, the Wayne County Treasurer has foreclosed upon owner-occupied homes in Detroit and across Wayne County, and plans to continue to do so, despite his awareness that many Wayne County homeowners' taxes are based on unlawful and grossly over-assessed values.

6.      The Wayne County Defendants' practice of foreclosing on homes in the county with tax debts based on an illegal over-assessments of property values has a gross disparate impact on African Americans in Wayne County.  In fact, in Census blocks within Wayne County where a majority of homeowners are African-American, the tax foreclosure rate is 10 to 15 times the rate of tax foreclosures in Census blocks where the majority of homeowners are non-African-American.  This is in direct violation of the Fair Housing Act, which bars not only intentional housing discrimination, but also unjustified neutral practices that have an adverse disparate impact on people of color.

7.      Moreover, impoverished homeowners in the City of Detroit are being illegally assessed property taxes that they should not be required to pay.  Michigan and Detroit law entitle

impoverished homeowners to a "poverty tax exemption," which reduces a qualified homeowner's tax burden by half or eliminates it entirely. However, the City of Detroit's process for Detroiters to obtain a poverty exemption is so convoluted and difficult, and in some cases impossible, that it has violated the due process rights of qualifying individuals.

8. Before this year, taxpayers who sought a poverty exemption had to first apply in person at the Coleman A. Young Municipal Center to receive an actual application for an exemption in the mail. The Municipal Center is located many miles away from the City's most impoverished areas and has limited hours of operation, which fall on weekdays at times when many homeowners are at work. In 2016, the Detroit Defendants changed their poverty-exemption application process, so that homeowners can now request an application over the phone and one will be mailed to them. However, even with this change, taxpayers who applied for an application either did not receive it, or it arrived so close to the deadline for submission that it was no feasible to complete the multiple-page form and collect the required supporting materials before the deadline. And still, many of those who succeeded in submitting a timely, complete poverty exemption application either never heard back regarding the decision on their application or were denied for reasons that were arbitrary and capricious.

9. Accordingly, many homeowners who qualified for, but were not able to secure, a poverty tax exemption have lost and are at risk of losing their homes as a result of their inability to pay taxes that they never should have been required to pay.

10. Plaintiffs ask this Court to (a) certify a class of all current and future African-American homeowners of owner-occupied homes in Wayne County at risk of tax foreclosure sale ("Over-Assessment Class"), and (b) enter a preliminary and final order declaring that the

5

Wayne County Defendants' actions violate the Fair Housing Act and halting foreclosures on owner-occupied homes in Wayne County until proper and lawful taxes are assessed.

11.     Plaintiffs further ask this Court to (c) certify a class of all current and future Detroit homeowners eligible for the poverty tax exemption ("Poverty Exemption Class"), and (d) enter a preliminary and final order declaring that the Detroit Defendants' actions violate the Due Process Clause; requiring the Detroit Defendants to allow members of the class to apply retroactively for poverty exemptions for each tax year between 2013 and 2016; and requiring the Detroit Defendants both to remove unduly burdensome documentary requirements from the application process and to ensure adequate procedural due process is extended to all poverty exemption applicants going forward.

## Parties

12.     Plaintiffs Walter Hicks, Spirlin Moore, Dewhannea Fox, DeAunna Black, and Robert Lewis are African-American homeowners in Wayne County who are facing foreclosure because they owe taxes based on over-assessments of their homes.  They bring this action individually and on behalf of the proposed Over-Assessment Class.

13.     Plaintiffs Walter Hicks, Spirlin Moore, Julia Aikens, and Edward Knapp are homeowners in the City of Detroit who were eligible for the poverty exemption from property taxes but were denied the exemption due to the unduly burdensome, arbitrary, and capricious policies and practices of the City of Detroit and the Detroit Citizens Board of Review.  They bring this action individually and on behalf of the proposed Poverty Exemption Class.

14.     Plaintiffs MorningSide Community Organization, Historic Russell Woods-Sullivan Area Association, Oakman Boulevard Community Association, and Neighbors Building Brightmoor are voluntary associations made up of members who live in communities within Wayne County and the City of Detroit.  These association Plaintiffs have members who are

6

facing foreclosure because they owe taxes based on over-assessments of their homes and members who have been unlawfully denied the poverty exemption to property taxes. These association Plaintiffs have been adversely affected by the unlawful tax foreclosures of homes in violation of the Fair Housing Act and by the illegal denial of poverty exemptions to eligible homeowners in violation of the constitutional guarantee of due process. Home foreclosures in these association Plaintiffs' neighborhoods destabilize their communities, reduce the tax base, and negatively affect schools, business investment, and other measures of neighborhood vitality.

15.     Defendant Eric Sabree (also referred to as "Defendant Wayne County Treasurer") occupies the office of Wayne County Treasurer and is sued in his official capacity.

16.     Defendant Wayne County is a political and corporate entity organized and existing under the laws of the State of Michigan.

17.     Collectively, Defendant Eric Sabree and Defendant Wayne County are referred to as the "Wayne County Defendants."

18.     Defendant City of Detroit is a political and corporate entity organized and existing under the laws of the State of Michigan.

19.     Defendant Detroit Citizens Board of Review is a municipal entity organized and existing under the laws of the State of Michigan.

20.     Collectively, Defendant City of Detroit and Defendant Detroit Citizens Board of Review are referred to as the "Detroit Defendants."

### Jurisdiction and Venue

21.     This court has jurisdiction over this suit brought under the Fair Housing Act, 42 USC 3601-3619; the Fourteenth Amendment to the United States Constitution; Article I, Section 17 of the Michigan Constitution; and 42 USC 1983.

7

22.     Venue is proper in this court in that Defendant Wayne County, Defendant City of Detroit, and Defendant Detroit Citizens Board of Review are political subdivisions of the State of Michigan; Defendant Eric Sabree is an official of a political subdivision of the State of Michigan sued in his official capacity; all individual Plaintiffs named herein reside within the County of Wayne, in the State of Michigan; and all association Plaintiffs named herein primarily operate within the County of Wayne, in the State of Michigan.

23.     The injuries claimed by Plaintiffs named herein occurred and continue to occur in the County of Wayne, in the State of Michigan.

## Statement of Facts

**I.     There Is an Extensive History of Housing Discrimination Against African Americans in Detroit.**

24.     Unfortunately, this is not the first time people of color have faced discriminatory housing policies in Detroit.  Indeed, a shameful pattern of housing discrimination pervades Detroit's modern history.[1]

25.     In the 1930s, the federal government, through the Federal Housing Administration and the Home-Owners Loan Corporation, discriminated against African Americans by granting low-interest loans and mortgages to white homeowners only.  The federal government encouraged the use of racially restrictive covenants and, in one case, refused to make loans to a developer for a housing development project unless he built a six-foot high wall to separate his property from property owned by African Americans.

26.     By the 1940s, 80% of property in Detroit outside of the inner city was subject to racial covenants, which white residents established neighborhood associations to enforce.  In 1945, after a middle-class African-American couple, Orsel and Minnie McGhee, purchased a

---

[1] Much of the history recounted in this complaint is documented in the seminal book Sugrue, *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit* (Princeton, N.J.: Princeton University Press, 2005).

8

home in an all-white Detroit neighborhood, white neighbors sued to enforce the racial covenant. The Wayne County Circuit Court ruled that the covenant forbade the McGhees from owning property in that neighborhood. In the 1947 case in which the United States Supreme Court held that racially restrictive covenants violated the Equal Protection Clause, twenty-five Detroit homeowner associations filed an amicus brief in support of the white homeowners seeking to uphold the restrictive covenants.

27. Despite the 1947 Supreme Court ruling outlawing racially restrictive covenants, real estate agents, developers, banks, and neighborhood associations acted in ways that continued to enforce racial segregation. Real estate agents refused to show African Americans homes in all-white neighborhoods, and banks refused to award African Americans conventional mortgages. Contractors found it impossible to get financial backing to construct homes for African Americans in white neighborhoods. A citywide association of homeowner groups called the Federated Property Homeowners of Detroit created a network to monitor the selling of homes to African Americans and harassed real estate brokers who sold homes to African Americans.

28. Throughout the 1950s and 1960s, many landlords openly refused to rent to African Americans, and those who would rent to people of color often charged 20-40% more than they charged whites. The government in Detroit enforced racially segregated public housing, and Mayor Albert Cobo used his veto power to stunt integration and public housing sites in white areas of the city.

29. Throughout Detroit's history, white homeowners frequently greeted African Americans who attempted to move into white neighborhoods with violence that forced them to leave. For example, when an African-American physician named Ossian Sweet and his family moved into an all-white neighborhood in 1925, an angry mob of several hundred white neighbors

9

attacked their home.[2] In 1942, a mob of over 1000 whites — many of them armed members of the Ku Klux Klan — vowed to prevent African Americans from entering into a segregated, African-American housing development because it was too close to a white neighborhood. Thousands of police officers and National Guardsmen were called in to prevent a major riot. Between the mid-1950s and mid-1960s, there were over 200 recorded acts of white neighbors harassing or committing violence against African-American "pioneers" attempting to integrate white neighborhoods, including the staging of mass protests, breaking windows with bricks and other items, throwing paint on houses, burning effigies and crosses, and physically attacking African-American homeowners.

30. In 1967, African Americans rebelled in the streets of Detroit in response to systemic police abuse and other forms of bias, including housing and job discrimination. Following this civil disturbance, there was a large exodus of white Detroit residents to the suburbs, commonly called "white flight."

31. Even after white flight, African-American residents of Detroit had tremendous difficulty obtaining mortgages due to "redlining," the practice of denying services based on the racial makeup of the neighborhood. Additionally, real-estate agents continued to steer prospective African-American home buyers away from predominantly white neighborhoods into lower-priced, predominantly black areas of the city.

32. In the 1990s and early 2000s, certain banks and mortgage companies that had previously engaged in redlining in Detroit started a practice called "reverse redlining." Motivated by the billions of dollars being made on Wall Street in the mortgage-backed securities market, lenders began targeting African-American communities in Detroit where credit was

---

[2] *See* Boyle, *Arc of Justice: A Saga of Race, Civil Rights and Murder in the Jazz Age* (New York: Henry Holt & Company, 2004).

traditionally unavailable and pushing the sale of high-interest, high-risk, subprime mortgages. In contrast to mortgages offered to white homeowners in the suburbs, unsavory salespeople pushed Detroiters into mortgages knowing full well that the mortgagees would not be able to afford the balloon payment when it became due. When the bubble in the real estate market burst in 2008, tens of thousands of Detroit homeowners were forced into mortgage foreclosure. Reverse redlining had a disparate impact on African Americans and devastated countless previously stable neighborhoods in Detroit.[3]

## II.     Wayne County Is in the Midst of a Tax Foreclosure Crisis.

33.     The African-American residents of Wayne County, particularly in Detroit, are now facing another crisis, this time from tax foreclosures. Homeowners in Wayne County, like all Michigan property owners, must pay property taxes in amounts based on municipal assessments of property values. If a homeowner does not pay those property taxes, the home is subject to foreclosure and sale at auction by the Wayne County Defendants.

34.     Property values in Wayne County generally, and in the City of Detroit particularly, have dropped precipitously since the 2008 financial crisis. Due to the collapse of the home-mortgage market, many residents of Wayne County have seen their home values drop by more than 80 percent.

35.     At the same time, properties in the county have been systematically over-assessed by some municipalities, leading those municipalities to levy inflated property taxes on county homeowners.[4] Defendant Wayne County Treasurer has acknowledged that Detroit and other

---

[3] *See, e.g., Adkins v Morgan Stanley*, Civil Action No 1:12-cv-07667 (SDNY), *documents available at* <https://www.aclu.org/cases/racial-equality/adkins-et-al-vs-morgan-stanley>.
[4] *E.g., 2015 Wayne County tax foreclosure auction ends, but a vicious cycle continues*, Michigan Radio (October 23, 2015), <http://michiganradio.org/post/2015-wayne-county-tax-foreclosure-auction-ends-vicious-cycle-continues#stream/0>.

11

Wayne County cities "didn't keep up with their assessments," which "didn't reflect the true market value."[5]

36. The most egregious over-assessment problem exists in the City of Detroit. Detroit city officials have acknowledged the systematic over-assessment of Detroit homes. For example, in 2015, Detroit Mayor Mike Duggan told the press, "For years homes across the city have been over-assessed."[6]

37. Until last year, the City of Detroit had not conducted a city-wide reassessment for fifty years. While reassessments have recently begun, they will not be complete until late 2016 at the earliest.[7] Meanwhile, homeowners continue to be charged property taxes based on inaccurate assessments and are then foreclosed upon if they cannot pay.

38. In recent years, the tax bills have grown even larger as many municipalities, including the City of Detroit, have begun adding water liens to the property tax debts certified to Defendant Wayne County for foreclosure, including the property tax debts for at least one named individual Plaintiff. Because of a series of poor financial investments by the City (and other reasons), water bills in Detroit have skyrocketed in recent years, leaving many homeowners unable to pay. The homeowners often face the dual challenge of a water shutoff in the short term — with hefty fees for reconnection —eventually followed by a tax foreclosure based in part on the unfairly high water bill. Bankruptcy Judge Steven P. Rhodes has noted that the harms from water shutoffs "may include a host of serious and even life-threatening medical conditions, as

---

[5] Eric Sabree Interview on *Stand Up Detroit!*, WMKM 1440 AM (May 12, 2015), *available at Understanding the Foreclosure difference Between Wayne County and the City of Detroit* <https://www.youtube.com/watch?v=VVADzh4OWqI> (accessed July 11, 2016).
[6] AlHajal, *Detroit property tax assessments to decline as 62,000 properties face foreclosure*, MLive (January 28, 2015), <http://www.mlive.com/news/detroit/index.ssf/2015/01/detroit_property_tax_assessmen.html>.
[7] *E.g., 2015 Wayne County tax foreclosure auction ends*, <http://michiganradio.org/post/2015-wayne-county-tax-foreclosure-auction-ends-vicious-cycle-continues#stream/0>.

12

well as adverse consequences in employment, in personal and family relations, and for children, at school. Water is necessary to sustain life."[8]

39.     The over-assessments of property values leave thousands of African-American residents, particularly in Detroit, with exorbitantly high property taxes. For Detroit homeowners, the difficulty of paying these property tax amounts is frequently exacerbated by other hardships. According to data collected by the United Way of Southeastern Michigan, more than 80% of Detroit homeowners facing tax foreclosure in 2015 had faced a hardship in the prior year — including medical problems, divorce, job loss, or a family death — and 36% met federal poverty levels.[9]

40.     For many Wayne County residents, inflated property tax bills result in the loss of their homes through tax-foreclosure sales. In the 2014 Wayne County tax foreclosure auction, 6,000 occupied homes were sold.[10] The number of occupied homes sold in the 2015 auction — which included a record-high number of properties — climbed to 8,000.[11]

41.     This year, Defendant Wayne County Treasurer sent out 38,000 foreclosure notices for back taxes from 2013 or earlier, as 2016 is the last year by which 2013 taxes must be paid in order to avoid foreclosure. Half of these, around 20,000, were for tax bills that were less than $3,000; about 5,500 homeowners owed less than $2,000; and 650 owed less than $500. While Defendant Wayne County Treasurer has stated that the Wayne County Treasurer's Office is

---

[8] *Lyda v City of Detroit*, unpublished order of the Bankruptcy Court for the Eastern District of Michigan, issued November 19, 2014 (Docket No. 13-53846), *available at* <http://voiceofdetroit.net/wp-content/uploads/Rhodes-order-on-water-shutoffs.pdf>.
[9] Kurth & MacDonald, *Detroit braces for a flood of tax foreclosures*, Detroit News (July 1, 2015), <http://www.detroitnews.com/story/news/special-reports/2015/07/01/detroit-braces-flood-tax-foreclosures/29589915/ >.
[10] Perkins, *Are real estate investors from Oakland County to Hong Kong driving Detroit's blight?*, Metro Times (May 4, 2016), <http://www.metrotimes.com/detroit/are-real-estate-investors-from-oakland-county-to-hong-kong-driving-detroits-blight/Content?oid=2441828>.
[11] *Detroit official to unveil property assessment changes*, Detroit News (January 29, 2016), <http://www.detroitnews.com/story/news/local/detroit-city/2016/01/29/detroit-officials-unveil-property-assessment-changes/79545144/>.

13

trying to alert homeowners with smaller tax bills to enter payment plans to stave off foreclosure sale, he has estimated that 20,000 properties are still likely to be auctioned this year.[12]

III.     **Under the Michigan Property Tax Assessment and Foreclosure Process, Counties Review Assessments by Municipal Assessors and Foreclose on Properties with Unpaid Taxes.**

42.     In Michigan, the taxes on a particular property must be determined by reference to the price at which a property could be sold on the open market, which is called the "True Cash Value." Michigan governmental entities use 50% of the estimated True Cash Value of the property, rather than an estimate of the full True Cash Value, as the assessed value for purposes of property tax calculations.

43.     Michigan law requires cities and townships to assess property values annually. MCL 211.10(1). Each year, the municipal assessor's office, including the assessor for Defendant City of Detroit, creates an assessment roll that contains an estimate of 50% of the True Cash Value for each piece of real property liable to be taxed in the jurisdiction. MCL 211.24.

44.     For residential properties, an assessor typically determines the True Cash Value using the comparable sales or market approach. Under this approach, the assessor looks at sales that occurred in the area during the preceding year and adjusts the estimated True Cash Value of a home based on increases or decreases in the sales prices of other properties in the neighborhood.

45.     The county board of commissioners, including the board for Defendant Wayne County, reviews the municipal assessment roll and can adjust for municipality-wide errors. The county board of commissioners then certifies the assessment roll. MCL 211.34(2). In 2013, the

---

[12] *Real estate investors*, <http://www.metrotimes.com/detroit/are-real-estate-investors-from-oakland-county-to-hong-kong-driving-detroits-blight/Content?oid=2441828>.

year upon which 2016 foreclosures are based, Defendant Wayne County certified the estimated values of all residential properties in the county as accurate, without any adjustment.

46.     Additional adjustments to the assessment roll can then made by the State. Like the County's adjustments, these are designed to ensure a consistent approach to assessment across the entire state.

47.     After the County's and State's adjustments are made, the final estimate of 50% of the True Cash Value of a property is called the State Equalized Value and becomes the basis for the property taxes actually levied on homeowners. Due to tax reduction measures like the Headlee Amendment and Proposition A, a property owner's taxes are sometimes capped at a value lower than the State Equalized Value.

48.     If a homeowner does not pay the property taxes owed, municipalities turn over the right to collect those delinquent taxes to counties, including the Wayne County Defendants. MCL 211.78a(2). If the taxes remain unpaid, the counties can foreclose on and then auction off the delinquent properties, subjecting the prior homeowners to eviction. MCL 211.78k(5).

49.     In spring 2016, the Wayne County Defendants foreclosed upon properties in the county based on delinquent taxes from 2013 or earlier. The 2016 foreclosures are scheduled to be sold at auction beginning in September 2016, likely resulting in homeowners being forced to move out of the foreclosed homes.

## IV.     The City of Detroit Has Systemically Over-Assessed Residential Property Values, Leading to the Imposition of Illegally Inflated Property Taxes on Detroit Residents.

50.     The City of Detroit has, for years, failed to conduct proper annual assessments of property values, in direct violation of Michigan law. Instead of conducting annual assessments or properly updating prior years' assessments with data on recent property sales, the City of

15

Detroit has compiled assessment rolls with estimated values bearing no relationship to the actual True Cash Value of properties within the municipality.

51.     Although the True Cash Values of properties in Detroit have fallen precipitously since the financial crisis in 2008, the City of Detroit's assessed values have not declined proportionally. Thus, the City of Detroit assesses property taxes based on State Equalized Values that do not reflect the actual True Cash Value of Detroit properties.

52.     As a result of this discrepancy, the property tax assessed by the City of Detroit is often based on a false, inflated property value, which in turn means that a property owner's tax bill will be much higher than if the City of Detroit conducted a proper assessment as required by Michigan law.

53.     Expert analysis of the City of Detroit's State Equalized Values and reported sales prices for the 2010 tax year shows that the State Equalized Values were consistently more than the required 50% of the 2009 reported sales price.

54.     The analysis found an average State Equalized Value of $28,060 and an average reported sales price of $12,667. Using the reported sales price as a benchmark of the actual True Cash Value, the average State Equalized Value should have been approximately $6,334. The result of this discrepancy was an average property tax bill that was more than four times greater than it should have been.

55.     Further, property owners with the lowest valued properties (the lowest fifth of all sales) had an average State Equalized Value more than 24 times higher than it would have been if based on the actual True Cash Value, as required by law.

56.     Discrepancies between State Equalized Value and the actual True Cash Value have important implications for individual property tax bills, as demonstrated by two example

16

Detroit properties. One property in Detroit, for example, had an actual True Cash Value of $1,700, and the other had an actual True Cash Value of $37,000. If Detroit assessors had assessed properties at 50% of the actual True Cash Value, as state law requires, the $1,700 home would have a State Equalized Value of $850 and the $37,000 home would have a State Equalized Value of $18,500. Based on these State Equalized Values, the estimated tax bill for the $1,700 property would have been $72 and the estimated tax bill for the $37,000 property would have been $1,562. Instead, these properties were assigned inflated State Equalized Values resulting in actual tax bills of $1,367 for the $1,700 home and of $2,272 for the $37,000 home. That is, the tax bill for the $1,700 home for a single year was equal to more than 80% of the actual True Cash Value of the home. The actual tax bill for the $1,700 home exceeded the amount of the proper tax bill for a properly assessed $37,000 home.

57. The City of Detroit employed deficient assessment practices that led to discrepancies between True Cash Value and assessed values through at least 2013. In July 2015, the Detroit News reported that, as of 2013, Defendant City of Detroit "was over-assessing homes by an average of 65 percent."[13]

58. Expert analysis of statistics reported by the State Tax Commission, as compared to residential property sale prices reported by CoreLogic, a well-regarded private data analysis firm, demonstrates that the City of Detroit's estimate of the True Cash Values of Detroit properties, and thus the State Equalized Values, were higher than actual sale prices in 2013. In 2013, the average estimate of True Cash Value by the Detroit assessor was about $14,000 more than the average sale price reported by CoreLogic, meaning that the average Detroit homeowner's property tax bill was almost twice as much as it should have been.

---

[13] *Detroit braces for a flood of tax foreclosures*, <http://www.detroitnews.com/story/news/special-reports/2015/07/01/detroit-braces-flood-tax-foreclosures/29589915/ >.

17

59.     Additionally, between 2008 and 2013, the average sales price reported by CoreLogic for Detroit residential properties dropped from around $75,000 to $15,000, an 80% decrease. In contrast, the average estimated True Cash Value from the Detroit assessor dropped from about $57,000 to 29,000, a decrease of only 50%. This further suggests that the City of Detroit's assessors were not following changes in the Detroit housing market closely enough, resulting in assessment inaccuracy and inequality.

60.     Indeed, assessment inaccuracy in the City of Detroit is exacerbated by the rapid deterioration of the Detroit housing market, including the rapid decline in property values and the high number of irregular sales. The Detroit assessor classifies many of these sales as "distressed" and therefore not suitable to be used as comparable sales for the purpose of assessment. Expert analysis of a sales study undertaken by the Detroit assessor to provide the basis for adjusting assessed values for the 2013 tax year shows that the assessor considered only 684 of the City's 12,118 home sales, or 5.6% percent of total home sales, from October 2011 to September 2012. This is a much lower percentage than cities in surrounding counties, such as Hazel Park, Pontiac, and Ferndale, which had assessments based on 15%, 16.5%, and 30% of sales, respectively.

61.     The observed level of assessment inaccuracy in the City of Detroit is not surprising given that staffing reductions have hindered the ability of assessors to make the proper adjustments to property values. Recent budget cuts have decreased the assessment division's staff from 90 employees in the late 1990s to 36 employees in 2012. Detroit's Chief Assessor, Linda Bade, has asserted that "workers do their best under tough conditions," but the resulting over-assessments show that the understaffing has dire consequences for many Detroiters.[14]

---

[14] MacDonald, *Property values, taxes often in error*, Detroit News (February 22, 2013).

18

62.     In short, expert analysis of assessment data from 2010 demonstrates that residential properties in Detroit were significantly over-assessed and that the largest discrepancies occurred among the lowest valued properties.  By 2013, some degree of the over-assessment in Detroit had diminished, but the average Detroit homeowner's property tax bill was still about twice as much as it should have been.

63.     Several other Wayne County municipalities produced similarly flawed and unlawfully high assessments of property value, resulting in severe over-assessment of property taxes.

## V.     The Wayne County Defendants Have Foreclosed on Residential Properties Based on the Nonpayment of Illegally Inflated Property Taxes.

64.     The Wayne County Defendants are responsible for conducting foreclosures of all properties in Wayne County with unpaid tax bills.

65.     The Wayne County Defendants foreclose on properties regardless of the fact that many of the homes are over-assessed and over-taxed in violation of Michigan state law. Defendant Eric Sabree, while serving as Wayne County Deputy Treasurer of Land Management, stated in 2015 that the Wayne County Treasurer's office forecloses on homes despite the fact that it knows the cities "didn't keep up with the property value" and "didn't keep up with their assessments."[15]

66.     As a result of the Wayne County Defendants' actions, Plaintiffs and thousands of other homeowners, the great majority of whom are African-American, have lost and will lose their homes on the basis of illegal taxes premised on inflated estimates of their True Cash Value.

---

[15] Sabree Interview, *available at* <https://www.youtube.com/watch?v=VVADzh4OWqI>.

19

67.     The Wayne County Defendants should have verified that the estimates of 50% of True Cash Value of homes in Wayne County — which were rubber-stamped and certified by the county board of commissioners — were assessed according to Michigan law prior to foreclosure.

68.     Although Defendant Wayne County Treasurer has stated that he has worked to avoid foreclosures by encouraging homeowners to enter into payment plans, this is an ineffective stopgap measure.  For homeowners whose homes are over-assessed, the payment plans do little to protect them, as the residence is not properly reassessed when the homeowner agrees to a payment plan.

69.     Many payment plans require the homeowner to pay 60% of the tax debt, plus interest and fees within a few months of entering the plan.  For a homeowner whose tax debt was based on an illegal over-assessment, this payment may be larger than the accurate tax debt on the property.  Taking the example $1,700 property from paragraph 56 above, due to the over-assessment, the homeowner who should have initially owed $72 would owe $2,129.80 once interest, penalties, and fees are added to his over-assessed taxes.  To even enter a payment plan, the homeowner would have to pay 60% of that amount, or $1,277.88.  And if the homeowner is unable to keep up with his payments, his home is still be at risk of foreclosure and sale.

70.     Furthermore, many homeowners cannot afford the payment plans. Not surprisingly, a significant percentage of the homeowners who entered into payment plans in 2015 to avoid foreclosure have already defaulted on those payment plans.

71.     The Wayne County Defendants have no substantial legitimate interest in a foreclosure process in which many of the homes are foreclosed upon for tax debts based on unlawful over-assessments.  Further, the illegal disparate impact on African Americans in Wayne County would be eliminated if, prior to foreclosure, the Wayne County Defendants confirmed

20

with the county's municipalities that the homes with property tax debts had been subject to a meaningful annual assessment, as required by Michigan law, and that the taxes charged were based on an accurate estimate of the True Cash Value of the homes.

## VI. The Wayne County Defendants' Foreclosures Have a Disparate Impact on African-American Homeowners.

72. The conduct of the Wayne County Defendants in conducting the foreclosure sale process causes a disparate impact on African-American homeowners in the county. Owner-occupied homes in Census blocks in Wayne County where at least a majority of homeowners are African-American are more likely to be at risk of a tax foreclosure sale than owner-occupied homes in Census blocks in the county where a majority of homeowners are non-African-American.

73. Based on an expert analysis of publicly available data, in Census blocks in Wayne County where a majority of the homeowners are African-American, 4.81% of owner-occupied homes were at risk of tax foreclosure sale as of February 16, 2016, as compared to only 0.48% of owner-occupied homes in Census blocks in the county where a majority of homeowners are non-African-American. Thus, owner-occupied homes in majority African-American Census blocks are 10 times more likely to be at risk of a tax foreclosure sale than other Census blocks. This disparity in risk of foreclosure sale for homeowners in majority-African-American Census blocks as compared to homeowners in majority-non-African-American Census blocks is statistically significant at the 99% level.[16]

74. Based on an expert analysis of publicly available data, in Census blocks in Wayne County where 100% of homeowners are African American, 5.18% of owner-occupied homes

---

[16] An observed outcome is considered "statistically significant" when there is a high probability that the outcome is not the result of random chance. Thus, if an observed outcome is statistically significant at the 99% level, this means there is less than a 1% chance that the observed outcome is the result of random chance.

were at risk of tax foreclosure sale as of February 16, 2016. In Census blocks in the county where 100% of homeowners are non-African American, only 0.39% of owner-occupied homes are at risk of a tax foreclosure sale. Thus, owner-occupied homes in Census blocks in the county where 100% of homeowners are African-American are 13.4 times more likely to be at risk of a tax foreclosure sale than owner-occupied homes in Census blocks where 100% of homeowners are non-African-American. This disparity in risk of foreclosure sale between homeowners in 100% African-American Census blocks as compared to homeowners in 100% non-African-American Census blocks is statistically significant at the 99% level.

## VII. The Named Individual Plaintiffs and Associational Plaintiffs Have Been and Will Continue to Be Harmed by the Wayne County Defendants' Foreclosures.

### A. Walter Hicks

75. Plaintiff Walter Hicks is a 57-year-old African-American resident of Wayne County and Detroit, Michigan.

76. Mr. Hicks has been on disability since 2009 due to a severe back injury.

77. Mr. Hicks owns and occupies his home as his principal residence.

78. Mr. Hicks purchased his home in January 2012.

79. Based on Defendant City of Detroit's assessment, the State Equalized Value of Mr. Hicks's home in 2013 was $20,078. This State Equalized Value corresponds to a True Cash Value estimate of $40,156.

80. The actual True Cash Value of Mr. Hicks's home in 2013, based on an appraisal of its fair-market value, was $9,000.

81. Defendant City of Detroit over-assessed the value of Mr. Hicks's home for the 2013 tax year by $31,156.

22

82.     In 2013, Defendant City of Detroit levied property taxes of $1,681.31 on Mr.

Hicks's home based on the over-assessed State Equalized Value.  Mr. Hicks was unable to pay

that amount.  Mr. Hicks has made small payments on his taxes.

83.     As of the date of this filing, Mr. Hicks owes $1,866.63 for unpaid property taxes

from tax year 2013 and earlier.  Mr. Hicks is unable to pay that amount.

84.     Mr. Hicks is on a Distressed Owner Occupant Extension ("DOOE") payment plan

that requires him to pay all of his 2013 taxes including fees, penalties, and interest by December

16, 2016. The City requested he pay $339 each month.  Mr. Hicks cannot afford this monthly

payment.

85.     Mr. Hicks's home is subject to tax foreclosure by the Wayne County Defendants.

**B.      Spirlin Moore**

86.     Plaintiff Spirlin Moore is a 77-year-old African-American resident of Wayne

County and Detroit, Michigan.

87.     Mr. Moore is almost completely deaf and is illiterate.  He also suffers from a

number of health problems.  Because of this, he regularly relies on a caretaker to assist him.  He

moved from Alabama to Detroit in the early 1960s.

88.     Mr. Moore owns and occupies his home as his principal residence.

89.     Mr. Moore has lived in his home since 1997 when he began renting it.  Mr. Moore

entered into a land contract agreement to purchase the home in August 2007.  Mr. Moore paid

off the land contract in March 2010, and he now holds title to his home.

90.     Based on Defendant City of Detroit's assessment, the State Equalized Value of

Mr. Moore's home in 2013 was $11,466.  This State Equalized Value corresponds to a True

Cash Value estimate of $22,932.

23

91. The value of Mr. Moore's home in 2013, based on an appraisal of the home's fair-market value, was $2,000.

92. Defendant City of Detroit over-assessed the value of Mr. Moore's home for the 2013 tax year by $20,932.

93. In 2013, Defendant City of Detroit levied property taxes of $2,023 on Mr. Moore's home based on the over-assessed State Equalized Value. Mr. Moore was unable to pay that amount.

94. Mr. Moore's outstanding water bill was added to his taxes in 2011, 2012, and 2013. The portion of Mr. Moore's 2013 tax bill attributable to this addition was approximately $770.

95. As of the date of this filing, Mr. Moore owes $5,705 for unpaid property taxes from tax year 2013 and earlier. Mr. Moore is unable to pay that amount.

96. Mr. Moore is on a payment plan that requires him to pay $144 in back taxes each month. Mr. Moore cannot afford this monthly payment.

97. Mr. Moore's home is subject to tax foreclosure by the Wayne County Defendants.

**C. Dewhannea Fox**

98. Plaintiff Dewhannea Fox is a 33-year-old African-American resident of Wayne County and Detroit, Michigan.

99. Ms. Fox owns and occupies her home as the principal residence of her, her husband, and their two minor children.

100. Ms. Fox's home is in Detroit's MorningSide neighborhood. Ms. Fox serves as a Director at Large for the MorningSide Community Organization.

24

101.    Based on Defendant City of Detroit's assessment, the State Equalized Value of Ms. Fox's home in 2013 was $24,539.  This State Equalized Value corresponds to a True Cash Value of $47,078.

102.    The actual True Cash Value of Ms. Fox's home in 2013, based on an appraisal of the home's fair-market value, was $16,000.

103.    Defendant City of Detroit over-assessed the value of Ms. Fox's home for the 2013 tax year by $31,078.

104.    In 2013, Defendant City of Detroit levied property taxes of $2,328 on Ms. Fox's home based on the over-assessed State Equalized Value.  Ms. Fox was unable to pay that amount.

105.    As of the date of this filing, Ms. Fox owes $5,249 for unpaid property taxes from tax year 2013 and earlier.  Ms. Fox is unable to pay that amount.

106.    Ms. Fox's home is subject to tax foreclosure by the Wayne County Defendants.

**D.    DeAunna Black**

107.    Plaintiff DeAunna Black is a 32-year-old African-American resident of Wayne County and Detroit, Michigan.

108.    Ms. Black works in cleaning services as the sole support of her family, despite suffering from pain caused by injury from a 2012 car accident.  Ms. Black was born and raised in Detroit and has lived in Detroit through most of high school.  After briefly moving to Georgia, Ms. Black returned to Detroit in 2010.

109.    Ms. Black owns and occupies her home as the principal residence of her and her two minor children.  Ms. Black is expecting her third child in August 2016.

110.    Ms. Black purchased her home in September 2013 for $3,500.

25

111.    Based on Defendant City of Detroit's assessment, the State Equalized Value of Ms. Black's home in 2013 was $18,451. This State Equalized Value corresponds to a True Cash Value estimate of $36,902.

112.    Ms. Black attempted to sell her home in 2016 for $13,000. She received no offers.

113.    The actual True Cash Value of Ms. Black's home in 2013, based on an appraisal of the home's fair-market value, was $5,000.

114.    Defendant City of Detroit over-assessed the value of Ms. Black's home for the 2013 tax year by $31,902.

115.    In 2013, Defendant City of Detroit levied property taxes of $607 on Ms. Black's home based on the over-assessed State Equalized Value. Ms. Black was unable to pay that amount.

116.    As of the date of this filing, Ms. Black owes $1,136.50 to Defendant City of Detroit for unpaid property taxes from tax year 2013 and earlier. Ms. Black is unable to pay that amount.

117.    Ms. Black's home is subject to tax foreclosure by the Wayne County Defendants.

**E.      Robert Lewis**

118.    Plaintiff Robert Lewis is a 45-year-old African-American resident of Wayne County and Detroit, Michigan.

119.    Mr. Lewis has been a truck driver for over 25 years. In the last three years, Mr. Lewis has been on short-term disability multiple times due to serious injuries requiring multiple surgeries to his knee, shoulder, and neck. Mr. Lewis was born and raised in Detroit.

120.    Mr. Lewis owns and occupies his home as his principal residence.

121.    Mr. Lewis's home is in Detroit's Russell Woods-Sullivan Historic District.

26

122.    Mr. Lewis purchased his home in 2005 from his grandmother, who lived in the home for almost 20 years.

123.    Although Mr. Lewis owns only one parcel of land on which his home stands, Defendant City of Detroit has assigned Mr. Lewis two parcel identification numbers for his home, Parcel ID 27072451 and Parcel ID 14004711.  Defendant City of Detroit sends Mr. Lewis a tax bill for each Parcel ID.  Mr. Lewis has tried on multiple occasions to resolve this discrepancy and has made payments on each Parcel ID.

124.    Based on Defendant City of Detroit's assessment under Parcel ID 14004711, the State Equalized Value of Mr. Lewis's home in 2013 was $23,920.  This State Equalized Value corresponds to a True Cash Value estimate of $47,840.

125.    The actual True Cash Value of Lewis's home in 2013, based on an appraisal of the home's fair-market value, was $17,000.

126.    Defendant City of Detroit over-assessed the value of Mr. Lewis's home for the 2013 tax year by $30,840.

127.    In 2013, Defendant City of Detroit levied property taxes of $2,736 on Mr. Lewis's home based on the over-assessed State Equalized Value.  Mr. Lewis was unable to pay that amount.

128.    As of the date of this filing, Mr. Lewis owes $25,571 for unpaid property taxes from tax year 2013 and earlier: $11,874 under Parcel ID 27072451; and $13,697 under Parcel ID 14004711.  Mr. Lewis is unable to pay that amount.

129.    Mr. Lewis received a foreclosure notice on Parcel ID 14004711 and Defendant City of Detroit continues to demand payment for the outstanding balance on Parcel ID 27072451.

130.     Mr. Lewis's home is subject to tax foreclosure on Parcel ID 14004711 by the Wayne County Defendants.

**F.     MorningSide Community Organization**

131.     Plaintiff MorningSide Community Organization is an incorporated voluntary association made up of approximately 15,476 members who live in homes in the MorningSide community, a neighborhood of approximately 5,500 homes located within the City of Detroit.

132.     MorningSide Community Organization was founded for the purpose of planning and organizing volunteer efforts addressing issues of community concern, including prevention of the deterioration of the neighborhood and promotion of a safe, healthful, and attractive environment for resident families.

133.     Many members of MorningSide Community Organization are owner-occupiers of homes within the MorningSide community.

134.     Most homes owned by MorningSide Community Organization members have been over-assessed by Defendant City of Detroit, and many members' homes have either been sold at foreclosure auctions by the Wayne County Defendants or face imminent foreclosure sale.

135.     MorningSide Community Organization does regular cleanups around the MorningSide community to care for and maintain properties that have become vacant due to tax foreclosures.  Expenses for these projects are paid out of MorningSide Community Organization's funds.

136.     In 2015, MorningSide Community Organization spent approximately $1,500 and 1,720 man-hours on maintaining and improving homes that had been abandoned due to tax foreclosures in an effort to stymie the effects of tax foreclosures in the MorningSide community.

137.    Approximately 1,187 foreclosure notices were issued against homes in the MorningSide community for 2016.  Currently, approximately 414 homes in MorningSide are at risk of sale in the 2016 foreclosure auction.

138.    The members of MorningSide Community Organization meet once a month for the purpose of addressing neighborhood issues.  Since the start of 2016, MorningSide Community Organization has devoted a portion of each monthly meeting to discussing ways to address tax foreclosures affecting MorningSide Community Organization members.

139.    Therefore, the members of MorningSide Community Organization have a significant and real interest in the matter being litigated, and that interest is germane to the purposes for which MorningSide Community Organization was founded and operates.  At least one member of MorningSide Community Organization has standing, or would have standing, in a civil action asserting this interest.  MorningSide Community Organization brings this action on behalf of the organization and its members.

### G.    Historic Russell Woods-Sullivan Area Association

140.    Plaintiff Russell Woods-Sullivan Area Association is a voluntary association made up of 104 members who live in homes in the Russell Woods-Sullivan Historic District ("Russell Woods"), a neighborhood of approximately 1,100 homes located within the City of Detroit.  The City of Detroit designated Russell Woods as a historic district in 1999.

141.    Russell Woods-Sullivan Area Association was formed in 1958 with the purpose of representing its members through civic engagement on matters of property maintenance and issues affecting homeownership.

142.    Many members of Russell Woods-Sullivan Area Association are owner-occupiers of homes within Russell Woods.

143.    Approximately 96 percent of Russell Woods residents are African-American.

29

144.    Russell Woods has a rich history as a middle-class, African-American neighborhood.

145.    Russell Woods was platted in the 1920s, and many original deeds contained racially discriminatory restrictive covenants limiting sale and occupancy of homes to Caucasians. Homes in Russell Woods were owned and occupied predominately by white and Jewish families until the late 1950s.

146.    The 1950s and 1960s saw an influx of African Americans into Russell Woods. These residents were middle-class and professional African Americans who were attracted to Russell Woods by the promise of homeownership and the security of living in a neighborhood of civically engaged homeowners.

147.    Russell Woods remains predominately African-American today.  Many homes in Russell Woods have been occupied by families for successive generations, and many current residents have lived in their homes for over 50 years.

148.    The 2008 mortgage crisis had a devastating effect on homeowners in Russell Woods.  In 2005, many homes in Russell Woods had fair market values in excess of $100,000; by 2009, these homes had fair market values of less than $20,000.

149.    Defendant City of Detroit's assessed values for homes in Russell Woods do not reflect the realities of the market, namely the depressed, post-mortgage-crisis home prices, leading to excessive tax bills for residents of Russell Woods and members of Russell Woods-Sullivan Area Association.

150.    Most homes owned by Russell Woods-Sullivan Area Association members have been over-assessed by the City, and many members' homes have either been sold at foreclosure auctions by the Wayne County Defendants or face imminent foreclosure sale.

30

151. In both 2014 and 2015, more than 200 of the 1,100 homes in Russell Woods were subject to tax foreclosure. These include homes owned by Russell Woods-Sullivan Area Association members.

152. In 2015, Russell Woods-Sullivan Area Association petitioned the City of Detroit and Wayne County to impose a moratorium on tax foreclosures for a period of one year to allow for the development of a comprehensive solution to the over-assessment of and tax foreclosures on homes in the City of Detroit.

153. In 2015, Russell Woods-Sullivan Area Association spent approximately $3,000 and 200 man-hours on efforts towards maintaining and improving homes that had been abandoned due to tax foreclosures in an effort to stymie the effects of tax foreclosures in Russell Woods.

154. There were approximately 320 foreclosure notices issued against homes in Russell Woods for 2016. Currently, 49 occupied homes in Russell Woods are at risk of sale in the 2016 foreclosure auction.

155. Therefore, the members of Russell Woods-Sullivan Area Association have a significant and real interest in the matter being litigated, and that interest is germane to the purposes for which Russell Woods-Sullivan Area Association was founded and operates. At least one member of Russell Woods-Sullivan Area Association has standing, or would have standing, in a civil action asserting this interest. Russell Woods-Sullivan Area Association brings this action on behalf of the organization and its members.

**H. Oakman Boulevard Community Association**

156. Plaintiff Oakman Boulevard Community Association was founded in 1986. It is an unincorporated voluntary association made up of approximately 100 dues-paying members

31

who live in homes in the Oakman Boulevard community, an historic neighborhood of approximately 600 homes located within the City of Detroit.

157.    Oakman Boulevard Community Association was founded for the purpose of upholding the integrity and historical nature of the neighborhood, maintaining the neighborhood's aesthetic appeal, and keeping residents informed about neighborhood business.

158.    Many members of Oakman Boulevard Community Association are owner-occupiers of homes within the Oakman Boulevard community.

159.    Most homes owned by Oakman Boulevard Community Association members have been over-assessed by the City, and many members' homes have either been sold at foreclosure auctions by the Wayne County Defendants or face imminent foreclosure sale.

160.    Approximately 910 foreclosure notices were issued against homes in the Oakman Boulevard community for 2016.  Currently, 183 occupied homes in the Oakman Boulevard community are at risk of sale in the 2016 foreclosure auction.

161.    The members of Oakman Boulevard Community Association meet once a month for the purpose of addressing neighborhood issues.  Since the start of 2016, Oakman Boulevard Community Association has devoted a portion of each monthly meeting to discussing ways to address tax foreclosures affecting Oakman Boulevard Community Association.

162.    Oakman Boulevard Community Association does regular cleanups around Oakman to care for and maintain properties that have become vacant due to tax foreclosures.

163.    Therefore, the members of Oakman Boulevard Community Association have a significant and real interest in the matter being litigated, and that interest is germane to the purposes for which Oakman Boulevard Community Association was founded and operates.  At least one member of Oakman Boulevard Community Association has standing, or would have

32

standing, in a civil action asserting this interest. Oakman Boulevard Community Association brings this action on behalf of the organization and its members.

## I. Neighbors Building Brightmoor

164.     Neighbors Building Brightmoor is an incorporated non-profit association of residents of the Brightmoor community. Brightmoor is a neighborhood of approximately 3,300 homes located within the City of Detroit.

165.     Neighbors Building Brightmoor was founded for the purpose of revitalizing the Brightmoor community by a range of initiatives including a focus on blight reduction through cleaning up trash, boarding up abandoned houses, and starting parks and gardens on vacant lots.

166.     Neighbors Building Brightmoor has approximately 80 membership households.

167.     Many members of Neighbors Building Brightmoor are owner-occupiers of homes within Brightmoor.

168.     Brightmoor was founded in 1922 as a suburban subdivision a mile away from Detroit's city limits. During the first two years after Brightmoor's founding, developers targeted sale of houses within its limits to white, working-class families. Developers even advertised the racially exclusive nature of the community, promoting Brightmoor as 100 percent white American. Homes in Brightmoor were owned and occupied predominately by white families until the early 1980s.

169.     The 1980s and 1990s saw an influx of African Americans into Brightmoor. These residents were working- to lower-class African Americans who were attracted to Brightmoor by its affordability and, for some, the promise of homeownership.

170.     Currently, residents in Brightmoor are approximately 90 percent African American.

33

171. Most homes owned by Neighbors Building Brightmoor members have been over-assessed by the City, and many members' homes have either been sold at foreclosure auctions by the Wayne County Defendants or face imminent foreclosure sale.

172. Approximately 1,138 foreclosure notices were issued against homes in Brightmoor in 2016. Many of these homes currently stand vacant. Currently, approximately 216 occupied homes in Brightmoor are at risk of sale in the 2016 foreclosure auction.

173. The members of Neighbors Building Brightmoor meet once a month for the purpose of addressing neighborhood issues. Neighbors Building Brightmoor has devoted a portion of each monthly meeting to discussing ways to address tax foreclosures affecting Neighbors Building Brightmoor members and the Brightmoor community.

174. Neighbors Building Brightmoor has collaborated with local organizations to organize tax foreclosure prevention workshops in the Brightmoor community. Neighbors Building Brightmoor does regular cleanups around Brightmoor to care for and maintain properties that have become vacant due to tax foreclosures. Expenses for these projects are paid out of Neighbors Building Brightmoor's funds.

175. Therefore, the members of Neighbors Building Brightmoor have a significant and real interest in the matter being litigated, and that interest is germane to the purposes for which Neighbors Building Brightmoor was founded and operates. At least one member of Neighbors Building Brightmoor has standing, or would have standing, in a civil action asserting this interest. Neighbors Building Brightmoor brings this action on behalf of the organization and its members.

34

## VIII.  State and Municipal Law Entitles Qualifying Detroit Residents to a Poverty Exemption from Michigan Property Taxes.

176.    Michigan state law requires municipalities to provide a property tax exemption to homeowners who, by reason of poverty, are unable to pay property taxes.  MCL 211.7u(1).

177.    To receive the poverty exemption, a homeowner must own and occupy the taxable property as his or her personal residence.  MCL 211.7u(2)(a).  An eligible homeowner must file a request for an exemption every year and provide the current or prior year's federal and state income tax returns for all individuals residing in the home (or sign an affidavit attesting that the resident is not required to file federal or state income taxes); a valid driver's license or other form of identification, if requested by the supervisor or board of review; and a deed, land contract, or other evidence of ownership of the property, if requested by the supervisor or board of review.  MCL 211.7u(2)(b)-(d).

178.    All poverty exemption applications are reviewed and determined by the local Board of Review.

179.    Defendant City of Detroit provides a 100% poverty exemption from property taxes for homeowners at or below its established poverty level, which is higher than the federal poverty level.  Defendant City of Detroit provides a 50% exemption for homeowners who make a proportioned amount (currently $2,500) above its established poverty level.

180.    The Detroit Defendants' policy and guidelines for the poverty exemption are not available online.  The city assessor's office will not mail a homeowner a copy of the poverty exemption guidelines on request.  A homeowner can only view copies of the guidelines in the assessor's office.

181.    Until this year, to obtain a poverty exemption in Detroit, a homeowner had to complete a two-step application process.  First, a homeowner was required to initiate the

35

application process in person at the Coleman A. Young Municipal Center by submitting a request form for a poverty application. The Detroit Defendants would then mail the homeowner an application. Second, the homeowner had to complete and return the application to the Detroit Defendants attaching supporting materials.

182.    The Detroit Defendants no longer require homeowners to complete the first step of the former two-step process. Homeowners can now request an application over the phone and the Detroit Defendants will mail an application to them. This change was only implemented recently and affected only some applicants for the poverty exemption for the 2016 tax year.

183.    In addition to the proof of income and assets that a homeowner must provide to qualify for a poverty exemption under state law, the Detroit Defendants require applicants to provide the report cards of every minor child in the household, to provide a Detroit reference, and to have the application notarized.

184.    Some homeowners who request a poverty exemption application never receive one.

185.    Homeowners who request a poverty exemption application regularly receive an application via mail just days before the application deadline, leaving insufficient time for applicants to prepare supporting materials.

186.    Homeowners who request a poverty exemption application regularly receive an application via mail bearing a return date that has already passed.

187.    The Detroit Defendants have a policy or practice of imposing additional requirements on poverty exemption applicants that exceed the criteria printed on the application guidelines, and of denying applications for failing to meet those additional requirements.

36

188.    The Detroit Defendants have a policy or practice of failing to inform poverty exemption applicants when their applications have been denied.

189.    The Detroit Defendants have a policy or practice of issuing vague denial letters that fail to identify the reasons an applicant's poverty exemption application was denied.

## IX.    The Named Individual Plaintiffs Have Been Harmed by the Detroit Defendants' Poverty Exemption Policies, and Similar Harm Is Foreseeable in Future Years.

### A.    Walter Hicks

190.    Walter Hicks is a 57-year-old resident of Detroit, Michigan.

191.    Mr. Hicks owns and occupies his home as his principal residence.

192.    Mr. Hicks's annual income is approximately $15,324 from social security disability benefits and food assistance.  Mr. Hick's annual income places him below the federal poverty level and the poverty level set by Defendant City of Detroit.

193.    Mr. Hicks is unable to pay his property taxes by reason of his poverty.

194.    Under Michigan state law and Defendant City of Detroit's policy, Mr. Hicks is entitled to a 100% exemption from property taxes due to poverty.

195.    In 2012, Mr. Hicks applied for a poverty exemption from the Detroit Defendants. He waited several months, and received another tax bill, but he never received a letter of approval or denial of his poverty exemption application.  Because he had not received an answer, Mr. Hicks inquired as to the status of his application in person, and a representative of the Detroit Defendants told him that his application had been denied but did not provide a reason.

196.    Physically going to the Coleman A. Young Municipal Center, once to apply for a poverty exemption application and again to inquire as to the status of the application, was difficult for Mr. Hicks because he does not own a vehicle and must rely on friends to drive him downtown.  When friends are unavailable or Mr. Hicks has an urgent matter that requires a

37

prompt trip to the Municipal Center, he is forced to take two or three buses and walk almost a mile, which causes him a lot of back pain. By bus, the travel takes over an hour.

197. Because of his frustration from his 2012 application, Mr. Hicks did not apply for a poverty exemption in 2013.

198. In 2014, Mr. Hicks went to the Municipal Center to request that an application for a poverty exemption be mailed to him.

199. At the Municipal Center, Mr. Hicks was required to pull a number and wait 30 minutes before he could speak to someone about requesting the poverty exemption application. The waiting aggravated Mr. Hick's back injury. Mr. Hicks completed the request to receive a poverty exemption application by mail.

200. Mr. Hicks received the poverty exemption application in the mail only four days before the deadline for returning the completed application.

201. Mr. Hicks completed the poverty exemption application and returned it to the Detroit Defendants. Mr. Hicks waited two months for a response from the Detroit Defendants. Because he had not received an answer, he inquired as to the status of his application in person, and a representative of the Detroit Defendants told him that his application had been denied.

202. After Mr. Hicks asked the reason for his denial, the representative informed him that the Board of Review denied his application for a poverty exemption because he owned another property. Mr. Hicks owns only one property — his principal residence. To prove this, Mr. Hicks obtained from the Register of Deeds at his own expense a copy of the deed to the second property that the City alleged he owned. The deed proved that another individual with the same first and last name as Mr. Hicks, but with a different middle name, owned the other

property. However, after providing proof of this fact to the Detroit Defendants, they stated that Mr. Hicks's application for a poverty exemption would remain denied.

203. The Detroit Defendants' denial of Mr. Hicks's application for a poverty exemption in 2014 was arbitrary and capricious.

204. It is likely that Mr. Hicks's income will fall below the poverty line in future tax years, and he will again apply for the poverty exemption. Absent intervention by the Court, it is likely that he will encounter a similarly arbitrary and capricious denial of the exemption.

**B. Spirlin Moore**

205. Spirlin Moore is a 77-year-old resident of Detroit, Michigan.

206. Mr. Moore owns and occupies his home as his principal residence.

207. Because Mr. Moore is almost completely deaf, has many health ailments, and is illiterate, he is reliant on his caregiver Trece Andrews.

208. Mr. Moore has relied on social security disability as his income since the late 1990s. His annual income is approximately $9,500 from social security disability and food assistance. Mr. Moore's annual income places him below the federal poverty level and the poverty level set by the City of Detroit.

209. Mr. Moore is unable to pay his property taxes by reason of his poverty.

210. Under Michigan state law and Defendant City of Detroit's policy, Mr. Moore is entitled to a 100% exemption from property taxes due to poverty.

211. The Detroit Defendants granted Mr. Moore a poverty exemption from his property taxes for the 2015 and 2016 tax years.

212. In 2011, Ms. Andrews drove Mr. Moore downtown to the Coleman A. Young Municipal Center to request a poverty exemption application. Ms. Andrews helped Mr. Moore complete the request for a poverty exemption application.

213.    Mr. Moore received the application in the mail with only a few days before the deadline.  Ms. Andrews helped Mr. Moore submit the application and extensive supporting documentation before the deadline.  Mr. Moore then received a letter denying his application because it was "incomplete," but the letter did not identify what was missing from the application.  Ms. Andrews called the Detroit Defendants and was told by a representative that the application was missing a bank statement.  Mr. Moore was not given the opportunity to supplement the application with the missing bank statement.

214.    Ms. Andrews attempted to help Mr. Moore apply for the poverty exemption again in 2012, 2013, and 2014.  Each time, they were required to travel downtown and wait for up to two hours to complete a request for the poverty exemption application.  Each year the application would be mailed only days before the deadline, leaving Mr. Moore and Ms. Andrews inadequate time to gather the numerous required documents.

215.    Mr. Moore applied for the poverty exemption in 2012, 2013, and 2014, but he was unable to collect all the required documents due to the late arrival of the application.  Mr. Moore's applications were denied in each of those years based on inadequate supporting documentation.  He was not given the opportunity to supplement his applications with the missing documents.

216.    The Detroit Defendants, in effect, improperly denied Mr. Moore a poverty exemption in 2013 and 2014.

217.    The Detroit Defendants' denial of Mr. Moore's application for a poverty exemption in 2013 and 2014 was arbitrary and capricious.

218.    It is likely that Mr. Moore's income will fall below the poverty line in future tax years, and he will again apply for the poverty exemption.  Absent intervention by the Court, it is likely that he will encounter a similarly arbitrary and capricious denial of the exemption.

**C.    Julia Aikens**

219.    Julia Aikens is a 67-year-old resident of Detroit.

220.    Ms. Aikens moved to Detroit from Georgia in 1969. She worked as a medical assistant in a nursing home from 1979 until 1999 when she was injured. Ms. Aikens has been on disability since 1999.

221.    Ms. Aikens owns and occupies her home as her principal residence.

222.    Ms. Aikens has received disability since 1999.  Ms. Aikens's annual income is approximately $12,900 from social security and food assistance.  Ms. Aikens's annual income places her below the federal poverty level and the poverty level set by the City of Detroit.

223.    Ms. Aikens is unable to pay her property taxes by reason of her poverty.

224.    Under Michigan state law and Defendant City of Detroit's policy, Ms. Aikens is entitled to a 100% exemption from property taxes due to poverty.

225.    In 2014, Ms. Aikens attempted to apply in person for a poverty exemption.  A representative of the Detroit Defendants turned Ms. Aikens away and informed her that she was not eligible for a poverty exemption until she had lived in her home for at least one year.  The poverty exemption application does not include a requirement that an applicant live in the residence for any minimum period of time in order to be eligible for the exemption.

226.    The Detroit Defendants' denial of Ms. Aikens's application for a poverty exemption in 2014 was arbitrary and capricious.

227. It is likely that Ms. Aikens's income will fall below the poverty line in future tax years, and she will again apply for the poverty exemption. Absent intervention by the Court, it is likely that she will encounter a similarly arbitrary and capricious denial of the exemption.

**D.  Edward Knapp**

228. Edward Knapp is a 67-year-old resident of Detroit.

229. Mr. Knapp has lived in Detroit, and in Brightmoor specifically, on and off since birth. He served in the Navy in California during the Vietnam War. In 2011, after being homeless, he returned to Michigan to start a new life.

230. Mr. Knapp owns and occupies his home as his principal residence.

231. Mr. Knapp's home is located in Brightmoor.

232. Mr. Knapp purchased his home in October 2011. The condition of Mr. Knapp's home at the time he purchased it required him to put extensive work, time, and money into it to ensure it was habitable.

233. Mr. Knapp's annual income is approximately $17,000 from social security. Mr. Knapp has been receiving social security since 2010. His income is below the poverty level set by the City of Detroit to receive a partial exemption.

234. Mr. Knapp has difficulty paying his property taxes by reason of his poverty.

235. Under Michigan state law and Defendant City of Detroit's policy, Mr. Knapp's annual income entitles him to receive a partial exemption from property taxes due to his poverty.

236. In 2014, Mr. Knapp went to the Coleman A. Young Municipal Center to apply for a poverty exemption. He had to walk almost twenty blocks after finding parking he could afford. Mr. Knapp then waited approximately 45 minutes until someone asked his name and informed him that they would mail him an application.

237.    After several weeks of not receiving the application, Mr. Knapp drove back to the Municipal Center to inquire as to its status.  He was told that he was in the system and it would be mailed to him.

238.    Mr. Knapp returned to the Municipal Center to ask for an application on four or five separate occasions.

239.    Mr. Knapp received the poverty exemption application in the mail the day after the printed deadline on the application.  Because the deadline had passed, Mr. Knapp did not apply.

240.    Mr. Knapp was unable to complete the second step of the poverty exemption application in 2014 due to the Detroit Defendants' late mailing of the poverty exemption application.  The Detroit Defendants, in effect, improperly denied Mr. Knapp a poverty exemption in 2014.

241.    The Detroit Defendants' denial of Mr. Knapp's application for a poverty exemption in 2014 was arbitrary and capricious.

242.    It is likely that Mr. Knapp's income will make him eligible for a poverty exemption from property taxes in future tax years, and he will again apply for the poverty exemption.  Absent intervention by the Court, it is likely that he will encounter a similarly arbitrary and capricious denial of the exemption.

## Class Action Allegations

243.    Plaintiffs Walter Hicks, Spirlin Moore, Dewhannea Fox, DeAunna Black, and Robert Lewis bring this action as a class action, pursuant to MCR 3.501, individually and on behalf of a proposed class consisting of African-American homeowners living in homes in Wayne County that were foreclosed on in 2016 for nonpayment of property taxes in 2013, or for

43

failure to make payments in accordance with payment plans they entered to resolve unpaid tax obligations for taxes assessed in years before 2013 (the "Over-Assessment Class").

244. Plaintiffs Walter Hicks, Spirlin Moore, Julia Aikens, and Edward Knapp bring this action as a class action, pursuant to MCR 3.501, individually and on behalf of a proposed class consisting of Detroit homeowners who applied for a poverty exemption from 2013 to the present and were denied process (the "Poverty Exemption Class").

245. There are over 3,000 members of the Over-Assessment Class, and there are more than 350 members of the Poverty Exemption Class. The members of the Classes are so numerous that joinder of all members is impracticable.

246. Plaintiffs' claims are typical of the claims of each member of each Class. Plaintiffs are members of the Class they seek to represent, and Plaintiffs were injured by the same wrongful conduct that injured other members within the Classes.

247. The Defendants have acted wrongfully in the same basic manner as to all members within each Class.

248. There are questions of law and fact common to all Class Members within each Class that predominate over any questions that, if they exist, affect only individual Class Members, including:

    a. whether it is the Wayne County Defendants' practice of foreclosing on owner-occupied homes despite the fact that many of the foreclosed properties have been over-assessed and over-charged property taxes in violation of Michigan state law;

    b. whether the Wayne County Defendants' foreclosure practices disparately impact African-American homeowners in Wayne County in violation of the Fair Housing Act;

44

c. whether the Detroit Defendants' process for obtaining a poverty exemption, including the numerous documents that are required to support an application for the exemption, is so unduly burdensome that it violates the due process rights of homeowners;

d. whether the Detroit Defendants have a policy or practice of failing to mail poverty exemption applications to homeowners who have requested them;

e. whether homeowners who request a poverty exemption application the Detroit Defendants regularly receive an application via mail just days before the application deadline, leaving insufficient time for applicants to prepare supporting materials;

f. whether homeowners who request a poverty exemption application from the Detroit Defendants regularly receive an application via mail bearing a return date that has already passed, which precludes or discourages applicants from seeking the exemption and in effect denies them the poverty exemption in violation of due process;

g. whether the Detroit Defendants have a policy or practice of failing to inform poverty exemption applicants when their applications have been denied;

h. whether the Detroit Defendants have a policy or practice of imposing additional requirements that are not printed on the application guidelines and of denying applications for failing to meet those additional requirements; and

i. whether the Detroit Defendants have a policy or practice of issuing denial letters that fail to identify the reasons an applicant's poverty exemption application was denied.

45

249. Plaintiffs and their chosen counsel will adequately represent the interests of the class.

250. Plaintiffs have selected counsel who are experienced with class action litigation.

251. Class litigation is superior to individually litigating the claims of each member of each class.

**Causes of Action**

**COUNT I**
**RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**
**(42 USC 3601-3619)**

252. Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

253. Under the Fair Housing Act, it is unlawful for any person, including a municipality or other governmental entity, to "make unavailable or deny[] a dwelling to any person because of race." 42 USC 3604(a).

254. A governmental body violates 42 USC 3604(a) when its neutral policies or practices have an unjustified disparate impact on members of a racial group.

255. The Wayne County Defendants have a neutral policy of foreclosing on properties, without regard to the inaccuracy of a property's assessment and tax bill.

256. The Wayne County Defendants' policies cause African-American homeowners in Wayne County to lose their homes through tax foreclosure at a higher rate than non-African-American homeowners in Wayne County.

257. The Wayne County Defendants have no legitimate justification for foreclosing on properties based on inaccurate and inflated tax bills. Even if there is a legitimate justification, there are less discriminatory alternatives available to the Wayne County Defendants that would achieve the same interests as these policies and practices.

46

258.    The Wayne County Defendants' policies and practices as alleged herein constitute discrimination in violation of the Fair Housing Act, 42 USC 3604(a).

259.    Plaintiffs and members of the Over-Assessment Class who have been subjected to the Wayne County Defendants' discriminatory housing practices are aggrieved persons as defined by the Fair Housing Act, 42 USC 3602(i). They have suffered actual injury as a result of the Wayne County Defendants' conduct as described herein, and will be further injured if the tax foreclosure process is permitted to go forward.

## COUNT II
## VIOLATION OF DUE PROCESS
## (US Const, Am XIV; Const 1963, art 1, § 17; 42 USC 1983)

260.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as though set out here word for word.

261.    The United States Constitution and the Michigan Constitution prohibit the government from depriving individuals of property interests without due process of the law. U.S. Const, Am XIV; Const 1963, art 1, § 17.

262.    42 USC 1983 allows individuals to bring actions against state actors for deprivations of federal constitutional and statutory rights.

263.    Michigan law allows individuals to bring actions against state actors for deprivations of rights guaranteed by the Michigan Constitution.

264.    The Detroit Defendants' unduly burdensome process for receiving a poverty exemption and general misadministration of the poverty exemption application process have resulted in denials of the poverty exemption to which Plaintiffs and members of the Poverty Exemption Class were entitled, in violation of their constitutional right to due process. The Detroit Defendants have failed to provide members of the Poverty Exemption Class with notice and a meaningful opportunity to be heard prior to denying their requests for a poverty exemption,

47

in violation of the Michigan Constitution and the United States Constitution. U.S. Const, Am XIV; Const 1963, art 1, § 17.

## Prayer for Relief

WHEREFORE, Plaintiffs, on behalf of themselves and each Class, pray for relief as follows:

A.   On Plaintiffs' First Cause of Action, Plaintiffs and the Over-Assessment Class respectfully request that the Court enter judgment:

> 1.   Declaring that the Wayne County Defendants' policies and practices, as alleged herein, violate the Fair Housing Act, as amended, 42 USC 3601-3691;
>
> 2.   Enjoining the Wayne County Defendants from continuing their practice of foreclosing on owner-occupied properties without regard to whether a property has been over-assessed;
>
> 3.   Requiring the Wayne County Defendants to take all necessary and appropriate affirmative steps to correct the continuing effects of their past and present discriminatory practices;
>
> 4.   Requiring such action by the Wayne County Defendants as may be necessary to restore all persons aggrieved by their discriminatory housing practices to the position they would have occupied but for such discriminatory conduct; and
>
> 5.   Awarding such other and further relief as the Court deems proper.

B.   On Plaintiffs' Second Cause of Action, Plaintiffs and the Poverty Exemption Class respectfully request that the Court enter judgment:

48

1. Finding that the Detroit Defendants' unduly burdensome poverty exemption application process, inaction on poverty exemption applications, inadequate notice when applications are denied, and general misadministration of the poverty exemption application process violated the due process rights of members of the Poverty Exemption Class;

2. Requiring the Detroit Defendants to allow Plaintiffs and members of the Poverty Exemption Class to apply retroactively for poverty exemptions for the 2013, 2014, 2015 and 2016 tax years;

3. Requiring the Detroit Defendants to remove the unduly burdensome documentary requirements from the poverty exemption application process and to ensure adequate procedural due process is extended to all poverty exemption applicants going forward; and

4. Awarding such other and further relief as the Court deems proper.

Respectfully submitted,

/s/ Sherrilyn Ifill
Sherrilyn Ifill[*]
   Director-Counsel
Janai Nelson[*]
Christina Swarns[*]
Joshua Rosenthal[*]
NAACP LEGAL DEFENSE AND EDUCATIONAL
   FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
cswarns@naacpldf.org
jrosenthal@naacpldf.org

/s/ Michael J. Steinberg
Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Mark P Fancher (P56223)
Kimberly Buddin (P79126)
AMERICAN CIVIL LIBERTIES UNION FUND
   OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6823
msteinberg@aclumich.org

49

| /s/  Coty Montag | /s/  Shankar Duraiswamy |
|---|---|
| Coty Montag[*] | Shankar Duraiswamy[*] |
| Ajmel Quereshi[*] | Sarah E. Tremont (P73809) |
| NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC. | Amia L. Trigg[*] |
| 1444 I Street, NW, 10th Floor | Jason Grimes[*] |
| Washington, DC 20005 | Wesley Wintermyer[*] |
| cmontag@naacpldf.org | COVINGTON & BURLING LLP |
| aquereshi@naacpldf.org | One CityCenter |
| | 850 Tenth Street, NW |
| | Washington, DC  20001-4656 |
| | (202) 662-6000 |
| | sduraiswamy@cov.com |
| | stremont@cov.com |
| | atrigg@cov.com |
| | jgrimes@cov.com |
| | wwintermyer@cov.com |

[*] Pro hac vice motions to be filed.

Attorneys for Plaintiffs

Dated:  July 13, 2016

50

**EXHIBIT 6B – PLAINTIFFS' OPPOSITION**

la

## STATE OF MICHIGAN
## IN THE WAYNE COUNTY CIRCUIT COURT

MORNINGSIDE, et al.,

    Plaintiffs,

v.

ERIC SABREE, et al.,

    Defendants.

Case No. 16-008807-CH
Hon. Robert J. Colombo, Jr.
Hearing: September 2, 2016 at 8:30 a.m.

**PLAINTIFFS' OPPOSITION TO
DETROIT DEFENDANTS' MOTION
FOR SUMMARY DISPOSITION**  16-008807-CH

---

Michael J. Steinberg (P43085)
Daniel S. Korobkin (P72842)
Mark P. Fancher (P56223)
Kimberly Buddin (P79126)
AMERICAN CIVIL LIBERTIES UNION FUND
  OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814

Christina Swarns (admitted pro hac vice)
Joshua Rosenthal (admitted pro hac vice)
NAACP LEGAL DEFENSE AND EDUCATIONAL
  FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Coty Montag (admitted pro hac vice)
Ajmel Quereshi (admitted pro hac vice)
NAACP LEGAL DEFENSE AND EDUCATIONAL
  FUND, INC.
1444 I Street, NW, 10th Floor
Washington, DC 20005
(202) 682-1300

Zenna Elhasan (P67961)
Wayne County Corporation Counsel
Davidde A. Stella (P69948)
Jacob S. Ghannam (P30572)
Assistant Corporation Counsel
500 Griswold St., 30th Floor
Detroit, MI 48226
(313) 224-5030

*Attorneys for Defendants Eric Sabree and
Wayne County*

Charles N. Raimi (P29746)
City of Detroit Law Department
2 Woodward Ave., Suite 500
Coleman A. Young Municipal Center
Detroit, MI 48226-3437
(313) 237-5037

*Attorney for Defendants City of Detroit and
Detroit Citizens Board of Review*

Shankar Duraiswamy (admitted pro hac vice)
Sarah E. Tremont (P73809)
Amia L. Trigg (admitted pro hac vice)
Jason Grimes (admitted pro hac vice)
Wesley Wintermyer (admitted pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4656
(202) 662-6000

*Attorneys for Plaintiffs*

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS CITY OF DETROIT AND DETROIT CITIZENS BOARD OF REVIEW'S MOTION FOR SUMMARY DISPOSITION

In this case, six Detroit homeowners, joined by four Wayne County neighborhood associations, bring a two-count class action to challenge unlawful government policies that are causing a severe tax foreclosure crisis in Wayne County. The sole claim that seeks relief against Defendants City of Detroit and Detroit Citizens Board of Review ("Detroit Defendants") is Count II, which alleges that the Detroit Defendants' administration of the poverty exemption application process violates Plaintiffs' constitutional rights to due process.[1]

Detroit Defendants have moved for summary disposition, contending that this Court lacks subject matter jurisdiction because Plaintiffs' claim "is within the exclusive jurisdiction of the Michigan Tax Tribunal." Defs' Mot at 3 ("Detroit Defendants' Motion"). However, the Detroit Defendants' Motion is premised on a basic and fundamental misunderstanding of the nature of Plaintiffs' claim against them and the relevant jurisprudential authority. Contrary to the Detroit

---

[1] Count I alleges that the Wayne County Treasurer and Wayne County ("Wayne County Defendants") foreclosure policies violate the Federal Fair Housing Act because they have an unjustified disparate impact on African-American homeowners. The legal theories and evidentiary proofs supporting this claim are laid out in full in Plaintiffs' Motion for Preliminary Injunction filed August 12, 2016.

2

Defendants' suggestion, Plaintiffs do not seek a ruling that they are actually entitled, individually or collectively, to a poverty exemption for any tax year. Rather, Plaintiffs' claim is directed entirely to the constitutionality of the poverty application process. Plaintiffs are only seeking (1) reforms to the application process to comply with constitutional requirements and (2) an opportunity to submit poverty exemption applications for prior years and have those applications considered under a reformed, constitutionally legitimate process.

Because Plaintiffs challenge only the constitutionality of the poverty exemption process and do not seek an order from this Court granting them a poverty exemption, this Court has subject-matter jurisdiction over Plaintiffs' claim. Michigan case law unequivocally holds that the Tax Tribunal cannot hear Plaintiffs' claim because the "Tax Tribunal lack[s] the authority to consider whether the procedures followed by [a city] and its board of review were sufficient to satisfy [a poverty exemption applicant's] constitutional right to procedural due process"—the very issue presented by Plaintiffs' claims. *Spranger v City of Warren*, 308 Mich App 477, 484; 865 NW2d 52 (2014). The law is equally clear that the Tax Tribunal's jurisdiction is limited to cases in which a taxpayer effectively seeks review of the *outcome* of the tax assessment process, which Plaintiffs' complaint does *not* do. See MCL 205.731.

For these reasons, Plaintiffs respectfully request that the Court deny the Detroit Defendants' Motion.

## BACKGROUND

Michigan law requires cities to provide an exemption to property taxes to persons who are unable to pay because of poverty. MCL 211.7u(1). As alleged in the Complaint, the Detroit Defendants' failure to provide Plaintiffs Walter Hicks, Edward Knapp, Spirlin Moore, and Julia Aikens, and the class of persons they seek to represent ("Poverty Exemption Class"), notice and a meaningful opportunity to be heard on their poverty exemption applications violated the

3

federal and Michigan constitutions' guarantee of due process. See Compl ¶¶ 180-89, 244, 264. The details regarding each named Plaintiff's due process claim underscore the extent to which the Detroit Defendants' egregious misadministration of the poverty exemption application process has denied Plaintiffs their constitutional rights:

- Plaintiff Walter Hicks applied for a poverty exemption in 2012 and 2014. *Id.* ¶¶ 195, 198. In 2012, he completed the in-person application and then submitted a written application, but, despite waiting several months, he never received a notification from Defendant City of Detroit regarding the outcome of his application.[2] *Id.* ¶¶ 188, 195. Mr. Hicks was forced to inquire about his application in person at the Detroit municipal building. *Id.* ¶ 195. A representative of Defendant City of Detroit told him that his application had been denied; Detroit Defendants never provided Mr. Hicks with a written denial or their reason(s) for denying his 2012 application. *Id.* ¶¶ 188, 195. Similarly, in 2014, Mr. Hicks completed the in-person and written application for a poverty exemption, did not receive a notification from Detroit Defendants as to the decision on his application, and was forced to inquire in person about the status of his application after months of waiting. *Id.* ¶¶ 198-201. A representative of Defendant City of Detroit told Mr. Hicks that his application was denied. *Id.* ¶¶ 201-02. Detroit Defendants never provided Mr. Hicks with a written denial or a written explanation for denying his 2014 application. *Id.*

- Plaintiff Edward Knapp went in person to the Detroit municipal building four or five times over several weeks to apply for a poverty exemption in 2014. *Id.* ¶ 236. Mr. Knapp was told that a written application would be mailed to him. *Id.* Mr. Knapp did not receive the application until the day after it was due, preventing him from completing the application process before the deadline. *Id.* ¶¶ 186, 237-39.

- Similarly, Plaintiff Spirlin Moore initiated the application process for a poverty exemption in 2011, 2012, 2013, and 2014. *Id.* ¶¶ 212, 215. He went to the Detroit municipal building to apply in person each year, but each year, he did not receive a written application in the mail until only a few days before the submission deadline. *Id.* ¶¶ 213, 215. As a result, Mr. Moore was unable to collect the extensive documentation that Detroit Defendants required be submitted with the written application. *Id.* ¶¶ 183, 185, 213-15. He was effectively denied the opportunity to

---

[2] Until 2016, Detroit Defendants required poverty exemption applicants to complete a two-step application process: "First, a homeowner was required to initiate the application process in person at the Coleman A. Young Municipal Center by submitting a request form for a poverty application. The Detroit Defendants would then mail the homeowner an application. Second, the homeowner had to complete and return the application to the Detroit Defendants attaching supporting materials." Compl ¶ 181.

complete the application process for a poverty exemption before the deadline. *Id.* ¶¶ 213-15.

- Plaintiff Julia Aikens fulfilled the first step of the poverty exemption application process by going in person to the Detroit municipal building and requesting a written application; however, she was turned away by someone who told her that she had to live in her home for one year before she could receive a written application for a poverty exemption. *Id.* ¶ 225. A minimum residency period is not a requirement of any publicly available poverty exemption guidelines of Detroit Defendants. *Id.* ¶¶ 187, 225.

This conduct by Detroit Defendants is a clear violation of the constitutional due process rights of Plaintiffs, and the members of the Poverty Exemption Class, because it denies them notice and an opportunity to be heard on their poverty exemption applications in a meaningful and timely manner. See *Spranger*, 308 Mich App at 482-83 (holding that the "owner of real property is entitled to the protection of constitutional due process with respect to the assessment and collection of property taxes"); see also *id.* at 483 (observing that due process requires "notice and an opportunity to be heard in a meaningful time and manner," and a "local board of review is required to provide constitutionally adequate notice in a manner that is consistent with due-process principles").

As a result, Plaintiffs and the Poverty Exemption Class request that the Court: (1) find that the Detroit Defendants' actions (and inactions) "violated the due process rights of members of the Poverty Exemption Class;" (2) allow the Poverty Exemption Class "to apply retroactively for poverty exemptions for the 2013, 2014, 2015, and 2016 tax years;" and (3) require that Detroit Defendants "ensure adequate procedural due process is extended to all poverty exemption applicants going forward." Compl, Prayer for Relief ¶ B. Although Plaintiffs believe that they may have been entitled to a poverty exemption for at least some of the tax years in question, they do *not* ask this Court to make that determination. Rather, Plaintiffs simply seek the opportunity to apply for a poverty exemption and have Detroit Defendants consider their

5

applications with the attendant protections of procedural due process, which they have not previously received.

The Detroit Defendants' Motion seeks dismissal of Plaintiffs' due process claim for lack of subject matter jurisdiction.[3] Detroit Defendants contend that the Tax Tribunal has exclusive jurisdiction over Plaintiffs' claims because they "seek to contest Board of Review decisions denying poverty tax exemptions" and "request . . . review of determinations relating to assessments under the property tax laws of this state." Defs' Mot at 4. As explained below, this clearly mischaracterizes the nature of Plaintiffs' claim and the relief sought.

## ARGUMENT

Summary disposition for lack of subject matter jurisdiction is appropriate only "if the pleadings sho[w] that defendant [is] entitled to judgment as a matter of law, or the affidavits and other proofs sho[w] that there [is] no genuine issue of material fact." *Weishuhn v Catholic Diocese of Lansing*, 279 Mich App 150, 176; 756 NW2d 483 (2008) (quotation marks and italics omitted).

This Court has subject matter jurisdiction over Plaintiffs' claim against Detroit Defendants for two reasons. First, as Michigan appellate courts have concluded, the state's circuit courts—and *not* the Tax Tribunal—have jurisdiction over pure procedural due process claims, which is what Plaintiffs are asserting here. Second, the Tax Tribunal's jurisdiction is limited to challenges to the outcome of a tax assessment in which a plaintiff seeks direct review

---

[3] The Detroit Defendants' Motion begins with a series of charges regarding the character and conduct of Plaintiffs' counsel—including a declaration that Plaintiffs' attorneys should be "ashamed" for having filed the lawsuit—none of which has any relevance to the Detroit Defendants' Motion. See Defs' Mot at 2-3. While Plaintiffs' counsel strongly disagrees with and objects to the Detroit Defendants' unreasonable and unusually personal attacks, Plaintiffs' opposition brief will spare the Court an extended discussion of these irrelevant distractions.

6

of an assessment decision, a form of relief that Plaintiffs are *not* seeking from this Court.

Therefore, the Detroit Defendants' Motion should be denied.

**I.     This Court Has Jurisdiction Because the Tax Tribunal Lacks the Authority to Adjudicate Pure Procedural Due Process Claims.**

The Detroit Defendants' Motion rests entirely on the false premise that "Plaintiffs in this case seek to contest Board of Review decisions denying poverty tax exemptions." Defs' Mot at 4; see also *id.* (erroneously asserting that Plaintiffs "request . . . review of determinations relating to assessments under the property tax laws of this state"). As explained above, it is clear from the face of the Complaint that the Detroit Defendants' characterization of Plaintiffs' claim is simply not true. Plaintiffs and the Poverty Exemption Class ask this Court to decide whether the *procedures* followed by Detroit Defendants were sufficient to satisfy Plaintiffs' constitutional right to procedural due process, and as relief, Plaintiffs seek only the opportunity to have their request for a poverty exemption considered under a constitutionally valid process. Compl ¶ 264, Prayer for Relief ¶ B. Michigan appellate courts have expressly held that circuit courts have jurisdiction to consider claims like this, in which taxpayers bring constitutional due process challenges to correct the procedures by which property taxes are assessed and poverty exemptions are adjudicated. Furthermore, they have held that the Tax Tribunal does *not* have jurisdiction over such claims.

**A.     The Case Law Clearly Establishes That The Tax Tribunal Lacks Jurisdiction Over Pure Procedural Due Process Claims.**

In *Spranger v City of Warren*, the Michigan Court of Appeals held that the Tax Tribunal does *not* have authority to resolve challenges to the constitutionality of the poverty exemption application process. There, the taxpayer applied for a poverty exemption with the City of Warren, but she omitted her exact income from her application. 308 Mich App at 478. The city board of review held a hearing on the application where the taxpayer could submit additional

7

evidence, but it failed to send the taxpayer written notice of the hearing. *Id.* at 478, 482. When the taxpayer did not attend the hearing or submit the necessary additional evidence, the city denied her application. *Id.* at 478. The taxpayer appealed the board of review's ruling on the poverty exemption application to the Tax Tribunal, which upheld the city's denial based on the missing income information in the application. *Id.* at 479. The taxpayer then appealed the Tax Tribunal's decision, arguing that the Tax Tribunal erred by basing its decision on the lack of specific income information in her application. *Id.*

The Michigan Court of Appeals reversed the Tax Tribunal's decision and held that the city violated the taxpayer's constitutional right to due process by failing to provide notice of the hearing and a right to be heard. See *id.* at 482-83. In doing so, the court made clear that the Tax Tribunal *itself* could not have decided the constitutional issue of the taxpayer's due process rights or shaped a remedy for the city's violation of those rights because the "Tax Tribunal does not have jurisdiction over constitutional questions." *Id.* at 484 (quoting *WPW Acquisition Co v City of Troy*, 254 Mich App 6, 8; 656 NW2d 881 (2002)). That is, the "Tax Tribunal lacked the authority to consider whether the procedures followed by the city of Warren and its board of review were sufficient to satisfy [the taxpayer's] constitutional right to procedural due process." *Id.* at 484. After ruling that the city had violated the taxpayer's constitutional due process rights, as a remedy, the Court of Appeals then remanded the matter to the Tax Tribunal so that the taxpayer could supplement her application and the Tax Tribunal could determine whether, in fact, she should be entitled to a poverty exemption. *Id.* at 484-85.

Detroit Defendants cite *Spranger* in their motion, highlighting a footnote in the decision that notes that the Tax Tribunal has exclusive jurisdiction to hear a "claim for a poverty exemption" following a board of review decision. Defs' Mot at 8. Detroit Defendants fail to

8

mention, however, the holding from *Spranger* that is actually relevant to the constitutional due process claim that Plaintiffs have asserted here: the Tax Tribunal "lack[s] the authority" to hear a claim that a city and board of review followed procedures that violated the "constitutional right to due process." *Spranger*, 308 Mich App at 484. That the Tax Tribunal has jurisdiction over a "claim for a poverty exemption" means only that, assuming compliance with due process requirements, the Tax Tribunal has jurisdiction to review the decision of whether a taxpayer should actually be granted a poverty tax exemption. Here, Plaintiffs do not challenge this jurisdiction; if the relief they seek is granted, they will re-submit poverty exemptions applications for a determination by the city board of review; if necessary, a challenge to the city's decision on the merits of their "claim for a poverty exemption" will then proceed before the Tax Tribunal.

*Spranger* is consistent with long-standing authority from the Court of Appeals holding that circuit courts, rather than the Tax Tribunal, have jurisdiction over constitutional due process challenges to property tax assessment procedures. In *Henshaw v State Tax Comm*, plaintiff taxpayers alleged that the State Tax Commission had denied them adequate procedural due process by barring them from independently representing their own interests, distinct from county elected officials, at property tax equalization hearings. 126 Mich App 806, 810-11; 338 NW2d 224 (1983); see *id.* at 809-10 (explaining that the ultimate question in the case was whether individual property owners were denied due process of law by the state's intercounty equalization procedures). The Court of Appeals held that the "circuit court"—and not the Tax Tribunal—was "the proper forum in which to raise these issues" because the taxpayers' procedural due process claim involved "purely constitutional issues outside the [Tax] [T]ribunal's sphere of expertise." *Id.* at 810.

9

Even the Tax Tribunal itself has repeatedly confirmed that it lacks authority to consider claims that due process has been violated where those claims do not challenge the accuracy of an underlying tax assessment, because "the issue of due process [is] unrelated to the law of taxation and, therefore, [is] not within the [Tax] Tribunal's sphere of expertise."[4] *Fahall Transp, Inc v Mich Dep't of Treasury*, unpublished opinion of the Michigan Tax Tribunal, 1995 WL 811650, at *2 (Docket Nos. 220493, 220531, 220507), issued December 18, 1995 (quotation marks omitted); see also *Highland-Howell Dev Co v Twp of Marion*, unpublished opinion of the Michigan Tax Tribunal, 2004 WL 2251148 (Docket No. 261431), issued March 19, 2004 (refusing to allow taxpayer's untimely protest of a special assessment despite claim that barring protest "would deprive [taxpayer] of due process" due to township's lack of notice, because Tax Tribunal "has no authority" to consider matters related to due process or to extend to a taxpayer any "remedy . . . . based on Due Process under the state and/or federal constitution(s)"); *Am Axle & Mfg Inc v City of Hamtramck*, unpublished opinion of the Michigan Tax Tribunal, 1995 WL 811653, at *4 (Docket No. 220264), issued December 15, 1995 (noting that Tax Tribunal lacks jurisdiction to hear "purely constitutional issues such as due process") (brackets omitted), *rev'd on other grounds* 461 Mich 352; 604 NW2d 330 (2000); *Cygan v Mich Dep't of Treasury*,

---

[4] This stems from the Michigan Supreme Court's recognition in *Wikman v City of Novi* that, although the Tax Tribunal lacks the power to determine constitutional questions, the Tax Tribunal may decide "constitutional" claims where the "claim is merely an assertion, in constitutional terms, that the assessment was arbitrary and without foundation." 413 Mich 617, 647; 322 NW2d 103 (1982). That is, although an issue "might be framed in constitutional terms," the Tax Tribunal has "jurisdiction over those tax issues which involve the *accuracy* and *methodology* of the property tax assessment." *Johnston v City of Livonia*, 177 Mich App 200, 208; 441 NW2d 41 (1989) (emphasis added); see also *Romulus City Treasurer v Wayne Co Drain Comm'r*, 413 Mich 728, 737; 322 NW2d 152 (1982) ("The expertise of the tribunal members can be seen to relate primarily to questions concerning the factual underpinnings of taxes."). By contrast, "purely constitutional" issues not related to the accuracy of a tax assessment are not within the Tax Tribunal's "sphere of expertise," and "the circuit court is the proper forum in which to raise these issues." *Henshaw*, 126 Mich App at 809-10.

10

unpublished opinion of the Michigan Tax Tribunal, 1995 WL 606082 at *2 (Docket No. 135626), issued August 28, 1995 (refusing to consider taxpayer's claim that statute violated his "due process rights" because it raised a question "not within the expertise of the [Tax] Tribunal").[5]

### B. Cases Cited by Detroit Defendants Are Inapplicable Because They Do Not Involve Pure Procedural Due Process Claims.

Detroit Defendants cite a few cases in which courts have found that the Tax Tribunal can consider claims that are framed in constitutional terms. But those cases are clearly distinguishable from this case, as well as from *Spranger* and *Henshaw*, because they do not involve pure procedural due process claims regarding notice and an opportunity to be heard. Rather, they all involve claims challenging the substantive merits of a particular tax assessment and seek, as relief, a determination by the court that the assessment was inaccurate and some form of monetary relief.

Detroit Defendants highlight *Johnson v State* to suggest that the Tax Tribunal has exclusive jurisdiction over "constitutional claims such as denial of due process." Defs' Mot at 5. But *Johnson* is clearly distinguishable. There, the plaintiffs did not simply challenge the procedures for determining property assessments and taxes, but the actual calculations. Specifically, they alleged that "defendants failed to equalize all tax valuations at 50 percent of true cash value on a uniform basis" and that this resulted in "unequal and inequitable assessments and collection of property taxes." 113 Mich App 447, 459; 317 NW2d 652 (1982). And as relief, they sought, *inter alia*, money damages and a refund due to the allegedly inaccurate assessments. *Id*. at 450-51, 461. The Court of Appeals concluded that the Tax

---

[5] All unpublished Tax Tribunal decisions cited herein are attached as exhibits for the convenience of the Court.

11

Tribunal had jurisdiction because, although the Plaintiffs asserted constitutional due process and equal protection claims, those claims arose from the assertion that the defendants had inaccurately calculated the assessments "based upon improper data" in violation of Michigan state law. *Id.* at 459-60, 462. By contrast, in this case, Plaintiffs have asserted a pure procedural due process claim against Detroit Defendants based on insufficient notice and a meaningful opportunity to be heard. Plaintiffs do not challenge the accuracy of any specific calculation or data, and they do not seek money damages or a refund of taxes based on an allegedly inaccurate calculation. Indeed, as explained above, the very problem faced by the named Plaintiffs is that they could not make such a challenge because they were denied the opportunity even to complete their applications or to learn why their application was denied.[6]

The Detroit Defendants' reliance on *Wikman v City of Novi* and *Johnston v City of Livonia* is also misplaced, as both cases involve allegations and requests for relief that are very different from this case. In *Wikman*, taxpayers filed an action in circuit court seeking a ruling that would declare a special tax assessment by a city based on a public improvement to be "null and void," enjoin collection of the assessment, and discharge any liens arising from the special assessment. 413 Mich 617, 630; 322 NW2d 103 (1982). After a hearing, the circuit court ruled that the special assessment was, in fact, improperly high because plaintiffs had not received any special benefit from the public improvement (the city's paving of a road near the plaintiffs' home); as a result, the court voided the assessment and enjoined its collection. *Id.* On appeal, the Court of Appeals held that the Tax Tribunal had jurisdiction over this challenge because,

---

[6] Moreover, *Johnson* predated the Court of Appeals' decisions in *Spranger* and *Henshaw*, wherein the court expressly recognized that issues of procedural due process are outside the Tax Tribunal's sphere of expertise and to be decided by a circuit court. *Spranger*, 308 Mich App at 484; *Henshaw*, 126 Mich App at 810.

12

although the plaintiffs had asserted a constitutional claim on the ground that the assessment was "arbitrary and inequitable," the merits of the claim turned on whether the city had properly determined that the plaintiffs' property benefitted from the public improvement. *Id.* at 629-30, 647. That issue, in turn, implicated "many fact determinations" that the Tax Tribunal was uniquely qualified to address. *Id.* at 647. Similarly, in *Johnston v City of Livonia*, 177 Mich App 200, 208; 441 NW2d 41 (1989), the plaintiff challenged the defendant city's refusal to partition a property for purposes of tax assessments on the ground that it was contrary to Michigan law about when such partitions should be undertaken. Plaintiff asked the court to order separate assessments for two parts of the property and award money damages for taxes that should not have been paid. *Id.* at 203. Although the plaintiff asserted a constitutional claim on the ground that the assessment was "arbitrary, capricious, and without foundation," this claim was premised on the plaintiff's contention that the decision not to partition the properties was substantively incorrect—a factual issue within the expertise of the Tax Tribunal. *Id.* at 207-08. Thus, relying on *Wikman*, the Court of Appeals held that the Tax Tribunal had jurisdiction over the claim. *Id.*

Unlike the plaintiffs in *Wikman* and *Johnston*, Plaintiffs in this case are not asking this court to review and overturn a city's decision regarding the amount of tax that they owe, to resolve an issue that is within the Tax Tribunal's expertise, or to award any monetary relief. Rather, Plaintiffs and the Poverty Exemption Class challenge the *processes* that Detroit Defendants put in place to apply for a poverty exemption because they have deprived them of a meaningful opportunity to have their eligibility for a poverty exemption considered in the first place. Plaintiffs seek an order from this Court that would simply allow them to re-apply for a

13

poverty exemption and to require Detroit Defendants to consider that application in a manner that is consistent with constitutional due process.

## II. The Tax Tribunal Does Not Have Jurisdiction over Plaintiffs' Claim Because It Does Not Seek Direct Review of a Decision to Deny a Poverty Exemption or the Redetermination of the Amount of an Assessment.

In addition to Michigan courts consistently holding that constitutional due process questions should be adjudicated by courts of general jurisdiction rather than the Michigan Tax Tribunal, it is clear that this case does not fall within statutorily-defined jurisdiction of the Tax Tribunal. The Tax Tribunal has jurisdiction over (a) "direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment"[7] or (b) "a refund or redetermination of a tax levied under the property tax laws." MCL 205.731. Here, it is plain that Plaintiffs are not seeking direct review of any ruling related to an assessment of their property value. And as explained above, Plaintiffs are not seeking a refund or a specific determination regarding the taxes they owe, but rather changes to the process by which their entitlement to a poverty exemption is considered.

Once again, the cases cited by Detroit Defendants—in which courts concluded that challenges to the validity of tax assessments were subject to the jurisdiction of the Tax Tribunal—fail to support their position. Each of these cases involves an attempt by plaintiffs to have a circuit court reassess the amount of an assessment and make a final determination as to the proper amount that should have been assessed—relief that is not sought by Plaintiffs here.

---

[7] As the Michigan Supreme Court recently interpreted this part of the Tax Tribunal's jurisdictional statute, "for the tribunal to have jurisdiction pursuant to MCL 205.731(a), four elements must be present: (1) a proceeding for direct review of a final decision, finding, ruling, determination, or order; (2) of an agency; (3) relating to an assessment, valuation, rate, special assessment, allocation, or equalization; (4) under the property tax laws." *Hillsdale Co Sr Servs, Inc v Hillsdale Co*, 494 Mich 46, 53; 832 NW2d 728 (2013)

For example, in *Colonial Village Townhouse Cooperative v City of Riverview*, the taxpayer sought monetary damages from a city based on the city's alleged wrongful assessment of taxes for garbage collection and disposal services it failed to provide. 142 Mich App 474, 476-77; 370 NW2d 25 (1985). The Court of Appeals explained that jurisdiction should "be determined . . . by the relief sought and the underlying basis of the action." *Id.* at 478. Because the plaintiff, in that case, ultimately sought a redetermination as to whether the property should have been assessed the taxes at the heart of the dispute, jurisdiction properly lay with the Tax Tribunal. See *id.* at 478 ("No matter how skillfully plaintiff camouflages it, the underlying basis of plaintiff's claim is that a city may not collect a tax to provide a service and then refuse to provide that service to certain individuals.").

Similarly, in *In re Petition of the Wayne County Treasurer for Foreclosure*, 286 Mich App 108, 109-10; 777 NW2d 507 (2009), the taxpayer sought to prevent the entry of a foreclosure judgment in circuit court by arguing that it was factually and legally entitled to an exemption from property taxes. The circuit court held that the property was exempt, but the Court of Appeals reversed, stating that a determination regarding the ultimate issue of whether the property was exempt was reserved for the Tax Tribunal. *Id.* at 110, 112. Because the Tax Tribunal has expertise concerning "assessments, valuations, rates, allocation and equalization" and the case "[was] simply a direct challenge to a tax assessment," the circuit court lacked the ability to declare the parcel exempt from taxation. *Id.* at 112, 113 (quoting *Romulus City Treasurer v Wayne Co Drain Comm'r*, 413 Mich 728, 737; 322 NW2d 152 (1982)). [8]

---

[8] The remaining cases cited by Detroit Defendants likewise involved situations in which taxpayers attempted to challenge the underlying factual bases of their tax assessments before circuit courts, as opposed to raising pure constitutional issues. See *Hillsdale Co Sr Servs, Inc*, 494 Mich at 53 (finding that the Tax Tribunal had jurisdiction to review decision of county board of commissioners not to fund plaintiff senior-services center through levy of additional 0.5 (continued...)

15

In contrast to these cases, Plaintiffs do not ask this Court to determine whether their ultimate property tax assessments were valid and lawful or whether they should have been awarded an exemption. Rather, they ask this Court to determine whether the process by which those decisions were made were compliant with constitutional due process protections. It is only after Plaintiffs' claims before this Court are resolved that the question of whether Plaintiffs are actually entitled to a poverty exemption, and whether their property tax assessments were therefore inaccurate, will be addressed through the administrative process. Therefore, the Tax Tribunal does not have jurisdiction over Plaintiffs' claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion by Defendants City of Detroit and Detroit Citizens Board of Review to Dismiss the Claims Against Them for Lack of Jurisdiction.

Date: August 26, 2016                          Respectfully submitted,

---

million property tax); *Forest Hills Co-operative v City of Ann Arbor*, 305 Mich App 572, 619-20; 854 NW2d 172 (2014) (finding that Tax Tribunal had jurisdiction over taxpayer's claim challenging city's "method of valuation" used for taxpayer's property tax assessment).

/s/ Michael J. Steinberg

Michael J. Steinberg (P43085)
AMERICAN CIVIL LIBERTIES UNION FUND
  OF MICHIGAN
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6814

/s/ Coty Montag

Coty Montag (admitted pro hac vice)
NAACP LEGAL DEFENSE AND EDUCATIONAL
  FUND, INC.
1444 I Street, NW, 10th Floor
Washington, DC 20005
(202) 682-1300

/s/ Shankar Duraiswamy

Shankar Duraiswamy (admitted pro hac vice)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4656
(202) 662-6000

17

## Unpublished Tax Tribunal Decisions

| Exhibit No. | Tax Tribunal Decision |
|---|---|
| Exhibit A | *Fahall Transp, Inc v Mich Dep't of Treasury*, 1995 WL 811650 (Mich Tax Tribunal) |
| Exhibit B | *Highland-Howell Dev Co v Twp of Marion*, 2004 WL 2251148 (Mich Tax Tribunal) |
| Exhibit C | *Am Axle & Mfg Inc v City of Hamtramck*, 1995 WL 811653 (Mich Tax Tribunal) |
| Exhibit D | *Cygan v Mich Dep't of Treasury*, 1995 WL 606082 (Mich Tax Tribunal) |

16-008807-CH
FILED IN MY OFFICE
WAYNE COUNTY CLERK
8/26/2016 3:24:15 PM
CATHY M. GARRETT