# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

**City of Detroit, Michigan**

          **Debtor**

**Bankruptcy Case No: 13-53846**
**Honorable Thomas J. Tucker**
**Chapter 9**

## VERIFIED MOTION FOR LEAVE TO
## FILE DELAYED PROOF OF CLAIM

Jerome Collins, by counsel, moves this Honorable Court pursuant to *Federal Rule of Bankruptcy Procedure Rule 3003(C) (3)* for leave to file a delayed or amended Proof of Claim. In support of his Motion, Collins states as follows:

1. Movant requests leave to file a delayed or amended POC #1877 which was timely filed by the Detroit Police Officers Association (hereinafter DPOA), his collective bargaining agent.[1]

2. That Collins' claims arises under, or are defined by, *Section 101(5)(A) of the Bankruptcy Code*, because he is asserting a right to payment for his contingent or unliquidated claim for monetary as well as equitable relief against DPD and certain individuals employed by DPD, who have violated rights arising under his *Collective Bargaining Agreement, the Fourteenth Amendment to the United States Constitution, federal statutes, the State of Michigan Constitution, and Michigan's statutes and common law.*

3. The individuals with exposure to Collins' claims in their individual capacity, at all times material hereto were employed by the DPD and were acting under color of law when they

---

[1] Logically, it seems to Movant that the POC would subsume any and all claims Collins might have in order to preserve his right to pursue any remedies he might have if, and when, the opportunity presented itself in the future.

1

violated Collins rights of equal protection and due process with respect to his liberty and property interests in his continued employment with DPD.

4. That Collins' claims arose within the *'fair contemplation'* of the City on July 11, 2013 when it filed its Chapter 9 Petition.

5. The City's view that the POC #1877 operated narrowly to preserve "... *his rights under the disciplinary process"* is inconsistent with well settled law to the effect that a POC may be read expansively, (or by inference amended),in order to preserve all claims the claimant might possess.

6. Movant asserts that a delayed POC is necessary in order to preserve his rights under the *U.S. Constitution, State of Michigan Constitution and other sources.* Said claims include a procedural due process liberty interest claim arising from the defamatory impression DPD created of him during the course of his termination. DPDP stigmatizing public statements violated Collins' liberty interest under a stigma plus analysis. *See Codd v Velger, 429 U.S. 624, 628 (1977).*

7. As Movant understands the governing law, a POC is not required to expressly enumerate on its face all aspects of any legal or constitutional (whether State of Michigan or United States) theories underlying a claim, provided other circumstances would apprise the City of additional elements of his claim. *See, Plymouth Mills, Inc., v FDIC, 876 F. Supp 439 (ED NY 1995)*

8. At the time, DPOA filed Movant's POC #1877, the DPD had been pursuing efforts since 2008 either to prosecute Collins criminally, or to terminate him.

9. Since the DPD had flagrantly and repeatedly violated Collins' right to due process of law by knowingly bringing false charges against him, falsifying or withholding exculpatory

evidence, *See Exhibit 1,* providing perjured testimony, concealing witness, conspiring with his former spouse, conducting investigations that violated *Art 1, §17 of the State of Michigan's Constitution* (which guaranteed Collins fair and just treatment) during the course of DPD's investigation, it knew full well on December 8, 2011, at the conclusion of a jury trial in Wayne County Circuit Court before Judge Patricia Fresard, in which Collins was acquitted of all charges brought by DPD, the range of its wrongful conduct towards Collins that created exposure for the individuals involved, as well as DPD.

10. DPD still pursued termination proceedings against him which exacerbated prior liberty interest violations under stigma plus circumstances.

11. Collins was charged with conduct unbecoming an officer for working a second job as a security officer. *See, Exhibit 2*

12. Since Collins had already been found not guilty by a jury for the same conduct, it was fully apprised of additional elements of Collins' claims. *See, Exhibit 3*

13. The departmental disciplinary process clawed back to 2007, after an anonymous letter (now known to have been authored by Collins' ex-wife) was mailed to Collins' superiors in 2008 accusing him of improprieties with respect to his time and attendance at his job with DPD. Internal affairs never informed Collins that he was under investigation for allegations of payroll fraud that his wife had made against him in her letter to his superiors.[2]

14. That DPD's wrongful conduct over time, while acting under color of law, created exposure to claims against individuals that greatly exceeded the narrowly drafted POC #1877.

---

[2] Commander DuLunt, the last custodian of the 2008 letter has informed Collins that said letter cannot be located.

15. That, in light of the numerous theories of recovery flowing from violations of federal and state law, or claims Collins had when POC #1877 was filed, arguably, said POC was defective because it omitted to even name said possible claims, or theories of which DPD was or should have been fully aware because its wrongful conduct and that of individuals over the span of several years created the exposure.

16. That under the holding in *Monell v N.Y. City Dept of Social Services, 436 US 658, 690-91, 692 (1978),* Detroit may be found liable for the deprivation of Collins' federal rights caused by its own custom, policy or practice. Equitable relief is available.

17. That amendments to a claim is permitted on a liberal basis. *See, In re: Orion Refining Corp., 317 B.R. 660 (Bankr. D. Del. 2004),* and should be freely permitted, absent equitable considerations or prejudice to the opposing party. *See, In Re Edison Bros Stores, Inc., No 99-532, 2002 WL 999 260 at *3 (Bankr.D.Del May 15, 2002). Copy attached as Exhibit 4*

18. On our facts, which demonstrate a sustained bad faith effort to 'get' Collins, and a prolonged abuse of the authority granted the City of Detroit/DPD, under *Michigan's Home Rule Statute,* it would be impossible for the City/DPD to demonstrate any counter-vailing equitable considerations or prejudice.

19. That at no time pertinent hereto did DPD, or any of its officers or agents with exposure in their individual capacities involved in investigating or prosecuting Collins for alleged payroll fraud, have probable cause to believe Collins had committed or was committing any of the three felonies with which he was falsely charged, and tried. Yet, DPD suspended Collins without pay on January 21, 2010, caused Collins at great expense for legal fees to defend against the false charges through a jury trial at which he was

4

acquitted of all charges on December 8, 2011. He requested reinstatement on December 12, 2012, and December 26, 2012.[3] *See, Exhibits 5, 6, and 7, and again on November 26, 2013.*

20. DPD, and its agents or officers, acted with actual malice towards Collins and with willful and wanton indifference to and deliberate disregard for Collins statutory and constitutional rights. Said conduct reflected a *'custom policy or practice'* to deprive Collins of federal rights under the holding in *Monell, supra.*

21. That Movant seeks to amend his POC to cure defects in #1877, to describe his claims with greater particularity, and to plead new theories of recovery supported by the facts of the original claim. Collins also seeks to proceed on his own because his union has notified him that it will no longer prosecute his grievance as to his termination. *See, Exhibit 8, letter from Linda Broaden, Union Steward over Collins' case, dated September 29, 2016.*

22. To be clear, the factual predicate underlying POC #1877, also subsumes claims arising under Michigan Common and Statutory Law, the *Michigan Constitution, i.e., Art 1, §17,* (which guaranteed Collins the right to be treated fairly and justly during any investigation DPD conducted of him), *42 USC § 1983, the Due Process and Equal Protection Clauses of the 14th Amendment,* as well as the *Elliott-Larsen Civil Rights Act, MCL 37,2201.*

23. The decision whether to allow Collins to file a delayed or amended POC lies within the sound discretion of the Court and is subject to a two-part test:

   – Whether an amendment relates back to the originally filed POC; and

   – Whether it is equitable to allow the amendment. *See, In Re Enron Creditors Recovery Corp., 370 B.R. 90-94-95 (Bankr S.D. NY 2007)*

---

[3] Collins was given a 'Garrity' on December 20, 2011.

24. That in weighing the equities, the salient consideration is whether the opposing party will be unduly prejudiced by the amendment. *See In Re Integrated Res., Inc., 157 B.R. 66, 70 (S.D.N.Y. 1993)* On our facts, no undue prejudice can be demonstrated.

25. That the City's filing of its Chapter 9 Petition on July 18, 2013, should have stayed all disciplinary proceedings against Collins arising from his employment as a police officer, including arbitration proceedings that concluded with his termination. The stay, however, was ignored, and between July 8, 2013 and July 11, 2013, the City conducted Final Board Proceedings to terminate Collins. *See, Exhibit 9* He was terminated, again, as a result of this hearing.

26. The reader should bear in mind that his Request for Reinstatement made on December 12, 2012, and repeated on December 26, 2012, was never resolved. However, a grievance arbitration was held on June 12, 2013, but as best Collins is able to determine, the matter remains open. Movant suggests that under the stay, neither the City, its Departments nor its agents were empowered to proceed without leave of the Bankruptcy Court.

27. That on June 12, 2013, a hearing convened on Collins' grievance for back pay and reinstatement based on his acquittal. It was adjourned without a decision on account of the City's filing of the Chapter 9 Petition. It remains open to date.

28. That since the City's intention to file a Chapter 9 Petition was well known to all of its employees or agents, any expedited disciplinary proceedings as to Collins, demonstrated a bad faith desire to proceed with same under the wire.

29. Such unseemly haste must be evaluated in light of well settled policies or procedures that look askance at conducts in the 90 days preceding the filing of the petition.

30.     That leave should be granted because Collins' due process right to reinstatement after he was acquitted on December 8, 2011, was somehow brushed aside, ignored, or completely disregarded in the proceedings conducted by Arbitrator Ashford which Movant suggests were *void ab initio* to the effect that any decision rendered by an Arbitrator was a nullity, and of no lawful effect.

WHEREFORE, based upon the foregoing, Collins moves this Court to grant him leave to file an amended or delayed POC that will state any and all claims, or theories of recovery sharing a common factual predicate with POC #1877, or which arose in the course of wrongful conduct from DPD and individuals acting under color of law, dating back to 2007 and continuing, the named individuals, and others.

The conduct complained of as to individuals acting under color of law is specifically exempted from the bar raised by the City's Chapter 9 proceedings. Conduct as to the City is subject to equitable relief on orders of this Court.

Collins further moves this Court to advance this matter on its docket because he has been denied justice for 7 or 8 years, and has had to endure ongoing economic deprivation since January 21, 2010, (when he was suspended without pay) denial of access to health care or treatment due to the cancellation of his health insurance benefit, and extreme emotional distress caused by the unrelenting and wholly unjustified attacks against him by the DPD acting through its officers or agents.

_____

Jerome Collins

BENJAMIN WHITFIELD, JR & ASSOCIATES, P.C.

/s/ Benjamin Whitfield, Jr.
     Benjamin Whitfield, Jr. (P23562)
     613 Abbott Street
     Detroit, Michigan 48226
     (313) 961-1000
     benwlaw4822@aol.com

Dated: November 30, 2016

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

City of Detroit, Michigan

              **Debtor**

Bankruptcy Case No: 13-53846
Honorable Thomas J. Tucker
Chapter 9

## LIST OF EXHIBITS FOR VERIFIED MOTION

1.   Copy of inter-office memorandum from Internal Affairs, dated February 15, 2012

2.   Transcript of Trial Board proceedings held on July 11, 2013

3.   Copy of articles dated April 20, 2010 and December 12, 2011

4.   *In re Edison Bros, Stores, Inc., 2002 WL 999 260*

5.   Letter dated December 12, 2013 from Mr. Goldspaugh, DPOA attorney to DPD requesting Mr. Collin' reinstatement

6.   Letter dated December 26, 2012, from Mr. Goldspaugh, DPOA attorney reiterating Collins' request to be reinstated.

7.   Letter dated September 29, 2016 from Linda Broaden, Shop Steward DPOA, notifying Collins that DPOA had closed its file on grievance #10-005

8.   Transcript of disciplinary board proceedings, dated July 8, 2013

**EXHIBIT 1**



To:        Commander Brian R. Stair, Internal Controls (Direct)

Subject:   IA CASE #09 142
           POLICE OFFICER JEROME COLLINS, BADGE 1508, PENSION #232998
           APPOINTED:       SEPTEMBER 20, 1993
           ASSIGNMENT:      EASTERN DISTRICT
           ALLEGATION:      TIME FRAUD

From:      Lieutenant Whitney Walton, Internal Affairs

## INTRODUCTION

On November 30, 2009, a letter was sent to then Chief of Police Warren C. Evans alleging that Police Officer Jerome Collins, badge 1508, assigned to the Eastern District was getting paid for work, even though he was not there.

On December 4, 2009, Commander Brian R. Stair, of Internal Affairs received an electronic copy of the aforementioned letter and directed members of Internal Affairs to respond to the Eastern District and obtain all documentation relative to the scheduled working hours and discretionary time of Officer Collins. (Document 7-1)

On this same date, at approximately 9:00 A.M., Internal Affairs Alert Team Members, Sergeant U. Renee' Hall, badge S-582, and Sergeant Dietrich Lever, badge S-177, responded to the Eastern District and obtain all documentation relative to the scheduled working hours and discretionary time of Officer Collins.

## ASSIGNMENT

On December 10, 2009, IA Case #09 142 was assigned to Sergeant Todd Svenkesen, badge S-556, of the Internal Affairs for investigation.

On January 23, 2012, IA Case #09 142 was re-assigned to writer, Lieutenant Whitney Walton, badge L-18, assigned to Internal Affairs for closure.

## INVESTIGATION

The Alert Team spoke with Police Officer Judith Bidinger, badge 1452, of the Eastern District Timekeeping, and subsequently obtained 590 Cards, Attendance Records and Leave Days for Officer Collins for 2007 through 2009.

Sergeant Hall spoke with Sergeant Mattie Lewis, badge S-66, of the Eastern District Community Relations and the direct supervisor of Officer Collins. Sergeant Lewis provided Activity Log Sheets and Daily Details for Community Relations officers for the period of June 2007 through December 2008; however, Sergeant Hall reviewed the aforementioned logs, which revealed that during that

period, Officer Collins submitted only four (4) Activity Logs. Those dates were October 29, 2007, January 29, 2008, October 31, 2008 and March 6, 2008.

Sergeant Hall spoke with Sergeant Lewis in regards to Officer Collins scheduled work hours and was informed that he worked 11:00 A.M. to 7:00 P.M.; this was confirmed by the logs and daily details. Sergeant Hall later inquired as to Officer Collin's location and work hours for December 4, 2009, and was informed that he was scheduled for 12:00 P.M. to 8:00 P.M. No explanation was provided for the change of hours.

Sergeant Lever conducted a brief review of Activity Logs for the period of January 2009 through November 2009, which revealed possible discrepancies in handwriting. (Document 8-16)

On December 22, 2009, Sergeant Rodney Cox, badge S-770, assigned to the Chief's Office reviewed the outside employment approvals. Officer Collins did not have approval for 2007, 2008 or 2009 to work outside employment.

Through investigation it was learned that Officer Collins was working armed security for St. John's Hospital, which was confirmed by members of Internal Affairs.

On January 5, 2010, search warrant #10 04132 was signed by Thirty-Sixth District Court Magistrate Renee McDuffee for Officer Collin's employment and time records for St. John's Hospital. It was discovered that Officer Collins had been employed at St. John's Hospital from December 2004 to the date of execution. Ms. Deb Dame, with Worklife Services, explained that St. John's Hospital employees, including Officer Collins had a swipe card that logs them in and out, which is then reflected on the time sheets. (Document 8-18)

On January 12, 2010, at the direction of Internal Affairs, Officer Collins was suspended from the Detroit Police Department by Sergeant J. Oehmke, badge 752, assigned to the Eastern District. (Document 7-14)

After an exhaustive search of the Eastern District archives it was revealed that they did not have Activity Logs or Daily Details for Officer Collins prior to November of 2007. However, after comparing and reviewing Officer Collins' time and attendance records for the Detroit Police Department and St. John's Hospital from November 14, 2007 through November 25, 2009, it was revealed that Officer Collins had five hundred and ninety four hours that overlapped between the two employers. Records further revealed that Officer Collins shift at Riverview Hospital typically started between 7:00 A.M. and 7:30 A.M. and ended between 2:00 P.M. and 3:00 P.M. Officer Collins working hours with the Detroit Police Department were generally from 11:00 A.M. to 7:00 PM. or 12:00 P.M to 8:00 P.M.

Delineated below is a synopsis of the number of days and hours that Officer Collins worked at St. John's Hospital when he was supposed to be working for the Detroit Police Department and the monetary payment that Officer Collins received from the City of Detroit while working at St. John's Hospital:

> ➢ Between November 11, 2007 and December of 2007, Officer Collins worked 12.6 hours over three (3) days at St. John's Hospital when he was supposed to be working for the Detroit Police Department. He was monetarily compensated at a rate of $24.12 an hour for a total of $303.91.

> ➢ Between January of 2008 and June of 2008, Officer Collins worked two hundred and forty two (242) hours over seventy three (73) days at St. John's Hospital when he was supposed to be working for the Detroit Police Department. He was monetarily compensated at a rate of $24.85 an hour for a total of $6013.00.

> ➢ Between July 2008 and November of 2009, Officer Collins worked three hundred and thirty nine (339) hours over one hundred and thirty four (134) days at St. John's Hospital when he was supposed to be working for the Detroit Police Department. He was monetarily compensated at a rate of $25.59 an hour for a total of $8675.01.

> ➢ Therefore the total monetary compensation that Officer Collins received from the City of Detroit for work he did not perform was $14,991.92

On January 18, 2010, Sergeant Svenkesen obtained the payroll registries for Officer Collins.

On January 19, 2010, an Investigator's Report naming Officer Collins as the defendant was submitted to Assistant Prosecuting Attorney Robert Donaldson of the Wayne County Prosecutor's Office. (Document 8-1)

On January 21, 2010, Chief Evans with the concurrence of the Board of Police Commissioners suspended Officer Collins without pay pending the criminal and departmental adjudication of this matter. (Document 7-17)

On February 8, 2010, Sergeant Svenkesen met with Mr. Michael Passage, the Security Director for St. John's Hospital and received surveillance video of the parking lot of Riverview hospital. The video showed Officer Collins vehicle for the hours that he worked at the hospital.

It should be noted that further investigation, revealed that Officer Collins was also employed by the Allen Academy located at 8666 Quincy, Detroit, MI as a Truancy Officer and Security Guard.

On March 1, 2010, a search warrant for Officer Collins employment records was served upon Ms. Diane Griggs, Human Resources for the Leona Group LLC. A review of the records revealed that from April 14, 2008 through January 9, 2009, Officer Collins worked Monday through Friday 11:30 P.M. to 6:30 A.M. as a Security Guard at the Allen Academy. Starting on January 12, 2009, through February 26, 2010, Officer Collins continued working 11:30 A.M. through 6:30 A.M. and along with being a Truancy Officer. This secondary position was Monday through Friday, 9:00 A.M. through 3:00 P.M. (Document Appendix B)

A spreadsheet was completed that documented the total number of hours per day that Officer Collins purportedly worked during eighty six (86) specific days from January 5, 2009 through November 25 2009 for all three employers. (Document 8-10)

Delineated below are the findings:

22 Hours – 2 days
24 Hours – 4 days
24.5 Hours – 6 days
24.75 – 1 day
25 Hours – 3 days
25.25 – 2 days
25.5 – 1 day
26 Hours – 5 days
26.25 Hours – 4 days
26.5 Hours – 7 days
26.75 Hours – 3 days
27 Hours – 35 days
27.25 Hours – 6 days
27.50 Hours – 4 days
27.75 Hours – 1 day

On April 16, 2010, APA Donaldson signed the Investigator's Report, recommending that Officer Collins be charged with one (1) count of Larceny by False Pretenses less than $20,000.00 and one (1) count of Misconduct in Office. (Document 9-1)

On April 19, 2010, Officer Collins was arraigned at the Thirty-Sixth District Court, before Magistrate Steven Lockhart. Officer Collins pled not guilty and was granted a $50,000.00 personal bond. His Preliminary Exam was scheduled for June 3, 2010 at 8:30 A.M.

After several adjournments, Officer Collins Preliminary Examination began on September 15, 2010.

On February 28, 2011, Officer Collins was bound over for trial to the Third Circuit Court.

On December 5, 2011, the trial started for Officer Collins.

On December 8, 2011, the trial ended with a verdict of not guilty on all counts.

It should be noted that on January 18, 2011, Sergeant Lewis received a forty five (45) day suspension for submitting and verifying Activity Logs and Daily Details for officers under her command who in actuality did not work. This was IA Case #10 017.

## WITNESS STATEMENTS

On January 12, 2010, approximately 11:45 A.M., Sergeant Svenkesen interviewed Mr. Passage who stated that Officer Collins worked as an armed security officer at the Riverview location. He stated that Officer Collins' hours were from 7:00 A.M. through 2:00 P.M. or 3:00 P.M. (Tape)

On this same date, Sergeant Svenkesen interviewed Sergeant Juan Rogers, Officer Collins direct supervisor at St. Johns Hospital. He stated that he would check on Officer Collins along with the other officers assigned to him throughout the day. Sergeant Rogers made the work schedules and Officer Collins was typically scheduled from 7:00 A.M. to 2:00 P.M. or 3:00 P.M. (Tape)

On February 25, 2010, approximately 12:00 P.M., Sergeant Svenkesen interviewed Mrs. Stacey Ann Collins, of 21901 Kenosho, Oak Park, MI, Officer Collins' wife. She stated that she had been separated from Mr. Collins for approximately four years. She provided information on two bank accounts for Officer Collins, but she did not know where he was living. When asked about Officer Collins secondary employment she provided information that he was employed at the Allen Academy as a security guard and Truancy Officer. (Tape)

On March 4, 2010, Sergeant Lewis was interviewed under Investigative Subpoena. During this interview under oath she testified that Officer Collins reported to duty everyday and she saw him at either 11:00 A.M. or 12:00 P.M. depending on his hours. Additionally, she stated that if she was not present, Lieutenant Pastella Williams, badge L-111, assigned to the Eastern District, (the executive lieutenant) would see him. It should be noted that Sergeant Lewis testified at the preliminary examination on January 12, 2011, and her testimony was consistent with her statement under Investigative Subpoena. (Document)

On March 30, 2010, approximately 1:45 P.M., writer conducted an audio taped interview with then Assistant Chief Godbee at Police Headquarters. He stated that he was the commander of the Ninth Precinct from November 2002 to December 2003 and Deputy Chief of the Eastern District starting in September of 2005 through March of 2007. He admitted to knowing Officer Collins from the Eastern District, but did not recall specifically when Officer Collins was assigned there. He was not aware that Officer Collins was working outside employment and he did not sign a request for outside employment for Officer Collins. He denied authorizing Officer Collins to work at St. John's Hospital instead of coming to work at the Eastern District. Assistant Chief Godbee also denied telling Sergeant Lewis that Officer Collins would be a direct report to him. Assistant Chief Godbee denied being a personal friend of Officer Collins. (Tape)

On April 7, 2010, at approximately 11:45 A.M., Sergeant Svenkesen interviewed former Deputy Chief Joyce Motley at the office of Internal Affairs. She was assigned to the Eastern District from March 2007 through September 2008. She denied that Assistant Chief Godbee directed her to let Officer Collins not come to work for the Detroit Police Department, but continue to be paid. She denied being aware that Officer Collins was working outside employment. She further denied telling Sergeant Lewis that Officer Collins was her direct report and not to question what he did. (Tape)

On December 6, 2010, Ms. Georgie Burrell, the School Leader of the Allen Academy testified at the Preliminary Examination and confirmed that Officer Collins was employed at the Allen Academy and he worked two shifts, one of which was 9:00 A.M. to 3:00 P.M. and he was monetarily compensated at a rate of $22.00 an hour. She further testified that Officer Collins position as a home school liaison officer required that he spend the primary part of his day in the school building. When asked if Officer Collins met these expectations she replied, no. She went on to testify that in fact there were occasions when they attempted to locate him, but they could not. (Court Transcript) *Check Trail Transcript*

### CANVASS

Due to the nature of the incident, there was no canvass conducted.

### EVIDENCE

Payroll records and timesheets for Allen Academy
Payroll records and timesheets for St. Johns Hospital
Payroll records, timesheets and Activity Logs for the Detroit Police Department

## WAYNE COUNTY PROSECUTOR'S RECOMMENDATION

On April 16, 2010, APA Donaldson signed the Investigator's Report, recommending that Officer Collins be charged with one (1) count of Larceny by False Pretenses less than $20,000.00 and one (1) count of Misconduct in Office. (Document)

## GARRITY INTERVIEW

On January 21, 2010, at approximately 12:00 P.M., writer interviewed Police Officer Tobios Rios, badge 4728, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Officer Rios stated that he was assigned to Community Relations for approximately three to four years. He stated he would report on duty at the front desk before starting his community policing shift of 6:00 A.M. until 2:00 P.M. Officer Rios stated that he was not aware of Officer Collins working another job and rarely saw him while on shift, because Officer Collins usually worked an afternoon shift. (Tape)

On January 21, 2010, at approximately 12:15 P.M., writer interviewed Police Officer Brad Hawkins, badge 3828, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Officer Hawkins stated he had been working Community Relations for about a year and did know Officer Collins. He stated that he would usually report on duty at the front desk and with the dispatcher, before starting his duty. He stated that Officer Collins had called him on his cell phone to switch his shift or cover for him a few times, because he would have a basketball game or other functions. He stated that he was unaware that Officer Collins had a second job and did not hear conversations regarding Officer Collins' shift or his whereabouts. (Tape)

On January 21, 2010, at approximately 12:30 P.M., writer interviewed Police Officer Vanessa Burt, badge 2008, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Officer Burt stated that her shift for Community Relations was usually 10:00 A.M. to 6:00 P.M. She stated that before starting the shift, she would check in with Sergeant Lewis to see if there were any Citizen Complaints or special assignments for the day. Officer Burt did not see Officer Collins during her shift and was unaware of Officer Collins' second job. (Tape)

On January 21, 2010, at approximately 12:55 P.M., writer interviewed Police Officer Shawntee Robins, badge 3700, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Officer Robins stated that she had been assigned to Community Relations for approximately three years and her shift was 10:00 A.M. to 6:00 P.M. She stated that before starting her shift, she would check in with Sergeant Lewis. She stated that she was unaware of

Officer Collins' second job and that she never really saw him during work hours due to the different assignments.

On January 25, 2010, at approximately 10:15 A.M., Sergeant Svenkesen interviewed Lieutenant Williams, under the provisions of Garrity at Internal Affairs. Lieutenant Williams stated that she was the administrative lieutenant for the District and was not directly in charge of the Community Relations unit. She stated that she did not know until recently that Officer Collins had a secondary job. She stated that she could not remember who told her, but it was never directly brought to her attention regarding Officer Collins. (Tape)

On January 25, 2010, at approximately 10:30 A.M., Sergeant Svenkesen interviewed Commander Steven Dolunt, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Commander Dolunt stated that he was the Commanding Officer of the Eastern District since December 2007. The concerns regarding Officer Collins not working his full shifts were brought to his attention in December 2008. Commander Dolunt stated that he could not recall who brought the incidents to his attention, but he contacted Commander Brian R. Stair, of Internal Affairs in December 2008. Commander Dolunt stated that he rarely saw Officer Collins and was suspicious of his whereabouts; however, Sergeant Lewis assured him that he reported to work. Additionally, he stated that Commander James Moore, of the Eastern District gave Officer Collins specific responsibilities to ensure he was working. (Tape)

On January 26, 2010, at approximately 10:30 A.M., Sergeant Svenkesen interviewed Lieutenant J Coleman, badge L-, assigned to Police Medical. Lieutenant Coleman stated that she was the administrative lieutenant at the Eastern District from approximately 2005 through mid 2009. She stated that she met with all the officers that were part of the Community Relations unit, except for Officer Collins. She stated that she ordered Officer Collins in to meet with her. She stated that she met with Officer Collins and wanted him to report to her directly and his shift was to be 7:00 A.M. to 3:00 P.M. She was told that he could not work those hours, because his mom was sick and he had to take care of his children. Officer Collins told her that Sergeant Lewis was aware and it was okay for him to work later hours. Lieutenant Coleman stated that she spoke with Sergeant Lewis regarding Officer Collins. She was told that everything was under control with all her officers in the Community Relations unit.(Tape)

On March 17, 2010, Commander Dolunt was re-interviewed by Sergeant Svenkesen and Commander Stair. In 2007, when he was working for Deputy Chief Motley when he questioned the activities of Officer Collins, she advised him not to worry about him. In 2008, when Deputy Chief Motley retired, he heard rumors that Officer Collins was running sports camps outside of the city. This caused Commander Moore to give him specific job responsibilities, which included delivering letters to the homes of persons that were the victims of Home

Invasions. Commander Dolunt stated that when they reviewed Officer Collins Activity Log the receipts of the letters were never home and this made him further suspicious of Officer Collins; however, Sergeant Lewis assured him that Officer Collins was there at roll call. (Tape)

On this same date, Sergeant Svenkesen and Commander Stair interviewed Commander Moore. He stated that when he was reporting to Deputy Chief Motley, he and Commander Dolunt were given specific responsibilities within the precinct. Community Relations reported to the Deputy Chief and when he (Commander Moore) inquired about Officer Collins she advised him, "I got that." Commander Moore had conversations with Sergeant Lewis and she assured him that Officer Collins was working. Commander Moore indicated that if an incident occurred later in the afternoon (2:30 P.M.) Officer Collins was present. Commander Moore indicated he received an anonymous letter indicating that Officer Collins was involved in Amateur Athletic Union (AAU) Basketball while he was supposed to be working. Commander Moore indicated that he notified Internal Affairs about this allegation. (Tape)

On February 9, 2010, at approximately 11:45 A.M., Sergeant Svenkesen interviewed Police Officer Audrey Curtis, badge 4724, assigned to the Eastern District, under the provisions of Garrity at Internal Affairs. Officer Curtis stated that she had been a Community Relations Officer for approximately eleven years. She stated that she knew Officer Collins, but did not know he was working a secondary job until she was told recently by her Commander. She stated that she would rarely see other Community Relations officers, unless she or another officer was requesting assistance.

Officer Curtis stated that her normal working hours were from 9:00 A.M. to 5:00 P.M., unless a detail was scheduled. At the beginning of the shift, she stated that she would check in with Sergeant Lewis and then at the end of the shift, unless Sergeant Lewis was gone. If she was gone, Officer Curtis stated she would sign out in the Blotter. (Tape)

On July 6, 2010, at approximately 10:55 A.M., writer interviewed Sergeant Lewis under the provisions of Garrity in the office of Internal Affairs. Specific to Officer Collins, Sergeant Lewis stated that in 2007 when former Deputy Chief Motley was newly assigned to the district she began to see Officer Collins everyday at on duty; however, prior to 2007 then Deputy Chief Godbee directed her to put Officer Collins on the Daily Detail, but he was a direct report to him. Sergeant Lewis stated she never saw him and did not question where he was. Sergeant Lewis denied knowing Officer Collins had outside employment and denied giving him permission to work outside employment. She stated that Officer Collins referred to himself as "Godbee's boy" and she interpreted that to mean he was friends with then assistant chief.

On December 20, 2011, at approximately 1:00 P.M., writer and Sergeant Svenkesen interviewed Officer Collins under the provisions of Garrity at Internal Affairs. Officer Collins asserted that he was given permission by then Deputy Chief Godbee to work as a football coach for a team in Huntington Woods, MI and a basketball team. Officer Collins produced two photographs of Chief Godbee at events that he stated were proof that Chief Godbee was aware of and approved his alternative work activities. Specific to the hours, Officer Collins stated that his actual works hours were 2:00 P.M. to 10:00 P.M., even though his Activity Logs and Daily Detail documented his hours as 11:00 A.M. to 7:00 P.M., or 12:00 P.M. to 8:00 P.M. He stated that Sergeant Lewis was aware of his work hours, but told him to submit Activity Logs with the alternative times. When questioned about the validity of the entries on his Activity Logs, Officer Collins stated that the entries were correct, but the times were not. Officer Collins stated that from 2:00 P.M. through 5:00 P.M., he worked around the precinct, but then ran basketball and football practices in the evening, depending on the time of year. Officer Collins repeatedly stated that he was given permission by Chief Godbee and that all the command staff that were assigned to the Eastern District from 2004 through 2010. Officer Collins in response to direct questioning could not provide the names or a roster of the children that were in his programs. Officer Collins when questioned as to why he did not properly document his work functions, if in fact they were sanctioned by the chief, he repeatedly stated that Sergeant Lewis told him to do it that way. (CD)

It should be noted that writer spoke with Chief Godbee regarding Officer Collins assertions and denied

## CONCLUSION/RECOMMENDATION

On December 4, 2009, in response to a letter received in the Chief's Office, Internal Affairs began an investigation into Officer Collins and time fraud.

Through investigation it was determined that Officer Collins was working for the Detroit Police Department, along with St. John's Hospital and the Allen Academy. On eighty-six occasions, these three employments showed that Officer Collins was purportedly working over 24 hours a day. Additionally, hours that he was expected to be working, overlapped for each employer on a daily basis.

It was determined that Officer Collins, defrauded the Detroit Police Department out of $14,991.92, during which time he was working as a armed security guard at St. John's Hospital and was supposed to be on duty working Community Relations.

Officer Collins was criminally charged, but he was found not guilty at trial.

Officer Collins was interviewed under the provisions of Garrity and admitted to working at St. John's Hospital and the Allen Academy without authorization. However, he denied defrauding the city. He claimed that although the Daily Details and Activity Logs that he signed and submitted (that document his hours as either 11:00 A.M through 7:00 P.M., or 12:00 P.M. to 8:00 P.M.) were false. He claimed that he actually worked 2:00 P.M. to 10:00 P.M., or whenever he arrived from his unauthorized outside employment. It was Officer Collins contention that everyone (department executives and supervision) knew what he was doing and it was allowed.

Sergeant Lewis was interviewed under the provisions of Garrity and stated that since 2007, she had seen Officer Collins everyday when he came on duty at either 11:00 A.M. or 12:00 P.M. Sergeant Lewis testified to the same at court.

Based upon the above facts and circumstances, writer recommends that IA Case #09 142, be closed with a finding of **"SUSTAINED"** and be forwarded to Disciplinary Administration for adjudication for the following violations of the department rules and regulations:

**CHARGE I:**　　　　**CONDUCT UNBECOMING AN OFFICER**

**Specification:**　　　That he, Police Officer Jerome Collins, badge 1508, assigned to the Eastern District, did, between November 2007 and November 2009, work two unauthorized outside employments that overlapped his duties and responsibilities with the Detroit Police Department as a Community Relations Officer, such conduct which tends to bring the department into disrepute and reflects discredit upon the individual as an officer, and is contrary to the Law Enforcement Code of Ethics; this being in violation of Series 102.3, Directive #102.3-7.9, Conduct, Unprofessional, Subsection 1, of the Detroit Police Manual.

# EXHIBIT 2

CITY OF DETROIT

TRIAL BOARD HEARING

In the Matter of:
CITY OF DETROIT
(POLICE DEPARTMENT),

        Employer,                  No. 12-0137

       =and=                    Volume 4

DETROIT POLICE OFFICERS ASSOCIATION
(POLICE OFFICER JEROME COLLINS),
        Union.

———————————————————————————————————/

                Proceedings had and testimony taken in the above matter before a Trial Board at 7310 Woodward Ave., 3rd Floor, Detroit, Michigan, on Thursday, July 11, 2013 commencing at or about 9:00 a.m.
APPEARANCES:

        TRIAL BOARD
        COMMANDER ROBERT ENNIS, Chairperson
        INSPECTOR GARY SROKA, Co-Member
        INSPECTOR DWAYNE BLACKMON, Co-Member
MS. LETITIA JONES, ESQUIRE, City Advocate
(Appearing on behalf of the Detroit Police Department)

MR. JOHN GOLDPAUGH, ESQUIRE
(Appearing on behalf of Police Officer Jerome Collins)

REPORTED BY:  TAMARA A. O'CONNOR (CSMR-2656, CER-2656)

# TABLE OF CONTENTS

WITNESSES                                                    PAGE

(No witnesses)

EXHIBIT                              IDENTIFIED    RECEIVED

BX#18  Mattie Lewis

       interview transcript        288           288

1          Detroit, Michigan
2          Thursday, July 11, 2013
3          9:19 a.m.
4         P R O C E E D I N G S
5      COMMANDER ENNIS: This Board is
6 reconvened today, Thursday, July 11, 2013. If no
7 one has any preliminary matters, we will turn over
8 the proceedings to the City's advocate, Ms. Jones.
9      MS. JONES: I believe the
10 parties have rested, and we are going to be doing
11 our closing argument. Is that correct, brother
12 counsel?
13      MR. GOLDPAUGH: That is
14 correct.
15      MS. JONES: Closing argument:
16 The Department has to show, by a preponderance of
17 the evidence, that the officer is guilty of the
18 charges that are before you.
19      There is some discrepancy as to
20 the first charge being by a preponderance of the
21 evidence. There are some arbitrators who wish that
22 to be a clear and convincing evidence standard
23 versus preponderance of the evidence. In any event,
24 none of these charges before you are beyond a
25 reasonable doubt.

1      As it relates to Count I,
2 Conduct Unbecoming an Officer, Officer Collins has
3 been charged with conducting himself in a manner
4 unbecoming an officer by working two unauthorized
5 outside employments that overlapped his duties and
6 responsibilities with the Detroit Police Department
7 as a Community Relations officer.
8      Generally, one of the standards
9 used with Conduct Unbecoming is whether it
10 discredited the officer or brought the Department
11 into disrepute. You have evidence presented to you
12 as well as testimony showing that it did discredit
13 the officer.
14      Secondly, you have the Free
15 Press news article that shows that the Department
16 was brought into disrepute not only from Officer
17 Collins but also from other officers within that
18 unit.
19      As it relates to Count I, you
20 have had the opportunity to hear the testimony and
21 review the evidence. You have activity logs from
22 Officer Collins. You have time records from Allen
23 Academy showing that he was working there. You have
24 time records from St. John's Hospital showing he was
25 working there.

1      You have the daily details from
2 the Detroit Police Department, and you also have the
3 charts that show the overlap as it relates to the
4 hours worked.
5      As it relates to Count II,
6 Willful Disobedience of Rules or Orders, you have
7 two specifications under this count, and the first
8 one being he was working security at St. John's
9 without approval from the Chief of Police.
10      You have heard no testimony on
11 this record that he ever obtained permission. Now,
12 he may indicate that it was tacit approval and that
13 people appeared-- and you will hear that in his
14 Garrity, that people appeared at the football
15 functions, but that does not go to these charges.
16      I don't want you to be confused
17 about the football functions and these charges.
18 These charges are whether he had approval to work
19 St. John's Hospital. Additionally, the second
20 specification is whether he had approval to work
21 security and as a truancy officer at Allen Academy.
22      You have heard nothing in this
23 record that states that he had approval. In fact
24 the testimony from the witnesses supports the
25 Department's position that he did not have approval.

1      Therefore, we will be asking you for a finding of
2 guilt on Counts I and II.
3      As it relates to Count III,
4 Using Authority or Position for Financial Gain or
5 for Obtaining Privileges or Favors, brother counsel
6 brought up that this actual charge is confusing
7 because, as a police officer, what privileges or
8 financial gain did he obtain as a police officer?
9      As it reads, it is to use his
10 position for financial gain by working security when
11 in fact he was supposed to be working as a Community
12 Relations officer resulting in him being monetarily
13 compensated by the City of Detroit for time worked.
14      What this is saying is he was
15 paid by the City of Detroit and its citizens for
16 work that should have been doing at the City of
17 Detroit. The problem is he went and worked other
18 places when he should have been working at the City.
19 That is what this particular charge is about.
20      So while it is confusing as to
21 its title, the substance of the charge is quite
22 clear, the fact that he was compensated when he
23 should have been working as a Community Relations
24 officer at Eastern District. So I defer to the
25 Board as it relates to the finding of guilt on Count

3 (Pages 261 to 264)

13-53846-tjt    Doc 11710    Filed 12/09/16    Entered 12/09/16 17:10:55    Page 25 of 56

III.

Finally, as it relates to Count IV, Willfully Making a False Oral or Written Statement or Report, there have been numerous activity logs that have been submitted into the record, some of which I specifically went over, that speak to his-- such as January 5, the month of April and then I think September 2 I also pulled out as a sampling of his activity logs.

His activity logs show that he was working during a specific time, but then the time record of the outside agency showed him working there at the specific time. As it relates to St. John's, they actually had a swipe card in addition to other things that were not entered into the record that show him working at St. John's at specific times.

It is my position to you that you look at each and every activity log that is listed here and see if he signed them. If he signed them and they compare to the time records, then we ask that you find him guilty. If his signature is not affixed to that activity log, then he should be found not guilty.

Once you have a finding of

guilt on these matters, we will be asking for the penalty of discharge. Before I get into discharge, I just want to be clear that there is a tendency to look at his good works with the youth and with the seniors, but I don't want you to be confused by that because that is not why we're here.

We are here because he abused his privileges by receiving compensation for time not worked. We are here because he abused the time as it relates to his job with the DPD, and he violated Department rules such as outside employment and inaccurate and/or incomplete activity logs.

What he did was tantamount of fraud against the City. He couches it as tacit permission, he couches it as being allowed slide time. He denies authoring some of the activity logs, which is why I made mention that you need to consider each date to the activity logs as to a finding of guilt in Specification 4.

There has been sufficient evidence that gives rise to just cause for discipline. As it relates to penalty, the Department's position is he should be discharged from the Department.

The Department acknowledges his

lack of disciplinary history. However, these charges and the extended amount of time over which they took place is so egregious that discharge is the only reasonable penalty. We are asking you to look outside of the progressive discipline standard and that the disciplinary matrix is not applicable in these proceedings.

The Department seeks discharge and reimbursement of the amounts compensated where he was not on the job, and you have that information through the charts.

It came up that supervisor Mattie Lewis was also charged. Her charges were not the same. She received a 45-day penalty. That should not be considered in this case because she entered into a plea. When you enter into a plea, those terms of that plea are not precedential, do not set precedence to this Board.

The same goes for Kenyata Borden. What she did in her plea is not precedential, and her charges were not similar either. It is not precedential to this Board. In fact one additional issue with Kenyata is hers was a one-time deal versus over a period of years.

In the event you believe

discharge is not the appropriate penalty, taking into account other factors, the fact that there was an acquittal, although since you have been police officers for a number of years, you do know that juries are unpredictable.

You don't know the reasoning behind acquitting him. It could have been because of his good works. We don't know. Other factors that might have been considered is the timeliness of the matter.

The problem is that the delay in bringing these charges forward-- or not bringing charges forward but in having the hearing was not due to the Department. Also, another factor to consider is his disciplinary history.

The penalty suggested, if you believe discharge is not the appropriate penalty, would be reinstatement with no back pay award which is essentially a suspension for the time he has already served from the Department.

While this alternate penalty was not run by the Department, I did not run it by the Department for approval, I am an attorney for the City of Detroit, and I have to look at the best interest of the City when I make these

1  recommendations.
2          So no, I did not get approval
3  from the Department to offer you an alternative
4  penalty. Additionally, please disregard my comments
5  about MCOLES in my opening statement. MCOLES
6  certification is not at issue here.
7          I believe I made mention that
8  he should be reinstated subject to him being
9  recertified within six months. That is not at issue
10 here. So I am correcting my initial argument.
11         While I have given you the
12 alternative option, let it be clear that the
13 Department's position is that he be discharged from
14 the Department. I reserve the right to rebuttal.
15         MR. GOLDPAUGH: You have that
16 right. Members of the Board, thank you for your
17 patience. It has been two days of testimony, but I
18 also know that you took a lot more time reading the
19 transcripts and going over the evidence and the
20 exhibits, and I appreciate that.
21         I also appreciate the
22 opportunity that we took a break between testimony
23 for the reason I had to be in court but also to give
24 you the opportunity, because too often in these
25 proceedings, documents, Garrity statements,

1  transcripts are admitted, and the Board doesn't have
2  a chance to review that, and we are making closing
3  argument on what we perceive we have heard or read
4  which you haven't.
5          In this case, I know that you
6  have gone through these materials, and it is
7  important. The interesting part is that Ms. Jones
8  states that, with respect to Conduct Unbecoming an
9  Officer, the first charge, that there is evidence
10 here to support that Officer Collins brought the
11 Department into disrepute.
12         Yet, it is even more
13 interesting to note that there is no evidence on
14 this record to support that charge. They rely on I
15 believe it is Exhibit No. 11, a newspaper article.
16 In Exhibit No. 11, there is no mention of Officer
17 Collins' name in it. There is no mention of where
18 he works.
19         There is no mention of what is
20 going on with respect to Officer Collins and, more
21 interesting than not, with respect to the individual
22 who is, quote, "suspended," there is no mention that
23 there was any time card fraud. Time card fraud is
24 addressing the other officer. That is Kenyata
25 Borden.

1          So how does this newspaper
2  article bring Officer Collins-- how does Officer
3  Collins not being mentioned in a newspaper article
4  bring the Department into disrepute? What brings
5  the Department into disrepute was the actions-- and
6  I have never said that he should get less than
7  Mattie Lewis got. I never even alleged that.
8          Ms. Jones has brought out in
9  her closing argument, and testimony came from
10 Lieutenant Walton regarding the plea agreements and
11 things like that. That came out on direct
12 testimony. When I was questioning her regarding the
13 investigative subpoena, Lieutenant Walton said, oh,
14 Mattie Lewis, she got 45 days.
15         But when you look at the
16 charges against Officer Collins in these
17 proceedings, this is exactly where it came from when
18 I made my opening statement. The Community
19 Relations Unit at the Eastern District before the
20 arrival of Commander Dolunt was basically in
21 disarray.
22         You heard testimony from
23 Commander Dolunt that he was wondering what was
24 going on. He was going to Mattie Lewis. Mattie
25 Lewis is saying, oh, no, he worked for Godbee when I

1  got here, I talked to Motley, all these things
2  occurred, and he goes and speaks to Deputy Chief
3  Motley.
4          Deputy Chief Motley, according
5  to Commander Dolunt, says don't worry about it, I
6  got it, I'll take care of it, meaning Officer
7  Collins. The same thing with Commander Moore. He
8  gives the same testimony.
9          Yet, you didn't hear that from
10 Deputy Chief Motley, did you? You heard nothing.
11 Oh, no, I didn't know anything about this, I didn't
12 do any of these things.
13         Members of this Board, he had a
14 relationship with Commander Godbee. He had a
15 relationship, and Commander Godbee at the time had
16 him working for him. That continued on. He was
17 running programs, he was running the Community
18 Relations Department.
19         The whole Community Relations
20 Department was that way, and then Mattie Lewis was
21 placed in charge of it, and it continued that way.
22 Four years of no activity logs from anybody in
23 Community Relations? You've got to be kidding me.
24 Yet, they want to hold him accountable and him alone
25 accountable for this fiasco.

13-53846-tjt   Doc 11710   Filed 12/09/16   Entered 12/09/16 17:10:55   Page 27 of 56

1  That's not what happened. What
2  happened was he was doing his work. You heard
3  nothing from that stand that has raised one incident
4  of a complaint about Officer Collins not getting his
5  work done, not doing what he was supposed to be
6  doing for the City of Detroit.
7  True there is an overlap, but
8  that overlap does not mean that he was not giving
9  eight full hours of time to Detroit on each day. He
10  did his job, he showed up. He did what he was
11  supposed to do, and he gave that to the community,
12  and he gave it to the City of Detroit, and he gave
13  it to the Detroit Police Department.
14  That is what the evidence shows
15  here. Even when you look at the trial transcript
16  from Mr. Green for example, all Mr. Green talked
17  about is lauded Officer Collins even though he is
18  called as a prosecution witness.
19  Do you find it interesting that
20  the People did not call Mattie Lewis in their case
21  in chief? She was the one who was his supervisor.
22  She was the one who basically testified at the
23  investigative subpoena as to her actions.
24  You know why they didn't call
25  her? Because she was going to say, and you saw

1  this, look, Godbee and Motley told me let him do it.
2  That's why. Because what they want to do is say he
3  was doing everything he was supposed to do.
4  The evidence shows that. He
5  was coming to work, he was showing up. He was
6  giving eight hours to the City of Detroit. He was
7  also working trying to make a buck other places too.
8  He was working on weekends for this community, he
9  was working weekends for the Detroit Police
10  Department.
11  That is why they didn't put
12  Mattie Lewis on the stand as a prosecution witness.
13  I wasn't the defense attorney, but I would have
14  called her too. I didn't represent him. Because
15  the facts show he did not bring this Department into
16  disrepute.
17  Did he get written permission?
18  I don't know. We have never seen it. We have
19  heard people say, well, he didn't get permission
20  from me, and I agree, he didn't go each time and get
21  permission to work from Commander Dolunt, for
22  example, or even Deputy Chief Motley.
23  But Commander Godbee knew what
24  was going on. Commander Godbee knew exactly what
25  was going on, and he allowed it to continue. Then

1  when he got out, Deputy Chief Motley continued the
2  way things were going.
3  Then the interesting part is,
4  and I found it kind of a surprise, was the anonymous
5  letter that comes up approximately a year before
6  the-- November 11 from the ever elusive
7  Ms. Catherine Jones who it turns out probably never
8  existed. It was probably his ex-wife. But we don't
9  know that for a fact. I'm just guessing and
10  speculating.
11  But we do have this anonymous
12  phone call or the anonymous letter which was quite
13  lengthy that Commander Dolunt spoke of, and so did
14  Commander Moore. They took steps to find out what
15  was going on. They sent it to Internal Affairs.
16  Internal Affairs, according to
17  Commander Dolunt, said that they either didn't do
18  anything or they were under-staffed or something
19  along those lines. Commander Moore was more
20  specific and said, well, yes, I spoke to them. I
21  called down there, and they told me we investigated,
22  and we found nothing.
23  Well, members of the Board, is
24  that even plausible that they found nothing if in
25  fact you believe what the Department wants you to

1  believe, if he is not showing up for work on time,
2  he is not doing his jobs, and he is just, willy
3  nilly, doing nothing?
4  Don't you think that they would
5  see if he was violating the rules and regulations of
6  the Department, along those lines, that something
7  would have materialized before the second letter?
8  The answer is nothing materialized because nothing
9  was going on out of the ordinary how things were
10  working with respect to Deputy Chief Motley and
11  Commander Godbee.
12  Then Commander Dolunt, because
13  he was tightening things up, and you read the
14  testimony of Mattie Lewis, she said yes, because I
15  then had to start having them do their activity logs
16  because Community Relations had come under greater
17  scrutiny.
18  Those were her words or those
19  were the prosecutor's words, I'm not sure. She
20  didn't know why that was, but she also knew that now
21  she had to get people to do activity logs. She even
22  testified that she went and asked Officer Collins to
23  back-date some, and he refused to do it.
24  He wasn't going to back-date
25  something that he was going to make up. You saw

1  that in the testimony. So is this the type of a
2  person who is cheating the City of Detroit out of
3  his time? No, just the opposite.
4  He was giving the time
5  constantly. He was providing that to the citizens
6  of Detroit. He was working. He was working for
7  Detroit, and he was working for two other places
8  trying to make a buck and trying to survive. There
9  is no doubt about that.
10  There is no dispute that he had
11  outside employment. There is no dispute that he did
12  not get permission for the outside employment from
13  Commander Dolunt.
14  The other interesting parts are
15  that, as Commander Dolunt indicated and testified to
16  with respect to the football programs and all these
17  activities which nobody seemed to remember occurring
18  when they were on the stand-- you have Exhibit
19  No. 16 that was posted in Commander Moore's office.
20  Why would that be posted in the
21  Eastern District if it didn't have something to do
22  with Detroit police work? It was posted there, the
23  schedule, that he, the Community Relations officer,
24  was involved in this program.
25  You heard testimony, and you

1  will read testimony if you haven't gotten to all
2  that yet, where then Commander Godbee was attending
3  functions.
4  You saw testimony from Mattie
5  Lewis where she stated with respect to these
6  initiative reports, it was Commander Serda who was
7  directing Officer Collins at certain times, that he
8  was reporting to different people, and that is what
9  was going on in this case.
10  I was kind of wondering, and I
11  thought it was skillful of Ms. Jones to try to
12  explain Count III. Because even with her
13  explanation, I still don't see it. Because if that
14  is what they're claiming that he used his position
15  for financial gain, it is basically what she is
16  alleging is larceny.
17  In other words, she is saying,
18  just like they said in Count well, he filled out
19  his activity logs saying he was at a certain
20  location, and he has denied doing some of those logs
21  as you are aware of, and that he wasn't really
22  there. So therefore, he must have stopped working
23  at 8:00 because he's someplace else.
24  That is a guess. That was the
25  gist of the criminal case too, which of course we

1  are all aware he was acquitted of. In other words,
2  we can guess and speculate why the jury did what
3  they did, but the jury did what they did because
4  they found beyond a reasonable doubt that he didn't
5  do it.
6  He was acquitted by a jury.
7  Too often, way too often, the Wayne County
8  Prosecutor's Office demands that we have a jury with
9  respect to police officers. I have been
10  representing them for a number of years.
11  It used to be you didn't have
12  to do that, you could waive in front of a judge.
13  The Wayne County Prosecutor will not allow that
14  under 95 percent of the cases because it is their
15  position that the people of the City of Detroit or
16  of Wayne County are the ones to make the
17  determination.
18  Well, that is what happened in
19  this case. It wasn't a judge who threw the case out
20  on a technicality, it was 12 people sitting in
21  judgment on him on these very charges. Don't kid
22  yourself, that's what these charges are all about.
23  On these very charges, they found that he was not
24  guilty, that the People did not prove the case.
25  I just bring that up because we

1  have this whole three-ring circus going on at the
2  very beginning of this matter. Interestingly
3  enough, Commander Dolunt, as I said, tightens the
4  reins up, and then we come up with another letter.
5  Now, this is specifically
6  dealing with somebody named Catherine Jones. So the
7  testimony shows that he was not obtaining financial
8  gain using his position. We all know what that
9  means. It doesn't mean, oh, you stole something.
10  It means you walk into the
11  arena after a Pistons game or into Joe Lewis, flash
12  your badge and say, hey, let me in for free. We all
13  know that is what this means. This situation does
14  not fit that.
15  This is a situation where a
16  police officer was working hard for the City of
17  Detroit. You saw in Exhibit No. 15 these initiative
18  reports. You see in the activity logs, there is a
19  series of activity logs where he is at the
20  basketball programs within the community. Those are
21  in his activity logs.
22  Yet, they are saying athletics
23  has nothing to do with community relations.
24  Commander Godbee, when he testified and gave
25  statements, admitted that he had been to functions.

1  He admitted he had been to a function I believe it
2  was at Allen Academy.
3              He didn't know what that was
4  all about, but the other interesting part is, and
5  this was on direct testimony before Arbitrator
6  Ashford in trying to get at the Community Relations
7  aspects of it, so this is like PAL, and Commander
8  Godbee, retired Chief Godbee, stated:
9     "Well, no, it's a little bit more
10    expansive than PAL, but it could include
11    activities similar to PAL, but it is not
12    just sports focused, but it is for
13    community building, building relationships
14    with the community. Each command has . . ."
15 And then it goes on.
16             So when Ms. Jones says don't
17 take into account all the good he did for the
18 community and for the elderly and for that, that is
19 just the opposite of what you are supposed to do,
20 because he was doing all of that, winning awards,
21 doing the basketball programs, the football
22 programs, he was doing all of that while he was a
23 Community Relations officer.
24             He was doing all of that for
25 the City of Detroit. He was doing all of that when

1  he was under the direction and tutelage of Commander
2  Godbee and following it on with Deputy Chief Motley.
3              Are there discrepancies in the
4  activity logs? Yes, there are. There is no doubt
5  about that. But he has told you in his Garrity
6  interview that he came in and he checked in every
7  day, because he has had to based on the directions of
8  Sergeant Lewis and Commander Dolunt.
9              Commander Dolunt said with all
10 these people, let's get this under control. You saw
11 the testimony of Mattie Lewis who said, I was seeing
12 him and I was telling these people where he was as
13 well as where her other individuals were.
14             The work was all done, maybe
15 not at the exact same times, but all of the work was
16 done, and he was giving eight hours a day, and that
17 is what the evidence shows, and that is what that's
18 all about.
19             Having a job outside without
20 permission is not a fireable offense, but that is
21 what they want you to do. Being not mentioned by
22 name in a newspaper article is not a firing offense.
23 That's what they want you to do.
24             I still haven't figured out the
25 financial gain aspect, and if I badged myself into a

1  hockey game as a police officer, I'm not going to
2  get fired for it, but that's what they want you to
3  do.
4              Then they want to take all this
5  together and say, oh, and by the way, he lied 81
6  times. That's what they're saying. He did not lie
7  81 times. He didn't even prepare half of those
8  activity logs.
9              You will notice, as Ms. Jones
10 has pointed out, some aren't signed by anybody.
11 Some are signed allegedly by Officer Collins and
12 some may or may not be his signatures. They have
13 not shown that they were his signatures.
14             We do have testimony from
15 Mattie Lewis that she wanted him to back-date ones,
16 and he refused. We don't know which ones they were
17 that she possibly prepared so that she would be in
18 better shape.
19             We also have testimony from her
20 and from his command that this entire investigation
21 was triggered less than a year after the clamp-down,
22 so to speak, or the attempts by Commanders Dolunt
23 and Moore to tighten up the situation.
24             He was doing what he was
25 supposed to do. He provided more than his eight

1  hours to the City of Detroit shift, and he did
2  exactly what he was supposed to do with respect to
3  this community. I ask that he be found not guilty
4  and be reinstated and made whole.
5              MS. JONES: Brief rebuttal:
6  Counsel brings forward an argument that Collins had
7  a relationship with Godbee, but you will see in the
8  testimony of Chief Godbee that wasn't necessarily
9  the case.
10             As it relates to the fact that
11 we didn't call Mattie Lewis, she was subpoenaed, she
12 chose not to appear. Therefore, her testimony is
13 shown in the criminal trial transcript, Exhibit
14 No. 8.
15             COMMANDER ENNIS: Counsel, hold
16 on one second.
17             MR. GOLDPAUGH: If Ms. Jones
18 took it that way, that's not what I meant. I said
19 the People in the criminal case. That's what I
20 said. I did not say that you did not call her.
21             MS. JONES: Okay, I took it
22 that way.
23             MR. GOLDPAUGH: I just want to
24 make sure that it is clear that I know why she
25 wasn't here for this.

8 (Pages 281 to 284)

1 MS. JONES: The initial letter
2 that was brought forth was by Mr. Collins' estranged
3 wife, ex-wife, current wife, whatever her status is.
4 A year later came the anonymous letter.
5 As to IA finding nothing, if
6 you recall Lieutenant Walton's testimony, she said
7 that they sat at the building in Canton. If you
8 recall, there was testimony about a sports arena in
9 Canton. So if he didn't appear in Canton, of course
10 they found nothing.
11 There was no indication that
12 they followed him around for a 24-hour period. So
13 where counsel says nothing out of the ordinary
14 happened, so nothing could be found, that is the
15 reason.
16 So then we go to his argument
17 that, under Collins' Garrity, he checked in every
18 day, he got his work done. He included that Mattie
19 Lewis supports that she saw him, he got his work
20 done. She saw him, but she didn't see him during
21 the full eight hours.
22 That he got his work done
23 doesn't mean that he worked eight hours. I can get
24 my work done, and I may not necessarily work eight
25 hours. So that logic is not sound logic there.

1 To say that he lied 81 times,
2 yes, there are 81 specifications, and yes there was
3 testimony through Collins' statement and also
4 through Mattie Lewis that she asked him to back-date
5 it but he refused, she acknowledged that she asked
6 him to back-date it, and he said that he refused.
7 If he refused, then his
8 signature would not be affixed to any of-- well, to
9 the activity logs that are before you. Counsel
10 stated he didn't prepare half of those activity
11 logs. Take a look at the activity logs.
12 If his signature is not affixed
13 to it and it corresponds to a day that is in
14 question, and you can look at the charts for
15 expediency if you like, then disregard it. He is to
16 be found not guilty on that.
17 But if his signature is affixed
18 to it and the charts show that he was working at two
19 of the locations, be it St. John's and DPD or Allen
20 Academy and DPD, then he should be found guilty on
21 those charges.
22 With a finding of guilt, we ask
23 that he be discharged from the Department or, in the
24 alternative, suspended for the period of time that
25 has transpired. Anything further, counsel?

1 MR. GOLDPAUGH: I don't get
2 another bite at the apple.
3 MS. JONES: Any questions from
4 the Board?
5 COMMANDER ENNIS: As far as our
6 deliberations, are we entitled to the transcripts
7 from the investigative subpoena of Mattie Lewis, and
8 I know that it was not admitted, but the Garrity
9 interview for Officer Collins?
10 MR. GOLDPAUGH: It was. That
11 is Exhibit No. 1.
12 MS. JONES: That is Exhibit
13 No. 1 is the Garrity interview and it is up to
14 counsel--
15 MR. GOLDPAUGH: I have no
16 problem.
17 COMMANDER ENNIS: Has it
18 already been transcribed?
19 MS. JONES: It is transcribed,
20 and it is somewhere in this box. So if you will
21 permit me, I will try and get it for you.
22 MR. GOLDPAUGH: I have no
23 objections to it. It was not made part of the
24 record, but I have no objections to you reviewing
25 that.

1 MS. JONES: Therefore, that
2 will be Board Exhibit No. 18. The Board requested
3 Exhibit No. 18, which is the transcript of the
4 investigative subpoena interview of Mattie Lewis.
5 (At 9:58 a.m., BX#18 marked
6 and received)
7 MS. JONES: Anything further?
8 COMMANDER ENNIS: No.
9 MS. JONES: Do you waive a
10 reconvening of the Board?
11 MR. GOLDPAUGH: Yes, we waive a
12 reconvening of the Board and accept it in writing.
13 COMMANDER ENNIS: This Trial
14 Board is completed.
15 (At 10:00 a.m., concluded)
16
17
18
19
20
21
22
23
24
25

9 (Pages 285 to 288)

```
 1          CERTIFICATION
 2
 3     STATE OF MICHIGAN    )
 4                          )
 5     COUNTY OF OAKLAND    )
 6
 7
 8          I certify that this transcript, consisting
 9     of 31 pages, is a complete, true and correct
10     transcript of the Trial Board proceedings in this
11     case on July 11, 2013.
12
13
14     7-15-13          James A. O'Connor
15     _____      _____
16     Date       TAMARA A. O'CONNOR, CSMR-2656, CER-2656
17                2385 Jakewood Drive
18                West Bloomfield, Michigan 48324
19     sd
```

#2

# EXHIBIT 3

JOHN J. GOLDPAUGH
DONALD HOWARD STOLBERG

(313) 963-8220
FAX (313) 226-0807

NANCY GOLDPAUGH
LEGAL ASSISTANT

November 26, 2013

James Craig
Chief of Police
Detroit Police Department
1301 Third Street
Suite 319 N
Detroit, MI 48226

RE: Reinstatement of Jerome Collins, Badge No. 1508

Dear Chief Craig:

On January 21, 2010, Officer Jerome Collins was suspended without pay from the Detroit Police Department. The basis for this suspension was the issuance of a three-count felony warrant for Larceny and Misconduct in Office.

On December 8, 2011, Officer Collins was acquitted of all charges by a jury. This was before the Honorable Patricia Fresard. On December 12, 2011, a request was made of Chief Ralph Godbee, Jr. to reinstate Officer Collins to the payroll forthwith. At that time, a copy of the Order of Acquittal/Dismissal was presented to then-Chief Godbee.

The request of December 12, 2011, fell on deaf ears and a second correspondence was send on December 26, 2011, the Order of Acquittal/Dismissal was again included. I am, again, enclosing the Order of Acquittal/Dismissal in this matter.

Subsequently an Article IX Suspension Without Pay Hearing was conducted. However, though this was held quite some time ago, no award has been made. As such, pursuant to the Suspension Without Pay of January 21, 2010, Officer Jerome Collins remains suspended without pay for almost two years. Also, a Departmental hearing has been held in this matter; and that decision has also been appealed to arbitration.

At this time, I am, once again, requesting that Officer Collins be reinstated to the payroll and, if necessary, remain in a suspension with pay status pending the outcome of all of these proceedings. There has been a great deal of hardship suffered by Officer Collins due to the Department's initial failure to reinstate him after his acquittal.

Please contact me should you have any questions.

Thank you for your anticipated cooperation in this regard.

Very truly yours,

John J. Goldpaugh

JJG/nag
cc: Bernie Cybulski
    P.O. Jerome Collins

**EXHIBIT 4**

Dyer, Alicia 11/30/2016
For Educational Use Only

2002 WL 999260
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.

In re: EDISON BROTHERS
STORES, INC., et al., Debtors.

No. 99–532 (JCA), 99–535(JCA), 99–
530(JCA), 99–533(JCA), 99–536(JCA),
99–531(JCA), 99–534(JCA), 99–
529(JCA), 99–537(JCA), 99–538(JCA).
|
May 15, 2002.

**Attorneys and Law Firms**

Carol Ann Rich, Campbell, Arellano & Rich, St. Thomas,
U.S. Virgin Islands 00801, Counsel for Tutu Park Limited.

Charlene D. Davis, Eric M. Sutty, The Bayard Firm,
Wilmington, Counsel for Alan M. Jacobs, Chapter 7
Trustee.

Alan M. Jacobs, Chapter 7 Trustee, Hewlett, NY.

Office of the United States Trustee, Wilmington.

MEMORANDUM OPINION ON
AMENDING PROOF OF CLAIM [1]

AKARD, Bankruptcy J.

**\*1** Before the Court is the motion of Tutu Park Limited
("Tutu Park") to amend its September 8, 1999, proof
of claim. The issue presented by the motion is whether
a landlord/creditor may amend its proof of claim, post-
bar date, as to amount in order to include lease rejection
damages permitted by § 502(b)(6). [2] After consideration
of the memoranda of law proffered, the Court concludes
that Tutu Park's motion must be granted and the proof of
claim amended. [3]

I. BACKGROUND [4]

On March 9, 1999, Edison Brothers Stores, Inc. and its
seven affiliates (the "Debtors") filed voluntary petitions
for relief pursuant to Chapter 11 of Title 11, of the
United States Code. The Debtors' Chapter 11 cases
were procedurally consolidated and jointly administered.
Edison, a publicly held corporation, was a specialty
retailer of men's and women's apparel and footwear. On
the Commencement Date, the Debtors had approximately
1,510 retail stores located throughout the United States,
Puerto Rico, and the Virgin Islands.

On March 22, 1999 the United States Trustee appointed a
committee of unsecured creditors in the Debtors' Chapter
11 cases. By July 30, 1999, the Debtors had ceased
all retail operations and had completed transactions for
assumption and assignment, rejection or other disposition
of virtually all of their retail stores, including the lease at
issue in the present motion.

The United States Trustee applied for an order appointing
Alan M. Jacobs as Trustee in the Chapter 11 case, which
was granted by the Court on May 30, 2000 (Order No.
1571). On July 5, 2000, the Court entered an Order (Order
No. 1603) approving the Chapter 11 Trustee's motion to
convert the Debtors' Chapter 11 Case to a case under Chapter
7, pursuant to § 1112(b). Simultaneously, pursuant to a
grant of authority in § 701(a), the United States Trustee
appointed the Mr. Jacobs to serve as the Chapter 7
Trustee in this case. The Chapter 7 Trustee is currently
engaged in the winding-up of the Debtors' estates through
limited administrative operations, claims resolution and
liquidation of assets.

Tutu Park is the owner and operator of the shopping
center known as the Tutu Park Mall, St. Thomas, U.S.
Virgin Islands, and is a duly scheduled creditor in this
case. In 1993, when Tutu Park Mall opened, Debtors
entered into four leases for the operation of a Baker's
Shoe store, a 5–7–9 store, an Oak Tree store and a Jeans
West store. All of the leases were for terms of ten years
from the commencement date, as defined under the leases.
The Baker's, Oak Tree and 5–7–9 leases all commenced
on June 3, 1993; the Jeans West lease commenced on
September 25, 1993.

In accordance with their rights under the lease, Section
37.13, the Debtors terminated the 5–7–9 lease on June

Dyer, Alicia 11/30/2016
For Educational Use Only

30, 1994. On November 3, 1995, the Debtors filed for Chapter 11 reorganization. [5] On October 1, 1996, during the Chapter 11 reorganization, the Debtors executed an amendment to the Jeans West lease, by which the Debtors expanded the Jeans West store and took over the still vacant and adjacent 5–7–9 space, "as is."

**\*2** The Oak Tree lease was amended on August 8, 1997, to allow the Debtors the right to terminate the lease upon written notice if gross sales for the period from February 1, 1998 to April 1, 1999, were less than $500,000.00. Notice of termination of the Oak Tree Lease was duly given by the Debtors on February 1, 1999, to be effective August 1, 1999.

The Baker's lease was also amended on August 8, 1997, to provide the Debtors with the right to give notice of termination if gross sales were less than $650,000.00 during the fifth lease year. Notice of termination was duly given by the Debtors on September 8, 1998, to be effective February 20, 1999. Thereafter, Tutu Park allowed the Debtors to remain in operation in the Baker's space as a hold-over tenant. The Debtors vacated the Baker's space on or about July 1, 1999. The Jeans West lease remained in full force and effect as there were no similar amendments to extend Debtors' right to terminate. On or about May 21, 1999, the Debtors filed a motion for approval of the sale of various assets, including the Jeans West lease at Tutu Park Mall.

During the Chapter 11 case, the Court entered an Order fixing September 10, 1999 as the bar date, or the last date to file proofs of claim on account of prepetition claims (Order No. 739). On August 3, 1999, under the terms of the Sale Order, the Debtors filed a Notice (DOC No. 829) advising that the purchaser had exercised its right under the agreement to reject certain leases, including the Jeans West lease at Tutu Park Mall, effective July 31, 1999. The Notice also set forth the September bar date for claims and that claims filed after such bar date would not be entitled to any distribution from the Debtors.

On September 8, 1999, Tutu Park filed a proof of claim under the Baker's, Oak Tree and Jeans West leases for additional rent charges due under the leases for real property taxes for 1994–1998, in the amount of $7,841.30.

At that time, Tutu Park did not include a claim for lease rejection damages under the Jeans West lease. Tutu Park was unable to relet the Jeans West space to a replacement tenant during the remainder of 1999, or any of 2000, and suffered rejection losses for one year from the rejection date totaling $144,174.24.

Subsequently, after the conversion of the cases to Chapter 7, the Court established November 20, 2000, as the claims bar date (Order No. 1646). On January 22, 2001, Tutu Park filed the present motion seeking to amend its proof of claim to include the lease rejection damages for a total claim amount of $152,015.54. Shortly thereafter, on January 25, 2001, the Chapter 7 Trustee moved the Court to compel landlords to provide information relating to allowance of claims arising out of rejected leases (DOC No.1952). The Chapter 7 Trustee lacked sufficient information to quantify all of the rejection damage claims. The Trustee's motion was granted on February 20, 2001, and the Court entered an Order authorizing the service of subpoenas to compel all landlords that were seeking lease rejection damages to execute Affidavits of No Mitigation, or Lease Rejection Damages Mitigation Affidavits (Order No.1988). Tutu Park duly responded to the Chapter 7 Trustee's subpoena by completing, executing and returning an Affidavit of No Mitigation which provided the same information as the earlier filed Motion to Amend the Proof of Claim.

**\*3** The first response to Tutu Park's Motion did not come until November 14, 2001, when the Chapter 7 Trustee objected (DOC No. 2686). Prior to the objection, the Chapter 7 Trustee filed a Motion (DOC No. 2485) on July 27, 2001, seeking to set maximum reserves for claims and other relief, which set a reserve of $7,841.30 for Tutu Park's claim. In response Tutu Park filed its objection to the Trustee's Motion on August 13, 2001, (DOC No. 2563) and reiterated that a total of $152,015.54 must be reserved for Tutu Park's claim. The Court granted the Chapter 7 Trustee's Motion and entered an Order (Order No. 2586) estimating claims and setting maximum reserves for unresolved claims, among other relief.

## II. POSITIONS OF THE PARTIES

Dyer, Alicia 11/30/2016
For Educational Use Only

A memorandum of law in support of the motion was submitted with the motion on January 22, 2001, by Tutu Park setting forth their arguments. The Chapter 7 Trustee objected to Tutu Park's motion to amend on November 14, 2001, arguing that Tutu Park failed to give any notice of the additional claim amount and that the amendment was essentially a new claim. On November 28, 2001, Tutu Park replied to the Chapter 7 Trustee's objection by asserting that the amendment was not a new claim and should therefore be allowed.

On March 19, 2002, the Chapter 7 Trustee submitted a supplemental memorandum of law stating that the amendment does not cure a defect in the original claim, it does not describe the original claim with greater particularity, and the amendment is not a new theory of recovery from the facts of the original claim. At the April 17, 2002, Omnibus Hearing, the parties agreed to forego argument on the motion and rely on the papers already submitted to the Court.

### III. DISCUSSION

According to Bankruptcy Rule 7015, amendments to claims shall be governed by Rule 15 of the Federal Rules of Civil Procedure. Fed.R.Bankr.P 7015; *In re Trans World Airlines, Inc.,* 145 F.3d 124, 141 (3d. Cir.1998). Under Rule 15, leave to amend "shall be freely given when justice so requires." Fed.R. Civ.P. 15(a). The decision to grant or deny leave to amend under Rule 15 is committed to the Court's sound discretion. *Trans World Airlines,* 145 F.3d at 141, citing, *Coventry v. United States Steel Corp.,* 856 F.2d 514, 518 (3d Cir.1988). Thus a Court must look to applicable case law in order to determine whether an amendment is proper.

It is a well settled principle that, absent contrary equitable considerations or prejudice to the opposing party, amendments to proofs of claim should be freely permitted. *See In re Walls & All, Inc.,* 127 B.R. 115, 117 (W.D.Pa.1991); *In re Metro Transportation,* 117 B.R. 143, 147 (Bankr.E.D.Pa.1990) (amendments to timely proofs of claim are liberally allowed). However, such amendments are to be allowed only where the original claim prompted notice to the court of the existence,

nature, and amount of the claim. *In re International Horizons, Inc.,* 751 F.2d 1213, 1217 (11th Cir.1985). Amendments are also permissible to cure defects in a claim already filed, to describe a claim with greater particularity, or to plead a new theory of recovery on the facts of the original claim. *See International Horizons,* 751 F.2d at 1216; *Hatzel & Buehler, Inc. V. Station Plaza Assoc., L.P.,* 150 B.R. 560, 562 (Bankr.D.Del.1993); *Walls & All,* 127 B.R. at 118; *Metro Transportation,* 117 B.R. at 147. Furthermore, "[a] court will deny leave to amend [,] only if there is undue delay, motivated by bad faith, or [it would be] prejudicial to [the] opposing party." *See Hatzel & Buehler,* 150 B.R. at 562; *See also Trans World Airlines,* 145 F.3d at 141; *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984).

*4 The deadlines for filing proofs of claims are to be strictly construed to ensure the efficient administration of bankruptcy cases and to provide all parties with finality. *Walls & All,* 127 B.R. at 118; *Metro Transportation,* 117 B.R. at 148. A post-bar date proof of claim amendment, as in the present motion, is to be scrutinized closely to ensure that the amendment is genuine rather than the assertion of an entirely new claim. *See International Horizons,* 751 F.2d at 1215; *Walls & All,* 127 B.R. at 118; *Metro Transportation,* 117 B.R. at 147.

The purpose of the bar date deadline is to "enable the debtor and his creditors to know, reasonably and promptly, what parties are making claims against the estate and in what general amounts." *See In re John R. Kolstad,* 928 F.2d 171, 173 (5th Cir.1991). However, bar date deadlines "by no means fix in stone the final 'allowed' amounts of claims." *Id.* at 174. Thus bar dates have little correlation to the actual, final amounts in which creditors will share any distribution; bar dates merely establish the "universe of participants in the debtor's case." *Id.*

Courts have generally held that a post-bar date proof of claim seeking to increase the amount of a timely-filed claim is not the assertion of a new claim. *Walls & All,* 127 B.R. at 118; *Metro Transportation,* 117 B.R. at 148. Amendments are generally disallowed where a claimant attempts to change the nature of the proof of claim. *Walls & All,* 127 B.R. at 118; *See Metro Transportation,* 117 B.R. at 148 (holding that amending a claim to change status from unsecured to sixth place priority changes the nature

Dyer, Alicia 11/30/2016
For Educational Use Only

of the proof of claim and, therefore, must be disallowed). In determining whether the amendment asserts a new claim, a court may compare the amendment to the original proof of claim. In comparing the proof of claim and the amendment, "[i]f the initial proof did not 'give fair notice of the conduct, transaction or occurrence that forms the basis of the claim asserted in the amendment' then the amendment asserts new claims and will not be allowed." *See In re Ben Franklin Hotel Assoc., L.P.,* 1998 WL 94808, *3 (E.D.Pa.1998), quoting *Metro Transportation,* 117 B.R. at 143. Furthermore, Rule 15 of the Federal Rules of Civil Procedure provides that an amendment relates back when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading ...". Fed.R.Civ.P. 15(c)(2).

The present Motion seeks to increase the amount of the claim already noticed through the filing of the original proof of claim on September 8, 1999. The Chapter 7 Trustee has not argued that Tutu Park's original proof of claim did not give fair notice of the basis of its claim, which was the lease.[6] The original claim for unpaid taxes as well as the rejection damages contained in the amendment are both grounded in rights that Tutu Park is entitled to by the lease. In other words both the claim and the amendment are based on the same transaction—the lease that commenced in September of 1993—and the "universe of participants" in the case was known. Therefore the amendment to include lease rejection damages in the claim is not a new claim. Since the amendment does not assert a new claim, it is well within this Court's discretion under Bankruptcy Rule 7015 to allow Tutu Park's amended proof of claim.[7] Under Bankruptcy Rule 7015 and Federal Rule of Civil Procedure 15 the timing of the amendment relates back to the date of filing of the original proof of claim since the amendment arises out of the same conduct, transaction or occurrence.

**\*5** The Chapter 7 Trustee's actions confirm this very notion through his own motion to compel landlords to provide information related to allowance of claims arising out of rejected leases, filed on January 25, 2001 (DOC No.1952). Interestingly, that motion was filed several days after Tutu Park submitted the motion presently being considered. It seems illogical that the Trustee objected to a motion (nearly 11 months later) that seeks to provide the information which, at the time, he was seeking from the other landlord/creditors with claims. These facts also lead us to believe that the Trustee was not surprised by the amendment.

Finally, there is no showing of bad faith on the part of Tutu Park. Under Virgin Islands law, a claim for rent due does not mature until each rent payment actually becomes due. *Christian v. Sylvest,* 1995 WL 504919, *3 (Terr.V.I.). Therefore Tutu Park did not know what its lease rejection damages would amount to, since each month that the space was not re-let would cause an increase in damages. Tutu Park would have been forced to amend, as to amount, regardless of whether the original proof of claim included rejection damages or not.

## IV. CONCLUSION

For the foregoing reasons, we grant Tutu Park's Motion to amend proof of claim.

Order accordingly.

**All Citations**

Not Reported in B.R., 2002 WL 999260

Footnotes

1    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2    All statutory references herein are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* unless otherwise noted.

3    This Court has jurisdiction over this matter, which is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (B), (C) and (O).

In re Edison Brothers Stroes, Inc., Not Reported in B.R. (2002)

2002 WL 999260

4       The facts are from the parties' Memoranda as the parties did not submit any evidence nor stipulations.

5       The Debtors' prior chapter 11 case (95–01355(PJW)) was terminated on December 23, 1997.

6       The reason the Trustee has not argued this point is that he cannot. The Trustee had notice of Tutu Park's rejection damages, as is evidenced by the fact that Tutu Park was served with the subpoena by the Trustee to provide information on mitigation and rejection damages. This proves that the Trustee was aware of Tutu Park's potential claim for rejection damages.

7       The Court is aware of Judge Walrath's bench ruling in *In re International Wireless Communications Holdings, Inc., et al.,* Case No. 98–2007(MFW) Transcript September 25, 2000, pg. 48–49, where it was held that an untimely claim for rejection damages was not an amendment of a prepetition claim. We do not believe that the bench ruling in that case is binding precedent on this Court. Also, in that Motion, the creditor had already participated in global settlement negotiations prior to the attempt to include lease rejection damages.

---

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

# GOLDPAUGH & ASSOCIATES, P.C.

615 GRISWOLD
SUITE 506
DETROIT, MICHIGAN 48226

JOHN J. GOLDPAUGH
DONALD HOWARD STOLBERG

(313) 963-8220
FAX (313) 226-0807

NANCY GOLDPAUGH
LEGAL ASSISTANT

December 12, 2011

Chief of Police Ralph Godbee, Jr.
Detroit Police Department
1300 Beaubien
Detroit, MI 48226

RE: Reinstatement of Jerome Collins, Badge No. 1508

Dear Chief Godbee:

On January 21, 2010, Officer Jerome Collins was suspended without pay from the Detroit Police Department. The basis for this suspension was allegations of larceny and misconduct in office, which resulted in a three-count felony warrant being issued on or about April 20, 2010.

On December 8, 2011, Officer Collins was found not guilty of all charges in a jury trial before the Honorable Patricia P. Fresard. I am enclosing a copy of the Order of Acquittal/Dismissal.

The basis for the suspension without pay no longer exists since Officer Collins was found not guilty of the charge. Therefore, at this time, I am requesting that Officer Collins be reinstated to the payroll and that the suspension without pay be set aside.

Please contact me should you have any questions or if further information is needed.

Thank you for your anticipated cooperation in this regard.

Very truly yours,

John J. Goldpaugh

JJG/nag
cc: Joe Duncan
    Lieutenant Robbin Rivers
    Lt. Pastella Williams
    Celia Washington
    P.O. Jerome Collins

# EXHIBIT 6

LAW OFFICES

## GOLDPAUGH & ASSOCIATES, P.C.

615 GRISWOLD
SUITE 506
DETROIT, MICHIGAN 48226

JOHN J. GOLDPAUGH
DONALD HOWARD STOLBERG

(313) 963-8220
FAX (313) 226-0807

NANCY GOLDPAUGH
LEGAL ASSISTANT

December 26, 2011

Chief of Police Ralph Godbee, Jr
Detroit Police Department
1300 Beaubien
Detroit, MI 48226

    RE: Reinstatement of Jerome Collins

Dear Chief Godbee:

    Enclosed please find correspondence forwarded to your office on December 12, 2011 requesting that Jerome Collins be reinstated to the payroll forthwith. As of this date, there has been no response to this correspondence. I am again requesting that Officer Collins be immediately reinstated to the payroll and placed in a position of administrative capacity.

    Officer Collins' criminal charges were dismissed, and he was found not guilty of all charges for which he is presently suspended. He has been suspended for a lengthy period of time; and your refusal to return him to the payroll in administrative capacity will have far-reaching effects with respect to his certification.

    Please contact this office or the Detroit Police Officers Association immediately regarding a response to the above request.

    Thank you for your anticipated cooperation in this regard

            Very truly yours,


            John J. Goldpaugh

JJG/nag
cc: Joe Duncan
     P.O. Jerome Collins

# EXHIBIT 7



# DETROIT POLICE OFFICERS ASSOCIATION

INCORPORATED

1938 E. JEFFERSON
DETROIT, MICHIGAN 48207

Phone (313) 567-8770
Fax (313) 567-7875

September 29, 2016

OFFICERS

MARK DIAZ
President

RONALD B. THOMAS
Vice President

DONNA LATOUF
Secretary-Treasurer

LINDA BRODEN
Sergeant-at-Arms

Jerome Collins
P.O. Box 214542
Auburn Hills, MI. 48231

REGARDING GRIEVANCE: # 10-005

Dear Mr. Collins:

Per Our conversation, the above reference grievance was scheduled for arbitration on February 9, 2012. The grievant Officer Collins, failed to appear for the arbitration. Officer Collins reason for not appearing was that he was acquitted of the charges and he wish to be reinstated to the payroll. The grievant failed to cooperate.

On February 9, 2012 a letter was sent to the grievant requesting his full cooperation and the grievance would be rescheduled at a later date. On June 12, 2013, the grievance was rescheduled and heard by Umpire Linda Ashford. However, a decision was never rendered due to all arbitrations were suspended and the bankruptcy occurred.

On February 7, 2014, the grievant was dismissed from the department on the disciplinary arbitration grievance # 12-0137, issued by Umpire Linda Ashford. Therefore, the Association closed the above reference grievance # 10-005, based on the Opinion and award of Umpire Linda Ashford.

Sincerely,

DETROIT POLICE AOFFICERS ASSOCIATION

Linda Broden
Sergeant at Arms

AFFILIATED

**POLC**          **MAPO**          **NAPO**
Police Officers Labor Council          Michigan Association of Police Organizations          National Association of Police Organizations

13-53846-tjt    Doc 11710    Filed 12/09/16    Entered 12/09/16 17:10:55    Page 47 of 56

# EXHIBIT 8

CITY OF DETROIT
TRIAL BOARD HEARING

In the Matter of:
CITY OF DETROIT
(POLICE DEPARTMENT),

         Employer,                    No. 12-0137

        -and-                     Volume 2

DETROIT POLICE OFFICERS ASSOCIATION
(POLICE OFFICER JEROME COLLINS),
         Union.
_____/

                         Proceedings had and testimony
taken in the above matter before a Trial Board at 7310
Woodward Ave., 3rd Floor, Detroit, Michigan, on
Monday, July 8, 2013 commencing at or about 9:00 a.m.
APPEARANCES:
         TRIAL BOARD
         COMMANDER ROBERT ENNIS, Chairperson
         INSPECTOR GARY SROKA, Co-Member
         INSPECTOR DWAYNE BLACKMON, Co-Member
MS. LETITIA JONES, ESQUIRE, City Advocate
(Appearing on behalf of the Detroit Police Department)

MR. JOHN GOLDPAUGH, ESQUIRE
(Appearing on behalf of Police Officer Jerome Collins)

REPORTED BY:  TAMARA A. O'CONNOR (CSMR-2656, CER-2656)

# TABLE OF CONTENTS

| WITNESSES | | PAGE |
|---|---|---|
| (No witnesses) | | |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| JX#1 | Garrity | 14 | 23 |
| JX#2 | Daily Details for 2007 - 2009 | 14 | 23 |
| JX#3 | Activity Logs for 2007 - 2009 | 14 | 23 |
| JX#4 | St. John's documents | 14 | 23 |
| JX#5 | Allen Academy documents | 14 | 23 |
| JX#6 | DPD payroll time records | 14 | 23 |
| JX#7 | Charts showing time overlaps | 14 | 23 |
| JX#8 | Criminal Trial Transcript | 14 | 23 |
| JX#9 | Outside Employment Manual provision | 14 | 23 |
| JX#10 | Letter initiating investigation | 14 | 23 |
| JX#11 | Free Press article | 14 | 23 |
| JX#12 | Notice of Acquittal | 14 | 23 |

1          Detroit, Michigan
2          Monday, July 8, 2013
3          11:27 a.m.
4         P R O C E E D I N G S
5          (Joint Exhibits No. 1 - 12
6          marked off the record)
7       COMMANDER ENNIS: This Trial
8 Board is convened today, Monday, July 8, 2013 by
9 order of the Chief of Police James Craig pursuant to
10 authority granted in Section 7-807 of the Charter of
11 the City of Detroit, Michigan.
12       This Board is composed of
13 myself, Commander Robert Ennis as chairperson, and
14 as co-members, Inspector Gary Sroka and Inspector
15 Dwayne Blackmon. The Board has been enjoined to
16 hear charges which have been filed against Police
17 Officer Jerome Collins, badge 1508, assigned to the
18 Eastern District.
19       I now turn the proceedings over
20 to the Department's advocate, Attorney Letitia
21 Jones, City of Detroit Law Department.
22       MS. JONES: Thank you, sir.
23 Letitia Jones on behalf of the City of Detroit
24 Police Department. This is discipline file number
25 12-037 charging Police Officer Jerome Collins, badge

1 1508, of the Eastern District with four counts and
2 several specifications. I will get to those in a
3 minute.
4       He is charged with Conduct
5 Unbecoming an Officer, one specification.
6       He is charged with Willful
7 Disobedience of Rules and Orders, two
8 specifications.
9       He is charged with Using
10 Authority or Position for Financial Gain or for
11 Obtaining Privilege or Favors, one specification.
12 Initially, that was 213 specifications.
13       He is charged with Willfully
14 Making a False Oral or Written Statement or Report,
15 and that is 81 specifications.
16       Today is the date and time set
17 for hearing. The Department is prepared to
18 potentially proceed with six to nine witnesses.
19       Counsel, can you place your
20 name on the record, and then I will go forward with
21 the other things that we have discussed off the
22 record.
23       MR. GOLDPAUGH: For the record,
24 John Goldpaugh appearing on behalf of Police Officer
25 Jerome Collins. Officer Collins is to my immediate

1 right.
2       We would waive a formal reading
3 of the charges and specifications. At this time,
4 Officer Collins would plead not guilty to all
5 charges and specifications.
6       MS. JONES: Thank you.
7 Preliminary matters: We have discussed off the
8 record the various processes and procedures that
9 have taken place as well as the exhibits. So at
10 this time, if counsel would permit, I am going to
11 ensure that the record is clear by telling this
12 Board what the procedural history is.
13       Just to make it clear for the
14 record, the Board initially started out with Dwayne
15 Love as the commander. It is now Robert Ennis that
16 is sitting as commander.
17       The time line: The incidents
18 took place between November 2007 and November 2009.
19 The Chief of Police received notification of the
20 alleged incidents on 11/20/2009, and that you will
21 see in Exhibit No. 10.
22       Internal Affairs was assigned
23 to investigate on December 4, 2009, and it started
24 with Investigator Todd Svenkesen. The warrant was
25 requested on January 18, 2010, and then there was a

1 suspension without pay by the Board of Police
2 Commissioners January 21, 2010.
3       The warrant was signed
4 April 16, 2010. He was arraigned 4/19/2010.
5 Criminal trial took place December 4 through 9, I
6 believe it was, and you have in your Exhibit No. 8
7 the testimony of that. You do not have any of the
8 preliminary opening statements or any motions or any
9 closing statements in the transcript in Exhibit
10 No. 8.
11       There was a reinstatement
12 request made December 12, 2011. A Garrity was taken
13 December 20, 2011. There was a second request for
14 reinstatement on December 26, 2011.
15       The investigation was
16 reassigned to Lieutenant Whitney Walton January 13,
17 2012. The MCOLES certification lapsed January 21,
18 2012.
19       The investigation was completed
20 February 15, 2012. It was delivered to the
21 Discipline Unit February 17, 2012.
22       Charges were drafted
23 February 20, 2012. An additional police Trial Board
24 was scheduled for April 24, 2012. At that time, the
25 Association attorney did appear, it was Emily

1 Rothgery who worked out of Mr. Goldpaugh's office.
2     The matter was adjourned by
3 request of the officer's attorney Mike Rataj who
4 works in Gerald Evelyn's office who also helped with
5 the criminal trial.
6     The police Trial Board was
7 scheduled again August 8 through 10, 2012,
8 September 17 through 21, 2012, October 23 through
9 24, 2012, November 19 and 21, 2012, December 18
10 through 19, 2012, January 14 through 15, 2013,
11 February 12 to 13, 2013 and then again our last
12 meeting was May 7, 2013.
13     We are here today because we
14 explained to Mr. Collins that we would proceed today
15 with him or with him and an attorney. It was
16 determined that the union would now represent him
17 after being asked not to represent him, but now they
18 are representing him, and we are prepared to go
19 forward with the hearing.
20     As it relates to--
21     MR. GOLDPAUGH: Excuse me. I
22 don't mean to interrupt. I understand your time
23 line. I just want to put one caveat with respect
24 to, as Ms. Jones indicated, there was a series of
25 scheduled Trial Boards from August, I believe, till

1 December, each one of them being delayed.
2     It gives the impression, just
3 for the record, since Ms. Jones indicated that all
4 these were adjourned, it gives the impression that
5 the Department continued to adjourn these at the
6 last minute, and that is not accurate.
7     What happened, and I'm only
8 speaking because once Mr. Rataj and Mr. Evelyn
9 became involved, which was in April or May, April
10 actually of 2012, the Department was informed that
11 neither of those individuals would be available
12 because they were involved in the Kilpatrick matter.
13     Therefore, the Department
14 should not waste time, effort or money in scheduling
15 that until they were going to be available. That is
16 the only reason I say that, and that is exactly what
17 happened.
18     Then comes their availability,
19 the Department schedules it, and then they are no
20 longer going to be doing it. So I just wanted to
21 bring that to your attention. It doesn't change the
22 time line, it just gives all these adjournments that
23 really should never have been set to begin with.
24 Thank you.
25     MS. JONES: With the time line

1 completed, I now go to the exhibits which the
2 parties have stipulated to.
3     Joint Exhibit No. 1 is the
4 Garrity interview of the accused, Officer Collins.
5     Joint Exhibit No. 2 are the
6 daily details that could be located for 2008 through
7 2009.
8     Joint Exhibit No. 3 are the
9 activity logs that could be located between 2007 and
10 2009.
11     Joint Exhibit No. 4 is the
12 documentation from St. John's relating to time
13 records and payroll.
14     Joint Exhibit No. 5 is the
15 Allen Academy documentation related to the time
16 records and payroll.
17     Joint Exhibit No. 6 is the
18 Detroit Police Department documentation relating to
19 time records and payroll.
20     Joint Exhibit No. 7 are charts
21 which show the foundation of Exhibits No. 4, 5 and
22 6, so that you can have a snapshot of the
23 overlapping time.
24     Joint Exhibit No. 8 is the
25 criminal trial transcript. As indicated off the

1 record, it is three volumes, December 5, December 6
2 and December 7.
3     On December 5, we have the
4 testimony of the prosecution's witnesses which were
5 Juan Rogers (phonetic) of St. John, Lieutenant
6 Whitney Walton from the Detroit Police Department,
7 Rhonda Davis from payroll, Frank Bica,
8 timekeeper, Georgia Burrell from Allen Academy,
9 Antonio Hitchcock from Allen Academy. Then we go to
10 December 6 where we have Tim Green from Allen
11 Academy.
12     The defense witnesses on
13 December 6 and 7 were Marjorie Henry from a
14 community group within the Eastern District, Vivian
15 Talbot, a commander from the Eastern District, Terry
16 Wilcox, a police officer from Communications, Philip
17 Curtis from Eastern District patrol. It looks like
18 he did work in Community Relations with Mr. Collins.
19     Sergeant Mattie Lewis who has
20 since retired and was served to appear today but has
21 declined to appear, Philip Johnson as a character
22 witness, Wanda Dixon as a character witness.
23     Lemuel Wilson retired from DPD
24 did not testify, extenuating circumstances, Tanya
25 Golfin (phonetic), a lieutenant for the Detroit

1 Police Department. Kevin Glynn (phonetic) works at
2 Deco Security, used to work for the Detroit Police
3 Department and Audrey Curtis who works at DPD as a
4 police officer, Eastern District Community
5 Relations.
6      Last was a Fiera Brownlee
7 (phonetic) who works at Grants. I think she works
8 at Grants now, but she was at the Eastern District
9 Community Relations Bureau.
10      Those individuals testified,
11 and you will see testimony in the transcript that
12 supports the charges.
13      Exhibit No. 9 is the Detroit
14 Police Department Manual on off-duty employment,
15 outside employment.
16      Exhibit No. 10, as I indicated
17 earlier, is the letter that initiated the
18 investigation.
19      Exhibit No. 11 are the news
20 articles to support the first charge of Conduct
21 Unbecoming an Officer and bringing the Department
22 into disrepute.
23      Exhibit No. 12 is the acquittal
24 of the criminal charges against him.
25      Is that a correct recitation of

1 the exhibits as we discussed them, counsel?
2      MR. GOLDPAUGH: That is
3 correct.
4      MS. JONES: We both have
5 stipulated to them?
6      MR. GOLDPAUGH: That is
7 correct, we both stipulated to them, and we jointly
8 ask that they be admitted as exhibits. Is that
9 correct, Ms. Jones?
10      MS. JONES: Joint Exhibits
11 No. 1 through 12, are they accepted, Commander?
12      COMMANDER ENNIS: Yes, they are
13 accepted.
14      MS. JONES: Thank you.
15      (At 12:05 p.m., JX#1-12
16 received)
17      MS. JONES: Giving the Board an
18 opportunity to review the exhibits, we have had an
19 off-the-record conversation for this hearing to be
20 adjourned at this time so that you can review the
21 exhibits.
22      Do you have any questions based
23 on the charges that are before you and based on the
24 list of exhibits?
25      COMMANDER ENNIS: No, we have

1 no additional questions.
2      MS. JONES: As to witnesses
3 tomorrow, we will present Todd Svenkesen, Lieutenant
4 Whitney Walton, Steve Dolunt, Jim Moore, Pastella
5 Williams, perhaps Ralph Godbee and perhaps Joyce
6 Motley, I'm not sure.
7      COMMANDER ENNIS: What's your
8 total?
9      MS. JONES: My total as of
10 right now is five for tomorrow. If former Chief
11 Godbee presents himself, that will be six, and if
12 Joyce Motley presents herself, that will be seven in
13 addition to the witness statements that are in the
14 transcript.
15      Does that adjourn this matter
16 for today, or are there any additional questions?
17      MR. GOLDPAUGH: Can we go off
18 the record for a quick second?
19      COMMANDER ENNIS: Yes.
20      (At 12:06 p.m., off the
21 record)
22      (At 12:07 p.m., back on
23 the record)
24      MS. JONES: I'm sorry, we are
25 not concluded quite yet. I forgot we had discussed

1 that we would do our opening statements today just
2 to give you a snapshot of what you should be looking
3 for as you are looking at the exhibits.
4      Essentially, what has taken
5 place is the accused officer was working two outside
6 jobs in addition to working for the City of Detroit.
7      Additionally, and you will see
8 this in the testimony in the criminal trial
9 transcript, he performed outside activities, and it
10 is in dispute whether they were or were not related
11 to his job at the City of Detroit Police Department.
12 What I mean by that is coaching youth sports
13 activities.
14      You will see in Exhibit No. 7
15 where he could not have possibly worked the number
16 of hours he claimed to have worked and given the
17 City of Detroit what he was supposed to be giving
18 the City of Detroit, and that is his services as a
19 police officer.
20      You will see that there was so
21 much overlap between the three entities, St. John's,
22 Allen Academy and the Detroit Police Department,
23 that he wasn't giving any one of the three their
24 full number of hours that he was supposed to have
25 given.

13-53846-tjt   Doc 11710   Filed 12/09/16   Entered 12/09/16 17:10:55   Page 53 of 56

1    In fact there are some days
2  where it appears that he worked 27, 26 hours in a
3  day. This was brought to the attention of the Chief
4  of Police. At that time, I believe it was Ella
5  Bully-Cummings-- I'm sorry, Warren Evans.
6    He had Internal Affairs
7  investigate. What they did in their investigation
8  was to gather documents. When they gathered
9  documents, of course, they had to seek subpoenas and
10  so forth to get documents from banks, from
11  St. John's, from Allen Academy, payroll records and
12  so forth in addition to getting the documents
13  internally from the City of Detroit.
14    You will hear testimony or you
15  will view the evidence, and it will show that he is
16  guilty as charged of working two unauthorized
17  outside employments. You will hear testimony from
18  former Chief Godbee and Commander Dolunt and
19  Commander Moore that he did not have permission to
20  work in these outside agencies.
21    You will hear testimony that he
22  did willfully disobey rules and orders by not
23  gaining the approval from the Chief of Police. You
24  will hear testimony that, because of this
25  overlapping between the three entities, he was

1  compensated by the City of Detroit when he wasn't
2  working for the City of Detroit.
3    Therefore, we will be seeking
4  restitution from those funds. One of the charts will
5  show you exactly what the amount of the compensation
6  is.
7    You will hear from the
8  testimony and you will see through the evidence that
9  he made false written reports and that his activity
10  logs were not accurate. Now, some of the activity
11  logs he claims he did not draft, yet they supposedly
12  state what his hours were and what his activities
13  were. Who else would better know what his hours
14  were and activities were but him?
15    After you have reviewed the
16  evidence and heard the testimony, we will be asking
17  for you to discharge this-- well, first, we will be
18  asking for a finding of guilt. The Department
19  wishes you, after the finding of guilt, to discharge
20  him from the City of Detroit Police Department.
21    The fact that his MCOLES
22  certification has lapsed is not in play here at all,
23  because if he is reinstated, he goes through the
24  waiver program. So I want you to be clear that you
25  are not to consider the fact that he doesn't have

1  his certification right now to be a factor even
2  though I have mentioned it in the time line.
3    We feel discharge is the
4  appropriate penalty, but if after reviewing all the
5  evidence and testimony you feel that discharge is
6  not the appropriate penalty, we offer an alterative,
7  and that is to have him reinstated, giving him time
8  to be recertified, a period of six months.
9    Discharge would be held in
10  abeyance for that six month period to give him time
11  to be recertified. If he does not get recertified,
12  he is discharged from the Department.
13    That the suspension that you
14  give him will be for the time that he has been off.
15  So in essence, he is going to be given credit for
16  time served if you feel that discharge is not
17  appropriate. He has been off since January 21,
18  2010. Counsel?
19    MR. GOLDPAUGH: Normally, I
20  would reserve opening statement as this Board is
21  well aware until proofs have been made, but I think
22  that under these circumstances, we might as well put
23  all of our cards on the table and at least let you
24  know what I think this case is all about.
25    First of all, I find it

1  interesting that, in an opening statement and in a
2  time line, it was necessary to mention his lack of
3  certification. Interestingly enough, if the
4  Department had done what it was supposed to do back
5  in December of 2012 when I sent a letter
6  immediately, which is in the evidence that she has
7  raised in her time line, then the Department should
8  and could and definitely should have reinstated him
9  to the payroll or at least put him into a suspension
10  with pay status so that he would not lose his
11  certification.
12    Certification lapses regardless
13  when you spent two years not doing police work. His
14  certification lapsed after he was acquitted and
15  after the correspondence had been forwarded to the
16  Chief at that time for reinstatement which fell on
17  deaf ears.
18    So the evidence is going to
19  show that occurred. The evidence is also going to
20  show that, as Ms. Jones has pointed out, you are not
21  to deal with certification. That is not your issue.
22    In giving her opening
23  statement, she said, but if you don't fire him, then
24  you should bring him back to work and give him time
25  to become recertified, which he has to do to be a

6 (Pages 26 to 29)

1 police officer. But if he doesn't get recertified
2 in six months, then fire him anyway. So she wants
3 you to take into account the certification.
4 The evidence is going to show
5 that this entire case was brought about because of
6 the mis-running and the total disarray of the
7 Community Relations Division at the Ninth Precinct.
8 That is what the problem was.
9 Now retired Sergeant Mattie
10 Lewis was authorizing overtime which she wasn't
11 allowed to authorize. She was providing people with
12 activity logs which she knew were not accurate
13 because all of these individuals, including Officer
14 Collins, worked in the Community Relations
15 Department.
16 Part of the Community Relations
17 Department or Section did all sorts of work within
18 the community outside their normal working hours
19 which they were not to be compensated for. That is
20 what was happening.
21 So what Sergeant Lewis would do
22 was say, okay, you sign your activity logs, you do
23 what you've got to do and just make sure you get all
24 of your work done. The evidence is going to show
25 that is exactly what the officer was doing.

1 The evidence is also going to
2 show through the testimony of the witnesses that
3 Commander Godbee, now retired Chief Godbee, knew
4 what was going on when he first started there.
5 Testimony is going to come out through this trial
6 back in 2006 and 2007-- testimony will come out in
7 this hearing both through those witnesses as well as
8 the other witnesses that are going to be called that
9 Commander Godbee said, he works for me, don't worry
10 about it. The same thing with Commander Motley,
11 don't worry about it.
12 Now, all of a sudden, somebody
13 new comes on board. But to Sergeant Lewis, that
14 doesn't change anything, and that is what the
15 evidence is going to show.
16 In doing his job for the
17 Department, he gave more than eight hours a day to
18 the Department. Was he doing it between noon and
19 eight o'clock? No, he wasn't. We all know that.
20 The evidence is going to show it wasn't exactly in
21 those time frames.
22 Ms. Jones has brought out the
23 activity logs. He gave a Garrity statement that I
24 may not have done these; people are filling them in
25 for me I guess. That's not my handwriting.

1 Sometimes, they were.
2 He admitted under Garrity, I
3 did all this work, I just didn't do it in the time
4 you're telling me I did it, and that is what it's
5 all about. The testimony is going to show that in
6 fact Sergeant Lewis admitted that.
7 The evidence is also going to
8 show that this was a witch hunt and a criminal
9 investigation not only into Officer Collins but
10 into-- and you will be shown, although not by name,
11 in I think it is Exhibit No. 11, the newspaper
12 article, about time fraud.
13 Well, it wasn't just Officer
14 Collins who was being investigated for this time
15 fraud, it was Sergeant Lewis as well as Kenyata
16 Borden. You will all recall the girls who went on
17 the cruise.
18 Sergeant Williams testified at
19 trial and in other proceedings to Internal Affairs
20 that this is what was going on. So here we are, lo
21 and behold, after a letter, Exhibit No. 10,
22 triggered this investigation according to Ms. Jones.
23 Well, really, Ms. Jones was a
24 friend of Officer Collins' ex-wife. That is the
25 testimony that is going to come out. We have a

1 bitter ex-wife, and she is ticked off, she's not
2 getting her cut of the child support, and that is
3 what triggers everything.
4 The evidence is going to show
5 that the only thing that he did wrong was not get
6 written permission for his outside employment. He
7 had permission, they knew what was going on, and now
8 they have made him a scapegoat.
9 I'm going to ask when all is
10 said and done that if you should find him guilty of
11 anything, take into account the settlements because
12 you are dealing with individuals and the same type
13 of treatment when you are dealing with what you find
14 him guilty of or what he should have been charged
15 with because there is no showing that he used his
16 position of authority, and the evidence will not
17 support this, for financial gain.
18 Where is there going to be any
19 evidence on this record that shows that he used his
20 position of authority for financial gain against the
21 Department? He didn't go out and say hire me and
22 pay for me because I'm a Detroit police officer.
23 He didn't say let me into this
24 activity or let me into that for free because I'm a
25 Detroit police officer. That is what that statute

1  talks about.
2          He was charged criminally with
3  Larceny by False Pretenses. The false pretenses
4  were the time cards. The false pretenses were never
5  proven because he didn't do anything false. He
6  provided all of his time to the Department. He
7  provided eight hours a day to this Department and
8  then some. The evidence will show that.
9          Thank you very much. At this
10 point in time, I would ask that we adjourn until
11 tomorrow morning.
12          COMMANDER ENNIS: Counsel, do
13 you have anything else?
14          MS. JONES: No.
15          COMMANDER ENNIS: We will be
16 adjourned until tomorrow morning at 9:00. Thank
17 you.
18          (At 12:22 p.m., adjourned)
19
20
21
22
23
24
25

1          CERTIFICATION
2
3  STATE OF MICHIGAN  )
4                    )
5  COUNTY OF OAKLAND  )
6
7
8
9          I certify that this transcript, consisting
10 of 24 pages, is a complete, true and correct
11 transcript of the TRIAL BOARD proceedings in this
12 case on July 8, 2013.
13
14
15 7-9-13      *James A. O'Connor*
16
17 Date    TAMARA A. O'CONNOR, CSMR-2656, CER-2656
18        2385 Jakewood Drive
19        West Bloomfield, Michigan 48324
20 sd

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com

89