# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

**CITY OF DETROIT'S SUPPLEMENTAL BRIEF PURSUANT TO ORDER REGARDING FURTHER PROCEEDINGS ON: (1) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. AGAINST DANNY CROMWELL, LEOTA MURPHY AND JASMINE CROMWELL (DOCKET # 11357); AND (2) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. <u>AGAINST NAJIB HODGE (DOCKET # 11583)</u>**

The City of Detroit ("<u>City</u>"), by its counsel, Miller, Canfield, Paddock and Stone, PLC, submits this Supplemental Brief Pursuant to Order Regarding Further Proceedings On: (1) City of Detroit's Motion to Enforce Order, Etc. Against Danny Cromwell, Leota Murphy and Jasmine Cromwell (Docket # 11357); and (2) City of Detroit's Motion to Enforce Order, Etc. Against Najib Hodge (Docket # 11583). In support of this Supplemental Brief, the City states as follows:

## I.     <u>Introduction</u>

The Court should grant the City's Motions. The order confirming the City's bankruptcy plan and the plan itself each provide that the plan does not modify the bar date order entered in this case. Neither the section of the plan addressing motor vehicle claims nor anything else in the plan or the confirmation order says (or even alludes to) anything to the contrary. As a result, there should be no

- 1 -

dispute that (a) the plaintiffs were required to file a timely proof of claim under the bar date order, (b) the plaintiffs did not file a proof of claim under the bar date order; and, thus (c) the bar date order permanently bars the claims the plaintiffs assert in their respective state court lawsuits.

The provision in the City's plan addressing claims relating to the operation of motor vehicles does not save the plaintiffs from these consequences. That provision provides that the City will pay "valid prepetition Claims . . . ." It says nothing about the nullification of, or creation of an exception to, the bar date order and its effects, or that it is intended to supersede or constitute an exception to anything contained elsewhere in the plan to the contrary (language commonly used when there is an overarching provision of primacy). In fact, it does not use any of those words or even synonyms for those words.

Simply put, a claim that is barred by an order of this Court is not, and cannot be, a "valid" claim against the City if the claim has no legal efficacy or force. Any contrary interpretation of the word "valid" or the alleged imputation of an implicit exception to what is otherwise unambiguous language that appears elsewhere in the plan and confirmation order would violate basic tenets of contract interpretation in Michigan and nullify the effect of the express provision in the plan stating that the plan does not modify the bar date order. Consequently, this Court should require the plaintiffs to dismiss their respective state court suits because

- 2 -

their claims are barred by the bar date order. Nothing in the plan or the confirmation order, whether directly or by alleged implication, is to the contrary, or saves or preserves their claims.

## II.  **Background**

### A.  **The Bar Date Order**

1.  On July 18, 2013 ("Petition Date"), the City filed this chapter 9 case.

2.  On November 21, 2013, this Court entered its Order, Pursuant to Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [Doc. No. 1782] ("Bar Date Order").

3.  The Bar Date Order established February 21, 2014 ("General Bar Date") as the deadline for filing claims against the City. Paragraph 6 of the Bar Date Order states that the

> following entities must file a proof of claim on or before the Bar Date…any entity: (i) whose prepetition claim against the City is not listed in the List of Claims or is listed as disputed, contingent or unliquidated; and (ii) that desires to share in any distribution in this bankruptcy case and/or otherwise participate in the proceedings in this bankruptcy case associated with the confirmation of any chapter 9 plan of adjustment proposed by the City…

Bar Date Order ¶ 6.

4.  Paragraph 22 of the Bar Date Order also provided that:

> Pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(2), any entity that is required to file a proof of claim in this case pursuant to the Bankruptcy Code, the Bankruptcy Rules or

- 3 -

this Order with respect to a particular claim against the City, but that fails properly to do so by the applicable Bar Date, shall be forever barred, estopped and enjoined from: (a) asserting any claim against the City or property of the City that (i) is in an amount that exceeds the amount, if any, that is identified in the List of Claims on behalf of such entity as undisputed, noncontingent and liquidated or (ii) is of a different nature or a different classification or priority than any Scheduled Claim identified in the List of Claims on behalf of such entity (any such claim under subparagraph (a) of this paragraph being referred to herein as an "<u>Unscheduled Claim</u>"); (b) voting upon, or receiving distributions under any Chapter 9 Plan in this case in respect of an Unscheduled Claim; or (c) with respect to any 503(b)(9) Claim or administrative priority claim component of any Rejection Damages Claim, asserting any such priority claim against the City or property of the City.

Bar Date Order ¶ 22 (emphasis added).

## B. The City's Confirmed Plan

5. On November 12, 2014, the Bankruptcy Court entered the Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit [Doc. No. 8272] ("<u>Confirmation Order</u>"). The Eighth Amended Plan was attached as Appendix 1 to the Confirmation Order ("<u>Plan</u>") and became effective on December 10, 2014. [Doc. No. 8649].

6. Article IV.S of the Plan includes a provision that the City and the State agreed to after extensive and lengthy negotiations. This provision provides:

From and after the Effective Date, the City will continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to MCL § 500.3101 in connection with the operation of the City's motor vehicles, as follows: (1) Claims for personal protection benefits as provided by

- 4 -

MCL § 500.3107 and MCL § 500.3108, for which insurance coverage is required by MCL § 500.3101(1), shall be paid in full, to the extent valid, provided, however, that the City will not be liable for or pay interest or attorneys' fees under MCL § 500.3142 or MCL § 500.3148 on prepetition Claims for personal protection benefits; (2) tort claims permitted by MCL § 500.3135, for which residual liability insurance coverage is required by MCL § 500.3101(1) and MCL § 500.3131, shall be paid, to the extent valid, only up to the minimum coverages specified by MCL § 500.3009(1), i.e., up to a maximum of (a) $20,000 because of bodily injury to or death of one person in any one accident, and subject to that limit for one person, (b) $40,000 because of bodily injury to or death of two or more persons in any one accident and (c) $10,000 because of injury to or destruction of property of others in any accident; and (3) Claims for property protection benefits under MCL § 500.3121 and MCL § 500.3123 shall be paid, to the extent valid, only up to the maximum benefits specified in MCL § 500.3121; provided, however, for the avoidance of doubt, to the extent any valid Claim subject to subsections 2 and 3 above exceeds the applicable payment limits, the excess claim amount shall be treated as an Other Unsecured Claim or a Convenience Claim (as applicable). Nothing in the Plan shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to MCL § 500.3101 or Claims within the minimum coverage limits in MCL § 500.3009(1). The City expressly reserves the right to challenge the validity of any Claim subject to this Section IV.S, and nothing herein shall be deemed to expand the City's obligations or claimants' rights with respect to these Claims under State law.

Plan, Art. IV.S, pp. 62-63.

7.     Similarly, the Confirmation Order provides:

<u>Claims Related to Operation of City Motor Vehicles</u>. From and after the Effective Date, the City shall continue to administer (either directly or through a third party administrator) and pay valid prepetition Claims for liabilities with respect to which the City is required to maintain insurance coverage pursuant to M.C.L. § 500.3101 in connection with the operation of the City's motor vehicles consistent with the terms of Section IV.S of the Plan. Nothing in the

- 5 -

Plan or this Order shall discharge, release or relieve the City from any current or future liability with respect to Claims subject to insurance coverage pursuant to M.C.L. § 500.3101 or Claims within the minimum coverage limits in M.C.L. § 500.3009(1); provided that the City shall retain the right to challenge the validity of any Claim subject to Section IV.S of the Plan or this paragraph, and nothing therein or herein shall be deemed to expand the City's obligations or any claimant's rights with respect to such Claims under State law.

Confirmation Order, Q.58, p 108. Plan Article IV.S and Confirmation Order Q.58 are collectively referred to as the "<u>Motor Vehicle Plan Provision</u>."

8.    The Plan is clear. It does not modify the Bar Date Order:

**d.    No Modification of Bar Date Order**

The Plan does not modify any other Bar Date Order, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

Plan, Art. II.A.2.d., p. 32 (emphasis in original).

9.    The Confirmation Order similarly provides that the all prior orders in the City's bankruptcy case are binding upon and inure to the benefit of the City and any other parties subject thereto:

**T.    Binding Effect of Prior Orders**

69.    Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 9 Case, all documents and agreements executed by the City as authorized and directed thereunder and all motions or requests for relief by the City pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the City and any other parties expressly subject thereto.

- 6 -

Confirmation Order, T.69, p. 114

10. The Confirmation Order further emphasizes that neither the Plan nor the Confirmation Order is intended to modify any prior order of this Court:

> Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of a direct conflict between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (except as provided in paragraph 24 above, and unless otherwise expressly provided for in such agreement, instrument, or document). In the event of a direct conflict between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

Confirmation Order, X.83, p. 122

## C. The Hearing on the Motions to Enforce

11. On July 12, 2016 and September 20, 2016, the City filed separate Motions to Enforce the Bar Date Order against Najib Hodge ("Hodge") and Danny Crowell, Leota Murphy and Jasmine Crowell (collectively, the "Crowell Plaintiffs", and together with Hodge, the "Plaintiffs") [Doc. Nos. 11357 & 11583] (collectively, the "Motions"). On November 16, 2016, this Court held a hearing on the Motions. *See* November 16, 2016, Hearing Transcript [Doc. No. 11685] ("Hr'g Tr."). During the hearing, the Court asked whether (a) the Motor Vehicle Plan Provision modified the Bar Date Order and if there are any provisions in the Plan or Confirmation Order which address this issue. Hr'g Tr. 115:15-25, 123:9-

28216576.8\022765-00213

11, 123:21-124:10; (b)  a claim can be "valid" under the Motor Vehicle Plan Provision if it was not the subject of a proof of claim that was timely filed. Hr'g Tr. 116:18-23, 122:2-6; and (c) the City has been paying any types of benefits covered by the Motor Vehicle Plan Provision during the pendency of the case for which a timely proof of claim was not filed by the claimant. Hr'g Tr. 136:2-5.  Two days after the hearing, the Court entered an order permitting further briefing on these issues and others.  [Doc. No. 11679].

12.    On December 2, 2016, the Crowell Plaintiffs filed a supplemental brief.  [Doc. No. 11692].  The brief, however, was stricken by order of the Court dated December 16, 2016, because the Crowell Plaintiffs failed to comply with the deficiency notice previously issued by the Court.  [Doc. No. 11719].  The Crowell Plaintiffs filed a motion for relief from the December 16 order but that motion was also stricken by the Court by order dated December 28, 2016, because the Crowell Plaintiffs failed to comply with this Court's order filed on December 5, 2016 at docket number 11691.  [Doc. Nos. 11739 & 11742].

13.    On December 15, 2016, Hodge filed his supplemental brief with the Court.   [Doc. No. 11718].  Hodge argues that due to the Bar Date Order and the Motor Vehicle Plan Provision there is a "direct conflict as to how Mr. Hodge's claim should be handled."    Hodge Supplemental Brief at 2.  As result of this alleged "direct conflict," Hodge asserts that the Motor Vehicle Plan Provision is

- 8 -

ambiguous and that any ambiguity should be construed against the City under the doctrine of contra proferentem. *Id.* at 2-3.

## III. Argument

### A. The Motor Vehicle Plan Provision Did Not Modify the Bar Date Order

14. The Motor Vehicle Plan Provision does not modify the Bar Date Order because there is a provision in the Plan which unambiguously states that the Plan is not modifying the Bar Date Order. Plan, Art. II.A.2.d., p. 32. The Confirmation Order reinforces this provision by stating that nothing in the Plan is intended to modify any prior order of this Court. Confirmation Order X.83, p. 122. The Bar Date Order is, of course, a "prior Order of this Court." *See* Doc. No. 1782. The Confirmation Order also provides that all prior orders (which again would include the Bar Date Order) remain binding upon and inure to the benefit of the City and any parties subject thereto (which would include the Plaintiffs). Confirmation Order, T.69, p. 114. Consequently, the unambiguous language in the Plan and Confirmation Order confirm that the Motor Vehicle Plan Provision did not modify the Bar Date Order.[1] Nothing in the Motor Vehicle Plan Provision, the

---

[1] The Court asked if the phrase "Bar Date Order" appears in the Confirmation Order. It appears once in paragraph Q.51, page 104. The phrase Bar Date Order appears in the Plan at Art. I.A.43, p. 5; Art. II.A.2.a, p. 31; and Art. II.A.2.d, p. 32.

Plan or the Confirmation Order is expressly to the contrary. And, nothing should be inferred or implied which validates the barred and invalid claims.

15. If the parties had intended to modify, supersede, nullify or create an exception to the applicability of the Bar Date Order to the Motor Vehicle Plan Provision, it would have been extremely easy to do so. All that would have been required would have been to include in the Plan such commonly used language as "notwithstanding anything contained in the Plan or elsewhere to the contrary . . ." or similar ranking language.[2] In fact, in other contexts, the Plan and its exhibits use the word "notwithstanding" 183 times when the intention is to establish a priority, exception, or superseding right of primacy. Yet, it did not do so here. There was no intent on the part of the parties to affect the Bar Date Order. And, nothing suggests otherwise.

16. This unambiguous language is further supported by the declaration of Charles N. Raimi. Exhibit 1, Raimi Decl. As Mr. Raimi states, the Motor Vehicle Plan Provision was jointly drafted after lengthy negotiations between the City and the State of Michigan. Raimi Decl. ¶ 8. Further, the "Motor Vehicle Plan Provision did not amend, supersede, or otherwise modify the Bar Date Order in

---

[2] Or, coming at it from the other direction, the use of language such as "subject to" in the provision that reiterates that the Bar Date Order is not modified by the plan.

28216576.8\022765-00213

any way nor did the City ever intend for the Motor Vehicle Plan Provision to do so." Raimi Decl. ¶ 8.

17.     Other than baldly asserting that they did not have to file a proof of claim under the Motor Vehicle Plan Provision, the Plaintiffs cite to nothing in the Plan or Confirmation Order in support of their unfounded and unsupported interpretation.  Tellingly, the Plaintiffs fail to address, much less explain, how the Motor Vehicle Plan Provision could be construed as modifying the Bar Date Order given the unambiguous and explicit provisions in the Plan which state that the Bar Date Order is not being modified and the supporting provisions in the Confirmation Order.

18.     The Plaintiffs argument that the Motor Vehicle Plan Provision modified Bar Date Order should be rejected.

**B.      The Plaintiffs do not have "Valid Prepetition Claims" because they did not Timely File Proofs of Claim**

19.     The Plaintiffs were required to file a timely proof of claim in order to have a "valid" prepetition claim because the Motor Vehicle Plan Provision does not modify the Bar Date Order.   Any other interpretation would mean that the

28216576.8\022765-00213

word "valid" includes claims that were barred by a previous order of this Court – the Bar Date Order.[3]

20.    Under Michigan law,[4] however, "words in a contract must be given their plain and ordinary meanings" and when "specific terms are not defined by the contract, their plain and ordinary meaning may be determined by reference to dictionary definitions." *Clark v. Feinman*, No. 324258, 2016 WL 620142, at *1 (Mich. Ct. App. Feb. 16, 2016); *Miranda & Associates, Inc. v. Abro,* No. 299430, 2011 WL 5870077, at *1 (Mich. Ct. App. Nov. 22, 2011).[5]   The dictionary definition of "valid" is "having legal efficacy or force." "Valid." *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 7 Jan. 2017.  The Plaintiffs' claims do not have any legal efficacy or force because the Plaintiffs are "forever barred, estopped and enjoined from…asserting any claim against the City or property of

---

[3] If the claims asserted by the Plaintiff had been barred by an order of a different court because they were, for example, barred by the statute of limitations, the Plaintiffs seemingly would not contest that their claims were not "valid." This Court's previous orders should certainly be accorded no less weight.

[4] Article VIII.I provides that that laws of the State of Michigan govern the construction and implementation of the Plan.  Plan, Art. VIII.I, p. 72.

[5] The *Clark* decision is attached as Exhibit 2 and the *Miranda* decision is attached as Exhibit 3.

the City." Bar Date Order ¶ 22. In short, a claim which is barred by a federal court order -- the Bar Date Order -- is not "valid."[6]

21.    Furthermore, interpreting the word "valid" to include claims for which no timely proof of claim was filed would nullify the provisions in the Plan and Confirmation Order which state that the Plan does not modify the Bar Date Order.

22.    Michigan law provides that "contracts must be construed so as to give effect to every word or phrase as far as practicable." *Klapp v. United Ins. Group Agency, Inc.* 468 Mich. 459, 467 (2003) (internal citations and quotations omitted). As a result, "if reasonably possible, all parts and every word should be considered; no part should be eliminated or stricken by another part unless absolutely necessary." *Workmon v. Publishers Clearing House*, 118 F.3d 457, 459 (6th Cir. 1997) (*citing Associated Truck Lines, Inc. v. Baer,* 346 Mich. 106, 110, 77 N.W.2d 384 (Mich. 1956)); *see also* 11 Williston on Contracts § 32:5 (4th ed.) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable.").

23.    Concluding that a claim can be a "valid" claim when a claimant has failed to take Court-mandated action to preserve its legal enforceability would render meaningless the language in the Plan which states that the Plan does not

---

[6] And, as we all learned in the first day of law school, "there is no right without a remedy."

- 13 -

modify the Bar Date Order (or the obligations imposed thereunder). This interpretation should be rejected because it is contrary to the unambiguous language in the Plan and Michigan law. Consequently, the Plaintiffs do not have "valid" claims because they did not timely file proofs of claim in violation of the Bar Date Order in order to preserve them.

### C. The City Has Acted in Accordance with the Bar Date Order

24. During the hearing, the Court also asked whether the City has been paying any types of benefits covered by the Motor Vehicle Plan Provision during the pendency of the case for which a timely proof of claim was not filed by the claimant. Hr'g Tr. 136:2-5 Mr. Raimi confirmed that the City had acted in accordance with the Bar Date Order in his declaration:

> 8. The City has consistently maintained, and has, since the Bar Date Order was entered, to the best of my knowledge after due inquiry, consistently taken the position, that (i) prepetition Insurance Claims, like all other Claims (with the specific exceptions noted above), are subject to the Bar Date Order, and (ii) a prepetition Insurance Claim is not a valid Insurance Claim if it is time-barred and not legally enforceable against the City or its property. The failure to file a proof of claim by the General Bar Date renders a prepetition Insurance Claim invalid because it is no longer legally enforceable in accordance with the terms of the Bar Date Order.
>
> 9. In accordance with the Plan, Confirmation Order and Bar Date Order, the City has, to the best of my knowledge after due inquiry, consistently contested and refused to pay prepetition Insurance Claims when the claimant failed to file a proof of claim in the City's bankruptcy case. In fact, the City has filed several motions in this bankruptcy case asserting that position and the Court has entered

- 14 -

orders granting those motions. *See e.g.* Doc. Nos. 9954, 10032, 10177, 10196, 10710, 10743, 10737, 10768, 10775, 10828, 10846, 11053, 11356, & 11416.

Raimi Decl. ¶¶ 8-9. As such, the City has acted in accordance with the Bar Date Order and the position asserted in the Motions is consistent with the City's conduct.

### D. Contra Proferentem Does Not Apply

25. Plaintiffs incorrectly assert that the Court should construe the language in the Motor Vehicle Plan Provision against the City under the rule of contra proferentem. As the Court correctly held at the November 16 hearing, contra proferentem

> …does not apply when both parties contribute to the drafting, or several parties. And that's probably what we have when we're talking about an order confirming plan or a plan of this magnitude and complexity where so many parties were involved in negotiations over the plan and the plan language and the order confirming plan before it was -- they were ultimately entered….

Nov. 16 Tr. 127:12-19; *see also Stryker Corp. v. XL Ins. Am., Inc.*, No. 4:01-CV-157, 2006 WL 1997142, at *11 (W.D. Mich. July 14, 2006) ("And, the Court agrees with the Magistrate Judge that the rule of *contra proferentum* has no application where the contract at issue resulted from the parties' negotiations."); *In re Walnut Equip. Leasing Co., Inc.*, No. 00-0864, 2003 WL 21262710, at *5 (Bankr. E.D. Pa. May 28, 2003) ("There is a well-established exception to the rule of *contra preferentem* where a contract is the result of the joint effort of the

- 15 -

attorneys or negotiators for both sides."); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 330 (1999) ("However, when the contract terms are negotiated, *contra proferentem* is inapplicable."); *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F. App'x 319, 323 (6th Cir. 2014) (*contra proferentem* doctrine applies only where the written contract is standardized and between parties of unequal bargaining power).[7]

26. Further, even in situations where the rule could apply, it is "the last one to be resorted to, and never to be applied except when other rules of interpretation fail. Treatises also indicate that this is a so-called rule of last resort." *Klapp*, 468 Mich. at 472 (2003) (internal citations and quotations omitted).

27. As explained in the Raimi declaration, after extensive and lengthy negotiations, the City and the State of Michigan agreed on the jointly drafted Motor Vehicle Plan Provision. Raimi Decl. ¶ 8. Consequently, the rule of contra proferentem does not apply because the Motor Vehicle Plan Provision was the result of a joint effort of the attorneys or negotiators for the State and City.[8]

---

[7] The *Stryker* decision is attached as Exhibit 4, the *Walnut* decision is attached as Exhibit 5 and the *Volunteer Energy* decision is attached as Exhibit 6. The Plaintiffs had an opportunity to object to Motor Vehicle Plan Provision but they did not.

[8] The sole case cited by Hodge in support of his assertion that the rule of *contra proferentem* should be applied involved an insurance contract that was an adhesion contract. *See Raska v. Fam Bureau Mut. Ins. Co. of Michigan*, 412 Mich. 355, 364 (1982). Consequently, the case is not applicable to the facts here.

- 16 -

Furthermore and more importantly, even if the rule were not inapplicable on its face here, it should not be applied because application of contract interpretation rules in Michigan establish that "valid" does not include claims for which no timely proof of claim was filed in order to preserve them.

## IV.   Conclusion

For the reasons stated above, the City respectfully requests that the Court enter orders granting the Motions.


Dated: January 9, 2017                MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Marc N. Swanson
Jonathan S. Green (P33140)
Marc N. Swanson (P71149)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 9, 2017, he caused a copy of ***CITY OF DETROIT'S SUPPLEMENTAL BRIEF PURSUANT TO ORDER REGARDING FURTHER PROCEEDINGS ON: (1) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. AGAINST DANNY CROMWELL, LEOTA MURPHY AND JASMINE CROMWELL (DOCKET # 11357); AND (2) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. AGAINST NAJIB HODGE (DOCKET # 11583), with its exhibits,*** to be served upon the following parties via email and first class mail:

Joseph Dedvukaj
The Joseph Dedvukaj Firm PC
1277 W Square Lake Rd
Bloomfield Hills, MI 48302-0845
jdlawfirm@aol.com

Clifford Neubauer, Jr.
Douglas A. Dempsey
Law Offices of Joumana B. Kayrouz
1000 Town Center, Suite 800
Southfield, MI 48075
cneubauer@joumanakayrouz.com

Dated: January 9, 2017

By: /s/ Marc N. Swanson
Marc N. Swanson
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 496-7591
Facsimile: (313) 496-8451
swansonm@millercanfield.com

# **EXHIBIT 1**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## DECLARATION OF CHARLES N. RAIMI IN SUPPORT OF THE CITY OF DETROIT'S SUPPLEMENTAL BRIEF PURSUANT TO ORDER REGARDING FURTHER PROCEEDINGS ON: (1) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. AGAINST DANNY CROMWELL, LEOTA MURPHY AND JASMINE CROMWELL (DOCKET # 11357); AND (2) CITY OF DETROIT'S MOTION TO ENFORCE ORDER, ETC. AGAINST NAJIB HODGE (DOCKET # 11583)

1.     My name is Charles N. Raimi.  I am the deputy corporation counsel for the City of Detroit Law Department and have held that position since January 2014. This declaration, except as otherwise stated, is made on my personal knowledge and review of documents maintained by the City in the ordinary course of business.

2.     My responsibilities include overseeing all attorneys who handle lawsuits and claims against the City of the types for which the City is required to maintain insurance coverage pursuant to M.C.L. § 500.3101 in connection with the operation of the City's motor vehicles (collectively, "Insurance Claims").   Those attorneys report to supervisors who in turn ultimately report to me.

3.     I joined the City in January 2014, approximately six months after the City filed its bankruptcy petition on July 18, 2013 ("Petition Date").  As of January

- 1 -

2014, the City had started processing a few Insurance Claims which, I believe, were "catastrophic claims," meaning they involved severe injuries and continuing need for treatment. I understood that the City was authorized by Chapter 9 of the Bankruptcy Code to pay such claims without prejudice to its ability to object to other claims.

4.     At the time of the Petition Date the City had pending 24 catastrophic claims. I understand that all such claimants timely filed bankruptcy claims except one, Courtney Payton. The City ultimately determined that his continuing claims were unsound, and his lawsuit was disallowed by this Court because the claimant failed to timely file a bankruptcy claim. Doc. No. 10743. To my knowledge, all other claimants with pre-petition catastrophic claims, and who timely filed bankruptcy claims, received continuing payment for their treatment.

5.     On November 21, 2013, this Court entered its Order, Pursuant to Sections 105, 501, and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof [Doc. No. 1782] ("Bar Date Order").

6.     The Bar Date Order established February 21, 2014 ("General Bar Date") as the deadline for filing claims against the City. The General Bar Date required holders of all Claims (with a few specified exceptions in paragraph 8 of the Bar Date Order), including Insurance Claims that arose prior to the Petition

Date, to file a proof of claim or be forever barred from asserting his or her Insurance Claim against the City or property of the City.

7. On November 12, 2014, the Bankruptcy Court entered the Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit [Doc. No. 8272] ("Confirmation Order"). The Eighth Amended Plan was attached as Appendix 1 to the Confirmation Order ("Plan") and became effective on December 10, 2014.

8. After extensive and lengthy negotiations, the City and the State of Michigan agreed on the jointly drafted language in article IV.S of the Plan and paragraph 58 of the Confirmation Order ("Motor Vehicle Plan Provision"). The Motor Vehicle Plan Provision did not amend, supersede or otherwise modify the Bar Date Order in any way nor did the City ever intend for the Motor Vehicle Plan Provision to do so. Moreover, the Motor Vehicle Plan Provision provided that "valid" Insurance Claims (and not all Insurance Claims) would be paid in accordance with the terms thereof.

9. The City has consistently maintained, and has, since the Bar Date Order was entered, to the best of my knowledge after due inquiry, consistently taken the position, that (i) prepetition Insurance Claims, like all other Claims (with the specific exceptions noted above), are subject to the Bar Date Order, and (ii) a prepetition Insurance Claim is not a valid Insurance Claim if it is time-barred and

not legally enforceable against the City or its property. The failure to file a proof of claim by the General Bar Date renders a prepetition Insurance Claim invalid because it is no longer legally enforceable in accordance with the terms of the Bar Date Order.[1]

10. In accordance with the Plan, Confirmation Order and Bar Date Order, the City has, to the best of my knowledge after due inquiry, consistently contested and refused to pay prepetition Insurance Claims when the claimant failed to file a proof of claim in the City's bankruptcy case. In fact, the City has filed several motions in this bankruptcy case asserting that position and the Court has entered orders granting those motions. *See e.g.* Doc. Nos. 9954, 10032, 10177, 10196, 10710, 10743, 10737, 10768, 10775, 10828, 10846, 11053, 11356, & 11416.

---

[1] According to the transcript of the hearing held on this matter on November 16, 2016 , the Court asked Mr. Swanson whether "the city [has been] paying any type of benefits covered by the motor vehicle plan provision during the pendency of the case for which a timely proof of claim was not filed by the claimant?" (Tr. at page 136, lines 2-5).

28233070.4\022765-00213

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: _____

Charles N. Raimi
Deputy corporation counsel
City of Detroit Law Department

Dated: January 6, 2017

# EXHIBIT 2

2016 WL 620142
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Dana CLARK, Plaintiff–Appellant,

v.

Jennifer FEINMAN, Defendant–Appellee,
and

Jeff Freiburger, Defendant.

Docket No. 324258.
|
Feb. 16, 2016.

St. Joseph Circuit Court; LC No. 14–000106–CZ.

Before: MURPHY, P.J., and WILDER and
BORRELLO, JJ.

**Opinion**

PER CURIAM.

**\*1** Plaintiff Dana Clark appeals as of right the trial
court's grant of defendant Jennifer Feinman's [1] motion for
summary disposition in this race discrimination action.
For the reasons set forth in this opinion, we affirm.

Plaintiff, a former employee of IAC Mendon, LLC, (IAC
Mendon) brought a race discrimination claim against
defendant, IAC Mendon's human resource specialist who
made the decision to terminate plaintiff's employment
following an altercation between plaintiff and one of his
coworkers. When plaintiff applied for employment with
IAC Mendon he signed an employment application that
contained the following provision:

> I further agree not to bring any
> action or suit relating directly or
> indirectly to employment with IAC,
> or termination of such employment,
> more than 6 months after the date
> of termination of such employment
> and I waive any statutes of
> limitations to the contrary.

Plaintiff was terminated on November 29, 2011, and he
filed this action on February 12, 2014. The trial court
granted defendant's motion for summary disposition
under MCR 2.116(C)(7), on the ground that the action
was time barred by the contractual limitations provision.
Plaintiff argues that defendant cannot enforce the
provision because the contractual limitations provision
only protects "IAC" and defendant was not a third-party
beneficiary of the contract. [2] We disagree.

This Court reviews a trial court's grant of summary
disposition de novo. *Terrace Land Dev Corp v. Seeligson
& Jordan,* 250 Mich.App 452, 455; 647 NW2d 524 (2002).
"The proper interpretation of a contract is a matter of law
that this Court reviews de novo." *Clark v. DaimlerChrysler
Corp,* 268 Mich.App 138, 141; 706 NW2d 471 (2005).

The words in a contract must be given "their plain
and ordinary meanings." *Holland v. Trinity Health Care
Corp,* 287 Mich.App 524, 527; 791 NW2d 724 (2010).
"[A] word or phrase is given meaning by its context or
setting." *Bloomfield Estates Improvement Ass'n, Inc v. City
of Birmingham,* 479 Mich. 206, 215; 737 NW2d 670 (2007)
(citation and quotation omitted). We can refer to the
dictionary definitions of terms to ascertain their plain
and ordinary meaning. *Hastings Mut Ins Co v. Safety
King, Inc,* 286 Mich.App 287, 294; 778 NW2d 275 (2009).
"[A]n unambiguous contractual provision providing for a
shortened period of limitations is to be enforced as written
unless the provision would violate law or public policy," or
is unenforceable under traditional contract defenses, such
as duress, waiver, estoppel, fraud, or unconscionability.
*Rory v. Continental Ins Co,* 473 Mich. 457, 470, 470 n 23;
703 NW2d 23 (2005). "A contract is ambiguous when two
provisions 'irreconcilably conflict with each other,' " or "
'when [a term] is equally susceptible to more than a single
meaning.' " *Coates v. Bastian Bros, Inc,* 276 Mich.App
498, 503; 741 NW2d 539, 543 (2007) (citation omitted).

Third-party beneficiaries can step into the shoes of a
promisee and enforce the contract, so long as the third-
party beneficiary was intended. *Koenig v. South Haven,*
460 Mich. 667, 680; 597 NW2d 99 (1999). We look to
the contract itself to determine whether a party was an
intended third-party beneficiary. *Schmalfeldt v. N Pointe
Ins Co,* 469 Mich. 422, 428; 670 NW2d 651 (2003). "[A]
third-party beneficiary may be one of a class of persons, if

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

the class is sufficiently described or designated." *Koenig,* 460 Mich. at 680.

**\*2** It is readily apparent from the context of the provision that the use of the phrase "with IAC" in the contractual language modifies "employment" and not the words "action or suit." "It is a general rule of grammar ... that a modifying word of clause is confined solely to the last antecedent, unless it is clear that something different was intended." *Sun Valley Foods Co v. Ward,* 460 Mich. 230, 237; 596 NW2d 119 (1999); see also *Bloomfield Estates,* 479 Mich. at 215 ("[A] word or phrase is given meaning by its context or setting.") The word "any" means "every; all." *Random House Webster's College Dictionary* (2000). Thus, the word "any," which modifies "action or suit" refers to all actions. And, the later language limits the action or suit to those relating "to employment with IAC, or termination of such employment," and the provision, therefore, limits the parties to only those that were involved in plaintiff's employment or termination. From the "form and meaning of the contract," *Schmalfeldt,* 469 Mich. at 428, we find that a class was created and sufficiently described as those against whom plaintiff may bring suit for employment or termination disputes, *Koenig,* 460 Mich. at 680. Plaintiff, when he signed the provision, was given notice that any action that was related to his employment or termination regardless of whether it was against IAC Mendon, IAC Mendon's parent corporation, or individual employees involved in employment and

termination decisions, must be brought within six months of his termination. Therefore, defendant was a third-party beneficiary, and as a third-party beneficiary, she could step into the shoes of IAC Mendon to enforce the contractual provision. *Id.*

The provision at issue imposes a time limit on all causes of action "relating directly or indirectly to employment with IAC." We concur with the findings of the trial court that contrary to plaintiff's arguments on appeal, this language is not limited to causes of action against IAC. His arguments that the time limit does not apply to the defendant in this case are unavailing. Hence, plaintiff had 6 months from his date of termination in which to bring this action. Having failed to do so, his action is barred by the limitations contained within the employment agreement. Lastly, because the contractual limitations provision is unambiguous in that it bars plaintiff's action against defendant, we enforce it as written. *Rory,* 473 Mich. at 470. Accordingly, we find the trial court did not err in granting defendant's motion for summary disposition under MCR 2.116(C)(7).

Affirmed. Defendant being the prevailing party may tax costs. MCR 7.219(A).

**All Citations**

Not Reported in N.W.2d, 2016 WL 620142

---

Footnotes

1     The parties stipulated to dismiss defendant Jeff Freiburger with prejudice. Therefore, we will refer to Jennifer Feinman as "defendant."

2     Defendant also raises agency and collateral estoppel challenges to plaintiff's claim on appeal. Because we determine that defendant was a third-party beneficiary, we find it unnecessary to address the merits of defendant's alternate claims.

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

2011 WL 5870077
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

MIRANDA & ASSOCIATES, INC., Mary
Y. Abro, Ted B. Abro, Robert B. Abro,
and Jason B. Abro, Plaintiffs–Appellees,
v.
George ABRO and Johnny Enterprises,
Inc., Defendants–Appellants.

Docket No. 299430.
|
Nov. 22, 2011.

Before: M.J. KELLY, P.J., and SAAD and
O'CONNELL, JJ.

**Opinion**

PER CURIAM.

 **\*1** Defendants appeal as of right from a circuit court
order denying their motion for attorney fees. We affirm.

Plaintiffs and defendants entered into agreements for the
sale of a business and the lease of the property on which
the business was located. The lease agreement contained
an option to purchase the property for $400,000, with
payment of $120,000 down and a land contract for the
balance, which was to be paid in 120 monthly installments
at nine percent interest. Plaintiffs gave defendants
notice that they were exercising the option to purchase,
but defendants refused to sell the property. The trial
court determined that plaintiffs were entitled to specific
performance and ordered defendants to execute a land
contract containing all "usual and customary covenants,"
as well as a clause allowing plaintiffs to prepay the balance
without penalty. After it was discovered that the property
was owned by another person, the trial court ordered
defendants to clear title. Eventually, the trial court granted
plaintiffs' motion for attorney fees pursuant to ¶ 18 of the
lease agreement, which provided:

> If suit is brought to enforce any
> covenant of this Lease or for the
> breach of any covenant or condition
> herein contained, the parties hereto
> agree that the losing party shall pay
> to the prevailing party a reasonable
> attorney's fee, which shall be fixed by
> the court, and the court costs.

In a prior appeal, this Court affirmed, but remanded
to the trial court to strike a "no prepayment penalty"
clause in the land contract. *Miranda & Assoc, Inc v. Abro,*
unpublished opinion per curiam of the Court of Appeals,
issued December 29, 2009 (Docket No. 287230).

On remand, the trial court granted defendants' motion to
amend the land contract in accordance with this Court's
ruling. Defendants then moved for attorney fees pursuant
to ¶ 18 of the lease agreement, arguing that they were the
prevailing party because they had successfully appealed
the inclusion of the prepayment penalty clause in the
land contract. Defendants further argued that because
they, rather than plaintiffs, were the prevailing party, the
attorney fees previously awarded to plaintiffs should be
disallowed. The trial court denied defendants' motion.
This appeal followed.

A trial court's ruling on a motion for attorney fees is
generally reviewed for an abuse of discretion. *Reed v.
Reed,* 265 Mich.App 131, 164; 693 NW2d 825 (2005). But
the interpretation of a contract is a question of law that
is reviewed de novo on appeal, *Kloian v. Domino's Pizza,
LLC,* 273 Mich.App 449, 452; 733 NW2d 766 (2006), as
are other questions of law. *Flint Cold Storage v. Dep't of
Treasury,* 285 Mich.App 483, 492; 776 NW2d 387 (2009).

Unambiguous contracts are to be enforced as written.
*Holland v. Trinity Health Care Corp,* 287 Mich.App 524,
527; 791 NW2d 724 (2010). The words used in a contract
are to be given their plain and ordinary meanings. *Id.*
When specific terms are not defined by the contract,
their plain and ordinary meaning may be determined
by reference to dictionary definitions. *Id.* at 527–528. A
prevailing party is one "in whose favor a judgment is
rendered, regardless of the amount of damages awarded."
Black's Law Dictionary (9th ed).

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.   1

**\*2** Contrary to defendants' argument, defendants were not the prevailing party in the trial court or on the first appeal. In the trial court, defendants argued that the option was void, that plaintiffs had not properly exercised the option, and that any land contract could not contain any terms not expressly included in the option itself. The trial court rejected those arguments and this Court affirmed, holding that plaintiffs had properly exercised the option to purchase and that the trial court did not err in requiring execution of a land contract containing terms consistent with the option to purchase and other terms "ordinarily and customarily used in any land contract" other than the prepayment penalty clause. This Court also rejected as moot the argument that the option was void, and the Court left the order for attorney fees in effect. *Miranda & Assoc, Inc,* unpub op at 7–11. In fact, this Court determined that neither party had prevailed in full on appeal. *Id* . at 11. Thus, the law of the case doctrine precluded the trial court from concluding that defendants were the prevailing party on appeal. *New Prop, Inc v. George D Newpower, Jr, Inc,* 282 Mich.App 120, 132; 762 NW2d 178 (2009).

The trial court properly determined that defendants were not prevailing parties entitled to attorney fees under ¶ 18 of the lease agreement.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2011 WL 5870077

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 2

# **EXHIBIT 4**

2006 WL 1997142
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

STRYKER CORPORATION and
Howmedica Osteonics Corp., Plaintiffs,
v.
XL INSURANCE AMERICA, INC., formerly
known as Winterthur International
America Insurance Company, Defendant.

No. 4:01-CV-157.
|
July 14, 2006.

**Attorneys and Law Firms**

D. Andrew Portinga, David J. Gass, Miller Johnson Snell & Cummiskey PLC, Grand Rapids, MI, Daniel P. Perk, Miller Johnson Snell & Cummiskey PLC, Kalamazoo, MI, for Plaintiffs.

David Bloss, Michael W. Betz, Betz & Bloss, PC, Grand Rapids, MI, for Defendant.

## *ORDER*

ROBERT HOLMES BELL, Chief District Judge.

**\*1** In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED** that Plaintiffs' and Defendant's Objections to the September 26, 2005 Report and Recommendation and the October 14, 2005 Report and Recommendation (Docket Nos. 767 and 777) are **OVERRULED** and each Report and Recommendation is **APPROVED** and **ADOPTED** as the opinion of the Court.

**IT IS FURTHER ORDERED** that, within seven (7) days of the entry of this order, the parties are to notify the Court, in writing, which of the pending motions in limine remain for resolution.

## *OPINION*

This matter is before the Court on Plaintiffs Stryker Corporation and Howmedica Osteonics Corporation's and Defendant XL Insurance America, Inc.'s objections to two Report and Recommendations issued by the Magistrate Judge on September 26, 2005 and October 14, 2005. On the eve of trial of this matter, the Court adjourned trial without date and directed the parties to confer with the Magistrate Judge to delineate the relevant issues for trial. After multiple conferences with the parties, the Magistrate Judge issued the R & R's, recommending that, in order to simplify the issues presented to the jury, the Court revisit certain issues previously addressed in the Court's summary judgment opinions and proposing a special verdict form and eight special jury instructions.

Both parties have filed objections to each R & R. The Court is required to make a *de novo* review upon the record of those portions of the R & R to which specific objections have been made. 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b). *See also* Miller v. Currie, 50 F.3d 373, 380 (6th Cir.1995). For the reasons that follow, the objections to each R & R are overruled and the Court approves and adopts each R & R as the opinion of the Court.

### I.

A. *The September 26, 2005 Report & Recommendation*
The Court will first address the parties' objections to the September 26, 2005 R & R. Defendant objects to the Magistrate Judge's recommendation that the jury be presented with the following question: "Did the parties intend that the Insurance Policy would cover all claims and lawsuits involving products in a single **batch**, no matter when **bodily injury** took place?" Proposed Special Verdict Form Ques. # 1, Oct. 14, 2005 Report and Recommendation (Docket # 777). This question encompasses Plaintiffs' interpretation of the insurance policy and Medical Products Endorsement. The next question on the verdict form presents Defendant's interpretation of the policy, that the Medical Products Endorsement does not relieve Plaintiffs of the obligation to show that each claimant suffered bodily injury from a defective Uni-Knee during the policy period. *See* Proposed Special Verdict Form Ques. # 2.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

The Court agrees with the Magistrate Judge that the jury must be presented with special questions embodying the conflicting interpretations of the policy and Medical Products Endorsement. Questions # 1 and # 2 of the Special Verdict Form accurately and clearly provide the jury with each party's interpretation of the policy and Medical Products Endorsement. This approach is consistent with the Court's previous opinion holding that the meaning of the Medical Products Endorsement and the coverage provision of the policy are ambiguous, and therefore a question of fact for the jury. Aug. 17, 2005 Opinion at 11-12 (citing *Fromm v. Meemic Ins. Co.,* 264 Mich.App. 302, 311, 690 N.W.2d 528, 533 (2004)) (Docket # 689). Defendant reads the Court's opinion far too narrowly in arguing that the ambiguity in the policy and Medical Products Endorsement is limited to the "interplay between" the endorsement and the coverage provision. Def.'s Obj. to R & R at 2. In the previous opinion, the Court held that the policy is "susceptible to *multiple* conflicting interpretations," and then proceeded to cite "two examples of the conflicts and ambiguity inherent in the policy and Medical Products Endorsement," involving the first and third paragraphs of the Medical Products Endorsement. Aug. 17, 2005 Op. at 10, 11-12 (emphasis added). The examples cited did not fully encompass the ambiguity presented in the coverage provision and Medical Products Endorsement. Further, the Court denied summary judgment on the issue of coverage to both Plaintiffs and Defendant based upon the ambiguous meaning of the coverage provision and Medical Products Endorsement. *Id.* at 11-12. In other words, the Court could not determine, as a matter of law, whether Plaintiffs' or Defendant's interpretation of the policy was correct.

**\*2** Because the meaning of the coverage provision and Medical Products Endorsement is ambiguous, Michigan law requires that the interpretation of the contract is a question of fact to be decided by the jury. *See e.g.,* *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 (2003). In order to resolve this dispute, it is necessary for the jury to be presented with each parties' interpretation of the relevant contractual provisions. Questions # 1 and # 2 accomplish this task. Accordingly, Defendant's objection to Question # 1 of the Special Verdict Form is overruled.

Plaintiffs have also objected to Questions # 1 and # 2 of the Special Verdict Form contending that Defendant's

refusal to defend Plaintiffs in the underlying claims renders the issue of whether bodily injury occurred during the policy period moot. This argument is premised upon Defendant's duty to defend Plaintiffs set forth in the policy. This argument apparently was never raised in front of the Magistrate Judge and makes its first appearance in Plaintiffs' objections to the R & R. A party cannot raise an issue for the first time in its objection to an R & R. *O'Neil v. Appel,* 165 F.R.D. 479, 482 (W.D.Mich.1996) (Bell, J.) ("Pursuant to the exhaustion doctrine that is applied with regularity to issues raised on appeal, the court need not review this argument as it was not raised before the magistrate judge."). *See also Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) (holding that the Magistrates Act was not intended "to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court."); *rev'd on other grounds United States v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Jesselson v. Outlet Assocs. of Williamsburg, Ltd. P'ship,* 784 F.Supp. 1223, 1228 (E.D.Va.1991) ("A magistrate's decision should not be disturbed on the basis of arguments not presented to him."). For this reason alone, Plaintiffs' objection to Questions # 1 and # 2 is overruled.

Even if the Court considered the merits of Plaintiffs' objection it would be overruled. Previously, this Court denied Plaintiffs' motion for summary judgment on Defendant's duty to defend. *See* Aug. 27, 2004 Op. at 13 (Docket # 603). The Court held that because Plaintiffs agreed to "self-insure," they were required to establish that the claims and lawsuits it settled or defended were within Defendant's policy coverage. The Court also found that genuine issues of material fact as to whether Plaintiffs' claims were within Defendant's coverage precluded summary judgment on the issue of the duty to defend. Plaintiffs' overlook the Court's previous denial of summary judgment in making the argument that Defendant's duty to defend renders the issue of the meaning and proper interpretation of the coverage provision and Medical Products Endorsement moot. Moreover, Plaintiffs appear to be under the impression that Defendant's refusal to defend resulted in a situation in which Plaintiffs were no longer required to establish the elements of coverage. This is erroneous. Defendant's refusal to defend cannot create coverage where none exists. And as stated in the Court's previous opinion, Plaintiffs have the burden of proving that the claims and

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2

lawsuits it settled or defended are subject to Defendant's coverage obligation.

**\*3** As Plaintiffs note, an insurer has two alternatives when it decides there is no coverage: repudiate liability and refuse to defend, thus taking the risk that its no coverage determination was wrong; or the insurer may protect itself by providing a defense under a reservation of rights. *Century Indem. Co. v. Aero-Motive Co.,* 336 F.Supp.2d 739, 745 (W.D.Mich.2004) (Quist, J.). An insurer, however, may always avoid liability by demonstrating there is no coverage under the policy. *Id.* That is the position that the litigants find themselves in this case. Defendant refused to defend, believing there was no coverage under the policy. The first stage of the trial will determine if Defendant's determination of no coverage was correct. The jury will determine if the underlying claims and lawsuits are within the coverage obligation set forth in Defendant's policy. In order to make this determination, the jury must first determine the meaning of the policy. That is, the jury must determine what the parties intended would be required for Defendant's coverage obligation to be triggered. Without making this initial determination, there could be no assessment of whether Defendant breached its duty to defend.

Thus, in the unique context of this case, the duty to defend is coextensive with the coverage determination in that it rises or falls upon the determination of whether coverage applies in this case. In order to determine the parties' intentions, the jury must be asked whether the parties intended that coverage would apply to all claims and lawsuits involving products in a single batch, regardless of when bodily injury took place (Plaintiffs' interpretation represented in Question # 1), or that Plaintiffs' are required to show that each individual claim suffered some bodily injury during the policy period (Defendant's position represented in Question # 2). Therefore, Questions # 1 and # 2 are highly relevant to this case and must be presented to the jury. Consequently, Plaintiffs' objection is overruled.

Defendant next objects to the Magistrate Judge's recommendation that the Court grant Plaintiffs summary judgment on the issue of whether an occurrence existed regarding the Uni-Knee batch at issue in this case. Defendant also objects to the Magistrate Judge's failure to include a question addressing whether bodily injury was caused by an occurrence. In the Court's August 17, 2005

Opinion, it held that the first paragraph of the Medical Products Endorsement was ambiguous and therefore neither party was entitled to summary judgment. Aug. 17, 2005 Op. at 11-12. Further, the Court also indicated that the issue of whether an "explant" was necessary for the existence of an occurrence was a question of fact for the jury. *Id.* In light of further development of the issues by the parties, the Court has a better understanding of the issues and agrees with the Magistrate Judge that the existence of an occurrence is a question of law and that the Medical Products Endorsement is not ambiguous with regard to the batch coverage presented in this case. As such, summary judgment on the issue of an occurrence is granted in Plaintiffs' favor.

**\*4** Defendant contends that the Magistrate Judge erred in reasoning that Defendant's repeated admission that the claims and lawsuits involving the Uni-Knees at issue in this case constituted a batch resulted in a concession that there was an occurrence. The Court agrees with the Magistrate Judge's analysis that Defendant cannot admit that a batch exists, yet also contest the existence of an occurrence. Defendant argues that the Magistrate Judge's analysis confuses the batch, which, in Defendant's view, consists only of the medical products, with the claims and lawsuits arising from the products. The Court fails to see the relevant distinction between "products" and "claims and lawsuits." It appears to be nothing more than a distinction without a difference. [1]

The claims and lawsuits are inextricably intertwined with the defective medical products. If there was no defective product, there would be no claim or lawsuit. Defendant's coverage obligation is only implicated if claims and lawsuits arising from the defective product are asserted against Plaintiffs. Moreover, the language of the Medical Products Endorsement does not make the fine distinction between products and claims now asserted by Defendant. In the third paragraph, the Medical Products Endorsement states, "[t]he date of the advisory memorandum will be considered the date of occurrence for *all claims* resulting from or relating to the batch." Medical Prods. End. ¶ 3 (emphasis added). Further, in the denial of coverage letter, when asserting its position that if Plaintiffs knew or suspected the defect in the Uni-Knee prior to January 1, 2000, Defendant explained, "there will be *no batch coverage* for the *Uni-Knee claims and lawsuits* under the Policies." Denial Letter, Def.'s Mot. Summ. J., Vol. F., Ex. 2 (Docket # 533) (emphasis added).

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Therefore, the Court overrules Defendant's objection to the Magistrate Judge's recommendation. The Magistrate Judge properly analyzed the issue of whether, as a matter of law, there is an occurrence in this case and the Court approves and adopts the Magistrate Judge's recommendation.

Plaintiffs next object to the Magistrate Judge's definition of the Uni-Knee's defect. The Magistrate Judge recommended that the Court revisit its previous decision holding that the definition of the defect was a question of fact for the jury. *See* Dec. 1, 2004 Opinion at 6 (Docket # 619). The Magistrate Judge recommended that this issue be resolved by the Court as a matter of law and also recommended that the defect be defined as the "Uni-Knees were available in inventory for implantation by physicians after the expiration of their shelf life." Sept. 26, 2006 R & R at 10. Upon review of the R & R and the record in this case, the Court agrees with the Magistrate Judge's thorough analysis of the definition of the defect issue and withdraws its previous ruling holding that the definition of the defect is a question of fact for the jury.

 **5** Plaintiff argues that the defect in the Uni-Knee was the *implantation* of the device after its intended shelf life. Plaintiff also asserts that the Magistrate Judge's analysis failed to consider the language of the Medical Products Endorsement and the July 28, 2000 advisory memorandum. The Court does not agree. Contrary to Plaintiffs' assertions, the definition of the defect set forth in the Magistrate Judge's R & R is entirely consistent with both the Medical Products Endorsement and the advisory memorandum. The only plausible definition of the defect revealed in the advisory memorandum is that the Uni-Knees were available for implantation beyond their intended shelf life. Plaintiffs' reliance on implantation as the defect confuses the use that the device is put to with the defect itself. Implantation is simply that, an action that the device is put to. It is not the defect itself. To be sure, as Plaintiffs' note, the advisory memorandum mentions that the defective devices were implanted beyond their shelf life. The reference to implantation in the advisory memorandum simply refers to the action or event that revealed the defective nature of the product.

The critical language of the advisory memorandum, which both parties agree is the relevant document for defining the defect, is the explanation that the Uni-Knees are "susceptible to oxidation and the potential for increased wear if they resided on the shelf for an extended period of time prior to implantation." Advisory Memo, Vol. A, Ex. 3 (Docket # 533). This is the defect in the Uni-Knees. After expiration of the shelf life, Uni-Knees that were available for implantation were defective because they were susceptible to oxidation and increased wear when put to their foreseeable use. The implantation simply reveals the defect, it is not the defect itself.

Plaintiffs' reliance on language from the Medical Products Endorsement in support of its position is similarly misplaced and does not support its claim that implantation is the defect. Plaintiffs point to a portion of the definition of "advisory memorandum" indicating that the purpose of the communication must be to inform recipients "of a risk of substantial harm from the medical product in commercial use." Medical Prods. End. ¶ 4. Plaintiff emphasizes the term "commercial use" to argue that a product is not in commercial use until it is sold. Plaintiffs also point to the clause of the endorsement excluding batch coverage for "any loss, which arises out of a defect, or deficiency that is known or suspected" prior to January 1, 2000. Medical Prods. End. ¶ 3. Based upon these portions of the endorsement, Plaintiffs suggest that the Uni-Knee is only defective upon sale and implantation.

Plaintiffs' argument is completely misguided. First, Plaintiffs construe "commercial use" too narrowly. "Commercial use" is a defined term in the Medical Products Endorsement. The term is defined by exclusion: " 'Commercial use' does not mean devices that (1) are being used in clinical investigations and (2) are not generally available for sale." Medical Prods. End. ¶ 4. By excluding those devices that are used in clinical investigations and not generally available for sale, "commercial use" clearly includes those devices which are *not* being used in clinical investigations and *are generally available for sale.* Therefore, "commercial use" is clearly not limited to products that were already sold. Consequently, Plaintiffs' contention that commercial use, and thereby the defect in the Uni-Knee, is limited to products already sold is incorrect. There is no requirement that the device is only defective upon sale or implantation.

 **6** Second, Plaintiffs' reliance on the language in the exclusion is misplaced because it equates the need for coverage with the defect in the product. Whether there is a loss that necessitates coverage under the policy is a

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

completely different issue from whether there is a defect in the product. While coverage may not be necessary until a loss caused by a defect occurs, this does not mean, as Plaintiffs suggest, that there is no defect until there is a loss or injury. Simply put, a product may be defective without any loss or injury resulting from that defect, and thus any need for coverage. Accordingly, Plaintiffs' objection to the R & R is unavailing and the Court finds that the Magistrate Judge properly concluded that the defect in the Uni-Knee did not include implantation and was limited to the availability in inventory of the product beyond the expiration of their shelf life. [2]

Defendant briefly objects to the Magistrate Judge's definition of the defect. While Defendant agrees with the Magistrate Judge that the definition of the defect does not include implantation and agrees with the definition of the defect contained in the September 26, 2005 R & R, it objects to the inclusion of the phrase, "held in inventory for sale" in the definition set forth in the third Special Jury Instruction attached to the October 14, 2005 R & R. Defendant also requests that the means by which the Uni-Knee was packaged and sterilized (standard atmospheric conditions and sterilized by gamma radiation) be included in the definition of the defect. The Court sees no need to inform the jury of the method by which the Uni-Knees were packaged and sterilized and it fails to see the relevance of the slight difference between the definition of the defect contained in the September 26, 2005 R & R and the special jury instruction. Nevertheless, the Court will make a slight modification to the special jury instruction so that it conforms with the definition contained in the September 26, 2005 R & R. The instruction will read: "The court has determined, for purposes of this case, the Duracon Uni-Knees were defective if they were available in inventory for implantation by physicians beyond their shelf life, that is, beyond five years." Notwithstanding this slight modification, the Court concludes that the Magistrate Judge properly analyzed this issue. Accordingly, the September 26, 2005 R & R is approved and adopted as the opinion of the Court.

B. *The October 14, 2005 Report and Recommendation*
In the October 14, 2005 R & R, the Magistrate Judge addressed the proposed instructions submitted by the parties, ultimately recommending eight special jury instructions to accompany the four-question special

verdict form. Both parties have filed objections to the Magistrate Judge's recommended instructions. The objections are addressed below.

Defendant first objects to Special Jury Instruction No. 1. This instruction provides a brief overview of the case as well as a short summary of the nature of an insurance contract. Defendant specifically objects to the second and third sentences of the second paragraph:

> **\*7** The Insurance Policy in this case requires the Insurance Company, in certain circumstances, to cover certain lawsuits and claims brought by third parties who allege that they suffered bodily injury because of defects in the Insured's medical products. Insurance policies such as the one involved in this case cover losses caused by accidents, even if the accident is caused by the negligence or fault of the insured party.

Special Instruction No. 1, Oct. 14, 2005 R & R, Attach. # 1 (Docket # 777). Defendant objects to the reference that it is "required" to provide coverage, arguing that the instruction should also refer to possible exclusionary language that may apply. Further, Defendant contends that the instruction is confusing because it fails to identify the "certain circumstances" that must exist for coverage to apply. Defendant's objection is misguided and is overruled. The first sentence of the quoted passage above provides an accurate, albeit general, summary of Defendant's coverage obligations. Defendant's objection that the instruction fails to refer to certain exclusions that may be applicable overlooks the fact that in the following paragraph the jury is informed that Defendant "affirmatively asserts that these lawsuits and claims were expressly excluded from coverage." Moreover, the objection also fails to account for the sixth special jury instruction which informs the jury that Defendant is relying on a specific exclusion contained in the Medical Products Endorsement. Further, the failure to identify the "certain circumstances" that must exist for coverage to apply is adequately remedied by the other seven special jury instructions explaining the requirements for coverage under the policy.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Defendant also objects to the final sentence of the quoted passage above. Defendant contends that the reference to "accidents" is surplusage and is not applicable to this case. The Court does not agree. This sentence simply informs the jury that, in general, insurance policies are purchased to cover an insured's accidents, or unintentional actions, that result from their own negligence or fault. The other special instructions describe, in detail, the requirements and limits of the specific policy at issue. The reference to "accidents" in Special Instruction No. 1 is, at best, harmless.

Defendant next objects to the final sentence in the second special instruction. In Special Instruction No. 2, the Magistrate Judge set forth a number of legal principles that the jury must apply in order to determine the meaning of the ambiguous insurance policy at issue in this case. Defendant objects to the following sentence: "If there is a conflict between an endorsement and the main body of the Insurance Policy, the endorsement controls." While Defendant acknowledges that this is a correct statement of law, it objects because, in it's view, this principle is a rule of construction that will not aid the jury in making a factual determination.

**\*8** Defendant's objection is meritless and ignores the Court's previous ruling that the meaning of the Medical Products Endorsement and the coverage provision is a question of fact for the jury. As such, the jury must apply the rules of contract construction set forth in Special Instruction No. 2, including the rule that where an endorsement conflicts with the main body of a policy, the endorsement controls. [3] *See McKusick v. Travelers Indem. Co.,* 246 Mich.App. 329, 332-33, 632 N.W.2d 525 (2001) ("[C]onflicts between the terms of an endorsement and the form provision of an insurance contract are resolved in favor of the terms of the endorsement."). Defendant's reliance on *Auto Owners Ins. Co. v. Jensen,* 667 F.2d 714 (8th Cir.1981), in support of its objection is completely misplaced. *Jensen* involved the interpretation of an insurance contract pursuant to Minnesota law, which requires that the interpretation of an insurance contract, even if ambiguous, is a matter of law for the court. 667 F.2d at 721. Michigan law is directly contrary. *See e.g., Klapp,* 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury."). Accordingly, Defendant's objection to special instruction No. 2 is overruled.

Defendant next objects to Special Instruction No. 7. This instruction addresses the "known or suspected" exclusion contained in the Medical Products Endorsement. In light of the Court's previous holding that this exclusion was ambiguous, the jury must determine the parties' intent with regard to this clause. Special Instruction No. 7 provides the jury with guidance on how to determine the parties' intent. Defendant objects to the final sentence in the first paragraph, which states: "If, after considering all these things, you are still unsure about the meaning of the exclusion, Michigan law says that the exclusion must be construed against the insurance company and in favor of coverage." Special Ins. No. 7. This is an accurate statement of Michigan law. *See Century Surety Co. v. Charron,* 230 Mich.App. 79, 83, 583 N.W.2d 486 (1998). Defendant contends that this instruction is a version of the rule of *contra proferentum* that Plaintiffs requested and the Magistrate Judge rejected. *See* Oct. 14, 2005 R & R at 6-9. Although closely related to the rule of *contra proferentum,* the portion of Special Instruction No. 7 quoted above, is a separate and distinct legal principle. The rule of *contra proferentum* applies where contractual language is ambiguous and requires that the ambiguities be construed against the drafter. *Klapp,* 468 Mich. at 470-71, 663 N.W.2d at 454-55. In contrast, the rule that exclusions are construed in favor of coverage is not dependent on a finding that the insurance company is the drafter of the policy and is not generally applicable to all ambiguities in an insurance policy, but rather is limited to exclusions. This Court agrees with the Magistrate Judge that this narrow rule of interpretation applies in this case and is consistent with Defendant's burden of proving the application of an exclusion from coverage.

**\*9** Although the Court agrees with the Magistrate Judge's inclusion of this instruction, the Court will make a few minor alterations to the language. The final sentence of the first paragraph of Special Instruction No. 7 will be as follows: "If, after considering all these things, you are still unsure about the meaning of the exclusion, Michigan law says that the exclusion must be *strictly* construed in favor of insurance coverage." (emphasis added to indicate alteration). This language hews more closely to Michigan law on the subject. *See Century Sur. Co.,* 230 Mich.App. at 83, 583 N.W.2d at 488.

Finally, Defendant objects to the Magistrate Judge's rejection of a proposed instruction that would inform the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

jury that knowledge of the officers, agents, or employees of a wholly-owned corporate subsidiary is imputed to the parent corporation. Defendant contends that this instruction is consistent with the imputed-collective-knowledge standard adopted in Michigan.

The Magistrate Judge properly analyzed this issue and properly rejected Defendant's proposed instruction. While Defendant cites the seminal case in Michigan on the imputed-collective-knowledge standard, *Upjohn Co. v. New Hampshire Ins. Co.,* 488 Mich. 197, 476 N.W.2d 392 (1991), it extends the standard well beyond the boundaries established in the Michigan Supreme Court's opinion. Namely, Defendant improperly stretches the holding in *Upjohn* to include imputation of knowledge of an employee of a subsidiary to the parent corporation. In making this assertion, Defendant fails to point to any portion of the decision in which the court made such a far reaching holding. The only discussion of the imputed collective knowledge standard in *Upjohn* is the court's adoption of the standard set forth in *Copeman Labs. Co. v. General Motors Corp.,* 36 F.Supp. 755, 762 (E.D.Mich.1941):

> When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person, pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

*Upjohn,* 438 Mich. at 214, 476 N.W.2d at 401. There is absolutely no indication that this standard obliterates the distinction between a parent and subsidiary and results in the imputation of the knowledge of a subsidiary's employee to a parent corporation.

Absent citation to a specific portion of the *Upjohn* decision in which the court extended the imputed knowledge

standard to include employees of a subsidiary, Defendant relies on the court's identification of the various entities involved in the case and a recitation of some of the underlying facts of the case. Defendant argues that while the state supreme court's identification of the corporate entities involved in the case was "imprecise," the court made it clear that the employee whose knowledge was imputed to the parent corporation was not an employee of the parent. Therefore, in Defendant's view, the court held that knowledge of an employee of a subsidiary can be imputed to a parent.

**\*10** Defendant misreads the *Upjohn* opinion. First, the court clearly distinguished between the various corporate entities involved in the case, describing the plaintiff as, "the Upjohn Company" or "Upjohn," and referring to Upjohn's Puerto Rico-based division as "the Upjohn Manufacturing Company," or "UMC." Contrary to Defendant's assertion, these designations were not used indiscriminately but were used precisely when referring to either the division or the plaintiff. *See e.g., Upjohn,* 438 Mich. at 202, 204, 476 N.W.2d at 394, 396 (describing actions taken by an "Upjohn employee," documents stored at the "UMC facility," and explaining "Upjohn filed suit against defendant"). Second, the court clearly indicated that the employee whose knowledge was imputed to plaintiff was an "Upjohn employee." *Id.* at 202, 210, 214, 476 N.W.2d at 394, 399, 401. Given the court's precise delineation between UMC and Upjohn, if the employee had been employed by Upjohn's division, the court would have referred to a "UMC employee." [4]

Furthermore, it is difficult to accept Defendant's argument that the Michigan Supreme Court jettisoned the long-standing principle that a parent and subsidiary are treated as separate and distinct entities absent some abuse of the corporate form, *see, e.g., Acton Plumbing & Heating Co. v. Jared Builders, Inc.,* 368 Mich. 626, 629, 118 N.W.2d 956, 958 (1962), through the device of imprecise reference to the various entities and without so much as a mention in the court's analysis in *Upjohn.* It seems highly unlikely that the court would do away with the distinction between a parent and subsidiary *sub silencio.* The better view, and the only view that is clearly expressed in *Upjohn,* is that knowledge about a particular subject obtained by a corporation's employee charged with responsibility for that subject is imputed to the corporation. This standard, however, does not extend to imputing knowledge of a subsidiary's employee to the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

7

parent corporation. Accordingly, Defendant's objection is overruled. [5]

The Court now turns to Plaintiffs' objections to the October 14, 2005 R & R. Plaintiffs' first object to the Magistrate Judge's rejection of their proposed *contra proferentum* instruction. As mentioned previously, the rule of *contra proferentum* provides that where a contract is ambiguous, and a jury is unable to determine the parties' intentions from relevant extrinsic evidence, the ambiguities are construed against the drafter of the contract. *See Klapp,* 468 Mich. at 471, 663 N.W.2d at 455. The Magistrate Judge determined that a *contra proferentum* instruction was not appropriate in this case because the policy and accompanying endorsements were the subject of negotiation between the parties.

The Magistrate Judge properly analyzed this issue. Plaintiffs' argue that the Magistrate Judge erred by not concluding that Defendant was the drafter of the policy and accompanying endorsements as a matter of law. Plaintiffs also assert that the Magistrate Judge made improper factual findings by concluding that the policy and endorsements were negotiated and that Daniel Dean substantially provided the language of the Medical Products Endorsement.

**\*11** First, according to Plaintiffs, Michigan law mandates that, in the insurance context, the insurance company is considered the drafter of the policy as a matter of law. In support of this position, Plaintiffs rely on *Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776 (2003). In *Wilkie,* the Michigan Supreme Court rejected the "rule of reasonable expectations," a rule of construction under which courts construed an insurance policy in a manner consistent with the parties' reasonable expectations. 469 Mich. at 51, 664 N.W.2d at 782. In the course of discussing the "rule of reasonable expectations" the court mentioned that the rule was a "surrogate for the rule of construing against the drafter" and was "nothing more than a unique title given to traditional contract principles applied to insurance contracts...." *Id.* at 61, 664 N.W.2d at 786-87 (quoting *Singer v. American States Ins.,* 245 Mich.App. 370, 381 n. 8, 631 N.W.2d 34, 40 (2001)). The court also briefly mentioned that, in the insurance context, the drafter is always the insurer. *Id.* Plaintiffs rely on this last statement from *Wilkie* to support their position in this case. This statement, however, was plainly dicta and does not support the conclusion that the Michigan

Supreme Court, as a matter of law, always considers the drafter of an insurance policy to be the insurer. While the Michigan Supreme Court plainly recognizes the general rule that ambiguity in a contract is construed against the drafter, *see State Farm Mut. Auto. Ins. Co. v. Enterprise Leasing Co.,* 452 Mich. 25, 38-39, 549 N.W.2d 345, 351 (1996) (holding that where an insurance contract is ambiguous, it "should be construed against its drafter and in favor of coverage.") (quoting *Raska v. Farm Bureau Ins. Co.,* 412 Mich. 355, 362, 314 N.W.2d 440, 441 (1982)), it has never explicitly held that this rule is strictly applied in the insurance context with the outcome being that the insurance company is always the drafter.

Such a rigid application of the rule is antithetical to the recent trend in Michigan law, thoroughly discussed in the R & R, holding that insurance policies are subject to the same general rules of interpretation that apply to all other contracts. *See e.g., Rory v. Continental Ins. Co.,* 473 Mich. 457, 461, 703 N.W.2d 23, 26 (2005) ("[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract."). An automatic and rigid conclusion that the insurance company is always the drafter of an insurance contract is directly contrary to the Michigan Supreme Court's clear rejection of specialized rules of construction applicable only in the insurance context.

Second, Plaintiffs' assertion that the Magistrate Judge made improper factual findings does not support rejection of the R & R. Plaintiffs take issue with the Magistrate Judge's determination that the language of the Medical Products Endorsement was "substantially provided by" Daniel Dean, a broker employed by Marsh & McClennan, Plaintiffs' broker during their negotiation with Defendant. Oct. 14, 2005 R & R at 8. Plaintiffs argue that Defendant, not Dean, provided the language of the Medical Products Endorsement. Based upon this Court's review of the record, it appears that while it is undisputed that Dean authored language that was nearly identical to the Medical Products Endorsement in this case and that this endorsement had been routinely used over the years by insurance companies, including Defendant; in this case Defendant, not Dean, provided the language of the Medical Products Endorsement. This minor factual discrepancy does not preclude the Court from ultimately agreeing with the Magistrate Judge's recommendation, however, because it is clear that the Magistrate Judge correctly determined that the policy and endorsements

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

were the product of negotiation. And, the Court agrees with the Magistrate Judge that the rule of *contra proferentum* has no application where the contract at issue resulted from the parties' negotiations.

**\*12** Plaintiffs do not dispute that the policy, in its entirety, was the subject of negotiation. Rather, they contend that certain ambiguous portions of the Medical Products Endorsement were not specifically negotiated. Plaintiffs, however, fail to cite any portion of the voluminous record in this case to support its assertion that Defendant refused to amend the Medical Products Endorsement and unilaterally imposed it on Plaintiffs. In fact, the record indicates that the parties discussed and negotiated the policy, and in particular the Medical Products Endorsement. According to Brad Kuchinic, Defendant's underwriter for Plaintiffs' policy, Dean was brought in to the discussion of the policy because the Medical Products Endorsement was "being knocked back and forth between the attorneys at Stryker and the broker and me." Kuchinic Dep. at 96, Def.'s Mot. Summ. J., Vol. H. Ex. 2 (Docket # 533). Dean also testified that he discussed the Medical Products Endorsement with both Defendant, Plaintiffs and Plaintiffs' broker on multiple occasions. Dean Dep. at 77. Further, Plaintiffs concede that certain portions of the Medical Products Endorsement were altered in response to their concerns during the course of the negotiation. Plaintiffs argue that a comparison of the language originally drafted by Dean with the Medical Products Endorsement demonstrates that Plaintiffs did not negotiate the terms of the endorsement. While the language of both endorsements is substantially similar, this does nothing to refute the record evidence indicating that Plaintiffs did negotiate the policy and endorsement.

Accordingly, Plaintiffs' objection to the Magistrate Judge's rejection of a *contra proferentum* instruction is overruled. The Court agrees with the Magistrate Judge that the *contra proferentum* rule has no application where the contract between the parties is the product of negotiation. [6]

Plaintiffs' final objections address the allocation of the burden of proof in Special Instruction Nos. 4 and 5. Plaintiffs contend that both instructions improperly place the burden of proof on them. Special Instruction No. 4 places the burden of proof on Plaintiffs to prove that the parties intended that the Medical Products Endorsement

altered the terms of the main policy so that all claims and lawsuits related to a single batch of implantable medical products would be included in a single policy year, regardless of when bodily injury occurred. Plaintiffs argue that *contra proferentum* rule mandates that this burden be placed upon Defendant.

The Magistrate Judge thoroughly addressed and properly rejected this argument. As stated previously, the Court agrees with the Magistrate Judge's conclusion that the *contra proferentum* rule is not applicable to this case. Moreover, the Court also agrees with the Magistrate Judge that, even if the rule applied, under Michigan law the burden of proof on issues of coverage is always on the insured and the *contra proferentum* rule does not shift that burden to the insurance company. As clearly demonstrated by the Magistrate Judge, Plaintiffs' reliance on out-of-state authority to support its argument is also misplaced.

**\*13** Special Instruction No. 5 addresses the second special verdict question regarding whether each claimant suffered bodily injury during the relevant policy period. The Magistrate Judge placed the burden of proving bodily injury during the policy period for each claimant on Plaintiffs. This is consistent with the traditional allocation of the burden of proof applicable to the terms of an insurance policy. *See Heniser v. Frankenmuth Mut. Ins. Co.,* 449 Mich. 155, 161 n. 6, 534 N.W.2d 502, 505 (1995) ("the 'insured bears the burden of proving coverage, while the insurer must prove that an exclusion to coverage is applicable.' ") (quoting *Arco Indus. Corp. v. American Motorists Ins. Co.,* 448 Mich. 395, 424-25, 531 N.W.2d 168 (1995) (Boyle, J., concurring)), *Harvey Oil Co. v. Federated Mut. Ins. Co.,* 837 F.Supp. 242, 244 (W.D.Mich.1993) (Bell, J.). Plaintiffs contend that this case is part of an exceptional class of cases in which the burden of proof should be shifted to the insurance company to prove that a claimant did not suffer bodily injury during the policy period. Plaintiffs rely on *Gelman Sciences, Inc. v. Fidelity and Cas. Co. of New York,* 456 Mich. 305, 572 N.W.2d 617 (1998), to support this position.

In *Gelman Sciences,* the Michigan Supreme Court adopted the "injury in fact" approach to determining when coverage is triggered under a comprehensive general liability insurance policy. 456 Mich. at 320-21, 572 N.W.2d at 623, *overruled on other grounds by Wilkie v.*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Auto-Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776 (Mich.2003). In discussing this approach, the court noted that the determination of when injury actually occurred would often be difficult. *Id.* at 323, 664 N.W.2d 776, 572 N.W.2d at 625. In apparent recognition of this difficulty, the court noted that it may be necessary for courts to employ rules "designed to assist a plaintiff in the face of an insurmountable burden of proof." *Id.* at 325 n. 12, 572 N.W.2d at 626. The court then mentioned a case in which plaintiffs that ingested a prescription drug manufactured by several companies were allowed to proceed against each manufacturer with the burden of proving causation in fact shifted to each defendant. *Id.* (citing *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164 (1984)). Although the court expressly declined to adopt a burden-shifting framework in the context of a comprehensive general liability insurance policy, it did indicate that *Abel's* approach was instructive on "how courts can employ fair rules to alleviate an impossible burden when justice requires." *Id.*

To the extent that *Gelman Sciences* suggests that shifting the burden of proof to a defendant is appropriate, it is clear that such action is reserved for situations in which a plaintiff faces an impossible or insurmountable burden of proof. *Id.* Such as where it is impossible to determine which of a multitude of defendants caused a harm, the situation presented in *Abel,* or where it is difficult to pinpoint when property damage occurred over the course of a number of years of pollution, the situation presented in *Gelman Sciences.* Plaintiffs, in this case, are not faced with a similar insurmountable burden of proof. Plaintiffs rely on testimony from a medical expert who is expected to testify that a defective Uni-Knee begins to deteriorate as soon as the recipient begins placing weight on the knee. Because of this immediate deterioration, Plaintiffs contend that their expert will explain that bodily injury begins immediately and that the recipient may suffer bodily injury prior to any overtly visible symptoms. Plaintiffs reliance on this expert testimony to support shifting the burden of proof to Defendant proves too much. Unlike the situations mentioned in *Gelman Sciences,* it is not impossible for Plaintiffs to prove when bodily injury occurred for each claimant. On the contrary, Plaintiffs intend to produce medical expert testimony supporting the position that bodily injury occurs almost immediately after implantation of the defective device. Thus, it is not a question of whether it is *possible* for Plaintiffs to produce evidence of bodily injury during the

policy period, but whether such evidence will be rebutted by Defendant or deemed incredible by the jury. Neither situation is of the same character as the impossible burden addressed in *Gelman Sciences* and does not warrant shifting the burden of proof from Plaintiffs to Defendant. Therefore, Plaintiffs objection to Special Instruction No. 5 is overruled.

**\*14** Accordingly, with only the few minor clarifications set forth above, the Court overrules each parties' objections to the September 26, 2005 R & R and the October 14, 2005 R & R and approves and adopts each R & R as the opinion of the Court. An order will be entered consistent with this opinion.

JOSEPH G. SCOVILLE, Magistrate Judge.

### *REPORT AND RECOMMENDATION ON JURY INSTRUCTIONS AND SPECIAL VERDICT FORM*

Pursuant to the court's memorandum opinion and order of September 15, 2005 (docket # 756), I have conferred with counsel in an effort to narrow and define the issues for trial. By report and recommendation entered September 26, 2005 (docket # 767), I recommended that two issues previously identified as questions of fact for the jury be decided by the court as matters of law. I also recommended an approach to the form of the special verdict.

Attached to this report and recommendation are a form of special verdict and eight proposed jury instructions, which deal with the factual issues propounded to the jury in the special verdict form. The verdict form and proposed instructions are premised on the assumption that the court accepts the previous report and recommendation. For this reason, the principal justification for the approach taken in the attached verdict form and instructions may be gleaned from the earlier report and recommendation. [1] The attached verdict form and instructions are necessarily provisional and tentative, and they are subject to revision in light of the actual evidence received at trial and the court's ruling on any motions for judgment under Rule 50.

In fashioning the attached proposed instructions, I have attempted to incorporate the substance of each party's proposed instructions, to the extent that those instructions were fairly worded and accurately reflected

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

the law. In addition, I have reviewed each instruction with counsel during lengthy telephone conferences held on the record and have adopted numerous changes in response to their comments. Despite this effort, each side remains substantively dissatisfied with some aspects of the instructions and verdict form.

In the remainder of this report and recommendation, I address the principal disagreements raised by counsel, to the extent that those objections have not been addressed in the September 26, 2005 report and recommendation.

## 1.

Plaintiffs' proposed instruction no. 31 purports to set forth rules for interpreting ambiguous language in insurance policies. This proposed instruction sets forth six rules of construction, each one saying, in one way or another, that an insurance policy must be construed against the insurance company and in favor of coverage. I recommend that the instructions contained in plaintiffs' proposed instruction no. 31 be substantially rejected, with two exceptions, for the reasons that follow.

Recent decisions of the Michigan Supreme Court make it clear that Michigan law considers an insurance policy to be a contract, subject to the general rules of interpretation that apply to all other contracts. *See, e.g., Rory v. Continental Ins. Co.,* 473 Mich. 457, 703 N.W.2d 23 (Mich.2005); *Wilkie v. Auto Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776 (Mich.2003); *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447 (Mich.2003); *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel,* 460 Mich. 558, 596 N.W.2d 915 (Mich.1999). In this series of cases, the Michigan Supreme Court made clear its rejection of "special rules" of construction applicable only to insurance contracts. In *Wilkie,* for example, the state Supreme Court rejected the rule of construction pursuant to which courts would construe an insurance policy in a manner that upholds the reasonable expectation of coverage by the insured. 664 N.W.2d at 782. More recently, in the *Rory* case, the Supreme Court rejected the concept that courts may refuse to enforce clear policy language that the courts deem "unreasonable," and specifically disapproved special rules of construction based on the labeling of an insurance contract as an "adhesion contract." 703 N.W.2d at 35 ("An 'adhesion contract' is simply that: a *contract."*). In

her dissent, Justice Weaver remarked that the majority's opinion required rejection of "five decades worth of precedent that created specialized rules of interpretation and enforcement for insurance contracts." 703 N.W.2d at 56 (Weaver, J., dissenting). In cataloging the "special" rules of construction rejected by the majority in *Rory,* Justice Weaver listed most of the concepts embraced by plaintiffs' proposed jury instruction no. 31.

**\*15** In light of this recent line of Supreme Court authority, it is fair to say that Michigan law now thoroughly repudiates special rules of construction for insurance contracts. "[I]nsurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory,* 703 N.W.2d at 26. The ultimate objective in construing an insurance policy, as with any other contract, is to ascertain the intent of the parties. *Klapp,* 663 N.W.2d at 457. The principal Michigan Supreme Court decision relied upon by plaintiffs in support of their requested instructions, *Powers v. Detroit Auto. Inter-Ins. Exch.,* 427 Mich. 602, 398 N.W.2d 411 (Mich.1986), has been severely undermined by these subsequent decisions of the Supreme Court and can no longer be considered good law.[2] For example, in *Nikkel,* the Supreme Court "repudiated" the two-justice plurality opinion in *Powers* and remarked that "*Powers* is contrary to the most fundamental principle of contract interpretation-the court may not read ambiguity into a policy where none exists." 596 N.W.2d at 920. More recently, the *Rory* court severely criticized the plurality opinion of *Powers,* which had decreed that all insurance contracts were contracts of adhesion and had applied the repudiated "reasonable expectations" doctrine to insurance policies. 703 N.W.2d at 39-40. In *Rory,* the Michigan Supreme Court signaled a clear intention to break with its earlier precedents, which had treated insurance contracts as being the product of imposition and overreaching by insurance companies and therefore subject to special rules of construction in favor of the insured. In light of *Rory* and the other recent Michigan Supreme Court cases cited above, I conclude that the Michigan Supreme Court would reject virtually every concept embraced in plaintiffs' proposed jury instruction no. 31, as these instructions are all premised on the now repudiated concept that insurance policies are adhesion contracts subject to special rules of construction in favor of the insured.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 11

**2.**

Two exceptions survive the recent line of Michigan Supreme Court authority. The first is that exclusions from coverage, when ambiguous, are construed against the insurance company and in favor of coverage. *See Auto-Owners Ins. Co. v. Churchman,* 440 Mich. 560, 489 N.W.2d 431, 433-34 (Mich.1992). This is a longstanding principle of Michigan law, *see, e.g., Pietrantonio v. Travelers Ins. Co.,* 282 Mich. 111, 275 N.W. 786, 788 (1937). This rule is not a rule of construction, and it does not depend upon a finding that the insurance company drafted the exclusion. Rather, the rule reflects the law's substantive reluctance to negate clear coverage on the basis of ambiguous exclusions. "A risk that comes naturally within the terms of the policy is not deemed to be excluded unless the intent of the parties to exclude it appears plainly, so that it cannot be misconstrued." 2 COUCH ON INSURANCE § 22:31 at 22-67 (3d ed.1997); *see Heniser v. Frankenmuth Mut. Ins.,* 449 Mich. 155, 534 N.W.2d 502, 505 (Mich.1995) ("An insurer is free to define or limit the scope of coverage *so long as the policy language fairly leads to only one reasonable interpretation* and is not in contravention of public policy.") (emphasis added). This is also consistent with the concept that the insurance company bears the burden of proving the application of an exclusion from coverage. *See Morril v. Gallagher,* 370 Mich. 578, 122 N.W.2d 687, 691 (Mich.1963); *Roddis Lumber & Veneer Co. v. Am. Alliance Ins. Co. of N.Y.,* 330 Mich. 81, 47 N.W.2d 23, 26 (Mich.1951); *accord Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 28 F.Supp.2d 440, 444 (E.D.Mich.1998). As the party with the burden of proof to establish an exclusion from coverage, the insurance company bears the risk of nonpersuasion on this issue. *See McKinstry v. Valley Obstetrics-Gynecology Clinic, P. C.,* 428 Mich. 167, 405 N.W.2d 88, 93-94 (Mich.1987). The recent line of Michigan Supreme Court authority does not appear to disturb this rule, which applies narrowly to policy exclusions. I have therefore included such an instruction in Special Instruction 7, which deals with the exclusion in Endorsement No. 15.

**3.**

**\*16** The second exception is the rule that ambiguities in an insurance policy must generally be construed against the insurance company and in favor of the insured. The

Michigan Supreme Court recently considered this rule in *Klapp v. United Insurance Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447 (Mich.2003). The court made it clear that this rule, called the "rule of *contra proferentem,*" is merely a specific application of the general rule that ambiguities in a contract are construed against the drafter. 663 N.W.2d at 456. The court went on to note that the *contra proferentem* rule is a "rule of last resort" which applies only where "the jury remains unable to determine what the parties intended after considering all relevant extrinsic evidence...." *Id.* at 455. Only then should the jury find in favor of the nondrafter of the contract pursuant to the rule of *contra proferentem. Id.* The court further noted that the rule is not a rule of contract interpretation, but a "rule of legal effect."

> It is a rule of legal effect, rather than a rule of legal interpretation, because its purpose is not to render more accurate or more perfect a jury's understanding of the meaning of the contract, but is merely to ascertain the winner and the loser in connection with a contract whose meaning has eluded the jury despite all efforts to apply conventional rules of interpretation.

663 N.W.2d at 456.

The *Klapp* decision makes clear that the *contra proferentem* rule is still recognized under Michigan law, but only in limited circumstances. It is not a rule that applies only to the disadvantage of insurance company, but applies, as a last resort, in any case where one party is responsible for providing contract language. The rule only applies where one party drafts the document. Contrary to plaintiff's suggestion, the law does not conclusively presume that the insurance company is always the drafter of policy language, although such is often the case. The courts of this country have refused to apply the *contra proferentem* rule woodenly. The rule has no application where, as here, the ambiguous provisions were dictated by statute or were negotiated by the contracting parties. This is not only the longstanding law of Michigan, *see Bay Trust Co. v. Agricultural Life Co.,* 279 Mich. 248, 271 N.W. 749, 750 (Mich.1937); *see also Auto-Owners Ins. Co. v. Gallup,* 191 Mich.App. 181, 477 N.W.2d 463, 464 (Mich.Ct.App.1991), but a generally accepted rule throughout the country. *See Newport Associates Dev. Co.*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*v. Travelers Indem. Co.,* 162 F.3d 789, 794 (3d Cir.1998); *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.,* 124 F.3d 508, 521 (3d Cir.1997); *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 639 (7th Cir.1992); *McDermott Int'l, Inc. v. LLoyds Underwriters of London,* 944 F.2d 1199, 1207 (5th Cir.1991); *Eagle Leasing Corp. v. Harford Ins. Co.,* 540 F.2d 1257, 1261 (5th Cir.1976) (When dealing with manuscript policy, *contra proferentem* rule has "no realistic application to a contract confected by a large corporation and a large insurance company each advised by competent counsel and informed experts."); *Information Leasing Corp. v. McGladrey & Pullen, L.L.P.,* No. 03-5111JNEJGL, 2005 WL 1706113, at *3 (D.Minn. July 21, 2005); *Silicon Image, Inc. v. Genesis Microchip, Inc.,* 271 F.Supp.2d 840, 850 (E.D.Va.2003) ("When the contract terms are negotiated, *contra proferentem* is inapplicable.") (collecting cases); *see generally* 2 COUCH ON INSURANCE § 22:25 (3d ed. 1997 & Supp.2005).

**\*17** The evidence indicates that the insurance policy, in its entirety, was the subject of negotiation. The basic policy itself was not a Winterthur form but was substantially adopted from the National Union policy by which Stryker had been covered the previous year. Endorsement No. 15 was not part of defendants' standard policy form, but was added to the contract by negotiated agreement of the parties. In those negotiations, Stryker was represented both by counsel and by Marsh & McClennan. The language in question was substantially provided by a broker, Daniel Dean, employed by Marsh & McClennan, *Stryker's* broker. Dean's deposition clearly establishes that the endorsement language was not exclusive to Winterthur, but had been used for years by other insurance companies and other insureds to cover risks posed by medical implants. (Dep.20-22, 33-34). It is undisputed that parts of Endorsement No. 15 itself were modified by negotiation. The parties disagree as to whether Dean was acting as agent for the insurance company or the insured. This factual disagreement, however, is irrelevant. The record clearly shows that Dean substantially provided the endorsement language, discussed the endorsement with both parties at one time or another, and that the final product was the result of negotiation, not unilateral imposition by the insurance company. Endorsement No. 15 was clearly a negotiated, manuscript endorsement, not dictated unilaterally by the Insurance Company. In such circumstances, the *contra proferentem* rule does not apply. *See, e.g., Newport Assoc.,*

162 F.3d at 794 (where policy language was supplied by broker and was not "unilaterally imposed" by insurance company, *contra proferentem* rule did not apply to resulting negotiated language, regardless of whose agent the broker was).

The Seventh Circuit's decision in *Northbrook Excess & Surplus Insurance Company v. Procter & Gamble Co.,* 924 F.2d 633 (7th Cir.1991), is instructive. The issue in that case is whether the trial court erred in refusing to instruct the jury that ambiguous provisions in an insurance contract should be construed most strongly against the insurance company. Applying Ohio law, the Seventh Circuit found that the district court committed no error in refusing to deliver the instruction proffered by the insured, because "the rule is grounded in the need to protect an insured from an insurer who has had exclusive control of the drafting process," a concern that was not implicated in that case. 924 F.2d at 638. The Court of Appeals determined that the insured was a co-drafter of the policy, and was not "simply a party given a take-it-or-leave-it option." Rather, the policy was the product of negotiation by a sophisticated insured. *Id.* at 639. The court determined that Ohio, "like other jurisdictions," would not apply the *contra proferentem* principle to this situation, in which the principle's underlying rationale is inapplicable. The *Northbrook* decision is but one example of the nearly universal rule in this country, pursuant to which negotiated insurance policy language is not subject to the *contra proferentem* rule.

### 4.

**\*18** A related issue arises from plaintiffs' objection to my proposed Special Instruction No. 4, which places upon plaintiffs the burden of proving their contention that the parties intended that all claims and lawsuits related to a single batch of medical products would be included in a single policy year. This issue arises from plaintiffs' argument that the parties intended to deviate, in the case of implantable medical devices, from the clear provisions of the standard policy. The standard policy, in paragraph I, unambiguously extends coverage only to claims for bodily injury "that takes place during the Policy Period." Plaintiffs contend that Endorsement No. 15, which applies only to implantable medical devices such as the Uni-Knee, alters this provision. Although the Endorsement does not expressly address the bodily injury requirement,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 13

plaintiffs contend that its intent was to "telescope" all claims related to a batch of medical devices into a single policy year, regardless of the date of injury. In short, plaintiffs seek coverage for claims clearly not included in the standard policy by relying on ambiguous language in an endorsement, bolstered by extrinsic evidence. Special Instruction No. 4 places the burden on plaintiffs to prove this element of their *prima facie* case, because Michigan law has always placed the burden of proof on the insured to prove coverage. *See Heniser,* 534 N.W.2d at 505 n. 6; *Solomon v. Royal Maccabees Life Ins. Co.,* 243 Mich.App. 375, 622 N.W.2d 101, 102 (Mich.Ct.App.2001) ("A generally recognized principle of insurance law is that the burden of proof lies with the insured to show that the policy covered the damage suffered."). Furthermore, the law generally places the burden of proof on the party asserting a fact to be true. *See Livingston Shirt Corp. v. Great Lakes Garment Mfg. Co.,* 351 Mich. 123, 88 N.W.2d 614, 617 (Mich.1958).

While acknowledging this general principle, plaintiffs nevertheless argue that the insurance company bears the burden of proof to disprove coverage in the case of ambiguous contract language. Again, plaintiffs rely on the *contra proferentem* rule, but seek to expand it to the point where it has the effect of shifting the burden of proof from the plaintiffs to the insurance company on issues of coverage. As demonstrated in the last section, plaintiffs are not entitled to rely on the *contra proferentem* rule in the circumstances of this case. Even if the rule were deemed to apply, however, plaintiffs have not demonstrated that the Michigan courts understand the rule to shift the burden of proof from the plaintiff on issues of coverage. Plaintiffs cite no Michigan case in support of this proposition.

Plaintiffs do cite several out-of-state authorities. Although some of these authorities state or imply that the *contra proferentem* rule shifts the burden of proof or the burden of proceeding in an insurance case, none of these cases would be followed by the Michigan Supreme Court. *Reliance Ins. Co. v. Armstrong World Indus., Inc.,* 259 N.J.Super. 538, 614 A.2d 642 (N.J.Super.Ct.1992), is the decision of a single judge of the New Jersey trial court. This decision was reversed by the appellate division and is therefore not authoritative law, even in New Jersey. *See Reliance Ins. Co. v. Armstrong World Indus., Inc.,* 292 N.J.Super. 365, 678 A.2d 1152 (N.J.Super.Ct.App.Div.1996). *Concord Hospital v. New Hampshire Med. Malpractice Joint Underwriting Ass'n,*

137 N.H. 680, 633 A.2d 1384 (N.H.1993), does indeed hold that the burden is on the insurance carrier to prove a lack of coverage. The New Hampshire Supreme Court was applying a New Hampshire statute, N.H.Rev.Stat. § 491:22-9, which places the burden of proof on the insurance company to disprove coverage in *every* case, even in the absence of ambiguity. 633 A.2d at 1386. Obviously, New Hampshire law cannot be considered persuasive on this point in the State of Michigan, which has no such statute. *Morgan Stanley Group, Inc. v. New England Ins. Co.,* 225 F.3d 270 (2d Cir.2000), involved New York law, in which the court, and not the jury, determines the meaning of policy language, even in the case of an ambiguity. The New York courts have apparently adopted a complex burden-shifting scheme to guide the court's determination of construction issues. 225 F.3d at 275-76. Again, Michigan law is to the contrary, and the New York scheme of shifting the burden of proceeding in bench trials can have no application here. *Twombly v. AIG Life Ins. Co.,* 199 F.3d 20 (1st Cir.1999), applying Maine law, did not hold that the burden of proof on coverage issues shifts to the insurer. Rather, it was a straightforward application of the rule that the burden of proving exclusions falls on the insurer. The *Twombly* court held that the insured was entitled to have ambiguity resolved in her favor, "unless the insurer can prove through extrinsic evidence *that the parties intended to exclude* the sort of business travel on which [the insured] was engaged." 199 F.3d at 23 (emphasis added). Finally, *Praham v. Rupp Construction,* 277 N.W.2d 389 (Minn.1979), does not support plaintiffs' position. The issue in *Rupp* was whether the insurance company was obligated to defend a suit against the insured. In resolving this issue, the Minnesota Supreme Court stated as follows:

> **\*19** The obligation to defend is contractual in nature and is determined by the allegations of the complaint and the indemnity coverage of the policy. If any part of a cause of action is arguably within the scope of coverage, the insurer must defend. Any ambiguity is resolved in favor of the insured, and the burden is on the insurer to prove that the claim clearly falls outside the coverage afforded by the policy. If the claim is not clearly

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 14

outside coverage, the insurer has a
duty to defend.

*277 N.W.2d at 390.* Obviously, the Minnesota court was
not dealing with ambiguities in insurance policies, but
ambiguities in claims set forth in a complaint by an injured
party against the insured. Although the rule in Michigan is
consistent with that stated by the *Rupp* court, that rule has
no application here. The *Rupp* court did not state or imply
that the insurance company has the burden of disproving
coverage when there is an ambiguity in *policy language.*

In short, Michigan law requires the court to place the
burden on plaintiffs to prove each element of their *prima
facie* case and on defendants to prove the applicability of
exclusions from coverage. The attached instructions seek
to do so.

### 5.

Defendant has presented four proposed instructions
concerning imputed knowledge. (Special Instruction Nos.
7, 8, 9, 10). Defendant's instructions 7 and 8 are
accurate statements of Michigan law concerning imputed
knowledge and therefore have been incorporated into
Special Instruction No. 7. *See Upjohn Co. v. New
Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392,
400-01 (Mich.1991).

I recommend that defendant's special instruction no. 9 not
be given, because it is irrelevant to this case. Defendant's
special instruction no. 9 is derived from Michigan Non-
Standard Jury Instructions, Civil, 17:07.70. This tort
instruction states that a corporate agent is required to
carry out its duties in light of the information imputed
to the corporation, even if the information has not been
passed on to the particular agent. That concept, while
an accurate statement of Michigan law, is irrelevant to
the present dispute. The relevant question is whether the
insured knew of or suspected the defect involved in the
batch of Uni-Knees before the inception date of the policy.
The question whether any particular corporate agent was
required to act on such knowledge or suspicion is not
material.

Defendant's special instruction no. 10 would inform the
jury that knowledge of officers, agents, or employees
of a wholly owned corporate subsidiary is imputed to

the parent corporation. This is an inaccurate statement
of Michigan law. Michigan law presumes that, absent
some abuse of corporate forum, parent and subsidiary
corporations are separate and distinct entities. *Seasword
v. Hilti, Inc.,* 449 Mich. 542, 537 N.W.2d 221, 224
(Mich.1995). The separateness of parent and subsidiary
corporations will only be disregarded in circumstances in
which a party bears its burden of piercing the corporate
veil, by showing that an otherwise separate corporate
existence has been used to subvert justice or that the
subsidiary has become a "mere instrumentality" of the
parent. *Id.* Defendant has not alleged in its pleadings facts,
which if true, would allow the court to pierce the corporate
veil between Stryker and its subsidiaries.

**\*20** In support of its instruction, defendant cites Judge
Hillman's decision in *CPC Int'l, Inc. v. Aerojet-General
Corp.,* 825 F.Supp. 795, 811-12 (W.D.Mich.1993). Judge
Hillman's decision is not contrary to the general rule of
Michigan law and does not support defendant's position.
In *CPC,* Judge Hillman held a parent corporation liable
for acts of a subsidiary "because parent corporation CPC
actively participated in and exerted significant control
over its wholly-owned subsidiary Ott II's business and
decisionmaking, including specific policy matters such as
hazardous waste disposal." 825 F.Supp. at 812. Judge
Hillman reached this conclusion only after engaging
in a "highly fact-specific inquiry" into the relationship
between parent and subsidiary. Consequently, CPC was
a specific application of the rule allowing piercing the
corporate veil upon a showing of domination by the
parent of the subsidiary corporation. Ultimately, in the
CPC case, the United States Supreme Court reaffirmed
the general principle of corporate law that a parent
corporation is legally distinct from its subsidiary and
that the corporate forum may only be ignored where
the facts warrant piercing the corporate veil. *See United
States v. Best Foods,* 524 U.S. 51, 55-56, 118 S.Ct.
1876, 141 L.Ed.2d 43 (1998). Defendant also relies on
principles of general agency law, arguing that Stryker's
subsidiaries are its agents because Stryker has the right
to control them and that the knowledge of the "agent"
subsidiaries is imparted to the parent. Defendant cites only
cases involving natural persons. Contrary to defendant's
contention, the Michigan courts do not apply agency
law to impute a subsidiary's knowledge to the parent.
Rather, Michigan law requires facts sufficient to pierce the
corporate veil. Defendant has cited no law to the contrary.
If defendant's argument were accepted, the entire doctrine

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

of corporate separateness would be swallowed up into agency law, and the clearly established requirement of a showing of fraud or instrumentality would disappear.

As neither the pleadings nor the proofs in this case support piercing the corporate veil between Stryker and its subsidiaries, the court is bound to respect the separate corporate forms of the parent and its subsidiaries. Defendant's proposed instruction no. 10 is not an accurate statement of Michigan law and should therefore not be given.

### *Recommended Disposition*

I recommend that the court tentatively adopt the attached substantive instructions and special verdict form, subject to revision on the basis of the evidence actually received at trial.

### *REPORT AND RECOMMENDATION*

This is a civil action brought by an insured under a commercial umbrella policy. Plaintiffs seek a declaratory judgment and damages for alleged breach of contract arising from the failure of defendant XLIA to defend and indemnify plaintiffs against more than seventy lawsuits and other claims seeking damages for bodily injury caused by an allegedly defective prosthetic device (the Uni-Knee) sold by plaintiffs. Shortly before jury trial on liability issues was to commence, Chief Judge Robert Holmes Bell issued an order adjourning the trial without date, citing the parties' last-minute raising of new issues for trial. The court directed the parties to meet with me for purposes of delineating the issues to be presented to the jury. (Memorandum Opinion and Order, docket # 756). Pursuant to that direction, I have held two telephone conversations with counsel for plaintiffs and defendant XLIA in an effort to arrive at a form of special verdict delineating the ultimate issues of fact to be determined by the jury at the liability trial.

**\*21** In the course of reviewing this matter and discussing the issues with counsel, I have concluded that certain dispositive issues determined by the court in the course of its lengthy summary judgment opinions should be revisited. In addition, I am recommending some modification of the tentative special verdict form

presented to counsel at the final pretrial conference. After discussing my conclusions at length with counsel, during off-the-record telephone conversations, I am recommending that two issues previously identified as questions of fact for the jury's determination should be decided by the court as a matter of law. If adopted, the recommendations herein promise to simplify an already complicated jury trial.

### 1. *Plaintiffs' Prima Facie Case*

In order to prove coverage under the standard language of the XLIA policy, Stryker must show (1) that it is legally obligated to pay "those sums in excess of the Retained Limit," (2) as a result of "bodily injury" that takes place during the policy period, and (3) caused by an "occurrence." (Opinion, docket # 689, at 7-8). The parties have agreed that the first element (whether plaintiffs have paid an amount in excess of the retained limit) should be reserved until the second phase of this litigation, which will be directly concerned with the amounts expended by plaintiffs and the reasonableness thereof. With regard to the second and third elements, the parties disagree sharply concerning plaintiffs' burden. The issues of bodily injury and occurrence are discussed separately below.

### A. Bodily Injury

Under the standard language of the insurance policy, coverage is triggered when liability is imposed on the insured "because of Bodily Injury ... that takes place during the Policy Period and is caused by an occurrence...." (Policy, ¶ I). Consequently, under the standard language, the trigger of coverage is bodily injury occurring during the policy period, regardless of the date of the occurrence. *See Gelman Sciences, Inc. v. Fidelity & Cas. Co. of N.Y.,* 456 Mich. 305, 572 N.W.2d 617, 623 (Mich.1998), *overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776 (Mich.2003); *accord, Dow Chem. Co. v. Associated Indem. Corp.,* 724 F.Supp. 474 (E.D.Mich.1989). With regard to claims involving implantable medical products (such as the Uni-Knee) manuscript endorsement no. 15 provides special rules. This endorsement is titled "Definition of Occurrence-Medical Products." In essence, plaintiffs contend that the intent and effect of endorsement no. 15 was to aggregate all bodily injury claims arising out of one batch of the insured's products, such that all claims arising from the same product defect or deficiency are "telescoped" into one year, regardless of the date

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

when bodily injury was sustained. The court has already determined that endorsement no. 15 is ambiguous in this regard and that parol evidence is admissible to discern the parties' intent. Plaintiffs' contention finds some support in the language of paragraph 2, which provides that "all Bodily Injury ... which arises out of one batch of the Named Insured's Products shall be considered one occurrence." Although the standard policy language clearly contemplates that the "occurrence" is the cause and "bodily injury" is the effect, the quoted language tends to disclose an intent to equate those two, otherwise distinct, concepts. Plaintiffs also rely on the testimony of Daniel J. Dean, who allegedly was the author of the manuscript endorsement, to support their interpretation. Defendant disputes this interpretation, arguing that the special definition of "occurrence" for implantable medical products in endorsement no. 15 does not relieve the insured of its obligation to show, for each claimant, that bodily injury was incurred during the term of the policy. In my opinion, a reading of the policy as a whole tends to support defendant's construction, but, as the court has already determined, ambiguities in the endorsement language prevent the court from resolving this issue as a matter of law.

**\*22** Because the jury must determine the intent of the parties under endorsement no. 15, the jury must answer a special verdict question under alternative assumptions. First, the jury must be asked whether the parties intended under endorsement no. 15 that all personal injury claims arising from one batch of the insured's products should be included in a single policy year, regardless of the date upon which bodily injury occurred. If the jury determines that this was indeed the intent of the parties, then plaintiffs will not be required to show that bodily injury occurred during the term of the policy, but only that an advisory memorandum was issued during the policy period (a fact which has already been agreed to). If, by contrast, the jury answers in the negative, then the provisions of paragraph 1 of the standard commercial umbrella policy continue to apply and would require plaintiffs to show that each claimant incurred bodily injury during the policy period. Hence, the jury must also be given a special verdict question asking whether *each* Uni-Knee claimant incurred bodily injury during the policy period. [1]

**B. Occurrence**

As noted, the standard language of the commercial umbrella policy requires that bodily injury be caused by an "occurrence." The standard policy definitions (¶ IV H) define "occurrence" to mean an accident, including continuous or repeated exposure to conditions, which results in bodily injury neither expected nor intended from the standpoint of the insured. With regard to implantable medical products only, however, endorsement no. 15 contains numerous provisions that affect the definition of occurrence. Relying on the first sentence of paragraph 1 of the endorsement, defendant has argued that "occurrence" means only the explant of a medical product. In its opinion of August 17, 2005, the court determined that paragraph 1 is ambiguous and that it is unclear whether an explant is necessary for the existence of an occurrence under the policy. Consequently, the court determined that neither party was entitled to summary judgment and that the question whether an explant was necessary for the existence of an occurrence was a question of fact for the jury. (Opinion, docket # 689, at 7-12).

Although the existence of an occurrence in the absence of an explant is indeed ambiguous under paragraph 1 of endorsement no. 15, the issue is mooted by the provisions of paragraphs 2 and 3, which introduce the concept of batch coverage. Paragraph 2 provides that for the purpose of determining the company's limits of insurance and the insured's self-insured retention amounts, all bodily injury which arises out of one batch of the named insured products shall be considered "one occurrence." Paragraph 3 goes on to define a "batch" as all medical products which have the same known or suspected defect or deficiency which is identified by the same advisory memorandum. Paragraph 3 (as clarified by endorsement no. 17) then provides that the date of the advisory memorandum "will be considered the date of occurrence for all claims resulting from or relating to the batch." Read as a whole, endorsement no. 15 (as clarified by endorsement no. 17) is not ambiguous with regard to the "batch" situation now facing the court, although the endorsement is ambiguous with regard to isolated product liability claims dealt with in paragraph 1.

**\*23** The defendant insurance company has repeatedly admitted that the claims and lawsuits involving the Uni-Knee products at issue in this case constitute a single batch. [2] By admitting that all Uni-Knee claims fall into one batch, defendant also admits, *ipso facto,* that there was an occurrence. Under paragraph 3, "the date of the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 17

advisory memorandum will be considered the date of occurrence for all claims resulting from or relating to the batch." Consequently, it is beyond genuine issue that an occurrence existed and that the date of the occurrence was July 28, 2000 (the date of the advisory memorandum). Defendant cannot admit that a batch exists and at the same time contest the existence of an occurrence.

Defendant relies on the first sentence of paragraph 1 to mechanistically substitute the word "explant" for "occurrence" in the basic words of coverage, so that, for each claimant, the insured would be required to show "Bodily Injury that takes place during the Policy Period and is caused by an (explant)." This approach ignores the rest of endorsement no. 15, especially the batch coverage provision, which all parties agree apply to this case. For claims in a batch, there is but a single occurrence, involving "*all* medical products which have the same known or suspected defect." (End. no 15, ¶ 3, emphasis added). Consequently, the appropriate substitution of the words of coverage in the batch situation involved in this case is "Bodily Injury ... that takes place during the Policy Period and is caused by (the defect identified in the advisory memorandum)."

If adopted, defendant's construction would require an insured to prove a separate "occurrence" falling within the Policy Period for each claimant, in addition to proving a batch occurrence. This result is illogical and finds no support in the policy language. The entire purpose of paragraphs 2 and 3 of endorsement no. 15 is to relate all claims involving the same defect to a single occurrence. Contrary to the clear intent, defendant would require the establishment of seriatim occurrences for every claim within the batch. Nothing in the policy requires an insured to establish the existence of an occurrence during the policy period or to establish more than one occurrence supporting one batch of claims.

I therefore recommend that the court grant plaintiffs a summary judgment on the issue whether an occurrence existed regarding the Uni-Knee batch. Regarding plaintiffs' prima facie case, this leaves for the jury's resolution only the issues identified in section I.A. above-whether all claimants in the batch must have incurred bodily injury during the policy period and whether each claimant did so.

## 2. *Affirmative Defense*

Relying on the last sentence of paragraph 3 of endorsement no. 15, defendant has asserted an exclusion from coverage. That sentence provides as follows: "Batch coverage shall not apply to any loss, which arises out of a defect, or deficiency that is known or suspected prior to 1-1-00." The court's previous opinions have identified three factual questions relevant to the existence of this exclusion:

**\*24** (1) What is the defect about which plaintiffs were required to have knowledge or suspicion before the relevant date?

(2) Is knowledge or suspicion by any employee sufficient, or did the parties intend that only knowledge by officers or risk managers would exclude coverage?

(3) Did the requisite officers or employees of plaintiffs know of or suspect the defect before the inception date of the policy?

The first issue-the definition of the defect identified in the advisory memorandum-was treated by the court in its opinion of December 1, 2004. (docket # 619). The parties had presented the court with widely divergent definitions of the defect at issue. Defendant contended that the Uni-Knees were defective because they were irradiated with gamma rays in air and therefore would oxidate over time. Plaintiffs defined the defect in the Uni-Knee as, "they were packaged in air and sterilized by gamma irradiation and then implanted after being stored on the shelf for an extended period of time (5 years) prior to implantation." (See Opinion, docket # 619 at 6). Essentially, Stryker argued that the defect in the Uni-Knee was its *implantation* after the intended shelf life. (*Id.*) The court determined that the definition of the defect described in the advisory memorandum framed a question of fact for resolution by the jury.

During off-the-record telephone discussions, both counsel agreed that this issue was not a question of fact, that it was inappropriate for a jury's determination, and that the parties in any event would be unable to offer substantial proofs to help the jury resolve this question. I concur. This issue must be resolved by the court as a matter of law.

Under the clear language of endorsement no. 15, paragraph 3, a known or suspected defect or deficiency is identified by an advisory memorandum. The parties concur that the relevant advisory memorandum was dated

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 18

July 28, 2000. The relevant language in the advisory memorandum is as follows:

> It has come to Howmedica Osteonics' attention that between January 1997 and April 2000 a number of Duracon Unicompartmental Knee tibial components were implanted four or more years after they were sterilized and placed into inventory. At the time which these components were manufactured, Howmedica, Inc. packaged the products in standard atmospheric conditions and utilized the process of gamma radiation to sterilize the products. Some published studies indicate that the polyethylene components processed under these condition may be susceptible to oxidation and the potential for increased wear if they resided on the shelf for an extended period of time prior to implantation. It is believed that issues unique to unicompartmental knees may make them more susceptible to early wear under these conditions.

(Op., docket # 619 at 4).

Liability insurance policies are written against the backdrop of general tort law, which defines the liabilities to which the insured is exposed and against which the insurance company is agreeing to defend and indemnify the insured. Under Michigan product liability law, a product is defective if it is not reasonably safe for its foreseeable uses. *See Ghrist v. Chrysler Corp.,* 451 Mich. 242, 547 N.W.2d 272, 275 (Mich.1996). The general tort law of the states is in agreement. *See, eg. Kallio v. Ford Motor Co.,* 407 N.W.2d 92, 94 (Minn.1987) (to establish that a product is defective, plaintiff must show that it is unreasonably dangerous); *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 463 N.Y.S.2d 398, 450 N.E.2d 204, 207 (N.Y.1983) (product is defective when it presents an unreasonable risk of harm to the user); *see generally* RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 6 (1998). In light of this definition of a product defect, which is nearly universal in this country, plaintiffs' proffered construction of the advisory memorandum is untenable. The evidence in this case is undisputed that the UHMWPE plastic used in the Uni-Knee, when sterilized by gamma radiation in the air, begins to deteriorate and becomes unsuitable for use after approximately five years. Consequently, the Uni-Knees had a limited shelf life. They were not "defective," within the meaning of products liability law, at the time of their manufacture or for the next five years. They became defective-not reasonably safe for their foreseeable use-after expiration of their shelf life. Contrary to plaintiffs' suggestion, the Uni-Knee products did not first become defective only upon implantation. They were defective after the expiration of their shelf life. This is also the only plausible definition of the defect identified in the July 28 advisory memorandum. Under paragraph 4 of endorsement no. 15, an advisory memorandum is a communication from the insured made for the purpose of informing the public "of a risk of substantial harm from the medical product in commercial use." The risk of substantial harm identified in the July 28 advisory memorandum was not limited to those Uni-Knees already implanted, but extended to any Uni-Knee held in inventory after expiration of its shelf life.

**\*25** Under the definition of "defect" adopted herein, the defendant will have the burden of proving that Stryker knew or suspected, before the policy inception date, that Uni-Knees were available in inventory for implantation by physicians after the expiration of their shelf life. Such products, available for their intended use (implantation) posed an unreasonable risk of harm to the patient and were therefore defective.

Plaintiffs nevertheless argue that in the context of an insurance policy, there could be no defect before implantation because the product had not yet been used and therefore no claim could have arisen. In making this argument, plaintiffs fail to focus on the context in which the words "defect or deficiency" appear. The entire purpose of endorsement no. 15 was to modify the meaning of the word "occurrence" in the insurance policy. One of the provisions of endorsement no. 15 was to create a "batch" for medical products which had the same known or suspected defect or deficiency. In order for a batch to exist, it is not necessary for a claim to have arisen. The last sentence of paragraph 3 does not require that the "loss" arise before the policy inception date, but only that the insured know of or suspect a "defect" before the inception date. Presumably, it is possible for an insured to know of the existence of a defective product years before any injury

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

or claim arises as a result of that defect. In short, plaintiffs' argument that no defect exists until the deteriorated Uni-Knee is actually implanted in a patient has no support in the words of the policy or general product liability law.

For the foregoing reasons, I recommend that the court determine as a matter of law that the defect identified in the advisory memorandum was the deteriorated condition of Uni-Knees caused by their retention in inventory for use beyond their shelf life.

### Recommended Disposition

For the foregoing reasons, I recommend as follows:

A. That the special verdict form propose alternative questions on the issue of bodily injury;

B. That the court grant plaintiffs' summary judgment to plaintiffs on the issue of the existence of an occurrence; and

C. That the court determine, with regard to the exclusion in paragraph 3 of endorsement no. 15, that the relevant issue is whether plaintiffs knew or suspected, before the policy inception date, that Uni-Knees were held in inventory beyond their shelf life.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 1997142

Footnotes

1    The Court also notes that Defendant's argument is internally inconsistent. On the one hand, Defendant acknowledges that the issue of whether there is an occurrence under the policy is a question of law for the Court. *See* Def.'s Obj. to R & R at 5 ("XLIA agrees that the determination of an "occurrence" is a matter of law."). But ultimately, Defendant concludes that this issue is a question of fact for the jury. Def.'s Obj. to R & R at 7. ("The jury thus *must* be asked what constitutes an occurrence and whether that event has been experienced by each individual claimant.") (emphasis in original). Defendant cannot have it both ways. The Court agrees with the Magistrate Judge (and the parties) that whether there is an occurrence is a question of law and further agrees with the Magistrate Judge's analysis evaluating whether there is an occurrence in this case.

2    Plaintiffs also contend that the definition of the defect should refer to the defect in the *batch* of Uni-Knees. The special jury instructions already inform the jurors that " [a] ll 79 Uni-Knees discussed during this trial had the same defect or deficiency and therefore are included in a single batch." This more than adequately informs the jury that the Uni-Knees suffered from a common defect and were part of the batch. Thus, Plaintiffs' objection is overruled.

3    The Court also notes that application of this principle is entirely consistent with the language of the policy and endorsements at issue in this case. Each endorsement attached to Defendant's policy includes the unambiguous cautionary language, *"[t]his endorsement changes the policy. Please read it carefully." See e.g.,* Medical Prods. End. (emphasis in original). Therefore, consistent with this language, terms of an endorsement control over the main body of the policy.

4    Defendant also points to historical corporate records purporting to show that UMC was a subsidiary of Upjohn at the time of the dispute addressed in the Michigan Supreme Court's *Upjohn* opinion. There is no indication, however, that these records were relied upon by the Michigan Supreme Court (or that they were even included in the record before the court) in reaching its decision in *Upjohn,* and they cannot be used to expand the court's holding.

5    Defendant also relies on *Standard Savings & Loan Ass'n v. Aldrich,* 163 F. 216 (6th Cir.1908), and *Baldassari v. Produce Terminal Realty Corp.,* 361 Mass. 738, 282 N.E.2d 649 (Mass.1972), to support its position. Neither of these cases is applicable to the issues addressed in this case and do not offer any support to Defendant's position.

6    Plaintiffs also contend that the Magistrate Judge erred in relying on cases applying the "sophisticated insured" exception. To the extent that the cases cited by the Magistrate Judge mention a "sophisticated insured" exception, it is clear that the insured's sophistication is not the dispositive issue in determining whether to apply the *contra proferentum* rule, rather the issue is whether the contract was negotiated by the parties. *See Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Illinois,* 162 F.3d 789, 796 (3d Cir.1998) ("[T]he dispositive question is not whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured. In such instances, we conclude that the doctrine of *contra preferentum* should not be invoked to inure to the benefit of the insured.") (quoting *Pittston Co. v. Allianz Ins. Co.,* 124 F.3d 508, 521 (3d Cir.1997)). In this case, it is not Plaintiffs' status as a sophisticated

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  20

business entity that precludes application of the *contra proferentum* rule, it is the fact that the parties negotiated the terms of the policy, in its entirety.

1   The proposed instructions incorporate elements found in plaintiffs' proposed jury instructions 13 through 35 and defendants' proposed instructions CV3.03 and special instructions 1 through 13. The proposed instructions attached hereto are intended to take the place of the cited instructions proffered by the parties in their entirety. I have not attempted to address other requested instructions, which fall outside the scope of the reference regarding identification of the issues to be tried.

2   Because the *Powers* decision was only a two-justice plurality, it has never been treated as binding precedent by the state courts. *See, e.g., VanDyke v. League Gen'l Ins. Co.,* 184 Mich.App. 271, 457 N.W.2d 141, 142 (Mich.Ct.App.1990).

1   The recommendations made in this section do not require revisiting any summary judgment decisions previously made by the court, but only involve a modification of the verdict form.

2   *See, e.g.,* Defendants' Denial of Coverage Letter dated October 11, 2001, at p. 5, 457 N.W.2d 141 ("Consequently, we agree that the Uni-Knee products at issue in the claims and lawsuits will constitute one 'batch.' ").

---

**End of Document**                                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   21

## EXHIBIT 5

2003 WL 21262710
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
E.D. Pennsylvania.

In re WALNUT EQUIPMENT
LEASING CO., INC., Debtor.
Stewart AXTELL, Liquidating Trustee, Plaintiff,
v.
THE EQUIPMENT LEASING COMPANY, dba
Quaker State Leasing Company, Defendant.
THE EQUIPMENT LEASING
COMPANY, dba Quaker State Leasing
Company, Third Party Plaintiff,
WALNUT EQUIPMENT LEASING
CO., INC., and Equipment Leasing
Corporation, Third Party Defendants.

No. 97–19699DWS, 00–0864.
|
May 28, 2003.

Liquidating trustee of debtors' estates brought action for breach of asset purchase agreement. The Bankruptcy Court, Sigmund, J., held that buyer had no right to terminate asset purchase agreement on basis of debtors' practice of carrying receivables for over one year past due where buyer was fully aware of debtors' practice prior to executing agreement.

Judgment for plaintiff.

West Headnotes (3)

[1]    **Corporations and Business Organizations**
       👉 Construction, operation, and effect

       There was no basis on which to construe asset purchase agreement against liquidating trustee of debtors' estates where contract was the result of the joint effort of the attorneys for both sides; document went through at least six draft versions before a final document was circulated for execution.

       3 Cases that cite this headnote

[2]    **Corporations and Business Organizations**
       👉 Construction, operation, and effect

       Under terms of asset purchase agreement entered into with liquidating trustee of debtors' estates, termination was permitted only if supported by buyer's dissatisfaction with the investigation of assets as narrowed by the due diligence provision; the dissatisfaction had to be a consequence of information gleaned during the due diligence investigation conducted after the agreement was signed.

       Cases that cite this headnote

[3]    **Corporations and Business Organizations**
       👉 Construction, operation, and effect

       Buyer had no right to terminate asset purchase agreement entered into with liquidating trustee of debtors' estates on basis of debtors' practice of carrying receivables for over one year past due where buyer was fully aware of debtors' practice prior to executing agreement; buyer's termination rights were limited to information gleaned during the due diligence investigation conducted after the agreement was signed.

       Cases that cite this headnote

**Attorneys and Law Firms**

Harry J. Giacometti, Timothy J. Holman, Smith, Giacometti & Chikowski, LLC, Philadelphia, PA, for Stewart Axwell, Liquidating Trustee.

Steven E. Bizar, Thomas P. Manning, Buchanan Ingersoll Professional Corporation, Philadelphia, PA, for the Equipment Leasing Company.

Charles Golden, Obermeyer Rebmann Maxwell & Hippel, LLP, Philadelphia, PA, for Debtor.

Dave P. Adams, Office of the United States Trustee, Philadelphia, PA, for United States Trustee.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*MEMORANDUM OPINION*

SIGMUND, Bankruptcy J.

**\*1** Before the Court is the Complaint of Stewart Axtell, Liquidating Trustee ("Trustee" ") of the estates of Walnut Equipment Leasing Co., Inc. ("Walnut") and Equipment Leasing Company of America ("ELCOA" and together with Walnut, "Debtors") [1] against Equipment Leasing Company d/b/a Quaker State Leasing Co. ("Quaker") for breach of contract as a result of Quaker's termination of an agreement to purchase assets from the Debtors during their consolidated Chapter 11 case. Trial of the liability phase of the Complaint was held on January 24, 27, 28, 29 and 31, 2003. [2] The parties requested, and were granted, leave to file post-trial findings of fact and conclusions of law and supporting memoranda which have now been received. For the reasons that follow, judgment is granted in favor of the Plaintiff Trustee, and a trial on damages shall be scheduled forthwith.

BACKGROUND

The Debtors, Walnut and ELCOA, were engaged in the business of financing and administering the purchase of small-ticket commercial equipment for direct finance leasing. [3] On August 8, 1997, each of the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code and continued to operate their business as debtors-in-possession, collecting payments on existing leases, instituting legal action to collect unpaid leases [4] and until the end of July 1998, generating new leases. The largest single asset of the bankruptcy estates was the Debtors' lease portfolio (the "Portfolio").

In the mid to late winter of 1998, Francis Lawall, Esquire ("Lawall") of the law firm of Pepper Hamilton, LLP ("Pepper"), counsel to the Official Committee of Unsecured Creditors (the "Committee") during the Debtors' Chapter 11 reorganization case, [5] engaged in discussions with Quaker about the Committee's desire to secure an agent to service the Portfolio. Quaker was represented in the discussions by its President Donald P. Kennedy ("Kennedy"). [6] Kennedy reported to George Mark ("Mark"), Executive Vice President of Progress

Financial Company ("Progress"), Quaker's parent and the parent of two other leasing companies, Equipment Leasing Company ("ELC") and PAM Financial. Mark, however, was not involved in the discussions regarding servicing the Portfolio or the subsequent negotiations to purchase the Portfolio. Indeed Mark was not aware of the asset purchase transaction before an agreement was signed nor had he been asked to provide input on its advisability. [7]

In connection with the servicing discussions, Kennedy met with Kenneth Shapiro ("Shapiro"), Walnut's Vice President, in February 1998 at Quaker's offices and again in March 1998 at both Walnut's and Pepper's offices. Lawall and Debtors' counsel Charles Golden, Esquire ("Golden") attended one of those meetings as well. During these meetings, Kennedy was given information about the Debtors, their reorganization cases, their business operations and the Portfolio. Shapiro recalls specifically advising Kennedy during the first meeting, that Walnut collected approximately sixty percent of the delinquent amounts which were referred to LOWS for collection and providing Kennedy with lease files to inspect and thereafter answering questions about them at the Walnut meeting.

**\*2** On March 20, 1998 Lawall faxed to Kennedy an eightpage letter dated March 18, 1998 from Kenneth Shapiro to his counsel Golden outlining "guidelines to be considered in the servicing and administration of 'small-ticket' lease portfolios" which was intended to serve as an exposition "at a minimum of the services which should be provided in order to maximize recovery from all lease receivables...." Ex. P–2. Attached to the letter were sample copies of documents maintained in the files of Walnut with respect to individual leases, including an equipment lease, the purchase order for the equipment that is the subject of the lease, a certificate of acceptance with respect to the equipment, a telephone memorandum created by Walnut employees after a telephone conversation with the lessee and an account history. *Id.*

These negotiations were ultimately abandoned without a servicing relationship being consummated. Rather the Committee, concerned with the protracted nature of the bankruptcy case and the escalating administrative costs of the Chapter 11 proceeding, determined that a sale of the Portfolio would be in the best interests of creditors since it would allow conclusion of the bankruptcy sooner. At

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

the time, according to Kennedy, Quaker was interested in purchasing leases on an "opportunistic basis" to grow its lease business in scope and dollars. Trans. 1/24/03 at 185. With the Committee wanting to sell and Quaker interested in buying, the discussions turned to the terms and conditions of an outright sale. [8]

In furtherance of this end, a number of documents were transmitted to Quaker.

1. On April 17, 1998 Lawall faxed to Kennedy a letter dated April 16, 1998 from Shapiro to Golden in which he set forth the number of leases outstanding at March 26, 1998; the number of leases assigned to LOWS at March 26, 1998; the anticipated cash flow projection of scheduled payments to be received during the twelve month period ending March 26; the geographical location of the equipment subject to the leases; and the types of equipment subject to the leases. Ex. P–6. Attached to Shapiro's letter was a spread-sheet which purported to set forth the lease receivable balances of Walnut and ELCOA. The combined pre and post-petition lease receivable balances of Walnut and ELCOA as broken down by aging according to the attachment to Exhibit P–6 were as follows: 0–30 days—$9,762,372.00; 31–60 days—$729,525.00; 61–90 days—$303,522.00; 91 plus days-$5,310,159.00. *Id.* Lawall did not recall receiving any specific request for a further breakdown of the aging of the Portfolio after having faxed Exhibit P–6 to Kennedy, and Kennedy acknowledged not recalling that either he or any other Quaker representative had requested a further breakdown of the precise number of days the leases in the 91 plus days category were delinquent.

2. On April 21, 1998 Lawall sent another fax to Kennedy consisting of 20–pages, one of which was a one-page schedule captioned "Projected Liquidation and Write-off of Defaulted Leases Assigned to W.S. Shapiro, Esq., P.C. for Liquidation" which was prepared by Walnut's controller and represented anticipated collections from the existing Portfolio and the balance of which was a projection of cash flows through April 2000 assuming that the Debtors would remain in the leasing business (*i.e.,* generate new leases). Exhibit P–7.

**\*3** 3. On April 24, 1998 Francis Brulenski ("Brulenski"), CPA, of the firm of Nihill Reidley & Co. ("Nihill"), accountants to the Committee, faxed to Kennedy, at his request, a document previously prepared by Nihill

which was titled "Summary of Legal Activity for the 63 Months Ended July 31, 1997." Exhibits P–8, 15A. This document showed collections and write-offs during the fiscal years 1996 and 1997 and the fiscal quarter ended July 1997 and the accounts that were referred to LOWS for collection during the years 1993 through 1997 and the fiscal quarter ended July 1997. *Id.* At the further request of Kennedy, Brulenski supplemented the report by adding information relating to amounts collected and written off during fiscal years 1993 through 1995. Exhibit P–15A. Kennedy acknowledged reviewing this data prior to executing the Agreement.

4. On May 12, 1998 Kennedy requested that Shapiro provide information on all the "asset fundings that you have done since 3/26," Exhibit P–9, to which Shapiro responded with a report of the leases generated by Walnut from March 27, 1998 through April 26, 1998. Exhibit P–10. In his transmittal letter, Shapiro recognized that the data was not provided with the detail requested but believed it had sufficient information to enable Quaker to analyze the new bookings for the most recently completed month. *Id.*

5. On May 14, 1998 Shapiro forwarded to Kennedy, at his request, a list of lessees and for each, the state in which leased equipment was located, the cost of the equipment, the terms of the lease, the monthly payment, the end of term buyout, a description of the equipment and the lease receivable amount. Exhibit P–10.

During this period, Quaker's transaction counsel, Lawrence Kotler, Esquire ("Kotler") prepared an initial letter of intent to purchase the Portfolio which he transmitted to Lawall and Golden on May 5, 1998. Exhibit D–3. The document contemplated a purchase price of $9,169,000 subject to reduction based on Quaker's due diligence which was anticipated to take 45 days from the date of the letter. *Id.* Lawall responded in writing on May 7, 1998, stating his view that the transaction would be "as is, where is," subject to due diligence which he hoped could be completed within 15 days of execution of the definitive agreement. Exhibit D–4. [9] Kotler replied on May 18, 1998 with a revised letter of intent increasing the price to $9,570,000 subject to adjustment after due diligence as before [10] and contemplating the execution of a definitive agreement that would contain limited warranties and representations as demanded by Lawall. Exhibit D–6. A formal letter of intent was never executed, the parties

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

3

abandoning the two step approach and going directly to negotiations over the asset purchase agreement (the "Agreement").

The initial draft of the Agreement was prepared by Lawall's associate Rena Kopelman, Esquire, and transmitted to Kotler by Lawall on June 3, 1998. Exhibit D–7. After negotiations, Kopelman transmitted a revised draft on June 23, 1998. Exhibit P–8. [11] This draft was sent to the Debtors' Board of Directors for review and comment with the expectation that after such input was received and resolved, the document would be executed. The final draft, Exhibit D–14, made no changes from the June 23rd draft, Exhibit P–8, which are relevant to the matters at issue here. It was executed as of July 9, 1998. Exhibit D–17.

**\*4** The parties agree that Lawall had a sense of urgency to consummate the transaction. Concerned about the impact of runaway administrative costs of the bankruptcy on creditor recoveries, he pressed Quaker to execute the Agreement and allow him to present it to the Bankruptcy Court for approval after notice and an opportunity for higher and better bids, as required under bankruptcy law, could be accomplished. Because of the expedited schedule which Quaker was willing to accommodate, the parties agreed that due diligence, which normally precedes execution of an asset purchase agreement, could occur afterwards.

On July 14, 1998 Kotler transmitted the signature pages of the Agreement and related documents to Lawall and notified him of Quaker's wish to conduct its due diligence under Section 5.1 of the Agreement "to commence" on July 16, 1998. On that date, Mark sent a team he assembled of four leasing experts, *i.e.,* Kennedy, William Brain ("Brain"), Scott Wheeler ("Wheeler") and Dennis Horner ("Horner") and two accountants from PriceWaterhouseCoopers to Debtors' premises. Brain was another Quaker employee whereas Horner and Wheeler were the President and Vice President of ELC, as noted above, a sister company to Quaker and also a Progress subsidiary. Notably ELC is more conservative in its credit criteria, pricing and marketing than Quaker. [12] Horner and Wheeler at best were less than enthused about the contemplated transaction and at worst, predisposed against it. Indeed upon his arrival at Walnut, Kennedy advised Shapiro that two of the six people on the team (*i.e.,* Horner and Wheeler) were "skeptical" about the

responsibilities that Quaker would encounter with the Portfolio, including its multi-state scope and its credit quality. Trans. 1/24/03 at 168. In his testimony, Horner acknowledged that prior to the due diligence review he was aware of Walnut as a "sub-prime lender" that "did transactions that [Horner] would imagine that 99 percent of the small ticket leasing companies would not enter into." Transcript 1/29/03 at 78. Also prior to the due diligence review as a result of some preliminary review of the documents, Wheeler was concerned about the large number of over 90 day delinquent receivables, a concern shared with and by Horner.

The due diligence team initially met with Shapiro for background and were provided past financial statements and then divided the investigation. Kennedy's primary focus was on post-petition leases (underwriting scores and liens) to determine if the underwriting criteria had improved as had been represented by Lawall and Shapiro. In the afternoon his attention turned to prepetition assets to test his expectation that the older portion of the Portfolio had stabilized as he had also been told. Horner reviewed the Debtors' annual reports and 10–Qs and then randomly examined between 100 and 150 active files, looking at the lease applications, the credit underwriting, the industries and equipment. Wheeler spent the morning pulling lease files to ascertain the credit scores. [13] Brain's tasks were to identify the geographical dispersion of the leases for purposes of securing registrations, to determine whether the Debtors' electronic files could be converted to Quaker's system and to develop a present value of the Debtors' cash flow. The Price Waterhouse accountants Jack Lonker and Tony Bizone conducted tests of the receivables, and reported to the Progress/Quaker team that Walnut and ELCOA lent to subprime lessees and funneled off collections to a law firm owned by one of the principals which generated fees for the firm. [14]

**\*5** While a multi-day investigation had been contemplated, Wheeler, Horner and Brain ceased their work prior to the completion of the first business day, having concluded that purchase of the Portfolio was inadvisable. They reported their findings to Mark. [15] Any further investigation was aborted after Kennedy who worked until 5 p .m. recommended to Mark that Quaker terminate the Agreement based on his concern with the collectability of the Portfolio. Trans. 1/24/03 at 171. [16] Oral notice of termination was provided on July

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 4

17, 1998, the morning of the Court hearing to consider Debtors' Motion to Approve Bidding Procedures.[17] Without a proposed purchaser, the Court proceedings were adjourned without entry of any order.[18] In a memorandum to Mark dated July 20, 1998, Kennedy memorialized the bases and some data underpinning his recommendation to terminate. He stated:

> We understood going in that the Walnut portfolio was a troubled portfolio, but that the prepetition portfolio had stabilized and the post-petition portfolio had new and improved credit criteria that would result in a cleaner portfolio. Our findings, as identified through Walnut's own Legal Report, is that the complete opposite was occurring.

Exhibit D–23. The formal notice of termination was transmitted on July 21, 2003. Exhibit D–26.[19]

At issue in this phase of the adversary case is whether Quaker breached the Agreement when it terminated it as described above. The resolution of this questions turns first on the proper interpretation to be accorded the contractual provision underlying Quaker's election to terminate the Agreement, *i.e.,* Section 5.1.[20] Once understanding the rights conferred by that provision, I examine whether they provided the legal foundation for Quaker's action in terminating the Agreement.

### DISCUSSION

#### I. *Burden of Proof*

**[1]** As correctly noted by Quaker, the party alleging a breach of contract bears the burden of proving all the elements by a preponderance of the evidence. *Bohler–Uddeholm America. Inc. v. Ellwood Group,* 247 F.3d 79, 102 (3d Cir.2001). Thus, it is the Trustee's burden to demonstrate that a proper interpretation of § 5.1 supports his view of the case. However, in so doing, I reject Quaker's invitation to apply the presumption that as an ambiguous contract, the provision is to be construed against the Trustee as Pepper drafted the Agreement. *Dardovitch v. Haltzman,* 190 F.3d 125, 141 (3d Cir.1999) (*quoting*

Restatement of Contracts § 206 that "in choosing among the reasonable meanings of a promise or agreement or term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."). There is a well established exception to the rule of *contra preferentem* where a contract is the result of the joint effort of the attorneys or negotiators for both sides. *Spatz v. Nascone,* 364 F.Supp. 967,971 (W.D.Pa.1973) (citing cases). Here while Pepper prepared the first draft of the document, it merely maintained control of the document thereafter with Koppelman, the draftsperson acting as a scrivener to incorporate the negotiated changes. The document went through at least six draft versions before a final document was circulated for execution. Exhibit D–14. Section 5.1 was specifically renegotiated from Lawall's first draft and if anything, its final form reflects Kotler's work, not Lawall's. Thus, there is no basis on these facts to construe the Agreement and § 5.1 in particular against the Trustee.

#### II. *Interpretation of Section 5.1 of the Agreement*

**\*6 [2]** Section 5.1 of the Agreement (the "Due Diligence Provision") sets forth Quaker's right of due diligence. It reads as follows:

> [f]or fourteen calender days from the date hereof, Purchaser shall be entitled, upon reasonable request and during normal business hours, through its employees and representatives, to perform an investigation of the Purchased Assets and to access Sellers' computer software and databases in order to determine the accuracy of Schedule 1.1 hereto and to ensure that (i) the accounts receivable have been timely and correctly presented, (ii) the Leases are enforceable for their remaining terms as has been presented, and (iii) the Equipment was delivered and accepted in accordance with the terms of the Leases.

Agreement § 5.1.[21]

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 5

Section 5.1 further provides the following remedy which Quaker invoked to terminate the Agreement rather than consummate the sale.

> If Purchaser is dissatisfied with the results of any such investigation, Purchaser may, within said fourteen calender day period, notify Sellers in writing that this Agreement is terminated.... Upon the termination of this Agreement as set forth in this Section 5.1, the Agreement shall be null and void and the parties shall have no further obligations or liabilities to the other other [*sic*] than return of the Deposit to Purchaser and those obligations which expressly survive termination as set forth herein.

*Id.* The underpinning of the dispute *sub judice* is the parties' conflicting interpretations of Section 5.1 of the Agreement.

I have previously determined in the context of the Trustee's Motion In Limine that the Due Diligence Provision is ambiguous. *Axtell v. Equipment Leasing Co. (In re Walnut Equipment Leasing Co. Inc.),* 2002 WL 31994477 (Bankr.E.D.Pa. Dec.13, 2002). I found that it could be read in two ways, and as such, I permitted extrinsic evidence to be introduced at trial to elucidate its meaning. *Id.* A summary of the trial evidence reveals not two, but four interpretations, belying the contention of the parties that the Due Diligence Provision was unambiguous.

The Trustee reads the Due Diligence Provision to afford Quaker a limited right of due diligence. His support for that position was put forth in Lawall's testimony. As noted above, Lawall was the person who negotiated and documented the Agreement on behalf of the bankruptcy estates with Quaker's transactional counsel Kotler. According to Lawall, Quaker's sole right was to investigate the Purchased Assets to determine the accuracy of Schedule 1.1. It is agreed that Schedule 1.1, which was never attached to the Agreement and which no one appears to have a copy of, contains a listing of the leases being purchased. Lawall's understanding was that Quaker's sole right was to verify that all the leases listed on Schedule 1.1 existed. Lawall explained that the

Committee's intent was to allow a very narrow out for any buyer since otherwise, the estates would be going through the time consuming and costly bankruptcy approval process with little assurance that the transaction would close. That is why, he stated, considerable information was given to Quaker up front, including during the period the servicing deal was being negotiated.

**\*7** Lawall's contention that he eschewed an unlimited escape from the Agreement based on Quaker's dissatisfaction for any reason arising from its investigation of the Purchased Assets is credible in the context of the bankruptcy case. It is improbable that given the Committee's fiduciary duty to conserve estate assets, it would expend estate funds to pursue a transaction that could so easily be avoided. However, Lawall's view of Quaker's right to terminate based on the results of its due diligence is overly narrow since it finds no support in the language of the Agreement. Indeed Lawall's interpretation is precisely the reading to be gained from the initial draft of the Agreement prepared by his associate Kopelman but notably that language did not survive the subsequent review and modification made by Kotler. The evolution of that document is as follows:

P–7 states:

> For the period within twenty (20) days after the entry of the Deposit Order by the Bankruptcy Court, Purchaser shall be entitled, upon reasonable request, through its employees and representatives, to perform an investigation of the Purchased Assets in order to determine the accuracy of Schedule 1.1 hereto. Any such investigation and review shall be conducted at reasonable times and under reasonable circumstances.

The next draft, Exhibit P–8, was blacklined to evidence the following changes:

> For [the period within twenty (20) days after the entry of the Deposit Order by the Bankruptcy Court] *fourteen days from the date hereof,* Purchaser shall be entitled, upon reasonable request, through

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

6

its employees and representatives, to perform an investigation of the Purchased Assets *and to access Seller' computer software and databases* in order to determine the accuracy of Schedule 1.1 hereto *and to ensure that (i) the accounts receivable have been timely and correctly presented, (ii) the Leases are enforceable in accordance with their terms and (iii) the Equipment was delivered and accepted in accordance with the terms of the Leases.* Any such investigation and review shall be conducted at reasonable times and under reasonable circumstances.

Lawall dismissed the new language, which he acknowledged was added by Quaker, as mere surplusage and not intended to change the function of the due diligence which, in his opinion, was to verify that the leases actually existed.

Kotler, who was the scrivener of the new language, not surprisingly disagreed, stating that the new language represented a compromise between the Committee's view that the investigation be on the narrow basis reflected in Lawall's first draft and as broad and unlimited as Quaker wanted it to be. He then gave his interpretation of new section 5.1, adopting one of the permutations I suggested was a possibility when I ruled on the In Limine Motion. According to Kotler, the Agreement provided two rights of due diligence: (1) to investigate the Purchased Assets and (2) to access Seller' computer software and databases in order to determine the accuracy of Schedule 1.1 hereto and to ensure that (i) the accounts receivable have been timely and correctly presented, (ii) the Leases are enforceable in accordance with their terms and (iii) the Equipment was delivered and accepted in accordance with the terms of the Leases (hereinafter the clauses set forth in romanettes (i) through (iii) shall be referred to as the "Purposes"). Trans. 1/27/03 at 94–95. In Kotler's reading, there is no limitation on the scope of the investigation of the Purchased Assets but access to the computer software and databases may only be permitted to determine the accuracy of Schedule 1.1 and to ensure the Purposes.

**\*8** Kotler attempts to make sense of the limiting impact of the Purposes Clause by contending that it modifies the

additional language Quaker requested regarding access to computer software and databases. Since the investigation of the Purchased Assets which take the form of written documents could arguably exclude such access, Quaker apparently negotiated the right to conduct its review of relevant data stored electronically. Kotler states that the limitations were a concession to the Debtors' need to operate their post-petition business without undue disruption from "an unfettered rights to look at *every single piece of paper,* every single computer database, *every single record available at large...." Id.* at 96 (emphasis added). If that were the case, he does not explain why the limitation documented applies only to the computer files, probably the easiest record to review without disrupting the business. Moreover, Quaker acknowledges that to ensure two of the three Purposes as contemplated, the investigator would have to refer to the physical assets, not the computer software and databases. While determining whether accounts have been timely and correctly stated could involve a review of electronically stored data, clearly a determination of whether the Leases were enforceable according to their terms required a review of the lease documents themselves as would a determination of whether the Equipment was delivered and accepted in accordance with the terms of the Leases. Thus, Kotler's contention that the Purposes Clause limits only the access to computer files is counterintuitive.

Kotler's partner, Kevin Silverang ("Silverang"), proffered another interpretation of § 5.1.[22] Silverang testified that he commented on the first Pepper draft, Exhibit P–7, finding it an unacceptable limitation on Quaker's right of due diligence. According to him, Exhibit P–8 reflects the culmination of the parties' discussions, incorporating to a "material degree" Quaker's requested changes. He found three functions allowed by § 5.1:(1) to investigate the Purchased Assets; (2) to access the computer software and databases in order to verify Schedule 1.1 and (3) to ensure the Purposes. He saw no limitation to the scope of the investigation of the Purchased Assets, drawing upon his experience with general business practice in transactions in which he was involved and his belief that the client did not intend to limit his due diligence in any way, particularly since the seller was in bankruptcy and the Agreement provided no warranties. He provided no basis for his conclusion that his client subjectively did not intend to limit its due diligence since there was no evidence of his having any discussions with Kennedy or any other representative of the client. Rather I construe Silverang's

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

comments to support Quaker's argument that it is not reasonable to conclude that Quaker would have limited its rights in the manner the Trustee contends.

**\*9** Just as there is a problem with Lawall's interpretation of the Due Diligence Provision which ignores the later negotiated language so there are problems with the interpretations put forth by Silverang. Notably Silverang's interpretation is different than that of Kotler who drafted the provision, undermining the credibility of Silverang's explanation as a record of what actually was intended by the language of the Agreement as opposed to what would support Quaker's position now. Under Silverang's version (adopted by Quaker in its brief), the Purposes stand alone as additional rights; only the access to computer databases is limited to determine the accuracy of Schedule 1.1.[23] However, in contending that Quaker has a broad and unlimited right to investigate the Purchased Assets, the Purposes Clause would be surplusage in Silverang's interpretation. If there is no restriction on the due diligence, why did Quaker feel obliged to add the Purposes Clause?[24]

It is hornbook law that in construing a contract a court should give meaning to all its words and phrases and adopt a construction that avoids surplusage. *Washington Hospital v. White,* 889 F.2d 1294, 1300 (3d Cir.1989); *Continental Insurance Co. v. Allstate Insurance Co.,* 820 F.Supp. 890, 897 (E.D.Pa.1993). The only rational interpretation of § 5.1 that gives effect to all its language allowed Quaker to investigate the Purchased Assets (*i.e.,* examine physical lease files and financial records) and to access the computer software and files (*i.e.,* examine the intangible records). However, its investigation of both sources was to be limited to determining the accuracy of Schedule 1.1 and ensuring that (i) the accounts receivable have been timely and correctly presented, (ii) the Leases are enforceable in accordance with their terms and (iii) the Equipment was delivered and accepted in accordance with the terms of the Leases. This interpretation is broader than originally proposed by Lawall in Exhibit P–7 and found unacceptable by Quaker and narrower than the unlimited due diligence unacceptable to the Committee. Moreover, it is consistent with Kotler's testimony that the blacklined document, Exhibit P–8, represents the results of a negotiation, *i.e.,* a compromise between Lawall's vision of a narrow right of due diligence and Silverang's view of an unlimited one.

Having determined the scope of the investigation provided for in § 5.1, I also find that the later language that allows Quaker to terminate the Agreement if it is dissatisfied with "such investigation" does not expand it. Quaker would have me construe that sentence as allowing it to terminate upon dissatisfaction with the Portfolio for any reason. To do so would ignore the modifier "such" which refers to the investigation described above and thereby completely swallow the first part of the paragraph which defines the scope of the investigation. Consistent with my finding above that a contract should be construed to give effect to all its terms and provisions, I will not do so. Nothing in the cases Quaker cites that allow a party to a contract to terminate upon dissatisfaction suggests otherwise. Once the scope of the investigation is determined as I have done, Quaker was permitted within that framework to terminate if it was dissatisfied and its dissatisfaction will be measured by the subjective standard it advances. *See Jenkins Towel Service, Inc. v. Tidewater Oil Co.,* 422 Pa. 601, 606, 223 A.2d 84, 86 (1966).

**\*10** In the face of what I view as the only internally consistent construction of § 5.1 of the Agreement, Quaker argues that the consequence of such a reading would be contrary to the intention of the parties and the practice in the commercial world. It is beyond cavil that "in construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all the circumstances ascribes the most reasonable, probable and natural conduct of the parties bearing in mind the objects manifestly to be accomplished." *Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 385, 476 A.2d 1, 5 (1984) (*citing Unit Vending Corp. v. Lucas,* 410 Pa. 614, 190 A.2d 298 (1963)).

Quaker elicited Kennedy's testimony that he did not intend to limit his right of due diligence in any way. Silverang and Kotler confirmed that view.[25] While a party's testimony as to his intent concerning the meaning and effect of a contract can be significant evidence of the meaning of the contract, it is not conclusive evidence. *Dardovich v. Halzman, supra,* 190 F.3d at 139. Kennedy's statements must be considered in the environment that he presents them, after the fact and as justification for the action he took. His testimony is that it never occurred to him that he was limiting his due diligence rights and that no one ever advised him of that fact. However, he also acknowledged that his expectations were a result of discussions surrounding the unfinished and unsigned

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

letter of intent and that he never communicated his view of his due diligence rights to anyone in the Debtors' or Committee's camp. Trans. 1/24/03 at 199. As he stated, "nor did I expect to since due diligence is a normal process that occurs certainly in the marketplace and anyone else acquiring a business or a portfolio would...." *Id.* Thus, Quaker's intent regarding due diligence seems to be unrelated to the Agreement it executed. It appears that while the lawyers were sending drafts back and forth and, notwithstanding Kennedy's review of them, he simply assumed that he would have unfettered due diligence rights and an opportunity to either walk from the deal or renegotiate its price after the Agreement was executed if he was dissatisfied with the Purchased Assets.

Kennedy appears to have been the sole actor in this drama for Quaker until the due diligence investigation was undertaken. His goal was to expand Quaker's leasing business, an objective supported by Mark. Notwithstanding the size of the transaction, Mark was not advised about it until the Agreement was to be signed. The due diligence team assembled by Mark now involved the more conservative ELC managers, Horner and Wheeler. They came with a predisposition against the transaction which was borne out by their investigation. Indeed Kennedy cautioned Shapiro about their negativity. They discontinued their work before Kennedy did, returning to Mark to report their adverse conclusions. Had they been the decision makers, it is possible the Agreement would not have been signed in the first place. However, as noted above, there is no evidence that Kennedy's now stated view that he had an unlimited right to due diligence that would support termination based on any dissatisfaction with the investigation was advanced during the negotiations. The sole clear evidence is that Quaker intended to reject Lawall's initial narrow view of an investigation of the Purchased Assets limited to determining the accuracy of Schedule 1.1 and put forth a compromise position evidenced by blacklined Exhibit P–8. Moreover I cannot conclude that Lawall ever intended to negotiate and recommend to the Committee that it seek court approval of an agreement that could be terminated if Quaker were dissatisfied for any reason. [26] His communication to Kotler made that quite clear. While I find it highly possible that Kennedy, to the extent he considered the issue prior to signing, could have thought he could walk away from the deal if it did not live up to its expectations, his view cannot be attributed to the seller and is at odds with the Agreement he signed.

*11 Finally there was testimony about industry practice by Silverang, an experienced corporate lawyer, and Quaker's expert, Bruce Kropschot ("Kropschot"), a consultant to the equipment leasing industry. Custom and practice in the industry is a relevant factor when interpreting an ambiguous contract. *Keegan v. Steamfitters Local Union No. 420 Pension Fund,* 211 F.Supp.2d 632, 642 (E.D.Pa.2002). Both testified convincingly that it is customary for a buyer to insist on broad due diligence rights, and indeed where, as here, the seller was liquidating in bankruptcy and could provide no meaningful representations and warranties, that right was even more important so that a broader rather than narrower due diligence would have been expected. I appreciate the seeming common sense which underlies this argument. However, there was no testimony as to whether that practice is applicable to bankruptcy sales which traditionally move quickly and often alter a party's due diligence opportunities. The consequence of these limitations are usually reflected in the price offered for the assets. Whether the assets were in anyway discounted because of the nature of the seller is unknown since there was little evidence as to how the purchase price was negotiated and set or the assets were valued. [27] If the price was discounted to account for the special nature of this seller, then the custom and practices that Kropschot and Silverang refer to may be distinguished. No witness addressed this point, limiting the utility of this testimony. Finally, to the extent that custom would have been applicable here, it flies in the face of the Agreement that was executed. Since the purpose of custom and industry practice evidence is to interpret an otherwise ambiguous contract, my finding that the extrinsic evidence of the drafting of the contract cleared the ambiguity also undercuts the force of this testimony.

According to Kennedy, Quaker terminated the Agreement because it learned in its due diligence, contrary to statements made by Shapiro and Lawall, that the prepetition portfolio had not stabilized and the postpetition portfolio credit criteria had not improved to result in a cleaner portfolio. [28] Quaker supported that conclusion by reference to summary data of pre-and post-petition accounts that "went legal" (*i.e.,* were referred to LOWS for collection) after the bankruptcy cases were filed in July 1997. Exhibit D–23. Based on prior disclosure that Debtors were utilizing the "Fair Isaacs" method of credit analysis to replace their prior subjective analysis,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Kennedy expected fewer early defaults than he found when reviewing the legal report relating to post-petition lease accounts. [29] Moreover, he concluded that because an additional 10% of the pre-petition accounts had "gone legal" over the twelve month period, the pre-petition portfolio had not achieved stability which he equated with a 2–3% default rate. As the Agreement contains no representations and warranties, Quaker's only recourse for its dissatisfaction with these performance statistics resided in the rights and remedies of the Due Diligence Provision.

**\*12** However, having heard all the explanations and reviewed all the relevant documents, I have found that the only way the Due Diligence Provision can be read so as to give effect to all its language is as it is written with the Purposes Clause modifying "to investigate the Purchased Assets" and "to access Sellers' computer software and databases." Accordingly, in order to have a right to terminate based on "such investigation," the termination must be supported by dissatisfaction with the investigation as narrowed by the Due Diligence Provision. Stated another way, the termination must have been based on dissatisfaction with the accuracy of Schedule 1.1 or one of the Purposes. The concerns addressed above do not relate to Schedule 1.1 (the leases being sold) or fall within one of the three Purposes for which the Due Diligence Provision allows termination. However, Quaker advances another basis for its dissatisfaction which it contends squarely supports termination under the Agreement as construed herein. It contends that termination was proper since its investigation also revealed that the accounts receivable were not timely and correctly presented. If so, Quaker is correct since it is not necessary that its dissatisfaction must solely or even principally relate to one of the Purposes. As noted by Quaker in its brief, satisfaction is a subjective concept. Whether I view the deficiency it identifies as meriting the action it took is besides the point. So long as Quaker had the right to terminate under Section 5.1 because of dissatisfaction with such investigation, it was permitted to do so provided it acted in good faith. Accordingly, I turn now to the question of whether the accounts receivable were timely and correctly presented.

III.

**[3]** In purchasing the Portfolio, Quaker was acquiring not only the right to a future stream of payments under the Leases (*i.e.,* the residual value of the Portfolio) but the right to collect the past due obligations (the "Receivables"). The Receivables being purchased were aggregated by age into four categories: 0 to 30 days; 31 to 60 days, 61 to 90 days and 91 plus days. Exhibit P–6. The basis of Quaker's contention that the accounts receivable were not "timely and accurately presented" resides in the last category. Specifically, it argues that in failing to write off and/or discount receivables in accordance with general accepted accounting principles ("GAAP") and industry standards, the over 90 day category was inflated and therefore the Receivables were not accurately presented. Quaker presented its expert Bruce Kropschot, a consultant to the equipment leasing industry and a non-practicing certified public accountant, to shed light on this issue.

According to Kropschot, it was incorrect for Walnut and ELCOA to retain receivables on their books well beyond one year as they did. Rather "in the field of equipment leasing the prevailing practice is to write off accounts when they appear to be uncollectible or at a point where the future collection efforts are not likely to recover a significant portion of the amount due after reflecting in the cost of collection." *Id.* at 39. [30] In his experience with over one hundred leasing companies, he opined that small ticket leasing companies would not have carried receivables that were over 180 days past due. [31] Yet the majority of Walnut and ELCOA's over 90 day Receivables were past due for over one year. Trans. 1/31/03 at 33. This may explain why Walnut's over 90 day Receivables represent one third of all its Receivables as opposed to a significantly smaller percentage in that category in other equipment leasing companies. [32] Kropschot believed that this fact was sufficient to cause Quaker to be dissatisfied with the results of its due diligence. Kropschot acknowledged that there was no accounting standard or rule that governed when an aged account should be written off although implicitly the accounting rules require that a worthless account be written off.

**\*13** The subject was also explored with Kennedy. The Trustee's counsel asked whether prior to executing the Agreement Kennedy believed that the Portfolio contained no leases over 365 days. He responded as follows:

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 10

A. We did not view—we viewed the category of 91 plus as—we understood those to be legal, but we also understood those as collectible.

What we found out in our due diligence on-site was that many of those assets were well beyond 365 days, they were two, three, even four years old, and they were uncollectible.

A normal practice, one a leasing practice, as well as a gap[sic] process, is you non-accrue and you write off at 180. This company was still carrying a receivable at par value. We had to investigate that.

Trans. 1/24/03 at 142, 143. Quaker's counsel followed up and Kennedy stated his view of whether the receivables were timely and correctly presented as follows:

> A. That they were certainly inconsistent with generally accepted accounting practices. That the information was that much of the receivables really were uncollectible and should have been written off, written down and certainly not presented to us as an open receivable that was available for the performance of this portfolio.

Trans. 1/27/03 at 38. He relayed his understanding of the small ticket leasing industry practice based on hundreds of companies he used to lend to as follows:

> The practice is to go non-accrual at 90 days and if, in fact, you think you have got an impaired asset, between 90 and 180 days you've either written down that asset, or you have collected that asset. At 180, in the absence of having collected that asset, that asset is written off.

*Id.* at 39. Comparing Walnut to the foregoing industry practice, he noted that it continued to carry receivables two to four years old after they were sent to LOWS for legal action. He took issue with Lawall who concluded that to be correctly stated the aging report merely required a correct aggregation of receivables that were due for 91 plus days. In Kropschot's expert opinion, Lawall failed to consider that standard accounting practice requires that

receivables are only carried if collectible and "if you have a damaged asset, you are either to wipe it out, write it off, or bring it down to a legitimate expected future value." Trans. 1/24/03 at 162.

I share Kropschot's criticism of Lawall's explanation. To accept the Trustee's interpretation of "correctly stated" belies the purpose of a due diligence investigation. Indeed it is an extension of what Lawall sought, but failed, to achieve when he pressed for an investigation of the Purchased Assets to verify the accuracy of Schedule 1.1. Lawall would have limited Quaker to merely verifying that every lease being sold existed. Similarly the Trustee argues that Quaker was limited to verifying that every Receivable on the aging existed and was properly identified by aged category. Thus, if all the Receivables in the 91 plus category were past due over 91 days, they were correctly presented. The receivable could be four years old and carried at full value but so long as it was presented as a receivable over 91 days old, it was correctly presented. Such a narrow construction of "correctly presented" is unwarranted.

**\*14** According to the Agreement, Quaker could investigate whether the accounts receivable were correctly presented and terminate the agreement if it was dissatisfied with such investigation. Webster defines "correct" as "conforming to an approved or conventional standard." Merriam–Webster's Collegiate Dictionary at 260 (10th ed.1995). While there is no generally accepted accounting practice with respect to the statement of lease receivables,[33] there are conventional standards that while, allowing for some leeway, enable me to evaluate whether the receivables have been correctly presented. From his years of experience with small ticket leasing companies, Kennedy understood that receivables would be written down after 91 days and written off if not collected after 180 days. According to Kropschot, small ticket leasing companies would have written off receivables after 180 days based on the "prevailing practice of writing off accounts when they appear to be uncollectible or at a point where the future collection efforts are not likely to recover a significant portion of the amount due after reflecting in the cost of collection." Trans. 1/31/03 at 39. Moreover, he opined that it is implicit that a worthless account be written off.

Walnut's practice was to carry receivables at full value for far in excess of the 180 day industry norm. Whether that

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

practice was based on the unique collection relationship it had with LOWS or some other reason is not clear. As part of its due diligence investigation, Quaker was permitted to determine whether the receivables were presented correctly, *i.e.* in accordance with the standards of the industry that only collectible accounts would be stated. If it did so and was dissatisfied with what it found, it was permitted to terminate the Agreement even if, as appears quite clear, Quaker's dissatisfaction, and the impetus for termination of the Agreement, was much deeper than this.

However, it also follows that the dissatisfaction must be a consequence of information gleaned during the due diligence investigation conducted after the Agreement was signed. The plain language of the Agreement ties dissatisfaction to "such investigation' and refers to the investigation permitted for fourteen days after the date of the Agreement. Thus the information Quaker acquired before the Agreement was executed could not be the basis for its termination. Presumably if it were dissatisfied with information gained from that investigation, it would not have signed the Agreement. The Trustee points to the information provided to Kennedy to argue that he was fully aware of Debtor's practice of carrying receivables for over one year past due prior to executing the Agreement. Thus, his dissatisfaction with the investigation did not relate to the statement of the accounts receivables. For the reasons that follow, I agree.

While the only Receivable aging document produced to Quaker prior to the due diligence investigation was Exhibit P–6 from which a determination of the extent of the age of the 91 plus day old Receivables could not be made, the Debtors are public companies with publically available information, a fact of which Shapiro made Kennedy aware at the February 1998 meeting. Pursuant to applicable disclosure requirements, Walnut filed 10K statements that indicated that it kept receivables on its books for greater than one year and two years. Such information was publically available for the fiscal years ended April 30, 1997 and 1996 but not for the most recent fiscal year ended prior to the transaction, April 30, 1998. Exhibits P–221 (Form 10–K f/y/e 4/30/96), P–222A (Amendment 1 to Form 10–K f/y/e 4/30/96), P–223 (Amendment 2 to Form 10–K y/e/4/30/96) and P–224 (Form 10–K f/y/e 4/30/97). Walnut's write-off policy is disclosed therein as follows:

> **\*15** Leases are written off only if there is an adverse court

> decision, bankruptcy, settlement, or unwarranted further costs of collecting insignificant lease balances, and assigned counsel in states where the lessee does business has determined that further action in recovering the debt is unwarranted.

Exhibit P–224 at 9. A table follows that sets forth the dollar value and percentage of lease receivables according to the payment due date. Unlike the document provided to Kennedy, Exhibit P–6, the Form 10–K discloses the breakdown of the over 91 days old Receivables further. This document identifies the portion of the 91 days plus Receivables that are twelve or more months and twenty-four or more months past due. Thus, from Exhibit P–6 Quaker could only glean that of the total Receivables as of March 26, 1998, $5,310,159 of $15,513,667 were over 91 days past due. However, from Exhibit P–224, Quaker could observe that of the total Receivables as of April 30, 1997, $6,004,884 of $20, 917,123 were over 91 days past due and further that $4,003,0241 of the $6,004,884 were over one year past due and $2,208,844 of the $6,004,884 were over two years old. A similar breakdown is provided for the year ended April 30, 1996 with fairly consistent allocations. *Id.* at 13.

The Trustee points to these public documents as evidence that even if a further breakdown of the over 91 days accounts receivables was required to correctly state the accounts receivable, it did so, and those 10–K statements were readily available to Quaker as Shapiro advised Kennedy in February 1998. Moreover, given Kennedy's knowledge of Walnut's practice of carrying old receivables, the Trustee views Kennedy's failure to ask for a further breakdown of the over 91 days old Receivables when he was provided with Exhibit P–6 to indicate that he did not consider the accounts receivables incorrectly stated by reason of its inclusion of the older receivables, *i.e.,* he was not dissatisfied.

Kennedy does not dispute his familiarity with those 10–K statements [34] nor his awareness that there were receivables in the 91 days plus category that were a year old. However, he dismisses the 10–K data as stale and highly unreliable and the precise reason he needed to conduct due diligence. He points out that the last available 10–K to contain the further breakdown of the 91 plus category was dated April 1997, 14 months old

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

at the time of the transaction. Yet it does not appear that a more current aging statement was either requested or prepared by the Quaker team from data acquired during the July 16 visit. Wheeler had reviewed the 10–K statements in preparation for and prior to the on-site due diligence, [35] and testified that notwithstanding the knowledge gleaned from these documents, "it was surprising when we got there to see how far they went." Trans. 1/29/03 at 69. However, no one questioned him on what he looked at or found. Since this appears to be the only reference to the Receivables being examined at the on-site investigation, it would have to be the sole source of Quaker's dissatisfaction. I find this testimony to be too thin a reed to support the action it took in terminating the Agreement.

 *16 Kennedy responds to the Trustee's challenge to his pre-Agreement knowledge by admitting that he was aware that the 91 plus category included Receivables over 180 days or even one year. That, he contends, misses the point. Rather the issue is that he was led to believe that the prepetition leases had stabilized. He states that when he received data indicating the number of pre-petition leases that had "gone legal" in the prior twelve month period, he realized that was not so. Exhibit D–23. While the data in this Exhibit indicates that in twelve month period following the bankruptcy filing, an additional $1.7 million of leases were referred to legal counsel, Kennedy fails to explain the correlation between the report of leases assigned for legal collection and the 91 plus day aging statistic. The statistics only reveal what was sent to legal counsel, not what happened to the Receivables. [36] It may very well be that the number of leases that "went legal" for that period was evidence of the poor quality of the pre-petition component of the Portfolio. However, I cannot on this record make a connection between what was learned in the on-site investigation that informed Quaker that the over 91 day Receivables were not collectible due to the practice of Walnut's failure to write off or write down the asset. Kennedy makes this same point himself when the Trustee's counsel examines him about a document received pre-execution of the Agreement captioned Summary of Legal Accounts for the 63 Months Ended July 31, 1997. Exhibit P–15A. Refusing to acknowledge that this report which evidences legal account activity dating back to 1993 put him on notice that ELCOA had receivable balances on its books that dated back to 1993, he rather questions how it ties into

the actual accounting of receivables. [37] Trans. 1/24/03 at 144. Yet a less fulsome legal activity report is the sole evidence proffered of information gained during the on-site investigation in support of Quaker's dissatisfaction with the 91 plus days aging statement.

I am also unpersuaded by Kennedy's dismissal of the 10–K information he received as unreliable due to its age when the 10–K does more then give him raw numbers. Rather it states the Debtors' practices with respect to carrying Receivables.

> Leases are written-off *only* if there is an adverse court decision. It carried receivables until there is an adverse decision, bankruptcy, settlement, or unwarranted further costs of collecting insignificant lease balances, and assigned counsel in the state where the lessee does business has determined that further action in recovering the debt is unwarranted.

Exhibit P–114 at 12 (emphasis added). Walnut's practice was apparently different than the industry norm identified by the leasing experts. Yet notwithstanding that clear statement in the public record, neither Kennedy nor any Quaker representative inquired about the practice and accordingly could have had no expectations that it had changed. Thus, while Kennedy makes light of the aged data in the 10–K, he can not so easily dismiss the companies' enunciated policy of which he was aware. He did not need to engage in further due diligence to discover that Debtors presented accounts receivable in a manner inconsistent with the industry norm. Having failed to ask Shapiro whether the policy had changed, he had no reason to believe that what was discovered pre-execution of the Agreement to be a practice now identified as unsatisfactory, had favorably changed.

### CONCLUSION

 *17 I have no doubt that Quaker was dissatisfied with the information it acquired at the on-site investigation. It appears that some of the Quaker team were dissatisfied with the contemplated assets to be purchased even before that visit. I also can appreciate Quaker's conclusion that the Agreement it signed was one that it wished to disavow. Moreover, it appears that the businesspeople believed that they had the latitude to walk way from the transaction

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

for any reason, and they articulated reasons for so doing. I need not speculate on the sincerity of the due diligence investigation based on the Trustee's evidence regarding the limited time committed to the on site review or the possible predisposition of members of the due diligence team against the purchase. I make no finding that Quaker acted in bad faith in terminating the Agreement. Rather I conclude that when Quaker signed the Agreement limiting its due diligence, its rights were compromised. It could terminate the Agreement if it were dissatisfied with "such investigation," and such investigation was limited under Section 5.1. The dissatisfaction from the on-site investigation simply does relate to any of the Purposes permitted by the Agreement, and its dissatisfaction with the presentation of the accounts receivable was not formed during the Due Diligence Investigation. Accordingly, Quaker had no right to terminate the Agreement. It is not the prerogative of a court to rewrite the parties' contract, but rather to interpret it "without regard to its wisdom or folly." *Steurt v. McChesny,* 498 Pa. 45, 50, 444 A.2d 659, 662 (1982). A deal, even if it is believed to be a bad one, is nonetheless a deal.

An Order consistent with this Memorandum Opinion shall be entered.

*ORDER*

AND NOW, this 28 th day of May 2003, after trial of the Complaint of Stewart Axtell, Liquidating Trustee (the "Trustee") against The Equipment Leasing Company d/b/a Quaker State Leasing Company ("Quaker"), and for the reasons set forth in the accompanying Memorandum Opinion which constitute this Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, it is hereby ORDERED that judgment is entered in favor of the Stewart Axtell, Liquidating Trustee and against The Equipment Leasing Company dba Quaker State Leasing Company. A conference call shall be held on June 25, 2003 at 10:00 a .m. with the Court to discuss scheduling the damages phase of this adversary case for trial. Plaintiff's counsel shall arrange the call and place it to Chambers. It is further ORDERED that pursuant to the agreement of the parties, the Third–Party Complaint against Walnut Equipment Leasing Co., Inc. and Equipment Leasing Corporation of America is dismissed.

**All Citations**

Not Reported in B.R., 2003 WL 21262710

Footnotes

1   Plaintiff is the duly appointed Trustee of the Walnut/ELCOA Liquidating Trust established pursuant to that certain Liquidating Trust Agreement dated February 3, 2000 (the "Liquidating Trust Agreement"), by and among the Debtors and the Plaintiff.

2   The parties agreed, with the Court's consent, to bifurcate the trial with damages evidence to be presented only if Plaintiff is successful in establishing liability. Moreover, at the start of trial the parties stipulated that the Third–Party Complaint against the Debtors, Walnut and ELCOA, should be dismissed. Pursuant to Fed.R.Civ.P. 41(a)(2), I will give effect to that agreement.

3   Small ticket leasing means equipment lease transactions ranging in value from $10,000 to $250,000 per lease.

4   Collection of delinquent lease accounts was referred to the Law Offices of William Shapiro, P.C. ("LOWS"), a firm owned by the Debtors' President and which did collection work only for the Debtors.

5   While the Debtors were managing their properties as debtors-in-possession, the reorganization had taken the form of a liquidation of assets in Chapter 11 for the benefit of creditors. Since the creditors as represented by the Committee were the real party in interest in the Chapter 11 liquidation proceeding, the Debtors deferred to the Committee's decisions with respect to maximizing value from estate assets. Accordingly, Committee counsel was the primary actor for the estates with respect to the transaction at issue in this matter.

6   Kennedy, Quaker's President from 1992 through December 1998 when Quaker was sold, had been in the leasing business since 1977.

7   Mark testified that he learned of the transaction as the purchase agreement was about to be signed but knew nothing about the characteristics or quality of the Portfolio or about Walnut and ELCOA, including that they were in bankruptcy proceedings. He observed that the transaction was consistent with corporate strategy to grow Quaker's lease portfolio.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.   14

8  In a servicing relationship, the servicer gets a flat fee for each contract as well as a percentage of the rental stream and possibly a fee for incidental services delivered. Upon acquisition, however, the buyer assumes the entire risk of collection. Thus, the business considerations attendant to servicing a lease portfolio are different than for purchasing one. How that fact bears on the information that Quaker would have reviewed during this phase of the parties' relationship versus in connection with a purchase transaction was not explained. Notably, however, Quaker acquired some knowledge of the Debtors' business to jump start their learning curve before the July 17 due diligence visit.

9  Lawall's concern was stated as follows:

> I do not want to be in a position where a topping fee is approved and notice of the proposed sale has gone out all the while the buyer has a significant "out" in the deal.
>
> *Id.* at 2, 444 A.2d 659.

10  While it appears that the due diligence period was shortened by fifteen days (from forty-five to thirty days), in effect it is the same since that amount of time had elapsed since the initial letter of intent during which the documentary exchange outlined above, was being undertaken. Although it appears that Quaker considered its due diligence to have commenced after the Agreement was executed, *see* Exhibit D–18, the information sought by and provided to Kennedy in April and May was in furtherance of Quaker's due diligence.

11  There appears to have been other drafts between P–7 and P–8 but these are the only versions of record in this proceeding. The word processing legend on the document indicates that P–8 is version 4. The final agreement is version 7. Presumably the other drafts make changes that do not relate to the dispute *sub judice.*

12  The failure of a proposed merger of ELC, Quaker and another sister company PAM Financial at the time of the Walnut transaction was attributed to the conservative nature of ELC's business policy *vis a vis* the other two companies.

13  In July 1997 the Debtors implemented a credit scoring system based on the "Fair Isaac" method utilized in the credit industry to eliminate applicants whose credit scores are below a certain minimum threshold. Exhibit P–224 at 9. As a result of this changed business practice, Kennedy expected improved performance in the post-petition assets. Trans. 1/27/03 at 62–63.

14  One of the accountants, Jack Lonker testified but not having any generated any notes or reports, had only a sketchy recollection of the engagement. He recalled concluding that the credit scores on the leases appeared low, an observation he shared with the "Progress guys." Trans. 1/28/03 at 96. However, neither he nor his associate Tony Bizone made a report to anyone and neither conferred with Mark about their observations. It appears the only input they provided on their examination occurred during a lunchtime discussion with the other team members. Lonker stated that he had allocated two to three days for the work but never went back and did not recall how it all ended.

15  Horner was concerned about the type of industries leased to, the type of equipment leased and the quality of the credit decisions. He told Mark of his concerns, including the aging of the accounts receivable which indicated that receivables over one year were being carried as opposed to charged off. Wheeler told Mark that the quality of the files was not what he was used to and he would not buy the asset.

16  The Agreement provides an alternative remedy to termination if there are "discrepancies in the value of the Purchased Assets." Buyer may provide notice to Sellers of the discrepancies and the reduction in the Purchase Price that should result therefrom. Sellers have five days to agree in writing to such reduction." Agreement ¶ 5.1. Kennedy testified that he rejected this option but did not explain his reason for so doing.

17  A bidding procedures motion is generally the first step in a sale of assets pursuant to 11 U.S.C. § 363. It seeks to set the terms of competitive bidding, including approval of a topping or break-up fee to the proposed purchaser if it is out bid for the assets.

18  The Agreement required the tender of a $500,000 deposit (the "Deposit") upon Court approval of the sale. Given the termination of the Agreement prior to the contemplated sale hearing, it was not provided. Quaker's failure to provide the Deposit is an issue reserved for the damages portion of this case.

19  The Agreement does not require that the reasons for the termination be specified. However, Quaker sent a letter terminating the Agreement "based on its dissatisfaction with due diligence" and at my request, specified the nature of its discontent. Given the consequence of the loss of this transaction to the estates, my goal in asking that it do so was to facilitate a discussion that would hopefully result in the parties finding a basis to go forward with the sale. Plaintiff wants the Court to review that conduct against the proofs in this adversary case to conclude that the termination was without cause. I refuse to do so as it would improperly penalize Quaker for complying with the Court's request.

20  The permitted bases for termination of the Agreement are set forth in Section 9.1. There is no dispute that Quaker invokes § 9.1.7 which allows termination in accordance with § 5.1. Thus, my focus is on the latter section.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  15

21    It is not clear from the copies of the Agreement provided to me that certain of what I have represented above as commas are not actually periods. No one has suggested as much nor is this punctuation an issue in this dispute.

22    Kotler was the main lawyer acting in this matter for Quaker who was a client of Silverang. Quaker's parent Progress had been Silverang's client since 1991, and he had been a member of its board of directors. Silverang became counsel to Quaker after it was acquired by Progress. Kotler and Silverang are no longer partners, Kotler having resigned from Buchanan Ingersoll in May 2001 to join Duane Morris.

23    Silverang stated that because the Portfolio was voluminous and would have taken a substantial period of time to manually review, access to a purportedly existing database was intended to shortcut the process. This testimony is at odds with that of Lawall whose one concession to Quaker's due diligence rights was to grant Quaker the right to physically examine the leases set forth in Schedule 1.1 to verify that they indeed existed, and Quaker's actual due diligence where lease files were physically reviewed, not accessed electronically.

24    When asked what the significance of these items were, Silverang stated that they related to some of the specific representations that had been made to Quaker as oral inducements to consider the Portfolio, and it wanted the ability to specifically focus on them in addition to other due diligence rights. Trans. 1/29/03 at 24. This response is puzzling. If Quaker had an unlimited right of due diligence, it would not have needed to identify specific areas. Moreover, if it wanted to single out specific areas, why didn't it identify the specific representations that it now indicates were at the heart of the transaction. According to Quaker, it was the quality of the underwriting (and its belief that it had improved based on representations to that effect) that was of greatest concern.

     Silverang's explanation is also belied by the structure of the Due Diligence Provision. First, the use of the connecting "and" after the first clause ("investigate the Purchased Assets") is unusual since the first and second of three equal clauses are generally separated by a comma (a, b and c, not a and b and c). Silverang's interpretation would have make sense if the Agreement read as follows:

     For [the period within twenty (20) days after the entry of the Deposit Order by the Bankruptcy Court] fourteen days from the date hereof, Purchaser shall be entitled, upon reasonable request, through its employees and representatives, to perform an investigation of the Purchased Assets to ensure, inter alia, that (i) the accounts receivable have been timely and correctly presented, (ii) the Leases are enforceable in accordance with their terms and (iii) the Equipment was delivered and accepted in accordance with the terms of the Leases and to access Seller' computer software and databases to determine the accuracy of Schedule 1.1 hereto [ ]. Any such investigation and review shall be conducted at reasonable times and under reasonable circumstances.

25    A close review of Silverang's testimony indicates that his view is based on the client's reaction to the initial draft of the agreement, Exhibit P–7. Trans. 1/29/03 at 34–35. Similarly Kotler's contention that the limitation on due diligence would be a deal breaker also related to Lawall's original concept of due diligence. Trans. 1/27/03 at 96. I have already noted that Lawall's attempt to circumscribe Quaker's due diligence in the manner memorialized in that draft (*i.e.,* to investigate the Purchased Assets solely to verify Schedule 1.1) was clearly rejected by the subsequent draft. Thus, his client's refusal to accede to due diligence as contained in the initial draft is not the relevant consideration. There does not appear to be any contemporaneous evidence that sheds light on Quaker's view of the ultimate language.

26    I am also not persuaded that because Debtors fully cooperated with Quaker, providing unfettered access to information on the date of the Due Diligence Investigation that they can be held to have expanded the scope of the permitted due diligence that would justify termination under the terms of the Agreement. I assume this evidence was elicited to prove that Debtors had the same view of the Due Diligence Provision that it had. I conclude it proves nothing more than during the brief Due Diligence Investigation, the Debtors were cooperative. Moreover, I do not conclude that Shapiro's provision of financial documents to the due diligence team at the inception of the site visit evidences that Kennedy had not seen them previously as Quaker argues. While unable to fix the date, Kennedy ultimately did not dispute having reviewed the 10K public documents prior to execution of the Agreement. Rather he stated that he found them to contain stale information that needed to be brought current during the due diligence review.

27    Kennedy testified in the broadest of terms about the purchase price.

     Q. How is it that Quaker arrived at a purchase price of $9,570,000.

     A. I am going to assume that we weighted various components, various ages of the portfolio, and created discounts off of that gross receivable to come to this number.

     Q. And when you say you're going to assume, I mean do you have any personal knowledge as to how Quaker arrived at the price?

     A. I know that I was doing some hand – I'm sure that I was doing some hand calculations myself to—you know, how I saw some methodology.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   16

Trans. 1/24/03 at 152. Those hand calculations are evidenced as notations on a document prepared and provided to Quaker by Debtors setting forth the Lease Receivable Balance as of March 31, 1998. Exhibit D–31 and Exhibit P–4. This document was part of the financial package that Lawall transmitted to Kennedy on April 17, 1998. Exhibit P–6. Kennedy did not indicate when he made these calculations but since they were made to determine the purchase price and the price calculated, $9,509,000, was set forth in the second draft of the letter of intent dated May 18, presumably they were done between April 17 and May 18. In the most informal manner, belying the notion that this was a big transaction for Quaker or that if it were, he viewed the Agreement as a committed obligation, Kennedy has scribbled some numbers in the margins of the document. According to his testimony, he took the total receivables in each category and applied different discount rates as well as made further adjustments for risk and present value. Trans. 1/24/03 at 153. He stated (and the document appears to confirm) that he used a 25% discount rate for the receivables aged 91 plus days. It looks like he affixed a $983,000 value to them before making some additional adjustments. Since the total receivables in this category were stated at $5.3 million, presumably other adjustments were factored in since it appears that $983,000 represents a 18.55% discount. Notably Kennedy notes three "issues" in his marginal notes, one of which is "91+break out." Thus, it would appear that by May 18, 1998, some two months before the Agreement was executed, Kennedy recognized an issue with the 91 plus days receivables. However, no one asked him to explain what was on his mind at this point. At least one of these calculations aggregated $9,509,000, the price in the Agreement. How the price set forth in the original letter of intent, *i.e.,* $9,169,000, was calculated and why it was increased was never explained.

28 The Trustee contends that Quaker's disenchantment with the Portfolio was attributable to its national scope and the attendant requirement of compliance with many new state regulations that it, as a regional leasing company, had never dealt with. While Mark agreed that was one of the basis for his termination decision, it does not appear to be the only one or for that matter, the most important one.

29 The accountant Lonker also noted the low Fair Isaacs scores.

30 This does not mean that collection efforts would cease although at this point they may become counterproductive if the costs of collection exceed the potential recovery. *Id.* at 40, 444 A.2d 659. According to Kropschot that break even point occurred with a receivable of about $5,000 unless counsel was retained on a contingent fee basis. Walnut sent its collections to LOWS, a captive law firm that billed for its time and costs on other than a contingent fee basis. How that affected the cost/benefit analysis of collecting these old receivables was not established.

31 Small ticket companies affiliated with banks typically write off leases after 90 days while two of the small ticket lessors who do business similar to Walnut wrote off leases after 120 days and 150 days respectively.

32 Kropschot reviewed overall statistics prepared by the credit rating agency Fitch in connection with an analysis of over 100 lease securitizations, the majority of which involved small ticket leases. In the year 1998, the percentage of accounts in these securitizations that were over 90 days past due ranged from .4% to 1%. *Id.* at 40, 444 A.2d 659.

33 Nor does the Agreement require that the receivables be presented according to GAAP.

34 While he could not recall when he reviewed them, it would appear that he did so before the on-site investigation.

35 Even prior to his due diligence visit and without regard to the actual delinquency information he uncovered, Wheeler was advising Marks that he was not in favor of the transaction because of the large number of Receivables over 90 days old.

36 As best as I can analyze the available information, it appears that delinquent leases are referred to counsel on the 91 st day after payment is due and unpaid. Exhibit P–224 at 12. If a hypothetical aging was prepared as of July 1998 (the date of the New Legal Report), the lease that "went legal" in 8/97 would have been 15 months old. The leases referred to legal collection in July 1998 would have been 3 months old. All of these leases would be reported in the 91 day plus category and more than half of them would be over 180 days old. However, this assumes something neither stated nor reasonable to conclude, *i.e.,* that the leases referred to legal counsel during the year period of the New Legal Report remained uncollected as of July 1998.

37 Indeed this document appears more enlightening than the data that Kennedy summarized in his report to Marks. It does show collections and write-offs each fiscal year from 1993 to 1997. Moreover, it states in footnote that "[t]here are no ELCOA receivables in legal status originating from the 1992 fiscal year." This document was sent to Kennedy by Brulenski by facsimile on April 24, 1998. Exhibit P–8. The transmittal memo states:

Per your request. Please find an updated version of legal account activity for ELCOA now dated back to fiscal year 1993.

If you have any questions or need further information please don't hesitate to ask.

There was no request for further information or questions asked. Kennedy acknowledged his review of the information from the notations on the document in his hand. He was not asked to explain his notations.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.   17

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   18

# EXHIBIT 6

579 Fed.Appx. 319
This case was not selected for
publication in West's Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

VOLUNTEER ENERGY SERVS., INC.,
Plaintiff–Appellee/Cross–Appellant,
v.
OPTION ENERGY, LLC, a Michigan Limited
Liability Company, jointly and severally,
Defendant–Appellant/Cross–Appellee,
and
Jonathan Rockwood, et al., Defendants.

Nos. 13–1035, 13–1087.
|
Aug. 5, 2014.

**Synopsis**
**Background:** Natural gas supplier with principal offices in Ohio brought action against Michigan alternative energy broker for breach of contract and tortious interference with business relationships. Broker countersued, alleging that supplier breached the contract by failing to pay commissions and thus violated Michigan Sales Representative Commission Act (SRCA). The United States District Court for the Western District of Michigan, 2012 WL 3545283, awarded damages to supplier for lost profits but also determined that supplier breached the contract by failing to pay commissions and awarded exemplary damages to broker under Ohio law. Both parties appealed.

**Holdings:** The Court of Appeals, Boggs, Circuit Judge, held that:

[1] nonsolicitation clause in contract applied during term of agreement as well as a period thereafter, under Ohio law;

[2] nonsolicitation clause in contract applied to all customers, under Ohio law;

[3] supplier provided sufficient evidence of lost profits, for purposes of damages award, under Ohio law;

[4] broker's solicitation of supplier's customers on behalf of a competitor did not constitute tortious interference with business relationships, under Michigan law;

[5] broker was entitled to exemplary damages award, under Ohio law; and

[6] amendment of judgment to provide for ongoing commissions payments was not an abuse of discretion.

Affirmed.

West Headnotes (12)

**[1]** **Contracts**
👉 Restriction of competition

Agreement between natural gas supplier and alternative energy broker was ambiguous, under Ohio law, where unartfully drafted nonsolicitation clause was susceptible of no reasonable interpretation as to when broker was prohibited from soliciting supplier's customers.

Cases that cite this headnote

**[2]** **Contracts**
👉 Restriction of competition

Ambiguous nonsolicitation clause in contract between natural gas supplier and alternative energy broker would not be construed against drafter, under Ohio law, since the agreement did not involve unequal bargaining power.

Cases that cite this headnote

**[3]** **Contracts**
👉 Duration of Contract in General

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Under Ohio law, ambiguous nonsolicitation provision of contract between natural gas supplier and alternative energy broker applied both during the term of the agreement and for a period thereafter.

Cases that cite this headnote

**[4]** **Contracts**
   👉 Restriction of competition

Under Ohio law, agreement between natural gas supplier and alternative energy broker that prohibited the solicitation of "customers" prohibited the solicitation of any customers, including broker's preexisting customers.

Cases that cite this headnote

**[5]** **Damages**
   👉 Loss of profits

Natural gas supplier provided sufficient evidence of lost profits, for purposes of damages award in breach of contract action under Ohio law, where supplier's witness testified from personal knowledge and explained that annual-load estimate on which he relied reflected the annual historical natural gas usage of each customer that had been improperly transferred by broker.

Cases that cite this headnote

**[6]** **Federal Courts**
   👉 Failure to mention or inadequacy of treatment of error in appellate briefs

Federal appellate court would not consider tortious interference claim brought by natural gas supplier against alternative energy broker that was not preserved or addressed on appeal.

Cases that cite this headnote

**[7]** **Federal Courts**
   👉 Contracts

Federal district court's determination of tortious interference claim brought by natural gas supplier against alternative energy broker

would be reviewed for clear error, where supplier's argument reflected a different view of the facts rather than a different view of the law.

Cases that cite this headnote

**[8]** **Torts**
   👉 Business relations or economic advantage, in general

Alternative energy broker did not act with malice when it solicited natural gas supplier's customers on behalf of a competitor, so as to support determination of tortious interference with business relationships under Michigan law, where it acted for business reasons.

Cases that cite this headnote

**[9]** **Torts**
   👉 Business relations or economic advantage, in general

Alternative energy broker that induced termination of at-will agreements between natural gas supplier and its customers did not engage in unlawful conduct, so as to support determination of tortious interference with business relationships under Michigan law.

Cases that cite this headnote

**[10]** **Federal Courts**
   👉 Matters of Substance

Natural gas supplier that expressly argued before federal district court that it was not liable for exemplary damages under Ohio statute governing unpaid commissions, preserved the issue for purposes of appeal.

Cases that cite this headnote

**[11]** **Damages**
   👉 Particular cases in general

Natural gas supplier that deliberately withheld commissions from alternative energy broker as setoff against alleged breach of contract deviated from its clear duty to pay commissions, warranting exemplary

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 2

damages award under Ohio law. Ohio R.C. § 1335.11(C, D).

Cases that cite this headnote

[12]  **Federal Civil Procedure**
👈 Justice;prevention of injustice

District court did not abuse its discretion in amending judgment in breach of contract action to provide for ongoing commissions payments to alternative energy broker as provided in agreement with natural gas supplier in order to prevent manifest injustice, even if broker had failed to raise the claim in earlier proceedings; agreement plainly provided for ongoing commission payments and the original judgment did not account for them. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

6 Cases that cite this headnote

**\*320** On Appeal from the United States District Court for the Western District of Michigan.

Before: MERRITT, BOGGS, and STRANCH, Circuit Judges.

**Opinion**

BOGGS, Circuit Judge.

This case involves a contract dispute between Volunteer Energy Services, Inc. ("Volunteer"), a natural-gas supplier that is incorporated and has its principal offices **\*321** in Ohio, and Option Energy, LLC ("Option"), an alternative-energy broker that is organized in Michigan. The two companies entered into an Agent Agreement ("Agreement") on February 2, 2009, in which Option agreed to procure customers for Volunteer in exchange for commissions. During the life of the contract, Volunteer learned that Option was soliciting Volunteer customers and transferring them over to another supplier. Volunteer, in turn, withheld commissions due Option. Option eventually terminated the Agreement, effective April 21, 2011.

On May 27, 2011, Volunteer sued Option in federal district court in Michigan, claiming that Option breached its contract with Volunteer by transferring Volunteer's customers over to a competitor, and that Option and two of its executives, including its owner, president, and CEO Jonathan Rockwood, tortiously interfered with Volunteer's business relationships, in violation of Michigan law. Option countersued, claiming, as relevant to this appeal, that Volunteer breached the contract by failing to pay Option the commissions that it had earned, and that, in so doing, Volunteer violated the Michigan Sales Representative Commission Act ("SRCA"), Mich. Comp. Laws § 600.2961.

The parties filed cross-motions for summary judgment, and the district court ruled that a key disputed provision in the Agreement—the non-solicitation/non-compete clause ("non-solicitation clause")—was ambiguous. In particular, it was unclear whether the clause prohibited Option from soliciting Volunteer's customers a) both during the term of the Agreement and for a period of time following its termination or, alternatively, b) only following the termination of the Agreement. The court held a bench trial to resolve the ambiguity, which it resolved in favor of Volunteer, finding that, given the parties' conduct and the communications between them during the course of their business relationship, the parties intended that the non-solicitation provision also apply during the term of the Agreement. Option thus breached the contract by transferring some of Volunteer's customers over to a competitor while the Agreement was still in effect. The district court awarded $509,000 in damages to Volunteer for lost profits. The court rejected Volunteer's tortious-interference claims, however, as unsupported by the evidence: Volunteer "ha[d] shown nothing more than a breach of contract by the corporation, not a separate tort of tortious interference." *Volunteer Energy Servs., Inc. v. Option Energy, LLC,* No. 1:11–CV–554, 2012 WL 6084158 at \*10 (W.D.Mich. Dec. 6, 2012), *judgment amended,* 2013 WL 1500433 (W.D.Mich. Apr. 10, 2013).

In addition, the district court found that Volunteer, too, had breached the contract by failing to pay the commissions that it owed Option. In addition, the court found that Ohio's sales-commission statute, Ohio Rev.Code § 1335.11, rather than Michigan's SRCA, properly applied to Option's claim for unpaid commissions, and, in accordance with the Ohio statute, the court awarded Option $159,000—treble damages for

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

the commissions not paid. Because the contract required Volunteer to continue to make certain payments following the termination of the Agreement, the court also ordered, in an amended judgment, that Volunteer continue to make those commission payments as they come due.

Both sides appealed. Option asserts two claims. First, Option claims that it was entitled to summary judgment on the breach-of-contract claim because the non-solicitation clause was unambiguous: it applied only after the termination of the Agreement and only to Volunteer customers that had not previously been recruited **\*322** by Option. Second, Option claims that the district court erred in awarding Volunteer anything other than nominal damages because Volunteer failed to prove lost profits with reasonable certainty. In its cross-appeal, Volunteer argues that it adequately proved its tortious-interference claims below, that Option was not entitled to treble damages for the unpaid commissions, and that Option had forfeited or waived any claim to ongoing commission payments.

We affirm the district court in all respects.

## I

## A

## 1

Option's first claim is that the contract's non-solicitation clause was unambiguous and prevented Option from soliciting Volunteer's customers only once the Agreement was terminated.

Under Ohio law, "[t]he role of courts in examining contracts is to ascertain the intent of the parties." *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 763 (6th Cir.2008) (internal quotation marks omitted). "[C]ourts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement." *Shifrin v. Forest City Enterprises, Inc.,* 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992). The interpretation of that language, including the determination of whether it is ambiguous, is a matter of law for initial determination by the court. *Savedoff,* 524 F.3d at 763. "Contractual language is ambiguous only where its meaning cannot

be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Ibid.* (citations and internal quotation marks omitted). "[W]here the written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 797 N.E.2d 1256, 1262 (2003). Otherwise, "[i]t is generally the role of the finder of fact to resolve ambiguity." *Ibid.*

Since the question whether the contract was ambiguous is a question of law, we review the district court's ruling on the issue de novo.

The non-solicitation clause in the Agreement reads, in relevant part, as follows:

> **For the term of this Agreement and for** the longer of (a) **one year after the Termination Date** (defined below) or (b) to Agent following termination, as set forth in Section 10, **Agent agrees that it will not** (1) employ any VESI [Volunteer Energy Services, Inc.] employee without VESI's prior written consent or solicit or attempt to induce any VESI employee to become its employee or the employee of any VESI competitor or customer; and/or (2) **solicit existing customers at the time of the termination date of VESI** (including those of VESI's affiliates) in the Territory regarding the purchase of natural gas by any such customer.

(emphasis added). The highlighted portion of the Agreement, read grammatically, states: "For the term of this Agreement and for one year after the Termination Date, Agent agrees that it will not solicit existing customers at the time of the termination date of VESI." Volunteer argues that the phrase "for the term of this Agreement" means that Option was not allowed to solicit Volunteer customers both during the term of the Agreement and for a period following its termination. Option argues that **\*323** the phrase "existing customers at the time of the termination date" means that the non-solicitation provision only took effect once the contract was terminated. Option also argues that, since Volunteer drafted the Agreement, any ambiguity should be construed against Volunteer. The district court determined that the apparently conflicting language —"for the term of this Agreement" and for a time thereafter, on the one hand, and "at the time of the termination date," on the other, rendered the contract

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

ambiguous. It therefore held a bench trial and determined the contract's meaning based on extrinsic evidence, finding that the parties intended that the non-solicitation provision apply during the term of the Agreement and for a time thereafter, not just following termination.

**[1]** We agree with the district court that the contract's non-solicitation clause was ambiguous: at the outset, it states that the provision applies "for the term of this Agreement" and for a period thereafter, and in the body, it states that the provision applies "at the time of the termination date." Option argues that the words "for the term of this Agreement" apply only to the first sub-clause (prohibiting Option from soliciting Volunteer employees), and that the language "at the time of the termination date" applies only to the second sub-clause (prohibiting Option from soliciting Volunteer customers). But such an interpretation would contravene the structure of the provision, which plainly applies the limitation "for the term of this Agreement" to both sub-clauses, not just the first. Both Volunteer's and Option's interpretations emphasize certain language to the exclusion of other language. We conclude that the inartfully drafted provision is susceptible of two reasonable interpretations—or, perhaps more accurately given its self-contradictory language, that it is susceptible of *no* reasonable interpretation—and that the contract is therefore ambiguous as to when Option was prohibited from soliciting Volunteer customers.

**[2]** Option argues that any ambiguity should nonetheless be construed in its favor since Volunteer drafted the contract. But Option does not acknowledge that the *contra proferentem* doctrine to which it alludes applies only "where the written contract is standardized and between parties of unequal bargaining power." *See Westfield Ins. Co., 797 N.E.2d at 1262.* The prototypical cases to which this doctrine applies are those involving insurance contracts with individual consumers. *See, e.g., Cincinnati Ins. Co. v. CPS Holdings, Inc., 115 Ohio St.3d 306, 875 N.E.2d 31, 34 (2007)* ("Ambiguity in an insurance contract is construed against the insurer and in favor of the insured."). Option does not claim that its contract with Volunteer involved the kind of "unequal bargaining power" that is often inherent in a contract of adhesion, and the facts do not appear to support such a conclusion. Accordingly, we reject Option's invitation to construe the ambiguity against Volunteer.

**[3]** Option does not contest the district court's factual findings made in an effort to resolve the ambiguity that it perceived. We thus affirm the district court's determination that the non-solicitation provision should be read to apply both during the term of the Agreement as well as for a period thereafter.

## 2

Option also claims that the provision preventing the solicitation of "existing customers" refers only to customers that are not "Agent Customers," and that, therefore, the solicitation of Agent Customers would not have constituted a breach of the Agreement. The contract defines "Agent **\*324** Customers" to include customers brought to Volunteer by Option and to exclude those with whom Volunteer already had a relationship prior to the date of the Agreement. The contract does not define the terms "customers" or "existing customers."

**[4]** We reject Option's argument that the term "customers" excludes "Agent Customers." In general, "common, undefined words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or some other meaning is clearly evidenced from the face or overall contents of the instrument." *State ex rel. Petro v. R.J. Reynolds Tobacco Co., 104 Ohio St.3d 559, 820 N.E.2d 910, 915 (2004)* (citations and internal quotation marks omitted). Where the Agreement prohibits the solicitation of "customers," it refers to *any* customers, and cannot be read as an attempt to designate a particular subset of customers. Such a construction would read into the Agreement an ambiguity that does not exist. *See Swartzentruber v. Wee–K Corp., 117 Ohio App.3d 420, 690 N.E.2d 941, 945 (1997)* ("[C]ourts should refrain from reading ambiguity into an agreement where it does not otherwise exist."). Nor would such a construction make sense: of all the customers Volunteer would have been concerned about losing to a competitor, it would have been most concerned about losing Agent Customers—i.e. those customers with whom Option already had a preexisting relationship. For that reason, it would make little sense for the non-solicitation provision to have excluded Agent Customers. As the district court concluded: "There is no ambiguity in the meaning of the term 'customers' as it is used in the Agent Agreement. Agent Customers are the Volunteer customers that were solicited by Option. Agent Customers are a

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 5

subset of Volunteer's customers." *Volunteer Energy Servs., Inc. v. Option Energy, LLC,* No. 1:11–CV–554, 2012 WL 3545283 at *5 (W.D.Mich. Aug. 16, 2012).

**B**

Option's second claim on appeal is that Volunteer failed to establish its damages from lost profits with reasonable certainty.

Under Ohio law, whether evidence is too speculative to prove profits with reasonable certainty is a determination to be made by the trial court. *Illinois Controls, Inc. v. Langham,* 70 Ohio St.3d 512, 639 N.E.2d 771, 783 (1994). In Ohio courts, "[s]uch a determination will not be reversed on appeal absent an abuse of discretion." *Ibid.* Since whether lost profits were proved with reasonable certainty requires weighing the evidence presented to the trial court, we treat the issue as a factual determination by the trial court and review it as such. Under the federal standard of appellate review, which is analogous to that of the state courts in this instance, "[w]e will not set aside the district court's findings of fact unless we find them to be clearly erroneous." *O'Sullivan Corp. v. Duro–Last, Inc.,* 7 Fed.Appx. 509, 513 (6th Cir.2001). The clear-error standard is met "if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Stryker Corp. v. XL Ins. Am.,* 735 F.3d 349, 354 (6th Cir.2012) (citations and quotation marks omitted).

Under Ohio law, "in order for a plaintiff to recover lost profits in a breach of contract action the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *City of Gahanna v. Eastgate Props., Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 818 (1988). "There must be more than a conclusory statement as to the amount of lost profits. An explanation of how that sum was determined **\*325** is required. Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." *Rhodes v. Rhodes Indus., Inc.,* 71 Ohio App.3d 797, 595 N.E.2d 441, 448 (1991) (internal citations omitted).

Option argues on appeal, as it did below, that Volunteer's evidence was insufficient because it was based on the conclusory and unsupported statements of Volunteer Vice President Shawn Hall as to a) the annual load of natural gas purchased by the customers switched by Option and b) the $1.20–per–mcf (1,000 cubic feet) profit margin that Volunteer would have earned on those forgone sales. Option cites *Kinetico, Inc. v. Indep. Ohio Nail Co.,* 19 Ohio App.3d 26, 482 N.E.2d 1345, 1350 (1984), in support of its argument, a case in which the appellate court reversed the trial court's damages award for lost profits. The appellate court found that the witness at trial did not testify from personal knowledge as to the "sales quotas" on which he relied, nor could he explain how the quotas were arrived at or why they were reliable sales estimates. *Id.* at 1349. The court also noted that the witness testified that the "net margin" estimate used to calculate lost profits was "not profit," and instead, that profit would have been "a very small portion" of that estimate. *Ibid.*

**[5]** As the district court explained, this case is materially distinguishable from *Kinetico.* Volunteer's witness testified from personal knowledge and explained that the annual-load estimate on which he relied reflected the annual *historical* natural-gas usage of each of the transferred customers. Volunteer's summary-judgment motion included an exhibit that listed each of those transferred customers individually along with that customer's annual natural-gas usage. Thus, unlike the unexplained estimates in *Kinetico,* the estimates here were rooted in concrete and uncontested historical fact. Also, unlike the margin calculation in *Kinetico,* Volunteer's witness here explained the calculation behind the profit-margin figure and why that figure was appropriate. Moreover, as the district court noted, Option "essentially opted not to cross-examine Mr. Hall on the issue of damages." *Volunteer Energy,* 2013 WL 1500433 at *3. Option continues to point to no evidence on appeal that would indicate that the district court should not have relied on Hall's estimates. Thus, we cannot say that the district court clearly erred in finding that profits were proved with reasonable certainty.

**II**

**A**

**[6]** We turn to Volunteer's claims, first addressing its tortious-interference claims. Volunteer originally asserted tortious-interference claims against a) Option, b) Jonathan Rockwood, the sole owner, president, and CEO of Option, and c) Ivan Pillars, another Option executive.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

The parties stipulated to the dismissal of the claim against Pillars, and the district court entered judgment in favor of Rockwood on Volunteer's tortious-interference claim against him. It is unclear from the record how the tortious-interference claim against Option itself was resolved, but we can reasonably conclude that that claim, too, was denied: First, the facts giving rise to a claim against Rockwood are the same as those underlying any claim against Option. Second, no judgment was entered in favor of Volunteer on the claim. And third, Volunteer does not appear to assert an independent claim against Option on appeal. Since Volunteer's tortious-interference claim against Option was not preserved or addressed on appeal, we decline **\*326** to consider any such claim. That leaves the claim against Rockwood.

Option argues that, because Volunteer failed to name Rockwood in the notice of cross-appeal that it filed, its claim against him was not adequately preserved. We need not decide whether Volunteer adequately preserved its claim against Rockwood because, in any event, we affirm the district court's denial of that claim on the merits.

**[7]** As a threshold matter, we address the appropriate standard of review. Volunteer contends that the district court's ruling on the claim is a question of law, which we review de novo. Second Br. of Appellee at 38. Option counters that Volunteer's claim challenges the district court's factual findings and should therefore be reviewed for clear error. Third Br. of Appellant at 12. The essence of Volunteer's argument is that, in transferring customers away from Volunteer, Rockwood sought "retaliation" and "self-serving profits" and acted with "a malicious intent to harm." Second Br. of Appellee at 39, 41. Because this argument reflects a different view of the facts rather than a different view of the law, we review the district court's determination for clear error. *See Tackett v. M & G Polymers USA, LLC,* 733 F.3d 589, 595–96 (6th Cir.2013) ("After a bench trial, we review the district court's factual findings for clear error."). Again, the clear-error standard is met "if, based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Stryker Corp.,* 735 F.3d at 354 (citations and quotation marks omitted).

"Under Michigan law, a claim of tortious interference with [a] business relationship requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant;

(3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship or expectancy; and (4) resulting damage to the plaintiff." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n,* 623 F.3d 281, 286 (6th Cir.2010). "The third element of this tort requires the plaintiff to demonstrate that the third party was induced either to breach the contract or to break off the prospective business relationship by an intentional act that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law." *Id.* at 287 (citations, quotation marks, and internal alteration marks omitted). "A 'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac,* 166 Mich.App. 772, 421 N.W.2d 289, 293 (1988). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Erickson's Flooring & Supply Co. v. Tembec, Inc.,* 212 F. App'x 558, 566 (6th Cir.2007) (citations and quotation marks omitted). A plaintiff "must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference." *Formall,* 421 N.W.2d at 292–93. "[T]he interference with a business relationship must be improper in addition to being intentional. Improper means illegal, unethical, or fraudulent." *Ibid.*

The district court accurately recited the legal standard for tortious interference and concluded that "the evidence does not support a finding of tortious interference," as Volunteer "has shown nothing more than a breach of contract by the corporation, not a separate tort of tortious interference." *Volunteer Energy,* 2012 WL 6084158 at *10. The district court did not explain further why its findings of fact did not rise to the level of tortious interference. **\*327** In its findings of fact, however, it identified no malice on Rockwood's part, nor did it indicate any "illegal, unethical, or fraudulent" behavior. On the contrary, the court recognized that Option encountered numerous difficulties in the course of its relationship with Volunteer that precipitated its decision to switch customers over to a competitor:

> Option switched customers ... because Rockwood was not satisfied with ... aspects of Option's relationship with Volunteer, including Volunteer's failure to promptly and efficiently enroll

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

customers Option brought in, Volunteer's failure to communicate pricing information, Volunteer's failure to offer a fixed rate program, Volunteer's failure to pay commissions on a timely basis, Volunteer's failure to offer a higher commission rate, and Volunteer's failure to offer a contract more similar to Option's contract with Integrys, which specified that Option could place the interest of its customers before those of the supplier.

*Id.* at *7.

**[8]** Volunteer does not identify any erroneous findings of fact by the district court. Rather, it asks us to read malice into Option's breach of its contract with Volunteer and its decision to solicit Volunteer's customers on behalf of a Volunteer competitor. The record, however, does not support any such inference: Rockwood acted for business reasons, not out of malice.

**[9]** In addition, Volunteer acknowledges that its customers' contracts were terminable at will. Under Michigan law, one who, for competitive reasons, causes a third party not to continue with a contract that is terminable at will, ordinarily "does not interfere improperly with the other's relation." *Feldman v. Green,* 138 Mich.App. 360, 360 N.W.2d 881, 890 n. 2 (1984). Given that Volunteer does not claim that Rockwood induced a breach—as opposed to termination —of agreements between Volunteer and its customers, Rockwood's conduct does not appear to have been unlawful. Volunteer argues that, under *Tata Consultancy Servs. v. Sys. Int'l, Inc.,* 31 F.3d 416, 424–25 (6th Cir.1994), even contracts terminable at will can give rise to a tortious-interference claim. *Tata* dealt with the related but distinct tort of tortious interference with contract, not with a business relationship. But even if that distinction is immaterial, *Tata* suggested only that a claim may be sustained where a contract is terminable at will if other behavior by the defendant constitutes wrongful interference. *Ibid.* Here, Volunteer appears to argue that Rockwood's purported malice and greed supply this missing element, but as previously explained, the record does not support such a finding. [1]

The district court's findings of fact were not clearly erroneous, and the court did not err in concluding that those facts failed to prove the elements of a tortious-interference claim.

**B**

Volunteer next argues that the district court erred in awarding exemplary damages to Option for the unpaid commissions. *328 Option counters that this claim was not raised below and should therefore not be considered, and that, even had it been preserved, it has no merit, because the intentional withholding of commissions is sufficient to warrant treble damages under Ohio's sales-commission statute.

**[10]** We reject Option's argument that Volunteer's claim is not properly before us. Volunteer expressly argued below that it was not liable for exemplary damages under the Ohio statute, and the district court expressly ruled on the issue, holding that "Volunteer's decision to withhold commissions was willful" and "was not excused by Option's violation of the non-solicitation provision, or by a common-law right of set-off." *Volunteer Energy,* 2012 WL 6084158 at *10. Option's argument that Volunteer failed to raise its claim below is without merit.

**[11]** The parties agree that we review de novo the district court's conclusion of law as to the applicability of exemplary damages. Under the Ohio statute, a principal who fails to timely pay a sales representative all commissions due is "liable in a civil action for exemplary damages in an amount not to exceed three times the amount of the commissions owed to the sales representative if the sales representative proves that the principal's failure ... constituted willful, wanton, or reckless misconduct or bad faith." *Ohio Rev.Code Ann.* § 1335.11(D). The sales representative is also entitled to reasonable attorney's fees and costs. *Ibid.* Volunteer does not dispute that Option earned the commissions or that Volunteer's decision to withhold payment was deliberate. It claims, however, that because Option breached the Agreement, resulting in a damages award to Volunteer of $509,000, Volunteer's behavior in withholding the commissions cannot be construed as "willful misconduct." Instead, Volunteer argues that it was merely exercising

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

8

its common-law right of setoff to recover some of the damages that it was owed.

The cases Volunteer cites in support of its view are inapposite. Volunteer first cites *Miller v. Pennitech Indus. Tools, Inc.,* No. 2356–M, 1995 WL 230894, at *6 (Ohio Ct.App. Apr. 19, 1995), in which the appellate court held that the principal was entitled to present evidence in support of its claim for damages, reversing the trial court's grant of summary judgment to the sales representative. Here, whether Volunteer was entitled to prove its damages is not in dispute. *Miller*, which dealt with a predecessor statute, did not address the question whether intentionally withholding commissions was ever permissible. Volunteer also cites *R.E. Condit Co. v. Colston,* No. CA10375, 1987 WL 20254 (Ohio Ct.App. Nov. 18, 1987), in which the principal was entitled to an offset, but that case predated any statutory enactment on point and is therefore irrelevant.

The district court concluded that, although it was aware of no Ohio case addressing the issue, "a right of set-off would not be consistent with the statutory requirement that the principal pay 'all commissions due' within a strict time frame, or face liability for exemplary damages." *Volunteer Energy,* 2012 WL 6084158 at *10. The court also looked to the Michigan courts' interpretation of the parallel Michigan SRCA for guidance, noting that in *Peters v. Gunnell, Inc.,* 253 Mich.App. 211, 655 N.W.2d 582, 587 (2002), the Michigan Court of Appeals held: "Nothing in the SRCA suggests that it is necessary or proper for a principal to reduce commissions that are due by the amount of expenses that might later be deemed owed by a sales representative." *Ibid.* The district court concluded that Option was therefore entitled to treble damages.

 **\*329** Although it seems clear that Option would have been entitled to damages under the Michigan statute, whether it was entitled to damages under the Ohio statute is less clear. The language employed by the two statutes differs in one critical respect: whereas the Michigan statute imposes liability where the failure to pay is "intentional," the Ohio statute does so only where the failure to pay "constituted willful, wanton, or reckless misconduct or bad faith." *See* Mich. Comp. Laws § 600.2961(5)(b); Ohio Rev.Code Ann. § 1335.11(D). This distinction suggests that the standard for liability under the two statutes is different. In fact, the Michigan appellate court specifically distinguished the requirement of intent under the SRCA

from a requirement of, for example, bad faith: "The SRCA does not mention bad faith or any other mental state of a principal." *Peters,* 655 N.W.2d at 588.

The question, then, is whether, as the district court found, Volunteer's deliberate withholding of commissions owed constituted "willful misconduct" under the Ohio statute. The Ohio Supreme Court has defined "willful misconduct" to require intent both with respect to the conduct and with respect to its wrongful quality: "The word, 'wilful,' used in the phrase, 'wilful misconduct,' implies intent, but the intention relates to the misconduct and not merely to the fact that some specific act, such as operating an automobile, was intentionally done. The intention relates to the commission of wrongful conduct, independent of the intent to use certain means with which to carry out such conduct." *Tighe v. Diamond,* 149 Ohio St. 520, 80 N.E.2d 122, 127 (1948) (internal citations omitted). "Thus, 'willful' misconduct is 'an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury.' " *Hunter v. Columbus,* 139 Ohio App.3d 962, 746 N.E.2d 246, 252 (2000) (quoting *Tighe,* 80 N.E.2d at 127).

The Ohio sales-commission statute imposes a clear obligation on the principal to pay the sales representative in a timely manner upon termination of the contract:

> Upon the termination of a contract between a principal and a sales representative for the solicitation of orders for a product or orders for services, the principal shall pay the sales representative all commissions due the sales representative at the time of the termination within thirty days of the termination and shall pay the sales representative all commissions that become due after the termination within thirteen days of the date on which the commissions become due.

Ohio Rev.Code Ann. § 1335.11(C). The statute does not provide for a common-law right of setoff or any other exceptions to the principal's obligation. Accordingly, we conclude that the principal, Volunteer, had a "clear

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

duty" to pay the commissions, and that it "intentionally deviated" from that duty by refusing to pay them.

To be sure, not all intentional refusals to pay constitute "willful misconduct." For example, had Volunteer not paid Option because it believed—mistakenly—that no commission had been earned, its failure to pay, though intentional, would likely not have constituted willful misconduct. That is because, although Volunteer would have intended not to pay, it would not have intended conduct that would violate the statute i.e. it would not have intended to withhold a commission that had been earned and was owed. Here, Volunteer intended to withhold such a commission and did so.

**\*330** We agree that Volunteer's deliberate withholding of commissions constituted willful misconduct and affirm the district court's exemplary-damages award.

### C

Finally, Volunteer argues that, by failing to raise a claim to ongoing commission payments at trial, Option waived its right to such payments. Option moved the district court to amend its judgment to require such payments, and the court granted Option's motion. Volunteer asks that we reverse the district court's decision.

"[W]e generally review a grant or denial of a motion to alter or amend a judgment under Rule 59(e) for abuse of discretion." *ACLU of Ky. v. McCreary Cnty., Ky.,* 607 F.3d 439, 450 (6th Cir.2010). We review de novo questions of law raised by such a motion. *See, e.g., Johnson v. City of Memphis,* 617 F.3d 864, 867 (6th Cir.2010) (reviewing de novo a district court's grant of summary judgment following a Rule 59(e) motion).

"A district court may grant a timely Rule 59 motion to alter or amend judgment to correct a clear error of law; to account for newly discovered evidence or an intervening change in the controlling law; or to otherwise prevent manifest injustice." *Doran v. Comm'r of Soc. Sec.,* 467 Fed.Appx. 446, 448 (6th Cir.2012). Here, the district court held that, in view of the unambiguous requirement under the Agreement that Volunteer pay commissions for forty-eight months following termination, "it would be a manifest injustice not to amend the judgment to require the payment of additional commissions ... as

they come due." *Volunteer Energy,* 2013 WL 1500433 at \*5. The court determined that, although Option failed to specifically request declaratory relief in the form of continued payments, neither did it waive or relinquish its right to such payments. *Ibid.* The court also noted that Option may reasonably have assumed that the issue was not in dispute: Under the terms of the Agreement, Option was entitled to forty-eight months of commission payments following termination unless Volunteer terminated the Agreement for cause. The court found, and the parties do not dispute, that Volunteer did not terminate the Agreement for cause; rather, Option terminated the Agreement. As a result, the court correctly concluded that Volunteer was required to continue to pay Option commissions for forty-eight months following termination.

**[12]** Volunteer argues that the district court erred in granting Option relief because Option waived its claim to ongoing commissions by not raising the claim in earlier proceedings. Even if Option's omission did constitute waiver, however, that does not mean that the district court erred in granting Option's Rule 59(e) motion. "Deviation from the rule of waiver is permissible when application of the rule would result in a manifest injustice." *Fryman v. Fed. Crop Ins. Corp.,* 936 F.2d 244, 251 (6th Cir.1991). "In the appellate context, whether or not the circumstances of a particular case justify deviation from the normal rule of waiver is left largely to the discretion of the appellate court." *Ibid.* The discretion of a trial court to grant a Rule 59(e) motion in order to prevent manifest injustice is analogous. *Ibid.* Here, the trial court determined that manifest injustice would result in the absence of an amended judgment.

Volunteer makes no argument as to why the court's manifest-injustice determination was erroneous. That is, it does not explain why a judgment denying relief that is clearly owed under the parties' agreement would not constitute a "manifest injustice" worthy of the district court's corrective action. Our cases do not offer **\*331** clear guidance as to what qualifies as "manifest injustice," but the plain meaning of those words is instructive. Black's Law Dictionary defines the phrase "manifest injustice" to mean: "An error in the trial court that is direct, obvious, and observable, such as a defendant's guilty plea that is involuntary or that is based on a plea agreement that the prosecution rescinds." BLACK'S LAW DICTIONARY 982 (8th ed.2004). Of course, as the examples suggest,

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

more than a clear error is required; injustice must also result.

Here, the error was obvious—the Agreement plainly provided for ongoing commission payments and the judgment did not account for them. In addition, the error would have resulted in an injustice—i.e. a "wrong," "want of equity," or "unfairness"—in not giving Option its due "desert." *See* 7 Oxford English Dictionary 982, 8 Oxford English Dictionary 325–26 (2d ed.1989) (defining "injustice" as "[t]he opposite of justice; unjust action; wrong; want of equity, unfairness," and defining justice, in turn, as "[e]xercise of authority or power in maintenance of right; vindication of right by assignment of reward or punishment; requital of desert.")

In view of the foregoing, we hold that the district court did not abuse its discretion in amending its judgment and the substance of the amendment contained no legal error. Volunteer's request to reverse the amendment is denied.

**V**

In summary, as to Option's claims on appeal, we affirm the district court's determination that the contract was ambiguous and affirm its award of damages to Volunteer for lost profits, as the district court did not clearly err in finding that lost profits were established with reasonable certainty.

As to Volunteer's claims, we affirm the district court's judgment in favor of Rockwood on Volunteer's tortious-interference claims, affirm the exemplary-damages award on the ground that Volunteer's failure to pay commissions constituted "willful misconduct," and affirm the court's decision to require Volunteer to make ongoing commission payments to Option as they come due.

**All Citations**

579 Fed.Appx. 319

Footnotes

1    Again, to prove tortious interference, Volunteer must point to an intentional act that is either (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law. Volunteer cannot show that Rockwood acted maliciously. It is unclear whether Rockwood's breach of its contract with Volunteer qualifies as an act that is "wrongful per se" under Michigan law. It seems unlikely that a breach of contract would be considered an act "never justified under any circumstances." *See Formall, Inc.,* 421 N.W.2d at 293. Regardless, given that Volunteer does not make or develop any argument that Option's breach was wrongful per se, we decline to consider that possibility.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.