# EXHIBIT 6B

**Dobry Arbitration Award**

## STANLEY T. DOBRY, ESQ.
## ARBITRATOR, MEDIATOR & FACT FINDER

P.O. Box 1244
Warren, MI 48090-0244
Phone and Fax (586) 754-0840

8275 Comargo Road
Cincinnati, OH 45243-1411
Toll free (888) 817-8220

E-mail Dobry@NAArb.org

*Member: National Academy of Arbitrators — Naarb.org*

### AMERICAN ARBITRATION ASSOCIATION
### VOLUNTARY LABOR ARBITRATION TRIBUNAL

*In the Matter of the Arbitration between:*

**CITY OF DETROIT**

Employer

AAA Case no. 54 390 01013 11
Gr No. 31-11
City No. 11-273
Discharge of Bradley Smola

- and -

**DETROIT FIRE FIGHTERS ASSOCIATION**

Union

_____/

# ARBITRATOR'S OPINION AND AWARD

## I. APPEARANCES

*For the Union:*

Alison L. Paton, Esq.
Suite 700, Ford Building
615 Griswold Street
1650 First National Building
Detroit, Michigan 48226
( 313) 965-5000 (313) 886-3989
apaton5000@aol.com

*For the Employer:*

June Adams, Esq.
Supervising Assistant Corporation Counsel
City of Detroit
First National Building, Suite 1650
660 Woodward Avenue
Detroit, Michigan 48226
(313) 237-0540
adamj@detroitmi.gov

Dated: April 26th 2012

Page 1

## II. INTRODUCTION

The Employer is the City of Detroit (hereafter "City," "Department" or "Employer"). The Union is the Detroit Fire Fighters Association, IAFF Local 344 ("IAFF" or "Union"), which represents the non-civilian employees as specified in Schedule II of the Labor Agreement, including Fire Fighters, Fire Fighter Drivers, Fire Engine Operators, etc.

The parties are signatory to a Collective Bargaining Agreement (C.B.A.). The parties stipulated that the contract dated July 1, 1998 through June 30, 2001 is unchanged in all material respects, and controls this proceeding.

The arbitrator was appointed through the American Arbitration Association. Pursuant to that agreement and under its rules, an arbitration was conducted on January 18 and March 23, 2012 before the undersigned arbitrator. 30 exhibits were received. Five witnesses testified under oath or affirmation, namely: **Chris Huber** (Acting Lieutenant); **Fred Wheeler** (Deputy Commissioner); **Frank Morelli** (Midwest Medical, Senior Account representative, certified drug and alcohol screen technician); **Dan McNamara** (Union President) ; and **Bradley Smola** (grievant).

The parties had a full opportunity for examination, cross examination, and to present argument.

Post hearing briefs were filed and exchanged through the American Arbitration Association and the arbitrator.

The parties agreed on the issues to be decided, to wit:

**Did the employer violate the CBA when it denied Grievant a Last Chance Agreement? And If so, what shall the remedy be?**

**Was there just cause for the discharge, and if not, what shall the remedy be?**

Page 2

They also stipulated that the arbitrator may retain jurisdiction in the event of a dispute as to the meaning or application of the remedy, if any. They stipulated the matter is properly before the arbitrator for final and binding resolution, and that there are no procedural issues.

### III. OPERATIVE EVENTS

Acting on an anonymous tip, a Deputy Commissioner made a surprise visit to a fire station to investigate reports that Grievant drinks on the job.

Bradley Smola ("grievant") was hired January 25, 1999 by the City of Detroit as a firefighter with the Fire Department ("DPD"). Pursuant to the grievant drinking alcohol on the job and was intoxicated [testing confirmed this fact] on the job he was terminated according to the Department's Substance Abuse Policy. The employer contends that just cause existed to terminate the grievant's employment. While the grievant now contends that he is an alcoholic [after his termination] he never sought the assistance of the employer before his termination to address his problem with alcohol to ensure that it did not affect the safety of himself, the general public and his co-workers. hall, and he concluded that . The discharge was based on the Department's ordering the grievant to submit to a drug and alcohol test in the early morning hours of June 26, 2011, with the results being positive for alcohol; the results were negative for any drugs.

The grievant was transported to Midwest clinic and was tested for the presence of alcohol. Mr. Morelli did not conduct the test that was given to the grievant, he is a Senior Account Representative for Midwest Medical Center. Mr. Morelli, testified that the grievant was given an Evidential Breath Test to gauge the amount of alcohol in his system. The device from Lifeloc Technologies that is used for the test is

Page 3

cleaned and calibrated after each use. Based on the two tests, grievant's alcohol level

was .135 and the second test measured at .132.

The negotiated substance abuse policy states that a positive test of .04 or

more is discharge for the first offense.

The grievance challenges the discharge as improper and without just cause

in violation of Article 2(F) of the contract. The union claims:

1) The grievance was without "just cause" as required by the collective
bargaining agreement.

2) The discharge was based on an alcohol test that the grievant was ordered to
take in violation of the procedures required under the negotiated Substance Abuse Policy;

3) The discharge was contrary to the clearly established past practice of offering
last chance agreements to employees in similar circumstances (this is also a violation of
Article 2(G) and Article 14 of the contract);

4) The penalty of discharge was excessive given the grievant's length of seniority,
lack of any prior disciplinary record, his voluntary rehabilitation treatment, and the City's
failure to regard him as a "troubled employee" so as to allow him an opportunity to be
treated and rehabilitated in lieu of discharge.

## IV. RELEVANT CONTRACTUAL LANGUAGE

### 2. MANAGEMENT RIGHTS

A. The Union recognizes the prerogatives of the City to operate and manage its affairs in
all respects in accordance in accordance with its responsibilities and powers of authority,
consistent with the Charter, the Home Rule Act and the terms of this Agreements.
* * *

D. The Department reserves the right to discipline and discharge for just cause.
* * *

F. No employee shall be disciplined or discharged except for just cause.

G. It is agreed by the Department and the Union that the City and the Department
are obligated, legally and morally, to provide equality of opportunity, consideration
and treatment of all employees of the Department and to establish policies and
regulations that will insure such equality of opportunity, consideration and
treatment of all employees of the Department in all phases of the employment
process. [Emphasis added.]

Page 4

## 7. ARBITRATION

Any unresolved grievance having been processed fully through the last step of the grievance procedure may be submitted to arbitration by either party in accordance with the following:

B. **The Arbitrator shall limit his decision to the interpretation, application, or enforcement of this Agreement or to matters fairly inferable therefrom, and he/she shall be without power or authority to make any decision:** [Emphasis added.]

1. Contrary to, or inconsistent with or modifying or varying in any way the terms of this Agreement or of applicable law or Rules or Regulations having the force and effect of law.

2. **Involving the exercise of discretion by the City under the provisions of this Agreement, its Charter, or applicable law.** [Emphasis added.]

3. Limiting or interfering in any way with the powers, duties or responsibilities of the City under its Charter, applicable law, and rules and regulations having the force and effect of law.

4. Changing, altering, or modifying and practice, policy or rule presently or in the future established by the City so long as such practice, policy or rule does not conflict with this Agreement.

5. **Implying any restriction or condition binding upon the city from this Agreement, it being understood that, except as such restrictions or conditions upon the City are specifically set forth herein, or are fairly inferable from the express language of any Article or Section hereof, the matter in question falls within the exercise of the rights set forth in the Article of this Agreement entitled 'Management Rights'. . . .** [Emphasis added.]

7. **Providing agreement for the parties in those cases where, by their contract, they may have agreed that further negotiations should occur to cover the matters in dispute. . . .** [Emphasis added.]

G. There shall be no appeal from the decision of the Arbitrator if made in accordance with his jurisdiction and authority under this Agreement. It shall be final and binding on the Union, on all bargaining unit employees, and on the City. The Union will discourage attempts by any bargaining unit employee to appeal a decision of the Arbitrator to any court or labor board. . . .

K. In a case involving discipline or discharge, if the arbitrator decides that the punishment imposed was unduly harsh or severe under the circumstances he/she may vacate or modify the findings and punishment accordingly, and his/her decision shall be final and binding upon the parties and the affected employee.

9. . . .

C. Forfeitures: An employee shall forfeit his seniority only for the following reasons:

1. he/she resigns or quits;
2. he/she is discharged or permanently removed from the payroll and such separation is not reversed through the grievance procedure or other legal action.

### 25. SUBSTANCE ABUSE

The parties recognize that the use or possession of alcohol or controlled substances by employees while on City property or engaged in providing City services threatens the safety of employees and the public and is detrimental to the provision of fire services. Pursuant to the City's zero tolerance policy against alcohol and substances abuse, the parties agree that the penalties set out in Exhibit VIII shall apply to the listed offenses and shall not be changed unilaterally.

### EXHIBIT VIII
### CITY OF DETROIT AND DETROIT FIRE FIGHTERS ASSOCIATION

### RE: SUBSTANCE ABUSE DISCIPLINARY GUIDELINES

| OFFENSE | PENALTY | RETENTION PERIOD OTHER CONDITIONS OF EMPLOYMENT |
|---|---|---|
| Alcohol - testing .02. | 1st offense - 3 tours of duty suspension (24 hour employee) 1st offense - Referral to Personal Guidance Unit (PGU) | Three years for assessment and treatment as needed |
| Marijuana - testing positive without being involved in injury or damage to property | 2nd offense - discharge 2nd offense - See Substance Abuse Policy No. 10 | |
| Alcohol - testing positive .04 or more | 1st offense - discharge | None, unless the City exercises its Discretion to execute LCA, then five (5) years [1] |
| Alcohol - Drinking on duty | 1st offense - 29 day suspension | Three years  Referral to PGU. See Substance Abuse Policy No. 10 |

PENALTY GUIDELINES FOR VIOLATION OF THIS POLICY. In order that employees of the Department are on notice of the seriousness with which the Department regards violations of this policy, penalty guidelines are set forth above. These guidelines are designed to cover the most common infractions. They are not meant to be all inclusive. They are to serve as a guide to insure consistency and fairness in the treatment of employees. Moreover, settlement agreements/Last Chance Agreements may contain additional conditions of employment. [Emphasis added.]

---

[1] Emphasis added. Grievant was well in excess of 04. Note the language "unless the City exercises discretion to execute LCA."

# V. DISCUSSION

This is a grievance protesting a discharge. The question directly turns on whether there was "just cause" for tho decision to terminate Grievant's employment.[1] As indicated hereafter, safety concerns could affect such a proceeding.

At the outset, let it be noted that there is no question presented as to Grievant's intoxication. Grievant was intoxicated on the job. He was well over the standards set forth in the substance abuse policy.

Does that mean an automatic discharge from employment? Other real questions are whether that fact was somehow tainted by the employer disregard of the contract regarding the details of the method of tesint? Whether there are mitigating circumstances that should have affected the penalty imposed? And what would be the appropriate penalty and remedy?

---

[1] In such cases, there is a question of whether the employer proved the misconduct it alleged, and whether the penalty fits. In such matters, there can be questions of procedural due process, and consideration of mitigating and aggravating circumstances. In 1964, Arbitrator Carroll Daugherty attempted to crystalize the existing "common law" definition of just cause into seven independent tests. Some of them implicitly support the need for "due process" as part of any just cause analyses. These tests, in the form of questions, represent a generally accepted analysis of the just cause standard.

The seven tests articulated by Arbitrator Daugherty are summarized as follows:
1.    Notice: Did the Employer give to the employee forewarning or foreknowledge of the possible or probable consequences of the employee's disciplinary conduct?
2.    Reasonable Rule or Order: Was the Employer's rule of managerial order reasonably related to (a) the orderly, efficient, and safe operation of the Employer's business, and (b) the performance that the Employer might properly expect of the employee?
3.    Investigation: Did the Employer, before administering the discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?
4.    Fair Investigation: Was the Employer's investigation conducted fairly and objectively?
5.    Proof: At the investigation, did the "judge" obtain substantial evidence or proof that the employee was guilty as charged?
6.    Equal Treatment: Has the Employer applied its rules, orders and penalties even-handedly and without discrimination to all employees?
7.    Penalty: Was the degree of discipline administered by the Employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense, and (b) the record of the employee in his service with the Employer?

### Last Chance Agreements and alleged Discrimination

The union has especially and forcefully argued that management discriminated against Grievant, thereby violating Article 2, §7 (G). It does this by arguing that Grievant was involved even before the discharge in efforts at rehabilitation, and noted his lengthy seniority and prior clean disciplinary record. The Union compared a litany of employees who were discharged and then offered Last Chance Agreements.

On this record, it is undisputed that nearly every employee involved in substance abuse cases received a Last Chance Agreement. The only two exceptions were the Hood case (which was overturned by Arbitrator Girolamo) and the Damian Duff decision (which this arbitrator let stand).[3]

In part, there is a question of whether the employer's decision here was unfair or invidious discrimination. The Employer made a reasoned judgment based upon its good faith assessment of the severity of Grievant's misconduct, its belief that Grievant posed a danger to public safety and to his fellow employees.

The clauses stop far short of saying that every employee gets the benefit of a 'do over' through a Last Chance Agreement.

That the employer considered potential liability and public danger was far from irrational, given Grievant's serious drinking and intoxication while on the job. Obviously public officials have power or right to act (or not act) in certain circumstances according to personal judgment and conscience.[4]

---

[3] AAA Case no. 54 390 00847 11. That Grievant was a drunk driver of a fire truck who caused an accident, and also had a long history of DUIL offenses.

[4] See Garner, Bryan A., Ed. (1999) *Black's Law Dictionary* 7th Ed (St. Paul MN: West) pp. 10, 479,

The issue is definitely *not* whether the arbitrator would have granted the request for a Last Chance Agreement. Rather, it is whether the employer erred in making its decision. I review those decisions for an abuse of discretion. That would case mean a decision not based on facts and reason, provided there is a relationship between the facts proved and the conclusions reached.

Moreover, it is clear enough that the current administration of the fire department has broken ranks from its predecessors. It took a harder line on drinking and drunkenness on the job and in the firehouse.

I also note that the substance abuse policy directly recognizes and sanctions the use of last chance agreements. This was within the parties' contemplation and negotiating horizon.

Nevertheless, at its core, these are Management's rights, and are a matter for its discretion. A change in management can bring about a change in policy. These are all interests recognized under the CBA as being a protected interest, unless management has otherwise agreed to abrogate them under the CBA. Indeed, matters involving management's discretion are expressly insulated from arbitral review. Article 7(B)(2) and (7) makes it clear that these are managerial functions, and such decisions should not be usurped by the arbitrator.

The Arbitrator is powerless to make the agreement for them.

The Union's reading of Article 2(G) may be plausible in isolation. However, the arbitrator must consider those words in light of the entire agreement read as an integrated whole. It is from this broader reading that gives effect to management's retained sole discretion in granting or denying Last Chance Agreements.

I have reviewed the Hood decision by Arbitrator Joseph Girolamo.[5] Like

Mr. Hood, Grievant's "rehabilitation efforts were made known, but were apparently not

considered." The arbitrator held:

> "In view of the above considerations, I conclude the Grievant
> should have been offered a LCA. I understand that some
> individuals cited by the Union had more seniority than Mr. Hood
> and many of the cases arose several years prior to the matter
> herein. It does not appear that the Department ever announced a
> change in policy in regard to the availability of LCAs. Insofar as
> years of service are concerned, it has been noted that Mr. Hood
> had substantial tenure. Testimony at the Hearing suggested that
> Mr. Hood's situation was more aggravated than others who had
> been extended a LCA. Of significance here in the fact that Mr.
> Hood did engage in rehabilitation efforts prior to the date his
> request for a LCA had been denied.

> "Based on the above considerations, I conclude Mr. Hood
> should be reinstated subject to the terms of a LCA which the
> Employer has utilized in the past for situations involving substance
> abuse. I am unable to conclude that the Grievant should be
> awarded full back pay since it is not clear he would have fulfilled all
> terms of a LCA. In this case, back pay will be awarded from
> termination to date of reinstatement, provided Mr. Hood fulfills all
> terms of the LCA. No interest is awarded on the back pay if and
> when it is payable."

The Hood decision is appealing. Indeed, this arbitrator is sorely tempted

to apply its reasoning here. Principles of *stare decisis*[6] are not applicable to arbitration,

and that arbitrator and the writer are on the same level. Prior decisions are not

technically binding on subsequent arbitrators in unrelated cases. Of course,

considerations for stable labor relations suggest that prior decisions between the same

parties should be given due weight.

---

[5] AAA No. 54 390 00251 08.

[6] "stare decisis [Latin 'to stand by things decided'] The doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation." Garner, Bryan A., Editor in Chief. (1999) *Black's Law Dictionary* 7th Ed. (St. Paul MN: West Publishing), p. 1414.

Page 10

On the other hand, the terms of the prior Last Chance Settlements have weight. The parties' language must be the lodestar, and forces this arbitrator's conclusion on the point.

LCAs are specialized memoranda, trilaterally signed by the Employer, Union and the individual employees. They effectively amend to CBA, at least as to the affected employee. The agreements are an attempt to rehabilitate an employee, and put the outcome into their hands. Typically in substance abuse cases, they set forth specific job and rehabilitation requirements. They also expressly state: "The parties understand that violation of any other general rule, regulation, or policy directive shall result . . . immediate termination and, despite any allegation of mitigating factors shall not be subject to the 'Just Cause Standards' of the Master Agreement."[7]

These last chance agreements all contained language which bar their use as precedent. They state:

> "It is further understood that the actions taken in this case have been as a result of a review of the particular circumstances relative to this case only and in no way will the offer of a last chance agreement in this case require or obligate the Detroit Fire Department to extend a last chance agreement offer in another case. All cases will be evaluated and acted upon [in] an appropriate case-by-case basis."

They also contain a recitation that, "All parties had the opportunity to consult legal counsel and have carefully and completely read and understood all the terms of this settlement agreement. All parties without duress or coercion freely and voluntarily enter into this settlement agreement. The parties agree that this agreement is entered into as a full and final settlement of the above referenced matter, and is to have

---

[7] Despite the sweeping language, there would still remain for an arbitrator to decide if there had been a violation of the LCA.

no precedential value." And, "Furthermore, the actions taken by the parties in settling this matter are not meant to establish a practice or right to be utilized in any other grievance, claim or litigation."

The arbitrator is convinced that the solemn and repeated mantra – recognizing that the employer has the discretion and that there is no implicit promise to grant LCAs in the future – is no idle ceremony. While the Union sees the fact that the agreements were made, it is impossible to blink away the *quid pro quo*, *i.e.*, the repeated expressed contractual recognition that each deal is one-time only, with no looking back or forward.

Implicit in the union's argument is an appeal to past practice. It is well established that a past practice can become an independent obligation, binding if there is proof of repetition and mutuality of intent.[8]

However, this contract and the myriad last chance agreements put on this record are clear and unequivocal. The parties repeatedly agreed that neither practice nor precedent was being established.

The management rights clause here underline that certain managerial prerogatives are maintained. They define those issues which remain under management's unilateral control, excluded from collective bargaining and outside the arbitrator's jurisdiction. This is a matter of substantive arbitrability. While it is often the case that arbitrators downplay the management's rights clause in evaluating management's

---

[8] Richard Mittenthal, "Past Practice and the Administration of Collective Bargaining Agreements." Reprinted in Arnold M. Zack, Ed., *Arbitration in Practice*, (1984, Cornell University), pp. 181-208. See http://www.naarb.org/proceedings/index.asp.

decisions, it is also true that an arbitrator[9] must remain faithful to the instrument under which he was appointed.

Here the express contractual language is clear and controlling on the question presented. Last Chance Agreements were the normal accepted escape clause from the negotiated bright line tests – and nominally harsh results – of the substance abuse policy.

On its face, the rules as negotiated are harsh. Presumably they were thought to be a 'carrot and a stick.' In practice, their unrelenting character was made less stringent by beneficent administration – everyone had an escape clause. In particular, in days gone by, the employer would routinely offer any firefighter who was caught with a substance abuse problem a "last chance agreement."

In any event, the current administration decided that the prior routine use of last chance agreements would be discontinued. This decision created a crisis, as it leaves them with the bare – and harsh – negotiated rules; and in order to opt out of their seemingly "automatic" operation, someone has to make a reasoned judgment and exercise professional responsibility. It also creates a new environment, which will inevitably lead to more union appeals to arbitration.

The question, in part, is whether the employer is now obligated to continue to offer last chance agreements, or may it discontinue the city's prior way of doing business.

---

[9] See St. Antoine, Theodore, Ed. *The Common Law of the Workplace: the Views of Arbitrators* 2nd Ed. (2005) (Washington D.C.: BNA), Gruenberg, Gladys W. "Management and Union Rights: Overview" §§3.6, 3.7, pp. 104-109.

I conclude that the employer has on a principled basis decided to discontinue the automatic availability of last chance agreements. This is its reserved management right. The employer's decision was based upon a discretionary judgment that had a rational basis. There was no impermissible "discrimination" within the meaning of Article 2 §G.

Just cause

A well-developed body of decisions and thought has put muscle and skin on the bare skeleton that is encompassed by the contractual phraseology: "no discipline or discharge shall be imposed without just cause." Procedural guarantees and due process are *inherent* in "just cause", and they are not a mere arbitrary creation of an arbitrator adopted *post hoc* during the hearing. Procedural due process of just cause antedates Arbitrator Carroll Daugherty's Opinions[9], and is so central that it even spawned many books.[11] This concept should be understood in the context of the particular industry and union; the mechanical application of the "Seven Tests" is controversial among arbitrators. In no event is it to be considered to be an "automatic" or "formula" that produces an inevitable result. Employers and arbitrators are required to make a *bona fide* judgment based on common sense.

It is significant that the methodology of carrying out the investigation was in violation of Section 5.6(c) of the Substance Abuse Policy which states as follows:

"C. THE BATTALION CHIEF MUST:

---

[9]*Grief Bros. Cooperage Corp.* , 42 LA 555, 557-59 (Daugherty, 1964), See also, *Enterprise Wire Co.* , 46 LA 359, 363-365 (1960). *Whirlpool Corp.*, 58 L.A. 421, 427 (1972).

[11]*E.g.*, R.W. Fleming, *The Labor Arbitration Process* , 136-140 (Illini Press, 1965); Adolph M. Koven and Susan L. Smith, *Just Cause: The Seven Tests (2nd Ed.)* (BNA, 1992); St. Antoine, Theodore, *The Common Law of the Workplace: The Views of Arbitrators 2nd Ed.* (BNA, 2005); Nolan, Dennis R., *Labor and Employment Arbitration in a nut shell 2nd ed.* (St. Paul, MN: Thomson West, 2007).

1.  Upon notification from the Officer or Supervisor, the Battalion Chief/Division Head or second in command shall immediately report to the location of the incident to confirm that there is a basis for sending the employee for drug and/or alcohol testing. If the Battalion Chief/Division Head or second in command agrees with the Officer or Supervisor that there is a basis for testing, the Battalion Chief/Division Head or second in command will transport the employee to the appropriate location for drug and/or alcohol testing without delay. If the Battalion Chief/Division Head or second in command disagrees that testing is necessary then he/she must notify the Administrative Duty Officer who will make the final decision. In any case where it is decided that the employee is to be transported for testing, notice of such action will be given to the Union." (emphasis in original)

2.  Document the incident. A Battalion Chief/Division Head or second in command shall document any incident of suspected or confirmed violation of this policy."

Commander Wheeler testified that the reason he called Paramedic/Acting Lt. Huber to be "a witness" was because the Substance Abuse Policy required a witness to confirm reasonable suspicion basis so as to warrant testing. However, Lt. Wheeler is in E.M.S., was not in the chain of command, and was not one of the designated witnesses.

Wheeler ultimately conceded that Section 5.6(c) was not complied with.

In any event, every procedural infirmity does not make or break a just cause for discharge case. It does not, for example, make the Grievant's misconduct disappear. Thus, even though a contractual violation is established, the remedy for the violation is not fixed or immutable. Rather, the arbitrator may take the matter into account, and give it due weight.[12]

In making a just cause decision, the arbitrator and the employer should take into account all of the pertinent facts, both aggravating and mitigating. Consideration of those facts follows.

---

[12]R.W. Fleming, *The Labor Arbitration Process*, 136-140 (Illini Press, 1965).

Troubled Employee analysis

The application of this analysis – a well recognized part of "just cause" – is a separate reason to overturn the employer's decision.

The "Troubled employee analysis"[13] applies a "modified just cause" standard. Grievant was a "troubled employee" who deserved an opportunity to be rehabilitated through treatment instead of being summarily discharged. See *The Common Law of the Workplace: the Views of Arbitrators* (2d Ed), pp 239-256. In this case, the grievant was a "troubled employee" in a number of respects: he was diagnosed back in 2005 with PTSD after suffering the trauma of accidentally killing a pedestrian while driving a fire rig, with the Department providing just two counseling sessions thereafter through PGU – it was after this on-duty accident that his descent into alcoholism began. Also, the grievant was treated for both alcoholism and depression at the Maplegrove facility shortly after his discharge. In addition, the stress of harassing phone calls (received) and the paternity issue going on at the time of the offense added an additional layer of "trouble" for the grievant.

As set forth in § 6.29, *Common Law of the Workplace*, p. 250:

> "When a troubled employee has engaged in dischargeable conduct (because of the trouble), the arbitrator expects the employer to assess the employee's potential and willingness for rehabilitation prior to opting for discharge; that is, before discharging the troubled employee, the employer must (1) have given the employee an adequate opportunity to become rehabilitated and (2) have concluded, with reason, that the employee is not salvageable."

---

[13]See St. Antoine, Theodore, Ed. *The Common Law of the Workplace: the Views of Arbitrators* 2nd Ed. (2005) (Washington D.C.: BNA), Spencer, Janet Maleson. "The Troubled Employee" §6.24 et seq, pp. 239-256.

Indeed, the negotiated Substance Abuse Policy itself in Section 7.3( C) requires that any employee upon testing positive for alcohol or drugs be referred to the Personnel Guidance Unit, but that never occurred.

Mr. Smola further related that his problem with alcohol first began following a 2005 on-duty accident wherein a pedestrian was struck and killed while Brad was driving the rig. That accident was not itself alcohol-related and he was not disciplined for it in any way; the problem with alcohol began *after* the accident due to his guilt feelings over the death. After the 2005 accident, he was diagnosed with PTSD. He did get counseling for the accident through the Department's Personal Guidance Unit, and wanted to continue counseling, but after two sessions was told by the PGU counselor, "I can't help you anymore". As the problem with alcohol progressed in the years since then, he was in denial about it, which he now recognizes from his treatment is part of the disease.

The existence of post discharge rehabilitation is also a relevant factor.

Unfortunately, Grievant is a personality that fits right in to the fire department where he works. He is part of a culture, where it is perfectly accepted that mental health problems should be ignored, hidden, and be left untreated. As he proves, stress and a mental order – common as it is, and it may be more common among fire and police than the general population[14] – will not self correct. And the foregoing study was

[14]Brent A. Vulcano, Gordon E. Barnes and Lawrence J. Breen. *The prevalence of psychosomatic disorders among a sample of police officers* "Social Psychiatry and Psychiatric Epidemiology" Springer-Berlin / Heidelberg, ISSN0933-7954 (Print) 1433-9285 (Online)
Issue Volume 19, Number 4 / December, 1984, DOI 10.1007/BF00596783 Pages181-186 (9 September 1983 ) Summary  The present study examined the prevalence of psychosoinatic disorders among a sample of 571 police officers. Psychosomatic disorders for the purposes of this study included the following symptoms (headaches, indigestion, constipation, nervous stomach, stomach aches, and diarrhea) and conditions (high blood pressure, asthma, ulcers, and colitis). Police officers reported a greater frequency of psychosomatic symptoms and conditions than previously tested general population samples. The high prevalence rates for psychosomatic symptoms and conditions found in

not looking directly at Post Traumatic Stress Disorder, which is itself a growing and increasingly diagnosed phenomenon, and was involved here.

Grievant seriously became involved in therapy after his discharge. He convinced the arbitrator that he has learned his lesson, gotten the treatment he needed, and amended his way.

Psychiatric disorders and compounded psychological conditions are common.[15] They are the grist for the disciplinary mill in arbitration, whether they are characterized as "mental illness," "ill temper," or simply "personal problems."[16]

Many such cases are not grounded in specific charges of "misconduct" and "termination for just cause," but instead are based on the theory that they are a "nondisciplinary" separation.[17] Dennis R. Nolan set forth the prerequisites for a modified just cause standard:

> "(1) As in all cases, the employer bears the burden of proving that the employee is guilty of the misconduct that is charged. The order of proof and the standards of proof, where a troubled employee is concerned, are also unchanged.
>
> "(2) The union bears the burden of proving that the employee is a 'troubled employee.' The employee must be found to be troubled before any special consideration or modification of the just cause standard is warranted.

---

this sample suggest that the occupational stress of police work could be a contributory factor in these elevated rates. This research was supported in part by the National Health Research and Development Program through a National Health Fellowship to Brent A. Vulcano.

[15]Sponsored by the U.S. Alcohol, Drug Abuse and Mental Health Administration, the "National Comorbidity Survey" applying DSM-III-R psychiatric disorder criteria. Arch Gen Psychiatric, 51: 8, 8-19.

[16]Dorothy J. Cramer, "Arbitration and Mental Illness: The Issues, the Rational and the Remedies," *The Arbitration Journal*, Vol 35, September, 1980, No. 3, p. 10; Mercia L. Greenbaum, "The 'Disciplinator,' the 'Arbichiatrist,' and the 'Social Psychotrator': An Inquiry into How Arbitrators Deal with a Grievant's Personal Problems and the Extent to Which They Affect the Award," *The Arbitration Journal*, Vol 37, December, 1992, No. 4, p. 51.

[17]*See*, Arandell Corp., 56 LA 832 (Hazelwood, 1971).

"(3) The union bears the burden of proving that the employee's 'trouble' caused, in whole or in part, the misconduct for which the employee was discharged. Unless this is established, no special consideration or modification of the just cause standard will be warranted."[18]

Grievant was troubled. His misconduct was caused, in large part, by mental illness and stress. Remedies for cases involving a modified just cause standard are problematical.[19]

## VI. CONCLUSION

To conclude, the employer has the right to refuse to grant Last Chance Agreements for drug and alcohol offenses. Its strong and principled position is intended to send a message to members of the City's uniformed services.

That being said, the employer's decision to discharge Grievant is always subject to a Just Cause standard as set forth in the collective bargaining agreement. If it is going to discharge, it must take into account all of the aggravating and mitigating circumstances. This standard survives, notwithstanding management's intent to 'draw a line in the sand.' Under the totality of the CBA, alcohol and drug abuse is subject to sanction, including discharge, but it should not be treated as an automatic penalty. In any event, the employer's decision is always subject to arbitral review for abuse of discretion.

In this case, it is clear that the employer did not consider mitigating circumstances. There was ample proof that Grievant was a "troubled employee," that he is a good prospect to return to work, and has been rehabilitated. While the arbitrator is not condoning drinking and drunkenness on the job, a summary severance of employment was too harsh.

---

[18] St. Antoine, Theodore J., Ed. *The Common Law of the Workplace: The Views of Arbitrators 2nd Ed.*. (BNA, 2005) Nolan, Dennis R. "Standards for Discipline and Discharge," §6.28, pp. 248-249.

[19] Id. §6.30, pp. 254-255.

## VII. AWARD

Nevertheless, in light of all the foregoing, the arbitrator finds that there was not just cause for the discharge. For all the foregoing reasons, both issues (page 2) are answered, "No."

Therefore, the grievance is **GRANTED IN PART AND DENIED IN PART**. Grievant shall be reinstated to his employment, effective January 18, 2012, and shall be made whole for all lost pay and benefits since then. From the date of his discharge until January 18, Grievant's status shall be converted to a leave of absence, during which he will receive medical insurance. Assuming insurance is unavailable, he shall be made whole for all medical expenses incurred, as if he had been employed.

His reinstatement is conditional. He shall refrain from the use of intoxicating liquor, both on and off duty, and shall be subject to immediate discharge if he fails to abide. He shall be subject to random and for cause alcohol and drug testing. He shall consult with the Personal Counseling Unit of the Department, and obtain any and all therapy, and attend a 12 Step Program, as they direct for as long as they direct. Further conditions of his reinstatement and continued employment shall be governed by a reasonable agreement for a reasonable duration which shall be reached between the President of the Union and the chosen designee of the Department.

I retain jurisdiction to resolve any disputes as to the meaning and application of the award, and to resolve the question further if the designees cannot come to their assigned agreement.

Dated: April 26th 2012

STANLEY T. DOBRY, Arbitrator

Page 20