

**detroit police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

| To: Chief of Police Chester L. Logan | Date: May 7, 2013 | PAGE 7 OF 22<br>DA# 12-0137 |
| --- | --- | --- |

| Name:<br>JEROME COLLINS | Rank:<br>POLICE OFFICER | Badge No.<br>1508 | COMMAND<br>EASTERN DISTRICT |
| --- | --- | --- | --- |

Specification 23:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on March 3, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 24:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on March 10, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 25:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on March 11, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 26:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on March 16, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:

_____

_____

C of D-639-RE (Rev. 5-02)                                                                 D.P.D 226



# CHARGE SHEET
# REVISED

Detroit **police**

Chester L. Logan
Chief of Police

To: Chief of Police Chester L. Logan          Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 35:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 7, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 36:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 8, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 37:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 13, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 38:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 14, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

JOHN SERDA
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____          Hearing Date: _____

Verdict: _____          Sentence: _____

Other Members Present: _____

C of D-639-RE (Rev. 5-02)                                                                                      D.P.D 226


**detroit**
**police**

:hester L. Logan
:hief of Police

# CHARGE SHEET
# **REVISED**

| To: Chief of Police Chester L. Logan | Date: May 7, 2013 | PAGE 11 OF 22 DA# 12-0137 |
|---|---|---|

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 39:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 15, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 40:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 20, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 41:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on May 28, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 42:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on June 5, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:

_____

_____



detroit
**police**

:hester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

| To: Chief of Police Chester L. Logan | Date: May 7, 2013 | PAGE 12 OF 22 DA# 12-0137 |
|---|---|---|

| Name: | Rank: | Badge No. | **COMMAND** |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 43: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on June 29, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 44: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on June 30, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 45: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 1, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 46: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 2, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

---

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____    Hearing Date: _____

Verdict: _____    Sentence: _____

Other Members Present: _____

_____

C of D-639-RE (Rev. 5-02)                                                D.P.D 226


detroit
**police**

:hester L. Logan
Chief of Police

# CHARGE SHEET
# **REVISED**

PAGE 13 OF 22
DA# 12-0137

To: Chief of Police Chester L. Logan          Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 47:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 8, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 48:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 10, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 49:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 14, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 50:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 15, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:
_____



# CHARGE SHEET
# REVISED

Chester L. Logan
Chief of Police

To: Chief of Police Chester L. Logan          Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 51:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 17, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 52:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 22, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 53:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 23, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 54:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 24, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:

_____

_____



**detroit
police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

| To: Chief of Police Chester L. Logan | Date: May 7, 2013 | PAGE 15 OF 22<br>DA# 12-0137 |
|---|---|---|

| Name:<br><br>JEROME COLLINS | Rank:<br><br>POLICE OFFICER | Badge No.<br><br>1508 | COMMAND<br><br>EASTERN DISTRICT |
|---|---|---|---|

**Specification 55:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 29, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 56:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on July 30, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 57:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 3, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 58:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 5, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

---

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:

_____

C of D-639-RE (Rev. 5-02)                                                                D.P.D 226


detroit
**police**

:hester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

| | PAGE 16 OF 22 |
|---|---|
| To: Chief of Police Chester L. Logan         Date: May 7, 2013 | DA# 12-0137 |

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

**Specification 59:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 7, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 60:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 21, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 61:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 25, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**Specification 62:** That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 27, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

---

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present:

_____

_____

C of D-639-RE (Rev. 5-02)                                                                 D.P.D 226



**detroit**
**police**

:hester L. Logan
:hief of Police

# CHARGE SHEET
# REVISED

To: Chief of Police Chester L. Logan          Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 63:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on August 28, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 64:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 2, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 65:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 14, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 66: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 15, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____          Hearing Date: _____

Verdict: _____          Sentence: _____

Other Members Present: _____



**detroit**
**police**

hester L. Logan
:hief of Police

# CHARGE SHEET
# REVISED

PAGE 18 OF 22
DA# 12-0137

**To: Chief of Police Chester L. Logan**          **Date: May 7, 2013**

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 67:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 21, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 68:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 23, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 69:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 24, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 70:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 29, 2009**, willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

- - - - - - - - - - - - - FOR USE AT COMMANDER'S HEARINGS ONLY - - - - - - - - - - - - -

**Hearing Officer:** _____   **Hearing Date:** _____

**Verdict:** _____   **Sentence:** _____

**Other Members Present:** _____

_____

C of D-639-RE (Rev. 5-02)                                                                D.P.D 226



**detroit**
**police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

PAGE 19 OF 22
DA# 12-0137

To: Chief of Police Chester L. Logan        Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 71:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on September 30, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 72:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 2, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 73:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 22, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 74:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 23, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____        Hearing Date: _____

Verdict: _____        Sentence: _____

Other Members Present: _____
_____



**detroit**
**police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

| | | | PAGE 20 OF 22 |
|---|---|---|---|
| To: Chief of Police Chester L. Logan | Date: May 7, 2013 | | DA# 12-0137 |

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 75: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 27, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 76: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 29, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 77: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on October 30, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 78: That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 16, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

---
FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____     Hearing Date: _____

Verdict: _____     Sentence: _____

Other Members Present: _____

_____



**detroit**
**police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

To: Chief of Police Chester L. Logan          Date: May 7, 2013

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 79:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 17, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 80:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 18, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 81:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 19, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 82:   That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 20, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

---

### FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____          Hearing Date: _____

Verdict: _____          Sentence: _____

Other Members Present: _____

_____

---

C of D-639-RE (Rev. 5-02)                                                                    D.P.D 226



detroit
**police**

Chester L. Logan
Chief of Police

# CHARGE SHEET
# REVISED

To: Chief of Police Chester L. Logan      Date: May 7, 2013

PAGE 22 OF 22
DA# 12-0137

| Name: | Rank: | Badge No. | COMMAND |
|---|---|---|---|
| JEROME COLLINS | POLICE OFFICER | 1508 | EASTERN DISTRICT |

Specification 83:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 23, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 84:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 24, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

Specification 85:  That he, POLICE OFFICER JEROME COLLINS, badge 1508, currently assigned to Eastern District, **did on November 25, 2009,** willfully make a false written report, when he completed and submitted an Activity Log that he knew contained false information, THIS BEING IN VIOLATION OF THE DETROIT POLICE DEPARTMENT MANUAL SERIES 100, DIRECTIVE 102.3 – 7.22 TRUTHFULNESS, COMMAND 1.

**JOHN SERDA**
Commander
Disciplinary Administration

FOR USE AT COMMANDER'S HEARINGS ONLY

Hearing Officer: _____      Hearing Date: _____

Verdict: _____      Sentence: _____

Other Members Present: _____
_____

C of D-639-RE (Rev. 5-02)

D.P.D 226

To: Commanding Officer, Eastern District

Subject: **RESCHEDULING OF POLICE TRIAL BOARD IN THE MATTER OF POLICE OFFICER JEROME COLLINS, BADGE 1508, ASSIGNED TO EASTERN DISTRICT**
**DISCIPLINE FILE NO. 12-0137**

From: Commander John Serda, Disciplinary Administration

**<u>COMPLIMENTARY COPIES</u>**
Detroit Police Officer's Association
Goldpaugh and Associates

Page 36

CITY OF DETROIT

TRIAL BOARD HEARING

In the Matter of:
CITY OF DETROIT
(POLICE DEPARTMENT),

        Employer,            No. 12-0137

      -and-               Volume 3

DETROIT POLICE OFFICERS ASSOCIATION
(POLICE OFFICER JEROME COLLINS),
        Union.

_____/

                       Proceedings had and testimony taken in the above matter before a Trial Board at 7310 Woodward Ave., 3rd Floor, Detroit, Michigan, on Tuesday, July 9, 2013 commencing at or about 9:00 a.m.
APPEARANCES:

        TRIAL BOARD
        COMMANDER ROBERT ENNIS, Chairperson
        INSPECTOR GARY SROKA, Co-Member
        INSPECTOR DWAYNE BLACKMON, Co-Member

MS. LETITIA JONES, ESQUIRE, City Advocate
(Appearing on behalf of the Detroit Police Department)

MR. JOHN GOLDPAUGH, ESQUIRE
(Appearing on behalf of Police Officer Jerome Collins)
REPORTED BY:  TAMARA A. O'CONNOR (CSMR-2656, CER-2656)

Page 37

## TABLE OF CONTENTS

WITNESSES                                                      PAGE

Joyce Motley

    Direct Examination by Ms. Jones                  40

    Cross-Examination by Mr. Goldpaugh               43

    Redirect Examination by Ms. Jones                52

Pastella Williams

    Direct Examination by Ms. Jones                  55

    Cross-Examination by Mr. Goldpaugh               60

    Redirect Examination by Ms. Jones                70

Steven Dolunt

    Direct Examination by Ms. Jones                  71

    Cross-Examination by Mr. Goldpaugh               78

    Redirect Examination by Ms. Jones                96

    Recross-Examination by Mr. Goldpaugh            102

    Redirect Examination by Ms. Jones               104

    Recross-Examination by Mr. Goldpaugh            107

    Redirect Examination by Ms. Jones               119

    Recross-Examination by Mr. Goldpaugh            120

James Moore

    Direct Examination by Ms. Jones                 121

    Cross-Examination by Mr. Goldpaugh              131

    Redirect Examination by Ms. Jones               150

Todd Svenkesen

    Direct Examination by Ms. Jones                 154

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 18 of 58

Page 38

| | WITNESSES (continued) | | PAGE |
|---|---|---|---|
| 1 | WITNESSES (continued) | | |
| 2 | Todd Svenkesen (continued) | | |
| 3 | Cross-Examination by Mr. Goldpaugh | | 177 |
| 4 | Redirect Examination by Ms. Jones | | 198 |
| 5 | Recross-Examination by Mr. Goldpaugh | | 213 |
| 6 | Whitney Walton | | |
| 7 | Direct Examination by Ms. Jones | | 214 |
| 8 | Cross-Examination by Mr. Goldpaugh | | 224 |
| 9 | Redirect Examination by Ms. Jones | | 240 |
| 10 | Recross-Examination by Mr. Goldpaugh | | 243 |
| 11 | Redirect Examination by Ms. Jones | | 245 |
| 12 | Recross-Examination by Mr. Goldpaugh | | 253 |
| 13 | Redirect Examination by Ms. Jones | | 255 |
| 14 | | | |

| | EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|---|
| 15 | EXHIBITS | | IDENTIFIED | RECEIVED |
| 16 | | | | |
| 17 | JX#13 | Godbee Arbitration | | |
| 18 | | testimony | 39 | 40 |
| 19 | DX#14 | Moore Garrity | 146 | 149 |
| 20 | AX#15 | 11/29/10 Initiative | | |
| 21 | | Reports | 209 | 212 |
| 22 | AX#16 | Football Schedule | 210 | 212 |
| 23 | DX#17 | 2007-2009 Chart | 241 | 243 |
| 24 | | | | |
| 25 | | | | |

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com

Page 39

1    Detroit, Michigan
2    Tuesday, July 9, 2013
3    9:21 a.m.
4    P R O C E E D I N G S
5    (JX#13 marked off the record)
6    COMMANDER ENNIS:  This Trial
7  Board is reconvened today, Tuesday, July 9, 2013.
8  If there are no preliminary matters pending, would
9  you please continue with the proceedings, Ms. Jones?
10    MS. JONES:  Yes.  There is one
11  preliminary matter.  Former Chief Godbee is
12  unavailable.  We have submitted his testimony
13  through the transcript as Exhibit No. 13, and I
14  believe I have a stipulation to that.
15    MR. GOLDPAUGH:  That is
16  correct.  I discussed the matter with my client,
17  Officer collins, and we would agree that we will
18  stipulate to his testimony from the previous
19  hearing.
20    MS. JONES:  That previous
21  hearing was the suspension without pay, the
22  arbitration of the grievance of the suspension
23  without pay hearing.
24    COMMANDER ENNIS:  And that will
25  be Exhibit No. 13?

Page 40

1    MS. JONES:  Yes, sir.
2    COMMANDER ENNIS:  It will be
3  admitted, Exhibit No. 13.
4    MS. JONES:  Thank you.
5    (At 9:26 a.m., JX#13
6    received)
7    MS. JONES:  The Department will
8  call Joyce Motley.  Have a seat and take the stand,
9  please.  Can the witness be sworn?
10    UNIDENTIFIED:  Raise your right
11  hand.  Do you swear or affirm that the testimony you
12  are about to give this Board is the truth?
13    MS. MOTLEY:  I do.
14    JOYCE MOTLEY
15    (At 9:26 a.m., sworn as a witness, testified
16    as follows)
17    DIRECT EXAMINATION
18  BY MS. JONES:
19  Q  Please make sure to speak up because your testimony
20    is being recorded.  Make sure that your responses
21    are verbal, no um-ums and uh-huhs, because we need
22    either a yes or no or a verbal response.
23  A  Yes, ma'am.
24  Q  Thank you.  Would you please state your name for the
25    record?

Page 41

1  A  Joyce Motley.
2  Q  Where are you employed?
3  A  I'm retired.
4  Q  Retired from where?
5  A  The Detroit Police Department.
6  Q  What was your position at the Detroit Police
7    Department prior to your retirement?
8  A  I was a Deputy Chief.
9  Q  Did you ever work at the Eastern District?
10  A  Yes, ma'am.
11  Q  Were you involved in any capacity with the Community
12    Relations Unit?
13  A  Well, they worked for me.
14  Q  Do you know what their assignments were from day to
15    day?
16  A  I looked at the daily detail, yes, and the sergeant
17    briefed me sometimes.
18  Q  As it relates to Mr. Collins, do you know Officer
19    Collins?
20  A  Yes.
21  Q  How do you know him?
22  A  He worked for me at the Eastern District.
23  Q  Were you aware of any request for outside employment
24    submitted by Officer Collins?
25  A  No.

Page 42

1  Q  Did Assistant Chief Godbee advise or did the Chief
2    at that time, either Ella Bully-Cummings or Warren
3    Evans, advise you that Officer Collins was to report
4    to them directly and not to the people in Eastern
5    District?
6  A  I never worked for Chief Warren Evans, and Chief
7    Bully-Cummings never advised me of that.
8  Q  So based on that, would it be fair to say that he
9    was to report to whoever the sergeant in charge was?
10    MR. GOLDPAUGH:  I'm going to
11  object, it calls for speculation.  She can only
12  testify as to what she knows or what--
13  Q  (By Ms. Jones)  If you know.
14  A  As far as I know, while working for me, he reported
15    to his sergeant, not to me.
16  Q  At any time, did you advise the sergeant that
17    Officer Collins could have slide time or anything
18    similar to what-- well, first of all, do you know
19    what slide time is?
20  A  Yes.
21  Q  Can you describe what slide time is for us?
22  A  When you allow a person to leave early without
23    deducting court time.
24  Q  At any time, did you allow him or tell Sergeant
25    Mattie Lewis that you were in charge of Collins and

4   (Pages 39 to 42)

Page 43

1  not her?
2  A   No.
3  Q   Did you tell Officer Collins that he could have
4      slide time at any time?
5  A   No.
6  Q   If an officer had to work late-- because it is my
7      understanding that the Community Relations Unit,
8      sometimes they would work evenings and go to
9      community meetings or what have you.
10             If they had to work late, were
11     they required to complete, when you were there, an
12     activity log?
13 A   Everybody is required to complete an activity log.
14 Q   If they worked late, would they have to reflect
15     that, or would they reflect what was on the daily
16     detail?
17 A   It should have been reflected on the activity log.
18 Q   Whatever hours they worked?
19 A   Correct.
20             MS. JONES:  Nothing further of
21     this witness.  Pass to Mr. Goldpaugh.
22             CROSS-EXAMINATION
23 BY MR. GOLDPAUGH:
24 Q   Good morning.
25 A   Good morning, sir.

Page 44

1  Q   The time frame that we're talking about when you
2      were at the Eastern District, what years were those,
3      please?
4  A   I believe it was 2007 through September 2008 I
5      think.
6  Q   So approximately a year?
7  A   About a year, maybe a little longer.
8  Q   You succeeded now retired Chief Godbee.  Is that
9      correct?
10 A   That is correct.
11 Q   Were you aware of any relationship or any
12     conversations that either-- I'm sorry.  When you
13     arrived, was Sergeant Mattie Lewis over Community
14     Relations at that time?
15 A   Yes.
16 Q   So when you arrived, did you make any changes as to
17     who was running Community Relations or anything
18     along those lines?
19 A   No.
20 Q   So you just let it go, not in a derogatory sense,
21     you just let it go the way it was going.  Is that
22     correct?
23 A   I let everybody stay in the same position.
24 Q   That was because everybody was doing their job and
25     everything was getting taken care of.  Would that be

Page 45

1  correct?
2  A   Sergeant Lewis was handling everything.
3  Q   When you spoke to Sergeant Lewis, did you have a
4      meeting with Sergeant Lewis and speak to her
5      regarding the members that were on the unit?
6  A   I'm sure I did.
7  Q   At that point in time, did you ever have a
8      conversation with her indicating that Officer
9      Collins was supposed to report to you or to Godbee
10     or anybody like that?
11 A   No.
12 Q   When you spoke to Sergeant Lewis, did she have any
13     type of a discussion regarding wanting to change the
14     hours for Community Relations?
15 A   Not that I can remember.
16 Q   Did she give you any type of situation where she
17     said, look, I can't be here on these particular
18     hours because of the hours I work, and I want to
19     change the Community Relations hours for the
20     officers so that I can control them in that way?
21     You don't have any recollection of that
22     conversation?
23 A   No.  I never told her I wanted to change the hours.
24     I mean she had to change the hours for a meeting or
25     something.

Page 46

1  Q   Then you left in 2008, and who succeeded you if you
2      recall?
3  A   I don't know.
4  Q   When you were there, Commander Dolunt worked for
5      you.  Is that correct?
6  A   That is correct.
7  Q   When did Commander Dolunt work for you, if you
8      recall?
9  A   I believe it was 2008 till I left.  I'm not sure
10     what month he came.
11 Q   Was he there when you arrived?
12 A   No.
13 Q   So he came after that?
14 A   Correct.
15 Q   Then also you had James Moore.  Is that correct?
16 A   Correct.
17 Q   Did either of them raise any concerns regarding the
18     hours of Community Relations while you were there?
19 A   Not that I can remember.
20 Q   Did Commander Dolunt raise concerns specifically
21     regarding Jerome Collins?
22 A   Not that I can remember.
23 Q   Just for my edification and for the Board as well,
24     as a member of the Community Relations Unit, what
25     did they do?

5 (Pages 43 to 46)

Page 47

1  A   They ran community meetings, did programs at the
2  schools, helped with the national night out, helped
3  plant flowers around the precinct, ran the monthly
4  meeting with the community.
5  Q   When you were there, was there a concern regarding
6  the number of B and Es that was ongoing everywhere
7  but particularly in the Eastern District?
8          MS. JONES:  Objection,
9  relevance.
10         MR. GOLDPAUGH:  It goes to one
11 of the obligations--
12         COMMANDER ENNIS:  Overruled.
13         THE WITNESS:  Yes, there was
14 concern about the B and Es.
15 Q   (By Mr. Goldpaugh)  Was part of the Community
16 Relations officers' responsibilities to go out when
17 people made reports about B and Es to verify and
18 follow up on those things, not to do an
19 investigation but to make sure they were being
20 treated properly so to speak?
21 A   I don't remember them doing that.
22 Q   Okay.  Do you recall any type of a conversation that
23 you had with Commander Dolunt when he first arrived
24 there regarding Officer Collins?
25 A   No, I don't.

Page 48

1  Q   Do you remember any type of a conversation that
2  Commander Dolunt brought to your attention what
3  Jerome Collins was doing as part of the Community
4  Relations Unit, and you told him don't worry about
5  it, keep your hands off it, it's our responsibility?
6  A   No.  I'm not saying we didn't have it, but I don't
7  remember it.
8  Q   But if you had that type of a discussion, what would
9  you have meant by keep your hands off of-- and I
10 don't mean that the way it came out with respect to
11 Officer Collins, but that it was our responsibility.
12 What would you have meant by that if that is what
13 you said?
14         MS. JONES:  Objection.  She
15 indicated she did not recall that conversation.
16         MR. GOLDPAUGH:  I agree, she
17 said she didn't recall.  She didn't say it didn't
18 occur.  So therefore, I was asking her if she said
19 something like that, what did she mean by that?
20         MS. JONES:  Calls for
21 speculation.
22         COMMANDER ENNIS:  That's a
23 stretch.  I will sustain the objection.
24 Q   (By Mr. Goldpaugh)  Was there any type of
25 conversation that you might have had with either

Page 49

1  Commander Dolunt, James Moore or Mattie Lewis
2  regarding any type of outside employment by Officer
3  Collins?
4  A   I never had any conversation with anybody about
5  outside employment that I recall.
6  Q   Do you recall ever having a meeting with Commander
7  Moore at the time along with Sergeant Lewis
8  regarding Officer Collins and his whereabouts during
9  the day?
10 A   No.  You will have to refresh my memory.  I don't
11 remember that.
12 Q   Do you recall any type of a conversation with
13 Commander Moore and the sergeant indicating that we
14 don't see Officer Collins as often as we see the
15 other members and you telling them don't worry about
16 it, I've got it covered?
17 A   No.
18 Q   You left there in 2008.  Is that correct?
19 A   I believe so.
20 Q   Was it the responsibility of Community Relations to
21 do activity logs during that period of time?
22 A   Correct.
23 Q   They would have been confirmed and signed by the
24 sergeants or whoever was supervising.  Is that
25 correct?

Page 50

1  A   That's correct.
2  Q   Now, was there a specific roll call for Community
3  Relations officers?
4  A   I don't believe so.
5  Q   Because this was under our general or under
6  anybody's general purview.  So the officers just
7  came in, checked in with whoever they were checking
8  in with and then would go off and do their jobs.  Is
9  that correct?
10 A   I think so.
11 Q   Would it be a fair statement, and I'm talking
12 generalities now, the officers pretty much ran their
13 own little community programs?  Would that be a fair
14 statement?
15 A   Under the supervision of the sergeant, that would be
16 a fair statement.
17 Q   I know that part of their responsibilities would be
18 to check school crossings, check certain schools.
19 Is that correct?
20 A   That's correct.
21 Q   So I'm assuming that each-- how many Community
22 Relations officers did you have at that time if you
23 recall?
24 A   I don't remember.
25 Q   But there was more than just Jerome Collins?

6  (Pages 47 to 50)

## Page 51

1  A   Correct.

2  Q   Probably five or six at least?

3  A   That's a good estimate.

4  Q   So those schools, for example, in your particular

5     precinct or in the district would be divvied up

6     between the officers to check on.  Would that be a

7     fair statement?

8  A   That's a fair statement.

9  Q   So they would be checking when schools are getting

10    out and things like that.  That is part of their

11    responsibilities.  Correct?

12 A   Correct.

13 Q   Other than that, the community meetings and stuff

14    that they were involved in, that was pretty much on

15    their own schedule.  Is that right?

16 A   It was on the service schedule.

17 Q   Meetings in the different areas sometimes went well

18    beyond 8:00 at night, wouldn't they?

19 A   Yes.

20 Q   The officers were expected to be there and do their

21    job.  Correct?

22 A   Correct.

23 Q   Even if they were starting at noon.  Correct?

24 A   That's correct.

25 Q   Of course, they would get no overtime for Community

## Page 52

1     Relations, would they?

2  A   They got overtime.

3  Q   How did they get overtime?

4  A   Well, they got paid overtime.  Some people took pay,

5     some people took time.  I mean their starting time

6     may have varied, they didn't always start at the

7     same time.  I think it depended on what time their

8     meeting was.

9  Q   I understand, but you said some of them took time,

10    some of them took money.  So by taking time, you

11    mean slide time.  Correct?

12 A   No.  I meant comp time.

13        MR. GOLDPAUGH:  I have no other

14    questions of this witness.

15        MS. JONES:  I have just a few

16    based on some of the questions that were asked by

17    counsel.

18        REDIRECT EXAMINATION

19 BY MS. JONES:

20 Q   Ms. Motley, were you aware at any time of any

21    special privileges given to Officer Collins by

22    anyone, be it Chief Godbee, Chief Evans-- I'm sorry,

23    not Evans-- Chief Ella Bully-Cummings, anyone in a

24    higher-ranking capacity?

25 A   No.

## Page 53

1  Q   Were you aware when these issues were raised that he

2     was not generally around as much as the other

3     Community Relations officers?

4        MR. GOLDPAUGH:  "When these

5     issues were raised," I'm just wondering because--

6        MS. JONES:  I will rephrase.

7  Q   (By Ms. Jones)  When the issue that counsel brought

8     up that Collins was not around, and he asked you did

9     you remember conversations involving you've got this

10    or you'll handle this or what have you, do you know

11    if that was ever brought up to you--

12        MR. GOLDPAUGH:  I'm going to

13    object to this line at this point in time because

14    she indicated she did not recall any of those

15    things.  Then when I asked the specific question,

16    well, if you said this, what did you mean by that,

17    the prosecution objected, and it was upheld.

18        MS. JONES:  That was because he

19    was asking for speculation.  I'm just asking her

20    does she recall these issues being raised at all?

21        MR. GOLDPAUGH:  She has already

22    indicated she did not do that.

23        MS. JONES:  She indicated she

24    did not have that conversation, but she has not

25    answered the question if she remembers this being

## Page 54

1     brought up.

2        MR. GOLDPAUGH:  My objection is

3     on the record.

4        COMMANDER ENNIS:  I will

5     sustain the objection.

6  Q   (By Ms. Jones)  The community meetings that counsel

7     asked you about, are they weekly, daily, once a

8     month, once very quarter?

9  A   It varies.  It depends on what group it is.  Most of

10    them are monthly.

11        MS. JONES:  Pass to the Panel.

12        COMMANDER ENNIS:  Inspector

13    Sroka?

14        INSPECTOR SROKA:  Nothing, sir.

15        COMMANDER ENNIS:  Inspector

16    BLACKMON:  Nothing.

17        COMMANDER ENNIS:  Thank you,

18    Chief, you're excused.

19        MS. JONES:  I appreciate you

20    coming in.  Thank you.

21        (At 9:48 a.m., witness excused)

22        MS. JONES:  Pastella Williams

23    is my next witness.

24        UNIDENTIFIED:  Raise your right

25    hand.  Do you swear or affirm that the testimony you

7  (Pages 51 to 54)

Page 55

```
1      are about to give to the Board is the truth?
2             LIEUTENANT WILLIAMS: I do.
3             PASTELLA WILLIAMS
4        (At 9:49 a.m., sworn as a witness, testified
5        as follows)
6             DIRECT EXAMINATION
7    BY MS. JONES:
8    Q    Please make sure that your responses are verbal, no
9        um-ums or uh-uhs, no nods or shakes of the head
10       because you are being recorded, and the recorder
11       can't pick that up.
12   A    Okay.
13   Q    Thank you.  Speak a little loud.  I know you have a
14       tendency to speak soft, so I need you to speak in
15       your street voice if possible.
16             Please state your name for the
17       record?
18   A    Pastella Williams.
19   Q    Where are you employed?
20   A    Detroit Police Department, Eastern District.
21   Q    What is your rank?
22   A    Lieutenant.
23   Q    Badge?
24   A    L-111.
25   Q    At the Eastern District, what are your duties?
```

Page 56

```
1    A    I'm acting inspector of the Ninth Precinct.
2    Q    What are your duties as acting inspector, please?
3    A    I oversee the day-to-day duties of patrol.
4    Q    Do you have any responsibilities over the Community
5        Relations Unit?
6    A    No.
7    Q    At some point in time, were you over the Eastern
8        District Community Relations Unit?
9    A    No.
10   Q    Was a Sergeant Mattie Lewis working under you?
11   A    She was under admin.
12   Q    When you say under admin, what are you referring to?
13   A    The administrative offices of Eastern at that time.
14   Q    That would be the inspector-- give me the time
15       period that you were there when Collins was there?
16   A    What is the question?
17   Q    What is the time frame that you were there?
18   A    Oh, I was there from-- I can only give you the year,
19       I can't give you the months-- 2006 to 2010, about
20       January of 2010.
21   Q    Then you came to the Discipline Unit?
22   A    No.  I left Eastern District and went to the Office
23       of the Assistant Chief.
24   Q    That Assistant Chief would have been?
25   A    Meyers.
```

Page 57

```
1    Q    When you say working under admin, would that be the
2        commander and inspector?
3    A    Yes.
4    Q    So Community Relations didn't fall under your
5        purview?
6    A    No.  I don't recall that they really-- I only saw
7        them when Mattie may have been on furlough, and I
8        had them come and report directly to me.
9    Q    When you say you had them come directly to you, was
10       there a roll call?
11   A    No, there wasn't a formal roll call.  I had them
12       come in and let me know that they were on duty, and
13       I instructed them to turn in their activity logs to
14       me at the end of the day.
15   Q    At the end of the day, could that mean 8:00 or 9:00
16       in the evening?
17   A    Well, if they were past the time I got off, they
18       knew that they were to put it under the door or give
19       it to me first thing the next day.
20   Q    Do you know Jerome Collins?
21   A    Yes.
22   Q    How do you know him?
23   A    He is an officer that was assigned to Community
24       Policing at the Eastern District.
25   Q    Do you know how the Community Relations Unit or
```

Page 58

```
1        Community Policing Unit was run as it relates to
2        when they would report, what shift they were to
3        report to?
4    A    As far as I know, they worked days, but I do know
5        they had the occasion to change their hours because
6        they had meetings in the evening.  They had to go to
7        all the community relations meetings and so forth.
8        So they did have a tendency to change their hours.
9    Q    So because of some evening activities, they may have
10       changed their hours.  Would that have been reflected
11       on their activity log?
12   A    It should have been, yes.
13   Q    What is the purpose of an activity log?
14   A    To keep an accurate record of what you did
15       throughout your tour of duty.
16   Q    So if you changed your hours, your activity log
17       should have reflected that.  Correct?
18   A    Correct.
19   Q    Do you know of any situation where Officer Collins
20       was given special permission or privileges that he
21       could work outside of the City of Detroit Police
22       Department?
23   A    No.
24   Q    Do you know if he applied to work outside of the--
25            MR. GOLDPAUGH: I'm sorry, the
```

8   (Pages 55 to 58)

Page 59

1  question, the way it was phrased, you said could he
2  work outside the City of Detroit.
3        MS. JONES: Police Department.
4        MR. GOLDPAUGH: Police
5  Department, yes, but are you saying did he get
6  permission for outside employment?
7        MS. JONES: That was my second
8  question.
9        MR. GOLDPAUGH: The question
10 just left something-- as to what she was asking for.
11 Was he able to physically work outside the City of
12 Detroit, that's what I'm saying.
13       MS. JONES: You will get your
14 turn.
15       MR. GOLDPAUGH: I'm just
16 wondering, the way the question was posed.
17 Q   (By Ms. Jones) Were you aware, did he apply for
18      outside employment?
19 A   Not that I'm aware of. I don't know.
20 Q   As far as you know, did he have permission to work
21      outside employment?
22 A   I don't know. I have no idea.
23 Q   At some point in 2009, it was brought to the
24      attention of the Department that he, Officer
25      Collins, was working for another company while he

Page 60

1  should have been working at the police department.
2  Are you aware of this?
3  A   I became aware of it.
4  Q   How did you become aware of it?
5  A   People talking about it.
6  Q   Did you take any action as it relates to that?
7  A   No, I did not.
8        MS. JONES: Nothing further of
9  this witness at this time.
10       CROSS-EXAMINATION
11 BY MR. GOLDPAUGH:
12 Q   Good morning, Lieutenant.
13 A   Good morning.
14 Q   Lieutenant, according to your testimony, you arrived
15      at the Ninth Precinct, Eastern District, some time
16      in 2006. Is that correct?
17 A   I think so.
18 Q   Who was the head of the district or the precinct at
19      that point in time?
20 A   I think it was Commander Godbee, and Moreland (sic)
21      was still there.
22 Q   When you arrived there, were you always the-- once
23      you got there, were you the admin lieutenant?
24 A   No.
25 Q   What were you first?

Page 61

1  A   Platoon one lieutenant.
2  Q   Then you became the admin lieutenant?
3  A   Yes.
4  Q   When did that occur?
5  A   I think about a year after I got there.
6  Q   So for that first year when Commander Godbee was
7      there, you didn't have any dealings with Sergeant
8      Mattie Moore (sic) or Community Relations in
9      general. Would that be a fair statement?
10 A   Mattie Lewis.
11 Q   Mattie Lewis, I'm sorry.
12 A   Other than them coming and going, no, not directly.
13 Q   That's what I mean, not directly. Once you became
14      the administrative lieutenant, that fell under your
15      purview more than as the shift lieutenant. Would
16      that be a fair statement?
17 A   Yes.
18 Q   So when you became the administrative lieutenant,
19      was that still under Commander Godbee, or was that
20      now under his successor, which would have been Joyce
21      Motley?
22 A   I can't answer that question. I don't know.
23 Q   But suffice to say there came a point in time when
24      you then became over a number of different staff
25      things, one of which was the Community Relations.

Page 62

1      Correct?
2  A   Only when Sergeant Lewis was not there.
3  Q   That is my question. So Sergeant Lewis was in
4      charge of the Community Relations, and she ran it
5      under the direction of whom? Who did she report to?
6  A   Whoever the commander was at that time.
7  Q   So she reported directly to the commander, and you,
8      as administrative lieutenant, reported directly to
9      the commander, but if Sergeant Lewis wasn't there,
10     then you would fulfill her duties as well. Would
11     that be a fair statement?
12 A   That is fair.
13 Q   Okay, good. Did there come a point in time after
14     Commander Dolunt took over that the Community
15     Relations individuals were directed to report to you
16     specifically?
17 A   I don't recall that.
18 Q   Did there come a point in time when there was a
19     discussion that you might have been present for
20     regarding the unavailability or the fact that a lot
21     of times people didn't know what was going on with
22     Community Relations and where the officers were at
23     specific times?
24       MS. JONES: Objection. I would
25     ask him to rephrase that question. It is compound,

9 (Pages 59 to 62)

Page 63

1 convoluted.
2    MR. GOLDPAUGH: I will agree
3 with convoluted. I don't know about compound. But
4 okay, I will rephrase it.
5    COMMANDER ENNIS: Thank you.
6 Q   (By Mr. Goldpaugh) Were there ongoing discussions
7 regarding the Community Relations Unit once
8 Commander Dolunt arrived there?
9 A   I can't recall that. I don't know at what point.
10 There was always conversation about their
11 whereabouts and what they were doing. I can't say
12 what commander was in place at that time.
13 Q   You got there basically as an admin lieutenant, and
14 so when you left, those conversations were ongoing?
15 A   I won't say ongoing, but they came up from time to
16 time.
17 Q   Do you recall specifically what might trigger any of
18 these conversations, what incident and so forth?
19 A   No.
20 Q   Now, I'm showing you an activity log that is part of
21 a stack of exhibits, but it is Exhibit No. 3, and it
22 is dated March 2, 2009. I know you probably haven't
23 seen that, but do you recognize that as a Department
24 document?
25 A   Yes.

Page 64

1 Q   Does that indicate a specific date?
2 A   Yes.
3 Q   The date is March 2, as I have indicated?
4 A   Yes.
5 Q   There is the name of Jerome Collins there. Is that
6 correct?
7 A   Correct.
8 Q   There is a signature next to that. Is that correct?
9 A   Yes.
10 Q   Where that was signed in, is there somebody who
11 accepted that document?
12 A   There is no indication of such.
13 Q   In other words, it appears that there is no
14 supervisor checking that particular log. Is that
15 correct?
16 A   Right.
17 Q   I'm showing you also one for March 3, the same
18 questions.
19    MS. JONES: Is that March 3,
20 2009, 2008 or 2007?
21 Q   (By Mr. Goldpaugh) I'm sorry, 2009. The only ones
22 I will be dealing with deal with the allegations
23 with respect to Charge IV. Is that correct, it's
24 not signed in?
25 A   Yes.

Page 65

1    COMMANDER ENNIS: Counsel, for
2 the sake of clarity, can you tell us whose activity
3 log that is?
4    MR. GOLDPAUGH: Oh, I'm sorry.
5 This is part of the exhibit, it's Jerome Collins.
6    COMMANDER ENNIS: Part of
7 Exhibit No. 3?
8    MR. GOLDPAUGH: Exhibit No. 3.
9 I apologize.
10    COMMANDER ENNIS: Just for the
11 sake of clarity, is that just Officer Collins'
12 activity log?
13    MR. GOLDPAUGH: That's correct.
14 There is only Officer Collins' name on this activity
15 log.
16 Q   (By Mr. Goldpaugh) I also want to show you one that
17 is dated-- again, I'm showing you another document
18 that has Jerome Collins' name on it. Is that
19 correct?
20 A   Yes.
21 Q   There is no signature next to that one, is there?
22 A   No.
23 Q   That one has been signed in or reviewed by Sergeant
24 Lewis. Is that correct?
25 A   Yes.

Page 66

1    MR. GOLDPAUGH: May I have one
2 second?
3    COMMANDER ENNIS: Certainly.
4 Q   (By Mr. Goldpaugh) Lieutenant, I know it was a long
5 time ago, and I'm sure I know the answer, but I'm
6 going to ask you anyway. Can you specifically
7 recall Officer Collins reporting on duty to you?
8 A   Yes. There were times, yes.
9 Q   Can you tell me the time frame of when that may have
10 occurred?
11 A   No, I cannot.
12 Q   You are just saying that when Mattie Lewis wasn't
13 there, you took over control. Correct?
14 A   I had them report to me for on duty.
15 Q   Would it be a fair statement then that, on those
16 particular days when they reported on duty to you,
17 you would have been the one who would have signed
18 off on the log as well?
19 A   Not necessarily.
20 Q   Did you, while you were the admin, hear any rumors
21 about Officer Collins working a second job?
22 A   I became aware of it once the complaint was made.
23 Q   Prior to the complaint being made, did you hear
24 anything about that?
25 A   I think once I did.

10   (Pages 63 to 66)

Page 67

1  Q   I know it was a while ago, but can you recall
2      approximately when that might have occurred?
3  A   No.
4  Q   Did you follow up on that in any way, shape or form?
5  A   No, I did not.
6  Q   Do you recall approximately-- you said once these
7      allegations came out, that is when you became more
8      aware of it.  Do you recall approximately how much--
9      let me rephrase this.
10         When you heard these rumors, do
11     you recall approximately when that was in relation
12     to when this letter was received and the
13     investigation started?
14 A   No, I don't.
15 Q   So it came to your attention that there was a point
16     in time where Mattie Lewis was being, I guess, for
17     lack of a better term, investigated with respect to
18     this ongoing situation with the log sheets and
19     Community Relations at the Eastern District.  Is
20     that correct?
21 A   What is the question?
22 Q   There came a point in time when these allegations
23     came forth against Officer Collins, there were
24     allegations made against other people with respect
25     to improprieties in the activity logs, is that

Page 68

1      correct, at Community Relations?
2  A   Yes.
3  Q   One of the subjects of that investigation was Mattie
4      Lewis.  Is that correct?
5  A   I do believe, yes.
6  Q   Had you addressed with her that situation and what
7      was going on with her subordinates, for lack of a
8      better term?
9          MS. JONES:  Objection,
10     foundation.  We don't know if she was there at the
11     time.  If you recall, John, Pastella was in DAU.
12     She wasn't assigned there originally.
13         MR. GOLDPAUGH:  I was just
14     asking if she-- I will ask the question.
15 Q   (By Mr. Goldpaugh)  When you became aware of the
16     investigation, were you still at the Eastern
17     District?
18 A   I don't know when the investigation began, so I
19     can't answer that question.  I don't know.
20 Q   Well, when did you come to DAU?
21 A   I didn't come to DAU from Eastern.  I went to the
22     Assistant Chief's Office.
23 Q   When did you go to the Assistant Chief's Office?
24 A   2010.
25 Q   These allegations came out in 2009.  Is that

Page 69

1      correct?
2  A   I don't know.
3          MR. GOLDPAUGH:  All right.  May
4      I approach?
5          COMMANDER ENNIS:  Yes.
6  Q   (By Mr. Goldpaugh)  I am showing you what purports
7      to be a transcript of your Garrity interview.  Can
8      you look at the date on that?
9  A   January 25, 2010.
10 Q   Thank you.  Would it be a fair statement that you
11     were aware of the investigation on January 10--
12 A   Yes.
13 Q   You were still at Eastern District at that point in
14     time?
15 A   I don't think so.
16 Q   You said you went to the Chief's--
17 A   I would have to see my records to know exactly what
18     date I left.  I don't know.
19 Q   I understand.  Well, I guess my question then is,
20     from the point in time that you learned of this, did
21     you ever have a discussion with Sergeant Lewis
22     regarding it?
23 A   No.
24 Q   There was a newspaper article which has been
25     admitted as exhibit number, I think it's 11--

Page 70

1          COMMANDER ENNIS:  Yes, that's
2      correct.
3  Q   (By Mr. Goldpaugh)  This was dated January 15 of
4      2010.  Did you see this newspaper article?
5  A   I have no idea if I did or not.
6  Q   When you left, Commander Dolunt and Commander Moore
7      were still at the Eastern District.  Is that
8      correct?
9  A   I can't speak on Moreland.
10 Q   Not Moreland, Moore.
11 A   Oh, I'm sorry, right, yes.
12         MR. GOLDPAUGH:  No other
13     questions of this witness.
14         MS. JONES:  Just briefly, one
15     question, I believe, maybe two.
16         REDIRECT EXAMINATION
17 BY MS. JONES:
18 Q   When the investigation started in December of 2009,
19     were you ever under investigation in relation to the
20     accusations of time fraud?
21 A   No.
22         MS. JONES:  Pass to the Panel.
23         COMMANDER ENNIS:  Inspector
24     Sroka?
25         INSPECTOR SROKA:  Nothing.

11 (Pages 67 to 70)

Page 71

1
2  COMMANDER ENNIS: Inspector
   Blackmon?
3
4  INSPECTOR BLACKMON: Nothing.
   COMMANDER ENNIS: Thank you.
5  You are excused.
6
7  (At 10:16 a.m., witness
   excused)
8
9  MS. JONES: We will call
   Commander Dolunt.
10
11 UNIDENTIFIED: Raise your right
   hand. Do you swear or affirm that the testimony you
12 are about to give the Board is the truth?
13 COMMANDER DOLUNT: Yes.
14 STEVEN DOLUNT
15 (At 10:18 a.m., sworn as a witness, testified
16 as follows)
17 DIRECT EXAMINATION
18 BY MS. JONES:
19 Q  Please make sure that your responses are verbal, no
20    nods of the head or shakes of the head. You are
21    being recorded. It does not record um-hums or
22    uh-huhs. Understood?
23 A  Yes.
24 Q  Please state your name for the record?
25 A  Steven Dolunt.

Page 72

1  Q  Where are you employed?
2  A  Detroit Police Department.
3  Q  What is your rank?
4  A  Commander.
5  Q  Where are you located?
6  A  Northwest District.
7  Q  At some point in time, were you assigned to the
8     Eastern District of the police department?
9  A  Yes.
10 Q  Do you recall what that time frame was?
11 A  I'm going to say 2007 till 2012. I'm not totally
12    sure on those dates, the beginning date.
13 Q  Do you know a police officer by the name of Jerome
14    Collins?
15 A  Yes.
16 Q  How do you know him?
17 A  He was assigned to the Eastern District.
18 Q  In what department? Was it patrol, Community
19    Relations?
20 A  Community Relations.
21 Q  When you were present at the Eastern District, do
22    you recall if the officers in Community Relations
23    were to fill out activity logs?
24 A  Yes.
25 Q  What is the purpose of the activity log, sir?

Page 73

1  A  To give a summary of their activities for the day.
2  Q  If they were to-- strike that. Generally, what
3     shift did they work?
4  A  I want to say either 10:00 to 6:00 or 11:00 to 7:00.
5  Q  If they were to stay late or have to come in early,
6     would they reflect that on their activity log?
7  A  They should document it, yes.
8  Q  Did there come a time when you became aware that
9     there were some time fraud issues going on in the
10    Community Relations office?
11 A  Yes.
12 Q  What brought that to your attention?
13 A  In this particular case, I wasn't seeing Officer
14    Collins.
15 Q  I'm sorry?
16 A  In this particular case, I wasn't seeing Officer
17    Collins.
18 Q  Okay. Did you come to find out where he was going
19    or where he had been?
20 A  Yes. There were allegations.
21 Q  What were those allegations, sir?
22 A  That he was working other jobs while he was on the
23    clock with the Detroit Police Department.
24 Q  Did you verify those allegations?
25 A  I didn't. Internal Affairs did.

Page 74

1  Q  Did Collins himself have permission to work outside
2     employment?
3  A  Not as far as I know.
4  Q  Did he come to you and apply?
5  A  No.
6  Q  Aren't the officers supposed to apply every year?
7  A  Yes, through the Chief's office.
8  Q  Was there ever a time that you told-- strike that.
9     Was there ever a time you were told by anyone in the
10    Chief's office or in a higher rank than you that
11    Collins was to report directly to them?
12 A  I can't remember the exact wording. Myself and
13    Commander Moore brought our concerns to then Deputy
14    Chief Joyce Motley, and she told us to let it go.
15 Q  She told you, let it go?
16 A  Let it go.
17 Q  Did she say why?
18 A  No, just let it go.
19 Q  At some point in time, did you allow him any special
20    privileges?
21 A  Did I allow him? No.
22 Q  You did not allow him. Do you know of anyone else
23    who allowed him special privileges?
24 A  I guess Deputy Chief Motley.
25 Q  When I say special privileges, what are you

12  (Pages 71 to 74)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 28 of 58

Page 75

1    interpreting that to mean?
2    A   Probably that he had a flexible work schedule and
3    that he could do his outside employment.
4    Q   But you don't know for a fact.  You said probably.
5    Correct?
6    A   I have never seen anything in writing that said,
7    yes, he could do this.  So I'm assuming.
8    Q   We don't want you to assume.  We want you to speak
9    on personal knowledge.  So do you have personal
10   knowledge that he was given flex hours?
11   A   No.
12   Q   As it relates to Community Relations officers or
13   Community Policing officers, did they have flex
14   hours?
15   A   They could, but it would go through our office
16   first.  If there is a community meeting or something
17   special like on a Saturday, which is a leave day for
18   them, we adjust their hours accordingly.
19   Q   So they would have to come through the
20   administrative offices to do that or through the
21   desk sergeant?
22   A   No, their sergeant.  Their sergeant would come to us
23   and say, listen, on such and such a day, this is
24   going on, we need to change their hours, or can we
25   switch a day, this is going on.  Because they did a

Page 76

1    good job.
2    Q   You had no complaints about-- what events he was
3    supposed to be covering, he covered?
4    A   Whenever there was a run to the school he was in
5    charge of, he was there.
6    Q   As it relates to the allegations that he was working
7    outside employment when he should have been working
8    at the City of Detroit, you indicated that you did
9    not take any action, and Internal Affairs did the
10   investigation?
11   A   No.  Actually, myself and Commander Moore, after
12   Deputy Chief Motley left the Department, that was
13   one of the first things we did, we contacted
14   Internal Affairs about our concerns.
15   We had received a letter, I
16   believe it was from his wife or ex-wife or
17   something, and so we were concerned about it.  We
18   called Internal Affairs and asked them to
19   investigate.
20   A short time later, they said
21   we've got nothing.  We can't find anything.  That
22   was fine.  I think it was a year later when Chief
23   Evans got the same letter, he went to Internal
24   Affairs, and within a day or two, they found out
25   there were irregularities.

Page 77

1    MS. JONES:  I am approaching
2    with Exhibit No. 10, counsel, and I also have the
3    letter.
4    Q   (By Ms. Jones)  Is that the letter you are referring
5    to?
6    A   I don't think this is the particular letter, because
7    it was more in-depth that I recall.
8    Q   So the letter you received was more in-depth.  This
9    is a letter to the Chief.
10   A   Yes.
11   Q   Referring to Exhibit No. 11, do you recall that news
12   article in the paper?
13   A   Not offhand.  What is this, the Free Press?
14   Q   Yes.
15   A   Not offhand.
16   Q   Thank you.  Did you turn that letter in that you
17   referenced, did you turn it in to Internal Affairs?
18   A   I believe so.
19   Q   Do you know who, if anyone, was assigned to look
20   into it?
21   A   The first time, no.  The person I contacted the
22   first time was Commander Stair.  I don't know who he
23   assigned it to.
24   Q   Do you know when that took place?
25   A   A little bit before Warren Evans became Chief,

Page 78

1    probably the year prior.  I'm not sure when Warren
2    Evans became Chief, what year.
3    MS. JONES:  Nothing further of
4    this witness.
5    CROSS-EXAMINATION
6    BY MR. GOLDPAUGH:
7    Q   Good morning.
8    A   Good morning.
9    Q   Commander, my understanding is that some time before
10   the allegations we are now addressing, you received
11   an anonymous letter.  Is that correct?
12   A   Yes.
13   Q   Based on that, you did some investigating yourself.
14   Would that be a fair statement?
15   A   I contacted Internal Affairs.
16   Q   You contacted Internal Affairs.  Did you at that
17   time, as part of that situation, realize that there
18   were no activity logs from Officer Collins for 2007
19   and 2008, or 2007 at least?
20   A   Probably.
21   Q   Is that when you went along with Commander Moore and
22   checked out and made some demands, rightfully so, on
23   Sergeant Lewis to make sure that Jerome Collins was
24   doing activity logs?
25   A   Yes.

13 (Pages 75 to 78)

Page 79

1    Q    You also, at that point in time, directed Commander
2    Moore or had Commander Moore also making sure that
3    the assignments were being given out.  Would that be
4    a fair statement?
5    A    We worked together.  I didn't really tell him.  I
6    wouldn't give Commander Moore an order.
7    Q    And I didn't mean it that way.  It came to your
8    attention that there were some irregularities with
9    respect to the Community Relations.  Would that be a
10   fair statement?
11   A    Yes.
12   Q    It wasn't just Jerome Collins, was it?
13   A    No.
14   Q    In fact, based on certain statements-- did you talk
15   to Sergeant Lewis regarding this?
16   A    Yes.
17   Q    Did she tell you that she had been informed by both
18   Commander Godbee and Inspector Motley that they were
19   to report directly to those individuals?
20   A    I don't remember specifically what she said.  I
21   think it-- Motley was a Deputy Chief--
22   Q    Correct.
23   A    And Godbee was the commander before.  I think she
24   may have alluded to the fact that he reported to
25   them.

Page 80

1    Q    Right, and you then tried to clean that up.  Would
2    that be a fair statement?  By that, I mean they were
3    supposed to be reporting to you?
4    A    Oh, absolutely.
5    Q    In fact, as part of this, did you actually go out to
6    Canton to see what he was doing about running sports
7    camps and athletics and things like that?
8    A    No.
9    Q    You indicated that you turned over this information
10   to Internal Affairs?
11   A    Yes.
12   Q    They basically said we don't have anything.  Would
13   that be a fair statement?
14   A    They said, we couldn't find anything.  We don't have
15   enough time to investigate this right now if I
16   recall at the time.
17   Q    Then a year later, the same thing surfaces.  Would
18   that be a fair statement?
19   A    Whenever Evans became Chief, yes.
20   Q    And this letter, the exhibit that was shown to you?
21   A    Correct.
22   Q    Did you specifically talk to Officer Collins
23   regarding the allegations that came down the first
24   time?
25   A    Probably.

Page 81

1    Q    After you notified Internal Affairs the first time,
2    did you start to see Collins more often?
3    A    Yes.  He made a point to see me.
4    Q    He made a point to see you to say I'm here, and I'm
5    taking care of business basically?
6    A    I'm here, yes.
7    Q    Did there also come a point in time when you had
8    Officer Collins directly report to Lieutenant
9    Williams in this matter?
10   A    I think that's possible.  I'm not sure offhand, but
11   it sounds like something I would do.
12            MR. GOLDPAUGH:  May I approach?
13            COMMANDER ENNIS:  Yes.
14            MR. GOLDPAUGH:  I'm just
15   showing him something to refresh his memory.
16            MS. JONES:  What are you
17   showing him?
18            MR. GOLDPAUGH:  His Garrity
19   interview.
20   Q    (By Mr. Goldpaugh)  The bottom of the page may
21   refresh your memory.
22   A    Okay.
23   Q    Does that refresh your memory?
24   A    A little bit, yes.
25   Q    Thank you.  The Community Relations Unit, for the

Page 82

1    most part, some of them were alone and some were
2    with partners.  Would that be a fair statement?
3    A    Yes.
4    Q    Officer Collins worked alone.  Is that correct?
5    A    Yes.
6    Q    There would be times, of course, when there may be a
7    group activity, and they would all go and work
8    together, but normally they would be either
9    partnered up or working alone.  Would that be a fair
10   statement?
11   A    Yes.
12   Q    Was Kenyata Borden part of that, Community
13   Relations?
14   A    Yes.
15   Q    So was Tobias Rios.  Is that correct?
16   A    Yes.
17   Q    When the investigation that we are here for today
18   came forth, this investigation was not only about
19   Officer Collins but also about other officers, is
20   that correct, initially?
21   A    Initially, I had information on just Officer
22   Collins.  Eventually, it went to the way Community
23   Relations was being managed.
24   Q    That was including the investigation into Kenyata
25   Borden who--

14  (Pages 79 to 82)

O'CONNOR COURT REPORTING
248.360.1331        www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 30 of 58

Page 83

1    MS. JONES: I'm going to object
2  because this Internal Affairs investigation is just
3  to Collins.
4    MR. GOLDPAUGH: Part of the
5  exhibits and part of the testimony that has been
6  admitted referred to this entire investigation, and
7  that is why in my opening statement, I brought forth
8  this information.
9    This was all raised in the
10  opening statement by Ms. Jones.
11    COMMANDER ENNIS: Overruled.
12    MR. GOLDPAUGH: Thank you.
13 Q  (By Mr. Goldpaugh) Commander, is that correct?
14 A  What was the question?
15 Q  My question, which was objected to, it may have
16  started out with Officer Collins, but it eventually
17  came into, as you testified, the way it was being
18  run and the alleged criminal activity of other
19  individuals. Would that be a fair statement?
20 A  Yes.
21 Q  One of those was Kenyata Borden. Is that correct?
22 A  Yes.
23 Q  One was Sergeant Lewis. Is that correct?
24 A  Yes.
25    MS. JONES: Objection to both

Page 84

1  of these questions, continued objection. This has
2  nothing to do with Collins. We are here for
3  Collins.
4    MR. GOLDPAUGH: It goes to
5  disparate treatment, and it goes to the very subject
6  that she made in her opening statement, what the
7  liabilities should be and the penalty should be for
8  this particular officer. That's all.
9    MS. JONES: I did not bring up
10  anything in my opening statement about other
11  officers. I don't recall that.
12    Secondly, this is about
13  Collins. It is about whether he violated a
14  Department rule and, if so, what his penalty should
15  be based on other factors.
16    But an opening statement is not
17  evidence. Therefore, I don't know what counsel is
18  saying.
19    MR. GOLDPAUGH: No, but an
20  opening statement also is a road map as to what they
21  expect to prove to support not only the finding of
22  guilt but also the penalty that is meted out.
23  Therefore, the entire investigation comes to this
24  point.
25    That's all I'm asking. I have

Page 85

1  only asked a question. I haven't asked for the
2  outcome of those. I just want to know if he knew
3  about this, that's all. If he doesn't know about
4  it, he doesn't know about it.
5    MS. JONES: If counsel is
6  speaking to the entire investigation, I'm looking at
7  the investigation, and we didn't mark it in as an
8  exhibit. This is about Jerome Collins.
9    MR. GOLDPAUGH: Also, as part
10  of that investigation, Sergeant Mattie Lewis was
11  questioned under an investigative subpoena which was
12  a part of our discovery materials. In that
13  investigative subpoena, it also has the name of
14  Kenyata Borden on it and time fraud.
15    In my experience as a criminal
16  defense attorney, when an individual gets an
17  investigative subpoena, that does not mean that he
18  or she is not subject to criminal charges. It can
19  be used against that person if in fact it is going
20  to be used.
21    MS. JONES: Once again, I'm
22  going to object to this line of questioning because
23  the misconduct report-- whether this investigation
24  led into other investigations, that is not what we
25  are here for.

Page 86

1    We are here because of Jerome
2  Collins, and Jerome Collins' case does not say
3  Jerome Collins, Mattie Lewis and what's the other
4  chick's name you said?
5    MR. GOLDPAUGH: The other
6  chick, as you put it, was Kenyata Borden, and there
7  were charges--
8    MS. JONES: And--
9    MR. GOLDPAUGH: Hold it. Look,
10  she brought it up.
11    MS. JONES: It doesn't state
12  that on here.
13    MR. GOLDPAUGH: No, but it
14  probably should have.
15    MS. JONES: But it doesn't.
16    MR. GOLDPAUGH: I know that.
17    COMMANDER ENNIS: All right--
18    MR. GOLDPAUGH: But if I may
19  respond since this was brought up here, the charges
20  against Mattie Lewis and Kenyata Borden
21  departmentally were brought but under different file
22  numbers. She brought that up.
23    MS. JONES: That has nothing to
24  do with this case.
25    MR. GOLDPAUGH: You are the one

15  (Pages 83 to 86)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 31 of 58

Page 87

1  who just said it didn't say it on there.  I know it
2  doesn't.
3          COMMANDER ENNIS:  Extremely
4  limited, extremely little leeway.  The case before
5  this Trial Board is focusing on the activities of
6  Officer Collins.
7          We have already made note of
8  the general overall complaint regarding the entire
9  Community Relations Unit, but this particular Trial
10  Board is related to the activities of Officer
11  Collins.
12          Anyone else, whether it is
13  Mattie Lewis or Officer Borden or Officer Tobias
14  Rios, are all severed investigations if they
15  happened, and I believe everybody has some
16  independent recollection of them being mentioned.
17          But I don't and the Board does
18  not want to go into a long discussion and review of
19  charges that were filed against other officers
20  because it is not germane to the activities of
21  Officer Collins.  The general overall activities of
22  Community Relations is not what the Trial Board is
23  focusing on.
24          MR. GOLDPAUGH:  I understand
25  that, and I wasn't going much further into that.  I

Page 88

1  was just asking him if he was aware of that.  That's
2  all.
3          COMMANDER ENNIS:  You may
4  repeat your question.
5  Q    (By Mr. Goldpaugh)  Commander?
6  A    Yes.
7  Q    Once the second set of allegations, I'm not talking
8        about the first one, once the second set of
9        allegations came into being, they investigated more
10        than just Jerome Collins.  Would that be a fair
11        statement?  You became aware of that?
12          MS. JONES:  Continuing
13  objection.
14          COMMANDER ENNIS:  Overruled.
15  Go ahead.
16          THE WITNESS:  No.  What
17  happened was the letter came, the second letter on
18  Collins.  I sent that to Internal Affairs.  This is
19  like the perfect storm, because right around the
20  same time, an officer came to me and said, how come
21  I can go on a cruise and Borden goes on a cruise,
22  and Borden gets paid and I don't?
23          I didn't know about that.  At
24  the same time, Rios did his thing.  It was poor
25  management, Rios get fired for what he did.  It was

Page 89

1  wrong.  Borden was suspended for quite some time.
2          It is my understanding that
3  they owed her time, and they gave her slide time,
4  which is fine, but you can't leave the country for
5  slide time, it's cheaper than overtime, I'll take
6  care of that.  I agree with that.
7          Neither of those two were
8  working another job at the same time that they were
9  supposed to be working for me.  The management was
10  slipshod there, the sergeant was suspended.
11          But again, they were all
12  different circumstances and, under the broad
13  spectrum of time fraud, those officers and that
14  supervisor did not take it upon themselves to work
15  another job while they were being paid by the
16  Detroit Police Department to do that job and carry
17  on a charade that they were there all the time.
18          Like I have said many a time, I
19  don't get any help looking stupid, I got it down
20  pat, and Officer Collins, Officer Rios and Officer
21  Borden made me look stupid.  Officer Collins made
22  the Department look inept and myself look inept.
23          I happen to like Officer
24  Collins.  He just got too big for his britches.
25  Does that answer your question?

Page 90

1  Q    (By Mr. Goldpaugh)  No, because it went well beyond.
2        All I asked was were you aware of the investigation?
3  A    No.  What you asked me was-- now, what did you ask
4        me, John?  What was the question?
5  Q    You have answered my question.  You answered well
6        beyond what I asked.
7  A    You asked me did the Collins investigation lead to
8        the other ones?  No.  It was the perfect storm.
9          The other things came forth
10  when people seen that I was actually doing something
11  about Collins.  They were like, oh, wait a minute,
12  how about this, this and this?  That's the answer.
13  Q    I understand that.  That wasn't my question.  My
14        question was, because of Collins, did it lead to
15        other criminal investigations?  That was my only
16        question.
17  A    His did not lead to others, but people brought
18        things to my attention.
19  Q    Then they combined it with Mattie Lewis, correct,
20        and her running the-- correct?
21  A    Yes.
22  Q    Thank you.  You had from Mattie Lewis' statements
23        that she had taken the actions of Jerome Collins to
24        her previous commanders, meaning D.C. Motley and
25        previously to Godbee, and they had said, we'll take

16  (Pages 87 to 90)

Page 91

1   care of it. Would that be a fair statement?
2   A   Yes.
3   Q   You took this to D.C. Motley and raised concerns.
4   She said, I've got it covered or something to that
5   effect. Is that correct?
6   A   The first time.
7   Q   The first time dealing specifically with Jerome
8   Collins?
9   A   Yes.
10  Q   She left. Mattie Lewis and Jerome Collins are still
11  acting in the same-- following the same procedures
12  as beforehand, and then a second letter arrives.
13  Correct?
14  A   The second letter arrived--
15  Q   With respect to Jerome Collins.
16  A   Yes.
17  Q   That is sent down to Internal Affairs and triggers
18  the investigation against Officer Collins and his
19  relationship with Sergeant Lewis in respect to the
20  criminal investigation. Would that be a fair
21  synopsis?
22          MS. JONES: I'm sorry, I'm even
23  confused by that.
24          THE WITNESS: You've got me
25  totally confused, John. Let me--

Page 92

1   Q   (By Mr. Goldpaugh) Let me just ask the question,
2   please.
3   A   Okay.
4   Q   The letter triggers-- goes back to Internal Affairs.
5   A   Which letter?
6   Q   The second letter.
7   A   Okay.
8   Q   You have already brought to the attention of
9   everybody in the Department regarding the anonymous
10  letter.
11  A   Correct.
12  Q   And it fell on deaf ears basically.
13  A   Correct.
14  Q   You took steps to confirm that things were being
15  taken care of. Is that correct?
16  A   Correct.
17  Q   Then a second letter comes, and now Chief Evans
18  decides to get Internal Affairs more involved.
19  Correct?
20  A   Correct.
21  Q   It is at this point in time that, for lack of a
22  better term, Sergeant Lewis' running of Community
23  Relations and the improper activity logs comes to
24  light. Would that be a fair statement?
25  A   Yes.

Page 93

1          MS. JONES: Continued
2   objection.
3          COMMANDER ENNIS: I'm just
4   waiting for a question.
5          MR. GOLDPAUGH: I asked him a
6   question, and then he went on with his--
7          COMMANDER ENNIS: I understand,
8   but let's--
9          MR. GOLDPAUGH: I'm almost
10  done. I will go off the subject.
11          COMMANDER ENNIS: Let me say
12  this: I simply want a question and a simple answer.
13          THE WITNESS: I apologize.
14          COMMANDER ENNIS: That's okay.
15          MS. JONES: We know you are
16  passionate.
17          MR. GOLDPAUGH: And I am too.
18  I understand that, and I understand what he said.
19  Q   (By Mr. Goldpaugh) Would it be a fair statement in
20  general that though you have hours that are
21  specific, that is not always the way it works with
22  respect to showing up at community efforts and
23  things like that? Correct?
24  A   Yes.
25  Q   Would it be a fair statement that officers may be

Page 94

1   involved in certain activities on Saturdays or
2   Sundays because of their relationship with the
3   community?
4   A   Yes.
5   Q   But their assignment to Community Relations is
6   basically five days during the work week. Would
7   that be a fair statement?
8   A   Twenty-day cycle.
9   Q   Twenty-day cycle, okay. So normally, their leave
10  days are weekends?
11  A   Normally.
12  Q   Did it come to your attention during this period of
13  time that Officer Collins was using police
14  equipment, the van and those types of things, during
15  this period of time for his football programs and
16  things like that on weekends?
17  A   I believe so.
18  Q   That wasn't documented on any type of activity logs,
19  was it?
20  A   I don't believe so.
21  Q   In fact there were times when he was running these
22  community programs dealing with the community that
23  members of your command-- did it come to your
24  attention that Chief Godbee or Commander Serda may
25  have attended certain of his banquets and things

17 (Pages 91 to 94)

Page 95

1    like that?
2  A   I don't know about that.
3  Q   During that period of time when he was working for
4    the Department as a Community Relations officer,
5    none of that was documented on his activity logs,
6    was it?
7        MS. JONES: One second. During
8    what period of time?
9  Q   (By Mr. Goldpaugh) The time when he ran his
10   football program that you are aware of.
11  A   I don't know.
12       MR. GOLDPAUGH: Can we take a
13   short break just for a second?
14       COMMANDER ENNIS: Yes.
15       (At 10:51 a.m., recess taken)
16       (At 11:04 a.m., back on the
17   record)
18       COMMANDER ENNIS: Back on the
19   record. Counsel?
20       MR. GOLDPAUGH: Thank you.
21  Q   (By Mr. Goldpaugh) Commander, when you discovered
22   after the first letter that there were no activity
23   logs prepared for Officer Collins or you couldn't
24   find anything for Officer Collins, was that true of
25   the remaining members of the Community Relations

Page 96

1    Section as well?
2  A   I believe so.
3  Q   So that was a point in time where there was no
4    accountability. Would that be a fair statement?
5  A   Yes.
6  Q   By way of activity logs. I mean the job was getting
7    done and things like that. Also, from the time when
8    you-- between the first and the second letter where
9    this accountability and the activity logs being
10   prepared and he was reporting to-- well, all of them
11   were reporting directly to either Sergeant Lewis or
12   to Lieutenant Williams, did you receive any
13   complaints about Officer Collins not doing his job
14   for Community Relations?
15  A   Not that I recall.
16       MR. GOLDPAUGH: Nothing else.
17       MS. JONES: I have a few
18   questions based on a couple questions that counsel
19   asked you.
20       REDIRECT EXAMINATION
21  BY MS. JONES:
22  Q   He asked you something about going to a sports arena
23   in Canton. Were you aware that Collins and his wife
24   owned a sports arena or something with batting cages
25   and basketball out in Canton?

Page 97

1  A   That was in the first letter. That is when I first
2    found out. The first letter claimed that he ran a
3    basketball camp or some type of sports complex in
4    Canton.
5  Q   Do you know if that was a volunteer type of thing,
6    or was it Department-sanctioned?
7  A   It wasn't Department-sanctioned. It was out in
8    Canton, so it would have to be volunteer or an
9    outside employment.
10  Q   As it relates to the activity logs, was it customary
11   for you to review activity logs on a regular basis?
12  A   Myself, no, it's not part of my job.
13  Q   But when you found out about the unavailability of
14   certain officers, is that when you went to look for
15   the activity logs?
16  A   Yes.
17  Q   The football program that counsel asked you about,
18   do you know if that was volunteer or Department-
19   sanctioned?
20  A   As far as I know, it would be volunteer, because I
21   coach, and I don't get--
22       MR. GOLDPAUGH: I'm going to
23   object. She said do you know is it volunteer or was
24   it sanctioned. He can only testify as to what he
25   knows.

Page 98

1        THE WITNESS: Eastern District
2    did not sanction a football team or any of our
3    officers to coach a football team on Department
4    time.
5  Q   (By Ms. Jones) If he were to coach a football team,
6    would it have been in the Detroit area? Would it
7    have been in Huntington Woods or would it have been
8    in Flint? Where would it generally have taken
9    place?
10  A   The City of Detroit has a youth football program,
11   and at one time I believe the Police Athletic League
12   was involved, and at one time, to my understanding,
13   Officer Collins was assigned to the Police Athletic
14   League.
15       So maybe that is where it
16   started, but in the time frame we're talking about,
17   to the best of my knowledge, in fact I know Eastern
18   District didn't sponsor it. I'm not sure of the
19   inner workings of PAL. If PAL had that, then the
20   officers should have been assigned to PAL.
21  Q   If it was determined or found that he was using the
22   Department van, is it possible he could have made
23   another key?
24       MR. GOLDPAUGH: I'm going to
25   object.

18   (Pages 95 to 98)

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 34 of 58

Page 99

1  Q   (By Ms. Jones) If you know.
2           MR. GOLDPAUGH:  Wait a minute.
3  This is well outside the scope of anything that was
4  on direct testimony.
5           COMMANDER ENNIS:  Sustained.
6  Q   (By Ms. Jones) Going back to the van, do you know
7  if he had permission to use the van to go to these
8  events?
9  A   I personally would not object when an officer was
10 off duty coaching and said, I need a favor, I need
11 to borrow this amount of chairs.  Can I use the van
12 to take these chairs to this function?  Or I'm
13 taking so many kids to a function, I'm off duty.
14          I personally, and it's probably
15 against Department regulations, I would approve that
16 because you're doing it to help the youth.  You are
17 not getting paid, you are doing it.  So the
18 Department for years has always tried to help out
19 the community.
20          If an officer came to me and
21 said, can I use the van to do X, Y, Z, and I thought
22 it was a charitable thing, yes, you work with the
23 community, you're not getting paid for it, and you
24 can use the van.  I'd even pay for the gas.  But
25 you're not on duty doing it.

Page 100

1  Q   Do you know if Officer Collins had permission to use
2  the van-- did you give him permission to use the
3  van?
4  A   I don't recall.  If he did that, he probably went
5  through Sergeant Lewis.
6  Q   The first letter that you received, do you still
7  have a copy of it?
8  A   I doubt it.
9  Q   Do you recall what was in it?
10 A   I think it was a complaint that Officer Collins was
11 working other jobs, specifically this sports
12 facility in Canton.  I don't remember the name on
13 the letter.  I recall his wife had sent the letter,
14 and there were a few things about various jobs he
15 was doing.
16          Again, the letter you showed me
17 was a brief paragraph.  The letter I received the
18 first time was a page long and broke down a lot of
19 things.
20 Q   As it relates to Officer Collins, were you aware
21 that he was also working St. John's Hospital and
22 Allen Academy?
23 A   I found that out after.
24 Q   At Allen Academy, were you aware that he worked not
25 only as a truant officer but also worked midnights

Page 101

1  in security?
2  A   That was brought to my attention later as well.
3  Q   Community Relations officers, generally they work
4  eight hours unless an event takes them over the
5  eight hours.  Correct?
6  A   That's correct.
7  Q   Do you know what hours he worked at the other jobs?
8  A   It is my understanding he worked days--
9           MR. GOLDPAUGH:  I'm going to
10 object, this calls for hearsay.
11          COMMANDER ENNIS:  Sustained.
12 Only if you have personal knowledge.  Don't testify
13 to hearsay or what someone told you.
14          MS. JONES:  Well, we are doing
15 an administrative hearing and, as counsel knows,
16 hearsay, as long as it is corroborated, it is
17 admissible, and we already have admitted the charts
18 and testimony.
19          MR. GOLDPAUGH:  And it is
20 irrelevant and immaterial from this witness.
21          COMMANDER ENNIS:  Why is that
22 irrelevant?
23          MR. GOLDPAUGH:  Well, because
24 she is now asking him what does he think or what has
25 he heard.  She has already admitted that we have

Page 102

1  already admitted the time charts for this Board.  So
2  what he heard from somebody else may not even be
3  accurate as to what is in those charts.
4           But we do know those charts
5  allegedly are accurate because they are now in
6  evidence.
7           COMMANDER ENNIS:  Did you have
8  a particular reason for--
9           MS. JONES:  I will withdraw the
10 question.
11          COMMANDER ENNIS:  It is
12 sustained.
13          MS. JONES:  Nothing further of
14 this witness.  Pass to the Panel.
15          MR. GOLDPAUGH:  May I just on
16 something that she brought back up?
17          RECROSS-EXAMINATION
18 BY MR. GOLDPAUGH:
19 Q   You indicated, I believe, with respect to the
20 football program that the Eastern District didn't
21 sponsor a team.  Correct?
22 A   Correct.
23 Q   You also testified on direct testimony and also you
24 gave statements that Officer Collins, at least
25 according to the conversations that you had with

19 (Pages 99 to 102)

Page 103

1  both Mattie Lewis and with D.C. Motley, were don't
2  worry about Collins, I'll take care of this.
3       In other words, he was
4  reporting directly to those individuals, Godbee and
5  to Motley. Is that correct?
6  A  Yes.
7  Q  Were you aware that there were conversations with
8  respect to Godbee and the running of programs and a
9  football program so long as there were community
10  youths being involved?
11       MS. JONES: Excuse me,
12  objection. Outside the scope of my redirect.
13       MR. GOLDPAUGH: She brought out
14  the whole thing about football.
15       COMMANDER ENNIS: I'm sorry, I
16  was distracted. Could you repeat the question?
17       MR. GOLDPAUGH: The question
18  was, was he aware of any conversations where Deputy
19  Chief Godbee talked to Officer Collins regarding
20  community members being on football programs, and
21  I'm paraphrasing that.
22       She objected that it was
23  outside the scope. It clearly isn't because she is
24  the one who brought up the football programs and
25  whether it could be in this community or that

Page 104

1  community. I didn't do that.
2       COMMANDER ENNIS: I will
3  overrule it.
4  Q  (By Mr. Goldpaugh) Were you aware of any of those
5  things?
6  A  No.
7       MR. GOLDPAUGH: May I just have
8  one moment, please?
9       COMMANDER ENNIS: Yes.
10  Q  (By Mr. Goldpaugh) You indicated on redirect that
11  you were aware that Officer Collins had been
12  involved with PAL. Correct?
13  A  Yes.
14  Q  And that had he been running programs of that
15  nature, then that is where he should have been
16  assigned out to or assigned to PAL as opposed to
17  Community Relations in the community. Is that
18  correct?
19  A  If he is going to be doing it on Department time,
20  yes.
21       MR. GOLDPAUGH: Nothing else of
22  this witness.
23       MS. JONES: Just briefly.
24       REDIRECT EXAMINATION
25  BY MS. JONES:

Page 105

1  Q  Counsel asked you a question as to Chief Godbee.
2  Godbee was not Chief at the time that this was
3  brought to your attention, was he?
4  A  The first time?
5  Q  Yes.
6  A  Ella Bully-Cummings was Chief.
7  Q  Godbee was not over the Eastern District when this
8  was brought to our attention, was he?
9  A  No.
10  Q  Therefore, if Godbee gave Collins permission back
11  when Godbee was at Eastern District, would that
12  permission still apply years later?
13       MR. GOLDPAUGH: That calls for
14  speculation. That calls for guesswork. Whether it
15  may technically not apply is one thing, but how it
16  is being treated by all that were involved is
17  another.
18       That is something for this
19  Board to determine. Because he didn't come
20  specifically and get that direction from this
21  commander, though it appears that the history has
22  been going on for quite a period of time, it is
23  totally inappropriate under the circumstances.
24       MS. JONES: There are two
25  different theories here. Their theory is he had

Page 106

1  permission. Our theory is he didn't, and we cannot
2  conclude one way or the other whether he did or
3  didn't. Therefore, this is a valid question.
4       COMMANDER ENNIS: Overruled.
5  Go ahead.
6       THE WITNESS: What was the
7  question?
8  Q  (By Ms. Jones) Would the permission given by a
9  commander at one point in time-- it is similar to
10  when you are given an order, your first order, last
11  order.
12       Would permission given to
13  Collins back when Godbee was over Eastern District,
14  would that continue on throughout?
15  A  Not necessarily. He would come to me and say,
16  listen, I have permission from Godbee to do this.
17  Can I still do this? That is how it would go. Then
18  I would make a determination.
19  Q  Did he do that?
20  A  No.
21  Q  Do you know if he did have permission one way or the
22  other from either your predecessor Motley or your
23  predecessor Godbee?
24  A  I don't know
25       MS. JONES: Thank you.

20  (Pages 103 to 106)

Page 107

1    RECROSS-EXAMINATION
2  BY MR. GOLDPAUGH:
3  Q   Commander, things are going along, you are not
4      receiving any complaints regarding Officer Collins'
5      work during these proceedings.  Correct?
6  A   Correct.
7  Q   You investigate an anonymous letter, you address the
8      concerns with Sergeant Lewis regarding the failure
9      to provide activity logs.  You bring this to Joyce
10     Motley's attention.
11              She says, I've got it under
12     control or I'm taking care of Collins, and it is
13     basically business as usual.  Would that be a fair
14     statement?
15 A   Under Joyce Motley, yes.
16 Q   Nothing changed with respect to his work product for
17     the Department.  By that, I mean he was showing up
18     at the schools like he was supposed to.  He isn't
19     receiving any complaints about not doing his job.
20     Correct?
21 A   Correct.
22 Q   He is running or supposedly involved in his football
23     programs, etcetera, as part of, in his mind,
24     community relations activities.  Is that correct?
25 A   I can't speak to what is in his mind.

Page 108

1  Q   Okay, but since you can't speak to what is in his
2      mind, why would any individual have to come to the
3      next commander and say this is what I've been doing
4      and I want to keep doing it?
5  A   Because it would be common sense to do that.  As an
6      officer, we give you a lot of responsibility--
7  Q   Correct.
8  A   --and we trust you to make the right decisions.
9  Q   Correct.
10 A   Working another job while he is working for me is
11     wrong.
12 Q   I didn't ask that question, Commander.
13 A   Okay.
14 Q   I asked the question regarding-- and this is limited
15     to the football program that Ms. Jones brought up.
16 A   Fine.
17 Q   That's all I'm asking about.
18 A   The football program.
19 Q   Right.  He is running it, and everything is going--
20     if that's what we're talking about.  He has
21     permission.  It's been going on, you have confirmed
22     that Motley was running the show with respect to
23     Collins, and nothing has changed from that program.
24              I'm not talking about this
25     other portion.

Page 109

1          MS. JONES:  Lack of foundation.
2   We have not established that Motley, either through
3   Motley's testimony or anyone else's testimony, gave
4   him permission.
5          MR. GOLDPAUGH:  We're not
6   talking about when she gave permission.  We also had
7   testimony from retired Deputy Chief Motley, and she
8   denies even the conversation that she had with
9   Commander Dolunt.  Yet, Commander Dolunt is saying
10  these are the conversations I had.
11         So how do we jump from we can't
12  confirm that she gave permission?  She is saying
13  these things never occurred.
14         I have no other questions of
15  this witness.
16         MS. JONES:  Nothing further.
17  Pass to the Panel.
18         INSPECTOR SROKA:  Assuming
19  there is a football program, which I don't think we
20  have really established if there is or isn't, was it
21  in the city or out of the city?  There is a big
22  difference.
23         MR. GOLDPAUGH:  I agree.
24         INSPECTOR SROKA:  Does anybody
25  know?

Page 110

1          COMMANDER ENNIS:  Do you
2   understand the question, Commander?
3          INSPECTOR SROKA:  Commander?
4          THE WITNESS:  The City of
5   Detroit has a football program.
6          INSPECTOR SROKA:  That's not
7   what I'm asking.  Was--
8          THE WITNESS:  He never told me.
9          INSPECTOR SROKA:  So we don't
10  know if he was involved in a football program?
11         THE WITNESS:  I can't assume.
12  I know Jerome coaches.  I think he coaches
13  basketball and he coaches football.  He worked for
14  PAL, so at one time, he probably coached a football
15  team in the city of Detroit.
16         PAL doesn't do that any more.
17  So if he was doing it, a reasonable person would
18  think that he was doing it on his own time.  That's
19  all I'm saying.  I didn't sanction it.  I didn't
20  say, Collins, take so many hours a day and coach
21  football.  I never said that ever.
22         If he coached, God love him,
23  because that's a good thing to help the youth, but
24  you do it on your own time.  Does that answer your
25  question, sir?

21 (Pages 107 to 110)

Page 111

1 INSPECTOR SROKA: Well, if
2 there was a football program, yes.
3 I have one other question.
4 Were you in charge once the second letter came?
5 THE WITNESS: The second letter
6 came to Warren Evans, and then I was called and
7 said, hey, this letter came, what do you know about
8 this? It has been brought to your attention over a
9 year ago.
10 INSPECTOR SROKA: Were you in
11 charge of the Ninth Precinct?
12 THE WITNESS: Yes.
13 INSPECTOR SROKA: The Eastern
14 District at that time?
15 THE WITNESS: Yes, sir.
16 INSPECTOR SROKA: Did you guys
17 make any moves to tighten it up?
18 THE WITNESS: The second time,
19 the Chief's office called or Internal or someone
20 called and said, did you know about it? I said,
21 yes, I knew about it a year ago.
22 I thought Internal would look
23 into it, and they just didn't for whatever reason.
24 I said I'm well aware of it. We're making new run
25 sheets.

Page 112

1 Don't get me wrong, he was
2 still turning in run sheets that said he was doing
3 A, B, C and D. False, but he said he was doing
4 them.
5 MR. GOLDPAUGH: I'm going to
6 object to the characterization that they were false.
7 THE WITNESS: They were false.
8 MR. GOLDPAUGH: I'm going to
9 object.
10 COMMANDER ENNIS: Hold on, hold
11 on. The objection is sustained.
12 MR. GOLDPAUGH: Thank you.
13 COMMANDER ENNIS: Commander,
14 hold off on the editorials. Don't make--
15 THE WITNESS: He turned in run
16 sheets, he turned in activity logs.
17 COMMANDER ENNIS: Let the Board
18 make the decision on what happened.
19 THE WITNESS: Fair enough.
20 INSPECTOR SROKA: Was anybody
21 removed from a position in the Community Relations
22 group considering the allegations that were arising?
23 THE WITNESS: I don't recall.
24 INSPECTOR SROKA: That's all I
25 have.

Page 113

1 INSPECTOR BLACKMON: I have
2 just one question, or maybe more than one question.
3 The alleged conversation between you and former
4 Deputy Chief Motley, was there anyone else there
5 during that time?
6 THE WITNESS: Probably
7 Commander Moore.
8 INSPECTOR BLACKMON: That
9 statement that was made could have been heard by
10 Commander Moore?
11 THE WITNESS: I think so.
12 INSPECTOR BLACKMON: In regard
13 to the sanctioning or not sanctioning or whatever of
14 the football program, and this is speculation, if
15 the football program was in the city of Detroit,
16 would Officer Collins have been authorized to do
17 this during Department time?
18 THE WITNESS: If Officer
19 Collins would have come to me and said, Commander,
20 I'm in Community Relations, I'm coaching this
21 football team, I can do it X amount of hours a day,
22 can I adjust my hours so I can do this, I would
23 confer with Sergeant Lewis and say what does he do
24 specifically?
25 He is a school officer at

Page 114

1 Southeastern I believe. Can he do this, yea or nay,
2 and me personally, I probably would have said, you
3 know what, Collins, it's a good idea, yes, we can
4 pull it off, but just remember you're on duty, don't
5 do anything stupid, and this will be part of our
6 Community Relations program at the football field.
7 I don't see a problem with
8 that.
9 INSPECTOR BLACKMON: Would you
10 see a problem with that if there was compensation
11 involved in it?.
12 THE WITNESS: Again, if he came
13 to me as a Community Relations officer and said,
14 listen, I want to start a program, and I want to
15 dedicate so many hours a day to it, this is what I
16 want to do, what do you think? I probably would
17 have double-checked with my boss, and we might be
18 able to work it through and pull this off.
19 I think his intent originally
20 was very good, it wasn't self-serving. I honestly
21 believe when he started this, he wanted it to be for
22 the kids. I honestly believe that. I've known him
23 for a long time. I like the guy.
24 But you still have a
25 paramilitary organization, and you've got to get

22 (Pages 111 to 114)

Page 115

1  permission. You just can't do what you want on your
2  own because you think you--
3      INSPECTOR BLACKMON: But my
4  question is, in that same scenario to where Officer
5  Collins is coaching a football program within the
6  city of Detroit, would you have seen an issue if
7  compensation was involved with that scenario?
8      THE WITNESS: If his hours
9  reflected that he was out there with the youth doing
10  these things, because football doesn't go all year,
11  it's three months, and then he could have said I
12  want to do a basketball team or a baseball team.
13      Cool, as long as it's part of
14  your job, and I think as a command officer it's
15  helping my community and getting kids off the
16  street, I'm all for it, and I'll pay him for it.
17      INSPECTOR BLACKMON: But what
18  if he is getting paid--
19      MS. JONES: I think we are
20  getting far afield on this, because the charges are
21  that he worked St. John's and worked Allen Academy
22  while he should have been at the Detroit Police
23  Department.
24      The fact that he had other
25  activities just enhances the number of hours he is

Page 116

1  doing all this stuff, but his charges are specific
2  to outside employment.
3      INSPECTOR BLACKMON: I agree,
4  and the only reason I'm asking that generalized
5  question, and that is, regardless of what you're
6  doing, if you are working and you have been given
7  the authority to do something that is not directly
8  police related but you're getting paid compensation
9  for that. That's my question. That's all.
10      INSPECTOR SROKA: There was an
11  allegation made that there was some use of
12  Department equipment that wasn't sanctioned, a la
13  the van. So that would, I think, lead to some of
14  the issues that are at hand in this.
15      MS. JONES: Okay.
16      MR. GOLDPAUGH: Just with
17  respect to the term of not sanctioned.
18      INSPECTOR SROKA: Well, he
19  didn't have approval to use the van.
20      MR. GOLDPAUGH: Whether it
21  would be an issue or not, as far as that's
22  concerned, I understand, but there has been no
23  allegation that he improperly used Department
24  equipment is what I'm trying to say.
25      You said there has been an

Page 117

1  allegation. There has been nothing in the charges
2  with respect to that.
3      INSPECTOR SROKA: There is
4  nothing in the charges, but it was brought up.
5      MR. GOLDPAUGH: It was brought
6  up that he was using the van, correct.
7      INSPECTOR SROKA: And I believe
8  there was no authorization.
9      MR. GOLDPAUGH: The question
10  was he was using it, and he said yes, he was. He
11  doesn't know if he was authorized or not to use it.
12      COMMANDER ENNIS: Commander, I
13  heard the term "flex hours." That was used earlier
14  when you began testifying. Just for the sake of
15  clarity, what do you mean by flex hours?
16      THE WITNESS: Now, we are
17  scheduled 11:00 to 7:00. If there is a Community
18  Relations meeting, I will adjust their hours to come
19  in later, flexible hours. If something is going on
20  in early morning, they will come in early morning,
21  and we will adjust their hours. They have flexible
22  hours.
23      COMMANDER ENNIS: When the
24  hours are flex, is it normal that they would reflect
25  the different hours on their activity log?

Page 118

1      THE WITNESS: Absolutely.
2      COMMANDER ENNIS: Do you know
3  or do you have any personal knowledge as to whether
4  or not the daily detail was changed to reflect if
5  they were flexing their hours?
6      THE WITNESS: No.
7      COMMANDER ENNIS: Did you-- or
8  was there a prohibition during your tenure regarding
9  any overtime for Community Relations officers either
10  working over late or not?
11      THE WITNESS: It depended on
12  the circumstances. If they made an arrest or
13  something of that nature, I would pay them overtime.
14  But sometimes they would say we're doing this over,
15  they would just make it up. Instead of getting paid
16  overtime, we would adjust the hours for tomorrow,
17  yes.
18      COMMANDER ENNIS: Were you ever
19  approached by Sergeant Lewis or Lieutenant Williams
20  regarding allowing officers in Community Relations--
21  well, not officers-- Officer Collins in Community
22  Relations to have slide time?
23      THE WITNESS: Particularly
24  Officer Collins about slide time, I don't believe
25  so.

23 (Pages 115 to 118)

## Page 119

1  COMMANDER ENNIS: By slide
2  time, for definition purposes meaning giving
3  somebody the authority to leave earlier from work or
4  come in late and not having it docked out of any of
5  their banks, whether it's comp time or whatever bank
6  is going to be used, or vacation pay?
7  THE WITNESS: As it pertains
8  just to Officer Collins, I would say no.
9  COMMANDER ENNIS: I have
10  nothing else. Thank you.
11  MS. JONES: I have a question.
12  REDIRECT EXAMINATION
13  BY MS. JONES:
14  Q  As it relates to PAL and Community Policing, was PAL
15  still in existence when the Community Policing
16  program started?
17  A  I'm not sure.
18  Q  Was PAL primarily athletics versus Community
19  Policing being other events such as community
20  meetings and things of that nature, going to
21  schools?
22  A  PAL would have been separate, yes.
23  COMMANDER ENNIS: Counsel,
24  anything else?
25  MR. GOLDPAUGH: Yes.

## Page 120

1  RECROSS-EXAMINATION
2  BY MR. GOLDPAUGH:
3  Q  Would you determine that-- based on this last line
4  of questioning, would you determine that Community
5  Relations would be more expansive than PAL?
6  A  Yes.
7  Q  PAL deals mainly with athletics. Community
8  Relations deals with athletics as you have indicated
9  and has more to it than that. Would that be a fair
10  statement?
11  A  Community Relations is broader, yes.
12  Q  But it would not be exclusively athletics, Community
13  Relations?
14  A  I don't believe so.
15  MR. GOLDPAUGH: Nothing else.
16  MS. JONES: Now, I guess we're
17  done.
18  COMMANDER ENNIS: Thank you,
19  Commander.
20  (At 11:35 a.m., witness
21  excused)
22  MS. JONES: I will call
23  Lieutenant Moore.
24  MR. GOLDPAUGH: If I may have
25  two minutes?

## Page 121

1  COMMANDER ENNIS: Certainly.
2  (At 11:35 a.m., off the record)
3  (At 11:37 a.m., back on the
4  record)
5  UNIDENTIFIED: Raise your right
6  hand. Do you swear or affirm that the testimony you
7  are about to give this Board is the truth?
8  LIEUTENANT MOORE: I do.
9  JAMES MOORE
10  (At 11:37 a.m., sworn as a witness, testified
11  as follows)
12  DIRECT EXAMINATION
13  BY MS. JONES:
14  Q  Please make sure that you respond verbally, no nods
15  or shakes of the head and no um-hums or uh-huhs
16  because you are being recorded, and we need a verbal
17  response. Do you understand?
18  A  Sure.
19  Q  Thank you. If you will please state your name for
20  the record?
21  A  James Moore.
22  Q  What is your badge and rank?
23  A  Lieutenant, badge L-181.
24  Q  That is with the Detroit Police Department?
25  A  Yes.

## Page 122

1  Q  How long have you been with the Detroit Police
2  Department, sir?
3  A  I'm in my 36th year.
4  Q  Prior to your being a lieutenant, were you a
5  commander?
6  A  Yes.
7  Q  Where were you a commander at?
8  A  Eastern, Western, Patrol Operations.
9  Q  Let's focus on Eastern District. When were you at
10  Eastern District?
11  A  I went to the Eastern District after I was promoted
12  in December of 2007. I stayed there for
13  approximately three years, a little longer maybe.
14  Q  While there, did you happen to know an officer by
15  the name of Jerome Collins?
16  A  Yes.
17  Q  How do you know him?
18  A  I met him years before that, but at the district, he
19  was a police officer assigned to the Community
20  Relations Unit.
21  Q  You say you met him years before. Where did you
22  meet him before that?
23  A  I think we originally met at 36th District Court.
24  Q  So you have known him for some time?
25  A  Yes.

## Page 123

1   Q   As a police officer at the Community Relations Unit,
2       was he to report directly to you?
3   A   No.
4   Q   Who would he report to?
5   A   The sergeant that was in charge.
6   Q   Would that be Mattie Lewis?
7   A   I believe that is her name, yes.
8   Q   Did Mattie Lewis, at any point in time, come to you
9       and advise that he was not to report to her, he was
10      to report to someone else?
11  A   No.
12  Q   Did she come to you and tell you that she was having
13      problems with him or locating him at any time?
14  A   No.
15  Q   At some point in time, did you have problems
16      locating him?
17  A   No, I didn't have problems locating him. At some
18      point in time, I had questions because I rarely saw
19      him. So I inquired as to where he was.
20  Q   Would you see the other Community Relations officers
21      from time to time?
22  A   A lot more frequently, yes.
23  Q   So as it relates to him, you questioned where he
24      might be?
25  A   I questioned how come I didn't see him as frequently

## Page 124

1       as I saw the others.
2   Q   Why would you question that?
3   A   Because you get used to seeing people. We are all
4       working out of a building, everybody comes in or out
5       of the building frequently. You get used to seeing
6       people, and when you don't see people, you ask
7       what's going on or where are they.
8           I think there were close to 300
9       people assigned there that we were responsible for.
10      When you have the IOU and all the shifts, you just
11      try to keep up with everybody.
12  Q   When you say we were responsible, who are you
13      referring to?
14  A   Originally, myself, Commander Dolunt and Deputy
15      Chief Joyce Motley.
16  Q   When did Motley leave if you recall?
17  A   I want to say September of 2008.
18  Q   So after that, who replaced her?
19  A   No one.
20  Q   So it was just you and Dolunt?
21  A   Yes.
22  Q   Did there come a time that there was a conversation
23      between either yourself and Motley or Dolunt and
24      Motley where there was a conversation to leave
25      Collins solely to her, and she will handle him?

## Page 125

1   A   There was a conversation because I think we were
2       talking at one point and the issue came up how come
3       we never see this guy, and we were told that
4       Community Relations was up under her, don't worry
5       about it.
6           We had the shifts, I think I
7       had platoon three and four, Dolunt had platoons one
8       and two, and Community Relations and administrative
9       staff people were assigned to her. She had that.
10  Q   So when she said don't worry about it, it wasn't
11      necessarily Collins she was referring to, it was--
12          MR. GOLDPAUGH: I'm going to
13      object to the speculation. She can ask a question,
14      but she can't lead him to an answer she wants.
15          MS. JONES: Okay, I will
16      rephrase.
17  Q   (By Ms. Jones) When you just said that she said CR
18      is up under her, don't worry about it, was she
19      referring to CR in its entirety or any specific
20      officer?
21          MR. GOLDPAUGH: I'm going to
22      object because he can't go into her particular mind.
23      He can't say what was in her mind.
24  Q   (By Ms. Jones) What is your understanding of the
25      conversation, sir?

## Page 126

1   A   I took it to mean both.
2   Q   Why is that?
3   A   Because Deputy Chief Motley was not one to mince
4       words. She is very clear when she gave directives,
5       and when she said don't worry about that, that's up
6       under me, she didn't only say that-- we were
7       discussing an individual, and she took it to the
8       unit as well as the administrative part of the
9       building.
10          Therefore, she wasn't only
11      speaking of the people who worked in that capacity,
12      she was talking about those entities at large to me.
13  Q   After she left, did you take any action-- did you or
14      do you know if anyone else took action to find out
15      what Collins was doing?
16  A   Yes. There was some conversation, it may have even
17      taken place with Sergeant Lewis, I'm not sure, but I
18      think we did initially say, okay, we expect to see
19      more of this person, because we want to know what is
20      going on.
21  Q   Did you see more of him after that?
22  A   No. That did not materialize. What were told
23      was or what I was told was-- we have this old
24      Community Relations van, and Jerome is one of those
25      people that don't like to hang around the station.

25  (Pages 123 to 126)

Page 127

1    All the things that I have
2 assigned for him to do, when he comes in, he grabs
3 that stuff, he gets in the van, and he's gone. When
4 he comes back, it's all done, and if you have
5 something you want him to do, let me know, I'll give
6 it to him, it will get done.
7    That's my recollection of what
8 she said.
9 Q    So that is what Sergeant Lewis advised you that it
10 would be taken care of?
11 A    Right. Each one of our people were given specific
12 tasks, and she split the work up among those
13 individuals, and her job was to manage it and make
14 sure that it was all done.
15    She assured me that he was
16 getting his share of the work, but he was not one of
17 those kind of people who would hang around the
18 station and mill around, drink coffee and socialize.
19 He took that old van, and he went out and did what
20 needed to be done.
21 Q    Do you know how this was getting done? Did she
22 advise how everything was getting done?
23 A    No. Community Relations primarily would handle a
24 lot of the nuisance complaints that we got in the
25 district, the junk cars, the overgrown weeds, issues

Page 128

1 like that.
2 Q    Environmental issues?
3 A    Environmental issues, right. According to her, his
4 run sheet would indicate that he had done these
5 things. There would be ordinances issued sometimes
6 for those issues and, whenever she went back and
7 spot checked to see whether or not it was true, she
8 didn't find any discrepancies.
9 Q    You are sure that she went back and spot checked?
10    MR. GOLDPAUGH: I'm going to
11 object. It calls for--
12    THE WITNESS: I never followed
13 her or had anybody spot check what she spot checked,
14 no.
15    COMMANDER ENNIS: Do you
16 withdraw your objection?
17    MR. GOLDPAUGH: That's okay, I
18 will withdraw it.
19    THE WITNESS: Sorry about that.
20    COMMANDER ENNIS: That's okay.
21 Q    (By Ms. Jones) As it relates to the investigation
22 that lead to the charges here today, were you aware
23 that he was working at St. John's Hospital and at
24 Allen Academy?
25 A    No.

Page 129

1 Q    Were you aware that any of the hours that-- were you
2 aware that he applied for permission to do outside
3 employment?
4 A    No, not to my recollection.
5 Q    Did you do any investigation on your own?
6 A    No. I requested one. I recall contacting Internal
7 Affairs and advising them of the situation, that
8 maybe we need to take a look at this.
9 Q    Did they?
10 A    When I got back to them, they did tell me yes, they
11 did.
12 Q    What did they find?
13 A    They told me that the results of their investigation
14 was negative. I inquired what kind of investigation
15 did you all do?
16    They told me that they had a
17 full investigation including putting a surveillance
18 team on him that had, I guess, followed him for a
19 period of time, and they didn't see anything out of
20 the ordinary.
21 Q    Did there come a time that you found out there was
22 something out of the ordinary going on?
23    MR. GOLDPAUGH: I'm going to
24 object to the characterization of something out of
25 the ordinary. He can only testify--

Page 130

1    COMMANDER ENNIS: Sustained.
2 Will you rephrase the question?
3 Q    (By Ms. Jones) Did you, at some time, find out that
4 Collins was doing something while he should have
5 been working at the Detroit Police Department?
6 A    There was a point at which we received a letter, and
7 it had some allegations that there was more going on
8 than should be going on, yes.
9 Q    What did that letter consist of?
10 A    An allegation that there was something going on in a
11 sports league or something and something going on
12 with some little league teams and maybe working
13 outside of-- I can't remember, to be honest with
14 you. It was a long time ago.
15 Q    That's fair.
16 A    I mean I really can't. I would be guessing. But I
17 can just tell you that I took it and forwarded it to
18 the people who were responsible for doing an
19 investigation into it.
20 Q    Okay. To this day, are you aware that he was
21 working the two other jobs?
22 A    Yes. It was brought to my attention that there was
23 some outside employment going on.
24 Q    Do you have any personal knowledge that his time
25 that he was working at these other jobs overlapped

26   (Pages 127 to 130)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 42 of 58

Page 131

1   the time he should have been working at the Detroit
2   Police Department?
3   A   I don't have any personal knowledge of it at all,
4   no. I was not involved in the investigation. At
5   some point while it was ongoing, I was transferred
6   out of the Eastern District.
7   MS. JONES:  Pass the witness.
8   CROSS-EXAMINATION
9   BY MR. GOLDPAUGH:
10  Q   Hello, sir.
11  A   Hi, how are you?
12  Q   You indicated that you have known Officer Collins
13  for a lengthy period of time. Correct?
14  A   Yes.
15  Q   That you first met him, I believe, at 36th District
16  Court?
17  A   Yes.
18  Q   Then you went down your different paths, and
19  eventually you reunited, so to speak. Were you
20  working at 36th District Court?
21  A   No. If I'm not mistaken, he was a security guard at
22  36th District Court at some point in his career, and
23  I was a police officer that went to 36th District
24  Court all the time to testify, and I would see him
25  there. That is how we initially met.

Page 132

1   Q   So he was assigned when DPD was originally doing the
2   36th District Court. That's how you met him?
3   A   No. He wasn't working for DPD.
4   Q   Oh, so you have known him even longer than the 20
5   years that he has been on the job?
6   A   That's my recollection, yes.
7   Q   I'm sorry, I misunderstood your answer. Other than
8   the Ninth Precinct, or Eastern District, did you
9   ever work together as police officers?
10  A   No. It is my understanding that he came on the job,
11  and I remember seeing him one day in a police
12  uniform, and I said, oh, you came on the job. Then
13  he worked PAL and other things, and I never worked
14  with him at all.
15  Q   As you indicated, he worked PAL. What did he do
16  with PAL if you know?
17  A   Whatever officers assigned to PAL do. I don't know.
18  Q   Was he running basketball leagues and football
19  leagues?
20  A   I would assume they would have some input into that
21  kind of stuff, but I don't know.
22  MS. JONES: Objection. He
23  indicated--
24  COMMANDER ENNIS: It is
25  sustained.

Page 133

1   Q   (By Mr. Goldpaugh)  There comes a point in time when
2   he is now working for you though. Get to that
3   point, get to the Eastern District.
4   A   There comes a point in time where now he is assigned
5   under my sphere of control, yes.
6   Q   That was approximately 2008 I believe, 2007?
7   A   The end of 2007 or January of 2008, either December
8   or January when I finally showed up over there.
9   Q   You and Commander Dolunt were the commanders at the
10  Eastern District, and Deputy Chief Motley was
11  basically running the district. Right?
12  A   Yes. She was the deputy chief.
13  Q   It is my understanding from your testimony and the
14  testimony of others that there became a concern
15  about the whereabouts of Officer Collins as a
16  Community Relations officer. Is that correct?
17  A   Okay. That's a fair characterization. I mean not
18  necessarily his whereabouts but just the fact that
19  we didn't see him.
20  Q   That's what I mean. I guess that's his whereabouts,
21  and that is why I say that. You are seeing Officer
22  Collins a lot less frequently than you are, say,
23  Officer Smith, and I'm making that name up?
24  A   Let's say we have one of our big Community Relations
25  meetings. We have a big Community Relations meeting

Page 134

1   and, all of a sudden, there is Officer Collins, and
2   you go where the hell has he been for the last 90
3   days? I don't recall seeing him.
4   Q   I understand, and you brought this to-- because
5   Sergeant Lewis was in charge of Community Relations
6   at that time. Right?
7   A   Yes.
8   Q   What about Lieutenant Williams, was she involved in
9   Community Relations at all?
10  A   I'm not sure. I don't think so. She may have been,
11  but I don't think so.
12  Well, at some point, she became
13  the administrative lieutenant and, if I'm not
14  mistaken, Community Relations would report to the
15  administrative lieutenant which would then go to the
16  deputy chief.
17  Q   You had some conversations with Sergeant Lewis
18  regarding this, is that correct, about the
19  whereabouts or why don't I see Officer Collins as
20  frequently as others?
21  A   Eventually, yes, I did make an inquiry.
22  Q   In fact there came a point in time when you brought
23  this, specifically with respect to Officer Collins,
24  to Deputy Chief Motley. Is that correct?
25  A   Yes.

27 (Pages 131 to 134)

O'CONNOR COURT REPORTING
248.360.1331      www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 43 of
58

Page 135

1  Q  When you spoke to Chief Motley regarding this, was
2     Commander Dolunt present?
3  A  I believe so.
4  Q  When this came to your attention, Commander Motley
5     spoke to you and said, I got that, don't worry about
6     it.  Is that correct?
7  A  I'm not quoting her, but that's the way I took it.
8     She told us basically that was up under her, that's,
9     hers, and we had our assignments.  Do what you're
10    supposed to do, and I've got my piece.
11 Q  Right, but I can show you this if you would like,
12    and you can review this to refresh your memory.
13    This is a copy of the Garrity interview that you
14    gave.
15            You don't need to read the
16    whole thing, but the bottom part is the highlighted
17    part and a little bit into the next page if you want
18    to review that for a second to refresh your memory
19    regarding that incident.
20 A  Her position was--
21 Q  I will ask you some questions, but I just want you
22    to read that to yourself for a second.
23 A  The highlighted portion.
24 Q  In fact why don't you read the highlighted portion
25    just to refresh your memory, and then go on to the

Page 136

1     next page through a little bit there?
2  A  (Witness complied)  Okay.
3  Q  Does that refresh your memory as to the subject
4     matter of the conversation with Deputy Chief Motley?
5  A  Yes.  The subject matter was Officer Collins.
6  Q  That's what I mean.  The subject matter was Officer
7     Collins, not the general running of Community
8     Relations.  Correct?
9  A  Yes.
10 Q  So when she was answering your questions or your
11    concerns, she said, I got him, I give him stuff, he
12    does these things.  Is that correct?
13 A  That's not what I said.  Let me share this with
14    you--
15 Q  Let me ask a question, please.  Is that what you
16    told Internal Affairs?
17 A  Not to my knowledge.  What I told Internal Affairs
18    is that she said, I got that, don't worry about that.
19 Q  Right, and then she went on to say, I give him
20    stuff, and things like that.  Correct?
21 A  Let me say this.  You are asking me what it says
22    here.  Right?  Now, I see that.
23 Q  No, I'm not asking that.  I'm asking you if that
24    refreshes your memory as to what was said?  Did you
25    give a Garrity statement?

Page 137

1  A  I gave a Garrity statement years after the
2     conversation that we had.
3  Q  I understand that, trust me.  I understand that, but
4     did you tell Internal Affairs during the
5     investigation that this is what Deputy Chief Motley
6     said?
7           MS. JONES:  May I see that?
8           MR. GOLDPAUGH:  This purports
9     to be a transcript of his Garrity interview.
10 Q  (By Mr. Goldpaugh)  Did you have a chance to review
11    this?
12 A  Yes.
13 Q  The reason I ask this is because you told Internal
14    Affairs in the Garrity interview-- and I know time
15    goes by in all these conversations--
16           MS. JONES:  The actual Garrity
17    would be the better--
18           MR. GOLDPAUGH:  I can show him
19    anything I want to refresh his memory.  If you want
20    to take the time to play the Garrity tape, that's
21    fine.
22           COMMANDER ENNIS:  For the
23    edification of the Board, we haven't seen it.  Have
24    you got a copy?  Is that the transcript of--
25           MR. GOLDPAUGH:  This is a

Page 138

1     transcript of the Garrity interview.  I received a
2     copy of his Garrity interview as part of discovery.
3           I have taken the time to
4     transcribe it so I can use that.  That is the tape.
5     The tape is not being admitted because that's not
6     evidence.  He is here to testify.  I have shown him
7     something to refresh his memory if need be as to
8     what he said.
9           On direct testimony, Ms. Jones
10    asked a series of questions regarding this
11    conversation, and then Ms. Jones, in her
12    questioning-- and then the response was that she,
13    meaning Deputy Chief Motley, was talking about the
14    situation of the running of Community Relations as
15    opposed to a specific discussion regarding what his
16    opinion was, which I objected to and was allowed in,
17    as to what she, meaning Motley, was talking about
18    when she made these statements.
19           It was answered in a way which
20    I do not believe was consistent with what he said
21    here, because the answer was he believed that what
22    Deputy Chief Motley was talking about was the entire
23    running of Community Relations, and that is not what
24    this says.
25           MS. JONES:  Actually, that is

28  (Pages 135 to 138)

Page 139

1   what it says--
2               MR. GOLDPAUGH:  No, it doesn't.
3               MS. JONES:  --on the following
4   page.
5               MR. GOLDPAUGH:  It does not,
6   but that's okay.  We are talking about this portion
7   of what he said.
8               COMMANDER ENNIS:  All right,
9   let's proceed.
10  Q   (By Mr. Goldpaugh)  Did you tell Internal Affairs
11      that when you told them:
12          "We had expressed some concerns about
13          the fact that we didn't see him, you know,
14          as frequently as we saw everybody else.
15          Actually, you know, it was very infrequent
16          that we saw him, you know, and we asked
17          where he is, and he's handling stuff, don't
18          worry about it."
19      Is that what you recall her answer was?
20  A   Yes.
21  Q   Were you then asked this question by Internal
22      Affairs saying:
23          "Okay, so she didn't expound on anything
24          else of what he might be doing for her or
25          anybody else?"

Page 140

1       Your answer was no, and then you went on to give
2       some more information.  Would that be a fair
3       recitation?
4   A   Okay.
5   Q   Now, Deputy Chief Motley left.  Correct?
6   A   Yes.
7   Q   Then you and Commander Dolunt took over.  By that, I
8       mean you shared responsibilities for running the
9       district.  Would that be a fair statement?
10  A   Yes.
11  Q   There comes a point in time when you receive an
12      anonymous letter, is that right, regarding Jerome
13      Collins?
14  A   Yes.
15  Q   And dealing with outside employment or something
16      along those lines about a basketball camp or
17      something along those lines?
18  A   Yes.
19  Q   What did you do with that information, if anything,
20      if you recall?
21  A   We discussed it, and we decided it would be better
22      handled if we sent it over to Internal Affairs,
23      because we felt it was their responsibility to do
24      those investigations, not ours, and we gave it to
25      them.

Page 141

1   Q   Okay, and I understand.
2   A   We called Commander Stair and let him know that it
3       was coming, and we sent it over.
4   Q   Then it came back, hey, there is nothing here.
5       Correct?
6   A   No.
7   Q   Well, didn't you say that they said we did it, and
8       we can't find anything?
9   A   I said that after a period of time, and we hadn't
10      heard from them about what was going on, we
11      contacted them to find out what was going on.
12  Q   All right.
13  A   That is when we were advised.
14  Q   So you followed up on what you were looking for and
15      found out that they couldn't find anything
16      supposedly.  Correct?
17  A   They found nothing.
18  Q   Now, this was in 2008 I guess?
19  A   I'm not sure.
20  Q   Did there come a point in time when you learned that
21      nobody was doing activity logs for Community
22      Relations?
23  A   No.
24  Q   Did there come a point in time after this anonymous
25      letter where there were allegations that he had

Page 142

1       outside employment and wasn't doing what he was
2       supposed to be doing with respect to Community
3       Relations?  Is that correct?
4   A   There did come a time where that occurred.
5   Q   That was before the second letter was sent
6       triggering this investigation.  Is that right?
7   A   No.  I don't understand what you're saying.
8   Q   Let me rephrase.  Did there come a point in time
9       where you and Commander Dolunt, in conjunction with
10      what was going on with Community Relations as a
11      whole, decided to make some changes for
12      accountability purposes?
13  A   I don't recall.
14  Q   Do you recall a change when the officers, including
15      Officer Collins, were directed to make sure they did
16      their activity logs and to appear and turn these
17      things in or to appear and get their assignments
18      from Sergeant Lewis or Lieutenant Williams?
19  A   Yes.
20  Q   That was before the second letter that triggered the
21      Internal Affairs investigation from Chief Evans.
22      Correct?
23  A   I believe so.
24  Q   Once Deputy Chief Motley left, the members of the
25      Community Relations Section or Unit were all

29  (Pages 139 to 142)

Page 143

1  specifically assigned by previous command staff.  Is
2  that correct?
3  A  Yes.
4  Q  In other words, members of Community Relations
5  basically sat at the pleasure of the commander.
6  Would that be a fair statement?
7  A  No.
8  Q  You could go up and say you will no longer be a
9  Community Relations officer.  Correct?
10  A  No.  That is not my understanding.
11  Q  If you were the commander of the precinct?  That's
12  an exempt unit, isn't it?
13  A  Not to my understanding.  My understanding was there
14  was negotiations that took place prior to turning
15  precincts into districts.
16      Part of those negotiations were
17  the discussion of Community Relations and how many
18  of those people would be selected by the commander
19  as well as how many would be allowed to go in by
20  seniority.  Even then--
21  Q  I understand.  So it was not your understanding that
22  they sat at your-- okay, that's fine.  I don't know
23  if it was, I was just asking that question.  That's
24  fine.
25      Did you ever have a

Page 144

1  conversation with Sergeant Lewis regarding Jerome
2  Collins specifically and directions she received
3  from either then Commander Godbee or Deputy Chief
4  Motley with respect to who Officer Collins was
5  supposed to report to?
6  A  I had a lot of conversations with Sergeant Lewis,
7  but I don't recall one specifically as to whether he
8  was supposed to report to-- he was supposed to
9  report to her in my mind.  She was his immediate
10  supervisor.
11  Q  Right.  My question was, did she ever tell you that
12  she was talking to other people, and she was told by
13  those two specifically he is to report to them, and
14  they will handle it.  You are saying you don't
15  recall that conversation?
16  A  No, not to my recollection.
17  Q  I may have asked this question and you indicated you
18  didn't recall about the activity logs.  Would you
19  just read that to yourself and see if that refreshes
20  your memory regarding that issue, the part above the
21  highlighted part.
22      MS. JONES:  What are you
23  highlighting?
24      MR. GOLDPAUGH:  This part.
25      THE WITNESS:  Okay.

Page 145

1  Q  (By Mr. Goldpaugh)  There came a point in time when
2  you then learned that activity logs weren't being
3  done by at least Officer Collins.  Would that be a
4  fair statement?
5  A  Yes.
6  Q  Then you directed at least Officer Collins through
7  Sergeant Lewis to make sure his activity logs were
8  being done, and she--
9  A  That's not what I meant.
10  Q  That's not what you meant?
11  A  No, that's not what I meant.
12  Q  What did you mean by that then?
13  A  What I meant by that was what I said earlier.  We
14  didn't see him, and when I discussed it with her,
15  she said that what she needed him to do, she was
16  giving him assignments, and it was getting done.
17      I told her, well, then make
18  sure if he's doing it, then his activity log should
19  reflect that he's doing it, where he is doing it and
20  what days he did it on.  Make sure that you've got
21  those because then you can go back and check those
22  places to make sure that what he said he did he did.
23  Q  Okay, that's fine.
24  A  That's what I meant.
25      MR. GOLDPAUGH:  I understand

Page 146

1  that.  Thank you.
2      MS. JONES:  Briefly.  Counsel
3  has been referencing a transcript that his office
4  provides to him as it relates to a Garrity statement
5  that this witness gave previously, his prior
6  statement.
7      I am moving to admit this prior
8  statement because there has been reading of the
9  transcript without the whole thing being placed in
10  the context.  So I would like to admit that as
11  Department Exhibit No. 14.
12      (At 12;09 p.m., DX#14 marked)
13      MR. GOLDPAUGH:  I am objecting
14  totally to this.  This is not an exhibit.  This is a
15  transcript that I prepared off a document that I
16  received during discovery.  This was his Garrity
17  statement.
18      Therefore, I can show him
19  anything I want to refresh his memory, and that is
20  all I did.  I told him specifically to please read
21  this to yourself, and then I will ask questions.
22      I did not ask him, and he did
23  not do that, read this in as testimony.  Clearly,
24  this is an attempt to improperly enter a Garrity
25  statement, and that is all this is.  If Ms. Jones

30  (Pages 143 to 146)

Page 147

1 and her staff wanted to take the same situation and
2 transcribe the document, she could have done it.
3        I have on numerous occasions
4 done that, particularly with the officers' Garrity
5 statements that are going to be admitted, and it has
6 been made clear that is not an exhibit, but rather
7 it is to help the trier of fact so they won't have
8 to listen to the whole thing if they don't want to.
9        There is no basis in
10 evidentiary rules or arbitration rules or any other
11 reason to submit this transcript or to submit the
12 tape under those circumstances. I showed it to him
13 to refresh his memory. He could have said yes, no,
14 or indifferent.
15        In fact on one occasion, he
16 didn't testify that he didn't say what is in that
17 statement, he gave his explanation of what he meant
18 by that. I didn't cut him off. I didn't try to
19 shut him down. I allowed him to testify as to what
20 he meant when he gave that statement. That's all.
21        MS. JONES: In reply, I'm not
22 saying that he read it into the record. He read it
23 into the record, and he read it and asked questions
24 out of context as to what was said, and that is why
25 this should go in.

Page 148

1        MR. GOLDPAUGH: If she wants to
2 get up there and-- no, it shouldn't go in. If she
3 wants to stand up there and say, okay, here is the
4 tape, listen to the tape, and isn't this what you
5 really meant, that's fine.
6        But to say because I picked
7 something out of a document that she has just as
8 much access to and talked about it doesn't
9 automatically make that document admissible.
10        MS. JONES: I will defer to the
11 Board.
12        COMMANDER ENNIS: The first
13 question, counselor: Your notes and your
14 transcription of the Garrity tape was done by your
15 office.
16        MR. GOLDPAUGH: Correct.
17        COMMANDER ENNIS: It was done
18 based on reviewing the Garrity tape and so forth.
19        MR. GOLDPAUGH: Yes.
20        COMMANDER ENNIS: Do you have a
21 specific prohibition on allowing the Board to hear
22 the entire Garrity?
23        MR. GOLDPAUGH: Yes, I do, and
24 the reason is because the Garrity tape and the
25 Garrity statement, whether it be recorded, whether

Page 149

1 it be transcribed or whatever, is not the evidence.
2 It is not the exhibit.
3        His testimony is what is at
4 stake here or is what is reviewed here. Had he said
5 that's not true, I never said any of this, it
6 wouldn't have made any difference, because the only
7 evidence is what is coming out of the witness'
8 mouth, not what is on some tape or something that is
9 transcribed.
10        I showed him this document to
11 refresh his memory as to what he purportedly said on
12 the tape. Purportedly, that is what is on this
13 tape, these words. That is all I did.
14        I even, as I said, allowed him
15 to go on when he said this is what I meant by what I
16 said.
17        COMMANDER ENNIS: I understand.
18 Do you have a response?
19        MS. JONES: No.
20        COMMANDER ENNIS: I will
21 overrule the objection.
22        MS. JONES: Thank you.
23        (At 12:11 p.m., DX#14 received)
24        MS. JONES: I have another
25 question.

Page 150

1        REDIRECT EXAMINATION
2 BY MS. JONES:
3 Q   Do you know who handled the initial investigation as
4     it relates to-- you said there was some type of
5     surveillance team, IA investigation?
6 A   Yes.
7 Q   Do you know who handled that?
8 A   No, I don't. There was a sergeant over there
9     handling the surveillance.
10 Q  There was a sergeant that handled the surveillance?
11 A  I can't remember his name. I don't think he's on
12    the job any more.
13 Q  Counsel asked you something about Community
14    Relations officers sitting at the pleasure of the
15    commander. If that had been the case, could you
16    have removed him?
17        MR. GOLDPAUGH: I'm going to
18 object only because he doesn't believe he could.
19        MS. JONES: That's my question
20 to him.
21        MR. GOLDPAUGH: I asked him
22 that question, doesn't he sit at the pleasure, and
23 he said I don't think so, no. So he doesn't think
24 he has the authority to do it. So it doesn't make
25 any difference.

31 (Pages 147 to 150)

Page 151

1    COMMANDER ENNIS:  Sustained.
2    MS. JONES:  Nothing further.
3  Pass to the Board.
4    MR. GOLDPAUGH:  My objection is
5  on the record in regard to the Garrity tape.
6    COMMANDER ENNIS:  Your
7  objection is noted.  Any questions, Inspector?
8    INSPECTOR BLACKMON:  The first
9  investigation that Internal did, what predicated
10  that?  What caused that to be generated?
11    THE WITNESS:  I think my
12  recollection is it was just our curiosities.  We
13  didn't see him, and we wanted to know what was going
14  on.  We called over there.  But then, again, it
15  might have been because we got a note.
16    Steve got information that he
17  shared with me.  I got information that I shared
18  with him, and it was a long time ago.  Did I make a
19  specific note of it?  No.  I mean it is fading to be
20  honest with you.
21    But the bottom line is that we
22  didn't see him the way we felt we should.  We made
23  inquiries.  We didn't get answers that satisfied us.
24  Therefore, we asked those people whose
25  responsibility it is to take a deeper dive.

Page 152

1    INSPECTOR BLACKMON:  My
2  question was what were they looking for when they
3  were initially investigating?  What were they
4  looking to discover?  Because when you say they
5  didn't find anything, what were they looking to
6  discover?
7    THE WITNESS:  We were looking
8  to see whether or not this person is where they are
9  supposed to be and doing what they are supposed to
10  be doing.
11    If they followed him for a week
12  and saw that he came to work, walked in there, got
13  his stuff, got in that van and went out and did all
14  of his work, came back, dropped it off, and he is
15  only in the station seven minutes out of the day
16  because he was dropping off and picking up, then
17  that's fine.
18    But if they followed him all
19  day long and found out he was doing something other
20  than that, then that's what we were trying to find
21  out without having to do it ourselves.  What is he
22  doing?
23    INSPECTOR BLACKMON:  So to your
24  knowledge, they weren't looking at whether or not he
25  was working somewhere else other than DPD at that

Page 153

1  time?
2    THE WITNESS:  They should have
3  been looking to discover whatever was going on.  In
4  other words, if you wake somebody up and you put
5  them to bed with a surveillance team, no matter what
6  they do, you're going to discover it.
7    INSPECTOR BLACKMON:  Based on
8  what they told you, they didn't see anything at that
9  time?
10    THE WITNESS:  That's what they
11  told us.  When we got back, we said, okay, then
12  everything must be good.  But when things went on
13  and on, at some point, of course, we said, well,
14  what the hell was the surveillance?
15    Then that is when we found out
16  that they had discovered some place in Canton or
17  something, and they weren't actually following him,
18  they were sitting on a building waiting for him to
19  show up when he should.
20    COMMANDER ENNIS:  Anything
21  else, counsel?
22    MS. JONES:  Nothing else from
23  me.
24    COMMANDER ENNIS:  Sitting on a
25  building.  Thank you, Commander, you're excused.

Page 154

1    (At 12:19 p.m., witness
2  excused)
3    COMMANDER ENNIS:  How many more
4  witnesses do you have?
5    MS. JONES:  Two.
6    COMMANDER ENNIS:  How long?
7    MS. JONES:  Todd is the OIC,
8  and Whitney.
9    COMMANDER ENNIS:  That's going
10  to be long.  We are adjourned till 1:30.
11    (At 12:19 p.m., recess taken)
12    (At 1:49 p.m., back on the
13  record)
14    COMMANDER ENNIS:  Back on the
15  record.
16    MS. JONES:  The Department
17  calls Todd Svenkesen to the stand.
18    UNIDENTIFIED:  Raise your right
19  hand.  Do you swear or affirm that the testimony you
20  are about to give the Board is the truth?
21    SERGEANT SVENKESEN:  I do.
22    TODD SVENKESEN
23    (At 1:50 p.m., sworn as a witness, testified
24  as follows)
25    DIRECT EXAMINATION

32  (Pages 151 to 154)

Page 155

```
 1   BY MS. JONES:
 2   Q   Please state your name for the record so that we all
 3       know how to pronounce it?
 4   A   Todd Svenkesen.
 5   Q   What is your rank?
 6   A   Sergeant.
 7   Q   Can you spell Svenkesen for the court reporter,
 8       please?
 9   A   S-v-e-n-k-e-s-e-n.
10   Q   Thank you.  Do you work for the City of Detroit
11       Police Department?
12   A   Yes.
13   Q   For how long?
14   A   About 16 years.
15   Q   Where are you currently?
16   A   Internal Affairs.
17   Q   How long have you been in Internal Affairs?
18   A   About four to four-and-a-half years.
19   Q   Before that, where were you?
20   A   TAC Mobile.
21   Q   In Internal Affairs, what are your duties?
22   A   Investigations.
23   Q   Of what?
24   A   Possible criminal activity.
25   Q   That would be criminal activity by police officers?
```

Page 156

```
 1   A   Of the City of Detroit in general.
 2   Q   So any City of Detroit employee?
 3   A   Correct.
 4   Q   Do you know Jerome Collins?
 5   A   Through my investigation, yes.
 6   Q   What were you tasked to investigate?
 7   A   Possible time fraud by Mr. Collins or Officer
 8       Collins.
 9   Q   As it relates to the investigation, when were you
10       assigned the investigation, sir?
11   A   I was actually given the assignment December 10,
12       2009.
13           MR. GOLDPAUGH:  I'm sorry,
14       could you repeat that date, Sergeant?
15           THE WITNESS:  It would be
16       December 10, 2009.
17           MR. GOLDPAUGH:  Thank you.
18   Q   (By Ms. Jones)  What did you do in furtherance of
19       your investigation?  Did you do interviews, document
20       gathering, or what did you do?
21   A   The Internal Affairs team, we were tasked to try to
22       get documentation of activity logs, daily details,
23       also do interviews of witnesses.
24   Q   What triggered this investigation?
25   A   From my understanding, a letter was sent to the
```

Page 157

```
 1       Chief and, from there, it was sent down to Internal
 2       Affairs, and then it was assigned to an Alert Team
 3       who did a preliminary and then directly assigned to
 4       me in December.
 5   Q   So you said the IA team gathered daily details,
 6       activity logs.  Anything else?
 7   A   We conducted interviews and received paperwork and
 8       payroll, etcetera, from some of the other places
 9       that he worked.
10   Q   You are referring to St. John's and Allen Academy?
11   A   Correct.
12   Q   We have testimony here today about-- well, did you
13       get the time sheets?  Strike that.
14           Did you get time records or
15       payroll records from the Detroit Police Department
16       as well?
17   A   Yes, ma'am.
18   Q   Personnel records?
19   A   Personnel meaning what type of records?
20   Q   His personnel file.
21   A   No, ma'am, I did not.
22   Q   Any desk blotters or work time reports, anything
23       like that?
24   A   Activity logs and the daily details.
25   Q   Did you follow the criminal trial?
```

Page 158

```
 1   A   Yes, ma'am.
 2   Q   So you indicated a letter initiated this, that
 3       letter to Warren Evans?
 4   A   Yes, ma'am.
 5   Q   Who did you interview?
 6   A   For the Department or--
 7   Q   Who did your team interview?  Because I know you
 8       didn't conduct all the interviews.
 9   A   Commander Dolunt, at the time, Commander Moore,
10       Lieutenant Williams, I think Lieutenant Justine
11       Coleman (phonetic), some of the officers in the
12       Community Relations I can't recall off the top of my
13       head.
14   Q   Do you have a copy of your report nearby?
15   A   Yes, ma'am.
16   Q   Can you refer to your report to refresh your memory,
17       please?
18   A   Yes, ma'am.  It would be Officer Rios, Officer
19       Hawkins, Officer Burt, Officer Robbins, as I
20       mentioned, Lieutenant Williams, Commander Dolunt,
21       Lieutenant Coleman, Officer Curtis, also former
22       Chief Godbee.
23           We also conducted interviews
24       with Mr. Passage (phonetic), Mr. Rogers.
25   Q   Who are they?
```

33  (Pages 155 to 158)

Page 159

1  A   Mr. Passage and Mr. Rogers were part of St. John's
2      Hospital.
3  Q   Okay.
4  A   Also Ms. Collins.
5  Q   Who is that?
6  A   Officer Collins' wife.
7  Q   Anyone else?
8  A   Not on my report.
9  Q   Do you recall speaking to a Sergeant Rodney Cox?
10 A   I personally did not speak with Mr. Cox, but the
11     Internal Affairs team did.
12 Q   Was that to find out if he had permission to get--
13         MR. GOLDPAUGH: I'm going to
14     object to what it was about. He didn't talk to him.
15     I'm going to object to what Rodney Cox may or may
16     not have said.
17         MS. JONES: This is the officer
18     in charge of the investigation.
19         MR. GOLDPAUGH: And he
20     testified he did not talk to him. So how does he
21     know what Rodney Cox said to him? I have no
22     information with respect to anything with Rodney Cox
23     in this particular matter.
24         He is not on a witness list,
25     and he is not in any type of situation here where he

Page 160

1      can come in and testify as to the facts here.
2          MS. JONES: Counsel, if you
3      will refer to page two of the investigation report--
4          MR. GOLDPAUGH: I don't
5      really-- excuse my bluntness-- care about the
6      investigator's report. He has testified he did not
7      talk to the man. I'm objecting.
8          MS. JONES: The investigator
9      can speak to what took place. He is the officer in
10     charge of the case. He can speak to what took place
11     in his investigation.
12         MR. GOLDPAUGH: And I have no
13     objections. He said, and somebody talked to him. I
14     didn't object to that. What he said was I did not.
15     Her next question was what did
16     Rodney Cox say? That is my objection.
17         COMMANDER ENNIS: Sustained.
18 Q   (By Ms. Jones) At some point in time, did you find
19     out that Officer Collins did not have permission for
20     outside employment?
21         MR. GOLDPAUGH: Object,
22     hearsay.
23         MS. JONES: It's part of his
24     investigation.
25         MR. GOLDPAUGH: Object,

Page 161

1      hearsay, unless I know who he got it from. Because
2      if he says he got it from Rodney Cox through
3      somebody else, that is objectionable.
4          If he says that one of those
5      individuals that he questioned stated that, then we
6      have that and it's been admitted. That is what my
7      objection is.
8          MS. JONES: Part of his
9      investigation was to find out if there was
10     permission for outside employment.
11         MR. GOLDPAUGH: Excuse me--
12         MS. JONES: You are not
13     allowing me to put in what Rodney Cox--
14         MR. GOLDPAUGH: Excuse me, that
15     was not what part of his investigation was when he
16     initiated that.
17         COMMANDER ENNIS: Counselor.
18         MS. JONES: You are not
19     allowing me to make my response.
20         COMMANDER ENNIS: Hold on,
21     let's stop. Each of you have the opportunity to
22     speak and finish your thoughts before the other one
23     interrupts or begins. So let's maintain some
24     decorum.
25         MR. GOLDPAUGH: I apologize.

Page 162

1          COMMANDER ENNIS: Let her
2      finish, and then you can respond.
3          MS. JONES: The charges before
4      you are about overlapping time as to St. John's,
5      Allen Academy and the Detroit Police Department. If
6      he had permission to be at one or the other, then we
7      wouldn't have I believe it's the first charge, it
8      might be even the second charge.
9          We wouldn't have the charges
10     before you. This is the officer in charge of the
11     investigation. They work in a team. He can speak
12     to what his team did and what information they
13     gathered pertinent to those charges that are before
14     you.
15         MR. GOLDPAUGH: May I respond?
16         COMMANDER ENNIS: Sure.
17         MR. GOLDPAUGH: The sergeant
18     stated that he was assigned the criminal
19     investigation into the time fraud. That is what he
20     was investigating. He was not, at the time that he
21     was assigned to this case, dealing with outside
22     employment or any other matters.
23         He was assigned to doing
24     criminal investigation with respect to a time fraud
25     claim. That is what he was assigned to. It came

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com

Page 163

1  through channels and, subsequently, he did certain
2  things. I have not objected to any of those things.
3          The question was we have gotten
4  to the point where he talked to certain people.
5  Then one of the questions was, did you talk to
6  Sergeant Rodney Cox? He said no. The inquiry as to
7  what he learned through Sergeant Cox ends at that
8  point in time for two reasons.
9          One is I don't have any
10 information from a Garrity interview of Rodney Cox,
11 number one. Number two, he is not on any of our
12 witness lists, and that is why I said I don't really
13 care what is in the investigator's report.
14         Number three, he has no
15 personal knowledge of what Rodney Cox stated. So
16 moving along to the next one, because the Board
17 upheld that objection, the next question was did he,
18 meaning Officer Collins, have any permission for
19 outside employment?
20         It is true that is one of the
21 charges here. We don't disagree with that. But he
22 initially was not investigating that. So if it
23 turns out, well, I learned it, well, then how did he
24 learn it during his portion of the investigation
25 when he was the officer in charge of the case?

Page 164

1          Because we know that Lieutenant
2  Walton, who the testimony is going to show, and that
3  was her opening statement, took it over at some
4  point in time and became the officer in charge of
5  the case. Therefore, anything he learned was as
6  part of the criminal investigation.
7          That is why if you tell me I
8  heard it from somebody else who has already come in
9  and testified they didn't have it from me, that's
10 fine, but how do we know what Rodney Cox said or how
11 he has determined that? That's my objection as to
12 did you learn from somebody I told him he didn't
13 have permission.
14         MS. JONES: I will defer to the
15 Board.
16         COMMANDER ENNIS: Let me ask a
17 question just for clarity's sake. Your position is
18 that Internal Affairs works as a team.
19         MS. JONES: They work as a
20 team.
21         COMMANDER ENNIS: The sergeant,
22 just like a lot of squads within the Department,
23 work as teams in doing investigations.
24         MS. JONES: In fact he
25 testified the IA team collected daily details,

Page 165

1  activity logs, conducted interviews, received
2  paperwork, time records and so forth.
3          COMMANDER ENNIS: What your
4  question is is, as a result of working as a team,
5  did you get additional information? Is that the
6  question you are asking him?
7          MS. JONES: Did he get any
8  information regarding permission for outside
9  employment?
10         COMMANDER ENNIS: Your
11 objection is based on?
12         MR. GOLDPAUGH: First of all,
13 that wasn't your question. The question was, did he
14 get permission for outside employment? That was the
15 question.
16         COMMANDER ENNIS: Meaning did
17 Officer Collins have permission.
18         MR. GOLDPAUGH: The question
19 was did he learn that Officer Collins did not get
20 permission for outside employment when he has
21 already testified as to who he interviewed. So the
22 question begs the choice of, well, how did you learn
23 it?
24         Did somebody that you talked to
25 who has testified say no, I didn't? Our position is

Page 166

1  that he had this permission, but that's another
2  question. Just because someone didn't come in here
3  and say I didn't give it to him, that's fine, and we
4  know we have certain channels to go through.
5          We have had testimony from
6  Commander Dolunt, Commander Moore and from Commander
7  Motley that, no, they never gave him permission.
8  But now we are speculating because somebody says,
9  well, I didn't give him permission. So what? Who
10 cares?
11         That is the problem I have with
12 this. We know what the procedure is. We know what
13 the situation is.
14         MS. JONES: If it is their
15 position that they had permission, they have an
16 opportunity, after the Department finishes their
17 case, to present witnesses to show that. However,
18 the officer in charge of the case can speak to his
19 investigation, what was done under his
20 investigation.
21         MR. GOLDPAUGH: And it's very
22 simple. All he has to do is say, did I go through
23 the records to see if there was a request for
24 outside employment, simple as that. Did he do that?
25 I don't know. Because that is the subject she has

35 (Pages 163 to 166)

**Page 167**

1  now brought up.  We are not talking about the
2  criminal investigation.
3        You take it for what it's
4  worth.  If there is nothing there, you do what
5  you've got to do.  But you can't guess around that
6  because somebody said he didn't have permission.  It
7  doesn't make any difference.
8        See, she is trying to shift the
9  burden.  It is our burden to defend the case.  It is
10  her burden to prove the case.  How does she prove
11  the case?  By showing that everything is in order,
12  that's all.
13        COMMANDER ENNIS:  Anything
14  else?
15        MS. JONES:  No.
16        COMMANDER ENNIS:  Overruled.
17  Go ahead.
18  Q   (By Ms. Jones)  Sergeant, someone from your team
19  learned that Officer Collins did not have permission
20  to work outside employment?
21  A   Yes.
22  Q   That was for what years, sir?
23  A   I would have to refer again to my report.  It was
24  learned that he did not have approval for 2008 or
25  2009 to work outside employment.

**Page 168**

1  Q   Did you also interview anyone else?
2  A   I sat in on--
3        MR. GOLDPAUGH:  Objection.  The
4  question was did he interview anyone.
5  Q   (By Ms. Jones)  Did your team interview anyone else
6  in relation to Jerome Collins?
7  A   Chief Godbee.
8  Q   What about Mattie Lewis?
9  A   I sat in on the investigative subpoena, but I did
10  not interview her.
11  Q   Did you interview anyone from the Allen Academy?
12  I'm sorry, let me rephrase that so I don't get
13  objected to.  Did you or anyone from your team
14  interview anyone from Allen Academy?
15  A   Yes.
16  Q   Who would that have been?
17  A   Ms. Burrell (phonetic).
18  Q   Did you or anyone from your team interview Joyce
19  Motley?
20  A   Yes.
21  Q   Who is Stacey Collins?
22  A   At the time, I don't know about now, but Ms. Collins
23  was Jerome's wife, Officer Collins' wife.
24  Q   Of the documents that you or your team obtained,
25  part of those were activity logs.  Correct?

**Page 169**

1  A   Yes.
2        MS. JONES:  I am going to bring
3  to your attention a sampling of those activity logs.
4  Counsel, April 2009.  Approaching the witness.
5  Q   (By Ms. Jones)  Sir, I have just handed you some
6  documents that purport to be Detroit Police
7  Department activity logs.  You have them in your
8  hands.  Is that what you are looking at?
9  A   It appears to be activity logs.
10  Q   What month is that for?
11  A   It appears to be for--
12        MR. GOLDPAUGH:  I didn't mean
13  to cut the witness off, but you said a number of
14  documents.  Can you tell me how many he is holding?
15        MS. JONES:  April of 2009.  I
16  don't know how many there are.
17        MR. GOLDPAUGH:  I just was
18  wondering because there are--
19  Q   (By Ms. Jones)  How many documents do you have, sir?
20  A   I'm counting nine documents from April.
21  Q   April 2009?
22  A   Correct.
23  Q   Are they for Jerome Collins?
24  A   His name appears on each of the documents.
25  Q   There is a signature on each of the documents?

**Page 170**

1  A   There is a signature affixed to that.
2  Q   Are those documents also signed by a supervisor?
3  A   Most of them are, yes.
4  Q   What is the supervisor's name whose signature is
5  affixed?
6  A   Sergeant Mattie Lewis.
7  Q   What shift is he working or scheduled to work there?
8  A   Most of them look like 12:00 p.m. to 8:00 p.m.
9        COMMANDER ENNIS:  Excuse me,
10  but just for clarity for the record, I have nine
11  activity logs.  Can you give me the dates of each of
12  the logs so we can have it on the record?
13        THE WITNESS:  Yes, sir.
14        COMMANDER ENNIS:  Also give me
15  the names of whoever the officers are who are listed
16  on the document.
17        MS. JONES:  Okay.
18        COMMANDER ENNIS:  And you also
19  referenced not having a supervisor's signature for
20  some of those?
21        THE WITNESS:  Correct.
22        COMMANDER ENNIS:  Can you give
23  that information as you reference each log?
24  Q   (By Ms. Jones)  Per the Board's instructions, take
25  the first document of the April package.

36  (Pages 167 to 170)

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 52 of 58

## Page 171

1  A  April 20, 2009, Jerome Collins, supervisor's name is
2  Sergeant Mattie Lewis.  The time would be 12:00 p.m.
3  to 8:00 p.m.
4       April 21, 2009, Jerome Collins,
5  12:00 p.m. to 8:00 p.m.
6       MR. GOLDPAUGH:  I'm sorry,
7  could you repeat that date again?  I apologize,
8  Sergeant.  The 21st did you say?
9       THE WITNESS:  Correct.
10      MR. GOLDPAUGH:  Thank you.
11      THE WITNESS:  That would be
12  Sergeant Mattie Lewis also.  April 22, 2009,
13  12:00 p.m. to 8:00 p.m., Officer Collins, the
14  supervisor would be Sergeant Mattie Lewis.
15      April 23, 2009, 12:00 p.m. to
16  8:00 p.m., Jerome Collins, supervisor Mattie Lewis.
17  April 24, 2009, 12:00 p.m. to 8:00 p.m., Officer
18  Collins, and Sergeant Mattie Lewis is the
19  supervisor.
20      April 27, 2009, 12:00 p.m. to
21  8:00 p.m., Officer Collins, Sergeant Mattie Lewis as
22  the supervisor.  April 28, 2009, 3:00 p.m. to
23  11:00 p.m., Officer Collins, and there is no
24  supervisor's signature.
25      April 29, 2009, 12:00 p.m. to

## Page 172

1  8:00 p.m., Officer Collins, Sergeant Lewis as the
2  supervisor.  April 30, 2009, 12:00 p.m. to
3  8:00 p.m., Officer Collins and Sergeant Mattie Lewis
4  as the supervisor.
5       MS. JONES:  I have two more to
6  show him, and I'm going to hand you the packet.
7  Counsel, I'm going to refer him to the January 5 and
8  September 2.
9       COMMANDER ENNIS:  What year is
10  it?
11      MS. JONES:  2009.
12  Q  (By Ms. Jones) Sir, on the April ones that you
13  spoke about, are all of those the 12:00 to 8:00
14  shift?
15  A  No.
16  Q  Can you tell us which ones are not 12:00 to 8:00?
17  A  April 28, 2009, 3:00 p.m. to 11:00 p.m.
18  Q  Any others?
19  A  No.
20      MS. JONES:  So all the rest
21  were 12:00 to 8:00.  I am going to refer you to the
22  January 5.  Did you find it, John?
23      MR. GOLDPAUGH:  I'm still
24  looking for it.
25      MS. JONES:  Off the record for

## Page 173

1  a minute while he locates his.
2       (At 2:22 p.m., off the record)
3       (At 2:24 p.m., back on the
4       record)
5  Q  (By Ms. Jones) Sir, can you tell me what shift is
6  on the January 5, 2009?
7  A  January 5, 2009 for Officer Collins is 11:00 a.m. to
8  7:00 p.m.
9  Q  Now, look at the September 2, 2009.  What is the
10  shift of that?
11  A  September 2, 2009 for Officer Collins, 1:00 p.m. to
12  9:00 p.m.
13  Q  So his shift varied from time to time.  Correct?
14  A  Yes.
15  Q  You indicated you got time records also from
16  St. John's and Allen Academy.  Correct?
17  A  Yes.
18  Q  You or your team?
19  A  Yes.
20  Q  Did you or your team also find information about a
21  center in Canton, Michigan?
22  A  Yes.
23  Q  What was located there?
24  A  My understanding it was a basketball, slash, sports
25  complex.

## Page 174

1  Q  Who was in charge of that complex or owned that
2  complex if you know?
3  A  The Collins.
4  Q  When you say the Collins, you are referring to
5  Officer Collins and his wife?
6  A  Correct.
7  Q  Do you know any information about the PAL program?
8  Have you ever worked it?
9  A  No, ma'am.
10  Q  In your investigation, did you find out information
11  about the football and basketball leagues that
12  Collins was in charge of?
13  A  Yes, ma'am.
14  Q  What did you find out there?
15  A  He was coaching a youth football team.  I don't
16  recall the name.
17  Q  Do you recall where the practice sessions took
18  place?
19  A  Huntington Woods.
20  Q  Where did the games take place?
21  A  Huntington Woods, and I do recall some place in
22  Flint.
23  Q  As it relates to the outside employment, St. John's
24  and Allen Academy, at some point in gathering the
25  information, was there a comparison done of the

37  (Pages 171 to 174)

Page 175

1    information gathered?
2  A  Yes, ma'am.
3  Q  What was that comparison for?
4  A  The overlap between Officer Collins' working hours
5     for the Detroit Police Department, Allen Academy and
6     St. John's Hospital.
7  Q  Part of your team-- and I know she is going to
8     testify after you. Part of your team also created
9     charts showing the overlap. Correct?
10 A  Yes.
11 Q  We have entered that as Exhibit No. 7. At some
12    point, did you seek a warrant for criminal activity?
13 A  Yes.
14 Q  What was the warrant for?
15 A  Can I refer to make it exact?
16 Q  Sure.
17 A  Investigator's Report 10058564 for Larceny by False
18    Pretenses Over $1,000 and Misconduct in Office.
19 Q  Going back, when you gathered information that
20    related to St. John's, what was his position at
21    St. John's?
22 A  Security officer.
23 Q  What was his position at Allen Academy?
24 A  Truancy officer during the day and security officer
25    on a midnight shift.

Page 176

1  Q  So he worked DPD generally during the day or
2     afternoon, 12:00 to 8:00--
3            MR. GOLDPAUGH: Objection,
4     leading.
5  Q  (By Ms. Jones) Can you explain the shifts again for
6     me? Generally, what were those shifts on the
7     activity log?
8  A  Eleven to 7:00, 12:00 to 8:00, and I did see one
9     1:00 to 9:00.
10 Q  Do you know what his hours were for Allen Academy?
11 A  Truancy officer during the day, no specific hours
12    that I have, and security guard or security officer
13    during a midnight shift of some sort.
14 Q  As it relates to St. John's, do you know what the
15    hours were?
16 A  Normally, his hours would be in the morning. I
17    don't have the sheets in front of me, but if I can
18    recall, I think it would be a 6:00 to 2:00 shift or
19    a 7:00--
20            MS. JONES: Let me just grab
21    the chart. May I have Exhibit No. 7, please?
22 Q  (By Ms. Jones) Referring you to Exhibit No. 7, you
23    did not create that document, did you?
24 A  No, ma'am.
25 Q  A member of your team did?

Page 177

1  A  Yes, ma'am.
2  Q  Thank you. If you will look through it, maybe you
3     can figure out the shift for St. John's.
4  A  Averaging shift, 7:00 a.m. until between 2:00 and
5     2:30.
6  Q  So you sought a warrant, and the warrant was signed?
7  A  Yes, ma'am.
8  Q  A preliminary exam took place?
9  A  Yes, ma'am.
10 Q  And he was bound over to trial?
11 A  Yes, ma'am.
12 Q  A trial took place?
13 A  Yes, ma'am.
14 Q  He was found not guilty?
15 A  Correct.
16 Q  On all counts?
17 A  Yes, ma'am.
18            MS. JONES: Pass the witness.
19            CROSS-EXAMINATION
20 BY MR. GOLDPAUGH:
21 Q  Sergeant, You indicated a warrant was sought, and a
22    warrant was issued, and one of those was for
23    Misconduct In Office, the ever popular catch-all.
24    Is that correct?
25 A  Yes.

Page 178

1  Q  He was acquitted on the Misconduct in Office charge.
2     Is that correct?
3  A  Yes.
4  Q  He was also charged through your offices with or at
5     least a warrant was sought for one count of Larceny
6     by False Pretenses. Correct?
7  A  Yes.
8  Q  Do you know, of your own knowledge, what the false
9     pretenses were supposedly be? You understand
10    false pretenses. Correct?
11 A  Please explain.
12 Q  You understand, under the law, what false pretenses
13    means under the statute?
14 A  Can you explain it to me?
15 Q  Well, my question was if you knew. If you don't--
16    it is some sort of a document or something along
17    those lines, is that your understanding, to support
18    the allegations that he obtained money in a wrongful
19    manner?
20 A  In a wrongful manner, yes.
21 Q  By a presentation of some sort of a document. Is
22    that correct?
23 A  Correct.
24 Q  And the documents-- because you sat through the
25    trial and I did not for the exam-- were the activity

38  (Pages 175 to 178)

Page 179

1  logs.  Is that correct?
2  A   Correct.
3  Q   So the jury found, beyond a reasonable doubt of
4  course, that he-- it was a jury trial.  Right?
5  A   Yes.
6  Q   Thank you.  So the jury found that he was not guilty
7  of the larceny by-- that there was any false
8  documents.  Is that correct?
9  A   Correct.
10  Q   Now, you were the officer in charge of the case
11  initially.  Correct?
12  A   Yes.
13  Q   Then there came a point in time, because of whatever
14  reasons with your office, that Lieutenant Walton
15  took over as the officer in charge.  Is that
16  correct?
17  A   I have no understanding of that.
18  Q   So as far as you are concerned, you are still the
19  officer in charge of the case?
20  A   Correct.
21  Q   Good.  This case came down through channels, and you
22  received the assignment.  Were you provided with the
23  letter which has been admitted as exhibit number, I
24  think it's 11 or 10, from a Ms. Rice?
25       I could be wrong with the name,

Page 180

1  but were you provided, as part of your
2  investigation, with that letter, Ms. Catherine
3  Jones?
4  A   Yes.
5  Q   You were, and did you follow up by talking to that
6  young lady?
7  A   I did a follow-up.  I could not locate a Ms. Jones.
8  Q   So in other words, this letter that was sent by a
9  Ms. Jones, you were never able to find Ms. Jones.
10  Would that be a fair statement?
11  A   A fair statement?
12  Q   Is it a fair statement you were never able to find
13  her if in fact she existed?
14  A   I wasn't able to find her.
15  Q   So in other words, you don't even know if she
16  exists, do you?
17  A   No, I do not.
18  Q   Thank you.  You have been sitting here through the
19  proceedings.  When you were given the assignment,
20  were you given any information regarding this
21  previous anonymous letter that Commander Dolunt
22  spoke to?
23  A   Which anonymous letter?
24  Q   Well, you have been sitting here for the
25  proceedings.  Correct?

Page 181

1  A   Correct.
2  Q   When you received the assignment, this was based on
3  the letter from Ms. Jones.  Correct?
4  A   The one I just--
5  Q   From Catherine Jones, not Attorney Jones.  That is
6  what triggered your investigation.  Correct?
7  A   Yes.
8  Q   Were you informed at that point in time that
9  Commander Dolunt had sent information down
10  previously regarding alleged outside employment of
11  Officer Collins?
12  A   No.
13  Q   You eventually contacted Mrs. Collins.  Is that
14  correct?
15  A   Correct.
16  Q   Did she admit to sending the phony letter?
17  A   No.
18  I guess my question is-- because we have heard
19  testimony regarding the Canton situation here, and
20  you have testified that you went and did some
21  checking regarding the situation out in Canton and
22  found out who owned things-- what put you in that
23  direction?
24  A   Information.
25  Q   From whom?

Page 182

1  A   Mrs. Collins being one of them.
2  Q   So you talked to Mrs. Collins, and Mrs. Collins
3  said, I didn't send this letter, but we own this
4  business out there.  Would that be a fair statement?
5  A   No, it's not a fair statement.
6  Q   How did you put Mr. and Mrs. Collins together on
7  that location?
8  A   One of our team members from Internal Affairs--
9  Q   Who was that?
10  A   Sergeant Dietrich Lever knows about the basketball
11  facility.
12  Q   Is that because his son plays out there more than
13  likely, or did play at that time?
14  A   I don't know.
15  Q   So Dietrich Lever told you about that, and that's
16  when you got ahold of Collins.  Would that be a fair
17  statement as to how that came about?
18  A   I already explained that we did receive the
19  information.  Sergeant Lever does know about the
20  facility.  We were able to speak with Mrs. Collins
21  at the time.  That let us know that there is a
22  facility out there.
23  Q   If you know, were they estranged at the time?
24  A   I do not know.
25  Q   Now, I notice you have listed a number of

39  (Pages 179 to 182)

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-2   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 55 of 58

Page 183

1   individuals that you or your team spoke to by way of
2   Garrity interviews. That was the commander, the
3   deputy chief, Chief Godbee. You also spoke to now
4   retired Deputy Chief Motley. Is that correct?
5   A   I didn't personally.
6   Q   You or your team?
7   A   Correct.
8   Q   I notice there was no Garrity interview of Sergeant
9   Lewis. Is that correct?
10  A   It was the investigative subpoena.
11  Q   My question was, there was no Garrity interview of
12  Sergeant Lewis, was there?
13  A   No.
14  Q   Was that at the direction of the Prosecutor's Office
15  that you should not Garrity them?
16  A   I don't recall anything like that.
17  Q   Well, then why didn't you, as part of this
18  investigation, do a Garrity interview of Sergeant
19  Lewis?
20  A   I have no reason.
21  Q   You were the officer in charge of the case.
22  Correct, Sergeant?
23  A   That is correct.
24  Q   You would make determinations as to who you wanted
25  to interview to get to the root of the evil, so to

Page 184

1   speak. Correct?
2   A   Correct.
3   Q   Did you tell your supervisors, the next one I want
4   to talk to is Sergeant Lewis because she is the one
5   who signed all these activity logs? Is that
6   correct?
7   A   It was done in the investigative subpoena.
8   Q   That wasn't my question. My question was, why did
9   she have an investigative subpoena instead of you
10  asking her to come down under Garrity or ordering
11  her down under Garrity? It's as simple as that.
12  A   I don't know.
13  Q   Did you have a meeting with your supervisors?
14  A   I was informed by my direct-- I can't recall who--
15  but that we would have to go do an investigative
16  subpoena on her.
17  Q   So that is why you didn't do it. I mean you did
18  know. You were told to do an investigative
19  subpoena. Correct?
20  A   Correct.
21  Q   So that is why you didn't do a Garrity interview.
22  Is that correct?
23  A   A Garrity interview, to my understanding, a Garrity
24  would be for a departmental charge. This was a
25  criminal investigation.

Page 185

1   Q   That's not my question, Sergeant. My question was
2   why didn't you do a Garrity interview? Your answer
3   was because you were told you had to do it under an
4   investigative subpoena. Isn't that correct?
5   MS. JONES: I believe he has
6   answered that.
7   MR. GOLDPAUGH: No, he hasn't.
8   I have asked him why he didn't do a Garrity
9   interview. It's a very simple answer. All he had
10  to do was say we're going to send her for an
11  investigative subpoena. He didn't say that. That's
12  all.
13  COMMANDER ENNIS: The objection
14  is overruled. Sarge, the simple question is, did
15  you not do the Garrity interview because you were
16  directed by your superiors not to do Garrity?
17  That's a yes or no.
18  THE WITNESS: Correct.
19  MR. GOLDPAUGH: Thank you.
20  Q   (By Mr. Goldpaugh) At the time of the investigative
21  subpoena, which you sat in on along with Lieutenant
22  Walton-- is that correct?
23  A   I would have to look. Lieutenant Walton was in
24  there.
25  Q   I can show you a copy just to refresh your memory.

Page 186

1   I'm not trying to-- my information indicates that it
2   was Bob Donaldson and you, and you didn't ask any
3   questions, I'm not suggesting that, but that you
4   were in the investigative subpoena at the same time.
5   (Inaudible discussion between
6   Ms. Jones and Mr. Goldpaugh)
7   MR. GOLDPAUGH: May I approach?
8   COMMANDER ENNIS: Yes.
9   Q   (By Mr. Goldpaugh) Looking at the cover sheet, does
10  that refresh your memory regarding--
11  A   Yes.
12  Q   Thank you. When was the date of that investigative
13  subpoena?
14  A   March 4, 2010.
15  Q   When did you submit the warrant request if you
16  recall?
17  A   (No response)
18  Q   Would it be a fair statement-- would April 16
19  refresh your memory, Sergeant?
20  A   I don't know the date.
21  Q   Would it be a fair statement that the warrant being
22  signed against Officer Collins would be some time in
23  April of 2010? Look at this time line prepared by
24  Ms. Jones and see if that refreshes your memory?
25  A   April 16, 2010.

40   (Pages 183 to 186)

Page 187

1  Q   Does that refresh your memory of approximately the
2      date? I'm not looking for the exact date, but it
3      was some time in April?
4  A   Sure.
5  Q   The investigative subpoena that you attended that
6      dealt with Officer Collins as part of your
7      investigation also included another officer. Isn't
8      that correct?
9  A   Could you repeat that?
10 Q   The investigative subpoena was not just for Officer
11     Collins, was it, or for a case dealing with Officer
12     Collins, was it?
13         Do you still have that in front
14     of you? It should be right on the cover sheet.
15 A   In reference to?
16 Q   Right.
17 A   In reference to Officer Collins--
18 Q   Don't read it. I'm just asking, was the
19     investigative subpoena that you attended, that
20     investigative subpoena was not only dealing with
21     Officer Collins, was it?
22 A   No.
23 Q   Who was it dealing with?
24 A   It says Officer Collins and Borden.
25 Q   Thank you. Now, had you been assigned to a criminal

Page 188

1      investigation with respect to Officer Borden?
2  A   Me personally?
3  Q   Yes.
4  A   No.
5  Q   Was there somebody on your team or a part of your
6      team that were talking about that was assigned to
7      a criminal investigation with respect to Officer
8      Borden if you know?
9  A   I don't know.
10 Q   Lieutenant Walton is your supervisor. Correct?
11 A   Correct.
12 Q   So she was the head of all the teams you had going.
13     Would that be a fair statement?
14 A   Sure.
15 Q   So is it safe to say, and you can correct me and say
16     no, it's not, that when you were there for the
17     purposes of your part of the investigation, the
18     criminal investigation into Officer Collins, you had
19     nothing to do with the Borden matter. Is that
20     correct?
21 A   Correct.
22 Q   As far as you know, you were just there sitting, and
23     you didn't ask any questions, I understand.
24     Lieutenant Walton, as part of that investigative
25     subpoena, was also there. Correct?

Page 189

1  A   Correct.
2  Q   Now, do you recall if during that investigation
3      Lieutenant Walton-- I'm not asking what she said or
4      didn't say. I'm just asking if you recall if she
5      was part of the question and answer procedure during
6      that incident?
7  A   I would have to take a look at the transcript.
8  Q   So you don't recall. Would that be a fair
9      statement?
10 A   Correct.
11 Q   Now, Sergeant, there came a point in time-- you did
12     not prepare the exhibit with respect to our
13     proceedings. This is Exhibit No. 7. Is that
14     correct?
15 A   Correct.
16 Q   You had nothing to do with the calculations. Is
17     that right?
18 A   No.
19 Q   You didn't do that. It was done at some point in
20     time. Do you know when Lieutenant Walton did that?
21 A   No.
22 Q   When you submitted your initial warrant request,
23     that was some time in, would it be a fair statement,
24     the middle of January of 2010 approximately?
25 A   Correct.

Page 190

1  Q   That was not part of your original warrant request,
2      was it?
3  A   I don't know.
4  Q   Well, you didn't prepare it. Right?
5  A   Correct.
6  Q   Your warrant request that you submitted back in
7      January of 2010 dealt with one count of Larceny by
8      False Pretenses and one count of Misconduct in
9      Office. Is that what you submitted?
10 A   If I could take a look at my Investigator's Report,
11     I could tell you.
12         MR. GOLDPAUGH: Will you
13     stipulate that is what it was for?
14         MS. JONES: Yes.
15         MR. GOLDPAUGH: The Department
16     will just stipulate that is what the original
17     warrant request was for.
18 Q   (By Mr. Goldpaugh) There was a preliminary
19     examination held in this matter, is that correct,
20     and you attended that?
21 A   I don't recall.
22 Q   You don't recall if you attended, but there was an
23     exam. Right?
24 A   Yes.
25 Q   At the end of the exam, Officer Lewis-- that exam

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com

Page 191

```
1        was held.  Right?
2    A   Officer Lewis?
3    Q   I'm sorry, I mean Officer Collins.  That was held.
4        Correct?  The exam was held?
5            MS. JONES:  I believe he
6        answered that when I asked him if a preliminary exam
7        did take place.
8            MR. GOLDPAUGH:  Okay, fine, no
9        problem.
10   Q   (By Mr. Goldpaugh)  Subsequently, Officer Collins,
11       based on other testimony, they added a count.  Is
12       that correct, if you are aware of that?
13   A   I would have to look at all this stuff again.
14   Q   That's fine.
15   A   If you would like to show it to me, I could--
16   Q   No, that's fine, because we have admitted--
17           MS. JONES:  Exhibit No. 12.
18           MR. GOLDPAUGH:  Well, we have
19       admitted Exhibit No. 12, but I mean we know when it
20       originally started, so I just wanted to make this
21       record complete.
22   Q   (By Mr. Goldpaugh)  That is the acquittal that has
23       been admitted as Exhibit No. 12.  That document
24       talks about three charges he was acquitted on.
25       Correct?
```

Page 192

```
1    A   That's correct.
2    Q   But you only issued a warrant on two.  Isn't that
3        correct?
4    A   That's correct.
5    Q   So would it be a fair statement that some time
6        between your initial warrant request and the signing
7        of the warrant, the prosecutor added some more on
8        top?
9    A   Correct.
10   Q   That's all I wanted to know.  Thank you.  That third
11       count dealt with the alleged overlapping with
12       respect to Allen Academy.  Correct?
13   A   Overlapping of?
14   Q   I mean they were claiming now that he was working at
15       all these jobs and, therefore, he was stealing from
16       Allen Academy as well.  Isn't that correct?
17   A   I don't know what--
18   Q   The prosecutor's theory was.
19   A   Correct.
20           MR. GOLDPAUGH:  I appreciate
21       that.  I don't think anybody knows what his theory
22       was sometimes.  I apologize to Attorney Evelyn for
23       that comment.
24   Q   (By Mr. Goldpaugh)  The trial is over.  You are
25       still the officer in charge of the case.  Correct?
```

Page 193

```
1    A   Correct.
2    Q   During the trial or during the procedures, did you
3        receive any type of subpoena for documents regarding
4        initiative reports or anything like that?
5    A   Did I receive any?
6    Q   Right.  I'm sorry, while you are going through that,
7        you didn't testify at the trial, did you?
8    A   No.
9    Q   Lieutenant Walton did.  Isn't that correct?
10   A   Correct.
11   Q   Because she is the one who prepared the documents
12       and things like that?
13   A   Correct.
14   Q   So it was through her as opposed to you, the officer
15       in charge of the case, that all the exhibits were
16       admitted for the criminal proceedings.  Would that
17       be a fair statement?
18   A   The documents?
19   Q   The documents, the activity logs, all those
20       documents.  Would that be a fair statement?
21   A   I don't understand the question.
22   Q   Normally, and you have been in trials before, when
23       you collect documents, you are the one that gets up
24       on the stand and says I collected them, and they get
25       admitted.  Right?
```

Page 194

```
1            You have done that as an
2        officer in charge whether you had any personal
3        knowledge of the criminal activity alleged of the
4        officer.
5            In this case, you are the one,
6        as the officer in charge of the case, who collected
7        everything, put it all together and so forth and so
8        on, but you didn't testify as to the collection of
9        those documents because it was through Lieutenant
10       Walton.  Is that correct?
11   A   As far as this document, yes.
12   Q   In fact didn't they all come through her, the
13       activity logs that were admitted, the daily details,
14       because that is how she prepared this document?  Is
15       that correct?
16   A   She was able to prepare this document with the
17       activity logs, that's correct.
18   Q   Sure, I understand.  When you were sitting in the
19       trial, did you learn that there were these, I guess
20       for lack of a better term, initiative reports that
21       had been requested by defense Attorney Evelyn?
22   A   I remember him mentioning something about it, but I
23       can't recall what was said.
24   Q   Do you know, of your own knowledge, whether those
25       initiative reports were ever turned over to the
```

42   (Pages 191 to 194)