Page 195

1    Detroit Police Department as part of your either
2    criminal or departmental investigation?
3  A  I don't have any idea. I would have to see one.
4  Q  Were you aware that during the trial, Lieutenant
5    Walton testified that she was provided with these by
6    Sergeant Lewis?
7         MS. JONES: Objection. The
8    best witness to answer that is Lieutenant Walton,
9    and she is the next one up.
10        MR. GOLDPAUGH: Well, we are
11   going to get to it because he was the officer in
12   charge of the case. I asked him if he was aware of
13   that. That's all.
14        COMMANDER ENNIS: I will allow
15   it.
16  Q  (By Mr. Goldpaugh)  Were you aware that during the
17   trial, Lieutenant Walton testified that she was
18   provided with these documents?
19  A  I don't recall that, no.
20  Q  Were you aware, as you sat through the trial, that
21   these documents that were requested were provided to
22   the Court through the testimony of Mattie Lewis?
23  A  I don't recall. I would have to see the testimony
24   that was given.
25  Q  You just don't recall, and I understand that.

Page 196

1    Suffice it to say, you did receive a letter or
2    Internal Affairs did receive a letter requesting
3    discovery in the departmental proceedings, is that
4    correct, once departmental charges came down?
5  A  That is common practice, yes.
6  Q  You, as the officer in charge of the case, or
7    whoever was in charge of it at that point in time,
8    put together-- and there are a whole lot of charges
9    here, I understand that-- put together a package, is
10   that right, your Investigator's Report and the
11   documents that were requested and so forth and so
12   on. Is that correct?
13  A  I didn't put it together, no.
14  Q  Who did that?
15  A  One of our clerks.
16  Q  You just gave it to--
17  A  I didn't give it to anybody.
18  Q  I mean the letter, I didn't mean the reports.
19  A  I didn't get the letter.
20  Q  You didn't get the letter, all right, but
21   eventually, somebody gave all this stuff that was in
22   the file. Right?
23  A  Correct.
24  Q  So you don't have any knowledge as to whether or not
25   Defendant Collins received these initiative reports

Page 197

1    that were requested?
2  A  No, I don't.
3  Q  Now, you have gone through and you have pointed out
4    certain activity logs we have talked about, and we
5    know there is a whole bunch of them there. Right?
6  A  Yes.
7  Q  By the way, did you go through the Department
8    records to see if there had ever been a written
9    request for outside employment by Officer Collins?
10  A  A check was made if that's what you're asking.
11  Q  My question was, did you go through the Department
12   records and see if there was a written request by
13   Officer Collins?
14        MS. JONES: I'm sorry, are you
15   referring to he, himself, personally, or the team?
16        MR. GOLDPAUGH: Did he do it.
17  Q  (By Mr. Goldpaugh)  Did you do that?
18  A  I did not personally go check records.
19  Q  Would it be a fair statement that you did not do
20   that because, initially, your investigation was into
21   the criminal area with respect to these charges that
22   were brought against Officer Collins?
23  A  Could you repeat that question?
24  Q  Well, it is the role and the mission of Internal
25   Affairs to investigate criminal activity. Correct?

Page 198

1  A  Yes.
2  Q  So you were investigating allegations of a crime.
3    Correct?
4  A  A possibility of a crime, sure.
5  Q  So you weren't worried, and I'm not saying you
6    should have been, whether or not he had permission
7    to work outside employment.
8         It was just, according to the
9    allegations, working outside employment, whether he
10   had permission or not, and he should have been at
11   the Department. Is that correct? That was the
12   allegation?
13  A  That would be correct.
14  Q  So whether or not he had permission to work outside
15   was irrelevant to your initial investigation. Would
16   that be a fair statement?
17  A  Initially, yes.
18        MR. GOLDPAUGH: No other
19   questions of this witness.
20        MS. JONES: Just briefly just
21   based on that last question.
22        REDIRECT EXAMINATION
23  BY MS. JONES:
24  Q  As part of your investigation into the fact that he
25   was working elsewhere when he should have been

43 (Pages 195 to 198)

Page 199

```
 1    working for the City of Detroit, is part of the fact
 2    that he had outside employment part of that
 3    investigation?
 4              MR. GOLDPAUGH: I'm going to
 5    object because, first of all, it's compound. Second
 6    of all, he has already testified that whether or not
 7    he had outside employment was totally irrelevant to
 8    his charges of criminal investigation.
 9              MS. JONES: I defer to the
10    Board.
11              COMMANDER ENNIS: Separate your
12    question. Your first question is?
13              MS. JONES: It wasn't compound.
14    Nonetheless--
15              MR. GOLDPAUGH: I will go to
16    convoluted statement.
17    Q   (By Ms. Jones) When did you get your investigation?
18    A   I have to refer real quick to my--
19    Q   Go ahead.
20    A   I received the assignment December 10, 2009.
21    Q   December 10, 2009. Do you recall or does your
22        report show when it was determined he did not have
23        permission to work outside--
24              MR. GOLDPAUGH: I'm going to
25    object to that.
```

Page 200

```
 1              MS. JONES: I haven't even got
 2    the question out.
 3              MR. GOLDPAUGH: Well, ask the
 4    question. You are saying does your report say when
 5    it was determined he didn't have permission.
 6              He can only testify as to what
 7    he did.
 8    Q   (By Ms. Jones) Do you recall what date your team
 9        found out he had no permission?
10              MR. GOLDPAUGH: I'm going to
11    object because of the very reason before. He said
12    the team determined. My simple question to him was,
13    did you go and check the records to see if he had
14    applied for outside employment? That's all I said.
15              He said he didn't do it. Now,
16    if some other team member wants to come in here and
17    say yes, we did it, that's fine. But all we hear on
18    this issue is, well, this person told me I didn't
19    give him permission, this person told me I didn't
20    give him permission, and there is allegations of all
21    that going on.
22              But the way it is to be proven
23    is, did you go and check the records? That's all.
24              MS. JONES: As we have talked
25    about before, they work in a team environment. I'm
```

Page 201

```
 1    not going to parade 20 IA people down here when the
 2    OIC should be able to answer the question, because
 3    that's what the team did.
 4              MR. GOLDPAUGH: But we don't
 5    know who did it, and not because he doesn't know.
 6    She says "the team." Well, I mean that's like if
 7    anybody tells me that officer so and so did
 8    something, and I'll buy that, but don't tell me I
 9    don't know, I know I didn't do it.
10              Then we hear the team did it.
11    I mean we tried to get in testimony of what Rodney
12    Cox told a member of the team. That's all I want to
13    know. I just want to know that Officer Smith on his
14    team came in and said, I checked the records, and
15    there is nothing there. I have no problems with
16    that.
17              MS. JONES: And you have that.
18              MR. GOLDPAUGH: No, I don't
19    have that. I have everybody said I didn't give him
20    permission.
21              COMMANDER ENNIS: Your
22    objection is you want him to specify who on the team
23    provided information as questions are asked?
24              MR. GOLDPAUGH: Among other
25    things, yes.
```

Page 202

```
 1              COMMANDER ENNIS: That's part
 2    one. Your position, the City's position--
 3              MS. JONES: I just want to know
 4    what the date is that he found out that the guy
 5    didn't have permission. I didn't ask who.
 6              MR. GOLDPAUGH: I know you
 7    didn't. That's my objection.
 8              COMMANDER ENNIS: We have
 9    allowed for the OIC to testify as the officer in
10    charge, as the person who puts the case together, as
11    the person who summarizes it, as the person who
12    gathers all the information from the team.
13              We have already allowed that,
14    and we have already allowed questioning, we have
15    allowed answers. So if your objection is he doesn't
16    know specifically who he got the information from,
17    is that--
18              MR. GOLDPAUGH: That's part of
19    it, yes, and I also would like to know how he got
20    the information. In other words, was it because
21    somebody, A, told B, who is a member of the team,
22    well, I didn't give him permission, so therefore, he
23    didn't have permission, or did B, the member of the
24    team go check the record and say it's not there?
25    That's what I want to know.
```

44   (Pages 199 to 202)

Page 203

1   COMMANDER ENNIS: I understand.
2   MS. JONES: Approaching the
3   witness.
4   Q   (By Ms. Jones) Referring you to the investigation
5   report that I have, can you determine if it was
6   hearsay or if files were looked up to determine that
7   he had no permission?
8   A   Should I just--
9   Q   I don't want you to read. Just answer the question.
10   Let's do it in two parts. Did someone say that he
11   had no permission to work outside employment during
12   the period of 2007 to 2009?
13   A   Correct.
14   Q   Was something reviewed in order to make that
15   determination?
16   A   Yes.
17   Q   What was that?
18   A   Outside employment approvals.
19   Q   Thank you. He had no approval to work outside
20   employment. Yet, he worked St. John's Hospital.
21   Correct?
22   A   Correct.
23   Q   In fact we have video that shows him working--
24   MR. GOLDPAUGH: I'm going to
25   object to that.

Page 204

1   Q   (By Ms. Jones) --at the hospital. Is that correct?
2   MR. GOLDPAUGH: I'm going to
3   object to that.
4   COMMANDER ENNIS: Hold on.
5   What is the nature of your objection?
6   MR. GOLDPAUGH: We have video
7   of something? Where?
8   MS. JONES: I was getting ready
9   to admit it. You have it in discovery.
10   MR. GOLDPAUGH: I'm not talking
11   about having it in discovery. You don't just
12   testify we have something on redirect, number one.
13   Number two, this is outside the
14   scope of anything. If she wants to admit something,
15   she doesn't start saying, oh, we have this where he
16   is working outside employment.
17   MS. JONES: It is not outside
18   the scope because he was speaking to-- that was his
19   questioning was speaking to his outside employment.
20   So it is not outside the scope.
21   MR. GOLDPAUGH: That is not
22   true. If she wants to admit something as an
23   exhibit, she can't start testifying from that seat,
24   oh, we have video showing something.
25   I never challenged that he

Page 205

1   wasn't working. I never challenged outside
2   employment. All I challenged was permission and
3   whether or not during those times, and that is the
4   issue, whether he was giving eight hours to the
5   Detroit Police Department as well as what he was
6   supposed to give to them.
7   So to say we have evidence,
8   where was this when we went through 14 exhibits? I
9   have no objections to it.
10   COMMANDER ENNIS: Sustained.
11   Move on.
12   Q   (By Ms. Jones) You acquired information that they
13   determined he worked at St. John's Hospital.
14   Correct?
15   A   Yes.
16   Q   Did you also acquire information or documentation
17   that showed that he worked Allen Academy?
18   A   Yes.
19   Q   There has been no dispute that he worked this
20   outside employment. Correct?
21   A   No.
22   Q   The dispute lies in did he--
23   MR. GOLDPAUGH: I'm going to
24   object as to the leading nature of the question as
25   to what she is posing to the officer in charge as to

Page 206

1   what the dispute is.
2   COMMANDER ENNIS: Sustain.
3   Rephrase it.
4   MS. JONES: I will rephrase.
5   Q   (By Ms. Jones) What is the dispute, if you know, as
6   it relates to the outside employment?
7   MR. GOLDPAUGH: Objection as to
8   relevancy. That is not to come from this witness.
9   We all know what the dispute is. The dispute is
10   whether or not he was working at the same time and
11   not giving eight hours to the Detroit Police
12   Department.
13   MS. JONES: Thank you, but you
14   can't testify, sir.
15   MR. GOLDPAUGH: Well, neither
16   can he as to what the dispute is. He is a witness,
17   not a prosecutor.
18   MS. JONES: You are the
19   attorney. What we say is not evidence. The
20   evidence has to come from the witness.
21   MR. GOLDPAUGH: What the
22   dispute is is not evidence. That is a theory or an
23   opinion. Evidence is what brings to the trier of
24   fact what is in dispute. We already know what is in
25   dispute, not from this witness.

45   (Pages 203 to 206)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 4 of 89

Page 207

1    MS. JONES: I defer to the
2  Board.
3       COMMANDER ENNIS: I will
4  sustain the objection. Please move on.
5       MS. JONES: Nothing further.
6  Pass to the Panel.
7       COMMANDER ENNIS: Inspector?
8       INSPECTOR BLACKMON: Just one
9  question. What was your purpose for interviewing
10 Mrs. Collins or having her interviewed?
11      THE WITNESS: What type of
12 activity he was actually doing at the sporting
13 complex and who actually owned it, and what was it.
14 That is what we wanted to get out of that.
15      INSPECTOR BLACKMON: Was there
16 ever a question about the times that he was at the
17 complex?
18      THE WITNESS: Not that I was
19 given, no.
20      INSPECTOR BLACKMON: Thank you.
21      COMMANDER ENNIS: I have a
22 couple questions, Sergeant. Were you the OIC from
23 the outset of the investigation?
24      THE WITNESS: From the onset?
25      COMMANDER ENNIS: Yes, from the

Page 208

1  onset?
2       THE WITNESS: Correct.
3       COMMANDER ENNIS: So you were
4  the OIC from the very beginning when the initial
5  complaint letter came in through the Chief's office?
6       THE WITNESS: What happens is
7  when the letter comes to the Chief's office and it
8  comes down to Internal Affairs, a preliminary-- the
9  Alert Team will go out to conduct a preliminary
10 investigation. From there, it gets determined
11 whether or not they will go forward to investigate
12 or not.
13      If they decide to go forward
14 with it, it gets assigned to an investigator, and
15 that was myself.
16      COMMANDER ENNIS: Did you
17 direct all the activities of the team and the
18 collection of the records, the interviewing of all
19 of the witnesses?
20      THE WITNESS: A coordination,
21 yes.
22      COMMANDER ENNIS: You were
23 present during the investigative subpoena?
24      THE WITNESS: Yes, sir.
25      COMMANDER ENNIS: Do you have a

Page 209

1  copy of the complaint letter?
2       MS. JONES: Exhibit No. 10.
3       COMMANDER ENNIS: Can we take
4  five minutes off the record?
5       (At 3:16 p.m., recess taken)
6       (At 3:37 p.m., back on the
7  record)
8       MS. JONES: Back on the record.
9  We were off the record for the Board to review a
10 document, I believe it was Exhibit No. 10.
11 Additionally, we have two documents that have been
12 presented by defendant's counsel which we have
13 listed as Exhibit No. 15, which is a compilation of
14 memorandums.
15      They are all dated November 29,
16 2010, but I don't believe that is the exact date
17 that these were actually drafted. They were drafted
18 by Sergeant Mattie Lewis. She is not present to
19 authenticate these in any way, so I do have my
20 question as to any weight you give these.
21      As counsel mentioned, they were
22 in the trial testimony, and he believes that the
23 Department should have had it in the Internal
24 Affairs file since it was an ongoing investigation.
25      (At 3:37 p.m., AX#15 marked)

Page 210

1       MS. JONES: Additionally, there
2  is Exhibit No. 16 which are football schedules. My
3  concern is this is a Flint football schedule. It
4  has nothing to do with the City of Detroit.
5  However, if you read the criminal trial transcript,
6  this did come out in the criminal trial.
7       (At 3:38 p.m., AX#16.marked)
8       MS. JONES: So I am stipulating
9  only as to its admissibility but caution what weight
10 you give this, if any. These are Association
11 Exhibits No. 15 and 16.
12      MR. GOLDPAUGH: Just to make
13 the record complete, as Ms. Jones indicated, there
14 is testimony with respect to Lieutenant Walton
15 indicating that these documents were presented to
16 the Department through Mattie Lewis. There was some
17 question at that point in time about the dates.
18      I don't know how these come up
19 because I receive documents all the time in that
20 little memorandum that always have the same dates,
21 so I have no idea what happens there. But that is
22 neither here nor there.
23      They were in the possession of
24 the Department. We were entitled to these documents
25 not only because they were potentially admitted

46  (Pages 207 to 210)

Page 211

1  through Sergeant Lewis in the criminal trial but
2  because, as part of the discovery and as part of the
3  defense that is being raised, we should have gotten
4  that in discovery. It never was.
5          It was authenticated and
6  admitted in the transcript and in the proceedings of
7  the trial which has been admitted. Therefore, to
8  keep as consistent as possible when you are looking
9  at defenses as well, you should have all the
10  documents.
11          We can always adjourn this and
12  bring everybody in, but I don't think we want to do
13  that. The other thing is that, with respect to the
14  schedule, there has been a great deal of testimony
15  about football, wherever it may be. There were some
16  defenses raised there.
17          There is testimony in the trial
18  transcript that this was posted at the Ninth
19  Precinct as well, therefore, we should have also been
20  included with this. We didn't get it, but we did
21  get it through these proceedings. So we are asking
22  that this also be admitted for those reasons.
23          Of course, with any piece of
24  evidence, it goes to admissibility. That is
25  something for you to make a determination as to what

Page 212

1  weight to give it. Thank you.
2          MS. JONES:  Did you receive it,
3  sir?
4          COMMANDER ENNIS:  I will
5  receive Association Exhibit No. 15, the Initiative
6  Reports authored by Sergeant Mattie Lewis.
7          Association Exhibit No. 16, the
8  football schedule, is also admitted.
9          MR. GOLDPAUGH:  I think one is
10  a four-page document. The rest of them are two
11  pages.
12          COMMANDER ENNIS:  Thank you.
13  The Initiative Reports are four pages?
14          MR. GOLDPAUGH:  I believe it is
15  four separate documents dealing with four different
16  times. It is a set of four, but I think it's a
17  total of six days, six or seven.
18          COMMANDER ENNIS:  Thank you.
19          (At 3:41 p.m., AX#15 and 16
20  received)
21          MS. JONES:  Are there any other
22  questions for the OIC at this time?
23          COMMANDER ENNIS:  No.
24          MS. JONES:  I do have one
25  question.

Page 213

1  Q  (By Ms. Jones)  Sergeant, you did eventually conduct
2      a Garrity of Mattie Lewis?
3  A  One of the team, yes.
4          MS. JONES:  Thank you. That
5  was the question.
6          RECROSS-EXAMINATION
7  BY MR. GOLDPAUGH:
8  Q  Was that after there was a determination no criminal
9      charges were going to be brought against Mattie
10      Lewis?
11  A  I don't know.
12  Q  You just know that after she went to an
13      investigative subpoena and after a warrant was
14      granted and Officer Collins was arraigned, that is
15      when the Garrity interview occurred, right, some
16      time in July of 2010?
17  A  Some time after the investigative subpoena for this
18      case?
19  Q  Right.
20  A  Yes, there was a Garrity conducted.
21  Q  Was it after the warrant was obtained against
22      Officer Collins?
23  A  I would have to look at the--
24          MS. JONES:  I will stipulate it
25  was, yes.

Page 214

1          MR. GOLDPAUGH:  No other
2  questions.
3          MS. JONES:  Thank you.
4          (At 3:43 p.m., witness excused)
5          MS. JONES:  We call Whitney
6  Walton to the stand.
7          UNIDENTIFIED:  Raise your right
8  hand. Do you swear or affirm that the testimony you
9  are about to give this Board is the truth?
10          LIEUTENANT WALTON:  I do.
11          WHITNEY WALTON
12          (At 3:43 p.m., sworn as a witness, testified
13  as follows)
14          DIRECT EXAMINATION
15  BY MS. JONES:
16  Q  Please state your name, badge and rank?
17  A  Lieutenant Whitney Walton, badge L-18.
18  Q  Where are you employed?
19  A  Detroit Police Department, and I'm in charge of
20      Internal Affairs.
21  Q  Does Todd Svenkesen work under you?
22          MR. GOLDPAUGH:  Stipulate.
23  Q  (By Ms. Jones)  At some point in time, did you know
24      Jerome Collins?
25  A  Yes.

47  (Pages 211 to 214)

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 6 of 89

Page 215

1  Q  How did you know him?
2  A  We had a case at Internal Affairs that was assigned
3     to Sergeant Svenkesen regarding time fraud.
4        MR. GOLDPAUGH:  Stipulate she
5  knows Officer Collins.
6        MS. JONES:  I'm asking
7  questions as I'm--
8        MR. GOLDPAUGH:  I apologize.
9  Q  (By Ms. Jones)  At some point in time, you created
10    some charts showing overlap of hours?
11  A  I did.
12  Q  How did you determine that these hours were
13    overlapping?
14  A  Initially, I only had the St. John's employment
15    records. So I took St. John's and activity logs and
16    daily details for DPD and did the Excel spreadsheet.
17        Then when we found out about
18  Allen Academy, then I expanded that to include Allen
19  Academy, and then, additionally, the one that shows
20  the total number of hours in a day that Officer
21  Collins was purportedly working.
22  Q  On one of those documents, you say you have a total
23    of the number of hours?
24  A  There is one of these that is missing.  The original
25    DPD one is not here. These all include Allen

Page 216

1     Academy, and St. John doesn't have the original.
2  Q  You are referring to the one that is DPD and just
3     St. John's.  Correct?
4  A  Yes.  I'm sorry, and your question was?
5  Q  My question is, at some point in time, is there a
6     document that you created that shows the number of
7     total hours for each individual day?
8  A  Yes.  For the total number of hours overlapping, is
9     that what you're saying, not for each day?
10  Q  One second.  I will try to find our copy of the
11    charts.
12        MR. GOLDPAUGH:  I have my
13  chart.
14        MS. JONES:  I'm going to have
15  to come up here and question you from looking at
16  this one.
17  Q  (By Ms. Jones)  Referencing the document that shows
18    the total, because there are three documents in
19    Exhibit No. 7, can you tell us what you are looking
20    at currently?
21  A  I am looking at the spreadsheet that has St. John's,
22    DPD, Allen Academy, and it has the total number, the
23    time on duty and off duty, total number of hours
24    worked for each entity and then the total number of
25    hours reflecting a 24-hour period.

Page 217

1  Q  Given the figures that you are showing for
2     St. John's, where did you get those figures from?
3  A  The employment records that we got through a search
4     warrant.
5  Q  From St. John's?
6  A  Yes.
7        MS. JONES:  Those have been
8  admitted for the Panel, the documentation in Exhibit
9  No. 4.
10        MR. GOLDPAUGH:  For the record,
11  I think a great deal of this testimony has been
12  dealt with with respect to the trial transcript.  I
13  want to make sure that the record is clear that the
14  documents we are talking about here, which are our
15  exhibits, you are aware of what exhibits Lieutenant
16  Walton is talking about in the prosecutor's numbers.
17        Ms. Jones and I talked about
18  this.  In other words, our Exhibit No. 7 is the
19  document that we are talking about here.  This
20  document is Exhibit No. 4, I believe, in the trial
21  transcript.
22        So when you are mixing and
23  matching, so to speak, I want to make sure that you
24  are not looking at our Exhibit No. 4--
25        COMMANDER ENNIS:  I understand.

Page 218

1     Yes, sir.
2        MR. GOLDPAUGH:  --when trying
3  to make heads or tails out of these things.
4        COMMANDER ENNIS:  Go ahead,
5  Ms. Jones.
6        MR. GOLDPAUGH:  Is that
7  correct?  Is that what we talked about?
8        MS. JONES:  Yes, that's fine.
9  Q  (By Ms. Jones)  Going forward, in the DPD column,
10    where did you get those figures from?
11  A  When it is highlighted in yellow, it is off of his
12    activity log and our payroll sheets.  It is a
13    combination of payroll sheets, activity logs, daily
14    details I reviewed.
15        MS. JONES:  That is why the
16  Board got the color copy.
17        COMMANDER ENNIS:  We don't have
18  color copies.
19        MS. JONES:  That's because she
20  has it right now.
21        THE WITNESS:  Also, these three
22  here are the ones that we used in the criminal
23  trial.  The one that I initially did also included
24  2008, and that was when there weren't activity logs,
25  that I went off of daily details.

48  (Pages 215 to 218)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 7 of 89

Page 219

1    MS. JONES:  Right, and I have
2    that here, but I did not admit it.  I didn't think
3    that it was necessary.
4  Q    (By Ms. Jones)  So the time that you are looking at
5    for Allen Academy, where did you get that
6    information from?
7  A    That information was taken off the employment
8    records we received from Allen Academy through the
9    search warrant.
10  Q    To the very right column, you show number of hours
11    total?
12  A    Correct.
13  Q    Some of those totals are more than a 24-hour period.
14    Correct?
15  A    Correct.
16  Q    Can you explain to us what the other two charts
17    would show us?
18  A    The one document is showing the overlap with DPD
19    strictly for our employment, that he was at one of
20    those other two entities for the time period that is
21    reflected.  So in this first one for January 5,
22    2009, there was three hours and 35 minutes.
23    MR. GOLDPAUGH:  She is
24    pointing.  I just want to know which document--
25    MS. JONES:  It has three hours

Page 220

1    and 35 minutes under the first--
2    MR. GOLDPAUGH:  The problem is
3    that when she is pointing, saying "this document,"
4    the record doesn't know-- these are all Exhibit
5    No. 7, but they are actually--
6    MS. JONES:  We will make them
7    A, B and C.
8    MR. GOLDPAUGH:  I've got no
9    problem with that.
10    MS. JONES:  Exhibit No. 7-A was
11    the first document which was the compilation, the
12    horizontal one, the compilation of hours.  I am
13    putting it on here, 7-A.
14    MR. GOLDPAUGH:  This one here?
15    MS. JONES:  With 22 at the top
16    line over to the right.
17    MR. GOLDPAUGH:  Okay.
18    MS. JONES:  Exhibit No. 7-B is
19    a document that the top line ends in 335, three
20    hours, 35.  Exhibit C, which is actually the one
21    that has been stamped officially here, the top line
22    has a dash in it.
23  Q    (By Ms. Jones)  Referring to 7-B, can you explain
24    what you were doing in that document when you
25    created it?

Page 221

1  A    This is showing the overlap strictly for DPD that
2    Officer Collins was either at St. John's or Allen
3    Academy, and that is during a time that he should
4    have been with DPD.
5  Q    So three hours and 35 minutes, he should have been
6    at DPD, and he wasn't?
7  A    Correct.
8    MR. GOLDPAUGH:  I'm going to
9    object as to when he was or wasn't there, because
10    all she can testify to is how she came up with this.
11    According to the documents that she reviewed, that
12    is what she is saying occurred.
13    To say that's when he was and
14    he wasn't there, we don't know where he was at these
15    particular times.  We just know what the documents
16    show.  I just want to make it clear.
17    COMMANDER ENNIS:  Sustained.
18    MR. GOLDPAUGH:  Thank you.
19  Q    (By Ms. Jones)  Activity logs are supposed to
20    accurately reflect where you are at any given time.
21    Correct?
22  A    That's correct.
23  Q    As far as you know, the ones that you reviewed had
24    Officer Collins' signature on the majority of them
25    if not all of them?

Page 222

1  A    They did.
2  Q    So what was the next document, 7-C, what was that
3    supposed to show?
4  A    This is showing an overlap with Allen Academy.
5  Q    At some point in time, did you calculate total
6    number of hours and total amount compensated where
7    he was compensated for work that he allegedly did
8    not perform?
9  A    For DPD, yes, for 2009.
10  Q    What document would that be?
11  A    Looking at 7-B.
12  Q    On 7-B, what amount do you show as being
13    compensated?
14  A    $6,864.51.
15  Q    How did you arrive at that calculation?
16  A    I took his hourly pay rate off his payroll
17    registry and multiplied that by the hours.
18  Q    That would have been his base pay versus any
19    overtime?
20  A    Correct, that's base pay.
21  Q    There was some discussion as to working St. John's
22    and working Allen Academy.  Do you know if he had to
23    punch in or punch out at either of the two places?
24  A    At St. John's, there was a swipe card I believe.  At
25    Allen Academy, I don't recall what the method was.

49  (Pages 219 to 222)

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com
13-53846-tjt    Doc 11961-3    Filed 07/14/17    Entered 07/14/17 12:55:42    Page 8 of 89

Page 223

1  Q   We just entered a couple of exhibits into the
2      record.  It was something about Initiative Reports.
3      Can you explain what those are?
4  A   I honestly don't know what Initiative Reports are.
5  Q   Is it an official document of DPD?
6  A   It is a document that was told to me by Sergeant
7      Mattie Lewis that this document existed.  I
8      contacted Eastern District and spoke to the front
9      office and the commander, and they had never heard
10     of it.  They had nothing filed, they had nothing
11     that they required as an Initiative Report.
12 Q   Then how did she get these Initiative Reports to you
13     for the trial?
14 A   She had printed them somewhere and brought them in.
15     I don't know where she got them from.  I don't know.
16 Q   Somehow, they weren't in the IA file.  Can you
17     explain why?
18 A   I turned them over to the prosecutor because, to me,
19     they were not official Department documents.
20 Q   Are you aware that there was a football schedule
21     posted at the precinct?
22 A   I was not aware of that.
23 Q   At trial, they brought forward football schedules.
24     Do you know anything about the football schedules?
25 A   I don't recall anything specific to me in the trial

Page 224

1      about a football schedule.
2  Q   No, it wasn't to you.  I just wondered if you knew.
3  A   No.
4           MS. JONES:  I think that is all
5      I have at the moment for you unless John goes
6      astray.
7           MR. GOLDPAUGH:  I have every
8      intention of going astray.  Don't worry about it.
9                CROSS-EXAMINATION
10 BY MR. GOLDPAUGH:
11 Q   Lieutenant Walton, you indicated, I believe, that
12     there was some conversation regarding the Initiative
13     Reports.  Correct?
14 A   Yes.
15 Q   Did you receive documentation or requests by defense
16     counsel, Mr. Evelyn, for these reports?
17 A   Yes.  I thought it was the prosecutor asking, but I
18     believe Gerald Evelyn asked through the prosecutor
19     who contacted me.
20 Q   Subsequently, you received these documents.  Is that
21     correct?
22 A   Yes, and turned them over to the prosecutor.
23 Q   I'm showing you what has now been admitted as
24     Association's Exhibit No. 15, it's four pages.  On
25     the top left, there is a fax number, do you see

Page 225

1      that, and a date?
2  A   Yes.
3  Q   Does that indicate that was provided to at least
4      Internal Affairs in November of 2011?
5  A   Yes.  That's our fax number.
6  Q   These deal with a time frame in April of 2007 and
7      2008, 2008 and 2008.  Is that correct?
8  A   I don't know.  I didn't look at that.
9  Q   I'm sorry.
10 A   Yes.
11 Q   Now, at that point in time, this was before the
12     trial started.  Correct?
13 A   Going by the date, yes.
14 Q   In fact the trial started about a week after this
15     matter.  Is that correct?
16 A   Yes.  I think it was December 5.
17 Q   Do you recall when you got the initial request for
18     these documents from Mr. Evelyn?
19 A   I do not.
20           MS. JONES:  I have to place an
21     objection here.  He mischaracterized her testimony.
22     She said she got it through the Prosecutor's Office
23     who got it from Evelyn.
24           MR. GOLDPAUGH:  All right.
25 Q   (By Mr. Goldpaugh) Do you recall when you got the

Page 226

1      call from the Prosecutor's Office regarding these
2      documents?
3  A   I do not.
4  Q   I apologize.  Suffice it to say though, you got a
5      request for these documents.  Correct?
6  A   Yes.
7  Q   And you then tried to track them down.  Is that
8      correct?
9  A   That's correct.
10 Q   Would it be a fair statement that this request was
11     made, and then eventually you found nothing, and
12     then he showed up on your doorstep?  Would that be a
13     fair statement?
14 A   I don't remember how it went.  I know that I had
15     contacted Community Relations, the main Community
16     Relations, checking with them if that was a report
17     through them.  They didn't have it.  Eastern didn't.
18           At some point, looking at that
19     document, it got faxed to us.
20 Q   Who did it get faxed to?
21 A   I don't know what that top fax number is.
22 Q   That is what I was wondering.  It says WCPA
23     Forfeiture, and it is a 224 number.  Could that have
24     possibly been the Wayne County Prosecutor's Office?
25     I'm just asking the question.

50  (Pages 223 to 226)

O'CONNOR COURT REPORTING
248.360.1331      www.oconnorcourtreporting.com
13-53846-tjt    Doc 11961-3    Filed 07/14/17    Entered 07/14/17 12:55:42    Page 9 of 89

Page 227

1    A   I don't know.
2    Q   Once you got this-- okay?
3    A   Yes.
4    Q   Now, as part of the investigation into Jerome
5        Collins, one of the individuals you were initially
6        investigating was Mattie Lewis.  Correct?
7    A   There was an investigation against Sergeant Mattie
8        Lewis.  Right.
9    Q   She was issued an investigative subpoena regarding
10       Officer Collins as well as others, and that has
11       already been placed on the record, and you were
12       present at that investigation, correct, at that
13       interview?
14   A   I was.
15   Q   You asked some questions?
16   A   I did.
17   Q   Subsequently, after that was completed, the warrant
18       came down against Officer Collins.  Is that correct?
19   A   I don't remember the time frame of how it all went.
20   Q   A short period of time.  I mean the warrant was
21       requested, and we already have on the record that it
22       came down two or three months after the
23       investigative subpoena, maybe two months at the
24       most.
25                    Subsequently, there was a

Page 228

1        Garrity interview of Mattie Lewis.  Correct?
2    A   Yes.
3    Q   When you received these, did you question Mattie
4        Lewis regarding them?
5    A   I don't recall questioning-- I don't recall if she
6        did it in person or not or how I got them.  It was a
7        long time ago, I don't remember.
8    Q   Okay, but I guess my question is, once you got these
9        documents which were a subject of the investigation
10       with respect to Officer Collins, did you then
11       continue to question Mattie Lewis regarding them
12       because she was going to be a witness, I would
13       assume, either for the Department or for the
14       prosecution?
15   A   I did not.
16   Q   Did anybody, if you know?
17   A   Not that I'm aware of.
18   Q   Then you testified at trial regarding these, that we
19       got them but we didn't know anything about them.
20       I'm paraphrasing when you were questioned regarding
21       this by Mr. Evelyn.  Is that correct?
22   A   Yes.
23   Q   Then Mattie Lewis got up on the stand, and she
24       testified.  Right?
25   A   I wasn't present.

Page 229

1    Q   Oh, you weren't present, okay.  Now, was it you and
2        the powers that be above Sergeant Svenkesen that
3        made a determination that you were not going to
4        Garrity Mattie Lewis initially but rather submit it
5        for an investigative subpoena?
6    A   Initially, Mattie Lewis, we were looking at her
7        criminally.
8    Q   So that was the reason why she wasn't given a
9        Garrity interview initially?
10   A   Right, because she was a criminal suspect.
11   Q   I understand, and so that is why you directed the
12       sergeant not to do a Garrity interview at that time.
13       Correct?
14                MS. JONES:  Asked and answered.
15   Q   (By Mr. Goldpaugh)  Would it be a fair statement
16       that when the investigative subpoena-- strike that.
17                When you prepared these
18       documents which have now been marked 7-A, B and C,
19       when were they prepared if you recall?
20   A   Prior to trial.
21   Q   Were they prepared prior to-- were they made part of
22       the warrant request?
23   A   Not A, B and C.  The one that I referenced earlier
24       was.
25   Q   Right, and that dealt only with DPD and St. John's.

Page 230

1        Is that correct?
2    A   Yes, because initially when we submitted, we only
3        knew about St. John's and DPD.
4    Q   In fact would it be a fair statement that the only
5        reason-- never mind, strike that.
6                The warrant request that was
7        issued was for one count of Larceny by False
8        Pretenses, correct, and one count of Misconduct in
9        Office?
10   A   Yes.
11   Q   It was after the exam in which Mr. Collins
12       determined that he wanted to exercise that right
13       that the Prosecutor added a charge.  Would that be
14       correct?
15   A   Because I didn't deal with the day-to-day, Sergeant
16       Svenkesen was, I don't recall.
17   Q   But suffice it to say, there were three charges that
18       he was acquitted on.  Correct?
19   A   He was acquitted, yes.
20   Q   Of all charges.  Right?
21   A   Yes.
22   Q   Now, my understanding from reviewing the trial
23       transcript is that the way you compare this and the
24       way you describe it is you took the hours on his
25       activity log that he said he was working at a

51 (Pages 227 to 230)

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 10 of 89

Page 231

1  certain place, then took the hours that he swiped in
2  or out at St. John's and said that, well, if he was
3  here and here, there is an overlap.  Is that
4  correct?
5  A   That's correct.
6  Q   You don't know where he physically was at any
7  particular time?
8  A   I do not.  I went off the documents.
9  Q   Exactly.  So if those documents are wrong as to the
10  times, then he could have put in eight hours at one
11  place and the other time at another place depending
12  on when he swiped in, when he swiped out, etcetera.
13  Is that right?
14  A   I went by the documents, what they showed.
15  Q   Exactly.  Now, you talk about Allen Academy here,
16  but there was no overlapping of anything with
17  respect to Allen Academy, was there?
18  A   Well, he was doing truancy work--
19  Q   With respect to DPD.
20  A   Yes, because he was working 11:00 to 7:00 or 12:00
21  to 8:00 for DPD, and truancy 9:00 a.m. to 5:00 p.m.
22  at Allen Academy.
23  Q   But was he doing it on a daily basis?  You don't
24  know which days he was doing certain things.  He
25  didn't get paid for nine hours at Allen Academy, did

Page 232

1  he?
2  A   I went off of the hours that he submitted to Allen
3  Academy, which he has here sometimes 9:00 to 4:00,
4  yes.
5  Q   But there was no-- his Allen Academy work as a
6  security officer was midnights, from 12:00 to 6:00
7  in the morning.  Is that correct?
8  A   As a security officer, he would start at like 11:00
9  and work midnights.  Truancy was 9:00 a.m. to--
10  Q   But it wasn't a straight 24-hour-- I mean it was
11  during a period of time that he may have delivered
12  some truancies or things like that.  Would that be a
13  fair statement?
14  A   According to Allen Academy, he worked from 9:00 a.m.
15  to 4:00 p.m. according to their documents, and that
16  is what I put him down as working.
17  Q   That was five days a week?
18  A   This is the days I have that overlapped.  If he
19  didn't work DPD, I didn't count it.
20  Q   Now, we have heard a lot of testimony about a
21  previous anonymous letter about a year before this
22  happened.  Commander Dolunt came in and so did
23  Commander Moore, and they both said that they
24  received an anonymous letter regarding outside
25  employment by Officer Collins.

Page 233

1      Do you know anything about that
2  as part of your investigation?
3  A   I do not.
4  Q   Were you informed by Commander Stair or anyone else
5  of this previous anonymous note?
6  A   I don't know about an anonymous note.  I know that
7  Commander Dolunt told me that he had approached
8  Commander Stair prior about an issue with Officer
9  Collins.
10  Q   Was that before or after this letter from
11  Ms. Catherine Jones?
12  A   This was well into our investigation.
13  Q   So would it be a fair statement that was the first
14  time that you learned about this previous
15  investigation or alleged investigation?
16  A   During this investigation was the first time I found
17  out about that, yes.
18  Q   If Commander Moore testified that they brought this
19  to Commander Stair's attention and that they finally
20  tracked down-- because nobody from your unit
21  notified them what the results were-- that they had
22  done surveillance and they found nothing, wouldn't
23  you think that the commander would have passed this
24  other information on to you as part of your
25  investigation into this alleged criminal activity?

Page 234

1  A   I mean--
2  Q   I will move on.  Now, you testified at the trial
3  that this investigation was premised on an anonymous
4  note.  Is that correct?
5  A   My recollection, I think there was a name on it, but
6  we couldn't attribute it to anybody.
7  Q   You mean you couldn't prove--
8  A   That it was an actual person.
9  Q   Because I know when you testified on direct, you
10  said, yes, this was an anonymous note that we
11  received, but it was actually signed, or at least
12  there was a name on there.  Is that correct?
13  A   Yes.  My recollection, if I said anonymous, I must
14  have gotten--
15  Q   I just wanted to make sure we weren't mixing the two
16  investigations up, that's all.
17  A   No.
18  Q   Now, did you use the daily detail sheets also in
19  compiling your documentation?
20  A   As I was saying, there was a previous sheet that I
21  submitted to the Prosecutor's Office that included
22  2008.
23      MS. JONES:  I think we need to
24  admit it as 7-D.
25      MR. GOLDPAUGH:  I was just

52  (Pages 231 to 234)

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 11 of 89

Page 235

1    asking her if--
2              MS. JONES: He keeps
3    referencing it.
4              MR. GOLDPAUGH: No, I don't
5    think it has to be referenced. I just asked her if
6    she used the daily detail sheet in compiling this.
7    That's all I want to know.
8              THE WITNESS: I did because I
9    can explain to you off of that one. If it's
10   highlighted in yellow--
11   Q   (By Mr. Goldpaugh) I just wanted to know if you
12       used the daily detail. That's all I wanted to know.
13   A   If there wasn't an activity log, I used the daily
14       detail.
15   Q   Okay. So on that case, all of those are off of the
16       activity logs?
17   A   When it is highlighted in yellow.
18   Q   The exhibit that has been admitted.
19   A   There is a few that are not highlighted in yellow,
20       which means there wasn't an activity log for that
21       day.
22   Q   Okay, that's fine, and that only deals with 2009.
23       That's what I wanted to know. So anything before
24       that, if you prepared a document, and it's not an
25       exhibit, and I don't care about it, I just wanted to

Page 236

1    know if you used that.
2              You did not use the time cards.
3    right? You did not use the time and payroll cards
4    with respect to your calculations?
5    A   When you are saying payroll, what payroll cards are
6        you referring to?
7    Q   Does the timekeeper fill out certain paperwork?
8    A   The payroll registries? I did not use those.
9    Q   In fact who prepares the payroll registries if you
10       know?
11   A   The timekeepers. At that time, it was the
12       timekeepers at the Eastern District.
13   Q   If you know, where did the timekeeper get that
14       information if you know?
15   A   From the time book put in by the supervisor.
16   Q   The supervisor puts that in by way of activity logs
17       or other daily detail numbers. Right?
18   A   Yes.
19   Q   So whatever the supervisor puts into the time book,
20       all the timekeeper does is take those things out and
21       prepares those documents. Right?
22   A   Right, as days, afternoons or midnights. It is not
23       any specific hours.
24   Q   Right. So it doesn't go into a time frame of 2:00
25       to 10:00 or 1:00 to 7:00. It goes in midnights,

Page 237

1    days and afternoons for an eight-hour period.
2    Correct?
3    A   Correct.
4    Q   Now, you said you didn't find any activity logs for
5        a period of time. Is that correct?
6    A   Correct.
7    Q   Did it come to your attention in your discussions as
8        part of the investigation that there was a time
9        period when Officer Collins, as well as a number of
10       other officers under the guidance of Sergeant Lewis,
11       were not doing activity logs?
12   A   Yes, there was a period where she was not--
13   Q   Making them do them.
14   A   Correct.
15   Q   And that, subsequently, she was directed to do so by
16       Commander Dolunt and Commander Moore for more
17       accountability. Would that be a fair statement?
18   A   Yes.
19   Q   In fact did it come to your attention while you were
20       investigating Sergeant Lewis as part of this
21       criminal activity that she admitted to filling out
22       other people's activity logs?
23   A   There was a specific detail that she admitted to
24       filling out activity logs for the officers.
25   Q   She said she did that because they were entitled to

Page 238

1    slide time or something along those lines. Is that
2    correct?
3    A   I don't remember--
4    Q   That they were getting paid for overtime because no
5        one was paying them overtime or something along
6        those lines, earned time that they had been taking.
7    A   Say your question again.
8    Q   I will strike that. But she did admit to doing
9        other people's activity logs. Right?
10   A   She did.
11   Q   So an officer gets paid not off his or her activity
12       logs but gets paid off the time and attendance
13       records and those cards. Is that correct?
14   A   It's a compilation of submitting your activity logs
15       that your supervisor--
16   Q   Supervisor then--
17   A   --daily detail time. There is a process.
18   Q   Oh, I know there is a process, but if there are no
19       activity logs to be accounted for, the supervisor is
20       saying yes, they worked and put in the time. So in
21       other words, the paper, the activity log, is not
22       what gets you paid. It is what your supervisor says
23       you should get paid for. Would that be a fair
24       statement?
25             MS. JONES: Objection,

53  (Pages 235 to 238)

Page 239

1   convoluted question. Can we rephrase this?
2        MR. GOLDPAUGH: I don't know
3   why it's convoluted.
4        COMMANDER ENNIS: Did you
5   understand the question, Lieutenant?
6        THE WITNESS: The daily detail
7   gets submitted to a timekeeper also and, in the
8   district, they put the time in the time book. That
9   is ultimately reflecting that you're getting paid
10  for the timekeeper to put it in.
11  Q  (By Mr. Goldpaugh) Right, but if there are not
12      activity logs for a period of time, and the
13      supervisor enters into the time book whether the
14      individual is working, that timekeeper then takes
15      those documents, and the person gets paid whether
16      there is an activity log there or not. Isn't that
17      true?
18  A  Sure.
19  Q  That's what I'm talking about. So when the
20      supervisor says that an individual worked his or her
21      eight hours and puts it into the time book, it
22      doesn't make any difference when those eight hours
23      were worked. Would that be a fair statement?
24  A  No.
25        MR. GOLDPAUGH: Could I just

Page 240

1   have one second?
2        COMMANDER ENNIS: Certainly.
3        MR. GOLDPAUGH: Nothing else of
4   this witness. Thank you.
5        MS. JONES: Just briefly.
6        REDIRECT EXAMINATION
7   BY MS. JONES:
8   Q  You spoke upon direct and also upon cross-
9      examination of your initial report. I am going to
10     bring to you your initial report. You referenced a
11     comparison to St. John and DPD. Is that the report
12     you were referencing?
13  A  Yes, it is.
14  Q  What is different about that report and the other
15     three that have already been admitted?
16  A  The ones that have already been admitted, A, B and
17     C, reflect 2009 when there was actual activity logs.
18     This one goes back to November of 2007 where I went
19     off of daily details because, prior to November of
20     2007, I couldn't even find a detail for the Eastern
21     District for Community Relations.
22        So this is all the documents.
23     It's a comparative for four days in 2007 through
24     2008 to 2009 and the overlap.
25        MS. JONES: Move to admit as

Page 241

1   Department Exhibit No. 17 I think we are at now.
2        (At 4:24 p.m., DX#17 marked)
3        MR. GOLDPAUGH: Objection as to
4   relevancy. Objection as to materiality, and
5   objection with respect to this should have all been
6   brought out in the case in chief and not on redirect
7   when she, in an attempt to explain certain things
8   which were not germane to my questioning, made this
9   order.
10        This has nothing to do with the
11  charges against this particular officer. He is
12  charged with the false statements from January of
13  2009 through November of 2009.
14        She has testified here that she
15  doesn't even have any of the activity logs, so we
16  don't know what it says on these activity logs, but
17  makes a determination that because the daily detail
18  may or may not say something, she made a
19  determination there was some overlap.
20        Clearly, this is not germane to
21  the charges, it's irrelevant, it's immaterial and
22  it's prejudicial at this point in time.
23        MS. JONES: Number one, it
24  doesn't matter when I present evidence as long as
25  the witness is still on the stand. So I don't know

Page 242

1   what the third argument he mentioned was about.
2        As to relevancy and
3   materiality, if you look at Charge I and Charge II,
4   it speaks to November 2007 through 2009. So it is
5   material and relevant to these proceedings.
6        MR. GOLDPAUGH: Commander, also
7   from her own testimony, she said I didn't have any
8   activity logs. I didn't compare these with activity
9   logs. I compared daily details.
10        We all know that daily details
11  change without notice. There is no signatures.
12  These officers said, yes, I was there, I was there
13  for these times. They have called in and it didn't
14  get on the daily detail. The daily detail only says
15  what you are supposed to be doing in advance. Those
16  change all the time.
17        MS. JONES: That does not go to
18  admissibility, it goes to the weight that you wish
19  to give it.
20        MR. GOLDPAUGH: It also goes to
21  admissibility for the reasons that I have set forth.
22        COMMANDER ENNIS: I understand,
23  and I agree. I've got it referenced in three of the
24  charges. I will overrule the objection, and we will
25  give it the appropriate weight when we review the

54  (Pages 239 to 242)

Page 243

1    evidence.
2              (At 4:26 p.m., DX#17 received)
3              MS. JONES: One other question.
4    Q    (By Ms. Jones) Counsel asked you about Mattie Lewis
5    and having to complete activity logs, that after she
6    was spoken to was when she started making them do
7    activity logs.
8              Prior to her being spoken to,
9    was it a requirement?
10   A    Absolutely.
11             MS. JONES: Nothing further.
12             RECROSS-EXAMINATION
13   BY MR. GOLDPAUGH:
14   Q    It was absolutely, but for two-and-a-half or three
15   years, Mattie Lewis didn't do that, did she?
16   A    From the documents that we could find, no.
17   Q    In fact for a number of years, the people at the
18   Eastern District didn't require that, did they?
19   A    I have no idea.
20   Q    Well, you talked about 2005, 2006, all those years,
21   there was no activity logs, is that correct, that
22   you could find?
23   A    We did not locate activity logs prior to November
24   2007 for Officer Collins.
25   Q    All the way back how far?

Page 244

1    A    I don't recall. I didn't go and pull the documents
2    myself, members of Internal did. So I don't know.
3    Q    Did you testify at the hearing that they went back
4    and looked all the way back to 2005?
5    A    I believe that is when Officer Collins got
6    transferred to-- I think that's when they joined
7    together, five and nine.
8    Q    So you went back to 2005, and they started looking
9    for them in 2005. Is that correct?
10   A    It would make sense. I don't remember the exact
11   date.
12   Q    During 2005, who was the commander at the Eastern
13   District; Commander Godbee?
14   A    I don't recall who was the commander in 2005.
15   Q    Was Deputy Chief Motley there after that in 2007?
16   A    I know she was there. I don't know the exact time
17   frame.
18   Q    Would it be a fair statement though that before
19   Commander Dolunt and Commander Moore became involved
20   with the Eastern District, the Ninth Precinct, that
21   it was being run by Deputy Chief Motley and,
22   previous to that, Commander at that time Godbee. Is
23   that correct?
24   A    Yes.
25   Q    That was a time when you found no activity logs for

Page 245

1    Officer Collins. Is that correct?
2    A    We started finding activity logs in January of 2009.
3    Q    As part of your investigation, you learned or your
4    team learned from Commander Dolunt that all these
5    issues were raised with Deputy Chief Motley. Is
6    that right?
7    A    I don't recall that.
8    Q    Did you review the Garrity interviews that were
9    provided as part of this investigation?
10   A    When I typed the final report, I reviewed the
11   synopsis that Sergeant Svenkesen had done, but I did
12   not listen to the Garrity interviews.
13             MR. GOLDPAUGH: Nothing else of
14   this witness.
15             REDIRECT EXAMINATION
16   BY MS. JONES:
17   Q    As it relates to outside employment, what is the
18   policy as to outside employment?
19             MR. GOLDPAUGH: This is outside
20   the scope of direct examination or cross-
21   examination. I have not raised one issue about
22   outside employment with her.
23             MS. JONES: You raised to her
24   about St. John's and Allen Academy.
25             MR. GOLDPAUGH: I didn't ask

Page 246

1    her about outside employment. I talked about how
2    she came up with her calculations.
3              MS. JONES: Isn't that outside
4    employment?
5              MR. GOLDPAUGH: No. That went
6    to the calculations. It had nothing to do with
7    outside employment.
8              COMMANDER ENNIS: I will
9    sustain the objection. Pass to the Panel or pass to
10   the Board?
11             MS. JONES: Pass to the Panel.
12             COMMANDER ENNIS: Inspector?
13             INSPECTOR SROKA: Your analysis
14   that you did for 2007 to 2008 utilized the daily
15   details?
16             THE WITNESS: Yes.
17             INSPECTOR SROKA: Was that a
18   comparison against St. John's also and the Allen
19   Academy?
20             THE WITNESS: No. This initial
21   one was only for St. John's, because when I did
22   this, we only knew about St. John's.
23             INSPECTOR SROKA: Were there
24   overlaps in that document?
25             THE WITNESS: Absolutely.

55  (Pages 243 to 246)

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 14 of
89

Page 247

1  INSPECTOR SROKA: How much did
2  that tally up to?
3  THE WITNESS: This tally came
4  to $15,506.54.
5  MR. GOLDPAUGH: My objection is
6  on the record with respect to these documents.
7  COMMANDER ENNIS: Noted.
8  MR. GOLDPAUGH: I just wanted--
9  COMMANDER ENNIS: I understand.
10 It's noted. Anything else?
11 INSPECTOR SROKA: No.
12 INSPECTOR BLACKMON: The chart
13 that you did, was it in military time?
14 THE WITNESS: Yes.
15 INSPECTOR BLACKMON: So when we
16 are looking at times and we see anything that is a
17 morning hour, based on what you are stating, based
18 on the information you received, he would have been
19 working in the mornings on three different occasions
20 on several days?
21 THE WITNESS: Correct.
22 INSPECTOR BLACKMON: That's all
23 I have.
24 COMMANDER ENNIS: You were
25 involved in the investigative subpoena involving

Page 248

1  Sergeant Lewis?
2  THE WITNESS: I was.
3  COMMANDER ENNIS: She made some
4  admissions as to preparing activity logs for Officer
5  Collins?
6  THE WITNESS: It was for a
7  specific-- I was doing an investigation involving an
8  officer Kenyata Borden who went on a Caribbean
9  cruise, and Mattie Lewis gave her slide time for
10 that but carried her on the detail.
11 They were handing out
12 Goodfellow packages and, after the fact, they were
13 told we need activity logs. So what Sergeant Lewis
14 said she did was, for that specific detail, for the
15 Goodfellows packages, she filled them out. It was
16 only specific to this Goodfellow, not in general
17 about activity logs.
18 COMMANDER ENNIS: Did she make
19 any admissions to doing any other activity logs for
20 any of the other-- well, specifically, for Officer
21 Collins?
22 THE WITNESS: It was whoever
23 was working the Goodfellows that day, or it was a
24 number of days.
25 COMMANDER ENNIS: It was only

Page 249

1  for the Goodfellow detail?
2  THE WITNESS: That is my
3  recollection. This investigative subpoena was
4  several years ago.
5  COMMANDER ENNIS: In the
6  investigation in attempting to pull out activity
7  logs for Officer Collins specifically, when did the
8  first activity logs appear? When I say appear, from
9  what date did you start to detect activity logs?
10 THE WITNESS: That was
11 January 5, 2009.
12 COMMANDER ENNIS: Prior to
13 January 5, 2009, were you able to locate any
14 activity logs for Officer Collins?
15 THE WITNESS: No.
16 COMMANDER ENNIS: If you know,
17 when Officer Collins was assigned to the Eastern
18 District, when did he come into Community Relations?
19 THE WITNESS: I don't know
20 that.
21 COMMANDER ENNIS: Do you know
22 what his assignment was prior to that?
23 THE WITNESS: I do not know.
24 COMMANDER ENNIS: When you
25 interviewed Sergeant Lewis, did she acknowledge that

Page 250

1  she did not require her Community Relations officers
2  to do activity logs?
3  THE WITNESS: Again, I did that
4  Garrity interview three years ago. Yes, because she
5  was charged with failing to-- departmentally,
6  failing to require her officers to complete activity
7  logs, and she received a 45-day suspension.
8  COMMANDER ENNIS: In your
9  analysis and in your compilation of the number of
10 hours and the payroll, did you ever pull W-2s? Do
11 you know how much Officer Collins made for 2009 from
12 Adams Academy and St. John's Hospital?
13 THE WITNESS: I don't think I
14 had a W-2. Sergeant Svenkesen has all the documents
15 that were in the file. So I'm not sure. I'm
16 assuming in their payroll records, it would have
17 shown his total for the year for those entities.
18 COMMANDER ENNIS: Does your
19 compilation in these documents give me the total
20 hours for the time periods here?
21 THE WITNESS: I totaled the
22 overlap. I did not total-- the one total I have is
23 on the one you have where at times he is working 27
24 hours in a 24-hour period. I didn't do a separate
25 St. John's he, he worked 80 hours this week.

56  (Pages 247 to 250)

Page 251

1    COMMANDER ENNIS: Exactly. You
2  did not do a--
3    THE WITNESS: I did not do that
4  on the Excel.
5    COMMANDER ENNIS: You didn't do
6  a separate Allen Academy or a St. John Hospital
7  saying that from this time period to this time
8  period, Officer Collins worked X number of hours.
9  You only concentrated on the overlap time.
10   THE WITNESS: Yes.
11   COMMANDER ENNIS: On your
12 documents, on these exhibits where you list the
13 dates and the time frames, if there was no conflict,
14 if he was not working DPD, you did not list those
15 dates that he was working either at Allen or at
16 St. John's.
17   THE WITNESS: Correct.
18   COMMANDER ENNIS: These are
19 only days where he worked at DPD on the same days
20 that he was working at Allen Academy or St. John
21 Hospital.
22   THE WITNESS: Right. If he was
23 on furlough with us, I didn't vet it.
24   COMMANDER ENNIS: Anything
25 else?

Page 252

1    INSPECTOR BLACKMON: One
2  question. In regard to Exhibit No. 7-A, you totaled
3  the number of hours per day, and some of them ranged
4  from 22 hours to 27 hours. Commander Ennis asked
5  you whether you know whether or not he was
6  compensated for that higher day for those total
7  hours. Would you know that?
8    THE WITNESS: He was
9  compensated, because these are all off the payroll
10 records.
11   INSPECTOR BLACKMON: So you
12 know he would have been paid for the 27 hours that
13 day?
14   THE WITNESS: Right. He would
15 have received a check from St. John's. We know from
16 their payroll records he worked that and was paid
17 it.
18   For DPD, he worked it and was
19 paid it. For Allen Academy, he worked it, and he
20 was paid it.
21   COMMANDER ENNIS: Any
22 additional questions?
23   MS. JONES: None from me.
24   MR. GOLDPAUGH: I have just
25 two.

Page 253

1    RECROSS-EXAMINATION
2  BY MR. GOLDPAUGH:
3  Q   With respect to the Allen Academy aspects, we know
4    that you took the activity logs giving starting
5    times and ending times, correct, coming up with X
6    number of hours.
7        In your testimony, how did you
8    determine the time that he allegedly worked at
9    St. John's? Were there activity logs, or were there
10   swipe cards?
11       MS. JONES: I'm sorry, you said
12   Allen Academy, and then you went to St. John's.
13 Q   (By Mr. Goldpaugh) I'm sorry, I meant St. John's.
14 A   St. John's, again, it's been three years, but it is
15   whatever was brought from the search warrant.
16 Q   You took the activity logs from DPD, I understand
17   that. With St. John's, what type of a document did
18   you have to show that he was allegedly at St. John's
19   for a period of time?
20 A   That was their-- they had their swipe.
21 Q   So when he came to work, he swiped a time clock?
22 A   Yes.
23 Q   He swiped a time clock, and when he checked out, he
24   swiped a time clock?
25 A   Yes.

Page 254

1  Q   So that was X number of hours for a particular day.
2    How about Allen Academy?
3  A   It was their employment records, and I believe they
4    told us his hours were the midnight security and
5    then the day truancy.
6  Q   So in other words, on the Allen Academy-- that is
7    what I wanted to clear up-- it was what they told
8    you he was supposed to be working?
9  A   Yes, what they considered his working hours to be.
10 Q   Right. So in other words, you didn't get an
11   activity log from Allen Academy for a particular
12   day?
13 A   I don't recall reviewing an activity log. I don't
14   know what his documents were.
15 Q   So in other words, if they said, well, this is what
16   we paid him because he was supposed to be working on
17   these particular days, or actually, this is what we
18   paid him because that's what we paid him to do, it
19   doesn't mean that he worked those particular hours
20   on that particular day with any documentation, just
21   what they said?
22 A   I never physically saw him at work at Allen Academy.
23 Q   Right, exactly, and that's what I mean. So from
24   that standpoint, he could have been getting paid for
25   a particular set of hours on a particular day but

57  (Pages 251 to 254)

Page 255

1  could have done that work on some other day. Would
2  that be a fair statement?
3  A  Say that again.
4  Q  In other words, let's suppose you have to go out and
5  do something as a truant officer-- I'm not talking
6  about the security aspects-- if he did the work on
7  one day as opposed to another day, it didn't make
8  any difference so long as he put in his eight hours.
9  Would that be a fair statement?
10 A  According to their payroll records, they were paying
11 him for a specific day.  That is what I went off of,
12 his records, this is the day you are working.
13 Q  Okay, but you have no knowledge nor any evidence
14 that he was actually at Allen Academy for any of
15 those days he was paid.  Would that be a fair
16 statement?
17 A  I never physically saw him at Allen Academy.
18 Q  But you have no documents that said he was working
19 other than they are telling you we paid him to be
20 here for this day?
21 A  We have his employment records that we received from
22 Allen Academy.
23      MR. GOLDPAUGH:  Nothing else.
24      REDIRECT EXAMINATION
25 BY MS. JONES:

Page 256

1  Q  His employment at Allen Academy were two separate
2  contracts.  Correct, if you recall?
3  A  He had the security job first, and then he picked up
4  the second job.  I don't remember all the documents
5  though.
6  Q  Do you recall documents showing the security time
7  sheets were at the bottom or at the top?  One was at
8  the top, and one was at the bottom.  Do you recall
9  that?
10 A  It has been a very long time since I saw those.
11      MS. JONES:  That's fine.  The
12 Board has the documents, and they also have the
13 transcript.
14      COMMANDER ENNIS:  Any
15 additional questions?
16      MS. JONES:  I am through, sir.
17      COMMANDER ENNIS:  Counsel?
18      MR. GOLDPAUGH:  Nothing.
19      COMMANDER ENNIS:  Thank you,
20 Lieutenant.
21      (Witness excused)
22      COMMANDER ENNIS:  Do we have
23 any other matters to be addressed before we adjourn
24 till Thursday morning at 9:00?
25      MR. GOLDPAUGH:  Are you

Page 257

1  resting?
2      MS. JONES:  I rested.
3      MR. GOLDPAUGH:  We rest.
4      MS. JONES:  I believe we will
5  be doing closing arguments on Thursday.
6      COMMANDER ENNIS:  Thursday
7  morning at 9:00?
8      MS. JONES:  Yes, sir.
9      COMMANDER ENNIS:  We are
10 adjourned till Thursday morning at 9:00.
11      (Adjourned to Thursday,
12 July 11, 2013 at 9:00 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 258

1      C E R T I F I C A T I O N
2
3  STATE OF MICHIGAN   )
4                      )
5  COUNTY OF OAKLAND   )
6
7
8      I certify that this transcript, consisting
9  of 223 pages, is a complete, true and correct
10 transcript of the Trial Board proceedings and
11 testimony taken in this case on July 9, 2013.
12
13
14
15  7-13-13
16
17
18 Date    TAMARA A. O'CONNOR, CSMR-2656, CER-2656
19        2385 Jakewood Drive
20        West Bloomfield, Michigan 48324
21
22 sd

58  (Pages 255 to 258)

O'CONNOR COURT REPORTING
248.360.1331      www.oconnorcourtreporting.com
13-53846-tjt   Doc 11961-3   Filed 07/14/17   Entered 07/14/17 12:55:42   Page 17 of 89

GARRITY INTERVIEW OF MATTIE LEWIS
IAS CASE NO. 10-017

LEWIS          TODAY IS JULY 6, 2010. THE TIME IS APPROXIMATELY 10:55 A.M.
               WE A     660 WOODWARD, SUITE 1650, FOR THE PURPOSE OF
               INTERVIEWING SERGEANT MATTIE LEWIS, BADGE S-66,
               ASSIGNED TO THE EASTERN DISTRICT, REGARDING IA CASE 10-
               017, AN ALLEGATION OF TIME FRAUD AND NEGLECT OF DUTY.
               SERGEANT LEWIS IS THE FOCUS OF THIS INVESTIGATION.
               PRESENT ARE MYSELF, LIEUTENANT WHITNEY WALTON,
               SERGEANT LEWIS AND ATTORNEY FRED WALKER.

WALKER         FRED WALKER ON BEHALF OF SERGEANT LEWIS. SHE AND I
               DISCUSSED THE GARRITY RIGHTS. SHE UNDERSTANDS HER
               GARRITY RIGHTS AND SHE AND I SIGNED THE FORM SIGNIFYING
               HER UNDERSTANDING AND WE ARE READY TO PROCEED.

WALTON         AND SERGEANT LEWIS YOU UNDERSTAND YOU ARE BEING
               ORDERED TO ANSWER THESE QUESTIONS TRUTHFULLY?

LEWIS          YES MA'AM.

WALTON         OKAY AND YOU UNDERSTAND ANY FALSE STATEMENTS CAN BE
               USED AGAINST YOU?

LEWIS          YES MA'AM.

WALTON         OKAY WE'RE GONNA BE TALKING ABOUT ESSENTIALLY TWO
               DIFFERENT IA CASES, BUT THE CASE FOCUSED AGAINST YOU, SO

1

EX 5

INVOLVING OFFICER BORDEN AND OFFICER JEROME COLLINS OKAY? OKAY, SO I'M GONNA START WITH OFFICER BORDEN AND THEN WE'LL TOUCH ON OFFICER COLLINS AFTER. OKAY, LET'S JUST START WITH IN DECEMBER, OBVIOUSLY WE BOTH KNOW THERE WAS AN ISSUE WITH OFFICER BORDEN WHERE SHE WAS CARRIED WORKING BUT WAS ON A CARIBBEAN CRUISE, CORRECT?

| | |
|---|---|
| LEWIS | CORRECT |
| WALTON | RUN ME THROUGH YOUR UNDERSTANDING OF WHAT HAPPENED AND WHY SHE WAS CARRIED WORKING |
| LEWIS | OFFICER BORDEN WAS CARRIED WORKING BECAUSE SHE HAD WORKED OVERTIME AND HAD NOT BEEN COMPENSATED FOR IT |
| WALTON | I'M SORRY, ONE SECOND. OKAY WE'RE BACK ON THE RECORD. I WENT TO GRAB THE BOOK THAT SERGEANT LEWIS HAD PROVIDED THROUGH FRED WALKER. OKAY SORRY TO CUT YOU OFF |
| LEWIS | . . . |
| WALKER | YOU SAID SHE HAD ACCUMULATED OVERTIME |
| LEWIS | SHE HAD ACCUMULATED OVERTIME THAT SHE WASN'T COMPENSATED FOR. SO WHAT I DO IS PUT IT ON THE BOOK, LET THE COMMANDER KNOW, PUT IT ON THE BOOKS AND SO SHE CAN USE IT AT A LATER DATE |

2

WALTON        OKAY AND HOW MANY DAYS DID YOU CARRY HER WORKING

              THAT SHE WASN'T THERE

LEWIS         THREE DAYS

WALTON        AND THOSE WERE WHICH DAYS

LEWIS         IN DECEMBER

WALTON        WHAT I CAN DO IS I'LL GIVE YOU A COPY OF SOME DETAILS.

              THIS IS DECEMBER 4TH THROUGH 11TH

LEWIS         OKAY

WALTON        AND IF YOU LOOK, ARE THOSE SIGNED BY YOURSELF

LEWIS         YEP

WALTON        DECEMBER THE 8TH, 9TH AND THE 10TH. OKAY AND BY

              LOOKING AT YOUR NOTEBOOK IS THIS GONNA REFRESH YOUR

              MEMORY ABOUT THE TIME THAT SHE WAS OWED

LEWIS         YES

WALTON        OKAY, I'LL GIVE YOU YOUR NOTE BOOK TO TAKE A LOOK AT

LEWIS         SHE WORKED AUGUST THE 22ND

WALTON        AND WHAT WAS THAT, WHAT DID SHE DO IN AUGUST

LEWIS         SHE TOOK THE KIDS TO SELFRIDGE AIR FORCE BASE WITH

              SERGEANT PRIDE JOHNSON

WALTON        OKAY

LEWIS         IN NOVEMBER, DID I SAY AUGUST 22ND, OKAY, NOVEMBER THE

              23RD, SHE DID THE GOODFELLOW BOX IN THE MORNING THEN

3

SHE DID THE . . IN THE EVENING. SHE WORKED A DOUBLE SHIFT BUT SHE WOULDN'T HAVE GOTTEN PAID FOR THE OVERTIME BUT WAS COMPENSATED TIME, OVERTIME THAT SHE WASN'T COMPENSATED FOR . . . ON THE 30TH, SHE WORKED. . . SHE WORKED FOUR HOURS OVERTIME. I TURNED THAT TIME INTO . . . GOING DOWNTOWN . . . TIME OFF ON DECEMBER THE 4TH. SHE WENT THROUGH GOODFELLOW PACKAGES AND MADE SURE EVERYTHING WAS ACCOUNTED FOR THEIR DISTRIBUTION.

WALKER HOW LONG HAD. . . FOR?

LEWIS EIGHT HOURS.

WALTON AND THAT'S ALL THE NOTATIONS YOU HAVE THERE?

LEWIS YES.

WALTON OKAY. I INTERVIEWED OFFICER BORDEN AND ON DECEMBER 4TH, SHE WAS ACTUALLY IN FLORIDA. SHE FLEW OUT THAT DAY. SHE SAID SHE DID NOT WORK THAT DAY.

LEWIS BORDEN WORKED FRIDAY.

WALTON HER FLIGHT, SHE LEFT AND SHE WAS IN FLORIDA, SHE SAID. SHE SAID THAT SHE COMPLETED A RUN SHEET AT YOUR DIRECTION, BUT SHE DID NOT WORK THAT DAY.

LEWIS ON FRIDAY?

WALTON YES, AND SHE WAS CARRIED ON LEAVE ON EVERYTHING OTHER THAN DETAIL AND AN ACTIVITY LOG. DID YOU DIRECT HER TO

4

|         | DO THE ACTIVITY LOG DOCUMENTING THAT SHE WAS WORKING THAT DAY? |
| LEWIS   | YES I DID. |
| WALTON  | AND DID SHE WORK THAT DAY? |
| LEWIS   | I COULD HAVE SWORN SHE DID. |
| WALTON  | SHE SAID SHE WAS ON A FLIGHT TO FLORIDA FOR HER CRUISE WHICH WAS LEAVING THE NEXT MORNING. |
| LEWIS   | SHE WAS THERE THAT FRIDAY. |
| WALTON  | SHE SAID SHE CAME IN, FILLED OUT THE LOG SHEET AND LEFT. |
| LEWIS   | I COULD HAVE SWORN SHE WAS THERE. I KNOW HE WAS THERE THAT FRIDAY. |
| WALTON  | OKAY BUT BEING THERE AND WORKING EIGHT HOURS IS WHAT WE'RE--OFFICER BORDEN SAID SHE DID NOT WORK EIGHT HOURS THAT DAY. |
| LEWIS   | OKAY. I WOULD HAVE TO SEE HER TIME SHEET. |
| WALTON  | WHEN YOU SAY HER TIME SHEET |
| LEWIS   | I'M SORRY A RUN SHEET. |
| WALTON  | AND FOR THE RECORD, I JUST HANDED HER-- SERGEANT LEWIS A COPY OF OFFICER BORDEN'S ACTIVITY LOG FOR DECEMBER 4TH. IS THIS YOUR SIGNATURE ON THE ACTIVITY LOG? |
| LEWIS   | YES IT IS. |
| WALTON  | OKAY DOES THIS REFRESH YOUR MEMORY AS TO WHAT |

5

|  | HAPPENED THAT DAY |
| --- | --- |
| LEWIS | I KNOW SHE WAS THERE THAT DAY.  SHE WAS THERE. |
| WALTON | AND SHE SAYS SHE WAS ON A FLIGHT TO FLORIDA. |
| LEWIS | SHE COULDN'T HAVE BEEN BECAUSE SHE WAS THERE. |
| WALTON | OKAY SO ARE YOU SAYING THAT OFFICER BORDEN LIED ABOUT WHEN HER FLIGHT LEFT OR? |
| LEWIS | I THOUGHT HER FLIGHT LEFT THAT SATURDAY |
| WALTON | NO THE CRUISE LEFT SATURDAY AT LIKE 9:00 A.M. |
| LEWIS | . . .SHE WAS THERE FRIDAY |
| WALTON | I CAN ONLY TELL YOU THAT SHE SAID SHE WAS ON HER FLIGHT WHICH SHE ARRIVED IN FLORIDA WHEN IT WAS DAYLIGHT OUT |
| LEWIS | OKAY |
| WALTON | AND THIS WAS DECEMBER WHICH MEANS THAT IT GETS DARK EARLY. SHE SAID SHE LEFT IN THE MORNING.  SHE DID NOT WORK THOSE EIGHT YOURS AND THIS WAS, SHE SAID THIS WAS ONE OF THE DAYS THAT SHE WAS GIVEN OFF FOR HAVING WORKED OTHER TIME. AND THAT YOU DIRECTED HER TO COMPLETE THE ACTIVITY LOG TO ACCOUNT FOR THIS DAY. |
| LEWIS | I DID. |
| WALTON | AND YOUR EXPLANATION IS? |
| LEWIS | AND I'M TRYING BUT I THINKS HE WAS THERE THAT FRIDAY |
| WALTON | AND A I SAID, SHE IS CLAIMING SHE CAME IN, DID HER LOG |

6

SHEET AND LEFT

WALTON      I MEAN I GUESS

WALKER      IT'S ONE OF THOSE THINGS

WALTON      IS THIS YOUR WRITING ON THE DAILY DETAIL? SHOWING OFFICER BORDEN WRITTEN IN PEN WORKING 8:00 A.M. TO 4:00 P.M.

LEWIS      RIGHT, IT IS.

WALTON      AND IN REGARDS TO GOING BACK TO THE AUGUST 22ND SELFRIDGE AIR FORCE BASE, HOW DID THAT COME ABOUT THAT SHE WORKED EIGHT HOURS OVERTIME?

LEWIS      SERGEANT PRIDE JOHNSON SAID HE NEEDED HER TO GO WITH HIM TO TAKE THE KIDS TO THE AIR FORCE BASE

WALTON      WHO DID HE SAY THAT TO?

LEWIS      HE SAID THAT TO ME.

WALTON      AND HOW IN PERSON, ON THE PHONE?

LEWIS      ON THE PHONE, AND I TOLD HIM I'D HAVE TO CHECK WITH THE COMMANDER. . . SAID THE SAME THING, SERGEANT PRIDE JOHNSON TOLD ME TO GO TO THE AIR FORCE BASE WITH HIM. I CHECKED WITH THE COMMANDER AND HE SAID WELL YOU KNOW YOU CAN'T PAY HER OVERTIME FOR IT. . . . GIVE HER THAT TIME AT A LATER DATE

WALTON      WHICH COMMANDER WAS THAT?

7

LEWIS              (INAUDIBLE)

WALTON            OKAY AND I'VE INTERVIEWED SERGEANT JOHNSON AND HE
                  DENIED THAT HE EVER HAD A CONVERSATION WITH YOU
                  REGARDING THIS. HE SAID THAT HE SPOKE DIRECTLY WITH
                  OFFICER BORDEN AND SAID THAT HE WAS TAKING, HE
                  VOLUNTEERED HIS TIME ALONG WITH A BUNCH OF OTHER
                  PEOPLE, THIS WAS NOT A DEPARTMENT-SANCTIONED EVENT
                  AND THAT OFFICER BORDEN SAID SHE WOULD SPEAK TO YOU
                  AND I HAVE INTERVIEWED OFFICER BORDEN AND SHE SAID SHE
                  SPOKE TO YOU.

LEWIS             CAN I...

WALTON            SURE.

LEWIS             AND SHE'S RIGHT. SHE CAME BACK AND SHE TALKED TO ME
                  AND I TALKED TO COMMANDER DOLUNT

WALTON            SO YOU DID NOT SPEAK TO

LEWIS             DID NOT SPEAK TO PRIDE JOHNSON

WALTON            DO YOU KNOW WHERE PRIDE JOHNSON WORKS

LEWIS             HE WORK AT TRAINING. TRAINING.

WALTON            AND SO IN ANY WAY IS THAT TIED INTO THE EASTERN
                  DISTRICT?

LEWIS             NO. NOT THAT I KNOW OF.

WALTON            WHY WAS OFFICER BORDEN SET TO WORK WHEN TRAINING IT

8

| | |
|---|---|
| LEWIS | ISN'T TIED INTO EASTERN DISTRICT, IT WAS HER LEAVE DAY BECAUSE HE HAD ASKED IF HE COULD.  HE ASKED HER IF SHE COULD DRIVE THE KIDS. AND HE NEEDED HER HELP AND SHE DIDN'T HAVE ANY MORE  LEAVE DAYS.  NORMALLY I WOULD HAVE SWITCHED HER LEAVE DAYS.  SHE DIDN'T HAVE ANY MORE LEAVE DAYS. |
| WALTON | AND WHY DIDN'T YOU JUST SAY NO? |
| LEWIS | BECAUSE  NORMALLY  WHEN  IT'S  COMING  FROM  THAT DIRECTION, I KIND OF LOOK AT IT COMING FROM THE CHIEF. |
| WALTON | WHAT DIRECTION ARE YOU TALKING ABOUT |
| LEWIS | TRAINING |
| WALTON | DOES TRAINING WORK FOR THE CHIEF? I MEAN DIRECTLY |
| LEWIS | NO, I DON'T THINK SO. |
| WALTON | THEY DON'T, SO WHY WOULD YOU, I MEAN IT WAS SERGEANT JOHNSON TALKING TO OFFICER BORDEN WHO THEN TALKED TO YOU. I MEAN HE IN NO WAY AM I CORRECT CAN AUTHORIZE WHAT HAPPENS AT THE EASTERN DISTRICT |
| LEWIS | EXACTLY |
| WALTON | AND AS OFFICER BORDEN'S SUPERVISOR AT THE EASTERN DISTRICT, YOU HAVE MORE CONTROL OVER IT CORRECT |
| LEWIS | (INAUDIBLE) |
| WALTON | SO WHY DIDN'T YOU JUST SAY NO |

9

LEWIS         BECAUSE HE NEEDED HER HELP AND I WANTED TO HELP HIM
              OUT AND SHE WANTED TO HELP HIM OUT AND THE ONLY WAY
              I COULD GET HER APPROVED WAS TO GO THROUGH THE
              COMMANDER.

WALTON        AND YOU SAID YOU SPOKE TO COMMANDER DOLUNT?

LEWIS         YES MA'AM.

WALTON        AND IF COMMANDER DOLUNT SAID NO YOU DID NOT, IS
              COMMANDER DOLUNT LYING?

LEWIS         YES MA'AM.

WALTON        SO JUST RECOUNTING, YOU DID NOT SPEAK TO SERGEANT
              JOHNSON

LEWIS         I DID NOT SPEAK TO SERGEANT JOHNSON. . . SPOKE TO
              SERGEANT JOHNSON

WALTON        FOR DECEMBER 4TH I'M GIVING YOU THE DAILY DETAIL, THE
              8TH 9TH AND 10TH THAT OFFICER BORDEN IS CARRIED
              WORKING, ARE THOSE YOUR SIGNATURES?

LEWIS         YES MA'AM.

WALTON        AND DID YOU PREPARE THOSE DAILY DETAILS FOR THE 8TH, 9TH
              AND 10TH? ARE THOSE YOUR SIGNATURES ON THE LOGS

LEWIS         YES MA'AM

WALTON        WHEN WERE THOSE ACTIVITY LOGS COMPLETED?

LEWIS         THESE ACTIVITY LOGS WAS COMPLETED THAT NEXT WEEK, NOT

10

THE FIRST WEEK OF DECEMBER, BUT HE SECOND WEEK. LIEUTENANT DOLUNT, NOT DOLUNT, LIEUTENANT WILLIAMS SAID SHE NEEDED DETAILS ASAP SO I PICKED UP A STACK OF RUN SHEETS, TOOK THEM OVER TO THE CHURCH AND PUT THEM ON . . .

WALTON      HAD THEY NOT DONE ACTIVITY LOGS

LEWIS       NEVER DONE ACTIVITY LOGS FOR BEING ASSIGNED OUT.

WALTON      OKAY AND WHEN YOU DROPPED OFF THE ACTIVITY LOGS WERE THEY BLANK?

LEWIS       THEY WERE BLANK.

WALTON      AND WHEN YOU RECEIVED THEM BACK DID YOU READ THEM?

LEWIS       NO 'CAUSE SHE SAID SHE WANTED THEM RIGHT AWAY SO I JUST SIGNED THEM AND HANDED THEM TO HER

WALTON      OKAY AND ON ALL THOSE ACTIVITY LOGS AS RECEIVING OR REVIEWING AS A SUPERVISOR; YOU DATED THEM FOR THE DATE THEY WERE GIVEN TO YOU IS THAT CORRECT? SO THEY WERE ACTUALLY COMPLETED THE WEEK OF DECEMBER 14TH BUT YOU SIGNED THOSE LIKE THE 9TH, IS SIGNED THAT YOU READ AND REVIEWED IT ON THE 9TH?

LEWIS       RIGHT.

WALTON      OKAY SO THAT'S FALSE CORRECT?

11

LEWIS           YES. BECAUSE I WAS ALWAYS TOLD BY THE DOJ THEY SAY WHAT TIME I GOT THEM AND SHE SAID THE TIME THAT I REVIEWED THEM PUT THE TIME THAT I REVIEWED THEM ON THERE.

WALTON          RIGHT WHICH

LEWIS           BUT I REVIEWED THEM A WEEK LATER

WALTON          YOU WERE TOLD, WELL BY THE DEPARTMENT RULES AND REGULATIONS, YOU'RE SUPPOSED TO RECEIVE A LOG SHEET THE DAY OF AND REVIEW IT WITHIN 24 HOURS.

LEWIS           EXACTLY

WALTON          OKAY BUT IF YOU'RE INSTRUCTING PEOPLE TO DO THEM A WEEK LATER, ARE YOU SAYING THAT SOMEBODY INSTRUCTED YOU TO ADJUST THE DATES?

LEWIS           NO PREVIOUSLY WHEN I'VE DONE RUN SHEETS AND I WOULD DO THEM THE TIME THAT I REVIEWED THEM SHE WOULD ALWAYS TELL ME THE DATES I . . WAS WRONG, SO I PUT THE DATE ON THERE ACCORDING TO WHAT SHE WOULD ASK FOR

WALTON          WELL, THE RULES AND REGULATIONS SAY YOU HAVE TO RECEIVE IT THE DAY IT'S COMPLETED AND REVIEW IT WITHIN 24 HOURS, BUT IF YOU DIDN'T DO THAT, WHY WOULD YOU ESSENTIALLY FALSIFY THE ENTRY

LEWIS           IT'S AN ERROR ON MY PART

12

WALTON       AND . . . TO ONE OF YOUR LOGS.  OKAY AND THIS IS FOR DECEMBER 8TH, 2009, YOUR ACTIVITY LOG IS THAT CORRECT?

LEWIS        THAT'S CORRECT.

WALTON       AND CAN YOU READ ME THE ENTRY FOR 11:45?

LEWIS        11:45. . .AND EAST OUTER DRIVE . . PICKED UP . . .

WALTON       AND WHAT DOES THAT ENTRY MEAN TO YOU

LEWIS        THAT I WENT TO THE LOCATION. . .

WALTON       AND THAT YOU SAW THOSE OFFICERS

LEWIS        I SAW ALL THE OFFICERS, EXCEPT OFFICER BORDEN

WALTON       OKAY BUT SHE IS LISTED ON YOUR LOG RIGHT

LEWIS        YES. . .

WALTON       I DON'T UNDERSTAND, EXPLAIN THAT TO ME

LEWIS        SHE IS ON THE DAILY DETAIL, SO I PUT HER FROM THE DAILY DETAIL ONTO THE LOG SHEET.  THAT'S WHEN I WENT BY THE DAILY DETAIL, BUT I DIDN'T SEE HER AT 8131 EAST OUTER DRIVE, BECAUSE SHE WASN'T THERE.

WALTON       OKAY SO WHY WOULD YOU EVEN PUT HER ON YOUR LOG?

LEWIS        BECAUSE THAT'S THE WAY I'VE ALWAYS DONE IT.  THAT'S THE WAY I WAS TRAINED TO DO IT AT THE DISTRICT.

WALTON       TRAINED BY WHO?  SOMEBODY TRAINED YOU TO FALSIFY DEPARTMENT RECORDS?

LEWIS        NO MA'AM.

13

WALTON        WELL WHO TRAINED YOU AND I GUESS WHAT ARE YOU
              TALKING ABOUT HOW THEY TRAINED YOU

LEWIS         . . THE WAY TO CARRY OFFICER BORDEN WORKING SINCE SHE
              WASN'T WORKING IN ORDER FOR HER TO GET PAID FOR IT

WALTON        BUT YOU SHOULDN'T HAVE CARRIED HER

LEWIS         I SHOULDN'T HAVE

WALTON        WORKING WHEN SHE'S NOT THERE.

LEWIS         RIGHT.

WALTON        SO YOU UNDERSTAND THAT THIS JUST LOOKS LIKE YOU'RE
              AGAIN TRYING TO COVER UP FOR WHAT YOU WERE DOING BY
              SAYING SHE'S THERE. THE DAILY DETAIL IS SAYING SHE IS
              THERE. IT LOOKS LIKE YOU'RE TRYING TO COVER UP YOUR
              OWN MISCONDUCT RIGHT?

LEWIS         AND I'M NOT AND I REALLY, I THOUGHT I WAS DOING IT THE
              RIGHT WAY.

WALTON        WELL THE RIGHT WAY WOULD HAVE BEEN TO CARRY HER ON
              VACATION BECAUSE SHE'S ON A CRUISE CORRECT?

LEWIS         RIGHT

WALTON        AND YOU SAID SOMEBODY TRAINED YOU TO DO THAT. WHO
              TRAINED YOU TO DO THAT?

LEWIS         THAT'S THE WAY THEY ALWAYS DO IT AT THE DISTRICT. I'VE
              SEEN THE LIEUTENANTS DO IT. CARRY OFFICERS WORKING ON

14

|  |  |
|---|---|
|  | THE SHEETS WHEN THEY WASN'T WORKING. |
| WALTON | OKAY SO WHO, DO YOU HAVE A SPECIFIC EXAMPLE OF WHO? |
| LEWIS | LIEUTENANT . . . THE OFFICER WOULD COME IN AND LEAVE AND THEY WOULD COMPLETE THE RUN SHEET |
| WALTON | SO THEY WEREN'T THERE THE WHOLE DAY OR |
| LEWIS | NO |
| WALTON | I WANT TO GET BACK TO YOUR NOTEBOOK THAT YOU PROVIDED ME.  OR ACTUALLY I'M GONNA START WITH. IN REGARDS TO OVERTIME YOU SAID THAT BOTH COMMANDER DOLUNT AND INSPECTOR KYRIACOU TOLD YOU  THAT THEY COULDN'T OR WOULDN'T PAY OVERTIME? |
| LEWIS | SAID CAN'T GET OVERTIME . . . GOING DOWNTOWN |
| WALTON | MEANING  DID THEY ELABORATE MORE? |
| LEWIS | NO THEY DID NOT.  ASKED KENYETTA SHE MIGHT TAKE SOME TIME OFF AND I ASKED HER, SHE SAID YES |
| WALTON | OKAY BUT OVERTIME DOES GET APPROVED DOESN'T IT |
| LEWIS | NOT COMMUNITY RELATIONS |
| WALTON | WELL I HAVE ALL THE RECORDS AND PEOPLE DO GET PAID OVERTIME |
| LEWIS | THAT'S OVERTIME IF YOU MAKE AN ARREST. |
| WALTON | AND THE 6 MONTHS PRIOR TO THIS, YOU YOURSELF MADE 213 HOURS OF OVERTIME. |

15

LEWIS        I WAS WORKING ANOTHER SHIFT. WHEN THEY WERE SHORT ON the SHIFT, THEY WERE CALLING ME FOR OVERTIME AND I WORKED OVERTIME ON THE SHIFT.

WALTON       THERE'S OTHER OVERTIME ON HERE FOR OFFICERS, THAT THEY GOT PAID FOR.

LEWIS        THAT WAS JUST IF THEY WERE IN COURT.

WALTON       NO THERE'S OTHER OVERTIME.

LEWIS        A COUPLE OF THEM GOT PAID OVERTIME IF THEY WAS WORKING AND IF THEY WERE IN COURT AND THEY CAME BACK FROM COURT LATE AND ONLY IF IT WAS ON AN ARREST.

WALTON       LET'S

LEWIS        AND THE ONLY OTHER OVERTIME WAS WHEN THEY WORKED A SHIFT

WALTON       LET'S START WITH OFFICER CURTIS OKAY? AND IT HAS DOWN THERE ON AUGUST 4TH, THAT SHE WORKED ONE HOUR OVERTIME IS THAT CORRECT?

LEWIS        THAT'S CORRECT.

WALTON       ARE YOU TRYING TO READ UPSIDE DOWN THERE, BECAUSE I'M TRYING TO

LEWIS        . . .

WALTON       I'M SORRY. OKAY, NOVEMBER 4TH. OKAY IT'S A LITTLE BIT OUT OF ORDER HERE. SO AUGUST 4TH, YOU HAVE ONE HOUR

16

OVERTIME.   OKAY SO HERE'S THE LOG SHEET AND THEN I ACTUALLY HAVE TWO FOR OFFICER CURTIS.  NOW THIS ONE, THE FIRST ONE I HANDED YOU IS AUGUST 4TH AND SHE'S ON THERE WITH OFFICER ROBBINS AND OFFICER COLLINS AND IT DOCUMENTS THAT THEY WORKED 2:00 P.M. TO 10:00 P.M. FOR I BELIEVE IS A . . .

LEWIS          YES

WALTON          WHICH IS SIGNED AND APPROVED BY YOURSELF AT OFF DUTY IS THAT CORRECT?

LEWIS          THAT'S CORRECT

WALTON          AND THEN THERE'S A SECOND LOG HERE WHICH DOCUMENTS DIFFERENT HOURS THAT SHE WORKED THAT'S NOT SIGNED BY YOU.  IS THAT CORRECT?

LEWIS          THAT'S CORRECT

WALTON          OKAY SO DID SHE WORK, WHAT HOURS DID SHE WORK AND

LEWIS          SHE WORKED ALL DAY THAT DAY. SHE WORKED FROM 1:00 TO 11:00

WALTON          OKAY THEN WHY IS THERE THIS LOG SHEET THAT SHE SIGNED THAT YOU RECEIVED  AT 10:00 O'CLOCK OFF DUTY

LEWIS          WE DIDN'T GET OFF THAT DAY AT 10:00 O'CLOCK

WALTON          THEN WHY IS THAT SIGNED AUGUST 4TH AT 10:00 P.M. AND IT DOCUMENTS THAT AUDREY CURTIS IS OFF DUTY AT 10:00 P.M.?

17

LEWIS        THAT'S A MISTAKE ON MY PART, BUT WE DID NOT GET OFF AT

             10:00 THAT NIGHT. . .WE WERE THERE PAST 12:00 O'CLOCK

WALTON       THEN I GUESS WHY ISN'T THIS BEING DOCUMENTED? FROM

             HERE IT SAYS 2:00 TO 10:00 AND AT 10:00 O'CLOCK YOU'RE

             SAYING YOU RECEIVED IT SO THEY'RE DONE?

LEWIS        THAT'S NOT RIGHT.

WALTON       OKAY. LET'S SEE, NOVEMBER 4TH FOR, AGAIN, OFFICER CURTIS.

             AND YOU HAVE TWO

WALKER       I'M SORRY, WHAT DATE WAS THE OTHER ONE

WALTON       THE FIRST ONE WAS AUGUST 4TH.

WALKER       ALRIGHT.

WALTON       AND THIS ONE IS NOVEMBER 4TH. TWO HOURS OVERTIME IS

             THAT CORRECT?

LEWIS        THAT'S CORRECT.

WALTON       HERE'S A COPY OF OFFICER CURTIS' LOG SHEET FOR THAT DATE.

             AND I BELIEVE IT DOCUMENTS THAT SHE WORKED 11:00 TILL

             2:00 AND WENT HOME SICK AT 2:00 O'CLOCK IS THAT CORRECT?

LEWIS        THAT'S CORRECT.

WALTON       OKAY IF SHE WENT HOME SICK, HOW DID SHE WORK TWO

             HOURS OVERTIME? DO YOU HAVE AN ANSWER FOR THAT?

LEWIS        SHE ALWAYS COME IN AND WORK. WHEN SHE LEAVE, SHE

             CAME, BACK, SHE CAME BACK THE NEXT DAY AND SHE

18

|  | WORKED OVER FOR TWO HOURS. |
|---|---|
| WALTON | I'M SORRY |
| LEWIS | I MEAN I MIGHT HAVE THE DATES WRONG, BUT SHE WORKED THOSE HOURS ON THE ABANDONED CARS. |
| WALTON | SO YOU DON'T HAVE AN EXPLANATION FOR THE --FOR IT OTHER THAN IT'S A MISTAKE. |
| LEWIS | YES IT IS. |
| WALTON | OKAY SO MOVING AGAIN TO OFFICER CURTIS, NOVEMBER 7TH ONE HOUR OVERTIME. THERE'S NO LOG SHEET BUT I HAVE A DAILY DETAIL WHERE OFFICER CURTIS IS ON LEAVE IS THAT |
| LEWIS | OFFICER CURTIS CAME IN ON THAT DAY. |
| WALTON | DID SHE COMPLETE ANY PAPERWORK FOR THAT? |
| LEWIS | I HAVE HER DOING THE ABANDONED CARS. IT WOULD HAVE TO BE THE CARS, PUT THEM IN THE COMPUTER FOR THE . . . SHE CAME IN FOR THAT. |
| WALTON | HOW DO YOU KNOW THAT? SHE'S ON LEAVE THERE. THERE'S NO ACTIVITY LOG, NO PAPERWORK COMPLETED, SHOWING THAT SHE WAS THERE. |
| LEWIS | SHE CALLED AND TOLD ME SHE WAS THERE. I WASN'T THERE. NORMALLY IF I'M NOT THERE, THEY HAVE TO CALL AND LET ME KNOW THEY'RE IN. |
| WALTON | AND YOU DON'T REQUIRE THEM TO COMPLETE ANY |

19

|  | PAPERWORK TO SHOW THAT THEY WERE THERE? |
|---|---|
| LEWIS | NORMALLY I DO, BUT IF THEY JUST COME IN ON THEIR TIME--ON THEIR REGULAR LEAVE DAY, I DON'T. |
| WALTON | AND HOW DO YOU KNOW SHE WAS THERE? |
| LEWIS | SHE CALLED AND TOLD ME SHE WAS THERE. I CAN ONLY GO BY THE PHONE CONVERSATION. |
| WALTON | SO YOU JUST TRUST THAT SHE WENT? |
| LEWIS | I HAVE TO. |
| WALTON | OKAY, AND AGAIN FOR OFFICER ROBBINS SHE WAS ON THE OTHER LOG SHE, WE'RE GOING ON HER ENTRY IS AUGUST 4TH IS THAT CORRECT? |
| LEWIS | THAT'S CORRECT. |
| WALTON | AND THE LOG I HAVE FOR HER SHOWS THAT SHE WAS WORKING 12:00 TO 10:00 |
| LEWIS | SHE WAS WORKING 2:00 TO 10:00 BUT SHE ALSO GETS SCHOOL CROSSINGS. WE DIDN'T GET OFF AT 10:00 THAT DAY EITHER, . . NIGHT OUT DAY, WE DIDN'T GET OFF AT 10:00 |
| WALTON | OKAY WHEN DID SHE DO THE SCHOOL CROSSING FOR TWO HOURS? |
| LEWIS | SHE DID SCHOOL CROSSINGS. THERE WAS NO SCHOOL IN AUGUST. THAT'S A MISTAKE ON THAT ONE, THERE WAS NO SCHOOL IN AUGUST. |

20

WALTON            OKAY SO, SO FAR WE HAVE FOUR MISTAKES OUT OF FOUR ENTRIES? IS THAT CORRECT?

LEWIS             THAT'S CORRECT.

WALTON            OKAY SO THERE'S NO SCHOOL THERE, THEY DID . . NIGHT OUT? OKAY NOW WE'RE MOVING ON TO OFFICER RIOS.  OKAY FOR SEPTEMBER 15TH, YOU HAVE TWO HOURS OVERTIME ON ABANDONED ENTRY. HER IS HIS LOG FOR SEPTEMBER 15TH AND YOU DOCUMENTED ON THERE ONE HOUR OVERTIME CORRECT? THIS IS PAGE TWO

LEWIS             YES IT IS THAT'S A MISTAKE, YES HE DID.

WALTON            SO NOW ON OVERTIME HE HAS THAT HE WAS IMPOUNDING A CAR, NOT ABANDONED ENTRIES ON THAT LOG SHEET.

LEWIS             THAT'S AN ABANDONED CAR.

WALTON            WELL YOU HAVE HERE THAT HE IMPOUNDED A CAR FOR PROPER OWNERSHIP.

LEWIS             THAT'S AN ABANDONED CAR.

WALTON            SO HE WORKED ONE HOUR NOT TWO HOURS?

LEWIS             HE WORKED ONE HOUR THAT DAY.

WALTON            SO THAT'S ANOTHER MISTAKE?

LEWIS             YES MA'AM.

WALTON            AND NOW YOU HAVE SEPTEMBER 22ND, ONE HOUR OVERTIME. I'LL GIVE YOU OFFICER RIOS' LOG SHEET.  OH I'M SORRY THIS

21

|         |                                                                                      |
|---------|--------------------------------------------------------------------------------------|
|         | ONE HERE, THAT LAST LOG SHEET IT WAS, THESE LOG SHEETS HAVE ALL BEEN SIGNED BY YOU    |
| LEWIS   | RIGHT.                                                                                |
| WALTON  | AND YOU HAVE YOUR NOTEBOOK FOR SEPTEMBER 22ND, ONE HOUR OVERTIME ABANDONED ENTRIES?   |
| WALTON  | YEAH HE WAS IN THE OFFICE THAT DAY.                                                   |
| WALTON  | WHAT DOES HIS LOG SAY, DOES IT NOT SAY 6:00 A.M TO 2:00 P.M.                          |
| LEWIS   | IT SAYS 6:00 TO 2:00, BUT HE DOESN'T HAVE HIS OFF DUTY TIME ON THERE.                 |
| WALTON  | OKAY LET'S LOOK AT THE FRONT AND DID YOU RECEIVE THIS?                                |
| LEWIS   | YES I DID.                                                                            |
| WALTON  | WHAT TIME DID YOU RECEIVE IT.                                                         |
| LEWIS   | I RECEIVED THIS AT 2:00 O'CLOCK.  BUT HE WAS STILL IN THE OFFICE.                     |
| WALTON  | SO IT'S NOT DOCUMENTED ANYWHERE, SO I'M JUST TAKING YOUR WORD THAT                    |
| LEWIS   | HE WAS STILL IN THE OFFICE,  BECAUSE NORMALLY HE WAS                                  |
| WALTON  | SO IS THIS ANOTHER MISTAKE                                                            |
| LEWIS   | HE JUST DIDN'T DOCUMENT IT ON HIS RUN SHEET.                                          |
| WALTON  | WELL I GUESS HOW DO I KNOW THAT THAT ACTUALLY HAPPENED?                               |

| | |
|---|---|
| LEWIS | BECAUSE IT'S NOT DOCUMENTED ANYWHERE, YOU DON'T. |
| WALTON | OKAY NOW WERE UP TO OCTOBER 6TH FOR OFFICER RIOS. YOU HAVE AN HOUR OVERTIME AND AGAIN ALMOST IDENTICAL LOT SHEET TO THE OTHER ONE. 6:00 TO 2:00 AND YOU RECEIVED IT AT 2:00 IS THAT CORRECT? |
| LEWIS | THAT'S CORRECT. |
| WALTON | WHERE IS THE HOUR OVERTIME? |
| LEWIS | IT'S NOT ON THERE. NORMALLY HE TURN IN HIS RUN SHEET BUT HE STILL THERE WORKING ON ABANDONED CARS. |
| WALTON | BUT IT'S NOT DOCUMENTED ANYWHERE? |
| LEWIS | EXACTLY. |
| WALTON | MOVE ON TO OFFICER HAWKINS. YOU HAVE DOWN ONE HOUR OVERTIME AND THIS IS YOUR BOOK THAT SHOWS YOU OWE THESE PEOPLE THE TIME CORRECT? |
| LEWIS | RIGHT. |
| WALTON | OKAY SO HERE'S OFFICER HAWKINS AND HE DOES HAVE AN HOUR. IS THAT CORRECT ON THERE? |
| LEWIS | THAT'S CORRECT. |
| WALTON | OKAY LET ME JUST SHOW YOU. THAT WAS OFFICER HAWKINS FOR MAY 6TH. . . OFFICER HAWKINS ON THAT WORK PERIOD TIME REPORT FOR MAY 6TH? DOES IT SHOW THAT HE GOT PAID ONE HOUR OVERTIME? |

23

LEWIS       YES HE GOT PAID ONE HOUR OVERTIME.

WALTON       OKAY ON HIS LOG SHEET FOR 5-6, HE HAS THAT HE WAS AT SCHOOL CROSSINGS. ON A WORK PERIOD TIME REPORT, HE GOT PAID FOR AN HOUR OVERTIME BUT HE'S IN YOUR BOOK AS BEING OWED AN HOUR OVERTIME FOR ABANDONED ENTRIES. SO WOULD YOU AGREE HE GOT PAID FOR AN HOUR OVERTIME FOR SCHOOL CROSSINGS?

LEWIS       I AGREE HE DID.

WALTON       SO THEN OFFICERS DO GET PAID FOR OVERTIME OTHER THAN GOING TO COURT OR, IF THEY PUT IN FOR IT?

LEWIS       SOMETIME THEY DO. HE GOT PAID FOR THE SCHOOL CROSSINGS BUT JUST REGULAR COMMUNITY RELATIONS WORK YOU DON'T GET PAID OVERTIME FOR IT.

WALTON       ISN'T SCHOOL CROSSINGS COMMUNITY RELATIONS?

LEWIS       NOT REALLY. THEY ONLY CALL IT IN WHEN CROSSING GUARDS DOESN'T COME AND DISPATCH LETS US KNOW . . OFF DUTY

WALTON       OKAY WHAT'S THE, IN YOUR NOTEBOOK THEN FOR 5-6, WHAT'S IS HE OWED AN HOUR FOR?

LEWIS       HE'S NOT OWED AN HOUR, BECAUSE HE GOT PAID FOR THAT HOUR.

WALTON       THAT'S ANOTHER MISTAKE?

LEWIS       YEAH.

WALTON        AND THEN AUGUST 4

LEWIS         THAT'S NATIONAL NIGHT OUT

WALTON        OKAY DID HE DO TWO HOURS ABANDONED ENTRY?

LEWIS         NO HE WAS THERE FOR OVER TWO HOURS ON OFF DUTY.

WALTON        SO HE WAS NOT DOING ABANDONED ENTRY?

LEWIS         NO.

WALTON        ANOTHER MISTAKE IN YOUR BOOK THEN?

LEWIS         THAT'S ANOTHER MISTAKE IN MY BOOK.

WALTON        OKAY, OFFICER BORDEN, WE'VE ALREADY DISCUSSED HER.
              WE'RE GONNA SKIP THIS PAGE OKAY? OFFICER COLLINS NONE?

LEWIS         NONE

WALTON        SO OUT OF ALL THESE, THEY'RE ALMOST ALL MISTAKEN
              ENTRIES. IS THAT WHAT WE COVERED. OFFICER CURTIS' WERE
              ALL MISTAKES. HERE WAS A MISTAKE ON ALL THREE OF THOSE.
              OFFICER RIOS. MISTAKES. OFFICER ROBBINS THAT WAS A
              MISTAKE. HAWKINS, BOTH OF THOSE WERE MISTAKES?

LEWIS         OFFICER ROBBINS THE TWO HOURS THAT SHE HAD FOR 8-4 WAS
              NATIONAL NIGHT OUT. NOT THE ABANDONED CAR ENTRIES.

WALTON        YOU HAVE SCHOOL CROSSINGS.

LEWIS         I'M SORRY SCHOOL CROSSINGS.

WALTON        WELL WHEN DID YOU, WHEN DO YOU FILL OUT YOUR
              NOTEBOOK?

25

LEWIS            I TRY TO DO IT RIGHT AFTERWARDS.  I TRY TO GO FROM MEMORY RIGHT AFTERWARDS THAT IT'S DONE.

WALTON           WELL SO FOR 8-4, YOU HAVE ROBBIN SCHOOL CROSSING, YOU HAVE HAWKINS ABANDONED ENTRY, AND THERE WAS ONE OTHER PERSON ON 8-4 I BELIEVE THAT ARE ALL DIFFERENT BUT YOU'RE SAYING THEY ALL DID THE SAME THING?

LEWIS            YEAH

WALTON           WOULD YOU HAVE PUT 8-4 ENTRIES ALL ON DIFFERENT DAYS THEN FOR THESE PEOPLE

LEWIS            WHAT YOU MEAN?

WALTON           WELL YOU SAID YOU TRY AND DO IT AS SOON AS RIGHT AFTER THE TIME THAT THEY WORKED CORRECT?

LEWIS            RIGHT, BUT THIS WAS DONE THE DAY AFTERWARDS, BECAUSE THAT NIGHT WE HAVE BEEN THERE ALL DAY AND ALL NIGHT LONG SO I PROBABLY DID IT THE NEXT DAY

WALTON           OKAY AN THEN THE NEXT DAY YOU DIDN'T REMEMBER HOW DID YOU GET THREE DIFFERENT ENTRIES IF THEY ALL WERE DOING THE SAME THING?  SCHOOL CROSSING, ABANDONED VEHICLE AND ONE HOUR OVERTIME?

LEWIS            I PUT IT DOWN AS I RECALLED IT.

WALTON           THE VERY NEXT DAY, AFTER WORKING WITH THEM, THAT'S HOW YOU RECALLED IT?

26

LEWIS         YEAH BECAUSE WE WERE TIRED.

WALTON        OKAY AND THE OTHER ENTRIES THAT WERE, YOU ACCOUNT
              FOR THAT HOW?

LEWIS         WRONG DATES.

WALTON        OKAY I'M GONNA FLIP THE TAPE OVER AND WE'LL START WITH
              THE NEXT ITEM.

WALTON        OKAY WE'RE BACK ON THE RECORD.  DID YOU HAVE ANY
              DISCUSSIONS WITH ANY   OF THE COMMANDERS AT YOUR
              DISTRICT REGARDING OFFICER BORDEN BEING CARRIED
              WORKING WHILE SHE WAS ON HER CARIBBEAN CRUISE?

LEWIS         I HAD TALKED TO COMMANDER DOLUNT BEFORE SHE WENT ON
              THE CRUISE, THAT SHE HAD A FEW.  ..

WALTON        AND WHEN WAS THAT

LEWIS         THAT WAS A FEW DAYS BEFORE THE CRUISE.  A FEW DAYS
              BEFORE SHE WENT.  WITHIN THAT SAME WEEK. I CAN'T RECALL
              WHAT DATE.

WALTON        SO YOU'RE SAYING HE WAS AWARE AND APPROVED OF IT?

LEWIS         YES MA'AM.

WALTON        OKAY WHY THEN DO YOU THINK HE THEN NOTIFIED US
              REGARDING THE TIME FRAUD?

LEWIS         I HAVE NO IDEA.

WALTON        DID YOU DISCUSS IT WITH HIM AFTERWARDS?

27

LEWIS      NO I DIDN'T, BECAUSE I DIDN'T KNOW I WAS BEING INVESTIGATED FOR TIME FRAUD.

WALTON      WHEN DID YOU BECOME AWARE?

LEWIS      I BECAME AWARE OF THAT WHEN I READ IT IN THE NEWSPAPER.

WALTON      AND THAT WAS, WAS IT

LEWIS      HE NEVER TALKED TO ME ABOUT IT.

WALTON      BUT YOU'RE SAYING HE APPROVED IT AND THEN AFTER HE APPROVED IT HE REPORTED IT TO US?

LEWIS      YES MA'AM.

WALTON      OKAY THIS IS AN ARTICLE DATED JANUARY 15TH. IS THIS THE ARTICLE THAT YOU'RE REFERRING TO?

LEWIS      THIS IS THE ONE.

WALTON      OKAY SO THAT'S WHEN -- THE FIRST TIME YOU REALIZED THERE WAS SOMETHING WRONG WITH THE TIME FOR OFFICER BORDEN?

LEWIS      ~~THAT'S WHEN I REALIZED THAT THEY WERE CHARGING ME OR YOU GUYS WERE INVESTIGATING ME FOR TIME~~ FRAUD. ~~BUT THE COMMANDER, HE NEVER~~ TALKED TO ME ABOUT IT.

WALTON      BUT PRIOR TO THIS WERE YOU AWARE THAT THERE WAS AN ISSUE REGARDING THIS?

LEWIS      NO MA'AM.

WALTON      PRIOR TO CHRISTMAS, THAT WEEK LEADING UP TO CHRISTMAS

28

|  | DID YOU HAVE A CONVERSATION WITH OFFICER BICA WHO WORKS TIME KEEPING AT EASTERN, A DISCUSSION ABOUT HAVING TO CHANGE OFFICER BORDEN'S TIME IN THE BOOK? |
| --- | --- |
| LEWIS | I SAID I NEEDED TO ADJUST SOME TIME. |
| WALTON | TELL ME ABOUT THAT CONVERSATION. |
| LEWIS | I DON'T NOW HOW IT CAME ABOUT, BUT I TOLD HIM I NEEDED TO ADJUST SOME TIME. |
| WALTON | WHAT TIME WERE YOU TALKING ABOUT? OFFICER BORDEN'S TIME? |
| LEWIS | OFFICER BORDEN'S TIME. THAT'S WHEN I KNEW THEN THAT THIS WAS GOING ON. |
| WALTON | THAT WAS PRIOR TO CHRISTMAS, BUT THIS ARTICLE IS JANUARY 15TH. |
| LEWIS | NO THAT WASN'T PRIOR TO CHRISTMAS. |
| WALTON | OFFICER BICA SAID IT WAS, HE WAS GETTING READY TO DO THE PAYROLL. IT WAS WHILE THE TWO COMMANDERS HAD TAKEN THE ADMINISTRATIVE STAFF OUT FOR A LUNCHEON |
| LEWIS | NO, NO MA'AM. |
| WALTON | SO OFFICER BICA IS NOT BEING TRUTHFUL |
| LEWIS | NO MA'AM |
| WALKER | WAIT WHEN YOU SAYS THAT YOU ARE ASKING HER TO SPECULATE ABOUT THE STATE OF MIND OF SOMEBODY ELSE. |

29

| | MAYBE HE'S WRONG ABOUT IT. |
|---|---|
| WALTON | OKAY WHEN DID YOU HAVE THAT CONVERSATION WITH OFFICER BICA? |
| LEWIS | THAT WAS AFTER I SAW THE ARTICLE IN THE PAPER. |
| WALTON | OKAY AND TELL ME ABOUT THE CONVERSATION? |
| LEWIS | I SAID I NEED TO ADJUST SOME TIME, BECAUSE THEY'RE TRYING TO GET ME FOR TIME FRAUD WHEN SHE HAD THE TIME COMING. |
| WALTON | OKAY AND WHAT DID HE SAY? |
| LEWIS | HE SAID OKAY. |
| WALTON | AND OKAY WHAT? I GUESS HOW WAS THAT LEFT? |
| LEWIS | JUST LIKE THAT, OKAY. THERE WAS NOTHING ELSE SAID. |
| WALTON | AND WHEN WAS THAT CONVERSATION? |
| LEWIS | THAT WAS IN JANUARY. WE HAD NO CONVERSATION ABOUT THAT IN DECEMBER. |
| WALTON | DO YOU RECALL WHEN IN JANUARY? |
| LEWIS | I REALLY CAN'T. |
| WALTON | BUT IT WAS AFTER THE ARTICLE? |
| LEWIS | IT WAS AFTER THE ARTICLE. |
| WALTON | AND WHY DID YOU WANT TO ADJUST HER TIME? |
| LEWIS | BECAUSE YOU GUYS WERE ABOUT TO CHARGE ME WITH TIME FRAUD WHEN I KNEW I HADN'T DONE ANY TIME FRAUD. SO SHE HAD THE COURT TIME JUST IF YOU'RE GONNA BE LIKE THAT |

30

|  |  |
|---|---|
|  | ABOUT IT, JUST GIVE HER THE COURT TIME. AFTER YOU HAVE ALREADY TOLD ME TO GIVE HER THE TIME OFF. |
| WALTON | AND YOU'RE SAYING COMMANDER DOLUNT? |
| LEWIS | YEAH. |
| WALTON | IS THERE ANYTHING ABOUT OFFICER BORDEN, BECAUSE WE'RE GOING TO MOVE ON TO OFFICER COLLINS, THAT I HAVEN'T ASKED YOU, THAT YOU THINK I NEED TO KNOW ABOUT THIS INVESTIGATION? |
| LEWIS | I DIDN'T FRAUDULENTLY GIVE HER ANY TIME OFF. I WAS GIVEN THE PERMISSION TO GIVE HER THE TIME OFF.  IF HE HAD A PROBLEM WITH IT HE SHOULD HAVE TOLD ME THEN. NOT WAIT UNTIL AFTERWARDS. |
| WALTON | AND YOU'RE REFERRING TO COMMANDER DOLUNT? |
| LEWIS | YES MA'AM. I CAN'T APPROVE HER THREE DAYS OFF IN A ROW. I CAN'T DO THAT.  I CAN GIVE YOU AN HOUR HERE AN HOUR THERE, BUT I CAN'T GIVE YOU THREE DAYS WITHOUT PRIOR APPROVAL. |
| WALTON | OKAY LET'S MOVE ON TO OFFICER JEROME COLLINS. HE IS ALSO ASSIGNED TO YOU IN COMMUNITY RELATIONS? |
| LEWIS | YES. |
| WALTON | OKAY AND WERE YOU AWARE THAT OFFICER COLLINS HAD TWO OTHER FULL TIME JOBS? |

31

LEWIS                       NO MA'AM.

WALTON                    WHAT HOURS DID OFFICER COLLINS WORK FOR YOU?

LEWIS                       HE WORKED 12:00 TO 8:00 AND SOMETIMES HE WORKED 11:00 TO

                            7:00 AND SOMETIMES SHE WORKED 1:00 TO 9:00.

WALTON                    AND WHAT HOURS DO YOU TYPICALLY WORK?

LEWIS                       SOMETIME I WORK,  MY HOURS VARY.  I WORK 8:00 TO 4:00.

                            SOMETIME I WORK 9:00 TO 5:00.  SOMETIME I WORK 10:00 TO 6:00.

                            2:00 TO 10:00.

WALTON                    OKAY AND OFFICER COLLINS WAS MONDAY THROUGH FRIDAY?

LEWIS                       YES.

WALTON                    AND WOULD YOU SEE HIM ON HIS ON DUTY EVERY DAY?

LEWIS                       I WOULD SEE HIM AT ON DUTY.

WALTON                    EVERY DAY?

LEWIS                       YES EVERY DAY.

WALTON                    AND WE HAVE VIDEO SHOWING HIM BEING ON DUTY BECAUSE

                            HE STARTED AT 7:00 A.M. AND WORKED TWO AT ST. JOHN'S

                            HOSPITAL AND HE'S ON VIDEO WORKING THERE.  WOULD YOU

                            HAVE AN EXPLANATION HOW HE COULD BE IN TWO PLACES AT

                            ONCE?

LEWIS                       I CANNOT EXPLAIN THAT, BUT JEROME COLLINS WAS HERE AT

                            WORK.

WALTON                    FOR HIS WHOLE EIGHT HOURS OR WHAT PART?

32

LEWIS          HE WOULD COME IN, GET HIS ASSIGNMENTS AND HE WOULD
               LEAVE.

WALTON         OKAY AND DID YOU CHECK ON HIM?

LEWIS          SOMETIMES I WOULD CHECK ON HIM.  IF HE, HE HAD THAT
               SCHOOL UP THERE ON WHITTIER AND . . HE HAD TO BE THERE
               AT A CERTAIN TIME.  IF I WOULD RIDE THROUGH I'D SEE THE
               VAN THERE, I KNEW HE WAS THERE.

WALTON         AND YOU'RE, IT'S YOUR CONTENTION EVERY DAY THAT YOU
               SAW HIM ON DUTY?

LEWIS          YES MA'AM

WALTON         AND WERE YOU AWARE HE HAD ANOTHER JOB?

LEWIS          I WAS NOT AWARE JEROME HAD ANOTHER JOB.

WALTON         AND HAVE YOU EVER HAD ANY DISCUSSIONS WITH HIM SINCE
               THIS INCIDENT REGARDING OTHER JOBS?

LEWIS          I HAD A DISCUSSION WITH HIM AFTER YOU GUYS CAME IN AND
               COMMANDER DOLUNT  CALLED ME INTO HIS OFFICE AND TOLD
               ME JEROME COLLINS  WAS INVESTIGATED FOR HAVING A
               SECOND JOB.  I TALKED TO JEROME COLLINS.  I CALLED HIM
               INTO MY OFFICE, I ASKED HIM HOW LONG HAS HE BEEN
               WORKING THAT SECOND JOB.  HE SAID SINCE 2004.

WALTON         OKAY AND DID YOU HAVE FURTHER DISCUSSION WITH HIM
               ABOUT IT?

LEWIS            NO MA'AM.

WALTON           SO ARE YOU AWARE NOW THAT HE WAS NOT WORKING EIGHT

                 HOURS FOR THE DETROIT POLICE DEPARTMENT ON HIS SHIFT?

LEWIS            I AM NOW.

WALTON           BUT IT'S YOUR CONTENTION YOU SAW HIM AT ON DUTY EVERY

                 DAY?

LEWIS            YES MA'AM..

WALTON           OKAY PREVIOUSLY, THE THREE OF US, BEING ATTORNEY

                 WALKER, YOURSELF AND I, WERE AT AN INVESTIGATIVE

                 SUBPOENA AND YOU HAD BROUGHT UP SOME INFORMATION

                 REGARDING ASSISTANT CHIEF GODBEE, FORMERLY DEPUTY

                 CHIEF MOTLEY AND COMMANDER DOLUNT AND THEIR

                 KNOWLEDGE REGARDING OFFICER COLLINS IS THAT CORRECT?

LEWIS            THAT'S CORRECT.

WALTON           OKAY WHAT IS IT, BECAUSE I DO NOT HAVE A COPY OF THE

                 INVESTIGATIVE SUBPOENA AUDIO.   TELL ME WHAT YOUR

                 UNDERSTANDING IS REGARDING THOSE EXECUTIVES AND

                 OFFICER COLLINS?

LEWIS            I CAME INTO THE DISTRICT IN I THINK, IN 2005.  GODBEE WAS

                 THERE IN 2005, THAT'S WHEN WE SWITCHED OVER.  I WAS A

                 SUPERVISOR, ME AND LIEUTENANT.  AFTER TONYA GOSS AND

                 WILSON WAS PROMOTED TO LIEUTENANT, D.C. GODBEE PUT ME

34

IN COMMUNITY RELATIONS.  WE HAD A MEETING HE SAID ALL I WAS SUPPOSED TO DO WITH JEROME COLLINS WAS PUT HIM ON THE DETAIL.  JEROME COLLINS WOULD REPORT DIRECTLY TO HIM.  DURING THE TIME I WAS IN COMMUNITY RELATIONS, FOR ALL OF THAT TIME I NEVER SAW JEROME.  I SAW JEROME COLLINS IN TWO THOUSAND--WHEN D.C. MOTLEY CAME IN 2007.

WALTON   OKAY SO EARLIER WHEN YOU WERE SAYINGYOU SAW JEROME COLLINS EVERY DAY AT ON DUTY, YOU WERE TALKING ABOUT WHEN?

LEWIS   THAT'S WHEN I WAS THERE.

WALTON   I'M A LITTLE BIT CONFUSED, I'M SORRY.

LEWIS   I CAME INTO THE UNIT 2006, I NEVER SAW HIM IN 2006.I DIDN'T SEE COLLINS UNTIL 2007. WHEN D.C. GODBEE WAS PROMOTED TO ASSISTANT CHIEF, THAT'S WHEN HE STARTED COMING IN.  HE STARTED COMING IN WHEN D.C. MOTLEY CAME IN.

WALTON   SO

LEWIS   SO PRIOR TO THAT, I HADN'T SEEN HIM.

WALTON   SO YOU WERE ASSIGNED TO COMMUNITY RELATIONS IN 2006

LEWIS   MMHMM

WALTON   IN BETWEEN 2006 AND 2007 YOU NEVER SAW HIM?

LEWIS   NO MA'AM.

WALTON          AND A.C. GODBEE OR THEN HE WAS A DEPUTY CHIEF THEN CORRECT?

LEWIS           HE WAS DEPUTY CHIEF THEN.

WALTON          HE TOLD YOU JUST CARRY HIM ON YOUR DETAIL

LEWIS           CARRY HIM ON MY DETAIL. JEROME COLLINS WILL REPORT DIRECTLY TO ME.

WALTON          AND SO EARLIER WHEN YOU WERE TALKING ABOUT YOU SAID YOU SAW OFFICER COLLINS EVERY DAY AT ON DUTY, YOU'RE TALKING ABOUT STARTING WHEN?

LEWIS           WHEN D.C. MOTLEY CAME IN

WALTON          THAT WAS 2007? AND HOW DID THAT, WHAT HAPPENED, WHAT WAS THE CHANGE THERE?

LEWIS           D.C. MOTLEY CAME IN. IF YOU KNOW D.C. MOTLEY, SHE WANT TO SEE EVERYBODY. SHE WANT EVERYBODY WORKING. SHE CAME IN, SHE ASSIGNED HIM TO SCHOOLS. ALL THE SCHOOLS. BEFORE DISMISSAL TIME, SHE WANTED HIM AT ALL THE SCHOOLS WRITING THOSE. . TICKETS. AND THAT'S WHAT HE DID FOR HER.

WALTON          OKAY SO 2007 TO THE PRESENT, YOU'RE SAYING HE WAS THERE EVERY DAY?

LEWIS           WHERE WORK?

WALTON          YES.

36

LEWIS            YES MA'AM.

WALTON           AND WHAT WAS YOUR UNDERSTANDING OF WHERE HE WAS IN

                 2005 TO 2007, OR NO, I'M SORRY YES, DURING 2006 WHAT WAS

                 YOUR UNDERSTANDING OF WHERE HE WAS?

LEWIS            I DIDN'T HAVE AN UNDERSTANDING.  HE REPORTED DIRECTLY

                 TO D.C. GODBEE.

WALTON           YOU NEVER ASKED?

LEWIS            NO, WHEN HE SAID JEROME COLLINS REPORTED DIRECTLY TO

                 HIM,  I LEFT IT JUST LIKE THAT, BECAUSE I KNEW THEY WERE

                 FRIENDS.

WALTON           HOW DO YOU KNOW THEY'RE FRIENDS?

LEWIS            BECAUSE HE SPOKE OF D.C. GODBEE ALL THE TIME.

WALTON           OFFICER COLLINS DID?

LEWIS            YEAH.

WALTON           WHAT DID HE SAY ABOUT A.C. GODBEE.

LEWIS            HE SAID A.C. GODBEE WAS HIS BOY.

WALTON           OKAY

LEWIS            SO WHEN HE SAY A.C. GODBEE IS MY BOY, I TAKE IT THOSE

                 GUYS ARE FRIENDS.

WALTON           AND SO YOU TOOK THAT TO BE HANDS OFF?   DON'T DO

                 ANYTHING WITH HIM?

LEWIS            THAT'S RIGHT.

37

WALTON          AND IN 2007 WHEN MOTLEY TOOK OVER, THAT ENDED THEN. JEROME COLLINS WAS COMING TO WORK?

LEWIS           HE WAS COMING TO WORK. SHE SAID IF SHE HAD TO BE THERE EVERYBODY HAD TO.

WALTON          BUT WE NOW KNOW HE WASN'T THERE, BECAUSE HE WAS WORKING AT ST. JOHN'S HOSPITAL.

LEWIS           I FOUND THAT OUT WHEN I FOUND OUT ABOUT THE SECOND JOB, THE OTHER JOB AT THE BOARD OF POLICE COMMISSIONERS.

WALTON          AND DID YOU HAVE ANY CONVERSATIONS WITH COMMANDER DOLUNT REGARDING OFFICER COLLINS AND HIM REPORTING TO WORK?

LEWIS           COMMANDER DOLUNT GAVE OFFICER COLLINS ALL THE B & E'S THAT OCCURRED IN THE DISTRICT. HE WAS SUPPOSED TO GO TO EVERY HOUSE, PUT A DOOR STOPPER, THOSE DOOR HANGERS ON THE DOORS. I TYPED UP A LETTER, HE PUT THE LETTER, WAS SUPPOSED TO PUT THE LETTERS IN THE DOORS AND TALK TO THE FOLKS ABOUT HOME SECURITY SERVICE. THAT WAS HIS JOB WITH COMMANDER DOLUNT, BECAUSE I HAD AUDREY CURTIS DOING THAT JOB AND HE TOOK IT FROM AUDREY AND GAVE IT TO JEROME.

WALTON          AND DID YOU EVER CHECK AND SEE, SUPERVISE ON HIS JOB TO

38

|          | SEE IF HE WAS DOING IT? |
|----------|-------------------------|
| LEWIS    | I COULD ALWAYS KEEP A COPY OF THOSE B & E REPORTS BECAUSE DOLUNT WOULD ALWAYS EMAIL THEM TO ME AND I WOULD GIVE THEM TO COLLINS. EMAIL THEM TO ME TO GIVE TO COLLINS. I RODE BY SOMETIMES. . .IF HE DID. . . |
| WALTON   | AND |
| LEWIS    | HE WAS |
| WALTON   | AND HOW OFTEN WOULD YOU CHECK ON HIS WORK OR IN GENERAL ALL THE PEOPLE WHO WORKED FOR YOU? |
| LEWIS    | I TRIED TO CHECK ON ALL MY PEOPLE AT LEAST TWICE A WEEK WHEN I HAD THE CHANCE. DURING THE WINTER MONTHS IT WAS EASIER, DURING THE SUMMER MONTHS IT WAS HARD. |
| WALTON   | DID YOU GIVE PERMISSION TO OFFICER COLLINS TO WORK A SECOND JOB AND NOT SHOW UP TO DPD? |
| LEWIS    | NO MA'AM. IF I GOT TO BE THERE, EVERYBODY GOT TO BE THERE. |
| WALTON   | OKAY IS THERE ANYTHING IN REGARDS TO OFFICER COLLINS THAT I HAVEN'T ASKED YOU THAT YOU THINK I NEED TO KNOW? |
| LEWIS    | NO. |
| WALTON   | OKAY THAT'S ALL I HAVE. WE'RE OFF THE RECORD AT NOON. |
| WALTON   | OKAY WE'RE BACK ON THE RECORD. IT'S STILL JULY 6, 2010. THE |

39

|   | TIME IS 12:15 P.M. WE HAD A COUPLE OF MINUTES OF OFF THE RECORD DISCUSSION AND MY UNDERSTANDING IS SERGEANT LEWIS THERE'S A FEW THINGS YOU WANT TO PUT ON THE RECORD? |
|---|---|
| LEWIS | YES. |
| WALTON | OKAY AND WHAT IS THAT? |
| LEWIS | THAT IS DURING THE DISCUSSION OF JEROME COLLINS' SECOND JOB, COMMANDER DOLUNT STATED HE WAS NOT GONNA BE DEMOTED FOR NOBODY. IN THE INTERIM COMMANDER MOORE CALLED ME AFTER HE HAD COME BACK FROM SUSPENSION AND HE TOLD ME THAT HE HAD HEARD COMMANDER DOLUNT WAS TRYING TO COVER HIS ASS. |
| WALTON | THIS WAS COMMANDER MOORE WAS BACK FROM SUSPENSION? |
| LEWIS | YES |
| WALTON | OKAY AND HOW WAS THIS CONVERSATION, WAS IT FACE TO FACE, HOW WAS IT? |
| LEWIS | HE CALLED ME ON MY CELL PHONE. HE WANTED TO KNOW WHAT WAS GOING ON AND I EXPLAINED TO HIM THAT THEY WERE TRYING TO JAM ME UP FOR KENYETTA'S TIME OFF THAT SHE WASN'T COMPENSATED FOR. AND HE SAID WELL I HEARD THAT COMMANDER DOLUNT IS TRYING TO COVER HIS ASS. |
| WALTON | SO HE SAID HE HEARD THAT. DID HE SAY HE HAD A |

40

|  | CONVERSATION WITH DOLUNT? |
| --- | --- |
| LEWIS | NO HE SAID HE HEARD IT. |
| WALTON | AND SPECIFIC TO THE, CONVERSATION ABOUT DOLUNT SAYING HE WASN'T GONNA GET DEMOTED AGAIN WHO SAID THAT? |
| LEWIS | COMMANDER DOLUNT SAID THAT DURING THE DISCUSSION WITH JEROME COLLINS HAVING A SECOND JOB, HE MADE THAT COMMENT. |
| WALTON | SO AND THEN LET'S GET BACK TO COMMANDER MOORE, SO HE CALLED YOU ON YOUR CELL PHONE AND HE SAID THAT HE HEARD DOLUNT WAS TRYING TO COVER HIS ASS? |
| LEWIS | YES MA'AM. |
| WALTON | OKAY WAS COMMANDER MOORE PRESENT FOR THE CONVERSATIONS THAT YOU HAD WITH DOLUNT ABOUT BORDEN HAVING TIME COMING AND HE SAID TO USE IT? |
| LEWIS | NO MA'AM. |
| WALTON | DID YOU MAKE HIM AWARE OF THOSE CONVERSATIONS? |
| LEWIS | NO MA'AM. |
| WALTON | HOW, DO YOU KNOW HOW DID MOORE KNOW THAT IT WAS DOLUNT COVERING IF HE WASN'T AWARE OF YOUR CONVERSATION WITH |
| LEWIS | DURING THE TIME COMMANDER MOORE CALLED ME I HAD ALREADY BEEN SUSPENDED. |

41

WALTON          OKAY.

LEWIS           AND I WASN'T THERE WHEN HE CAME BACK TO WORK.

WALTON          OKAY.

LEWIS           OFF OF HIS SUSPENSION, SO I DON'T KNOW HOW HE HEARD IT,

                BUT HE HAD HEARD IT.

WALTON          IS THERE ANYTHING ELSE?

LEWIS           NO I THINK THAT'S ABOUT IT.

WALTON          OKAY, 12:17.  WE'RE OFF THE RECORD.

42

75

```
1    nothing further.

2                        MR. WOODYARD:  I have nothing

3    further.

4                        THE COURT:  Thank you, Officer.

5    You can step down.

6                        (Whereupon a recess was held)

7                        THE COURT:  Back on the record in

8    10-58564, People versus Jerome Collins.  Good

9    afternoon.

10                       MR. EVELYN:   Gerald Evelyn on

11   behalf of defendant.

12                       MR. WOODYARD:  Michael Woodyard for

13   the people.

14                       M A T T I E   L E W I S,

15   after having been first duly sworn, to tell the truth,

16   the whole truth and nothing but the truth, was examined

17   and testified as follows:

18                       THE WITNESS:  Yes.

19                       THE COURT:  As soon as you're

20   ready.

21                       DIRECT EXAMINATION

22   BY MR. EVELYN:

23   Q    Can you state your name for the record?

24   A    Mattie Lewis.

25   Q    And how are you employed?
```

EX.6

76

1    A     City of Detroit Police Department.

2    Q     And your assignment is community relations?

3    A     Yes.

4    Q     And you're a sergeant?

5    A     Yes.

6

7                          THE COURT:  Okay, and you're here
     pursuant to a subpoena, correct?

8                          THE WITNESS:  Yes.

9                          THE COURT:  With your attorney,
10   Mr. Walker?

11                         MR. EVELYN:  My esteemed colleague,
12   Mr. Fred Walker?

13                         THE WITNESS:  That's correct.

14                         THE COURT:  Would you like to move
15   closer to her, counsel?

16                         MR. WALKER:  No, I'm fine, your
17   Honor.  Thank you.

18                         THE COURT:  Would you identify
19   yourself for the record?

20                         MR. WALKER:  Fred Walker on behalf
21   of Miss Mattie Lewis.

22                         THE COURT:  Thank you.

23   BY MR. EVELYN:

24   Q     Sergeant Lewis, where were you assigned in 2006 to
25         2009?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (2098)

77

1    A    The Eastern District.

2    Q    What was your responsibilities?

3    A    Community relations.

4    Q    And just in very general terms, what's the mission of

5         the community relations unit?

6    A    The unit, community relations is to bring the community

7         and the police closer together to, like, setting up

8         block clubs, neighborhood watches, attending meetings.

9    Q    Anything that will improve the relationship between the

10        department and the citizens; is that correct?

11   A    Exactly.

12   Q    And did you have a unit that you supervised?

13   A    Yes.

14   Q    And who were the members of that unit?

15   A    Officer Collins, Officer Curtis, Officer Burt, Officer

16        Robbins, Officer Brownlee, Officer Philip Curtis,

17        Officer Taylor and Officer Borden.

18                        THE COURT:   I'm sorry, last name?

19                        THE WITNESS:  Borden.

20                        THE COURT:   And Burke, do you know

21        which way Burke is spelled?

22                        THE WITNESS:  B-u-r-t.

23                        THE COURT:   Burt.  Thank you.

24   BY MR. EVELYN:

25   Q    And when did you become the supervisor for that unit?

78

1    A    To the best of my recollection, it was in July of '06.

2    Q    And who gave you that command of that unit?

3    A    D.C. Godbee.

4    Q    D.C. Stands for?

5    A    I'm sorry, Deputy Chief Godbee.

6    Q    And he is now chief of the police?

7    A    Exactly.

8    Q    Did you meet all of the members of your unit when you

9    were assigned that unit?

10   A    No, I met all of them except for Officer Collins when

11   we had the meeting.

12   Q    So you had a meeting with those officers that you just

13   mentioned and everyone was there except Officer

14   Collins?

15   A    Yes, with D.C. Godbee.

16   Q    You, D.C. Godbee and the union?

17   A    Correct.

18   Q    Was there some reason why Officer Collins wasn't

19   present, if you know?

20   A    To my recollection he said Officer Collins was assigned

21   to him.

22   Q    So the deputy chief say he is in your unit, but he is

23   assigned to me?

24   A    Exactly.

25   Q    Now is it correct, Sergeant Lewis, that at least as far

79

1      as the community relations unit was concerned, when you

2      first took over they weren't doing activity logs as a

3      matter of course; is that correct?

4   A  Not to my recollection.  I really don't know.

5   Q  Well, you certainly -- activity logs are documents that

6      you, at some -- you, as a supervisor, would have to

7      sign; is that correct?

8   A  Right.

9   Q  So your recollection is that when you took over the

10     unit in 2006 I think you said?

11  A  Yeah, 2006.

12  Q  Two thousand six, that that unit, because of it's

13     mission, didn't do activity logs; is that correct,

14     those officers?

15  A  In 2006?

16  Q  Yes.

17  A  I can't testify to that.  I just know they started

18     doing activity logs when I was there.

19  Q  So you're saying that when you took over in 2006 they

20     did activity logs?

21  A  They -- to my recollection.  I'm really not sure.

22  Q  If I suggested to you that that unit did not submit

23     activity logs in 2006, 7 or 8, is your memory any

24     different from that?

25  A  I know there was activity logs in 2007.

80

```
 1    Q     Okay.

 2    Q     Let me ask you regarding Officer Collins, did he -- was

 3          he submitting activity logs in even 2006?

 4    A     No.

 5    Q     Two thousand and seven?

 6    A     Yes.

 7    Q     He did activity logs in 2007, you're sure of that.  Is

 8          it possible that he didn't start doing activity logs

 9          until 2009, is that at least possible?

10    A     I really can't remember.

11    Q     You don't remember, okay.

12    A     No.

13    Q     Now I believe you indicated that he was -- you were

14          told by Deputy Chief Godbee that at least initially

15          Officer Collins was reporting to him; is that correct?

16    A     That's correct.

17    Q     And did you -- but you did have some idea of some of

18          the activities that he was involved in; is that

19          correct?

20    A     Not at that time, no.

21    Q     When did you become aware of what he did?

22    A     I became aware back in -- when did D.C. Godbee come?

23    Q     When was that?

24    A     Two those and I want to say seven.

25    Q     You think it was 2007, you're not positive?
```

81

1    A       Yeah.  Right.  I want to say 2007.

2    Q       But whenever Deputy Chief Motley took over for Deputy

3    Chief Godbee, then you became aware of what Officer

4    Collins was doing; is that correct?

5    A       Exactly.

6    Q       And what were Officer Collins responsibilities in 2007

7    that you were aware of?

8    A       Deputy Chief Motley would give me his assignment, get

9    him to go to the schools.  We had four high schools in

10   the area, so he went to all the high schools and wrote

11   tickets for kids hanging outside of the schools.

12   Q       Let me make sure I understand.  Did you say when he

13   began, when Deputy Chief Motley took over, Deputy Chief

14   Godbee, Deputy Chief Motley would give you Officer

15   Collins assignments?

16   A       Yes.

17   Q       So he was still reporting to a Deputy Chief; is that

18   correct?

19   A       Pretty much.

20   Q       So Motley would give you what Motley said were Officer

21   Collins assignments; is that correct?

22   A       Exactly.

23   Q       And did Motley tell you what his hours were?

24   A       No, she didn't.

25   Q       So you can't testify that, at least, as far as 2007 was

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER

82

1   concerned, what hours he supposedly worked?

2   A   Twelve to eight, one to nine or two to ten, depending

3   on what was going on but --

4   Q   But you didn't give him his regular work assignments,

5   did you?

6   A   They was given to me to give to him.

7   Q   Well let's talk about 2009 for a moment.  I think 2009,

8   starting in January, do you know what his

9   responsibilities were?

10  A   His responsibilities then were to go to all the homes

11  that had experienced B and E's, to put those 100 Speak-

12  up fliers on the doors, to give them a letter for home

13  security surveys and there was something else, inform

14  them on how to start block clubs if they needed one.

15  Q   Was he responsible to go to any of the schools in 2009?

16  A   He went to the schools.  He was still responsible for

17  the schools.

18  Q   And was this any different in 2008, what you just

19  describe?

20  A   No.

21  Q   So 2008 he did the same thing as far as you were

22  concerned; is that right?

23  A   Right.

24  Q   Is that a yes?

25  A   Yes.

83

1   Q   Now would it be a fair statement that Officer Collins

2       worked a flexible schedule because of his duties?

3   A   We all worked flexible schedules.

4   Q   Well he worked -- would that include him?

5   A   Yes.

6   Q   And by flexible schedule does that mean his actual work

7       hours would vary from day-to-day?

8   A   The actual work hours were from 12 to 8, but sometimes

9       time might change.  Like if we had a meeting, had an

10      event going on in the precinct, the time would change.

11  Q   Is it your testimony that he always worked one of those

12      regular shifts, 11 to 8 -- I mean 11 to 7, 12 to 8 or 2

13      to 10?

14  A   Two to ten or one to nine.

15  Q   When he would do activity logs -- well, let me ask you

16      this, if he worked a regular shift, would it be his

17      responsibility to see you when he first came in, come

18      to your desk and say I'm here?

19  A   Yes.

20  Q   So every day that he has an activity log that says 11

21      to 7, that means that he came to see you at 11:00?

22  A   He either came to see me or he came to see the

23      lieutenant.

24  Q   Okay, and this would have been in 2008 and 2009?

25  A   Lieutenant -- Yes.

84

1    Q    So that means that you're saying that the activity

2        logs, if there are activity logs for 2009 that you

3        signed, they're all accurate, is that your testimony?

4    A    Yes.

5    Q    And they're all accurate as to what he did, what his

6        responsiblity and duties were?

7    A    Yes.

8    Q    And you were required to confirm as much as you could

9        in your supervisory capacity that the members of

10       community relations unit -- strike that.

11                  You're required to suervise their

12       activities; is that correct?

13    Q    The members of the unit?

14    A    Supervise their activities?

15    Q    Right?

16    A    What exactly do you mean?

17    Q    I mean make sure that they were doing their jobs?

18    A    Yes.

19    Q    And as far as your concerns, your testimony is that

20       Officer Collins did his job; is that correct?

21    A    He did his job.

22    Q    Now you did mention in the list of things Officer

23       Collins did was Officer Collins was responsible for

24       youth activity?

25    A    Yes.

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

85

```
 1   Q   Did he run a football program, rather extensive

 2       football program out of that precinct -- strike that,

 3       out of Eastern District as part of his duties?

 4   A   Yes.

 5   Q   And was the football schedule for the games posted in

 6       your office?

 7   A   The commanders had it.

 8   Q   It was posted in the commanders' office?

 9   A   Yes.

10   Q   Those games were played on weekend's; isn't that

11       correct?

12   A   I don't know.

13   Q   You never looked at the schedule?

14   A   No, not -- no.

15   Q   You -- Let me indicate you were his supervisor,

16       correct?

17   A   Right.

18   Q   And that was part of what he did as a part of his job,

19       which is to run sports programs; is that correct?

20   A   That's correct.

21   Q   And the commanders required that those schedules be

22       posted in the commanders office, right?

23                       MR. WOODYARD:   Judge, I'm going to

24       object, leading.

25                       THE COURT:   Do you want to
```

LISA A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

86

1    rephrase?

2                              MR. EVELYN:   I'll rephrase.

3    BY MR. EVELYN:

4    Q    You are aware that there were schedules that they had

5         for those games; is that correct?

6    A    Yes.

7    Q    And did you ever see the schedule?

8    A    I saw the schedule.

9    Q    Where were they?

10   A    In the commanders' office.

11   Q    Why were they in the rcommander's office?

12   A    The commander wanted the schedule.

13   Q    Who are the commanders?

14   A    It was Commander Moreland, Commander Verta Coserta,

15        Commander Leo Powels.  I can't recall -- I know there

16        was a couple more commanders, but I can't recall them.

17   Q    Did you ever attend any of the football games or

18        sporting programs that Officer Collins was

19        coordinating?

20   A    No.

21   Q    Did you ever go to any of the championship games along

22        with other command officers?

23   A    No.

24   Q    Did you ever attend any of the practices?

25   A    No.

LEONA A. FILOMIO, CERTIFIED SHORTHAND REPORTER (3098)

87

```
 1   Q    He did have the permission to use department vehicles
 2        and equipment for this because this is a department
 3        activity; isn't that correct?
 4   A    I -- that would have to come from the chief -- I mean
 5        the deputy chief.
 6   Q    Well there were two vans in that precinct; is that
 7        correct?
 8   A    Right.
 9   Q    And he used one of them, didn't he?
10   A    Yes.
11   Q    On a regular basis?
12   A    Exactly.
13   Q    And one of the sports programs involves him
14        transporting --
15                    MR. WOODYARD:  Judge, I'm going to
16        object.  It's leading.
17                    MR. EVELYN:  Okay.  I'll rephrase.
18                    MR. WOODYARD:  'Cuz this is
19        counsel's witness.
20                    THE COURT:  I'm mindful.
21                    MR. WOODYARD:  Thank you.
22   BY MR. EVELYN:
23   Q    In the course -- you testified that Officer Collins did
24        his job; is that correct?
25   A    Correct.
```

CERTIFIED SHORTHAND REPORTER (3098)

88

1    Q    And you testified that at least initially, his job
2         involved the B and E follow-up activities and going to
3         schools; is that right?

4    A    Right.

5    Q    Correct?

6    A    Correct.

7    Q    Now I suggested to you or I asked you a question about
8         sports activity, 'cuz you didn't list those as part of
9         his -- what he did; isn't that correct?

10   A    Correct.

11   Q    Wouldn't it be correct that most of what he did was
12        coordinate sports programs?

13   A    I didn't know about the sports programs.  That was done
14        after work.

15   Q    The sports programs were part of his responsibilities
16        though, weren't they?

17   A    Yes.

18   Q    Part of what he got paid to do; isn't it?

19   A    Not to my knowledge.

20   Q    Not to your knowledge?

21   A    No.  If he -- no.

22   Q    Sergeant Lewis, you have a lawyer because part of the
23        investigation that was conducted involving Officer
24        Collins lead to an investigation of you; is that
25        correct?

CERTIFIED SHORTHAND REPORTER (3098)
89

89

1    A     That's correct.

2    Q     And you have a position that is somewhat adverse to my

3          client, would that be a fair statement?

4    A     Adverse?

5    Q     I'll rephrase it.  You were questioned about your

6          supervision of him; isn't that correct?

7    A     Correct.

8    Q     You were questioned from the perspective of you

9          potentially being disciplined yourself; isn't that

10         correct?

11   A     Correct.

12   Q     You were the subject of disciplinary action which were

13         involved with activity logs?

14   A     That's correct.

15                   MR. EVELYN:  I would ask that I be

16         allowed to cross-examine the witness.  I believe she's

17         a hostile witness.

18                   THE COURT:  Mr. Woodyard, wish to

19         be heard?

20                   MR. WOODYARD:  Yeah.  Sergeant

21         Lewis has respectfully and calmly answered all of

22         counsel's questions.  There is absolutely no indication

23         that she's hostile.  I think that the only hostile

24         person is emanating from the podium, with all due

25         respect, from Mr. Evelyn.

BETH A. FOMAN CERTIFIED SHORTHAND REPORTER (3098)

90

1          MR. EVELYN:  And I say I've been
2    around a long time.  I know when someone is
3    disrespecting me.  I disagree with him.  He's entitled
4    to that.  I think that her condition -- she is adverse
5    to my client and some of the testimony has been
6    adverse.  For that reason --
7                    MR. WOODYARD:  I think that's a
8    different question under the Rule of Evidence of
9    whether the position is adverse.  I think that the
10   question is whether the witness is hostile and I didn't
11   address the question of whether the positions were
12   adverse.
13                    THE COURT:  That wasn't what you
14   were asked to do.
15                    MR. WOODYARD:  That was not, your
16   Honor.
17                    MR. EVELYN:   At this point, I
18   think that I should be allowed to ask leading
19   questions.
20                    THE COURT:  Not yet, but I can
21   envision you'll renew your request.
22   BY MR. EVELYN:
23   Q     Sergeant Lewis, were you questioned about your
24         supervision of Sergeant --- Officer Lewis (sic)?
25   A     That's correct.

91

1    Q    You were asked about why he was able to work outside

2         position under your supervision, among other things,

3         weren't you?  Weren't you, among other things?

4    A    I was.

5    Q    You said you didn't know he had an outside job?

6    A    That's correct.

7    Q    In addition, you know that part of the basis for your

8         discipline was a claim that you didn't adequately

9         supervise Mr. Collins, isn't that correct?

10   A    Yes.

11   Q    And you obviously claim that you did adequately

12        supervise him; is that correct?

13   A    Yes.

14   Q    So it's certainly to your interest to claim that

15        anything that he did that was regular police function

16        was outside your field of endeavor, you didn't know

17        about it; is that correct?

18   A    That was something with him and the chief or the deputy

19        chief at that time.

20   Q    So you're saying that his sporting programs, activity

21        was something that came from the deputy chief; is that

22        correct?

23   A    Yes.

24   Q    Which means he was being paid to do it, correct?

25   A    Yes.

CERTIFIED SHORTHAND REPORTER (3098)

92

1    Q    And those sports activities continued after Deputy

2         Chief Godbee left and the next deputy chief came; is

3         that correct?

4    A    That's correct.

5    Q    And it continued when he was working under your

6         supervision; isn't that correct?

7    A    That's correct.

8    Q    He had to get the keys from the van from you, isn't

9         that right?

10   A    That's correct.

11   Q    Did he have his own set of keys?

12   A    No.

13   Q    If I tell you that other officers have testified that

14        they had their own sets of keys, is that --

15   A    That would be news to me.  They're not supposed to.

16   Q    Was it your testimony that Officer Collins had to come

17        to you, wherever he wanted to use the van, he had to

18        come to you to get the keys?

19   A    The keys was always in the drawer.  He had a key to the

20        office.

21   Q    Okay.  So you're saying he had access to the keys; is

22        that correct?

23   A    Yes.

24   Q    And you saw him transporting young men, young people

25        from that district to and from practice and to and from

93

1    their homes and to and from games; isn't that correct?

2                      MR. WOODYARD:   For what it's worth,

3    I'll just lodge a continuing objection to leading

4    questions.

5                      THE COURT:   If you'll rephrase as

6    to the last question.

7    BY MR. EVELYN:

8    Q    You testified that you knew that part of his job was to

9    run these sports program; is that correct?

10   A    That's correct.

11   Q    You testified that was part of why he was paid; is that

12   correct?

13   A    That's correct.

14                    MR. WOODYARD:   I'm going to object

15   to leading.  Every single, solitary question has been

16   leading.

17                    MR. EVELYN:   She's already

18   testified to that.  That's foundational is all I'm

19   asking.  You can ask a foundational, leading question.

20                    THE COURT:   Indeed hasn't she

21   testified that he was therefore getting paid for it

22   after the new deputy chief came in?

23                    MR. WOODYARD:   Asked and answered,

24   your Honor.

25                    THE COURT:   And I -- that I'll

LISA A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

94

1        sustain.

2    BY MR. EVELYN:

3    Q    In any event, did Officer Collins get keys from -- he

4         had access -- did Officer Collins have access to the

5         keys to use the van for work activity?

6    A    That's correct.

7    Q    Now you testified that you supervised some of his work

8         activity, but you're testifying that you never attended

9         any of the sports program that he did pursuant to your

10        direction by the deputy chief; is that correct?

11   A    That's correct.

12   Q    Never went to one basketball game, right?

13   A    That's right.

14   Q    Never went to any bowling activities that he was

15        supposed to do?

16   A    No, sir.

17   Q    And he did have a bowling program too, didn't he?

18   A    I didn't know about the bowling.

19   Q    You don't know about the bowling program?

20   A    No.

21   Q    He did have a football program; is that correct?

22   A    Yes.

23   Q    And none of these -- none of these activities ever

24        appeared on the activity logs of his, did they?

25   A    No.

95

1   Q    Bowling, football, basketball, never on the activity

2        log; is that correct?

3   A    That's correct.

4   Q    And that would be a major portion of what he did, isn't

5        that correct?

6                       MR. WOODYARD:   Judge, I'm going to

7        object to the leading questions.

8                       THE COURT:   Would you rephrase?

9                       MR. EVELYN:   I still think that

10       she's a hostile witness and I've asked the court --

11                      THE COURT:   You don't have a

12       ruling to that, though.

13                      MR. EVELYN:   All right.

14                      THE COURT:   I like to think I'm

15       six feet tall, but no one's confirmed that yet.

16  BY MR. EVELYN:

17  Q    Sergeant Lewis, I believe you testified that that

18       included in Sergeant -- included in Officer Collins'

19       responsibilities were community relations unit, were

20       these sports programs that you've just been discussing;

21       is that correct?

22  A    That's correct.

23  Q    And you indicated that you were a supervisor, at least,

24       at one point in 2008, at least by then; is that

25       correct?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

96

1    A    Correct.

2    Q    And you supervise what he did; is that correct?

3    A    That's correct.

4    Q    Did you go out to the homes to make sure he had put

5         these tags on the doors at these B and E locations?

6    A    Yes, I would.

7    Q    And if anybody had complaints about them, any citizen

8         complained about them, you would know about that; is

9         that correct?

10   A    I would.

11   Q    And no one ever complained that they weren't getting

12        attended to; is that correct?

13   A    That's correct, never.

14   Q    The schools he was supposed to be performing these

15        functions at, did you recall the names of those

16        schools, by the way?

17   A    Finney, Denby, Osborn and Southeastern.

18   Q    Did you ever get any complaints from any of the schools

19        that he wasn't where he was supposed to be?

20   A    No, sir.

21   Q    Ever have to write him up about not being on the job or

22        not doing what he was supposed to do?

23   A    No.

24   Q    Now when you were scrutinizing his activities, did you

25        ever take the next step and say well, he also does

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

97

1    sports programs, let me go to the sports program and

2    see if those are actually up and running?

3  A   No, sir.

4  Q   So you never went to one game, never went to one

5    practice; is that correct?

6  A   That's correct.

7  Q   And the schedule that was posted in the commander's

8    office, did you ever look at the schedule?  I'm sure

9    you looked at it at least once, didn't you?

10 A   Just once to give it to him.

11 Q   Okay.  Did you look at what was on it?

12 A   No, sir.

13              MR. EVELYN:  May I approach the

14    witness?

15              THE COURT:  As long as

16    Mr. Woodyard knows with what you're approaching.

17              MR. WOODYARD:  Judge, I'm going to

18    object to the relevancy of this document that counsel

19    has.

20              MR. EVELYN:  I haven't even shown

21    it to her, yet, Judge.  It's a purported schedule for

22    football from 2008.  She testified that she's posted

23    schedules in commanders' offices.  I'm going to ask,

24    this is one that's really simple.

25              MR. WOODYARD:  All right.

TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

98

```
 1                      THE COURT:   Withdraw your
 2     objection?
 3                      MR. WOODYARD:   I'll withdraw the
 4     objection.
 5                      MR. EVELYN:   May I approach the
 6     witness?
 7     BY MR. EVELYN:
 8     Q    I'm going to show you purported schedule for football,
 9          2008, football schedule, ask you if you recognize it?
10     A    Yes.  This is it, one of 'em.
11     Q    That's one of the schedules that was posted in the --
12     A    In the commander's office.
13                      MR. EVELYN:   Okay.  I move for the
14     exhibit, your Honor.
15                      THE COURT:   Mr. Woodyard?
16                      MR. WOODYARD:   Actually, I will
17     have no objection to the admission of that document as
18     a defense exhibit.
19                      THE COURT:   Okay.  If you'll see
20     the court reporter.
21                      (Whereupon Exhibits A-H were marked
22     for the record.)
23     BY MR. EVELYN:
24     Q    Now showing you Defendant's Exhibit A, that schedule
25          depicts a schedule of football games; is that correct?
```

CERTIFIED SHORTHAND REPORTER (3098)

89

1 A  Correct.

2 Q  And the commanders wanted that in their office, so they

3   would know what Officer Collins was involved in; is

4   that correct?

5 A  That's correct.

6 Q  And those football games are all on weekends, aren't

7   they?

8 A  I really can't tell from the schedule.

9 Q  Well the calendar will reflect whether they're weekends

10   or not?

11 A  Right.

12       MR. EVELYN:  May I publish it to

13   the court, your Honor?

14       THE COURT:   You may.

15 BY MR. EVELYN:

16 Q  And those activities on that Defendant's Exhibit A are

17   not on any -- to your knowledge, any of the Officer

18   Collins' activities logs, are they?

19 A  Not to my knowledge.

20 Q  That you signed, but that's part of what he did for the

21   department, isn't it?

22 A  It is.

23 Q  Is it your understanding if something appears on an

24   activity log, if work appears on an activity log and

25   it's outside the normal schedule an officer has a right

100

1     to ask for compensation for it?

2  A   In community relations we don't get paid overtime.  If

3  you work over --

4  Q   Can you say that louder?

5  A   In community relations we don't work over.  If we work

6  over --

7  Q   So you work extra hours in community relations that the

8  department doesn't pay you for?

9  A   Exactly.

10  Q   It's kind of the breaks of the game?

11  A   Yeah.

12                MR. EVELYN:   Can I approach the

13  witness?

14                THE COURT:  As long as Mr. Woodyard

15  knows -- People know what you're approaching with.

16                MR. WOODYARD:  I have no problem

17  with it being -- I have no problem with it being handed

18  into evidence.

19  BY MR. EVELYN:

20  Q   I'm going to show you 2009 scheduling of games,

21  starting the weekend of September 19th and running

22  through October 24th, 2009 and also October 31st and

23  November 7th, this championship games that's

24  Defendant's B.  That's a schedule that would have been

25  posted in the commander's office also; is that correct?

101

1    A    That's correct, but I've never seen this one.

2    Q    You've never saw that one?

3    A    No.

4    Q    Well, does it refresh your recollection as to any

5         information that was on their schedule in 2009 --

6         strike that.   That's a bad question.

7                    You indicated that the schedules

8         were always posted in the commander's office, per their

9         instructions, their directive, right.

10   A    Right.   If I didn't give it to the commander he would

11        give it to him.

12   Q    If you didn't give it to the commander, Officer Collins

13        would give it to him?

14   A    Officer Collins, yes.

15   Q    And there was one posted every week 2008, 2009 also?

16   A    Yes.

17   Q    You say you don't recall that particular exhibit?

18   A    I don't recall this one because normally the commanders

19        put it on his wall and I don't recall that.

20   Q    Well, let me ask you some questions about it.   If you

21        look at this document that has not been admitted, do

22        you recall whether there was a schedule that you saw in

23        2009 in the commander's office?

24   A    No, I can't recall.

25   Q    Do you know that there was one posted, but you don't

1   recall whether you saw it, is that your testimony?

2   A   That's correct.

3   Q   That schedule was proposed games on weekends; is that

4       correct?

5   A   That's correct.

6   Q   Do you know if Officer Collins ever had any

7       compensation or payment for activities for those

8       weekends?

9   A   Not to my knowledge.

10  Q   Now what about basketball schedules, were they also

11      posted in the commander's office?

12  A   Yes.

13  Q   Did you look at any of the basketball schedules?

14  A   No.

15  Q   Do you have any sense of how much of Officer Collins

16      time was spent on sports programs, as programs as

17      opposed to other activities?

18  A   I have no knowledge.

19  Q   You have no idea even in 2009?

20  A   Two thousand and nine, if he had a basketball game or a

21      football game, it was Saturday. That's a lot of time.

22  Q   Well, what about in the evenings on weekdays, 8, 9:00?

23  A   I couldn't attest to that, but I would be gone.

24  Q   Did you ever -- what schedule -- did you have any

25      particular schedule in 2009?

103

1    A    My schedule varied from eight to four, nine to five,

2         eleven to seven, twelve to eight, two to ten.

3    Q    Well let me ask you about the two to ten days, did you

4         ever see youth, young people at the precinct waiting

5         for Officer Collins?

6    A    Yes.

7    Q    And that would have been after two or 3:00 after you

8         arrived?

9    A    No, that would be late in the evening.

10   Q    Ten o'clock?

11   A    At ten o'clock -- we had meetings from two to ten.

12        When I say two to ten, those are the meetings that we

13        attend.

14   Q    Okay.  So you were never working two to ten in the

15        precinct, is that what you're saying?

16   A    Right, just community meetings.

17   Q    You have community meetings at the district office; is

18        that correct?

19   A    In the district, but not inside the district, not

20        inside the police station, in other locations.

21   Q    Okay.  Well, when you said you would see youth waiting

22        for Officer Collins at the district office when you

23        were working two to ten, you did testify that would be

24        late in the evenings; is that correct?

25   A    I have seen a couple in the evening.

104

1    Q    Well, did you work two to ten, officer?

2    A    No.

3    Q    Just occasionally?

4    A    Maybe two to three times a week.

5    Q    Two to three times a week, you said and wouldn't it be

6         a regular occurrence that young people would be sitting

7         in the precinct waiting for him to transport him home?

8    A    If they were just sitting out in the lobby, I wouldn't

9         see them.

10   Q    You wouldn't see them when you came in or left?

11   A    I come through -- if you been to Eastern District

12        there's the back door, so I would come through the

13        back.

14   Q    Well, you testified that you would see them when --

15        where would you see them in the lobby?

16   A    Couple of times I have seen them in the conference

17        room.

18   Q    Where is the conference room?

19   A    The conference room is the door coming through the

20        back.

21   Q    The conference room is closest to the back entrance?

22   A    Yes.

23   Q    So they would have either come in the back entrance or

24        come through the front and come all the way to the

25        back?

BETH A. TOMASO, CERTIFIED SHORTHAND REPORTER (3098)