105

```
 1   A      More than likely they would have come through the
 2          front.
 3   Q      They would have permission to come from the front all
 4          the way to the back area?
 5   A      Right.
 6   Q      So these young people would have been in the conference
 7          area with police permission?
 8   A      Exactly.
 9   Q      You can't get back there without permission; is that
10          correct?
11   A      No.
12   Q      A police officer would have to have permission to take
13          a police vehicle out of -- to use a police vehicle, is
14          that correct, like the van; is that right?
15   A      Right.
16   Q      And certainly to take the vehicle out of district, out
17          of the City of Detroit, you would have had to have
18          permission; is that correct?
19   A      Exactly.
20   Q      'Cuz that's a dischargeable offense, you can be fired
21          for that, right?
22   A      Exactly.
23   Q      Now proposed B that I showed you reflect a league
24          that's Suburban league, actually a league that was in
25          the Flint area; is that correct?
```

BETH A. TOMASKY, CERTIFIED SHORTHAND REPORTER (3098)

106

1    A    This is correct.

2    Q    And do you know whether Officer Collins had permission

3    to use a police vehicle to take young people from the

4    Detroit area from the Eastern District to participate

5    in the football league in the Flint area?

6    A    I can only testify to that I didn't give him

7    permission.

8                        THE COURT:   I'm sorry, I didn't

9    hear the answer.

10                       THE WITNESS:   I'm sorry.  I didn't

11   give him permission.  Only the chief could give him

12   permission or assistant chief.

13   BY MR. EVELYN:

14   Q    Do you know if he had permission to do that?

15   A    I have no knowledge of him having permission to do

16   that.

17   Q    Officer Lewis, weren't you the least bit concerned --

18   strike that.

19                       Weren't you the least bit curious

20   of his other activities, his sports activity?

21   A    As long as he was doing community service, that was my

22   basic concern.

23   Q    But that was something that you didn't feel that you

24   needed to supervise; is that correct?

25   A    Which one, the sports?

107

1    Q    The sports activity?

2    A    Right.

3    Q    Was that because you thought he had permission from the

4    chief and the deputy chief to do it?

5    A    Yes.

6    Q    Now I've been told that community relations is a unit

7    that other officers would like to get into, that other

8    officers are somewhat jealous about.  Have you heard

9    the same thing or not?

10    A    No, I haven't.

11    Q    Do you ever hear anybody complain about their inability

12    to get into that unit?

13    A    No, I haven't.

14    Q    Did any of the officers complain to you about Officer

15    Collins' very flexible schedule?

16    A    No.

17    Q    You never had one complaint?

18    A    Not one complaint.

19    Q    Did you ever hear a complaint from any of your other

20    officers in the community relations unit?

21    A    No.

22    Q    Do you know Officer Brownlee?

23    A    Yes.

24    Q    Are you aware of her making a complaint concerning

25    Officer Collins availability for details?

BETTY A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

108

1   A    I found that out during the course of this
2        investigation.
3   Q    You didn't know anything about it beforehand?
4   A    No.
5   Q    Now you did something called an initiative report; is
6        that correct?
7   A    Correct.
8   Q    And those were reports that you prepared at whose
9        direction?
10  A    Chief.
11  Q    The chief of police and that would have been Chief
12       Cummins at one point; is that correct?
13  A    Cummins, Barron.
14  Q    You said Cummins and who?
15  A    Barron, Evans and the last one would be Godbee.
16  Q    So all the chiefs required that, at least, as far as
17       you were concerned, the Eastern District had to prepare
18       initiative reports that discussed the initiatives that
19       your unit was involved in; is that correct?
20  A    Right.   That's a city-wide -- that's a city-wide
21       report.
22  Q    That's a city-wide report?
23  A    Yes.
24  Q    But each district office had their own community
25       relations unit; is that correct?

109

1    A    That's correct.

2    Q    So I take it that means that each office would have to

3    prepare their own; is that correct?

4    A    Exactly.

5    Q    Eastern District would do one, Western District would

6    do one?

7    A    Yes.

8    Q    You're saying it was a city-wide requirement?

9    A    Yes.

10   Q    These reports were routed by the preparer up to the

11   chain of command; is that correct?

12   A    Through the channels, yes.

13   Q    Through channels. So do you have any copies of those

14   or would those be kept at the precinct?

15   A    Those should be at the precinct.

16   Q    If I tell you that a search was done pursuant to a

17   court order and that nobody could find any of these

18   reports or that we were told that no one could find

19   them?

20   A    Those reports I turn into the front office. From the

21   front office they make a copy and they're sent

22   downtown.

23   Q    So you turn them into the front office at Eastern

24   District; is that correct?

25   A    Yes.

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

110

1   Q   Eastern District makes a copy?

2   A   Yes.

3   Q   They keep a copy, like you do most police documents; is

4       that correct?

5   A   Yes.

6   Q   And then your original goes up through channels?

7   A   That's correct.

8   Q   All the way to the chief's office?

9   A   That's correct.  Yes.

10  Q   So the chief's office presumably should have a copy of

11      it?

12  A   They should.

13  Q   And the chief should have a copy?

14  A   Exactly.

15  Q   You thought that the Western District did the same?

16  A   Yes.

17  Q   She should have them also?

18  A   Yes.

19  Q   If somebody checks, they should be told what they are?

20  A   Yes.

21  Q   She should know what they are?

22  A   Yes, they should.  If they're community relations

23      sergeant.

24  Q   Well, let me ask you, just say we were unable to get

25      copies of these documents that you said existed, you

BETH A. TOMASZEWSKI, CERTIFIED SHORTHAND REPORTER (3098)

111

1   were asked to see if you could retrieve some from your

2   computer; is that correct?

3   A   Correct.

4   Q   Who asked you to do that?

5   A   Commander Moore.

6   Q   Commander Moore did and you generated some documents

7   that were -- where did they come from, let me ask you

8   that?

9   A   I save 'em -- I save all the work that I do.

10  Q   You save all the work that you do?

11  A   Yes.

12  Q   You produced some in response to that request I just

13  described; is that correct?

14  A   Pardon me?

15  Q   Did someone ask you to generate what you could in

16  connection with these?

17  A   Yes.

18  Q   And where did you find them?

19  A   In my file.

20  Q   I'm sorry?

21  A   In my computer file.

22  Q   Your computer file.  So you didn't have to type them

23  all over again?

24  A   No.

25                      (Whereupon Exhibits  B-H were

112

1      marked for the record.)

2                          MR. EVELYN:  I'm going to show you

3      what's marked as Defendant's C.

4                          THE COURT:  That is two page

5      document.

6      BY MR. EVELYN:

7      Q    I'm going to ask you if this is something that you

8           generated?

9      A    Yes, sir, it is.

10                         MR. EVELYN:  With the court's

11     permission, I'm going to staple C so it doesn't get --

12                         THE COURT:  As long as the staple

13     doesn't go through type or words, numbers.

14                         MR. EVELYN:  That's fine.

15                         THE COURT:  'Cuz if the staples

16     comes out, it would destroy what one might want to look

17     at.  Thank you.

18                         MR. EVELYN:  Thank you, Judge.

19     Good idea.

20     BY MR. EVELYN:

21     Q    That document is something that you generated?

22     A    Yes.

23     Q    Now it has at the top of the date November 29th, 2010;

24          is that right?

25     A    Yes.

113

1  Q   And why does it say November 29th, 2010?

2  A   'Cuz when I printed it out on the computer, that's the

3  date that popped up and I didn't go back and change it.

4  Q   So that's the date you printed it out?

5  A   Right.

6

7             MR. EVELYN:  Move the admission of
   Defendant C, your Honor.

8             MR. WOODYARD:  Without objection.

9             THE COURT:  Court would admit

10  Defendant's C.

11  BY MR. EVELYN:

12  Q   Now in that document it describes some things that you

13  summarize that you were going to send to the chief

14  office; is that correct?

15  A   That's correct.

16  Q   And you were summarizing activities for what time

17  period?

18  A   January the 1st, 2008 through the December the 31st,

19  2008.

20             THE COURT:   Say those dates again.

21             THE WITNESS:  January the 1st, 2008

22  through December the 31st, 2008.  It's yearly reports.

23             THE COURT:   Thank you.

24  BY MR. EVELYN:

25  Q   And does it have a youth on the intuitive description

BETH A. TYLER, CERTIFIED SHORTHAND REPORTER (3098)

1           on there?

2    A      Yes, it does.

3    Q      And it talks about what kind of youth initiative?

4    A      The Eastern District League and basketball team and

5           football team and age brackets of their team.

6    Q      What's it say about that league?

7    A      In 2007 in this age group, number one, 2007 in

8           basketball and football championship.  The team

9           consists of youth in the Eastern District.  This is a

10          year round intuitive.

11   Q      It's a year round intuitive.  Where did you get that

12          information from?

13   A      I got this information from D.C. Godbee.

14   Q      From D.C. Godbee?

15   A      And Jerome Collins.

16   Q      So you didn't do anything of your own to observe any of

17          what you describe in this; is that correct?

18   A      Exactly.

19   Q      Those sports activities describes the sport activity

20          that were run by Officer Collins?

21   A      That's correct.

22   Q      And year long intuitive?

23   A      Yes.

24   Q      Which means 12 months, year round?

25   A      Yes.

115

1    Q    Okay.  I'm going to show you some other reports which I

2    believe you generated in response to the court's order.

3    Well, I shouldn't say I believe you generated at the

4    direction of commander.  Let me show you first, what's

5    been marked as Defendants D and I believe that the

6    people have no objection to it being admitted?

7                    MR. WOODYARD:  I'll stipulate to

8    all the documents being admitted.

9                    MR. EVELYN:   That would be D, E

10    and F.

11                    MR. WOODYARDS:   D, E and F I have

12    no objection.

13    BY MR. EVELYN:

14    Q    What is D?

15    A    This is the 2008 intuitives.

16    Q    That 2008?

17    A    Yes.

18                    MR. EVELYN:  If I may approach?

19                    THE COURT:   You may?

20    BY MR. EVELYN:

21    Q    And I thought you said those were 2008?

22    A    They're both the same except for the second page.

23    Q    Okay.  So the second page is different on one than the

24    other?

25    A    Exactly.

116

1    Q    Can you explain that?

2    A    I can't explain that, 'cuz I just do it by month, as I

3         go through the month.  This could have been one that

4         was generated, actually, in error.

5                        THE COURT:  When you say this, what

6         letter do you mean?  Look at the blue sticker.

7                        THE WITNESS:  I'm sorry, Exhibit C

8         could have been totally in error.

9    BY MR. EVELYN:

10   Q    So you're saying Exhibit C may not have been one that

11        was routed through?

12   A    Right.

13   Q    It may have been a correction of C?

14   A    Exactly.

15   Q    'Cuz these came off of your computer, right?

16   A    Right.

17   Q    But is the information in C correct?

18   A    The information for C is correct.

19   Q    The information in D is correct?

20   A    The information in D is correct, but more information

21        is given D than it is in C.

22   Q    Okay.  So D would be more complete version of C?

23   A    Exactly.

24   Q    I'm going to show you E and E is for what year?

25   A    E is for 2007.

117

1    Q    Okay.  And is there -- is there a program described

2         Pitch, Hit and Run; is that correct?

3    A    That's correct.

4    Q    And that was a program also that Officer Collins was

5         involved in; is that correct?

6    A    That's correct.

7    Q    He coordinated Pitch, Hit and Run, it was athletic,

8         correct?

9    A    Correct.

10   Q    And --

11   A    Can I put some more emphasis on it?

12   Q    If your answer wasn't complete.

13   A    On the Pitch, Hit and Run, that was on a project

14        sponsored through Commander Serta (ph) through the

15        Pepsi Company and he picked Collins to do that program

16        for him.

17   Q    For the Detroit Police Department?

18   A    Yes.

19   Q    And F is for -- that's also 2008?

20   A    Yes.

21                    THE COURT:   Two thousand and

22        eight.

23                    THE WITNESS:   Yes, ma'am.

24   BY MR. EVELYN:

25   Q    That would be a supplement to 2008 then?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (2008)

118

1    A    Exactly.

2    Q    This is more like our Exhibit F, is it more like a

3         shorter version?

4    A    They didn't want a long drawn out version, they wanted

5         a shorter version.

6    Q    They being who?

7    A    I'm sorry, chief of police.

8                   MR. EVELYN:  Okay.  May I publish

9         those to the court?

10                  THE COURT:   You may.

11   BY MR. EVELYN:

12   Q    Would it be fair to state, officer -- I'm sorry,

13        forgive me.

14                  THE COURT:  I'm sorry, you're going

15        to move then for D, E and F?

16                  MR. EVELYN:  Yeah.  I thought I

17        already did.

18                  THE COURT:   I heard no objection.

19                  MR. EVELYN:   I would move the

20        admission of D, E and F.

21                  THE COURT:  Court would admit D, E

22        and F.

23                  MR. WOODARDS:   Thank you, your

24        Honor.

25   BY MR. EVELYN:

119

1  Q     It would be a fair statement would it not, sergeant -- strike that.

2

3           Is it a fair statement that you

4  don't know what Officer Collins actual work hours were

5  for 2009 on a daily basis?

6  A     I can't recall.

7  Q     You don't know, do you?

8  A     I know there was twelve to eight, one to nine, two to

9  ten.

10 Q     I'm asking you a different question.  You don't know

11 the actual hours that he worked, do you?

12 A     What you mean, like over?

13 Q     When he worked.  I'm not requesting a schedule, I'm

14 asking if you know when he actually worked?

15 A     Yes.

16 Q     When he came to work and when he left?

17 A     I can't attest to when he left.

18 Q     When did you first become aware that Officer Collins

19 was being investigated in internal affairs?

20 A     The day that internal affairs came to the office.

21 Q     Which was when?

22 A     Sometime in December, first part of December.

23 Q     Two thousand and ten?

24 A     Two thousand ten.  No, was it -- 2000 --

25 Q     Nine?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (109f)

120

1    A    Nine.

2    Q    Right.  Who came to the office of internal affairs, if

3    you remember?

4    A    I can't recall.  I know it was a sergeant and a police

5    officer.

6                    MR. EVELYN:  I'm going to show you

7    some exhibits that have already been admitted.  If I

8    can approach the witness?

9                    THE COURT:   You may, as long as

10   Mr. Woodyard knows, in general, what you're approaching

11   with.

12                   MR. WOODYARD:  I know.  Thank you,

13   your Honor.

14   BY MR. EVELYN:

15   Q    I'm going to give you People's Exhibit 2, which is

16   purportedly activity logs of Officer Collins.  I'm

17   going to ask you first, if you can look at 'em and tell

18   me if you recognize -- you can identify those?

19   A    Yes.

20   Q    Okay.  Exhibit 3 and by the way, are those -- those

21   signatures that purport to have been your name on them,

22   are those your signatures?

23   A    Yes.

24   Q    And do you see Officer Collins signature on them?

25   A    Yes.

121

1   Q    You recognize those as his signature?

2   A    Yes.  Yes.

3   Q    I want you to look at 4, 5, 6, 8, 9, 10, 11 and well

4        they're also activities logs.

5                    THE COURT:  Sergeant Lewis, while

6        you're looking through those, can I see counsel over

7        here?

8                    (Whereupon a brief discussion was

9        held off the record)

10  BY MR. EVELYN:

11  Q    Sergeant, have an opportunity to look and those

12       activities logs, they contain your signature; is that

13       right?

14  A    Yes.

15  Q    Did you participate in preparing any of those?

16  A    It looks like Lieutenant Williams signed them.

17                   THE COURT:   I can barely hear you.

18                   THE WITNESS:  I'm sorry.

19       Lieutenant Williams signed, it was checked with me and

20       Lieutenant Williams signed.

21  BY MR. EVELYN:

22  Q    On Exhibit 10?

23  A    Yes.

24  Q    I believe I lost a paperclip where Lieutenant Williams'

25       names appears.  Both of you signed it; is that correct?

122

1    A    Right.

2    Q    Now any of entries that reflect work activity, did you

3         write any of those entries?

4    A    No.

5    Q    That would have been all Officer Collins, as far as

6         your concern?

7    A    Yes.

8    Q    You didn't help him prepare any of these?

9    A    No, sir.

10   Q    Now did you recall whether you had any conversation

11        with Officer Collins about the need to prepare activity

12        logs because they -- because prior to 2009 he wasn't

13        responsible for preparing them?

14   A    I told them everybody had to do activity logs.

15   Q    Okay.  And did that conversation occur in 2008 or 2009?

16   A    In 2008 and 2009.

17   Q    Okay.  Up to that point in time, he wasn't preparing

18        them; is that correct, up to that point of your

19        conversation, whenever that was?

20   A    Exactly.

21   Q    And did you tell him that you needed him to prepare

22        some backlogs for days that he already worked?

23   A    Yes.

24   Q    And he said I can't do that, right?

25   A    That's correct.

123

1   Q    Did you attempt to reconstruct activities for a back

2        period?

3   A    No, sir.

4   Q    So you're sure you never prepared any of these activity

5        logs, hold on and none of the writing on this -- on

6        these activity logs that are exhibits that you just

7        looked at for 2009, including entries made by you in

8        your handwriting?

9   A    No, sir.

10  Q    Or yes, you're sure that didn't happen, right?

11  A    That didn't happen.

12  Q    Now these activity logs reflect Officer Collins working

13       the shift of eleven to seven or twelve to eight; is

14       that correct?

15  A    That's correct.

16  Q    So you're sure he never had permission from you, at

17       least, to appear at 2:00 when the activity log may show

18       eleven to seven?

19  A    Exactly.

20  Q    And you're sure that when the activity log said eleven

21       to seven, that he worked eleven to seven?

22  A    That's correct.

23  Q    And you could be wrong about that, right?

24  A    No, 'cuz he came in -- if he worked eight to eleven, he

25       came in at 11 'cuz we had worked together a couple

times at 11 at the schools.                                    124

Q    Well if you're wrong about that, if you're wrong and he actually had permission to come in at two on those days when his activity logs reflect a different time, that would be a department violation by you, wouldn't it?

A    I wouldn't have known about that.

Q    But if you sign an activity log that said 11:00 was his start time when his start time was 2:00, then the activity log would be wrong, isn't that correct, at least as far as that information as to when he started; is that correct?

A    That's correct.

Q    And you would have been wrong to sign it; is that correct?

A    That's correct.

Q    And you could get in trouble for doing that?

A    Exactly.

Q    So certainly you're saying that that's not what happened here, that these activity logs are all accurate; is that correct?

A    That's correct.

Q    But it's also important that they be accurate otherwise you did something wrong; is that correct?

A    Exactly.

Q    If I tell you that other members of his crew -- strike

That's not true.

2    Q    His normal start time was 11 or twelve; is that

3          correct?

4    A    Eleven or twelve, unless he got permission to start at

5          a later time, which I can't have that authority to

6          give.

7    Q    It was always 11 or 12; is that correct?

8    A    Yes.

9    Q    Did you ever ask for permission to change your schedule

10         hours?  Did you ever ask your supervisor could I change

11         my scheduled hours so you could probably supervise your

12         staff?

13    A    I worked from ten to six.  I would supervise -- I would

14         change my hours periodically, but most of the time I

15         had meetings to attend.  So if my hours change, they

16         were due to these meetings.

17    Q    Did you ever ask your supervisor for permission that

18         was denied, to change those hours because you felt you

19         needed to change the hours to match up with your crew?

20    A    My commanders thought that the hours that I had was

21         matching up with my time supervised my crew.

22    Q    I asked a different question.  Did you ever ask for

23         permission to change 'em?

24    A    No.

25    Q    You gave a statement pursuant to an investigative

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

127

```
 1          subpoena on March the 4th, 2010; is that correct?

 2     A    Yes.

 3     Q    Your lawyer was present, a sergeant and Lieutenant from

 4          the police department and Wayne County Prosecutor named

 5          Ronald Johnson, do you remember that --

 6     A    Yes.

 7     Q    -- that day?

 8     A    Yes.

 9     Q    I'm going to show you a copy of the transcript from

10          that hearing, page 15.

11                         THE COURT:   Mr. Walker, you've

12          seen it?

13                         MR. WALKER:   No, I've never seen

14          it, your Honor, no.

15                         THE COURT:   And Mr. Woodyard you

16          followed along with the transcript he's reflecting?

17                         MR. WOODYARD:   I have it.   Thank

18          you, your Honor.

19                         MR. EVELYN:   May I approach the

20          witness?

21                         THE COURT:   You may.   Mr. Walker,

22          you had an opportunity to see it?

23                         MR. WALKER:   Yes, your Honor.   I

24          had a chance to look at pages 15 and 16 of the

25          transcript.   I'd like to have a copy of the whole
```

128

1    transcript.

2                    THE COURT:  As an issue for the

3    statute governs, I don't think I can grant your

4    request.

5                    MR. EVELYN:   The last question

6    would lead me to a different--

7                    THE COURT:   Likewise, if you wish

8    to move closer to your client I'd be glad to do that.

9                    MR. WALKER:  That's okay.

10  BY MR. EVELYN:

11   Q    Sergeant Lewis, you had a chance to review pages 15 and

12        portions of pages 16 of your testimony investigative

13        subpoena hearing.  Do you recall now what I asked you

14        about?

15   A    Yes, I do.

16   Q    Do you recall that you told D.C. Motley that you wanted

17        to change the hours so that you could more properly

18        supervise the unit?

19   A    Yes, I did.

20   Q    You want to change the hours?

21   A    Exactly.

22   Q    Because you weren't around when you're subordinates

23        were working all the time; is that correct?

24   A    That's correct.

25   Q    And that includes Officer Collins; is that correct?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER  (3030)

1    A    That is correct.

2    Q    A lot of work he did you weren't around for; is that

3         correct?

4    A    Exactly.

5    Q    Now Officer Collins would have banquets for his sports

6         programs; is that correct?

7    A    That's correct.

8    Q    Did you ever attend any of the banquets?

9    A    No, sir.  I wasn't invited.

10   Q    You weren't invited?

11   A    No, sir.

12   Q    If I tell you that Deputy Chief Godbee was the 2006

13        football game, he was the guest speaker, you're just

14        telling us that you weren't invited, didn't know?

15   A    I wasn't invited, didn't --

16   Q    Chief Cummins would come to championship basketball

17        games.  You would not be invited; is that correct?

18   A    No, sir.

19   Q    Do you know whether the fellow members of his unit

20        would come to support youth activity?

21   A    I have no knowledge of that.

22   Q    You didn't feel it was part of your duty as a

23        supervisor, to be there if this is part of what he did

24        for a living and he posted the schedule in the

25        commanders' office, that you should appear at those

130

1     games so you could be supportive?

2   A   As long as the deputy chief and the commanders were

3     going, no, sir.

4   Q   You didn't want to go, would that be a fair statement?

5   A   Exactly.

6   Q   It wasn't really that you weren't invited, you didn't

7     want to go?

8   A   I wasn't invited and I'm not a sports person.

9   Q   Okay.  I understand.  Do you know whether either of the

10     programs that Officer Collins was involved in received

11     national awards, programs like the Weed and Seed

12     Program?

13   A   I don't know nothing about the Weed and Seed Program.

14   Q   I'm sorry, I stepped on your answer.  I apologize.

15   A   That was before I came to the unit that I have no

16     knowledge of the Weed and Seed Program.

17   Q   Do you know whether he got a Spirit of Detroit award

18     from the city council?

19   A   I have no knowledge of that.

20   Q   Don't know whether he was written up in the newspapers

21     for the activity with --

22           MR. WOODYARD:  Objection to the

23     relevance.

24           MR. EVELYN:   She's supervising.

25     That's a two -- what he did for a living for the police

131

1      department, I'm trying to find out whether she knows

2      about it.

3                              THE COURT:    Mr. Woodward?

4                              MR. WOODYARD:  No, nothing.

5                              THE COURT:    Overruled.

6                              MR. EVELYN:    Thank you, Judge.

7      BY MR. EVELYN:

8      Q    You did indicate that the mission was to get the

9           community involved with the police department, right?

10     A    If that occurred, it occurred before I came to the

11          unit, 'cuz I have no knowledge of it.

12     Q    What's the newspaper, what's the newspaper you're

13          referring to?

14     A    The newspaper articles, Spirit of Detroit, the Weed and

15          Seed.

16                              (Whereupon Exhibit Number G was

17          marked and identified for the record.)

18     BY MR. EVELYN:

19     Q    I'm going to show you what's been marked as Defendant's

20          Exhibit G.  It's a public document.  It's a Spirit of

21          Detroit Award, 2009.  You were his supervisor, right?

22     A    Yes, I was.

23     Q    For his activities in appreciation by the city council

24          for his activities; is that correct?

25     A    That's correct.

132

1    Q    In performing his job as a police officer in community

2         relations; is that correct?

3    A    That's correct.

4    Q    And you knew nothing about that?

5    A    I don't recall getting this one.

6    Q    Do you recall hearing about it?

7    A    No, sir.

8    Q    So if a police officer under your command gets an award

9         from the city council, a public document for what he

10        does working for you, you don't even know about it; is

11        that your testimony?

12   A    That's correct.

13   Q    I'm going to show you what's been marked as Exhibit H

14        that was issued on the same date by the Wayne County

15        Board of Commissioners; is that correct?

16   A    That's correct.

17   Q    Commending Officer Collins for his work?

18   A    That's correct.

19   Q    Did you know anything about that?

20   A    I didn't know anything about this either.

21   Q    And he was working for you, working under you when that

22        occurred; is that correct?

23   A    That's correct.

24             MR. EVELYN:   Working for -- move

25        for the admission of G and H.

133

1      MR. WOODYARD:  Without objection,

2  your Honor.

3              THE COURT:   Sergeant Lewis, what

4  date do they say they were issued?

5              THE WITNESS:  Just, 2009.

6          MR. EVELYN:  February 4th, 2009.

7          THE COURT:  That's correct,

8  sergeant?

9              THE WITNESS:  Yep, February 4th,

10  2009.

11              THE COURT:  Court would admit.

12  Thank you.

13  BY MR. EVELYN:

14  Q    Now did you attend the police community relations

15      meeting for that district?

16  A    Yes.

17  Q    And were you at that meeting, which is a community

18      relations meeting, whenever one received that award?

19  A    I can't recall because all of them had gotten one too.

20  Q    Well, if I told you that everybody in the unit got an

21      award like that that day and it was a police community

22      relations meeting, is it your testimony that you don't

23      recall that happening?

24  A    I don't recall it.

25  Q    Were you there?

134

1    A    I'm pretty sure I was.

2    Q    Then you would have gotten one too?

3    A    I don't have one.

4    Q    Didn't you get one?

5    A    No, sir.

6                    THE COURT:    You said G and H are

7    two separate -- I don't know what you're referring to.

8    BY MR. EVELYN:

9    Q    You would have gotten each -- strike that.

10                   If I told you that these awards

11   were presented, not only to Officer Collins but to the

12   other members of the police community relations unit in

13   the Eastern District by Councilwoman Brenda Jones at a

14   community relations meeting, is it your testimony that

15   you don't recall the meeting?

16   A    I don't recall the awards being given out and I can't

17   recall attending the meeting either.    That was in 2009?

18   Q    Yes, February 4th, 2009.

19   A    I really can't recall.

20   Q    On the intuitive reports that are marked already that

21   were admitted, those reports don't contain any of the

22   officers names that were involved in those activities?

23   A    Exactly.

24   Q    Did you delete them?

25   A    No.

135

1  Q    So in the original reports that were brought up in

2       demands, you didn't put the officers names on them?

3  A    The names are never in the reports. I do the report,

4       the report go to -- I e-mail it to the commanding

5       officer, the commanding officer, in turn, makes all the

6       corrections needed for that report and then they send

7       that report down to the chief's office.

8  Q    Did you know -- you know who Commander Moore is; don't

9       you?

10 A    Yes.

11 Q    Was he one of your supervisors?

12 A    Yes.

13 Q    Superiors?

14 A    Yes.

15 Q    Do you recall Commander Moore approaching you in 2008

16      and asking you to have Officer Collins run a city-wide

17      basketball program?

18 A    Yes, I do.

19 Q    When was that?

20 A    I can't recall when it was, but he spoke with Officer

21      Collins about running that city-wide basketball

22      program.

23 Q    But Commander Moore approached you, said he wanted you

24      to have a city-wide basketball program?

25 A    Yes. He said he wanted to talk to Officer Collins, but

136

1    I can't recall what month or year it was.

2    Q    Did you approach Officer Collins and tell them that

3    Commander Moore wanted to run a city-wide basketball

4    program?

5    A    I told him that Commander Moore, that I wanted -- that

6    Commander Moore wanted to talk to him.

7                         THE COURT:    Does Commander Moore

8    have a first name?

9                         THE WITNESS:    James.   I'm sorry.

10   BY MR. EVELYN:

11   Q    But and that would be a program --

12   A    Yes.

13   Q    -- a basketball program?

14   A    Yes.

15   Q    That was in 2008?

16   A    I can't say.

17   Q    You don't recall when that was?

18   A    No, I can't.

19   Q    Could have been in 2008?

20   A    Could have been.

21   Q    And did you make any notations of that anywhere?

22   A    No, I did not.

23   Q    And did you speak to Officer Collins in person about

24   that?

25   A    Yes, I did.

137

1   Q   And do you have any personal knowledge of whether he

2       contacted the Officer Moore -- Commander Moore?

3   A   I'm pretty sure he did.

4   Q   Did Commander Moore follow-up with you at all?

5   A   No.  No, sir, he didn't.

6   Q   Did you follow-up with Officer Collins and say what

7       happened with that program, that's a community affairs

8       program that I want to know about it, what's going on

9       with it, did you ask him anything about that?

10  A   I can't recall asking anything about it.

11  Q   Does that mean you don't know if you did or not?

12  A   I don't know if I did or not.  I can't recall.

13          MR. EVELYN:  That's all I have,

14  Judge.

15

16          THE COURT:  Sergeant Lewis, you can

17  step down.  During the side bar I had while you were

18  looking at the exhibits, we're going to come back on

19  another day for cross-examination.

20          THE WITNESS:  Okay.

21          THE COURT:  By the people.  That

22  would have me tell you to remember that you've been

23  served with a subpoena and we expect you back on that

24  day.  If you'll hang on, certainly you can help us pick

25  a day, 'cuz I don't want to pick a day that you're not

    otherwise available.

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (2000)

138

THE WITNESS:  Should I sit here?

THE COURT:  Or you can sit in the pew, whichever you like.  And that's to say as to those numbers, exhibits, those exhibits that the sergeant was looking at, Mr. Woodyard, do you have them back?

MR. WOODYARD:  Yes.

MR. EVELYN:  The activity logs, I gave them back to you.

MR. WOODYARD:  Yes.  I got them.  I got them.  Thank you.

THE COURT:  Gentlemen?

MR. EVELYN:  Next week is no good for me, Judge, 'cuz I'm going to be in trial before Judge -- well, I guess I could do Friday afternoon. No, that -- I have a motion.

MR. EVELYN:   We could do the 24th. That's the week --

MR. WOODYARD:  I'm clear that entire week, your Honor.

THE COURT:  We have the 25th or the 26th.  Aside from your cross, cross from Sergeant Lewis, how many other witnesses?

MR. EVELYN:  I think there are two others.

THE COURT:  And how long do you

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

139

1   expect, together, they'll be?

2               THE WITNESS:  Half an hour.

3               THE COURT:  So an afternoon would

4   work?

5               MR. EVELYN:  Oh, yes.

6               MR. WOODYARD:  Either of those

7   dates.

8               THE COURT:   Either is fine, 'cuz

9   I'll move what's there because this is a felony

10  preliminary exam, those are civil matters I'll move.

11              MR. EVELYN:  Tuesday afternoon,

12  Judge.

13              THE COURT:  Okay.  If you'll fill

14  out the continuance form then for me and then you can

15  pick up Exhibit A, C through H and the exhibit --

16              MR. EVELYN:   You want to say 1:30

17  so your staff can have a lunch?

18              THE COURT:  Let's say 1:30.

19              MR. WOODYARD:  Your Honor --

20              THE COURT:  We're coming on the --

21              MR. WOODYARD:  Twenty-fifth, 1:30.

22              THE COURT:  Is that good for you,

23  Mr. Walker?

24              MR. WALKER:  Yes, your Honor.  Will

25  it be in this courtroom?

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

140

1

2          THE COURT:   It won't be in this
courtroom.  It will be back in 331, which is where I'm

3   normally found and Sergeant Lewis, the 25th is a good

4   day for you?

5
           THE WITNESS:  Yes, ma'am.

6          THE COURT:  Thank you.  See you all

7   at 1:30.  People have an objection that bond continue,

8   Mr. Collins' bond continue?

9
           MR. WOODYARD:  No objection.

10         THE COURT:   Court will order

11  today's transcript, Mr. Woodyard, probably won't be

12  ready until the lunchtime on the 24th, at least you

13  will have a chance to peruse it on the 25th.

14         MR. WOODYARD:   That's great.  Thank

15  you.

16
           THE COURT:    The Court will order

17  at the court's expense because of the ongoing nature.

18         (Proceedings adjourned at

19  approximately 3:30 p.m. )

20

21

22

23

24

25

BETH A. TOMASI, CERTIFIED SHORTHAND REPORTER (3098)

1    exhibit's been admitted.  It lists a series of
2    football games, is that correct?
3        A.   That's correct.
4        Q.   And they run from September 19th through
5    October 24th, right?
6        A.   I believe so.
7        Q.   And they are all on Saturday?
8        A.   Appears to be so, yes.
9        Q.   Is that correct?
10       A.   That's correct it's on Saturdays.
11           MR. EVELYN:  I have nothing further.
12           MR. WOODYARD:  I have nothing else.
13   Thank you, Judge.
14           THE COURT:  Members of the jury,
15   does anyone have any questions of this witness?
16   Please raise your hand if you have a question.
17   Thank you.  You may step down.  You may call your
18   next witness.
19           THE CLERK:  Do you solemnly swear or
20   affirm that the testimony you will give in the
21   matter now pending before the Court will be the
22   truth so help you God?
23           MS. LEWIS:  I do.
24           M A T T I E  L E W I S
25       called as a witness at 2:13 p.m., testified

1          upon her oath as follows:

2                    DIRECT EXAMINATION

3     BY MR. EVELYN:

4          Q.   Can you state your name for the record,

5     please?

6          A.   Sergeant Mattie Lewis.

7          Q.   And judging by your uniform, can I assume

8     that you are a Detroit Police officer?

9          A.   Yes, I am.

10         Q.   And for how long?

11         A.   For 24 years and 11 months.

12         Q.   One month, you'll have 25 years then?

13         A.   Exactly.

14         Q.   Have any plans after you hit the 25 year

15    mark?

16         A.   I'm going to Mississippi.

17         Q.   Okay.  Let me ask you.  Did you ever have

18    as assignment to be the supervisor of the Community

19    Relations Unit at the Eastern District, Eastern

20    District Police Department?

21         A.   Yes, I did.

22         Q.   And when was that?

23         A.   If I'm not mistaken, it was in 2006.

24         Q.   2006 through 2009?

25         A.   Through 2010.

152

1          Q.    2010, I'm sorry.  Thank you.  And had you

2     ever run a Community Relations Unit before that

3     time?

4          A.    I was Community Relations sergeant at the

5     Fifth Precinct for about six months.

6          Q.    When was that?

7          A.    That was in 2004.

8          Q.    Who was your supervisor then?

9          A.    Hilton Napoleon, Inspector Hilton

10    Napoleon.

11         Q.    There came a point in time where the Fifth

12    and the Ninth Precincts were merged into the

13    Eastern District, is that right?

14         A.    That is correct.

15         Q.    And do you recall when that was, whether

16    it be 2004, 2005?

17         A.    I'm thinking it was 2005.

18         Q.    And who gave you your assignment to be

19    head of the Community Relations Unit in the Eastern

20    District in 2006?

21         A.    Chief Godbee.

22         Q.    And that's the same Chief Godbee who's the

23    chief of police now?

24         A.    That's correct.

25         Q.    Was he a deputy chief then?

1          A.    Yes, he was.

2          Q.    Did he personally give that you

3    assignment?

4          A.    Yes, he did.

5          Q.    And was that going to be a permanent

6    assignment, if you know?  Was it going to be

7    temporary?

8          A.    It was going to be temporary until they

9    found someone else to fill the slot.

10          Q.    Is that what was communicated to you when

11    you received the assignment?

12          A.    That's correct.

13          Q.    But you end up staying there for three

14    years, four years?

15          A.    Exactly.

16          Q.    Were you at the Eastern District when he

17    gave you this assignment?

18          A.    Yes, I was.

19          Q.    So did you have a meeting with any of your

20    staff?

21          A.    I think we did.  I'm not sure.

22          Q.    Do you know Jerome Collins?

23          A.    Yes.

24          Q.    And was he assigned to your detail in

25    Community Relations?

1    present, if you know?

2        A.    'Cause Mr. Collins was to report --

3              MR. WOODYARD:  I'd object if it

4    calls for hearsay, Judge.

5              THE COURT:  Sustained.

6        Q.   (By Mr. Evelyn)  Did Mr. Collins report to

7    you?

8        A.    No.

9        Q.    Was that part of the assignment?  Was part

10   of the assignment for him to report to you?

11       A.    No.

12       Q.    Who was he supposed to report to?

13             MR. WOODYARD:  Objection, hearsay,

14   Judge.

15             MR. EVELYN:  I mean --

16             THE COURT:  If she knows who he's

17   supposed to report to, she can state that.

18             MR. WOODYARD:  My concern, Your

19   Honor, is the only way she could know that is if

20   somebody told her something.

21             MR. EVELYN:  How do you get an

22   assignment, though, Judge?

23             THE COURT:  If she works at a

24   certain place and she knows who's someone's boss,

25   that is not necessarily hearsay.  The Court will

1     allow that.

2                    MR. WOODYARD:   Thank you, Judge.

3         Q.   (By Mr. Evelyn)   Who was he supposed to

4     report to?

5         A.   The chief.

6         Q.   So everyone in the unit reported to you.

7     Jerome Collins reported directly to the deputy

8     chief?

9         A.   Exactly.

10        Q.   Now were there other members of the unit

11    besides Mr. Collins, Officer Collins?

12        A.   Yes, it was.

13        Q.   Was there an Officer Burt?

14        A.   Yes.

15        Q.   Officer Robbins?

16        A.   Yes.

17        Q.   Officer Brownlee?

18        A.   Yes.

19        Q.   Was there an Officer Phillip Curtis?

20        A.   Yes.

21        Q.   Was there is an Officer Borden?

22        A.   Yes.

23        Q.   Did Phillip Curtis's wife also work in

24    that unit?

25        A.   Yes, she did.

15?

1          Q.     Would it be a fair statement that when you
2     took over the unit, there were no activity logs
3     being done by members of that unit?
4          A.     That is correct.
5          Q.     That included Jerome Collins?
6          A.     Yes.
7          Q.     Police officers still got paid, didn't
8     they?
9          A.     Yes.
10         Q.     There came a point in time when activity
11    logs were implemented for that unit, is that right?
12         A.     That's correct.
13         Q.     And there even came a point in time where
14    you were told to make sure that Officer Collins did
15    activity logs, is that correct?
16         A.     That's correct.
17         Q.     And did you ever have a conversation with
18    him about the fact that you had been directed to
19    make sure that activity logs were done, and as a
20    result of that, you asked him to do some back
21    dating of some logs?
22         A.     Yes.
23         Q.     Or to recreate some?
24         A.     No, I told him he had to start doing them.
25         Q.     But did you also tell him to back date

1    some?

2        A.   I don't recall telling him to back date

3    them.

4        Q.   Between the time that you were, I believe

5    you said you had the unit from 2006 to 2010, is

6    that correct?

7        A.   That's correct.

8        Q.   And how many different deputy chiefs did

9    you have to report to in that time frame?

10       A.   Deputy Chief Motley.  She was the only

11   deputy chief we had at that time.  The rest were

12   commanders and inspectors.

13       Q.   How many different commanders did you

14   have?

15       A.   Commander Moreland, Commander Delant

16   (pht.), Commander Powers.

17       Q.   Do you know why there was so much

18   turnover, if you know?

19       A.   No.  We had a couple more commanders.  I

20   can't think of their names.

21       Q.   Now did Officer Collins ever, ever have

22   any other responsibility -- strike that.

23                Did you know at the time you took

24   over the unit what Officer Collins' duties were?

25       A.   No, I did not.

1          Q.    Did you know whether he was involved in
2    sports programs when you took over the unit?
3          A.    No, I did not.
4          Q.    Did that ever become something that you
5    became aware of?
6          A.    Yes, I did.
7          Q.    And you know about when that was, if you
8    recall?
9          A.    I really can't recall.
10          Q.    So at some point in time, you take over
11   the unit.  He's already doing whatever he's doing,
12   is that correct?
13          A.    That's correct.
14          Q.    And you're not really engaged in active
15   supervision because you have been directed that he
16   was supposed to report to --
17               MR. WOODYARD:  I will object.  It's
18   leading, Judge.
19               THE COURT:  Sustained.
20          Q.    (By Mr. Evelyn)  For the reasons you
21   already testified, you were not supervising him
22   directly, is that correct?
23          A.    That's correct.
24          Q.    Deputy Chief Motley takes over.  And is he
25   given some additional duties at that point?

1      A.   Yes, he is.

2      Q.   What are those?

3      A.   He is to go to the schools to write MUP

4   (pht.) miscellaneous tickets, for students hanging

5   outside of school during school hours and school

6   crossing.

7      Q.   And did he do that?

8      A.   Yes.

9      Q.   And throughout the time that you

10  supervised, well, throughout the time that you were

11  involved in any supervision of Officer Collins, did

12  he perform his job?

13     A.   Yes, he did to the best of my knowledge.

14     Q.   You never had reason to think he wasn't

15  performing his job?

16     A.   No.

17     Q.   You never had -- strike that.

18          What about home surveys for B & E's?

19  Did he ever have a role in that?

20     A.   I can't recall anyone enrolling in it.

21  Those were fliers he had to go door to door, put in

22  those 1-800-SPEAKUP.

23     Q.   He would put those on the doors?

24     A.   On the door knob.

25     Q.   Of people who had --

1         A.    B & E's.

2         Q.    B & E's, okay.  Do you know when he

3    started doing that?  You said whenever Deputy Chief

4    Motley took over, is that when that happened?

5         A.    No, he started doing that when Commander

6    Delant took over.

7         Q.    Do you know what year that was?

8         A.    I want to say 2007, 2008.

9         Q.    Did he work a flexible schedule?

10        A.    Yes.

11        Q.    Did there come a point in time when you

12   became more aware of his athletic activities that

13   he was involved in for the department?

14        A.    No.

15        Q.    Did you ever do any reports?

16        A.    What do you mean by reports?

17        Q.    Initiative reports.

18        A.    Oh, yes, I did.

19        Q.    And what are initiative reports?

20        A.    What is going on in the Eastern District

21   for that a year.

22        Q.    And why did you have to do initiative

23   reports?

24        A.    It originally got started with Chief

25   Godbee.

1        Q.    Okay.  I'm going to approach the witness,

2    have this marked.

3                  I'm going to show you what's been

4    marked as Defendant's Exhibit K.  It's a copy of

5    something that was generated on an interoffice

6    memorandum.  Can you tell me what that is?

7        A.    This is the initiative program that they

8    wanted downtown to see what was going on in the

9    Eastern District for that year.

10       Q.    Now is that something you prepared?

11       A.    Yes, I did.

12       Q.    And when you prepared that, what did you

13    do with it?

14       A.    I would e-mail it to the deputy chief --

15    not the deputy chief, the commander.  And the

16    commander would go over it, and they would send it

17    to the chief.

18       Q.    Those are copies of documents that you had

19    to replicate, is that correct?

20       A.    That's correct.

21       Q.    You download them off your computer?

22       A.    Yes.

23       Q.    And we received a court order directing

24    the department to produce their originals.  And

25    that never happened to your knowledge, did it?

1          A.    Not to my knowledge.

2          Q.    The only person that was able to produce

3     any was the ones that came off your computer, is

4     that correct?

5          A.    That's correct.

6          Q.    But you have copies, but they're on the

7     same kind of memorandum format, is that correct?

8          A.    Yes.

9          Q.    Now the date at the top of that memorandum

10    says November 29th, 2010, is that correct?

11         A.    That's correct.

12         Q.    Is that when this was done?

13         A.    No, sir, it was not.

14         Q.    Why is that date in there?

15         A.    That date automatically comes up on the

16    computer once you click on.

17         Q.    So that as a result of you requesting the

18    printout that had already been done?

19         A.    Exactly.

20         Q.    Is there any description of athletic

21    programs in that report?

22         A.    Pitch, hit and run.

23         Q.    What's pitch, hit and run?

24         A.    I have no idea.  That was something that

25    Commander Moreland, Commander Serta (pht.) gave

1    him.  It was an assignment.

2         Q.   Commander Serta was the assignment they

3    gave to Officer Collins?

4         A.   Yes.

5         Q.   Did he often get assignments from

6    commanders?

7         A.   Yes.

8         Q.   Did you get that information for that

9    report from Officer Collins?

10        A.   I got this information from commander,

11   from the commander.

12        Q.   From Commander Serta?

13        A.   Yes.

14        Q.   About a program that Officer Collins was

15   responsible for, is that correct?

16        A.   That's correct.

17        Q.   And this was to go to the chief's office,

18   is that correct?

19        A.   Correct.

20        Q.   And do you know what the purpose for it

21   was other than to explain what you were doing?

22        A.   I have no the idea.

23        Q.   Do they have Community Relations offices

24   in each district?

25        A.   Yes, they do.

1      Q.   Do you know where the Eastern District was
2  supposed to generate reports like that?
3      A.   I don't know about every other district,
4  but I know we had to do one.
5           MR. EVELYN:  Have a moment, Your
6  Honor.
7      Q.   (By Mr. Evelyn)  I'm going to show you a
8  document that's marked Defendant's Exhibit L.
9  That's another initiative report that you prepared?
10     A.   Yes, it is.
11     Q.   Does it describe any of the sports
12  programs on there?
13     A.   It says, Youth Initiative.
14     Q.   And what's the Youth Initiative that you
15  describe in there?
16     A.   It's an Eastern District league.  It's a
17  basketball team and football team.
18     Q.   And was that something Officer Collins
19  ran?
20     A.   Yes.
21     Q.   And where'd the information come from for
22  you to put in that report?  Did it come from him?
23  Did it come from someone else?
24     A.   It came from Officer Collins.
25           MR. WOODYARD:  I'd object, Judge.

1       It's hearsay.  I move that it be stricken.

2              THE COURT:  Sustained.

3              MR. EVELYN:  I'd move that's the

4       next exhibit, Your Honor.

5              MR. WOODYARD:  I object to the

6       admission of these hearsay documents.

7              MR. EVELYN:  They are not hearsay

8       documents.  She prepared them herself, Your Honor.

9       Q.   (By Mr. Evelyn)  This the report you sent

10      through channels to your commanding officer up to

11      the chief of police, is that correct?

12      A.   That's correct.

13      Q.   And it documents, among other things,

14      youth programs, is that correct?

15      A.   That's correct.

16             MR. EVELYN:  Move to admit the

17      documents, Your Honor.

18             MR. WOODYARD:  Judge, it doesn't

19      matter to whom this was sent or who wrote it.  The

20      question is what the content of the document is.

21      And by the witness's own testimony, at least the

22      parts that she's managed to read into the record

23      now, they're things that she was told.

24             It's hearsay, Judge.  And under 805,

25      hearsay within hearsay must still conform to a

1          requirement of Michigan Rules of Evidence.

2                    MR. EVELYN:  It was something done

3     in the normal course of her business, Your Honor.

4     She was required to prepare this.  It's clearly a

5     business record of regularly connected activity she

6     did.

7                    THE COURT:  May I see the record,

8     please?

9                    MR. EVELYN:  May I approach, Your

10    Honor?

11                   THE COURT:  Yes.  And you can go

12    ahead and question her and lay the foundation, and

13    then I'll let counsel cross-examine as to whether

14    this is -- go ahead.

15         Q.    (By Mr. Evelyn)  You were the supervisor

16    of the Community Relations Unit in the Eastern

17    District, is that correct?

18         A.    That's correct.

19         Q.    And you had certain duties that were

20    assigned to you as a part of that job, is that

21    correct?

22         A.    That's correct.

23         Q.    Given to you by Chief Godbee, is that

24    correct?

25         A.    Yes.

1    Q.   Was one of your responsibilities to

2    document on a periodic basis the work of that unit?

3                    MR. WOODYARD:  Judge, it's leading.

4    Objection.

5                    THE COURT:  I'll allow this for the

6    foundation whether this is a business record or

7    not, and you can cross-examine as to the issue

8    whether this is a business record.

9                    MR. WOODYARD:  Thank you, Judge.

10   Q.   (By Mr. Evelyn)  Was this something you

11   were required to do by your commanding officer?

12   A.   That report?

13   Q.   Yes.

14   A.   Yes.

15   Q.   And you didn't just do it because you

16   wanted to do it.  You did it because you were

17   required to do it?

18   A.   That's correct.

19   Q.   And you would have been in trouble had you

20   not done it, is that correct?

21   A.   They would have wanted to know why it was

22   late.

23   Q.   And you did those on an annual basis?

24   A.   Yes.

25   Q.   You did those for 2005 and 2006, 2007 and

1    2008?

2        A.   I can't recall all of those years, but I

3    know I did it for 2007.

4        Q.   And did you do that on departmental

5    memorandum?

6        A.   Yes, I did.

7        Q.   Why?

8        A.   Because it was a department issue.

9        Q.   And where did you submit that document?

10       A.   (No response).

11       Q.   On the title of it it says, Commander's

12   Office, Eastern District Through Channels?

13       A.   Through channels mean it go to the

14   commanding officer first, and from there, it go to

15   the chief.

16           THE COURT:   All right.   Do you have

17   some questions on this?

18           MR. WOODYARD:   I do, Judge.

19           THE COURT:   Go ahead.

20       Q.   (By Mr. Woodyard)  Sergeant Lewis, the

21   information that you put into these initiative

22   reports, the facts that you set forth in them --

23   are you all right?

24       A.   Yeah.

25       Q.   Do you need a glass of water?

1       A.   Yes.

2       Q.   We'll -- thank you.

3       A.   Thank you.

4       Q.   Are you all right?  We'll wait just a

5    second.  Can you talk?

6       A.   I can talk.

7       Q.   The facts that you put in them, did you

8    know those facts from having personal knowledge,

9    having seen the things that were going on?

10      A.   The majority of it was personal facts that

11   I saw.

12      Q.   Okay.

13      A.   But like the pitch, hit and run, I didn't

14   see that.

15      Q.   Other than people told you about it, said

16   put this in the report?

17      A.   Yes.

18      Q.   Let me ask you specifically about the

19   Eastern District League that you write about.  Is

20   that something that you saw with your own eyes, or

21   is that something someone told you about?

22      A.   Something someone told me about.

23      Q.   Thank you, ma'am.

24               (Proceedings stenographically

25   recorded, but not ordered transcribed.)

171

1      Q.    (By Mr. Evelyn)  Initiative reports didn't
2  just include basketball and football programs, it
3  included other things, right?
4      A.    Yes.
5      Q.    Blood drives and other things the
6  Community Relations Department was doing, is that
7  right?
8      A.    That's correct.
9      Q.    Now these sports programs that you
10  reported on that Officer Collins was involved in,
11  this is part of what he did for the department,
12  isn't that correct?
13      A.    I can't testify to that.
14      Q.    You included it in your report, though,
15  didn't you?
16      A.    Right, I was told to.
17      Q.    So as far as you were concerned, it was
18  the business of the police department?
19      A.    Right.
20      Q.    Now you never attended any of the football
21  games or basketball games, is that correct?
22      A.    That's correct.
23      Q.    You never attended any of the sports
24  activities, is that correct?
25      A.    That's correct.

1        Q.    And did you attend the program -- do you

2    know that Officer Collins received a Spirit of

3    Detroit Award 2009 and a commendation from the

4    Wayne County Board of Commissioners?

5        A.    That's correct.

6        Q.    Were you present at the community meeting

7    where he got that award -- those awards?

8        A.    I don't recall being present at the

9    meeting.

10       Q.    Now do you know whether Officer Collins --

11   strike that.

12             Was there ever a football schedule

13   posted in the Community Relations office?

14       A.    It was posted in the commander's office.

15       Q.    And who was the commander?

16       A.    At that time, it was Commander Moore.

17       Q.    And why was it posted in the commander's

18   office?

19       A.    He asked for it.

20       Q.    Would you know what the schedule looked

21   like if you saw it?

22       A.    I wouldn't, but I can look at it.

23       Q.    You wouldn't, but you could look at it?

24       A.    Yeah.

25       Q.    Let me show you what's been admitted as

1      Exhibit J and ask you if this looks like the

2      schedule.  It's a copy, so it's not the same color.

3          A.   Okay.

4          Q.   Have you looked at it?

5          A.   I looked at it.

6          Q.   Do you recognize it at all?

7          A.   Kind of.

8          Q.   Could be you're not sure?

9          A.   Yes.

10         Q.   You know it was a schedule, a football

11     schedule was posted in the commander's office, is

12     that right?

13         A.   Correct.

14         Q.   And the one that you've been shown could

15     be the schedule, is that right?  You're not sure?

16         A.   I'm not sure, but it could be.

17         Q.   Did you ever really look at the schedule?

18         A.   No.  Commander asked for it, so I gave it

19     straight to him.

20         Q.   So you only saw it when you gave it to the

21     commander?

22         A.   That's correct.

23         Q.   And you got it from Officer Collins?

24         A.   Yes.

25         Q.   So Collins gives it to you.  You give the

1      to the commander, is that right?

2         A.   Right.

3         Q.   And ultimately it ends up being posted in

4      his office?

5         A.   Yes.

6         Q.   So everybody could see it that went in

7      there, is that right?

8         A.   That's correct.

9         Q.   Whose decision was it to actually post it

10     in the office?

11        A.   I guess the commander.

12        Q.   You don't know.  You didn't

13     post it in the office?

14        A.   No, I didn't.

15        Q.   You didn't supervise Officer Collins in

16     sports activities.  You don't know how much time he

17     spent on them, is that correct?

18        A.   That's correct.

19        Q.   You don't know when he took care of those

20     activities?

21        A.   No, I do not.

22        Q.   You don't know if he worked on weekends,

23     is that right?

24        A.   That's correct.

25        Q.   You don't know if he was there late in the

1    evenings?

2        A.   That's correct.

3        Q.   You worked the day shift, is that right?

4        A.   Right.

5        Q.   So and you, that means you would have been

6    working from what to when, eight to four?

7        A.   It depends. My hours range from eight to

8    four, nine to five, eleven to seven, two to ten

9    depending on what's scheduled for that day.

10       Q.   Did you ever ask your supervisor if you

11   could change your schedule so you could be in a

12   better position to supervise your unit?

13       A.   Yes.

14       Q.   And that was refused?

15       A.   Yes.

16       Q.   Now with regard to the initiative reports,

17   what is your understanding of what would happen to

18   that report? You prepare it. You submit it

19   through channels. Are copies retained anywhere?

20       A.   Supposed to be retained in the front

21   office as far as my knowledge.

22       Q.   So you're saying you're supposed to keep a

23   copy in the front office?

24       A.   They're supposed to.

25       Q.   Now I asked you earlier about whether you

1    ever asked Officer Collins to back date activity

2    logs after you were told you had to prepare them.

3    You said you don't recall telling him that,

4    correct?

5         A.   Right.

6         Q.   I'm going to show you a copy of your

7    preliminary examination testimony.  This is

8    testimony that you gave on January 12th, 2010,

9    before Judge Kathryn Hansen, 36th District Court.

10   I'm going to show you page 122.  I have highlighted

11   it.  You can read that and any other portion that

12   you think you need to refresh your recollection.

13        A.   Okay.

14        Q.   Do you recall that?

15        A.   Yep.

16        Q.   Do you recall testifying that you asked

17   him to back date his activity logs, and he refused

18   to do so?

19        A.   Yes.  I would have to go by what I see

20   here because I can't think back that far.

21        Q.   You don't -- that's what the transcript

22   says, right?

23        A.   Right.

24        Q.   And you're not prepared to dispute that,

25   is that right?

1       A.   Right.

2       Q.   But you just don't recall it?

3       A.   Exactly.

4       Q.   I understand.  Now there were several

5  sporting events that were attended by command

6  officers.  You never went to any of those, is that

7  right?

8       A.   That's correct.

9       Q.   You didn't go to -- do you remember Sandra

10 Talbot?

11      A.   Yes.

12      Q.   Did you ever work under her?

13      A.   Yes.

14      Q.   Do you recall a basketball program that

15 Officer Collins -- that you reported about in your

16 initiative report that Officer Collins did for the

17 Eastern District?

18      A.   I don't recall that when Commander Talbot

19 was there.  That was in another unit.

20      Q.   But you nevertheless never attended any of

21 the events, is that correct?

22      A.   That's correct.

23      Q.   And was that because you just felt that

24 wasn't part of your responsibilities, or you didn't

25 want to do it, or can you give us a reason why you

178

1   didn't go to any of those events?  Did you not know

2   about them?

3       A.   I didn't know about them, and I'm not a

4   sports person.

5       Q.   But after you began to put them in your

6   initiative reports, did you feel like maybe you

7   should go and see what's going on since I'm writing

8   about it?

9       A.   No.

10      Q.   Did Commander Moore ever direct you to

11   have Collins start a citywide basketball --

12              MR. WOODYARD:  Objection, calls for

13   hearsay, Judge.

14              THE COURT:  Sustained.

15      Q.   (By Mr. Evelyn)  Did you ever approach

16   Officer Collins about starting a program called the

17   Citywide Basketball Program?

18      A.   I recall telling him commander was talking

19   about a citywide basketball game -- team.

20      Q.   And that was Commander Moore?

21      A.   Yes.

22      Q.   Do you remember when that was?

23      A.   No.

24      Q.   Do you recall whether this was, any

25   followup to find out if that happened, or was that

1      something you just were communicating to him?

2          A.    That was just something I communicated.

3      That was it.

4                  MR. EVELYN:   I have no further

5      questions at this time.

6                        CROSS-EXAMINATION

7      BY MR. WOODYARD:

8          Q.    Sergeant Lewis, good afternoon.

9          A.    Good afternoon.

10         Q.    The responsibility you were assigned when

11     you were the Community Relations sergeant was to

12     supervise the Community Relations Unit, is that

13     correct?

14         A.    That's correct.

15         Q.    And that unit consisted of nine officers,

16     is that correct?

17         A.    That's correct.

18         Q.    And I'm talking now, all of my questions

19     are going to only deal with 2009 unless I say

20     different, okay?

21         A.    Okay.

22         Q.    So during 2009, there were between seven

23     and nine officers who reported to you depending on

24     whether or not there were changes in the

25     assignments?

1       A.   Correct.

2       Q.   Is that fair?  And you were the only

3  sergeant, right?

4       A.   Right.

5       Q.   And you worked a regular shift five days a

6  week whatever was required of you by the

7  department?

8       A.   Right.

9       Q.   Did you work more than five days a week

10  generally or not?

11      A.   The way our leave days are, it's a Monday

12  through Friday, weekend off, but you can work

13  through that weekend and have other days off during

14  the week.

15      Q.   But generally, any 28-day period, you have

16  four leave days, is that right, or eight leave

17  days?

18      A.   Eight.

19      Q.   Thank you very much for correcting me.  So

20  you get two days off every week whether it's Friday

21  and Saturday, Saturday and Sunday, that might

22  change, right?

23      A.   Right.

24      Q.   Two days off?

25      A.   That's correct.

1      Q.    And that was the schedule that you

2    followed, right?

3      A.    Right.

4      Q.    When you were in charge of the Community

5    Relations Unit, you would keep tabs on what the

6    officers who reported to you were doing, is that

7    fair?

8      A.    That's fair.

9      Q.    And that was because your responsibility

10   to your superior for the performance of the

11   officers who report to you?

12     A.    That's correct.

13     Q.    Because if there were not -- you talked

14   about these hang tags for B & E's.  If those

15   weren't getting put on the doors and that made its

16   way back to channels to your boss, you would get

17   asked about that, right?

18     A.    That is correct.

19     Q.    Generally your boss or their boss or the

20   commander of the district wouldn't go to the line

21   officer who's responsible.  They go to that

22   person's supervisor generally?

23     A.    Yes, they would.

24     Q.    And that would be you?

25     A.    That would.

1        Q.    Now one of the things that you had to do
2    when you were the sergeant in charge of the
3    Community Relations Unit was fill out time reports,
4    is that right?
5        A.    Time reports?
6        Q.    Yeah.  Let me show you -- and I might be
7    wrong about that -- number eight.  I want to show
8    you something, and tell me if this is something you
9    had to fill out.
10        A.    Oh, the time book.
11        Q.    Time book?
12        A.    Yes.
13        Q.    So you did fill this out?
14        A.    Yes.
15        Q.    All right.  And that would have been
16    filled out by you for the whole time that you were
17    the sergeant there?
18        A.    If I wasn't there, somebody else would
19    have done it.
20        Q.    Like if you were on leave or vacation or
21    furlough I think you call it?
22        A.    Exactly.
23        Q.    Now the time books that you filled out
24    every week that you were there had Officer Collins'
25    name on it, right?

1       A.    Right.

2       Q.    Along with seven or eight other police

3    officers?

4       A.    That is correct.

5       Q.    Now you testified a moment ago that I

6    believe Mr. Evelyn asked you a question such along

7    the lines of if you know what Officer Collins'

8    hours were?  Do you know if he worked weekends?  Do

9    you know if he worked evenings, and said you don't

10   know?

11      A.    Right.

12      Q.    But in fact, you do know what his hours

13   were, don't you?

14      A.    Yeah, Monday through Friday.

15      Q.    Where did you get the information to put

16   on this time book, from his activity logs, right?

17      A.    From activity logs and viewing the

18   officers coming in.

19      Q.    Say that last part?

20      A.    Seeing the officers coming in.  I'm sorry.

21      Q.    No, no.  I want to make sure I understand.

22   So from the activity logs that the officers filled

23   out and from actually seeing them yourself as they

24   came in and out?

25      A.    Yes.

1      Q.   So that information gave you the
2  opportunity to go ahead and fill out the time
3  report, correct?
4      A.   That's correct.
5      Q.   So if, for example, Officer Collins was
6  not working, you would not have put him down as
7  working?
8      A.   That's correct.
9      Q.   Now we have entered into evidence the
10  activity logs that we, under Exhibit 1.  Do you
11  know -- let me ask you this.  Do you know whether
12  Officer Collins filled out an activity log everyday
13  that he worked during 2009?
14      A.   2009?
15      Q.   Yes, ma'am.
16      A.   I can't definitively say yes, and I can't
17  definitively say no.
18      Q.   If an activity log were not filled out,
19  how would you get the information to fill in the
20  time book?
21      A.   I would see them.
22      Q.   You would see them, all right.  Did you
23  testify already that Officer Collins was a Monday
24  through Friday employee?
25      A.   We all worked.

1       Q.   So generally Community Relations did not
2   work weekends?
3       A.   Unless we had a special assignment.
4       Q.   The NCAA tournament, for example, that was
5   a --
6       A.   Yeah, or they would assign us out to other
7   details.
8       Q.   But that was the exception rather than the
9   rule?
10      A.   Right.
11      Q.   Generally Monday through Friday?
12      A.   Exactly.
13      Q.   What was Officer Collins' general shift on
14  the Monday through Friday assignment?  Was he
15  generally working days, afternoons, if you
16  remember?
17      A.   It would fluctuate.  All of our hours
18  would fluctuate, plus it's not really a set shift,
19  Community Relations.  Anything can pop up.
20      Q.   Okay.
21      A.   So you have to go with the flow.
22      Q.   You would generally work eight hours?
23      A.   Right.
24      Q.   When you say go with the flow, does that
25  mean sometimes you would work eleven to seven, and

1     sometimes you would work noon to eight?

2         A.   Exactly or two to ten.

3         Q.   Or two to ten.  It does not mean that

4     sometimes you wouldn't come in from two to ten, but

5     you would work on the weekends to make it up?

6         A.   No.

7         Q.   These initiative reports that you talked

8     about that I guess they've been admitted now, the

9     ones you have in your hand there --

10        A.   Right there.

11        Q.   Sit tight.

12             Judge, can I grab this?  Thank you.

13    They don't have Officer Collins' name in them

14    anywhere, do they?

15        A.   No.

16        Q.   In fact, the only names that appear on

17    those several pages is your name and then a fellow

18    named Rios is mentioned a couple times, Officer

19    Rios.  He or she was apparently involved in a child

20    seat safety inspection type program.  Does that

21    sound familiar?

22        A.   Yes, he was.

23             MR. WOODYARD:  Thank you.  I don't

24    have anything else.

25                  REDIRECT EXAMINATION

1    BY MR. EVELYN:

2        Q.    Just very briefly.  What's the daily

3    detail?

4        A.    Daily detail is a sheet we fill out

5    everyday detailing what each officer's working, the

6    time and their assignments.

7        Q.    I'm going to show you --  may I approach

8    the witness, Your Honor?

9                THE COURT:  Yes.

10       Q.    (By Mr. Evelyn)  Do you know what daily

11   detail is?

12       A.    Yes.

13       Q.    What's a daily detail?

14       A.    It's the assignment sheet we make out

15   everyday for officers assigned to certain details

16   like I'm on platoon three now.  Guys assigned to

17   scout cars, leave, furlough, court.

18       Q.    I'm going to show you some sheets that are

19   purportedly daily details that you signed from

20   July 17th through November 17th of 2009.  I'm

21   sorry.  Did you look at those documents?

22       A.    Yes.

23       Q.    Are those daily details that you prepared?

24       A.    Yes.

25                MR. EVELYN:  Move the admission.

```
 1                    MR. WOODYARD:  Your Honor, I have no
 2      objection.
 3                    THE COURT:  Admitted into evidence
 4      at this time.  It's Exhibit M.
 5           Q.    (By Mr. Evelyn)  When do you prepare these
 6      details?
 7           A.    Everyday.
 8           Q.    At the beginning of the shift, at the end
 9      of the shift, when do you prepare them?
10           A.    Normally at the beginning of the shift.
11           Q.    Now you responded to some questions on
12      cross regarding what goes on activity logs.  You've
13      already testified that for a period of years,
14      activity logs were not done by Community
15      Relations --
16           A.    Right.
17           Q.    -- personnel, is that correct?
18           A.    That's correct.
19           Q.    And in fact, you've also testified that
20      you submitted initiative reports that covered
21      activities, some which occurred on the weekends, is
22      that correct?
23           A.    That's correct.
24           Q.    And then football schedules only Saturday,
25      is that right?
```

1      A.   Right.

2      Q.   And that's no where on anybody's activity

3   log, is that correct?

4      A.   That's correct.

5      Q.   Those games, the basketball programs, the

6   championship games, that's not on anybody's

7   activity log, is that correct?

8      A.   That's correct.

9      Q.   To your knowledge, is that right?

10     A.   That's right.

11     Q.   And if I tell that you some of those games

12   were attended by command personnel, even Deputy

13   Chief Godbee, that still doesn't change the fact

14   that they're on anybody's activity logs, are they?

15     A.   Right.

16     Q.   Sometimes -- let help ask you.  Do you

17   know about the Toys for Tots program?

18     A.   Yes, I do.

19     Q.   And that would run Monday through

20   Saturdays, the weeks they would have it?

21     A.   That's correct.

22     Q.   Would that go on activity logs?

23     A.   We didn't do activity logs for those

24   details.

25     Q.   Something else you didn't do activity logs

1    for?

2         A.   Right.

3         Q.   You would see Officer Collins when he

4    would arrive for his shift, is that correct?

5         A.   That's correct.

6         Q.   In the month of December, 2009, was

7    Officer Collins reporting directly to you, or was

8    he reporting to another supervisor?

9         A.   I can't recall.

10        Q.   Was there a supervisor by the name of

11   Lieutenant Williams at the Eastern District at this

12   time?

13        A.   Oh, yeah, yes, it was.

14        Q.   And was there a period of time where

15   Officer Collins was supposed to report to

16   Lieutenant Williams?

17        A.   That's correct.

18        Q.   And he had to go and see her visually?

19        A.   Yes.

20        Q.   Was that true for everybody else in your

21   unit that they had to all come and report directly

22   to the supervisor?

23        A.   Not that I recall.

24        Q.   Do you recall having to call dispatch when

25   Community Relations people arrived?

1          A.   Yes.

2          Q.   And when did that start?

3          A.   I can't recall.

4          Q.   In 2009, that wouldn't be likely?

5          A.   It could have.

6          Q.   And was this because there was this

7     transition to now scrutinizing Community Relations'

8     activities more often?

9          A.   I can't answer that.

10         Q.   So you don't know why at a point in time

11    in 2009 you were told that Community Relations

12    officers themselves had to come in and personally

13    present themselves to a supervisor, and then they

14    had to call dispatch to let them know they were

15    there?

16         A.   I would call dispatch and let them know

17    what cars I had out.

18         Q.   And you would tell them the time these

19    people arrived?

20         A.   Yes.

21         Q.   Did you call dispatch and tell them about

22    the other people that weren't working in cars like

23    Officer Collins?

24         A.   No.  I would call them all in.

25         Q.   What do you mean you would call them all

1    in?

2         A.    In the morning.  You can call them all in

3    at the same time or just give different times.

4         Q.    So you make one call for everybody?

5         A.    Yes.

6         Q.    So you would call in to dispatch, and you

7    give the assignments for everybody in your unit

8    that day?

9         A.    Correct.

10        Q.    And how would you confirm the assignments

11   for that day?

12        A.    What do you mean by assignments?

13        Q.    For example, people that came in the

14   afternoon.  If you are calling in the morning and

15   some people come two to ten or twelve o'clock, how

16   would you let dispatch know where everybody was

17   going to be working before they even arrived?

18        A.    You can always give them the time and

19   their codes.

20        Q.    Would you just give them the time and the

21   codes?

22        A.    Yes.

23        Q.    Now you said that Community Relations

24   works flexible schedule, is that correct?

25        A.    That's correct.

1          Q.   Does that mean that sometimes a person

2     might come in at one time twelve to eight and then

3     discover that they had to stay later for a

4     community meeting?

5          A.   That's true.

6          Q.   Or some other assignment that was not on

7     the schedule, is that right?

8          A.   That's right.

9          Q.   And that would not necessarily appear on

10    the activity log, would it?

11         A.   No.

12         Q.   Have you heard the term slide time before?

13         A.   Yes.

14         Q.   That's not supposed to be something that

15    is proper though, is it?

16         A.   No, it's not.

17         Q.   Does it go on?  I'm not asking you whether

18    you were involved in that, but does it go on at

19    all?

20         A.   I'm sure it does someplace.

21         Q.   There are places where people, officers

22    because they can't afford to pay them overtime and

23    they work overtime, they get compensated by being

24    able to come in later, come in later or leave

25    early?

1          A.    I have heard that.

2          Q.    You heard that.  That's all I'm asking.

3     You are aware that that goes on, okay.

4                     Now when you looked at the -- did

5     you ever have any conversation with Officer Collins

6     about the time you carried him on your time reports

7     that say eleven to seven, twelve to eight?  Did he

8     ever tell you why I can't be listed two to ten

9     which is when I really come in?

10                    MR. WOODYARD:  I'd object.  That

11    calls for hearsay, Judge.

12                    THE COURT:  Sustained.

13                    MR. EVELYN:  I will rephrase it.

14         Q.    (By Mr. Evelyn)  Did you ever receive a

15    request for him to change the time that you put on

16    the --

17                    MR. WOODYARD:  Calls for hearsay,

18    Judge.  Objection.

19                    THE COURT:  You're asking her if she

20    ever -- ask the whole question, and don't answer

21    until --

22                    MR. EVELYN:  Okay, I'll ask the

23    question.

24         Q.    (By Mr. Evelyn)  You said that the

25    activity logs, the time reports, time books, you

```
 1    put the time in based upon activity logs and what
 2    you see, is that correct?
 3         A.   That's is correct.
 4         Q.   And obviously, when you know what
 5    someone's going to be doing, it's because you
 6    either gave them an assignment or because you
 7    observed it, is that correct?
 8         A.   That's correct.
 9         Q.   Now Officer Collins was involved in things
10    that you didn't see because you didn't go out to
11    watch all the time, is that correct?
12         A.   Correct.
13         Q.   You followed up on the B & E requirements
14    that he had to do, was that correct?
15         A.   That's correct.
16         Q.   You followed up on the MUP tickets, is
17    that right?
18         A.   Right.
19         Q.   But the athletic programs you left to
20    someone else or at least you didn't participate in
21    that, is that correct?
22         A.   That's correct.
23         Q.   Did you ever have -- you also indicated
24    you, at some point in time, made a request to have
25    your hours changed so that you could more
```

1        adequately supervise your unit, is that correct?

2             A.    That's correct.

3             Q.    Your request was refused, is that right?

4             A.    That's right.

5             Q.    Did you ever consider changing the time

6        that you listed him on the time report?

7             A.    Not that I can recall.

8             Q.    Was there ever any -- did he ever give you

9        reason to do that?

10            A.    No.

11            Q.    Is your memory good in that regard?  Is it

12       possible you could be wrong on that?

13            A.    I could be.

14                  MR. EVELYN:  I have nothing further.

15                  THE COURT:  Okay.

16                  MR. WOODYARD:  Judge, I have got a

17       few follow-up questions.

18                  THE COURT:  Go ahead.

19                  RECROSS-EXAMINATION

20       BY MR. WOODYARD:

21            Q.    Sergeant Lewis, I want to talk about the

22       daily details, the last set of documents that you

23       were just handed, or do you still have them?

24            A.    No, I think the attorney has them.

25            Q.    Is it your testimony that you prepared

1      these?

2          A.    Yes.

3          Q.    Is it your testimony that you prepared

4      every one of them?

5          A.    That's a strong possibility that I did.

6          Q.    Is there a possibility that you didn't

7      like, for example, one that might have been

8      prepared while you were away on leave?

9          A.    That's possible.

10         Q.    Okay, all right.  Let me ask you this.

11     You did testify, if I'm not mistaken, that there

12     were no activity logs that reflected sports

13     programs?

14         A.    That's correct.

15         Q.    Is that your recollection?  You never saw

16     an activity log from any of your Community

17     Relations officers that reflected involvement in

18     the sports programs?

19         A.    To the best that I can, to the best of my

20     knowledge, no.

21         Q.    Did you -- you looked at the activity

22     logs, is that correct?

23         A.    Right.

24         Q.    And you signed the activity logs

25     indicating that they were correct to the best of

1       your knowledge?

2           A.    Exactly.

3           Q.    Not only Officer Collins, but every other

4       one of the officers in the Community Relations Unit

5       filled out activity logs, is that right?

6           A.    Right.

7           Q.    I'm going to show a couple things here,

8       see if this helps you to remember things that you

9       saw.  This is an activity log that's dated March --

10      can you see that?

11          A.    Yes.

12          Q.    March 23rd of 2009, Eastern District?

13          A.    Yes.

14          Q.    Can you read the name here?

15          A.    Yes, I can.

16          Q.    What is that?  Read it out loud for me.

17          A.    P.O. Jerome Collins.

18          Q.    And then the document then contains sort

19      of a narrative down here that says, Here's what I

20      did, and here's the time I did it?

21          A.    Right.

22          Q.    If you look at the back, we see that in

23      fact between five and seven, Officer Collins

24      indicated that he is at State Fair and Hayes at

25      Elden Rec visiting at above with boys basketball

1       league, right?

2           A.    Right.

3           Q.    That is between five and seven?

4           A.    Yes.

5           Q.    Later on goes, he goes -- and he's off

6       duty at eight o'clock, correct?

7           A.    Correct.

8           Q.    Activity log for April 20, 2009, also

9       Police Officer Jerome Collins.   On the back, we see

10      that between five and seven, Holloman Rec, boys

11      basketball, busy at the above with boys basketball

12      league, right?

13          A.    Yes.

14          Q.    And those hours are -- what hours are

15      those, ma'am?   Can you read from there?

16          A.    I sure can.

17          Q.    Okay.

18          A.    Start at five and end at seven.

19          Q.    Five to seven.   What does MA mean?

20          A.    Miscellaneous activities.

21          Q.    Miscellaneous activities, thank you.   So

22      officer Collins in fact was involved in a

23      basketball program, is that correct?

24          A.    That's correct.

25          Q.    Does looking at these -- here's another

1    one, April 23rd, of 2009, boys and girls busy at

2    the above location with boys basketball league for

3    district, right, between five and seven?  Does that

4    help you remember having seen these before?

5         A.   Yes, it does.

6         Q.   So in fact, Officer Collins did make

7    records in his activity logs of involvement in

8    sports programs, right?

9         A.   That's correct.

10        Q.   Now there was never a weekend activity log

11   that you saw for Mr. Collins, was there?

12        A.   No.

13        Q.   You were asked questions about the unit

14   receiving, I'll use the phrase, heightened

15   scrutiny.  People began paying closer attention to

16   when officers came and went, is that right?

17        A.   Yes.

18        Q.   Do you remember Mr. Evelyn was asking you

19   about how --

20        A.   Yes.

21        Q.   -- you had to call into dispatch or

22   something?

23        A.   Yes.

24        Q.   Okay.  And is it your testimony that you

25   don't know why that heightened scrutiny was imposed

```
1      upon your particular unit?

2          A.    No, I do not.

3                   MR. WOODYARD:  Judge, could we

4      approach for a moment?

5                   THE COURT:  Yes.

6                   (At 3:12 p.m., bench conference.)

7                   (Proceedings stenographically

8      recorded, but not ordered transcribed.)

9                   THE COURT:  You may proceed.

10                  MR. WOODYARD:  You know what after

11     all of that, I don't have any other questions.  I

12     apologize.

13                  THE COURT:  Okay.

14                  MR. WOODYARD:  Thank you.

15                  REDIRECT EXAMINATION

16     BY MR. EVELYN:

17         Q.    You indicated in response to questions

18     that were put on --

19                  MR. WOODYARD:  Judge, I didn't ask

20     any other questions, so I think the witness is

21     done, right?

22                  MR. EVELYN:  We interrupted his

23     questioning --

24                  MR. WOODYARD:  Oh, of course.  I

25     lost track of where I was.  I apologize.
```

```
1        Q.   And so if somebody went to use the van,
2   they had to come get the keys from you?
3        A.   Get the keys from the desk unless they had
4   another key made on their own.
5        Q.   But if they didn't have a key made on
6   their own, they would get the keys from you?
7        A.   Keys from the desk.
8        Q.   From whose desk?
9        A.   My desk.
10       Q.   Where was your desk?
11       A.   Community Relations office.
12                 MR. EVELYN:  I have nothing further.
13  Thank you.
14                 THE COURT:  Anything else?
15                 MR. WOODYARD:  Nothing from the
16  People, Your Honor.
17                 THE COURT:  Anything from the jury
18  for this witness?  Raise are hand if you have any
19  questions.  All right, thank you.  You may step
20  down.
21                 THE WITNESS:  Yes, thank you.
22                 (Proceedings stenographically
23  recorded, but not ordered transcribed.)
24                 (At 4:13 p.m., proceedings
25  adjourned.)
```

LAW OFFICES
## GOLDPAUGH & ASSOCIATES, P.C.
615 GRISWOLD
SUITE 506
DETROIT, MICHIGAN 48226

JOHN J. GOLDPAUGH
DONALD HOWARD STOLBERG

(313) 963-8220
FAX (313) 226-0807

NANCY GOLDPAUGH
LEGAL ASSISTANT

March 15, 2012

Commander Brian Stair
Internal Controls Bureau
The First National Building
660 Woodward Ave.
Suite 1650
Detroit, MI 48226

RE: Formal Request for Discovery
Police Officer Jerome Collins
Discipline File No. 120137
IAS No. 09-142

Dear Commander Stair:

I have been advised that a Police Disciplinary Trial Board has been scheduled to convene in the above-referenced matter on April 24, 2012.

In furtherance of the right to confront the witnesses and evidence against this officer and to otherwise assist in the preparation of an adequate and informed defense, please accept this letter as formal request for discovery.

At your earliest opportunity, kindly provide this office with all documentary evidence accumulated, produced and/or maintained by the Department during the investigation and processing of this case.

The term "document" includes, without limitation and regardless of origin or location, all correspondence, books, pamphlets, letters, diaries, logs, memorandum, reports, records, studies, stenographic or handwritten notes, working papers, invoices, vouchers, charts, graphs, preliminary complaint records, activity logs, time records, agreements, affidavits, witness statements, pictures, voice recordings, tapes, transcripts or taped or recorded conversations, surveillance reports, recommendations, investigative reports, and all records or writings however produced or reproduced.

The request covers all documents whether accumulated, produced, generated or maintained by the Disciplinary Administration Section, Internal Affairs Section, Internal Controls Bureau, Professional Standards Section, Office of the Chief Investigator, and/or any other Precinct, Section, Unit and Detail, within the Detroit Police Department and any other Division, Department, Office, Section, Unit or Detail within the City of Detroit administration. Further, any documents in the

**#7**

Page 259

CITY OF DETROIT
TRIAL BOARD HEARING

In the Matter of:
CITY OF DETROIT
(POLICE DEPARTMENT),

               Employer,               No. 12-0137

          -and-                    Volume 4

DETROIT POLICE OFFICERS ASSOCIATION
(POLICE OFFICER JEROME COLLINS),
          Union.

_____/

               Proceedings had and testimony
taken in the above matter before a Trial Board at 7310
Woodward Ave., 3rd Floor, Detroit, Michigan, on
Thursday, July 11, 2013 commencing at or about 9:00 a.m.
APPEARANCES:
        TRIAL BOARD
        COMMANDER ROBERT ENNIS, Chairperson
        INSPECTOR GARY SROKA, Co-Member
        INSPECTOR DWAYNE BLACKMON, Co-Member
MS. LETITIA JONES, ESQUIRE, City Advocate
(Appearing on behalf of the Detroit Police Department)

MR. JOHN GOLDPAUGH, ESQUIRE
(Appearing on behalf of Police Officer Jerome Collins)

REPORTED BY:  TAMARA A. O'CONNOR (CSMR-2656, CER-2656)



Page 261

```
 1        Detroit, Michigan
 2        Thursday, July 11, 2013
 3        9:19 a.m.
 4        P R O C E E D I N G S
 5        COMMANDER ENNIS:  This Board is
 6   reconvened today, Thursday, July 11, 2013.  If no
 7   one has any preliminary matters, we will turn over
 8   the proceedings to the City's advocate, Ms. Jones.
 9        MS. JONES:  I believe the
10   parties have rested, and we are going to be doing
11   our closing argument.  Is that correct, brother
12   counsel?
13        MR. GOLDPAUGH:  That is
14   correct.
15        MS. JONES:  Closing argument:
16   The Department has to show, by a preponderance of
17   the evidence, that the officer is guilty of the
18   charges that are before you.
19        There is some discrepancy as to
20   the first charge being by a preponderance of the
21   evidence.  There are some arbitrators who wish that
22   to be a clear and convincing evidence standard
23   versus preponderance of the evidence.  In any event,
24   none of these charges before you are beyond a
25   reasonable doubt.
```

Page 262

```
 1        As it relates to Count I,
 2   Conduct Unbecoming an Officer, Officer Collins has
 3   been charged with conducting himself in a manner
 4   unbecoming an officer by working two unauthorized
 5   outside employments that overlapped his duties and
 6   responsibilities with the Detroit Police Department
 7   as a Community Relations officer.
 8        Generally, one of the standards
 9   used with Conduct Unbecoming is whether it
10   discredited the officer or brought the Department
11   into disrepute.  You have evidence presented to you
12   as well as testimony showing that it did discredit
13   the officer.
14        Secondly, you have the Free
15   Press news article that shows that the Department
16   was brought into disrepute not only from Officer
17   Collins but also from other officers within that
18   unit.
19        As it relates to Count I, you
20   have had the opportunity to hear the testimony and
21   review the evidence.  You have activity logs from
22   Officer Collins.  You have time records from Allen
23   Academy showing that he was working there.  You have
24   time records from St. John's Hospital showing he was
25   working there.
```

Page 263

```
 1        You have the daily details from
 2   the Detroit Police Department, and you also have the
 3   charts that show the overlap as it relates to the
 4   hours worked.
 5        As it relates to Count II,
 6   Willful Disobedience of Rules or Orders, you have
 7   two specifications under this count, and the first
 8   one being that he was working security at St. John's
 9   without approval from the Chief of Police.
10        You have heard no testimony on
11   this record that he ever obtained permission.  Now,
12   he may indicate that it was tacit approval and that
13   people appeared-- and you will hear that in his
14   Garrity, that people appeared at the football
15   functions, but that does not go to these charges.
16        I don't want you to be confused
17   about the football functions and these charges.
18   These charges are whether he had approval to work
19   St. John's Hospital.  Additionally, the second
20   specification is whether he had approval to work
21   security and as a truancy officer at Allen Academy.
22        You have heard nothing in this
23   record that states that he had approval.  In fact
24   the testimony from the witnesses supports the
25   Department's position that he did not have approval.
```

Page 264

```
 1   Therefore, we will be asking you for a finding of
 2   guilt on Counts I and II.
 3        As it relates to Count III,
 4   Using Authority or Position for Financial Gain or
 5   for Obtaining Privileges or Favors, brother counsel
 6   brought up that this actual charge is confusing
 7   because, as a police officer, what privileges or
 8   financial gain did he obtain as a police officer?
 9        As it reads, it is to use his
10   position for financial gain by working security when
11   in fact he was supposed to be working as a Community
12   Relations officer resulting in him being monetarily
13   compensated by the City of Detroit for time worked.
14        What this is saying is he was
15   paid by the City of Detroit and its citizens for
16   work that he should have been doing at the City of
17   Detroit.  The problem is he went and worked other
18   places when he should have been working at the City.
19   That is what this particular charge is about.
20        So while it is confusing as to
21   its title, the substance of the charge is quite
22   clear, the fact that he was compensated when he
23   should have been working as a Community Relations
24   officer at Eastern District.  So I defer to the
25   Board as it relates to the finding of guilt on Count
```

3  (Pages 261 to 264)

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com

Page 273

1   That's not what happened. What
2  happened was he was doing his work. You heard
3  nothing from that stand that has raised one incident
4  of a complaint about Officer Collins not getting his
5  work done, not doing what he was supposed to be
6  doing for the City of Detroit.
7   True there is an overlap, but
8  that overlap does not mean that he was not giving
9  eight full hours of time to Detroit on each day. He
10 did his job, he showed up. He did what he was
11 supposed to do, and he gave that to the community,
12 and he gave it to the City of Detroit, and he gave
13 it to the Detroit Police Department.
14   That is what the evidence shows
15 here. Even when you look at the trial transcript
16 from Mr. Green for example, all Mr. Green talked
17 about is lauded Officer Collins even though he is
18 called as a prosecution witness.
19   Do you find it interesting that
20 the People did not call Mattie Lewis in their case
21 in chief? She was the one who was his supervisor.
22 She was the one who basically testified at the
23 investigative subpoena as to her actions.
24   You know why they didn't call
25 her? Because she was going to say, and you saw

Page 274

1  this, look, Godbee and Motley told me let him do it.
2  That's why. Because what they want to do is say he
3  was doing everything he was supposed to do.
4   The evidence shows that. He
5  was coming to work, he was showing up. He was
6  giving eight hours to the City of Detroit. He was
7  also working trying to make a buck other places too.
8  He was working on weekends for this community, he
9  was working weekends for the Detroit Police
10 Department.
11   That is why they didn't put
12 Mattie Lewis on the stand as a prosecution witness.
13 I wasn't the defense attorney, but I would have
14 called her too. I didn't represent him. Because
15 the facts show he did not bring this Department into
16 disrepute.
17   Did he get written permission?
18 I don't know. We have never seen it. We have
19 heard people say, well, he didn't get permission
20 from me, and I agree, he didn't go each time and get
21 permission to work from Commander Dolunt, for
22 example, or even Deputy Chief Motley.
23   But Commander Godbee knew what
24 was going on. Commander Godbee knew exactly what
25 was going on, and he allowed it to continue. Then

Page 275

1  when he got out, Deputy Chief Motley continued the
2  way things were going.
3   Then the interesting part is,
4  and I found it kind of a surprise, was the anonymous
5  letter that comes up approximately a year before
6  the-- November 11 from the ever elusive
7  Ms. Catherine Jones who it turns out probably never
8  existed. It was probably his ex-wife. But we don't
9  know that for a fact. I'm just guessing and
10 speculating.
11   But we do have this anonymous
12 phone call or the anonymous letter which was quite
13 lengthy that Commander Dolunt spoke of, and so did
14 Commander Moore. They took steps to find out what
15 was going on. They sent it to Internal Affairs.
16   Internal Affairs, according to
17 Commander Dolunt, said that they either didn't do
18 anything or they were under-staffed or something
19 along those lines. Commander Moore was more
20 specific and said, well, yes, I spoke to them. I
21 called down there, and they told me we investigated,
22 and we found nothing.
23   Well, members of the Board, is
24 that even plausible that they found nothing if in
25 fact you believe what the Department wants you to

Page 276

1  believe, if he is not showing up for work on time,
2  he is not doing his jobs, and he is just, willy
3  nilly, doing nothing?
4   Don't you think that they would
5  see if he was violating the rules and regulations of
6  the Department, along those lines, that something
7  would have materialized before the second letter?
8  The answer is nothing materialized because nothing
9  was going on out of the ordinary how things were
10 working with respect to Deputy Chief Motley and
11 Commander Godbee.
12   Then Commander Dolunt, because
13 he was tightening things up, and you read the
14 testimony of Mattie Lewis, she says yes, because I
15 then had to start having them do their activity logs
16 because Community Relations had come under greater
17 scrutiny.
18   Those were her words or those
19 were the prosecutor's words, I'm not sure. She
20 didn't know why that was, but she also knew that now
21 she had to get people to do activity logs. She even
22 testified that she went and asked Officer Collins to
23 back-date some, and he refused to do it.
24   He wasn't going to back-date
25 something that he was going to make up. You saw

6  (Pages 273 to 276)

Page 277

1  that in the testimony. So is this the type of a
2  person who is cheating the City of Detroit out of
3  his time? No, just the opposite.
4          He was giving the time
5  constantly. He was providing that to the citizens
6  of Detroit. He was working. He was working for
7  Detroit, and he was working for two places
8  trying to make a buck and trying to survive. There
9  is no doubt about that.
10          There is no dispute that he had
11  outside employment. There is no dispute that he did
12  not get permission for the outside employment from
13  Commander Dolunt.
14          The other interesting parts are
15  that, as Commander Dolunt indicated and testified to
16  with respect to the football programs and all these
17  activities which nobody seemed to remember occurring
18  when they were on the stand-- you have Exhibit
19  No. 16 that was posted in Commander Moore's office.
20          Why would that be posted in the
21  Eastern District if it didn't have something to do
22  with Detroit police work? It was posted there, the
23  schedule, that he, the Community Relations officer,
24  was involved in this program.
25          You heard testimony, and you

Page 278

1  will read testimony if you haven't gotten to all
2  that yet, where then Commander Godbee was attending
3  functions.
4          You saw testimony from Mattie
5  Lewis where she stated with respect to these
6  initiative reports, it was Commander Serda who was
7  directing Officer Collins at certain times, that he
8  was reporting to different people, and that is what
9  was going on in this case.
10          I was kind of wondering, and I
11  thought it was skillful of Ms. Jones to try to
12  explain Count III. Because even with her
13  explanation, I still don't see it. Because if that
14  is what they're claiming that he used his position
15  for financial gain, it is basically what she is
16  alleging is larceny.
17          In other words, she is saying,
18  just like they said in court, well, he filled out
19  his activity logs saying he was at a certain
20  location, and he has denied doing some of those logs
21  as you are aware of, and that he wasn't really
22  there. So therefore, he must have stopped working
23  at 8:00 because he's someplace else.
24          That is a guess. That was the
25  gist of the criminal case too, which of course we

Page 279

1  are all aware he was acquitted of. In other words,
2  we can guess and speculate why the jury did what
3  they did, but the jury did what they did because
4  they found beyond a reasonable doubt that he didn't
5  do it.
6          He was acquitted by a jury.
7  Too often, way too often, the Wayne County
8  Prosecutor's Office demands that we have a jury with
9  respect to police officers. I have been
10  representing them for a number of years.
11          It used to be you didn't have
12  to do that, you could waive in front of a judge.
13  The Wayne County Prosecutor will not allow that
14  under 95 percent of the cases because it is their
15  position that the people of the City of Detroit or
16  of Wayne County are the ones to make the
17  determination.
18          Well, that is what happened in
19  this case. It wasn't a judge who threw the case out
20  on a technicality, it was 12 people sitting in
21  judgment on him on these very charges. Don't kid
22  yourself, that's what these charges are all about.
23  On these very charges, they found that he was not
24  guilty, that the People did not prove the case.
25          I just bring that up because we

Page 280

1  have this whole three-ring circus going on at the
2  very beginning of this matter. Interestingly
3  enough, Commander Dolunt, as I said, tightens the
4  reins up, and then we come up with another letter.
5          Now, this is specifically
6  dealing with somebody named Catherine Jones. So the
7  testimony shows that he was not obtaining financial
8  gain using his position. We all know what that
9  means. It doesn't mean, oh, you stole something.
10          It means you walk into the
11  arena after a Pistons game or into Joe Lewis, flash
12  your badge and say, hey, let me in for free. We all
13  know that is what this means. This situation does
14  not fit that.
15          This is a situation where a
16  police officer was working hard for the City of
17  Detroit. You saw in Exhibit No. 15 these initiative
18  reports. You see in the activity logs, there is a
19  series of activity logs where he is at the
20  basketball programs within the community. Those are
21  in his activity logs.
22          Yet, they are saying athletics
23  has nothing to do with community relations.
24  Commander Godbee, when he testified and gave
25  statements, admitted that he had been to functions.

7 (Pages 277 to 280)

Page 285

1      MS. JONES:  The initial letter
2  that was brought forth was by Mr. Collins' estranged
3  wife, ex-wife, current wife, whatever her status is.
4  A year later came the anonymous letter.
5      As to IA finding nothing, if
6  you recall Lieutenant Walton's testimony, she said
7  that they sat at the building in Canton.  If you
8  recall, there was testimony about a sports arena in
9  Canton.  So if he didn't appear in Canton, of course
10  they found nothing.
11      There was no indication that
12  they followed him around for a 24-hour period.  So
13  where counsel says nothing out of the ordinary
14  happened, so nothing could be found, that is the
15  reason.
16      So then we go to his argument
17  that, under Collins' Garrity, he checked in every
18  day, he got his work done.  He included that Mattie
19  Lewis supports that she saw him, he got his work
20  done.  She saw him, but she didn't see him during
21  the full eight hours.
22      That he got his work done
23  doesn't mean that he worked eight hours.  I can get
24  my work done, and I may not necessarily work eight
25  hours.  So that logic is not sound logic there.

Page 286

1      To say that he lied 81 times,
2  yes, there are 81 specifications, and yes there was
3  testimony through Collins' statement and also
4  through Mattie Lewis that she asked him to back-date
5  it but he refused, he acknowledged that she asked
6  him to back-date it, and he said that he refused.
7      If he refused, then his
8  signature would not be affixed to any of-- well, to
9  the activity logs that are before you.  Counsel
10  stated he didn't prepare half of those activity
11  logs.  Take a look at the activity logs.
12      If his signature is not affixed
13  to it and it corresponds to a day that is in
14  question, and you can look at the charts for
15  expediency if you like, then disregard it.  He is to
16  be found not guilty on that.
17      But if his signature is affixed
18  to it and the charts show that he was working at two
19  of the locations, be it St. John's and DPD or Allen
20  Academy and DPD, then he should be found guilty on
21  those charges.
22      With a finding of guilt, we ask
23  that he be discharged from the Department or, in the
24  alternative, suspended for the period of time that
25  has transpired.  Anything further, counsel?

Page 287

1      MR. GOLDPAUGH:  I don't get
2  another bite at the apple.
3      MS. JONES:  Any questions from
4  the Board?
5      COMMANDER ENNIS:  As far as our
6  deliberations, are we entitled to the transcripts
7  from the investigative subpoena of Mattie Lewis, and
8  I know that it was not admitted, but the Garrity
9  interview for Officer Collins?
10      MR. GOLDPAUGH:  It was.  That
11  is Exhibit No. 1.
12      MS. JONES:  That is Exhibit
13  No. 1 is the Garrity interview and it is up to
14  counsel--
15      MR. GOLDPAUGH:  I have no
16  problem.
17      COMMANDER ENNIS:  Has it
18  already been transcribed?
19      MS. JONES:  It is transcribed,
20  and it is somewhere in this box.  So if you will
21  permit me, I will try and get it for you.
22      MR. GOLDPAUGH:  I have no
23  objections to it.  It was not made part of the
24  record, but I have no objections to you reviewing
25  that.

Page 288

1      MS. JONES:  Therefore, that
2  will be Board Exhibit No. 18.  The Board requested
3  Exhibit No. 18, which is the transcript of the
4  investigative subpoena interview of Mattie Lewis.
5      (At 9:58 a.m., BX#18 marked
6      and received)
7      MS. JONES:  Anything further?
8      COMMANDER ENNIS:  No.
9      MS. JONES:  Do you waive a
10  reconvening of the Board?
11      MR. GOLDPAUGH:  Yes, we waive a
12  reconvening of the Board and accept it in writing.
13      COMMANDER ENNIS:  This Trial
14  Board is completed.
15      (At 10:00 a.m., concluded)

9  (Pages 285 to 288)

O'CONNOR COURT REPORTING
248.360.1331     www.oconnorcourtreporting.com

**A**

abused 266:7,9
Academy 262:23
  263:21 281:2
  286:20
accept 288:12
account 268:2
  281:17
accountable 272:24
  272:25
acknowledged
  286:5
acknowledges
  266:25
acquittal 268:3
acquitted 279:1,6
acquitting 268:7
actions 271:5
  273:23
activities 277:17
  281:11
activity 262:21
  265:5,9,10,19,23
  266:12,16,18
  272:22 276:15,21
  278:19 280:18,19
  280:21 282:4
  283:8 286:9,10,11
actual 264:6
addition 265:15
additional 267:23
Additionally
  263:19 269:4
addressing 270:24
admitted 270:1
  280:25 281:1
  287:8
advocate 259:19
  261:8
Affairs 275:15,16
affixed 265:23
  286:8,12,17
agency 265:12
agree 274:20
agreements 271:10

alleged 271:7
allegedly 283:11
alleging 278:16
Allen 262:22
  263:21 281:2
  286:19
allow 279:13
allowed 266:15
  274:25
alternate 268:21
alternative 269:3
  269:12 286:24
amount 267:2
amounts 267:9
and/or 266:12
anonymous 275:4
  275:11,12 285:4
answer 276:8
anybody 272:22
  283:10
appear 284:12
  285:9
APPEARANCES
  259:15
appeared 263:13
  263:14
Appearing 259:19
  259:21
apple 287:2
applicable 267:6
appreciate 269:20
  269:21
appropriate 268:1
  268:17
approval 263:9,12
  263:18,20,23,25
  268:23 269:2
approximately
  275:5
April 265:7
Arbitrator 281:5
arbitrators 261:21
arena 280:11 285:8
argument 261:11
  261:15 269:10

270:3 271:9 284:6
  285:16
arrival 271:20
article 262:15
  270:15 271:2,3
  282:22
Ashford 281:6
asked 276:22 286:4
  286:5
asking 264:1 266:1
  267:4
aspect 282:25
aspects 281:7
ASSOCIATION
  259:7
athletics 280:22
attempts 283:22
attending 278:2
attorney 268:23
  274:13
authoring 266:16
Authority 264:4
Ave 259:13
award 268:18
awards 281:20
aware 278:21 279:1
a.m 259:14 261:3
  288:5,15

**B**

back 268:18
back-date 276:23
  276:24 283:15
  286:4,6
badge 280:12
badged 282:25
based 282:7
basically 271:20
  273:22 278:15
basketball 280:20
  281:21
beginning 280:2
behalf 259:19,21
believe 261:9
  267:25 268:17

269:7 270:15
  275:25 276:1
  281:1
best 268:24
better 283:18
beyond 261:24
  279:4
bit 281:9
bite 287:2
BLACKMON
  259:18
Bloomfield 289:18
Board 259:1,12,16
  261:5 264:25
  267:18,22 269:16
  270:1 272:13
  275:23 287:4
  288:2,2,10,12,14
  289:10
Borden 267:20
  270:25
box 287:20
break 269:22
Brief 284:5
bring 271:2,4
  274:15 279:25
bringing 268:12,12
brings 271:4 284:6
brother 261:11
  264:5
brought 262:10,16
  264:6 270:10
  271:8 285:2
buck 274:7 277:8
building 281:13,13
  285:7
BX#18 260:5 288:5

**C**

C 261:4 289:1,1
call 273:20,24
  275:12 284:11,20
called 273:18
  274:14 275:21
Canton 285:7,9,9

card 265:14 270:23
  270:23
care 272:6
case 267:15 270:5
  273:20 278:9,25
  279:19,19,24
  284:9,19 289:11
cases 279:14
Catherine 275:7
  280:6
cause 266:21
certain 278:7,19
certification 269:6
certify 289:8
CER-2656 259:23
  289:16
Chairperson
  259:17
chance 270:2
charge 261:20
  264:6,19,21 270:9
  270:14 272:21
charged 262:3
  267:13
charges 261:18,24
  263:15,17,18
  267:2,13,21
  268:12,13 271:16
  279:21,22,23
  286:21
charts 263:3
  267:11 286:14,18
cheating 277:2
checked 282:6
  285:17
chief 263:9 272:2,4
  272:10 273:21
  274:22 275:1
  276:10 281:8
  282:2 284:8
chose 284:12
circus 280:1
citizens 264:15
  277:5
City 259:1,4,19

**ESQUIRE** 259:19
259:20
essentially 268:19
estranged 285:2
event 261:23
267:25
evidence 261:17,21
261:22,23 262:11
262:21 266:21
269:19 270:9,13
273:14 274:4
282:17
exact 282:15
exactly 271:17
274:24 284:2
example 273:16
274:22
**Exhibit** 260:4
270:15,16 277:18
280:17 284:13
287:11,12 288:2,3
exhibits 269:20
existed 275:8
expansive 281:10
expediency 286:15
explain 278:12
explanation 278:13
extended 267:2
ex-wife 275:8 285:3

**F**

F 289:1
fact 263:23 264:11
264:22 267:23
268:2 275:9,25
284:10
factor 268:14
factors 268:2,8
facts 274:15
False 265:3
far 287:5
Favors 264:5
fiasco 272:25
figured 282:24
filled 278:18

**Finally** 265:2
financial 264:4,8
264:10 278:15
280:7 282:25
find 265:22 273:19
275:14
finding 264:1,25
265:25 266:19
285:5 286:22
fireable 282:20
fired 283:2
firing 282:22
first 261:20 263:7
270:9
fit 280:14
flash 280:11
Floor 259:13
focused 281:12
followed 285:12
following 282:2
football 263:14,17
277:16 281:21
forth 285:2
forward 268:12,13
284:6
found 265:24 275:4
275:22,24 279:4
279:23 284:3
285:10,14 286:16
286:20
Four 272:22
fraud 266:14
270:23,23
free 262:14 280:12
front 279:12
full 273:9 285:21
function 281:1
functions 263:15
263:17 278:3
280:25
further 286:25
288:7

**G**

G 261:4

**gain** 264:4,8,10
278:15 280:8
282:25
game 280:11 283:1
**Garrity** 263:14
269:25 282:5
285:17 287:8,13
**GARY** 259:17
Generally 262:8
getting 273:4
gist 278:25
give 269:23
given 269:11
gives 266:21 272:8
giving 273:8 274:6
277:4 282:16
go 263:15 274:20
285:16
Godbee 271:25
272:14,15 274:1
274:23,24 276:11
278:2 280:24
281:8,8 282:2
284:7,8
goes 267:19 272:2
281:15
going 261:10
269:19 270:20
271:24,24 273:25
274:24,25 275:2
275:15 276:9,24
276:25 278:9
280:1 283:1
**GOLDPAUGH**
259:20 261:13
269:15 284:17,23
287:1,10,15,22
288:11
good 266:4 268:8
281:17
gotten 278:1
greater 276:16
Green 273:16,16
guess 278:24 279:2
guessing 275:9

**guilt** 264:2,25
266:1,19 286:22
guilty 261:17
265:22,24 279:24
284:3 286:16,20

**H**

half 283:7 286:10
happened 273:1,2
279:18 285:14
hard 280:16
hear 262:20 263:13
272:9
heard 263:10,22
270:3 271:22
272:10 273:2
274:19 277:25
hearing 269:1
268:13
hey 280:12
history 267:1
268:15
hockey 283:1
hold 272:24 284:15
Hospital 262:24
263:19
hours 263:4 273:9
274:6 282:16
284:1 285:21,23
285:25

**I**

IA 285:5
**IDENTIFIED**
260:4
II 263:5 264:2
III 264:3 265:1
278:12
important 270:7
inaccurate 266:12
incident 273:3
include 281:10
included 285:18
incomplete 266:12
indicate 263:12

**indicated** 277:15
indication 285:11
individual 270:21
individuals 282:13
information 267:10
initial 269:10 285:1
initiative 278:6
280:17
**INSPECTOR**
259:17,18
interest 268:25
interesting 270:7
270:13,21 273:19
275:3 277:14
281:4
Interestingly 280:2
Internal 275:15,16
interview 260:6
282:6 287:9,13
288:4
investigated 275:21
investigation
283:20
investigative
271:13 273:23
287:7 288:4
involved 277:24
issue 267:23 269:6
269:9
IV 265:3

**J**

Jakewood 289:17
January 265:7
Jerome 259:8,21
job 266:10 267:10
273:10 282:19
jobs 276:2
Joe 280:11
**JOHN** 259:20
John's 262:24
263:8,19 265:14
265:16 286:19
Jones 259:19 261:8
261:9,15 270:7

permit 287:21
person 277:2
phone 275:12
Pistons 280:11
place 267:3
placed 272:21
places 264:18 274:7
    277:7
plausible 275:24
plea 267:16,16,17
    267:20 271:10
please 269:4
pointed 283:10
police 259:4,7,8,19
    259:21 262:6
    263:2,9 264:7,8
    268:3 273:13
    274:9 277:22
    279:9 280:16
    283:1
position 263:25
    264:4,10 265:18
    266:23 269:13
    278:14 279:15
    280:8
possibly 283:17
posted 277:19,20
    277:22
precedence 267:18
precedential
    267:17,21,22
preliminary 261:7
prepare 283:7
    286:10
prepared 283:17
preponderance
    261:16,20,23
presented 262:11
Press 262:15
privileges 264:5,7
    266:8
probably 275:7,8
problem 264:17
    268:11 287:16
proceedings 259:11

261:8 267:7
269:25 271:17
289:10
program 277:24
programs 272:17
    277:16 280:20
    281:21,22
progressive 267:5
prosecution 273:18
    274:12
Prosecutor 279:13
prosecutor's
    276:19 279:8
prove 279:24
provided 283:25
providing 277:5
pulled 265:8
put 274:11

_____

Q

question 286:14
questioning 271:12
questions 287:3
quite 264:21
    275:12
quote 270:22

_____

R

R 261:4 289:1
raised 273:3
read 270:3 276:13
    278:1
reading 269:18
reads 264:9
really 278:21
reason 269:23
    285:15
reasonable 261:25
    267:4 279:4
reasoning 268:6
rebuttal 269:14
    284:5
recall 285:6,8
received 260:4
    267:14 288:6

receiving 266:8
recertified 269:9
recommendations
    269:1
reconvened 261:6
reconvening
    288:10,12
record 263:11,23
    265:6,12,16
    270:14 287:24
records 262:22,24
    265:21
refused 276:23
    283:16 286:5,6,7
regarding 271:10
    271:12
regulations 276:5
reimbursement
    267:9
reins 280:4
reinstated 269:8
    284:4
reinstatement
    268:18
relates 262:1,19
    263:3,5 264:3,25
    265:2,13 266:10
    266:22 284:10
relations 262:7
    264:12,23 271:19
    272:18,19,23
    276:16 277:23
    280:23 281:6,23
relationship 272:14
    272:15 284:7
relationships
    281:13
rely 270:14
remember 277:17
Report 265:4
REPORTED
    259:23
reporting 278:8
reports 278:6
    280:18

represent 274:14
representing
    279:10
requested 288:2
reserve 269:14
respect 270:8,20,21
    276:10 277:16
    278:5 279:9 284:2
responsibilities
    262:6
rested 261:10
resulting 264:12
retired 281:8
review 262:21
    270:2
reviewing 287:24
right 269:14,16
rise 266:21
ROBERT 259:17
rules 263:6 266:11
    276:5
run 268:22,22
running 272:17,17

_____

S

S 261:4
sampling 265:9
sat 285:7
saw 273:25 276:25
    278:4 280:17
    282:10 285:19,20
saying 264:14
    271:25 278:17,19
    280:22 283:6
says 272:5 281:16
    285:13
schedule 277:23
scrutiny 276:17
sd 289:19
second 263:19
    276:7 284:16
Secondly 262:14
security 263:8,21
    264:10
see 265:20 276:5

278:13 280:18
    284:7 285:20
seeing 282:11
seeks 267:8
seen 274:18
seniors 266:5
sent 275:15
September 265:8
Serda 278:6
Sergeant 282:8
series 280:19
served 268:20
set 267:18
shape 283:18
shift 284:1
show 261:16 263:3
    265:10,16 274:15
    286:18
showed 265:12
    273:10
showing 262:12,23
    262:24 274:5
    276:1
shown 283:13
    284:13
shows 262:15
    273:14 274:4
    280:7 282:17
signature 265:22
    286:8,12,17
signatures 283:12
    283:13
signed 265:20,20
    283:10,11
similar 267:21
    281:11
sitting 279:20
situation 280:13,15
    283:23
six 269:9
skillful 278:11
slide 266:15
somebody 280:6
someplace 278:23
sound 285:25

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com

writing 288:12
written 265:3
  274:17

**Y**

year 275:5 283:21
  285:4
years 267:24 268:4
  272:22 279:10
youth 266:4

**1**

1 287:11,13
10:00 288:15
11 259:14 261:2,6
  270:15,16 275:6
  289:11
12 279:20
12-0137 259:5
15 280:17
16 277:19
18 288:2,3

**2**

2 265:8
2013 259:14 261:2
  261:6 289:11
2385 289:17
24-hour 285:12
288 260:6,6

**3**

3rd 259:13
31 289:9

**4**

4 259:6 266:19
45 271:14
45-day 267:14
48324 289:18

**5**

5 265:7

**7**

7-15-13 289:14

7310 259:12

**8**

8 284:14
8:00 278:23
81 283:5,7 286:1,2

**9**

9:00 259:14
9:19 261:3
9:58 288:5
95 279:14

O'CONNOR COURT REPORTING
248.360.1331    www.oconnorcourtreporting.com

**A**

abused 266:7,9
Academy 262:23
  263:21 281:2
  286:20
accept 288:12
account 268:2
  281:17
accountable 272:24
  272:25
acknowledged
  286:5
acknowledges
  266:25
acquittal 268:3
acquitted 279:1,6
acquitting 268:7
actions 271:5
  273:23
activities 277:17
  281:11
activity 262:21
  265:5,9,10,19,23
  266:12,16,18
  272:22 276:15,21
  278:19 280:18,19
  280:21 282:4
  283:8 286:9,10,11
actual 264:6
addition 265:15
additional 267:23
Additionally
  263:19 269:4
addressing 270:24
admitted 270:1
  280:25 281:1
  287:8
advocate 259:19
  261:8
Affairs 275:15,16
affixed 265:23
  286:8,12,17
agency 265:12
agree 274:20
agreements 271:10

alleged 271:7
allegedly 283:11
alleging 278:16
Allen 262:22
  263:21 281:2
  286:19
allow 279:13
allowed 266:15
  274:25
alternate 268:21
alternative 269:3
  269:12 286:24
amount 267:2
amounts 267:9
and/or 266:12
anonymous 275:4
  275:11,12 285:4
answer 276:8
anybody 272:22
  283:10
appear 284:12
  285:9
**APPEARANCES**
  259:15
appeared 263:13
  263:14
Appearing 259:19
  259:21
apple 287:2
applicable 267:6
appreciate 269:20
  269:21
appropriate 268:1
  268:17
approval 263:9,12
  263:18,20,23,25
  268:23 269:2
approximately
  275:5
April 265:7
Arbitrator 281:5
arbitrators 261:21
arena 280:11 285:8
argument 261:11
  261:15 269:10

270:3 271:9 284:6
  285:16
arrival 271:20
article 262:15
  270:15 271:2,3
  282:22
Ashford 281:6
asked 276:22 286:4
  286:5
asking 264:1 266:1
  267:4
aspect 282:25
aspects 281:7
**ASSOCIATION**
  259:7
athletics 280:22
attempts 283:22
attending 278:2
attorney 268:23
  274:13
authoring 266:16
Authority 264:4
Ave 259:13
award 268:18
awards 281:20
aware 278:21 279:1
a.m 259:14 261:3
  288:5,15

**B**

back 268:18
back-date 276:23
  276:24 283:15
  286:4,6
badge 280:12
badged 282:25
based 282:7
basically 271:20
  273:22 278:15
basketball 280:20
  281:21
beginning 280:2
behalf 259:19,21
believe 261:9
  267:25 268:17

269:7 270:15
  275:25 276:1
  281:1
best 268:24
better 283:18
beyond 261:24
  279:4
bit 281:9
bite 287:2
**BLACKMON**
  259:18
Bloomfield 289:18
Board 259:1,12,16
  261:5 264:25
  267:18,22 269:16
  270:1 272:13
  275:23 287:4
  288:2,2,10,12,14
  289:10
Borden 267:20
  270:25
box 287:20
break 269:22
Brief 284:5
bring 271:2,4
  274:15 279:25
bringing 268:12,12
brings 271:4 284:6
brother 261:11
  264:5
brought 262:10,16
  264:6 270:10
  271:8 285:2
buck 274:7 277:8
building 281:13,13
  285:7
BX#18 260:5 288:5

**C**

C 261:4 289:1,1
call 273:20,24
  275:12 284:11,20
called 273:18
  274:14 275:21
Canton 285:7,9,9

card 265:14 270:23
  270:23
care 272:6
case 267:15 270:5
  273:20 278:9,25
  279:19,19,24
  284:9,19 289:11
cases 279:14
Catherine 275:7
  280:6
cause 266:21
certain 278:7,19
certification 269:6
certify 289:8
CER-2656 259:23
  289:16
Chairperson
  259:17
chance 270:2
charge 261:20
  264:6,19,21 270:9
  270:14 272:21
charged 262:3
  267:13
charges 261:18,24
  263:15,17,18
  267:2,13,21
  268:12,13 271:16
  279:21,22,23
  286:21
charts 263:3
  267:11 286:14,18
cheating 277:2
checked 282:6
  285:17
chief 263:9 272:2,4
  272:10 273:21
  274:22 275:1
  276:10 281:8
  282:2 284:8
chose 284:12
circus 280:1
citizens 264:15
  277:5
City 259:1,4,19

ESQUIRE 259:19
  259:20
essentially 268:19
estranged 285:2
event 261:23
  267:25
evidence 261:17,21
  261:22,23 262:11
  262:21 266:21
  269:19 270:9,13
  273:14 274:4
  282:17
exact 282:15
exactly 271:17
  274:24 284:2
example 273:16
  274:22
Exhibit 260:4
  270:15,16 277:18
  280:17 284:13
  287:11,12 288:2,3
exhibits 269:20
existed 275:8
expansive 281:10
expediency 286:15
explain 278:12
explanation 278:13
extended 267:2
ex-wife 275:8 285:3

**F**

F 289:1
fact 263:23 264:11
  264:22 267:23
  268:2 275:9,25
  284:10
factor 268:14
factors 268:2,8
facts 274:15
False 265:3
far 287:5
Favors 264:5
fiasco 272:25
figured 282:24
filled 278:18

Finally 265:2
financial 264:4,8
  264:10 278:15
  280:7 282:25
find 265:22 273:19
  275:14
finding 264:1,25
  265:25 266:19
  285:5 286:22
fireable 282:20
fired 283:2
firing 282:22
first 261:20 263:7
  270:9
fit 280:14
flash 280:11
Floor 259:13
focused 281:12
followed 285:12
following 282:2
football 263:14,17
  277:16 281:21
forth 285:2
forward 268:12,13
  284:6
found 265:24 275:4
  275:22,24 279:4
  279:23 284:3
  285:10,14 286:16
  286:20
Four 272:22
fraud 266:14
  270:23,23
free 262:14 280:12
front 279:12
full 273:9 285:21
function 281:1
functions 263:15
  263:17 278:3
  280:25
further 286:25
  288:7

**G**

G 261:4

gain 264:4,8,10
  278:15 280:8
  282:25
game 280:11 283:1
Garrity 263:14
  269:25 282:5
  285:17 287:8,13
GARY 259:17
Generally 262:8
getting 273:4
gist 278:25
give 269:23
given 269:11
gives 266:21 272:8
giving 273:8 274:6
  277:4 282:16
go 263:15 274:20
  285:16
Godbee 271:25
  272:14,15 274:1
  274:23,24 276:11
  278:2 280:24
  281:8,8 282:2
  284:7,8
goes 267:19 272:2
  281:15
going 261:10
  269:19 270:20
  271:24,24 273:25
  274:24,25 275:2
  275:15 276:9,24
  276:25 278:9
  280:1 283:1
GOLDPAUGH
  259:20 261:13
  269:15 284:17,23
  287:1,10,15,22
  288:11
good 266:4 268:8
  281:17
gotten 278:1
greater 276:16
Green 273:16,16
guess 278:24 279:2
guessing 275:9

guilt 264:2,25
  266:1,19 286:22
guilty 261:17
  265:22,24 279:24
  284:3 286:16,20

**H**

half 283:7 286:10
happened 273:1,2
  279:18 285:14
hard 280:16
hear 262:20 263:13
  272:9
heard 263:10,22
  270:3 271:22
  272:10 273:2
  274:19 277:25
hearing 259:1
  268:13
hey 280:12
history 267:1
  268:15
hockey 283:1
hold 272:24 284:15
Hospital 262:24
  263:19
hours 263:4 273:9
  274:6 282:16
  284:1 285:21,23
  285:25

**I**

IA 285:5
IDENTIFIED
  260:4
II 263:5 264:2
III 264:3 265:1
  278:12
important 270:7
inaccurate 266:12
incident 273:3
include 281:10
included 285:18
incomplete 266:12
indicate 263:12

indicated 277:15
indication 285:11
individual 270:21
individuals 282:13
information 267:10
initial 269:10 285:1
initiative 278:6
  280:17
INSPECTOR
  259:17,18
interest 268:25
interesting 270:7
  270:13,21 273:19
  275:3 277:14
  281:4
Interestingly 280:2
Internal 275:15,16
interview 260:6
  282:6 287:9,13
  288:4
investigated 275:21
investigation
  283:20
investigative
  271:13 273:23
  287:7 288:4
involved 277:24
issue 267:23 269:6
  269:9
IV 265:3

**J**

Jakewood 289:17
January 265:7
Jerome 259:8,21
job 266:10 267:10
  273:10 282:19
jobs 276:2
Joe 280:11
JOHN 259:20
John's 262:24
  263:8,19 265:14
  265:16 286:19
Jones 259:19 261:8
  261:9,15 270:7

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com

permit 287:21
person 277:2
phone 275:12
Pistons 280:11
place 267:3
placed 272:21
places 264:18 274:7
277:7
plausible 275:24
plea 267:16,16,17
267:20 271:10
please 269:4
pointed 283:10
police 259:4,7,8,19
259:21 262:6
263:2,9 264:7,8
268:3 273:13
274:9 277:22
279:9 280:16
283:1
position 263:25
264:4,10 265:18
266:23 269:13
278:14 279:15
280:8
possibly 283:17
posted 277:19,20
277:22
precedence 267:18
precedential
267:17,21,22
preliminary 261:7
prepare 283:7
286:10
prepared 283:17
preponderance
261:16,20,23
presented 262:11
Press 262:15
privileges 264:5,7
266:8
probably 275:7,8
problem 264:17
268:11 287:16
proceedings 259:11

261:8 267:7
269:25 271:17
289:10
program 277:24
programs 272:17
277:16 280:20
281:21,22
progressive 267:5
prosecution 273:18
274:12
Prosecutor 279:13
prosecutor's
276:19 279:8
prove 279:24
provided 283:25
providing 277:5
pulled 265:8
put 274:11

Q

question 286:14
questioning 271:12
questions 287:3
quite 264:21
275:12
quote 270:22

R

R 261:4 289:1
raised 273:3
read 270:3 276:13
278:1
reading 269:18
reads 264:9
really 278:21
reason 269:23
285:15
reasonable 261:25
267:4 279:4
reasoning 268:6
rebuttal 269:14
284:5
recall 285:6,8
received 260:4
267:14 288:6

receiving 266:8
recertified 269:9
recommendations
269:1
reconvened 261:6
reconvening
288:10,12
record 263:11,23
265:6,12,16
270:14 287:24
records 262:22,24
265:21
refused 276:23
283:16 286:5,6,7
regarding 271:10
271:12
regulations 276:5
reimbursement
267:9
reins 280:4
reinstated 269:8
284:4
reinstatement
268:18
relates 262:1,19
263:3,5 264:3,25
265:2,13 266:10
266:22 284:10
relations 262:7
264:12,23 271:19
272:18,19,23
276:16 277:23
280:23 281:6,23
relationship 272:14
272:15 284:7
relationships
281:13
rely 270:14
remember 277:17
Report 265:4
REPORTED
259:23
reporting 278:8
reports 278:6
280:18

represent 274:14
representing
279:10
requested 288:2
reserve 269:14
respect 270:8,20,21
276:10 277:16
278:5 279:9 284:2
responsibilities
262:6
rested 261:10
resulting 264:12
retired 281:8
review 262:21
270:2
reviewing 287:24
right 269:14,16
rise 266:21
ROBERT 259:17
rules 263:6 266:11
276:5
run 268:22,22
running 272:17,17

S

S 261:4
sampling 265:9
sat 285:7
saw 273:25 276:25
278:4 280:17
282:10 285:19,20
saying 264:14
271:25 278:17,19
280:22 283:6
says 272:5 281:16
285:13
schedule 277:23
scrutiny 276:17
sd 289:19
second 263:19
276:7 284:16
Secondly 262:14
security 263:8,21
264:10
see 265:20 276:5

278:13 280:18
284:7 285:20
seeing 282:11
seeks 267:8
seen 274:18
seniors 266:5
sent 275:15
September 265:8
Serda 278:6
Sergeant 282:8
series 280:19
served 268:20
set 267:18
shape 283:18
shift 284:1
show 261:16 263:3
265:10,16 274:15
286:18
showed 265:12
273:10
showing 262:12,23
262:24 274:5
276:1
shown 283:13
284:13
shows 262:15
273:14 274:4
280:7 282:17
signature 265:22
286:8,12,17
signatures 283:12
283:13
signed 265:20,20
283:10,11
similar 267:21
281:11
sitting 279:20
situation 280:13,15
283:23
six 269:9
skillful 278:11
slide 266:15
somebody 280:6
someplace 278:23
sound 285:25

| | | | | |
|---|---|---|---|---|
| writing 288:12 | 7310 259:12 | | | |
| written 265:3 | **8** | | | |
| 274:17 | 8 284:14 | | | |
| **Y** | 8:00 278:23 | | | |
| year 275:5 283:21 | 81 283:5,7 286:1,2 | | | |
| 285:4 | **9** | | | |
| years 267:24 268:4 | 9:00 259:14 | | | |
| 272:22 279:10 | 9:19 261:3 | | | |
| youth 266:4 | 9:58 288:5 | | | |
| **1** | 95 279:14 | | | |
| 1 287:11,13 | | | | |
| 10:00 288:15 | | | | |
| 11 259:14 261:2,6 | | | | |
| 270:15,16 275:6 | | | | |
| 289:11 | | | | |
| 12 279:20 | | | | |
| 12-0137 259:5 | | | | |
| 15 280:17 | | | | |
| 16 277:19 | | | | |
| 18 288:2,3 | | | | |
| **2** | | | | |
| 2 265:8 | | | | |
| 2013 259:14 261:2 | | | | |
| 261:6 289:11 | | | | |
| 2385 289:17 | | | | |
| 24-hour 285:12 | | | | |
| 288 260:6,6 | | | | |
| **3** | | | | |
| 3rd 259:13 | | | | |
| 31 289:9 | | | | |
| **4** | | | | |
| 4 259:6 266:19 | | | | |
| 45 271:14 | | | | |
| 45-day 267:14 | | | | |
| 48324 289:18 | | | | |
| **5** | | | | |
| 5 265:7 | | | | |
| **7** | | | | |
| 7-15-13 289:14 | | | | |

**A**

abeyance 28:10
Academy 13:13
  20:15 21:8,9,11
  25:22 26:11
accepted 23:11,13
account 30:3 33:11
accurate 19:6
  27:10 30:12
accused 20:4 25:5
acquittal 13:22
  22:23
aequitted 29:14
activities 25:9,13
  27:12,14
activity 13:10 20:9
  27:9,10 30:12,22
  31:23 33:24
addition 24:13 25:6
  26:12
additional 17:23
  24:1,16
Additionally 25:7
adjourn 19:5 24:15
  34:10
adjourned 18:2
  19:4 23:20 34:16
  34:18
adjournments
  19:22
admitted 23:8 32:2
  32:6
advocate 12:19
  14:20
Affairs 16:22 26:6
  32:19
agencies 26:20
alleged 16:20
Allen 13:13 20:15
  21:8,9,10 25:22
  26:11
allowed 30:11
alterative 28:6
amount 27:5
Antonio 21:9

anyway 30:2
appear 17:25 21:20
  21:21
APPEARANCES
  12:15
appearing 12:19,21
  15:24
appears 26:2
appropriate 28:4,6
  28:17
approval 26:23
April 17:4,24 19:9
  19:9
arraigned 17:4
article 13:21 32:12
articles 22:20
asked 18:17
asking 27:16,18
assigned 14:17
  16:22
Association 12:7
  17:25
attention 19:21
  26:3
attorney 14:20
  17:25 18:3,15
Audrey 22:3
August 18:7,25
authority 14:10
  15:10 33:16,20
authorize 30:11
authorizing 30:10
availability 19:18
available 19:11,15
Ave 12:13
aware 28:21
a.m 12:14 14:3

**B**

back 24:22 29:4,24
  31:6
badge 14:17,25
banks 26:10
based 23:22,23
behalf 12:19,21

14:23 15:24
behold 32:21
believe 17:6 18:25
  26:4
better 27:13
Bica 21:7
bitter 33:1
Blackmon 12:18
  14:15
Bloomfield 35:19
board 12:1,12,16
  14:8,12,15 16:12
  16:14 17:1,23
  18:6 23:17 28:20
  31:13 35:11
Boards 18:25
Borden 32:16
bring 19:21 29:24
bringing 22:21
brought 26:3 30:5
  31:22
Brownlee 22:6
Bully-Cummings
  26:5
Bureau 22:9
Burrell 21:8

**C**

C 14:4 35:1,1
called 31:8
cards 28:23 34:4
case 28:24 30:5
  35:12
caveat 18:23
certification 17:17
  27:22 28:1 29:3
  29:11,12,14,21
  30:3
certify 35:9
CER-2656 12:23
  35:17
chairperson 12:17
  14:13
change 19:21 31:14
character 21:21,22

charge 22:20
charged 15:4,6,9
  15:13 26:16 33:14
  34:2
charges 14:16 16:3
  16:5 17:22 22:12
  22:24 23:23
charging 14:25
Charter 14:10
charts 13:15 20:20
  27:4
Chief 14:9 16:19
  24:10 26:3,18,23
  29:16 31:3
child 33:2
circumstances
  21:24 28:22
City 12:1,4,19
  14:11,21,23 25:6
  25:11,17,18 26:13
  27:1,2,20
claimed 25:16
claims 27:11
clear 16:11,13
  27:24
closing 17:9
coaching 25:12
Collins 12:8,21
  14:17,25 15:25,25
  16:4 18:14 20:4
  21:18 30:14 32:9
  32:14,24
come 31:5,6 32:25
comes 19:18 31:13
commander 12:17
  14:7,13 16:15,16
  21:15 23:11,12,25
  24:7,19 26:18,19
  31:3,9,10 34:12
  34:15
commencing 12:14
Commissioners
  17:2
Communications
  21:16

community 21:14
  21:18 22:4,9 30:7
  30:14,16,18
compensated 27:1
  30:19
compensation 27:5
complete 35:10
completed 17:19
  20:1
composed 14:12
concluded 24:25
Conduct 15:4
  22:20
consider 27:25
consisting 35:9
CONTENTS 13:1
continued 19:5
convened 14:8
conversation 23:19
correct 22:25 23:3
  23:7,9 35:10
correspondence
  29:15
counsel 15:19
  16:10 23:1 28:18
  34:12
counts 15:1
COUNTY 35:5
course 26:9
Co-Member 12:17
  12:18
co-members 14:14
Craig 14:9
credit 28:15
criminal 13:17 17:5
  18:5 20:25 22:24
  25:8 32:8
criminally 34:2
cruise 32:17
CSMR-2656 12:23
  35:17
Curtis 21:17 22:3
cut 33:2

**D**

history 16:12
Hitchcock 21:9
hours 25:16,24
   26:2 27:12,13
   30:18 31:17 34:7
hunt 32:8

**I**

IDENTIFIED 13:5
immediate 15:25
immediately 29:6
impression 19:2,4
incidents 16:17,20

including 30:13
indicated 18:24
   19:3 20:25 22:16
individuals 19:11
   22:10 30:13 33:12
informed 19:10
initially 15:12
   16:14
initiated 22:17
initiating 13:19
Inspector 12:17,18
   14:14,14
interesting 29:1
Interestingly 29:3
Internal 16:22 26:6
   32:19
internally 26:13
interrupt 18:22
interview 20:4
investigate 16:23
   26:7
investigated 32:14
investigation 13:20
   17:15,19 22:18
   26:7 32:9,22
Investigator 16:24
involved 19:9,12
issue 29:21

**J**

Jakewood 35:18
James 14:9

January 16:25 17:2
   17:16,17 18:10
   28:17
Jerome 12:8,21
   14:17,25 15:25
Jim 24:4
job 25:11 31:16
jobs 25:6
John 12:20 15:24
   21:5
Johnson 21:21
John's 13:12 20:12
   25:21 26:11

Joint 14:5 20:3,5,8
   20:11,14,17,20,24
   23:10
jointly 23:7
Jones 12:19 14:21
   14:22,23 16:6
   18:24 19:3,25
   23:4,9,10,14,17
   24:2,9,24 29:20
   31:22 32:22,23
   34:14
Joyce 24:5,12
Juan 21:5
July 12:14 14:2,8
   35:12
JX#1 13:7
JX#1-12 23:15
JX#10 13:19
JX#11 13:21
JX#12 13:22
JX#2 13:8
JX#3 13:10
JX#4 13:12
JX#5 13:13
JX#6 13:14
JX#7 13:15
JX#8 13:17
JX#9 13:18

**K**

Kenyata 32:15
Kevin 22:1

Kilpatrick 19:12
knew 30:12 31:3
   33:7
know 27:13 28:24
   31:19

**L**

lack 29:2
lapsed 17:17 27:22
   29:14
lapses 29:12
Larceny 34:3
Law 14:21
Lemuel 21:23
Letitia 12:19 14:20
   14:23
letter 13:19 22:17
   29:5 32:21
Lewis 21:19 30:10
   30:21 31:13 32:6
   32:15
lieutenant 17:16
   21:5,25 24:3
line 16:17 18:23
   19:22,25 28:2
   29:2,7
list 23:24
lo 32:20
located 20:6,9
logs 13:10 20:9
   27:10,11 30:12,22
   31:23
longer 19:20
looking 25:2,3
looks 21:17
lose 29:10
Love 16:15

**M**

Making 15:14
Manual 13:18
   22:14
Marjorie 21:13
marked 14:6
matter 12:3,12 18:2

19:12 24:15
matters 16:7
Mattie 21:19 30:9
MCOLES 17:17
   27:21
mean 18:22 25:12
meeting 18:12
mention 29:2
mentioned 28:2
Michigan 12:13
   14:1,11 35:3,19
Mike 18:3
minute 15:3 19:6
mis-running 30:6
Monday 12:14 14:2
   14:8
money 19:14
month 28:10
months 28:8 30:2
Moore 24:4 26:19
morning 34:11,16
motions 17:8
Motley 24:6,12
   31:10

**N**

N 14:4 35:1
name 15:20 32:10
necessary 29:2
neither 19:11
never 19:23 34:4
new 31:13
news 22:19
newspaper 32:11
nine 15:18
Ninth 30:7
noon 31:18
normal 30:18
Normally 28:19
Notice 13:22
notification 16:19
November 16:18
   16:18 18:9
number 14:24
   25:15,24

**O**

O 14:4 35:1
OAKLAND 35:5
Obtaining 15:11
occurred 29:19
October 18:8
offer 28:6
office 18:1,4
officer 12:8,21
   14:17,25 15:5,24
   15:25 16:4 20:4
   21:16 22:4,21
   25:5,19 30:1,13
   30:25 32:9,13,24
   33:22,25
OFFICERS 12:7
officer's 18:3
off-duty 22:14
off-the-record
   23:19
okay 30:22
once 19:8
opening 17:8 25:1
   28:20 29:1,22
opportunity 23:18
Oral 15:14
order 14:9
orders 15:7 26:22
outside 13:18 22:15
   25:5,9 26:17,20
   30:18 33:6
overlap 25:21
overlapping 20:23
   26:25
overlaps 13:16
overtime 30:10
o'clock 31:19
O'CONNOR 12:23
   35:17

**P**

P 14:4
PAGE 13:2
pages 35:10
Part 30:16

Page  40

Terry 21:15
testified 22:10
  32:18
testify 21:24
testimony 12:11
  17:7 21:4 22:11
  25:8 26:14,17,21
  26:24 27:8,16
  28:5 31:2,5,6 32:5
  32:25
Thank 14:22 16:6
  19:24 23:14 34:9
  34:16
thing 31:10 33:5
things 15:21
think 22:7 28:21,24
  32:11
three 21:1 25:21,23
  26:25
ticked 33:1
till 18:25
Tim 21:10
time 13:14,15 15:16
  16:3,10,17 17:24
  18:22 19:14,22,25
  20:12,15,19,23
  23:20 26:4 28:2,7
  28:10,14,16 29:2
  29:7,16,24 31:21
  32:3,12,14 34:4,6
  34:10
timekeeper 21:8
today 14:8 15:16
  18:13,14 21:20
  24:16 25:1
Todd 16:24 24:3
tomorrow 24:3,10
  34:11,16
total 24:8,9 30:6
transcript 13:17
  17:9 20:25 22:11
  24:14 25:9 35:9
  35:11
treatment 33:13
trial 12:1,12,16

13:17 14:7 17:5
  17:23 18:5,6,25
  20:25 25:8 31:5
  32:19 35:11
triggered 32:22
triggers 33:3
true 35:10
turn 14:19
two 15:7 25:5 26:16
  29:13
type 33:12

### U

unauthorized
  26:16
Unbecoming 15:5
  22:21
understand 18:22
union 12:9 18:16
Unit 17:21

### V

various 16:8
view 26:15
Vivian 21:14
Volume 12:6
volumes 21:1

### W

waive 16:2
waiver 27:24
Walton 17:16 21:6
  24:4
Wanda 21:22
want 18:23 27:24
wanted 19:20
wants 30:2
warrant 16:24 17:3
Warren 26:5
wasn't 25:23 27:1
  30:10 31:19,20
  32:13
waste 19:14
went 32:16
West 35:19
Whitney 17:16

21:6 24:4
Wilcox 21:16
Willful 15:6
willfully 15:13
  26:22
Williams 24:5
  32:18
Wilson 21:23
wishes 27:19
witch 32:8
witness 21:22,22
  24:13
witnesses 13:2,3
  15:18 21:4,12
  24:2 31:2,7,8
Woodward 12:13
work 21:18 22:2
  26:20 29:13,24
  30:17,24 32:3
worked 18:1 25:15
  25:16 26:2 30:14
working 25:5,6
  26:16 27:2 30:18
works 18:4 22:1,3,7
  22:7 31:9
worry 31:9,11
written 15:14 27:9
  33:6
wrong 33:5

### Y

years 29:13
youth 25:12

### 1

1 14:5 20:3 23:11
10 16:21 18:7 22:16
  32:21
11 22:19 32:11
11/20/2009 16:20
11:27 14:3
12 14:5 17:12 18:11
  22:23 23:11
12-0137 12:5
12-037 14:25

12:05 23:15
12:06 24:20
12:07 24:22
12:22 34:18
13 17:16 18:11
14 13:7,9,11,12,13
  13:14,16,17,18,20
  13:21,22 18:10
15 17:20 18:10
1508 14:17 15:1
16 17:4
17 17:21 18:8
18 16:25 18:9
19 18:9,10

### 2

2 12:6 20:5
20 17:13,23
2006 31:6
2007 13:9,11 16:18
  20:9 31:6
2008 20:6
2009 13:9,11 16:18
  16:23 20:7,10
2010 16:25 17:2,4
  28:18
2011 17:12,13,14
2012 17:17,18,20
  17:21,23,24 18:7
  18:8,9,9,10 19:10
  29:5
2013 12:14 14:2,8
  18:10,11,12 35:12
21 17:2,17 18:8,9
  28:17
213 15:12
23 13:7,9,11,12,13
  13:14,16,17,18,20
  13:21,22 18:8
2385 35:18
24 17:24 18:9 35:10
26 17:14 26:2
27 26:2

### 3

3 20:8
3rd 12:13

### 4

4 16:23 17:5 20:11
  20:21
4/19/2010 17:4
48324 35:19

### 5

5 20:14,21 21:1,3

### 6

6 20:17,22 21:1,10
  21:13

### 7

7 18:12 20:20 21:2
  21:13 25:14
7-807 14:10
7-9-13 35:15
7310 12:12

### 8

8 12:14 14:2,8 17:6
  17:10 18:7 20:24
  35:12
81 15:15

### 9

9 17:5 22:13
9:00 12:14 34:16

O'CONNOR COURT REPORTING
248.360.1331   www.oconnorcourtreporting.com