# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## DECLARATION OF ANGELA HIPPS IN SUPPORT OF THE CITY OF DETROIT'S OMNIBUS REPLY IN SUPPORT OF THE FORTY-SEVENTH OMNIBUS OBJECTION TO CERTAIN CLAIMS

I, Angela Hipps, a Manager with the City of Detroit General Services Department ("GSD"), submit this declaration in support of the City of Detroit's ("City") Omnibus Reply in Support of the Forth-Seventh Omnibus Objection to Certain Claims.

1. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge or are based upon information provided to me by other City employees. If I were called to testify, I could and would testify to the facts set forth in this declaration.

2. I began oversight of the irrigation systems repair and maintenance contract for GSD, City of Detroit, in June of 2013. My position with GSD was Floriculture Supervisor. I have a Bachelor of Science in Horticulture from Michigan State University. I also have training in irrigation repairs, and was responsible for completing all irrigation repairs for the Rogell Golf Course, where I served as superintendent for 17 years.

3. Agar Lawn Sprinkler Systems Inc. ("Agar") maintains and repairs irrigation systems, such as sprinkler systems, such as those used by the City to maintain its public areas.

4. Robert (or "Bob") Agar is the owner of Agar.

5. On July 28, 2016, the City filed its Forty-Seventh Omnibus Objection to Certain Claims [Doc. No. 11399] ("Objection"). As set forth in the Objection, the City objected to proof of claim number 776 ("Agar Claim") filed by Agar on February 4, 2014. Agar filed a response to the Objection on August 23, 2016, at

docket number 11451 ("Agar Response"). I have reviewed the Objection, the Agar Claim, and the Agar Response.

6. Agar maintains and repairs irrigation systems, such as sprinkler systems,

7. The Agar Claim asserts a claim for "services performed" in the amount of $189,752.63.

8. In support of the Agar Claim, Agar attaches a summary of amounts that it claims represent unpaid invoices ("Agar Claim List").

9. The Agar Claim List only contains three invoice numbers: #410, #412, and #413. These are listed next to the entry marked "Pg. 10 11, 12."

10. The remaining entries on the Agar Claim List do not provide information to substantiate the Agar Claim. Each entry contains no more than (1) a cryptic statement that may indicate a City department or function Agar claims owes it money, (2) the year in which services allegedly were provided or billed, and (3) a dollar amount claimed. All of the entries other than the one noted in the prior paragraph lack invoice numbers. Agar did not attach copies of any invoices to the Agar Claim.

11. For the entries that lack invoice numbers or even dates and service descriptions, there is no way for the City to verify that any amount is owed, much less the amount claimed. There is no way to determine (1) whether any invoices were ever issued in the amounts alleged, (2) what the alleged services might have been that would justify these amounts or where and when they might have been provided, or (3) whether the amount asserted might already have been paid by the City.

12. Further, I have reason to suspect that the amounts asserted likely have been fabricated or inflated.

13. Soon after I began my tenure with GSD, I received questions from colleagues over the amounts that Agar was billing for services.

14. As an example of these concerns, Building Maintenance Supervisor Johnnie Haynes discussed with me an Agar invoice. He told me that someone had broken into one of the City's trucks and had stolen items needed to turn on water to a building. He had asked Agar to handle this request. He said that Agar had dispatched a technician who turned on the water in under five minutes while he

watched. Later, he had received an invoice claiming that four men had been involved and had each spent four hours on the problem.

15. A number of my colleagues observed that many invoices from Agar asserted that four men had provided four hours of labor each, regardless of the nature of the job in question.

16. Because of these concerns, Brad Dick, Director of GSD, asked me to supervise work assigned to Agar. My experience in irrigation would help GSD verify the invoices it received.

17. An opportunity to witness a repair presented itself on June 20, 2013. A sprinkler head was stuck on and was flooding an area on Madison Avenue. I contacted Agar that day and asked them to repair it. They agreed to repair it the next day, Friday, June 21, as they would be working at Grand Circus Park nearby. I was to meet them at noon.

18. Agar's technician arrived and changed out a solenoid and a faulty valve and turned the water back on. I did not witness the entire repair, but remained in the area and checked in from time to time. In my experience, such a repair should normally take no more than two hours for one person to complete.

19. The next Monday, June 24, Karen Agar from Agar emailed invoice #412 to the City for the work that had been done. The invoice was for $496.30, $416.00 of which was for labor. There was no breakout for how the figure for labor had been determined.

20. When I requested a breakout of hours, Agar responded that three men had each worked four hours on the job for a total of 16 hours at $26 per hour. I pointed out that this math did not work. The next day, June 25, Agar emailed a revised invoice showing that that four men had been present, not three.

21. Also on June 25, I witnessed another service request to West Grand Circus. Agar had said it would start work at 8:00 a.m. I arrived at 8:00 a.m. at the job site and waited for Agar's people to arrive.

22. The first irrigation person showed up at 9:25 a.m., identified himself as "Steve," and said that others were on the way.

23. Ultimately, four people showed up, including the owner Bob Agar, at various times between 10:30 a.m. and 11:30 a.m. None of them had contacted

Municipal Parking to get access to the job site. It was their responsibility to do so, and because they had not, they could not enter to conduct the scheduled repairs.

24. Bob Agar told me they would return the next day, June 26. I stated there should not be a charge for June 25 since no work had been done. Bob told me that he intended to charge for four people's time starting at 8:00 a.m. that morning because they had left their shop at 8:00 a.m., went to retrieve parts, and so forth. I told him that I would not approve an invoice where no actual work had been done.

25. I also told Bob that after the job was completed, I wanted all parts that were replaced. Bob told me that he did not have to give me the parts. I insisted on receiving them anyway, as I believe the City has a right to the original parts when it is paying for replacement parts.

26. I asked Bob at what time Agar would arrive tomorrow. Bob said they would return at 9:00 a.m. He appeared very angry. He and his team then left.

27. That afternoon, the City received an email from Bob canceling the June 26 repair appointment.

28. Over the next few days, I exchanged emails with Bob regarding his invoice for the Madison Avenue repair. He insisted that Agar spent 16 hours on the job, stating that the time included the initial contact, scheduling, invoicing, pre-meeting and actual meeting time, research, parts procurement, and "pure man hours" in addition to the actual repair time. In my experience, irrigation specialists set an hourly rate that covers these overhead items and bill only for the time that they actually spend on the job.

29. Ultimately, the City terminated its contract with Agar.

30. Based on my experience with Agar and on conversations I have had with other current and former City employees, I believe Agar likely overbilled the City for services for years. I have no reason to trust any invoice from Agar.

31. Because the Agar Claim is unsupported by credible documentation, and because my personal experience with Agar indicates that invoices from Agar may well contain inflated labor charges, I do not believe the Agar Claim demonstrates that the City owes Agar anything, much less the amount claimed.

- SIGNATURE LINE IS ON THE NEXT PAGE -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

By: /s/ Angela Hipps
Angela Hipps
Manager, City of Detroit General Services Department

Executed on August 26, 2016