B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|
| **PLAINTIFFS**<br><br>GOTHAM MOTOWN RECOVERY, LLC | **DEFENDANTS**<br><br>CITY OF DETROIT |
| **ATTORNEYS** J. Adam Behrendt (P58607)<br>BODMAN PLC<br>201 W. Big Beaver, Suite 500<br>Troy, MI 48084<br>(248) 743-6000 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☑ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Action for Declaratory Judgment Under 28 U.S.C. §1337 and 29 U.S.C. 2201

### NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23
☐ Check if a jury trial is demanded in complaint | Demand $ Injunctive Relief

Other Relief Sought

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES ||||
|---|---|---|---|
| NAME OF DEBTOR<br>CITY OF DETROIT || BANKRUPTCY CASE NO. 13-53846 ||
| DISTRICT IN WHICH CASE IS PENDING<br>EASTERN DISTRICT OF MICHIGAN || DIVISION OFFICE<br>SOUTHERN DIVISION | NAME OF JUDGE<br>THOMAS TUCKER |
| RELATED ADVERSARY PROCEEDING (IF ANY) ||||
| PLAINTIFF | DEFENDANT || ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING || DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/ J. Adam Behrendt (P58607) ||||
| DATE 02/26/2018 || PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>J. Adam Behrendt ||

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Case No. 13-53846
Chapter 9
Hon. Thomas J. Tucker

_____/

GOTHAM MOTOWN RECOVERY, LLC,

A.P. No.

Plaintiff,

vs.

**COMPLAINT FOR DECLARATORY RELIEF**

CITY OF DETROIT, MICHIGAN,

Defendant.

_____/

Plaintiff Gotham Motown Recovery, LLC ("Gotham") complains against the City of Detroit, Michigan ("City") as follows:

## JURISDICTION

1. This adversary proceeding is brought to declare the parties' rights and responsibilities arising from a dispute under the Development Agreement - Option To Acquire And Develop Land ("Agreement"), entered into as of December 10, 2014 by and among the City, the State of Michigan and Financial Guaranty Insurance Company ("FGIC"). A copy of the Agreement is attached as **Exhibit A**.

2. As is expressly permitted under the terms of the Agreement, FGIC transferred and assigned all its right, title and interest under the Agreement to Gotham and, conversely, Gotham assumed all of FGIC's obligations under the Agreement. FGIC provided the City written notice of such assignment, as contemplated by the Agreement. *See* Exhibit A at § 13, p 22.

3. The Court has jurisdiction over this matter and this Chapter 9 proceeding under 28 U.S.C. § 1334 and the general order of reference in this District. Further, the Court retained jurisdiction over all disputes as to the Agreement that involve the City, among other parties, under Sections 92 and 95 of the Order Confirming Eighth Amended Plan For The Adjustment of Debts of The City Of Detroit, entered on November 12, 2014 (Dkt. No. 8272) ("Confirmation Order"). The Agreement further

2

provides any dispute between the parties shall be brought in this Court for so long as it has jurisdiction. *See* Exhibit A at § 9, p 21.

4. This adversary proceeding is brought under Rule 7001, *et seq.*, of the Federal Rules of Bankruptcy Procedure. It constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(O).

5. The parties have consented to entry of a final order by the Court in this adversary proceeding. *See* Exhibit A at § 9, p 21.

6. Venue is proper in this District under 28 U.S.C. § 1409.

## THE PARTIES

7. The City is a municipal corporation located in Wayne County, Michigan.

8. On July 18, 2013, the City filed a petition for relief under Chapter 9 of title 11 of the United States Code ("Bankruptcy Code") (Dkt. No. 1).

9. On December 5, 2013, the Court determined that the City was eligible to be a debtor under Chapter 9 of the Bankruptcy Code and entered an Order for Relief Under Chapter 9 of the Bankruptcy Code (Dkt. No. 1946).

10. On October 22, 2014, the City filed the Eighth Amended Plan for the Adjustment of Debts (Dkt. No. 8045) ("Eighth Amended Plan"), which was confirmed pursuant to the Confirmation Order.

11. FGIC, a New York stock insurance company, was a large creditor in this Chapter 9 case. As is further detailed below, the Agreement was provided by the City to FGIC in connection with the settlement of certain claims in the City's bankruptcy.

3

12. Gotham is a Delaware limited liability company that is managed by FGIC, which maintains its principal place of business in New York, New York. Gotham was formed for the purpose of owning, managing and administering certain assets, including the Agreement.

## THE FACTUAL BACKGROUND

13. The Agreement, and the rights granted to FGIC (now Gotham) under it, was entered into as part of a settlement between FGIC, the City, and the State. The settlement resolved FGIC's claims against the City, which were valued at over $1 billion. The Agreement reflects the parties' mutual understanding and desire to resolve their differences and to promote the City's economic growth and redevelopment. Indeed, as was stated in the Confirmation Order, the Agreement:

> will provide the City with various benefits that the City otherwise would be unable to realize, including by laying the groundwork for a decades-long partnership among the City, FGIC and the State that promises to provide substantial investment in, and rehabilitation of, City assets.

See Dkt. No. 8272, ¶ 2.

14. The Agreement concerns the development of 5.3 acres of real property located at 19 Steve Yzerman Drive in Detroit, commonly known as the Joe Louis Arena, and its parking garage located at 900 W. Jefferson Avenue (collectively, the "Property"). At its core, the Agreement grants Gotham (as FGIC's assignee) the right to develop the Property subject to various conditions and requirements.

15. Specifically, the Agreement grants Gotham 36 months following November 21, 2014 (the last day of which, as the same may be extended, is defined in the Agreement as the "Development Proposal Deadline") to identify a development partner or manager to manage the development of the Property and to prepare and submit to the City a comprehensive development plan for the Property (the "Development Proposal"). *See* Exhibit A at § 1(A), p. 2. The Agreement expressly contemplates that the Development Proposal Deadline "may be extended in accordance with the terms of [the Agreement]." *Id.*

16. Under the Agreement, the Development Proposal is to include a "mixed use project consisting of (i) a first-class hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreational, residential and/or condominium units . . . given prevailing market conditions . . . ." *See* Exhibit A at § 1(A)(1), pp 2-3. Once submitted, the City "shall review any Development Proposal" within 90 days and either approve the proposal or provide specific reasons why the Development Proposal is unacceptable and allow for its resubmission. *Id.*

17. Under the Agreement, no more than 90 days after the expiration of the then existing lease for the Joe Louis Arena, the City is obligated to commence its demolition of the arena. *See* Exhibit A at ¶ 5(h), pp 16-17.

18. A critical provision of the Agreement is Section 1(A)(3), which provides, in relevant part, as follows:

5

> Upon request of [Gotham], the City may approve an extension of the Development Proposal Deadline by up to twenty-four (24) additional months, *which approval shall not be unreasonably withheld, delayed or conditioned*. The City agrees that it would be unreasonable to withhold its approval of such extension if . . . (ii) *it is reasonable given the complexity of the development contemplated by [Gotham] for the Property*.

Exhibit A at § 1(A)(3) (emphasis added).

19. The City has undergone significant changes since the parties executed the Agreement. Changes to "prevailing market conditions," together with knowledge obtained about the Property's physical condition and matters of title, access and similar issues, have rendered any development substantially more complex than was originally envisioned. There are numerous developments that have been successfully completed or that are underway in the downtown area, including a massive new stadium complex, significant multi-unit residential developments, numerous hotel projects, new and restored office buildings and related projects anchored by an 800-foot mixed-use tower at the old Hudson's site, and the rebirth of large-scale retail. By all measures, the City's circumstances and prospects today are markedly different from what they were when the City was in bankruptcy. These changes and positive developments for the City as a whole necessarily have changed the uses that that may be needed or desirable for the Property and, importantly, have vastly increased the complexity of the development of the Property.

20. Gotham has worked very hard over the last several years to ensure that its plans for the Property not only take into account the scale and scope of these other

projects, but are consistent with the City's overall vision. At the City's urging, Gotham has spent hundreds of thousands of dollars in connection with those efforts.

21. Because the City ultimately must approve its Development Proposal, Gotham has worked hand in glove with the City to try to elicit and understand its vision for the development of the Property so that the development will be successful and both parties will realize the benefit of their significant bargain and compromise contained in the Agreement.

22. To that end, Gotham has worked closely with the City of Detroit Planning & Development Department and the Detroit Economic Growth Corporation to better understand the City's desired development vision for the Property and surrounding area. Those efforts have included extensive meetings, numerous presentations, and telephone conversations. In the last 18 months alone, more than ten meetings have occurred where Gotham has sought the City's input.

23. During the course of these interactions, the City acknowledged that its vision for the area has changed and that it is uncertain what sort of development it would like to see for the Property.

24. Moreover, the City of Detroit Planning & Development Department has, consistent with Gotham's view, questioned whether the Development Proposal should still include the contractually specified hotel or whether the Property would be better utilized in another form.

7

25. Gotham has steadfastly attempted to assist the City in the planning process. At significant expense, Gotham has engaged consultants, architects, brokers, planners and lawyers to help develop a planning framework and vision for the Property that would be acceptable to the City. Detailed market studies were conducted, the results of which were shared with the City. Conceptual drawings of various possibilities were prepared and provided. Gotham has diligently complied with every City request over the past several years to help it with its decision making process and vision for the Property.

26. In particular, Gotham engaged the independent and highly regarded architectural firm SmithGroupJJR to assist with the planning process. At the request of the City, Gotham authorized SmithGroupJJR to conduct a detailed site analysis and prepare concept plans for the Property and surrounding area. SmithGroupJJR held an initial meeting with the City to get guidance on its vision for the area. Based upon that guidance, SmithGroupJJR generated numerous concept plans. The City, however, was unable to steer Gotham and its advisors to a particular development concept. Rather, the City expressed a desire to change the potential density of the development and explore different development options, including elements not contemplated by the Agreement.

27. Nevertheless, Gotham diligently complied with every request of the City over the past several years.

28. Most recently and, again, at the City's request, in July 2017, Gotham contributed to the cost of a planning study desired by the City for the entire west riverfront area surrounding the Property ("West Riverfront Study"), which the City has represented is necessary for it to make any decisions about the development of the Property. It was only a little over a week ago, on February 16, 2018, that an initial report from the West Riverfront Study was made available to Gotham.

29. The City previously stated it would not be in a position to consider any development proposals for the Property until the West Riverfront Study was completed. Gotham was repeatedly assured that the deadlines in the Agreement would be appropriately adjusted to reflect Gotham's voluntary participation in the joint planning process and the delay associated with the West Riverfront Study.

30. Separate and apart from these delays and the lengthy West Riverfront Study, the parties have uncovered numerous unforeseen complexities during the due diligence and planning process, with respect to any development of the Property. These complexities include, but are by no means limited to:

- Significant access constraints and issues for the Property, including limited vehicular and pedestrian access to the Property from the Lodge Freeway (M-10) and central business district.

- Shared or overlapping infrastructure issues with Cobo Hall, including water lines, electric lines, loading docks, pedestrian platforms and emergency egress routes.

- The massive underground interceptor drain which crosses the Property without an easement.

- Cobo's ongoing desire to expand its use of part of the Property.

- The changing scope of new projects in the City since the Agreement's execution, which impacts the demand analysis for the specific requirements of the Development Proposal.

- The effect that certain kinds of developments on the Property may have on neighboring properties, including Wayne County Community College.

- The need to restructure or redesign public utilities servicing the Property, including the fact that the parking garage is serviced in part by lines from the Property which may be impacted by the demolition of the Joe Louis Arena.

- Identifying and addressing the state and local tax incentives that may be available to any development of the Property.

- Coordinating the development of the Property with the Riverfront Conservancy regarding a possible extension of the riverfront walk.

- The rapidly deteriorating condition of the parking garage and the City's ongoing analysis of its obligations under the Agreement to maintain the parking garage in at least the same condition and repair (except for environmental condition and repair, which is addressed in another provision of the Agreement) as existed on the Effective Date of the Agreement, which obligations Gotham believes will cost the City several million dollars.

- Uncertainty as to when demolition of the Joe Louis Arena by the City will commence and be completed.

- The issue of whether it would be most productive to develop the Property in phases, as would be customary for a development of this magnitude.

- The current treatment of the arena site and parking deck site as one property, rather than bifurcating such parcels as appropriate given the separation by Jefferson Avenue and the potential ability to continue to operate the parking garage.

- The City's expressed interest in potentially renting the parking garage on the Property to third parties.

- Lack of clarity over easements and maintenance responsibilities for the pedestrian tubes connecting the arena, Cobo, the parking deck and Riverfront Towers.

31. Moreover, although it appears that the lease for Joe Louis Arena has expired, which triggers the City's obligation to commence demolition within 90 days thereafter, the City has yet to submit to Gotham demolition plans for its review and approval as required by the Agreement.

32. The uncertainties inherent in the City's changing and undefined plan for this area makes it impractical for Gotham to partner with an appropriate development partner or manager and submit a feasible Development Proposal within the timeframes provided under the Agreement. Further, any delay by the City in the demolition of the Joe Louis Arena will, in turn, delay the development of the Property and the deadlines contained in the Agreement.

33. Given the enormous complexities involved in any development of the Property, the City's continuing uncertainty as to what it thinks is the optimal development plan for the Property and surrounding area and changes in prevailing market conditions, the deadlines set forth in the Agreement, including the Development Proposal Deadline, are simply unreasonable and unattainable. Thus, in accordance with Section 1(A)(3) of the Agreement, pursuant to a letter dated July 20, 2017, Gotham formally exercised its right to request a 24-month extension to the Development Proposal Deadline.

34. The City failed to respond to the extension request for more than six months. During that period, Gotham sent numerous letters and emails and made multiple calls seeking to confirm the requested extension.

35. The City waited until February 7, 2018, to respond. In its February 7, 2018 correspondence, the City did not acknowledge Gotham's entitlement to a 24-month extension of the Development Proposal Deadline (or otherwise offer to amend the Agreement to address any of the unforeseeable delays and complexities set forth above). Instead, it advised Gotham that it will only approve a 180-day extension (*i.e.*, until August 18, 2018) for Gotham to submit the Development Proposal (which, pursuant to the Agreement, includes the hotel component that the City has already advised Gotham it does not want). The City's "offer" to extend the Development Proposal Deadline for only 180 days is conditioned upon Gotham's waiver of its right to seek any further extension, thereby eliminating Gotham's contractual right to seek an extension of up to two years. Notably, in its letter the City acknowledged that the West Riverfront Study had not been completed, that decisions regarding infrastructure have not been made and that "[t]he City has not issued an opinion or preference for any of the provided [development] options and fully understands that additional due diligence will be required prior to investment decisions."

36. Thus, the City's position is that it will only approve an extension unilaterally set by it for a Development Proposal that the City itself has acknowledged is no longer feasible or desirable from a planning perspective and

13

which must address infrastructure and other improvements that have not yet even been identified by the City. The City's position is in direct conflict with its express agreement with Gotham "that it would be unreasonable to withhold its approval of such extension if . . . (ii) *it is reasonable given the complexity of the development contemplated by [Gotham] for the Property.*" Exhibit A at § 1(A)(3) (emphasis added).

37. Gotham wants the development of the Property to be successful. As previously noted, the right to develop the Property was a key component of FGIC's agreement in this Chapter 9 case to settle claims it had against the City valued at over $1 billion. Gotham wants to submit a Development Proposal that is consistent with the City's vision and goals for this area.

38. Given the unforeseeable delays and complexities involved and changes in prevailing market conditions, it is clear and reasonable that Gotham will need, and is entitled to be granted, the entirety of the 24-month extension period permitted in the Agreement for the development of the Property to be successful. Anything less than the full 24 months threatens the viability of the development of the Property and thus the value of the development option that FGIC obtained in exchange for its claims in this Chapter 9 case.

39. Thus, there exists an actual controversy between the parties regarding the rights and obligations under the Agreement and, in particular, Section 1(A)(3) thereof.

14

# COUNT I
## 29 U.S.C. § 2201
### Declaratory Judgment

40. Gotham re-alleges each of the preceding paragraphs.

41. The Federal Declaratory Judgment Act provides courts with the authority to "declare the rights and other legal relations of any interested party seeking such declaration" in any actual controversy within its jurisdiction. *See* 28 U.S.C. § 2201.

42. Here, there exists an actual controversy between the parties relating to their rights and obligations under the Agreement.

43. In light of the changes in the City's circumstances and prospects and in prevailing market conditions since the City's bankruptcy, the City's continued and continuing uncertainty with respect to the elements of a development plan for the Property that it desires and the delays caused by that uncertainty and the unforeseen complexities inherent in the development of the Property, Gotham contends that it is entitled to the full 24-month extension permitted by Section 1(A)(3) of the Agreement. Specifically, Gotham contends that a 24-month extension of the contractual deadlines, including the Development Proposal Deadline, is "reasonable given the complexity of the development contemplated by the Developer for the Property." *See* Exhibit A at § 1(a)(3), p 4.

44. The City, on the other hand, has taken the position that it will only grant a 180-day extension, and has conditioned even that brief extension by insisting that

15

Gotham waive the right to seek any further extension. Gotham contends that the City, in addition to unreasonably delaying its consent to Gotham's extension request for more than six months, is unreasonably withholding its consent to Gotham's reasonable request for a 24-month extension. In sum, the City's refusal to recognize Gotham's right to a 24-month extension of the Development Proposal Deadline given the admitted complexity of the development of the Property is unreasonable and violates the City's obligations under the Agreement.

## **RELIEF REQUESTED**

WHEREFORE, Gotham respectfully requests that the Court issue a declaratory judgment that the City has unreasonably delayed, conditioned and/or withheld its consent to Gotham's request for a 24-month extension of the deadlines in the Agreement, including the Development Proposal Deadline.

BODMAN PLC

February 26, 2018

By: /s/ J. Adam Behrendt
J. Adam Behrendt (P58607)
Attorneys for Gotham Motown Recovery, LLC
201 W. Big Beaver, Suite 500
Troy, Michigan 48084
(248) 743-6000
abehrendt@bodmanlaw.com

# CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to all attorneys of record.

/s/ J. Adam Behrendt (P58607)