# Exhibit A

# DEVELOPMENT AGREEMENT

## OPTION TO ACQUIRE AND DEVELOP LAND

## BY AND AMONG

## CITY OF DETROIT,

## THE STATE OF MICHIGAN

## AND

## FINANCIAL GUARANTY INSURANCE COMPANY

**THIS AGREEMENT** (referred to herein as this "Agreement") is entered into as of the 10th day of December, 2014 (the "Effective Date"), by and between the City of Detroit, a Michigan public body corporate (the "City"), acting through its Planning & Development Department ("PDD"), whose address is 2300 Cadillac Tower, Detroit, Michigan 48226, the State of Michigan (the "State"), whose address is P.O. Box 30013, Lansing, Michigan 48909, and Financial Guaranty Insurance Company, a New York stock insurance company ("Developer"), whose address is 521 Fifth Avenue – 15th Floor, New York, New York 10175. The City and Developer are sometimes referred to in this Agreement as a "Party" and, collectively, as the "Parties."

### Recitals:

A.     In consideration of the Parties' various contractual arrangements and settlements entered into contemporaneously herewith between the City and Developer, and the mutual desire of the Parties to promote economic growth in the City (the "Arrangement"), the City has agreed to grant an option to Developer to acquire that certain real property upon which is presently situated the improvements commonly referred to as the Joe Louis Arena, inclusive of 5.3 acres of real property located at 19 Steve Yzerman Drive, Detroit, Michigan, and the Joe Louis Arena Garage, inclusive of 3.3 acres of real property located at 900 W. Jefferson Avenue, Detroit, Michigan (collectively, the "Property"). As used herein, the term "Property" shall be deemed to include:   (i) the land as depicted on the attached Schedule 1, subject to additions and

modifications as reasonably requested by Developer, together with all air, mineral, subsurface and riparian rights appertaining thereto, if any; (ii) the City's interest, if any, in those certain above ground pedestrian walkways and all necessary related easements located on the Property or appurtenant thereto, whether now existing or hereafter granted prior to the Closing (as hereinafter defined), allowing access from the property to COBO Center (the "COBO Interests"); (iii) the City's interest, if any, in any land lying in the bed of any street, road, alley, right-of-way or avenue, at the foot of, adjoining or dividing the Property, only to the extent such street, road, alley, right-of-way or avenue is not open for the general benefit of the public; (iv) the City's interest, if any, in the use and benefit of all easements appurtenant to the Property whether or not of record; (v) the City's interest in and development rights under all authorizations, permits and approvals with respect to the use and development of the Property; and (vi) such other rights, interests and properties as may be specified in this Agreement to be sold, transferred, assigned or conveyed by the City to Developer.

      B.    The State has agreed to grant to the Developer or assist the Developer in obtaining certain economic development incentives for purposes of developing the Property upon the terms and conditions set forth herein.

      C.    If Developer exercises its option with respect to the Property as set forth herein, Developer shall develop such Property in accordance with the terms and provisions of this Agreement.

      Accordingly, the Parties agree as follows:

**Section 1.    DEVELOPMENT AND OPTION**

      (A)    <u>Development Proposal</u>.

      (1)    On or before a date which is thirty-six (36) months following full and complete execution of this Agreement (as the same may be extended in accordance with the terms hereof, the "Development Proposal Deadline"), the Developer shall (i) identify a developer partner that shall serve as development manager for the Development, or a development manager to be hired on a fee for service basis by Developer to manage construction of the Development (as hereinafter defined), either of which shall have significant experience in the development of large, complex mixed-use urban projects, and (ii) prepare a comprehensive development plan for the Development, and shall submit such information along with such plan (in form and substance reasonably acceptable to the City) to the City for its review and approval in the manner set forth in this Section 1(A) (the "Development Proposal"), which approval shall not be unreasonably withheld, conditioned or delayed, including, without limitation, any condition in such approval that would interfere with the eligibility of the Development for TIF Incentives (as defined in Section 5(I)(a) below) as contemplated hereby. For purposes of this Agreement, "Development" shall mean that certain mixed use project consisting of (i) a first-class hotel and related facilities including not less than 300 hotel rooms, and (ii) such other office, retail, commercial, recreational, residential and/or condominium units as shall be determined by the Developer (industrial, adult entertainment and other noxious uses excepted) given prevailing market conditions, with

CHI-181944729v9

a height above ground not to exceed 30 floors, to be constructed upon the Property by the Developer, together with all onsite improvements, site preparation, onsite infrastructure (including, without limitation, sanitary sewer, water, storm sewer, sidewalks, street lighting, driveways, storm water detention or retention facilities), related parking facilities and landscaping, necessary or appurtenant thereto; in all instances as approved by the City in accordance herewith, which approval shall not be unreasonably withheld, conditioned or delayed to the extent consistent with the City's urban planning policies and the City's comprehensive development plan as existing on the date any applicable Required Approvals (as defined below) are obtained by the Developer. For purposes of this Agreement, and without limiting the Developer's ability to identify and receive approval of a different development partner, the Detroit Regional Convention Facility Authority is deemed by the City an approved development partner. The Development Proposal shall include an application for the brownfield plan necessary for the application for TIF Incentives, and it shall also identify which components of the Development Proposal are eligible for the TIF Incentives, disbursement of which shall be governed by the Economic Incentive Agreements (as defined in Section 5(I)(a) below), and the City shall use its commercially reasonable efforts to cause the State or applicable State related entity to grant any approvals necessary for those TIF Incentives no later than one hundred twenty (120) days after the date of approval of the Development Proposal, subject to the terms hereof. The Development Proposal shall include the terms of such Guaranty (as defined in Section 5(B) below), including the identity of any guarantor thereunder, and also include the terms of any proposed equity investment and financing for the Development; provided, however, (i) the Development Proposal does not need to disclose any additional equity partners, provided that the Developer will not partner with any third party that is prohibited from doing business with the City, (ii) the Development proposal does not need to disclose the holder(s) of the COPs or holders of the beneficial interests in the COPs, and (iii) the Development Proposal does not need to identify a development partner if the rights under the Agreement have been transferred to a developer prior to the date of the Development Proposal Deadline, which transferee has previously been approved by the City, which approval shall not be unreasonably withheld, conditioned or delayed.

(2)     The City shall review any Development Proposal submitted to the City by the Developer and within ninety (90) days of receipt by the City of such Development Proposal (the "Development Proposal Review Period") the City shall either (i) approve the Development Proposal or (ii) provide the Developer with the specific reasons why the Development Proposal is not acceptable, which may include unacceptability of the proposed development partner (if required). If the City does not approve the Development Proposal, the Developer may provide a revised Development Proposal(s) to the City for its approval pursuant to the process herein, which shall continue until the earlier of (i) the date on which a Development Proposal is approved, and (ii) the Development Proposal Deadline which shall be automatically extended by the aggregate of all Development Proposal Review Periods. The City and, to the extent applicable related to the TIF Incentives, the State, shall reasonably cooperate with the Developer in preparation of the Development Proposal, at no incremental cost to the City or, as applicable, the State. The Development Proposal, as approved by the City pursuant to

3

this Section 1(A) shall be hereinafter referred to as the "<u>Approved Development Proposal</u>."

(3)     Upon request of the Developer, the City may approve an extension of the Development Proposal Deadline by up to twenty-four (24) additional months, which approval shall not be unreasonably withheld, delayed or conditioned.  The City agrees that it would be unreasonable to withhold its approval of such extension if (i) the Developer requested the extension because development in the immediate vicinity of the Property has materially decreased or the general economic condition of the City has deteriorated to such a level that it would not be economically feasible for the Developer to pursue development of the Property or (ii) it is reasonable given the complexity of the development contemplated by the Developer for the Property.

(B)     <u>Option and Diligence Procedure</u>.

(1)     The Developer shall have until a date which is one hundred eighty (180) days prior to the Development Proposal Deadline (as may be extended) to give the City written notice of its intent to conduct the Diligence Activities (as hereinafter defined) on the Property (the "<u>Diligence Notice</u>"). Following receipt of the Diligence Notice, the City shall use its commercially reasonable efforts during the Diligence Period (as defined below) to provide the Developer and its contractors, consultants and their respective agents with such access to the Property as may be  reasonably requested by the Developer from time to time, subject to any access limitation of that certain Sublease of Riverfront Arena between the City, Olympia Entertainment, Inc. and the Detroit Red Wings, Inc., dated June 15, 2014, and the related Parking Agreement (as may be amended, restated or modified, the "<u>JLA Lease</u>").  For purposes of this Agreement, "<u>Diligence Activities</u>" include but are not limited to the following:

(a)     such physical inspections, surveys, soil borings and bearing tests and possible relocation of utilities, all as Developer deems necessary in its sole discretion, all of which shall be completed at Developer's expense;

(b)     subject to the terms and provisions of Section 2 below, including giving of such Investigation Notices and obtaining City approval as may be required thereunder, investigations, environmental studies, environmental site assessments (including Phase I and Phase II site assessments, and/or sampling and invasive testing of soil, groundwater, surface water, soil vapors, indoor air, and building materials (such as Asbestos and lead-based paint)), and such other investigations and assessments as Developer may deem necessary in its sole discretion to determine the condition of the Property and the Property's compliance with Environmental Laws (as defined below) and any other federal, state and local laws, rules, regulations and orders relating in any way to protection of human health, the environment and natural resources, all of which shall be completed at Developer's expense; and

(c)     a review of available public and private utilities and public accesses necessary for the proposed development of the Property.

CHI-181944729v9

(2)     Title and Survey. The City shall deliver to Developer a title commitment and ALTA survey for the Property (the "Title Commitment and Survey") promptly following execution of this Agreement. Within twenty (20) business days after the Developer's receipt of the Title Commitment and Survey (in form reasonably acceptable to the Developer) and copies of each of the title exceptions referenced in the Title Commitment and Survey, the Developer shall examine the Title Commitment and Survey and shall make any objections to any items therein that would cause title to the Property not to be good and marketable, free and clear of any items that, in Developer's reasonable discretion, would unreasonably interfere with the construction, use or operation of the Development for its intended purposes or impair the value of the Development to such an extent as to make such Development not commercially feasible (any of the foregoing a "Title Defect") by written notice to the City (the "Title Objection Notice"). For avoidance of doubt, the City shall not be obligated to cure, remove or bond over any objection to the Title Commitment and Survey that fails to qualify as a Title Defect hereunder. The Title Objection Notice shall state with specificity the reasons for Developer's objection(s) and the curative steps requested by the Developer which would remove the basis for the Developer's objection(s). The City shall cure, remove or bond over any Title Defects prior to the Closing Date. If the Developer orders an update to the Title Commitment and Survey prior to Closing (as defined in Section 3(A) below), and such update shows any additional Title Defect not caused by the Developer or its agents, consultants or contractors, the City shall cause each such Title Defect to be cured, removed or bonded over prior to Closing.

(3)     City Information. To the extent within the possession of the City and the City Parties (as defined below), as reasonably determined by the City's corporation counsel upon due inquiry, the City shall, promptly upon the written request of the Developer, provide, and shall cause all City Parties to provide, to the Developer (i) copies of all environmental studies, asbestos reports or other environmental reports on the Property, and all material documents, records or non-privileged communications related to the presence, use or release of Hazardous Materials at the Property subject to a pending claim or matter or present at concentrations exceeding those allowed by law, (ii) copies of all title reports and the underlying documents referenced therein, (iii) copies of all surveys of the Property, (iv) copies of any other records, documents, instruments, agreements or files with respect to the use or ownership of the Property, to the extent materially relevant after Closing, (v) to the extent not included in the above, copies of the correspondence to or from the City or any City Parties related to the use or ownership of the Property, to the extent materially relevant after Closing and (vi) such other documentation as is reasonably requested by Developer with respect to the Property. For purposes of this Agreement, "City Parties" shall mean any department, subdivision or agency of the City and/or any governmental authority within the direct or indirect control or supervision of the City.

(4)     Insurance. Prior to entering onto the Property for any Diligence Activities, Developer or its contractors shall maintain the insurance coverage and comply with the insurance requirements specified in the City's Right-of-Entry, a form of which is attached as **Exhibit A** (the "Right-of-Entry").

CHI-181944729v9

(5)    Indemnity.  Developer shall defend, indemnify and hold harmless the City from and against any loss, liability, cost or expense incurred by the City to the extent resulting from Developer's (including its duly authorized employees, agents, engineers or other representatives) negligence or willful acts occurring in connection with the Diligence Activities; provided, however, that the Developer shall not be responsible for any loss, liability, cost, or expense resulting from the City's (or any City Parties') negligence or misconduct.

(6)    The Developer shall notify the City in writing, no less than one hundred twenty (120) days following the Diligence Notice (the "Diligence Period"), that either (i) the Developer intends to proceed to Closing on the Property (the "Notice of Option Exercise"), or (ii) the condition of the Property is such that, in Developer's reasonable judgment, the condition adversely affects Developer's ability to timely complete the Development or adversely affects the use, value or marketability of the Property (the "Objection Notice"), which Objection Notice shall state with reasonable specificity the particular diligence matter(s) unacceptable to the Developer, including any Title Defects ("Objections").  The City, in its sole discretion, shall have the option (but not the obligation) to cure, remove or bond over such Objections within sixty (60) days following receipt of the Objection Notice (the "Cure Period"), provided, that the City must cure, remove or bond over such Objections that (a) are encumbrances for the benefit of the City, the City Parties, their lenders or vendors, (b) are Title Defects, or (c) may reasonably be deemed to directly cause a delay in the Developer's ability to complete the Development in accordance with the terms and conditions of this Agreement more than two (2) years after the Completion Deadline; provided, however, in the event any such Objection may reasonably be deemed to directly cause a delay in the Developer's ability complete the Development in accordance with the terms and conditions of this Agreement of two (2) years or less after the Completion Deadline (a "Minor Delay Defect"), then the City shall not be obligated to cure, remove or bond over such Minor Delay Defect; however, the number of days of delay reasonably determined to be caused by such Minor Delay Defect shall be deemed Force Majeure Delay (as hereinafter defined) for the equivalent number of days.  Without limiting the generality of the foregoing, the City shall be obligated to cause to be cured, removed or bonded over prior to expiration of the Cure Period: (i) mechanics' liens; (ii) judgment liens against the City or any City Parties; (iii) mortgages, similar loan documents and voluntary liens with respect to indebtedness of the City or any City Party; (iv) delinquent taxes, charges, impositions or assessments; (v) fines issued by any governmental or quasi-governmental authority or other liens encumbering the Property or any portion thereof which are in liquidated amounted; and (vi) any other monetary liens against the property. To the extent the Developer desires to proceed to Closing on the Property following delivery of an Objection Notice, the Developer must deliver to the City a Notice of Option Exercise prior to fifteen (15) days following expiration of the Cure Period.   Failure of the Developer to timely deliver a Notice of Option Exercise as provided for herein shall result in automatic termination of the Developer's rights under this Agreement and the Developer shall thereafter have no further interest in the Property. Following delivery by the Developer of a Notice of Option Exercise, the City shall be bound to convey the Property, upon the terms and conditions set forth herein, and the City and the Developer

6

shall proceed to closing on the Property on a mutually agreed upon date which is the later of (i) two (2) years following approval by the City of the Development Proposal, and (ii) six (6) months following completion of Demolition (as defined in Section 5(H)(b) below) by the City (the "Closing Date").

(7)   As Is Condition of Property; City Cooperation. The City makes no implied or express representations or warranties of any kind as to any condition that may adversely affect the development, or its fitness for absolutely any purpose whatsoever, other than with respect to the Sufficient Environmental Remediation (as defined in Section 5(H)(b) below). Upon delivery to the City of the Notice of Option Exercise, Developer will be deemed to have acknowledged that it is satisfied with the condition of the applicable Property, subject to the completion of the Sufficient Environmental Remediation, and shall be deemed to have waived any right to object to the status of title or to the condition of the Property, regardless of the result of any Diligence Activities, except as expressly provided for in this Agreement.

(8)   Release of City from Liability.  Upon Closing and subject to the City's obligation hereunder to perform Sufficient Environmental Remediation, Developer shall release the City and its officials, employees, and agents (but not any third party) from any and all claims or causes of action the Developer may have against the City for any liability, injury or loss as a result of any physical defects in or physical conditions of the Property, including but not limited to any surface, subsurface, latent or patent conditions whether naturally occurring or by action of any party.

(C)   Brokerage and Finder's Fees and Commission. Developer will defend and indemnify the City and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under Developer incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the City has a written agreement with a broker, finder or agent providing for such payment in which case the City shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses.  To the maximum extent permitted by applicable law, the City will defend and indemnify the Developer and hold it harmless with respect to any commissions, fees, judgments, or expenses of any nature and kind that the City or Developer may become liable to pay by reason of any claims by or on behalf of brokers, finders or agents claiming by, through or under the City incident to this Agreement and the transaction contemplated hereby or any litigation or similar proceeding arising therefrom unless the Developer has a written agreement with a broker, finder or agent providing for such payment in which case the Developer shall be responsible for such broker, finder or agents' commissions, fees, judgments or expenses. Developer represents and warrants to the City that it has not engaged or otherwise dealt with any brokers entitled to any commissions, fees, judgments, or expenses in connection with this Agreement.

(D)   Taxes And Assessments.  All taxes and assessments which (i) have become a lien upon the Property or part thereof prior to the date of Closing, and (ii) have been discovered and specifically identified by Developer prior to the Closing, shall be paid by the City on or prior to the Closing Date; provided, further that all current property taxes shall paid by the City through

7

the date of Closing. From and after Closing, and subject to any abatement or other tax limitation described in this Agreement, Developer shall be solely responsible for all taxes, liens, and assessments that become due and payable for the period after the Closing against the Property it acquires hereunder or any part thereof, whenever assessed, levied, or due.

**Section 2.      ENVIRONMENTAL MATTERS**

(A)      <u>Definitions</u>. The following words and expressions shall, wherever they appear in this Agreement, be construed as follows:

(1)      "<u>Asbestos</u>" shall have the meanings provided under the Environmental Laws and shall include, but not be limited to, asbestos fibers, friable asbestos or asbestos-containing materials or presumed asbestos-containing materials, as such terms are defined under the Environmental Laws.

(2)      "<u>Environmental Claims</u>" shall mean all claims, demands, suits, proceedings, actions, whether pending or threatened, contingent or non-contingent, known or unknown, including but not limited to investigations and notices by any governmental authority or other person, brought under common law and/or under any of the Environmental Laws which can or do relate to the Property or the operations conducted thereon.

(3)      "<u>Environmental Laws</u>" shall mean all applicable federal, state, and local laws, rules, regulations, orders, judicial determinations and decisions or determinations by any judicial, legislative or executive body of any governmental or quasi-governmental entity, or any other legally binding requirement, whether in the past, present or future, with respect to or otherwise related to the environment, natural resources, pollution or contamination and human health and safety, including, but not limited to:

(a)      the installation, existence, or removal of, or exposure to, Asbestos at, on or in the Property;

(b)      the existence on, discharge from, release of, exposure to, or removal from the Property of Hazardous Materials; and

(c)      the effects on the environment of the Property or any activity conducted now, or previously or hereafter conducted, on the Property.

Without limiting the foregoing, Environmental Laws shall include, but not be limited to, the following: (i) the Michigan Natural Resources and Environmental Protection Act, 1994 Public Act 451, as amended ("<u>NREPA</u>"); the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC Sections 9601, et seq. ("<u>CERCLA</u>"); the Superfund Amendments and Reauthorization Act, Public Law 99-499, 100 Stat. 1613; the Resource Conservation and Recovery Act, 42 USC Sections 6901, et seq.; the National Environmental Policy Act, 42 USC Section 4321; the Toxic Substances Control

CHI-181944729v9

Act, 15 USC Section 2601; the Hazardous Materials Transportation Act, 49 USC Section 1801; the Clean Air Act, 42 USC Sections 7401, et seq.; the Occupational Safety and Health Act, 29 USC Sections 651, et seq., as each have been amended and the regulations promulgated in connection therewith; (ii) Environmental Protection Agency regulations pertaining to Asbestos (including 40 CFR Part 61, Subpart M); Occupational Safety and Health Administration Regulations pertaining to Asbestos (including CFR Sections 1901.1001 and 1926.58) as each may now or hereafter be amended; and (iii) any Michigan state and local laws and regulations pertaining to any Hazardous Materials.

(4)     "Hazardous Materials" shall include any material, substance or waste classified, regulated, or otherwise characterized as "hazardous," "toxic," "radioactive," a "pollutant," "contaminant," or words of similar meaning or is otherwise regulated by Environmental Laws, including, without limitation, polychlorinated biphenyls (PCBs), paint containing lead and urea formaldehyde foam insulation, and sewage.

(B)     The City and Developer acknowledge and agree that some of the parcels to be transferred may be "facilities" pursuant to Part 201 of NREPA, whether or not as yet discovered to be such and that the obligations to perform Sufficient Environmental Remediation is the City's obligation and shall be done at its cost and expense.

(C)     The City shall authorize the Developer, through a fully executed Right-of-Entry (in the form attached), to enter upon the Property during the Diligence Period to, subject to the reasonable conditions set forth herein, make soil boring and bearing tests, undertake such surveying and environmental due diligence activities as Developer deems appropriate, including without limitation sampling and testing of soil, soil vapor, surface water, groundwater, indoor air, and the installation of groundwater wells, provided such do not materially and unreasonably interfere with demolition or site improvement activities of the City or the rightful use of the Property by a tenant in possession or other third party, if any, provided the City shall use its commercially reasonable efforts to facilitate such access to tenant spaces. All such testing and remediation shall be done at Developer's expense; provided, if sampling occurs, the City shall have the right, at its cost and expense, to obtain split samples of any environmental media to the extent reasonably practicable. During the Diligence Period, Developer shall comply with the terms and provisions of the Right-of-Entry. Developer's right to enter upon the applicable Property is subject to execution of such Right-of-Entry and subject to the prior written authorization by the tenant under the JLA Lease, which the City shall use commercially reasonable efforts to procure promptly upon receipt of the Diligence Notice from the Developer. Upon request from the City, Developer shall promptly provide the City with a copy of each final survey or environmental testing report generated as a result of such activities. Developer shall give prior written notice to the City of Developer's plan to inspect and/or investigate the environmental condition of the Property during the Diligence Period (each such notice referred to herein as an "Investigation Notice"). The Investigation Notice shall identify any agents or contractors that the Developer intends to use in conducting the activities covered by the Investigation Notice and the general scope of such activities; provided, the scope of any such investigations, site assessments or testing activities shall be subject to the City's prior written

CHI-181944729v9

approval, which approval shall not be unreasonably withheld, conditioned or delayed; provided, further, Developer shall have sole discretion to determine what analysis any samples will be subjected to. Developer shall use all commercially reasonable efforts to minimize damage to the Property in connection with such entry and shall restore the Property to the condition existing prior to such entry. Developer shall indemnify, defend and hold the City harmless from and against any and all out-of-pocket loss, cost, liability and expense, including reasonable attorney fees and litigation costs, suffered or incurred by the City as a result of the Developer's (including any of its duly authorized employees, agents, engineers or other representatives) negligent acts or omissions or willful misconduct occurring in connection with the activities conducted in accordance with the Right-of-Entry.

(D)    In the event Developer elects to proceed to take title to the Property, upon the Closing and subject to the Sufficient Environmental Remediation, Developer takes such Property as it finds it, "AS IS", and the City makes no express or implied representations or warranties as to its fitness for absolutely any purpose whatsoever, including but not limited to any warranty that the Property is fit for the Developer's purpose or regarding the presence or absence of Hazardous Materials at, on, in, under, at, or from the Property and compliance with the Property with Environmental Laws, other than with respect to Sufficient Environmental Remediation. Except with respect to Sufficient Environmental Remediation, Developer acknowledges that neither the City nor any agent or employee of the City has made any representation, warranty or agreement, either express or implied, and Developer has not relied on any representation, warranty or agreement of any kind made by the City or any agent or employee of the City, concerning (a) the physical or environmental condition of the Property, or (b) the presence or absence of any condition, substance or material, including but not limited to any waste material, equipment or device at, on, in, under, about, or from the Property. Developer agrees that the disclosures of the City concerning the Property and its condition are intended to satisfy any duties the City may have under the law, including but not limited to the statutes, Environmental Laws, and common law. By executing this Agreement, Developer acknowledges that it is entitled to receive from the City Sufficient Environmental Remediation and is entitled to conduct its Diligence Activities, including but not limited to inspection of the Property, review of title, and the results of the tests, investigations and surveys permitted under this Agreement. If, prior to Closing, Developer fails to undertake such investigations and/or obtain such test results and surveys, or fails to object to the condition of the Property based on the results of its Diligence Activities, and Developer thereafter elects to proceed to Closing, Developer shall thereupon be deemed to have waived any right to object to the condition of the Property and shall be deemed to have declared its full satisfaction therewith, subject to Sufficient Environmental Remediation.

(E)    Upon Closing, Developer, for itself and its successors and assigns, expressly waives and releases all Environmental Claims (whether for personal injury, property damage or otherwise) that Developer may have against the City and its officials, employees and agents in connection with or related to such Property or any aspect thereof, except with respect to Sufficient Environmental Remediation.

(F)    After the Closing, the City shall have no obligation or liability to Developer whatsoever to undertake any cleanup or other remedial action that may be required in connection with the Property under any Environmental Law, or to comply with any other federal, state or

CHI-181944729v9

local requirement to attend to the physical condition of the Property, subject to the City's obligations hereunder related to Sufficient Environmental Remediation.

(G)     At its sole cost and expense, with respect to the Property for the period commencing on the Closing and ending on Commencement of Construction (as defined in Section 5(C) below), Developer shall: (a) comply with all Environmental Laws; (b) pay when due the cost of Developer's compliance with the Environmental Laws resulting out of environmental conditions caused or permitted by Developer during its period of ownership, use, possession or development of the Property; and (c) keep the Property free of any lien imposed pursuant to the Environmental Laws resulting out of Developer's ownership, use, possession, or development of the Property.

(H)     Notwithstanding anything to the contrary which may be contained in this Agreement, Developer represents and warrants and covenants to the City for the period after Developer's commencement of ownership, use, possession or development of the Property through and including Commencement of Construction, as follows:

(a)     Developer shall not use or allow the use of the Property for the purpose of storing any Hazardous Materials Developer brings into the Property, nor shall Developer use the Property in a manner which will cause or increase the likelihood of causing the release of such Hazardous Materials onto or from the Property, in each case other than those Hazardous Materials which are necessary and commercially reasonable for the conduct of Developer's development activities or the business operated on the Property and which Hazardous Materials shall be handled and disposed of in compliance with all Environmental Laws and industry standards and in a commercially reasonable manner.

(b)     Developer shall promptly notify the City of any claims or litigation against the Developer by any person (including any governmental authority), concerning the presence or possible presence of Hazardous Materials contamination at the Property or concerning any violation or alleged violation of the Environmental Laws by the Developer respecting the Property, and shall furnish the City with a copy of any such communication received by Developer.

(c)     Developer shall notify the City promptly and in reasonable detail in the event that Developer becomes aware of or suspects the presence of Hazardous Materials at levels exceeding those allowed by the Environmental Laws or contamination or a material violation of the Environmental Laws at the Property.

(d)     If Developer's operations at the Property violate the Environmental Laws so as to subject Developer or the City to a formal notice of violation by a governmental agency alleging a violation of the Environmental Laws, Developer shall promptly notify the City of the Developer's receipt of such formal notice of violation and shall promptly investigate the underlying circumstances and notify the City within five (5) days after the completion of its investigation of the results of its investigation. If Developer determines that an ongoing material violation by

11

Developer is occurring or did occur, Developer shall, to the extent required by Environmental Laws, cease or cause a cessation of or take other actions to address those aspects of the use or operations causing the violation and shall remedy and cure in compliance with the Environmental Laws any conditions arising therefrom to the extent required by Environmental Laws at its own cost and expense. If Developer disputes that its activities are violating Environmental Laws, it shall expeditiously appeal and prosecute an appeal of the notice of violation or take other commercially reasonable actions to dispute such notice.

**Section 3.**     **CLOSING**

(A)     On the Closing Date, the City shall, subject to Developer's satisfaction of the conditions precedent set forth in Section 3(B) below, convey the Property to the Developer (the "Closing") by quit-claim deed substantially in the form of the deed set forth in **Exhibit B** (the "Deed") using legal descriptions approved by Developer and the City.  The Parties agree and acknowledge that the sole and exclusive consideration for conveyance of the Property hereunder is deemed to be the Arrangement, the sufficiency of which is hereby acknowledged.

(B)     Conditions to Closing.  The City's obligation to proceed with a Closing is conditioned on the fulfillment by Developer of each of the following conditions precedent:

a.     Resolution of Developer's Authority.  Developer shall furnish to the City a certified copy of a resolution in form and substance reasonably acceptable to the City and the title company insuring title to the Property, duly authorizing the execution, delivery and performance of this Agreement and all other documents and actions contemplated hereunder.

b.     Payment of Closing Costs.  Developer shall have tendered payment of the closing costs payable by Developer, which shall include all title charges, escrow, closing and recording fees associated with any conveyance hereunder except those costs expressly allocated to the City hereunder.  The City shall pay all closing costs in connection with transfer of the Property at Closing to the extent such costs are expressly allocated to sellers of real property in Detroit, Michigan pursuant to applicable law.  Each Party shall bear the cost of its own legal fees and expenses in connection with this Agreement.

(C)     Delivery of Deeds and Possession.  The City will deliver to Developer at Closing the Deed with respect to the Property and possession thereof.

(D)     Recording.  Provided that Developer has complied with all conditions precedent as specified in Section 3(B) above, the Deed shall be delivered at the Closing for prompt recordation with the Register of Deeds of Wayne County, Michigan.  Developer shall pay at Closing all costs for recording the Deed.  Possession of the Property shall be delivered to Developer at the Closing.

**Section 4:**     **NOTICES**

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted, or desired to be given hereunder to any Party shall be in writing and either (a) hand delivered, (b) sent by registered or certified mail, postage prepaid,

CHI-181944729v9

return receipt requested, (c) sent by facsimile transmission (with confirmation), or (d) sent by reputable overnight prepaid courier, addressed to the Party to be so notified at its address set forth below, or to such other address as such Party may hereafter specify in accordance with the provisions of this Section. Any Notice shall be deemed to have been effectively given and received: (i) in the case of hand delivery, at the time of delivery if delivered prior to 5:00 P.M. New York time on a Business Day (or if delivered after 5:00 P.M. or on a day other than a Business Day, then the next succeeding Business Day); (ii) in the case of registered or certified mail, three (3) Business Days from transmittal; (iii) in the case of reputable overnight prepaid courier, one (1) Business Day subsequent to transmittal; or (iv) in the case of facsimile transmission, upon confirmation that receipt of such transmission was received, provided receipt of such transmission is confirmed prior to 5:00 P.M. New York time on the Business Day on which such confirmation is received (or if confirmed after 5:00 P.M. or on a day other than a Business Day, then the succeeding next Business Day), in each case addressed to the respective Party as follows:

| | |
|---|---|
| If to Developer: | Financial Guaranty Insurance Company<br>521 Fifth Avenue – 15th Floor<br>New York, New York 10175<br>Attention: General Counsel<br>Fax: 212-312-3221 |
| If to the City: | Director<br>Planning & Development Department<br>65 Cadillac Square, Suite 2300<br>Detroit, Michigan 48226<br>Fax:_____ |
| | With a copy to (which copy shall not constitute notice):<br><br>Corporation Counsel<br>City of Detroit Law Department<br>2 Woodward Avenue<br>Suite 500<br>Detroit, MI 48226<br>Fax:_____ |
| If to the State: | State of Michigan<br>P.O. Box 30013<br>Lansing, Michigan 48909<br>Attention: _____<br>Fax:_____ |

Any Party may notify any other Party of any changes to the address or any of the other details for Notice to such Party specified above; provided, however, that no such change shall be effective earlier than the date such Notice is received or deemed to have been received in accordance with this Section.

CHI-181944729v9

**Section 5:    COVENANTS**

(A)    Developer covenants for itself and its successors and assigns and every successor in interest to the Property, that from and after Closing on the Property, Developer and its successors and assigns shall develop such Property only to and in accordance with the Approved Development Proposal and otherwise pursuant to the terms and conditions of this Agreement, unless otherwise agreed in writing by the City.  Subject to Force Majeure Delays (as defined below), within twelve (12) months following the Closing Date (the "Commencement Deadline"), the Developer shall achieve Commencement of Construction with respect to such Property. Following Commencement of Construction, the Developer shall diligently prosecute the Development on the Property to substantial completion in material conformance with the Approved Development Proposal (which shall mean substantial completion of the Development and all improvements related thereto, exclusive of landscaping, punch list items and any tenant work for commercial or other space for which there are no tenants or for which the work is to be done by a tenant and any onsite or offsite work that is not commercially necessary for occupancy in material conformance with the Approved Development Proposal) (the date upon which such substantial completion occurs referred to herein as the "Completion Date").  Subject to Force Majeure Delays, the Completion Date shall occur within thirty-six (36) months following the Closing Date (the "Completion Deadline").  For purposes of this Agreement, "Force Majeure Delays" shall mean an event, casualty, occurrence, condition, or circumstance of any kind or nature reasonably beyond the control of the applicable party hereto which renders such party unable to perform any of its obligations contemplated hereunder, in full or in part, including, without limitation, (i) acts of declared or undeclared war by a foreign enemy; (ii) civil commotion, insurrection or riots; (iii) fire or casualty or condemnation; (iv) floods, hurricanes or other materially adverse weather conditions; (v) earthquakes; (vi) acts of God; (vii) governmental preemption in the case of emergency; (viii) unavailability of materials to the extent not within the reasonable control of the applicable party (other than shortage of funds); (ix) strikes, lockouts or other labor trouble; (x) inability to secure labor or access to the Property including, without limitation, holdover of the tenant under the JLA Lease (as defined below) beyond any stated expiration date (inclusive of all renewal options thereunder); (xi) acts of terrorism; (xii) the suspension of government operations; (xiii) any act, omission, rule, order or regulation of any governmental authority or any department or subdivision thereof (other than, with respect to the City, the City, any department, subdivision or agency of the City or any governmental authority within the direct or indirect control or supervision of the City and other than, with respect to the Developer, the failure of the Developer to secure the Required Approvals if the Developer does not apply for and diligently prosecute the applications for such Required Approvals); (ix) the presence of hazardous materials on the Property and any related remedial action; and (x) any other cause, event or circumstance not within the reasonable control of the applicable party (other than shortage of funds).

(B)    The Commencement Deadline and Completion Deadline shall be extended for a period of time equal to the number of days during which Developer is prevented from proceeding with the construction of the development at the Property by reason of Force Majeure Delays, provided that (i) Developer is otherwise in compliance with the terms and provisions of this Agreement, and (ii) Developer notifies the City of the events constituting such Force Majeure Delays no later than sixty (60) days after Developer has actual knowledge of their

14

CHI-181944729v9

occurrence. At Closing, Developer shall cause the City to be provided with a commercially reasonable completion guarantee, or other assurance of completion (which other assurance of completion shall be reasonably acceptable to the City), given by an entity reasonably acceptable to the City, which guarantees for the benefit of the City substantial completion of the Development on or before the Completion Deadline (the "Guaranty").

(C)    For purposes of this Agreement, "Commencement of Construction" on the Property shall be deemed to have occurred when the Developer shall have commenced site preparation work on the Property, which site preparation work may include renovation or demolition of existing structures located on the Property by the Developer, as applicable.

(D)    Developer covenants and agrees that from and after Closing, through and including the Commencement of Construction, it will: (i) comply with all applicable zoning requirements, and all other applicable state and federal statutes and regulations and local laws and ordinances applicable to the ownership, use and/or occupancy of the Property; and (ii) except as abated in accordance with the terms hereof, pay and discharge when due without penalty, and in all events before penalty for nonpayment attaches thereto, all taxes, assessments and governmental charges, including but not limited to real estate taxes or assessments on the Property or any part thereof, except where the same may be contested in good faith.

(E)    Developer covenants and agrees to permit the City or its designee to encumber that portion of the Property depicted in the attached **Exhibit C** with an easement upon terms and conditions determined by the City in its reasonable discretion, for the purpose of constructing certain riverwalk improvements. In the event the easement contemplated above is not placed of record prior to Closing, the Developer (including any successors or assigns thereof) shall permit such easement to be placed of record following Closing free of charge. Notwithstanding any provision hereof to the contrary, no such easement described in this paragraph, to the extent recorded prior to Closing, shall form the basis for a Title Defect or any Objection hereunder, and the City shall not be required for any reason to cure, remove or bond over such encumbrance.

(F)    Developer covenants and agrees to permit the City or its designee to maintain on the Property those certain public transportation assets of the City commonly referred to as the "people mover" and all ancillary assets related thereto free of charge (the "People Mover"). Developer further covenants and agrees to permit the City or its designee to encumber the Property with an easement upon terms and conditions determined by the City in its reasonable discretion, for the purpose of maintaining, renewing and replacing, as necessary in the City's sole discretion, the People Mover in the location on the Property in which the People Mover is situated as of the date of this Agreement. In the event the easement contemplated above is not placed of record prior to Closing, the Developer (including any successors or assigns thereof) shall permit such easement to be placed of record following Closing free of charge. Notwithstanding any provision hereof to the contrary, no such easement described in this paragraph, to the extent recorded prior to Closing, shall form the basis for a Title Defect or any Objection hereunder, and the City shall not be required for any reason to cure, remove or bond over such encumbrance.

15

(G) <u>Estate Conveyed</u>. Notwithstanding anything contained in this Agreement to the contrary, the estate conveyed hereby shall be deemed to be a determinable fee and only upon Commencement of Construction hereunder will the possibility of reverter retained by the City automatically expire as to that part of the applicable Property.

(H) <u>City Covenants</u>.

(a) Prior to Closing, the City shall (1) subject to Demolition, maintain the Property in at least the same condition and repair (except for environmental condition and repair thereof, which is addressed in sub-clause (2) below) as such exists on the Effective Date, (2) not, through its own action, alter the environmental condition of the Property, as such exists on the Effective Date, in a material and adverse manner, (3) not take zoning or land use action on the Property without Developer's prior written consent, and (4) not execute or grant any lease, contract, agreement, lien, security interest, encumbrance, easement, or restriction with respect to such Property, or amend, modify, renew or extend any of the foregoing, without prior written consent of the Developer, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, without the consent of the Developer, the City shall be permitted to (i) enter into, amend, modify or renew any contract, agreement or lease with respect to the Property to the extent that such instrument is terminable at will by the City and is terminated by the City prior to the Closing or the term of such instrument does not extend beyond Closing, and (ii) amend or modify the JLA Lease in any manner which would not materially, adversely alter the rights of the Developer hereunder (for avoidance of doubt, the City shall be permitted to terminate the JLA Lease without the Developer's prior consent); provided, however, in no event shall the City renew or otherwise extend the JLA Lease, subject to the right of the existing tenant thereunder to so extend the JLA Lease. The City shall pass no charter, ordinance or other provision that solely affects or primarily targets the Developer or its rights under this Agreement which charter, ordinance or other provision has a material adverse impact on the Developer or its rights under this Agreement (it being understood that a "material adverse impact" shall include any adverse financial impact on or any contradiction, or adverse impact on the enforceability of, the terms of this Agreement or the Economic Incentive Agreements). To the extent any COBO Interests are intended to benefit the owner of the Property, but are not otherwise in the name of, or held by, the City, upon written request of the Developer given to the City not less than ninety (90) days prior to Closing, the City shall use reasonable efforts to cause such COBO Interests to be conveyed to the Developer at Closing.

(b) Promptly upon expiration of the JLA Lease, but in no event more than ninety (90) days after expiration of the JLA Lease (the "<u>Demolition Commencement Date</u>"), the City shall commence or cause to be commenced the demolition of all improvements on the Property (except for those certain improvements commonly referred to as the Joe Louis Arena Garage) (the "<u>Demolition Property</u>"), which demolition shall include (i) removal and disposal of all building improvements and materials located thereon and (ii) certain excavation work to be completed at the Demolition Property, which excavation work shall include, without limitation, clearing and grubbing, soil erosion and control, and site excavation and embankment on the Demolition Property, all in accordance with plans and specifications reasonably acceptable to the Developer and all applicable laws, including, but not limited to Environmental Laws ("<u>Demolition</u>"). For the avoidance of doubt, if the City commences staging for the Demolition

16

by the Demolition Commencement Date, the City will be deemed to have timely commenced Demolition. Notwithstanding the foregoing, Demolition shall also include (i) remediation or removal of Hazardous Materials (including, but not limited to, asbestos-containing materials, PCB-containing light fixtures, mercury-containing switches) related to the removal and disposal of materials from the Demolition Property to the extent required by or necessary to comply with applicable laws or as is customary for demolition projects of a similar scope and nature and (ii) the investigation, control or removal of any Hazardous Materials at, on or below the surface of the Property that is sufficient under and otherwise causes the Property to comply with applicable law for Developer to develop and use the Property consistent with the Development Proposal for its intended purposes as a multiuse hotel, residential condominium, office or retail development ("Sufficient Environmental Remediation"). Sufficient Environmental Remediation may, at the City's election, include controls that do not unreasonably interfere with the Development Proposal; provided such are acceptable to the governmental authorities with jurisdiction over the Property. Developer agrees that, in conjunction with Developer, the City may have prepared and submitted to the Michigan Department of Environmental Quality a Baseline Environmental Assessment (Phase II) and associated Due Care Plans approved by and for the benefit of Developer, which approval shall not be unreasonably withheld, delayed or conditioned; however, the submission of such shall not alleviate the City's obligation to undertake such other actions necessary to perform Sufficient Environmental Remediation to allow for the implementation of the Development Proposal. The Developer agrees that in conducting Sufficient Environmental Remediation, the City may rely on protective barriers to prevent contact with affected soil and deed restrictions to limit groundwater use and other due care requirements approved by the governmental authorities and reasonably acceptable to Developer. Sufficient Environmental Remediation shall not include the construction of measures adopted as controls to the extent that they are otherwise specifically part of the Development Proposal, in which case Developer shall construct them as part of the Development; however, if the costs to do so are increased as a result of government approved controls, the City shall reimburse Developer for the increased costs to satisfy any government imposed controls. Developer or any future owner will be responsible for maintaining any reasonable controls or due care measures adopted as part of the Sufficient Environmental Remediation. The Demolition Commencement Date is expected to occur on or before September 15, 2017. Demolition shall be completed within one (1) year following the Demolition Commencement Date. The State shall make available to the City and/or the City Parties certain CRP Incentives set forth below, of which up to $6,000,000 will be for the purpose of reimbursing the City for the costs and expenses incurred in connection with the Demolition (the "Demolition CRP Incentives"). For purposes of this Agreement, "CRP Incentives" shall mean incentives available from the Michigan Strategic Fund, in cooperation with the Michigan Economic Development Corporation ("MEDC"), through the Community Revitalization Program under Public Act 252 of 2011. If there are any remaining Demolition CRP Incentives following the Demolition and the Sufficient Environmental Remediation, such funds shall be made available to reimburse the Developer for other eligible costs for the Development, to the extent the Developer otherwise meets the eligibility requirements for CRP Incentives and enters into the Economic Incentive Agreements applicable to such CRP Incentives.

(c)     Until the earlier of Closing or termination of the Developer's rights under this Agreement, the City shall fund or cause to be funded all costs and expenses for the repairs specified on page 15 "Opinion of Expected Construction Costs – July 2014" in the Physical

17

CHI-181944729v9

Conditions Due Diligence Review and Evaluation dated September 2014 prepared by Desman Associates, except for Item #3 identified therein.

(d)     The City represents to Developer that, as of the Closing Date, the City or an instrumentality of the City will have the right, power and authority to convey the Property in the manner provided for in this Agreement.

(I)     Economic Incentive Covenants.

(a)     In order to facilitate construction of the Development pursuant to the Approved Development Proposal on the Property, the State has agreed to reimburse the Developer for certain eligible project costs through TIF Incentives, as more particularly set forth herein. To the extent that the Approved Development Proposal meets the eligibility requirements for TIF Incentives, the Developer shall be provided up to $18,000,000 in TIF Incentives, which TIF Incentives will accrue interest at three percent (3%) per annum on any outstanding balance thereof, pursuant to one or more subsequent final written grants or loans (forgivable or otherwise), as applicable, and a development agreement or other economic assistance agreements, as applicable, which shall be entered into by the Developer and the State no later than one hundred twenty (120) following the City's approval of the Approved Development Proposal (which date may be extended by up to sixty (60) days in the event that the TIF Incentives require review by the Michigan Department of Environmental Quality) (the "Economic Incentive Agreements"). The Economic Incentive Agreements shall include (i) a schedule of performance- based project milestones for construction of the Development, and (ii) a pro-forma budget for the Development, as agreed upon by the City, the State and the Developer. The Economic Incentive Agreements will be executed in accordance with the standard process, including the filing of any necessary applications. The Economic Incentive Agreements shall govern disbursement of the TIF Incentives, including those project costs related to the Development that are eligible for TIF Incentives, as well as conditions precedent, milestones and timing for such disbursement, and shall include customary periodic reporting requirements of the Developer for data related to the Development both during and after construction.     For purposes of this Agreement, "TIF Incentives" shall mean certain redevelopment incentives awarded by the Michigan Strategic Fund (MSF) under the Brownfield Tax Increment Financing Program (Act 381 of 1996), as administered by MEDC.

(b)     To the extent the Development includes residential uses, the Economic Incentive Agreements shall also provide for designation of the Development as a Neighborhood Enterprise Zone ("NEZ"), and the City and each of the City Parties shall cooperate with and assist the Developer in applying for the NEZ certificate. The City and each of the City Parties shall establish either a Commercial Redevelopment Zone (as defined in the Commercial Redevelopment Act, defined below) or a Commercial Rehabilitation Zone (as defined in the Commercial Rehabilitation Act, defined below), as requested by the Developer, such that the Property will be eligible for the property tax abatements available for properties in the applicable zone.   The City and each of the City Parties shall cooperate with and assist the Developer in applying for and obtaining the tax abatements for which the Property and any development thereon is eligible under the Commercial Rehabilitation Act or the Commercial Redevelopment Act. For purposes hereof, "Commercial Redevelopment Act" means the Public Act 255 of 1978,

CHI-181944729v9

MCL § 207.651 *et seq.*, and "Commercial Rehabilitation Act" means the Public Act 210 of 2005, MCL § 207.841 *et seq.*

(c)     The City shall use its commercially reasonable efforts to assist the Developer in obtaining any additional sources of developer financings and grants not already expressly provided for in this Agreement that are identified in writing to the City by the Developer.

(J)     Land Use Covenants.

(a)     The City shall change the zoning requirement for the Property to be designated "B-5", which will permit the Developer to develop the Property as a mixed-use development, provided that the City administratively approves the site plans, which approval will not be unreasonably withheld, delayed or conditioned.  Approval by the City of the Development Proposal shall not be deemed approval with respect to any site plan, elevation, special land use, environmental, conditional use or other municipal approvals or permits, or variances therefrom, required for the Development (the "Required Approvals"); provided, however, upon approval by the City of the Development Proposal and prior to Closing, the Developer may proceed with securing the Required Approvals at its sole cost and expense.

(b)     With respect to any formal requests made by Developer or its designee to the City or State for any Required Approvals, the City or State, as applicable: (a) agrees to process such requests promptly and to use commercially reasonable efforts to process them within thirty (30) days of submission by the Developer, (b) shall not unreasonably withhold, condition or delay approvals of the applicable requests, provided that the City or State have the legal authority to grant such approval and that such approval does not violate any applicable law, rule or regulation of general application, (c) shall not unreasonably impede or interfere with the Development, (d) shall not discriminate against Developer in the consideration or approval of such Required Approvals on account of the circumstances surrounding the Arrangement and this Agreement and the events leading up thereto, and (e) shall use reasonable efforts to facilitate such requests, taking into consideration other similar requests for approvals or inducements, as applicable, of third parties granted thereby for similarly situated developments and uses as those contemplated for the Development; provided, however, the City or State, as applicable, shall process such requests for all Required Approvals pursuant to all then applicable rules, regulations, statutes and similar requirements.

**Section 6:     REMEDIES**

(A)     City's Remedies Prior to Conveyance.  In the event that, prior to the Closing on the Property, Developer assigns or otherwise transfers this Agreement or any right therein or in the Property to any entity prohibited from doing business with the City, this Agreement and any rights of Developer in this Agreement, may, at the option of the City, be terminated by the City after thirty (30) days written notice and opportunity to cure provided by the City to Developer.  In any case, the Developer shall provide written notice to the City of such assignment.

(B)     City's Remedies Subsequent to Conveyance.

19

CHI-181944729v9

(1)  Event of Default.  If, prior to the Developer achieving substantial completion of the Development, the Developer breaches any covenant set forth in this Agreement and fails to cure such breach within thirty (30) days after written demand by the City, such an event shall be deemed to constitute an "Event of Default", provided, however, that if the nature of Developer's default is such that more than the cure period provided is reasonably required for its cure, then Developer shall not be deemed to be in default if Developer commences such cure within said period and thereafter diligently pursues such cure to completion within one hundred eighty (180) days of City's initial written demand hereunder.  Notwithstanding the foregoing, Developer shall have the right to dispute that an Event of Default has occurred or that an Event of Default has not been timely cured by written notice of dispute sent to the City ("Notice of Dispute").  In the event a Notice of Dispute is sent, such Parties shall meet and in good faith work to resolve their differences.  In the event the City and Developer cannot resolve their differences as to whether an Event of Default has occurred or has been cured, then the City shall not take any action with respect to such uncured and disputed Event of Default as described in Sections 6(B)(2) or 6(B)(3) below without first bringing an action in a court of competent jurisdiction for a final judicial determination that an Event of Default occurred and was uncured. Notwithstanding the foregoing, the Developer shall not be entitled to give a Notice of Dispute and the City shall not be required to first meet in good faith with the Developer as provided for above, and may proceed directly to seek judicial relief in a court of competent jurisdiction to the extent such Event of Default arises from or relates to the imminent risk of harm to property or persons.  The City may, in its sole discretion, waive in writing any default or Event of Default by Developer.

(2)  City's Remedies.  Upon the occurrence of an Event of Default by the Developer, then after a judicial determination as required by Section 6(B)(1) above, the City shall have the right (as its sole remedy except as set forth in Section 6(B)(3) below with respect to the failure of the Developer to achieve Commencement of Construction prior to the Commencement Deadline as the same may be extended as provided herein), to seek injunctive relief, specific performance or other equitable remedies (other than the forfeiture of Developer's title to or interest in the Property) for the Developer's breach of this Agreement,.  In no event shall the City be entitled to monetary damages as a result of the Developer's breach of this Agreement.

(3)  Right of Reverter.  It is expressly understood and agreed between the Parties hereto that until Commencement of Construction, the conveyance of such Property to Developer shall be construed and interpreted as the conveyance of a fee simple determinable, and that in the event of an uncured and undisputed Event of Default caused solely by the failure of the Developer to achieve Commencement of Construction prior to the Commencement Deadline as the same may be extended as provided herein, then after a judicial determination as required by Section 6(B)(1) above, title to the Property shall automatically revest in the City. Upon such revesting of title, the City shall have the right to re-enter and take immediate possession of the Property.  While the right of reversion as to the Property automatically terminates upon Commencement of Construction, the City agrees to provide Developer with a written acknowledgement, in recordable form, that Commencement of Construction has occurred and the City's right of reversion has terminated hereunder and to take such further action as may

20

CHI-181944729v9

reasonably be requested by the Developer, at no incremental cost to the City, to extinguish the right of reversion of record.

(C)   <u>Rights and Remedies Cumulative</u>. The rights and remedies of the City and the Developer, whether provided by law or by this Agreement, shall be cumulative, and the exercise by the City or the Developer of any one or more remedies shall not preclude the exercise by it, at the same or different times, of any other remedy for the same default or breach or any other default or breach by the Developer or the City. No waiver made by any Party shall apply to obligations beyond those expressly waived in writing.

(D)   <u>Developer's Remedies</u>. If the City breaches its obligations under this Agreement after reasonable notice and opportunity to cure, Developer shall have the right to seek injunctive relief, specific performance or other equitable remedies for the City's breach of this Agreement. In no event shall the Developer be entitled to monetary damages as a result of the City's breach of this Agreement.

(E)   <u>Representatives Not Individually Liable</u>. No official or employee of the City shall be personally liable to Developer or any successor in interest, in the event of any default or breach by the City or for any amount which may become due to Developer or successor or on any obligations under the terms of this Agreement. No director, officer or employee of the Developer or any successor in interest shall be personally liable to the City, in the event of any default or breach by the Developer or any successor in interest for any amount which may become due to the City or on any obligations under the terms of this Agreement.

## Section 7: PROVISIONS NOT MERGED WITH DEEDS

No provision of this Agreement is intended to or shall be merged into the Deed transferring title to the Property from the City to Developer or any successor in interest, and any such Deed shall not be deemed to affect or impair the provisions and covenants of this Agreement.

## Section 8: ENTIRE AGREEMENT; AMENDMENT

This Agreement (including all exhibits, schedules or other attachments hereto) constitutes the complete and exclusive statement of the terms of the agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, promises, and arrangements, oral or written, between or among the Parties with respect to the subject matter hereof. This Agreement may be amended or modified only by an instrument in writing signed by all of the Parties.

## Section 9: GOVERNING LAW; JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to conflicts-of-law principles that would require the application of any other law. Any dispute between the Parties under this Agreement which cannot be resolved by informal dispute resolution by the Parties within sixty (60) days of notice to the other Party shall be brought in the United States Bankruptcy Court for the Eastern District of Michigan

CHI-181944729v9

(the "Bankruptcy Court") for so long as it has jurisdiction, and thereafter in the United States District Court for the Eastern District of Michigan (the "District Court"); provided, that if the District Court does not have jurisdiction, then such legal action, suit or proceeding shall be brought in such other court of competent jurisdiction located in Wayne County, Michigan; provided, further, by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding and specifically consents to the jurisdiction and authority of the Bankruptcy Court to hear and determine all such actions, suits, and proceedings under 28 U.S.C. §157(b) or (c), whichever applies.

### Section 10: COUNTERPARTS

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but together such counterparts shall constitute one and the same instrument.

### Section 11: <u>AUTHORITY OF CITY</u>.

**Notwithstanding anything in this Agreement, in law or in equity, or otherwise to the contrary, this Agreement shall be of no force or effect and may not in any way be enforced against the City unless or until this Agreement and the transaction contemplated hereby have been: (i) approved in writing by the Emergency Manager for the City of Detroit, in accordance with Emergency Manager Order No. 5 (as modified by Order No. 42), (ii) either included in the Emergency Manager's financial and operating plan or approved in writing by the Governor of the State of Michigan or his or her designee, in accordance with Section 12(1)(k) of Public Act 436 of 2012; and (iii) either included in the Emergency Manager's financial and operating plan or approved in writing by the State Treasurer, in accordance with Section 15(1) of Public Act 436 of 2012. The City shall provide written notice to Developer of the satisfaction of the foregoing conditions, within five (5) business days after satisfaction thereof.**

### Section 12: CITY AGENCIES AND DEPARTMENTS.
Whenever this Agreement requires an action or creates an obligation on behalf of the City, the City shall also be required, as applicable, to cause all of the City Parties to take such actions and perform such obligations.

### Section 13: TRANSFERABILITY.

(A) Developer shall be entitled to freely transfer or assign its rights and obligations hereunder at any time, as long as it provides the City written notice thereof and it does not transfer its rights hereunder to a party that is prohibited from doing business with the City, and upon such assignment and an assumption of the obligations and liabilities of the Developer by any such transferee, the Developer shall be automatically released from any of its obligations or liabilities hereunder.

(B) Notwithstanding anything to the contrary contained herein, the COPs and any beneficial interests in COPs shall be freely transferable without restriction of any kind or notice to the City or any City Parties.

22

CHI-181944729v9

(signatures on following pages)

CHI-181944729v9

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

WITNESSES:

DEVELOPER

FINANCIAL GUARANTY INSURANCE COMPANY, a New York stock insurance corporation

Print: Derek M. Donnelly

By: _____
Print: Timothy S. Travers
Its: Chief Executive Officer

STATE OF NEW YORK )
                     ) ss.
COUNTY OF NEW YORK )

The foregoing instrument was acknowledged before me on November 21 2014 by Timothy S. Travers the CEO of Financial Guaranty Insurance Company, a New York stock insurance company, on behalf of said company.

_____
Notary Public, New York County, New York
Acting in New York County, New York
My commission expires:

[signatures continue on following page]

Camille A. Taylor
Notary Public, State of New York
No. 43-01TA4994058
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires March 30, 20__/8

24

CHI-181944729

WITNESSES:                                    STATE OF MICHIGAN

_Samantha West_                               By: _(signature)_
Print: Samantha West                          Print: Michael Gadola
                                              Its: Legal Counsel, Governor Rick Snyder


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF WAYNE            )

        The foregoing instrument was acknowledged before me on November 19 2014 by
Michael Gadola, Legal Counsel, Governor Rick Snyder, on behalf of the State of Michigan.


                                              _(signature)_
                                              C. Ashton
                                              Notary Public, Wayne County, Michigan
                                              Acting in Wayne County, Michigan    Ingham
                                              My commission expires:

                                              CHERYL J. ATWOOD
                                              NOTARY PUBLIC-STATE OF MICHIGAN
                                              COUNTY OF CLINTON
                                              My Commission Expires Dec. 29, 2018

                        [signatures continue on following page]

WITNESSES:

CITY OF DETROIT,
a Michigan public body corporate

Print: Daniel T Moss

By: _____
Print: KEVIN D. ORR
Its: EMERGENCY MANAGER

District of Columbia

STATE OF MICHIGAN )
                  ) ss.
~~COUNTY OF WAYNE~~ )

The foregoing instrument was acknowledged before me on November 21st 20_14_ by
_____, the _Emergency Manager_ of the City of
Detroit, a Michigan public body corporate, on behalf of the City.

_____
Notary Public, Wayne County, Michigan
Acting in Wayne County, Michigan
My commission expires: March 31, 2016

Pursuant to § 18-5-12 of the Detroit City Code,
I hereby certify that proper and fair
consideration has been received by the City
pursuant to this contract.

Approved by the City Law Department
pursuant to Sec. 7.5-206 of the Charter of the
City of Detroit.

Corporation Counsel

Finance Director

City Council Approval Date:

**Drafted by and when recorded return to:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226

26

**EXHIBIT A**

**RIGHT OF ENTRY**

[See attached]

CHI-181944729v9



**CITY OF DETROIT**
Buildings, Safety Engineering and Environmental Department
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 401
Detroit, Michigan 48226
(313) 471-5108
www.detroitmi.gov

**RIGHT OF ENTRY ("ROE") PERMIT APPLICATION**
A detailed scope of work, site maps, drawings and certificate of insurance in accordance with City of Detroit
requirements are required in order to process the permit.

**PROPERTY ADDRESS:** _____ **DATE:** _____

**CROSS STREETS/BOUNDARIES:** _____

**TYPE OF ROE REQUEST** (check one): ☐ Parcel of Land ☐ Right-Of-Way (R-O-W)

☐ Extension/Modification for Parcel ☐ Extension/Modification for R-O-W

## APPLICANT CONTACT INFORMATION

| Contact Person: | Telephone Number: | | |
|---|---|---|---|
| Company Name: | Email Address: | | |
| Address: | City: | State: | Zip: |

## PROPERTY INFORMATION

| | | |
|---|---|---|
| Requested Site City Owned/Controlled: | ☐ Yes | ☐ No |
| Structure's on Property: | ☐ Yes | ☐ No |
| If Yes, # and type:_____ | | |

## PERMIT INFORMATION

Timeline for access (dd/mm/yyyy): Start date_____ End date_____

Insurance Policy Expiration Date:_____

Are monitoring wells being installed in the R-O-W? ☐ Yes ☐ No

If Yes: ☐ Less (<) than 30 days (Temporary) ☐ More (>) than 30 days (Permanent - Requires City Council approval)

Type of Activities: ☐ Soil Excavations ☐ Temporary Staging ☐ Soil Borings: # of Borings_____
☐ Well Installation: # of Wells _____ ☐ Other:_____

Is a site inspection being requested: ☐ Yes ☐ No

Are additional copies of the permit being requested: ☐Yes, # of copies_____ ☐ No

**APPLICANT'S SIGNATURE:** _____ **DATE**_____

| Make checks payable to "Treasurer, City of Detroit" Total Fee: _Include Permit # on check._ | ROE Permit #: |
|---|---|

*Applications must be completed in full or will be denied.*

# City of Detroit
# ENVIRONMENTAL AFFAIRS

## Right of Entry Fee Schedule

Effective March 1, 2013 the Buildings, Safety Engineering & Environmental Department, Environmental Affairs (EA) Division is implementing a new Fee Schedule for Right-Of-Entry (ROE) permits.

The EA coordinates the City of Detroit's ROE permit process for persons, developers and environmental consultants desiring to enter and conduct work on City-owned property or right-of-ways. Our responsibilities include reviewing permit requests, scope of work documents, figures/diagrams and insurance certificates. As necessary, EA conducts site inspections, contacts federal & state agencies and responds to emergencies.

EA works closely with the Law Department to ensure insurance certificates meet the City's requirements and to identify the property owner for the requested properties. The division also coordinates with various city departments that own property to acquire sign off on the ROE permit.

The fees for ROE permits are based on the following considerations.

| | |
|---|---|
| **ECONOMICS** | Accounting for staff time to process ROE permits, cost of materials to issue the permit such as printing, copying and mailing, and costs associated with researching deed records for ownership information. |
| **ACCURACY** | Ensuring that required documents and technical data are submitted to EA once site activities are completed, and to account for additional staff time during emergency response activities or negligence of the applicant. |
| **EFFICIENCY** | Reducing the number of ROE permits that are requested, issued and subsequently not used or are cancelled by the requester after the process has been completed, and limiting extensions to encourage that work is conducted during the applicants requested time. |



City of Detroit
**Buildings,
Safety Engineering &
Environmental Department**

For further information about the Right-of-Entry Fee Schedule and process, please contact Environmental Affairs Division at 313.471.5108

**Buildings, Safety Engineering & Environmental Department
2 Woodward Avenue #401, Detroit MI 48226**

# CITY OF DETROIT
## BUILDINGS, SAFETY ENGINEERING AND ENVIRONMENTAL DEPARTMENT

FEE SCHEDULE
MARCH 2013

## ENVIRONMENTAL RIGHT OF ENTRY

### A. RIGHT OF ENTRY("ROE") PERMIT
The following ROE Fees are based on requests and/or Scope of Work received for access onto City owned property:

BASE FEE applied to each permit..............................................$ 200.00

Draft/Final Report Retainer.......................................$ 150.00
(Returned after final documents are submitted)

Site Inspection (Requested by applicant or required)............................$ 75.00

Failure to obtain permit.............................................$ 500.00

### B. RIGHT OF WAY ("ROW") PERMIT
The following ROW Fees are based on requests and/or Scope of Work received for access onto the City owned Right of Way:

BASE FEE applied to each permit..............................................$ 150.00

Draft/Final Report Retainer.......................................$ 150.00
(Returned after final documents are submitted)

Site Inspection (Requested by applicant or required)............................$ 75.00

Failure to obtain permit.................................... ............ $ 500.00

### C. PERMIT EXTENSION & MODIFICATION
Permit Extension...................................................... $ 50.00
Permit Modification.....................................................$ 50.00

### D. PHOTOCOPY
Each Copy..........................................................$ 5.00
Each Page over 8.................................................$ 1.00

- 1 -

02/2013

### E. **REFUNDS**

There are no refunds for Permit Fees

**Service fee for returned checks** **$35.00**

Any returned checks not reimbursed with additional returned check fee within fourteen days of our receipt of Non Sufficient Funds Notice shall be subject to collection action and may result in the imposition of more fees and collection costs as authorized by law.

- 2 -

**Do I need a Right-Of-Entry (ROE) permit from the City for private, county, state or federally owned property?**

No. We only issue ROE permits for City owned/controlled property (parcels & Right-Of-Way (ROW)). If the property is not owned or controlled by the City, you will need to contact the owner of the property to gain access.

**I am working on a project and have a large group of City owned parcels for which I need a ROE permit. Do I have to pay a fee for each parcel?**

No. There is a flat fee for the first 10 parcels per ROE for those parcels within the Project Boundaries.

**What are Project Boundaries?**

Project Boundaries define the area of your project. Project Boundaries will be determined by the reviewer, but usually include contiguous, adjacent and/or nearby parcels within a defined limited radius.

**Can I email my application package to get the process started and provide my payment at a later date?**

No. The entire package must be submitted at the same time in order to be processed, otherwise it will not be accepted. Your package should include your ROE application, detailed scope of work, timeline, figures/soil boring location map, insurance certificate (including all corresponding additional insured endorsements as required) and a check made payable to "Treasurer, City of Detroit" in the appropriate amount.

**How do I submit my ROE package?**

You can either mail or hand-deliver your complete package to 2 Woodward Ave., Suite 401, Detroit, MI 48226 to the attention of Mr. Raymond Scott. If your package is received by mail, your receipt of payment will be mailed or emailed to you. Time permitting, if you hand deliver your package, you may be able to receive your invoice and process your payment with the cashier in Suite 402; otherwise your receipt will be mailed/emailed to you.

**How can I prevent delays in getting my ROE package approved?**

Prior to submitting your package you can confirm the following:

1) Your package is complete with all the required submittals. It is recommended that you include 2 copies of your figure/soil boring location map.
2) Make sure you provide a clear and detailed scope of work, providing an overview of the project and detailed site activities including site restoration.

3) Your Certificate of Insurance (COI) meets all of the City's Requirements. Your COI shall read "THE CITY OF DETROIT IS A NAMED ADDITIONAL INSURED WITH RESPECTS TO COMMERCIAL, AUTO AND POLLUTION LIABILITY" in the Description of Operations box. Make sure to include all corresponding additional insured endorsements.
4) Confirm that the property or ROW is owned and/or controlled by the City of Detroit prior to submitting your ROE package. The City cannot give access to property or public ROW's that are not city owned.

## How long does it take to process my ROE?

If your ROE package is complete and meets all of the City of Detroit requirements it usually takes approximately 1-2 weeks for you to receive your ROE.

## What is the difference between a ROE for a parcel versus a ROE for the Public ROW?

A parcel of land is identified by an address and parcel number. A ROE for a parcel would be requested if you are performing activities on the actual parcel (within the property line).

The Public ROW is generally the area that includes the sidewalk, berm (area between sidewalk and curb), curb, street and alley. A ROE for a ROW would be requested if you are performing activities within these areas or an area that is not considered a parcel.

## How do I obtain a refund for my report retainer fee?

Once your work activities are complete, you are required by your ROE permit to submit plans, technical reports (e.g., environmental data) manifest and any other documents relating in any way or arising out of the activities performed at the Site under your ROE. Once you submit the documents to the Environmental Affairs of BSEED, you will need to submit an Application for Refund of Permit, License & Certificate Fees. If you are not in the City's system as a Supplier, a Non PO Supplier form will need to be processed and approved prior to a refund being issued to add you to the system. This form will be completed internally.

Once all documents are received you will be eligible to receive a refund for the report retainer fee you paid in the amount of $150.00. The ROE fee is non-refundable.

## Is a ROE permit for the ROW the same as a ROW permit from City Engineering?

No. A ROE permit from BSEED is required to grant you access to enter onto City owned property (parcel & ROW) to perform site activities and confirms that you are complying with all City requirements. A permit from City Engineering is required to perform work in the public ROW. This work includes curb cuts, excavations, utility cuts, sidewalk & driveway approach construction/reconstruction or street and alley construction/reconstruction. Although the ROE permit is one of the requirements to receive a ROW permit from City Engineering, the approval of the ROE does not relieve you from securing a City Engineering ROW permit for performing work/activities in the public ROW, including but not limited to open cuts, backfills, and barricades. ROW permits must be obtained prior to the commencement of site work/activities from the Department of Public Works, City Engineering Division, 65 Cadillac Square, Suite 900, (313) 224-3935.

**[DATE]**

Mr. John Smith, Project Manager
[Name of Environmental Consultant]
[Address]

RE:    **Request for Right-of-Entry:**
           **[Address/Location] (Ward #/Item #)**
           **Detroit, Michigan 48226**

Dear Mr. Smith:

You have requested a right-of-entry to conduct [**general description of requested activities**] at the above-referenced address (hereinafter, the "Site").

Please be advised that the City of Detroit grants permission to [**Environmental Consultant**], including its contractors, subcontractors, representatives, agents, and employees (collectively, "User") to enter the above-referenced Site for the sole purpose of conducting certain environmental activities, within the confines of the Scope of Work contained in **Exhibit A**.

This Right-of-Entry is subject in all respects to the following conditions:

1.    Subject to satisfaction of the terms and conditions contained herein, this Right-of-Entry shall commence on [**start date**], and shall automatically terminate upon the completion of the work described herein, or on [**end date**], whichever occurs first.

2.    User shall hold the City of Detroit harmless and shall defend and indemnify the City of Detroit from and against any and all damages, claims, obligations, penalties, costs, charges, losses, demands, liabilities, and expenses (including, without limitation, fees and expenses for attorneys, expert witnesses and other consultants) that may be imposed upon, incurred by, or asserted against the City of Detroit or its departments, officers, employees, or agents arising from and related to User and its contractors', subcontractors', representatives', agents', and employees' use of the Site and this Right-of-Entry (including but not limited to, any release or threatened release of hazardous and non-hazardous substances, contaminants, exacerbation, evacuation, on-site and/or off-site property damage, or bodily injury).

3.    [**Environmental Consultant**] shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

• Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence-based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

• Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a

minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

- Worker's Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

- Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence, and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificates of insurance, without limitation, for all preceding coverage, excluding workers' compensation and employers' liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies.

4.  User shall not impair any part of the Site, except as customarily incident to the activities described in Exhibit A and in accordance with all applicable laws. User shall repair any damage caused to the Site and/or properties affected by the activities at the Site, and restore the Site and/or properties affected by the activities at the Site to its/their original condition. Initial access to the Site shall be coordinated through the Planning and Development Department, Property Management Section at (313) 224-1187.

5.  User shall contact the Department of Public Works, City Engineering Division at (313) 224-3935 upon the discovery of any damage caused by User's activities to the curb, sidewalk, street, or any portion of the right of way and/or infrastructure in order to provide notice and obtain the proper City of Detroit permits for repair.

6.  User will not bring any soils or other materials onto the Site, except in strict accordance with the Department of Public Works, City Engineering Division Standard Specifications for the above-referenced Site and only with prior written verification for compliance by the City of Detroit's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs of the User's fill material analytical data. User shall be responsible for the removal of any and all materials, tools and equipment brought onto the Site required for the authorized activities, and User shall assume the risk of loss or damage to any materials, tools and equipment.

7.  User is entering upon and using the Site at its own risk, and accepts the Site "As Is". The City of Detroit makes no representation or warranty as to the status of title or the physical or environmental condition of the Site, or its fitness for any particular use.

8.  User shall take all reasonable measures and precautions to mitigate any noise, vibrations, dust, and odors emanating from the activities on the Site.

9.  User shall immediately notify the City's Buildings, Safety Engineering, and Environmental Department – Environmental Affairs at (313) 471-5108 upon the

discovery of a suspected release of hazardous substances, hazardous materials, contaminants, or property damage as a result of User's activity at the Site.

10. User shall provide to the City of Detroit, without charge, copies of any and all draft and final work plans, reports, health and safety plans, and other environmental, analytical, or engineering documents relating in any way or arising out of its activities at the Site.

Upon the preparation of the documents, three copies of each document shall be provided to:

Raymond A. Scott, General Manager
City of Detroit
Buildings, Safety Engineering, and Environmental Department
2 Woodward Avenue, Suite 401
Detroit, Michigan 48226

11. This instrument and the rights granted hereunder may not be assigned by User.

12. User shall take all precautions necessary to make the Site safe for the authorized activities, including, where appropriate, preparation and adherence to a site-specific health and safety plan.

13. User shall be responsible for ensuring compliance with all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders. Any violation of the applicable laws, rules, regulations, standards, plans, and orders; or breach of the terms contained within this document may be considered grounds for termination of the Right-of-Entry.

14. This instrument constitutes the entire Right-of-Entry agreement between the City of Detroit and the User with respect to its subject matter. This agreement may not be modified, amended, changed, or altered in any respect unless done so in a writing acknowledged by both the City of Detroit and User.

15. No activities other than the activities authorized in Exhibit A may be performed on the Site.

This Right-of-Entry will be effective only upon execution of the acknowledgment and agreement noted herein by an authorized representative of User and upon delivery of same to Mr. Raymond Scott, Buildings, Safety Engineering, and Environmental Department, at the address listed above.

Sincerely,

_____

*** [Authorized City of Detroit Department Signature]

[**Environmental Consultant**], by its duly authorized representative, hereby acknowledges receipt of the original copy of this letter, and agrees to be bound by the terms and conditions stated therein.

[**ENVIRONMENTAL CONSULTANT**]

BY: _____
(Signature)

PRINT NAME: _____

ITS: _____
(Duly Authorized Representative)

DATE _____

TELEPHONE NUMBER: _____

## EXHIBIT A

# SCOPE OF WORK

The following is the Scope of Work that [**Environmental Consultant**], its contractors, subcontractors, representatives, agents and employees (collectively, "User"), is authorized to perform at the Site. User shall be responsible for ensuring compliance in all respects with the Scope of Work, and all applicable federal, state, and local laws, rules, regulations, standards, plans, and orders.

User is only authorized to undertake the following activities at the Site:

### [LIST OF AUTHORIZED ACTIVITIES]

\*\*\*

# LEARN ABOUT RIGHT OF ENTRY INSURANCE REQUIREMENTS

CONSULTANT shall continue to maintain, and shall cause its contractors, subcontractors, representatives, and agents (collectively, "User") to continue to maintain, at their sole expense, during the time this Right-of-Entry is in effect, the following separate insurance policies:

- Commercial General Liability Insurance (Broad Form Comprehensive) written on an occurrence based coverage, with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage, and $2,000,000.00 in the aggregate, with the general aggregate limit applying per location.

- Automobile Liability Insurance covering all owned, hired, and non-owned vehicles with Michigan No-Fault Coverage plus residual liability coverage with a minimum combined single limit of $1,000,000.00 for each occurrence of bodily injury and property damage.

- Workers Compensation Insurance for employees which meets Michigan's Statutory minimum requirements and Employer's Liability Insurance with the minimum limits of $500,000.00 for each disease, person, and accident.

- Contractor Pollution Liability Insurance with minimum limits of $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate.

Said insurance policies shall name the User as the insured. The City of Detroit shall be named as an additional insured on the certificate of insurance, without limitation, for all preceding coverage, excluding worker's compensation and employer's liability insurance. Each policy shall be accompanied by a commitment from the insurer that such policies shall not be canceled, modified, or coverage reduced without at least thirty (30) days prior notice to the City of Detroit. Certificates of Insurance evidencing such coverage and endorsements shall be submitted to the City of Detroit prior to the commencement of performance under this Right-of-Entry, and at least fifteen (15) days prior to the expiration dates of expiring policies. The certificate of insurance should be forwarded to:

City of Detroit Building, Safety Engineering, and Environment Department
2 Woodward Avenue, Suite 401
Detroit, Michigan 48226

**EXHIBIT B**

**QUIT CLAIM DEED**

The City of Detroit, a Michigan public body corporate whose address is 2 Woodward Avenue, Detroit, MI 48226 ("Grantor"), quit claims to _____, a Michigan _____ ("Grantee"), whose address is _____, the premises located in the City of Detroit, Wayne County, Michigan, described as:

A/K/A _____     Ward: _____ Item(s): _____

(the "Property"), for the sum of _____ ($_____), subject to and reserving to the City of Detroit its rights under public easements and rights of way, easements of record, applicable zoning ordinances, development plans pursuant to Act 344 of 1945 as amended (if any), and restrictions of record.

This Deed is given subject to the terms, covenants and conditions of a Development Agreement - Option to Purchase and Develop Land dated _____, 20___ entered into by the parties hereto and which is incorporated herein by reference and a memorandum of which was recorded on _____, 20___ in the Office of the Register of Deeds for the County of Wayne in Liber _____ on Pages _____ through _____ inclusive, none of the terms, covenants and conditions of which shall be deemed merged in this Deed. The covenants therein recited to be covenants running with the land are hereby declared to be covenants running with the land enforceable by the City as therein set forth until Commencement of Construction as defined therein.

The Grantor grants to the Grantee the right to make all divisions under Section 108 of the land division act, Act No. 288 of the Public Acts of 1967, as amended. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan right to farm act.

This deed is dated as of _____.

CITY OF DETROIT,
a Michigan public body corporate

By: _____
Print: _____
Its: _____

*[acknowledgement on following page]*

CHI-181944729v9

STATE OF MICHIGAN    )
                             ) ss.
COUNTY OF WAYNE    )

        The foregoing instrument was acknowledged before me on _____
20__, by _____, the _____ of
the City of Detroit, a Michigan public body corporate, on behalf of the City.

                                    _____

                                    Print: _____
                                    Notary Public, Wayne County, Michigan
                                    Acting in Wayne County, Michigan
                                    My commission expires:

---

Pursuant to § 18-5-12 of the Detroit City Code, I hereby certify that proper and fair consideration has been received by the City pursuant to this contract.

        Finance Director

Approved by the City Law Department pursuant to Sec. 7.5-206 of the Charter of the City of Detroit.

        Corporation Counsel

Approved by the City Council on.

JCC pp _____ or Detroit Legal News,

_____, on file in my office.

Approved by Mayor on

        City Clerk

---

**This Instrument Drafted by:**

Bruce N. Goldman
Senior Assistant Corporation Counsel
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226

**When recorded, return to:**

Grantee

Exempt from transfer taxes pursuant to MCL § 207.505(h)(i) and MCL § 207.526(h)(i).

CHI-181944729v9

**EXHIBIT C**

**RIVERWALK EASEMENT AREA**

[See attached]

CHI-181944729v9



PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

GWE
Giffels–Webster Engineers, Inc.

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=300' |
|---|---|---|---|---|---|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 1 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY



SCALE: 1"= 60'

0   30   60   120

N08°33'45"E
84.50

ARC=124.23'
RADIUS=339.37'
DELTA=20°58'27"
CHORD=N81°15'54"E
123.54'

2667.18'
S88°35'48"W

55.86'

117.29'

106.55'

ARC=50.64'
RADIUS=396.57'
DELTA=7°19'01"
CHORD=S80°27'20"E
50.61'

ARC=33.61'
RADIUS=43.97'
DELTA=43°47'52"
CHORD=S65°58'53"E
32.80'

S85°26'37"E
27.45'

133.55'

N67°03'39"E
16.78'

N22°03'50"W

N21°25'16"W
103.20'

S66°38'48"W
12.21'

N21°13'02"W
26.27'

## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
### CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS   LAND SURVEYORS   PLANNERS   LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI 48309
(248) 852-4100

| | | CHECKED BY | DATE | SCALE: | 1"=60' |
|---|---|---|---|---|---|
| DATE: | 03/01/10 | C.A.A. | 03/10 | | |
| DRAWN: | J.Z.B. | | | SHEET: | 2 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

Copyright © 2010 Giffels-Webster Engineers, Inc.
The reproduction and/or use without the prior
written consent of Giffels-Webster Engineers, Inc.

N:\SURVEY\16667\RIVERWALK\10024-PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



MATCHLINE SEE SHEET 4

N68°33'45"E
784.50'

2687.18'
S68°33'46"W

MATCHLINE SEE SHEET 2

SCALE: 1"=60'

0    30    60         120

**PROMENADE AREA FOR RIVERWALK IMPROVEMENTS**
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

Copyright © 2006 Giffels-Webster Engineers, Inc.
No reproduction shall be made without the prior
written consent of Giffels-Webster Engineers, Inc.

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
1651 BOND STREET, ROCHESTER HILLS, MI 48309
(248) 852-3100

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=60' |
|---|---|---|---|---|---|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 3 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY

N:\SURVEY\16667\RIVERWALK\10022A PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



MATCHLINE SEE SHEET 5

ARC=254.89
RADIUS=3892.50'
DELTA=3°45'07"
CHORD=N69°18'13"E
254.85'

S85°38'43"W
2687.18'

ARC=189.70'
RADIUS=1458.77'
DELTA=7°27'02"
CHORD=N70°25'32"E
189.56'

N68°33'45"E
784.50'

MATCHLINE SEE SHEET 3

SCALE: 1"=60'

0    30    60          120

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS LAND SURVEYORS PLANNERS LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI 48309
(248) 852-3100

N:\SURVEY\16667RIVERWALK\170254-PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

| DATE: 03/01/10 | CHECKED BY | DATE | SCALE: 1"=60' |
| DRAWN: J.Z.B. | C.A.A. | 03/10 | SHEET: 4 OF 8 |
| DESIGN: C.A.A. | | | JOB No: 16667.01 |
| SECTION: | | | |

REV 8-1-2010 BOUNDARY



MATCHLINE SEE SHEET 6

N68°39'32"E
176.09'

ARC=23.90'
RADIUS=199.87'
DELTA=6°51'09"
CHORD=N74°46'01"E
23.89'

N79°48'45"E
98.65'

S56°30'38"E
15.35'
S49°33'30"E
16.04'
S43°59'48"E
20.20'
S81°48'25"E
3.73'

S52°09'22"E
39.16'

ARC=85.71'
RADIUS=603.14'
DELTA=8°08'29"
CHORD=N57°16'40"E
85.63'

S68°56'48"W
283.79'

ARC=65.57'
RADIUS=603.14'
DELTA=6°13'42"
CHORD=N64°29'45"E
65.54'

SEE SHEET 2
FOR POINT OF
COMMENCEMENT

POINT OF
BEGINNING
PROMENADE
EASEMENT

ARC=254.89'
RADIUS=3892.50'
DELTA=3°45'07"
CHORD=N69°18'13"E
254.85'

MATCHLINE SEE SHEET 4

SCALE: 1"=60'

0    30    60              120

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

Giffels-Webster Engineers, Inc.
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
1851 BOND STREET, ROCHESTER HILLS, MI 48309
(248) 852-3100

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=60' |
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 5 OF 8 |
| DESIGN: | C.A.A. | | | JOB No: | 16667.01 |
| SECTION: | | | | | |

REV 8-1-2010 BOUNDARY

N:\SURVEY\16667RIVERWALK\16667-24 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



MATCHLINE SEE SHEET 5

SCALE: 1" = 60'

0    30    60         120

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

| | DATE: 03/01/10 | CHECKED BY | DATE | SCALE: 1"=60' |
|---|---|---|---|---|
| **Giffels-Webster Engineers, Inc.** | DRAWN: J.Z.B. | C.A.A. | 03/10 | SHEET: 6 OF 8 |
| ENGINEERS LAND SURVEYORS PLANNERS LANDSCAPE ARCHITECTS | DESIGN: C.A.A. | | | |
| 1871 BOND STREET, ROCHESTER HILLS, MI 48309 (248) 852-4100 | SECTION: | | | JOB No: 16667.01 |

REV 8-1-2010 BOUNDARY

Copyright © 2009 Giffels-Webster Engineers, Inc. No reproduction shall be made without the prior written consent of Giffels-Webster Engineers, Inc.



PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

## LEGAL DESCRIPTION
## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS

LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS PART OF LOTS 1 AND 2 OF BLOCK B, PART OF LOTS 1 THROUGH 4 OF BLOCK C, AND PART OF LOTS 1 THROUGH 4 OF BLOCK F IN "MAP OF THE FRONT OF THE CASS FARM AS SUBDIVIDED INTO LOTS FOR THE PROPRIETORS", AS RECORDED IN LIBER 9, PAGE 409 OF CITY RECORDS; ALSO PART OF LOTS 1 THRU 6, AND PART OF LOT A, IN "SCHOOLCRAFT'S SUBDIVISION OF LOTS 1 AND 2, CITY PLAT OF DETROIT, 1841", AS RECORDED IN LIBER 12, PAGE 622 OF CITY RECORDS; ALSO PART OF LOTS 3 THRU 6, AND PART OF LOT 7, SOUTH OF WOODBRIDGE, PART OF THE PUBLIC ALLEY, 16 FEET WIDE, SOUTH OF WOODBRIDGE ST., IN A TRACT OF LAND CALLED "THE MILITARY RESERVE", AND SHOWN ON A "MAP" RECORDED IN LIBER 5, PAGE 218 OF CITY RECORDS; ALSO PART OF LOTS 7, 8 AND 9, IN 'PLAN OF THE MILITARY TRACT IN THE CITY OF DETROIT AS LAID OUT INTO LOTS UNDER THE DIRECTION OF MAJOR WHITING", AS RECORDED IN LIBER 5, PAGE 311 OF CITY RECORDS; ALSO PART OF LOTS 89, 92, 118, AND 119 OF THE PLAN OF SECTION 3 OF THE GOVERNOR AND JUDGES PLAN, AS RECORDED IN LIBER 34, PAGE 548 OF DEEDS, WAYNE COUNTY RECORDS; ALSO PART OF THE "DESNOYERS CLAIM" AND THE "U.S. ROBY CLAIM" TO PART OF SECTION 3 OF THE GOVERNOR AND JUDGES PLAN OF THE CITY OF DETROIT, AS RECORDED IN LIBER 1, PAGE 290 OF PLATS, WAYNE COUNTY RECORDS; ALSO PART OF LOT A, AND PART OF LOTS 112 THROUGH 115 OF 'PLAT OF THE JONES PROPERTY KNOWN AS THE BEARD AND GREELY CLAIMS, SECTION 3, GOVERNOR AND JUDGES PLAN OF THE CITY OF DETROIT, AS RECORDED IN LIBER 1, PAGE 290 OF PLATS, WAYNE COUNTY RECORDS; ALSO PART OF LOT 186 OF THE PLAN OF SECTION 4 OF THE GOVERNOR AND JUDGES PLAN, AS RECORDED IN LIBER 34, PAGE 548 OF DEEDS, WAYNE COUNTY RECORDS; ALSO PART OF VACATED THIRD STREET, SECOND STREET, FIRST STREET, WAYNE STREET, GRISWOLD STREET, WOODWARD AVENUE, AND PUBLIC ALLEYS ALL WITHIN THE BOUNDS OF THE FOLLOWING DESCRIBED LAND:

COMMENCING AT THE INTERSECTION OF WEST LINE OF FIRST STREET (60 FEET WIDE) WITH THE NORTH LINE OF CONGRESS STREET (60 FEET WIDE), SAID POINT ALSO BEING THE SOUTHEAST CORNER OF LOT 12 OF BLOCK 13 OF "MAP OF THE WESTERN ADDITION TO THE CITY OF DETROIT AS SURVEYED INTO LOTS BY JOHN MULLETT, SURVEYOR", AS RECORDED IN LIBER 7, PAGE 164 OF CITY RECORDS; THENCE S59'51'24"W, 120.91 FEET ALONG THE NORTH LINE OF SAID CONGRESS STREET; THENCE S30'09'42"E, 60.00 FEET TO A POINT ON THE SOUTH LINE OF SAID CONGRESS STREET; THENCE N59'51'24"E, 754.29 FEET ALONG SAID SOUTH LINE TO THE WEST LINE OF WASHINGTON BOULEVARD (VARIABLE WIDTH); THENCE S30'09'06" E, 808.54 FEET ALONG SAID WEST LINE TO A POINT IN THE SOUTH LINE OF PROPOSED CIVIC CENTER DRIVE; THENCE THE FOLLOWING EIGHT COURSES ALONG THE SOUTH, WEST AND NORTH LINE OF PROPOSED CIVIC CENTER DRIVE: (1) N59'50' 26"E, 339.46 FEET, AND (2) ALONG A TANGENT CURVE TO THE RIGHT, 88.24 FEET, SAID CURVE HAVING A RADIUS OF 56.17 FEET, A CENTRAL ANGLE OF 90'00'19", AND A LONG CHORD BEARING S75'09'34" E, 79.44 FEET, AND (3) S30'09'34"E, 58.58 FEET, AND (4) S59'50'28"W, 20.50 FEET, AND (5) S30'09'42"E, 164.29 FEET, AND (6) ALONG A TANGENT CURVE TO THE RIGHT, 58.93 FEET, SAID CURVE HAVING A RADIUS OF 91.65 FEET, A CENTRAL ANGLE OF 36'50'27" AND A LONG CHORD BEARING S11'44'28"E, 57.92 FEET, AND (7) S6'40'45"W, 55.35 FEET, AND (8) ALONG A TANGENT CURVE TO THE LEFT, 72.37 FEET, SAID CURVE HAVING A RADIUS OF 174.00 FEET, A CENTRAL ANGLE OF 23'49'55" AND A LONG CHORD BEARING S5'14'12"E, 71.85 FEET; THENCE S28'39'06"E, 50.48 FEET TO THE POINT OF BEGINNING; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 85.71 FEET, SAID CURVE HAVING A RADIUS OF 603.14 FEET, A CENTRAL ANGLE OF 8'08'29", AND A LONG CHORD BEARING N57'16'40"E, 85.63 FEET; THENCE N52'02'22"E, 91.08 FEET; THENCE S81'48'25"E, 3.73 FEET; THENCE S43'59'48"E, 20.20 FEET; THENCE S49'33'30"E, 16.04 FEET; THENCE S56'30'36"E, 15.35 FEET; THENCE N79'48'45"E, 98.69 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 23.90 FEET, SAID CURVE HAVING A RADIUS OF 199.87 FEET, A CENTRAL ANGLE OF 6'51'09", AND A LONG CHORD BEARING N74'40'01"E, 23.89 FEET; THENCE N68'39'32"E, 176.09 FEET; THENCE N5'58'13"W, 8.69 FEET; THENCE N51'24'22"E, 36.74 FEET; THENCE N36'17'01"W, 9.70 FEET; THENCE N68'42'38"E, 85.47 FEET; THENCE S6'27'21"E, 9.83 FEET; THENCE N82'06'49"E, 34.66 FEET; THENCE S26'34'00"E, 11.05 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 36.11 FEET, SAID CURVE HAVING A RADIUS OF 2153.94 FEET, A CENTRAL ANGLE OF 0'57'38", AND A LONG CHORD BEARING N82'49'25"E, 36.11 FEET; THENCE N59'44'53"E, 81.52 FEET; THENCE N43'09'01"E, 6.26 FEET; THENCE N59'49'26"E, 83.58 FEET; THENCE S30'11'33"E, 13.11 FEET; THENCE N28'35'39"W, 13.11 FEET; THENCE N30'06'31"W, 24.80 FEET; THENCE S66'08'54"W, 2.28 FEET; THENCE N59'49'27"E, 23.88 FEET; THENCE N73'24'16"E, 19.39 FEET; THENCE S30'12'39"E, 130.99 FEET TO A POINT ON THE U.S. HARBOR LINE; THENCE S68'38'48"W, 2687.18 FEET ALONG SAID HARBOR LINE; THENCE N22'03'50"W, 133.55 FEET; THENCE S68'38'48"W, 12.21 FEET; THENCE N21'25'16"W, 103.20 FEET; THENCE N21'13'02"W, 26.27 FEET; THENCE N67'03'39"E, 16.78 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 33.61 FEET, SAID CURVE HAVING A RADIUS OF 43.97 FEET, A CENTRAL ANGLE OF 43'47'52", AND A LONG CHORD BEARING S65'58'53"E, 32.80 FEET; THENCE S83'26'37"E, 27.45 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE RIGHT, 50.64 FEET, SAID CURVE HAVING A RADIUS OF 396.57 FEET, A CENTRAL ANGLE OF 7'19'01", AND A LONG CHORD BEARING S80'27'20"E, 50.61 FEET; THENCE S83'18'44"E, 108.35 FEET; THENCE S83'17'30"E, 117.29 FEET; THENCE S87'06'01"E, 35.86 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 124.23 FEET, SAID CURVE HAVING A RADIUS OF 339.37 FEET, A CENTRAL ANGLE OF 20'58'27", AND A LONG CHORD BEARING N81'15'54"E, 123.54 FEET; THENCE N68'33'45"E, 784.50 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE RIGHT, 189.70 FEET, SAID CURVE HAVING A RADIUS OF 1458.77 FEET, A CENTRAL ANGLE OF 7'27'02", AND A LONG CHORD BEARING N70'25'32"E, 189.56 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 254.89 FEET, SAID CURVE HAVING A RADIUS OF 3892.50 FEET, A CENTRAL ANGLE OF 3'45'07", AND A LONG CHORD BEARING N69'18'13"E, 254.85 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 65.57 FEET, SAID CURVE HAVING A RADIUS OF 603.14 FEET, A CENTRAL ANGLE OF 6'13'45", AND A LONG CHORD BEARING N64'27'45"E, 65.54 FEET TO THE POINT OF BEGINNING, CONTAINING 4.00 ACRES.

## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
### CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**
**Giffels-Webster Engineers, Inc.**
ENGINEERS   LAND SURVEYORS   PLANNERS   LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI, 48309
(248) 852-3100

| DATE: 03/01/10 | CHECKED BY | DATE | SCALE: N/A |
| DRAWN: J.Z.B. | C.A.A. | 03/10 | SHEET: 8 OF 8 |
| DESIGN: C.A.A. | | | JOB No: 16667.01 |
| SECTION: | | | |

REV 8-1-2010 BOUNDARY

N:\SURVEY\16667B\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



SHEET 6

SHEET 5

POINT OF
BEGINNING

SHEET 4

U.S. HARBOR LINE
DETROIT RIVER

LEGEND

PROMENADE
AREA

SHEET 3

*VARIABLE WIDTH
PROMENADE AREA
FOR RIVERWALK
IMPROVEMENTS*

NOTE: PROMENADE SEE SHEET 7
FOR A POINT OF COMMENCEMENT
SKETCH

SHEET 2

SCALE: 1" = 300'

0    150    300    600

## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

N:\SURVEY\16667\RIVERWALK\10024 PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

**GWE**
**Giffels-Webster Engineers, Inc.**
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

Copyright © 2008 Giffels-Webster Engineers, Inc.
No reproduction shall be made without the prior
written consent of Giffels-Webster Engineers, Inc.

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=300' |
|---|---|---|---|---|---|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 1 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY



MATCHLINE SEE SHEET 3

SCALE: 1"=60'

0    30    60    120

4

SECOND

N68°33'45"E
784.50'

Detroit River

U.S. HARBOR LINE

S68°38'48"W
2687.18'

ARC=124.23'
RADIUS=339.37'
DELTA=20°58'27"
CHORD=N81°15'54"E
123.54'

1

S87°06'01"E
35.86'

2

S83°17'30"E
417.29'

1'-3" TO FENDER TIMBERS

3

1'-3" TO FACE OF CONCRETE

S85°18'44"E
108.39'

4

6949.006

ARC=50.64'
RADIUS=396.57'
DELTA=7°19'01"
CHORD=S80°27'20"E
50.61'

ARC=33.61'
RADIUS=43.97'
DELTA=43°47'52"
CHORD=S65°58'53"E
32.80'

S83°26'37"E
27.45'

THIRD

RM.39

133.55'
N22°03'50"W

N67°03'39"E
16.78'

N21°25'16"E
103.20'

S68°38'48"W
12.21'

N21°13'02"W
26.27'

N

GWE

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

Giffels-Webster Engineers, Inc.
GWE
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

| DATE: 03/01/10 | CHECKED BY | DATE | SCALE: 1"=60' |
| DRAWN:  J.Z.B. | C.A.A. | 03/10 | SHEET: 2 OF 8 |
| DESIGN:  C.A.A. | | | JOB No: 16667.01 |
| SECTION: | | | |

RBV 8-1-2010 BOUNDARY

N:\SURVEY\16667\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



MATCHLINE SEE SHEET 4

3

A

6
5
3
2

SCHOOL-CRAFTS SUB
L.12, P.622
ATH RECORDS

1 DETROIT COMMONS
P.C.55
1

BLOCK B

2

FIRST

DETROIT RIVER

U.S. HARBOR LINE

N68°33'45"E
784.50'

2687.18'
S68°38'48"W

1

2

3

CASS FARM
C

MATCHLINE SEE SHEET 2

SCALE: 1"=60'

0    30    60         120

N

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

| | | CHECKED BY | DATE | SCALE: | 1"-60' |
|---|---|---|---|---|---|
| DATE: | 03/01/10 | C.A.A. | 03/10 | | |
| DRAWN: | J.Z.B. | | | SHEET: | 3 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY

Copyright © 2006 Giffels-Webster Engineers, Inc. No reproductions shall be made without the prior consent of Giffels-Webster Engineers, Inc.

N:\SURVEY\16667\RIVERWALK\10024 PROMENADE AREA FOR RIVERWALK\ PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



MATCHLINE SEE SHEET 5

PLAN OF SECTION 3 L.34, P.548

92

ARC=254.89'
RADIUS=3892.50'
DELTA=3°45'07"
CHORD=N69°18'13"E
254.85'

WAYNE VAC.

PLAN OF MILITARY TRACT BY MAJ WHITING L.5, P.311 CITY RECORDS

89

90

2667.18'
S68°38'48"W

DETROIT RIVER

MILITARY RESERVE L.5, P.218 CITY RECORDS

7

9

ARC=189.70'
RADIUS=1458.77'
DELTA=7°27'02"
CHORD=N70°25'32"E
189.56'

U.S. HARBOR LINE

D

8

7

PLAN OF MILITARY TRACT BY MAJ WHITING L.5, P.311 CITY RECORDS

VAC. ALLEY

6

N68°33'45"E
784.50'

5

MILITARY RESERVE L.5, P.218 CITY RECORDS

4    C

MATCHLINE SEE SHEET 3

SCALE: 1"=60'

0    30    60    120

N

**PROMENADE AREA FOR RIVERWALK IMPROVEMENTS**
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

N:\SURVEY\16667\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

Copyright © 2008 Giffels-Webster Engineers, Inc. the reproduction and/or in made without the prior written consent of Giffels-Webster Engineers, Inc.

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS   LAND SURVEYORS   PLANNERS   LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=60' |
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 4 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY



MATCHLINE SEE SHEET 6

PLAT OF WATER LOTS

112

113

114

N68°39'32"E
176.09'

DETROIT RIVER

U.S. HARBOR LINE

ARC=23.90'
RADIUS=199.87'
DELTA=6°51'09"
CHORD=N74°40'01"E
23.89'

N79°48'45"E
98.69'

S56°30'38"E
15.35'
S49°33'30"E
16.04'
S43°59'48"E
20.20'
S81°48'25"E
3.73'

PLAT OF THE JONES PROPERTY
KNOWN AS THE BEARD AND
GREELY CLAIMS SECTION 3
GOVERNOR & JUDGES PLAN L.1,
P.290 OF PLATS

A

N52°02'22"E
55.91'

2687.18'
S68°38'48"W

ARC=85.71'
RADIUS=603.14'
DELTA=8°08'29"
CHORD=N57°16'40"E
85.63'

SEE SHEET 7
FOR POINT OF
COMMENCEMENT

J.S. ROBY
CLAIM

ARC=65.57'
RADIUS=603.14'
DELTA=6°13'42"
CHORD=N64°27'45"E
65.54'

POINT OF
BEGINNING
PROMENADE
EASEMENT

DESNOYER OLD
CLAIM

ARC=254.89'
RADIUS=3892.50'
DELTA=3°45'07"
CHORD=N69°18'13"E
254.85'

MATCHLINE SEE SHEET 4

SCALE: 1"=60'

0    30    60         120

N

## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
### CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

GWE
Giffels-Webster Engineers, Inc.
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

Copyright © 2006 Giffels-Webster Engineers, Inc.
Its reproduction shall be made without the prior
written consent of Giffels-Webster Engineers, Inc.

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=60' |
|---|---|---|---|---|---|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 5 OF 8 |
| DESIGN: | C.A.A. | | | JOB No: | 16667.01 |
| SECTION: | | | | | |

REV 8-1-2010 BOUNDARY

N:\SURVEY\16667\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG



PLAT OF
WATER LOTS

187

186

118

119

115

VAC.

VAC.

N30'06'31"W
24.80'

S66'08'54"W
2.28'

S30'12'39"E
130.99'

54.93'
N29'59'52"W

N73'24'16"E
19.39'

N59'48'27"E
23.88'

S30'11'33"E
13.11'

83.56'
N59'49'26"E

N28'35'39"W
13.11'

N61'24'21"E
38.54'

N43'09'01"E
6.26'
ARC=36.11'
RADIUS=2153.94'
DELTA=0'57'38"
CHORD=N62'49'25"E
36.11'

81.52'
N59'44'53"E

S46'58'10"E
14.36'

S26'34'00"E
11.05'

N82'08'49"E
34.66'

S6'27'21"E
9.83'

2687.18'
S68'38'48"W
U.S. HARBOR LINE

DETROIT RIVER

N68'42'38"E
85.47'

N36'17'01"W
9.70'

N51'24'22"E
36.74'

N5'58'13"W
8.69'

N68'39'32"E
176.09'

MATCHLINE SEE SHEET 5

SCALE: 1"=60'

0     30    60          120

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**
Giffels-Webster Engineers, Inc.
ENGINEERS   LAND SURVEYORS   PLANNERS   LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

Copyright © 2006 Giffels-Webster Engineers, Inc.
No reproduction shall be made without the prior written consent of Giffels-Webster Engineers, Inc.

N:\SURVEY\16667\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=60' |
|---|---|---|---|---|---|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 6 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY



PROMENADE AREA FOR RIVERWALK IMPROVEMENTS

S30°09'34"E  
56.58'

S59°50'28"W  
20.50'

C2  
58.93'  
C3  
72.37'

184.29'  
S30°09'42"E

S6°40'45"W  
55.35'

S28°39'06"E  
50.48'

POINT OF  
BEGINNING  
PROMENADE  
EASEMENT

C1  
88.24

N59°50'26"E  
339.45'

S30°09'06"E  
808.54'

N59°51'24"E  
754.29'

*PROMENADE AREA*  
*FOR RIVERWALK*  
*IMPROVEMENTS*

S59°51'24"W  
120.91'

POINT OF COMMENCEMENT THE  
INTERSECTION OF THE WEST LINE  
OF FIRST STREET AND THE NORTH  
LINE OF CONGRESS STREET

S30°09'42"E  
60.00'

| CURVE | DELTA | RADIUS | ARC | CHORD BEARING | CHORD |
|-------|-------|--------|-------|---------------|-------|
| 1 | 90°00'19" | 56.17 | 88.24 | S75°09'34"E | 79.44 |
| 2 | 36°50'27" | 91.65 | 58.93 | S11°44'28"E | 57.92 |
| 3 | 23°49'55" | 174.00 | 72.37 | S05°14'12"E | 71.85 |

SCALE: 1" = 300'

0    150    300              600

N

PROMENADE AREA FOR RIVERWALK IMPROVEMENTS  
CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

**GWE**  
**Giffels-Webster Engineers, Inc.**  
ENGINEERS  LAND SURVEYORS  PLANNERS  LANDSCAPE ARCHITECTS  
2871 BOND STREET, ROCHESTER HILLS, MI. 48309  
(248) 862-3100

| DATE: | 03/01/10 | CHECKED BY | DATE | SCALE: | 1"=300' |
|-------|----------|------------|------|--------|---------|
| DRAWN: | J.Z.B. | C.A.A. | 03/10 | SHEET: | 7 OF 8 |
| DESIGN: | C.A.A. | | | | |
| SECTION: | | | | JOB No: | 16667.01 |

REV 8-1-2010 BOUNDARY

Copyright © 2006 Giffels-Webster Engineers, Inc. No reproduction shall be made without the prior written consent of Giffels-Webster Engineers, Inc.

N:\SURVEY\16667\RIVERWALK\100024 PROMENADE AREA FOR RIVERWALK\PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

## LEGAL DESCRIPTION
## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS

LAND IN THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN BEING DESCRIBED AS PART OF LOTS 1 AND 2 OF BLOCK B, PART OF LOTS 1 THROUGH 4 OF BLOCK C, AND PART OF LOTS 1 THROUGH 4 OF BLOCK F IN 'MAP OF THE FRONT OF THE CASS FARM AS SUBDIVIDED INTO LOTS FOR THE PROPRIETORS', AS RECORDED IN LIBER 9, PAGE 409 OF CITY RECORDS; ALSO PART OF LOTS 1 THRU 6, AND PART OF LOT 1, IN 'SCHOOLCRAFT'S SUBDIVISION OF LOTS 1 AND 2, CITY PLAT OF DETROIT, 1841', AS RECORDED IN LIBER 12, PAGE 622 OF CITY RECORDS; ALSO PART OF LOTS 3 THRU 6, AND PART OF LOT 7, SOUTH OF WOODBRIDGE, PART OF THE PUBLIC ALLEY, 16 FEET WIDE, SOUTH OF WOODBRIDGE ST., IN A TRACT OF LAND CALLED "THE MILITARY RESERVE", AND SHOWN ON A 'MAP' RECORDED IN LIBER 5, PAGE 218 OF CITY RECORDS; ALSO PART OF LOTS 7, 8 AND 9, IN 'PLAN OF THE MILITARY TRACT IN THE CITY OF DETROIT AS LAID OUT INTO LOTS UNDER THE DIRECTION OF MAJOR WHITING", AS RECORDED IN LIBER 5, PAGE 311 OF CITY RECORDS; ALSO PART OF LOTS 89, 92, 118, AND 119 OF THE PLAN OF SECTION 3 OF THE GOVERNOR AND JUDGES PLAN, AS RECORDED IN LIBER 34, PAGE 548 OF DEEDS, WAYNE COUNTY RECORDS; ALSO PART OF THE 'DESNOYERS CLAIM' AND THE 'U.S. ROBY CLAIM" TO PART OF SECTION 3 OF THE GOVERNOR AND JUDGES PLAN OF THE CITY OF DETROIT, AS RECORDED IN LIBER 1, PAGE 290 OF PLATS, WAYNE COUNTY RECORDS; ALSO PART OF LOT A, AND PART OF LOTS 112 THROUGH 115 OF 'PLAT OF THE JONES PROPERTY KNOWN AS THE BEARD AND GREELY CLAIMS, SECTION 3, GOVERNOR AND JUDGES PLAN OF THE CITY OF DETROIT, AS RECORDED IN LIBER 1, PAGE 290 OF PLATS, WAYNE COUNTY RECORDS; ALSO PART OF LOT 186 OF THE PLAN OF SECTION 4 OF THE GOVERNOR AND JUDGES PLAN, AS RECORDED IN LIBER 34, PAGE 548 OF DEEDS, WAYNE COUNTY RECORDS; ALSO PART OF VACATED THIRD STREET, SECOND STREET, FIRST STREET, WAYNE STREET, GRISWOLD STREET, WOODWARD AVENUE, AND PUBLIC ALLEYS ALL WITHIN THE BOUNDS OF THE FOLLOWING DESCRIBED LAND:

COMMENCING AT THE INTERSECTION OF WEST LINE OF FIRST STREET (60 FEET WIDE) WITH THE NORTH LINE OF CONGRESS STREET (60 FEET WIDE), SAID POINT ALSO BEING THE SOUTHEAST CORNER OF LOT 12 OF BLOCK 13 OF 'MAP OF THE WESTERN ADDITION TO THE CITY OF DETROIT AS SURVEYED INTO LOTS BY JOHN MULLETT, SURVEYOR", AS RECORDED IN LIBER 7, PAGE 164 OF CITY RECORDS; THENCE S59°51'24"W, 120.91 FEET ALONG THE NORTH LINE OF SAID CONGRESS STREET; THENCE S30°09'42"E, 60.00 FEET TO A POINT ON THE SOUTH LINE OF SAID CONGRESS STREET; THENCE N59°51'24"E, 754.29 FEET ALONG SAID SOUTH LINE TO THE WEST LINE OF WASHINGTON BOULEVARD (VARIABLE WIDTH); THENCE S30°09'06" E, 808.54 FEET ALONG SAID WEST LINE TO A POINT IN THE SOUTH LINE OF PROPOSED CIVIC CENTER DRIVE; THENCE THE FOLLOWING EIGHT COURSES ALONG THE SOUTH, WEST AND NORTH LINE OF PROPOSED CIVIC CENTER DRIVE:  (1) N59°50'26"E, 339.46 FEET, AND (2) ALONG A TANGENT CURVE TO THE RIGHT, 88.24 FEET, SAID CURVE HAVING A RADIUS OF 56.17 FEET, A CENTRAL ANGLE OF 90°00'19", AND A LONG CHORD BEARING S75°09'34" E, 79.44 FEET, AND (3) S30°09'34"E, 56.58 FEET, AND (4) S59°50'28"W, 20.50 FEET, AND (5) S30°09'42"E, 164.29 FEET, AND (6) ALONG A TANGENT CURVE TO THE RIGHT, 58.93 FEET, SAID CURVE HAVING A RADIUS OF 91.65 FEET, A CENTRAL ANGLE OF 36°50'27" AND A LONG CHORD BEARING S11°44'28"E, 57.92 FEET, AND (7) S6°40'45"W, 55.35 FEET, AND (8) ALONG A TANGENT CURVE TO THE LEFT, 72.37 FEET, SAID CURVE HAVING A RADIUS OF 174.00 FEET, A CENTRAL ANGLE OF 23°49'55" AND A LONG CHORD BEARING S5°14'12"E, 71.85 FEET; THENCE S28°39'08"E, 50.48 FEET TO THE POINT OF BEGINNING; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 85.71 FEET, SAID CURVE HAVING A RADIUS OF 603.14 FEET, A CENTRAL ANGLE OF 8°08'29", AND A LONG CHORD BEARING N57°16'40"E, 85.63 FEET; THENCE N52°02'22"E, 91.98 FEET; THENCE S81°48'25"E, 3.73 FEET; THENCE S43°59'48"E, 20.20 FEET; THENCE S49°33'30"E, 16.04 FEET; THENCE S56°30'38"E, 15.35 FEET; THENCE N79°48'45"E, 98.69 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 23.90 FEET, SAID CURVE HAVING A RADIUS OF 199.87 FEET, A CENTRAL ANGLE OF 6°51'09", AND A LONG CHORD BEARING N74°40'01"E, 23.89 FEET; THENCE N68°39'32"E, 176.09 FEET; THENCE N5°58'13"W, 8.69 FEET; THENCE N51°24'22"E, 36.74 FEET; THENCE N38°17'01"W, 9.70 FEET; THENCE N88°42'38"E, 85.47 FEET; THENCE S6°27'21"E, 9.83 FEET; THENCE N82°06'49"E, 34.66 FEET; THENCE S26°34'00"E, 11.05 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 36.11 FEET, SAID CURVE HAVING A RADIUS OF 2153.94 FEET, A CENTRAL ANGLE OF 0°57'38", AND A LONG CHORD BEARING N62°49'25"E, 36.11 FEET; THENCE N59°44'53"E, 81.52 FEET; THENCE N43°09'01"E, 6.26 FEET; THENCE S46°58'10"E, 14.36 FEET; THENCE N61°24'21"E, 38.54 FEET; THENCE N28°39'39"E, 13.11 FEET; THENCE N59°49'28"E, 83.58 FEET; THENCE S30°11'33"E, 13.11 FEET; THENCE N59°48'27"E, 23.88 FEET; THENCE N30°06'31"W, 24.80 FEET; THENCE S66°08'54"W, 2.28 FEET; THENCE N29°59'52"W, 54.93 FEET; THENCE N73°24'16"E, 19.39 FEET; THENCE S30°12'39"E, 130.99 FEET TO A POINT ON THE U.S. HARBOR LINE; THENCE S68°38'48"W, 2687.18 FEET ALONG SAID HARBOR LINE; THENCE N22°03'50"W, 133.55 FEET; THENCE S68°38'48"W, 12.21 FEET; THENCE N21°25'16"W, 103.20 FEET; THENCE N21°13'02"W, 26.27 FEET; THENCE N67°03'39"E, 16.78 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 33.61 FEET, SAID CURVE HAVING A RADIUS OF 43.97 FEET, A CENTRAL ANGLE OF 43°47'52", AND A LONG CHORD BEARING S63°58'53"E, 32.80 FEET; THENCE S83°26'37"E, 27.45 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE RIGHT, 50.64 FEET, SAID CURVE HAVING A RADIUS OF 396.57 FEET, A CENTRAL ANGLE OF 7°19'01", AND A LONG CHORD BEARING S80°27'20"E, 50.61 FEET; THENCE S83°18'44"E, 108.35 FEET; THENCE S83°17'30"E, 117.29 FEET; THENCE S87°08'01"E, 35.86 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 124.23 FEET, SAID CURVE HAVING A RADIUS OF 339.37 FEET, A CENTRAL ANGLE OF 20°58'27", AND A LONG CHORD BEARING N81°15'54"E, 123.54 FEET; THENCE N88°33'45"E, 784.50 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE RIGHT, 189.70 FEET, SAID CURVE HAVING A RADIUS OF 1458.77 FEET, A CENTRAL ANGLE OF 7°27'02", AND A LONG CHORD BEARING N70°25'32"E, 189.56 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 254.89 FEET, SAID CURVE HAVING A RADIUS OF 3892.50 FEET, A CENTRAL ANGLE OF 3°45'07", AND A LONG CHORD BEARING N69°18'13"E, 254.85 FEET; THENCE ALONG A NON–TANGENT CURVE TO THE LEFT, 65.57 FEET, SAID CURVE HAVING A RADIUS OF 603.14 FEET, A CENTRAL ANGLE OF 6°13'45", AND A LONG CHORD BEARING N64°27'45"E, 65.54 FEET TO THE POINT OF BEGINNING, CONTAINING 4.00 ACRES.

## PROMENADE AREA FOR RIVERWALK IMPROVEMENTS
### CITY OF DETROIT, WAYNE COUNTY, MICHIGAN

Copyright © 2006 Giffels-Webster Engineers, Inc.
No reproduction and no lease without the prior written consent of Giffels-Webster Engineers, Inc.

**GWE**
**Giffels-Webster Engineers, Inc.**
ENGINEERS   LAND SURVEYORS   PLANNERS   LANDSCAPE ARCHITECTS
2871 BOND STREET, ROCHESTER HILLS, MI. 48309
(248) 852-3100

| | | | |
|---|---|---|---|
| DATE: 03/01/10 | CHECKED BY | DATE | SCALE: N/A |
| DRAWN: J.Z.B. | C.A.A. | 03/10 | |
| DESIGN: C.A.A. | | | SHEET: 8 OF 8 |
| SECTION: | | | JOB No: 16667.01 |

REV 8-1-2010 BOUNDARY

N:\SURVEY\16667\RIVERWALK\100224 PROMENADE AREA FOR RIVERWALK IMPROVEMENTS.DWG

## *Schedule 1*

[See attached]

The Parties shall agree upon a legal description for the Property and associated easements upon receipt of Title and Survey, consistent with this Schedule 1.

CHI-181944729v9



Joe Louis Arena
Arena: 5.3 Acres

0 70 140 280 Feet

Source: Esri, DigitalGlobe, GeoEye, i-cubed, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AEX, Getmapping, Aerogrid, IGN, IGP, swisstopo, and the GIS User Community



Joe Louis Arena Garage

N >