# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

### REPLY IN SUPPORT OF CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS

The City of Detroit, Michigan ("City") by its undersigned counsel, Miller, Canfield, Paddock and Stone, PLC, files this *Reply in Support of its Motion for the Entry of an Order Enforcing the Bar Date Order and Confirmation Order Against Desmond Ricks, Akilah Cobb and Desire'a Ricks* ("Reply"). In support of this Reply, the City respectfully states as follows:

1. Plaintiff Desmond Ricks[1] mistakenly asserts that his claim is not barred because it allegedly did not accrue under applicable non-bankruptcy law until after the City's bankruptcy case. This Court, however, has made clear that the proper test is not when the cause of action accrues under nonbankruptcy law

---

[1] The City sought relief against *Desmond Ricks, Akilah Cobb and Desire'a Ricks* in its *Motion to Enforce*. Upon further review of the First Amended Complaint, the City is only a named defendant in Count I and Akilah Cobb and Desire'a Ricks are not asserting claims or seeking relief in Count I. Based on this assumption, the City withdraws without prejudice its requested relief against Akilah Cobb and Desire'a Ricks.

33210423.2\022765-00213

but rather when a right to payment arises for bankruptcy purposes. *In re City of Detroit, Mich.*, 548 B.R. 748 (Bankr. E.D. Mich. 2016). And, as Ricks' claim against the City is a direct result of his alleged unlawful conviction in 1992 and the City's alleged customs and policies "in and before March 5, 1992," his claim was within his fair contemplation for over twenty-one years before the City filed for bankruptcy. First Amended Complaint, ¶ 81. Indeed, no later than 2011 and before the City filed for bankruptcy, on Ricks' behalf, the University of Michigan Innocence Clinic began requesting information and evidence from the City of Detroit and the US Attorney in an effort to overturn Ricks's conviction. Exhibits 1-16. During this same time period, Ricks was also professing his innocence and alleging that tainted evidence from the Detroit Crime Lab resulted in his conviction. *Id.* Consequently, the City respectfully requests that the Court require Ricks to dismiss the City with prejudice from the federal court action.

**Background**

2. The First Amended Complaint[2] contains three counts: in Count I, entitled "Constitutional Violations by all Defendants," Plaintiff Desmond Ricks (but not Plaintiffs Cobb or Desire'a Ricks) asserts a claim against the City and the Individual Defendants. The other two counts assert claims against the individual defendants but not the City.

---

[2] The First Amended Complaint was attached to the City's *Motion to Enforce* filed at docket number 13000 in this bankruptcy case

33210423.2\022765-00213

3.     In Count I, Ricks asserts that the City is liable because

## DETROIT'S *Monell* Liability

> Defendant, DETROIT, created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendants, PAUCH and STAWIASZ, in the manner set forth above, which demonstrated "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind the individual Defendants' violations of Plaintiff's constitutional rights.

First Amended Complaint, ¶ 93.

4.     Plaintiff described the alleged policies and practices in paragraph 81 through 85 of the First Amended Complaint.  Paragraph 81 makes clear that alleged unconstitutional policies existed before the date of Plaintiff's alleged unlawful arrest:

> In and before March 5, 1992, the date of Plaintiff's arrest, the City of Detroit, by and through its final policymakers, had a customer and policy to authorize….

First Amended Complaint, ¶ 81.

5.     Consequently, the basis for the Plaintiff's claim against the City was a conviction and allegedly policies and procedures that were in effect over twenty-one years before the City filed for bankruptcy.

## Argument

6.     Plaintiff's claim against the City was discharged by the City's Plan because it within his fair contemplation before the City filed for bankruptcy.  As

this Court explained in *In re City of Detroit, Michigan*, 548 B.R. 748 (Bankr. E.D. Mich. 2016):

> The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5). "Congress intended by this language to adopt the broadest available definition of 'claim,'" *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (citations omitted), which includes "'all legal obligations of the debtor, no matter how remote or contingent.'" *In re Huffy Corp.,* 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010) (quoting *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 200 (4th Cir. 1988)). This broad definition serves the two primary goals of bankruptcy:  to ensure that all creditors are treated equitably and to secure a fresh start for the debtor.  As the *Huffy* court put it, "a broad definition of claim allows a bankruptcy court to deal fairly and comprehensively with all creditors in the case and, without which, a debtor's ability to reorganize would be seriously threatened by the survival of lingering remote claims and potential litigation rooted in the debtor's prepetition conduct."  424 B.R. at 301.
>
> …
>
> [Claimants] may be correct that their claims were not yet actionable under state law or the City Employment Terms as of the petition date.  But the question of when a claim arises under the Bankruptcy Code is governed by federal law.  *In re Parks,* 281 B.R. 899, 902 (Bankr. E.D. Mich. 2002) (citations omitted). And, as the above quoted definition of "claim" in Section 101(5) of the Bankruptcy Code indicates, pre-petition claims that are "contingent" or "unmatured," and thus not presently actionable, may be discharged. *In re Dixon,* 295 B.R.

226, 229–30 (Bankr.E.D.Mich.2003) (citing *In re Kilbarr Corp. v. G.S.A. (In re Remington Rand Corp.),* 836 F.2d 825, 830–31 (3rd Cir.1988)) (other citations omitted) ("Courts have been careful to distinguish when a right to payment arises for bankruptcy purposes, and when the cause of action accrues.").

In *Parks,* the court explained the meaning of a "contingent" debt, as that term is used in Section 101(5):

> A "contingent debt is 'one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.'" Thus, a right to payment need not be concurrently enforceable in order to constitute a claim that is dischargeable in bankruptcy. *See Riverwood Int'l Corp. v. Olin Corp.* (*In re Manville Forest Prods. Corp.*), 225 B.R. 862, 866 (Bankr. S.D.N.Y. 1998) ("Because contingent and unmatured rights of payment are 'claims' under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code."). *See also Kilbarr Corp. v. G.S.A.* (*In re Remington Rand Corp.*), 836 F.2d 825, 832 (3rd Cir. 1988) ("[A] party may have a bankruptcy claim and not possess a cause of action on that claim.").

*In re Parks,* 281 B.R. at 901–02 (other citations omitted).

By contrast, "it is well-settled that 'a debt is *noncontingent* if all events giving rise to liability occurred prior to the filing of the bankruptcy petition.'" *In re Redburn,* 193 B.R. 249, 259 (Bankr. W.D. Mich. 1996) (emphasis added) (quoting *Nicholes v. Johnny Appleseed of Wash.* (*In re Nicholes* ), 184 B.R. 82, 88 (9th Cir. BAP 1995)).

33210423.2\022765-00213

*City of Detroit,* , 548 B.R. at 761-63.

7.     The Court then rejected the "right to payment" test, which provides that arises for bankruptcy purposes only after each element of the claim has been established, and, instead adopted the "fair contemplation" test.   "Under this test, a claim is considered to have arisen pre-petition if the creditor could have ascertained through the exercise of reasonable due diligence that it had a claim at the time the petition is filed. *Id.* (citations and quotations omitted).   This test allows "the Court to examine all of the circumstances surrounding a particular claim—the debtor's conduct, the parties' pre-petition relationship, the parties' knowledge, the elements of the underlying claim—and use its best judgment to determine what is fair to the parties, in context." *Id.*

8.     In *Sanford v. City of Detroit, et al*, No. 17-13062, (E.D. Mich. Dec. 4, 2018), the United States District Court for the Eastern District of Michigan applied this Court's fair contemplation test in dismissing a claim against the City that was nearly identical to the one asserted by Ricks.   Ex. 17.   The plaintiff in that case, Sanford, also asserted that the City's alleged customs, policies, and practices resulted in his unlawful conviction.   *Id.* p. 8.   And, Sanford argued that because his prepetition conviction was not overturned until after the City exited bankruptcy, his claim was not subject to the discharge in the City's plan.   The court rejected that argument stating:

He certainly contemplated the factual bases underlying the claims raised in his complaint, since he attempted repeatedly to argue actual innocence before the state courts since at least 2008, insisting that his confessions was falsely obtained, concocted, and coerced. Sanford correctly points out that he could not have sued the City until his convictions were set aside, which did not happen until after bankruptcy. But, the courts that have considered the question uniformly have concluded that claims based on prepetition malicious prosecutions were barred, notwithstanding that the plaintiff could not file suit on his claims until his criminal conviction was overturned.

*Id.*, p. 10.

9.     Despite this Court's adoption of the fair contemplation test (and not the right to payment test), Ricks' argues that his claim was not discharged because his cause of action against the City did not accrue "until the conviction or sentence has been invalidated." Response, p. 2. This Court should reject this argument because it adopted under the fair contemplation test. Under the fair contemplation test, as in *Sanford*, Ricks' claim against the City arose prior to the City's bankruptcy filing.

10.     Here, by Ricks' own admission, the City's alleged conduct which gave rise to his claim occurred "in and before March 5, 1992." First Amended Complaint ¶ 81. Of course, the relationship between the parties that gave rise to the claim also took place in 1992. Further, Ricks has always proclaimed his innocence and thus he knew he had an alleged claim against the City since 1992.

*See*, *e.g.*, First Amended Complaint 75-78; Exhibits 1-16. Beginning no later than 2011, with the assistance of firearms identification expert David Townshend, Attorney David Moran and Student Attorney Sally Larsen at the University of Michigan Law School Innocence Project, Claudia Whitman, Director of the National Capital Crime Assistance Network, and Roberto Guzman, Senior Legal Assistant at the Peoples Task Force To Free The Wrongfully Convicted, Ricks undertook substantial efforts to prove his alleged innocence well before the City filed for bankruptcy in 2013. *Id.* Finally, *Monell* holds that municipalities may be held liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014). There can be no liability under *Monell* without an underlying constitutional violation. *See Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir. 2000). The alleged constitutional violations here all took place in 1992. First Amended Complaint ¶¶ 90-98. In short, all of the factors considered under the fair contemplation test demonstrate that the claim asserted against the City arose in 1992 and was discharged by the City's Plan.

WHEREFORE, the City respectfully requests that the Court enter an order requiring Ricks to dismiss the City with prejudice from the federal court action.

- 8 -

Dated: March 15, 2019         MILLER, CANFIELD, PADDOCK AND
                              STONE, P.L.C.

                              By: /s/ Marc N. Swanson
                              Marc N. Swanson (P71149)
                              150 West Jefferson, Suite 2500
                              Detroit, Michigan 48226
                              Telephone: (313) 496-7591
                              Facsimile: (313) 496-8451
                              swansonm@millercanfield.com

                              Attorneys for the City of Detroit

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Bankruptcy Case No. 13-53846 |
| City of Detroit, Michigan, | Judge Thomas J. Tucker |
| Debtor. | Chapter 9 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 15, 2019, he served a copy of the foregoing **REPLY IN SUPPORT OF CITY OF DETROIT'S MOTION FOR THE ENTRY OF AN ORDER ENFORCING THE BAR DATE ORDER AND CONFIRMATION ORDER AGAINST DESMOND RICKS, AKILAH COBB AND DESIRE'A RICKS** upon counsel for Desmond Ricks, Akilah Cobb and Desire'a Ricks, in the manner described below:

Via first class mail and email:

James J. Harrington , IV
Fieger, Fieger, Kenney, Giroux & Harrington, P.C.
19390 W. Ten Mile Road
Southfield, MI 48075-2463
Email: j.harrington@fiegerlaw.com

Milica Filipovic
Fieger, Fieger, Kenney & Harrington
19390 West Ten Mile Road
Southfield, MI 48075-2463
Email: m.filipovic@fiegerlaw.com

- 1 -

Sima G. Patel
Fieger, Fieger, Kenney & Harrington
19390 W. Ten Mile Rd.
Southfield, MI 48075-2463
Email: s.patel@fiegerlaw.com

DATED:  March 15, 2019

By: /s/ Marc N. Swanson
    Marc N. Swanson (P71149)
    150 West Jefferson, Suite 2500
    Detroit, Michigan 48226
    Telephone: (313) 496-7591
    Facsimile: (313) 496-8451
    swansonm@millercanfield.com

| Ex. No. | Date | Document | Summary |
|---|---|---|---|
| 1 | 5/21/2018 | Deposition Transcript of Desmond Ricks | Ricks discussing contacting Townshend (the expert he used in the 1992 trial) in 2009<br>  p. 38, lines 15-24<br>  p. 39, lines 5-25 (bar journal page<br>        referenced is last page in exhibit 1)<br>  p. 40, lines 7-20<br>  p. 41, lines 6-15<br>  p. 43, lines 1-17<br>  p. 46, lines 22-25<br>  p. 47, line 1 |
| 2 | 8/6/2009 | Letter from State Appellate Defender Office to Ricks | State Appellate Defender Office acknowledging Rick's letters asking whether tainted evidence from Detroit Crime Lab resulted in conviction |
| 3 | 2/11/2010 | Letter from State Appellate Defender Office to Ricks | Enlosing questionnaire for potential representation regarding potential Detroit crime lab issues |
| 4 | 8/16/2010 | Letter from Townshend to Ricks | Discussing Ricks' request to have Townshend meet with him |
| 5 | 6/23/2011 | Email from Assistant US Attorney to Claudia Whitman (an investigator for Ricks) | Indicating that Assistant US Attorney referred issues to University of Michigan Innocence Clinic |
| 6 | 11/23/2011 | Email from University of Michigan student Z. Dembo to Claudia Whitman | Discussing prison's refusal to allow Ricks access to research materials regarding firearms evidence |
| 7 | 12/16/2011 | Email chain between Roberto Guzman and Claudia Whittman | Regarding efforts to contact US Attorney regarding claim |

# Exhibit List
## (Page 2 of 2)

| Ex. No. | Date | Document | Summary |
|---|---|---|---|
| 8 | 2/1/2012 | Letter from Ricks to Bureau of Alcohol, Tobacco and Firearms | Ricks asserting that he is incarcerated for a crime he did not committ and asking that Claudia Whitman (an investigator for Ricks) be allowed to interview two federal agents that arrested him on March 5, 1992 |
| 9 | 6/13/2012 | Letter from Michigan Innocence Clinic to US Attorney McQuade | Requesting assistance in accessing information regarding Ricks' case |
| 10 | 6/19/2012 | FOIA request to City of Detroit from Michigan Innocence Clinic | Requesting information on Ricks' case |
| 11 | 9/14/2012 | Email from Michigan Innocence Clinic to Claudia Whitman | Regarding possibility of rerunning ballistics |
| 12 | 8/1/2012 | Email chain between Michigan Innocence Clinic and Claudia Whitman | Discussing ballistics |
| 13 | 9/24/2012 | Letter from Ricks to Michigan Innocence Clinic | Discussing caselaw |
| 14 | 10/9/2012 | Emails between Innocence Clinic and Claudia Whitman | Regarding notes of discussion with ballistic experts |
| 15 | 11/3/2012 | Email chain between Michigan Innocence Clinic and Claudia Whitman | Discussing ballistics issues |
| 16 | 9/12/2012 | Letter from Ricks to crime scene witness (Ms. Strong) | Professing innocence and alleging issues with Detroit Crime Lab |

# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


DESMOND RICKS, AKILAH COBB,

and DESIRE'A RICKS,

                    Plaintiffs,

        vs.                      USDC Case No. 17-cv-12784

                                 Hon. Paul D. Borman

DAVI PAUCH, DONALD STAWIASZ,

and CITY OF DETROIT,

                    Defendants.

_____


The Videotaped Deposition of DESMOND RICKS

Taken at 34405 West 12 Mile Road, Suite 200A

Farmington Hills, Michigan

Commencing at 10:20 a.m.

Monday, May 21, 2018

Before Maureen Collier, CSR-7422.

1    Q.    If you can identify them for me.

2    A.    **Yes, sir.**

3    Q.    Okay.

4                    MR. MUELLER:  For the record, Exhibit 1 is

5           18 pages?

6                    MR. ASHFORD:  Yes, sir.  18 pages.

7                    THE WITNESS:  Yes, sir.

8    BY MR. ASHFORD:

9    Q.    Exhibit 1.

10   A.    **Uh-hmm.**

11   Q.    Okay?

12   A.    **Uh-hmm.  Yes, sir.**

13   Q.    The first name is David Townshend.

14   A.    **Correct.**

15   Q.    How do you know Mr. Townshend?

16   A.    **Mr. Townshend is the man who I hired to do the initial**

17          **firearms examination after the Detroit Police**

18          **Department said that those bullets matched that gun**

19          **and it didn't.**

20                   **So I subsequently had sought his help to**

21          **come in and do -- do another analysis to show that**

22          **what I'm saying was correct:  That that gun didn't**

23          **kill that guy, and I didn't commit this crime.**

24   Q.    When did you first contact David Townshend?

25                   MR. MUELLER:  During, during the criminal

1       process or like years later?

2              THE WITNESS:  Yes, that's what I was --

3   BY MR. ASHFORD:

4   Q.   Years later.

5   A.   I was in the law library in 2009 at -- I forgot the

6        place they sent us to.  But I was in the law library

7        in 2009, and I was going through the bar journal.  And

8        sometimes you just sit there.

9              And one of these days I was -- you have

10       different days you do different stuff.  You type one

11       day.  You would write brief -- write briefs one day.

12       Type one day.  Go back and forth.

13             So this particular day was a writing day.

14       So as I'm in there writing, I'm going through the bar

15       journal.  I'm looking for names in there that have --

16       I always, always sought help.  Always wrote letters

17       and wrote the people, call me, please help me, I'm

18       innocent.  So always -- I would just go through there

19       periodically.

20             And as I'm going through there, I'm

21       going -- I'm flipping through the back, and I happen

22       to see the name that says, it said Spectrum Forensic

23       Examination Services.  And as I look closer, I look at

24       the bottom.  I see his name.  And I know it's God sent

25       it to me.  Only God, only God can do this.

1    At the bottom it said David Townshend. I

2    thought he had died. To be truthful with you, I

3    thought he -- because he was an older gentleman then.

4    And this was 20 -- this was 25, 20 -- at that time it

5    was almost 20 years. So I figured he might have

6    passed. But God is good. He was still alive.

7    So I, I wrote to that place, and I asked

8    him -- I wrote there -- no, I called first. And they

9    told me that he, that he did like outsourcing work for

10   them; that he didn't reside there.

11   So I wrote, I wrote, asked them could I

12   send him some mail there because I had no other

13   address for him, only what was in the bar journal

14   which was their address. So accommodated me and said

15   yes, we'll get -- next time he comes out or whatever,

16   we'll give it to him. Because I didn't know when that

17   would be, but I'm shooting my shot, you know. I

18   didn't care. I had nothing to lose.

19   So I got all the paperwork out and sent it.

20   You know, I sent it to him. And then he contacted me.

21   Q.   How long was it before he contacted you?

22   A.   Maybe about -- to be truthful with you, I can't

23        remember. It wasn't -- it was, it was, it was long,

24        but it, it -- it felt long, but I don't think it was

25        long. But you know how you just be anticipating so --

1    you want it so bad and it comes, you think it -- I

2    don't think -- maybe -- to be truthful, I don't really

3    want to put a time on it.  I can't say, because I

4    can't say.  But I know it, it felt long, but I don't

5    think it was really long.

6              And when he finally contacted me, you know,

7    I asked him do you remember me.  And he said no.  He

8    told me the truth.  I don't remember you.  I don't

9    remember the case.  I don't remember none of that

10   stuff.

11             You have to understand this man didn't know

12   me.  He didn't know -- all he know it's somebody on

13   the phone asking him different questions about

14   something that he may have done, you know, a while

15   ago.  He didn't know.  He wasn't going to commit

16   himself to that, and I understood that.  I understood

17   that.

18             So this when I got to the point where I

19   needed to see him, you know.  And I asked him, would

20   you be willing to come and visit me.  I work in

21   prison.  I don't have no money.  I work in prison.  I

22   work in the, in, in, in prison, and I be saving my

23   money and stuff.

24             I can, you know, go to my counselor, and

25   they can take the money out of your account and send

1     to people. I can send you 30, 40, 50 bucks for some

2     gas if you would just come up here and visit me and

3     let me show you some of this stuff I got, and maybe

4     you'll help me. You know, I had nothing else to lose,

5     you know. Nothing to lose.

6  Q.  So then what happened?

7  A.  He came. He -- well, I had to go through the visit

8     process. I had to the visiting process first.

9  Q.  Did he tell you on the phone that, that he would come?

10  A.  No. I'm going to get that correct. I'm going to give

11     you the whole story.

12           I called. I asked him -- I talked to him.

13     I asked him, I said well, I'm in prison. He said, he

14     said you went to prison? He said he didn't even know

15     I went -- he didn't know what had happened, from what

16     he, what he said. But I let it go. That's not what I

17     was trying to get. What I was trying to get was some

18     help. You know what I'm saying?

19           So I explained to him what was going on.

20     He, he agreed to do the visiting process. I went

21     through that, got the visiting process. Maybe about

22     two, three weeks he came to visit me. And when he

23     came to visit me, this is when I had some paperwork.

24     I didn't have the majority of the paperwork. I had, I

25     had some paperwork.

Page 43

1        And when I showed him some stuff, he was

2    kind of like -- he didn't, he couldn't remember.  And

3    I understood that.  That was 20 -- that was 20 years,

4    over 20 years ago.  I understand he couldn't remember,

5    but I was trying to save certain stuff or show him

6    certain things and jog his memory a little bit.  And

7    it really did -- and it did.  I'm going to be truth --

8    it didn't the first time.  It didn't.  You know, he

9    felt -- he say he can recall, but he had told me he

10   had lost all his effects and stuff, all his effects in

11   a flood somewhere.  Something happened.  A flood

12   somewhere.  He lost all his stuff that he had had from

13   back then.

14       Because I wanted to get some of them notes

15   that he had of some of the stuff that he had did

16   during this process that could help me, but he didn't

17   have it, you know.  And that was kind of like a

18   downer, but, you know, I took it, you know.  At least

19   I can still talk to you and I see who knows what I

20   might get.

21       And the second time he came, this is when I

22   had more paperwork.  Now when I went out there and

23   showed him his name and where he signed stuff and

24   examination and stuff he did, and he had did a little

25   more research.  He started recalling a little more,

```
 1        and we started going back and forth.  When he seen it,

 2        you know, I guess, you know, memory comes back.  It's

 3        like --

 4   Q.   How did you have more paperwork?

 5   A.   Because my, my -- I had got -- in 1994 my mother had

 6        went to 1300 Beaubien, police headquarters in Detroit.

 7        And I asked her to get my homicide file from the

 8        Detroit Police Department.  And they charged her $40.

 9        Gave -- I don't know where the receipt at now.  But

10        they charged her $40 and gave her a copy of my

11        homicide file.

12             She subsequently sent that file to me when

13        I was incarcerated.  And me and my cellmate, the guy

14        you talking about, one of my cellmates, we sat down

15        and started going over my stuff.  And this is when I

16        was trying to effectuate my appeal and try, you know,

17        do different things, you know.

18             And I had all that extra paperwork, but

19        my -- when my mother died -- when I went to prison, my

20        mother died.  My sister ended up -- my oldest sister

21        Gwen ended up with it.  She take the paperwork, not

22        knowing what it is, puts it in her closet.  And it

23        sits in there from 2000, when my mother passed, until

24        2011, almost '11.

25             Because he had seen me in '10, and I, I
```

1    don't know how long it took for him to come back.  But

2    '10 or '11, something like that.  It sat there for

3    over ten years.

4              So one day she was just -- me and her had

5    been conversing on the phone.  And she moved to

6    Charleston, South Carolina.  And one day me and her

7    conversing on the phone, and she said I found some

8    paperwork in my closet that momma had at the house

9    that I took.  And I was like what?  What kind of

10   paperwork?  She was like some stuff with -- some court

11   stuff with some names on there and different stuff.

12             So when she said this, I'm thinking to

13   myself what -- popped back in my mind, '94, the

14   homicide file.  It had to be some of that paperwork

15   that she kept.  Because I told my mother to make a

16   copy of the file.  Keep the original and make a copy

17   and send me the copies.

18             So she got the original.  Now my sister got

19   it.  Once again it's God helping me, blessing me.  My

20   sister, you know, my sister say she found those papers

21   in her closet when she was going to find some shoes to

22   go dancing with her husband.  And she just happened to

23   see the box on the floor and remembered it, opened the

24   box up and all my papers were in there.

25             And when she sent me those papers, it was

1  the papers Mr. Townshend had done and all the other

2  papers and everything else I needed to show people

3  that, you know, this man might be -- this man might be

4  telling the truth.

5       Because you have to understand, in the

6  beginning you telling people -- I, I was telling

7  people I didn't do this.  Nobody believed me.  Nobody,

8  nobody believed me.  Called me a liar and a bunch of

9  other things that I don't want to say.  But I had to

10 accept that, and I took that.

11      It hurt.  Don't get me wrong.  But I didn't

12 have time to feel pain.  I had to continue to do what

13 I had to do to prove my innocence, and I wasn't going

14 to stop no matter what nobody else said or what nobody

15 else felt.

16      And when I got those papers -- he came back

17 on the second visit.  And when I started showing him

18 that and he seen his name and what was going on, he

19 knew it was legitimate.

20 Q.  So you received those documents after the first visit.

21 A.  Yes, sir.  Yes, sir.

22 Q.  So what did Mr. Townshend tell you during the second

23      visit?

24 A.  I mean, it was pretty much he, he didn't fully recall.

25      But he started to remember certain things about what

1       know.  I don't know.

2   Q.  Did he work for the innocence project?

3   A.  Not that I know of.  He worked, maybe he worked for

4       one, but I don't think he worked for -- he didn't work

5       for the University of Michigan.  No, sir.

6   Q.  Did he work with Claudia Whitman?

7   A.  Yes.  At one point, yes.

8   Q.  Okay.  Who is Claudia Whitman?

9   A.  She is the lady who is responsible for me sitting here

10      talking to you right now.  The first person who

11      believed I was innocent and the lady who fought tooth

12      and nail to get me out of prison.  The first person

13      who believed in me, who knew what I was telling her

14      was true because she could see it.  She could feel it.

15      That's what she does.

16              She helps innocent people all over United

17      States of America.  So in doing that -- you do that

18      job for so long, you get a feel for people.  You know

19      what I'm saying.  And you be around that person.  You

20      get a feel for them.  You say okay, this person -- you

21      might still have a little apprehension in there.  But

22      once people start showing you stuff, you start seeing

23      different paperwork -- I started showing her that

24      stuff.  She knew what it was.  She could see it.

25  Q.  Has she helped anyone else that you, that you knew of?

1  prison, Mr. Townshend had never informed me or, to my

2  knowledge, my attorney Kristi Glenn about the

3  irregularities he observed when he examined the

4  evidence in my case. Is that true?

5  A.  That's true.

6  Q.  What irregularities?

7  A.  That the bullets were in pristine condition, as he

8  said in his affidavit. I didn't know these things,

9  you know. I didn't know none of this. I was hoping,

10  but I didn't know. I was praying, but I didn't know.

11  Q.  Mr. Ricks, you wrote a lot of letters when you were in

12  prison; right?

13  A.  Yes, sir.

14  Q.  Do you have copies of any of those letters?

15  A.  Yes, sir. I wrote Barbara McQuade, United States

16  Attorney General. I mean, United States Attorney for

17  the Eastern District of Michigan. Judith Levy. I

18  wrote a lot of people, all kind of people that helped

19  me. I wrote Obama. Wouldn't make no difference. I'd

20  write Trump.

21  Q.  You wrote --

22  A.  I wasn't guilty.

23  Q.  In paragraph number four, you wrote Ms. Strong a

24  letter; correct?

25  A.  Yes, sir.

Page 242

1   Q.   Okay.  Do you have a copy of that letter?

2   **A.**   **Yes, sir.  Yes, sir.  Yes, sir.**

3   Q.   You wrote letters to the innocence project?

4   **A.**   **Yes, sir.**

5   Q.   And Ms. Whitman?

6   **A.**   **Yes, sir.  Ms. Winware (ph) over in Canada.  She's**

7       **over in Canada.  She's -- it's not called the Canadian**

8       **Innocence Project, but it's just an innocence project**

9       **over there in Canada.  Her name is Winware.  She's a**

10      **representative over there.  She runs it.  Wrote her,**

11      **too.  She was going to help me.**

12           **I wrote Kym Worthy several letters.  Wrote**

13      **Ms. Worthy several letters begging her, please.  I**

14      **didn't do this.  Please help me.**

15   Q.   How do you feel about Ms. Worthy?

16           MR. MUELLER:  Objection.

17           THE WITNESS:  I just, I just felt that she

18      could have did better than what she did.  That's all.

19      I felt she could have did a lot better than what she

20      did, especially when she seen it wasn't right.

21           Beforehand I could understand.  Everybody

22      screams they're innocent.  But when a guy proves he's

23      innocent, you see he's innocent, at least have the

24      decency to come back and say it wasn't on my watch,

25      but I apologize what happened to you.  And we going to

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 27 of 110

Page 243

```
1      make it right and get you out of there.
2                 They wouldn't even come and get me.  The
3      State Police said I was innocent three weeks before
4      they even came and got me.  They wouldn't even come
5      and get me until they called the ATF.  They basically
6      forced their hand.  Let that man out of there.  Why
7      y'all got that innocent man in there.  Y'all know that
8      man didn't commit that crime.  Let him out.  It make
9      no sense.
10                But no, I have no ill will towards her, no.
11     I don't have no ill will towards nobody, Mr. Ashford,
12     nobody.  I'm just happy to be alive and out of that
13     prison.
14  Q.  And it's your testimony today that you didn't bribe or
15      threaten or promise anyone anything --
16  A.  No, sir.
17  Q.  -- for their testimony?
18  A.  No, sir.
19                MR. MUELLER:  That is your testimony?
20  BY MR. ASHFORD:
21  Q.  To change their testimony?
22  A.  I didn't promise or offer anybody anything, sir.  Not
23      at all.  I just asked for the truth.  The truth is
24      enough.  That's all you need.  Lies, you got to change
25      them up.
```

Page 245

1   and it had her name -- it had her birth date on there.

2   And I was able to use that to get some help.

3   Q.  Okay.

4   A.  The rest of the people, I didn't have that.  They just

5   had -- like it was blacked out, so I really

6   couldn't -- I caught a break with that.  Basically

7   just her and Mr. -- Ms. Strong and Mr. Townshend.

8   Q.  How did you find out about Ms. Whitman at the National

9   Capital Crime Assistance Network?

10  A.  I was -- I was directed to her by a guy who I dealt

11  with in there named Jessie Agnew.  He introduced me to

12  Claudia.

13  Q.  And how did you first come into contact with the

14  innocence project?

15  A.  I wrote --

16  Q.  And for the record, we're talking about the innocence

17  project at the University of Michigan Law School.

18  A.  That's correct.  That's correct.  I wrote them a

19  letter back in 2009 and asked them could they assist

20  me.  But they had a waiting list.  They had just

21  started in like, a couple years before, something like

22  that.  And they had, you know, got swamped.  And they

23  had a waiting list.

24          And they would have to go through and

25  figure out who was innocent and who wasn't basically.

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 29 of 110

 1   A.   No, sir.  I mean, that's hard to say because if

 2        somebody come and visit me and they work for Detroit,

 3        I don't know where they work.  I don't want to lie to

 4        you and say I don't and I -- I don't where those

 5        people work.  I don't ask them.

 6                  MR. MUELLER:  We can narrow it --

 7   BY MR. ASHFORD:

 8   Q.   But as far as you know, you haven't, you haven't had

 9        any contact with any Detroit police officers.

10   A.   No, sir.

11   Q.   In the last ten years.

12   A.   No, sir.

13   Q.   Or any Detroit lawyers.

14   A.   No, sir.  No, sir.  I was at that place --

15   Q.   Have you had, have you had any contact with anyone at

16        the National Capital Crime Assistance Network besides

17        Claudia Whitman and the paralegal that you, that you

18        referenced earlier?

19   A.   Yeah.  And her husband, Mr. Laird, Laird Carlson.

20        That's Claudia's husband.  He works -- he does the

21        newspaper part of stuff like that for the --

22   Q.   For her organization?

23   A.   Yes, sir.  Yes, sir.

24   Q.   Have you had any contact with any Wayne County

25        prosecutors in the last ten years?

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 30 of 110

Page 249

1              MR. MUELLER:  Other than David Townshend.

2              THE WITNESS:  Through my attorneys.

3              MR. MUELLER:  Well, he's retired.

4              MR. ASHFORD:  Yeah, he's retired.

5              THE WITNESS:  But I'm saying through my

6     attorneys I've had contact with --

7     BY MR. ASHFORD:

8     Q.   No, you personally.

9     **A.   No, sir.  No, sir.**

10    Q.   And you've mentioned the innocence project in Canada.

11    **A.   Yes, sir.**

12    Q.   That you contacted.

13    **A.   Yes, sir.  I have letters and all that stuff, too.**

14    Q.   What other organizations have you contacted?

15             MR. MUELLER:  Other than what he's talked

16    about?

17    BY MR. ASHFORD:

18    Q.   Other than what you've told me about.

19    **A.   People in Atlanta, they had some kind of thing and**

20    **they was doing -- helping the people get transcripts.**

21    **It took me a long time -- I, I couldn't get my**

22    **transcripts.  They wouldn't give me my transcripts**

23    **from down there.**

24             **They wouldn't give it to me in the '90s.**

25    **They wouldn't give it to me in the early 2000s.  I**

1     incarceration; correct?

2  A.   Yes, sir.

3  Q.   So why are you still suing the City of Detroit?

4            MR. MUELLER:  Let me make a general

5       objection.  One, that's why he's got a lawyer.  But

6       you can go head and tell him how you were wronged and

7       what you --

8  BY MR. ASHFORD:

9  Q.   I'm not asking for a legal basis.  I'm asking for you

10      personally.  Why are you --

11 A.   It's not, it's not the money, Mr. Ashford.  I want my

12      life back.  I want them 25 years they took from me

13      back, and I can't get that.  And I understand that.

14           And I love that city to death, man.  I love

15      that city.  But some of the people that were in that

16      city back then weren't right.  They weren't right.

17      And they got to answer for what they did.  And that's

18      just -- I don't wish no ill will.  I have no hard

19      feelings, none of that.  I don't have none of that,

20      none of that.  Because I went, I went -- I came out of

21      the bottom of hell, and I asked God laying on my back

22      on that floor in that darkness, will you please help

23      me.  If you help me to get out of here, I'm not -- I

24      can't be the best person I can be.  I'm not going to

25      lie to you, God.  But I'm going to be -- I'm going to

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 32 of 110

Page 253

```
 1        want wrong around me.  I didn't go to the yard.  I
 2        didn't go to chow hall.  I didn't leave my cell.
 3        Because my focus was to get out of prison.  And God
 4        gave it to me when he closed that crime lab in 2008.
 5        That was a blessing to me.
 6   Q.   Why?
 7   A.   Because that was the -- that was the reason I was sent
 8        to jail, and that was the reason I'm out of jail.
 9   Q.   Why?
10   A.   Because that crime lab wasn't right down there.  The
11        error rate was too high.  You playing with people's
12        lives.  You got a 10 percent error rate down there,
13        Mr. Ashford.  Out of 10 percent, that's a lot of
14        people going to jail.  And I'm one of them that went
15        to jail and didn't have -- never was supposed to see
16        inside a jail, not for that crime, something that you
17        know I didn't do.
18                And then this man tells me right to my
19        face, I know you didn't do it.  But if you don't help
20        me basically catch the criminal, you going -- you good
21        enough.  I'm going to take you.
22                MR. MUELLER:  What man said that?
23                THE WITNESS:  Donald Stawiasz told me to my
24        face if you don't help me get these people, we're
25        going to take you.  And I couldn't help him get those
```

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 33 of 110

# Classified Advertising—Expert

**DOCUMENT EXAMINATION**

## AMERICAN DOCUMENT EXAMINERS, INC.

- FORGERY DETECTION
- HANDWRITING IDENTIFICATION
- OPINION LETTER—REPORT
  - Certified
  - Civil Criminal
  - Expert Witness
  - Citizen
  - Probate
  - Federal

**(248) 681-7255**

hic@tec.akt.com
www.AmericanDocumentExaminers.com

---

**DOCUMENT EXAMINATION**

### JOHN P. RICCI—FORENSIC DOCUMENT EXAMINER

3 years as an Apprentice with the Detroit Police Department and Michigan State Police
35 years of governmental and private practice experience

*Member of the Midwestern Association of Forensic Scientists*

**Expert witness testimony in criminal, civil and federal courts, administrative hearings and arbitration boards.**

- Detection of Forgery
- Handwriting/Printing Identification
- Ink analysis/dating
- Examination of medical and business records for alterations, additions, and rewritings
- Experienced in all other document-related problems
- Résumé upon request

1230 W. Church Road, Morrice, MI 48857-9759
517-625-7319 ❖ FAX: 517-625-3732

---

**ECONOMICS & FINANCE**

Anderson Economic Group, experts in Economics, Finance, and Statistics for matters of commercial damages, business valuation, asset valuation, lost profits, antitrust, tax, buy/sell agreements, and fairness opinions. We also provide economic and market feasibility studies. Call 517.333.6984, or visit www.AndersonEconomicGroup.com. Offices in East Lansing, Chicago, Dallas, and Oklahoma City.

---

**Online Change of Address form**
**http://www.michbar.org/programs/address_change.cfm**

---

**ENGINEERS**

### W. Thomas Munsell, P.E.
**Structural Engineer**

- Structural Building Inspections
- Expert Witness
- Engineers
- Structural Design & Evaluation of Brick and Block Masonry, Steel, Wood, Concrete, & Foundations

**W. Thomas Munsell, P.E.**



41550 Rayburn
Northville, MI 48168
Ph: (248) 755-0922
Fax: (734) 420-1167
E-mail: Tom@munselloneng.com

---

### State Bar of Michigan Advertising Information
*http://www.michbar.org/
publications/
advertising.cfm*

---

**FORENSIC EXAMINATION**



## SPECKIN FORENSIC LABORATORIES

**Experts in Criminal Defense—Assistance provided in obtaining court ordered expert funding**
**Specialists in the following disciplines using many former government experts:**

- OUIL–OUID – Toxicology review in impaired driving cases – Datamaster and Blood Alcohol review and consultation – Expert court testimony
- Forensic firearms and ballistics examinations – Distance determination – Self Defense – Trajectory
- Crime scene reconstruction – Pathology Review
- Fingerprint, palmprint and AFIS analysis and ID
- DNA review, consultation, and analysis
- Computer forensics – deletions – recovery – analysis

- Dating of documents, inks, paper and photo copies, forensic examination of medical and business records for alteration, additions, and rewritings
- Identification of handwriting, signatures and forgeries
- Trace evidence analysis, shoe and tire prints
- Civil and criminal forensic consultation

| | | |
|---|---|---|
| **ROGER J. BOLHOUSE**<br>Laboratory Director<br>Crime Scene Reconstruction<br>Forensic Analyst and Consultant | **KARL E. EBNER, Ph.D.**<br>Forensic Toxicologist | **MICHAEL J. SINKE**<br>Latent Print Specialist<br>Crime Scene Reconstruction<br>Forensic Document Analyst |
| **RICHARD L. BRUNELLE**<br>Retired Ink Dating Consultant | **JASON S. HARMER, BS**<br>Forensic Chemist and Examiner | |
| **ANN CHAMBERLAIN, MS**<br>Serologist<br>DNA Analyst and Consultant<br>Crime Scene Reconstruction<br>Bloodstain Pattern Analyst | **ROBERT D. KULLMAN**<br>Forensic Document Analyst | **ERICH J. SPECKIN**<br>Forensic Document Analyst<br>Forensic Ink Dating Specialist |
| | **MARCO A. SCARPETTA, Ph.D.**<br>DNA Analyst and Consultant | **LEONARD A. SPECKIN**<br>Retired Document Consultant |
| **LARRY A. DALMAN**<br>Computer Recovery Specialist | **JAY A. SIEGEL, Ph.D.**<br>Analytical Chemist | **DAVID G. TOWNSHEND**<br>Forensic Firearms Examiner |
| | **LAURENCE R. SIMSON, MD**<br>Forensic Pathologist | |

**TOLL FREE**
**(888) 999-1009**
**(517) 349-3526**
Fax (517) 349-5538

Testimony presented in over
~1800+ state and federal
court appearances
Local and national references available

www.4N6.com
e-mail info@4N6.com
2105 University Park Dr., Ste. A
Okemos, MI 48864

MI Innocence Clinic 002438

13-53846-tjt   Doc 13020   Filed 03/15/19   Entered 03/15/19 14:07:18   Page 34 of 110

# EXHIBIT 2

# STATE APPELLATE DEFENDER OFFICE

Main Office: SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

JAMES R. NEUHARD
DIRECTOR

DAWN VAN HOEK
CHIEF DEPUTY DIRECTOR
DETROIT/LANSING

JONATHAN SACKS
DEPUTY DIRECTOR
DETROIT



LANSING OFFICE
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
Phone: 517.334.6069 • Fax: 517.334.6987

Website: www.sado.org

August 6, 2009

Desmond L. Ricks
No. 187002
Pine River Correctional Facility
320 N. Hubbard
St. Louis, MI 48880

Dear Mr. Ricks:

I write in response to your letters regarding the Detroit Crime Lab. The State Appellate Defender Office (SADO) is undertaking a complete review of our Wayne County clients to determine whether tainted evidence from the Detroit Crime Lab resulted in conviction.

We are also determining whether SADO can provide representation to non-clients with potential Detroit Crime Lab problems. We will keep your letter on file and update you as this process unfolds. For now, I can only suggest that you contact the Forensic Integrity Review Unit at the Wayne County Prosecutor's Office.

> Wayne County Prosecutor's Office
> Forensic Integrity Unit
> 1441 Saint Antoine St., Fl 12
> Detroit, MI 48226

I wish you the best of luck as you continue to explore post-conviction options and I will contact you if SADO receives a mandate to represent former non-SADO clients.

Sincerely,

Jonathan Sacks
Deputy Director

MI Innocence Clinic 002235

# EXHIBIT 3

# STATE APPELLATE DEFENDER OFFICE

Main Office: SUITE 3300 PENOBSCOT • 645 GRISWOLD • DETROIT, MICHIGAN 48226-4281
Phone: 313.256.9833 • Fax: 313.965.0372
CLIENT CALLS 313.256.9822

JAMES R. NEUHARD
DIRECTOR

DAWN VAN HOEK
CHIEF DEPUTY DIRECTOR
DETROIT/LANSING

JONATHAN SACKS
DEPUTY DIRECTOR
DETROIT

LANSING OFFICE
101 NORTH WASHINGTON
14TH FLOOR
LANSING, MICHIGAN 48913-0001
Phone: 517.334.6069 • Fax: 517.334.6987

Website: www.sado.org



February 11, 2010

Desmond Ricks
No. 187002
Pine River Correctional Facility
320 Hubbard Street
St Louis MI 48880

     Re:   Detroit Crime Lab

Dear Desmond Ricks:

You have expressed interest in having our office review your case for potential Detroit Crime Lab issues. Enclosed you will find an eleven page questionnaire and consent form that you need to complete and return to us as soon as possible. Please follow the instructions provided and do not send any documents pertaining to your case at this time.

Return the completed questionnaire to my attention at the Detroit address above.

The review process will take time, so please be patient as the process unfolds.

                    Sincerely,

                    Kim McGinnis
                    Assistant Defender
                    Principal Attorney, Crime Lab Unit

KMM/mbd
Enclosure

MI Innocence Clinic 002451

# EXHIBIT 4



# FORENSIC EXAMINATION SERVICE
## CIVIL AND CRIMINAL EXAMINATIONS
David G. Townshend
(517) 628-2411

5395 Bunker Road
Mason, MI 48854

August 16, 2010

Mr. Desmond Ricks
Inmate # 187002
R.A. Handlon Correctional Facility
1728 W. Bluewater Hwy
Ionia, MI 48846

Dear Mr. Ricks:

I called the TX # you gave me immediately after speaking with you on this date.
The lady I spoke with advised that I could not just show up to visit you. She said
that you had to; first meet with your counsellor, then submit an application for me to
fill out and return. She said that the process would take 4-6 weeks altogether.
She went on to advise that without prior approval a person could not stop and visit you.

Sincerely,

David G. Townshend
Forensic Examination Service

MI Innocence Clinic 002439

# EXHIBIT 5

From: **Levy, Judith (USAMIE)** Judith.Levy@usdoj.gov
Subject: RE: Question on Desmond Ricks
Date: June 23, 2011 at 9:37 AM
To: Claudia Whitman claudia@celldoor.com
Cc: David Moran morand@umich.edu



Ms. Whitman:

I sent a letter to the University of Michigan Innocence Clinic indicating that I had spoken to Mr. Ricks but was unable to investigate his claim of innocence. There is no federal statute that gives the United States the authority to investigate individual claims of this nature.

I did not send a letter to the Innocence Clinic to "press" them in any manner. Rather, I wrote to inform them of the information I received because these are the sorts of issues they deal with in their work.

Thank you very much for your message,

Judy Levy

Judith E. Levy
Assistant U.S. Attorney
Eastern District of Michigan
Chief, Civil Rights Unit
211 West Fort Street, Ste. 2001
Detroit, Michigan 48226
judith.levy@usdoj.gov
(o) 313-226-9727
(c) 313-244-5160


-----Original Message-----
From: Claudia Whitman [mailto:claudia@celldoor.com]
Sent: Wednesday, June 22, 2011 12:57 PM
To: Levy, Judith (USAMIE)
Cc: David Moran
Subject: Question on Desmond Ricks

Judith: I hope you remember me from asking you about Det./Ronald Sanders. Desmond Ricks called yesterday and said that he talked with you and you wrote a letter to Dave about his case. I did speak with David Townshend, the ballistics expert who looked at the bullets 19 years ago and he said they were pristine, had no blood or anything on them and were test bullets. Also, they were in an unsealed envelope.I He is willing to give an affidavit but no longer has his notes, though he remembers the case well. Did you, in fact, write Dave to press for the IP looking at the case? Thanks. Claudia Whitman

**EXHIBIT 6**

**From:** **Zach Dembo** zdembo@umich.edu
**Subject:** Re: Desmond Ricks
**Date:** November 23, 2011 at 9:41 AM
**To:** Claudia Whitman claudia@celldoor.com



Interesting. And yes, I got both the fax yesterday and the material for Lacino a week or two ago, thank you. Enjoy your newest friend! Happy Thanksgiving!

On Wed, Nov 23, 2011 at 11:25 AM, Claudia Whitman <claudia@celldoor.com> wrote:
This speaks for itself. Did you get all the stuff I faxed yesterday? And have a fun Thanksgiving. We picked up my friend's new Morgan yesterday. What a prince! C

Begin forwarded message:

**From:** Roberto Guzman <legal_begal01@sbcglobal.net>
**Date:** November 23, 2011 7:54:17 AM MST
**To:** claudia@celldoor.com
**Subject:** **Desmond Ricks**

I can't believe they intercepted some research material I sent to Desmond involving firearms evidence. What reactionaries! They should at least allow him the Executive Summary prepared by the National Research Council.

**PEOPLE'S TASK FORCE TO FREE THE WRONGFULLY CONVICTED**
**16234 WHITCOMB**
**DETROIT, MICHIGAN 48235**
**(313) 272-1406**

November 23, 2011

Mr. John Prelesnik
Warden
Handlon Correctional Facility
1728 Bluewater Highway
Ionia, MI 48846

     *Re:    Appeal of Notice of Package/Mail Rejection*

Dear Mr. Prelesnik:

Please consider this letter my objection to the enclosed Notice of Package/Mail Rejection, which was received by me on November 22, 2011. For the following reasons, I ask that you reconsider the grounds for rejecting the material and allow Mr. Ricks to receive it.

The package I sent to Mr. Ricks contained two informational pieces about forensics evidence: one entitled *Firearms, Projectiles, and Toolmark Identification Evidence*, the other entitled *Executive Summary, Strengthening Forensics Science in the United States: A Path Forward*.

While the firearms and tool mark identification material contains information about bullets and how they are used as evidence, nothing more can be said about that. Indeed, the misidentification or otherwise mishandling of ballistics evidence by Detroit Police in Mr. Ricks' 1992 murder trial for which someone other than he was the killer is at the heart of research we are doing in assisting him in possibly filing post-conviction appeals. We are at the initial stages of researching the science of forensics evidence on his behalf and merely intend to share our findings with him to assist him in preparing for an appeal. It strains reasoning to conclude that the research material could pose a threat to institutional security or possibly encourage criminal activity when prisoners are not walking around your facility with firearms on their person. If that were the case, every prisoner serving time at your facility involving forensics evidence and who has crime lab or expert reports prepared by ballistics and/or DNA experts at the time of their trials could be said to be in possession of material posing a threat to institutional security or encourage criminal behavior. Of course, that is a stretch at logic, as was done here in rejecting the research material I sent to him. For these reasons, I ask that you reconsider the rejection notice and allow Mr. Ricks to receive the material for his information.

As concerns the executive summary prepared by the National Research Council, that report was given to Congress in February 2009 in the wake of scandals involving the now-defunct Detroit Crime Lab in which many defendants, Mr. Ricks among them, were wrongfully convicted of crimes based on faulty or falsified ballistics evidence. The NRC's report contained recommendations for the development of forensic science into a mature field of multidisciplinary research and practice run by forensics sciences independent of law enforcement agencies and prosecutors, both of whom bring an inherent bias into the field of forensics investigations. That is what that report discusses. Nothing in that report contains sensitive information on how to make, build or manufacture bullets or other weapons such that it would pose a threat to institutional security or encourage criminal activity, as the rejection notice flatly assumes. Therefore, I ask that you overturn the rejection notice as it concerns this informational piece as well.

In closing, I want to stress that both items sent to Mr. Ricks were legal research material intended to assist him with his appeals and nothing more. That said, even if the firearms and tool mark identification research material can be said to pose a threat to institutional security (which I disagree), the NRC's report to Congress clearly does not.

In invite you to review the material and provide me your findings at your convenience. If you have any questions or concerns, kindly contact the undersigned at the return address above or feel free to call me at (313) 272-1406.

Sincerely,


Roberto Guzman
Senior Legal Assistant

RG/klm

c:    Mr. Desmond Ricks, #187002
      K. Kasper, Mailroom Supervisor

**EXHIBIT 7**

**From: Roberto Guzman** legal_begal01@sbcglobal.net
**Subject:** Re: Attaching letter on Ricks to US Attorney
**Date:** December 16, 2011 at 11:58 AM
**To:** Claudia Whitman claudia@celldoor.com



I did a google and corrections based search on him several weeks ago and came up with no hits. But I will see about searching other applications for hits on Pitts. I just thought about something else too - much of what Desmond has told us puts me right in that parking lot that day and in the cop car with him. Much of what he has said we are finding out is true (like, for instance, his account that two federal agents were involved, the door being left wide open, Arlene Strong's description of the shooter, etc.) Our confirming from the paperwork Desmond's account that the two FBI agents were involved, leads me to also believe Desmond when he says they showed him a picture of Craig Pitts as the possible murder suspect. But when and why did they lose his scent? Big question.

Here's another thought - How is it that Desmond knows Craig Pitts' name? Do the FBI feed that to him? I think I recall Desmond saying other inmates at the prison saw his picture in a paper or something and told him Craig Pitts' name.

I suppose if you get a chance to interview or depose those agents, we sit with them with the FBI's paperwork to refresh their recollection and be able to find out if they ever caught up with Craig Pitts and find out why were they initially focusing on him as the killer in Desmond's case.

I would think the feds had Pitts and/or the other guy under surveillance for quite some time, as apparently they were business partners in the drug trade. What do you think we attempt to discover some information about the deceased too, which might lead us to Craig Pitts? I am going to do a pacer search to see if Pitts was ever federally charged for drug crimes and let you know what I find.

--- On **Fri, 12/16/11, Claudia Whitman <*claudia@celldoor.com*>** wrote:

> From: Claudia Whitman <claudia@celldoor.com>
> Subject: Re: Attaching letter on Ricks to US Attorney
> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
> Date: Friday, December 16, 2011, 12:25 PM
>
> Let me know. Des just called and was excited that I found the agents. I suggested he write Ms. McQuade and reenforce how important this is to proving his innocence and also ask that he be present to question them under subpoena. He just said, "You don't know what it is like. I look in the mirror every day and see an innocent face in the mirror". Can you do any checking on Pitts? He is not in the system now. C
> On Dec 16, 2011, at 7:21 AM, Roberto Guzman wrote:
>
>> I saw paperwork to where those two agents names were involved in Desmond's arrest, which leads me to believe much of what Desmond says. He was never federally charged for the case or any case for that matter, so it begs the question why were the feds even looking at this murder, which for all purposes was something for the local authorities to prosecute - and they did. My take on it is that Desmond is correct in saying the feds were hot on Pitts' nephew and suspected he was (or even knew he was) involved in this killing. One other thing that stands out in my mind about the crime scene, and I shared this with Desmond when he called the other day. When police arrived on the scene, the passenger door to the vehicle where Desmond was seated was left open. That lends credibility to Desmond's claim that he ran for his life and was being fired upon by Pitts as he fled. The fact the door was found open is proof someone got the hell out of there really fast. If Desmond had walked with the deceased into the restaurant to make the transaction but instead chose to rob and kill him, he would have closed that passenger door and not leave it left open. I definitely will take another look at the lab reports to determine if more than two shell casings were found at the scene. If so, that would lend credence to Desmond's claim that after killing the victim, Pitts then turned his gun on Desmond as he fled.
>>
>> --- On **Fri, 12/16/11, Claudia Whitman <*claudia@celldoor.com*>** wrote:
>>
>>> From: Claudia Whitman <claudia@celldoor.com>

From: Claudia Whitman <claudia@celldoor.com>
Subject: Re: Attaching letter on Ricks to US Attorney
To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
Date: Friday, December 16, 2011, 12:31 AM

You are so sweet. Thanks. I will certainly let you know but no plan now. I have to be in
DC for the NCADP Board meeting mid-January and the 21st is the Move to Amend
demonstration. Let's see what Ms. McQuade says. Unfortunately, unless he was lying,
Reghi didn't remember Des or anything about the case. But if he did show Des a picture
and say this guy was the suspect, maybe it is in the file or in his report. His name is
definitely on the police report as one of the two federal agents involved in the case, as is
Primak's. C
On Dec 15, 2011, at 3:53 PM, Roberto Guzman wrote:

If you are able to arrange an interview with the US attorney and need to come to Detroit,
by all means, let me know and I will gladly accommodate you again (this time with no
hiccups 😊 in the plans. I have the time where I could take off work, rent a car and pick
you up at the airport, accommodate you at my house, etc., so by all means, don't
hesitate to ask, okay?

--- On Thu, 12/15/11, Claudia Whitman <claudia@celldoor.com> wrote:

> From: Claudia Whitman <claudia@celldoor.com>
> Subject: Re: Attaching letter on Ricks to US Attorney
> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
> Date: Thursday, December 15, 2011, 11:12 AM
>
> I have talked and e-mailed with Judy. I actually have to get permission from
> Ms. McQuade so we will see what happens next. C
> On Dec 15, 2011, at 8:55 AM, Roberto Guzman wrote:
>
>> Very good introduction letter, Claudia. And your message of seeking their
>> cooperation is clear Just one note, in the address line of the US Attorney's
>> Office, be sure to address it to Barbara McQuade. Her name is in the
>> salutation, but not in the address subject line. If you arrange a meeting,
>> having Moran or others from his staff go with you would be wise, so that was
>> good to put that in there too. Moran is well known in Judith Levy's office.
>>
>> --- On Wed, 12/14/11, Claudia Whitman <claudia@celldoor.com> wrote:
>>
>>> From: Claudia Whitman <claudia@celldoor.com>
>>> Subject: Attaching letter on Ricks to US Attorney
>>> To: "Roberto Guzman Roberto" <legal_begal01@sbcglobal.net>
>>> Date: Wednesday, December 14, 2011, 11:58 PM

**From:** Roberto Guzman legal_begal01@sbcglobal.net
**Subject:** Re: Attaching letter on Ricks to US Attorney
**Date:** December 16, 2011 at 7:21 AM
**To:** Claudia Whitman claudia@celldoor.com



I saw paperwork to where those two agents names were involved in Desmond's arrest, which leads me to believe much of what Desmond says. He was never federally charged for the case or any case for that matter, so it begs the question why were the feds even looking at this murder, which for all purposes was something for the local authorities to prosecute - and they did. My take on it is that Desmond is correct in saying the feds were hot on Pitts' nephew and suspected he was (or even knew he was) involved in this killing. One other thing that stands out in my mind about the crime scene, and I shared this with Desmond when he called the other day. When police arrived on the scene, the passenger door to the vehicle where Desmond was seated was left open. That lends credibility to Desmond's claim that he ran for his life and was being fired upon by Pitts as he fled. The fact the door was found open is proof someone got the hell out of there really fast. If Desmond had walked with the deceased into the restaurant to make the transaction but instead chose to rob and kill him, he would have closed that passenger door and not leave it left open. I definitely will take another look at the lab reports to determine if more than two shell casings were found at the scene. If so, that would lend credence to Desmond's claim that after killing the victim, Pitts then turned his gun on Desmond as he fled.

--- On Fri, 12/16/11, Claudia Whitman *<claudia@celldoor.com>* wrote:

> From: Claudia Whitman <claudia@celldoor.com>
> Subject: Re: Attaching letter on Ricks to US Attorney
> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
> Date: Friday, December 16, 2011, 12:31 AM
>
> You are so sweet. Thanks. I will certainly let you know but no plan now. I have to be in DC for the
> NCADP Board meeting mid-January and the 21st is the Move to Amend demonstration. Let's see
> what Ms. McQuade says. Unfortunately, unless he was lying, Reghi didn't remember Des or anything
> about the case. But if he did show Des a picture and say this guy was the suspect, maybe it is in the
> file or in his report. His name is definitely on the police report as one of the two federal agents
> involved in the case, as is Primak's. C
> On Dec 15, 2011, at 3:53 PM, Roberto Guzman wrote:
>
>> If you are able to arrange an interview with the US attorney and need to come to Detroit, by all
>> means, let me know and I will gladly accommodate you again (this time with no hiccups 😊 in the
>> plans. I have the time where I could take off work, rent a car and pick you up at the airport,
>> accommodate you at my house, etc., so by all means, don't hesitate to ask, okay?
>>
>> --- On Thu, 12/15/11, Claudia Whitman *<claudia@celldoor.com>* wrote:
>>
>>> From: Claudia Whitman <claudia@celldoor.com>
>>> Subject: Re: Attaching letter on Ricks to US Attorney
>>> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
>>> Date: Thursday, December 15, 2011, 11:12 AM
>>>
>>> I have talked and e-mailed with Judy. I actually have to get permission from Ms.
>>> McQuade so we will see what happens next. C
>>> On Dec 15, 2011, at 8:55 AM, Roberto Guzman wrote:
>>>
>>>> Very good introduction letter, Claudia. And your message of seeking their cooperation is
>>>> clear Just one note, in the address line of the US Attorney's Office, be sure to address it
>>>> to Barbara McQuade. Her name is in the salutation, but not in the address subject line.
>>>> If you arrange a meeting, having Moran or others from his staff go with you would be
>>>> wise, so that was good to put that in there too. Moran is well known in Judith Levy's
>>>> office.
>>>>
>>>> --- On Wed, 12/14/11, Claudia Whitman *<claudia@celldoor.com>* wrote:

C000012

From: Claudia Whitman <claudia@celldoor.com>
Subject: Attaching letter on Ricks to US Attorney
To: "Roberto Guzman Roberto" <legal_begal01@sbcglobal.net>
Date: Wednesday, December 14, 2011, 11:58 PM

**From:** **Roberto Guzman** legal_begal01@sbcglobal.net
**Subject:** Re: Attaching letter on Ricks to US Attorney
**Date:** December 16, 2011 at 12:28 PM
**To:** Claudia Whitman claudia@celldoor.com



Yeah, and a client of mine told me about Ken and Byron and Ken and another lawyer downtown here looking at cases. Very creepy stuff. Yeah, Mr. Byron's nose is so high in the air knowing the Pitts name precedes him. He is also very cozy with Ron Scott of the Coalition Against Police Brutality, who, most of us feel, has not turned coat to the cops. He is a sell out. Scott is. The corruption and political pay to play here is so deep it is crazy.

--- On **Fri, 12/16/11, Claudia Whitman <_claudia@celldoor.com_>** wrote:

From: Claudia Whitman <claudia@celldoor.com>
Subject: Re: Attaching letter on Ricks to US Attorney
To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
Date: Friday, December 16, 2011, 2:22 PM

Byron is pretty arrogant. Damion Todd, the juvenile on the ACLU complaint against JLWOP, and one of the people in my notebook, had Cornelius as his attorney and he not only did nothing, there is reason to believe he colluded with the prosecution. I met with Byron when I was there last month. He is friends, big time, with my investigator, Ken.
On Dec 16, 2011, at 12:15 PM, Roberto Guzman wrote:

Yes, I met Byron Pitts at the Godboldo trial. The Pitts family tree leaves a bad taste in my mouth. The Kelly Nobles case I sent you last week? Cornelius Pitts represented Nobles at preliminary exam, but was fired by the time of trial. Long story. Cornelius used to take the big time dope cases in the 80s and crooked police cases. When all the dope dealers got sent to prison or were killed, his business plummeted. Very shady character. He would always play the race card too, if a defendant was African-American and got on a soap box about black persecution by a white system. Very very unscrupulous lawyer. He only won cases because he was good at reminding people of the Jim Crow era and pulling the race card. I see Byron going down that same road.

--- On **Fri, 12/16/11, Claudia Whitman <_claudia@celldoor.com_>** wrote:

From: Claudia Whitman <claudia@celldoor.com>
Subject: Re: Attaching letter on Ricks to US Attorney
To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
Date: Friday, December 16, 2011, 2:10 PM

I think Des only found out the name recently. Pitts is the nephew of Cornelius Pitts, well known lawyer in Detroit and he is thus a cousin of Byron Pitts, currently a hot shit lawyer. Gerry Bennett is the victim. Maybe you can put him together with Pitts. If all is true, they were watching Pitts but there were political reasons not to hassle him and Des was handy to take the fall. They do this all the time. Des told me Craig Pitts did some time and got release. I think his name is Craig Kent Pitts. C
On Dec 16, 2011, at 11:58 AM, Roberto Guzman wrote:

I did a google and corrections based search on him several weeks ago and came up with no hits. But I will see about searching other applications for hits on Pitts. I just thought about something else too - much of what Desmond has told us puts me right in that parking lot that day and in the cop car with him. Much of what he has said we are finding out is true (like, for instance, his account that two federal agents were involved, the door being left wide open, Arlene Strong's description of the shooter, etc.) Our confirming from the paperwork Desmond's account that the two FBI agents were involved, leads me to also believe Desmond when he says they showed him a picture of Craig Pitts as the possible murder suspect. But when and why did they lose his scent? Big question.

Here's another thought - How is it that Desmond knows Craig Pitts' name? Do the FBI feed that to him? I think I recall Desmond saying other inmates at the prison saw his

feed that to him? I think I recall Desmond saying other inmates at the prison saw his picture in a paper or something and told him Craig Pitts' name.

I suppose if you get a chance to interview or depose those agents, we sit with them with the FBI's paperwork to refresh their recollection and be able to find out if they ever caught up with Craig Pitts and find out why were they initially focusing on him as the killer in Desmond's case.

I would think the feds had Pitts and/or the other guy under surveillance for quite some time, as apparently they were business partners in the drug trade. What do you think we attempt to discover some information about the deceased too, which might lead us to Craig Pitts? I am going to do a pacer search to see if Pitts was ever federally charged for drug crimes and let you know what I find.

--- On Fri, 12/16/11, Claudia Whitman <*claudia@celldoor.com*> wrote:

> From: Claudia Whitman <claudia@celldoor.com>
> Subject: Re: Attaching letter on Ricks to US Attorney
> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
> Date: Friday, December 16, 2011, 12:25 PM
>
> Let me know. Des just called and was excited that I found the agents. I
> suggested he write Ms. McQuade and reenforce how important this is to
> proving his innocence and also ask that he be present to question them under
> subpoena. He just said, "You don't know what it is like. I look in the mirror
> every day and see an innocent face in the mirror". Can you do any checking
> on Pitts? He is not in the system now. C
> On Dec 16, 2011, at 7:21 AM, Roberto Guzman wrote:
>
>> I saw paperwork to where those two agents names were involved in
>> Desmond's arrest, which leads me to believe much of what Desmond says.
>> He was never federally charged for the case or any case for that matter, so it
>> begs the question why were the feds even looking at this murder, which for
>> all purposes was something for the local authorities to prosecute - and they
>> did. My take on it is that Desmond is correct in saying the feds were hot on
>> Pitts' nephew and suspected he was (or even knew he was) involved in this
>> killing. One other thing that stands out in my mind about the crime scene,
>> and I shared this with Desmond when he called the other day. When police
>> arrived on the scene, the passenger door to the vehicle where Desmond
>> was seated was left open. That lends credibility to Desmond's claim that he
>> ran for his life and was being fired upon by Pitts as he fled. The fact the
>> door was found open is proof someone got the hell out of there really fast. If
>> Desmond had walked with the deceased into the restaurant to make the
>> transaction but instead chose to rob and kill him, he would have closed that
>> passenger door and not leave it left open. I definitely will take another look
>> at the lab reports to determine if more than two shell casings were found at
>> the scene. If so, that would lend credence to Desmond's claim that after
>> killing the victim, Pitts then turned his gun on Desmond as he fled.
>>
>> --- On Fri, 12/16/11, Claudia Whitman <*claudia@celldoor.com*> wrote:
>>
>>> From: Claudia Whitman <claudia@celldoor.com>
>>> Subject: Re: Attaching letter on Ricks to US Attorney
>>> To: "Roberto Guzman" <legal_begal01@sbcglobal.net>
>>> Date: Friday, December 16, 2011, 12:31 AM
>>>
>>> You are so sweet. Thanks. I will certainly let you know but no plan
>>> now. I have to be in DC for the NCADP Board meeting mid-
>>> January and the 21st is the Move to Amend demonstration. Let's
>>> see what Ms. McQuade says. Unfortunately, unless he was lying,

Reghi didn't remember Des or anything about the case. But if he
did show Des a picture and say this guy was the suspect, maybe it
is in the file or in his report. His name is definitely on the police
report as one of the two federal agents involved in the case, as is
Primak's. C

On Dec 15, 2011, at 3:53 PM, Roberto Guzman wrote:

> If you are able to arrange an interview with the US attorney and
> need to come to Detroit, by all means, let me know and I will
> gladly accommodate you again (this time with no hiccups 😊 in
> the plans. I have the time where I could take off work, rent a car
> and pick you up at the airport, accommodate you at my house,
> etc., so by all means, don't hesitate to ask, okay?
>
> --- On **Thu, 12/15/11, Claudia Whitman**
> <_claudia@celldoor.com_> wrote:
>
>> From: Claudia Whitman <claudia@celldoor.com>
>> Subject: Re: Attaching letter on Ricks to US Attorney
>> To: "Roberto Guzman"
>> <legal_begal01@sbcglobal.net>
>> Date: Thursday, December 15, 2011, 11:12 AM
>>
>> I have talked and e-mailed with Judy. I actually have to
>> get permission from Ms. McQuade so we will see what
>> happens next. C
>>
>> On Dec 15, 2011, at 8:55 AM, Roberto Guzman wrote:
>>
>>> Very good introduction letter, Claudia. And your
>>> message of seeking their cooperation is clear Just
>>> one note, in the address line of the US Attorney's
>>> Office, be sure to address it to Barbara McQuade.
>>> Her name is in the salutation, but not in the address
>>> subject line. If you arrange a meeting, having Moran
>>> or others from his staff go with you would be wise, so
>>> that was good to put that in there too. Moran is well
>>> known in Judith Levy's office.
>>>
>>> --- On **Wed, 12/14/11, Claudia Whitman**
>>> <_claudia@celldoor.com_> wrote:
>>>
>>>> From: Claudia Whitman
>>>> <claudia@celldoor.com>
>>>> Subject: Attaching letter on Ricks to US
>>>> Attorney
>>>> To: "Roberto Guzman Roberto"
>>>> <legal_begal01@sbcglobal.net>
>>>> Date: Wednesday, December 14, 2011,
>>>> 11:58 PM

# EXHIBIT 8

Desmond L. Ricks #187002

R.A. Handlon Correctional Facility
1728 W. Bluewater Highway
Ionia, Michigan 48846

February 1, 2012

Bureau of Alcohol, Tobacco, and Firearms
1155 Brewery Park Blvd., Suite 300
Detroit, Michigan 48207-2602

RE: Legal Assistance

Dear Bureau of Alcohol, Tobacco, and Firearms,

I am writing to you in concerns of hopefully receiving some help from your office with the legal matters that I am having.

I know that you are very busy, so I will keep this correspondence as brief as possible.

I have been incarcerated for the past 20yrs. for a crime that I did not commit. I have reached out to so many people on so many occasions for help, but I guess that it was not my time then.

But, recently I have been blessed to have the assistance of Mrs. Claudia Whitman, she is the Director of NDRAN of Cure. Which is a National Organization that reaches out to aid and assist the Wrongfully Convicted.

I was Arrested on March 5, 1992 in the City of Detroit, MI by 2 Federal Agents.

[1] Tony Primak #2703, A.T.F. Agent  <>  [2] John Reghi #2858, U.S. Marshal

Also upon my arrest, my Mothers .38 Caliber Handgun was confiscated by these Agents. In the police car on the ride to the police station, Agent John Reghi showed me a picture of the man whom I had seen shoot and kill the now deceased victim. I asked the Agents if they knew that he was the killer, why was I being taken to jail? They told me that everything was going to be alright.

Once we got to the police station, I never again saw those 2 Federal Agents.

The Detroit Police started asking me questions and I explained to them that the 2

MI Innocence Clinic 000126

Federal Agents that brought me down there knew that I was not the person who had committed that crime. They did not want to hear what I was saying. I was told by the Detroit Police Dept. that my Mothers Gun was used to commit that murder. I knew then that I was being railroaded for a crime that I did not commit.

So I hired an Independent Firearms Examiner to come and re-test the (2) Slugs in this case that were removed from the body of the deceased victim, and show that the police were in error with their findings.

An Order was entered by the Judge allowing the Independent Firearms Examiner to go down to the Detroit Crime Laboratory and conduct his examination on the evidence. But, when the Independent Firearms Examiner called the Detroit Crime Lab to schedule a date to got there and do his test, he was told that he could not perform his examination there. There was never a reason given as to why he was not allowed. So the (2) Evidence Slugs were taken to the Independent Examiner by the Lead Detective in the case. The same man that repeatedly told me that he was going to send me to jail. The Independent Examiner was not given the (2) Slugs from the crime, he was given <u>test-fired shots</u> that had been fired from my Mothers Gun.      (the evidence was <u>never sealed</u>)

I have an Affidavit from the Independent Firearms Examiner, David G. Townshend, in which he says that the (2) Slugs that he was given to test <u>did not have any "Blood" or</u> <u>other "Trace Evidence"</u> on them that would indicate that they had been removed from the body of a "deceased victim".

There was also an eyewitness to the crime that made a statement to the police in which she said that "she observed a "bright-complexioned man", "medium height", with a "Big Silver Gun" shooting".

I have a "dark complexion", I am 6' 3" in height, and the <u>Gun</u> that was confiscated was a "black .38".

I humbly and sincerely ask that you would "Please" allow Mrs. Whitman the opportunity to interview these 2 Federal Agents who arrested me, and also be provided with their Reports that were made on March 5, 1992.

MI Innocence Clinic 000127

Hopefully that will show that I am not the man who committed this crime and I can finally go home.

When the Detroit Crime Lab was closed down in 2008, I knew that GOD had answered my Prayer for Help.

I wrote a letter to the Prosecutors Office in Detroit, and asked could the evidence in my case be re-tested by the Michigan State Police. They wrote me back and basically said be patient, they will get around to it. I have been patient for 20yrs. with the exact same problem. They want me to give up and I will never do that!

I did not kill that man, and I respectfully ask for your Help.

I Thank You in advance for your time in listening to my plea for help.

MAY GOD BLESS YOU.

P.S.

I wrote to the United States Attorney, Barbara L. McQuade, and she directed me to you. *Please fine the letter enclosed.*

Respectfully,

Desmond L. Ricks #187002

MI Innocence Clinic 000128

# EXHIBIT 9

June 13, 2012

U.S. Attorney Barbara L. McQuade
United States Attorney's Office
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Tel: (313) 226-9100

Dear U.S. Attorney McQuade:

I am writing to request your assistance in accessing information related to the murder of Gerry Bennett in Detroit in 1992, or to the case of Desmond Ricks, MDOC # 187002, who was convicted of Mr. Bennett's murder. We believe that agents with the U.S. Marshalls and the U.S. Bureau of Alcohol, Tobacco and Firearms may have information related to this incident. We do not represent Mr. Ricks, but are investigating his claims of innocence, and information from these agencies could help us to understand whether or not his claims might have merit.

Mr. Ricks was convicted of the March 3, 1992 shooting of Mr. Bennett at the Top Hat Restaurant then located at the intersection of Puritan St. and James Couzens Fwy. in Detroit, Michigan. He maintains that while he was on the scene, he was not the shooter, and that he saw the face of the man who was in fact the shooter. He claims that on March 5, 1992, he was picked up by two federal agents: Tony Primak, ATF Agent #2703, and John Reghi, U.S. Marshall #2858. As they drove him to the police station they showed him a picture of a man and asked him whether this was the person Mr. Ricks had seen shoot Mr. Bennett. Mr. Ricks said that it was, and the agents told him everything was going to be alright. However, when Mr. Ricks reached the police station he was taken for questioning and charged with the shooting. He did not see the agents again.

One key piece of evidence in Mr. Ricks' conviction was ballistics testing by the Detroit Crime Lab that found a match between the bullets in Mr. Bennett's body and test bullets fired from Mr. Ricks' mother's gun. Independent testing requested by Mr. Ricks' defense attorney confirmed that that there was a match between the test bullets and those the Crime Lab identified as having been taken from Mr. Bennett's body.

However, the independent examiner has now come forward with an affidavit stating that, due to a number of irregularities in the evidence that the Detroit Crime Lab gave him to test in Mr. Ricks' case, he believes "a new examination of the evidence on this case is warranted." Aff. of David G. Townshend, Aug. 30, 2011, p. 3. Among other irregularities, the bags containing the ballistics evidence were improperly sealed and the bullets identified as having been taken from Mr. Bennett's body were in "near pristine" condition: They "failed to reveal the presence of trace evidence or deformation that would be associated with bullets that had been fired in to the skull and the body of a homicide victim." Aff. of David G. Townshend, Aug. 30, 2011, p. 2.

MI Innocence Clinic 001088

Given Mr. Townshend's affidavit and what is now known about the ballistics testing practices at the Detroit Crime Lab at this time, we believe Mr. Ricks' innocence claims warrant further investigation. Therefore, any information that the U.S. Marshalls or the Bureau of Alcohol, Tobacco and Firearms might have related to Mr. Bennett's murder or Mr. Ricks' arrest could be very important, and we request your assistance in accessing any information they might have.

Thank you for your time and consideration. If you have questions related to this request, please contact the Michigan Innocence Clinic at (734) 763-9353 or at the address above.

Sincerely,

David Moran
Clinical Professor of Law
The Michigan Innocence Clinic

Sally Larsen
Student Attorney
The Michigan Innocence Clinic

# EXHIBIT 10



# MICHIGAN INNOCENCE CLINIC

BRIDGET McCORMACK
DAVID A. MORAN

701 South State Street
Ann Arbor, Michigan 48109-3091
734.763.9353
Fax: 734.764.8242

June 19, 2012

Ellen Ha
City of Detroit Law Department, FOIA Coordinator
660 Woodward Ave., Ste. 1650
Detroit, MI 48226
313-237-0423 (p)
313-224-5505 (f)

Dear FOIA Coordinator:

Pursuant to the Michigan Freedom of Information Act, the Michigan Innocence Clinic requests police reports, progress notes, test results, witness/suspect statements, sketches and all other disclosable documents relating to the following persons and incident.

Incident Type: Homicide

Date: 03/03/1992

DPD File/Case No.: 92-126

Location: The Top Hat Restaurant located at the intersection of James Couzen Fwy and Puritan St.

Victim's Name: Gerry Bennett

Suspect Arrested: Desmond Ricks

If you have any questions regarding this request or require any further information, please contact us by phone at (734) 763-9353.

Sincerely,

Sally Larsen
Student Attorney
Michigan Innocence Clinic

# EXHIBIT 11

From: **Claudia Whitman** claudia@celldoor.com
Subject: Fwd: Des
Date: September 16, 2012 at 1:35 PM
To: Claudia Whitman claudia@celldoor.com



Begin forwarded message:

**From:** Sally Larsen <sally.e.larsen@gmail.com>
**Date:** September 14, 2012 6:44:12 PM EDT
**To:** Claudia Whitman <claudia@celldoor.com>
**Subject:** Re: Des

Hi Claudia,

Yes, I definitely understand that the bullets that were tested were not actually the bullets that killed Gerry Bennett. When I said that they could be retested, I meant that they could be examined by a ballistics lab to determine whether they are "pristine" enough that they could not have been fired into a body (especially a skull, as one of the shots that killed Bennett went right through the bone of his skull into his brain). I left a voicemail for Mr. Townsend this morning because I think that it would be very useful for Mr. Westrick to talk to Townsend, although it is discouraging that he can't find his notes. Please know that Ricks' case is one of my highest priorities at the Clinic and I am familiar with Mr. Townsend's affidavit and the other ballistics evidence in his case -- although there is always the possibility that I have overlooked or misread something.

Because Derrick Andrews and I were unable to find a time when we both could talk (due to my class schedule and his limited phone hours), he suggested that I call his assistant resident unit supervisor and schedule a call with him. I left two voicemails for his supervisor this week but he has not yet been in touch. Believe me, I understand the important of talking to Mr. Andrews. He has been so consistent in reaching out to me despite all the scheduling conflicts, it has been really heartening. But your point that every witness has a point where they lose interest is well-taken. I will send Andrews a J-Pay asking him to talk to his supervisor about calling me back - if that doesn't work, I can skip a portion of class if it comes to it.

Best,

Sally

On Fri, Sep 14, 2012 at 2:28 PM, Claudia Whitman <claudia@celldoor.com> wrote:
> David Townshend is the guy who testified, visited Des, talked to me several times, did a long affidavit, etc. You should have it but I just forwarded it. Lamentably, he never could find his work notes where he normally had a chart where he would mark things off. He did mention that the evidence was not properly sealed in his initial report but never mentioned the pristine nature of the bullets being a concern, which, he says, would have been on the work sheet. He did look for it and found notes but can't explain why he didn't do the regular chart thing. But if they give you the same bullets to test, you won't get anything because they are pristine. Townshend also says that when the Det. police brought him the bullets (contrary to what the judge had ordered and what was normal, ie., his going to the police station to do the testing, they had a smug demeanor like they knew he would get a match. Well, he did, because they were the test bullets.
> On Sep 14, 2012, at 12:28 PM, Sally Larsen wrote:
>
>> Yikes, that sounds crazy. I'll keep an eye out for info on Det. Rice. I wanted you to know I have gotten in touch with a ballistics expert who is interested in learning more about the case - Aaron Westrick. (He is quite Google-able if you want to know more about him. You also may already know him, since he says he worked with us on the Titus case - I hadn't been aware of that before we talked.) At any rate, I'm going to check with my supervisors about whether we can send him more information related to Mr. Rick's case - if we are able to get ahold of the ballistics evidence in the case (which, for now, we are not even sure exists), he would be willing to do the retesting for us. Let me know if you had someone else in mind or if I should hold off for any reason in getting him more involved in the case.
>>
>> Best,
>>
>> Sally
>>
>> On Thu, Sep 13, 2012 at 3:05 PM, Claudia Whitman <claudia@celldoor.com> wrote:
>>> Des called today and wants to talk with you and wanted to know when. I suggested he JPay you directly so you can set it up. Did you see the article on the 10th on Det. William Rice. He often appears in many of my cases. I think he took over when Sanders had the stroke. But he was equally as bad and now they are going after him for fraud and drug dealing. There was a pretty dirty bunch up there in homicide: James Harris, who just got out of federal prison, Rice, Sanders, and their boss, a guy named Stewart, who was really a slime bag. Claudia

--
Sally Larsen
University of Michigan Law School

C000037

Class of 2014

--
Sally Larsen
University of Michigan Law School
Class of 2014

C000038

# EXHIBIT 12

From: **Sally Larsen** sally.e.larsen@gmail.com
Subject: Re: Desmond Ricks
Date: August 1, 2012 at 4:05 PM
To: Claudia Whitman claudia@celldoor.com



Hi Claudia,

I've been looking and looking for the notes that I took on our conversation when I was in the car on July 20th, but I can't find them. Could you please send me by email the information we talked about on the phone related to the name of the possible shooter in the Burton/Owens/Young case? My apologies.

- Sally

On Wed, Jul 25, 2012 at 5:07 PM, Sally Larsen <sally.e.larsen@gmail.com> wrote:

Claudia,

Attached are the files I received from the U.S. Attorney for the Eastern District of Michigan, related to Desmond Ricks' case.

I'll stay in touch on this, although over the next couple of weeks I will probably be working more heavily on other cases, since there are a lot I will be transferring or closing out before the end of the summer.

Best,

Sally

On Tue, Jul 24, 2012 at 10:31 PM, Claudia Whitman <claudia@celldoor.com> wrote:

You may be right. It's just that I can usually find previous criminal records one place or another and I believe I asked my friend who is with the fed. defenders' office to check him out and he couldn't find anything. They have deep access. It would be great if you had a picture of him when you meet with Primak, though, if what Des says is true, they just avoided mentioning the other suspect once they had Des in line for the conviction. I think the next step is to interview Arlene, especially if you could get the picture of Pitts, because her first statement describes a person who is not Des and then her memory "fades". Tomorrow is fine for the documents and thanks.

On Jul 24, 2012, at 8:27 PM, Sally Larsen wrote:

Hi Claudia,

I just got back to Ann Arbor, much later than I expected. If its alright, I'll scan and send you the documents from the feds tomorrow instead of going into the office tonight.

About the Pitts charge, its not clear to me whether its being purposefully hidden. It might not being showing up on OTIS because he's been releases from prison and may be through with parole/probation as well. Was there some place besides OTIS that seemed to be hiding this information? Desmond didn't seem surprised about the charge; he seemed to assume it was the shooting he heard about at a Coney Island restaurant on Six Mile in Detroit. I may have a way of inquiring further about Pitts; I'm looking into it and will let you know.

- Sally

On Jul 24, 2012 5:55 PM, "Claudia Whitman" <claudia@celldoor.com> wrote:

Interesting on Pitts. They have hidden it from general knowledge. Did Des have any ideas?

On Jul 24, 2012, at 3:56 PM, Sally Larsen wrote:

Hi Claudia,

I just spoke to him - he seemed to take it alright. I let him know that I will be trying to get in touch with Agent Primak for more information. I also found some info on Craig Kent Pitts on the Court of Appeals website, including an opinion affirming his conviction for second-degree murder in a shooting in 1996.

- Sally

On Tue, Jul 24, 2012 at 11:08 AM, Claudia Whitman <claudia@celldoor.com> wrote:

Great. It will be interesting to see how Des handles it today. I think he will be super bummed. I really believe he didn't do it and I trust him more than those agents. Good luck on your other case.

On Jul 24, 2012, at 12:50 AM, Sally Larsen wrote:

Hi Claudia,

I will email you the documents tomorrow. It probably won't be till late afternoon/evening since I'm going to Battle Creek/Grand Rapids tomorrow for another case. I may have used the wrong word earlier in saying "summaries": I

Grand Rapids tomorrow for another case. I may have used the wrong word earlier in saying "summaries", I believe the documents we received were in fact the statements of the agents. (They were referred to as "interviews.") I believe they gave us everything they have. However, I will get in touch with the U.S. Attorney's Office to see if they can confirm that. I'll also ask Dave/them about the possibility of interviewing Primak.

Best,

Sally

On Mon, Jul 23, 2012 at 9:53 PM, Claudia Whitman <claudia@celldoor.com> wrote:
> I would like to see them.  I spoke with Reghi and he said he didn't remember the case.  The bullets issue is clearly explained by Townsend; they were not the bullets that killed the victim, according to him.  The guy who did ballistics for the police, Pauch, I think was not above cooking the books on several cases.  But this is disappointing.  I think your supposition is probably right: ones they got the alleged "match" they didn't need to mention another suspect.  I think Primak still works for ATF.  Maybe you could interview him.  That was my intention.  Also, summaries of statements by Primak and Reghi seem insufficient.  Is there a way to see the actual statement?  Des did call today and my husband told him that 2:3o0 was a go.  Great work getting the records!
> On Jul 23, 2012, at 8:16 PM, Sarah Larsen wrote:
>
>> Hi Claudia,
>>
>> I wanted to let you know that today I had mail from the U.S. Attorney's office. They sent over records related to the Ricks case, which included summaries of statements from Tony Primak, John Reghi and one other ATF agent, Curtis Brunson. Unfortunately, none of the statements mentioned another suspect in the case. The statements were pretty barebones and dealt only with Ricks' arrest, not with any larger view of the case. They all did include the fact that the ballistics ended up matching Ricks' mother's gun; I wonder if the statements were influenced by that (supposed) fact. At any rate, I can scan and email you the documents tomorrow, and will let Ricks know about it on our phone call tomorrow afternoon. I think we have plenty else to follow up on and investigate, but this was certainly disappointing.
>>
>> Best,
>>
>> Sally
>>
>> --
>> Sally Larsen
>> Michigan Innocence Clinic
>> University of Michigan Law School
>> Class of 2014
>>

--
Sally Larsen
University of Michigan Law School
Class of 2014

--
Sally Larsen
University of Michigan Law School
Class of 2014

--
Sally Larsen
University of Michigan Law School
Class of 2014

--

C000054

Sally Larsen
University of Michigan Law School
Class of 2014

C000055

# EXHIBIT 13

Desmond L Ricks #187002

R A. Handlon Correctional Facility
1728 W. Bluewater Highway
Ionia, Michigan 48846

September 24, 2012

Ms. Sally Larsen, Student Attorney
University Of Michigan Law School
Michigan Innocence Clinic

701 South State Street
Ann Arbor, Michigan 48109-3091

RE: Legal Assistance

Dear Ms. Larsen,

How are you? Good I hope.

This is a case that I was fortunate enough to get from the Court of Appeals. I was in the Law Library reading and ran across it. It's a fairly new case, within the last year as you can see.

It sent it to you to show the parallels between this case and mine. I also have enclosed a "brief guide" to show you exactly the points I feel are pertinent.

I know that you will read the whole case, but the information that I needed starts on * pg.14 > pg 17 *        (I apologize for the mistakes, wanted to get it out A.S.A.P)

As always, I am greatly appreciative of your help.  *GOD BLESS*

Sincerely,

Desmond L. Ricks #187002

MI Innocence Clinic 000175

# EXHIBIT 14

From: **Sally Larsen** sallyel@umich.edu
Subject: Re: Call with David Townshend + Burton/Owens/Young
Date: October 9, 2012 at 9:30 PM
To: Claudia Whitman claudia@celldoor.com



Hi Claudia,

Thanks for your emails. It will be disappointing if David Townshend cannot find his notes. Thank you very much for talking to him and asking him to double-check; hopefully it will turn something up.

Funny you should mention Kristi Glenn - I had just reached out to her myself. I'd like to talk to her and see whether she remembers anything - basically whether she remembers Townshend mentioning anything to her about the bullets looking funny. My guess is no, but it would be good to know before we go much further if she does remember this. She said she doesn't remember anything about the case, and asked me to send her a disk with the transcripts on it, which I will try to do by the end of the week.

About the evidence tag numbers changing -- it's possible that Desmond did mention this and it got lost in the shuffle of all the issues surrounding the evidence. He is sending me some more information about the ballistics, and we are scheduled to talk again on Friday, so I will bring it up with him then.

If you find me a little out of touch over the next week, I apologize. There's a crunch of stuff going on at school.

Best,

Sally

On Mon, Oct 8, 2012 at 11:54 AM, Claudia Whitman <claudia@celldoor.com> wrote:
> As I suspected, he never sent me those notes. I spoke to him on 8/22/2011 and he told me he found his notes from 11/30/95 and that he had not done a worksheet, which he couldn't explain. He says he gave information he had to a Gwendolyn Brumfield. (I don't know who this is; I didn't make notes on her but you could ask him or I could). I had called Kristi Glenn, his trial attorney. She now lives somewhere like VA. She says she kept no paper work. I had also asked him whether he felt he had any conflict of interest testifying as he did, since Des had hired him. He said he did not because the prosecutor had subpoenaed him and paid for his coming to court.
> I just talked to him and he is going to double check. He doesn't remember who Brumfield is or where he might have sent them but he is going to look and see if he can find them. Claudia
>
> There is also that issue that a number had been changed on the evidence. Originally, I think it was 923409 and 10 but then something is labeled 423.... Did Des go over this with you?
> On Oct 6, 2012, at 1:33 PM, Sally Larsen wrote:
>
>> Okay great, thank you so much! If you fax them, put something like Michigan Innocence Clinic prominently on the cover sheet, because the fax machine goes to all of the clinics.
>>
>> I'm in Brooklyn for the weekend and it is way too warm. I hope it's cooler where you (still Maine?) for hay moving!
>>
>> - Sally
>>
>> On Sat, Oct 6, 2012 at 3:05 PM, Claudia Whitman <claudia@celldoor.com> wrote:
>>> I did e-mail Danny and said I wanted him to call me about Nicole to clarify things. I asked him to try this weekend, if he actually gets the JPay in time. I don't know what I have from Townshend but it is all in the file. I have a new printer that scans and have your fax at the clinic so I will try to do it tomorrow. Today we are moving 900 pound bales of hay. You are doing such great work. C
>>>
>>> On Oct 6, 2012, at 12:36 AM, Sally Larsen wrote:
>>>
>>>> Hi Claudia,
>>>>
>>>> Sorry for the delay, but below are my notes from my call with David Townshend. They are sort of extensive, sorry about that. He says you have his notes from the examination he did. Would you mind making a copy for me and scanning or mailing them to me? (If mailing, the address is Michigan Innocence Clinic, 701 S. State St., Ann Arbor, MI 48109.) Probably good to have lots of copies of those, I think they might become important. I've come across a law student who is a former police officer - I'm going to ask him to take a look at the chain of custody issue with me and help me understand it fully.
>>>>
>>>> Also, I spoke with Dave and he is interested in pursuing Mr. Andrews' story (he agrees - we have no other choice at this point but to pursue the truth on this matter). He had some good ideas on what comes next -- we can ask the Wayne County ME's office to let us know whether they had a death like Foots' come in during the right time frame. And I think I'm going to go visit Mr. Andrews to try to get a fuller sense of his story. But before I do that, I'd love to get a better sense of what Nicole Accola's murder has to do with this, so let me know if you talk to Danny about it.
>>>>
>>>> I think that's all I've got for now. Hope you're having a great weekend :)
>>>>
>>>> - Sally

C000018

Daly

## Notes from call with David Townshend
### October 2, 2012

Overall: Mr. Townshend was quite nice and sounded 100% competent. He spent a long time on the phone with me and was thoughtful in his responses. He seemed like he would be happy to continue to help us out as necessary.

He said that the Ricks case has always stuck in his mind as one where things "just didn't seem right."

6 months or a year before DT was asked to look at the ballistics in Ricks' case, he had been asked to look at the ballistics in another case - he can't remember the defendant's name. The defense asked him to take a second look at the conclusion of the Detroit Crime Lab that test bullets from the defendant's gun in that case matched the bullets removed from a victim's body. But Townshend did not find a match. He performed his test at the Detroit Crime Lab and could not find sufficient similarities between the marks and grooves in the two sets of bullets. He asked the lab tech to point out what he thought proved they were from the same gun, and the tech pointed to a tiny dot present on all the bullets - not nearly enough, Townshend said, to prove they were the same. DT testified that in his opinion the bullets were not a match, and he believes the defendant was acquitted. He says he knows the Lab was furious about that.

Though originally DT was supposed to go to the Detroit Crime Lab to do the test in Ricks' case, he later received word that a sergeant would be bringing the evidence to him instead. This strikes him as very strange, because it costs substantial man hours and gas for the police to send someone to his lab, far from Detroit. He says the Detroit Crime Lab had never done that sort of thing before - he always went to them - although sometimes federal agencies like the FBI would go to DT's lab for the testing. Although this was definitely strange, DT cannot think of any advantage that the Lab would have gained by having the test done at DT's lab... if a fraud was perpetrated, this could just as easily have been accomplished by DT coming to Detroit. So that remains an open question -- and potentially an important one.

DT remembers thinking to himself, "Damn, these bullets look good," when he saw the bullets that purportedly came from Mr. Bennett's body. They were in "great condition" and "did not look like they came out of a body." He also noticed that marks that are usually made by the ME on either the slugs themselves or the envelopes into which the slugs are placed when they are removed from a victim's body were not present on these slugs. DT does not remember whether he mentioned this to Ms. Glenn, although this would normally be the kind of thing that he would mention. He does remember that when he gave his testimony in court and announced that the bullets were a match, Ricks was clearly shocked -- Ms. Glenn had not informed him of what DT's testimony would be (Ricks confirmed this to me). I know from conferences recorded in the trial transcript that Ms. Glenn was aware of

C000019

what Mr. Townshend's testimony would be before he testified. It is super unfortunate that Ms. Glenn did not inform Mr. Ricks of the results in advance, but that doesn't mean that she also knew, and failed to communicate, that DT believed the bullets were suspicious. This could make the difference between whether the claim is a new evidence claim or an ineffective assistance of counsel claim... and the IAC claim might be stronger, if we could make it. Or maybe less strong -- either way, we need to know.

DT was of the opinion that, if the slugs were switched, it would have happened after the Detroit Crime Lab test, but before Townshend was given the bullets. This suggests a pattern of events such as this: The correct slugs are removed from Bennett's body and put in envelopes, but unsealed. They are taken to the Detroit Crime Lab and perform the test with Ricks' gun. Pauch concludes that the two sets up bullets are a match (this could be either because he is incompetent or because he purposely overlooked that the bullets did not appear to be the same). Then he hears that DT will be retesting the bullets. He realizes that DT will not find a match, either because the bullets from Bennett's body clearly were not a match to Ricks or because the bullets from Bennett's body are too beat up to draw a match at all. So he fires some test bullets from Ricks' gun and replaces them with the slugs in the unsealed evidence bags.

This would mean the chain of custody from the date on which the Detroit Crime Lab test was performed and the date when Townshend's test was performed is very important. If Pauch had access to the bullets between those dates, that's important. What Townshend pointed out is that it is possible that the bullets that were preserved in evidence are the ones removed from Bennett's body - that the bullets Townshend was shown were discarded at some point and not preserved. I think this would be okay. For one thing, maybe those bullets could be excluded as having come from Ricks' gun. For another, if they couldn't, Townshend could testify that those were definitely not the bullets he was shown at the time, and he or another ballistics expert could testify that no match can be found between the two sets of bullets.

Townshend explained the reasons why, at the time he did the testing, he felt that something was fishy about the bullets:
- They did not look like they had been fired into a body.
  - They were lead bullets, and lead is pretty soft. They should have had deformations from hitting bone.
  - They did not have trace evidence deposited on them. He said he can't recall a case in which he tested a bullet and didn't find blood, human issue, threads of fabric, something like that. There should be material on the bullet, unless the bullet has been washed, which it is not supposed to be.
- The bullets appeared to have been fired recently. Normally, he said, a lead bullet has lubricant on it that is removed when it passes through the barrel. This causes the bullet to begin to oxidize, and the oxidation process progresses over time - so one can tell to some degree by looking at the bullet how long

C000020

ago it was fired. He remembers that these bullets looked like they had been fired unusually recently. He asked me to look up the dates from the ballistics testing forms to see how long it should have been between when Bennett was shot and when Townshend did his testing.

- The bullets, or the envelopes they were stored in, were not marked by pathology. Townshend thought this was something he had mentioned in his affidavit. While his affidavit mentioned that the envelopes were not sealed, I think this is a somewhat different issue. I will ask him to take a look at his affidavit and tell me if this is a different issue.

Townshend said he would find his notes from this case and send them to me, but later he emailed and said he couldn't find them and must have sent them to Claudia. I'll write to her and ask her for a copy.

--
Sally Larsen
Michigan Innocence Clinic
University of Michigan Law School
Class of 2014

--
Sally Larsen
Michigan Innocence Clinic
University of Michigan Law School
Class of 2014

--
Sally Larsen
Michigan Innocence Clinic
University of Michigan Law School
Class of 2014

**EXHIBIT 15**

From: **Sally Larsen** sallyel@umich.edu 
Subject: Re: Interesting update
Date: November 3, 2012 at 4:00 PM
To: Claudia Whitman claudia@celldoor.com

Hi Claudia,

That's awesome, I would love to talk to this guy (as would everyone else in the Clinic, I imagine). Thanks so much for this.

About the lead bullets - I'm attached the ME receipt for bullets - that's the only thing I've got from the ME on ballistics, but I don't think it will be useful because it doesn't say what type of bullets they were. I read through the ME's testimony again and he doesn't get more specific there either. I have been assuming that we were looking at soft bullets because Townshend seemed certain that they should have been fairly destroyed by what they supposedly went through.

- Sally

On Thu, Nov 1, 2012 at 4:43 PM, Claudia Whitman <claudia@celldoor.com> wrote:
> So, a guy who is an investigator in the Fed. Defenders' office in Detroit was a homicide detective who started in 1994. He switched
> to defense partly because he believed there were innocent people out there. Anyway, he described the "closet" to me in detail and
> he is going to check, since it is now used for storage, if I could get in there and get it photographed. Also, he doesn't know Sanders
> but says he is willing to talk about the fact that the kind of stuff Sanders did is what they did in those days. He is also willing to meet
> with you. I'll send info and plan to talk to him when I return.
>
> On Des: I told John Nixon, who is from Indiana, though British by birth and a major expert, that it was a lead bullet and the type of
> gun. He wanted to know if he have info on the name of the bullet type because there are 3 lead bullets and one is very soft and
> would have marks and one is medium and one is hard. He also wants to know what the ME described in his report about the bullet.
> He also said that they often do some kind of a wash on bullets after the ME is finished before they go to get tested but he doesn't
> think they did it before 2000. The purpose is to clean them up in case of AIDS, etc. What other info do you have? I don't think I've
> seen the ME report but I may have it.

--
Sally Larsen
Michigan Innocence Clinic
University of Michigan Law School
Class of 2014

**PDF**

ME Police
Receip...s 2.pdf

# EXHIBIT 16

December 12, 2012

Dear Ms Strong,

I do not know how to begin this letter. So I will simply start by saying, "I hope that you have been well, and "GOD has Blessed You & Your Family".

I know that we have never met, so for the sake of proper introduction, my name is Desmond Ricks.

Let me first say, that I do not wish to upset you or bring any grief into your life. I just simply wish to briefly speak to you on this paper, and convey what I have been wanting to say in the past, and now the present.

You are not the reason why I am in prison. We both know that. Through a series of mostly bad choices, and reckless living as a young adult, I take full responsibility for what has happened to me. I fully understand that **real men** have to accept the mistakes that they have made, and live with the consequences that those mistakes carry with them. I also have come to understand, that when a man starts to learn from his past mistakes and begins to correct the flaws that he has, his life will change for the better.

I am no philosopher or psychiatrist Ms. Strong, I have just lived on this earth a long time, and in doing so you begin to have insight on the different aspects of life, and living. This insight is heightened by being isolated from society, and the simple things that people sometimes take for granted.

I know that you may be busy with the holiday season being in full swing, and I do not want to take away any of your time from that in reading this letter. So I will make this as brief and to the point as I possibly can. **I need your help Ms. Strong**

As you know, I was the guy that was in the Red Car with the guy that came into the restaurant and got shot. (His name was Gerry Bennett) The police wanted me to tell them who the guy was that shot Gerry. I am telling you as I told them Ms. Strong, I do not know who that guy was, or the other guys that were with him. Sure, I knew why we were there, and what we were there for, but I did not kill my friend.

MI Innocence Clinic 000112

I waited in the car for him to conduct his business with that guy, as you saw  I never got out of the car until the shooting started  When I did get out of the car, the same guy shot at me and I started running across the parking lot. As I was running, I seen the bushes that were next to the building at the back. I didn't want my coat to get stuck in the bushes when I ran through them, so I slipped my coat off as I was running and it was left on the ground  In my coat pocket was a parking lot hospital pass with my girlfriends hospital room number on it. It was from Hutzel Hospital  We had a daughter born 2 days before this happened. Also in the pocket was a picture of my then 7 year old daughter, and my telephone book.

Why would I leave my coat at the scene of a crime with all of that vital information in it that would ultimately lead the police straight to me  It makes no sense, and I tried to explain that to them but they would not listen.

I could have went to the police afterwards, but I could only give them the same description that you gave them, "bright-complexion man", "medium height", with a "Big Silver Gun". The difference was, that I was a street guy, and the street code was, never under any circumstances, cooperate with the police. I know that you may not understand, but try this. My newborn daughter and her mother along with the rest of my family was out there unprotected. Never would I have allowed anything to happen to them on account of the street life that I was living.

I have never cried at any time in this place, or felt depressed  I knew that with that life came consequences. Knowing that, I had to as we say in the old school, "take my medicine". Please don't misunderstand, I was extremely angry and frustrated at what the police did to me. But I can never let that anger and frustration I felt towards the police cloud my judgement and hinder me from my regaining my freedom.

I knew that someone had to have seen what happened, and would eventually tell the police  This happened in broad daylight.

After the police got my coat, went through it and found my stuff inside, they came to arrest me. 2 days later on March 5th, I was arrested at my mothers home, on Hubbell and Florence. The police took my mothers gun from the house, which was a "Black .38", that

MI Innocence Clinic 000113

was registered to her since the late 70's. They said after some tests that were done on it, it was the gun that killed Gerry. So since I was with Gerry when he died, I must have killed him.

Ms. Strong, I am "6'3" tall, I have a "dark complexion", and the gun that the police have is a "Black .38". That man that you described shooting at the restaurant, "medium height", "bright complexion", with a "Big Silver Gun", was not, and could never be me. The Detroit Crime Lab was closed down in 2008 for doing bad testing on evidence, such as Guns and Bullets. I am hoping that they will re-test the evidence in my case, but until that day comes, will you "PLEASE HELP ME".

I did not kill Gerry Ms. Strong. The police wanted me to tell them who did, and since I couldn't, they believed that I wouldn't, and sent me to prison for a crime that **they know I did not commit**.

I don't know if you have been watching the various television programs that show how innocent people are sent to prison all the time. The show **Vindicated** which comes on BET and **Centric Tusday Nights**, shows how people finally receive justice after spending years and years in prison for crimes that they have not committed. I hope to be vindicated one day for this crime that I did not commit.

I have done wrong in the past Ms. Strong, and Karma catches up with everyone. But, for the past 20 years of my life that I have spent in prison an innocent man, I figure that Me, Karma, and everyone else, are all even. I don't want to die in prison Ms. Strong.

I have a daughter whom I said was 7 years old when I was sent to prison. She is 27 now, and I have 6 grandchildren, 4 granddaughters, and 2 grandsons. I have spoken with my grandchildren on the telephone as much as I can, but I have never seen them face to face. I vowed to never have them subjected to coming inside of a prison and visiting me. I don't want them to ever have to see this side of life, especially for a circumstance that they did not cause. Their ages start at 7 years to 6 months. They are too young to understand now anyway. My second daughter is 20 years old now and a college student. She will be 21 years old on March 1st, and I will have been in prison

MI Innocence Clinic 000114

21 years, 4 days after her birthday.

My daughters wanted to meet with you and ask you to help their father. But I had to explain to them that this was not an ordinary situation that we are in, and that you may have reservations about helping me. I understand how they feel, they just want me to come home and help them the way a father is suppose to help his daughters.

My Faith and My Belief are never shaken.

Ms Strong, I Prayed, and Prayed, and Prayed, for GOD to help me. Then in May of this year, I was blessed to have the University Of Michigan Innocence Clinic take a serious look at my case and see if they could help me. Ms. Sally Larsen of the Michigan Innocence Clinic has been assisting me with getting the facts together and contacting potential help for me. I am deeply indebted to her for her help.

Ms. Strong, I just need for you to do an Affidavit for me, which basically is a letter stating that I was not the person whom you saw shooting at the restaurant. "Please Ms Strong", with that letter I can be one of those people on T.V. who has been Vindicated. There is no harm that can come to you for telling the Truth. I know that you have been reading the newspapers and watching T.V. The police have been running wild in Detroit, doing all sorts of corrupt and unethical things to lock people up whether innocent or not. They don't care.

I said that I was not going to take up a lot of your time, but when a person is basically begging for their life, time seems to evaporate rapidly.

I sincerely appreciate your reading this letter. I hope that you can find it in your heart to help me.

I lost my Mother in August of 2000. She went to her grave knowing that the police used her gun to send me to prison. I am not looking for any sympathy Ms. Strong, I just would like for you to help me make this wrong right.

As I close this correspondence, let me lastly say, no matter what you decide, I always have and always will, wish you nothing but the best of what this life has to offer.

* MAY GOD BLESS YOU & YOUR FAMILY *

*MERRY CHRISTMAS & HAPPY NEW YEAR*

Sincerely,

MI Innocence Clinic 000115

**EXHIBIT 17**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

               Plaintiff,                        Case Number 17-13062

v.                                          Honorable David M. Lawson

CITY OF DETROIT, MICHAEL
RUSSELL, and JAMES TOLBERT,

               Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Fourteen-year-old Davontae Sanford was convicted of murdering four people upon his plea of guilty in a Detroit, Michigan court in 2008. After another person confessed to the crimes and confirmed that Sanford was not involved, a state police investigation uncovered evidence that Sanford's confession and ensuing guilty plea were the product of Detroit police misconduct. His conviction was set aside and all charges against him were dismissed in 2016, but not before he had spent over eight years in prison. He filed this lawsuit against the City of Detroit and the officers who constructed the case against him to recover damages for the violations of his civil rights that led to his wrongful conviction and confinement. The defendants moved to dismiss the complaint on various theories. One has merit: Detroit's intervening bankruptcy bars Sanford's claim against the City in this Court, because the final plan of adjustment discharged prepetition claims and the plaintiff is enjoined from pursuing his claim against the City except as the plan allows. Therefore, the Court will grant the motion to dismiss in part and dismiss the case against the City. The case will proceed, however, against the City's police officers.

I. Facts

The City's motion is based in part on Federal Rule of Civil Procedure 12(b)(1); it contends that the Court does not have subject-matter jurisdiction over Sanford's claim against it.   The defendant police officers' motion is based on Federal Rule of Civil Procedure 12(b)(6).   Because the defendants have challenged the adequacy of the complaint under that rule, the following facts as stated in the complaint are summarized below.

Around 11:25 p.m. on September 17, 2007, two professional hit men, Vincent Smothers and Ernest Davis, executed Michael Robinson, a low level drug dealer, and three other people who were present in Robinson's home on Runyon Street, on Detroit's East Side.   The killings were provoked by a drug war.   Smothers also found a woman and her young child in the house, hiding in a back bedroom.   The woman and her child had been hit when Smothers and Davis first fired their weapons into the house, but they had survived.   Smothers told them to hide and then left the house.   Once outside, he exchanged gunfire with police chaplain Jesse King, who had happened upon the scene.   Smothers and Davis then ran through a vacant lot to their getaway car.

Police soon responded and began to canvas the neighborhood of the crime scene.   Among the officers on scene were the defendants, Detroit Police Department (DPD) Sergeant Michael Russell and Homicide Commander James Tolbert, and non-party Investigator Dale Collins.   Witnesses at the scene told the police that the shooters were two black men, 30 to 35 years old, with brown skin and slim to medium builds.   One was just over six feet tall, and the other just under six feet.   Both men were wearing dark clothes and masks, and the taller man (Smothers), was wearing a coat and carrying a rifle.

From their survey of the scene, the police observed that the perpetrators began their shooting rampage outside, firing into the house through the front door and windows.   Then they

-2-

went inside and continued shooting at the persons they found inside.  The four victims all were killed in the living room, and a handgun and assault rifle were used during the attack.  A seven-year-old boy was found hiding under a bed in the back room with his mother, Valerie Glover. Glover told police that one of the attackers had spoken to her briefly, then left the house.  Several marijuana plants were found growing in the basement, and neighbors told police that they thought Robinson had been selling drugs out of the home.  The police also spoke to King, who told them that he had exchanged fire with one of the shooters as the men ran away from the house.

Plaintiff Davontae Sanford was 14 years old at the time and lived nearby on Beland Street. He was blind in one eye, functionally illiterate, and had a learning disability.  When the police showed up, Sanford went outside, still in his pajamas, to ask them what was going on.  Defendant Russell approached Sanford and asked him some questions about the shooting, which Sanford could not answer, since he did not know anything about the crime.  Nearby, a K-9 officer was standing with his dog, who had been searching the scene, but the dog did not react to or show any interest in Sanford.  Sanford also had no trace of blood on his clothes or person, despite the abundance of blood at the gory scene where multiple victims had been executed.  Russell told Investigator Collins to take Sanford to his home and obtain parental consent to question the boy, and Collins secured a signed consent form from Sanford's grandmother.  The defendants then transported Sanford to the police station, where they performed a gunshot residue test on his hands, and then interrogated him.  The residue test eventually came back with a negative result.

Over the next two days, Sanford was interrogated twice by Russell and Tolbert.  During one of those interrogations (it is unclear which), Sanford told the defendants that he recently had smoked marijuana and was still feeling the effect of it.  The defendants also were aware of Sanford's learning disability.  Nevertheless, and despite his young age, Russell and Tolbert

questioned Sanford without an attorney or guardian present, contrary to DPD policy. The first interrogation ran for several hours into the morning of September 18th, and at the end of that first session Sanford signed a confession. Sanford's purported written confession, which was composed and typed up by Russell, stated that Sanford was present during the planning of the crime, but not during the shooting, and that the executions were carried out by three persons named as "Tone," "Tone-Tone," and "Carrie." The only accurate details in the statement were inserted by the defendants when it was composed, which were (1) that a handgun and assault rifle were used, (2) that the name of the intended victim was Michael or Mike, and (3) that there was a red car in the driveway of the home.

Sanford was released and went home after he signed the first statement. However, around 8:40 p.m. on September 18th, Russell and Tolbert went to Sanford's home and spoke to Sanford and his mother, Taminko Sanford. The officers did not inform Ms. Sanford that they already had obtained a statement from Davontae in which he implicated himself. But they did obtain another signed parental consent to further question the boy. Sanford was taken to the police station, where Russell began to interrogate him a second time around 9:30 p.m. The defendants lied to Sanford during the interrogation, telling him that he would be free to go afterwards, also falsely telling him that blood from the scene had been found on his shoes. When Sanford asked for an attorney, Russell responded by calling him a "dumbass," and he told Sanford that no attorneys were available at that hour. Russell and Tolbert concocted another written confession, which included additional details police had learned about the crime, including that the shooting had started outside, there were two gunmen involved who used a handgun and a rifle, the specific positions of bodies found at the scene, the survivors found hiding in a back room, and the fact that the shooters had traded shots with a witness after they left the house. The description of the clothing Sanford

was wearing when he first was encountered by police also differed in the second statement and better matched the description of clothing witnesses had seen the gunmen wearing.

Russell and Tolbert reported, and later testified, that Sanford also had drawn a diagram of the crime scene that was attached to the second written confession. However, Tolbert had drawn that diagram and given it to Sanford, with instructions to sketch in the locations of bodies to match photographs of the scene that were shown to Sanford during the interrogation. During a 2015 investigation, Tolbert confessed to Michigan State Police investigators that he had drawn the sketch and that he falsely had testified that it was drawn by Sanford.

The interrogation facilities had audio and video recording features, but those were not active during most of the interrogation. Instead they only were turned on at the end, when police directed Sanford to "proofread" his confession (which he, however, could neither read nor understand, due to his illiteracy).

In the second statement, the perpetrators of the shooting were identified as "Los, Tone-Tone, PBI Tone, and Carrie," but police later learned that none of those persons were involved. In particular, on September 29, 2007, DPD officers learned that Angelo Gardner, a.k.a. "Los," and Antonio Langston, a.k.a. "PBI Tone," both had solid alibis, and Gardner and Langston never were charged for the Runyon Street shooting. DPD officers later arrested Santo Green, a.k.a. "Tone-Tone," but he never was charged either.

Sanford was charged with four counts of first-degree murder, based solely on the purported written confession and the sketch that he supposedly had drawn. During a psychiatric exam ordered after his arraignment, Sanford insisted he was innocent and that the police had fabricated and coerced his confession. The written statements and sketch were used as evidence at Sanford's preliminary examination, and at a bench trial in March 2008. The defendants also testified that all

of the facts in the written statements were volunteered by Sanford with no prompting from his interrogators, and that many of them would have been known only by the shooters.

Sanford entered a mid-trial guilty plea to the four murder charges (reduced to second-degree  murder) and one firearm count.  On April 4, 2008, the state court sentenced him to four concurrent terms of 37 to 90 years for the murder counts and an additional two-year term for the gun count.

On April 19, 2008, two weeks after Davontae went to prison, Vincent Smothers was arrested outside his home in Shelby Township and taken in for questioning by police.  Smothers was interviewed by police over the course of two days, and he confessed that he had committed multiple murders in the Detroit area in 2006 and 2007, including the Runyon Street shootings.

Smothers told police that Sanford was not involved in the Runyon Street murders, and he volunteered several facts about the crimes that previously were unknown to police, including that his accomplice and the other shooter was Ernest Davis, that Davis had used a .45 caliber pistol and Smothers used an AK-47, that Davis had fired from outside the house, that Smothers found a woman and child hiding under a bed in the back room, and spoke briefly to them before leaving, that he had taken a .40 caliber pistol from the scene which he later used in another contract killing, and that when he learned there was a warrant out for his arrest, he told his wife to hide the guns used at Runyon Street in a house that belonged to Davis's cousin.

One of the officers who questioned Smothers was defendant Russell.  During an intermission, when Russell took Smothers to the bathroom, he instructed Smothers to stop making statements about the Runyon Street shooting.  In May 2008, Smothers was interviewed again by DPD Investigator Ira Todd, and he again confessed to the Runyon Street shootings.  Smothers

-6-

eventually was charged with eight of the twelve murders in which he had confessed his involvement — every one *except* the four shootings on Runyon Street.

In 2008, Sanford's appellate lawyer learned about Smothers' confession from news reports. Sanford filed a post-conviction motion asserting his innocence, supported in part by an affidavit supplied by Smothers.  In 2015, the Michigan State Police began an investigation into alleged police misconduct surrounding the Runyon Street murder investigation.  As noted above, Tolbert finally confessed to state police investigators then that he had fabricated the sketch supposedly drawn by Sanford.  The evidence collected by the state police also included the contents of victim Michael Robinson's cell phone, which included a photograph of a .40 caliber pistol that resembled the gun used by Smothers in one of the murders to which he confessed (the same gun that Smothers told police he had taken away from the Runyon Street scene).

On May 20, 2016, the state police submitted a report of the investigation to the Wayne County Prosecutor's office.  On June 8, 2016, Sanford's attorneys and the Wayne County Prosecutor's Office submitted a joint stipulation asking the trial court to set aside Sanford's conviction, and Sanford was released from custody.  Finally, on July 19, 2016, the state court dismissed all of the charges against him.

The plaintiff filed his complaint in this case on September 18, 2017.  The defendants filed a motion to dismiss in lieu of an answer.  The complaint pleads four counts alleging violations of various constitutional amendments via 42 U.S.C. § 1983 and the Americans With Disabilities Act (ADA), and a separate claim against the City of Detroit.  In Count I, the complaint alleges that the police violated the plaintiff's right to due process under the Fifth and Fourteenth Amendments by (1) fabricating inculpatory evidence, (2) withholding exculpatory evidence that they were required to disclose under *Brady v. Maryland*, and (3) compelling, manipulating, and coercing the plaintiff

to make a false confession.  In Count II Sanford alleges that the police violated his rights under the Fourth Amendment by instigating a malicious prosecution against him based on fabricated evidence and without probable cause.

In Count III, Sanford alleges that the City of Detroit endorsed the illegal conduct by the defendants through customs, policies, and practices of pursuing rushed, shoddy investigations of high profile cases in order to secure quick arrests and convictions of any available suspect, while deliberately ignoring and suppressing evidence that pointed to anyone other than the designated suspect, and, subsequently, bestowing commendations and promotions on officers who secured rapid arrests and convictions, even when supervisors knew about dishonest and illegal conduct during their investigations.  Sanford alleges in the complaint that defendant Tolbert was promoted to Commander of the Detroit Police Department's Major Crimes Unit in 2005, the same year when he was accused by Southfield police of filing a false police report (a felony).

In Count IV, Sanford alleges that when he was arrested and interrogated, he had intellectual and learning disabilities, was a minor (age 14), and was illiterate, and that he therefore was subject to a disability under the ADA, but instead of reasonably accommodating the plaintiff's disability and ensuring that he understood what was happening during his interrogation, the police instead intentionally exploited his diminished mental capacity by subjecting him to extended interrogation sessions, telling him to sign documents including a confession that he could not read or understand, and leading him to believe that he would be allowed to go free if he confessed, although that obviously was false.

In their motion, the defendants challenge each of these counts.

II.  Post-Bankruptcy Claim Against Detroit

In 2013, the City of Detroit filed for protection under Chapter 9 of the Bankruptcy Code. The bankruptcy court set a date of February 21, 2014 for filing a proof of claim against the City. The City argues that Sanford's claims against it are barred by the discharge that resulted from the approval of the City's final plan of adjustment, which occurred on November 12, 2014.  Sanford responds that none of the claims are barred by the bankruptcy, because they did not accrue, and he could not have asserted them by the exercise of reasonable diligence, before his conviction was vacated in 2016.

It is undisputed that Sanford never filed a proof of claim in the bankruptcy proceeding. The critical question is whether Sanford's claims raised against the City in this lawsuit are prepetition "claims."  The City's liability on prepetition claims "was discharged when the Plan [of Adjustment] was confirmed on November 12, 2014, and became effective on December 10, 2014." *In re City of Detroit, Michigan*, 548 B.R. 748, 751 (Bankr. E.D. Mich. 2016).  Claimants seeking damages from the City based on claims that can be characterized as prepetition claims "are enjoined from pursuing a recovery beyond what is provided for in the Plan." *Ibid.* (citing 11 U.S.C. §§ 524(a)(2), 901(a), 944).

"The Bankruptcy Code defines 'claim' as a 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'"  *Id.* at 761 (quoting 11 U.S.C. § 101(5)). "'Congress intended by this language to adopt the broadest available definition of "claim,"' which includes 'all legal obligations of the debtor, no matter how remote or contingent.'"  *Ibid.* (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991); *In re Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010) (quotations marks omitted)).

-9-

"'[F]ederal law determines when a claim arises under the Bankruptcy Code.'"  *In re Castellino Villas, AKF, LLC*, 836 F.3d 1028, 1034 (9th Cir. 2016) (quoting *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009)).  When determining whether a creditor's claim arose before a bankruptcy petition was filed, most federal courts, including bankruptcy courts within the Sixth Circuit, "use the 'fair contemplation' test.  Under this test, 'a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law.'"  *Ibid.* (quoting *SNTL Corp.*, 571 F.3d at 839); *see also In re City of Detroit, Michigan*, 548 B.R. at 761 (collecting cases).  "'It is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has not yet accrued.'"  *SNTL Corp.*, 571 F.3d at 839 (quoting *VillCool Fuel, Inc. v. Board of Equalization (In re Cool Fuel, Inc.)*, 210 F.3d 999, 1007 (9th Cir. 2000)).

It must be said here that all Sanford's claims against the City were within his "fair contemplation" before the City declared bankruptcy.  He certainly contemplated the factual bases underlying the claims raised in the complaint, since he attempted repeatedly to argue actual innocence before the state courts since at least 2008, insisting that his confession was falsely obtained, concocted, and coerced.  Sanford correctly points out that he could not have sued the City until his convictions were set aside, which did not happen until after the bankruptcy.  But the courts that have considered the question uniformly have concluded that claims based on prepetition malicious prosecutions were barred, notwithstanding that the plaintiff could not file suit on his claims until his criminal conviction was overturned.

For instance, in *In re Motors Liquidation Co.*, 576 B.R. 761 (Bankr. S.D.N.Y. 2017), the court, confronting similar facts, concluded that the claims based on prepetition misconduct were barred, notwithstanding that the plaintiff could not file suit until after the criminal case against him

-10-

was dismissed, which occurred post-petition.  The plaintiff, Gillispie, brought a claim alleging that certain General Motors employees were complicit in causing his wrongful conviction for rape, kidnapping and robbery.  The employees' conduct predated the automaker's bankruptcy filing, but Gillispie's convictions were not vacated until after the bankruptcy filing.  In finding the claims barred, the court found "irrelevant" the fact that non-bankruptcy law prevented Gillispie from bringing his claim against GM until his convictions were set aside, because "the 'accrued state law claim theory' does not apply to the determination whether a creditor has a 'claim' under section 101(5)(A) of the Bankruptcy Code."  *Id.* at 777.  The court explained:

> The occurrence of the contingency event that would trigger Old GM's potential liability, namely the vacation of the conviction, was within the actual or presumed contemplation of Gillispie at the time he was convicted allegedly as a result of the conduct of GM employees.  Gillispie surely knew (and believed) that his conviction was not warranted based on Old GM's employees' testimony, and as a result[,] Gillispie "has steadfastly maintained his innocence and labored tirelessly for over 20 years to clear his name."  Gillispie initiated proceedings to vacate or reverse his conviction as soon as he was convicted.  For example, as soon as February 26, 1991 — two weeks after his conviction — Gillispie filed a motion in state court seeking a new trial.

*Ibid.*  Because Gillispie's claims were contingent on the successful termination of his criminal case, and were disputed and unliquidated, they were "contingent claims within the meaning of section 101(5)(A) of the Bankruptcy Code.  To preserve the claims in this bankruptcy case, Gillispie had to file a proof of claim before the Bar Date."  *Ibid.*; *see also Stone v. Kmart Corp.*, No. 06-302, 2007 WL 1034959, at *3 (M.D. Ala. Mar. 30, 2007) ("The accrual time for Plaintiff's malicious prosecution claim under Alabama law does not control this action.  The relevant inquiry is whether a claim has accrued under bankruptcy law based upon the statutory definition of a claim. The court finds that Plaintiff's claim accrued for purposes of bankruptcy law prior to the Bar Date. Applying the broad definition of claim to the facts of this case, Plaintiff, at the time of her arrest, had an arguably remote claim for malicious prosecution against Kmart.  The scope of the term

claim, as determined through the legislative history of the Bankruptcy Code, is more than broad enough to accommodate a malicious prosecution action, although the action has not accrued for purposes of state law.").

For the same reasons, Sanford's claims against the City must be considered prepetition claims.  As such, it is barred by the City's bankruptcy.  11 U.S.C. §§ 524(a)(2) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . .").

### III.  Claims Against the Officers

Sanford brings his claims against the individual defendants under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

Defendants Russell and Tolbert argue that (1) the plaintiff is estopped from proceeding with any claims against them for his wrongful conviction because his guilty pleas, and the subsequent affirmance of his convictions by the state courts, were "superseding causes" of his damages; (2) the *Brady* claims are barred because (a) the State had no obligation to disclose any information about the other person who confessed to the crimes of conviction, after the plaintiff pleaded guilty and was convicted, (b) the information about the falsity of the plaintiff's confession and the fabrication of the sketch was equally available to the plaintiff, and the State therefore had no obligation to disclose any such information to him, and (c) fabricated information in police reports that were not disclosed was inadmissible hearsay, and the State has no obligation to disclose any information that does not constitute evidence; (3) the plaintiff is judicially estopped from asserting that he was unable to read or write, because he testified under oath at his plea hearing that he could read and write English; and (4) the plaintiff's ADA claim for failure to provide

reasonable accommodations during his interrogation accrued 10 years ago when he was interrogated, his *Brady* claims accrued nine years ago when he became aware of the allegedly falsified and withheld information, his claims based on a coerced confession accrued when his confession was used against him during the trial proceedings, and the limitations period was not tolled due to the plaintiff's incarceration and expired after any period of tolling due to the plaintiff's minority, so all of those claims are time barred under Michigan's three-year statute of limitations.

To state a claim under section 1983, the plaintiff must plead facts showing that a defendant acting "under color of state law" deprived him of a right established by the Constitution or the laws of the United States. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The plaintiff must establish the liability of each individual defendant by that person's own conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Sanford contends that the conduct of both Russell and Tolbert deprived him of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments and the ADA.

### A. Claims Relating to Police Misconduct

#### 1. Coerced Confession

Sanford contends that his confession, and later his guilty plea, were coerced by the defendants' misconduct. The misconduct consisted of fabricating evidence, deception, refusing a request for a lawyer, and exploiting the plaintiff's illiteracy and mental deficiencies. The complaint plainly states a claim under the Fifth and Fourteenth Amendments.

It is true that extracting an involuntary confession by itself does not establish the civil liability of the interrogator under section 1983. *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003).

However, "[u]sing a coerced confession against the accused at trial may give rise to a claim for violation of the accused's Fifth Amendment right not to be a witness against himself." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 n.2 (7th Cir. 2017) (citing *Chavez*, 538 U.S. at 767).

A confession is involuntary when "'(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements.'" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

The plaintiff plausibly has alleged sufficient facts establishing each of these elements. He has outlined how the conduct of Tolbert and Russell was objectively coercive, when these defendants, knowing of his minority and his learning disability, induced Sanford to endorse a written confession and purported accompanying sketch of the crime scene which, due to his mental condition and illiteracy, he had no reasonable capacity knowingly or intelligently to comprehend or adopt. Moreover, the complaint also alleges that, during the second interrogation, at the end of which Sanford purportedly signed a second and more detailed written confession, the defendants refused the plaintiff's request for an attorney and assured the plaintiff that he would be free to go if he confessed. Promises by police that a suspect would not be prosecuted may be illusory and suffice to show coercion where the police had no authority control whether the defendant would be charged or not based on the evidence collected by them. *United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013).

The plaintiff also alleges that the confession played a major role in his midtrial guilty plea, thereby connecting the defendants' misconduct as a "crucial motivating factor" in his decision to plead guilty. Sanford has stated a viable claim for violation of his rights under the Fifth

-14-

Amendment's self-incrimination and due process clauses.  *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1025 (7th Cir. 2006) ("[W]here, as here, a suspect's criminal prosecution was not only initiated, but was commenced because of her allegedly un-warned confession, the 'criminal case' contemplated by the Self–Incrimination Clause has begun."); *Avery*, 847 F.3d at 439.

2.   Malicious Prosecution

The plaintiff also amply has made out viable claims for malicious prosecution under the Fourth and Fourteenth Amendments.  The complaint states facts establishing these elements:  "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor."  *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted).

The plaintiff charges that the defendants induced a fraudulent prosecution that resulted in the defendant's guilty plea to four murders that he did not commit.  Those allegations track "[t]he prototypical case of malicious prosecution[, which] involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person."  *Ibid.*  So it is here.  The Sixth Circuit readily has recognized malicious prosecution claims where the police instigate a fraudulent prosecution by presenting false evidence and lying under oath. *Sykes v. Anderson*, 625 F.3d 294, 313-14 (6th Cir. 2010) ("[W]e have no trouble concluding that a reasonable jury could have found that Sgt. Nichols influenced or participated in the decision to prosecute and that her

false testimony was thus one cause of the commencement of the criminal proceedings against the Plaintiffs." (rejecting argument that police officers did not "make the decision" to prosecute)).

### B. Superseding Cause

The defendants take the curious position that the plaintiff's guilty plea, and state court appellate rulings upholding his conviction, were "superseding causes" of his damages that bar him from recovering for the defendants' misconduct. But the two cases that they cite to support that theory readily are distinguishable because in those cases the plaintiffs' convictions had not been overturned, and in one case the allegedly fabricated evidence supported a single charge that had been dismissed. *Reyes v. City of New York*, 992 F. Supp. 2d 290, 298 (S.D.N.Y. 2014) ("Plaintiff did not plead guilty to the tampering with evidence charge that the purportedly fabricated evidence [a packet of heroin] created (as it was dropped) — thus, the charge formed no part of his criminal sentence."); *Barmapov v. Barry*, No. 09-03390, 2011 WL 32371, at *4 (E.D.N.Y. Jan. 5, 2011) ("Plaintiff was convicted by guilty plea on September 8, 2009, and sentenced to ninety days imprisonment. As ninety days after September 8, 2009 have long since elapsed, and there is no evidence that Plaintiff is currently incarcerated, this Court can only conclude that Plaintiff is no longer 'in custody.'").

All the other cases that might illuminate the argument involved claims of alleged Fourth Amendment violations for unreasonable searches or seizures without probable cause, which the courts uniformly held were barred by subsequent guilty pleas or admissions that resulted in still-intact convictions. *Brown v. Morales*, No. 13-1056, 2017 WL 6949522, at *5 (W.D.N.Y. Oct. 10, 2017), *report and recommendation adopted*, No. 13-1056, 2018 WL 451823 (W.D.N.Y. Jan. 17, 2018) ("Because Plaintiff pled guilty to multiple counts in the superseding indictment, there is conclusive evidence that probable cause existed for his arrest, and his false arrest claim should be

-16-

barred."); *Masetta v. Town of Irondequoit*, No. 06-6143, 2010 WL 4823684, at *4 (W.D.N.Y. Nov. 29, 2010) ("[A] guilty plea on an underlying charge establishes probable cause as a matter of law."); *Padilla v. Miller*, 143 F. Supp. 2d 453, 477 (M.D. Pa. 1999) ("At trial, Fayne Padilla admitted that the firearms found in his trunk were not owned by him and that he was carrying the concealed weapons and ammunition without a license to do so. Under these circumstances, Trooper Miller's violation of Padilla's Fourth Amendment rights cannot be regarded as the proximate cause of Fayne Padilla's incarceration.").

In this case, Sanford is not attempting to recover merely for an unlawful initial arrest or an unreasonable search — violations which are complete when they occur, regardless of the ultimate outcome of the criminal proceeding. Instead, he is seeking damages arising from a wrongful prosecution and conviction — which, the plaintiff alleges, inevitably compelled his fateful decision to plead guilty in the face of substantial false evidence manufactured by the police and presented to the court at his bench trial. The defendants' position that they should be *absolved* of liability for stacking the deck against the plaintiff because their efforts to corner him into a guilty plea *succeeded* is nonsense, and they cite no authority to support it. Instead, the Supreme Court has stated that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Malley v. Briggs,* 475 U.S. 335, 345 (1986) (quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961)).

Sanford unquestionably has pleaded facts that demonstrate the defendants' wrongful conduct caused his damages. "Traditional tort concepts of causation inform the causation inquiry on a § 1983 claim." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley v. City of Mansfield,* 404 F.3d 418, 438 (6th Cir. 2005)). Sanford has alleged that Tolbert's and Russell's conduct was both a cause-in-fact and the proximate cause of

his injuries. He has alleged that his prosecution and incarceration for a crime he did not commit "would not have occurred but for the[ir] conduct." *Ibid.* (citing *Butler v. Dowd,* 979 F.2d 661, 669 (8th Cir. 1992)). And he has plausibly alleged that his damages were the foreseeable result of their misconduct in fabricating a case against him. *Id.* at 609 (noting that "courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct").

The defendants' attempt to foist responsibility on the state courts fares no better, because judicial action does not "supersede" the defendants' liability where the instigation and progress of the trial and appellate process was tainted by the defendants' deception. *Cf. Geronimo-Dominguez v. Vill. of Albion*, No. 07-406C, 2009 WL 3128311, at *3 (W.D.N.Y. Sept. 29, 2009) ("A *valid* prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest."); *Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) ("*In the absence of evidence that Officer Weller misled or pressured the prosecution or trial judge*, we cannot conclude that his conduct caused the violation of Wray's constitutional rights; rather, the violation was caused by the ill-considered acts and decisions of the prosecutor and trial judge.") (emphases added).

Nothing about Sanford's guilty plea sensibly can be regarded as an intervening or superseding cause that isolated the defendants' misconduct and prevented it from visiting damages for the constitutional violations Sanford alleged. Sanford has pleaded viable claims for these violations of his rights.

## C. *Brady v. Maryland* Claims

Sanford also plausibly has alleged violations of his Fourteenth Amendment due process rights based on the defendants' unconscionable conduct in falsifying evidence against him and

suppressing evidence that would have prompted his exoneration (and eventually did).  It is well established that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

The defendants persistently fixate on the plaintiff's knowledge of his own innocence.  But they ignore the crucial evidence that was so stubbornly suppressed by them, *namely their admissions that they made up evidence and concocted a written confession out of whole cloth, and then lied under oath to the prosecutor and the state trial court to procure a conviction*.  However, courts have "'[c]onsistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'"  *Avery*, 847 F.3d at 439 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[T]he presentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.")).

The defendants' confessions of their own lies certainly would have been admissible in any court proceeding.  And their admissions would have lent decisive weight to the plaintiff's claims that he was innocent — likely, as it did nearly a decade later, promptly leading to his exoneration and the dismissal of the case against him.  Those facts certainly suffice to sustain a substantive due process claim.  *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012) ("Plaintiffs assert that their substantive due process rights were violated when Defendants conducted a conscience-shocking reckless investigation and amassed false evidence that was used to box Plaintiffs into entering

guilty pleas. . . . Accordingly, we find Plaintiffs have pointed to sufficient evidence to support their claims based on a conscience-shocking, reckless investigation and manufactured false evidence.").

The plaintiff also plausibly has alleged violations of his post-conviction due process rights caused by the defendants' continued efforts to obscure and conceal the evidence that another person had confessed to the murders. According to the complaint, defendant Russell went as far as brazenly coaching the confessed true killer to "keep quiet" about his guilt and Sanford's innocence. "In 2009, the Supreme Court acknowledged that convicted individuals 'have a liberty interest in demonstrating [their] innocence with new evidence under state law.'" *Howard v. City of Durham*, No. 17-477, 2018 WL 1621823, at *4 (M.D.N.C. Mar. 31, 2018) (quoting *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)). "While *Osborne* recognizes that a 'criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man,' it also makes clear that conduct that 'transgresses any recognized principle of fundamental fairness in operation' can cause a violation of a convicted individual's right to demonstrate his innocence with new evidence." *Ibid.* (quoting 557 U.S. at 68-69). The *Howard* court had little difficulty when facing similar facts finding a viable claim for denial of post-conviction due process:

> Howard represents, and the officers do not dispute, that the 2011 court order directed the DPD to "immediately share with counsel for Mr. Howard any information it possesses about the man whose DNA was detected in Doris W.'s sexual assault kit." Howard further alleges that Soucie and Pennica intentionally suppressed the recording of Jones and its contents, despite that order. The recording was plausibly key evidence, as Howard was exonerated at the hearing when it was presented to the state court. As such, the court finds that a reasonable person in the position of Soucie and Pennica should have known that suppression of the recording would violate the court's disclosure order and Howard's right to post-conviction relief, pursuant to his liberty interest. Moreover, that Soucie and Pennica acted intentionally in violation of the order is plausibly alleged, given the detailed allegations regarding their involvement in the case and that they provided

-20-

a written report that allegedly misrepresented their interactions with Jones and omitted the fact that Jones made incriminating, contradictory, and inconsistent statements.

*Howard*, 2018 WL 1621823, at *5 (citations omitted).

Similarly, Sanford has stated a viable claim for violation of his rights under the Fourteenth Amendment's Due Process Clause.

### D.  Americans with Disabilities Act

The plaintiff alleges that the defendants violated the ADA by their failure to account for his mental limitations during his interrogation, and, moreover, their apparent cynical and deliberate exploitation of those limitations, of which they allegedly were aware.  Title II of the ADA "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'"  *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017) (quoting 42 U.S.C. § 12132).  "Neither the Supreme Court nor [the Sixth Circuit] has squarely addressed whether Title II of the ADA applies in the context of an arrest."  *Id.* at 489.  However, "several [other] circuits [] have found Title II applicable to law-enforcement activities, including arrests."  *Ibid.*

Two types of claims can be brought under Title II: "claims for intentional discrimination and claims for a reasonable accommodation."  *Ibid.* (citing *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004)).  The Eighth Circuit has held that both types of ADA claims may arise from exploitative police conduct in the course of a custodial interrogation, on facts that pale against the stark allegations in the complaint in this case.  *See Folkerts v. City of Waverly*, 707 F.3d 975, 983-84 (8th Cir. 2013).

The defendants contend that the plaintiff is "judicially estopped" from claiming that he cannot read or write (or could not in 2007), based on his monosyllabic response to the trial judge's

-21-

question on that point during the plea colloquy.  Defs.' Reply, Ex. 7, Plea Tr. at 71 ("Q. You can read and write the English language without trouble? A. Yes.") (Pg ID 1780).

"Judicial estoppel is an 'equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment.'"  *United States v. Bates*, 730 F. App's 281, 283 (6th Cir. 2017) (quoting *Mirando v. United States Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014)).  "While declining to establish 'inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel,' the Supreme Court identified three factors that often guide a court in deciding whether to apply the doctrine: 'First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Ibid.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).  However, "it is 'well-settled that judicial estoppel does not apply where the prior inconsistent position occurred because of mistake or inadvertence.'"  *Ibid.* (quoting *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 425 (6th Cir. 2005)); *see also New Hampshire v. Maine*, 532 U.S. at 753 ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." (quotations omitted)).

The balance of equities does not favor the application of judicial estoppel here, because (1) the plaintiff does not stand to procure any "unfair advantage" by his supposed contradictory

positions; and (2) in any event, he plausibly has alleged that his mental condition was such that he reasonably could have given his answer in the criminal proceeding inadvertently or by mistake — i.e., because he did not fully understand the nature or consequences of the question posed to him.

The complaint states cognizable claims for intentional discrimination and denial of reasonable accommodations under Title II of the ADA.

### E. Statute of Limitations

Finally, the defendants contend that the plaintiff's claims are time-barred. "Although the statute of limitations is an affirmative defense, a claim may be dismissed under Rule 12(b)(6) if the complaint affirmatively shows that the claim is time-barred." *Lambert v. Sessions*, No. 17-5324, 2017 WL 8217699, at *2 (6th Cir. Oct. 4, 2017) (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("The statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.") (citing Fed. R. Civ. P. 8(a), (c))). The defendants argue that Sanford did not file his complaint within three years of when his claims accrued. They contend that the plaintiff's claims accrued either when he was interrogated or confessed, or when he was convicted.

In Michigan, a three-year statute of limitations applies to federal claims brought under 42 U.S.C. § 1983. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009). The date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles. *Wallace v. Kato,* 549 U.S. 384, 388 (2007). "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Ibid.* (internal citations, quotations marks, and brackets omitted). That rule was complicated, however, by the Court's earlier decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), which held that "a § 1983 cause of action for damages

attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90.  The conviction is invalidated when it "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487.

Sanford's claims are timely because it is undisputed that they were filed within three years after the criminal proceedings against the plaintiff terminated in his favor, by the trial court's order of dismissal.  *See King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017).  "Because an 'element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused,' the statute of limitations in such an action does not begin to run until 'the plaintiff knows or has reason to know of' such favorable termination." *Ibid.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Eidson v. State of Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)).  The same can be said of Sanford's other claims, since he was convicted and success on his claims would imply the invalidity of the convictions.  *See Kucharski v. Leveille*, 526 F. Supp. 2d 768, 774 (E.D. Mich. 2007).

Curiously, the defendants argue that *Heck* does not apply to prolong the accrual date of Sanford's claims because the criminal proceedings have not terminated in the plaintiff's favor, since the dismissal was "without prejudice."  But the record is unclear on the precise nature of the trial court's order, since no copy of that order was attached to the pleadings, and none is evident from the portions of the trial court record so far submitted to the Court.  In any event, the Sixth Circuit readily has found that the third element under *Heck* is satisfied where the prosecution has been "abandoned" by the State, without regard to whether the dismissal was "with" or "without" prejudice.  *E.g.*, *Mills*, 869 F.3d at 479-480 ("In 2014, Mills filed a motion to dismiss the

-24-

indictment, and the State responded with a *nolle prosequi* motion. The Marshall County Circuit Court entered a *nolle prosequi* order on April 4, 2014. . . . There appears to be no dispute that Mills suffered a deprivation of liberty and that the proceeding was eventually resolved in his favor . . . ."); Black's Law Dictionary (10th ed. 2014) ("Nolle Prosequi: 1. A legal notice that a lawsuit or prosecution *has been abandoned*. 2. A docket entry showing that the plaintiff or the prosecution *has abandoned the action*."); *King*, 852 F.3d at 576 ("On October 9, 2014, the Spencer Circuit Court entered an order dismissing the charges against King, *thereby terminating the criminal prosecution against her*. King now seeks to bring claims under both 42 U.S.C. § 1983 and Kentucky tort law against Defendants, chiefly arising from her prosecution and confinement.") (emphases added).

Sanford's claims are not time-barred.

### IV.  Conclusion

Plaintiff Davontae Sanford's claims against the City of Detroit must be considered prepetition claims that are barred by the approval of the City's final plan of adjustment, which was approved by the bankruptcy court on November 12, 2014.  However, he has stated viable claims against defendants Michael Russell and James Tolbert.  Their challenges to those claims in their motion to dismiss have no merit.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss (ECF No. 36) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the complaint is **DISMISSED WITHOUT PREJUDICE** against defendant City of Detroit **only**.  The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 4, 2018

-25-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on December 4, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI

-26-